| | |
|---|---|
| | **Reason:** The Port of Unlading Code is missing. All vessel shipments, and any air shipments between the United States and Puerto Rico must provide a Port of Unlading Code. |
| | **Resolution:** The Port of Unlading Code is the foreign port where the exported merchandise is unloaded from the exporting carrier. Report a valid Port of Unlading Code for all vessel shipments, and any air shipments between the United States and Puerto Rico. |
| | Verify the Port of Unlading Code, correct the shipment and resubmit. |
| **Fatal Error Response Code: 539** | **Narrative:** Shipping Weight Must be Zero for MOT |
| | **Reason:** The Mode of Transportation Code is not Vessel, Rail, Truck or Air and the Shipping Weight is not reported as zeros. |
| | **Resolution:** When the Mode of Transportation is other than Vessel, Rail, Truck or Air and the Export Information Code is not HH for household goods, the Shipping Weight must be zero. |
| | Verify the Mode of Transportation and Shipping Weight, correct the shipment and resubmit. |

## 7. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

• USITC - Certain Semiconductor Devices, Integrated Circuits, and Consumer Products Containing the Same: Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

• USITC - Large Residential Washers: Monitoring Developments in the Domestic Industry - The Commission has instituted investigation No. TA-204-013, *Large Residential Washers: Report on Monitoring of Developments in the Domestic Industry,* for the purpose of preparing the report to the President and the Congress required by section 204(a)(2) of the Trade Act of 1974 on its monitoring of developments in the domestic industry following the President's decision to impose a safeguard measure on imports of large residential washers and certain washer parts as described in Proclamation 9694 of January 23, 2018. Persons wishing to participate in the investigation as parties must file an entry of appearance with the Secretary to the Commission, as provided in section 201.11 of the Commission's rules, not later than 21 days after publication of this notice in the Federal Register.

## 8. GAO & CRS Reports, Testimony, and Correspondence of Interest

• GAO - COAST GUARD SHORE INFRASTRUCTURE: Applying Leading Practices Could Help Better Manage Project Backlogs of at Least $2.6 Billion GAO-19-82: Published: Feb 21, 2019. Publicly Released: Feb 21, 2019.

- GAO - DEFENSE CONTRACTING: Enhanced Information Needed on Contractor Workplace Safety GAO-19-235: Published: Feb 21, 2019. Publicly Released: Feb 21, 2019.

- GAO - DEFENSE HEALTH CARE: Actions Needed to Determine the Required Size and Readiness of Operational Medical and Dental Forces GAO-19-206: Published: Sep 21, 2019. Publicly Released: Feb 21, 2019.

- GAO - DEPARTMENT OF HOMELAND SECURITY: Review of the Fiscal Year 2017 Entry/Exit Overstay Report GAO-19-298R: Published: Feb 22, 2019. Publicly Released: Feb 22, 2019.

- CRS - The Army's Optionally Manned Fighting Vehicle (OMFV) Program: Background and Issues for Congress - February 22, 2019

- CRS - Department of Defense Use of Other Transaction Authority: Background, Analysis, and Issues for Congress - Updated February 22, 2019

- CRS - Cluster Munitions: Background and Issues for Congress - Updated February 22, 2019

## 9. U.S. Government Trade Forms and Other Information Collections Open for Public Comment

(84 Fed. Reg. 5663) - Agency: U.S. Dept. of Commerce/International Trade Administration (ITA) - Title: Foreign-Trade Zone Applications - Agency Form No.: None - Type of Review: Regular submission - Deadline for Public Comment: 30 days from Feb. 22, 2019

**Other Headlines**

## 10. U.S. Threatens New Sanctions on Venezuela if Aid Convoys Blocked-Official

Reuters.com, Feb. 22 - The U.S. government could announce new sanctions to pressure Venezuelan President Nicolas Maduro as early as next week unless his military defies orders to block convoys of humanitarian aid planned for this weekend, a senior administration official said on Friday. U.S. Vice President Mike Pence and other leaders in the Western Hemisphere will meet in Bogota on Monday. Depending on what happens on Venezuela's borders over the weekend, the leaders could dramatically boost aid pledges to the country - or take new steps to crack down, the official told reporters. "If there is any type of violence, or if there is any type of negative reaction from the hierarchy of the Venezuela armed forces, there may also be measures that are announced by the vice president and other countries in regards to closing even further the international financial circle," the official said, speaking on condition of anonymity.

## 11. Microsoft Workers Call for Canceling Military Contract for Technology That Could Turn Warfare Into a 'Video Game'

Washington Post.com, Feb. 22 - Employees at Microsoft on Friday demanded that the company cancel a contract to supply its augmented-reality headsets to the U.S. Army,

warning in a letter that putting HoloLens in the military's hands could "help people kill." Writing to chief executive Satya Nadella, more than 50 workers said the devices would be "turning warfare into a simulated 'video game.'" They also urged Microsoft, which won the $480 million contract in November, to "cease developing any and all weapons technologies" for the government. "As employees and shareholders we do not want to become war profiteers," the letter concluded. "To that end, we believe that Microsoft must stop in its activities to empower the U.S. Army's ability to cause harm and violence." . . . The internal revolt at Microsoft highlights the heightened activism among employees at tech giants and follows similar uprisings at Amazon and Google, where workers have bristled over their companies' business relationships with the U.S. military or law enforcement agencies.

## 12. Heckler & Koch Fined €3.7 Million Over Illegal Arms Sales to Mexico

Deutsche Welle, Feb. 21 - Two former staff members at the weapons manufacturer were given suspended sentences for violating Germany's War Weapons Control Act for their involvement in the delivery of machine guns to Mexico. The 10-month trial of former employees of Germany's biggest gun-maker, Heckler & Koch, ended in disappointment for arms trade opponents as former CEOs were acquitted for their part in the illegal sale of G36 assault rifles to Mexico between 2006 and 2009, while Marianne B. and Ingo S., employees with largely administrative duties, were found guilty. A few boos rang out in the courtroom as Judge Frank Maurer read the verdict, especially as Peter B., a former CEO, was found not guilty. The executive, who was also H&K's main contact with government export authorities, was the most powerful of the defendants, none of whom showed a visible reaction as the verdict was read. The company Heckler & Koch itself was fined €3.7 million ($4.2 million), the approximate value of the guns at the time of their sale. That came as a welcome surprise to veteran anti-arms trade activist Jürgen Grässlin, who had initially pressed the charges and had expected a fine based only on the profits from the illegal sale. He added that the fine could exacerbate H&K's financial troubles.

## 13. EU Debates How and When to Start Trade Talks With Trump

Reuters.com, Feb. 21 - France expressed reservations on Friday about proposed trade negotiations with the United States, diplomats said, while other EU countries supported talks with Washington that could ward off punitive U.S. tariffs on European cars. The European Commission has asked the EU's 28 countries to approve two negotiating mandates so that formal talks can begin, with many aware that U.S. President Donald Trump may hit EU car imports with duties if they wait too long. Diplomats say Germany, whose exports of cars and parts to the United States are worth more than half the EU total, wants to press ahead. But France, with very few U.S. car exports, is reluctant to move before the European Parliament election in May, convinced that dealing with Trump is not a vote winner.

## 14. UK Says It Will Not Transition EU-Japan Trade Deal Before March 29

Reuters.com, Feb. 21 - Britain will not be able to replicate the European Union's trade deal with Japan before it leaves the bloc on March 29, the government said on Thursday in a document setting out its progress on transitioning existing agreements. Britain is seeking to roll over around 40 EU bilateral trade deals ahead of its exit from the bloc in 36 days. The

government is yet to win parliament's backing for its Brexit deal with Brussels, and if Britain leaves without a deal those bilateral agreements will cease to apply, likely disrupting trade.

## 15. U.S., China Resume Talks on Thorniest Issues in Trade War

Reuters.com, Feb. 22 - Top U.S. and Chinese trade negotiators met on Friday to wrap up a week of talks that have seen the two sides struggle to detail how to bridge deep differences on China's role in global commerce. If the two sides fail to reach a deal by midnight on March 1, then their seven-month trade war could escalate. U.S. President Donald Trump is scheduled to raise tariffs to 25 percent from 10 percent on $200 billion of Chinese imports into the United States. Trump will meet with Chinese Vice Premier Liu He at the Oval Office later on Friday. The two also met at the end of talks during Liu's last visit to Washington in late January.

## 16. Thirty Years On, U.S.-China Politics and Tech Collide

Reuters.com, Feb. 22 - "U.S. EASES CURBS ON EXPORTS TO CHINA" read a Reuters headline on March 1, 1989, when Washington lifted long-standing restrictions on technology shipments to China. On that day 30 years ago, U.S. commerce officials talked warmly of improving ties with China and of the need to help its economy — then about half the size of Italy's — to grow, despite the objections of military strategists at the Pentagon. Next Friday not only marks the 30th anniversary of the decision, but it is also the deadline set by President Donald Trump for a deal to end the seven-month trade war between the United States and China, now its biggest economic rival. A different kind of technology transfer is at the center of the trade tussle that is likely to play a big part in defining the path of the world economy in years to come.

## 17. China Uses DNA to Track Its People, With the Help of American Expertise

New York Times.com, Feb. 21 - The authorities called it a free health check. Tahir Imin had his doubts. They drew blood from the 38-year-old Muslim, scanned his face, recorded his voice and took his fingerprints. They didn't bother to check his heart or kidneys, and they rebuffed his request to see the results. "They said, 'You don't have the right to ask about this,'" Mr. Imin said. "'If you want to ask more,' they said, 'you can go to the police.'" Mr. Imin was one of millions of people caught up in a vast Chinese campaign of surveillance and oppression. To give it teeth, the Chinese authorities are collecting DNA — and they got unlikely corporate and academic help from the United States to do it. . . . To bolster their DNA capabilities, scientists affiliated with China's police used equipment made by Thermo Fisher, a Massachusetts company. For comparison with Uighur DNA, they also relied on genetic material from people around the world that was provided by Kenneth Kidd, a prominent Yale University geneticist.

## 18. U.S.-Huawei Fight to Take Center Stage at Trade Show

Wall Street Journal.com, Feb. 22 - A large delegation of U.S. officials is heading to Spain this weekend for the world's largest telecommunications trade show, planning to ratchet up a monthslong offensive against Huawei Technologies Co. that has produced mixed results. U.S. officials typically visit the show, Barcelona's Mobile World Congress, to meet foreign counterparts and industry executives and to check out the latest technology. This year,

DOC_0038557

though, the mission is different. The Trump administration is running a full-court press, particularly in Europe, to narrow Huawei's lead in supplying the world's cellular-communications infrastructure. American diplomats have been pressing allied governments, as well as their countries' wireless and internet providers, to dump the Chinese company—saying the world's largest provider of telecom gear could be forced by Beijing to spy on or disable their networks.

## 19. U.S. Campaign Against Huawei Runs Aground in an Exploding Tech Market

Wall Street Journal.com, Feb. 21 - Washington has hit an unlikely roadblock in its extraordinary global push to sideline China's Huawei Technologies Co.: the world's biggest democracy, India. Policy makers and telecommunications firms here are so far largely unpersuaded by U.S. warnings that using Huawei's equipment to upgrade India's telecom networks presents a major cybersecurity threat, according to more than a dozen government officials and industry executives. Many argue that any such risk is outweighed by Huawei's cut-rate prices and technological prowess. "The perception here is that the U.S. action is more a matter of foreign policy," said Rajan Mathews, director of the Cellular Operators Association of India. The widespread skepticism is turning India into an unexpected battlefield in Washington's yearslong effort to head off the Chinese company's dominance of the coming generation of mobile technology known as 5G. While India's 5G development is still in its infancy, the heft of the Indian market means the direction the South Asian country takes could make or break U.S. efforts to thwart Chinese influence in other nations that have yet to choose a side, analysts say. For years, many officials assumed India would stay in the U.S. corner given its own longtime rivalry with China.

## 20. China Tightens Grip on East African Port

Wall Street Journal.com, Feb. 21 - A Chinese port operator is tightening its grip on a strategic container terminal in East Africa, resetting operations and infrastructure at a site crucial to Beijing's push to control seagoing trade lanes between Asia and Europe. China Merchants Port Holdings is asserting control of operations at Djibouti's Doraleh Container Terminal, maritime officials say, while state-owned China Civil Engineering Construction Corp. and China State Construction Engineering Corp. have built a multipurpose cargo facility next door to handle cars, livestock, steel and other goods. Crew members of ships that recently docked at Djibouti said the new port resembles other Chinese-managed ports around the world. "At the multipurpose port it's the same cranes, the same silos for grain, fertilizers and other commodities, it's very Chinese," said Apolinario Bautista, executive officer of a dry-bulk ship that docked in Djibouti in late January.

## 21. Army Driving Forward with Electric Vehicle Plans

National Defense Magazine.org, Feb. 21 - While government and industry have long been experimenting with electric and hybrid-electric vehicles, JP-8 conventional fuel — with its long logistical tail — is still king on the battlefield. But technological advancements in batteries and alternative fuels could shake up the status quo. Proponents of electric and hybrid-electric vehicles for the military say the technology can offer lower-cost power sources, greater performance and quieter, stealthier operations. The Army — which has led the vast majority of the Defense Department's work in electric vehicles — recently hosted an electrification forum that drew engineers, project managers, academia and industry together

to discuss electric vehicles. The forum — which took place in Troy, Michigan, in November — was the second such event in 2018, said Dean Zeal McGrew, leader of the U.S. Army Tank Automotive Research, Development and Engineering Center's powertrain electrification team.

## 22. Autonomous Convoy Tech Moves Toward Official Program

National Defense Magazine.org, Feb. 22 - After years of exploring the technology, the Army is gearing up to turn its autonomous truck convoy demonstrations into a formal program of record. The service has been pursuing the idea of having unmanned vehicles incorporated into its convoys for more than a decade, with the goal of reducing the number of casualties associated with ground resupply missions. However, encouragement by Army leadership is accelerating the timeline for a leader-follower capability, Bernard Theisen, autonomous ground resupply program manager at the Tank Automotive Research, Development and Engineering Center, said in an interview. Expedient leader-follower is a capability that allows for a convoy that contains one manned vehicle followed by unmanned vehicles. The initiative went to the Army Requirements Oversight Council, which decided to proceed with the capability in February 2018, he noted. After examining the technology at TARDEC, Army Secretary Mark Esper was so impressed that he asked to push the timeline forward, Theisen noted.

## 23. Army Adapts Aircraft EW to Protect Tanks: BAE RAVEN

Breaking Defense.com, Feb. 21 - As the Army races to modernize against the Russian threat, it's adapting countermeasures used on aircraft to protect its armored vehicles from anti-tank missiles. Systems like BAE's RAVEN jammer, which won a recent Army "rodeo," could be a lot more effective than just bolting on another layer of armor on already overloaded vehicles — if the contractor can make what originally an airborne system rugged enough to function in in the mud, dust and clutter of ground combat. We're talking high-tech hardware here. RAVEN is a "soft kill" jammer that tricks missiles into missing. It would part of a second wave of upgrades to Army vehicles, following the Israeli-made "hard kill" systems – which physically shoot missiles out of the air – that the service is already urgently fielding. The Army wants both types for maximum protection.

## 24. Army Cloud: Big Announcement in March

Breaking Defense.com, Feb. 22 - In just three weeks, the Army will roll out a new policy for cloud computing, officials said this afternoon. The strategy will open up new options for outsourcing functions to contractors that the government currently does for itself. "The rollout comes next month," said Col. Jeth Rey, Army Cyber Command's director of operations, at an AFCEA luncheon here. "This is very new to us and we want to explore it." "Currently, how we operate is government-owned, government-operated equipment; we're exploring the possibility of contractor-owned, contractor operated, [but] government owns the sites," Rey continued. "That's the lesson learned from the Navy and the Air Force." "Next month, CIO/G6" – the Army's Chief Information Officer, Lt. Gen. Bruce Crawford – "will hold his annual conference [aka AFCEA's annual Army Signal Conference, March 12th-15th]. I recommend each and everyone one of you to come out," Rey told the audience, mostly contractors. "We will talk 'as a service' at that event."

## 25. DoD File-Sharing Tool Is SAFE Again

FifthDcmain.com, Feb. 22 - The Department of Defense has reinstated a secure file-sharing service after a vulnerability forced the Army to take the system offline in November and kept it out of commission for four months. Army leaders disabled the Safe Access File Exchange, or SAFE site, as a preventative measure in November after outside agencies identified potential security risks. The tool was created as an alternate to the traditional File Transfer Protocol or email, and operates much like the popular commercial file-sharing system Dropbox. The site provides a way to allow for the sharing of large data files, including those as large as 2 gigabytes, between defense organizations and industry representatives. Officials put the system back online Feb. 13.

## 26. Navy Wants Faster Ship Repairs; 70% of Destroyer Fleet Late

Breaking Defense.com, Feb. 21 - If the Navy ever hopes to reach its goal of a 355-ship fleet, it won't be by simply building new hulls and launching them. Instead, the admirals have long recognized they'll have to extend the lives of dozens of ships already long in the tooth — and do so at a time when shipyard space is already stretched and less than half of its ships are able to complete scheduled maintenance on time. "We've really got to get better than what we're doing today," Vice Adm. Tom Moore, head of Naval Sea Systems Command, told the West 2019 conference last week. "We're digging out of a little bit of a maintenance backlog." Moore and other commanders at the annual event insisted that they were getting better at getting ships in and out of maintenance availabilities, but currently only about 30 percent of destroyers are able to leave the docks on time.

## 27. DoD Wants Help to Spot — & Kill — Mobile Missiles

Breaking Defense.com, Feb. 22 - Three weeks from today, defense contractors will submit proposals for spotting hidden missile launchers — so the US military can destroy them before they ever fire. The winning entries could go on to flight demonstrators in just two years, a meteoric pace for the Pentagon. It's the first concrete step towards implementing the much-debated Missile Defense Review released last month, which called for an ambitious and expensive array of high-tech countermeasures, not just to usual suspects Iran and North Korea, but to the much larger arsenals of Russia and China. Outlined in a document blandly titled "Time-Sensitive Target Mission Payloads Demonstration" that was posted without fanfare on the federal government's main contracting website Feb. 15, the plan describes acquiring a variety of satellites and surveillance assets to find and track often hard-to-find mobile missile launchers that can be hit before they pop off their first missile. The solicitation released to the defense industry invites US nationals (no foreigners allowed) to an industry day briefing March 1st, with initial proposals due March 15 and flight demonstrations by 2021.

## 28. Heather Wilson's Commitment to Trump's Space Force Was Questioned. Now She Leads the Effort to Build It.

Washington Post.com, Feb. 22 - Long before President Trump introduced his Space Force vision as an applause line at political rallies, the top administration official who would be selected to oversee its creation came out decisively against a similar plan. Air Force Secretary Heather Wilson said in a visit to Capitol Hill in June 2017 she opposed the creation

of a "Space Corps," a service some lawmakers had proposed to oversee military operations in space. "The Pentagon is complicated enough. We're trying to simplify. This will make it more complex, add more boxes to the organization chart and cost more money," she said. "If I had more money, I would put it into lethality, not bureaucracy." Less than two years later, Wilson finds herself leading a similar effort directed this week by the president.

## 29. Branson's Virgin Galactic Takes Another Step Toward Space Tourism

Reuters.com, Feb. 22 - A Virgin Galactic rocket plane on Friday soared to the edge of space with a test passenger for the first time, nudging British billionaire Richard Branson's company closer to its goal of suborbital flights for space tourists. Virgin Galactic's chief astronaut instructor Beth Moses, who will train future space tourists, joined pilots onboard SpaceShipTwo VSS Unity to evaluate the customer experience and cabin. "This is what we're here to do, we're here to fly people in the back of our spaceship, that's what it's all about," said pilot David Mackay, who is now the first Scottish-born astronaut. "So for me it was an important step toward that operation."

## 30. NASA, SpaceX OK 1st Test Flight of Crew Capsule Next Week

New York Times.com & Associated Press, Feb. 22 - NASA and SpaceX on Friday approved a first test flight next week of the new commercial Dragon capsule designed for crew. No one will be aboard, only an instrumented dummy in a white SpaceX spacesuit. But the capsule will still fly to the International Space Station, following its planned March 2 liftoff from NASA's Kennedy Space Center. Officials gave the green light after conducting a safety review. NASA's head of human exploration and operations, William Gerstenmaier, called the upcoming test flight "an absolutely critical first step" to eventually putting astronauts on board. A phenomenal amount of work has gone into ensuring the capsule does not endanger the space station and its three occupants as it pulls up and docks, Gerstenmaier said. It will remain at the orbiting lab just under a week before aiming for a splashdown in the Atlantic off Florida. Radiation monitors and supplies are going up, and science samples and used equipment are coming down.

## 31. How Does Pakistan's Thunder Fare Against Contenders in Malaysia's Aircraft Competition?

DefenseNews.com, Feb. 22 - Pakistan hopes to sell its JF-17 Thunder aircraft to Malaysia, now that the cash-strapped country is officially looking for such a fighter. Malaysia was eyeing larger fighters like the Rafale and Typhoon, but that plan was shelved due to budgetary woes, and the country instead turned to fulfill a light combat aircraft requirement. An LCA fleet would support Malaysia's F/A-18 and Su-30 fighters. The JF-17 is under consideration alongside the Tejas, produced by India's Hindustan Aeronautics Limited, and the FA-50 Golden Eagle, made by South Korea's Korea Aerospace Industries. Pakistan's offering is the most affordable of the three.

## 32. Despite Putin's Swagger, Russia Struggles to Modernize Its Navy

Reuters.com, Feb. 21 - President Vladimir Putin calls improving the Russian navy's combat capabilities a priority. The unfinished husks of three guided-missile frigates that have languished for three years at a Baltic shipyard show that is easier said than done.

DOC_0038561

Earmarked for Russia's Black Sea Fleet, the frigates fell victim to sanctions imposed by Ukraine in 2014 after Russia annexed the Crimean peninsula, prompting Kiev to ban the sale of the Ukrainian-made engines needed to propel them. With Moscow unable to quickly build replacement engines for the Admiral Grigorovich-class frigates, construction stopped. Russia is now cutting its losses and selling the three ships to India without engines. The navy's problems stem largely, but not exclusively, from the Ukrainian sanctions. There are also problems, for different reasons, with new equipment for the army and air force.

## 33. British Fraud Office Abandons Rolls-Royce, GSK Investigations

Reuters.com, Feb. 22 - The UK's Serious Fraud Office (SFO) has abandoned two of its largest and longest investigations, into alleged bribery at aero engine maker Rolls-Royce and drugs maker GlaxoSmithKline, in a move described by one lawyer as "extraordinary". The decision, which comes under SFO Director Lisa Osofsky who took the helm last August pledging to review the agency's caseload, weed out weaker cases and propel others forward, underlines the difficulties of prosecuting senior executives. "After an extensive and careful examination, I have concluded that there is either insufficient evidence to provide a realistic prospect of conviction or it is not in the public interest to bring a prosecution in these cases," Osofsky said.

## 34. Viewpoint: Rivals, Allies Trying to Harness U.S. Innovation

National Defense Magazine.org, Feb. 22 - Have you ever considered why U.S. armed forces have enjoyed a technological battlefield advantage for so many years? Perhaps it's just good fortune, or maybe divine favoritism, or possibly an insatiable curiosity coded into our DNA. In reality, the advantage results from various entities — academic institutes, government agencies, industry and the user community — unknowingly and yet intentionally working together to realize the nation's drive toward innovation. In the United States, we are blessed with numerous technical universities, from the Massachusetts Institute of Technology and Georgia Institute of Technology on the East Coast to Stanford University and the California Institute of Technology in the West, with many other exceptional schools in between. These universities form the foundation of our tiered technology development process. Government laboratories and agencies bridge the academic-to-defense gap, constituting a second step in the development process.

## 35. Opinion: Congress Should Block Rule Changes for Firearm Exports

TheHill.com, Feb. 20 - As the nation is reminded of the tragic consequences of gun violence with the one-year anniversary of the Parkland school shooting, the Trump administration is pushing forward with plans to expedite the export abroad of the same kind of military-style weapons used in many of the mass shootings that have taken place in recent years. These are not the commodities that the United States should make easier to export. Congress can and should stop the changes, which would put the Department of Commerce in charge of regulating these exports, removing them from the State Department-led U.S. Munitions List (USML).

## Upcoming Export Control and Other Trade Compliance Conferences

**Feb. 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Control - Miami - DoubleTree Hotel at Miami Airport and Convention Center**

**March 4-6 - Society for International Affairs - 2019 Winter Back to Basics Conference - Savannah, Georgia - Savannah Marriott Riverfront Hotel**

**March 5-6 - American Conference Institute - 11th Expert Forum on ITC Litigation & Enforcement - Washington, DC**

**March 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - San Diego - The Four Points Sheraton San Diego Hotel**

**March 5-7 - Partnering for Compliance™ - March 2019 "Partnering for Compliance™" East Export/Import Control Training and Education Program - Orlando - Holiday Inn Orlando International Airport Hote l-** *See also separate Customs/Import Boot Camp on March.*

**March 12-13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - Complying with U.S. Export Control - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive**

**March 13-14 - C5 Group - 6th Forum on Anti-Corruption Italy - Milan - Meliá Milano**

**March 14 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - How to Build an Export Compliance Program - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive**

**March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort**

**March 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Pittsburgh - Westin Convention Center Hotel**

**March 27-28 - American Conference Institute - 6th Summit on Anti-Corruption Mexico - Mexico City - JW Marriottt Hotel Mexico City**

**April 2-3 - Society for International Affairs - 2019 Exemptions and Voluntary Disclosure/Voluntary Self-Disclosure Seminar - Long Beach, California - Renaissance Long Beach Hotel**

**April 3-4 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver, Colorado - Grand Hyatt Denver Hotel**

**April 23-24 - Nielsonsmith - Sanctions, Anti-Corruption & Export Controls Compliance in the Middle East - Dubai, UAE**

**May 2-3 - American Conference Institute - 12th Annual Flagshp Conference on Economic Sanctions - Washington, DC**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

**May 15-17 - International Compliance Professionals Association (ICPA) - 2019 EU Conference - London - Tower Hotel**

**May 16-17 - International Compliance Professionals Association (ICPA) - 2019 ICPA Canada Conference - Toronto, Canada- Hyatt Regency Toronto Hotel**

**May 22-23 - Nielsonsmith - US Trade Controls Compliance in Europe Copnference 2019 - Munich -** *Gary Stanley, Editor of Defense and Export-Import Update, will speak at this conference.*

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DCFeb. 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Control - Miami - DoubleTree Hotel at Miami Airport and Convention Center**

**March 1 - UK Government/Export Control Joint Unit - Webinar: Open General Export Licenses and EU General Export Authorisations in a no deal Brexit - 11:00 AM - 12:00 PM GMT**

**March 4-6 - Society for International Affairs - 2019 Winter Back to Basics Conference - Savannah, Georgia - Savannah Marriott Riverfront Hotel**

**March 5-6 - American Conference Institute - 11th Expert Forum on ITC Litigation & Enforcement - Washington, DC**

**March 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - San Diego - The Four Points Sheraton San Diego Hotel**

**March 5-7 - Partnering for Compliance™ - March 2019 "Partnering for Compliance™" East Export/Import Control Training and Education Program - Orlando - Holiday Inn Orlando International Airport Hote l-** *See also separate Customs/Import Boot Camp on March.*

**March 12-13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - Complying with U.S. Export Control - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive**

**March 13-14 - C5 Group - 6th Forum on Anti-Corruption Italy - Milan - Meliá Milano**

**March 14 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - How to Build an Export Compliance Program - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive**

**March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort**

**March 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Pittsburgh - Westin Convention Center Hotel**

**March 26-27 - American Conference Institute - 9th Advanced Industry Forum on Global Encryption, Cloud & Cyber Trade Controls - San Francisco - Marine's Memorial Club**

**March 27-28 - American Conference Institute - 6th Summit on Anti-Corruption Mexico - Mexico City - JW Marriottt Hotel Mexico City**

**April 2-3 - Society for International Affairs - 2019 Exemptions and Voluntary Disclosure/Voluntary Self-Disclosure Seminar - Long Beach, California - Renaissance Long Beach Hotel**

**April 3-4 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver, Colorado - Grand Hyatt Denver Hotel**

**April 3-4 - C5 Group - Anti-Corruption Switzerland - Zürich - Sheraton Zürich Hotel**

**April 23 - American Conference Institute - 2nd National Forum on FOCI - Washington, DC - Westin Washington City Center Hotel**

**April 24-25 - American Conference Institute - Fifth National Conference on CFIUS & Team Telecom - Washington, DC - Westin Washington City Center Hotel**

**April 23-24 - Nielsonsmith - Sanctions, Anti-Corruption & Export Controls Compliance in the Middle East - Dubai, UAE**

**May 2-3 - American Conference Institute - 12th Annual Flagshp Conference on Economic Sanctions - Washington, DC**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

**May 15-16 - American Conference Institute - Foreign Corrupt Practices Act (New York) - New York City - The Westin New York at Times Square**

**May 15-17 - International Compliance Professionals Association (ICPA) - 2019 EU Conference - London - Tower Hotel**

**May 16-17 - International Compliance Professionals Association (ICPA) - 2019 ICPA Canada Conference - Toronto, Canada- Hyatt Regency Toronto Hotel**

**May 22-23 - Nielsonsmith - US Trade Controls Compliance in Europe Copnference 2019 - Munich -** *Gary Stanley, Editor of Defense and Export-Import Update, will speak at this conference.*

**May 22-23 - American Conference Institute - Anti-Corruption Brazil - São Paulo - InterContinental São Paulo Hotel**

**May 29-30 - American Conference Institute - 2nd Annual Hong Kong Summit on Economic Sanctions Compliance and Enforcement - Hong Kong**

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 7 - Society for International Affairs - 2019 Spring Golf Outing - Upper Marlboro, Maryland - Lake Presidential Golf Course**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 11-12 - American Conference Institute - 12th China Forum on Anti-Corruption - Shanghai**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**June 18-19 - C5 Group - 13th International Conference on Anti-Corruption London - London**

**June 26-27 - American Conference Institute - ITC Litigation & Enforcement - Washington, DC - Park Hyatt Washington Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**Sept. 24-25 - 12th Conference on the Foreign Corrupt Practices Act - San Francisco**

**Oct. 27 - American Conference Institute - 5th Asia Pacific Summit on Economic Sanctions Compliance and Enforcement - Singapore**

**Oct.28-29 - American Conference Institute - 8th Asia-Pacific on Anti-Corruption Singapore - Singapore**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 5-6 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to ████████@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. ████████
Fax ████████
Mobile ████████
E-mail ████████@glstrade.com

The information contained herein. This transaction, their assets, values, or related materials.

# "3D PRINTING" OF FIREARMS

While there has been a lot of media attention given recently regarding the use of what has been termed "3D printing" technology to produce firearms, it is important to note that this technology, in itself, does not present a public safety problem.

Its high cost, limited effectiveness, and the need for highly-skilled experts to use this technology mean that criminals are not using — and will likely never use — 3D printing to produce firearms.

## HIGH COST, LOW BENEFIT

It costs many thousands of dollars and many hours to produce firearm parts using this advanced printer technology and the required computer-assisted design (CADCAM) programs. Established manufacturers may reap the benefits of the technology as a way to help develop prototypes for later production.

Even after the high cost, the end result is not as effective as a conventionally produced firearm. For example, in the frequently cited stunt in which a lower receiver for an AR-15 was produced using such technology, the assembled firearm fell apart after 6 shots.i This is hardly a mass-production tool ready for do-it-yourself production of firearms.

## CRIMINALS HAVE EASIER, CHEAPER SOURCES

There have been no reports of a criminal using 3D printing to manufacture a firearm. In fact, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has publicly stated they have never had a

- 3D Printing Does Not Present a Public Safety Risk.
- Criminals Won't Make Guns; They Steal Them and Get Them on the Street
- Current Laws Properly Govern 3D Printing of Firearm Parts and Components

trace request for a firearm produced by 3D printing and there has never been such a firearm used in a crime. ii Considering that it would be easier and cheaper for criminals to make a firearm through more "traditional" means, the development of this technology will not change the fact that criminals have easier and cheaper avenues to obtain firearms. According to the U.S. Department of Justice, nearly 40 percent of criminals acquired their guns illegally, through theft or on the black market. Another 40 percent obtained their firearms from family or friends.iii

## FIREARMS ALREADY REGULATED

Furthermore, firearms produced using this advanced manufacturing technology are already heavily regulated under current law. The 1968 Gun Control Act, the 1988 Undetectable Firearms Act and other federal laws all govern firearms produced by a 3D printing process, just as they apply to conventional manufacturing processes using machine tools. If the technology at some point in the distant future reached the point where fully functioning and reliable firearms could be brought to market, the sales of such firearms produced with this technology would be governed by these federal laws. Depending on jurisdiction, state statutes and local

ordinances may also apply.

Despite rhetoric about "undetectable" firearms, if this technology were to reach the point in the future where it could be used to produce fully functional firearms, some critical components of the firearms and magazines, e.g. bolt, barrel liner, springs, would still be made of steel, and hence detectable. In addition, ammunition cartridges are made with metal components that are detectable.
In summary, given the exceedingly high costs and technical hurdles involved with 3D printing technology, the development of this advanced manufacturing technology does not pose a public safety risk. The federal laws now on the books are more than sufficient for its management.

i    Devin Coldewey, "3-D printed gun fires 6 shots — then falls apart," NBC News,http://www.nbcnews.com/technology/futureoftech/3-d-printed-gun-fires-6-shots-then-falls-apart-1C7404226#/technology/futureoftech/3-d-printed-gun-fires-6-shots-then-falls-apart-1C7404226(Last accessed Feb. 19, 2013).

ii   Testimony of Earl Griffith, Chief, Firearms Technology Branch, Bureau of Alcohol, Tobacco, Firearms and Explosives, to the United Nations Second Open-Ended Meeting of Government Experts, June 1, 2015.

iii   Caroline Wolf Harlow, Department of Justice, Bureau of Justice Statistics Special Report, "Firearm Use by Offenders: Survey of Inmates in State and Federal Correctional Facilities," NCJ 189369, November 2001. http://bjs.ojp.usdoj.gov/content/pub/pdf/fuo.pdf

 **THE FIREARMS INDUSTRY TRADE ASSOCIATION  |  NSSF.ORG  |**     



## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

### 15 CFR Parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774

**[Docket No. 111227796–5786–01]**

**RIN 0694–AF47**

### Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**AGENCY:** Bureau of Industry and Security, Department of Commerce.

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I—Firearms, Close Assault Weapons and Combat Shotguns; Category II—Guns and Armament; and Category III— Ammunition/Ordnance would be controlled under the Commerce Control List (CCL). This proposed rule is being published simultaneously with a proposed rule by the Department of State that would revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list.

**DATES:** Comments must be received by July 9, 2018.

**ADDRESSES:** You may submit comments by any of the following methods:

• Submit comments via Federal eRulemaking Portal: *http:// www.regulations.gov.* You can find this proposed rule by searching on its regulations.gov docket number, which is BIS–2017–0004.

• By mail or delivery to Regulatory Policy Division, Bureau of Industry and Security, U.S. Department of Commerce, Room 2099B, 14th Street and Pennsylvania Avenue NW, Washington, DC 20230. Refer to RIN 0694–AF47.

**FOR FURTHER INFORMATION CONTACT:** Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482–1641 or email *steven.clagett@ bis.doc.gov.*

**SUPPLEMENTARY INFORMATION:**

### Background

This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I—Firearms, Close Assault Weapons and Combat Shotguns; Category II—Guns and Armament; and Category III— Ammunition/Ordnance, would be controlled on the Commerce Control List (CCL) and by the Export Administration Regulations (EAR). This proposed rule is being published in conjunction with a proposed rule from the Department of State, Directorate of Defense Trade Controls, which would amend the list of articles controlled by USML Category I (Firearms, Close Assault Weapons and Combat Shotguns), Category II (Guns and Armament), and Category III (Ammunition/Ordnance) of the USML to describe more precisely items warranting continued control on that list.

The changes described in this proposed rule and in the State Department's companion proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the amendments. The review was focused on identifying the types of articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non- military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States, and are almost exclusively available from the United States. If an article satisfies one or both of those criteria, the article remains on the USML. If an article does not satisfy either criterion, it has been identified in the new Export Control Classification Numbers (ECCNs) included in this proposed rule. Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items.

BIS has created ECCNs, referred to as the "600 series," to control items that would be removed from the USML and controlled under the CCL, or items from the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (Wassenaar Arrangement Munitions List or WAML) that are already controlled elsewhere on the CCL.

These ECCNs are referred to as the "600 series" because the third character in each of the new ECCNs is "6." The first two characters of the "600 series" ECCNs serve the same function as any other ECCN as described in § 738.2 of the EAR. The first character is a digit in the range 0 through 9 that identifies the Category on the CCL in which the ECCN is located. The second character is a letter in the range A through E that identifies the product group within a CCL Category. With few exceptions, the final two characters identify the WAML category that covers items that are the same or similar to items in a particular "600 series" ECCN. Category II of the USML and category ML2 of the WAML cover large caliber guns and other military weapons such as: Howitzers, cannon, mortars, anti-tank weapons, projectile launchers, military flame throwers and recoilless rifles.

In this proposed rule, items that are currently controlled in Category II of the USML would be controlled on the CCL under four new "600 series" ECCNs. Placement of the items currently in USML Category II into the CCL's 600 series would be consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML would be controlled in new ECCNs in which the third character is a "5." These items are not appropriate for 600 series control because, for the most part, they have civil, recreational, law enforcement, or other non- military applications. As with 600 series ECCNs, the first character would represent the CCL category, the second character would represent the product group, and the final two characters would represent the WAML category that covers items that are the same or similar to items in the ECCN.

This proposed rule does not deregulate the transferred items. BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by this proposed rule. BIS would also require licenses for the export or reexport of guns and armament that would be controlled under new ECCN 0A602, such as guns and armaments manufactured between 1890 and 1919 to all destinations except Canada. As compared to decontrolling firearms and other items, in publishing this proposed rule, BIS, working with the Departments of Defense and State, is trying to reduce the procedural burdens and costs of export compliance on the U.S. firearms industry while allowing the U.S. Government to enforce export controls for firearms appropriately and to make better use of its export control resources. BIS encourages comments from the public on this aspect of the proposed rule.

All references to the USML in this rule are to the list of defense articles that are controlled for purposes of export, temporary import, or brokering pursuant to the International Traffic in

Arms Regulations (ITAR), 22 CFR parts 120 through 130, and not to the list of defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import, or that are subject to brokering controls, are part of the USML under the AECA. All defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA, 22 U.S.C. 2778 *et seq.*, for purposes of permanent import or brokering controls.

BIS believes the control of these firearms under the EAR is justified because the firearms described in this proposed rule are either not inherently military or do not warrant the obligations that are imposed under the ITAR pertaining to such items. After review, the Defense Department, in conjunction with the Departments of State and Commerce, concluded that the firearms in this proposed rule also do not provide a critical military or intelligence advantage to the United States, are not the types of weapons that are almost exclusively available from the United States, and are manufactured from "technology" that is widely available. Moreover, the firearms have commercial and other non-military characteristics that distinguish them from other articles controlled under the ITAR. There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities. Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their "parts," "components," "accessories" and "attachments."

An additional justification for the change in the jurisdictional status of the items described in this rule is that the current ITAR controls burden U.S. industry without any proportionate benefits to United States national security or foreign policy objectives. Similar to the challenges faced by other industries, the firearms trade has been negatively affected by the incentives the ITAR creates for foreign manufacturers to avoid U.S.-origin content. Currently, under the ITAR, any part, component, accessory or attachment for any of the firearms described in this proposed rule remains ITAR controlled, regardless of its significance, when incorporated into foreign-made items or reexported to any third country. Under the EAR, the *de minimis* provisions may, in certain cases, mean a foreign item that incorporates U.S.-origin content may not be subject to the EAR, provided the U.S.-origin items meet the applicable *de minimis* level for the country of reexport. Similarly, a technical drawing of such part, component, accessory or attachment is ITAR controlled, as is the provision of a "defense service" to a foreign person concerning those items, such as the application of protective coatings. Moreover, a U.S. person engaged in manufacturing or exporting these items or providing related defense services must register with the State Department under the ITAR. Thus, even if a U.S. company can manufacture or service these items at a lower cost in the United States as compared to the cost for a U.S. or foreign company to manufacture or service the items outside of the United States, the ITAR's restrictions may render the items unattractive or uncompetitive for foreign manufacturers. The EAR does not include a concept of "defense services," and the "technology" related controls are more narrowly focused and apply in limited contexts as compared to the ITAR.

The EAR also includes well-established and well understood criteria for excluding certain information from the scope of what is "subject to the EAR." (*See* part 734 of the EAR.) Items that would move to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to "development" and "production," as well operation, installation, and maintenance "technology." While controlling such "technology," as well as other "technology" is important, the EAR includes criteria in part 734 that would exclude certain information and software from control. For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (*i.e.,* unlimited distribution), the operation and maintenance information included in that published operation and maintenance manual would no longer be "subject to the EAR." (*See* §§ 734.3(b) and 734.7(a).) Non-proprietary system descriptions, including for firearms and related items, are another example of information that would not be subject to the EAR. (*See* § 734.3(b)(3)(v).)

Pursuant to section 38(f) of the AECA, the President shall review the USML "to determine what items, if any, no longer warrant export controls under" the AECA. The President must report the results of the review to Congress and wait 30 days before removing any such items from the USML. The report must "describe the nature of any controls to be imposed on that item under any other provision of law." 22 U.S.C. 2778(f)(1).

This Commerce proposed rule is being published simultaneously with a Department of State proposed rule. Collectively, the rules address defense articles currently controlled under Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML. The Department of State proposed rule would revise Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML so that they describe in positive terms the defense articles that should remain on the USML. The Department of Commerce rule would add to the CCL items that the President determines no longer warrant control under the USML.

In addition, this rule would clarify the scope of some ECCNs currently on the CCL. This rule would also renumber these ECCNs to place certain firearms-related items currently on the CCL in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL to make it easier to identify and classify such items.

BIS is interested in comments in response to this proposed rule as to whether the public find this reorganization helpful. In some instances, the juxtapositions resulting from this reorganization highlight different license requirements and licensing policies for various firearms and related items. The public is invited to comment on the appropriateness of these license requirements and licensing policies. The public is also encouraged to comment on whether or not the proposed rule describes items that are not widely available in commercial outlets.

**Detailed Description of Changes Proposed by This Rule**

**Creation of New ECCNs**

This proposed rule would create 17 new ECCNs to control items proposed for removal from the USML. A discussion of each new ECCN and the controls that would apply to items under that ECCN follows below.

*New ECCN 0A501: Firearms and Related Commodities*

New ECCN 0A501 would apply national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC Column 1), United Nations (UN), and anti-terrorism (AT Column 1) reasons for control to the following firearms, the following enumerated parts and components and to "specially designed" "parts," "components," "accessories" and "attachments" for those firearms and "parts" and "components:"

—Non-automatic and semi-automatic firearms (other than shotguns) with a caliber of less than or equal to .50 inches (12.7 mm);

—Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but not greater than .72 inches (18.0 mm);

—Detachable magazines with a capacity of greater than 16 rounds but less than 50 rounds that are "specially designed" for the firearms listed above;

—Receivers (frames) and complete breech mechanisms, including castings, forgings, or stampings thereof, "specially designed" for the firearms listed above; and

—Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components," and buttstocks that contain fire control "parts" or "components" (*e.g.,* triggers, hammers, sears, or disconnectors) if "specially designed" for the firearms listed above or for firearms listed in USML Category I (unless the part or component itself is listed in USML Category I(g) or (h) as specified in the Department of State proposed rule entitled "Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III," also published in this issue).

ECCN 0A501.y would be subject only to anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would cover such items as scope mounts or accessory rails, iron sights, sling swivels, butt plates, recoil pads, bayonets, and stocks or grips that do not contain any fire control "parts" or "components."

This proposed rule would add a technical note to ECCN 0A501 stating that "parts" and "components" include "parts" and "components" that are common to firearms described in ECCN 0A501 and to firearms "subject to the ITAR."

It also would add a second note to ECCN 0A501 to state that certain firearms and similar items are EAR99, *i.e.,* subject to the EAR but not on the CCL. Those items are: Antique firearms (*i.e.,* those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles.

In addition, for purposes of new ECCN 0A501 and the rest of the new ECCNs described below, items previously determined to be "subject to the EAR" under a commodity jurisdiction determination issued by the U.S. Department of State that were designated as EAR99 would generally not be classified in any of the new ECCNs that would be created with this proposed rule. This would be consistent with Supplement No. 1 to Part 736, General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determination) and the paragraph (b)(1) release from "specially designed." As a conforming change, this proposed rule would revise paragraph (e)(3) of General Order No. 5 to add a reference to "0x5zz" (to account for new ECCNs 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502 described below). The "600 series" and 9x515 (spacecraft and related items) are already included in paragraph (e)(3), and those references remain unchanged.

*New ECCN 0A502: Shotguns and Certain Related Commodities*

New ECCN 0A502 would control both the shotguns currently on the USML that are to be added to the CCL (barrel length less than 18 inches) and the shotguns and the enumerated "parts" and "components" currently controlled in ECCN 0A984 (barrel length 18 inches or greater). Shotguns currently controlled in ECCN 0A984 would retain their current reasons for control of Firearms Convention (FC), crime control (CC Column 1, 2 or 3 depending on barrel length and end user) and United Nations (UN) reasons. Shotguns with a barrel length less than 18 inches would be controlled under NS Column 1, CC Column 1, FC, UN and AT Column 1 plus regional stability (RS Column 1), consistent with their current control on the USML. The shotguns controlled in 0A502 currently controlled in ECCN 0A984 would not be controlled for national security reasons because they are not on the WAML.

*New ECCN 0A503: Discharge Type Arms, and Certain Other Commodities*

This rule would replace existing ECCN 0A985 with a new ECCN 0A503. The rule would add "non-lethal or less-lethal grenades and projectiles and 'specially designed' 'parts' and 'components' of those projectiles" to the description of controlled items in the header of ECCN 0A985 to make clear that such projectiles are classified in that ECCN 0A503 and not classified under ECCN 0A602 or on the USML. Renumbering this ECCN would cause entries controlling firearms and related items to be placed in close proximity to each other, which would make it easier for readers to identify items on the CCL.

*New ECCN 0A504: Optical Sighting Devices and Certain Related Commodities*

New ECCN 0A504 would replace existing ECCN 0A987, which controls optical sighting devices for firearms. The reasons for control table, which currently states, *inter alia,* that the Firearms Convention (FC) reason for control applies to "optical sights for firearms," would be revised to state specifically that the FC reason for control applies to all paragraphs in the ECCN except the one that controls laser pointing devices. In addition, BIS would add an RS control for certain riflescopes. These riflescopes would be identified in their own paragraph in the ECCN under 0A504.i. The riflescopes in this paragraph would be limited to those "specially designed" for use in firearms that are "subject to the ITAR." An exclusion would be included in the criteria of this paragraph to ensure less sensitive riflescopes that would be moved from ECCN 0A987 to 0A504 on the effective date of a final rule, that currently are not RS controlled under the EAR, would not be controlled under this paragraph. This rule would also add a note to this paragraph (i) to specify that paragraph (a)(1) of the definition of "specially designed" is what would be used to determine whether a riflescope is "specially designed" for purposes of this paragraph.

This change would make clear, consistent with BIS's existing interpretation, that such devices are not optical sights and are not subject to the

FC reason for control. The new number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other.

*New ECCN 0A505: Ammunition and Certain Related Commodities*

New ECCN 0A505 would impose national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC), United Nations (UN), and anti-terrorism (AT Column 1) controls on ammunition not enumerated on the USML, for firearms that would be classified under proposed ECCN 0A501, and for most "parts" and "components" of such ammunition. Such ammunition would be for small arms, in most cases, firearms of caliber not exceeding 0.50 inches, although some ammunition for firearms of caliber up to 0.72 inches would be included. This proposed rule would retain the CCL reasons for control currently found in ECCNs 0A984 and 0A986 for shotgun shells. Buckshot shotgun shells would be subject to the CC Column 1, FC Column 1 and UN reasons for control. Other shotgun shells would be subject to the FC, UN and AT (North Korea only) reasons for control. Only "parts" and "components" would be eligible for License Exception LVS. Ammunition for larger caliber weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles would remain in USML Category III. Ammunition that has little or no civil use or that is inherently military such as ammunition that is preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile also would remain in USML Category III. Possession of the ammunition that would be added to the CCL by this rule does not provide a critical military advantage to the United States. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in Category III of the USML would be controlled for United Nations and anti-terrorism reasons only. Consolidating all ammunition on the CCL into one ECCN would simplify use of the CCL.

Inclusion of this ammunition on the CCL is appropriate because such ammunition is available from a number of countries, some of which are not close allies of the United States or members of multilateral export control regimes. Possession of this ammunition does not confer a military advantage on the United States. This rule proposes adding three notes to clarify the scope of "parts" and "components" for ammunition classified under ECCN 0A505. Note 1 to 0A505.c would clarify the relationship between ECCNs 0A505 and 1A984 for shotgun shells, stating that shotgun shells that contain only chemical irritants would be controlled under 1A984 and not 0A505. Separately, Note 2 to 0A505.x would include an illustrative list of the controls on "parts" and "components" in this entry, such as Berdan and boxer primers. Note 3 to 0A505.x would clarify that the controls in ECCN 0A505 include "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

*New ECCN 0A602: Guns and Armament*

New ECCN 0A602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) controls on guns and armament manufactured between 1890 and 1919 and for military flame throwers with an effective range less than 20 meters. It would impose those same reasons for control on parts and components for those commodities and for defense articles in USML Category II if such parts or components are not specified elsewhere on the CCL or USML. Note 2 to 0A602 confirms that black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99. Inclusion of these guns and armament on the CCL is appropriate because they do not confer a significant military or intelligence advantage on the United States. The guns controlled in this ECCN are between 98 and 127 years old. The parts, components, accessories and attachments controlled in this ECCN include some that are for modern artillery. Modern artillery will remain on the USML, along with the most sensitive "parts," "components," "accessories" and "attachments" for these USML items. This proposed rule adds a note to clarify that "parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are not subject to the EAR. The USML Order of Review and CCL Order of Review already provide guidance for making such a jurisdictional and classification determination, but to highlight that these "parts," "components," "accessories" and "attachments" are not classified under paragraph (x) of 0A602, this rule proposes adding a note.

*New ECCN 0B501: Test, Inspection and Production Equipment for Firearms*

New ECCN 0B501 would cover "Test, inspection and production 'equipment' and related commodities for the 'development' or 'production' of commodities enumerated in ECCN 0A501 or USML Category I." This new ECCN would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to four specific types of machinery and to one class of items. The four specific types of machinery are: Small arms chambering machines, small arms deep hole drilling machines and drills therefor, small arms rifling machines, and small arms spill boring machines. The class of items covers dies, fixtures and other tooling "specially designed" for the "production" of items in the State Department proposed rule for USML Category I or ECCN 0A501.

The NS and RS reasons for control do not apply to equipment for the "development" or "production" of commodities in ECCN 0A501.y because those reasons for control do not apply to the commodities in ECCN 0A501.y themselves.

The first four specific items noted above currently are listed in ECCN 2B018, paragraphs .o, .p, .q, and .r and would be listed in paragraphs .a, .b, .c and .d of ECCN 0B501. In addition, the class of items in new 0B501 that is currently included within ECCN 2B018, paragraph .n (jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms, ordnance, and other stores and appliances for land, sea or aerial warfare) would, if applicable to firearms controlled in 0A501, be subsumed in paragraph .e. Jigs, fixtures and metal working implements currently in 2B018 that are applicable to larger guns would be controlled in ECCN 0B602 and are discussed below.

Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability (RS) reason for control from RS Column 2 to RS Column 1. This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the item is exported or reexported in considering whether to approve a license.

*New ECCN 0B505: Test, Inspection and Production Equipment for Ammunition*

New ECCN 0B505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III, and "specially designed" "parts" and "components" therefor, that are "specially designed" for the "production" of ammunition other than for the ammunition specified in 0A505.b, .c or .d (certain shotgun shells with buckshot and without buckshot and certain blank ammunition). Equipment for manufacturing shotgun shells that do not contain buckshot would be controlled for the AT (North Korea only) and UN reasons for control, which are the reasons for control that currently apply to this equipment in ECCN 0B986. ECCN 0B505 would not include equipment for the hand loading of cartridges and shotgun shells, so this rule specifies this in the heading.

The equipment controlled in ECCN 0B505 is used to produce conventional ammunition and is similar to equipment that is in operation in a number of countries, some of which are not allies of the United States or members of multinational export control regimes. Possession of such equipment does not confer a significant military advantage on the United States, and thus its inclusion on the CCL is appropriate.

*New ECCN 0B602: Test, Inspection and Production Equipment for Certain Guns and Armament*

New ECCN 0B602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on test, inspection and production equipment enumerated for commodities enumerated or otherwise described in ECCN 0A602.a or USML Category II. ECCN 0B602 would control eight specific types of equipment that currently are listed in paragraphs .e through .l of ECCN 2B018. Those eight specific types of equipment are: Gun barrel rifling and broaching machines and tools therefor; Gun barrel rifling machines; Gun barrel trepanning machines; Gun boring and turning machines; Gun honing machines of 6 feet (183 cm) stroke or more; Gun jump screw lathes; Gun rifling machines; and Gun straightening presses. ECCN 0B602 also would control one class of equipment that is included within ECCN 2B018 paragraph .n (jigs and

fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II). Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability reason for control from RS Column 2 to RS Column 1. This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the items is exported or reexported in considering whether to approve or reject a license application.

Additionally, ECCN 0B602 would control any other tooling and equipment that is "specially designed" for the production of items in ECCN 0A602 or USML Category II along with test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

*New ECCN 0D501: Software for Firearms and Certain Related Commodities*

New ECCN 0D501 would apply national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls to "software" "specially designed" for the "development," "production," operation or maintenance of all commodities classified under ECCNs 0A501 or equipment under 0B501 except those commodities classified under 0A501.y. "Software" for ECCN 0A501.y would be controlled only for United Nations and anti-terrorism reasons to match the reason for control that applies to commodities classified under that paragraph.

*New ECCN 0D505: Software for Ammunition and Certain Related Commodities*

New ECCN 0D505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A505.a and .x (rifle, pistol, carbine and revolver ammunition and "specially designed" parts and components therefor) or 0B505.a and .x. However, only United Nations and anti-terrorism

controls would apply to "software" for the blank ammunition in ECCN 0A505.d.

*New ECCN 0D602: Software for Guns and Armament and Certain Related Items*

New ECCN 0D602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A602 or 0B602.

*New ECCN 0E501: Technology for Firearms and Certain Related Items*

New ECCN 0E501 would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to "technology" "required" for the "development" and "production" of firearms other than shotguns. This new ECCN also would apply the anti-terrorism and United Nations reasons for control to "technology" "required" for the operation, installation, maintenance, repair, or overhaul of such firearms. Controlling this "technology" under the EAR rather than the ITAR is appropriate because the "technology" for the "development," "production," operation, installation, maintenance, repair, and overhaul of the firearms to be described in 0A501 is widely available throughout the world and its possession does not confer a significant military or intelligence advantage on the United States.

*New ECCN 0E502: Technology for Shotguns*

New ECCN 0E502 would apply the crime control (CC Column 1) and United Nations (UN) reasons for control to "technology" required for the development or production of shotguns that would be controlled in new ECCN 0A502. Crime control and United Nations are the reasons for control currently imposed on "technology" required for the "development" or "production" of shotguns in ECCN 0E984. The only difference between shotguns currently on the CCL and those that would be added by this proposed rule is barrel length. BIS believes that "technology" related to shotguns does not vary significantly based on the barrel length of the shotgun. Attempts to apply different reasons for control or to control different types of technology based

solely on the barrel length of the shotgun would likely be ineffective.

*New ECCN 0E504: Technology for Certain Optical Sighting Devices*

New ECCN 0E504 would replace existing ECCN 0E987, which controls "technology" "required" for the "development," or "production" of certain commodities controlled by 0A504. The new ECCN number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other. New ECCN 0E504 would also impose a United Nations (UN) control on the entire entry.

*New ECCN 0E505: Technology for Ammunition and Related Items*

New ECCN 0E505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.a and .x (rifle and pistol ammunition and "parts" and "components); 0B505 equipment for those commodities; and "software" for that equipment and those commodities controlled by 0D505. "Technology" for the "development" or "production" of buckshot shotgun shells would be controlled for crime control (CC Column 1) and UN reasons. United Nations and anti-terrorism (AT Column 1) controls would apply to "technology" for the blank ammunition (controlled in 0A505.d) for firearms controlled in ECCN 0A501 and to "technology" for "software" for that ammunition. Inclusion of this "technology" on the CCL is appropriate because, like the ammunition and production equipment addressed by this rule, it is widely available, including in countries that are not allies of the United States or members of multilateral export control regimes and thus confers no military advantage on the United States.

*New ECCN 0E602: Technology for Guns and Armament, Including Technology for Test, Inspection and Production Equipment and Software for Guns and Armament*

New ECCN 0E602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or

refurbishing of commodities controlled by ECCNs 0A602 or 0B602, or "software" controlled by 0D602.

**Revisions to Seven ECCNs**

To conform to new *Federal Register Drafting Handbook* requirements, the amendatory instructions in this proposed rule would set forth the entire text of the seven ECCNs to be revised. To help the public understand what specific parts of the ECCNs would be different, the narrative below describes the amendments in detail.

*Revision to ECCN 0A018*

With the proposed removal of ECCN 0A984 and the addition of 0A502 described above, this proposed rule would make the conforming change of removing and reserving 0A018.c since all the items classified in 0A018.c would be classified under other entries on the CCL. This change includes the removal of the note to 0A018.c.

*Revision to ECCN 0E982*

ECCN 0E982 controls "technology" exclusively for the "development" or "production" of equipment controlled by ECCN 0A982 or 0A985. This rule would replace "0A985," which applies to discharge type arms and some other crime control equipment, with 0A503 to conform to the replacement of ECCN 0A985 with new ECCN 0A503 proposed elsewhere in this rule.

*Revision to ECCN 1A984*

To clarify an existing agency practice of controlling shotguns shells that contain only chemical irritants under 1A984, this proposed rule would revise the heading of 1A984. As described above, the same type of clarification would be made to ECCN 0A505.c under new Note 1 to paragraph (c). BIS considers these to be conforming changes to the removal of ECCN 0A986 and the addition of ECCN 0A505.c in this proposed rule.

*Revisions to ECCN 2B004*

As a conforming change, this rule would replace the reference to ECCN 2B018 in the related controls paragraph of ECCN 2B004 with references to ECCNs 0B501, 0B602 and 0B606. This rule would make no substantive changes to ECCN 2B004.

*Revisions to ECCN 2B018*

This proposed rule would remove and reserve paragraphs .e, .f, .g, .h, .i, .j, and .l from ECCN 2B018 because the commodities listed in those paragraphs would be listed in ECCN 0B602. It would remove paragraph .n, because the commodities listed in that paragraph

would be controlled under either ECCNs 0B501 or 0B602 or under existing ECCN 0B606 in this proposed rule. It would remove paragraphs .a through .d, .m and .s, because the commodities listed in those paragraphs would be controlled in ECCN 0B606. It would remove paragraphs .o, .p, .q, and .r because the commodities listed in those paragraphs would be controlled in ECCN 0B501. The commodities described in the MT control in ECCN 2B018 currently listed as MT are controlled elsewhere in the EAR, so no additional changes are needed to add these commodities to other ECCNs.

*Revisions to ECCN 2D018*

Currently ECCN 2D018 controls software for the "development," "production" or "use" of equipment controlled by ECCN 2B018. As a conforming change, this rule would replace the control text of ECCN 2D018 with a statement referring readers to ECCNs 0D501, 0D602 and 0D606.

*Revisions to ECCN 7A611*

As a conforming change, this rule would remove the reference to 0A987 in the Related Controls paragraph (2) and add in its place 0A504.

**Removal of Nine ECCNs**

*Removal of ECCN 0A918*

ECCN 0A918 controls "bayonets" for regional stability, anti-terrorism, and United Nations reasons. This proposed rule would remove bayonets from ECCN 0A918 and add them to the .y paragraph of proposed ECCN 0A501, where they would be subject to United Nations and anti-terrorism (AT column 1) reasons for control. Bayonets and the "technology" to produce them are available in many countries. Possession of bayonets does not confer a significant military advantage on the United States and attempting to restrict their availability by requiring a license for export to most destinations is unlikely to be effective. Therefore, for these reasons, this proposed rule does not retain a regional stability (RS column 2) control on bayonets because it is no longer warranted.

*Removal of ECCN 0A984*

This proposed rule would remove ECCN 0A984 because all of the commodities that it currently controls would be controlled by either proposed ECCN 0A502 or 0A505. As conforming changes, references to ECCN 0A984 would be replaced with references to ECCN 0A502 or 0A505 or both, as appropriate in §§ 742.7(a)(1), (2) and (3); 742.17(f) and 748.12(a)(1) and in ECCN 0A018.

*Removal of ECCN 0A985*

This proposed rule would remove ECCN 0A985 because all of the commodities that it currently controls would be controlled by proposed ECCN 0A503. As conforming changes, references to ECCN 0A985 would be replaced with references to ECCN 0A503 in §§ 740.20(b)(2); 742.7(a)(4) and (c); 746.7(a) and ECCN 0E982.

*Removal of ECCN 0A986*

This proposed rule would remove ECCN 0A986 because all of the commodities that it currently controls would be controlled by proposed 0A505.c, including less than lethal rounds. As conforming changes, references to ECCN 0A986 would be replaced with references to ECCN 0A505, as appropriate in §§ 742.17(f); 742.19(a)(1); 746.3(b)(2) and 748.12(a)(1).

*Removal of ECCN 0A987*

This proposed rule would remove ECCN 0A987 because proposed ECCN 0A504 would control all commodities currently controlled by ECCN 0A987. As conforming changes, references to ECCN 0A987 would be replaced with references to ECCN 0A504, as appropriate in §§ 740.16(b)(2)(iv); 742.7(a)(1); 742.17(f); 744.9(a)(1) and (b); and 748.12(a)(1); and in ECCN 7A611.

*Removal of ECCN 0B986*

This proposed rule would remove ECCN 0B986 because all of the commodities that it controls would be controlled in proposed ECCN 0B505.c. As conforming changes, references to ECCN 0B986 would be replaced with references to 0B505.c in §§ 742.19(a) and 772.1, definition of specially designed Note 1.

*Removal of ECCN 0E918*

This proposed rule would remove ECCN 0E918, which controls "technology" for the "development," "production," or "use" of bayonets for regional stability, United Nations, and anti-terrorism reasons. Because "technology" for the "development," "production," or "use" of bayonets is widely known, any attempt to limit its dissemination through export license requirements is unlikely to be effective.

*Removal of ECCN 0E984*

This proposed rule would remove ECCN 0E984, which controls "technology" for the development of shotguns and buckshot shotgun shells, because such "technology" would be controlled under proposed ECCN 0E502 (shotguns) or 0E505 (buckshot shotgun

shells). As a conforming change, this proposed rule would replace a reference to ECCN 0E984 in § 742.7(a) with references to ECCNs 0E502 and 0E505.

*Removal of ECCN 0E987*

This proposed rule would remove ECCN 0E987 because proposed ECCN 0E504 would control all "technology" currently controlled by ECCN 0E987. As conforming change, references to ECCN 0E987 would be replaced with references to ECCN 0E504, as appropriate in §§ 740.20(b)(2)(ii) and 742.7(a)(1).

**Conforming Change to General Order No. 5**

This proposed rule would amend General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determinations), in Supplement No. 1 to part 736, to add a reference in two places to the new 0x5zz ECCNs that would be created by this rule. This change to paragraph (e)(3) is a conforming change and is needed because paragraph (e)(3) now only references the "600 series" and 9x515 ECCNs. 0x5zz ECCNs would include new ECCN 0A501, 0A502, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E502, 0E505. Paragraph (e)(2) is important because, for example, it ensures that items previously determined to be "subject to the EAR" and designated EAR99, would not be classified in a new ECCN being created to control items moved from the USML to the CCL, unless specifically enumerated by BIS in an amendment to the CCL. For example, most swivels and scope mounts for firearms have previously been determined through the CJ and classification process to not be "subject to the ITAR" and designated as EAR99. The classification of such "parts" would not be changed, provided the "part" was not subsequently changed, which would require a separate jurisdiction and classification analysis.

**Revisions to Regional Stability Licensing Policy for Firearms and Ammunition That Would Be Added to the EAR**

This proposed rule would apply the regional stability licensing policy set forth in § 742.6(b)(1)(i) of the EAR to the items controlled for regional stability reasons in ECCNs 0A501, 0A505, 0B501, 0B505, 0A504, 0D501, 0D505, 0E501, 0E504 and 0E505. That policy, which also applies to "600 series" and 9x515 items is case-by-case review "to determine whether the transaction is contrary to the national security or foreign policy interests of the United

States, including the foreign policy interest of promoting the observance of human rights throughout the world." This proposed rule would also revise the regional stability licensing policy set forth in the last sentence of paragraph (b)(1)(i) that is specific to the People's Republic of China for 9x515 items. This proposed rule would add ECCNs 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 to this sentence to specify that these firearms and related items will be subject to a policy of denial when destined to the People's Republic of China or a country listed in Country Group E:1. Lastly, this proposed rule would add a sentence to the end of paragraph (b)(1)(i) to make it explicit that applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items would be subject to a policy of denial when there is reason to believe the transaction involves certain parties of concern. In addition, transactions involving criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries would be subject to a policy of denial.

**Availability of License Exceptions**

Many of the items in the new "600 series" ECCNs generally would be eligible for the same license exceptions and subject to the same restrictions on use of license exceptions as other "600 series" ECCNs. BIS intends that those restrictions be no more restrictive than the ITAR license exemption restrictions that currently apply to those items.

For the ECCNs currently on the CCL that would be renumbered and placed in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL, these existing firearms-related items would continue to be eligible for the same EAR license exceptions, as they were prior to publication of this rule, unless otherwise restricted under § 740.2, if the requirements of the license exceptions are met.

*License Exception: Shipments of Limited Value (LVS)*

Under this proposed rule, complete firearms controlled under ECCN 0A501 would not be eligible for License Exception LVS, 15 CFR 740.3. Firearms "parts", "components," "accessories," and "attachments" controlled under ECCN 0A501, other than receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS, with

a limit of $500 on net value per shipment. In addition, receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS if the ultimate destination is Canada. These limits would be stated in the License Exceptions paragraph of ECCN 0A501, and no revisions to the text of the license exception itself would be needed to implement them. BIS believes that this provision is generally consistent with the license exemption for limited value shipments of firearms in the ITAR (22 CFR 123.17(a)). This LVS proposal would be less restrictive than the current ITAR provision in two respects. First, the value limit per shipment would be $500 compared to $100 in the ITAR. Second, the LVS proposal would allow exports of receivers and complete breech mechanisms to Canada whereas § 123.17(a) does not. However, the $500 LVS limit is based on the actual selling price or fair market value, whereas the ITAR $100 limit is based on "wholesale" value. BIS believes that the LVS value standard is more precise and easier to apply than the ITAR standard and is more in keeping with current prices. In addition, with respect to Canada, an LVS limit of $500 per shipment is needed to comply with the Section 517 of the Commerce, Justice, Science, and Related Agencies Appropriations Act of 2015, which prohibits expending any appropriated funds to require licenses for the export of certain non-automatic firearms parts, components, accessories and attachments to Canada when valued at under $500.

Guns and armament and related items controlled under ECCN 0A602 would be eligible for License Exception LVS, with a limit of $500 net value per shipment.

Ammunition controlled under ECCN 0A505 would not be eligible for License Exception LVS; however, ammunition parts and components would be eligible with a limit of $100 net value per shipment.

Test, inspection and production equipment controlled under ECCNs 0B501, 0B602 and 0B505 for firearms, guns and armament and ammunition/ ordnance would be eligible for License Exception LVS with a limit of $3,000 net value per shipment, which is consistent with LVS eligibility for most 600 series ECCNs.

*License Exception: Temporary Imports, Exports, Reexports, and Transfers (In-Country) (TMP)*

This proposed rule would amend the regulations at § 740.9 to state that

License Exception TMP would not be available to export or reexport the items that are the subject of this rule to destinations in Country Group D:5 (*See* Supplement No. 1 to part 740). License Exception TMP would also not be available to export or reexport some firearms and ammunition shipped from or manufactured in the Russia (Russian Federation), Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. In addition, this proposed rule would prohibit the use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 that was shipped from or manufactured in Country Group D:5. It also would prohibit use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 that is shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by proposed 0A501 that is also excluded under Annex A in Supplement No. 4 to part 740 (the prohibition would not apply to such firearms), and any shotgun with a barrel length less than 18 inches controlled under 0A502 that was shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. These prohibitions would apply to temporary exports of firearms from the United States, and the export of firearms temporarily in the United States.

This proposed rule would limit temporary exports of firearms controlled under ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 pursuant to License Exception TMP to exhibition and demonstration (§ 740.9(a)(5) of the EAR) and inspection, test, calibration, and repair (§ 740.9(a)(6) of the EAR). Consistent with the ITAR requirements previously applicable to temporary exports of the firearms covered by this rule (see 22 CFR 123.17(c), 123.22), exporters would continue to be required to file Electronic Export Information (EEI) to the Automated Export System (AES) for transactions involving such firearms that are authorized pursuant to License Exception TMP (*See* § 758.1(a)(10) of the EAR).

The proposed rule would also authorize the use of License Exception TMP for the export of ECCN 0A501 firearms temporarily in the United States for a period of not more than one year subject to the requirement that the firearms not be imported from or

ultimately destined for certain proscribed or restricted countries. Certain information as described below would also be collected by CBP on behalf of BIS and done under existing or new Commerce paperwork collections. The proposed rule would also make eligibility to export under License Exception TMP for ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 subject to the following conditions:

Upon the entry portion of a temporary import, the temporary importer would be required to provide the required statement to U.S. Customs and Border Protection (CBP), as proposed in paragraph (b)(5)(iv)(A).

The temporary importer would be required to include on the invoice or other appropriate import-related documentation (or electronic equivalents) provided to CBP a complete list and description of the 0A501 firearms being imported, including their serial numbers, model, make, caliber, quantity, and U.S. dollar value, as proposed in paragraph (b)(5)(iv)(B).

If the firearms are temporarily imported for a trade show, exhibition, demonstration, or testing, the temporary importer must provide to CBP the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States, as proposed in paragraph (b)(5)(iv)(C).

At the time of export, the temporary importer or its agent as proposed in paragraph (b)(5)(v) would be required to provide the temporary import documentation (*i.e.,* the invoice used at the time of entry for the temporary importation or other appropriate temporary import-related documentation (or electronic equivalents)) related to paragraph (b)(5)(iv)(B) to CBP. This information would be used by CBP to confirm that such firearms were in fact temporarily imported under the EAR for subsequent export under License Exception TMP.

The proposed rule would include a note to License Exception TMP to direct temporary importers and exporters to contact CBP at the port of import or export for the proper procedures to provide any data or documentation required by BIS.

*License Exception: Governments, International Organizations, International Inspections Under the Chemical Weapons Convention, and the International Space Station (GOV)*

This proposed rule would revise the regulations at § 740.11 to limit the applicability of License Exception GOV for firearms, "parts" and "components" controlled by ECCN 0A501 and ammunition controlled by 0A505 to exports, reexports and transfers for official use by U.S. government agencies and official and personal use by U.S. government employees (and the immediate families and household employees of those government employees) (§ 740.11(b)(2)(i) and (ii) of the EAR). This proposed authorization under License Exception GOV would treat 0A501 firearms in the same manner that other items that are subject to the EAR may be exported to U.S. government employees under License Exception GOV. It would not impose certain restrictions that are imposed by the current ITAR license exemption. The ITAR exemption authorizes exports of only non-automatic firearms and "parts" and "components." License Exception GOV would authorize non-automatic and semi-automatic firearms and "parts" and "components."

The ITAR exemption (22 CFR 123.18) authorizes shipments consigned to and for the use of servicemen's clubs, and for service members or civilian employees if the firearms are for personal use and the shipment is accompanied by a written authorization from the commanding officer concerned. The ITAR exemption also authorizes exports to other U.S. government employees for personal use if the chief of the U.S. diplomatic mission in the country of destination has approved in writing to the Department of State the specific types and qualities of firearms into that country. The exporter must present a copy of the written statement to the CBP Port Director. License Exception GOV would impose none of the foregoing limitations. BIS believes that the limitations are unnecessary. The EAR control exports for national security and foreign policy reasons. BIS believes that the restrictions imposed in the ITAR exemption primarily pertain to concerns over the security of U.S. government personnel and property located outside the United States. Those concerns may be addressed more appropriately through policies and procedures implemented by the U.S. government agencies whose personnel and properties are located outside the United States. Export license

requirements are not needed to implement such policies.

All other items that are the subject of this rule would be subject to the limits on use of License Exception GOV that apply to 600 series items generally, *i.e.*, § 740.11(b)—to, for or on behalf of the U.S. Government (including contractors, government employees, their families and household employees) or § 740.11(c) to a government in Country Group A:1 cooperating governments or an agency of NATO. However, this rule would add some additional restrictions for E:1 and E:2 countries. This proposed rule would exclude the use of License Exception GOV for any item listed in a 0x5zz ECCN for E:1 countries, unless authorized under paragraph (b)(2)(i) or (ii) when the items are solely for U.S. government official use. In addition, to better ensure compliance with section 6(j) of the EAA and address concerns with certain end users and uses in Country Group E:1 and E:2 countries, this proposed rule would add a new Note 1 to paragraph (b)(2), which would restrict the use of License Exception GOV for E:1 and E:2 countries for multilaterally controlled items and anti-terrorism (AT) controlled items when destined to certain end users or end uses of concern.

*License Exception: Baggage (BAG)*

This proposed rule would revise License Exception BAG, § 740.14, to allow United States citizens and permanent resident aliens leaving the United States temporarily to take up to three firearms controlled by proposed ECCN 0A501 and up to 1,000 rounds of ammunition for such firearms controlled under ECCN 0A505.a for personal use while abroad. This proposed change to License Exception BAG would be made to be consistent with 22 CFR 123.17(c), which authorizes U.S. persons to take up to three non-automatic firearms and up to 1,000 cartridges therefor abroad for personal use. This proposed amendment to License Exception BAG would apply to both non-automatic and semi-automatic firearms. Consistent with the ITAR requirements previously applicable to temporary exports of the firearms and associated ammunition covered by this rule, BIS is proposing to modify § 758.1 of the EAR to make clear that exporters would continue to be required to file Electronic Export Enforcement (EEI) to the Automated Export System (AES) for transactions involving such firearms and associated ammunition that are otherwise authorized pursuant to License Exception BAG. BIS is aware that U.S. Customs and Border Protection (CBP)

has temporarily suspended the requirement to file EEI to the AES for personally-owned firearms and ammunition that are "subject to the ITAR" being exported under 22 CFR 123.17(c), due to operational challenges related to implementation. *See* the following CBP website page for additional information: *https:// help.cbp.gov/app/answers/detail/a_id/ 323/~/traveling-outside-of-the-u.s.--- temporarily-taking-a-firearm%2C- rifle%2C-gun%2C*. BIS is proposing in this rule to ensure consistency with the current ITAR filing requirements and any measures that are being used at this time to track such temporary exports of personally-owned firearms and ammunition. Whether and how BIS includes this requirement in a final rule would be based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published. If CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Certification of Registration Form 4457, until a workable solution is developed or CBP suggests an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition. BIS will also take into consideration any public comments submitted on this aspect of the proposed rule regarding imposing an EEI filing requirement in AES, as well as comments on the current practice of using the CBP Form 4457, as well as any other suggestions on alternative approaches for tracking such information.

Though BIS does not require prior authorization to use License Exception BAG, in order to facilitate the physical movement and subsequent importation of firearms authorized under this license exception, this information would need to be collected by CBP by requiring EEI filing in AES.

Travelers leaving the United States temporarily would be required to declare the 0A501 and 0A505 items to a CBP officer prior to departure from the United States and present the firearms, "parts," "components," "accessories," "attachments," and ammunition they are exporting to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG, that the exporter is compliant with its terms. Should exporters desire to contact CBP prior to departure, contact information and a list of U.S. air, land and sea ports of entry can be found at: *http://www.cbp.gov/xp/ cgov/toolbox/ports/*.

This proposed rule also would revise License Exception BAG to allow nonresident aliens leaving the United States to take firearms, "accessories," "attachments," "components," "parts," and ammunition controlled by ECCN 0A501 or 0A505 that they lawfully brought into the United States. This change would be consistent with 22 CFR 123.17(d), which authorizes foreign persons leaving the United States to take firearms and ammunition controlled under Category I(a) of the USML (both non-automatic and semi-automatic) that they lawfully brought into the United States. This proposed rule would not make changes to the availability of License Exception BAG for shotguns and shotgun shells authorized under paragraph (e)(1) or (2).

As a clarification to License Exception BAG, this proposed rule would add two sentences to the introductory text of paragraph (b)(4) to highlight the special provisions that apply in paragraph (e) for firearms and ammunition and in paragraph (h) for personal protective equipment under ECCN 1A613.c or .d. These two sentences would not change the existing requirement and have been included to assist the public in better identifying these special provisions.

*License Exception STA*

This proposed rule would revise the regulations at § 740.20 to make firearms controlled under ECCN 0A501 and most "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501 ineligible for License Exception STA. Only those "parts," "components," "accessories," and "attachments" that are controlled under paragraph .x (*i.e.*, those "specially designed" for 0A501 or ITAR-controlled firearms that are not specifically listed either on the CCL or USML) are eligible for export under License Exception STA. Items controlled under ECCNs 0A502 and 0A503 are also excluded from STA eligibility.

This proposed rule would exempt gun "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501.x; test, inspection and production equipment and "parts," "components," "accessories" and "attachments" in ECCN 0B501; "software" in 0D501; and "technology" in ECCN 0E501 from the License Exception STA end-use limitation set forth in § 740.20(b)(3)(ii) that applies to "600 series" items. That end-use limitation is intended to ensure that the military-related items controlled by most 600 series ECCNs are ultimately used by appropriate agencies of the governments of certain U.S allies or multilateral export control regime

members. Because the aforementioned exempted items are not of a military nature, the limitation is not necessary. As a conforming change, this proposed rule also would remove ECCNs 0A985 and 0E987 in paragraph (b)(2)(ii) and add in their place 0A503 and 0E504. This change does not change the availability of License Exception STA, but simply reflects the fact that these items would now be controlled under ECCNs 0A503 and 0E504 and the License Exception STA exclusion would continue to apply to them.

**Support Documentation for Firearms, Parts, Components, Accessories, and Attachments Controlled by ECCN 0A501**

This proposed rule would require that for commodities controlled by ECCN 0A501 exported or reexported transactions for which a license would be required, the exporter or reexporter must obtain, prior to submitting an application, an import permit (or copy thereof) if the importing country requires such permits for import of firearms. That import permit would be a record that must be kept by the exporter or reexporter as required by part 762 of the EAR. The purpose of this requirement is to assure foreign governments that their regulations concerning the importation of firearms are not circumvented. Obtaining an import certificate or equivalent official document issued by member states of the Organization of American States meets this requirement. To implement this change, this proposed rule would revise § 748.12 to include the commodities controlled under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) and 0A505 (except 0A505.d) within the list of commodities that are subject to the requirement and would add a new paragraph (e) requiring that import certificates or permits be obtained from countries other than OAS member states if those states require such a certificate or permit.

**Licenses for Firearms and Ammunition Would Be Limited to the Authorized End Use and End Users**

Consistent with other BIS licenses, including "600 series" and 9x515 items, licenses for firearms and ammunition that move from the USML to the CCL would be limited to the authorized end use and end users specified on the license and supporting documentation submitted as part of the license application. This means any change in the authorized end use or end user for a licensed transaction would require a BIS authorization. This existing

requirement of BIS licenses is specified in § 750.7(a) and on the boiler plate text included on all BIS licenses. These requirements would also be applied to firearms and ammunition licenses. A change in end use or end user, including a change of authorized end use or end user within a single foreign country for a firearm or ammunition authorized under a BIS license, would require a BIS authorization. BIS does not propose any changes in this rule to these well-established and understood requirements on using BIS licenses. Applicants for firearms and ammunition licenses are also advised that BIS would continue to exercise its authority, as specified in § 748.11 in the Note 2 to paragraph (a), on a case-by-case basis to require a Statement by Ultimate Consignee and Purchaser as warranted.

The exporter, reexporter or transferor using a BIS license, including for firearms and ammunition licenses, would also be required pursuant to § 750.7(a) to inform the other parties identified on the license, such as the ultimate consignees and end users of the license's scope and of the specific conditions applicable to them. As an additional safeguard for firearms and ammunition licenses, BIS would when warranted include a license condition that would require the exporter, reexporter or transferor to receive from the other parties identified on the license a confirmation in writing that those other parties had received and agreed to the terms and conditions of the license. For example, the condition may state "Prior to using this license, the exporter (reexporter or transferor) and other parties to the license must agree to the conditions in writing and the exporter (reexporter or transferor) must keep this on file with their other records." The documents described in this paragraph would be required to be kept for EAR recordkeeping purposes under part 762 of the EAR.

**Conventional Arms Reporting for Certain Exports of ECCN 0A501.a and .b Commodities**

In § 743.4 (Conventional arms reporting), this rule would revise paragraphs (c)(1)(i) and (c)(2)(i) to add ECCN 0A501.a and .b as commodities that would require Wassenaar Arrangement reporting and United Nations reporting under this conventional arms reporting section of the EAR. This requirement would assist the United States Government to meet its multilateral commitments for the special reporting requirements for exports of certain items listed on the Wassenaar Arrangement Munitions List and the UN Register of Conventional

Arms when these items are authorized for export under License Exceptions LVS, TMP, RPL, STA, or GOV (see part 740 of the EAR) or the Validated End User authorization (see § 748.15 of the EAR) and for United Nations reporting. License Exceptions LVS and STA are identified in § 743.4(b)(1), but because ECCN 0A501.a and .b commodities are not eligible for those two license exceptions, the reporting requirements under § 743.4(c)(1)(i) and (c)(2)(i) would be limited to exports authorized License Exceptions TMP, GOV and RPL or the Validated End User authorization. This rule also adds contact information for these reports.

## Changes to Export Clearance Requirements for Firearms Being Moved to the CCL

In part 758 (Export Clearance Requirements), this rule would make certain changes to clarify that a filing of Electronic Export Information (EEI) to the Automated Export System (AES) would be required for exports of the firearms transferred from the USML pursuant to this rule regardless of value or destination, including exports to Canada. As noted above, this requirement will also apply, as is presently the case under the ITAR, for temporary exports of such items pursuant to License Exception TMP or BAG.

In addition, this rule proposes to expand the data elements required as part of an AES filing for these items to include serial numbers, make, model and caliber. This requirement would ensure law enforcement officials are able to effectively verify that firearms exports are properly authorized and in conformance with all applicable regulations, including those associated with the temporary export and subsequent return of controlled firearms and unused ammunition. Similar to the description above regarding whether BIS would publish an EEI filing requirement in AES for personally-owned firearms and ammunition exported under License Exception BAG in the final rule, these expanded data elements required as part of an AES filing would be included in the final rule if CBP has made such data easily enterable in AES. If the necessary changes were not made by the time the final rule was to be published, CBP may continue to rely on CBP Form 4457 as described above.

## Entry Clearance Requirements for Temporary Imports

Temporary imports are transactions that involve both the temporary entry of an item into the U.S. from a foreign country and the subsequent export of that item from the U.S. To preserve the treatment of temporary import transactions for items in this rule that transfer from the USML in the ITAR to become subject to the EAR, BIS would need to create a process under the EAR to impose entry clearance requirements for temporary imports of such items based on BIS's authorities over U.S. exports.

Therefore, BIS proposes a temporary imports entry clearance requirement by adding new § 758.10. This new section would be limited to items in this rule that are both "subject to the EAR" and on the USML in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this rule proposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export. BIS would not impose a license requirement for such imports, but this information would be necessary to facilitate the export after a temporary import. The entry clearance requirement would be an EAR requirement and any false representation made under the new § 758.10 would be a violation of the EAR.

BIS is particularly interested in receiving comments on these temporary import provisions in § 758.10 and the subsequent export under paragraph (b)(5) of License Exception TMP. A license requirement is not being proposed for these temporary imports, but BIS is proposing an entry clearance requirement whereby, as described above, the exporter at the time of import would need to make a legal representation to the U.S. Government under the EAR that the item was being temporarily imported into the United States for subsequent export under paragraph (b)(5) of License Exception TMP. BIS also welcomes comments on whether there are advantages to how the ITAR regulates temporary imports of USMIL items that should be incorporated into the Commerce final rule.

## Changes to EAR Recordkeeping Requirements for Firearms Being Moved to the CCL

In part 762 (Recordkeeping), this rule would make two changes to the recordkeeping requirements under the EAR. These changes would specify that certain records, that are already created and kept in the normal course of business, must be kept by the "exporter" or any other party to the transaction (see § 758.3 of the EAR), that creates or receives such records.

Specifically, in § 762.2 (Records to be retained), this rule would redesignate paragraph (a)(11) as (a)(12) and add a new paragraph (a)(11) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. The "exporter" or any other "party to the transaction" that creates or receives such records would be the person responsible for retaining this record.

In § 762.3 (Records exempt from recordkeeping requirements), this rule would narrow the scope of an exemption from the EAR recordkeeping requirements for warranty certificates. This rule would narrow this exclusion to specify the exclusion from the recordkeeping requirements does not apply (meaning the record would need to be kept under the recordkeeping requirements) for warranty certificates for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502, when the certificate issued is for an address located outside the United States. This would be an expansion of the EAR recordkeeping requirements, but because warranty certificates are already created and kept as part of normal business recordkeeping purposes, this expansion is not anticipated to create any new or increased burden under the EAR, because it is a document that is created in the normal course of business and are records that should be easily accessible. These recordkeeping requirements would assist the United States Government because this information is important to have access to for law enforcement concerns for these types of items.

The public may submit comments on whether they agree with this BIS determination that these changes described above to the EAR recordkeeping requirements would not result in increased burdens under the EAR.

## Alignment With the Wassenaar Arrangement Munitions List

This rule maintains the alignment with respect to firearms, guns and armament, and ammunition that exists between the USML and the WAML. USML Category I firearms that would be added to the CCL under ECCN 0A501 are controlled under category ML1 of the WAML. USML Category II guns and armament that would be added to the CCL under 0A602 are controlled under WAML category ML2.

Rather than strictly following the Wassenaar Arrangement Munitions List pattern of placing production

equipment, "software" and "technology" for munitions list items in categories ML 18, ML 21 and ML 22, respectively, this rule follows the existing CCL numbering pattern for test, inspection and production equipment (0B501, 0B602 and 0B505), "software" (0D501, 0D602 and 0D505) and "technology" (0E501, 0E602 and 0E505). BIS believes that including the ECCNs for test, inspection and production equipment, "software," and "technology" in the same category as the items to which they relate results in an easier way to understand the CCL than using separate categories.

BIS believes that the controls in proposed ECCNs 0A501, 0A602 and 0A505 are consistent with controls imposed by the Wassenaar Arrangement.

## Appropriate Delayed Effective Date for a Final Rule

BIS also invites comments from the public on the appropriate delayed effective date needed to prepare for the changes included in this proposed rule if published in final form. A 180-day delayed effective date was used for many of the other rules that moved items from the USML to the CCL, but certain rules included shorter delayed effective dates. BIS requests the public to provide comments on whether 180-delayed effective date is warranted, or if some shorter period, such as 90-day delated effective date is warranted for this proposed rule if published in final form.

## Request for Comments

All comments on this proposed rule must be in writing and submitted via the Federal rulemaking portal *www.regulations.gov* or by mail or delivery to the address identified in the addresses section of this proposed rule. All comments (including any personal identifiable information) would be available for public inspection and copying. Anyone wishing to comment anonymously may do so by leaving the fields for information that would identify the commenter blank.

## Export Administration Act

Although the Export Administration Act of 1979 expired on August 20, 2001, the President, through Executive Order 13222 of August 17, 2001, 3 CFR, 2001 Comp., p. 783 (2002), as amended by Executive Order 13637 of March 8, 2013, 78 FR 16129 (March 13, 2013) and as extended by the Notice of August 15, 2017, 82 FR 39005 (August 16, 2017), has continued the Export Administration Regulations in effect under the International Emergency

Economic Powers Act. BIS continues to carry out the provisions of the Export Administration Act of 1979, as appropriate and to the extent permitted by law, pursuant to Executive Order 13222, as amended by Executive Order 13637.

## Executive Order Requirements

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distribute impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This proposed rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Although the items identified in this proposed rule have been determined to no longer warrant ITAR control by the President, the proliferation of such items has been identified as a threat to domestic and international security if not classified and controlled at the appropriate level under the EAR. Commerce estimates that the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the number of license applications to be submitted to BIS by approximately 30,000 annually.

This proposed rule does not contain policies with Federalism implications as that term is defined under E.O. 13132.

To control these items under the EAR that no longer warrant ITAR control, appropriate controls on the CCL needed to be included in the Department of Commerce proposed rule. This includes creating new ECCNs and revising certain existing ECCNs, as well as making other changes to the EAR to control items that would be moved from these three USML categories to the CCL once the section 38(f) notification process is completed and a final rule is published and becomes effective. Adding new controls and other requirements to the EAR imposes regulatory burdens on exporters and some other parties involved with those items, but compared to the burdens these exporters and other parties faced under the ITAR, these regulatory burdens, including financial costs, would be reduced significantly. The EAR is a more flexible regulatory structure whereby the items can still be controlled appropriately, but in a much

more efficient way that would significantly reduce the burdens on exporters and other parties compared to the regulatory burdens they faced when the item were "subject to the ITAR." Deregulatory does not mean a decontrol of these items.

For those items in USML Categories I, II and III that would move by this rule to the CCL, BIS would be collecting the necessary information using the form associated with OMB Control No. 0694–0088. BIS estimates that this form takes approximately 43.8 minutes for a manual or electronic submission. Using the State Department's estimate that 10,000 applicants annually would move from the USML to the CCL and BIS's estimate that 6,000 of the 10,000 applicants would require licenses under the EAR, that constitutes a burden of 4,380 hours for this collection under the EAR. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden is reduced by 5,620 hours. The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR.

In addition to the reduced burden hours of 5,620 hours, there would also be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. The Department of State charges a registration fee to apply for a license under the ITAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other related activities. The Department of Commerce would incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to apply for a license under the EAR, and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications.

Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR would result in a permanent and recurring direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they would no longer pay fees to the State Department for licenses and there is no fee charged by the Department of Commerce to apply for a license.

*Estimated Cost Savings*

For purposes of E.O. 13771 of January 30, 2017 (82 FR 9339), the Department of State and Department of Commerce proposed rules are expected to be "net deregulatory actions." The Department of Commerce has conducted this analysis in close consultation with the Department of State, because of how closely linked the two proposed rules are for the regulated public and the burdens imposed under the U.S. export control system.

E.O. 13771 and guidance provided to the agencies on interpreting the intended scope of the E.O. do not use the term "net deregulatory action," but rather refer to deregulatory actions. As outlined above, the Departments of State and Commerce proposed rules are closely linked and are best viewed as a consolidated regulatory action although being implemented by two different agencies. Also, as noted above, items may not be subject to both sets of regulations. Therefore, the movement of a substantial number of items from the USML determined to no longer warrant ITAR control to the CCL would result in a significant reduction of regulatory burden for exporters and other persons involved with such items that were previously "subject to the ITAR."

The Departments of State and Commerce for purposes of E.O. 13771 have agreed to equally share the cost burden reductions that would result from the publication of these two integral regulatory actions. The Department of State would receive 50% and the Department of Commerce would receive 50% for purposes of calculating the deregulatory benefit of these two integral regulatory actions.

*Under this agreed formulation, the burden reductions will be calculated as follows:*

For purposes of the Department of Commerce, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in

burden hours by 2,810 would result in an additional cost savings of [1] $126,281 to the exporting public. Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of Commerce.

For purposes of the Department of State, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in burden hours by 2,810 would result in an additional cost savings of $126,281 to the exporting public. Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of State.

The Department of Commerce welcomes comments from the public on the analysis under E.O. 13771 described here. Comments from companies that would no longer need to register with the Department of State because the company only deals with items under USML Category I, II, and/or III that would move to the CCL would be particularly helpful for the Department of Commerce and Department of State to receive. Comments are also encouraged on any of the other collections that may be relevant for the items that would move from the USML to the CCL. In particular, data on Department of State forms that would no longer need to be submitted would be helpful to receive.

**Paperwork Reduction Act Requirements**

Notwithstanding any other provision of law, no person may be required to respond to or be subject to a penalty for failure to comply with a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

This proposed regulation involves four collections currently approved by OMB under these BIS collections and control numbers: Simplified Network Application Processing System (control number 0694–0088), which includes, among other things, license applications; License Exceptions and Exclusions (control number 0694–0137); Import Certificates and End-User Certificates (control number 0694–0093); Five Year Records Retention Period (control number 0694–0096); and the U.S. Census Bureau collection for

the Automated Export System (AES) Program (control number 0607–0152).

This proposed rule would affect the information collection, under control number 0694–0088, associated with the multi-purpose application for export licenses. This collection carries a burden estimate of 43.8 minutes for a manual or electronic submission for a burden of 31,833 hours. BIS believes that the combined effect of all rules to be published adding items removed from the ITAR to the EAR that would increase the number of license applications to be submitted by approximately 30,000 annually, resulting in an increase in burden hours of 21,900 (30,000 transactions at 43.8 minutes each) under this control number. For those items in USML Categories I, II and III that would move by this rule to the CCL, the State Department estimates that 10,000 applicants annually will move from the USML to the CCL. BIS estimates that 6,000 of the 10,000 applicants would require licenses under the EAR, resulting in a burden of 4,380 hours under this control number. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden would be reduced by 5,620 hours. (*See* the description above for the E.O. 13771 analysis for additional information on the cost benefit savings and designation of the two rules as "net deregulatory actions".)

This proposed rule would also affect the information collection under control number 0694–0137, addressing the use of license exceptions and exclusions. Some parts and components formerly on the USML, and "software" and "technology" for firearms and their parts and components formerly on the USML, would become eligible for License Exception STA under this proposed rule. Additionally, test, inspection and production equipment and "software" and "technology" related to these firearms and "parts" may become eligible for License Exception STA. BIS believes that the increased use of License Exception STA resulting from the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the burden associated with control number 0694–0137 by about 23,858 hours (20,450 transactions at 1 hour and 10 minutes each).

---

[1] The Department of Commerce used the Department of State's estimate that the burden hour cost for completing a license application is $44.94 per hour. Multiplied by the estimated burden hour savings of 2,810 equals a cost savings to the public of $126,281.

BIS expects that this increase in burden as a result of the increased use of License Exception STA would be more than offset by a reduction in burden hours associated with approved collections related to the ITAR. This proposed rule addresses controls on firearms and "parts," production equipment and "parts" and related "software" and "technology" and specifically non-automatic and semi-automatic firearms and their "parts" and "parts," "components," "attachments," and "accessories" that are used in both semi-automatic and fully automatic firearms. BIS has made this determination on the basis that with few exceptions, the ITAR allows exemptions from license requirements only for exports to Canada, and requires a specific State Department authorization for most exports of firearms used for hunting and recreational purposes and exports of "parts," "components," "attachments," and "accessories" that are common to military fully automatic firearms and their semi-automatic civilian counterparts, even when destined to NATO and other close allies and also requires State Department authorization for the exports necessary to produce "parts" and "components" for defense articles in the inventories of the United States and its NATO and other close allies. However, under the EAR, as specified in this proposed rule, a number of low-level parts would be eligible for export under License Exception STA and would therefore not require a license to such destinations.

This proposed rule would also affect the information collection under control number 0694–0096, for the five-year recordkeeping retention because of two changes this rule would make to part 762 of the EAR. This rule would add a new paragraph (a)(55) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. This rule would also require warranty certificates for these items to be retained for EAR recordkeeping. However, because these records are already created and kept as part of normal business recordkeeping, this expansion is not anticipated to create any new or increased burden under the EAR.

Even in situations in which a license would be required under the EAR, the burden would likely be reduced compared to a license requirement under the ITAR. In particular, license applications for exports of "technology" controlled by ECCN 0E501 would likely

be less complex and burdensome than the authorizations required to export ITAR-controlled technology, *i.e.,* Manufacturing License Agreements and Technical Assistance Agreements (as a result of the differences in the scope of the ITAR's and the EAR's technology controls).

This proposed rule would affect the information collection under control number 0694–0093, import certificates and end-user certificates because of the changes included in this proposed rule. First, this regulation would require that for shipments requiring a license of firearms, "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501, the exporter obtain a copy of the import certificate or permit if the importing country requires one for importing firearms. License applications for which an import or end-user certificate is already required under § 748.12 of the EAR would not be subject to this new requirement. BIS expects that this requirement would result in no change in the burden under control number 0694–0093. Second, this proposed rule also would require that prior to departure, travelers leaving the United States and intending to temporarily export firearms, parts, and components controlled under ECCN 0A501 under License Exception BAG declare the firearms and parts to a CBP officer and present the firearms and parts to the CBP officer for inspection. As the State Department also requires that persons temporarily exporting firearms, parts and components declare the items to CBP, BIS does not expect that the requirement in this proposed rule would result in a change in burden under control number 0694–0093.

Third, this proposed rule would affect the information collection under control number 0694–0093 by creating a new temporary import entry clearance requirement by adding § 758.10. This new section would be limited to items in this rule that are both "subject to the EAR" and on the United States Munitions List (USML) in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this rule proposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export under License Exception TMP. BIS would not impose a license requirement for such imports, but collecting this information would be necessary to facilitate the export after a temporary import. The temporary import entry clearance requirement in § 758.10 would also conform to the requirement in License Exception TMP under § 740.9(b)(5), so

providing this information to CBP at the entry after a temporary import would facilitate the export phase of a temporary import under License Exception TMP. At the time of entry for a temporary import, the importer would need to provide a statement to CBP indicating that this shipment was being temporarily imported in accordance with the EAR for subsequent export in accordance with and under the authority of License Exception TMP. The entry clearance requirement would be an EAR requirement and any false representation made under the new § 758.10 would be a violation of the EAR. The importer would also need to provide CBP an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the items being imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value. If imported for a trade show, exhibition, demonstration, or testing, the temporary importer would need to provide CBP with the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are temporarily in the United States. Lastly, at the time of exportation, as requested by CBP, the exporter, or an agent acting on his or her behalf, would have to provide the entry document number or a copy of the CBP document under which the "item" "subject to the EAR" on the USMIL was temporarily imported under this proposed entry clearance requirement. As the State Department also requires that persons temporarily importing items in this rule provide the same type of information to CBP, BIS expects that the requirement in this proposed rule would result in a change in burden under control number 0694–0093, but because of the decrease under the burden imposed under the State collection the burden on the public will not change.

This proposed rule would also affect the information collection under control number 0607–0152, for filing EEI in AES because of one change this rule would make to part 758 of the EAR. Under new paragraph (b)(10), EEI would be required for all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada. Exports of these USML firearms and ammunition prior to

moving to the CCL required filing EEI in AES for all items "subject to the ITAR," so the burden in this collection would not change for the exporter. For some exporters, however, there may be an EEI filing requirement that would otherwise not have existed, such as for the export of a firearm that would be controlled under ECCN 0A501.a authorized under License Exception BAG or the export of certain firearms or ammunition to Canada.

The proposed rule would include a requirement that, for all exports of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing requirements, the exporter provide to CBP the serial number, make, model, and caliber for each firearm being exported. The Department of Commerce is carrying over the existing CBP filing requirements for items transferred from the USML to the CCL. The Department of Homeland Security currently is collecting these data elements for firearms "subject to the ITAR" under OMB Control Number 1651–0010 (CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad). There is no change to the information being collected or to the burden hours as a result of this rule. Separate from this rule, CBP will update the information collection to reflect the use of AES or some other simplified electronic alternative to CBP Form 4457.

Any comments regarding the collection of information associated with this proposed rule, including suggestions for reducing the burden, may be sent to Jasmeet K. Seehra, Office of Management and Budget (OMB), by email to *Jasmeet_K._Seehra@omb.eop.gov,* or by fax to (202) 395–7285.

## Administrative Procedure Act and Regulatory Flexibility Act Requirements

The Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 601 *et seq.,* generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to the notice and comment rulemaking requirements under the Administrative Procedure Act (5 U.S.C. 553) or any other statute, unless the agency certifies that the proposed rule would not have a significant economic impact on a substantial number of small entities. Under section 605(b) of the RFA, however, if the head of an agency certifies that a proposed rule would not have a significant impact on a

substantial number of small entities, the statute does not require the agency to prepare a regulatory flexibility analysis. Pursuant to section 605(b), the Chief Counsel for Regulation, Department of Commerce, submitted a memorandum to the Chief Counsel for Advocacy, Small Business Administration, certifying that this proposed rule would not have a significant impact on a substantial number of small entities.

### Number of Small Entities

The Bureau of Industry and Security (BIS) does not collect data on the size of entities that apply for and are issued export licenses. Although BIS is unable to estimate the exact number of small entities that would be affected by this proposed rule, it acknowledges that this proposed rule would affect some unknown number.

### Economic Impact

This proposed rule and the companion State rule would assist in making the United States Munitions List (22 CFR part 121) (USML) into a more "positive" list, *i.e.,* a list that does not use generic, catch-all controls on any "part," "component," "accessory," "attachment," or "end item" that was in any way specifically modified for a defense article, regardless of the article's military or intelligence significance or non-military applications. At the same time, articles that are determined no longer to warrant control on the USML would become controlled on the Commerce Control List (CCL). Such items, along with certain military items that currently are on the CCL, would be identified in specific Export Control Classification Numbers (ECCNs) known as the "600 series" ECCNs. In addition, some items currently on the CCL would move from existing ECCNs to the new "600 series" ECCNs. This proposed rule addresses USML Category I, II and III articles that would be removed from the USML and added to the CCL.

Category I of the USML, entitled "Firearms, Close Assault Weapons and Combat Shotguns," consists of small arms (typically up to a caliber of 0.50 inches) and related parts, components, accessories, attachments, production equipment, software, and technology. Fully automatic firearms would remain on the USML as would parts and components that are used only in fully automatic firearms. However, non-automatic and semi-automatic firearms, their parts and components and the parts and components common to them and to fully automatic firearms would become subject to the EAR. Department of State officials have informed BIS that license applications for such parts and

components are a high percentage of the license applications for USML articles reviewed by that department. Such parts and components are more likely to be produced by small businesses than are complete firearms.

Category II of the USML, entitled "Guns and Armament," encompasses large guns (caliber over 0.50 inches) such as howitzers, mortars, cannon and recoilless rifles along with related parts, components, accessories, attachments, production equipment, software and technology. Modern large guns would remain on the USML. Guns and armament manufactured between 1890 and 1919 would be controlled on the CCL. Unless specified elsewhere on the CCL or the USML, "parts," "components," "accessories," "attachments," production equipment, "software" and "technology" for large guns would be controlled on the CCL.

Category III of the USML, entitled "Ammunition/Ordnance," encompasses ammunition for a wide variety of firearms that may have military, law enforcement or civilian applications. Ammunition that has only or primarily military applications would remain on the USML as would parts, production equipment, "software" and "technology" therefor. Ammunition for firearms that have primarily civilian and sporting application and ammunition that is used in civilian, law enforcement and military small arms would move to the CCL. In most instances, these firearms have a caliber of 0.50 inches or less although ammunition for manual firearms with a caliber up to 0.72 inches is included. The proposed rule also applies to "parts," "components," production equipment, and "technology" related to that ammunition.

Changing the jurisdictional status of the articles described in this proposed rule would reduce the burden on small entities (and other entities as well) through elimination of some license requirements, simpler license application procedures, and reduced (or eliminated) registration fees. In addition, small entities would be able to take advantage of *de minimis* treatment under the EAR for all items that this proposed rule would transfer from the USML to the CCL, provided those items meet the applicable *de minimis* threshold level. In practice, the greatest impact of this proposed rule on small entities would likely be reduced administrative costs and reduced delay for exports of items that are now on the USML but would become subject to the EAR.

Small entities (and other entities as well) that are affected by this proposed

rule would benefit from the elimination of some license requirements implemented by this proposed rule. Six types of "parts" and "components," identified in ECCN 0A501.y, would be designated immediately as "parts" and "components" that, even if "specially designed" for a military use or a Category I firearm, have little or no military significance. These "parts" and "components," which under the ITAR require a license to nearly all destinations would, under the EAR, require a license to Cuba, Iran, Sudan, North Korea, Syria and the People's Republic of China as well as to destinations subject to United Nations arms embargoes.

Furthermore, many exports and reexports of Category I firearms along with "parts" and "components" that would be placed on the CCL by this proposed rule, would become eligible for license exceptions that apply to shipments to United States government agencies, shipments valued at $500 or less, "parts" and "components" being exported for use as replacement parts, and temporary exports. Similarly, exports and reexports of Category II firearms "parts," "components," "accessories," and "attachments" that would be placed on the CCL by this proposed rule would become eligible for those license exceptions, although the value limit would be $3,000. Category III ammunition placed on the CCL by this proposed rule would also become eligible with a value limit of $100.

Even for exports and reexports in which a license would be required, the process would be simpler and less costly under the EAR. When a USML Category I, II, or III article is moved to the CCL, the number of destinations for which a license is required would remain largely unchanged. However, the burden on the license applicant would decrease because the licensing procedure for CCL items is simpler and more flexible than the licensing procedure for USML defense articles.

Under the USML licensing procedure, an applicant must include a purchase order or contract with its application. There is no such requirement under the CCL licensing procedure. This difference gives the CCL applicant at least two advantages. First, the applicant has a way of determining whether the U.S. Government would authorize the transaction before it enters into potentially lengthy, complex and expensive sales presentations or contract negotiations. Under the USML licensing procedure, the applicant would need to caveat all sales presentations with a reference to the need for government approval and

would more likely have to engage in substantial effort and expense with the risk that the government might reject the application. Second, a CCL license applicant need not limit its application to the quantity or value of one purchase order or contract. It may apply for a license to cover all of its expected exports or reexports to a particular consignee over the life of a license, reducing the total number of licenses for which the applicant must apply.

In addition, many applicants exporting or reexporting items that this proposed rule would transfer from the USML to the CCL would realize cost savings through the elimination of some or all registration fees currently assessed under the ITAR. This is particularly relevant to small- and medium-sized companies that manufacture or export parts and components for Category I firearms. Registration fees for manufacturers and exporters of articles on the USML start at $2,250 per year, increase to $2,750 for organizations applying for one to ten licenses per year and further increase to $2,750 plus $250 per license application (subject to a maximum of three percent of total application value) for those who need to apply for more than ten licenses per year. There are no registration or application processing fees for applications to export items currently listed on the CCL. Once the items that are the subject to this proposed rulemaking are removed from the USML and added to the CCL, entities currently applying for licenses from the Department of State could find their registration fees reduced if the number of USML licenses those entities need declines. If an entity's entire product line is moved to the CCL, then its ITAR registration and registration fee requirement would be eliminated.

Finally, *de minimis* treatment under the EAR would become available for all items that this proposed rule would transfer from the USML to the CCL. Items subject to the ITAR remain subject to the ITAR when they are incorporated abroad into a foreign-made product regardless of the percentage of U.S. content in that foreign-made product. This proposed rule would apply that same principle to "600 series" items only if the foreign-made item is being exported to a country that is subject to a United States arms embargo. In all other cases, foreign-made products that incorporate items that this proposed rule would move to the CCL would be subject to the EAR only if their total controlled U.S.-origin content exceeded 25 percent. Because including small amounts of U.S.-origin content would not subject foreign-made products to the

EAR, foreign manufacturers would have less incentive to avoid such U.S.-origin "parts" and "components," a development that potentially would mean greater sales for U.S. suppliers, including small entities.

For items currently on the CCL that would be moved from existing ECCNs to the new "600 series," license exception availability would be narrowed somewhat. However, BIS believes that the increased burden imposed by those actions would be offset substantially by the reduction in burden attributable to the moving of items from the USML to CCL and the compliance benefits associated with the consolidation of all WAML items subject to the EAR in one series of ECCNs.

*Conclusion*

BIS is unable to determine the precise number of small entities that would be affected by this proposed rule. Based on the facts and conclusions set forth above, BIS believes that any burdens imposed by this proposed rule would be offset by a reduction in the number of items that would require a license, simpler export license applications, reduced or eliminated registration fees, and application of a *de minimis* threshold for foreign-made items incorporating U.S.-origin "parts" and "components," which would reduce the incentive for foreign buyers to design out or avoid U.S.-origin content. For these reasons, the Chief Counsel for Regulation of the Department of Commerce certified to the Chief Counsel for Advocacy of the Small Business Administration that this proposed rule, if adopted in final form, would not have a significant economic impact on a substantial number of small entities.

List of Subjects

*15 CFR Parts 736 and 772*

Exports.

*15 CFR Parts 740 and 748*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 742*

Exports, Terrorism.

*15 CFR Part 743*

Administrative practice and procedure, Reporting and recordkeeping requirements.

*15 CFR Part 744*

Exports, Reporting and recordkeeping requirements, Terrorism.

*15 CFR Parts 746 and 774*

Exports, Reporting and recordkeeping requirements.

*15 CFR Part 758*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 762*

Administrative practice and procedure, Business and industry, Confidential business information, Exports, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772 and 774 of the Export Administration Regulations (15 CFR parts 730–774) are proposed to be amended as follows:

## PART 736—GENERAL PROHIBITIONS

■ 1. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

■ 2. Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

**Supplement No. 1 to Part 736—General Orders**

\* \* \* \* \*

(e) \* \* \*

(3) *Prior commodity jurisdiction determinations.* If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for purposes of the 9x515 ECCNs), then the item is per se not within the scope of a "600 series" ECCN, a 0x5zz ECCN, or a 9x515 ECCN. If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.,* the item was designated EAR99), the item shall remain designated EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

\* \* \* \* \*

## PART 740—LICENSE EXCEPTIONS

■ 3. The authority citation for 15 CFR part 740 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 7201 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 4. Section 740.9 is amended by:
■ a. Adding five sentences at the end of paragraph (a) introductory text;
■ b. Adding one sentence at the end of paragraph (b)(1) introductory text;
■ c. Adding paragraph (b)(5); and
■ d. Redesignating notes 1 through 3 to paragraph (b) as notes 2 through 4 to paragraph (b);

The additions read as follows:

**§ 740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP).**

\* \* \* \* \*

(a) \* \* \* This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair"). In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment. In accordance with the requirements in § 758.1(b)(10) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES. In accordance with the exclusions in License Exception TMP under paragraph (b)(5), the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured

in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5).

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \* No provision of paragraph (b) of this section, other than paragraph (b)(3), (4), or (5), may be used to export firearms controlled by ECCN 0A501.a, .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\* \* \* \* \*

(5) *Exports of firearms and certain shotguns temporarily in the United States.* This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.,* destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.,* destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exemption TMP (15 CFR 740.9(b)(5))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition,

demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(5)(iv)(B) of this section to U.S. Customs and Border Protection at the time of export.

*Note 1 to paragraph (b)(5): In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

\* \* \* \* \*

■ 5. Section 740.11 is amended by:
■ a. Adding a sentence at the end of the introductory text;
■ b. Adding Note 2 to paragraph (b)(2); and
■ c. Redesignating note 1 to paragraph (c)(1) as note 3 to paragraph (c)(1) and notes 1 and 2 to paragraph (e) as notes 4 and 5 to paragraph (e).

The additions read as follows:

### §740.11 Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).

\* \* \* Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) of this section. Any item listed in a 0x5zz ECCN for export, reexport, or transfer (in-country) to an E:1 country are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) solely for U.S. government official use of this section.

\* \* \* \* \*

*Note 2 to paragraph (b)(2): Items controlled for NS, MT, CB, NP, FC or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end-users of a government in a Country Group E:1, or E:2 country.*

\* \* \* \* \*

■ 6. Section 740.14 is amended by revising paragraph (b)(4), revising the heading to paragraph (e), and by adding paragraphs (e)(3) and (4) to read as follows:

### §740.14 Baggage (BAG).

\* \* \* \* \*

(b) \* \* \*

(4) *Tools of trade.* Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving. For special provisions regarding firearms and ammunition, see paragraph (e) of this section. For special provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section. For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph (b)(4), see paragraph (g) of this section. For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

\* \* \* \* \*

(e) *Special provisions for firearms and ammunition.* \* \* \*

(3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii) "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control. Accordingly, except as provided in paragraph (e)(4) of this section, firearms, "parts," "components," "accessories," "attachments," and ammunition, may not be exported permanently under this License Exception. All firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under this License Exception must be returned to the United States.

(v) Travelers leaving the United States temporarily are required to declare the firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonresident alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the provisions of Department of Justice Regulations at 27 CFR 478.115(d).

\* \* \* \* \*

### §740.16 [Amended]

■ 7. Section 740.16 is amended by removing "0A987" from paragraph (b)(2)(iv) and adding in its place "0A504".

■ 8. Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

### §740.20 License Exception Strategic Trade Authorization (STA).

\* \* \* \* \*

(b) \* \* \*

(2) \* \* \*

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503, 0E504, 0E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

\* \* \* \* \*

■ 9. Add Supplement No. 4 to part 740 to read as follows:

### Supplement No. 4 to Part 740—Annex A Firearm Models

(a) *Pistols/revolvers.*

(1) German Model P08 Pistol = SMCR.
(2) IZH 34M, .22 Target pistol.
(3) IZH 35M, .22 caliber Target pistol.
(4) Mauser Model 1896 pistol = SMCR.
(5) MC–57–1 pistol.
(6) MC–1–5 pistol.
(7) Polish Vis Model 35 pistol = SMCR.
(8) Soviet Nagant revolver = SMCR.
(9) TOZ 35, .22 caliber Target pistol.
(10) MTs 440.
(11) MTs 57–1.
(12) MTs 59–1.
(13) MTs 1–5.
(14) TOZ–35M (starter pistol).
(15) Biathlon–7K.
(b) *Rifles.*
(1) BARS–4 Bolt Action carbine.

(2) Biathlon target rifle, .22.

(3) British Enfield rifle = SMCR.

(4) CM2, .22 target rifle (also known as SM2, .22).

(5) German model 98K = SMCR.

(6) German model G41 = SMCR.

(7) German model G43 = SMCR.

(8) IZH–94.

(9) LOS–7, bolt action.

(10) MC–7–07.

(11) MC–18–3.

(12) MC–19–07.

(13) MC–105–01.

(14) MC–112–02.

(15) MC–113–02.

(16) MC–115–1.

(17) MC–125/127.

(18) MC–126.

(19) MC–128.

(20) Saiga.

(21) Soviet Model 38 carbine = SMCR.

(22) Soviet Model 44 carbine-SMCR.

(23) Soviet Model 91/30 rifle = SMCR.

(24) TOZ 18, .22 bolt action.

(25) TOZ 55.

(26) TOZ 78.

(27) Ural Target, .22lr.

(28) VEPR rifle.

(29) Winchester Model 1895, Russian Model rifle = SMCR.

(30) Sever—double barrel.

(31) IZH18MH single barrel break action.

(32) MP–251 over/under rifle.

(33) MP–221 double barrel rifle.

(34) MP–141K.

(35) MP–161K.

(36) MTs 116–1.

(37) MTs 116M.

(38) MTs 112–02.

(39) MTs 115–1.

(40) MTs 113–02.

(41) MTs 105–01.

(42) MTs 105–05.

(43) MTs 7–17 combination gun.

(44) MTs 7–12–07 rifle/shotgun.

(45) MTs 7–07.

(46) MTs 109–12–07 rifle.

(47) MTs 109–07 rifle.

(48) MTs 106–07 combination.

(49) MTs 19–97.

(50) MTs 19–09.

(51) MTs 18–3M.

(52) MTs 125.

(53) MTs 126.

(54) MTs 127.

(55) Berkut–2.

(56) Berkut–2M1.

(57) Berkut–3.

(58) Berkut–2–1.

(59) Berkut–2M2.

(60) Berkut–3–1.

(61) Ots–25.

(62) MTs 20–07.

(63) LOS–7–1.

(64) LOS–7–2.

(65) LOS–9–1.

(66) Sobol (Sable).

(67) Rekord.

(68) Bars—4–1.

(69) Saiga.

(70) Saiga–M.

(71) Saiga–308.

(72) Saiga–308–1.

(73) Saiga–308–2.

(74) Saiga–9.

(75) Korshun.

(76) Ural–5–1.

(77) Ural 6–1.

(78) Ural–6–2.

(79) SM–2.

(80) Biatlon–7–3.

(81) Biatlon–7–4.

(82) Rekord–1.

(83) Rekord–2.

(84) Rekord–CISM.

(85) Rekord–1–308.

(86) Rekord–2–308.

(87) Rekord–1–308–CISM.

(88) VEPR.

(89) VEPR Super.

(90) VEPR Pioner.

(91) VEPR Safari.

(92) TOZ 109.

(93) KO 44–1.

(94) TOZ 78–01.

(95) KO 44.

(96) TOZ 99.

(97) TOZ 99–01.

(98) TOZ 55–01 Zubr.

(99) TOZ 55–2 Zubr.

(100) TOZ 120 Zubr.

(101) MTs 111.

(102) MTs 109.

(103) TOZ 122.

(104) TOZ 125.

(105) TOZ 28.

(106) TOZ 300.

## PART 742—CONTROL POLICY—CCL BASED CONTROLS

■ 10. The authority citation for part 742 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 3201 *et seq.;* 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

■ 11. Section 742.6 is amended by revising the first and sixth sentences of paragraph (b)(1)(i) and adding a seventh sentence at the end of paragraph (b)(1)(i) to read as follows:

### §742.6  Regional stability.

\*    \*    \*    \*    \*

(b) \* \* \*

(1) \* \* \*

(i) Applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0A504, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and "600 series" items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. \* \* \* When destined to the People's Republic of China or a country listed in Country Group E:1 in supplement no. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial. In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

\*    \*    \*    \*    \*

■ 12. Section 742.7 is amended by revising paragraphs (a)(1) through (4) and (c) to read as follows:

### §742.7  Crime control and detection.

(a) \* \* \*

(1) Crime control and detection instruments and equipment and related "technology" and "software" identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section. A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR). Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979, 0E502, 0E505 ("technology" for "development" or for "production" of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2) Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License

Requirements'' section regardless of end-user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3) Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the ''License Requirements'' section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4) Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982. Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

\* \* \* \* \*

(c) *Contract sanctity.* Contract sanctity date: August 22, 2000. Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503 and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

\* \* \* \* \*

■ 13. Section 742.17 is amended by:
■ a. Revising the first sentence of paragraph (a); and
■ b. Revising paragraph (f) to read as follows:

### §742.17  Exports of firearms to OAS member countries.

(a) *License requirements.* BIS maintains a licensing system for the export of firearms and related items to all OAS member countries. \* \* \*

\* \* \* \* \*

(f) *Items/Commodities.* Items requiring a license under this section are ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d). (See Supplement No. 1 to part 774 of the EAR).

\* \* \* \* \*

### §742.19  [AMENDED]

■ 14. Section 742.19(a)(1) is amended by:
■ a. Removing ''0A986'' and adding in its place ''0A505.c''; and
■ b. Removing ''0B986'' and adding in its place ''0B505.c''.

### PART 743—SPECIAL REPORTING AND NOTIFICATION

■ 15. The authority citation for 15 CFR part 743 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR,

2001 Comp., p. 783; E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; 78 FR 16129; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 16. Section 743.4 is amended by adding paragraphs (c)(1)(i) and (c)(2)(i) and revising paragraph (h) to read as follows:

### §743.4  Conventional arms reporting.

\* \* \* \* \*

(c) \* \* \*
(1) \* \* \*
(i) ECCN 0A501.a and .b.

\* \* \* \* \*

(2) \* \* \*
(i) ECCN 0A501.a and .b.

\* \* \* \* \*

(h) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel. (202) 482–0092, Fax: (202) 482–4094. Information concerning the reporting requirements for items identified in paragraphs (c)(1) and (2) of this section is available from the Office of Nonproliferation and Treaty Compliance (NPTC), Tel. (202) 482–4188, Fax: (202) 482–4145.

### PART 744—CONTROL POLICY: END-USER AND END-USE BASED

■ 17. The authority citation for 15 CFR part 744 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 3201 *et seq.;* 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 12947, 60 FR 5079, 3 CFR, 1995 Comp., p. 356; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of September 18, 2017, 82 FR 43825 (September 19, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017); Notice of January 17, 2018, 83 FR 2731 (January 18, 2018).

### §744.9  [AMENDED]

■ 18. Section 744.9 is amended by removing ''0A987'' from paragraphs (a)(1) and (b) and adding in its place ''0A504''.

### PART 746—EMBARGOES AND OTHER SPECIAL CONTROLS

■ 19. The authority citation for 15 CFR part 746 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 287c; Sec 1503, Pub. L. 108–11, 117 Stat. 559; 22 U.S.C. 6004; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O.

12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007–7, 72 FR 1899, 3 CFR, 2006 Comp., p. 325; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

### §746.3  [AMENDED]

■ 20. Section 746.3 is amended by removing ''0A986'' from paragraph (b)(2) and adding in its place ''0A505.c''.

### §746.7  [AMENDED]

■ 21. Section 746.7 is amended in paragraph (a)(1) by:
■ a. Adding ''0A503'' immediately before ''0A980''; and
■ b. Removing ''0A985''.

### PART 748—APPLICATIONS (CLASSIFICATION, ADVISORY, AND LICENSE) AND DOCUMENTATION

■ 22. The authority citation for 15 CFR part 748 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 23. Section 748.12 is amended by:
■ a. Revising the heading;
■ b. Adding introductory text;
■ c. Revising paragraphs (a) introductory text and (a)(1);
■ d. Redesignating the note to paragraph (c)(8) as note 1 to paragraph (c)(8); and
■ e. Adding paragraph (e).
The revisions and additions read as follows:

### §748.12  Firearms import certificate or import permit.

License applications for certain firearms and related commodities require support documents in accordance with this section. For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section. For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraphs (e) through (g) of this section.

(a) *Requirement to obtain document for OAS member states.* Unless an exception in §748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that

are destined for member countries of the OAS. This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1) *Items subject to requirement.* Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) or 0A505 (except 0A505.d).

\* \* \* \* \*

(e) *Requirement to obtain an import certificate or permit for other than OAS member states.* If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1) A license is not required for the export or reexport; or

(2) The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraphs (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

**Note 2 to paragraph (e).** *Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) of this section because that statement is not issued by a government.*

## PART 758—EXPORT CLEARANCE REQUIREMENTS

■ 24. The authority citation for part 758 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 25. Section 758.1 is amended as follows:
■ a. By revising paragraphs (b)(7), (8) and (9) and adding paragraph (b)(10);
■ b. By revising paragraph (c)(1); and

■ c. By adding paragraph (g)(4) to read as follows:

### § 758.1 The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).

\* \* \* \* \*

(b) \* \* \*

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as described in § 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement No. 6 to part 744 of the EAR), regardless of value or destination;

(9) For items that fall under ECCNs that list CC Column 1 and 3 and RS Column 2 (see Supplement No. 1 to part 738 of the EAR) as reasons for control and such items are for export, regardless of value, to India; or

(10) For all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

(c) \* \* \*

(1) License Exception Baggage (BAG), except for exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, as set forth in § 740.14 of the EAR. See 15 CFR 30.37(x) of the FTR;

\* \* \* \* \*

(g) \* \* \*

(4) *Exports of Firearms and Related Items.* For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model number, caliber and serial number of the exported items.

\* \* \* \* \*

■ 26. Add § 758.10 to read as follows:

### § 758.10 Entry clearance requirements for temporary imports.

(a) *Scope.* This section specifies the temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27 CFR 447.21). These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502. Items that are temporarily exported under the EAR for permanent return to the United

States are outside of the scope of this section because the items are not considered temporary imports, but these items must have met the export clearance requirements specified in § 758.1 of the EAR. See paragraph (a)(2) of this section for permanent import requirements.

(1) An authorization under the EAR is *not* required for the temporary import of "items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL. Temporary imports of firearms described in this section must meet the entry clearance requirements specified in paragraph (b) of this section.

(2) Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports.* To the satisfaction of the Port Directors of U.S. Customs and Border Protection, the temporary importer must comply with the following procedures:

(1) At the time of entry into the U.S. of the temporary import:

(i) Provide the following statement to U.S. Customs and Border Protection: "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));"

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

**Note 1 to paragraph (b)(1):** *In accordance with the exclusions in License Exception TMP under § 740.9(b)(5) of the EAR, the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova,*

*Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under § 740.9(b)(5).*

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(10) of the EAR file the export information with CBP by filing EEI in AES, noting the applicable EAR authorization as the authority for the export, and provide as requested by CBP, the entry document number or a copy of the CBP document under which the "item" subject to the EAR on the USMIL was temporarily imported. *See* also the additional requirements inspection in § 758.1(g)(4).

## PART 762—RECORDKEEPING

■ 27. The authority citation for part 762 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 28. Section 762.2 is amended by removing "; and," at the end of paragraph (a)(10), redesignating paragraph (a)(11) as paragraph (a)(12), and adding a new paragraph (a)(11) to read as follows:

### § 762.2  Records to be retained.

(a) * * *

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been exported. The "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record; and

* * * * *

■ 29. Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

### § 762.3  Records exempt from recordkeeping requirements.

(a) * * *

(5) Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with

barrel length less than 18 inches controlled in 0A502;

* * * * *

## PART 772—DEFINITIONS OF TERMS

■ 30. The authority citation for part 772 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

### § 772.1  [AMENDED]

■ 31. In § 772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c".

## PART 774—THE COMMERCE CONTROL LIST

■ 32. The authority citation for 15 CFR part 774 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c, 22 U.S.C. 3201 *et seq.;* 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824a; 50 U.S.C. 4305; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 33. In Supplement No. 1 to part 774, Category 0, revise Export Control Classification Number (ECCN) 0A018 to read as follows:

### Supplement No. 1 to Part 774—The Commerce Control List

* * * * *

**0A018  Items on the Wassenaar Munitions List (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, AT, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to entire entry. | NS Column 1 |
| AT applies to entire entry. | AT Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3,000 for 0A018.b, $1,500 for 0A018.c and .d
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See also 0A979, 0A988, and 22 CFR 121.1 Categories I(a), III(b–d), and X(a). (2) See ECCN 0A617.y.1 and .y.2 for items formerly controlled by ECCN 0A018.a. (3) See ECCN 1A613.c for military helmets providing less than NIJ Type IV

protection and ECCN 1A613.y.1 for conventional military steel helmets that, immediately prior to July 1, 2014 were classified under 0A018.d and 0A988. (4) See 22 CFR 121.1 Category X(a)(5) and (a)(6) for controls on other military helmets.
*Related Definitions:* N/A
*Items:*

a. [RESERVED]
b. "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130);

***Note to 0A018.b:*** *0A018.b does not apply to "components" "specially designed" for blank or dummy ammunition as follows:*
*a. Ammunition crimped without a projectile (blank star);*
*b. Dummy ammunition with a pierced powder chamber;*
*c. Other blank and dummy ammunition, not incorporating components designed for live ammunition.*

c. [RESERVED]
d. [RESERVED]

■ 34. In Supplement No. 1 to part 774, Category, add, between entries for ECCNs 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504, and 0A505 to read as follows:

**0A501  Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).**

**License Requirements**

*Reason for Control:* NS, RS, FC, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to entire entry except 0A501.y. | NS Column 1 |
| RS applies to entire entry except 0A501.y. | RS Column 1 |
| FC applies to entire entry except 0A501.y. | FC Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $500 for 0A501.c, .d, and .x, $500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in this entry.

**List of Items Controlled**

*Related Controls:* (1) Firearms that are fully automatic, and magazines with a capacity of 50 rounds or greater, are "subject to the ITAR." (2) See ECCN 0A502 for shotguns and their "parts" and "components" that are subject to the EAR. (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Related Definitions:* N/A

*Items:*

a. Non-automatic and semi-automatic firearms of caliber less than or equal to .50 inches (12.7 mm).

b. Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c. The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)): Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.,* triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d. Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

e. Receivers (frames) and complete breech mechanisms, including castings, forgings or stampings thereof, "specially designed" for a commodity by controlled by paragraph .a or .b of this entry.

f. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y. Specific "parts," "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL.

y.1. Stocks or grips, that do not contain any fire control "parts" or "components" (*e.g.,* triggers, hammers, sears, disconnectors);

y.2. Scope mounts or accessory rails;

y.3. Iron sights;

y.4. Sling swivels;

y.5. Butt plates or recoil pads; and

y.6. Bayonets.

***Technical Note 1 to 0A501:*** *The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."*

***Note 1 to 0A501:*** *Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.*

**0A502 Shotguns; complete trigger mechanisms; magazines and magazine extension tubes; complete breech mechanisms; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

**License Requirements**

*Reason for Control:* RS, CC, FC, UN, AT, NS

| Control(s) | Country chart (see supp. No. 1 to part 738) |
| --- | --- |
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | NS Column 1 |
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | RS Column 1 |
| FC applies to entire entry. | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user. | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of end user. | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement. | CC Column 3 |
| UN applies to entire entry. | See §746.1(b) of the EAR for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm). | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* This entry does not control combat shotguns and fully automatic shotguns. Those shotguns are "subject to the ITAR."

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

**0A503 Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles;** except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s.

**License Requirements**

*Reason for Control:* CC, UN

| Control(s) | Country chart (see supp. No. 1 to part 738) |
| --- | --- |
| CC applies to entire entry. | A license is required for ALL destinations, except Canada, regardless of end use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information) |
| UN applies to entire entry. | See §746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 For a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982. Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

**0A504 Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* FC, RS, CC, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| RS applies to paragraph .i. | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, d, .e, .g and .i of this entry. | FC Column 1 |
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See §746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A

*CIV:* N/A

## List of Items Controlled

*Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 μA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 of the EAR imposes a license requirement on certain commodities described in 0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

*Related Definitions:* N/A

*Items:*

a. Telescopic sights.

b. Holographic sights.

c. Reflex or "red dot" sights.

d. Reticle sights.

e. Other sighting devices that contain optical elements.

f. Laser aiming devices or laser illuminators "specially designed" for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

*Note 1 to 0A504.f: 0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.*

g. Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e or .i.

h. [Reserved]

i. Riflescopes that were not "subject to the EAR" as of [DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE] and are "specially designed" for use in firearms that are "subject to the ITAR."

*Note 2 to paragraph i: For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" in § 772.1 of the EAR is what is used to determine whether the riflescope is "specially designed."*

## 0A505 Ammunition as follows (see List of Items Controlled).

### License Requirements

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x. | NS Column 1 |
| RS applies to 0A505.a and .x. | RS Column 1 |
| CC applies to 0A505.b. | CC Column 1 |
| FC applies to entire entry except 0A505.d. | FC Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to 0A505.a, .d and .x. | AT Column 1 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| AT applies to 0A505.c. | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons. The Commerce Country Chart is not designed to determine AT licensing requirements for this entry. See § 742.19 of the EAR for additional information |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $100 for items in 0A505.x

*GBS:* N/A

*CIV:* N/A

### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.

### List of Items Controlled

*Related Controls:* (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR." (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions:* N/A

*Items:*

a. Ammunition for firearms controlled by ECCN 0A501 and not enumerated in paragraph .b, .c or .d of this entry or in USML Category III.

b. Buckshot (No. 4 .24" diameter and larger) shotgun shells.

c. Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

*Note 1 to 0A505.c: Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.*

d. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

*Note 2 to 0A505.x: The controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.*

*Note 3 to 0A505.x: The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.*

■ 35. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

## 0A602 Guns and Armament as follows (see List of Items Controlled).

### License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $500

*GBS:* N/A

*CIV:* N/A

### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

### List of Items Controlled

*Related Controls:* (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles are "subject to the ITAR." (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions:* N/A

*Items:*

a. Guns and armament manufactured between 1890 and 1919.

b. Military flame throwers with an effective range less than 20 meters.

c. through w. [Reserved]

x. "Parts," and "components," that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

*Note 1 to 0A602: "Parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.*

*Note 2 to 0A602: Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants designated EAR99.*

**Supplement No. 1 to Part 774— [Amended]**

■ 36. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0A918, 0A984, 0A985, 0A986, and 0A987.

■ 37. In Supplement No. 1 to part 774, Category 0, add, before the entry for ECCN 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501** Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment for ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except equipment for ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

a. Small arms chambering machines.
b. Small arms deep hole drilling machines and drills therefor.
c. Small arms rifling machines.
d. Small arms spill boring machines.
e. Dies, fixtures, and other tooling "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I.

**0B505** Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to paragraphs .a and .x. | NS Column 1 |
| RS applies to paragraphs .a and .x. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to paragraphs .a, .d and .x. | AT Column 1 |
| AT applies to paragraph .c. | A license is required for export or reexport of these items to North Korea for anti-terrorism reasons |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B505.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

a. Tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.

b. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.

c. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.

d. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.

e. through .w [Reserved]

x. "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

■ 38. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602** Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B602.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

a. The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:
a.1. Gun barrel rifling and broaching machines and tools therefor;
a.2. Gun barrel rifling machines;
a.3. Gun barrel trepanning machines;
a.4. Gun boring and turning machines;
a.5. Gun honing machines of 6 feet (183 cm) stroke or more;
a.6. Gun jump screw lathes;
a.7. Gun rifling machines; and
a. 8. Gun straightening presses.
b. Jigs and fixtures and other metalworking implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.
c. Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.
d. Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

**Supplement No. 1 to Part 774— [Amended]**

■ 39. In Supplement No. 1 to part 774, Category 0, remove ECCN 0B986.

■ 40. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

**0D501** "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A501 or 0B501.

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR" (See 22 CFR 121.1, Category I).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

**0D505** "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A505 or 0B505.

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x. | NS Column 1 |
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| AT applies to "software" for commodities in ECCN 0A505.a, .d or .x and equipment in ECCN 0B505.a, .d or .x. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR" (See 22 CFR 121.1, Category III).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 41. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

**0D602** "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any item in 0D602.

**List of Items Controlled**

*Related Controls:* (1) "Software" required for and directly related to articles enumerated in USML Category II is controlled under USML Category II(k). (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions:* N/A
*Items:* "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

■ 42. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E018 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

**0E501** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."
*Related Definitions:* N/A
Items:
a. "Technology" "required" for the "development," or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.
b. "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

**0E502** "Technology" "required" for the "development" or "production," of commodities controlled by 0A502.

**License Requirements**

*Reason for Control:* CC, UN

| Controls | Country chart (see Supp. No. 1 part 738) |
|---|---|
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See §746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E504** "Technology" "required" for the "development," or "production" of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.

**License Requirements**

*Reason for Control:* RS, UN, AT

| Controls | Country chart (see Supp. No. 1 part 738) |
|---|---|
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See §746.1(b) of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E505** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.

**License Requirements**

*Reason for Control:* NS, RS, UN, CC, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505. | NS Column 1 |
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for "software" for those commodities and that equipment in 0D505. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b. | CC Column 1 |
| AT applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a, .d and .x. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR" (See 22 CFR 121.1, Category III).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 43. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E521 and 0E604, an entry for ECCN 0E602:

**0E602** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any item in 0E602.

**List of Items Controlled**

*Related Controls:* Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."
*Related Definitions:* N/A
*Items:* "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

**Supplement No. 1 to Part 774— [Amended]**

■ 44. In Supplement No. 1 to part 774, Category 0, remove ECCN 0E918.

■ 45. In Supplement No. 1 to part 774, Category 0, revise ECCN 0E982 to read as follows.

**0E982** "Technology" exclusively for the "development" or "production" of equipment controlled by 0A982 or 0A503.

**License Requirements**

*Reason for Control:* CC

| Control(s) |
|---|

CC applies to "technology" for items controlled by 0A982 or 0A503. A license is required for ALL destinations, except Canada, regardless of end-use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information.)

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

## Supplement No. 1 to Part 774—[Amended]

■ 46. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0E984 and 0E987.

■ 47. In Supplement No. 1 to part 774, Category 1, revise ECCN 1A984 to read as follows:

**1A984   Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less; smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and "parts" and "components" "specially designed" therefor, n.e.s.**

### License Requirements

*Reason for Control:* CC

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | CC Column 1 |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

### List of Items Controlled

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

■ 48. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B004 to read as follows:

**2B004   Hot "isostatic presses" having all of the characteristics described in the List of Items Controlled, and "specially designed" "components" and "accessories" therefor.**

### License Requirements

*Reason for Control:* NS, MT NP, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 2 |
| MT applies to entire entry. | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa. | NP Column 1 |
| AT applies to entire entry. | AT Column 1 |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

### List of Items Controlled

*Related Controls:* (1) See ECCN *2D001* for software for items controlled under this entry. (2) See ECCNs *2E001* ("development"), *2E002* ("production"), and *2E101* ("use") for technology for items controlled under this entry. (3) For "specially designed" dies, molds and tooling, see ECCNs 1B003, 0B501, 0B602, 0B606, 9B004, and 9B009. (4) For additional controls on dies, molds and tooling, see ECCNs 1B101.d, *2B104* and *2B204*. (5) Also see ECCNs *2B117* and *2B999.a.*
*Related Definitions:* N/A
*Items:*

a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*

b. Having any of the following:

b.1. A maximum working pressure exceeding 207 MPa;

b.2. A controlled thermal environment exceeding 1,773 K (1,500 °C); *or*

b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

***Technical Note:*** *The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.*

■ 49. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B018 to read as follows:

**2B018   Equipment on the Wassenaar Arrangement Munitions List.**

No commodities currently are controlled by this entry. Commodities formerly controlled by paragraphs .a through .d, .m and .s of this entry are controlled in ECCN 0B606. Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602. Commodities formerly controlled by paragraphs .o through .r of this entry are controlled in ECCN 0B501. Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are "specially designed" for the "production" of the items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

■ 50. In Supplement No. 1 to part 774, Category 2, revise ECCN 2D018 to read as follows:

**2D018   "Software" for the "development," "production," or "use" of equipment controlled by 2B018.**

No software is currently controlled under this entry. See ECCNs 0D501, 0D602 and 0D606 for software formerly controlled under this entry.

■ 51. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E001 to read as follows:

**2E001   "Technology" according to the General Technology Note for the "development" of equipment or "software" controlled by 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).**

### License Requirements

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for items controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002. | NS Column 1 |
| MT applies to "technology" for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons. | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201 or 2D202 for NP reasons. | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons. | NP Column 2 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CB applies to "technology" for equipment controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* See also *2E101, 2E201,* and *2E301*
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.
   **Note:** *ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.*

■ 52. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E002 to read as follows:

**2E002** "Technology" according to the General Technology Note for the "production" of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).

**License Requirements**

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart ≤(see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment controlled by 2A001, 2B001 to 2B009. | NS Column 1 |

| Control(s) | Country chart ≤(see Supp. No. 1 to part 738) |
|---|---|
| MT applies to "technology" for equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons. | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233 for NP reasons. | NP Column 1 |
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons. | NP Column 2 |
| CB applies to "technology" for equipment controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
Items: The list of items controlled is contained in the ECCN heading.

■ 53. In Supplement No. 1 to part 774, Category 7, revise ECCN 7A611 to read as follows:

**7A611 Military fire control, laser, imaging, and guidance equipment, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, MT, RS, AT, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738). |
|---|---|
| NS applies to entire entry except 7A611.y. | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c. | MT Column 1 |
| RS applies to entire entry except 7A611.y. | RS Column 1 |
| AT applies to entire entry. | AT Column 1 |
| UN applies to entire entry except 7A611.y. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $1,500
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 7A611.

**List of Items Controlled**

*Related Controls:* (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR. (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103. (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment. (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S. origin "600 series" controlled content.
*Related Definitions:* N/A
*Items:*
   a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.
   b. to w. [RESERVED]
   x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are "specially designed" for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:
   1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;
   2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102 or 7A103; or

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:

y.1 [RESERVED]

Dated: May 4, 2018.

**Richard E. Ashooh,**

*Assistant Secretary for Export Administration.*

[FR Doc. 2018–10367 Filed 5–21–18; 8:45 am]

**BILLING CODE 3510–33–P**

**From:** Jim Bartlett, Full Circle Compliance ("FCC") ▮▮▮▮@fullcirclecompliance.eu]
**Sent:** 3/1/2019 8:08:15 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 19-0301 Friday "Daily Bugle"



## Friday, 1 March 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1.     DHS/CBP Seeks Comments on Form 3171, Application-Permit-Special License Unlading-Lading-Overtime Services
2.     DHS/CBP Seeks Comments on Form 1300, Vessel Entrance or Clearance Statement

### OTHER GOVERNMENT SOURCES

3.     Items Scheduled for Publication in Future Federal Register Editions

4.     Commerce/BIS: (No new postings.)

5.     DHS/CBP Announces Delay in Determination on Enforcement Dates for In-Bond

6.     DHS/CBP Posts Updated ACE Development and Deployment Schedule

7.     GAO: "Export Controls: State and Commerce Should Share Watch List Information If Proposed Rules to Transfer Firearms Are Finalized"

8.     Justice: "Snohomish County Resident Convicted of Violating the Arms Export Control Act and Three Federal Firearms Laws"

9.     State/DDTC: (No new postings.)

### NEWS

10.     Expeditors News: "CBP Updates HTS to Extend 10% Duty Rate for Third Round of Section 301 Tariffs"

11.     Financial Times: "U.S. Pledges to Limit Export Controls on Advanced Tech"

12.     Roll Call: "Menendez Blocks Firearm Export Rule, Citing Oversight Concerns"

13.     ST&R Trade Report: "Export Control Changes for Firearms, Ammunition on Hold"

COMMENTARY

14.     J.W. Bennett: "Are Cleared Defense Contractors Becoming Unwitting Export Violators?"

15.     M. Volkov: "AppliChem Pays OFAC $5.5 Million for Cuba Sanctions Violations"

16.     S. Capruzzi: "Dual-Use Goods. The European Union and The United Kingdom Are Preparing for A No Deal Scenario"

EX/IM TRAINING EVENTS & CONFERENCES

17.     FCC Presents U.S. Export Controls Awareness Course: "ITAR & EAR from a non-U.S. Perspective", 9 April in Bruchem, the Netherlands

18.     List of Approaching Events: 142 Events Posted This Week, Including 34 New Events

EDITOR'S NOTES

19.     Bartlett's Unfamiliar Quotations

20.     Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (14 Jan 2019), DOC/EAR (20 Dec 2018), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (26 Dec 2018), DOS/ITAR (4 Oct 2018), DOT/FACR/OFAC (15 Nov 2018), HTSUS (27 Feb 2019)

21.     Weekly Highlights of the Daily Bugle Top Stories



WORD ONLY

Are you Keeping Up to Date with the Latest Regulations?

The BITAR and BAFTR will keep you updated on the latest ITAR and FTR amendments.

MORE INFORMATION AVAILABLE HERE

ITEMS FROM TODAY'S FEDERAL REGISTER

# 1. DHS/CBP Seeks Comments on Form 3171, Application-Permit-Special License Unlading-Lading-Overtime Services
(Source: Federal Register, 1 Mar 2019.) [Excerpts.]

84 FR 7098-7099: Agency Information Collection Activities:
* AGENCY: U.S. Customs and Border Protection (CBP), Department of
Homeland Security.
* ACTION: 60-Day notice and request for comments; extension of an existing
collection of information. ...
* ADDRESSES: Written comments and/or suggestions regarding the item(s)
contained in this notice must include the OMB Control Number 1651-0005
in the subject line and the agency name. To avoid duplicate
submissions, please use only one of the following methods to submit
comments:
  (1) Email. Submit comments to: CBP_PRA@cbp.dhs.gov.
  (2) Mail. Submit written comments to: CBP Paperwork Reduction Act Officer,
U.S. Customs and Border Protection, Office of Trade, Regulations and Rulings,
Economic Impact Analysis Branch, 90 K Street NE, 10th Floor, Washington, DC
20229-1177.
* FOR FURTHER INFORMATION CONTACT: Requests for additional PRA
information should be directed to Seth Renkema, Chief, Economic Impact
Analysis Branch, U.S. Customs and Border Protection, Office of Trade,
Regulations and Rulings, 90 K Street NE, 10th Floor, Washington, DC 20229-
1177, Telephone number (202) 325-0056 or via email CBP_PRA@cbp.dhs.gov.
Please note that the contact information provided here is solely for questions
regarding this notice. Individuals seeking information about other CBP
programs should contact the CBP National Customer Service Center at 877-
227-5511, (TTY) 1-800-877-8339, or CBP website at https://www.cbp.gov.
* SUPPLEMENTARY INFORMATION: ...
  - Title: Application-Permit-Special License Unlading-Lading-Overtime
Services.
  - OMB Number: 1651-0005.
  - Form Number: CBP Form 3171.
  - Action: CBP proposes to extend the expiration date of this information
collection with no change to the estimated burden hours or to CBP Form 3171.
  - Abstract: The Application-Permit-Special License Unlading-Lading-Overtime
Services (CBP Form 3171) is used by commercial carriers and importers as a
request for permission to unlade imported merchandise, baggage, or
passengers. It is also used to request overtime services from CBP officers in
connection with lading or unlading of merchandise, or the entry or clearance of
a vessel, including the boarding of a vessel for preliminary supplies, ship's
stores, sea stores, or equipment not to be reladen. CBP Form 3171 is provided
for 19 CFR 4.10, 4.30, 4.39, 4.91, 10.60, 24.16, 122.38, 123.8, 146.32 and
146.34. This form is accessible here. ...

  Dated: February 26, 2019.
Seth D Renkema, Branch Chief, Economic Impact Analysis Branch, U.S.
Customs and Border Protection.

back to top

* * * * * * * * * * * * * * * * * *

# 2. DHS/CBP Seeks Comments on Form 1300, Vessel Entrance or Clearance Statement

(Source: Federal Register, 1 Mar 2019.) [Excerpts.]

84 FR 7099-7100: Agency Information Collection Activities: Vessel Entrance or Clearance Statement
* AGENCY: U.S. Customs and Border Protection (CBP), Department of Homeland Security.
* ACTION: 30-Day notice and request for comments; extension of an existing collection of information. ...
* ADDRESSES: Interested persons are invited to submit written comments on this proposed information collection to the Office of Information and Regulatory Affairs, Office of Management and Budget. Comments should be addressed to the OMB Desk Officer for Customs and Border Protection, Department of Homeland Security, and sent via electronic mail to dhsdeskofficer@omb.eop.gov.
* FOR FURTHER INFORMATION CONTACT: Requests for additional PRA information should be directed to Seth Renkema, Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection, Office of Trade, Regulations and Rulings, 90 K Street NE, 10th Floor, Washington, DC 20229-1177, Telephone number (202) 325-0056 or via email CBP_PRA@cbp.dhs.gov. Please note that the contact information provided here is solely for questions regarding this notice. Individuals seeking information about other CBP programs should contact the CBP National Customer Service Center at 877-227-5511, (TTY) 1-800-877-8339, or CBP website at https://www.cbp.gov/.
* SUPPLEMENTARY INFORMATION: ...
  - Title: Vessel Entrance or Clearance Statement.
  - OMB Number: 1651-0019.
  - Form Number: CBP Form 1300.
  - Current Actions: CBP proposes to extend the expiration date of this information collection with no change to the burden hours or to the information being collected.
  - Abstract: CBP Form 1300, Vessel Entrance or Clearance Statement, is used to collect essential commercial vessel data at time of formal entrance and clearance in U.S. ports. The form allows the master to attest to the truthfulness of all CBP forms associated with the manifest package, and collects information about the vessel, cargo, purpose of entrance, certificate numbers, and expiration for various certificates. It also serves as a record of fees and tonnage tax payments in order to prevent overpayments. CBP Form 1300 was developed through agreement by the United Nations Intergovernmental Maritime Consultative Organization (IMCO) in conjunction with the United States and various other countries. This form is authorized by 19 U.S.C. 1431, 1433, and 1434, and provided for by 19 CFR part 4, and accessible here. ...

  Dated: February 26, 2019.
Seth D. Renkema, Branch Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection.

back to top

* * * * * * * * * * * * * * * * * *

OTHER GOVERNMENT SOURCES

## 3. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* State; NOTICES; Bureau of Political-Military Affairs; Rescission of Statutory Debarment of Rocky Mountain Instrument Company under the International Traffic in Arms Regulations [Pub. Date: 4 Mar 2019.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. DHS/CBP Announces Delay in Determination on Enforcement Dates for In-Bond
(Source: CSMS #19-000100, 1 Mar 2019.)

This message is to provide notification that an enforcement date for updated in-bond regulations has not been determined at this time.

On January 18, 2019, the Office of Field Operations announced via CSMS 19-000011 that enforcement of the changes to the in-bond regulations that was scheduled to begin on February 6, 2019 was postponed and a new enforcement date would be established. In this announcement, CBP stated that enforcement is not expected prior to March 1, 2019. This was to allow CBP to reschedule the planned consultation and collaboration with the trade through the Commercial Customs Operations Advisory Committee (COAC) In-bond Working Group. This collaboration is currently scheduled to take place in early April. The new enforcement date will be determined and announced at the completion of the review.

 - Related CSMS No. 19-000011

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. DHS/CBP Posts Updated ACE Development and Deployment Schedule
(Source: CSMS #19-000102, 1 Mar 2019.)

An updated ACE Development and Deployment Schedule has been posted to CBP.gov/ACE. The schedule includes updates as of February 2019.

Please note that this is a notional schedule and subject to change.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. GAO: "Export Controls: State and Commerce Should Share Watch List Information If Proposed Rules to Transfer Firearms Are Finalized"
(Source: GAO Reports and Testimonies, 1 Mar 2019.)

**What GAO Found**

The Department of State (State) reviewed approximately 69,000 commercial export license applications for firearms, artillery, and ammunition valued at up to $45.4 billion during fiscal years 2013 to 2017. About two-thirds of these applications were for firearms, and the majority involved the export of non-automatic and semi-automatic firearms, which are among the items proposed for transfer from State to Department of Commerce (Commerce) control.

GAO identified several differences in Commerce's and State's export controls including those related to registration, licensing, end-use monitoring, and congressional notification that, according to the agencies, would apply to firearms, artillery, and ammunition proposed for transfer. Some of these differences are due to varying requirements in applicable laws and regulations. For example, the law requires manufacturers, exporters, and brokers to register with State for items controlled by State but not for items controlled by Commerce. Additionally, while Commerce and State both screen parties to licenses against relevant watch lists, Commerce officials said they do not have direct access to State's internal watch list, which contains derogatory information from past screening of licenses for firearms, artillery, and ammunition exports. State and Commerce officials stated that, while they have held some discussions, they have not established a process for sharing watch list information. Without access to State's watch list, Commerce may lack critical information to effectively screen parties to exports of firearms and related items. State and Commerce also both have end-use monitoring programs to confirm the legitimacy of end-users but some differences exist. For example, State relies on embassy staff to conduct end-use monitoring whereas Commerce relies primarily on several officers positioned overseas specifically for this purpose. In addition, a statutory requirement to notify Congress of proposed firearms exports over $1 million would no longer apply to firearms that transfer from State to Commerce, according to Commerce officials.

According to the proposed rules and agency officials, the proposed transfer, if finalized, would result in a decline in licenses and revenues for State and an increase in licenses for Commerce, but the precise extent of these changes is unknown. State estimates that the transfer would result in a decline in revenue from registration fees but officials stated it is difficult to predict the extent of this decline. Commerce officials stated that they expected their licensing and

enforcement workload to increase as a result of the transfer, if finalized, but they believe they have sufficient staff resources available to absorb the increase.

**Why GAO Did This Study**

The U.S. government implements an export control system to manage risks associated with exporting sensitive items while facilitating legitimate trade. State currently controls the export of most firearms, artillery, and ammunition. Regulatory changes proposed by State and Commerce would transfer this responsibility for many of these items to Commerce, which implements export controls under different legal and regulatory authorities. The proposed changes are part of a larger export control reform effort since 2010 to transfer control of less sensitive items from State to Commerce.

GAO was asked to review the proposed changes to export controls of firearms, artillery, and ammunition. This report assesses (1) the volume and value of commercial export license applications State reviewed for these items in fiscal years 2013-2017, (2) how certain export controls differ between State and Commerce, and (3) what is known about the resource implications for State and Commerce due to the proposed transfer. GAO reviewed the proposed rules and related laws and regulations; analyzed data and documents related to licensing, end-use monitoring, and staff resources; and interviewed agency officials.

**What GAO Recommends**

GAO recommends that if the proposed regulatory changes become final, State and Commerce develop a process for sharing State's internal watch list with Commerce to enhance oversight of firearms, artillery, and ammunition exports. State and Commerce agreed with GAO's recommendations.

For more information, contact Kimberly Gianopoulos at (202) 512-8612 or GianopoulosK@gao.gov.

*[Editor's Note: The entire report can be found here.]*

back to top

* * * * * * * * * * * * * * * * * * *

## 8. Justice: "Snohomish County Resident Convicted of Violating the Arms Export Control Act and Three Federal Firearms Laws"
(Source: Justice, 28 Feb 2019.) [Excerpts.]

A 35-year-old resident of Tulalip, Washington, was convicted late yesterday in U.S. District Court in Seattle on four federal felonies related to illegal gun possession and trafficking, announced U.S. Attorney Brian T. Moran. Hany Veletanlic, a citizen of Bosnia legally residing in the United States, was found guilty of violating the Arms Export Control Act, illegally possessing two

unregistered silencers, and possessing a firearm with an obliterated serial number. The jury deliberated nearly three hours following two days of testimony. U.S. District Judge James L. Robart scheduled sentencing for May 20, 2019.

According to records filed in the case and testimony at trial, in February 2017, Swedish law enforcement seized a part of a Glock firearm from a residence in Fagersta, Sweden. The serial number on the Glock firearm had been filed off, but Glock Inc. was able to trace the sale of the firearm using a specialized company code imprinted on the part. The gun had been purchased by a resident of the Seattle area. When contacted by law enforcement, the resident said he had privately sold the gun to VELETANLIC. In May 2017, VELETANLIC contacted Homeland Security agents when he learned they had been asking about the firearm. VELETANLIC told agents about his activity selling firearms on eBay and in direct sales. After being advised of his Miranda rights, VELETANLIC ultimately admitted shipping packages of firearms overseas - as many as 20 different shipments to two different customer groups in Sweden. He also shipped gun parts to a person in France.

In the course of a July 2017 interview with law enforcement, VELETANLIC admitted that the customer in France had shipped him two silencers in exchange for the firearms parts. VELETANLIC claimed the silencers had been destroyed. However, when agents received permission to look in VELETANLIC's gun safe, they found one of the silencers. The second silencer was turned over by VELETANLIC to agents in August 2017.

In May 2018, VELETANLIC was arrested on federal charges. At the time of his arrest he was carrying a Ruger pistol with an obliterated serial number. VELETANLIC admitted the weapon had an obliterated serial number because it had been stolen.

Violating the Arms Export Control Act is punishable by up to 20 years in prison. Possession of as unregistered firearm is punishable by up to ten years in prison. Possession of a firearm with an obliterated serial number is punishable by up to five years in prison. The maximum statutory sentence is prescribed by Congress and is provided here for informational purposes. The sentencing of the defendant will be determined by the court based on the advisory Sentencing Guidelines and other statutory factors. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



**U.S. Export Controls:**
**ITAR & EAR from a non-U.S. Perspective**

Tuesday, 9 April 2019
Bruchem, The Netherlands

Register Now and get an Early-Bird Discount!

## 10. Expeditors News: "CBP Updates HTS to Extend 10% Duty Rate for Third Round of Section 301 Tariffs"
(Source: Expeditors News, 27 Feb 2019.)

On February 27, 2019, U.S. Customs and Border Protection (CBP) made changes to the Harmonized Tariff Schedule (HTS) to extend the 10% duty rate on HTS 9903.88.03, as announced in Cargo System Messaging Service (CSMS) #19-000088. The duty rate was set to increase on March 2, 2019 to 25% for goods that were subject to the third round of Section 301 tariffs.

CBP states that additional updates are possible once a forthcoming Federal Register notice is published.

The CSMS may be found here.

back to top

* * * * * * * * * * * * * * * * * *

## 11. Financial Times: "U.S. Pledges to Limit Export Controls on Advanced Tech"

(Source: Financial Times, 28 Feb 2019.) [Excerpts.]

*Silicon Valley had feared fallout from broad ban sweeping up AI and other products*

Donald Trump's plans to slap controls on US exports of artificial intelligence and other advanced technologies will be far narrower than initially feared by Silicon Valley when the move was unveiled last year, according to a senior White House official.

Lynne Parker, the assistant director of artificial intelligence at the White House Office of Science and Technology Policy, said on Thursday that the list of technologies that will eventually be targeted by the Trump administration will be much shorter than an initial list published last November would suggest.

Speaking at the Center for a New American Security, Ms Parker said: "Don't take from that notice of proposed rulemaking - the very broad nature of that list - don't take it to mean what's going to be export-controlled. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 12. Roll Call: "Menendez Blocks Firearm Export Rule, Citing Oversight Concerns"
(Source: Roll Call, 28 Feb 2019.)

A senior Democratic senator has blocked a Trump administration proposed rule to switch oversight authority of firearm sales abroad from the State Department to the Commerce Department, arguing the move would significantly weaken congressional oversight and increase the risk of terrorists and criminals getting their hands-on powerful military-grade weapons.

Sen. Robert Menendez, ranking member on the Foreign Relations Committee, placed the hold last week after he was notified earlier this month about the proposed change by the State Department. Menendez is objecting to the final language of the rule.

"Firearms and ammunition - especially those derived from military models ... are uniquely dangerous," the New Jersey Democrat wrote in a Feb. 22 letter to Secretary of State Mike Pompeo announcing his hold. "They should be subject to more, not less, rigorous export controls and oversight."

Hill staffers and outside experts are concerned President Donald Trump will disregard Menendez's hold, which is not legally binding but is based on decades of bipartisan tradition. The development of the rule change started under the Obama administration, and the Trump administration is now proposing it.

The proposed rule change would switch oversight responsibility on exports of firearms, including semi-automatic pistols, sniper rifles and AK-47-type assault weapons from Foggy Bottom to the Commerce Department. Critics of the move say that human rights, terrorism and rule of law concerns would take a back

seat when considering an export request. It would also, they say, make it more difficult for lawmakers to learn about and stop firearm sales they disagree with.

Menendez has halted - for now - the regulatory change process, which would otherwise next move to a formal congressional notification period before the rule change would go into effect. The final rule has not been shared but an earlier version was published in May 2018 in the Federal Register. Supporters of the rule argue it will bring more efficiency to the firearm export control process and make it easier to investigate potential export violations as Commerce has more resources to commit to the matter than the State Department.

"At the time, I liked the fact that Commerce has 105 special agents whose sole purpose is to investigate and enforce export control violations," Kevin Wolf, a former assistant secretary of Commerce for export administration in the Obama administration, said in an interview. "That was actually part of my motive for supporting this, because of the added enforcement resources that would be provided to this. Commerce is better able to deal with non-military customers."

Wolf, now a partner with the law firm Akin Gump, said the Obama administration developed but never put forth the rule change because it occurred so close to the 2012 gun massacre at Sandy Hook Elementary School, and the political climate for it never improved. But the core motive of the rule change, which was part of a broader regulatory overhaul of defense industry exports, "was for State to do what it did best and for Commerce to do what it did best," he said.

Also at issue is whether the State Department and other government agencies like the Pentagon will be able to block Commerce from approving an export request if the other agencies determine it is not in U.S. foreign policy or national security interests.

"They will send possible license exports over to State for comment but they will be the ones making the final decision," said a congressional aide, referring to the Commerce Department. "One of the reasons for doing this is fundamentally for export promotion, to make it easier to traffic in these arms abroad." The staffer opposes the rule change and is not authorized to be quoted.

But Wolf insisted that under the proposed rule, "Commerce must get consensus from the other agencies and any one agency can object."

If there is interagency disagreement about a proposed gun sale, the matter would be brought up the chain to higher agency officials, but how disputes ultimately would be settled is still unclear.

"I'm an Obama appointee and I'm a gun-control Democrat," Wolf said. "I am also just an export control person, who wanted a more efficient regulatory system to more properly [monitor] these dangerous items."

DOC_0038830

## Congress in the Dark

But rule opponents and supporters agree that Congress would be left in the dark on the majority of firearm exports.

Under the Arms Export Control Act, the State Department is required to notify Congress about any proposed exports of lethal weapons worth $1 million or more that fall under the United States Munitions List.

But the rule change would take firearms off the Munitions List and place them on the Commerce Control List, where they would be subject to much less congressional oversight including the pre-sale notification requirements contained in the export control law.

Furthermore, the Commerce Department is not required to notify Congress, as the State Department is, when there is evidence that U.S. defense exports have been misused, according to a July 2018 report by the liberal Center for International Policy. The Center objects to the proposed rule change.

In the past, lawmakers have used the notification period provided by the export control law to stop the proposed sale of guns to a number of problematic foreign governments that the State Department would otherwise have approved. In 2016 and 2017, lawmakers blocked separate Foggy Bottom proposals to export assault rifles and semi-automatic handguns to security services in the Philippines and Turkey due to human rights and rule of law concerns.

Without that final backstop of congressional notification, human rights advocates argue that even the State Department will be more likely to give the go-ahead to exporting military-grade weapons to buyers who could use them against civilians.

 "It's definitely the most dramatic reduction in export control since the creation of the Arms Export Control Act," said Colby Goodman, an independent arms control analyst, who co-authored the Center for International Policy report. In the past few years, he said, "we know that Congress has played a pretty important role in reviewing arms control and human rights cases."

Among other things, Goodman's report recommends the rule change not go forward until Congress' internal watchdog, the Government Accountability Office, has completed an analysis on the risks of moving firearms from State's Munitions List to the Commerce Control List.

For his part, Menendez has said he will not lift his hold until his concerns are addressed about how congressional oversight over foreign firearms sales will be maintained.

Menendez is also demanding Commerce make a final legal determination on whether 3D-printed firearms, which are difficult for metal detectors to uncover, constitute an "emerging" technology. Such a determination would make it illegal for someone in America to upload to the Internet the blueprints for a

3D-printable firearm. The State Department until recently barred the posting online of 3D-printed gun designs, though a lawsuit has thrown the matter to the courts.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. ST&R Trade Report: "Export Control Changes for Firearms, Ammunition on Hold"
(Source: Sandler, Travis & Rosenberg Trade Report, 1 Mar 2019.)

Sen. Robert Menendez, D-N.J., notified the State Department recently that he is putting a hold on a congressional notification of a department proposal to transfer responsibility for export controls on firearms and ammunition from the U.S. Munitions List to the Commerce Control List. This proposal, along with a related proposal from the Bureau of Industry and Security, would move articles that the president determines no longer warrant control under categories I (firearms, close assault weapons, and combat shotguns), II (guns and armament), and III (ammunition/ordnance) of the USML to the CCL.

BIS has said these changes would not deregulate the transferred items and that licenses would be required to export or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL. BIS would also require licenses for the export or reexport of guns and armament that would be controlled under new ECCN 0A602. BIS said it is trying to reduce the procedural burdens and costs of export compliance on the U.S. firearms industry while allowing the U.S. government to enforce export controls for firearms appropriately and make better use of its export control resources.

However, Menendez said firearms and ammunition are "uniquely dangerous" and are easily modified, diverted, and proliferated, meaning "they should be subject to more, not less, rigorous export controls and oversight." In particular, he said, combat rifles and rifles of any type that are U.S. military standard, along with semi-automatic firearms and any related equipment, ammunition, or associated manufacturing equipment, technology, or technical data, should not be removed from the USML.

Menendez expressed concern that the proposed rules would effectively eliminate congressional oversight and potential disapproval of exports of lethal weapons. In addition, he said, they present a risk of "open[ing] the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests." In so doing, he added, the proposals may be at odds with the Export Control Reform Act of 2018, which authorizes the Department of Commerce (which oversees the CCL) to control emerging and foundational technologies (such as 3D printing). Menendez said his hold will remain in place until these issues are sufficiently addressed.

Blocking this and other transfers from the USML would also be the result of the Prevent Crime and Terrorism Act (H.R. 1134) introduced recently in the House.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**COMMENTARY**

## 14. J.W. Bennett: "Are Cleared Defense Contractors Becoming Unwitting Export Violators?"
(Source: Clearance Jobs, 28 Feb 2019.)

\* Author: Jeffrey W. Bennett, security consultant with SFPC, SAPPC, ISOC, ISP certifications. Visit his website www.redbikepublishing.com for more information.

With technology improvements, time, and the shrinking of borders in this well-connected global economy, we should consider the question: "what would an adversary with limited resources be able to exploit in our computers?"

This is an important question to ask as cyber-attacks increase in frequency and severity. Now an adversary on foreign lands can easily gather military or dual use technical information governed by the International Traffic in Arms Regulation (ITAR) and commercial information covered in the Export Administration Regulations (EAR) without ever meeting a U.S. citizen.

**Export Training May be Lacking**

This cyber-attack activity should not be surprising to the well-educated security cleared employee. What may be surprising is the protected sensitive information's vulnerability on well-connected information systems. For example, Facility Security Officers, (FSOs), those working in corporate law, and export compliance officers provide regular reminders and conduct training on requirements to protect sensitive information. However, there may be a disconnect between training and application. The immediate "go to" measure is to protect the organization's enterprise network of computers from cyber threats and to remind employees that exports are not authorized without a license or exemption.

The U.S. Government encourages companies to pursue business with foreign enterprises and these opportunities are provide through requested licenses. However, exports are occurring where licenses may not exist. According to ITAR, an export is defined as:

1.      Sending or taking hardware out of the U.S. or transferring to a foreign person in the U.S.

2.      Disclosing (oral, email, written, video, or other visual disclosure) or transferring technical data to a foreign person whether in the U.S. or abroad.

3.      Providing a service to, or for the benefit of a foreign person, whether in the U.S. or abroad.

Definition two provides the most risk to our technical information if we consider that disclosure can be voluntary or unwitting. For example, if the movement of

non-U.S. persons visiting a facility is not controlled, they may be able to exploit export controlled information appearing on a computer screen, overhead projection, left on a printer, and etc. Additionally, cyber-threat examples abound, such as hacking into enterprise networks and exfiltrating sensitive information.

## Re-thinking an Export: the Evolution

In 2012, John Reece Roth, a plasma physicist, was sentenced to prison for export violations. The charges included taking a laptop containing sensitive plans with him on a lecture tour in China. Despite warning not to do so, he brought his computer and sensitive information to China where that information was vulnerable to exploitation.

The above story provides good reference points for security safeguards while travelling abroad. Recommended practices include getting approval for all presentations to non U.S. persons, getting licenses for technical data expected to be released during the presentation, and bringing a "clean" computer that only stores information permitted for presentation.

## Changing the Export Paradigm

Whether or not we are in the U.S. or visiting overseas, we should be concerned with an adversary's ability to conduct cyber-attacks anywhere and at any time. Whenever an employee travels abroad, they may find themselves liberated from their computer at the host country's customs. They should also expect to have the hard drive duplicated, files read, etc. These are the contingencies for which astute security specialists plan.

While an information system is employed at a defense contractor facility, sensitive information should be protected by firewalls, software, network defense, and other countermeasures to prevent cyber-intrusion. However, once the information system is removed, so is the cyber-security protection afforded by the facility.

A common practice is for employees to bring their laptops on business trips, vacation, to night school, and other locations. Our sense of security of being within the U.S. borders provides an added vulnerability to that sensitive information.

## What could go wrong?

Consider that an employee may be providing a presentation in another country. The contractor facility may provide the employee with a computer storing only the authorized material. Everything is done properly to ensure the employee and information are protected from unauthorized information disclosure.

In our example the laptop is removed from the facility for authorized work. However, since the laptop will be used within United States borders, the employee is permitted to take his working laptop, with all the unclassified

technical information he has been working on for the past few years. Since the employees business is within the U.S., and will not be "releasing" the information to non-U.S. persons, there is no problem; or is there?

The employee will connect to the internet at the airport, university, or other public wi-fi or other provider of the needed internet connection. Without the proper protections (which usually don't travel with the employee) the information is almost as vulnerable as if the laptop were provided for international travel.

**What can be done to protect U.S. secrets?**

The best place to begin change is by facing the facts; global connectivity makes our sensitive information vulnerable to exploitation. Even more eye opening is that an adversary with limited resources is better equipped through this connectivity to target and acquire information they seek. Defense contractors should assume the task of making targeted information very difficult to get.

Policies that allow for the removal of information systems should consider how sensitive information is vulnerable both within and outside of the facility. Construct the behavior that recognizes and prevents unauthorized disclosure of economic, classified or sensitive information. Policies should consider any removal of information from the security of the enterprise network as vulnerable to export violation through cyber attacks.

Our well-connected global economy should remind us that our information is vulnerable to "export violations" even while resting in information systems physically residing at home. Defense contractors should rethink the definition of export to include weak cybersecurity practices of information removed from the protected facility networks.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 15. M. Volkov: "AppliChem Pays OFAC $5.5 Million for Cuba Sanctions Violations"
(Source: Volkov Law Group Blog, 27 Feb 2019. Reprinted by permission.)

\* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

OFAC continues to pile up enforcement actions for sanctions violations.  In yet another example of a failure of companies to address compliance, to follow up on compliance and to ensure ultimate compliance, AppliChem, a German company agreed to pay $5.5 million for 304 violations of the Cuban Assets Control Regulations during the time period between May 2012 and February 2016. Specifically, AppliChem engaged in 304 prohibited transactions for sale of chemical reagents to customers in Cuba.

On January 1, 2012, Illinois Tool Works, Inc. (ITW), in Glenview, Illinois, acquired AppliChem, a German manufacturer of chemicals and reagents for the pharmaceutical and chemical industries. During the acquisition negotiations, ITW noticed that AppliChem's website listed certain countries subject to U.S. economic and trade sanctions.

On December 19, 2011, ITW warned AppliChem that it would be required to cease all Cuban business after ITW's acquisition. After the acquisition closed, an ITW official sent AppliChem's former owners (who were still working at the merged company) a memo explaining ITW's guidelines for complying with U.S. sanctions, including the Cuban sanctions.

AppliChem ignored the two separate warnings from ITW and continued to complete and collect on existing orders with Cuban nationals under pre-acquisition contracts.

ITW discovered this continuing sales activity and warned AppliChem's former owners, yet again, to cease all sales to Cuba. ITW then submitted a voluntary disclosure on January 23, 2013. ITW represented to OFAC that all Cuba transactions were cancelled.

On May 29, 2015, OFAC issued a warning letter to ITW concerning the post-acquisition Cuba transactions.

On January 27, 2016, ITW's ethics helpline received an anonymous report that AppliChem continued to conduct sales to Cuba through a third-party in Berlin, Germany. ITW launched an internal investigation which confirmed that AppliChem's former owners continued its Cuba business. Specifically, ITW learned that AppliChem implemented what it called "Caribbean Procedures" (a code referring to Cuba) to ensure that no documents were prepared or retained relating to its continuing Cuba business.

AppliChem engaged an external logistics company and independent consultant to prepare shipping documents and declarations. In fact, AppliChem conducted training sessions for AppliChem staff to further the illegal scheme and ensure that it was hidden from ITW. At AppliChem, the illegal procedures were known and an "open secret" at AppliChem.

Prior to the helpline report, AppliChem employees reported the continuing misconduct to the General Manager of ITW's relevant division. The General Manager sought assurances from the intermediary company that a pending shipment would not be diverted to Cuba, but did not initiate a fuller internal investigation at that time.

ITW earned over 2.8 million euros (approximately $3.4 million) through these illegal transactions.

According to OFAC, the enforcement action underscores the importance of: (i) implementing risk-based controls, such as regular audits to ensure subsidiaries are complying with their obligations under OFAC's sanctions regulations; (ii) performing follow-up due diligence on acquisitions of foreign persons known to

engage in historical transactions with sanctioned persons and jurisdictions; and (iii) appropriately responding to derogatory information regarding the sanctions compliance efforts of foreign persons subject to the jurisdiction of the United States.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. S. Capruzzi: "Dual-Use Goods. The European Union and The United Kingdom Are Preparing for A No Deal Scenario" (Source: Dejalex, 27 Feb 2019.)

\* Authors: Sara Capruzzi, Associate, s.capruzzi@dejalex.com.

On 19 December 2018, the European Commission presented a proposal for a Regulation to add the United Kingdom to the list of countries for which a general authorisation to export dual-use items is valid throughout the EU. [FN/1]

At the European level, the export control regime of dual-use items is governed by Regulation (EC) No. 428/2009 setting up a Community regime for the control of exports, transfer, brokering and transit of dual-use items (Dual-Use Regulation). [FN/2] The Dual-Use Regulation is binding and directly applicable in all Member States, including the United Kingdom.

According to the Regulation, dual-use goods are "... *items, including software and technology, which can be used for both civil and military purposes. They consist of all goods, including intermediate ones, which may be used for non-explosive purposes, as well as for the manufacture of nuclear weapons or other nuclear explosive devices...*". [FN/3]

The Regulation establishes a common EU control list as well as rules for its implementation. Under the Regulation, an authorisation is required for the export of dual-use items to third countries. This authorisation may be individual, global or general. The Regulation provides for "Union General export authorisations" for the export of certain dual-use items to certain third countries under certain conditions. In particular, Annex IIa to the Regulation provides for a Union General Export Authorisation ("EU001") for certain low-risk transactions, e.g. exports to Australia, Canada, Japan, New Zealand, Norway, Switzerland (including Liechtenstein), and the United States of America.

According to the Commission, the United Kingdom should be added to the list of EU001 countries since: (i) it is a party to relevant international treaties and a member of international non-proliferation regimes and maintains full compliance with related obligations and commitments; (ii) it maintains full compliance with obligations under sanctions imposed by a decision or a common position adopted by the Council or by a decision of the Organization for Security and Co-operation in Europe (OSCE) or by a resolution of the Security Council of the United Nations; and (iii) it applies proportionate and adequate controls effectively addressing considerations about intended end use

and the risk of diversion consistent with the provisions and objectives of the Regulation. [FN/4]

On the same date, the Export Control Joint Unit (ECJU) of the Department for International Trade of the UK Government [FN/5] updated its guidelines on export of controlled goods in case of a no deal Brexit, explaining that, despite the overall system continuing to be the same, changes would occur to some licensing requirements. In particular: (i) the movement of dual-use items from the UK to the EU would require an export licence; (ii) since extant export licences issued in the UK would no longer be valid for exporting dual-use items from EU Member States, a new licence, issued by an EU Member State, will be required; (iii) extant export licences issued by the remaining Member States would no longer be valid for exporting dual-use items from the UK and a new licence, issued by the UK, will be required. [FN/6]

As a result, on 1 February 2019 the ECJU published a new open general export licence (OGEL) [FN/7], coming into force on 29 March 2019 should the UK leave the EU without a deal. The OGEL will allow the export of dual-use items from the UK to EU Member States and the Channel Islands.

-------------

[FN/1] Commission proposal for a Regulation of the European Parliament and of the Council amending Council Regulation (EC) No 428/2009 by granting a Union General Export Authorisation for the export of certain dual-use items from the Union to the United Kingdom of Great Britain and Northern Ireland. COM(2018) 891 final.
[FN/2] Council Regulation (EC) No 428/2009 of 5 May 2009 setting up a Community regime for the control of exports, transfer, brokering and transit of dual-use items, OJ L 134, 29.5.2009.
[FN/3] Article 2 of Regulation (EC) No 428/2009.
[FN/4] See the Commission proposal for a Regulation of the European Parliament and of the Council amending Council Regulation (EC) No 428/2009 by granting a Union General Export Authorisation for the export of certain dual-use items from the Union to the United Kingdom of Great Britain and Northern Ireland. COM(2018) 891 final.
[FN/5] The Export Control Joint Unit (ECJU) is responsible for the UK system of export controls on military items, dual-use items (items with both civil and military uses), civilian firearms, and items usable for torture. These items are regulated through a system of export licensing.
[FN/6] Joint Export Control Unit, 19 December 2018, *Exporting controlled goods if there's no Brexit deal*. Available at the following LINK.
[FN/7] Joint Export Control Unit, 1 February 2019, *Open General Export Licence. Export of Dual-Use items to EU Member States*. Available at the following LINK.

back to top

* * * * * * * * * * * * * * * * * * *

EX/IM TRAINING EVENTS & CONFERENCES

## 17. FCC Presents U.S. Export Controls Awareness Course: "ITAR & EAR from a non-U.S. Perspective", 9 April in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance professionals and those in a similar role who aim to stay up-to-date with the latest U.S. export control requirements that apply to non-U.S. transactions, and industry's best practices.

The course will cover multiple topics relevant for organizations outside the U.S. that are subject to U.S. export controls, including: the U.S. regulatory framework, key concepts and definitions, tips regarding classification and licensing, essential steps to ensure a U.S. export control compliant shipment, how to handle a (potential) non-compliance issue, recent enforcement trends, and the latest and anticipated regulatory amendments.  Participants will receive a certification upon completion of the training.

* What: Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective
* When: Tuesday, 9 Apr 2010, 9.30 am - 4.30 pm (CET)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Drs. Ghislaine C.Y. Gillessen RA, Michael E. Farrell, and Drs. Alexander P. Bosch
* Information & Registration: HERE, or email events@fullcirclecompliance.eu.

back to top

* * * * * * * * * * * * * * * * * * * *

## 18. List of Approaching Events: 142 Events Posted This Week, Including 34 New Events
(Sources: Editor and Event Sponsors)

Published every Friday or last publication day of the week, our overview of Approaching Events is organized to list continuously available training, training events, seminars & conferences, and webinars.

Please, submit your event announcement to Alexander Witt, Events & Jobs Editor (email: awitt@fullcirclecompliance.eu), composed in the below format:

    # DATE: LOCATION; "EVENT TITLE"; EVENT SPONSOR; WEBLINK;
    CONTACT DETAILS (email and/or phone number)

"#" = New or updated listing

### Continuously Available Training

* E-Seminars: "US Export Controls" / "Defense Trade Controls"; Export Compliance Training Institute; danielle@learnexportcompliance.com

* Webinar: "Company-Wide US Export Controls Awareness Program"; Export Compliance Training Institute; danielle@learnexportcompliance.com
* E-Seminars: "ITAR/EAR Awareness"; Export Compliance Solutions; spalmer@exportcompliancesolutions.com
* Online: "Simplified Network Application Process Redesign (SNAP-R)"; Commerce/BIS; 202-482-2227
* E-Seminars: "Webinars On-Demand Library"; Sandler, Travis & Rosenberg, P.A.
* Online: "International Trade Webinars"; Global Training Center
* Online: "On-Demand Webinars"; "General Training"; Center for Development of Security Excellence; Defense Security Service (DSS)
* Online: "ACE Reports Training and User Guide"; DHS/CBP
* Online: "Increase Your International Sales - Webinar Archive"; U.S. Commercial Service
* Web Form: "Compliance Snapshot Assessment"; Commonwealth Trading Partners (CTP)
* Online: "Customs Broker Exam Prep Course"; The Exam Center

### Seminars and Conferences

* Mar 4-6: Savannah, GA; "2019 Winter Back to Basics Conference"; SIA
* Mar 5: Leeds, UK; "Understanding Incoterms"; Chamber International
* Mar 5-6: San Diego, CA; "Complying with U.S. Export Controls"; Commerce/BIS
* Mar 5-7:  Orlando, FL; "'Partnering for Compliance' Export/Import Control Training and Education Program"; Partnering for Compliance
* Mar 6: McLean, VA; "International Trade, Export Compliance & Customs Update"; KPMG LLP; cdonahue@kpmg.com; +1 703-286-8131;
* Mar 6-7: San Diego, CA; "Complying with U.S. Export Controls"; Commerce/BIS
# Mar 7: Washington, DC; "2019 International Trade Update"; Georgetown Law
* Mar 7-8: Dallas, TX; "CTPAT Training"; SCS America
* Mar 9: Orlando, FL; "Customs/Import Boot Camp;" Partnering for Compliance
* Mar 11: Hoofddorp, NL; "Export Control, Dual-use en Sancties"; Fenex
* Mar 12-14: Dallas, TX; "Complying with U.S. Export Controls"; Commerce/BIS
* Mar 12-14: Dallas, TX; "How to Build an Export Compliance Program"; Commerce/BIS
* Mar 12: Hasselt, Belgium; "Wegwijs in exportcontrole, dual-use goederen & embargo"; Vlaams Netwerk van Ondernemingen
# Mar 12: Sheffield, UK; "Customs Procedures and Compliance in International Trade"; Sheffield Chamber of Commerce
# Mar 12-13: Plano, TX; "Complying with U.S. Export Controls"; Commerce/BIS
* Mar 13: Birmingham, UK; "Strategic Export Control: Intermediate Practitioners course"; UK/DIT
* Mar 14: Birmingham, UK; "Strategic Export Control: Foundation Workshop"; UK/DIT
* Mar 14: Birmingham, UK; "Strategic Export Control: Licenses Workshop"; UK/DIT
# Mar 14: Charlotte, NC; "Importing Procedures"; Global Training Center

# Mar 14: Plano, TX; "How to Build an Export Compliance Program"; Commerce/BIS
# Mar 15: Charlotte, NC; "Importing 201"; Global Training Center
* May 15-17; London, UK; "ICPA European Conference"; ICPA
* Mar 18-21: Las Vegas, NV; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI
# Mar 19: Charlotte, NC; "Tariff Classification"; Global Training Center
# Mar 20: Charlotte, NC; "NAFTA Rules of Origin"; Global Training Center
* Mar 20: Miami, FL; "CHINA TARIFFS/AD/CVD 101"; Diaz Trade Consulting
# Mar 20: St. Johns, Canada: "Export Controls Seminar"; Atlantic Canada
# Mar 21: Charlotte, NC; "Exporting Procedures"; Global Training Center
* Mar 24-27: Orlando, FL; "2019 ICPA Annual Conference"; ICPA
* Mar 25-27: San Francisco; "Global Encryption, Cloud and Cyber Trade Controls Conference"; Thomsen & Burke LLP;
* Mar 26: Leeds, UK; "Understanding Exporting"; Chamber International
* Mar 26-27: Pittsburgh, PA; "Complying with U.S. Export Controls"; Commerce/BIS
* Mar 26-27: Scottsdale, AZ; "Managing ITAR/EAR Complexities"; Export Compliance Solutions (ECS); spalmer@exportcompliancesolutions.com or 866-238-4018
* Mar 27: Bristol, UK; "Classification of Goods - Using Commodity and Tariff Codes"; BusinessWest
* Mar 27: Bristol, UK; "Incoterms® Rules 2010"; BusinessWest
* Mar 27-28: San Francisco, CA; "Global Encryption, Cloud & Cyber Trade Controls;" American Conference Institute
* Mar 28: Bristol, UK; "Introduction to Export Procedures"; BusinessWest
* Apr 1: Eindhoven, NL; "Export Control, Dual-use en Sancties"; Fenex
* Apr 2: Brussels, Belgium; "Dual-Use, Military Research & Misuse"; Vrije Universiteit Brussel
# Apr 2: Delft, The Netherlands; "Export Compliance Training"; Netherlands Aerospace Group and Full Circle Compliance
* Apr 1-4: Washington, DC; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI
* Apr 2-3: Long Beach, CA; "Voluntary Disclosure/Self Disclosure and Exemptions/Exceptions Seminars"; SIA
* Apr 3-4: Denver, CO; "Complying with U.S. Export Controls"; Commerce/BIS
* Apr 4-5; Miami, FL; "CTPAT Training"; SCS America
* Apr 9: Bruchem, The Netherlands; "Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective"; Full Circle Compliance
# Apr 9: Sheffield, UK; "An Introduction to Export"; Sheffield Chamber of Commerce
# Apr 9: London, UK; "Strategic Export Control: Intermediate Practitioners Course"; UK/DIT
# Apr 10: London, UK; "Strategic Export Control: Foundation Workshop"; UK/DIT
# Apr 10: London, UK; "Strategic Export Control: Licenses Workshop"; UK/DIT
# April 10: Sheffield, UK; "Export Documentation - How and Why?" ; Sheffield Chamber of Commerce
* Apr 16: Leeds, UK; "Export Documentation"; Chamber International
* Apr 17: Miami, FL; "CBP COMPLIANCE & ENFORCEMENT"; Diaz Trade Consulting

* Apr 17-18; Miramar, FL; "11th Maritime Forwarding, Freight Logistics & Global Chain Supply Workshop"; ABS Consulting;
# April 18: Sheffield, UK; "International Trade Operations and Procedures (ITOPS)"; Sheffield Chamber of Commerce
* Apr 23-24: Portsmouth, NH; "Complying with U.S. Export Controls"; Commerce/BIS
* Apr 25: Portsmouth, NH; "Technology Controls"; Commerce/BIS
# Apr 25: London, UK; "Making better License Applications"; UK/DIT
* Apr 29-May 2: London, UK; "US Export Controls on Non-US Transactions: EAR, OFAC & ITAR Compliance for EU/UK and other Non-US Companies PLUS Other Country Controls Comparison to US"; ECTI
* Apr 30-May 1: Irvine, CA: "Complying with U.S. Export Controls"; Commerce /BIS
* Apr 30-May 1: Nashville, TN: "Mastering ITAR/EAR Challenges"; Export Compliance Solutions (ECS);
* May 1: Leeds, UK; "Understanding Exporting & Incoterms"; Chamber International
* May 2-3: Washington DC; "Economic Sanctions Enforcement and Compliance;" American Conference Institute
* May 5: Munich, Germany; "European and German Export Controls"; AWA;
* May 5-7: Savannah, GA; "2019 Spring Seminar"; National Association of Foreign Trade Zones (NAFTZ)
* May 6-7: Atlanta, GA; "2019 Spring Conference"; SIA
* May 7: Bruchem, The Netherlands; "An Introduction to EU / Dutch Dual-Use and Military Export Controls"; Full Circle Compliance
# May 8: Southampton, UK; "Strategic Export Control: Intermediate Practitioners course"; UK/DIT
# May 9: Southampton, UK; "Strategic Export Control: Foundation Workshop"; UK/DIT
# May 9: Southampton, UK; "Strategic Export Control: Licenses Workshop"; UK/DIT
# May 9: Sheffield, UK; "Essential Incoterms - Getting it Rights"; Sheffield Chamber of Commerce
* May 13-16: Washington, D.C.; "ITAR / EAR / OFAC Commercial and Military Export Controls. How ITAR, EAR & OFAC Regulations Impact Non-US Companies, Affiliates and Transactions"; ECTI;
* May 15: Bristol, UK; "A Foundation Course in Importing"; BusinessWest
* May 15-17; London, UK; "ICPA European Conference"; ICPA
* May 16: Bristol, UK; "Export Controls and Licensing"; BusinessWest
* May 16: Bristol, UK; "Inward Processing Relief"; BusinessWest
* May 16: Hamburg, Germany; "U.S. Export Controls and Embargoes & Sanctions for European Companies"; Hamburger Zollakademie
* May 16-17; Toronto, Canada; "ICPA Canada Conference"; ICPA
* May 21: London, UK; "US & UK Export Controls: A Basic Understanding"; The Institute of Export and International Trade
* May 27-30: Singapore; "US Export Controls on Non-US Transactions: EAR, OFAC & ITAR Compliance for Asia and other Non-US Companies PLUS Other Country Controls Comparison to US"; ECTI;
* Jun 5-6: Seattle, WA; "Complying with U.S. Export Controls"; Commerce/BIS
* Jun 7: Upper Marlboro, MD; "2019 Spring Golf Outing"; SIA
* Jun 10: Cleveland, OH; "Letters of Credit"; Global Training Center

* Jun 11: Cleveland, OH; "Export Doc & Proc"; Global Training Center
# Jun 11: Sheffield, UK; "Customs Procedures and Compliance in International Trade"; Sheffield Chamber of Commerce
* Jun 12: Cleveland, OH; "Tariff Classification"; Global Training Center
# Jun 12: Derby, UK; "Strategic Export Control: Intermediate Practitioners course"; UK/DIT
* Jun 13: Cleveland, OH; "NAFTA Rules of Origin"; Global Training Center
# Jun 13: Derby, UK; "Strategic Export Control: Foundation Workshop"; UK/DIT
# Jun 13: Derby, UK; "Strategic Export Control: Licenses Workshop"; UK/DIT
* Jun 13: Detroit, MI; "How to Build an Export Compliance Program"; Commerce/BIS
* Jun 14: Cleveland, OH; "Incoterms® 2010 Rules"; Global Training
* Jun 17-20: San Diego, CA; "ITAR Defense Trade Controls / EAR Export Controls"; ECTI
* Jul 3: Bristol, UK; "Introduction to Export Procedures - Export Training"; BusinessWest
# Jul 3: Cambridge, UK; "Strategic Export Control: Intermediate Practitioners Course"; UK/DIT
# Jul 4: Cambridge, UK; "Strategic Export Control: Foundation Workshop"; UK/DIT
# Jul 4: Cambridge, UK; "Strategic Export Control: Licenses Workshop"; UK/DIT
* Jul 4: Bristol, UK; "Using Documentary Letters of Credit, Drafts and Bills"; BusinessWest
# Jul 4: Sheffield, UK; "An Introduction to Export"; Sheffield Chamber of Commerce
* Jul 8-9: Seattle, WA; "Boot Camp: Achieving ITAR/EAR Compliance"; Export Compliance Solutions (ECS);
* Jul 8 - 10: National Harbour, MD; "2019 Summer Back to Basics Conference"; SIA
# July 10: Sheffield, UK; "Export Documentation - How and Why?" ; Sheffield Chamber of Commerce
* Jul 11: Birmingham, UK; "US & UK Export Controls: A Basic Understanding"; The Institute of Export and International Trade
* Aug 20-21: Cincinnati, OH; "Complying with U.S. Export Controls"; Commerce/BIS
* Aug 20-21: Milpitas, CA; "Complying with U.S. Export Controls"; Commerce/BIS
* Aug 22: Milpitas, CA: "Encryption Controls"; Commerce/BIS
* Sep 8-11: Chicago, IL; "2019 Annual Conference and Exposition"; National Association of Foreign Trade Zones (NAFTZ)
* Sep 16-19: Austin, TX; "ITAR Controls / EAR & OFAC Export Controls (Sep 18-19) Seminar Series"; ECTI; 540-433-3977
# Sep 17: Sheffield, UK; "Customs Procedures and Compliance in International Trade"; Sheffield Chamber of Commerce
* Sep 17-19: Annapolis, MD; "The ECS 2nd Annual ITAR/EAR Symposium"; ECS
* Sep 20: Las Vegas; "EAR and OFAC Fundamentals: Export Control Of Dual-Use Equipment"; Barnes & Thornburg LLP

* Sep 25: Bristol, UK; "Classification of Goods - Using Commodity and Tariff Codes"; BusinessWest
* Sep 25: Bristol, UK; "Incoterms® Rules 2010"; BusinessWest
* Sep 25: London, UK; "US & UK Export Controls: A Basic Understanding"; The Institute of Export and International Trade
# Sep 25: Sheffield, UK; "Essential Incoterms - Getting it Rights"; Sheffield Chamber of Commerce
* Sep 26: Bristol, UK; "Understanding The Paperwork"; BusinessWest
* Sep 30 - Oct 3; Amsterdam, NL; "ITAR Controls / EAR/OFAC Commercial and Military Controls"; ECTI; 540-433-3977
* Oct 7: Munich, Germany; "European and German Export Controls"; AWA
* Oct 14-17; Columbus, OH; "University Export Controls Seminar"; ECTI; 540-433-3977
# Oct 17: Sheffield, UK; "Export Documentation - How and Why?" ; Sheffield Chamber of Commerce
* Oct 27: Singapore; "5th Asia Pacific Summit on Economic Sanctions Compliance and Enforcement"; American Conference Institute
* Oct 28-29: Washington D.C.; "2019 Fall Advanced Conference"; SIA
* Oct 28-31; Phoenix, AZ; "ITAR Controls / EAR & OFAC Export Controls Seminar Series"; ECTI; 540-433-3977
* Nov 11-14; Washington, DC; "ITAR Controls / EAR & OFAC Export Controls Seminar Series"; ECTI; 540-433-3977
* Nov 20: Bristol, UK; "Introduction to Export Procedures - Export Training"; BusinessWest
* Nov 21: Bristol, UK; "A Foundation Course in Importing"; BusinessWest
* Nov 26: Bruchem, The Netherlands; "The International Traffic in Arms Regulations (EAR) from a non-U.S. Perspective"; Full Circle Compliance
* Nov 27: Bruchem, The Netherlands; " The Export Administration Regulations (EAR) from a non-U.S. Perspective"; Full Circle Compliance
* Nov 27: Manchester, UK; "US & UK Export Controls: A Basic Understanding"; The Institute of Export and International Trade
* Dec 4-5: New York, NY; "10th Annual New York Forum on Economic Sanctions;" American Conference Institute
* Dec 4-5: Washington, DC; "36th International Conference on the Foreign Corrupt Practices Act"; American Conference Institute
* Dec 9-12; Miami, FL; "ITAR Controls / EAR & OFAC Export Controls Seminar Series"; ECTI; 540-433-3977
* Dec 12-13; Washington D.C.; "Coping with U.S. Export Controls and Sanctions 2019"; Practicing Law Institute

*2020*

* Jan 30-31: Houston, TX; "14th Forum on the Foreign Corrupt Practices Act"; American Conference Institute

**Webinars**

* Mar 6: Webinar: "Cornerstones of ITAR Compliance: Registration, Empowered Officials & Exemptions"; ECTI; 540-433-3977
* Mar 7: Webinar: "Global Transportation & Trade Compliance - 2 Sides of the Same Coin"; 3rdwave

DOC_0038844

* Mar 8: Webinar: "Managing Export Compliance and Export Controls Risk"; Online Compliance Panel
* Mar 12: Webinar; "DIY Encryption Classification 2019 Edition"; ECTI; 540-433-3977; danielle@learnexportcompliance.com
* Mar 13: Webinar: "Cornerstones of ITAR Compliance: Licenses and Agreements"; ECTI; 540-433-3977
* Mar 14: Webinar: "ITAR Training Basics - For Compliance Executives March"; CVG Strategy
* Mar 20: Webinar: "Cornerstones of ITAR Compliance: Administration, Documentation and Shipping"; ECTI; 540-433-3977
* Apr 8: Webinar: "Export Control Compliance: Creating And Self Assessing Your Export Control Program (ECP) To Sanctioned Countries"; GRC Educators
* Apr 23: Webinar: "ITAR Training Basics - For Compliance Executives April"; CVG Strategy

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 19. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Frederic Chopin** (Frédéric François Chopin; 1 Mar 1810 - 17 Oct 1849; was a Polish composer and virtuoso pianist of the Romantic era who wrote primarily for solo piano. He has maintained worldwide renown as a leading musician of his era, one whose "poetic genius was based on a professional technique that was without equal in his generation.")
  - *"As long as I have health and strength, I will gladly work all my days."*

* **Dr. Seuss** (Theodor Seuss Geisel; 2 Mar 1904 - 24 Sep 1991; was an American children's author, political cartoonist, and animator. He is known for his work writing and illustrating more than 60 books under the pen name Dr. Seuss. His work includes many of the most popular children's books of all time, selling over 600 million copies and being translated into more than 20 languages by the time of his death.)
  - *"You have brains in your head. You have feet in your shoes. You can steer yourself in any direction you choose. You're on your own, and you know what you know. And you are the guy who'll decide where to go."*
  - *"You're never too old, too wacky, too wild, to pick up a book and read to a child."*

**Friday funnies:**
* "I'm proud of myself.  I finished a jigsaw puzzle in only 6 months, and the box said 2-4 years."
* "Sometimes I tuck my knees into my chest and lean forward.  That's just how I roll."

* Sign outside a church: "Adultery is a sin.  You can't have your Kate and Edith too."

back to top

* * * * * * * * * * * * * * * * *

## 20. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199.  Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
  - Last Amendment: 14 Jan 2019: 84 FR 112-116: Extension of Import Restrictions Imposed on Certain Archaeological and Ecclesiastical Ethnological Material from Bulgaria; and 84 FR 107-112: Extension of Import Restrictions Imposed on Certain Archaeological Material From China.

* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
  - Last Amendment: 20 Dec 2018: 83 FR 65292-65294: Control of Military Electronic Equipment and Other Items the President Determines No Longer Warrant Control Under the United States Munitions List (USML); Correction [Concerning ECCN 7A005 and ECCN 7A105.]

* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30.  Implemented by Dep't of Commerce, U.S. Census Bureau.
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (1 Jan 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment

with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

\* DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under the Atomic Energy Act of 1954.
  - Last Amendment: 23 Feb 2015: 80 FR 9359, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

\* DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under the Atomic Energy Act of 1954.
  - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

\* DOJ ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
  - Last Amendment: 26 Dec 2018: 83 FR 66514-66554: Bump-Stock-Type Devices

\* DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
  - Last Amendment: 4 Oct 2018: 83 FR 50003-50007: Regulatory Reform Revisions to the International Traffic in Arms Regulations.
  - The only available fully updated copy (latest edition: 1 Jan 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR, please contact us to receive your discount code.

\* DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders.
Implemented by Dep't of Treasury, Office of Foreign Assets Control.
  - Last Amendment: 15 Nov 2018: 83 FR 57308-57318: Democratic Republic of the Congo Sanctions Regulations

\* USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S. International Trade Commission. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)

- Last Update: 27 Feb 2019: Harmonized System Update 1902 [contains 40 ABI records and 11 harmonized tariff records.]
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 21. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITORIAL POLICY

\* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 6,500 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

\* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

\* CAVEAT: The contents cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

\* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

\* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

\* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

| | |
|---|---|
| **From**: | Gary Stanley [░░░░░@glstrade.com] |
| **Sent**: | 3/5/2019 4:34:48 AM |
| **To**: | Richard Ashooh [Richard.Ashooh@bis.doc.gov] |
| **Subject**: | Defense and Export-Import Update (March 4, 2019) |

**Dear All,**

**Good Day!**

**Gary Stanley's EC Tip of the Day: The EAR's Validated End-User (VEU) program is an innovative trade-facilitating program that enhances high-technology civilian trade between the United States and VEU-eligible countries (currently, China and India). Use of Authorization VEU reduces the licensing burden on industry by allowing U.S. exporters to ship designated items to pre-approved entities under a general authorization instead of individual export licenses.**

**Today's Items:**

1. **DDTC Rescinds Statutory Debarment of Rocky Mountain Instrument Company**
2. **DDTC Posts Four New Name/Address Change Notices**
3. **U.S. Department of Commerce Initiates Section 232 Investigation into Titanium Sponge Imports**
4. **DoD/DSCA Updates Security Assistance Management Manual and Policy Memos**
5. **Dutch Government Publishes Updates "Guidelines for Compiling an Internal Compliance Programme"**
6. **Australia Government's Defence Export Controls Will Close for Canberra Day Public Holiday**
7. **United States Will Terminate GSP Designation of India and Turkey**
8. **USTR Releases 2019 Trade Policy Agenda and 2018 Annual Report**
9. **Commerce/NIST's Information Security and Privacy Advisory Board to Meet March 20-21**
10. **WTO News**
11. **U.S. Customs and U.S. Census/AES Updates**
12. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**
13. **GAO & CRS Reports, Testimony, and Correspondence of Interest**
14. **U.S. Government Trade Forms and Other Information Collections Open for Public Comment**

**Other Headlines**

15. **U.S. Firearms Export Changes Meet Challenges**
16. **Washington Wants to Know If Pakistan Used U.S.-Built Jets to Down Indian Warplane**
17. **Trump Symbolically Tightens Embargo on Cuba**
18. **This Week in Congress: Budget Release Countdown**

19. **U.S. Increases Pressure on Maduro With New Sanctions, Revokes Visas of Associates**

20. **China Is Blocking Joint World Bank Report That Calls for State-Owned Enterprise Reform**

21. **U.S. Probes Titanium Imports in Possible Tariff Case**

22. **U.S. Push on Food Trade Pressures EU**

23. **Weapons Makers Declare War on Drones**

24. **Berlin Arms Policy Risks 'German-Free' European Defense Projects**

25. **Germany in Talks With Airbus on 600 Million Euros of A380 Loans**

26. **The Cybersecurity 202: Commerce Department's Pitch at RSA: Companies Should Publish 'Ingredients' for Their Technology**

27. **Space Force Would Be by Far the Smallest Military Service**

28. **SpaceX Crew Capsule, With a Dummy Astronaut, Docks With Space Station**

29. **NASA Needs SpaceX to Prove It Can Fly Astronauts Safely. Saturday's Test Flight a 'Critical First Step.'**

30. **After India Loses Dogfight to Pakistan, Questions Arise About Its 'Vintage' Military**

31. **Lockheed Gets $1 Billion Down Payment for Saudi THAAD Missile System**

32. **Eyes on the Sea: Companies Compete for Australian Maritime Surveillance Contract**

33. **Opinion: Mitchell Weighs In: More F-35s or New, Old F-15s?**

34. **Opinion: Why Trump's Effort to Narrow the Trade Gap Has Flopped So Far**

35. **Opinion: The U.S. Is Ceding the Pacific to China**

**Upcoming Export Control and Other Trade Compliance Conferences**

## 1. DDTC Rescinds Statutory Debarment of Rocky Mountain Instrument Company

(84 Fed. Reg. 7411) - The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) has rescinded the statutory debarment of Rocky Mountain Instrument Company. This notice rescinds the statutory debarment of RMI but does not provide notice of reinstatement of export privileges for RMI pursuant to the statutory requirements of Sec. 38(g)(4) of the AECA and ITAR Sec. 127.11. As required by the statute, the Department may not issue a license directly to RMI except as may be determined on a case-by-case basis after interagency consultations, a thorough review of the circumstances surrounding the conviction, and a finding that appropriate steps have been taken to mitigate any law enforcement concerns. Any determination by the Department regarding the reinstatement of export privileges for RMI will be made in accordance with these statutory and regulatory requirements and will be the subject of a separate notice. All otherwise eligible persons may engage in exports of RMI manufactured defense articles, incorporate RMI manufactured items into defense articles for export, or otherwise engage in transactions subject to the ITAR without providing prior written notification of RMI's involvement as otherwise required by ITAR Sec. 127.1(d) and the transaction exception requirements of the Federal Register notice of statutory debarment at 75 Fed. Reg. 54693 (Sept. 8, 2010).

## 2. DDTC Posts Four New Name/Address Change Notices

The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) has posted on its website the following four new name/address change notices:

• MEITEC Corporation Address Change

• Vasini Srl and Sacil srl to RB SRL Name Change

• General Dynamics Subsidiaries Address Change

• Excelitas Technologies Corp and Qioptiq Singapore PTE LTD to Excelitas Technologies Singapore PTE LTD Name Change

## 3. U.S. Department of Commerce Initiates Section 232 Investigation into Titanium Sponge Imports

U.S. Secretary of Commerce Wilbur Ross has accepted the Section 232 petition filed on September 27, 2018, by domestic producer Titanium Metals Corporation (TIMET) and launched an investigation into whether the quantity or circumstances of titanium sponge imports into the United States threaten to impair the national security. Secretary Ross sent a letter to Acting Secretary of Defense Patrick Shanahan informing him that he has initiated an investigation in response to this petition. The Department of Defense supports the initiation of this 232 investigation on titanium sponge. Titanium sponge is the primary form of titanium metal from which almost all other titanium products are made. Titanium is used in the production of strategic articles such as military aircraft, space vehicles, satellites, naval vessels, missiles, and munitions. It is also widely used in critical infrastructure and commercial applications such as civilian aircraft, chemical plants, oil and gas plants, electric power and desalination plants, building structures, automobile products, and bio-medical devices. Imports account for more than 60 percent of U.S. titanium sponge consumption. Currently only one facility in the United States has the capacity to process titanium ore into the sponge used in manufacturing. Titanium sponge is difficult to stockpile for long periods as it degrades, rendering the sponge unsuitable for the most demanding military and aerospace applications. See also Item 21 below.

## 4. DoD/DSCA Updates Security Assistance Management Manual and Policy Memos

The U.S. Department of Defense's Defense Security Cooperation Agency (DSCA) has made the following updates to its Security Assistance Management Manual (SAMM) and Policy Memorandums:

• DSCA Policy Memo 19-02 Assignment of Program Code "QJ" to track Fiscal Year (FY) 2019/2020 Coalition Readiness Support Program (CRSP) has been posted.

Effective immediately, Program Code "QJ" is assigned to track FY 2019/2020 Operation and Maintenance, Defense-wide funds appropriated under the Coalition Support Fund (CSF) and designated for the CRSP. CRSP is funded by CSF, appropriated in the Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 (Division A of P.L. 115-245).

This memo revises Table C4.T2B. - Security Cooperation (SC) Customer and Regional Codes and FMS Eligibility (DSCA/DFAS Reserved) and C15.T2. - Coalition Readiness Support Program (CRSP)

## 5. Dutch Government Publishes Updates "Guidelines for Compiling an Internal Compliance Programme"

The Dutch Government's Ministry of Foreign Affairs has published updated Guidelines for Compiling an Internal Compliance Program in English. The updated version reflects new Regulation (EU) 2019/125 of January 16, 2019, concerning trade in certain goods which could be used for capital punishment, torture or other cruel, inhuman or degrading treatment or punishment, which codifies Council Regulation (EC) No. 1236 2005.

## 6. Australia Government's Defence Export Controls Will Close for Canberra Day Public Holiday

The Australian Government's Defence Export Controls (DEC) will be closed for the Canberra Day public holiday on Monday 11 March 2019, reopening on Tuesday 12 March 2019. Please note that applications cannot be processed during this time. Please contact DEC as soon as possible should you urgently require a permit on 11 March 2019.

## 7. United States Will Terminate GSP Designation of India and Turkey

At the direction of President Donald J. Trump, U.S. Trade Representative Robert Lighthizer has announced that the United States intends to terminate India's and Turkey's designations as beneficiary developing countries under the Generalized System of Preferences (GSP) program because they no longer comply with the statutory eligibility criteria. India's termination from GSP follows its failure to provide the United States with assurances that it will provide equitable and reasonable access to its markets in numerous sectors. Turkey's termination from GSP follows a finding that it is sufficiently economically developed and should no longer benefit from preferential market access to the United States market. By statute, these changes may not take effect until at least 60 days after the notifications to Congress and the governments of India and Turkey, and will be enacted by a Presidential Proclamation. Click here for further details.

## 8. USTR Releases 2019 Trade Policy Agenda and 2018 Annual Report

The Office of the U.S. Trade Representative (USTR) has released its 2019 Trade Policy Agenda and 2018 Annual Report. Click here for a USTR press release on the report and here for USTR Fact Sheet. See also Reuters.com, March 1 - U.S. Says Rejects WTO's 'Straitjacket' of Trade Obligations.

## 9. Commerce/NIST's Information Security and Privacy Advisory Board to Meet March 20-21

(84 Fed. Reg. 7347) - The U.S. Department of Commerce's National Institute of Standards and Technology (NIST) has announced that its Information Security and Privacy Advisory Board (ISPAB) will meet Wednesday, March 20, 2019, from 9:00 AM until 5:00 PM EDT, and Thursday, March 21, 2019, from 9:00 AM until 4:30 PM EDT, at Symantec, 700 13th Street, N.W., Washington, DC 20005. Pre-registration, which is not required, may expedite the

entrance process. Please email Jeff Brewer at ,Jeffrey.Brewer@nist.gov by March 19, 2019 to pre-register. Details regarding the ISPAB's activities are available here. The agenda is expected to include the following items:

- Briefing on the U.S. Government Supply Chain Risk Management Council

- Briefing from Health and Human Services on their Healthcare Cybersecurity Program

- Briefing on AI and cybersecurity

- Briefing on Global Positioning System cybersecurity

- Briefing on the Department of Homeland Security Emergency Directive

- Briefing on transitions from internet Protocols Version (IPV) 4 to IPV 6.

## 10. WTO News

- DG Azevêdo urges open and inclusive discussions on investment facilitation

- DG Azevêdo: Perspectives and priorities of LDCs must be heard in debate on WTO future

## 11. U.S. Customs and U.S. Census/AES Updates

- U.S. Customs - Commissioner Speaks to Government, Industry Execs

## 12. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

- Commerce/E&C - Carbon and Alloy Seamless Standard, Line and Pressure Pipe (Under 4.5 Inches) From Romania: Partial Rescission of Antidumping Duty Administrative Review; 2017-2018

- Commerce/E&C - Certain Carbon and Alloy Steel Cut-to-Length Plate From Austria: Notice of Court Decision Not in Harmony With Final Determination in Less Than Fair Value Investigation and Notice of Amended Final Determination and Order Pursuant to Court Decision

- Commerce/E&C - Certain Fabricated Structural Steel From Canada, Mexico, and the People's Republic of China: Initiation of Less-Than-Fair-Value Investigations

- Commerce/E&C - Certain Fabricated Structural Steel From Canada, Mexico, and the People's Republic of China: Initiation of Countervailing Duty Investigations

- Commerce/E&C - Steel Racks and Parts Thereof From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value

## 13. GAO & CRS Reports, Testimony, and Correspondence of Interest

- CRS - Coast Guard Polar Security Cutter (Polar Icebreaker) Program: Background and Issues for Congress - Updated March 1, 2019

- CRS - Coast Guard Cutter Procurement: Background and Issues for Congress - Updated March 1, 2019

- CRS - Kuwait: Governance, Security, and U.S. Policy - Updated March 4, 2019

## 14. U.S. Government Trade Forms and Other Information Collections Open for Public Comment

(84 Fed. Reg. 7366) - Agency: Export-Import Bank of the United States (Ex-Im Bank) - Title: Application for Medium Term Insurance or Guarantee - Agency Form No.: EIB 03-02 - Type of Review: Renewal - Deadline for Public Comment: May 3, 2019

(84 Fed. Reg. 7366) - Agency: Export-Import Bank of the United States (Ex-Im Bank) - Title: Application for Issuing Bank Credit Limit (IBCL) Under Lender or Exporter-Held Policies - Agency Form No.: EIB 92-36 - Type of Review: Renewal - Deadline for Public Comment: April 3, 2019

(84 Fed. Reg. 7366) - Agency: Export-Import Bank of the United States (Ex-Im Bank) - Title: Application for Short-Term Multi- Buyer Export Credit Insurance Policy - Agency Form No.: EIB 92-50 - Type of Review: Renewal - Deadline for Public Comment: May 3, 2019

## Other Headlines

## 15. U.S. Firearms Export Changes Meet Challenges

ArmsControl.org, March 2019 - The Trump administration proposed changes in February to how the United States approves exports of certain firearms, a move that triggered quick responses from some congressional leaders who argued that the approach would be dangerous and reduce oversight. They warned that semiautomatic and military-style weapons, as well as 3D-printed "ghost" guns, would more easily end up in the hands of criminals, terrorists, and human rights abusers if the rules were to take effect. . . . Sen. Bob Menendez (D-N.J.) sponsored legislation Feb. 12 that rejected the rationale for the change and would prohibit the transfer to Commerce Department oversight. The Senate measure also focused on the danger of 3D gun printing, with Menendez saying, "Every terrorist and criminal that wants to hijack an airplane with Americans onboard will more easily be able to smuggle 3D-printed, virtually undetectable guns aboard." . . . House Foreign Affairs Committee Chairman Eliot Engel (D-N.Y.) co-sponsored a measure with Rep. Norma Torres (D-Calif.) on Feb. 9 that would also block the change.

## 16. Washington Wants to Know If Pakistan Used U.S.-Built Jets to Down Indian Warplane

Reuters.com, March 2 - The United States said on Sunday it was trying to find out if Pakistan used U.S.-built F-16 jets to down an Indian warplane, potentially in violation of U.S. agreements, as the stand-off between the nuclear-armed Asian neighbors appeared to

be easing. . . . Pakistan bought several batches of F-16 planes, built by Lockheed Martin Corp, from Washington before relations soured and the United States cut off subsidized sales in 2016. It is not clear what exactly these so-called "end-user agreements" restrict Pakistan from doing. "The U.S. Government does not comment on or confirm pending investigations of this nature," the U.S. Embassy added. On Thursday Indian officials displayed to reporters parts of what they called an air-to-air missile that can only be fired from F-16 jets, alleging they were used to bomb its side of the disputed Kashmir border on Wednesday.

## 17. Trump Symbolically Tightens Embargo on Cuba

New York Times.com & Associated Press, March 4 - The Trump administration announced Monday that it is tightening the six-decade trade embargo on Cuba by allowing lawsuits against Cuban companies using properties confiscated after its 1959 revolution, though the impact appears to be largely symbolic. The announcement limits lawsuits to a list of about 200 Cuban businesses and government agencies that are already subject to special U.S. sanctions because they are tied to the Cuban military and intelligence ministries. Virtually none of the businesses have any links to the U.S. legal or financial systems, meaning the ability to sue is unlikely to have any effect on the Cuban economy or foreign businesses that work with the socialist government. Some of the businesses on the list are hotels operated as joint ventures with foreign companies, but the Trump administration measure does not allow the foreign companies themselves to be sued, a State Department official told reporters on condition of anonymity.

## 18. This Week in Congress: Budget Release Countdown

MilitaryTimes.com, March 4 - One week before the president's fiscal 2020 budget is released, lawmakers have a flurry of defense and veterans oversight hearings to prep their work for that looming funding debate. Among 17 House Appropriations Committee hearings next week are five related to the Defense Department and Veterans Affairs. Meetings with the heads of U.S. European Command and Central Command will be closed, but the others will be open to the public. Senate Armed Services Committee members will hold their second hearing of the year on problems with military housing, this time summoning top service officials to answer for problems with the available privatized housing. And lawmakers are expected to continue to press administration officials for more details on which military construction projects could be used to pay for the president's controversial border wall project. Details on that are expected from the Defense Department in advance of the budget release.

## 19. U.S. Increases Pressure on Maduro With New Sanctions, Revokes Visas of Associates

Reuters.com, March 1 - The United States imposed new sanctions on six Venezuelan security officials and revoked the visas of dozens of associates and their families with ties to President Nicolas Maduro, in the latest move to pile pressure on him to step down. The U.S. Treasury said the six current or former security officials controlled groups that blocked humanitarian aid from reaching people in Venezuela last weekend from neighboring countries Colombia and Brazil. "We are sanctioning members of Maduro's security forces in response to the reprehensible violence, tragic deaths, and unconscionable torching of food and medicine destined for sick and starving Venezuelans," U.S. Treasury Secretary Steven

Mnuchin said. The United States "will continue to target Maduro loyalists prolonging the suffering of the victims of this man-made humanitarian crisis," Mnuchin added.

## 20. China Is Blocking Joint World Bank Report That Calls for State-Owned Enterprise Reform

Washington Post.com, March 1 - China has delayed the publication of a report on its economy, written in conjunction with the World Bank, as it tries to tone down recommendations about reforming its state-owned enterprises and allowing more market-led principles to reign. The report, titled "New Drivers of Growth in China," has been ready for a year, according to four people involved in drafting it, but Chinese authorities have not allowed it to be published. The delays underscore the Chinese Communist Party's extreme sensitivity about its economy as growth rapidly slows, particularly amid a protracted trade war with the United States. Many of the core recommendations of the report echo calls from the United States and other industrialized countries for China to make its trading practices more fair. Beijing's objections to the report underscore just how difficult it will be for Washington to persuade China to change.

## 21. U.S. Probes Titanium Imports in Possible Tariff Case

Wall Street Journal.com, March 4 - The Trump administration said Monday it will investigate the possible national-security risks of imports of titanium, the metal used in aircraft and other products, in a case that could end in tariffs or other trade barriers. The U.S. Commerce Department is undertaking the investigation into a form of the metal known as titanium sponge at the request of a domestic producer, Titanium Metals Corp., also known as Timet. As such, the case differs from similar probes of steel, aluminum and auto-industry imports, which were initiated directly by the administration under a trade law known as Section 232, which allows for tariffs or quotas on national-security grounds. The steel and aluminum probes ended in global tariffs and quotas, while the White House has yet to weigh in on the Commerce Department's auto-industry report.

## 22. U.S. Push on Food Trade Pressures EU

Wall Street Journal.com, March 4 - U.S. and European trade negotiators face growing domestic pressure over agriculture, with clashing demands threatening to rekindle a tit-for-tat economic war. The food fight comes as U.S. farm lobbies, Congress and some Trump administration officials demand access to European markets following a trans-Atlantic trade truce in July. European Union officials are refusing to engage, arguing the White House agreement specifically omitted agriculture and focused instead on slashing tariffs on industrial goods. U.S. Trade Representative Robert Lighthizer and EU Trade Commissioner Cecilia Malmstrom will meet in Washington on Wednesday for their fifth round of talks, now under pressure to avoid a fight over agriculture that neither appears to want.

## 23. Weapons Makers Declare War on Drones

Wall Street Journal.com, March 3 - Arms makers are targeting the growing menace of drones at airports and on battlefields with a rush to develop new missile systems, radar jammers and laser cannons. U.S. forces, along with Middle East allies and Russian troops, have been forced to confront hostile drone operations. Commercial flights at some of the world's busiest hubs—in New York, London and Dubai—have been grounded in recent

months amid concerns that nearby drones could endanger airliners. The rising number of incidents has put the threat in the public eye and propelled interest in anti-drone technology. Defense industry officials say armed forces still account for most spending. The anti-drone market should exceed $1.2 billion in annual sales next year and top $1.5 billion in 2021, Frost & Sullivan estimated. While that is a fraction of the spending each year on combat aircraft, the fast-growing category could become a lucrative new revenue stream for weapons makers.

## 24. Berlin Arms Policy Risks 'German-Free' European Defense Projects

Reuters.com, March 4 - Germany's latest restrictions on arms exports risk making Berlin a pariah in Europe's defense industry, threatening future collaboration on weapons development and its own ambitions to foster a common European defense policy. Germany's decision to unilaterally halt all shipments of military equipment to Saudi Arabia in November after the killing of journalist Jamal Khashoggi has brought long-standing differences between Berlin and its European partners over arms controls to a tipping point. The move has put a question mark over billions of euros of military orders, including a 10 billion pound deal to sell 48 Eurofighter Typhoon jets to Riyadh, and has prompted some firms such as Airbus to strip German components from some of their products. With British defense contractor BAE Systems, the company behind the Eurofighter Typhoon, warning that the German embargo would weigh on its financial performance, London and Paris are racing to convince Berlin to lift it.

## 25. Germany in Talks With Airbus on 600 Million Euros of A380 Loans

Reuters.com, March 4 - Germany is in talks with Airbus about 600 million euros ($680.10 million) in outstanding loans advanced for development of the A380 superjumbo, which the European planemaker now plans to scrap, the Berlin government said on Monday. The loans are at the center of a longstanding trade dispute about mutual claims of illegal aircraft subsidies between the European Union and the United States. A spokeswoman for the German economy ministry confirmed the value of the outstanding loans, first reported by Funke Mediengruppe newspaper chain, but said it was premature to discuss how the issue would be resolved.

## 26. The Cybersecurity 202: Commerce Department's Pitch at RSA: Companies Should Publish 'Ingredients' for Their Technology

Washington Post.com, March 4 - A top Commerce Department cybersecurity official is attending the tech security industry's biggest annual sales conference this week with a sales pitch of his own. Allan Friedman, who leads cybersecurity initiatives at the agency's National Telecommunications and Information Administration, thinks companies could make the entire technology ecosystem dramatically more secure just by publishing a record of all the software that goes into their products. In other words, he wants every piece of technology in the United States to have a public "ingredients list." And just like ingredient lists at the grocery store help consumers make smarter decisions about what they eat, the equivalent in software will help companies make smarter decisions about what they buy and how they protect it, he told me. And he wants to convince companies he meets with at RSA that being more transparent about their software — which can be complicated for legal and competitive reasons — could actually help them improve the services or products they offer clients.

## 27. Space Force Would Be by Far the Smallest Military Service

New York Times.com & Associated Press, March 1 - The Trump administration's proposed Space Force, which faces an uncertain fate in Congress, would be the smallest military service — by far. Details of the Pentagon's proposal released Friday show the new service would have about 15,000 personnel, including an unspecified number of civilians, but would begin in 2020 as only a headquarters of about 200. The proposal was submitted Wednesday to Congress, which must authorize the new service. Space Force would be the first new military service since an independent Air Force was established in 1947 as part of a broad reorganization of the government's military and intelligence agencies. Space Force would reside within the Department of the Air Force, similar to how the Marine Corps exists within the Department of the Navy. It would have its own chief of staff, a four-star general who would answer to the secretary of the Air Force, currently Heather Wilson.

## 28. SpaceX Crew Capsule, With a Dummy Astronaut, Docks With Space Station

Wall Street Journal.com, March 3 - A new-generation SpaceX capsule autonomously docked with the international space station on Sunday, in a successful test of computers and maneuvering systems deemed essential to carry U.S. astronauts on future missions. The initial demonstration flight of the Crew Dragon spacecraft, which blasted off from Florida a day earlier without people on board, is intended to show that SpaceX's latest craft will be safe and reliable enough to start regular crew runs to the orbiting laboratory possibly later this year. The high-profile mission was considered historic even before the gumdrop-shaped vehicle linked up with the station about 250 miles above the Earth. In large part, it aims to test navigational equipment, automated flight-control features and laser-assisted positioning hardware. . . . After a flawless liftoff from Florida's Kennedy Space Center, the capsule—with a mannequin inside it equipped with sensors to record environmental changes and forces—executed a faster-than-usual route to the rendezvous point. The reason for the extra speed was to prevent certain thruster parts from freezing and potentially breaking off, NASA and SpaceX officials told reporters.

## 29. NASA Needs SpaceX to Prove It Can Fly Astronauts Safely. Saturday's Test Flight a 'Critical First Step.'

Washington Post.com, March 1 - The Securities and Exchange Commission is all over him. The Air Force inspector general is auditing his launch certifications. And even NASA, one of his most ardent supporters, is reviewing the safety culture at SpaceX after Elon Musk smoked a joint on a podcast. If that weren't enough pressure, the billionaire entrepreneur is facing one of the most crucial moments in SpaceX's history early Saturday, when the spacecraft designed to carry humans is scheduled to lift off from a storied launch site here. Although the Dragon spacecraft won't be carrying astronauts — only a mannequin named "Ripley" with sensors and about 400 pounds of cargo — the flight will mark a significant step toward the restoration of human spaceflight from U.S. soil since the space shuttle was retired nearly eight years ago.

## 30. After India Loses Dogfight to Pakistan, Questions Arise About Its 'Vintage' Military

New York Times.com, March 4 - It was an inauspicious moment for a military the United States is banking on to help keep an expanding China in check. An Indian Air Force pilot found himself in a dogfight last week with a warplane from the Pakistani Air Force, and ended up a prisoner behind enemy lines for a brief time. . . . The aerial clash, the first by the South Asian rivals in nearly five decades, was a rare test for the Indian military — and it left observers a bit dumbfounded. While the challenges faced by the India's armed forces are no secret, its loss of a plane last week to a country whose military is about half the size and receives a quarter of the funding was still telling. India's armed forces are in alarming shape. If intense warfare broke out tomorrow, India could supply its troops with only 10 days of ammunition, according to government estimates. And 68 percent of the army's equipment is so old, it is officially considered "vintage."

## 31. Lockheed Gets $1 Billion Down Payment for Saudi THAAD Missile System

Reuters.com, March 4 - Lockheed Martin Corp will receive the first payment toward the installation a $15 billion missile defense system in Saudi Arabia as part of a $110 billion arms package the Trump administration said it negotiated with the Kingdom in 2017, the Pentagon said on Monday. The Pentagon awarded Lockheed a $946 million payment for the foreign military sale. In November, the Saudis and U.S. officials signed the letters of offer and acceptance formalizing terms for Saudi's purchase of 44 THAAD launchers, missiles and related equipment. As a part of the scope of work outlined by the Pentagon, obsolete systems currently in place will be updated to prepare the current Saudi missile defense infrastructure for the new Terminal High Altitude Area Defense (THAAD) technology.

## 32. Eyes on the Sea: Companies Compete for Australian Maritime Surveillance Contract

Reuters.com, March 4 - Major global defense contractors want to sell Australia on cutting-edge technology such as high-altitude, solar-electric powered drones and optionally manned aircraft to keep an eye on the oceans. Airbus SE, Italy's Leonardo SpA, Northrop Grumman Corp and Lockheed Martin Corp are among the companies that have expressed interest in providing Australia's Department of Home Affairs with such equipment, showcased at the Australian International Airshow last week. The four companies said they have responded to a request for information issued late last year; the next step, after the government responds, would be to submit proposals.

## 33. Opinion: Mitchell Weighs In: More F-35s or New, Old F-15s?

Breaking Defense.com, March 4 - The Air Force needs to buy more new fighter planes. The constricted size and increasing age of the Air Force's fighter inventory is the product of long-standing deferred investment; the 2009 decision to prematurely curtail the F-22 buy at less than half its required inventory; failure to boost F-35 production to originally planned rates; and the fact that 234 of 1970's era F-15Cs will be hitting the end of their service lives in the next decade. Maintaining the current fighter inventory size demands that the Air Force buy at least 72 fighters per year into the 2020s. . . . On one side of the debate, the Air Force could boost the production rate of its newest fifth-generation F-35 fighter—an aircraft imbued with stealth and information gathering, processing, and sharing capabilities that allow it to effectively execute its missions in modern threat environments and return home safely. The other side of the debate involves a course of action already written into the 2020

budget headed to Capitol Hill. The Office of the Secretary of Defense (OSD) has influenced the Air Force to submit a budget request for a newly constructed legacy fighter—the F-15X.

## 34. Opinion: Why Trump's Effort to Narrow the Trade Gap Has Flopped So Far

Wall Street Journal.com, March 2 - President Trump set his sights on reducing mammoth U.S. trade deficits. In the coming week, the Census Bureau will likely report the U.S. last year registered the largest trade deficit in its history. How that happened is a lesson in the economics of imbalances. In this case, the president's tax policies were as much in play as his trade policies. Large fiscal deficits had the side effect of enabling businesses and consumers to purchase more goods from abroad, driving down overall U.S. saving and driving up the trade imbalance. "The evolution of the trade balance over Trump's first two years is a good illustration of the basic principles that led most economists to predict the trade deficit would continue to widen with Trump's policies," said Brad Setser, a senior fellow at the Council on Foreign Relations.

## 35. Opinion: The U.S. Is Ceding the Pacific to China

Wall Street Journal.com, March 3 - The way to deal with China, and thus North Korea, its naughty but wholly dependent vassal, is not by a failing and provocative attempt to weaken it, but by attending to America's diminishing strengths. Unlike the short-focused U.S., China plays the long game, in which the chief objective is a favorable correlation of forces over time and the most important measure is military capacity. As a dictatorship, it can continue military development and expansion despite economic downturns. With big data and big decrees, Xi Jinping has severely tightened party control in expectation of inevitable variations of fortune. The hatches are battened for a trade war that would adversely effect China and the world should the U.S. not blink first or fail to reject false or delaying assurances. China looks past this and all short-term maneuvering to see the U.S. ill-attending to its fundamental strengths, and marks us down as a declining country that cannot come to terms with necessities.

## Upcoming Export Control and Other Trade Compliance Conferences

**March 5-6 - American Conference Institute - 11th Expert Forum on ITC Litigation & Enforcement - Washington, DC**

**March 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - San Diego - The Four Points Sheraton San Diego Hotel**

**March 5-7 - Partnering for Compliance™ - March 2019 "Partnering for Compliance™" East Export/Import Control Training and Education Program - Orlando - Holiday Inn Orlando International Airport Hote l-** *See also separate Customs/Import Boot Camp on March.*

**March 12-13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - Complying with U.S. Export Control - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive**

**March 13-14 - C5 Group - 6th Forum on Anti-Corruption Italy - Milan - Meliá Milano**

**March 14 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - How to Build an Export Compliance Program - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive**

**March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort**

**March 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Pittsburgh - Westin Convention Center Hotel**

**March 27-28 - American Conference Institute - 6th Summit on Anti-Corruption Mexico - Mexico City - JW Marriottt Hotel Mexico City**

**April 2-3 - Society for International Affairs - 2019 Exemptions and Voluntary Disclosure/Voluntary Self-Disclosure Seminar - Long Beach, California - Renaissance Long Beach Hotel**

**April 3-4 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver, Colorado - Grand Hyatt Denver Hotel**

**April 23-24 - Nielsonsmith - Sanctions, Anti-Corruption & Export Controls Compliance in the Middle East - Dubai, UAE**

**May 2-3 - American Conference Institute - 12th Annual Flagshp Conference on Economic Sanctions - Washington, DC**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

**May 15-17 - International Compliance Professionals Association (ICPA) - 2019 EU Conference - London - Tower Hotel**

**May 16-17 - International Compliance Professionals Association (ICPA) - 2019 ICPA Canada Conference - Toronto, Canada- Hyatt Regency Toronto Hotel**

**May 22-23 - Nielsonsmith - US Trade Controls Compliance in Europe Copnference 2019 - Munich -** *Gary Stanley, Editor of Defense and Export-Import Update, will speak at this conference.*

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DCFeb. 26-27 - U.S.**

Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Control - Miami - DoubleTree Hotel at Miami Airport and Convention Center

March 1 - UK Government/Export Control Joint Unit - Webinar: Open General Export Licenses and EU General Export Authorisations in a no deal Brexit - 11:00 AM - 12:00 PM GMT

March 4-6 - Society for International Affairs - 2019 Winter Back to Basics Conference - Savannah, Georgia - Savannah Marriott Riverfront Hotel

March 5-6 - American Conference Institute - 11th Expert Forum on ITC Litigation & Enforcement - Washington, DC

March 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - San Diego - The Four Points Sheraton San Diego Hotel

March 5-7 - Partnering for Compliance™ - March 2019 "Partnering for Compliance™" East Export/Import Control Training and Education Program - Orlando - Holiday Inn Orlando International Airport Hote l- *See also separate Customs/Import Boot Camp on March.*

March 12-13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - Complying with U.S. Export Control - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive

March 13-14 - C5 Group - 6th Forum on Anti-Corruption Italy - Milan - Meliá Milano

March 14 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - How to Build an Export Compliance Program - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive

March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort

March 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Pittsburgh - Westin Convention Center Hotel

March 26-27 - American Conference Institute - 9th Advanced Industry Forum on Global Encryption, Cloud & Cyber Trade Controls - San Francisco - Marine's Memorial Club

March 27-28 - American Conference Institute - 6th Summit on Anti-Corruption Mexico - Mexico City - JW Marriottt Hotel Mexico City

April 2-3 - Society for International Affairs - 2019 Exemptions and Voluntary Disclosure/Voluntary Self-Disclosure Seminar - Long Beach, California - Renaissance Long Beach Hotel

April 3-4 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver, Colorado - Grand Hyatt Denver Hotel

April 3-4 - C5 Group - Anti-Corruption Switzerland - Zürich - Sheraton Zürich Hotel

April 23 - American Conference Institute - 2nd National Forum on FOCI - Washington, DC - Westin Washington City Center Hotel

April 24-25 - American Conference Institute - Fifth National Conference on CFIUS & Team Telecom - Washington, DC - Westin Washington City Center Hotel

April 23-24 - Nielsonsmith - Sanctions, Anti-Corruption & Export Controls Compliance in the Middle East - Dubai, UAE

**May 2-3 - American Conference Institute - 12th Annual Flagshp Conference on Economic Sanctions - Washington, DC**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

**May 15-16 - American Conference Institute - Foreign Corrupt Practices Act (New York) - New York City - The Westin New York at Times Square**

**May 15-17 - International Compliance Professionals Association (ICPA) - 2019 EU Conference - London - Tower Hotel**

**May 16-17 - International Compliance Professionals Association (ICPA) - 2019 ICPA Canada Conference - Toronto, Canada- Hyatt Regency Toronto Hotel**

**May 22-23 - Nielsonsmith - US Trade Controls Compliance in Europe Copnference 2019 - Munich -** *Gary Stanley, Editor of Defense and Export-Import Update, will speak at this conference.*

**May 22-23 - American Conference Institute - Anti-Corruption Brazil - São Paulo - InterContinental São Paulo Hotel**

**May 29-30 - American Conference Institute - 2nd Annual Hong Kong Summit on Economic Sanctions Compliance and Enforcement - Hong Kong**

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 7 - Society for International Affairs - 2019 Spring Golf Outing - Upper Marlboro, Maryland - Lake Presidential Golf Course**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 11-12 - American Conference Institute - 12th China Forum on Anti-Corruption - Shanghai**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**June 18-19 - C5 Group - 13th International Conference on Anti-Corruption London - London**

**June 26-27 - American Conference Institute - ITC Litigation & Enforcement - Washington, DC - Park Hyatt Washington Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**Sept. 24-25 - 12th Conference on the Foreign Corrupt Practices Act - San Francisco**

**Oct. 27 - American Conference Institute - 5th Asia Pacific Summit on Economic Sanctions Compliance and Enforcement - Singapore**

**Oct.28-29 - American Conference Institute - 8th Asia-Pacific on Anti-Corruption Singapore - Singapore**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 5-6 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to ████████@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. ███████████
Fax ███████████
Mobile ███████████
E-mail ████████@glstrade.com

**From:**    Gary Stanley       @glstrade.com]
**Sent:**    3/5/2019 4:34:48 AM
**To:**    Matthew Borman [Matthew.Borman@bis.doc.gov]
**Subject:**    Defense and Export-Import Update (March 4, 2019)

**Dear All,**

**Good Day!**

**Gary Stanley's EC Tip of the Day: The EAR's Validated End-User (VEU) program is an innovative trade-facilitating program that enhances high-technology civilian trade between the United States and VEU-eligible countries (currently, China and India). Use of Authorization VEU reduces the licensing burden on industry by allowing U.S. exporters to ship designated items to pre-approved entities under a general authorization instead of individual export licenses.**

**Today's Items:**

1. **DDTC Rescinds Statutory Debarment of Rocky Mountain Instrument Company**

2. **DDTC Posts Four New Name/Address Change Notices**

3. **U.S. Department of Commerce Initiates Section 232 Investigation into Titanium Sponge Imports**

4. **DoD/DSCA Updates Security Assistance Management Manual and Policy Memos**

5. **Dutch Government Publishes Updates "Guidelines for Compiling an Internal Compliance Programme"**

6. **Australia Government's Defence Export Controls Will Close for Canberra Day Public Holiday**

7. **United States Will Terminate GSP Designation of India and Turkey**

8. **USTR Releases 2019 Trade Policy Agenda and 2018 Annual Report**

9. **Commerce/NIST's Information Security and Privacy Advisory Board to Meet March 20-21**

10. **WTO News**

11. **U.S. Customs and U.S. Census/AES Updates**

12. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**

13. **GAO & CRS Reports, Testimony, and Correspondence of Interest**

14. **U.S. Government Trade Forms and Other Information Collections Open for Public Comment**

**Other Headlines**

15. **U.S. Firearms Export Changes Meet Challenges**

16. **Washington Wants to Know If Pakistan Used U.S.-Built Jets to Down Indian Warplane**

17. **Trump Symbolically Tightens Embargo on Cuba**

18. **This Week in Congress: Budget Release Countdown**

19. **U.S. Increases Pressure on Maduro With New Sanctions, Revokes Visas of Associates**

20. **China Is Blocking Joint World Bank Report That Calls for State-Owned Enterprise Reform**

21. **U.S. Probes Titanium Imports in Possible Tariff Case**

22. **U.S. Push on Food Trade Pressures EU**

23. **Weapons Makers Declare War on Drones**

24. **Berlin Arms Policy Risks 'German-Free' European Defense Projects**

25. **Germany in Talks With Airbus on 600 Million Euros of A380 Loans**

26. **The Cybersecurity 202: Commerce Department's Pitch at RSA: Companies Should Publish 'Ingredients' for Their Technology**

27. **Space Force Would Be by Far the Smallest Military Service**

28. **SpaceX Crew Capsule, With a Dummy Astronaut, Docks With Space Station**

29. **NASA Needs SpaceX to Prove It Can Fly Astronauts Safely. Saturday's Test Flight a 'Critical First Step.'**

30. **After India Loses Dogfight to Pakistan, Questions Arise About Its 'Vintage' Military**

31. **Lockheed Gets $1 Billion Down Payment for Saudi THAAD Missile System**

32. **Eyes on the Sea: Companies Compete for Australian Maritime Surveillance Contract**

33. **Opinion: Mitchell Weighs In: More F-35s or New, Old F-15s?**

34. **Opinion: Why Trump's Effort to Narrow the Trade Gap Has Flopped So Far**

35. **Opinion: The U.S. Is Ceding the Pacific to China**

**Upcoming Export Control and Other Trade Compliance Conferences**

# 1. DDTC Rescinds Statutory Debarment of Rocky Mountain Instrument Company

(84 Fed. Reg. 7411) - The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) has rescinded the statutory debarment of Rocky Mountain Instrument Company. This notice rescinds the statutory debarment of RMI but does not provide notice of reinstatement of export privileges for RMI pursuant to the statutory requirements of Sec. 38(g)(4) of the AECA and ITAR Sec. 127.11. As required by the statute, the Department may not issue a license directly to RMI except as may be determined on a case-by-case basis after interagency consultations, a thorough review of the circumstances surrounding the conviction, and a finding that appropriate steps have been taken to mitigate any law enforcement concerns. Any determination by the Department regarding the reinstatement of export privileges for RMI will be made in accordance with these statutory and regulatory requirements and will be the subject of a separate notice. All otherwise eligible persons may engage in exports of RMI manufactured defense articles, incorporate RMI manufactured items into defense articles for export, or otherwise engage in transactions subject to the ITAR without providing prior written notification of RMI's involvement as otherwise required by ITAR Sec. 127.1(d) and the transaction exception requirements of the Federal Register notice of statutory debarment at 75 Fed. Reg. 54693 (Sept. 8, 2010).

## 2. DDTC Posts Four New Name/Address Change Notices

The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) has posted on its website the following four new name/address change notices:

- MEITEC Corporation Address Change

- Vasini Srl and Sacil srl to RB SRL Name Change

- General Dynamics Subsidiaries Address Change

- Excelitas Technologies Corp and Qioptiq Singapore PTE LTD to Excelitas Technologies Singapore PTE LTD Name Change

## 3. U.S. Department of Commerce Initiates Section 232 Investigation into Titanium Sponge Imports

U.S. Secretary of Commerce Wilbur Ross has accepted the Section 232 petition filed on September 27, 2018, by domestic producer Titanium Metals Corporation (TIMET) and launched an investigation into whether the quantity or circumstances of titanium sponge imports into the United States threaten to impair the national security. Secretary Ross sent a letter to Acting Secretary of Defense Patrick Shanahan informing him that he has initiated an investigation in response to this petition. The Department of Defense supports the initiation of this 232 investigation on titanium sponge. Titanium sponge is the primary form of titanium metal from which almost all other titanium products are made. Titanium is used in the production of strategic articles such as military aircraft, space vehicles, satellites, naval vessels, missiles, and munitions. It is also widely used in critical infrastructure and commercial applications such as civilian aircraft, chemical plants, oil and gas plants, electric power and desalination plants, building structures, automobile products, and bio-medical devices. Imports account for more than 60 percent of U.S. titanium sponge consumption. Currently only one facility in the United States has the capacity to process titanium ore into the sponge used in manufacturing. Titanium sponge is difficult to stockpile for long periods as it degrades, rendering the sponge unsuitable for the most demanding military and aerospace applications. See also Item 21 below.

## 4. DoD/DSCA Updates Security Assistance Management Manual and Policy Memos

The U.S. Department of Defense's Defense Security Cooperation Agency (DSCA) has made the following updates to its Security Assistance Management Manual (SAMM) and Policy Memorandums:

- DSCA Policy Memo 19-02 Assignment of Program Code "QJ" to track Fiscal Year (FY) 2019/2020 Coalition Readiness Support Program (CRSP) has been posted.

Effective immediately, Program Code "QJ" is assigned to track FY 2019/2020 Operation and Maintenance, Defense-wide funds appropriated under the Coalition Support Fund (CSF) and designated for the CRSP. CRSP is funded by CSF, appropriated in the Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 (Division A of P.L. 115-245).

This memo revises Table C4.T2B. - Security Cooperation (SC) Customer and Regional Codes and FMS Eligibility (DSCA/DFAS Reserved) and C15.T2. - Coalition Readiness Support Program (CRSP)

## 5. Dutch Government Publishes Updates "Guidelines for Compiling an Internal Compliance Programme"

The Dutch Government's Ministry of Foreign Affairs has published updated Guidelines for Compiling an Internal Compliance Program in English. The updated version reflects new Regulation (EU) 2019/125 of January 16, 2019, concerning trade in certain goods which could be used for capital punishment, torture or other cruel, inhuman or degrading treatment or punishment, which codifies Council Regulation (EC) No. 1236 2005.

## 6. Australia Government's Defence Export Controls Will Close for Canberra Day Public Holiday

The Australian Government's Defence Export Controls (DEC) will be closed for the Canberra Day public holiday on Monday 11 March 2019, reopening on Tuesday 12 March 2019. Please note that applications cannot be processed during this time. Please contact DEC as soon as possible should you urgently require a permit on 11 March 2019.

## 7. United States Will Terminate GSP Designation of India and Turkey

At the direction of President Donald J. Trump, U.S. Trade Representative Robert Lighthizer has announced that the United States intends to terminate India's and Turkey's designations as beneficiary developing countries under the Generalized System of Preferences (GSP) program because they no longer comply with the statutory eligibility criteria. India's termination from GSP follows its failure to provide the United States with assurances that it will provide equitable and reasonable access to its markets in numerous sectors. Turkey's termination from GSP follows a finding that it is sufficiently economically developed and should no longer benefit from preferential market access to the United States market. By statute, these changes may not take effect until at least 60 days after the notifications to Congress and the governments of India and Turkey, and will be enacted by a Presidential Proclamation. Click here for further details.

## 8. USTR Releases 2019 Trade Policy Agenda and 2018 Annual Report

The Office of the U.S. Trade Representative (USTR) has released its 2019 Trade Policy Agenda and 2018 Annual Report. Click here for a USTR press release on the report and here for USTR Fact Sheet. See also Reuters.com, March 1 - U.S. Says Rejects WTO's 'Straitjacket' of Trade Obligations.

## 9. Commerce/NIST's Information Security and Privacy Advisory Board to Meet March 20-21

(84 Fed. Reg. 7347) - The U.S. Department of Commerce's National Institute of Standards and Technology (NIST) has announced that its Information Security and Privacy Advisory Board (ISPAB) will meet Wednesday, March 20, 2019, from 9:00 AM until 5:00 PM EDT, and Thursday, March 21, 2019, from 9:00 AM until 4:30 PM EDT, at Symantec, 700 13th Street, N.W., Washington, DC 20005. Pre-registration, which is not required, may expedite the

entrance process. Please email Jeff Brewer at ,Jeffrey.Brewer@nist.gov by March 19, 2019 to pre-register. Details regarding the ISPAB's activities are available here. The agenda is expected to include the following items:

- Briefing on the U.S. Government Supply Chain Risk Management Council

- Briefing from Health and Human Services on their Healthcare Cybersecurity Program

- Briefing on AI and cybersecurity

- Briefing on Global Positioning System cybersecurity

- Briefing on the Department of Homeland Security Emergency Directive

- Briefing on transitions from internet Protocols Version (IPV) 4 to IPV 6.

## 10. WTO News

- DG Azevêdo urges open and inclusive discussions on investment facilitation

- DG Azevêdo: Perspectives and priorities of LDCs must be heard in debate on WTO future

## 11. U.S. Customs and U.S. Census/AES Updates

- U.S. Customs - Commissioner Speaks to Government, Industry Execs

## 12. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

- Commerce/E&C - Carbon and Alloy Seamless Standard, Line and Pressure Pipe (Under 4.5 Inches) From Romania: Partial Rescission of Antidumping Duty Administrative Review; 2017-2018

- Commerce/E&C - Certain Carbon and Alloy Steel Cut-to-Length Plate From Austria: Notice of Court Decision Not in Harmony With Final Determination in Less Than Fair Value Investigation and Notice of Amended Final Determination and Order Pursuant to Court Decision

- Commerce/E&C - Certain Fabricated Structural Steel From Canada, Mexico, and the People's Republic of China: Initiation of Less-Than-Fair-Value Investigations

- Commerce/E&C - Certain Fabricated Structural Steel From Canada, Mexico, and the People's Republic of China: Initiation of Countervailing Duty Investigations

- Commerce/E&C - Steel Racks and Parts Thereof From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value

## 13. GAO & CRS Reports, Testimony, and Correspondence of Interest

• CRS - Coast Guard Polar Security Cutter (Polar Icebreaker) Program: Background and Issues for Congress - Updated March 1, 2019

• CRS - Coast Guard Cutter Procurement: Background and Issues for Congress - Updated March 1, 2019

• CRS - Kuwait: Governance, Security, and U.S. Policy - Updated March 4, 2019

## 14. U.S. Government Trade Forms and Other Information Collections Open for Public Comment

(84 Fed. Reg. 7366) - Agency: Export-Import Bank of the United States (Ex-Im Bank) - Title: Application for Medium Term Insurance or Guarantee - Agency Form No.: EIB 03-02 - Type of Review: Renewal - Deadline for Public Comment: May 3, 2019

(84 Fed. Reg. 7366) - Agency: Export-Import Bank of the United States (Ex-Im Bank) - Title: Application for Issuing Bank Credit Limit (IBCL) Under Lender or Exporter-Held Policies - Agency Form No.: EIB 92-36 - Type of Review: Renewal - Deadline for Public Comment: April 3, 2019

(84 Fed. Reg. 7366) - Agency: Export-Import Bank of the United States (Ex-Im Bank) - Title: Application for Short-Term Multi- Buyer Export Credit Insurance Policy - Agency Form No.: EIB 92-50 - Type of Review: Renewal - Deadline for Public Comment: May 3, 2019

## Other Headlines

## 15. U.S. Firearms Export Changes Meet Challenges

ArmsControl.org, March 2019 - The Trump administration proposed changes in February to how the United States approves exports of certain firearms, a move that triggered quick responses from some congressional leaders who argued that the approach would be dangerous and reduce oversight. They warned that semiautomatic and military-style weapons, as well as 3D-printed "ghost" guns, would more easily end up in the hands of criminals, terrorists, and human rights abusers if the rules were to take effect. . . . Sen. Bob Menendez (D-N.J.) sponsored legislation Feb. 12 that rejected the rationale for the change and would prohibit the transfer to Commerce Department oversight. The Senate measure also focused on the danger of 3D gun printing, with Menendez saying, "Every terrorist and criminal that wants to hijack an airplane with Americans onboard will more easily be able to smuggle 3D-printed, virtually undetectable guns aboard." . . . House Foreign Affairs Committee Chairman Eliot Engel (D-N.Y.) co-sponsored a measure with Rep. Norma Torres (D-Calif.) on Feb. 9 that would also block the change.

## 16. Washington Wants to Know If Pakistan Used U.S.-Built Jets to Down Indian Warplane

Reuters.com, March 2 - The United States said on Sunday it was trying to find out if Pakistan used U.S.-built F-16 jets to down an Indian warplane, potentially in violation of U.S. agreements, as the stand-off between the nuclear-armed Asian neighbors appeared to

be easing. . . . Pakistan bought several batches of F-16 planes, built by Lockheed Martin Corp, from Washington before relations soured and the United States cut off subsidized sales in 2016. It is not clear what exactly these so-called "end-user agreements" restrict Pakistan from doing. "The U.S. Government does not comment on or confirm pending investigations of this nature," the U.S. Embassy added. On Thursday Indian officials displayed to reporters parts of what they called an air-to-air missile that can only be fired from F-16 jets, alleging they were used to bomb its side of the disputed Kashmir border on Wednesday.

## 17. Trump Symbolically Tightens Embargo on Cuba

New York Times.com & Associated Press, March 4 - The Trump administration announced Monday that it is tightening the six-decade trade embargo on Cuba by allowing lawsuits against Cuban companies using properties confiscated after its 1959 revolution, though the impact appears to be largely symbolic. The announcement limits lawsuits to a list of about 200 Cuban businesses and government agencies that are already subject to special U.S. sanctions because they are tied to the Cuban military and intelligence ministries. Virtually none of the businesses have any links to the U.S. legal or financial systems, meaning the ability to sue is unlikely to have any effect on the Cuban economy or foreign businesses that work with the socialist government. Some of the businesses on the list are hotels operated as joint ventures with foreign companies, but the Trump administration measure does not allow the foreign companies themselves to be sued, a State Department official told reporters on condition of anonymity.

## 18. This Week in Congress: Budget Release Countdown

MilitaryTimes.com, March 4 - One week before the president's fiscal 2020 budget is released, lawmakers have a flurry of defense and veterans oversight hearings to prep their work for that looming funding debate. Among 17 House Appropriations Committee hearings next week are five related to the Defense Department and Veterans Affairs. Meetings with the heads of U.S. European Command and Central Command will be closed, but the others will be open to the public. Senate Armed Services Committee members will hold their second hearing of the year on problems with military housing, this time summoning top service officials to answer for problems with the available privatized housing. And lawmakers are expected to continue to press administration officials for more details on which military construction projects could be used to pay for the president's controversial border wall project. Details on that are expected from the Defense Department in advance of the budget release.

## 19. U.S. Increases Pressure on Maduro With New Sanctions, Revokes Visas of Associates

Reuters.com, March 1 - The United States imposed new sanctions on six Venezuelan security officials and revoked the visas of dozens of associates and their families with ties to President Nicolas Maduro, in the latest move to pile pressure on him to step down. The U.S. Treasury said the six current or former security officials controlled groups that blocked humanitarian aid from reaching people in Venezuela last weekend from neighboring countries Colombia and Brazil. "We are sanctioning members of Maduro's security forces in response to the reprehensible violence, tragic deaths, and unconscionable torching of food and medicine destined for sick and starving Venezuelans," U.S. Treasury Secretary Steven

Mnuchin said. The United States "will continue to target Maduro loyalists prolonging the suffering of the victims of this man-made humanitarian crisis," Mnuchin added.

## 20. **China Is Blocking Joint World Bank Report That Calls for State-Owned Enterprise Reform**

Washington Post.com, March 1 - China has delayed the publication of a report on its economy, written in conjunction with the World Bank, as it tries to tone down recommendations about reforming its state-owned enterprises and allowing more market-led principles to reign. The report, titled "New Drivers of Growth in China," has been ready for a year, according to four people involved in drafting it, but Chinese authorities have not allowed it to be published. The delays underscore the Chinese Communist Party's extreme sensitivity about its economy as growth rapidly slows, particularly amid a protracted trade war with the United States. Many of the core recommendations of the report echo calls from the United States and other industrialized countries for China to make its trading practices more fair. Beijing's objections to the report underscore just how difficult it will be for Washington to persuade China to change.

## 21. **U.S. Probes Titanium Imports in Possible Tariff Case**

Wall Street Journal.com, March 4 - The Trump administration said Monday it will investigate the possible national-security risks of imports of titanium, the metal used in aircraft and other products, in a case that could end in tariffs or other trade barriers. The U.S. Commerce Department is undertaking the investigation into a form of the metal known as titanium sponge at the request of a domestic producer, Titanium Metals Corp., also known as Timet. As such, the case differs from similar probes of steel, aluminum and auto-industry imports, which were initiated directly by the administration under a trade law known as Section 232, which allows for tariffs or quotas on national-security grounds. The steel and aluminum probes ended in global tariffs and quotas, while the White House has yet to weigh in on the Commerce Department's auto-industry report.

## 22. **U.S. Push on Food Trade Pressures EU**

Wall Street Journal.com, March 4 - U.S. and European trade negotiators face growing domestic pressure over agriculture, with clashing demands threatening to rekindle a tit-for-tat economic war. The food fight comes as U.S. farm lobbies, Congress and some Trump administration officials demand access to European markets following a trans-Atlantic trade truce in July. European Union officials are refusing to engage, arguing the White House agreement specifically omitted agriculture and focused instead on slashing tariffs on industrial goods. U.S. Trade Representative Robert Lighthizer and EU Trade Commissioner Cecilia Malmstrom will meet in Washington on Wednesday for their fifth round of talks, now under pressure to avoid a fight over agriculture that neither appears to want.

## 23. **Weapons Makers Declare War on Drones**

Wall Street Journal.com, March 3 - Arms makers are targeting the growing menace of drones at airports and on battlefields with a rush to develop new missile systems, radar jammers and laser cannons. U.S. forces, along with Middle East allies and Russian troops, have been forced to confront hostile drone operations. Commercial flights at some of the world's busiest hubs—in New York, London and Dubai—have been grounded in recent

months amid concerns that nearby drones could endanger airliners. The rising number of incidents has put the threat in the public eye and propelled interest in anti-drone technology. Defense industry officials say armed forces still account for most spending. The anti-drone market should exceed $1.2 billion in annual sales next year and top $1.5 billion in 2021, Frost & Sullivan estimated. While that is a fraction of the spending each year on combat aircraft, the fast-growing category could become a lucrative new revenue stream for weapons makers.

## 24. Berlin Arms Policy Risks 'German-Free' European Defense Projects

Reuters.com, March 4 - Germany's latest restrictions on arms exports risk making Berlin a pariah in Europe's defense industry, threatening future collaboration on weapons development and its own ambitions to foster a common European defense policy. Germany's decision to unilaterally halt all shipments of military equipment to Saudi Arabia in November after the killing of journalist Jamal Khashoggi has brought long-standing differences between Berlin and its European partners over arms controls to a tipping point. The move has put a question mark over billions of euros of military orders, including a 10 billion pound deal to sell 48 Eurofighter Typhoon jets to Riyadh, and has prompted some firms such as Airbus to strip German components from some of their products. With British defense contractor BAE Systems, the company behind the Eurofighter Typhoon, warning that the German embargo would weigh on its financial performance, London and Paris are racing to convince Berlin to lift it.

## 25. Germany in Talks With Airbus on 600 Million Euros of A380 Loans

Reuters.com, March 4 - Germany is in talks with Airbus about 600 million euros ($680.10 million) in outstanding loans advanced for development of the A380 superjumbo, which the European planemaker now plans to scrap, the Berlin government said on Monday. The loans are at the center of a longstanding trade dispute about mutual claims of illegal aircraft subsidies between the European Union and the United States. A spokeswoman for the German economy ministry confirmed the value of the outstanding loans, first reported by Funke Mediengruppe newspaper chain, but said it was premature to discuss how the issue would be resolved.

## 26. The Cybersecurity 202: Commerce Department's Pitch at RSA: Companies Should Publish 'Ingredients' for Their Technology

Washington Post.com, March 4 - A top Commerce Department cybersecurity official is attending the tech security industry's biggest annual sales conference this week with a sales pitch of his own. Allan Friedman, who leads cybersecurity initiatives at the agency's National Telecommunications and Information Administration, thinks companies could make the entire technology ecosystem dramatically more secure just by publishing a record of all the software that goes into their products. In other words, he wants every piece of technology in the United States to have a public "ingredients list." And just like ingredient lists at the grocery store help consumers make smarter decisions about what they eat, the equivalent in software will help companies make smarter decisions about what they buy and how they protect it, he told me. And he wants to convince companies he meets with at RSA that being more transparent about their software — which can be complicated for legal and competitive reasons — could actually help them improve the services or products they offer clients.

## 27. Space Force Would Be by Far the Smallest Military Service

New York Times.com & Associated Press, March 1 - The Trump administration's proposed Space Force, which faces an uncertain fate in Congress, would be the smallest military service — by far. Details of the Pentagon's proposal released Friday show the new service would have about 15,000 personnel, including an unspecified number of civilians, but would begin in 2020 as only a headquarters of about 200. The proposal was submitted Wednesday to Congress, which must authorize the new service. Space Force would be the first new military service since an independent Air Force was established in 1947 as part of a broad reorganization of the government's military and intelligence agencies. Space Force would reside within the Department of the Air Force, similar to how the Marine Corps exists within the Department of the Navy. It would have its own chief of staff, a four-star general who would answer to the secretary of the Air Force, currently Heather Wilson.

## 28. SpaceX Crew Capsule, With a Dummy Astronaut, Docks With Space Station

Wall Street Journal.com, March 3 - A new-generation SpaceX capsule autonomously docked with the international space station on Sunday, in a successful test of computers and maneuvering systems deemed essential to carry U.S. astronauts on future missions. The initial demonstration flight of the Crew Dragon spacecraft, which blasted off from Florida a day earlier without people on board, is intended to show that SpaceX's latest craft will be safe and reliable enough to start regular crew runs to the orbiting laboratory possibly later this year. The high-profile mission was considered historic even before the gumdrop-shaped vehicle linked up with the station about 250 miles above the Earth. In large part, it aims to test navigational equipment, automated flight-control features and laser-assisted positioning hardware. . . . After a flawless liftoff from Florida's Kennedy Space Center, the capsule—with a mannequin inside it equipped with sensors to record environmental changes and forces—executed a faster-than-usual route to the rendezvous point. The reason for the extra speed was to prevent certain thruster parts from freezing and potentially breaking off, NASA and SpaceX officials told reporters.

## 29. NASA Needs SpaceX to Prove It Can Fly Astronauts Safely. Saturday's Test Flight a 'Critical First Step.'

Washington Post.com, March 1 - The Securities and Exchange Commission is all over him. The Air Force inspector general is auditing his launch certifications. And even NASA, one of his most ardent supporters, is reviewing the safety culture at SpaceX after Elon Musk smoked a joint on a podcast. If that weren't enough pressure, the billionaire entrepreneur is facing one of the most crucial moments in SpaceX's history early Saturday, when the spacecraft designed to carry humans is scheduled to lift off from a storied launch site here. Although the Dragon spacecraft won't be carrying astronauts — only a mannequin named "Ripley" with sensors and about 400 pounds of cargo — the flight will mark a significant step toward the restoration of human spaceflight from U.S. soil since the space shuttle was retired nearly eight years ago.

## 30. After India Loses Dogfight to Pakistan, Questions Arise About Its 'Vintage' Military

New York Times.com, March 4 - It was an inauspicious moment for a military the United States is banking on to help keep an expanding China in check. An Indian Air Force pilot found himself in a dogfight last week with a warplane from the Pakistani Air Force, and ended up a prisoner behind enemy lines for a brief time. . . . The aerial clash, the first by the South Asian rivals in nearly five decades, was a rare test for the Indian military — and it left observers a bit dumbfounded. While the challenges faced by the India's armed forces are no secret, its loss of a plane last week to a country whose military is about half the size and receives a quarter of the funding was still telling. India's armed forces are in alarming shape. If intense warfare broke out tomorrow, India could supply its troops with only 10 days of ammunition, according to government estimates. And 68 percent of the army's equipment is so old, it is officially considered "vintage."

## 31. Lockheed Gets $1 Billion Down Payment for Saudi THAAD Missile System

Reuters.com, March 4 - Lockheed Martin Corp will receive the first payment toward the installation a $15 billion missile defense system in Saudi Arabia as part of a $110 billion arms package the Trump administration said it negotiated with the Kingdom in 2017, the Pentagon said on Monday. The Pentagon awarded Lockheed a $946 million payment for the foreign military sale. In November, the Saudis and U.S. officials signed the letters of offer and acceptance formalizing terms for Saudi's purchase of 44 THAAD launchers, missiles and related equipment. As a part of the scope of work outlined by the Pentagon, obsolete systems currently in place will be updated to prepare the current Saudi missile defense infrastructure for the new Terminal High Altitude Area Defense (THAAD) technology.

## 32. Eyes on the Sea: Companies Compete for Australian Maritime Surveillance Contract

Reuters.com, March 4 - Major global defense contractors want to sell Australia on cutting-edge technology such as high-altitude, solar-electric powered drones and optionally manned aircraft to keep an eye on the oceans. Airbus SE, Italy's Leonardo SpA, Northrop Grumman Corp and Lockheed Martin Corp are among the companies that have expressed interest in providing Australia's Department of Home Affairs with such equipment, showcased at the Australian International Airshow last week. The four companies said they have responded to a request for information issued late last year; the next step, after the government responds, would be to submit proposals.

## 33. Opinion: Mitchell Weighs In: More F-35s or New, Old F-15s?

Breaking Defense.com, March 4 - The Air Force needs to buy more new fighter planes. The constricted size and increasing age of the Air Force's fighter inventory is the product of long-standing deferred investment; the 2009 decision to prematurely curtail the F-22 buy at less than half its required inventory; failure to boost F-35 production to originally planned rates; and the fact that 234 of 1970's era F-15Cs will be hitting the end of their service lives in the next decade. Maintaining the current fighter inventory size demands that the Air Force buy at least 72 fighters per year into the 2020s. . . . On one side of the debate, the Air Force could boost the production rate of its newest fifth-generation F-35 fighter—an aircraft imbued with stealth and information gathering, processing, and sharing capabilities that allow it to effectively execute its missions in modern threat environments and return home safely. The other side of the debate involves a course of action already written into the 2020

budget headed to Capitol Hill. The Office of the Secretary of Defense (OSD) has influenced the Air Force to submit a budget request for a newly constructed legacy fighter—the F-15X.

## 34. Opinion: Why Trump's Effort to Narrow the Trade Gap Has Flopped So Far

Wall Street Journal.com, March 2 - President Trump set his sights on reducing mammoth U.S. trade deficits. In the coming week, the Census Bureau will likely report the U.S. last year registered the largest trade deficit in its history. How that happened is a lesson in the economics of imbalances. In this case, the president's tax policies were as much in play as his trade policies. Large fiscal deficits had the side effect of enabling businesses and consumers to purchase more goods from abroad, driving down overall U.S. saving and driving up the trade imbalance. "The evolution of the trade balance over Trump's first two years is a good illustration of the basic principles that led most economists to predict the trade deficit would continue to widen with Trump's policies," said Brad Setser, a senior fellow at the Council on Foreign Relations.

## 35. Opinion: The U.S. Is Ceding the Pacific to China

Wall Street Journal.com, March 3 - The way to deal with China, and thus North Korea, its naughty but wholly dependent vassal, is not by a failing and provocative attempt to weaken it, but by attending to America's diminishing strengths. Unlike the short-focused U.S., China plays the long game, in which the chief objective is a favorable correlation of forces over time and the most important measure is military capacity. As a dictatorship, it can continue military development and expansion despite economic downturns. With big data and big decrees, Xi Jinping has severely tightened party control in expectation of inevitable variations of fortune. The hatches are battened for a trade war that would adversely effect China and the world should the U.S. not blink first or fail to reject false or delaying assurances. China looks past this and all short-term maneuvering to see the U.S. ill-attending to its fundamental strengths, and marks us down as a declining country that cannot come to terms with necessities.

## Upcoming Export Control and Other Trade Compliance Conferences

**March 5-6 - American Conference Institute - 11th Expert Forum on ITC Litigation & Enforcement - Washington, DC**

**March 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - San Diego - The Four Points Sheraton San Diego Hotel**

**March 5-7 - Partnering for Compliance™ - March 2019 "Partnering for Compliance™" East Export/Import Control Training and Education Program - Orlando - Holiday Inn Orlando International Airport Hote l-** *See also separate Customs/Import Boot Camp on March.*

**March 12-13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - Complying with U.S. Export Control - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive**

**March 13-14 - C5 Group - 6th Forum on Anti-Corruption Italy - Milan - Meliá Milano**

**March 14 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - How to Build an Export Compliance Program - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive**

**March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort**

**March 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Pittsburgh - Westin Convention Center Hotel**

**March 27-28 - American Conference Institute - 6th Summit on Anti-Corruption Mexico - Mexico City - JW Marriottt Hotel Mexico City**

**April 2-3 - Society for International Affairs - 2019 Exemptions and Voluntary Disclosure/Voluntary Self-Disclosure Seminar - Long Beach, California - Renaissance Long Beach Hotel**

**April 3-4 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver, Colorado - Grand Hyatt Denver Hotel**

**April 23-24 - Nielsonsmith - Sanctions, Anti-Corruption & Export Controls Compliance in the Middle East - Dubai, UAE**

**May 2-3 - American Conference Institute - 12th Annual Flagshp Conference on Economic Sanctions - Washington, DC**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

**May 15-17 - International Compliance Professionals Association (ICPA) - 2019 EU Conference - London - Tower Hotel**

**May 16-17 - International Compliance Professionals Association (ICPA) - 2019 ICPA Canada Conference - Toronto, Canada- Hyatt Regency Toronto Hotel**

**May 22-23 - Nielsonsmith - US Trade Controls Compliance in Europe Copnference 2019 - Munich -** *Gary Stanley, Editor of Defense and Export-Import Update, will speak at this conference.*

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DCFeb. 26-27 - U.S.**

**Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Control - Miami - DoubleTree Hotel at Miami Airport and Convention Center**

**March 1 - UK Government/Export Control Joint Unit - Webinar: Open General Export Licenses and EU General Export Authorisations in a no deal Brexit - 11:00 AM - 12:00 PM GMT**

**March 4-6 - Society for International Affairs - 2019 Winter Back to Basics Conference - Savannah, Georgia - Savannah Marriott Riverfront Hotel**

**March 5-6 - American Conference Institute - 11th Expert Forum on ITC Litigation & Enforcement - Washington, DC**

**March 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - San Diego - The Four Points Sheraton San Diego Hotel**

**March 5-7 - Partnering for Compliance™ - March 2019 "Partnering for Compliance™" East Export/Import Control Training and Education Program - Orlando - Holiday Inn Orlando International Airport Hote l-** *See also separate Customs/Import Boot Camp on March.*

**March 12-13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - Complying with U.S. Export Control - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive**

**March 13-14 - C5 Group - 6th Forum on Anti-Corruption Italy - Milan - Meliá Milano**

**March 14 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - How to Build an Export Compliance Program - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive**

**March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort**

**March 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Pittsburgh - Westin Convention Center Hotel**

**March 26-27 - American Conference Institute - 9th Advanced Industry Forum on Global Encryption, Cloud & Cyber Trade Controls - San Francisco - Marine's Memorial Club**

**March 27-28 - American Conference Institute - 6th Summit on Anti-Corruption Mexico - Mexico City - JW Marriottt Hotel Mexico City**

**April 2-3 - Society for International Affairs - 2019 Exemptions and Voluntary Disclosure/Voluntary Self-Disclosure Seminar - Long Beach, California - Renaissance Long Beach Hotel**

**April 3-4 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver, Colorado - Grand Hyatt Denver Hotel**

**April 3-4 - C5 Group - Anti-Corruption Switzerland - Zürich - Sheraton Zürich Hotel**

**April 23 - American Conference Institute - 2nd National Forum on FOCI - Washington, DC - Westin Washington City Center Hotel**

**April 24-25 - American Conference Institute - Fifth National Conference on CFIUS & Team Telecom - Washington, DC - Westin Washington City Center Hotel**

**April 23-24 - Nielsonsmith - Sanctions, Anti-Corruption & Export Controls Compliance in the Middle East - Dubai, UAE**

**May 2-3 - American Conference Institute - 12th Annual Flagshp Conference on Economic Sanctions - Washington, DC**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

**May 15-16 - American Conference Institute - Foreign Corrupt Practices Act (New York) - New York City - The Westin New York at Times Square**

**May 15-17 - International Compliance Professionals Association (ICPA) - 2019 EU Conference - London - Tower Hotel**

**May 16-17 - International Compliance Professionals Association (ICPA) - 2019 ICPA Canada Conference - Toronto, Canada- Hyatt Regency Toronto Hotel**

**May 22-23 - Nielsonsmith - US Trade Controls Compliance in Europe Copnference 2019 - Munich -** *Gary Stanley, Editor of Defense and Export-Import Update, will speak at this conference.*

**May 22-23 - American Conference Institute - Anti-Corruption Brazil - São Paulo - InterContinental São Paulo Hotel**

**May 29-30 - American Conference Institute - 2nd Annual Hong Kong Summit on Economic Sanctions Compliance and Enforcement - Hong Kong**

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 7 - Society for International Affairs - 2019 Spring Golf Outing - Upper Marlboro, Maryland - Lake Presidential Golf Course**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 11-12 - American Conference Institute - 12th China Forum on Anti-Corruption - Shanghai**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**June 18-19 - C5 Group - 13th International Conference on Anti-Corruption London - London**

**June 26-27 - American Conference Institute - ITC Litigation & Enforcement - Washington, DC - Park Hyatt Washington Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**Sept. 24-25 - 12th Conference on the Foreign Corrupt Practices Act - San Francisco**

**Oct. 27 - American Conference Institute - 5th Asia Pacific Summit on Economic Sanctions Compliance and Enforcement - Singapore**

**Oct.28-29 - American Conference Institute - 8th Asia-Pacific on Anti-Corruption Singapore - Singapore**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 5-6 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to ▮▮▮▮@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. ▮▮▮▮▮▮▮▮▮▮
Fax ▮▮▮▮▮▮▮
Mobile ▮▮▮▮▮▮▮▮▮
E-mail ▮▮▮▮▮@glstrade.com

.

**From:** Gary Stanley [███████@glstrade.com]
**Sent:** 3/5/2019 4:34:48 AM
**To:** Mira Ricardel [Mira.Ricardel@bis.doc.gov]
**Subject:** Defense and Export-Import Update (March 4, 2019)

**Dear All,**

**Good Day!**

**Gary Stanley's EC Tip of the Day: The EAR's Validated End-User (VEU) program is an innovative trade-facilitating program that enhances high-technology civilian trade between the United States and VEU-eligible countries (currently, China and India). Use of Authorization VEU reduces the licensing burden on industry by allowing U.S. exporters to ship designated items to pre-approved entities under a general authorization instead of individual export licenses.**

**Today's Items:**

1. **DDTC Rescinds Statutory Debarment of Rocky Mountain Instrument Company**
2. **DDTC Posts Four New Name/Address Change Notices**
3. **U.S. Department of Commerce Initiates Section 232 Investigation into Titanium Sponge Imports**
4. **DoD/DSCA Updates Security Assistance Management Manual and Policy Memos**
5. **Dutch Government Publishes Updates "Guidelines for Compiling an Internal Compliance Programme"**
6. **Australia Government's Defence Export Controls Will Close for Canberra Day Public Holiday**
7. **United States Will Terminate GSP Designation of India and Turkey**
8. **USTR Releases 2019 Trade Policy Agenda and 2018 Annual Report**
9. **Commerce/NIST's Information Security and Privacy Advisory Board to Meet March 20-21**
10. **WTO News**
11. **U.S. Customs and U.S. Census/AES Updates**
12. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**
13. **GAO & CRS Reports, Testimony, and Correspondence of Interest**
14. **U.S. Government Trade Forms and Other Information Collections Open for Public Comment**

**Other Headlines**

15. **U.S. Firearms Export Changes Meet Challenges**
16. **Washington Wants to Know If Pakistan Used U.S.-Built Jets to Down Indian Warplane**
17. **Trump Symbolically Tightens Embargo on Cuba**
18. **This Week in Congress: Budget Release Countdown**

19. **U.S. Increases Pressure on Maduro With New Sanctions, Revokes Visas of Associates**

20. **China Is Blocking Joint World Bank Report That Calls for State-Owned Enterprise Reform**

21. **U.S. Probes Titanium Imports in Possible Tariff Case**

22. **U.S. Push on Food Trade Pressures EU**

23. **Weapons Makers Declare War on Drones**

24. **Berlin Arms Policy Risks 'German-Free' European Defense Projects**

25. **Germany in Talks With Airbus on 600 Million Euros of A380 Loans**

26. **The Cybersecurity 202: Commerce Department's Pitch at RSA: Companies Should Publish 'Ingredients' for Their Technology**

27. **Space Force Would Be by Far the Smallest Military Service**

28. **SpaceX Crew Capsule, With a Dummy Astronaut, Docks With Space Station**

29. **NASA Needs SpaceX to Prove It Can Fly Astronauts Safely. Saturday's Test Flight a 'Critical First Step.'**

30. **After India Loses Dogfight to Pakistan, Questions Arise About Its 'Vintage' Military**

31. **Lockheed Gets $1 Billion Down Payment for Saudi THAAD Missile System**

32. **Eyes on the Sea: Companies Compete for Australian Maritime Surveillance Contract**

33. **Opinion: Mitchell Weighs In: More F-35s or New, Old F-15s?**

34. **Opinion: Why Trump's Effort to Narrow the Trade Gap Has Flopped So Far**

35. **Opinion: The U.S. Is Ceding the Pacific to China**

**Upcoming Export Control and Other Trade Compliance Conferences**

## 1. DDTC Rescinds Statutory Debarment of Rocky Mountain Instrument Company

(84 Fed. Reg. 7411) - The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) has rescinded the statutory debarment of Rocky Mountain Instrument Company. This notice rescinds the statutory debarment of RMI but does not provide notice of reinstatement of export privileges for RMI pursuant to the statutory requirements of Sec. 38(g)(4) of the AECA and ITAR Sec. 127.11. As required by the statute, the Department may not issue a license directly to RMI except as may be determined on a case-by-case basis after interagency consultations, a thorough review of the circumstances surrounding the conviction, and a finding that appropriate steps have been taken to mitigate any law enforcement concerns. Any determination by the Department regarding the reinstatement of export privileges for RMI will be made in accordance with these statutory and regulatory requirements and will be the subject of a separate notice. All otherwise eligible persons may engage in exports of RMI manufactured defense articles, incorporate RMI manufactured items into defense articles for export, or otherwise engage in transactions subject to the ITAR without providing prior written notification of RMI's involvement as otherwise required by ITAR Sec. 127.1(d) and the transaction exception requirements of the Federal Register notice of statutory debarment at 75 Fed. Reg. 54693 (Sept. 8, 2010).

## 2. DDTC Posts Four New Name/Address Change Notices

The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) has posted on its website the following four new name/address change notices:

- MEITEC Corporation Address Change

- Vasini Srl and Sacil srl to RB SRL Name Change

- General Dynamics Subsidiaries Address Change

- Excelitas Technologies Corp and Qioptiq Singapore PTE LTD to Excelitas Technologies Singapore PTE LTD Name Change

## 3. U.S. Department of Commerce Initiates Section 232 Investigation into Titanium Sponge Imports

U.S. Secretary of Commerce Wilbur Ross has accepted the Section 232 petition filed on September 27, 2018, by domestic producer Titanium Metals Corporation (TIMET) and launched an investigation into whether the quantity or circumstances of titanium sponge imports into the United States threaten to impair the national security. Secretary Ross sent a letter to Acting Secretary of Defense Patrick Shanahan informing him that he has initiated an investigation in response to this petition. The Department of Defense supports the initiation of this 232 investigation on titanium sponge. Titanium sponge is the primary form of titanium metal from which almost all other titanium products are made. Titanium is used in the production of strategic articles such as military aircraft, space vehicles, satellites, naval vessels, missiles, and munitions. It is also widely used in critical infrastructure and commercial applications such as civilian aircraft, chemical plants, oil and gas plants, electric power and desalination plants, building structures, automobile products, and bio-medical devices. Imports account for more than 60 percent of U.S. titanium sponge consumption. Currently only one facility in the United States has the capacity to process titanium ore into the sponge used in manufacturing. Titanium sponge is difficult to stockpile for long periods as it degrades, rendering the sponge unsuitable for the most demanding military and aerospace applications. See also Item 21 below.

## 4. DoD/DSCA Updates Security Assistance Management Manual and Policy Memos

The U.S. Department of Defense's Defense Security Cooperation Agency (DSCA) has made the following updates to its Security Assistance Management Manual (SAMM) and Policy Memorandums:

- DSCA Policy Memo 19-02 Assignment of Program Code "QJ" to track Fiscal Year (FY) 2019/2020 Coalition Readiness Support Program (CRSP) has been posted.

Effective immediately, Program Code "QJ" is assigned to track FY 2019/2020 Operation and Maintenance, Defense-wide funds appropriated under the Coalition Support Fund (CSF) and designated for the CRSP. CRSP is funded by CSF, appropriated in the Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 (Division A of P.L. 115-245).

This memo revises Table C4.T2B. - Security Cooperation (SC) Customer and Regional Codes and FMS Eligibility (DSCA/DFAS Reserved) and C15.T2. - Coalition Readiness Support Program (CRSP)

## 5. Dutch Government Publishes Updates "Guidelines for Compiling an Internal Compliance Programme"

The Dutch Government's Ministry of Foreign Affairs has published updated Guidelines for Compiling an Internal Compliance Program in English. The updated version reflects new Regulation (EU) 2019/125 of January 16, 2019, concerning trade in certain goods which could be used for capital punishment, torture or other cruel, inhuman or degrading treatment or punishment, which codifies Council Regulation (EC) No. 1236 2005.

## 6. Australia Government's Defence Export Controls Will Close for Canberra Day Public Holiday

The Australian Government's Defence Export Controls (DEC) will be closed for the Canberra Day public holiday on Monday 11 March 2019, reopening on Tuesday 12 March 2019. Please note that applications cannot be processed during this time. Please contact DEC as soon as possible should you urgently require a permit on 11 March 2019.

## 7. United States Will Terminate GSP Designation of India and Turkey

At the direction of President Donald J. Trump, U.S. Trade Representative Robert Lighthizer has announced that the United States intends to terminate India's and Turkey's designations as beneficiary developing countries under the Generalized System of Preferences (GSP) program because they no longer comply with the statutory eligibility criteria. India's termination from GSP follows its failure to provide the United States with assurances that it will provide equitable and reasonable access to its markets in numerous sectors. Turkey's termination from GSP follows a finding that it is sufficiently economically developed and should no longer benefit from preferential market access to the United States market. By statute, these changes may not take effect until at least 60 days after the notifications to Congress and the governments of India and Turkey, and will be enacted by a Presidential Proclamation. Click here for further details.

## 8. USTR Releases 2019 Trade Policy Agenda and 2018 Annual Report

The Office of the U.S. Trade Representative (USTR) has released its 2019 Trade Policy Agenda and 2018 Annual Report. Click here for a USTR press release on the report and here for USTR Fact Sheet. See also Reuters.com, March 1 - U.S. Says Rejects WTO's 'Straitjacket' of Trade Obligations.

## 9. Commerce/NIST's Information Security and Privacy Advisory Board to Meet March 20-21

(84 Fed. Reg. 7347) - The U.S. Department of Commerce's National Institute of Standards and Technology (NIST) has announced that its Information Security and Privacy Advisory Board (ISPAB) will meet Wednesday, March 20, 2019, from 9:00 AM until 5:00 PM EDT, and Thursday, March 21, 2019, from 9:00 AM until 4:30 PM EDT, at Symantec, 700 13th Street, N.W., Washington, DC 20005. Pre-registration, which is not required, may expedite the

entrance process. Please email Jeff Brewer at ,Jeffrey.Brewer@nist.gov by March 19, 2019 to pre-register. Details regarding the ISPAB's activities are available here. The agenda is expected to include the following items:

- Briefing on the U.S. Government Supply Chain Risk Management Council

- Briefing from Health and Human Services on their Healthcare Cybersecurity Program

- Briefing on AI and cybersecurity

- Briefing on Global Positioning System cybersecurity

- Briefing on the Department of Homeland Security Emergency Directive

- Briefing on transitions from internet Protocols Version (IPV) 4 to IPV 6.

## 10. WTO News

- DG Azevêdo urges open and inclusive discussions on investment facilitation

- DG Azevêdo: Perspectives and priorities of LDCs must be heard in debate on WTO future

## 11. U.S. Customs and U.S. Census/AES Updates

- U.S. Customs - Commissioner Speaks to Government, Industry Execs

## 12. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

- Commerce/E&C - Carbon and Alloy Seamless Standard, Line and Pressure Pipe (Under 4.5 Inches) From Romania: Partial Rescission of Antidumping Duty Administrative Review; 2017-2018

- Commerce/E&C - Certain Carbon and Alloy Steel Cut-to-Length Plate From Austria: Notice of Court Decision Not in Harmony With Final Determination in Less Than Fair Value Investigation and Notice of Amended Final Determination and Order Pursuant to Court Decision

- Commerce/E&C - Certain Fabricated Structural Steel From Canada, Mexico, and the People's Republic of China: Initiation of Less-Than-Fair-Value Investigations

- Commerce/E&C - Certain Fabricated Structural Steel From Canada, Mexico, and the People's Republic of China: Initiation of Countervailing Duty Investigations

- Commerce/E&C - Steel Racks and Parts Thereof From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value

## 13. GAO & CRS Reports, Testimony, and Correspondence of Interest

- CRS - Coast Guard Polar Security Cutter (Polar Icebreaker) Program: Background and Issues for Congress - Updated March 1, 2019

- CRS - Coast Guard Cutter Procurement: Background and Issues for Congress - Updated March 1, 2019

- CRS - Kuwait: Governance, Security, and U.S. Policy - Updated March 4, 2019

## 14. U.S. Government Trade Forms and Other Information Collections Open for Public Comment

(84 Fed. Reg. 7366) - Agency: Export-Import Bank of the United States (Ex-Im Bank) - Title: Application for Medium Term Insurance or Guarantee - Agency Form No.: EIB 03-02 - Type of Review: Renewal - Deadline for Public Comment: May 3, 2019

(84 Fed. Reg. 7366) - Agency: Export-Import Bank of the United States (Ex-Im Bank) - Title: Application for Issuing Bank Credit Limit (IBCL) Under Lender or Exporter-Held Policies - Agency Form No.: EIB 92-36 - Type of Review: Renewal - Deadline for Public Comment: April 3, 2019

(84 Fed. Reg. 7366) - Agency: Export-Import Bank of the United States (Ex-Im Bank) - Title: Application for Short-Term Multi- Buyer Export Credit Insurance Policy - Agency Form No.: EIB 92-50 - Type of Review: Renewal - Deadline for Public Comment: May 3, 2019

## Other Headlines

## 15. U.S. Firearms Export Changes Meet Challenges

ArmsControl.org, March 2019 - The Trump administration proposed changes in February to how the United States approves exports of certain firearms, a move that triggered quick responses from some congressional leaders who argued that the approach would be dangerous and reduce oversight. They warned that semiautomatic and military-style weapons, as well as 3D-printed "ghost" guns, would more easily end up in the hands of criminals, terrorists, and human rights abusers if the rules were to take effect. . . . Sen. Bob Menendez (D-N.J.) sponsored legislation Feb. 12 that rejected the rationale for the change and would prohibit the transfer to Commerce Department oversight. The Senate measure also focused on the danger of 3D gun printing, with Menendez saying, "Every terrorist and criminal that wants to hijack an airplane with Americans onboard will more easily be able to smuggle 3D-printed, virtually undetectable guns aboard." . . . House Foreign Affairs Committee Chairman Eliot Engel (D-N.Y.) co-sponsored a measure with Rep. Norma Torres (D-Calif.) on Feb. 9 that would also block the change.

## 16. Washington Wants to Know If Pakistan Used U.S.-Built Jets to Down Indian Warplane

Reuters.com, March 2 - The United States said on Sunday it was trying to find out if Pakistan used U.S.-built F-16 jets to down an Indian warplane, potentially in violation of U.S. agreements, as the stand-off between the nuclear-armed Asian neighbors appeared to

be easing. . . . Pakistan bought several batches of F-16 planes, built by Lockheed Martin Corp, from Washington before relations soured and the United States cut off subsidized sales in 2016. It is not clear what exactly these so-called "end-user agreements" restrict Pakistan from doing. "The U.S. Government does not comment on or confirm pending investigations of this nature," the U.S. Embassy added. On Thursday Indian officials displayed to reporters parts of what they called an air-to-air missile that can only be fired from F-16 jets, alleging they were used to bomb its side of the disputed Kashmir border on Wednesday.

## 17. Trump Symbolically Tightens Embargo on Cuba

New York Times.com & Associated Press, March 4 - The Trump administration announced Monday that it is tightening the six-decade trade embargo on Cuba by allowing lawsuits against Cuban companies using properties confiscated after its 1959 revolution, though the impact appears to be largely symbolic. The announcement limits lawsuits to a list of about 200 Cuban businesses and government agencies that are already subject to special U.S. sanctions because they are tied to the Cuban military and intelligence ministries. Virtually none of the businesses have any links to the U.S. legal or financial systems, meaning the ability to sue is unlikely to have any effect on the Cuban economy or foreign businesses that work with the socialist government. Some of the businesses on the list are hotels operated as joint ventures with foreign companies, but the Trump administration measure does not allow the foreign companies themselves to be sued, a State Department official told reporters on condition of anonymity.

## 18. This Week in Congress: Budget Release Countdown

MilitaryTimes.com, March 4 - One week before the president's fiscal 2020 budget is released, lawmakers have a flurry of defense and veterans oversight hearings to prep their work for that looming funding debate. Among 17 House Appropriations Committee hearings next week are five related to the Defense Department and Veterans Affairs. Meetings with the heads of U.S. European Command and Central Command will be closed, but the others will be open to the public. Senate Armed Services Committee members will hold their second hearing of the year on problems with military housing, this time summoning top service officials to answer for problems with the available privatized housing. And lawmakers are expected to continue to press administration officials for more details on which military construction projects could be used to pay for the president's controversial border wall project. Details on that are expected from the Defense Department in advance of the budget release.

## 19. U.S. Increases Pressure on Maduro With New Sanctions, Revokes Visas of Associates

Reuters.com, March 1 - The United States imposed new sanctions on six Venezuelan security officials and revoked the visas of dozens of associates and their families with ties to President Nicolas Maduro, in the latest move to pile pressure on him to step down. The U.S. Treasury said the six current or former security officials controlled groups that blocked humanitarian aid from reaching people in Venezuela last weekend from neighboring countries Colombia and Brazil. "We are sanctioning members of Maduro's security forces in response to the reprehensible violence, tragic deaths, and unconscionable torching of food and medicine destined for sick and starving Venezuelans," U.S. Treasury Secretary Steven

Mnuchin said. The United States "will continue to target Maduro loyalists prolonging the suffering of the victims of this man-made humanitarian crisis," Mnuchin added.

## 20. China Is Blocking Joint World Bank Report That Calls for State-Owned Enterprise Reform

Washington Post.com, March 1 - China has delayed the publication of a report on its economy, written in conjunction with the World Bank, as it tries to tone down recommendations about reforming its state-owned enterprises and allowing more market-led principles to reign. The report, titled "New Drivers of Growth in China," has been ready for a year, according to four people involved in drafting it, but Chinese authorities have not allowed it to be published. The delays underscore the Chinese Communist Party's extreme sensitivity about its economy as growth rapidly slows, particularly amid a protracted trade war with the United States. Many of the core recommendations of the report echo calls from the United States and other industrialized countries for China to make its trading practices more fair. Beijing's objections to the report underscore just how difficult it will be for Washington to persuade China to change.

## 21. U.S. Probes Titanium Imports in Possible Tariff Case

Wall Street Journal.com, March 4 - The Trump administration said Monday it will investigate the possible national-security risks of imports of titanium, the metal used in aircraft and other products, in a case that could end in tariffs or other trade barriers. The U.S. Commerce Department is undertaking the investigation into a form of the metal known as titanium sponge at the request of a domestic producer, Titanium Metals Corp., also known as Timet. As such, the case differs from similar probes of steel, aluminum and auto-industry imports, which were initiated directly by the administration under a trade law known as Section 232, which allows for tariffs or quotas on national-security grounds. The steel and aluminum probes ended in global tariffs and quotas, while the White House has yet to weigh in on the Commerce Department's auto-industry report.

## 22. U.S. Push on Food Trade Pressures EU

Wall Street Journal.com, March 4 - U.S. and European trade negotiators face growing domestic pressure over agriculture, with clashing demands threatening to rekindle a tit-for-tat economic war. The food fight comes as U.S. farm lobbies, Congress and some Trump administration officials demand access to European markets following a trans-Atlantic trade truce in July. European Union officials are refusing to engage, arguing the White House agreement specifically omitted agriculture and focused instead on slashing tariffs on industrial goods. U.S. Trade Representative Robert Lighthizer and EU Trade Commissioner Cecilia Malmstrom will meet in Washington on Wednesday for their fifth round of talks, now under pressure to avoid a fight over agriculture that neither appears to want.

## 23. Weapons Makers Declare War on Drones

Wall Street Journal.com, March 3 - Arms makers are targeting the growing menace of drones at airports and on battlefields with a rush to develop new missile systems, radar jammers and laser cannons. U.S. forces, along with Middle East allies and Russian troops, have been forced to confront hostile drone operations. Commercial flights at some of the world's busiest hubs—in New York, London and Dubai—have been grounded in recent

months amid concerns that nearby drones could endanger airliners. The rising number of incidents has put the threat in the public eye and propelled interest in anti-drone technology. Defense industry officials say armed forces still account for most spending. The anti-drone market should exceed $1.2 billion in annual sales next year and top $1.5 billion in 2021, Frost & Sullivan estimated. While that is a fraction of the spending each year on combat aircraft, the fast-growing category could become a lucrative new revenue stream for weapons makers.

## 24. Berlin Arms Policy Risks 'German-Free' European Defense Projects

Reuters.com, March 4 - Germany's latest restrictions on arms exports risk making Berlin a pariah in Europe's defense industry, threatening future collaboration on weapons development and its own ambitions to foster a common European defense policy. Germany's decision to unilaterally halt all shipments of military equipment to Saudi Arabia in November after the killing of journalist Jamal Khashoggi has brought long-standing differences between Berlin and its European partners over arms controls to a tipping point. The move has put a question mark over billions of euros of military orders, including a 10 billion pound deal to sell 48 Eurofighter Typhoon jets to Riyadh, and has prompted some firms such as Airbus to strip German components from some of their products. With British defense contractor BAE Systems, the company behind the Eurofighter Typhoon, warning that the German embargo would weigh on its financial performance, London and Paris are racing to convince Berlin to lift it.

## 25. Germany in Talks With Airbus on 600 Million Euros of A380 Loans

Reuters.com, March 4 - Germany is in talks with Airbus about 600 million euros ($680.10 million) in outstanding loans advanced for development of the A380 superjumbo, which the European planemaker now plans to scrap, the Berlin government said on Monday. The loans are at the center of a longstanding trade dispute about mutual claims of illegal aircraft subsidies between the European Union and the United States. A spokeswoman for the German economy ministry confirmed the value of the outstanding loans, first reported by Funke Mediengruppe newspaper chain, but said it was premature to discuss how the issue would be resolved.

## 26. The Cybersecurity 202: Commerce Department's Pitch at RSA: Companies Should Publish 'Ingredients' for Their Technology

Washington Post.com, March 4 - A top Commerce Department cybersecurity official is attending the tech security industry's biggest annual sales conference this week with a sales pitch of his own. Allan Friedman, who leads cybersecurity initiatives at the agency's National Telecommunications and Information Administration, thinks companies could make the entire technology ecosystem dramatically more secure just by publishing a record of all the software that goes into their products. In other words, he wants every piece of technology in the United States to have a public "ingredients list." And just like ingredient lists at the grocery store help consumers make smarter decisions about what they eat, the equivalent in software will help companies make smarter decisions about what they buy and how they protect it, he told me. And he wants to convince companies he meets with at RSA that being more transparent about their software — which can be complicated for legal and competitive reasons — could actually help them improve the services or products they offer clients.

## 27. Space Force Would Be by Far the Smallest Military Service

New York Times.com & Associated Press, March 1 - The Trump administration's proposed Space Force, which faces an uncertain fate in Congress, would be the smallest military service — by far. Details of the Pentagon's proposal released Friday show the new service would have about 15,000 personnel, including an unspecified number of civilians, but would begin in 2020 as only a headquarters of about 200. The proposal was submitted Wednesday to Congress, which must authorize the new service. Space Force would be the first new military service since an independent Air Force was established in 1947 as part of a broad reorganization of the government's military and intelligence agencies. Space Force would reside within the Department of the Air Force, similar to how the Marine Corps exists within the Department of the Navy. It would have its own chief of staff, a four-star general who would answer to the secretary of the Air Force, currently Heather Wilson.

## 28. SpaceX Crew Capsule, With a Dummy Astronaut, Docks With Space Station

Wall Street Journal.com, March 3 - A new-generation SpaceX capsule autonomously docked with the international space station on Sunday, in a successful test of computers and maneuvering systems deemed essential to carry U.S. astronauts on future missions. The initial demonstration flight of the Crew Dragon spacecraft, which blasted off from Florida a day earlier without people on board, is intended to show that SpaceX's latest craft will be safe and reliable enough to start regular crew runs to the orbiting laboratory possibly later this year. The high-profile mission was considered historic even before the gumdrop-shaped vehicle linked up with the station about 250 miles above the Earth. In large part, it aims to test navigational equipment, automated flight-control features and laser-assisted positioning hardware. . . . After a flawless liftoff from Florida's Kennedy Space Center, the capsule—with a mannequin inside it equipped with sensors to record environmental changes and forces—executed a faster-than-usual route to the rendezvous point. The reason for the extra speed was to prevent certain thruster parts from freezing and potentially breaking off, NASA and SpaceX officials told reporters.

## 29. NASA Needs SpaceX to Prove It Can Fly Astronauts Safely. Saturday's Test Flight a 'Critical First Step.'

Washington Post.com, March 1 - The Securities and Exchange Commission is all over him. The Air Force inspector general is auditing his launch certifications. And even NASA, one of his most ardent supporters, is reviewing the safety culture at SpaceX after Elon Musk smoked a joint on a podcast. If that weren't enough pressure, the billionaire entrepreneur is facing one of the most crucial moments in SpaceX's history early Saturday, when the spacecraft designed to carry humans is scheduled to lift off from a storied launch site here. Although the Dragon spacecraft won't be carrying astronauts — only a mannequin named "Ripley" with sensors and about 400 pounds of cargo — the flight will mark a significant step toward the restoration of human spaceflight from U.S. soil since the space shuttle was retired nearly eight years ago.

## 30. After India Loses Dogfight to Pakistan, Questions Arise About Its 'Vintage' Military

New York Times.com, March 4 - It was an inauspicious moment for a military the United States is banking on to help keep an expanding China in check. An Indian Air Force pilot found himself in a dogfight last week with a warplane from the Pakistani Air Force, and ended up a prisoner behind enemy lines for a brief time. . . . The aerial clash, the first by the South Asian rivals in nearly five decades, was a rare test for the Indian military — and it left observers a bit dumbfounded. While the challenges faced by the India's armed forces are no secret, its loss of a plane last week to a country whose military is about half the size and receives a quarter of the funding was still telling. India's armed forces are in alarming shape. If intense warfare broke out tomorrow, India could supply its troops with only 10 days of ammunition, according to government estimates. And 68 percent of the army's equipment is so old, it is officially considered "vintage."

## 31. Lockheed Gets $1 Billion Down Payment for Saudi THAAD Missile System

Reuters.com, March 4 - Lockheed Martin Corp will receive the first payment toward the installation a $15 billion missile defense system in Saudi Arabia as part of a $110 billion arms package the Trump administration said it negotiated with the Kingdom in 2017, the Pentagon said on Monday. The Pentagon awarded Lockheed a $946 million payment for the foreign military sale. In November, the Saudis and U.S. officials signed the letters of offer and acceptance formalizing terms for Saudi's purchase of 44 THAAD launchers, missiles and related equipment. As a part of the scope of work outlined by the Pentagon, obsolete systems currently in place will be updated to prepare the current Saudi missile defense infrastructure for the new Terminal High Altitude Area Defense (THAAD) technology.

## 32. Eyes on the Sea: Companies Compete for Australian Maritime Surveillance Contract

Reuters.com, March 4 - Major global defense contractors want to sell Australia on cutting-edge technology such as high-altitude, solar-electric powered drones and optionally manned aircraft to keep an eye on the oceans. Airbus SE, Italy's Leonardo SpA, Northrop Grumman Corp and Lockheed Martin Corp are among the companies that have expressed interest in providing Australia's Department of Home Affairs with such equipment, showcased at the Australian International Airshow last week. The four companies said they have responded to a request for information issued late last year; the next step, after the government responds, would be to submit proposals.

## 33. Opinion: Mitchell Weighs In: More F-35s or New, Old F-15s?

Breaking Defense.com, March 4 - The Air Force needs to buy more new fighter planes. The constricted size and increasing age of the Air Force's fighter inventory is the product of long-standing deferred investment; the 2009 decision to prematurely curtail the F-22 buy at less than half its required inventory; failure to boost F-35 production to originally planned rates; and the fact that 234 of 1970's era F-15Cs will be hitting the end of their service lives in the next decade. Maintaining the current fighter inventory size demands that the Air Force buy at least 72 fighters per year into the 2020s. . . . On one side of the debate, the Air Force could boost the production rate of its newest fifth-generation F-35 fighter—an aircraft imbued with stealth and information gathering, processing, and sharing capabilities that allow it to effectively execute its missions in modern threat environments and return home safely. The other side of the debate involves a course of action already written into the 2020

budget headed to Capitol Hill. The Office of the Secretary of Defense (OSD) has influenced the Air Force to submit a budget request for a newly constructed legacy fighter—the F-15X.

## 34. Opinion: Why Trump's Effort to Narrow the Trade Gap Has Flopped So Far

Wall Street Journal.com, March 2 - President Trump set his sights on reducing mammoth U.S. trade deficits. In the coming week, the Census Bureau will likely report the U.S. last year registered the largest trade deficit in its history. How that happened is a lesson in the economics of imbalances. In this case, the president's tax policies were as much in play as his trade policies. Large fiscal deficits had the side effect of enabling businesses and consumers to purchase more goods from abroad, driving down overall U.S. saving and driving up the trade imbalance. "The evolution of the trade balance over Trump's first two years is a good illustration of the basic principles that led most economists to predict the trade deficit would continue to widen with Trump's policies," said Brad Setser, a senior fellow at the Council on Foreign Relations.

## 35. Opinion: The U.S. Is Ceding the Pacific to China

Wall Street Journal.com, March 3 - The way to deal with China, and thus North Korea, its naughty but wholly dependent vassal, is not by a failing and provocative attempt to weaken it, but by attending to America's diminishing strengths. Unlike the short-focused U.S., China plays the long game, in which the chief objective is a favorable correlation of forces over time and the most important measure is military capacity. As a dictatorship, it can continue military development and expansion despite economic downturns. With big data and big decrees, Xi Jinping has severely tightened party control in expectation of inevitable variations of fortune. The hatches are battened for a trade war that would adversely effect China and the world should the U.S. not blink first or fail to reject false or delaying assurances. China looks past this and all short-term maneuvering to see the U.S. ill-attending to its fundamental strengths, and marks us down as a declining country that cannot come to terms with necessities.

## Upcoming Export Control and Other Trade Compliance Conferences

**March 5-6 - American Conference Institute - 11th Expert Forum on ITC Litigation & Enforcement - Washington, DC**

**March 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - San Diego - The Four Points Sheraton San Diego Hotel**

**March 5-7 - Partnering for Compliance™ - March 2019 "Partnering for Compliance™" East Export/Import Control Training and Education Program - Orlando - Holiday Inn Orlando International Airport Hote l-** *See also separate Customs/Import Boot Camp on March.*

**March 12-13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - Complying with U.S. Export Control - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive**

**March 13-14 - C5 Group - 6th Forum on Anti-Corruption Italy - Milan - Meliá Milano**

**March 14 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - How to Build an Export Compliance Program - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive**

**March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort**

**March 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Pittsburgh - Westin Convention Center Hotel**

**March 27-28 - American Conference Institute - 6th Summit on Anti-Corruption Mexico - Mexico City - JW Marriottt Hotel Mexico City**

**April 2-3 - Society for International Affairs - 2019 Exemptions and Voluntary Disclosure/Voluntary Self-Disclosure Seminar - Long Beach, California - Renaissance Long Beach Hotel**

**April 3-4 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver, Colorado - Grand Hyatt Denver Hotel**

**April 23-24 - Nielsonsmith - Sanctions, Anti-Corruption & Export Controls Compliance in the Middle East - Dubai, UAE**

**May 2-3 - American Conference Institute - 12th Annual Flagshp Conference on Economic Sanctions - Washington, DC**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

**May 15-17 - International Compliance Professionals Association (ICPA) - 2019 EU Conference - London - Tower Hotel**

**May 16-17 - International Compliance Professionals Association (ICPA) - 2019 ICPA Canada Conference - Toronto, Canada- Hyatt Regency Toronto Hotel**

**May 22-23 - Nielsonsmith - US Trade Controls Compliance in Europe Copnference 2019 - Munich -** *Gary Stanley, Editor of Defense and Export-Import Update, will speak at this conference.*

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DCFeb. 26-27 - U.S.**

Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Control - Miami - DoubleTree Hotel at Miami Airport and Convention Center

March 1 - UK Government/Export Control Joint Unit - Webinar: Open General Export Licenses and EU General Export Authorisations in a no deal Brexit - 11:00 AM - 12:00 PM GMT

March 4-6 - Society for International Affairs - 2019 Winter Back to Basics Conference - Savannah, Georgia - Savannah Marriott Riverfront Hotel

March 5-6 - American Conference Institute - 11th Expert Forum on ITC Litigation & Enforcement - Washington, DC

March 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - San Diego - The Four Points Sheraton San Diego Hotel

March 5-7 - Partnering for Compliance™ - March 2019 "Partnering for Compliance™" East Export/Import Control Training and Education Program - Orlando - Holiday Inn Orlando International Airport Hote l- *See also separate Customs/Import Boot Camp on March.*

March 12-13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - Complying with U.S. Export Control - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive

March 13-14 - C5 Group - 6th Forum on Anti-Corruption Italy - Milan - Meliá Milano

March 14 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The North Texas District Export Council - How to Build an Export Compliance Program - Plano, Texas - Center for American and International Law, located at 5201 Democracy Drive

March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort

March 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Pittsburgh - Westin Convention Center Hotel

March 26-27 - American Conference Institute - 9th Advanced Industry Forum on Global Encryption, Cloud & Cyber Trade Controls - San Francisco - Marine's Memorial Club

March 27-28 - American Conference Institute - 6th Summit on Anti-Corruption Mexico - Mexico City - JW Marriottt Hotel Mexico City

April 2-3 - Society for International Affairs - 2019 Exemptions and Voluntary Disclosure/Voluntary Self-Disclosure Seminar - Long Beach, California - Renaissance Long Beach Hotel

April 3-4 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver, Colorado - Grand Hyatt Denver Hotel

April 3-4 - C5 Group - Anti-Corruption Switzerland - Zürich - Sheraton Zürich Hotel

April 23 - American Conference Institute - 2nd National Forum on FOCI - Washington, DC - Westin Washington City Center Hotel

April 24-25 - American Conference Institute - Fifth National Conference on CFIUS & Team Telecom - Washington, DC - Westin Washington City Center Hotel

April 23-24 - Nielsonsmith - Sanctions, Anti-Corruption & Export Controls Compliance in the Middle East - Dubai, UAE

DOC_0039087

**May 2-3 - American Conference Institute - 12th Annual Flagshp Conference on Economic Sanctions - Washington, DC**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

**May 15-16 - American Conference Institute - Foreign Corrupt Practices Act (New York) - New York City - The Westin New York at Times Square**

**May 15-17 - International Compliance Professionals Association (ICPA) - 2019 EU Conference - London - Tower Hotel**

**May 16-17 - International Compliance Professionals Association (ICPA) - 2019 ICPA Canada Conference - Toronto, Canada- Hyatt Regency Toronto Hotel**

**May 22-23 - Nielsonsmith - US Trade Controls Compliance in Europe Copnference 2019 - Munich -** *Gary Stanley, Editor of Defense and Export-Import Update, will speak at this conference.*

**May 22-23 - American Conference Institute - Anti-Corruption Brazil - São Paulo - InterContinental São Paulo Hotel**

**May 29-30 - American Conference Institute - 2nd Annual Hong Kong Summit on Economic Sanctions Compliance and Enforcement - Hong Kong**

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 7 - Society for International Affairs - 2019 Spring Golf Outing - Upper Marlboro, Maryland - Lake Presidential Golf Course**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 11-12 - American Conference Institute - 12th China Forum on Anti-Corruption - Shanghai**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**June 18-19 - C5 Group - 13th International Conference on Anti-Corruption London - London**

**June 26-27 - American Conference Institute - ITC Litigation & Enforcement - Washington, DC - Park Hyatt Washington Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**Sept. 24-25 - 12th Conference on the Foreign Corrupt Practices Act - San Francisco**

**Oct. 27 - American Conference Institute - 5th Asia Pacific Summit on Economic Sanctions Compliance and Enforcement - Singapore**

**Oct.28-29 - American Conference Institute - 8th Asia-Pacific on Anti-Corruption Singapore - Singapore**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 5-6 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to ▮▮▮▮▮@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. ▮▮▮▮▮▮▮▮▮▮
Fax ▮▮▮▮▮▮▮▮▮▮
Mobile ▮▮▮▮▮▮▮▮▮▮
E-mail ▮▮▮▮▮▮@glstrade.com

**From:** Jim Bartlett, Full Circle Compliance ▮▮▮▮▮ ▮fullcirclecompliance.eu]
**Sent:** 3/6/2019 8:35:35 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 19-0306 Wednesday "Daily Bugle"



## Wednesday, 6 March 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. Commerce/BIS Seeks Comments on National Security and Critical Technology Assessments of the U.S. Industrial Base
2. State Maintains Kurdistan Workers' Party's FTO Designation

### OTHER GOVERNMENT SOURCES

3. Items Scheduled for Publication in Future Federal Register Editions
4. Commerce/BIS: (No new postings.)
5. State/DDTC: (No new postings.)
6. Treasury/OFAC Announces Temporary Extension of Ukraine-related General Licenses
7. UK DIT/ECJU Posts Guidance on Exporting Controlled Goods after EU Exit

### NEWS

8. American Shipper: "BIS Pockmarked by Vacancies"
9. Defense One: "We'll Soon Learn Whether You Can Post 3D-Gun Plans Online"
10. ST&R Trade Report: "GSP Eligibility for India, Turkey to be Terminated"

### COMMENTARY

11. The Export Compliance Journal: "Cement Company Fined Over $500,000 For Violating U.S. Sanctions on Iran"
12. G. Farnsworth: "Who's Liable for What? Transport Contracts Under the Microscope"

13.   J. Abramson: "U.S. Firearms Export Changes Meet Challenges"

14.   J. Morey: "Third Wave of Section 301 Tariff Increases Officially Delayed"

**EX/IM TRAINING EVENTS & CONFERENCES**

15.   ECTI Presents "CFIUS Update: New Requirements to Meet, New Industries Affected" Webinar on 16 Apr

**EDITOR'S NOTES**

16.   New Edition of Bartlett's Annotated ITAR ("BITAR") Available

17.   Bartlett's Unfamiliar Quotations

18.   Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (14 Jan 2019), DOC/EAR (20 Dec 2018), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (26 Dec 2018), DOS/ITAR (4 Oct 2018), DOT/FACR/OFAC (15 Nov 2018), HTSUS (27 Feb 2019)

19.   Weekly Highlights of the Daily Bugle Top Stories



FULL CIRCLE

**U.S. Export Controls:**
**ITAR & EAR from a non-U.S. Perspective**
Tuesday, 9 April 2019
Bruchem, The Netherlands

Register Now and get an Early-Bird Discount!

**ITEMS FROM TODAY'S FEDERAL REGISTER**

# 1. Commerce/BIS Seeks Comments on National Security and Critical Technology Assessments of the U.S. Industrial Base

(Source: Federal Register, 6 Mar 2019.) [Excerpts.]

84 FR 8074-8075: Proposed Information Collection; Comment Request; National Security and Critical Technology Assessments of the U.S. Industrial Base
* AGENCY: Bureau of Industry and Security.
* ACTION: Notice. ...
* DATES: Written comments must be submitted on or before May 6, 2019.
* ADDRESSES: Direct all written comments to Jennifer Jessup, Departmental Paperwork Clearance Officer, Department of Commerce, Room 6616, 14th and Constitution Avenue NW, Washington, DC 20230 (or via the internet at PRAcomments@doc.gov).
* FOR FURTHER INFORMATION CONTACT: Requests for additional information or copies of the information collection instrument and instructions should be directed to Mark Crace, BIS ICB Liaison, (202) 482-8093, mark.crace@bis.doc.gov.

This link clarifies the policies and procedures of the Bureau of Industry and Security (BIS) for conducting surveys to obtain information in order to perform industry studies assessing the U.S. industrial base to support the national defense pursuant to the Defense Production Act of 1950, as amended.
* SUPPLEMENTARY INFORMATION:
  - Abstract: The Department of Commerce, in coordination with the Department of Defense and other Federal agencies, conducts survey assessments of U.S. industrial base sectors deemed critical to U.S. national security. The information gathered is necessary to determine the health and competitiveness as well as the needs of these critical market segments in order to maintain a strong U.S. industrial base.
  - Comments are invited on:
   (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility;
   (b) the accuracy of the agency's estimate of the burden (including hours and cost) of the proposed collection of information;
   (c) ways to enhance the quality, utility, and clarity of the information to be collected; and
   (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology. ...

  Sheleen Dumas, Departmental Lead PRA Officer, Office of the Chief Information Officer, Commerce Department.

back to top

* * * * * * * * * * * * * * * * * * *


# 2. State Maintains Kurdistan Workers' Party's FTO Designation
(Source: Federal Register, 6 Mar 2019.) [Excerpts.]

84 FR 8150: Review of the Designation as a Foreign Terrorist Organization (FTO) of the Kurdistan Workers' Party (and Other Aliases)

Based upon a review of the Administrative Record assembled pursuant to Section 219(a)(4)(C) of the Immigration and Nationality Act, as amended (8 U.S.C. 1189(a)(4)(C)) (``INA''), and in consultation with the Attorney General and the Secretary of the Treasury, I conclude that the circumstances that were the basis for the designation of the aforementioned organization as a Foreign Terrorist Organization have not changed in such a manner as to warrant revocation of the designation and that the national security of the United States does not warrant a revocation of the designation.

Therefore, I hereby determine that the designation of the aforementioned organization as a Foreign Terrorist Organization, pursuant to Section 219 of the INA (8 U.S.C. 1189), shall be maintained. ...

Dated: February 5, 2019.
Michael R. Pompeo, Secretary of State.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OTHER GOVERNMENT SOURCES

## 3. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

\* Commerce; Industry and Security Bureau; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: License Exemptions and Exclusions [Pub. Date: 7 Mar 2019.]

\* President; ADMINISTRATIVE ORDERS; Venezuela; Continuation of National Emergency (Notice of March 5, 2019) [Pub. Date: 7 Mar 2019.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. Treasury/OFAC Announces Temporary Extension of Ukraine-related General Licenses
(Source: Treasury/OFAC, 6 Mar 2019.)

Today OFAC extended the expiration date of two general licenses related to GAZ Group by issuing General License No. 13K - Authorizing Certain Transactions Necessary to Divest or Transfer Debt, Equity, or Other Holdings in Certain Blocked Persons, and General License No. 15E - Authorizing Certain Activities Necessary to Maintenance or Wind Down of Operations or Existing Contracts.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. UK DIT/ECJU Posts Guidance on Exporting Controlled Goods after EU Exit
(Source: UK DIT/ECJU, 6 Mar 2019.)

Leaving the EU with a deal remains the UK government's top priority. This has not changed. However, the government is continuing with no deal preparations to ensure the country is prepared for every eventuality.

**Controlled goods**

Controlled goods are regulated through a system of export licensing and include:
  - military items
  - dual-use items (items with both civil and military uses)
  - firearms
  - items that can be used for torture or capital punishment

The Export Control Joint Unit (ECJU) is responsible for the exporting control and licensing of these items.

**Exporting military items**

There will be no changes to controls on the export of military items from the UK other than minor legislative fixes.
You will need to continue to apply for licences as you do now.

**Exporting firearms to the EU**

You will no longer be able to take personal firearms to the EU using the European Firearms Pass because this will no longer be available in the UK.

The exemption that currently applies to the temporary export of firearms as personal effects to the rest of the world will now cover exports to the EU.

If you want to take firearms as personal effects to an EU country, you will need to make sure that the destination country would also permit the import and re-export of the firearm.

If you are a dealer or exporter of firearms, you will need to continue to apply for licences.

**Exporting dual-use items**

The overall framework of controls for dual-use exports will not change, but there will be changes to some licensing requirements.

**From the UK to the EU and the Channel Islands**

You will need a new export licence if you are exporting dual-use items from the UK to the EU or the Channel Islands, issued by the UK.

ECJU has published the Open General Export Licence (OGEL) for exports of dual-use items to EU countries. This licence also covers exports to the Channel Islands.

This new export licence will remove the need for you to apply for individual licences and can be used immediately after 29 March 2019, following registration on SPIRE, the online export licensing system.

**From the UK to a non-EU country**

If you already have a licence to export dual-use items to a non-EU country issued by the UK, it will remain valid for export from the UK. This includes registrations for Open General Export Licences and General Export Authorisations, which will still operate as UK licences.

An export licence issued by one of the 27 EU countries will no longer be valid for export from the UK.

**From the EU to a non-EU country**

You will need a new licence, issued by an EU member state, for exporting dual-use items from EU member states to a non-EU country.

An export licence issued in the UK will no longer be valid to export dual-use items from an EU member state

**From the EU to the UK**

You will need a new licence, issued by an EU member state, for exporting dual-use items from EU member states to the UK.

The European Council has proposed to add the UK as a permitted destination to Union General Export Authorisation (GEA) EU001, to minimise

any additional licensing burden for those exporting dual-use items from the EU to the UK.

**Exporting civil nuclear material**

If you export civil nuclear material you can find out what other conditions will apply besides export controls. They include:
  - civil nuclear regulation if there's no Brexit deal
  - nuclear research if there's no Brexit deal

**Exporting goods that could be used for torture or capital punishment**

Strict controls apply to the export of goods that could be used for torture or capital punishment. The overall framework of the strict controls on these goods will not change, except that exports to EU countries will be treated in the same way as exports to non-EU destinations are treated now.

This means that you will:
  - be prohibited from exporting items in Annex II of Council Regulation 2016/2134 to EU member states
  - be prohibited from providing brokering, training or advertising services relating to items in Annex II of Regulation 2016/2134 to any person or entity in an EU member state
  - need a licence to export items in Annexes III and IIIA of Regulation 2016/2134 to EU member states

**What you can do next**

You should:
  - check if you need an export licence for exports to EU countries on OGEL and goods checker tools, using as a guide the licensing provisions in current legislation for a 'third country' (a non-EU country) to understand what controls would apply for exports to EU countries
  - refer to guidance links on OGEL and goods checker tools to apply for a licence
  - remember, it's your responsibility to comply with the export control regulations, and breaching export controls is a criminal offence
  - sign up for updates on export controls and licensing.

For further information you could:
  - find out more about export controls and licensing
  - find out how the government administers the UK's system of export controls and licensing for military and dual-use items
  - read more information on importing and exporting if the UK leaves the EU with no deal

You can contact the Department for International Trade if you still have a question about exporting controlled goods after EU Exit.

back to top

* * * * * * * * * * * * * * * * * * * *

## 8. American Shipper: "BIS Pockmarked by Vacancies"
(Source: American Shipper, 5 Mar 2019.) [Excerpts.]

Nazak Nikakhtaris, assistant secretary for industry and analysis at the Commerce Department's BIS, also will perform "nonexclusive duties" of the agency's undersecretary for industry and security post.

Nikakhtar, who was nominated by President Trump to become the assistant secretary for industry and analysis, was confirmed by the U.S. Senate on March 19, 2018.

In this role, she serves as the Commerce Department's primary liaison with U.S. industry and trade associations to help address industry concerns and support American competitiveness. She also heads the division that conducts research and analysis on manufacturing, services, travel and tourism, textiles and apparel, global trade, investment and economic trends that impact the International Trade Administration's mission. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. Defense One: "We'll Soon Learn Whether You Can Post 3D-Gun Plans Online"
(Source: Defense One, 6 Mar 2019.)

A proposed export-rules change has snagged over the question: is publishing such designs a boon to U.S. business or foreign terrorists?

It's approaching high noon for a showdown between the Trump administration and Congress over 3D-printed guns.

The Trump administration notified Congress last month that it intended to move jurisdiction for most commercial firearms exports from the State Department to the Commerce Department, a seemingly arcane bureaucratic move that has ignited a firestorm of controversy. Critics say Commerce's laxer export rules will allow criminals, terrorists, and human rights abusers access to a host of new weapons - including metal-free "ghost guns" manufactured on 3D printers.

Congress had 30 days to object to the rules change. Sen. Bob Menendez, D-N.J., on Feb. 26 issued a hold on the proposal, in part, he argued in associated legislation with other Senate Democrats, because it would allow for the "unfettered proliferation of untraceable, virtually undetectable, 3D printable guns that threaten public safety."

On Tuesday, that 30 days ran out. It's not clear whether the Trump administration will honor Menendez's objection, or move to implement the change anyway. The executive branch is not legally required to comply with the hold, although past administrations have traditionally heeded such congressional strictures. The top Republican on the Senate Foreign Relations Committee, Sen. Jim Risch, R-Idaho, has said that he opposes any "further delays in the process."

But administration officials have been marshalling their arguments. Last year, the Commerce Department said it was a "myth" that the transfer would deregulate the export of firearms, saying in a fact sheet that "the U.S. Government is not considering removing the export authorization requirements for any firearms regardless of which agency has licensing jurisdiction or the proposed destination." It also claims that "as a result [of the change], foreign manufacturers will enjoy a greater opportunity to source from small U.S. companies" because "export licensing requirements and process implemented by the Department of Commerce will be calibrated both to the sensitivity of the item and the proposed destination."

A bizarre legal drama has made 3D guns one key sticking point in what otherwise might have been an under-the-radar change originally conceived under the Obama administration. (The broader plan to reform export controls was shelved after the 2012 shooting in Newtown, Conn. killed 26 people, mainly children.)

In 2013, Cody Wilson, a law student and gun activist, posted the blueprints online to assemble a plastic gun from parts made on a 3D printer. The Directorate of Defense Trade Controls, the State Department office that controls firearms exports, took the position that publicly posting that information was the legal equivalent of emailing it to a foreign government - an "export." Wilson's company, Defense Distributed, took down the plans but sued the State Department.

Last summer brought a surprise twist: the State Department settled the case for around $40,000 and allowed the plans black online. Hours before they were to be available again, a federal judge granted a request from eight states and the District of Columbia to temporarily block the settlement from taking effect. The State Department gave no rationale for its abrupt reversal, but the Trump administration was pursuing the rule change to shift the authority for the technology to the Commerce Department at the time.

Onlookers believe that moving the authority for online plans for 3D guns to the Commerce Department would effectively moot the judge's restraining order.And the Commerce Department has signaled that it doesn't intend to place any licensing restrictions on the kinds of plans Wilson sought to post online, of the kind that State originally sought to enforce. In its May Federal Registrar notice announcing the proposed change, it said that "if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination, the operation and maintenance information included in that published operation and

maintenance manual would no longer be "subject to the [Export Administration Regulations]."

A handful of Democrats have sought to use any tool at their disposal to stymie the move. In addition to the Menendez hold, Sen. Ed Markey, D-Mass., has blocked indefinitely the nomination of Clarke Cooper to run the office in the State Department that oversees the Directorate of Defense Trade Controls. Cooper himself appears uncontroversial, and because of the ongoing interagency process, the State Department can't unilaterally give Markey what he wants to release the hold - specifically that the administration maintain its prohibition on publishing the 3D gun blueprints online - leaving a senior post with a myriad of international responsibilities vacant with no clear resolution in sight.

Blocking the rule change permanently would require an act of Congress. Democratic lawmakers are weighing a number of pieces of legislation to address the matter - including blocking the authority transfer in statute and expressly banning posting 3D plans online - but their fate in a Republican-controlled Senate is murky. The change is supported by the firearms industry, traditionally backed by congressional Republicans favorable to more permissive gun laws. Manufacturers believe it will ease regulations and help them boost sales of smalls arms overseas.

Supporters argue the change keeps control of military-grade weapons at the State Department while moving widely available commercial weapons, like semi-automatic pistols, assault-style rifles, sniper rifles and ammunition, to a more natural home at the Commerce Department. The Defense Department and the State Department "will remain active" in vetting and approving exports, the Commerce Department said in its fact sheet, claiming that "foreign manufacturers will enjoy a greater opportunity to source from small U.S. companies."

 "This is good for: U.S. manufacturing, the defense industrial base, security of supply to the U.S. military, and interoperability with allies, to name but a few benefits."

Some legal experts and arms control advocates argue that trying to regulate plastic guns as an export was never the ideal way to keep them out of the hands of criminals and terrorists at home. While the court blocked Wilson from posting his plans on the internet for free, it expressly permitted him to email or otherwise security transmit them as long as he verifies that the recipient is within the U.S.

 "There are genuine issues raised by plastic guns, but they need to be addressed directly, not through export laws designed to keep U.S. guns out of foreigners' hands without State Department approval," wrote Clif Burns, an attorney who specializes in export controls.

back to top

* * * * * * * * * * * * * * * * * *

## 10. ST&R Trade Report: "GSP Eligibility for India, Turkey to be Terminated"
(Source: <u>Sandler, Travis & Rosenberg Trade Report</u>, 6 Mar 2019.)

President Trump announced March 4 his intent to terminate the eligibility of India and Turkey as beneficiary developing countries under the Generalized System of Preferences. These changes will not take effect until at least May 3 and will be enacted by a presidential proclamation. Once that proclamation takes effect, thousands of products imported from these two countries will no longer be eligible for duty-free treatment under GSP.

The president said India is being terminated from GSP because it has not assured the U.S. that it will provide equitable and reasonable access to its markets. A note from the Office of the U.S. Trade Representative explains that India has implemented a wide array of trade barriers that "create serious negative effects on U.S. commerce." These include tougher rules on e-commerce marketplaces, efforts to force foreign companies to store data in India, and higher import tariffs on electronic products in apparent violation of India's commitments under the World Trade Organization's Information Technology Agreement. However, Trump said he will continue to assess this factor, suggesting that India's eligibility could be reinstated if sufficient progress is met.

Turkey is being terminated based on its level of economic development, the president said, pointing to Turkey's increases in gross national product per capita, declining poverty rates, and export diversification since being named a GSP beneficiary in 1975. Given this reason, there appears to be little possibility of a reinstatement.

According to press sources, U.S. imports under GSP in 2017 totaled $5.7 billion from India, making it the largest user of the program, and $1.7 billion from Turkey.

USTR announced in October 2017 that GSP beneficiaries would be subject to heightened scrutiny to help "ensure that countries that are not playing by the rules do not receive U.S. trade preferences." USTR said it would review each beneficiary's compliance with the 15 GSP eligibility criteria every three years and that if a review raises compliance concerns for a particular country the U.S. may launch a full country practice review.

The first assessment period focused on BDCs in Asia, and in October 2017 USTR received petitions requesting the removal or suspension of GSP benefits for India based on (a) lack of equitable and reasonable market access for medical devices and (b) unreasonable barriers to imports of U.S. dairy products. In August 2018 USTR launched a review of Turkey based on its imposition of additional tariffs on $1.78 billion worth of U.S. imports in response to the United States' Section 232 additional tariffs on imports of steel and aluminum products.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DOC_0039422

## 11. The Export Compliance Journal: "Cement Company Fined $500,000 For Violating U.S. Sanctions on Iran"
(Source: The Export Compliance Journal, 5 Mar 2019.)

The United States Treasury Department's Office of Foreign Assets Control (OFAC) announced on February 21, 2019 that ZAG IP LLC, a U.S.-based multinational producer of cement, must pay $506,250 in fines to settle potential civil liabilities associated with violations of U.S. sanctions on Iranian entities, and goods and services originating in Iran.

The sanctions in question prohibit trade-related transactions with Iran for goods, technology, or services. Between July 2014 and January 2015, it is alleged that ZAG purchased over 250,000 metric tons of cement clinker (a type of cement used in construction) worth $14.5M USD, while having full knowledge that it was Iranian in origin. The goods were then resold and transported to a company in Tanzania.

**But It Could Have Been Worse**

While ZAG was aware of the U.S. sanctions on Iran, they relied on an Alternative Supplier based in the United Arab Emirates who misrepresented that "cement clinker was not subject to U.S. economic sanctions on Iran." As a result (and under immense pressure to fulfil the order or lose the contract altogether), ZAG eventually purchased the Iranian-sourced material.
All told, the potential monetary penalties could have run as high as $29,000,000 USD, however, OFAC determined the violations in question constituted a non-egregious case. Among the extenuating factors OFAC considered when making its assessment of the situation were:

  - ZAG's self-disclosure of the violations,
  - Cooperating with the investigation by providing relevant information when requested,
  - Conducting a thorough internal investigation to identify the cause of the compliance failures, and
  - Implementing multiple remedial measures to help prevent a recurrence.

**What to Take Away from This Case**

Like many cases involving an OFAC violation, ZAG's sanctions contraventions highlight the importance of doing your due-diligence, and having strong compliance procedures and mechanisms in place. This is especially the case for companies that trade and transact internationally.

It also demonstrates that companies should not ignore common sense warning signs. For instance, knowing that the cement was of Iranian origin should have caused ZAG to look into the transaction further rather than trusting the word of a third party-in this case their UAE-based Alternative Supplier.

Finally, this case demonstrates the importance of self-disclosure and cooperating with OFAC. The fact that ZAG voluntarily disclosed the violation themselves and cooperated with OFAC's investigation are directly cited as mitigating factors in OFAC's final judgement of the situation.

back to top

* * * * * * * * * * * * * * * * * *


## 12. G. Farnsworth: "Who's Liable for What? Transport Contracts Under the Microscope"
(Source: Holding Redlich, 5 Mar 2019.)

* Author: Geoff Farnsworth, Esq., geoff.farnsworth@holdingredlich.com. Of Holding Redlich, Sydney.

It is a truth universally acknowledged that transport operators will have no liability for any loss or damage to the goods they carry (unless they are ocean carriers in which case different rules may apply much to the chagrin of the said ocean carriers).

This Golden Rule is not contained in any statute, though it is worth making the point that under the Australian Consumer Law as it applies to small business, it is likely that non-negotiable exclusion clauses in standard form contracts may be considered to be unfair and therefore unenforceable.

The exemptions from liability are to be found in transport contracts themselves, often in what is known as the fine print. The clause will usually say (in effect) that the carrier is not liable for anything, ever. It may go on to say that if the carrier is sued by anyone claiming loss or damage (a third party negligence claim, for example) the contracting party will indemnify the carrier.

The exclusion clause often begins with the mysterious incantation: "The Carrier is not a Common Carrier and will have no liability as such." Despite the fact that the incantation is repeated (figuratively) every time a transport contract is entered into, it is doubtful that either party knows what it means.
To understand the status and meaning of Common Carrier, one must go back in time, around 200 years, to the days of horse and carriage, and before the railroads.

At that time carriers, usually illiterate, operated on usual routes. Let's say London to Bristol, and return. In those days, if you wanted your chest to go to Bristol, you would approach a Common Carrier who worked that route,

and ask him (it would almost invariably have been a man) to take your chest to Bristol. You would probably agree on a price, and that was basically that.

Because there was no written contract the common law described the obligations of the Common Carrier (the word *common* in this context referring to the fact that the carrier carried goods for many different people, rather than his social class).

Despite the fact that written contract terms will generally prevail over any common law duties as a Common Carrier, the phrase continues to be used.

A large part of the significance of the law of Common Carrier related to his or her liability for loss of or damage to the goods carried. Despite its antiquity, it was considered in a recent decision of the UK Supreme Court (formerly known as the House of Lords, the UK's highest court), in the case of *Volcafe v Compania Sud Americana De Vapores SA* [2018] UKSC 61. That case concerned carriage of goods by sea, so the facts are not relevant here. However Lord Sumption traversed liability regimes for bailees of goods, which includes the common carrier.

He said:

> The characteristic feature of a common carrier was that he held himself out as accepting for carriage the goods of all comers on a given route, subject to capacity limits. As such, he was strictly liable at common law for loss of or damage to the cargo subject only to exceptions for acts of God and the Queen's enemies. The absence of negligence was irrelevant. But although the position of common carriers is commonly referred to by way of background in the case law, as it was in the judgments below, it is no longer a useful paradigm for the common law liability of a shipowner. Common carriers have for many years been an almost extinct category. For all practical legal purposes, the common law liability of a carrier, unless modified by contract, is the same as that of bailees for reward generally.

The UK Supreme Court has helpfully restated that:

   - a common carrier is strictly liable for loss and damage (unless caused by an Act of God or Queen's Enemies)
   - a bailee for reward is not an insurer and his or her obligation extends only to taking reasonable care of the goods (though he or she must also prove the absence of negligence)
   - in any event, the terms of written contracts of carriage will modify and prevail over these common law relationships.

## Some Common Issues

While claims under transport contracts might be relatively straightforward (ie the carrier has no liability, for anything, ever), this might be a little more complicated when a third party is involved.

A common example is where third party asks a Freight Forwarder to arrange for the delivery of goods from the wharf or warehouse to the third party's premises. The Forwarder will often contract with a Carrier (a transport company or courier). If the goods are damaged while in the care of the Carrier, the third party may make a claim in bailment (as per the second point above) on the basis that the third party is not bound by the terms of the contract between the Forwarder and the Carrier. This can give rise to complicated legal issues relating to Himalaya Clauses and Sub-Bailment on Terms, but also (as mentioned above) the terms of the contract may require the Forwarder to indemnify the Carrier in relation to any claims.

The other complicating factor can be insurance. Transit insurance is common but there may be issues around who's policy applies (someone has to pay for the policy, plus wear any deductible that might apply to any claim).

It is also common for Carriers to give an assurance that they have insurance. While this is almost always true, it is potentially misleading and will depend on what form of insurance the Carrier has. While the Carrier may indeed have liability insurance (for example), if the Carrier's terms and conditions exclude liability, the insurer has no obligation to pay because the Carrier has no liability.

And if the Carrier has transit insurance, there may be an issue as to whether the Carrier has an insurable interest in the goods.

**Conclusion**

Transport contracts are all about clearly defining the parties' obligations and liabilities, who does what, and who is liable for what. Once that is clear the parties can manage the relationship appropriately, through pricing and/or insurance.

While it is tempting to leave "barnacle" clauses in contracts (such as reference to Common Carrier) because they've always been there, they have the potential to confuse relationships and potentially lead to avoidable disputes.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. J. Abramson: "U.S. Firearms Export Changes Meet Challenges"
(Source: Arms Control Association, Mar 2019.)

\* Author: Jeff Abramson, Esq., Senior Fellow for arms control and conventional arms transfers at the Arms Control Association.

The Trump administration proposed changes in February to how the United States approves exports of certain firearms, a move that triggered quick responses from some congressional leaders who argued that the approach

would be dangerous and reduce oversight. They warned that semiautomatic and military-style weapons, as well as 3D-printed "ghost" guns, would more easily end up in the hands of criminals, terrorists, and human rights abusers if the rules were to take effect.

Under the proposed rules, semiautomatic and nonautomatic firearms and their ammunition are deemed to "no longer warrant control under the United States Munitions List (USML)," a State Department-administered list of weapons. Instead, they would be transferred to a list administered by the Commerce Department, the Commerce Control List, an indication of the administration's view that these are "essentially commercial items widely available in retail outlets and less sensitive military items."
Sen. Bob Menendez (D-N.J.) sponsored legislation Feb. 12 that rejected the rationale for the change and would prohibit the transfer to Commerce Department oversight. The proposed new rules would "defy common sense," Menendez said in a statement. He added, "Small arms and associated ammunition are uniquely lethal. They are easily spread and easily modified and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world."

The Senate measure also focused on the danger of 3D gun printing, with Menendez saying, "Every terrorist and criminal that wants to hijack an airplane with Americans onboard will more easily be able to smuggle 3D-printed, virtually undetectable guns aboard." Because online plans for 3D-printed guns currently controlled by the USML are deemed an export, a move to the Commerce Department would likely deregulate their control. The Commerce Department is not expected to impose licensing restrictions on what 3D print advocates are trying to make open-source information. An administration decision last year to allow the organization Defense Distributed to publish 3D plans online met an outcry and has been delayed in ongoing court cases.

On Feb. 26, Menendez sent a letter to U.S. Secretary of State Mike Pompeo placing a hold on the proposed rules change, but whether the administration will honor the hold remains to be seen. It could choose to publish the final rules this month, when the 30-day clock for congressional review that began Feb. 4 expires. Such changes typically then have a six-month implementation phase-in period.

House Foreign Affairs Committee Chairman Eliot Engel (D-N.Y.) co-sponsored a measure with Rep. Norma Torres (D-Calif.) on Feb. 9 that would also block the change. In his statement about the rules, Engel warned that Congress would lose its oversight role, which is needed "so we can step in and make sure these weapons aren't sent to bad actors, including terrorists, drug cartels, human rights abusers or violent criminals."

In 2002, Congress amended notification requirements so it would be informed of potential commercial sales of firearms under USML Category I when they were valued at just $1 million, but no such notifications exist for items on the Commerce Control List.

Data compiled by the Security Assistance Monitor indicates that the Trump administration requested Congress to approve at least $746 million in firearms sales to a total of 14 countries in 2018, more than two-thirds of which was for Saudi Arabia. The value of transfers that would be subject to the new rule is not clear as that data cannot be disaggregated from the automatic and other firearms that would remain on the USML.

The rules were considered during the Obama administration as part of a broader export control effort that transferred portions of the larger USML to Commerce Department control. Changes to firearms and ammunition in the first three USML categories were never formerly introduced, in part due to a different sensibility related to gun violence.

The Trump administration first introduced the rules for public comment in May 2018, garnering thousands of public responses. (See *ACT, June 2018.*)

These military-style weapons, although more tightly controlled in many other countries, have been sold domestically and used in many mass shootings, including at Sandy Hook Elementary School in Newtown, Conn.; the Pulse nightclub in Orlando, Fla., and Stoneman Douglas High School in Parkland, Fla. Human rights and gun control groups have backed the legislative efforts to stop the change. Kris Brown, president of the Brady Campaign, stated on Feb. 8, "While the corporate gun lobby is no doubt thrilled to be able to take their products to a wider audience, we need to be taking steps to reduce gun violence at home, rather than exporting it."

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 14. J. Morey: "Third Wave of Section 301 Tariff Increases Officially Delayed"
(Source: Trade and Manufacturing Monitor, 5 Mar 2019.)

\* Author: Joshua Morey, Esq., Kelley Drye, jmorey@kelleydrye.com

On March 5, 2019, the Office of the United States Trade Representative ("USTR") published a notice in the Federal Register officially postponing the date on which the rate of Section 301 duties on $200 billion of Chinese goods (i.e., List 3 items) will increase from 10% to 25%.

USTR's notice follows President Trump's announcement of his decision to delay the March 2, 2019 deadline for increasing tariffs on List 3 items due to "substantial progress" in his administration's talks with China, as well as Ambassador Lighthizer's testimony before the House Ways and Means Committee concerning the same issue.

The 10% percent duties, which took effect on September 24, 2018, were initially set to increase to 25% on January 1, 2019, but that deadline was delayed to March 2, 2019 pursuant to a December 19, 2018 Federal Register

<u>notice</u>. USTR's March 5, 2019 notice does not establish a new deadline for an increase in duties, but instead leaves the possibility of an increase open.

As Ambassador Lighthizer indicated in his testimony to the House Ways and Means Committee, there has been no agreement to remove the current 10% tariff on List 3 items, though the removal of such tariffs is a negotiating objective of the Government of China. We will continue to monitor further developments regarding the Trump Administration's Section 301 tariffs and trade negotiations with China.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EX/IM TRAINING EVENTS & CONFERENCES

## 15. ECTI Presents "CFIUS Update: New Requirements to Meet, New Industries Affected" Webinar on 16 Apr
(Source: Danielle Hatch, <u>danielle@learnexportcompliance.com</u>)

* What: CFIUS Update: New Requirements to Meet, New Industries Affected
* When: April 16, 2019 1:00 p.m. (EDT)
* Where: Webinar
* Sponsor: Export Compliance Training Institute (ECTI)
* ECTI Speaker: Thaddeus McBride
* Register: <u>Here</u> or Danielle Hatch, 540-433-3977, <u>danielle@learnexportcompliance.com</u>.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 16. New Edition of *Bartlett's Annotated ITAR* ("BITAR") Available
(Source: Editor)

A revised edition of the BITAR was published yesterday, 5 March. Although there have been no amendments to the official ITAR text since October 4, 2018, the 5 March 2019 BITAR edition contains the following changes:

* Added footnotes to the sections:
  - 120.11(a)(7), re *Stagg v. State Dep't.*
  - 120.25(a), re DDTC Consent Agreement, *Matter of R.E. Darling Industries, Inc.* (Feb 26, 2019)

- 124.2(c)(5)(v), indicating the error in (v), which "Gas turbine engine hot sections covered by Category XIX(f)."  All gas turbine engine hot section components are controlled in XIX(f)(2).
- 129.9 re DDTC, Advisory Opinions notice.
* Added "(b) [Reserved]" to § 129.4.
* Added DDTC Consent Agreement, *Matter of R.E. Darling Industries, Inc.* (Feb 26, 2019) to Appendix E.
* Added *Stagg v. State Dep't* case to list of cases in Index.

The BITAR is a 361-page Word document containing all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by download, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. If you are already subscribed to the BITAR you can download the latest version via your own account on our website.

back to top

* * * * * * * * * * * * * * * * * * *

## 17. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Stanislaw Jerzy Lec** (6 Mar 1909 - 7 May 1966; born Baron Stanis Jerzy de Tusch-Letz, was a Polish aphorist and poet. Often mentioned among the greatest writers of post-war Poland, he was one of the most influential aphorists of the 20th century, known for lyrical poetry and skeptical philosophical-moral aphorisms, often with a political subtext.)
  - *"Youth is the gift of nature, but age is a work of art."*

* **Michelangelo** (Michelangelo di Lodovico Buonarroti Simoni; 6 Mar 1475 - 18 Feb 1564; was an Italian sculptor, painter, architect, and poet of the High Renaissance, who exerted an unparalleled influence on the development of Western art. Considered by many the greatest artist of his lifetime, and by some the greatest artist of all time, his artistic versatility was of such a high order that he is often considered a contender for the title of the archetypal Renaissance man, along with his rival, the fellow Florentine and client of the Medici, Leonardo da Vinci.)
  - *"The greater danger for most of us lies not in setting our aim too high and falling short; but in setting our aim too low, and achieving our mark."*
  - *"There is no greater harm than that of time wasted."*

back to top

* * * * * * * * * * * * * * * * * * *

## 18. Are Your Copies of Regulations Up to Date?
(Source: Editor)

\* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199. Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
  - Last Amendment: 14 Jan 2019: 84 FR 112-116: Extension of Import Restrictions Imposed on Certain Archaeological and Ecclesiastical Ethnological Material from Bulgaria; and 84 FR 107-112: Extension of Import Restrictions Imposed on Certain Archaeological Material From China

\* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
  - Last Amendment: 20 Dec 2018: 83 FR 65292-65294: Control of Military Electronic Equipment and Other Items the President Determines No Longer Warrant Control under the United States Munitions List (USML); Correction [Concerning ECCN 7A005 and ECCN 7A105.]

\* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30. Implemented by Dep't of Commerce, U.S. Census Bureau.
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (1 Jan 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

\* DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under Atomic Energy Act of 1954.
  - Last Amendment: 23 Feb 2015: 80 FR 9359, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

* <u>DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL</u>; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under Atomic Energy Act of 1954.
   - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

* <u>DOJ ATF ARMS IMPORT REGULATIONS</u>: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
   - Last Amendment: 15 Jan 2016: <u>81 FR 2657-2723</u>: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* <u>DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR)</u>: 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
   - Last Amendment: 4 Oct 2018: <u>83 FR 50003-50007</u>: Regulatory Reform Revisions to the International Traffic in Arms Regulations.
   The only available fully updated copy (latest edition: 5 March 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR is a 361-page Word document containing all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by download, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance <u>website</u>. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR, please <u>contact us</u> to receive your discount code.

* <u>DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR)</u>: 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders.
Implemented by Dep't of Treasury, Office of Foreign Assets Control.
   - Last Amendment: 15 Nov 2018: <u>83 FR 57308-57318</u>: Democratic Republic of the Congo Sanctions Regulations

* <u>USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA)</u>, 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S. International Trade Commission. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
   - Last Amendment: 27 Feb 2019: <u>Harmonized System Update 1902</u> [contains 40 ABI records and 11 harmonized tariff records.]
   - HTS codes for AES are available <u>here</u>.
   - HTS codes that are not valid for AES are available <u>here</u>.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * *

19. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITORIAL POLICY

\* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 6,500 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

\* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

\* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

\* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

\* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

\* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top



Stay Connected

The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

**From**: Jim Bartlett, Full Circle Compliance [█████@fullcirclecompliance.eu]
**Sent**: 3/12/2019 7:19:57 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 19-0312 Tuesday "Daily Bugle"



## Tuesday, 12 March 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1.   DHS/CBP Amends Regulations, Extends Import Restrictions Imposed on Archaeological and Ecclesiastical Ethnological Material from Honduras
2.   DHS/CBP Seeks Comments on 21st Century Customs Framework

### OTHER GOVERNMENT SOURCES

3.   Items Scheduled for Publication in Future Federal Register Editions
4.   Commerce/BIS: (No new postings.)
5.   State/DDTC: (No new postings.)
6.   President Continues National Emergency with Respect to Iran

### NEWS

7.   EU Sanctions: "UK Publishes Post-Brexit Sanctions Regulations on Democratic Republic of Congo and South Sudan"
8.   SCMP: "China Sells Arms to More Countries and Is World's Biggest Exporter of Armed Drones, Says Swedish Think Tank SIPRI"

### COMMENTARY

9.   D.A. Ring & J. Clark: "Un-Empowered Official: Department of State Fines Exporter for Unqualified EO"
10.   J. Reeves & K. Heubert: "A Comparison of Export Authorizations Under the ITAR and EAR"
11.   J. Sturtevant: "'Technology' - Part II: Development, Production, & Use"

12. ECS Presents "Mastering ITAR/EAR Challenges" on 30 Apr - 1 May in Nashville, TN

13. ICPA Presents "2019 EU Conference", 15-17 May in London

EDITOR'S NOTES

14. Bartlett's Unfamiliar Quotations

15. Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (12 Mar 2019), DOC/EAR (20 Dec 2018), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (26 Dec 2018), DOS/ITAR (4 Oct 2018), DOT/FACR/OFAC (15 Nov 2018), HTSUS (7 Mar 2019)

16. Weekly Highlights of the Daily Bugle Top Stories



WORD ONLY

Are you Keeping Up to Date with the Latest Regulations?

The BITAR and BAFTR will keep you updated on the latest ITAR and FTR amendments.

MORE INFORMATION AVAILABLE HERE

ITEMS FROM TODAY'S FEDERAL REGISTER

## 1. DHS/CBP Amends Regulations, Extends Import Restrictions Imposed on Archaeological and Ecclesiastical Ethnological Material from Honduras

(Source: Federal Register, 12 Mar 2019.) [Excerpts.]

84 FR 8807-8809: Extension of Import Restrictions Imposed on Archaeological and Ecclesiastical Ethnological Material From Honduras
* AGENCY: U.S. Customs and Border Protection, Department of Homeland Security; Department of the Treasury.
* ACTION: Final rule.

* SUMMARY: This document amends the U.S. Customs and Border Protection (CBP) regulations to reflect an extension of import restrictions on certain archaeological and ecclesiastical ethnological material from Honduras. The restrictions, which were originally imposed by CBP Dec. 04-08 and last extended by CBP Dec. 14-03, are due to expire March 12, 2019. The Assistant Secretary for Educational and Cultural Affairs, United States Department of State, has made the requisite determination for extending the import restrictions that previously existed and entering into a new Memorandum of Understanding (MOU) with Honduras to reflect the extension of these import restrictions. The new MOU supersedes the existing agreement that became effective on March 12, 2014. Accordingly, these import restrictions will remain in effect for an additional five years, and the CBP regulations are being amended to reflect this further extension through March 12, 2024. CBP Dec. 14-03 contains the amended Designated List of archaeological and ecclesiastical ethnological material from Honduras to which the restrictions apply.
* DATES: Effective Date: March 12, 2019.
* FOR FURTHER INFORMATION CONTACT: For legal aspects, Lisa L. Burley, Branch Chief, Cargo Security, Carriers and Restricted Merchandise Branch, Regulations and Rulings, Office of Trade, (202) 325-0215, ototrrculturalproperty@cbp.dhs.gov. For operational aspects, Christopher N. Robertson, Branch Chief, Commercial Targeting and Analysis Center, Trade Policy and Programs, Office of Trade, (202) 325-6586, CTAC@cbp.dhs.gov.
* SUPPLEMENTARY INFORMATION: ...

On December 14, 2018, the Assistant Secretary for Educational and Cultural Affairs, United States Department of State, after consultation with and recommendations by the Cultural Property Advisory Committee, determined that the cultural heritage of Honduras continues to be in jeopardy from pillage of certain archaeological and ecclesiastical ethnological material and that the import restrictions should be extended for an additional five years. Subsequently, a new MOU was concluded between the United States and Honduras. The new MOU supersedes and replaces the prior MOU and extends the import restrictions that went into effect under the prior MOU for an additional five years. This MOU is titled: "Memorandum of Understanding between the Government of the United States of America and the Government of Republic of Honduras Concerning the Imposition of Import Restrictions on Archaeological Material from the Pre-Columbian Cultures of Honduras and Ecclesiastical Ethnological Materials from the Colonial Period of Honduras." Accordingly, CBP is amending 19 CFR 12.104g(a) to reflect the extension of the import restrictions.

The restrictions on the importation of archaeological and ecclesiastical ethnological material are to continue in effect through March 12, 2024. Importation of such material from Honduras continues to be restricted through that date unless the conditions set forth in 19 U.S.C. 2606 and 19 CFR 12.104c are met.

The Designated List and additional information may also be found here by selecting the material for "Honduras." ...

Kevin K. McAleenan, Commissioner, U.S. Customs and Border Protection.
   Approved: March 7, 2019.
Timothy E. Skud, Deputy Assistant Secretary, Department of the Treasury.

* * * * * * * * * * * * * * * * * * * *

## 2. DHS/CBP Seeks Comments on 21st Century Customs Framework

(Source: Federal Register, 12 Mar 2019.) [Excerpts.]

84 FR 8884-8885: Announcing the Re-Opening of the Public Comment Period for 21st Century Customs Framework
* AGENCY: U.S. Customs and Border Protection (CBP), Department of Homeland Security (DHS).
* ACTION: Re-opening of comment period.
* SUMMARY: U.S. Customs and Border Protection (CBP) is announcing the re-opening of the public comment period on the six key themes identified by "The 21st Century Customs Framework" initiative.
* DATES: Comments must be received on or before April 11, 2019. ...
* FOR FURTHER INFORMATION CONTACT: Mr. Brandon Lord, Office of Trade, U.S. Customs and Border Protection, 1331 Pennsylvania Avenue NW, Suite 950N, Washington, DC 20229; telephone (202) 325-6432 or email 21CCF@cbp.dhs.gov.
* SUPPLEMENTARY INFORMATION: ...
   CBP is cognizant of the need to stay modern in order to meet the challenges of an evolving trade landscape. New actors, industries, and modes of conducting business have emerged, disrupting the traditional global supply chain. To continue to effectively fulfill CBP's mission, CBP is pursuing an initiative titled "The 21st Century Customs Framework." "The 21st Century Customs Framework" will seek to address and enhance numerous aspects of CBP's trade mission to better position the agency to operate in the 21st century trade environment.
   Through preliminary efforts, CBP has identified key themes for which CBP seeks public input:
   (1) Emerging Roles in the Global Supply Chain;
   (2) Intelligent Enforcement;
   (3) Cutting-Edge Technology;
   (4) Data Access and Sharing;
   (5) 21st Century Processes; and
   (6) Self-Funded Customs Infrastructure.

Brief descriptions of each theme are provided below along with the request for public comments on questions posed by CBP related to each theme. ...

   Dated: March 6, 2019.
Cynthia F. Whittenburg, Deputy Executive Assistant Commissioner, Office of Trade.

back to top

* * * * * * * * * * * * * * * * * * *

## 3. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce; Industry and Security Bureau; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals [Pub. Date: 13 Mar 2019.]:
  - License Exemptions and Exclusions
  - Offsets in Military Exports

* Justice; Alcohol, Tobacco, Firearms, and Explosives Bureau; RULES; Bump-Stock-Type Devices [Pub. Date: 14 Mar 2019.]

* President; ADMINISTRATIVE ORDERS; Iran; Continuation of National Emergency (Notice of March 12, 2019) [Pub. Date: 13 Mar 2019.]

*[Editor's Note: This notice is included in today's Daily Bugle, item #6.]*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. President Continues National Emergency with Respect to Iran
(Source: The White House, 12 Mar 2019.)

On March 15, 1995, by Executive Order 12957, the President declared a national emergency with respect to Iran to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States constituted by the actions and policies of the Government of Iran. On May 6, 1995, the President issued Executive Order 12959, imposing more comprehensive sanctions on Iran to further respond to this threat. On August 19, 1997, the President issued Executive Order 13059, consolidating and clarifying those previous orders. The President took additional steps pursuant to this national emergency in Executive Order

13553 of September 28, 2010; Executive Order 13574 of May 23, 2011; Executive Order 13590 of November 20, 2011; Executive Order 13599 of February 5, 2012; Executive Order 13606 of April 22, 2012; Executive Order 13608 of May 1, 2012; Executive Order 13622 of July 30, 2012; Executive Order 13628 of October 9, 2012; Executive Order 13645 of June 3, 2013; Executive Order 13716 of January 16, 2016; and Executive Order 13846 of August 6, 2018.

As outlined in National Security Presidential Memorandum-11 of May 8, 2018 (Ceasing United States Participation in the Joint Comprehensive Plan of Action and Taking Additional Action to Counter Iran's Malign Influence and Deny Iran All Paths to a Nuclear Weapon), the actions and policies of the Government of Iran, including its proliferation and development of missiles and other asymmetric and conventional weapons capabilities, its network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates continue to pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States.

For these reasons, the national emergency declared on March 15, 1995, must continue in effect beyond March 15, 2019.  Therefore, in accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), I am continuing for 1 year the national emergency with respect to Iran declared in Executive Order 12957.  The emergency declared by Executive Order 12957 constitutes an emergency separate from that declared on November 14, 1979, by Executive Order 12170, in connection with the hostage crisis.  This renewal, therefore, is distinct from the emergency renewal of November 2018.

This notice shall be published in the *Federal Register* and transmitted to the Congress.

DONALD J. TRUMP
THE WHITE HOUSE,
March 12, 2019

back to top

* * * * * * * * * * * * * * * * * * *

NEWS

## 7. EU Sanctions: "UK Publishes Post-Brexit Sanctions Regulations on Democratic Republic of Congo and South Sudan"
(Source: EU Sanctions, 8 Mar 2019.)

The UK government has now published regulations under the Sanctions and Anti-Money Laundering Act 2018 on the following regimes:

  - The Democratic Republic of Congo (Sanctions) (EU Exit) Regulations 2019, SI 2019/433. See Explanatory Memorandum.
  - South Sudan (Sanctions) (EU Exit) Regulations 2019, SI 2019/438. See Explanatory Memorandum.

These regulations will not come until force until Exit Day in the event that the UK leaves the EU without a Brexit deal. The UK has now published post-Brexit regulations on five sanctioned states: Burma, Iran (Human Rights), Venezuela, and the above. See previous post.

back to top

* * * * * * * * * * * * * * * * * *

## 8. SCMP: "China Sells Arms to More Countries and is World's Biggest Exporter of Armed Drones, Says Swedish Think Tank SIPRI"
(Source: South China Morning Post, 12 Mar 2019.) [Excerpts.]

China is selling arms to more countries and is now the world's leading exporter of armed drones, according to a report released by the Stockholm International Peace Research Institute (SIPRI) on Monday.

But the latest data from the Swedish think tank shows Chinese arms exports increased by a relatively low 2.7 per cent in the period from 2014 to 2018, compared to the previous five years.
Weapons exports from the United States, however, jumped 29 per cent in the 2014-18 period from 2009-13.

Meanwhile, China expanded its customer base to 53 countries in 2014-18, up from 41 in the previous five years. ...

back to top

* * * * * * * * * * * * * * * * * *

### COMMENTARY

## 9. D.A. Ring & J. Clark: "Un-Empowered Official: Department of State Fines Exporter for Unqualified EO"
(Source: Wiggin and Dana LLP, 11 Mar 2019.)

* Authors: David A. Ring, Esq., dring@wiggin.com, +1 203 498 4377; and Jared Clark, Esq., jclark@wiggin.com, +1 203 498 4410. Both of Wiggin and Dana LLP.

A recent enforcement action by the Department of State for alleged violations of the International Traffic in Arms Regulations (ITAR) yields important lessons for exporters with respect to the necessity of appointing qualified export compliance personnel and the value in immediately submitting voluntary disclosures of export violations upon their discovery.

In February 2019, Darling Industries, Inc. (Darling) entered into an 18-month consent agreement with the Department of State, Directorate of Defense Trade Controls (DDTC) to settle alleged ITAR violations committed by Darling's subsidiary, R.E. Darling Co., Inc. (R.E. Darling), relating to unauthorized exports of defense articles, including ITAR-controlled technical data, the unauthorized furnishing of defense services, and the failure to appoint a qualified Empowered Official. Under the terms of the consent agreement, Darling agreed to pay a fine of $400,000, $200,000 of which was suspended on the condition that Darling apply the amount to remedial compliance measures, which include designating an Internal Special Compliance Officer and undertaking an export control classification review of all items manufactured by the company.

According to the consent agreement, R.E. Darling, a manufacturer and exporter of specialty fabricated rubber and composite products, became aware of the violations as the result of a compliance program review conducted by an outside consulting firm that uncovered "decades of systematic, reoccurring violations" of the ITAR. R.E. Darling disclosed to DDTC that the company had exported, without authorization, thousands of pounds of ethylene propylene diene monomer compound (EPDM), a Kevlar-filled raw material used as a missile case insulator and missile motor insulator, as well as related technical data and defense services, to an aerospace company in Canada for the production of rocket motors for end use by the National Aeronautics and Space Administration (NASA). The sales associate handling R.E. Darling's exports of EPDM to the Canadian aerospace company believed that the compound was commercial and exported the EPDM to Canada as "No License Required" under the Department of Commerce's Export Administration Regulations (EAR). R.E. Darling also disclosed that it had exported without authorization oxygen breathing hoses and components to several countries for end use on military aircraft. The sales staff responsible for exporting the hoses were not aware that the products were ITAR controlled and had no ITAR compliance training.

Darling's consent agreement with DDTC highlights the perils of appointing an unqualified Empowered Official (EO). The ITAR requires companies that manufacture or export defense articles to appoint one or more EOs to oversee their ITAR-related activities; among other requirements, an EO must be in a position of authority for policy or management within the company and must understand the provisions and requirements of export control statutes and regulations as well as the potential civil, criminal, and administrative penalties that can result from export violations. DDTC's proposed charging letter states that R.E. Darling's EO "was not in a position of having authority for policy or management," and, because R.E. Darling did not provide the EO any ITAR training, the EO "did not understand the provisions and requirements of the various export statutes and regulations". The Darling consent agreement

makes clear that DDTC-registered companies must appoint EOs with adequate authority and export-related expertise and cannot satisfy their obligations under the ITAR merely by designating an employee as an EO in title only.

DDTC's enforcement action against Darling also underscores the value to companies of immediately disclosing the discovery of export violations. The ITAR provides that the Department of State may consider a voluntary disclosure as a mitigating factor in determining any administrative penalties to be imposed, and that companies should notify DDTC immediately after discovering a violation. While Darling did voluntarily disclose the discovery of export violations to DDTC, it submitted the disclosure 22 months after it discovered the violations. Therefore, as the proposed charging letter states, even though the Department of State considered the voluntary disclosure as a mitigating factor, the Department also considered the delayed disclosure as a countervailing factor. Companies that wish to maximize the value of voluntary disclosure as a mitigating factor should disclose violations as soon as they are discovered, or risk incurring greater penalties due to delayed disclosure.

Export control statutes and regulations are complex and subject to frequent changes. To avoid running afoul of the ITAR and risking penalties such as those imposed on Darling - or greater - companies must invest in a culture of compliance by appointing qualified compliance personnel and providing adequate training throughout the organization.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


## 10. J. Reeves & K. Heubert: "A Comparison of Export Authorizations Under the ITAR and EAR"
(Source: Reeves & Dola LLP Alert, 12 Mar 2019.) [Available by subscription via info@reevesdola.com.]

\* Authors: Johanna Reeves, Esq., jreeves@reevesdola.com; and Katherine Heubert, Esq., kheubert@reevesdola.com. Both of Reeves & Dola LLP.

In anticipation of the government publishing the final rules to transition most firearms and ammunition away from the export controls of the U.S. Department of State and over to the Department of Commerce, we continue our series reviewing the key differences between the *International Traffic in Arms Regulations* (ITAR) and the *Export Administration Regulations* (EAR). In this alert, we will examine how export authorizations of the two licensing regimes compare.

Before we do that, however, we will address very briefly the hold that Sen. Menendez placed on the Department of State's Section 38(f) congressional notification of the proposed revisions to the U.S. Munitions List Categories I-III. Sen. Menedez announced the hold on February 26, 2019 out of "concern about a proposal to drastically weaken firearms export regulations." (Ranking

Member's Press, "Menedez Annoiunces Hold on Trump Admin's Proposed Move to Weaken Regulatory Control Over U.S. Guns Sales Abroad," February 26, 2019). In his letter to Secretary of State Mike Pompeo, Sen. Menendez outlined his two major concerns about the proposed rules: (1) removal of firearms exports from Congressional information and review, and (2) the proliferation of 3D gun printing technical information. The 38(f) notification was supposed to run (March 5), so we should known soon how the Administration has responded to the issues Sen. Menendez raised.

So now we will continue onward and upward with our series comparing the EAR to the ITAR. Below is another chart showing the differences between exports of defense articles (USML articles) under the ITAR, and exports of commercial items, dual-use items and certain military items subject to the EAR.

Export license applications under both the ITAR and EAR are submitted via electronic filing, unless otherwise authorized by the respective agency. ITAR license applications are submitted through the Directorate of Defense Trade Control (DDTC) DTrade system and EAR license applications are submitted through the Bureau of Industry and Security (BIS) Simplified Network Application Processing system (SNAP-R). One major distinction between the electronic filing systems, one which industry certainly will enjoy, is that there is no fee associated with submitting license applications through SNAP-R, nor is there requirement to register as an exporter or manufacturer (or pay an associated fee) with BIS. All an exporter needs to do is get established on the SNAP-R system, which is an on-line process. This difference alone could save certain members of industry a fair amount of money.

As you will also see below, all types of EAR export transactions that require a license utilize a single license form from BIS. This single form is called the Form BIS-748P: Multipurpose Application. Unlike the ITAR, the license application does not need be limited to a single shipment (or purchase order) but may represent a reasonable estimate of items to be shipped throughout the validity of the license and can cover a variety of types of transactions. EAR Part 748 provides detailed guidance for completing export applications.

| ACTION | ITAR | EAR |
| --- | --- | --- |
| **Permanent Export (Hardware or Information)** | DSP-5 (or exemption) | BIS-748P (or exception) |
| **Temporary Export (Hardware)** | DSP-73 (or exemption) | BIS-748P (or exception) |
| **Temporary Import (Hardware)** | DSP-61 (or exemption) | See Note 1 below |
| **Warehousing/ Distribution (Hardware)** | Warehouse & Distribution Agreement | BIS-748P See Note 2 below |
| **Defense Service** | Type of authorization depends on the activity covered: | BIS-748P See Note 3 below |

| | DSP-5 (limited use for "exceptional cases," <u>see</u> ITAR 124.1(a)).<br><br>Technical Assistance Agreement (agreement for performance of a defense service or disclosure of technical data; no production rights or manufacturing know-how).<br><br>Manufacturing License Agreement (authorization to manufacture defense articles abroad). | |
| --- | --- | --- |
| **Brokering** | Paper letter submission (if license required). | See Note 4 below |

**Note 1**: The temporary entry of EAR-controlled items into the U.S. does not require a license from BIS (though it may trigger other requirements from different U.S. agencies (*e.g.*
, ATF for short barrel firearms)). However, the return of the item to its originating source or other foreign location may require authorization from BIS, if a license is required to that country. The return (export) of the temporarily imported item would normally require a Form BIS-748P license (or exception). But see EAR § 740.9(b), Exports of items temporarily in the United States, which authorizes use of exception TMP for return without a license of some items temporarily in the United States.

**Note 2:** The export of hardware is a controlled event under the EAR. If you require a license to provide the hardware for the identified end-uses or end-users, then complete and submit a Form BIS-748P license application that identifies the distribution chain.

**Note 3:** As we noted in our previous alert, generally speaking, there is no analogous concept to defense services under the EAR. The EAR focuses on the provision of EAR-controlled "technology" when one is giving assistance or simply disclosing the "technology." If you require a license to provide "technology" for the identified end-use or end-user, then complete and submit a Form BIS-748P license application. We note, however, that the EAR (section 744.6(a)(2)) prohibits U.S. persons from engaging in activities, including services, that directly support certain nuclear, missile, chemical, or biological end-uses without a license.

**Note 4:** The EAR does not regulate "brokering" of items subject to the EAR. However, for firearms and ammunition moving over to the CCL, the proposed rules indicated that ***all defense articles*** described in either the U.S. Munitions Import List (USMIL) or the USML are subject to the brokering controls administered by DDTC in Part 129 of the ITAR. The final rules, once published, should be carefully studied to determine how brokering

requirements under the ITAR may impact transactions that are subject to the EAR.

As you can see, the forms of export authorizations differ between the ITAR and the EAR. You should also know that the supporting documentary requirements under the EAR are also different from what the ITAR requires. Part 748 in the EAR provides detailed guidance to aid in determining what, if any supporting documentation is required for a particular type of export transaction.

The good news is that under the EAR, export license preparation should be more streamlined, as there is only one form that industry will have to use. However, exporters must still know the chain of custody, including the intended end-user and ultimate end-use. As we have noted many times before, the transition of items from the USML to the CCL is not a decontrol. Reviewing the transaction for license requirements will continue to be necessary.

Next up - we will analyze noteworthy export enforcement activity under the EAR.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. J. Sturtevant: "'Technology' - Part II: Development, Production, & Use"
(Source: CTP, 12 Mar 2019.)

* Author: John Sturtevant, Esq., Commonwealth Trading Partners (CTP), Washington DC.

We're back with Part III of our blog series in understanding "technology" controlled under the EAR. In Part I, we explored the concept of controlled technology. Then, in Part II, we examined the three different types of technology ("development," "production," and "use") and how they are applied in practice. Now, in this Part III post, we're examining what it means when an ECCN controls technology that is "required" for the development, production, or use of an item on the CCL (and also what it means when a control entry *doesn't* include the defined term "required").

Let's first have a quick recap. Under the EAR, "technology" is information, in any tangible or intangible form, that is necessary for the "development," "production," or "use" of an item on the CCL.

  - "Development" technology is related to all stages prior to serial production.
  - "Production" technology includes all production stages, such as product engineering, manufacture, integration, assembly (mounting), inspection, testing, and quality assurance.
  - "Use" technology relates to operation, installation (including on-site installation), maintenance (checking), repair, overhaul and refurbishing.

As discussed in Part I, the drafters of the EAR point out to readers that controlled "technology" is defined in what is called the General Technology Note (GTN). Here's what the GTN says, in pertinent part:

*The export of "technology" that is* **required***" for the "development", "production", or "use" of items on the Commerce Control List is controlled according to the provisions in each Category.*

Next, the drafters of the EAR have defined the term "required" as follows:

*As applied to "technology," ["required"] refers to only that portion of "technology" which is* peculiarly responsible for achieving or exceeding the controlled performance levels, characteristics or functions. *Such "required" "technology" may be shared by different products.*

This EAR definition goes on to provide the following example:

* Assume product "X" is controlled on the CCL if it operates at or above 400 MHz and is not controlled if it operates below 400 MHz.
  - If production technologies "A," "B," and "C" allow production at no more than 399 MHz, then technologies "A," "B," and "C" are not "required" to produce the controlled product "X".
  - If technologies "A," "B," "C," "D," and "E" are used together, a manufacturer can produce product "X" that operates at or above 400 MHz. In this example, technologies "D" and "E" are peculiarly responsible for making the controlled product and are thus "required" technology.

In an attempt to help clarify these matters for exporters, BIS published an Advisory Opinion in March 2014, expounding on the scope of the GTN. In that Advisory Opinion, BIS concluded that,

*The EAR's definition of "technology" states that "[c]ontrolled 'technology' is defined in the General Technology Note . . . and the GTN states that "[t]he export of ' technology' that is 'required' for the 'development', 'production', or 'use' of items on the Commerce Control List is controlled according to the provisions in each Category." The EAR does not limit its definition of technology or the GTN to only those technologies controlled in the EAR pursuant to the [Wassenaar Arrangement]. Therefore, the GTN and the EAR's definition of "required" apply to all references to "technology" in all the ECCNs on the CCL.*

In other words, the GTN and the EAR-defined term "required" apply to all ECCNs on the CCL that control "technology," regardless of whether the ECCN specifically refers to the GTN or uses the term "required."

Next time, in Part IV of this series, we'll look at the EAR's license exceptions related to controlled "technology:" Technology and Software under Restriction (TSR) and Technology and Software-Unrestricted (TSU). Be sure to subscribe to our blog so you can get the fourth and final post in our "technology" series delivered straight to your inbox.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



EX/IM TRAINING EVENTS & CONFERENCES

## 12. ECS Presents "Mastering ITAR/EAR Challenges" on 30 Apr - 1 May in Nashville, TN
(Source: Suzanne Palmer, spalmer@exportcompliancesolutions.com)

\* What: Mastering ITAR/EAR Challenges; Nashville, TN
\* When: April 30-May 1, 2019
\* Where: Renaissance Nashville Hotel
\* Sponsor: Export Compliance Solutions (ECS)
\* ECS Speaker Panel:  Suzanne Palmer; Lisa Bencivenga; Timothy Mooney, Debi Davis, Matthew McGrath, Matt Doyle
\* Register here or by calling 866-238-4018 or email
spalmer@exportcompliancesolutions.com

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. ICPA Presents "2019 EU Conference", 15-17 May in London
(Source: ICPA)

\* What: 2019 EU Conference
  - Import and Export Track (click here for the agenda)
  - Professional Speakers
  - Hot Industry Topics

* When: 15-17 May 2019
* Where: The Tower Hotel, London, United Kingdom
* Sponsor: International Compliance Professionals Association (ICPA)
* Information & Registration: Click here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 14. Bartlett's Unfamiliar Quotations
(Source: Editor)

**\* Sir Richard Steele** (12 Mar 1672 - 1 Sep 1729; was an Irish writer, playwright, and politician, remembered as co-founder, with his friend Joseph Addison, of the magazine The Tatler.)
  - *"Reading is to the mind what exercise is to the body."*

**\* Earl Nightingale** (12 Mar 1921 - 25 Mar 1989; was an American radio speaker and author, dealing mostly with the subjects of human character development, motivation, and meaningful existence. He was the voice during the early 1950s of Sky King, the hero of a radio adventure series, and was a WGN radio program host from 1950 to 1956. Nightingale was the author of *The Strangest Secret,* which economist Terry Savage has termed "...one of the great motivational books of all time".)
  - *"Don't let the fear of the time it will take to accomplish something stand in the way of your doing it. The time will pass anyway; we might just as well put that passing time to the best possible use."*
  - *"All you need is the plan, the road map, and the courage to press on to your destination."*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 15. Are Your Copies of Regulations Up to Date?
(Source: Editor)

* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199.  Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
  - Last Amendment:
12 Mar 2019: 84 FR 8807-8809: Extension of Import Restrictions Imposed on Archaeological and Ecclesiastical Ethnological Material From Honduras

* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
  - Last Amendment: 20 Dec 2018: 83 FR 65292-65294: Control of Military Electronic Equipment and Other Items the President Determines No Longer

Warrant Control Under the United States Munitions List (USML); Correction [Concerning ECCN 7A005 and ECCN 7A105.]

* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30.  Implemented by Dep't of Commerce, U.S. Census Bureau.
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (1 Jan 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under Atomic Energy Act of 1954.
  - Last Amendment: 23 Feb 2015: 80 FR 9359, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

* DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under Atomic Energy Act of 1954.
  - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

* DOJ ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
  - Last Amendment: 4 Oct 2018: 83 FR 50003-50007: Regulatory Reform Revisions to the International Traffic in Arms Regulations.
  - The only available fully updated copy (latest edition: 5 Mar 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR, please contact us to receive your discount code.

* DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders.
Implemented by Dep't of Treasury, Office of Foreign Assets Control.
  - Last Amendment: 15 Nov 2018: 83 FR 57308-57318: Democratic Republic of the Congo Sanctions Regulations

* USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S. International Trade Commission. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 7 Mar 2019: Harmonized System Update (HSU) 1903 [contains 67 ABI records and 13 harmonized tariff records].
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

back to top

* * * * * * * * * * * * * * * * * * *


# 16. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * *


## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and

Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 6,500 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance [████████@fullcirclecompliance.eu]
**Sent:** 3/14/2019 10:07:37 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 19-0314 Thursday "Daily Bugle"



## Thursday, 14 March 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. Justice/ATF Ratifies Final Rule to Define Bump-Stock-Type Devices as Machineguns

### OTHER GOVERNMENT SOURCES

2. Items Scheduled for Publication in Future Federal Register Editions
3. Commerce/BIS: (No new postings.)
4. DoD/DSS Publishes Revised Certificate Pertaining to Foreign Interests (SF 328)
5. State/DDTC: (No new postings.)
6. Treasury/OFAC Introduces the "CAPTA List", Removes the "Part 561 List"
7. Treasury/OFAC Extends Expiration Date of Venezuela-related General License 7A
8. Japan METI Publishes Highlights of 26th Asian Export Control Seminar

### NEWS

9. Bloomberg: "U.K. Unveils Tariffs for a No-Deal Brexit Ahead of Key Vote"
10. Expeditors News: "CBP Publishes Informational Notice on CBP Form 5106"
11. FAIR: "Bill Introduced in Senate to Modify Definition of Antique Firearm"
12. Reuters: "Huawei Pleads Not Guilty to U.S. Charges in New York Court"
13. Reuters: "U.S. Working on Steel, Aluminum Tariff Relief for Mexico, Canada: Trade Chief"

14.     ST&R Trade Report: "New Task Force to Combat Counterfeit Imports Includes CBP, BIS, Other Agencies"

COMMENTARY

15.     A.J. Brackett, E.P. Gordy & J.M. Hanna: "What the Venezuela Sanctions May Mean for Future Sanctions Programs"

16.     SIPRI: "Emerging Technologies Pose Challenges to the Control of Biological Weapons, New SIPRI Report"

17.     T. McCarthy, K. Wolf & B. Powell: "State and Commerce Open Public Comment Period on Rocket, Missile, Launch Vehicle, Spacecraft and Satellite Export Controls"

EX/IM TRAINING EVENTS & CONFERENCES

18.     ECS Presents "ITAR/EAR Bootcamp: Achieving Compliance" on 8-9 Jul in Seattle, WA

19.     ICPA Presents "2019 EU Conference", 15-17 May in London

20.     ECTI Presents "CFIUS Update: New Requirements to Meet, New Industries Affected" Webinar on 16 Apr

EDITOR'S NOTES

21.     Bartlett's Unfamiliar Quotations

22.     Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (12 Mar 2019), DOC/EAR (20 Dec 2018), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (26 Dec 2018), DOS/ITAR (4 Oct 2018), DOT/FACR/OFAC (15 Nov 2018), HTSUS (7 Mar 2019)

23.     Weekly Highlights of the Daily Bugle Top Stories



WORD ONLY

Are you Keeping Up to Date with the Latest Regulations?

The BITAR and BAFTR will keep you updated on the latest ITAR and FTR amendments.

MORE INFORMATION AVAILABLE HERE

## 1. Justice/ATF Ratifies Final Rule to Define Bump-Stock-Type Devices as Machineguns
(Source: Federal Register, 14 Mar 2019.)

84 FR 9239-9240: Bump-Stock-Type Devices

* AGENCY: Bureau of Alcohol, Tobacco, Firearms, and Explosives; Department of Justice.
* ACTION: Final rule; ratification.
* SUMMARY: The Attorney General is ratifying a final rule, published in the Federal Register on December 26, 2018,
that amended the definition of "machinegun" (or "machine gun") in Department of Justice regulations. The ratification is issued as a prudential matter in light of pending litigation.
* DATES: March 14, 2019.
* FOR FURTHER INFORMATION CONTACT: Vivian Chu, Office of Regulatory Affairs, Enforcement Programs and Services,
Bureau of Alcohol, Tobacco, Firearms, and Explosives, U.S. Department of Justice, 99 New York Ave. NE, Washington, DC 20226; telephone: (202) 648-7070.
* SUPPLEMENTARY INFORMATION: On December 26, 2018, the Department of Justice published a final rule in the Federal Register that amended the definition of "machinegun" (or "machine gun") contained in 27 CFR 447.11, 478.11, and 479.11. See 83 FR 66514.
That final rule, which was adopted after the publication of a notice of proposed rulemaking in the Federal Register and a period of public comment, was signed by Acting Attorney General Matthew G. Whitaker on December 18, 2018. That final rule has become the subject of litigation in which parties have argued that Mr. Whitaker was not validly serving as the Acting Attorney General, as either a statutory or constitutional matter.
On February 14, 2019, I was sworn in as Attorney General following confirmation by the Senate and appointment by the President. Although I believe that the challenges to Mr. Whitaker's designation lack merit, I elected, out of an abundance of caution, to independently reevaluate the above-mentioned rule and the underlying rulemaking record. Having now familiarized myself with the rulemaking record that was before the Acting Attorney General and having reevaluated those materials without any deference to his earlier decision, I have personally come to the conclusion that it is appropriate to ratify and affirm the final rule as it was published at 83 FR 66514, and I hereby do so.

  Dated: March 11, 2019.
William P. Barr, Attorney General.

back to top

* * * * * * * * * * * * * * * * *

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce/BIS; NOTICES; Meetings: Regulations and Procedures Technical Advisory Committee [Pub. Date: 15 Mar 2019.]

* State; NOTICES; Designation as a Specially Designated Global Terrorist:
  - Akram 'Abbas al-Kabi, aka Akram Abas al-Ka'bi, aka Sheik Akram al-Ka'abi, aka Shaykh Abu-Akram al-Ka'abi, aka Abu-Muhammad, aka Karumi, aka Abu Ali; and
  - Harakat al-Nujaba, aka Harakat Hezbollah al-Nujaba, aka Movement of the Noble Ones Hezbollah, etc. [Pub. Dates: 15 Mar 2019.]

* Treasury/OFAC; RULES; List of Foreign Financial Institutions Subject to Correspondent Account or Payable-Through Account Sanctions [Pub. Date: 15 Mar 2019.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. Commerce/BIS (No New Postings)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. DoD/DSS Publishes Revised Certificate Pertaining to Foreign Interests (SF 328)
(Source: DoD/DSS, 14 Mar 2019.)

The revision provides for additional uses by Department of Homeland Security and the Department of Defense. No additional substantive changes were made to the form and industry can begin use immediately. The form can be found on the GSA website, and the DoD issuance site. There is no requirement for industry to resubmit forms already provided to the government.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 6. Treasury/OFAC Introduces the "CAPTA List" and Removes the "Part 561 List"
(Source: Treasury/OFAC, 14 Mar 2019.)

The Department of the Treasury's Office of Foreign Assets Control (OFAC) is replacing the List of Foreign Financial Institutions Subject to Part 561 (the "Part 561 List") with the List of Foreign Financial Institutions Subject to Correspondent Account or Payable-Through Account Sanctions (the "CAPTA List").

The CAPTA List contains identifying information of foreign financial institutions for which the opening or maintaining of a correspondent account or a payable-through account in the United States is prohibited or is subject to one or more strict conditions. The specific strict conditions or prohibitions to which the foreign financial institutions are subject to include the Ukraine Freedom Support Act of 2014, as amended by the Countering America's Adversaries Through Sanctions Act, the North Korea Sanctions Regulations, 31 C.F.R. part 510, the Iranian Financial Sanctions Regulations, 31 C.F.R. Part 561, which were identified on OFAC's now defunct Part 561 List, and the Hizballah International Financing Prevention Act of 2015, which would be identified on the Hizballah Financial Sanctions Regulations List (the "HFSR List").

The CAPTA List is not part of the Specially Designated Nationals (SDN) List. Information that appears on the CAPTA list will be included in the data formats associated with the Consolidated Sanctions List.

OFAC is also issuing an amendment to the Iranian Financial Sanctions Regulations, 31 CFR Part 661, to replace references to the Part 561 List in those regulations with references to the CAPTA List. This regulatory amendment is currently available for public inspection with the Federal Register and will take effect upon publication in the Federal Register on March 14, 2019.

Additionally, OFAC is issuing an amendment to the Hizballah Financial Sanctions Regulations, 31 CFR part 566, to replace references to the HFSR List in those regulations with references to the CAPTA List. This regulatory amendment is currently available for public inspection with the Federal Register and will take effect upon publication in the Federal Register on March 14, 2019.

Finally, to implement these changes the following listing has been moved from the Part 561 List to the new CAPTA List.  The only alteration to this record has been the removal of the [561List] program tag and the addition of the new [561-Related] program tag.

BANK OF KUNLUN CO LTD (f.k.a. KARAMAY CITY COMMERCIAL BANK CO LTD.; f.k.a. KARAMAY URBAN CREDIT COOPERATIVES), 172 Xibin Rd, Ranghulu District, (Daqing, Heilongjiang Branch), Daqing 163453, China; 9

DOC_0039914

Dongzhimen North Street, Dongcheng District, (Head Office), Beijing 100007, China; No. 7 Century Ave, (Registered Office), Xinjiang, Karamay 834000, China; No. 68 Zhongya South Rd, Economic and Technological Development Zone, (Urumqi, Xinjiang Branch), Urumqi 830026, China; SWIFT/BIC CKLBCNBJ; United States financial institutions are prohibited from opening or maintaining a correspondent account or a payable-through account for the foreign financial institution listed here, pursuant to 31 C.F.R. section 561.201(c) [561-RELATED].

back to top

* * * * * * * * * * * * * * * * * *

## 7. Treasury/OFAC Extends Expiration Date of Venezuela-related General License 7A
(Source: Treasury/OFAC, 14 Mar 2019.)

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) today extended the expiration date of a general license related to PDV Holding, Inc. (PDVH), and CITGO Holding, Inc. General License 7A provides an 18-month authorization that renews automatically on a monthly basis, which will enable CITGO to maintain operations in markets that are based on long-term planning and contractual commitments.

"This extension will further enable CITGO's ongoing operations while prohibiting any benefit from flowing back to the illegitimate Maduro regime," said a Treasury spokesperson.

On January 28, 2019, OFAC designated Petroleos de Venezuela, S.A. (PdVSA) pursuant to Executive Order (E.O.) 13850 for operating in the oil sector of the Venezuelan economy. Concurrent with this action, OFAC issued a general license that authorized certain transactions and activities related to PdVSA and its subsidiaries within specified timeframes. Effective March 14, 2019, General License 7, dated January 28, 2019, is replaced and superseded in its entirety by General License 7A. As with any general license issued by OFAC, the license may be revoked or amended at any time.

View General License 7A.

back to top

* * * * * * * * * * * * * * * * *

## 8. Japan METI Publishes Highlights of 26th Asian Export Control Seminar
(Source: METI, 4 Mar 2019.) [Excerpts.]

For three days from February 26, 2019, an Asian Export Control Seminar, which was organized by the Center for Information on Security Trade Control (CISTEC), and co-organized by with the Ministry of Economy, Trade and Industry (METI) and the Ministry of Foreign Affairs (MOFA), was held in Tokyo. The seminar was the 26th seminar since its inauguration, bringing

together approximately 200 participants from 32 countries and regions, international organizations and other organizations. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

NEWS

## 9. Bloomberg: "U.K. Unveils Tariffs for a No-Deal Brexit Ahead of Key Vote"
(Source: Bloomberg, 13 Mar 2019.) [Excerpts.]

The U.K. will avoid imposing tariffs on most imported goods in the event of a no-deal Brexit, though officials said prices of key European Union products including beef, cheese and cars will rise.

The government said Wednesday its "balanced approach" aims to offset a spike in prices that consumers would experience in a no-deal departure as a result of the falling pound and higher costs of imports. But a major U.K. business lobby described it as a "sledgehammer" for the economy.

The announcement comes after Parliament overwhelmingly rejected Prime Minister Theresa May's Brexit deal for a second time Tuesday night, and lawmakers are expected to vote Wednesday to rule out leaving the EU without a deal - a scenario the premier herself accepted would cause "damage" to the U.K. Revealing the government's no-deal planning so close to the vote will be seen by many MPs as a strategy to focus minds. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. Expeditors News: "CBP Publishes Informational Notice on CBP Form 5106"
(Source: Expeditors News , 13 Mar 2019.)

On March 11, 2019, U.S. Customs and Border Protection (CBP) published an informational notice with details on the revised CBP Form 5106, used to create or update an importer identity, which will be deployed in the Automated Commercial Environment (ACE).

The informational notice covers:
  (1) What will stay the same in ACE;
  (2) What will change in ACE;
  (3) What resources are available for submission to ACE;
  (4) Who to contact for issues with the use of the form 5106.

DOC_0039916

Per the notice, CBP Form 5106 is used for "establishing bond coverage, release and entry of merchandise, liquidation, issuance of bills, refunds and the processing of drawback, and Fines Penalties & Forfeitures actions." CBP will deploy the revised form in ACE on March 16, 2019.

The CBP notice may be found here.

back to top

* * * * * * * * * * * * * * * * * *

## 11. FAIR: "Bill Introduced in Senate to Modify Definition of Antique Firearm"
(Source: Firearms and Ammunition Import/Export Roundtable (FAIR), 14 Mar 2019.)

On February 12, 2019, Senator Bill Cassidy (R-LA) introduced S. 443 to change the definition of "antique firearm" in the Gun Control Act of 1968 (GCA) and in the National Firearms Act (NFA) by replacing "1898" with "the calendar year that is 100 years before the calendar year in which the determination as to whether the firearm meets the requirement of this subparagraph is being made." If enacted, firearms manufactured 100 years ago or more generally would not be subject to GCA or NFA controls. This would be a rolling determination as opposed to a static year of manufacture. So to illustrate, if the bill were to pass both the Senate and the House, and President Trump were to sign into law this year, firearms made before 1919 would be classified as antiques. The full text of the bill is available here.

Modernizing the federal firearms laws in this way would be a welcome change for collectors and enthusiasts. However, this is not the first time Sen. Cassidy has attempted to revise the definition of "antique firearm" and advance the cut-off date. Unfortunately, none of the bills made it out of committee. ...

back to top

* * * * * * * * * * * * * * * * * *

## 12. Reuters: "Huawei Pleads Not Guilty to U.S. Charges in New York Court"
(Source: Reuters, 14 Mar 2019.) [Excerpts.]

China's Huawei Technologies Co Ltd on Thursday pleaded not guilty to a 13-count indictment filed in a New York federal court against the company, as tensions have ratcheted up between the U.S. and Beijing.

Huawei, the world's largest telecommunications equipment maker, was charged with bank and wire fraud, violating sanctions against Iran and obstructing justice.

The company's chief financial officer, Meng Wanzhou, was arrested in December in Canada on charges in the indictment, which was not unsealed

until January. She has said she is innocent of the charges and is fighting extradition. ...

U.S. authorities claim Huawei used Skycom to obtain embargoed U.S. goods, technology and services in Iran, and to move money via the international banking system. ...

back to top

* * * * * * * * * * * * * * * * * *

## 13. Reuters: "U.S. Working on Steel, Aluminum Tariff Relief for Mexico, Canada: Trade Chief"
(Source: Reuters, 12 Mar 2019.) [Excerpts.]

The United States is working on a plan to lift tariffs from Mexican and Canadian steel and aluminum but preserve the gains that domestic producers have received from the duties so far, U.S. Trade Representative Robert Lighthizer said on Tuesday. ...

The United States imposed the "Section 232" tariffs on steel and aluminum nearly a year ago to protect domestic producers on national security grounds. A plan to lift tariffs on the metals from Canada and Mexico was once linked to the renegotiation of the North American Free Trade Agreement but ultimately was excluded from that deal.

Since then, a number of U.S. lawmakers have said they did not believe the new U.S.-Mexico-Canada Agreement (USMCA) could win approval in Congress if the metals tariffs - along with and retaliatory duties on U.S. farm and other products - were left in place. ...

[Representative Ron] Kind cautioned that the Trump administration would need to submit the USMCA enabling legislation soon to Congress so it could be considered before the August recess. After that, it could become caught up in another border wall funding fight in the fall and later the 2020 presidential election campaign, which would diminish its approval chances. ...

back to top

* * * * * * * * * * * * * * * * * *

## 14. ST&R Trade Report: "New Task Force to Combat Counterfeit Imports Includes CBP, BIS, Other Agencies"
(Source: Sandler, Travis & Rosenberg Trade Report, 14 Mar 2019.)

A new multi-agency task force designed to protect national security and combat counterfeit goods was launched recently in Detroit and could serve as a national model for related investigations.

According to a press release from the Department of Homeland Security, the Global Trade Task Force is led by U.S. Immigration and Customs

Enforcement's Homeland Security Investigations and combines the investigative, interdiction, regulatory, and licensing capabilities of a variety of agencies, including HSI, U.S. Customs and Border Protection, the Drug Enforcement Administration, the Bureau of Industry and Security, and the Food and Drug Administration's Office of Criminal Investigations.
The GTTF's primary mission is to counter the following types of illicit commercial activities.

   (1) trafficking of counterfeit, substandard, or tainted goods, with an emphasis on those that pose a threat to public health or safety including pharmaceuticals and cosmeceuticals; automotive, aerospace, rail, and heavy industry products; and environmental crimes
   (2) financially-motivated fraud schemes that deprive the U.S. government of revenue, harm businesses or rights holders, or undermine financial institutions
   (3) illegal export of U.S. military products, sensitive dual-use technology, weapons of mass destruction, or chemical, biological, radiological, and nuclear materials

The press release states that the task force will use "robust import and export controls and investigative authorities" to combat these activities. Its first enforcement operation targeted goods and shipments entering and exiting the U.S. at express delivery, rail, and centralized examination station facilities in the Detroit area. During this weeklong effort HSI and CBP seized more than $1 million worth of counterfeit goods and prescription drugs, including transceiver network modules, e-cigarettes, watches, and smartphones.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMMENTARY

## 15. A.J. Brackett, E.P. Gordy & J.M. Hanna: "What the Venezuela Sanctions May Mean for Future Sanctions Programs"
(Source: McGuire Woods LLP, 11 Mar 2019.)

\* Authors: Alex J. Brackett, Esq., abrackett@mcguirewoods.com; Emily P. Gordy, Esq., egordy@mcguirewoods.com; and Jeffrey M. Hanna, Esq., jhanna@mcguirewoods.com. All of McGuire Woods LLP.

When the Trump Administration designated Venezuelan state-owned oil producer Petroleos de Venezuela ("PdVSA") on January 28, 2019, pursuant to preexisting sanctions relating to the political situation created by the Maduro regime, it sent a significant but not unanticipated ripple through the global petroleum markets. The impact of the sanctions for commodities

traders and petroleum refiners-particularly in the U.S. Gulf Coast, where PdVSA's steady supply of heavy crude has long been a sizable staple feedstock-was fairly immediate, and appears to have had the intended effect of isolating PdVSA, impairing its production capabilities and reducing its cash revenues. According to industry reports, many of the larger commodity traders around the world have largely if not entirely backed away from trading in PdVSA crude, and PdVSA has been cut off from its primary sources of naphtha and other diluents it needs to move its heavy crude through pipelines. Whether the sanctions will have the intended political effect of forcing regime change in Venezuela remains to be seen.

Although at a high level the PdVSA sanctions are not functionally different from other OFAC sanctions designations, their political contours, the immediacy of the underlying humanitarian crisis in Venezuela, and the proximity and entanglement of PdVSA in U.S. markets-including the fact that one of PdVSA's most valuable assets is the U.S.-based Citgo-makes them appear like a different creature. So, what can the Venezuela sanctions, as imposed against PdVSA, tell us about the future of U.S. sanctions?

*Possibly, Nothing*

All sanctions regimes, export controls, import controls and other forms of trade restriction are reflections of foreign policy. In the case of sanctions, their form and function tends to be highly particularized to the political situation at issue. The Venezuela sanctions appear unique in part because of the specific circumstances in which they are imposed: Maduro's government is in crisis, Venezuela is a significant crude producer and exporter for the international oil market, and PdVSA is a critical element of the Venezuelan economy and of great symbolic importance to the Venezuelan people. Combine that with Venezuela's physical proximity to the United States and the fact that the imposition of sanctions against PdVSA is cutting that company off from its biggest export market and cutting U.S. refiners off from one of their largest sources of feedstock, and you have a uniquely impactful sanctions action that is unlikely to be repeated.

*It's Complicated*

Sanctions can be a blunt instrument, but they can also be a precise tool, as they appear to be here. The Venezuela sanctions continue a trend of applying incremental pressure to targeted sectors of an economy or particular operators in that sector, without going so far as to impose a comprehensive embargo against an entire country. Unlike the Russia/Ukraine sectoral sanctions, the Venezuela sanctions, through the PdVSA designation, went from incremental to exponential in the pressure being applied. But like the sectoral sanctions, the Venezuela sanctions are more complex in design and application. It is reasonable to expect that future sanctions programs will probably look more like the Venezuela sanctions and Russia/Ukraine sectoral sanctions than the Cuba embargo.

*Sanctions to the Front*