As of this writing, the Maduro regime remains in place and it is unclear whether the regime change being sought by the Trump Administration will occur-at least in a reasonably orderly fashion. Regardless of that outcome, the PdVSA designation has certainly impacted the political conversation, and moved Venezuela's political and humanitarian crisis more to the forefront in terms of U.S. and international awareness and attention. As a result, it is possible that the current and future administrations will feel emboldened to consider the use of sanctions more liberally, particularly if Maduro does step aside without internal armed conflict or outside military intervention. On that point, we can't ignore that the Trump administration has not shied away from applying sanctions and appears ready and willing to do so to further its foreign policy agenda.

For now, we remain relatively early in the life cycle of the PdVSA designation, with the first wind-down deadlines set to pass and the global commodities markets remaining in a wait-and-see posture. More time needs to pass before we will have a clear understanding of the likely political and economic trajectory of the situation in Venezuela, and that clarity may remain elusive. For now, we have to view the posture of the Venezuela sanctions as dynamic and subject to significant change with limited notice.

back to top

* * * * * * * * * * * * * * * * * *

## 16. SIPRI: "Emerging Technologies Pose Challenges to the Control of Biological Weapons, New SIPRI Report"
(Source: SIPRI ,14 Mar 2019.)

* Authors: Kolja Brockmann, Researcher; Sibylle Bauer, Director of Studies; and Dr. Vincent Boulanin, Senior Researcher. All of Stockholm International Peace Research (SIPRI).

Advances in additive manufacturing, artificial intelligence and robotics could increase the possibilities for the development, production and use of biological weapons. The existing biological arms control and non-proliferation governance framework needs to be adapted to address these security risks, according to a new report from the Stockholm International Peace Research Institute (SIPRI).

The SIPRI report, 'Bio Plus X: Arms Control and the Convergence of Biology and Emerging Technologies', will be presented at the international conference '2019. Capturing technology. Rethinking arms control' at the German Federal Foreign Office in Berlin on 15 March 2019.

*Emerging technologies could facilitate the production and use of biological weapons*

The report explores the risks and challenges posed by the interaction of developments in biotechnology and advances in three emerging technologies: additive manufacturing (so-called 3D printing), artificial

intelligence and robotics. 'Each of these technologies could, in its own way, facilitate the development, production and use of biological weapons, and make them more dangerous,' says Kolja Brockmann, Researcher at SIPRI and lead author of the report. 'The increased use of robots in laboratories could lead to significant gains in productivity during the design-build-test cycle of biological weapons, while artificial intelligence could be used to find new ways to optimize the transmissibility or virulence of a biological agent,' says Dr Vincent Boulanin, Senior Researcher at SIPRI on emerging technologies.

*Governance frameworks must be strengthened and re-envisioned*

All three technologies are difficult to control, particularly due to their digitization and their dual-use nature. 'A key challenge for effective biological arms control is that treaty structures and the institutional arrangements in ministries and government agencies do not correspond to today's technical realities,' says Dr Sibylle Bauer, Director of the SIPRI Armament and Disarmament programme.

*New policy options could address governance issues*

The report recommends that, in order to tackle the governance issues presented by emerging technologies, national governments need to monitor and assess developments in science and technology on a more systematic basis. They should also strengthen international efforts to foster responsible science and biosecurity awareness. In addition, the report suggests that the private sector should reinforce self-regulation and compliance standards.

Read the report here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 17. T. McCarthy, K. Wolf & B. Powell: "State and Commerce Open Public Comment Period on Rocket, Missile, Launch Vehicle, Spacecraft, and Satellite Export Controls"
(Source: Akin Gump Strauss Hauer & Feld LLP, 12 Mar 2019.)

\* Authors: Tom McCarthy, Esq., tmccarthy@akingump.com, +1 202-887-4047; Kevin Wolf, Esq., kwolf@akingump.com, +1 202-887-4051; and Brad Powell, Esq., powellb@akingump.com, +1 202-887-4312. All of Akin Gump Strauss Hauer & Feld LLP.

*Key Points*

   - The Departments of State and Commerce are soliciting comments on USML Categories IV and XV and related entries on the CCL (e.g., 9x004, 9x515, 9x604).

- This comment period is the first opportunity for industry to provide input on the full scope of USML Categories IV and XV and their related CCL entries since Export Control Reform efforts in 2014.
- Comments are due by April 22, 2019.

*Background*

In 2014, Categories IV (launch vehicles and missiles) and XV (spacecraft) of the U.S. Munitions List (USML) were substantially revised to move commercial items and less-sensitive military items to new or amended controls on the Commerce Control List (CCL). These changes were part of the Export Control Reform (ECR) effort to implement U.S. national security and foreign policy objectives by revising the USML to only control articles providing a critical military or intelligence advantage and not inadvertently control items in normal commercial use. As described by the Department of State ("State"), "this approach, however, requires that the list be regularly revised and updated to account for technological developments, practical application issues identified by exporters and reexporters, and changes in the military and commercial applications of items affected by the list." Although there have been several minor revisions, updates and corrections to these USML Categories since 2014, this notice is the Trump administration's first request for comments on how these space-related USML Categories can be improved.

The requests for comments are part of the effort by the National Space Council to develop and implement recommendations to streamline the regulatory environment for commercial space companies. [FN/1] On May 24, 2018, President Trump issued Space Policy Directive 2 (SPD-2), "Streamlining Regulations on Commercial Use of Space," which directed various U.S. agencies to review and revise regulations applicable to the commercial space sector in order to promote growth, minimize uncertainty, protect national security and "encourage American leadership in space commerce." [FN/2] SPD-2 also formalized the National Space Council's recommendation regarding export controls by directing the National Space Council to review export licensing regulations affecting commercial space flight activity and recommend revisions consistent with the goals of SPD-2. Although any such recommendations have yet to be released publicly, the National Space Council appears to be already working with State and the Department of Commerce ("Commerce"), both of which issued Advanced Notices of Proposed Rulemaking (ANPRMs) on March 8, 2019 as "part of their work" with the National Space Council. [FN/3]

*ANPRMs and Comment Period*

On March 8, 2019, State and Commerce issued ANPRMs requesting public comments on Categories IV and XV of the USML and related entries on the CCL, including 9x004, 9x515 and 9x604.[FN/4] Among other things, these categories control rockets, missiles, launch vehicles, spacecraft, satellites and many of their related subsystems, parts, components, accessories and attachments.

While these ANPRMs relate specifically to the President's policy objectives on the commercial use of outer space and the work of the National Space Council, the ANPRMs broadly ask how to improve and update the current versions of Categories IV and XV and their related CCL entries. Like other ECR-related ANPRMs in the past, State and Commerce seek input on the following general questions:

- Are there any emerging or new technologies that warrant control in USML Categories IV or XV, that are not currently described or not described with sufficient clarity?
- Are there specific defense articles described in USML Categories IV and XV that have entered into normal commercial use since the most recent revisions of those categories?
- Are there any defense articles described in USML Categories IV and XV for which commercial use is proposed, intended or anticipated in the next five years?
- Are there any other technical issues that should be addressed for items in USML Categories IV and XV or corresponding entries of the CCL (e.g., the addition of technical notes or defined terms)?
- Are there any other technologies controlled in USML Categories IV or XV, which are not currently described, or are not described with sufficient clarity, that should move to the CCL?
- What are the potential cost savings to private entities from shifting control over commercial items from the USML to the CCL?

Additionally, the ANPRMs identify a number of particular topics relevant to specific U.S. space program activities and the commercial space industry:

- What are the appropriate controls for items associated with the NASA Lunar Gateway project? [FN/5]
- In consideration of existing control parameters on the size of space-based optical telescopes, how might future control parameters differentiate technically between space-based optical telescopes for astrophysics missions and those used for Earth observation?
- Are there any suggested revisions, such as a definition of "clear aperture," that would clarify the scope of Categories XV(a)(7) and XV(e)(2)?
- Are there any suggested revisions, such as a definition of "servicing," that would clarify the scope of Category XV(a)(12)?
- Should any other specific space-related technologies be added to the following list for review: satellite thrusters, gyroscopes, inertial navigation systems, large aperture earth observation cameras, spacecraft antenna systems and adaptive Global Navigation Satellite System (GNSS) antennas, suborbital systems with propulsion systems currently controlled under USML, kapton tape, star trackers and astrocompasses?
- For technologies controlled under 9A515 (including habitats, planetary rovers and planetary systems), what factors or specific technologies should be considered for movement to a different Export Control Classification Number (ECCN) or a paragraph under 9A515 with less stringent licensing requirements?

Comments are due to State and Commerce by April 22, 2019.

State and Commerce export control personnel read all public comments and take them into account when preparing proposed rules to revise the categories - if you have suggestions for how to improve the categories, now is the best time to make them. The higher the quality of the comments and supporting documentation, the more likely your suggestions are to be taken seriously as part of future revision efforts.

----------------

[FN/1] See here.
[FN/2] See here.
[FN/3] State ANPRM is available here; Commerce ANPRM is available here.
[FN/4] Id.
[FN/5] NASA's Lunar Orbital Platform Gateway (formerly known as "Deep Space Gateway" and colloquially referred to as "Lunar Gateway" or "Gateway") is a developing, U.S.-led project to establish a habitable outpost in lunar orbit that will serve as a strategic waystation between Earth and the Moon's surface (and ultimately, Mars). At the time of this writing, NASA plans to develop many of the various modules by competitive award to U.S. industry, and Gateway payloads (other than crew) are expected to launch on commercial rockets. Further details are available here and here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



U.S. Export Controls:
ITAR & EAR from a non-U.S. Perspective

Tuesday, 9 April 2019
Bruchem, The Netherlands

Register Now and get an Early-Bird Discount!

---

EX/IM TRAINING EVENTS & CONFERENCES

## 18. ECS Presents "ITAR/EAR Bootcamp: Achieving Compliance" on 8-9 Jul in Seattle, WA
(Source: S. Palmer, spalmer@exportcompliancesolutions.com.)

* What: ITAR/EAR Bootcamp: Achieving Compliance; Seattle, WA
* When: July 8-9, 2019
* Where: Sheraton Grande
* Sponsor: Export Compliance Solutions & Consulting (ECS)
* ECS Speaker Panel:  Suzanne Palmer, Mal Zerden
* Register here or by calling 866-238-4018 or e-mail
  spalmer@exportcompliancesolutions.com

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 19. ICPA Presents "2019 EU Conference", 15-17 May in London
(Source: ICPA)

* What: 2019 EU Conference
  - Import and Export Track (click here for the agenda)
  - Professional Speakers
  - Hot Industry Topics
* When: 15-17 May 2019
* Where: The Tower Hotel, London, United Kingdom
* Sponsor: International Compliance Professionals Association (ICPA)
* Information & Registration: Click here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 20. ECTI Presents "CFIUS Update: New Requirements to Meet, New Industries Affected" Webinar on 16 Apr
(Source: D. Hatch, danielle@learnexportcompliance.com.)

* What: CFIUS Update: New Requirements to Meet, New Industries Affected
* When: April 16, 2019 12:00 p.m. (EDT)
* Where: Webinar
* Sponsor: Export Compliance Training Institute (ECTI)
* ECTI Speaker: Thaddeus McBride
* Register: here or contact Danielle Hatch, 540-433-3977, danielle@learnexportcompliance.com.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 21. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Albert Einstein** (14 Mar 1879 - 18 Apr 1955; was a German-born theoretical physicist who developed the theory of relativity, one of the two pillars of modern physics (with quantum mechanics). He is best known to the general public for his mass-energy equivalence formula, $E = mc^2$, which has been dubbed "the world's most famous equation". He received the 1921 Nobel Prize in Physics for "'his services to theoretical physics, and especially for his discovery of the law of the photoelectric effect", a pivotal step in the development of quantum theory.)
   - *"The true sign of intelligence is not knowledge but imagination."*
   - *"Whoever is careless with the truth in small matters cannot be trusted with important matters."*

* **Hannah Cowley** (14 Mar 1743 - 11 Mar 1809; was an English dramatist and poet.  The major themes of her plays - including her first, *The Runaway*(1776), and her major hit which is being revived, *The Belle's Stratagem* (1780) - revolve around marriage, and how women strive to overcome the injustices imposed by family life and social custom.)
   - *"The charms of women were never more powerful, and never inspired such achievements, as in those immortal periods when they could neither read nor write."*
   - *"It requires genius to make a good pun - some men of bright parts can't reach it."*

back to top

* * * * * * * * * * * * * * * * *

## 22. Are Your Copies of Regulations Up to Date?
(Source: Editor)

* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199.  Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
   - Last Amendment: 12 Mar 2019: 84 FR 8807-8809: Extension of Import Restrictions Imposed on Archaeological and Ecclesiastical Ethnological Material From Honduras

* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
   - Last Amendment: 20 Dec 2018: 83 FR 65292-65294: Control of Military Electronic Equipment and Other Items the President Determines No Longer Warrant Control Under the United States Munitions List (USML); Correction [Concerning ECCN 7A005 and ECCN 7A105.]

* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30.  Implemented by Dep't of Commerce, U.S. Census Bureau.
   - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
   - HTS codes that are not valid for AES are available here.
   - The latest edition (1 Jan 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The

DOC_0039927

BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under Atomic Energy Act of 1954.
  - Last Amendment: 23 Feb 2015: 80 FR 9359, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

* DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under Atomic Energy Act of 1954.
  - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

* DOJ ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
  - Last Amendment: 4 Oct 2018: 83 FR 50003-50007: Regulatory Reform Revisions to the International Traffic in Arms Regulations.
  - The only available fully updated copy (latest edition: 5 Mar 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated

DOC_0039928

copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR, please contact us to receive your discount code.

* DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders.
Implemented by Dep't of Treasury, Office of Foreign Assets Control.
   - Last Amendment: 15 Nov 2018: 83 FR 57308-57318: Democratic Republic of the Congo Sanctions Regulations

* USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S. International Trade Commission. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
   - Last Amendment: 7 Mar 2019: Harmonized System Update (HSU) 1903 [contains 67 ABI records and 13 harmonized tariff records].
   - HTS codes for AES are available here.
   - HTS codes that are not valid for AES are available here.

back to top

* * * * * * * * * * * * * * * * * *


## 23. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * *


## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 6,500 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws. If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice. Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources. If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free. Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by [jebartlett@fullcirclecompliance.eu](mailto:jebartlett@fullcirclecompliance.eu)

DOC_0039931

1

The Honorable Robert S. Lasnik

2

3

4

5

6

7            UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

8                 AT SEATTLE

9

STATE OF WASHINGTON, et al.,         )
                                    )  No. 2:18-cv-1115-RSL

10

     Plaintiffs,                      )  **FEDERAL DEFENDANTS'**

11

             v.                 )  **CONSOLIDATED OPPOSITION**
                                    )  **TO PLAINTIFFS' MOTION**

12

UNITED STATES DEPARTMENT OF      )  **FOR SUMMARY JUDGMENT**
STATE, et al.,                       )  **AND CROSS-MOTION FOR**

13

                                    )  **SUMMARY JUDGMENT**
     Defendants.                    )

14

                                    )  **NOTED FOR: April 19, 2019**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039940

## INTRODUCTION

Manufacture or possession of plastic guns that are undetectable is a serious federal crime, punishable by up to five years in prison.  Among other statutes, the Undetectable Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C. § 922(p).  The Department of Justice, among other agencies, enforces that prohibition, and will continue to do so vigorously.  Neither those enforcement efforts nor the prohibition itself is affected in any way by the actions challenged in this case.

Indeed, this case is not about the regulation of U.S. persons who wish to utilize a 3D printer to produce their own small-caliber firearms.  Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns.  The Department is tasked with determining what technology and weaponry provide a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where it could be used to threaten U.S. national security, foreign policy, or international peace and stability.  Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies—and the states—to regulate.

Plaintiffs' Amended Complaint, as well as their motion for summary judgment, misunderstands the nature of the Department of State's authority.  But the Court need not reach Plaintiffs' claims under the Administrative Procedure Act ("APA") or the Tenth Amendment because Plaintiffs lack standing to assert their claims and fall outside the relevant statute's zone of interests.  And in any event, Plaintiffs' claims fail on the merits.  Accordingly, and for the reasons set forth below, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

## BACKGROUND

### I.    Statutory And Regulatory Background

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 1
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039941

States" to "control the *import* and the *export* of defense articles and defense services" and to promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1) (emphasis added).  The President has delegated this authority to the Department of State ("Department") in relevant part, and the Department has accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are administered by the Department's Directorate of Defense Trade Controls ("DDTC").  *See* Exec. Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130.  At the heart of the AECA is the United States Munitions List ("USML"), an extensive listing of materials that constitute "defense articles and defense services" under the ITAR.  *See* 22 C.F.R. Part 121.  As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all technical data directly related to such firearms.  *Id.* § 121.1(I)(a), (i). Technical data is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles."  *Id.* § 120.10(a)(1).  Section 2778 of the AECA authorizes the President to (1) designate those defense articles and services to be included on the USML; (2) require licenses for the export of items on the USML; and (3) promulgate regulations for the import and export of such items on the USML.  22 U.S.C. § 2778.

The ITAR does not regulate any transfers of defense articles except those that constitute "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary imports."  The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2) "[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or subdivisions, such as a diplomatic mission or consulate, in the United States," *id.* § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

In certain cases where it is unclear whether a particular item is a defense article or defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using a procedure set forth in the ITAR.  *See id.* § 120.4.  Upon written request, DDTC will provide applicants with a determination as to whether the article, service, or data is within the scope of

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 2
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039942

1   the ITAR.  These assessments are made on a case-by-case basis through an inter-agency

2   process, evaluating whether the article, service, or data is covered by the USML, provides the

3   equivalent performance capabilities of a defense article on the USML, or has a critical military

4   or intelligence advantage.  *See id.* § 120.4(d).

5        While the AECA and ITAR do not provide the Department with authority to prohibit

6   the domestic manufacture or possession of 3D-printed guns, another federal statute deals with

7   this topic.  The Undetectable Firearms Act bars the manufacture, possession, sale, import, or

8   transfer of undetectable firearms.  *See* 18 U.S.C. § 922(p); An Act to Extend the Undetectable

9   Firearms Act of 1988 for 10 Years, Pub. L. No. 113-57, 127 Stat. 656 (2013).  Under that

10  statute, firearms manufactured or sold in the United States must generally be capable of being

11  detected by metal detectors and by x-ray machines.  *See* 18 U.S.C. § 922(p)(1).  Those

12  requirements are not in any way affected by the actions challenged in this case, nor are the

13  separate federal prohibitions on the possession of firearms by felons, persons subject to

14  restraining orders, or the mentally ill.  *See id.* § 922(g)(1) (felons and certain state-law

15  misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders); *id.* § 922(g)(4) (persons

16  adjudicated as mentally ill).  The Government continues to enforce these laws in order to

17  address domestic safety issues related to undetectable firearms.  The Department's

18  determination under the ITAR at issue here will not affect those enforcement efforts.

19  **II.   The Government's Settlement With Defense Distributed**

20       In 2012, Defense Distributed published on the Internet "privately generated technical

21  information regarding a number of gun-related items."  *Def. Distributed v. U.S. Dep't of State*,

22  121 F. Supp. 3d 680, 687 (W.D. Tex. 2015).  In May 2013, DDTC sent Defense Distributed a

23  letter stating that Defense Distributed may have released ITAR-controlled technical data

24  without the required authorization.  *See id.*  Defense Distributed removed the technical data and

25  submitted a CJ request.  *Id.*  The company, however, and in conjunction with another non-

26  profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the

27  Department and DDTC, claiming that the requirement to obtain authorization prior to

28

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 3
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039943

1
2
publishing the subject files on its website violated plaintiffs' rights under the First, Second, and

Fifth Amendments and exceeded the Department's statutory authority. *Id.* at 688.

3
4
5
6
7
8
9
In August 2015, the U.S. District Court for the Western District of Texas denied

Defense Distributed's motion for a preliminary injunction. *Id.* at 701.  For purposes of the

preliminary injunction analysis, the district court considered the files to be subject to the

protection of the First Amendment. *Id.* at 691-92.  Applying intermediate scrutiny, the court

concluded that "because the AECA and ITAR do not prohibit domestic communications" and

plaintiffs remained "free to disseminate the computer files at issue domestically," they had not

shown a substantial likelihood of success on the merits. *Id.* at 695.

10
11
12
13
14
15
16
17
18
19
20
21
22
The Fifth Circuit affirmed in a split decision. *See* 838 F.3d 451 (5th Cir. 2016).

Focusing narrowly on the question of the non-merits requirements for preliminary relief, the

panel majority concluded that the "Department's stated interest in preventing foreign nationals

. . . from obtaining technical data on how to produce weapons and weapon parts" outweighed

plaintiffs' interest in their constitutional rights. *Id.* at 458-59.  The panel majority "decline[d]

to address the merits" because the failure by plaintiffs to meet any single requirement for a

preliminary injunction would require affirmance of the district court. *See id.* at 456-58.  A

dissent from the panel opinion did address the merits. *See id.* at 461 (Jones, J. dissenting).

"[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding

that "the State Department's application of its 'export' control regulations to this domestic

Internet posting appears to violate the governing statute, represents an irrational interpretation

of the regulations, and violates the First Amendment as a content-based regulation and a prior

restraint." *Id.* at 463-64.

23
24
25
26
27
After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138

S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in

district court.  In April 2018, the Government moved to dismiss plaintiffs' second amended

complaint. *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92.  Meanwhile, the district

court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby

28

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 4
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039944

initiating a process under which the parties were able to reach a settlement before briefing on the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

Pursuant to the settlement and as relevant here, the Government agreed to the following:

(a)   Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.[1]

(b)   Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the . . . [ITAR], 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

(c)   Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

(d)   Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

The parties executed the agreement on June 29, 2018, and the Government complied with (b) and (c) on July 27, 2018. *See* Declaration of Sarah Heidema ("Heidema Decl."), Dkt.

---

1 *See* Section III, *infra*. At the time settlement negotiations began, the parties had long expected such a Notice of Proposed Rulemaking ("NPRM") to be issued. *See* 78 Fed. Reg. 22,740, 22,741 (April 16, 2013) (announcing that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR amendments periodically"). Reflecting nearly a decade of efforts to carry out a reform of export regulations and pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg. 16,129 (Mar. 8, 2013). By January 20, 2017, this export reform process had been completed for USML categories IV through XX.

2 Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States."

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 5
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039945

No. 64-1, ¶¶ 27, 29.  The Settlement Agreement states that Defendants deny that they violated plaintiffs' constitutional rights.  *See id.* ¶ 28.

### III.     The Government's Rulemaking

On May 24, 2018—after the initial exchange of settlement offers but more than one month prior to the settlement with Defense Distributed—the Departments of State and Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the technical data at issue in *Defense Distributed.  See* 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed. Reg. 24,166 (May 24, 2018).  In those NPRMs, the Government proposed amending the ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely the articles warranting export and temporary import control on the USML."  83 Fed. Reg. at 24,198.  As proposed, the items removed from the USML—which encompass the technical data at issue in *Defense Distributed* and this litigation—would no longer be subject to the ITAR's authorization requirements, i.e., no license from the Department of State would be required for their export.  *See* Heidema Decl. ¶ 21; *see generally* 83 Fed. Reg. at 24,198.  The Department of State "received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms."  Heidema Decl. ¶ 23.

### IV.     Procedural History

On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department, the Secretary of State, DDTC, and Defense Distributed.  Compl., Dkt. No. 1.  Plaintiffs alleged that the Government's settlement with Defense Distributed adversely affected their public safety laws, in violation of the APA and the Tenth Amendment.  *Id.* at 21-41.  Also on July 30, 2018, Plaintiffs moved for a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court granted on July 31, 2018, Dkt. No. 23 ("Order").  Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and moved for a preliminary injunction on August 9, 2018, Dkt. No. 43.  The Court granted Plaintiffs' motion on August 27, 2018.  Dkt. No. 95 ("Prelim. Inj.").  Pursuant to the preliminary injunction issued by the Court, the Government is enjoined from "implementing or enforcing the

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 6
*State of Washington, et al., v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039946

'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018," and the Federal Defendants must "preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued until further order of the Court." *Id.* at 25.

The Federal Defendants produced the administrative record on October 19, 2018, Dkt. No. 116, and filed supplementary materials on December 20, 2018, Dkt. No. 158. Plaintiffs moved for summary judgment on February 15, 2019. Dkt. No. 170 ("Pls.' MSJ").

## ARGUMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Generally, judicial review of agency action is limited to review of the record on which the administrative decision was based." *Partridge v. Reich*, 141 F.3d 920, 926 n.4 (9th Cir. 1998). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). "[I]n a case involving review of a final agency action under the [APA] . . . summary judgment becomes the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1084 (E.D. Cal. 2011) (citation omitted).

### A.   Plaintiffs Are Not Within The AECA's Zone Of Interests.[3]

"[A] person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Havasupai Tribe*

---

[3] The Court did not previously address the Federal Defendants' zone-of-interests argument. *See* Prelim. Inj. at 8-12. Moreover, for the reasons provided in the Federal Defendants' opposition to Plaintiffs' motion for a preliminary injunction, the Federal Defendants maintain that Plaintiffs lack Article III standing to assert their claims. *See* Dkt. No. 64 ("Defs.' PI Opp.") at 13-16.

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 7
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039947

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018) (citation omitted).  While the zone of interests test is not "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"  *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

    Here, Plaintiffs—whose Amended Complaint focuses on the Federal Defendants' compliance with the AECA's congressional notification provision, 22 U.S.C. §2778(f)(1)—do not fall within the zone of interests protected by the statute.  *See Bennett v. Spear*, 520 U.S. 154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the particular provision of law upon which the plaintiff relies").  The AECA "is designed to protect against the national security threat created by the unrestricted flow of military information abroad." *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v. Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President to control the import and export of defense articles and defense services in 'furtherance of world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C. § 2778(a)(1))); *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports").  The primary concerns of the statute are thus national security and foreign relations. In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to" certain congressional committees. As the legislative history makes clear, Congress enacted this provision in response to "legitimate industry concerns" by exporters, and cautioned the Executive Branch to "avoid unnecessary export regulation." H.R. Rep. No. 97-58, at 21-22 (1981).  Thus Plaintiffs—states who neither exercise congressional oversight of the Department nor function as would-be exporters, and whose alleged harms concern purely domestic, non-military matters unrelated to foreign relations, fail to meet the zone of interests test. *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989) (Illinois not within zone of interest of the Base Closure

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 8
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039948

and Realignment Act, because, as here, the state "is not the subject of the Secretary's action" and "states have no constitutional or statutory role in federal military policy").

## B. Plaintiffs' APA Claims Fail.

According to Plaintiffs, the Department exceeded its statutory authority in not providing advance notice to Congress about the actions undertaken in connection with the settlement agreement. Pls.' MSJ at 10-11. But as the Federal Defendants have previously explained, Defs.' PI Opp. at 18-19, the statutory provision on which Plaintiffs rely requires such notice only with respect to the *removal* of *items* from the USML. *See* 22 U.S.C. § 2778(f)(1) (providing that "the President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal" to the appropriate congressional committees). Because the subject files are not specifically enumerated on the USML and therefore are not items, and because the Department effectuated only a temporary modification, not a removal, the Department's actions were in accord with its delegated authority. *But see* Prelim. Inj. at 12-15.

The Court should also reject Plaintiffs' claim that the Temporary Modification and Letter were arbitrary and capricious. As the Federal Defendants explained in their opposition to Plaintiffs' preliminary injunction motion, items belong on the United States Munitions List if they "provide[] a critical military or intelligence advantage." 22 C.F.R. § 120.3(b). Here, the administrative record reveals that the government had determined that small-caliber firearms do not satisfy that standard. *See generally* Defs.' PI Opp. at 22 (citing State and Commerce NPRMs).[4]

Defendants acknowledge that the Court previously suggested that Defendants failed to sufficiently "consider[] the unique properties of 3D plastic guns," Prelim. Inj. at 17, or to provide a "reasoned explanation for its change in position," *id.* at 18. Defendants nonetheless respectfully maintain that they satisfied their obligations. *See generally* Defs.' PI Op. at 21-22.

---

[4] Plaintiffs' suggestion that "the Temporary Modification is the *only* document in the filed administrative record that reflects any reason for the State Department's reversal of its position on 3D-printable firearms files," Pls.' MSJ at 13, is therefore not correct. When an agency's decision is properly before the Court, it "review[s] the entire administrative record." *Epsilon Elec., Inc. v. U.S. Dep't of Treas., Office of Foreign Assets Control*, 857 F.3d 913, 924 (D.C. Cir. 2017).

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 9
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039949

1
2
3

Specifically, Defendants maintain that it sufficed to consider the need to regulate small-caliber firearms generally, as undetectable firearms are separately regulated by other agencies under the Undetectable Firearms Act. *See id.* at 10.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

In any case, even if the Court were to find the Federal Defendants' rationale inadequate, it should reject Plaintiffs' contention that the Federal Defendants' rationale was pretextual. Plaintiffs suggest that the Temporary Modification and Letter were procedurally irregular because they were issued without notice to Congress, but Defendants respectfully maintain that no such notice was required. *See id.* at 18-19; *but see* Prelim. Inj. at 12-15. While Plaintiffs further suggest that the Department's decision was made "abruptly, sometime during the three-week period from April 6 to April 30, 2018," Pls.' MSJ at 19, the Federal Defendants have explained that the decision was made following the District Court of the Western District of Texas's instruction to the parties to exchange written settlement demands, *see* Defs.' PI Opp. at 5; it is no secret that the Temporary Modification and Letter arose from a settlement of the *Defense Distributed* litigation. *Cf.* Pls.' MSJ at 19. Last, Plaintiffs complain that certain documents were initially omitted from the administrative record, *see* Pls.' MSJ at 20, but those documents were omitted from the record because they were not among the documents considered by the agency decision-maker. *See* generally Defs.' Opp. at Pls.' Mot. to Compel, Dkt. No. 152. In any case, Defendants agreed to supplement the record with these documents for the Court's convenience in determining whether to rely on the materials as extra-record evidence and the convenience of the parties. *See* Dkt. No. 158.

21

### C.    Plaintiffs' Tenth Amendment Claim Fails.

22
23
24
25
26
27
28

Plaintiffs fare no better in arguing that the Department's actions constitute a violation of the Tenth Amendment to the Constitution. *See* Pls.' MSJ at 11-12. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. "Under the Tenth Amendment, 'the Federal Government may not compel States to implement, by legislation or executive action, federal regulatory programs.'" *Envtl. Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 847 (9th Cir. 2003) (quoting *Printz v. United States*,

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 10
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039950

521 U.S. 898, 925 (1997)). "The crucial proscribed element is coercion; the residents of the State or municipality must retain 'the ultimate decision' as to whether or not the State or municipality will comply with the federal regulatory program." *Id.* (quoting *New York v. United States*, 505 U.S. 144, 168 (1992)).

Here, Plaintiffs claim that "[t]he Department's overly broad authorization well exceeds the scope of its authority under AECA to regulate exports, and on its face purports to abrogate the states' police powers to enforce their gun-safety laws in violation of the Tenth Amendment." Pls.' MSJ at 11; *see also id.* at 12 (arguing that "[t]he States' ability and authority to enforce their gun-safety laws is undermined by the State Department's purported authorization of 'any United States person' to 'use' the files to print their own undetectable and untraceable weapons"). To be abundantly clear, however, the Government does not suggest, and has never suggested, that the settlement agreement conflicts with or otherwise preempts such state laws. To the contrary, the Department has consistently emphasized that its actions are taken only pursuant to its authority to regulate the United States' system of export controls, not domestic activity. *See Def. Distributed*, 121 F. Supp. 3d at 695. The protections for state law legislated by Congress in the Gun Control Act remain in force, *see* 18 U.S.C. § 927, as well as the laws invoked by Plaintiffs, remain unaffected by the settlement agreement. Nor is there any basis to substitute Plaintiffs' understanding of the agreement for the far more reasonable interpretation of the Government.

Moreover, Plaintiffs fall well short of establishing any element of a violation of the Tenth Amendment. "[T]here is simply no evidence that [Plaintiffs were] compelled to enact or enforce any federal regulatory program. Nor is there any evidence that [Plaintiffs were] compelled to assist in the enforcement of federal statutes regulating private individuals." *See City of Tombstone v. United States*, No. 11-cv-00845, 2015 WL 11120851, at *19 (D. Ariz. Mar. 12, 2015). Absent such a program or compulsion, the Court should reject Plaintiffs' Tenth Amendment claim. *See id.; see also, e.g., Envtl. Def. Ctr.*, 344 F.3d at 845 (holding agency action "does not violate the Tenth Amendment, because it directs no unconstitutional coercion").

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 11
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039951

The two cases cited by Plaintiffs are not to the contrary. *See* Pls.' MSJ at 11-12. First, Plaintiffs point to the Supreme Court's general statement in *Bond v. United States* that "[t]he States have broad authority to enact legislation for the public good—what we have often called a 'police power.'" 572 U.S. 844, 854 (2014). But the Federal Defendants do not even purport to infringe upon that power, let alone coerce Plaintiffs into complying with a federal program. Likewise, in *District of Columbia v. Heller*, the Supreme Court noted that "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful[.]" 554 U.S. 570, 626-27 & n.26 (2008). Yet *Heller* concerned the Second Amendment, not the Tenth, and nothing in *Heller* indicates that the Department's exercise of its export authority, which does not involve commandeering State funds or entities, can give rise to a Tenth Amendment violation.

### D.      An Injunction Is Unwarranted.

As Plaintiffs correctly note, Pls.' MSJ at 20, in the APA context, "[v]acatur is the standard remedy for unlawful agency decisions," *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1239 (N.D. Cal. 2015); *see* 5 U.S.C. § 706(2)(A) (requiring court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Nevertheless, in the event the Court finds that the challenged agency actions were inconsistent with the APA, Plaintiffs "additionally ask the Court to enjoin the Federal Defendants from issuing any subsequent 'temporary modification' or otherwise removing the subject files from the Munitions List or permitting their export without providing congressional notice as required by AECA." Pls.' MSJ at 21. Plaintiffs' request is unfounded and should be denied.

"A court's decision to issue an injunction constitutes an unwarranted 'extraordinary remedy' if a less drastic remedy, such as vacatur, could sufficiently redress plaintiff's injury. *Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1247 (quoting *Monsanto Co. v. Geertson*

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 12
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039952

*Seed Farms*, 561 U.S. 139, 165-66 (2010)).  Here, there is no basis to conclude that vacatur would be insufficient to redress Plaintiffs' alleged injuries.  Plaintiffs' Amended Complaint and motion for summary judgment make clear that at issue are not the substantive policies underlying the challenged actions, but rather the procedures used by the agency in taking those actions.  *See* Am. Compl. ¶¶ 230-40 (alleging failure to provide congressional notification and failure to adequately explain basis for actions); Pls.' MSJ at 10-18 (same).  Vacatur and remand would appropriately allow the Federal Defendants to cure any deficiencies with respect to those procedures.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 657 (2007) ("[I]f the EPA's action was arbitrary and capricious, . . . the proper course would have been to remand to the Agency for clarification of its reasons."); *Se. Ak. Conservation Council v. U.S. Army Corps of Engineers*, 486 F.3d 638, 654-55 (9th Cir. 2007), *rev'd and remanded on other grounds sub nom. Coeur Ak., Inc. v. Se. Ak. Conservation Council*, 557 U.S. 261 (2009) ("Under the APA . . . a court should 'vacate the agency's action and remand to the agency to act in compliance with its statutory obligations.'" (citation omitted)).

The rationale underlying Plaintiffs' request confirms that an injunction is not appropriate.  According to Plaintiffs, such relief is warranted to "prohibit[] further procedurally defective agency actions."  Pls.' MSJ at 21; *see also id.* at 21 n.53 ("[T]he States merely ask the Court to invalidate procedurally defective and unlawful agency actions and require the State Department to follow the law in making regulatory changes that affect the subject files.").  Yet "[t]he Supreme Court has warned against 'sweeping injunctions to obey the law' and has cautioned courts about their 'duty to avoid' such orders." *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, No. 11-cv-1062, 2016 WL 8861712, at *7 (C.D. Cal. Nov. 22, 2016), *aff'd*, 745 F. App'x 1 (9th Cir. 2018) (quoting *Swift & Co. v. United States*, 196 U.S. 375, 401 (1905)); *accord Cuviello v. City of Oakland*, No. 06-cv-5517, 2009 WL 734676, at *3 (N.D. Cal. Mar. 19, 2009) (explaining that "courts have held that not only vague injunctions but also injunctions that simply require a defendant to 'obey the law' fail to comply with Rule 65(d)").[5]

---

[5] Indeed, based on Plaintiffs' request, it is difficult to discern the marginal relief provided by an injunction, as vacatur itself would involve setting aside the challenged actions, and any future challenges would be considered in light of a new administrative record.

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 13
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039953

The cases relied on by Plaintiffs do not compel a different result.  For instance, in *New York v. U.S. Department of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019), cited in Pls.' MSJ at 21, the district court "enjoin[ed] Defendants from adding a citizenship question to the 2020 census questionnaire based on Secretary Ross's March 26, 2018 memorandum or based on any reasoning that is substantially similar to the reasoning contained in that memorandum." *Id.* at 676-77.  The court entered this injunction in part because "an injunction will make it easier for Plaintiffs to seek immediate recourse from this Court in the event that Defendants seek to do anything inconsistent with this Opinion," which the court found necessary "given the looming [census] printing deadline."  *Id.* at 676.  Here, however, no similar temporal constraints exist to justify injunctive relief, and in any event the Department should be permitted to address any concerns the Court might have without the need for an injunction.  *Cf. Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29-30 (D.C. Cir. 2005) ("[T]he usual rule is that, with or without vacatur, an agency that cures a problem identified by a court is free to reinstate the original result on remand.").  Plaintiffs likewise cannot persuasively rely on *United States v. Laerdal Manufacturing Corp.*, 73 F.3d 852 (9th Cir. 1995), cited in Pls.' MSJ at 22, as that case did not involve a challenge to government action under the APA, and therefore did not discuss whether vacatur would be an adequate remedy.

Nor have Plaintiffs demonstrated that the injunction factors weigh in their favor.  "The equitable remedy of an injunction—whether preliminary or permanent−is 'unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again.'"  *JPMorgan Chase Bank, N.A. v. Yamassee Tribal Nation*, No. 1:17-cv-00759, 2018 WL 3629940, at *6 (E.D. Cal. July 30, 2018) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).  Plaintiffs fall short of meeting this standard.  All of the concerns identified are harms that might result from the domestic availability of 3D-printed guns in the United States, but such concerns have little to do with whether particular files should be regulated for foreign export on national security grounds.  Further, their relation to the Department's exercise of authority and the settlement agreement is speculative.  At best, Plaintiffs have only identified harms that may result from

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 14
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039954

3D-printed guns *generally*, not from the challenged actions regulating foreign exports.  But there are already laws aimed at domestic conduct that seek to prevent such harms.  And as the Ninth Circuit has made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is relevant for the injunction analysis.  *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).  Plaintiffs simply cannot tie their fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially when there are separate statutes governing domestic manufacture, possession, and sale that remain unaffected by the challenged actions.  *See also* Defs.' PI Opp. at 9-13.

The single case Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), cited in Pls.' MSJ at 24—is inapposite.  In *Maryland*, Chief Justice Roberts, sitting as Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's petition for a writ of certiorari.  567 U.S. at 1301.  Chief Justice Roberts wrote that a stay was appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety interests."  *Id.*  As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA Collection Act] to help prevent [serious] injuries[.]"  *Id.*  Here, by contrast, the Department's settlement has not prevented any of Plaintiffs from employing their public safety statutes.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment, grant the Federal Defendants' motion for summary judgment, and enter judgment in favor of the Federal Defendants.

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 15
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

DOC_0039955

Dated: March 15, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

*/s/ Stuart J. Robinson*
STUART J. ROBINSON
STEVEN A. MYERS
ERIC J. SOSKIN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
(415) 436-6635 (telephone)
(415) 436-6632 (facsimile)
stuart.j.robinson@usdoj.gov

*Attorneys for the Federal Defendants*

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 16
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

DOC_0039956

1

2

## **CERTIFICATE OF SERVICE**

3    I hereby certify that on March 15, 2019, I electronically filed the foregoing brief using

4 the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

5

6 Dated: March 15, 2019                    */s/ Stuart J. Robinson*
                                          Stuart J. Robinson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 17
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

DOC_0039957

**From:** Gary Stanley [▓▓▓▓@glstrade.com]
**Sent:** 3/19/2019 1:55:16 AM
**To:** Richard Ashooh [Richard.Ashooh@bis.doc.gov]
**Subject:** Defense and Export-Import Update (March 18, 2019)

**Dear All,**

**Good Day!**

**Gary Stanley's EC Tip of the Day:** Any foreign national is subject to the ITAR and EAR deemed export rules except a foreign national who (1) is granted permanent residence, as demonstrated by the issuance of a permanent resident visa (*i.e.*, Green Card); or (2) is granted U.S. citizenship; or (3) is granted status as a protected person under 8 U.S.C. 1324b(a)(3). This includes all persons in the U.S. as tourists, students, businesspeople, scholars, researchers, technical experts, sailors, airline personnel, salespeople, military personnel, diplomats, etc. As noted, one exception to this general statement is a protected person. Protected persons include political refugees and political asylum holders. Be aware that individuals seeking protected person status must satisfy all of the terms and conditions that are fully set forth in 8 U.S.C. 1324b(a)(3). It should be emphasized that although the deemed export rules may be triggered, this does not necessarily mean that a license is required. For example, the technology may be EAR99 or license exception eligible.

**Today's Items:**

1. **DDTC Posts Four New Name/Address Change Notices**

2. **DoD/DSS Provides NISP eMASS Update**

3. **UK Government Publishes "No-Deal Brexit" Regulations on International Counter-Terrorism and Guinea-Bissau**

4. **DOD Announces FY2018 Minerva Research Initiative Awards**

5. **EU Commission Posts Trade-Related Documents**

6. **U.S. Customs and U.S. Census/AES Updates**

7. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**

8. **GAO Reports, Testimony, and Correspondence of Interest**

9. **U.S. Government Trade Forms and Other Information Collections Open for Public Comment**

**Other Headlines**

10. **New Report on Arms Control and the Convergence of Biology and Emerging Technologies – Analysis**

11. **Pentagon Issues Broad List of Projects at Risk of Cuts for Border Wall—but Hedges on Details**

12. **U.S. Chip Makers Fear Trap in a Trade Deal With China**

13. **Once Again, the US Navy Looks to Scrap Its Largest Combatants to Save Money**

14. **DoD Requests Almost $23B for Key Intel Account**

15. **Industry Touts Advanced Power Systems for Navy Ships**

16. **Argonne, Intel to Build First U.S. Exascale Supercomputer**
17. **China Rejects 'Abnormal' U.S. Spying Concerns As EU Pushes Trade**
18. **U.S. Campaign to Ban Huawei Overseas Stumbles as Allies Resist**
19. **Germany Plans to Renege on Pledge to Raise Military Spending, Defying Trump**
20. **U.S. Heavy Equipment Makers Feeling Pain From Tariffs, Disputes: Report**
21. **US, India Collaborating on Air-Launched Drone**
22. **US, India Collaborating on Air-Launched Drone**
23. **Nazzic Keene to Lead SAIC As Tony Moraco Announces Retirement**
24. **Embraer CEO to Step Down Ahead of Deal With Boeing**
25. **Opinion: US Air Power: The Imperative for Modernization (Buy the F-35)**

**Upcoming Export Control and Other Trade Compliance Conferences**

# 1. DDTC Posts Four New Name/Address Change Notices

The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) has posted on its website the following four new name/address change notices:

- MEITEC Corporation Address Change

- Renault Trucks Defense to ARQUUS Name Change

- Abacus Innovations Israel, Ltd. to Leidos Innovations Israel A.B. Ltd. Name Change

- Rohde & Schwarz Benelux B.V. Address Change

# 2. DoD/DSS Provides NISP eMASS Update

The U.S. Department of Defense's Defense Security Service (DSS) has posted on its website a notice that the National Industrial Security Program (NISP) Enterprise Mission Assurance Support Service (eMASS) is scheduled to be operational on May 6, 2019. Industry partners should continue to use the ODAA Business Management System (OBMS) until then. Work with your local Information Systems Security Professional and/or ISSP Team Lead to complete the required training to ensure readiness for the transition. The NISP Authorization Office posted a job aid that provides cleared industry security professionals with instructions on how to access the training and for DSS sponsorship instructions regarding External Certification Authority (ECA) Certificates and RMF Knowledge Service Sponsorship. The following are the step-by-step procedures to request a NISP eMASS account and complete the training: 1. Complete DISA eMASS Computer Based Training (CBT) 2. Complete DISA Cyber Awareness Challenge (CAC) training 3. Complete DSS IO (pre-populated) System Authorization Access Request (SAAR) form 4. Submit the completed artifacts (DD 2875 SAAR, CAC certification, and eMASS training completion certification) to DSS NAO eMASS mailbox: dss.quantico.dss.mbx.emass@mail.mil.

# 3. UK Government Publishes "No-Deal Brexit" Regulations on International Counter-Terrorism and Guinea-Bissau

The U.K. Government has published the following "No Deal Brexit" statutory instruments under the Sanctions and Anti-Money Laundering Act 2018:

- The Counter-Terrorism (Sanctions) (EU Exit) Regulations 2019 (SI 2019/577) and Explanatory Memorandum.

- The Republic of Guinea-Bissau (Sanctions) (EU Exit) Regulations 2019 (SI 2019/554) and Explanatory Memorandum.

## 4. DOD Announces FY2018 Minerva Research Initiative Awards

The U.S. Department of Defense continued its history of strong support for fundamental research by selecting 12 faculty investigators for awards through the FY2018 Minerva Research Initiative. This initiative supports basic research that focuses on topics of particular relevance to U.S. national security. Through its network of faculty investigators, the Minerva Research Initiative also strengthens the department's connections with the social science community and helps DOD better understand and prepare for future challenges, including National Defense Strategy priorities such as great power competition. The 12 faculty awardees were selected for the prestigious awards following a merit competition from approximately 175 applicants across eight categories. Research proposals were peer-reviewed and selected in conference between the Office of the Under Secretary of Defense for Research and Engineering and the Office of the Under Secretary of Defense for Policy to identify proposals that make foundational contributions to basic social science and align with the National Defense Strategy. The Minerva Research Initiative is jointly administered by the Basic Research Office in the Office of the Under Secretary of Defense for Research and Engineering and the Strategy and Force Development Office in the Office of the Under Secretary of Defense for Policy. The projects are jointly supported by the Basic Research Office, the Air Force Office of Scientific Research and the Office of Naval Research.

## 5. EU Commission Posts Trade-Related Documents

The European Commission has posted the following traded-related documents:

- Trade organisation chart

- Latest Eurostat data on international trade

- Internaltional procurement instruments - factsheet

- Top Trading Partners 2018 - Trade Statistics

## 6. U.S. Customs and U.S. Census/AES Updates

- U.S. Customs - CSMS #19-000135 Title: Document Image System (DIS) File Name and Document Label Guidance for CBMA

- U.S. Customs - CSMS #19-000136 Title: Delayed Importer/Bond Query (KI/KR) Response Times

- U.S. Census - Country Name Updated in the Automated Export System (AES) - The following Country Name has been UPDATED in the AES:

| Old Country Name | New Country Name | ISO Country Code |
|---|---|---|
| Macedonia | North Macedonia | MK |

- The ISO Country Code will remain the same.

## 7. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

- Commerce/E&C - Acetone From Belgium, the Republic of Korea, the Kingdom of Saudi Arabia, Singapore, the Republic of South Africa, and Spain: Initiation of Less-Than-Fair-Value Investigations

- Commerce/E&C - Certain Steel Nails From Malaysia: Final Results of Antidumping Duty Administrative Review; 2016-2017

- USITC - Certain Food Processing Equipment: Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

## 8. GAO Reports, Testimony, and Correspondence of Interest

- GAO: DOD Space Acquisitions: Including Users Early and Often in Software Development Could Benefit Programs GAO-19-136: Published: Mar 18, 2019. Publicly Released: Mar 18, 2019

- CRS: Nord Stream 2: A Fait Accompli? - March 18, 2019

- CRS: Arms Control and Nonproliferation: A Catalog of Treaties and Agreements - Updated March 18, 2019

- CRS: Algeria: In Focus - March 18, 2019

## 9. U.S. Government Trade Forms and Other Information Collections Open for Public Comment

(84 Fed. Reg. 9834) - Agency: U.S. Dept. of Justice/Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) - Title: Application To Register as an Importer of U.S. Munitions Import List Articles - Agency Form No.: ATF Form 4587 (5330.4) - Type of Review: Extension with change of a currently-approved information collection - Deadline for Public Comment: May 17, 2019

(84 Fed. Reg. 9835) - Agency: U.S. Dept. of Justice/Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) - Title: Report of Stolen or Lost ATF Form 5400.30 (Type 60 coupon) Intrastate Purchase Explosive Coupon - Agency Form No.: ATF Form 5400.30 - Type of

Review: Extension without change of a currently-approved information collection - Deadline for Public Comment: May 17, 2019

(84 Fed. Reg. 9753) - Agency: U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Title: BIS Program Evaluation - Agency Form No.: None - Type of Review: Regular submission - Deadline for Public Comment: May 17, 2019

## Other Headlines

## 10. New Report on Arms Control and the Convergence of Biology and Emerging Technologies – Analysis

EurasianReview.com, March 18 - A new report has warned of the risks and challenges posed by the interaction of developments in biotechnology and advances in three emerging technologies: additive manufacturing (AM or so-called 3D printing), artificial intelligence (AI) and robotics. The report from the Stockholm International Peace Research Institute (SIPRI) cautions that the latest advances could increase the possibilities for the development, production and use of biological weapons. The existing biological arms control and non-proliferation governance framework, therefore, needs to be adapted to address the emerging security risks, says the report. SIPRI report, 'Bio Plus X: Arms Control and the Convergence of Biology and Emerging Technologies', was presented at the international conference '2019. Capturing technology. Rethinking arms control' at the German Federal Foreign Office in Berlin on March 15, 2019.

## 11. Pentagon Issues Broad List of Projects at Risk of Cuts for Border Wall—but Hedges on Details

Wall Street Journal.com, March 18 - The Defense Department late Monday released a broad list of the possible projects whose funding might be diverted to build a wall along the border with Mexico, but it didn't reflect any final decisions about which projects would be delayed. Lawmakers had pressed the administration to detail which military construction projects would be affected by President Trump's decision last month to declare a national emergency, part of an effort to secure more money to construct the wall. Administration officials had initially told lawmakers they would receive a list detailing which projects would be delayed by funding being diverted to the wall before they voted on it. The list released Monday didn't reflect any final determination of which funding could be delayed or canceled. A similar list of possible projects at risk had been circulating on Capitol Hill for weeks.

## 12. U.S. Chip Makers Fear Trap in a Trade Deal With China

Wall Street Journal.com, March 18 - U.S. semiconductor companies want no part of any trade deal that calls for stepped-up purchases from China, worried that would give Beijing more control over their industry. As prospects for an agreement to settle the U.S.-China trade standoff have waxed and waned in recent weeks, Washington has pressed Beijing to buy more than $1 trillion in U.S. goods and services as part of any deal. But U.S. chip makers said they have told President Trump's administration not to include them in any such agreement. Because U.S. production costs are so high, mandatory-purchase quotas would essentially force U.S. chip makers to open new factories in China and give Beijing bureaucrats more sway over the U.S. firms, these companies said. That would benefit Chinese competitors and make the U.S. firms more dependent on Beijing, executives at the U.S. companies fear. "Whatever the number, the Chinese chip purchase offer is a distraction

that risks deepening Chinese state influence in an environment that is otherwise market-based," said John Neuffer, president of the Semiconductor Industry Association. "The market should determine commercial success, not government fiat."

## 13. Once Again, the US Navy Looks to Scrap Its Largest Combatants to Save Money

DefenseNews.com, March 18 - The U.S. Navy is eyeing canceling six planned service-life extensions on its oldest cruisers, meaning the Navy will be short six of its current 22 largest surface combatants by 2022, according to defense officials who spoke to Defense News on background. The plan as it will be proposed to Congress is to decommission the cruisers Bunker Hill, Mobile Bay, Antietam, Leyte Gulf, San Jacinto and Lake Champlain in 2021 and 2022, foregoing plans for service life extensions that have been supported in Congress in the past. All the ships will be at or near the end of their 35-year service lives when they are decommissioned, but the Navy has yet to decide on a replacement for the cruisers, the largest combatants in the fleet with 122 vertical launch systems cells. This comes at a time when the Navy needs as many missiles downrange as it can field as it squares off with the threat from Chinese and Russian anti-ship missiles. . . . But the cruisers, which act as the lead air defense ship in a carrier strike group, have been notoriously difficult to maintain as the fleet has managed everything from cracking hulls to aging pipes and mechanical systems. The ships' SPY-1 radars have also been difficult to maintain, as components age and need constant attention from technicians to keep up.

## 14. DoD Requests Almost $23B for Key Intel Account

DefenseNews.com, March 18 -  The Pentagon wants to increase its black budget for intelligence programs for a fifth straight year. The Department of Defense has requested $22.95 billion for the top-line budget of the Military Intelligence Program, the DoD announced Monday. While the overall fiscal 2020 budget request was released last week, the MIP request typically comes days or weeks afterward. The Department of Defense has requested $22.95 billion for the top-line budget of the Military Intelligence Program, the DoD announced Monday. While the overall fiscal 2020 budget request was released last week, the MIP request typically comes days or weeks afterward. A 2016 Congressional Research Service report says the MIP represents "defense intelligence activities intended to support tactical military operations and priorities," including "tactical-level systems, people and activities" for the Pentagon and services as they work on intelligence gathering.

## 15. Industry Touts Advanced Power Systems for Navy Ships

National Defense Magazine.org, March 18 - Defense contractors are investing in alternative propulsion and power systems as the Navy develops and upgrades its fleet of warships. Leonardo DRS, which is currently building its second generation hybrid-electric propulsion system for the Coast Guard's new offshore patrol cutter, is touting its technology as the wave of the future. Three major advantages of hybrid-electric propulsion for Navy ships include: greater fuel economy, lowered maintenance costs and quieter vessels for advanced warfare operations, said Jamie McMullin, senior director of business development for Leonardo DRS' naval power systems. "Our hybrid-electric drive can bring the U.S. Navy real warfighting capability … and then you get all the benefits of fuel economy and less operation on engines and more space in the ship," he said in an interview. The electric systems' quiet

nature makes it advantageous for anti-submarine warfare, noted Clive Wilgress-Pipe, director of business development for Leonardo DRS' naval power systems.

## 16. Argonne, Intel to Build First U.S. Exascale Supercomputer

National Defense Magazine.org, March 18 - The Department of Energy has picked Argonne National Laboratory and its industry partner Intel Corp. to build the United States' first exascale supercomputer by 2021, officials announced March 18. The system — known as Aurora — is slated for completion in 2021, said Paul Dabbar, undersecretary for science at the Energy Department. Aurora will jump "to the top performance computer of the world," he told reporters during a media call before the official announcement. "It will hit an exaflop of performance — so that is 10 to the 18th [power], or a billion-billion calculations per second." The system will push forward the bounds of human knowledge and discovery science, he said. The contract is valued at more than $500 million and work will be performed by Intel with its subcontractor Cray Computing, he added. Aurora is the next step in a long history of the Energy Department and U.S. national labs' pursuit of high-performance computing, he noted. Just last year, the department unveiled the Summit supercomputer that — with a peak performance of 200,000 petaflops — surpassed China's Sunway TaihuLight in capability. Summit is based at Oak Ridge National Laboratory.

## 17. The Cybersecurity 202: Huawei Is Suing the U.S. to Win – In the Court of Public Opinion

Washington Post.com, March 18 - Huawei is nearly guaranteed to lose a lawsuit it filed this month claiming the U.S. government acted unfairly by banning it from federal computer networks. But Huawei's main goal isn't to win in a court of law, experts say -- it's seeking a victory in the court of public opinion. The Chinese telecommunications giant is seizing an opportunity to push back against the United States in a high-profile and public forum -- as Washington tries to convince allies Huawei can't be trusted to build next-generation 5G wireless networks in their countries without passing along secrets to the Chinese government. If Huawei can make a strong argument that the United States is unfairly biased against it, that may make other governments think twice about imposing 5G bans, Eric Crusius, an attorney at the Holland & Knight law firm who focuses on government contract disputes, told me.

## 18. China Rejects 'Abnormal' U.S. Spying Concerns As EU Pushes Trade

Reuters.com, March 18 - China dismissed U.S. security warnings against its telecoms equipment maker Huawei as groundless and "abnormal" on Monday, as the Chinese government's top diplomat went to Brussels to cool growing European frustration over trade. In a veiled reference to Huawei Technologies Co., which the United States says could spy on the West, Chinese State Councillor Wang Yi told Washington to stop its attempts to "bring down" the company. "What we oppose are groundless accusations for political purposes and attempts to bring down a foreign company," Wang told a news conference, although he did not name Huawei, which is seeking to sell the next generation of mobile technology in Europe, its top market outside China.

## 19. U.S. Campaign to Ban Huawei Overseas Stumbles as Allies Resist

New York Times.com, March 17 - The Trump administration's aggressive campaign to prevent countries from using Huawei and other Chinese telecommunications equipment in their next-generation wireless networks has faltered, with even some of America's closest allies rejecting the United States' argument that the companies pose a security threat. Over the past several months, American officials have tried to pressure, scold and, increasingly, threaten other nations that are considering using Huawei in building fifth-generation, or 5G, wireless networks. Mike Pompeo, the secretary of state, has pledged to withhold intelligence from nations that continue to use Chinese telecom equipment. The American ambassador to Germany cautioned Berlin this month that the United States would curtail intelligence sharing if that country used Huawei. . . . But the campaign has run aground. Britain, Germany, India and the United Arab Emirates are among the countries signaling they are unlikely to back the American effort to entirely ban Huawei from building their 5G networks. While some countries like Britain share the United States' concerns, they argue that the security risks can be managed by closely scrutinizing the company and its software.

## 20. Germany Plans to Renege on Pledge to Raise Military Spending, Defying Trump

Wall Street Journal.com, March 18 - The German government is poised to renege on its pledge to raise military spending, the latest gesture of defiance by Chancellor Angela Merkel toward President Donald Trump. If confirmed at a cabinet meeting on Wednesday, the move would mark a fresh step in the gradual estrangement between the U.S. and its erstwhile loyal European ally and comes after Mr. Trump's repeated attacks of North Atlantic Treaty Organization leaders for not meeting a 2% military-spending target. In recent months, Berlin has rebuked Washington's demands that it limits gas purchases from Russia, ban Chinese components from its communication networks, and prevent German companies from doing business with Iran. In another sign of Berlin pushing for Europe to chart a more independent geopolitical course, Ms. Merkel is planning an unprecedented summit between European Union heads of government and Chinese President Xi Jinping next year, European diplomats said Monday.

## 21. U.S. Heavy Equipment Makers Feeling Pain From Tariffs, Disputes: Report

Reuters.com, March 18 - U.S. makers of bulldozers and other heavy equipment are raising prices, losing sales and in some cases beginning to trim workers in response to the Trump administration's protracted trade disputes with various countries, according to a new report. Advocates of tariffs point to continued job growth and low overall inflation as proof that tariffs are not harming these manufacturers, which include global producers such as Caterpillar Inc, Alamo Group Inc and Terex Corp. But an economic analysis conducted on behalf the Association of Equipment Manufacturers and set to be released on Monday by IHS Markit, notes that increased costs and the disruption of supply chains will slowly filter through the overall economy, gradually raising prices for finished goods and curbing employment over the next decade.

## 22. US, India Collaborating on Air-Launched Drone

DefenseNews.com, March 18 - The U.S. and India are working on development of a small, air-launched unmanned system that could be launched from cargo aircraft, according to Pentagon acquisition head Ellen Lord. The systems are part of a broader technology effort

known as the Defense Technology and Trade Initiative, or DTTI, which seeks opportunities for co-production and development of military technologies between the two countries. Lord highlighted the drone project during a roundtable with reporters on March 15, a day after she hosted a delegation from India to discuss DTTI programs. The UAV project — a collaboration between the Air Force Research Laboratory and India's Defence Research and Development Organization — is a recent addition to the DTTI slate. The two organizations intend to write a technical planning document next month and then sign that plan during a meeting in New Delhi, which Lord will attend, tentatively planned for late September.

## 23. Nazzic Keene to Lead SAIC As Tony Moraco Announces Retirement

Washington Post.com, March 15 - The top job at one of the Washington area's most influential government services companies will soon change hands, as chief executive Tony Moraco prepares to hand the reigns to the company's second-in-command, chief operating officer Nazzic Keene. Moraco will retire as of July 31, the company said in an announcement, capping a six-year run as chief executive. Moraco became CEO in 2013 and saw the company through a period of financial and political turmoil, as federal defense spending cuts from the sequestration process hamstrung numerous government services firms for years. Keene joined SAIC in 2012 after serving as a top manager at CGI, another large government contractor. She climbed the ranks at SAIC to become chief operating officer, helping steer the company through a high-profile spin-off in 2013, in which it effectively split in two and created another $4 billion unit that is now known as Leidos.

## 24. Embraer CEO to Step Down Ahead of Deal With Boeing

Reuters.com, March 18 - The chief executive of Brazilian planemaker Embraer SA will step down next month, the company said on Monday, as it prepares to cede control of its commercial aviation division to Boeing Co for $4.2 billion. Embraer CEO Paulo Cesar Silva will step down on April 22 and a new CEO will be announced by then, the company said. Silva assumed the top position at Embraer in June 2016 as the company dealt with the fallout from a bribery investigation in the United States. Before becoming CEO, he led Embraer's commercial plane division.

## 25. Opinion: US Air Power: The Imperative for Modernization (Buy the F-35)

Breaking Defense.com, March 18 - In 2006, a relatively obscure book caused a major stir among the U.S. Air Force leadership. Why Air Forces Fail, edited by Robin Higham and Stephen J. Harris, lays out the determinants of failure: deficiencies in the industrial base, misguided technology and tactical picks, inattention to logistics and neglect of training. The case studies are broken into three categories: "Dead Ducks," those who never had a chance to win; "Hares," who did well at the outset, but failed to exploit their success; and "Phoenixes"–who overcame early defeats to carry the day. The book crystalized the Air Force's battle with Defense Secretary Robert Gates, who describes the service as "one of my biggest headaches" in his own book, Duty: Memoirs of a Secretary at War. In Gates' eyes, the Air Force suffered from "next-war-itis"—focus on future wars with peer adversaries, rather than combat in Iraq and Afghanistan. . . . Air Forces — and militaries — do not fail by themselves. Failure occurs in a national context, wherein "ducks, hares, and phoenixes" don't suffice as an explanation.

# Upcoming Export Control and Other Trade Compliance Conferences

**March 21 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Export Control Briefing - 8:30 AM to 10:30 AM - Long Beach, California**

**March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort**

**March 25 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Professional Association of Exporters and Importers - An Evening with U.S. Assistant Secretary of Commerce for Export Administration, Rich Ashooh - 4:00 PM to 5:30 PM PDT - NVIDIA Corp., 2788 San Tomas Expressway, Santa Clara, CA**

**March 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Pittsburgh - Westin Convention Center Hotel**

**March 26-27 - American Conference Institute - 9th Advanced Industry Forum on Global Encryption, Cloud & Cyber Trade Controls - San Francisco - Marine's Memorial Club**

**March 27-28 - American Conference Institute - 6th Summit on Anti-Corruption Mexico - Mexico City - JW Marriottt Hotel Mexico City**

**April 2-3 - Society for International Affairs - 2019 Exemptions and Voluntary Disclosure/Voluntary Self-Disclosure Seminar - Long Beach, California - Renaissance Long Beach Hotel**

**April 3-4 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver, Colorado - Grand Hyatt Denver Hotel**

**April 3-4 - C5 Group - Anti-Corruption Switzerland - Zürich - Sheraton Zürich Hotel**

**April 17-18 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver - Grand Hyatt Denver Hotel**

**April 23 - American Conference Institute - 2nd National Forum on FOCI - Washington, DC - Westin Washington City Center Hotel**

**April 23-24 - Nielsonsmith - Sanctions, Anti-Corruption & Export Controls Compliance in the Middle East - Dubai, UAE**

**April 23-24 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Granite State Export Council - Complying with U.S. Export Controls - Portsmouth, New Hampshire - Portsmouth Harbor Events & Conference Center**

**April 24-25 - American Conference Institute - Fifth National Conference on CFIUS & Team Telecom - Washington, DC - Westin Washington City Center Hotel**

**April 29-May 1 - Association of Old Crows & Georgia Tech Research Institute (GTRI) - Security Cooperation Symposium: Interoperability, EW & FMS - GTRI Conference Center 250 14th Street, N.W. | Atlanta, GA 30318**

**April 30 - May 1 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Women in International Trade Orange County (WITOC)- Complying with U.S. Export Controls - Irvine, California - Hilton Irvine/Orange County Hotel**

**May 2-3 - American Conference Institute - 12th Annual Flagshp Conference on Economic Sanctions - Washington, DC**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

**May 15-16 - American Conference Institute - Foreign Corrupt Practices Act (New York) - New York City - The Westin New York at Times Square**

**May 15-17 - International Compliance Professionals Association (ICPA) - 2019 EU Conference - London - Tower Hotel**

**May 16-17 - International Compliance Professionals Association (ICPA) - 2019 ICPA Canada Conference - Toronto, Canada- Hyatt Regency Toronto Hotel**

**May 22-23 - Nielsonsmith - US Trade Controls Compliance in Europe Copnference 2019 - Munich -** *Gary Stanley, Editor of Defense and Export-Import Update, will speak at this conference.*

**May 22-23 - American Conference Institute - Anti-Corruption Brazil - São Paulo - InterContinental São Paulo Hotel**

**May 29-30 - American Conference Institute - 2nd Annual Hong Kong Summit on Economic Sanctions Compliance and Enforcement - Hong Kong**

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 7 - Society for International Affairs - 2019 Spring Golf Outing - Upper Marlboro, Maryland - Lake Presidential Golf Course**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 11-12 - American Conference Institute - 12th China Forum on Anti-Corruption - Shanghai**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**June 18-19 - C5 Group - 13th International Conference on Anti-Corruption London - London**

**June 26-27 - American Conference Institute - ITC Litigation & Enforcement - Washington, DC - Park Hyatt Washington Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**Sept. 24-25 - 12th Conference on the Foreign Corrupt Practices Act - San Francisco**

**Oct. 27 - American Conference Institute - 5th Asia Pacific Summit on Economic Sanctions Compliance and Enforcement - Singapore**

**Oct.28-29 - American Conference Institute - 8th Asia-Pacific on Anti-Corruption Singapore - Singapore**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 5-6 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to gstanley@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. +1 (202) 686-4854
Fax +1 (202) 686-2624
Mobile ███████
E-mail ████████@glstrade.com

**From:** Gary Stanley [g████████glstrade.com]
**Sent:** 3/19/2019 1:55:16 AM
**To:** Matthew Borman [Matthew.Borman@bis.doc.gov]
**Subject:** Defense and Export-Import Update (March 18, 2019)

**Dear All,**

**Good Day!**

**Gary Stanley's EC Tip of the Day: Any foreign national is subject to the ITAR and EAR deemed export rules except a foreign national who (1) is granted permanent residence, as demonstrated by the issuance of a permanent resident visa (*i.e.*, Green Card); or (2) is granted U.S. citizenship; or (3) is granted status as a protected person under 8 U.S.C. 1324b(a)(3). This includes all persons in the U.S. as tourists, students, businesspeople, scholars, researchers, technical experts, sailors, airline personnel, salespeople, military personnel, diplomats, etc. As noted, one exception to this general statement is a protected person. Protected persons include political refugees and political asylum holders. Be aware that individuals seeking protected person status must satisfy all of the terms and conditions that are fully set forth in 8 U.S.C. 1324b(a)(3). It should be emphasized that although the deemed export rules may be triggered, this does not necessarily mean that a license is required. For example, the technology may be EAR99 or license exception eligible.**

**Today's Items:**

1. **DDTC Posts Four New Name/Address Change Notices**

2. **DoD/DSS Provides NISP eMASS Update**

3. **UK Government Publishes "No-Deal Brexit" Regulations on International Counter-Terrorism and Guinea-Bissau**

4. **DOD Announces FY2018 Minerva Research Initiative Awards**

5. **EU Commission Posts Trade-Related Documents**

6. **U.S. Customs and U.S. Census/AES Updates**

7. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**

8. **GAO Reports, Testimony, and Correspondence of Interest**

9. **U.S. Government Trade Forms and Other Information Collections Open for Public Comment**

**Other Headlines**

10. **New Report on Arms Control and the Convergence of Biology and Emerging Technologies – Analysis**

11. **Pentagon Issues Broad List of Projects at Risk of Cuts for Border Wall—but Hedges on Details**

12. **U.S. Chip Makers Fear Trap in a Trade Deal With China**

13. **Once Again, the US Navy Looks to Scrap Its Largest Combatants to Save Money**

14. **DoD Requests Almost $23B for Key Intel Account**

15. **Industry Touts Advanced Power Systems for Navy Ships**

16. **Argonne, Intel to Build First U.S. Exascale Supercomputer**
17. **China Rejects 'Abnormal' U.S. Spying Concerns As EU Pushes Trade**
18. **U.S. Campaign to Ban Huawei Overseas Stumbles as Allies Resist**
19. **Germany Plans to Renege on Pledge to Raise Military Spending, Defying Trump**
20. **U.S. Heavy Equipment Makers Feeling Pain From Tariffs, Disputes: Report**
21. **US, India Collaborating on Air-Launched Drone**
22. **US, India Collaborating on Air-Launched Drone**
23. **Nazzic Keene to Lead SAIC As Tony Moraco Announces Retirement**
24. **Embraer CEO to Step Down Ahead of Deal With Boeing**
25. **Opinion: US Air Power: The Imperative for Modernization (Buy the F-35)**

**Upcoming Export Control and Other Trade Compliance Conferences**

## 1. DDTC Posts Four New Name/Address Change Notices

The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) has posted on its website the following four new name/address change notices:

- MEITEC Corporation Address Change

- Renault Trucks Defense to ARQUUS Name Change

- Abacus Innovations Israel, Ltd. to Leidos Innovations Israel A.B. Ltd. Name Change

- Rohde & Schwarz Benelux B.V. Address Change

## 2. DoD/DSS Provides NISP eMASS Update

The U.S. Department of Defense's Defense Security Service (DSS) has posted on its website a notice that the National Industrial Security Program (NISP) Enterprise Mission Assurance Support Service (eMASS) is scheduled to be operational on May 6, 2019. Industry partners should continue to use the ODAA Business Management System (OBMS) until then. Work with your local Information Systems Security Professional and/or ISSP Team Lead to complete the required training to ensure readiness for the transition. The NISP Authorization Office posted a job aid that provides cleared industry security professionals with instructions on how to access the training and for DSS sponsorship instructions regarding External Certification Authority (ECA) Certificates and RMF Knowledge Service Sponsorship. The following are the step-by-step procedures to request a NISP eMASS account and complete the training: 1. Complete DISA eMASS Computer Based Training (CBT) 2. Complete DISA Cyber Awareness Challenge (CAC) training 3. Complete DSS IO (pre-populated) System Authorization Access Request (SAAR) form 4. Submit the completed artifacts (DD 2875 SAAR, CAC certification, and eMASS training completion certification) to DSS NAO eMASS mailbox: dss.quantico.dss.mbx.emass@mail.mil.

## 3. UK Government Publishes "No-Deal Brexit" Regulations on International Counter-Terrorism and Guinea-Bissau

The U.K. Government has published the following "No Deal Brexit" statutory instruments under the Sanctions and Anti-Money Laundering Act 2018:

• The Counter-Terrorism (Sanctions) (EU Exit) Regulations 2019 (SI 2019/577) and Explanatory Memorandum.

• The Republic of Guinea-Bissau (Sanctions) (EU Exit) Regulations 2019 (SI 2019/554) and Explanatory Memorandum.

## 4. DOD Announces FY2018 Minerva Research Initiative Awards

The U.S. Department of Defense continued its history of strong support for fundamental research by selecting 12 faculty investigators for awards through the FY2018 Minerva Research Initiative. This initiative supports basic research that focuses on topics of particular relevance to U.S. national security. Through its network of faculty investigators, the Minerva Research Initiative also strengthens the department's connections with the social science community and helps DOD better understand and prepare for future challenges, including National Defense Strategy priorities such as great power competition. The 12 faculty awardees were selected for the prestigious awards following a merit competition from approximately 175 applicants across eight categories. Research proposals were peer-reviewed and selected in conference between the Office of the Under Secretary of Defense for Research and Engineering and the Office of the Under Secretary of Defense for Policy to identify proposals that make foundational contributions to basic social science and align with the National Defense Strategy. The Minerva Research Initiative is jointly administered by the Basic Research Office in the Office of the Under Secretary of Defense for Research and Engineering and the Strategy and Force Development Office in the Office of the Under Secretary of Defense for Policy. The projects are jointly supported by the Basic Research Office, the Air Force Office of Scientific Research and the Office of Naval Research.

## 5. EU Commission Posts Trade-Related Documents

The European Commission has posted the following traded-related documents:

• Trade organisation chart

• Latest Eurostat data on international trade

• Internaltional procurement instruments - factsheet

• Top Trading Partners 2018 - Trade Statistics

## 6. U.S. Customs and U.S. Census/AES Updates

• U.S. Customs - CSMS #19-000135 Title: Document Image System (DIS) File Name and Document Label Guidance for CBMA

• U.S. Customs - CSMS #19-000136 Title: Delayed Importer/Bond Query (KI/KR) Response Times

- U.S. Census - Country Name Updated in the Automated Export System (AES) - The following Country Name has been UPDATED in the AES:

| Old Country Name | New Country Name | ISO Country Code |
|---|---|---|
| Macedonia | North Macedonia | MK |

- The ISO Country Code will remain the same.

## 7. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

- Commerce/E&C - Acetone From Belgium, the Republic of Korea, the Kingdom of Saudi Arabia, Singapore, the Republic of South Africa, and Spain: Initiation of Less-Than-Fair-Value Investigations

- Commerce/E&C - Certain Steel Nails From Malaysia: Final Results of Antidumping Duty Administrative Review; 2016-2017

- USITC - Certain Food Processing Equipment: Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

## 8. GAO Reports, Testimony, and Correspondence of Interest

- GAO: DOD Space Acquisitions: Including Users Early and Often in Software Development Could Benefit Programs GAO-19-136: Published: Mar 18, 2019. Publicly Released: Mar 18, 2019

- CRS: Nord Stream 2: A Fait Accompli? - March 18, 2019

- CRS: Arms Control and Nonproliferation: A Catalog of Treaties and Agreements - Updated March 18, 2019

- CRS: Algeria: In Focus - March 18, 2019

## 9. U.S. Government Trade Forms and Other Information Collections Open for Public Comment

(84 Fed. Reg. 9834) - Agency: U.S. Dept. of Justice/Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) - Title: Application To Register as an Importer of U.S. Munitions Import List Articles - Agency Form No.: ATF Form 4587 (5330.4) - Type of Review: Extension with change of a currently-approved information collection - Deadline for Public Comment: May 17, 2019

(84 Fed. Reg. 9835) - Agency: U.S. Dept. of Justice/Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) - Title: Report of Stolen or Lost ATF Form 5400.30 (Type 60 coupon) Intrastate Purchase Explosive Coupon - Agency Form No.: ATF Form 5400.30 - Type of

Review: Extension without change of a currently-approved information collection - Deadline for Public Comment: May 17, 2019

(84 Fed. Reg. 9753) - Agency: U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Title: BIS Program Evaluation - Agency Form No.: None - Type of Review: Regular submission - Deadline for Public Comment: May 17, 2019

## Other Headlines

## 10. New Report on Arms Control and the Convergence of Biology and Emerging Technologies – Analysis

EurasianReview.com, March 18 - A new report has warned of the risks and challenges posed by the interaction of developments in biotechnology and advances in three emerging technologies: additive manufacturing (AM or so-called 3D printing), artificial intelligence (AI) and robotics. The report from the Stockholm International Peace Research Institute (SIPRI) cautions that the latest advances could increase the possibilities for the development, production and use of biological weapons. The existing biological arms control and non-proliferation governance framework, therefore, needs to be adapted to address the emerging security risks, says the report. SIPRI report, 'Bio Plus X: Arms Control and the Convergence of Biology and Emerging Technologies', was presented at the international conference '2019. Capturing technology. Rethinking arms control' at the German Federal Foreign Office in Berlin on March 15, 2019.

## 11. Pentagon Issues Broad List of Projects at Risk of Cuts for Border Wall—but Hedges on Details

Wall Street Journal.com, March 18 - The Defense Department late Monday released a broad list of the possible projects whose funding might be diverted to build a wall along the border with Mexico, but it didn't reflect any final decisions about which projects would be delayed. Lawmakers had pressed the administration to detail which military construction projects would be affected by President Trump's decision last month to declare a national emergency, part of an effort to secure more money to construct the wall. Administration officials had initially told lawmakers they would receive a list detailing which projects would be delayed by funding being diverted to the wall before they voted on it. The list released Monday didn't reflect any final determination of which funding could be delayed or canceled. A similar list of possible projects at risk had been circulating on Capitol Hill for weeks.

## 12. U.S. Chip Makers Fear Trap in a Trade Deal With China

Wall Street Journal.com, March 18 - U.S. semiconductor companies want no part of any trade deal that calls for stepped-up purchases from China, worried that would give Beijing more control over their industry. As prospects for an agreement to settle the U.S.-China trade standoff have waxed and waned in recent weeks, Washington has pressed Beijing to buy more than $1 trillion in U.S. goods and services as part of any deal. But U.S. chip makers said they have told President Trump's administration not to include them in any such agreement. Because U.S. production costs are so high, mandatory-purchase quotas would essentially force U.S. chip makers to open new factories in China and give Beijing bureaucrats more sway over the U.S. firms, these companies said. That would benefit Chinese competitors and make the U.S. firms more dependent on Beijing, executives at the U.S. companies fear. "Whatever the number, the Chinese chip purchase offer is a distraction

that risks deepening Chinese state influence in an environment that is otherwise market-based," said John Neuffer, president of the Semiconductor Industry Association. "The market should determine commercial success, not government fiat."

## 13. Once Again, the US Navy Looks to Scrap Its Largest Combatants to Save Money

DefenseNews.com, March 18 - The U.S. Navy is eyeing canceling six planned service-life extensions on its oldest cruisers, meaning the Navy will be short six of its current 22 largest surface combatants by 2022, according to defense officials who spoke to Defense News on background. The plan as it will be proposed to Congress is to decommission the cruisers Bunker Hill, Mobile Bay, Antietam, Leyte Gulf, San Jacinto and Lake Champlain in 2021 and 2022, foregoing plans for service life extensions that have been supported in Congress in the past. All the ships will be at or near the end of their 35-year service lives when they are decommissioned, but the Navy has yet to decide on a replacement for the cruisers, the largest combatants in the fleet with 122 vertical launch systems cells. This comes at a time when the Navy needs as many missiles downrange as it can field as it squares off with the threat from Chinese and Russian anti-ship missiles. . . . But the cruisers, which act as the lead air defense ship in a carrier strike group, have been notoriously difficult to maintain as the fleet has managed everything from cracking hulls to aging pipes and mechanical systems. The ships' SPY-1 radars have also been difficult to maintain, as components age and need constant attention from technicians to keep up.

## 14. DoD Requests Almost $23B for Key Intel Account

DefenseNews.com, March 18 -  The Pentagon wants to increase its black budget for intelligence programs for a fifth straight year. The Department of Defense has requested $22.95 billion for the top-line budget of the Military Intelligence Program, the DoD announced Monday. While the overall fiscal 2020 budget request was released last week, the MIP request typically comes days or weeks afterward. The Department of Defense has requested $22.95 billion for the top-line budget of the Military Intelligence Program, the DoD announced Monday. While the overall fiscal 2020 budget request was released last week, the MIP request typically comes days or weeks afterward. A 2016 Congressional Research Service report says the MIP represents "defense intelligence activities intended to support tactical military operations and priorities," including "tactical-level systems, people and activities" for the Pentagon and services as they work on intelligence gathering.

## 15. Industry Touts Advanced Power Systems for Navy Ships

National Defense Magazine.org, March 18 - Defense contractors are investing in alternative propulsion and power systems as the Navy develops and upgrades its fleet of warships. Leonardo DRS, which is currently building its second generation hybrid-electric propulsion system for the Coast Guard's new offshore patrol cutter, is touting its technology as the wave of the future. Three major advantages of hybrid-electric propulsion for Navy ships include: greater fuel economy, lowered maintenance costs and quieter vessels for advanced warfare operations, said Jamie McMullin, senior director of business development for Leonardo DRS' naval power systems. "Our hybrid-electric drive can bring the U.S. Navy real warfighting capability … and then you get all the benefits of fuel economy and less operation on engines and more space in the ship," he said in an interview. The electric systems' quiet

nature makes it advantageous for anti-submarine warfare, noted Clive Wilgress-Pipe, director of business development for Leonardo DRS' naval power systems.

## 16. Argonne, Intel to Build First U.S. Exascale Supercomputer

National Defense Magazine.org, March 18 - The Department of Energy has picked Argonne National Laboratory and its industry partner Intel Corp. to build the United States' first exascale supercomputer by 2021, officials announced March 18. The system — known as Aurora — is slated for completion in 2021, said Paul Dabbar, undersecretary for science at the Energy Department. Aurora will jump "to the top performance computer of the world," he told reporters during a media call before the official announcement. "It will hit an exaflop of performance — so that is 10 to the 18th [power], or a billion-billion calculations per second." The system will push forward the bounds of human knowledge and discovery science, he said. The contract is valued at more than $500 million and work will be performed by Intel with its subcontractor Cray Computing, he added. Aurora is the next step in a long history of the Energy Department and U.S. national labs' pursuit of high-performance computing, he noted. Just last year, the department unveiled the Summit supercomputer that — with a peak performance of 200,000 petaflops — surpassed China's Sunway TaihuLight in capability. Summit is based at Oak Ridge National Laboratory.

## 17. The Cybersecurity 202: Huawei Is Suing the U.S. to Win – In the Court of Public Opinion

Washington Post.com, March 18 - Huawei is nearly guaranteed to lose a lawsuit it filed this month claiming the U.S. government acted unfairly by banning it from federal computer networks. But Huawei's main goal isn't to win in a court of law, experts say -- it's seeking a victory in the court of public opinion. The Chinese telecommunications giant is seizing an opportunity to push back against the United States in a high-profile and public forum -- as Washington tries to convince allies Huawei can't be trusted to build next-generation 5G wireless networks in their countries without passing along secrets to the Chinese government. If Huawei can make a strong argument that the United States is unfairly biased against it, that may make other governments think twice about imposing 5G bans, Eric Crusius, an attorney at the Holland & Knight law firm who focuses on government contract disputes, told me.

## 18. China Rejects 'Abnormal' U.S. Spying Concerns As EU Pushes Trade

Reuters.com, March 18 - China dismissed U.S. security warnings against its telecoms equipment maker Huawei as groundless and "abnormal" on Monday, as the Chinese government's top diplomat went to Brussels to cool growing European frustration over trade. In a veiled reference to Huawei Technologies Co., which the United States says could spy on the West, Chinese State Councillor Wang Yi told Washington to stop its attempts to "bring down" the company. "What we oppose are groundless accusations for political purposes and attempts to bring down a foreign company," Wang told a news conference, although he did not name Huawei, which is seeking to sell the next generation of mobile technology in Europe, its top market outside China.

## 19. U.S. Campaign to Ban Huawei Overseas Stumbles as Allies Resist

New York Times.com, March 17 - The Trump administration's aggressive campaign to prevent countries from using Huawei and other Chinese telecommunications equipment in their next-generation wireless networks has faltered, with even some of America's closest allies rejecting the United States' argument that the companies pose a security threat. Over the past several months, American officials have tried to pressure, scold and, increasingly, threaten other nations that are considering using Huawei in building fifth-generation, or 5G, wireless networks. Mike Pompeo, the secretary of state, has pledged to withhold intelligence from nations that continue to use Chinese telecom equipment. The American ambassador to Germany cautioned Berlin this month that the United States would curtail intelligence sharing if that country used Huawei. . . . But the campaign has run aground. Britain, Germany, India and the United Arab Emirates are among the countries signaling they are unlikely to back the American effort to entirely ban Huawei from building their 5G networks. While some countries like Britain share the United States' concerns, they argue that the security risks can be managed by closely scrutinizing the company and its software.

## 20. Germany Plans to Renege on Pledge to Raise Military Spending, Defying Trump

Wall Street Journal.com, March 18 - The German government is poised to renege on its pledge to raise military spending, the latest gesture of defiance by Chancellor Angela Merkel toward President Donald Trump. If confirmed at a cabinet meeting on Wednesday, the move would mark a fresh step in the gradual estrangement between the U.S. and its erstwhile loyal European ally and comes after Mr. Trump's repeated attacks of North Atlantic Treaty Organization leaders for not meeting a 2% military-spending target. In recent months, Berlin has rebuked Washington's demands that it limits gas purchases from Russia, ban Chinese components from its communication networks, and prevent German companies from doing business with Iran. In another sign of Berlin pushing for Europe to chart a more independent geopolitical course, Ms. Merkel is planning an unprecedented summit between European Union heads of government and Chinese President Xi Jinping next year, European diplomats said Monday.

## 21. U.S. Heavy Equipment Makers Feeling Pain From Tariffs, Disputes: Report

Reuters.com, March 18 - U.S. makers of bulldozers and other heavy equipment are raising prices, losing sales and in some cases beginning to trim workers in response to the Trump administration's protracted trade disputes with various countries, according to a new report. Advocates of tariffs point to continued job growth and low overall inflation as proof that tariffs are not harming these manufacturers, which include global producers such as Caterpillar Inc, Alamo Group Inc and Terex Corp. But an economic analysis conducted on behalf the Association of Equipment Manufacturers and set to be released on Monday by IHS Markit, notes that increased costs and the disruption of supply chains will slowly filter through the overall economy, gradually raising prices for finished goods and curbing employment over the next decade.

## 22. US, India Collaborating on Air-Launched Drone

DefenseNews.com, March 18 - The U.S. and India are working on development of a small, air-launched unmanned system that could be launched from cargo aircraft, according to Pentagon acquisition head Ellen Lord. The systems are part of a broader technology effort

known as the Defense Technology and Trade Initiative, or DTTI, which seeks opportunities for co-production and development of military technologies between the two countries. Lord highlighted the drone project during a roundtable with reporters on March 15, a day after she hosted a delegation from India to discuss DTTI programs. The UAV project — a collaboration between the Air Force Research Laboratory and India's Defence Research and Development Organization — is a recent addition to the DTTI slate. The two organizations intend to write a technical planning document next month and then sign that plan during a meeting in New Delhi, which Lord will attend, tentatively planned for late September.

## 23. Nazzic Keene to Lead SAIC As Tony Moraco Announces Retirement

Washington Post.com, March 15 - The top job at one of the Washington area's most influential government services companies will soon change hands, as chief executive Tony Moraco prepares to hand the reigns to the company's second-in-command, chief operating officer Nazzic Keene. Moraco will retire as of July 31, the company said in an announcement, capping a six-year run as chief executive. Moraco became CEO in 2013 and saw the company through a period of financial and political turmoil, as federal defense spending cuts from the sequestration process hamstrung numerous government services firms for years. Keene joined SAIC in 2012 after serving as a top manager at CGI, another large government contractor. She climbed the ranks at SAIC to become chief operating officer, helping steer the company through a high-profile spin-off in 2013, in which it effectively split in two and created another $4 billion unit that is now known as Leidos.

## 24. Embraer CEO to Step Down Ahead of Deal With Boeing

Reuters.com, March 18 - The chief executive of Brazilian planemaker Embraer SA will step down next month, the company said on Monday, as it prepares to cede control of its commercial aviation division to Boeing Co for $4.2 billion. Embraer CEO Paulo Cesar Silva will step down on April 22 and a new CEO will be announced by then, the company said. Silva assumed the top position at Embraer in June 2016 as the company dealt with the fallout from a bribery investigation in the United States. Before becoming CEO, he led Embraer's commercial plane division.

## 25. Opinion: US Air Power: The Imperative for Modernization (Buy the F-35)

Breaking Defense.com, March 18 - In 2006, a relatively obscure book caused a major stir among the U.S. Air Force leadership. Why Air Forces Fail, edited by Robin Higham and Stephen J. Harris, lays out the determinants of failure: deficiencies in the industrial base, misguided technology and tactical picks, inattention to logistics and neglect of training. The case studies are broken into three categories: "Dead Ducks," those who never had a chance to win; "Hares," who did well at the outset, but failed to exploit their success; and "Phoenixes"–who overcame early defeats to carry the day. The book crystalized the Air Force's battle with Defense Secretary Robert Gates, who describes the service as "one of my biggest headaches" in his own book, Duty: Memoirs of a Secretary at War. In Gates' eyes, the Air Force suffered from "next-war-itis"—focus on future wars with peer adversaries, rather than combat in Iraq and Afghanistan. . . . Air Forces — and militaries — do not fail by themselves. Failure occurs in a national context, wherein "ducks, hares, and phoenixes" don't suffice as an explanation.

# Upcoming Export Control and Other Trade Compliance Conferences

**March 21 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Export Control Briefing - 8:30 AM to 10:30 AM - Long Beach, California**

**March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort**

**March 25 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Professional Association of Exporters and Importers - An Evening with U.S. Assistant Secretary of Commerce for Export Administration, Rich Ashooh - 4:00 PM to 5:30 PM PDT - NVIDIA Corp., 2788 San Tomas Expressway, Santa Clara, CA**

**March 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Pittsburgh - Westin Convention Center Hotel**

**March 26-27 - American Conference Institute - 9th Advanced Industry Forum on Global Encryption, Cloud & Cyber Trade Controls - San Francisco - Marine's Memorial Club**

**March 27-28 - American Conference Institute - 6th Summit on Anti-Corruption Mexico - Mexico City - JW Marriottt Hotel Mexico City**

**April 2-3 - Society for International Affairs - 2019 Exemptions and Voluntary Disclosure/Voluntary Self-Disclosure Seminar - Long Beach, California - Renaissance Long Beach Hotel**

**April 3-4 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver, Colorado - Grand Hyatt Denver Hotel**

**April 3-4 - C5 Group - Anti-Corruption Switzerland - Zürich - Sheraton Zürich Hotel**

**April 17-18 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver - Grand Hyatt Denver Hotel**

**April 23 - American Conference Institute - 2nd National Forum on FOCI - Washington, DC - Westin Washington City Center Hotel**

**April 23-24 - Nielsonsmith - Sanctions, Anti-Corruption & Export Controls Compliance in the Middle East - Dubai, UAE**

**April 23-24 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Granite State Export Council - Complying with U.S. Export Controls - Portsmouth, New Hampshire - Portsmouth Harbor Events & Conference Center**

**April 24-25 - American Conference Institute - Fifth National Conference on CFIUS & Team Telecom - Washington, DC - Westin Washington City Center Hotel**

**April 29-May 1 - Association of Old Crows & Georgia Tech Research Institute (GTRI) - Security Cooperation Symposium: Interoperability, EW & FMS - GTRI Conference Center 250 14th Street, N.W. | Atlanta, GA 30318**

**April 30 - May 1 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Women in International Trade Orange County (WITOC)- Complying with U.S. Export Controls - Irvine, California - Hilton Irvine/Orange County Hotel**

**May 2-3 - American Conference Institute - 12th Annual Flagshp Conference on Economic Sanctions - Washington, DC**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

DOC_0039979

**May 15-16 - American Conference Institute - Foreign Corrupt Practices Act (New York) - New York City - The Westin New York at Times Square**

**May 15-17 - International Compliance Professionals Association (ICPA) - 2019 EU Conference - London - Tower Hotel**

**May 16-17 - International Compliance Professionals Association (ICPA) - 2019 ICPA Canada Conference - Toronto, Canada- Hyatt Regency Toronto Hotel**

**May 22-23 - Nielsonsmith - US Trade Controls Compliance in Europe Copnference 2019 - Munich -** *Gary Stanley, Editor of Defense and Export-Import Update, will speak at this conference.*

**May 22-23 - American Conference Institute - Anti-Corruption Brazil - São Paulo - InterContinental São Paulo Hotel**

**May 29-30 - American Conference Institute - 2nd Annual Hong Kong Summit on Economic Sanctions Compliance and Enforcement - Hong Kong**

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 7 - Society for International Affairs - 2019 Spring Golf Outing - Upper Marlboro, Maryland - Lake Presidential Golf Course**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 11-12 - American Conference Institute - 12th China Forum on Anti-Corruption - Shanghai**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**June 18-19 - C5 Group - 13th International Conference on Anti-Corruption London - London**

**June 26-27 - American Conference Institute - ITC Litigation & Enforcement - Washington, DC - Park Hyatt Washington Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**Sept. 24-25 - 12th Conference on the Foreign Corrupt Practices Act - San Francisco**

**Oct. 27 - American Conference Institute - 5th Asia Pacific Summit on Economic Sanctions Compliance and Enforcement - Singapore**

**Oct.28-29 - American Conference Institute - 8th Asia-Pacific on Anti-Corruption Singapore - Singapore**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 5-6 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to gstanley@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. +1 (202) 686-4854
Fax +1 (202) 686-2624
N███████████████
E-mail ████████@glstrade.com

**From:** Gary Stanley [▮▮▮▮▮@glstrade.com]
**Sent:** 3/19/2019 1:55:16 AM
**To:** Mira Ricardel [Mira.Ricardel@bis.doc.gov]
**Subject:** Defense and Export-Import Update (March 18, 2019)

Dear All,

**Good Day!**

**Gary Stanley's EC Tip of the Day:** Any foreign national is subject to the ITAR and EAR deemed export rules except a foreign national who (1) is granted permanent residence, as demonstrated by the issuance of a permanent resident visa (*i.e.*, Green Card); or (2) is granted U.S. citizenship; or (3) is granted status as a protected person under 8 U.S.C. 1324b(a)(3). This includes all persons in the U.S. as tourists, students, businesspeople, scholars, researchers, technical experts, sailors, airline personnel, salespeople, military personnel, diplomats, etc. As noted, one exception to this general statement is a protected person. Protected persons include political refugees and political asylum holders. Be aware that individuals seeking protected person status must satisfy all of the terms and conditions that are fully set forth in 8 U.S.C. 1324b(a)(3). It should be emphasized that although the deemed export rules may be triggered, this does not necessarily mean that a license is required. For example, the technology may be EAR99 or license exception eligible.

**Today's Items:**

1. **DDTC Posts Four New Name/Address Change Notices**

2. **DoD/DSS Provides NISP eMASS Update**

3. **UK Government Publishes "No-Deal Brexit" Regulations on International Counter-Terrorism and Guinea-Bissau**

4. **DOD Announces FY2018 Minerva Research Initiative Awards**

5. **EU Commission Posts Trade-Related Documents**

6. **U.S. Customs and U.S. Census/AES Updates**

7. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**

8. **GAO Reports, Testimony, and Correspondence of Interest**

9. **U.S. Government Trade Forms and Other Information Collections Open for Public Comment**

**Other Headlines**

10. **New Report on Arms Control and the Convergence of Biology and Emerging Technologies – Analysis**

11. **Pentagon Issues Broad List of Projects at Risk of Cuts for Border Wall—but Hedges on Details**

12. **U.S. Chip Makers Fear Trap in a Trade Deal With China**

13. **Once Again, the US Navy Looks to Scrap Its Largest Combatants to Save Money**

14. **DoD Requests Almost $23B for Key Intel Account**

15. **Industry Touts Advanced Power Systems for Navy Ships**

16. **Argonne, Intel to Build First U.S. Exascale Supercomputer**
17. **China Rejects 'Abnormal' U.S. Spying Concerns As EU Pushes Trade**
18. **U.S. Campaign to Ban Huawei Overseas Stumbles as Allies Resist**
19. **Germany Plans to Renege on Pledge to Raise Military Spending, Defying Trump**
20. **U.S. Heavy Equipment Makers Feeling Pain From Tariffs, Disputes: Report**
21. **US, India Collaborating on Air-Launched Drone**
22. **US, India Collaborating on Air-Launched Drone**
23. **Nazzic Keene to Lead SAIC As Tony Moraco Announces Retirement**
24. **Embraer CEO to Step Down Ahead of Deal With Boeing**
25. **Opinion: US Air Power: The Imperative for Modernization (Buy the F-35)**

**Upcoming Export Control and Other Trade Compliance Conferences**

# 1. DDTC Posts Four New Name/Address Change Notices

The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) has posted on its website the following four new name/address change notices:

- MEITEC Corporation Address Change

- Renault Trucks Defense to ARQUUS Name Change

- Abacus Innovations Israel, Ltd. to Leidos Innovations Israel A.B. Ltd. Name Change

- Rohde & Schwarz Benelux B.V. Address Change

# 2. DoD/DSS Provides NISP eMASS Update

The U.S. Department of Defense's Defense Security Service (DSS) has posted on its website a notice that the National Industrial Security Program (NISP) Enterprise Mission Assurance Support Service (eMASS) is scheduled to be operational on May 6, 2019. Industry partners should continue to use the ODAA Business Management System (OBMS) until then. Work with your local Information Systems Security Professional and/or ISSP Team Lead to complete the required training to ensure readiness for the transition. The NISP Authorization Office posted a job aid that provides cleared industry security professionals with instructions on how to access the training and for DSS sponsorship instructions regarding External Certification Authority (ECA) Certificates and RMF Knowledge Service Sponsorship. The following are the step-by-step procedures to request a NISP eMASS account and complete the training: 1. Complete DISA eMASS Computer Based Training (CBT) 2. Complete DISA Cyber Awareness Challenge (CAC) training 3. Complete DSS IO (pre-populated) System Authorization Access Request (SAAR) form 4. Submit the completed artifacts (DD 2875 SAAR, CAC certification, and eMASS training completion certification) to DSS NAO eMASS mailbox: dss.quantico.dss.mbx.emass@mail.mil.

# 3. UK Government Publishes "No-Deal Brexit" Regulations on International Counter-Terrorism and Guinea-Bissau

The U.K. Government has published the following "No Deal Brexit" statutory instruments under the Sanctions and Anti-Money Laundering Act 2018:

- The Counter-Terrorism (Sanctions) (EU Exit) Regulations 2019 (SI 2019/577) and Explanatory Memorandum.

- The Republic of Guinea-Bissau (Sanctions) (EU Exit) Regulations 2019 (SI 2019/554) and Explanatory Memorandum.

## 4. DOD Announces FY2018 Minerva Research Initiative Awards

The U.S. Department of Defense continued its history of strong support for fundamental research by selecting 12 faculty investigators for awards through the FY2018 Minerva Research Initiative. This initiative supports basic research that focuses on topics of particular relevance to U.S. national security. Through its network of faculty investigators, the Minerva Research Initiative also strengthens the department's connections with the social science community and helps DOD better understand and prepare for future challenges, including National Defense Strategy priorities such as great power competition. The 12 faculty awardees were selected for the prestigious awards following a merit competition from approximately 175 applicants across eight categories. Research proposals were peer-reviewed and selected in conference between the Office of the Under Secretary of Defense for Research and Engineering and the Office of the Under Secretary of Defense for Policy to identify proposals that make foundational contributions to basic social science and align with the National Defense Strategy. The Minerva Research Initiative is jointly administered by the Basic Research Office in the Office of the Under Secretary of Defense for Research and Engineering and the Strategy and Force Development Office in the Office of the Under Secretary of Defense for Policy. The projects are jointly supported by the Basic Research Office, the Air Force Office of Scientific Research and the Office of Naval Research.

## 5. EU Commission Posts Trade-Related Documents

The European Commission has posted the following traded-related documents:

- Trade organisation chart

- Latest Eurostat data on international trade

- Internaltional procurement instruments - factsheet

- Top Trading Partners 2018 - Trade Statistics

## 6. U.S. Customs and U.S. Census/AES Updates

- U.S. Customs - CSMS #19-000135 Title: Document Image System (DIS) File Name and Document Label Guidance for CBMA

- U.S. Customs - CSMS #19-000136 Title: Delayed Importer/Bond Query (KI/KR) Response Times

- U.S. Census - Country Name Updated in the Automated Export System (AES) - The following Country Name has been UPDATED in the AES:

|  | New Country Name | ISO Country Code |
|---|---|---|
| Old Country Name |  |  |
| Macedonia | North Macedonia | MK |

- The ISO Country Code will remain the same.

## 7. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

- Commerce/E&C - Acetone From Belgium, the Republic of Korea, the Kingdom of Saudi Arabia, Singapore, the Republic of South Africa, and Spain: Initiation of Less-Than-Fair-Value Investigations

- Commerce/E&C - Certain Steel Nails From Malaysia: Final Results of Antidumping Duty Administrative Review; 2016-2017

- USITC - Certain Food Processing Equipment: Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

## 8. GAO Reports, Testimony, and Correspondence of Interest

- GAO: DOD Space Acquisitions: Including Users Early and Often in Software Development Could Benefit Programs GAO-19-136: Published: Mar 18, 2019. Publicly Released: Mar 18, 2019

- CRS: Nord Stream 2: A Fait Accompli? - March 18, 2019

- CRS: Arms Control and Nonproliferation: A Catalog of Treaties and Agreements - Updated March 18, 2019

- CRS: Algeria: In Focus - March 18, 2019

## 9. U.S. Government Trade Forms and Other Information Collections Open for Public Comment

(84 Fed. Reg. 9834) - Agency: U.S. Dept. of Justice/Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) - Title: Application To Register as an Importer of U.S. Munitions Import List Articles - Agency Form No.: ATF Form 4587 (5330.4) - Type of Review: Extension with change of a currently-approved information collection - Deadline for Public Comment: May 17, 2019

(84 Fed. Reg. 9835) - Agency: U.S. Dept. of Justice/Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) - Title: Report of Stolen or Lost ATF Form 5400.30 (Type 60 coupon) Intrastate Purchase Explosive Coupon - Agency Form No.: ATF Form 5400.30 - Type of

Review: Extension without change of a currently-approved information collection - Deadline for Public Comment: May 17, 2019

(84 Fed. Reg. 9753) - Agency: U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Title: BIS Program Evaluation - Agency Form No.: None - Type of Review: Regular submission - Deadline for Public Comment: May 17, 2019

## Other Headlines

## 10. New Report on Arms Control and the Convergence of Biology and Emerging Technologies – Analysis

EurasianReview.com, March 18 - A new report has warned of the risks and challenges posed by the interaction of developments in biotechnology and advances in three emerging technologies: additive manufacturing (AM or so-called 3D printing), artificial intelligence (AI) and robotics. The report from the Stockholm International Peace Research Institute (SIPRI) cautions that the latest advances could increase the possibilities for the development, production and use of biological weapons. The existing biological arms control and non-proliferation governance framework, therefore, needs to be adapted to address the emerging security risks, says the report. SIPRI report, 'Bio Plus X: Arms Control and the Convergence of Biology and Emerging Technologies', was presented at the international conference '2019. Capturing technology. Rethinking arms control' at the German Federal Foreign Office in Berlin on March 15, 2019.

## 11. Pentagon Issues Broad List of Projects at Risk of Cuts for Border Wall—but Hedges on Details

Wall Street Journal.com, March 18 - The Defense Department late Monday released a broad list of the possible projects whose funding might be diverted to build a wall along the border with Mexico, but it didn't reflect any final decisions about which projects would be delayed. Lawmakers had pressed the administration to detail which military construction projects would be affected by President Trump's decision last month to declare a national emergency, part of an effort to secure more money to construct the wall. Administration officials had initially told lawmakers they would receive a list detailing which projects would be delayed by funding being diverted to the wall before they voted on it. The list released Monday didn't reflect any final determination of which funding could be delayed or canceled. A similar list of possible projects at risk had been circulating on Capitol Hill for weeks.

## 12. U.S. Chip Makers Fear Trap in a Trade Deal With China

Wall Street Journal.com, March 18 - U.S. semiconductor companies want no part of any trade deal that calls for stepped-up purchases from China, worried that would give Beijing more control over their industry. As prospects for an agreement to settle the U.S.-China trade standoff have waxed and waned in recent weeks, Washington has pressed Beijing to buy more than $1 trillion in U.S. goods and services as part of any deal. But U.S. chip makers said they have told President Trump's administration not to include them in any such agreement. Because U.S. production costs are so high, mandatory-purchase quotas would essentially force U.S. chip makers to open new factories in China and give Beijing bureaucrats more sway over the U.S. firms, these companies said. That would benefit Chinese competitors and make the U.S. firms more dependent on Beijing, executives at the U.S. companies fear. "Whatever the number, the Chinese chip purchase offer is a distraction

that risks deepening Chinese state influence in an environment that is otherwise market-based," said John Neuffer, president of the Semiconductor Industry Association. "The market should determine commercial success, not government fiat."

## 13. Once Again, the US Navy Looks to Scrap Its Largest Combatants to Save Money

DefenseNews.com, March 18 - The U.S. Navy is eyeing canceling six planned service-life extensions on its oldest cruisers, meaning the Navy will be short six of its current 22 largest surface combatants by 2022, according to defense officials who spoke to Defense News on background. The plan as it will be proposed to Congress is to decommission the cruisers Bunker Hill, Mobile Bay, Antietam, Leyte Gulf, San Jacinto and Lake Champlain in 2021 and 2022, foregoing plans for service life extensions that have been supported in Congress in the past. All the ships will be at or near the end of their 35-year service lives when they are decommissioned, but the Navy has yet to decide on a replacement for the cruisers, the largest combatants in the fleet with 122 vertical launch systems cells. This comes at a time when the Navy needs as many missiles downrange as it can field as it squares off with the threat from Chinese and Russian anti-ship missiles. . . . But the cruisers, which act as the lead air defense ship in a carrier strike group, have been notoriously difficult to maintain as the fleet has managed everything from cracking hulls to aging pipes and mechanical systems. The ships' SPY-1 radars have also been difficult to maintain, as components age and need constant attention from technicians to keep up.

## 14. DoD Requests Almost $23B for Key Intel Account

DefenseNews.com, March 18 - The Pentagon wants to increase its black budget for intelligence programs for a fifth straight year. The Department of Defense has requested $22.95 billion for the top-line budget of the Military Intelligence Program, the DoD announced Monday. While the overall fiscal 2020 budget request was released last week, the MIP request typically comes days or weeks afterward. The Department of Defense has requested $22.95 billion for the top-line budget of the Military Intelligence Program, the DoD announced Monday. While the overall fiscal 2020 budget request was released last week, the MIP request typically comes days or weeks afterward. A 2016 Congressional Research Service report says the MIP represents "defense intelligence activities intended to support tactical military operations and priorities," including "tactical-level systems, people and activities" for the Pentagon and services as they work on intelligence gathering.

## 15. Industry Touts Advanced Power Systems for Navy Ships

National Defense Magazine.org, March 18 - Defense contractors are investing in alternative propulsion and power systems as the Navy develops and upgrades its fleet of warships. Leonardo DRS, which is currently building its second generation hybrid-electric propulsion system for the Coast Guard's new offshore patrol cutter, is touting its technology as the wave of the future. Three major advantages of hybrid-electric propulsion for Navy ships include: greater fuel economy, lowered maintenance costs and quieter vessels for advanced warfare operations, said Jamie McMullin, senior director of business development for Leonardo DRS' naval power systems. "Our hybrid-electric drive can bring the U.S. Navy real warfighting capability … and then you get all the benefits of fuel economy and less operation on engines and more space in the ship," he said in an interview. The electric systems' quiet

nature makes it advantageous for anti-submarine warfare, noted Clive Wilgress-Pipe, director of business development for Leonardo DRS' naval power systems.

## 16. Argonne, Intel to Build First U.S. Exascale Supercomputer

National Defense Magazine.org, March 18 - The Department of Energy has picked Argonne National Laboratory and its industry partner Intel Corp. to build the United States' first exascale supercomputer by 2021, officials announced March 18. The system — known as Aurora — is slated for completion in 2021, said Paul Dabbar, undersecretary for science at the Energy Department. Aurora will jump "to the top performance computer of the world," he told reporters during a media call before the official announcement. "It will hit an exaflop of performance — so that is 10 to the 18th [power], or a billion-billion calculations per second." The system will push forward the bounds of human knowledge and discovery science, he said. The contract is valued at more than $500 million and work will be performed by Intel with its subcontractor Cray Computing, he added. Aurora is the next step in a long history of the Energy Department and U.S. national labs' pursuit of high-performance computing, he noted. Just last year, the department unveiled the Summit supercomputer that — with a peak performance of 200,000 petaflops — surpassed China's Sunway TaihuLight in capability. Summit is based at Oak Ridge National Laboratory.

## 17. The Cybersecurity 202: Huawei Is Suing the U.S. to Win – In the Court of Public Opinion

Washington Post.com, March 18 - Huawei is nearly guaranteed to lose a lawsuit it filed this month claiming the U.S. government acted unfairly by banning it from federal computer networks. But Huawei's main goal isn't to win in a court of law, experts say -- it's seeking a victory in the court of public opinion. The Chinese telecommunications giant is seizing an opportunity to push back against the United States in a high-profile and public forum -- as Washington tries to convince allies Huawei can't be trusted to build next-generation 5G wireless networks in their countries without passing along secrets to the Chinese government. If Huawei can make a strong argument that the United States is unfairly biased against it, that may make other governments think twice about imposing 5G bans, Eric Crusius, an attorney at the Holland & Knight law firm who focuses on government contract disputes, told me.

## 18. China Rejects 'Abnormal' U.S. Spying Concerns As EU Pushes Trade

Reuters.com, March 18 - China dismissed U.S. security warnings against its telecoms equipment maker Huawei as groundless and "abnormal" on Monday, as the Chinese government's top diplomat went to Brussels to cool growing European frustration over trade. In a veiled reference to Huawei Technologies Co., which the United States says could spy on the West, Chinese State Councillor Wang Yi told Washington to stop its attempts to "bring down" the company. "What we oppose are groundless accusations for political purposes and attempts to bring down a foreign company," Wang told a news conference, although he did not name Huawei, which is seeking to sell the next generation of mobile technology in Europe, its top market outside China.

## 19. U.S. Campaign to Ban Huawei Overseas Stumbles as Allies Resist

New York Times.com, March 17 - The Trump administration's aggressive campaign to prevent countries from using Huawei and other Chinese telecommunications equipment in their next-generation wireless networks has faltered, with even some of America's closest allies rejecting the United States' argument that the companies pose a security threat. Over the past several months, American officials have tried to pressure, scold and, increasingly, threaten other nations that are considering using Huawei in building fifth-generation, or 5G, wireless networks. Mike Pompeo, the secretary of state, has pledged to withhold intelligence from nations that continue to use Chinese telecom equipment. The American ambassador to Germany cautioned Berlin this month that the United States would curtail intelligence sharing if that country used Huawei. . . . But the campaign has run aground. Britain, Germany, India and the United Arab Emirates are among the countries signaling they are unlikely to back the American effort to entirely ban Huawei from building their 5G networks. While some countries like Britain share the United States' concerns, they argue that the security risks can be managed by closely scrutinizing the company and its software.

## 20. Germany Plans to Renege on Pledge to Raise Military Spending, Defying Trump

Wall Street Journal.com, March 18 - The German government is poised to renege on its pledge to raise military spending, the latest gesture of defiance by Chancellor Angela Merkel toward President Donald Trump. If confirmed at a cabinet meeting on Wednesday, the move would mark a fresh step in the gradual estrangement between the U.S. and its erstwhile loyal European ally and comes after Mr. Trump's repeated attacks of North Atlantic Treaty Organization leaders for not meeting a 2% military-spending target. In recent months, Berlin has rebuked Washington's demands that it limits gas purchases from Russia, ban Chinese components from its communication networks, and prevent German companies from doing business with Iran. In another sign of Berlin pushing for Europe to chart a more independent geopolitical course, Ms. Merkel is planning an unprecedented summit between European Union heads of government and Chinese President Xi Jinping next year, European diplomats said Monday.

## 21. U.S. Heavy Equipment Makers Feeling Pain From Tariffs, Disputes: Report

Reuters.com, March 18 - U.S. makers of bulldozers and other heavy equipment are raising prices, losing sales and in some cases beginning to trim workers in response to the Trump administration's protracted trade disputes with various countries, according to a new report. Advocates of tariffs point to continued job growth and low overall inflation as proof that tariffs are not harming these manufacturers, which include global producers such as Caterpillar Inc, Alamo Group Inc and Terex Corp. But an economic analysis conducted on behalf the Association of Equipment Manufacturers and set to be released on Monday by IHS Markit, notes that increased costs and the disruption of supply chains will slowly filter through the overall economy, gradually raising prices for finished goods and curbing employment over the next decade.

## 22. US, India Collaborating on Air-Launched Drone

DefenseNews.com, March 18 - The U.S. and India are working on development of a small, air-launched unmanned system that could be launched from cargo aircraft, according to Pentagon acquisition head Ellen Lord. The systems are part of a broader technology effort

known as the Defense Technology and Trade Initiative, or DTTI, which seeks opportunities for co-production and development of military technologies between the two countries. Lord highlighted the drone project during a roundtable with reporters on March 15, a day after she hosted a delegation from India to discuss DTTI programs. The UAV project — a collaboration between the Air Force Research Laboratory and India's Defence Research and Development Organization — is a recent addition to the DTTI slate. The two organizations intend to write a technical planning document next month and then sign that plan during a meeting in New Delhi, which Lord will attend, tentatively planned for late September.

## 23. Nazzic Keene to Lead SAIC As Tony Moraco Announces Retirement

Washington Post.com, March 15 - The top job at one of the Washington area's most influential government services companies will soon change hands, as chief executive Tony Moraco prepares to hand the reigns to the company's second-in-command, chief operating officer Nazzic Keene. Moraco will retire as of July 31, the company said in an announcement, capping a six-year run as chief executive. Moraco became CEO in 2013 and saw the company through a period of financial and political turmoil, as federal defense spending cuts from the sequestration process hamstrung numerous government services firms for years. Keene joined SAIC in 2012 after serving as a top manager at CGI, another large government contractor. She climbed the ranks at SAIC to become chief operating officer, helping steer the company through a high-profile spin-off in 2013, in which it effectively split in two and created another $4 billion unit that is now known as Leidos.

## 24. Embraer CEO to Step Down Ahead of Deal With Boeing

Reuters.com, March 18 - The chief executive of Brazilian planemaker Embraer SA will step down next month, the company said on Monday, as it prepares to cede control of its commercial aviation division to Boeing Co for $4.2 billion. Embraer CEO Paulo Cesar Silva will step down on April 22 and a new CEO will be announced by then, the company said. Silva assumed the top position at Embraer in June 2016 as the company dealt with the fallout from a bribery investigation in the United States. Before becoming CEO, he led Embraer's commercial plane division.

## 25. Opinion: US Air Power: The Imperative for Modernization (Buy the F-35)

Breaking Defense.com, March 18 - In 2006, a relatively obscure book caused a major stir among the U.S. Air Force leadership. Why Air Forces Fail, edited by Robin Higham and Stephen J. Harris, lays out the determinants of failure: deficiencies in the industrial base, misguided technology and tactical picks, inattention to logistics and neglect of training. The case studies are broken into three categories: "Dead Ducks," those who never had a chance to win; "Hares," who did well at the outset, but failed to exploit their success; and "Phoenixes"–who overcame early defeats to carry the day. The book crystalized the Air Force's battle with Defense Secretary Robert Gates, who describes the service as "one of my biggest headaches" in his own book, Duty: Memoirs of a Secretary at War. In Gates' eyes, the Air Force suffered from "next-war-itis"—focus on future wars with peer adversaries, rather than combat in Iraq and Afghanistan. . . . Air Forces — and militaries — do not fail by themselves. Failure occurs in a national context, wherein "ducks, hares, and phoenixes" don't suffice as an explanation.

# Upcoming Export Control and Other Trade Compliance Conferences

**March 21 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Export Control Briefing - 8:30 AM to 10:30 AM - Long Beach, California**

**March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort**

**March 25 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Professional Association of Exporters and Importers - An Evening with U.S. Assistant Secretary of Commerce for Export Administration, Rich Ashooh - 4:00 PM to 5:30 PM PDT - NVIDIA Corp., 2788 San Tomas Expressway, Santa Clara, CA**

**March 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Pittsburgh - Westin Convention Center Hotel**

**March 26-27 - American Conference Institute - 9th Advanced Industry Forum on Global Encryption, Cloud & Cyber Trade Controls - San Francisco - Marine's Memorial Club**

**March 27-28 - American Conference Institute - 6th Summit on Anti-Corruption Mexico - Mexico City - JW Marriottt Hotel Mexico City**

**April 2-3 - Society for International Affairs - 2019 Exemptions and Voluntary Disclosure/Voluntary Self-Disclosure Seminar - Long Beach, California - Renaissance Long Beach Hotel**

**April 3-4 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver, Colorado - Grand Hyatt Denver Hotel**

**April 3-4 - C5 Group - Anti-Corruption Switzerland - Zürich - Sheraton Zürich Hotel**

**April 17-18 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver - Grand Hyatt Denver Hotel**

**April 23 - American Conference Institute - 2nd National Forum on FOCI - Washington, DC - Westin Washington City Center Hotel**

**April 23-24 - Nielsonsmith - Sanctions, Anti-Corruption & Export Controls Compliance in the Middle East - Dubai, UAE**

**April 23-24 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Granite State Export Council - Complying with U.S. Export Controls - Portsmouth, New Hampshire - Portsmouth Harbor Events & Conference Center**

**April 24-25 - American Conference Institute - Fifth National Conference on CFIUS & Team Telecom - Washington, DC - Westin Washington City Center Hotel**

**April 29-May 1 - Association of Old Crows & Georgia Tech Research Institute (GTRI) - Security Cooperation Symposium: Interoperability, EW & FMS - GTRI Conference Center 250 14th Street, N.W. | Atlanta, GA 30318**

**April 30 - May 1 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Women in International Trade Orange County (WITOC)- Complying with U.S. Export Controls - Irvine, California - Hilton Irvine/Orange County Hotel**

**May 2-3 - American Conference Institute - 12th Annual Flagshp Conference on Economic Sanctions - Washington, DC**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

**May 15-16 - American Conference Institute - Foreign Corrupt Practices Act (New York) - New York City - The Westin New York at Times Square**

**May 15-17 - International Compliance Professionals Association (ICPA) - 2019 EU Conference - London - Tower Hotel**

**May 16-17 - International Compliance Professionals Association (ICPA) - 2019 ICPA Canada Conference - Toronto, Canada- Hyatt Regency Toronto Hotel**

**May 22-23 - Nielsonsmith - US Trade Controls Compliance in Europe Copnference 2019 - Munich -** *Gary Stanley, Editor of Defense and Export-Import Update, will speak at this conference.*

**May 22-23 - American Conference Institute - Anti-Corruption Brazil - São Paulo - InterContinental São Paulo Hotel**

**May 29-30 - American Conference Institute - 2nd Annual Hong Kong Summit on Economic Sanctions Compliance and Enforcement - Hong Kong**

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 7 - Society for International Affairs - 2019 Spring Golf Outing - Upper Marlboro, Maryland - Lake Presidential Golf Course**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 11-12 - American Conference Institute - 12th China Forum on Anti-Corruption - Shanghai**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**June 18-19 - C5 Group - 13th International Conference on Anti-Corruption London - London**

**June 26-27 - American Conference Institute - ITC Litigation & Enforcement - Washington, DC - Park Hyatt Washington Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**Sept. 24-25 - 12th Conference on the Foreign Corrupt Practices Act - San Francisco**

**Oct. 27 - American Conference Institute - 5th Asia Pacific Summit on Economic Sanctions Compliance and Enforcement - Singapore**

**Oct.28-29 - American Conference Institute - 8th Asia-Pacific on Anti-Corruption Singapore - Singapore**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 5-6 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to gstanley@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. +1 (202) 686-4854
Fax +1 (202) 686-2624
Mobile
E-mail ▮glstrade.com

.

**From**: Jim Bartlett, Full Circle Compliance ("FCC") [██████]@fullcirclecompliance.eu]
**Sent**: 3/22/2019 7:33:52 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 19-0322 Friday "Daily Bugle"



## Friday, 22 March 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1.  USTR Announces Modifications to Rules of Origin of the United States Morocco Free Trade Agreement

### OTHER GOVERNMENT SOURCES

2.  Items Scheduled for Publication in Future Federal Register Editions

3.  Commerce/BIS: (No new postings.)

4.  DHS/CBP Posts Notice on Common Create/Update Importer Identity Form ACE Error Message Solutions

5.  Justice: "Australian National Sentenced to Prison Term For Exporting Electronics to Iran"

6.  State/DDTC: (No new postings.)

7.  Treasury/OFAC P Updates Guidance on Addressing North Korea's Illicit Shipping Practices

8.  EU Amends Restrictive Measures Concerning Bosnia and Herzegovina & Egypt

9.  German BAFA Publishes Preliminary Information on the Renewal and Amendment of Multiple General Authorizations

10.  UK OFSI Updates Three Sanctions Guidance Documents

### NEWS

11.  Expeditors News: "European Council Extends the UK Withdrawal from the EU"

12.  Osburn Oracle: "US Judge Extends Ban on Publication of 3D Printed Gun Blueprints"

13.  Reuters: "Trump Says He Is Withdrawing Earlier North Korea-Related Sanctions"

14. ST&R Trade Report: "Tariffs to Remain in Place After China Deal, Trump Says"

COMMENTARY

15. International Trade Compliance Blog: "EU- Commission Opens Consultation of EU-US Regulatory Cooperation

16. L. Caponetti: "The Belgian Trade Control System: Legislation by Items-Category and Competent Authority"

17. M. Hamilton: "Empowered Officials Are Necessary for ITAR Compliance"

18. M. Volkov: "Ethics, Profits, Sustainability and Stakeholders: An Update on a Familiar Relationship"

EX/IM TRAINING EVENTS & CONFERENCES

19.

ECS Presents "2nd Annual ECS ITAR/EAR Symposium and Boot Camp" on 17-19 Sep in Annapolis, MD

20. FCC Presents "An Introduction to EU / Dutch Dual-Use and Military Export Controls", 7 May in Bruchem, the Netherlands

21. List of Approaching Events: 146 Events Posted This Week, Including 9 New Events

EDITOR'S NOTES

22. Bartlett's Unfamiliar Quotations

23. Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (12 Mar 2019), DOC/EAR (20 Dec 2018), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (14 Mar 2019), DOS/ITAR (19 Mar 2018), DOT/FACR/OFAC (15 Mar 2019), HTSUS (7 Mar 2019)

24. Weekly Highlights of the Daily Bugle Top Stories



From the publisher of WorldECR, Dual-use Export Controls of the European Union, and The Export Compliance Manager's Handbook

**Dual-use Export Controls in International Transit and Transhipment**

Covers the regulations in more than 40 countries. To find out more, CLICK HERE or go to www.worldecr.com/books

# 1. USTR Announces Modifications to Rules of Origin of the United States Morocco Free Trade Agreement
(Source: <u>Federal Register</u>, 22 Mar 2019.)

84 FR 10883: Effective Date of Modifications to Rules of Origin of the United States Morocco Free Trade Agreement

* AGENCY: Office of the United States Trade Representative.
* ACTION: Notice.
* SUMMARY: In December 2018, the President modified the rules of origin for certain goods of Morocco under the United States-Morocco Free Trade Agreement (USMFTA). This notice announces the effective date for those modifications.
* DATES: **This notice is applicable on April 1, 2019.**
* FOR FURTHER INFORMATION CONTACT: Janet Heinzen, Deputy Assistant U.S. Trade Representative for Textiles, at 202-395-6092 or <u>janet.e.heinzen@ustr.eop.gov</u>.
* SUPPLEMENTARY INFORMATION: ...

   In 2015 and 2016, the Government of Morocco submitted requests to modify certain textile and apparel rules of origin based on commercial availability of specific inputs. Following public comment on the proposed rules changes, the United States and Morocco reached agreement to modify certain rules of origin. Pursuant to the USMFTA Implementation Act, the International Trade Commission conducted an economic impact review and concluded that the impact on U.S. imports, exports, and production of the proposed modifications would be negligible. The Industry Trade Advisory Committee on Textiles and Clothing did not object to the proposed modifications. Congress also did object during the consultation and layover process.

   In Proclamation 9834 of December 21, 2018, the President determined pursuant to section 203 of the USMFTA Implementation Act, that the subject modifications to the HTSUS were appropriate and modified general note 27 to the HTSUS with respect to goods of Morocco. The modifications are effective with respect to goods of Morocco entered or withdrawn from warehouse for consumption on the date announced by the United States Trade Representative in the Federal Register.

   On March 4, 2019, Morocco notified the United States that it had completed its domestic procedures to give effect to the agreement to change the USMFTA rules of origin for certain apparel goods of specified fabrics with respect to goods of the United States. Subsequently, Morocco and the United States agreed to implement these changes with respect to each other's eligible goods, effective April 1, 2019.

   William Jackson, Assistant U.S. Trade Representative for Textiles, Office of the U.S. Trade Representative.

back to top

* * * * * * * * * * * * * * * * *

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce; Industry and Security Bureau; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Special Priorities Assistance [Pub. Date: 25 Mar 2019.]

* Treasury; Foreign Assets Control Office; NOTICES; Blocking or Unblocking of Persons and Properties [Pub. Date: 25 Mar 2019.]

* U.S. Trade Representative; NOTICES; 2019 Generalized System of Preferences: Annual GSP Product and Country Review; Deadline for Filing Petitions [Pub. Date: 25 Mar 2019.]

* U.S. Trade Representative; NOTICES; Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation [Pub. Date: 25 Mar 2019.]

back to top

* * * * * * * * * * * * * * * * * *


## 3. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * *


## 4. DHS/CBP Posts Notice on Common Create/Update Importer Identity Form ACE Error Message Solutions
(Source: CSMS 19-000146, 21 Mar 2019.)

CBP is providing a list of solutions for the most common errors that are being experienced with inputting the Create/Update Importer Identity Form (CBP Form 5106).

*Error Message PDM - Data Element PATTERN UNKNOWN*

Solution: Many create/update importer record requests are being submitted with phone numbers that include dashes in the TD record. Phone numbers should be provided in the TD record as either an unseparated group of numbers, example 1234567899, or with spaces, example 123 456 7899.

Another input mistake that can cause the PDM error is not providing names in the TL record (Certification) with commas, per the Create/Update Importer Identity Form CATAIR's instructions. For example, "John Weer Doe" needs to

be provided in the TL record as "Doe, John, W". The CATAIR can be accessed on cbp.gov.

*Error Message MVM - Data Element MISSING*

Solution: Many of the CBP Form 5106s being uploaded to CBP are missing a title in the TL record for the individual certifying the form. This data element is the "Printed or Typed Full Name" block in section 4 of the new CBP Form 5106. Both a name and title are mandatory data elements on the revised CBP Form 5106.

*Error Message R05 - IMPORTER NUMBER ALREADY ON FILE*

Solution: This error is being caused by Importer of Record (IOR) creation being requested for IORs that already exist. Entities or their representatives should ensure that they are selecting the correct type of action, "Notification of identification number" (create), "Change of Name" (update), and "Change of Address" (update), when submitting a Create/Update Importer Identity request.

Please note, information on existing IOR numbers can potentially be obtained from the 5106@cbp.dhs.gov mailbox by an IOR's owner or individuals representing the IOR with an active Power of Attorney.

*Error Message X39 - DATA FOUND IN FILLER*

Solution: Refer to "ACE Draft CATAIR: Importer/Consignee Create/Update" on cbp.gov and ensure that the data being input in the new ACE CBP Form 5106 Automated Broker Interface/EDI is not being accidentally entered into a portion of a record that can only be occupied by "space fill". For example, if the Alternate Importer Name provided in the TA record exceeds 32 characters, the additional characters will overflow into the filler record which will cause an X39 error. Records that have a filler component that can only contain "space fill", as outlined by the "ACE Draft CATAIR: Importer/Consignee Create/Update", are TA, T3, TB, TC, TD, TE, TF, TG, TH, TI, TJ, TK, TL, TM, TN. The CATAIR can be accessed on cbp.gov.

An error message dictionary for the Create/Update Importer Identity Form (CBP Form 5106) functionality can be found on cbp.gov.

Questions or concerns about CBP Form 5106 ACE error messages should be sent to 5106@cbp.dhs.gov.

back to top

* * * * * * * * * * * * * * * * * *

# 5. Justice: "Australian National Sentenced to Prison Term For Exporting Electronics to Iran"
(Source: Justice, 21 Mar 2019.) [Excerpts.]

An Australian man was sentenced today to 24 months in prison on four counts of violations of the International Emergency Economic Powers Act, which criminalizes knowing transactions with Iranian entities without a license from the U.S. Department of Treasury.

David Russell Levick, 57, of Cherrybrook NSW, Australia, pled guilty to the charges on Feb. 1, 2019, in the U.S. District Court for the District of Columbia. He was sentenced by the Honorable James E. Boasberg. In addition to the prison term, Levick must pay a forfeiture amount of $199,227, which represents the total value of the goods involved in the illegal transactions. Following completion of his prison term, Levick will be subject to deportation proceedings. ...

According to the plea documents, Levick was the general manager of ICM Components, Inc., located in Thornleigh Australia. He solicited purchase orders and business for the goods from a representative of a trading company in Iran. This person in Iran, referenced in court documents as "Iranian A," also operated and controlled companies in Malaysia that acted as intermediaries for the Iranian trading company.

Levick then placed orders with U.S. companies on behalf of "Iranian A" for the goods, which were aircraft parts and other items that "Iranian A" could not have directly purchased from the United States without the permission of the U.S. government.

The defendant admitted to procuring or attempting to procure the following items for transshipment to Iran, each of which required a license from the Treasury Department prior to any export to Iran:

  - Precision Pressure Transducers. These are sensor devices that have a wide variety of applications in the avionics industry, among others, and can be used for altitude measurements, laboratory testing, measuring instrumentations and recording barometric pressure.
  - Emergency Floatation System Kits. These kits contained a landing gear, float bags, composite cylinder and a complete electrical installation kit. Such float kits were designed for use on Bell 206 helicopters to assist the helicopter when landing in either water or soft desert terrain.
  - Shock Mounted Light Assemblies. These items are packages of lights and mounting equipment designed for high vibration use and which can be used on helicopters and other fixed wing aircraft.

When necessary, Levick used a broker in Tarpon Springs, Florida, through whom orders could be placed for the parts to further conceal the fact that the parts were intended for transshipment to "Iranian A" in Iran. Levick intentionally concealed the ultimate end-use and end-users of the parts from manufacturers, distributors, shippers, and freight forwarders located in the United States and elsewhere. In addition, Levick and others structured their payments between each other for the parts to avoid trade restrictions imposed on Iranian financial institutions by other countries. Levick and ICM wired money to companies located in the United States as payment for the parts.

The activities took place in 2007 and 2008. Levick was indicted in February 2012. At the request of the United States, Australia arrested him for the purposes of extradition, and Australia extradited him to the United States in December 2018. He has remained in custody here. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. Treasury/OFAC P Updates Guidance on Addressing North Korea's Illicit Shipping Practices
(Source: Treasury/OFAC, 21 Mar 2019.) [Excerpts.]

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC), with the U.S. Department of State and the U.S. Coast Guard, is updating the advisory published on February 23, 2018. This advisory provides new information about North Korea's deceptive shipping practices, additional guidance on how to mitigate the risk of involvement in these practices, a new graphic depicting certain ports of call, and three new annexes. The U.S. government recommends that all parties involved in the shipping industry and related commercial entities, including ship owners, managers, and operators, brokers, flag registries, oil companies, port operators, shipping companies, classification service providers, insurance companies, and financial institutions - be aware of the practices set out in this advisory in order to implement appropriate controls to identify North Korea's illicit shipping practices.

Despite robust U.S. and United Nations (UN) sanctions on North Korea, North Korea continues to evade sanctions, particularly through illicit ship-to-ship transfers of refined petroleum and coal. In 2018, North Korean ports received at least 263 tanker deliveries of refined petroleum procured from UN-prohibited ship-to-ship transfers. If these tankers were fully laden when they made their delivery, North Korea would have imported 3.78 million barrels, or more than seven and a half times the allowable amount of refined petroleum (i.e., 500,000 barrels/year) under UN Security Council Resolution (UNSCR) 2397.

In addition to continued illicit imports of refined petroleum, North Korea has resumed exports of coal in the Gulf of Tonkin. UNSCR 2371, adopted in August 2017, prohibits the procurement of North Korean-origin coal, and UNSCR 2397, adopted in December 2017, acknowledges that the proceeds of North Korea's trade in sectoral goods, including coal, contribute to the regime's nuclear weapons and ballistic missile programs. The United States will continue to use its sanctions authorities to target persons in various industries, including, but not limited to, the shipping industry that further North Korea's illicit revenue-generating schemes that fund the regime's nuclear weapons and ballistic missile programs.

This advisory now contains five annexes, three of which are new. The first provides an overview of U.S. and UN sanctions relevant to the shipping industry, including a non-exhaustive list of bases for which persons may be sanctioned by OFAC. The second provides an updated list of 28 North Korean tankers known to be capable of engaging in ship-to-ship transfers of refined petroleum products and other banned goods. The new third annex provides specific guidance for UN Member States and relevant industry actors on best practices to avoid engaging in North Korea-related illicit activities. The new fourth annex provides a list of 18 vessels that are believed to have engaged in illicit ship-to-ship transfers of refined petroleum with North Korean tanker vessels. The new fifth annex provides a list of 49 vessels that are believed to have exported North Korean-origin coal.

The United States, along with Australia, Canada, France, Italy, Japan, and the United Kingdom, have highlighted these deceptive practices at the International Maritime Organization (IMO) to call all IMO Member States' attention to these deceptive shipping practices, and to remind all Members States of the requirements and guidance contained in relevant IMO instruments. The IMO consequently issued Circular MSC.1/Circ. 1602 on March 5, 2019, to call the attention of all Member States and other maritime industry stakeholders to North Korea's deceptive practices. The United States requests that UN Member States, port state control authorities, and flag registries provide this advisory to all relevant persons in their jurisdictions. ...

back to top

* * * * * * * * * * * * * * * * * *

## 8. EU Amends Restrictive Measures Concerning Bosnia and Herzegovina & Egypt
(Source: Official Journal of the European Union, 22 Mar 2019.)

*Regulations:*
* Council Implementing Regulation (EU) 2019/459 of 21 March 2019 implementing Regulation (EU) No 270/2011 concerning restrictive measures directed against certain persons, entities and bodies in view of the situation in Egypt

*Decisions:*
* Council Decision (CFSP) 2019/467 of 21 March 2019 amending Decision 2011/173/CFSP concerning restrictive measures in view of the situation in Bosnia and Herzegovina
* Council Decision (CFSP) 2019/468 of 21 March 2019 amending Decision 2011/172/CFSP concerning restrictive measures directed against certain persons, entities and bodies in view of the situation in Egypt

back to top

* * * * * * * * * * * * * * * * * *

## 9. German BAFA Publishes Preliminary Information on the Renewal and Amendment of Multiple General Authorizations

(Source: German BAFA, 21 Mar 2019.)

The German Federal Office for Economic Affairs and Export Control (BAFA) published preliminary information on the renewal and amendment of General Authorizations No. 18 to 27 and No. 30.

BAFA intends to extend General Authorizations No. 18 to No. 27 and No. 30 until 31.03.2020.

More details on all German General Export Authorizations can be found here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. UK/OFSI Updates Three Sanctions Guidance Documents
(Source: UK/OFSI, 21 Mar 2019.)

The UK Office of Financial Sanctions Implementation (OFSI) has updated several of its guidance documents:

- UK Sanctions on Zimbabwe
- UK Sanctions on the Republic of Belarus
- UK Sanctions if there's no Brexit deal
- Financial Sanctions Notice on Iraq

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



An Introduction to EU / Dutch Dual-Use and Military Export Controls

Tuesday, 7 May 2019
Brachem, The Netherlands



FULL CIRCLE

NEWS

## 11. Expeditors News: "European Council Extends the UK Withdrawal from the EU"
(Source: <u>Expeditors News</u>, 22 Mar 2019.)

On March 21, 2019, the European Council agreed to an extension on the United Kingdom (UK) withdrawing from the European Union (EU).

The European Council extended the withdrawal date to April 12, 2019, unless the UK's House of Commons approves the withdrawal agreement by next week. In that instance, the European Council has agreed to an extension until May 22, 2019.

The European Council's press release may be found <u>here</u>.

<u>back to top</u>

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 12. Osburn Oracle: "US Judge Extends Ban on Publication of 3D Printed Gun Blueprints"
(Source: <u>Osburn Oracle</u>, 21 Mar 2019.)

A US judge extended a ban on publishing blueprints for 3D printed guns online, handing a procedural victory to states and gun-control groups that argue the practice will make it easy for criminals and terrorists to get their hands on untraceable firearms.

The injunction against Austin, Texas-based Defense Distributed was issued Monday by US District Judge Robert Lasnik in Seattle, where 19 states and Washington, DC, to block it from making technical plans for an array of guns available globally on the internet with the government's blessing. The injunction will remain in place until the suit is resolved.

The 3D printing of guns gained urgency after Defense Distributed reached a surprise settlement with President Donald Trump's administration resolving a 2015 government challenge. Former President Barack Obama's administration had sued the firm on national-security grounds, alleging the publishing of gun schematics violated the federal Arms Export Control Act.

Trump said in July that allowing unfettered public access to instructions for making guns with 3D printers doesn't "seem to make much sense" but hasn't fought to stop it.

In Monday's ruling, Lasnik criticized the government's argument that the states won't be harmed by publication of the blueprints because the federal government is committed to battling undetectable firearms. The "very purpose" of Defense Distributed's plan is to "arm every citizen outside of the government's traditional control mechanisms," the judge said.

"It is the untraceable and undetectable nature of these small firearms that poses a unique danger," Lasnik said. "Promising to detect the undetectable while at the same time removing a significant regulatory hurdle to the proliferation of these weapons - both domestically and internationally - rings hollow and in no way ameliorates, much less avoids, the harms that are likely to befall the states if an injunction is not issued."

Josh Blackman, a lawyer for Defense Distributed, said the company is reviewing the decision and considering all its options.

The ruling was hailed by New York Attorney General Barbara Underwood in a statement on Twitter.

Avery Gardiner, co-president of the Brady Campaign to Prevent Gun Violence, said the decision is "an unqualified success for the American public and, indeed, the global community.

"3D-printed guns represent a supreme threat to our safety and security, and we are grateful that Judge Lasnik recognized it as such," Gardiner said in a statement.

The Trump administration once appeared to back Obama's stance. In April, the US urged dismissal of the company's lawsuit, highlighting the "potentially devastating" implications of online gun designs getting into the hands of terrorists, according to the Brady Center.

Weeks later, the government offered a settlement which gave the plaintiffs "everything they asked for, and more," the Brady Center said. The US agreed to pay the company almost $40,000, a court filing shows.

"I'm glad we put a stop to this dangerous policy," Washington State Attorney General Bob Ferguson said in an emailed statement. "But I have to ask a simple question: Why is the Trump Administration working so hard to allow these untraceable, undetectable, 3D-printed guns to be available to domestic abusers, felons and terrorists?"

The State Department, which struck the deal with Defense Distributed, is also named in the suit. The US changed the regulation after deciding firearms up to .50 calibre "would not provide a military advantage to adversaries and therefore no longer warrant export control," according to the ruling.

The US's argument that the federal government is limited in the matter to exports while the states' concerns are "purely domestic," according to Monday's ruling.

"Defendants' argument is so myopic and restrictive as to be unreasonable," Lasnik said. "Whatever defendants' statutory authority, the fact is that the internet is both domestic and international."

back to top

* * * * * * * * * * * * * * * * * * *

DOC_0040022

## 13. Reuters: "Trump Says He Is Withdrawing Earlier North Korea-Related Sanctions"
(Source: <u>Reuters</u>, 22 Mar 2019.)

U.S. President Donald Trump on Friday said he was ordering the withdrawal of recently announced North Korea-related sanctions imposed by the U.S. Treasury Department.

"It was announced today by the U.S. Treasury that additional large-scale Sanctions would be added to those already existing Sanctions on North Korea," Trump said on Twitter. "I have today ordered the withdrawal of those additional Sanctions!"

It was not immediately clear what sanctions Trump was referring to. There were no new U.S. sanctions on North Korea announced on Friday but on Thursday the United States blacklisted two Chinese shipping companies that it said helped North Korea evade sanctions over its nuclear weapons program.

White House spokeswoman Sarah Sanders did not specify which sanctions Trump spoke of but said: "President Trump likes Chairman Kim (Jong Un) and he doesn't think these sanctions will be necessary."

The sanctions on the Chinese shippers were the first since the second U.S.-North Korea summit broke down last month. Hours after the sanctions announcement, North Korea on Friday pulled out of a liaison office with the South, a major setback for Seoul.

North Korea said it was quitting the joint liaison office set up in September in the border city of Kaesong after a historic summit between leader Kim Jong Un and South Korea's President Moon Jae-in early last year.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 14. ST&R Trade Report: "Tariffs to Remain in Place After China Deal, Trump Says"
(Source: <u>Sandler, Travis & Rosenberg Trade Report</u>, 22 Mar 2019.)

President Trump indicated this week that higher tariffs on $250 billion worth of goods imported from China will remain in place for the foreseeable future. The president's stance could complicate efforts to secure a bilateral trade agreement.

Senior U.S. officials will travel to Beijing next week to continue negotiations on an agreement aimed at resolving issues such as forced technology transfer, intellectual property rights, currency, and agriculture. Chinese officials could follow up with a visit to Washington in early April and presidents Trump and Xi Jinping could meet in late April to conclude a deal.

According to press sources, one of the key issues negotiators have struggled with in recent weeks has been enforcement; i.e., measures the U.S. could take if China does not comply with the commitments it makes in any final agreement. Trump administration officials have indicated a preference for reimposing tariffs in such a case, with no retaliatory tariffs allowed by China.

However, Trump said March 20 that "we're not talking about removing" the existing tariffs but instead are talking about "leaving them for a substantial period of time ... to make sure that ... China lives by the deal." A Washington Post article notes that this approach is not new for Trump, as he has maintained tariffs on steel and aluminum imports from Canada and Mexico even after reaching agreement with them on revisions to NAFTA.

back to top

* * * * * * * * * * * * * * * * * *

## COMMENTARY

## 15. International Trade Compliance Blog: "EU- Commission Opens Consultation of EU-US Regulatory Cooperation"
(Source: Baker McKenzie, 18 Mar 2019.)

The European Commission has opened a consultation with stakeholders relating to regulatory cooperation activities with the United States as a follow up to the 25 July 2018 meeting between the President of the US and the President of the European Commission. An interim progress report was published on 30 January, providing a detailed overview on the state of the work of the Executive Working Group, which was formed after the July meeting, and lists a number of concrete actions where regulatory cooperation can facilitate transatlantic trade such as pharmaceuticals, medical devices and cybersecurity, by lowering regulatory barriers. Similar progress reports will be published at regular intervals as the discussions with the US progress. Stakeholder input will be instrumental to making progress and identify solutions that allow us to facilitate trade while maintaining, if not enhancing, levels of regulatory protection.

The European Commission is inviting comments from all interested stakeholder groups on potential areas for regulatory co-operation with the United States. In particular, comments in the following areas are welcome:

   - Conformity Assessment: a possible future agreement on conformity assessment aiming at a horizontal approach to facilitate the acceptance of certificates issued by the conformity assessment bodies of the other Party in a number of selected sectors such as electric and electronic equipment, machinery, medical devices, toys, recreational crafts, pressure equipment, construction products, measuring instruments etc. In this regard, the Commission would welcome input by stakeholders, in particular on the barriers

exporters face and the difficulties that conformity assessment bodies face in seeking accreditation in the other party;

- Dialogue on standards: the EU and the US for historical reasons adopted divergent standards in many sectors, leading to high adaptation costs for exporters. In order to facilitate trade in the future and increase regulatory convergence, cooperation on standards would focus especially on areas where no standards exist yet. Additive manufacturing, robotics and technical textiles have been identified as possible areas of cooperation. The Commission is also interested in receiving stakeholder input regarding other possible standard areas where such cooperation could bring trade benefits.

- Regulatory cooperation in sectors: the Commission would want to receive stakeholder input on concrete initiatives for regulatory cooperation in sectors with the potential of facilitating bilateral trade, while fully respecting EU levels of protection.

The closing date for the consultation is 23 April 2019. The European Commission will make public all written submissions received in response to this call for proposals. Submissions should be made to: TRADE-EU-US-REG-COOP-CONSULTATION@ec.europa.eu.

back to top

* * * * * * * * * * * * * * * * * *

## 16. L. Caponetti: "The Belgian Trade Control System: Legislation by Items-Category and Competent Authority"
(Source: ESU/ULG, 20 Mar 2019.)

*Author: Lia Caponetti, Researcher, European Studies Unit (ESU), University of Liège (ULG), +32 4 366 46 84, lcaponetti@uliege.be.

This table sums up legislation in force in Belgium for the following categories of controlled items:

- Conventional weapons;
- Dual-use goods and technologies;
- Goods which could be used for capital punishment, torture or other cruel, inhuman or degrading treatement or punishment.

The table breaks down the legislation in force by category of controlled items and by competent authority.

The Special Law of 12 August 2003 transfers the competence for arms and dual-use items licensing to the Regions, except the transfer of goods originating from the Belgian military or police.

More precisely, the Special Law transfers to the Regions: "The import, export and transit of arms, ammunition and equipment specifically intended for military or law enforcement use and related technology as well as dual-use goods and technology, without prejudice to the federal competence for import and export concerning the army and police and in accordance with the criteria laid down in the European Union Code of Conduct on Arms Exports".

It follows that Regions have a competence in licensing operations clearly listed in the Special Law (import, export and transit), while not listed operations, such as brokering activities, remain a Federal competence.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 17. M. Hamilton: "Empowered Officials Are Necessary for ITAR Compliance
(Source: Tucker Arensberg, 20 Mar 2019.)

\* Author: Mark Hamilton, Esq., Tucker Arensberg Attorneys, mhamilton@tuckerlaw.com.

The International Traffic in Arms Regulations (ITAR) requires companies to appoint Empowered Officials. See 22 CFR § 120.25.  Failure to take this requirement seriously can be costly - as one company recently found out. Here's what you need to know.

An Empowered Official must be a lawful permanent US resident that:
  (1) Your company or its subsidiary directly employs in a position of authority pertaining to your company's policy or management;
  (2) This person must be given written legal authority to sign license applications or other such requests for your company;
  (3) This person must understand the relevant export control regimes, including the criminal, civil and administrative penalties for violations of both ITAR and the Arms Export Control Act; and
  (4) This person must have independent authority to:
      (i) Make inquiries into your company's export, import and brokering activity;
      (ii) Verify the legality of transactions and accuracy of information submitted on behalf of your company; and
      (iii) Refuse to sign license applications or other requests without penalty or repercussion.

As you can see, the U.S. Government takes this requirement seriously. So your company's decision to appoint an Empowered Official should be carefully made and this person needs to be given the requisite authority and training to fulfill your company's responsibilities under the statute.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 18. M. Volkov: "Ethics, Profits, Sustainability and Stakeholders: An Update on a Familiar Relationship"
(Source: Volkov Law Group Blog, 22 Mar 2019.) Reprinted by permission.)

\* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

And now we return to a familiar theme with some important updates - I always start with the simple pro that does not mean that ethical companies will always be profitable, but it does mean that ethical companies will perform better than they would otherwise perform.

Some call this the ethical advantage or the ethical premium. I like to call it good old common sense. There is a growing body of research in this area confirming this connection between ethics and performance. I have cited this in earlier postings. (Here).

An interesting report in this area has been developed by JUST U.S. Large Cap Equity ETF (JUST). (Here).

Each year JUST capital conducts a survey on what it defines as ideal criteria for companies, focused on worker pay, well-being, customer treatment, privacy, beneficial products, environmental impact, job creation, strong communities and ethical leadership. The survey considers 80 items of information about each company and then ranks the companies. JUST created a index consisting of 428 companies and compared the performance of these 428 companies to the Russell 1000 companies over the period 2007 to 2018.

Lo and behold, the JUST index companies return was nearly 2 percent higher than the Russell's 1000 listing (10.4 percent to 8.7 percent). Additionally, the JUST companies delivered a 7 percent higher return on investment over the last five years than the Russell 1000 companies not included in the JUST Index.

Many continue to criticize and seek reform of our current financial reporting scheme and the obsession with quarterly financial reports. Some have suggested that this short-term perspective leads to short-sighted definition of business "success."

Measuring a company's profits requires a long-term perspective. But what do we mean by that? A three-month period, or quarter, is certainly not an accurate barometer of financial success. It takes time (and money) to invest in new products and services, implement a new competitive strategy, seek a competitive advantage in the market, or respond to consumer demands.

This is where ethical decision making or ethical business leadership can play a role. Applying this construct, ethical business leaders may ground themselves by weighing all stakeholders' interests (of which shareholders are one). Business leaders have to understand the context in which they operate and understand that they have stakeholders that are not just shareholders. A company has a social contract that encompasses society and the community in which it operates.

At the same time, a short-term, quarterly perspective, forecloses consideration of efforts that require a longer time to materialize. Sometimes companies employ a more refined weighing of strategies that may bear fruit over a longer time period.

How does a company establish a positive image over the long term? There are a number of relevant factors, one of which is the company's fair and honest treatment of customers and employees. When consumers look for an industry leader and potential employees are considering employment opportunities, companies with ethical reputations and business practices are likely at the top of the list.

Shareholders consist of individuals and institutions that own company stock. Corporate boards and managers should not solely focus on immediate shareholder needs or input because responsible management includes long-term competition and sustainable growth.

A simple but helpful exercise is to create a page with three columns: the first consists of a list of all stakeholders in priority (e.g. shareholders, employees, vendors/suppliers, customers); the second includes a list of each stakeholder's interests and goals; and the third column lists the likely impact of a business decision on each stakeholder.

A company's intangible positive support is often referred to as "goodwill," i.e. the business's reputation, its brand name, its workforce attitude, and the loyalty of its customer base. The ethical performance of the company, its managers and its employees will increase the value of these components. The company's culture consists of shared beliefs, values and behaviors that create an internal environment within which managers, employees, and other stakeholders interact.

In this context, it is easy to see that a long-term view of business success is critical for accurately measuring profitability. If the company's stakeholders benefit from ethical conduct, increasing goodwill and profitability, the perspective of stakeholders will positively turn to longer-term and sustainable growth strategies.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EX/IM TRAINING EVENTS & CONFERENCES

## 19. ECS Presents "2nd Annual ECS ITAR/EAR Symposium and Boot Camp" on 17-19 Sep in Annapolis, MD
(Source: S. Palmer, spalmer@exportcompliancesolutions.com.)

\*What: The 2nd Annual ECS ITAR/EAR Symposium and Boot Camp; Annapolis, MD
\* When: 17-19 September 2019
\* Where: Chart House
\* Sponsor: Export Compliance Solutions & Consulting (ECS)

\* ECS Speaker Panel: Suzanne Palmer, Mal Zerden, Lisa Bencivenga, Timothy Mooney, Matthew McGrath, Matt Doyle
\* Register here or by calling 866-238-4018 or e-mail spalmer@exportcompliancesolutions.com

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 20. FCC Presents "An Introduction to EU / Dutch Dual-Use and Military Export Controls", 7 May in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

This 1-day training course is ideally suited for compliance professionals and those in a similar role who aim to gain a better understanding of EU and Dutch export control laws and regulations and industry's best practices to ensure compliance.
  The course will cover multiple topics relevant for organizations subject to EU and Dutch dual-use and/or military export controls, including: the EU and Dutch regulatory framework; key concepts and definitions; practical tips regarding classification and licensing, and for ensuring a compliant shipment; identifying red flag situations and handling (potential) non-compliance issues; and the latest developments regarding Internal Compliance Program requirements in the EU an the Netherlands.

\* Training Event: "An Introduction to EU / Dutch Dual-Use and Military Export Controls"
\* Date: Tuesday, 7 May 2019
\* Location: Full Circle Compliance, Landgoed Groenhoven, Dorpsstraat 6, Bruchem, The Netherlands
\* Times:
  - Registration and welcome: 9.00 am - 9.30 am
  - Training course hours: 9.30 am - 4.00 pm
\* Level: Awareness / Beginner.
\* Target Audience: Compliance professionals or those in a similar role in any industry affected by EU/Dutch export controls (*e.g.,* manufacturing, logistics, research & development, aerospace & defense, government, etc.).
\* Instructors: Marco F.N. Crombach MSc (Senior Manager) & Vincent J.A. Goossen MA (Program Manager).
\* Information & Registration: click here or contact us at events@fullcirclecompliance.eu or 31 (0)23 - 844 - 9046.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 21. List of Approaching Events: 146 Events Posted This Week, Including 9 New Events
(Sources: Editor and Event Sponsors)

Published every Friday or last publication day of the week, our overview of Approaching Events is organized to list continuously available training, training events, seminars & conferences, and webinars.

If you wish to submit an event listing, please send it to to jobs@fullcirclecompliance.eu, composed in the below format:

   # * Date: Location; "Event Title"; <Weblink>"; EVENT SPONSOR

   "# *" = New or updated listing

## *Continuously Available Training*

* E-Seminars: "US Export Controls" / "Defense Trade Controls"; Export Compliance Training Institute; danielle@learnexportcompliance.com
* Webinar: "Company-Wide US Export Controls Awareness Program"; Export Compliance Training Institute; danielle@learnexportcompliance.com
* E-Seminars: "ITAR/EAR Awareness"; Export Compliance Solutions; spalmer@exportcompliancesolutions.com
* Online: "Simplified Network Application Process Redesign (SNAP-R)"; Commerce/BIS; 202-482-2227
* E-Seminars: "Webinars On-Demand Library"; Sandler, Travis & Rosenberg, P.A.
* Online: "International Trade Webinars"; Global Training Center
* Online: "On-Demand Webinars"; "General Training"; Center for Development of Security Excellence; Defense Security Service (DSS)
* Online: "ACE Reports Training and User Guide"; DHS/CBP
* Online: "Increase Your International Sales - Webinar Archive"; U.S. Commercial Service
* Web Form: "Compliance Snapshot Assessment"; Commonwealth Trading Partners (CTP)
* Online: "Customs Broker Exam Prep Course"; The Exam Center

## *Seminars and Conferences*

* Mar 24-27: Orlando, FL; "2019 ICPA Annual Conference"; ICPA
* Mar 25-27: San Francisco; "Global Encryption, Cloud and Cyber Trade Controls Conference"; Thomsen & Burke LLP;
* Mar 26: Leeds, UK; "Understanding Exporting"; Chamber International
* Mar 26-27: Pittsburgh, PA; "Complying with U.S. Export Controls"; Commerce/BIS
* Mar 26-27: Scottsdale, AZ; "Managing ITAR/EAR Complexities"; Export Compliance Solutions (ECS); spalmer@exportcompliancesolutions.com or 866-238-4018
* Mar 27: Bristol, UK; "Classification of Goods - Using Commodity and Tariff Codes"; BusinessWest
* Mar 27: Bristol, UK; "Incoterms® Rules 2010"; BusinessWest
# * Mar 27: Washington D.C.; "Making Sanctions Effective: The Case of North Korea"; Committee on Foreign Affairs
* Mar 27-28: San Francisco, CA; "Global Encryption, Cloud & Cyber Trade Controls;" American Conference Institute

* Mar 28: Bristol, UK; "Introduction to Export Procedures"; BusinessWest
# * Mar 28: Geneva, Switzerland; "Sanctions in an era of trans-Atlantic Geopolitical Divergence"; Graduate Institute Geneva
* Mar 29: Leeds, UK; "How to Complete Export Declarations"; Chamber International
* Apr 1: Eindhoven, NL; "Export Control, Dual-use en Sancties"; Fenex
* Apr 2: Brussels, Belgium; "Dual-Use, Military Research & Misuse"; Vrije Universiteit Brussel
* Apr 2: Delft, The Netherlands; "Export Compliance Training"; Netherlands Aerospace Group and Full Circle Compliance
* Apr 1-4: Washington, DC; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI
* Apr 2-3: Long Beach, CA; "Voluntary Disclosure/Self Disclosure and Exemptions/Exceptions Seminars"; SIA
* Apr 3-4: Denver, CO; "Complying with U.S. Export Controls"; Commerce/BIS
* Apr 4-5; Miami, FL; "CTPAT Training"; SCS America
* Apr 9: Bruchem, The Netherlands; "Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective"; Full Circle Compliance
* Apr 9: Sheffield, UK; "An Introduction to Export"; Sheffield Chamber of Commerce
* Apr 9: London, UK; "Strategic Export Control: Intermediate Practitioners Course"; UK/DIT
# * Apr 10: Arlington, VA; "Basic ITAR"; Barnes & Thornburg
* Apr 10: London, UK; "Strategic Export Control: Foundation Workshop"; UK/DIT
* Apr 10: London, UK; "Strategic Export Control: Licenses Workshop"; UK/DIT
* April 10: Sheffield, UK; "Export Documentation - How and Why?" ; Sheffield Chamber of Commerce
* Apr 16: Leeds, UK; "Export Documentation"; Chamber International
* Apr 17: Miami, FL; "CBP COMPLIANCE & ENFORCEMENT"; Diaz Trade Consulting
* Apr 17-18; Miramar, FL; "11th Maritime Forwarding, Freight Logistics & Global Chain Supply Workshop"; ABS Consulting;
* Apr 17-18: Scottsdale, AZ; "Complying with U.S. Export Controls"; Commerce/BIS
* April 18: Sheffield, UK; "International Trade Operations and Procedures (ITOPS)"; Sheffield Chamber of Commerce
# * Apr 23: Anaheim, CA; "Export Controls Essentials: What Finance Personnel Need to Know"; California State University
* Apr 23-24: Portsmouth, NH; "Complying with U.S. Export Controls"; Commerce/BIS
* Apr 25: Portsmouth, NH; "Technology Controls"; Commerce/BIS
* Apr 25: London, UK; "Making better License Applications"; UK/DIT
# * Apr 25: Minneapolis, MN; "Importing 201: Advanced Import Compliance"; Global Training Center
* Apr 25-26: Dallas, TX; "Compliance Officer Training"; Globaleyes; andrewmell@getglobaleyes.com
* Apr 29-May 2: London, UK; "US Export Controls on Non-US Transactions: EAR, OFAC & ITAR Compliance for EU/UK and other Non-US Companies PLUS Other Country Controls Comparison to US"; ECTI

* Apr 30-May 1: Irvine, CA: "Complying with U.S. Export Controls"; Commerce /BIS
* Apr 30-May 1: Nashville, TN: "Mastering ITAR/EAR Challenges"; Export Compliance Solutions (ECS);
* May 1: Leeds, UK; "Understanding Exporting & Incoterms"; Chamber International
* May 2-3: Washington DC; "Economic Sanctions Enforcement and Compliance;" American Conference Institute
* May 5: Munich, Germany; "European and German Export Controls"; AWA;
* May 5-7: Savannah, GA; "2019 Spring Seminar"; National Association of Foreign Trade Zones (NAFTZ)
* May 6-7: Atlanta, GA; "2019 Spring Conference"; SIA
* May 7: Bruchem, The Netherlands; "An Introduction to EU / Dutch Dual-Use and Military Export Controls"; Full Circle Compliance
* May 8: Southampton, UK; "Strategic Export Control: Intermediate Practitioners course"; UK/DIT
* May 9: Southampton, UK; "Strategic Export Control: Foundation Workshop"; UK/DIT
* May 9: Southampton, UK; "Strategic Export Control: Licenses Workshop"; UK/DIT
* May 9: Sheffield, UK; "Essential Incoterms - Getting it Rights"; Sheffield Chamber of Commerce
* May 13-16: Washington, D.C.; "ITAR / EAR / OFAC Commercial and Military Export Controls. How ITAR, EAR & OFAC Regulations Impact Non-US Companies, Affiliates and Transactions"; ECTI;
* May 15: Bristol, UK; "A Foundation Course in Importing"; BusinessWest
* May 15-17; London, UK; "ICPA European Conference"; ICPA
* May 16: Bristol, UK; "Export Controls and Licensing"; BusinessWest
* May 16: Bristol, UK; "Inward Processing Relief"; BusinessWest
* May 16: Hamburg, Germany; "U.S. Export Controls and Embargoes & Sanctions for European Companies"; Hamburger Zollakademie
* May 16-17; Toronto, Canada; "ICPA Canada Conference"; ICPA
# * May 17: Milwaukee, WI; "Importing 201: Advanced Import Compliance"; Global Training Center
* May 19: Traverse City; "Export Compliance Overview Traning"; Foster Swift Collins & Smith PC
* May 21: London, UK; "US & UK Export Controls: A Basic Understanding"; The Institute of Export and International Trade
* May 27-30: Singapore; "US Export Controls on Non-US Transactions: EAR, OFAC & ITAR Compliance for Asia and other Non-US Companies PLUS Other Country Controls Comparison to US"; ECTI;
* Jun 5-6: Seattle, WA; "Complying with U.S. Export Controls"; Commerce/BIS
* Jun 7: Upper Marlboro, MD; "2019 Spring Golf Outing"; SIA
* Jun 10: Cleveland, OH; "Letters of Credit"; Global Training Center
* Jun 11: Cleveland, OH; "Export Doc & Proc"; Global Training Center
* Jun 11: Sheffield, UK; "Customs Procedures and Compliance in International Trade"; Sheffield Chamber of Commerce
* Jun 11-12: Detroit, MI; "Complying with U.S. Export Controls"; Commerce/BIS
* Jun 12: Cleveland, OH; "Tariff Classification"; Global Training Center

* Jun 12: Derby, UK; "Strategic Export Control: Intermediate Practitioners course"; UK/DIT
* Jun 13: Cleveland, OH; "NAFTA Rules of Origin"; Global Training Center
* Jun 13: Derby, UK; "Strategic Export Control: Foundation Workshop"; UK/DIT
* Jun 13: Derby, UK; "Strategic Export Control: Licenses Workshop"; UK/DIT
* Jun 13: Detroit, MI; "How to Build an Export Compliance Program"; Commerce/BIS
* Jun 14: Cleveland, OH; "Incoterms® 2010 Rules"; Global Training
* Jun 17-20: San Diego, CA; "ITAR Defense Trade Controls / EAR Export Controls"; ECTI
* Jul 3: Bristol, UK; "Introduction to Export Procedures - Export Training"; BusinessWest
* Jul 3: Cambridge, UK; "Strategic Export Control: Intermediate Practitioners Course"; UK/DIT
* Jul 4: Cambridge, UK; "Strategic Export Control: Foundation Workshop"; UK/DIT
* Jul 4: Cambridge, UK; "Strategic Export Control: Licenses Workshop"; UK/DIT
* Jul 4: Bristol, UK; "Using Documentary Letters of Credit, Drafts and Bills"; BusinessWest
* Jul 4: Sheffield, UK; "An Introduction to Export"; Sheffield Chamber of Commerce
* Jul 8-9: Seattle, WA: "Boot Camp: Achieving ITAR/EAR Compliance"; Export Compliance Solutions (ECS);
* Jul 8 - 10: National Harbour, MD; "2019 Summer Back to Basics Conference"; SIA
* Jul 9-11: Washington; "BIS 2019 Annual Conference on Export Controls and Policy"; Commerce/BIS
* July 10: Sheffield, UK; "Export Documentation - How and Why?"; Sheffield Chamber of Commerce
* Jul 11: Birmingham, UK; "US & UK Export Controls: A Basic Understanding"; The Institute of Export and International Trade
*Jul 24-25: St. Louis, MO; " Complying with U.S. Export Controls"; Commerce/BIS
* Aug 20-21: Cincinnati, OH; "Complying with U.S. Export Controls"; Commerce/BIS
* Aug 20-21: Milpitas, CA; "Complying with U.S. Export Controls"; Commerce/BIS
* Aug 22: Milpitas, CA: "Encryption Controls"; Commerce/BIS
* Sep 2, 9, 16: Rotterdam, the Netherlands; "Awareness training Export Control, Dual-use en Sancties"; FENEX
* Sep 8-11: Chicago, IL; "2019 Annual Conference and Exposition"; National Association of Foreign Trade Zones (NAFTZ)
* Sep 16-19: Austin, TX; "ITAR Controls / EAR & OFAC Export Controls (Sep 18-19) Seminar Series"; ECTI; 540-433-3977
* Sep 17: Sheffield, UK; "Customs Procedures and Compliance in International Trade"; Sheffield Chamber of Commerce
* Sep 17-19: Annapolis, MD; "The ECS 2nd Annual ITAR/EAR Symposium"; ECS

* Sep 20: Las Vegas; "EAR and OFAC Fundamentals: Export Control Of Dual-Use Equipment"; Barnes & Thornburg LLP
* Sep 25: Bristol, UK; "Classification of Goods - Using Commodity and Tariff Codes"; BusinessWest
* Sep 25: Bristol, UK; "Incoterms® Rules 2010"; BusinessWest
* Sep 25: London, UK; "US & UK Export Controls: A Basic Understanding"; The Institute of Export and International Trade
* Sep 25: Sheffield, UK; "Essential Incoterms - Getting it Rights"; Sheffield Chamber of Commerce
* Sep 26: Bristol, UK; "Understanding The Paperwork"; BusinessWest
* Sep 30 - Oct 3; Amsterdam, NL; "ITAR Controls / EAR/OFAC Commercial and Military Controls"; ECTI; 540-433-3977
* Oct 7: Munich, Germany; "European and German Export Controls"; AWA
* Oct 14-17; Columbus, OH; "University Export Controls Seminar"; ECTI
* Oct 17: Sheffield, UK; "Export Documentation - How and Why?" ; Sheffield Chamber of Commerce
* Oct 27: Singapore; "5th Asia Pacific Summit on Economic Sanctions Compliance and Enforcement"; American Conference Institute
* Oct 28-29: Washington D.C.; "2019 Fall Advanced Conference"; SIA
* Oct 28-31; Phoenix, AZ; "ITAR Controls / EAR & OFAC Export Controls Seminar Series"; ECTI
* Nov 11-14; Washington, DC; "ITAR Controls / EAR & OFAC Export Controls Seminar Series"; ECTI
* Nov 20: Bristol, UK; "Introduction to Export Procedures - Export Training"; BusinessWest
* Nov 21: Bristol, UK; "A Foundation Course in Importing"; BusinessWest
* Nov 26: Bruchem, The Netherlands; "The International Traffic in Arms Regulations (EAR) from a non-U.S. Perspective"; Full Circle Compliance
* Nov 27: Bruchem, The Netherlands; " The Export Administration Regulations (EAR) from a non-U.S. Perspective"; Full Circle Compliance
* Nov 27: Manchester, UK; "US & UK Export Controls: A Basic Understanding"; The Institute of Export and International Trade
* Dec 4-5: New York, NY; "10th Annual New York Forum on Economic Sanctions;" American Conference Institute
* Dec 4-5: Washington, DC; "36th International Conference on the Foreign Corrupt Practices Act"; American Conference Institute
* Dec 9-12; Miami, FL; "ITAR Controls / EAR & OFAC Export Controls Seminar Series"; ECTI
* Dec 12-13; Washington D.C.; "Coping with U.S. Export Controls and Sanctions 2019"; Practicing Law Institute

*2020*

* Jan 30-31: Houston, TX; "14th Forum on the Foreign Corrupt Practices Act"; American Conference Institute

**Webinars**

* Mar 26: Webinar: "Duty Drawback"; CITTA Brokerage Co.
* Mar 27: Webinar: "Trade in Turmoil [Monthly Update]"; Sandler, Travis & Rosenberg, P.A

* Apr 2: Webinar: "Cornerstones of EAR Compliance: Controlled Items, Activities & Hardware Classification"; ECTI; 540-433-3977
* Apr 8: Webinar: "Export Control Compliance: Creating And Self Assessing Your Export Control Program (ECP) To Sanctioned Countries"; GRC Educators
* Apr 10: Webinar: " Cornerstones of EAR Compliance: Technology & Software Classification, and No License Required (NLR) Determination"; ECTI; 540-433-3977
* Apr 10: Webinar: "Import Compliance Bootcamp"; Sandler, Travis & Rosenberg, P.A
* Apr 16: Webinar: "CFIUS Update: New Requirements to Meet, New Industries Affected"; ECTI; 540-433-3977
# * Apr 16: Webinar: "Importing 201: Advanced Import Compliance"; Global Training Center
* Apr 17: Webinar: "Cornerstones of EAR Compliance: Understanding License Exceptions & End-Use(r) Controls"; ECTI; 540-433-3977
* Apr 23: Webinar: "How to Improve Export Compliance with Effective Audits"; ECTI; 540-433-3977
* Apr 23: Webinar: "ITAR Training Basics - For Compliance Executives April"; CVG Strategy
* Apr 24: Webinar: "Cornerstones of EAR Compliance: License Application Process & Export Clearance"; ECTI; 540-433-3977
* Apr 25: Webinar: "Best Practices for Voluntary and Required Self Disclosures"; Massachusetts Export Center
# * May 22: Webinar: "ITAR"; Global Training Center
# * May 23: Webinar: "EAR"; Global Training Center

back to top

* * * * * * * * * * * * * * * * * * *

## 22. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Louis L'Amour** (Louis Dearborn L'Amour; 22 Mar 1908 - 10 Jun 1988; was an American novelist and short-story writer. His books consisted primarily of Western novels; however, he also wrote historical fiction as well as poetry and short-story collections. Many of his stories were made into films.  At the time of his death almost all of his 105 existing works (89 novels, 14 short-story collections, and two full-length works of nonfiction) were still in print, and he remains one of the world's most popular writers.)
   - "Often I hear people say they do not have time to read. That's absolute nonsense. In the one year during which I kept that kind of record, I read twenty-five books while waiting for people. In offices, applying for jobs, waiting to see a dentist, waiting in a restaurant for friends, many such places."

**Friday's proverbs:**

* Character is always corrupted by prosperity. | Icelandic Proverb
* A fault confessed is half redressed. | Zulu Proverb
* Everyone is kneaded out of the same dough, but not baked in the same oven. | Yiddish Proverb

back to top

* * * * * * * * * * * * * * * * * *


# 23. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments to applicable regulations are listed below.

* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199. Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
  - Last Amendment: 12 Mar 2019: 84 FR 8807-8809: Extension of Import Restrictions Imposed on Archaeological and Ecclesiastical Ethnological Material From Honduras

* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
  - Last Amendment: 20 Dec 2018: 83 FR 65292-65294: Control of Military Electronic Equipment and Other Items the President Determines No Longer Warrant Control Under the United States Munitions List (USML); Correction [Concerning ECCN 7A005 and ECCN 7A105.]

* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30. Implemented by Dep't of Commerce, U.S. Census Bureau.
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (1 Jan 2019) of Bartlett's Annotated FTR ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat

program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under the Atomic Energy Act of 1954.
   - Last Amendment: 23 Feb 2015: 80 FR 9359, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

* DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under the Atomic Energy Act of 1954.
   - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

*DOJ ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
   - Last Amendment: 14 Mar 2019: 84 FR 9239-9240: Bump-Stock-Type Devices

* DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
   - Last Amendment: 19 Mar 2019: 84 FR 9957-9959: Department of State 2019 Civil Monetary Penalties Inflationary Adjustment
   - The only available fully updated copy (latest edition: 19 March 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR is a 361-page Word document containing all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by download, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR, please contact us to receive your discount code.

* DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders. Implemented by Dep't of Treasury, Office of Foreign Assets Control.
   - Last Amendment: 15 Mar 2019: 84 FR: 9456-9458: List of Foreign Financial Institutions Subject to Correspondent Account or Payable-Through Account Sanctions (CAPTA List)

* USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S.

International Trade Commission. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Update: 7 Mar 2019: Harmonized System Update (HSU) 1903 [contains 67 ABI records and 13 harmonized tariff records].
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

back to top

* * * * * * * * * * * * * * * * * * * *

## 24. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

* * * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 7,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations. Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws. If you would like to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents cannot be relied upon as legal or expert advice. Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources. If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax

or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

| | |
|---|---|
| **From**: | Gary Stanley ▮▮▮▮ @glstrade.com] |
| **Sent**: | 3/25/2019 11:56:38 AM |
| **To**: | Richard Ashooh [Richard.Ashooh@bis.doc.gov] |
| **Subject**: | Defense and Export-Import Update (March 20, 2019) |

**Dear All,**

**Good Day!**

**Gary Stanley's EC Tip of the Day: Where a foreign end user is not certain of the original procurement method of a an item (U.S. Foreign Military Sale or U.S. Direct Commercial Sale), the U.S. Department of State's Office of Regional Security and Arms Transfer (RSAT) is the appropriate office for the foreign end user to submit a request (PM_RSAT-TPT@state.gov). In such cases, RSAT will process the request and coordinate with DDTC. Information on RSAT and the third party transfer process can be found at www.state.gov/t/pm/rsat/index.htm. Whether for RSAT or DDTC, to facilitate adjudication of the request, RSAT asks that the foreign end user provide a best-faith statement as to what it believes to be the original acquisition method (*i.e.,* via DCS or FMS), a summary of steps taken to investigate the acquisition of the article(s), and any other information that may be helpful.**

**Today's Items:**

1. **State Dept. Publishes 2019 Civil Monetary Penalties Inflationary Adjustment**
2. **Russian National Extradited From Estonia to Face Charges of Illegal Procurement of U.S. Electronics**
3. **Staten Island Attorney Pleads Guilty to Fraud and Extortion Scheme**
4. **President Trump Takes Additional Step to Address the National Emergency With Respect to Significant Transnational Criminal Organizations**
5. **OFAC Sanctions Venezuela's State Gold Mining Company and its President for Propping Up Illegitimate Maduro Regime**
6. **OFAC Posts Technical Notice for Users of Its Sanctions Lists Data Files**
7. **Global Affairs Canada Posta Q&A's on Strengthening Canada's Export Control Program**
8. **SIPRI Examines Convergence of Biology and Emerging Technologies in Arms Controls**
9. **UK Government's Export Control Joint Unit Posts Webinar on OGELS and EU General Authorisations in a "No-Deal" Brexit**
10. **UK Government's Treasury Committee Releases Report on Anti-Money Laundering Sanctions**
11. **DoD/DSCA Updates Security Assistance Management Manual and Policy Memos**
12. **WTO News**
13. **U.S. Customs and U.S. Census/AES Updates**
14. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**
15. **GAO Reports, Testimony, and Correspondence of Interest**

**Other Headlines**

16. **Britain's Arms Export Watchdog in Danger of Becoming Toothless**
17. **What Aircraft Does the US Air Force Need to Beat China and Russia? This New Study Has an Answer.**
18. **DoD 2020 Budget Looks to Fix Shipbuilding, Ammo Industrial Base**
19. **Army Both Keen, Cautious About OTA Agreements**
20. **More Fire Power: US Army Sets Out to Develop New Missiles in FY20**
21. **A DoD AI Expert Is Coming — And That Could Mean Big Things for Directed Energy**
22. **MBDA Doubles Down on Tiny European Laser-Weapon Project**
23. **Northrop Launches Hypersonic Defense Push**
24. **Here's How DoD Will Invest in the Cyber Mission**
25. **Trump to Nominate Stephen M. Dickson to Head the Federal Aviation Administration**
26. **Opinion: 386! Go On Air Force. Say it Loud. Now!**

**Upcoming Export Control and Other Trade Compliance Conferences**

# 1. State Dept. Publishes 2019 Civil Monetary Penalties Inflationary Adjustment

(84 Fed. Reg. 9957) - Pursuant to various statutes including the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, the U.S. Department of State has issued a final rule adjusting the civil monetary penalties (CMP) for regulatory provisions it maintains and enforces. The new amounts will apply only to those penalties assessed on or after the effective date of this rule, regardless of the date on which the underlying facts or violations occurred. The following increases affect export control provisions:

22 C.F.R. Part 103 - The CWC Act provided domestic implementation of the Convention on the Prohibition of the Development, Production, Stockpiling, and Use of Chemical Weapons and on Their Destruction. The penalty provisions of the CWC Act are codified at 22 U.S.C. 6761.

• Applying the 2019 multiplier (1.02522), the new maximum amounts are as follows: Prohibited acts related to inspections, $38,549; for Recordkeeping violations, $7,710.

22 C.F.R. Part 127 - The Assistant Secretary of State for Political-Military Affairs is responsible for the imposition of CMPs under the International Traffic in Arms Regulations (ITAR), which is administered by the Directorate of Defense Trade Controls (DDTC).

• AECA section 38(e): Applying the 2019 multiplier (1.02522), the new maximum penalty under 22 U.S.C. 2778 (22 CFR 127.10(a)(1)(i)) is $1,163,217.

• AECA section 39A(c): Applying the multiplier, the new maximum penalty under 22 U.S.C. 2779a (22 CFR 127.10(a)(1)(ii)) is $845,764, or five times the amount of the prohibited payment, whichever is greater.

- AECA section 40(k): Applying the multiplier, the new maximum penalty under 22 U.S.C. 2780 (22 CFR 127.10(a)(1)(iii)) is $1,006,699.

## 2. Russian National Extradited From Estonia to Face Charges of Illegal Procurement of U.S. Electronics

The U.S. Department of Justice (DOJ) has announced that a federal grand jury has handed down a 52-count indictment charging Valery Kosmachov with engineering a scheme to illegally procure sophisticated electronic components from the United States and to smuggle them into the Russian Federation. According to the indictment filed September 21, 2017, and unsealed March 20, 2019, Kosmachov, 66, is a Russian national, naturalized citizen of Estonia, and resident of Tallinn, Estonia. He served as owner of Adimir OU and co-owner of Eastline Technology OU, along with co-defendant and Russian national Sergey Vetrov, 66. The indictment describes how Kosmachov and Vetrov used the Estonia-based companies as procurement "fronts" to obtain controlled U.S.-origin microelectronics, in part by misrepresenting that the end-users for the components were located in Estonia. The components included dual-use programmable computer chips capable of operating in austere environments making them useful in both civilian and military applications. Once in possession of the chips in Estonia, the co-defendants allegedly later smuggled them into the Russian Federation, in part by using laundered funds. In sum, Kosmachov, Vetrov, and their two companies are charged with one count of conspiracy to violate the International Emergency Economic Powers Act (IEEPA) and one count of conspiracy to commit international money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and (h). In addition, Kosmachov and Vetrov are charged with 12 substantive counts of violating the IEEPA, in violation of 50 U.S.C. § 1705, 19 counts of smuggling, in violation of 18 U.S.C. §§ 554 and 2; and 17 counts of international money laundering, in violation of 18 U.S.C. § § 1956(a)(2)(A).

## 3. Staten Island Attorney Pleads Guilty to Fraud and Extortion Scheme

The U.S. Department of Justice (DOJ) has announced that Richard Luthmann, a Staten Island attorney, has pleaded guilty to wire fraud conspiracy and extortion conspiracy in connection with a scheme starting in summer 2015 in which he and co-defendant George Padula contracted with overseas companies to sell and ship them containers of valuable scrap metal, but instead packed the containers with cheap filler material, such as concrete blocks. As part of the scheme, Luthmann registered shell companies, including Omni Metal Corporation, with the New York Department of State and recruited a client of his law practice to be the nominal president of Omni. At the direction of Luthmann and Padula, the client opened bank accounts to facilitate the fraud, and between October 2015 and December 2015, the over-seas companies wired over $500,000 to those accounts. That money was then transferred into accounts controlled by Luthmann or a co-conspirator. On December 5, 2016, Luthmann lured the victim to his law office, ostensibly to sign some paperwork. Once there, Padula and co-defendant Michael Beck blocked the victim from leaving. Beck then pulled out a firearm, aimed it at the victim's head and knee, and claimed the victim owed him $10,000 because Beck had purchased a $7,000 debt that the victim owed Padula, plus a $3,000 "vig," or interest payment, that Beck had added. The victim was then permitted to leave, but not before being warned by Padula not to contact the police. As part of his guilty plea, Luthmann stipulated that he obstructed justice following his arrest, by

sending a threatening letter to a potential witness whom he believed was cooperating with the government and violating a court order regarding discovery materials.

## 4. President Trump Takes Additional Step to Address the National Emergency With Respect to Significant Transnational Criminal Organizations

(84 Fed. Reg. 10225) - By the authority vested in him as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), the National Emergencies Act (50 U.S.C. 1601 et seq.), and section 301 of title 3, United States Code, President Trump has issued Executive Order 13863 to take additional steps to address the national emergency with respect to significant transnational criminal organizations originally declared in Executive Order 13581 of July 24, 2011 (Blocking Property of Transnational Criminal Organizations). This new Executive Order amends subsection (e) of section 3 of Executive Order 13581 to provide as follows:

(e) the term "significant transnational criminal organization" means a group of persons that includes one or more foreign persons; that engages in or facilitates an ongoing pattern of serious criminal activity involving the jurisdictions of at least two foreign states, or one foreign state and the United States; and that threatens the national security, foreign policy, or economy of the United States.

## 5. OFAC Sanctions Venezuela's State Gold Mining Company and its President for Propping Up Illegitimate Maduro Regime

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has designated CVG Compania General de Mineria de Venezuela CA, or Minerven, the Venezuelan state-run ferrous metals mining company, and its President, Adrian Antonio Perdomo Mata, targeting the illicit gold operations that have continued to prop up the illegitimate regime of former President Nicolas Maduro. These actions, taken pursuant to Executive Order (E.O.) 13850, as amended, targets an entity and an individual that operate in the gold sector of the Venezuelan economy. As a result of these actions, all property and interests in property of this entity and individual, and of any entities that are owned, directly or indirectly, 50 percent or more by this entity and individual, that are in the United States or in the possession or control of U.S. persons are blocked and must be reported to OFAC. OFAC's regulations generally prohibit all dealings by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked or designated persons. Click here for further identifying information on the designated individual and entity.

## 6. OFAC Posts Technical Notice for Users of Its Sanctions Lists Data Files

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has posted on its website a technical notice for users of its sanctions lists data files. In early February of 2019, multiple users of OFAC's data files contacted OFAC's technical support hotline to report difficulty in downloading sanctions list data files hosted at this URL: https://www.treasury.gov/ofac/downloads/. After investigating the issue, OFAC discovered that changes had been made regarding HTTP request methods. These changes generally

affected users that leverage command line connections to OFACS' website. Users who download OFAC's sanctions list data files manually via browser were not impacted by this change. Previously users were allowed to request sanctions list data files via HTTP using both POST and GET commands. The change made in February eliminated users' ability to use the POST command and only GET commands are allowed henceforth. OFAC made this change to improve the security for public file repositories and is a permanent change. Users who continue to have difficulty downloading OFAC's sanctions list data files due to this change are welcome to contact OOFAC at O_F_A_C@treasury.gov or contact OFAC's technical support hotline at 1-800-540-6322 – Menu Option 8 for assistance. OFAC understands that this change may have unexpectedly interrupted users' ability to download and access OFAC data and is working with Treasury's technical team to ensure advance notification of any future changes.

## 7. Global Affairs Canada Posta Q&A's on Strengthening Canada's Export Control Program

The Canadian Government's Global Affairs Canada has posted on its website answers to various questions asked during the the the on-line and in-person consultations on strengthening Canada's export controls. It is intended to provide further clarity on the new processes and obligations stemming from Canada's accession to the Arms Trade Treaty (ATT). The questions are grouped according to themes identified during the public consultations.

- General

- Arms trade treaty assessment criteria and substantial risk test

- Brokering controls

- Exports to the U.S.

- Firearms

- Next steps following the consultations

- The export permit process

- Compliance

## 8. SIPRI Examines Convergence of Biology and Emerging Technologies in Arms Controls

The Stockholm International Peace Research Institute (SIPRI) has released a report entitled *Bio Plus X: Arms Control and the Convergence of Biology and Emerging Technologies*. The report explores the risks and challenges posed by the interaction of developments in biotechnology and advances in three emerging technologies: additive manufacturing (so-called 3D printing), artificial intelligence and robotics. All three technologies are difficult to control, particularly due to their digitization and their dual-use nature. 'A key challenge for effective biological arms control is that treaty structures and the institutional arrangements

in ministries and government agencies do not correspond to today's technical realities,' says Dr Sibylle Bauer, Director of the SIPRI Armament and Disarmament programme. The report recommends that, to tackle the governance issues presented by emerging technologies, national governments need to monitor and assess developments in science and technology on a more systematic basis. They should also strengthen international efforts to foster responsible science and biosecurity awareness. In addition, the report suggests that the private sector should reinforce self-regulation and compliance standards.

## 9. UK Government's Export Control Joint Unit Posts Webinar on OGELS and EU General Authorisations in a "No-Deal" Brexit

The U.K. Government's Export Control Joint Unit (ECJU) has posted on its website a webinar entitled *Open General Export Licenses and EU General Export Authorisations in a No Deal Brexit*. Other than a small number of sensitive items, no licence is currently required to transfer dual-use items between the United Kingdom and other European Union countries. If the United Kingdom leaves the European Union without a deal, dual-use items from the United Kingdom to the European Union would require a licence. An Open General Licence has been created for this purpose to facilitate the export process. This webinar has been designed to assist U.K. companies to understand the status of EUGEAs and the recently published OGEL by:

• Raising awareness of the terms of the OGEL

• Providing information on the policy landscape of EU-related legislation in a no deal Brexit

• Outlining the benefit of registering early

• A Q&A session for UK companies to put questions directly to policymakers

## 10. UK Government's Treasury Committee Releases Report on Anti-Money Laundering Sanctions

The U.K. Government's Treasury Committee has released a report entitled *Economic Crime - Anti-Money Laundering Supervision and Sanctions Implementation*. The Committee examines the scale of money laundering, terrorist financing, and sanctions in the United Kingdom, the current regulatory and legislative landscape, and how individuals, firms and the wider economy have been impacted by these regimes and the implementation of them.

## 11. DoD/DSCA Updates Security Assistance Management Manual and Policy Memos

The U.S. Department of Defense's Defense Security Cooperation Agency (DSCA) has made the following updates to its Security Assistance Management Manual (SAMM) and Policy Memorandums:

• DSCA Policy Memo 19-09 Pilot Use of Foreign Military Sales (FMS) Administrative Surcharge Funds to Support Specific Requirements Generating Activities for Department of Defense (DoD)-funded Caseshas been posted.

Effective immediately, this memorandum implements a new pilot policy which allows IAs to use FMS Administrative Surcharge funds for pre-MOR activities for BPC cases on a case-by-case basis when approved by the relevant GCC and DSCA.

## 12. WTO News

- Registration opens for delayed broadcast of arbitration hearing in US-EU aircraft dispute

- Russia launches two safeguard investigations: on microwave ovens and on welded tubes of stainless steel

- DDG Wolff: A crisis properly managed can lead to a positive outcome

- Trade Policy Review: East African Community (EAC)

## 13. U.S. Customs and U.S. Census/AES Updates

- U.S. Customs - CSMS #19-000137 Title: ACE PRODUCTION Scheduled Maintenance, Tuesday 3/19/2019 @0500 ET

- U.S. Customs - CSMS #19-000138 Title: RESOLVED:Delayed Importer/Bond Query (KI/KR) Response Times

- U.S. Customs - CSMS #19-000139 Title: Information about NMFS SIM program updates

- U.S. Customs - CSMS #19-000140 Title: ACE Deployment Support Call on March 20, 2019 Cancelled

- U.S. Customs - CSMS #19-000141 Title: FDA ITACS Planned Maintenance Saturday, 3/23/19 1 AM - 6 AM ET

- U.S. Customs - CSMS #19-000142 Title: ACE CERTIFICATION Scheduled Maintenance, Wed. March 20, 2019 @ 1700 ET to 2000 ET

- U.S. Customs - CBP, Ireland Ink New Preclearance Agreement

- U.S. Customs - Integrated Trade Targeting Workshop Helps CBP to 'Unearth Unknowns'

- U.S. Customs - CBP Toronto Welcomes Beagle to Team

- U.S. Customs - Customs Bulletin and Decisions - Vol. 53, March 20, 2019, No. 7 Index

General Notices

U.S. Court of Appeals for the Federal Circuit Decisions

U.S. Court of International Trade Slip Opinions

- U.S. Census - Tips on How to Resolve AES Response Messages

| | |
|---|---|
| **Response Code: 166** | **Narrative:** Transportation Reference Number Missing<br><br>**Severity: Fatal Reason:** The Mode of Transportation is declared as Vessel and the Transportation Reference Number is missing.<br><br>**Resolution:** A number referencing the transportation booking number must be declared on a vessel shipment.<br><br>Verify the Transportation Reference Number, correct the shipment and resubmit. |
| **Response Code: 8H1** | **Narrative:** Value/Quantity 1 Out of Range - High<br><br>**Severity:** Verify<br><br>**Reason:** For the reported Schedule B/HTS Number, the Value of Goods/Quantity (1) ratio is outside of the expected range. The ratio is too high.<br><br>**Resolution:** For a particular Schedule B/HTS Number declared, the value of the goods divided by the first quantity should fall within a certain parameter based on historical statistical averages for that commodity. Ratios outside this pre-determined parameter might indicate either a keying error or misclassification of the product.<br><br>Verify the Value of Goods, Quantity 1 and Schedule B/HTS Number, correct the shipment and resubmit (if necessary). If the line item is verified correct as reported, no action is necessary. |

## 14. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

- Commerce/E&C - Aluminum Wire Cable From China: Postponement of Preliminary Determination of Antidumping Duty Investigation

- Commerce/E&C - Carbon and Alloy Steel Threaded Rod From India, Taiwan, Thailand, and the People's Republic of China: Initiation of Less-Than-Fair-Value Investigations

- Commerce/E&C - Carbon and Alloy Steel Threaded Rod From India and the People's Republic of China: Initiation of Countervailing Duty Investigations

- Commerce/E&C - Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Continuation of Antidumping Duty Order

- Commerce/E&C - Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Continuation of Countervailing Duty Order

- Commerce/E&C - Refillable Stainless Steel Kegs From the Federal Republic of Germany, Mexico and the People's Republic of China: Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations

## 15. GAO Reports, Testimony, and Correspondence of Interest

- GAO WatchBlog - DOD: Prioritizing Amid Changing Threats - March 20, 2019

- GAO - UN PEACEKEEPING OPERATIONS: State Should Take Additional Steps to Work with the UN to Improve Effectiveness and Performance Information GAO-19-224: Published: Mar 19, 2019. Publicly Released: Mar 19, 2019

- GAO - INTERNATIONAL AIR ALLIANCES: Greater Transparency Needed on DOT's Efforts to Monitor the Effects of Antitrust Immunity GAO-19-237: Published: Mar 20, 2019. Publicly Released: Mar 20, 2019.

- CRS - U.S.-Taiwan Trade Relations - Updated March 19, 2019

- CRS - Proposed Air Force Acquisition of New F15EXs - March 19, 2019

- CRS - Joint Light Tactical Vehicle (JLTV): Background and Issues for Congress - Updated March 19, 2019

- CRS - Evaluating DOD Strategy: Key Findings of the National Defense Strategy Commission - March 19, 2019

- CRS - The International Emergency Economic Powers Act: Origins, Evolution, and Use - March 20, 2019

- CRS - NASA Appropriations and Authorizations: A Fact Sheet Updated - March 20, 2019

- CRS - Guatemala: Political and Socioeconomic Conditions and U.S. Relations - Updated March 20, 2019

- CRS - Foreign Relations Reauthorization: Background and Issues - Updated March 20, 2019

- CRS - Europe's Refugee and Migration Flows - Updated March 20, 2019

## Other Headlines

## 16. Britain's Arms Export Watchdog in Danger of Becoming Toothless

The Guardian, March 20 - As Britain's foreign secretary warns of "a shortening window of opportunity" for peace in Yemen, the hours are also counting down for weapons manufacturer Raytheon UK to explain its activities to the government's committees on arms export control (CAEC). Raytheon, the world's third largest manufacturer, was called upon to give live evidence on Wednesday. However, the company has effectively avoided face-to-face scrutiny by simply declining to attend. Raytheon is not alone. A precedent was set last year when British secretaries of state also failed to appear before the watchdog. Such conduct raises questions about CAEC's accountability and effectiveness. The body, which consists of representatives from thedefence, foreign, business and enterprise, and international development select committees, is charged with policing the government's arms export strategy. Committee members want to raise questions over UK involvement in Yemen and the supply of weapons to the Saudi-led coalition. But the refusal of Raytheon UK to appear potentially limits the committee's ability to establish what steps are being taken by manufacturers to avoid misuse and diversion of supplied arms, once export applications have been authorised by the government.

## 17. What Aircraft Does the US Air Force Need to Beat China and Russia? This New Study Has an Answer.

DefenseNews.com, March 20 - Last September, the U.S. Air Force revealed that it will need a total of 386 operational squadrons to take on future threats posed by Russia and China. A new congressionally mandated study posits that number may not be enough. Further, the Center for Strategic and Budgetary Assessments study — which has been obtained exclusively by Defense News — goes on to recommend that the Air Force begin developing a handful of new technologies not in its plans, including a stealthy weaponized drone, a new unmanned reconnaissance plane that can penetrate into contested spaces, and refueling tankers that are unlike anything in its current inventory. The study is the result of language in the 2018 defense policy bill, which called for the Air Force, the government-funded research firm MITRE Corp. as well as CSBA to make recommendations for the future force structure of the Air Force. In its study, which was delivered to Congress earlier this month, CSBA found critical shortfalls in the tanker, bomber, fighter, strike/reconnaissance drones, and command-and-control/intelligence, surveillance and reconnaissance inventories, with the bomber, tanker and drone fleets especially needing a bump in aircraft numbers.

## 18. DoD 2020 Budget Looks to Fix Shipbuilding, Ammo Industrial Base

Breaking Defense.com, March 19 - The Defense Department plans to pump $286 million into parts of the defense industrial base identified as at risk by a major White House report released late last year. The investments aim to boost everything from large shipyards to tiny suppliers of ammunition components. Budget documents released last week for fiscal 2020 fail to spell out exactly where that money will go. But Pentagon spokesperson Lt. Col. Mike Andrews told me that the money will support "a number of areas in the industrial base – such as shipbuilding and munitions – to increase readiness and ensure robust capabilities as we address the near-peer threats outlined in the National Defense Strategy." There are plenty of concerns about the health of the manufacturing sectors both in shipbuilding and ammo production, albeit for very different reasons. On the Navy side, the service currently faces a massive backlog in shipyard availabilities and that means slow repair times. A whopping 70 percent of the service's destroyers can't make it out of the shipyard on time when they come in for repairs. That has more than operational impacts. If the Navy ever

hopes to reach its goal of a 355-ship fleet, it will have to extend the lives of dozens of ships already nearing the end of their lifespans — and do so at a time when shipyard space is already stretched.

## 19. Army Both Keen, Cautious About OTA Agreements

National Defense Magazine.org, March 20 - The Army is enthusiastic about using other transaction authority agreements to fast-track procurement, but it wants to avoid overplaying its hand, said a senior service official. OTA agreements enable the Defense Department to cut through some of the bureaucratic red tape associated with the Pentagon's traditional acquisition system. Congress gave the department the expanded authority in the fiscal year 2016 National Defense Authorization Act to help speed the delivery of new capabilities. "The OTA initiative is proving to be a highly effective business tool for the Army" for research, prototyping and production efforts, said Jeff White, principal deputy to the assistant secretary of the Army for acquisition, logistics and technology. The agreements are contracting mechanisms that "you're going to see the Army explore in greater detail and probably do a lot more of," he told attendees at the Tactical Wheeled Vehicles Conference in Monterey, California, which was hosted by the National Defense Industrial Association.

## 20. More Fire Power: US Army Sets Out to Develop New Missiles in FY20

DefenseNews.com, March 20 - The U.S. Army is embarking on several new missile development programs while ramping up and accelerating other ongoing programs to deliver more fire power to the force at greater ranges, according to the service's justification books for its fiscal year 2020 budget request. The service's No. 1 modernization priority is Long-Range Precision Fires, or LRPF, because the Army believes it is central to future operations in environments where access to terrain may be difficult or entirely denied, or where soldiers lack the territorial advantage to counter threats. And the LRPF capability plays an important role the service's emerging doctrine — Multidomain Operations — where the Army and its sister services will work more in concert across sea, land, air, space and cyber domains to overtake the enemy. The Army plans to begin the development of three major missiles beginning in FY20: a land-based hypersonic missile, a mobile medium-range missile, and a future interceptor for medium-range air and missile defense.

## 21. A DoD AI Expert Is Coming — And That Could Mean Big Things for Directed Energy

C4ISRNet.com, March 20 - A vacant Pentagon position on artificial intelligence will be filled "quite soon," with a focus on cross-cutting artificial intelligence through various technologies, according to undersecretary of research and engineering Michael Griffin. Griffin, speaking to the Directed Energy Summit March 20, was asked about how AI can be applied to directed-energy weaponry, which elicited him to say, "What I know about AI can be written on the back of a tiny postage stamp." Hence, Griffin said, the R&E team is "bringing on board a very capable person quite soon, I won't name him here, to head up AI. He will, in fact, as one of the assistant directors, be reporting directly to us, and one of our goals ... that we want him to explore [is] answering exactly the question you've posed: How do we integrate AI across the other priorities?"

## 22. MBDA Doubles Down on Tiny European Laser-Weapon Project

DefenseNews.com, March 20 - Initiatives launched by the European Commission since 2017 are a "game changer" for European missile-maker MBDA, whose CEO Antoine Bouvier said those projects will "profoundly change the environment in which we work." Presenting the company's annual results this week — revenue is up to €3.2 billion (U.S. $3.6 billion) in 2018, from €3.1 billion a year earlier — Bouvier said the lineup of relatively small, European Union-sponsored activities has great potential. "Commission initiatives have a much more structuring effect than their budgets might indicate, and have a real impact," he said. Asked by Defense News to clarify this statement Bouvier took as an example the TALOS (Tactical Advanced Laser Optical System), part of the so-called 2018 Preparatory Action on Defence Research projects, for which MBDA and CILAS have been selected. The ground agreement is still in preparation but the funds — as yet unspecified — have been approved by the European Commission. The project will be implemented by the European Defence Agency.

## 23. Northrop Launches Hypersonic Defense Push

DefenseNews.com, March 19 - With the Pentagon making hypersonic weapons a priority, Northrop Grumman is throwing its hat into the ring in an attempt to claim space in the still-early hypersonic defense market. The company last week launched a new campaign website focused on hypersonic defense as part of a broader push into the business area, where the Pentagon expects to spend more than $10 billion in the next five years to develop offensive and defensive capabilities. Hypersonic defense is significantly behind hypersonic offense, something Kenn Todorov, vice president of missile defense solutions and the lead for Northrop's counter-hypersonic efforts, acknowledged in a March 19 interview. That means there is a lot of room for experimentation in how to tackle the issue.

## 24. Here's How DoD Will Invest in the Cyber Mission

FifthDomain.com, March 20 - Insights into specific military cyber programs can be challenging. However, recently available budget documents provide a peek into how the Department of Defense seeks to equip and train cyberwarriors. Specifically, details regarding U.S. Cyber Command's two most well know, and largely funded, programs — Unified Platform and the Persistent Cyber Training Environment — are clearer. In the past, the services developed their own disparate platforms for operations. Given the joint nature of cyberspace operations, DoD decided it needed a singular platform — as well as tools — that the entire cyber mission force will use. The command established something called the Joint Cyber Warfighting Architecture to guide capability development priorities across the services for singular joint use. Unified Platform will provide the cyber mission force an infrastructure capable of mission planning, data analytics and decision support, according to Air Force budget documents released March 18. The Air Force is procuring the system on behalf of Cyber Command and the joint force.

## 25. Trump to Nominate Stephen M. Dickson to Head the Federal Aviation Administration

Washington Post.com, March 19 - President Trump plans to nominate former airline executive Stephen M. Dickson to head the Federal Aviation Administration, according to a White House statement on Tuesday. Dickson, a former executive at Delta Air Lines, would

replace acting FAA Administrator Daniel K. Elwell. The FAA has been under interim leadership since January 2018, following the departure of Michael Huerta, whose five-year term had expired. The announcement comes as the agency faces increasing criticism and scrutiny over what some viewed as its slow response to the crash of an Ethiopian Airlines jetliner and questions over whether it did enough to ensure the aircraft involved in the crash, a Boeing 737 Max 8, was safe to fly. . . . Dickson, who must be confirmed by the Senate, previously served as an airline captain and senior vice president for flight operations at Delta Air Lines. In that role, he was responsible for the safety and performance of the airline's global flight operations. He was also an Air Force pilot. Dickson graduated from the U.S. Air Force Academy near Colorado Springs, and also holds a law degree from the Georgia State University College of Law.

## 26. Opinion: 386! Go On Air Force. Say it Loud. Now!

Breaking Defense.com, March 19 - The Air Force is too small for what it is being asked to do. The problem is clear to anyone familiar with the state of the service, its lack of capability and capacity, and the rise of peer threats. Unfortunately for the Air Force, that group of knowledgeable people is limited, especially in Congress. In order to convince the American people and their elected representatives of the need to grow the Air Force, service leaders must put forward a compelling and straightforward narrative of the force structure required to meet the challenges laid out in the 2018 National Defense Strategy. At the annual Air Force Association Air, Space and Cyber conference last September, Secretary of the Air Force Heather Wilson made a bold statement, unprecedented in modern Air Force history. She issued a new benchmark based on internal analysis uniting the entire service under a single narrative: "The Air Force is too small for what the nation is asking us to do…We have 312 operational squadrons today. The Air Force We Need has 386 operational squadrons by 2030."

## Upcoming Export Control and Other Trade Compliance Conferences

**March 21 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Export Control Briefing - 8:30 AM to 10:30 AM - Long Beach, California**

**March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort**

**March 25 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Professional Association of Exporters and Importers - An Evening with U.S. Assistant Secretary of Commerce for Export Administration, Rich Ashooh - 4:00 PM to 5:30 PM PDT - NVIDIA Corp., 2788 San Tomas Expressway, Santa Clara, CA**

**March 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Pittsburgh - Westin Convention Center Hotel**

**March 26-27 - American Conference Institute - 9th Advanced Industry Forum on Global Encryption, Cloud & Cyber Trade Controls - San Francisco - Marine's Memorial Club**

**March 27-28 - American Conference Institute - 6th Summit on Anti-Corruption Mexico - Mexico City - JW Marriottt Hotel Mexico City**

**April 2-3 - Society for International Affairs - 2019 Exemptions and Voluntary Disclosure/Voluntary Self-Disclosure Seminar - Long Beach, California - Renaissance Long Beach Hotel**

**April 3-4 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver, Colorado - Grand Hyatt Denver Hotel**

**April 3-4 - C5 Group - Anti-Corruption Switzerland - Zürich - Sheraton Zürich Hotel**

**April 17-18 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver - Grand Hyatt Denver Hotel**

**April 23 - American Conference Institute - 2nd National Forum on FOCI - Washington, DC - Westin Washington City Center Hotel**

**April 23-24 - Nielsonsmith - Sanctions, Anti-Corruption & Export Controls Compliance in the Middle East - Dubai, UAE**

**April 23-24 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Granite State Export Council - Complying with U.S. Export Controls - Portsmouth, New Hampshire - Portsmouth Harbor Events & Conference Center**

**April 24-25 - American Conference Institute - Fifth National Conference on CFIUS & Team Telecom - Washington, DC - Westin Washington City Center Hotel**

**April 29-May 1 - Association of Old Crows & Georgia Tech Research Institute (GTRI) - Security Cooperation Symposium: Interoperability, EW & FMS - GTRI Conference Center 250 14th Street, N.W. | Atlanta, GA 30318**

**April 30 - May 1 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Women in International Trade Orange County (WITOC) - Complying with U.S. Export Controls - Irvine, California - Hilton Irvine/Orange County Hotel**

**May 2-3 - American Conference Institute - 12th Annual Flagshp Conference on Economic Sanctions - Washington, DC**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

**May 15-16 - American Conference Institute - Foreign Corrupt Practices Act (New York) - New York City - The Westin New York at Times Square**

**May 15-17 - International Compliance Professionals Association (ICPA) - 2019 EU Conference - London - Tower Hotel**

**May 16-17 - International Compliance Professionals Association (ICPA) - 2019 ICPA Canada Conference - Toronto, Canada- Hyatt Regency Toronto Hotel**

**May 22-23 - Nielsonsmith - US Trade Controls Compliance in Europe Copnference 2019 - Munich -** *Gary Stanley, Editor of Defense and Export-Import Update, will speak at this conference.*

**May 22-23 - American Conference Institute - Anti-Corruption Brazil - São Paulo - InterContinental São Paulo Hotel**

**May 29-30 - American Conference Institute - 2nd Annual Hong Kong Summit on Economic Sanctions Compliance and Enforcement - Hong Kong**

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 7 - Society for International Affairs - 2019 Spring Golf Outing - Upper Marlboro, Maryland - Lake Presidential Golf Course**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 11-12 - American Conference Institute - 12th China Forum on Anti-Corruption - Shanghai**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**June 18-19 - C5 Group - 13th International Conference on Anti-Corruption London - London**

**June 26-27 - American Conference Institute - ITC Litigation & Enforcement - Washington, DC - Park Hyatt Washington Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**Sept. 24-25 - 12th Conference on the Foreign Corrupt Practices Act - San Francisco**

**Oct. 27 - American Conference Institute - 5th Asia Pacific Summit on Economic Sanctions Compliance and Enforcement - Singapore**

**Oct.28-29 - American Conference Institute - 8th Asia-Pacific on Anti-Corruption Singapore - Singapore**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 5-6 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to gstanley@glstrade.com.

Cordially yours,

DOC_0040055

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. +1 (202) 686-4854
Fax +1 (202) 686-2624

E-ma██████@glstrade.com

.

| From: | Gary Stanley ███████ @glstrade.com] |
| Sent: | 3/25/2019 11:56:58 AM |
| To: | Mira Ricardel [Mira.Ricardel@bis.doc.gov] |
| Subject: | Defense and Export-Import Update (March 20, 2019) |

**Dear All,**

**Good Day!**

**Gary Stanley's EC Tip of the Day:** **Where a foreign end user is not certain of the original procurement method of a an item (U.S. Foreign Military Sale or U.S. Direct Commercial Sale), the U.S. Department of State's Office of Regional Security and Arms Transfer (RSAT) is the appropriate office for the foreign end user to submit a request (PM_RSAT-TPT@state.gov). In such cases, RSAT will process the request and coordinate with DDTC. Information on RSAT and the third party transfer process can be found at www.state.gov/t/pm/rsat/index.htm. Whether for RSAT or DDTC, to facilitate adjudication of the request, RSAT asks that the foreign end user provide a best-faith statement as to what it believes to be the original acquisition method (*i.e.,* via DCS or FMS), a summary of steps taken to investigate the acquisition of the article(s), and any other information that may be helpful.**

**Today's Items:**

1. **State Dept. Publishes 2019 Civil Monetary Penalties Inflationary Adjustment**
2. **Russian National Extradited From Estonia to Face Charges of Illegal Procurement of U.S. Electronics**
3. **Staten Island Attorney Pleads Guilty to Fraud and Extortion Scheme**
4. **President Trump Takes Additional Step to Address the National Emergency With Respect to Significant Transnational Criminal Organizations**
5. **OFAC Sanctions Venezuela's State Gold Mining Company and its President for Propping Up Illegitimate Maduro Regime**
6. **OFAC Posts Technical Notice for Users of Its Sanctions Lists Data Files**
7. **Global Affairs Canada Posta Q&A's on Strengthening Canada's Export Control Program**
8. **SIPRI Examines Convergence of Biology and Emerging Technologies in Arms Controls**
9. **UK Government's Export Control Joint Unit Posts Webinar on OGELS and EU General Authorisations in a "No-Deal" Brexit**
10. **UK Government's Treasury Committee Releases Report on Anti-Money Laundering Sanctions**
11. **DoD/DSCA Updates Security Assistance Management Manual and Policy Memos**
12. **WTO News**
13. **U.S. Customs and U.S. Census/AES Updates**
14. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**
15. **GAO Reports, Testimony, and Correspondence of Interest**

**Other Headlines**

16. **Britain's Arms Export Watchdog in Danger of Becoming Toothless**
17. **What Aircraft Does the US Air Force Need to Beat China and Russia? This New Study Has an Answer.**
18. **DoD 2020 Budget Looks to Fix Shipbuilding, Ammo Industrial Base**
19. **Army Both Keen, Cautious About OTA Agreements**
20. **More Fire Power: US Army Sets Out to Develop New Missiles in FY20**
21. **A DoD AI Expert Is Coming — And That Could Mean Big Things for Directed Energy**
22. **MBDA Doubles Down on Tiny European Laser-Weapon Project**
23. **Northrop Launches Hypersonic Defense Push**
24. **Here's How DoD Will Invest in the Cyber Mission**
25. **Trump to Nominate Stephen M. Dickson to Head the Federal Aviation Administration**
26. **Opinion: 386! Go On Air Force. Say it Loud. Now!**

**Upcoming Export Control and Other Trade Compliance Conferences**

# 1. State Dept. Publishes 2019 Civil Monetary Penalties Inflationary Adjustment

(84 Fed. Reg. 9957) - Pursuant to various statutes including the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, the U.S. Department of State has issued a final rule adjusting the civil monetary penalties (CMP) for regulatory provisions it maintains and enforces. The new amounts will apply only to those penalties assessed on or after the effective date of this rule, regardless of the date on which the underlying facts or violations occurred. The following increases affect export control provisions:

22 C.F.R. Part 103 - The CWC Act provided domestic implementation of the Convention on the Prohibition of the Development, Production, Stockpiling, and Use of Chemical Weapons and on Their Destruction. The penalty provisions of the CWC Act are codified at 22 U.S.C. 6761.

• Applying the 2019 multiplier (1.02522), the new maximum amounts are as follows: Prohibited acts related to inspections, $38,549; for Recordkeeping violations, $7,710.

22 C.F.R. Part 127 - The Assistant Secretary of State for Political-Military Affairs is responsible for the imposition of CMPs under the International Traffic in Arms Regulations (ITAR), which is administered by the Directorate of Defense Trade Controls (DDTC).

• AECA section 38(e): Applying the 2019 multiplier (1.02522), the new maximum penalty under 22 U.S.C. 2778 (22 CFR 127.10(a)(1)(i)) is $1,163,217.

• AECA section 39A(c): Applying the multiplier, the new maximum penalty under 22 U.S.C. 2779a (22 CFR 127.10(a)(1)(ii)) is $845,764, or five times the amount of the prohibited payment, whichever is greater.

DOC_0040058

- AECA section 40(k): Applying the multiplier, the new maximum penalty under 22 U.S.C. 2780 (22 CFR 127.10(a)(1)(iii)) is $1,006,699.

## 2. Russian National Extradited From Estonia to Face Charges of Illegal Procurement of U.S. Electronics

The U.S. Department of Justice (DOJ) has announced that a federal grand jury has handed down a 52-count indictment charging Valery Kosmachov with engineering a scheme to illegally procure sophisticated electronic components from the United States and to smuggle them into the Russian Federation. According to the indictment filed September 21, 2017, and unsealed March 20, 2019, Kosmachov, 66, is a Russian national, naturalized citizen of Estonia, and resident of Tallinn, Estonia. He served as owner of Adimir OU and co-owner of Eastline Technology OU, along with co-defendant and Russian national Sergey Vetrov, 66. The indictment describes how Kosmachov and Vetrov used the Estonia-based companies as procurement "fronts" to obtain controlled U.S.-origin microelectronics, in part by misrepresenting that the end-users for the components were located in Estonia. The components included dual-use programmable computer chips capable of operating in austere environments making them useful in both civilian and military applications. Once in possession of the chips in Estonia, the co-defendants allegedly later smuggled them into the Russian Federation, in part by using laundered funds. In sum, Kosmachov, Vetrov, and their two companies are charged with one count of conspiracy to violate the International Emergency Economic Powers Act (IEEPA) and one count of conspiracy to commit international money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and (h). In addition, Kosmachov and Vetrov are charged with 12 substantive counts of violating the IEEPA, in violation of 50 U.S.C. § 1705, 19 counts of smuggling, in violation of 18 U.S.C. §§ 554 and 2; and 17 counts of international money laundering, in violation of 18 U.S.C. § § 1956(a)(2)(A).

## 3. Staten Island Attorney Pleads Guilty to Fraud and Extortion Scheme

The U.S. Department of Justice (DOJ) has announced that Richard Luthmann, a Staten Island attorney, has pleaded guilty to wire fraud conspiracy and extortion conspiracy in connection with a scheme starting in summer 2015 in which he and co-defendent George Padula contracted with overseas companies to sell and ship them containers of valuable scrap metal, but instead packed the containers with cheap filler material, such as concrete blocks. As part of the scheme, Luthmann registered shell companies, including Omni Metal Corporation, with the New York Department of State and recruited a client of his law practice to be the nominal president of Omni. At the direction of Luthmann and Padula, the client opened bank accounts to facilitate the fraud, and between October 2015 and December 2015, the over-seas companies wired over $500,000 to those accounts. That money was then transferred into accounts controlled by Luthmann or a co-conspirator. On December 5, 2016, Luthmann lured the victim to his law office, ostensibly to sign some paperwork. Once there, Padula and co-defendant Michael Beck blocked the victim from leaving. Beck then pulled out a firearm, aimed it at the victim's head and knee, and claimed the victim owed him $10,000 because Beck had purchased a $7,000 debt that the victim owed Padula, plus a $3,000 "vig," or interest payment, that Beck had added. The victim was then permitted to leave, but not before being warned by Padula not to contact the police. As part of his guilty plea, Luthmann stipulated that he obstructed justice following his arrest, by

sending a threatening letter to a potential witness whom he believed was cooperating with the government and violating a court order regarding discovery materials.

## 4. President Trump Takes Additional Step to Address the National Emergency With Respect to Significant Transnational Criminal Organizations

(84 Fed. Reg. 10225) - By the authority vested in him as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), the National Emergencies Act (50 U.S.C. 1601 et seq.), and section 301 of title 3, United States Code, President Trump has issued Executive Order 13863 to take additional steps to address the national emergency with respect to significant transnational criminal organizations originally declared in Executive Order 13581 of July 24, 2011 (Blocking Property of Transnational Criminal Organizations). This new Executive Order amends subsection (e) of section 3 of Executive Order 13581 to provide as follows:

(e) the term "significant transnational criminal organization" means a group of persons that includes one or more foreign persons; that engages in or facilitates an ongoing pattern of serious criminal activity involving the jurisdictions of at least two foreign states, or one foreign state and the United States; and that threatens the national security, foreign policy, or economy of the United States.

## 5. OFAC Sanctions Venezuela's State Gold Mining Company and its President for Propping Up Illegitimate Maduro Regime

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has designated CVG Compania General de Mineria de Venezuela CA, or Minerven, the Venezuelan state-run ferrous metals mining company, and its President, Adrian Antonio Perdomo Mata, targeting the illicit gold operations that have continued to prop up the illegitimate regime of former President Nicolas Maduro. These actions, taken pursuant to Executive Order (E.O.) 13850, as amended, targets an entity and an individual that operate in the gold sector of the Venezuelan economy. As a result of these actions, all property and interests in property of this entity and individual, and of any entities that are owned, directly or indirectly, 50 percent or more by this entity and individual, that are in the United States or in the possession or control of U.S. persons are blocked and must be reported to OFAC. OFAC's regulations generally prohibit all dealings by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked or designated persons. Click here for further identifying information on the designated individual and entity.

## 6. OFAC Posts Technical Notice for Users of Its Sanctions Lists Data Files

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has posted on its website a technical notice for users of its sanctions lists data files. In early February of 2019, multiple users of OFAC's data files contacted OFAC's technical support hotline to report difficulty in downloading sanctions list data files hosted at this URL: https://www.treasury.gov/ofac/downloads/. After investigating the issue, OFAC discovered that changes had been made regarding HTTP request methods. These changes generally

affected users that leverage command line connections to OFACS' website. Users who download OFAC's sanctions list data files manually via browser were not impacted by this change. Previously users were allowed to request sanctions list data files via HTTP using both POST and GET commands. The change made in February eliminated users' ability to use the POST command and only GET commands are allowed henceforth. OFAC made this change to improve the security for public file repositories and is a permanent change. Users who continue to have difficulty downloading OFAC's sanctions list data files due to this change are welcome to contact OOFAC at O_F_A_C@treasury.gov or contact OFAC's technical support hotline at 1-800-540-6322 – Menu Option 8 for assistance. OFAC understands that this change may have unexpectedly interrupted users' ability to download and access OFAC data and is working with Treasury's technical team to ensure advance notification of any future changes.

## 7. Global Affairs Canada Posta Q&A's on Strengthening Canada's Export Control Program

The Canadian Government's Global Affairs Canada has posted on its website answers to various questions asked during the the the on-line and in-person consultations on strengthening Canada's export controls. It is intended to provide further clarity on the new processes and obligations stemming from Canada's accession to the Arms Trade Treaty (ATT). The questions are grouped according to themes identified during the public consultations.

- General

- Arms trade treaty assessment criteria and substantial risk test

- Brokering controls

- Exports to the U.S.

- Firearms

- Next steps following the consultations

- The export permit process

- Compliance

## 8. SIPRI Examines Convergence of Biology and Emerging Technologies in Arms Controls

The Stockholm International Peace Research Institute (SIPRI) has released a report entitled *Bio Plus X: Arms Control and the Convergence of Biology and Emerging Technologies*. The report explores the risks and challenges posed by the interaction of developments in biotechnology and advances in three emerging technologies: additive manufacturing (so-called 3D printing), artificial intelligence and robotics. All three technologies are difficult to control, particularly due to their digitization and their dual-use nature. 'A key challenge for effective biological arms control is that treaty structures and the institutional arrangements

in ministries and government agencies do not correspond to today's technical realities,' says Dr Sibylle Bauer, Director of the SIPRI Armament and Disarmament programme. The report recommends that, to tackle the governance issues presented by emerging technologies, national governments need to monitor and assess developments in science and technology on a more systematic basis. They should also strengthen international efforts to foster responsible science and biosecurity awareness. In addition, the report suggests that the private sector should reinforce self-regulation and compliance standards.

## 9. UK Government's Export Control Joint Unit Posts Webinar on OGELS and EU General Authorisations in a "No-Deal" Brexit

The U.K. Government's Export Control Joint Unit (ECJU) has posted on its website a webinar entitled *Open General Export Licenses and EU General Export Authorisations in a No Deal Brexit*. Other than a small number of sensitive items, no licence is currently required to transfer dual-use items between the United Kingdom and other European Union countries. If the United Kingdom leaves the European Union without a deal, dual-use items from the United Kingdom to the European Union would require a licence. An Open General Licence has been created for this purpose to facilitate the export process. This webinar has been designed to assist U.K. companies to understand the status of EUGEAs and the recently published OGEL by:

• Raising awareness of the terms of the OGEL

• Providing information on the policy landscape of EU-related legislation in a no deal Brexit

• Outlining the benefit of registering early

• A Q&A session for UK companies to put questions directly to policymakers

## 10. UK Government's Treasury Committee Releases Report on Anti-Money Laundering Sanctions

The U.K. Government's Treasury Committee has released a report entitled *Economic Crime - Anti-Money Laundering Supervision and Sanctions Implementation*. The Committee examines the scale of money laundering, terrorist financing, and sanctions in the United Kingdom, the current regulatory and legislative landscape, and how individuals, firms and the wider economy have been impacted by these regimes and the implementation of them.

## 11. DoD/DSCA Updates Security Assistance Management Manual and Policy Memos

The U.S. Department of Defense's Defense Security Cooperation Agency (DSCA) has made the following updates to its Security Assistance Management Manual (SAMM) and Policy Memorandums:

• DSCA Policy Memo 19-09 Pilot Use of Foreign Military Sales (FMS) Administrative Surcharge Funds to Support Specific Requirements Generating Activities for Department of Defense (DoD)-funded Caseshas been posted.

Effective immediately, this memorandum implements a new pilot policy which allows IAs to use FMS Administrative Surcharge funds for pre-MOR activities for BPC cases on a case-by-case basis when approved by the relevant GCC and DSCA.

## 12. WTO News

- Registration opens for delayed broadcast of arbitration hearing in US-EU aircraft dispute

- Russia launches two safeguard investigations: on microwave ovens and on welded tubes of stainless steel

- DDG Wolff: A crisis properly managed can lead to a positive outcome

- Trade Policy Review: East African Community (EAC)

## 13. U.S. Customs and U.S. Census/AES Updates

- U.S. Customs - CSMS #19-000137 Title: ACE PRODUCTION Scheduled Maintenance, Tuesday 3/19/2019 @0500 ET

- U.S. Customs - CSMS #19-000138 Title: RESOLVED:Delayed Importer/Bond Query (KI/KR) Response Times

- U.S. Customs - CSMS #19-000139 Title: Information about NMFS SIM program updates

- U.S. Customs - CSMS #19-000140 Title: ACE Deployment Support Call on March 20, 2019 Cancelled

- U.S. Customs - CSMS #19-000141 Title: FDA ITACS Planned Maintenance Saturday, 3/23/19 1 AM - 6 AM ET

- U.S. Customs - CSMS #19-000142 Title: ACE CERTIFICATION Scheduled Maintenance, Wed. March 20, 2019 @ 1700 ET to 2000 ET

- U.S. Customs - CBP, Ireland Ink New Preclearance Agreement

- U.S. Customs - Integrated Trade Targeting Workshop Helps CBP to 'Unearth Unknowns'

- U.S. Customs - CBP Toronto Welcomes Beagle to Team

- U.S. Customs - Customs Bulletin and Decisions - Vol. 53, March 20, 2019, No. 7 Index

General Notices

U.S. Court of Appeals for the Federal Circuit Decisions

U.S. Court of International Trade Slip Opinions

- U.S. Census - Tips on How to Resolve AES Response Messages

| | |
|---|---|
| **Response Code: 166** | **Narrative:** Transportation Reference Number Missing<br><br>**Severity: Fatal Reason:** The Mode of Transportation is declared as Vessel and the Transportation Reference Number is missing.<br><br>**Resolution:** A number referencing the transportation booking number must be declared on a vessel shipment.<br><br>Verify the Transportation Reference Number, correct the shipment and resubmit. |
| **Response Code: 8H1** | **Narrative:** Value/Quantity 1 Out of Range - High<br><br>**Severity:** Verify<br><br>**Reason:** For the reported Schedule B/HTS Number, the Value of Goods/Quantity (1) ratio is outside of the expected range. The ratio is too high.<br><br>**Resolution:** For a particular Schedule B/HTS Number declared, the value of the goods divided by the first quantity should fall within a certain parameter based on historical statistical averages for that commodity. Ratios outside this pre-determined parameter might indicate either a keying error or misclassification of the product.<br><br>Verify the Value of Goods, Quantity 1 and Schedule B/HTS Number, correct the shipment and resubmit (if necessary). If the line item is verified correct as reported, no action is necessary. |

## 14. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

- Commerce/E&C - Aluminum Wire Cable From China: Postponement of Preliminary Determination of Antidumping Duty Investigation

- Commerce/E&C - Carbon and Alloy Steel Threaded Rod From India, Taiwan, Thailand, and the People's Republic of China: Initiation of Less-Than-Fair-Value Investigations

- Commerce/E&C - Carbon and Alloy Steel Threaded Rod From India and the People's Republic of China: Initiation of Countervailing Duty Investigations

- Commerce/E&C - Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Continuation of Antidumping Duty Order

- Commerce/E&C - Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Continuation of Countervailing Duty Order

- Commerce/E&C - Refillable Stainless Steel Kegs From the Federal Republic of Germany, Mexico and the People's Republic of China: Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations

## 15. GAO Reports, Testimony, and Correspondence of Interest

- GAO WatchBlog - DOD: Prioritizing Amid Changing Threats - March 20, 2019

- GAO - UN PEACEKEEPING OPERATIONS: State Should Take Additional Steps to Work with the UN to Improve Effectiveness and Performance Information GAO-19-224: Published: Mar 19, 2019. Publicly Released: Mar 19, 2019

- GAO - INTERNATIONAL AIR ALLIANCES: Greater Transparency Needed on DOT's Efforts to Monitor the Effects of Antitrust Immunity GAO-19-237: Published: Mar 20, 2019. Publicly Released: Mar 20, 2019.

- CRS - U.S.-Taiwan Trade Relations - Updated March 19, 2019

- CRS - Proposed Air Force Acquisition of New F15EXs - March 19, 2019

- CRS - Joint Light Tactical Vehicle (JLTV): Background and Issues for Congress - Updated March 19, 2019

- CRS - Evaluating DOD Strategy: Key Findings of the National Defense Strategy Commission - March 19, 2019

- CRS - The International Emergency Economic Powers Act: Origins, Evolution, and Use - March 20, 2019

- CRS - NASA Appropriations and Authorizations: A Fact Sheet Updated - March 20, 2019

- CRS - Guatemala: Political and Socioeconomic Conditions and U.S. Relations - Updated March 20, 2019

- CRS - Foreign Relations Reauthorization: Background and Issues - Updated March 20, 2019

- CRS - Europe's Refugee and Migration Flows - Updated March 20, 2019

## Other Headlines

## 16. Britain's Arms Export Watchdog in Danger of Becoming Toothless

The Guardian, March 20 - As Britain's foreign secretary warns of "a shortening window of opportunity" for peace in Yemen, the hours are also counting down for weapons manufacturer Raytheon UK to explain its activities to the government's committees on arms export control (CAEC). Raytheon, the world's third largest manufacturer, was called upon to give live evidence on Wednesday. However, the company has effectively avoided face-to-face scrutiny by simply declining to attend. Raytheon is not alone. A precedent was set last year when British secretaries of state also failed to appear before the watchdog. Such conduct raises questions about CAEC's accountability and effectiveness. The body, which consists of representatives from thedefence, foreign, business and enterprise, and international development select committees, is charged with policing the government's arms export strategy. Committee members want to raise questions over UK involvement in Yemen and the supply of weapons to the Saudi-led coalition. But the refusal of Raytheon UK to appear potentially limits the committee's ability to establish what steps are being taken by manufacturers to avoid misuse and diversion of supplied arms, once export applications have been authorised by the government.

## 17. What Aircraft Does the US Air Force Need to Beat China and Russia? This New Study Has an Answer.

DefenseNews.com, March 20 - Last September, the U.S. Air Force revealed that it will need a total of 386 operational squadrons to take on future threats posed by Russia and China. A new congressionally mandated study posits that number may not be enough. Further, the Center for Strategic and Budgetary Assessments study — which has been obtained exclusively by Defense News — goes on to recommend that the Air Force begin developing a handful of new technologies not in its plans, including a stealthy weaponized drone, a new unmanned reconnaissance plane that can penetrate into contested spaces, and refueling tankers that are unlike anything in its current inventory. The study is the result of language in the 2018 defense policy bill, which called for the Air Force, the government-funded research firm MITRE Corp. as well as CSBA to make recommendations for the future force structure of the Air Force. In its study, which was delivered to Congress earlier this month, CSBA found critical shortfalls in the tanker, bomber, fighter, strike/reconnaissance drones, and command-and-control/intelligence, surveillance and reconnaissance inventories, with the bomber, tanker and drone fleets especially needing a bump in aircraft numbers.

## 18. DoD 2020 Budget Looks to Fix Shipbuilding, Ammo Industrial Base

Breaking Defense.com, March 19 - The Defense Department plans to pump $286 million into parts of the defense industrial base identified as at risk by a major White House report released late last year. The investments aim to boost everything from large shipyards to tiny suppliers of ammunition components. Budget documents released last week for fiscal 2020 fail to spell out exactly where that money will go. But Pentagon spokesperson Lt. Col. Mike Andrews told me that the money will support "a number of areas in the industrial base – such as shipbuilding and munitions – to increase readiness and ensure robust capabilities as we address the near-peer threats outlined in the National Defense Strategy." There are plenty of concerns about the health of the manufacturing sectors both in shipbuilding and ammo production, albeit for very different reasons. On the Navy side, the service currently faces a massive backlog in shipyard availabilities and that means slow repair times. A whopping 70 percent of the service's destroyers can't make it out of the shipyard on time when they come in for repairs. That has more than operational impacts. If the Navy ever

hopes to reach its goal of a 355-ship fleet, it will have to extend the lives of dozens of ships already nearing the end of their lifespans — and do so at a time when shipyard space is already stretched.

## 19. Army Both Keen, Cautious About OTA Agreements

National Defense Magazine.org, March 20 - The Army is enthusiastic about using other transaction authority agreements to fast-track procurement, but it wants to avoid overplaying its hand, said a senior service official. OTA agreements enable the Defense Department to cut through some of the bureaucratic red tape associated with the Pentagon's traditional acquisition system. Congress gave the department the expanded authority in the fiscal year 2016 National Defense Authorization Act to help speed the delivery of new capabilities. "The OTA initiative is proving to be a highly effective business tool for the Army" for research, prototyping and production efforts, said Jeff White, principal deputy to the assistant secretary of the Army for acquisition, logistics and technology. The agreements are contracting mechanisms that "you're going to see the Army explore in greater detail and probably do a lot more of," he told attendees at the Tactical Wheeled Vehicles Conference in Monterey, California, which was hosted by the National Defense Industrial Association.

## 20. More Fire Power: US Army Sets Out to Develop New Missiles in FY20

DefenseNews.com, March 20 - The U.S. Army is embarking on several new missile development programs while ramping up and accelerating other ongoing programs to deliver more fire power to the force at greater ranges, according to the service's justification books for its fiscal 2020 budget request. The service's No. 1 modernization priority is Long-Range Precision Fires, or LRPF, because the Army believes it is central to future operations in environments where access to terrain may be difficult or entirely denied, or where soldiers lack the territorial advantage to counter threats. And the LRPF capability plays an important role the service's emerging doctrine — Multidomain Operations — where the Army and its sister services will work more in concert across sea, land, air, space and cyber domains to overtake the enemy. The Army plans to begin the development of three major missiles beginning in FY20: a land-based hypersonic missile, a mobile medium-range missile, and a future interceptor for medium-range air and missile defense.

## 21. A DoD AI Expert Is Coming — And That Could Mean Big Things for Directed Energy

C4ISRNet.com, March 20 - A vacant Pentagon position on artificial intelligence will be filled "quite soon," with a focus on cross-cutting artificial intelligence through various technologies, according to undersecretary of research and engineering Michael Griffin. Griffin, speaking to the Directed Energy Summit March 20, was asked about how AI can be applied to directed-energy weaponry, which elicited him to say, "What I know about AI can be written on the back of a tiny postage stamp." Hence, Griffin said, the R&E team is "bringing on board a very capable person quite soon, I won't name him here, to head up AI. He will, in fact, as one of the assistant directors, be reporting directly to us, and one of our goals ... that we want him to explore [is] answering exactly the question you've posed: How do we integrate AI across the other priorities?"

## 22. MBDA Doubles Down on Tiny European Laser-Weapon Project

DefenseNews.com, March 20 - Initiatives launched by the European Commission since 2017 are a "game changer" for European missile-maker MBDA, whose CEO Antoine Bouvier said those projects will "profoundly change the environment in which we work." Presenting the company's annual results this week — revenue is up to €3.2 billion (U.S. $3.6 billion) in 2018, from €3.1 billion a year earlier — Bouvier said the lineup of relatively small, European Union-sponsored activities has great potential. "Commission initiatives have a much more structuring effect than their budgets might indicate, and have a real impact," he said. Asked by Defense News to clarify this statement Bouvier took as an example the TALOS (Tactical Advanced Laser Optical System), part of the so-called 2018 Preparatory Action on Defence Research projects, for which MBDA and CILAS have been selected. The ground agreement is still in preparation but the funds — as yet unspecified — have been approved by the European Commission. The project will be implemented by the European Defence Agency.

## 23. Northrop Launches Hypersonic Defense Push

DefenseNews.com, March 19 - With the Pentagon making hypersonic weapons a priority, Northrop Grumman is throwing its hat into the ring in an attempt to claim space in the still-early hypersonic defense market. The company last week launched a new campaign website focused on hypersonic defense as part of a broader push into the business area, where the Pentagon expects to spend more than $10 billion in the next five years to develop offensive and defensive capabilities. Hypersonic defense is significantly behind hypersonic offense, something Kenn Todorov, vice president of missile defense solutions and the lead for Northrop's counter-hypersonic efforts, acknowledged in a March 19 interview. That means there is a lot of room for experimentation in how to tackle the issue.

## 24. Here's How DoD Will Invest in the Cyber Mission

FifthDomain.com, March 20 - Insights into specific military cyber programs can be challenging. However, recently available budget documents provide a peek into how the Department of Defense seeks to equip and train cyberwarriors. Specifically, details regarding U.S. Cyber Command's two most well know, and largely funded, programs — Unified Platform and the Persistent Cyber Training Environment — are clearer. In the past, the services developed their own disparate platforms for operations. Given the joint nature of cyberspace operations, DoD decided it needed a singular platform — as well as tools — that the entire cyber mission force will use. The command established something called the Joint Cyber Warfighting Architecture to guide capability development priorities across the services for singular joint use. Unified Platform will provide the cyber mission force an infrastructure capable of mission planning, data analytics and decision support, according to Air Force budget documents released March 18. The Air Force is procuring the system on behalf of Cyber Command and the joint force.

## 25. Trump to Nominate Stephen M. Dickson to Head the Federal Aviation Administration

Washington Post.com, March 19 - President Trump plans to nominate former airline executive Stephen M. Dickson to head the Federal Aviation Administration, according to a White House statement on Tuesday. Dickson, a former executive at Delta Air Lines, would

replace acting FAA Administrator Daniel K. Elwell. The FAA has been under interim leadership since January 2018, following the departure of Michael Huerta, whose five-year term had expired. The announcement comes as the agency faces increasing criticism and scrutiny over what some viewed as its slow response to the crash of an Ethiopian Airlines jetliner and questions over whether it did enough to ensure the aircraft involved in the crash, a Boeing 737 Max 8, was safe to fly. . . . Dickson, who must be confirmed by the Senate, previously served as an airline captain and senior vice president for flight operations at Delta Air Lines. In that role, he was responsible for the safety and performance of the airline's global flight operations. He was also an Air Force pilot. Dickson graduated from the U.S. Air Force Academy near Colorado Springs, and also holds a law degree from the Georgia State University College of Law.

## 26. Opinion: 386! Go On Air Force. Say it Loud. Now!

Breaking Defense.com, March 19 - The Air Force is too small for what it is being asked to do. The problem is clear to anyone familiar with the state of the service, its lack of capability and capacity, and the rise of peer threats. Unfortunately for the Air Force, that group of knowledgeable people is limited, especially in Congress. In order to convince the American people and their elected representatives of the need to grow the Air Force, service leaders must put forward a compelling and straightforward narrative of the force structure required to meet the challenges laid out in the 2018 National Defense Strategy. At the annual Air Force Association Air, Space and Cyber conference last September, Secretary of the Air Force Heather Wilson made a bold statement, unprecedented in modern Air Force history. She issued a new benchmark based on internal analysis uniting the entire service under a single narrative: "The Air Force is too small for what the nation is asking us to do…We have 312 operational squadrons today. The Air Force We Need has 386 operational squadrons by 2030."

## Upcoming Export Control and Other Trade Compliance Conferences

**March 21 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Export Control Briefing - 8:30 AM to 10:30 AM - Long Beach, California**

**March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort**

**March 25 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Professional Association of Exporters and Importers - An Evening with U.S. Assistant Secretary of Commerce for Export Administration, Rich Ashooh - 4:00 PM to 5:30 PM PDT - NVIDIA Corp., 2788 San Tomas Expressway, Santa Clara, CA**

**March 26-27 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Pittsburgh - Westin Convention Center Hotel**

**March 26-27 - American Conference Institute - 9th Advanced Industry Forum on Global Encryption, Cloud & Cyber Trade Controls - San Francisco - Marine's Memorial Club**

**March 27-28 - American Conference Institute - 6th Summit on Anti-Corruption Mexico - Mexico City - JW Marriottt Hotel Mexico City**

**April 2-3 - Society for International Affairs - 2019 Exemptions and Voluntary Disclosure/Voluntary Self-Disclosure Seminar - Long Beach, California - Renaissance Long Beach Hotel**

**April 3-4 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver, Colorado - Grand Hyatt Denver Hotel**

**April 3-4 - C5 Group - Anti-Corruption Switzerland - Zürich - Sheraton Zürich Hotel**

**April 17-18 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The World Trade Center Denver - Complying with U.S. Export Controls - Denver - Grand Hyatt Denver Hotel**

**April 23 - American Conference Institute - 2nd National Forum on FOCI - Washington, DC - Westin Washington City Center Hotel**

**April 23-24 - Nielsonsmith - Sanctions, Anti-Corruption & Export Controls Compliance in the Middle East - Dubai, UAE**

**April 23-24 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Granite State Export Council - Complying with U.S. Export Controls - Portsmouth, New Hampshire - Portsmouth Harbor Events & Conference Center**

**April 24-25 - American Conference Institute - Fifth National Conference on CFIUS & Team Telecom - Washington, DC - Westin Washington City Center Hotel**

**April 29-May 1 - Association of Old Crows & Georgia Tech Research Institute (GTRI) - Security Cooperation Symposium: Interoperability, EW & FMS - GTRI Conference Center 250 14th Street, N.W. | Atlanta, GA 30318**

**April 30 - May 1 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Women in International Trade Orange County (WITOC) - Complying with U.S. Export Controls - Irvine, California - Hilton Irvine/Orange County Hotel**

**May 2-3 - American Conference Institute - 12th Annual Flagshp Conference on Economic Sanctions - Washington, DC**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

**May 15-16 - American Conference Institute - Foreign Corrupt Practices Act (New York) - New York City - The Westin New York at Times Square**

**May 15-17 - International Compliance Professionals Association (ICPA) - 2019 EU Conference - London - Tower Hotel**

**May 16-17 - International Compliance Professionals Association (ICPA) - 2019 ICPA Canada Conference - Toronto, Canada- Hyatt Regency Toronto Hotel**

**May 22-23 - Nielsonsmith - US Trade Controls Compliance in Europe Copnference 2019 - Munich -** *Gary Stanley, Editor of Defense and Export-Import Update, will speak at this conference.*

**May 22-23 - American Conference Institute - Anti-Corruption Brazil - São Paulo - InterContinental São Paulo Hotel**

**May 29-30 - American Conference Institute - 2nd Annual Hong Kong Summit on Economic Sanctions Compliance and Enforcement - Hong Kong**

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 7 - Society for International Affairs - 2019 Spring Golf Outing - Upper Marlboro, Maryland - Lake Presidential Golf Course**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 11-12 - American Conference Institute - 12th China Forum on Anti-Corruption - Shanghai**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**June 18-19 - C5 Group - 13th International Conference on Anti-Corruption London - London**

**June 26-27 - American Conference Institute - ITC Litigation & Enforcement - Washington, DC - Park Hyatt Washington Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**Sept. 24-25 - 12th Conference on the Foreign Corrupt Practices Act - San Francisco**

**Oct. 27 - American Conference Institute - 5th Asia Pacific Summit on Economic Sanctions Compliance and Enforcement - Singapore**

**Oct.28-29 - American Conference Institute - 8th Asia-Pacific on Anti-Corruption Singapore - Singapore**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 5-6 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to gstanley@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. +1 (202) 686-4854
Fax +1 (202) 686-2624
Mobile █████████████████
E-mail ███████@glstrade.com

**From**: Jim Bartlett, Full Circle Compliance [____@fullcirclecompliance.eu]
**Sent**: 3/26/2019 7:26:29 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 19-0326 Tuesday "Daily Bugle"



## Tuesday, 26 March 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription.  Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1.    Items Scheduled for Publication in Future Federal Register Editions

2.    Commerce/BIS: Arnoldo Antonio Arredondo of Beaumont, TX, Denied Export Privileges for Ten Years

3.    DHS/CBP Posts Harmonized System Update 1904

4.    DoD/DSCA Posts Policy Memo 19-18

5.    State/DDTC: (No new postings.)

6.    Singapore Customs Circulars of Interest: ASEAN Single Window

### NEWS

7.    Reuters: "U.S. Sanctions Firms Accused of Helping Fund Iran's Revolutionary Guards"

8.    ST&R Trade Report: "Still No Exclusion Request Process for China List 3 Goods"

### COMMENTARY

9.    A. McGregor and C. Whitehouse: "What Are the Circumstances in Which Acting in Breach of EU Sanctions Will Kill a Claim?"

10.    Johanna Reeves Testifies Before Congress on Proposed Revision of ITAR/USML Cats I, II, and III

11.    K. Lampe and T. Lateef: "What Does a No-Deal Brexit Mean for any Future UK Sanctions Regime?"

12.    V. Gilinski and H. Sokolski: "America's Nuclear Export Controls are Fundamentally Flawed"

**EX/IM TRAINING EVENTS & CONFERENCES**

13.    ECS Presents "Mastering ITAR/EAR Challenges" on 30 Apr - 1 May in Nashville, TN

14.    ICPA Presents "2019 EU Conference", 15-17 May in London

**EDITOR'S NOTES**

15.    Bartlett's Unfamiliar Quotations

16.    Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (12 Mar 2019), DOC/EAR (20 Dec 2018), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (14 Mar 2018), DOS/ITAR (19 Mar 2018), DOT/FACR/OFAC (15 Mar 2018), HTSUS (25 Mar 2019)

17.    Weekly Highlights of the Daily Bugle Top Stories



*From the publisher of WorldECR, Dual-use Export Controls of the European Union, and The Export Compliance Manager's Handbook*

**Dual-use Export Controls in International Transit and Transhipment**

Covers the regulations in more than 40 countries. To find out more, CLICK HERE or go to

**www.worldecr.com/books**

**ITEMS FROM TODAY'S FEDERAL REGISTER**

[No items of interest noted today.]

back to top

* * * * * * * * * * * * * * * * * * *

**OTHER GOVERNMENT SOURCES**

# 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* U.S. Customs and Border Protection; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Country of Origin Marking Requirements for Containers or Holders [Pub. Date: 27 Mar 2019.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 2. Commerce/BIS: Arnoldo Antonio Arredondo of Beaumont, TX, Denied Export Privileges for Ten Years
(Source: Commerce/BIS, 26 Mar 2019.)

* Respondent: Arnoldo Antonio Arredondo, Selmer, TN
* Charges: On 28 November 2017, in the U.S. District Court for the Southern District of Texas, Arnoldo Antonio Arredondo ("Arredondo") was convicted of violating Section 38 of the Arms Export Control Act (22 U.S.C. § 2778 (2012)) ("AECA"). Arredondo was convicted of violating Section 38 of the AECA by conspiring and agreeing with others to knowingly and willfully export and cause to be exported, from the United States Munitions List, without the required U.S. Department of State licenses. Arredondo was sentenced to 46 months in prison, three years of supervised release, and an assessment of $100.
* Debarred: Denied export privileges for ten years from the date of Arredondo's conviction, until 28 November 2027.
* Date of Order: 25 Mar 2019

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 3. DHS/CBP Posts Harmonized System Update 1904
(Source: CSMS #19-000160, 26 Mar 2019.)

Harmonized System Update (HSU) 1904 was created on March 25, 2019 and contains 1,015 ABI records and 194 harmonized tariff records.

This update contains changes made to support PGA message set functionality. Some, not all, of the associated HTS codes for composite wood products, flagged with an EP7 (TSCA certification 'may be required') code, are included.

In addition, adjustments include those made as a result of the USTR's Notice of Modification to Section 301 Action: China's Acts Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation. The Notice can be found in the Federal Register dated March 25, 2019, Vol. 84 No. 57, page 11152. It can be retrieved here.

DOC_0040255

Modifications required by the verification of the 2019 Harmonized Tariff Schedule (HTS) are included as well.

The modified records are currently available to all ABI participants and can be retrieved electronically via the procedures indicated in the CATAIR. For further information about this process, please contact your client representative. For all other questions regarding this message, please contact Jennifer Keeling via email at Jennifer.L.Keeling@cbp.dhs.gov.

  - Related CSMS No. 19-000082, 19-000155.

back to top

* * * * * * * * * * * * * * * * * *

## 4. DoD/DSCA Posts Policy Memo 19-18
(Source: DoD/DSCA, 26 Mar 2019.)

* DSCA Policy Memo 19-18 Security Assistance Management Manual (SAMM) name change for Macedonia has been posted.
  - On February 15, 2019, Macedonia was renamed the Republic of North Macedonia, as reflected by the U.S. Board of Geographic Names precipitated by ratification of the 2018 Prespa Agreement. Effective immediately, SAMM Table C4.T2A. Security Cooperation (SC) Customer and Regional Codes and FMS Eligibility (Regions), is updated to indicate the new name and maintain the historical reference to the former name.

back to top

* * * * * * * * * * * * * * * * * *

## 5. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * *

## 6. Singapore Customs Circulars of Interest: ASEAN Single Window
(Source: Singapore Customs, 25 Mar 2019.)

Singapore Customs has released the following document(s) on its website:

*Notices*

* Notice No: 03/2019: Updates to Customs Circular No. 15/2017 Live Operation of the ASEAN Single Window (ASW) for the Electronic Exchange of Form D under the ASEAN Trade in Goods Agreement of the ASEAN Free Trade Area ("ATIGA")

back to top

* * * * * * * * * * * * * * * * * *



An Introduction to EU / Dutch
Dual-Use and Military Export Controls

Tuesday, 7 May 2019
Bruchem, The Netherlands



FULL CIRCLE

NEWS

## 7. Reuters: "U.S. Sanctions Firms Accused of Helping Fund Iran's Revolutionary Guards"
(Source: Reuters, 26 Mar 2019.)

The United States on Tuesday imposed fresh sanctions on a network of companies and people in Iran, Turkey and the United Arab Emirates it said was helping to raise billions of dollars to fund the operations of Iran's elite Revolutionary Guards.

The U.S. Treasury blacklisted 25 people and organizations, including a clutch of front companies based in the three countries, that were working on behalf of Iran's Islamic Revolutionary Guards Corps (IRGC) and Iran's defense ministry to raise money for their activities.

The targeted institutions include banks and other financial institutions such as Ansar Bank, Atlas Exchange, Iranian Atlas Company, the U.S. Treasury said in a statement. ...

"They created front companies to access the U.S. financial system on their own," said Hook, adding that Tehran was feeling the pressure from U.S. sanctions and created the network to look for a way around the restrictions.

He said the Ansar front companies had raised $800 million over the last year and a half to buy military vehicles and to fund the IRGC's and Quds Force operations.

Additionally, Hook said the United States was sanctioning Iran's defense ministry "for its support for terrorism" and providing logistics support to the Revolutionary Guards.

A U.S. official said the sanctions were not related to the U.S. State Department's labeling of groups as so-called foreign terrorist organizations, known as FTOs. The defense ministry was blacklisted in 2007 for its role in weapons of mass destruction proliferation, Hook added. ...

back to top

* * * * * * * * * * * * * * * *

## 8. ST&R Trade Report: "Still No Exclusion Request Process for China List 3 Goods"
(Source: Sandler, Travis & Rosenberg Trade Report, 26 Mar 2019.)

The Trump administration has yet to comply with a congressional directive to allow requests for exclusions from the Section 301 additional tariffs for most of the Chinese goods subject to such tariffs. Companies interested in seeking such exclusions should consider backing legislation that would require the administration to accept requests.

Imports of so-called List 3 goods from China, with an annual import value of about $200 billion, were assessed an additional 10 percent tariff as of Sept. 24, 2018. (Click here for a list of affected goods and details on all actions taken in this Section 301 case.) While the Office of the U.S. Trade Representative has accepted requests for tariff exclusions for List 1 ($34 billion) and List 2 ($16 billion) goods, it has not provided for exclusions for List 3 goods. Congress directed USTR to do so in an explanatory statement accompanying appropriations legislation signed into law in February and requested a report on the nature and timing of this process no later than March 17.

However, no such report has been submitted and USTR Robert Lighthizer has continued to assert that no exclusion process will be developed until tariffs on List 3 goods are increased from 10 percent to 25 percent. That was supposed to occur March 1 but in late February President Trump delayed it indefinitely.

In the meantime, lawmakers have introduced legislation that would require the establishment of a tariff exclusion request process for goods on List 3 and any future lists. As with the existing exclusion process for List 1 and List 2 goods, refunds could be sought for duties paid on any List 3 goods granted an exclusion. Additionally, efforts are underway to amend this legislation to include an appeals process for goods denied tariff exclusions, with the review possibly being conducted by the International Trade Commission.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. A. McGregor and C. Whitehouse: "What Are the Circumstances in Which Acting in Breach of EU Sanctions Will Kill a Claim?"
(Source: Reynolds Porter Chamberlain, 21 Mar 2019.)

* Authors: Andy McGregor, Esq., andy.mcgregor@rpc.co.uk, +44 20 3060 6188; and Christopher Whitehouse, Esq., christopher.whitehouse@rpc.co.uk, +44 20 3060 6024. Both of Reynolds Porter Chamberlain LLP.

An Iranian oil company was defrauded in a failed attempt to circumvent EU sanctions - does its claim survive the Patel v Mirza illegality test?

**The Transaction**

The claimant, Iranian Offshore Engineering and Construction Company or IOEC, was a contractor in the offshore oil and gas sector. In 2012, to purchase an oil rig it paid US$87 million to a company established in the BVI and controlled by one of the defendants ("Dean"). Arrangements had been made for Dean to acquire the relevant oil rig from a Maltese subsidiary of the Romanian company Grup Servicii Petroliere SA ("GSP"). Ultimately Dean failed to acquire the relevant oil rig from GSP and IOEC's payment was misappropriated by several of the defendants including IOEC's managing Director at the time, Dr Taheri. As a result, IOEC brought proceedings for breach of fiduciary duty, knowing receipt, dishonest assistance, conspiracy and deceit.

The judge found in favor or IOEC in almost all respects. Dr Taheri had been central to the fraud and the other defendants in the proceedings had provided wide-ranging assistance.

**Role of Sanctions in the Defense**

As a final line of defense, some of the defendants argued that IOEC should not succeed due to the sanctions on trading with Iran in place at the time. They ran the argument that IOEC's claim arose from a contract which was prohibited by the regulation imposing the EU Iran sanctions regime (Regulation EU/267/2012, "the Regulation") in which IOEC was specifically identified (although it ceased to be a sanctioned entity by the time it issued proceedings). The effect of that regulation was for it to be prohibited for any person subject to it to sell, supply, transfer or export drilling equipment to

IOEC. The defendants contended that the entire set of arrangements taken together was entered into for the purpose of circumventing the sanctions regime.

The judge found that the use of BVI-based Dean as an intermediary was an attempt to circumvent the sanctions regime so as to allow an EU company (GSP) to sell to a sanctioned Iranian entity. This brought into play considerations of illegality and of public policy, and required the court to ask itself whether such considerations defeated the otherwise good claims brought by IOEC.

To determine this, the court applied the test in the Supreme Court case of Patel v Mirza. That test requires the court to consider whether it would be contrary to the public interest to enforce a claim if to do so would be harmful to the integrity of the legal system. In assessing if the public interest would be harmed, the must court consider;

 - the underlying purpose of the prohibition that has been breached,
 - the relevant public policy on which the denial of the claim may have an impact and
 - whether denial of an otherwise valid claim would be a proportionate response to the illegality.

On the basis of the points above and applying the criteria set out in Patel v Mirza, the judge considered that it would not be contrary to the public interest to enforce IOEC's relevant claims. The denial of those claims:

 - would not enhance the purpose of the sanctions, given that enforcement of the claims would not provide IOEC with a rig, and the purpose of the prohibition was never to prevent the recovery of money obtained by fraud
 - would adversely impact the public policy of preventing and deterring fraud and that of the victims of fraud being able to take steps to recover money and property of which they have been defrauded; and
 - would be a disproportionate response to any illegality involved.

The following factors were at the heart of the judge's assessment:

 (a) IOEC's claims were not to enforce the sale agreement with Dean and IOEC did not and would not actually obtain the GSP Fortuna
 (b) IOEC was not, by the date of issue of proceedings, a sanctioned entity and had the transaction taken place at the date it would not have involved a breach of the sanctions regime
 (c) IOEC's complaints related to serious wrongs, which were independent of the intended breach of the sanctions regime, which only provided the opportunity for them to take place.

Accordingly, IOEC's otherwise successful claims succeeded.

**Comment**

This case provides an interesting example of the extent to which entities complicit in the breach of EU sanctions are still able to bring legal proceedings relating to matters arising out of those breaches. However, it is difficult to draw any broad principles from this case given the specific factual circumstances.

Of particular interest is the judge's analysis that it was considered material that the relevant activity beaching sanctions at the time was no longer prohibited. This reasoning might be criticized in so far as it seems odd to evaluate the severity of illegality in retrospect rather than at the time it was committed. It is also curious that the judge omits explicit consideration in the judgment of the public interest in ensuring that EU sanctions are enforced.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. Johanna Reeves Testifies Before Congress on Proposed Revision of ITAR/USML Cats I, II, and III
(Source: Editor) [Excerpts. See copy of full prepared testimony HERE.]

Testimony prepared for presentation by Johanna Reeves, Executive Director, F.A.I.R. Trade Group, to the U.S. House Committee on Foreign Affairs on March 26, 2019: "Proposed Small Arms Transfers: Big Implications for U.S. Foreign Policy"

Chairman Bera, Ranking Member Zeldin, and other distinguished members of the House Foreign Affairs Committee's Oversight and Investigations Subcommittee, thank you for inviting the F.A.I.R. Trade Group to testify today on this important issue of reform to our export control regulations, and the perceived impact such reform may have on our national security and foreign policy. ...

Almost a year ago, the Administration published the last in a series of proposed rules to reform the U.S. export control system; which reform initiative began in 2010 under the Obama Administration. The proposed rules that are at the heart of today's hearing are to transition commercially available firearms from the export controls of the U.S. Department of State's International Traffic in Arms Regulations (ITAR) to the controls of the U.S. Department of Commerce known as the Export Administration Regulations (EAR). It is interesting to note that when the Obama Administration launched the Export Control Reform (ECR) initiative, the ITAR U.S. Munitions List (USML) Categories I, II, and III, the Categories that control firearms and ammunition, were the first categories to be revised. The fact that the rules were not rolled out until May 2018 does not make it a creation of President Trump.

Although no longer branded "ECR," the proposed rules to revise Categories I, II and III are a continuation of the U.S. Government's effort to modernize U.S. export controls and better focus ITAR controls over those weapons or

articles that are inherently for military use or that provide the United States with a critical military or intelligence advantage. The purpose of the proposed revisions to the USML is to adjust the scope of the Department of State's jurisdiction to focus on those weapons or articles that are inherently for military use, or that provide the United States with a critical military or intelligence advantage. All other items will transition to the export controls of the Department of Commerce, as has happened for all previously implemented reform efforts. What is being proposed for USML Categories I, II, and III is nothing new.

Since the publication of the proposed rules for USML Categories I, II, and III, there has been a plethora of misinformation and mischaracterizations of the proposed rules. Indeed, these distortions, many of which are politically motivated, have given rise to the current attempts to prevent the President from exercising authority which Congress originally granted under the Arms Export Control Act. The fact is, the proposed transition rules are not a decontrol over the manufacture, transfer, or export of firearms or ammunition. The proposed changes are an effort to reform outdated regulations and right-size our export control system. The proposed shift in oversight responsibility is long overdue and will help strengthen the national security of the United States by ensuring that export licensing authorities can focus on those items that warrant control under the ITAR rather than waste resources on export licensing for springs and bolts for items that are abundant throughout the world. In addition, this reform is absolutely necessary to ensure "America's ability to engage effectively with the rest of the world and keep our most sensitive technology away from those who would do us harm."

These are not my words. These are the words of Defense Secretary Gates in 2010, when President Obama issued the directive to overhaul the overly complicated U.S. export controls system, a system with too many redundancies to effectively support the national security and foreign policy interests of the United States. By modernizing U.S. export controls, we could more effectively account for emerging critical technologies, whose exports would be subject to closer scrutiny than those items readily available at Walmart or hardware stores.

**Items that Have Already Transitioned from State to Commerce Export Controls**

Since the Obama Administration first rolled out ECR in 2010, several items once classified as defense articles and subject to ITAR licensing controls of the Department of State have moved over to the licensing controls of the Department of Commerce. The following USML categories were revised under the Obama Administration:

  - Launch vehicles and missiles;
  - Explosives and propellants
  - Vessels of War
  - Tanks and military vehicles
  - Military aircraft

- Training equipment
- Personal protective equipment
- Military electronics
- Fire control
- Toxicological agents
- Spacecraft and satellites
- Nuclear weapons
- Directed energy weapons
- Gas turbine engines
- Submersible vessels

The list of items that have already moved off the U.S. Munitions List and over to the Commerce Control List is extensive. Every single one of these items is subject to the same set of controls that commercially available firearms and ammunition would be, including the treatment of information published on the Internet.

**Military Weapons Will Stay Controlled Under ITAR**

Under the proposed transition rules, military weapons will remain under the State Department licensing authority. As I stated earlier, fully automatic firearms will remain under USML Category I. A fully automatic firearm includes those firearms that have the option to select either a semiautomatic function, a two or three-round burst function (in other words it fires two or three rounds with a single pull of the trigger), and also a fully automatic function. These firearms, known as "select-fire" firearms, are well recognized as military weapons. These should not be confused with purely semi-automatic firearms. To that end, some argue the AR15 rifle, a purely semi-automatic rifle, is a military-style weapon. It is not, and it should not be conflated with a rifle that has full automatic capabilities. AR15-type rifles are not used in the military, and to say there is little difference between a semi-automatic firearm and a fully automatic firearm is disingenuous. Congress itself recognized this substantial difference when it established the National Firearms Act of 1934, which imposed significant restrictions on civilian possession of fully automatic firearms, but not on semi-automatic firearms.
While it is true that soldiers in combat may use fully automatic firearms in semi-automatic mode, this is dependent on the situation and threat level. In close quarters, the military trains shooters to engage targets with controlled pairs (two shots). If fire suppression is needed, then full auto is more effective at keeping the enemy down and permits freedom of movement by friendly forces. The use of semi or single shot or controlled pair is more prevalent but it is mostly a matter of ammunition consumption so as not to waste ammunition. For the soldier, the full auto option offers reassurance and a tactically sound choice. It provides lethality overmatch and makes a smaller fighting force more effective.

The AR15, a sporting rifle that has been widely available on the commercial market since 1963, cannot and must not be grouped in the same category as the assault weapon described above. The semi-automatic AR15 (or other model) rifle does not have the design features that allows it to accept a full

automatic sear that changes its design into a machinegun capable of shooting automatically. Indeed, the current effort to reform our export control laws will allow the U.S. Government to focus more on controlling true military assault weapons.

**Domestic Controls over Firearms and Ammunition**

Any reforms to our export control system will not affect in any way domestic controls over firearms and ammunition. The Bureau of Alcohol, Tobacco, Firearms and Explosives is the agency in charge of enforcing the Gun Control Act and the National Firearms Act, and these statutes will continue to regulate the manufacture, transfer and possession of firearms and ammunition.

ATF controls over firearms in the United States extends to 3-D printed guns. The Gun Control Act prohibits the manufacture, import, sale, shipment, delivery, possession, transfer and receipt of any handgun that is undetectable by x-ray machines commonly used at airports. Violations of this statute are punishable by up to five years imprisonment and a fine of $250,000. The last time this prohibition was due to sunset in 2013, Congress passed a renewal unanimously by voice vote.

**U.S. Department of Commerce Export Controls**

  (1) Export License Requirements. It is important to remember that not all firearms and ammunition are slated to transition to Commerce controls. The firearms that will remain under the Department of State are those that are inherently military, including fully automatic firearms, regardless of the caliber, fully automatic shotguns, magazines and drums with a capacity of 50 rounds or greater, and all specially designed parts and components therefor. The types of ammunition that will remain with the Department of State include ammunition pre-assembled into links or belts, and projectiles with a core or projectile produced from tungsten, steel, or beryllium copper alloys (also referred to as armor piercing ammunition).

Contrary to many of the objections that have been voiced about the proposed rules, the transition of firearms and ammunition from State Department's oversight to the Department of Commerce's control will NOT result in a decontrol or a deregulation of these articles. Firearms transitioning to the Department of Commerce will be subject to licensing controls under National Security, Regional Stability, Crime Control and Detection, the Firearms Convention, United Nations Sanctions, and Anti-Terrorism. Indeed, the proposed rules make it abundantly clear that the Commerce Department will require U.S. Government authorization to export or reexport firearms or ammunition transitioning from the USML to ANY country, including Canada. The transition will not result in the unlicensed export of firearms and ammunition.

It must be emphasized that the proposed changes are to license processing, NOT POLICY. End-use monitoring will continue, including vetting of potential end-users, and contrary to popular belief, the State Department, as well as

the Department of Defense will remain very involved in the review of export license applications for national security and foreign policy reasons. Commerce Department will continue to staff license requests to executive agencies for review, just as State Department has done under ITAR. Of course, we must not forget the fact that the Commerce Department, like the State Department today, will not approve any license application if the export will violate the laws of the destination country.

   (2) Office of Export Enforcement. Another myth is that the Department of Commerce does not have the capability to control firearms or ammunition exports, or has looser licensing rules and procedures. In reality, the Department of Commerce has an arsenal of tools it can use, and indeed does use already to effectively control exports and enforce against export violations, including those that have not yet occurred. The Department of Commerce, Bureau of Industry and Security (BIS) Export Enforcement consists of the Office of Export Enforcement (OEE), the Office of Enforcement Analysis (OEA), and the Office of Antiboycott Compliance (OAC). The overarching mission is to protect the U.S. national security, homeland security, foreign policy and economic interests through a law enforcement program focused on: sensitive exports to hostile entities or those that engage in onward proliferation; prohibited foreign boycotts; and related public safety laws. BIS's Export Enforcement is an elite law enforcement organization recognized for its expertise, professionalism, integrity, and accomplishments. It accomplishes its mission through preventative and investigative enforcement activities and then, pursuing appropriate criminal and administrative sanctions against export violators.

In particular, the Office of Export Enforcement is dedicated to protecting U.S. national security, foreign policy, and economic interests by investigating violations, prosecuting violators of export control laws, interdicting illegal exports, and educating parties to export transactions on how to improve export compliance practices. To accomplish this, OEE Special Agents work with Commerce Department licensing officials and policy staff to deter the export of items which, in the hands of unreliable users, can prove damaging to U.S. national security and foreign policy interests.

Noteworthy is the fact that Commerce enforcement of export controls is carried out by Special Agents, sworn federal officers with "authority to bear firearms, make arrests, execute search warrants, serve subpoenas, detain and seize items about to be illegally exported, and order the redelivery to the United States of items exported in violation of U.S. law." Indeed, OEE is the only federal law enforcement agency exclusively dedicated to the enforcement of export control laws, specifically the EAR, and it works closely with the Department of Justice to prosecute criminal violations, and with the Office of Chief Counsel for Industry and Security for civil enforcement cases. Under the ITAR, the State Department's Office of Defense Trade Controls Compliance investigates export violations. This office is comprised of Compliance Specialists who are not law enforcement officers. What does this all mean? Stated plainly, this means that the Commerce Department already has in place the resources to send special agents to investigate suspected

violations of the EAR. And they do. This includes investigating suspected export violations by U.S. persons, as well as suspected unauthorized reexports or transfers by foreign persons. As outlined on OEE's website, OEE Special Agents also conduct end use checks to confirm items are being used in accordance with any license conditions, as well as to assess the suitability of foreign end-users to receive U.S.-origin licensed goods and technology, assess prospective end-users on pending license applications for diversion risk, and conduct educational outreach to foreign trade groups.

In a recent Commerce publication, Don't Let This Happen To You (Nov. 2018), in fiscal year 2017, BIS investigations led to the criminal convictions of 31 individuals and businesses for export violations with penalties of over $287 million in criminal fines, more than $166 million in forfeitures, and 576 months of imprisonment. In addition, OEE and BIS's Office of Chief Counsel completed 52 administrative export matters, resulting in over $692 million in civil penalties." In contrast, in 2017 and 2018 combined the U.S. Department of State, Directorate of Defense Trade Controls (DDTC) issued only two consent agreements.

**Fostering Competitiveness of the American Manufacturer**

Another unfortunate truth of our current export control system is the unintended harm on our ability to provide weapons to our allies. It is no secret that many foreign governments restrict bidding on supply contracts to non-ITAR-controlled product. This affects U.S. manufacturers from being able to sell firearms and firearm components, all controlled under the ITAR. To illustrate, let me draw your attention to a French tender for semi-automatic pistols. Although it does not specifically reference "ITAR-free," the governing French legislation requires the applicant offer:

  (1) A certification according to which the offeror will be able to meet all obligations in terms of export, import, transfer and transit of defense articles related to the awarded contract, including those obligations contained in any other document related to such tender; and
  (2) The indication of any restrictions resulting from any security or export-control regime applicable to such offeror and/or its defense articles or services and which affects the disclosure, transfer and/or usage of such defense articles and/or defense services (i.e. maintenance services, product support services, etc.).

The legislation does not cite to the ITAR precisely. However, because of the inherent controls of the ITAR that affect all U.S.-origin defense articles and services, especially in terms of prior export license and the required prior approvals from the Department of State for reexports or retransfers, the above provisions of the French legislation nearly eliminate any chance for success in proposing US-origin ITAR-controlled defense articles and/or services in response to this tender (and to any tender for defense articles and services issued by the French Government). On the contrary, this situation does not replicate among E.U. Member States to the extent that, E.U. member states have agreed to principles of mutual trust and reciprocity between the Member States' export control policies and procedures for the

defense sector so that once delivered to one Member State, defense articles and/or services from another Member State are controlled onward only by the recipient Member State export control policies and procedures.

Another example is the restriction on countries sourcing product made with U.S. - origin components and parts. The ITAR restrictions on reexport attach to each defense article, so that even for ITAR-controlled parts and components that are incorporated into a non-U.S. end-item, the end-item becomes subject to the ITAR requirement for advance U.S. Government approval for nearly all reexports. At this time, all firearm parts and components and accessories are subject to ITAR export and reexport controls, with very few exceptions. Regardless of the size of the part, whether it be a bolt or a spring, or a barrel or a receiver, the part is subject to ITAR restrictions on reexports. In many cases, the process for obtaining such reexport approval has resulted in significant and even detrimental delays, even when the reexport is for ally governments.

Consequently, there is a push to reduce U.S.-made components from defense products so as not to be burdened with the reexport restrictions under ITAR. Our allies are shunning U.S. products because of ITAR, both because of unreliable delivery and the inability to reexport. The result is they source their products from other countries, including Russia and China. This poses a significant threat to our national security, because not only is the U.S. removed from the immediate supply chain (including potential U.S. government oversight thereof), but long term we are isolated from the replacement and repair market. This has very significant consequences on the American defense sector, not the least of which is the firearms and ammunition manufacturers.

**Conclusion**

Because of the age and wide-scale availability of the underlying technology, most firearms do not possess characteristics or parameters that provide a critical military advantage to the United States, nor are firearms exclusively available from the United States. In fact, it is these points that make the current system of export controls particularly harmful to U.S. industry, and indeed U.S. national security because of global competition and the inability of U.S. firearms companies to compete with foreign sources.
The policies and regulations currently in place have not prevented firearms or the related technology from going to restricted places. Indeed, to our detriment they have only prevented the U.S. firearms industry from becoming reliable suppliers to our NATO and non-NATO allies, and in general competing effectively in the global market place. Similar to the challenges faced by other defense industries, the firearms trade has been negatively impacted by the incentives of foreign companies and governments to avoid U.S.-origin firearms. Our inability to effectively compete globally will undermine our firearms manufacturing base by inducing U.S. companies to move production offshore. This will affect jobs and domestic production levels, thus weakening the US Defense Industrial base. ...

DOC_0040267

We urge Congress to permit the right-sizing of the longstanding one-size-fits-all export policy for firearms and ammunition, and allow the firearms and ammunition sector to be regulated as other defense sectors are. This reform will not result in the decontrol of firearms or ammunition, and is critical to the positioning of our manufacturers in the world market and thus our national security. It is time to control exports of firearms and ammunition as we do all other sectors in the defense industry, and we look to this Committee to ensure this occurs. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. K. Lampe and T. Lateef: "What Does a No-Deal Brexit Mean for any Future UK Sanctions Regime?"
(Source: Freshfields Bruckhaus Deringer, 25 Mar. 2019)

\* Authors: Kristin Lampe, Esq., and Tahleel Lateef, Esq.. Both of Freshfields Bruckhaus Deringer LLP.

### (1) No immediate change

Following Brexit, the UK will retain its existing sanctions regime. Sanctions currently in place before Exit Day will be implemented in the UK either by the EU (Withdrawal) Act 2018 (**the Withdrawal Act**) or under new regulations created by the Sanctions and Anti-Money Laundering Act 2018 (**SAMLA**).

The Withdrawal Act carries across EU law into UK law, and enables the Government to address any deficiencies by enacting new statutory instruments. In contrast, SAMLA creates a free standing and unilateral power for the UK to impose its own sanctions.

The combined purpose of these Acts is to ensure continuity between the existing EU and new UK sanctions regimes.

### (2) Sanctions powers come home

As an EU member state, the UK's power to impose domestic sanctions is limited to certain anti-terrorism related measures.

Except certain UN measures, all other sanctions currently in effect in the UK are imposed by EU law and have direct effect in the UK under the 1972 European Communities Act, which is set to be repealed by the Withdrawal Act on Exit Day.

Post-Brexit, the UK will be free to impose unilateral sanctions that are not in line with those of the EU. Only time will tell whether the Treasury Committee's reference to "*flexible*" sanctions means a more onerous and extensive UK regime. If Brexit is delayed (or if the UK ends up staying in the

EU) it remains to be seen how the UK's powers under SAMLA will interact with the EU's Common Foreign and Security Policy.

### (3) Existing financial sanctions licenses remain valid, for now

The Office of Financial Sanctions Implementation (**OFSI**) has updated its "Post-EU" guidance to confirm that any existing financial sanctions licenses issued by the Treasury will remain valid until they expire, are revoked or are replaced by a license under the UK's new, post-Brexit regime. This indicates that business can continue as usual immediately following Brexit.

Looking ahead, the UK will no longer have to follow the EU regime on sanctions authorizations and exemptions, and new authorizations will be granted under SAMLA. It will be important for businesses to continue to monitor changes to UK sanctions in case these impact on existing licenses and to track any differences between the SAMLA and the EU retained law regimes.

*Two steps businesses can take to prepare for a no-deal Brexit:*

(1) Broaden approach to sanctions law compliance:

Currently, the UK and EU sanctions regimes are aligned, so compliance with one typically equates to compliance with the other. Post-Brexit this will no longer be guaranteed.

In the future, the UK could be more stringent than its European counterparts, particularly regarding counter-terrorism-related asset freezes. For example, the recent proscription of Hezbollah (including its political wing) as a "Terrorist Organization" could, in the weeks following Brexit, be bolstered by a corresponding asset-freeze measure under the UK's new counter-terrorism sanctions powers.

(2) Review existing UK financial sanctions licenses used to carry out European activities:

The question remains of whether financial sanctions licenses granted by UK authorities will continue to be recognized by the EU in a no-deal scenario. To date, there has been no official announcement from the EU clarifying this issue, or on more general cooperation between the UK and EU on sanctions alignment and enforcement post-Brexit.

As the final countdown to a potential no-deal Brexit continues, it is important for businesses to review any UK financial sanctions licenses used to conduct European activities and ensure that such licenses continue to be effective in the future.

back to top

* * * * * * * * * * * * * * * * * * *

DOC_0040269

## 12. V. Gilinski and H. Sokolski: "America's Nuclear Export Controls are Fundamentally Flawed"
(Source: The National Interest, 25 Mar 2019.) [Excerpts.]

* Authors: Victor Gilinski, Program Advisor for the Nonproliferation Policy Education Center (NPEC), and Henry Sokolski, Executive Director of NPEC, info@npolicy.org, +1 571-970-3187.

Washington must identify countries or regions that ought to not receive significant nuclear goods or technology, starting with the Middle East.

Congressional battles over U.S. nuclear exports revolve around terms in civil cooperation agreements intended to protect against their diversion to military uses. The latest example is the whether the proposed agreement with the Kingdom of Saudi Arabia should include a bar to uranium enrichment. It definitely should, but is this enough to keep the kingdom from making bombs?

The question applies not only to the kingdom. The civil cooperation agreements with importers are the legal basis of American trade in nuclear technology. The fundamental requirement, the sine qua non, is that such exports be subject to periodic inspection by the International Atomic Energy Agency (IAEA). There are generally additional conditions concerning the disposition of produced plutonium and production of enriched uranium. Such agreements make sense among countries with a history of observing their international commitments. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EX/IM TRAINING EVENTS & CONFERENCES

## 13. ECS Presents "Mastering ITAR/EAR Challenges" on 30 Apr - 1 May in Nashville, TN
(Source: Suzanne Palmer, spalmer@exportcompliancesolutions.com)

* What: Mastering ITAR/EAR Challenges; Nashville, TN
* When: April 30-May 1, 2019
* Where: Renaissance Nashville Hotel
* Sponsor: Export Compliance Solutions (ECS)
* ECS Speaker Panel:  Suzanne Palmer; Lisa Bencivenga; Timothy Mooney, Debi Davis, Matthew McGrath, Matt Doyle
* Register here or by calling 866-238-4018 or email spalmer@exportcompliancesolutions.com

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DOC_0040270

## 14. ICPA Presents "2019 EU Conference", 15-17 May in London
(Source: <u>ICPA</u>)

* What: 2019 EU Conference
  - Import and Export Track (click <u>here</u> for the agenda)
  - Professional Speakers
  - Hot Industry Topics
* When: 15-17 May 2019
* Where: <u>The Tower Hotel</u>, London, United Kingdom.
* Sponsor: International Compliance Professionals Association (ICPA)
* Information & Registration: Click <u>here</u>.

<u>back to top</u>

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 15. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Robert Frost** (Robert Lee Frost; 26 Mar 1874 - 29 Jan 1963; was an American poet. His work was initially published in England before it was published in America. Known for his realistic depictions of rural life and his command of American colloquial speech, Frost frequently wrote about settings from rural life in New England in the early twentieth century, using them to examine complex social and philosophical themes. Frost was honored frequently during his lifetime, receiving four Pulitzer Prizes for Poetry.)
  - *"By working faithfully eight hours a day you may eventually get to be boss and work twelve hours a day."*
  - *"Education is the ability to listen to almost anything without losing your temper or your self-confidence."*

* **A. E. Housman** (Alfred Edward Housman; 26 Mar 1859 - 30 Apr 1936; was an English classical scholar and poet, best known to the general public for his cycle of poems, *A Shropshire Lad*. Lyrical and almost epigrammatic in form, the poems wistfully evoke the dooms and disappointments of youth in the English countryside. Housman was one of the foremost classicists of his age, and has been ranked as one of the greatest scholars who ever lived. He established his reputation publishing as a private scholar and, on the strength and quality of his work, was appointed Professor of Latin at University College London and then at the University of Cambridge. His editions of Juvenal, Manilius and Lucan are still considered authoritative.)
  - *"Great literature should do some good to the reader: must quicken his perception though dull, and sharpen his discrimination though blunt, and mellow the rawness of his personal opinions."*
  - *"And malt does more than Milton can to justify God's ways to man."*

* * * * * * * * * * * * * * * * * *

# 16. Are Your Copies of Regulations Up to Date?
(Source: Editor)

* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199. Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
   - Last Amendment: 12 Mar 2019: 84 FR 8807-8809: Extension of Import Restrictions Imposed on Archaeological and Ecclesiastical Ethnological Material From Honduras

* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
   - Last Amendment: 20 Dec 2018: 83 FR 65292-65294: Control of Military Electronic Equipment and Other Items the President Determines No Longer Warrant Control Under the United States Munitions List (USML); Correction [Concerning ECCN 7A005 and ECCN 7A105.]

* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30. Implemented by Dep't of Commerce, U.S. Census Bureau.
   - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
   - HTS codes that are not valid for AES are available here.
   - The latest edition (1 Jan 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense.
   - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under Atomic Energy Act of 1954.
   - Last Amendment: 23 Feb 2015: 80 FR 9359, comprehensive updating of

regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

* DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under Atomic Energy Act of 1954.
  - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

* DOJ ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
  - Last Amendment: 14 Mar 2019: 84 FR 9239-9240: Bump-Stock-Type Devices

* DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
  - Last Amendment: 19 Mar 2019: 84 FR 9957-9959: Department of State 2019 Civil Monetary Penalties Inflationary Adjustment.
  - The only available fully updated copy (latest edition: 19 Mar 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR, please contact us to receive your discount code.

* DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders.
Implemented by Dep't of Treasury, Office of Foreign Assets Control.
  - Last Amendment: 15 Mar 2019: 84 FR: 9456-9458: List of Foreign Financial Institutions Subject to Correspondent Account or Payable-Through Account Sanctions (CAPTA List)

* USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S. International Trade Commission. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment:
25 Mar 2019: Harmonized System Update 1904, contains 1,015 ABI records and 194 harmonized tariff records
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

back to top

* * * * * * * * * * * * * * * * * *

## 17. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 7,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

\* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available <u>HERE</u>.

\* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | <u>www.FullCircleCompliance.us</u>

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu



March 2019

# EXPORT CONTROLS

# State and Commerce Should Share Watch List Information If Proposed Rules to Transfer Firearms are Finalized

DOC_0040323

**March 2019**

# EXPORT CONTROLS

## State and Commerce Should Share Watch List Information If Proposed Rules to Transfer Firearms Are Finalized

## Why GAO Did This Study

The U.S. government implements an export control system to manage risks associated with exporting sensitive items while facilitating legitimate trade. State currently controls the export of most firearms, artillery, and ammunition. Regulatory changes proposed by State and Commerce would transfer this responsibility for many of these items to Commerce, which implements export controls under different legal and regulatory authorities. The proposed changes are part of a larger export control reform effort since 2010 to transfer control of less sensitive items from State to Commerce.

GAO was asked to review the proposed changes to export controls of firearms, artillery, and ammunition. This report assesses (1) the volume and value of commercial export license applications State reviewed for these items in fiscal years 2013-2017, (2) how certain export controls differ between State and Commerce, and (3) what is known about the resource implications for State and Commerce due to the proposed transfer. GAO reviewed the proposed rules and related laws and regulations; analyzed data and documents related to licensing, end-use monitoring, and staff resources; and interviewed agency officials.

## What GAO Recommends

GAO recommends that if the proposed regulatory changes become final, State and Commerce develop a process for sharing State's internal watch list with Commerce to enhance oversight of firearms, artillery, and ammunition exports. State and Commerce agreed with GAO's recommendations.

View GAO-19-307. For more information, contact Kimberly Gianopoulos at (202) 512-8612 or GianopoulosK@gao.gov.

## What GAO Found

The Department of State (State) reviewed approximately 69,000 commercial export license applications for firearms, artillery, and ammunition valued at up to $45.4 billion during fiscal years 2013 to 2017. About two-thirds of these applications were for firearms, and the majority involved the export of non-automatic and semi-automatic firearms, which are among the items proposed for transfer from State to Department of Commerce (Commerce) control.

**Examples of Firearms and Ammunition Proposed to Transfer from Department of State to Department of Commerce Control**



Source: Bureau of Alcohol, Tobacco, Firearms and Explosives | GAO-19-307

GAO identified several differences in Commerce's and State's export controls including those related to registration, licensing, end-use monitoring, and congressional notification that, according to the agencies, would apply to firearms, artillery, and ammunition proposed for transfer. Some of these differences are due to varying requirements in applicable laws and regulations. For example, the law requires manufacturers, exporters, and brokers to register with State for items controlled by State but not for items controlled by Commerce. Additionally, while Commerce and State both screen parties to licenses against relevant watch lists, Commerce officials said they do not have direct access to State's internal watch list, which contains derogatory information from past screening of licenses for firearms, artillery, and ammunition exports. State and Commerce officials stated that, while they have held some discussions, they have not established a process for sharing watch list information. Without access to State's watch list, Commerce may lack critical information to effectively screen parties to exports of firearms and related items. State and Commerce also both have end-use monitoring programs to confirm the legitimacy of end-users but some differences exist. For example, State relies on embassy staff to conduct end-use monitoring whereas Commerce relies primarily on several officers positioned overseas specifically for this purpose. In addition, a statutory requirement to notify Congress of proposed firearms exports over $1 million would no longer apply to firearms that transfer from State to Commerce, according to Commerce officials.

According to the proposed rules and agency officials, the proposed transfer, if finalized, would result in a decline in licenses and revenues for State and an increase in licenses for Commerce, but the precise extent of these changes is unknown. State estimates that the transfer would result in a decline in revenue from registration fees but officials stated it is difficult to predict the extent of this decline. Commerce officials stated that they expected their licensing and enforcement workload to increase as a result of the transfer, if finalized, but they believe they have sufficient staff resources available to absorb the increase.

_____ **United States Government Accountability Office**

DOC_0040324

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 2 |
| | State Reviewed about 69,000 Export License Applications Valued at up to $45.4 Billion for Firearms, Artillery, and Ammunition in Fiscal Years 2013-2017 | 7 |
| | State and Commerce Export Controls Have Several Different Requirements, Including for Registration, Licensing, End-Use Monitoring, and Congressional Notification | 13 |
| | Proposed Rules, If Finalized, Would Reduce State's and Increase Commerce's Licensing Volume, but Extent of the Resource Impact on These Agencies Is Unknown | 32 |
| | Conclusions | 34 |
| | Recommendations for Executive Action | 34 |
| | Agency Comments | 35 |
| Appendix I | Objectives, Scope, and Methodology | 37 |
| Appendix II | The U.S. Munitions List and the Commerce Control List | 40 |
| Appendix III | Comments from the Department of State | 42 |
| Appendix IV | Comments from the Department of Commerce | 44 |
| Appendix V | GAO Contacts and Staff Acknowledgments | 46 |
| Tables | | |
| | Table 1: The U.S. Munitions List (USML) Categories I, II, and III | 4 |
| | Table 2: State Department and Commerce Department Export Control Systems' Legal and Regulatory Frameworks | 5 |
| | Table 3: United States Munitions List and Dates of Rule Changes under Export Control Reform | 40 |
| | Table 4: Commerce Control List Categories and Groups | 41 |

DOC_0040325

Figures

Figure 1: Volume of Export License Applications Reviewed by the Department of State for All U.S. Munitions List (USML) Categories and for Firearms, Artillery, and Ammunition (Categories I-III) Only, Fiscal Years 2013-2017    8

Figure 2: Percentage of Export License Applications for Firearms, Artillery, and Ammunition (U.S. Munitions List Categories I-III), Fiscal Years 2013-2017    10

Figure 3: Firearms, Artillery, and Ammunition Export License Applications by Geographic Region, Fiscal Years 2013-2017    12

Figure 4: Top 20 Countries of Export License Applications for Firearms, Artillery, and Ammunition, Fiscal Years 2013 to 2017    13

Figure 5: Locations of Commerce Department Export Control Officer Positions and Area of Responsibility    26

Figure 6: Percentage of State Department's End-use Checks on Firearms, Artillery, and Ammunition by Region, Fiscal Years 2013-2017    27

Figure 7: Percentage of Pre-License and Post-Shipment End-Use Checks by State for U.S. Munitions List Categories I-III and by Commerce for Commerce Control List, All Items, Fiscal Years 2013-2017    28

DOC_0040326

## Abbreviations

| | |
|---|---|
| AECA | Arms Export Control Act of 1976, as amended |
| BIS | Bureau of Industry and Security |
| CAD | Computer Aided Design |
| CCL | Commerce Control List |
| Commerce | Department of Commerce |
| DDTC | Directorate of Defense Trade Controls |
| DHS | Department of Homeland Security |
| DRL | Bureau of Democracy, Human Rights, and Labor |
| DOD | Department of Defense |
| DOJ | Department of Justice |
| EAA | Export Administration Act of 1979, as amended |
| EAR | Export Administration Regulations |
| ECO | Export Control Officer |
| ECRA | Export Control Reform Act of 2018 |
| FBI | Federal Bureau of Investigation |
| ICE | Immigration and Customs Enforcement |
| ISN | Bureau of International Security and Nonproliferation |
| ITAR | International Traffic in Arms Regulations |
| STA | Strategic Trade Authorization |
| State | Department of State |
| USML | U.S. Munitions List |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

DOC_0040327

GAO
U.S. GOVERNMENT ACCOUNTABILITY OFFICE

441 G St. N.W.
Washington, DC 20548

March 1, 2019

Congressional Requesters,

The U.S. government implements an export control system to manage risks associated with exporting sensitive items while facilitating legitimate trade. The Department of State (State) currently controls the commercial export of firearms, artillery, and ammunition, which represented approximately $7.5 billion in U.S. exports over fiscal years 2013 to 2017.[1] As part of its export controls, State, among other things, registers manufacturers, exporters, and brokers of controlled items, licenses and monitors export transactions, and notifies Congress of high value exports. Regulatory changes proposed by State and Commerce, if finalized, would transfer responsibility for controlling certain firearms, artillery, and ammunition to Commerce, which implements export controls under different legal and regulatory authorities. Under the proposed rules, the items to be transferred to Commerce control include non-automatic and semi-automatic firearms, various firearms parts and components, artillery manufactured between 1890 and 1919, and certain types of ammunition. State would maintain export controls on fully-automatic firearms and modern artillery, as well as ammunition and some of the parts and components for such items.

The proposed rules are part of a larger effort since 2010 to modernize the U.S. export control system and transfer less sensitive items from State to Commerce control. According to State's and Commerce's proposed rules, the purpose of the transfer is to limit the items that State controls to those items that provide the United States with a critical military or intelligence advantage or are inherently for military use. The State proposed rule notes that the items planned for transfer to Commerce do not meet this standard, including many items which are widely available in retail outlets in the United States and abroad.

You asked us to review the proposed changes to export controls of firearms, artillery, and ammunition. This report assesses (1) the volume and value of commercial export license applications State reviewed for these items in fiscal years 2013-2017, (2) how certain export controls differ between State and Commerce, and (3) what is known about the

---

[1]This figure represents the actual export value as reported by the Census Bureau.

GAO-19-307  Export Controls

DOC_0040328

resource implications for State and Commerce due to the proposed transfer.

To assess the volume of export license applications for firearms, artillery, and ammunition that State reviewed during fiscal years 2013 to 2017, we obtained data from the interagency export licensing database, USXPORTS, and interviewed State officials. We analyzed the data to describe the number and reported value of export license applications, the items to be exported, and the destination country, among other characteristics. We assessed these data and found them to be sufficiently reliable for the purpose of conducting these analyses. To analyze how certain export controls differ between State and Commerce, we reviewed the departments' proposed rules, relevant laws and regulations, agency guidance, and annual reports related to State's and Commerce's export controls. We also interviewed officials from Commerce, State, the Department of Homeland Security (DHS), and the Department of Defense (DOD). In addition, we analyzed State's end-use monitoring data, which we assessed and found to be sufficiently reliable for characterizing State's end-use checks of licenses for firearms, artillery, and ammunition. To assess what is known about the resource implications for State and Commerce due to the proposed transfer, we held discussions with State and Commerce officials, and reviewed State's export license data, annual budget documents, and other agency reports. For more details on our scope and methodology, see appendix I.

We conducted this performance audit from February 2018 to March 2019 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## U.S. Export Control System

The U.S. government implements an export control system to manage risks associated with exporting sensitive items and ensure that legitimate trade can still occur. The export control system is governed by a complex set of laws, regulations, and processes that multiple federal agencies administer to ensure compliance. State and Commerce each play a role in the U.S. export control system. Historically, State has controlled the

DOC_0040329

export of military items, known as defense articles and services, while Commerce has controlled the export of less sensitive items with both military and commercial applications, known as dual-use items.[2] In addition to firearms, artillery, and ammunition, State controls the export of items such as tanks, fighter aircraft, missiles, and military training, which it lists on the U.S. Munitions List (USML). Commerce controls the export of dual-use items such as computers, radars, and telecommunications equipment, which it lists on the Commerce Control List (CCL).[3]

State and Commerce both control the export of items within their jurisdictions by requiring a license or other authorization to export a controlled item; vetting the parties associated with export transactions; monitoring the end-use of exports and other compliance activities; and supporting law enforcement agencies' investigations of possible violations of export control laws and regulations. Generally, unless a license exemption[4] applies, exporters submit a license application to State if their items are controlled on the USML or to Commerce if they are controlled on the CCL to receive export approval.[5] As part of the application review process, State and Commerce consult with other agencies, including DOD. Additionally, offices within Commerce, DHS, and the Department of Justice (DOJ) investigate potential violations of export control laws and regulations, and conduct enforcement activities.

## State and Commerce Export Control Lists

Items identified on the State and Commerce export control lists are subject to different laws and regulations. The Arms Export Control Act of 1976, as amended, (AECA) provides the statutory authority to control the export of defense articles and services, which the President delegated to the Secretary of State.[6] State's International Traffic in Arms Regulations

---

[2]State uses the term "defense articles and services" to refer to the items it controls, while Commerce uses the term "items." For purposes of this report we sometimes refer to both as "items."

[3]Commerce's export control jurisdiction also includes basic commercial items that generally do not require a U.S. Government authorization unless destined to a prohibited end use, end-user, or to an embargoed or sanctioned destination. Commerce controls also include a small number of military items.

[4]State uses license "exemption" and Commerce uses license "exception" in instances in which a controlled item may be exported without the need for an approved license.

[5]Exporters may also require a license from Commerce for exports involving prohibited end uses, end-users, and embargoed or sanctioned destinations.

[6]See 22 U.S.C. § 2778 and Exec. Order 13,637 (Mar. 8, 2013).

DOC_0040330

(ITAR) implement this authority and identify the specific types of items subject to control in the USML.[7] The USML is comprised of 21 categories of items, each with multiple sub-categories, encompassing defense items such as firearms, missiles, and aircraft.[8] Firearms, artillery, and ammunition represent the first three categories of the USML (see table 1).[9] Additional information on the 21 categories of the USML is presented in appendix II. Within State, the Directorate of Defense Trade Controls (DDTC) is responsible for implementing controls on the commercial export of these items.

**Table 1: The U.S. Munitions List (USML) Categories I, II, and III**

| USML Category | Category title | Examples of items controlled |
|---|---|---|
| I | Firearms, Close Assault Weapons, and Combat Shotguns | Small arms up to .50 caliber, including non-automatic, semi-automatic, and fully automatic firearms. Silencers, mufflers, sound and flash suppressors, military-grade riflescopes, parts and components, and technical data and defense services related to the above items. |
| II | Guns and Armament | Larger guns over .50 caliber, whether towed, airborne, self-propelled, or fixed, including, but not limited to, howitzers, mortars, cannons, recoilless rifles, and grenade launchers. Related engines, tooling, test, and evaluation equipment, components, parts, accessories, and technical data and defense services for the above items. |
| III | Ammunition/Ordnance | Ammunition/ordnance for the articles in Categories I and II of this section. Handling equipment, tooling equipment, components, parts, accessories, attachments, and technical data and defense services for the above items. |

Source: GAO analysis of 22 C.F.R. § 121.1. | GAO-19-307

Note: We refer to U.S. Munitions List Categories I, II, and III as "firearms, artillery, and ammunition."

The Export Control Reform Act of 2018 (ECRA) provides the statutory authority for Commerce to control the export of less sensitive military items, dual-use items, and basic commercial items.[10] Commerce's Export Administration Regulations (EAR), which contain the CCL, implement this authority.[11] The CCL classifies less sensitive military items, dual-use

---

[7]22 C.F.R. Parts 120–130 contain the International Traffic in Arms Regulations.

[8]22 C.F.R. § 121.1, *The United States Munitions List*.

[9]Throughout this report we refer to USML Categories I-III as "firearms, artillery, and ammunition."

[10]The Export Control Reform Act of 2018 was enacted on August 13, 2018, as part of the John S. McCain National Defense Authorization Act for Fiscal Year 2019, and replaced the lapsed Export Administration Act of 1979 (EAA), as amended, as the principal legal authority for the Export Administration Regulations. See Pub. L. No. 115-232, Title XVII, Subtitle B, Aug. 13, 2018, classified at 50 U.S.C. § 4801 et seq.

[11]See 15 C.F.R. Part 774.

DOC_0040331

items, and basic commercial items in 10 categories, such as Nuclear & Miscellaneous, Electronics, and Telecommunications, and in 5 product groups. Appendix II shows the 10 categories and five groups of the CCL. Commerce's Bureau of Industry and Security (BIS) is responsible for implementing these export controls (see table 2 for a summary of the legal and regulatory frameworks for State's and Commerce's export controls).

**Table 2: State Department and Commerce Department Export Control Systems' Legal and Regulatory Frameworks**

| Agency/office | Mission | Legal authority | Implementing regulations | Control list |
|---|---|---|---|---|
| State Department's Directorate of Defense Trade Controls | Regulates and enforces controls on the export of defense articles and services | Arms Export Control Act, as amended | International Traffic in Arms Regulations | United States Munitions List |
| Commerce Department's Bureau of Industry and Security | Regulates and enforces controls on the export of dual-use items | Export Control Reform Act of 2018[a] | Export Administration Regulations | Commerce Control List |

Source: GAO. | GAO-19-307

[a]The Export Control Reform Act of 2018 was enacted on August 13, 2018, as part of the John S. McCain National Defense Authorization Act for Fiscal Year 2019, and replaced the lapsed Export Administration Act of 1979 (EAA), as amended, as the principal legal authority for the Export Administration Regulations. See Pub. L. No. 115-232, Title XVII, Subtitle B, Aug. 13, 2018, classified at 50 U.S.C. § 4801 et seq.

# Proposed Transfer of Certain Firearms from State to Commerce Jurisdiction

In May 2018, State and Commerce published proposed rules in the Federal Register to request public comments on the proposed transfer of certain items in USML Categories I, II, and III (firearms, artillery, and ammunition) to the CCL.[12] According to State and Commerce's proposed rules, the purpose of the transfer is to limit the items that State controls to those that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use. According to the proposed rules, items that do not meet these criteria would be removed from State's export control jurisdiction and moved to Commerce's jurisdiction. The proposed rules state that some, but not all, of the firearms, artillery, and ammunition currently controlled for export by State would transfer to Commerce control. The items proposed for

[12]For the State Department's proposed rule, see *International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III*, 83 Fed. Reg. 24,198 (May 24, 2018). For the Commerce Department's proposed rule, see *Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)*, 83 Fed. Reg. 24,166 (May 24, 2018).

DOC_0040332

transfer to the CCL include non-automatic and semi-automatic firearms up to .50 caliber, and non-automatic shotguns with a barrel length less than 18 inches; as well as parts, components, accessories, attachments, and ammunition for these firearms and shotguns, among other items.[13] According to the proposed rules, if finalized, State would continue to control fully-automatic firearms, shotguns, and modern artillery; silencers, components, parts, and accessories specially designed for automatic firearms and shotguns; and specific types of ammunition, including ammunition for automatic firearms.[14] The proposed rules would also make a variety of conforming changes to the USML and CCL to accommodate the transferred items.[15]

The proposed transfer of firearms, artillery, and ammunition is part of an ongoing effort to reform the export control lists by reviewing the USML categories and transferring certain items considered less sensitive to the CCL.[16] Since the export control reform initiative was first announced in 2010 with the objective of modernizing the export control system, State and Commerce have finalized various rulemakings that transferred certain items from USML Categories IV through XXI to Commerce's control.[17] Firearms, artillery, and ammunition are the last three USML

---

[13]Under the proposed rules, parts and components that are common to both semi-automatic and fully-automatic firearms would transfer to Commerce, while those that are used only in fully-automatic firearms would remain with State.

[14]As defined in 22 C.F.R. § 121.1, a firearm is a weapon not over .50 caliber (12.7 mm), which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so. State's proposed rule would incorporate a definition of a fully automatic firearm or shotgun, which is any firearm or shotgun which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. See 83 Fed. Reg. 24,198 at 24,202 (May 24, 2018).

[15]For example, if finalized, the proposed rules would renumber and eliminate certain CCL numbers to align with the transferred items.

[16]State's proposed rule notes that all references to the USML are to the list of AECA defense articles that are controlled for purposes of export or temporary import pursuant to the ITAR, and not to the list of AECA defense articles on the United States Munitions Import List that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives for purposes of permanent import under its regulations at 27 C.F.R. § 447.

[17]Commerce labeled these transferred items as the "600 series" of the CCL.

DOC_0040333

categories proposed to undergo regulatory changes under export control reform.[18]

In accordance with the AECA, the President must notify Congress of items proposed for removal from the USML and describe the nature of any controls to be imposed on the items, and may not remove the items until 30 days after providing such notice.[19] State and Commerce published the proposed rules in the Federal Register on May 24, 2018, opening a 45-day public comment period that ended on July 9, 2018. After reviewing public comments, State and Commerce submitted final rules to the Office of Management and Budget for regulatory review on November 7, 2018. The required 30-day congressional notification period pursuant to the AECA began on February 4, 2019, according to a State official.

# State Reviewed about 69,000 Export License Applications Valued at up to $45.4 Billion for Firearms, Artillery, and Ammunition in Fiscal Years 2013-2017

State reviewed 68,690 export license applications for firearms, artillery, and ammunition with a potential value of up to $45.4 billion during fiscal years 2013 to 2017.[20] The number of export license applications for firearms, artillery, and ammunition remained relatively constant from fiscal years 2013 to 2017, averaging 13,738 annually, even as the total number of licenses reviewed by State declined as the export control reform process transferred items from State to Commerce control (see fig. 1). Firearms, artillery, and ammunition increased from about 16 percent of all license applications reviewed by State in fiscal year 2013 to about 36 percent in 2017.

---

[18]GAO reported in 2012 on the potential impacts of these reforms on export control compliance and enforcement. See GAO, *Export Controls: U.S. Agencies Need to Assess Control List Reform's Impact on Compliance Activities,* GAO-12-613 (Washington, D.C.: April 23, 2012); and GAO, *Export Controls: Proposed Reforms Create Opportunities to Address Enforcement Challenges,* GAO-12-246 (Washington, D.C.: Mar. 27, 2012).

[19]22 U.S.C. § 2778(f)(1).

[20]$45.4 billion reflects the total value of export license applications for firearms, artillery, and ammunition reviewed by State over fiscal years 2013 to 2017 and does not reflect the actual export value for this time period. According to State officials, State does not approve all applications and, of those it does approve, exporters may use the export license over multiple years and may not fully utilize the potential value of the export license.

DOC_0040334

**Figure 1: Volume of Export License Applications Reviewed by the Department of State for All U.S. Munitions List (USML) Categories and for Firearms, Artillery, and Ammunition (Categories I-III) Only, Fiscal Years 2013-2017**



Number (in thousands)

Fiscal year

•••••• All USML categories

▬▬▬ Firearms, artillery, and ammunition

Source: GAO analysis of State Department data. | GAO-19-307

Note: All USML categories reflect the total number of export license applications publicly reported by the Department of State, and include certain license types that were not applicable to GAO's analysis of the number of export license applications for firearms, artillery, and ammunition.

State processes export license applications for permanent exports, temporary exports and imports, and certain types of agreements.[21] During fiscal years 2013 to 2017, about 91 percent of export license applications for firearms, artillery, and ammunition were for permanent exports, about

---

[21]An example of a temporary export is the export of a U.S. defense article to a foreign country for a trade show or for marketing purposes, which is then returned to the United States. An example of a temporary import is the import of a U.S. defense article to be repaired by a U.S. company and then returned to the foreign owner. Examples of agreements include licenses to manufacture U.S. firearms overseas or to provide certain types of technical assistance to foreign militaries in the use of firearms.

DOC_0040335

8 percent for temporary exports and imports, and about 2 percent for agreements.[22]

State can take various actions on the export license applications it receives, including approving the license, approving with conditions, returning without action,[23] and denying the license. For fiscal years 2013-2017, State approved 87 percent of the number of export license applications for firearms, artillery, and ammunition, returned without action 12 percent, and denied 1 percent.[24] State can approve an application but place conditions on the export license, such as limiting the validity period or prohibiting certain types of intermediaries in the export transaction. State can also return without action export license applications that are missing information or that it is otherwise unable to review, and can deny, revoke, suspend, or amend a license for foreign policy or national security reasons.[25]

## About Two-Thirds of Category I-III Export License Applications Were for Firearms in Fiscal Years 2013-2017

About two-thirds of the export license applications for firearms, artillery, and ammunition that State reviewed during fiscal years 2013-2017 were for firearms and related items controlled under Category I of the USML (see fig. 2). Of the applications for these items, about 57 percent involved non-automatic or semi-automatic firearms—most of which are proposed to transfer to the CCL under Commerce control—and about 4 percent involved fully-automatic firearms—which would remain on the USML

---

[22]These percentages include both original applications and amendments to each type of export license, and may not sum to 100 percent due to rounding. ITAR requires amendments for administrative changes or corrections for typographical errors. During fiscal years 2013 to 2017, about 6 percent of the export license applications for firearms, artillery, and ammunition were amendments.

[23]According to State, "return without action" is a denial without prejudice, typically due to missing information or documentation, or because State does not have confidence in some aspect of the transaction.

[24]In terms of license value, State approved about $25.4 billion, or approximately 56 percent, of the $45.4 billion in export license applications for firearms, artillery, and ammunition over fiscal years 2013 to 2017.

[25]Per 22 C.F.R. § 126.7, additional grounds for denying a license to applicants include violations of regulations or export agreements, ineligibility to contract with the U.S. government, being the subject of a complaint or having been convicted of violating certain criminal statutes, debarment or suspension from a U.S. government agency, failure to include information expressly required on a license application, and being subject to sanctions under other relevant U.S. laws.

DOC_0040336

under State control.[26] The remainder of export license applications for Category I items included other types of firearms such as combat shotguns, firearm attachments such as silencers and riflescopes, firearm parts and components, and technical data and defense services related to these items. The proposed rules state that some of these items would transfer to Commerce control while others would remain under State control.[27]

**Figure 2: Percentage of Export License Applications for Firearms, Artillery, and Ammunition (U.S. Munitions List Categories I-III), Fiscal Years 2013-2017**



**5%**
Artillery

**8%**
Multiple

**21%**
Ammunition

**66%**
Firearms

**N = 68,690**

Source: GAO analysis of State Department data  |  GAO-19-307

Note: The category "Multiple" includes export license applications for items controlled in more than one category of United States Munitions List Categories I, II, and III.

---

[26]Non-automatic and semi-automatic firearms are controlled in USML Sub-Category I(a) and fully-automatic firearms are controlled in USML Sub-Category I(b). Our analysis of State's export license applications data excludes amendments to export license applications as they are not associated with a USML Sub-Category in State's licensing data since an amendment cannot change the type of item specified for export in the original application. Of the 57 percent of Category I export license applications that involved non-automatic or semi-automatic firearms and the 4 percent that involved fully-automatic firearms, about 1 percent involved both types of firearms.

[27]Due to limitations with the level of detail included in the licensing data we analyzed, we were unable to estimate the exact number of export license applications for firearms, artillery, and ammunition that will transfer from State to Commerce control if the proposed rules are finalized.

DOC_0040337

As shown in figure 2, export license applications for Category II artillery were about 5 percent of all Category I-III license applications from fiscal years 2013 through 2017. According to State, under the proposed rules, modern artillery, their ammunition, and certain related parts and components would remain under State's control.[28] Category III ammunition represented about 21 percent of the Category I-III export license applications. As stated in the State and Commerce proposed rules, USML Category III would be revised to specifically list the ammunition that it controls, which would include ammunition that has only or primarily military applications. Generally, ammunition used in the non-automatic and semi-automatic firearms that are proposed to transfer to Commerce control would also transfer.[29] About 8 percent of the export license applications involved items controlled in more than one category of USML Categories I, II, and III, which are shown as "Multiple" in figure 2.

## Volume of Category I-III Export License Applications Varied by Geographic Region of End-User in Fiscal Years 2013-2017

In fiscal years 2013 to 2017, 32 percent of license applications for the export of firearms, artillery, and ammunition were intended for end-users in countries in Europe and Eurasia, 29 percent to the Western Hemisphere, 24 percent to East Asia and the Pacific, 7 percent to the Near East, 3 percent to Africa, 3 percent to South and Central Asia, and 2 percent to multiple countries (see fig. 3). Export license applications for firearms, artillery, and ammunition during fiscal years 2013 to 2017 included applications for end-users spanning 189 countries and territories, yet the top 20 countries represented about 70 percent of the total number of applications (see fig. 4).

---

[28]Under the proposed rules, artillery manufactured between 1890 and 1919 and military flame throwers with an effective range less than 20 meters, both of which are currently controlled under USML Category II, would transfer to Commerce.

[29]According to State, ammunition otherwise controlled by Commerce would be State controlled when it is belted or linked.

DOC_0040338

**Figure 3: Firearms, Artillery, and Ammunition Export License Applications by Geographic Region, Fiscal Years 2013-2017**



**2%**
Multiple

**3%**
South and Central Asia

**3%**
Africa

**7%**
Near East

**24%**
East Asia and Pacific

**29%**
Western Hemisphere

**32%**
Europe and Eurasia

N = 64,226

Source: GAO analysis of State Department data. | GAO-19-307

Note: This analysis excludes amendments to export license applications. Amendments are not associated with a destination country in State's licensing data since an amendment cannot change the destination country or countries specified in the original application. The category "Multiple" includes export license applications for end-users in multiple countries, which may be located in one or more geographic regions.

DOC_0040339

**Figure 4: Top 20 Countries of Export License Applications for Firearms, Artillery, and Ammunition, Fiscal Years 2013 to 2017**



Number (in thousands)

N = 43,991

Source: GAO analysis of State Department data.   |   GAO-19-307

Note: This analysis excludes amendments to license applications as amendments are not associated with a destination country. It also excludes license applications where the destination country includes more than one country.

# State and Commerce Export Controls Have Several Different Requirements, Including for Registration, Licensing, End-Use Monitoring, and Congressional Notification

State's and Commerce's export controls are guided by different laws, regulations, or policies that have several different requirements for registration, licensing, end-use monitoring, congressional notification, public reporting, and enforcement. The AECA requires manufacturers, exporters, and brokers of items on the USML to register with State whereas there is no registration requirement in the law for manufacturers, exporters, and brokers of items on the CCL under Commerce's jurisdiction. Differences also exist in how State and Commerce screen export license applications and in their license requirements. For example, State and Commerce rely on different internal watch lists to screen applicants. In addition, according to Commerce, certain exports that currently require a State license would not require a Commerce license once transferred to Commerce's jurisdiction. State and Commerce also conduct end-use monitoring of selected controlled exports differently. For example, State relies primarily on embassy staff to conduct end-use checks and Commerce relies primarily on several export control officers based overseas for this responsibility. In addition, congressional

DOC_0040340

notification and public reporting requirements that under current law apply to firearms on the USML would not be applicable if they are transferred to the CCL. Finally, there are some differences in enforcement of export control laws, such as different maximum fines for civil violations, depending on whether the item is controlled by the ITAR under State's jurisdiction or controlled by the EAR under Commerce's jurisdiction.

## The Law Requires Registration for Items on the USML but Not for Items on the CCL

The AECA requires manufacturers, exporters, and brokers of defense articles or services listed on the USML to register annually with State's Directorate of Defense Trade Controls (DDTC) whereas there is no requirement in the law for registration for manufacturers, exporters, and brokers of items on the CCL.[30] State reported having 13,083 registrants across all 21 USML categories in fiscal year 2017. Registration, which requires a fee payment of at least $2,250 per year,[31] is generally a precondition for obtaining a State export license, unless State grants an exception to a manufacturer or exporter, or a broker is eligible for an exemption. According to a State document, registration provides important information on the identity and location of defense companies and conveys management responsibility for compliance with export control laws. Those registering must disclose any foreign ownership or affiliations and certify that they have not been indicted, otherwise charged with, or convicted of export control violations and other crimes.[32] Manufacturers and exporters whose entire product line transfers to the CCL would no longer have to register, according to Commerce's

---

[30]22 U.S.C. § 2778(b)(1)(A). See also State regulations 22 C.F.R. Part 122 regarding the registration requirement for manufacturers and exporters and 22 C.F.R. Part 129 regarding the registration requirement for brokers. Brokering activities are defined in 22 C.F.R. § 129.2 as "any action on behalf of another to facilitate the manufacture, export, permanent import, transfer, re-export, or retransfer of a U.S. or foreign defense article or defense service, regardless of its origin."

[31]The fee increases depending on the number of licenses registrants have submitted to State.

[32]See 22 C.F.R. § 120.27 for a list of the applicable criminal statutes.

DOC_0040341

proposed rule, while those that manufacture or export any items that remain on the USML, would continue to register with DDTC.[33]

## Differences Exist in State and Commerce Applicant Screening Processes and License Requirements

### Both Agencies Review Export License Applications Using an Interagency Process

State's and Commerce's processes for reviewing export license applications involve opportunities for other Departments to review applications. While DDTC has primary responsibility for reviewing State's commercial export license applications, other bureaus within State, as well as DOD, also review certain applications, depending on the defense article, defense service, or the destination country. Commerce export license applications also involve an interagency review that includes State, DOD, and the Department of Energy, depending on the item to be exported.[34] Both departments have a process for resolving disagreements among the reviewing bureaus or agencies on the disposition of the application.[35] According to State officials, as part of the interagency review process for Commerce licenses, State has generally reviewed applications for items that have previously moved from the USML to the

[33]According to State officials, State will continue to require brokers to register with DDTC for certain items moving to Commerce, including non-automatic and semi-automatic firearms. All items on the United States Munitions Import List are defense articles under the AECA, and the permanent import control of these items has been delegated to the Attorney General. See 22 U.S.C. 2778(a)(1); Exec. Order 13,637 (2013); 27 C.F.R. § 447.21.

[34]According to State and Commerce officials, the Department of Energy is not involved in reviewing State's license applications for firearms, artillery, and ammunition and would not be part of initial reviews of Commerce license applications for such items if the proposed transfer is finalized. However, Energy would be part of Commerce's interagency review process when departments involved in the initial application reviews disagree.

[35]For example, Executive Order 12981 established an interagency review process for reaching a decision on Commerce license applications in which reviewing departments disagree. An Operating Committee with representatives of the Departments of Commerce, State, Defense, and Energy and non-voting representatives of the Joint Chiefs of Staff and the Nonproliferation Center of the Central Intelligence Agency reviews all such license applications. A dissenting department can escalate a license decision to an Advisory Committee on Export Policy at the Assistant Secretary level, followed by an Export Administration Review Board at the Secretary level and, ultimately, to the President for a final decision to approve or deny the license. Exec. Order 12,981 (1995).

DOC_0040342

CCL and would continue to do so for items that would transfer to the CCL under the proposed rules.[36]

Moreover, DOD officials told us that DOD intends to review Commerce export license applications for these items during the interagency review process, if the proposed transfer is implemented. This would represent a change from DOD's current practice to generally not review State's firearms license applications. DOD officials told us that if the proposed rules are finalized, they believed it is prudent to begin reviewing Commerce license applications for items that would transfer under the proposed rules, at least initially.

## State and Commerce Use Different Watch Lists to Screen Parties to the Export Transaction

State and Commerce each maintain their own internal watch lists to screen all parties identified on license applications. A watch list match would trigger further review of the license and ultimately can result in a denial of the license in some cases. State and Commerce also use watch lists as a means of targeting transactions for possible end-use checks to verify legitimacy of end-users of controlled exports. Both departments' watch lists include any derogatory information they collect internally from their past screening and end-use monitoring of licenses. For example, if information is identified raising questions about the legitimacy of a party to a license during the application review, that information would be used to update the watch list to inform future license application reviews. State's and Commerce's watch lists also include information from automated databases maintained by other U.S. agencies as well as information from law enforcement agencies and the intelligence community.[37] State's watch list contains over 200,000 entries, including sensitive details related to ongoing and previous law enforcement activities, according to State officials.

---

[36]The Bureau of International Security and Nonproliferation would have lead responsibility at State for reviewing Commerce licenses for items the proposed rules identify for transfer from the USML to the CCL, as it currently does for items previously transferred from the USML to the CCL, according to State officials.

[37]State and Commerce also rely on the "Consolidated Screening List," a publicly available file that consolidates other screening lists including: State's "Debarred List," which identifies parties denied export privileges; State's "Nonproliferation Sanctions List," which identifies parties that have been sanctioned under various statutes; multiple Department of the Treasury lists related to sanctions; and Commerce's "Parties of Concern" lists. Parties of Concern lists include: Commerce's "Denied Persons List," which identifies parties denied export privileges; Commerce's "Unverified List," which identifies end-users who Commerce has been unable to verify in prior transactions; and Commerce's "Entity List," which identifies foreign parties that are prohibited from receiving some or all controlled items unless the exporter first receives a license.

DOC_0040343

According to Commerce officials, because State has been responsible for export controls of firearms, artillery, and ammunition, its internal watch list is also more likely than Commerce's to include derogatory information collected from past screening and end-use monitoring related to exports of these items. However, Commerce does not have access to State's watch list, according to State and Commerce officials. These officials noted that a Commerce licensing officer can ask State to screen an applicant with State's watch list on a case-by-case basis, although such checks are not done routinely.

State and Commerce officials told us that, in anticipation of the transfer of firearms, artillery, and ammunition to Commerce's responsibility, the two departments are engaged in ongoing discussions to potentially share State's watch list with Commerce.[38] According to State officials, these discussions involve determining which specific watch list information Commerce would need and State is able to share, depending on the source of the information. State and Commerce also have to resolve the sharing and updating of information using different information technology infrastructures, according to department officials. As of February 2019, the departments had not reached agreement or established a documented process to achieve the goal of sharing watch list information before implementation of the proposed transfer would occur, according to State and Commerce officials.

Information sharing is supported by a policy statement included in the ECRA. The statement says that among other factors, the "export control system must ensure that it is transparent, predictable, and timely, has the flexibility to be adapted to address new threats in the future, and allows seamless access to and sharing of export control information among all relevant United States national security and foreign policy agencies."[39] Without access to State's watch list, if the proposed rules are finalized, Commerce may lack critical information needed to effectively screen license applicants for firearms and related exports and target possible cases for end-use monitoring to ensure that these exports are used as intended and by legitimate end-users.

---

[38]Discussions also involve the possibility of sharing information from Commerce's watch list with State, according to State officials.

[39]50 U.S.C. § 4811(8).

DOC_0040344

## Both Agencies Screen License Applications for Human Rights Concerns but Statutory Prohibition Applies Differently

Both State and Commerce screen license applications for human rights concerns, but the federal law that prohibits exports to the governments of certain foreign countries on human rights grounds applies differently to items under State's jurisdiction than under Commerce's. Under Section 502B of the Foreign Assistance Act of 1961, as amended, in general, "no security assistance may be provided to any country the government of which engages in a consistent pattern of gross violations of internationally recognized human rights."[40] For this provision, "security assistance" is defined in part as any license in effect with respect to the export to or for the armed forces, police, intelligence, or other internal security forces of a foreign country of (1) any defense articles or defense services licensed for export under section 38 of the AECA, or (2) items listed under the 600 series of the CCL.[41] Licenses under Commerce's jurisdiction generally may not be issued for items defined as "crime control and detection instruments and equipment" to a country, the government of which engages in a consistent pattern of gross violations of internationally recognized human rights.[42] For items under Commerce's jurisdiction, the Commerce proposed rule specifies that concern for human rights is a regulatory reason for denying a license for firearms and ammunition under Commerce's Export Administration Regulations (EAR).[43]

Within State, the Bureau of Democracy, Human Rights and Labor (DRL) is primarily responsible for screening export license applications to ensure that exports do not involve parties with human rights concerns. According to DRL officials, the bureau reviews applications for exports to specific countries where human rights concerns exist and prioritizes applications for firearms exports because they are often associated with human rights

---

[40]22 U.S.C. § 2304(a)(2).

[41]22 U.S.C. § 2304(d)(2)(C).

[42]22 U.S.C. § 2304(a)(2). In addition, the United States Conventional Arms Transfer Policy, updated in a Presidential Memorandum on April 19, 2018, also provides a basis for screening applications based on human rights. The policy states that it will "continue to meet the requirements of all applicable statutes, including … the Foreign Assistance Act." The policy also includes human rights among the considerations to be accounted for in arms transfer decisions.

[43]This proposed rule states that it would apply the regional stability licensing policy set forth in 15 C.F.R. § 742.6(b)(1)(i) to the items, including firearms and ammunition, controlled for regional stability reasons. The regulation states that licenses will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world.

DOC_0040345

abuses committed by government police and military units. The officials noted, however, that State rarely denies an export license based solely on human rights concerns. If firearms are transferred to Commerce's responsibility, DRL will continue to have the primary role in screening license applications for human rights as part of the Commerce-led interagency review process, according to DRL officials. For Commerce license applications, however, State's position would be weighed together with the positions of Commerce, DOD, and Energy, according to Commerce officials.[44] By contrast, for State export license applications, State alone makes the final determination, according to State officials.

## State Has Different Requirements than Commerce for End-Users to Certify They Will Not Re-Export Certain Licensed Exports

State and Commerce have different end-user certification requirements. State's export control regulations require that for certain items, applicants provide a written certification from end-users that they will not re-export, resell, or otherwise dispose of the commodity outside of the country listed on the license.[45] This requirement generally applies to all items on the USML that are designated as Significant Military Equipment, including firearms, and ammunition.[46] In contrast, Commerce generally does not require end-user certification for items on the CCL but does require it when it has not verified the legitimacy of end-users and may also impose this requirement on a case-by-case basis.[47] Written end-user certification provides additional assurance and accountability that end-users will comply with the terms and conditions of the license, according to State

---

[44]These officials further explained that Commerce's interagency review process would then apply if there is disagreement among the departments' positions. While Energy would not be involved in the initial review of firearms licenses, it is one of the agencies involved in the interagency review.

[45]22 C.F.R. § 123.10.

[46]In most instances, State has waived this requirement for applications with a quantity of less than 50 of certain types of firearms and less than 100,000 rounds of ammunition.

[47]See 15 C.F.R. § 748.11. In addition, pursuant to 15 C.F.R. § 750.7(d), for all Commerce licenses, it is the licensee's responsibility to communicate in writing the specific license conditions to the parties to whom those conditions apply, and this is an export control record that must be retained under the EAR as specified in 15 C.F.R. § 762.2(b )(27). Commerce licenses also include the following standard condition to help keep licensed transactions within their authorized scope: "Unless limited by a condition set forth below, the export, reexport or transfer (in-country) authorized by this license is for the item(s), end-use(s), and parties described in the license application and any letters of explanation. The applicant is responsible for informing the other parties identified on the license, such as ultimate consignees and end-users, of the license's scope and of the specific conditions applicable to them. BIS has granted this license in reliance on representations the applicant made in the license application, letters of explanation, and other documents submitted."

DOC_0040346

officials. It also is a deterrent and provides documentary evidence that can be later used in court, if necessary, according to an official from Immigration and Customs Enforcement (ICE).

**The Law Requires Disclosure of Political Contributions, Fees and Commissions for Items on the USML but Not for Items on the CCL**

The AECA states that the Secretary of State shall require reporting on political contributions, gifts, commissions, and fees paid or offered, or agreed to be paid by any person in connection with a commercial sale of an item listed on the USML to or for the armed forces of a foreign country or an international organization.[48] State's export control regulations also require license applicants to disclose certain payment of political contributions, fees, and commissions for certain sales of defense articles and defense services.[49] This requirement applies to exports of $500,000 or more. Applicants must report political contributions in an aggregate amount of $5,000 or more and paid fees or commissions in an aggregate amount of $100,000 or more. Applicants must provide a letter to DDTC containing specific information about the sale, including the amounts of political contributions, fees, or commissions paid, and the name and nationality of each recipient. The disclosures are intended to ensure that purchases made by foreign governments of U.S. defense articles are based on merit without improper influence. Failure of applicants to comply with these disclosure requirements can result in additional oversight measures and civil penalties.[50] According to an ICE official, this disclosure information may provide valuable information in criminal or civil matters. There is no requirement in the law for these disclosures for items listed on the CCL and Commerce licenses do not require these disclosures. Therefore, this information would no longer be collected as part of the licensing process for firearms, artillery, and ammunition that are proposed for transfer to the CCL, according to Commerce officials.

---

[48]22 U.S.C. § 2779(a)(2).

[49]These regulations (22 C.F.R. Part 130) implement Section 39(a) of the AECA (22 U.S.C. § 2779), which requires the U.S. Secretary of State to report on political contributions, gifts, commissions, and fees paid, offered, or agreed to be paid by any person in connection with a sale of defense articles or defense services to or for the armed forces of a foreign country or international organization in order to solicit, promote, or otherwise to secure the conclusion of such sale.

[50]For example, in 2011 DDTC entered into a consent agreement with BAE systems for 2,591 violations of the AECA and ITAR, including failure to report the payment of fees or commissions.

DOC_0040347

According to Commerce, Certain Exports That Require a State License Would Not Require a Commerce License if Transferred to the CCL

Consistent with export control regulations, there are several circumstances in which some exports proposed for transfer that currently require State licenses would either require fewer or no Commerce licenses if the proposed rules are finalized, according to Commerce.

**Multiple end-users on one license.** State requires licenses to be limited to only one end-user, while Commerce allows multiple end-users on a single license. The applicant for a State export license must provide a purchase order documenting the proposed export to a single end-user and an additional license would be required for each additional end-user. According to Commerce officials, a Commerce license can have multiple end-users associated with a particular consignee, reducing the total number of licenses for which the applicant must apply.[51]

**Technical data and defense services.** State requires licenses for defense services and technical data whereas Commerce's export controls do not generally apply to defense services and apply to technical data more narrowly than State. State's regulations define defense services as "the furnishing of assistance (including training) to foreign persons … in the design, development, engineering, manufacture, production, assembly, testing, repair, maintenance, modification, operation, demilitarization, destruction, processing or use of defense articles." State's definition of defense services also includes military training of foreign units and forces including publications, training exercises, and military advice.[52] State's definition of technical data includes information, such as blueprints, drawings, or instructions.[53] Commerce's export control regulations generally do not apply to services.[54] For example, training in the basic operation of a firearm controlled by Commerce would not be subject to export controls, according to State officials. In addition, Commerce's regulations do not control technology or software, if it is "available to the public without restrictions."[55] For example, Commerce

---

[51]State and Commerce export licenses are generally valid for up to 4 years.

[52]See 22 C.F.R. § 120.9.

[53]22 C.F.R. § 120.10 defines technical data and 22 C.F.R. § 120.6 includes technical data in the definition of a defense article.

[54]See 15 C.F.R. § 734.3. Services are generally not included among items subject to Commerce's export controls. However, according to Commerce officials, there can be circumstances where providing a service involves the release of technology that is subject to Commerce's export controls.

[55]See 15 C.F.R. § 734.7.

DOC_0040348

officials told us that Commerce would not require an export license for the posting of instructions for 3D printing of firearms on the internet, if they were publicly available without restrictions.[56]

**Minimum level of U.S.-origin content.** Items subject to State's controls require a license when they are incorporated into a foreign-made product regardless of the percentage of controlled U.S. content in that product. Commerce does not require a license for items when they are incorporated into foreign-made items unless the controlled U.S.-origin content of a foreign-made product exceeds the applicable minimum percentage which, according to Commerce officials, may be 10 or 25 percent, depending on the destination. This minimum level of U.S.-origin content is referred to as "de minimis treatment."[57] Commerce's proposed rule states that de minimis treatment in Commerce's regulations would apply for all foreign-made items proposed for transfer to the CCL, unless they are being exported to a country that is subject to a United States arms embargo, in which case there would be no minimum threshold for U.S.-origin content.

**License exceptions.** State regulations contain some country-based license exceptions, including for exports to Canada[58] and, more narrowly, to Australia and the United Kingdom[59] whereas Commerce has several different license exceptions under its regulations.[60] For example, Commerce regulations have the "Strategic Trade Authorization" (STA)

---

[56]Prior to June 2018, State restricted the distribution of computer aided design ("CAD") files for the automated production of 3D printed weapons by a private company based on its authority under 22 C.F.R. § 120.6 and 22 C.F.R. § 120.10 to control the export of technical data. State's position was that posting instructions for 3D printing certain firearms "could cause serious harm to U.S. national security and foreign policy interests." However, on June 29, 2018, State reached a settlement agreement in a case with the private company to reverse this restriction with respect to those files described in the settlement agreement. On July 31, 2018, a U.S. District Court granted a temporary restraining order to keep the restriction in place on the distribution of the CAD files described in the settlement agreement for the production of 3D printed weapons.

[57]See 15 C.F.R. § 734.4.

[58]See 22 C.F.R. § 126.5. State uses the term, "license exemption," and Commerce uses the term, "license exception," for circumstances in which a license is not required to export controlled items.

[59]See 22 C.F.R. § 126.16 regarding exemptions for Australia and 22 C.F.R. § 126.17 regarding the United Kingdom.

[60]15 C.F.R. Part 740 describes the different license exceptions available under Commerce's export control regulations.

DOC_0040349

exception that permits exports of certain items to countries determined to be low risk, which includes NATO partners and other close allies, of which 37 are eligible for a broader STA authorization and seven are eligible for a much narrower STA authorization.[61] Commerce's proposed rule specifies that it would revise Commerce's regulations to make firearms and most parts, components, accessories, and attachments ineligible for the STA license exception. However, Commerce estimates that 450 to 650 license applications per year involving certain eligible items would still be authorized under STA exceptions if the proposed rules are finalized.

Commerce also has a "Limited Value Shipment" exception, which is available for proposed exports of certain less sensitive firearms parts and components with a value of $500 or less per shipment based on the actual selling price or fair market value.[62] Commerce's proposed rule specifies that this exception would only be available for certain parts, components, and accessories and attachments for firearms; complete firearms would be ineligible for this exception. State offers a similar exemption but only for licenses with a value of $100 or less, based on the wholesale price.[63]

# State and Commerce Both Conduct End-Use Monitoring of Selected Controlled Exports but Differences Exist

## State and Commerce Both Implement End-Use Monitoring Programs

State and Commerce both conduct end-use monitoring to verify the reliability of foreign end-users and legitimacy of proposed transactions and to provide reasonable assurance of compliance with the terms of the license and proper use of the licensed items. State recommends that end-

---

[61]See 15 C.F.R. § 740.20. To be eligible for this license exception, exporters must provide Commerce with a "destination control statement" notifying the foreign consignee of certain requirements; exporters must also obtain from the foreign consignee a statement acknowledging their understanding and willingness to comply with these requirements, including a prohibition against re-exporting the items without a license or re-exporting to destinations outside the STA-eligible countries.

[62]See 15 C.F.R. § 740.3.

[63]See 22 C.F.R. § 123.17(a).

DOC_0040350

use checks involve a site visit whenever possible, while Commerce policy requires that the end-use check include a physical verification on-site with a party to the transaction, according to Commerce officials. State and Commerce also apply their own means of risk-based targeting to select the licenses or exports that will undergo end-use monitoring, however, similarities exist involving selection criteria. For example, State and Commerce may target transactions that involve unfamiliar foreign parties, unusual shipping routes, or derogatory information from watch lists, according to the departments. The number of end-use checks conducted by State averaged about 1.3 percent of its license applications, and those conducted by Commerce averaged about 3.3 percent of its applications from fiscal years 2013-2017.

State and Commerce end-use checks may result in either "favorable" or "unfavorable" findings. Commerce may also categorize an end-use check as "unverified." An "unfavorable" or "unverified" result occurs if the end-use check cannot verify information in the license or reveals facts that are inconsistent with the license. For either State or Commerce, an unfavorable end-use check can lead to denying applications, revoking licenses, removing parties from licenses, updating the watch list, or making referrals to U.S. law enforcement agencies for investigation, according to a State report and Commerce officials. State closed 166 of 766, or 22 percent, of end-use monitoring cases as "unfavorable" in fiscal years 2013-2017 for firearms, artillery, and ammunition licenses.[64] State's three most common reasons for an unfavorable finding for end-use checks for firearms, artillery, and ammunition were derogatory information on a foreign party, inability to confirm order or receipt of goods, and involvement of an unlicensed party.[65]

State relies on U.S. embassy or consulate staff in the country or countries involved in the transaction to conduct its end-use checks. Commerce relies primarily on Export Control Officers (ECOs) positioned overseas to conduct end-use checks. ECOs conducted an average of about 60 percent of Commerce's end-use checks per year from fiscal years 2013 to 2017. According to Commerce officials, Commerce had a total of nine

---

[64]State noted that because of the risk-based selection process, transactions targeted for end-use checks are more likely to result in unfavorable findings than a random sampling of license applications.

[65]In the State end-use data we analyzed, State can assign multiple reasons for each unfavorable end-use check. In its public reporting, however, State assigns one primary reason for each unfavorable end-use check.

DOC_0040351

ECO positions in Beijing, Dubai, Frankfurt, Hong Kong, Istanbul, New Delhi, and Singapore, as of October 2018 (see fig. 5). Six of these nine positions were filled as of this date.[66] The ECOs have areas of responsibility covering multiple countries within their geographic region. For the remaining 40 percent of end-use checks, Commerce relied primarily on its "Sentinel Program" in which BIS special agents based in domestic field offices, along with other responsibilities, travel to destination countries not covered by ECOs to conduct end-use checks.[67] In addition, a small percentage of Commerce's end-use checks are conducted by Foreign Commercial Service officers or other personnel stationed at U.S. embassies, according to Commerce officials.

---

[66]As of October 18, 2018, the three vacant overseas ECO positions were in Beijing (one of the two positions based there), Frankfurt (one of the two positions based there), and New Delhi.

[67]According to Commerce officials, each year, the Sentinel program selects countries for visits to conduct end-use checks based on a variety of factors. Among those factors considered are the previous year's end-use check locations, volume of licensed exports to a country, past unfavorable end-use monitoring results, and the number of open investigative cases and leads connected to entities in each country. Typically, these visits are done by two-person teams for 2 weeks.

DOC_0040352

**Figure 5: Locations of Commerce Department Export Control Officer Positions and Area of Responsibility**



Location of ECO positions

Frankfurt | Istanbul | Dubai | New Delhi | Singapore | Hong Kong | Beijing

▨ Countries within an ECO Area of Responsibility

☐ Countries not within an ECO Area of Responsibility

Sources: GAO analysis of Commerce Department data; Map Resources (map). | GAO-19-307

Note: As of October 18, 2018, there were 9 Export Control Officer (ECO) positions: Beijing, China (2), Dubai, United Arab Emirates; Frankfurt, Germany (2); Hong Kong; Istanbul, Turkey; New Delhi, India, and Singapore. Three of the positions were vacant: Beijing, China (1); Frankfurt, Germany (1); and New Delhi, India.

**State Conducted Many of its End-Use Checks in the Western Hemisphere Where Commerce Currently Has No Export Control Officers**

State conducted 766 end-use checks for firearms, artillery, and ammunition in fiscal years 2013-2017 with the largest share, over 40 percent, in the Western Hemisphere (see fig. 6). None of Commerce's overseas ECO positions are located in this region nor do any cover it within their areas of responsibility. According to Commerce officials, the number and locations of end-use checks for firearms, artillery, and ammunition, if these items are transferred to the CCL, will depend on how exports of these items factor into the department's existing targeting criteria. To the extent that Commerce needs to conduct end-use checks for these items in the Western Hemisphere, Commerce officials told us

DOC_0040353

that they plan to cover these checks via the Sentinel Program and, where necessary, through checks by Foreign Commercial Service Officers. The officials noted that they plan to reassess their end-use monitoring efforts after items are transferred to the CCL if the proposed rules are finalized.

**Figure 6: Percentage of State Department's End-use Checks on Firearms, Artillery, and Ammunition by Region, Fiscal Years 2013-2017**



Source: GAO analysis of State Department data. | GAO-19-307

## State Conducted More than Half of Its End-Use Checks before Issuing Licenses, While Commerce Conducted Most after Shipment

End-use checks include pre-license checks in support of the license application review or post-shipment verifications after the license has been approved and items have shipped.[68] As shown in figure 7, more than 50 percent of State's end-use checks specifically for firearms, artillery, and ammunition licenses from fiscal years 2013 to 2017 were pre-license checks. Conversely, about 90 percent of Commerce's end-use checks for all items subject to the EAR for this period were post-shipment verifications. Commerce noted that it conducts mostly post-

---

[68]Commerce may also conduct end-use checks for unlicensed exports of controlled items, such as those that qualified for a license exception. State conducts some checks after licenses are issued but before shipments are made, although such checks are relatively rare, according to State officials.

DOC_0040354

shipment verifications because it controls a higher share than State of items that are exported without a license.

**Figure 7: Percentage of Pre-License and Post-Shipment End-Use Checks by State for U.S. Munitions List Categories I-III and by Commerce for Commerce Control List, All Items, Fiscal Years 2013-2017**



Source: GAO analysis of State Department and Commerce Department data.  | GAO-19-307

Note: State conducts some checks, known as post-license/pre-shipment checks, after licenses are issued but before shipments are made. We were unable to determine if any end-use checks included in the data provided by State fell into this category. Such checks are relatively rare, according to State officials.

## State Is Required by Law to Notify Congress of Certain Export License Applications for Firearms, Artillery, and Ammunition While Commerce Is Not

The AECA requires State to notify Congress before State can approve certain export licenses for firearms, artillery, and ammunition. These notification requirements depend on the proposed export value and type of export, among other factors. For example, the AECA requires State to notify Congress of proposed licenses for the export of USML Category I firearms in the amount of $1 million or more. Additionally, State must notify Congress of proposed licenses for commercial agreements that involve the overseas manufacture of certain USML items, including many

DOC_0040355

firearms, artillery, and ammunition items, regardless of the proposed value.[69]

During fiscal years 2013 to 2017, State identified 240 export license applications involving firearms, artillery, and ammunition that required congressional notification, totaling approximately $2.5 billion. Additionally, State identified 41 license applications for commercial technical assistance or manufacturing license agreements involving the overseas manufacture of firearms, artillery, and ammunition that required congressional notification, totaling approximately $5.7 billion.

According to State and Commerce officials, these congressional notification requirements would no longer apply to firearms, artillery, and ammunition that move from State's to Commerce's export control responsibility because the requirements apply specifically to USML controlled items.[70] The proposed rule transferring firearms to Commerce's responsibility does not revise Commerce's export control regulations to add a congressional notification requirement for firearms, according to Commerce officials.

## State Is Required by Law to Publicly Report More Details on Controlled Exports than Commerce

The Foreign Assistance Act, as amended, requires State to report to Congress annually on military assistance and military exports to the governments of each foreign country and international organization and specifies that the report include "a statement of the aggregate dollar value and quantity of semiautomatic assault weapons, or spare parts for such weapons."[71] The Act also requires that State post all unclassified

---

[69]22 U.S.C. § 2776 subsections (c) and (d) specify the notification requirements for Category I firearms and commercial agreements involving overseas manufacture, respectively. 22 U.S.C. § 2776 also establishes other congressional notification requirements that depend on the proposed export value, type of USML items, and the destination country.

[70]22 U.S.C. § 2776(c) also applies to major defense equipment listed on the 600 series of the CCL, as required by 22 U.S.C. § 2778(f)(6). Also, 50 U.S.C. § 4813(c) requires Commerce to notify Congress at least 30 days before issuing a license to export, re-export, or transfer in-country controlled items if they are destined for a designated state sponsor of terrorism or could make a significant contribution to the military potential of the government of a country that has repeatedly provided support for acts of international terrorism or could enhance the ability of such country to support acts of international terrorism. This requirement applies to State licenses as well. This is a continuation of notification requirements previously found in Section 6(j) of the EAA.

[71]22 U.S.C. § 2415.

DOC_0040356

information from this report on the internet. To comply with this requirement, State posts an annual report that includes the aggregate dollar value and quantity of defense articles and services, by USML category, licensed to each foreign country and international organization, as well as data on the actual shipments occurring during the fiscal year. The report also includes an appendix that breaks out exports specifically for the USML sub-category I(a), which includes non-automatic and semi-automatic firearms, and sub category I(h), which includes firearms components, parts, accessories, and attachments.

This reporting requirement only applies to exports of items on the USML, which are licensed by State under the AECA, but does not apply to exports controlled by Commerce. This information on exports, by country, would no longer be available for firearms and other items from Categories I-III of the USML after they are transferred to the CCL if the proposed rules are finalized, according to Commerce officials.

## Some Differences Exist between Export Control Enforcement of Items Controlled by State and Commerce

The statutory penalties available for criminal violations of export control laws are the same regardless of whether the items are on the USML and controlled by State or on the CCL and controlled by Commerce. Criminal violations may result in fines up to $1 million and prison terms up to 20 years, or both.[72]

Under the AECA, civil violations of State's export controls may result in a fine of up to $500,000[73] but, according to State officials, can be much higher based on inflation under the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended.[74] State told us that actual civil penalties for civil violations in 2018 ranged from $824,959 to $1,134,602. By contrast, the ECRA set the penalty for civil violations of Commerce's export controls at up to $300,000 or twice the value of the transaction that is the basis of the violation, whichever is of greater value.[75] According to

---

[72]See 22 U.S.C. § 2778(c) regarding violations of State's export controls and U.S.C. § 4819(b) regarding violations of Commerce's export controls.

[73]See 22 U.S.C. § 2778(e).

[74]See 28 U.S.C. § 2461 note for requirements for federal agencies to adjust civil monetary penalties.

[75]28 U.S.C. § 4819(c)(1).

DOC_0040357

Commerce officials, this can substantially increase the monetary penalty for civil violations.

Criminal violations of either State's or Commerce's export control laws may result in prohibiting the violator from involvement in future exports of controlled items.[76] The AECA also precludes the issuance of State licenses to persons convicted of violating certain federal laws, such as the Foreign Corrupt Practices Act.[77] Similarly, Commerce can deny the export privileges, including the ability to obtain a license, of companies and individuals for a period of 10 years from the date of conviction for violating certain federal laws.[78] This prohibition can be expanded to include other related parties, such as those connected with the denied person by virtue of affiliation, ownership, or control.

Agencies with responsibility for export control enforcement can vary depending on whether items are controlled by State or Commerce. According to DHS officials, ICE has jurisdiction to investigate potential export control violations and U.S. Customs and Border Protection has primary enforcement responsibility for export control violations at the border, seaports, and airports. The Federal Bureau of Investigation (FBI) can also investigate these cases involving items controlled by either State or Commerce. According to Commerce, the Office of Export Enforcement in BIS has over 100 special agents in U.S.-based field offices authorized to investigate potential violations of Commerce's export control laws. These investigative resources would be available, in addition to DHS and FBI, to address illegal firearms trafficking if the proposed transfer is implemented, according to Commerce officials.

---

[76]See 22 U.S.C. § 2778(g) and 22 C.F.R. § 127.11 for the effect of past ITAR violations and 50 U.S.C. § 4819(e) and 15 C.F.R. § 766.25 for the effect of past EAR violations.

[77]22 U.S.C. § 2778(g)(4). In addition to the statutory bar to issuance of a license, State has also stated a policy against issuing licenses to persons convicted of violating certain additional export control or national security related statutes (see 22 C.F.R. §§ 127.11 and 120.27).

[78]50 U.S.C. § 4819(e).

DOC_0040358

# Proposed Rules, If Finalized, Would Reduce State's and Increase Commerce's Licensing Volume, but Extent of the Resource Impact on These Agencies Is Unknown

## According to State, the Proposed Transfer Would Impact Resources from State Fee Collections to an Uncertain Extent

State expects to lose revenue from registration fees if the proposed transfer of firearms, artillery, and ammunition to Commerce is implemented. State estimates in its proposed rule that the transfer would result in about 10,000 fewer license applications per year for Category I-III items—a reduction of about 26 percent from the 38,862 applications that State processed in fiscal year 2017.[79] State estimates a recurring annual registration fee revenue loss of about $2.5 million, according to its proposed rule.[80] State officials told us, if the proposed rules become final, there would be additional revenue declines from an uncertain drop in the number of registrants that State cannot estimate. They explained that because many manufacturers and exporters would likely be involved in items controlled by State as well as Commerce, they would still need to register with State. Others involved only in items moving to Commerce would no longer have to register with State. For example, according to State officials, a manufacturer of both semi-automatic weapons that the proposed rules identify for transfer to the CCL and fully automatic weapons that would stay on the USML would still be required to register with State, if the proposed rules are finalized. State officials noted that the decline in the number of license applications resulting from previous transfers of items from the USML to the CCL has not produced a

---

[79]We could not independently assess the accuracy of State's estimated reduction in licenses resulting from the proposed transfer. For additional information, see appendix I.

[80]State charges a tiered registration fee, the amount of which is based on the number of license applications the registrant submitted in the prior year. The fee for registrants in the third, and highest, tier is generally $2,750 plus $250 times the total number of applications over ten. Commerce does not charge any fees.

DOC_0040359

proportional decline in registration revenue. According to data provided by State, registration revenue has dropped less than 25 percent from about $47 million in fiscal year 2013 to about $36 million in fiscal year 2017, while the number of export license applications has dropped more than 50 percent from about 83,000 to almost 39,000.

With the decline in license workload that State expects would result if the proposed rules are finalized, State officials told us that four contractors currently responsible for reviewing licenses for firearms and ammunition in DDTC could be moved to other teams with vacancies in order to review licenses for other controlled items. On the other hand, State's Bureau of International Security and Nonproliferation (ISN), which has lead responsibility at State for reviewing Commerce licenses for items transferring from the USML to the CCL, expects to see an increase in its workload. An ISN official told us his bureau could potentially need an additional 2.5 full-time equivalent staff to review items transferred to the CCL as part of Commerce's interagency review process.

## Commerce Officials Believe They Have Sufficient Resources to Handle an Increase in Workload Resulting from the Proposed Transfer

Commerce estimates in its proposed rule that it would gain 6,000 additional license applications from the proposed transfer—an increase of about 18 percent above the 34,142 license applications it reviewed in fiscal year 2017.[81] Commerce officials told us that the increased workload to review license applications will also create more work for some related activities. For example, Commerce expects the number of investigative leads and export enforcement investigations to include more firearms-related actions.[82] However, Commerce officials told us they have not estimated the magnitude of these changes.

---

[81]According to Commerce officials, Commerce's estimate of 6,000 additional export license applications that would result from the proposed transfer is smaller than State's estimated reduction in licenses due to differences in licensing requirements, which we describe earlier in this report. For example, Commerce does not require licenses for defense services and offers license exceptions under certain circumstances. We could not independently assess the accuracy of Commerce's estimated gain in licenses that would result if the proposed rules become final. For additional information, see appendix I.

[82]Commerce does not plan to increase the number of end-use checks it conducts annually in response to expected increases in the number of license applications that would result from the transfer. Commerce officials told us they will continue to select high-risk transactions based on their targeting strategy and priorities. The target number of end-use checks has been 850 per year for the past several years, but increased to 1,020 beginning in fiscal year 2019 to account for the addition of ECOs in Germany and Turkey, according to Commerce officials.

DOC_0040360

Commerce officials told us they believe they have enough resources to absorb the increase in workload.[83] They noted that they have flexibility to shift license review staff to meet demand created by the additional licenses, if necessary. In addition, BIS received an 18 percent increase in full-time equivalent staff positions, from 367 to 432, in fiscal year 2018. This increase was in response to workload demands created by previous transfers of items from the USML to the CCL, according to Commerce officials. Commerce officials told us that they will continue to assess workload data after the proposed transfer is implemented to determine whether they have adequate staff levels to meet increased workload demands.

## Conclusions

If finalized, the proposed rules to transfer certain firearms, artillery, and ammunition from Categories I-III of the USML to the CCL would apply Commerce's export control system to these items instead of State's. However, critical information needed to effectively screen applicants and target licenses for end-use monitoring may be unavailable to Commerce unless State shares its watch list data. Further, because State has been responsible for export controls of firearms, artillery, and ammunition, its watch list is more likely than Commerce's to include derogatory information collected from past screening and end-use monitoring related to exports of these items, according to Commerce officials. While State and Commerce officials said that they have held discussions regarding how to share relevant information from their internal watch lists, as of February 2019, they had not reached any agreement on how to share watch lists if the proposed rules are finalized. Without such an agreement or process to share State's watch list, Commerce may lack critical information needed to ensure that items proposed for transfer are used as intended and by legitimate end-users.

## Recommendations for Executive Action

We are making a total of two recommendations, including one to State and one to Commerce.

If responsibility for controlling the exports of certain firearms, artillery, and ammunition is transferred from State to Commerce, the Secretary of State should ensure that the Under Secretary of State for Arms Control and

---

[83]In 2012, we recommended that State and Commerce assess the potential impact of export control list reforms on the resource needs of their compliance activities. Both departments implemented this recommendation. See GAO-12-613.

DOC_0040361

International Security Affairs develops a process for sharing State's internal watch list with Commerce to enhance oversight of these items. (Recommendation 1)

If responsibility for controlling the exports of certain firearms, artillery, and ammunition is transferred from State to Commerce, the Secretary of Commerce should ensure that the Under Secretary of Commerce for Industry and Security develops a process for receiving State's internal watch list and integrating it into Commerce's licensing review process to enhance oversight of these items. (Recommendation 2)

## Agency Comments

We provided a draft of this report to State, Commerce, DOD, DHS, and DOJ for review and comment. In their written comments, reproduced in appendixes III and IV, State and Commerce agreed with our recommendations. Commerce provided some minor revisions to the recommendation, which we incorporated. DOD, DHS, and DOJ did not provide written comments. In addition, State, Commerce, and DOJ provided technical comments, which we incorporated as appropriate.

We are sending copies of this report to the appropriate congressional committees and the Secretaries of State, Commerce, Defense, and Homeland Security; and the Attorney General of the United States. In addition, the report is available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-8612 or gianopoulosk@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix V.

Kimberly Gianopoulos
Director, International Affairs and Trade

DOC_0040362

*List of Requesters*

The Honorable Robert Menendez
Ranking Member
Committee on Foreign Relations
United States Senate

The Honorable Dianne Feinstein
Ranking Member
Committee on the Judiciary
United States Senate

The Honorable Richard Blumenthal
United States Senate

The Honorable Benjamin Cardin
United States Senate

The Honorable Richard Durbin
United States Senate

The Honorable Patrick Leahy
United States Senate

DOC_0040363

# Appendix I: Objectives, Scope, and Methodology

Our objectives were to assess (1) the volume and value of commercial export license applications State Department (State) reviewed for firearms, artillery, and ammunition—Categories I-III of the U.S. Munitions List (USML)—in fiscal years 2013-2017, (2) how certain export controls differ between State and Commerce, and (3) what is known about the resource implications for State and Commerce due to the proposed transfer.

To assess the volume and value of export license applications for USML Category I-III firearms, artillery, and ammunition that State reviewed during fiscal years 2013 to 2017, we obtained data from the interagency export licensing database, USXPORTS. USXPORTS is the system of record for all munitions and dual-use export license applications and adjudications, and is maintained by the Defense Technology Security Administration, within the Department of Defense (DOD). The data on USXPORTS originates from private companies applying for export licenses which, in the case of munitions, State is responsible for adjudicating. The agencies use this database to review and adjudicate applications, and also to report back to the applicants. We interviewed officials from State's Directorate of Defense Trade Controls (DDTC) in State's Bureau of Political and Military Affairs to understand the data and identify any limitations on how we use them. We analyzed the data to describe the number and reported value of export license applications, the USML items in the applications, and the reported destination country, among other characteristics. We assessed these data and found them to be sufficiently reliable for the purpose of conducting these analyses, but recognized that approved applications may not necessarily result in actual exports. We also noted some minor data limitations in our report, such as the fact that amendments to export license applications are not associated with destination countries. We did not independently audit the underlying data submitted to DDTC by private companies.

To analyze how certain export controls differ between State and Commerce, we reviewed the departments' proposed rules, relevant laws and regulations, agency guidance, and annual reports related to State's and Commerce's export controls. We also interviewed officials from Commerce's Bureau of Industry and Security; DDTC; State's Bureau of Democracy, Human Rights and Labor; State's Bureau of International Security and Nonproliferation; Immigration and Customs Enforcement and U.S. Customs and Border Protection in the Department of Homeland Security; and the Defense Technology Security Administration. We sought to present differences between State's and Commerce's export controls that are potentially relevant for items proposed for transfer from

DOC_0040364

the USML to the CCL, rather than every possible distinction between the two departments' export control systems. To describe the number of export license applications for firearms, artillery, and ammunition that required congressional notification, we reviewed the licensing data from the USXPORTS database. To describe the end-use monitoring conducted on exports of firearms, artillery, and ammunition, we extracted data from State's Defense Trade Application database and interviewed agency officials to understand the data. We analyzed the data by the number of checks per year, the proportion of pre-license checks to post-shipment checks, the countries where the checks were conducted, and the outcome of the checks. We assessed these data and found them to be sufficiently reliable for these purposes.

To assess what is known about the resource implications for State and Commerce due to the proposed transfer, we held discussions with State and Commerce officials, and reviewed annual budget documents and other agency reports. To better understand State's estimated reduction of 10,000 license applications per year and Commerce's estimated gain of 6,000 licenses that would result from the proposed transfer of items from the USML to the CCL, we reviewed State's fiscal year 2013-2017 export license data and the proposed rules. We also discussed the estimates with agency officials. Commerce officials told us that their estimate was fairly broad, based on State's estimate and their knowledge and experience of differences between the two agencies' license requirements that account for the difference between the two estimates. We were not able to independently assess the accuracy of either estimate because the license data we collected from State were not disaggregated to identify which items on license applications would be transferring to the CCL under the proposed rules and which would be staying on the USML. Each State license application can involve multiple items across multiple USML Sub-Categories. We also reviewed the number of full-time equivalent staff responsible for export control activities and State's annual revenue from registration fees paid by manufacturers, exporters, and brokers involved in items on the USML. We discussed State's registration data with agency officials and while we assessed these data as sufficiently reliable for descriptive purposes, we also determined that these data could not be used to generate reliable estimates about the resource implications for the Department of State because there was no clear pattern in the relationship between applications, registrants, and revenue in the data provided.

We conducted this performance audit from February 2018 to March 2019 in accordance with generally accepted government auditing standards.

DOC_0040365

Those standards require that we plan and perform the audit to obtain
sufficient, appropriate evidence to provide a reasonable basis for our
findings and conclusions based on our audit objectives. We believe that
the evidence obtained provides a reasonable basis for our findings and
conclusions based on our audit objectives.

DOC_0040366

# Appendix II: The U.S. Munitions List and the Commerce Control List

Defense articles and services subject to export controls under the Department of State's jurisdiction are listed in the 21 categories of the United States Munitions List (USML). Table 3 shows the 21 USML categories and the dates of rule changes under export control reform that transferred certain items within these categories to the Commerce Control List (CCL).

**Table 3: United States Munitions List and Dates of Rule Changes under Export Control Reform**

| Category | Category title | Effective Date of Rule Change |
|----------|----------------|-------------------------------|
| I | Firearms | Proposed |
| II | Artillery | Proposed |
| III | Ammunition | Proposed |
| IV | Launch vehicles, guided missiles, ballistic missiles, rockets, torpedoes, bombs, and mines | July 1, 2014 |
| V | Explosives and energetic materials, propellants, incendiary agents, and their constituents | July 1, 2014 |
| VI | Surface vessels of war and special naval equipment | January 6, 2014 |
| VII | Ground vehicles | January 6, 2014 |
| VIII | Aircraft and related articles | October 15, 2013 |
| IX | Military training equipment | July 1, 2014 |
| X | Personal protective equipment | July 1, 2014 |
| XI | Military electronics | December 30, 2014 |
| XII. | Fire control/sensors/night vision | December 31, 2016 |
| XIII | Materials and miscellaneous articles | January 6, 2014 |
| XIV | Toxicological agents | December 31, 2016 |
| XV | Spacecraft and related articles | November 10, 2014 |
| XVI | Nuclear weapons related articles | July 1, 2014 |
| XVII | Classified articles, technical data, and defense services | October 15, 2013 |
| XVIII | Directed energy weapons | December 31, 2016 |
| XIX | Gas turbine engines and associated equipment | October 15, 2013 |
| XX | Submersible vessels and related articles | January 6, 2014 |
| XXI | Articles, technical data, and defense services otherwise not enumerated | October 15, 2013 |

Source: Department of State. | GAO-19-307

Note: Transfers of items from these U.S. Munitions List categories to the Commerce Control List under export control reform involved a transition period after the effective date of the rule change.

DOC_0040367

The CCL is divided into ten broad categories and each category is further subdivided into five product groups (see table 4).

**Table 4: Commerce Control List Categories and Groups**

| Category | Category title |
|---|---|
| 0 | Nuclear & Miscellaneous |
| 1 | Materials, Chemicals, Microorganisms and Toxins |
| 2 | Materials Processing |
| 3 | Electronics |
| 4 | Computers |
| 5 (part 1) | Telecommunications |
| 5 (part 2) | Information Security |
| 6 | Sensors and Lasers |
| 7 | Navigation and Avionics |
| 8 | Marine |
| 9 | Aerospace and Propulsion |
| **Group** | **Group title** |
| A | Systems, Equipment and Components |
| B | Test, Inspection and Production Equipment |
| C | Material |
| D | Software |
| E | Technology |

Source: Department of Commerce. | GAO-19-307

DOC_0040368

# Appendix III: Comments from the Department of State



United States Department of State

*Comptroller*

*Washington, D.C. 20520*

FEB 1 3 2019

Thomas Melito
Managing Director
International Affairs and Trade
Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548-0001

Dear Mr. Melito:

We appreciate the opportunity to review your draft report,
"EXPORT CONTROLS: State and Commerce Should Share Watch List
Information If Proposed Rules to Transfer Firearms are Finalized, GAO Job
Code 102600.

The enclosed Department of State comments are provided for
incorporation with this letter as an appendix to the final report.

If you have any questions concerning this response, please contact
Christienne Carroll, Public Diplomacy Officer, Office of Congressional and
Public Affairs, Bureau of Political-Military Affairs at (202) 736-4020.

Sincerely,

Jeffrey C. Mounts (Acting, Comptroller)

Enclosure:
    As stated

cc:    GAO – Kimberly Gianopoulos
       PM – Marik String
       OIG - Norman Brown

DOC_0040369

**Department of State Comments on GAO Draft Report**

<u>**EXPORT CONTROLS: State and Commerce Should Share Watch List Information If Proposed Rules to Transfer Firearms Are Finalized (GAO-19-307SU, GAO Code 102600)**</u>

Thank you for the opportunity to comment on the GAO draft report, entitled *"Export Controls: State and Commerce Should Share Watch List Information If Proposed Rules to Transfer Firearms Are Finalized."*

**Recommendation 1: If responsibility for controlling the export of certain firearms, artillery, and ammunition is transferred from State to Commerce, the Secretary of State should ensure that the Under Secretary of Commerce for Industry and Security develop a process for sharing State's internal watch list with Commerce to enhance oversight of these items.**

The Department of State agrees with this recommendation. The Department is already engaged in the process of coordinating approval of the required Interagency Agreement (IAA) and Interconnect Security Agreement (ISA) to allow for electronic transfer of this information to the Department of Commerce.

DOC_0040370

# Appendix IV: Comments from the Department of Commerce



**UNITED STATES DEPARTMENT OF COMMERCE**
**The Secretary of Commerce**
Washington, D.C. 20230

February 14, 2019

Ms. Kimberly Gianopoulos
Director, International Affairs and Trade
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Ms. Gianopoulos:

Thank you for the opportunity to review and comment on the Government Accountability Office's (GAO) draft report: *"Export Controls: State and Commerce Should Share Watch List Information If Proposed Rules to Transfer Firearms are Finalized"* (GAO-19-307SU).

The Department of Commerce concurs with GAO's recommendation, as clarified in the attached document. The document also provides recommended technical clarifications to the underlying draft report. The edit to the recommendation clarifies that the recommendation is for the Department to develop a process for receiving and integrating State's internal watch list into Commerce's licensing review process.

If you have any questions on this response, please contact Frank Bray, Senior Advisor, Bureau of Industry and Security, Department of Commerce, at (202) 482-2087.

Sincerely,

Wilbur Ross

Enclosure

DOC_0040371

02/14/19

<u>Subject</u>: Commerce technical edits on GAO report: *Export Controls: State and Commerce Should Share Watch List Information If Proposed Rules to Transfer Firearms are Finalized*

<u>Structure for Commerce technical edits</u>:

- Commerce has copied and pasted text from the draft report where we had technical edits for ease of reference.
- Commerce has included the draft report page number, when available, before its technical edits for ease of reference.

<u>GAO DRAFT Recommendations to Commerce</u>:

**GAO Recommendation 2 (page 33):** If responsibility for controlling the exports of certain firearms, artillery and ammunition is transferred from State to Commerce, the Secretary of Commerce should ensure that the Under Secretary of Commerce for Industry and Security develop a process for sharing State's internal watch list with Commerce to enhance oversight of these items. (Recommendation 2)

**Commerce response:** Commerce concurs with this Recommendation as revised below

If responsibility for controlling the exports of certain firearms, artillery and ammunition is transferred from State to Commerce, the Secretary of Commerce should ensure that the Under Secretary of Commerce for Industry and Security develop a process for ~~sharing~~ **receiving and integrating** State's internal watch list with Commerce**'s licensing review process** to enhance oversight of these items. (Recommendation 2)

1

DOC_0040372

# Appendix V: GAO Contacts and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Kimberly Gianopoulos, (202) 512-8612 or gianopoulosk@gao.gov |
| **Staff Acknowledgements** | In addition to the individual named above, Drew Lindsey (Assistant Director), Howard Cott (Analyst in Charge), Ashley Alley, Martin de Alteriis, Neil Doherty, Adam Peterson, and Aldo Salerno made significant contributions to this report. |

DOC_0040373

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (https://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to https://www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet: Website: https://www.gao.gov/fraudnet/fraudnet.htm Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | James-Christian Blockwood, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

**From**: Jim Bartlett, Full Circle Compliance [████@fullcirclecompliance.eu]
**Sent**: 4/1/2019 6:58:49 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 19-0401 Monday "Daily Bugle"



## Monday, 1 April 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. Commerce/BIS Announces SITAC Meeting on 30 Apr in Washington DC
2. Commerce/BIS Seeks Members for Technical Advisory Committees

### OTHER GOVERNMENT SOURCES

3. Items Scheduled for Publication in Future Federal Register Editions
4. Commerce/BIS: "Mohan L. Nirala of Laurel, MD, Denied Export Privileges for 10 Years"
5. State/DDTC Seeks Attorney Candidates
6. President Continues National Emergency with Respect to South Sudan
7. UK Government Publishes Explanatory Memorandum on Zimbabwe (Sanctions) (EU Exit) Regulations 2019
8. Singapore Customs Circulars of Interest: TradeNet Extended Downtime

### NEWS

9. Reuters: "Exclusive: Trump Eyeing Stepped-Up Venezuela Sanctions for Foreign Companies - Bolton"
10. World Nuclear News: "WANO Warns Export Controls are Impacting its Work"

### COMMENTARY

11. J. Reeves & K. Heubert: "Please Meet the Office of Export Enforcement"
12. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Changes to Export Controls in March 2019"

13.    The FAQ of the Day: DSP-5 and Export Control Reform

**EX/IM MOVERS & SHAKERS**

14.    Monday List of Ex/Im Job Openings: 149 Openings Posted This Week, Including 22 New Openings

**EX/IM TRAINING EVENTS & CONFERENCES**

15.    ECS Presents "Mastering ITAR/EAR Challenges" on 30 Apr-1 May in Nashville, TN

16.    FCC Presents "An Introduction to EU / Dutch Dual-Use and Military Export Controls", 7 May in Bruchem, the Netherlands

**EDITOR'S NOTES**

17.    Bartlett's Unfamiliar Quotations

18.    Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (12 Mar 2019), DOC/EAR (20 Dec 2018), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (14 Mar 2018), DOS/ITAR (19 Mar 2018), DOT/FACR/OFAC (15 Mar 2018), HTSUS (25 Mar 2019)

19.    Weekly Highlights of the Daily Bugle Top Stories



*From the publisher of WorldECR, Dual-use Export Controls of the European Union, and The Export Compliance Manager's Handbook*

**Dual-use Export Controls in International Transit and Transhipment**

Covers the regulations in more than 40 countries. To find out more, CLICK HERE or go to
**www.worldecr.com/books**

## ITEMS FROM TODAY'S FEDERAL REGISTER

# 1. Commerce/BIS Announces SITAC Meeting on 30 Apr in Washington DC

(Source: Federal Register, 1 Apr 2019.)

84 FR 12196: Sensors and Instrumentation Technical Advisory Committee; Notice of Partially Closed Meeting

The Sensors and Instrumentation Technical Advisory Committee (SITAC) will meet on Tuesday, April 30, 2019, 9:30 a.m., in the Herbert C. Hoover Building, Room 3884, 14th Street between Constitution and Pennsylvania

Avenues NW, Washington, DC. The Committee advises the Office of the Assistant Secretary for Export Administration on technical questions that affect the level of export controls applicable to sensors and instrumentation equipment and technology.

*Agenda - Open Session*

(1) Welcome and Introductions.
(2) Remarks from the Bureau of Industry and Security Management.
(3) Industry Presentations.
(4) New Business.

*Agenda - Closed Session*

(5) Discussion of matters determined to be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 2 Sec. Sec. 10(a)(1) and 10(a)(3).

The open session will be accessible via teleconference to 20 participants on a first come, first serve basis. To join the conference, submit inquiries to Ms. Yvette Springer at Yvette.Springer@bis.doc.gov no later than April 23, 2019. A limited number of seats will be available during the public session of the meeting. Reservations are not accepted. To the extent that time permits, members of the public may present oral statements to the Committee. The public may submit written statements at any time before or after the meeting. However, to facilitate distribution of public presentation materials to the Committee members, the Committee suggests that the materials be forwarded before the meeting to Ms. Springer.

The Assistant Secretary for Administration, with the concurrence of the General Counsel, formally determined on March 12, 2019 pursuant to Section 10(d) of the Federal Advisory Committee Act, as amended (5 U.S.C. app. 2 Sec. 10(d), that the portion of this meeting dealing with pre-decisional changes to the Commerce Control List and U.S. export control policies shall be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 2 Sec. Sec. 10(a)(1) and 10(a)(3). The remaining portions of the meeting will be open to the public.

For more information contact Yvette Springer on (202) 482-2813.

Yvette Springer, Committee Liaison Officer.

back to top

* * * * * * * * * * * * * * * * *


## 2. Commerce/BIS Seeks Members for Technical Advisory Committees
(Source: Federal Register, 1 Apr 2019.)

84 FR 12195-12196: Technical Advisory Committees; Notice of Recruitment of Members

* SUMMARY: The Bureau of Industry and Security (BIS), Department of Commerce is announcing its recruitment of candidates to serve on one of its seven Technical Advisory Committees ("TACs" or "Committees"). TAC members advise the Department of Commerce on the technical parameters for export controls applicable to dual-use items (commodities, software, and technology) and on the administration of those controls. The TACs are composed of representatives from industry, academia, and the U.S. Government and reflect diverse points of view on the concerns of the exporting community. Industry representatives are selected from firms producing a broad range of items currently controlled for national security, non-proliferation, foreign policy, and short supply reasons or that are proposed for such controls. Representation from the private sector is balanced to the extent possible among large and small firms.

Six TACs are responsible for advising the Department of Commerce on the technical parameters for export controls and the administration of those controls within specified areas: Information Systems TAC: Control List Categories 3 (electronics), 4 (computers), and 5 (telecommunications and information security); Materials TAC: Control List Category 1 (materials, chemicals, microorganisms, and toxins); Materials Processing Equipment TAC: Control List Category 2 (materials processing); Sensors and Instrumentation TAC: Control List Category 6 (sensors and lasers); Transportation and Related Equipment TAC: Control List Categories 7 (navigation and avionics), 8 (marine), and 9 (propulsion systems, space vehicles, and related equipment); and the Emerging Technology TAC (identification of emerging and foundational technologies that may be developed over a period of five to ten years with potential dual-use applications). The seventh TAC, the Regulations and Procedures TAC, focuses on the Export Administration Regulations (EAR) and procedures for implementing the EAR.

TAC members are appointed by the Secretary of Commerce and serve terms of not more than four consecutive years. TAC members must obtain secret-level clearances prior to their appointment. These clearances are necessary so that members may be permitted access to classified information that may be needed to formulate recommendations to the Department of Commerce. Applicants are strongly encouraged to review materials and information on each Committee website, including the Committee's charter, to gain an understanding of each Committee's responsibilities, matters on which the Committee will provide recommendations, and expectations for members. Members of any of the seven TACs may not be registered as foreign agents under the Foreign Agents Registration Act. No TAC member may represent a company that is majority owned or controlled by a foreign government entity (or foreign government entities). TAC members will not be compensated for their services or reimbursed for their travel expenses.

If you are interested in becoming a TAC member, please provide the following information: 1. Name of applicant; 2. affirmation of U.S. citizenship; 3. organizational affiliation and title, as appropriate; 4. mailing address; 5. work telephone number; 6. email address; 7. summary of qualifications for membership; 8. an affirmative statement that the candidate will be able to meet the expected commitments of Committee

work. Committee work includes: (a) Attending in-person/teleconference Committee meetings roughly four times per year (lasting 1-2 days each); (b) undertaking
additional work outside of full Committee meetings including subcommittee conference calls or meetings as needed, and (c) frequently drafting, preparing or commenting on proposed recommendations to be evaluated at Committee meetings. Finally, candidates must provide an affirmative statement that they meet all Committee eligibility requirements.
The Department of Commerce is committed to equal opportunity in the workplace and seeks diverse Advisory Committee membership.
To respond to this recruitment notice, please send a copy of your resume to Ms. Yvette Springer at Yvette.Springer@bis.doc.gov.
   Deadline: This Notice of Recruitment will be open for one year from its date of publication in the Federal Register.
* FOR FURTHER INFORMATION CONTACT: Ms. Yvette Springer on (202) 482-2813.

back to top

* * * * * * * * * * * * * * * * * * *

## 3. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* President; ADMINISTRATIVE ORDERS; South Sudan; Continuation of National Emergency (Notice of April 1, 2019) [Included in today's Daily Bugle, item #6. Pub. Date: 2 Apr 2019.]

* Justice/ATF; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Furnishing of Samples [Pub. Date: 2 Apr 2019.]

back to top

* * * * * * * * * * * * * * * * * * *

## 4. Commerce/BIS: "Mohan L. Nirala of Laurel, MD, Denied Export Privileges for 10 Years"
(Source: Commerce/BIS, 26 Mar 2019.)

* Respondent: Mohan L. Nirala, Laurel, MD
* Charges: On March 13, 2017, in the U.S. District Court for the Eastern District of Virginia, Mohan L. Nirala ("Nirala") was convicted of violating Section 793(e) of the Espionage Act (18 U.S.C. 792-799 (2012)) ("the Espionage Act"). Nirala was convicted of having unauthorized possession of a document relating to the national defense, namely, a forty-seven page

classified document containing emails, exhibits, and PowerPoint slides, each individually marked as being classified, and willfully retaining the document and failing to deliver it to the officer and employee of the United States entitled to receive it. Nirala was sentenced to twelve months and one day in prison, supervised released for one year and an assessment of $100.
* Penalty: Denied export privileges for ten years from the date of Nirala's conviction, until 13 March 2027.
* Date of Order: 25 Mar 2019.

back to top

* * * * * * * * * * * * * * * * * * *


## 5. State/DDTC Seeks Attorney Candidates

(Source: State/DDTC, 25 Mar 2019.) [Reposted at DDTC's request.]

The Office of the Legal Adviser of the Department of State seeks attorneys with at least 3 years of relevant experience to provide counsel to the Bureau of Political-Military Affairs Directorate of Defense Trade Controls (DDTC), handling issues related to export controls and administrative law.  This advertisement is for two non-rotational specialist positions within the Office of the Legal Adviser.  Salary: GS Level 12-15, commensurate with experience. Applicant must be a U.S. citizen, and have a J.D. degree.

Applicants should have significant legal experience in the area of export control law, including with the Arms Export Control Act and International Traffic in Arms Regulations, and/or significant legal experience in administrative law, including the promulgation and civil and/or criminal enforcement of federal regulations.  Applicants must have an outstanding record of academic and professional achievement.  They must be able to handle a wide variety of assignments with short, time-critical deadlines, as well as design and execute substantial analytical projects.  They must also possess exceptional analytical, writing, organizational, and interpersonal communications skills, suitable for successfully working with policy makers and senior-level officials as well as licensing officers and compliance personnel.

Preferred:
  - At least 3 years of relevant experience.  Ideally 5+.
  - Experience and ability to work in a regulatory environment is key (e.g. knowledge of administrative law, self-starter, limited support).
  - Experience with enforcement/criminal law.

Ability to obtain security clearance is required. Applicants should send a current detailed resume, law school transcript, and reference information by email to the attention of Barbara Barrett Spencer at legaljobs@state.gov. Applications must be received by Friday, April 19, 2019.

back to top

* * * * * * * * * * * * * * * * * *

## 6. President Continues National Emergency with Respect to South Sudan

(Source: The White House, 1 Apr 2019.)

*Text of a Message to the Congress on the Continuation of the National Emergency with Respect to South Sudan*

On April 3, 2014, by Executive Order 13664, the President declared a national emergency pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701-1706) to deal with the unusual and extraordinary threat to the national security and foreign policy of the United States constituted by the situation in and in relation to South Sudan, which has been marked by activities that threaten the peace, security, or stability of South Sudan and the surrounding region, including widespread violence and atrocities, human rights abuses, recruitment and use of child soldiers, attacks on peacekeepers, and obstruction of humanitarian operations.

The situation in and in relation to South Sudan continues to pose an unusual and extraordinary threat to the national security and foreign policy of the United States.  For this reason, the national emergency declared on April 3, 2014, to deal with that threat must continue in effect beyond April 3, 2019.  Therefore, in accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), I am continuing for 1 year the national emergency declared in Executive Order 13664.

This notice shall be published in the *Federal Register* and transmitted to the Congress.

DONALD J. TRUMP
THE WHITE HOUSE,
April 1, 2019.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. UK Government Publishes Explanatory Memorandum on Zimbabwe (Sanctions) (EU Exit) Regulations 2019

(Source: HM Government, 29 Mar 2019.) [Excerpts.]

This explanatory memorandum has been prepared by the UK Foreign and Commonwealth Office and is laid before Parliament by Command of Her Majesty (HM).

These Regulations are intended to ensure that the UK can operate an effective sanctions regime in relation to Zimbabwe after the UK leaves the EU. When these Regulations come into force they will replace, with substantially the same effect, the EU sanctions regime relating to Zimbabwe that is currently in force under EU legislation and related UK regulations. This sanctions regime is aimed at encouraging the Government of Zimbabwe, and any person or entity who may be involved in human rights