**From:** McNerney, Robert (Federal) [RMcNerney@doc.gov]
**Sent:** 4/29/2019 1:11:39 PM
**Subject:** DOC Morning News Clips for Monday, April 29th, 2019

## DOC Morning News Clips for Monday, April 29th, 2019
### U.S. Consumer Spending Rises in February, March
**Wall Street Journal**

U.S. consumers picked up their spending in February and March, a sign that households were feeling confident about their economic prospects.

Personal-consumption expenditures, a measure of household spending on everything from cars to cocktails increased a seasonally adjusted 0.1% in February and 0.9% in March over the prior months, the Commerce Department said Monday.

The department released two months of data to catch up from delays in releases caused by the government shutdown earlier this year.

Personal income, which includes Americans' pretax earnings from wages, salaries and investments, grew more slowly, up 0.1% in March on the month after rising 0.2% in February.

### Census Bureau to Hire 500,000 People for 2020 Count
**Courthouse News**

The citizenship question expected to be placed on the 2020 census has mired the survey in partisan acrimony, but speakers at a black mayors conference in Houston were upbeat Friday about the 500,000 well-paying, if temporary, jobs slated for census workers.

Rebecca Briscoe, U.S. Census Bureau partnership coordinator for the Houston metro area, is already recruiting staff for the census, set for spring 2020 when households will receive the survey and have the option of responding by mail, online or by phone.

A panelist on a "Make It Count: Preparing Cities for Census 2020" discussion at the African American Mayors Association conference, Briscoe said she went to a Baptist mega church in Houston last Sunday to recruit people for $24.50-per-hour census jobs. She said a church minister let her employee get on the pulpit to announce the jobs…

She said in 2020 the U.S. Census Bureau will be the nation's second-largest employer behind only Walmart.

### US economy grows faster than expected
**BBC**

The economy expanded at an annualised pace of 3.2% in the January-to-March period, well above analysts' forecasts.

The economy has accelerated since the previous quarter, when it grew at a pace of 2.2%.

However, some analysts warned growth had been boosted by one-off factors, and could slow in the months ahead. The growth figures - which are subject to revision in the months ahead - appeared to dispel any fears of an economic slowdown.

Secretary of Commerce Wilbur Ross welcomed the data, saying: "The Trump economy has repeatedly defied the sceptics who predicted an economic downturn and has restored America's position in the world as a consistent source of economic growth."

Trade helped to boost growth in the first quarter, as exports rose while imports fell. Companies also built up inventories of goods at the fastest rate since the second quarter of 2015

### U.S. investigating whether N.B.'s cheap property taxes on forests break trade rules
**CBC**

The U.S. Commerce Department in Washington is set to rule in June whether cheap property taxes charged by New Brunswick on privately owned forests in the province are a subsidy.

It's a decision that could mean trouble for more than 40,000 New Brunswick landowners and force a hard look by Fredericton lawmakers at the way the majority of private property in the province is assessed and taxed.

So far the New Brunswick government is not commenting on what will happen if the ruling goes poorly.

"Our government is confident that our property tax policies do not constitute a countervailable subsidy," said Robert Duguay, a spokesperson for the province's Intergovernmental Affairs division, in a statement to CBC News late Sunday.

"We continue to fight this unfair US trade action."

In a hearing inside the Herbert Hoover Building in Washington last month, lawyers for a collection of U.S. lumber companies argued New Brunswick's practice of assessing and taxing forest properties as though they are worth $100 per hectare is artificially low and a clear government benefit to private owners of timberland.

## What to watch at the Milken Institute conference
**CNN Business (Live Updates)**
This year's speakers run the gamut, including:
- Commerce Secretary Wilbur Ross
- Elmo (the puppet is billed as a guest on a panel about creating opportunities for refugee children)
- Ivanka Trump
- IMF chairwoman Christine Lagarde
- Karl Rove, senior advisor to President George W. Bush
- David Solomon, CEO of Goldman Sachs
- Actress Laura Dern

---

*POLITICO's MORNING TRADE*

---

### QUICK FIX

**— The Trump administration is hoping to ramp up pressure on moving USMCA forward in Congress** as lawmakers return to Washington this week.

**— Senate Finance Chairman Chuck Grassley fires a warning to the president, saying that USMCA is "dead"** if the administration doesn't deal with steel and aluminum tariffs with Canada and Mexico.

**— Trump said he wants to sign a trade deal with Japan by the time he visits next month** but officials are still working on what's actually going to be in the agreement.

### DRIVING THE DAY

**A TURNING POINT FOR TRUMP'S TOP LEGISLATIVE PRIORITY:** Several items on the to-do list for USMCA are crossed off or nearly done: The U.S. International Trade Commission report is in, Mexico is poised to pass a required new labor law, and Vice President Mike Pence has launched the promotional roadshow.

Procedurally, there isn't anything holding up Congress from taking it up, but there isn't quite the wherewithal to do so among House Democrats.

"The path is open, and the question is, will [Congress] do something, or will they put it in a drawer?" notes Shannon O'Neil, an expert on global trade and the U.S.-Mexico relationship at the Council on Foreign Relations.

**Trump meets Pelosi:** The president is expected to sit down this week with House Speaker Nancy Pelosi, who has not shut down consideration of the deal if the administration responds to certain demand.

But over the two-week break, several leading members of the party seemed as entrenched as ever in pushing for a go-slow approach. Megan has the story on what to expect with USMCA in the coming weeks.

**GRASSLEY TAKES A STAND ON STEEL TARIFFS:** Senate Finance Chairman Chuck Grassley made the strongest connection yet between a demand that the administration to remove steel and aluminum tariffs on Canada and Mexico and USMCA's prospects in Congress.

"If these tariffs aren't lifted, USMCA is dead," Grassley wrote in an op-ed The Wall Street Journal. "There is no appetite in Congress to debate USMCA with these tariffs in place."

Grassley has been growing frustrated as the process for lifting the tariffs has made little headway. Farmers in his state have been hit hard by retaliatory duties imposed by Canada and Mexico, two of the biggest markets for U.S. agricultural goods.

**TECH INDUSTRY MAKES A USMCA PUSH:** A dozen tech and software industry groups pressed congressional trade leaders to take up the USMCA, noting that the pact's digital trade rules would "establish a new global norm on addressing challenges confronting global access and usage of the digital trade and investment system."

The groups also highlight in a letter sent today that the U.S. International Trade Commission in its impact study featured the digital trade rules as the one part the agreement that would have the most significant effect on the U.S. economy.

**CLOCK IS TICKING FOR MEXICO'S LABOR REFORM LAW:** Mexico's Senate could pass a major labor reform law as soon as today as required per USMCA. Mexican lawmakers have repeatedly expressed confidence that they can deliver on passing the labor changes before they go on recess at the end of the month.

**Refresher:** The new law would overhaul the country's existing labor structure by ensuring workers can organize independent unions and have secret votes when selecting representation. The changes aim to create a more efficient and independent arbitration system for labor disputes.

It would also require that Mexico review 700,000 collective bargaining agreements within four years. AFL-CIO President Richard Trumka has questioned whether Mexico has the bandwidth to handle that commitment.

**MEXICO WORRIED ABOUT COSTLY BORDER DELAYS:** The Mexican government on Friday pointed to all the problems cropping up as a result of the Trump administration's decision to reassign some U.S. customs personnel who inspect commercial goods to help Border Patrol on immigration duties.

Mexican Foreign Minister Marcelo Ebrard explained in a tweet that the delays at the border have cost U.S. and Mexican companies millions of dollars in the past month. In Juarez alone, the delays have cost $170 million in losses, he said.

Mexico also delivered a diplomatic note to the U.S. embassy in Mexico City to press for a quick resolution. "The urgency of speeding up the movement of goods and people, and deepening mutual cooperation to guarantee the efficiency and safety of our shared border," Mexico said in the note.

**TRUMP AND ABE TALK TRADE AND PLAY GOLF:** Trump and Japanese Prime Minister Shinzo Abe squeezed in a quick round of golf on Saturday, but not before discussing the path for a possible U.S.-Japan trade deal.

At the Oval Office on Friday, Trump said a agriculture would be discussed "very strongly" as U.S. farmers pressure the administration to use a deal to make up for lost ground as a result of withdrawing from the Trans-Pacific Partnership. Trump indicated that withdrawing the threat of auto tariffs could be offered for Japan's ag concessions.

"As the prime minister knows, Japan puts very massive tariffs on agriculture — our agriculture — going for many years, going into Japan. And we want to get rid of those tariffs," Trump said. "Because we don't tariff their cars, so I think that that will — something we'll work out."

**Trump's timing on a trade deal:** The administration is looking to get a quick initial deal and then work out something more comprehensive at a later date. The president said he thought trade talks would "go quickly" with the possibility of signing a deal during his visit to Japan next month.

Trump is traveling to Japan at the end of May to meet the newly crowned emperor. But sources close to negotiations have told Morning Trade that timeline is unrealistic as officials are still scoping out what will be in a potential deal. Trump is also expected to go to Japan for the G-20 summit in Osaka on June 28-29.

**TRUMP'S EXPORT CONTROL CONUNDRUM:** An effort dating to the Obama administration to ease regulation on exports for goods that have both military and civilian uses is bearing fruit for a range of U.S. industries.

The firearms industry had hoped Trump would make a final push to conclude the process for its exports — something President Barack Obama held back on amid a rise in mass shootings — but the current president has his own concerns that have stalled a final rule over the publication of 3D printed gun plans.

That effort that has already run into legal problems because of a potential violation of free speech rights in the Constitution. And just as Trump cheered gun rights on Friday at the National Rifle Association convention, the industry is getting impatient.

"He's giving a win to the gun control advocates at the expense of the industry that supported him," said one industry official.

## INTERNATIONAL OVERNIGHT

— Beijing tells the United Kingdom to resist external pressure when it comes to restricting Huawei, POLITICO Europe reports.

— Trump's trade wars could be accelerating the extinction of Wisconsin's dairy industry, The New York Times reports.

DOC_0041309

— During an appearance with Canadian Prime Minister Justin Trudeau in Ottawa, Abe said he would use push for an overhaul of the WTO, The Wall Street Journal reports.

— China on Friday said it would not appeal a World Trade Organization case it lost against the U.S. related to its ag import quotas, Pro Trade reports.

— Chinese President Xi Jinping could travel to Washington in June to sign a trade deal with Trump, the South China Morning Post reports.

--
Robert McNerney
Press Assistant
Office of the Secretary | Department of Commerce
RMcNerney@doc.gov
202-482-1986

**From**: Douglas Hassebrock [Douglas.Hassebrock@bis.doc.gov]
**Sent**: 5/6/2019 1:16:08 PM
**To**: John Sonderman [John.Sonderman@bis.doc.gov]
**Subject**: RE: Touching Base

> # DPP

--
Douglas R. Hassebrock

> # PII

Confidentiality Notice: This e-mail message is intended only for the named recipients. It contains information that may be confidential, privileged, attorney work-product, or otherwise exempt from disclosure under applicable law. If you received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, be advised that any review, disclosure, use, dissemination, distribution, or reproduction of this message or its contents is strictly prohibited. Please notify us immediately that you received this message in error, and delete the message.

**From:** John Sonderman <John.Sonderman@bis.doc.gov>
**Sent:** Monday, May 06, 2019 9:14 AM
**To:** Douglas Hassebrock <Douglas.Hassebrock@bis.doc.gov>
**Subject:** RE: Touching Base

Nothing much so far today... but there is a noon meeting on CAD files so could be an interesting day...

**From:** Douglas Hassebrock <Douglas.Hassebrock@bis.doc.gov>
**Sent:** Monday, May 06, 2019 9:12 AM
**To:** John Sonderman <John.Sonderman@bis.doc.gov>; Kevin Kurland <Kevin.Kurland@bis.doc.gov>
**Subject:** Touching Base

How's things? I'm here all week [ DPP ] just let me know

--

Douglas R. Hassebrock, Director
Office of Export Enforcement
US Department of Commerce
Performing the Non-Exclusive Functions and
Duties of the Assistant Secretary

> # PII

Confidentiality Notice: This e-mail message is intended only for the named recipients. It contains information that may be confidential, privileged, attorney work-product, or otherwise exempt from disclosure under applicable law. If you received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, be advised that any review, disclosure, use, dissemination, distribution, or reproduction of this message or its contents is strictly prohibited. Please notify us immediately that you received this message in error, and delete the message.

**From**: Jim Bartlett, Full Circle Compliance ("FCC") ███████@fullcirclecompliance.eu]
**Sent**: 5/15/2019 9:45:37 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 19-0515 Wednesday "Daily Bugle"



## Wednesday, 15 May 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1.      President Continues National Emergency with Respect to Yemen

2.      Commerce/BIS Seeks Comments on National Security and Critical Technology Assessment of the U.S. Industrial Base

3.      Commerce/BIS Seeks Comments on Import Certificate Procedure

4.      USTR Implements Modification to Section 301, Increased tariff of List 3 Goods from 10 Percent to 25 Percent

5.      U.S.- China Economic and Security Review Commission Announces Public Hearing on Jun 7 in Washington DC

### OTHER GOVERNMENT SOURCES

6.      Items Scheduled for Publication in Future Federal Register Editions

7.      Commerce/BIS: (No new postings.)

8.      State/DDTC: (No new postings.)

### NEWS

9.      Deutsche Welle: "U.S. Warns EU Over €13-Billion Defense Spending"

10.     Josh Hawley: "Sen. Hawley Introduces Bill to Stop the Chinese Military's Acquisition of Sensitive American Technology"

11.     Reuters: "Exclusive: Trump Expected to Sign Order Paving Way for U.S. Telecoms Ban on Huawei"

12.     Reuters: "U.S. Senators Offer Bill Targeting Russia-Germany Pipeline"

13.     The Moscow Times: "Russia Eases Arms Resale Rules to Avoid Sanctions - Reports"

## COMMENTARY

14.    D. W. Layton, J. Zhang & T. C. Lee: "U.S. Prepares to Hit All Chinese Imports with Tariffs, as China Retaliates and Launches a Product Exclusion Process"

15.    M. Miller, B. Murphy & S. Murray: "Recommendations re China Section 301 List 3 Trade Remedy Rate Increase from 10% to 25%"

16.    M. Volkov: "OFAC Framework for Sanctions Compliance Programs - Testing and Auditing and Training (Part III of IV)"

17.    R. Burke, N. Erb & C. A. DeLelle: "Iran Threatens Partial JCPOA Suspension; US Imposes Sanctions on Certain Iranian Metals Sectors"

18.    R. Fayhee, O. Dorgans & A. G. Kashdan: "The U.S. Issues New Iran Secondary Sanctions, Placing Europe in the Cross-Fire"

## EX/IM TRAINING EVENTS & CONFERENCES

19.    FCC Presents "The ABC of FMS", 28 Nov in Bruchem, the Netherlands

## EDITOR'S NOTES

20.    Bartlett's Unfamiliar Quotations

21.    Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (5 Apr 2019), DOC/EAR (14 May 2019), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (14 Mar 2019), DOS/ITAR (19 Apr 2019), DOT/FACR/OFAC (29 Apr 2019), HTSUS (13 May 2019)

22.    Weekly Highlights of the Daily Bugle Top Stories



From the publisher of WorldECR and The Export Compliance Manager's Handbook

# THE CFIUS BOOK

A new guide on how to navigate an investment or acquisition in sensitive industries or companies in the US, past the bureaucratic obstacles and hidden pitfalls to a successful conclusion. To find out more, **CLICK HERE** or go to **www.worldecr.com/books**

## ITEMS FROM TODAY'S FEDERAL REGISTER

# 1. President Continues National Emergency with Respect to Yemen
(Source: Federal Register, 15 May 2019.) [Excerpts.]

On May 16, 2012, by Executive Order 13611, the President declared a national emergency pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701-1706) to deal with the unusual and extraordinary threat to the national security and foreign policy of the United States constituted by the actions and policies of

certain former members of the Government of Yemen and others that threaten Yemen's peace, security, and stability. These actions include obstructing the political process in Yemen and blocking implementation of the agreement of November 23, 2011, between the Government of Yemen and those in opposition to it, which provided for a peaceful transition of power that meets the legitimate demands and aspirations of the Yemeni people.

The actions and policies of certain former members of the Government of Yemen and others in threatening Yemen's peace, security, and stability continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States. For this reason, the national emergency declared on May 16, 2012, to deal with that threat must continue in effect beyond May 16, 2019. Therefore, in accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), I am continuing for 1 year the national emergency declared in Executive Order 13611. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 2. Commerce/BIS Seeks Comments on National Security and Critical Technology Assessment of the U.S. Industrial Base
(Source: Federal Register, 15 May 2019.) [Excerpts.]

84 FR 21751: Submission for OMB Review; Notice

The Department of Commerce will submit to the Office of Management and Budget (OMB) for clearance the following proposal for collection of information under the provisions of the Paperwork Reduction Act (44 U.S.C. Chapter 35).
- Agency: Bureau of Industry and Security.
- Title: National Security and Critical Technology Assessments of the U.S. Industrial Base.
- OMB Control Number: 0694-0119.
- Type of Review: Regular submission. ...
- Needs and Uses: The Department of Commerce, in coordination with the Department of Defense and other Federal agencies, conducts survey assessments of U.S. industrial base sectors deemed critical to U.S. national security. The information gathered is necessary to determine the health and competitiveness as well as the needs of these critical market segments in order to maintain a strong U.S. industrial base.
- Affected Public: Business or other for-profit organizations.
- Respondent's Obligation: Mandatory.

This information collection request may be viewed at reginfo.gov http://www.reginfo.gov/public. Follow the instructions to view Department of Commerce collections currently under review by OMB.
Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to OIRA_Submission@omb.eop.gov.

Sheleen Dumas,Departmental Lead PRA Officer, Office of the Chief Information Officer, Commerce Department.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. Commerce/BIS Seeks Commentson Import Certificate Procedure

(Source: Federal Register, 15 May 2019.) [Excerpts.]

84 FR 21751: Agency Information Collection Activities:
* AGENCY: Bureau of Industry and Security, Department of Commerce.
* ACTION: Notice.
* ADRESSES: Direct all written comments to Jennifer Jessup, Departmental Paperwork Clearance Officer, Department of Commerce, 1401 Constitution Avenue NW, Room 6616, Washington, DC 20230 (or via the internet at docpra@doc.gov.)
* FOR FURTHER INFORMATION CONTACT: Requests for additional information or copies of the information collection instrument and instructions should be directed to Mark Crace, BIS ICB Liaison, (202) 482-8093 or at mark.crace@bis.doc.gov.
* SUPPLEMENTARY INFORMATION:...
- OMB Number: 0694-0017.
- Form Number: BIS-645P.
- Abstract: The United States and several other countries have increased the effectiveness of their respective controls over international trade in strategic commodities by means of an Import Certificate procedure. For the U.S. importer, this procedure provides that, where required by the exporting country, the importer submits an international import certificate to the U.S. Government to certify that he/she will import commodities into the United States and will not reexport such commodities, except in accordance with the export control regulations of the United States. The U.S. Government, in turn, certifies that such representations have been made.
- Request for Comments: Comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden (including hours and cost) of the proposed collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology.

Sheleen Dumas, Departmental Lead PRA Officer, Office of the Chief Information Officer, Commerce Department.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. USTR Implements Modification to Section 301, Increased Tariff of List 3 Goods from 10 Percent to 25 Percent

(Source: Federal Register, 15 May 2019.) [Excerpts.]

84 FR 21892: Notice of implementing modification of Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation

* AGENCY:Office of the United States Trade Representative.
* ACTION: Notice of implementing modification.
* SUMMARY:In a notice published on May 9, 2019 (May 9 Notice), the U.S. Trade Representative (Trade Representative) increased the rate of additional duty from 10 percent to 25 percent for the products of China covered by the September 2018 action that are (i) entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on May 10, 2019, and (ii) exported to the United States on or after May 10, 2019. This notice provides that products of China that are covered by the September 2018 action and that were exported to the United States prior to May 10, 2019, are not subject to the additional duty of 25 percent, as long as such products are entered into the United States prior to June 1, 2019. Such products remain subject to the additional duty of 10 percent for this interim period.
* DATES: **HTSUS heading 9903.88.09, which is set out in the Annex to this notice, applies to products of China covered by the September 2018 action that were exported before May 10, 2019, and entered into the United States on or after May 10, 2019, and before June 1, 2019.**
* FOR FURTHER INFORMATION CONTACT: For questions about this notice, contact Associate General Counsel Arthur Tsao or Assistant General Counsel Juli Schwartz, or Director of Industrial Goods Justin Hoffmann at (202) 395-5725. For questions on customs classification or implementation of additional duties on products covered in the supplemental action, contact _traderemedy@cbp.dhs.gov_.
* SUPPLEMENT INFORMATION:

In the May 9 Notice, the Trade Representative modified the action being taken in the Section 301 investigation by increasing the rate of additional duty from 10 percent to 25 percent for the products of China covered by the September 2018 action in this investigation. The "September 2018 action" refers to the additional duties on products of China with an annual trade value of approximately $200 billion, published at 83 FR 47974 (Sep. 21, 2018), as subsequently modified by the notice published at 83 FR 49153 (September 28, 2018). The increase in the rate of additional duty became effective on May 10, 2019.

Under this implementing modification, and as specified in the Annex to this notice, products of China that are covered by the September 2018 action that were exported prior to May 10, 2019, are not subject to the additional duty of 25 percent as long as such products are entered into the United States prior to June 1, 2019. Such products remain subject to the additional duty of 10 percent for a transitional period of time before June 1, 2019. The covered products of China that are entered into the United States on or after June 1, 2019, are subject to the 25 percent rate of additional duty.

To distinguish between covered products of China subject to the 10 percent rate of additional duty from those subject to the 25 percent rate, the Annex to this notice creates a new heading in Chapter 99 of the HTSUS (9903.88.09) for products of

China covered by the September 2018 action that were exported before May 10, 2019, and entered into the United States on or after May 10, 2019 and before June 1, 2019. HTSUS heading 9903.88.09 is limited to covered products of China entered into the United States during this period of time to account for customs enforcement factors and the average transit time between China and the United States by sea.

The products of China covered by the September 2018 action that are admitted into a foreign-trade zone (FTZ) in "Privileged Foreign" status shall retain that status consistent with 19 CFR 146.41(e) and will be subject, at the time of entry for consumption, to the additional duty rate that was in effect at the time of FTZ admission of said product.

U.S. Customs and Border Protection will issue instructions on entry guidance and implementation.

*Annex ...*

Joseph Barloon, General Counsel, Office of the U.S. Trade Representative.

back to top

* * * * * * * * * * * * * * * * * *

## 5. U.S.- China Economic and Security Review Commission Announces Public Hearing on 7 Jun in Washington DC
(Source: Federal Register, 15 May 2019.)[Excerpts.]

84 FR 21905: Notice of Open Public Hearing

* AGENCY: U.S.-China Economic and Security Review Commission.
* ACTION: Notice of open public hearing.
* SUMMARY: Notice is hereby given of the following hearing of the U.S.-China Economic and Security Review Commission.
The Commission is mandated by Congress to investigate, assess, and report to Congress annually on "national security implications of the economic relationship between the United States and the People's Republic of China." Pursuant to this mandate, the Commission will hold a public hearing in Washington, DC on June 7, 2019 on "Technology, Trade, and Military-Civil Fusion: China's Pursuit of Artificial Intelligence, New Materials, and New Energy."
* DATES: The hearing is scheduled for Thursday, June 7, 2019 at 9:30 a.m.
* ADDRESSES: TBD, Washington, DC. A detailed agenda for the hearing will be posted on the Commission's website at *www.uscc.gov.* Also, please check the Commission's website for possible changes to the hearing schedule. *Reservations are not required to attend the hearing.*
* SUPPLEMENTARY INFORMATION: ... This is the fifth public hearing the Commission will hold during its 2019 report cycle. This hearing will examine China's development of artificial intelligence, new materials, and energy storage, renewable energy, and nuclear power. It will assess China's capabilities in producing and commercializing these technologies vis-à-vis the United States and its ambitions to export these

technologies and shape their global governance in ways that disadvantage the United States. The hearing will also consider China's potential military application of these technologies and strategic implications for the United States. The hearing will be co-chaired by Vice Chairman Robin Cleveland and Commissioner Thea Lee. Any interested party may file a written statement by June 7, 2019 by mailing to the contact above. A portion of each panel will include a question and answer period between the Commissioners and the witnesses. ...

Dated: May 10, 2019.

Daniel W. Peck, Executive Director, U.S.-China Economic and Security Review Commission.

back to top

* * * * * * * * * * * * * * * * * *

## OTHER GOVERNMENT SOURCES

## 6. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce/BIS; NOTICE; Requests for Nominations: Technical Advisory Committees; [Pub. Date: 16 May 2019.]

* State/DDTC; NOTICE; Determination on Imposition and Waiver of Sanctions under Sections 603 and 604 of the Foreign Relations Authorization Act, Fiscal Year 2003; [Pub. Date: 16 May 2019.]

* Treasury; Foreign Assets Control Office; NOTICE; Blocking or Unblocking of Persons and Properties [Pub. Date: 16 May 2019.]

back to top

* * * * * * * * * * * * * * * * * *

## 7. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * *

## 8. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * *



Are You Keeping Up to Date with the Latest Regulations?

Bartlett's Annotated ITAR will keep you updated on the latest ITAR amendments.

MORE INFORMATION AVAILABLE HERE

## NEWS

## 9. Deutsche Welle: "U.S. Warns EU Over €13-Billion Defense Spending"

(Source: Deutsche Welle, 15 May 2019.) [Excerpts.]

The US has warned the European Union that plans to boost defense cooperation within the EU could undo decades of trans-Atlantic cooperation and damage NATO. The EU's foreign policy chief said US concerns were unfounded.

The United States has decried "poison pills" embedded in proposed rules which could shut third country allies such as the United States out of European defense projects.

US Ambassador to the EU Gordon Sondland emphasized the point in a letter and warned of possible US sanctions: "I hope we can avoid contemplating similar courses of action," he said. The EU has been asked to respond to the letter by June 10.

Speaking after EU defense ministers met in Brussels on Tuesday, High Representative of the European Union for Foreign Affairs and Security Policy Federica Mogherini said the US concerns were unfounded.

"The EU is actually at the moment much more open than the US procurement market is for the European Union companies and equipment," Mogherini said in Brussels. "In the EU there is no 'buy European' act and around 81% of international contracts go to the US firms in Europe today." ...

**Self-Reliance in the EU**

The US concerns are focused on the seven-year, €13-billion ($14.6-billion) European Defense Fund (EDF) approved by the European Parliament in April, and the EU defense pact Permanent Structured Cooperation (PESCO). The plans would see EU states cooperate on projects to develop new military equipment such as fighter

planes and drones, and on support systems such as military hospitals and training centers.

German Defense Minister Ursula von der Leyen said Europeans were doing what the Americans had been demanding for many years: building up their defense capabilities. She said it was necessary to trust that NATO would benefit from their collective efforts.

However, the US had written of its suspicions: "The draft EDF regulation and PESCO general conditions represent a dramatic reversal of the last three decades of increased integration of the trans-Atlantic defense sector," US Undersecretary of Defense Ellen Lord and US arms control negotiator Andrea Thompson, wrote in their May 1 letter to Mogherini.

NATO Secretary-General Jens Stoltenberg has publicly backed the pact, as long as it does not lead to duplication.

Mogherini met with EU defense ministers on Tuesday to discuss how to involve non-EU states, including the UK and the US, in the bloc's defense projects.

According to the Stockholm International Peace Research Institute think tank, the US is the world's largest arms exporter with a 36% share, followed by Russia, France and Germany. In terms of imports it sits at 16th on the list, with Germany, the Netherlands and France being the three top sources.

**New Projects**

France and Germany are planning to develop a European fighter jet as part of a project to achieve improved strategic autonomy and end the historic reliance on the US to guarantee regional security.

In 2011, a Franco-British mission in Libya ran out of munitions and equipment and was obliged to turn to the US. The French response has been guided by that experience.
EU governments claim surveys indicate a majority of citizens want the bloc to provide security.

back to top

* * * * * * * * * * * * * * * * * *

## 10. Josh Hawley: "Sen. Hawley Introduces Bill to Stop the Chinese Military's Acquisition of Sensitive American Technology"
(Source: Hawley Senate, 14 May 2019.)

Today Senator Josh Hawley introduced the China Technology Transfer Control Act of 2019 to stop the Chinese military's acquisition of sensitive American technology and formally admonish China for its predatory trade practices.

In recent years, China has aggressively acquired sensitive U.S. technology through intellectual property theft and unfair trade practices. Once China has the technology, it invariably finds its way to the Chinese military.

"It's time to acknowledge that China acts more like an adversary than a friend," said Senator Hawley. "For too long, China has exploited American innovation to undermine our values and threaten our security. This legislation is an important step toward keeping American technology out of the hands of the Chinese government and its military."

## Background

In recent years, China has aggressively acquired sensitive U.S. technology to advance its military capabilities through intellectual property theft and unfair trade practices. China seeks to surpass the U.S. in high tech manufacturing through its state-sponsored "Made in China 2025" initiative and has exploited American technology to advance its military capabilities in two major ways:

## "Trade-Technology-for-Market"

- The "Trade-Technology-for-Market" policy requires American companies to form joint ventures Chinese state-owned partners and share strategic technology in order to gain access to the Chinese market. This strategic technology inevitably finds its way to the Chinese military.

- A prominent example of this is Google attempting to gain access to the Chinese market by building a censored search engine in partnership with a Chinese company.

## Working around U.S. laws designed to confront China's military buildup

- China has worked to find and exploit loopholes in American laws designed to protect sensitive American technology from falling into the hands of the Chinese military.

- A prominent example of this is a Chinese state-controlled entity renting bandwidth on American satellites that it would be forbidden from purchasing under U.S. law. These satellites could be used to aid China in a military conflict.

## The China Technology Transfer Control Act of 2019

Formally admonishes China for intellectual property theft and manipulation of lawful transfer and uses of technology in ways that directly support its military objectives and threaten the United States.

Places all "core technologies" from China's "Made in China 2025" strategy on the Department of Commerce's Export Control List.
- Once a technology is placed on the Export Control List, companies must obtain licenses to export that technology to China.
- "Core technologies" include nearly 15 different technologies such as artificial intelligence, robotics, semiconductors, advanced construction equipment and lithium battery manufacturing.

Imposes sanctions on foreign entities and individuals that violate these export controls through transfer of these "core technologies" to China.

back to top

* * * * * * * * * * * * * * * * * *

## 11. Reuters: "Exclusive: Trump Expected to Sign Order Paving Way for U.S. Telecoms Ban on Huawei"
(Source: Reuters, 15 May 2019.) [Excerpts.]

President Donald Trump is expected to sign an executive order this week barring U.S. companies from using telecommunications equipment made by firms posing a national security risk, paving the way for a ban on doing business with China's Huawei, three U.S. officials familiar with the plan told Reuters.

The order, which will not name specific countries or companies, has been under consideration for more than a year but has repeatedly been delayed, the sources said, asking not to be named because the preparations remain confidential. It could be delayed again, they said.

The executive order would invoke the International Emergency Economic Powers Act, which gives the president the authority to regulate commerce in response to a national emergency that threatens the United States. The order will direct the Commerce Department, working with other government agencies, to draw up a plan for enforcement, the sources said. ...

back to top

* * * * * * * * * * * * * * * * * *

## 12. Reuters: "U.S. Senators Offer Bill Targeting Russia-Germany Pipeline"
(Source: Reuters, 14 May 2019.) [Excerpts.]

A group of Republican and Democratic U.S. senators introduced legislation on Tuesday seeking sanctions targeting the Nord Stream 2, a planned gas pipeline from Russia to Germany under fire from the United States and some European Union countries.

The bill introduced by Republican Senators Ted Cruz, John Barrasso and Tom Cotton and Democrat Jeanne Shaheen, seeks to impose travel and financial sanctions on companies and individuals involved in constructing the pipeline.

The legislation reflects continued U.S. concerns over Russian influence in Europe, but the measure is many steps from becoming law. It would need to pass both the Senate and House of Representatives and be signed by President Donald Trump to go into effect.

The Nord Stream 2 project is led by the Russian state-owned gas company Gazprom, with funding from Germany's Uniper and BASF unit Wintershall, Anglo-Dutch firm Shell, Austria's OMV and France's Engie. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. The Moscow Times: "Russia Eases Arms Resale Rules to Avoid Sanctions - Reports"
(Source: The Moscow Times, 15 May 2019.)

Russia has eased its weapons resale rules to alleviate secondary buyers' fears of U.S. sanctions, according to an unpublished government decree cited by the Vedomosti business daily Wednesday.

Reports found that Russia sold the second-most weapons in 2018 despite five years of declining sales. Countries trading with Russia's defense and intelligence sectors currently face secondary sanctions under U.S. measures imposed in August 2017 over Moscow's actions that include alleged election interference.

The new decree relaxes export control rules that required secondary arms buyers to inform Russia in writing that it was the final buyer, Vedomosti reported. These countries can now avoid direct contact with Russia by making the primary arms buyer responsible for informing Moscow that the secondary buyer vows not to resell the weapons.

"Foreign states voice interest in buying Russian military products but, fearing sanctions, refuse to purchase them," an explanatory note was quoted as saying.

Russia's relaxed regulations will free up Sub-Saharan African, Latin American and certain Southeast Asian states to purchase small arms and light weapons from Russia without fear of secondary sanctions, according to arms expert Konstantin Makienko.

The measures do not target China, India, Egypt, Algeria and Vietnam, which either ignore U.S. sanctions or negotiate exceptions for themselves, Vedomosti cited Makienko as saying.
Last September, the Trump administration imposed sanctions on the Chinese military for buying 10 Su-35 aircraft from Russia.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMMENTARY

## 14. D. W. Layton, J. Zhang & T. C. Lee: "U.S. Prepares to Hit All Chinese Imports with Tariffs, as China Retaliates and Launches a Product Exclusion Process"
(Source: Mayer Brown, 14 May 2019.)

* Authors: Duane W. Layton, Esq., dlayton@mayerbrown.com, +1 202 263 3811; Jing Zhang, Esq., jzhang@mayerbrown.com, +1 202 263 3385; and Timothy C. Lee, Esq., tlee@mayerbrown.com, +1 202 263 3055. All of Mayer Brown.

On May 13, 2019, the Office of the United States Trade Representative ("USTR") released a draft Federal Register notice beginning the process to subject virtually all remaining imports from China (the so-called "Tranche IV") to tariffs pursuant to Section 301 of the Trade Act of 1974. [FN/1] This announcement follows closely on the heels of an announcement by USTR that tariffs on approximately $200 billion worth of imports from China (the so-called "Tranche III") would increase from 10 to 25 percent. [FN/2] The US government has clarified that Chinese products that were exported to the United States prior to May 10, 2019, are not subject to the increase from 10 to 25 percent as long as they are entered for "consumption" prior to June 1. [FN/3]

The May 13 draft notice requests comments on a proposed 25 percent ad valorem duty on additional imports from China, 3,805 products that are collectively valued at approximately $300 billion. [FN/4] A list of the products, organized by tariff subheadings, was included in an annex to USTR's notice. [FN/5] As expected, the list is comprehensive and includes consumer items such as smartphones, computers and textiles, as well as industrial products such as iron and steel pipes. However, imports of pharmaceuticals, certain pharmaceutical inputs, certain medical devices, rare earth materials and critical minerals are not included in the annex. [FN/6]

The draft notice provides details on the deadlines for submitting comments on the proposed tariffs and the schedule for public hearings. Specifically, the deadline for submitting requests to appear at the public hearing, along with a summary of expected testimony, is June 10, 2019. [FN/7] The deadline for submitting written comments is June 17, 2019, when the Section 301 Committee will also convene the public hearing on the proposed tariffs. [FN/8] Any post-hearing rebuttal comments must be submitted seven days after the last day of the public hearing. [FN/9

### China's Response to Tranche III

For its part, China responded to the US increase in tariffs on Tranche III by announcing on May 13, 2019, an increase in the tariffs applicable to three of the four lists that make up China's version of Tranche III countermeasures. [FN/10] Specifically, the tariff applicable to (a) List 1 of China's Tranche III will increase from 10 to 25 percent; [FN/11] (b) List 2 of China's Tranche III will increase from 10 to 20 percent; [FN/12] and (c) List 3 of China's Tranche III will increase from 5 to 10 percent. [FN/13] The tariff imposed on US goods appearing on China's List 4 will remain for the time being at 5 percent. [FN/14] All tariff increases by China will take effect June 1, 2019.

List 1 of China's Tranche III consists of 2,493 tariff codes, covering, inter alia, sheep, horse meat, honey, starch, sugar, mango juice, lime, liquefied natural gas, calcium, sodium sulfate, toluene, methanol, glutamic acid, urea, perfume, lip cosmetics, ophthalmic cosmetics, laser printers and tablets. List 2 of China Tranche III consists of 1,078 tariff codes, covering, inter alia, linseed, vodka, mineral water, toothpaste, plastic toilet seats and covers, toilet paper, rivets, springs, thermal printers, shredders and bearings. List 3 of China Tranche III consists of 974 items, covering, inter alia, frozen sweet corn, roasted peanuts, sodium acetate, first aid kits, electrical blankets, vehicle rearview mirrors, fire extinguishers, painting robots and diapers. List 4 maintained by China consists of 595 tariff codes, covering, inter alia, magnesium chloride, xylitol, ether, fireworks, firecrackers, solar water heaters, parts for oil or gas drilling machines, 3D printers, stethoscopes and dentures.

## China's Launch of a Product Exclusion Process

Amid all the talk of tariffs and retaliation, the Customs Tariff Commission of China's State Council announced on May 13, 2019, that the country will soon launch a product exclusion process related to its Section 301 countermeasures. US products covered by China Tranches I - III are eligible for exclusion as long as there is no revocation or suspension in place. Products for which China's countermeasures (e.g., tariffs) have been revoked or suspended (e.g., certain automobiles and auto parts) are not eligible. [FN/15]

For products on China Tranches I [FN/16] and II, [FN/17] the Ministry of Finance will start accepting applications for exclusion on June 3, 2019, with a deadline of July 5. For products on China Tranche III, the process will start on September 2, 2019, with a deadline of October 18.

## Escalating Trade Tensions

The tariff increases announced by the United States and China, together with the release of the proposed US Tranche IV, reflect an escalation of trade tensions between the two countries. Meanwhile, both countries have granted a grace period for their respective tariff increases. As noted previously, the United States exempts Chinese products that were exported prior to May 10, 2019, and entered (or withdrawn) for consumption prior to June 1 from its tariff increase. China's tariff increases will not take effect until June 1. In addition, whether the United States will actually impose Section 301 tariffs on additional Chinese imports (i.e., those on US Tranche IV) remains a question. President Trump indicated on the same day of the May 13 draft notice that he has yet to make a final decision on that issue. Based on the timeline discussed above, the earliest that US Tranche IV could go into effect would be June 24, 2019, which leaves open the possibility that the two sides could come to an agreement beforehand.

Prospects for a trade deal between the two countries remain uncertain. According to Larry Kudlow (director of the US National Economic Council), China has invited US Trade Representative Robert Lighthizer and Treasury Secretary Steven Mnuchin for additional talks in Beijing, but neither government has confirmed a date for those talks. [FN/18] President Trump has stated that he will meet with China's President Xi at the G20 Summit from June 28 to 29 in Osaka, Japan. [FN/19]

Takeaways for Business

Interested parties should continue to closely monitor developments in this matter and take timely actions to avail themselves of duty avoidance opportunities offered by either side, including participation in the US public comment and/or the Chinese product exclusion process. Additionally, parties that are exploring potential changes to their Chinese production supply chain should carefully consider the complex US customs rules and judicial precedent that govern this area of the law.

[FN/1] 19 U.S.C. §§ 2411-2420 (collectively, "Section 301").
[FN/2] Mayer Brown Legal Update, US Tariff Increase on $200 Billion Chinese Imports Kicks In Today, available here ("Mayer Brown May 10 Legal Update").
[FN/3] Our May 10 Legal Update explained that "in order to retain the 10 percent rate in this situation, importers will need to follow certain special filing procedures yet to be announced." US Customs and Border Production ("CBP") has issued instructions for the special filing procedures. CBP, CSMS #19-000238, UPDATE- Section 301 (Tranche 3) Duties as of May 10, 2019, available here.
[FN/4] USTR, Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, available here ("May 13 Draft Notice").
[FN/5] May 13 Draft Notice at 7.
[FN/6] May 13 Draft Notice at 3.
[FN/7] May 13 Draft Notice at 1.
[FN/8] Id.
[FN/9] Id.
[FN/10] http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201905/t20190513_3256788.html.
[FN/11] List 1 of China Tranche III may be found here.
[FN/12] List 2 of China Tranche III may be found here.
[FN/13] List 3 of China Tranche III may be found here.
[FN/14] List 4 of China Tranche III may be found here.
[FN/15] See here;
[FN/16] China Tranche I may be found here.
[FN/17] China Tranche II may be found here.
[FN/18] Wall Street Journal, China Invites U.S. Negotiators to Continue Trade Talks, White House Economics Adviser Says (May 12, 2019), available here.
[FN/19] Wall Street Journal, Trade Fight Escalates as China Hits U.S. With Higher Tariffs (May 13, 2019), available here.

back to top

☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆

## 15. M. Miller, B. Murphy & S. Murray: "Recommendations re China Section 301 List 3 Trade Remedy Rate Increase from 10% to 25%"
(Source: Editor, 15 May 2019.)

Authors: Marshall Miller, Esq., mmiller@millerco.com; Brian Murphy, Esq., bmurphy@millerco.com, and Sean Murray, Esq., Smurray@millerco.com, all of Miller & Company P.C., Kansas City, MO, (816) 561-4999.

The USTR Federal Register notice was published on 9 May 2019, and Customs followed with CSMS message CSMS #19-000236 on the same day. We have a number of recommendations related to the additional duties which increased on May 10, 2019, for China goods subject to China Section 301 List 3:

**(1) FTZs provide multiple opportunities to continue to use the 10% rate, not the 25% rate.** The "exported to the United States" language allows a window of opportunity for in-transit goods at a 10% rate.

**(2) PF Status On-Hand Inventory**. Current FTZ on-hand inventory which is in Privileged Foreign (PF) status with a PF election date before May 10, 2019 will be assessed at the time of Entry Summary with the current 10% rate of duty.

**(3) NPF Status On-Hand Inventory**. Note the following regarding current FTZ on-hand inventory subject to China Section 301 List 3 which is in Non-Privileged Foreign (NPF) status and is being warehoused only in the FTZ:

(a) For China goods admitted into the FTZ before the September 24, 2018 effective date, clients should file a status change (Admission Type C) e214 to change these goods to Privileged Foreign (PF) status today.

(b) For China goods admitted into the FTZ after the September 24, 2018 effective date, clients should (i) file a status change (Admission Type C) e214 zone to change these goods to Privileged Foreign (PF) status today, and (ii) immediately contact the firm to assist in filing of a Prior Disclosure and Voluntary Notification related to the failure to properly admit the China goods in PF status.

**(4) FTZ-Bound China Goods (Exported May 9 or Earlier.)**

**(a) E214s**. Special attention should be paid to ensure that the correct "export date" is utilized on the e214 FT 20 record as outlined in the CATAIR. Clients should consider filing separate CBPF e214s for China Section 301 List 3 goods to better manage these goods.

**(b) PF Status CBP Entry Summary Reporting**. Customs entries must report the date of export at the line level for Privileged Foreign (PF) goods. Reporting of the date of export is mandatory per entry line in order for CBP to validate eligibility for the 10% duty rate. Customs is working on programming with an uncertain timetable. Clients should ensure their FTZ software is able to report date of export from e214s to Entry Summary.

**(c) Zone-to-Zone Transfers.** Date of export information must be obtained from the transferring FTZ for China Section 301 List 3 goods.

**(d) NAFTA Duty Deferral.** The export date must be secured for entry purposes.

**(e) Customs Entry.** The option of Customs entry should be considered for China goods exported May 9 or earlier.

back to top

✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧

## 16. M. Volkov: "OFAC Framework for Sanctions Compliance Programs - Testing and Auditing and Training (Part III of IV)"
(Source: Volkov Law Group Blog, 13 May 2019. Reprinted by permission.)

* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

OFAC's new Framework for Sanctions Compliance Programs incorporates a number of important principles from Justice Department and US Sentencing Guideline requirements for effective compliance programs.

Today, I am going to review the requirements relating to Testing and Audits and Training.

## Testing and Audits

OFAC requires companies to assess the effectiveness of current processes and check for inconsistencies between these and day-to-day operations. A comprehensive and objective testing or audit function within an SCP ensures that an organization identifies program weaknesses and deficiencies, and it is the organization's responsibility to enhance its program, including all program-related software, systems, and other technology, to remediate any identified compliance gaps. Such enhancements might include updating, improving, or recalibrating SCP elements to account for a changing risk assessment or sanctions environment. Testing and auditing can be conducted on a specific element of an SCP or at the enterprise-wide level.

Under this element a company has to implement three specific elements:

(1) The organization ensures that the testing or audit function is accountable to senior management, is independent of the audited activities and functions, and has sufficient authority, skills, expertise, resources, and authority within the organization.
(2) The organization employs testing or audit procedures appropriate to the level and sophistication of its SCP and that this function, whether deployed internally or by an external party, reflects a comprehensive and objective assessment of the organization's OFAC-related risk assessment and internal controls.
(3) The organization ensures that, upon learning of a confirmed negative testing result or audit finding pertaining to its SCP, it will take immediate and effective action, to the extent possible, to identify and implement compensating controls until the root cause of the weakness can be determined and remediated.

## Training

OFAC observed that "[a]n effective training program is an integral component of a successful SCP." A training program should be "tailored to an entity's risk profile and all appropriate employees and stakeholders." Companies have to conduct training for relevant employees and personnel on a periodic basis (and at a minimum, annually).

To meet this requirement, companies have to satisfy five basic criteria:

(1) An organization ensures that its OFAC-related training program provides adequate information and instruction to employees and, as appropriate, stakeholders (for example, clients, suppliers, business partners, and counterparties). Such training should be further tailored to high-risk employees within the organization.

(2) The organization commits to provide OFAC-related training with a scope that is appropriate for the products and services it offers; the customers, clients, and partner relationships it maintains; and the geographic regions in which it operates.
(3) The organization commits to providing OFAC-related training with a frequency that is appropriate based on its OFAC risk assessment and risk profile.
(4) The organization commits to ensuring that, upon learning of a confirmed negative testing result or audit finding, or other deficiency pertaining to its SCP, it will take immediate and effective action to provide training to or other corrective action with respect to relevant personnel.
(5) The organization's training program includes easily accessible resources and materials that are available to all applicable personnel.

back to top

* * * * * * * * * * * * * * * * * *


## 17. R. Burke, N. Erb & C. A. DeLelle: "Iran Threatens Partial JCPOA Suspension; US Imposes Sanctions on Certain Iranian Metals Sectors"
(Source: White & Case LLP, 13 May 2019)

* Authors: Richard Burke, Esq., rburke@whitecase.com, +1 202 626 3687; Nicole Erb, Esq., nerb@whitecase.com, +1 202 626 3694; Claire A. DeLelle, claire.delelle@whitecase.com, +1 202 626 6485. All of White & Case LLP.

On May 8, 2019, following Iran's announcement that it intends to suspend certain nuclear proliferation-related commitments under the Joint Comprehensive Plan of Action (JCPOA), the United States issued a new Executive order (EO) imposing sectoral sanctions targeting the Iranian iron, steel, aluminum, and copper sectors. [FN/1] In response, the current parties to the JCPOA (after US withdrawal from the JCPOA precisely one year ago)-including the European Union (EU), China and Russia-reiterated their support for the JCPOA and the importance of avoiding escalation.

Hours after Iranian President Hassan Rouhani announced that Iran intends to resume certain nuclear proliferation activities if the remaining parties to the JCPOA [FN/2] do not "fulfil their obligations" under the JCPOA in the next 60 days, the White House and the US Department of the Treasury's Office of Foreign Assets Control (OFAC) announced new sanctions that supplement the existing sanctions provided for in the Iran Freedom and Counter-Proliferation Act of 2012 (IFCA). [FN/3] These new sanctions, which target Iran's second largest industry sector, were issued exactly one year after the United States' withdrawal from the JCPOA on May 8, 2018. [FN/4] A White House press statement issued in connection with the new sanctions warns other nations that the United States will not tolerate trade in Iranian industrial metals. [FN/5] As of May 10, 2019, no sanctions have been imposed against specific parties under this EO.

Iran announces intent to increase nuclear-related activities following key US sanctions-related actions
On May 8, 2019, the Iranian Ministry of Foreign Affairs announced Iran's issuance of a statement to certain parties to the JCPOA stating that it may take actions that

contravene its nuclear commitments under the JCPOA. [FN/6] As of May 8, Iran announced that it "stops some of its measures under the JCPOA," specifically measures on stockpiling of enriched uranium and heavy water reserves. Iran further stated that "the remaining [JCPOA] countries will be given sixty days to fulfil their obligations, especially in banking and oil fields. If they fail to meet [Iran's] demands in the time given, then the Islamic Republic of Iran will suspend compliance with the uranium enrichment limits and measures to modernize the Arak Heavy Water Reactor. Whenever our demands are met, we will resume the same amount of suspended commitments, but otherwise, the Islamic Republic of Iran will suspend the implementation of other obligations step by step." [FN/7]

This development comes days after the United States took several key sanctions-related actions relating to Iran as part of the US campaign of "maximum pressure:" [FN/8]

- On May 2, the United States allowed the "Significant Reduction Exception" waivers to expire, which previously allowed China, India, Italy, Greece, Japan, South Korea, Taiwan, and Turkey to purchase Iranian petroleum and petroleum products without violating the US sanctions reimposed as part of US withdrawal from the JCPOA, among other things. [FN/9]

- On May 3, the US State Department announced sanctions targeting the provision of assistance to the expansion of Iran's Bushehr Nuclear Power Plant and involvement in transferring enriched uranium out of Iran in exchange for natural uranium, and prohibiting the storage of heavy water produced by Iran in excess of current limits. [FN/10] The State Department specifically "permitted" several nonproliferation activities for a renewable "duration" of 90 days, including the redesign of the Arak nuclear reactor to prevent it from becoming a weapons-grade plutonium factory, among other enumerated activities.

- Additionally, on May 5, the United States deployed a carrier group and bomber task force to the Persian Gulf in response to indications of an Iranian threat to US operations in the Middle East. [FN/11]

## New US Executive Order

The new EO issued on May 8, "Imposing Sanctions with Respect to the Iron, Steel, Aluminum, and Copper Sectors of Iran," authorizes:

(1) Blocking sanctions on certain persons determined to be involved with Iran's iron, steel, aluminum, and copper sectors,

(2) Correspondent and payable-through account sanctions on foreign financial institutions (FFIs) determined to have knowingly conducted or facilitated certain significant financial transactions involving Iran's iron, steel, aluminum, and copper sectors.

The EO "supplements" existing menu-based sanctions related to steel and aluminum under the IFCA, but does not draw legal authority from the IFCA. IFCA § 1245 authorizes the imposition of five or more menu-based sanctions on persons determined to have knowingly sold, supplied, or transferred to or from Iran, directly

or indirectly, graphite, raw or semi-finished metals such as steel and aluminum, coal, and software for integrating industrial processes. [FN/12] The EO is separate and distinct from the IFCA.

On May 8, OFAC also issued six Frequently Asked Questions (FAQs) on the new sectoral sanctions. [FN/13] These FAQs state that there is a 90-day wind-down period for taking the necessary steps to wind down transactions that could be sanctioned under the EO. OFAC emphasizes that entering into new business that would be sanctionable under the EO will not be considered "wind down activity" and could be sanctioned during the wind-down period. This 90-day wind-down is not stated in the EO, nor has OFAC issued a general license to that effect as of May 10.

These FAQs also clarify that the EO became effective upon signing on May 8, and that the sanctions do not apply to transactions for the conduct of official business of the United States Government or the United Nations-including its specialized agencies, programs, funds, and related organizations-by employees, grantees, or contractors thereof. The inclusion of this exemption is unusual for an EO of this nature, given that such exemptions typically appear in more expansive EOs, such as those instituting trade bans.

**Blocking Sanctions**

The EO authorizes designation to the List of Specially Designated Nationals and Blocked Persons (SDN List) and the blocking of the property and interests in property located in the United States or in the possession or control of a US person [FN/14] of any person-including non-US persons-determined by the Secretary of the Treasury in consultation with the Secretary of State:

- To operate in the iron, steel, aluminum, or copper sector of Iran;
- To be a person that owns, controls, or operates an entity that is part of the iron, steel, aluminum, or copper sector of Iran; [FN/15]
- To have knowingly engaged in a significant transaction for the sale, supply, or transfer to Iran of significant goods or services used in connection with the iron, steel, aluminum, or copper sector of Iran on or after the date of this EO; and
- To have knowingly engaged in a significant transaction for the purchase, acquisition, sale, transport, or marketing of iron, iron products, aluminum, aluminum products, steel, steel products, copper, or copper products from Iran on or after the date of this EO.

Especially relevant for non-US persons are the following two derivative designation grounds, which accompany most blocking sanctions. First, any person determined to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of any person blocked pursuant to the EO may be subject to designation and blocking. In addition, any person deemed to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person blocked pursuant to this EO may be subject to designation and blocking. The EO also prohibits transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate any of the prohibitions set forth in the EO, including any conspiracy to violate any of the prohibitions.

Any property of the persons blocked under this EO located in the United States or within the possession or control of a US person, wherever located, are considered blocked. US persons are prohibited from engaging in transactions with such property or interests in property absent a specific license from OFAC, and from engaging in transactions with entities that are owned 50 percent or more in the aggregate, directly or indirectly, by designated persons. The EO also imposes a travel ban on designated individuals by suspending their entry into the United States.

## FFI Correspondent and Payable-Through Account Sanctions

The EO also authorizes sanctions prohibiting the opening of, and prohibiting or imposing strict conditions on maintaining, correspondent accounts or payable-through accounts in the United States by FFIs determined by the Secretary of the Treasury in consultation with the Secretary of State to have knowingly conducted or facilitated any significant financial transactions on or after the date of this EO:

- For the sale, supply, or transfer to Iran of significant goods or services used in connection with the iron, steel, aluminum, or copper sector of Iran;
- For the purchase, acquisition, sale, transport, or marketing of iron, iron products, aluminum, aluminum products, steel, steel products, copper, or copper products from Iran; and
- For or on behalf of any person blocked pursuant to this EO.
OFAC could amend the newly-created List of Foreign Financial Institutions Subject to Correspondent Account or Payable-Through Account Sanctions (the CAPTA List) to include any FFIs sanctioned under this EO. [FN/16] The CAPTA List superseded the Part 561 List and includes all FFIs for which the opening or maintaining of a correspondent account or payable-through account in the United States is prohibited or subject to one or more strict conditions pursuant to an enumerated list of US sanctions laws and regulations. [FN/17] At present, the only FFI on the CAPTA List is Bank of Kunlun.

## Significant transactions, goods and services, and financial transactions

For purposes of this EO, OFAC anticipates adopting the interpretation of "significant" set out in the Iranian Financial Sanctions Regulations (IFSR), as used for the IFCA and certain other Executive orders. [FN/18] Under the IFSR, in determining whether specific transactions, financial services, or financial transactions are "significant," the Department of the Treasury may consider the totality of the facts and circumstances, including a list of eight factors. These factors include:

- The size, number, and frequency of transactions and services;
- The nature of such transactions and services, including their type, complexity, and commercial purpose;
- The level of awareness of management and whether the transactions are part of a pattern of conduct;
- The nexus of the transactions and services with blocked persons;
- The impact of the transactions and services on statutory objectives;
- Whether the transactions and services involve deceptive practices; [FN/19]
- Whether the transactions solely involve the passive holdings of Central Bank of Iran (CBI) reserves or repayment by the CBI of official development assistance or the

transfer of funds required as a condition of Iran's membership in an international financial institution; and
- Other relevant factors that the Secretary of the Treasury deems relevant. [FN/20]
**International Support for the JCPOA under Pressure**

The EU, and particularly France, Germany, and the United Kingdom, face a difficult decision given Iran's threat to contravene certain of its JCPOA commitments, and the United States' imposition of new sanctions that could target the activity of European economic operators. A general EU statement issued following the Iranian and US developments on May 8 expressed support for the JCPOA, while calling on Iran and the United States to exercise restraint. [FN/21] In a press conference, the UK Foreign Secretary urged Iran not to take further escalatory steps and to adhere to its JCPOA commitments, stating that there would be consequences should Iran cease to observe the JCPOA. [FN/22] However, it is too early to tell at this stage what the potential impact of Iran's statement could be on EU sanctions, for example, as the JCPOA parties have seemingly so far adopted a "wait and see" attitude.

Previously, following the United States' withdrawal from the JCPOA and re-imposition of sanctions on Iran, the EU responded by updating Council Regulation (EC) No. 2271/96 (the "Blocking Regulation") in an effort to reduce the impact on Iran and preserve the JCPOA commitments. [FN/23] The updated Blocking Regulation forbids EU natural and legal persons from complying with any requirement or prohibition based on or resulting from any of the statutes and regulations set out in its annex [FN/24] where these apply extraterritorially, unless exceptionally authorized to do so by the European Commission.

Also in an effort to give effect to the JCPOA and protect European-Iranian business, France, Germany, and the UK implemented a special purpose vehicle on January 31, 2019, called INSTEX SAS, to enable payments related to "legitimate" trade between European economic operators and Iran that might otherwise be subject to US sanctions. [FN/25] However, the general impact of this mechanism, and especially whether it could help ensure that payments to and from Iran are made despite certain US sanctions imposed on Iran-related financial transactions, remains unclear.

China reiterated its support for the JCPOA following the Iranian announcements, stating that the JCPOA should continue to be implemented fully despite the United States' JCPOA withdrawal. [FN/26] China called on all involved parties to exercise restraint and to engage in discussion to prevent escalation. A Kremlin spokesperson stated on May 8 that Russian President Vladimir Putin sees no alternative to the JCPOA, and expressed Russia's intention to continue international discussions on these issues. [FN/27]

## Conclusion

The United States advises that it will implement these new sanctions on Iran, which are effective as of May 8, 2019, including by adding offenders to the SDN List and enforcing against prohibited non-wind-down activities during the 90-day wind-down period. Companies involved in business activities related to Iran should carefully consider their obligations under both US and EU law (and any other applicable laws), as the ramifications of these conflicting rules can vary depending on a company's particular circumstances. Companies considering engaging in Iran-related business

should exercise caution to ensure compliance with all applicable sanctions, including sanctions relating to persons designated on the SDN List pursuant to this Executive order. Foreign Financial Institutions face the particular compliance challenge of determining which financial transactions relate to targeted activities.

-------

[FN/1] Executive order, Imposing Sanctions with Respect to the Iron, Steel, Aluminum, and Copper Sectors of Iran, available here; OFAC, Recent Action, Issuance of Executive Order of May 8, 2019, "Imposing Sanctions with Respect to the Iron, Steel, Aluminum, and Copper Sectors of Iran," available here.

[FN/2 ]The current parties to the JCPOA are the so-called "E3/EU+3", i.e., China, France, Germany, Russia, and the United Kingdom, plus the EU as represented by the High Representative of the EU for Foreign Affairs and Security Policy. The JCPOA has been endorsed at UN level through UN Security Council Resolution 2231.

[FN/3] Iran Freedom and Counter-Proliferation Act of 2012 (IFCA), Pub. L. 112-239.

[FN/4] Our previous alert on the United States withdrawal from the JCPOA is available here.

[FN/5] White House, Statements & Releases, Statement from President Donald J. Trump Regarding Imposing Sanctions with Respect to the Iron, Steel, Aluminum and Copper Sectors of Iran, available here; State Department, Remarks, After the Deal: a New Iran Strategy, available here.

[FN/6] Islamic Republic of Iran Ministry of Foreign Affairs, Latest News, SNSC in a statement addressing nuclear deal parties: Iran stops some of its measures under JCPOA, available here.

[FN/7] Islamic Republic of Iran Ministry of Foreign Affairs, Latest News, SNSC in a statement addressing nuclear deal parties: Iran stops some of its measures under JCPOA, available here.

[FN/8] White House, Fact Sheet, President Donald J. Trump is Cutting Off Funds the Iranian Regime Uses to Support its Destructive Activities Around the World, available here.

[FN/9] State Department, Fact Sheet, Advancing the US Maximum Pressure Campaign on Iran, available here.

[FN/10] State Department, Fact Sheet, Advancing the Maximum Pressure Campaign by Restricting Iran's Nuclear Activities, available here.

[FN/11] White House, Statements & Releases, Statement from the National Security Advisor Ambassador John Bolton, available here. This deployment was to the US Central Command region, which includes the Persian Gulf.

[FN/12] IFCA § 1245(a)(1)(B-C).

[FN/13] OFAC FAQs 666-671, available here.

[FN/14] US person is defined to include US citizens and permanent resident aliens, wherever located, entities organized under US law (including foreign branches), and individuals and entities located in the United States.

[FN/15] Other OFAC sanctions targeting economic sectors do not include language including "persons that own, control, or operate" entities, such as EO 13661 and 13662 on certain sectors of the Russian economy, and EO 13850 on certain sectors of the Venezuelan economy.

[FN/16] OFAC Press Bulletin, Introduction of the Correspondent Account or Payable-Through Account Sanctions (the "CAPTA List") and Removal of the List of Foreign Financial Institutions Subject to Part 561 (the "Part 561 List"), available here; OFAC Recent Actions, Introduction of the Correspondent Account or Payable-Through

Account Sanctions (the "CAPTA List") and Removal of the List of Foreign Financial Institutions Subject to Part 561 (the "Part 561 List"), available here.

[FN17] OFAC Recent Actions, Introduction of the Correspondent Account or Payable-Through Account Sanctions (the "CAPTA List") and Removal of the List of Foreign Financial Institutions Subject to Part 561 (the "Part 561 List"), available here; OFAC, List of Foreign Financial Institutions Subject to Correspondent Account or Payable-Through Account Sanctions, available here.

[FN18] 31 C.F.R. § 561.404; OFAC FAQs 671, 289.

[FN19] Deceptive practices include attempts to obscure or conceal the actual parties or true nature of the transactions or services, or attempts to evade sanctions. 31 C.F.R. § 561.404(f).

[FN20] 31 C.F.R. § 561.404; OFAC FAQ 289.

[FN21] EEAS, Joint statement by High Representative of the European Union and the Foreign Ministers of France, Germany and the United Kingdom on the JCPoA [sic], available here.

[FN22] State Department, Remarks by Secretary of State, Press Availability with British Foreign Secretary Jeremy Hunt, available here.

[FN23] Our previous alerts on the EU revisions to the Blocking Regulation are available here and here, and here.

[FN24] The EU Blocking Regulation annex lists the Iran Freedom and Counter-Proliferation Act of 2012 (IFCA); the Iran Sanctions Act of 1996; the National Defense Authorization Act for Fiscal Year 2012; the Iran Threat Reduction and Syria Human Rights Act of 2012; and the Iranian Transactions and Sanctions Regulations (ITSR) (as well as two statutes containing US sanctions against Cuba).

[FN25] Our previous alert on INSTEX is available here.

[FN26] Ministry of Foreign Affairs of the People's Republic of China, Spokesperson's Remarks, Foreign Ministry Spokesperson Geng Shuang's Regular Press Conference on May 8, 2019, available here.

[FN27] Washington Post, Iran announced it will stop complying with parts of landmark nuclear deal, available here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


## 18. R. Fayhee, O. Dorgans & A.G. Kashdan: "The U.S. Issues New Iran Secondary Sanctions, Placing Europe in the Cross-Fire"
(Source: Hughes Hubbard, 13 May 2019.)

\* Authors: Ryan Fayhee, Esq., ryan.fayhee@hugheshubbard.com, +1 (202) 721-4691; Olivier Dorgans, Esq., olivier.dorgans@hugheshubbard.com,+33 (0) 1 44 05 79 68, and Alan G. Kashdan, alan.kashdan@hugheshubbard.com, +1 (202) 721-4630. All of Hughes Hubbard.

On May 8, 2019, the Trump Administration announced sanctions against the industrial-metals sector of Iran's economy, leaving European countries caught in the middle as tensions escalate between the United States and Iran. The new Executive Order, in pertinent part, authorizes secondary sanctions on persons determined to have "knowingly engaged" in "significant transactions" involving Iranian-origin iron, steel, aluminum, or copper, or goods or services used in connection with those sectors of Iran's economy. The sanctions also include a 90-day period for companies and countries to wind down their business with Iran.

The sanctions potentially impact nearly $5 billion of Iranian exports, which is about 10% of Iran's total exports. While the new round of sanctions may not be as commercially significant as existing sanctions on the oil industry, it illustrates the United States' ongoing strategy to apply economic pressure on Iran through a comprehensive and severe sanctions regime. The new round of sanctions is even more sweeping than sanctions imposed on Iran's metal industry by the United States in the years prior to the 2015 Joint Comprehensive Plan of Action ("JCPOA"), from which the U.S. withdrew almost exactly one year ago. Further, the new sanctions come only a few weeks after the United States ended sanctions waivers that had allowed certain countries to continue importing Iranian oil.

The sanctions come on the same day that Iranian President Hassan Rouhani announced that Iran would begin walking away from its commitments under the JCPOA if it did not receive relief from severe U.S. sanctions in the next 60 days. President Rouhini warned that, without assistance from European countries still party to the agreement, Iran would disregard the 3.67% cap on uranium enrichment established by the JCPOA and possibly resume construction of the Arak nuclear reactor.

In the months leading up to Iran's ultimatum, European countries have tried to rescue the JCPOA and find a mechanism to bypass U.S. sanctions in Iran, but European companies are reluctant to risk the steep fines imposed by the United States if they violate sanctions. Europe has also consistently opposed the U.S. withdrawal from the JCPOA and imposition of unilateral sanctions. The European Union has repeatedly emphasized its commitment to the JCPOA, recently issuing a press release disapproving of the United States' re-imposition of sanctions. However, even though the EU's objective is to preserve the deal, EU leaders have rejected President Rouhani's ultimatum and have urged Iran to continue adhering to the terms of the agreement.

Through these increasingly severe and broad sanctions, the United States aims to apply maximum pressure on Iran to meet a variety of demands, including dismantling its uranium enrichment programs, halting Iran's military support for the Houthi militia, ceasing support to paramilitary groups, and recognizing the sovereignty of Iraq. According to some experts, Iran might incrementally breach its commitments in the JCPOA but not fully withdraw, potentially giving the country more leverage for a future deal if there is a new U.S. president after 2020. If Iran does pursue that strategy, the Trump Administration could respond with additional measures to further isolate Iran from the world economy.

back to top

* * * * * * * * * * * * * * * * * * *

EX/IM TRAINING EVENTS & CONFERENCES

## 19. FCC Presents "The ABC of FMS", 28 Nov in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

This training course is specifically designed for compliance professionals and those in a similar role working for government agencies or companies (temporarily) obtaining U.S. export-controlled articles and technology procured through government-to-government Foreign Military Sales (FMS), and authorized by the Arms Export Control Act (AECA) (22 U.S.C. 2751, *et. seq.*).

The course will cover multiple topics relevant for organizations outside the U.S. working with U.S. export-controlled articles and technology procured through FMS, including: the U.S. regulatory framework, with a special focus on the AECA, key concepts and definitions, and practical compliance tips to ensure the proper handling of FMS-acquired articles and technology. Participants will receive a certification upon completion of the training.

**Details**
* What: The ABC of Foreign Military Sales (FMS)
* When: Thursday, 28 Nov 2019
- Welcome and Registration: 9.00 am - 9.30 am
- Training hours: 9.30 am - 4.00 pm
* Where: Full Circle Compliance, Landgoed Groenhoven, Dorpsstraat 6, Bruchem, the Netherlands
* Information & Registration: here or contact FCC at events@fullcirclecompliance.eu or + 31 (0)23 - 844 - 9046
* This course can be followed in combination with "U.S. Export Controls: The International Traffic in Arms Regulations (ITAR) from a non-U.S. Perspective" (26 Nov 2019), and/or "U.S. Export Controls: The Export Administration Regulations (EAR) from a non-U.S. Perspective" (27 Nov 2019). Please, see the event page for our combo deals.

back to top

* * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

## 20. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **L. Frank Baum** (Lyman Frank Baum; May 15, 1856 - May 6, 1919; was an American author chiefly famous for his children's books, particularly *The Wonderful Wizard of Oz* and its sequels. He wrote 14 novels in the Oz series, plus 41 other novels, 83 short stories, over 200 poems, and at least 42 scripts for plays.)
- *"I can't give you a brain, but I can give you a diploma."*

* **Katherine Anne Porter** (15 May 15, 1890 - 18 Sep 1980; was an American journalist, essayist, short story writer, novelist, and political activist. Her 1962 novel *Ship of Fools* was the best-selling novel in America that year, but her short stories received much more critical acclaim. She is known for her penetrating insight; her work deals with dark themes such as betrayal, death and the origin of human evil.)
- *"I shall try to tell the truth, but the result will be fiction."*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 23. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199.  Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
  - Last Amendment: 5 Apr 2019:  5 Apr 2019: 84 FR 13499-13513: Civil Monetary Penalty Adjustments for Inflation

* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
  - Last Amendment: 14 May 2019: 84 FR 21233-21238: Addition of Certain Entities to the Entity List, Revision of an Entry on the Entity List, and Removal of an Entity From the Entity List

* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30.  Implemented by Dep't of Commerce, U.S. Census Bureau.
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (1 Jan 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal

standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under the Atomic Energy Act of 1954.
  - Last Amendment: 23 Feb 2015: 80 FR 9359, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

* DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under the Atomic Energy Act of 1954.
  - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

* DOJ ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
  - Last Amendment: 14 Mar 2019: 84 FR 9239-9240: Bump-Stock-Type Devices

* DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
  - Last Amendment: 19 Apr 2019: 84 FR 16398-16402: International Traffic in Arms Regulations: Transfers Made by or for a Department or Agency of the U.S. Government
  - The only available fully updated copy (latest edition: 19 Apr 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR is a 361-page Word document containing all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by download, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR. Please contact us to receive your discount code.

* DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders. Implemented by Dep't of Treasury, Office of Foreign Assets Control.
  - Last Amendment: 29 Apr 2019: 84 FR 17950-17958: Foreign Interference in U.S. Elections Sanctions Regulations [amendment of 31 CFR Part 579 to implement EO 13848]

* USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S. International Trade Commission. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 13 May 2019: Harmonized System Update (HSU) 1907

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 24. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITORIAL POLICY

\* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Vincent J.A. Goossen and Alex Witt; and Events & Jobs Editor, Sven Goor. The Ex/Im Daily Update is emailed every business day to approximately 7,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

\* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

\* CAVEAT: The contents cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

\* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

\* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

\* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

**From**: Jim Bartlett, Full Circle Compliance ███████@fullcirclecompliance.eu]
**Sent**: 5/20/2019 6:55:34 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 19-0520 Monday "Daily Bugle"



## Monday, 20 May 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1.  Items Scheduled for Publication in Future Federal Register Editions
2.  Commerce/BIS Welcomes Registrations for Annual Conference on 9-11 July
3.  DoD/DSCA Posts New Policy Memo
4.  State/DDTC: (No new postings.)
5.  EU Council Extends Syria Sanctions by One Year
6.  EU Amends Restrictive Measures Concerning ISIL (Da'esh) and Al-Qaida, and Syria, Creates New Cyber-Attack Sanctions Regime

### NEWS

7.  The Buffalo News: "Man Accused of International Gun Sales Goes to Prison"
8.  The Drive: "Company Teases New F-16 Flight Sim After Developer Ends Up in Jail Over Buying USAF Manuals"
9.  The New York Times: "Infineon Denies Report It Has Suspended Huawei Shipments
10. Nikkei Asian Review: "Japan Weighs Export Controls for Cutting-Edge Tech"
11. ST&R Trade Report: "U.S., Canada, Mexico to Terminate Steel and Aluminum Tariffs"
12. Tech Crunch: "Why Start-Ups Need to Be Careful About Export Licenses and the Huawei Ban"

## COMMENTARY

13.     D.H. Laufman & J. Clark: "Executive Order Imposes New Compliance Obligations on Parties to Transactions Involving Information and Communications Technologies"

14.     J. Haggin: "Turkey Loses GSP Status & More!"

15.     T.M. Polino, D.R. Hamill & D. Salkeld: "Additional Duties Proposed on Another $300 Billion of China Products"a

## EX/IM MOVERS & SHAKERS

16.     David Laufman Moves to Wiggin & Dana Law Firm

17.     Monday List of Ex/Im Job Openings: 152 Openings Posted This Week, Including 17 New Openings

## EX/IM TRAINING EVENTS & CONFERENCES

18.     FCC Presents: "U.S. Export Controls: The ITAR from a non-U.S. Perspective", 26 Nov in Bruchem, the Netherlands

## EDITOR'S NOTES

19.     Bartlett's Unfamiliar Quotations

20.     Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (5 Apr 2019), DOC/EAR (14 May 2019), DOC/FTR (24 Apr 2019), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (14 Mar 2018), DOS/ITAR (19 Apr 2018), DOT/FACR/OFAC (29 Apr 2018), HTSUS (13 May 2019)

21.     Weekly Highlights of the Daily Bugle Top Stories



THE CFIUS BOOK

From the publisher of WorldECR and The Export Compliance Manager's Handbook

THE CFIUS BOOK

The essential guide to navigating an investment or acquisition in sensitive industries or companies in the US, past the bureaucratic obstacles and hidden pitfalls to a successful conclusion. To find out more, CLICK HERE or go to www.worldecr.com/books

## ITEMS FROM TODAY'S FEDERAL REGISTER

[No items of interest noted today.]

back to top

* * * * * * * * * * * * * * * * * *

## OTHER GOVERNMENT SOURCES

## 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce/BIS; RULES; Addition of Entities to the Entity List [Pub. Date: 21 May 2019.]

back to top

* * * * * * * * * * * * * * * * * *

## 2. Commerce/BIS Welcomes Registrations for Annual Conference on 9-11 July
(Source: Commerce/BIS, 13 May 2019.) [Repost of 13 May Daily Bugle.]

The Bureau of Industry and Security (BIS) will hold the 32nd Annual Conference on Export Controls in Washington, D.C. July 9-11, 2019. The conference attracts experts from industry, academia, and government from around the world to learn and exchange ideas about export control issues.  It is one of the Bureau's most notable export control outreach events.
The theme of this year's conference is "Emerging Technologies, Strategic Trade, and Global Threats".  The planned agenda includes sessions on:

- 5G
- Artificial Intelligence (AI)
- Emerging Technology
- The Committee on Foreign Investment in the United States (CFIUS)/ Foreign Investment Risk Review Modernization of 2018 (FIRRMA)
- Export Control Reform Act of 2018 (ECRA)

The 2019 BIS Annual Conference will be at the Marriott Marquis Hotel. A conference room rate is available for attendees.

To Register Now as an Attendee Click Here.

Exhibit opportunities are available.  The exhibit hall will be open during the entire conference:  on Tuesday, July 9 from 7:30 a.m. - 5:00 p.m., on Wednesday, July 10 from 7:30 a.m. - 6:30 p.m., and on Thursday, July 11 from 7:30 a.m. - 1:30 p.m. To Register Now as an Exhibitor Click Here.

back to top

* * * * * * * * * * * * * * * * * * *

## 3. DoD/DSCA Posts New Policy Memo
(Source: DoD/DSCA, 19 May 2019.)

- DSCA Policy Memo 19-28 Assignment of Program Code "7E" to track Fiscal Year (FY) Funds Provided for FY 2019/2020 Peacekeeping Operations (PKO), Overseas Contingency Operations (OCO) has been posted.
    Effective immediately, Program Code "7E" is assigned to track and execute FY 2019/2020 funds provided for PKO-OCO under Division F of the Department of State, Foreign Operation and Related Program Appropriations Act, 2019 (P.L. 116-06). These funds are available for obligation until September 30, 2020 and for reprogramming until September 30, 2024.
    This memo revises Table C4.T2B. - Security Cooperation (SC) Customer and Regional Codes and FMS Eligibility (DSCA/DFAS Reserved) and C15.T2. - Peacekeeping Operations (PKO)

back to top

* * * * * * * * * * * * * * * * * * *


## 4. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * * *


## 5. EU Council Extends Syria Sanctions by One Year
(Source: Council of the European Union, 17 May 2019.) [Excerpts.]

On 17 May 2019, the Council extended EU restrictive measures against the Syrian regime until 1 June 2020. In line with the EU strategy on Syria, the EU decided to maintain its restrictive measures against the Syrian regime and its supporters as the repression of civilian population continues.

The Council also removed 5 deceased persons from the list, as well as one entity which ceased to exist and one entity for which there were no longer grounds to keep it under restrictive measures. The list now includes 270 persons and 70 entities targeted by a travel ban and an asset freeze for being responsible for the violent repression against the civilian population in Syria, benefiting from or supporting the regime, and/or being associated with such persons or entities.

More broadly, sanctions currently in place against Syria include an oil embargo, restrictions on certain investments, a freeze of the assets of the Syrian central bank held in the EU, export restrictions on equipment and technology that might be used for internal repression as well as on equipment and technology for the monitoring or interception of internet or telephone communications. ...

back to top

* * * * * * * * * * * * * * * * * * *

## 6. EU Amends Restrictive Measures Concerning ISIL (Da'esh) and Al-Qaida, and Syria, Creates New Cyber-Attack Sanctions Regime
(Source: Official Journal of the European Union, 17 and 20 May 2019.)

*Regulations*
* Commission Implementing Regulation (EU) 2019/791 of 16 May 2019 amending for the 302nd time Council Regulation (EC) No 881/2002 imposing certain specific restrictive measures directed against certain persons and entities associated with the ISIL (Da'esh) and Al-Qaida organisations
* Council Regulation (EU) 2019/796 of 17 May 2019 concerning restrictive measures against cyber-attacks threatening the Union or its Member States
* Council Implementing Regulation (EU) 2019/798 of 17 May 2019 implementing Regulation (EU) No 36/2012 concerning restrictive measures in view of the situation in Syria

*Decisions*
* Council Decision (CFSP) 2019/797 of 17 May 2019 concerning restrictive measures against cyber-attacks threatening the Union or its Member States
* Council Decision (CFSP) 2019/806 of 17 May 2019 amending Decision 2013/255/CFSP concerning restrictive measures against Syria

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NEWS

## 7. The Buffalo News: "Man Accused of International Gun Sales Goes to Prison"
(Source: The Buffalo News, 17 May 2019.) [Excerpts.]

A Canadian accused of international arms sales stood before a judge in Buffalo Friday and admitted his guilt.

Aydan Sin, 47, pleaded guilty to violating the Arms Export Control Act and will face a recommended sentence of up to 63 months in prison.

Sin, who appeared Friday before U.S. District Judge Richard J. Arcara, was accused of conspiring with two other Canadians to sell 15 mini Uzi submachine guns and 40 9mm Glock pistols in 2017 to customers in Colombia and the United Arab Emirates.

Prosecutors don't know who the intended customers were, but Assistant U.S. Attorney Aaron J. Mango said they requested the guns' serial numbers be removed. ...

back to top

* * * * * * * * * * * * * * * * * *

## 8. The Drive: "Company Teases New F-16 Flight Sim After Developer Ends Up in Jail Over Buying USAF Manuals"
(Source: The Drive, 17 May 2019.) [Excerpts.]

It's no secret that *The War Zone* is a fan of Eagle Dynamics' hyper-realistic flight simulator Digital Combat Simulator World, better known as DCS World. So it's exciting to see the company offer the first glimpse of its upcoming F-16C Block 50 module. But it now comes with an unusual added twist as one of the company's programmers, Oleg Tishchenko, is now sitting in the Weber County Jail in Utah charged with attempting to smuggle sensitive U.S. military aircraft flight manuals related to the F-16 Viper and the F-22 Raptor back home in violation of the U.S. government's International Traffic in Arms Regulations (ITAR). ...

The U.S. government has charged Tishchenko with one count each of conspiracy to commit an offense against the United States, violation of the Arms Export Control Act, smuggling goods from the United States, attempted violation of the Arms Export Control Act, and attempts to smuggle goods from the United States. You can find a copy of the full indictment here. All of this centers around the Russian's purchase and attempts to purchase U.S. Air Force "Technical Order" manuals for various models of the F-16, as well as the F-22. ...

back to top

* * * * * * * * * * * * * * * * * *

## 9. The New York Times: "Infineon Denies Report It Has Suspended Huawei Shipments
(Source: The New York Times, 20 May 2019.) [Excerpts.]

German chipmaker Infineon is continuing most shipments to Huawei, it said on Monday, denying a report in Japan's Nikkei daily that it had suspended deliveries to the Chinese telecoms firm.

Infineon, which makes power-management chips used in cars, smartphones and wind turbines, said most of its products were not covered by the U.S. export control restrictions announced by the Trump administration last Thursday.

"As of today, the great majority of products Infineon delivers to Huawei is not subject to U.S. export control law restrictions, therefore those shipments will continue," Infineon said in a statement. ...

back to top

## 10. Nikkei Asian Review: "Japan Weighs Export Controls for Cutting-Edge Tech"
(Source: Nikkei Asian Review, 20 May 2019.) [Excerpts.]

Japan is considering restricting exports of advanced technology used in such applications as artificial intelligence and robots, following the lead set by recent American measures aimed at China.

While Japanese law has a framework for keeping sensitive technology out of foreign hands, it focuses mainly on dual-use goods that can be utilized in nuclear weapons, missiles, and chemical and biological weapons, for example. The list of restricted items includes certain machine tools, electronic components and materials.

But there are advanced technologies expected to see broader use that are not covered by these curbs even if they present a security risk. While exports of certain 3D printers can be restricted via the machine tools category, "there are many other technologies that cannot be banned under our current framework," including AI and robotics, a government source said.

The U.S. is employing export controls in its trade war with China, most recently with the addition of Huawei Technologies to a blacklist that essentially bans exports to the telecommunications giant. Washington earlier this year closed a public comment period on planned restrictions that target emerging technologies in 14 categories, including AI, biotechnology, robotics, quantum computing, 3D printing and advanced materials. ...

back to top

## 11. ST&R Trade Report: "U.S., Canada, Mexico to Terminate Steel and Aluminum Tariffs"
(Source: Sandler, Travis & Rosenberg Trade Report, 20 May 2019.)

The U.S. announced May 17 that it will eliminate all section 232 tariffs on steel and aluminum products from Canada and Mexico, which in turn will remove all retaliatory tariffs on U.S. goods. However, tariffs could be reimposed if imports of these products surge.

The U.S. imposed section 232 tariffs of 25 percent on steel and 10 percent on aluminum products imported from Canada and Mexico as of June 1, 2018. Those two countries responded with retaliatory tariffs on goods imported from the U.S. (Click here for ST&R's web page providing full details.)

To address the problems underlying the decision to impose these tariffs, which largely have to do with the growth of production in and exports from China, a joint statement said the U.S. and Canada have agreed to implement effective measures to prevent (a) the importation of aluminum and steel that is unfairly subsidized and/or sold at dumped prices and (b) the transshipment of aluminum and steel made outside of the U.S. or Canada to the other.

In addition, the statement said, a process will be established for monitoring U.S.-Canada trade in steel and aluminum products. If imports surge meaningfully beyond historic volumes over a period of time (which was not defined), the importing country may request consultations with the exporting country. After such consultations, the importing party may impose duties of 25 percent for steel and 10 percent for aluminum with respect to the individual product(s) where the surge took place. If such measures are imposed, the exporting country agrees to retaliate only in the affected sector.

Although no official notice from Mexico was available at press time, press sources indicate that the terms above will apply to U.S.-Mexico trade in steel and aluminum products as well.

back to top

* * * * * * * * * * * * * * * * * * *

## 12. Tech Crunch: "Why Start-Ups Need to Be Careful About Export Licenses and the Huawei Ban"
(Source: Tech Crunch, 20 May 2019.) [Excerpts.]

America is the land of free trade ... precisely until it is not. Through a thicket of laws and regulations, the U.S. government has broad control over what can get exported to whom, particularly in areas with sensitive technology or national security concerns. In general, those restrictions are loose, which is why startups mostly haven't had to think about export laws.

That open world is rapidly closing though, and startups could well be the most harmed given that they have limited resources to handle these sorts of bureaucratic processes and the potential large penalty fines.

Last week, President Trump signed an executive order requiring that the Department of Commerce initiate a review of regulations and enforcement practices to ensure that U.S. entities (people and companies) don't provide "information and communications technology or services" to a "foreign adversary." That term was read as describing China, although nothing in the order prevents its expansion to cover other countries in the future. ...

back to top

* * * * * * * * * * * * * * * * * * *

## 13. D.H. Laufman & J. Clark: "Executive Order Imposes New Compliance Obligations on Parties to Transactions Involving Information and Communications Technologies"
(Source: Wiggin & Dana Advisory, 16 May 2019.)

* Authors: David H. Laufman, Esq., dlaufman@wiggin.com; and Jared Clark, Esq., jclark@wiggin.com. Both of Wiggin & Dana LLP

On May 15, President Trump issued an Executive order declaring a national emergency with respect to the threat posed by "foreign adversaries" seeking to exploit vulnerabilities in U.S. information and communications technology infrastructure and services. The "Executive Order on Securing the Information and Communications Technology and Services Supply Chain," which comes amidst heightened trade tensions with China, presents considerable new challenges and complications for U.S. companies dependent on Chinese information or communications technology. In particular, the order will require U.S. businesses to implement new compliance strategies as they race to adopt fifth-generation, or 5G, networking technology.

The order broadly prohibits U.S. companies from acquiring, importing, transferring, dealing in, or using any information and communications technology or service "where the transaction involves any property in which any foreign country or a national thereof has any interest," if the Secretary of Commerce has made the following determinations: (1) the transaction involves information and communications technology or services designed, developed, manufactured, or supplied, by persons owned by, controlled by, or subject to the jurisdiction or direction of a "foreign adversary"; and (2) the transaction (a) poses an undue risk of sabotage to or subversion of the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of information and communications technology or services in the United States; (b) poses an undue risk of catastrophic effects on the security or resiliency of United States critical infrastructure or the digital economy of the United States; or (c) otherwise poses an unacceptable risk to the national security of the United States or the security and safety of United States persons.

China is clearly the primary target of the order, though not expressly identified as such.  On the same day the order was issued, the Department of Commerce added Chinese telecommunications giant Huawei Technologies Co. Ltd. to its "Entity List" on the grounds that that Huawei "is engaged in activities that are contrary to U.S. national security or foreign policy interests." As a result, U.S. companies are now prohibited from exporting equipment to Huawei without a license, with license applications subject to a presumptive policy of denial. In addition, the order follows and supplements a 2018 law, included in the Defense Authorization Act, that banned the U.S. government and government contractors from using equipment manufactured by Huawaei and fellow Chinese telecommunications company ZTE

Corporation. Finally, the order defines "foreign adversary" as "any foreign government or foreign non-government person engaged in a long-term pattern or serious instances of conduct significantly adverse to the national security of the United States or security and safety of United States persons" - a definition that closely corresponds to U.S. Government intelligence and law enforcement assessments regarding Chinese government threats to the U.S. supply chain.

In addition to authorizing the Secretary of Commerce to block transactions of the nature described above, the order empowers the Secretary to designate specific countries and companies as "foreign adversaries" and to identify certain technologies that warrant particular scrutiny under the order.  The Secretary may also direct when and how U.S. businesses must cease using such technologies, and may establish procedures for licensing otherwise-prohibited transactions. The Secretary must publish regulations implementing these new authorities within 150 days of the order.

The ultimate impact of the order on business operations will be determined by the final form of implementing regulations and practical experience, but there is little question that the order will result in significant new compliance obligations for U.S. businesses. Even with a framework of published rules in place, regulatory uncertainty is likely to persist; like the U.S. sanctions on Russia, the order draws its legal authority in part from the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), and, if the Russia sanctions are any guide, U.S. businesses may find that compliance with the order is complicated by the fact that even the most well-intentioned rules are easier to follow in theory than in practice. At a minimum, forward-thinking U.S. businesses considering transacting with foreign companies in the information or communications technology space should begin to develop compliance processes that front-load due diligence on the ownership structures of prospective counterparties and the relationships between prospective counterparties and their home (or other foreign) governments.

back to top

* * * * * * * * * * * * * * * * * *

## 14. J. Haggin: "Turkey Loses GSP Status & More!"
(Source: Editor, 18 May 2019.)

* Author: Judy Haggin, Senior Director of Compliance, Total Logistics Resource, judyh@shiptlr.com, +1 971-634-1477

On April 30th, we issued a Compliance Alert regarding the Trump administration's intention to terminate Turkey's designations as a beneficiary developing country under the GSP program.  Last night (May 16), President Trump issued his Presidential Proclamation ending GSP status for Turkey, effective today, May 17, 2019.   The proclamation also ended safeguard exemptions that Turkey had enjoyed for residential washers and CSPV cells.  In a second proclamation issued yesterday, President Trump restored the duty rate on steel products from Turkey from 50% to 25%, effective May 21, 2019.

We also learned today that an agreement has been reached to remove Section 232 duties from Canada and Mexico within the next 48 hours. This will remove one major barrier to the newly negotiated USMCA agreement being ratified by all three countries. For more information on all of these issues and their developments, please see the Compliance Alert at www.shiptlr.com.

back to top

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

## 15. T.M. Polino, D.R. Hamill & D. Salkeld: "Additional Duties Proposed on Another $300 Billion of China Products"
(Source: Arent Fox, 15 May 2019.)

* Authors: Teresa M. Polino, Esq., teresa.polino@arentfox.com; David R. Hamill, Esq., david.hamill@arentfox.com; and David Salkeld, Esq. david.salkeld@arentfox.com. All of Arent Fox LLP.

*Update on Product Exclusions and Enforcement of List 3 Duty Increase*

As President Donald Trump threatened last weekend - just days after the Section 301 tariff on List 3 products was increased from 10 percent to 25 percent following a breakdown in trade negotiations between the United States and China - the Administration on Monday released a fourth list of Chinese-origin products to be subject to additional duties. For these tariffs to become effective, the US Trade Representative will need to publish a final notice after public comment and hearing.

The United States and China have been engaged in protracted negotiations over the Chinese government's acts, policies, and practices related to technology transfer, intellectual property, and innovation that the Trump Administration has found to be unreasonable and burdensome to US commerce.

To date, the President has used his authority under Section 301 of the Trade Act of 1974 three times to levy a 25 percent retaliatory tariff on 6830 subheading categories of imported Chinese high-tech and consumer goods valued at $250 billion per year. Although List 3, alone valued at $200 billion, had originally set an additional duty rate at 10 percent, that rate was increased to 25 percent effective 12:01 A.M. May 10, further straining the bilateral talks.

**New Products for China Tariffs**

Moreover, after China allegedly "retreated from specific commitments made in previous rounds" and increased its own tariffs against US goods, the USTR officially proposed a fourth list of goods valued at nearly $300 billion. This 135-page List 4 would comprise 3805 categories of goods including cellphones and other electronic devices, agricultural products like cheese,

toys, apparel, home goods, shoes, sporting goods, chemicals, and child safety seats.

If this proposal is accepted, all Chinese imports excluding certain pharmaceuticals, medical products, rare earth metals, and minerals will be subject to a 25 percent extra levy.

Before List 4 can take effect, the proposal will undergo a public comment period and hearing similar to those for Lists 1 through 3. The dates are:

  - June 10: Deadline to request to appear at hearing
  - June 17: Deadline to submit pre-hearing comments
  - June 17: Public hearing at USTR
  - June 24: Deadline to submit post-hearing rebuttal comments (due 7 days after the final day of hearings).

USTR has requested that comments focus on:

- The specific tariff subheadings to be subject to increased duties, including whether the subheadings listed in the proposal should be retained or removed, or whether subheadings not currently on the list should be added;
- The level of the increase, if any, in the rate of duty;
The appropriate aggregate level of trade to be covered by additional duties;
- Whether imposing increased duties on a particular product would be practicable or effective to obtain the elimination of the concerned Chinese acts, policies, and practices; and
- Whether imposing additional duties on a particular product would cause disproportionate economic harm to US interests, including small- or medium-size businesses and consumers.

President Trump has indicated his desire to meet with Chinese President Xi Jinping at a G20 summit in Osaka, Japan in late June, which may affect the implementation of List 4. However, absent progress on negotiations, USTR could publish the final version of List 4 as soon as July with an effective date shortly thereafter if it moves as fast as it did to implement earlier tariffs.

A combined list of the products covered by Section 301 Lists 1, 2, 3, and 4 is available here.

**Product Exclusions**

Meanwhile, USTR published its fourth notice of product exclusions for List 1. The excluded goods, mostly machinery, include outboard motor engines for boats, certain fork lifts, ATM circuit boards, and pressure valves. It remains unknown whether a process for importers to request an exclusion of specific products would accompany List 4 as it did for Lists 1 and 2, and as is expected to be announced before the end of the month for List 3. The USTR confirmed that List 3 will have an exclusion process only after the duty rate was increased from 10 percent to 25 percent.

**List 3 Increased Tariff Rate Effective Date**

Furthermore, following an updated CSMS message, USTR published in the Federal Register a notice stipulating that List 3 goods already in transit from China before May 10 and entered prior to June 1 will be subject to the 10 percent duty rate rather than the higher 25 percent rate. Goods exported and entered on or after May 10 will be assessed the 25 percent rate, as will all goods entered on or after June 1, regardless of export date.

back to top

* * * * * * * * * * * * * * * * * * *



Are You Keeping Up to Date with the Latest Regulations?

Bartlett's Annotated ITAR will keep you updated on the latest ITAR amendments.

MORE INFORMATION AVAILABLE HERE

## EX/IM MOVERS & SHAKERS

## 16. David Laufman Moves to Wiggin & Dana Law Firm
(Source: Editor)

David H. Laufman has moved from a solo practice to the Wiggin & Dana law firm in Washington, D.C. Laufman was previously chief of the U.S. Department of Justice National Security Division's Counterintelligence and Export Control Section, where he supervised the Justice Department's enforcement of U.S. export control and sanctions laws, as well as the Foreign Agents Registration Act, and oversaw investigations in 2016 involving both Hillary Clinton's use of a private email server and Russian election interference.  At Wiggin & Dana, David will co-chair the national security practice group. He will also be a member of the firm's white-collar defense, investigations, and corporate compliance practice group and the international trade compliance group. Contact David at d.laufman@wiggin.com or call + 1 202-800-2477.

back to top

* * * * * * * * * * * * * * * * * * *

# 17. Monday List of Ex/Im Job Openings: 152 Openings Posted This Week, Including 17 New Openings
(Source: Events & Jobs Editor)

Published every Monday or first business day of the week. Please, send job openings in the following format to jobs@fullcirclecompliance.eu.

* COMPANY; LOCATION; POSITION TITLE (WEBLINK); CONTACT INFORMATION; REQUISITION ID

   "#" New or amended listing this week

* Abbott; Irving, TX; Customs and Trade Compliance Analyst
* Abbott; Sylmar, CA; Compliance Director
# * Accenture; Buenos Aires, Argentina; Contract Analyst - Trade Compliance
* Adient; Plymouth, MI; Director Americas Regional Compliance; Requisition ID: R-03478
* AeroVironment; Simi Valley, CA; Trade Compliance Specialist II; Requisition ID: 333
* Agility; Basel, Switzerland; Sachbearbeiter/in Special Services Air & Ocean Pharma
* Agility; Houston, TX; Ocean Export Team Leader;
* Ajilon; Grapevine, TX; Import Export Compliance Manager; Requisition ID: US_EN_7_849168_2557836
* AM General; Auburn Hills, MI; International Compliance Analyst
* Ansys; Pittsburgh, PA; Export Compliance Specialist; Requisition ID: 7539
* Arrow Electronics; Arlington, TX or Centennial, CO or Phoenix, AZ or Reno, NV; Officer, Global Trade Management & Compliance; Requisition ID: R169517
* Arrow Electronics; Hong Kong, China; Global Trade Management & Compliance Officer; Requisition ID: R168802
* ASML; San Diego, CA; Customs & Export Control Classification Specialist; Requisition ID: req9558
* ASML; Veldhoven, the Netherlands; Customs & Export Control Classification Specialist; Requisition ID: req9253
* Autodesk; San Rafael, CA (SF Bay Area) or Portland, OR; Export Compliance Officer; Requisition ID: 19WD31812
* Belk; Charlotte, NC; Sr Manager - Global Trade & Customs Compliance; Skyler Evans; Requisition ID: JR-20062
* BMW Manufacturing; Spartanburg, SC; SECT MGR Customs Compliance; Requisition ID: 190001DP
* Boehringer Ingelheim; Milan, Italy; Internship Compliance; Requisition ID: 192007
# * Boeing; Bangalore, India; Trade Control Specialist; Requisition ID: 1900122844
# * Boeing; Berlin, Germany; Global Trade Controls Manager; Requisition ID: 1900113134
* Brooks; Chelmsford, MA; Senior Import / Export Compliance Analyst; Requisition ID: R0822

* C4ATS; Orlando, FL; Defense Import-Export Compliance Manager; Ivette De Jesus;
# * Cisco; Charlotte, NC; Trade Compliance Manager; Requisition ID: 1261937
* Continental; Fairlawn, OH; Import Specialist, International Trade Compliance; Requisition ID: 117416BR
* Crowell Moring; Washington D.C.; Government Contracts & International Trade Associate (Export Controls)
* Danaher - Leica Microsystems; Wetzlar, Germany; Trade Compliance Manager - EMEA (m/f/d); Requisition ID: LEI004901
* Dell; Bukit Mertajam, Malaysia; Analyst, Import/Export; Requisition ID: R60622
* Dell; Bukit Mertajam, Malaysia; Specialist, Import/Export; Requisition ID: R45267
* Deloitte; Zaventem, Belgium; Experienced Junior/Senior Customs and Global Trade Consultant; Requisition ID: 1800009Q
# * DHL; Hong Kong, China; Regional Compliance Officer, APEC; Requisition ID: req78306
# * DHL; Central Europe; Compliance Manager; Requisition ID: req77632
* EDCO; Eindhoven, the Netherlands; Customs & Trade Compliance Coordinator
* Elbit Systems of America; Merrimack, NH; Licenses & Agreements Officer; Requisition ID 2019-6948
* Embraer; Melbourne, FL; Sr. Trade Compliance Specialist; Requisition ID: 176896
* Engenium; Orlando, FL; Import/Export Compliance Specialist
* Expeditors; Krefeld, Germany; Clerk Import / Export
* Expeditors; Bedfont, United Kingdom; Customs Brokerage Clerk
* Expeditors; Frankfurt, Germany; Consultant - Customs and Trade Compliance (m/w), unbefristet und in Vollzeit
* Flexport; Amsterdam, the Netherlands; Regional Compliance Manager
* FLIR; Arlington, VA, Elkridge, MD, and Nashua, NH; Senior Manager, Global Export Licensing (Commercial); Requisition ID: REQ12110
* FLIR; Elkridge, MD; Global Trade Compliance, Traffic Analyst OTS
* Fortive - Tektronix; Beaverton, OR; Chief Compliance Counsel
* Fourstar Group USA; Milford, MA; Import Manager/Customs Compliance/Classification Specialist
* General Atomics; San Diego, CA; Government Compliance Specialist; Requisition ID: 23607BR
* General Atomics; San Diego, CA; Government Regulatory Compliance Specialist; Requisition ID: 23576BR
* Gulfstream Aerospace; Savannah, GA; Trade Compliance Project Manager Sr; Requisition ID: 142611
* Harley-Davidson; Milwaukee, WI; Logistics Lead - Trade Compliance; Requisition ID: 826
* Harris Corporation; Van Nuys, CA; Trade Compliance Senior Specialist; Richard Wellbrock; Requisition ID: ES20192103-30606
* Henderson Group Unlimited, Inc; State Dept, DDTC; Washington, DC; Commodities Jurisdiction Analyst
* Henkel; Rocky Hill, CT; Global Trade Manager; Requisition ID: 190001EB

* Hitachi Vantara; Singapore; Trade Compliance Analyst; Requisition ID: 1003050 (026187)
* Honeywell; Paris, France; Export Compliance Lead; Requisition ID: HRD60078
* Huntington Ingalls Industries; Fairfax, VA; Contracts/Business Administration Manager; Requisition ID: 18613
* IGT; Reno, NV; Global Trade Analyst; Requisition ID: 1171
* IKEA Purchasing Services; King of Prussia, PA; Regional Customs Manager, Americas
* Illumina; Great Abington, United Kingdom; Trade Compliance Manager; Requisition ID: 16204-JOB
* Illumina; San Diego, CA; Associate Director, Global Trade Compliance; Requisition ID: 16094-JOB
* Illumina; Woodlands, Singapore; Manager, Trade Compliance; Requisition ID: 16361-JOB
* Infineon; El Segundo, CA; Manager, Export Control; Requisition ID: 33841
* Integra LifeSciences; Plainsboro, NJ; Import/Export Compliance Specialist; Requisition ID: 2019-29346
* IPG Photonics; Oxford, MA; Global Director Trade Compliance
* Itron; Austin, TX; Compliance & Regulatory Counsel; Requisition ID: 1900030
* Johnson Controls; Milwaukee, WI; Director, Global Trade Compliance; Requisition ID: WD30055791295
# * Kelley Drye & Warren LLP; Washington DC; Junior Export Controls/Sanctions Associate
* Kirkland's; Brentwood, TN; Customs Compliance Program Manager; Requisition ID: 2019-8158
* Koch Chem Tech; Tulsa, OK; Import/Export Compliance Specialist; Requisition ID: 052017
* KPMG; Chicago, IL or New York, NY or Washington D.C.; Export and Sanctions Compliance Manager; Requisition ID: 41146
* Kubota; Grapevine, TX; Manager, Import & Export Compliance; Requisition ID: 228
# * LanceSoft; Tewksbury, MA; Export Controls / Classification Contractor
* Leidos; Columbia, MD; International Trade Manager / Export Compliance; Req. ID: R-00005745
* Leonardo DRS; Arlington, VA; Trade Compliance Import Manager; Requisition ID: 93515
# * Lockheed Martin; multiple locations, U.S., Cyber Governance Compliance Analyst; Requisition ID: 467162BR
* Leonardo DRS; Melbourne, FL; Senior Supply Chain Analyst - Small Business Compliance; Requisition ID: 91669
* Leonardo DRS; St Louis, MO; Export/Trade Compliance Specialist;brandy.mormino@drs.com; Requisition ID: 94325
* Lockheed Martin; Arlington, VA; International Licensing Analyst; Requisition ID: 468160BR
* Lockheed Martin; Arlington, VA; International Licensing Analyst Staff; Requisition ID: 480803BR
* Lockheed Martin Aeronautics; Palmdale, CA; Export Compliance Site Lead; Requisition ID: 477630BR

\# \* Lockheed Martin Rotary and Mission Systems; Liverpool, NY, Moorestown, NJ, Owego, NY, Stratford, CT; Intl Licensing Analyst Stf; Requisition ID: 483502BR

\* Lutron Electronics Co; Lehigh Valley, PA; Trade Compliance Coordinator; Requisition ID: 4025

\* Mastercard; O'Fallon, MO; Manager, Legal Compliance, Export Controls Compliance; Requisition ID: R-84414

\* Meggitt; Miami, FL; Trade Compliance Coordinator; Requisition ID: 37514

\* Meggitt; Rockmart, GA; Trade Compliance Coordinator; Requisition ID: 37846

\* Mercury Systems; multiple locations; Principle Trade Compliance Specialist; Requisition ID: 19-226

\* Mercury Systems; multiple locations; Manager, Trade Compliance; Requisition ID: 19-349

\* Mercury Systems; multiple locations; Trade Compliance Specialist; Requisition ID: 19-203

\# \* Microsoft; Redmond, WA; Export Control Manager; Requisition ID: 609856

\* Navigos Search; Ho Chi Minh City, Vietnam; Legal & Compliance Manager; Requisition ID: JO-1904-415857

\* Netflix; Los Angeles, CA; Specialist, Trade Compliance

\* Newell Brands; Norwalk, CT; Manager of Trade Operations

\* Northrop Grumman; Herndon, VA; Principal International Trade Compliance Analyst Level 3 or 4; Requisition ID: 19007160

\* Northrop Grumman; Rancho Bernardo, CA; Sr. Manager, International Trade Compliance; Contact: Fred Czarske at 310-332-7606, fred.czarske@ngc.com; Requisition ID: 19008010

\* Northrop Grumman; Redondo Beach, CA, San Diego, CA or Melbourne, FL; Sr. International Trade Compliance Analyst; Requisition ID: 19013440

\* Nouryon; Radnor, PA; Global Trade Compliance Manager; Requisition ID: 190001UJ

\# \* Ormat Technologies; Reno, NV; Manager, Global Trade Compliance

\* Parexel; Kiev, Ukraine; Trade Compliance Specialist; Requisition ID: 51579BR

\* PCCW Limited; Herndon, VA; Manager - International Trade Compliance (Americas); career-corporate@pccw.com; Requisition ID: MITC-0419-US

\* PCCW Limited; Hong Kong, China; Manager - International Trade Compliance (Asia); career-corporate@pccw.com; Requisition ID: MITC-041900-HK

\* Philips; Best, the Netherlands; Head of Trade Compliance; Requisition ID: 308818

\* Pinpoint Pharma; Lincolnshire,IL; Export Compliance Specialist; Requisition ID: 351

\* Project Alpha - Centre for Science and Security Studies KCL; London, United Kingdom; Internship Opportunity

\* Qorvo; Richardson, TX; Import/Export Analyst; Requisition ID: 0008593

\* Qualcomm; Bangalore, India; Export Compliance Specialist; Requisition ID: N1969832

\* Raytheon; El Segundo, CA; Global Trade Authorization Owner; Requisition ID: 137660BR

* Raytheon; El Segundo, CA; Import Ctl&Compliance Advisor; Requisition ID:136269BR
* Raytheon; El Segundo, CA/McKinney, TX/Rosslyn, VA; Senior Analyst Global Trade Management; Requisition ID: 136411BR
* Raytheon; El Segundo, CA/McKinney, TX; Senior Manager, Global Trade Strategy; Requisition ID: 135692BR
* Raytheon; Tuscon, AZ; Manager Export-Import Control; Requisition ID: 134614BR
* Raytheon; Tuscon, AZ; Senior Export Licensing and Compliance Specialist; Requisition ID: 135002BR
* Repligen; Waltham, MA; Senior Manager, Global Trade Compliance
* Rockwell Automation; Mayfield Heights, OH and Milwaukee, WI; Senior Analyst, Import/Export Compliance; Requisition ID: 85004BR
# * Rolls Royce; Indianapolis, IN; Export Control Manager - Defense; Requisition ID: JR6046902
* Saab Defense and Security USA LLC; East Syracuse, NY; Senior Import and Classifications Analyst
* SABIC; Houston TX; Senior Analyst, Trade Compliance; Danielle.Cannata@sabic.com; Requisition ID: 8411BR
* Sarepta Therapeutics; Cambridge, MA; Director, Logistics & Global Trade Compliance
* Science and Engineering Services, LLC; Huntsville, AL; Trade Compliance Administrator; Requisition ID: 946
* Shell; Houston, TX; Advisor Trade Controls; Requisition ID: 105518BR
# * Siemens; Taipei, Taiwan; Summer Internship Legal & Compliance; Requisition ID: 107028
* Sierra Nevada Corporation; Arlington, VA; International Trade Compliance Analyst I; Requisition ID: R0008021
* Sierra Nevada Corporation; Arlington, VA; International Trade Compliance Analyst II; Requisition ID: R0007508
* Sierra Nevada Corporation; Arlington, VA; International Trade Compliance Analyst II; Requisition ID: R0007996
* Sierra Nevada Corporation; Arlington, VA / Sparks, NV / Centennial, CO; International Trade Compliance Manager II; Requisition ID: R0007901
* SIG SAUER, Inc.; Newington, NH; Director of Trade Compliance; Requisition ID: 1114
* Signify; Eindhoven or Amsterdam, the Netherlands; Legal Export Control Officer; Requisition ID: 289784
* Solenis; Wilmington, DE; Global Trade Compliance Specialist II; Requisition ID: R0002807
# * Spin Master; Bratislava, Slovakia; Logistics Coordinator - Trade Compliance Analyst
* Sun Chemical; Cincinnati, OH, Northlake, IL, Parsippany, NJ; Requisition ID: 2019-2733
* Synopsys Inc.; Remote, U.S.; Director, Global Trade Compliance; Requisition ID: 20358BR
* TE Connectivity; El Cajon, CA or Middletown, PA; Licensing Specialist; tbaker@te.com; Requisition 40514
* Tesla, Inc.; Fremont, CA; Program Manager, Tariff Strategy; Requisition ID: 46503

* Textron Aviation; Wichita, KS; Trade Compliance Analyst; Requisition ID: 269127
* Thales; Stuttgart, Germany; Trade Compliance Spezialist (M/W/D); Requisition ID: R0054290
* ThermoFisher Scientific; Monza, Italy; Trade Compliance Specialist - Pharma; Requisition ID: 88807BR
* ThermoFisher Scientific; Loughborough, United Kingdom; Global Trade Compliance Manager; Requisition ID: 90337BR
* Thomas Jones Consulting; Washington, DC; Jr. International Trade, Export Controls & Economic Sanctions Associate
* Trek Bicycle; Waterloo, WI; Trade Compliance Manager
* Twitter; San Francisco, CA; Snr Compliance Counsel - Investigations and Trade Compliance
* United Technologies - Collins Aerospace; Cedar Rapids, IA; Export Licensing Specialist (ITC); Requisition ID: 01311691
* United Technologies - Collins Aerospace; Cedar Rapids, IA; Sr. Product Classification Specialist; Requisition ID: 01311991
* United Technologies - Collins Aerospace; Rockford, IL; International Trade Compliance Intern; Requisition ID: 01308699
* United Technologies - Collins Aerospace; Windsor Locks, CT; Associate Director Trade Compliance; Requisition ID: 01308017
* University of California; San Francisco, CA; Export Control Officer; Requisition ID: 51010
* University of Manchester; Manchester, United Kingdom; Export Control Compliance Officer; Requisition ID: PSX-13808
* UPS; Münchenstein, Switzerland; Customs & Trade Compliance Coordinator; Requisition ID: 052228
* Veridos GmbH; München, Germany; Ausfuhrbeauftragter (Export Control Officer m/w/d; Requisition ID: 1677
* Viasat; Carlsbad, CA; Global Trade Analyst; Requisition ID: 2771
* Viasat; Carlsbad, CA; Global Trade Analyst; Requisition ID: 2824
* Vigilant GTS; Remote Position, U.S.; Global Trade Compliance Account Manager
* Walt Disney; Kissimmee, FL; Trade Compliance Analyst (Project Hire); Requisition ID: 654599BR
* Wealth Ocean; Newport Beach, CA; Marketing & International Trade Specialist
* Xilinx; San Jose, CA; Trade Compliance Specialist; Requisition ID: 155901
# * XPO Logistics; Greenwich, CT; Compliance Paralegal
# * XPO Logistics; Greenwich, CT; Director, Trade Compliance Counsel

back to top

* * * * * * * * * * * * * * * * * * *

# EX/IM TRAINING EVENTS & CONFERENCES

## 18. FCC Presents "U.S. Export Controls: The ITAR from a non-U.S. Perspective", 26 Nov in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

This intermediate-level training course is specifically designed for compliance professionals and those in a similar role who aim to stay up-to-date with the latest International Traffic in Arms Regulations (ITAR) requirements that apply to non-U.S. transactions.

The course will cover multiple topics relevant for organizations outside the U.S. that are subject to the International Traffic in Arms Regulations, including but not limited to: the U.S. regulatory framework, key ITAR concepts and definitions, tips regarding classification and licensing, essential steps to ensure an ITAR compliant shipment, how to handle a (potential) non-compliance issue, recent enforcement trends, and the latest regulatory amendments, including the latest U.S. Export Control Reform developments. Participants will receive a certification upon completion of the training.

**Details**
* What: U.S. Export Controls: The International Traffic in Arms Regulations (ITAR) from a non-U.S. Perspective
* When: Tuesday, 26 Nov 2019
 - Welcome and Registration: 9.00 am - 9.30 am
 - Training hours: 9.30 am - 4.30 pm
* Where: Full Circle Compliance, Landgoed Groenhoven, Dorpsstraat 6, Bruchem, the Netherlands
* Information & Registration: via the event page or contact FCC at events@fullcirclecompliance.eu or + 31 (0)23 - 844 - 9046
* This course can be followed in combination with "U.S. Export Controls: The Export Administration Regulations (EAR) from a non-U.S. Perspective" (27 Nov 2019), and/or "The ABC of Foreign Military Sales" (29 Nov 2019). Please, see the event page for our combo deals.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

EDITOR'S NOTES

## 19. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Nancy Astor** (Nancy Witcher Langhorne Astor; 19 May 1879 - 2 May 1964; was an American-born British politician and the first female Member of Parliament (MP) to take her seat. Astor was an American citizen who moved to England at age 26 and married Waldorf Astor. He succeeded to the peerage and entered the House of Lords; she then entered politics and won his former seat in Plymouth in 1919, becoming the first woman to sit as an MP in the House of Commons.)

- *"The penalty of success is to be bored by people who used to snub you."*

* **Honore de Balzac** (20 May 1799 - 18 Aug 1850; was a French novelist and playwright. The novel sequence *La Comédie Humaine,* which presents a panorama of post-Napoleonic French life, is generally viewed as his magnum opus.)
   - *"Laws are spider webs through which the big flies pass and the little ones get caught."*

**Monday is pun day:**
* Two birds are sitting on a perch and one says "Do you smell fish?"
* What's it called when you have too many aliens? Extraterrestrials.
* Want to hear a pizza joke? Never mind, it's too cheesy.

back to top

* * * * * * * * * * * * * * * * * * *


## 20. Are Your Copies of Regulations Up to Date?
(Source: Editor)

* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199.  Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
   - Last Amendment: 5 Apr 2019: 84 FR 13499-13513: Civil Monetary Penalty Adjustments for Inflation

* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
   - Last Amendment: 14 May 2019: 84 FR 21233-21238: Addition of Certain Entities to the Entity List, Revision of an Entry on the Entity List, and Removal of an Entity From the Entity List

* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30.  Implemented by Dep't of Commerce, U.S. Census Bureau.
   - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
   - HTS codes that are not valid for AES are available here.
   - The latest edition (1 Jan 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

DOC_0042891

* <u>DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL</u> <u>(NISPOM)</u>: DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: <u>Change 2</u>: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary <u>here</u>.)

* <u>DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES</u>: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under Atomic Energy Act of 1954.
  - Last Amendment: 23 Feb 2015: <u>80 FR 9359</u>, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

* <u>DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL</u>; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under Atomic Energy Act of 1954.
  - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

* <u>DOJ ATF ARMS IMPORT REGULATIONS</u>: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
  - Last Amendment: 14 Mar 2019: <u>84 FR 9239-9240</u>: Bump-Stock-Type Devices

* <u>DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR)</u>: 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
  - Last Amendment: 19 Apr 2019: <u>84 FR 16398-16402</u>: International Traffic in Arms Regulations: Transfers Made by or for a Department or Agency of the U.S. Government
  - The only available fully updated copy (latest edition: 19 Apr 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance <u>website</u>. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR, please <u>contact us</u> to receive your discount code.

* <u>DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR)</u>: 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders.
Implemented by Dep't of Treasury, Office of Foreign Assets Control.
  - Last Amendment: 29 Apr 2019: <u>84 FR 17950-17958</u>: Foreign Interference in U.S. Elections Sanctions Regulations [amendment of 31 CFR Part 579 to implement EO 13848]

* USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S. International Trade Commission. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
   - Last Amendment: 13 May 2019: Harmonized System Update (HSU) 1907
   - HTS codes for AES are available here.
   - HTS codes that are not valid for AES are available here.

back to top

* * * * * * * * * * * * * * * * * *

## 21. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published  here.

back to top

* * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Vincent J.A. Goossen and Alexander Witt; and Events & Jobs Editor, Sven Goor. The Ex/Im Daily Update is emailed every business day to approximately 7,000 readers of changes to defense and high-tech trade laws and regulations.
We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "The Export/Import Daily Bugle of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the The Export/Import Daily Update ("Daily Bugle"), please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other

DOC_0042893

unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

**From**: Jim Bartlett, Full Circle Compliance[blacked out]@fullcirclecompliance.eu]
**Sent**: 5/21/2019 7:23:33 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 19-0521 Tuesday "Daily Bugle"



## Tuesday, 21 May 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. President Adjusts Imports of Automobiles and Automobile Parts into the U.S.
2. President Adjusts Imports of Steel into the U.S.
3. President Continues National Emergency with Respect to the Stabilization of Iraq
4. Commerce/BIS Amends EAR, Adds Huawei and 68 of its Non-U.S. Affiliates to Entity List

### OTHER GOVERNMENT SOURCES

5. Items Scheduled for Publication in Future Federal Register Editions
6. Commerce/BIS: (No new postings.)
7. DHS/CBP Releases Harmonized System Update (HSU) 1908
8. DHS/CBP Terminates Section 232 Duty for Steel and Aluminum Products of Canada and Mexico
9. State/DDTC: (No new postings.)
10. EU Amends Restrictive Measures Concerning Iraq
11. UK OFSI Publishes Updated Guidance Concerning UK Sanctions on Syria

### NEWS

12. Deutsche Welle: "U.S. Issues Huawei a Temporary Reprieve"
13. Enterprise AI: "Tech Sector Frets Over U.S. Export Controls"
14. The Guardian: "Citizens Committee Puts Saudi Arms Sales Under Scrutiny"

15.     ST&R Trade Report: "Legislative Update: China, Cuba, Freight Transport, Trade Promotion, Etc."

16.     Stratfor: "Will Rare Earths Be the Next Front in the U.S.-China Tech War?"

17.     The Wall Street Journal: "U.S. Slows Hiring of Chinese Nationals by Chip Makers"

## COMMENTARY

18.     G. Kelley: "Broad New Trade Restrictions on Huawei"

19.     J. Reeves and K. Heubert: "Yes, BIS License Applications Are Subject to Interagency Review"

20.     P. DiVecchio: "Why This Export Compliance Consultant is 'Mad as Hell'!"

21.     S. Gearity: "Huawei, ZTE, and the Certainty of Trade Disruption"

## EX/IM TRAINING EVENTS & CONFERENCES

22.     FCC Presents "Designing an ICP for Export Controls & Sanctions", 1 Oct in Bruchem, the Netherlands

## EDITOR'S NOTES

23.     Bartlett's Unfamiliar Quotations

24.     Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (5 Apr 2019), DOC/EAR (14 May 2019), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (14 Mar 2018), DOS/ITAR (19 Apr 2018), DOT/FACR/OFAC (29 Apr 2018), HTSUS (13 May 2019)

25.     Weekly Highlights of the Daily Bugle Top Stories



From the publisher of WorldECR and The Export Compliance Manager's Handbook

# THE CFIUS BOOK

The essential guide to navigating an investment or acquisition in sensitive industries or companies in the US, past the bureaucratic obstacles and hidden pitfalls to a successful conclusion. To find out more, **CLICK HERE** or go to www.worldecr.com/books

**ITEMS FROM TODAY'S FEDERAL REGISTER**

# 1. President Adjusts Imports of Automobiles and Automobile Parts into the U.S.

(Source: <u>Federal Register</u>, 21 May 2019.)

84 FR 23433: Adjusting Imports of Automobiles and Automobile Parts into the U.S.

*A Proclamation*

(1) On February 17, 2019, the Secretary of Commerce (Secretary) transmitted to me a report on his investigation into the effects of imports of passenger vehicles (sedans, sport utility vehicles, crossover utility vehicles, minivans, and cargo vans) and light trucks (collectively ``automobiles'') and certain automobile parts (engines and engine parts, transmissions and powertrain parts, and electrical components) on the national security of the United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862).

(2) The report found that automotive research and development (R&D) is critical to national security. The rapid application of commercial breakthroughs in automobile technology is necessary for the United States to retain competitive military advantage and meet new defense requirements. Important innovations are occurring in the areas of engine and powertrain technology, electrification, lightweighting, advanced connectivity, and autonomous driving. The United States defense industrial base depends on the American-owned automotive sector for the development of technologies that are essential to maintaining our military superiority.

(3) Thus, the Secretary found that American-owned automotive R&D and manufacturing are vital to national security. Yet, increases in imports of automobiles and automobile parts, combined with other circumstances, have over the past three decades given foreign-owned producers a competitive advantage over American-owned producers.

(4) American-owned producers' share of the domestic automobile market has contracted sharply, declining from 67 percent (10.5 million units produced and sold in the United States) in 1985 to 22 percent (3.7 million units produced and sold in the United States) in 2017. During the same time period, the volume of imports nearly doubled, from 4.6 million units to 8.3 million units. In 2017, the United States imported over 191 billion dollars' worth of automobiles.

(5) Furthermore, one circumstance exacerbating the effects of such imports is that protected foreign markets, like those in the European Union and Japan, impose significant barriers to automotive imports from the United States, severely disadvantaging American-owned producers and preventing them from developing alternative sources of revenue for R&D in the face of declining domestic sales. American-owned producers' share of the global automobile market fell from 36 percent in 1995 to just 12 percent in 2017, reducing American-owned producers' ability to fund necessary R&D.

(6) Because "[d]efense purchases alone are not sufficient to support . . . R&D in key automotive technologies," the Secretary found that "American-owned automobile and automobile parts manufacturers must have a robust presence in the U.S. commercial market" and that American innovation capacity "is now at serious risk as imports continue to displace American-owned production." Sales revenue enables R&D expenditures that are necessary for long-term automotive technological superiority, and automotive technological superiority is essential for the national defense. The lag in R&D expenditures by American-owned producers is weakening innovation and, accordingly, threatening to impair our national security.

(7) In light of all of these factors, domestic conditions of competition must be improved by reducing imports. American-owned producers must be able to increase R&D expenditures to ensure technological leadership that can meet national defense requirements.

(8) The Secretary found and advised me of his opinion that automobiles and certain automobile parts are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States. The Secretary found that these imports are "weakening our internal economy" and that "[t]he contraction of the American owned automotive industry, if continued, will significantly impede the United States' ability to develop technologically advanced products that are essential to our ability to maintain technological superiority to meet defense requirements and cost effective global power projection."

(9) The Secretary therefore concluded that the present quantities and circumstances of automobile and certain automobile parts imports threaten to impair the national security as defined in section 232 of the Trade Expansion Act of 1962, as amended.

(10) In reaching this conclusion, the Secretary considered the extent to which import penetration has displaced American-owned production, the close relationship between economic welfare and national security, see 19 U.S.C. 1862(d), the expected effect of the recently negotiated United States-Mexico-Canada Agreement (USMCA), and what would happen should the United States experience another economic downturn comparable to the 2009 recession.

(11) In light of the report's findings, the Secretary recommended actions to adjust automotive imports so that they will not threaten to impair the national security. One recommendation was to pursue negotiations to obtain agreements that address the threatened impairment of national security. In the Secretary's judgment, successful negotiations could allow American-owned automobile producers to achieve long-term economic viability and increase R&D spending to develop cutting-edge technologies that are critical to the defense industry.

(12) I concur in the Secretary's finding that automobiles and certain automobile parts are being imported into the United States in such quantities

and under such circumstances as to threaten to impair the national security of the United States, and I have considered his recommendations.

(13) I have also considered the renegotiated United States-Korea Agreement and the recently signed USMCA, which, when implemented, could help to address the threatened impairment of national security found by the Secretary.

(14) Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the President to take action to adjust the imports of an article and its derivatives that are being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security. If that action is the negotiation of an agreement contemplated in 19 U.S.C. 1862(c)(3)(A)(i), and such an agreement is not entered into within 180 days of the proclamation or is not being carried out or is ineffective, then the statute authorizes the President to take other actions he deems necessary to adjust imports and eliminate the threat that the imported article poses to national security. See 19 U.S.C. 1862(c)(3)(A).

(15) I have decided to direct the United States Trade Representative (Trade Representative) to pursue negotiation of agreements contemplated in 19 U.S.C. 1862(c)(3)(A)(i) to address the threatened impairment of the national security with respect to imported automobiles and certain automobile parts from the European Union, Japan, and any other country the Trade Representative deems appropriate, and to update me on the progress of such negotiations within 180 days. Under current circumstances, this action is necessary and appropriate to remove the threatened impairment of the national security.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 301 of title 3, United States Code, and section 232 of the Trade Expansion Act of 1962, as amended, do hereby proclaim as follows:

(1) The Trade Representative, in consultation with the Secretary, the Secretary of the Treasury, and any other senior executive branch officials the Trade Representative deems appropriate, shall pursue negotiation of agreements contemplated in 19 U.S.C. 1862(c)(3)(A)(i) to address the threatened impairment of the national security with respect to imported automobiles and certain automobile parts from the European Union, Japan, and any other country the Trade Representative deems appropriate.
(2) Within 180 days of the date of this proclamation, the Trade Representative shall update me on the outcome of the negotiations directed under clause (1) of this proclamation.
(3) The Secretary shall continue to monitor imports of automobiles and certain automobile parts and shall, from time to time, in consultation with any senior executive branch officials the Secretary deems appropriate, review the status of such imports with respect to the national security. The Secretary shall inform the President of any circumstances that in the Secretary's opinion

might indicate the need for further action by the President under section 232 of the Trade Expansion Act of 1962, as amended.

(4) Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

IN WITNESS WHEREOF, I have hereunto set my hand this seventeenth day of May, in the year of our Lord two thousand nineteen, and of the Independence of the United States of America the two hundred and forty-third.

(Presidential Sig.)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 2. President Adjusts Imports of Steel into the U.S.
(Source: Federal Register , 21 May 2019.)

84 FR 23421: Adjusting Imports of Steel into the United States

*A Proclamation*

(1) On January 11, 2018, the Secretary of Commerce (Secretary) transmitted to me a report on his investigation into the effect of imports of steel articles on the national security of the United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862). The Secretary found and advised me of his opinion that steel articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States.

(2) In Proclamation 9705 of March 8, 2018 (Adjusting Imports of Steel Into the United States), I concurred in the Secretary's finding that steel articles, as defined in clause 1 of Proclamation 9705, as amended by clause 8 of Proclamation 9711 of March 22, 2018 (Adjusting Imports of Steel Into the United States), are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States, and decided to adjust the imports of these steel articles by imposing a 25 percent ad valorem tariff on such articles imported from most countries.

(3) In Proclamation 9705, I also directed the Secretary to monitor imports of steel articles and inform me of any circumstances that in the Secretary's opinion might indicate the need for further action under section 232 of the Trade Expansion Act of 1962, as amended, with respect to such imports.

(4) In August 2018, the Secretary informed me that while capacity utilization in the domestic steel industry had improved, it was still below the target capacity utilization level recommended by the Secretary in his report.

Although imports of steel articles had declined since the imposition of the tariff, I was advised that they were still several percentage points greater than the level of imports that would allow domestic capacity utilization to reach the target level. Given that imports had not declined as much as anticipated and capacity utilization had not increased to that target level, I concluded that it was necessary and appropriate in light of our national security interests to adjust the tariff imposed by previous proclamations.

(5) In the Secretary's January 2018 report, the Secretary recommended that I consider applying a higher tariff to a list of specific countries should I determine that all countries should not be subject to the same tariff. One of the countries on that list was the Republic of Turkey (Turkey). As the Secretary explained in that report, Turkey was among the major exporters of steel to the United States for domestic consumption. To further reduce imports of steel articles and increase domestic capacity utilization, I determined in Proclamation 9772 of August 10, 2018 (Adjusting Imports of Steel Into the United States), that it was necessary and appropriate to impose a 50 percent ad valorem tariff on steel articles imported from Turkey, beginning on August 13, 2018. The Secretary advised me that this adjustment would be a significant step toward ensuring the viability of the domestic steel industry.

(6) The Secretary has now advised me that, since the implementation of the higher tariff under Proclamation 9772, imports of steel articles have declined by 12 percent in 2018 compared to 2017 and imports of steel articles from Turkey have declined by 48 percent in 2018, with the result that the domestic industry's capacity utilization has improved at this point to approximately the target level recommended in the Secretary's report. This target level, if maintained for an appropriate period, will improve the financial viability of the domestic steel industry over the long term.

(7) Given these improvements, I have determined that it is necessary and appropriate to remove the higher tariff on steel imports from Turkey imposed by Proclamation 9772, and to instead impose a 25 percent ad valorem tariff on steel imports from Turkey, commensurate with the tariff imposed on such articles imported from most countries. Maintaining the existing 25 percent ad valorem tariff on most countries is necessary and appropriate at this time to address the threatened impairment of the national security that the Secretary found in the January 2018 report.

(8) Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the President to adjust the imports of an article and its derivatives that are being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security.

(9) Section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), authorizes the President to embody in the Harmonized Tariff Schedule of the United States (HTSUS) the substance of statutes affecting import treatment,

and actions thereunder, including the removal, modification, continuance, or imposition of any rate of duty or other import restriction.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 232 of the Trade Expansion Act of 1962, as amended, section 301 of title 3, United States Code, and section 604 of the Trade Act of 1974, as amended, do hereby proclaim as follows:

(1) Clause 2 of Proclamation 9705, as amended, is revised to read as follows:

"(2)(a) In order to establish certain modifications to the duty rate on imports of steel articles, subchapter III of chapter 99 of the HTSUS is modified as provided in the Annex to this proclamation and any subsequent proclamations regarding such steel articles.

(b) Except as otherwise provided in this proclamation, or in notices published pursuant to clause 3 of this proclamation, all steel articles imports covered by heading 9903.80.01, in subchapter III of chapter 99 of the HTSUS, shall be subject to an additional 25 percent ad valorem rate of duty with respect to goods entered for consumption, or withdrawn from warehouse for consumption, as follows: (i) on or after 12:01 a.m. eastern daylight time on March 23, 2018, from all countries except Argentina, Australia, Brazil, Canada, Mexico, South Korea, and the member countries of the European Union; (ii) on or after 12:01 a.m. eastern daylight time on June 1, 2018, from all countries except Argentina, Australia, Brazil, and South Korea; (iii) on or after 12:01 a.m. eastern daylight time on August 13, 2018, from all countries except Argentina, Australia, Brazil, South Korea, and Turkey; and (iv) on or after 12:01 a.m. eastern daylight time on May 21, 2019, from all countries except Argentina, Australia, Brazil, and South Korea. Further, except as otherwise provided in notices published pursuant to clause 3 of this proclamation, all steel articles imports from Turkey covered by heading 9903.80.02, in subchapter III of chapter 99 of the HTSUS, shall be subject to a 50 percent ad valorem rate of duty with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on August 13, 2018 and prior to 12:01 a.m. eastern daylight time on May 21, 2019. All steel articles imports covered by heading 9903.80.61, in subchapter III of chapter 99 of the HTSUS, shall be subject to the additional 25 percent ad valorem rate of duty established herein with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on the date specified in a determination by the Secretary granting relief. These rates of duty, which are in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles, shall apply to imports of steel articles from each country as specified in the preceding three sentences".

(2) The text of U.S. note 16(a)(i) to subchapter III of chapter 99 of the HTSUS is amended by deleting ``Except as provided in U.S. note 16(a)(ii), which applies to products of Turkey that are provided for in heading 9903.80.02, heading 9903.80.01 provides'' and inserting the following in lieu thereof: ``Heading 9903.80.01 provides''.

(3) Heading 9903.80.02, in subchapter III of chapter 99 of the HTSUS, and its accompanying material, and U.S. note 16(a)(ii) to subchapter III of chapter 99 of the HTSUS, are deleted.

(4) Paragraphs (b), (c), and (d) of U.S. note 16 to subchapter III of chapter 99 of the HTSUS are each amended by replacing "headings 9903.80.01 and 9903.80.02" with "heading 9903.80.01".

(5) The "Article description" for heading 9903.80.01 in subchapter III of chapter 99 of the HTSUS is amended by replacing "of Brazil, of Turkey" with "of Brazil".

(6) The modifications to the HTSUS made by clauses 1 through 5 of this proclamation shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on May 21, 2019 and shall continue in effect, unless such actions are expressly reduced, modified, or terminated.

(7) Any steel articles imports from Turkey that were admitted into a United States foreign trade zone under ``privileged foreign status'' as defined in 19 CFR 146.41, prior to 12:01 a.m. eastern daylight time on May 21, 2019, shall be subject upon entry for consumption on or after such time and date to the ad valorem rate of duty in heading 9903.80.01 in subchapter III of chapter 99 of the HTSUS.

(8) Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

IN WITNESS WHEREOF, I have hereunto set my hand this sixteenth day of May, in the year of our Lord two thousand nineteen, and of the Independence of the United States of America the two hundred and forty-third.

(Presidential Sig.)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. President Continues National Emergency with Respect to the Stabilization of Iraq
(Source: Federal Register, 21 May 2019.)

84 FR 23437: Continuation of the National Emergency with Respect to the Stabilization of Iraq

On May 22, 2003, by Executive Order 13303, the President declared a national emergency pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701-1706) to deal with the unusual and extraordinary threat to the national security and foreign policy of the United States posed by obstacles to the orderly reconstruction of Iraq, the restoration and maintenance of peace and security in the country, and the development of political, administrative, and economic institutions in Iraq.

The obstacles to the orderly reconstruction of Iraq, the restoration and maintenance of peace and security in the country, and the development of political, administrative, and economic institutions in Iraq continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States. For this reason, the national emergency declared in Executive Order 13303, as modified in scope and relied upon for additional steps taken in Executive Order 13315 of August 28, 2003, Executive Order 13350 of July 29, 2004, Executive Order 13364 of November 29, 2004, Executive Order 13438 of July 17, 2007, and Executive Order 13668 of May 27, 2014, must continue in effect beyond May 22, 2019. Therefore, in accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), I am continuing for 1 year the national emergency with respect to the stabilization of Iraq declared in Executive Order 13303.

This notice shall be published in the Federal Register and transmitted to the Congress.

(Presidential Sig.)
THE WHITE HOUSE,
May 20, 2019.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 4. Commerce/BIS Amends EAR, Adds Huawei and 68 of its Non-U.S. Affiliates to Entity List
(Source: Federal Register , 21 May 2019.) [Excerpts.]

FR 22961-22968: Addition of Entities to the Entity List

* AGENCY: Bureau of Industry and Security, Commerce.
* ACTION: Final rule.
* SUMMARY: In this rule, the Bureau of Industry and Security (BIS) amends the Export Administration Regulations (EAR) by adding Huawei Technologies Co., Ltd. (Huawei) to the Entity List. The U.S. Government has determined that there is reasonable cause to believe that Huawei has been involved in activities contrary to the national security or foreign policy interests of the United States. BIS is also adding non-U.S. affiliates of Huawei to the Entity List because those affiliates pose a significant risk of involvement in activities

contrary to the national security or foreign policy interests of the United States. Huawei will be listed on the Entity List under the destination of China. This final rule also adds to the Entity List sixty-eight non-U.S. affiliates of Huawei located in twenty-six destinations: Belgium, Bolivia, Brazil, Burma, Canada, Chile, China, Egypt, Germany, Hong Kong, Jamaica, Japan, Jordan, Lebanon, Madagascar, Netherlands, Oman, Pakistan, Paraguay, Qatar, Singapore, Sri Lanka, Switzerland, Taiwan, United Kingdom, and Vietnam.
* DATES: Effective Date: **This rule is effective May 16, 2019.**
* FOR FURTHER INFORMATION CONTACT: Director, Office of Exporter Services, Bureau of Industry and Security, Department of Commerce, Phone: (949) 660-0144 or (408) 998-8806 or email your inquiry to: ECDOEXS@bis.doc.gov.
* SUPPLEMENTARY INFORMATION: ...

## ERC Entity List Decision

*Additions to the Entity List*

Under Sec. 744.11(b) (Criteria for revising the Entity List) of the EAR, persons for whom there is reasonable cause to believe, based on specific and articulable facts, that the person has been involved, is involved, or poses a significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the United States and those acting on behalf of such persons may be added to the Entity List. Pursuant to Sec. 744.11(b) of the EAR, the ERC has determined that there is reasonable cause to believe that Huawei Technologies Co., Ltd. (Huawei) has been involved in activities determined to be contrary to the national security or foreign policy interests of the United States. To illustrate, Huawei has been indicted in the U.S. District Court for the Eastern District of New York on 13 counts of violating U.S. law (Superseding Indictment), including violations of the International Emergency Economic Powers Act (IEEPA), by knowingly and willfully causing the export, reexport, sale and supply, directly and indirectly, of goods, technology and services (banking and other financial services) from the United States to Iran and the government of Iran without obtaining a license from the Department of Treasury's Office of Foreign Assets Control (OFAC), as required by OFAC's Iranian Transactions and Sanctions Regulations (31 CFR part 560), and conspiracy to violate IEEPA by knowingly and willfully conspiring to cause the export, reexport, sale and supply, directly and indirectly, of goods, technology and services (banking and other financial services) from the United States to Iran and the government of Iran without obtaining a license from OFAC as required by OFAC's Iranian Transactions and Sanctions Regulations (31 CFR part 560). The Superseding Indictment also alleges that Huawei and an Iranian-based affiliate, working with others, knowingly and willfully conspired to impair, impede, obstruct, and defeat, through deceitful and dishonest means, the lawful government operations of OFAC.

Further, Huawei's affiliates present a significant risk of acting on Huawei's behalf to engage in such activities. Because the ERC has determined that there is reasonable cause to believe that the affiliates pose a significant risk of becoming involved in activities contrary to the national security or foreign

policy interests of the United States due to their relationship with Huawei, this final rule also adds to the Entity List sixty-eight non-U.S. affiliates of Huawei located in twenty-six destinations: Belgium, Bolivia, Brazil, Burma, Canada, Chile, China, Egypt, Germany, Hong Kong, Jamaica, Japan, Jordan, Lebanon, Madagascar, Netherlands, Oman, Pakistan, Paraguay, Qatar, Singapore, Sri Lanka, Switzerland, Taiwan, United Kingdom, and Vietnam. Without the imposition of a license requirement as to these affiliated companies, there is reasonable cause to believe that Huawei would seek to use these entities to evade the restrictions imposed by its addition to the Entity List. As set forth in the Superseding Indictment filed in the Eastern District of New York, Huawei participated along with certain affiliates in the alleged criminal violations of U.S. law, including one or more non-U.S. affiliates. The Superseding Indictment also alleges that Huawei and affiliates acting on Huawei's behalf engaged in a series of deceptive and obstructive acts designed to evade U.S. law and to avoid detection by U.S. law enforcement.

In light of the foregoing, Huawei and sixty-eight non-U.S. affiliates of Huawei raise sufficient concern that prior review of exports, reexports, or transfers (in-country) of items subject to the EAR involving these entities, and the possible imposition of license conditions or license denials on shipments to these entities, will enhance BIS's ability to prevent activities contrary to the national security or foreign policy interests of the United States.
For all of the entities added to the Entity List in this final rule, unless authorized by the Savings Clause in this final rule, BIS imposes a license requirement for all items subject to the EAR and a license review policy of presumption of denial. Similarly, no license exceptions are available for exports, reexports, or transfers (in-country) to the persons being added to the Entity List in this rule except as allowed in the Savings Clause in this final rule.

This final rule adds the following entity to the Entity List:

*China*

(1) Huawei Technologies Co., Ltd. (Huawei), Bantian Huawei Base, Longgang District, Shenzhen, 518129, China.

This final rule also adds the following sixty-eight non-U.S. affiliates of the entry above to the Entity List:

*Belgium*

(1) Huawei Technologies Research & Development Belgium NV, Belgium.

*Bolivia*

(1) Huawei Technologies (Bolivia) S.R.L., La Paz, Bolivia.

*Brazil*

(1) Huawei do Brasil Telecomunicacões Ltda, Sao Paulo, Brazil.

*Burma*

(1) Huawei Technologies (Yangon) Co., Ltd., Yangon, Burma.

*Canada*

(1) Huawei Technologies Canada Co., Ltd., Markham, ON, Canada.

*Chile*

(1) Huawei Chile S.A., Santiago, Chile.

*China*

(1) Beijing Huawei Digital Technologies Co., Ltd., Beijing, China;
(2) Chengdu Huawei High-Tech Investment Co., Ltd., Chengdu, Sichuan, China;
(3) Chengdu Huawei Technologies Co., Ltd., Chengdu, Sichuan, China;
(4) Dongguan Huawei Service Co., Ltd., Dongguan, Guangdong, China;
(5) Dongguan Lvyuan Industry Investment Co., Ltd., Dongguan, Guangdong, China;
(6) Gui'an New District Huawei Investment Co., Ltd., Guiyang, Guizhou, China;
(7) Hangzhou Huawei Digital Technology Co., Ltd., Hangzhou, Zhejiang, China;
(8) HiSilicon Optoelectronics Co., Ltd., Wuhan, Hubei, China;
(9) HiSilicon Technologies Co., Ltd (HiSilicon), Bantian Longgang District, Shenzhen, 518129, China.
(10) HiSilicon Tech (Suzhou) Co., Ltd., Suzhou, Jiangsu, China;
(11) Huawei Device Co., Ltd., Dongguan, Guangdong, China;
(12) Huawei Device (Dongguan) Co., Ltd., Dongguan, Guangdong, China;
(13) Huawei Device (Shenzhen) Co., Ltd., Shenzhen, Guangdong, China;
(14) Huawei Digital Technologies (Suzhou) Co., Ltd., Suzhou, Jiangsu, China;
(15) Huawei Machine Co., Ltd., Dongguan, Guangdong, China;
(16) Huawei Software Technologies Co., Ltd., Nanjing, Jiangsu, China;
(17) Huawei Technical Service Co., Ltd., China;
(18) Huawei Technologies Service Co., Ltd., Langfang, Hebei, China;
(19) Huawei Training (Dongguan) Co., Ltd., Dongguan, Guangdong, China;
(20) Huayi Internet Information Service Co., Ltd., Shenzhen, Guangdong, China;
(21) North Huawei Communication Technology Co., Ltd., Beijing, China;
(22) Shanghai Haisi Technology Co., Ltd., Shanghai, China;
(23) Shanghai Huawei Technologies Co. Ltd., Shanghai, China;
(24) Shanghai Mossel Trade Co., Ltd., Shanghai, China;
(25) Shenzhen Huawei Technical Services Co., Ltd., Shenzhen, Guangdong, China;
(26) Shenzhen Huawei Terminal Commercial Co., Ltd., Shenzhen, Guangdong, China;
(27) Shenzhen Huawei Training School Co., Ltd., Shenzhen, Guangdong, China;

(28) Shenzhen Huayi Loan Small Loan Co., Ltd., Shenzhen, Guangdong, China;
(29) Shenzhen Legrit Technology Co., Ltd., Shenzhen, Guangdong, China;
(30) Shenzhen Smartcom Business Co., Ltd., Shenzhen, Guangdong, China;
(31) Suzhou Huawei Investment Co., Ltd., Suzhou, Jiangsu, China;
(32) Wuhan Huawei Investment Co., Ltd., Wuhan, Hubei, China;
(33) Xi'an Huawei Technologies Co., Ltd., Xi'an, Shaanxi, China;
(34) Xi'an Ruixin Investment Co., Ltd., Xi'an, Shaanxi, China; and
(35) Zhejiang Huawei Communications Technology Co., Ltd., Hangzhou, Zhejiang, China.

Egypt

(1) Huawei Technology, Cairo, Egypt.

*Germany*

(1) Huawei Technologies Deutschland GmbH, Germany.

*Hong Kong*

(1) Huawei Device (Hong Kong) Co., Limited, Tsim Sha Tsui, Kowloon, Hong Kong;
(2) Huawei International Co., Limited, Hong Kong;
(3) Huawei Tech. Investment Co., Limited, Hong Kong;
(4) Huawei Technologies Co. Ltd., Tsim Sha Tsui, Kowloon, Hong Kong;
(5) Hua Ying Management Co. Limited, Tsim Sha Tsui, Kowloon, Hong Kong; and
(6) Smartcom (Hong Kong) Co., Limited, Sheung Wan, Hong Kong;

*Jamaica*

(1) Huawei Technologies Jamaica Company Limited, Kingston, Jamaica.

*Japan*

(1) Huawei Technologies Japan K.K., Japan.

*Jordan*

(1) Huawei Technologies Investment Co. Ltd., Amman, Jordan.

*Lebanon*

(1) Huawei Technologies Lebanon, Beirut, Lebanon.

*Madagascar*

(1) Huawei Technologies Madagascar Sarl, Antananarivo, Madagascar.

*Netherlands*

(1) Huawei Technologies Coöperatief U.A., Netherlands.Start Printed Page 22963

*Oman*

(1) Huawei Tech Investment Oman LLC, Muscat, Oman.

*Pakistan*

(1) Huawei Technologies Pakistan (Private) Limited, Islamabad, Pakistan.

*Paraguay*

(1) Huawei Technologies Paraguay S.A., Asuncion, Paraguay.

*Qatar*

(1) Huawei Tech Investment Limited, Doha, Qatar.

*Singapore*

(1) Huawei International Pte. Ltd., Singapore.

*Sri Lanka*

(1) Huawei Technologies Lanka Company (Private) Limited, Colombo, Sri Lanka.

*Switzerland*

(1) Huawei Technologies Switzerland AG, Liebefeld, Bern, Switzerland.

*Taiwan*

(1) Xunwei Technologies Co., Ltd., Taipei, Taiwan.

*United Kingdom*

(1) Huawei Global Finance (UK) Limited, Great Britain;
(2) Proven Glory, British Virgin Islands; and
(3) Proven Honour, British Virgin Islands.

*Vietnam*

(1) Huawei Technologies (Vietnam) Company Limited, Hanoi, Vietnam; and
(2) Huawei Technology Co. Ltd., Hanoi, Vietnam.

**Savings Clause**

Shipments of items removed from eligibility for a License Exception or export or reexport without a license (NLR) as a result of this regulatory action that were en route aboard a carrier to a port of export or reexport, on May 16, 2019, pursuant to actual orders for export or reexport to a foreign destination, may proceed to that destination under the previous eligibility for a License Exception or export or reexport without a license (NLR). ...

Dated: May 16, 2019.
Wilbur Ross, Secretary of Commerce.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OTHER GOVERNMENT SOURCES

## 5. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

\* Commerce/BIS; NOTICES; Meetings: Regulations and Procedures Technical Advisory Committee [Pub. Date: 22 May 2019.]

\* Commerce/BIS; RULES; Temporary General License [Pub. Date: 22 May 2019.]

\* State; NOTICES; Imposition of Nonproliferation Measures Against Foreign Persons, Including a Ban on U.S. Government Procurement [Pub. Date: 22 May 2019.]

\* Treasury/OFAC; NOTICES; Blocking or Unblocking of Persons and Properties [Pub. Date: 22 May 2019.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. Commerce/BIS: (No new postings.)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. DHS/CBP Releases Harmonized System Update (HSU) 1908
(Source: CSMS# 19-000258, 21 May 2019.

Harmonized System Update (HSU) 1908 was created on May 20, 2019 and contains 212 ABI records and 43 harmonized tariff records.

Modifications include those made as a result of Presidential Proclamation 9886, Adjusting Imports of Steel into the United States. This proclamation was published in the Federal Register on May 21, 2019, Vol. 84 No. 98, page 23421, and can be found using this link.

Additional changes were made to support the PGA Message Set functionality as well.

Adjustments required by the verification of the 2019 Harmonized Tariff Schedule (HTS) are also included.

The modified records are currently available to all ABI participants and can be retrieved electronically via the procedures indicated in the CATAIR. For further information about the retrieval process, please contact your client representative.

All other questions regarding this message, please contact Jennifer Keeling via email at Jennifer.L.Keeling@cbp.dhs.gov.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. DHS/CBP Terminates Section 232 Duty for Steel and Aluminum Products of Canada and Mexico
(Source: CSMS# 19-000252, 19 May 2019.)

\* UPDATE: Effective for goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on May 20, 2019, the Section 232 duty on imports of steel and aluminum articles with a country of origin of Canada or Mexico will no longer be in effect.
\* COMMODITY:
Steel mill and aluminum articles with a country of origin of Canada or Mexico.
\* FILING INSTRUCTIONS:
Imports of steel mill and aluminum articles with a country of origin of Canada or Mexico:
Do not report Harmonized Tariff Schedule (HTS) classification 9903.80.01 or 9903.85.01.
- Steel Products
Report the regular Chapter 72 or 73 HTS classification for the imported merchandise.
- Aluminum Products
Report the regular Chapter 76 HTS classification for the imported merchandise.
\* FOR FURTHER INFORMATION:
See the May 2019 Proclamations on Adjusting Imports of Steel and Aluminum into the United States.

Questions related to Section 232 entry filing requirements should be emailed to traderemedyunit@cbp.dhs.gov.
Questions from the importing community concerning ACE rejections should be referred to their Client Representative.

back to top

* * * * * * * * * * * * * * * * * *

## 9. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * *

## 10. EU Amends Restrictive Measures Concerning Iraq
(Source: Official Journal of the European Union, 21 May 2019.)

*Regulations*
* Commission Implementing Regulation (EU) 2019/808 of 20 May 2019 amending Council Regulation (EC) No 1210/2003 concerning certain specific restrictions on economic and financial relations with Iraq.

back to top

* * * * * * * * * * * * * * * * * *

## 11. UK OFSI Publishes Updated Guidance Concerning UK Sanctions on Syria
(Source: UK OFSI, 21 May 2019.)

The UK Office of Financial Sanctions Implementation (OFSI) has updated the guidance on the UK's sanctions regime on Syria, if the UK leaves the EU without a deal.

The Guidance can be read here.

back to top

* * * * * * * * * * * * * * * * * *

NEWS

## 12. Deutsche Welle: "U.S. Issues Huawei a Temporary Reprieve"
(Source: Deutsche Welle, 21 May 2019.) [Excerpts.]

*The Trump administration has eased some trade restrictions on Huawei, allowing the Chinese tech giant to continue doing business with US firms for another 90 days. Huawei's founder has warned conflict is "inevitable."*

US officials on Monday granted a temporary license that will allow Huawei to continue doing business with American firms for the next 90 days.

The new authorization is intended to give telecommunications operators that rely on Huawei equipment time to make other arrangements, US Secretary of Commerce Wilbur Ross said in a statement.

"In short, this license will allow operations to continue for existing Huawei mobile phone users and rural broadband networks," Ross added.

However, a Commerce Department filing says the delay does not change the ban imposed by President Donald Trump on national security grounds, an action with major implications for US and Chinese technology firms.

The company is still prohibited from buying American parts and components to manufacture new products without license approvals that likely will be denied.

The reprieve comes after Google said on Sunday that it was pulling Huawei's license to use its mobile phone operating system Android. ...

back to top

* * * * * * * * * * * * * * * * * *

## 13. Enterprise AI: "Tech Sector Frets Over U.S. Export Controls"
(Source: Enterprise AI, 20 May 2019.) [Excerpts.]

As regulators prepare to tighten U.S. export controls with an eye toward restricting technology transfers to China, industry groups are pushing back, arguing that overly restrictive rules would cost U.S. industry hundreds of billions in export sales.

Trade groups are meanwhile seeking to ensure that export control issues are not swept up in the current trade tensions between the U.S. and China.

Congress moved last year to expand export rules to cover so-called "emerging and foundational technologies" deemed vital to U.S. national security but not currently covered by existing regulations. Among the technology categories raising the most concern among industry groups are AI and machine learning, data analytics, emerging computing approaches such as "memory-centric logic" and quantum computing, encryption and sensing. ...

Industry groups are especially concerned that lawmakers left undefined precisely what constitutes either emerging or foundational technologies.

Those hotly-debated definitions were left to the Commerce Department's Bureau of Industry and Security (BIS), which enforces U.S. export controls. ...

back to top

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 14. The Guardian: "Citizens Committee Puts Saudi Arms Sales Under Scrutiny"
(Source: The Guardian, 21 May 2019.) [Excerpts.]

The failure of Britain's "broken select committee system" to mount a new inquiry into UK arms sales to Saudi Arabia has prompted a group of MPs, arms sales analysts and former army officers to form its own citizens committee to argue against the multibillion-pound weapons contracts.

Nearly half of UK arms sales go to Saudi Arabia, which is involved in an intractable five-year civil war in Yemen where international law has been violated by both sides.

The new citizens committee on arms sales (CCAS), meeting in Westminster on Wednesday, is due to take evidence from Yemeni human rights campaigners speaking from the capital Sana'a as well as a former UK brigadier to the Saudi capital, Riyadh, who has previously claimed the UK is breaking its own rules by selling arms for use in Yemen. ...

The backdrop to the assembly on Wednesday includes a long-awaited court of appeal verdict into whether UK government is abiding by its own commitment not to supply weapons where there is a clear risk that they might be used in serious violations of international humanitarian law. The judges' ruling is expected by the summer.

back to top

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 15. ST&R Trade Report: "Legislative Update: China, Cuba, Freight Transport, Trade Promotion, Etc."
(Source: Sandler, Travis & Rosenberg Trade Report, 21 May 2019.) [Excerpts.]

**China**. The China Technology Transfer Control Act (S. 1459, introduced May 14 by Sen. Hawley, R-Mo.) would place all "core technologies" from China's "Made in 2025" strategy (e.g., artificial intelligence, robotics, semiconductors, advanced construction equipment) on the Department of Commerce's export control list, which would require companies to obtain licenses to export such technologies to China and impose sanctions on foreign entities and individuals that violate these restrictions. This bill would also formally admonish China for intellectual property theft and manipulation of the lawful transfer and uses of technology in ways that directly support its military objectives and threaten the U.S.

The U.S.-China Economic and Security Review Act (H.R. 2565, introduced May 7 by Reps. Sherman, D-Calif., and Gallagher, R-Wis.) seeks to reduce the U.S. government's reliance on supply chains in China and push back on Beijing's unfair trading practices by implementing many of the U.S.-China Economic and Security Review Commission's recommendations. Among other things, this bill would require the Office of the U.S. Trade Representative to assess whether it is in the national interest to bring a complaint against China at the World Trade Organization in coordination with U.S. allies and partners; require the director of national intelligence to report on the effect of China's existing and potential facilities along the Silk Road Economic Belt and the New Maritime Silk Road on freedom of navigation, sea control, and U.S. interests;; and require USTR to report on China's trade-distorting practices and what it is doing to counteract their anticompetitive impact. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. Stratfor: "Will Rare Earths Be the Next Front in the U.S.-China Tech War?"
(Source: Stratfor, 21 May 2019.) [Excerpts.]

The rise of the Chinese tech sector has helped power Beijing's rivalry with the United States. The recent efforts of the White House to counter China's tech champions, including its most profitable foreign venture, Huawei Technologies, have already taken effect, leading to a move by Google parent Alphabet Inc. to halt some business with the telecommunications giant.

One possible response for China would be to restrict or ban exports of the rare earth elements critical to high-tech products. China's preeminence in the rare earths supply chain would make that a potent option; China has about a third of the world's reserves of the elements but controls a much larger portion of mining and refining operations. Rare earths are crucial for components across a variety of technologies. ...

In the current trade climate, a ban on rare earths exports, especially heavy rare earths, would be a risky move that could pull other countries into a more active role in the U.S.-China trade war. Additionally, China lacks sufficient export control personnel and monitoring systems to effectively enforce a targeted export ban aimed at the United States. In an effort to balance its own domestic supply - and because of concerns about illegal mining operations - China recently enacted a ban on imports of rare earths from Myanmar. That action will likely have some near-term effects, apparently limited for now to a speculative reaction, on the global market.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 17. The Wall Street Journal: "U.S. Slows Hiring of Chinese Nationals by Chip Makers"
(Source: The Wall Street Journal, 21 May 2019.) [Excerpts. Subscription required.]

The U.S. has sharply slowed approvals for the nation's semiconductor companies to hire Chinese nationals for advanced engineering jobs, according to industry insiders, who say the delays are limiting access to vital talent.

The disruption, which started last year, has affected hundreds of jobs across the industry at companies including Intel Corp., Qualcomm Inc. and Globalfoundries Inc., impeding their ability to hire Chinese employees or move existing employees to key projects in the U.S., these people said. ...

back to top

* * * * * * * * * * * * * * * * * *

COMMENTARY

## 18. G. Kelley: "Broad New Trade Restrictions on Huawei"
(Source: Author, 21 May 2019.)

* Author: Glen Kelley, Esq., gkelley@jacobsonburton.com. Of Jacobson Burton Kelley PLLC.

As a follow-up to our Huawei update last Thursday (May 16):
-  We put out an alert on Sunday (May 19) noting that the US Bureau of Industry and Security (BIS), which administers the Entity List, is taking the position that the addition of Huawei and 68 of its affiliates to the Entity List took effect at 4:15pm ET on Thursday May 16, 2019.
-  As we predicted in that alert, BIS has issued a "Temporary General License" (TGL), authorizing some transactions with Huawei that would otherwise be prohibited by the Entity List action. We discuss the TGL below.

**Effective date of Entity List restrictions**
In our initial alert on May 16, we noted that the Final Rule adding the 69 Huawei companies to the Entity List (the Huawei Rule) should not be effective until it is published in the Federal Register on Tuesday May 21, 2019.  However, late on Friday (May 17) BIS posted guidance on its website regarding the Huawei Rule. That guidance links to a one paragraph PDF document stating that the Huawei Rule was effective at 4:15pm on Thursday May 16 when the advance copy of the Rule was released for public inspection.

Unlike changes to the Denied Persons List or the OFAC SDN List, a formal amendment of regulations is required to modify the Entity List, specifically

Part 744 of the Export Administration Regulations (EAR).

BIS has suggested that a provision of the Export Control Reform Act of 2018 gave BIS new authority to amend the EAR without prior notice or formal publication. Nonetheless, the position of BIS seems to run counter to decades of regulatory practice and US administrative law. If BIS brings enforcement actions for pre-May 21, 2019 transactions with Huawei, BIS may face challenges in the US courts.

**Recommended approach**
Out of an abundance of caution, companies should move as quickly as possible to comply with the Huawei Rule as if it is went into effect on May 16. We summarized in our alert below the relevant restrictions on exports, reexports and transfers of items to the 69 Huawei companies.  In our alert we noted that there is a "savings clause" in the Huawei Rule that generally exempts items that had already been shipped to Huawei and were en route when the Rule became effective, so long as they did not previously require a BIS export license.

Companies should also document actions they take to comply with the Huawei Rule, and the timing of those actions. To document the uncertainty over the effective date, we note that:
- As of 9pm ET on Monday May 20, the Electronic Code of Federal Regulations, updated daily and stated to be current through May 17 did not reflect the addition of any of the 69 Huawei entities to the Entity List.
- The Entity List provided on the BIS website had not been updated to include the Huawei entities as of May 19 and was difficult to download on May 20. This is part of a copy of the EAR set out in PDF files which BIS normally updates promptly to reflect amendments.
- The Consolidated Screening List made available by Commerce was updated to include the Huawei entities during the afternoon of Monday, May 20.

We also note that as of May 20 most third party software screening providers had not added the 69 Huawei entities to their lists since they are based on electronic data provided by the US government.

**Temporary General License**
Effective 4:15pm ET on Monday, May 20), BIS issued a TGL authorizing the following four categories of transactions for a 90 day period through August 19, 2019:
- Transactions necessary to maintain and support networks and equipment that "currently fully operational", pursuant to agreements in place with any of the 69 Huawei entities on or before May 16, 2019.
- Transactions necessary for service or support, including software updates and patches, to "existing Huawei handsets", which appears to mean existing models of Huawei devices that were already being manufactured and sold to the public as of May 16.
- Disclosure of information regarding security vulnerabilities in items owned or controlled by any of the 69 Huawei entities, as part of "ongoing security research critical to maintaining the integrity and reliability of" fully operational networks and equipment, as well as handsets.

-  Engagement with the 69 Huawei entities "necessary for the development of 5G standards as part of duly recognized international standards bodies" such as the IEEE, ISO, ITU and GSMA.

The authorization provided by the TGL only covers the restrictions imposed by the Entity List action. It does not lift any other restriction on a transaction imposed by other provisions of the regulations, including general BIS export licensing requirements applicable to the Huawei entities before they were added to the Entity List.

Companies relying upon the TGL should review it closely and take appropriate care to ensure that any products, software or technology they provide to Huawei going forward either (i) fall outside the scope of the Entity List restrictions completely, or (ii) fall squarely within the terms of the TGL.

Being confident regarding the analysis of transactions covered by the TGL is particularly important because the TGL requires that a company complete and maintain in its own files a written "certification statement" before engaging in a transaction with Huawei in reliance on the TGL. The statement must "specify" how the relevant export, reexport or transfer to Huawei "meets the scope of" the TGL.

Companies should be alert for changes in the TGL. It is likely that before the end of its 90 day period on August 19 the TGL will be modified (either broadened or cut back), and it could be extended or even terminated early.

Like the Final Rule adding the Huawei entities to the Entity List, BIS has taken the position that the TGL was effective immediately upon its release on Monday May 20, in the Public Inspection section of the Federal Register website. The TGL is not due to be formally published in the Federal Register until Wednesday, May 22.

back to top

* * * * * * * * * * * * * * * *

## 19. J. Reeves and K. Heubert: "Yes, BIS License Applications Are Subject to Interagency Review"
(Source: Reeves & Dola, 17 May, 2019.) [Available by subscription via info@reevesdola.com.]

In preparation for the finalization of the proposed transition of U.S. Munition List ("USML") certain Categories I, II, and III items, we take a look at the licensing process under the Department of Commerce, Bureau of Industry and Security's ("BIS") Export Administration Regulations ("EAR") in hopes of dispelling some myths and misconceptions. Unless the final rules vary widely from the proposed rules, which is unlikely but always a possibility, non-automatic and semi-automatic firearms up to and including .50 caliber currently controlled under USML Category I(a), as well as all parts, components, accessories and attachments specially designed for those firearms will move off of the USML. These items will be subject to the EAR

under newly created "500 series" Export Control Classification Numbers ("ECCNs") in the Commodity Control List ("CCL").

As we have covered in previous alerts, a license still will be required under the EAR for exports of firearms and ammunition to any country in the world, including Canada. The license submission process for BIS is not so different from Department of State's DTrade system, except one critical difference is it's free of charge, as are individual license applications. Companies will need to get set up on the Simplified Network Application Process - Redesign ("SNAP-R") electronic licensing system in order to submit a license application, but this is not the same as the registration requirement on the State Department side and there is no annual fee requirement. SNAP-R allows users to submit export license applications, commodity classification requests, reexport license applications using the same form. Each different type of request has specific information that may be required. Like the DTrade system, supporting documents can be uploaded as attachments in SNAP-R. Part 748 of the EAR provides instructions for completing a license application.

Once an application is submitted, you can track the U.S. Government review progress using the BIS System for Tracking Export License Applications ("STELA"). This internal government review process can sometimes be a mystery and seems to be where a lot of misinformation and confusion is coming from, at least as far as future BIS license applications for firearms and ammunition moving over from the USML. We have heard rumors that run the gamut about the level of scrutiny that will be given to such license applications, ranging from "there will be no interagency review outside of BIS" to "BIS will be able to overrule other agencies." This is not accurate.

On August 13, 2018, the Export Control Reform Act of 2018 ("ECRA") became law as part of the John S. McCain National Defense Authorization Act for Fiscal Year 2019. ECRA provides permanent statutory authority for the EAR. Part I, the "Export Controls Act of 2018" ("ECA"), authorizes BIS to administer the export controls under its purview. Section 1758 of the ECA requires BIS to control the export of "emerging and foundational technologies" that are "essential to the national security of the United States." Interestingly, Congress did not provide a definition for "emerging" or "foundational" technologies in ECRA - this is left up to BIS to define.

To assist BIS in determining what should be considered an "emerging" or "foundational" technology, BIS published an Advance Notice of Proposed Rulemaking (ANPRM) back in November 2018. In the ANPRM, BIS provided a listing of representative technologies that may be considered "emerging technology" and asked for public comment (public comment period has now closed). However, BIS notes in the ANPRM that it will be publishing a separate Federal Register notice regarding "identification of foundational technologies that may be important to U.S. national security." This ANPRM has yet to publish. Are they waiting for the transition rules? We don't know for sure, but we do note it is possible certain firearms and ammunition may be added to a "foundational technology" list as part of the finalization of the transition process.

If firearms and ammunition are identified as "foundational technology that is essential to the national security of the United States," the license review process outlined in § 1758(b)(3) of the ECA will apply to any application submitted to export firearms or ammunition. That license review process requires BIS to follow the procedures set forth in <u>Executive Order (EO) 12981</u>, which makes it clear that "the Departments of State, Defense, and Energy, and the Arms Control and Disarmament Agency each shall have the authority to review any export license application submitted to [BIS]."

It is important to note that this interagency review process is not new; it has been in existence since 1995 (the issuance date of EO 12981) and is already outlined in the existing text of § 750.4 of the EAR. The ECA simply reiterates the process and formally attaches it to "emerging" or "foundational" technologies. This interagency review establishes a process by which any one of the reviewing agencies can issue a recommendation to deny a license application. If there is disagreement on the issuance of a license, it is then raised to the Operating Committee ("OC"), which includes members from the aforementioned agencies, as well as non-voting representatives of the Joint Chiefs of Staff and the Nonproliferation Center of the Central Intelligence Agency. There is an appeal process by which a reviewing agency can appeal the decision of the OC. This appeal is made to the Advisory Committee on Export Policy ("ACEP"), who's majority vote is final.

In addition to invoking the license review process of EO 12981, § 1758(b)(3)(B) of the ECA requires BIS "take into account information provided by the Director of National Intelligence regarding any threat to the national security of the United States posed by the proposed export, reexport, or transfer." Finally, the existing language in § 750.4 of the EAR allows for pre-license checks of the proposed end-user, requests for government-to-government assurances, consultations with other governments, multilateral reviews, as well as Congressional Notifications for items that require it under the EAR.

As you can see, there is already established a robust license review process in the EAR, and the ECRA provides permanent statuary authority for it and requires it to be applied to "emerging" or "foundational" technologies. All of this together clearly debunks the myth that there are no reviews of export license applications outside of BIS or that BIS' decision is final, and underscores the potential for firearms to be placed in a subset of items that will require just as much scrutiny as they do now as USML items.

<u>back to top</u>

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 20. P. DiVecchio: "Why This Export Compliance Consultant is 'Mad as Hell'!"
(Source: Author, 21 May 2019.)

* Author: Paul DiVecchio, Principla, DiVecchio & Associates, pauldivec@earthlink.net.

I'm mad as hell!  Let me tell you why.  In my nearly 40 years of interpreting and advising my myriad of clients on export control regulations, I have never seen such a terrible mishandling of rulemaking rollout that I have just witnessed with this latest placement of Huawei and 68 of its overseas affiliates on the Commerce Department's Entity List.

Specifically, there has been mass confusion within the export industry, as well as among the legal community, when the effective date for the Entity List restrictions are to commence.  The Trump administration declared the enforcement clock for these Entity List additions turned on last Thursday at 4:15 p.m. EST, or in other words, the date and time that the Federal Register notice was released in prepublication form. In that same prepublication notice, the Commerce Department's Bureau of Industry and Security stated that the final Federal Register notice will be published at midnight, starting Tuesday, thus traditionally could be assumed as setting the start of enforcement by the agency.

So which date is it?  Let's face it, most exporters do not refer to the public inspection postings of Federal Register notices - or for that matter even know these exist.  Even if the exporter's compliance manager had reviewed the public inspection notice of the Entity List additions, he or she could have read the statement on the second page, "Effective Date: This rule is effective [INSERT DATE OF DISPLAY ON THE PUBLIC INSPECTION LIST]." That would signal to the exporter that enforcement of the rule actually would actually start at midnight on Tuesday and that his or her exports en route to Huawei through that actual publication date in the Federal Register are still in compliance.

BIS did not highlight on its website that the effective date of the restriction, May 16, for the addition of Huawei and its 68 overseas affiliates until Friday, in essence 24 hours later than the public inspection notice's release. At the same time, the agency's website posting incorrectly referenced the Federal Register notice (which will be officially published Tuesday) and did not correctly identify the Federal Register "public inspection."

As of midnight EST Monday, the BIS Entity List posted on the Export Administration Regulations (EAR), under Supplement No. 4, part 744, had not been updated with Huawei and its 68 affiliates.  The Consolidated List on the BIS website, which is used by many export compliance staff to conduct their restricted party screening, also had not been updated by the agency as of midnight Monday.  During the scramble to figure out exactly when enforcement of the Huawei additions to the Entity List, the various third-party restricted parties screening vendors did not update their databases until various times on Friday, almost one day after the date of restriction.  On top of that, media outlets, through no fault of their own, showed a lack of consistency and understanding to the effective date for the Huawei-related additions to the Entity List.

The bottom line is that the business community relies on predictability and transparency of federal regulations in order to eliminate the risks of noncompliance and enhance opportunities to be competitive in the marketplace.

If you knew there was such a thing as a "public inspection" to the Federal Register and if you knew where to find it, then you would at least have been able to read the ambiguous language identified on page two, which alludes to the posting date on page 28. Add to that, in case you missed it, the "saving clause" found on page 13 of the "public inspection" document, which reads: "Shipments of items removed from eligibility for a license exception or export or re-export without a license (NLR) as a result of this regulatory action that were en route aboard a carrier to a port of export or re-export on [INSERT DATE OF DISPLAY ON THE PUBLIC INSPECTION LIST], pursuant to actual orders for export or re-export to a foreign destination may proceed to that destination under the previous eligibility for a license or export or re-export without a license (NLR)."

In essence, you had to know that you could not release from your shipping dock exports to Huawei or any of the company's 68 affiliates on the Entity List no later than 11:59 pm. EST on May 16. Otherwise, you would be in violation. (You would have had to know that the posting to the Federal Register public inspection was made at 4:15 pm EST on May 16. In essence, you would have had seven hours and 44 minutes to know about the posting - 45 minutes prior to the end of the workday - in order to get the shipment off of your dock or you would be in violation of the EAR.)

BIS has done a great job in posting real-world FAQs and detailed answers on the BIS website. On the homepage, go to Policy Guidance - Entity List FAQs. Several of the FAQs address: "Can a U.S. company have any dealings with a listed entity?" and "Do the license requirements and policies of the Entity List apply to separately incorporated subsidiaries, partially owned subsidiaries or sister companies of a listed entity?"

However, the terrible mishandling by the Commerce Department of when the enforcement of Huawei additions to the Entity List actually takes place means that some large suppliers of semiconductors and other electronics technology to the Chinese telecom may already be in violation.

On the positive side, the good news is that BIS has posted on the pre-publication to the Federal Register a "General Temporary License"(GTL) for those affected Hauwei and "the 68" affiliates which is effective as of 4:15 pm EST on 5/20/19 as a final rule. There are 4 sets of "authorizations" that you must meet at least one in order to take advantage of the GTL. If eligible for the GTL, you also must prepare a "Certification Statement" prior to the export/re-export/or in country transfer. This is not the same type of "General License" issued to the posting of ZTE to the Entity List. There are a number of qualifying factors for usage of the TGL and you can expect a visit from Special Agents of BIS's Office of Export Enforcement to ensure that you qualify for using the TGL.

back to top

DOC_0042942

## 21. S. Gearity: "Huawei, ZTE, and the Certainty of Trade Disruption"
(Source: The Export Compliance Training Institute, 20 May 2019.)

\* Author: Scott Gearity, Principal of BSG Consulting, and President of the Export Compliance Training Institute (ECTI), Inc.  Contact Scott at scott@learnexportcompliance.com.

As I write these words, Huawei and 68 of its affiliates around the world are set to be added tomorrow (21 May) to the Bureau of Industry and Security's Entity List, an action which will trigger the need for a license for the export, reexport, and transfer of all items subject to the EAR to these companies.

The consequences are already piling up. In the past few days we have learned that Google will limit Huawei's access to the Android software which runs its smartphones. Multiple semiconductor manufacturers have told their employees to stop business with Huawei.

We have known since at least 2016 that the US Government was investigating Huawei. Not coincidentally, 2016 was the year BIS first sanctioned a different Shenzhen-based telecommunications firm, ZTE. BIS took the unusual step of publishing evidence obtained during a search of a ZTE executive and his assistant at the Boston airport. The documents demonstrated ZTE's intent to circumvent export controls on components it was buying from US suppliers and no doubt contributed to the decision by BIS to place ZTE on the Entity List. But the documents also identified a company called "F7" who ZTE seemed to regard as a sort of role model for US sanctions evasion. According to reporting, F7 is Huawei.

It's been nearly five years since that border search at Logan International Airport. Nonetheless, we may be closer to the beginning of the Huawei export enforcement story than the end. It's instructive to recall the sequence of events involving ZTE:

(1) Added to the Entity List
(2) Temporary general license issued
(3) Temporary general license extended (a total of four times)
(4) Removed from the Entity List as part of settlement agreement including payment of penalties
(5) Suspended denial order activated following false statements by ZTE to BIS
(6) Denial order lifted with new settlement agreement and additional penalties

back to top



Are You Keeping Up to Date with the Latest Regulations?

Bartlett's Annotated ITAR will keep you updated on the latest ITAR amendments.

MORE INFORMATION AVAILABLE HERE

## EX/IM TRAINING EVENTS & CONFERENCES

## 22. FCC Presents "Designing an ICP for Export Controls & Sanctions", 1 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

This training course is designed for compliance officers, managers, and other professionals who aim to enhance their organization's compliance efforts. The course will cover multiple topics and tackle various key questions, including but not limited to:
- Setting the Scene: ensuring compliance in the export control and sanctions arena
- What is expected from your organization? A closer look at the official frameworks and guidelines from U.S. and European government agencies
- Key elements of an ICP
- Best practice tips for enhancing your current compliance efforts
- Internal controls samples (policies, procedures, instructions)
- Strategic benefits of having an ICP.

* What: Designing an Internal Compliance Program (ICP) for Export Controls & Sanctions
* Date: Tuesday, 1 Oct 2019
* Location: Full Circle Compliance, Landgoed Groenhoven, Dorpsstraat 6, Bruchem, The Netherlands
* Times:
  - Registration and welcome: 9.00 am - 9.30 am
  - Training course hours: 9.30 am - 4.30 pm
* Level: Intermediate
* Target Audience:  the course provides valuable insights for both compliance professionals, employees and (senior / middle) management working in any

industry subject to U.S. and/or EU (member state) export control laws and sanctions regulations.
* Instructors: Drs. Ghislaine C.Y. Gillessen RA and Marco M. Crombach MSc.
* Information & Registration: click here or contact us at events@fullcirclecompliance.eu or 31 (0)23 - 844 - 9046.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 23. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Alexander Pope** (21 May 1688 - 30 May 1744; was an 18th-century English poet. He is best known for his satirical verse, including *Essay on Criticism, The Rape of the Lock*, and *The Dunciad,* and for his translation of Homer. He is the second-most frequently quoted writer in The Oxford Dictionary of Quotations after Shakespeare.)
  - *"No one should be ashamed to admit he is wrong, which is but saying, in other words, that he is wiser today than he was yesterday."*
  - *"Be not the first by whom the new are tried, Nor yet the last to lay the old aside."*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 24. Are Your Copies of Regulations Up to Date?
(Source: Editor)

* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199.  Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
  - Last Amendment: 5 Apr 2019: 84 FR 13499-13513: Civil Monetary Penalty Adjustments for Inflation

* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
  - Last Amendment: 21 May 2019: FR 22961-22968: Addition of Entities to the Entity List [Addition of Huawei and 68 of its Non-U.S. Affiliates to Entity List.]

* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30.  Implemented by Dep't of Commerce, U.S. Census Bureau.
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.

- The latest edition (1 Jan 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

\* DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under Atomic Energy Act of 1954.
  - Last Amendment: 23 Feb 2015: 80 FR 9359, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

\* DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under Atomic Energy Act of 1954.
  - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

\* DOJ ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
  - Last Amendment: 14 Mar 2019: 84 FR 9239-9240: Bump-Stock-Type Devices

\* DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
  - Last Amendment: 19 Apr 2019: 84 FR 16398-16402: International Traffic in Arms Regulations: Transfers Made by or for a Department or Agency of the U.S. Government
  - The only available fully updated copy (latest edition: 19 Apr 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of

errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR, please contact us to receive your discount code.

* DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders.
Implemented by Dep't of Treasury, Office of Foreign Assets Control.
  - Last Amendment: 29 Apr 2019: 84 FR 17950-17958: Foreign Interference in U.S. Elections Sanctions Regulations [amendment of 31 CFR Part 579 to implement EO 13848]

* USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S. International Trade Commission. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 21 May 2019: Harmonized System Update (HSU) 1908
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 25. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published  here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Vincent J.A. Goossen and Alexander Witt; and Events & Jobs Editor, Sven Goor. The Ex/Im Daily Update is emailed every business day to approximately 7,000 readers of changes to defense and high-tech trade laws and regulations.
We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items

\* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

\* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

\* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

\* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

\* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

DOC_0042948

Sent by jebartlett@fullcirclecompliance.eu

**From**: Jim Bartlett, Full Circle Compliance ▇▇▇@fullcirclecompliance.eu]
**Sent**: 5/22/2019 7:14:00 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 19-0522 Wednesday "Daily Bugle"



## Wednesday, 22 May 2019

*The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe* here. Contact us *for advertising inquiries and rates.*

### ITEMS FROM FEDERAL REGISTER

1. Commerce/BIS Announces RPTAC Meeting on 4 June 2019 in Washington DC

2. Commerce/BIS Grants 90-Day Temporary General License to Sixty-Nine Entities

3. State Imposes Nonproliferation Measures Against Foreign Entities and Persons, Including a Ban on U.S. Government Procurement

### OTHER GOVERNMENT SOURCES

4. Items Scheduled for Publication in Future Federal Register Editions

5. Commerce/BIS: (No new postings.)

6. State/DDTC: (No new postings.)

7. UK/OFSI Updates Multiple Sanctions Guidance Documents

8. Australia/DEC Closed on 27 May, ACT Public Holiday

### NEWS

9. The National Law Review: "Hua-Wait a Minute: Entity Designation Affects Non-U.S. Manufacturers' Exports to China Tech Giant"

10. The New York Times: "Trump Administration Could Blacklist China's Hikvision, a Surveillance Firm"

11. Reuters: "Special Report - Hobbling Huawei: Inside the U.S. War on China's Tech Giant"

12. Taiwan News: "Japan To Expand Trade Control on AI and Robotics Following US Restrictions on Advanced Technology Exports"

13.     The Economist: "Sanctions Create Business Risks - and Opportunities"

14.     Unian: "U.S. to Slap Sanctions on Russian Supplier of Missiles for S-300, S-400 Systems"

## COMMENTARY

15.     Jatin Verma: "U.S - Iran Sanctions: Implications, Impact on India & Way Forward"

16.     M. Volkov: "What Happens When Managers Misbehave?"

17.     R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "BIS Issues Temporary General License Authorizing Limited Activities with Huawei"

18.     S.F. Kjeldsen: "EU Cyber-Attack Sanctions Regime - a New Era for Sanctions?"

19.     S.M.C. Kovarovics: "Don't be Caught Off Guard: Huawei Entities Added to US Entity List"

## EX/IM TRAINING EVENTS & CONFERENCES

20.     FCC Presents "The ABC of FMS", 28 Nov in Bruchem, the Netherlands

## EDITOR'S NOTES

21.     Bartlett's Unfamiliar Quotations

22.     Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (5 Apr 2019), DOC/EAR (22 May 2019), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (14 Mar 2018), DOS/ITAR (19 Apr 2018), DOT/FACR/OFAC (29 Apr 2018), HTSUS (21 May 2019)

23.     Weekly Highlights of the Daily Bugle Top Stories



From the publisher of WorldECR and The Export Compliance Manager's Handbook

# THE CFIUS BOOK

The essential guide to navigating an investment or acquisition in sensitive industries or companies in the US, past the bureaucratic obstacles and hidden pitfalls to a successful conclusion. To find out more, CLICK HERE or go to www.worldecr.com/books

## ITEMS FROM TODAY'S FEDERAL REGISTER

# 1. Commerce/BIS Announces RPTAC Meeting on 4 June 2019 in Washington DC
(Source: Federal Register, 22 May 2019.)

84 FR 23524-23525: Regulations and Procedures Technical Advisory Committee; Notice of Partially Closed Meeting

The Regulations and Procedures Technical Advisory Committee (RPTAC) will meet June 4, 2019, 9:00 a.m., Room 3884, in the Herbert C. Hoover Building, 14th Street between Constitution and Pennsylvania Avenues NW, Washington, DC. The Committee advises the Office of the Assistant Secretary for Export Administration on implementation of the Export Administration Regulations (EAR) and provides for continuing review to update the EAR as needed.

**Agenda**

*Public Session*
(2) Opening remarks by the Bureau of Industry and Security
(3) Presentation of papers or comments by the Public
(4) Export Enforcement update
(5) Regulations update
(6) Working group reports
(7) Automated Export System update

*Closed Session*
(8) Discussion of matters determined to be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 2 Sec. Sec. 10(a)(1) and 10(a)(3).

The open session will be accessible via teleconference to 25 participants on a first come, first serve basis. To join the conference, submit inquiries to Ms. Yvette Springer at Yvette.Springer@bis.doc.gov no later than May 29, 2019. A limited number of seats will be available for the public session. Reservations are not accepted. To the extent that time permits, members of the public may present oral statements to the Committee. The public may submit written statements at any time before or after the meeting. However, to facilitate the distribution of public presentation materials to the Committee members, the Committee suggests that presenters forward the public presentation materials prior to the meeting to Ms. Springer via email. For more information, call Yvette Springer at (202) 482-2813.

Yvette Springer, Committee Liaison Officer.

back to top

* * * * * * * * * * * * * * * * * * *

# 2. Commerce/BIS Grants 90-Day Temporary General License to Sixty-Nine Entities
(Source: Federal Register, 22 May 2019.) [Excerpts.]

84 FR 23468-23471: Temporary General License

* AGENCY: Bureau of Industry and Security, Commerce.
* ACTION: Final rule.
* SUMMARY: This final rule creates a 90-day temporary general license that partially restores the licensing requirements and policies under the Export Administration Regulations (EAR) for exports, reexports, and transfers (in-country) to sixty-nine entities added to the Entity List on May 16, 2019.
* DATES: This rule is effective May 20, 2019, through August 19, 2019.
* FOR FURTHER INFORMATION CONTACT: Director, Office of Exporter Services, Bureau of Industry and Security, Department of Commerce, Phone: (949) 660-0144 or (408) 998-8806 or email your inquiry to: ECDOEXS@bis.doc.gov.
* SUPPLEMENTARY INFORMATION:

Background

The Entity List (Supplement No. 4 to Part 744) identifies entities and other persons reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States. The End-User Review Committee (ERC), composed of representatives of the Departments of Commerce (Chair), State, Defense, Energy and, where appropriate, the Treasury, makes all decisions regarding additions to, removals from, or other modifications to the Entity List. The ERC makes all decisions to add an entry to the Entity List by majority vote and all decisions to remove or modify an entry by unanimous vote.

This final rule does not amend the Entity List, but modifies the license requirement for the sixty-nine entries added to the Entity List in the May 16, 2019, final rule entitled "Addition of Entities to the Entity List," as described further below, by adding a temporary general license for the specified entities.

Addition of Huawei Technologies Co., Ltd. and Sixty-Eight Related Entities to the Entity List

BIS added Huawei Technologies Co., Ltd. (Huawei) and sixty-eight of its non-U.S. affiliates to the Entity List on May 16, 2019. Details regarding the scope of the listing are in the final rule titled "Addition to the Entity List," effective May 16, 2019, and scheduled to publish in the May 21, 2019, issue of the Federal Register. The sixty-eight non-U.S. affiliates are also listed in Supplement No. 7 to part 744--Temporary General License.

Addition of Temporary General License

This final rule amends the EAR by adding Supplement No. 7 to Part 744 to create a Temporary General License that returns in part the prior requirements through August 14, 2019. In this final rule, pursuant to Supplement No. 5 to part 744 of the Export Administration Regulations (EAR),

BIS is modifying the effect of the sixty-nine entries on the Entity List by adding a temporary general license to temporarily authorize, as specified below, engagement in transactions, involving the export, reexport, and transfer (in-country) of items subject to the EAR to Huawei and its sixty-eight non-U.S. affiliates subject to the conditions described below.

a. This temporary general license is effective from the date of this Authorization, May 20, 2019, through August 19, 2019.

b. This temporary general license does not relieve persons of other obligations under the EAR, including but not limited to licensing requirements to the People's Republic of China (PRC or China) or elsewhere and/or the requirements of part 744 of the EAR. This authorization does not authorize any activities or transactions involving Country Group E countries (i.e., Cuba, Iran, North Korea, Sudan, and Syria) or persons.

c. With the exception of the transactions explicitly authorized by this temporary general license, exports, reexports, and transfers (in-country) continue to require a license pursuant to the license requirement set forth in Supplement No. 4 to part 744 for Huawei and the sixty-eight non-U.S. affiliates and will be reviewed under the license review policy for those entities.

This temporary general license allows, from May 20, 2019, through August 19, 2019, the following:

(1) Continued Operation of Existing Networks and Equipment: BIS authorizes engagement in transactions, subject to other provisions of the EAR, necessary to maintain and support existing and currently fully operational networks and equipment, including software updates and patches, subject to legally binding contracts and agreements executed between Huawei and third parties or the sixty-eight non-U.S. Huawei affiliates and third parties on or before May 16, 2019.

(2) Support to Existing Handsets: BIS authorizes engagement in transactions, subject to other provisions of the EAR, necessary to provide service and support, including software updates or patches, to existing Huawei handsets that were available to the public on or before May 16, 2019.

(3) Cybersecurity Research and Vulnerability Disclosure: BIS authorizes, subject to other provisions of the EAR, the disclosure to Huawei and/or the sixty-eight non-U.S. affiliates of information regarding security vulnerabilities in items owned, possessed, or controlled by Huawei or any of the sixty-eight non-U.S. affiliates when related to the process of providing ongoing security research critical to maintaining the integrity and reliability of existing and currently fully operational networks and equipment, as well as handsets.

(4) Engagement as Necessary for Development of 5G Standards by a Duly Recognized Standards Body: BIS authorizes, subject to other provisions of the EAR, engagement with Huawei and/or the sixty-eight non-U.S. affiliates as necessary for the development of 5G standards as part of a duly

recognized international standards body (e.g., IEEE--Institute of Electrical and Electronics Engineers; IETF--internet Engineering Task Force; ISO--International Organization for Standards; ITU--International Telecommunications Union; ETSI- European Telecommunications Standards Institute; 3GPP--3rd Generation Partnership Project; TIA--Telecommunications Industry Association; and GSMA, a.k.a., GSM Association, Global System for Mobile Communications).

The licensing and other policies of the EAR regarding exports, reexports, and transfers (in-country) to Huawei and sixty-eight of its non-U.S. affiliates that were in effect prior to their addition to the Entity List on May 16, 2019, are available for exports, reexports, and transfers (in-country) for transactions eligible for the temporary general license established by this final rule. For example, the authority of NLR or alicense exception that was available on or before May 16, 2019, may be used pursuant to this temporary general license if the underlying export, reexport, or transfer (in-country) meets the temporary general license conditions and is limited in scope to the support of one or more of activities described in clauses 1-4 above.

This temporary general license does not relieve persons of other obligations under the EAR, including but not limited to licensing requirements to the PRC or elsewhere and/or the requirements of the part 744 of the EAR, such as those specified in Sec. Sec. [thinsp]744.2, 744.3 and 744.4 of the EAR. This temporary general license does not authorize any activities or transactions involving Country Group E countries or persons. For example, this temporary general license does not relieve persons of their obligations under General Prohibition 5 in Sec. [thinsp]736.2(b)(5) of the EAR which provides that, "you may not, without a license, knowingly export or reexport any item subject to the EAR to an end-user or end-use that is prohibited by part 744 of the EAR." BIS strongly urges the use of Supplement No. 3 to part 732 of the EAR, BIS's `Know Your Customer' Guidance and Red Flags," when persons are involved in transactions that are subject to the EAR.

Required Certification Statement and Change to EAR Recordkeeping Requirement ...

Dated: May 20, 2019.

Nazak Nikakhtar, Assistant Secretary for Industry and Analysis, Performing the Nonexclusive Functions and Duties of the Under Secretary for Industry and Security.

back to top

* * * * * * * * * * * * * * * * *

# 3. State Imposes Nonproliferation Measures Against Foreign Entities and Persons, Including a Ban on U.S. Government Procurement
(Source: Federal Register, 22 May 2019.)

84 FR 23627-23628: Imposition of Nonproliferation Measures Against Foreign Persons, Including a Ban on U.S. Government Procurement

* AGENCY: Bureau of International Security and Nonproliferation, Department of State.
* ACTION: Notice.
* SUMMARY: A determination has been made that a number of foreign persons have engaged in activities that warrant the imposition of measures pursuant to Section 3 of the Iran, North Korea, and Syria Nonproliferation Act.
* DATES: The imposition of measures pursuant to Section 3 of the Iran, North Korea, and Syria Nonproliferation Act described in this notice went into effect May 14, 2019.
* FOR FURTHER INFORMATION CONTACT: On general issues: Pam Durham, Office of Missile, Biological, and Chemical Nonproliferation, Bureau of International Security and Nonproliferation, Department of State, Telephone (202) 647-4930. For U.S. Government procurement ban issues: Eric Moore, Office of the Procurement Executive, Department of State, Telephone: (703) 875-4079.
* SUPPLEMENTARY INFORMATION: On May 14, 2019, the U.S. Government applied the measures authorized in Section 3 of the Iran, North Korea, and Syria Nonproliferation Act (Pub. L. 109-353) against the following foreign persons identified in the report submitted pursuant to Section 2(a) of the Act:

- Abascience Tech Co., Ltd. (China) and any successor, sub-unit, or subsidiary thereof;
- Emily Liu [a.k.a. Emily Lau, Liu Baoxia] (Chinese individual);
- Hope Wish Technologies Incorporated (China) and any successor, sub-unit, or subsidiary thereof;
- Jiangsu Tianyuan Metal Powder Co Ltd (China) and any successor, sub-unit, or subsidiary thereof;
- Li Fangwei [a.k.a. Karl Lee] (Chinese individual);
- Raybeam Optronics Co., Ltd (China) and any successor, sub-unit, or subsidiary thereof;
- Ruan Runling [a.k.a. Ricky Runling, Ricky Ruan] (Chinese individual);
- Shanghai North Begins (China) and any successor, sub-unit, or subsidiary thereof;
- Sinotech (Dalian) Carbon and Graphite Corporation (SCGC) (China) and any successor, sub-unit, or subsidiary thereof;
- Sun Creative Zhejiang Technologies Inc (China) and any successor, sub-unit, or subsidiary thereof;
- T-Rubber Co. Ltd (China) and any successor, sub-unit, or subsidiary thereof;
- Wuhan Sanjiang Import and Export Co Ltd (China) and any successor, sub-unit, or subsidiary thereof;
- Yenben Yansong Zaojiu Co Ltd (China) and any successor, sub-unit, or subsidiary thereof;
- Defense Industries Organization (Iran) and any successor, sub-unit, or subsidiary thereof;
- Gatchina Surface-to-Air Missile (SAM) Training Center (Russia) and any successor, sub-unit, or subsidiary thereof;

I - nstrument Design Bureau (KBP) Tula (Russia) and any successor, sub-unit, or subsidiary thereof;
- Moscow Machine Building Plant Avangard (MMZ Avangard) (Russia) and any successor, sub-unit, or subsidiary thereof;
- Army Supply Bureau (ASB) (Syria) and any successor, sub-unit, or subsidiary thereof;
L - ebanese Hizballah (Syria) and any successor, sub-unit, or subsidiary thereof;
- Megatrade (Syria) and any successor, sub-unit, or subsidiary thereof;
- Syrian Air Force (Syria) and any successor, sub-unit, or subsidiary thereof; and
- Syrian Scientific Studies and Research Center (SSCR) (Syria) and any successor, sub-unit, or subsidiary thereof.

The Act provides for penalties on foreign entities and individuals for the transfer to or acquisition from Iran since January 1, 1999; the transfer to or acquisition from Syria since January 1, 2005; or the transfer to or acquisition from North Korea since January 1, 2006, of goods, services, or technology controlled under multilateral control lists (Missile Technology Control Regime, Australia Group, Chemical Weapons Convention, Nuclear Suppliers Group, Wassenaar Arrangement) or otherwise having the potential to make a material contribution to the development of weapons of mass destruction (WMD) or cruise or ballistic missile systems. The latter category includes (a) items of the same kind as those on multilateral lists but falling below the control list parameters when it is determined that such items have the potential of making a material contribution to WMD or cruise or ballistic missile systems, (b) items on U.S. national control lists for WMD/missile reasons that are not on multilateral lists, and (c) other items with the potential of making such a material contribution when added through case-by-case decisions. Accordingly, pursuant to Section 3 of the Act, the following measures are imposed on these persons:

(1) No department or agency of the United States Government may procure or enter into any contract for the procurement of any goods, technology, or services from these foreign persons, except to the extent that the Secretary of State otherwise may determine;
(2) No department or agency of the United States Government may provide any assistance to these foreign persons, and these persons shall not be eligible to participate in any assistance program of the United States Government, except to the extent that the Secretary of State otherwise may determine;
(3) No United States Government sales to these foreign persons of any item on the United States Munitions List are permitted, and all sales to these persons of any defense articles, defense services, or design and construction services under the Arms Export Control Act are terminated; and
(4) No new individual licenses shall be granted for the transfer to these foreign persons of items the export of which is controlled under the Export Administration Act of 1979 or the Export Administration Regulations, and any existing such licenses are suspended.

These measures shall be implemented by the responsible departments and agencies of the United States Government and will remain in place for two years from the effective date, except to the extent that the Secretary of State may subsequently determine otherwise.

Christopher A. Ford, Assistant Secretary of State for International Security and Nonproliferation.

back to top

* * * * * * * * * * * * * * * * * *

## OTHER GOVERNMENT SOURCES

## 4. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* President; PROCLAMATIONS; Trade [Pub. Date: 23 May 2019.]
   - Aluminum; Adjustment of Imports into the U.S. (Proc. 9893)
   - Steel; Adjustment of Imports into the U.S. (Proc. 9894)

* Commerce/BIS; RULES; Implementation of Certain New Controls on Emerging Technologies Agreed at Wassenaar Arrangement 2018 Plenary [Pub. Date: 23 May 2019.]

back to top

* * * * * * * * * * * * * * * * * *

## 5. Commerce/BIS: (No new postings.)

back to top

* * * * * * * * * * * * * * * * * *

## 6. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * *

## 7. UK/OFSI Updates Multiple Sanctions Guidance Documents
(Source: UK OFSI, 22 May 2019.)

The UK Office of Financial Sanctions Implementation (OFSI) has published the following updates on its website:

- UK sanctions on the Republic of Belarus

- UK chemical weapons sanctions
- UK domestic counter-terrorism sanctions
- UK international counter-terrorism sanctions
- UK sanctions on the Democratic Republic of the Congo
- UK sanctions on the Democratic People's Republic of Korea
- UK sanctions on the Republic of Guinea-Bissau
- UK sanctions on Iran relating to nuclear weapons
- UK sanctions on ISIL (Da'esh) and Al-Qaida
- UK sanctions on Russia
- UK sanctions on South Sudan
- UK sanctions on Zimbabwe

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 8. Australia/DEC Closed on 27 May, ACT Public Holiday
(Source: Australia DoD/DEC, 22 May 2019.)

Defence Export Controls will be closed Monday, 27th of May 2019 for an Australian Capital Territory (ATC) Public Holiday. Please note that applications cannot be processed during this time. Defence Export Controls will re-open on Tuesday, 28th of May 2019.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NEWS

# 9. The National Law Review: "Hua-Wait a Minute: Entity Designation Affects Non-U.S. Manufacturers' Exports to China Tech Giant"
(Source: The National Law Review, 21 May 2019.) [Excerpts.]

On May 16, 2019, a sweeping U.S. export control rule went into effect that will impact the U.S. tech industry, but may also create an outsized risk for non-U.S. manufacturers. The rule, issued by the U.S. Department of Commerce, Bureau of Industry and Security (BIS) adds Huawei Technologies Co., Ltd. (Huawei) and 68 of its affiliates to the Entity List. That designation effectively prohibits the export, reexport, and retransfer of all U.S.-origin "items subject to the Export Administration Regulations (EAR)" to those entities. The designation arises from a U.S. government finding that the restrictions are warranted on U.S. national security and foreign policy grounds.

The De Minimis Rule

For companies in the United States, the effect of the rule is straightforward: virtually all items manufactured in the United States are "subject to the EAR." (The biggest exception is military items, which are already subject to a total export prohibition for China under the International Traffic in Arms Regulations.) But the seemingly straightforward Entity List prohibition becomes a little more complicated for manufacturers outside the United States. The source of that complication is the de minimis rule.

## Effects on Non-U.S. Manufacturers

Under the *de minimis* rule, U.S. export controls are applied to certain foreign-made products. The *de minimis* rule provides that a foreign-made commodity is subject to the EAR if that foreign-made commodity contains more than 25% controlled U.S.-origin content by value. The rule does not count so-called EAR99 items or other items that do not require a license (NLR items) to the final destination. That means that some low-level U.S.-origin software, technology, or commodities do not count in the 25% *de minimis* threshold.

We won't delve into the details here, but if you make a product outside the United States that incorporates U.S. parts, components, or technology, or bundles U.S.-origin software, U.S. export controls may apply to the export of your product from *outside the United States* to Huawei in China. If the relevant controls apply, the foreign manufacturer (and any other person wherever located) is prohibited from exporting the item to Huawei.

## Turning the Screws

For now, the application of the *de minimis* rule is straightforward: foreign made product with 25% or less controlled U.S.-origin content - no EAR, no worry.

Currently, the 25% de minimis threshold does not count U.S.-origin content that does not require a license to the item's final destination. Consider, however, what would happen if, for exports to Huawei, BIS took into account that all U.S.-origin content would require a license *to Huawei*. That would mean counting EAR99 and NLR items in the 25%. That would restrict an enormous number of foreign-made goods that use commercial, off-the-shelf U.S. parts and technology, from being sold to Huawei.

BIS has not published guidance or clarification on how the Entity List additions will intersect with the de minimis rule. However, we understand that, in the past, BIS and the Office of Export Enforcement have considered regulations interpretations that would prevent companies from exploiting the de minimis to "laundering" U.S.-origin input items in non-U.S. end-products.

## The Takeaway

At this point, non-U.S. manufacturers that sell to Huawei or other designated entities would do well to assess the amount of U.S.-origin content they use in their products. If the value of that content, including U.S.-origin technology

and software, approaches 25%, those companies would be well advised to carefully account and record the U.S.-origin value in that product. . . .

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. The New York Times: "Trump Administration Could Blacklist China's Hikvision, a Surveillance Firm"
(Source: The New York Times, 22 May 2019.) [Excerpts.]

The Trump administration is considering limits to a Chinese video surveillance giant's ability to buy American technology, people familiar with the matter said, the latest attempt to counter Beijing's global economic ambitions.

The move would effectively place the company, Hikvision, on a United States blacklist. It also would mark the first time the Trump administration punished a Chinese company for its role in the surveillance and mass detention of Uighurs, a mostly Muslim ethnic minority.

The move is also likely to inflame the tensions that have escalated in President Trump's renewed trade war with Chinese leaders. The president, in the span of two weeks, has raised tariffs on $200 billion worth of Chinese goods, threatened to tax all imports and taken steps to cripple the Chinese telecom equipment giant Huawei. China has promised to retaliate against American industries. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. Reuters: "Special Report - Hobbling Huawei: Inside the U.S. War on China's Tech Giant"
(Source: Reuters, 21 May 2019.) [Excerpts.]

In early 2018, in a complex of low-rise buildings in the Australian capital, a team of government hackers was engaging in a destructive digital war game.

The operatives - agents of the Australian Signals Directorate, the nation's top-secret eavesdropping agency - had been given a challenge. With all the offensive cyber tools at their disposal, what harm could they inflict if they had access to equipment installed in the 5G network, the next-generation mobile communications technology, of a target nation? ...

The anti-Huawei campaign intensified last week, when President Donald Trump signed an executive order that effectively banned the use of Huawei equipment in U.S. telecom networks on national security grounds and the Commerce Department put limits on the firm's purchasing of U.S. technology. Google's parent, Alphabet, suspended some of its business with Huawei, Reuters reported. ...

The Americans are now campaigning aggressively to contain Huawei as part of a much broader effort to check Beijing's growing military might under President Xi Jinping. Strengthening cyber operations is a key element in the sweeping military overhaul that Xi launched soon after taking power in 2012, according to official U.S. and Chinese military documents. The United States has accused China of widespread, state-sponsored hacking for strategic and commercial gain. ...

back to top

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 12. Taiwan News: "Japan To Expand Trade Control on AI and Robotics Following US Restrictions on Advanced Technology Exports"
(Source: Taiwan News, 22 May 2019.) [Excerpts.]

To protect its emerging technologies, the country says it will follow US lead to add more items to export control list.

After the U.S. blacklisted Huawei and its foreign entities in order to prevent them from compromising US national security and foreign policy interests, Japan is contemplating similar measures to safeguard emerging technologies.

The Nikkei Asia Review reported Monday (May 20) that this decision came after Washington's decision to impose trade controls on emerging technologies that include AI (Artificial Intelligence), biotechnologies, robotics, quantum computing, 3D printing, and advanced materials.

The report said Japan will not single out China, and will also monitor other international academic research partnerships to prevent technologies from leaking out to third parties.

Japan's existing restrictions on export control only target dual-use goods that can be used in the development of weapons of mass destruction (WMD).

back to top

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 13. The Economist: "Sanctions Create Business Risks - and Opportunities"
(Source: The Economist, 16 May 2019.) [Excerpts.]

An oil tanker entered the Persian Gulf in early February, supposedly heading to the Basra terminal, off the coast of Iraq. Then it turned off its transponders and went dark. Ten days later it resumed transmissions, sailed back through the Strait of Hormuz to Fujairah, in the United Arab Emirates, and emptied its tank. It then reversed towards Basra, went dark again, reappeared and delivered oil to Fujairah once more. In the past eight months, vessels followed this pattern more than 60 times.

Such manoeuvres near Iran are of interest to officials in America, which on May 2nd barred all exports of Iranian oil. In this instance, though, the information was gathered not by intelligence agencies but by a company, Windward. With headquarters in Israel and backed by investors including David Petraeus, a former director of the cia, and John Browne, a former boss of bp, Windward is helping companies navigate a maze of sanctions. ...

back to top

* * * * * * * * * * * * * * * * * *

## 14. Unian: "U.S. to Slap Sanctions on Russian Supplier of Missiles for S-300, S-400 Systems"
(Source: Unian, 21 May 2019.) [Excerpts.]

The United States has decided to impose sanctions on two Russian missile suppliers and a military training center.

The three entities are mentioned in an unpublished notice by the U.S. Department of State on imposition of nonproliferation measures against foreign persons, including a ban on U.S. government procurement, which is due to be published on May 22, according to the Ukrainian news outlet Hromadske.

Subject to the U.S. sanctions will be, among others, Gatchina Surface-to-Air Missile (SAM) Training Center (Russia); Instrument Design Bureau (KBP) Tula (Russia); Moscow Machine Building Plant Avangard (MMZ Avangard) (Russia) jointly with any of their successor, sub-unit, or subsidiary.

According to the notice, "a determination has been made that a number of foreign persons have engaged in activities that warrant the imposition of measures pursuant to Section 3 of the Iran, North Korea, and Syria Nonproliferation Act." ...

back to top

* * * * * * * * * * * * * * * * * *

## COMMENTARY

## 15. Jatin Verma: "U.S - Iran Sanctions: Implications, Impact on India & Way Forward"
(Source: Jatin Verma, 20 May 2019.)

* Author: Admin

Since the US pulled out of Iran's 2015 nuclear accord (JCPOA) last year and imposed crippling sanctions on Iran, tensions between the United States and Iran have been on the rise.

*About*

- Iran and the P5+1-the United States, the United Kingdom, France, Russia, China, and Germany-signed the Joint Comprehensive Plan of Action (JCPOA in 2015).
- Under the deal, Iran agreed to take steps to curb its nuclear program in return for a significant easing of US, UN, and EU sanctions.
- However, in 2018, U.S unilaterally decided to pull out from the agreement and reimpose sanctions on Iran.
- Except for the US, other partners, especially the EU and the three major European countries UK, Germany and France have expressed their commitments to go ahead with the JCPOA agreement.
- US has decided not to renew any of the oil waivers it had granted in 2108, which means that countries that do not stop buying Iranian oil by then could face American strictures.

*Why Did U.S Pullout?*

- Restrictions on Iran's nuclear program would start to relax about 10 years after the deal was signed (though the agreement not to build a nuclear weapon is permanent).
- JCPOA didn't cover other problematic things Iran was doing, including ballistic missile development and its support for violent militias around the Middle East (like Hezbollah in Lebanon).

*Implications of the Sanctions*

(1) Rise in oil prices - With one of the major oil producers being apparently isolated, demand of oil would certainly overshoot its supply resulting inflated oil prices.
(2) Unravelling of JCPOA - Iran has already announced the suspension of some of the restrictions in the deal and has given 60 days to other signatories to find solutions.
(3) Fear of nuclear escalation - The big threat is that Iran will resume higher levels of enrichment to build weapons unless its grievances are addressed.
(4) Risk of regional instability - Iran's government if really collapses, the outcome could be catastrophic, and could include civil war or a total or partial takeover by radicals similar to what happened in Syria or Iraq and a massive new refugee crisis for Europe.
(5) Escalation of proxy wars - With armed proxies across the region, Iran is well placed to launch an asymmetric war against the US and its allies especially in Yemen, Syria and Iraq.
(6) Threat to strategic trade routes - Iran has already threatened to close the Straits of Hormuz that moves oil from inside the Gulf to the rest of the world if its own oil sales remain blocked.
(7) Spillover effects - Such unilateral unsubstantiated sanctions would certainly erode the trust over capability and capacity of international

agreements and the countries involved. North Korea probably could learn and reciprocate accordingly in future.

*Reasons for America's Economic Leverage*

- One of several reasons for America's economic leverage is that it sits at the epicenter of the global financial system. The dollar is a reserve currency. Global trade is preponderantly carried out in dollars. Oil is priced in dollars.
- The US treasury is the favored haven for risk averse investors.  And, it controls the financial messaging system (SWIFT).
- Banks, financial intermediaries and corporates would not be able to function if they did not have access to this system.
- Clearly, this threat would lose its edge if there were an alternative messaging system that enabled non-dollar transactions without SWIFT.
- The European signatories of JCPOA (Germany, France and the UK) have created such a system. They announced in January the establishment of a SPV "Instrument in support of Trade Exchange" (INSTEX) to enable companies to trade with Iran without having to deal with dollar-based US banks.
- It remains to be seen whether companies will avail of this mechanism.

A practical alternative would be for Iran to end this brinkmanship and deepen cooperation with other signatories instead of breaking the deal. Europe, on its part, should stand firmly up to the U.S.'s unilateral threats and pressure, and come up with ways to help Iran. A collapse of the deal would not only exacerbate the Iran nuclear crisis but also set a bad precedent in international diplomacy.

*India - Iran: Related to Sanctions*

Iran's Foreign Minister Mohammad met Indian External Affairs Minister in New Delhi in May,2019, the visit took place amid rising tensions between the US and Iran.

India's Stand- India has conveyed to Iran that it would like all parties to the JCPOA agreement to continue to fulfil their commitments and that all parties should engage "constructively" and resolve all issues "peacefully and through dialogue".

*India's Concerns*

- Diaspora - Over 8 million Indian migrant workers live and work in the West Asian region.
- Scarcity of smooth transaction - Iran is India's third-largest oil supplier behind Iraq and Saudi Arabia with convenient transport, high credit period and insurance guaranteed.
- Balancing delicate ties- While Delhi has played the chessboard in the region tactically so far, hardening of the battle lines will make it increasingly difficult for India, especially with Saudi Arabia and Israel.
- Ethical Dilemma - India had earlier maintained that it follows the UN sanctions, and not unilateral sanctions. Following the listing of Azhar, the US

expects reciprocity in dismantling Iran's terror network, leaving India with few choices.
- Strategic autonomy at stake - Inability of India to secure its right to have free trade under unilateral sanctions and pressure definitely erodes its right to decide it bilateral ties and foreign policy.
- Adverse impact on economy - The global cost of crude oil determines Indian retail prices of petrol and diesel, an escalation of which could fuel inflation and throw India's macroeconomic numbers out of balance.

In a relief to India, US has not put sanctions on Chabahar port development, since both Delhi and Washington's objectives on accessing Afghanistan remain the same.

*Way forward*

- Promote regional reconciliation between Iran and the Gulf Arabs through gulf peace initiative.
- Leverage improved relations with Saudi Arabia and the UAE to negotiate long-term alternatives to energy dependence on Iran.
- Strategic oil reserves & diversification of sources must be proactively pursued in order to reduce India's dependency on limited and unstable regional sources.
- Non-dollar-based trading regime - Countries must find ways of creating a non-dollar-based trading system, particularly regards petroleum and thereby weakening America's stranglehold over the global financial system (SWIFT).
- Complement JCPOA - Amending JCPOA to include larger concerns like Iran's ballistic missile program and its regional activities in places such as Syria.

India's mantra of "commercial consideration, energy security and economic interests" should guide its options in oil imports. It cannot afford to forsake Iran, with which it has had close civilizational and historical links.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


# 16. M. Volkov: "What Happens When Managers Misbehave?"
(Source: Volkov Law Group Blog, 20 May 2019. Reprinted by permission.)

\* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

Company managers are the lynchpin of a corporate compliance program. Without belaboring the Tinkers to Evers to Chance baseball analogy, a corporate culture of compliance requires an important information and accountability flow (or cascade) from leadership to senior managers to on-the-ground managers. It is at this level that the compliance message requires effective communications and conduct by managers directly to employees. This is where the rubber meets the road.

More companies are coming to this realization and affirmatively enhancing managers;' ability to communicate important ethics and compliance

messages and demonstrate by day-to-day examples, how to implement such ethical principles in their supervisory and work responsibilities. Managers are an important reflection of a company's culture.

A company places an extraordinary amount of trust in its managers. They carry an important message and have direct responsibilities over their employees. It is no accident that employees, when surveyed, prefer to report their concerns to their immediate supervisor. In fact, many companies explicitly encourage such reporting in their compliance program policies and code of conduct. This reporting preference reflects a basic human desire - seeking approval from their immediate supervisor.

But what happens when there is a breakdown in the manager's own ethical commitment? Recent studies have shown that managers commit fraud and other misconduct at a high rate of almost 40 percent. To compound this problem, managers who engage in misconduct, often do so on more than one occasion. In other words, manager misconduct, when it occurs, does so on a repeated basis.

This reality presents serious challenges for a CCO seeking to rely on this important player in the compliance world. Managers carry an important burden - and they need to be monitored for risks and misconduct. If here is a breakdown among managers, such misconduct can have a disastrous impact on the surrounding employees, the culture of the company, and the risk of increased misconduct by employees.

It is beyond obvious that employees, who know or observe their managers engage in misconduct, are more likely themselves to engage in nefarious acts. A lawless community will experience higher rates of misconduct.

To counter instances of manager misconduct, companies hope (and pray) that employees will instead choose to report the manager rather than join the manager in any improper scheme. This is the real delicate balance - a culture of compliance may itself preserve its performance by reporting managers who engage in misconduct. Whether this will occur depends on the extent to which a company's ethical culture has taken hold and whether employees have adopted the company's culture as part of their own makeup.

Companies sometimes spend so much time focused on third-party risks that managers and employees are "taken for granted" or ignored on the risk scale. Hopefully, this attitude will mature into a healthy balance between managing third-party risks and internal manager/employee risks. An internal focus is important and can be very successful, especially in light of the direct control and influence that a compliance program can exert on its employees. A CCO can engage in a variety of strategies and mechanisms for monitoring managers and employees - in fact, such compliance activities can result in improvements to more difficult areas, such as monitoring third-party behaviors.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DOC_0042967

## 17. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "BIS Issues Temporary General License Authorizing Limited Activities with Huawei"

(Source: Thomsen and Burke LLP, 21 May 2019. Available by subscription via maher@t-b.com.)

* Authors: Roszel C. Thomsen II, Esq., +1 410-539-2596, roz@t-b.com; Antoinette D. Paytas, Esq., +1 410-539-2655, toni@t-b.com; and Maher M. Shomali, Esq., +1 410-539-6336, maher@t-b.com. All of Thomsen and Burke LLP.

On May 16, 2019, the Commerce Department's Bureau of Industry and Security ("BIS") added Huawei Technologies Co., Ltd. ("Huawei") and sixty-eight non-U.S. affiliates to the Entity List creating a licensing requirements for the export, reexport or transfer of all items subject to the Export Administration Regulations ("EAR") to the affected entities.

On May 21, BIS posted a final rule that creates a temporary general license that allows, from May 20, 2019, through August 19, 2019, the following:

(1) *Continued Operation of Existing Networks and Equipment*: BIS authorizes engagement in transactions, subject to other provisions of the EAR, necessary to maintain and support existing and currently fully operational networks and equipment, including software updates and patches, subject to legally binding contracts and agreements executed between Huawei and third parties or the sixty-eight non-U.S. Huawei affiliates and third parties on or before May 16, 2019.

(2) *Support to Existing Handsets*: BIS authorizes engagement in transactions, subject to other provisions of the EAR, necessary to provide service and support, including software updates or patches, to existing Huawei handsets that were available to the public on or before May 16, 2019.

(3) *Cybersecurity Research and Vulnerability Disclosure*: BIS authorizes, subject to other provisions of the EAR, the disclosure to Huawei and/or the sixty-eight non-U.S. affiliates of information regarding security vulnerabilities in items owned, possessed, or controlled by Huawei or any of the sixty-eight non-U.S. affiliates when related to the process of providing ongoing security research critical to maintaining the integrity and reliability of existing and currently fully operational networks and equipment, as well as handsets.

(4) *Engagement as Necessary for Development of 5G Standards by a Duly Recognized Standards Body*: BIS authorizes, subject to other provisions of the EAR, engagement with Huawei and/or the sixty-eight non-U.S. affiliates as necessary for the development of 5G standards as part of a duly recognized international standards body (e.g., IEEE - Institute of Electrical and Electronics Engineers; IETF - Internet Engineering Task Force; ISO - International Organization for Standards; ITU - International Telecommunications Union; ETSI- European Telecommunications Standards Institute; 3GPP - 3rd Generation Partnership Project; TIA- Telecommunications Industry Association; and GSMA, a.k.a., GSM Association, Global System for Mobile Communications).

These are the only authorized activities under the new temporary general license.

Exporters, re-exporters, and/or transferors utilizing this Temporary General License are also required to make a certification statement specifying how the export, reexport, or transfer (in-country) meets the scope of the Temporary General License, and must retain the certification statement in accordance with the record retention requirements in Part 762 of the EAR.

This final rule does not amend the Entity List, and restrictions that are outside of the scope of this Temporary General License still require an export license from BIS, as further described in the May 16th order.

*Additional online resources:*

- BIS Website Notices
- Huawei Designations
- Temporary General License

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 18. S.F. Kjeldsen: "EU Cyber-Attack Sanctions Regime - a New Era for Sanctions?"
(Source: LinkedIn, 20 May 2019.)

\* Author: Simon Fasterkjær Kjeldsen, Legal Advisor at Ministry of Foreign Affairs of Denmark.

Yesterday, a new EU sanctions regime entered into force, cf. Council Regulation (EU) 2019/796 and Council Decision (CFSP) 2019/797. This new regime allows for targeted sanctions to "deter and respond to cyber-attacks which constitute a threat to EU member states, third States or international organisations". The adoption of the new sanctions regime falls - quite remarkably - a week ahead of the elections for the European Parliament.

**Scope of the Cyber-Attack Sanctions Regime**

The adoption of such a sanctions regime was part of the EU "Cyber Diplomacy Toolbox" launched on 19 June 2017, where the Council stressed the growing need to protect the integrity and security of the EU, its Member States and their citizens against cyber threats and malicious cyber activities.

As a consequence of the recent adoption of the said legislation, EU can now impose restrictive measures such as travel bans and asset freezing measures on those "responsible for cyber-attacks or attempted cyber-attacks, who provide financial, technical or material support for such attacks or who are involved in other ways".

Cyber-attacks falling within the scope of this new sanctions regime are those which have significant impact and which:

- originate or are carried out from outside the EU; or
- use infrastructure outside the EU; or
- are carried out by persons or entities established or operating outside the EU; or
- are carried out with the support of person or entities operating outside the EU.

Attempted cyber-attacks with a potentially significant effect are also covered by this sanctions regime. Sanctions may also be imposed on persons or entities associated with the responsible parties.

**A New Era for Sanctions?**

Traditionally, sanctions regimes have been imposed as a foreign policy tool by the EU on a country-specific level in order to change the behavior of a certain government/person/group in a given conflict/context. Currently, EU has more than 40 of such country-specific regimes.

The cyber-sanctions regime is different as it is a thematic regime with horizontal application. This means that it can be applied autonomously and globally. EU has formerly only had two of such thematic regimes; one to combat terrorism (adopted on 27 December 2001) and one against the proliferation and use of chemical weapons (adopted on 15 October 2018).

The new cyber-attack regime is a modern way to facilitate the use of sanctions in pursuance of the new threats and changing circumstances of the digital world. It remains to be seen how the sanctions regime will come into use, however, as with all sanctions regimes it is the obligation of persons and entities acting within the EU (and for citizens of the member states) to comply with the measures, cf. the territorial and personal applicability as stipulated in art. 18 of Council Regulation (EU) 2019/796.

See the press release from EU here.

back to top

* * * * * * * * * * * * * * * * *

## 19. S.M.C. Kovarovics: "Don't be Caught Off Guard: Huawei Entities Added to US Entity List"
(Source: World Trade Controls, 21 May 2019.)

* Author: Susan M.C. Kovarovics, Esq., Bryan Cave LLP, susan.kovarovics@bryancave.com, 202-508-6132.

The Trump Administration announced last week that the US Government has added Huawei to the Commerce Department Entity List. Here is a link to a

copy of the Federal Register Notice pursuant to which that designation occurred. This notice was formally published 21 May 2019, but the Commerce Department has noted that it became effective when a public inspection copy was published on the Federal Register site at 4:15 pm (presumably Eastern Daylight Time) on 16 May 2019. It covers Huawei Technologies Co., Ltd. ("Huawei") and 68 of its non-US affiliates.

The restrictions associated with this Entity List designation impact all exports, reexports or in-country transfers of items (goods, technology or software) subject to the US Export Administration Regulations ("EAR") to any of the Huawei entities named in the Federal Register Notice. Keep in mind that items received from the United States or that are US origin continue to be subject to the EAR unless and until they have been incorporated into an item made outside the United States that contains only *de minimis* US content controlled to the country to which the item destined. Items made outside the United States that do contain greater than *de minimis* controlled US content are themselves considered to be subject to the EAR and, thus, within the scope of this Entity List restriction. Be cognizant of aftermarket activities and software and technology transfers that may also trigger these EAR restrictions.

The Commerce Department has issued a temporary general license effective 20 May 2019 to 19 August 2019 that authorizes the export, reexport or transfer in accordance with the license requirements and exceptions applicable as of 16 May 2019 for items destined to Huawei or one of its 68 affiliates subject to the Entity List designation if such items are for one of the four approved end uses:

- Continued operation of existing networks and equipment
- Support to existing handsets
- Cybersecurity research and vulnerability disclosure
- Engagement as necessary for development of 5G standards by a duly recognized standards body

Use of the temporary general license is predicated on creation of a certification in advance of the export identifying how the transaction meets the criteria for the temporary general license. The certification must be maintained as part of the export records for the transaction in accordance with the EAR's recordkeeping requirements.

For all other exports, reexports, or transfers to Huawei and its affiliates, specific licenses can be sought. However, there is a presumption of denial, so the case must be made to explain why any particular proposed transaction does not run contrary to the national security and foreign policy reasons behind the designations in the first instance.

back to top

* * * * * * * * * * * * * * * * * *



Are You Keeping Up to Date with the Latest Regulations?

Bartlett's Annotated ITAR will keep you updated on the latest ITAR amendments.

**MORE INFORMATION AVAILABLE HERE**

## 20. FCC Presents "The ABC of FMS", 28 Nov in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

This training course is specifically designed for compliance professionals and those in a similar role working for government agencies or companies (temporarily) obtaining U.S. export-controlled articles and technology procured through government-to-government Foreign Military Sales (FMS), and authorized by the Arms Export Control Act (AECA) (22 U.S.C. 2751, *et. seq.*).

The course will cover multiple topics relevant for organizations outside the U.S. working with U.S. export-controlled articles and technology procured through FMS, including: the U.S. regulatory framework, with a special focus on the AECA, key concepts and definitions, and practical compliance tips to ensure the proper handling of FMS-acquired articles and technology. Participants will receive a certification upon completion of the training.

**Details**
* What: The ABC of Foreign Military Sales (FMS)
* When: Thursday, 28 Nov 2019
  - Welcome and Registration: 9.00 am - 9.30 am
  - Training hours: 9.30 am - 4.00 pm
* Where: Full Circle Compliance, Landgoed Groenhoven, Dorpsstraat 6, Bruchem, the Netherlands
* Information & Registration: here or contact FCC at events@fullcirclecompliance.eu or + 31 (0)23 - 844 - 9046
* This course can be followed in combination with "U.S. Export Controls: The International Traffic in Arms Regulations (ITAR) from a non-U.S. Perspective" (26 Nov 2019), and/or "U.S. Export Controls: The Export Administration

Regulations (EAR) from a non-U.S. Perspective" (27 Nov 2019). Please, see the event page for our combo deals.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 21. Bartlett's Unfamiliar Quotations
(Source: Editor)

\* **Arthur Conan Doyle** (Sir Arthur Ignatius Conan Doyle; 22 May 1859 - 7 Jul 1930; was a British writer best known for his detective fiction featuring the character Sherlock Holmes. Originally a physician, in 1887 he published *A Study in Scarlet,* the first of four novels about Holmes and Dr. Watson. In addition, Doyle wrote over fifty short stories featuring the famous detective. The Sherlock Holmes stories are generally considered milestones in the field of crime fiction.)
  - *"There is nothing more deceptive than an obvious fact."*
  - *"When you have eliminated the impossible, whatever remains, however improbable, must be the truth."*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 22. Are Your Copies of Regulations Up to Date?
(Source: Editor)

\* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199.  Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
  - Last Amendment: 5 Apr 2019: 84 FR 13499-13513: Civil Monetary Penalty Adjustments for Inflation

\* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
  - Last Amendment: 22 May 2019: 84 FR 23468-23471: Temporary General License

\* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30.  Implemented by Dep't of Commerce, U.S. Census Bureau.
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (1 Jan 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and

approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under Atomic Energy Act of 1954.
  - Last Amendment: 23 Feb 2015: 80 FR 9359, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

* DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under Atomic Energy Act of 1954.
  - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

* DOJ ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War. Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
  - Last Amendment: 14 Mar 2019: 84 FR 9239-9240: Bump-Stock-Type Devices

* DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
  - Last Amendment: 19 Apr 2019: 84 FR 16398-16402: International Traffic in Arms Regulations: Transfers Made by or for a Department or Agency of the U.S. Government
  - The only available fully updated copy (latest edition: 19 Apr 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full

Circle Compliance website. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR, please contact us to receive your discount code.

* DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders.
Implemented by Dep't of Treasury, Office of Foreign Assets Control.
  - Last Amendment: 29 Apr 2019: 84 FR 17950-17958: Foreign Interference in U.S. Elections Sanctions Regulations [amendment of 31 CFR Part 579 to implement EO 13848]

* USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S. International Trade Commission. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 21 May 2019: Harmonized System Update (HSU) 1908
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

back to top

* * * * * * * * * * * * * * * * * * *


## 23. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published  here.

back to top

* * * * * * * * * * * * * * * * * * *

EDITORIAL POLICY


* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Vincent J.A. Goossen and Alexander Witt; and Events & Jobs Editor, Sven Goor. The Ex/Im Daily Update is emailed every business day to approximately 7,000 readers of changes to defense and high-tech trade laws and regulations.
We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely

circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws. If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice. Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources. If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free. Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

**From:** Nazak Nikakhtar [Nazak.Nikakhtar@bis.doc.gov]
**Sent:** 5/26/2019 7:17:17 PM
**To:** Comstock, Earl (Federal) [EComstock@doc.gov]
**Subject:** FW: Defense and Export-Import Update (May 25, 2019)

This is a really good email update I get regularly. Good recap on developments in export controls and trade in general.

**From:** Gary Stanley <██████@glstrade.com>
**Sent:** Sunday, May 26, 2019 10:08 AM
**To:** Nazak Nikakhtar <Nazak.Nikakhtar@bis.doc.gov>
**Subject:** Defense and Export-Import Update (May 25, 2019)

**Dear All,**

**Good Day! Congratulations to Alex Terry at NielsonSmith for organizing a truly outstanding export control conference in Munich last week. Outstanding presentations and interaction among speakers and attendees throughout the two days!**

**Gary Stanley's EC Tip of the Day: There are two types of Congressional Notifications mandated by Section 36 (22 U.S.C. § 2776) of the Arms Export Control Act handled by DDTC: the 36(c) Notification for value and the 36(d) Notification for the manufacture of significant military equipment (SME) abroad. The following triggers value notifications:**

• **Commercially licensed exports to non-NATO +5 (Japan, Australia, New Zealand, the Republic of Korea, or Israel) member countries involving the export of: Major Defense Equipment valued at $14 million or more, or defense articles or services valued at $50 million or more;**

• **Commercially licensed exports to NATO +5 (Japan, Australia, New Zealand, the Republic of Korea, or Israel) member countries involving the export of: Major Defense Equipment valued at $25 million or more, or defense articles or services valued at $100 million or more; and**

• **Commercially licensed exports of firearms controlled under Category I of the U.S. Munitions List in an amount of $1,000,000 or more.**

**Today's Items:**

1. **BIS Implements Certain New Controls on Emerging Technologies Agreed at Wassenaar Arrangement 2018 Plenary**
2. **BIS Revises Country Group Designations for Venezuela and Conforms License Requirements**
3. **BIS Publishes Correction to Entity List Revision**
4. **OFAC Sanctions Argentina-based Goldpharma**
5. **State Dept. Invokes AECA "Emergency" Power to Authorize FMS to Saudi Arabia and the UAE**
6. **DoD/DSCA Updates Security Assistance Management Manual and Policy Memos**
7. **President Trump Nominates Kenneth Canterbury, Jr., as New ATF Director**

8. **Secretary of Commerce Wilbur Ross Honors U.S. Companies with Presidential Award for Export Achievements**

9. **EU Creates General License for Dual-Use Exports to the UK Post-Brexit**

10. **WTO News**

11. **U.S. Customs and U.S. Census/AES Updates**

12. **Commerce/ITA, Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**

13. **GAO and CRS eports, Testimony, and Correspondence of Interest**

**Other Headlines**

14. **Trump Planning More Restrictions on Tech Exports to China**

15. **Trump Wields More Powerful Weapon Than Tariffs in Trade War**

16. **Will U.S. War on Huawei Help China End Its Dependency on Western Tech?**

17. **Huawei's Yearslong Rise Is Littered With Accusations of Theft and Dubious Ethics**

18. **China's Supply of Minerals for iPhones and Missiles Could Be a Risky Trade Weapon**

19. **Huawei Feels U.S. Squeeze in U.K., Japan as Partners Curb Business**

20. **Trump Team Is Split Over How Hard to Push North American Trade Deal**

21. **U.S. Weighs Letting Companies Seek New Penalties Over Currency Manipulation**

22. **Trump Invokes Emergency Arms Sales Authority to Counter Iran**

23. **Pentagon Eyes Expanding DARPA Future Warfare Research Office**

24. **Defense Spending Will Bust BCA Caps: Mark Cancian**

25. **NDAA 2020: SASC Emphasizes Tech Race With China**

26. **SALES TAKING OFF: International Market for F-35 Heats Up**

27. **US Army Picks 5 Companies to Study Stryker Weapon System Integration**

28. **Marine Corps Adopts Product for Smartphone Communications**

29. **SOCOM to Develop New AI Strategy**

30. **New Software Can Sift Through Decades of Stovepiped Intelligence Data**

31. **NASA Executive Quits Weeks After Appointment to Lead 2024 Moon Landing Plan**

32. **Boeing Drops Embraer Name From Brazil Commercial Jet Division**

33. **NASA's First-of-Kind Tests Look to Manage Drones in Cities**

34. **Opinion: How the U.S. Went Wrong on Huawei**

**Upcoming Export Control and Other Trade Compliance Conferences**

# 1. BIS Implements Certain New Controls on Emerging Technologies Agreed at Wassenaar Arrangement 2018 Plenary

(84 Fed. Reg. 23886) - The U.S. Department of Commerce's Bureau of Industry and Security (BIS) has amended the Commerce Control List set forth at EAR Part 774 to to

implement certain changes made to the Wassenaar Arrangement List of Dual-Use Goods and Technologies maintained and agreed to by governments participating in the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual-Use Goods and Technologies (Wassenaar Arrangement, or WA) at the December 2018 WA Plenary meeting. The specific ECCNs affected are as follows:

• ECCN 3A001 is amended by adding paragraph b.3.f to control discrete microwave transistor "rated for operation with a peak saturated power output greater than 5 W (37.0 dBm) at all frequencies exceeding 8.5 GHz up to and including 31.8 GHz." Although older devices specified limited frequency ranges, new microwave transistors cover wider frequency bands at higher power levels, opening up new possibilities for radar and other transmitting applications. Note 1 that appears after paragraph b.3.f is revised, so that it does not apply to new paragraph b.3.f, meaning that the control status of a transistor in b.3.f is not determined by the lowest peak saturated power output control threshold.

• ECCN 3D005 is added to the CCL in order to control software that ensures continuity of operation when electronics are exposed to Electromagnetic Pulse (EMP) or Electrostatic Discharge (ESD).

• ECCN 5A002 is amended to add a control on certain types of post-quantum cryptographic algorithms. This rule adds paragraph 2.c of the Technical Notes that follow paragraph 5A002.a.4 to include a new paragraph addressing certain post-quantum asymmetric algorithms. This rule also revises paragraphs 5A002.a, a.4, paragraph 2 of the Technical Notes that follow paragraph 5A002.a.4, paragraph a.1.a.1.b in Note 2 to 5A002.a, and paragraph (4)(a) of Related Controls to 5A002, to replace the term `in excess of 56 bits of symmetric key length, or equivalent' with `described security algorithm'. These changes are being made for technical accuracy since methods for establishing equivalence between modern classical and post-quantum cryptography (PQC) are not settled. In addition, this rule revises the Nota Bene to Note 3 (the Cryptography Note) to specify that items that include post-quantum asymmetric algorithms described by paragraph 2.c of the Technical Notes are subject to the classification or self-classification reporting requirements for mass market items.

• ECCN 6A001 is amended by moving the Note previously located below Item paragraph a.2.g.4 to below the introductory Item paragraph a.2 for better readability. This Note informs the public that Item paragraph a.2 ``applies to receiving equipment, whether or not related in normal application to separate active equipment, and ``specially designed'' components therefor''. This rule also adds a Technical Note 2 after paragraph a.2.a to alert the public that underwater acoustic transducers designed to operate as passive receivers are hydrophones. This rule revises paragraph a.2.a.6 to add the parameter ``and having a `hydrophone sensitivity' better than -230 dB below 4 kHz'', to remove any transducers or hydrophones that are not of strategic concern. This rule also corrects a License Exception LVS paragraph for 6A001.a.1.b.1 by reversing the frequency band range for the equipment from "30 kHz to 2 kHz" to "2 kHz to 30 kHz."

• ECCN 9A004 is amended by revising the Heading to add air-launch platforms. This rule adds new Item paragraph 9A004.g, which controls "aircraft" "specially designed" or modified to be air-launch platforms for space launch vehicles (SLV). The license requirements table is revised to add 9A004.g to the NS and AT license requirements paragraphs. Several commercial entities are building space-bound craft that will utilize an

air-launch rather than traditional ground launch. This new Item paragraph expands existing space-launch controls to include this developing technology.

This rule harmonizes the CCL with only the agreements on recently developed or developing technologies not previously controlled that are essential to the national security of the United States and warrant early implementation. The remaining agreements will be implemented in a separate rule. This rule is effective May 23, 2019.

## 2. BIS Revises Country Group Designations for Venezuela and Conforms License Requirements

(84 Fed. Reg. 24018) - The U.S. Department of Commerce's Bureau of Industry and Security (BIS) has amended EAR Parts 738 and 740 to remove Venezuela from Country Group B, which affords favorable treatment for certain exports of National Security-controlled items, and moves Venezuela to Country Group D:1, which lists countries of national security concern. This final rule makes these changes to the EAR to reflect current national security concerns related to Venezuela, *e.g.*, the introduction of foreign military personnel and equipment into Venezuela, and to better protect U.S. national security. The changes in this final rule also better align the Country Group designations for Venezuela with other EAR national security-related provisions that already apply to Venezuela, e.g., the military end-use and end-user controls that apply to certain items for export, reexport, or transfer (in-country) and provisions that are specific to countries subject to U.S. arms embargoes. In addition, this final rule adds Venezuela to Country Groups D:2-4, which list countries of nuclear, chemical and biological weapons, and missile technology concern, respectively. This rule is effective May 24, 2019.

## 3. BIS Publishes Correction to Entity List Revision

(84 Fed. Reg. 24021) - The U.S. Department of Commerce's Bureau of Industry and Security (BIS) has published a correction to its Federal Notice at 84 Fed. Reg. 21233 (May 14, 2019) revising its Entity List set forth in Supplement No. 4 to EAR Part 744 by adding twelve entities, under a total of sixteen entries, to the Entity List. This rule also modified one existing entry on the Entity List under the destination of the United Arab Emirates and removed one entity under the destination of the United Arab Emirates. The correction is as follows: On page 21236, in the table labeled "Supplement No. 4 to Part 744--Entity List," in the second column, in the third entry "Multi- Mart Electronics Technology Co, Ltd.," the second line, "SF" should appear as "5/F."

## 4. OFAC Sanctions Argentina-based Goldpharma

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has identified the Argentina-based Goldpharma Drug Trafficking and Money Laundering Organization (Goldpharma DTO/MLO) as a significant foreign narcotics trafficker pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act). OFAC has also designated eight Argentine nationals for their role in the Goldpharma DTO/MLO, as well as nine entities located in Argentina, Colombia, Canada, the United Kingdom, and the Netherlands. As a result of these actions, all property and interests in property of the designated persons in the United States or in the possession or control of U.S. persons must be blocked and reported to OFAC. OFAC's regulations generally prohibit all dealings by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked persons. Click here for a chart identifying the designated individuals and entities.

## 5. State Dept. Invokes AECA "Emergency" Power to Authorize FMS to Saudi Arabia and the UAE

Pursuant to section 36 of the Arms Export Control Act, Secretary of State Michael Pompeo has directed the U.S. Department of State to complete immediately the formal notification of 22 pending arms transfers to Jordan, the United Arab Emirates, and Saudi Arabia totaling approximately $8.1 billion. The U.S. Department of Defense's Defense Security Cooperation Agency (DSCA) has, in turn, delivered the required certifications notifying Congress of the following Foreign Military Sales:

• Saudi Arabia has requested to buy follow-on logistics support and services for the Royal Saudi Air Force aircraft, engines, and weapons; publications and technical documentation; support equipment; spare and repair parts; repair and return; calibration support and test equipment; personnel equipment; U.S. Government and contractor technical and logistics support, and other related elements of program support. Equipment and spares will be procured for support of, but not limited to, F-5, F-15, KA-350, C-130, KC-130, E-3, RE-3, and KE-3 aircraft. The total estimated program cost will be $1.8 billion. There will be various contractors associated with the equipment involved with this case, and there is no prime contractor. There are no known offset agreements proposed in connection with this potential sale.

• Saudi Arabia has requested to purchase spare and repair parts, U.S. Government and contractor engineering, technical, and logistics support services, and other related elements of program support for their TASS (Tactical Air Surveillance System) aircraft program. Additionally, the sale will support rehabilitation of the integrated lab located in the United States used for testing and troubleshooting. The total estimated program cost will be $136 million. The prime contractor will be L3 Technologies, Greenville, Texas. There are no known offsets proposed with this sale.

• Saudi Arabia has requested to purchase follow-on support and services for Royal Saudi Air Force aircraft, engines, and weapons; publications and technical documentation; support equipment; spare and repair parts; repair and return; calibration support and test equipment; personnel equipment; U.S. Government and contractor technical and logistics support, and other related elements of program support. Equipment and spares will be procured for support of, but not limited to, F-5, RG-5, F-15, C-130, KC-130, E-3, RE-3, and KE- 3 aircraft. The total estimated program cost will be $800 million.

• The Government of the UAE has requested to buy twenty (20) RQ-21A Blackjack Unmanned Air Vehicles (UAVs). Also included are forty (40) Global Positioning Systems (GPS) with Selective Availability Anti-Spoofing Module (SAASM) Type II (MPE-S); air vehicle support equipment including eight (8) Ground Control Stations (GCS), four (4) launchers, and four (4) retrievers; spare and repair parts; publications; training; and technical support services. The estimated total case value is $80 million. The prime contractor will be Insitu, Bingen, WA, a wholly owned subsidiary of the Boeing Company. There are no known offset agreements proposed in connection with this potential sale.

• The Government of the United Arab Emirates (UAE) has requested to buy three hundred thirty-one (331) Javelin Guided Missiles with container. Also included are System Integration & Checkout (SICO) service; Field Service Representative; U.S. Government and

contractor technical, engineering and logistics support services' tools and test equipment; support equipment; publications and technical documentation; spare and repair parts; and other related elements of logistics and program support. The estimated total case value is $102 million.

- The Government of the United Arab Emirates has requested a possible sale of twenty thousand four (20,004) Advanced Precision Kill Weapon Systems (APKWS) II All-Up-Rounds. Also included was weapon support and test equipment, spares, technical publications, personnel training, other training equipment, transportation, U.S. Government and contractor engineering, technical and logistics support services, and other related elements of logistical and program support. The estimated total case value is $900 million.The prime contractor will be BAE Systems, Nashua, NH. There are no known offset agreements proposed in connection with this potential sale.

- The Government of the United Arab Emirates (UAE) has requested follow-on blanket order U.S. Marine Corps training, training support, and other training related services in support of the UAE Presidential Guard Command. The total value for this sale is $100 million.There will be no principal contractor associated with this proposed sale. There are no known offset agreements proposed in connection with this potential sale.

## 6. DoD/DSCA Updates Security Assistance Management Manual and Policy Memos

The U.S. Department of Defense's Defense Security Cooperation Agency (DSCA) has made the following updates to its Security Assistance Management Manual (SAMM) and Policy Memorandums:

- DSCA Policy Memo 19-04 End Use Monitoring (EUM) Focused Verification Checks (FVC) and Reporting Potential End Use Violations has been posted.

Focused Verification Checks (FVC) are ad hoc inspections of U.S.-origin defense articles that may be directed when concerns arise regarding their use, transfer, and physical security. They are a mechanism to proactively address issues that could lead to end-use violations. The implementation of FVCs will address a gap in EUM practice identified during the recent deep dive on EUM policy and procedure. This revision also provides more detailed guidance on the requirements and process for reporting potential end-use violations to the DSCA EUM Team and to the Department of State.

This memo revises Chapter 8 - End-Use Monitoring (EUM), specifically by adding/modifying sections C8.5.4. Focused Verification Checks (FVC) + subsections, C8.6.2.1. Reporting + subsections, and adds Figure C8.F2. - Section 3 Violation Reporting Process.

## 7. President Trump Nominates Kenneth Canterbury, Jr., as New ATF Director

President Donald J. Trump has nominated Kenneth Charles Canterbury, Jr., of South Carolina, to be the Director of the U.S. Department of Justice's Bureau of Alcohol, Tobacco, Firearms, and Explosives. Mr. Canterbury currently serves as President of the National Fraternal Order of Police, a position he has held since 2003. He earned the rank of Major in the Horry County Police Department in Conway, South Carolina, after 26 years in the Patrol Division, Criminal Division, and Training Division. He has served on the Executive Board of

the National Fraternal Order of Police for more than two decades. Mr. Canterbury is a graduate of Coastal Carolina University.

## 8. Secretary of Commerce Wilbur Ross Honors U.S. Companies with Presidential Award for Export Achievements

U.S. Secretary of Commerce Wilbur Ross has honored 48 U.S. companies and organizations, recognizing their contribution to American export growth during the 2019 President's "E" Awards ceremony. Winners hail from 25 states, and of this year's 48 honorees, 41 are small and medium-sized businesses, while 26 firms are manufacturers. The President's "E" Award was created in 1961 by Executive Order of the President and is the highest recognition a U.S. entity can receive for making a significant contribution to the expansion of U.S. exports. In 2018 alone, the United States exported $2.5 trillion worth of goods and services – the highest on record.

## 9. EU Creates General License for Dual-Use Exports to the UK Post-Brexit

The European Parliament and the European Council have adopted Regulation (EU) 2019/496 which amends Council Regulation (EC) No 428/2009 by granting a Union general export authorisation for the export of certain dual-use items from the Union to the United Kingdom in the event of the United Kingdom's withdrawal from the European Union.

## 10. WTO News

- Azevêdo: E-commerce must be a force for inclusion

- Items proposed for consideration at the next meeting of the Dispute Settlement Body

- Azevêdo urges ministers' action on systemic issues and to intensify fisheries subsidies work

- WTO opens its doors to the public on 16 June

## 11. U.S. Customs and U.S. Census/AES Updates

- U.S. Customs - CSMS #19-000261 Title: Validation of AES Commodity Filing Response Messages 007 and 227

- U.S. Customs - CSMS #19-000262 Title: Turkey Designation as a Developing Country in WTO GSP Under Section 201 is Removed

- U.S. Customs - CSMS #19-000263 Title: ACE PRODUCTION Scheduled Maintenance, Sat. May 25, 2019 @ 2200 to 0400 ET Sun. May 26

- U.S. Customs - CBP and Shannon, Ireland Airport Authority Sign MOU for Extended Preclearance Services

- U.S. Customs - Travel Tips Ensure Smooth CBP Processing Experience

## 12. Commerce/ITA, Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

- Commerce/E&C - Request for Comment on Subsidy Programs Provided by Countries Exporting Softwood Lumber and Softwood Lumber Products to the United States - Interested persons have until June 10, 2019, to submit their comments

- Commerce/E&C - Carbon and Alloy Steel Wire Rod From Turkey: Correction to Notice of Opportunity To Request Administrative Review

- Commerce/E&C - Certain Cold Rolled Steel Flat Products From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016- 2017

- Commerce/E&C - Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2016

- Commerce/E&C - Certain Lined Paper Products From India: Final Results of Countervailing Duty Administrative Review; 2016

- Commerce/E&C - Certain Oil Country Tubular Goods From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017

- Commerce/E&C - Certain Steel Wheels From the People's Republic of China: Antidumping and Countervailing Duty Orders

- Commerce/E&C - Certain Quartz Surface Products From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances

- Commerce/E&C - Certain Quartz Surface Products From the People's Republic of China: Final Affirmative Countervailing Duty Determination, and Final Affirmative Determination of Critical Circumstances

- Commerce/E&C - Diamond Sawblades and Parts Thereof From the People's Republic of China: Notice of Court Decision Not in Harmony With the Final Results of Review, Rescission of Administrative Review in Part, and Amended Final Results of the Antidumping Duty Administrative Review; 2013-2014

- Commerce/E&C - Vertical Metal File Cabinets From the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation

- Commerce/E&C - Vertical Metal File Cabinets From the People's Republic of China: Initiation of Countervailing Duty Investigation

- USITC - Carburetors and Products Containing Such Carburetors: Notice of a Commission Determination Not To Review an Initial Determination Granting In-Part a Motion for Leave To Amend the Complaint and Notice of Investigation

- USITC - Certain Light- Emitting Diode Products, Systems, and Components Thereof: Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

- USITC - Certain Toner Cartridges and Components Thereof: Notice of a Commission Determination To Affirm an Initial Determination Granting Respondents' Motions for Summary Determination of Non-Infringement; Finding of No Violation of Section 337; Termination of the Investigation

- USITC - Government in the Sunshine Act Meeting Notice - May 29, 2019, at 11:00 AM EDT

## 13. GAO and CRS eports, Testimony, and Correspondence of Interest

- GAO - COMMERCIAL SPACE TRANSPORTATION: Improvements to FAA's Workforce Planning Needed to Prepare for the Industry's Anticipated Growth GAO-19-437: Published: May 23, 2019. Publicly Released: May 23, 2019.

- GAO - EXPORT-IMPORT BANK: EXIM Should Explore Using Available Data to Identify Applicants with Delinquent Federal Debt GAO-19-337: Published: May 23, 2019. Publicly Released: May 23, 2019.

- GAO - ADVANCED MANUFACTURING: Innovation Institutes Have Demonstrated Initial Accomplishments, but Challenges Remain in Measuring Performance and Ensuring Sustainability GAO-19-409: Published: May 23, 2019. Publicly Released: May 23, 2019.

- CRS - Export-Import Bank of the United States (Ex-Im Bank) - Updated May 23, 2019

- CRS - Enforcing U.S. Trade Laws: Section 301 and China - Updated May 23, 2019

- CRS - Bahrain: Unrest, Security, and U.S. Policy - Updated May 23, 2019

- CRS - Escalating Tariffs: Timeline - Updated May 24, 2019

- CRS - Defense Primer: Military Use of the Electromagnetic Spectrum - Updated May 24, 2019

- CRS - Defense Primer: Electronic Warfare - Updated May 24, 2019

- CRS - Defense Primer: Acquiring Specialty Metals, Rare Earth Magnets, and Tungsten - May 24, 2019

## Other Headlines

## 14. Trump Planning More Restrictions on Tech Exports to China

Politico.com, May 23 - The Trump administration is taking steps toward issuing even more restrictions on exports of high-tech goods to China as the U.S. ratchets up its trade war with Beijing, according to two people familiar with the plans. . . . Commerce is considering at least four regulatory actions targeting China under the Export Control Reform Act, said the two people, who declined to be identified because of the sensitive nature of the deliberations. Two of those options would involve revoking two license exceptions U.S. companies can get for shipping restricted technology to China. U.S. firms can avoid an export license requirement to China if they can prove the good is bound for civilian end-use or if a U.S.-origin good is approved for re-export to China from an allied third country. Another option would be expanding a prohibition on any U.S. goods bound for military use in China on par with restrictions now applied to Russia and Venezuela. Finally, Commerce could look at changing its general policy of approving export licenses for goods bound for civilian uses. One of the people close to the deliberations said the actions appear to be "a direct response to the civilian-military fusion that is happening in China."

## 15. Trump Wields More Powerful Weapon Than Tariffs in Trade War

Bloomberg.com, May 23 - President Donald Trump's trade war against China has so far focused on attacking imports. His new front: Weaponizing American exports. The Trump administration is seeking to choke off Beijing's access to key technologies by limiting the sale of vital U.S. components to China's Huawei Technologies Co. The U.S. is considering putting at least five Chinese surveillance companies on the same blacklist. The moves are part of a bigger effort by the U.S. to expand and toughen the export control regime that for decades has curbed the sale of defense-related technologies to rogue regimes and strategic rivals. It's a process that has prompted fears from business that as Trump's trade war grows into a broader technology-driven conflict with China the U.S. could end up damaging its own economic future. . . . Administration hawks are pushing for broad definitions to restrict exports related to technologies such as artificial intelligence, robotics and 3D printing that they call essential to competitiveness. The new regulations could also limit the ability of companies to hire foreign engineers and scientists to work in affected areas as the knowledge they gain is considered a sensitive "deemed" export.

## 16. Will U.S. War on Huawei Help China End Its Dependency on Western Tech?

Washington Post.com, May 24 - The geopolitical clash between the United States and China hinges on the tiniest of technologies, chips and other components that are essential to nearly every smartphone, laptop computer and cellular network on Earth. And the best ones— for now — are made only by America and its allies. With names like MEMS accelerometers and field-programmable gate arrays, they operate invisibly to consumers but are at the heart of a long-running technological race that, so far, China is losing despite billions of dollars of investments. But while the U.S. now has a strategic edge that China can't easily counter, it may not last. By placing Huawei on its "Entity List" last week, threatening the future of one of China's most important international companies, the Trump

administration likely prodded China to redouble its efforts to close that crucial technological gap, say industry analysts. The U.S. move, based on national security concerns, could have long-term consequences that would not be in U.S. interests, spurring the creation of new competitors in an industry now dominated by Western companies such as Qualcomm, Intel, Arm and others.

## 17. Huawei's Yearslong Rise Is Littered With Accusations of Theft and Dubious Ethics

Wall Street Journal.com, May 25 - On a summer evening in 2004, as the Supercomm tech conference in Chicago wound down, a middle-aged Chinese visitor began wending his way through the nearly abandoned booths, popping open million-dollar networking equipment to photograph the circuit boards inside, according to people who were there. A security guard stopped him and confiscated memory sticks with the photos, a notebook with diagrams and data belonging to AT&T Corp. , and a list of six companies including Fujitsu Network Communications Inc. and Nortel Networks Corp. The man identified himself to conference staff as Zhu Yibin, an engineer. The word on his lanyard read "Weihua"—an accidental scramble, he said, of his employer's name: Huawei Technologies Co. . . . Huawei has since grown from a little-known interloper into China's global tech champion, the world's biggest maker of telecoms gear, a leader in next-generation 5G networks, and a significant source of friction between the world's biggest powers. Along the way, Huawei has been dogged by allegations that its gains came on the back of copying and theft. A review of 10 cases in U.S. federal courts, and dozens of interviews with U.S. officials, former employees, competitors, and collaborators suggest Huawei had a corporate culture that blurred the boundary between competitive achievement and ethically dubious methods of pursuing it.

## 18. China's Supply of Minerals for iPhones and Missiles Could Be a Risky Trade Weapon

New York Times.com, May 23 - President Xi Jinping of China strode this week through a high-ceilinged factory that makes magnets out of rare earths, minerals that are essential to global manufacturing and a sector that his country dominates. His top trade negotiator, Vice Premier Liu He, stood near. Mr. Xi did not threaten to block supplies of rare earths to the United States. He didn't have to. The veiled threat, broadcast over state-run news media this week as President Trump ratcheted up his trade war against Beijing, was clear. China's command of the rare-earth market could give Beijing a way to strike back at Mr. Trump as he raises tariffs and deprives Chinese companies of the technology they need to survive. A similar move by China nine years ago, against Japan over a territorial dispute, shocked manufacturers around the world, sent prices soaring and revealed Beijing's control of an essential part of the global supply chain. This time, however, the impact of any block on rare earths may be far less clear cut. It could undermine China's reputation as a manufacturing hub. Other trading partners, notably Japan and South Korea, could become collateral damage. And in an odd turnabout, China's own needs have made it somewhat dependent on ore from the United States.

## 19. Huawei Feels U.S. Squeeze in U.K., Japan as Partners Curb Business

Wall Street Journal.com, May 23 - The pressure on Huawei Technologies Co.'s global business is growing as foreign partners back away from the Chinese maker of networking

DOC_0042987

equipment and smartphones in the face of U.S. restrictions. U.K.-based chip design company Arm Holdings PLC is suspending its business with Huawei following Washington's blacklisting of the Chinese technology giant, according to a person familiar with the matter. Meanwhile, mobile-phone carriers in Japan and the U.K. have suspended launches of Huawei smartphone models over concerns that U.S. curbs on exports to the company will jeopardize the phones' performance. In addition to being among the world's biggest suppliers of telecom equipment and smartphones, Huawei is one of China's most-advanced makers of semiconductors. That technology is a national priority for Beijing, but licenses from Arm are crucial to the underlying designs for an array of Huawei-made chips.

## 20. Trump Team Is Split Over How Hard to Push North American Trade Deal

Wall Street Journal.com, May 24 - President Trump wants Congress to quickly approve his trade deal with Canada and Mexico, but his own team is divided over how to force a reluctant Democratic-controlled House to act. An increasingly personal clash between Mr. Trump and House Speaker Nancy Pelosi has raised questions about whether the two can collaborate on key legislation. The trade deal, the fate of which Ms. Pelosi controls in the House, is a priority of the business community. Part of a private West Wing meeting on the trade deal Thursday was spent rehashing Mr. Trump's quarrels with Mrs. Pelosi. Vice President Mike Pence, senior adviser Jared Kushner, economic adviser Larry Kudlow, industry groups and corporate executives attended the meeting. . . . Democrats in Congress want changes to the trade deal, which is called the U.S.-Mexico-Canada Agreement, and time to work on them. But Mr. Pence's team and other senior advisers to the president are pushing to exert pressure by sending the accord to Congress and triggering a procedural countdown that would force a decision from the House. The strategy is designed to elevate the issue in the news and avoid pushing too far into the 2020 campaign season, which could make Democrats less willing to hand the president a victory.

## 21. U.S. Weighs Letting Companies Seek New Penalties Over Currency Manipulation

Wall Street Journal.com, May 24 - U.S. companies would be able to seek penalties against foreign competitors they say benefit from artificially weak currencies, under a new rule proposed by the Trump administration. The proposal—on which the Commerce Department is now seeking public comment—would treat an undervalued currency as a subsidy that allows foreign businesses to export their goods more cheaply. The rule would allow U.S. companies to file a complaint with the U.S. International Trade Commission, the first stop in arguing for countervailing duties that could lead to additional tariffs on certain imports. Currently, companies can't cite currency weakness in claims of improper foreign subsidization of their competitors. Commerce Secretary Wilbur Ross said the measure adds to the administration's arsenal in fighting foreign-currency manipulation, which the Trump administration says hurts American industry.

## 22. Trump Invokes Emergency Arms Sales Authority to Counter Iran

Wall Street Journal.com, May 24 - The Trump administration on Friday invoked a rarely used provision of American arms control laws to sidestep Congress and authorize billions of dollars in weapons sales to Middle East allies, angering U.S. lawmakers who characterized the decision as an abuse of power. Citing concerns about Iran, U.S. officials notified

Congress that the administration is declaring an emergency under arms control laws so it can rush through the weapons sales to Saudi Arabia and the United Arab Emirates, two key allies in Washington's intensifying confrontation with Tehran. The sale represents a broad package of 22 separate deals worth about $8 billion, including sales of precision-guided missiles to Saudi Arabia and the U.A.E., according to people familiar with the deal and documents seen by The Wall Street Journal. The decision also clears the way for the U.A.E. to transfer 500 of the precision-guided missiles "as a gift" to the Jordanian army, according to the documents. The deals involve systems made by companies including Raytheon Co. and Boeing Co. and will support defense work in places like India, South Korea, the United Kingdom, Spain and Italy.

## 23. Pentagon Eyes Expanding DARPA Future Warfare Research Office

Reuters.com, May 24 - The U.S. Department of Defense is close to expanding its legendary future warfare and technology agency DARPA by combining it with the Pentagon office in charge of adapting existing weapons to new uses, people familiar with the plans said. The Defense Advanced Research Projects Agency would absorb the Strategic Capabilities Office (SCO) and centralize more research units under the Pentagon's Chief Technology Officer Michael Griffin. The combination would end an experiment with SCO that began as an attempt to adapt to future threats quickly and with less bureaucracy. SCO reported directly to the defense secretary, removing it from traditional bureaucratic channels at the Pentagon. If all of SCO's $1.3 billion 2020 budget request were transferred to DARPA, DARPA would gain control over 37 percent more funding on top of its 2020 funding request of $3.5 billion. The SCO is charged with developing unexpected and game-changing capabilities to counter emerging threats.

## 24. Defense Spending Will Bust BCA Caps: Mark Cancian

Breaking Defense.com, May 24 - This week, two key committees rejected President Trump's attempt to bypass budget caps on defense. That set up the latest round of fiscal fighting to amend the Budget Control Act and avoid the automatic cuts called sequestration. In that clash, a leading budget expert told us, defense hawks will clobber deficit hawks, and Trump will go along. Trump's 2020 budget request asked to move almost $100 billion out of the regular or "base" defense budget — which is capped — into the account funding urgent Overseas Contingency Operations — which is not. But both the GOP-led Senate Armed Services Committee and the Democrat-led House Appropriations Committee moved all or most (respectively) of this "OCO for Base" money back into the regular Pentagon budget. That raises defense spending above the caps, setting the Pentagon budget on a collision course with the repeatedly amended Budget Control Act. CSIS scholar Mark Cancian predicts the BCA will once again give way.

## 25. NDAA 2020: SASC Emphasizes Tech Race With China

Breaking Defense.com, May 23 - From missile defense sensors in space to 5G networks at Air Force bases, from developing software to mining rare earth minerals, the Senate Armed Services Committee draft of the annual defense policy bill puts an extraordinary emphasis on high tech. Not only does SASC create a Space Force — click here for our in-depth story — and add $1.4 billion to Pentagon R&D programs, it takes a broad look at the global competition between the American private sector and China." . . . Along with the usual lists of ships and aircraft the bill would fund, the executive summary SASC released today — the

full legislation is still being finished — offers a lot of detail on technology investments and policies. (There's a whole section headlined "Maintaining our technological advantage through innovation," but relevant proposals are sprinkled through other parts of the bill as well). Echoing the Trump Administration, which launched a major study of the defense industrial base him himand has sanctioned Chinese firms accused of espionage such as Huawei, the SASC spends considerable energy on what could be called industrial policy, if that term hadn't fallen out of favor.

## 26. SALES TAKING OFF: International Market for F-35 Heats Up

National Defense Magazine.org, May 24 - Twelve countries have committed to orders of the F-35 joint strike fighter either as formal partner nations or through foreign military sales. As production of the fifth-generation systems ramp up, the joint program office and manufacturer Lockheed Martin are looking to expand their global footprint even further. Australia, Canada, Denmark, Italy, the Netherlands, Norway, Turkey and the United Kingdom currently are in formal partnership with the United States on the F-35 program. Israel, Japan and South Korea have made orders through the foreign military sales process. Belgium also recently signed on to purchase platforms. Vice Adm. Mathias Winter, program executive officer for the F-35 joint program office, said his team is currently examining a number of new potential FMS candidates. These include nations such as Singapore, Greece, Romania, Spain and Poland, he said in written testimony to the House Armed Services subcommittee on tactical and land forces in April. Additionally, "the F-35 FMS team is also focused on responding to formal requests for proposals from both Finland and Switzerland, with U.S. government response expected in August and November, respectively," he said.

## 27. US Army Picks 5 Companies to Study Stryker Weapon System Integration

DefenseNews.com, May 23 - The U.S. Army has picked five companies to come up with designs to integrate a new weapon system on the Stryker combat vehicle, according to a May 23 announcement. The service awarded design integration study contracts — no more than $150,000 each — for the Stryker Medium Caliber Weapons System (MCWS) lethality program to General Dynamics Land Systems, Kollsman Inc., Leonardo DRS, Raytheon and Pratt & Miller Engineering and Fabrication Inc. Defense News first reported earlier this month that the Army had decided, after upgunning some of its Stryker vehicles with a 30mm cannon, that it would proceed to outfit at least three of its six brigades of Double V-Hull A1 Stryker Infantry Carrier Vehicles with the more powerful guns and would hold a competition to acquire that weapon system.

## 28. Marine Corps Adopts Product for Smartphone Communications

National Defense Magazine.org, May 23 - The Marine Corps is moving forward with a program to allow its warfighters to transmit classified information via their smartphones and tablets. "It's really to allow those folks to have the same type of access to information that you and I enjoy as consumers using our smartphones," Jeff Sinclair, vice president of sales at Pacific Star Communications, Inc., or PacStar, told National Defense on the sidelines of the Special Operations Forces Industry Conference, which is hosted by the National Defense Industrial Association. PacStar is providing its secure wireless command post for the Marine common handheld program. Sinclair said this allows warfighters to have untethered access to secure applications in the field, rather than rely on rolling out cables to set up a

traditional terrestrial network. The five-year indefinite-delivery/indefinite-quantity contract includes up to $48 million for the systems, according to a press release. The primary contractor is information technology company iGov Technologies. Work is slated to be performed in Tampa, Florida.

## 29. SOCOM to Develop New AI Strategy

National Defense Magazine.org, May 23 - Special Operations Command plans to craft a new artificial intelligence and machine learning strategy to inform its future spending, according to the organization's chief data officer. David Spirk Jr. said the blueprint will help SOCOM determine asset allocation for AI as it builds its program objective memorandum for fiscal years 2022 to 2026. "We're going to start the crafting of a real roadmap," he said May 23 at the Special Operations Forces Industry Conference in Tampa, Florida, which is sponsored by the National Defense Industrial Association. "This will help the command … talk about the investments we need to make and the resources that we're going to need." All of the SOF components will gather at a symposium in September to begin developing the new strategy, he noted. Spirk told National Defense that the gathering will be limited to the military, which will first establish its goals for investing in AI and machine learning before reaching out to academia and industry for input.

## 30. New Software Can Sift Through Decades of Stovepiped Intelligence Data

National Defense Magazine.org, May 23 - Defense contractor Leidos revealed a new big data analytics tool that an intelligence community customer has been using for the past six months to sift through terabytes of data previously stored on different devices. . . . The problem for intelligence analysts has been that data that can be useful for them has been stored on a variety of stovepiped software systems, or in different digital mediums, said Christine J. Harney, data systems engineer in the surveillance and reconnaissance group at Leidos. They are too massive and there isn't enough manpower to look through it all, she added. "These data collections are very complex and there are multiple types of devices and the number of those devices grows over time," she said. An analyst could never hope to see all the data available with manual searches, she added. Artificial intelligence and machine learning is helping the intelligence community sort through all the data coming from different media and find the content relevant to them, she said.

## 31. NASA Executive Quits Weeks After Appointment to Lead 2024 Moon Landing Plan

Reuters.com, May 23 - A top NASA executive hired in April to guide strategy for returning astronauts to the moon by 2024 has resigned, the space agency said on Thursday, the culmination of internal strife and dwindling congressional support for the lunar initiative. Mark Sirangelo, named six weeks ago as special assistant to NASA Administrator Jim Bridenstine, left the agency as NASA abandoned a reorganization plan due to a chilly reception on Capitol Hill, Bridenstine said in a statement. Two individuals close to the space program and familiar with the situation said Sirangelo was escorted out of NASA's headquarters in Washington on Wednesday after his resignation. His departure came after lawmakers rejected NASA's proposal to create a separate directorate within the space agency to oversee future lunar missions and ultimately develop human exploration of Mars.

## 32. Boeing Drops Embraer Name From Brazil Commercial Jet Division

Reuters.com, May 23 - Boeing Co on Thursday said that after taking over Brazilian planemaker Embraer SA's passenger jet unit, it will call the division Boeing Brasil - Commercial, dropping one of Brazil's most iconic company names. The name change comes after Boeing agreed to pay $4.2 billion to buy 80% of Embraer's operation making passenger jets with fewer than 150 seats. Embraer will retain a 20% stake. That division is still Embraer's most profitable and considered a gold standard of Brazilian engineering. Boeing has not made a decision yet about whether to rebrand the small and mid-sized planes, which currently carry the Embraer name followed by a model code. . . . After Airbus SE took a controlling stake in the CSeries division of Bombardier Inc, which competes directly with Embraer's commercial jets, it rebranded the planes Airbus A220, in line with the branding of other Airbus planes.

## 33. NASA's First-of-Kind Tests Look to Manage Drones in Cities

New York Times.com & Associated Press, May 23 - NASA has launched the final stage of a four-year effort to develop a national traffic management system for drones, testing them in cities for the first time beyond the operator's line of sight as businesses look in the future to unleash the unmanned devices in droves above busy streets and buildings. Multiple drones took to the air at the same time above downtown Reno this week in a series of simulations testing emerging technology that someday will be used to manage hundreds of thousands of small unmanned commercial aircraft delivering packages, pizzas and medical supplies. "This activity is the latest and most technical challenge we have done with unmanned aerial systems," said David Korsmeyer, associate director of research and technology at NASA's Ames Research Center in Mountain View, California.

## 34. Opinion: How the U.S. Went Wrong on Huawei

Wall Street Journal.com, May 24 - To understand the Huawei problem, remember that the problem isn't Huawei; the problem is China. Understand: Nobody's equipment in your telecom network can be trusted as long as governments like China's, Russia's, Iran's or North Korea's, in cahoots or in competition with criminal gangs, are trying to break into them. Let's not kid ourselves: The U.S. CIA and National Security Agency are also looking for vulnerabilities to exploit. . . . While security cannot be guaranteed by buying one company's equipment and refusing to buy another's, it can be strengthened by having a mix of suppliers, by pitting them against each other, by constantly testing for vulnerabilities and watching for suspicious traffic flows, and by being ready to yank hardware and shift traffic whenever problems are detected. All this is a lot more complicated than: If we keep out Huawei equipment, because Huawei equipment might have "backdoors," then our networks will be safe. Our networks won't be safe. Anybody who thinks so is barking up the wrong tree.

## Upcoming Export Control and Other Trade Compliance Conferences

**May 29-30 - American Conference Institute - 2nd Annual Hong Kong Summit on Economic Sanctions Compliance and Enforcement - Hong Kong**

**May 30 - U.S. Dept. of Commerce/U.S. Commercial Service - Doing Business in Baltics - Webinar - 11:00 AM to 12:00 PM EDT - Free**

DOC_0042992

**May 30 - U.K. Government/Export Control Joint Unit - Export Control Symposium - London - Park Plaza Hotel, Westminster Bridge**

**June 5 - OCR Services - Use of General Rules of Interpretation for HS Classifictions - Webinar - 2:00 PM to 3:00 PM EDT**

**June 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Greater Seattle Partners - Complying with U.S. Export Controls - Seattle, Washington - Lynnwood Embassy Suites Hotel**

**June 6 - Massachusetts Small Business Development Center Network - China Trade Update - Webinar - 11:30 AM to 1:00 PM EDT - $50**

**June 7 - Society for International Affairs - 2019 Spring Golf Outing - Upper Marlboro, Maryland - Lake Presidential Golf Course**

**June 11 - Australian Government/Defence Exports Control Office - Defence Export Controls Sydney Outreach 2019 - Sydney, Australia - The University of Technology Sydney Lecture Theatre CB05B.01.011, Building 05, Block B 1-50 Quay Street, Haymarket**

**June 11 - U.S. Dept. of Commerce/U.S. Census Bureau - Automated Commercial Environment (ACE) Exports Compliance Seminar - Philadelphia - Temple University, Fox School of Business, Alter Hall, 1801 Liacouras Walk, Room 031/Auditorium**

**June 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Eastern Michigan Export Council - Complying with U.S. Export Controls - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 11-12 - American Conference Institute - 12th China Forum on Anti-Corruption - Shanghai**

**June 13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The East Michigan District Export Council - How to Build and Export Compliance Program - Detroit, Michigan - Weston Book Cadillac Hotel**

**June 13 - National Defense Industries Association/Women in Defense - 2019 Women in Defense Conference - Arlington, VA - Crystal Gateway Marriott Hotel**

**June 18-19 - C5 Group - 13th International Conference on Anti-Corruption London - London**

**June 26-27 - American Conference Institute - ITC Litigation & Enforcement - Washington, DC - Park Hyatt Washington Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

**July 9-11 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - BIS 2019 Annual Conference on Export Controls - Washington, DC - Marriott Marquis Hotel**

**July 19 - Massachusetts Small Business Development Center Network - Managing Export Operations and Compliance - Webinar - 11:30 AM to 1:30 PM EDT - $50**

**July 24-25 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Missouri District Export Council - Complying with U.S. Export Controls - St. Louis - Eric P. Newman Education Center, 320 South Euclid Avenue**

**Aug. 20-21 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Southern Ohio District Export Council - Complying with U.S. Export Controls - Cincinnati, OH - Hilton Cincinnati Netherland Plaza Hotel**

**Sept. 24-25 - 12th Conference on the Foreign Corrupt Practices Act - San Francisco**

**Sept. 25-26 - SMi Group - Defence Exports 2019 - Amsterdam - Ramada Apollo Amsterdam Centre Hotel** - *Gary Stanley, Editor of Defense and Export-Import Update, will once again chair this important conference.*

**Oct. 27 - American Conference Institute - 5th Asia Pacific Summit on Economic Sanctions Compliance and Enforcement - Singapore**

**Oct.28-29 - American Conference Institute - 8th Asia-Pacific on Anti-Corruption Singapore - Singapore**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldor, Germany**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 5-6 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

**Feb. 24-26 - Society for International Affairs - 2020 Winter Back to Basics Conference - Las Vegas - Westin Las Vegas Hotel**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to gstanley@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. +1 (202) 686-4854
Fax +1 (202) 686-2624
Mob
E-mail ▮▮▮▮▮@glstrade.com



Organisation for Economic Co-operation and Development

**For Official Use**

**TRADE AND AGRICULTURE DIRECTORATE**
**TRADE COMMITTEE**

**Working Party of the Trade Committee**

**3D printing and international trade**

**A scoping paper**

**13 June 2019**

This scoping paper proposes work 3D printing and international trade. It proposes to identify the varying characteristics of the technology and their implications for trade and trade-policy.

This scoping paper was written by Andrea Andrenelli and Javier López-González. It received useful comments from Rachel Bae, Francesca Casalini, Emanuel Ritschard, Silvia Sorescu, Christian Steidl, Jehan Sauvage, Janos Ferencz, Gwen Deboe and Julia Nielson (TAD).

The work is foreseen under Output Area 3.1.1.1.4 (Digital trade, emerging measures and new technologies) of the 2019-20 PWB.

The scoping paper is presented for Approval under Item 3 of the June 2019 meeting of the Working Party of the Trade Committee.

Andrea ANDRENELLI ([ HYPERLINK "mailto:andrea.andrenelli@oecd.org" ]);
Javier LOPEZ GONZALEZ ([ HYPERLINK "mailto:javier.lopezgonzalez@oecd.org" ])

**JT03447904**

*This document, as well as any data and map included herein, are without prejudice to the status of or sovereignty over any territory, to the delimitation of international frontiers and boundaries and to the name of any territory, city or area.*

*Table of contents*

[ TOC \o "1-3" \h \z \t "Heading 2,2,Heading 3,3,Heading 6,1,Heading 7,1,Heading 8,2,Heading 9,2,Annex H2,3,Title 2,2,Title 3,3" ]

**Figures**

[ TOC \h \z \c "Figure" ]

For Official Use

# 3D printing and international trade — A scoping paper

## 1. Introduction

1.     3D printing, or additive manufacturing, has been said to have a strong *potential* to disrupt international trade, changing who participates in cross-border transactions, what is traded and how global production is organised (Kommerskollegium, 2016[1]).[1] However, despite its potential for disruption, adoption of 3D printing technology, while growing, remains relatively low and there are still many uncertainties about its implications for trade.

2.     Against this background, this scoping paper proposes work to identify what 3D printing technologies may mean for trade and trade-related policies, looking initially at how the technology is currently being adopted and, where possible, exploring some potential future implications. Its purpose is to help policy-makers better understand the issues at stake and to prepare for forthcoming challenges.[2]

3.     To this end, this scoping paper is organised as follows. The next section provides a preliminary mapping of the spread of 3D printing, describing some of the technology's key features and identifying some initial trade policy implications. Section 3 then provides an overview of the proposed approach for the work. Section 4 discusses outputs and the timeline for deliverables.

4.     Given that this technology is at the early stages of adoption, a general caveat applies to this work. Identifying potential future implications will depend not just on the speed of uptake, but also on how the technology evolves and diffuses and how it changes existing business models. In view of these uncertainties, some of the work in this area, including the work proposed here, involves a degree of speculation.

## 2. 3D printing technology: key features, likely developments and preliminary trade policy issues

5.     3D printing refers to a manufacturing process that operates through the successive superposition of layers of materials (e.g. plastics, ceramics) to produce goods from computer-aided design (CAD) files using a 3D printer.[3] Given its potential for disruption, the implications of 3D printing have been the subject of wide speculation. Some argue that 3D printing might replace as much as two-fifths of world trade in goods by 2040 (Leering,

---

[1] In this scoping paper the terms 3D printing and additive manufacturing are used interchangeably.

[2] The analysis would highlight some of the issues that could arise in terms of the coverage of different trade rules but it will not seek to interpret those rules, nor to reach conclusions as to their application.

[3] The latter vary in the exact printing process they employ, including extruding a solid filament of material through a heated nozzle (Thermoplastic injection) or using liquid photopolymer that hardens when UV light strikes it (Light-polymerised printing) (OECD, 2017[11]).

2017[2]). Others provide more conservative estimates, suggesting that it might replace between 1 and 2% of physical trade by 2030 ( (McKinsey Global Institute, 2019[3]))._[4]

6.        The wide gap between these estimates reflects the high degree of uncertainty in the evolution of the technology._[5] Indeed, little is known about the challenges and opportunities that 3D printing raises for trade and trade policy. Is 3D printing a threat to global trade as suggested by ING (2017[2])? Or is it a market-creating technology that will spur innovation, enhance productivity and increase global trade (Freund, Mulabdic and Ruta, n.d.[4])? Will 3D printing mechanise stages of production resulting in a "re-shoring" of manufacturing activities? Does it allow easier access to technologically advanced inputs and lead to growing productivity and employment?

7.        Understanding the nature and evolution of 3D printing technologies is key to assessing their possible implications for trade and to providing insights into some of the questions raised above. To this end, this section reviews a number of key aspects of the technology, first mapping its international spread and then looking at some of its most salient features, with a view to providing a preliminary assessment of its trade and trade-policy implications.

## 2.1. Mapping the 3D printing landscape

8.        There are considerable difficulties in mapping the evolving 3D printing landscape – for a start, little data on adoption, diffusion or trade currently exists. This means that different measures and proxies are required to identify different facets of this evolving environment. This section uses preliminary trade-based measures and firm level relationships to shed light on certain aspects of international 3D printing relationships. The project going forward will aim to provide, where possible, a more granular mapping, including trade in 3D printable products and trade in the materials used for 3D printing.

9.        A first approach is to look at potential trade in 3D printers, helping identify evolving dynamics and key producers and consumers of this technology. However, there is no accepted product code for 3D printers, meaning that proxy measures need to be used._[6] Using HS code 847780 as a proxy for trade in 3D printers (following Abeliansky, Martínez-Zarzoso and Prettner (2015[5]), [ REF _Ref8836335 \h ] shows that there has been a seven-fold increase in trade since 1988._[7] The data also reveals that there might be significant concentration in terms of exporters – the top 10 exporters, many of which are

---

[4] Some also criticise the technology for its possible implications for lost tariff revenue, especially for developing countries (Banga, 2019[19]).

[5] As well as considerable differences in the methods used for capturing the impact of the technology.

[6] A new product line for additive manufacturing systems is expected to come into force in January 2022 with the planned revision of the Harmonised System (CECIMO, 2019[20]). In the meantime, HS code 847780 is among the product codes which can capture additive manufacturing according to the WCO (Yuk, 2018[21]). While perhaps also capturing other machinery, changes in trade could arguably largely reflect new 3D printing technology. These measurement issues will be explored at greater length in the paper.

[7] HS code 8477.80 refers to trade in "Machinery; for working rubber or plastics or for the manufacture of products from these materials". See Abeliansky et al. (2015[5]).

OECD countries, represented 83% of global exports in 2017 ([ REF _Ref8891250 \h ]a). That said, export concentration has been falling, suggesting that the technology could be diffusing with more *producers* entering the market ([ REF _Ref8891231 \h ]).

10.     In terms of importers, concentration is lower – the top 10 importers represent 61% of total imports ([ REF _Ref8891250 \h ]b). These include more non-OECD countries such as China, Viet Nam, India and Indonesia, appearing as key *users* of 3D printing technology. However, there is little sign of falling concentration ([ REF _Ref8891231 \h ]) suggesting that, beyond these countries, adoption of 3D printing technology might not be spreading widely.

**Figure [ STYLEREF 1 \s ].[ SEQ Figure \* ARABIC \s 1 ]. Potential trade in 3D printers – 1988 to 2017**

Values in billion USD



*Note*: 3D printers are identified as HS code 847780 referring to "Machinery; for working rubber or plastics or for the manufacture of products from these materials". See Abeliansky et al. (2015[5]).
*Source*: Own calculation using COMTRADE.

**Figure [ STYLEREF 1 \s ].[ SEQ Figure \* ARABIC \s 1 ]. Distribution of 3D printing exports and imports by country – 2017**



*Note*: 3D printers identified as HS code 847770 referring to "Machinery; for working rubber or plastics or for the manufacture of products from these materials". See Abeliansky et al. (2015).
*Source*: Own calculation using COMTRADE.

**Figure [ STYLEREF 1 \s ].[ SEQ Figure \* ARABIC \s 1 ]. Concentration of 3D printer exporters and importers – 1988 to 2017**

Herfindahl-Hirshman Index (HHI)



*Note*: The HHI captures the degree of concentration in a market. Higher values imply more concentration.
*Source*: Own calculations using COMTRADE data.

11.     Firm-level data adds insights into the current adoption of 3D printing technology at the sectoral level, especially in the context of Global Value Chains. Using a sample of major 3D printing companies from Factset, the industry distribution of customers to additive manufacturing firms can be identified.[8] This can serve as a proxy measure for the *adoption* of this technology across different industries ([ REF _Ref8838854 \h ]). The preliminary results show a degree of concentration across a number of high-tech sectors like Electronic Equipment/Instruments, Industrial Machinery and Medical Specialties.

---

[8] The sample includes: Stratasys Ltd. (United States), Materialise NV Sponsored ADR (Belgium), Proto Labs, Inc. (United States), 3D Systems Corporation (United States), SLM Solutions Group AG (Germany), Nano Dimension Ltd (Israel), ExOne Co. (United States), Organovo Holdings, Inc. (United States), Arcam AB (Sweden).

**Figure [ STYLEREF 1 \s ].[ SEQ Figure \* ARABIC \s 1 ]. Industry distribution of customers of major 3D printing companies**



*Note*: Based on a sample of 101 company relationships. The figure reflects the number of business relationships and not their economic value.
*Source*: Own calculations using Factset.

12.     The geographical distribution of cross-border customer relationships between 3D printing companies and their business partners provides preliminary insights into ongoing GVC interactions ([ REF _Ref8839253 \h ]). The data show customer relationships, i.e. those involving entities sourcing from 3D printing firms. Although difficult to interpret, the international relationships could possibly involve the transmission of digital files to 3D printing companies for these to print an object, which can then be exported back to the customer in physical form. This highlights one pathway through which 3D printing could complement rather than substitute for trade. Alternatively, the source company might be providing the design for 3D printing which might then take place locally. Moving forward, the paper will seek to better understand these different business models.

**Figure [ STYLEREF 1 \s ].[ SEQ Figure \* ARABIC \s 1 ]. Customer networks of major 3D printing companies**

Customer relationship of major 3D printing companies



*Note*: Customers are "Entities to which the source company sells products/services" (Factset, 2015[6]). The orange dots identify the supplying companies.
*Source*: Own calculations using Factset.

For Official Use

## 2.2. Reviewing the literature and identifying preliminary trade implications

13. The implications of 3D printing for trade and GVCs are, in many ways, tied to what the technology can do today and what it might be able to do in the future. Currently, adoption remains low and concentrated in certain high-tech sectors, including precision instruments, medical equipment, aviation and spare parts (see [ REF _Ref8838854 \h ] and McKinsey (2019[3])). That said, the technology has strong potential across a range of uses and sectors and, moreover, its use is likely to change in time (see Kommerskollegium (2016[1]) and Baumers et al. (2016[7]))[9]

14. Looking at some of the broad characteristics of 3D printing technology allows some preliminary observations about how it might affect trade to be drawn. For instance, since 3D printing can mechanise certain activities and replace manufacturing stages of production, its wider adoption might result in a shortening of value chains and a re-shoring of some manufacturing processes (Kommerskollegium, 2016[1]), possibly reducing trade (Leering, 2017[2]). However, 3D printing might also enable reductions in the costs of engaging in trade, given its potential to replace costly cross-border physical transport with digital transfers. The resulting reductions in prices might lead to more trade, although this might not be recorded in traditional trade statistics given difficulties in capturing digitally delivered trade (OECD-WTO, 2019[8]).

15. There are some key limitations to the use of 3D printing technologies. For instance, additive manufacturing does not provide significant opportunities for economies of scale, implying that its ability to fully replace more traditional manufacturing might be limited (see Kommerskollegium, (2016[1])). Print-time and material use are also important factors that condition 3D printing costs (OECD, 2017). For these reasons, the technology is traditionally associated with the production of smaller batches of more specialised and geometrically complex products, most useful in manufacturing prototypes; materially simple final consumer goods; and customised intermediate products (see the example of air-cooling ducts in the F-18 Super Hornet Fighter-Jets in Khajavi, Partanen and Holmstrom, (2014[9])).

16. The scope of the products that can be printed can depend on the size of the object and on the materials used to print – the 'ink' (OECD, 2017). 3D printers can be limited by the size of their casing (Attaran, 2017[10]), although they are now being used to produce larger objects, as is the case in the architecture industry (OECD, 2017, p. 178[11]). Limitations can also arise from the strength of the materials used, which may condition the size of what can be printed (Huang et al., 2013, p. 1194[12]). The scope of 3D printing can also be limited when it comes to micro or nano-products (OECD, 2017, pp. 178-179[11]; Li et al., 2011[13]). Moreover, products requiring many different materials like, for instance, mobile phones, are less likely to be fully 3D printable, at least in the near future (OECD, 2017, p. 179[11]).[10]

---

[9] In terms of the overall economic incentives of adopting additive manufacturing techniques for production and distribution, Wittbrodt et al. (2013[22]) adopt life-cycle economic analysis of a RepRap machine to estimate the possible cost saving accruing to the user of 3D printing technologies for the production of a basket of consumption items. They find that economic gains stand between USD 300 to USD 2 000 a year for the typical American household.

[10] This does not mean that the technology cannot be used in manufacturing plants to print specific components of a mobile phone that can then be assembled.

17.     Overall, a preliminary review of the literature suggests that 3D printing is a versatile technology with many potential uses across many sectors. This suggests that trade impacts are likely to be contingent on how the technology is adopted and how it evolves and diffuses. However, rather than resulting in less cross-border trade, it is more likely that 3D printing changes the composition of trade: spurring more trade in the materials, or natural resources, used as 'ink'; enabling new trade in customised products; and shifting trade from physical goods to electronic transmissions (Kommerskollegium, 2016[1]; Andrenelli and López-González, n.d.[14]).

18.     In terms of trade policy, 3D printing raises a range of issues, depending on the way transactions take place. For instance, one type of transaction might involve the digital delivery of a product (see [ REF _Ref9256039 \h ]a). In this instance, a digitally delivered design, embodied in a CAD file, crosses a border to be 'transformed' into a physical product when printed. The trade rules that apply to this transaction are uncertain. When the CAD file crosses the border it can be considered to be a design *service*, but when it reaches the consumer it arguably becomes a good. Would GATS commitments apply, and if so, in what sector? Or would it be GATT rules that apply?[11]

19.     But 3D printing transactions can take different forms, each raising different trade issues. For instance, customer relations identified in the previous section suggest that current business models might involve sending design files across borders for products to be printed and then exported through traditional means ([ REF _Ref9256039 \h ]b). In this instance, this constitutes a more traditional form of outsourcing where the manufacturing stage is offshored. The trade policy issues raised by this type of 3D printing transaction are less uncertain and more similar to those discussed in the GVC literature (see OECD (2013[15])).

20.     However, there are many other ways through which 3D printing transactions could take place. For example, companies could set up 'print-shops', providing centralised printing services operating across national or international hubs. Or dedicated platforms where firms and individuals buy and sell 3D printed designs might emerge, which could then be printed in localised fulfilment centres close to consumers. Given the many different possibilities, the proposed work will explore different business models with a view to identifying the different trade policy issues that these might raise.

---

[11] The 3D printing transaction might also raise issues of interest to recent discussion on electronic transmissions at the WTO (Banga, 2019[19]; Andrenelli and López-González, n.d.[14]) as well as for IP protection more broadly.

For Official Use

**Figure [ STYLEREF 1 \s ].[ SEQ Figure \* ARABIC \s 1 ]. Hypothetical cross-border 3-D printing transaction**



*Source*: Adapted from Lopez-Gonzalez and Jouanjean (2017).

## 3. Proposed approach

21.     As is highlighted throughout this scoping paper, the issues that 3D printing raises for trade are complex and depend on a range of factors including: the capabilities of the technology, its adoption and diffusion; how these impact business models; and how the technology evolves (in terms of materials and capabilities). Given the degree of uncertainty, the work proposed herein, especially that attempting to identify longer-term consequences, will involve a degree of speculation.

22.     Against this backdrop, it is proposed that the work deepen the preliminary mapping and analysis of this scoping paper:

- First, by fleshing out in more detail the characteristics of the technology and its implications for trade, reviewing the technical and empirical literature.

- Second, by providing a more granular mapping of the boundaries of the technology today.

- Third, by discussing in more detail the trade policy implications, including across different business models and evolutions of the technology.[12]

23.    The mapping exercise would further explore the use of trade data to identify more and different facets of trade in 3D printing. This would include looking at outputs such as trade in 3D printers themselves, but also identifying a list of HS products most likely to be 3D printable. The work would also seek to identify the input side of the technology, looking into who produces the materials that are used in 3D printers including plastics, resins, rubbers, ceramics, glass, concretes, and metals (Bourell et al., 2017[16]).

24.    The mapping exercise would also explore the use of firm-level data from Factset and ORBIS to dig deeper into the adoption of the technology and the relationships between firms, as sellers and users of 3D printing technology. Finally, the mapping exercise could also explore future impacts of the technology by running different thought experiments using the Inter Country Input Output tables of the TiVA database.

## 4. Output, timeline and deliverables

25.    The work is foreseen under Output Area 3.1.1.1.4 (Digital trade, emerging measures and new technologies) of the 2019-20 PWB. It is part of the digital trade deep dives, which take the form of shorter, issue-specific papers of relevance to ongoing discussions on digital trade.

26.    A final draft of this work is expected to be presented to the WPTC by Q4 2019-Q1 2020. It is intended that the report be published as a policy paper in the *OECD Trade Policy Papers* series shortly after. Its key findings will also be summarised for a non-technical audience in a Trade Policy Note. These outputs will subsequently be publicised through an enhanced communications strategy.

27.    The work complements ongoing work on digital trade, including scoping work on parcels and electronic transmissions. It will also be of interest to a wider audience, including OECD discussions around the Going Digital horizontal project.

---

[12] While the analysis would highlight some of the issues that could arise in terms of the coverage of different trade rules, it will not seek to interpret those rules, nor to reach conclusions as to their application.

*References*

[ BIBLIOGRAPHY ]

For Official Use

**From:** Nazak Nikakhtar [Nazak.Nikakhtar@bis.doc.gov]
**Sent:** 6/6/2019 2:13:37 AM
**To:** Rathburn, Kolo (Federal) [CRathburn@doc.gov]; Kluttz, Lawson (Federal) [LKluttz@doc.gov]; Branson, Ross (Federal) [RBranson@doc.gov]; Comstock, Earl (Federal) [EComstock@doc.gov]; Rockas, James (Federal) [JRockas@doc.gov]
**Subject:** Fwd: Senate Banking, Housing, and Urban Affairs Committee Nomination Hearing, sked FINAL

Article in link below is quite good. Good way to end the day.

**Nazak Nikakhtar**
Assistant Secretary, Industry & Analysis
Performing the Non-Exclusive Duties of the
Under Secretary for Industry and Security

United States Department of Commerce
Office: 202-482-1455 | Email: Nazak.Nikakhtar@bis.doc.gov

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This Message was sent from my Mobile Device.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From:** "Bart Meroney" <Bart.Meroney@trade.gov>
**Subject:** Senate Banking, Housing, and Urban Affairs Committee Nomination Hearing, sked FINAL
**Date:** 05 June 2019 16:25
**To:** "Nazak Nikakhtar" <Nazak.Nikakhtar@bis.doc.gov>

Hi Nazak,

It was great to see you and Gene today. (I re-introduced myself to Gene.) I thought you did a good job today in the hearing. I received the transcript below from Bloomberg and wanted to pass it along. I also saw there was article featuring you in American Shipper soon after the hearing. (It looks like the photo is from your previous hearing.) https://www.americanshipper.com/news/nikakhtar-urges-updated-export-controls?autonumber=848702&source=main-feed&taxonomy=

Take care and I hope to see you soon.

Bart

**From:** Bloomberg Government <alerts@bgov.com>
**Sent:** Wednesday, June 05, 2019 4:09 PM
**To:** Bart Meroney <Bart.Meroney@trade.gov>
**Subject:** Alert: Senate Banking, Housing, and Urban Affairs Committee Nomination Hearing, sked FINAL

**Bloomberg** GOVERNMENT

# Senate Banking, Housing, and Urban Affairs Committee Nomination Hearing, sked FINAL

June 5, 2019 04:09PM ET | Bloomberg Government Transcripts

TRANSCRIPT
June 05, 2019
COMMITTEE HEARING
SEN. MICHAEL D. CRAPO, R-IDAHO
SENATE BANKING, HOUSING, AND URBAN AFFAIRS COMMITTEE
NOMINATION
HEARING
Bloomberg Government
Support: 1-877-498-3587
www.bgov.com

Copyright 2019. Provided under license from Bloomberg Government.
All materials herein are protected by United States copyright law
and/or license from Bloomberg Government, and may not be
reproduced, distributed, transmitted, displayed, published or
broadcast without the prior written permission of
Bloomberg Government.
You may not alter or remove any trademark, copyright or other
notice from copies of the content.

SENATE BANKING, HOUSING, AND URBAN AFFAIRS COMMITTEE
NOMINATION
HEARING
JUNE 5, 2019
SPEAKERS:
SEN. MICHAEL D. CRAPO, R-IDAHO, CHAIRMAN
SEN. RICHARD C. SHELBY, R-ALA.
SEN. PATRICK J. TOOMEY, R-PA.
SEN. BEN SASSE, R-NEB.
SEN. TIM SCOTT, R-S.C.
SEN. TOM COTTON, R-ARK.
SEN. MIKE ROUNDS, R-S.D.
SEN. DAVID PERDUE, R-GA.
SEN. THOM TILLIS, R-N.C.
SEN. JOHN KENNEDY, R-LA.
SEN. JERRY MORAN, R-KAN.
SEN. KEVIN CRAMER, R-N.D.
SEN. MARTHA MCSALLY, R-ARIZ.
SEN. SHERROD BROWN, D-OHIO, RANKING MEMBER
SEN. JACK REED, D-R.I.
SEN. ROBERT MENENDEZ, D-N.J.
SEN. JON TESTER, D-MONT.
SEN. MARK WARNER, D-VA.
SEN. ELIZABETH WARREN, D-MASS.
SEN. CATHERINE CORTEZ MASTO, D-NEV.
SEN. BRIAN SCHATZ, D-HAWAII
SEN. CHRIS VAN HOLLEN, D-MD.
SEN. DOUG JONES, D-ALA.
SEN. KYRSTEN SINEMA, D-ARIZ.
SEN. TINA SMITH, D-MINN.
WITNESSES:

MR. THOMAS PETER FEDDO
TO BE ASSISTANT SECRETARY, THE TREASURY FOR INVESTMENT
SECURITY
MS. NAZAK NIKAKHTAR, TO BE UNDER SECRETARY, COMMERCE FOR
INDUSTRY AND SECURITY
MR. IAN PAUL STEFF, TO BE ASSISTANT SECRETARY OF COMMERCE AND
DIRECTOR GENERAL, THE UNITED STATES AND FOREIGN COMMERCIAL
SERVICE
MS. MICHELLE BOWMAN, TO BE A MEMBER, THE BOARD OF GOVERNORS
OF
THE FEDERAL RESERVE SYSTEM
MR. PAUL SHMOTOLOKHA, TO BE FIRST VICE PRESIDENT, THE
EXPORT-IMPORT BANK OF THE UNITED STATES
MS. ALLISON HERREN LEE, TO BE A MEMBER, THE SECURITIES AND
EXCHANGE COMMISSION
CRAPO: This hearing will come to order.
First of all, I want to thank our six nominees who are here to serve in five different
agencies.
As -- as you are well aware, we've had votes scheduled today at 11 o'clock, so
we're trying to adjust how we move along, and we've changed the instructions to
you several times this morning. But let me tell you how we will proceed.
We will -- at one point we had asked you to just forgo your opening statements to
give us more time for senators to ask questions. The senators have indicated that
they would like to have you make your opening statements if you would like to
make one, and so any of you who would like to, and I invite you to, can -- can
make your opening statements.
And we will then proceed as -- as -- normally from there. We're going to ask
everybody here to help us move along quickly with answers and questions. And
hopefully we'll get through this with no difficulty.
CRAPO: With that, this morning we have, first, Mr. Thomas Peter Feddo, who will
be an assistant -- he's nominated to be the assistant secretary for treasury -- of
treasury for investment security.
Next, the Honorable Nazak Nikta -- Nick -- I got this -- Nikakhtar. Did I get it right?
Where are -- there -- there you are.
And then next, Mr. Ian Paul Steff.
By the way, Nazak is to be the undersecretary of commerce for industry and
security.
Next, Mr. Ian Paul Steff, to be the assistant secretary of commerce and director
general of the United States and Foreign Commercial Service.
Then we have the Honorable Michelle Bowman, to be a member of the Board of
Governors of the Federal Reserve.
We next have Mr. Shmotolokha.
SHMOTOLOKHA: (OFF-MIKE)
CRAPO: I got it pretty close.
Who has been nominated to serve as the first vice president and vice chairman of
the Export-Import Bank of the United States.
And finally, we have Ms. Allison Lee, who is nominated to serve as a member of
the Securities and Exchange Commission.
And I welcome all of you to the hearing today.

I see friends and family behind you, and I welcome you to introduce them, if you would like to do so, as well when we turn the time over to you.

At this point, I am going to forego any further statement by my -- of my own so that we can move on more quickly. Senator Brown does have a statement.

I'm going to turn to you, Senator Brown.

BROWN: I thank you, Chairman Crapo.

Thanks to all of you and welcome to your families.

And I know even though this hearing may be truncated, we don't want that to happen. So I want you to do whatever you want to say in your opening statements, and don't feel pressured in time in terms of answering questions or anything else. Your family's here. It's a big moment for them. It's a big moment for you.

If for reasons of votes -- and the chairman and I have talked; he has not agreed to this -- but if we do need to bring you back for questions if members don't get a chance to ask questions because of the floor votes, then I would also just mention the frustration on this side of the aisle, that all this Senate seems to be doing is the majority leader just wants to jam through as many possible judges as possible -- as he can get through the Senate. That's why we have many of these votes today. An d especially considering the number of judges that the majority leader blocked in the Obama administration, and now is trying to fill all these with very young judges. So it's a power move from the majority leader.

My relationship with the chairman has been great. And we will continue to work together. We disagree on some of the bigger-picture issues. We want to move on all of you if we can. Some of you I'm happier with than others, as your public records and all.

But I want to just speak and -- with my opening statement give some thoughts and then we'll move forward.

But these are all really important jobs, all six of you. And I don't think it's fair to you or to members in both parties to get anything but a full -- a chance to do full questioning.

Just the fact that there are six of you here is, frankly, too many -- that's our decision, not yours, to bring you all together -- considering the importance of your jobs and considering that all of us have questions, multiple questions, for many of you far beyond our five minutes.

That's why it's rare to do six together, and why I'm not wild about doing six together. I understand the crunch of time, but that crunch of time is often artificially squeezed.

So let me say a few things.

Mr. Feddo, thank you for joining us. First nominee to be assistant secretary treasury for investment security, a position we created under the Foreign Investment Risk Review Modernization Act of 2018, the bipartisan legislation that came out of this committee. We're thrilled you're here.

We created this new position because of the critical role that CFIUS plays, promoting U.S. national security from increasing threats from certain foreign investments.

Yesterday, we heard about how China's adopted new tactics to acquire American technology in sectors vital to our national security. It's why we passed this bill. It's why your job is so, so important.

BROWN: He current -- Mr. Feddo currently serves as deputy assistant secretary for investment security. He's played a key role in formulating the reforms last year. He is now working to carry out the technical and structural changes of FIRRMA -- under FIRRMA, including finishing the rulemaking to expand CFIUS's scope.

If confirmed, Mr. Feddo, you'll need to continue this critical work. I know you've made progress. I look forward to hearing with you about next steps.

Ms. Nikakhtar, welcome. Nice that you're here; been nominated to serve as undersecretary of commerce for industry and security, responsible for a set of key U.S. national security and foreign policy and economic objectives through application of effective U.S. and multilateral export controls and treaty compliance. Although Ms. Nikakhtar has extensive experience in international trade, she's more limited experience in national security and export control matters. If confirmed, she'll be responsi ble for administering critical U.S. export control laws and regulations that cover forms of -- all kinds of sensitive technology.

I hope you'll work with your colleagues to navigate, Ms. Nikakhtar, navigate the complex national security and political concerns that surround the export of sophisticated U.S. technology.

Mr. Steff is nominated to be assistant secretary of commerce for global markets, to direct -- director general of U.S. and foreign commercial service. Welcome. He will be responsible in that role for the ITA's work to advance U.S. business overseas and promote U.S. exports and fair trade rules. His current experience as deputy secretary for manufacturing and commerce and his prior experience working on economic development provide him with an understanding of how to strengthen U.S. -- the compet itive (sic) of U.S. industry. We count on you for that.

Ms. Bowman, welcome. Good to see you again -- was nominated be a member of the Board of Governors for a full 14-year term expiring in 2034 -- 2034. As a former State Bank commissioner, she serves in the role designated as -- for a fed governor with community bank experience. At her first nomination hearing I was concerned that Ms. Bowman would be a rubber stamp for Wall Street. I have -- I think I was right to be concerned about that. This administration looks like a retreat for Wall Street exec utives. Far too many people with Wall Street connections and Wall Street bias have been nominated by this administration to key regulatory positions.

I know you possess a day -- a -- a deep understanding of community banks, and are being nominated for a full 14-year term. I am concerned that you have too often taken a side on the Fed, the side of big banks and Wall Street, doing favors for Wall Street by relaxing capital standards and weakening stress tests and other post-crisis safeguards. That Federal Reserve and the Trump nominees have seemed to have a collective amnesia about what happened in this country 10 years ago, and the number of p eople that lost savings, lost lifetime savings, lost their jobs, lost their home. I hope you'll do, if confirmed, all that you can to ensure the regulatory system works for community banks, but for our financial system and protecting all consumers. So far, you've fallen short. I'm hoping you'll do better.

Mr. Shmotolokha is the nominee to be first vice president of the XM Bank. For four years I've pushed XM to be fully reopened. The vice president apparently, and a handful of Republicans on this committee have blocked the export/import

bank, costing thousands of manufacturing jobs in my state and tens of thousands, maybe hundreds of thousands of jobs around the United States because they have blocked -- they have not seen fit to do what this Congress used to do bipartisanly, almost unanimously, t o support the export/import bank. We're counting on you to -- to push back when they try to slow it and stop it and -- and -- and cripple that agency. Your work is especially important. They're the -- the final nominee to the bank's board to be before this committee.

Ms. Lee, welcome. She's been nominated to be commissioner of SEC. If confirmed, she'd return to the SEC at a critical time. I expect Ms. Law (sic) to draw on her SEC enforcement experience, while considering rules that would affect investor rights and remedies against wrongdoers, and when paying penalties -- when weighing penalties and misconduct cases, your work is especially important in light of what I said earlier; that this administration has such a strong bias towards the most privileged i n this country, whether it's Wall Street, whether it's corporations that ship jobs overseas, whether it's special interests that take advantage of people. We really count on you, Ms. Lee, in that job. Thank you, Mr. Chairman.

CRAPO: Thank you, Senator Brown. And I know I said I wasn't going to make an opening statement, but I do need to respond to two things that you said.

Senator Brown and I do have an excellent working relationship. I just want to make it clear that there's plenty of precedent, both in this committee, as well as others, to have six nominees before us. And frankly, especially, I don't know of any significant controversy about any of the nominees before us today.

Secondly, with regard to the comments that you made about the -- us being jammed by unreasonable pressure to push votes on the floor for nominations of judges, I guess this is one where we're just going to have to continue to disagree. I think that the reason we're having these kinds of extensive votes is because we've been stopped from having votes in a -- in what I consider to be a reasonably-orderly process for the last two and half years. And we are now moving forward with more votes because we have been in a -- a battle, if you will, on the floor of the Senate over getting two votes. So anyway, you -- we've had this debate for many, many months, and we'll continue to have it.

With that, before we proceed to the nominees, I do need to administer the oath to you. So would each of you please rise and raise your right hands?

Do you swear or affirm that the testimony you are about to give is the truth, the whole truth and nothing but the truth, so help you God?

NOMINEES: (OFF MIKE) (inaudible)

CRAPO: And do you agree to appear and testify before any duly-constituted committee of the Senate?

NOMINEES: (OFF MIKE) (inaudible)

CRAPO: All right, thank you. You may sit down.

With that, we will proceed in the order that I introduced you earlier. And so Mr. Feddo, please make any remarks or introductions you would like to make.

FEDDO: Chairman Crapo, Ranking Member Brown and distinguished members of the committee, I am honored to appear before you today. I'm humbled to be nominated by the president to serve as assistant secretary of the Treasury for investment security, a new position created by the Foreign Investment Risk Review Modernization Act of 2018.

Last August, FIRRMA was enacted with overwhelming bipartisan support from this committee, both houses of Congress and the administration. In creating this position, specifically through an amendment by Chairman Crapo, the statute recognizes the need for dedicated, accountable leadership of the critical national security function executed by the Committee on Foreign Investment in the United States. I'm confident that my professional background affords me the experience and knowledge to lead CFIUS and to effectively and faithfully implement FIRRMA over the coming months.

I grew up with two younger sisters and attended public school near Buffalo, New York. We had a full-time mom and a dad who served in the Marine Corps, and then worked for the local electric company for nearly 25 years. My dad worked long hours to make sure that our family had all that we needed, and a little more than he had as a child. He suddenly passed away just months after seeing me graduate college, but I know that he'd be pleased, were he here today.

My mom dedicated herself to building a warm and loving home for us, and she's watching the hearing from Buffalo. I'm deeply grateful to my parents for laying the foundation that has brought me to this point. By example, they instilled the virtues in my sisters and me, and we came to know the value of hard work, loyalty and family.

I wouldn't be here today without my extraordinary wife, Muffin (ph). She's been an unwavering source of support and encouragement, while selflessly devoting her many talents to raising our three wonderful children, who are dispersed through the crowd: Emma (ph), Kay (ph) and Gus (ph).

Early in high school, I decided that I'd serve our nation in the military, and sought to attend the Naval Academy. And I'm honored to have my two academy roommates in attendance today.

Since taking the oath of office at Annapolis 33 years ago, it's been my privilege to spend literally half my life in public service, including first as a lieutenant on a nuclear submarine, and then with the Naval Criminal Investigative Service.

After law school, I served as a counsel with the House Energy and Commerce Committee before stints as an attorney at the Pentagon and a civil servant at the Treasury Department. I've served in all three branches of the federal government, with nearly 20 years in a national security-related capacity.

In the private sector, I practice law as a patent and trademark litigator, and most recently as a partner in a large firm's international trade group.

By virtue of these professional experiences, I understand the importance of protecting American innovators' intellectual property, our nation's vital economic engine.

And as a navy submariner, educated and trained as an engineer, I experienced firsthand how America's superior technology ensures our warfighting edge.

As an attorney representing global businesses large and small, I've gained a true appreciation for the importance of foreign investment to our strong and vibrant economy, as well as the benefits of regulatory certainty to business transactions.

If I'm confirmed, you have my unqualified commitment that I'll work closely with this committee and Congress as a whole to continue what I've been doing over the last year as deputy assistant secretary: faithfully and transparently implementing FIRRMA, ensuring our national security is protected while foreign investment is fostered, and serving with humility in a deep and abiding respect for

our dedicated and talented career professionals at Treasury and across the government, who diligently ex ecutive the CFIUS mission.

Thank you again for the privilege and opportunity to appear before you today. I'm happy to answer any questions you may have.

CRAPO: Thank you, Mr. Feddo.

Ms. Nikakhtar?

NIKAKHTAR: Mr. Chairman, Ranking Member Brown and members of the committee, thank you for the opportunity to appear before you today.

In 2018, I was honored to be confirmed as assistant secretary for Industry and Analysis at the Department of Commerce. And today, I am extremely honored to be nominated for the position of under secretary for Industry and Security.

With me today are my husband, Gene (ph) Degnan (ph), and my mother, Dr. Manijeh (ph) Nikakhtar. My father, Bijan (ph) Nikakhtar, passed away several months ago. But he would have been beaming with pride if he were here today, as an amateur political historian and one of the greatest American patriots I've ever known.

I am proud to say that my parents and my husband have served our government as federal employees for many years. My husband served for over a decade at the Department of Commerce and my parents served for over 40 years collectively as physicians at the V.A. hospital, taking care of our nation's veterans. My brother, Nersi (ph) Nikakhtar, also a physician at the V.A. hospital, had work obligations today. I am proud to be part of a family that honors government service.

I immigrated to America with my family 39 years ago. I can remember, from a very young age, how proud I was to be an American, and how I marveled at American innovation and ingenuity.

I knew at an early age that I wanted to be part of the narrative of American growth. This is what prompted me to study law and economics after college. I attained my juris doctor and master's in economics from Syracuse University. And in 2002, I began my career at the Commerce Department, first at the Bureau of Industry and Security, and subsequently at the International Trade Administration. At the department, I worked with and learned from incredibly smart and talented civil servants. Many of those dedicated professionals are still there today, and they are the pillars that shape our government from administration to administration. I have great respect for them and I am privileged to work with them again.

I joined the private sector several years later as a trade and export control lawyer, representing industries in aerospace and steel sectors, in aquaculture, high-tech goods, chemicals and minerals.

In private practice, I worked to level the playing field for U.S. industries. And on exports, I conducted internal investigations to enforce clients' compliance agreements with the U.S. government, to address U.S. national security concerns.

My training and expertise, both as a lawyer and an economist, have given me the expertise to protect U.S. national security and simultaneously advance the economic interests of U.S. industries.

Today, national security is -- no longer begins and ends with military strength. It is a fact in today's world that national security is dependent on our economic strength and our technological leadership. Yet advancements in technology and

the interconnectedness of our economies make our national security challenges more complex than ever before.

Economic integration has emboldened some foreign nations to behave in ways that undermine our national security, expecting that the threats of economic retaliation will weaken our resolve to act. They've increased illicit procurement of items to build weapons of mass destruction and trans-ship those items to terrorist organizations and regimes.

We are witnessing illegal acquisitions of sensitive technologies, to weaponize dual-use items and oppress millions of innocent citizens. And we've seen for years how rampant intellectual property theft has displaced U.S. industries, stifled innovation and enabled the advancement of strategic competitors.

The key to our success is maintaining U.S. technological superiority and economic interests through multilateral coordination that is more forward-leaning, better use of our intelligence analytics, robust enforcement of our laws, and a tightly coordinated whole-of-government approach that includes proactive engagement with Congress.

Time is of the essence. And during my three and a half months at the bureau, I have been leading the department's efforts to update our regulations to incorporate (inaudible) reforms and address global threats. We are engaging with industry to identify emerging technologies that undermine our national security.

And I've begun an initiative to work with like-minded allies on better export control coordination and wider end use checks. It is imperative that we better coordinate multilateral policies on sensitive technology so U.S. companies can compete globally while governments prevent technologies from being misused by adversaries.

At the bureau, I challenge my colleagues every day to rethink how we modernize policies to stay ahead of new threats. And I have made it a priority to seek industry input as today's complex challenges cannot be solved without close engagement with U.S. businesses. Our policies must advance America's technological and economic leadership.

My parents immigrated to America, knowing that this is the greatest country in the world. And as an American, it is my responsibility and honor to preserve this nation's security for future generations.

I thank you again for the opportunity to be here in front of this committee and I look forward to your questions.

CRAPO: Thank you, Ms. Nikakhtar.

Mr. Steff?

STEFF: Chairman Crapo, Ranking Member Brown, members of the committee, it is the greatest of honors to sit before you today. If confirmed, it would be my privilege to serve as the assistant secretary of Commerce for Global Markets, and director general of the U.S. and Foreign Commercial Service.

I thank President Trump for this nomination. So, too, I am grateful for the continued support of Vice President Pence, both in my former capacities in Indiana, and now in Washington.

STEFF: Speaking of Hoosiers, I am proud to be joined by my wife, Brittany (ph). I remain forever grateful for your incredible encouragement, compassion and flexibility as we serve the nation we love and raise our two little stars, Daniel (ph) and Owen (ph).

I am also joined by my parents, Wayne (ph) and Lisa (ph). Our childhood home was filled with love, faith, respect and hard work and an enduring sense of service to one's country. Thank you mom, dad, gram, Aunt Laurie (ph), Aaron (ph) and to all of those family members, friends and teachers who helped me along the way. My story started under a few feet of snow 30 miles south of Buffalo, New York, on my grandparents dairy farm. My two younger brothers, Eric (ph) and Levi (ph), often reflect on the camaraderie we developed shoveling that never-ending lake-effect byproduct, raising our pet ducks and commiserating over our beloved Buffalo Bills.

Childhood summers encompassed exploring the pastures and woods, working on our neighbor's berry and plant farm and waiting for the rumble of dad's cycle as he returned home from his job in highway maintenance.

This is a glimpse of our small slice of country and my upbringing in rural America. Rural, yes, encouraged to dream big every step of the way, and dream we did. I devoted nearly every penny earned on the farm to my stamp and coin collection. Years later, as I arrived at American University to begin my academic career in international affairs, I knew unequivocally that my future involved fostering relations with foreign markets and the people personified in that postage and currency I had accumulated. That dream and future continue here today.

If confirmed, I would be incredibly honored to lead a world class team of professionals, providing export counseling to small and medium sized business, while identifying new foreign markets for their products and services, advocate on behalf of US companies competing for foreign government procurements, attract foreign direct investment while working to grow the US manufacturing base and reduce, remove and prevent foreign trade barriers that impede market access for US goods in a free, fair and reciprocal fashion.

As the Deputy Assistant Secretary of Commerce for Manufacturing since June of 2017, I've seen the impact the global markets team has on US manufacturers and service providers. This vast network of more than 1,300 trade and investment specialists and headquarters in the US field, combined with the presence of the foreign commercial service in over 70 markets, deliver daily.

Simply put, I have come to know the global markets team as a team that works, a team that chooses to compete and a team that delivers. These professionals deliver one deal at a time and have a tremendous impact measured at over $120 billion in F.Y. 2018 in the areas I outlined.

In my former professional capacities, I accrued experience in economic development, executive leadership and trade policy. In my past economic development roles, I worked successfully to attract foreign direct investment. SelectUSA, which would be in - under my purview, if confirmed, is a valued economic development partner to many states. Likewise, during my time in the semiconductor industry, I witnessed the contributions of the Commerce Department to ensure foreign market access.

I regularly engaged with the commerce team while managing the leading chip industry association's international engagements and technology programs for over a decade. I've seen the challenges posed by unfair foreign trade measures and massive market distorting practices that have crippled companies looking to compete internationally.

Early in my professional career, I worked on the trade subcommittee of the House, Ways and Means Committee. I have a profound appreciation for the vital

role of Congress when it comes to ensuring the global competitiveness of US industry.

While my stamp and coin collection are now the responsibility of my two young Hoosiers, I have no doubt that they and our country have a limitless and prosperous future based on the unparalleled accomplishments of the global markets team at Commerce.

I aspire to help this team continue to achieve its mission. If confirmed, I will devote every working moments to its success on behalf of our nation's exporters. Distinguished members of the committee, thank you for your consideration.

CRAPO: Thank you, Mr. Steff. Ms. Bowman?

BOWMAN: Chairman Crapo, Ranking Member Brown and members of the committee, it has been just over a year since this committee first recommended my nomination as a Federal Reserve Board governor.

While I'm not the first community banker to serve on the board, I am humbled by the opportunity you gave me to serve as the first governor to fill the role Congress designated for someone with community banking experience on the Federal Reserve Board.

I'm deeply honored that the President has renominated me to serve in that capacity. Thank you for the honor of this hearing today. I am also grateful to my family for their continued support. My husband Wes (ph) and our children Jack (ph) and Audrey (ph) are here with me today.

The rest of my family are watching from home in Kansas. Since my confirmation last year, I have worked to fulfill my unique role on the board by traveling widely and listening closely to community bankers, to consumers, small business owners and community leaders.

I have visited with farmers, workers and business leaders from across the country to discuss the economy. I'm making sure these unique perspectives are represented in the Federal Reserve's deliberations and decision-making on both monetary policy and regulatory matters.

During my time at the Board, I have also drawn on my experience as a community banker and regulator to ensure that our work is guided by a deep understanding of the practical realities confronting bankers and the communities they serve across the country.

The work done after the crisis to address the weaknesses of the US financial system and ensure its future resilience was essential. However, during my time working in my family's community bank, I saw firsthand how the regulatory changes created in the aftermath of the crisis impacted community financial institutions.

Small, solid institutions like this one are essential to so many of our citizens and communities. As regulators, we need to ensure that we are not imposing unnecessary burdens on community banks. That's why one of my priorities as governor has been to appropriately tailor our supervision and regulation to the size, complexity and capacity and risks posed by an institution.

To further this effort, I recently formed a working group of experts from across the Federal Reserve system to launch a comprehensive review of our supervisory work with smaller, regional and community banks.

While serving as the Kansas state bank commissioner, I was committed to treating every consumer and institution fairly and respectfully and fostering open communication. This working group will follow those same principles.

We are looking for ways to optimize our supervision and regulation to ensure it adapts to the on the ground realities of an evolving industry and changing consumer expectations while maintaining the safety and soundness of our banking system.

Let me close by saying a few words about monetary policy and the Federal Reserve's dual mandate. As a community banker, it was my job to support local businesses and consumers.

I draw upon this experience often when thinking about monetary policy because it's given me a personal and practical understanding of how the Federal Reserve's goals of fostering maximum employment and stable prices directly affects individuals as well as the broader financial system and economy.

BOWMAN: The Congress has given the Federal Reserve independence to pursue these goals because our work is critical to our economy, to businesses, to families and to communities, and I am deeply committed to fulfilling this mandate.

If confirmed by the Senate, I will continue the important work I have done -- have begun and be committed to accountability, to transparency and clear communication in all of my responsibilities at the Federal Reserve. Thank you for the honor of this hearing and I look forward to answering the committee's questions.

CRAPO: Thank you, Ms. Bowman.

Mr. Shmotolokha?

SHMOTOLOKHA: Chairman Crapo, Ranking Member Brown and distinguished members of the committee, thank you for considering my nomination to serve as first vice president of the Export-Import Bank of the United States.

I am deeply thankful to President Trump for selecting me, and humbled by the obligations that this role brings to American workers and taxpayers.

I'd like to introduce some family members who are with me today. First, my parents, Stephen (ph) and Christine (ph), who made the trip from California. They came to America as child refugees of World War II, and I am always inspired by their contributions to our country. My father worked as an engineer in the Defense Industry for more than 40 years. And my mother served tirelessly as a nurse.

I'm also joined by wife and best friend, Danya (ph), who guided the family through multiple international moves and extensive overseas travels. And Max (ph), my son, who is entering his senior year in college.

My brother, Adrian (ph), and many of my friends, family and coworkers from around the world are also watching online.

I sit before you as somebody who has spent the past 16 years in the front lines of global trade, with a strong record in growing American exports. I also bear the battle scars of leadership in a time of unparalleled competition in global markets.

I am here out of a sense of duty, honor and the wish to use my experience to serve a wider grouping of American businesses, to grow their exports. And I am also paying back a debt for all this country has given my family.

It is not simple for any manufacturer to export. They must overcome political risks, economic hazards and many non-tariff barriers. Sometimes, they also need extra financial support, especially when there are over 100 export credit agencies that are upping the ante and creating new incentives for the end customer.

I have experienced firsthand the circumstances requiring an ECA like Ex-Im to finance deals in a timely and relevant fashion when the private sector cannot.

My deep commitment and my international experience in both the buying and the selling side of international trade over the last 30 years, will allow me to contribute strongly to the team at Ex-Im.

Ex-Im's mission is to help support and create jobs. I have experienced firsthand the thrill of walking assembly lines in Georgia and Washington, and meeting the newest workers putting together products for export, thanks to deals that my team closed. These are some of my best experiences.

My legacy and value as a businessperson comes from the people that I mentor and the jobs that I help create. By working with the president of the bank, my fellow board members and the talented staff at Ex-Im, I believe I can best serve America to multiply the job-creation effects of Ex-Im.

Having served on numerous private sector boards in various capacities, I understand board responsibilities, proper corporate governance, the need for transparency and how good strategic guidance and a positive leadership attitude can enable organizations to realize their full productive potential.

The Ex-Im board needs to make sure it doesn't lose sight of its role as an important source for small businesses. Many of its financial products in this area resonate with those who are looking to expand to new markets.

As an entrepreneur, I have worked in small companies and faced the pressure of making payroll. Speed to market and effective financing can make or break these companies.

I built a significant export business in a medium-size U.S. manufacturer that, while a very successful domestic business, had yet to find its legs overseas. All companies -- small, medium and large -- need help at times in leveling the playing field in today's global economy.

If confirmed, I will bring a fresh perspective and a fiercely competitive mindset to the bank. My experience as an officer in the United States Army taught me to lead from the front. And I will work tirelessly to support the Made in America brand that we all share and support.

I will ensure that American companies have full access to an understanding of the programs authorized by Congress to maximize their global reach and competitiveness.

To this end, I would paraphrase Vince Lombardi. "Winning isn't everything. It is the only thing" for American business and American workers. And I pledge to bring a can-do winning attitude, and to win responsibly for the American taxpayer. Thank you for consideration. I'd be pleased to answer any questions.

CRAPO: Thank you, Mr. Shmotolokha.

Ms. Lee?

LEE: Chairman Crapo, Ranking Member Brown and distinguished members of the committee, it is a tremendous privilege to appear before you today, and to be considered for the position of commissioner at the Securities and Exchange Commission, an agency in whose mission and dedicated staff I believe deeply.

I'm very fortunate today to be supported by a large contingent of family. I'd like to introduce them: my husband, J. Brown; four of the five children in our blended family: Tess (ph), Beth (ph), Josh (ph) and Zoe (ph); also, our granddaughter, Emerson (ph), is here and our son-in-law Colin (ph); my sister, Laurie (ph); my brother, Will (ph); my niece, Emily (ph) and my brothers-in-law, Jeff (ph) and Chris (ph). Unfortunately, my mother could not be here today but I know she will be watching.

I have spent the bulk of my legal career at the SEC for a very simple reason. The SEC has a mission that is vital to the economic well-being of Americans and American businesses. And it navigates the critical intersection between these two. Between everyday Americans, striving to build savings, to buy a home, to send children to college and eventually retire; and American businesses that need capital to grow and prosper.

This reciprocal relationship must be nourished from both sides. We're a nation of investors, both retail and institutional, and it's the SEC's job to protect them.

This is especially important as we continue the shift away from employer pensions toward individual plans in which people must fund and select their own retirement assets and importantly, manage their own risk.

The SEC works to ensure that investors are taking the kids of risks they sign up for, business and economic risk, not the risk of fraud and not the risk of poorly structured or opaque markets that may disadvantage investors. This instills confidence, which in turn promotes capital formation.

Beyond instilling investor confidence, the SEC works to ensure that American businesses of all sizes can access the capital they need to grow their businesses, and thus create the kinds of opportunities that investors want and need. These businesses deserve thoroughly researched, well-tailored and clear rules.

I have seen, experienced and understood this interdependence between investors and business from nearly every angle. I worked in the oil business at both private and public companies, I've owned and run my own small business. And since law school, I've worked for over two decades as a securities lawyer, first in private practice as a litigator and partner, and then I was privileged to work on the staff of the SEC. Like many Americans, I've worn a lot of hats and juggled a lot of priorities, work ing my way through college and eventually through law school, raising children, paying the bills and investing my savings for retirement.

If I have the honor of being confirmed, I will bring all of these perspectives to bear in my role as commissioner, and I will reach out and listen to all constituencies served by the SEC to further its critical mission.

Thank you for the opportunity to appear before you today, and I'm happy to answer questions.

CRAPO: Thank you, Ms. Lee.

And in the interest of time, I'm going to forgo my questions. We'll go immediately to Senator Brown.

BROWN: Thanks, Mr. Chairman.

Mr. Shmotolokha, thank you. Thanks for sharing your story and your experience with us. Explain why U.S. companies in the tech -- technology and telecommunications sector -- sector look to Ex-Im to expand their sales abroad. And as you answer that, if you'd also answer if -- if Ex-Im is unavailable -- assistance is unavailable, are companies able to complete foreign sales.

SHMOTOLOKHA: If I could touch on the first one -- sorry, the second one first.

BROWN: Sure.

SHMOTOLOKHA: In my own experiences, self-financing for -- is the first thing any company looks for. It's the easiest, the quickest, and when you're doing a deal with somebody, you're looking to see if you can consummate it in the speediest of fashions and receive your payables.

But next, I turn to private sector, and when you look to Ex-Im, well, that's largely when you start really expanding your business. You're looking at countries that

have a higher degree of political risk or economic risk, or legal systems in which you can't recuperate your -- your -- your receivables.

Probably the biggest challenge, though, that we face today -- the fact that other ECAs or ECA-like institutions in several countries, specifically in the bricks (ph) that are non-OECD countries, have -- are using additional finance vehicles, especially long-term ones. So where we came up -- up against this in the telecommunications industry, certain global vendors today create extremely attractive medium- to long-term financing situations for the same clients for which we are competing.

Sometimes those clients do not have to even make a payment the first two years. They get extremely low interest rates, and it makes it very attractive for them, just simply from a capital perspective, where quality, trust and good customer service sometimes are overcome. So at that point, being able to seek institutions that can help bring about long -- medium- to longer-term financing, and sometimes private-sector institutions aren't comfortable in many of those locations.

I would add that today, a lot of the game, or a lot of the opportunities are actually in emerging markets. There are tremendous infrastructure builds going on in those markets. So to compete in the first-world markets, it's -- it -- it can be relatively level. But a lot of -- today, the opportunities are in Latin America, Africa, parts of Asia, so that makes it a real challenge. And then having the -- sort of the sense of approval of Ex-Im behind you makes many in those countries extra comfortab le with a vendor.

BROWN: Right.

SHMOTOLOKHA: So that combination of public and private, with those loan guarantees that Ex-Im does is sometimes very useful.

BROWN: Thank -- thank -- thank you very much.

Ms. Bowman, thank you for your service in Kansas and -- and the Federal Reserve. You've said that the community banks, quote, "were significantly affected by the global financial crisis, a crisis they did not cause." I think every member of this committee on both sides would agree with that. Recently, though, the Fed has issued many rules that would weaken requirements for the largest U.S. and foreign banks, the same Wall Street banks that made risky bets and crushed the economy.

My -- I have a couple of yes-or-no questions. Have you voted against any of the Fed's proposals that weaken the rules for the largest Wall Street banks?

BOWMAN: (OFF MIKE) I'm sorry. I voted in favor of those proposals.

BROWN: OK.

BOWMAN: I would -- but I would disagree with your characterization that they've weakened the requirements for banks.

BROWN: They've scaled back the requirements. You would not disagree with that.

BOWMAN: I would say that we've targeted the requirements more to the risk of the banks as they pose them.

BROWN: Does weakening rules -- let me -- another yes/no question. Does weakening rules for Wall Street banks help community banks? Putting aside what -- how you voted, does -- does actually weakening the rules, scaling back rules for Wall Street banks, does that help community banks?

BOWMAN: I think with respect to community banks, it's important that we understand the risks that they pose to the system and target the regulations and

rules that they are required to -- required to abide by to their risks that they pose -- the size, the complexity and the risks that they pose to the system. They're a separate category of banks from Wall Street banks. The largest...

BROWN: We're not arguing that the community banks pose, even in the aggregate, pose much risk. It's the larger banks, where this -- this Fed and the FDIC have weakened rules. It's not the community banks that -- that we focus on. Let me -- let me ask you another quick one. You said community banks are a priority. The Fed's -- but the Fed's actions weakening the rules for Wall Street, opening the door for shadow banks and for Silicon Valley. The Fed's also considering a merger between two regional banks, each with over $200 billion in assets. They say it's too difficult for them to compete with the biggest banks' investment in technology. I hear from community bankers -- some of your friends, I'm sure -- in my state and a cross the country that this leads to more consolidation, making it harder for small banks to compete. So my question is, do you believe that consolidation of the banking industry has an adverse effect on community banks?

BOWMAN: As consolidation applies in the community banking space, my concern is more that the investment in the local communities are -- are distributed, instead of located where the charter was originally held. So as branches are acquired in rural communities, that home investments in the community tends to be dissipated.

BROWN: Well, let me -- real quick, Mr. Chairman, yes or no. Will you support -- will you support Fed actions in -- in the FDIC votes on this to -- such as approval of BB&T and SunTrust -- Trust merger. Would you -- would you vote for that?

BOWMAN: It would depend on the -- on how we -- the outcome of the review of the application is. We have several statutory factors that we must consider as we're reviewing that application. If -- if the statutory factors are met and a recommendation is for approval, I would certainly consider that as I would cast a vote.

BROWN: OK. Thanks.

CRAPO: Thank you.

Senator Toomey?

TOOMEY: Thank you very much, Mr. Chairman. I appreciate this hearing, and I want to thank our witnesses for testifying today and coming before us.

Ms. Nikakhtar -- am I pronouncing that right?

NIKAKHTAR: Yes, senator.

TOOMEY: Thank -- thank you. I'd like to start with you, and my understanding is in your recent position as assistant secretary for industry and analysis at Commerce, you played a lead role in the Commerce Department's investigation into whether auto and auto part imports threaten U.S. national security. As you no doubt know, that report is still being kept a secret from the American public, but we now know that it contained an affirmative finding that foreign cars, imports and part imports were deemed to be a national security threat.

First of all, it is highly objectionable to me that this report has not been disclosed to Congress and the American public. If Toyotas and Volkswagens really impose a national security threat to the United States so great that we have to tax my constituents when they purchase one, I think the American people ought to know why.

So my first question to you, Ms. Nikakhtar, are you aware that federal law and regulations actually require that the Auto 232 Report be made public?

NIKAKHTAR: Yes, senator, it's in the statute.

TOOMEY: Yes, so do you know why it has not been made public?

NIKAKHTAR: Senator, when we completed the report and we delivered it to the Secretary and then over to the president, it sits at the White House right now and per the statute, it's up to the president to determine when he's -- wants to release it and when -- the timing for that.

TOOMEY: Well let me just say that the post to which you have been nominated obviously has a very significant national security component. Your signature recent effort in this space is that report and it's hard for me to understand how senators can properly judge your qualifications without being able to read that report.

I understand that is not in your direct control, but it's important. The president's May 29 proclamation repeatedly states that, and I quote this phrase, "American-owned producers," end quote, must be able to increase R&D spending in order to quote "develop cutting edge technologies that are critical to the defense industry." And as such, the proclamation reaches the conclusion that quote "domestic conditions of competition must be improved by reducing imports."

So the conclusion that Toyotas and Volkswagens are a threat to our national security seems to be premised on the notion that the sales of those vehicles precludes sales that would otherwise occur at American-owned producers, which would then lead to additional presumably sufficient R&D investments.

So let me ask a factual question here. So despite the fact that foreign headquartered auto companies have invested hundreds of billions of dollars in the US, building plants, hiring tens of thousands -- hundreds of thousands of American workers, is it true that the auto report considers quote "American-owned" to include only GM, Ford and Tesla?

NIKAKHTAR: Senator, I should put that in a little bit more context. Yes, American-owned is -- is GM, Ford and Tesla ...

TOOMEY: OK, I'm -- I'm going to run out of time here. So -- so you are confirming that it is only those three. And so for the purpose of considering the R&D investment of American-owned companies, did you include in your analysis the investment made by companies like Google and Apple and Uber into the space, into the -- especially automation of -- of vehicles? Was that included in your analysis?

NIKAKHTAR: Yes, Senator, we -- we -- that -- part of our -- a large part of our research did include that, but it ...

TOOMEY: OK, it'd be -- it would be nice to be able to see that. These -- this very narrow definition of American-owned, even at -- accepting that definition for this purpose, between Tesla, GM and Ford, my understanding is in 2017, they spent a combined investment of $17 billion in R&D alone.

NASA's budget, by way of comparison, is about $16 billion. If the $17 is inadequate, what's the correct number? What -- what -- what do the people at the Defense Department tell you they need, American-owned car companies to invest in R&D in order to be able to defend America adequately?

NIKAKHTAR: Senator, what -- what I was trying to get at earlier was the fact that the -- we -- to your point about the investments, the foreign made auto -- foreign

headquartered automakers have made in the United States, without question those contributions are significant.

But because we -- we allow for an open investment climate, which we absolutely encourage and we have this SelectUSA summit forthcoming at the Department of Commerce, that's not the point. It's -- it's -- the point is the excessive imports have basically -- the -- the closed US market now is being shared by American-owned and foreign-owned producers, and that's fine.

We've lost market share here but we've been unable to make up those lost sales in foreign markets when less than one percent of autos sold in Japan, for example, are from the United States, let alone ...

TOOMEY: OK, OK ...

(CROSS-TALK)

NIKAKHTAR: That's the focus and that's the R&D -- erosion of the R&D that the ...

TOOMEY: But the R&D is at a record level, it's $17 billion, and my question is what did the Defense Department folks tell you they need for American-owned car producers to invest in R&D in order to be able to safeguard the United States?

NIKAKHTAR: The Defense Department didn't provide us a number. We looked at our -- our shrinking share of R&D vis-a-vis Europe and Japan and our global competitors. And based off that, the Secretary's assessment was that we needed to increase R&D.

And I should incidentally note that all of the surveys that we issued to all automakers and armored vehicle producers had inquired about their levels of R&D and we took all of that information into account.

TOOMEY: Thank you, Mr. Chairman.

CRAPO: Senator Tester?

TESTER: Thank you, Mr. Chairman, ranking member, and I want to thank all of the folks who are here today on the panel. I appreciate it very much. I'm going to start with you, Ms. Bowman. The 2018 farm bill decriminalized hemp and took it from the controlled substances list.

It is now as legal as soybeans or wheat to be able to grow on the farms. Producers in Montana are hitting the fields. Some has been planted, it's kind of wet, some has yet to be planted. The problem is they still face barriers to access the financial system.

And not only the farms themselves who grow the hemp, but also input suppliers are facing barriers if they supply inputs for the growing of hemp, as well as equipment dealers. I understand that FinCEN will have to update their guidelines and I sent a letter to Director Blanco to get him -- tell him to get moving on it.

As the primary regulators for our financial institutions, can you give me an update on what you're telling banks and credit unions today that will help them be able to do business in the hemp sector?

BOWMAN: (OFF-MIKE).

TESTER: Mic -- yes.

BOWMAN: I'm sorry. Senator, this is an important issue that, when I meet with bankers from across the country, many states have engaged heavily in -- in this crop for growth.

And when we visit with them and speak with them about the treatment by prudential regulators, the Federal Reserve in particular, we refer them to

BSA/AML guidance to ensure that they are understanding the risks of their -- of the customers that they face and that those decisions about who they are -- are working with were -- who should they choose to serve as customers are -- are appropriately vetted according to their business ...

TESTER: So are you telling they can bank them or are you telling them that -- go ahead but you might end up upside down?

BOWMAN: No, we absolutely tell them that it's not our job, or (ph) our role to tell them who their customers should be and that they should understand what their business strategies and risks are with respect to any customer that they have.

We do recognize that this is a challenging regulatory environment based on the -- the relationship with ...

TESTER: When the Montana bankers were in a month and a half ago, they said that they couldn't bank them because the regulators told them they couldn't bank them. Have you told them they could bank?

BOWMAN: We have not told them that they cannot bank them. We've told them that there are regulations ...

TESTER: Let's -- let's be proactive about it because we decriminalized it in the farm bill and it's -- this ain't pot, this is hemp. Why not just tell them they can do it? Because quite frankly, I would just tell you, prices are in a tank, these tariffs are killing production in agriculture.

I'm not saying hemp's going to bail anybody out cause it's not but it gives them another option. But they're not going to do it. I wouldn't do it if the -- if the bank -- if you can't get the dough, you're not going to do it and in this economic time for production ag, they need the banks.

So ...

BOWMAN: I would agree with you. And we would not discourage banks from banking these types of customers.

TESTER: OK. Well, maybe we're saying the same thing. But I'm not sure bankers are hearing the same thing, OK?

BOWMAN: We'll try to clarify that. It is -- it not -- hemp is not an illegal crop.

TESTER: Right. That's what I wanted to hear. Thank you very, very much.

Mr. Feddo, good to have you here. Under the current structure of CFIUS, you have been able to review -- or the body has been able to review several large agribusiness transactions in recent years, including -- a biggie -- when Bayer acquired Monsanto.

And I would just tell you unequivocally, this company plays a huge role in production agriculture across this country. I believe that food security is equivalent to national security. I don't think there's any debate about that.

So do you believe CFIUS currently does enough to protect our food systems here in the U.S.?

FEDDO: Senator Tester, I do. With respect to any transaction that implicates national security, we bring in the appropriate member agencies to assist us in that analysis.

TESTER: So do you agree that food security and national security go hand-in-hand?

FEDDO: It can. It depends on the facts and circumstances, yes.

TESTER: So if you got people starving to death, do you think that's good for national security?

FEDDO: Ah...

TESTER: You've got people starving to death, do you think that's good for national security?

FEDDO: Sir, we take a look at who the investor is.

TESTER: Yeah, yeah, yeah. That's not the question. If you got -- if you don't have adequate food supply, it is my contention that you have turned your national security on its ear. That's why these mergers are so critically important.

And let me give you a statistic. Currently, with the merger, Bayer -- Monsanto, whatever you want to call them -- controls 25 percent of the seed supply -- which, if you control the seed, you control the food -- and 23 percent of the chemicals. The question is, does CFIUS think about this stuff? And then I'll kick it back. But does CFIUS think about this stuff? Because it's real. And if, for a second, that I thought we were offshoring our food security to a foreign country, that's what it appears to me.

Now, in retrospect, they may have offshored a lot of liability. But the truth is, when it happened, we didn't know that.

FEDDO: We do -- we do think about that. It's part of our -- of our risk-based analysis. We look at the threat from the actor, from the investor. That is the intent and capacity to exploit a weakness in our national security, as well as the vulnerability of the U.S. business. And so we look at both of those factors to determine the risk to national security.

TESTER: Well, I would just say -- I would -- I think 25 percent's a lot. I mean, we're talking the whole shebang here. And so I would -- I would just ask for you to specifically ask some tough questions of the folks on that. OK? Thank you very, very...

(CROSSTALK)

FEDDO: I will.

CRAPO: Senator Tillis?

TILLIS: Thank you, Mr. Chairman.

Mr. Feddo, I'm going to -- first off, I share some of Senator Tester's concerns. I'm not going to ask you questions. I am going to do a couple of questions for the record for you, specifically around U.S.-controlled private funds and particularly when they're controlled by U.S. persons, because I have a concern about some scoping -- and focus there. But we're going to -- we'll do that for the record.

Mr. Steff, in your opening statement, you said you had pet ducks and a coin collection. I had a pet rooster named Pete (ph) and a coin collection. So glad to see we share -- in the rural areas. So I'm glad we share a common bond there.

Ms. Bowman, I'm going to spend most of my time talking with you. And some of this is -- I don't normally speak from notes, but this is something important for us to get on the record because it's a priority that I hope I can get your commitment. And it has to do with inter-affiliate margins.

Number one, I think that we're out of step with the European Union, Japan and most other G20 jurisdictions. Number two, I think that we have a record across administrations on the issue.

In 2013, we had the CFTC chair provide an exemption. In 2015, we had the CFTC chair provide an exemption. And now, we have a situation where the Fed has not provided an exemption from the initial margin in 2016 -- or in 2016 rules. And I think as a result, U.S. banking entities collected nearly $50 billion in initial margin from their own affiliates. That's capital that could be deployed, that right now is sitting on the sidelines.

In 2017, the Treasury noted that this rule puts U.S. firms at a disadvantage, both domestically and internationally, recommending that your agencies provide an exemption consistent with the margin requirements of the CFTC.

Do you agree that an initial exemption -- an exemption from an initial margin is appropriate for inter-affiliate transactions? Get your mike.

BOWMAN: Thank you. I keep forgetting that. Senator Tillis, we're very aware of this issue and aware of your concern with respect to this issue. We're actively reviewing the application of inter-affiliate -- of margin requirements for inter-affiliate transactions.

TILLIS: I'd like to get -- and we can follow up and maybe give you an opportunity to respond -- to a question for the record. But I would like to get a commitment to prioritize the role, to provide an exemption.

And I think that it can be done expeditiously. I don't think it has to necessarily be done with Regulation W rewrite, which could take a couple of years. I think it's something that could be done relatively quickly. And for the record, we will -- we will go through mechanically how we think we can get it done. And I'd like to get -- I'd like to get your specific response.

We've been talking about this for a while. We met with a lot of the other Fed regulators. Everybody seems to think it's a good idea. It's been a -- it's been a policy that has transcended administrations, so I don't think it's politically volatile. And I'd like to figure out a way to expeditiously move and not have this be a two- or three-year matter. I think putting $50 billion back into -- into play is something that's helpful and will let us continue our economic growth.

The last thing I want to talk with you about has to do with the Fed payments proposal. It's another area where, again, I'm going to honor the time commitment. It's another area where we'll probably just submit context for the record.

But I don't believe that we need two systems. I think that we have emerging opportunities that are in play with the private sector. I think it's something that the Fed should think seriously about not spending their time and resources on.

And I've gotten mixed responses. It feels like when you go to a public hearing and you talk to some of the regulators, they say, "Thank you very much for your input." And move on. But it gives me a sense that they're going to move in that direction, and I think they should step back and really decide if that's a good use of their resources.

I'll give you a few minutes to respond, and then we'll put that as a question for the record for more fulsome response.

BOWMAN: Senator, this is an issue that has been active within the Federal Reserve for -- since 2014, when we had a working group focused on this -- this issue.

The Fed has had, historically, a strong role in payments and -- since its inception. This is something that we think is very important. And we issued questions last fall so that we could consider the comments back from the public regarding the appropriate place and structure for this type of initiative. We're continuing to review the work of the working group and the comments that we've received through that publication. And at this point no decision has been made, but I would be happy to answer your question for the record.

TILLIS: Thank you. This is something our office will spend a significant amount of time on.

Thank you all very much. I -- look -- I look forward to supporting all of your confirmations.

CRAPO: Thank you.

Senator Jones?

JONES: Thank you, Mr. Chairman, and thank you to all the witnesses that are here today, and thank you for your service.

Mr. Feddo, I'd like to talk to you a little bit about CFIUS. I think Congress last year passed FIRRMA, but calls of concerns, especially the rise of the way China has been doing business in this country. I think Ms. Nikakhtar -- and I apologize for bumbling that -- talked about that in -- in her role.

I want to raise a transaction that occurred last year and ask you about this. And -- and when I do this, I'm not making -- casting any aspersions. But something that troubles me, because it has an impact on Alabama, and also, I think, national security implications. 2018, a Chinese steel company formed a joint venture with an American company that's known for its supply of highly-specialized stainless steel which is used across defense and aerospace sectors.

Now, stainless steel is a very technology-sensitive industry. There are a lot of different recipes, and there was no question that China was lacking in their ability to produce high-quality stainless steel. Given everything that we know about the Chinese practices, it seems pretty clear that at least some portion of this transaction was done simply to acquire manufacturing technology and know-how by the Chinese. But there is no evidence whatsoever that CFUIS reviewed this transaction before it w as closed. And again, without -- I'm not casting aspersions, but it seems even though this deal was slightly before FIRRMA passed, can you confirm that this is actually the same kind of joint venture deal that CFIUS had the authority to review for whatever reason, resources or something, didn't? But this seems like the exact kind of thing that they had the authority to review. Is that -- can you confirm that for me?

FEDDO: Senator, so as you alluded to, I can't comment in this venue on a particular transaction or -- or whether a review occurred or a pending review is underway. I -- I can talk about accomplished or completed reviews with you in a -- in a closed setting with classified information, as well.

But more to your point, though, it is important to protect America's critical technology. On the joint venture front, CFIUS can and does look at joint ventures when there's a -- a U.S. business involved. We have the ability to look at investments in U.S. businesses engaged in interstate commerce.

This is something that was talked about a great deal during the build-out of FIRRMA with respect to outbound joint ventures and -- and where CFIUS might have a gap, and...

JONES: Can -- can we do a look-back? If -- if, for instance -- and I can talk to you, you know, in a -- in a different setting. If CFIUS didn't review this, can we do a look-back and review something that occurred last year, if it now comes to your attention?

FEDDO: As a general matter, we do have the opportunity and ability to look back at -- at transactions that have already been consummated and weren't reviewed by the committee. We call those "non-notifies," and -- and we certainly do that often. The one point I would make is that some joint ventures that don't contribute a U.S. business are -- are -- are more appropriately tackled through the export controls process. But I'm happy to continue...

JONES: All right, well, we'll -- I'll get with you from that.

Ms. Nikakhtar, I want to follow up on Senator Toomey's questions because I am -- I am exactly where he is on this automobile tariff stuff. I mean, my -- my state has -- is sitting on edge right now, waiting to determine whether or not the 60,000 jobs in Alabama are going to go away because of -- of these tariffs. And did I understand your -- your testimony earlier, that with regard to national security, the Commerce Department did not contact or ask the Defense Department anything about the secu rity implications for foreign automobiles and foreign auto parts?

NIKAKHTAR: No, Senator. Well, thank you for that question. The -- the -- the response only was in terms of the quantitative level of R&D; that we actually had a lot of proprietary information from survey results, so we didn't need to ask them about that. But we have worked closely, hand-in-glove, with the Department of Defense all past summer for months and months, and we had a really wonderful working relationship with them to understand the -- the interconnectedness between the commercia l and the defense needs for innovation.

JONES: Did they -- did the Defense Department believe that these foreign automobiles, the -- the Volkswagens and the Mercedes-Benz and the Toyotas pose a national security threat?

NIKAKHTAR: The -- the -- the secretary of defense submitted a letter to secretary -- the secretary of commerce noting the importance of the commercial auto sector and the innovations they provide for the defense sector.

JONES: All right, well, it sounded to me -- and all -- with all due respect, and I agree with Senator Toomey that without having seen that and the analysis that went through that, it seems to me -- because a lot of your answer was purely market-driven. I mean, a lot of the answer that you gave Senator Toomey was about the markets, and I don't know how many foreign -- I don't know how many American automobiles it would take in Japan to make it not a national security threat. But with all due res pect, it sounded to me, in your answer, that somebody said we need to use this as leverage for -- to get our market share up. And so let's find a way to make this national security. I hope I'm wrong about that, and I hope I get to look at that report. I would love to be able to look at that report before your nomination comes to the vote here, or certainly, before the Senate, and I would encourage you to talk to the secretary of commerce and the president of the United States to release the re port to us, even in a closed setting, that we can look at it before your nomination.

NIKAKHTAR: And Senator, I just wanted to assure you that trade leverage, none of that constituted any of our thinking when we were drafting the report. We use publicly-available data, and all of that was corroborated by confidential survey information we received.

JONES: All right, well, thank you.

CRAPO: Senator McSally?

MCSALLY: Thank you, Mr. Chairman. Thanks for holding this hearing today to consider these nominations for many critical positions at a number of agencies. I do want to specifically focus on Governor Bowman's renomination to be a -- continue to be a member of the Federal Reserve Board. You're off to a good start representing community banks and being a voice for -- to -- to them, and I really appreciate that.

Community banks are really vital for us in Arizona. By extending credit and other services to especially small businesses, they really reach a lot of rural and underserved populations that are just a critical for our economy and continuing to support people that I represent. And where we really feel the presence along the border of the importance of community banks, and when they close, the impact is severe, and the financial services that they provide are just very critical for us in Arizona. S o I'm pleased that you're providing that voice at the Federal Reserve Board with your perspective, and I hope you will continue to do so.

Can you walk me through some problems you see that community banks are currently facing, even with some of the reforms that we've made, and adjustments, and what the Federal Reserve is doing to make sure that regulations are properly tailored?

BOWMAN: (OFF MIKE) McSally, thank you for that. Community banks are clearly important -- important to our community, to our businesses, our families and our communities.

Let me first say that one of the first priorities for the Federal Reserve is to implement the provisions of S-2155. So through my chairmanship of the Smaller Regional Bank and Community Bank Subcommittee at the Federal Reserve, we're working very diligently to finalize the CBLR, the Community Banking Leverage Ratio proposal, which simplifies capital requirements for community banks.

We've revisited that proposal, re-engaged our community bank -- state bank supervisors for their input and participation in that process, as well, since I came onboard. That proposal was issued prior to my joining the Board of Governors, so it's something that we're taking another close look at.

We're also looking at -- closely at the call report reduction -- the burden for call report reduction and reduction at those burdens. That's a priority for our subcommittee, as well, so there are many things that we're looking on -- at.

One thing that's probably important to your community banks is the BSA and AML procedures, so that's something that's on our agenda, as well, to look at examination procedures and -- and see where we can find some efficiencies.

MCSALLY: Great, thank you. When Chairman Powell had testified before our committee, we spent a lot of time talking about the rural-urban divide and what's going on economically in the country. Again, I represent a lot of rural communities.

So from your perspective, what is access to banking -- are there other factors that you think are -- are really causation for that divide and the challenges for rural communities?

BOWMAN: The differences between rural communities and urban communities is often vast. 97 percent of our country is rural. It's -- I'm from a rural community, as well, I recognize many of these economic challenges that we face in those rural communities.

The importance of community banks in those -- in those communities is leadership that's provided to the community, its access to credit for consumers and for small businesses. It's an important cornerstone of many of those communities.

One of the concerns that we discussed earlier with -- with Ranking Member Brown was the -- the consolidation of those rural institutions and the continued commitment of the remaining entity in the community that they're serving.

MCSALLY: Great, thank you. We also have some unique cross-border challenges right at the border that are impacting our communities there, and we've talked a lot about this on the committee already, but we need to continue to work across multiple agencies to make sure that our legitimate cross-border commerce still has access to banking.

So I don't know if you have any comments on specifically the border elements of that, but it's not just rural but also the cross-border.

BOWMAN: Yes, we recognize that those are challenges for the banks that are on the border. I was recently in El Paso, Texas and in Deming, New Mexico where we were able to observe some of those and visit with bankers on the border.

I'd be happy to visit with you further about that and continue to work with you on those issues.

MCSALLY: Great, thank you. I yield back.

BOWMAN: Thank you.

CRAPO: Senator Cortez Masto?

CORTEZ MASTO: Thank you, Mr. Chair. Ms. Bowman, let me -- let me follow up on some of the conversations. You just said you were in Texas, I'm curious. Friday, the regulators closed Enloe State Bank in Texas.

I think it was a -- a $36 million bank. What went wrong?

BOWMAN: My understanding, that was an FDIC-regulated bank, was that there was fraud on behalf of one of the -- the management -- representatives of management.

CORTEZ MASTO: OK and my understanding is that the cost of the FDIC, because of this closure, is about $27 million. I guess my question to you is if this community bank had more assets, would the loss have been such as great?

BOWMAN: I think the challenge is, when you are dealing with the closure of an institution as I mentioned when I was testifying last May before this committee, as well, I -- closed a similar situation institution in Kansas during my time as the state bank commissioner.

When you have fraud that's resident in the institution, often times it only comes to light during an examination. My understanding is that the call report information that was filed indicated that the bank was in good condition and it revealed, when the FDIC came to do an examination, that that was not the case.

CORTEZ MASTO: But the intent is -- and I -- and -- and I guess this is my concern. You know, community banks, many have record profits, but the goal here is to ensure that if there is a fraud or there is something happening, they have access -- they have efficient capital or assets for just this very reason so that there isn't a big hit and they have the ability to cover those costs.

And so I guess my -- my concern with this process that's happening right now, in all due respect to the chairman, I -- there are -- there's no way I'm going to get to ask every single one of you a question, but here's what I do know.

Last time you were before us, we had a short, limited time to ask questions and when I didn't get the answers, I actually submitted questions for the record. But your questions that you responded to me were similar, word for word, to another individual that was on the panel at the same time.

Excuse me? And so I -- I guess my -- my concern is I don't have enough time to ask you questions the way this has been presented here, and -- and this is ridiculous to me. These are important positions for every single one of you.

And to not even be able to have five minutes with all of you, let alone a second, is outrageous to me. And -- and let me jump over here because for the last two years, the Export-Import Bank has not been filled. We're finally filling these positions and I will tell you the Export-Import Bank is important to Nevada.

We have 21 firms that export electrical equipment, machinery, minerals and other products to other nations like Mexico, Turkey and India, and we are now just putting in place a -- a -- individuals that can help finalize and make -- start moving this forward.

I -- I think -- and Mr. Chairman, with all due respect, I -- I just -- this is now -- no way to conduct our business long term in -- in -- in the Senate. It is time for us to start working together and start putting people in positions but making sure we get the right people in these positions and not crowd everybody in because there is no way I'm going to be able to ask everybody that is before us a question that is important for my state.

So I -- I -- I appreciate you all being here but at the same time I am frustrated with how this process is moving forward and I just don't think it does a service to anybody here in Congress, let alone the people that represent -- or in my state that I am supposed to represent or any of the states that are supposed to represent.

This is not how we should be doing business.

CRAPO: Senator Menendez?

MENENDEZ: Let me echo the senator from Nevada's concerns. I expressed this to the ranking member, as well. Six people, major positions, in one hearing is almost an impossibility to get what you need, but I'm going to try to get some of it but I doubt I'm going to get all of it.

So let me start off with Ms. Nikakhtar. I appreciated your visit with me. Are you aware that 3D gun blueprints are already available online?

NIKAKHTAR: Yes, senator, and I understand it's currently the subject of litigation.

MENENDEZ: So my concern is my understanding of the department, which you've been nominated to, takes the position that once something has been published it can no longer seek to control it. So what will you do to allay the concerns of Americans who are worried about the administration's actions that could make 3D gun prints more widely available?

And if you can't control the release of those designs under existing regulations, will you commit to changing those regulations or simply change the proposed transfer to leave such technical information under the purview of the State Department?

NIKAKHTAR: Senator, I -- I very much enjoyed our conversation yesterday, thank you for taking the time. What -- what you're referring to is the CATS 123 (ph) transfer from the munitions list to the commerce control list.

Once that happens -- and I want to go on record saying it here, and as I communicated to you -- I am committed to working with every single member of Congress, to the extent that they would like engage with me and my bureau, to make sure that we're developing and implementing sound policies with respect to our export controls rules and procedures.

MENENDEZ: Well, I appreciate that. But that doesn't answer my question. So when it comes to 3-D guns specifically, because of my understanding of the regulations as they exist, since they're supposedly published in some entity, they no longer can be controlled. But we don't need the widespread distribution of this.

So I hope that you will do something. And I'd like to see an answer in writing from you as to what you will do.

And I -- as I'll repeat to you what I said in private, it's no value, your offer to me -- which I appreciate -- to be engaged on transactions if I don't know that a transaction exists. If I have no notification that you are in the midst of considering an arms sale to some entity, if I don't know it, unless I find out through some other source, I can't comment on it.

So there has to be some way -- if this goes through -- in which you, if confirmed, ultimately engage us in letting us know. At least a simple notification, so we can comment and take value of your offer, otherwise your offer is of no value. So I hope you're understanding that in that respect.

Mr. Feddo, one of the provisions that I offered in FIRRMA was to require CFIUS to develop regulations to ensure that state-owned entities are declaring their transactions with CFIUS and not using complex financial structures to conceal their ownership or evade CFIUS review.

We saw this situation at work in December, when the Wall Street Journal reported that a firm owned by China's Ministry of Finance was able to use offshore subsidiaries to purchase a U.S. satellite firm, and was thereby allegedly able to access information that may have been restricted under U.S. export controls.

Do you agree that CFIUS needs to do more to evaluate the extent of foreign government control or influence over foreign firms seeking to invest in the United States? And secondly, will you commit to implementing this provision, which is law, of FIRRMA so that foreign governments seeking to invest in critical American industries are required to file declarations with CFIUS?

FEDDO: Sir, I absolutely commit to implementing that provision. I think it's a very important piece of FIRRMA with respect to state-owned entities.

There is, as you're well aware, there is a real challenge in discerning ultimate beneficial owners. And so we're taking a great deal of energy and attention to building out a team to look at non-notified transactions and identify ultimate beneficial owners when appropriate. I can't comment about the specific transaction that you raised, but I'm absolutely committed to implementing this provision.

MENENDEZ: Well, I appreciate it and look forward to working with you on that. Mr. Shontolokha (ph)?

SHMOTOLOKHA: Shmotolokha

MENENDEZ: Oh, Shmotolokha. OK.

SHMOTOLOKHA: Shmotolokha.

MENENDEZ: Shmotolokha. Thank you very much. I've always been a strong supporter of the Export-Import Bank. Given, in your experience in the private sector, how important is it that we reauthorize the bank, don't let it -- just shut it down as we did in 2015?

SHMOTOLOKHA: It is critical, sir.

MENENDEZ: And do you believe it's appropriate for Congress to increase the bank's exposure cap, the amount of loans it can finance, in light of the increased resources some economic competitors like China are giving to their export credit agencies?

SHMOTOLOKHA: Yes, sir.

MENENDEZ: All right. If everybody gave me answers like that, I could get through the whole process.

(LAUGHTER)

One last question, if I may, Mr. Chairman.

I'd like to ask Ms. Lee. I appreciate the conversation we had yesterday in my office. Do you believe that tough penalties are a successful deterrent for future lawbreakers? I'm concerned that we often seem to have, at the SEC, a reticence to pursue the type of enforcement and penalties that are a deterrent, and ultimately pursue what we want, which is conformance with the rules.

Should such an effective enforcement strategy incorporate tough penalties as part of its strategy to prevent harm, deter bad actors and punish wrongdoers?

LEE: Yes. Thank you, senator. I actually think that compliance is the overall goal of enforcement. And the best way to get at compliance is deterrence. I think that includes tough penalties where they're warranted, you know, on a case-by-case basis. But I do support strong penalties in the right case. Because I do think that has the best deterrent value.

MENENDEZ: I have other questions chairman, but my time has expired.

CRAPO: Senator Van Hollen.

VAN HOLLEN: Thank you, chairman.

Thank all of you for your testimony.

Governor Bowman, you and I have spoken about this. I think the fact that the United States does not have a real-time payment system is an embarrassment. And it is costing millions of Americans billions of dollars, especially Americans who don't have big balances in their bank accounts. Now, I heard some questions from Senator Tillis along these lines.

I just want to point out to you, an article by Thomas Hoenig, a former vice chair of the FDIC and former president of the Federal Reserve Bank of Kansas City, who wrote a recent editorial regarding this issue, stating -- and I quote -- "the needs of consumers and businesses and the depositary institutions nationwide that provide them services, will be best served by the Federal Reserve continuing to play its role as a payment processor."

He goes on to say, "The alternative is to award the clearing house a de factor monopoly, resulting in a less competitive and less efficient market for immediate payment." Are you aware of that editorial?

BOWMAN: Senator Van Hollen, I am familiar with that editorial and I've read it. It's consistent with some of the comments that we've received during our request for comment on the questions we issued last fall.

VAN HOLLEN: And do you share some of those concerns?

BOWMAN: There are many factors that are in consideration as we're deliberating this issue within the Federal Reserve system. It's a live discussion and we're actively in a process of considering all of the comments that we receive.

(CROSSTALK)

VAN HOLLEN: All right. OK. So part of your job, of course, is to look out for the community banks and they ...

BOWMAN: Yes, sir.

VAN HOLLEN: ... concerns expressed about giving this monopoly to The Clearing House come from community banks in large measure. You're aware of that, right?

BOWMAN: Yes, I have heard from community banks about this issue.

VAN HOLLEN: Yeah. So Ms. Nikakhtar, let me just follow up on the use of Section 232 because in my view, it's been sort of a -- a gross abuse of claims of

national security when we use that to place tariffs on our allies like Canada and others.

So count me in with those other members who have said we really want to get this report with respect to Section 232 and automobiles. Where I do agree with some of the actions the administration's taken is where I think we face a real strategic threat, which is China's theft of a lot of our IP and technology.

So I supported the efforts that you at the Commerce Department took last year with respect to ZTE after it was found in violation of our sanctions. I was incredibly disappointed that the president then tweeted out that he's going to reverse the blocking order because he wanted to help his quote "friend President Xi" and so now we have your measure of putting Huawei on the entities list because of 5G.

And as I read the explanation for that -- and I -- I -- I think this is a move in the right direction, lots of complicated issues, but a move in the right direction, it was based not only on the finding that they violated the Iran sanctions but also other findings that they posed to national security threat. Is that right?

NIKAKHTAR: Senator, yes, that's what -- what -- that's what we've indicated.

VAN HOLLEN: OK, so I'm -- I'm with you in addressing this issue. What I'm concerned about is you're trading off something that you agree is a national security issue as part of a concession over a tariff fight. Can you tell this committee that you will not trade off legitimate national security concerns in order to get some better deal in a tariff fight with China?

NIKAKHTAR: Senator, you raise very important points. It's -- it's -- if it's up to me, I want to make sure that we do everything we can to protect national security. Trade is not in my jurisdiction, national security is. With respect to ZTE, I completely get your points.

Under the compliance agreement, ZTE now is the most monitored company in the world. My commitment is to make sure that we never, ever compromise national security threats. And to the extent that you ever have any concerns, I am happy to engage with you or your staff directly to make sure those concerns are addressed.

VAN HOLLEN: Right, and so the -- the actions that you've taken with respect to Huawei and 5G are a result of your conclusion that it poses a national security threat. Is that correct?

NIKAKHTAR: A national security threat and undermining foreign policy interests of the United States.

VAN HOLLEN: OK, so I'm going to be watching very carefully to see if we somehow are trading off that legitimate national security issue to try to get a better deal on some tariff issues. Not only do I think it's wrong to compromise and -- compromise our national security, it totally undermines our credibility when foreign countries think that we are using national security concerns as leverage in some other area like -- like trade.

Because that is a very, very dangerous path to go down. Would you agree with that?

NIKAKHTAR: You have my commitment and I want to go on the record that I -- my singular focus is national security. That is the purview of my job and that is what I'm committed to.

VAN HOLLEN: Thank you.

CRAPO: Thank you, Senator Van Hollen. That concludes our questioning for today's hearing. For senators who wish to submit questions for the record, those questions are due to the committee by the end of the day on Friday, June 7th. And we ask that our nominees respond to those questions no later than the close of business on Friday, June 14th.

MENENDEZ: Mr. Chairman, may I ...

CRAPO: Yes.

MENENDEZ: ... one remark ...

CRAPO: Yes, you may.

MENENDEZ: ... close. I have other questions. I'm going to submit them for the record. I'd like to get substantive answers. If I don't get substantive answers then I will do everything possible on the floor to impede the nominations moving forward.

Since we don't have time to go through a second round here -- or have enough time, I'd like to get substantive answers to those questions.

CRAPO: That's a fair request. And we would like to thank our nominees for being here today. Thank you again for your willingness to serve. We've got a vote that's already 15 minutes under way, so we're going to wrap -- wrap this up and leave quickly.

I just want to again extend to each of you our thanks for your willingness to help keep our country strong and to -- to serve in your respective capacity. With that, this hearing is adjourned.

END

Jun 05, 2019 16:09 ET .EOF

ITA nominees US I&A AS News Alert

© 2019 BGOV LLC. All Rights Reserved. | Privacy Policy | Manage Alerts

MIKE CRAPO, IDAHO, CHAIRMAN

RICHARD C. SHELBY, ALABAMA
PATRICK J. TOOMEY, PENNSYLVANIA
TIM SCOTT, SOUTH CAROLINA
BEN SASSE, NEBRASKA
TOM COTTON, ARKANSAS
MIKE ROUNDS, SOUTH DAKOTA
DAVID PERDUE, GEORGIA
THOM TILLIS, NORTH CAROLINA
JOHN KENNEDY, LOUISIANA
MARTHA McSALLY, ARIZONA
JERRY MORAN, KANSAS
KEVIN CRAMER, NORTH DAKOTA

SHERROD BROWN, OHIO
JACK REED, RHODE ISLAND
ROBERT MENENDEZ, NEW JERSEY
JON TESTER, MONTANA
MARK WARNER, VIRGINIA
ELIZABETH WARREN, MASSACHUSETTS
BRIAN SCHATZ, HAWAII
CHRIS VAN HOLLEN, MARYLAND
CATHERINE CORTEZ MASTO, NEVADA
DOUG JONES, ALABAMA
TINA SMITH, MINNESOTA
KYRSTEN SINEMA, ARIZONA

GREGG RICHARD, STAFF DIRECTOR
LAURA SWANSON, DEMOCRATIC STAFF DIRECTOR

**United States Senate**

COMMITTEE ON BANKING, HOUSING, AND
URBAN AFFAIRS

WASHINGTON, DC 20510–6075

June 7, 2019

Ms. Nazak Nikakhtar
Secretary-Designate of Commerce for Industry and Security
US Department of Commerce
c/o Charles Kolo Rathburn
1401 Constitution Avenue, NW, Room 5421
Washington, DC 20230

Dear Ms. Nikakhtar:

Thank you for testifying before the United States Senate Committee on Banking, Housing, and Urban Affairs on June 5, 2019, at our hearing to consider nominations.

In order to complete the hearing record, we would appreciate your answers to the enclosed by close of business on June 14, 2019. When formatting your response, please repeat the question, then your answer, single spacing both question and answer. Please do not use all capitals.

Send your reply to Mr. Cameron Ricker, the Committee's Chief Clerk. He will transmit copies to the appropriate offices, including the Committee's publications office. Due to current procedures regarding Senate mail, it is recommended that you send replies via e-mail in a Microsoft Word or PDF attachment to Cameron_Ricker@banking.senate.gov.

If you have any questions about this letter, please contact Mr. Ricker at (202) 224-5587.

Sincerely,

Mike Crapo
Chairman

MC/cr

Committee on Banking, Housing, and Urban Affairs
Nomination Hearing
June 5, 2019

**Questions for Ms. Nazak Nikakhtar, to be Under Secretary of Commerce for Industry and Security, From Ranking Member Sherrod Brown:**

1)      Last year, there was bipartisan concern that when it came to ZTE the administration allowed trade, economic and political considerations to drive what should have been exclusively law enforcement and national security decisions. ZTE had clearly repeatedly and willfully violated our export control laws, and Commerce enforcement officials in the government had inflicted major punishments that were then reversed by the President.

Many in Congress are concerned that we are preparing to see the same thing on Huawei, with the administration making certain trade concessions to China in return for not pressing our national security concerns, including in developing 5G systems around the world.

   A. What is your view on this question? Do you think these concerns are justified? What should Congress be doing to reinforce our concern that law enforcement and national security considerations should be treated as separate - and paramount - in these situations?

2)      One of the most significant changes in last year's export control reforms required the President to establish an interagency process to identify emerging and foundational technologies critical to US national security – areas like artificial intelligence, advanced computing, certain forms of biotechnology, and the like. Commerce then was to establish a licensing policy for those items. That is moving forward.

   A. What do you think the committee should be looking for in the coming months as we assess whether these lists are targeting the right technologies, and appropriately balancing critical national security concerns vs. commercial considerations? What has been the reaction of industry to the preliminary lists already published?

3)      If confirmed, you will be part of the interagency CFIUS review process. As you know, CFIUS is able to look at joint ventures when there is a U.S. business involved. In the confirmation hearing, Senator Jones asked Mr. Feddo about a Chinese steel company that formed a joint venture with an American stainless steel component parts company key to U.S. national defense and aerospace sectors.

   A. If a joint venture results in the Chinese company gaining access to sensitive steel manufacturing technology and trade secrets important for U.S. national security, and it potentially disrupts the U.S. supply chain, should CFIUS review it? If the same company's request for a Section 232 tariff exclusion was denied, is that information relevant to the CFIUS review? What experience and perspective would you bring to CFIUS on matters similar to this one and as well as others considered by the Committee?

1

**Questions for Ms. Nazak Nikakhtar, to be Under Secretary of Commerce for Industry and Security, From Senator Catherine Cortez Masto:**

1)      Would you agree that trade and international cooperation have a direct impact on tourism?

2)      What specifically will you do on a regular basis in this role to help expand the interests of bringing international visitors to one of America's best destinations for both indoor and outdoor activities, namely Nevada – where we saw over eight million international visitors in Las Vegas alone in 2016, accounting for $11 billion in spending?

3)      Can you provide us a sense of how we can continue to improve our outreach worldwide?

4)      During your consideration by the Senate Commerce Committee last Congress, you stated in your response to me the importance of "initiatives that facilitate travel to the United States, such as aviation liberalization, the streamlining of visa application processes, improvements to customer service at ports of entry, and the enhancement of passenger screening." How do you reconcile that statement with the lack of progress in these areas under the current Administration, even going so far to employ the questionable tactic of moving passenger screeners from the Transportation Security Administration (TSA) to the southern border where they have not been trained and are vacating their security posts at our nation's airports and surface transportation outlets?

5)      While I received you assessment during consideration of your nomination last Congress, can you please provide an update to the trends we are currently seeing in international tourism given the rhetoric and policies toward some nations or groups, of this Administration?

6)      I also previously asked you for your thoughts on the federal BrandUSA program, for which I didn't receive a specific answer to whether you supported federal funding of this specific successful program?

7)      In your previous response on BrandUSA, you stated "I will commit to being a strong advocate for public-private partnerships that promote the United States as a tourist destination, and will do so based on the Administration's and Congress's approved budgets and policies." From that statement, please help me reconcile what your position will be toward that program as the Trump Administration has again proposed to cut funding for Brand USA in their FY20 budget?

2

**Questions for Ms. Nazak Nikakhtar, to be Under Secretary of Commerce for Industry and Security, From Senator Robert Menendez:**

1)      If export control of the technical information to produce handguns using 3D printers is transferred from the jurisdiction of the Department of State to the Department of Commerce, can the Bureau of Industry and Security prevent the posting of such information on the Internet by U.S. persons without a license from BIS? If not, why not?

2)      If the Export Administration Regulations prevent that – especially if someone has previously, illegally, posted such information – why won't BIS seek to change such regulations?

3)      Should U.S. law be changed in order for BIS to maintain control in all instances?

4)      If BIS will not be able to maintain positive export controls over such information in all instances, then why does Commerce seek to acquire regulatory control over such information if it ultimately cannot control it? Isn't that effectively the decontrol of such 3D Gun Printing information?

5)      The Export Control Reform Act states that the Secretary of Commerce shall control emergent technology for national security purposes, and in a public notice for comment last year in the Federal Register, identified 3D printing or "additive manufacturing" as an example of an emergent technology. So, shouldn't the use of such an emergent technology to produce lethal weapons be controlled in all instances? If not, why not?

6)      The Congress has acted to place heightened oversight over the sale of lethal firearms to ensure that they are not going to dangerous or unreliable end-users. They have also been subject to a decades-long informal process of consultation, which has in the past prevented just such sales. BIS could inform the Congress, specifically the Senate Foreign Relations Committee, which has jurisdiction over the export of lethal arms abroad, before licenses are granted, if it chooses to do so. Will you so inform us?

**Questions for Ms. Nazak Nikakhtar, to be Under Secretary of Commerce for Industry and Security, From Senator Jerry Moran:**

1)     This Committee shepherded to passage the Export Control Reform Act (ECRA), which enjoyed a strong bipartisan consensus due to its careful approach toward pursuing important US national security objectives while preserving US leadership in technological innovation. The Commerce Department is now leading implementation of export control reforms for emerging and foundational technologies called for in the legislation.

   A. If confirmed as Under Secretary, what steps will you take to ensure that any new export controls do not undermine the ability of US companies to innovate and compete on at the frontiers of technology?

DOC_0043374

**Questions for Ms. Nazak Nikakhtar, to be Under Secretary of Commerce for Industry and Security, From Senator David Perdue:**

*USML to CCL Transition*

1)      Ms. Nikakhtar, as I'm sure you are aware, the previous administration implemented the transfer of export licensing authority for dual use items from the US Munition List to Commerce Control List to modernize our cold-war era export licensing controls to enhance our national security and to improve the ability of U.S. companies to better compete in an increasingly global marketplace, increasing the amount of US exports and creating more American jobs. One of the ECR's objectives was to rationalize the control lists and pursuant to its authority under the Arms Export Control Act, transfer export licensing authority for commercial or dual-use items to the Commerce Department - Bureau of Industry Security (BIS) and its Commerce Control List (CCL) from the State Department's Directorate of Defense Trade Controls (DDTC) and its U.S. Munitions List. The prior administration moved commercial and dual use products covered in 18 of the 21 USML's categories to the BIS's CCL.

However, three of the 21 categories - USML categories I, II and III (commercial and sporting firearms and ammunition products) – were purposely singled out by the past administration for transparent political reasons and have not realized the benefits of the USML to CCL Initiative. I am very concerned about the impact this is having on our small businesses and national security. Each day that passes with no action taken on Categories I, II, and III  American businesses are at a competitive disadvantage and our national security is at risk because the State Department is having to dedicate time on commercial articles rather than on controlling those sensitive articles with national security implications. Approximately 25% of DDTC's current export licensing workload now involves Category I products like the single shot bolt action .22 caliber rifle that are used at summer camps. I know that several of my colleagues from both sides of the aisle share these same concerns, and 29 Senators and 145 members of the House sent bipartisan letters to Secretary Ross and then-Secretary Tillerson urging the completion of the ECR initiative. BIS published the proposed rule on May 24, 2018, which was then opened up for public comment. The congressional committees of jurisdiction received formal 30-day Section 38(f) notification in February of the final rules, and it was our understanding that the final rules were expected to be published in about mid-March.

   A. It is now June 5th – more than a year after the proposed rules were published and three months since Congress received notification. When can we expect the final rules to be published to transfer to BIS the export licensing responsibility for commercial and sporting products currently on the USML categories I, II, and III? I am looking for a date certain by which the final rules will appear in the Federal Register.

   B. If confirmed by the Senate, will you commit to having the Commerce Department expeditiously as possible publish the final rule to transfer from the State Department to the Commerce Department the export licensing responsibility of dual use, commercial

DOC_0043375

and sporting firearms and ammunition products currently on the USML categories I, II, and III?

C.  What steps will BIS take to work with members of the firearms and ammunition industry to ensure a smooth transition to BIS from DDTC? It is my understanding that the industry's trade association, the National Shooting Sports Foundation, has done joint seminars and industry outreach with BIS, to ensure a smooth transition. Can you commit that BIS will continue those public-private cooperative efforts that work toward achieve compliance with the legal and regulatory requirements under the Export Administration Regulations (EAR)?

6

**Questions for Ms. Nazak Nikakhtar, to be Under Secretary of Commerce for Industry and Security, From Senator Mark Warner:**

1)      As Commerce compiles its emerging and foundational technologies list, are there sectors concerned may not receive enough coverage or inclusion?

   A.  What areas of China's Made in China 2025 priority list or in terms of the gaps in their military capabilities development are not covered?

   B.  What steps should be considered to address the problem of companies seeking to redefine the technologies or products to skirt review?

2)      As one of the most persistent critics of Huawei's concerning relationship with the Chinese government and its pattern of behavior, I was pleased to see the Trump Administration finally take steps to place Huawei on the Entity List.

At the same time, I have concerns that this move reflects a haphazard and not-coherent approach to these issues — particularly when we see the President suggest that the designation could simply be a bargaining chip, to be trade away in the context of a trade deal. Huawei represents a real — not speculative — security risk and one that will not be resolved in the context of a trade agreement.

We see a number of technology companies that boast unusually intimate relationships with the Chinese government, are instrumental in domestic efforts within China to harness technology to conduct in censorship, surveillance and social control, and that receive significant support — in the form of digital infrastructure grants and loans — to help China export its model of tech-enabled authoritarianism abroad. We even see municipalities in the U.S. buying security cameras from companies like Hikvision because — as in the case of Huawei — it's artificially priced below products from legitimate vendors.

   A.  Would you support entity list designations with other technology providers, such as Hikvision and Dahua, that are engaged in activities that are contrary to the U.S. national security and U.S. foreign policy interests?

   B.  Given the pattern of behavior we've seen from a company like Huawei — with well-documented allegations of a concerted effort to evade sanctions on Iran, a longstanding and comprehensive strategy of IP theft from U.S. companies, and a close relationship with the Chinese Communist Party and Chinese military — would it be appropriate for the President to roll back the Entity List designation in exchange for minor trade concessions by the Chinese government?

DOC_0043377

C. What is your view on the scope of the Temporary General License the Trump
Administration issued with respect to Huawei?

    a. Are there areas where a more relaxed policy would be warranted?

DOC_0043378

| From: | Zemek, Alex [alex.zemek@hq.dhs.gov] |
| --- | --- |
| Sent: | 7/9/2019 1:28:56 PM |
| To: | Richard Ashooh [Richard.Ashooh@bis.doc.gov]; Jessica Curyto [Jessica.Curyto@bis.doc.gov] |
| Subject: | FYI news article about 3D printing |

Rich and Jessica –
    Hope you are doing well. ██████████████████████████████

Alex

## [NY] Man gets caught with unassembled 3D printed gun at airport (FOX News)

FOX News [7/8/2019 5:42 PM, Michael Hollan]

It turns out, it's not ok to bring gun parts onto a plane, even if they aren't assembled and 3D printed.

A man from Kansas learned this the hard way at LaGuardia Airport on July 3rd. He was reportedly stopped by a TSA officer when he tried to pass the pieces in his bag through the airport security X-ray machines.

The pieces were discovered in the man's roller bag, Fox 5 reports. The components were reportedly disassembled at the time, although that didn't make it ok to bring on a plane. While the man was eventually allowed to fly, he was not allowed to bring the gun body and trigger with him on the plane.

He was reportedly not arrested since the components did not make a full gun.

In a statement to Fox News, a TSA spokesperson said, "Transportation Security Administration officers at LaGuardia Airport stopped a Kansas resident from bringing the trigger and body of a 3D printed handgun past the security checkpoint on Wednesday, July 3.

"A TSA officer spotted the main component of the handgun as the man's roller bag entered the checkpoint X-ray machine," the statement continued. "The item was confiscated by TSA and the man, a resident of Leawood, Kan., in Johnson County, was permitted to catch his flight without his gun."

While it may seem obvious, the TSA wanted to remind everyone which items are not permitted on the planes. "Handguns and handgun parts are prohibited past airport security checkpoints, including 3D imprinted guns," the spokesperson confirmed. "Passengers are encouraged to use the "What Can I Bring" tool on tsa.gov prior to traveling to ensure they do now have any prohibited items in their carry-on or checked bags."

_____

Alex Zemek
Deputy Assistant Secretary
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
Phone: 202-891-2120
Email: ████████@hq.dhs.gov

| | |
|---|---|
| **From:** | Richard Ashooh [Richard.Ashooh@bis.doc.gov] |
| **Sent:** | 7/9/2019 3:24:09 PM |
| **To:** | Zemek, Alex [alex.zemek@hq.dhs.gov]; Jessica Curyto [Jessica.Curyto@bis.doc.gov] |
| **Subject:** | Re: FYI news article about 3D printing |

Nice that the system worked!

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This Message was sent from my Mobile Device.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On: 09 July 2019 09:29,
"Zemek, Alex" <alex.zemek@hq.dhs.gov> wrote:

Rich and Jessica –
   Hope you are doing well. ███████████████████████████████████
████████████

Alex


## [NY] Man gets caught with unassembled 3D printed gun at airport (FOX News)
FOX News [7/8/2019 5:42 PM, Michael Hollan]
It turns out, it's not ok to bring gun parts onto a plane, even if they aren't assembled and 3D printed.

A man from Kansas learned this the hard way at LaGuardia Airport on July 3rd. He was reportedly stopped by a TSA officer when he tried to pass the pieces in his bag through the airport security X-ray machines.

The pieces were discovered in the man's roller bag, Fox 5 reports. The components were reportedly disassembled at the time, although that didn't make it ok to bring on a plane. While the man was eventually allowed to fly, he was not allowed to bring the gun body and trigger with him on the plane.

He was reportedly not arrested since the components did not make a full gun.

In a statement to Fox News, a TSA spokesperson said, "Transportation Security Administration officers at LaGuardia Airport stopped a Kansas resident from bringing the trigger and body of a 3D printed handgun past the security checkpoint on Wednesday, July 3.

"A TSA officer spotted the main component of the handgun as the man's roller bag entered the checkpoint X-ray machine," the statement continued. "The item was confiscated by TSA and the man, a resident of Leawood, Kan., in Johnson County, was permitted to catch his flight without his gun."

While it may seem obvious, the TSA wanted to remind everyone which items are not permitted on the planes. "Handguns and handgun parts are prohibited past airport security checkpoints, including 3D imprinted guns," the spokesperson confirmed. "Passengers are encouraged to use the "What Can I Bring" tool on tsa.gov prior to traveling to ensure they do now have any prohibited items in their carry-on or checked bags."

_____
Alex Zemek
Deputy Assistant Secretary
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
Phone: 202-891-2120
Email: alex.zemek@hq.dhs.gov

**From:** Gary Stanley ██████ glstrade.com]
**Sent:** 7/16/2019 2:46:51 AM
**To:** Richard Ashooh [Richard.Ashooh@bis.doc.gov]
**Subject:** Defense and Export-Import Update (July 15, 2019)



**Dear All,**

**Good Day!**

**Gary Stanley's ECR Tip of the Day:** To support a license application for an item subject to missile technology export controls or when the item to be exported will be used in a missile project or program, the information provided with your application should include technical specifications or brochures on the items you wish to export. Information that substantiates the legitimate activities of the end-user should be supplied as well. You should also include import or end-user certificates if the item is also subject to national security controls. For items to be used in a missile project or program, at a minimum, always specify the maximum capable range and payload of the delivery system or launch vehicle. Any information regarding the specific project or program should be provided; note if there is any U.S Government funding or oversight involved. You can also include open source information from Web sites, marketing brochures, etc. All of this information will assist licensing officers in their evaluation, determination, and licensing recommendations for the case. Including this information could prevent potential delays in the processing of the case and avoid a return of the application without action. The documentation requirements for export license applications are explained in detail in Part 748 of the EAR.

**Today's Items:**

1. **DDTC Changes DTCC Registration Name**
2. **DDTC Posts Four New Name/Address Changes Notices**
3. **BIS Posts Presentations from BIS 2019 Update Conference**
4. **BIS Reaches Settlement Agreement with Two Iranian-American Individuals and an Iranian Co.**
5. **Two Mitsubishi Units Settle Antiboycott Charges**
6. **OFAC Sanctions Venezuela's Military Counterintelligence Agency Following the Death of a Venezuelan Navy Captain**
7. **OFAC Targets Iranian-Backed Hizballah Officials for Exploiting Lebanon's Political and Financial System**
8. **OFAC Targets Cuban Support for the Illegitimate Venezuelan Regime**
9. **President Trump Issues Executive Order on Maximizing Use of American-Made Goods and Materials**
10. **DoD/DSCA Notifies Congress of Possible FMS to Germany, Greece, and Taipei**
11. **DoD/DSCA Updates Security Assistance Management Manual and Policy Memos**

12. **DoD/DCSA Posts Notice on DISS Provisioning**

13. **Justice Dept. Charges Software Engineer with Taking Stolen Trade Secrets to China**

14. **USTR Announces Product Exclusions from Tariffs on PRC Goods**

15. **USTR Announces Initiation of Section 301 Investigation into France's Digital Services Tax**

16. **USTR Pursues Competition-Related Concerns Under the U.S.-Korea Free Trade Agreement**

17. **Commerce/ITA Seeks New Members for District Export Councils**

18. **Commerce Dept. Seeks Public Comments on State of Counterfeit and Pirated Goods Trafficking**

19. **WTO News**

20. **U.S. Government Contracting**

21. **U.S. Customs and U.S. Census/AES Updates**

22. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**

23. **GAO and CRS Reports, Testimony, and Correspondence of Interest**

24. **U.S. Government Trade Forms and Other Information Collections Open for Public Comment**

**Other Headlines**

25. **U.S. Firms May Get Nod to Restart Huawei Sales in Two-Four Weeks-Official**

26. **Manufacturers Move Supply Chains Out of China**

27. **China Says Will Freeze Out U.S. Companies That Sell Arms to Taiwan**

28. **Japan, South Korea Spar Over Trade Talks as U.S. Stays Away**

29. **India Likely to Miss NATO+ Grouping of US Arms Buyers**

30. **How Do Americans Feel About US Arms Sales? Not Great.**

31. **Judge Sides With Pentagon and Amazon in Cloud Bidding Case**

32. **Pentagon Races to Track U.S. Rare Earths Output Amid China Trade Dispute**

33. **Defense Department Accelerates Hypersonic Weapons Development**

34. **China, Russia Hypersonic Programs - Real Progress or Bluster?**

35. **Space Startups See Big Payouts in New Push to the Moon**

36. **GAO Looks at Where Pentagon Contract Awards End Up**

37. **Opinion: Defense Community Must Help Lower-Tier Suppliers**

38. **Opinion: Space Force: What Is It Good For?**

**Upcoming Export Control and Other Trade Compliance Conferences**

# 1. DDTC Changes DTCC Registration Name