DefenseNews.com, Sept. 9 - — U.S. Defense Secretary Mark Esper intends to implement changes from his review of Defense Department organizations on a rolling basis, rather than waiting until the review process is completely finished, according to the department's top spokesman. Jonathan Rath Hoffman, assistant to the secretary of defense for public affairs, said Monday that there's "no interest" from Esper to wait until the review is fully done or the start of the next fiscal year to start implementing program changes, including potential cuts. "It's going to be an ongoing process. If he makes a decision, it's not going to be 'I have to look through everything and then make some decisions.' If he sees a program that needs to end or be moved, he'll make that decision as quickly as he can," Hoffman told reporters. "He's going to make changes as we move forward. If he identifies changes that would save money, there's no interest in waiting until next year to start saving money." An Aug. 2 memo kicked off a departmentwide review of programs ahead of the development for the fiscal 2021 budget request. The goal is to find savings and drive a "longer-term focus on structural reform, ensuring all [defensewide] activities are aligned to the National Defense Strategy while evaluating the division of functions between defense-wide organizations and the military departments," per the document.

## 16. Not So Bad? Window of Opportunity May Exist for US Firms to Benefit from EU's Defense Fund

DefenseNews.com, Sept. 10 - The Pentagon has repeatedly voiced concern about the European Union's fund for defense projects that divvies dollars primarily to EU companies, but a Raytheon executive in Europe is less concerned, noting that U.S. firms are not entirely shut out. The EU has yet to finalize language for how projects that fall within the €13 billion (U.S. $14 billion) European Defence Fund might incorporate international participation. And certainly the Trump administration has criticized the EDF and the growing collection of programs under the Permanent Structured Cooperation initiative, or PESCO, as needless competition to NATO and unfair to U.S. companies. But U.S. firms can play a role, said Chris Lombardi, Raytheon's vice president for European business development, who's based in Brussels. During an interview at the DSEI defense and security expo, he pointed to the two scenarios that ultimately mirror the tactics used by European companies to participate in U.S. Defense Department programs. "Are there entities in Europe contributing as local industry? That's a way to leverage the money," said Lombardi, referring to U.S. companies that have set up a European subsidiary with an EU-based headquarters — technically qualified for funds only if they meet certain standards and get an exception. "But you can also through existing partnerships work on these projects. You might not leverage the EU funds [directly] coming out of the EDF, but you can contribute as part of a team."

## 17. The 2019 Arms Sales Risk Index

Cato.org, Sept. 11 - The 2019 Arms Sales Risk Index, designed to help policy makers assess the potential negative consequences of international arms sales, is now online at Cato here. It represents an expanded and improved version of the original risk index published in Risky Business: The Role of Arms Sales in U.S. Foreign Policy, published in 2018 by A. Trevor Thrall and Caroline Dorminey. The United States has long been the world's leading arms exporter. In 2018 the Trump administration notified Congress of $78 billion in major conventional weapons sales, giving the United States 31% of the global arms market. Between 2002 and 2018 the United States notified Congress of over $560 billion in sales of major conventional weapons to 167 different nations. Though arms sales can play an important role in American foreign policy, the risks involved with sending billions of dollars

DOC_0046810

of deadly weapons to all sorts of places are significant. The Arms Export Control Act of 1976 requires the executive branch to produce a risk assessment to ensure that the risks do not outweigh the potential benefits of selling major conventional weapons. Unfortunately, however, recent history strongly suggests that the risk assessment process is broken.

## 18. What Does State-of-the-Art Cybersecurity Look Like to the Pentagon?

FifthDomain.com, Sept. 10 - The Department of Defense wants to hear from industry leaders about the Pentagon's proposal to grade contractors on their cybersecurity. The Defense Department is focusing on the cybersecurity of its suppliers. According to experts, while DoD requires compliance with certain standards released in 2017 from the National Institute of Standards and Technology, many companies blew past those deadlines and requirements. Now, DoD is rolling out what it calls the Cybersecurity Maturity Model Certification, a framework that grades companies on a scale of one to five. A one designates basic hygiene and a five represents advanced hygiene. The scale is flexible, officials said, and will adapt over time. Right now, Pentagon leaders want input from companies on what controls work and which don't. Feedback is due before Sept. 22.

## 19. The 3 Major Security Threats to AI

C4ISRNet.com, Sept. 10 - The artificial intelligence community needs to put a lot more effort and money into systems protection to avoid it costing billions more down the line, according to the founding director of the Center for Security and Emerging Technology. Jason Matheny leads the center, a shop housed at Georgetown University's Walsh School of Foreign Service to provide policy and intelligence analysis to the government. Prior to launching the think tank, Matheny was assistant director of national intelligence, and before that he served as director of IARPA — the Intelligence Advanced Research Projects Activity. He currently sits on the National Security Commission on Artificial Intelligence. Speaking from that vantage Sept. 4 during a panel at the 2019 Intelligence and National Security Summit, Matheny said AI systems are not being developed with a healthy focus on evolving threats, despite increased funding by the Pentagon and the private sector.

## 20. 3-D Printers Could Help Spread Weapons of Mass Destruction

ScientificAmerican.com, Sept. 10 - In the mid-1990s boy scout David Hahn used household objects and his scientific knowledge to start building a nuclear reactor in his backyard. Police and the Environmental Protection Agency stopped him before he could finish. Twenty years later, revolutions in manufacturing and computing have made projects such as Hahn's a lot more feasible; if he had access to a 3-D printer, for example, he might have finished his reactor before authorities intervened. Modern technologies also mean one does not need to be as smart as Hahn to create at least some kinds of DIY weapons. With the right machine and blueprints anyone can build a handgun in their living room—and firearms are just the beginning. Researchers fear that artificial intelligence and 3-D printing might one day create, on demand, weapons of mass destruction. A report published Tuesday from a multi-institutional research group led by the Middlebury Institute of International Studies at Monterey sounds an alarm about this possibility. "This is the proverbial wicked problem," says paper co-author Robert Shaw, Director of the institute's Export Control and Nonproliferation Program.

## 21. Italy Joins Britain's Tempest Ccombat Aircraft Program

DefenseNews.com, Sept. 10 - Italy is expected to join a nascent British effort to build a sixth-generation fighter jet, expanding that program's membership club to three partners after Sweden signed up earlier this summer. Officials here at the DSEI defense trade show were still unsure as of Tuesday afternoon in what form the government-to-government agreement would be announced, saying that Italy's and Britain's turbulent political situations made for little certainty. It appeared that a written statement by the respective defense ministries would be published by Wednesday morning, to be accompanied by a formal event that day. The U.K. subsidiary of Italy's Leonardo has been part of the program since it announced its participation at the Farnborough Airshow last year, working on new new ideas for sensors and avionics. It remains to be seen if involving the whole of Italy's flagship contractor will alter the playing field on the industrial side.

## 22. Arianespace Reveals Manifest, Notes Launch Market Variety

SpaceNews.com, Sept. 9 - Orders for geostationary satellites are beginning to rebound in a market that is far more varied than in the past, said Arianespace CEO Stéphane Israel. Of the 11 geostationary satellites ordered industry-wide in 2019, nine rely on electric propulsion. The satellite masses range from 300 kilograms for Astranis, a startup planning to provide internet links via satellite, to ViaSat-3 weighing in at 6,500 kilograms, Israel told reporters in a Sept. 9 briefing at the World Satellite Business Week conference here. In addition, Inmarsat announced plans in May to buy three GX Flex satellites from Airbus. The reprogrammable, 3,000-kilogram GX Flex satellites are small enough to share a ride into orbit. "We see the dominance of electric propulsion, a very large breadth of masses and the possibility of aggregating these satellites with the platform," Israel said. Arianespace has booked nine contracts since Jan. 1: two contracts apiece for Ariane 5, Ariane 6 and Soyuz plus three Vega contracts. Arianespace also announced plans this year to move the planned launch of the ViaSat-3 communications satellite from an Ariane 5 to an Ariane 6 rocket.

## 23. UK Has Robust Arms Export Controls But Will Reflect on Saudi Ruling: Wallace

Reuters.com, Sept. 11 - Britain has a robust control system for weapons sales but is reflecting on a ruling that it broke the law in granting licenses to export arms to Saudi Arabia, defense Minister Ben Wallace said on Wednesday. An English court ruled in June that Britain broke the law by allowing arms sales to Saudi Arabia that might have been deployed in the war in Yemen, after activists said there was evidence the weapons had been used in violation of human rights statutes. The British government is appealing the ruling and no new export licenses to Saudi Arabia can be granted in the meantime. Asked by Reuters about the ruling after he gave a speech at the Defence and Security Equipment International arms fair in London, Wallace said the court had noted that Britain already had a robust system in place.

## 24. Opinion: Huawei Has a Plan to Help End Its War With Trump

NewYorkTimes.com, Sept. 10 - After a week of interviews in Beijing, Shenzhen and Hong Kong, I've come away with some strong feelings about the United States-China trade dispute. There are two battlefronts: One is the negotiation to eliminate the barriers to

American companies competing in China, and the other is what to do about Huawei, China's enormous telecom networking company that Beijing sees as a crown jewel of national innovation and the Trump team sees as a giant global espionage device. . . . On the pure trade battlefront, I left China feeling that there's a decent chance a limited deal — rolling back some American tariffs in exchange for a resumption of certain Chinese purchases, particularly of agricultural products, from the United States — can be reached in the near term. Both sides could use such a deal. . . . That is why I was happy to accept the invitation of Huawei's founder and chief executive, Ren Zhengfei, to come to his company's headquarters in Shenzhen for a rare interview, which he used to — for the first time — propose negotiations with the Justice Department to try to resolve all the outstanding issues between Washington and Huawei. . . . And if the United States — which has no indigenous 5G networking manufacturer — still does not trust Huawei to install its equipment across America at scale, added Ren, then he is also ready, for the first time, to license the entire Huawei 5G platform to any American company that wants to manufacture it and install it and operate it, completely independent of Huawei.

## 25. Opinion: Will Trump Sell Out the U.S. on Huawei?

WallStreetJournal.com, Sept. 9 - The greatest—and perhaps only—foreign policy accomplishment of the Trump administration has been the development of a coherent and genuinely bipartisan policy toward Xi Jinping 's China. The administration rightly declared Beijing a strategic rival and placed Huawei, China's multinational telecommunications giant, on the Commerce Department's so-called "entity list" as a national-security threat. This prevents U.S. companies from doing business with Huawei. China is a dangerous rival in artificial intelligence and machine learning. But for now it still depends on about 30 U.S. companies to supply Huawei with the core components it needs to compete in the 5G market. As long as Huawei remains on the entity list, it will lack crucial technology and be seriously weakened. The coming years will therefore be crucial in determining whether the U.S. or China comes out ahead in 5G. The current situation strongly favors the U.S. However, President Trump may soon undermine his own China policy and cede the advantage to Beijing.

## 26. Opinion: Restore Controls Over Dangerous Gun Exports

TheHill.com, Sept. 10 - ne of the most ill-advised decisions made by the Trump administration is to transfer oversight of the export of firearms from the State Department to the Department of Commerce. The new policy will make it easier for terrorists, tyrants and criminal gangs to get access to U.S.-made semi-automatic pistols, assault-style firearms, sniper rifles and ammunition. To add insult to injury, it would also end the practice of notifying Congress of major firearms exports, thereby thwarting its ability to stop dangerous sales. This reckless approach to firearms exports should not be allowed to stand. Congress has a chance to reverse the current policy and restore executive branch and congressional oversight through this year's National Defense Authorization Act (NDAA). Incorporating House-approved language proposed by Rep. Norma Torres (D-Calif.) into the NDAA would block the Trump administration's plan to transfer authority over foreign firearms transfers from the State Department to the Department of Commerce. The NDAA will be finalized within the next week or so, so time is of the essence. The negative consequences of gutting firearms controls cannot be overstated.

## Upcoming Export Control and Other Trade Compliance Conferences - *NEW EVENTS ADDED!*

**Sept. 17 - America's Small Business Development Centers and M-PALM - Automated Commercial Environment (ACE) Export Compliance Seminar - Chicago - College of DuPage**

**Sept. 10-11 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & - Pacific Northwest Defense Coalition (PNDC) - Complying with U.S. Export Controls - Portland, Oregon - University Place Hotel**

**Sept. 18-19 - U.S. Dept. Commerce/Bureau of Industry and Security (BIS) & The District Export Council of Southern California - Complying with U.S. Export Controls - Los Angeles - Sheraton Gateway Los Angeles Hotel**

**Sept. 18-19 - U.S. Dept. Commerce/Bureau of Industry and Security (BIS) & The Minnesota Trade Office - Complying with U.S. Export Controls - Minneapolis - InterContinental Hotel MSP Airport**

**Sept. 24-25 - American Conference Institute - 12th Conference on the Foreign Corrupt Practices Act - San Francisco**

**Sept. 25 - American Conference Institute - National Forum on FARA - Washington DC**

**Sept. 25-26 - American Conference Institute - West Coast Conference on FCPA Enforcement and Compliance - San Francisco - Marines' Memorial Club & Hotel**

**Sept. 25-26 - Informa PLC - Global Trade Controls 2019 - London - The Hatton, 51-53 Hatton Garden**

**Sept. 25-26 - SMi Group - Defence Exports 2019 - Amsterdam - Ramada Apollo Amsterdam Centre Hotel** *- Gary Stanley, Editor of Defense and Export-Import Update, will once again chair this important conference.*

**Sept. 27 - Space Coast World Trade Council - Terms of Trade, Tariff Classification, and Import/Export Formalities - Put-In Bay, Ohio - Village Town Hall**

**Oct. 1 - Strong & Herd LLP/Global Legal Services, P.C. - ITAR & EAR from a UK Perspective - Advanced Seminar - London -** *Gary Stanley, Editor of Defense and Export/Import Update, will conduct this seminar.*

**Oct. 1 - Canadian Global Affairs Institute - Security, Commerce and FDI in Canada - Toronto - The Albany Club - 91 King Street East**

**Oct. 1 - Massachusetts Export Center - Incoterms® 2020 Rules - Boston - Starr Center at Schepens Eye Research Institute, 185 Cambridge Street**

**Oct. 2-3 - Canadian Institute - Canadian Forum on Global Economic Sanctions Compliance & Enforcement - Toronto - Sheraton Centre Toronto Hotel**

**Oct. 9 - Massachusetts Export Center - Powering Your Exports: A Program for Manufacturing and Tech Companies - Salem, Massachusetts - Enterprise Center at Salem State University, 121 Loring Avenue**

**Oct. 10-13 - Pacific Coast Council - WESCON 2019: Architects in Trade - Designing Our Blocks in the Chain - Rancho Mirage, California**

**Oct. 14 - Chatham House - Global Trade 2019 - London - Chatham House**

**Oct. 15 - American Conference Institute - 5th Asia Pacific Summit on Economic Sanctions Compliance and Enforcement - Singapore**

**Oct. 15 - Michigan District Export Council - Incoterms Rules for Americans - Troy, Michigan - Automation Alley, 2675 Bellingham**

**Oct. 16-17 - American Conference Institute - 8th Asia-Pacific on Anti-Corruption Singapore - Singapore**

**Oct. 17 - IDEEA, Inc. - ComDef 2019 - Washington, DC - Ronald Reagan Center -** *Gary Stanley, Editor of Defense and Export-Import Update, will moderate a panel, Export Control Update, featuring Heidi Grant (Director, DoD/DTSA), Mike Miller (Acting DAS, State/Bureau of Political/Military Affairs), and Matt Borman (Deputy Ass't Secretary of Commerce for Export Administration)*

**Oct. 17 - Chatham House - Illicit Financial Flows 2019 - London - Chatham House**

**Oct. 20-22 - International Compliance Professionals Association (ICPA) - 2019 ICPA Fall Conference - Grapevine, Texas - Embassy Suites by Hilton Dallas DFW Airport North**

**Oct. 22-23 - C5 Group - Anti-Corruption France - Paris**

*NEW* **- Oct. 23-24 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Milwaukee**

**Oct. 28-29 - Society for International Affairs - 2019 Fall Advanced Conference - Washington, DC - Marriott Wardman Park Hotel**

**Oct. 29-30 - Aéro Montréal and Cirrus Research Associates - Training on the Canadian Defence Market - Montreal**

**Nov. 4-5 - Aéro Montréal and McCarter & English - Training on the US Market - Montreal**

**Nov. 5 - America's Small Business Development Centers and M-PALM - Automated Commercial Environment (ACE) Export Compliance Seminar - Baltimore - Lofts Hotel**

*NEW* **- Nov. 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Huntsville, AL**

**Nov. 12 - US Dept. of the Treasury/Office of Foreign Assets Control (OFAC) - 2019 OFAC Symposium - Washington, DC - Walter E. Washington Convention Center**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldorf, Germany**

**Nov. 18 - Cnxtd ("Connected") Inc. - 2019 International Conference on the EU Cybersecurity Act - Brussels - Hotel Brussels**

**Nov. 19 - C5 Group - European Forum on U.S. Export Controls - Brussels**

**Nov. 20-21 - C5 Group - European U.S. Defence Contracting - Brussels**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 3-4 - C5 Group - 12th Advanced Conference on Customs Compliance - London - St. James' Court, A Taj Hotel**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 10-11 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Dec. 11 - German Government/Federal Office of Economics and Export Control - 11th Information Day Export Control 2019 -Frankfurt - Cape Europa, Osloer Str. 5, 60327 Frankfurt am Main**

**Dec. 13 - European Commission - 2019 Export Control Forum - Brussels - Albert Borschette Conference Centre (CCAB) Room CCAB0A Rue Froissart 36**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 28-29 - American Conference Institute - 9th Forum on U.S. Export & Re-Export Compliance for Canadian Operations - Toronto - Toronto Airport Marriott Hotel** - Gary Stanley, Editor of Defense and Export-Import Update, will once again co-chair this important conference.

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

**Feb. 24-26 - Society for International Affairs - 2020 Winter Back to Basics Conference - Las Vegas - Westin Las Vegas Hotel**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to gstanley@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. +1 (202) 686-4854
Fax +1 (202) 686-2624



E-mail ██████@glstrade.com

Unsubscribe

blueprints on the internet to make a 3-D printed plastic gun capable of evading metal detectors.

In a morning tweet, <u>Mr. Trump said</u> that he "already spoke to the NRA, doesn't seem to make much sense!"



The online statement from the president <u>comes a day after</u> nine states and the District of Columbia filed a joint lawsuit in federal court in Seattle attempting to force the Trump administration to prevent the company, Defense Distributed, from making the technical plans for the plastic guns available online.

DOC_0047165

**From:** Comstock, Earl (Federal) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AAD3162FBDF84E5D9A4729D2B7472E2D-EARL COMSTO]
**Sent:** 9/16/2019 10:09:52 PM
**To:** Biery, Meghan N. EOP/NSC [███████████@nsc.eop.gov]

**Subject:** Accepted: CATS I-III Sync
**Location:** EEOB 374

**Start:** 9/18/2019 8:00:00 PM
**End:** 9/18/2019 9:30:00 PM


**Recurrence:** (none)

| **From:** | Abraham, Liz (Federal) [LAbraham@doc.gov] |
| **Sent:** | 8/6/2019 7:12:35 PM |
| **To:** | Kurland, Kevin [Kevin.Kurland@bis.doc.gov] |
| **Subject:** | FW: text |
| **Attachments:** | For addition to Part 734 05.07.2019 (for sharing).docx; ATT00001.htm |

FYI. ███████████████████████

# SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1. *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.  *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

5.  *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.  *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.  *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

5

8. *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9. *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.  *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

DOC_0048545

| **From:** | Comstock, Earl (Federal) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AAD3162FBDF84E5D9A4729D2B7472E2D-EARL COMSTO] |
| **Sent:** | 9/23/2019 8:42:03 PM |
| **To:** | Biery, Meghan N. EOP/NSC [████████@nsc.eop.gov] |
| | |
| **Subject:** | Accepted: CATS I-III Small Group Sync |
| **Location:** | WHSR Exec |
| | |
| **Start:** | 9/27/2019 2:30:00 PM |
| **End:** | 9/27/2019 3:50:00 PM |
| | |
| | |
| **Recurrence:** | (none) |





# United States Senate
WASHINGTON, DC 20510

July 26, 2018

RECEIVED 2018 JUL 27 A 11:46 LEGISLATIVE AFFAIRS

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street N.W.
Washington, DC 20520

Dear Secretary Pompeo:

We write with great alarm regarding the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation. We urge the State Department not to allow Defense Distributed to publish online blueprints for undetectable, three-dimensional ("3-D") printable firearms.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's determination that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for 3-D printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations (ITAR). Indeed, as recently as April 2018, the Trump administration filed a motion to dismiss the suit in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[1]

Despite the court's twice siding with the government's position, in a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing blueprints in any form. Specifically, the State Department has agreed to allow Defense Distributed to publish its blueprints by July 27, 2018 — by making a "temporary modification" of the United States Munitions List (USML) and granting Defense Distributed an "exemption" from ITAR regulations. The administration also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with the administration's previous position and is as dangerous as it is confounding. The settlement will allow these blueprints to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).

abroad. It also sets a dangerous precedent in defending against challenges to other legally sound determinations made by the State Department under the Arms Export Control Act and ITAR.

Yesterday, in response to questioning by Senator Markey before the Senate Foreign Relations Committee, you committed to reviewing the decision to allow Defense Distributed to publish its blueprints online. In accordance with this commitment, we ask that you suspend the special treatment given to Defense Distributed while you undertake this review.

In addition to suspending these actions, we ask that, prior to August 1, 2018, the State Department provide us with a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to such a dangerous outcome.

Specifically we request a response to the following questions:

1. Does the State Department no longer believe that the online publication of blueprints for the 3-D printing of firearms is a violation of federal export controls? If so, when did this reversal of opinion occur and why? Was there a change in the law or the facts that prompted this change? If so, please explain the change in either the law or facts that prompted the change.

2. On May 24, 2018, the State and Commerce Departments published proposed rules to amend Categories I, II, and III of the USML and transfer from the State Department to the Commerce Department oversight over export of certain firearms, ammunition, and related items. What role did the Defense Distributed litigation play in deciding to publish these proposed rules? What analysis, if any, did the State and Commerce Departments undertake to evaluate the potential risks of the proposed rules changes on export controls on the online publication of blueprints for 3-D printed firearms? If the State Department did evaluate the risks, what risks were identified? Please identify the individuals involved in that analysis.

3. If these proposed rules are finalized and jurisdiction over technical data related to the design, production, or use of semi-automatic or military-style firearms is transferred to the Commerce Department, the release into the public domain of instructions for printing 3-D firearms will be permissible. Does the State Department have concerns about the dangerous consequences of this rules change? Did the State Department make the Commerce Department aware of the litigation between it and Defense Distributed and the Second Amendment Foundation, the terms of the settlement, or the consequences of online publication of blueprints for 3-D printed firearms? If so, please identify to whom and how that information was conveyed.

4. Given the risks of the government abdicating control over the online publication of blueprints for 3-D printed firearms, why did the State Department agree to move forward with the rulemaking? How does the State Department plan to mitigate these risks?

5. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "draft and fully pursue . . . the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to the technical data that is the subject of the" litigation. Why did the State Department agree to this relief?

6. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department, "while the above-referenced final rule is in development," to announce "a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the" litigation, and to publish the announcement on the website of the Directorate of Defense Trade Controls on or before July 27, 2018. Why did the State Department agree to this relief? What will this temporary modification likely entail? Will the State Department put any restrictions on the types of 3D technical data that can be released to the public without prior U.S. government approval, including types of firearms, 3D printing, and materials, among other possible issues? Why did the State Department fail to provide 30 days' notice to the relevant congressional committees of its intention to remove Defense Distributed's "technical data" from the USML, as required by 22 U.S.C. § 2278(f)(1)?

7. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to issue "a letter to Plaintiffs on or before July 27, 2018 signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that [the 3-D printing files at issue in the litigation] are approved for public release (i.e., unlimited distribution) in any form and are exempt from the licensing requirements of ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)." Why did the State Department agree to this relief?

8. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "acknowledg[e] and agree[] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce[,] or otherwise benefit from the" 3-D printing files at issue in the litigation. Why did the State Department agree to this relief?

9. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to pay the Plaintiffs $39,581.00, reported to be for a portion of their legal fees. Please identify what funding source within the government this payment was drawn from. Additionally, please provide information regarding why the State Department agreed to this relief.

We are concerned about the immediate impact of publishing these 3-D gun blueprints. Once the State Department allows them to circulate freely online, the threats to U.S. and international security will be irreversibly increased. We urge you not to grant this special treatment to Defense

Distributed — but rather to postpone this action while you fulfill your commitment to review this decision, and until the above questions can be adequately addressed.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

Elizabeth Warren
United States Senator

Patrick Leahy
United States Senator

Richard J. Durbin
United States Senator

Benjamin L. Cardin
United States Senator





JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510-6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member



SEP 2 4 2018

The Honorable
Robert Menendez
United States Senate
Washington, DC 20510

Dear Senator Menendez:

In response to your letter regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain

firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Charles S. Faulkner
Acting Assistant Secretary
Legislative Affairs


DOC_0058997







The Honorable
Edward J. Markey
United States Senate
Washington, DC 20510

AUG 16 2018

Dear Senator Markey:

In response to your letter regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain

firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary of State
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

AUG 16 2018

The Honorable
Bill Nelson
United States Senate
Washington, DC 20510

Dear Senator Nelson:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

The Honorable
Richard Blumenthal
United States Senate
Washington, DC 20510

AUG 16 2018

Dear Senator Blumenthal:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



The Honorable
Christopher S. Murphy
United States Senate
Washington, DC 20510

Dear Senator Murphy:

In response to your letter of July 26 regarding the settlement agreement with Defense
Distributed, the Department of State (Department) reached this settlement in consultation with
the Department of Justice and with careful consideration of the security and foreign policy
interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The
Department regulates the export of defense articles, including related manufacturing
technologies and information, as an integral part of safeguarding U.S. national security and
furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act
(AECA). The Department has never regulated the downloading or dissemination of CAD files
for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to
remember and understand the exclusive reason for the Department's involvement in this matter,
which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24,
2018—before the Department of State entered into a settlement agreement with Defense
Distributed—proposing to transfer oversight from the Department of State to the Department of
Commerce of exports of firearms and related items that do not provide the United States with a
critical military or intelligence advantage or, in the case of weapons, are not inherently for
military end use, including many items that are widely available in retail outlets in the United
States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the
Department briefed staff from Senate Foreign Relations Committee, Senate Committee on
Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the
proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to
modernize the U.S. export control regulations to create a simpler, more robust system that
improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over
firearms and related articles that are inherently for military end use or that are not otherwise
widely available in retail outlets. By contrast, the interagency, including the Department of
Defense, determined that certain firearms and related items that are widely available for
commercial sale, and technical data related to those items, are of a type that do not offer a critical
military or intelligence advantage to the United States, and therefore warrant export licensing
requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is
the subject of the *Defense Distributed* settlement agreement is technical data related to certain
firearms and other USML items that would transfer to the Department of Commerce under the
proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters

Mary K. Waters
Assistant Secretary
Legislative Affairs



The Honorable
Dianne Feinstein
United States Senate
Washington, DC 20510

Dear Senator Feinstein:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

*Mary K. Waters*

Mary K. Waters
Assistant Secretary
Legislative Affairs



The Honorable
Elizabeth Warren
United States Senate
Washington, DC 20510

AUG 16 2018

Dear Senator Warren:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

The Honorable
Patrick Leahy
United States Senate
Washington, DC 20510

Dear Senator Leahy:

In response to your letter of July 26 regarding the settlement agreement with Defense
Distributed, the Department of State (Department) reached this settlement in consultation with
the Department of Justice and with careful consideration of the security and foreign policy
interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The
Department regulates the export of defense articles, including related manufacturing
technologies and information, as an integral part of safeguarding U.S. national security and
furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act
(AECA). The Department has never regulated the downloading or dissemination of CAD files
for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to
remember and understand the exclusive reason for the Department's involvement in this matter,
which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24,
2018—before the Department of State entered into a settlement agreement with Defense
Distributed—proposing to transfer oversight from the Department of State to the Department of
Commerce of exports of firearms and related items that do not provide the United States with a
critical military or intelligence advantage or, in the case of weapons, are not inherently for
military end use, including many items that are widely available in retail outlets in the United
States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the
Department briefed staff from Senate Foreign Relations Committee, Senate Committee on
Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the
proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to
modernize the U.S. export control regulations to create a simpler, more robust system that
improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over
firearms and related articles that are inherently for military end use or that are not otherwise
widely available in retail outlets. By contrast, the interagency, including the Department of
Defense, determined that certain firearms and related items that are widely available for
commercial sale, and technical data related to those items, are of a type that do not offer a critical
military or intelligence advantage to the United States, and therefore warrant export licensing
requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is
the subject of the *Defense Distributed* settlement agreement is technical data related to certain
firearms and other USML items that would transfer to the Department of Commerce under the
proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

The Honorable
Richard J. Durbin
United States Senate
Washington, DC 20510

AUG 1 6 2018

Dear Senator Durbin:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



The Honorable
Benjamin L. Cardin
United States Senate
Washington, DC 20510

AUG 16 2018

Dear Senator Cardin:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters

Mary K. Waters
Assistant Secretary
Legislative Affairs







# United States Senate
WASHINGTON, DC 20510

July 26, 2018

RECEIVED

2018 JUL 27 A 11: 46

LEGISLATIVE AFFAIRS

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street N.W.
Washington, DC 20520

Dear Secretary Pompeo:

We write with great alarm regarding the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation. We urge the State Department not to allow Defense Distributed to publish online blueprints for undetectable, three-dimensional ("3-D") printable firearms.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's determination that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for 3-D printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations (ITAR). Indeed, as recently as April 2018, the Trump administration filed a motion to dismiss the suit in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[1]

Despite the court's twice siding with the government's position, in a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing blueprints in any form. Specifically, the State Department has agreed to allow Defense Distributed to publish its blueprints by July 27, 2018 — by making a "temporary modification" of the United States Munitions List (USML) and granting Defense Distributed an "exemption" from ITAR regulations. The administration also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with the administration's previous position and is as dangerous as it is confounding. The settlement will allow these blueprints to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).

abroad. It also sets a dangerous precedent in defending against challenges to other legally sound determinations made by the State Department under the Arms Export Control Act and ITAR.

Yesterday, in response to questioning by Senator Markey before the Senate Foreign Relations Committee, you committed to reviewing the decision to allow Defense Distributed to publish its blueprints online. In accordance with this commitment, we ask that you suspend the special treatment given to Defense Distributed while you undertake this review.

In addition to suspending these actions, we ask that, prior to August 1, 2018, the State Department provide us with a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to such a dangerous outcome.

Specifically we request a response to the following questions:

1. Does the State Department no longer believe that the online publication of blueprints for the 3-D printing of firearms is a violation of federal export controls? If so, when did this reversal of opinion occur and why? Was there a change in the law or the facts that prompted this change? If so, please explain the change in either the law or facts that prompted the change.

2. On May 24, 2018, the State and Commerce Departments published proposed rules to amend Categories I, II, and III of the USML and transfer from the State Department to the Commerce Department oversight over export of certain firearms, ammunition, and related items. What role did the Defense Distributed litigation play in deciding to publish these proposed rules? What analysis, if any, did the State and Commerce Departments undertake to evaluate the potential risks of the proposed rules changes on export controls on the online publication of blueprints for 3-D printed firearms? If the State Department did evaluate the risks, what risks were identified? Please identify the individuals involved in that analysis.

3. If these proposed rules are finalized and jurisdiction over technical data related to the design, production, or use of semi-automatic or military-style firearms is transferred to the Commerce Department, the release into the public domain of instructions for printing 3-D firearms will be permissible. Does the State Department have concerns about the dangerous consequences of this rules change? Did the State Department make the Commerce Department aware of the litigation between it and Defense Distributed and the Second Amendment Foundation, the terms of the settlement, or the consequences of online publication of blueprints for 3-D printed firearms? If so, please identify to whom and how that information was conveyed.

4. Given the risks of the government abdicating control over the online publication of blueprints for 3-D printed firearms, why did the State Department agree to move forward with the rulemaking? How does the State Department plan to mitigate these risks?

5. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "draft and fully pursue . . . the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to the technical data that is the subject of the" litigation. Why did the State Department agree to this relief?

6. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department, "while the above-referenced final rule is in development," to announce "a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the" litigation, and to publish the announcement on the website of the Directorate of Defense Trade Controls on or before July 27, 2018. Why did the State Department agree to this relief? What will this temporary modification likely entail? Will the State Department put any restrictions on the types of 3D technical data that can be released to the public without prior U.S. government approval, including types of firearms, 3D printing, and materials, among other possible issues? Why did the State Department fail to provide 30 days' notice to the relevant congressional committees of its intention to remove Defense Distributed's "technical data" from the USML, as required by 22 U.S.C. § 2278(f)(1)?

7. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to issue "a letter to Plaintiffs on or before July 27, 2018 signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that [the 3-D printing files at issue in the litigation] are approved for public release (i.e., unlimited distribution) in any form and are exempt from the licensing requirements of ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)." Why did the State Department agree to this relief?

8. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "acknowledg[e] and agree[] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce[,] or otherwise benefit from the" 3-D printing files at issue in the litigation. Why did the State Department agree to this relief?

9. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to pay the Plaintiffs $39,581.00, reported to be for a portion of their legal fees. Please identify what funding source within the government this payment was drawn from. Additionally, please provide information regarding why the State Department agreed to this relief.

We are concerned about the immediate impact of publishing these 3-D gun blueprints. Once the State Department allows them to circulate freely online, the threats to U.S. and international security will be irreversibly increased. We urge you not to grant this special treatment to Defense

Distributed — but rather to postpone this action while you fulfill your commitment to review this decision, and until the above questions can be adequately addressed.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

Elizabeth Warren
United States Senator

Patrick Leahy
United States Senator

Richard J. Durbin
United States Senator

Benjamin L. Cardin
United States Senator





BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO               ROBERT MENENDEZ, NEW JERSEY
MARCO RUBIO, FLORIDA               BENJAMIN L. CARDIN, MARYLAND
RON JOHNSON, WISCONSIN             JEANNE SHAHEEN, NEW HAMPSHIRE
JEFF FLAKE, ARIZONA                CHRISTOPHER A. COONS, DELAWARE
CORY GARDNER, COLORADO             TOM UDALL, NEW MEXICO
TODD YOUNG, INDIANA                CHRISTOPHER MURPHY, CONNECTICUT
JOHN BARRASSO, WYOMING             TIM KAINE, VIRGINIA
JOHNNY ISAKSON, GEORGIA            EDWARD J. MARKEY, MASSACHUSETTS
ROB PORTMAN, OHIO                  JEFF MERKLEY, OREGON
RAND PAUL, KENTUCKY                CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member



United States Department of State

*Washington, D.C. 20520*

SEP 2 4 2018

The Honorable
Robert Menendez
United States Senate
Washington, DC 20510

Dear Senator Menendez:

In response to your letter regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain

firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Charles S. Faulkner
Acting Assistant Secretary
Legislative Affairs









The Honorable
Edward J. Markey
United States Senate
Washington, DC 20510

AUG 16 2018

Dear Senator Markey:

In response to your letter regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain

firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

*Mary K Waters*

Mary K. Waters
Assistant Secretary of State
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

AUG 16 2018

The Honorable
Bill Nelson
United States Senate
Washington, DC 20510

Dear Senator Nelson:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters

Mary K. Waters
Assistant Secretary
Legislative Affairs



The Honorable
Richard Blumenthal
United States Senate
Washington, DC 20510

AUG 16 2018

Dear Senator Blumenthal:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



The Honorable
Christopher S. Murphy
United States Senate
Washington, DC 20510

Dear Senator Murphy:

In response to your letter of July 26 regarding the settlement agreement with Defense
Distributed, the Department of State (Department) reached this settlement in consultation with
the Department of Justice and with careful consideration of the security and foreign policy
interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The
Department regulates the export of defense articles, including related manufacturing
technologies and information, as an integral part of safeguarding U.S. national security and
furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act
(AECA). The Department has never regulated the downloading or dissemination of CAD files
for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to
remember and understand the exclusive reason for the Department's involvement in this matter,
which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24,
2018—before the Department of State entered into a settlement agreement with Defense
Distributed—proposing to transfer oversight from the Department of State to the Department of
Commerce of exports of firearms and related items that do not provide the United States with a
critical military or intelligence advantage or, in the case of weapons, are not inherently for
military end use, including many items that are widely available in retail outlets in the United
States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the
Department briefed staff from Senate Foreign Relations Committee, Senate Committee on
Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the
proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to
modernize the U.S. export control regulations to create a simpler, more robust system that
improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over
firearms and related articles that are inherently for military end use or that are not otherwise
widely available in retail outlets. By contrast, the interagency, including the Department of
Defense, determined that certain firearms and related items that are widely available for
commercial sale, and technical data related to those items, are of a type that do not offer a critical
military or intelligence advantage to the United States, and therefore warrant export licensing
requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is
the subject of the *Defense Distributed* settlement agreement is technical data related to certain
firearms and other USML items that would transfer to the Department of Commerce under the
proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

*Mary K. Waters*

Mary K. Waters
Assistant Secretary
Legislative Affairs



The Honorable
Dianne Feinstein
United States Senate
Washington, DC 20510

Dear Senator Feinstein:

In response to your letter of July 26 regarding the settlement agreement with Defense
Distributed, the Department of State (Department) reached this settlement in consultation with
the Department of Justice and with careful consideration of the security and foreign policy
interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The
Department regulates the export of defense articles, including related manufacturing
technologies and information, as an integral part of safeguarding U.S. national security and
furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act
(AECA). The Department has never regulated the downloading or dissemination of CAD files
for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to
remember and understand the exclusive reason for the Department's involvement in this matter,
which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24,
2018—before the Department of State entered into a settlement agreement with Defense
Distributed—proposing to transfer oversight from the Department of State to the Department of
Commerce of exports of firearms and related items that do not provide the United States with a
critical military or intelligence advantage or, in the case of weapons, are not inherently for
military end use, including many items that are widely available in retail outlets in the United
States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the
Department briefed staff from Senate Foreign Relations Committee, Senate Committee on
Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the
proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to
modernize the U.S. export control regulations to create a simpler, more robust system that
improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over
firearms and related articles that are inherently for military end use or that are not otherwise
widely available in retail outlets. By contrast, the interagency, including the Department of
Defense, determined that certain firearms and related items that are widely available for
commercial sale, and technical data related to those items, are of a type that do not offer a critical
military or intelligence advantage to the United States, and therefore warrant export licensing
requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is
the subject of the *Defense Distributed* settlement agreement is technical data related to certain
firearms and other USML items that would transfer to the Department of Commerce under the
proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

The Honorable
Elizabeth Warren
United States Senate
Washington, DC 20510

AUG 16 2018

Dear Senator Warren:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

The Honorable
Patrick Leahy
United States Senate
Washington, DC 20510

AUG 16 2018

Dear Senator Leahy:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



The Honorable
Richard J. Durbin
United States Senate
Washington, DC 20510

AUG 16 2018

Dear Senator Durbin:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

The Honorable
Benjamin L. Cardin
United States Senate
Washington, DC 20510

AUG 16 2018

Dear Senator Cardin:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters

Mary K. Waters
Assistant Secretary
Legislative Affairs







# United States Senate

WASHINGTON, DC 20510

July 26, 2018

LEGISLATIVE AFFAIRS  2018 JUL 27  A 11:46  RECEIVED

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street N.W.
Washington, DC 20520

Dear Secretary Pompeo:

We write with great alarm regarding the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation. We urge the State Department not to allow Defense Distributed to publish online blueprints for undetectable, three-dimensional ("3-D") printable firearms.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's determination that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for 3-D printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations (ITAR). Indeed, as recently as April 2018, the Trump administration filed a motion to dismiss the suit in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[1]

Despite the court's twice siding with the government's position, in a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing blueprints in any form. Specifically, the State Department has agreed to allow Defense Distributed to publish its blueprints by July 27, 2018 — by making a "temporary modification" of the United States Munitions List (USML) and granting Defense Distributed an "exemption" from ITAR regulations. The administration also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with the administration's previous position and is as dangerous as it is confounding. The settlement will allow these blueprints to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).

abroad. It also sets a dangerous precedent in defending against challenges to other legally sound determinations made by the State Department under the Arms Export Control Act and ITAR.

Yesterday, in response to questioning by Senator Markey before the Senate Foreign Relations Committee, you committed to reviewing the decision to allow Defense Distributed to publish its blueprints online. In accordance with this commitment, we ask that you suspend the special treatment given to Defense Distributed while you undertake this review.

In addition to suspending these actions, we ask that, prior to August 1, 2018, the State Department provide us with a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to such a dangerous outcome.

Specifically we request a response to the following questions:

1. Does the State Department no longer believe that the online publication of blueprints for the 3-D printing of firearms is a violation of federal export controls? If so, when did this reversal of opinion occur and why? Was there a change in the law or the facts that prompted this change? If so, please explain the change in either the law or facts that prompted the change.

2. On May 24, 2018, the State and Commerce Departments published proposed rules to amend Categories I, II, and III of the USML and transfer from the State Department to the Commerce Department oversight over export of certain firearms, ammunition, and related items. What role did the Defense Distributed litigation play in deciding to publish these proposed rules? What analysis, if any, did the State and Commerce Departments undertake to evaluate the potential risks of the proposed rules changes on export controls on the online publication of blueprints for 3-D printed firearms? If the State Department did evaluate the risks, what risks were identified? Please identify the individuals involved in that analysis.

3. If these proposed rules are finalized and jurisdiction over technical data related to the design, production, or use of semi-automatic or military-style firearms is transferred to the Commerce Department, the release into the public domain of instructions for printing 3-D firearms will be permissible. Does the State Department have concerns about the dangerous consequences of this rules change? Did the State Department make the Commerce Department aware of the litigation between it and Defense Distributed and the Second Amendment Foundation, the terms of the settlement, or the consequences of online publication of blueprints for 3-D printed firearms? If so, please identify to whom and how that information was conveyed.

4. Given the risks of the government abdicating control over the online publication of blueprints for 3-D printed firearms, why did the State Department agree to move forward with the rulemaking? How does the State Department plan to mitigate these risks?

5. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "draft and fully pursue . . . the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to the technical data that is the subject of the" litigation. Why did the State Department agree to this relief?

6. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department, "while the above-referenced final rule is in development," to announce "a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the" litigation, and to publish the announcement on the website of the Directorate of Defense Trade Controls on or before July 27, 2018. Why did the State Department agree to this relief? What will this temporary modification likely entail? Will the State Department put any restrictions on the types of 3D technical data that can be released to the public without prior U.S. government approval, including types of firearms, 3D printing, and materials, among other possible issues? Why did the State Department fail to provide 30 days' notice to the relevant congressional committees of its intention to remove Defense Distributed's "technical data" from the USML, as required by 22 U.S.C. § 2278(f)(1)?

7. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to issue "a letter to Plaintiffs on or before July 27, 2018 signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that [the 3-D printing files at issue in the litigation] are approved for public release (i.e., unlimited distribution) in any form and are exempt from the licensing requirements of ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)." Why did the State Department agree to this relief?

8. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "acknowledg[e] and agree[] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce[,] or otherwise benefit from the" 3-D printing files at issue in the litigation. Why did the State Department agree to this relief?

9. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to pay the Plaintiffs $39,581.00, reported to be for a portion of their legal fees. Please identify what funding source within the government this payment was drawn from. Additionally, please provide information regarding why the State Department agreed to this relief.

We are concerned about the immediate impact of publishing these 3-D gun blueprints. Once the State Department allows them to circulate freely online, the threats to U.S. and international security will be irreversibly increased. We urge you not to grant this special treatment to Defense

Distributed — but rather to postpone this action while you fulfill your commitment to review this decision, and until the above questions can be adequately addressed.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

Elizabeth Warren
United States Senator

Patrick Leahy
United States Senator

Richard J. Durbin
United States Senator

Benjamin L. Cardin
United States Senator





JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

July 25, 2018

2018 JUL 26   A  7 46

LEGISLATIVE AFFAIRS

RECEIVED

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member



United States Department of State

*Washington, D.C. 20520*

SEP 24 2018

The Honorable
Robert Menendez
United States Senate
Washington, DC 20510

Dear Senator Menendez:

In response to your letter regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain

firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Charles S. Faulkner
Acting Assistant Secretary
Legislative Affairs







| **From:** | Matthew Borman [/O=CAIM/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MATTHEW S. BORMAN] |
|---|---|
| **Sent:** | 10/9/2019 9:00:39 PM |
| **To:** | Coppolino, Tony (CIV) [Tony.Coppolino@usdoj.gov] |
| **Subject:** | Read: Updated Commerce Cat I-III firearms rule with changes to address 3D printing of firearms for informal review (Please provide comments to COB on 10/4/19) |

Your message

| **To:** | Khawam, Joseph N; Minarich, Christine M; Timothy Mooney; Soskin, Eric (CIV); Robinson, Stuart J. (CIV); Myers, Steven A. (CIV); Koelling, Richard W; Memos, Nicholas; Foster, John A; Heidema, Sarah J; Coppolino, Tony (CIV) |
|---|---|
| **CC:** | Abraham, Liz; Matthew Borman; Richard Ashooh; Steven Clagett; Alexander Lopes; Hillary Hess; Karen NiesVogel; Jessica Curyto |
| **Subject:** | RE: Updated Commerce Cat I-III firearms rule with changes to address 3D printing of firearms for informal review (Please provide comments to COB on 10/4/19) |
| **Sent:** | 10/9/2019 8:55:44 PM |

| was read on | 10/9/2019 8:59:47 PM |
|---|---|

| **From**: | Matthew Borman [/O=CAIM/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MATTHEW S. BORMAN] |
|---|---|
| **Sent**: | 10/17/2019 4:01:59 PM |
| **To**: | Robinson, Stuart J. (CIV) [Stuart.J.Robinson@usdoj.gov] |
| **Subject**: | Read: RE: Updated Commerce Cat I-III firearms rule with changes to address 3D printing of firearms for informal review (Please review for clearance to send to OMB by COB on 10/17) |

Your message

| **To**: | Timothy Mooney; Coppolino, Tony (CIV); Khawam, Joseph N; Minarich, Christine M; Soskin, Eric (CIV); Myers, Steven A. (CIV); Koelling, Richard W; Memos, Nicholas; Foster, John A; Heidema, Sarah J |
|---|---|
| **CC**: | Abraham, Liz; Matthew Borman; Richard Ashooh; Steven Clagett; Alexander Lopes; Hillary Hess; Karen NiesVogel; Jessica Curyto; KLASON, PETER; Curtis, Deborah (Federal); JEST, JOE |
| **Subject**: | RE: Updated Commerce Cat I-III firearms rule with changes to address 3D printing of firearms for informal review (Please review for clearance to send to OMB by COB on 10/17) |
| **Sent**: | 10/17/2019 3:19:32 PM |

| was read on | 10/17/2019 4:01:59 PM |
|---|---|

| **From:** | Richard Ashooh [/O=CAIM/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=RICHARD ASHOOH2CB] |
| **Sent:** | 10/17/2019 4:20:03 PM |
| **To:** | Robinson, Stuart J. (CIV) [Stuart.J.Robinson@usdoj.gov] |
| **Subject:** | Read: RE: Updated Commerce Cat I-III firearms rule with changes to address 3D printing of firearms for informal review (Please review for clearance to send to OMB by COB on 10/17) |

Your message

| **To:** | Timothy Mooney; Coppolino, Tony (CIV); Khawam, Joseph N; Minarich, Christine M; Soskin, Eric (CIV); Myers, Steven A. (CIV); Koelling, Richard W; Memos, Nicholas; Foster, John A; Heidema, Sarah J |
| **CC:** | Abraham, Liz; Matthew Borman; Richard Ashooh; Steven Clagett; Alexander Lopes; Hillary Hess; Karen NiesVogel; Jessica Curyto; KLASON, PETER; Curtis, Deborah (Federal); JEST, JOE |
| **Subject:** | RE: Updated Commerce Cat I-III firearms rule with changes to address 3D printing of firearms for informal review (Please review for clearance to send to OMB by COB on 10/17) |
| **Sent:** | 10/17/2019 3:19:32 PM |

| was read on | 10/17/2019 4:20:03 PM |

| | |
|---|---|
| **From**: | Matthew Borman [/O=CAIM/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MATTHEW S. BORMAN] |
| **Sent**: | 10/18/2019 12:17:24 AM |
| **To**: | Coppolino, Tony (CIV) [Tony.Coppolino@usdoj.gov] |
| **Subject**: | Read: Updated Commerce Cat I-III firearms rule with changes to address 3D printing of firearms for informal review (Please review for clearance to send to OMB by COB on 10/17) |

Your message

| | |
|---|---|
| **To**: | Koelling, Richard W; Timothy Mooney; Khawam, Joseph N; Robinson, Stuart J. (CIV); Minarich, Christine M; Soskin, Eric (CIV); Myers, Steven A. (CIV); Foster, John A; Heidema, Sarah J |
| **CC**: | Abraham, Liz; Matthew Borman; Richard Ashooh; Steven Clagett; Alexander Lopes; Hillary Hess; Karen NiesVogel; Jessica Curyto; KLASON, PETER; Curtis, Deborah (Federal); JEST, JOE; Miller, Michael F; Kovar, Jeffrey D |
| **Subject**: | RE: Updated Commerce Cat I-III firearms rule with changes to address 3D printing of firearms for informal review (Please review for clearance to send to OMB by COB on 10/17) |
| **Sent**: | 10/17/2019 8:50:37 PM |

| | |
|---|---|
| was read on | 10/18/2019 12:16:36 AM |

**From:** Gary Stanley [gstanley@glstrade.com]
**Sent:** 10/28/2019 1:11:02 PM
**To:** Richard Ashooh [Richard.Ashooh@bis.doc.gov]
**Subject:** Defense and Export-Import Update (Oct. 28, 2019)



**CUSTOMS COMPLIANCE INDUSTRY EXCHANGE**
NOVEMBER 20 - 21, 2019 WASHINGTON PLAZA, WASHINGTON, DC

**Dear All,**

**Good Day!**

**Gary Stanley's Export Control Tip of the Day:** A a foreign person may make a self-determination of an item's jurisdictional and classification status. Indeed, a foreign person is obligated to know whether an item is subject to the ITAR or, if subject to the EAR, how it is classified before reexporting or transferring the item in order to ensure compliance with the ITAR's and the EAR's licensing and other obligations. The U.S. exporter is responsible for determining the jurisdictional and classification status of the items it is exporting. However, if reliable jurisdictional and classification information has not already been provided by another party, such as the original equipment manufacturer, then the foreign person may and, indeed, must make these determinations itself in order to avoid violating the ITAR or the EAR if it later reexports or retransfers the article or item. As a matter of due diligence, however, the foreign person should seek jurisdictional and classification information from the manufacturer of the items or the owner of the technology in question and resolve any potential differences in interpretation. If after reviewing the ITAR's U.S. Munitions List (USML) and all relevant facts, doubt exists regarding whether the item is enumerated or otherwise described on the USML, the foreign person should request from DDTC a commodity jurisdiction determination pursuant to 22 C.F.R. § 120.4. If the item is clearly not enumerated or otherwise described on the USML and, after reviewing the EAR and all relevant facts, there is doubt regarding whether or where the item is enumerated or otherwise described on the EAR's Commerce Control List, then the foreign person should request from the Department of Commerce's Bureau of Industry and Security a commodity classification determination pursuant to 15 C.F.R. § 748.3.

**Today's Items:**

1. **DDTC Seeks Public Comment on Electronic Form for Voluntary Disclosures**

2. **BIS Issues Order Denying Export Privileges of Alexis Vlachos of Montréal**

3. **Columbus Man Sentenced to Prison for Illegally Exporting Goods to Iran**

4. **Treasury and State Announce New Humanitarian Mechanism to Increase Transparency of Permissible Trade Supporting the Iranian People**

5. **OFAC Publishes General Licenses Relating to Iran and Venezuela**

6. **President Trump Continues National Emergency With Respect to the Democratic Republic of the Congo**

7. **EU Commission Opens Registration for 2019 Export Control Forum**

8. **UK Government's OFSI Updates Post Brexit - Russia Guidance**

9. **USTR Grants Certain Requests for Exclusion from Additional Duties on Certain Chinese Products**

10. **USTR Publishes Exclusion Request Schedule on Additional Chinese Products Subject to Increased Tariffs**

11. **USTR Seeks Applications for Inclusion on the Binational Panels Roster Under the North American Free Trade Agreement**

12. **EXIM Bank Advisory Committee and Sub-Saharan Africa Advisory Committee to Meet Oct. 30**

13. **Commerce/ITA's Civil Nuclear Trade Advisory Committee to Meet Nov. 12**

14. **Homeland Security Advisory Committee to Meet Nov. 14**

15. **Commerce/ITA's Environmental Technologies Trade Advisory Committee to Meet Nov. 19**

16. **U.S. Government Contracting**

17. **U.S. Customs and U.S. Census/AES Updates**

18. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**

19. **GAO and CRS Reports, Testimony, and Correspondence of Interest**

20. **U.S. Government Trade Forms and Other Information Collections Open for Public Comment**

**Other Headlines**

21. **This Week in Congress: New Worries About the NDAA**

22. **Beijing Woos U.S. and Other Foreign Companies as Trade War Takes Toll**

23. **Amazon or Microsoft? DoD Picks a Winner for Its Controversial JEDI Contract**

24. **Key Dates Leading Up to the U.S. Pentagon's Cloud-Computing Award to Microsoft**

25. **Hypersonics Pitch Day: Air Force Woos Startups**

26. **Pentagon, With an Eye on China, Pushes for Help From American Tech**

27. **Air Force Halts Funding for Boeing's bBallistic Missile Replacement**

28. **Analysts Predict Counterdrone Market Will Top $2B**

29. **Uphill Sledding for EOD Funding**

30. **FTC Investigates Northrop: GBSD?**

31. **How the Army Will Use Satellites to Track Land Threats in Real Time**

32. **Does Major Joint Military Procurement Really Work in the Baltics?**

33. **Opinion: Is 3-D Printing the Future of Terrorism?**

34. **Opinion: US-China Competition: The Coming Decoupling? – Analysis**

**Upcoming Export Control and Other Trade Compliance Conferences**

## 1. DDTC Seeks Public Comment on Electronic Form for Voluntary Disclosures

(84 Fed. Reg. 57801) - The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) is seeking public comment on its electronic form DS-7787 - "Disclosure of Violations of the Arms Export Control Act." interested persons have until November 27, 2019, to submit their comments.

## 2. BIS Issues Order Denying Export Privileges of Alexis Vlachos of Montréal

The U.S. Department of Commerce's Bureau of Industry and Security (BIS) has issued an Order Denying Export Privileges to Alexis Vlachos of Montréal, Québec, Canada, until September 4, 2025. On September 4, 2018, in the U.S. District Court for the District of Vermont, Alexis Vlachos ("Vlachos") was convicted of violating Section 38 of the Arms Export Control Act (22 U.S.C. § 2778 (2012)) ("AECA"). Vlachos was convicted of violating Section 38 of the AECA by knowingly and willfully exporting and causing to be exported from the United States to Canada firearms that were designated as defense articles on the United States Munitions List, without the required U.S. Department of State licenses. Vlachos was sentenced to fifty-one (51) months in prison and an assessment of $200.

## 3. Columbus Man Sentenced to Prison for Illegally Exporting Goods to Iran

The U.S. Department of Justice (DOJ) has announced that Behrooz Behroozian, 64, Columbus, Ohio, has been sentenced to 20 months in prison for exporting gas and oil pipeline parts to Iran for more than a decade in deliberate violation of a U.S. embargo and trade sanctions. According to the sentencing memorandum filed in this case, Behroozian used an intermediary company, Sumar Industrial Equipment, to attempt to cover-up that he was illegally supplying industrial equipment to Iran in violation of the Emergency Economic Powers Act (IEEPA). Behroozian exported manifolds, valves and connectors used for industrial pipelines in the gas and oil refinement industry to Iran via Sumar and profited $35,000 to $40,000 per year. This violated embargo and trade sanctions imposed upon Iran by the United States in May 1995. In November 2006, Behroozian became the owner and operator of a computer parts supplier in Dublin, Ohio, called Comtech International. Comtech had no storefront and made no domestic sales. It seldom exported computer parts. Instead, Comtech primarily exported industrial equipment to Sumar in the United Arab Emirates for further exportation to Iran.

## 4. Treasury and State Announce New Humanitarian Mechanism to Increase Transparency of Permissible Trade Supporting the Iranian People

The U.S. Departments of the Treasury and State has announced a new humanitarian mechanism to ensure unprecedented transparency into humanitarian trade with Iran. This mechanism will help the international community perform enhanced due diligence on humanitarian trade to ensure that funds associated with permissible trade in support of the Iranian people are not diverted by the Iranian regime. Concurrently, Treasury's Financial Crimes Enforcement Network (FinCEN) identified Iran as a jurisdiction of primary money

laundering concern under Section 311 of the USA PATRIOT Act, and issued a new rulemaking to protect the U.S. financial system from malign Iranian financial activities. The humanitarian mechanism will require foreign governments and financial institutions that choose to participate in the mechanism to conduct enhanced due diligence and provide to Treasury a substantial and unprecedented amount of information, with appropriate disclosure and use restrictions, on a monthly basis, as described in guidance provided by OFAC outlining specific requirements.

## 5. OFAC Publishes General Licenses Relating to Iran and Venezuela

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has taken the following actions:

• Issued General License K "Authorizing Maintenance or Wind Down of Transactions Involving Cosco Shipping Tanker (Dalian) Co., Ltd."

• Amended General License 5A "Authorizing Certain Transactions Related to the Petróleos de Venezuela, S.A. 2020 8.5 Percent Bond on or After January 22, 2020." In conjunction with this action, OFAC is amending Frequently Asked Question 595.

## 6. President Trump Continues National Emergency With Respect to the Democratic Republic of the Congo

(84 Fed. Reg. 56927) - In accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), President Donald J. Trump is continuing for 1 year the national emergency with respect to the situation in or in relation to the Democratic Republic of the Congo declared in Executive Order 13413, as amended by Executive Order 13671.

## 7. EU Commission Opens Registration for 2019 Export Control Forum

The European Commission and the Finnish Presidency of the Council are inviting representatives from EU Member States and the European Parliament, industry and civil society to participate in the 2019 Export Control Forum. The 2019 Export Control Forum will provide an opportunity to review ongoing export control implementation and latest developments in the EU, as well as to discuss the future of EU and global international export controls. The 2019 Export Control Forum will be opened by representatives of the Commission, the Presidency and the European Parliament, and will convene selected panels of experts, to be followed by open dialogue with the stakeholders.

• Date: 13 December 2019

• Venue: Albert Borschette Conference Centre (CCAB) Room 0A. Rue Froissart 36, Brussels

• Time: 10:00 – 17:00. Registration will be open at 9:30.

• Registration: Please register via the online registration tool. The deadline for registration is 1 December 2019.

## 8. UK Government's OFSI Updates Post Brexit - Russia Guidance

The U.K. Government's Office of Financial Sanctions Implementation (FSI) has updated its guidance on the financial and investment restrictions in the Russia sanctions regime should

the UK leave the EU without a deal. This guidance does not currently apply and would only come in to effect if the UK leaves the EU without a deal and when the Russia (Sanctions) (EU Exit) Regulations 2019 come into force. This is therefore for information only at this stage.

## 9. USTR Grants Certain Requests for Exclusion from Additional Duties on Certain Chinese Products

(84 Fed. Reg. 57803) - In September 2018, the U.S. Trade Representative imposed additional duties on goods of China with an annual trade value of approximately $200 billion as part of the action in the Section 301 investigation of China's acts, policies, and practices related to technology transfer, intellectual property, and innovation. The U.S. Trade Representative initiated a product exclusion process in June 2019, and interested persons have submitted requests for the exclusion of specific products. This notice announces the U.S. Trade Representative's determination to grant certain exclusion requests, as specified in the annex to this notice. The product exclusions announced in this notice will apply as of the September 24, 2018, effective date of the $200 billion action, to August 7, 2020.

## 10. USTR Publishes Exclusion Request Schedule on Additional Chinese Products Subject to Increased Tariffs

(84 Fed. Reg. 57144) - In a notice published at 84 Fed. Reg. 43304 (Aug. 20, 2019), the U.S. Trade Representative announced that the Office of the U.S. Trade Representative (USTR) would establish a process by which U.S. stakeholders may request an exclusion from additional duties of particular products classified within a tariff subheading covered by the August 2019 action. This notice announces that USTR will open an electronic portal for submission of exclusion requests on October 31, 2019 for products covered by Annex A of the August 2019 action, and sets out the specific procedures for submitting requests.

• October 31, 2019 at noon EDT: The web portal for submitting exclusion requests--https://exclusions.USTR.gov--will open.

• January 31, 2020 at 11:59 PM EST: Last day for submitting exclusion requests.

• Responses to individual exclusion requests are due 14 days after USTR posts the request on the online portal.

• Any replies to responses to an exclusion request are due the later of 7 days after the close of the 14-day response period, or 7 days after the posting of a response.

## 11. USTR Seeks Applications for Inclusion on the Binational Panels Roster Under the North American Free Trade Agreement

(84 Fed. Reg. 57152) - The North American Free Trade Agreement (NAFTA) provides for the establishment of a roster of individuals to serve on binational panels convened to review final determinations in antidumping or countervailing duty (AD/CVD) proceedings and amendments to AD/CVD statutes of a NAFTA Party. The United States annually renews its selections for the roster. The Office of the United States Trade Representative (USTR) invites applications from eligible individuals wishing to be included on the roster for the period April

1, 2020, through March 31, 2021. USTR must receive your application by November 29, 2019.

## 12. EXIM Bank Advisory Committee and Sub-Saharan Africa Advisory Committee to Meet Oct. 30

(84 Fed. Reg. 56810) - The Export-Import Bank of the United States (EXIM) as announced that its advisory committee and its Sub-Saharan Africa Advisory Committee will meet Wednesday, October 30, 2019, 11:00 AM to 2:30 PM EDT, at 811 Vermont Avenue NW, Room 1126, Washington, DC 20571. If you plan to attend, a photo ID must be presented at the guard's desk as part of the clearance process into the building, you may contact India Walker at external@exim.gov to be placed on an attendee list. Discussion of EXIM programs and comments for inclusion in the report on competitiveness of the Export-Import Bank of the United States to Congress.

## 13. Commerce/ITA's Civil Nuclear Trade Advisory Committee to Meet Nov. 12

(84 Fed. Reg. 57699) - The U.S. Department of Commerce's International Trade Administration (ITA) has announced that its Civil Nuclear Trade Advisory Committee will meet in open sessionTuesday, November 12, 2019, 3:00 PM to 4:00 PM EST, at the U.S. Department of Commerce, Herbert C. Hoover Building, Commerce Research Library, 1401 Constitution Ave. NW, Washington, DC 20230. Requests to register to participate (including to speak or for auxiliary aids) and any written comments should be submitted to: Mr. Devin Horne, Office of Energy & Environmental Industries, International Trade Administration, Room 28018, 1401 Constitution Ave. NW, Washington, DC 20230. (Fax: 202-482- 5665; email: devin.horne@trade.gov). Members of the public are encouraged to submit registration requests and written comments via email to ensure timely receipt.

## 14. Homeland Security Advisory Committee to Meet Nov. 14

(84 Fed. Reg. 56828) - The U.S. Department of Homeland Security's Office of Partnership and Engagement has announced that the Homeland Security Advisory Council will meet in open session Thursday, November 14, 2019, 1:45 PM to 3:30 PM EST, in the Town Hall at the Transportation Security Administration, 601 S 12th Street (East Building), Arlington, VA 20598. The Council will swear in new members, and review and deliberate on reports from the Families and Children Care Panel, Emerging Technologies, Prevention of Targeted Violence Against Faith- based Communities, and State, Local, Tribal, and Territorial Cybersecurity subcommittees. Following this, there will be a break for public commentary.

## 15. Commerce/ITA's Environmental Technologies Trade Advisory Committee to Meet Nov. 19

(84 Fed. Reg. 57698) - The U.S. Department of Commerce's International Trade Administration (ITA) has announced that its Environmental Technologies Trade Advisory Committee (ETTAC) will meet Tuesday, November 19, 2019, 8:45 AM to 3:30 PM EST, in the Research Library at the U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230. Those interested in attending must provide notification by Friday, November 8, at 5:00 PM EST. To register and obtain call-in information, submit comments, or request auxiliary aids, please contact: Ms. Amy Kreps, Office of Energy & Environmental

Industries (OEEI), International Trade Administration, Room 28018, 1401 Constitution Avenue NW, Washington, DC 20230 or email: amy.kreps@trade.gov. The ETTAC will receive briefings from ITA as well as the interagency and will discuss its priorities and objectives for potential recommendations to the interagency through the Secretary of Commerce. Topics to be considered during the afternoon subcommittee breakout sessions will fall under the three themes of Trade Policy and Trade Negotiations, Trade Promotion and Export Market Development, and Cooperation on Standards, Certifications and Regulations.

## 16. U.S. Government Contracting

- DoD, GSA & NASA/Federal Acquisition Regulation (FAR): OMB Information Collection Submission - Patents - Deadline for Public Comment: Dec. 23, 2019

- DoD/Office of the Under Secretary of Defense for Acquisition and Sustainment: OMB Information Collection Submission - Department of Defense Application for Priority Rating for Production or Construction Equipment - Agency Form No.: DD Form 691 - Deadline for Public Comment: Nov. 25, 2019

- DoD/Defense Logistics Agency (DLA): OMB Information Collection Submission - ASSIST Database - Deadline for Public Comment: Nov. 25, 2019

- GSA: Notice of Announcement of Industry Engagement Event - GSA is hosting an industry engagement event on Wednesday, November 6, 2019, from 9:00 AM to 11:00 AM EST, at the Department of Interior (DOI) Yates Auditorium at 1849 C St. NW, Washington, DC 20240k, to highlight how section 889 of Title VII of the NDAA for FY 2019 (hereinafter Sec. 889) will affect GSA's business and supply chain.

## 17. U.S. Customs and U.S. Census/AES Updates

- U.S. Customs - CSMS #40363706 - ACE CERTIFICATION CQ Deployment Thursday morning, Oct 24, 2019 at 0630 ET

- U.S. Customs - CSMS #40371652 - Food and Drug Administration (FDA) New Center for Tobacco (CTP) Product Subclass Code

- U.S. Customs - CSMS #40373287 - Trade Policy Update for Drawback: Trade Facilitation and Trade Enforcement Act (TFTEA) Combination Privilege Application

- U.S. Customs - CSMS #40386416 - ACE PROD AND CERT EXTENDED Scheduled Maintenance this weekend, Sat. Oct 26, 2019@ 2100 ET to 0400 ET Sun. Oct 27

- U.S. Customs - CSMS #40389928 - Update for the Automated Commercial Environment (ACE) Collections Release 1 – PZ Output Release Date

- U.S. Census - Tips on How to Resolve AES Response Messages

| Fatal Error Response Code: 068 | **Narrative:** SRN on File; Action Not Allowed |
| | **Severity:** Fatal |
| | **Reason: The Shipment is not on file in AES, therefore the requested action is not allowed.** |
| | **Resolution:** When the Shipment Filing Action Request Indicator is a Change, Replace, or X for Cancel, the Shipment Reference Number must exist on a previous filing in AES for the filer. |
| | Verify the Shipment Filing Action Request Indicator and the Shipment Reference Number, correct the shipment and resubmit. |
| Fatal Error Response Code: 808 | **Narrative:** Improbable Destination for Commodity |
| | **Severity:** Verify |
| | **Reason:** For the reported Schedule B/HTS Number, the Country of Destination Code is improbable. |
| | **Resolution:** Certain products are highly unlikely to be exported to certain Countries of Destination based on historical data and industry input. This might indicate either a keying error or misclassification of the product. |
| | Verify the Schedule B/HTS Number and Country of Destination Code, correct the shipment and resubmit (if necessary). If the information is verified correct as reported, no action is necessary. |

## 18. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

• Commerce/E&C - Certain Amorphous Silica Fabric From the People's Republic of China: Rescission of Countervailing Duty Administrative Review; 2018

• Commerce/E&C - Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017

• Commerce/E&C - Certain Large Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Over 4.5 Inches) From Japan: Rescission of Antidumping Duty Administrative Review: 2018-2019

• Commerce/E&C - Certain Small Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Under 4.5 Inches) From Japan: Rescission of Antidumping Duty Administrative Review: 2018-2019

• Commerce/E&C - Certain Uncoated Paper From Brazil: Final Results of Antidumping Duty Administrative Review; 2017-2018

- Commerce/E&C - Fresh Tomatoes From Mexico: Final Determination of Sales at Less Than Fair Value Pages 57401 - 57403 [FR DOC #2019-23341]

- Commerce/E&C - High Pressure Steel Cylinders From the People's Republic of China: Rescission of Countervailing Duty Administrative Review: 2018

- Commerce/E&C - Mattresses From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part

- Commerce/E&C - Refillable Stainless Steel Kegs From Germany: Final Affirmative Determination of Sales at Less Than Fair Value

- Commerce/E&C - Refillable Stainless Steel Kegs From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part

- Commerce/E&C - Refillable Stainless Steel Kegs From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part

- Commerce/E&C - Stainless Steel Flanges From the People's Republic of China: Rescission of Countervailing Duty Administrative Review; 2019

- Commerce/E&C - Vertical Metal File Cabinets From the People's Republic of China: Final Determination of Sales at Less Than Fair Value

- Commerce/E&C - Vertical Metal File Cabinets From the People's Republic of China: Final Affirmative Countervailing Duty Determination

- USITC - USITC Releases Report on MTB Effects - This report provides a broad assessment of the economic effects of duty suspensions and reductions on U.S. producers, purchasers, and consumers, as well as case studies looking at the effects on groups of products covered by the Miscellaneous Tariff Bill Act of 2018. The report also includes recommendations from interested parties with respect to those domestic industry sectors that might benefit from permanent duty suspensions or reductions, with a particular focus on inequities created by tariff inversions. Much of the information in this report comes from a survey conducted by the Commission after the duty suspensions and reductions became effective.

- USITC - USITC Releases The Year in Trade 2018

- USITC - Certain Microfluidic Systems and Components Thereof and Products Containing Same: Commission Determination To Review in Part a Final Initial Determination Finding a Violation of Section 337 and To Extend the Target Date; Schedule for Filing Written Submissions

- USITC - Certain Semiconductor Devices, Integrated Circuits, and Consumer Products Containing the Same: Commission Determination Not To Review an Initial Determination Terminating the Investigation Based on a Settlement Agreement and a Withdrawal of the Complaint; Termination of the Investigation

- USITC - Certain Shaker Screens for Drilling Fluids, Components Thereof, and Related Marketing Materials: Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

- USITC - Fresh Tomatoes From Mexico: Continuation of the Final Phase of an Antidumping Duty Investigation and Revised Schedule

- USITC - Wooden Cabinets and Vanities From China: Scheduling of the Final Phase of Countervailing Duty and Anti-Dumping Duty Investigations

- USITC - Government in the Sunshine Act Meeting Notice - October 31, 2019, 11:00 AM EDT

## 19. GAO and CRS Reports, Testimony, and Correspondence of Interest

- CRS - Brexit: Status and Outlook

- CRS - The European Parliament and U.S. Interests

- CRS - The Changing Landscape of Immigrant Investment Programs

- CRS - Australia

## 20. U.S. Government Trade Forms and Other Information Collections Open for Public Comment

(84 Fed. Reg. 57054) - Agency: U.S. Dept. of Justice/Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) - Title: Informant Agreement - Agency Form No.: ATF Form 3252.2 - Type of Review: New Collection - Deadline for Public Comment: Dec. 23, 2019

## Other Headlines

## 21. This Week in Congress: New Worries About the NDAA

MiltiaryTimes.com, Oct. 28 - Senate Armed Services Committee officials this week will release a "skinny" defense authorization bill plan as lawmakers grow increasingly pessimistic about the possibility of reaching a compromise on a host of disputed issues with the massive military policy bill. Committee Chairman Jim Inhofe, R-Okla., said last week that the move is designed to ensure that a host of necessary items — including numerous military specialty pay authorizations — are passed by the end of the year. But a day later, House Armed Services Chairman Adam Smith, D-Wash., said a stripped-down version of the measure wouldn't solve all of lawmakers' problems. Negotiations on the broader measure have stalled

in recent weeks as Democrats and Republicans have fought over military construction money used for President Donald Trump's controversial border wall project.

## 22. Beijing Woos U.S. and Other Foreign Companies as Trade War Takes Toll

WSJ.com, Oct. 27 - China has stepped up its charm offensive to attract U.S. and other foreign companies in recent weeks, seeking to offset the debilitating impact of the trade war while still exchanging blistering comments with Washington. The country's premier, Li Keqiang, has wooed foreign companies with noticeable enthusiasm this month, telling a roundtable of Western executives, for example, that global manufacturing enterprises are welcome to seize opportunities as China opens up further. The move suggests a growing realization of the trade war's toll on the Chinese economy and on U.S. companies' willingness to invest in China. It also reflects a recognition that foreign companies are key to achieving Chinese leaders' ambitions for both growth and technological advancement. The pursuit of foreign investors comes as the Communist party elite sits down Monday for its first top policy-setting meeting, or plenum, since early last year, during which leaders will discuss their next five-year economic blueprint, according to Chinese officials involved in policy making.

## 23. Amazon or Microsoft? DoD Picks a Winner for Its Controversial JEDI Contract

DefenseNews.com, No. 26 - Microsoft won the contract for the Department of Defense's enterprise cloud, potentially worth $10 billion over 10 years, the Pentagon announced Oct. 25. The tech giant won the award over Amazon Web Services, just three days after Secretary of Defense Mark Esper recused himself from the award after months of review because his son worked for IBM. Amazon was widely considered by industry to be the front runner for the award. The JEDI contract process continues to be under investigation by the DoD inspector general and stuck in federal court. The Pentagon plans to move 80 percent of its systems over to the Joint Enterprise Defense Infrastructure cloud, better known as JEDI. The cloud will contain both unclassified and classified data. In a statement, DoD CIO Dana Deasy heralded the contract award as a win for the war fighter. "The National Defense Strategy dictates that we must improve the speed and effectiveness with which we develop and deploy modernized technical capabilities to our women and men in uniform," DoD Chief Information Officer Dana Deasy said. "The DoD Digital Modernization Strategy was created to support this imperative. This award is an important step in execution of the Digital Modernization Strategy."

## 24. Key Dates Leading Up to the U.S. Pentagon's Cloud-Computing Award to Microsoft

Reuters.com, Oct. 27 - Microsoft Corp has won the U.S. Pentagon's $10 billion cloud-computing contract, the Defense Department said on Friday, beating out favorite Amazon.com Inc. The contract, called the Joint Enterprise Defense Infrastructure Cloud, or JEDI, is part of a broad modernization of the Pentagon's information technology systems. Here is a timeline of important dates leading up to the award.

## 25. Hypersonics Pitch Day: Air Force Woos Startups

BreakingDefense.com, Oct. 25 - Hypersonics and "pitch days," two of the hottest concepts at the Air Force right now, will come together for the first time Nov. 7. Air Force experts will judge products and ideas from startup firms related to solving key challenges to hypersonic flight, such as Mach 5-plus propulsion and new materials that can withstand extremely high temperatures. Lt. Gen. Duke Richardson, military deputy to Air Force acquisition czar Will Roper, will oversee the panel of judges who pick the winner of a same-day contract of up to $750,000 to jumpstart their work, according to an Oct. 18 announcement from Air Force Materiel Command's 96th Test Wing. The pitch day will be held at the Doolittle Institute in Niceville, Fla. "Fielding hypersonic weapons is a top priority for our warfighters. The Air Force is leading the way, and we can use all the help we can get from innovative companies," Richardson said. "That's one reason why this pitch day is so exciting."

## 26. Pentagon, With an Eye on China, Pushes for Help From American Tech

NYTimes.com, Oct. 25 - Pentagon officials have been holding private discussions with tech industry executives to wrestle with a key question: how to ensure future supplies of the advanced computer chips needed to retain America's military edge. The talks, some of which predate the Trump administration, recently took on an increased urgency, according to people who were involved or briefed on the discussions. Pentagon officials encouraged chip executives to consider new production lines for semiconductors in the United States, said the people, who declined to be identified because the talks were confidential. The discussions are being driven by the Pentagon's increased dependence on chips made abroad, especially in Taiwan, as well as recent tensions with China, these people said. One chip maker, the Taiwan Semiconductor Manufacturing Company, better known as TSMC, plays a particularly crucial role producing commercial chips that also have applications for aircraft, satellites, drones and wireless communications. And because of unrest over the past few months in the semiautonomous Chinese territory of Hong Kong, some Pentagon officials and chip executives have wondered about situations that could force suppliers in Taiwan to limit or cut off silicon shipments, the people said.

## 27. Air Force Halts Funding for Boeing's bBallistic Missile Replacement

WashingtonPost.com, Oct. 22 - The Air Force has halted funding for Boeing's $349 million ballistic missile development effort, effectively clearing the way for a Northrop Grumman-led team to become the only bidder for one of the Pentagon's most expensive weapons production programs. The move is an apparent response to Boeing's recent announcement that it will drop out of the Ground Based Strategic Deterrent program, an $85 billion project to replace the nation's Minuteman III ballistic missiles. The Defense Department appears unwilling to pay Boeing to develop a next-generation ballistic missile when the company is refusing to submit that missile for review. A Boeing representative said the company is disappointed in the Air Force's decision not to allot more funding for its missile.

## 28. Analysts Predict Counterdrone Market Will Top $2B

C4ISRNet.com, Oct. 28 - The three biggest obstacles facing the counterdrone market are the law, the nature of the threat, and the technology itself. In fairness, those are obstacles to the adoption of most any national security technology. A new analysis by investment consultants Frost & Sullivan tackles the counterdrone market, an area of high interest, no

consensus, and much proverbial snake oil. The report projects a counterdrone market whose revenues will exceed $2 billion by 2024. What legal obstacles counterdrone systems face depend on how, exactly, the equipment works to stop a drone. "Adoption of these [counterdrone] technologies is limited by individual country rules against wiretapping, jamming, and computer hacking — all methods employed by various C-UAS," said Michael Blades of Frost & Sullivan.

## 29. Uphill Sledding for EOD Funding

NationalDefenseMagazine.org, Oct. 28 - Once a high-profile mission set, the military's explosive ordnance disposal community is now receiving less attention — and less money — from lawmakers. Just a decade ago, policymakers were pumping billions of dollars annually into initiatives to counter improvised explosive devices that were being used to target U.S. troops overseas. The film "The Hurt Locker," about a fictional EOD team operating in Iraq, won an Oscar for Best Picture. But times have changed. "We became very well publicized and we became a very big thing during the height of the IED years," noted Maj. Daniel Long with the Air Force's congressional liaison office. "As we've withdrawn out of Iraq, as Afghanistan starts to pull down, I don't know that we normally get the same amount of attention that we have previously, which is frankly a bit of a problem" because of the ongoing threat, he said at the National Defense Industrial Association's Global EOD Symposium and Exhibition. Between 2006 and 2009, the Joint Improvised Explosive Device Defeat Organization received more than $16 billion, according to the Government Accountability Office. By 2015, the renamed Joint Improvised-Threat Defeat Organization was receiving less than $600 million annually, and its budgets have remained relatively flat since then.

## 30. FTC Investigates Northrop: GBSD?

BreakingDefense.com, Oct. 24 - The Federal Trade Commission appears to be investigating whether Northrop Grumman acted in restraint of trade and violated an order requiring the company to sell its solid motor rocket engines on "a non-discriminatory basis to all competitors for missile contracts." Northrop disclosed the investigation today in its quarterly report: "In October 2019, the company received a civil investigative demand from the FTC requesting certain information relating to a potential issue of the company's compliance with the Order in connection with a pending strategic missile competition. The company is working to respond to the request. We believe the company has been and continues to be in full compliance with the Order, but we cannot predict any potential impact on the pending competition." Now, that does not make clear that the FTC is looking at the Ground Based Strategic Deterrent (GBSD), but there aren't a lot of other candidates for "a strategic missile competition" and it refers to an "Order."

## 31. How the Army Will Use Satellites to Track Land Threats in Real Time

C4ISRNet.com, Oct. 25 - The Army has needs. One of those needs is the ability to track and target land threats that are beyond the war fighters' line of sight. Though much of the focus on space sensing capabilities is directed at missile defense or space situational awareness, the ability to see time-sensitive ground threats like tanks beyond the line of sight of ground forces is essential for the war fighter. To help build this capability, the Army is teaming with the Space Development Agency on a space-based sensor layer dedicated to deep targeting

that can feed information to the war fighter on the ground in real time. The SDA is actually developing a trio of sensing capabilities in space: a layer dedicated to tracking hypersonic weapons and ballistic missiles; a layer dedicated to space situational awareness and investigating objects in cislunar orbit; and a layer dedicated to detecting and maintaining custody of time-sensitive ground threats.

## 32. Does Major Joint Military Procurement Really Work in the Baltics?

DefenseNews.com, Oct. 28 - On paper, the Baltic nations appear to have closely aligned defense modernization needs that make the joint procurement of advanced military equipment a no-brainer. After all, Latvia, Estonia and Lithuania have historically shared national interests, are currently facing a similar threat from Russia and each have relatively small defense budgets. Joint procurement would drive down costs for large defense articles by allowing the smaller Baltic nations to buy in greater numbers. It would also allow the countries to share maintenance responsibilities, which would save money. And it would drive greater interoperability in countering an adversary's simultaneous attack all three nations. But then there's the reality of the situation. "I think there are many misperceptions on Baltic integration," Janis Garisons, state secretary for the Latvian Ministry of Defence, told Defense News during a September visit to Washington. "I think this is a little bit of a wrong perception that there is a lot of added value in those common procurements."

## 33. Opinion: Is 3-D Printing the Future of Terrorism?

WSJ.com, Oct. 25 - On Oct. 9, a gunman tried to massacre worshipers on Yom Kippur at a synagogue in Halle, Germany, and crossed a new threshold: It was the first time a terrorist perpetrated a deadly attack with homemade weapons using 3-D-printed components—including a 3-D-printed gun. Instead of the slaughter the gunman had hoped for, he killed two people—in part because he couldn't get past a locked synagogue door, in part because what he called his "improvised guns" jammed or failed to fire. But the Halle attack shouldn't be dismissed as a macabre flop. The killer was interested not just in murder but in inspiration. In an online manifesto that German authorities have confirmed he wrote, the gunman styled himself a pioneer on a trial run: He wanted to use emerging technologies to encourage subsequent terrorists to follow in his footsteps and perfect his tactics. His goal was what security experts call "proof of concept." . . . The self-made Halle arsenal is a harbinger of a worrisome new era. The shooter sought to demonstrate the possibility of making simple, lethal, hard-to-trace, homemade guns that can be used by furtive lone-wolf terrorists like himself, as well as by larger extremist groups trying to lie low. More such attempts will likely follow, each building on the other to become increasingly deadly.

## 34. Opinion: US-China Competition: The Coming Decoupling? – Analysis

Eurasiareview.com, Oct. 27 - The United States and China are now clearly locked in a competition over dominance of the technologies of the future. At the same time, some elements of key government organisations on both sides are pushing for a major decoupling of very intertwined supply chains and value generation ecosystems that have developed over more than 30 years. How did we get to the point where zero sum competition and some level of decoupling are now widely accepted in government, academic, and business circles, and companies on both sides are acting in ways that will both heighten the competition and accelerate the decoupling? All this in several short years? Several parallel

processes came together to produce this, which is happening in some sense organically, with no clear long-term thinking in either capital that accounts for the economic and national security costs, and second-, third-, and fourth- order effects. US policy towards China on technology issues has been driven by four major factors, some stemming from long standing concerns, and others coming out of recent developments around advanced technologies, where Chinese firms are suddenly both a supplier and collaborator and a new competitor.

## Upcoming Export Control and Other Trade Compliance Conferences

**Oct. 29-30 - Aéro Montréal and Cirrus Research Associates - Training on the Canadian Defence Market - Montreal**

**Nov. 4-5 - Aéro Montréal and McCarter & English - Training on the US Market - Montreal**

**Nov. 5 - America's Small Business Development Centers and M-PALM - Automated Commercial Environment (ACE) Export Compliance Seminar - Baltimore - Lofts Hotel**

**Nov. 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Huntsville, AL**

**Nov. 12 - US Dept. of the Treasury/Office of Foreign Assets Control (OFAC) - 2019 OFAC Symposium - Washington, DC - Walter E. Washington Convention Center**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldorf, Germany**

**Nov. 18 - Cnxtd ("Connected") Inc. - 2019 International Conference on the EU Cybersecurity Act - Brussels - Hotel Brussels**

**Nov. 19 - C5 Group - European Forum on U.S. Export Controls - Brussels**

**Nov. 20-21 - C5 Group - European U.S. Defence Contracting - Brussels**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 3-4 - C5 Group - 12th Advanced Conference on Customs Compliance - London - St. James' Court, A Taj Hotel**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 10-11 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Dec. 11 - German Government/Federal Office of Economics and Export Control - 11th Information Day Export Control 2019 -Frankfurt - Cape Europa, Osloer Str. 5, 60327 Frankfurt am Main**

**Dec. 13 - European Commission - 2019 Export Control Forum - Brussels - Albert Borschette Conference Centre (CCAB) Room CCAB0A Rue Froissart 36**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 28-29 - American Conference Institute - 9th Forum on U.S. Export & Re-Export Compliance for Canadian Operations - Toronto - Toronto Airport Marriott Hotel** - Gary Stanley, Editor of Defense and Export-Import Update, will once again co-chair this important conference.

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

**Feb. 24-26 - Society for International Affairs - 2020 Winter Back to Basics Conference - Las Vegas - Westin Las Vegas Hotel**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to gstanley@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. +1 (202) 686-4854
Fax +1 (202) 686-2624
Mobile +1 (202) 352-3059
E-mail gstanley@glstrade.com

Unsubscribe

**From:** Gary Stanley [gstanley@glstrade.com]
**Sent:** 10/28/2019 1:11:02 PM
**To:** Matthew Borman [Matthew.Borman@bis.doc.gov]
**Subject:** Defense and Export-Import Update (Oct. 28, 2019)



**CUSTOMS COMPLIANCE INDUSTRY EXCHANGE**
NOVEMBER 20 - 21, 2019 WASHINGTON PLAZA, WASHINGTON, DC

**Dear All,**

**Good Day!**

**Gary Stanley's Export Control Tip of the Day: A** a foreign person may make a self-determination of an item's jurisdictional and classification status. Indeed, a foreign person is obligated to know whether an item is subject to the ITAR or, if subject to the EAR, how it is classified before reexporting or transferring the item in order to ensure compliance with the ITAR's and the EAR's licensing and other obligations. The U.S. exporter is responsible for determining the jurisdictional and classification status of the items it is exporting. However, if reliable jurisdictional and classification information has not already been provided by another party, such as the original equipment manufacturer, then the foreign person may and, indeed, must make these determinations itself in order to avoid violating the ITAR or the EAR if it later reexports or retransfers the article or item. As a matter of due diligence, however, the foreign person should seek jurisdictional and classification information from the manufacturer of the items or the owner of the technology in question and resolve any potential differences in interpretation. If after reviewing the ITAR's U.S. Munitions List (USML) and all relevant facts, doubt exists regarding whether the item is enumerated or otherwise described on the USML, the foreign person should request from DDTC a commodity jurisdiction determination pursuant to 22 C.F.R. § 120.4. If the item is clearly not enumerated or otherwise described on the USML and, after reviewing the EAR and all relevant facts, there is doubt regarding whether or where the item is enumerated or otherwise described on the EAR's Commerce Control List, then the foreign person should request from the Department of Commerce's Bureau of Industry and Security a commodity classification determination pursuant to 15 C.F.R. § 748.3.

**Today's Items:**

1. **DDTC Seeks Public Comment on Electronic Form for Voluntary Disclosures**

2. **BIS Issues Order Denying Export Privileges of Alexis Vlachos of Montréal**

3. **Columbus Man Sentenced to Prison for Illegally Exporting Goods to Iran**

4. **Treasury and State Announce New Humanitarian Mechanism to Increase Transparency of Permissible Trade Supporting the Iranian People**

5. **OFAC Publishes General Licenses Relating to Iran and Venezuela**

6. **President Trump Continues National Emergency With Respect to the Democratic Republic of the Congo**

7. **EU Commission Opens Registration for 2019 Export Control Forum**

8. **UK Government's OFSI Updates Post Brexit - Russia Guidance**

9. **USTR Grants Certain Requests for Exclusion from Additional Duties on Certain Chinese Products**

10. **USTR Publishes Exclusion Request Schedule on Additional Chinese Products Subject to Increased Tariffs**

11. **USTR Seeks Applications for Inclusion on the Binational Panels Roster Under the North American Free Trade Agreement**

12. **EXIM Bank Advisory Committee and Sub-Saharan Africa Advisory Committee to Meet Oct. 30**

13. **Commerce/ITA's Civil Nuclear Trade Advisory Committee to Meet Nov. 12**

14. **Homeland Security Advisory Committee to Meet Nov. 14**

15. **Commerce/ITA's Environmental Technologies Trade Advisory Committee to Meet Nov. 19**

16. **U.S. Government Contracting**

17. **U.S. Customs and U.S. Census/AES Updates**

18. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**

19. **GAO and CRS Reports, Testimony, and Correspondence of Interest**

20. **U.S. Government Trade Forms and Other Information Collections Open for Public Comment**

**Other Headlines**

21. **This Week in Congress: New Worries About the NDAA**

22. **Beijing Woos U.S. and Other Foreign Companies as Trade War Takes Toll**

23. **Amazon or Microsoft? DoD Picks a Winner for Its Controversial JEDI Contract**

24. **Key Dates Leading Up to the U.S. Pentagon's Cloud-Computing Award to Microsoft**

25. **Hypersonics Pitch Day: Air Force Woos Startups**

26. **Pentagon, With an Eye on China, Pushes for Help From American Tech**

27. **Air Force Halts Funding for Boeing's bBallistic Missile Replacement**

28. **Analysts Predict Counterdrone Market Will Top $2B**

29. **Uphill Sledding for EOD Funding**

30. **FTC Investigates Northrop: GBSD?**

31. **How the Army Will Use Satellites to Track Land Threats in Real Time**

32. **Does Major Joint Military Procurement Really Work in the Baltics?**

33. **Opinion: Is 3-D Printing the Future of Terrorism?**

34. **Opinion: US-China Competition: The Coming Decoupling? – Analysis**

**Upcoming Export Control and Other Trade Compliance Conferences**

# 1. DDTC Seeks Public Comment on Electronic Form for Voluntary Disclosures

(84 Fed. Reg. 57801) - The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) is seeking public comment on its electronic form DS-7787 - "Disclosure of Violations of the Arms Export Control Act." interested persons have until November 27, 2019, to submit their comments.

# 2. BIS Issues Order Denying Export Privileges of Alexis Vlachos of Montréal

The U.S. Department of Commerce's Bureau of Industry and Security (BIS) has issued an Order Denying Export Privileges to Alexis Vlachos of Montréal, Québec, Canada, until September 4, 2025. On September 4, 2018, in the U.S. District Court for the District of Vermont, Alexis Vlachos ("Vlachos") was convicted of violating Section 38 of the Arms Export Control Act (22 U.S.C. § 2778 (2012)) ("AECA"). Vlachos was convicted of violating Section 38 of the AECA by knowingly and willfully exporting and causing to be exported from the United States to Canada firearms that were designated as defense articles on the United States Munitions List, without the required U.S. Department of State licenses. Vlachos was sentenced to fifty-one (51) months in prison and an assessment of $200.

# 3. Columbus Man Sentenced to Prison for Illegally Exporting Goods to Iran

The U.S. Department of Justice (DOJ) has announced that Behrooz Behroozian, 64, Columbus, Ohio, has been sentenced to 20 months in prison for exporting gas and oil pipeline parts to Iran for more than a decade in deliberate violation of a U.S. embargo and trade sanctions. According to the sentencing memorandum filed in this case, Behroozian used an intermediary company, Sumar Industrial Equipment, to attempt to cover-up that he was illegally supplying industrial equipment to Iran in violation of the Emergency Economic Powers Act (IEEPA). Behroozian exported manifolds, valves and connectors used for industrial pipelines in the gas and oil refinement industry to Iran via Sumar and profited $35,000 to $40,000 per year. This violated embargo and trade sanctions imposed upon Iran by the United States in May 1995. In November 2006, Behroozian became the owner and operator of a computer parts supplier in Dublin, Ohio, called Comtech International. Comtech had no storefront and made no domestic sales. It seldom exported computer parts. Instead, Comtech primarily exported industrial equipment to Sumar in the United Arab Emirates for further exportation to Iran.

# 4. Treasury and State Announce New Humanitarian Mechanism to Increase Transparency of Permissible Trade Supporting the Iranian People

The U.S. Departments of the Treasury and State has announced a new humanitarian mechanism to ensure unprecedented transparency into humanitarian trade with Iran. This mechanism will help the international community perform enhanced due diligence on humanitarian trade to ensure that funds associated with permissible trade in support of the Iranian people are not diverted by the Iranian regime. Concurrently, Treasury's Financial Crimes Enforcement Network (FinCEN) identified Iran as a jurisdiction of primary money

laundering concern under Section 311 of the USA PATRIOT Act, and issued a new rulemaking to protect the U.S. financial system from malign Iranian financial activities. The humanitarian mechanism will require foreign governments and financial institutions that choose to participate in the mechanism to conduct enhanced due diligence and provide to Treasury a substantial and unprecedented amount of information, with appropriate disclosure and use restrictions, on a monthly basis, as described in guidance provided by OFAC outlining specific requirements.

## 5. OFAC Publishes General Licenses Relating to Iran and Venezuela

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has taken the following actions:

- Issued General License K "Authorizing Maintenance or Wind Down of Transactions Involving Cosco Shipping Tanker (Dalian) Co., Ltd."

- Amended  General License 5A "Authorizing Certain Transactions Related to the Petróleos de Venezuela, S.A. 2020 8.5 Percent Bond on or After January 22, 2020." In conjunction with this action, OFAC is amending Frequently Asked Question 595.

## 6. President Trump Continues National Emergency With Respect to the Democratic Republic of the Congo

(84 Fed. Reg. 56927) - In accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), President Donald J. Trump is continuing for 1 year the national emergency with respect to the situation in or in relation to the Democratic Republic of the Congo declared in Executive Order 13413, as amended by Executive Order 13671.

## 7. EU Commission Opens Registration for 2019 Export Control Forum

The European Commission and the Finnish Presidency of the Council are inviting representatives from EU Member States and the European Parliament, industry and civil society to participate in the 2019 Export Control Forum. The 2019 Export Control Forum will provide an opportunity to review ongoing export control implementation and latest developments in the EU, as well as to discuss the future of EU and global international export controls. The 2019 Export Control Forum will be opened by representatives of the Commission, the Presidency and the European Parliament, and will convene selected panels of experts, to be followed by open dialogue with the stakeholders.

- Date: 13 December 2019

- Venue: Albert Borschette Conference Centre (CCAB) Room 0A. Rue Froissart 36, Brussels

- Time: 10:00 – 17:00. Registration will be open at 9:30.

- Registration: Please register via the online registration tool. The deadline for registration is 1 December 2019.

## 8. UK Government's OFSI Updates Post Brexit - Russia Guidance

The U.K. Government's Office of Financial Sanctions Implementation (FSI) has updated its guidance on the financial and investment restrictions in the Russia sanctions regime should

the UK leave the EU without a deal. This guidance does not currently apply and would only come in to effect if the UK leaves the EU without a deal and when the Russia (Sanctions) (EU Exit) Regulations 2019 come into force. This is therefore for information only at this stage.

## 9. USTR Grants Certain Requests for Exclusion from Additional Duties on Certain Chinese Products

(84 Fed. Reg. 57803) - In September 2018, the U.S. Trade Representative imposed additional duties on goods of China with an annual trade value of approximately $200 billion as part of the action in the Section 301 investigation of China's acts, policies, and practices related to technology transfer, intellectual property, and innovation. The U.S. Trade Representative initiated a product exclusion process in June 2019, and interested persons have submitted requests for the exclusion of specific products. This notice announces the U.S. Trade Representative's determination to grant certain exclusion requests, as specified in the annex to this notice. The product exclusions announced in this notice will apply as of the September 24, 2018, effective date of the $200 billion action, to August 7, 2020.

## 10. USTR Publishes Exclusion Request Schedule on Additional Chinese Products Subject to Increased Tariffs

(84 Fed. Reg. 57144) - In a notice published at 84 Fed. Reg. 43304 (Aug. 20, 2019), the U.S. Trade Representative announced that the Office of the U.S. Trade Representative (USTR) would establish a process by which U.S. stakeholders may request an exclusion from additional duties of particular products classified within a tariff subheading covered by the August 2019 action. This notice announces that USTR will open an electronic portal for submission of exclusion requests on October 31, 2019 for products covered by Annex A of the August 2019 action, and sets out the specific procedures for submitting requests.

• October 31, 2019 at noon EDT: The web portal for submitting exclusion requests--https://exclusions.USTR.gov--will open.

• January 31, 2020 at 11:59 PM EST: Last day for submitting exclusion requests.

• Responses to individual exclusion requests are due 14 days after USTR posts the request on the online portal.

• Any replies to responses to an exclusion request are due the later of 7 days after the close of the 14-day response period, or 7 days after the posting of a response.

## 11. USTR Seeks Applications for Inclusion on the Binational Panels Roster Under the North American Free Trade Agreement

(84 Fed. Reg. 57152) - The North American Free Trade Agreement (NAFTA) provides for the establishment of a roster of individuals to serve on binational panels convened to review final determinations in antidumping or countervailing duty (AD/CVD) proceedings and amendments to AD/CVD statutes of a NAFTA Party. The United States annually renews its selections for the roster. The Office of the United States Trade Representative (USTR) invites applications from eligible individuals wishing to be included on the roster for the period April

1, 2020, through March 31, 2021. USTR must receive your application by November 29, 2019.

## 12. EXIM Bank Advisory Committee and Sub-Saharan Africa Advisory Committee to Meet Oct. 30

(84 Fed. Reg. 56810) - The Export-Import Bank of the United States (EXIM) as announced that its advisory committee and its Sub-Saharan Africa Advisory Committee will meet Wednesday, October 30, 2019, 11:00 AM to 2:30 PM EDT, at 811 Vermont Avenue NW, Room 1126, Washington, DC 20571. If you plan to attend, a photo ID must be presented at the guard's desk as part of the clearance process into the building, you may contact India Walker at external@exim.gov to be placed on an attendee list. Discussion of EXIM programs and comments for inclusion in the report on competitiveness of the Export-Import Bank of the United States to Congress.

## 13. Commerce/ITA's Civil Nuclear Trade Advisory Committee to Meet Nov. 12

(84 Fed. Reg. 57699) - The U.S. Department of Commerce's International Trade Administration (ITA) has announced that its Civil Nuclear Trade Advisory Committee will meet in open sessionTuesday, November 12, 2019, 3:00 PM to 4:00 PM EST, at the U.S. Department of Commerce, Herbert C. Hoover Building, Commerce Research Library, 1401 Constitution Ave. NW, Washington, DC 20230. Requests to register to participate (including to speak or for auxiliary aids) and any written comments should be submitted to: Mr. Devin Horne, Office of Energy & Environmental Industries, International Trade Administration, Room 28018, 1401 Constitution Ave. NW, Washington, DC 20230. (Fax: 202-482- 5665; email: devin.horne@trade.gov). Members of the public are encouraged to submit registration requests and written comments via email to ensure timely receipt.

## 14. Homeland Security Advisory Committee to Meet Nov. 14

(84 Fed. Reg. 56828) - The U.S. Department of Homeland Security's Office of Partnership and Engagement has announced that the Homeland Security Advisory Council will meet in open session Thursday, November 14, 2019, 1:45 PM to 3:30 PM EST, in the Town Hall at the Transportation Security Administration, 601 S 12th Street (East Building), Arlington, VA 20598. The Council will swear in new members, and review and deliberate on reports from the Families and Children Care Panel, Emerging Technologies, Prevention of Targeted Violence Against Faith- based Communities, and State, Local, Tribal, and Territorial Cybersecurity subcommittees. Following this, there will be a break for public commentary.

## 15. Commerce/ITA's Environmental Technologies Trade Advisory Committee to Meet Nov. 19

(84 Fed. Reg. 57698) - The U.S. Department of Commerce's International Trade Administration (ITA) has announced that its Environmental Technologies Trade Advisory Committee (ETTAC) will meet Tuesday, November 19, 2019, 8:45 AM to 3:30 PM EST, in the Research Library at the U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230. Those interested in attending must provide notification by Friday, November 8, at 5:00 PM EST. To register and obtain call-in information, submit comments, or request auxiliary aids, please contact: Ms. Amy Kreps, Office of Energy & Environmental

Industries (OEEI), International Trade Administration, Room 28018, 1401 Constitution Avenue NW, Washington, DC 20230 or email: amy.kreps@trade.gov. The ETTAC will receive briefings from ITA as well as the interagency and will discuss its priorities and objectives for potential recommendations to the interagency through the Secretary of Commerce. Topics to be considered during the afternoon subcommittee breakout sessions will fall under the three themes of Trade Policy and Trade Negotiations, Trade Promotion and Export Market Development, and Cooperation on Standards, Certifications and Regulations.

## 16. U.S. Government Contracting

- DoD, GSA & NASA/Federal Acquisition Regulation (FAR): OMB Information Collection Submission - Patents - Deadline for Public Comment: Dec. 23, 2019

- DoD/Office of the Under Secretary of Defense for Acquisition and Sustainment: OMB Information Collection Submission - Department of Defense Application for Priority Rating for Production or Construction Equipment - Agency Form No.: DD Form 691 - Deadline for Public Comment: Nov. 25, 2019

- DoD/Defense Logistics Agency (DLA): OMB Information Collection Submission - ASSIST Database - Deadline for Public Comment: Nov. 25, 2019

- GSA: Notice of Announcement of Industry Engagement Event - GSA is hosting an industry engagement event on Wednesday, November 6, 2019, from 9:00 AM to 11:00 AM EST, at the Department of Interior (DOI) Yates Auditorium at 1849 C St. NW, Washington, DC 20240k, to highlight how section 889 of Title VII of the NDAA for FY 2019 (hereinafter Sec. 889) will affect GSA's business and supply chain.

## 17. U.S. Customs and U.S. Census/AES Updates

- U.S. Customs - CSMS #40363706 - ACE CERTIFICATION CQ Deployment Thursday morning, Oct 24, 2019 at 0630 ET

- U.S. Customs - CSMS #40371652 - Food and Drug Administration (FDA) New Center for Tobacco (CTP) Product Subclass Code

- U.S. Customs - CSMS #40373287 - Trade Policy Update for Drawback: Trade Facilitation and Trade Enforcement Act (TFTEA) Combination Privilege Application

- U.S. Customs - CSMS #40386416 - ACE PROD AND CERT EXTENDED Scheduled Maintenance this weekend, Sat. Oct 26, 2019@ 2100 ET to 0400 ET Sun. Oct 27

- U.S. Customs - CSMS #40389928 - Update for the Automated Commercial Environment (ACE) Collections Release 1 – PZ Output Release Date

- U.S. Census - Tips on How to Resolve AES Response Messages

| | |
|---|---|
| **Fatal Error Response Code: 068** | **Narrative:** SRN on File; Action Not Allowed |
| | **Severity:** Fatal |
| | **Reason: The Shipment is not on file in AES, therefore the requested action is not allowed.** |
| | **Resolution:** When the Shipment Filing Action Request Indicator is a Change, Replace, or X for Cancel, the Shipment Reference Number must exist on a previous filing in AES for the filer. |
| | Verify the Shipment Filing Action Request Indicator and the Shipment Reference Number, correct the shipment and resubmit. |
| **Fatal Error Response Code: 808** | **Narrative:** Improbable Destination for Commodity |
| | **Severity:** Verify |
| | **Reason:** For the reported Schedule B/HTS Number, the Country of Destination Code is improbable. |
| | **Resolution:** Certain products are highly unlikely to be exported to certain Countries of Destination based on historical data and industry input. This might indicate either a keying error or misclassification of the product. |
| | Verify the Schedule B/HTS Number and Country of Destination Code, correct the shipment and resubmit (if necessary). If the information is verified correct as reported, no action is necessary. |

## 18. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

- Commerce/E&C - Certain Amorphous Silica Fabric From the People's Republic of China: Rescission of Countervailing Duty Administrative Review; 2018

- Commerce/E&C - Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017

- Commerce/E&C - Certain Large Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Over 4.5 Inches) From Japan: Rescission of Antidumping Duty Administrative Review: 2018-2019

- Commerce/E&C - Certain Small Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Under 4.5 Inches) From Japan: Rescission of Antidumping Duty Administrative Review: 2018-2019

- Commerce/E&C - Certain Uncoated Paper From Brazil: Final Results of Antidumping Duty Administrative Review; 2017-2018

- Commerce/E&C - Fresh Tomatoes From Mexico: Final Determination of Sales at Less Than Fair Value Pages 57401 - 57403 [FR DOC #2019-23341]

- Commerce/E&C - High Pressure Steel Cylinders From the People's Republic of China: Rescission of Countervailing Duty Administrative Review: 2018

- Commerce/E&C - Mattresses From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part

- Commerce/E&C - Refillable Stainless Steel Kegs From Germany: Final Affirmative Determination of Sales at Less Than Fair Value

- Commerce/E&C - Refillable Stainless Steel Kegs From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part

- Commerce/E&C - Refillable Stainless Steel Kegs From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part

- Commerce/E&C - Stainless Steel Flanges From the People's Republic of China: Rescission of Countervailing Duty Administrative Review; 2019

- Commerce/E&C - Vertical Metal File Cabinets From the People's Republic of China: Final Determination of Sales at Less Than Fair Value

- Commerce/E&C - Vertical Metal File Cabinets From the People's Republic of China: Final Affirmative Countervailing Duty Determination

- USITC - USITC Releases Report on MTB Effects - This report provides a broad assessment of the economic effects of duty suspensions and reductions on U.S. producers, purchasers, and consumers, as well as case studies looking at the effects on groups of products covered by the Miscellaneous Tariff Bill Act of 2018. The report also includes recommendations from interested parties with respect to those domestic industry sectors that might benefit from permanent duty suspensions or reductions, with a particular focus on inequities created by tariff inversions. Much of the information in this report comes from a survey conducted by the Commission after the duty suspensions and reductions became effective.

- USITC - USITC Releases The Year in Trade 2018

- USITC - Certain Microfluidic Systems and Components Thereof and Products Containing Same: Commission Determination To Review in Part a Final Initial Determination Finding a Violation of Section 337 and To Extend the Target Date; Schedule for Filing Written Submissions

- USITC - Certain Semiconductor Devices, Integrated Circuits, and Consumer Products Containing the Same: Commission Determination Not To Review an Initial Determination Terminating the Investigation Based on a Settlement Agreement and a Withdrawal of the

Complaint; Termination of the Investigation

- USITC - Certain Shaker Screens for Drilling Fluids, Components Thereof, and Related Marketing Materials: Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

- USITC - Fresh Tomatoes From Mexico: Continuation of the Final Phase of an Antidumping Duty Investigation and Revised Schedule

- USITC - Wooden Cabinets and Vanities From China: Scheduling of the Final Phase of Countervailing Duty and Anti-Dumping Duty Investigations

- USITC - Government in the Sunshine Act Meeting Notice - October 31, 2019, 11:00 AM EDT

## 19. GAO and CRS Reports, Testimony, and Correspondence of Interest

- CRS - Brexit: Status and Outlook

- CRS - The European Parliament and U.S. Interests

- CRS - The Changing Landscape of Immigrant Investment Programs

- CRS - Australia

## 20. U.S. Government Trade Forms and Other Information Collections Open for Public Comment

(84 Fed. Reg. 57054) - Agency: U.S. Dept. of Justice/Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) - Title: Informant Agreement - Agency Form No.: ATF Form 3252.2 - Type of Review: New Collection - Deadline for Public Comment: Dec. 23, 2019

## Other Headlines

## 21. This Week in Congress: New Worries About the NDAA

MiltiaryTimes.com, Oct. 28 - Senate Armed Services Committee officials this week will release a "skinny" defense authorization bill plan as lawmakers grow increasingly pessimistic about the possibility of reaching a compromise on a host of disputed issues with the massive military policy bill. Committee Chairman Jim Inhofe, R-Okla., said last week that the move is designed to ensure that a host of necessary items — including numerous military specialty pay authorizations — are passed by the end of the year. But a day later, House Armed Services Chairman Adam Smith, D-Wash., said a stripped-down version of the measure wouldn't solve all of lawmakers' problems. Negotiations on the broader measure have stalled in recent weeks as Democrats and Republicans have fought over military construction money used for President Donald Trump's controversial border wall project.

## 22. Beijing Woos U.S. and Other Foreign Companies as Trade War Takes Toll

WSJ.com, Oct. 27 - China has stepped up its charm offensive to attract U.S. and other foreign companies in recent weeks, seeking to offset the debilitating impact of the trade war while still exchanging blistering comments with Washington. The country's premier, Li Keqiang, has wooed foreign companies with noticeable enthusiasm this month, telling a roundtable of Western executives, for example, that global manufacturing enterprises are welcome to seize opportunities as China opens up further. The move suggests a growing realization of the trade war's toll on the Chinese economy and on U.S. companies' willingness to invest in China. It also reflects a recognition that foreign companies are key to achieving Chinese leaders' ambitions for both growth and technological advancement. The pursuit of foreign investors comes as the Communist party elite sits down Monday for its first top policy-setting meeting, or plenum, since early last year, during which leaders will discuss their next five-year economic blueprint, according to Chinese officials involved in policy making.

## 23. Amazon or Microsoft? DoD Picks a Winner for Its Controversial JEDI Contract

DefenseNews.com, No. 26 - Microsoft won the contract for the Department of Defense's enterprise cloud, potentially worth $10 billion over 10 years, the Pentagon announced Oct. 25. The tech giant won the award over Amazon Web Services, just three days after Secretary of Defense Mark Esper recused himself from the award after months of review because his son worked for IBM. Amazon was widely considered by industry to be the front runner for the award. The JEDI contract process continues to be under investigation by the DoD inspector general and stuck in federal court. The Pentagon plans to move 80 percent of its systems over to the Joint Enterprise Defense Infrastructure cloud, better known as JEDI. The cloud will contain both unclassified and classified data. In a statement, DoD CIO Dana Deasy heralded the contract award as a win for the war fighter. "The National Defense Strategy dictates that we must improve the speed and effectiveness with which we develop and deploy modernized technical capabilities to our women and men in uniform," DoD Chief Information Officer Dana Deasy said. "The DoD Digital Modernization Strategy was created to support this imperative. This award is an important step in execution of the Digital Modernization Strategy."

## 24. Key Dates Leading Up to the U.S. Pentagon's Cloud-Computing Award to Microsoft

Reuters.com, Oct. 27 - Microsoft Corp has won the U.S. Pentagon's $10 billion cloud-computing contract, the Defense Department said on Friday, beating out favorite Amazon.com Inc. The contract, called the Joint Enterprise Defense Infrastructure Cloud, or JEDI, is part of a broad modernization of the Pentagon's information technology systems. Here is a timeline of important dates leading up to the award.

## 25. Hypersonics Pitch Day: Air Force Woos Startups

BreakingDefense.com, Oct. 25 - Hypersonics and "pitch days," two of the hottest concepts at the Air Force right now, will come together for the first time Nov. 7. Air Force experts will

judge products and ideas from startup firms related to solving key challenges to hypersonic flight, such as Mach 5-plus propulsion and new materials that can withstand extremely high temperatures. Lt. Gen. Duke Richardson, military deputy to Air Force acquisition czar Will Roper, will oversee the panel of judges who pick the winner of a same-day contract of up to $750,000 to jumpstart their work, according to an Oct. 18 announcement from Air Force Materiel Command's 96th Test Wing. The pitch day will be held at the Doolittle Institute in Niceville, Fla. "Fielding hypersonic weapons is a top priority for our warfighters. The Air Force is leading the way, and we can use all the help we can get from innovative companies," Richardson said. "That's one reason why this pitch day is so exciting."

## 26. Pentagon, With an Eye on China, Pushes for Help From American Tech

NYTimes.com, Oct. 25 - Pentagon officials have been holding private discussions with tech industry executives to wrestle with a key question: how to ensure future supplies of the advanced computer chips needed to retain America's military edge. The talks, some of which predate the Trump administration, recently took on an increased urgency, according to people who were involved or briefed on the discussions. Pentagon officials encouraged chip executives to consider new production lines for semiconductors in the United States, said the people, who declined to be identified because the talks were confidential. The discussions are being driven by the Pentagon's increased dependence on chips made abroad, especially in Taiwan, as well as recent tensions with China, these people said. One chip maker, the Taiwan Semiconductor Manufacturing Company, better known as TSMC, plays a particularly crucial role producing commercial chips that also have applications for aircraft, satellites, drones and wireless communications. And because of unrest over the past few months in the semiautonomous Chinese territory of Hong Kong, some Pentagon officials and chip executives have wondered about situations that could force suppliers in Taiwan to limit or cut off silicon shipments, the people said.

## 27. Air Force Halts Funding for Boeing's bBallistic Missile Replacement

WashingtonPost.com, Oct. 22 - The Air Force has halted funding for Boeing's $349 million ballistic missile development effort, effectively clearing the way for a Northrop Grumman-led team to become the only bidder for one of the Pentagon's most expensive weapons production programs. The move is an apparent response to Boeing's recent announcement that it will drop out of the Ground Based Strategic Deterrent program, an $85 billion project to replace the nation's Minuteman III ballistic missiles. The Defense Department appears unwilling to pay Boeing to develop a next-generation ballistic missile when the company is refusing to submit that missile for review. A Boeing representative said the company is disappointed in the Air Force's decision not to allot more funding for its missile.

## 28. Analysts Predict Counterdrone Market Will Top $2B

C4ISRNet.com, Oct. 28 - The three biggest obstacles facing the counterdrone market are the law, the nature of the threat, and the technology itself. In fairness, those are obstacles to the adoption of most any national security technology. A new analysis by investment consultants Frost & Sullivan tackles the counterdrone market, an area of high interest, no consensus, and much proverbial snake oil. The report projects a counterdrone market whose revenues will exceed $2 billion by 2024. What legal obstacles counterdrone systems face

depend on how, exactly, the equipment works to stop a drone. "Adoption of these [counterdrone] technologies is limited by individual country rules against wiretapping, jamming, and computer hacking — all methods employed by various C-UAS," said Michael Blades of Frost & Sullivan.

## 29. Uphill Sledding for EOD Funding

NationalDefenseMagazine.org, Oct. 28 - Once a high-profile mission set, the military's explosive ordnance disposal community is now receiving less attention — and less money — from lawmakers. Just a decade ago, policymakers were pumping billions of dollars annually into initiatives to counter improvised explosive devices that were being used to target U.S. troops overseas. The film "The Hurt Locker," about a fictional EOD team operating in Iraq, won an Oscar for Best Picture. But times have changed. "We became very well publicized and we became a very big thing during the height of the IED years," noted Maj. Daniel Long with the Air Force's congressional liaison office. "As we've withdrawn out of Iraq, as Afghanistan starts to pull down, I don't know that we normally get the same amount of attention that we have previously, which is frankly a bit of a problem" because of the ongoing threat, he said at the National Defense Industrial Association's Global EOD Symposium and Exhibition. Between 2006 and 2009, the Joint Improvised Explosive Device Defeat Organization received more than $16 billion, according to the Government Accountability Office. By 2015, the renamed Joint Improvised-Threat Defeat Organization was receiving less than $600 million annually, and its budgets have remained relatively flat since then.

## 30. FTC Investigates Northrop: GBSD?

BreakingDefense.com, Oct. 24 - The Federal Trade Commission appears to be investigating whether Northrop Grumman acted in restraint of trade and violated an order requiring the company to sell its solid motor rocket engines on "a non-discriminatory basis to all competitors for missile contracts." Northrop disclosed the investigation today in its quarterly report: "In October 2019, the company received a civil investigative demand from the FTC requesting certain information relating to a potential issue of the company's compliance with the Order in connection with a pending strategic missile competition. The company is working to respond to the request. We believe the company has been and continues to be in full compliance with the Order, but we cannot predict any potential impact on the pending competition." Now, that does not make clear that the FTC is looking at the Ground Based Strategic Deterrent (GBSD), but there aren't a lot of other candidates for "a strategic missile competition" and it refers to an "Order."

## 31. How the Army Will Use Satellites to Track Land Threats in Real Time

C4ISRNet.com, Oct. 25 - The Army has needs. One of those needs is the ability to track and target land threats that are beyond the war fighters' line of sight. Though much of the focus on space sensing capabilities is directed at missile defense or space situational awareness, the ability to see time-sensitive ground threats like tanks beyond the line of sight of ground forces is essential for the war fighter. To help build this capability, the Army is teaming with the Space Development Agency on a space-based sensor layer dedicated to deep targeting that can feed information to the war fighter on the ground in real time. The SDA is actually developing a trio of sensing capabilities in space: a layer dedicated to tracking hypersonic

weapons and ballistic missiles; a layer dedicated to space situational awareness and investigating objects in cislunar orbit; and a layer dedicated to detecting and maintaining custody of time-sensitive ground threats.

## 32. Does Major Joint Military Procurement Really Work in the Baltics?

DefenseNews.com, Oct. 28 - On paper, the Baltic nations appear to have closely aligned defense modernization needs that make the joint procurement of advanced military equipment a no-brainer. After all, Latvia, Estonia and Lithuania have historically shared national interests, are currently facing a similar threat from Russia and each have relatively small defense budgets. Joint procurement would drive down costs for large defense articles by allowing the smaller Baltic nations to buy in greater numbers. It would also allow the countries to share maintenance responsibilities, which would save money. And it would drive greater interoperability in countering an adversary's simultaneous attack all three nations. But then there's the reality of the situation. "I think there are many misperceptions on Baltic integration," Janis Garisons, state secretary for the Latvian Ministry of Defence, told Defense News during a September visit to Washington. "I think this is a little bit of a wrong perception that there is a lot of added value in those common procurements."

## 33. Opinion: Is 3-D Printing the Future of Terrorism?

WSJ.com, Oct. 25 - On Oct. 9, a gunman tried to massacre worshipers on Yom Kippur at a synagogue in Halle, Germany, and crossed a new threshold: It was the first time a terrorist perpetrated a deadly attack with homemade weapons using 3-D-printed components—including a 3-D-printed gun. Instead of the slaughter the gunman had hoped for, he killed two people—in part because he couldn't get past a locked synagogue door, in part because what he called his "improvised guns" jammed or failed to fire. But the Halle attack shouldn't be dismissed as a macabre flop. The killer was interested not just in murder but in inspiration. In an online manifesto that German authorities have confirmed he wrote, the gunman styled himself a pioneer on a trial run: He wanted to use emerging technologies to encourage subsequent terrorists to follow in his footsteps and perfect his tactics. His goal was what security experts call "proof of concept." . . . The self-made Halle arsenal is a harbinger of a worrisome new era. The shooter sought to demonstrate the possibility of making simple, lethal, hard-to-trace, homemade guns that can be used by furtive lone-wolf terrorists like himself, as well as by larger extremist groups trying to lie low. More such attempts will likely follow, each building on the other to become increasingly deadly.

## 34. Opinion: US-China Competition: The Coming Decoupling? – Analysis

Eurasiareview.com, Oct. 27 - The United States and China are now clearly locked in a competition over dominance of the technologies of the future. At the same time, some elements of key government organisations on both sides are pushing for a major decoupling of very intertwined supply chains and value generation ecosystems that have developed over more than 30 years. How did we get to the point where zero sum competition and some level of decoupling are now widely accepted in government, academic, and business circles, and companies on both sides are acting in ways that will both heighten the competition and accelerate the decoupling? All this in several short years? Several parallel processes came together to produce this, which is happening in some sense organically,

with no clear long-term thinking in either capital that accounts for the economic and national security costs, and second-, third-, and fourth- order effects. US policy towards China on technology issues has been driven by four major factors, some stemming from long standing concerns, and others coming out of recent developments around advanced technologies, where Chinese firms are suddenly both a supplier and collaborator and a new competitor.

## Upcoming Export Control and Other Trade Compliance Conferences

**Oct. 29-30 - Aéro Montréal and Cirrus Research Associates - Training on the Canadian Defence Market - Montreal**

**Nov. 4-5 - Aéro Montréal and McCarter & English - Training on the US Market - Montreal**

**Nov. 5 - America's Small Business Development Centers and M-PALM - Automated Commercial Environment (ACE) Export Compliance Seminar - Baltimore - Lofts Hotel**

**Nov. 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Huntsville, AL**

**Nov. 12 - US Dept. of the Treasury/Office of Foreign Assets Control (OFAC) - 2019 OFAC Symposium - Washington, DC - Walter E. Washington Convention Center**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldorf, Germany**

**Nov. 18 - Cnxtd ("Connected") Inc. - 2019 International Conference on the EU Cybersecurity Act - Brussels - Hotel Brussels**

**Nov. 19 - C5 Group - European Forum on U.S. Export Controls - Brussels**

**Nov. 20-21 - C5 Group - European U.S. Defence Contracting - Brussels**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 3-4 - C5 Group - 12th Advanced Conference on Customs Compliance - London - St. James' Court, A Taj Hotel**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 10-11 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Dec. 11 - German Government/Federal Office of Economics and Export Control - 11th Information Day Export Control 2019 -Frankfurt - Cape Europa, Osloer Str. 5, 60327 Frankfurt am Main**

**Dec. 13 - European Commission - 2019 Export Control Forum - Brussels - Albert Borschette Conference Centre (CCAB) Room CCAB0A Rue Froissart 36**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 28-29 - American Conference Institute - 9th Forum on U.S. Export & Re-Export Compliance for Canadian Operations - Toronto - Toronto Airport Marriott Hotel** - Gary Stanley, Editor of Defense and Export-Import Update, will once again co-chair this important conference.

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

**Feb. 24-26 - Society for International Affairs - 2020 Winter Back to Basics Conference - Las Vegas - Westin Las Vegas Hotel**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to gstanley@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. +1 (202) 686-4854
Fax +1 (202) 686-2624
Mobile +1 (202) 352-3059
E-mail gstanley@glstrade.com

Unsubscribe

**From:** Gary Stanley [gstanley@glstrade.com]
**Sent:** 10/28/2019 1:11:02 PM
**To:** Mira Ricardel [Mira.Ricardel@bis.doc.gov]
**Subject:** Defense and Export-Import Update (Oct. 28, 2019)



**CUSTOMS COMPLIANCE INDUSTRY EXCHANGE**

NOVEMBER 20 - 21, 2019 WASHINGTON PLAZA, WASHINGTON, DC

**Dear All,**

**Good Day!**

**Gary Stanley's Export Control Tip of the Day:** A a foreign person may make a self-determination of an item's jurisdictional and classification status. Indeed, a foreign person is obligated to know whether an item is subject to the ITAR or, if subject to the EAR, how it is classified before reexporting or transferring the item in order to ensure compliance with the ITAR's and the EAR's licensing and other obligations. The U.S. exporter is responsible for determining the jurisdictional and classification status of the items it is exporting. However, if reliable jurisdictional and classification information has not already been provided by another party, such as the original equipment manufacturer, then the foreign person may and, indeed, must make these determinations itself in order to avoid violating the ITAR or the EAR if it later reexports or retransfers the article or item. As a matter of due diligence, however, the foreign person should seek jurisdictional and classification information from the manufacturer of the items or the owner of the technology in question and resolve any potential differences in interpretation. If after reviewing the ITAR's U.S. Munitions List (USML) and all relevant facts, doubt exists regarding whether the item is enumerated or otherwise described on the USML, the foreign person should request from DDTC a commodity jurisdiction determination pursuant to 22 C.F.R. § 120.4. If the item is clearly not enumerated or otherwise described on the USML and, after reviewing the EAR and all relevant facts, there is doubt regarding whether or where the item is enumerated or otherwise described on the EAR's Commerce Control List, then the foreign person should request from the Department of Commerce's Bureau of Industry and Security a commodity classification determination pursuant to 15 C.F.R. § 748.3.

**Today's Items:**

1. **DDTC Seeks Public Comment on Electronic Form for Voluntary Disclosures**

2. **BIS Issues Order Denying Export Privileges of Alexis Vlachos of Montréal**

3. **Columbus Man Sentenced to Prison for Illegally Exporting Goods to Iran**

4. **Treasury and State Announce New Humanitarian Mechanism to Increase Transparency of Permissible Trade Supporting the Iranian People**

5. **OFAC Publishes General Licenses Relating to Iran and Venezuela**

6. **President Trump Continues National Emergency With Respect to the Democratic Republic of the Congo**

7. **EU Commission Opens Registration for 2019 Export Control Forum**

8. **UK Government's OFSI Updates Post Brexit - Russia Guidance**

9. **USTR Grants Certain Requests for Exclusion from Additional Duties on Certain Chinese Products**

10. **USTR Publishes Exclusion Request Schedule on Additional Chinese Products Subject to Increased Tariffs**

11. **USTR Seeks Applications for Inclusion on the Binational Panels Roster Under the North American Free Trade Agreement**

12. **EXIM Bank Advisory Committee and Sub-Saharan Africa Advisory Committee to Meet Oct. 30**

13. **Commerce/ITA's Civil Nuclear Trade Advisory Committee to Meet Nov. 12**

14. **Homeland Security Advisory Committee to Meet Nov. 14**

15. **Commerce/ITA's Environmental Technologies Trade Advisory Committee to Meet Nov. 19**

16. **U.S. Government Contracting**

17. **U.S. Customs and U.S. Census/AES Updates**

18. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**

19. **GAO and CRS Reports, Testimony, and Correspondence of Interest**

20. **U.S. Government Trade Forms and Other Information Collections Open for Public Comment**

## Other Headlines

21. **This Week in Congress: New Worries About the NDAA**

22. **Beijing Woos U.S. and Other Foreign Companies as Trade War Takes Toll**

23. **Amazon or Microsoft? DoD Picks a Winner for Its Controversial JEDI Contract**

24. **Key Dates Leading Up to the U.S. Pentagon's Cloud-Computing Award to Microsoft**

25. **Hypersonics Pitch Day: Air Force Woos Startups**

26. **Pentagon, With an Eye on China, Pushes for Help From American Tech**

27. **Air Force Halts Funding for Boeing's bBallistic Missile Replacement**

28. **Analysts Predict Counterdrone Market Will Top $2B**

29. **Uphill Sledding for EOD Funding**

30. **FTC Investigates Northrop: GBSD?**

31. **How the Army Will Use Satellites to Track Land Threats in Real Time**

32. **Does Major Joint Military Procurement Really Work in the Baltics?**

33. **Opinion: Is 3-D Printing the Future of Terrorism?**

34. **Opinion: US-China Competition: The Coming Decoupling? – Analysis**

## Upcoming Export Control and Other Trade Compliance Conferences

## 1. DDTC Seeks Public Comment on Electronic Form for Voluntary Disclosures

(84 Fed. Reg. 57801) - The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) is seeking public comment on its electronic form DS-7787 - "Disclosure of Violations of the Arms Export Control Act." interested persons have until November 27, 2019, to submit their comments.

## 2. BIS Issues Order Denying Export Privileges of Alexis Vlachos of Montréal

The U.S. Department of Commerce's Bureau of Industry and Security (BIS) has issued an Order Denying Export Privileges to Alexis Vlachos of Montréal, Québec, Canada, until September 4, 2025. On September 4, 2018, in the U.S. District Court for the District of Vermont, Alexis Vlachos ("Vlachos") was convicted of violating Section 38 of the Arms Export Control Act (22 U.S.C. § 2778 (2012)) ("AECA"). Vlachos was convicted of violating Section 38 of the AECA by knowingly and willfully exporting and causing to be exported from the United States to Canada firearms that were designated as defense articles on the United States Munitions List, without the required U.S. Department of State licenses. Vlachos was sentenced to fifty-one (51) months in prison and an assessment of $200.

## 3. Columbus Man Sentenced to Prison for Illegally Exporting Goods to Iran

The U.S. Department of Justice (DOJ) has announced that Behrooz Behroozian, 64, Columbus, Ohio, has been sentenced to 20 months in prison for exporting gas and oil pipeline parts to Iran for more than a decade in deliberate violation of a U.S. embargo and trade sanctions. According to the sentencing memorandum filed in this case, Behroozian used an intermediary company, Sumar Industrial Equipment, to attempt to cover-up that he was illegally supplying industrial equipment to Iran in violation of the Emergency Economic Powers Act (IEEPA). Behroozian exported manifolds, valves and connectors used for industrial pipelines in the gas and oil refinement industry to Iran via Sumar and profited $35,000 to $40,000 per year. This violated embargo and trade sanctions imposed upon Iran by the United States in May 1995. In November 2006, Behroozian became the owner and operator of a computer parts supplier in Dublin, Ohio, called Comtech International. Comtech had no storefront and made no domestic sales. It seldom exported computer parts. Instead, Comtech primarily exported industrial equipment to Sumar in the United Arab Emirates for further exportation to Iran.

## 4. Treasury and State Announce New Humanitarian Mechanism to Increase Transparency of Permissible Trade Supporting the Iranian People

The U.S. Departments of the Treasury and State has announced a new humanitarian mechanism to ensure unprecedented transparency into humanitarian trade with Iran. This mechanism will help the international community perform enhanced due diligence on humanitarian trade to ensure that funds associated with permissible trade in support of the Iranian people are not diverted by the Iranian regime. Concurrently, Treasury's Financial Crimes Enforcement Network (FinCEN) identified Iran as a jurisdiction of primary money

laundering concern under Section 311 of the USA PATRIOT Act, and issued a new rulemaking to protect the U.S. financial system from malign Iranian financial activities. The humanitarian mechanism will require foreign governments and financial institutions that choose to participate in the mechanism to conduct enhanced due diligence and provide to Treasury a substantial and unprecedented amount of information, with appropriate disclosure and use restrictions, on a monthly basis, as described in guidance provided by OFAC outlining specific requirements.

## 5. OFAC Publishes General Licenses Relating to Iran and Venezuela

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has taken the following actions:

• Issued General License K "Authorizing Maintenance or Wind Down of Transactions Involving Cosco Shipping Tanker (Dalian) Co., Ltd."

• Amended General License 5A "Authorizing Certain Transactions Related to the Petróleos de Venezuela, S.A. 2020 8.5 Percent Bond on or After January 22, 2020." In conjunction with this action, OFAC is amending Frequently Asked Question 595.

## 6. President Trump Continues National Emergency With Respect to the Democratic Republic of the Congo

(84 Fed. Reg. 56927) - In accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), President Donald J. Trump is continuing for 1 year the national emergency with respect to the situation in or in relation to the Democratic Republic of the Congo declared in Executive Order 13413, as amended by Executive Order 13671.

## 7. EU Commission Opens Registration for 2019 Export Control Forum

The European Commission and the Finnish Presidency of the Council are inviting representatives from EU Member States and the European Parliament, industry and civil society to participate in the 2019 Export Control Forum. The 2019 Export Control Forum will provide an opportunity to review ongoing export control implementation and latest developments in the EU, as well as to discuss the future of EU and global international export controls. The 2019 Export Control Forum will be opened by representatives of the Commission, the Presidency and the European Parliament, and will convene selected panels of experts, to be followed by open dialogue with the stakeholders.

• Date: 13 December 2019

• Venue: Albert Borschette Conference Centre (CCAB) Room 0A. Rue Froissart 36, Brussels

• Time: 10:00 – 17:00. Registration will be open at 9:30.

• Registration: Please register via the online registration tool. The deadline for registration is 1 December 2019.

## 8. UK Government's OFSI Updates Post Brexit - Russia Guidance

The U.K. Government's Office of Financial Sanctions Implementation (FSI) has updated its guidance on the financial and investment restrictions in the Russia sanctions regime should

the UK leave the EU without a deal. This guidance does not currently apply and would only come in to effect if the UK leaves the EU without a deal and when the Russia (Sanctions) (EU Exit) Regulations 2019 come into force. This is therefore for information only at this stage.

## 9. USTR Grants Certain Requests for Exclusion from Additional Duties on Certain Chinese Products

(84 Fed. Reg. 57803) - In September 2018, the U.S. Trade Representative imposed additional duties on goods of China with an annual trade value of approximately $200 billion as part of the action in the Section 301 investigation of China's acts, policies, and practices related to technology transfer, intellectual property, and innovation. The U.S. Trade Representative initiated a product exclusion process in June 2019, and interested persons have submitted requests for the exclusion of specific products. This notice announces the U.S. Trade Representative's determination to grant certain exclusion requests, as specified in the annex to this notice. The product exclusions announced in this notice will apply as of the September 24, 2018, effective date of the $200 billion action, to August 7, 2020.

## 10. USTR Publishes Exclusion Request Schedule on Additional Chinese Products Subject to Increased Tariffs

(84 Fed. Reg. 57144) - In a notice published at 84 Fed. Reg. 43304 (Aug. 20, 2019), the U.S. Trade Representative announced that the Office of the U.S. Trade Representative (USTR) would establish a process by which U.S. stakeholders may request an exclusion from additional duties of particular products classified within a tariff subheading covered by the August 2019 action. This notice announces that USTR will open an electronic portal for submission of exclusion requests on October 31, 2019 for products covered by Annex A of the August 2019 action, and sets out the specific procedures for submitting requests.

- October 31, 2019 at noon EDT: The web portal for submitting exclusion requests--https://exclusions.USTR.gov--will open.

- January 31, 2020 at 11:59 PM EST: Last day for submitting exclusion requests.

- Responses to individual exclusion requests are due 14 days after USTR posts the request on the online portal.

- Any replies to responses to an exclusion request are due the later of 7 days after the close of the 14-day response period, or 7 days after the posting of a response.

## 11. USTR Seeks Applications for Inclusion on the Binational Panels Roster Under the North American Free Trade Agreement

(84 Fed. Reg. 57152) - The North American Free Trade Agreement (NAFTA) provides for the establishment of a roster of individuals to serve on binational panels convened to review final determinations in antidumping or countervailing duty (AD/CVD) proceedings and amendments to AD/CVD statutes of a NAFTA Party. The United States annually renews its selections for the roster. The Office of the United States Trade Representative (USTR) invites applications from eligible individuals wishing to be included on the roster for the period April

1, 2020, through March 31, 2021. USTR must receive your application by November 29, 2019.

## 12. EXIM Bank Advisory Committee and Sub-Saharan Africa Advisory Committee to Meet Oct. 30

(84 Fed. Reg. 56810) - The Export-Import Bank of the United States (EXIM) as announced that its advisory committee and its Sub-Saharan Africa Advisory Committee will meet Wednesday, October 30, 2019, 11:00 AM to 2:30 PM EDT, at 811 Vermont Avenue NW, Room 1126, Washington, DC 20571. If you plan to attend, a photo ID must be presented at the guard's desk as part of the clearance process into the building, you may contact India Walker at external@exim.gov to be placed on an attendee list. Discussion of EXIM programs and comments for inclusion in the report on competitiveness of the Export-Import Bank of the United States to Congress.

## 13. Commerce/ITA's Civil Nuclear Trade Advisory Committee to Meet Nov. 12

(84 Fed. Reg. 57699) - The U.S. Department of Commerce's International Trade Administration (ITA) has announced that its Civil Nuclear Trade Advisory Committee will meet in open sessionTuesday, November 12, 2019, 3:00 PM to 4:00 PM EST, at the U.S. Department of Commerce, Herbert C. Hoover Building, Commerce Research Library, 1401 Constitution Ave. NW, Washington, DC 20230. Requests to register to participate (including to speak or for auxiliary aids) and any written comments should be submitted to: Mr. Devin Horne, Office of Energy & Environmental Industries, International Trade Administration, Room 28018, 1401 Constitution Ave. NW, Washington, DC 20230. (Fax: 202-482- 5665; email: devin.horne@trade.gov). Members of the public are encouraged to submit registration requests and written comments via email to ensure timely receipt.

## 14. Homeland Security Advisory Committee to Meet Nov. 14

(84 Fed. Reg. 56828) - The U.S. Department of Homeland Security's Office of Partnership and Engagement has announced that the Homeland Security Advisory Council will meet in open session Thursday, November 14, 2019, 1:45 PM to 3:30 PM EST, in the Town Hall at the Transportation Security Administration, 601 S 12th Street (East Building), Arlington, VA 20598. The Council will swear in new members, and review and deliberate on reports from the Families and Children Care Panel, Emerging Technologies, Prevention of Targeted Violence Against Faith- based Communities, and State, Local, Tribal, and Territorial Cybersecurity subcommittees. Following this, there will be a break for public commentary.

## 15. Commerce/ITA's Environmental Technologies Trade Advisory Committee to Meet Nov. 19

(84 Fed. Reg. 57698) - The U.S. Department of Commerce's International Trade Administration (ITA) has announced that its Environmental Technologies Trade Advisory Committee (ETTAC) will meet Tuesday, November 19, 2019, 8:45 AM to 3:30 PM EST, in the Research Library at the U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230. Those interested in attending must provide notification by Friday, November 8, at 5:00 PM EST. To register and obtain call-in information, submit comments, or request auxiliary aids, please contact: Ms. Amy Kreps, Office of Energy & Environmental

Industries (OEEI), International Trade Administration, Room 28018, 1401 Constitution Avenue NW, Washington, DC 20230 or email: amy.kreps@trade.gov. The ETTAC will receive briefings from ITA as well as the interagency and will discuss its priorities and objectives for potential recommendations to the interagency through the Secretary of Commerce. Topics to be considered during the afternoon subcommittee breakout sessions will fall under the three themes of Trade Policy and Trade Negotiations, Trade Promotion and Export Market Development, and Cooperation on Standards, Certifications and Regulations.

## 16. U.S. Government Contracting

- DoD, GSA & NASA/Federal Acquisition Regulation (FAR): OMB Information Collection Submission - Patents - Deadline for Public Comment: Dec. 23, 2019

- DoD/Office of the Under Secretary of Defense for Acquisition and Sustainment: OMB Information Collection Submission - Department of Defense Application for Priority Rating for Production or Construction Equipment - Agency Form No.: DD Form 691 - Deadline for Public Comment: Nov. 25, 2019

- DoD/Defense Logistics Agency (DLA): OMB Information Collection Submission - ASSIST Database - Deadline for Public Comment: Nov. 25, 2019

- GSA: Notice of Announcement of Industry Engagement Event - GSA is hosting an industry engagement event on Wednesday, November 6, 2019, from 9:00 AM to 11:00 AM EST, at the Department of Interior (DOI) Yates Auditorium at 1849 C St. NW, Washington, DC 20240k, to highlight how section 889 of Title VII of the NDAA for FY 2019 (hereinafter Sec. 889) will affect GSA's business and supply chain.

## 17. U.S. Customs and U.S. Census/AES Updates

- U.S. Customs - CSMS #40363706 - ACE CERTIFICATION CQ Deployment Thursday morning, Oct 24, 2019 at 0630 ET

- U.S. Customs - CSMS #40371652 - Food and Drug Administration (FDA) New Center for Tobacco (CTP) Product Subclass Code

- U.S. Customs - CSMS #40373287 - Trade Policy Update for Drawback: Trade Facilitation and Trade Enforcement Act (TFTEA) Combination Privilege Application

- U.S. Customs - CSMS #40386416 - ACE PROD AND CERT EXTENDED Scheduled Maintenance this weekend, Sat. Oct 26, 2019@ 2100 ET to 0400 ET Sun. Oct 27

- U.S. Customs - CSMS #40389928 - Update for the Automated Commercial Environment (ACE) Collections Release 1 – PZ Output Release Date

- U.S. Census - Tips on How to Resolve AES Response Messages

| | |
|---|---|
| **Fatal Error Response Code: 068** | **Narrative:** SRN on File; Action Not Allowed<br><br>**Severity:** Fatal<br><br>**Reason: The Shipment is not on file in AES, therefore the requested action is not allowed.**<br><br>**Resolution:** When the Shipment Filing Action Request Indicator is a Change, Replace, or X for Cancel, the Shipment Reference Number must exist on a previous filing in AES for the filer.<br><br>Verify the Shipment Filing Action Request Indicator and the Shipment Reference Number, correct the shipment and resubmit. |
| **Fatal Error Response Code: 808** | **Narrative:** Improbable Destination for Commodity<br><br>**Severity:** Verify<br><br>**Reason:** For the reported Schedule B/HTS Number, the Country of Destination Code is improbable.<br><br>**Resolution:** Certain products are highly unlikely to be exported to certain Countries of Destination based on historical data and industry input. This might indicate either a keying error or misclassification of the product.<br><br>Verify the Schedule B/HTS Number and Country of Destination Code, correct the shipment and resubmit (if necessary). If the information is verified correct as reported, no action is necessary. |

## 18. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

• Commerce/E&C - Certain Amorphous Silica Fabric From the People's Republic of China: Rescission of Countervailing Duty Administrative Review; 2018

• Commerce/E&C - Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017

• Commerce/E&C - Certain Large Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Over 4.5 Inches) From Japan: Rescission of Antidumping Duty Administrative Review: 2018-2019

• Commerce/E&C - Certain Small Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Under 4.5 Inches) From Japan: Rescission of Antidumping Duty Administrative Review: 2018-2019

• Commerce/E&C - Certain Uncoated Paper From Brazil: Final Results of Antidumping Duty Administrative Review; 2017-2018

• Commerce/E&C - Fresh Tomatoes From Mexico: Final Determination of Sales at Less Than Fair Value Pages 57401 - 57403 [FR DOC #2019-23341]

- Commerce/E&C - High Pressure Steel Cylinders From the People's Republic of China: Rescission of Countervailing Duty Administrative Review: 2018

- Commerce/E&C - Mattresses From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part

- Commerce/E&C - Refillable Stainless Steel Kegs From Germany: Final Affirmative Determination of Sales at Less Than Fair Value

- Commerce/E&C - Refillable Stainless Steel Kegs From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part

- Commerce/E&C - Refillable Stainless Steel Kegs From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part

- Commerce/E&C - Stainless Steel Flanges From the People's Republic of China: Rescission of Countervailing Duty Administrative Review; 2019

- Commerce/E&C - Vertical Metal File Cabinets From the People's Republic of China: Final Determination of Sales at Less Than Fair Value

- Commerce/E&C - Vertical Metal File Cabinets From the People's Republic of China: Final Affirmative Countervailing Duty Determination

- USITC - USITC Releases Report on MTB Effects - This report provides a broad assessment of the economic effects of duty suspensions and reductions on U.S. producers, purchasers, and consumers, as well as case studies looking at the effects on groups of products covered by the Miscellaneous Tariff Bill Act of 2018. The report also includes recommendations from interested parties with respect to those domestic industry sectors that might benefit from permanent duty suspensions or reductions, with a particular focus on inequities created by tariff inversions. Much of the information in this report comes from a survey conducted by the Commission after the duty suspensions and reductions became effective.

- USITC - USITC Releases The Year in Trade 2018

- USITC - Certain Microfluidic Systems and Components Thereof and Products Containing Same: Commission Determination To Review in Part a Final Initial Determination Finding a Violation of Section 337 and To Extend the Target Date; Schedule for Filing Written Submissions

- USITC - Certain Semiconductor Devices, Integrated Circuits, and Consumer Products Containing the Same: Commission Determination Not To Review an Initial Determination Terminating the Investigation Based on a Settlement Agreement and a Withdrawal of the

Complaint; Termination of the Investigation

- USITC - Certain Shaker Screens for Drilling Fluids, Components Thereof, and Related Marketing Materials: Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

- USITC - Fresh Tomatoes From Mexico: Continuation of the Final Phase of an Antidumping Duty Investigation and Revised Schedule

- USITC - Wooden Cabinets and Vanities From China: Scheduling of the Final Phase of Countervailing Duty and Anti-Dumping Duty Investigations

- USITC - Government in the Sunshine Act Meeting Notice - October 31, 2019, 11:00 AM EDT

## 19. GAO and CRS Reports, Testimony, and Correspondence of Interest

- CRS - Brexit: Status and Outlook

- CRS - The European Parliament and U.S. Interests

- CRS - The Changing Landscape of Immigrant Investment Programs

- CRS - Australia

## 20. U.S. Government Trade Forms and Other Information Collections Open for Public Comment

(84 Fed. Reg. 57054) - Agency: U.S. Dept. of Justice/Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) - Title: Informant Agreement - Agency Form No.: ATF Form 3252.2 - Type of Review: New Collection - Deadline for Public Comment: Dec. 23, 2019

## Other Headlines

## 21. This Week in Congress: New Worries About the NDAA

MiltiaryTimes.com, Oct. 28 - Senate Armed Services Committee officials this week will release a "skinny" defense authorization bill plan as lawmakers grow increasingly pessimistic about the possibility of reaching a compromise on a host of disputed issues with the massive military policy bill. Committee Chairman Jim Inhofe, R-Okla., said last week that the move is designed to ensure that a host of necessary items — including numerous military specialty pay authorizations — are passed by the end of the year. But a day later, House Armed Services Chairman Adam Smith, D-Wash., said a stripped-down version of the measure wouldn't solve all of lawmakers' problems. Negotiations on the broader measure have stalled in recent weeks as Democrats and Republicans have fought over military construction money used for President Donald Trump's controversial border wall project.

## 22. Beijing Woos U.S. and Other Foreign Companies as Trade War Takes Toll

WSJ.com, Oct. 27 - China has stepped up its charm offensive to attract U.S. and other foreign companies in recent weeks, seeking to offset the debilitating impact of the trade war while still exchanging blistering comments with Washington. The country's premier, Li Keqiang, has wooed foreign companies with noticeable enthusiasm this month, telling a roundtable of Western executives, for example, that global manufacturing enterprises are welcome to seize opportunities as China opens up further. The move suggests a growing realization of the trade war's toll on the Chinese economy and on U.S. companies' willingness to invest in China. It also reflects a recognition that foreign companies are key to achieving Chinese leaders' ambitions for both growth and technological advancement. The pursuit of foreign investors comes as the Communist party elite sits down Monday for its first top policy-setting meeting, or plenum, since early last year, during which leaders will discuss their next five-year economic blueprint, according to Chinese officials involved in policy making.

## 23. Amazon or Microsoft? DoD Picks a Winner for Its Controversial JEDI Contract

DefenseNews.com, No. 26 - Microsoft won the contract for the Department of Defense's enterprise cloud, potentially worth $10 billion over 10 years, the Pentagon announced Oct. 25. The tech giant won the award over Amazon Web Services, just three days after Secretary of Defense Mark Esper recused himself from the award after months of review because his son worked for IBM. Amazon was widely considered by industry to be the front runner for the award. The JEDI contract process continues to be under investigation by the DoD inspector general and stuck in federal court. The Pentagon plans to move 80 percent of its systems over to the Joint Enterprise Defense Infrastructure cloud, better known as JEDI. The cloud will contain both unclassified and classified data. In a statement, DoD CIO Dana Deasy heralded the contract award as a win for the war fighter. "The National Defense Strategy dictates that we must improve the speed and effectiveness with which we develop and deploy modernized technical capabilities to our women and men in uniform," DoD Chief Information Officer Dana Deasy said. "The DoD Digital Modernization Strategy was created to support this imperative. This award is an important step in execution of the Digital Modernization Strategy."

## 24. Key Dates Leading Up to the U.S. Pentagon's Cloud-Computing Award to Microsoft

Reuters.com, Oct. 27 - Microsoft Corp has won the U.S. Pentagon's $10 billion cloud-computing contract, the Defense Department said on Friday, beating out favorite Amazon.com Inc. The contract, called the Joint Enterprise Defense Infrastructure Cloud, or JEDI, is part of a broad modernization of the Pentagon's information technology systems. Here is a timeline of important dates leading up to the award.

## 25. Hypersonics Pitch Day: Air Force Woos Startups

BreakingDefense.com, Oct. 25 - Hypersonics and "pitch days," two of the hottest concepts at the Air Force right now, will come together for the first time Nov. 7. Air Force experts will

judge products and ideas from startup firms related to solving key challenges to hypersonic flight, such as Mach 5-plus propulsion and new materials that can withstand extremely high temperatures. Lt. Gen. Duke Richardson, military deputy to Air Force acquisition czar Will Roper, will oversee the panel of judges who pick the winner of a same-day contract of up to $750,000 to jumpstart their work, according to an Oct. 18 announcement from Air Force Materiel Command's 96th Test Wing. The pitch day will be held at the Doolittle Institute in Niceville, Fla. "Fielding hypersonic weapons is a top priority for our warfighters. The Air Force is leading the way, and we can use all the help we can get from innovative companies," Richardson said. "That's one reason why this pitch day is so exciting."

## 26. Pentagon, With an Eye on China, Pushes for Help From American Tech

NYTimes.com, Oct. 25 - Pentagon officials have been holding private discussions with tech industry executives to wrestle with a key question: how to ensure future supplies of the advanced computer chips needed to retain America's military edge. The talks, some of which predate the Trump administration, recently took on an increased urgency, according to people who were involved or briefed on the discussions. Pentagon officials encouraged chip executives to consider new production lines for semiconductors in the United States, said the people, who declined to be identified because the talks were confidential. The discussions are being driven by the Pentagon's increased dependence on chips made abroad, especially in Taiwan, as well as recent tensions with China, these people said. One chip maker, the Taiwan Semiconductor Manufacturing Company, better known as TSMC, plays a particularly crucial role producing commercial chips that also have applications for aircraft, satellites, drones and wireless communications. And because of unrest over the past few months in the semiautonomous Chinese territory of Hong Kong, some Pentagon officials and chip executives have wondered about situations that could force suppliers in Taiwan to limit or cut off silicon shipments, the people said.

## 27. Air Force Halts Funding for Boeing's bBallistic Missile Replacement

WashingtonPost.com, Oct. 22 - The Air Force has halted funding for Boeing's $349 million ballistic missile development effort, effectively clearing the way for a Northrop Grumman-led team to become the only bidder for one of the Pentagon's most expensive weapons production programs. The move is an apparent response to Boeing's recent announcement that it will drop out of the Ground Based Strategic Deterrent program, an $85 billion project to replace the nation's Minuteman III ballistic missiles. The Defense Department appears unwilling to pay Boeing to develop a next-generation ballistic missile when the company is refusing to submit that missile for review. A Boeing representative said the company is disappointed in the Air Force's decision not to allot more funding for its missile.

## 28. Analysts Predict Counterdrone Market Will Top $2B

C4ISRNet.com, Oct. 28 - The three biggest obstacles facing the counterdrone market are the law, the nature of the threat, and the technology itself. In fairness, those are obstacles to the adoption of most any national security technology. A new analysis by investment consultants Frost & Sullivan tackles the counterdrone market, an area of high interest, no consensus, and much proverbial snake oil. The report projects a counterdrone market whose revenues will exceed $2 billion by 2024. What legal obstacles counterdrone systems face

depend on how, exactly, the equipment works to stop a drone. "Adoption of these [counterdrone] technologies is limited by individual country rules against wiretapping, jamming, and computer hacking — all methods employed by various C-UAS," said Michael Blades of Frost & Sullivan.

## 29. Uphill Sledding for EOD Funding

NationalDefenseMagazine.org, Oct. 28 - Once a high-profile mission set, the military's explosive ordnance disposal community is now receiving less attention — and less money — from lawmakers. Just a decade ago, policymakers were pumping billions of dollars annually into initiatives to counter improvised explosive devices that were being used to target U.S. troops overseas. The film "The Hurt Locker," about a fictional EOD team operating in Iraq, won an Oscar for Best Picture. But times have changed. "We became very well publicized and we became a very big thing during the height of the IED years," noted Maj. Daniel Long with the Air Force's congressional liaison office. "As we've withdrawn out of Iraq, as Afghanistan starts to pull down, I don't know that we normally get the same amount of attention that we have previously, which is frankly a bit of a problem" because of the ongoing threat, he said at the National Defense Industrial Association's Global EOD Symposium and Exhibition. Between 2006 and 2009, the Joint Improvised Explosive Device Defeat Organization received more than $16 billion, according to the Government Accountability Office. By 2015, the renamed Joint Improvised-Threat Defeat Organization was receiving less than $600 million annually, and its budgets have remained relatively flat since then.

## 30. FTC Investigates Northrop: GBSD?

BreakingDefense.com, Oct. 24 - The Federal Trade Commission appears to be investigating whether Northrop Grumman acted in restraint of trade and violated an order requiring the company to sell its solid motor rocket engines on "a non-discriminatory basis to all competitors for missile contracts." Northrop disclosed the investigation today in its quarterly report: "In October 2019, the company received a civil investigative demand from the FTC requesting certain information relating to a potential issue of the company's compliance with the Order in connection with a pending strategic missile competition. The company is working to respond to the request. We believe the company has been and continues to be in full compliance with the Order, but we cannot predict any potential impact on the pending competition." Now, that does not make clear that the FTC is looking at the Ground Based Strategic Deterrent (GBSD), but there aren't a lot of other candidates for "a strategic missile competition" and it refers to an "Order."

## 31. How the Army Will Use Satellites to Track Land Threats in Real Time

C4ISRNet.com, Oct. 25 - The Army has needs. One of those needs is the ability to track and target land threats that are beyond the war fighters' line of sight. Though much of the focus on space sensing capabilities is directed at missile defense or space situational awareness, the ability to see time-sensitive ground threats like tanks beyond the line of sight of ground forces is essential for the war fighter. To help build this capability, the Army is teaming with the Space Development Agency on a space-based sensor layer dedicated to deep targeting that can feed information to the war fighter on the ground in real time. The SDA is actually developing a trio of sensing capabilities in space: a layer dedicated to tracking hypersonic

weapons and ballistic missiles; a layer dedicated to space situational awareness and investigating objects in cislunar orbit; and a layer dedicated to detecting and maintaining custody of time-sensitive ground threats.

## 32. Does Major Joint Military Procurement Really Work in the Baltics?

DefenseNews.com, Oct. 28 - On paper, the Baltic nations appear to have closely aligned defense modernization needs that make the joint procurement of advanced military equipment a no-brainer. After all, Latvia, Estonia and Lithuania have historically shared national interests, are currently facing a similar threat from Russia and each have relatively small defense budgets. Joint procurement would drive down costs for large defense articles by allowing the smaller Baltic nations to buy in greater numbers. It would also allow the countries to share maintenance responsibilities, which would save money. And it would drive greater interoperability in countering an adversary's simultaneous attack all three nations. But then there's the reality of the situation. "I think there are many misperceptions on Baltic integration," Janis Garisons, state secretary for the Latvian Ministry of Defence, told Defense News during a September visit to Washington. "I think this is a little bit of a wrong perception that there is a lot of added value in those common procurements."

## 33. Opinion: Is 3-D Printing the Future of Terrorism?

WSJ.com, Oct. 25 - On Oct. 9, a gunman tried to massacre worshipers on Yom Kippur at a synagogue in Halle, Germany, and crossed a new threshold: It was the first time a terrorist perpetrated a deadly attack with homemade weapons using 3-D-printed components—including a 3-D-printed gun. Instead of the slaughter the gunman had hoped for, he killed two people—in part because he couldn't get past a locked synagogue door, in part because what he called his "improvised guns" jammed or failed to fire. But the Halle attack shouldn't be dismissed as a macabre flop. The killer was interested not just in murder but in inspiration. In an online manifesto that German authorities have confirmed he wrote, the gunman styled himself a pioneer on a trial run: He wanted to use emerging technologies to encourage subsequent terrorists to follow in his footsteps and perfect his tactics. His goal was what security experts call "proof of concept." . . . The self-made Halle arsenal is a harbinger of a worrisome new era. The shooter sought to demonstrate the possibility of making simple, lethal, hard-to-trace, homemade guns that can be used by furtive lone-wolf terrorists like himself, as well as by larger extremist groups trying to lie low. More such attempts will likely follow, each building on the other to become increasingly deadly.

## 34. Opinion: US-China Competition: The Coming Decoupling? – Analysis

Eurasiareview.com, Oct. 27 - The United States and China are now clearly locked in a competition over dominance of the technologies of the future. At the same time, some elements of key government organisations on both sides are pushing for a major decoupling of very intertwined supply chains and value generation ecosystems that have developed over more than 30 years. How did we get to the point where zero sum competition and some level of decoupling are now widely accepted in government, academic, and business circles, and companies on both sides are acting in ways that will both heighten the competition and accelerate the decoupling? All this in several short years? Several parallel processes came together to produce this, which is happening in some sense organically,

with no clear long-term thinking in either capital that accounts for the economic and national security costs, and second-, third-, and fourth- order effects. US policy towards China on technology issues has been driven by four major factors, some stemming from long standing concerns, and others coming out of recent developments around advanced technologies, where Chinese firms are suddenly both a supplier and collaborator and a new competitor.

## Upcoming Export Control and Other Trade Compliance Conferences

**Oct. 29-30 - Aéro Montréal and Cirrus Research Associates - Training on the Canadian Defence Market - Montreal**

**Nov. 4-5 - Aéro Montréal and McCarter & English - Training on the US Market - Montreal**

**Nov. 5 - America's Small Business Development Centers and M-PALM - Automated Commercial Environment (ACE) Export Compliance Seminar - Baltimore - Lofts Hotel**

**Nov. 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Huntsville, AL**

**Nov. 12 - US Dept. of the Treasury/Office of Foreign Assets Control (OFAC) - 2019 OFAC Symposium - Washington, DC - Walter E. Washington Convention Center**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldorf, Germany**

**Nov. 18 - Cnxtd ("Connected") Inc. - 2019 International Conference on the EU Cybersecurity Act - Brussels - Hotel Brussels**

**Nov. 19 - C5 Group - European Forum on U.S. Export Controls - Brussels**

**Nov. 20-21 - C5 Group - European U.S. Defence Contracting - Brussels**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 3-4 - C5 Group - 12th Advanced Conference on Customs Compliance - London - St. James' Court, A Taj Hotel**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 10-11 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Dec. 11 - German Government/Federal Office of Economics and Export Control - 11th Information Day Export Control 2019 -Frankfurt - Cape Europa, Osloer Str. 5, 60327 Frankfurt am Main**

**Dec. 13 - European Commission - 2019 Export Control Forum - Brussels - Albert Borschette Conference Centre (CCAB) Room CCAB0A Rue Froissart 36**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 28-29 - American Conference Institute - 9th Forum on U.S. Export & Re-Export Compliance for Canadian Operations - Toronto - Toronto Airport Marriott Hotel** - Gary Stanley, Editor of Defense and Export-Import Update, will once again co-chair this important conference.

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

**Feb. 24-26 - Society for International Affairs - 2020 Winter Back to Basics Conference - Las Vegas - Westin Las Vegas Hotel**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to gstanley@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. +1 (202) 686-4854
Fax +1 (202) 686-2624
Mobile +1 (202) 352-3059
E-mail gstanley@glstrade.com

Unsubscribe

**From:** Gary Stanley [gstanley@glstrade.com]
**Sent:** 10/28/2019 1:11:02 PM
**To:** Nazak Nikakhtar [Nazak.Nikakhtar@bis.doc.gov]
**Subject:** Defense and Export-Import Update (Oct. 28, 2019)



**CUSTOMS COMPLIANCE INDUSTRY EXCHANGE**
NOVEMBER 20 - 21, 2019 WASHINGTON PLAZA, WASHINGTON, DC

**Dear All,**

**Good Day!**

**Gary Stanley's Export Control Tip of the Day: A** a foreign person may make a self-determination of an item's jurisdictional and classification status. Indeed, a foreign person is obligated to know whether an item is subject to the ITAR or, if subject to the EAR, how it is classified before reexporting or transferring the item in order to ensure compliance with the ITAR's and the EAR's licensing and other obligations. The U.S. exporter is responsible for determining the jurisdictional and classification status of the items it is exporting. However, if reliable jurisdictional and classification information has not already been provided by another party, such as the original equipment manufacturer, then the foreign person may and, indeed, must make these determinations itself in order to avoid violating the ITAR or the EAR if it later reexports or retransfers the article or item. As a matter of due diligence, however, the foreign person should seek jurisdictional and classification information from the manufacturer of the items or the owner of the technology in question and resolve any potential differences in interpretation. If after reviewing the ITAR's U.S. Munitions List (USML) and all relevant facts, doubt exists regarding whether the item is enumerated or otherwise described on the USML, the foreign person should request from DDTC a commodity jurisdiction determination pursuant to 22 C.F.R. § 120.4. If the item is clearly not enumerated or otherwise described on the USML and, after reviewing the EAR and all relevant facts, there is doubt regarding whether or where the item is enumerated or otherwise described on the EAR's Commerce Control List, then the foreign person should request from the Department of Commerce's Bureau of Industry and Security a commodity classification determination pursuant to 15 C.F.R. § 748.3.

**Today's Items:**

1. **DDTC Seeks Public Comment on Electronic Form for Voluntary Disclosures**

2. **BIS Issues Order Denying Export Privileges of Alexis Vlachos of Montréal**

3. **Columbus Man Sentenced to Prison for Illegally Exporting Goods to Iran**

4. **Treasury and State Announce New Humanitarian Mechanism to Increase Transparency of Permissible Trade Supporting the Iranian People**

5. **OFAC Publishes General Licenses Relating to Iran and Venezuela**

6. **President Trump Continues National Emergency With Respect to the Democratic Republic of the Congo**

7. **EU Commission Opens Registration for 2019 Export Control Forum**

8. **UK Government's OFSI Updates Post Brexit - Russia Guidance**

9.  **USTR Grants Certain Requests for Exclusion from Additional Duties on Certain Chinese Products**

10. **USTR Publishes Exclusion Request Schedule on Additional Chinese Products Subject to Increased Tariffs**

11. **USTR Seeks Applications for Inclusion on the Binational Panels Roster Under the North American Free Trade Agreement**

12. **EXIM Bank Advisory Committee and Sub-Saharan Africa Advisory Committee to Meet Oct. 30**

13. **Commerce/ITA's Civil Nuclear Trade Advisory Committee to Meet Nov. 12**

14. **Homeland Security Advisory Committee to Meet Nov. 14**

15. **Commerce/ITA's Environmental Technologies Trade Advisory Committee to Meet Nov. 19**

16. **U.S. Government Contracting**

17. **U.S. Customs and U.S. Census/AES Updates**

18. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**

19. **GAO and CRS Reports, Testimony, and Correspondence of Interest**

20. **U.S. Government Trade Forms and Other Information Collections Open for Public Comment**

## Other Headlines

21. **This Week in Congress: New Worries About the NDAA**

22. **Beijing Woos U.S. and Other Foreign Companies as Trade War Takes Toll**

23. **Amazon or Microsoft? DoD Picks a Winner for Its Coveted JEDI Contract**

24. **Key Dates Leading Up to the U.S. Pentagon's Cloud-Computing Award to Microsoft**

25. **Hypersonics Pitch Day: Air Force Woos Startups**

26. **Pentagon, With an Eye on China, Pushes for Help From American Tech**

27. **Air Force Halts Funding for Boeing's bBallistic Missile Replacement**

28. **Analysts Predict Counterdrone Market Will Top $2B**

29. **Uphill Sledding for EOD Funding**

30. **FTC Investigates Northrop: GBSD?**

31. **How the Army Will Use Satellites to Track Land Threats in Real Time**

32. **Does Major Joint Military Procurement Really Work in the Baltics?**

33. **Opinion: Is 3-D Printing the Future of Terrorism?**

34. **Opinion: US-China Competition: The Coming Decoupling? – Analysis**

## Upcoming Export Control and Other Trade Compliance Conferences

## 1. DDTC Seeks Public Comment on Electronic Form for Voluntary Disclosures

(84 Fed. Reg. 57801) - The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) is seeking public comment on its electronic form DS-7787 - "Disclosure of Violations of the Arms Export Control Act." interested persons have until November 27, 2019, to submit their comments.

## 2. BIS Issues Order Denying Export Privileges of Alexis Vlachos of Montréal

The U.S. Department of Commerce's Bureau of Industry and Security (BIS) has issued an Order Denying Export Privileges to Alexis Vlachos of Montréal, Québec, Canada, until September 4, 2025. On September 4, 2018, in the U.S. District Court for the District of Vermont, Alexis Vlachos ("Vlachos") was convicted of violating Section 38 of the Arms Export Control Act (22 U.S.C. § 2778 (2012)) ("AECA"). Vlachos was convicted of violating Section 38 of the AECA by knowingly and willfully exporting and causing to be exported from the United States to Canada firearms that were designated as defense articles on the United States Munitions List, without the required U.S. Department of State licenses. Vlachos was sentenced to fifty-one (51) months in prison and an assessment of $200.

## 3. Columbus Man Sentenced to Prison for Illegally Exporting Goods to Iran

The U.S. Department of Justice (DOJ) has announced that Behrooz Behroozian, 64, Columbus, Ohio, has been sentenced to 20 months in prison for exporting gas and oil pipeline parts to Iran for more than a decade in deliberate violation of a U.S. embargo and trade sanctions. According to the sentencing memorandum filed in this case, Behroozian used an intermediary company, Sumar Industrial Equipment, to attempt to cover-up that he was illegally supplying industrial equipment to Iran in violation of the Emergency Economic Powers Act (IEEPA). Behroozian exported manifolds, valves and connectors used for industrial pipelines in the gas and oil refinement industry to Iran via Sumar and profited $35,000 to $40,000 per year. This violated embargo and trade sanctions imposed upon Iran by the United States in May 1995. In November 2006, Behroozian became the owner and operator of a computer parts supplier in Dublin, Ohio, called Comtech International. Comtech had no storefront and made no domestic sales. It seldom exported computer parts. Instead, Comtech primarily exported industrial equipment to Sumar in the United Arab Emirates for further exportation to Iran.

## 4. Treasury and State Announce New Humanitarian Mechanism to Increase Transparency of Permissible Trade Supporting the Iranian People

The U.S. Departments of the Treasury and State has announced a new humanitarian mechanism to ensure unprecedented transparency into humanitarian trade with Iran. This mechanism will help the international community perform enhanced due diligence on humanitarian trade to ensure that funds associated with permissible trade in support of the Iranian people are not diverted by the Iranian regime. Concurrently, Treasury's Financial Crimes Enforcement Network (FinCEN) identified Iran as a jurisdiction of primary money

laundering concern under Section 311 of the USA PATRIOT Act, and issued a new rulemaking to protect the U.S. financial system from malign Iranian financial activities. The humanitarian mechanism will require foreign governments and financial institutions that choose to participate in the mechanism to conduct enhanced due diligence and provide to Treasury a substantial and unprecedented amount of information, with appropriate disclosure and use restrictions, on a monthly basis, as described in guidance provided by OFAC outlining specific requirements.

## 5. OFAC Publishes General Licenses Relating to Iran and Venezuela

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has taken the following actions:

• Issued General License K "Authorizing Maintenance or Wind Down of Transactions Involving Cosco Shipping Tanker (Dalian) Co., Ltd."

• Amended  General License 5A "Authorizing Certain Transactions Related to the Petróleos de Venezuela, S.A. 2020 8.5 Percent Bond on or After January 22, 2020." In conjunction with this action, OFAC is amending Frequently Asked Question 595.

## 6. President Trump Continues National Emergency With Respect to the Democratic Republic of the Congo

(84 Fed. Reg. 56927) - In accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), President Donald J. Trump is continuing for 1 year the national emergency with respect to the situation in or in relation to the Democratic Republic of the Congo declared in Executive Order 13413, as amended by Executive Order 13671.

## 7. EU Commission Opens Registration for 2019 Export Control Forum

The European Commission and the Finnish Presidency of the Council are inviting representatives from EU Member States and the European Parliament, industry and civil society to participate in the 2019 Export Control Forum. The 2019 Export Control Forum will provide an opportunity to review ongoing export control implementation and latest developments in the EU, as well as to discuss the future of EU and global international export controls. The 2019 Export Control Forum will be opened by representatives of the Commission, the Presidency and the European Parliament, and will convene selected panels of experts, to be followed by open dialogue with the stakeholders.

• Date: 13 December 2019

• Venue: Albert Borschette Conference Centre (CCAB) Room 0A. Rue Froissart 36, Brussels

• Time: 10:00 – 17:00. Registration will be open at 9:30.

• Registration: Please register via the online registration tool. The deadline for registration is 1 December 2019.

## 8. UK Government's OFSI Updates Post Brexit - Russia Guidance

The U.K. Government's Office of Financial Sanctions Implementation (FSI) has updated its guidance on the financial and investment restrictions in the Russia sanctions regime should

the UK leave the EU without a deal. This guidance does not currently apply and would only come in to effect if the UK leaves the EU without a deal and when the Russia (Sanctions) (EU Exit) Regulations 2019 come into force. This is therefore for information only at this stage.

## 9. USTR Grants Certain Requests for Exclusion from Additional Duties on Certain Chinese Products

(84 Fed. Reg. 57803) - In September 2018, the U.S. Trade Representative imposed additional duties on goods of China with an annual trade value of approximately $200 billion as part of the action in the Section 301 investigation of China's acts, policies, and practices related to technology transfer, intellectual property, and innovation. The U.S. Trade Representative initiated a product exclusion process in June 2019, and interested persons have submitted requests for the exclusion of specific products. This notice announces the U.S. Trade Representative's determination to grant certain exclusion requests, as specified in the annex to this notice. The product exclusions announced in this notice will apply as of the September 24, 2018, effective date of the $200 billion action, to August 7, 2020.

## 10. USTR Publishes Exclusion Request Schedule on Additional Chinese Products Subject to Increased Tariffs

(84 Fed. Reg. 57144) - In a notice published at 84 Fed. Reg. 43304 (Aug. 20, 2019), the U.S. Trade Representative announced that the Office of the U.S. Trade Representative (USTR) would establish a process by which U.S. stakeholders may request an exclusion from additional duties of particular products classified within a tariff subheading covered by the August 2019 action. This notice announces that USTR will open an electronic portal for submission of exclusion requests on October 31, 2019 for products covered by Annex A of the August 2019 action, and sets out the specific procedures for submitting requests.

- October 31, 2019 at noon EDT: The web portal for submitting exclusion requests--https://exclusions.USTR.gov--will open.

- January 31, 2020 at 11:59 PM EST: Last day for submitting exclusion requests.

- Responses to individual exclusion requests are due 14 days after USTR posts the request on the online portal.

- Any replies to responses to an exclusion request are due the later of 7 days after the close of the 14-day response period, or 7 days after the posting of a response.

## 11. USTR Seeks Applications for Inclusion on the Binational Panels Roster Under the North American Free Trade Agreement

(84 Fed. Reg. 57152) - The North American Free Trade Agreement (NAFTA) provides for the establishment of a roster of individuals to serve on binational panels convened to review final determinations in antidumping or countervailing duty (AD/CVD) proceedings and amendments to AD/CVD statutes of a NAFTA Party. The United States annually renews its selections for the roster. The Office of the United States Trade Representative (USTR) invites applications from eligible individuals wishing to be included on the roster for the period April

DOC_0067790

1, 2020, through March 31, 2021. USTR must receive your application by November 29, 2019.

## 12. EXIM Bank Advisory Committee and Sub-Saharan Africa Advisory Committee to Meet Oct. 30

(84 Fed. Reg. 56810) - The Export-Import Bank of the United States (EXIM) as announced that its advisory committee and its Sub-Saharan Africa Advisory Committee will meet Wednesday, October 30, 2019, 11:00 AM to 2:30 PM EDT, at 811 Vermont Avenue NW, Room 1126, Washington, DC 20571. If you plan to attend, a photo ID must be presented at the guard's desk as part of the clearance process into the building, you may contact India Walker at external@exim.gov to be placed on an attendee list. Discussion of EXIM programs and comments for inclusion in the report on competitiveness of the Export-Import Bank of the United States to Congress.

## 13. Commerce/ITA's Civil Nuclear Trade Advisory Committee to Meet Nov. 12

(84 Fed. Reg. 57699) - The U.S. Department of Commerce's International Trade Administration (ITA) has announced that its Civil Nuclear Trade Advisory Committee will meet in open sessionTuesday, November 12, 2019, 3:00 PM to 4:00 PM EST, at the U.S. Department of Commerce, Herbert C. Hoover Building, Commerce Research Library, 1401 Constitution Ave. NW, Washington, DC 20230. Requests to register to participate (including to speak or for auxiliary aids) and any written comments should be submitted to: Mr. Devin Horne, Office of Energy & Environmental Industries, International Trade Administration, Room 28018, 1401 Constitution Ave. NW, Washington, DC 20230. (Fax: 202-482- 5665; email: devin.horne@trade.gov). Members of the public are encouraged to submit registration requests and written comments via email to ensure timely receipt.

## 14. Homeland Security Advisory Committee to Meet Nov. 14

(84 Fed. Reg. 56828) - The U.S. Department of Homeland Security's Office of Partnership and Engagement has announced that the Homeland Security Advisory Council will meet in open session Thursday, November 14, 2019, 1:45 PM to 3:30 PM EST, in the Town Hall at the Transportation Security Administration, 601 S 12th Street (East Building), Arlington, VA 20598. The Council will swear in new members, and review and deliberate on reports from the Families and Children Care Panel, Emerging Technologies, Prevention of Targeted Violence Against Faith- based Communities, and State, Local, Tribal, and Territorial Cybersecurity subcommittees. Following this, there will be a break for public commentary.

## 15. Commerce/ITA's Environmental Technologies Trade Advisory Committee to Meet Nov. 19

(84 Fed. Reg. 57698) - The U.S. Department of Commerce's International Trade Administration (ITA) has announced that its Environmental Technologies Trade Advisory Committee (ETTAC) will meet Tuesday, November 19, 2019, 8:45 AM to 3:30 PM EST, in the Research Library at the U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230. Those interested in attending must provide notification by Friday, November 8, at 5:00 PM EST. To register and obtain call-in information, submit comments, or request auxiliary aids, please contact: Ms. Amy Kreps, Office of Energy & Environmental

Industries (OEEI), International Trade Administration, Room 28018, 1401 Constitution Avenue NW, Washington, DC 20230 or email: amy.kreps@trade.gov. The ETTAC will receive briefings from ITA as well as the interagency and will discuss its priorities and objectives for potential recommendations to the interagency through the Secretary of Commerce. Topics to be considered during the afternoon subcommittee breakout sessions will fall under the three themes of Trade Policy and Trade Negotiations, Trade Promotion and Export Market Development, and Cooperation on Standards, Certifications and Regulations.

## 16. U.S. Government Contracting

• DoD, GSA & NASA/Federal Acquisition Regulation (FAR): OMB Information Collection Submission - Patents - Deadline for Public Comment: Dec. 23, 2019

• DoD/Office of the Under Secretary of Defense for Acquisition and Sustainment: OMB Information Collection Submission - Department of Defense Application for Priority Rating for Production or Construction Equipment - Agency Form No.: DD Form 691 - Deadline for Public Comment: Nov. 25, 2019

• DoD/Defense Logistics Agency (DLA): OMB Information Collection Submission - ASSIST Database - Deadline for Public Comment: Nov. 25, 2019

• GSA: Notice of Announcement of Industry Engagement Event - GSA is hosting an industry engagement event on Wednesday, November 6, 2019, from 9:00 AM to 11:00 AM EST, at the Department of Interior (DOI) Yates Auditorium at 1849 C St. NW, Washington, DC 20240k, to highlight how section 889 of Title VII of the NDAA for FY 2019 (hereinafter Sec. 889) will affect GSA's business and supply chain.

## 17. U.S. Customs and U.S. Census/AES Updates

• U.S. Customs - CSMS #40363706 - ACE CERTIFICATION CQ Deployment Thursday morning, Oct 24, 2019 at 0630 ET

• U.S. Customs - CSMS #40371652 - Food and Drug Administration (FDA) New Center for Tobacco (CTP) Product Subclass Code

• U.S. Customs - CSMS #40373287 - Trade Policy Update for Drawback: Trade Facilitation and Trade Enforcement Act (TFTEA) Combination Privilege Application

• U.S. Customs - CSMS #40386416 - ACE PROD AND CERT EXTENDED Scheduled Maintenance this weekend, Sat. Oct 26, 2019@ 2100 ET to 0400 ET Sun. Oct 27

• U.S. Customs - CSMS #40389928 - Update for the Automated Commercial Environment (ACE) Collections Release 1 – PZ Output Release Date

• U.S. Census - Tips on How to Resolve AES Response Messages

| | |
|---|---|
| **Fatal Error Response Code: 068** | **Narrative:** SRN on File; Action Not Allowed |
| | **Severity:** Fatal |
| | **Reason: The Shipment is not on file in AES, therefore the requested action is not allowed.** |
| | **Resolution:** When the Shipment Filing Action Request Indicator is a Change, Replace, or X for Cancel, the Shipment Reference Number must exist on a previous filing in AES for the filer. |
| | Verify the Shipment Filing Action Request Indicator and the Shipment Reference Number, correct the shipment and resubmit. |
| **Fatal Error Response Code: 808** | **Narrative:** Improbable Destination for Commodity |
| | **Severity:** Verify |
| | **Reason:** For the reported Schedule B/HTS Number, the Country of Destination Code is improbable. |
| | **Resolution:** Certain products are highly unlikely to be exported to certain Countries of Destination based on historical data and industry input. This might indicate either a keying error or misclassification of the product. |
| | Verify the Schedule B/HTS Number and Country of Destination Code, correct the shipment and resubmit (if necessary). If the information is verified correct as reported, no action is necessary. |

## 18. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

- Commerce/E&C - Certain Amorphous Silica Fabric From the People's Republic of China: Rescission of Countervailing Duty Administrative Review; 2018

- Commerce/E&C - Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017

- Commerce/E&C - Certain Large Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Over 4.5 Inches) From Japan: Rescission of Antidumping Duty Administrative Review: 2018-2019

- Commerce/E&C - Certain Small Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe (Under 4.5 Inches) From Japan: Rescission of Antidumping Duty Administrative Review: 2018-2019

- Commerce/E&C - Certain Uncoated Paper From Brazil: Final Results of Antidumping Duty Administrative Review; 2017-2018

- Commerce/E&C - Fresh Tomatoes From Mexico: Final Determination of Sales at Less Than Fair Value Pages 57401 - 57403 [FR DOC #2019-23341]

- Commerce/E&C - High Pressure Steel Cylinders From the People's Republic of China: Rescission of Countervailing Duty Administrative Review: 2018

- Commerce/E&C - Mattresses From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part

- Commerce/E&C - Refillable Stainless Steel Kegs From Germany: Final Affirmative Determination of Sales at Less Than Fair Value

- Commerce/E&C - Refillable Stainless Steel Kegs From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part

- Commerce/E&C - Refillable Stainless Steel Kegs From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part

- Commerce/E&C - Stainless Steel Flanges From the People's Republic of China: Rescission of Countervailing Duty Administrative Review; 2019

- Commerce/E&C - Vertical Metal File Cabinets From the People's Republic of China: Final Determination of Sales at Less Than Fair Value

- Commerce/E&C - Vertical Metal File Cabinets From the People's Republic of China: Final Affirmative Countervailing Duty Determination

- USITC - USITC Releases Report on MTB Effects - This report provides a broad assessment of the economic effects of duty suspensions and reductions on U.S. producers, purchasers, and consumers, as well as case studies looking at the effects on groups of products covered by the Miscellaneous Tariff Bill Act of 2018. The report also includes recommendations from interested parties with respect to those domestic industry sectors that might benefit from permanent duty suspensions or reductions, with a particular focus on inequities created by tariff inversions. Much of the information in this report comes from a survey conducted by the Commission after the duty suspensions and reductions became effective.

- USITC - USITC Releases The Year in Trade 2018

- USITC - Certain Microfluidic Systems and Components Thereof and Products Containing Same: Commission Determination To Review in Part a Final Initial Determination Finding a Violation of Section 337 and To Extend the Target Date; Schedule for Filing Written Submissions

- USITC - Certain Semiconductor Devices, Integrated Circuits, and Consumer Products Containing the Same: Commission Determination Not To Review an Initial Determination Terminating the Investigation Based on a Settlement Agreement and a Withdrawal of the

Complaint; Termination of the Investigation

- USITC - Certain Shaker Screens for Drilling Fluids, Components Thereof, and Related Marketing Materials: Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

- USITC - Fresh Tomatoes From Mexico: Continuation of the Final Phase of an Antidumping Duty Investigation and Revised Schedule

- USITC - Wooden Cabinets and Vanities From China: Scheduling of the Final Phase of Countervailing Duty and Anti-Dumping Duty Investigations

- USITC - Government in the Sunshine Act Meeting Notice - October 31, 2019, 11:00 AM EDT

## 19. GAO and CRS Reports, Testimony, and Correspondence of Interest

- CRS - Brexit: Status and Outlook

- CRS - The European Parliament and U.S. Interests

- CRS - The Changing Landscape of Immigrant Investment Programs

- CRS - Australia

## 20. U.S. Government Trade Forms and Other Information Collections Open for Public Comment

(84 Fed. Reg. 57054) - Agency: U.S. Dept. of Justice/Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) - Title: Informant Agreement - Agency Form No.: ATF Form 3252.2 - Type of Review: New Collection - Deadline for Public Comment: Dec. 23, 2019

## Other Headlines

## 21. This Week in Congress: New Worries About the NDAA

MiltiaryTimes.com, Oct. 28 - Senate Armed Services Committee officials this week will release a "skinny" defense authorization bill plan as lawmakers grow increasingly pessimistic about the possibility of reaching a compromise on a host of disputed issues with the massive military policy bill. Committee Chairman Jim Inhofe, R-Okla., said last week that the move is designed to ensure that a host of necessary items — including numerous military specialty pay authorizations — are passed by the end of the year. But a day later, House Armed Services Chairman Adam Smith, D-Wash., said a stripped-down version of the measure wouldn't solve all of lawmakers' problems. Negotiations on the broader measure have stalled in recent weeks as Democrats and Republicans have fought over military construction money used for President Donald Trump's controversial border wall project.

## 22. Beijing Woos U.S. and Other Foreign Companies as Trade War Takes Toll

WSJ.com, Oct. 27 - China has stepped up its charm offensive to attract U.S. and other foreign companies in recent weeks, seeking to offset the debilitating impact of the trade war while still exchanging blistering comments with Washington. The country's premier, Li Keqiang, has wooed foreign companies with noticeable enthusiasm this month, telling a roundtable of Western executives, for example, that global manufacturing enterprises are welcome to seize opportunities as China opens up further. The move suggests a growing realization of the trade war's toll on the Chinese economy and on U.S. companies' willingness to invest in China. It also reflects a recognition that foreign companies are key to achieving Chinese leaders' ambitions for both growth and technological advancement. The pursuit of foreign investors comes as the Communist party elite sits down Monday for its first top policy-setting meeting, or plenum, since early last year, during which leaders will discuss their next five-year economic blueprint, according to Chinese officials involved in policy making.

## 23. Amazon or Microsoft? DoD Picks a Winner for Its Controversial JEDI Contract

DefenseNews.com, No. 26 - Microsoft won the contract for the Department of Defense's enterprise cloud, potentially worth $10 billion over 10 years, the Pentagon announced Oct. 25. The tech giant won the award over Amazon Web Services, just three days after Secretary of Defense Mark Esper recused himself from the award after months of review because his son worked for IBM. Amazon was widely considered by industry to be the front runner for the award. The JEDI contract process continues to be under investigation by the DoD inspector general and stuck in federal court. The Pentagon plans to move 80 percent of its systems over to the Joint Enterprise Defense Infrastructure cloud, better known as JEDI. The cloud will contain both unclassified and classified data. In a statement, DoD CIO Dana Deasy heralded the contract award as a win for the war fighter. "The National Defense Strategy dictates that we must improve the speed and effectiveness with which we develop and deploy modernized technical capabilities to our women and men in uniform," DoD Chief Information Officer Dana Deasy said. "The DoD Digital Modernization Strategy was created to support this imperative. This award is an important step in execution of the Digital Modernization Strategy."

## 24. Key Dates Leading Up to the U.S. Pentagon's Cloud-Computing Award to Microsoft

Reuters.com, Oct. 27 - Microsoft Corp has won the U.S. Pentagon's $10 billion cloud-computing contract, the Defense Department said on Friday, beating out favorite Amazon.com Inc. The contract, called the Joint Enterprise Defense Infrastructure Cloud, or JEDI, is part of a broad modernization of the Pentagon's information technology systems. Here is a timeline of important dates leading up to the award.

## 25. Hypersonics Pitch Day: Air Force Woos Startups

BreakingDefense.com, Oct. 25 - Hypersonics and "pitch days," two of the hottest concepts at the Air Force right now, will come together for the first time Nov. 7. Air Force experts will

judge products and ideas from startup firms related to solving key challenges to hypersonic flight, such as Mach 5-plus propulsion and new materials that can withstand extremely high temperatures. Lt. Gen. Duke Richardson, military deputy to Air Force acquisition czar Will Roper, will oversee the panel of judges who pick the winner of a same-day contract of up to $750,000 to jumpstart their work, according to an Oct. 18 announcement from Air Force Materiel Command's 96th Test Wing. The pitch day will be held at the Doolittle Institute in Niceville, Fla. "Fielding hypersonic weapons is a top priority for our warfighters. The Air Force is leading the way, and we can use all the help we can get from innovative companies," Richardson said. "That's one reason why this pitch day is so exciting."

## 26. Pentagon, With an Eye on China, Pushes for Help From American Tech

NYTimes.com, Oct. 25 - Pentagon officials have been holding private discussions with tech industry executives to wrestle with a key question: how to ensure future supplies of the advanced computer chips needed to retain America's military edge. The talks, some of which predate the Trump administration, recently took on an increased urgency, according to people who were involved or briefed on the discussions. Pentagon officials encouraged chip executives to consider new production lines for semiconductors in the United States, said the people, who declined to be identified because the talks were confidential. The discussions are being driven by the Pentagon's increased dependence on chips made abroad, especially in Taiwan, as well as recent tensions with China, these people said. One chip maker, the Taiwan Semiconductor Manufacturing Company, better known as TSMC, plays a particularly crucial role producing commercial chips that also have applications for aircraft, satellites, drones and wireless communications. And because of unrest over the past few months in the semiautonomous Chinese territory of Hong Kong, some Pentagon officials and chip executives have wondered about situations that could force suppliers in Taiwan to limit or cut off silicon shipments, the people said.

## 27. Air Force Halts Funding for Boeing's bBallistic Missile Replacement

WashingtonPost.com, Oct. 22 - The Air Force has halted funding for Boeing's $349 million ballistic missile development effort, effectively clearing the way for a Northrop Grumman-led team to become the only bidder for one of the Pentagon's most expensive weapons production programs. The move is an apparent response to Boeing's recent announcement that it will drop out of the Ground Based Strategic Deterrent program, an $85 billion project to replace the nation's Minuteman III ballistic missiles. The Defense Department appears unwilling to pay Boeing to develop a next-generation ballistic missile when the company is refusing to submit that missile for review. A Boeing representative said the company is disappointed in the Air Force's decision not to allot more funding for its missile.

## 28. Analysts Predict Counterdrone Market Will Top $2B

C4ISRNet.com, Oct. 28 - The three biggest obstacles facing the counterdrone market are the law, the nature of the threat, and the technology itself. In fairness, those are obstacles to the adoption of most any national security technology. A new analysis by investment consultants Frost & Sullivan tackles the counterdrone market, an area of high interest, no consensus, and much proverbial snake oil. The report projects a counterdrone market whose revenues will exceed $2 billion by 2024. What legal obstacles counterdrone systems face

depend on how, exactly, the equipment works to stop a drone. "Adoption of these [counterdrone] technologies is limited by individual country rules against wiretapping, jamming, and computer hacking — all methods employed by various C-UAS," said Michael Blades of Frost & Sullivan.

## 29. Uphill Sledding for EOD Funding

NationalDefenseMagazine.org, Oct. 28 - Once a high-profile mission set, the military's explosive ordnance disposal community is now receiving less attention — and less money — from lawmakers. Just a decade ago, policymakers were pumping billions of dollars annually into initiatives to counter improvised explosive devices that were being used to target U.S. troops overseas. The film "The Hurt Locker," about a fictional EOD team operating in Iraq, won an Oscar for Best Picture. But times have changed. "We became very well publicized and we became a very big thing during the height of the IED years," noted Maj. Daniel Long with the Air Force's congressional liaison office. "As we've withdrawn out of Iraq, as Afghanistan starts to pull down, I don't know that we normally get the same amount of attention that we have previously, which is frankly a bit of a problem" because of the ongoing threat, he said at the National Defense Industrial Association's Global EOD Symposium and Exhibition. Between 2006 and 2009, the Joint Improvised Explosive Device Defeat Organization received more than $16 billion, according to the Government Accountability Office. By 2015, the renamed Joint Improvised-Threat Defeat Organization was receiving less than $600 million annually, and its budgets have remained relatively flat since then.

## 30. FTC Investigates Northrop: GBSD?

BreakingDefense.com, Oct. 24 - The Federal Trade Commission appears to be investigating whether Northrop Grumman acted in restraint of trade and violated an order requiring the company to sell its solid motor rocket engines on "a non-discriminatory basis to all competitors for missile contracts." Northrop disclosed the investigation today in its quarterly report: "In October 2019, the company received a civil investigative demand from the FTC requesting certain information relating to a potential issue of the company's compliance with the Order in connection with a pending strategic missile competition. The company is working to respond to the request. We believe the company has been and continues to be in full compliance with the Order, but we cannot predict any potential impact on the pending competition." Now, that does not make clear that the FTC is looking at the Ground Based Strategic Deterrent (GBSD), but there aren't a lot of other candidates for "a strategic missile competition" and it refers to an "Order."

## 31. How the Army Will Use Satellites to Track Land Threats in Real Time

C4ISRNet.com, Oct. 25 - The Army has needs. One of those needs is the ability to track and target land threats that are beyond the war fighters' line of sight. Though much of the focus on space sensing capabilities is directed at missile defense or space situational awareness, the ability to see time-sensitive ground threats like tanks beyond the line of sight of ground forces is essential for the war fighter. To help build this capability, the Army is teaming with the Space Development Agency on a space-based sensor layer dedicated to deep targeting that can feed information to the war fighter on the ground in real time. The SDA is actually developing a trio of sensing capabilities in space: a layer dedicated to tracking hypersonic

weapons and ballistic missiles; a layer dedicated to space situational awareness and investigating objects in cislunar orbit; and a layer dedicated to detecting and maintaining custody of time-sensitive ground threats.

## 32. Does Major Joint Military Procurement Really Work in the Baltics?

DefenseNews.com, Oct. 28 - On paper, the Baltic nations appear to have closely aligned defense modernization needs that make the joint procurement of advanced military equipment a no-brainer. After all, Latvia, Estonia and Lithuania have historically shared national interests, are currently facing a similar threat from Russia and each have relatively small defense budgets. Joint procurement would drive down costs for large defense articles by allowing the smaller Baltic nations to buy in greater numbers. It would also allow the countries to share maintenance responsibilities, which would save money. And it would drive greater interoperability in countering an adversary's simultaneous attack all three nations. But then there's the reality of the situation. "I think there are many misperceptions on Baltic integration," Janis Garisons, state secretary for the Latvian Ministry of Defence, told Defense News during a September visit to Washington. "I think this is a little bit of a wrong perception that there is a lot of added value in those common procurements."

## 33. Opinion: Is 3-D Printing the Future of Terrorism?

WSJ.com, Oct. 25 - On Oct. 9, a gunman tried to massacre worshipers on Yom Kippur at a synagogue in Halle, Germany, and crossed a new threshold: It was the first time a terrorist perpetrated a deadly attack with homemade weapons using 3-D-printed components—including a 3-D-printed gun. Instead of the slaughter the gunman had hoped for, he killed two people—in part because he couldn't get past a locked synagogue door, in part because what he called his "improvised guns" jammed or failed to fire. But the Halle attack shouldn't be dismissed as a macabre flop. The killer was interested not just in murder but in inspiration. In an online manifesto that German authorities have confirmed he wrote, the gunman styled himself a pioneer on a trial run: He wanted to use emerging technologies to encourage subsequent terrorists to follow in his footsteps and perfect his tactics. His goal was what security experts call "proof of concept." . . . The self-made Halle arsenal is a harbinger of a worrisome new era. The shooter sought to demonstrate the possibility of making simple, lethal, hard-to-trace, homemade guns that can be used by furtive lone-wolf terrorists like himself, as well as by larger extremist groups trying to lie low. More such attempts will likely follow, each building on the other to become increasingly deadly.

## 34. Opinion: US-China Competition: The Coming Decoupling? – Analysis

Eurasiareview.com, Oct. 27 - The United States and China are now clearly locked in a competition over dominance of the technologies of the future. At the same time, some elements of key government organisations on both sides are pushing for a major decoupling of very intertwined supply chains and value generation ecosystems that have developed over more than 30 years. How did we get to the point where zero sum competition and some level of decoupling are now widely accepted in government, academic, and business circles, and companies on both sides are acting in ways that will both heighten the competition and accelerate the decoupling? All this in several short years? Several parallel processes came together to produce this, which is happening in some sense organically, with no clear long-term thinking in either capital that accounts for the economic and national

security costs, and second-, third-, and fourth- order effects. US policy towards China on technology issues has been driven by four major factors, some stemming from long standing concerns, and others coming out of recent developments around advanced technologies, where Chinese firms are suddenly both a supplier and collaborator and a new competitor.

## Upcoming Export Control and Other Trade Compliance Conferences

**Oct. 29-30 - Aéro Montréal and Cirrus Research Associates - Training on the Canadian Defence Market - Montreal**

**Nov. 4-5 - Aéro Montréal and McCarter & English - Training on the US Market - Montreal**

**Nov. 5 - America's Small Business Development Centers and M-PALM - Automated Commercial Environment (ACE) Export Compliance Seminar - Baltimore - Lofts Hotel**

**Nov. 5-6 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Huntsville, AL**

**Nov. 12 - US Dept. of the Treasury/Office of Foreign Assets Control (OFAC) - 2019 OFAC Symposium - Washington, DC - Walter E. Washington Convention Center**

**Nov. 12-13 - Nielsonsmith - Customs Compliance in Europe 2019 - Düsseldorf, Germany**

**Nov. 18 - Cnxtd ("Connected") Inc. - 2019 International Conference on the EU Cybersecurity Act - Brussels - Hotel Brussels**

**Nov. 19 - C5 Group - European Forum on U.S. Export Controls - Brussels**

**Nov. 20-21 - C5 Group - European U.S. Defence Contracting - Brussels**

**Nov. 20-21 - Nielsonsmith - The European Anti-Corruption Summit - Munich, Germany**

**Dec. 3-4 - C5 Group - 12th Advanced Conference on Customs Compliance - London - St. James' Court, A Taj Hotel**

**Dec. 4-5 - American Conference Institute - 36th International Conference on the Foreign Corrupt Practices Act - Washington, DC**

**Dec. 10-11 - American Conference Institute - 10th Annual New York Forum on Economic Sanctions - New York City**

**Dec. 11 - German Government/Federal Office of Economics and Export Control - 11th Information Day Export Control 2019 -Frankfurt - Cape Europa, Osloer Str. 5, 60327 Frankfurt am Main**

**Dec. 13 - European Commission - 2019 Export Control Forum - Brussels - Albert Borschette Conference Centre (CCAB) Room CCAB0A Rue Froissart 36**

**Jan. 23-24 - American Conference Institute - AML & OFAC Compliance for the Insurance Industry - New York City**

**Jan. 28-29 - American Conference Institute - 9th Forum on U.S. Export & Re-Export Compliance for Canadian Operations - Toronto - Toronto Airport Marriott Hotel - Gary Stanley, Editor of Defense and Export-Import Update, will once again co-chair this important conference.**

**Jan. 30-31 - American Conference Institute - 14th Forum on the Foreign Corrupt Practices Act - Houston**

**Feb. 5-6 - Nielsonsmith - Export Compliance in Europe - Munich, Germany**

**Feb. 11-12 - Nielsonsmith - European, EU and EU Member State Trade Controls Compliance for North American Companies Summit - Washington, DC**

**Feb. 24-26 - Society for International Affairs - 2020 Winter Back to Basics Conference - Las Vegas - Westin Las Vegas Hotel**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to gstanley@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. +1 (202) 686-4854
Fax +1 (202) 686-2624
Mobile +1 (202) 352-3059
E-mail gstanley@glstrade.com

Unsubscribe

| | |
|---|---|
| **From:** | Steven Clagett [/O=CAIM/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=STEVEN B. CLAGETT] |
| **Sent:** | 11/8/2019 1:48:43 PM |
| **To:** | Steven Clagett |
| **Subject:** | OMB cleared Commerce Cat I-III firearms |
| **Attachments:** | OMB cleared Commerce Cat I-III firearms .pdf |

**From**: Jim Bartlett, Full Circle Compliance ▮▮▮▮@fullcirclecompliance.eu]
**Sent**: 11/12/2019 8:21:23 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 19-1112 Tuesday "Daily Bugle"



## Tuesday, 12 November 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here. Contact us for advertising inquiries and rates. **[The Daily Bugle was not published yesterday, 11 November, a U.S. Federal holiday.]**

### ITEMS FROM FEDERAL REGISTER

[No items of interest today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions

2. Commerce/BIS: (No new postings.)

3. State/DDTC: (No new postings.)

4. EU Commission Publishes Report on Materials Dependencies for Dual-Use Technologies Relevant to Europe's Defence Sector

5. EU Council Adopts Framework for Sanctions Concerning Turkey

6. EU Council Renews Venezuela Sanctions Until 14 November 2020

7. UK HMRC Issued Fines of Between £5,000 and £90,000 to 9 UK Exporters for Unlicensed Exports

### NEWS

8. American Shipper: "OFAC: Know Your Equipment Lease End-User"

9. Geospacial World: "Skydweller Aero to Build First Solar-Powered ITAR-Free Drone"

10. The Moscow Times: "Russia Might Ease Accounting Rules on Sanctioned Firms"

11. Newsweek: "Saudi Nationals Charged with Firearms Smuggling, Pretended Weapons Parts Were 'Shower Curtain Rods'"

### COMMENTARY

12.    Baker McKenzie: "USTR Posts More Exclusions From $200 Bn Sec. 301 Action Against Chinese Products"

13.    R.L. Cassin: "These 'Mistakes' Are Behind Most OFAC Violations"

14.    T. Murphy: "Section 301 Update - Transshipment (and Enforcement) Issues"

**EX/IM MOVERS & SHAKERS**

15.    Monday List of Ex/Im Jobs: 112 Openings Posted This Week; 9 New Openings

**EX/IM TRAINING EVENTS & CONFERENCES**

16.    ECS Presents "Managing ITAR/EAR Complexities Seminar" on 25-26 Mar in Park City, UT

17.    FCC Presents "U.S. Export Controls: ITAR from a non-U.S. Perspective", 26 Nov in Bruchem, the Netherlands

**EDITOR'S NOTES**

18.    Bartlett's Unfamiliar Quotations

19.    Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (5 Apr 2019), DOC/EAR (21 Oct 2019), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (14 Mar 2018), DOS/ITAR (30 Aug 2019), DOT/FACR/OFAC (9 Sep 2019), HTSUS (3 Sep 2019)

20.    Weekly Highlights of the Daily Bugle Top Stories



From the publisher of WorldECR

## dual-use EXPORT CONTROLS of the European Union

● Essential reading for anyone active in trade in – or with – the EU.
● Guidance on the EU's dual-use export control regime plus detailed information on the individual procedures and contact details for the national export authorities.

For information and to order your copy, **CLICK HERE**

**ITEMS FROM TODAY'S FEDERAL REGISTER**

[No items of interest today.]

back to top

* * * * * * * * * * * * * * * * * *

# 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce/BIS; RULES; Addition of Entities to the Entity List, Revision of an Entry on the Entity List, and Removal of Entities from the Entity List [Pub. Date: 13 Nov 2019.]

* USTR; NOTICES; Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation [Pub. Date: 13 Nov 2019.]

back to top

* * * * * * * * * * * * * * * * * * *

# 2. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * *

# 3. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * * *

# 4. EU Commission Publishes Report on Materials Dependencies for Dual-Use Technologies Relevant to Europe's Defence Sector
(Source: European Commission, 9 Nov 2019.)

To support the European Commission in the preparation of future initiatives fostering the sustainability of strategic supply chains, this study was commissioned to assess bottlenecks in the supply of materials needed for the development of technologies important to Europe's defence and civil industries. The study focuses on five dual-use technology areas, namely advanced batteries, fuel cells, robotics, unmanned vehicles and additive manufacturing (3D printing). This report examines how these technologies could address specific military needs and their differences in relation to civil needs and identified opportunities for future defence research areas that could potentially serve as a basis for the design of research initiatives to be funded under the future European Defence Fund.

Moreover, potential opportunities for common policy actions are identified, notably to strengthen Europe's position along the selected technologies' supply chains, to facilitate collaboration between stakeholders, to increase

industry involvement with special emphasis on SMEs, to improve existent legislation, and to increase synergies between civil and defence sectors to speed up progress in promising research areas.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. EU Council Adopts Framework for Sanctions Concerning Turkey
(Source: Council of the European Union, 11 Nov 2019.)

Today, the Council adopted a framework for restrictive measures in response to Turkey's unauthorised drilling activities in the Eastern Mediterranean. The framework will make it possible to sanction individuals or entities responsible for or involved in **unauthorised drilling activities of hydrocarbons in the Eastern Mediterranean**.

The sanctions will consist of a **travel ban** to the EU and an **asset freeze** for persons, and an asset freeze for entities. In addition, EU persons and entities will be forbidden from making funds available to those listed.

The framework for restrictive measures makes it possible to place under sanctions:
   (1) persons or entities responsible for drilling activities related to hydrocarbon exploration and production not authorised by Cyprus within its territorial sea, exclusive economic zone (EEZ) or continental shelf. Such drilling activities include, where the EEZ or continental shelf has not been delimited in accordance with international law, activities which may jeopardize or hamper the reaching of such a delimitation agreement;
   (2) persons or entities providing financial, technical or material support for the above mentioned drilling activities;
   (3) persons or entities associated with them.

Today's decision is a direct follow-up to the Council conclusions of 14 October 2019, which were endorsed by the European Council on 17-18 October 2019, when the EU reaffirmed its **full solidarity with Cyprus**, regarding the respect of its sovereignty and sovereign rights in accordance with international law and invited the Commission and the European External Action Service to submit proposals for a framework for restrictive measures.
...

*Decisions*
\* Council Decision (CFSP) 2019/1894 of 11 November 2019 concerning restrictive measures in view of Turkey's unauthorised drilling activities in the Eastern Mediterranean.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. EU Council Renews Venezuela Sanctions Until 14 November 2020

(Source: Council of the European Union, 11 Nov 2019.)

In light of the ongoing political, economic, social and humanitarian crisis in Venezuela with **persistent actions undermining democracy, the rule of law and the respect for human rights**, the Council today extended the restrictive measures against Venezuela **for one year, until 14 November 2020**. The measures include **an embargo on arms and on equipment for internal repression** as well as a travel ban and an asset freeze on **25 listed individuals** in official positions who are responsible for human rights violations and/or for undermining democracy and the rule of law in Venezuela.

These measures are intended to help **encourage democratic shared solutions** in order to bring political stability to the country and allow it to **address the pressing needs of the population**. The targeted measures are flexible and reversible and designed not to harm the Venezuelan population.

*Regulations*

* Council Regulation (EU) 2019/1889 of 11 November 2019 amending Regulation (EU) 2017/2063 concerning restrictive measures in view of the situation in Venezuela
* Council Implementing Regulation (EU) 2019/1891 of 11 November 2019 implementing Regulation (EU) 2017/2063 concerning restrictive measures in view of the situation in Venezuela

*Decisions*

* Council Decision (CFSP) 2019/1893 of 11 November 2019 amending Decision (CFSP) 2017/2074 concerning restrictive measures in view of the situation in Venezuela

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 7. UK HMRC Issued Fines of Between £5,000 and £90,000 to 9 UK Exporters for Unlicensed Exports

(Source: UK ECJU,12 Nov 2019.)

Between May and October 2019, HM Revenue & Customs (HMRC) issued compound penalties between £5,000 and £90,000 to 9 UK exporters. These related to unlicensed exports of dual use goods, military goods and related activity controlled by The Export Control Order 2008.

HMRC have policy responsibility for enforcing export controls on strategic goods and sanctions, and investigating breaches of those controls. Where appropriate, HMRC can use their powers to offer a compound penalty in lieu of prosecution.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. American Shipper: "OFAC: Know Your Equipment Lease End-User"
(Source: American Shipper, 9 Nov 2019.) [Excerpts.]

The U.S. Treasury Department's Office of Foreign Assets Control assessed $210,600 civil penalty against Apollo Aviation Group for violating the Sudanese Sanctions Regulations.

Apollo Aviation Group, which is now part of Carlyle Aviation Partners Ltd., has agreed to pay a $210,600 civil penalty to settle 12 alleged violations of the Sudanese Sanctions Regulations, the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) said.

The violations began on July 30, 2013, when Apollo leased two aircraft engines to a company in the United Arab Emirates, which in turn subleased the engines to a Ukrainian airline that installed them on an aircraft leased to Sudan Airways.  At the time of the violations, Sudan Air was listed on OFAC's Specially Designated Nationals and Blocked Persons (SDN) List for its ownership by the Sudanese government. U.S. persons and companies are generally prohibited from exporting to entities on the SDN List.

OFAC did not name the United Arab Emirates company or the Ukrainian airline in the settlement agreement. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. Geospacial World: "Skydweller Aero to Build First Solar-Powered ITAR-Free Drone"
(Source: Geospacial World, 12 Nov 2019) [Excerpts.]

Leonardo S.p.A. of Italy is accelerating the progress of technology and innovation in autonomous flight by investing in Skydweller Aero Inc., a US/Spanish start-up specializing in large-scale solar-powered unmanned air systems. The initiative will result in the development and deployment of the Skydweller drone, the world's first fully-electric unmanned aircraft capable of carrying large payloads with unlimited range and ultra-persistent endurance.  . . .

Thanks to its unique features, Skydweller combines potentially unlimited persistence and range with the flexibility of an aircraft. It will operate from existing airbases around the world, deploy thousands of miles away to areas of high need, and remain overhead for orders of magnitude longer than

current aircraft. This revolutionary platform will be used for purposes ranging from land and maritime surveillance to monitoring the environment and infrastructure, from industrial geo-information services to telecommunications and precision navigation. During emergencies and disaster-recovery situations, the system can be rapidly deployed from distant locations to provide backup communications and direct support to first responders. . . .

The system will comply with European export laws and will not be subject to International Traffic in Arms Regulations (ITAR) restrictions. This will enable the aircraft to satisfy government and commercial needs around the world. Leonardo will act as the prime contractor for commercial opportunities in Italy, the United Kingdom, Poland and NATO.  Development and construction of the aircraft will be carried out at the Skydweller facility in the Castilla-La Mancha region of Spain. Leonardo Aircraft division will participate in development and engineering activities via a dedicated team.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. The Moscow Times: "Russia Might Ease Accounting Rules on Sanctioned Firms"
(Source: The Moscow Times, 8 Nov 2019.) [Excerpts.]

Russia's defense contractors would no longer have to produce annual financial reports in latest proposals to protect sanctioned companies.  Russia could let a handful of companies stop publishing mandatory annual reports and financial statements in an attempt to protect them from further Western sanctions.

In new proposals submitted this week, the Finance Ministry proposed cancelling obligatory reporting for around 20 Russian firms on a government list of companies that should receive special treatment because of U.S. and EU sanctions against them. The move is designed to limit how much Western governments can find out about the companies, and protect their customers and contractors from being named on future sanctions lists by the U.S. or EU.

Companies that could receive the exemption include sanctioned businesses connected to the defense industry, such as Russian Helicopters, gun maker Kalashnikov Concern and state arms exporter Rosoboronexport, the Russian business daily Kommersant reported. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. Newsweek: "Saudi Nationals Charged with Firearms Smuggling, Pretended Weapons Parts Were 'Shower Curtain Rods'"
(Source: Newsweek, 9 Nov 2019.) [Excerpts.]

Two Saudi nationals have been charged by a federal grand jury with conspiring to smuggle firearms out of the United States, contrary to strict export controls governed by the Arms Export Control Act.

A five-count indictment outlining the charges was handed down on Wednesday naming Saudi residents Hatim Humeed Alsufyani, 36, and Mosab Alzahrani, 27, who previously lived in the United States on a student visa while purportedly attending California State University, San Bernardino. Both men are believed to currently be in the Kingdom.

The 1976 Arms Export Control Act and a related executive order allow presidential administrations to restrict the flow of weapons out of the country. The State Department determines which weapons to designate as "defense articles" under the statute, which forms the basis of the United States Munitions List in the tome of Federal Regulations.

Individuals exporting weapons or weapons components covered by the munitions list, as Alsufyani and Alzahrani are alleged to have done, would need to first obtain an export license from the State Department. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMMENTARY

## 12. Baker McKenzie: "USTR Posts More Exclusions From $200 Bn Sec. 301 Action Against Chinese Products"
(Source: International Trade Compliance Update, 8 Nov 2019.)

On November 7, 2019, the US Trade Representative (USTR) posted an advance copy of a Federal Register notice that announces USTR's determination to grant certain exclusion requests, as specified in the annex to this notice from the additional duties on goods of China with an annual trade value of approximately $200 billion (Tranche 3) as part of the action in the Section 301 investigation of China's acts, policies, and practices related to technology transfer, intellectual property, and innovation.

Effective September 24, 2018, USTR imposed additional 10 percent duties on goods of China classified in 5,757 full and partial subheadings of the Harmonized Tariff Schedule of the United States (HTSUS), with an approximate annual trade value of $200 billion. See 83 Fed. Reg. 47974, as modified by 83 Fed. Reg. 49153. In May 2019, USTR increased the additional duty to 25 percent. See 84 Fed. Reg. 20459. On June 24, 2019, USTR established a process by which U.S. stakeholders may request exclusion of particular products classified within an 8-digit HTSUS subheading covered by the $200 billion action from the additional duties. See 84 Fed. Reg. 29576 (the June 24 notice).

The June 24 notice required submission of requests for exclusion from the $200 billion action no later than September 30, 2019, and noted that USTR would periodically announce decisions. In August 2019, USTR granted an initial set of exclusion requests. USTR granted additional exclusions in September and October 2019. USTR regularly updates the status of each pending request on the USTR Exclusions Portal.

Based on the evaluation of the factors set out in the June 24 notice, USTR has determined to grant the product exclusions set out in the Annex to the notice. USTR's determination also takes into account advice from advisory committees and any public comments on the pertinent exclusion requests.

As set out in the Annex, the exclusions are reflected in 2 ten-digit HTSUS subheadings and 34 specially prepared product descriptions, which cover 42 separate exclusion requests.

In accordance with the June 24 notice, the exclusions are available for any product that meets the description in the Annex, regardless of whether the importer filed an exclusion request. Further, the scope of each exclusion is governed by the scope of the product descriptions in the Annex, and not by the product descriptions set out in any particular request for exclusion.

- Paragraph A, subparagraphs 1 and 2 establish a new subheading, 9903.88.34 and a new US note 20(mm) to subchapter III of chapter 99 to cover the products granted exclusions;

- Paragraph A, subparagraphs 3-5 are conforming amendments to the HTSUS reflecting the modification made by the Annex. As stated in the September 20, 2019 notice, the exclusions will apply from September 24, 2018, to August 7, 2020.
U.S. Customs and Border Protection will issue instructions on entry guidance and implementation.

USTR will continue to issue determinations on pending requests on a periodic basis.

back to top

* * * * * * * * * * * * * * * * * * *


# 13. R.L. Cassin: "These 'Mistakes' Are Behind Most OFAC Violations"
(Source: FCPA Blog, 8 Nov 2019.) [Excerpts.]

* Author: Richard L. Cassin, Editor at Large.

Earlier this year the Treasury Department's Office of Foreign Assets Control published *A Framework for OFAC Compliance Commitments.* It describes essential components of a sanctions compliance program (management commitment, risk assessment, internal controls, testing and auditing, and training). There's also a neat section about "root causes" of sanctions violations that OFAC found during actual investigations.

To paraphrase Bismarck, it's great to learn from mistakes, especially when the mistakes aren't yours. Here then are the mistakes of others, accidental or otherwise, behind most OFAC violations:

*No sanctions compliance program.* Incredible but true. After nearly 70 years of OFAC regulations, "numerous" enforcement actions still involve companies with no formal sanctions compliance program. OFAC regulations don't require companies to adopt a program and a lot of them don't. But it's a no brainer that companies subject to OFAC jurisdiction and doing anything that crosses borders should have a formal sanctions compliance program.

*Improper due diligence.* Some companies with cross-border businesses are still failing to ask and answer basic sanctions-related questions. OFAC found violators that didn't know who owned their customers or intermediaries, where they were physically located, and whether the counter-parties and agents were even aware of OFAC regulations

*Bad information and the wrong tools.* Outdated lists of sanctioned people and organizations caused violations. As did search software that didn't account for alternative or regional spellings of prohibited countries or parties - Habana instead of Havana, Kuba instead of Cuba, Soudan instead of Sudan, and so on.

*Being wrong about who and what are covered by OFAC regulations.* Numerous violators concluded wrongly that they weren't subject to OFAC regulations, or that the regulations didn't apply to or prohibit their specific deal. Multiple organizations violated sanctions by shifting deals to their foreign units. "In many instances," OFAC said, "the root cause of these violations stems from a misinterpretation or misunderstanding of OFAC's regulations."

*Being willfully blind about where U.S.-origin goods, technology, or services will end up.* OFAC said even large and sophisticated companies sold controlled items to buyers (often repeatedly and over several years) who had "the specific intent" of re-selling or transferring the items to blocked people, organizations, or countries.

*De-centralized and inconsistent compliance functions and programs.* At some violators, OFAC found compliance staff and decision-makers scattered across offices or business units. The organizations lacked a formal escalation process to review high-risk customers or transactions. OFAC also found "inefficient or incapable oversight and audit function" in some violators, and frequent miscommunication about the organization's sanctions-related policies and procedures.

*Bosses going rogue.* Employees - particularly in supervisory, managerial, or executive-level positions - played "integral roles" in causing or abetting some violations. It happened even in companies that had "a fulsome sanctions compliance program in place." Compounding the problem, the bad bosses usually did their best to "obfuscate and conceal" their activities from compliance personnel and from regulators and law enforcement. OFAC calls

this root cause "individual liability" but said it can hold the employers liable for the violations (see *respondeat superior*), as well as the rogue employees. *A final caveat:* OFAC's *Framework* lists ten "root causes" behind sanctions violations and describes them in more complete and technically accurate language. I've shortened OFAC's list by combining items and dropping others.

This summary is only an introduction to OFAC's guidance and isn't a substitute for the original, available <u>here</u>.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * *

## 14. T. Murphy: "Section 301 Update - Transshipment (and Enforcement) Issues"
(Source: Author)

* Author: Ted Murphy, Esq., Sidley Austin LLP, 1-202-736-8016, <u>ted.murphy@sidley.com.</u>

With negotiations over the Phase 1 deal in full swing in the press (e.g., China publicly saying that the United States had agreed to roll back tariffs as part of the deal last Thursday, and President Trump saying that he had not agreed to do so on Friday, etc.), we wanted to flag an issue that all companies seeking alternative sources of supply outside of China should keep in mind.

In the past week, there have been several stories about foreign suppliers seeking to take (illegal) shortcuts to avoid the Section 301 tariffs on Chinese-origin goods shipped to the United States.  These stories recount situations where Chinese-origin goods are exported to a third country (e.g., Vietnam) where minimal-to-no processing occurs, but the suppliers relabel the goods to conceal the true origin in order to avoid the additional U.S. duties.

In one story, Vietnam Customs reportedly seized $4.3 billion worth of Chinese-origin aluminum that had been relabeled as Vietnam-origin and destined for shipment to the United States (this was in part to avoid antidumping/countervailing duties applicable to Chinese-origin aluminum).  The story also mentions recent seizures of bicycles, machinery, clothes, shoes and electronics that were falsely labeled as being of Vietnam origin after being transshipped from China, through Vietnam, to the United States.  A copy of this specific report is attached for your reference.

Countries like Vietnam, Malaysia, Thailand, etc. are all reaping the benefits of the U.S.-China trade war as suppliers look to move production out of China.  Unscrupulous suppliers, however, will seek to cut corners by transshipping or relabeling Chinese-origin products destined for the United States.  The governments of these countries have a meaningful incentive to root out that behavior and stop it, so as not to draw the ire of the United States.  An increasing trade in goods deficit is concerning enough to these governments; the last thing they want is to be branded as a haven for transshipment thereby drawing unwanted attention from the United States

DOC_0073201

(e.g., a new Section 301 action, new antidumping/countervailing duty investigation, etc.).  Accordingly, these governments are increasingly comparing import data to export data and scrutinizing export shipments to identify possible transshipment situations.  Certain countries, like Vietnam, are also drafting new rules to address when an article can be labeled "Made in Vietnam" (to the extent these rules impose standards that are inconsistent with the U.S. Customs and Border Protection substantial transformation test, it will create additional headaches for U.S. importers - e.g., if a product that must be labeled as being "Made in Vietnam" under the U.S. rules cannot be labeled as "Made in Vietnam" under the new rules in Vietnam).

Accordingly, all companies working with suppliers to move production from China to third countries should take reasonable steps to ensure that transshipment is not occurring.  Companies should ensure that new/relocated production facilities actually have the capability to perform the expected processing operations, obtain additional certifications from the suppliers, add this issue to third-party inspections/audits performed as part of the new facility set up, and take other reasonable steps to demonstrate that reasonable precautions against transshipment have been taken.  We expect that CBP will increasingly be asking importers about this issue (i.e., to validate non-China country of origin).  Those who can pull the answer out of the file will fare much better than those who have to scramble to put the answer together at that point.  Make sure you are part of the former group, and not the latter.

back to top

* * * * * * * * * * * * * * * * * * *



Are You Keeping Up to Date with the Latest Regulations?

Bartlett's Annotated ITAR will keep you updated on the latest ITAR amendments.

MORE INFORMATION AVAILABLE HERE

## EX/IM MOVERS & SHAKERS

## 15. Monday List of Ex/Im Job Openings: 112 Openings Posted This Week, 9 New Openings
(Source: Events & Jobs Editor)

Published every Monday or first business day of the week. (The list was not published yesterday, a U.S national holiday.) Please send job openings in the following format to jobs@fullcirclecompliance.eu.  Listings are free.

* COMPANY; LOCATION; POSITION TITLE (WEBLINK); CONTACT INFORMATION; REQUISITION ID

"#" New or amended listing this week

* 3M; Maplewood, MN; Trade Compliance Counsel; Requisition ID; R00990035
* ABB; Bangalore, India; Trade Compiance Manager;
# * Adecco; Round Rock, TX; Export Compliance;
* Advanced Concepts & Technologies International, Lexington Park, MD; Foreign Disclosure Specialist
# * Ajilon; Princeton, NJ; Import and Export Coordinator;
# * Ajilon; Melville, NY; Import Export Administrator;
# * Ajilon; Elizabeth, NJ; Ocean Air Import and Export Specialist;
* AM General; Auburn Hills, MI; International Compliance Analyst
* Arrow Electronics; Denver, CO; Transportation Import/Export Specialist; amanda.elam@arrow.com; Requisition ID: 172946
* Arrow Electronics; Zapopan, Mexico; Transportation Coordinator II; luci.desouza@arrow.com
; Requisition ID: R172262
* Arrow Electronics: Zapopan, Mexico; Transportation Coordinator II; luci.desouza@arrow.com; Requisition ID: R172264
* Arrowhead Products; Los Alamitos, CA; Trade Compliance Specialist
* ASML; Chandler, AZ; Sr Export Controls Manager; Requisition ID: 40860
* BAE Systems; Arlington, VA; International Trade Manager I (Compliance); Requisition ID: 52578BR
* BASF; Mannheim, Germany; Manager Global Export Control; Requisition ID: EN57992009_ONLE_1
* Battelle; Columbus, OH, or alternate location; International Trade Compliance Manager
* Belk; Charlotte, NC; Manager, Global Trade & Customs Compliance; ewelina_janiszewski@belk.com; Requisition ID: JR-27974
* Blue Origin; Kent, WA; Export Control Administrator;
* Bose; Framingham, MA; Senior Customs & Trade Compliance Lead; Requisition ID: R12731
* BP; Houston, TX; International Trade Regulations Analyst; Requisition ID: 110367BR
* Butler Aerospace & Defense; New Brighton, MN; HSE and Compliance Coordinator;
* C4ATS; Orlando, FL; Defense Import-Export Compliance Manager; Ivette De Jesus
* CACI; Chantilly, VA; Trade Compliance Analyst; Requisition ID: 223627_20151
* CACI; Chantilly, VA; Trade Compliance Specialist; Requisition ID: 225842_20151

* CACI; Reston, VA; Trade Compliance Specialist; Requisition ID: 225842
* Carnegie Mellon University; Pittsburgh, PA, Export Compliance Manager; hbragg@andrew.cmu.edu;
* Cobham Advanced Electronic Solutions; Exeter, NH; Export Compliance Administrator; Requisition ID: req2614
* Cobham Advanced Electronic Solutions; San Diego; Manager, USG Compliance; Requisition ID: req2730
* Cobham Satcom; Concord, CA; Import Export Compliance Officer; Carolyn Grimes or 1-925-681-9596;
* Collins Aerospace; Windsor Locks, CT; International Trade Compliance Intern (Summer 2020); Requisition ID: 01348159
* Comtech EF Data; Tempe, AZ or Germantown, MD; Vice President Compliance; Requisition ID: 2503
* Crowell Moring; Washington D.C.; Government Contracts & International Trade Associate (Export Controls)
* Cubic; Durham, NC; Senior Export Compliance Analyst; Requisition ID: REQ_19711
* Curtiss-Wright; Charlotte, NC; Senior Manager, Global Trade Compliance; Requisition ID:5558
* Curtiss-Wright; Cheswick, PA; Sr. Manager, Global Trade Compliance; Kirsty.harris@curtisswright.com; Requisition ID: 5272
* Danaher - Leica Microsystems; Wetzlar, Germany; Chief Compliance Officer; Requisition ID: LEI004530
* Danaher; Portsmouth, UK; Trade Compliance Analyst;Requisition ID: SHA001042;
* DHL; Duisburg, Germay; Compliance Manager; Requisition ID: req73899
* Elbit Systems of America; Merrimack, NH; Senior Manager, Trade Compliance; Requisition ID: 2019-7120
* Expeditors; Bedfont, United Kingdom; Customs Brokerage Clerk
* Expeditors; Rozenburg, the Netherlands; Import en Export control medewerker
* Expolanka; El Segundo, CA; Export/Import Compliance Analyst;
* FLIR; Täby, Sweden; Director, Global Export Compliance EMEA; Requisition ID: REQ12627
* Fluke Electronics; Everett, WA; Trade Compliance Analyst
* General Atomics; San Diego, CA; Government Compliance Specialist; Requisition ID: 23607BR
* General Atomics; San Diego, CA; Government Regulatory Compliance Specialist; Requisition ID: 25215BR
* IDEX Corporation; Albuquerque, NM; Trade Compliance Coordinator;
* IPG Photonics; Oxford, MA; Trade Compliance Manager; Requisition ID: 285450196
* Irving; Halifax, Canada; Export Compliance Specialist; Requisition ID: 19003115
* Itron; Raleigh, NC; Sr Manager Information Security - Audit and Compliance; Requisition ID: 1901000
* Johnson Controls; Milwaukee, WI; Director, Global Trade Compliance; Requisition ID: WD30055791295;
* Koch Chem Tech; Tulsa, OK; Import/Export Compliance Specialist; Requisition ID: 052017

* L3Harris; Clifton, NJ; Senior Trade Compliance Specialist; Requisition ID: SAS20190509-33185
* L3Harris; Greenville, TX; Empowered Official; Contact Roger Ethridge, roger.ethridge@l3harris.com; Requisition ID: 110364
* Lawrence Berkeley National Laboratory; Berkeley, CA; Export Compliance Specialist; Requisition ID: 88638
* Lawrence Livermore National Laboratory; Livermore, CA; Export Control Officer; Requisition ID: 106174
* Lenovo; Guandong, China; AP Trade Compliance Specialist; Requisition ID: 73183
* Leonardo DRS; Melbourne, FL; Senior Supply Chain Analyst - Small Business Compliance; Requisition ID: 91669
* Levi Strauss & Co.; San Francisco, CA; Trade Compliance Specialist, Process Documentation & Education
* Lexacount; Washington DC; Export Controls Associate; Requisition ID: 6522
* Lockheed Martin Aeronautics; Arlington, VA; International Licensing Analyst; Requisition ID: 493288BR
* Lockheed Martin Aeronautics; Fort Worth, TX; International Trade Compliance Intern; Requisition ID: 487961BR
* Lutron Electronics Co; Lehigh Valley, PA; Trade Compliance Coordinator; Requisition ID: 4025;
* Mars; Chicago, IL; Trade Compliance Analyst; Requisition ID: 249666;
* Medtronic; Columbia Hights, MN; Associate Export Controls Analyst; Requisition ID: 19000EXL
* Medtronic; Sao Paulo, Brazil; Import/Export Coord III; Requisition ID: 19000C9M
* Mercury Systems; Any City; Principal Trade Compliance Specialist; Requisition ID: 19-604
* Miller Canfield; Troy, Mi; Associate Attorney - Mergers & Acquisitions; brennans@millercanfield.com
* Moog Inc., Space and Defense Group; East Aurora, NY; Operation Trade Specialist;
* Moog Inc., Space and Defense Group; East Aurora, NY; Senior Trade Compliance Specialist;
Moog Inc., Space and Defense Group; Torrence, CA; Trade Compliance Administrator (Export);
* Morson Group; Glasgow, UK; Export Control Officer Investigations
* Netflix; Los Gatos, CA; Manager, Trade Compliance;
* Nouryon Corp; Houston, TX; Director, Global Trade Compliance;
# * Northrop Grumman; Falls Church, VG; International Trade Compliance Manager 1; Requisition ID: 19032304
* Northrop Grumman; Herndon, VA; International Trade Compliance Analyst; Requisition ID: 19026257
* Northrop Grumman; Melbourne, FL; Principal International Trade Compliance Analyst; Requisition ID: 19033647
* Northrop Grumman; Mesa, AZ; Principal International Trade Compliance Analyst: Jill VanValkenburg, 1-925-351-7665 or Jill.Valkenburg@ngc.com
* OneWeb; McLean, VA; Export Compliance Specialist
* PAE; Falls Church, VA; Director - International Trade Compliance Office; Requisition ID: R0037636
* Paraxel; Kiev, Ukraine; Trade Compliance Specialist;

* Pattonair; Fort Worth, TX; Trade & Regulatory Compliance Manager;
* Plexus Corp; Remote; Sr. Manager - International Trade Controls;
Requisition ID: R006729
* PolyOne, Avon Lake, OH; Trade Compliance Analyst
* Raytheon; Andover, MA; Sr An Global Trade Licensing; Requisition ID:
147196BR
* Raytheon; Ft. Wayne, IN; Sr. Analyst Global Trade Licensing; Requisition
ID: 147565BR
* Raytheon; Fulton, MD; Global Trade Licensing Manager; Requisition ID:
144665BR
* Raytheon; Tucson, AZ; Global Trade Licensing Analyst; Requisition ID:
149549BR
* Roche; Mannheim, Germany; Head of Export Control & Customs;
* SABIC; Houston TX; Senior Analyst, Trade Compliance;
Danielle.Cannata@sabic.com; Requisition ID: 8411BR
* SAP; Newtown Square, PA; Export Control - Senior Specialist; Requisition
ID: 226489
* SAP; Walldorf, GER; Regional Export Control Coordinator (RECC) for EMEA;
Requisition ID: 226695
* Saudi Aramco; Dhahran, Saudi Arabia; Paralegal; Requisition ID: 17184BR
* Sierra Nevada Corporation; Arlington, VA; International Trade Compliance
Analyst II; Requisition ID: R0007996
# * SLAC National Accelerator Laboratory (Stanford University); Menlo Park,
CA; Export Compliance Manager; Requisition ID: 3928
* Sophos; Multiple Locations; Senior Manager, Trade Compliance;
* SRC Inc.; Syracuse, NY; International Trade Compliance Analyst;
Requisition ID: 3526
* Thales; Crawley, UK; Trade Compliance Officer; Requisition ID: R0071081
* Thales; Ottawa, Canada; Procurement Supplier Contracts Manager;
Requisition ID: R0077808;
# * Thales; Gennevilliers, France; Trade Compliance Manager H/F;
Requisition ID: R0071200
# * Thales; Melbourne, Australia; Trade Compliance Manager; Requisition ID:
R0074607;
* Thales; Valence, France; Trade Compliance Manager (H/F); Requisition ID:
R0069297
* Thomas Jones Consulting; Washington, DC; Jr. International Trade, Export
Controls & Economic Sanctions Associate
* Tiffany & Co; Parsippany, NJ; Director, Trade & Logistics - Americas
* TJX; Marlborough, MA; Senior Import & Customs Compliance Specialist;
* Torres Law, PLLC; Dallas, TX; Import/Export Consultant-
Legal; info@torrestradelaw.com
* United Technologies; Haute-Garonne, France; Export Control Officer;
Requisition ID: 17485
* Viasat; Carlsbad, CA; Global Trade Analyst; Requisition ID: 2824
* Walt Disney; Burbank, CA; Principal Counsel - Compliance; Requisition ID:
706363BR
* Walt Disney; Kissimmee, FL; Trade Compliance Analyst; Requisition ID:
654599BR
* Wealth Ocean; Newport Beach, CA; Marketing & International Trade
Specialist

DOC_0073206

* World Wide Technology; Edwardsville, IL; International Trace Compliance Specialist; Requisition ID: 19-0772

back to top

* * * * * * * * * * * * * * * * * * * *

## 16. ECS Presents "Managing ITAR/EAR Complexities Seminar" on 25-26 Mar in Park City, UT
(Source: ECS)

*What:  Managing ITAR/EAR Complexities Seminar
*When:  March 25-26, 2020
*Where: DoubleTree by Hilton Hotel Park City - The Yarrow; Park City, UT
*Sponsor:  Export Compliance Solutions & Consulting (ECS)
*ECS Instructors:  Suzanne Palmer, Lisa Bencivenga
*Register here or by calling 866-238-4018 or email.

back to top

* * * * * * * * * * * * * * * * * * * *

## 17. FCC Presents "U.S. Export Controls: ITAR from a non-U.S. Perspective", 26 Nov in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

This intermediate-level training course is specifically designed for compliance professionals and those in a similar role who aim to stay up-to-date with the latest International Traffic in Arms Regulations (ITAR) requirements that apply to non-U.S. transactions.

The course will cover multiple topics relevant for organizations outside the U.S. that are subject to the International Traffic in Arms Regulations, including but not limited to: the U.S. regulatory framework, key ITAR concepts and definitions, tips regarding classification and licensing, essential steps to ensure an ITAR compliant shipment, how to handle a (potential) non-compliance issue, recent enforcement trends, and the latest regulatory amendments, including the latest U.S. Export Control Reform developments. Participants will receive a certification upon completion of the training.

**Details**
* What: U.S. Export Controls: The International Traffic in Arms Regulations (ITAR) from a non-U.S. Perspective
* When: Tuesday, 26 Nov 2019
- Welcome and Registration: 9.00 am - 9.30 am
- Training hours: 9.30 am - 4.30 pm
* Where: Full Circle Compliance, Landgoed Groenhoven, Dorpsstraat 6, Bruchem, the Netherlands
* Information & Registration: here or contact FCC at events@fullcirclecompliance.eu or + 31 (0)23 - 844 - 9046

* This course can be followed in combination with "U.S. Export Controls: The Export Administration Regulations (EAR) from a non-U.S. Perspective" (27 Nov 2019), and/or "The ABC of Foreign Military Sales" (29 Nov 2019). Please, see the event page for our combo deals.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 18. Bartlett's Unfamiliar Quotations
(Source: Editor)

(Editor's note:  The Daily Bugle was not published yesterday because it was Veterans Day, a U.S. Federal holiday. But we know you don't want your full week of quotations and puns to be cut short, so here they are Monday's entries, a day late.]

**\* Martin Luther** (10 Nov 1483 - 18 Feb 1546; was a German professor of theology, composer, priest, monk, and the seminal figure in the Protestant Reformation. An ordained priest, Luther disputed several of the Catholic church practices. His refusal to renounce all of his writings at the demand of Pope Leo X resulted in his excommunication and condemnation as an outlaw by the Holy Roman Emperor.)
 - *"There is no more lovely, friendly, and charming relationship, communion, or company than a good marriage."*

**\* Fyodor Dostoevsky** (Fyodor Mikhailovich Dostoevsky; 11 Nov 1821 - 9 Feb 1881, was a Russian novelist, short story writer, essayist, journalist, and philosopher. His most acclaimed works include *Crime and Punishment*, *The Idiot*, *Demons*, and *The Brothers Karamazov*. Many literary critics rate him as one of the greatest psychologists in world literature.)
  - *"There is no subject so old that something new cannot be said about it."*
  - *"If there is no God, everything is permitted."*

**Monday is pun day.**
\* Q: What kind of chocolate do they sell at the airport?
  A: Plane chocolate.
\* Q: What kind of music are balloons afraid of?
  A: Pop Music
\* Q: Why shouldn't you fall in love with a pastry chef?
  A: He'll dessert you.

**Tuesday, 12 Nov**

**\* Auguste Rodin** (François Auguste René Rodin; 12 Nov 1840 - 17 Nov 1917; was a French sculptor, generally considered the progenitor of modern sculpture.  Rodin spent over 40 years working on his elaborate *Gates of*

*Hell,* an unfinished portal for a museum that was never built. Many of the portal's figures became sculptures in themselves, including two of Rodin's most famous figures, *The Thinker* and *The Kiss.*)
  - *"Nothing is a waste of time if you use the experience wisely."*
  - *"I choose a block of marble and chop off whatever I don't need."*

back to top

＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊

## 19. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199.  Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
  - Last Amendment: 5 Apr 2019:  5 Apr 2019: 84 FR 13499-13513: Civil Monetary Penalty Adjustments for Inflation

* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.

* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
  - Last Amendment: 21 October 2019: FR 56117-56121: Restricting Additional Exports and Reexports to Cuba

* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30.  Implemented by Dep't of Commerce, U.S. Census Bureau.
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (4 Jul 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR is a 152-page Word document containing all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompliance.eu.

* <u>DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL</u> <u>(NISPOM)</u>: DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: <u>Change 2</u>: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary <u>here</u>.)

* <u>DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES</u>: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under the Atomic Energy Act of 1954.
  - Last Amendment: 23 Feb 2015: <u>80 FR 9359</u>, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

* <u>DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL</u>; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under the Atomic Energy Act of 1954.
  - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

* <u>DOJ ATF ARMS IMPORT REGULATIONS</u>: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
  - Last Amendment: 14 Mar 2019: <u>84 FR 9239-9240</u>: Bump-Stock-Type Devices

* <u>DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR)</u>: 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
  - Last Amendment: 30 Aug 2019: <u>84 FR 45652-45654</u>, Adjustment of Controls for Lower Performing Radar and Continued Temporary Modification of Category XI of the United States Munitions List.
  - The only available fully updated copy (latest edition: 30 August 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR is a 371-page Word document containing all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance <u>website</u>. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR, please <u>contact us</u> to receive your discount code.

* <u>DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR)</u>: 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders.
Implemented by Dep't of Treasury, Office of Foreign Assets Control.
- Last Amendment: 9 Sep 2019: <u>84 FR 47121-47123</u> - Cuban Assets Control Regulations

* <u>USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS,</u>
<u>HTSA or HTSUSA)</u>, 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S.
International Trade Commission. ("HTS" and "HTSA" are often seen as
abbreviations for the Harmonized Tariff Schedule of the United States
Annotated, shortened versions of "HTSUSA".)
   - Last Amendment: 4 Sep 2019: <u>Harmonized System Update (HSU) 1915</u>
   - HTS codes for AES are available <u>here</u>.
   - HTS codes that are not valid for AES are available <u>here</u>.

<u>back to top</u>

* * * * * * * * * * * * * * * * * *

## 20. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top
Stories" posted <u>here</u>.

<u>back to top</u>

* * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by:
Editor, James E. Bartlett III; and Assistant Editor, Alexander Witt. The Ex/Im
Daily Update is emailed every business day to approximately 7,500 readers of
changes to defense and high-tech trade laws and regulations.

We check the following sources daily: Federal Register, Congressional Record,
Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF,
DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White
House, and similar websites of Australia, Canada, U.K., and other countries
and international organizations.  Due to space limitations, we do not post
Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or
export-controlled information. All items are obtained from public sources or
are published with permission of private contributors, and may be freely
circulated without further permission, provided attribution is given to "*The
Export/Import Daily Bugle* of (date)". Any further use of contributors'
material, however, must comply with applicable copyright laws.  If you would
to submit material for inclusion in the *The Export/Import Daily Update ("Daily
Bugle")*, please find instructions <u>here</u>.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or
expert advice. Consult your own legal counsel or compliance specialists
before taking actions based upon news items or opinions from this or other
unofficial sources.  If any U.S. federal tax issue is discussed in this

communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

1
2
3
4
5
6
7
8
9
10
11
12
13
14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, *et al.*,

    Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF
STATE, *et al.*,

    Defendants.

NO. C18-1115RSL

ORDER INVALIDATING JULY 27,
2018, TEMPORARY
MODIFICATION AND LETTER

15
16
17
18
19
20
21
22

  This matter comes before the Court on the parties' cross-motions for summary judgment. Dkt. #170, #173, and #174. Plaintiffs seek a summary determination that the federal defendants violated the Administrative Procedures Act ("APA") when they modified the United States Munitions List ("USML") and issued a letter authorizing the on-line publication of certain computer aided design ("CAD") data files in July 2018. They request that the Court vacate the agency action and permanently enjoin the federal defendants from removing the CAD files at issue from the USML unless and until they comply with the statutory procedural requirements.

23

## BACKGROUND AND PROCEDURAL HISTORY

24
25
26

  Since at least 2013, the federal government had taken the position that the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorizes restrictions on the internet publication of

27
28

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 1

CAD files that allow users to create guns and their components with a 3D printer. When defendant Defense Distributed posted CAD files for various weapons on its website at the end of 2012, the Directorate of Defense Trade Controls ("DDTC"), which is part of the Department of State, notified Defense Distributed that the publication may have been unauthorized and in violation of the AECA's implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-30. The DDTC explained that making the CAD files available on the internet constituted a disclosure or transfer of technical data to foreign persons and was considered an "export" subject to the AECA and ITAR. The government advised Defense Distributed to remove the files from its website and, if it believed the files were not properly subject to export control, to utilize the commodity jurisdiction ("CJ") procedure to obtain an official determination from the DDTC.

Defense Distributed filed a number of determination requests. When the DDTC failed to make timely rulings, Defense Distributed filed a lawsuit in the United States District Court for the Western District of Texas. Defense Distributed v. U.S. Dep't of State, C15-0372RP (W.D. Tex). That litigation pitted Defense Distributed and the Second Amendment Foundation on one side against the Department of State, the DDTC, and various federal employees on the other. Defense Distributed challenged the federal government's power to regulate its publication of the CAD files on the internet, arguing that the regulation subjected its gun-related speech to a system of prior restraints that was applied in an arbitrary manner in violation of Defense Distributed's First, Second, and Fifth Amendment rights. A month after the Texas litigation was filed, the DDTC determined that some, but not all, of the CAD data files Defense Distributed wanted to publish on the internet were technical data subject to the AECA and ITAR.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 2

Defense Distributed filed a motion for preliminary injunction in the Texas litigation to preclude the federal government from imposing prepublication approval requirements on any of its CAD files. The federal government opposed the motion, arguing that:

- "export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests" that "warrant subjecting [the files] to ITAR's export licensing of technical data;"

- Defense Distributed's "CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of 'automatically' generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment;"

- "The State Department is particularly concerned that [Defense Distributed's] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons;" and

- both the government and the public "have a strong interest in curbing violent regional conflicts elsewhere in the world, especially when such conflict implicates the security of the United States and the world as a whole."

Id., Dkt. #32 at 19-20 (W.D. Tex.) (internal quotation marks and citations omitted). The then-Director of the Office of Defense Trade Controls Management, Lisa V. Aguirre, concluded that the unrestricted export of Defense Distributed's CAD files would result in the production of plastic firearms that are fully operable and virtually undetectable by conventional security measures, that their use to commit terrorism, piracy, assassinations, or other serious crimes would cause serious and long-lasting harm to the foreign policy and national security interests of the United States, that efforts to restrict the availability of these articles to enemies of the United

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 3

States would fail, that the proliferation of weapons and related technologies would contribute to a more dangerous international environment, and that the export would undercut the domestic laws of nations that have more restrictive firearm controls and the United States' foreign relations with those nations would suffer. Id., Dkt. #32-1 at ¶ 35.

The Honorable Robert L. Pitman denied Defense Distributed's motion for preliminary injunction, noting that Defense Distributed's avowed purpose is to facilitate "*global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ('3D') printing of arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation of conflict" and are of the type Congress authorized the President to regulate through the AECA. Id., Dkt. #43 at 8-9 (emphasis in original). The Fifth Circuit affirmed, finding that "the State Department's stated interest in preventing foreign nationals - including all manner of enemies of this country - from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458 (5th Cir. 2016).

In April 2018, the federal government moved to dismiss Defense Distributed's claims in the Texas litigation, reiterating that what was at stake was "the United States' ability to control the export of weapons - a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." C15-0372RP, Dkt. #92 at 1 (W.D. Tex). Later that month, the parties reached a

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 4

tentative settlement agreement. Pursuant to the settlement, which was not signed until July 29, 2018, the Department of State changed course, abandoning its prior regulatory and litigation positions and allowing the private defendants, Defense Distributed, the Second Amendment Foundation, and Conn Williamson, to publish on the internet CAD files for the automated production of 3D-printed weapons. The federal government specifically agreed, among other things, to publish a notice of proposed rulemaking and final rule revising the United States Munitions List ("USML") that would allow the distribution of the CAD files, to announce a temporary modification of the USML to allow immediate distribution while the final rule was in development, and to issue a letter to Defense Distributed and other defendants advising that the CAD files are approved for public release and unlimited distribution. The federal defendants also acknowledged and agreed that the temporary modification and letter "permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from" the CAD files. The announcement of the temporary modification and the issuance of the letter were to occur on or before July 27, 2018. No findings of fact or other statements are provided in the settlement agreement that address, much less invalidate, the federal government's prior analysis regarding the likely impacts of publication on national security or world peace or that otherwise explain the federal government's change of position.

On May 24, 2018, the Department of State published a notice of proposed rulemaking ("NPRM") that implicated the technical data at issue in the litigation. The NPRM proposed an amendment to the ITAR to, *inter alia*, remove certain Category I items (primarily small caliber weapons and their related technical data) from the USML, thereby lifting the requirement to obtain a license for their export. 83 Fed. Reg. 24,198 (May 24, 2018). Although the NPRM did

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 5

not explicitly mention 3D-printed firearms or their related technical data, approximately 12% of the comments received in response to the NPRM did, and all of them opposed lifting the license requirement. The public comment period end on July 9, 2018. The settlement agreement was made public the following day. The temporary modification was published and the letter to the private defendants was issued on July 27, 2018. The temporary modification contains an assertion that the DDTC "has determined that it is in the interest of the security and foreign policy of the United States" to immediately modify Category I of the USML to exclude the technical data at issue in the Texas litigation. Dkt. #171-2 at 2. The public comments opposing exclusion were not considered by the agency when it issued the temporary modification and letter. Dkt. #179-2 at ¶ 7.

Three days after the temporary modification was published, eight states and the District of Columbia filed this lawsuit, alleging that the federal defendants' conduct was *ultra vires* and in violation of the APA and the Tenth Amendment to the United States Constitution.[1] In response to plaintiffs' motion for preliminary injunctive relief, the federal defendants justified the deregulation of the CAD files (along with the delisting of other items within Category I of the USML) by pointing to a Department of Defense determination that the items "do not provide the United States with a critical military or intelligence advantage" and "are already commonly available and not inherently for military end-use." Dkt. #64-1 at 10. After an expedited hearing, the Court found that plaintiffs had shown a likelihood of success on the merits of their APA claim insofar as the temporary modification resulted in the removal of one or more items from

---

[1] An amended complaint, adding eleven more States/Commonwealths as plaintiffs, was filed on August 2, 2018. Dkt. # 29.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 6

the USML, that plaintiffs had shown a likelihood of irreparable injury if an injunction did not issue because Defense Distributed had announced its intent to make the CAD files downloadable from its website on August 1, 2018,[2] and that the balance of hardships and the public interest tipped sharply in plaintiffs' favor. The federal defendants were enjoined from implementing or enforcing the temporary modification of the USML and/or the July 27th letter and were required to preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued. Dkt. #23 and #95.

In the context of the States' challenge to the issuance of the temporary modification and letter, the federal defendants produced and supplemented the administrative record on which the decision to issue the temporary modification and letter was based.[3] Plaintiffs now seek an order invalidating the temporary modification and letter under the APA and permanently enjoining the federal defendants from removing the computer files at issue from the USML unless and until they comply with the governing procedural requirements. The federal and private defendants oppose plaintiffs' motion and request judgment in their favor.

## DISCUSSION

### A. Jurisdiction

Both the federal and private defendants challenge the Court's jurisdiction over this matter. The federal defendants argue that the States cannot meet prudential standing

---

[2] The private defendants now assert that they published the subject CAD files to the internet immediately upon receipt of the letter and the issuance of the temporary modification. Dkt. #174-1 at 5-6. The publication does not change the following analysis.

[3] Plaintiffs do not concede that the record, as supplemented, is complete or that defendants' various claims of privilege are proper.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 7

requirements. The private defendants argue that the issuance of the temporary modification and letter are "committed to agency discretion by law" and not subject to judicial review under 5 U.S.C. § 701(a)(2) and 22 U.S.C. § 2278(h), that listing on the USML is a political question over which the Court lacks subject matter jurisdiction, and that the claims are barred by the Tucker Act.[4]

## 1. Zone of Interests

The question of standing involves both constitutional limitations imposed by Article III of the U.S. Constitution and prudential limitations imposed by the judiciary to limit the exercise of federal jurisdiction. See Warth v. Seldin, 422 U.S. 490, 498 (1975); Allen v. Wright, 468 U.S. 737, 751 (1984). To present a justiciable case or controversy under Article III, plaintiffs must demonstrate an "injury in fact" that is "fairly traceable" to the actions of the defendants and that will likely be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). The prudential limitations are "founded in concern about the proper - and properly limited - role of the courts in a democratic society." Warth, 422 U.S. at 498. The prudential requirement at issue here is that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision on which the claim is based. See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970).

The zone-of-interests test is a standing requirement of general applicability, but "the zone of interests of a statute for purposes of obtaining judicial review of administrative action under

---

[4] Defendants also incorporate by reference arguments made in the preliminary injunction context regarding Article III standing and this lawsuit being an impermissible collateral attack on the outcome of the litigation in the Western District of Texas. Those arguments are again rejected. See Dkt. #95 at 9-12.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 8

the generous review provisions of the APA" is fairly expansive. Bennett v. Spear, 520 U.S. 154, 163 (1997) (internal quotation marks and citations omitted). The test "is not meant to be especially demanding" in the APA context, and the Supreme Court applies "the test in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable." Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012) (internal quotation marks and citations omitted). Plaintiffs need not establish a congressional purpose to benefit them through passage of the underlying statute, they need simply have interests that relate to and are not inconsistent with the purposes implicit in the statute. Id. The Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." Id.

The AECA "was intended to authorize the President to control the import and export of defense articles and defense services in 'furtherance of world peace and the security and foreign policy of the United States." U.S. v. Chi Mak, 683 F.3d 1126, 1134 (9th Cir. 2012) (quoting 22 U.S.C. § 2778(a)(1)). In keeping with the goals of the statute, the federal government has, in the past, justified subjecting the CAD files at issue to ITAR's export licensing scheme based on their characteristics and functionality, which make them especially dangerous to U.S. national security and foreign policy interests. The agency properly focused its analysis on the factors specified in the AECA and deemed it important to keep plastic, undetectable firearms out of foreign hands where they were not subject to U.S. laws and controls. The agency's focus on exports, national security, and world peace does not, however, mean that the States' domestic interests are unrelated or marginally related to the AECA's purposes. The State Department found that the firearms generated by the subject CAD files "can be easily modified to be

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 9

virtually undetectable in metal detectors and other security equipment," could be used in assassinations or terrorist activities "specifically directed at U.S. persons," and could lead to violent regional conflicts that implicate the security of the United States. <u>Defense Distributed v. U.S. Dep't of State</u>, C15-0372RP, Dkt. #32 at 19-20 (W.D. Tex). Given that the CAD files and the resulting weapons can be transported, undetected, virtually anywhere in the world, these same impacts would likely arise within the United States even if the plastic weapons are manufactured abroad. The States' interests in curbing violence, assassinations, terrorist threats, aviation and other security breaches, and violations of gun control laws within their borders are at least marginally related to the interests protected or regulated by the AECA. The state and federal interests, while not identical, are aligned and not in any way inconsistent. Because the States' grievance arguably falls within the zone of interests protected or regulated by the AECA, there is no judicially-imposed limit on the Court's exercise of jurisdiction in this matter.

**2. Agency Discretion and Judicial Review**

The private defendants argue that this Court lacks jurisdiction over plaintiffs' APA claims because the APA does not apply "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The AECA expressly commits one type of decision to agency discretion, namely the decision to designate an item as a defense article or defense service. 22 U.S.C. § 2778(h). The decision at issue here, however, is the removal of an item from the USML. Plaintiffs are challenging the federal defendants' failure to comply with statutory procedures and/or to consider certain congressionally-specified factors when making removal decisions under AECA. Congress did not expressly make such removal decisions unreviewable.

Even absent a statutory bar to judicial review, certain agency decisions have traditionally

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 10

been considered wholly discretionary and beyond review. To be sure, the AECA confers broad

discretion on the President when determining whether to add or remove items from the USML,

but that discretion is not unbounded: Congress has imposed both procedural and substantive

benchmarks to guide the agency's action. In order to honor the "basic presumption of judicial

review" embodied in the APA and to "give effect to the command that courts set aside agency

action that is an abuse of discretion," the Supreme Court has "read the § 701(a)(2) exception for

action committed to agency discretion quite narrowly, restricting it to those rare circumstances

where the relevant statute is drawn so that a court would have no meaningful standard against

which to judge the agency's exercise of discretion" and has "generally limited the exception to

certain categories of administrative decisions that courts traditionally have regarded as

committed to agency discretion, . . . such as a decision not to institute enforcement proceedings .

. . or a decision by an intelligence agency to terminate an employee in the interest of national

security . . . ." Dep't of Commerce v. N.Y., __ U.S. __, 139 S. Ct. 2551, 2567-68 (2019)

(internal quotation marks and citations omitted).

       The procedural and substantive requirements at issue in this case are clearly stated, and

whether the agency complied with those requirements can be judicially evaluated without fear of

treading on any matter that implicates agency expertise, involves a complicated balancing of

factors, or has been traditionally regarded as beyond judicial review. The Court finds that the

process through which defendants removed items from the USML in July 2018, defendants'

compliance with the standards furnished by the AECA, and the adequacy of the agency's

analysis of and explanation for its decision are subject to judicial review under the APA.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 11

### 3. Political Question

The private defendants also argue that the regulation or deregulation of defense articles or services under the AECA is a political question that is nonjusticiable under the separation of powers doctrine. This argument fails for much the same reasons as the agency discretion and judicial review arguments. While the decision to include an item on the USML or to grant or deny an export license for a listed item is statutorily excluded from judicial review and/or requires an exercise of discretion within the agency's expertise, whether the agency complied with clear procedural requirements and considered factors Congress deemed relevant when removing an item from the USML is neither a political question nor one committed to the agency's discretion as a matter of statute or case law.

### 4. Tucker Act

Finally, the private defendants assert that the Court of Federal Claims has exclusive jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). Plaintiffs seek to invalidate agency action under the APA because it violates the procedural requirements of the AECA and/or is arbitrary and capricious. These claims are statutory and, as plaintiffs point out, the Tucker Act has no application in this context. Dkt. #186 at 22. The private defendants abandoned this argument in reply.

## B. Administrative Procedures Act Claims

The APA authorizes judicial review of final agency action and provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 12

excess of statutory jurisdiction, authority, or limitations; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706. Plaintiffs argue that the federal government's efforts to immediately remove items from the USML through issuance of a temporary modification and letter were not in accordance with law and were without observance of procedure required by law insofar as the State Department failed to give thirty days' notice to the Congressional foreign relations committees specified in 22 U.S.C. § 2778(f)(1). Plaintiffs also seek to invalidate the decision to allow the CAD files to be published on the internet on the ground that the temporary modification violates the limitations on federal power imposed by the Tenth Amendment. Finally, plaintiffs argue that the agency action was arbitrary and capricious because the agency failed to consider the factors identified by Congress and because the delisting is not supported by substantial evidence in the administrative record.

**1. Congressional Notice**

The AECA requires that the President or his designee periodically review the items on the USML to ensure that export controls are warranted. 22 U.S.C. § 2778(f)(1). The results of the review must be reported to Congress, and the Department "may not remove any item from the Munitions List until 30 days after the date on which [it] has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate . . . ." Id. The federal defendants argue that the Congressional notice requirement does not apply because the CAD files at issue here are not specifically enumerated on the USML and are therefore not "items" for purposes of § 2778(f)(1). This argument was rejected at the preliminary injunction stage, and the Court sees no reason to reconsider its decision.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 13

The President has the power to designate "defense articles and defense services" and to control their import and export "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). The articles and services (*i.e.*, items) so designated constitute the USML. Id. See also 22 C.F.R. § 121.1(a) (describing the organization of the USML and noting each USML category is composed of related defense articles). Category I of the USML includes all firearms up to .50 caliber (22 C.F.R. § 121.1(I)(a) and (b)) and all technical data "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" such firearms (22 C.F.R. § 120.10(a)). Through the CJ process, the Department of State specifically determined that the subject CAD files are subject to the export controls of ITAR.

The Department of State argues that its decision to immediately allow the unlicensed export of previously-regulated items does not trigger the Congressional notice requirement because the temporary modification did not deregulate a whole group or category of defense articles described in the USML, such as "nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," 22 C.F.R. § 121.1(I)(a). This argument conflates "category" with "item." As described in the statute, the USML is a list of items designated by the President as "defense articles and defense services." 22 U.S.C. § 2778(a)(1). Rather than generate an exhaustive list of every individual article or service that is subject to export control under the AECA, the Department of State opted to populate the USML with generally descriptive categories. Those categories describe actual items, however, and it is those items that are the "defense articles and defense services" subject to export control under the AECA. 22 C.F.R. § 121.1.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 14

The congressional review and notice requirements specifically apply to items, not categories of items. 22 U.S.C. § 2778(f). The Department's CJ regulation further confirms that it is the removal of a particular article or service - an item rather than a category - that triggers the review and notice requirements. The Department describes the CJ procedure as a means of resolving doubts "as to whether an article or service is covered by the U.S. Munitions List" and to seek "redesignation of an article or service currently covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a). Immediately after the reference to redesignation, the regulations reiterate that the "Department must provide notice to Congress at least 30 days before any item is removed from the U.S. Munitions List." Id. Given the language, structure, and purpose of the statute and implementing regulations, the Court finds that the attempt to revoke the listing of an item previously covered by the USML through the issuance of a "temporary modification," thereby lifting all export controls under the AECA and ITAR, triggers the congressional notice requirement of the statute.

It is undisputed that Congress was not notified prior to the removal of the subject CAD files from the USML. This procedural failure cannot be rectified by providing Congressional notice thirty days in advance of making the "temporary" removal "final:" the temporary modification implemented the removal immediately, without waiting for the proposed rule to become final and without giving Congress notice and an opportunity to exercise its oversight role. Because the removal to which the States object occurred as of July 27, 2018, a subsequent notice is obviously not timely under the statute.[5]

---

[5] To the extent the federal defendants are relying on 22 C.F.R. § 126.2 as authority for the temporary modification (see Dkt. #173 at 6), its use of that procedure to immediately redesignate an item that was previously covered by the USML without Congressional notice violates the governing

The Court finds that the temporary modification of the USML to allow immediate publication of the previously-regulated CAD files constitutes the removal of one or more items from the USML without the required Congressional notice. Because the agency action was "without observance of procedure required by law," it must be held unlawful and set aside under § 706 of the APA.

**2. Tenth Amendment Claim**

As part of the settlement agreement in the Texas litigation, the federal defendants agreed that the temporary modification that would be issued on or before July 27, 2018, would permit "any United States person" including the private defendants' customers and members, "to access, discuss, use, reproduce, or otherwise benefit from the technical data" contained in the CAD files at issue. Dkt. #171-2 at 6. Plaintiffs argue that this provision exceeds the limits imposed on the federal government by the Tenth Amendment in that it conflicts with, and presumably abrogates, state laws restricting certain persons from possessing, manufacturing, owning, and/or using firearms in general or 3D-printed firearms in particular. Plaintiffs therefore argue that the temporary modification must be invalidated as "otherwise not in accordance with law" under the APA.

Both the federal and private defendants have, at various times during this litigation, disavowed any intent to alter or in any way impact existing prohibitions or limitations on the possession of firearms, and the federal defendants recognize the continuing viability of state law gun control measures. Plaintiffs find no comfort in these statements "given the plain language of

---

statute. "It is beyond dispute that a federal regulation cannot empower the Government to do what a federal statute prohibits it from doing." <u>Tuan Thai v. Ashcroft</u>, 366 F.3d 790, 798 (9th Cir. 2004).

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 16

the operative Temporary Modification and Letter." Dkt. #186 at 14. A review of the notice of

temporary modification and letter shows, however, that neither communication expressly

permits "any United States person" to "use" the CAD files or 3D-printed firearms. Nor do they

contain a reference incorporating the settlement agreement or the promises set forth therein.

Without assistance from the parties, the Court declines to determine whether a contractual

provision regarding the intended meaning of a promised, future statement would have any effect

on state law or be otherwise enforceable when the statement, when finally issued, contains no

language regarding the subject matter.

### 4. Arbitrary and Capricious

Plaintiffs allege that the federal defendants' decision to allow Defense Distributed to

upload to the internet CAD files containing 3D printing instructions for the manufacture of

undetectable weapons was arbitrary and capricious because the State Department failed to

consider the factors set forth in the AECA, failed to offer an explanation supported by

substantial evidence in the administrative record, and/or has asserted justifications that are

pretextual. In determining whether agency action was arbitrary and capricious, the Court's scope

of review is "narrow" and focused on determining whether the agency "examined the relevant

data and articulated a satisfactory explanation for [its] decision, including a rational connection

between the facts found and the choice made." Dep't of Commerce, 139 S. Ct. at 2569 (citing

Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43

(1983) (internal quotation marks omitted). In order for the Court to be able to determine whether

the agency has acted within the bounds imposed by the governing statute, the agency is required

to disclose the basis for its action, making the findings necessary to support the decision, and

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 17

produce an administrative record that substantially supports those findings. <u>Burlington Truck</u> <u>Lines, Inc. v. U.S.</u>, 371 U.S. 156, 168 (1962).

The federal defendants, citing 22 C.F.R. § 120.3(b), argue that only items that "provide[] a critical military or intelligence advantage" belong on the USML and that a multi-year, inter-agency review process led to the determination that firearms up to .50 caliber do not satisfy that standard. There are a number of problems with this argument. First, the regulation cited states that articles or services that provide "a critical military or intelligence advantage" "shall be" included on the USML. Items that fit that description must be on the USML, but they are not the only items that can be included. Thus, an agency determination that small-caliber firearms do not provide critical military or intelligence advantages does not explain why those previously-controlled items were removed from the list.

Second, Congress granted the President and his designees the discretion to remove an item from the USML in light of certain considerations and factors. Congress directed the agency to consider how the proliferation of weaponry and related technical data would impact world peace, national security, and foreign policy. The State Department essentially concedes that, despite the specified statutory considerations, it evaluated the export controls on small caliber firearms only through the prism of whether restricting foreign access would provide the United States with a military or intelligence advantage. Because the delisting was not "based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute," it must be invalidated under the APA. <u>Motor Vehicle Mfrs.</u>, 463 U.S. at 42.

Third, given the agency's prior position regarding the need to regulate 3D-printed

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 18

firearms and the CAD files used to manufacture them, it must do more than simply announce a contrary position.

> [T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. . . . [T]he agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate . . . [But s]ometimes it must - when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy . . . . It would be arbitrary or capricious to ignore such matters. In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy.

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515-16 (2009) (emphasis in original). Until April 2018, the federal government regulated technical data related to the design and production of weapons using a 3D printer because the data and weapons posed a threat to world peace and the security and foreign policy of the United States. Some of its concerns related specifically to the undetectable nature of a gun made from plastic: because they could slip through conventional security equipment, the State Department feared that they could be used in assassination attempts, hijackings, piracy, and terrorist activities. Other concerns related to the portability and ease of a manufacturing process that would allow terrorist groups and embargoed nations to evade sanctions, repair weapons, restock arms supplies, and fuel violent regional conflicts. Both aspects of the technical data at issue would, the State Department feared, subvert the domestic laws of nations with restrictive firearm controls, impairing the United States' foreign relations with those nations. Overall, the Department of State concluded that the worldwide publication of computerized instructions for the manufacture of undetectable firearms was a threat to world peace and the national security interests of the United States and would

cause serious and long-lasting harm to its foreign policy. Against these findings, the federal defendants offer nothing: no analysis of the potential impacts of removing the CAD files for 3D-printed firearms from the USML, no response to the public comments raising concerns about such a removal, no acknowledgment in the NPRMs of its change in position with regards to the CAD files, and no justification in the temporary modification, the letter, or the administrative record for the change.[6]

The federal defendants argue that the agency appropriately evaluated whether import and export restrictions on small caliber firearms were warranted and that the results of the multi-year inter-agency review apply to 3D-printed guns and the technical data related to them. The only parts of the administrative record cited in support of this argument are the NPRMs issued by the Departments of State and Commerce regarding the delisting of certain items in Category I of the USML. A review of those documents shows that:

- the goal of the proposed revisions is to limit Category I to only those items "that provide the United States with a critical military or intelligence advantage or, in

_____

[6] The private defendants point to a PowerPoint presentation made at an Additive Manufacturing Symposium in February 2014 and a law review article written by their former counsel that same year as support for the agency's 2018 decision to remove the subject CAD files from the USML. The law review article merely raises constitutional arguments against the regulation of 3D-printed guns and is seemingly unrelated to any justification the agency has offered for its action. The symposium presentation includes two slides related to 3D-printed guns, one displaying a picture of a 3D-printed gun (courtesy of Cody Wilson) and another including text stating that export controls offer no benefit to U.S. manufacturing or national security. Dkt. #116-1 at 32. There is no indication that the agency actually relied on this document when issuing the temporary modification in 2018: in fact, it tacitly concedes that it did not because the multi-year review upon which the decision was apparently based focused on small caliber firearms generally, not 3D-printed guns specifically. Just as importantly, the slides do not reflect consideration of the factors Congress intended the agency to consider or constitute a "reasoned explanation" for disregarding the agency's prior findings regarding the impact of 3D-printed weapons on world peace, national security, and foreign policy. Fox Television Stations, 556 U.S. at 516.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 20

the case of weapons, are inherently for military end use" (83 Fed. Reg. 24,198);[7]

● the revised Category I will no longer cover small-caliber non-automatic and semi-automatic firearms (Id.);

● the revised Category I will no longer cover "commercial items widely available in retail outlets and less sensitive military items" (83 Fed. Reg. 24,166);

● the proposed changes are based on an inter-agency review (Id.).

These statements are merely descriptions of the changes proposed and the process used, not an analysis of or justification for the changes. The Department of Commerce goes on to say that it believes that, unless an item provides a critical military or intelligence advantage to the United States or is generally unavailable at retail outlets for civil and recreational activities, the burdens of subjecting U.S. manufacturers to the obligations of the ITAR are not warranted by any proportionate benefits to national security or foreign policy objectives. 83 Fed. Reg. 24,167.

Whatever the merits of this analysis with regards to the rim fire rifles, pistols, and other popular shooting implements specifically mentioned in the NPRMs, it does not provide a "reasoned explanation" for the action with regards to the CAD files and 3D-printed weapons at issue here. Less than two months before the NPRMs were published, the State Department had taken the position that 3D-printed weapons posed unique threats to world peace, national

---

[7] The descriptions of what will be covered by the revised Category I vary in the NPRMs. The Department of State asserts that the revised Category I will cover "only defense articles that are inherently military or that are not otherwise widely available for commercial sale." 83 Fed. Reg. 24, 198. The Department of Commerce describes Category I items under the amended USML as those which are "inherently military and otherwise warrant control on the USML" or "possess parameters or characteristics that provide a critical military or intelligence advantage to the United States[] and are almost exclusively available from the United States." 83 Fed. Reg. 24,166.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 21

security, and the foreign policy of the United States: the agency's specific concerns regarding the proliferation of these weapons are well-documented in the administrative record. The NPRMs neither display an awareness that the agency is changing its position with regards to the data files, nor provide a reasoned explanation for a new policy that necessarily "rests upon factual findings that contradict those which underlay its prior policy." Fox Television Stations, 556 U.S. at 515-16. The agency has simply abandoned, without acknowledgment or analysis, its previous position and has sub silentio found that the delisting is consistent with world peace, national security, and U.S. foreign policy despite explicit, recent findings to the contrary. See Motor Vehicles Mfrs. Ass'n, 463 U.S. at 46-51 (acknowledging that an agency need not consider and reject all policy alternatives when reaching a decision, but noting that where an alternative is within the ambit of the existing standard or policy, "it may not be abandoned without any consideration whatsoever").[8] Because it is arbitrary and capricious to ignore the contradiction in these circumstances, the agency action must be invalidated.

The Court finds that the agency action is arbitrary and capricious in two, independent respects. First, the agency failed to consider aspects of the problem which Congress deemed important before issuing the temporary modification and letter on July 27, 2018. Second, the agency failed to identify substantial evidence in the administrative record explaining a change of position that necessarily contradicts its prior determinations and findings regarding the threats posed by the subject CAD files and the need to regulate the same under the AECA. Because the agency action was arbitrary and capricious, it is unlawful and must be set aside under § 706 of

---

[8] In addition, there are no findings (and no evidence in the administrative record) that the CAD files at issue here were widely available before the agency abruptly deregulated them on July 27, 2018.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 22

the APA.[9]

## C. The Private Defendants' Other Arguments

### 1. Motion to Dismiss

The private defendants incorporate by reference a motion to dismiss that was denied almost a year ago. Having offered no reason to reconsider the prior ruling and no explanation for the delay in seeking reconsideration, the motion is denied.

### 2. Personal Jurisdiction

Defense Distributed argues that the Court lacks jurisdiction over its person. Such a defense can be, and has been, waived. Although Defense Distributed asserted a personal jurisdiction defense in its answer, it omitted it from the motion to dismiss it filed on October 11, 2018, and has therefore waived the defense under Fed. R. Civ. P. 12(h)(1)(A).

### 3. First Amendment Justification for Agency Action

The private defendants argue that the CAD files are protected speech under the First Amendment and assert that the files were removed from the USML in order to avoid constitutional problems. The agency, however, has not relied on the First Amendment as justification for its action, and neither the Court nor the private defendants may supply a basis for the decision that the agency itself did not rely upon. Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 683-84 (2007).

### 4. First Amendment Violation

The private defendants again assert that restrictions on their ability to publish the files

---

[9] Because the agency action must be invalidated on other grounds, the Court has not considered whether the agency's justifications were pretextual or whether such a finding would warrant invalidation under the APA.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 23

constitute a prior restraint that is presumed to be unconstitutional and that the regulations should be subjected to strict scrutiny. Whether or not the First Amendment precludes the federal government from regulating the publication of technical data under the authority granted by the AECA is not relevant to the merits of the APA claims plaintiffs assert in this litigation. Plaintiffs allege that the federal defendants failed to follow prescribed procedures and acted in an arbitrary and capricious manner when they issued the temporary modification and letter authorizing the immediate publication of the CAD files. The State Department has not attempted to justify its action as compelled by the First Amendment, nor have the private defendants shown that their First Amendment interests are a defense to plaintiffs' claims or a talisman that excuses the federal defendants' failures under the APA.

**D. Remedy**

The presumptive remedy for unlawful agency action is vacatur and remand. All. for the Wild Rockies v. United States Forest Serv., 907 F.3d 1105, 1121 (9th Cir. 2018). Plaintiffs also seek an injunction preventing the federal defendants from again issuing a temporary modification purporting to deregulate the subject CAD files with no warning. Plaintiffs have not shown that the harm they fear is likely to occur, however. There is no indication that the federal defendants are poised to immediately modify the USML as soon as their previous efforts are invalidated or are otherwise inclined to ignore the procedural and substantive requirements of the AECA discussed in this order. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction.").

1

## CONCLUSION

2

For all of the foregoing reasons, plaintiffs' motion for summary judgment (Dkt. #170) is

3

4

GRANTED in part and DENIED in part. The July 27, 2018, "Temporary Modification of

Category I of the United States Munitions List" and letter to Cody R. Wilson, Defense

5

6

Distributed, and the Second Amendment Foundation were unlawful and are hereby VACATED.

7

Defendants' motions for summary judgment (Dkt. #173 and #174) are DENIED.

8

9

Dated this 12th day of November, 2019.

10

11

12

*MW S Lasnik*

Robert S. Lasnik
United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 25

**From:** International Trade Law360
[news-q2@law360.com]
**Sent:** 11/13/2019 8:39:52 AM
**To:** Nazak Nikakhtar
[Nazak.Nikakhtar@bis.doc.gov]
**Subject:** Trump Will Raise Tariffs
'Substantially' If China Talks
Falter

INTERNATIONAL TRADE



Wednesday, November 13, 2019

 Follow

## TOP NEWS

### Trump Will Raise Tariffs 'Substantially' If China Talks Falter

President Donald Trump said Tuesday that he will "substantially" raise tariffs on Chinese imports if the U.S. and Beijing are unable to finalize the details of an early-phase trade deal that the two governments unveiled a month ago.
Read full article »

### Boston Modem Co. Can't Get Exemption On China Tariffs

The federal government has denied the last of Zoom Telephonics Inc.'s appeals for exemption from tariffs on its Chinese-made products, the company said, saying that the Office of the U.S. Trade Representative gave no explanation for its decision.
Read full article »

### US Spares 36 More Products From China Duties

The Trump administration has issued its latest round of Chinese products exempted from a 25% levy, sparing items like vinyl flooring, pet leashes and silk fabrics from those tariffs.
Notice attached | Read full article »

## LITIGATION

### Feds' Deal For Posting 3D-Printed Gun Plans Ruled Unlawful

A federal judge in Washington state struck down as unlawful on Tuesday a Trump administration settlement last year that cleared the way for private groups to distribute online blueprints and instructions for manufacturing firearms with 3D printers.
Order attached | Read full article »

### CIT Asks Commerce To Reexplain Duty On Chinese Solar Cells

The U.S. Court of International Trade has asked the U.S. Department of Commerce for a second time to explain its countervailing duty on Chinese solar cell imports, saying that the agency has failed to address its concerns about how the duty was determined.



Listen to our new podcast here

LAW FIRMS
Baker Botts
Baker Donelson
Baker McKenzie
Butler Snow LLP
Clifford Chance
Clyde & Co
Cravath Swaine
Dewey & LeBoeuf
Fried Frank
Hinshaw & Culbertson
Hogan Lovells

⊞Opinion attached | Read full article »

## EXPERT ANALYSIS

**Opinion**

### In A Trade War, Everyone Loses

While some countries may temporarily benefit from bilateral trade disputes, in the long term, the Trump administration's protectionist strategy puts at risk the enormous achievements of the last decades, both in the U.S. and globally, says Anahita Thoms at Baker McKenzie.

Read full article »

**Series**

### Judging A Book: McKeown Reviews 'Conversations With RBG'

Reading Jeffrey Rosen's "Conversations With RBG: Ruth Bader Ginsburg on Life, Love, Liberty, and Law" is like eavesdropping on the author and his subject while they discuss how the restrained judicial minimalist became the fiery leader of the opposition, says Ninth Circuit Judge M. Margaret McKeown.

Read full article »

## LEGAL INDUSTRY

### No Vote Thurs. For 5th Circ. Pick Opposed By GOP Sens.

A Fifth Circuit nominee opposed by several GOP senators was left off the list of judicial picks eligible for a committee vote this week at the White House's request, suggesting that U.S. District Judge Halil S. Ozerden has lost his opportunity for elevation.

Read full article »

### BigLaw Firms Fall In Line With 2019 Associate Bonuses

BigLaw associate bonus announcements have started flooding in, with at least five law firms following Milbank's lead as of Tuesday, unveiling mostly uniform year-end bonuses ranging from $15,000 to $100,000 based on experience.

Read full article »

### How GC Belt-Tightening May Hit Your Firm

More than three-quarters of law department leaders expect that a recession will hit the United States during the next two years, according to a survey of general counsel and chief legal officers released Tuesday, with many saying they plan to spend less money in the coming year.

Read full article »

### Law Firm Revenues Inch Up As Expenses Level Out

Associate base salary raises adopted by many BigLaw firms in the middle of 2018 and subsequently absorbed by the legal industry, combined with improved demand and strong rate increases, have eased margin pressure, according to a report out Tuesday by Citi Private Bank.

Read full article »

### Clyde & Co. Nabs Legal Ethics Trio From Hinshaw

Three seasoned professional responsibility and legal malpractice experts from Hinshaw & Culbertson LLP have jumped to Clyde & Co. LLP, the firm announced Tuesday.

Read full article »

### Baker Atty Lied To Get Loan Just Before Ch. 11, Lender Says

Holwell Shuster
Jones Walker
Milbank LLP
Mowry & Grimson
Paul Weiss
Sedgwick LLP
Trade Pacific PLLC
Troutman Sanders

### COMPANIES

Organisation for Economic Co-operation and Development
Altman Weil Inc.
American Civil Liberties Union
Chicago Cubs
Federalist Society
Goodyear Tire & Rubber Co.
Hobby Lobby Stores
International Speedway Corporation
Major League Baseball Inc.
Nascar Holdings Inc.
National Federation of Independent Business
Sina Corporation
Sinclair Broadcast Group Inc.
Trina Solar Ltd.
U.S. Chamber of Commerce
Zoom Telephonics Inc.

### GOVERNMENT AGENCIES

Department of Commerce
European Union
Federal Election Commission
International Monetary Fund
Office of the U.S. Trade Representative
U.S. Bankruptcy Court for the Southern District of Mississippi
U.S. Court of Appeals for the District of Columbia Circuit
U.S. Court of Appeals for the Ninth Circuit
U.S. Department of Justice
U.S. Department of State
U.S. District Court for the Southern District of Mississippi
U.S. District Court for the Western District of Washington

A director at Baker Donelson Bearman Caldwell & Berkowitz PC borrowed more than $81,000 to insure trucks in a floundering shipping business just hours after the venture filed for Chapter 11, a Michigan financing company told a Mississippi federal bankruptcy court.

Read full article »

Interview

**15 Minutes With The Chicago Cubs' General Counsel**

January will mark Brett Scharback's two-year anniversary as general counsel at the Chicago Cubs. Here, he discusses the legal issues he deals with as the top lawyer of a baseball club, what it's like having Major League Baseball as a governing body, and whether law firm experience is necessary to be an effective general counsel.

Read full article »

**JOBS**
Search full listings or advertise your job opening

U.S. Supreme Court
World Trade Organization

Not sure if your firm subscribes? Ask your librarian.

We hope you found this message to be useful.
However, if you'd rather not receive future emails of this sort,
you may unsubscribe here.

Please DO NOT reply to this email. For customer support inquiries, please call +1-646-783-7100 or visit our Contact Us page.

Privacy Policy

Law360 | Portfolio Media, Inc, 111 West 19th Street, 5th Floor, New York, NY 10011

**From:** International Trade Law360
[news-q2@law360.com]
**Sent:** 11/13/2019 8:42:49 AM
**To:** Matthew Borman
[Matthew.Borman@bis.doc.gov]
**Subject:** Trump Will Raise Tariffs
'Substantially' If China Talks
Falter

INTERNATIONAL TRADE



Wednesday, November 13, 2019



## TOP NEWS

### Trump Will Raise Tariffs 'Substantially' If China Talks Falter

President Donald Trump said Tuesday that he will "substantially" raise tariffs on Chinese imports if the U.S. and Beijing are unable to finalize the details of an early-phase trade deal that the two governments unveiled a month ago.
Read full article »

### Boston Modem Co. Can't Get Exemption On China Tariffs

The federal government has denied the last of Zoom Telephonics Inc.'s appeals for exemption from tariffs on its Chinese-made products, the company said, saying that the Office of the U.S. Trade Representative gave no explanation for its decision.
Read full article »

### US Spares 36 More Products From China Duties

The Trump administration has issued its latest round of Chinese products exempted from a 25% levy, sparing items like vinyl flooring, pet leashes and silk fabrics from those tariffs.
Notice attached | Read full article »

## LITIGATION

### Feds' Deal For Posting 3D-Printed Gun Plans Ruled Unlawful

A federal judge in Washington state struck down as unlawful on Tuesday a Trump administration settlement last year that cleared the way for private groups to distribute online blueprints and instructions for manufacturing firearms with 3D printers.
Order attached | Read full article »

### CIT Asks Commerce To Reexplain Duty On Chinese Solar Cells

The U.S. Court of International Trade has asked the U.S. Department of Commerce for a second time to explain its countervailing duty on Chinese solar cell imports, saying that the agency has failed to address its concerns about how the duty was determined.



Listen to our new podcast here

LAW FIRMS
Baker Botts
Baker Donelson
Baker McKenzie
Butler Snow LLP
Clifford Chance
Clyde & Co
Cravath Swaine
Dewey & LeBoeuf
Fried Frank
Hinshaw & Culbertson
Hogan Lovells

🗎 *Opinion attached* | Read full article »

## EXPERT ANALYSIS

### Opinion
### In A Trade War, Everyone Loses
While some countries may temporarily benefit from bilateral trade disputes, in the long term, the Trump administration's protectionist strategy puts at risk the enormous achievements of the last decades, both in the U.S. and globally, says Anahita Thoms at Baker McKenzie.

Read full article »

### Series
### Judging A Book: McKeown Reviews 'Conversations With RBG'
Reading Jeffrey Rosen's "Conversations With RBG: Ruth Bader Ginsburg on Life, Love, Liberty, and Law" is like eavesdropping on the author and his subject while they discuss how the restrained judicial minimalist became the fiery leader of the opposition, says Ninth Circuit Judge M. Margaret McKeown.

Read full article »

## LEGAL INDUSTRY

### No Vote Thurs. For 5th Circ. Pick Opposed By GOP Sens.
A Fifth Circuit nominee opposed by several GOP senators was left off the list of judicial picks eligible for a committee vote this week at the White House's request, suggesting that U.S. District Judge Halil S. Ozerden has lost his opportunity for elevation.

Read full article »

### BigLaw Firms Fall In Line With 2019 Associate Bonuses
BigLaw associate bonus announcements have started flooding in, with at least five law firms following Milbank's lead as of Tuesday, unveiling mostly uniform year-end bonuses ranging from $15,000 to $100,000 based on experience.

Read full article »

### How GC Belt-Tightening May Hit Your Firm
More than three-quarters of law department leaders expect that a recession will hit the United States during the next two years, according to a survey of general counsel and chief legal officers released Tuesday, with many saying they plan to spend less money in the coming year.

Read full article »

### Law Firm Revenues Inch Up As Expenses Level Out
Associate base salary raises adopted by many BigLaw firms in the middle of 2018 and subsequently absorbed by the legal industry, combined with improved demand and strong rate increases, have eased margin pressure, according to a report out Tuesday by Citi Private Bank.

Read full article »

### Clyde & Co. Nabs Legal Ethics Trio From Hinshaw
Three seasoned professional responsibility and legal malpractice experts from Hinshaw & Culbertson LLP have jumped to Clyde & Co. LLP, the firm announced Tuesday.

Read full article »

### Baker Atty Lied To Get Loan Just Before Ch. 11, Lender Says

Holwell Shuster
Jones Walker
Milbank LLP
Mowry & Grimson
Paul Weiss
Sedgwick LLP
Trade Pacific PLLC
Troutman Sanders

COMPANIES
Organisation for Economic Co-operation and Development
Altman Weil Inc.
American Civil Liberties Union
Chicago Cubs
Federalist Society
Goodyear Tire & Rubber Co.
Hobby Lobby Stores
International Speedway Corporation
Major League Baseball Inc.
Nascar Holdings Inc.
National Federation of Independent Business
Sina Corporation
Sinclair Broadcast Group Inc.
Trina Solar Ltd.
U.S. Chamber of Commerce
Zoom Telephonics Inc.

GOVERNMENT AGENCIES
Department of Commerce
European Union
Federal Election Commission
International Monetary Fund
Office of the U.S. Trade Representative
U.S. Bankruptcy Court for the Southern District of Mississippi
U.S. Court of Appeals for the District of Columbia Circuit
U.S. Court of Appeals for the Ninth Circuit
U.S. Department of Justice
U.S. Department of State
U.S. District Court for the Southern District of Mississippi
U.S. District Court for the Western District of Washington

DOC_0073300

A director at Baker Donelson Bearman Caldwell & Berkowitz PC borrowed more than $81,000 to insure trucks in a floundering shipping business just hours after the venture filed for Chapter 11, a Michigan financing company told a Mississippi federal bankruptcy court.

Read full article »

Interview
## 15 Minutes With The Chicago Cubs' General Counsel
January will mark Brett Scharback's two-year anniversary as general counsel at the Chicago Cubs. Here, he discusses the legal issues he deals with as the top lawyer of a baseball club, what it's like having Major League Baseball as a governing body, and whether law firm experience is necessary to be an effective general counsel.

Read full article »

## JOBS
Search full listings or advertise your job opening

U.S. Supreme Court
World Trade Organization

Not sure if your firm subscribes? Ask your librarian.

We hope you found this message to be useful.
However, if you'd rather not receive future emails of this sort,
you may unsubscribe here.

Please DO NOT reply to this email. For customer support inquiries, please call +1-646-783-7100 or visit our Contact Us page.

Privacy Policy

Law360 | Portfolio Media, Inc, 111 West 19th Street, 5th Floor, New York, NY 10011