**From:** International Trade Law360 [news-alt@law360.com]
**Sent:** 11/13/2019 8:43:28 AM
**To:** Walsh, Michael (Federal) [MWalsh@doc.gov]
**Subject:** Trump Will Raise Tariffs 'Substantially' If China Talks Falter

INTERNATIONAL TRADE



Wednesday, November 13, 2019



## TOP NEWS

### Trump Will Raise Tariffs 'Substantially' If China Talks Falter

President Donald Trump said Tuesday that he will "substantially" raise tariffs on Chinese imports if the U.S. and Beijing are unable to finalize the details of an early-phase trade deal that the two governments unveiled a month ago.
Read full article »

### Boston Modem Co. Can't Get Exemption On China Tariffs

The federal government has denied the last of Zoom Telephonics Inc.'s appeals for exemption from tariffs on its Chinese-made products, the company said, saying that the Office of the U.S. Trade Representative gave no explanation for its decision.
Read full article »

### US Spares 36 More Products From China Duties

The Trump administration has issued its latest round of Chinese products exempted from a 25% levy, sparing items like vinyl flooring, pet leashes and silk fabrics from those tariffs.
Notice attached | Read full article »

## LITIGATION

### Feds' Deal For Posting 3D-Printed Gun Plans Ruled Unlawful

A federal judge in Washington state struck down as unlawful on Tuesday a Trump administration settlement last year that cleared the way for private groups to distribute online blueprints and instructions for manufacturing firearms with 3D printers.
Order attached | Read full article »

### CIT Asks Commerce To Reexplain Duty On Chinese Solar Cells

The U.S. Court of International Trade has asked the U.S. Department of Commerce for a second time to explain its countervailing duty on Chinese



Listen to our new podcast here

**LAW FIRMS**

Baker Botts
Baker Donelson
Baker McKenzie
Butler Snow LLP
Clifford Chance
Clyde & Co
Cravath Swaine
Dewey & LeBoeuf
Fried Frank

solar cell imports, saying that the agency has failed to address its concerns about how the duty was determined.

Opinion attached | Read full article »

## EXPERT ANALYSIS

Opinion
### In A Trade War, Everyone Loses
While some countries may temporarily benefit from bilateral trade disputes, in the long term, the Trump administration's protectionist strategy puts at risk the enormous achievements of the last decades, both in the U.S. and globally, says Anahita Thoms at Baker McKenzie.

Read full article »

Series
### Judging A Book: McKeown Reviews 'Conversations With RBG'
Reading Jeffrey Rosen's "Conversations With RBG: Ruth Bader Ginsburg on Life, Love, Liberty, and Law" is like eavesdropping on the author and his subject while they discuss how the restrained judicial minimalist became the fiery leader of the opposition, says Ninth Circuit Judge M. Margaret McKeown.

Read full article »

## LEGAL INDUSTRY

### No Vote Thurs. For 5th Circ. Pick Opposed By GOP Sens.
A Fifth Circuit nominee opposed by several GOP senators was left off the list of judicial picks eligible for a committee vote this week at the White House's request, suggesting that U.S. District Judge Halil S. Ozerden has lost his opportunity for elevation.

Read full article »

### BigLaw Firms Fall In Line With 2019 Associate Bonuses
BigLaw associate bonus announcements have started flooding in, with at least five law firms following Milbank's lead as of Tuesday, unveiling mostly uniform year-end bonuses ranging from $15,000 to $100,000 based on experience.

Read full article »

### How GC Belt-Tightening May Hit Your Firm
More than three-quarters of law department leaders expect that a recession will hit the United States during the next two years, according to a survey of general counsel and chief legal officers released Tuesday, with many saying they plan to spend less money in the coming year.

Read full article »

### Law Firm Revenues Inch Up As Expenses Level Out
Associate base salary raises adopted by many BigLaw firms in the middle of 2018 and subsequently absorbed by the legal industry, combined with improved demand and strong rate increases, have eased margin pressure, according to a report out Tuesday by Citi Private Bank.

Read full article »

### Clyde & Co. Nabs Legal Ethics Trio From Hinshaw
Three seasoned professional responsibility and legal malpractice experts from Hinshaw & Culbertson LLP have jumped to Clyde & Co. LLP, the firm announced Tuesday.

Hinshaw & Culbertson
Hogan Lovells
Holwell Shuster
Jones Walker
Milbank LLP
Mowry & Grimson
Paul Weiss
Sedgwick LLP
Trade Pacific PLLC
Troutman Sanders

COMPANIES
Organisation for Economic Co-operation and Development
Altman Weil Inc.
American Civil Liberties Union
Chicago Cubs
Federalist Society
Goodyear Tire & Rubber Co.
Hobby Lobby Stores
International Speedway Corporation
Major League Baseball Inc.
Nascar Holdings Inc.
National Federation of Independent Business
Sina Corporation
Sinclair Broadcast Group Inc.
Trina Solar Ltd.
U.S. Chamber of Commerce
Zoom Telephonics Inc.

GOVERNMENT AGENCIES
Department of Commerce
European Union
Federal Election Commission
International Monetary Fund
Office of the U.S. Trade Representative
U.S. Bankruptcy Court for the Southern District of Mississippi
U.S. Court of Appeals for the District of Columbia Circuit
U.S. Court of Appeals for the Ninth Circuit
U.S. Department of Justice
U.S. Department of State
U.S. District Court for the Southern District of Mississippi

DOC_0073303

Read full article »

## Baker Atty Lied To Get Loan Just Before Ch. 11, Lender Says

A director at Baker Donelson Bearman Caldwell & Berkowitz PC borrowed more than $81,000 to insure trucks in a floundering shipping business just hours after the venture filed for Chapter 11, a Michigan financing company told a Mississippi federal bankruptcy court.

Read full article »

Interview

## 15 Minutes With The Chicago Cubs' General Counsel

January will mark Brett Scharback's two-year anniversary as general counsel at the Chicago Cubs. Here, he discusses the legal issues he deals with as the top lawyer of a baseball club, what it's like having Major League Baseball as a governing body, and whether law firm experience is necessary to be an effective general counsel.

Read full article »

### JOBS
Search full listings or advertise your job opening

U.S. District Court for the Western District of Washington
U.S. Supreme Court
World Trade Organization

Not sure if your firm subscribes? Ask your librarian.

We hope you found this message to be useful.
However, if you'd rather not receive future emails of this sort,
you may unsubscribe here.

Please DO NOT reply to this email. For customer support inquiries, please call +1-646-783-7100 or visit our Contact Us page.

Privacy Policy

Law360 | Portfolio Media, Inc. 111 West 19th Street, 5th Floor, New York, NY 10011

**From:** Aerospace & Defense Law360
[news-alt@law360.com]
**Sent:** 11/13/2019 8:48:43 AM
**To:** Matthew Borman
[Matthew.Borman@bis.doc.gov]
**Subject:** Feds' Deal For Posting 3D-Printed Gun Plans Ruled Unlawful

AEROSPACE & DEFENSE



Wednesday, November 13, 2019



## TOP NEWS

### Feds' Deal For Posting 3D-Printed Gun Plans Ruled Unlawful

A federal judge in Washington state struck down as unlawful on Tuesday a Trump administration settlement last year that cleared the way for private groups to distribute online blueprints and instructions for manufacturing firearms with 3D printers.

*Order attached* | Read full article »

### Sinclair, Mar-A-Lago Member Settle Suit Over 'Spy' Report

Sinclair Broadcast Group Inc. has reached a settlement to resolve a $50 million defamation lawsuit from a Chinese billionaire who is a member of President Donald Trump's Mar-a-Lago Club over a news report detailing allegations that he is a spy for China.

*2 documents attached* | Read full article »

### 9th Circ. Backs Boeing's $200M Win In Ukraine Space Co. Row

A Ninth Circuit panel on Tuesday backed up The Boeing Co. in a suit against its Ukrainian partners in a defunct satellite launching project, affirming a $200 million judgment and ending nearly a decade of litigation that stretched across the U.S., Sweden, Russia and the U.K.

*Opinion attached* | Read full article »

### Mulvaney Drops Suit And Will Ignore House Subpoena

Acting White House Chief of Staff Mick Mulvaney dropped his attempt to join a lawsuit over congressional subpoenas related to the impeachment inquiry Tuesday and told a D.C. federal judge he will instead rely on President Donald Trump's order not to testify.

*Letter attached* | Read full article »

## ENFORCEMENT

### WikiLeaks 'A Gift' To Trump Campaign, Gates Tells Stone Jury

Former Trump campaign honcho Rick Gates testified Tuesday that the organization was thrilled to learn from Roger Stone about WikiLeaks' plan to dump stolen emails to damage Democratic opponent Hillary Clinton,



Listen to our new podcast here

### COMPANIES

Organisation for Economic Co-operation and Development

Altman Weil Inc.

American Civil Liberties Union

Chicago Cubs

Dow Jones & Co.

Federalist Society

Goodyear Tire & Rubber Co.

Hobby Lobby Stores

International Speedway Corporation

Major League Baseball Inc.

bolstering prosecutors' case that Stone lied to Congress about not speaking to anyone in the campaign about the controversial anti-secrecy group.

Read full article »

## LITIGATION

### High Court Allows Sandy Hook Families To Sue Remington

The Supreme Court rejected a bid by Remington on Tuesday to review a ruling by Connecticut state courts that allowed the families of Sandy Hook shooting victims to sue the gunmaker.

📄 *Order List attached* | Read full article »

### Trump Can't Take Wall Money From Military, 9th Circ. Told

The Sierra Club, along with California and a number of other states, urged the Ninth Circuit on Tuesday to block President Donald Trump from using $2.5 billion in defense funds to construct a wall on the U.S.-Mexico border, arguing the president's decision to take the money was unconstitutional.

Read full article »

### Justices Tilting Toward Border Agent Who Killed Mexican Teen

The U.S. Supreme Court on Tuesday appeared wary of allowing the parents of a Mexican teen fatally shot along the U.S.-Mexico border to sue the border agent who killed him.

Read full article »

### Justices Won't Hear Corps Contractor's Mistaken Bid Dispute

The U.S. Supreme Court declined Tuesday to clarify federal agencies' responsibilities around a potentially mistaken contract bid after Army Corps of Engineers contractor Zafer Construction alleged it heavily underbid a hospital renovation deal due to incorrect drawings provided by the Corps.

Read full article »

### United Partially Beats Pilots' Military Leave Benefits Suit

United Airlines Inc. beat part of a class action accusing it of denying sick time, vacation time and full pension payments to pilots on military leave, with an Illinois federal judge letting it escape two out of three of the suit's claims Tuesday.

📄 *Order attached* | Read full article »

### 10th Circ. Finds No Harm From Terror Watchlist Placement

A Utah imam's placement on the federal terrorist watchlist had not substantially interfered with his travel or reputational rights, meaning he hadn't been unconstitutionally denied due process, the Tenth Circuit ruled Tuesday.

📄 *Opinion attached* | Read full article »

## EXPERT ANALYSIS

Opinion
### In A Trade War, Everyone Loses

While some countries may temporarily benefit from bilateral trade disputes, in the long term, the Trump administration's protectionist strategy puts at risk the enormous achievements of the last decades, both in the U.S. and globally, says Anahita Thoms at Baker McKenzie.

Read full article »

Series
### Judging A Book: McKeown Reviews 'Conversations With RBG'

Nascar Holdings Inc.

National Federation of Independent Business

Remington Arms Co. LLC

Sierra Club

Sina Corporation

Sinclair Broadcast Group Inc.

The Boeing Co.

United Continental Holdings Inc.

LAW FIRMS

Baker Botts

Baker Donelson

Baker McKenzie

Ballard Spahr

Bruce S. Rogow PA

Buschel & Gibbons

Butler Snow LLP

Clifford Chance

Clyde & Co

Cooper & Kirk

Cravath Swaine

Dewey & LeBoeuf

Fitzpatrick & Hunt

Fried Frank

Gdanski Law

Halloran Farkas

Hinshaw & Culbertson

Holwell Shuster

Jones Walker

KMA Zuckert LLC

KaiserDillon

Kirkland & Ellis

Koskoff Koskoff

Milbank LLP

Munger Tolles

O'Melveny & Myers

Paul Weiss

Sedgwick LLP

Sidley Austin

Silverio & Hall

Siprut PC

Skadden

Stonebarger Law

Swanson Martin

Troutman Sanders

GOVERNMENT AGENCIES

Reading Jeffrey Rosen's "Conversations With RBG: Ruth Bader Ginsburg on Life, Love, Liberty, and Law" is like eavesdropping on the author and his subject while they discuss how the restrained judicial minimalist became the fiery leader of the opposition, says Ninth Circuit Judge M. Margaret McKeown.

Read full article »

## LEGAL INDUSTRY

### No Vote Thurs. For 5th Circ. Pick Opposed By GOP Sens.
A Fifth Circuit nominee opposed by several GOP senators was left off the list of judicial picks eligible for a committee vote this week at the White House's request, suggesting that U.S. District Judge Halil S. Ozerden has lost his opportunity for elevation.

Read full article »

### BigLaw Firms Fall In Line With 2019 Associate Bonuses
BigLaw associate bonus announcements have started flooding in, with at least five law firms following Milbank's lead as of Tuesday, unveiling mostly uniform year-end bonuses ranging from $15,000 to $100,000 based on experience.

Read full article »

### How GC Belt-Tightening May Hit Your Firm
More than three-quarters of law department leaders expect that a recession will hit the United States during the next two years, according to a survey of general counsel and chief legal officers released Tuesday, with many saying they plan to spend less money in the coming year.

Read full article »

### Law Firm Revenues Inch Up As Expenses Level Out
Associate base salary raises adopted by many BigLaw firms in the middle of 2018 and subsequently absorbed by the legal industry, combined with improved demand and strong rate increases, have eased margin pressure, according to a report out Tuesday by Citi Private Bank.

Read full article »

### Clyde & Co. Nabs Legal Ethics Trio From Hinshaw
Three seasoned professional responsibility and legal malpractice experts from Hinshaw & Culbertson LLP have jumped to Clyde & Co. LLP, the firm announced Tuesday.

Read full article »

### Baker Atty Lied To Get Loan Just Before Ch. 11, Lender Says
A director at Baker Donelson Bearman Caldwell & Berkowitz PC borrowed more than $81,000 to insure trucks in a floundering shipping business just hours after the venture filed for Chapter 11, a Michigan financing company told a Mississippi federal bankruptcy court.

Read full article »

Interview
### 15 Minutes With The Chicago Cubs' General Counsel
January will mark Brett Scharback's two-year anniversary as general counsel at the Chicago Cubs. Here, he discusses the legal issues he deals with as the top lawyer of a baseball club, what it's like having Major League Baseball as a governing body, and whether law firm experience is necessary to be an effective general counsel.

Army Corps of Engineers
California Attorney General's Office
European Union
Federal Acquisition Regulatory Council
Federal Bureau of Investigation
Federal Election Commission
International Monetary Fund
Transportation Security Administration
U.S. Army
U.S. Attorney's Office
U.S. Bankruptcy Court for the Southern District of Mississippi
U.S. Court of Appeals for the District of Columbia Circuit
U.S. Court of Appeals for the Ninth Circuit
U.S. Court of Appeals for the Tenth Circuit
U.S. Customs and Border Protection
U.S. Department of Defense
U.S. Department of Justice
U.S. Department of State
U.S. District Court for the Northern District of Illinois
U.S. District Court for the Southern District of Florida
U.S. District Court for the Southern District of Mississippi
U.S. District Court for the Southern District of New York
U.S. District Court for the Western District of Washington
U.S. House of Representatives
U.S. Supreme Court
World Trade Organization

Read full article »

## JOBS
Search full listings or advertise your job opening

Environment & Energy Associate (Newark, NJ Office)
McCarter & English, LLP
Newark, New Jersey

Not sure if your firm subscribes? Ask your librarian.

We hope you found this message to be useful.
However, if you'd rather not receive future emails of this sort,
you may unsubscribe here.

Please DO NOT reply to this email. For customer support inquiries, please call +1-646-783-7100 or visit our Contact Us page.

Privacy Policy

Law360 | Portfolio Media, Inc, 111 West 19th Street, 5th Floor, New York, NY 10011

**From**: BISnewsletter [bisnewsletter@bis.doc.gov]
**Sent**: 11/13/2019 2:57:02 PM
**Subject**: BIS News Clips 13 NOV 2019

1. Huawei to pay workers an extra month's salary, give bonuses for 'struggle' against U.S. | The Washington Post
2. U.S. Software Company Discloses Potential Sanctions Violations | The Wall Street Journal
3. Hong Kong protests: Rule of law on 'brink of collapse', police say | BBC News
4. Trump faces decision on auto tariffs; House lawmakers' return could spark USMCA movement | World Trade Online
5. Huawei Founder Says Chinese Giant Doesn't Need the U.S. | Wall Street Journal
6. FCC Wants to Know if Huawei Gear Is Near U.S. Military Bases | Bloomberg
7. US urges Taiwan to curb chip exports to China | Financial Times
8. Judge blocks White House from allowing downloads of 3-D printed gun blueprints| Reuters

_____

1. Huawei to pay workers an extra month's salary, give bonuses for 'struggle' against U.S. | The Washington Post
https://www.washingtonpost.com/world/asia-pacific/huawei-to-pay-workers-an-extra-months-salary-give-bonuses-for-struggle-against-the-us/2019/11/13/6feff5a8-05c0-11ea-9118-25d6bd37dfb1_story.html
By Anna Fifield
Nov. 13, 2019

China's Huawei Technologies plans to double the amount it pays nearly all of its 194,000 employees this month and reward them with bonuses totaling $285 million, in recognition of the "extraordinary external challenges" posed by the Trump administration's pressure campaign.  The tech giant, which Western officials accuse of facilitating Chinese government espionage, will pay "special awards for struggles," internal communications show, even as it faces a $10 billion hit this year as a result of Washington's actions. "The company has decided to hand out a 'Special Award for Struggles' to all employees, who have made contributions to our coping with the U.S. sanctions," Zheng Liangcai, of Huawei's human resources management department, wrote to staff this week in an internal memo reviewed by The Washington Post. With a few exceptions for bad performance or violating company rules, employees will receive double their October base salary, to be paid by the end of November, Zheng said in the memo, which was sent on Nov. 11, an auspicious day known as "Double 11" in China. There will be a minimum additional payment of $2,850. Nov. 11 is China's answer to Black Friday and Cyber Monday, when hundreds of millions of consumers flock to Taobao, an e-commerce site owned by Alibaba. Buyers spent a record $38.4 billion on Monday, an outcome that would have pleased the Chinese government as the economy slows. Despite the payout, one Huawei employee, Yang Hui, said that money wasn't the point. "There is sentiment attached to our work," he said in the company memo. "Under the current circumstances, bonuses are not the priority. The priority is to fight to the end."

Details of the extra payments were first reported by the South China Morning Post.

In addition, the company has earmarked $285 million in bonuses for employees who have helped with "business continuity" this year. Local media reported that this applies to staff who have helped the Shenzhen-based company build alternative supply chains as President Trump has sought to cut off Huawei's access to American-made components. This applies especially to Huawei's Harmony OS operating system, developed as an alternative to Google's Android, and to Kunpeng chips, the microprocessors that Huawei has made to replace American-built semiconductors. Huawei, the world's largest manufacturer of telecommunications equipment, has come under extreme pressure from the Trump administration, which suspects its technology could be used to spy on behalf of China's ruling Communist Party. The company was founded in 1987 by former People's Liberation Army engineer Ren Zhengfei and has grown into a corporate behemoth that exemplifies the party's vision for the country's future: advanced, high-tech and Chinese to the core. But its emergence has been met with growing suspicions about its links to the ruling party and whether the company might be acting on Beijing's behalf. Huawei and Ren have strenuously denied such accusations.

But the Trump administration is far from convinced. In May, it banned U.S. government agencies from doing business with Huawei and has put the company and 70 of its affiliates on a security-related blacklist, blocking American manufacturers from selling their products to the Chinese firm. The White House has tried to convince other countries to take similar action, in particular to block Huawei from building next-generation 5G wireless networks. But last month Huawei said it had signed more than 60 commercial contracts for 5G — double the number it had secured in January — and had shipped more than 400,000 base stations used to transmit 5G. More than half the 5G contracts are in Europe. Germany's government last month said it would not exclude any equipment makers from its 5G networks. Huawei is not publicly listed and therefore does not have to release financial results, but every quarter it publishes selected and unaudited numbers. Based on the latest announcement, last month, analysts said the company looked to be holding up relatively well and on track to fare better this year than in 2017 or 2018.

That might be enough to make Huawei chiefs feel flush enough to pay extra bonuses. In August, Ren warned the company faced a "live or die moment" because of the American campaign against it and warned that Huawei might have to shed staff. Still, reaction to Wednesday's news on the heavily censored Chinese Internet was mixed. "Even Apple people will want to become Huawei staff!" said one person who used the name WuTian9 on Weibo, China's answer to Twitter. Another claimed to have contributed to the award fund. "I bought Huawei products on Singles Day, and I contributed a little to that two billion," wrote Taotaobujue, referring to the amount of the bonuses in Chinese yuan. But others noted that Huawei employees work around the clock, so people should keep their workload in mind before envying the extra payments. Underlining the close ties between the company and the party, state media reported Wednesday that China's top political adviser, Wang Yang, had visited a Huawei innovation exhibition center in Cairo. Wang, chairman of the National Committee of the Chinese People's Political Consultative Conference, was briefed on Huawei's operations, investment, research and development and plans, state broadcasting unit CGTN reported. "This is a miniature of the development of Chinese enterprises and a model of exchanges between companies in different countries in the age of globalization," Wang was quoted as saying.

Lyric Li contributed to this report.

———————————————

2. U.S. Software Company Discloses Potential Sanctions Violations | The Wall Street Journal
https://www.wsj.com/articles/u-s-software-company-discloses-potential-sanctions-violations-11573594857
By Mengqi Sun
Nov. 12, 2019

Altair Engineering Inc. may have violated U.S. economic sanctions and export control regulations, the company said in a regulatory filing.
The Troy, Mich.-based engineering software company said it discovered the possible violations in May and disclosed them to regulators, according to the company's latest quarterly financial report, which was filed last week with the Securities and Exchange Commission.
A representative for Altair declined to comment beyond the regulatory filing. Altair suspected an unaffiliated third-party consultant in Poland may have provided proprietary software to an individual subcontractor residing in Iran, according to a regulatory filing in May that disclosed the potential breaches. The commercial software involved was developed by a Greek subsidiary of Altair, according to the May filing. Altair said it conducted an internal investigation, and in July it disclosed the results to the U.S. Treasury Department's Office of Foreign Assets Control, which enforces U.S. economic sanctions, and to the U.S. Commerce Department's Bureau of Industry and Security, which administers export control regulations. The company said in its filing last week that it reported to regulators the unintentional transfers of commercial software and trial software licenses to several individuals located in Iran and other restricted countries. The transfers involved freeware, trial software licenses and volunteer software testing communities, the company said. Altair said it didn't find any evidence of commercial transactions with restricted parties or countries. The company also said it implemented several compliance measures to prevent similar transfers. The Bureau of Industry and Security in August notified the company of the conclusion of the agency's investigation and didn't issue criminal or administrative penalties, Altair said. A spokesperson for BIS didn't immediately respond to a request for comment.

OFAC is still investigating the potential violations, Altair said, adding that it doesn't expect investigations arising from the self-disclosure to have a meaningful impact on its business or operations.

_____

3. Hong Kong protests: Rule of law on 'brink of collapse', police say | BBC News
https://www.bbc.com/news/world-asia-china-50384360
Nov. 12, 2019

Hong Kong's rule of law has been pushed to the "brink of total collapse" after more than five months of protests, police have warned. The warning came as protesters clashed with police across the city on Tuesday. At the Chinese University of Hong Kong, police fired tear gas and rubber bullets at protesters who built barricades on the campus. Earlier in the day, around 1,000 protesters rallied in central Hong Kong during the lunch hour blocking roads . Protesters, wearing office clothes, were seen chanting: "Fight for freedom, stand with Hong Kong!" The demonstrations come just a day after the territory saw a marked escalation in violence, with police shooting one activist in the torso. A pro-Beijing supporter was set on fire by anti-government protesters. The protests started in June against a now-withdrawn plan to allow extradition to mainland China, but have since morphed into wider demonstrations, with activists demanding greater democracy and police accountability in Hong Kong. On Tuesday afternoon, police spokesman Kong Wing-cheung hit out at the protesters, saying they had "countless examples of rioters using random and indiscriminate violence against innocent" people. "Hong Kong's rule of law has been pushed to the brink of total collapse as masked rioters recklessly escalate their violence under the hope that they can get away with it," he told reporters, adding that Monday's attack on the pro-Beijing supporter was being investigated as attempted murder. Speaking at the same conference, Supt Li Kwai-wah defended the officer's decision to shoot the protester on Monday. "We found out that our colleague did not only face threat from one person, instead it was a group of people with an organised plan attempting to steal the gun," he said.  "In a situation like this, we believe our police are reacting according to the guideline, to protect themselves as well as the people around them." Both the protester and the pro-Beijing supporter remain in hospital, with the latter in a critical condition.

What happened on Tuesday?
Clashes erupted at the Chinese University of Hong Kong, with police firing tear gas to disperse students, while at City University there was a standoff between students and riot police which continued into the evening. Police continued to use tear gas to try to disperse the protesters who responded with bricks and petrol bombs. Hundreds of protesters remain at the Chinese University of Hong Kong. Students built roadblocks on streets in and around City University campus to stop police from entering. At one stage, a van used as part of a street barricade was set on fire. Students at Hong Kong Polytechnic also tried to disrupt traffic near their campus. In the morning, suspended railway services and road closures had already led to long traffic jams in the early rush hour. At noon, protesters moved into the city's central business district for a flash mob protest. Protests continued to intensify throughout the day. A Christmas tree inside Festival Walk shopping mall was set on fire by protesters while others were seen smashing a glass railing with hammers. Train stations were closed across the city. Eight universities have announced they will suspend classes on Wednesday. Monday's protests saw 260 people arrested bringing the number to more than 3,000 since the protests began in June.

Students swear they will not surrender
The ground was strewn with bricks. The air was filled with the smell of tear gas. Fire was raging on campus. Hundreds of protesters, most of them clad in black, formed human chains to pass bricks and petrol bombs to the front line. One of the best universities in Hong Kong has turned into a battlefield after another day of intense clashes between students, who have been at the forefront of anti-government protests, and police. The Chinese University students have been putting up resistance since the morning. On Monday, police seemed to change strategy by deploying forces to campuses. Students told me they should not be allowed there. The university's management has tried to deescalate the situation. Vice-chancellor Rocky Tuan was also tear gassed as he was negotiating with police. Dozens of students have been injured, including at least one hit in the eye by a projectile. The night is young and students swear they will not surrender.

Why are there protests in Hong Kong?

Hong Kong is part of China but as a former British colony it has some autonomy and people have more rights. The protests started in June against plans to allow extradition to the mainland - which many feared would undermine the city's freedoms. The bill was withdrawn in September but demonstrations continued and now call for full democracy and an inquiry into police behaviour. Clashes between police and activists have become increasingly violent and in October the city banned all face masks.

_____

4. Trump faces decision on auto tariffs; House lawmakers' return could spark USMCA movement | World Trade Online
https://insidetrade.com/week-trade/trump-faces-decision-auto-tariffs-house-lawmakers%E2%80%99-return-could-spark-usmca-movement
Nov. 11, 2019

A six-month window for negotiations with the European Union and Japan on autos ends this week, setting up a possible decision by President Trump on how to proceed following a Section 232 probe that automakers and many in Congress have long feared could lead to new tariffs on cars. Meanwhile, House lawmakers return to Washington, DC, this week for what U.S.-Mexico-Canada Agreement advocates hope will be a productive few days of work that will lead to a vote on the deal this year. Trump in May directed the Office of the U.S. Trade Representative to pursue talks with the EU, Japan, and any other country USTR deemed "appropriate" to address what the Commerce Department determined was the national security threat of imports of autos and auto parts. Under Section 232, the president can start negotiations with other countries and, if satisfactory agreements are not secured within 180 days, take action to restrict imports. Commerce Secretary Wilbur Ross last week said he hoped that talks with foreign auto companies about their capital investment plans would "bear enough fruit" to render potential auto tariffs unnecessary. The U.S. and Japan have reached a preliminary trade agreement since May. While that deal does not explicitly address potential auto tariffs, Japan has said it has received assurances from the U.S. that it will be exempt from any duties or quotas. A Sept. 25 U.S.-Japan joint statement says that "While faithfully implementing these agreements, both nations will refrain from taking measures against the spirit of these agreements and this Joint Statement." Talks with the EU have not progressed as far, in part due to a disagreement over whether to include agriculture in negotiations on a broad trade deal. Outgoing European Commission President Jean-Claude Juncker, however, told a German newspaper last week that the U.S. would not impose auto tariffs but did not elaborate. "Trump is going to make some criticism, but there won't be any auto tariffs," Juncker said, according to Reuters. "He won't do it. ... You are speaking to a fully informed man." Senate Finance Committee Chairman Chuck Grassley (R-IA) last week said he had a "gut feeling" that Trump would delay a decision on auto tariffs. Grassley also said he had still not received a copy of Commerce's autos report despite requesting it months earlier. "I think it shows they're embarrassed to make public what the report actually says," he said.

Grassley said on the Senate floor last week that he was "optimistic" about moving forward with legislation to reform Section 232. Sens. Rob Portman (R-OH) and Pat Toomey (R-PA), both members of the Finance Committee, have introduced separate bills to update the 1962 law. Both would see the Pentagon play a larger role in 232 investigations, but Toomey's bill would require that Congress approve any tariffs before they could take effect, while Portman's would allow lawmakers to roll back tariffs via a resolution of disapproval. Portman defended his approach in an interview with Inside U.S. Trade last week.
Trump is set to deliver a speech on trade and the economy in New York on Tuesday. Ahead of his remarks, the Center for American Progress, a left-leaning think tank, released a statement blasting Trump's trade policies. "President Trump prides himself on his dealmaking ability and declared on Twitter that 'trade wars are good and easy to win,'" the statement says. "But the reality is that the Trump administration's erratic approach to U.S. trade policy is imposing large costs on American families while simultaneously only pushing for corporations' interests. The Trump administration's boasts are fake, but the harm this bait-and-switch trade war is causing is real."

China talks 'moving along'
Trade talks with China are "moving along" but they've progressed "too slowly," Trump said over the weekend. "They've moved slowly. Much too slowly for me. But they want to make the deal much more than I do," Trump told reporters on Saturday. "But the trade talks with China are moving along, I think, very nicely." Trump also decried what he called incorrect reporting about a potential deal, including the "level of tariff lift." A Chinese official last week said both

countries had agreed to eliminate some tariffs as part of a "phase-one" deal. "There's a difference on tariffs, but we're going to always get tariffs," Trump said. "We never got anything. Just so you understand, China, forever, never paid us 10 cents. Now we have -- literally, we will soon have, literally, hundreds of billions of dollars coming in from China." The U.S. China Economic and Security Review Commission will release its annual report on the bilateral trade and economic relationship and its national security implications on Thursday. Also on Thursday, American University's Washington College of Law will hold an event on the regulatory aspects of the U.S.-China trade conflict. Speakers are set to include Zhou Hanhua, professor of law and deputy director in the Institute of Law, Chinese Academy of Social Sciences; Liao Fan, senior fellow and professor at the Institute of International Law, Chinese Academy of Social Sciences; Jamie Horsley, senior fellow at Yale Law School's Paul Tsai China Center; and Neysun Mahboubi, research scholar at the University of Pennsylvania Center for the Study of Contemporary China.

Movement on USMCA?
The House will be back in session this week as time runs out for consideration of the U.S.-Mexico-Canada agreement this year. House Agriculture Committee Chairman Collin Peterson (D-MN) said last week that House Ways & Means Committee Chairman Richard Neal (D-MA) told him USMCA could "move" this week. A source familiar with the talks told Inside U.S. Trade that implementing legislation for USMCA could be sent to the Hill this week, setting up a vote in early December. The president can submit the implementing bill on a day when both the House and Senate are in session; the next is Tuesday. House Minority Leader Kevin McCarthy (R-CA) continued to press Speaker Nancy Pelosi (D-CA) on the deal in an interview on Fox News on Sunday. "This speaker of the House, in name only, she has said for the last 10 months she's working to getting to yes," McCarthy said. "She holds all the power to bring that -- to bring it up. And we would pass the USMCA. No one is fighting it. It would only make this country stronger in our negotiations with China."

_____

5. Huawei Founder Says Chinese Giant Doesn't Need the U.S. | Wall Street Journal
https://www.wsj.com/articles/huawei-founder-says-chinese-giant-doesnt-need-the-u-s-11573042649?mod=hp_lead_pos9
By Dan Strumpf and Eva Dou
Nov. 6, 2019

Huawei Technologies Co. can survive without the U.S., Chief Executive Ren Zhengfei said, dismissing Washington's campaign against it as ineffective.

The Chinese telecom giant hasn't yet received any expressions of interest from U.S. companies to buy the intellectual property underpinning its 5G technology—a workaround floated earlier this year after years of being blocked in the U.S.—but the proposal remains on the table, he added. In an interview with The Wall Street Journal, Huawei's 75-year-old founder struck a defiant tone on the Trump administration's recent moves against the company, while also praising the U.S.'s entrepreneurial spirit. "We can survive very well without the U.S.," Mr. Ren said. "The China-U.S. trade talks are not something I'm concerned with." Mr. Ren said Huawei isn't a factor in the trade war because "we have virtually no business dealings in the U.S." He also said "there has been no confrontation with the U.S." and said he would welcome a visit from Mr. Trump now or after he has left office.
"We would certainly give him a warm welcome," Mr. Ren said.

In May the U.S. added Huawei to a Commerce Department "entity list," preventing many American suppliers from doing business with the Shenzhen-based company. Huawei, the world's largest maker of networking equipment and No. 2 smartphone vendor, has also emerged as a central issue in the trade war, and Beijing has insisted on a reprieve as a condition for any deal. Huawei, which last year bought $11 billion of technology from American suppliers—including software from Alphabet Inc. and Microsoft Corp. , and chips from an array of manufacturers—has moved to find backup sources, while also working on its own chips and software. Huawei executives say the company is building its entire portfolio of 5G networking products without any American technology, at a clip of 5,000 base stations a month. "We don't expect the U.S. to remove Huawei from the entity list," Mr. Ren said. "They may as well keep us there forever because we'll be fine without them." Still, Huawei executives say the company is still buying technology from American companies. Chips made by U.S. companies at factories offshore, for example, generally aren't subject to the U.S.

restrictions, legal experts said. That has allowed several American companies, including chip makers Intel Corp. and Qualcomm Inc., to resume sales to Huawei. Will Zhang, Huawei's president of corporate strategy, said in an interview that the purchase of U.S. technology is at 70% to 80% of its previous level.

The blacklisting was one of numerous anti-Huawei actions in the past year by Washington, which regards it as a security threat. U.S. officials have pressed allies to keep Huawei out of their 5G networks, and last December in Vancouver, Canadian authorities arrested Mr. Ren's daughter— Meng Wanzhou, who is also Huawei's CFO—at U.S. behest. Huawei nonetheless continues to win 5G contracts around the world, while its smartphone sales are booming—particularly in China—despite uncertainty over its continued access to Google's Android operating system. Mr. Ren initially forecast a $30 billion revenue hit from the blacklisting this year and next, but the company has said revenue for the first nine months of the year was up 24%. Mr. Ren first made his 5G offer to the U.S. earlier this year as a way to help it catch up, while raising money to fund research and development, for which Huawei budgeted about $14.5 billion last year. The U.S. has no large vendor of cellular networking equipment of its own. Huawei's main rivals in that sector are Sweden's Ericsson AB and Finland's Nokia Corp. "We are completely sincere in our offer to license our 5G technology to the U.S.," Mr. Ren said. He said the U.S. could "overtake Huawei" in three years.

The U.S. defends its actions against Huawei by citing concerns that Beijing could use its equipment for spying. It also says Huawei would be legally bound to comply with requests for customer data from Beijing. Mr. Ren has repeatedly denied spying on customers for any government and has said he would deny any such requests from Beijing. Asked if Huawei could be sure that none of its nearly 200,000 employees around the world engage in espionage on behalf of a government, Mr. Ren pointed to the company's compliance guidelines.
"We don't allow for violations," he said. "If there were any employees that did such a thing, they would be severely punished." Insisting Huawei has no access to the data that flows through it networks, Mr. Ren argued by analogy. "Just like automobile manufacturers, we only sell equipment," he said, adding, "Carriers build pipes and ensure information flows smoothly through the pipes, while we produce the iron sheets on top of the pipes. What could we do with iron sheets?"

———————————————

6. FCC Wants to Know if Huawei Gear Is Near U.S. Military Bases | Bloomberg
https://www.bloomberg.com/news/articles/2019-11-05/fcc-wants-to-know-if-huawei-gear-is-near-u-s-military-bases?cmpid%3D=socialflow-twitter-tech&utm_campaign=socialflow-organic&utm_medium=social&utm_content=tech&utm_source=twitter
By Todd Shields, Alyza Sebenius and Scott Moritz
Nov. 5, 2019

U.S. officials plan to assess where equipment from Huawei Technologies Co. has been installed, and would be concerned if it's found near domestic military bases, the head of the Federal Communications Commission said. The FCC also will consider how to finance removing equipment made by the Chinese company considered a security risk by U.S. officials, Ajit Pai said in a meeting in New York with Bloomberg News reporters and editors. Pai has proposed reimbursing carriers for replacing the equipment. "Any untrusted vendor with equipment in a network that is close to sensitive installations would raise a concern for me," Pai said. Pai has scheduled an FCC vote for Nov. 22 to bar spending U.S. telecommunications subsidies on equipment from Huawei and China's ZTE Corp. Pai also wants U.S. companies to remove equipment from the Chinese gearmakers, and as part of that has asked the agency to begin examining the extent of Huawei's deployment in U.S. networks. Pai leads the Republican majority at the agency, where Democrats also back strong action on Huawei, so his proposals are considered almost certain to pass. Huawei's customers in the U.S. are largely limited to small carriers that rely on federal subsidies. "What the commission is proposing is an immediate, seismic shift that will likely disrupt mobile communications in rural markets," the Rural Wireless Association said in a Nov. 4 filing posted Tuesday on the FCC's website. "The chairman is proposing an overly-simplified solution that might inadvertently cripple basic communications" as ill-financed carriers struggle without subsidies to cope with maintaining equipment already purchased. Pai's proposals follow continued pressure by U.S. diplomats and lawmakers who say Huawei poses a threat of espionage.

"If we see the Chinese government willing to use this leverage over things like basketball and flag emojis and gaming, what do you think is the appetite of the Chinese government to take a more restrained view when it comes to surveillance requests involving 5G networks?" he said. "If you map out where the broadband is in the United States provided by Huawei, without going into detail, it doesn't look charitable or unintentional in its distribution," John Demers, assistant attorney general for national security, said at an Aspen Institute event in New York last month. FCC Commissioner Jessica Rosenworcel last week said equipment made by Huawei and ZTE "lies next to military bases in this country." It's insecure and we need to move it out," Rosenworcel, a Democrat, said at a hearing the Senate Committee on Homeland Security and Governmental Affairs. Pai was asked for details Tuesday. "I obviously can't discuss classified information, but at a very high level, what I would say is that if you think about where wireless networks are deployed and what type of insights they can give on all kinds of commercial and noncommercial activities, you can imagine that the Chinese government would have very strong interests in knowing some of those things," Pai said. The U.S. Has been "monitoring closely" the issue of communicating securely with other countries that have not taken the same risk-mitigating measures in their 5G networks, said Pai.

Why 5G Mobile Arrives With a Subplot of Espionage: QuickTake
"One of the things we've been looking at very extensively with some of our partners in the national security and intelligence community is how do we handle some of the traffic that goes on some of the international circuits" Pai said. "The question is always one about how do we address the risks that are present." While Huawei has been the focus of security concerns, it is also part of a broader issue: ongoing trade discussions between the U.S. and China. "Our jurisdiction doesn't extend to any of the trade negotiations," Pai said in the interview. "All I can say is that from our perspective we want to make sure that we don't expend federal funds on any untrusted vendors." Huawei has argued that restrictive measures will hurt small carriers in rural areas. "Banning specific vendors based on country origin will do nothing to protect America's telecommunications networks," Huawei said in an emailed statement Oct. 29 responding to news of the FCC vote, adding that the company "remains open" to talks with Washington on the matter. Small carriers have said a ban would deny them good, cheap equipment used to offer broadband in rural areas. Rural providers will need to be able to continue to use subsidies to support their networks until equipment from Huawei and ZTE can be replaced, Caressa Bennet, general counsel of the Rural Wireless Association, said in an Oct. 28 email. President Donald Trump's administration in May moved to restrict U.S. companies from doing business with Huawei and ZTE. The administration has said Huawei gear could be used for spying -- an allegation denied by the Shenzhen-based company. Commerce Secretary Wilbur Ross on Nov. 3 said licenses allowing U.S. companies to do business with restricted firms such as Huawei would be granted soon. He expressed optimism the U.S. would reach a "Phase One" trade deal with China this month.

_____

7. US urges Taiwan to curb chip exports to China | Financial Times
https://www.ft.com/content/6ab43e94-fca8-11e9-a354-36acbbb0d9b6
By Kathrin Hille
Nov. 3, 2019

The US government is pushing Taiwan to restrict its biggest chipmaker from producing semiconductors for Huawei, the Chinese telecoms group, and to institute stricter controls on technology exports to China. Washington has over the past year repeatedly asked the government of president Tsai Ing-wen to restrain Taiwan Semiconductor Manufacturing Company (TSMC), the world's largest contract chipmaker, from selling chips to Huawei, according to Taiwanese and US government officials. Last month, a US official told Taiwanese diplomats in Washington that chips made by TSMC for Huawei were going straight into Chinese missiles pointing at Taiwan — a statement intended as a "metaphor" illustrating the risks of supplying China. The move comes as Washington seeks to plug loopholes in its ban on selling to Huawei, part of a broader effort to ensure secure supplies for the US defence sector and to stem China's rise as a technology power. The US concerns relate to chips that US companies are no longer allowed to sell to China.China has been stepping up efforts to transfer technology between civilian industry and the military, heightening US concerns about supply chains."US officials often have conversations with Taiwan interlocutors about the security and end-use of their technology supply chains. We have similar general export control and non-proliferation conversations with many

partners," the official said."In this particular case, we have a partner that is under a direct military threat from China, and is also one of the few places that produce certain technologies China needs to support its military ambitions."

TSMC has received a boost from Washington's blacklisting of Huawei, which limits some US companies from selling to the Chinese company. China accounted for about 20 per cent of TSMC's revenue in the third quarter, and Huawei constitutes almost half of that, estimates Randy Abrams, head of regional semiconductor research at Credit Suisse. "If the Taiwan government were to force TSMC to drop Huawei as a customer, the stock market would react unfavourably," he said. Industry experts remain sceptical that Washington can force Taiwan's hand. The Trump administration's campaign to convince other countries to ban Huawei from their 5G networks has had patchy success. "Given Washington's focus on competition with China and the role of semiconductors in things like 5G and advanced military capabilities, I expect the administration and Congress to increase their scrutiny of the export of advanced chips to China from Taiwan and other countries like Japan and South Korea," said Eric Sayers, vice-president at Beacon Global Strategies, a security advisory firm in Washington.

Taipei declined to comment on the US demands. Alex Huang, Ms Tsai's spokesman, would only confirm that the US had discussed technology industry issues of mutual concern. "Taiwan's technology industry strictly respects international rules and continues to co-operate with major countries including the US," he added. While Washington recognises that Taiwan is unlikely to rein in TSMC ahead of January's presidential election, the administration said that additional export controls on chip trade with China should be a next step for the country. "We expect that Taiwan will take a closer look at those considerations in the near future," the US official said.

_____

8. Judge blocks White House from allowing downloads of 3-D printed gun blueprints| Reuters
https://www.reuters.com/article/us-usa-3d-guns/judge-blocks-white-house-from-allowing-downloads-of-3-d-printed-gun-blueprints-idUSKBN1XM2SJ?feedType=RSS&feedName=newsOne
By Jonathan Stempel
Nov. 12, 2019

A federal judge on Tuesday struck down the Trump administration's effort to allow blueprints for making guns from 3-D printers to be posted online.

U.S. District Judge Robert Lasnik said the State Department violated federal law by letting Defense Distributed, a Texas-based nonprofit, publish downloadable blueprints for the untraceable, undetectable, mainly plastic firearms, as part of a June 2018 legal settlement. Lasnik cited the State Department's prior view that publishing such instructions could threaten U.S. foreign policy, national security and even world peace by enabling criminals, including terrorists outside the United States, to obtain the firearms. "Against these findings, the federal defendants offer nothing" to support the reversal, the Seattle-based judge wrote. "Because the agency action was arbitrary and capricious, it is unlawful and must be set aside." The State Department is reviewing the decision. The U.S. Department of Justice, which represented the agency, did not immediately respond to requests for comment. Chad Flores, a lawyer for Defense Distributed, said it would appeal, and deserved protection under the U.S. Constitution from the "indirect censorship efforts" of the states. In an email, Flores said, "Appellate courts exist to rein in rogue decisions like this one."

Lasnik ruled in a lawsuit by 19 U.S. states and Washington, D.C., led mainly by Democrats, to keep the blueprints offline. Gun rights advocates have said fears about posting the blueprints were overblown, but the states called a ban necessary to protect the public and deny criminals easy access to weapons. "It is baffling that the Trump administration continued to work so hard to allow domestic abusers, felons and terrorists access to untraceable, undetectable 3D-printed guns," Washington state's attorney general, Bob Ferguson, said in a statement.

He said Republican President Donald Trump tweeted one day after the July 2018 lawsuit was filed that he was looking into the public sale of 3-D guns and had spoken to the National Rifle Association, and said the guns did not "seem to make much sense!"
"I'm thankful the court agrees," said Ferguson, a Democrat. California, Illinois, Massachusetts, New Jersey, New York, North Carolina, Pennsylvania and Virginia were among the more populous states to join Ferguson's lawsuit. Defense

Distributed had argued that the earlier ban violated its constitutional rights to free speech and to bear arms under the First and Second Amendments. It had hoped to make its blueprints available to the public in August 2018. The case is Washington v U.S. Department of State et al, U.S. District Court, Western District of Washington, No. 18-01115.



The Honorable
James E. Risch, Chairman
Committee on Foreign Relations
United States Senate
Washington, D.C. 201510

NOV 1 2 2019

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), the Department is transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of item currently on the United States Munitions List (USML) to the Commerce Control List (CCL).

Attached for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the controls for major defense equipment.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosures:
    As stated.



The Honorable
Robert Menendez, Ranking Member
Committee on Foreign Relations
United States Senate
Washington, DC 20510

NOV 1 2 2019

Dear Senator Menendez:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), the Department is transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of item currently on the United States Munitions List (USML) to the Commerce Control List (CCL).

Attached for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the controls for major defense equipment.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosures:
    As stated.



The Honorable
Eliot L. Engel, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

NOV 1 2 2019

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), the Department is transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of item currently on the United States Munitions List (USML) to the Commerce Control List (CCL).

Attached for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the controls for major defense equipment.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosures:
    As stated.



The Honorable
Michael T. McCaul, Ranking Member
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

NOV 1 2 2019

Dear Mr. McCaul:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), the Department is transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of item currently on the United States Munitions List (USML) to the Commerce Control List (CCL).

Attached for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the controls for major defense equipment.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosures:
    As stated.

**From:** Jim Bartlett, Full Circle Compliance ("FCC") ▮▮▮@fullcirclecompliance.eu]
**Sent:** 11/14/2019 8:52:47 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 19-1114 Thursday "Daily Bugle"



## Thursday, 14 November 2019

### ITEMS FROM FEDERAL REGISTER

[No items of interest today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions
2. Commerce/BIS: (No new postings.)
3. State/DDTC: (No new postings.)

### NEWS

4. Defense News: "US Air Force's New International Affairs Chief Lays Out Her Goals"
5. Expeditors News: "EU Publishes Revised Combined Common Customs Tariff and Statistical Nomenclature"
6. Spokesman-Review: "Seattle Judge Keeps Ban on Internet Sales of 3D-Printed Gun Plans"

### COMMENTARY

7. Meyer Brown: "UK Government Remains Committed to Adopting New National Security Review Legislation"
8. Impex: "Implementing Documentation Compliance as an Important Need of International Trade"
9. M. Bell: "Managing Export Controls and Sanctions: It's About Who You Know and What You Know"
10. Spectator: "The Crisis in Arms Control: What Crisis?"
11. O. Gonzalez: "The October 2019 Customs Broker Exam Was A Debacle For CBP"

### EX/IM TRAINING EVENTS & CONFERENCES

12.   ECS Presents "Mastering ITAR/EAR Challenges Seminar" on 21-22 Apr in New Orleans, LA

**EDITOR'S NOTES**

13.   Bartlett's Unfamiliar Quotations

14.   Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (5 Apr 2019), DOC/EAR (13 Nov 2019), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (14 Mar 2019), DOS/ITAR (30 Aug 2019), DOT/FACR/OFAC (9 Sep 2019), HTSUS (3 Sep 2019)

15.   Weekly Highlights of the Daily Bugle Top Stories



From the publisher of WorldECR

**dual-use EXPORT CONTROLS of the European Union**

● Essential reading for anyone active in trade in – or with – the EU.
● Guidance on the EU's dual-use export control regime plus detailed information on the individual procedures and contact details for the national export authorities.

For information and to order your copy, **CLICK HERE**

## ITEMS FROM TODAY'S FEDERAL REGISTER

[No items of interest today.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OTHER GOVERNMENT SOURCES

## 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 2. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * *



Are You Keeping Up to Date with the Latest Regulations?

Bartlett's Annotated ITAR will keep you updated on the latest ITAR amendments.

**MORE INFORMATION AVAILABLE HERE**

## NEWS

## 4. Defense News: "US Air Force's New International Affairs Chief Lays Out Her Goals"
(Source: Defense News, 13 Nov 2019.) [Excerpts.]

The U.S. Air Force is the only American military service to have a designated headquarters office, led by a senior official, with the specific purpose of guiding foreign policy and helping broker arms sales. And that international affairs office, known as SAF/IA, has been through some big changes lately. Chief of those is its new leader, Kelli Seybolt, a career civil servant who became Deputy Undersecretary of the Air Force for International Affairs in April, after the departure of longtime SAF/IA boss Heidi Grant. ...

**One of the Trump administration's major priorities is export reform, particularly for unmanned aerial systems. How have the changes impacted the Air Force's ability to export drones?**

Aside from the U.S. export control processes, remotely piloted aircraft (RPA) exports are subject to the Missile Technology Control Regime (MTCR). While recognizing RPA exports are subject to additional review, the U.S. Air Force has taken the lead in developing a "commoditized" version of the MQ-9. This solution will allow us to quickly provide interested customers with projections for cost and schedule of a predefined standard configuration of MQ-9.

If a customer requests a unique capability, such as a nonstandard sensor, the U.S. Air Force will go through the formal process of delivering cost estimates for the development, integration and testing of that sensor. These tailor-made upgrades will inherently extend the developmental process of a sale and likely impact cost and delivery times.

According to Seybolt, "for partners who prefer off-the-shelf solutions, the commoditized option will allow the U.S. Air Force to deliver the most relevant capabilities more rapidly. Commoditization of high-demand systems ensures systematic policy hurdles are overcome in advance of the customer requests, making us more responsive to our partners." ...

back to top

* * * * * * * * * * * * * * * * * *

## 5. Expeditors News: "EU Publishes Revised Combined Common Customs Tariff and Statistical Nomenclature"
(Source: Expeditors News, 13 Nov 2019.)

On October 9, 2019, the European Union (EU) published the Implementing Regulation (EU) 2019/1776 amending Annex I to Council Regulation (EEC) No 2658/87 and establishing the Combined Nomenclature for the EU. This new edition will fully replace the current text of the Combined Nomenclature (CN), effective January 1, 2020.

The Combined Nomenclature is drawn up to meet the requirements of the Common Customs Tariff and the Statistical Nomenclature of the EU. The amendment is necessary to keep the Common Customs Tariff in line with the external trade policy objectives of the EU, to remain aligned to international agreements and to, where necessary, adapt its structure to meet modernization.

More information can be found in the Regulation (EU) 2019/1776.

back to top

* * * * * * * * * * * * * * * * * *

## 6. Spokesman-Review: "Seattle Judge Keeps Ban on Internet Sales of 3D-Printed Gun Plans"
(Source: Spokesman-Review, Spokane, WA, 12 Nov 2019) [Excerpts.]

Computer programs to make plastic guns with a 3D printer have to stay off the internet, at least for now, because the Trump administration failed to follow proper procedures for changing the rules that currently keep them offline, a federal judge in Seattle ruled Tuesday.

U.S. District Judge Robert Lasnik [appointed by President Clinton in 1998] agreed with Washington State and 18 other states that the way the U.S. State Department tried to lift the ban on internet sales of the plans was arbitrary, not supported by evidence, and a violation of the federal Administrative Procedures

Act. That federal law governs the steps an agency must take when changing rules.

"The agency has simply abandoned, without acknowledgment or analysis, its previous position" that 3D-printed weapons posed unique threats to world peace, national security and foreign policy, the judge wrote. "Because it is arbitrary and capricious to ignore the contradiction in these circumstances, the agency action must be invalidated."

In 2013, the State Department said the Arms Export Control Act gave it the authority to restrict the posting of computer-assisted design files that can be used to make guns with a 3D printer. It ordered a Texas company, Defense Distributed, which had posted those files, to remove them. Eventually, Defense Distributed filed a lawsuit in Texas, contending among other things the rule was prior restraint on gun-related speech. The State Department countered that allowing the files on the internet would result in "the production of plastic firearms that are fully operable and virtually undetectable by conventional security measures, that their use to commit terrorism, piracy, assassinations, or other serious crimes would cause serious and long-lasting harm."

A judge in Texas denied the company's request for an injunction, and the circuit court of appeals agreed. In April 2018, the Federal government asked to dismiss the case, continuing to cite the need to ensure "articles useful for warfare or terrorism are not shipped from the United States." But later that month, the federal government and Defense Distributed reached a tentative settlement that would allow the company to publish the files. The government announced a temporary modification of the rules under export law would take place at the end of July.

"No findings of fact or other statements are provided in the settlement that address, much less invalidate, the federal government's prior analysis," Lasnik said. While the Trump administration has the authority to propose the change, it didn't adequately notify Congress of its plans before announcing the change last year, he said. It didn't offer a reason for the change or respond to public comments raising concerns. It justified the change by saying it wasn't worried about firearms below .50 caliber or the kind that are readily available at stores. That's not a reasoned explanation, he said.

With Washington Attorney General Bob Ferguson's office as the lead plaintiff, states sued to block the settlement before it took effect. After a hearing in his Seattle courtroom, Lasnik said his job wasn't to decide the larger issues behind the potential danger of 3D guns, adding, "I wish the legislative and executive branches would step up to this." His job was to decide whether the federal agencies followed the rules to make the change. Tuesday, he ruled it hadn't, and struck down the temporary rule change based on the tentative settlement. He declined, however, to issue an order preventing the federal government from issuing another temporary modification without warning. There's no indication they are preparing to do that, he said.

Ferguson said it was "baffling" that the administration worked so hard to defend a rule that would allow access to untraceable, undetectable guns: "Even the

president himself said in a tweet that this decision didn't make any sense -- one of the rare instances when I agreed with him." . . .

Since the temporary rule change was announced, and the state's lawsuit was filed, the Legislature passed a law banning guns made by 3D printers. It's a felony to make, own, buy, or sell such a weapon without government authorization, and an extra felony that can be charged for selling such a gun to a person ineligible to possess a firearm.

back to top

* * * * * * * * * * * * * * * * * *

## COMMENTARY

## 7. Myer Brown: "UK Government Remains Committed to Adopting New National Security Review Legislation"
(Source: Mayer Brown, 13 Nov 2019.) [Excerpt.]

* Principal Author: David M. Harrison, Esq., dharrison@mayerbrown.com; Mayer Brown.

The UK Government has pledged to adopt legislation to strengthen existing powers to scrutinise and intervene in business transactions in order to protect national security. The proposal was included in the legislative programme put forward by the Government in the Queen's Speech on 14 October 2019, which was approved by Parliament on 24 October 2019. [FN/1]

The proposal confirms the Government's intention to redefine its ability to intervene in transactions on national security grounds, and reflects the contents of a consultation document published under former Prime Minister Theresa May in July 2018 (the "**White Paper**") [FN/2]. It comes shortly after the Government's announcement on 18 September 2019 that it had intervened on national security grounds in respect of Advent International's bid for Cobham plc - on which we commented here. [FN/3]

**The proposal**

Under the proposal, the key elements of the legislation will be threefold:

(1) A notification system - allowing businesses to flag transactions that may give rise to national security concerns to the Government for screening (similar to the US CFIUS process);

(2) Further powers to mitigate risks to national security - by adding conditions to a transaction, blocking a transaction (as a last resort) or imposing sanctions for non-compliance with the regime; and

(3) A safeguarding mechanism - allowing business to appeal decisions.

The Government intends the regime to be transparent and applicable across the United Kingdom as a whole, in all sectors of the economy and, crucially, to **all** businesses of any size; this suggests that there will be little room for *de minimis* criteria or safe harbours from scrutiny. However, the Government has sought to assure businesses that it expects to rule out national security risks quickly in most cases, allowing parties to proceed with certainty. To date, the Government has made 10 public interest interventions in transactions on national security grounds since the regime was overhauled in 2002.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. Impex: "Implementing Documentation Compliance as an Important Need of International Trade"
(Source: ImpexDocs, 11 Nov 2019.)

International trade is an extremely complex process. The exporting country needs to devise and implement certain rules to ensure that the set standards are met without any compromise. At the same time, there are organizations that are assigned responsibilities to perform multiple checks at different stages to prevent any kind of disobedience with the rules and laws. An important part of the process is export documentation compliance which must be done according to the prescribed procedures.

As an exporter, you need to act responsibly while preparing every important trade documents, failing which may lead to dire consequences like legal actions, penalties, consignment delays, profit losses and blemished business reputation. Here are some important things to know in order to ensure compliant export documents.

**Assign Responsibilities Carefully**

You may choose to hire an agent or a person from your organization to supervise the process of export documentation. The person would be ethically and legally responsible for every detail in the documents and also for the documents' accuracy and adherence to the prescribed formats. Make sure to:

- Choose an experienced person who is familiar with export regulations
- Assign the responsibility to the same person for every consignment
- Keep a check that the person understands the documents before signing

It would be great if the person is trained in the entire process as it would help you save time and efforts in a big way.

**Nature And Quality Of Export Goods**

The Australian Border Force maintains an elaborated list of prohibited and dangerous goods that are allowed for export through set procedures only. For example, if you want to export Australian native species of plants and animals,

you must obtain an export permit from the Department of Environment and Energy.

Likewise, if you want to export plants and animals products from Australia, you must obtain phytosanitary/health certificates from the Department of Agriculture and Water Resources (DAWR). These documents should comply with:

- Australia's Export Control Act of 1982
- Importing country requirements

In order to ensure that these compliance requirements are met, the DAWR implements a procedure of inspecting the goods intended for export. One of the purposes of these inspections is to ensure that the goods are export quality compliant and have been grown, prepared or processed in the recommended environments.

**Compliance With The FTAs**

Preparing documents that are compliant with the Free Trade Agreements (FTAs) between Australia and other countries is in favour of the exporters. These FTAs list goods that can be traded at preferential rates (reduced tariffs) that add to the profits or the exporters. In order to enjoy these benefits, a certificate of origin certifying that the goods intended for export are prepared or manufactured in Australia must be obtained from one of the Chambers of Commerce.

An international trade software can be extremely useful in establishing compliance in the above-mentioned and many other ways. The mistakes that you are probable of committing while following manual documentation can be dramatically reduced with the help of one such tool.

back to top

* * * * * * * * * * * * * * * * * * *

## 9. M. Bell: "Managing Export Controls and Sanctions: It's About Who You Know and What You Know"
(Source: JDSupra, 11 Nov 2019.) [Excerpts.]

* Author: Matt Bell, Esq., matt.bell@fticonsulting.com, FTI Consulting.

*A patchwork of domestic and international regulations has grown trickier to navigate over the past few years. Even the most mindful companies can stumble.*

If you serve in a managerial or advisory role with a company that has foreign operations, suppliers or customers, several familiar phrases have probably caught your attention more often lately. Do "change to the entity list" and "new sanctions announced" sound familiar?

Global policies and norms around the exchange of goods, services and ideas are in flux. Various countries, multinational organizations and multilateral treaties with their own best interests in mind are all attempting to regulate trade between foreign nationals and across international boundaries. This has created an increasingly complex patchwork of disparate and sometimes conflicting rules.

The volume of changes and shifts in enforcement and interpretation of existing laws makes it tricky to navigate the regulatory environment. Accordingly, the risk of companies and their affiliates running afoul of regulators has risen significantly. Even the most seasoned and mindful officers with the best intentions can wind up scratching their heads over how to proceed.

There is light at the end of the tunnel. Those companies that are aware of certain interrelated elements of the regulatory environment and design and implement a robust compliance plan around it can improve their odds of success. ...

back to top

* * * * * * * * * * * * * * * * *

## 10. Spectator: "The Crisis in Arms Control: What Crisis?"
(Source: Spectator Newsbrief, 12 Nov 2019) [Summary.]

Arms control appears to be in a state of crisis. .... What crisis are we exactly talking about?

The US and Russia have recently pulled out of the 1987 INF treaty on intermediate nuclear forces, a landmark treaty that paved the way for the end of the Cold War. Even worse, both countries announced the development of spectacular new weapon systems. Meanwhile, ambitious China tries to portray itself as a non-aligned player and refuses to join current arrangements. In a world increasingly characterised by competitiveness rather than restraint, we could be witnessing a crisis in arms control.

People worry about the state of play for arms control and many indicators seem to prove them right. But before determining what lies behind these worries, it is necessary to have a closer look at the very concept of arms control. Absent a universally accepted definition, it may be helpful to establish what we want to talk about when addressing arms control's 'crisis' - and what not.

In essence, arms control concerns efforts to control or limit the number of weapons and the ways in which they can be used in order to preserve, enhance or restore international peace and security. Specifically, it concerns the restriction of the development, production, stockpiling, proliferation, distribution or usage of weapons. In August 2019 President Trump officially pulled out of the 1987 INF treaty on intermediate nuclear forces, a landmark treaty that paved the way for the end of the Cold War. Disarmament and non-proliferation are often mentioned in conjunction with arms control. Although associated, these are separate categories. A similar association is made with Confidence and Security Building Measures (CSBMs), which are

instruments that 'contribute to reducing the dangers of armed conflict and of misunderstanding and miscalculation of military activities. Finally, arms control may be coupled with topics such as export control regimes, arrangements concerning arms trade, management or destruction of ammunition stockpiles or trafficking of small arms and light weapons.

Several of the major arms control agreements are essentially about limiting weaponry. This Spectator series therefore focuses on aspects of disarmament and non-proliferation in arms control. Furthermore, whereas the well-known arms control treaties are often about the statics of military capabilities (e.g. numbers, locations), CSBMs rather oversee the dynamics of armed forces (e.g. manoeuvres, exercises).

It therefore seems logical to consider these three areas - disarmament, non-proliferation and CSBMs - together, while leaving the more technical export control and trade regimes aside. ...

back to top

* * * * * * * * * * * * * * * * * * *

## 11. O. Gonzalez: "The October 2019 Customs Broker Exam Was a Debacle for CBP"
(Source:Author)

* Author: Oscar Gonzalez, Esq., oscarg@exportimportlaw.com, Gonzalez, Rolon, Valdespino, Rodriguez, LLC,

Hundreds of people who took the October 2019 customs broker exam studied weeks or months to prepare, but many were still surprised and even traumatized by what awaited them at the exam site which contributed to the low pass rate. It is not uncommon for people that sit for the exam to complain about errors found in the eighty multiple-choice questions of the 4.5 hour exam. While those kind of complaints have arisen, the greater concerns are about the testing conditions and extreme security measures that U.S. Customs and Border Protection (CBP) took. One of our students told us, "I am a former boxer and nothing makes me nervous. But my hands were shaking when I started that exam."

The U.S. Customs Broker exam is given by CBP. Since the exam went electronic in October 2017, CBP has outsourced the exam to private contractors and subcontractors. The private contractor proctors the exam and secures dozens of exam sites across the nation. While the private contractor performs these duties, CBP is ultimately and immediately responsible for any problems and successes with the customs broker exam. Just as CBP will not allow an importer to pawn off responsibility for legal compliance to its customs broker, CBP should not pawn or assign its responsibility for the failures or success of the customs broker exam to private contractors and subcontractors.

In administering the October 2019 exam, CBP ignored its own rules. Its Notice of Examination (https://bit.ly/29gl6bo) reads: "Examinees may use any written reference material; however, use of any electronic device during the exam

(e.g., laptop, iPad / Nook / Kindle, smart phone, personal digital assistant, smart watch, etc.) is strictly prohibited." Thus people should have been allowed to bring in any written material, but no electronic devices. These are reasonable restrictions and allowances. People often depend on written resources developed and provided by the professional review courses they are enrolled in, like the one from our law firm. Some individuals also develop their own, personalized aids, including flash cards, mnemonics, rulers, and notes. The customs broker exam is open book. If you do not know how to classify goods going into the customs broker exam, there is no cheat sheet that is going to help you pass. Furthermore, CBP had always allowed people to bring with them any and all written material of their own choosing. As for banning electric devices, our students sometimes rely on sand timers, tiny and much cuter versions of the hour glasses. Unless you are Dorothy and your loathing of hour glasses is the Wicked Witch's doing, who could object?  How could you cheat with a sand timer? Apparently some CBP's proctors objected because they deviated from the Notice of Examination and from tradition to ban both written materials and sand timers. Take that, pass rate!

But CBP proctors not only objected to pre-industrial time pieces, they also banned catalog racks that people use to bind the HTSUS. I cannot recall ever being forced to read, much less consult, a towering pile of 3,500 loose leaf pages, especially not in the middle of a time crunch. I imagine that a good gust of wind would not have been conducive to the Gestapo security measures that the proctors were trying so hard to observe. Also, the catalog racks are nothing but solid steel, like really muscular three-hold binders. How could anyone use them to cheat?

I supposed that the racks could be turned into weapons...if you were in prison and you needed a shiv. I don't say that lightly. The proctors seemed to be emulating prison conditions. We hear that women were asked to lift up their blouses and were also asked to expose their bare shoulders. While no cavity searches have been reported, some proctors required people to pat themselves down and search for hidden electronic devices. I wonder if the proctors were expecting someone to yell, "Aha, I caught myself! Officer, I would like to turn myself in, let me check my ID, give me a second, oh yes, I'd like to turn myself in, but may I first have my catalog racks back?"

Proctors demonstrated a vicious pettiness in other ways (as reported to us). One person was forced to remove the wrappers from her cough drops. Why? Maybe the wrappers contained the exam answers written in microscopic script or maybe they camouflaged an electronic device that, when swallowed, makes you smarter. People were forced to take off hair ties and jewelry (as if you can connect to the internet with a hoop ear ring). People were not allowed to bring in their suitcases with their course materials and were forced to make several trips from their car to their desk with about 75 pounds of course materials. We do not understand these tactics. Does CBP think that people that take the exam are children of billionaires?

Most exam facilities were not entirely conducive to exam-taking. Hundreds of people discovered that the tops of their desks did not have enough room for both CBP's computer (the one where individuals take and record their answers)

and all the materials that exam-takers are instructed to bring (which require more landing space than your average aircraft carrier). One person started nudging the computer to make room for the materials when the proctor issued the following warning, and here I paraphrase: "I will kick you out if you touch that computer one more time." I suspect most people would have been both intimidated and baffled. How do you take the customs broker exam on the computer that CBP assigned to you when CBP doesn't allow you touch that computer? If CBP is requiring that exam-takers answer riddles as a condition of taking the exam, it should make that clear in its Notice of Examination.

Of course, not all proctors acted so unpredictably, imperiously, or maliciously, but enough of them did, and that is the problem. Proctors may not have been reading from the same script, and whatever script or scripts they were consulting was not shared with the public. Proctors should not be allowed to spring new secret screening measures and certainly should not be allowed to deviate from CBP's Notice of Examination. Abuse of discretion by proctors is now a larger and more certain problem than cheating. If proctors continue with this kind of nonsense, CBP will have to confront serious due process issues.

Another problem with the October 2019 customs broker exam is that CBP forced exam-takers to sign a secret agreement not to discuss the contents of the exam with anyone. I have not seen or read the agreement because it is a secret agreement and people were not allowed to keep a copy, but conscripting the public into clandestine activities again raises due process concerns, to say the least.

Although the exam is electronic, CBP for some unfathomable reason takes weeks to officially record the answers and inform individuals of their score and whether they passed or failed. CBP presumably has its answer key finalized long before the exam date. Why does it take so long to get pass/fail letter out then? Is it because CBP is finding out that the test takers are smarter than the test writers?

Lastly, CBP's changed the exam date late in the game. In August 2019 (mind you, the exam was on October 17, 2019), CBP changed the exam date. The federal regulations say that the exam is to be given on "the fourth Wednesday in April and October unless the regularly scheduled examination date conflicts with a national holiday, religious observance, or other foreseeable event and the agency publishes in the Federal Register an appropriate notice of a change in the examination date." It is now November and we still do not have a federal register notice telling us when the April 2020 exam date is. Moving the date at the last possible moment disrupts the travel and work plans for exam-takers. October 23 is national Mole Day. Perhaps CBP was concerned that holding the exam on that day would have infuriated the millions of people who annually take this day off from work to celebrate these short-sighted, subterranean mammals renown for burrowing intricate tunnels through prized gardens. Calamity avoided. Phew!

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DOC_0073742

## 12. ECS Presents "Mastering ITAR/EAR Challenges Seminar" on 21-22 Apr in New Orleans, LA
(Source: ECS)

*What:  Mastering ITAR/EAR Challenges Seminar
*When:  April 21-22, 2020
*Where: Le Meridien; New Orleans, LA
*Sponsor:  Export Compliance Solutions & Consulting (ECS)
*ECS Instructors:  Suzanne Palmer, Lisa Bencivenga
*Register here or by calling 866-238-4018 or email.

back to top

* * * * * * * * * * * * * * * * * *



**Training Course Combo**

**Day 1: ITAR from a non-U.S. Perspective**

**Day 2: EAR from a non-U.S. perspective**

**Day 3: The ABC of Foreign Military Sales**

**26 - 28 November 2019**
**Zaltbommel, The Netherlands**

FULL CIRCLE
COMPLIANCE

13. Bartlett's Unfamiliar Quotations
(Source: Editor)

**\* Claude Monet** (Oscar-Claude Monet, 14 Nov 1840 - 5 Dec 1926; was a French painter, a founder of French Impressionist painting, and the most consistent and prolific practitioner of the movement's philosophy of *en plein air* outdoor landscape painting.)
 - *"My life has been nothing but a failure."*

**\* Jawaharlal Nehru** (14 Nov 1889 - 27 May 1964. He emerged as an eminent leader of the Indian independence movement under the tutelage of Mahatma

Gandhi, and served India as the first Prime Minister of India from its independence in 1947 until his death in 1964.)
 - *"Life is like a game of cards. The hand you are dealt is determinism; the way you play it is free will."*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


## 14. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199.  Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
  - Last Amendment: 5 Apr 2019:  5 Apr 2019: 84 FR 13499-13513: Civil Monetary Penalty Adjustments for Inflation

* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
  - Last Amendment: 13 Nov 2019: 84 FR 61674-61676: Addition of Entities to the Entity List, Revision of an Entry on the Entity List, and Removal of Entities from the Entity List

* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30.  Implemented by Dep't of Commerce, U.S. Census Bureau.
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (4 Jul 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR is a 152-page Word document containing all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompliance.eu.

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment

with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under the Atomic Energy Act of 1954.
  - Last Amendment: 23 Feb 2015: 80 FR 9359, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

* DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under the Atomic Energy Act of 1954.
  - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

* DOJ ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
  - Last Amendment: 14 Mar 2019: 84 FR 9239-9240: Bump-Stock-Type Devices

* DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
  - Last Amendment: 30 Aug 2019: 84 FR 45652-45654, Adjustment of Controls for Lower Performing Radar and Continued Temporary Modification of Category XI of the United States Munitions List.
  - The only available fully updated copy (latest edition: 30 August 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR is a 371-page Word document containing all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR.  Please contact us to receive your discount code.

* DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders.
Implemented by Dep't of Treasury, Office of Foreign Assets Control.
- Last Amendment: 9 Sep 2019: 84 FR 47121-47123: Cuban Assets Control Regulations

* USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S. International Trade Commission. ("HTS" and "HTSA" are often seen as

abbreviations for the Harmonized Tariff Schedule of the United States
Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 4 Sep 2019: Harmonized System Update (HSU) 1915
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

back to top

* * * * * * * * * * * * * * * * * *

## 15. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top
Stories" posted here.

back to top

* * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by:
Editor, James E. Bartlett III; and Assistant Editor, Alexander Witt. The Ex/Im Daily
Update is emailed every business day to approximately 7,500 readers of
changes to defense and high-tech trade laws and regulations. We check the
following sources daily: Federal Register, Congressional Record, Commerce/AES,
Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS,
State/DDTC, Treasury/OFAC, White House, and similar websites of Australia,
Canada, U.K., and other countries and international organizations.  Due to space
limitations, we do not post Arms Sales notifications, Denied Party listings, or
Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or
export-controlled information. All items are obtained from public sources or are
published with permission of private contributors, and may be freely circulated
without further permission, provided attribution is given to "*The Export/Import
Daily Bugle* of (date)". Any further use of contributors' material, however, must
comply with applicable copyright laws.  If you would to submit material for
inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find
instructions here.

* CAVEAT: The contents cannot be relied upon as legal or expert
advice.  Consult your own legal counsel or compliance specialists before
taking actions based upon news items or opinions from this or other
unofficial sources.  If any U.S. federal tax issue is discussed in this
communication, it was not intended or written by the author or sender for tax
or legal advice, and cannot be used for the purpose of avoiding penalties
under the Internal Revenue Code or promoting, marketing, or recommending
to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

# Identification of
# Emerging Technologies
## for Export Control

Lisa Wenger, U.S. Department of State
December, 2019

# Requirements of Export Control Reform Act

- A regular, ongoing U.S. interagency process will identify emerging and foundational technologies that are
  - Are critical to the U.S. national security, and
  - Are not critical technologies as defined in the Defense Production Act

- 14 categories of emerging technologies were published for public comment on criteria for defining and identifying those of criticality
  - An Advanced Notice of Proposed Rulemaking was published on November 19, 2018; some of your governments and prominent exporters responded with useful comments

Defense Production Act – 721(a)(6)(A) of the DPA of 1950, as amended by Section 1703.

# Categories of Emerging Technology

- Biotechnology
- Artificial intelligence (AI)
- Position, Navigation, and Timing (PNT) technology
- Microprocessor technology
- Advanced computing technology
- Data analytics technology
- Quantum information and sensing technology
- Logistics technology
- Additive manufacturing
- Robotics
- Brain-computer interfaces
- Hypersonics
- Advanced materials
- Advanced surveillance technologies

# Technology "Sprint Groups"

- Resources require focused approach to reviewing the current state of the 14 categories
- Interagency technical teams are comprised of a core of technical export control experts, augmented for the particular category by intelligence analysts and subject-matter experts from all across the federal government
- Three categories are evaluated at one time to allow licensing, outreach, multilateral regime support and other activities
- The three-month duration of each "sprint group" allows a good number of currently-evaluated proposals to be brought to the respective multilateral regime

# ECRA Process

- The interagency shall seek multiple sources of information, including that from
  - publicly available information
  - classified information
  - reviews of proposed foreign investments in sensitive U.S. sectors
  - advisory committees comprised of industry and other relevant representatives
  - analyses of foreign developments in emerging and foundational technologies

- Both the identification and information review processes are continual, creating for technical employees year-round work requirements that were formerly done on the Wassenaar Arrangement Experts Group timetable.

Foreign acquisition of sensitive technologies by purchase or partnership has long been a problem.  With the Export Control Reform Act of 2018 (ECRA) and the Foreign Investment Risk Review Moderation Act of 2018 (FIRRMA), the U.S. has fused its approach to export control and foreign investment laws.  These two issues are now co-equal, representing two sides of the same coin.  Both issues need to be addressed together in order to effectively prevent the acquisition of critical and emerging military and dual-use goods and technologies by strategic competitors.

# Evaluation of a Broad New Field for Export Control Applicability (part 1 of 2)

- Identify national security concern
  - Review national strategies
  - Review vital interests
  - Review existing tools and agreements
- Involve technical experts, including industry, in analysis
  - NSC effort allowed tapping of wide pool of experts
  - Seeking of public comment opens channels
- Identify what is publicly available for that technology field
  - Requires continual awareness of scientific literature and industry announcements
- Identify what is already controlled (and if amendments are necessary)

# Evaluation of a Broad New Field for
# Export Control Applicability (part 2 of 2)

- Identify technology chokepoints in manufacturing, know-how, etc.
  - Limited-availability items key to "production" of emerging technologies of military applicability can be the most effective means of controlling the wider technology
- Assess whether a control can be effective
- Reject controls on extremely low-cost items
- Consider controls only on "technology" and/or software
  - In some cases, it's where design data or other "development" may lead that is of national security concern
- Consider war-gaming adversaries' response to export controls
  - Would the proposed control be defeated by a likely adversarial response?

# U.S. Experts Group Proposals
# from Sprint Group Deliberations

- 2019:  Quantum computers
          Additive Manufacturing

- 2020 (notional):  Geospatial Imagery Software
                    Metal Additive Manufacturing Tools
                    Dilution Refrigerators
                    and others

# What is Different about Emerging Technologies?

- Fast pace of development and application
- Militarily-applicable items come from the same supply chain as their related commercial items
- Controls must be timely applied
  - Information on probable and/or observed development by foreign militaries and other manufacturers of concern should be shared
  - Assessment of foreign competitors' state-of-the-art helps identify what controls may be agreed
  - Items and participants in the supply chain can point to logical interim controls pending multilateral controls

# Expanding the Conventional Arms Catch-All

The Wassenaar Arrangement conventional arms catch-all is of limited utility, requiring pre-existing and significant government and industry understanding of the rules:

- It can only be invoked when the exporting country is bound by a relevant U.N. or regional arms embargo, or has consented to be bound thereto,

And pertains when:

- The authorities of the exporting country are aware of their exporters' trade in non-listed dual-use items to potentially relevant destinations,

And/or pertains when:

- The exporter is both aware that the items are intended for a military end-use and the exporter can timely notify the authorities of the exporting country regarding whether to make the export subject to authorization,

And may pertain when:

- The non-listed dual-use item will be used in conjunction with an ML item.

# Is an Expanded Catch-All Useful?

- Nonproliferation, national security and foreign policy occasionally require governments to require specific authorization for dual-use items not controlled by the Wassenaar Arrangement that would contribute to military or intelligence capability of an end-user of concern – or for which the exporting government is concerned may be re-exported in violation of its law or policy.
- The U.S. accomplishes an expanded licensing review not only with its well-known Entity List, but also with a variety of unilateral controls.
- What expansions of the conventional arms catch-all might be (or have been) useful to other governments?



# Additional Protections of Intellectual Property and National Security Beyond Export Control Laws

- Investment screening
- Visa screening
- Cyber security
- Counterintelligence awareness
- Outreach to sensitize leaders and cadre in
  - academia
  - private equity and
  - venture capital

# WA Catch-All Denials
# in 2009 - 2018

December 2019

Ministry of Foreign Affairs, Japan

DOC_0076363

# Introduction

➢ Catch-all controls are a fundamental element of an effective export control system which complement export controls on listed items and deny exports of non-listed items that would contribute to development of WMD programs and conventional weapons.

➢ Japan reviewed the numbers and destinations of catch-all denials notified by WA Participating States from 2009 to 2018

DOC_0076364

# Overview

➢ Total 41 notifications of Voluntary Catch-all Denials(VCD) were posted to WAIS in 2009 - 2018 (Average 4 notifications each year)

➢ Notifications were posted by 9 different Participating States for 11 destination countries

➢ Reasons for 21 Denials were risks of diversion to military purposes including "WMD programs" and some notifications were also reported to MTCR and/or NSG

➢ The number of WA VCD notifications is very low in comparison with NSG and MTCR

| Regimes | 2016 | 2017 | 2018 | Total |
|---------|------|------|------|-------|
| WA | 5 | 4 | 4 | 13 |
| NSG | 90 | 50 | 57 | 197 |
| MTCR | 74 | 34 | 44 | 152 |
| AG | 6 | 6 | 8 | 20 |

DOC_0076365

# VCD reported by PSs

| PSs | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Australia | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | **4** |
| Czech | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | **2** |
| Denmark | 2 | 1 | 2 | 1 | 2 | 2 | 2 | 1 | 0 | 0 | **13** |
| Ireland | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | **1** |
| Japan | 0 | 0 | 0 | 1 | 3 | 0 | 2 | 3 | 3 | 3 | **15** |
| Malta | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | **1** |
| NZ | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **1** |
| Norway | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | **1** |
| Sweden | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | **3** |
| **Total** | **2** | **4** | **2** | **4** | **6** | **5** | **5** | **5** | **4** | **4** | **41** |

4

DOC_0076366

# VCD reported by Destination

| PSs | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Belarus | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| China | 0 | 0 | 0 | 1 | 4 | 0 | 3 | 4 | 3 | 3 | 18 |
| India | 1 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 5 |
| Iran | 1 | 3 | 0 | 1 | 0 | 0 | 1 | 1 | 1 | 0 | 8 |
| Israel | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Libya | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Malaysia | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 |
| Myanmar | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Pakistan | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Taiwan | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| UAE | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| **Total** | 2 | 4 | 2 | 4 | 6 | 5 | 5 | 5 | 4 | 4 | 41 |

5

DOC_0076367

**From:** Cordell Hull [Cordell.Hull@bis.doc.gov]
**To:** Kluttz, Lawson (Federal) [LKluttz@doc.gov]; Cordell Hull [Cordell.Hull@bis.doc.gov]

**Subject:** HOLD: CATS I-III meeting with Sen. Menendez and State Department
**Location:** TBD Captiol Hill

**Start:** 12/19/2019 7:00:00 PM
**End:** 12/19/2019 8:00:00 PM
**Show Time As:** Busy


**Recurrence:** (none)

**From**:      BISnewsletter [bisnewsletter@bis.doc.gov]
**Sent**:      12/17/2019 5:59:14 PM
**Subject**:   BIS News Clips 17 DEC 2019

**BIS News Clips 17 DEC 2019**

**1. Exclusive: U.S. finalizing rules to limit sensitive tech exports to China, others** | Reuters
**2. Ways and Means votes on USMCA** | Politico
**3. House passes bill barring government from buying Huawei gear** | Cnet
**4. How Huawei Landed at the Center of Global Tech Tussle** | Bloomberg
**5. Important New Guidance for Companies Considering Voluntary Disclosures of Export Control and Sanctions Violations** | The National Law Review

_____

**1. Exclusive: U.S. finalizing rules to limit sensitive tech exports to China, others | Reuters**
https://www.reuters.com/article/us-usa-tech-china-exclusive/exclusive-u-s-initial-crackdown-on-advanced-tech-exports-appears-more-restrained-than-feared-idUSKBN1YL1B8
By Alexandra Alper
Dec. 17, 2019

WASHINGTON (Reuters) - The Trump administration is finalizing a set of narrow rules to limit exports of sophisticated technology to adversaries like China, a document seen by Reuters shows, in a boon to U.S. industry that feared a much tougher crackdown on sales abroad.
The Commerce Department is putting the finishing touches on five rules covering products like quantum computing and 3-D printing technologies that were mandated by a 2018 law to keep sensitive technologies out of the hands of rival powers. Before drafting the rules, Commerce sought industry comment last year on a raft of high-tech sectors that it could cover under the law, from artificial intelligence technology to robotics. That fueled concerns among U.S. businesses the department would craft broad, tough regulations that would stymy a host of exports to key customers. But the internal status update seen by Reuters shows for the first time that Commerce is finishing a first batch of rules that touch on just a few technologies that will be proposed to international bodies before taking effect, a reprieve for U.S. companies. "Based on their titles, the rules appear to be narrowly tailored to address specific national security issues, which should go a long way to calming the nerves of those in industry concerned that the administration would impose controls over broad categories of widely available technologies," said Kevin Wolf, former assistant secretary of commerce for export administration.

Commerce declined to confirm any details but said it has a number of proposed rules in the review process. Despite the apparent reprieve, Commerce could issue more rules in the future regulating sales abroad of cutting-edge items. The document failed to outline when the rule proposals would be made public or what the controls would look like for specific countries, buyers and uses. In a move that should appeal to U.S. firms, the rules will be submitted to international bodies for approval so that they may be implemented overseas, not just by the United States. That would establish a level playing field for U.S. companies abroad, but would also take much longer to review and go into effect, likely until mid-2021 at the earliest. Commerce is expected to seek industry comment on the rules before submitting them to the groups, a source said, adding that a sixth rule, covering artificial intelligence, will go into effect in the United States without a comment period. The revelations come amid growing frustration from Republican and Democratic lawmakers over the slow pace of the rule roll-out, with Senate minority leader Chuck Schumer urging the Commerce Department to speed up the process. In a statement to Reuters, Republican Senator Tom Cotton said he was "disappointed at the lack of political will" at the Commerce department, accusing it of a "troubling" lack of urgency. "While bureaucrats and industry shills twiddle their thumbs, the Chinese Communist Party continues to purchase sensitive U.S. technologies with clear military applications," he said. "I will be digging deep into the Commerce Department's actions."

According to the status update, the agency plans to regulate exports of quantum diluted refrigerators, which are used to keep qubits cold in some quantum machines. Qubits are used in quantum computers to perform calculations that would take conventional computers thousands of years. Major makers of the refrigeration devices include U.K.-based ICE Oxford, Finland-based Bluefors and U.S.-based Janis Research. The rules would apply to exports of goods from the United States as well as shipments of items made abroad that contain a significant amount of U.S. technology or components. That rule was sent to the Commerce Department's Office of Policy and Strategic Planning on Nov. 19, along with another rule regulating 3-D printing for explosives, the document shows. Another regulation on exports of the so called "Gate-All-Around Field Effect transistor technology, which is used to manufacture semiconductors, was awaiting comments from other agencies on Dec. 5. The transistors are expected to play a major role in newer, faster semiconductors that are under development by Taiwan Semiconductor Manufacturing Co (2330.TW), Samsung Electronics Co Ltd (005930.KS) and Intel Corp (INTC.O).  Two other rules would regulate chemicals used to make Russian nerve agent Novichok and single-use chambers for chemical reactions.

_____

## 2. Ways and Means votes on USMCA | Politico
https://www.politico.com/newsletters/morning-trade/2019/12/17/ways-and-means-votes-on-usmca-783765
By Sabrina Rodriguez
Dec. 17, 2019

— The Ways and Means Committee will consider the revised USMCA today, keeping the House on track to pass the deal later this week.

— Mexico's top trade negotiator backed down from a self-created diplomatic crisis after U.S. Trade Representative Robert Lighthizer clarified that certain language in the USMCA bill does not mean the U.S. will send labor inspectors to Mexico.

— Congress is expected to pass a bipartisan spending deal this week that would extend the Export-Import Bank's charter for seven years and require the Trump administration to publish the results of its national security investigation on imported autos.

**WAYS AND MEANS VOTES ON USMCA:** The House Ways and Means Committee is widely expected to advance the revised USMCA, H.R. 5430, at a markup today, clearing the path for a full vote on the House floor later this week. Keep an eye out: It's the first time members will have a chance to weigh in on the outcome of months of negotiations between Lighthizer and the nine-member working group appointed by Speaker Nancy Pelosi. Some committee members, including Reps. Dan Kildee (D-Mich.) and Jimmy Panetta (D-Calif.), previously expressed frustration over how the administration and working group kept talks under wraps — but that was because both sides signed confidentiality agreements pledging not to reveal details.

**Tick tock:** The markup today starts at 11 a.m.

The House will vote on the 239-page implementing bill to replace NAFTA on Thursday.

**TRADE GOODIES IN THE SPENDING BILL:** The Export-Import Bank will see its charter extended for seven years as part of the spending package released Monday. The appropriations bill, which is expected to be signed into law by week's end, would also place more restrictions on the bank's lending when it comes to China. That includes the goal of reserving 20 percent of the bank's exposure authority to support exports of high-tech products and U.S. exports that compete directly with Chinese exports. The measure would also establish new reporting requirements to assess transactions of $25 million and greater that involves an entity controlled by the Chinese government. Senate Majority Leader Mitch McConnell refused to take up House legislation that would have extended Ex-Im's operations for the next decade, instead opting to keep the bank running as part of the government funding bill. The bank's charter expired on Nov. 21

after an attempt to reach agreement on standalone legislation hit a snag over Republican demands to strengthen the China provisions.

**232 auto report:** The bill also retains an amendment inserted by Sen. Pat Toomey (R-Pa.) and other lawmakers requiring the administration to publish the results of its national security investigation into imports of automobiles. The president ultimately did not act on that report, which was carried out by the Commerce Department under Section 232 of the Trade Expansion Act of 1962.

**Funding bump for Commerce:** The Commerce Department's trade agencies will see funding increases in the spending bill. The $521 million for the International Trade Administration will be a $26 million increase from fiscal year 2019. The Bureau of Industry and Security will get $128 million, representing a $10 million increase from fiscal 2019 levels. The increased funding for ITA will allow the agency to stand up a unit dedicated to investigating evasion and circumvention of U.S. trade remedy duties. The extra money for BIS is supposed to help the bureau carry out implementation of new requirements for export controls on emerging technologies, the Senate Appropriations Committee said in a fact sheet.

––––––––––––––––––––––––––

### 3. House passes bill barring government from buying Huawei gear | Cnet
https://www.cnet.com/news/house-passes-bill-barring-government-from-buying-huawei-gear/
By Corinne Reichert
Dec. 16, 2019

The legislation now faces a Senate vote.

The US House of Representatives has voted to pass legislation that will prevent the government from using funds to help carriers buy Huawei's telecommunications equipment. Other equipment considered to be a threat to national security is also banned under the draft Secure and Trusted Communications Networks Act, as reported earlier Monday by The Hill. The move is "critical" to protect America's wireless networks from "malicious foreign interference," Energy and Commerce Committee Chairman Frank Pallone Jr. (D-NJ), Ranking Member Greg Walden (R-OR) and Reps. Doris Matsui (D-CA) and Brett Guthrie (R-KY) said. "Companies like Huawei and its affiliates pose a significant threat to America's commercial and security interests because a lot of communications providers rely heavily on their equipment," they added in a statement Monday. The draft legislation -- which now faces a vote from the Senate -- prevents the Federal Communications Commission from providing funds to carriers to purchase the equipment, The Hill said. It also requires the government to help smaller carriers rip out any "suspect network equipment," and it will see the government share supply chain security information with carriers.

The FCC had similarly voted unanimously in November to bar use of its $8.5 million a year Universal Service Fund to purchase equipment and services from Chinese providers Huawei and ZTE. Huawei was blacklisted in May when it was added to the United States' "entity list" (PDF). In addition to adding Huawei to the list, US President Donald Trump at the same time signed an executive order essentially banning the company in light of national security concerns that Huawei had close ties with the Chinese government. Huawei has repeatedly denied that charge. Huawei didn't immediately respond to a request for comment.

––––––––––––––––––––––––––

### 4. How Huawei Landed at the Center of Global Tech Tussle | Bloomberg
https://www.washingtonpost.com/business/how-huawei-landed-at-the-center-of-global-tech-tussle/2019/12/17/18498c82-20a6-11ea-b034-de7dc2b5199b_story.html
Dec. 17, 2019

This was supposed to be the year that Huawei Technologies Co., China's biggest tech firm, rose to global prominence as the leader in 5G, the much ballyhooed, next-generation wireless technology. Instead, it's landed in the crossfire of a brutal trade war between the U.S. and China, with the Trump administration pushing allies to ban Huawei equipment

DOC_0077335

from their telecom networks over security concerns. The dispute is threatening to divide German Chancellor Angela Merkel's ruling coalition, after China's ambassador hinted at retaliation against the likes of Volkswagen and Mercedes. Other U.S. allies, including the U.K., are considering restrictions to promote security without an outright ban.

*1. Why does the U.S. have an issue with Huawei?*
U.S. government officials say Huawei is dangerous in part because it could use its growing share of the telecom equipment market to spy for the Chinese government. In 2012, a report by the U.S. House Permanent Select Committee on Intelligence tagged Huawei and ZTE Corp. as potential security threats. U.S. concerns about Huawei drove the 2018 decision by President Donald Trump to block a hostile takeover bid from Broadcom Ltd., based at the time in Singapore, for the U.S. chipmaker Qualcomm Inc. The transaction could have curtailed American investments in chip and wireless technologies and handed global leadership in those spheres to Huawei. Such concerns have expanded as carriers prepare to spend billions on new 5G networks, which will collect data and enable services on an unparalleled scale.

*2. How important is Huawei?*
In just over three decades it's grown from an electronics re-seller into one of the world's biggest private companies, with leading positions in telecommunications gear, smartphones, cloud computing and cybersecurity, with substantial operations in Asia, Europe and Africa. With a 2019 sales target of $125 billion, Huawei generates more revenue than Boeing Co. It's plowed billions of dollars into 5G and is now among China's top recipients of patents both internationally and domestically. It has helped build 5G networks in more than 10 countries and expects to do the same in another 20 by 2020.

*3. Why is its equipment a security issue?*
The U.S. government — like the Chinese and others — is wary of employing foreign technology in vital communications for fear that manufacturers could open backdoors to information, or that the companies themselves would hand over sensitive data to their home governments. Vodafone is said to have found and fixed backdoors on Huawei equipment used in the carrier's Italian business in 2011 and 2012. While it's hard to know if the vulnerabilities were nefarious or unintentional, the revelation dealt a blow to the Chinese company's reputation. U.S. Secretary of State Michael Pompeo has said the U.S. might hold back intelligence-sharing with NATO allies if they use Huawei equipment, a threat met with some skepticism. The 5G networks are of particular concern because they will go beyond making smartphone downloads faster to enable new technologies like self-driving cars and the Internet of Things.

*4. Who's using Huawei and who's not?*
Japan and Australia are among a handful of countries that have joined the U.S. boycott, with Vietnam quietly following suit. But Huawei does have plenty of supporters: Its equipment tends to be less expensive than alternatives from Nokia Oyj and Ericsson AB and is often higher quality. The company has won 5G customers in Russia, the Middle East and Southeast Asia, including the Philippines and Thailand. In Malaysia, the prime minister has trumpeted the advantages of Huawei's gear, saying his country will use "as much as possible."

*5. What's going on in Europe?*
Some U.S. allies have balked at shutting Huawei out completely from 5G network construction. U.K. intelligence agencies reportedly argued that Huawei is a manageable risk, but a political decision has been delayed until 2020. Norway decided against a ban, leaving the choice to individual companies; so far two have gone with Ericsson. French President Emmanuel Macron says his country is looking to balance the need for "good technology and to preserve our national security." In Germany, Merkel faces a similar dilemma, but is facing a potential revolt by lawmakers who want to effectively ban Huawei equipment. China's ambassador to Germany threatened Berlin with retaliation if such a ban were adopted, citing the millions of vehicles German carmakers sell in China.

*6. What else has the U.S. done?*

The U.S. has moved to curb Huawei's ability to sell equipment in the U.S. and, more significantly, to buy parts from U.S. suppliers, by adding Huawei to a Commerce Department blacklist. But it's also granted temporary reprieves that allow U.S. companies to continue to sell parts to Huawei. Microsoft Corp., for instance, said it got a license to sell "mass-market software" to Huawei. The U.S. Federal Communications Commission voted to prohibit the use of federal subsidies to buy telecommunications equipment made by Huawei and ZTE and said it would consider requiring carriers now using the products to remove them. Meanwhile, in December 2018 Canada, at the request of the U.S., arrested Huawei's chief financial officer, Meng Wanzhou, who's also the daughter of the company's founder, Ren Zhengfei. The U.S. is seeking her extradition as part of a criminal case alleging that she conspired to defraud banks into unwittingly clearing transactions linked to Iran in violation of U.S. sanctions. Both Meng, who is also deputy chairwoman, and the company have denied wrongdoing.

### 7. Who else has accused Huawei?

In 2003, Cisco Systems Inc. sued Huawei for allegedly infringing on its patents and illegally copying source code used in routers and switches. Huawei removed the contested code, manuals and command-line interfaces and the case was dropped. Motorola sued in 2010 for allegedly conspiring with former employees to steal trade secrets. That lawsuit was later settled. In 2017 a jury found Huawei liable for stealing robotic technology from T-Mobile US Inc., and on Jan. 28 the Justice Department indicted Huawei for theft of trade secrets related to that case. Meanwhile, Poland, a staunch U.S. ally, arrested a Huawei employee on suspicion of spying for the Chinese government. Huawei fired the employee and denied any involvement in his alleged actions.

### 8. What does Huawei say?

It has repeatedly denied that it helps Beijing spy on other governments or companies. The company, which says it's owned by Ren as well as its employees through a union, has in recent years begun releasing financial results, spent more on marketing and engaged foreign media in an effort to boost transparency. The formerly reclusive Ren has become more outspoken as he fights to save his company from numerous challenges. While he said he was proud of his military career and Communist Party membership, he rejected suggestions he was doing Beijing's bidding or that Huawei handed over customer information. In March, Huawei went on the offensive, filing a lawsuit in federal court against a statute that blocks U.S. government agencies from using its equipment. Ren once predicted the Trump administration's move could knock $30 billion off his company's revenue. That estimate was later trimmed to "less than $10 billion." Xi Jinping with Huawei President Ren Zhengfei.

### 9. Are other Chinese companies feeling the heat?

Yes. In October, the Trump administration placed eight other Chinese tech giants on its blacklist, accusing them of being implicated in human rights violations against minority Muslims in the country's Xinjiang region. They included Hangzhou Hikvision Digital Technology Co. and Zhejiang Dahua Technology Co., which by some accounts control as much as a third of the global market for video surveillance; SenseTime Group Ltd., the world's most valuable artificial intelligence startup; and fellow AI giant Megvii Technology Ltd. ZTE almost collapsed after the U.S. Commerce Department banned it for three months in 2018 from buying American technology. The U.S. Justice Department has charged state-owned Fujian Jinhua Integrated Circuit Co., its Taiwanese partner and three individuals with conspiring to steal trade secrets from Micron Technology Inc.

---

**5. Important New Guidance for Companies Considering Voluntary Disclosures of Export Control and Sanctions Violations | The National Law Review**

https://www.natlawreview.com/article/important-new-guidance-companies-considering-voluntary-disclosures-export-control

By Nate Bolin and Peter Baldwin

Dec. 14, 2019

On December 13, 2019, the U.S. Department of Justice's National Security Division (NSD) issued important new policy guidance regarding voluntary disclosures of export control and sanctions laws violations. Among other things, the latest policy – which is effective immediately – makes clear that companies will not receive mitigation credit for potentially willful violations of these laws unless they make voluntary disclosures and otherwise cooperate with both the federal agency concerned and the NSD. Companies conducting internal investigations and considering whether a voluntary self-disclosure may be warranted should carefully review this latest policy and factor it into their decision-making.

The new policy applies to voluntary disclosures of "potentially willful violations" of the Arms Export Control Act and International Traffic in Arms Regulations (ITAR), the Export Control Reform Act and Export Administration Regulations (EAR), and the International Emergency Economic Powers Act (IEEPA) and economic sanctions issued pursuant to that statute by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC). "Potentially willful violations" are defined as those resulting from an act that was done with knowledge that it was illegal. Adopting the standard articulated in the 1998 Supreme Court case of Bryan v. United States, the policy emphasizes that in identifying willful acts, NSD is "not required to show that the defendant was aware of the specific law, rule, or regulation that its conduct may have violated."

To receive mitigation credit under the policy, a company must disclose the underlying conduct to both the administrative agency concerned (i.e., Commerce, State, and/or OFAC) and NSD's Counterintelligence and Export Control Section (CES) before there is "an imminent threat of disclosure or government investigation." Further, the company must file its voluntary disclosure "within a reasonably prompt time after becoming aware" of the violation. Finally, the company must disclose all relevant facts known to it at the time of the disclosure and that it becomes aware of thereafter, including "as to any individuals substantially involved in or responsible for the misconduct at issue." This last point continues the Department of Justice's emphasis on individual accountability for corporate wrong-doing as articulated in the Yates Memo of 2015 and the 2018 Justice Manual.

Overall, the latest NSD policy guidance underscores the importance of acting promptly and holistically to address potential export control and sanctions violations. Where there is any indication that the underlying conduct was willful, companies should act immediately and coordinate the disclosure process carefully and consider filing with both the NSD and the relevant administrative agency. Moreover, the policy's emphasis on "proactive cooperation," individual accountability, and "timely and appropriate remediation" should completely dispel any notion that voluntary disclosures are a case of "file and forget it."

_____

JAMES E. RISCH, IDAHO, CHAIRMAN

MARCO RUBIO, FLORIDA                ROBERT MENENDEZ, NEW JERSEY
RON JOHNSON, WISCONSIN              BENJAMIN L. CARDIN, MARYLAND
CORY GARDNER, COLORADO             JEANNE SHAHEEN, NEW HAMPSHIRE
MITT ROMNEY, UTAH                   CHRISTOPHER A. COONS, DELAWARE
LINDSEY GRAHAM, SOUTH CAROLINA     TOM UDALL, NEW MEXICO
JOHNNY ISAKSON, GEORGIA             CHRISTOPHER MURPHY, CONNECTICUT
JOHN BARRASSO, WYOMING             TIM KAINE, VIRGINIA
ROB PORTMAN, OHIO                   EDWARD J. MARKEY, MASSACHUSETTS
RAND PAUL, KENTUCKY                 JEFF MERKLEY, OREGON
TODD YOUNG, INDIANA                 CORY A. BOOKER, NEW JERSEY
TED CRUZ, TEXAS

**United States Senate**

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

December 10, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C.

Dear Secretary Pompeo:

On February 4, 2019, I received congressional notification from the Department, pursuant to the authority of section 38(f) of the Arms Export Control Act (AECA), for the proposed transfer of responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I wrote to inform you on February 22 that I was placing a hold on that congressional notification. On November 12, 2019, the Department submitted a new 38(f) notification in response to a proposed regulatory change by the Department of Commerce. I write to inform you that I am placing a hold on the November 12, 2019 notification for the reasons detailed below.

As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely in-use by military and security services - are uniquely dangerous.  They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more rigorous export controls and oversight, not less.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

My hold will remain in place until such time as the issue identified below is sufficiently addressed.

1) <u>Removal of Firearms Exports from Congressional Information and Review</u>
The AECA provides for congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests.  As you know, Congress took action in 2002 to ensure that the sale and export of these weapons would receive closer scrutiny and oversight, including by amending the AECA to set a lower congressional reporting threshold (from $14 million to $1 million) specifically for firearms on the USML.  Moving such firearms from the USML to the CCL would effectively eliminate congressional oversight of exports of these weapons by eliminating this congressional reporting requirement, and would be directly contrary to congressional intent.

To that end, I reiterate my demand from my previous letter: the Senate Foreign Relations and House Foreign Affairs committees must be immediately informed of any proposed license to export firearms formerly controlled on the USML at the appropriate dollar threshold mandated in the Arms Export Control Act. This concern must be satisfactorily addressed before I will lift my hold.

2) Proliferation of 3D Gun Printing Technical Information

In my February letter, I expressed that there is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests. The Department of Commerce claimed that it could not, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally. I wrote that:

> *Ultimately, the specific provision of the Export Administration Regulations that is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control. Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.*

I understand that the Department of Commerce has now decided to alter its regulations to address this concern; technical information related to the manufacture of firearms, to include 3D-printing information, proposed for transfer to the CCL will be prohibited from publication or Internet posting without a license. That does seek to address my previously-expressed concern, and I will not insist on this to lift my hold. However, I note that this improvement could easily be undone through a simple regulatory change in the future that would not even require congressional notification or review; a statutory authority to maintain such licensing, or better yet, an outright prohibition, may be required. Moreover, Commerce must maintain a policy of "presumption of denial" for any license application sought to publish or post such information, and pursue any violations vigorously.

Sincerely,

Robert Menendez
Ranking Member

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

February 22, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20520

Dear Secretary Pompeo:

On February 4, 2019, I received a congressional notification from the Department for a proposal to transfer responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I write to inform you that I am placing a hold on the congressional notification, pursuant to the authority of Section 38(f) of the Arms Export Control Act (AECA).

I am deeply concerned about this proposed transfer. As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely used by military and security services – are uniquely dangerous. They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more, not less, rigorous export controls and oversight.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

Consequently, my hold will remain in place until such time as the issues identified below are sufficiently addressed.

## 1) Removal of Firearms Exports from Congressional Information and Review

The AECA enables congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests. Congress took action in 2002 to ensure that the sale and export of these weapons would receive stringent oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL would directly

contradict congressional intent and effectively eliminate congressional oversight and potential disapproval of exports of these weapons. Congressional oversight must be retained.

2) Proliferation of 3D Gun Printing Technical Information
There is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests. The Department of Commerce claims that it cannot, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally. This is outrageous and simply unacceptable given the dangers it poses to U.S. citizens and interests.

Moreover, it may also be at variance with recent law. Section 1758 of the Export Control Reform Act of 2018 authorizes the Secretary of Commerce to control "emerging and foundational technologies" that (A) are essential to the national security of the United States; and (B) are not critical technologies described in clauses (i) through (v) of section 721(a)(6)(A) of the Defense Production Act of 1950. 3D printing has been identified by this Administration as an emerging technology of concern, and the Department of Commerce itself used 3D printing as an example of "emerging technology" in its November 19, 2018 Federal Register notice seeking public comment on what constitutes emerging technologies pursuant to this new statutory charge. Then-Secretary of Defense Mattis twice mentioned the challenges of 3D printing in congressional testimony, and Director of National Intelligence Coats, in his 2018 Worldwide Threat Assessment of the U.S. Intelligence Community, stated that, "[a]dvances in manufacturing, particularly the development of 3D printing, almost certainly will become even more accessible to a variety of state and non-state actors and be used in ways contrary to our interests."

It would seem axiomatic that the capability to 3D-print lethal weaponry that cannot easily or reliably be detected by metal detectors at airports, schools, governmental or other facilities (including the U.S. Capitol and the Department of State) would qualify as an emerging technology in need of regulatory control. Yet, the Commerce Department has told my staff that the interagency process to identify emerging and foundational technologies to be controlled has not been completed, and is unlikely to be completed for months. By proceeding with the transfer of firearms, including 3D printing technical information, to Commerce, the Administration is acting recklessly and endangering innocent lives. It should go without saying that we collectively need to understand the threat and have a plan to address this issue before making the regulatory change.

Moreover, the Department of Commerce would seem to have adequate additional regulatory authority to control 3D gun printing information, at least temporarily. Commerce can control any item for foreign policy reasons under the miscellaneous category of 0Y521, according to a final rule issued by Commerce in 2012. Preventing foreign terrorists and thugs from acquiring

the means to print undetectable guns to use against U.S. citizens is a sufficient foreign policy justification to control this technology from public release.

Ultimately, the specific provision of the Export Administration Regulations is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control. Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.

I look forward to your prompt response to my concerns.

Sincerely,

Robert Menendez
Ranking Member

CC: The Honorable Wilbur Ross, U.S. Secretary of Commerce

January 10, 2020

Oliver Potts, Director
Office of the Federal Register
National Archives and Records Administration
7 G Street NW, Suite A-734
Washington, DC 20401

Director Potts,

This is to certify that the files on the disk furnished with the final rule concerning "**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**" – **Docket No. 191107-0079; RIN 0694-AF47** are true copies of the original signed document.

Further, the Bureau of Industry and Security (BIS) requests this final rule to be published simultaneously with the following final rule:

Department of State final rule entitled "**International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III**" – [**Public Notice: 10603; RIN 1400-AE30**].

Please notify Nancy Kook at 202/482-3451 or email her at [ HYPERLINK "mailto:nancy.kook@bis.doc.gov" ] when the rule has been scheduled for publication. In addition, you may contact Nancy if you have questions or problems in publishing this rule. Thank you.


Sincerely,



Hillary Hess
Director, Regulatory Policy Division



41217

# Submission of Federal Rules
# Under the Congressional Review Act

☐ **President of the Senate**    ☐ **Speaker of the House of Representatives**    ☑ **GAO**

Please fill the circles electronically or with black pen or #2 pencil.

| 1. Name of Department or Agency | 2. Subdivision or Office |
|---|---|
| U.S. Department of Commerce | Bureau of Industry and Security |

3. Rule Title

Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

4. Rule Identification Number (RIN) or Other Unique Identifier (if applicable)   0694-AF47

5.     Major Rule ○    Non-major Rule ●

6.     Final Rule ●    Other ○ _____

7. With respect to this rule, did your agency solicit public comments?    Yes ●    No ○    N/A ○

8. Priority of Regulation (fill in one)

● Economically Significant; or Significant; or Substantive, Nonsignificant

○ Routine and Frequent or Informational/Administrative/Other *(Do not complete the other side of this form if filled in above.)*

9. Effective Date (if applicable)   45 days after publication in the Federal Register

10. Is a concise Summary of the Rule provided?    Yes ○    No ●

Submitted by: _____ (signature)

Name: Richard E. Ashooh

Title: Assistant Secretary for Export Administration

_____

For Congressional Use Only:

Date Received: _____

Committee of Jurisdiction: _____

11/09/99

DOC_0079774



41217

|   | Yes | No | N/A |
|---|---|---|---|
| A. With respect to this rule, did your agency prepare an analysis of costs and benefits? | ○ | ○ | ● |
| B. With respect to this rule, at the final rulemaking stage, did your agency | | | |
| 1. certify that the rule would not have a significant economic impact on a substantial number of small entities under 5 U.S.C. § 605(b)? | ● | ○ | ○ |
| 2. prepare a final Regulatory Flexibility Analysis under 5 U.S.C. § 604(a)? | ○ | ○ | ● |
| C. With respect to this rule, did your agency prepare a written statement under § 202 of the Unfunded Mandates Reform Act of 1995? | ○ | ○ | ● |
| D. With respect to this rule, did your agency prepare an Environmental Assessment or an Environmental Impact Statement under the National Environmental Policy Act (NEPA)? | ○ | ○ | ● |
| E. Does this rule contain a collection of information requiring OMB approval under the Paperwork Reduction Act of 1995? | ● | ○ | ○ |
| F. Did you discuss any of the following in the preamble to the rule? | | | |
| ● E.O. 13132, Federalism | ● | ○ | ○ |
| ● E.O. 12630, Government Actions and Interference with Constitutionally Protected Property Rights | ○ | ● | ○ |
| ● E.O. 12866, Regulatory Planning and Review | ● | ○ | ○ |
| ● E.O. 12988, Civil Justice Reform | ○ | ● | ○ |
| ● E.O. 13045, Protection of Children from Environmental Health Risks and Safety Risks | ○ | ● | ○ |
| ● Other statutes or executive orders discussed in the preamble concerning the rulemaking process (please specify) | | | |

Administrative Procedure Act (5 U.S.C. 553) and E.O. 13771 Reducing Regulation and Controlling Regulatory Costs

JAN 1 0 2020

The Honorable Sherrod Brown
Ranking Member, Committee on Banking,
    Housing and Urban Affairs
United States Senate
Washington, DC 20510

Dear Senator Brown:

Enclosed is a copy of a rule to amend the Export Administration Regulations (EAR) that has been submitted by the Bureau of Industry and Security (BIS) to the Federal Register. This copy is provided to you pursuant to Section 4821(c) of the Export Control Reform Act of 2018 (ECRA), 50 U.S.C. 4801 et seq.

On May 24, 2018, the Department of Commerce published a proposed rule in conjunction with a Department of State proposed rule to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armaments), and III (ammunition/ordnance) of the U.S. Munitions List (USML) and transfer items that no longer warrant control on the USML to the Commerce Control List (CCL). This final rule responds to and adopts changes based on the comments received on the Commerce proposed rule and is being published simultaneously with a final rule by the Department of State that will revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list. These revisions complete the initial review of the USML that the Department of State began in 2011 and the conforming changes made to the EAR to control these items not warranting control under the ITAR.

Should you have additional questions or concerns, please contact Anthony Foti, Performing the Delegated Duties of the Assistant Secretary for Legislative and Intergovernmental Affairs, at (202) 482-3663.

Sincerely,

Richard E. Ashooh

Enclosure



JAN 1 0 2020

The Honorable Mike Crapo
Chairman, Committee on Banking,
    Housing and Urban Affairs
United States Senate
Washington, DC 20510

Dear Mr. Chairman:

Enclosed is a copy of a rule to amend the Export Administration Regulations (EAR) that has been submitted by the Bureau of Industry and Security (BIS) to the Federal Register. This copy is provided to you pursuant to Section 4821(c) of the Export Control Reform Act of 2018 (ECRA), 50 U.S.C. 4801 et seq.

On May 24, 2018, the Department of Commerce published a proposed rule in conjunction with a Department of State proposed rule to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armaments), and III (ammunition/ordnance) of the U.S. Munitions List (USML) and transfer items that no longer warrant control on the USML to the Commerce Control List (CCL). This final rule responds to and adopts changes based on the comments received on the Commerce proposed rule and is being published simultaneously with a final rule by the Department of State that will revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list. These revisions complete the initial review of the USML that the Department of State began in 2011 and the conforming changes made to the EAR to control these items not warranting control under the ITAR.

Should you have additional questions or concerns, please contact Anthony Foti, Performing the Delegated Duties of the Assistant Secretary for Legislative and Intergovernmental Affairs, at (202) 482-3663.

Sincerely,

Richard E. Ashooh

Enclosure



JAN 1 0 2020

The Honorable Eliot L. Engel
Chairman, Committee on Foreign Affairs
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

Enclosed is a copy of a rule to amend the Export Administration Regulations (EAR) that has been submitted by the Bureau of Industry and Security (BIS) to the Federal Register. This copy is provided to you pursuant to Section 4821(c) of the Export Control Reform Act of 2018 (ECRA), 50 U.S.C. 4801 et seq.

On May 24, 2018, the Department of Commerce published a proposed rule in conjunction with a Department of State proposed rule to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armaments), and III (ammunition/ordnance) of the U.S. Munitions List (USML) and transfer items that no longer warrant control on the USML to the Commerce Control List (CCL). This final rule responds to and adopts changes based on the comments received on the Commerce proposed rule and is being published simultaneously with a final rule by the Department of State that will revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list. These revisions complete the initial review of the USML that the Department of State began in 2011 and the conforming changes made to the EAR to control these items not warranting control under the ITAR.

Should you have additional questions or concerns, please contact Anthony Foti, Performing the Delegated Duties of the Assistant Secretary for Legislative and Intergovernmental Affairs, at (202) 482-3663.

Sincerely,

Richard E. Ashooh

Enclosure



JAN 1 0 2020

The Honorable Michael McCaul
Ranking Member, Committee on Foreign Affairs
U.S. House of Representatives
Washington, DC 20515

Dear Ranking Member McCaul:

Enclosed is a copy of a rule to amend the Export Administration Regulations (EAR) that has been submitted by the Bureau of Industry and Security (BIS) to the Federal Register. This copy is provided to you pursuant to Section 4821(c) of the Export Control Reform Act of 2018 (ECRA), 50 U.S.C. 4801 et seq.

On May 24, 2018, the Department of Commerce published a proposed rule in conjunction with a Department of State proposed rule to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armaments), and III (ammunition/ordnance) of the U.S. Munitions List (USML) and transfer items that no longer warrant control on the USML to the Commerce Control List (CCL). This final rule responds to and adopts changes based on the comments received on the Commerce proposed rule and is being published simultaneously with a final rule by the Department of State that will revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list. These revisions complete the initial review of the USML that the Department of State began in 2011 and the conforming changes made to the EAR to control these items not warranting control under the ITAR.

Should you have additional questions or concerns, please contact Anthony Foti, Performing the Delegated Duties of the Assistant Secretary for Legislative and Intergovernmental Affairs, at (202) 482-3663.

Sincerely,

Richard E. Ashooh

Enclosure



The Honorable Ben Sasse
Chairman, Subcommittee on National Security
    and International Trade Finance
Committee on Banking, Housing and Urban Affairs
United States Senate
Washington, DC 20510

JAN 1 0 2020

Dear Mr. Chairman:

    Enclosed is a copy of a rule to amend the Export Administration Regulations (EAR) that
has been submitted by the Bureau of Industry and Security (BIS) to the Federal Register. This
copy is provided to you pursuant to Section 4821(c) of the Export Control Reform Act of 2018
(ECRA), 50 U.S.C. 4801 et seq.

    On May 24, 2018, the Department of Commerce published a proposed rule in
conjunction with a Department of State proposed rule to revise Categories I (firearms, close
assault weapons and combat shotguns), II (guns and armaments), and III (ammunition/ordnance)
of the U.S. Munitions List (USML) and transfer items that no longer warrant control on the
USML to the Commerce Control List (CCL). This final rule responds to and adopts changes
based on the comments received on the Commerce proposed rule and is being published
simultaneously with a final rule by the Department of State that will revise Categories I, II, and
III of the USML to describe more precisely the articles warranting continued control on that list.
These revisions complete the initial review of the USML that the Department of State began in
2011 and the conforming changes made to the EAR to control these items not warranting control
under the ITAR.

    Should you have additional questions or concerns, please contact Anthony Foti,
Performing the Delegated Duties of the Assistant Secretary for Legislative and
Intergovernmental Affairs, at (202) 482-3663.

                                    Sincerely,

                                    Richard E. Ashooh

Enclosure





41217

# Submission of Federal Rules
# Under the Congressional Review Act

☐ President of the Senate    ☑ Speaker of the House of Representatives    ☐ GAO

Please fill the circles electronically or with black pen or #2 pencil.

1. Name of Department or Agency

U.S. Department of Commerce

2. Subdivision or Office

Bureau of Industry and Security

3. Rule Title

Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

4. Rule Identification Number (RIN) or Other Unique Identifier (if applicable)   0694–AF47

5.   Major Rule ○   Non-major Rule ●

6.   Final Rule ●   Other ○ _____

7. With respect to this rule, did your agency solicit public comments?   Yes ●   No ○   N/A ○

8. Priority of Regulation (fill in one)

● Economically Significant; or Significant; or Substantive, Nonsignificant

○ Routine and Frequent or Informational/Administrative/Other *(Do not complete the other side of this form if filled in above.)*

9. Effective Date (if applicable)   45 days after publication in the Federal Register

10. Is a concise Summary of the Rule provided?   Yes ○   No ●

Submitted by _____ (signature)

Name: Richard E. Ashooh

Title: Assistant Secretary for Export Administration

_____

For Congressional Use Only:

Date Received: _____

Committee of Jurisdiction: _____

11/09/99



41217

|  | Yes | No | N/A |
|---|---|---|---|
| A. With respect to this rule, did your agency prepare an analysis of costs and benefits? | ○ | ○ | ● |
| B. With respect to this rule, at the final rulemaking stage, did your agency | | | |
| 1. certify that the rule would not have a significant economic impact on a substantial number of small entities under 5 U.S.C. § 605(b)? | ● | ○ | ○ |
| 2. prepare a final Regulatory Flexibility Analysis under 5 U.S.C. § 604(a)? | ○ | ○ | ● |
| C. With respect to this rule, did your agency prepare a written statement under § 202 of the Unfunded Mandates Reform Act of 1995? | ○ | ○ | ● |
| D. With respect to this rule, did your agency prepare an Environmental Assessment or an Environmental Impact Statement under the National Environmental Policy Act (NEPA)? | ○ | ○ | ● |
| E. Does this rule contain a collection of information requiring OMB approval under the Paperwork Reduction Act of 1995? | ● | ○ | ○ |
| F. Did you discuss any of the following in the preamble to the rule? | | | |
| ● E.O. 13132, Federalism | ● | ○ | ○ |
| ● E.O. 12630, Government Actions and Interference with Constitutionally Protected Property Rights | ○ | ● | ○ |
| ● E.O. 12866, Regulatory Planning and Review | ● | ○ | ○ |
| ● E.O. 12988, Civil Justice Reform | ○ | ● | ○ |
| ● E.O. 13045, Protection of Children from Environmental Health Risks and Safety Risks | ○ | ● | ○ |
| ● Other statutes or executive orders discussed in the preamble concerning the rulemaking process (please specify) | | | |

Administrative Procedure Act (5 U.S.C. 553) and E.O. 13771 Reducing Regulation and Controlling Regulatory Costs

11/09/99

DOC_0079784



41217

# Submission of Federal Rules
# Under the Congressional Review Act

☑ **President of the Senate**  ☐ **Speaker of the House of Representatives**  ☐ **GAO**

Please fill the circles electronically or with black pen or #2 pencil.

| 1. Name of Department or Agency | 2. Subdivision or Office |
|---|---|
| U.S. Department of Commerce | Bureau of Industry and Security |

3. Rule Title

Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

4. Rule Identification Number (RIN) or Other Unique Identifier (if applicable) 0694-AF47

5.     Major Rule ○     Non-major Rule ●

6.     Final Rule ●     Other ○ _____

7. With respect to this rule, did your agency solicit public comments?     Yes ●   No ○   N/A ○

8. Priority of Regulation (fill in one)

● Economically Significant; or Significant; or Substantive, Nonsignificant

○ Routine and Frequent or Informational/Administrative/Other *(Do not complete the other side of this form if filled in above.)*

9. Effective Date (if applicable)  45 days after publication in the Federal Register

10. Is a concise Summary of the Rule provided?     Yes ○     No ●

Submitted by _____ (signature)

Name: Richard E. Ashooh

Title: Assistant Secretary for Export Administration

_____

For Congressional Use Only:

Date Received: _____

Committee of Jurisdiction: _____

11/09/99



41217

|  | Yes | No | N/A |
|---|---|---|---|
| A. With respect to this rule, did your agency prepare an analysis of costs and benefits? | ○ | ○ | ● |
| B. With respect to this rule, at the final rulemaking stage, did your agency | | | |
| 1. certify that the rule would not have a significant economic impact on a substantial number of small entities under 5 U.S.C. § 605(b)? | ● | ○ | ○ |
| 2. prepare a final Regulatory Flexibility Analysis under 5 U.S.C. § 604(a)? | ○ | ○ | ● |
| C. With respect to this rule, did your agency prepare a written statement under § 202 of the Unfunded Mandates Reform Act of 1995? | ○ | ○ | ● |
| D. With respect to this rule, did your agency prepare an Environmental Assessment or an Environmental Impact Statement under the National Environmental Policy Act (NEPA)? | ○ | ○ | ● |
| E. Does this rule contain a collection of information requiring OMB approval under the Paperwork Reduction Act of 1995? | ● | ○ | ○ |
| F. Did you discuss any of the following in the preamble to the rule? | | | |
| ● E.O. 13132, Federalism | ● | ○ | ○ |
| ● E.O. 12630, Government Actions and Interference with Constitutionally Protected Property Rights | ○ | ● | ○ |
| ● E.O. 12866, Regulatory Planning and Review | ● | ○ | ○ |
| ● E.O. 12988, Civil Justice Reform | ○ | ● | ○ |
| ● E.O. 13045, Protection of Children from Environmental Health Risks and Safety Risks | ○ | ● | ○ |
| ● Other statutes or executive orders discussed in the preamble concerning the rulemaking process (please specify) | | | |

Administrative Procedure Act (5 U.S.C. 553) and E.O. 13771 Reducing Regulation and Controlling Regulatory Costs

DOC_0079786

JAN 1 0 2020

The Honorable Mark R. Warner
Ranking Member, Subcommittee on National Security and
    International Trade Finance
Committee on Banking, Housing and Urban Affairs
United States Senate
Washington, DC 20510

Dear Ranking Member Warner:

Enclosed is a copy of a rule to amend the Export Administration Regulations (EAR) that has been submitted by the Bureau of Industry and Security (BIS) to the Federal Register. This copy is provided to you pursuant to Section 4821(c) of the Export Control Reform Act of 2018 (ECRA), 50 U.S.C. 4801 et seq.

On May 24, 2018, the Department of Commerce published a proposed rule in conjunction with a Department of State proposed rule to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armaments), and III (ammunition/ordnance) of the U.S. Munitions List (USML) and transfer items that no longer warrant control on the USML to the Commerce Control List (CCL). This final rule responds to and adopts changes based on the comments received on the Commerce proposed rule and is being published simultaneously with a final rule by the Department of State that will revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list. These revisions complete the initial review of the USML that the Department of State began in 2011 and the conforming changes made to the EAR to control these items not warranting control under the ITAR.

Should you have additional questions or concerns, please contact Anthony Foti, Performing the Delegated Duties of the Assistant Secretary for Legislative and Intergovernmental Affairs, at (202) 482-3663.

Sincerely,

Richard E. Ashooh

Enclosure



# DEPARTMENT OF STATE

## 22 CFR Parts 121, 123, 124, 126, and 129

[Public Notice: 10603]

RIN 1400-AE30

**International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III**

**AGENCY:** Department of State.

**ACTION:** Final rule.

**SUMMARY:** The Department of State (the Department) amends the International Traffic in Arms Regulations (ITAR) to revise Categories I- firearms, close assault weapons and combat shotguns, II- guns and armament, and III- ammunition/ordnance of the U.S. Munitions List (USML) to describe more precisely the articles that provide a critical military or intelligence advantage or, in the case of weapons, perform an inherently military function and thus warrant export and temporary import control on the USML. These revisions complete the initial review of the USML that the Department began in 2011. Items not subject to the ITAR or to the exclusive licensing jurisdiction of any other set of regulations are subject to the Export Administration Regulations.

**DATES:** This final rule is effective **[INSERT DATE 45 DAYS FROM THE DATE OF PUBLICATION IN THE FEDERAL REGISTER]**.

**FOR FURTHER INFORMATION CONTACT:**

Sarah Heidema, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663-2809; email *DDTCPublicComments@state.gov*. ATTN: Regulatory Change, USML Categories I, II, and III.

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130). On May 24, 2018, DDTC published a proposed rule, 83 FR 24198, for public comment regarding proposed revisions to Categories I, II, and III of the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). After review of received comments and with the revisions to the proposed rule further described below, DDTC now publishes this final rule to amend the ITAR.

The articles and related technical data subject to the jurisdiction of the ITAR, *i.e.*, "defense articles," are identified on the USML. With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations (EAR, 15 CFR parts 730 through 774, which includes the Commerce

2

Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR impose license requirements on exports and reexports. Items not subject to the ITAR or to the exclusive licensing jurisdiction of any other set of regulations are subject to the EAR. The Department of Commerce is publishing a companion rule in this edition of the *Federal Register*.

Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import are part of the USML under the AECA. All references to the USML in this rule, however, are to the list of AECA defense articles that are controlled for purposes of export or temporary import pursuant to the ITAR, and not to the list of AECA defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. References to the USMIL are to the list of AECA defense articles controlled by ATF for purposes of permanent import.

Section 38(b)(1)(A)(ii) of the AECA, requires, with limited exceptions, registration of persons who engage in the business of brokering activities

3

with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President as such under section 38(a)(1) and licensing for such activities. Through Executive Order 13637, the President delegated the responsibility for registration and licensing of brokering activities to the Department of State with respect to defense articles or defense services controlled either for purposes of export by the Department of State or for purposes of permanent import by ATF. Section 129.1 of the ITAR states this requirement. As such, all defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of jurisdiction from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA for purposes of permanent import or brokering controls for any brokering activity, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. This rule adds two new paragraphs, (b)(2)(vii) and (viii), to § 129.2 to update the enumerated list of actions that are not brokering. This change is a conforming change and is needed to address the transfer from the USML to the CCL of USMIL defense articles that remain subject to the brokering

4

controls, and to ensure that the U.S. government does not impose a double licensing requirement on the export, reexport, or retransfer of such items subject to the EAR or continue to require registration with the Department solely based on activities related to the manufacture of these items.

The Department of State is engaged in an effort, described more fully below, to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, have an inherently military function. The Department has undertaken these revisions pursuant to the President's delegated discretionary statutory authority in section 38(a)(1) of the AECA to control the import and export of defense articles and defense services in furtherance of world peace and the security and foreign policy of the United States and to designate those items which constitute the USML. The Department determined that the articles in USML Categories I, II, and III that are removed from the USML under this final rule do not meet this standard, including many articles that are widely available in retail outlets in the United States and abroad (such as many firearms previously described in Category I, paragraph (a), including, for example, a .22 caliber rifle).

5

The descriptions below describe the status of the subject categories of the USML and CCL as of the effective date of this rule and the companion rule published by the Department of Commerce in this *Federal Register* issue. Any reference in the preamble to this final rule to transfer from the USML to the CCL reflects the combined effects of removal of the defense article from the controls of the ITAR by virtue of the removal of an item (*i.e.*, enumerated control text) from the USML by this rule and the corresponding adoption of the former defense article as an item subject to the EAR by action of the companion rule. Comments regarding the overall rule are addressed immediately below, while comments specific to a Category or amended section of the ITAR are addressed in the relevant discussion of revisions to Categories I, II, or III, or in the discussion under the title of "Conforming ITAR Changes."

**Comments of General Applicability**

The Department believes that a restatement of the overall principles behind the multi-year review of the USML and the efforts to better harmonize the ITAR and the EAR and the larger U.S. government's export control system is applicable to many of the comments received and to the reasoning behind this rule. Therefore, before addressing individual

6

comments, the Department reiterates that it, along with its interagency

partners, is engaged in a years-long effort to revise the USML to limit its

scope to those items that provide the United States with a critical military or

intelligence advantage or, in the case of weapons, perform an inherently

military function. Review of the USML is statutorily required by section

38(f) of the AECA, and the Department conducts this review in accordance

with, and in full recognition of, the President's authority, conferred in

section 38(a) of the Act, to control the import and export of defense articles

and defense services in furtherance of world peace and the security and

foreign policy of the United States, and to designate those items that

constitute the USML. In connection with this effort, the Department has

published 26 final, or interim final, rules revising eighteen of the twenty-one

USML categories, removing less sensitive items from the USML. While a

wide range of interagency stakeholders review and clear the *Federal

Register* notices that revise the USML, the Department works particularly

closely with the Departments of Defense and Commerce to solicit their

views on the appropriate composition of the USML. As required by

Executive Order 13637, the Department obtains the concurrence of the

Secretary of Defense for designations, including changes in designations, of

7

items or categories of items that are defense articles and defense services enumerated on the USML. The engagement with the Department of Commerce is further intended to ensure that the jurisdictional posture of a given item is clear, and that the application of ITAR or EAR controls to that item can be discerned and understood by the public.

The Department underscores that this rule constitutes an important part of a nine-year program of revisions that has streamlined the USML. From the beginning, the Department has repeatedly stated its goals for that program (*see e.g.,* 76 FR 68694 (Nov. 7, 2011), 76 FR 76097 (Dec. 6, 2011), 80 FR 11313 (Mar. 2, 2015), 82 FR 4226 (Jan. 13, 2017)). First, that it is seeking to better focus its resources on protecting those articles and technologies that provide the United States with a critical military or intelligence advantage. As applied to this rule, for example, firearms and firearms technology that are otherwise readily available do not provide such an advantage, whereas an M134 Minigun or the next generation squad automatic rifle continues to warrant USML control even if there is some limited civil availability for either. Second, to resolve jurisdictional confusion between the ITAR and EAR among the regulated community through revision to "bright line" positive lists. Third, to provide clarity to the regulated community thereby

8

making it easier for exporters to comply with the regulations and enable them to compete more successfully in the global marketplace. Finally, to develop a regulatory system that supports enhanced interoperability between the United States and its allies and partners and thereby better supports our ability to address shared security challenges.

With respect to revisions of Categories I-III, the review was focused on identifying the defense articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States. If a defense article satisfies one or both of those criteria, it remained on the USML. For example, while the U.S. military supplies some of its service members with sidearms for military use, a sidearm also has many uses outside of the military, such that its function is not inherently military and therefore it does not warrant control on the USML. Alternatively, squad automatic weapons do not generally have such non-military uses and remain controlled on the USML in this final rule. Any single non-military use, however, does not negate such a weapon's inherently military function. In summary, the Department analyzes the

9

patterns, both current and anticipated, of use and availability of the defense articles and the utility they provide to the U.S. military or intelligence community to inform the ultimate determination as to whether control is merited on the USML.

The Department recognizes the sensitivities and foreign policy implications associated with the sale and export of small arms, light weapons, and associated equipment and ammunition as expressed in the President's National Security Policy Memorandum Regarding U.S. Conventional Arms Transfer Policy of April 19, 2018 (Conventional Arms Transfer Policy). Those sensitivities and foreign policy implications will continue to be addressed through the licensing and enforcement requirements of the Department of Commerce. All export license applications for the items transitioning to Commerce jurisdiction are subject to review by the interagency, specifically the Departments of State, Defense, and Energy, as appropriate. The Department will continue to advance its foreign policy mission by reviewing all license applications submitted to the Department of Commerce for the export of firearms and related technology.

Multiple commenters took issue with the proposed transfer from the USML to the CCL of weapons that the Department determined, in

10

conjunction with its interagency partners, are not inherently for military end-use, citing the fact that military and law enforcement personnel regularly use them. As previously noted, the fact that a military uses a specific piece of hardware is not a dispositive factor when determining whether it has an inherently military function. Given that the majority of the items referenced in these comments that will transfer to the CCL through this rule are widely available in retail outlets in the United States and abroad, and widely utilized by the general public in the United States, it is reasonable for the Department to determine that they do not serve an inherently military function, absent specific characteristics that provide military users with significantly enhanced utility, such as automatic weapons, sound suppressors, and high capacity magazines.

Several commenters disputed that the U.S. market should be the basis for assessing the commercial availability of firearms, as this is not the market to which the proposed rule would be directed. The Department recognizes that there are variations in commercial availability of firearms not only between nations, but also within the domestic market itself; however, this variation in availability does not overcome the Department's assessment that the subject firearms do not provide a critical military or intelligence advantage such that

11

they warrant control under the ITAR. In addition, all exports of firearms are subject to the laws of the importing country, and the U.S. government does not issue licenses for exporters to ship firearms to countries where the end-use is illegal.

Several commenters predicted that the rule will make it easier for foreign manufacturers to obtain U.S.-origin components and proprietary technology, thereby causing U.S. firearms manufacturers to lose global market share. The Department refers the commenters to the above-stated objectives of this review effort, which include making it easier for exporters to comply with export control regulations and enabling them to compete more successfully in the global marketplace. The Department further notes that this rule is expected to provide certain key advantages that will substantially benefit domestic manufacturers by: 1) amending the regulatory burden on the U.S. commercial firearms and ammunition industry; 2) clarifying the regulatory requirements for independent gunsmiths; and 3) enabling foreign manufacturers to source from small- and medium-sized U.S. companies more easily.

Several commenters predicted that this rule will diminish the United States' ability to set global normative standards for arms transfers and non-

12

proliferation. The Department strongly disagrees and remains fully committed to the goals outlined in the AECA. In particular, the Department takes seriously its responsibility to implement the AECA's declaration that: "It shall be the policy of the United States to exert leadership in the world community to bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments" (22 U.S.C. 2751). The Department will continue to meet this responsibility, in part, by reviewing export license applications for items subject to the EAR that were formerly controlled by the ITAR, including those on the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual-Use Goods and Technologies (Wassenaar Arrangement) control lists. The Department will continue to take into account the considerations of Section 3 of the Conventional Arms Transfer Policy, such as the national security and foreign policy interests of the United States, when making arms transfer decisions, both for firearms that remain subject to the ITAR and firearms that are subject to the EAR.

Other commenters suggested that this rule contravenes international commitments the United States has made through mechanisms such as the Wassenaar Arrangement. The transfer of the concerned items to the CCL

13

DOC_0079800

does not contravene U.S. international commitments, as the U.S. government will continue to apply a high level of control to these items and require U.S. government authorization for all exports of firearms and major components.

Multiple commenters raised concerns about the role and function of the Department of Commerce regarding the items that are transferred from the USML to the CCL. Some commenters expressed concerns that the Department of Commerce has neither the appropriate resources nor the appropriate expertise or mission to process associated applications for export. Other commenters asserted that because the Department of Commerce, unlike the Department of State, does not charge registration or licensing fees, the transfer to the CCL constitutes an unnecessary burden on taxpayers. As stated previously, the Department is engaged in an effort to revise the USML so that its scope is limited to those defense articles that warrant the U.S. government's highest level of export control because those defense articles offer a critical military or intelligence advantage or, in the case of weapons, have an inherently military function. The revisions implemented by the Department are necessary in order to focus our resources on such defense articles. This effort in general, and this rule in

14

particular, were developed in close consultation with other departments and agencies, including the Department of Commerce. While the Department of Commerce is best suited to address the specific details of the implementation of its regulations and its allocation of appropriated resources, the Department is confident that the framework for control of firearms, and parts and components thereof, across the EAR and the ITAR is sufficient to address the concerns of the U.S government and does not diminish or damage the national security or foreign policy interests of the United States. The Department does not share the concerns expressed about the Department of Commerce's expertise or mission, and the Department further notes that the Department of Commerce has been licensing shotguns and shotgun ammunition, as well as various firearms-related articles such as sighting devices and a range of other similar articles and technologies, for decades. Additionally, the Department of Commerce has investigated and disrupted numerous diversion rings related to EAR-controlled items and will apply its years of export control enforcement expertise to the items this rule transfers to its jurisdiction.

Multiple commenters expressed a general concern that the transfer to the CCL increases the risk of overseas trafficking, proliferation, or diversion.

15

Multiple commenters also raised concerns about the Department of Commerce's end-use monitoring (EUM) capabilities and the impact this rule has on the Department of State's EUM programs. This rule does not deregulate the export of firearms. All firearms and major components being transferred to the CCL will continue to require export authorization from the Department of Commerce. Further, the Department of Commerce has both a robust EUM program and a law enforcement division sufficiently capable of monitoring foreign recipients' compliance with their obligations regarding the transfer, use, and protection of items on the CCL. Additionally, the Federal Bureau of Investigation and the Department of Homeland Security will continue to investigate and enforce criminal violations of the export control laws as appropriate. This rule also will not impact the Department's ability to execute the Blue Lantern EUM program required by section 40A of the AECA, 22 U.S.C. 2785. Finally, this rule will not affect existing federal or state public safety laws that address domestic criminal conduct.

Several commenters expressed concern that the Department of Commerce will not have access to the same databases and background information that the Department of State uses to evaluate license applications. Similarly, some commenters expressed concern that as a result

16

of this rule some exporters will no longer be subject to U.S. government registration requirements, thereby depriving regulators of an important source of information and decreasing transparency and reporting regarding firearms exports. The Department considered these concerns and determined that the interagency license review process maintains appropriate oversight of the articles at issue. The Department of Commerce's export licensing requirements and process are calibrated both to the sensitivity of the article and the proposed destination. Additionally, all requests for export licenses for firearms remain subject to interagency review, including by the Department of State.

Several commenters suggested that the Department create a registration exemption or reduce registration fees for small volume non-exporting firearms manufacturers. Multiple commenters similarly suggested modifying ITAR § 122.1 to include a minimum size requirement for registration. Modification of the requirements of part 122 is outside the scope of this rulemaking; however, the Department highlights that the Department of Commerce does not have a registration requirement for manufacturers and exporters of the items under its jurisdiction. Therefore, gunsmiths that do not manufacture, export, or broker articles that remain subject to the ITAR after

17

this rule's effective date will no longer need to determine if they are required to register under the ITAR. They may, however, still be required to comply with ATF licensing requirements. Any additional changes to the ITAR related to the registration requirement would be addressed in a separate rulemaking.

On the issue of registration, one commenter noted that as a result of this rule some U.S. manufacturers may no longer have to register with the Department of State and be subject to the requirements in ITAR § 122.4(b) for advance notification of intended sales or transfers to foreign persons of ownership or control of the registrant. The commenter asserted that without the advance notification requirement foreign entities could potentially influence the sales and marketing activities of U.S. manufacturers in a manner that would be detrimental to U.S. national security. The Department notes in response that its regulatory authorities are limited to export-related activities for defense articles and services, and highlights that other federal regulatory regimes, such as the Committee on Foreign Investment in the United States, have the ability to address potential foreign ownership or control issues that may impact national security.

18

Multiple commenters expressed concerns that this rule would reduce congressional oversight of arms transfers since the Department of Commerce does not have to notify Congress of firearms sales in excess of $1 million as the Department of State does. The Department acknowledges those concerns and notes that those firearms that the U.S. government deemed through the interagency review process to warrant continued control under the ITAR as defense articles will remain subject to congressional notification requirements in conformity with section 36 of the AECA and Executive Order 13637.

A number of commenters suggested the proposed rule, if made final, may have a negative impact on human rights in foreign countries. As stated previously, the Department of Commerce will continue its longstanding end-use monitoring efforts, including vetting of potential end-users, to help prevent human rights abuses. Similarly, as part of the aforementioned continuing interagency review of export licenses for firearms, the Departments of Defense and State will review export license applications on a case-by-case basis for national security and foreign policy reasons, including the prevention of human rights abuses.

19

DOC_0079806

One commenter expressed concern that foreign law enforcement personnel in particular are at risk of having the transferred CCL items used against them. These concerns are mitigated by the fact that, as stated previously: 1) these articles remain subject to the Department of Commerce's EUM programs that vet potential end-users of concern, and 2) license applications for CCL items will be approved only if their end-use is permitted under the laws of the importing country.

Multiple commenters expressed concerns that, as a result of the revision of the USML to remove items from Category I, the rule will also remove from the USML the technical data directly related to these items, thereby lifting a purported block on the domestic dissemination of computer-aided design (CAD) files for the three-dimensional (3-D) printing or CAD-enabled production of firearms. Commenters suggested that use of these files in the United States could lead to a potential increase in the number of unserialized firearms in circulation, or the manufacture or distribution of a non-metal firearm otherwise prohibited under federal law. Some commenters also expressed concerns that foreign dissemination of such files could provide adversaries with a military or intelligence advantage.

20

DOC_0079807

The Department considered the concerns of the commenting parties. While the Department concluded that these concerns do not warrant modification to the controls on the USML, the Department of Commerce, as described below, determined that certain modifications to its companion rule are warranted to address similar concerns expressed by commenters to its proposed rule.

As an initial matter, the Department reiterates that the scope of this rulemaking is limited to the Department's delegated authority under the AECA. Neither the AECA nor ITAR expressly provide the Department with authority to regulate the distribution of technical data in the United States to U.S. persons. This applies to all technical data subject to the ITAR, regardless of whether it is for the manufacture of ITAR-controlled firearms or any other defense article. Furthermore, the Department notes that the AECA does not provide the Department with the authority to 1) prohibit the domestic manufacture or possession of firearms, whether produced from CAD files with a 3-D printer or otherwise, or 2) regulate the domestic distribution among U.S. persons of any defense article, including firearms. Domestic activities that do not involve release to foreign persons are generally left to other federal agencies—and the states—to regulate. The

21

manufacture, import, sale, shipment, delivery, transfer, receipt, or possession

of firearms that are undetectable as provided in federal law is a federal

crime, punishable by fine and/or up to five years in prison. 18 U.S.C. §

924(f). Among other statutes, the Undetectable Firearms Act of 1988

prohibits the manufacture, possession, sale, import, shipment, delivery,

receipt, or transfer of undetectable firearms. *See* 18 U.S.C. 922(p).

When determining whether nonautomatic and semi-automatic firearms to

.50 caliber (12.7mm) inclusive should be removed from the USML, and the

technical data directly related thereto, the Department evaluated whether the

hardware and its directly related technical data would confer a critical

military or intelligence advantage or whether they are inherently military

based on their function. The Department made a determination that neither

the hardware nor its directly related technical data met these criteria. In

response to the specific comments related to the potential uses for CAD files

that can be used to 3-D print firearms, the Department confirms that it did

consider the potential uses for these CAD files in its review. The Department

determined, in consultation with the Department of Defense and other

interagency partners, that these CAD files do not confer a critical military or

intelligence advantage and are not inherently military based on their

22

function. This determination took into account the effect that a transfer to the CCL would have on the national security and foreign policy interests of the United States, consistent with the AECA and ITAR, to include the degree to which it would limit the ability of a foreign person to obtain CAD files, publish them on the internet, and subsequently manufacture CCL-controlled firearms, including those that are unserialized or manufactured from a non-metallic material.

Although the Department determined that such hardware and its directly related technical data do not confer a critical military or intelligence advantage or perform an inherently military function for purposes of maintaining inclusion on the USML, the Department agrees with the Department of Commerce that maintaining controls over such exports under the EAR remains in the national security and foreign policy interests of the United States. The Department of Commerce has recognized in its companion rule that concerns raised over the possibility of widespread and unchecked availability of 3-D printing technology and software, the lack of government visibility into production and use, and the potential damage to U.S. counter-proliferation efforts warrant making certain technology and software capable of producing firearms subject to the EAR when posted on

23

the internet, as described in the Department of Commerce's companion rule. The Department agrees that EAR controls on technology and software for firearms previously controlled in USML Category I(a) - and for all other items this rule removes from the USML - sufficiently address the U.S. national security and foreign policy interests relevant to export controls. In sum, while Commerce controls over such items and technology and software are appropriate, continued inclusion of them on the USML is not.

This rule is consistent with broader USML to CCL review efforts. During the multi-year process of reviewing and revising the USML, the Department has exercised its discretion, authorized by delegation in section 38(a)(1) of the AECA, to determine which national security and foreign policy interests warrant consideration within the context of export controls. Under its current standard, the Department assesses the national security and foreign policy interests against factors, such as those discussed above and in other *Federal Register* notices, in assessing whether items merit inclusion on the USML; this analysis has resulted in a number of items previously included in other USML categories being transferred to the EAR (*see, e.g.*, 78 FR 22740 (Apr. 16, 2013), 81 FR 70340 (Oct. 12, 2016)). Through this rule, the Department is now applying this standard to Categories I, II, and III

24

of the USML. As previously noted, the AECA requires periodic review of the USML, and the Department will continue to evaluate technological advancements, including those related to 3-D printing, to inform future revisions to the USML.

One commenter predicted that the rule's effect of removing licensing requirements for temporary imports of the items removed from the USML would create another channel for criminal elements to obtain weapons in the United States. The Department did not receive any further information to support the assertion that the hypothetical diversion of temporary imports of firearms from foreign countries would appreciably bolster criminal access to such items. The Department additionally notes that other departments and agencies possess enforcement capabilities relevant to criminal acquisition of firearms within the United States.

One commenter recommended coordinating proposed changes with ATF so that the corresponding changes are made to the U.S. Munitions Import List (USMIL) at the same time, which would prevent businesses from having to consult both the USML and USMIL when deciding whether a transaction involves brokering. The USML and the USMIL are separate lists of AECA defense articles with both shared as well as different AECA

25

objectives, and as such warrant the retention as separate lists for AECA defense article and control purposes.

**Effective Date**

The Department has determined that the appropriate effective date for this final rule is [INSERT DATE 45 DAYS FROM THE DATE OF PUBLICATION IN THE FEDERAL REGISTER]. The Department notes that the Department has previously articulated a policy of providing a 180-day transition period between the publication of the final rule for each revised USML category and the effective date of the transition to the CCL for items that will undergo a change in export jurisdiction. *See* 78 Fed. Reg. 22,740, 22,747 (Apr. 16, 2013). In addition, some commenters suggested that the final rule should have a delayed effective date or a split effective date for companies of a particular size. However, in consultation with interagency partners, the Department has determined that, based on the nature of the items at issue, a 180-day transition period or a delayed or a split effective date for certain companies is not necessary.

**Revision of Category I**

This final rule renames Category I as "USML Category I—Firearms and Related Articles" (formerly "Category I—Firearms, Close Assault Weapons

26

and Combat Shotguns") and amends the category to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, the amended category does not include non-automatic and semi-automatic firearms to .50 caliber (12.7mm) inclusive, formerly controlled under paragraph (a), and all of the parts, components, accessories, and attachments for those articles. Such items are subject to the new controls in Export Control Classification Numbers 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E502, 0E504, and 0E505, which also includes the items moved from Category II described below. Such controls in Category 0 of the CCL are being published in the companion rule by the Department of Commerce.

Paragraph (a) of amended USML Category I covers firearms that fire caseless ammunition. Paragraph (b) continues to cover fully automatic firearms, which are firearms that shoot more than one bullet by a single function of the trigger, to .50 caliber (12.7mm) inclusive. Paragraph (c) covers firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems, and all weapons previously described in paragraph (c) that remain on the USML are now covered by paragraphs (a), (b) or (c) of this category or by Category II. Specially designed parts and

27

components for the defense articles that remain in paragraph (c) are moved to Category I paragraph (h) of this final rule. This change from the proposed rule is necessary to allow for the designation of the end-item defense articles in paragraph (c) as Significant Military Equipment (SME) whereas the specially designed parts and components therefor are not. Paragraph (d) covers fully automatic shotguns. Paragraph (e) continues to cover silencers, mufflers, and sound suppressors. However, for the same reason as paragraph (c) above, specially designed parts and components for those defense articles in paragraph (e) are moved to paragraph (h) so as not to be designated SME. Flash suppressors are removed from paragraph (e) and are transferred to the CCL. The text of paragraph (f) is removed and the subsection is reserved, thereby removing as a controlled item "[r]iflescopes manufactured to military specifications." However, any firearms sighting device (including riflescopes) that fits within the controls in USML Category XII (*see e.g.,* XII(c)(2) regarding night vison or infrared capabilities) remains subject to the ITAR under that category. Other riflescopes are transferred to the CCL. Paragraph (g) continues to cover barrels, receivers (frames), bolts, bolt carriers, slides, or sears, specially designed for the firearms that remain in Category I. Paragraph (h) covers high capacity (greater than 50 rounds)

28

magazines, and parts and components to convert a semi-automatic firearm into a fully automatic firearm, and accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting. In a change from the proposed rule, this final rule paragraph (h) includes a new paragraph (h)(3) to control parts and components specially designed for defense articles in (c) and (e) as described above. This addition necessitated the renumbering of proposed paragraph (h)(3) to (h)(4) in this final rule. Paragraph (i) covers the technical data and defense services directly related to all of the defense articles in the category as well as classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. This is a change from the proposed rule, in which defense articles in paragraph (c) were inadvertently omitted from the technical data paragraph.

This rule adds a new (x) paragraph to USML Category I, allowing ITAR licensing for all commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category I *and* are described in the purchase documentation submitted with the license application.

29

DOC_0079816

The text of the note to Category I is removed and replaced with a note containing a slightly revised interpretation of the term "firearm," (formerly included at (j)(1)) and to add interpretations of the terms "fully automatic" and "caseless ammunition."

Several commenters requested clarification regarding the proposed Note 1 to USML Category I. The Department determined that the control text of the category sufficiently describes the defense articles to be controlled, and, as a result, the final rule removes the proposed Note 1 to Category I in order to avoid possible confusion.

One commenter recommended changes to the text of paragraph (b) in an effort to avoid potential overlap with other paragraphs in the category. The Department believes these changes are unnecessary because the control text adequately differentiates the controlled defense articles to allow for self-determination. If an exporter or manufacturer requires a definitive determination of category, they may submit a commodity jurisdiction request to DDTC.

Several commenters expressed concern about the designation of certain parts and components in USML Category I as SME. The Department recognizes these concerns, and, in response, the final rule revises the

30

proposed rule by moving the specially designed parts and components for paragraphs (c) and (e) to (h) where they are not designated as SME.

Multiple commenters suggested that the rule should remove firearm sound suppressors (silencers) from paragraph (e) and transfer them to the CCL. The Department recognizes that sound suppressors (silencers) are sold commercially in some jurisdictions, often for use at ranges or for hunting in certain environments, although their availability in retail markets varies significantly within the United States as well as foreign countries. However, sound suppressors (silencers) provide the capability to muffle the sound of weapons fire, which can degrade the ability of an adversary to localize the source of the incoming rounds and return fire or raise an alarm. The Department has determined, in coordination with the interagency, that silencers continue to warrant control on the USML.

One commenter requested clarification regarding paragraph (g) and the barrels, receivers (frames), bolts, bolt carriers, slides, or sears that are common to semi-automatic and automatic firearms on the civilian market. The commenter noted that the lack of clarity arises from the difference between the control text in USML Category I(g) and Note 1 to Category I in the proposed rule. The commenter also requested clarification about which

31

specially designed articles are controlled under this paragraph. The commenter's concerns can be resolved by applying the definition of "specially designed" in ITAR § 120.41(b)(3), as any article that is common to a non-automatic or semiautomatic firearm that is on the CCL (*i.e.*, not on the USML) is not specially designed and thus is not subject to the ITAR (but is subject to the EAR).

One commenter suggested amending the Canadian exemptions located in ITAR § 126.5 to allow exports of receivers and breech mechanisms under paragraph (g). The Department is not revising Supplement No. 1 to ITAR § 126 or the provisions of the Canadian exemptions through this rulemaking. However, the Department is currently undertaking a review of Supplement No. 1 to ITAR Part 126 and any changes will be the subject of a separate rulemaking.

Multiple commenters suggested that paragraph (h)(1) under this rule should exclude high-capacity magazines, *i.e.*, drums or magazines for firearms with a capacity of greater than 50 rounds. The Department recognizes that civilians can purchase magazines and drums with a capacity of greater than 50 rounds; however, these high-capacity magazines provide an inherently military function and warrant continued control on the USML

32

due to their utility in enabling effective use of automatic weapons and combat tactics.

One commenter requested clarification regarding paragraph (h)(3) in order to differentiate the terms "automatic targeting" and "automatic tracking" or "automatic firing." However, the comment did not identify any specific confusion. The Department believes that the control text appropriately describes the capabilities that warrant control, so the final rule does not make any changes to this provision.

One commenter noted that the technical data and defense service control in paragraph (i) did not apply to USML Category I(c) and suggested that the Department include paragraph (c) in the list of paragraphs to which the technical data and defense service controls applies. This was an oversight and final rule paragraph (i) is revised to exclude the paragraph identifiers in the proposed rule. Excluding the paragraph identifiers clarifies that technical data and defense services for all USML Category I articles are controlled.

**Revision of Category II**

This final rule revises USML Category II, covering guns and armament, establishing a bright line between the USML and the CCL for the control of these articles.

33

Most significantly, amended paragraph (j), controlling parts and components, is revised to enumerate the items controlled therein. In a change from the proposed rule explained below, proposed paragraph (j)(10) is revised to clarify that the control applies only to recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms. When reviewing proposed paragraph (j) for this final rule, the Department noted that proposed paragraphs (10) and (13) described related defense articles, as did proposed paragraphs (j)(9) and (j)(11). In order to keep related articles in consecutive paragraphs within the category, the Department reorganized the paragraphs such that the control text of paragraph (10) of the proposed rule is found at paragraph (14) of the final rule and the control text of paragraphs (9) and (11) of the proposed rule are found at paragraphs (10) and (9) of the final rule, respectively. In addition, a new paragraph (12) is added to (j) to clarify that systems and equipment for the defense articles in the category for programming ammunition are controlled on the USML. Where necessary, paragraphs are renumbered to accommodate movement of proposed paragraphs (j)(10) and (9) and the addition of new paragraph (12). The Note to proposed paragraph

34

(j)(9) is also revised from the proposed rule to include reference to mounts for surface vessels and special naval equipment controlled in Category VI.

Amended paragraph (a) enumerates the items controlled in that paragraph. The item formerly covered in paragraph (c) (*i.e.*, apparatus and devices for launching or delivering ordnance) is removed, and defense articles still warranting control on the ITAR are described in new paragraph (a)(4). A new paragraph (a)(5) is added for developmental guns and armaments funded by the Department of Defense and the specially designed parts and components of those items. The item formerly controlled in paragraph (f), (*i.e.*, engines specifically designed or modified for the self-propelled guns and howitzers controlled in paragraph (a)), is removed from the USML and placed on the CCL in ECCN 0A606 pursuant to the companion rule. Tooling and equipment specifically designed or modified for the production of items controlled in USML Category II, formerly in paragraph (g), is also removed from the USML and transferred to the CCL in ECCN 0B602 through the Commerce rule. Test and evaluation equipment and test models, formerly in paragraph (h), is removed from the USML and transferred to the CCL in ECCN 0B602 through the Commerce rule. Certain autoloading systems formerly controlled in paragraph (i) are moved to

35

paragraphs (j)(9) and components therefor to (j)(10) (paragraph (j)(11) of the proposed rule). In a change from the proposed rule explained below, final paragraph (j)(11) now contains a specific reference to "ammunition feeder systems."

This rule adds a new (x) paragraph to USML Category II, allowing ITAR licensing for all commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category II *and* are described in the purchase documentation submitted with the application.

One commenter recommended defining the term "gun" as it is used in both the category title and in paragraph (a)(1). The control text in the proposed rule appropriately described the capabilities that warrant control, and so the final rule does not make any changes in this regard.

One commenter pointed out that U.S law classifies firearms as antique if they were made on or before 1898 and took issue with the usage of the year 1890 in Note 1 to paragraph (a). The Gun Control Act of 1968 does define antique firearms for domestic purposes, in part, as any firearm manufactured in or before 1898. *See* 18 U.S.C. § 921(a)(16)(A). However, as this rule is regarding the export of firearms, it uses the year 1890 in order for the United

36

States to remain consistent with its international export control commitments under the Wassenaar Arrangement, which uses 1890 as the cutoff year to identify many firearms and armaments that are not on the control list.

One commenter requested clarification regarding what is considered to be part of the firing mechanisms listed in paragraph (j)(4) and inquired whether the rule controls electronic firing mechanisms. The language in the rule appropriately describes the capabilities that warrant control and confirms that the control does include electronic firing mechanisms.

One commenter requested a note be added to proposed paragraph (j)(9) (final paragraph (j)(10)) to clarify what constitutes an independently powered ammunition handling system and platform interface components. The control text appropriately describes the capabilities of concern that warrant control and confirms that an independently-powered ammunition handling system need not be external to the gun or platform for the control to apply.

One commenter expressed concern that proposed paragraphs (j)(9) and (j)(11) (final paragraphs (j)(10) and (j)(9), respectively) may capture the same parts and components and recommended deleting proposed paragraph (j)(11) if the paragraphs are redundant. These paragraphs are distinct, as

37

proposed (j)(9) identifies certain components for the end-item ammunition handling system that are controlled and proposed (j)(11) controls the end-item independent ammunition handling system itself. Because these paragraphs are not redundant, the final rule retains both of them. The Department revised proposed paragraph (j)(11) (final paragraph (j)(9)) to clarify its scope in response to this comment.

Proposed paragraph (j)(10) (final paragraph (j)(14)) is revised in this final rule with language limiting recoil systems to those specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms. This revision was made in response to a commenter who highlighted that the language in the proposed rule would have controlled recoil systems solely due to end-use platform and not due to the performance capability.

One commenter suggested that the Department reconcile proposed paragraphs (j)(10) and (j)(13) (final paragraphs (j)(14) and (j)(13), respectively) to prevent an overlap in the control text. Proposed (j)(10) and (j)(13) are adequately differentiated to allow for self-determination. If an exporter or manufacturer requires a definitive determination of category, they may submit a commodity jurisdiction request to DDTC.

38

One commenter submitted a question about whether specific ammunition containers that are independent of a cannon system would be controlled under the proposed paragraph (j)(12) (final paragraph (j)(11)). Although absent a commodity jurisdiction request the Department cannot make a definitive determination, it is unlikely that the ammunition container is controlled because proposed paragraph (j)(12) requires that the ammunition container be specially designed for the gun or armament, not for the ammunition. The control text appropriately describes the capabilities that warrant control, and so the final rule does not make any changes to this provision.

One commenter also recommended adding clarifying language to proposed paragraph (j)(12) (final paragraph (j)(11)) regarding whether "conveyor elements" are intended to relate to large caliber ammunition or medium caliber ammunition. As the control is not limited, it applies to all such systems. To clarify the scope of the control, the Department adds "ammunition feeder systems" to the text of final paragraph (j)(11).

**Revision of Category III**

This final rule renames Category III as "USML Category III—Ammunition and Ordnance" (formerly "Category III—

39

Ammunition/Ordnance") and revises its content to establish a bright line between the USML and the CCL for the control of these articles and to be consistent with the changes to Category I.

Most significantly, paragraphs (a) and (d) are revised to remove broad catch-alls and enumerate the articles controlled therein. For example, paragraph (a), which controls ammunition for articles in USML Categories I and II, is amended to specifically list the ammunition that it controls. In a change from the proposed rule, paragraph (a)(7) regarding ammunition for automatic and superposed (or stacked) guns and firearms is revised to clarify the control text. A new paragraph (a)(10) is added for developmental ammunition funded by the Department of Defense and the parts and components specially designed for such developmental ammunition. In a change from the proposed rule, the SME designator is moved from paragraph (a) in its entirety to only those paragraphs of III(a) warranting control as SME and the SME designation is removed from paragraph (a)(10), to be consistent with the controls on developmental defense articles funded by the Department of Defense in other categories of the USML. Ammunition formerly controlled in paragraph (a) that is not now specifically enumerated in paragraph (a) or captured by paragraph (a)(10) is transferred

40

to the CCL pursuant to the companion rule. Likewise, revised paragraph (d), which controls parts and components, enumerates the items it controls; those parts and components previously captured via the catch-all and not now enumerated are transferred to the CCL.

Additionally, paragraph (c) is removed and placed into reserve. The production equipment and tooling formerly controlled in that paragraph is now controlled by the CCL pursuant to the companion rule.

In a change from the proposed rule, the references to steel tipped ammunition, and hardened core or solid projectiles made of tungsten, steel, or beryllium copper alloys are moved from (d)(1) to paragraph (d)(6) for additional clarity.

This rule adds a new (x) paragraph to USML Category III, allowing ITAR licensing for all commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category III *and* are described in the purchase documentation submitted with the application.

In addition, in this final rule, DDTC revised the format of the notes to Category III from the proposed rule in order to make them consistent with concluding notes to other categories (*see, e.g.*, notes to Category VII). In

41

place of three notes within one heading of "Notes to Category III" as in the proposed rule, this final rule identifies each clearly as Note 1, Note 2, and Note 3.

One commenter highlighted that the placement of the asterisk beside paragraph (a) in the proposed rule created inconsistencies with other USML category provisions concerning developmental defense articles funded by the Department of Defense (DoD). The Department agrees, and the final rule revises the category in order to clarify that DoD-funded developmental ammunition is not SME. In particular, the final rule adds a specific SME identifier to each relevant subcategory and removes one from paragraph (a)(10).

One commenter suggested removing paragraph (a)(2) on the grounds that the underlying commodity does not fundamentally change when it is incorporated into an ammunition link. The control appropriately identifies the object that warrants control (linked or belted ammunition) which are used primarily for automatic weapons. Consequently, the final rule makes no changes to the text of paragraph (a)(2).

One commenter suggested revising proposed paragraph (a)(4) to remove the language "manufactured with smokeless powder" on the grounds that the

42

rule could be interpreted to mean caseless ammunition manufactured with anything besides smokeless powder, which is controlled on the CCL. The Department disagrees because the control text accurately describes the defense article to be controlled. Caseless ammunition that is not manufactured with smokeless powder is not controlled by the subcategory. The Department controls ammunition in paragraph (a)(4) because smokeless powder has higher energy than other propellants and is more readily adapted to a sustained fire.

One commenter suggested removing the articles under paragraphs (a)(5) and (a)(8) and transferring them to the CCL. The Department disagrees, as lightweight and railgun ammunition offer a significant military advantage because lightweight ammunition significantly improves battlefield activities and railguns are a uniquely military capability in which the United States enjoys a critical advantage, in part due to our projectiles, and therefore warrant control on the USML.

One commenter recommended revising paragraph (a)(6) to address the potential redundancy with (a)(1) and to clarify whether the ammunition control parameters in the paragraph are based on the pyrotechnic material, the tracer materials, or the specification that it must be able to be seen by

43

night vision optical systems. While it is possible that there may be some overlap between these controls for specific articles, each control correctly identifies a capability that warrants control on the USML. To clarify the control text, the Department replaces the word "and" in paragraph (a)(6) of the proposed rule with "or" in this final rule to identify that these are separate articles. If an exporter or manufacturer requires a definitive determination of category, they may submit a commodity jurisdiction determination request to DDTC.

One commenter highlighted that paragraph (a)(7) in the proposed rule could be interpreted to cover all ammunition for fully automatic firearms, which could take ammunition currently controlled by the Department of Commerce and change it into SME if for use in a fully automatic firearm. The Department notes this concern and has revised the control to limit the scope of the control to ammunition that is not used with semi or non-automatic firearms (*i.e.*, firearms not on the USML).

One commenter suggested changing the description of "primers" in paragraph (d)(10) to "cap type primers" on the grounds that the provision as written is overly broad. The Department disagrees, as the final rule

44

appropriately reflects the primers that warrant control on the USML. The final rule does not make any changes to this provision.

One commenter assessed that certain production equipment previously controlled on the USML would not be captured by the revised USML Category III or by the corresponding Department of Commerce rule. The Department of Commerce's companion rule to this final rule expands the relevant ECCNs 0B505.a as a control for all production equipment specially designed for USML Category III, and 0B501.e, for all production equipment specially designed for USML Category I.

One commenter expressed concern that paragraph (d)(1) appears to overlap with the control text in paragraphs (a)(1) and (6) and (d)(2) and (6). While it is possible that there may be some overlap between these controls for specific articles, each correctly identifies a capability that warrants control on the USML. To add additional clarity, the Department is removing the reference to steel tipped and core or solid projectiles made from tungsten, steel, or beryllium copper alloys, and addressing those fully in (d)(6). If an exporter or manufacturer requires a definitive determination of category, they may submit a commodity jurisdiction determination request to DDTC.

45

One commenter suggested deleting the word "tracer" from paragraph (d)(2) on the grounds that that would make the provision consistent with (d)(1). Because certain tracer shotgun shells are non-pyrotechnic and warrant control on the USML, no change is made in this final rule.

One commenter suggested deleting "specially designed parts and components" from paragraph (d)(4) on the basis that the language adds duplicative controls on parts that are also subject to the controlled parts in paragraphs (d)(7) and (d)(11). The Department believes that the paragraphs are not duplicative and the language appropriately describes the capabilities that warrant control, so the final rule does not make any changes to this provision.

One commenter recommended adding language to paragraph (d)(6) in the proposed rule to clarify whether the paragraph is intended to capture all armor piercing rounds. The Department did not adopt this recommendation, as the control text adopted in this rule provides objective criteria that more effectively identifies the ammunition types that warrant control on the USML.

Multiple commenters recommend revising paragraph (d)(7). One commenter suggested adding "specially designed for items controlled in

46

USML Category II" to ensure that articles common to those used with non-USML items are not described. The Department agrees and made this change.

One commenter suggested modifying the wording in paragraph (d)(11) to capture all artillery and ammunition fuses and to delete "specially designed parts therefor" to align with bomb fusing wording in Category IV(h)(25). The control correctly identifies a capability warranting control on the USML; fuses and arming and safing devices for Category III articles cover a wider range of sensitive devices that provide the United States with a critical military advantage, separate and apart from the control in Category IV(h)(25), for fuses specific to that category, so the Department is not implementing any change to paragraph (d)(11).

One commenter noted that paragraph (e) controls technical data and defense services directly related to the defense articles controlled in paragraphs (a), (b), and (d) and that technical data and defense services in these areas would not be controlled on the USML as they are already in the public domain. Information that is in the public domain (*see* ITAR § 120.11), is not controlled; however, defense services remain controlled, as would any controlled technical data.

47

**Conforming ITAR Changes**

Additionally, this final rule makes conforming changes to several sections of the ITAR that referred to the control of articles formerly in USML Category I(a). These sections are amended because they all refer to firearms that are now controlled on the CCL. The firearms exemptions formerly at § 123.17(a) through (e) are removed and the subsections reserved as a consequence of the removal from the USML of non-automatic and semi-automatic firearms and their transfer to the CCL. Section 123.17 is renamed "Exemption for personal protective gear" (formerly "Exports of firearms, ammunition, and personal protective gear") to accurately reflect the articles permitted for export without a license by that section. Sections 123.16(b)(2) and (6) are amended to make conforming changes to reflect the removal of the § 123.17 firearms exemptions, as is the policy guidance on Zimbabwe found at § 126.1(s). The text of § 123.18 is removed, as it described exemptions for firearms that are now controlled for export by the Department of Commerce, and the section placed into reserve. The text of § 123.16(b)(7) referencing the removed § 123.18 exemption is also removed and the subsection placed in reserve. In addition, § 124.14(c)(9) is amended to remove the example of "sporting firearms for commercial resale."

48

Section 129.1(b) of the ITAR is amended to clarify that the regulations on brokering activities in part 129 apply to those defense articles and defense services designated as such on the USML and those items described on the USMIL (27 CFR 447.21). Section 129.4 of the ITAR is also amended to clarify brokering requirements for items on the USMIL that are subject to the brokering requirements of the AECA. The articles that are transferred to the CCL for export control purposes, yet are on the USMIL for permanent import control purposes, remain subject to the brokering requirements of part 129 with respect to all brokering activities, including facilitation in their manufacture abroad, permanent import, transfer, reexport, or retransfer. In a change from the proposed rule, this final rule revises slightly the proposed language of § 129.2(b)(2)(vii), renumbers it as (viii), and adds a new paragraph (b)(2)(vii) to that section, in order to definitively exclude from the definition of brokering activities certain domestic activities related to the manufacture of EAR controlled items and their export. The revisions to § 129.4 also clarify that foreign defense articles that are on the USMIL require brokering authorizations.

One commenter asserted that this rule's revisions to § 123.15 will unnecessarily expand congressional notification requirements to parts,

49

components, and accessories under Categories I(e) and I(g). The commenter recommended that § 123.15 be revised to limit the notification requirements to "USML Category I paragraphs (a) through (d)." Contrary to the commenter's assertion, this rule does not extend congressional notification requirements to parts, components, and accessories. Department practice is, and has been, to notify Congress of the proposed exports of all Category I(e) and (g) articles that meet the threshold value requirement of $1,000,000.

One commenter expressed concern that the proposed rule's removal and placement of ITAR § 123.16(b)(7) in reserve could potentially affect the exemption at ITAR § 123.18 regarding firearms for personal use by civilian and active duty members of the U.S. Armed Forces. The Department notes in response that amendatory instruction number 5 of the proposed rule directed the removal and reserving of paragraph (b)(7) of § 123.16. In order to eliminate any confusion regarding this action, the final rule includes exemplary text showing the subsection as reserved.

Several commenters suggested raising the value of the low value shipment exemption in ITAR § 123.17(a) from $100 to $500 because although the rule's changes increase the eligible amount, they then reduce it by shifting the definition of value from wholesale to selling price. The

50

Department appreciates this suggestion, but notes in response that amendatory instruction 6 of the proposed and final rules directs the removal of ITAR § 123.17(a).

One commenter noted that the current language in ITAR § 125.4(b)(6) refers to "…firearms not in excess of caliber .50 and ammunition for such weapons…" and suggested a review to ensure consistency with language in other areas of the ITAR. The Department appreciates the commenter's suggestion and directs the commenter's attention to the Note to Category I of the final rule, paragraph (1), which uses a similar description to the one in ITAR § 125.4(b)(6) and which has been present since the 2003 CFR. The Department believes the regulated community clearly understands caliber demarcation and declines to make changes at this time. The Department notes the commenter's concern for future consideration.

Multiple commenters expressed concerns that this rule would remove license requirements for brokers, or potentially relinquish enforcement authority over brokers. The Department asserts that this rule makes no changes to the statutory requirements for the registration and licensing of brokers, which remain the same under section 38(b)(1)(A)(ii) of the AECA (*see* 28 U.S.C. § 2778) and are implemented through ITAR part 129, which

51

will continue to apply to all firearms listed on the USMIL in addition to those on the USML. Regarding enforcement, the Department retains its civil enforcement capacity for violations of the ITAR, including all articles subject to the brokering regulations, and the Department of Commerce retains its civil enforcement authority over items subject to its jurisdiction. Additionally, the Department of Justice retains the ability under separate authorities to prosecute persons criminally for violations involving firearms on the CCL or for brokering violations under the AECA.

One commenter expressed concern that this rule will create a double licensing requirement because the scope of "brokering activities" requiring registration, fee payments, and licensing under ITAR part 129 includes many types of activities that occur before the Department of Commerce will issue a license. The Department does not intend to impose a double licensing requirement for individuals undertaking activities on behalf of another to facilitate a transaction that will require licensing by the Department of Commerce. Therefore, the Department is revising the proposed § 129.2(b)(2)(vii) and adding a new (b)(2)(viii) to clarify that activities to facilitate the domestic manufacture or export of items subject to the EAR are

52

not brokering under the ITAR and do not require authorization or registration.

One commenter requested clarification regarding whether "brokering activities" as defined in § 129.2(b)(2) apply to activities to facilitate the manufacture, export, permanent import, transfer, reexport, or retransfer of items designated on the USMIL. The Department directs the commenter to the preambles of the proposed rule and this final rule, which state the regulations in part 129 apply to both USML and USMIL defense articles and defense services.

One commenter requested clarification regarding whether the proposed rule's revision to § 129.2(b)(2)(vii) would apply not only to items currently controlled in USML Categories I, II, and III, or to all items on the USMIL that are currently subject to the EAR (*i.e.*, to include 600 series items previously transferred to the EAR). The commenter also recommended specifying whether the paragraph (b)(2)(vii) exclusion would apply to activities related to exports, reexports, or transfers of an items subject to the EAR that does not require use of an EAR license or license exception (*i.e.*, No License Required (NLR)). The commenter assessed that the language at (b)(2)(vii) appears to provide a broad carve-out to the brokering activities

53

DOC_0079840

definition. The commenter also requested clarification regarding whether the language was intended to convey that any ITAR or EAR approval for the items in question is sufficient to meet this criteria and that the approvals do not have to list the specific consignees or end-users for the future export, reexport, or transfer. The Department confirms that new provisions in § 129.2(b)(2)(vii) and (viii) apply to all items subject to the EAR, not just those that transitioned from USML Categories I, II or III, to the extent that other items subject to the EAR are also included on the USMIL. These provisions also clarify the use of the NLR designation and revise the scope of the exclusion from brokering activities to include those activities that are controlled by the Department of Commerce.

**Regulatory Analysis and Notices**

*Administrative Procedure Act*

The Department of State is of the opinion that controlling the import and export of defense articles and services is a military or foreign affairs function of the United States government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this final rule is exempt from the rulemaking provisions of

54

the APA, the Department published this rule as a proposed rule (83 FR 24198) with a 45-day provision for public comment and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function.

*Regulatory Flexibility Act*

Since the Department is of the opinion that this final rule is exempt from the rulemaking provisions of 5 U.S.C. 553, it does not require analysis under the Regulatory Flexibility Act.

*Unfunded Mandates Reform Act of 1995*

This amendment does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Small Business Regulatory Enforcement Fairness Act of 1996*

This rulemaking has been found not to be a major rule within the meaning of the Small Business Regulatory Enforcement Fairness Act of 1996.

55

*Executive Orders 12372 and 13132*

This rulemaking will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this rulemaking does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this rulemaking.

*Executive Orders 12866 and 13563*

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). The Department believes that the benefits of this rulemaking largely outweigh any costs, in that many items currently controlled on the more-restrictive USML are being moved to the CCL.

56

Executive Order 13563 emphasizes the importance of considering both benefits and costs, both qualitative and quantitative, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget (OMB).

The Department believes the effect of this rule will decrease the number of license applications submitted to the Department under OMB Control No. 1405-0003 by approximately 10,000 annually, for which the average burden estimates are one hour per form, which results in a burden reduction of 10,000 hours per year.

The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the Department are eligible for license exceptions or otherwise not require a separate license under the EAR. The Department of Commerce estimates that 6,000 transactions require an individual validated license. The Department of Commerce collects the information necessary to process license applications under OMB Control No. 0694-0088. The Department of Commerce estimates that each manual or electronic response to that information collection takes approximately 43.8 minutes. The

57

Department of Commerce estimates that the 6,000 licenses constitute a burden of 4,380 hours for this collection.

The Department estimates a reduction in burden of 10,000 hours due to the transition of these items to the Department of Commerce. The Department of Commerce estimates that the burden of submitting license applications for these items to the Department of Commerce is 4,380 burden hours. Therefore, the net burden is reduced by 5,620 hours. The Department estimates that the burden hour cost for completing a license application is $44.94 per hour. Therefore, the estimated net reduction of 5,620 burden hours per year is estimated to result in annual burden hour cost reduction of $252,562.80.

In addition to the reduction in burden hours, there are direct cost savings to the State Department that result from the 10,000 license applications no longer required under the ITAR for items transferred to the EAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration

58

fees with the cost of licensing, compliance and other related activities. The Department of Commerce will incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to exporters under the EAR and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications. Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR will result in a direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they will no longer pay fees to the State Department and there is no fee charged by the Department of Commerce to apply for a license.

*Estimated Cost Savings*

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from Executive Order 13771 (82 FR 9339, February 3, 2017). Although the Department is of the opinion that this final rule is exempt from

59

E.O. 13771 and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, this rule is an E.O. 13771 deregulatory action. The Department has conducted this analysis in close consultation with the Department of Commerce.

The total cost savings will be $1,376,281 in present (2017) dollars. To allow for cost comparisons under E.O. 13771, the value of these costs savings in 2016 dollars is $1,353,574. Assuming a 7% discount rate, the present value of these cost savings in perpetuity is $19,336,771. Since the costs savings of this rule are expected to be permanent and recurring, the annualized value of these cost savings is also $1,353,574 in 2016 dollars.

*Executive Order 12988*

The Department of State reviewed this rulemaking in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

*Executive Order 13175*

The Department of State determined that this rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not preempt tribal law. Accordingly, Executive Order 13175 does not apply to this rulemaking.

60

DOC_0079847

*Paperwork Reduction Act*

Notwithstanding any other provision of law, no person is required to respond to, nor is subject to a penalty for failure to comply with, a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

The Department of State believes there will be a reduction in burden for the following forms: OMB Control No. 1405-0003, Application/License for Permanent Export of Unclassified Defense Articles and Related Unclassified Technical Data; OMB control number 1405-0092, Application for Amendment of a DSP-5 License; OMB control number 1405-0013, Application/License for Temporary Import of Unclassified Defense Articles; OMB control number 1405-0092, Application for Amendment to a DSP-61 License ; OMB control number 1405-0023, Application/License for Temporary Export of Unclassified Defense Articles; OMB control number 1405-0092, Application for Amendment to a DSP-73 License ; OMB control number 1405-0022, Application/License for Permanent/ Temporary Export or Temporary Import of Classified Defense Articles and Related Classified Technical Data; OMB control number 1405-0174, Request for Advisory

61

DOC_0079848

Opinion; and OMB control number 1405-0173, Request To Change End User, End Use and/or Destination of Hardware. This form is an application that, when completed and approved by Department of State, constitutes the official record and authorization for the commercial export of unclassified U.S. Munitions List articles and technical data, pursuant to the AECA and ITAR. For an analysis of the reduction in burden for OMB Control No. 1405-0003, see the above Section for E.O. 12866.

The proposed version of this rule referenced only the first of these forms. However, subsequent its release, the Department of State submitted the remaining eight forms for public notice via Federal Register Public Notice 10646 on February 12, 2019. As such, this final rule is being amended to reflect all nine forms associated with the changes reflected in this rule.

**List of Subjects in 22 CFR Parts 121, 123, 124, 126, and 129**

Arms and munitions, Exports.

Accordingly, for the reasons set forth above, title 22, chapter I, subchapter M, parts 121, 123, 124, 126, and 129 are amended as follows:

**PART 121–THE UNITED STATES MUNITIONS LIST**

1. The authority citation for part 121 continues to read as follows:

62

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920; Section 1261, Pub. L. 112-239; E.O. 13637, 78 FR 16129.

2. Section 121.1 is amended by revising U.S. Munitions List Categories I, II, and III to read as follows:

## § 121.1 The United States Munitions List.

\* \* \* \* \*

### Category I—Firearms and Related Articles

*(a) Firearms using caseless ammunition.

*(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.

*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms).

*Note to paragraph (c):* Integration does not include only attaching to the firearm or rail.

*(d) Fully automatic shotguns regardless of gauge.

*(e) Silencers, mufflers, and sound suppressors.

(f) [Reserved]

(g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this

63

category.

(h) Parts, components, accessories, and attachments, as follows:

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm;

(3) Parts and components specially designed for defense articles described in paragraphs (c) and (e); or

(4) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(j)–(w) [Reserved]

64

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note to Category I:* The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant;

(2) A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger; and

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

**Category II—Guns and Armament**

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:

*(1) Guns, howitzers, artillery, and cannons;

65

*(2) Mortars;

*(3) Recoilless rifles;

*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (12.7 mm); (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated **[INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER]**, or later.

66

*Note 1 to paragraph (a):* This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602; or black powder guns and armaments manufactured earlier than 1890.

*Note 2 to paragraph (a):* Guns and armament when integrated into their carrier (*e.g.*, surface vessels, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flamethrowers with an effective range greater than or equal to 20 meters.

(c) [Reserved]

*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

*Note to paragraph (d):* Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses

67

larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices).

(f)–(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

68

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(10) Components for independently powered ammunition handling systems and platform interface, as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

*Note to paragraph (j)(10):* For weapons mounts specially designed for surface vessels and special naval equipment, *see* Category VI. For weapons mounts specially designed for ground vehicles, *see* Category VII.

(11) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, ammunition feeder systems, and ammunition

69

container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Systems and equipment for the guns and armament controlled in paragraphs (a) and (d) of this category for use in programming ammunition, and specially designed parts and components therefor;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(15) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(16) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

70

DOC_0079857

*(17) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(l)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

71

DOC_0079858

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Category III—Ammunition and Ordnance**

(a) Ammunition, as follows:

*(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

*(2) Ammunition preassembled into links or belts;

*(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

*(4) Caseless ammunition manufactured with smokeless powder;

*Note to paragraph (a)(4):* Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

*(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

72

*(6) Ammunition employing pyrotechnic material in the projectile base or any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

*(7) Ammunition for fully automatic firearms that fire superposed or stacked projectiles or for guns that fire superposed or stacked projectiles;

*(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

*(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition: (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

DOC_0079860

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated **[INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER]**, or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary or explosive;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

74

*Note to paragraph (d)(2):* This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Projectiles that employ tips (*e.g.*, M855A1 Enhanced Performance Round (EPR)) or cores regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases specially designed for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

75

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note to paragraph (d)(10):* This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant

76

thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(f)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note 1 to Category III:* This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

77

DOC_0079864

*Note 2 to Category III:* This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

*Note 3 to Category III:* Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

* * * * *

## PART 123–LICENSES FOR THE EXPORT OF DEFENSE ARTICLES

3. The authority citation for part 123 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2753; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec 1205(a), Pub. L. 107–228; Sec. 520, Pub. L. 112–55; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

4. Section 123.15 is amended by revising paragraph (a)(3) to read as follows:

**§ 123.15 Congressional certification pursuant to Section 36(c) of the Arms Export Control Act.**

(a) * * *

DOC_0079865

(3) A license for export of defense articles controlled under Category I paragraphs (a) through (g) of the United States Munitions List, § 121.1 of this subchapter, in an amount of $1,000,000 or more.

* * * * *

5. Section 123.16 is amended by revising paragraphs (b)(2) introductory text and (b)(6) and removing and reserving paragraph (b)(7) to read as follows:

§ 123.16 **Exemptions of general applicability.**

* * * * *

(b) * * *

(2) Port Directors of U.S. Customs and Border Protection shall permit the export of parts or components without a license when the total value does not exceed $500 in a single transaction and:

* * * * *

(6) For exemptions for personal protective gear, refer to § 123.17.

(7) [Reserved]

* * * * *

6. Section 123.17 is amended by revising the section heading, removing and reserving paragraphs (a) through (e), and revising paragraph (j) to read as follows:

79

## § 123.17 Exemption for personal protective gear.

\* \* \* \* \*

(j) If the articles temporarily exported pursuant to paragraphs (f) through (i) of this section are not returned to the United States, a detailed report must be submitted to the Office of Defense Trade Controls Compliance in accordance with the requirements of § 127.12(c)(2) of this subchapter.

\* \* \* \* \*

## § 123.18 [Removed and Reserved]

7. Section 123.18 is removed and reserved.

## PART 124–AGREEMENTS, OFF-SHORE PROCUREMENT, AND OTHER DEFENSE SERVICES

8. The authority citation for part 124 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; 22 U.S.C. 2776; Section 1514, Pub. L. 105–261; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

9. Section 124.14 is amended by revising paragraph (c)(9) to read as follows:

DOC_0079867

### § 124.14 Exports to warehouses or distribution points outside the United States.

\* \* \* \* \*

(c) \* \* \*

(9) Unless the articles covered by the agreement are in fact intended to be distributed to private persons or entities (*e.g.*, cryptographic devices and software for financial and business applications), the following clause must be included in all warehousing and distribution agreements: "Sales or other transfers of the licensed article shall be limited to governments of the countries in the distribution territory and to private entities seeking to procure the licensed article pursuant to a contract with a government within the distribution territory, unless the prior written approval of the U.S. Department of State is obtained."

\* \* \* \* \*

### PART 126–GENERAL POLICIES AND PROVISIONS

10. The authority citation for part 126 continues to read as follows:

**Authority:** Secs. 2, 38, 40, 42 and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791 and 2797); 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p.899; Sec. 1225, Pub. L.

DOC_0079868

108–375; Sec. 7089, Pub. L. 111–117; Pub. L. 111–266; Section 7045, Pub. L. 112-74; Section 7046, Pub. L. 112-74; E.O. 13637, 78 FR 16129.

11. Section 126.1 is amended by revising paragraph (s) to read as follows:

**§ 126.1 Prohibited exports, imports, and sales to or from certain countries.**

* * * * *

(s) *Zimbabwe.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Zimbabwe, except that a license or other approval may be issued, on a case-by-case basis, for the temporary export of firearms and ammunition for personal use by individuals (not for resale or retransfer, including to the Government of Zimbabwe).

* * * * *

**PART 129—REGISTRATION AND LICENSING OF BROKERS**

12. The authority citation for part 129 continues to read as follows:

**Authority**: Section 38, Pub. L. 104–164, 110 Stat. 1437, (22 U.S.C. 2778); E.O. 13637, 78 FR 16129.

13. Section 129.1 is amended by revising paragraph (b) to read as follows:

82

## § 129.1 Purpose.

\* \* \* \* \*

(b) All brokering activities identified in this subchapter apply equally to those defense articles and defense services designated in § 121.1 of this subchapter and those items designated in 27 CFR 447.21 (U.S. Munitions Import List).

14. Section 129.2 is amended by:

a. In paragraph (b)(2)(v), removing the word "or" at the end of the paragraph;

b. Removing the period at the end of paragraph (b)(2)(vi) and adding ";" in its place; and

c. Adding paragraphs (b)(2)(vii) and (viii).

The addition reads as follows:

## § 129.2 Definitions.

\* \* \* \* \*

(b) \* \* \*

(2) \* \* \*

(vii) Activities by persons to facilitate the manufacture in the United States or export of an item subject to the EAR; or

83

(viii) Activities by persons to facilitate the reexport, or transfer of an item subject to the EAR that has been approved pursuant to a license, license exception, or no license required authorization under the EAR or a license or other approval under this subchapter.

* * * * *

15. Section 129.4 is amended by revising paragraphs (a)(1) and (a)(2)(i) to read as follows:

## § 129.4 Requirement for approval.

(a) * * *

(1) Any foreign defense article or defense service enumerated in part 121 of this subchapter (*see* § 120.44 of this subchapter, and § 129.5 for exemptions) and those foreign origin items on the U.S. Munitions Import List (*see* 27 CFR 447.21); or

(2) * * *

(i) Firearms and other weapons of a nature described by Category I(a) through (d), Category II(a) and (d), and Category III(a) of § 121.1 of this subchapter or Category I(a) through (c), Category II(a), and Category III(a) of the U.S. Munitions Import List (*see* 27 CFR 447.21);

* * * * *

84

16. Section 129.6 is amended by revising paragraph (b)(3)(i) to read as follows:

**§ 129.6 Procedures for obtaining approval.**

* * * * *

 (b) * * *

 (3) * * *

 (i) The U.S. Munitions List (*see* § 121.1 of this subchapter) or U.S. Munitions Import List (*see* 27 CFR 447.21) category and sub-category for each article;

* * * * *

Michael R. Pompeo,
*Secretary of State.*


**Billing Code 4710-25**

85

DOC_0079872

Billing Code: 3510-33-P

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**15 CFR Parts 732, 734, 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774**

**[Docket No. 191107-0079]**

**RIN 0694-AF47**

**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**

**AGENCY:** Bureau of Industry and Security, Department of Commerce.

**ACTION:** Final rule.

**SUMMARY:** On May 24, 2018, the Department of Commerce published a proposed rule in conjunction with a Department of State proposed rule to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armaments), and III (ammunition/ordnance) of the USML and transfer items that no longer warrant control on the USML to the Commerce Control List (CCL). This final rule responds to and adopts changes based on the comments received on the Commerce proposed rule and is being published simultaneously with a final rule by the Department of State that will revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list. These revisions complete the

DOC_0080994

initial review of the USML that the Department of State began in 2011 and the conforming changes made to the EAR to control these items not warranting control under the ITAR.

**DATES:** This rule is effective [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

**FOR FURTHER INFORMATION CONTACT:** Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482-1641 or e-mail steven.clagett@bis.doc.gov.

**SUPPLEMENTARY INFORMATION:**

**Background**

On May 24, 2018, the Department of Commerce (referred to henceforth as "the Department") published the proposed rule, *Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)* (83 FR 24166) (referred to henceforth as the "Commerce May 24 rule") in conjunction with a Department of State proposed rule to revise Categories I, II, and III of the USML (referred to henceforth as the "State May 24 rule"). The Department of Commerce is issuing this final rule that describes how articles the President determines no longer warrant control under USML Category I – Firearms, Close Assault Weapons and Combat Shotguns; Category II – Guns and Armament; and Category III – Ammunition/Ordnance will be controlled on the CCL of the Export Administration Regulations (EAR) and is being published in conjunction with a final rule on Categories I, II, and III from the Department of State, Directorate of Defense Trade Controls (DDTC), completing the initial review of the USML that

2

began in 2011 and making conforming changes to the EAR to control these items on the Commerce Control List (CCL).

The changes described in this final rule and in the State Department's companion final rule on Categories I, II, and III of the USML are based on a thorough interagency review of those categories, after which the Department of State concluded that the items added to the CCL in this final rule do not provide a critical military or intelligence advantage to the United States and, in the case of firearms, do not have an inherently military function. The Departments of Defense, State, and Commerce have, therefore, determined that the EAR is the appropriate source of authority to control these firearms, ammunition, and other articles previously controlled under Categories I-III of the USML. There is a significant worldwide market for items in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities.

This final rule does not deregulate the transferred items. BIS will require authorization to export or reexport to any country a firearm or other weapon that is being moved from the USML to the CCL by this final rule, including releases of related technology and software to foreign persons in the United States. Rather than decontrolling firearms and other items, in publishing this final rule, BIS, working with the Departments of Defense and State, is continuing to ensure that appropriate regulatory oversight will be exercised over exports, reexports, and transfers (in-country) of these items while reducing the procedural burdens and costs of export compliance on the U.S. firearms industry and allowing the U.S. Government to make better use of its export control resources.

DOC_0080996

Certain software and technology capable of producing firearms when posted on the internet under specified circumstances is being controlled under this final rule in order to protect important U.S. national security and foreign policy interests; however, communication of ideas regarding such software or technology is freely permitted. Moreover, nothing in this final rule prohibits U.S. persons within the United States from acquiring firearms of any type—there are other laws and regulations that control the acquisition of firearms in the U.S.

Structure of 600 series

BIS has created Export Control Classification Numbers (ECCNs), referred to as the "600 series," to control items that will be removed from the USML and controlled under the CCL, or items from the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (Wassenaar Arrangement Munitions List or WAML) that are already controlled elsewhere on the CCL.

These ECCNs are referred to as the "600 series" because the third character in each of the new ECCNs is "6." The first two characters of the "600 series" ECCNs serve the same function as any other ECCN as described in § 738.2 of the EAR. The first character is a digit in the range 0 through 9 that identifies the Category on the CCL in which the ECCN is located. The second character is a letter in the range A through E that identifies the product group within a CCL Category. With few exceptions, the final two characters identify the WAML category that covers items that are the same or similar to items in a particular "600 series" ECCN. Category II of the USML and category ML2 of the WAML cover large caliber guns and other military weapons such as: howitzers, cannon, mortars, anti-tank weapons, projectile launchers, military flame throwers, and recoilless rifles.

4

Items that are currently controlled in Category II of the USML will be controlled on the CCL under four new "600 series" ECCNs. Placement of the items currently in USML Category II into the CCL's 600 series is consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML will be controlled in new ECCNs in which the third character is a "5." These items are not appropriate for 600 series control because, for the most part, they have civil, recreational, law enforcement, or other non-military applications. As with 600 series ECCNs, the first character represents the CCL category, the second character represents the product group, and the final two characters represent the WAML category that covers items that are the same or similar to items in the ECCN.

Relation to USMIL

Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import, or that are subject to brokering controls, are part of the USML under the AECA. All references to the USML in this final rule are to the list of defense articles that are controlled for purposes of export, temporary import, or brokering pursuant to the International Traffic in Arms Regulations (ITAR), 22 CFR parts 120 through 130, and not to the list of AECA defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. All defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the

DOC_0080998

EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under section 38 of the AECA, 22 U.S.C. 2778, for purposes of permanent import or brokering controls.

## Overview

For the Commerce May 24 rule, BIS received nearly 3,000 comments and posted 1,540 unique comments and 135 bulk comments, which were representative of issues raised by 1,256 commenters. BIS appreciates the constructive comments it received to improve the Commerce May 24 rule and incorporated changes where appropriate. BIS also received many comments that were outside the scope of the Commerce May 24 rule and thus that are not addressed here. The Commerce May 24 rule and this final rule address U.S. export controls. BIS does not regulate the domestic sale or use of firearms in the United States, or the transfer of firearms or related software or technology between U.S. persons within the United States.

BIS reviews the comments it received in the preamble to this final rule in three parts. First, BIS describes the comments of general applicability. Then, it describes the comments received on specific proposed provisions included in the Commerce May 24 rule. Finally, this final rule describes the changes being adopted from the proposed rule and revisions being made to what was proposed in the Commerce May 24 rule. As this final rule is being published in conjunction with the companion Department of State rule, the preamble may also reference the State Department's analysis related to these changes.

## COMMENTS OF GENERAL APPLICABILITY

## USML Review Criteria

6

*Comment 1:* Multiple commenters took issue with the proposed transfer from the USML to the CCL of weapons that the Department of State determined, in conjunction with its interagency partners (including BIS), are not inherently for military end use, citing the fact that military and law enforcement personnel regularly use them. Many commenters asserted that being commercially available is not a good indicator of whether these weapons merit the oversight of the Department of State. In addition, several commenters disputed that the U.S. market should be the basis for assessing the commercial availability of firearms, as this is not the market to which the proposed rule would be directed. Many commenters also asserted that semi-automatic weapons should not be seen as just another product to be promoted, bought, and sold like washing machines or any other consumer product. Commenters supportive of the rule, however, agreed that export controls of commercial firearms and ammunition which are not inherently military, have no critical military or intelligence advantage, and have predominant commercial applications correctly belong under the EAR.

*BIS response:* The fact that a military uses a specific piece of hardware is not a dispositive factor when determining whether it has an inherently military function. Given that the majority of the items referenced in these comments that will transfer to the CCL through this final rule are widely available in retail outlets in the United States and abroad, and widely utilized by the general public in the United States, it is reasonable for the Department of State to determine that they do not serve an inherently military function, absent specific characteristics that provide military users with significantly enhanced utility, such as automatic weapons, sound suppressors, and high capacity magazines.

With respect to revisions of Categories I-III, the review was focused on identifying the defense articles that are now controlled on the USML that are either (i) inherently military and

otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States. If a defense article satisfies one or both of those criteria, it remained on the USML. For example, while the U.S. military supplies some of its service members with sidearms for military use, a sidearm also has many uses outside of the military, such that its function is not inherently military and therefore a sidearm does not warrant control on the USML. Alternatively, squad automatic weapons do not generally have such non-military uses and will remain controlled on the USML. Any single non-military use, however, does not negate such a weapon's inherently military function.

BIS notes that the scope of items "subject to the EAR," includes basic commercial items, dual-use items, and military items not warranting ITAR control. The EAR control structure is well-suited to control this range of items, and BIS has particular historical expertise in controlling dual-use items. The Departments of State and Commerce also recognize that there are variations in commercial availability of firearms, but these variations do not overcome the Department of State's assessment that the subject firearms do not provide a critical military or intelligence advantage such that they warrant control under the ITAR. In addition, all exports of firearms are subject to the laws of the importing country, and the U.S. Government does not issue licenses for exporters to ship firearms to countries where the end use is illegal.

_Comment 2_: Many commenters asserted that many semi-automatic rifles are easily converted to fully automatic firearms and for this reason semi-automatic firearms and the parts and components needed to do this should be retained on the USML.

8

_BIS response_: BIS agrees that certain components may be used to convert a semi-automatic firearm into a fully automatic firearm. A fully automatic weapon is subject to the ITAR. The component(s) needed to turn a semi-automatic into a fully automatic are also retained on the USML. Therefore, the export of the component needed to turn the semi-automatic into a fully automatic would require an ITAR license or other approval. In addition, if the ITAR component was incorporated into the semi-automatic firearm, the now automatic weapon would be regulated by the ITAR as an automatic weapon and because of the inclusion of the ITAR component within the firearm. To address exports of semi-automatic firearms intended to be made automatic with a foreign-origin component that was not subject to the ITAR, BIS as a result of this comment has revised § 740.2 in this final rule to restrict the use of EAR license exceptions involving these components or parts, as described below in the regulatory changes made in this final rule.

**Commerce's Mission and the Regulation of Firearms**

_Comment 3_: Many commenters expressed concerns about the role and function of BIS regarding the items that are transferred from the USML to the CCL. Some commenters expressed concerns that BIS has neither the appropriate resources nor the appropriate expertise or mission to process associated applications for exports of firearms. Several commenters asserted BIS is not set up for the proper vetting of those parties in export transactions to ensure that they are not acting as middlemen for terrorists or other subversive entities that will use them against our troops or our allies or, even worse, civilian populations. Several other commenters asserted that BIS's enforcement office, with no staff in Latin America, Africa, or many other parts of the world, is not equipped to take the same level of preventive measures for end-use controls. Many

DOC_0081002

commenters asserted that the transfer of these firearms to Commerce control is inconsistent with the statutory framework enacted by Congress to regulate the export of arms.

*BIS response:* The mission of BIS is to advance U.S. national security, foreign policy, and economic objectives by ensuring an effective export control and treaty compliance system and promoting continued U.S. strategic technology leadership. BIS controls many items on the CCL that implement U.S. commitments to the Wassenaar Arrangement and other multilateral regimes related to national security. These controls are supplemented by U.S. controls on additional items as well as broad catch-all controls targeting end uses and end users of concern.

BIS licenses are subject to an interagency review process that includes review by the Departments of State, Defense, and Energy, which allows BIS to supplement its technical expertise with that of its interagency partners on matters of national security, foreign policy, regional stability, and national defense. The interagency review process for Commerce licenses is specified in Executive Order 12981 and in part 750 of the EAR. The well-established and transparent interagency review process (including specifying the timelines for each step of the review process) ensures that a variety of perspectives and expertise from these U.S. Government agencies are able to inform the Commerce license review process to ensure only those exports that are consistent with U.S. export control interests will be approved. BIS also emphasizes that it has flexibility in how it approves licenses and can include additional safeguards as may be warranted. The interagency review process also helps to inform how licenses are approved.

BIS has decades of experience licensing firearms and related items that has prepared it well for licensing these additional firearms and related items that this final rule moves to the CCL. BIS is also prepared because of its experiences with licensing other items that have moved from the USML to the CCL, including such sensitive items as components "specially designed"

10

for use in military aircraft, and certain "spacecraft," including satellites, and space vehicles. In addition, BIS estimates that existing staff will be able to manage the anticipated increased workload of approximately 6,000 additional license applications.

In addition to its experience in the licensing arena, BIS has substantial law enforcement experience. BIS's Export Enforcement (EE) is a dedicated law enforcement organization recognized for its expertise, professionalism, integrity, and accomplishments. EE accomplishes its mission through preventive and investigative enforcement activities and then, pursuing appropriate criminal and administrative sanctions against export violators. EE works with the Department of Justice to impose criminal sanctions for violations, including incarceration and fines, and with the Office of Chief Counsel for Industry and Security to impose civil fines and denials of export privileges. EE also works closely with other federal law enforcement agencies, including the Federal Bureau of Investigation and the Department of Homeland Security, when conducting investigations or preventative actions.

EE has Export Control Officers (ECOs) in offices that cover different regions of the world and are not limited to the specific country in which the EE personnel are located. The ECOs are supplemented by other personnel who engage in enforcement-related activities. For example, BIS regularly sends BIS enforcement agents on temporary duty assignments overseas under the Sentinel Program where they go to areas not easily covered by existing ECOs. BIS also works with certain foreign governments on enforcement as well as transshipment issues. In conducting pre-license checks or post shipment verifications, BIS also uses the resources the Department has with various Foreign Commercial Service (FCS) officers that are located at embassies and consulates around the world. Upon BIS's request, Department of State Foreign

DOC_0081004

Service Officers at embassies and consulates often assist BIS with pre-license checks when the FCS is not present.

BIS has resources it and the other agencies use to identify parties of concern to transactions, not all of which are public. The information BIS and other agencies use to vet licenses and transactions is not static and is being continuously improved to better target and exclude entities or individuals that should not be receiving items subject to the EAR.

BIS also notes that this final rule imposes a requirement to file Electronic Export Information (EEI) in Automated Export System (AES) for nearly all exports of firearms being moved to the CCL. The EAR includes robust recordkeeping requirements that have been enhanced further for the firearms being moved to the CCL. BIS can and does on a regular basis contact parties to a transaction to request all records related to a particular export or reexport or series of exports or reexports. These record requests may also involve in-person visits from representatives of EE.

BIS does not agree that the controls will be inconsistent with the statutory framework enacted by Congress to regulate the export of firearms. The firearms that warrant ITAR control will continue to be subject to the AECA and its requirements as applicable. The firearms not warranting ITAR control that this final rule will control under the EAR will be subject to the Export Control Reform Act of 2018 (ECRA) (50 U.S.C. 4801-4852). For example, BIS has regulated long barrel shotguns (a type of firearm) under the statutory framework enacted by Congress in the earlier Export Administration Act (EAA) and now under ECRA. The same will be true for the firearms that this final rule adds to the CCL. Congress stated that one of the purposes of ECRA is "[t]o control the release of items for use in – (i) the proliferation of …

12

conventional weapons; (ii) the acquisition of destabilizing numbers or types of conventional weapons; (iii) acts of terrorism…" 50 U.S.C. 4811(2)(A).

*Comment 4:* One commenter asserted that BIS does not have resources to enforce export controls, even before the addition of 30,000 firearms export licenses as a result of this rule predicted by the Commerce May 24 rule.

*BIS response:* BIS clarifies here that the reference to 30,000 licenses in the Commerce May 24 rule represented the increase as a result of the total USML to CCL review process, not solely the USML Categories I-III items. The estimate of 10,000 licenses is the number of anticipated State licenses that will be impacted by the transfer to Commerce in the Commerce May 24 rule. The larger 30,000 number was included for context for the overall USML to CCL review process and its implementation. As noted in the response to Comment 3 above, BIS estimates the transfer resulting in approximately 6,000 license applications. BIS has invested considerable effort in assessing the increased licensing and enforcement responsibilities that will be incurred following publication of this final rule and has determined that it is within its means and resources to effectively administer the subject export controls.

**The Effect of the Shift in Regulatory Jurisdiction of Certain Firearms**

*Comment 5:* Several commenters asserted that reducing regulations on firearms and ammunition is dangerous. One commenter asserted that moving firearms to the CCL where they would be subject to loosened controls seems inconsistent with enhancing national security. Another commenter asserted that as even the National Rifle Association (NRA) has acknowledged, "items on the USML controlled under ITAR are generally treated more strictly, whereas regulation under the CCL is more flexible." Many commenters asserted that the proposal

13

weakens controls over semi-automatic assault weapons including AR-15s and AK-47s, 50 caliber sniper rifles, and high-capacity ammunition magazines.

*BIS response:* The EAR control structure is more flexible and will reduce the burden on the regulated, but the items will still be controlled. For example, the EAR is a more flexible control structure because it does not require a purchase order for a license. This is more efficient and flexible than the ITAR but does not undermine U.S. national security. The applicant still needs to specify the parties to the license, end use, and items to be authorized, but not having to present a purchase order allows a more flexible licensing arrangement. The ability under the EAR to create country-based license exceptions, *e.g.*, License Exception Strategic Trade Authorization (STA), is another example. License Exception STA will only be available for the .x parts and components under 0A501, but this is another example of the more flexible EAR control structure. In other words, greater flexibility under the EAR does not mean decontrol.

Further, having the ITAR control items that are in commercial use and do not have an inherent military function does not help promote U.S. national security, because it takes time and resources away from the Department of State that could be better used to focus on items that do warrant ITAR control. BIS has decades of experience in regulating dual-use items, including long barreled shotguns controlled under 0A984 and certain chemicals and toxins that have commercial applications, but are controlled for chemical and biological weapons reasons, *e.g.*, ricin and sarin gas. *See*, *e.g.*, 50 U.S.C. 4811(2)(A)(i) (stating that one of the policies of ECRA is to control the proliferation of weapons of mass destruction). BIS also has a proven track record for licensing and enforcing the controls for other items that have moved from USML to the CCL.

DOC_0081007

BIS further clarifies that the AK-47 automatic firearm and any other automatic firearm are retained on the USML. The semi-automatic firearms this rule adds to the CCL will require a U.S. Government authorization for export.

*Comment 6:* One commenter noted that according to the State May 24 rule, "The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the [State] Department will be eligible for license exceptions or otherwise not require a separate license under the EAR." The commenter noted that the Commerce May 24 rule clarifies, "The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR." The commenter asserted that "while it recognizes that other forms of oversight may be available, this dramatic difference in the number of licenses raises our concern."

*BIS response:* This comment on the meaning of the 4,000 Department of State licenses that will not require a license under the EAR creates a good opportunity for BIS to clarify how the EAR controls are structured. Under the EAR, an exporter does not have a right to export. If the EAR does not impose a license requirement or some other prohibition, the exporter may proceed under the No License Required (NLR) designation. The NLR designation may be available for certain 0x5zz.y exports, but otherwise all other exports will require a U.S. Government authorization. Therefore, the reference to 6,000 being authorized under licenses and 4,000 under license exceptions and a small subset as NLR, is not a dramatic change. When BIS imposes a license requirement under the EAR, this means the exporter will need to meet all of the applicable requirements of a license exception, or obtain a license from BIS to proceed with the export. The license exceptions or portions of license exceptions that will be available for these items

15

moved to the CCL, including some of the new requirements and limitations added, will be sufficient to protect U.S. export control interests.

**3D Printing of Firearms**

_Comment 7_:  Three-dimensional (3D) printing is a type of additive manufacturing based on the principle of combining numerous, extremely thin layers of a physical material (including plastics, metals, and even living cells) in a controlled build process and joining them to gradually build up a physical, three-dimensional object.  Computer controlled manufacturing may be either subtractive or additive.  Subtractive manufacturing includes traditional manufacturing methods such as turning, grinding or milling, where metal or other material is removed from the base shape to form the final product.  For example, you take a steel block and remove material until it becomes the final item.  In additive manufacturing, which is often referred to as 3D printing, material such as metal or plastic is laid down in very thin layers one upon the other fusing together until the final net shape is achieved.  In both instances, the adding or removing of the material is controlled by a computer without human intervention.  3D printers utilize electronic digital files to process the materials into a physical object, and these files can be distributed over the internet.  A 3D printer or computer numerically-controlled (CNC) equipment uses Computer Aided Manufacturing (CAM) files in G-code or AMF format as executable code to produce certain items.  There are currently technological limitations for the effectiveness of 3D printing of firearms, but the concept has been demonstrated and the ability to manufacture commercially viable firearms is inevitable given the increasing improvements of 3D printing equipment and 3D printing materials.  Congress directed that the export control system under ECRA is intended to have "the flexibility to be adapted to address new threats in the future," and this final rule implements that instruction.  50 U.S.C. 4811(8).

16

Technology and software are required for 3D printing of firearms and are critical for the 3D printing manufacturing process. Publicly posting such technology and software online without restriction creates the risk that foreign persons and countries, including countries of concern, will be able to obtain technology and software for 3D printing of firearms. In the absence of controls on the export, reexport, or in-country transfer of such technology and software, such items could be easily used in the proliferation of conventional weapons, the acquisition of destabilizing numbers of such weapons, or for acts of terrorism. As noted earlier, Congress expressly directed that ECRA should be used to address these risks. 50 U.S.C. 4811(2)(A).

Like 3D printing, CNC milling or machining is an automated manufacturing process controlled by technology and software. CNC milling/turning/grinding are all subtractive manufacturing processes in which the computerized equipment removes layers of material from a base—known as the workpiece or the blank—to produce a manufactured part or item. As with 3D printing, the posting online of CNC technology and software needed to create working firearms creates export control concerns.

Under the ITAR, the unrestricted public dissemination of technical data (as defined in section 120.10 of the ITAR) in a manner that allows access by foreign persons – including through the internet – is an export requiring appropriate authorization. For purposes of the CCL, Commerce has historically taken the approach (with limited exceptions) that material is not subject to export control if it has been "published" within the meaning of 15 C.F.R. § 734.7, including through posting on the internet. The proposed rules published by the Departments of State and Commerce took these differences in the ITAR and EAR control structures into account, and the Commerce proposed rule acknowledged these differences to ensure commenters

17

had an opportunity to fully take these differences into account when submitting their comments on the Commerce rule. *See* page 24167 of the Commerce May 24 rule and 15 C.F.R. § 734.7.

Comments on the Commerce proposed rule reflected the commenters' understanding of these differences between the ITAR and EAR control structures. BIS received many comments expressing concerns about 3D printing of firearms and whether appropriate controls would be in place under the EAR. It also received a small number of commenters that supported the part 734 criteria. The commenters critical of the part 734 criteria provided the following input:

(1) Part 734 criteria should be changed to regulate 3D printing, even if the information would otherwise be publicly available. These commenters were concerned that the application of the part 734 criteria appears to give rise to the possibility of widespread and openly sanctioned circulation of open source, non-proprietary instructions for using computer-aided design (CAD) files to produce operable firearms via 3D-printing technology, or text files to produce such firearms via CNC milling of the firearms. Commenters requested BIS to weigh the fact that the part 734 criteria would make posting on the internet of ECCN 0E501 technology (*e.g.*, 3D printer specs) for the production of an ECCN 0A501 firearm publicly available information that is no longer subject to the EAR.

(2) Allowing 3D-printed gun technology and software to be posted freely online for use with 3D printers will make it easier to obtain firearms in the U.S. and abroad. These commenters were concerned that the combination of internet dissemination and do-it-yourself 3D production is problematic because the government would have no oversight of the producer, the end use or the end user of the firearm. Other commenters in this area were greatly concerned about the perceived loss of controls on 3D gun-printing plans, which these commenters asserted has

DOC_0081011

increasingly assisted bad actors in enhancing their capabilities to inflict atrocities around the world. Several commenters cited *Defense Distributed v. Department of State*, a lawsuit filed in the U.S. District Court for the Western District of Texas and appealed to the U.S. Court of Appeals for the Fifth Circuit,, in support of the State Department's decision to restrict the 3D printing of firearms under the ITAR (*i.e.*, requiring appropriate authorization under the ITAR prior to allowing unrestricted posting on the internet).

(3) Unregulated 3D printing would undermine U.S. efforts, as well as governments overseas, to vet parties obtaining firearms, and to track 3D printed firearms. These commenters noted that with access to 3D printing machines and plans on how to build a gun, anyone could circumvent U.S. laws that seek to prevent known criminals from obtaining U.S. firearms. Other commenters in this area were particularly concerned that these changes would result in an increase in the number of untraceable firearms in circulation because as 3D printing technology becomes more widely available, the likelihood that it may be used to construct operable firearms that are exempt from serialization requirements would increase.

(4) The transfer of control of these items to the CCL would undermine longstanding U.S. efforts to counter proliferation of small arms in the world. Commenters in this area noted that they couldn't understand how allowing untraceable 3D printing of firearms would serve U.S.-recognized goals to combat illicit trafficking of firearms. Commenters in this area also noted that the United States is the world's largest donor, as the commenter understands it, to helping countries build their ability to trace weapons, secure weapons stockpiles, and to destroy those stocks when warranted. However, according to the commenter, this transfer of authority to Commerce appears to open the door to unfettered 3D printing of firearms, which threatens to undermine nearly all those efforts.

19

One commenter asserted that the proposed changes may result in increased circulation of plans for non-automatic weapons produced by 3D printing technology, and this may be at odds with the Wassenaar Arrangement.

A small number of commenters supported the application of the criteria in part 734 and emphasized that the information is so widely available in various formats that trying to control it would not be practical or warranted. One commenter noted that America boasts hundreds of millions of privately-owned firearms and has produced countless books, magazine articles, videos, websites, and online forums that exhaustively detail firearm technology and use. Thus, this commenter asserted it is difficult to imagine any information about the design, development, production, manufacturing, and use of firearms that is not already within the public domain and this same information is commonly available overseas. Other commenters that supported the part 734 criteria asserted that they had concerns generally over their First Amendment rights being possibly violated unless the criteria in part 734 applied equally to information posted online. These commenters requested an end to any harassing or censorship of firearm instructors within the U.S., as well as bloggers, writers, and those posting online guides or tutorials discussing technology about defense items because these activities seem to be a clear violation of the First Amendment right to free speech. Given the foreign policy and national security interests at stake, Commerce believes that the restrictions imposed by this rule are appropriately tailored. Commerce is also aware of, and has taken into account, the constitutional and statutory concerns raised by the plaintiffs in the *Defense Distributed* case and by the plaintiffs in *Washington v. Dep't of State*, No. 2:18-cv-01115-RSL (W.D. Wash.). Commerce also notes that it has received correspondence from members of Congress concerning the issues raised in *Defense Distributed*.

20

*BIS response:* The Commerce May 24 proposed rule addressed the application of part 734, including § 734.7, for items (specifically for certain information and software) proposed for transfer from USML Categories I-III (*see* 83 FR 24167). These criteria support the free exchange of public information and, as a general matter, do not warrant being changed. However, the concerns commenters raised about the specific application of part 734 criteria to 3D printing of firearms suggests that modification to the proposed controls is warranted.

With the transfer of certain firearms from the USML to the CCL, rifles, pistols, revolvers and related parts and components will fall within ECCN 0A501, and BIS will be responsible for their licensing. This transfer adds to Commerce's existing licensing jurisdiction over most shotguns and shotgun shells as well as optical sighting devices. The items that remain on the ITAR include fully automatic and selective fire weapons, weapons for caseless ammunitions, silencers and certain high capacity (50 rounds or greater) magazines, and certain military-specific ammunition such as tracers.

BIS recognizes that several commenters, including a large number of private citizens, expressed concern over global access to 3D printing technology and software with the transfer of certain firearms to the CCL. BIS also recognizes that several commenters and plaintiffs in *Washington v. Dep't of State* raised concerns about risks to public safety related to domestic access to 3D printing technology and software. BIS shares the concerns raised over the possibility of widespread and unchecked availability of the software and technology internationally, the lack of government visibility into production and use, and the potential damage to U.S. counter proliferation efforts. In this final rule, BIS addresses the concerns raised about 3D printing of firearms by making certain technology and software capable of producing firearms subject to the EAR when posted on the internet under specified circumstances. This

21

control will help ensure that U.S. national security and foreign policy interests are not undermined by foreign persons' access to firearms production technology. Although the Department of State determined that such technology and software do not warrant continued control under the USML, maintaining controls over such exports under the EAR remains in the national security and foreign policy interests of the United States, as described below. As noted in other places in the Commerce final rule, the movement of items from the USML is not a decontrol, and appropriate controls must be in place to protect U.S. national security and foreign policy interests, such as by maintaining Commerce licensing authority over certain technology and software capable of producing firearms subject to the EAR when posted on the internet under specified circumstances as described in this final rule. And although the domestic transfer of commodities is outside the purview of BIS jurisdiction, the concerns related to the unrestricted posting of CAD files on the internet, more accurately described in this final rule as CAM files, have been addressed in this final rule and nothing in this final rule affects existing federal or state laws that pertain to the manufacture, possession, use, or commercial sale of firearms.

BIS provides more information about the specific changes below under the Description of Regulatory Changes under the heading Revision of "Published."

BIS does not agree with the commenter that stated that the part 734 criteria are at odds with the Wassenaar Arrangement. As described both in the proposed rule and this final rule, part 734 remains consistent with the Wassenaar Arrangement. BIS's changes in this final rule, however, ultimately addressed this commenter's concern.

In response to commenters who favored the part 734 criteria as outlined in the proposed rule , BIS notes that information regarding firearms, including information for production of

DOC_0081015

firearms, is often widely available, and nothing described below would restrict persons from publishing books or magazines, such as those that could be found in a local public library, and that the changes made to part 734 described below are limited to addressing a specific fact pattern (posting on the internet of certain types of files) that warrants U.S. Government oversight to ensure unrestricted releases are not being made to persons of concern outside the United States or to foreign persons in the United States. BIS also took into account these commenters' support for the part 734 criteria and their First Amendment concerns but did not adopt the approach that they advocated. Given concerns regarding First Amendment restrictions the control is appropriately tailored to only impact technology and software in an electronic format, such as AMF or G-code, that is ready for direct insertion into a computer numerically controlled machine tool, additive manufacturing equipment to produce the firearm frame or receiver or complete firearm. This technology and software are functional in nature, having the capability to cause a machine to use physical materials to produce a firearm frame or receiver or complete firearm. Limitations on the dissemination of such functional technology and software do not violate the right to free expression under the First Amendment. Nor does the final rule violate the right to keep and bear arms under the Second Amendment. The rule does not prohibit U.S. persons within the United States from acquiring firearms of any type; indeed, nothing in this rule prohibits persons within the United States from developing, discussing, or transferring by hand or mail (*e.g.*, by the U.S. Postal Service or a common carrier) CAM files related to 3D-printing technology and software. The domestic transfer of commodities is outside of the scope of BIS jurisdiction and would be within the purview of domestic law. The release of controlled technology in the United States would only be regulated to the extent it would constitute a deemed export (*i.e.*, release to a foreign person). This means transfers between U.S. persons

23

within the United States are not regulated under the EAR so long as there is no release to a foreign national. The ITAR takes a similar approach. BIS's approach in using targeted changes is not intended to otherwise change the other criteria in part 734 that these commenters assert they strongly support.

In response to the comments received on the proposed rule, BIS has reflected on the need to take into account various interests in regulating technology and software for the 3D printing of firearms. At the time of the proposed rule, BIS believed that its existing framework struck the appropriate approach in providing for national security and foreign policy control of firearms that would transfer to the CCL. Since that time, BIS has had considerable time to review the comments related to 3D printing of firearms. Although the military usefulness of 3D printed firearms is not significant, there are other U.S. national security and foreign policy interests, as described by commenters, in regulating the unlimited access to certain files for the 3D printing of firearms that the framework of BIS regulations as described in the proposed rule did not adequately address. As the State Department noted in the *Defense Distributed* litigation, unrestricted export of such files abroad could have a potential detrimental effect on aspects of U.S national security and foreign policy, including by undercutting efforts to combat the illicit trafficking of firearms or possession of firearms by hostile parties or dangerous organizations, as well as other efforts to assist other countries in protecting domestic and international security. BIS believes this potential detrimental effect on U.S. national security and foreign policy warrants the control of the export of certain files for the 3D printing of firearms set forth in this rule.

At the same time, BIS recognizes that there is a longstanding tradition to encourage the free exchange of ideas as already acknowledged in BIS regulations, such as in 15 C.F.R. § 734.7.

24

DOC_0081017

The agency takes seriously its responsibility to regulate judiciously, seeking to assert jurisdiction only as needed and consistent with its statutory authority. As set forth in the Export Control Reform Act of 2018, 50 U.S.C. §§ 4801-4852, Commerce's policy is to use export control only to the extent necessary to restrict the export of items that would make a "significant contribution to the military potential of another country... which would prove detrimental to the national security of the United States" or "further significantly the foreign policy of the United States or to fulfill its declared international obligations." 50 U.S.C. § 4811(1)(A)-(B). Further, Commerce must ensure that its controls are "tailored to focus on those core technologies and other items that are capable of being used to pose a serious national security threat to the United States." 50 U.S.C. § 4811(2)(G).

Because of the national security and foreign policy risks associated with the unlimited access and unrestricted production of 3D printed firearms, BIS is offering a tailored approach, consistent with its statutory obligations, that places restriction on the posting on the internet of files for the printing of certain firearms and their critical elements. As set forth in § 734.7(c) in this final rule, only technology or software for the complete firearm, its frame, or its receiver are subject to BIS licensing requirements, aligning BIS controls with existing statutory concepts set forth in the definition of "firearm" under the Gun Control Act, 18 U.S.C. § 921(a)(3). Recognizing that libraries and academic institutions within the United States may already carry books or other materials related to firearms manufacturing, BIS does not seek to regulate this existing landscape of activity for the items transferred from the USML to CCL, consistent with its treatment of firearms it controlled on the CCL prior to this final rule. Instead, since the harm identified with unrestricted dissemination has been tied to the easy and untraceable distribution

25

in electronic format that the internet provides, BIS has crafted its rule to regulate dissemination in this space as it poses a significant risk to U.S. national security and foreign policy.

As a result, Commerce has reached the conclusion that U.S. national security and foreign policy necessitate that BIS maintain controls over the 3D printing of firearms when such software and technology is posted on the internet. The potential for the ease of access to the software and technology, undetectable means of production, and potential to inflict harm on U.S. persons and allies abroad present a grave concern for the United States. Without regulatory oversight, U.S. foreign relations and national security interests could be seriously compromised. For these reasons, this final rule provides that technology and software ready for insertion into an automated manufacturing tool that makes use of the software or technology to produce a firearm frame, receiver, or complete firearm is subject to the EAR, consistent with the regulation of such software and technology when previously controlled under the USML.

**Vetting Transaction Parties and Monitoring Exports**

*Comment 8:* Many commenters were concerned about a possible reduction in the monitoring of the end users of exported firearms and publicly available information about this monitoring. These commenters asserted that public reporting of Blue Lantern information is mandatory and there are readily available statistics about the results. Some commenters requested that if the proposed rules move forward, the BIS program be strengthened to address the need to monitor the end users of exported firearms.

*BIS response:* BIS does not publish end-user monitoring information in the same format as the Department of State, but the same type of information is available publicly from BIS. The new ECRA maintains an annual reporting requirement to Congress that provides an additional layer

DOC_0081019

of transparency. Specifically, under Section 1765(a)(6) of ECRA, the Secretary of Commerce

shall submit a report to Congress that includes a summary of export enforcement actions,

including of actions taken to implement end-use monitoring of dual-use, military, and other

items subject to the EAR. BIS already has practices in place to continuously evaluate its end-use

monitoring program and to improve it as opportunities to do so are identified. BIS intends to

continue those efforts for the firearms that are moved to the CCL with this final rule.

**Registration Requirement for Screening**

*Comment 9:* Several commenters expressed concerns that BIS will not have access to the same

databases and background information that the Department of State uses to evaluate license

applications since the EAR does not require registration. These commenters asserted that not

including a registration requirement will deprive regulators of an important source of information

and decrease transparency and reporting regarding gun exports. Some commenters

recommended removing or limiting the registration fee for manufacturers but keeping the

requirement for registration. Another commenter suggested waiving the fee for manufacturers

who do not, in reality, export these items.

*BIS response:* BIS, along with the Department of State, considered these concerns and

determined that the interagency license review process maintains appropriate oversight of the

items at issue. BIS's export licensing requirements and process are calibrated both to the

sensitivity of the item and the proposed destination. Additionally, all requests for export licenses

for firearms remain subject to interagency review, including by the Department of State.

BIS does not need the information included in the ITAR registration requirement to

regulate those items under the EAR. To apply for a license under the EAR, the applicant is

required to create a free account in BIS's online submission system called SNAP-R. The SNAP-

DOC_0081020

R account includes basic information about the exporter. In addition, each party identified on the license application is reviewed. The requirements to file EEI in AES is another important way that BIS obtains information needed to effectively track exports.

BIS agrees that if there were a registration requirement, removing or limiting the fee for registration would ease the burden on small businesses and individuals. However, as noted above, BIS does not believe that the information included in the registration requirements is necessary for BIS to effectively license and enforce the EAR. Therefore, registration requirements, even if they are free, would impose an unnecessary burden on individuals, small companies, and manufacturers.

**Brokering**

*Comment 10:* Many commenters asserted that the proposed changes to USML Categories I-III would mean that brokers of semi-automatic weapons and related ammunition will be exempt from registration and licensing that is currently triggered by their inclusion as defense articles on the USML. Other commenters correctly understood that State would continue to impose brokering controls for items which moved to the CCL that are also listed on the USMIL. One of these commenters asserted that they are pleased to see that the State May 24 rule attempts to maintain effective oversight of arms brokers by ensuring that brokers must register with the Department of State and seek a license. This commenter asserted that these provisions are critical in helping mitigate illegal arms trafficking to major conflict zones and transnational criminal organizations.

*BIS response:* BIS clarifies that the Department of State in its May 24 rule and its final rule retains brokering controls for items which are now listed on the CCL that are also listed on USMIL. BIS directs the public to review the State final rule for information on the brokering

28

controls under the ITAR. The Department of State in its companion rule noted it does not intend to impose a double licensing requirement for individuals undertaking activities on behalf of another to facilitate a transaction that will require licensing by the Department of Commerce. In practical terms, this means the vast majority of exporters who only export firearms on the CCL directly from the U.S. or reexport U.S.-origin firearms on the CCL are not "brokers" and will not have to register with DDTC.

**Congressional Oversight**

*Comment 11:* Multiple commenters expressed concerns that this final rule would reduce congressional oversight of arms transfers because BIS does not have to notify Congress of firearms sales in excess of $1 million, as the Department of State does. These commenters asserted that: (1) Congress needs to be able to review these types of firearms sales to ensure large risky exports do not proceed; (2) Congress has played an important role in stopping several risky firearms sales because of the congressional notification requirement (commenters provided examples of sales from 2017 to Turkey and the Philippines that they asserted were blocked by Congress); (3) congressional notifications are a valuable tool for the public to be able to see when large firearms sales are being proposed; and (4) certain members of Congress have asserted their concern that not including a congressional notification requirement under the EAR would be counter to congressional intent.

*BIS response:* The Department of State in its companion rule also acknowledges those concerns and notes that those firearms that the U.S. Government deemed through the interagency review process to warrant continued control under the ITAR as defense articles will remain subject to congressional notification requirements in conformity with section 36 of the AECA and Executive Order 13637. In this response, BIS also puts the congressional notification issue into

29

context under the EAR and the statutes that the regulations implement for items "subject to the EAR."

BIS notes that at the time of publication of the Commerce May 24 rule, the Export Administration Act (EAA) did not include a congressional notification requirement for firearms, nor did any other statute that the EAR implements for firearms. Therefore, BIS did not include a congressional notification requirement because it did not want to prejudge congressional intent in this area. On August 13, 2018, the President signed the National Defense Authorization Act for Fiscal Year 2018, which included ECRA. Congress did not include in ECRA any requirements for congressional notification for firearms and related items exports. Therefore, BIS is not including a congressional notification requirement in the final rule.

**Overseas Trafficking, Proliferation, and Diversion of Firearms**

*Comment 12:* Multiple commenters expressed a general concern that the transfer to the CCL increases the risk of overseas trafficking, proliferation, or diversion. Multiple commenters also expressed concerns about the BIS end-use monitoring (EUM) capabilities and the impact the companion Department of State rule has on the Department of State's EUM programs. Many commenters asserted that the decision to relax controls on the export of firearms will make it easier for terrorists to obtain the same dangerous firearms that have been used in mass shootings in the United States. Many commenters also asserted that these firearms are weapons of choice for criminal organizations, narcotics traffickers, and gun traffickers, and making it easier for them to get firearms will make their activities worse and further fuel armed conflict abroad.

*BIS response:* This final rule does not deregulate the export of firearms. All firearms and major components being transferred to the CCL will continue to require a U.S. Government authorization. Further, BIS has both a robust EUM program and a law enforcement division

30

sufficiently capable of monitoring foreign recipients' compliance with their obligations regarding the transfer, use, and protection of items on the CCL. Additionally, the Federal Bureau of Investigation and the Department of Homeland Security will continue to investigate and enforce civil and criminal violations of the export control laws as appropriate.

BIS does not agree that moving these firearms to the CCL will mean less oversight to prevent gun trafficking. Exporting these firearms will require a U.S. Government authorization. The EAR also includes a robust set of end-use and end-user controls that will supplement the CCL based license requirements. Similar to the ITAR, BIS will impose appropriate conditions as needed on authorizations or not approve certain transactions if there is a concern over risk of diversion. BIS also will maintain a robust end-use verification program for the firearms and other items moved to the CCL from USML Categories I-III. In addition, most firearms will require submission of a license, and the license review policies would lead to a denial for exports to terrorists. The EAR also includes sections in part 744, *e.g.*, § 744.14 for Foreign Terrorist Organizations (FTO), that impose additional restrictive license requirements and license review policies for terrorists identified under certain designations on the Department of Treasury's Specially Designated Nationals (SDN) list. This is significant because it excludes the use of any EAR license exceptions; imposes a license requirement for all items subject to the EAR, including the firearms being moved to the CCL; and acts as an additional safeguard for transactions involving EAR items located outside the U.S. that the Department of Treasury controls are not able to reach.

BIS included provisions in the Commerce May 24 rule and in this final rule to address this issue by including a presumption of denial license review policy under the regional stability reason for control for these types of end users. Specifically, in this final rule, the license review

31

policy in § 742.6(b)(1)(ii) is a policy of denial when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries.

*Comment 13:* One commenter, a human rights organization, asserted that "it has for many years called attention to the risks associated with untrammeled export of small arms and light weapons around the world." This commenter asserted that "these arms have been associated with the deployment of child soldiers and the rise of insurgent groups." This commenter also asserted that "these firearms are easier to divert than larger weapons and often end up in the illicit market."

*BIS response:* BIS does not agree that there is anything in the EAR that will make the possibility of diversion any greater than it was under the ITAR. These concerns of diversion are taken into consideration by the export control system and underlie the basis for some of the agency's controls. BIS also notes that the U.S. Government continuously monitors the export control system to determine where the most likely points of diversion are and takes actions to prevent potential diversion points by using existing license review policies, rescinding or revoking prior authorizations, or imposing new license requirements or other prohibitions.

**Impact on Foreign Law Enforcement**

*Comment 14:* One commenter expressed concern that foreign law enforcement personnel in particular are at risk of having the firearms and ammunition that would be transferred to the CCL used against them. Another commenter asserted that moving these firearms to the CCL will make it hard for foreign law enforcement to counter gun trafficking.

DOC_0081025

*BIS response:* These assertions are mitigated by the fact that, as stated previously: (1) these articles remain subject to BIS's EUM programs that vet potential end users of concern, and (2) applications for firearms and ammunition licenses will be approved only if the end use is permitted under the laws and supervision of the importing country.

BIS notes that this final rule is consistent with U.S. multilateral commitments, *e.g.*, to the Wassenaar Arrangement and the United Nations for conventional arms reporting. The support documentation requirements are consistent with Organization of American States (OAS) requirements to require an import certificate issued by the importing country. This support document requirement applies to other countries that also impose a requirement for an import certificate prior to allowing an import of a firearm, permitting these other countries to better control the flow of firearms coming into their countries. In addition, U.S. law enforcement agencies, including BIS's Office of Export Enforcement, also coordinate with law enforcement agencies outside the U.S., as was referenced above in the BIS response to Comment 3. The area of preventing illegal transshipments is a good example of where various countries have worked together, including law enforcement agencies, regulators, and policy makers, to come up with standards and protocols to reduce illegal transshipments, and this work will continue.

**Human Rights Issues**

*Comment 15:* A number of commenters suggested the proposed rule, if made final, may have a negative impact on human rights in foreign countries. BIS also received many comments asserting "it is now recognized that rape and sexual assault are systematically used as weapons of war in conflicts around the world." One of these commenters asserted that "in interviews with women and girls who have survived sexual violence during conflict, a very high number of their stories include descriptions of the torture they endured at the point of a gun. Although the

DOC_0081026

particular models of firearms involved are seldom identified, there is no doubt that a military-style weapon contributed to gross violations of their human rights." Many commenters asserted that even after a conflict has officially ended, the weapons left behind are used all too often by perpetrators of domestic violence.

*BIS response:* BIS will use its resources and expertise in this area to vet parties involved in transactions subject to the EAR for human rights concerns. Similarly, as part of the aforementioned continuing interagency review of export licenses for firearms, the Departments of State and Defense will remain active in the interagency review process of determining how an item is controlled and will review export license applications on a case-by-case basis for national security and foreign policy reasons, including the prevention of human rights abuses. As stated previously in this final rule and in the companion rule published by the Department of State, the Department of State will continue vetting potential end users when reviewing Commerce licenses, to help prevent human rights abuses.

BIS does not anticipate authorizing exports of firearms to regions involved in active conflicts because of the presumption of denial license review policy for regional stability. Commerce on its licenses as well as in its license exceptions includes certain requirements and conditions to ensure subsequent disposition or use of the item will continue to be in accordance with U.S. export control interests. These requirements are enhanced by the EAR end-use controls in part 744, which in many cases apply to transfers (in-country). Ultimately, the issue raised by this commenter is one of the reasons why the license review process is done in a careful and deliberative way to ensure as much as possible that the items authorized for export will not subsequently be used in ways not in accordance with the regulations, as well as larger U.S. national security and foreign policy interests.

34

DOC_0081027

**Effect on Other Countries**

*Comment 16:* Some commenters asserted moving these firearms to the CCL would increase the likelihood for greater destabilization and conflict worldwide as well as for these weapons to be trafficked back into the U.S. for nefarious uses here. Some commenters asserted that *"military-style semi-automatic rifles and their ammunition, are weapons of choice for criminal organizations in Mexico and other Latin American countries that are responsible for most of the increasing and record levels of homicides in those countries."* These commenters asserted that this will only send more asylum seekers fleeing to U.S. borders.

*BIS response:* BIS does not agree that the transfer of items to the CCL would increase the likelihood of greater destabilization and conflict worldwide, or specifically in Mexico or other Latin American countries. As described above, each foreign government decides what firearms may be imported into its country. In addition, as noted above, these items will be controlled for regional stability, so each license application will be reviewed to evaluate whether the export of these firearms may contribute to destabilizing that foreign country or other regional stability concerns.

**U.S. Nationals and Interests Overseas**

*Comment 17:* Some commenters asserted that this change in licensing jurisdiction could lead to an unfortunate future situation where our own combat troops face troublemakers armed with American-made weaponry.

*BIS response:* The U.S. export control system, whether that is the export controls implemented under the EAR or the ITAR, is focused on protecting U.S. national security and foreign policy interests. Effective controls are in place under the EAR to ensure as much as possible that items

subject to EAR do not endanger U.S. troops, U.S. nationals, or other U.S. interests is one of the key objectives of EAR controls. This final rule is intended to ensure that items being moved to the EAR will not endanger U.S. interests. BIS, as well as the Department of State, works to ensure that diversions do not occur, but it is a concern not unique to firearms moved to the CCL, and something the U.S. export control system is designed to counter.

**Consistency with U.S. Multilateral Commitments**

*Comment 18:* Other commenters suggested that this rule contravenes international commitments the United States has made through mechanisms such as the Wassenaar Arrangement. One commenter asserted that the U.S. has already alienated many of our allies, and this rule change will further aggravate relations by pushing more firearms into their countries.

*BIS response:* The transfer of the concerned items to the CCL does not contravene U.S. international commitments, as the U.S. Government will continue to apply a high level of control to these items and require U.S. Government authorization for all exports of firearms and major components. Further, the controls being implemented under the EAR with this final rule are consistent with U.S. multilateral commitments, *e.g.*, to the Wassenaar Arrangement, the United Nations, and the OAS. BIS notes that foreign governments decide what items may be imported into their countries and how such items will be regulated within that country. Regardless of the U.S. export control system, an exporter must still meet the requirements of an importing country and if the importing country does not allow the importation of these items or requires certain requirements to be met, those foreign regulatory or other legal parameters set the parameters and scope for what may be imported, who may use such items, and for what end uses.

**Reporting Requirement for Political Contributions and Fees to the EAR to Prevent Corruption in the Arms Trade**

DOC_0081029

*Comment 19:* One commenter asserted that the transfer of certain Categories I-III items from ITAR to EAR control will mean the loss of the reporting requirements outlined in 22 CFR 130. This commenter asserted that part 130 requires exporters to report payment of certain political contributions, fees, and commissions related to the sale of defense articles and services to the armed forces of a foreign country or international organization to the DDTC and because the EAR does not have the same type of reporting requirement, this may result in increased corruption in arms sales. The same commenter asserted that "in many countries around the world, corruption is rampant within their arms procurement systems, as foreign officials seek to steal funds from their national budgets for their personal gain," so not including a reporting requirement in the EAR may make the corruption worse. The same commenter asserted that under the Commerce May 24 rule, BIS would limit its ability to obtain useful information on U.S. defense companies and prosecute bribery.

*BIS response:* BIS does not agree with these assertions. The Foreign Corrupt Practices Act (FCPA) already prohibits this type of corruption activity and provides a robust regulatory scheme. FCPA applies to all items subject to the EAR, including items that will be moved from the USML to the CCL. Therefore, imposing a separate reporting requirement is not needed under the EAR to prevent this type of illegal activity. BIS highlights here in the preamble of this final rule that any party involved in a transaction "subject to the EAR" must also follow any other applicable U.S. laws, including the FCPA. Questions on the FCPA should be directed to the Department of Justice and the U.S. Securities and Exchange Commission (SEC).

**Commenters Asserting Burdens Will Be Reduced (for Purposes of EO 13771)**

DOC_0081030

*Comment 20:* A firearms trade association commenter asserted that "it has reviewed the proposed rule thoroughly with its membership… and most members have told it that the final versions of the rules would eventually be beneficial because they would significantly reduce the overall burden and cost of complying with controls on the export of commercial firearms and ammunition." This trade association noted that "[a]ll who responded told us that there would be an initial short-term increase in burden and cost because of the need to re-classify thousands of commodity, software, and technology line items and SKUs affected by the new rules, but that the long-term regulatory burden reduction would significantly outweigh the short-term need to adjust internal compliance programs and practices." One firearms industry trade association commenter noted that most of "its members, particularly the small- and medium-sized companies, believe that the changes will be economically beneficial for them because the eventual regulatory simplification and cost reductions will allow them to consider exporting when they might not have otherwise." Additionally, many small independent gunsmiths commented about the disproportionate negative impact the costs of ITAR compliance had on their businesses. Several commenters asserted that by moving such items to the EAR, many domestic manufacturers who do not export would be relieved of the significant financial burden of registering under the ITAR. One trade association commenter asserted that the costs for their members would be reduced because under the Commerce system, there are no fees to apply for licenses. This commenter also asserted that their burdens would be reduced because the Commerce license application forms are vastly simpler compared to the Department of State license application forms.

One commenter asserted that "one of the benefits under the EAR will be that controls on less sensitive and widely available basic parts, components, and technology are more tailored

38

and allow for less burdensome trade with close allies through license exceptions." This same commenter also asserted that "sales with regular customers can be combined in to fewer license applications, thus reducing overall paperwork to achieve the same policy objectives."

One trade association commenter asserted that these changes "will lead to growth for U.S. companies, more jobs in the United States, and related economic benefits for the cities and states where the members reside while accomplishing the same national security and foreign policy objectives they have always had." One commenter asserted that the items being moved to the CCL are manufactured in many parts of the world and that by engaging more with the world, U.S. firearms manufacturers will improve their knowledge and capability. One commenter that identified himself as a U.K. citizen, who often travels to the U.S. and visits sporting goods stores, asserted that the price of certain items, *e.g.*, cartridge cases and bullets, are less than half the price charged in the U.K. The commenter asserted, "fix this and U.S. manufacturers will see a significant increase in demand from U.K. based firearms owners."

*BIS response:* BIS agrees that the Commerce May 24 rule would reduce the overall regulatory burden of complying with U.S. export controls, including through regulatory simplification and cost reductions that may allow certain persons, *e.g.*, small independent gunsmiths, to consider exporting when they might not have otherwise because of the economic burden of complying with the ITAR. One of the strengths of the EAR control structure is its focused approach on exports without unduly burdening persons that are not a party to an export transaction. Not requiring domestic manufacturers to register with BIS is a good example of the more focused EAR controls. The fact that BIS does not charge a registration fee to be able to apply for a Commerce license is another financial benefit.

39

The EAR is a more tailored control structure, and this more flexible control structure will reduce burdens and create more opportunities to export. One of the key benefits of the more flexible Commerce licensing processes is the ability for applicants to combine multiple transactions on license applications for sales to regular customers. Because BIS does not require a purchase order, the overall number of licenses an exporter may need to submit is reduced.

The changes included in this final rule may lead to increased sales opportunities for U.S. exporters and related economic benefits for the United States, while also accomplishing the same national security and foreign policy objectives of the U.S. export control system. Because of the more flexible EAR control structure, parties outside the U.S. may want to purchase more items, such as ECCN 0A501.x parts or components that were previously avoided because of no *de minimis* eligibility under the ITAR. This rule might also lead to increased export activity because parties outside the U.S. may import more U.S. origin firearms because of the more flexible Commerce licenses that do not require a purchase order. Importantly, any additional exports that may occur are the same types of exports that would have been otherwise approved under the ITAR.

As asserted by some of the commenters, the changes made by this final rule may help to foster innovation in the United States by encouraging collaboration with companies outside the United States, and this may lead to better U.S. products. They may also encourage more people to be interested in purchasing items from the United States.

**Commenters Asserting Burdens Will Not be Reduced (for Purposes of EO 13771)**

*Comment 21:* One anonymous commenter asserted that moving these items to the CCL would create a small cost-savings for its company in registration and licensing fees, but the commenter

40

did not see a demonstrated equivalent in terms of paperwork reduction or real time savings. This commenter asserted that the issue for small companies having to pay the registration fees due to their manufacturing activities is better resolved by changing the definition of manufacturer to add a minimum size requirement. The same commenter asserted that the EAR does not include a concept of defense services and the technology controls are more narrowly focused and apply in limited contexts as compared to the ITAR, and this change represents an improvement in terms of the commenter's ability to share information needed for marketing firearms and for repairing them internationally. However, this commenter asserted that the same result could be achieved via amendment to the ITAR. The same commenter asserted that "the improvements and savings are quantified using the 43.8 minutes for BIS application vs. the 60 minutes for DDTC application and that this metric provides no meaningful data from which to extrapolate total process savings or if any is really generated." This commenter also asserted that other additional burdens proposed in the Commerce May 24 rule also need to be accounted for, *e.g.*, increasing the quantity and type of data elements which will be required for AES filing. The same commenter asserted that there will be burdens and expenses of transition related to reclassification of all products, re-training of all employees, and advanced training needed for compliance personnel. The commenter acknowledged that it understands this burden is considered short term; however, the commenter asserted that the benefits of moving these items to the CCL still has not been adequately explained to justify these short-term burdens. This same commenter asserted that other than utilizing a different application form and the change in the agency receiving applications, it has not been demonstrated exactly what, if any, process improvement this represents.

DOC_0081034

*BIS response:* While this commenter did not anticipate significant cost or burden reduction from the transition to the EAR, most other commenters addressing these issues anticipated more significant benefits. The reform effort is not intended to make the ITAR the same as the EAR; this would not be warranted because the more restrictive ITAR controls are needed to regulate items such as fighter aircraft, submarines, and intercontinental ballistic missiles. BIS agrees that the more focused EAR technology controls will ease burdens, but still appropriately control technology for these items.

BIS does not agree with the assertion that the way the cost savings were calculated in the Commerce May 24 rule provided no meaningful data to extrapolate total process savings. Many commenters asserted that they believed their burden would be reduced by moving these items to the CCL. This commenter is correct that other commenters expressed concerns about individuals being required to file EEI in AES for exports under License Exception BAG of their personally owned firearms, and concerns about including the serial number, make, model number, and caliber of firearms in the EEI in AES. However, this final rule significantly reduces these burdens. For example, this final rule requires the U.S. Customs and Border Protection (CBP) Certification of Registration Form 4457, a form already being used by exporters. Therefore, there will be no additional burden because BIS will be requiring information already submitted by exporters to CBP for other reasons. For licensed exports, BIS also eliminated the requirement to file those additional data elements, except for temporary exports or when the Commerce license includes a condition requiring it, similar to the approach Department of State takes with provisos on its licenses.

BIS acknowledges that there will be some short-term adjustment costs. BIS also acknowledges that the EAR is a more complex control structure because with greater flexibility

42

there is a need for additional nuances in the control structure. BIS disagrees that the rationale for the transition was not clearly demonstrated in the Commerce May 24 rule.

BIS appreciates this same commenter highlighting a key point of commonality. The commenter is correct that the Commerce license applications will continue to be reviewed by the Departments of State and Defense. This well-established interagency review process specified in both Executive Order 12981 and in the EAR helps to protect U.S. export control interests and ensures that a diversity of interests and agency expertise is being used to review license applications. BIS disagrees that the only difference is a different application. For example, the fact that an applicant does not require a purchase order under the EAR to apply for a license allows for more companies to compete for business opportunities.

**Licensing Costs**

*Comment 22:* Many commenters asserted that the Commerce May 24 rule would transfer the cost of reviewing applications and processing licenses from gun manufacturers to taxpayers. Many commenters also asserted that with respect to firearms exports, taxpayers and the public at large should be concerned about pressures to cut corners that could result in authorization of irresponsible transfers of firearms, because BIS will not be charging fees for licensing.

*BIS response:* By statute, Congress prohibits BIS from imposing fees for any license application, authorization or other requests. This prohibition applies for submissions in connections with all items subject the EAR and is not specific to the firearms industry. BIS has effectively licensed items for several decades based on the fee free license construct that was included in the Commerce May 24 rule and in this final rule.

DOC_0081036

# COMMENTS SPECIFIC TO THE REGULATORY TEXT

## Inclusion in the "600 series"

*Comment 23:* One commenter requested BIS include semi-automatic firearms and related items in the "600 series" instead of in 0x5zz ECCNs.

*BIS response:* BIS does not agree. As was stated in the Commerce May 24 rule and discussed above in response to the comments, the semi-automatic firearms this final rule adds to ECCN 0A501.a have a significant worldwide market in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities. For these reasons, the movement of firearms and ammunition from USML Category I and III, similar to the civilian spacecraft and related items moved from the USML and controlled on the CCL under 0x515 ECCNs, do not warrant being controlled under the "600 series."

## New ECCN 0A501: Firearms and Related Commodities

*Comment 24:* One commenter identified an inconsistency between the Commerce May 24 rule in the "Related Controls" paragraph that stated magazines with a "capacity of 50 rounds or greater" are "subject to the ITAR." However, the proposed USML Category I(h)(1) referenced only magazines and drums with a "capacity greater than 50 rounds."

*BIS response:* This final rule corrects the EAR text to make it clear that magazines with a "capacity of greater than 50 rounds" are subject to the ITAR.

DOC_0081037

*Comment 25:* One commenter asserted there had been past issues of interpretation under the ITAR for what was meant by "complete breech mechanism" and therefore the commenter recommended defining the term under the EAR.

*BIS response:* BIS accepts the change to include a definition of "complete breech mechanisms." This final rule will add a definition for "complete breech mechanisms" to part 772 and will add double quotation marks around the term where it is used in ECCNs 0A501 and 0A502.

*Comment 26:* One commenter took issue with the use of the term "assault weapons" or "close assault weapons." This commenter asserted that the terms should be defined, or not used. This commenter requested the term "semi-automatic" rifles, pistols, or other firearm be used instead.

*BIS response:* BIS agrees and has removed the term "assault weapons" in this final rule and instead uses the term "semi-automatic," which better aligns with the terms used in the control parameters.

*Comment 27:* One commenter recommended BIS define "firearm" in harmonization with the USML.

*BIS response:* BIS does not agree the term "firearm" needs to be defined in the EAR. The term "firearms" is used in this final rule with additional technical parameters or ECCN identifiers, *e.g.*, 0A501.a, that will enable identification of these firearms. BIS does not believe the use of the term "firearms" will create confusion with the USML or the USMIL.

*Comment 28:* One commenter noted an inconsistency in the way calibers are described in the control lists under the Commerce May 24 rule. In USML Categories I and II, firearms and guns are described as "caliber .50 inclusive (12.7 mm)" and "greater than .50 caliber (12.7 mm),"

45

respectively. In new ECCN 0A501, firearms are described in "items" paragraph .a and .b as "of caliber less than or equal to .50 inches (12.7 mm)" and "with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm)," respectively. This commenter asserted that the caliber terms not being aligned between the control lists could cause confusion and misinterpretation of the controls between the USML and CCL, particularly in regard to the ammunition controls which follow the respective firearm controls.

*BIS response:* BIS notes that the intent of this final rule is to transfer those items previously controlled under Categories I-III that no longer warrant ITAR control, to the respective ECCNs as created under this rule to the CCL by using long-accepted industry standards of "caliber" as the defining delineation between ammunition types. BIS made changes in this final rule to use the appropriate text in this final rule to be consistent with the text used in the USML, so that .50 caliber ammunition and .50 caliber firearms will transition into their proper 0x5zz ECCNs. For example ECCN 0A501, includes all non-automatic and semi-automatic ".50 caliber (12.7mm) and less" firearms under "items" paragraph .a.

*Comment 29:* One commenter was concerned that with the proposed description of caliber in inches in ECCN 0A501, ammunition for .50 caliber Browning Machine Guns ("50 BMG") would be controlled under both 0A505 and USML Category III creating overlapping controls.

*BIS response:* BIS clarifies in this final rule that ECCN 0A501 includes all non-automatic and semi-automatic "equal to .50 caliber (12.7mm) and less" firearms under "items" paragraph .a. Therefore, this final rule also would not control the 50 BMG under ECCN 0A501.a. However, the corresponding ammunition which is used in a number of non-automatic and semi-automatic firearms will be controlled under 0A505.a, when not linked or belted.

DOC_0081039

*Comment 30*: Some commenters requested BIS revise Note 3 to 0A501 so that the definition of antique firearms is aligned with the Wassenaar Arrangement controls or alternatively that the date threshold in the definition of antique firearm in Note 3 be changed from 1890 to 1898 to align with the ITAR's exemption.

*BIS response*: BIS does not agree. Because this rule focuses on the export of firearms, it uses the year 1890 so that the United States remains consistent with its international export control commitments under the Wassenaar Arrangement, which uses 1890 as the cutoff year to identify many firearms and armaments that are not on the control list.

*Comment 31*: One commenter requested that BIS clarify where combination firearms would be controlled, noting that neither ECCN 0A501 (firearms) nor ECCN 0A502 (shotguns) refer to firearms that are a combination of shotgun and rifle, *i.e.*, that have two barrels.

*BIS response*: BIS agrees, and in this final rule adds a note to clarify that combination firearms are controlled under ECCN 0A501.a. This final rule also adds a note under ECCN 0A502 to specify that all shotguns and "shot-pistols" are controlled identically.

*Comment 32*: One commenter sought clarification on the classification of detachable magazines for ECCN 0A501 firearms with a capacity of less than or equal to 16 rounds. The commenter asserted that ECCN 0A501.d explicitly lists magazines with a capacity of greater than 16 rounds, but it was not clear whether magazines with a lesser capacity are designated as EAR99 or controlled under 0A501.x.

*BIS response*: BIS agrees, and this final rule adds a new note to paragraph .d to clarify that magazines with a capacity of 16 rounds or less are classified under ECCN 0A501.x.

DOC_0081040

*Comment 33:* One commenter asserted that as currently proposed, paragraph .x would apply to parts and components specially designed for a commodity classified anywhere on the USML. This commenter recommended revising as follows: "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or USML Category I and not elsewhere specified on the USML or CCL.

*BIS response:* BIS does not agree that a change is needed. Because some of the parts and components controlled under ECCN 0A501.x may be for firearms incorporated into a fully automatic firearm that is incorporated into a military vehicle (a USML Category VII commodity), the broader reference to the USML is more appropriate. The USML Order of Review and CCL Order of Review will ensure that only those parts and components intended to be classified under ECCN 0A501.x will be classified under this "items" paragraph.

*Comment 34:* One commenter requested revising paragraph 0A501.y by replacing the period at the end of the paragraph with the phrase "including" or "as follows:" in order to clarify whether .y is limited to the enumerated .y paragraphs, or itself is a control paragraph in which items can be controlled.

*BIS response:* BIS clarifies that the .y listings are exhaustive, and to be classified in a .y paragraph, the item needs to meet the identified description and the definition of "specially designed."

*Comment 35:* One commenter requested clarification of whether the .y paragraph itself serves as a catch-all for "parts," "components," "accessories," and "attachments." For example, a set of fiber-optic sights for a pistol are not "iron sights" as listed in .y.3, but may be a "specially designed" "attachment."

DOC_0081041

*BIS response*: BIS agrees that the introductory text of ECCN 0A501.y needs to be revised to clarify that the "parts," "components," "accessories," and "attachments" "specially designed" therefor for the .y items are also controlled in the .y paragraphs. This final rule makes this change. BIS had previously made this same correction to the other .y paragraphs on the CCL to ensure, for example, that "specially designed" parts used in "specially designed" galleys classified under ECCN 9A610.y for military aircraft, would not be controlled in 9A610.x.

*Comment 36*: One commenter asserted that ECCN 0A501.y contains three types of commodities that have been officially determined to be EAR99 for many years: (i) .y.2 - scope mounts and accessory rails; (ii) .y.3 - iron sights; and (iii) .y.4 - sling swivels. This commenter requested that the parts in .y paragraphs .y.2, .y.3, and .y.4 be removed from ECCN 0A501 and a note be added to confirm that they remain EAR99 items.

*BIS response*: BIS does not accept this change because it only works if the past CJs covered those items and all variants. Paragraph (b)(1) of "specially designed" and General Order No. 5 would not be applicable to those items not included within the scope of a CJ – meaning an item may get pulled up into .x. Therefore, to address this issue definitively this final rule keeps these items as .y items.

**License Exception LVS**

*Comment 37*: BIS received a number of comments on License Exception LVS eligibility. Some commenters supported its availability, though one commenter suggested that wholesale value rather than actual value should be used while another commenter requested higher value shipments should be authorized to Canada. One commenter recommended pegging the LVS dollar value to inflation to allow for incremental increases to match price increases over time.

49

One commenter requested that Canada should have all of its LVS eligibility specified in its own LVS paragraph in the ECCN, distinguishing Canada's eligibility from other Country Group B countries. Some commenters raised concerns related to License Exception LVS availability, asserting that it would not curb risky exports of pistol grips and magazine clips valued at $500, that it is possible for companies or individuals to export many low-value items in one shipment without a U.S. license, and that it could fuel gun violence in Mexico and Central America. One commenter requested reducing the LVS eligibility under ECCN 0A501 from $500 to $100, and reducing further the commodities that would be eligible.

*BIS response:* BIS agrees that License Exception LVS will be particularly useful for the firearms industry for low value shipments and believes that the license exception is properly scoped in the dollar value used and the scope of availability for the reasons outlined in the Commerce May 24 rule. BIS emphasizes as specified in the name of the license exception itself, this license exception is limited to low value shipments. This includes the total quantity for consolidated shipments, even if a shipper was consolidating several shipments. BIS also notes that an exporter is limited to twelve orders per year to the same consignee. The terms of License Exception LVS also strictly prohibit the splitting of orders to try to evade the applicable LVS dollar value. In addition, if there are questions whether an exporter has stayed within the required scope of LVS, EE can require exporters to hand over all the required recordkeeping documents related to a transaction under License Exception LVS to identify whether there has been a violation of the EAR. LVS is not currently linked to inflation, but the public may at any time make recommendations for changes to the regulations, including suggestions for revising the LVS dollar values in an ECCN.

DOC_0081043

BIS notes that only countries identified in Country Group B are eligible to receive commodities under License Exception LVS. These are countries that the U.S. Government does not have export control concerns with for purposes of the commodities that are eligible to be authorized under License Exception LVS. More sensitive commodities, such as firearms and some key components, are excluded from License Exception LVS. As noted in the Commerce May 24 rule, the ITAR has a similar type of exemption. Relatedly, BIS does not believe Canada-specific provisions are necessary in the License Exception LVS paragraph of ECCN 0A501 to specify all LVS eligibility for Canada in one stand-alone paragraph. First, it would deviate from how LVS is described in other ECCNs. Second, there is the potential that an exporter may get confused and believe LVS is available for other Country Group B countries because the same commodities were identified in more than one LVS paragraph.

Finally, it is important to note that the importing country will also have its own requirements for imports and domestic sale and use, including for commodities such as pistol grips. While someone like a jeweler or other craftsman in the U.S. (*e.g.*, a hobbyist who enjoys engraving pistol grips with western cowboy motifs) could use License Exception LVS, it would not be available for larger transactions, such as someone wanting to export to a retail store in a foreign country.

**New ECCN 0A502: Shotguns and Certain Related Commodities**

*Comment 38*: One commenter requested revising the heading of ECCN 0A502 to specify the parts and components enumerated in the heading are shotgun parts and components.

*BIS response*: BIS agrees, and this final rule revises the heading to specify that parts and components enumerated in the heading of ECCN 0A502 are shotgun "parts" and "components."

DOC_0081044

BIS also makes one other change to address the issue of clarity raised by this commenter. This final rule adds a note to ECCN 0A501 to specify that "shot-pistols" will be controlled as shotguns.

*Comment 39:* One commenter requested that rather than having the items controlled contained in the ECCN heading, BIS should enumerate the shotguns in separate "items" paragraphs that track with the different reasons for control for the different size shotguns in the "items" paragraph to ease the compliance burden for exporting these shotguns.

*BIS response:* BIS does not agree. The license requirement section in this final rule is already consistent with the current control text, applying CC Column 2 and CC Column 3 as appropriate depending on the destination. BIS already uses this structure for long barreled shotguns, which this final rule moves to ECCN 0A502.

*Comment 40:* One commenter requested that the final rule define antique shotguns in ECCN 0A502 to capture those guns made "in or before 1898," consistent with the definition of antique rifles and handguns in the Gun Control Act of 1968.

*BIS response:* BIS agrees, and this final rule adds a new Note 1 to 0A502 specifying that shotguns made in or before 1898 are considered antique shotguns and designated as EAR99.

*Comment 41:* One commenter requested BIS clarify the control status of accessories of optics, *e.g.*, sunshades or other anti-glare devices.

*BIS response:* BIS clarifies that sunshades or other anti-glare devices if not enumerated or otherwise described in ECCN 0A502 or any other ECCN are designated as EAR99.

*Comment 42:* One commenter requested that the description in the "Related Controls" paragraph of ECCN 0A502 be made consistent with how such shotguns are referred to in the revised USML Category I.

DOC_0081045

*BIS response:* BIS agrees, and this final rule removes the phrase "combat shotguns" wherever it appears in ECCN 0A502, including in the "Related Controls" paragraph. BIS in this final rule also removes references to "combat shotguns" in ECCN 0A505.

*Comment 43:* One commenter requested in order to have consistent controls and exceptions for similar commodities, that BIS allow the use of License Exception LVS for ECCN 0A502 parts and components to the same extent proposed for 0A501, *e.g.*, for shotgun trigger mechanisms, magazines, and magazine extensions.

*BIS response:* BIS agrees, and in this final rule revises the LVS paragraph in the License Exceptions section of ECCN 0A502 to add LVS eligibility of $500 for the same types of parts and components for ECCN 0A502 shotguns that are available for LVS under 0A501. Complete shotguns will continue to be excluded.

*Comment 44:* One commenter asserted that to facilitate the use of License Exception LVS, the ECCN 0A502 heading should be changed to "Shotguns and related commodities (See List of Items controlled)…" and then under the "List of Items Controlled" parts and components should be enumerated to include "complete trigger mechanisms," "magazines," and "magazine extension tubes."

*BIS response:* BIS does not agree. BIS in this final rule continues to enumerate "parts" and "components" in the heading, but in the interest of clarity it also includes the specific eligible commodities in the LVS paragraph.

**New ECCN 0A504: Optical Sighting Devices and Certain Related Commodities**

*Comment 45:* One commenter asserted that the proposed Note 1 to 0A504.f states that "0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide

DOC_0081046

a reference for aligning the firearms sights." This commenter asserted there are a variety of boresighting devices that are placed over the muzzle of the barrel instead of inside the bore or chamber and perform the same function as those described in the note. For these reasons, the commenter requested that this Note be revised to read as follows: "0A504.f does not control laser boresighting devices that provide a reference for aligning the firearms sights. This includes any laser boresighting device, regardless of how it attaches to the firearm (*e.g.*, boresights that fit over the muzzle of the barrel), which performs the same function."

*BIS response:* BIS does not agree. Revising Note 1 to 0A504.f would make it difficult to distinguish between what the commenter is proposing and a laser pointer. The note included in this final rule makes it clear that those commodities that are placed inside a bore or chamber would preclude its subsequent use as or with a firearm.

*Comment 46:* One commenter requested License Exception LVS should be made available for ECCN 0A504.g commodities that are similarly insignificant as those commodities eligible in ECCN 0A501.

*BIS response:* BIS agrees, and this final rule includes License Exception LVS eligibility for "parts" and "components" classified under ECCN 0A504.g.

**New ECCN 0A505: Ammunition and Certain Related Commodities**

*Comment 47:* One commenter recommended revising ECCN 0A505.a to include ammunition for firearms controlled in USML Category I that may not otherwise be captured by adding the phrase "or USML Category I" to clarify that ammunition for these type of firearms is also controlled under ECCN 0A505.a.

54

*BIS response:* BIS agrees, and this final rule incorporates the suggested text to clarify that ammunition for firearms in both ECCN 0A501 and USML Category I will be controlled under 0A505.a, provided it is not enumerated elsewhere in 0A505 or in USML Category III.

*Comment 48:* One commenter requested BIS revise ECCN 0A505 to include a note similar to the Note to 0A018.b to specify that dummy ammunition is designated EAR99.

*BIS response:* BIS agrees, and this final rule adds a Note 4 to 0A505 to specify that all dummy and blank (unless linked or belted) ammunition, not incorporating a lethal or non-lethal projectile(s) is designated EAR99.

*Comment 49:* One commenter asserted that there are several magazine manufacturers in the U.S. producing magazines of greater than 50 rounds that would benefit from also having their magazine moved to the CCL. This commenter asserted that limiting this magazine capacity to 50 rounds or less does not protect any special U.S. or allied military advantage, but magazines of greater than 50 rounds are commonly found and manufactured worldwide.

*BIS response:* BIS does not agree. Magazines with a capacity of 50 rounds or less are appropriate on the CCL, and magazines greater than 50 rounds warrant ITAR control.

*Comment 50:* One trade association commenter noted that proposed ECCN 0A505 included an allowance for License Exception LVS of $100 for 0A505.x "parts" and "components," but that firearm parts and components under 0A501 have an LVS allowance of $500. This commenter asserted that its members feel this is an inconsistency in the treatment of related commodities. The commenter asserted that in recent years, costs related to ammunition components have been increasing, with the largest increases affecting larger caliber cartridges. This commenter asserted that the "$100 limit on LVS will be quickly met with small amounts of components, making this

55

exception not as useful as intended." Another commenter asserted that the ITAR allows for $500 per shipment, so $100 net under EAR would be more restrictive than ITAR exemption.

*BIS response:* While the ITAR does not have an exemption for exports of ammunition parts and components, BIS agrees, and this final rule raises the LVS dollar value from $100 to $500 for ECCN 0A505.

**New ECCN 0A602: Guns and Armament**

*Comment 51:* One commenter suggested revising ECCN 0A606 to clearly identify engines for self-propelled guns and howitzers as controlled therein rather than in 0A602.

*BIS response:* BIS notes that the USML Order of Review and CCL Order of Review would likely already address this. However, this final rule adds a Related Controls paragraph (3) and a new note to ECCN 0A602.x to clarify the appropriate classification, but it does not add such a note to ECCN 0A606.

**New ECCN 0B501: Test, Inspection and Production Equipment for Firearms**

*Comment 52:* One commenter requested guidance on what is the definition of production equipment under ECCN 0B501.e. This commenter asserted that it has "many hobbyist customers who would not qualify as a gunsmith let alone as a manufacturer and tools and equipment designed for hobbyists are quite different than manufacturing equipment… yet we have a concern these tools will be included in 0B501.e because even the hobbyist is 'producing' a firearms part."

DOC_0081049

*BIS response:* The term "production" is a defined term in part 772. "Production" means all production stages, such as: product engineering, manufacture, integration, assembly (mounting), inspection, testing, and quality assurance. Part 772 also includes a definition of "production equipment" that includes tooling, templates, jigs, mandrels, moulds, dies, fixtures, alignment mechanisms, test equipment, other machinery and components therefor, limited to those specially designed or modified for "development" or for one or more phases of "production." The definition of "production equipment" in part 772 applies only in the Missile Technology Control Regime context, but for purposes of this comment, the definition of "production" and the definition of "production equipment" provides the needed guidance. BIS also emphasizes that the person using the production equipment does not change the classification of the production equipment. Importantly, domestic use – that is use of production equipment in the United States – does not implicate export controls.

*Comment 53:* One commenter requested BIS ensure there were no gaps for the production equipment controls on the CCL for USML Category I items as well as Category III items.

*BIS response:* BIS agrees. To ensure there are no gaps in production equipment for USML Category I, this final rule expands ECCN 0B501.e to include all production equipment "specially designed" for USML Category I items. It also expands ECCN 0B505.a to include all production equipment "specially designed" for USML Category III items.

**New ECCN 0B602: Test, inspection and production equipment for certain guns and armament**

DOC_0081050

*Comment 54:* One commenter requested adding examples of specific tooling that would be controlled under ECCN 0B602, such as a note including ECCN 0B602 boresights and units made specifically for testing purposes.

*BIS response:* BIS does not agree to this addition. As described above, part 772 defines "production" and "production equipment," so these existing definitions already address this comment.

**New ECCN 0E501: Technology for firearms and certain related items**

*Comment 55:* One commenter requested BIS clarify how "technology" is defined for 0E501 and whether shooting chronographs or empty brass cartridge annealing machines are included in the definition of "technology."

*BIS response:* BIS clarifies that the definition of "technology" in part 772 applies to ECCN 0E501 and any other Product Group E ECCNs on the CCL, including the other Product Group E ECCNs this final rule adds, *e.g.*, 0E505. In addition, BIS clarifies that shooting chronographs or empty brass cartridge annealing machines are end items and generally designated EAR99. Therefore, the examples given fall outside the Commerce definition of "technology."

*Comment 56:* BIS received a number of comments on the concept of "defense services," including concerns about the lack of defense services controls under the EAR, the potential loss of U.S. Government oversight on many types of defense services, and concerns about firearms training being provided to foreign security forces without U.S. Government approval. There were also concerns raised about the ability of U.S. companies to provide a wide range of assistance and training to foreign persons without sufficient U.S. oversight and a suggestion that the definition of "technology" be expanded to capture these defense-service type activities, such

58

as private security contractor training of foreign police with firearms. One commenter asserted that "the proposed rule could also create an unfortunate scenario where U.S. private security contractors are able to provide services to foreign security units or militias that are otherwise prohibited from receiving training through U.S. foreign security aid."

*BIS response:* BIS clarifies that defense services is specific to the ITAR, but the EAR maintains controls related to exports, reexports, and in-country transfers of commodities, software, and technology in a number of ways. For example, a U.S. person is prohibited from engaging in exports, reexports, or in-country transfers related to certain end uses (as specified in § 744.6) or a "knowing" violation (as specified in §§ 764.2(e) and 736.2(b)(10)). In addition, as part of providing a service, a person must determine whether there will be an export, reexport, or in-country transfer of any commodities, software, or technology requiring an EAR authorization. Accordingly, although the EAR generally does not control services directly, the EAR is still highly effective at protecting U.S. export control interests implicated by the supply of services in connection with exports, reexports, or in-country transfers. The effectiveness comes by controlling the technology -- *e.g.*, "technology" for how to produce a firearm. The release of technology is the key nexus where providing a service crosses over into a transaction that is subject to the EAR and that merits control. In most cases, the analysis will focus on whether any technology that is subject to the EAR will be released as part of providing the service. The release of technology moved from USML Categories I-III will require a U.S. Government authorization, except for 0E602 technology being exported to Canada which may be exported No Licensed Required ("NLR").

For example, providing design and development assistance, testing, and production assistance on firearms and ammunition to foreign persons would be a release of "technology"

59

subject to the EAR and require an EAR authorization, unless the information being released fully met the criteria in part 734 for exclusion from the EAR. The EAR requirements would apply if the technology was being exported. The EAR requirements would also apply if the technology was being released in the United States to a foreign national as a deemed export, including technology released through training.

BIS cautions against assuming that no U.S. Government authorization is required to provide training to foreign security forces. Providing military training of foreign units and forces would still be a defense service regulated by the ITAR. Questions on whether a specific service may be a defense service should be directed to the Department of State. For purposes of the EAR, as described above, the question centers on whether any items that are subject to the EAR are provided as part of that service, and if such items are related to firearms, then U.S. Government authorization will be required.

BIS notes that if an item, such as the firearms moved to the CCL in this final rule, is being exported under the Foreign Military Sales (FMS) program, those items are not "subject to the EAR" – meaning the EAR would not apply and for purposes of the AECA those items being exported under an FMS letter of offer and acceptance are defense articles subject to State Department controls under 22 U.S.C. 2794(3) for the specific transaction. BIS also notes that for non-FMS U.S. foreign security aid, the granting U.S. organization can include provisos as needed as part of the aid agreement that imposes any necessary restrictions the aid granting U.S. agency believes is warranted. In addition, BIS through the licensing process can impose conditions as warranted on licenses to ensure consistency with other requirements as needed. As noted above, the Department of State is a licensing review agency for Commerce licenses and

DOC_0081053

can advise on Commerce export licenses as warranted if additional conditions may be needed in furtherance of a direct commercial sale as part of U.S. foreign security aid.

*Comment 57:* One commenter asserted that because of the narrowness of the definition of "required," it "means companies may be able to provide a wide range of training activities, design and development assistance, testing, and production assistance on firearms and ammunition to foreign persons without sufficient scrutiny and oversight."

*BIS response:* BIS does not agree. The term "required" is an EAR defined term and is a well understood concept used on the control lists of the multilateral export control regimes. The EAR has effectively controlled "technology" for various other sensitive and sometimes lethal items using the existing definition and concept of "required."

*Comment 58:* One commenter asserted that "in 2016, U.S. registration for firearms manufacturing activities was deemed so important that DDTC issued specific guidance providing that a broad range of activities (*e.g.*, use of any special tooling or equipment upgrading in order to improve the capability of assembled or repaired firearms, and rechambering firearms through machining, cutting, or drilling) constitute "manufacturing" and required registration." This commenter asserted it was concerned because this 2016 guidance will not apply to Category I-III items moving to the CCL.

*BIS response:* BIS clarifies that individuals have been able to lawfully make their own firearms in the United States, but not for reselling. ATF licenses domestic manufacturers. The types of gunsmithing services described by this commenter are not considered "production" under the EAR.

DOC_0081054

**Revision to ECCN 0A018**

*Comment 59*: Some commenters requested removing ECCN 0A018 and transferring those commodities to 0A505, so all commercial firearms, ammunition, and related items could be in one of the series of new 0x5zz ECCNs and not be left behind in legacy xY018 entries. The commenter suggested that once the items in the proposed ECCN 0A018.b are moved to 0A505, and controlled in the same manner, then 0A018 could be removed. Another commenter requested the commodities classified in ECCN 0A018.b for "specially designed" components should be controlled under 0A505.x. The commenter also requested that the decontrol note in ECCNs 0A018.b be transferred to 0A505 so that the current EAR99 status of such items is maintained.

*BIS response:* BIS agrees with these requested changes. This final rule removes the items controlled under ECCN 0A018 and adds these commodities to 0A505 but retains the heading of ECCN 0A018 and adds a cross reference to ECCN 0A505. This final rule removes the commodities controlled under ECCN 0A018, because this final rule controls these commodities under 0A505.d or .x. As conforming changes, this final rule removes ECCN 0E018, because 0E505 is broad enough to control this technology and revises the heading of ECCN 0A988 to remove an outdated reference to ECCN 0A018.d.1. ECCN 0A018.d paragraph is reserved in 0A018, so this reference in 0A988 should have been updated in an earlier rule.

BIS clarifies that the control parameters of ECCN 0A505.x in this final rule are broad enough to control commodities classified in ECCN 0A018.b for "specially designed" components controlled under 0A505.x. without further revisions. This final rule adds a Note 4 to ECCN 0A505 to address the commenters' request related to the decontrol note in 0A018.

DOC_0081055

**Conforming Change to General Order No. 5**

*Comment 60:* One commenter requested that licenses already granted under the ITAR should be grandfathered for all outstanding transactions.

*BIS response:* BIS clarifies here that this was already addressed with the revisions proposed in the Commerce May 24 rule for General Order No. 5, which adds 0x5zz ECCNs to General Order No. 5 and will be adopted in this final rule. The current General Order No. 5 includes grandfathering provisions and allows for applying for Commerce licenses once a final rule is published, but not yet effective.

**Revisions to Regional Stability Licensing Policy for Firearms and Ammunition**

*Comment 61:* Several commenters raised concerns that laws against the provision of arms where certain human rights abuses are of concern may not apply to the 0x5zz ECCNs and that the role of the Bureau of Democracy, Human Rights, and Labor (DRL) at the Department of State would be diminished. One commenter asserted that the Department of State would no longer have a statutory basis for vetoing a proposed sale on human rights grounds for firearms, guns, ammunition, and related parts that move to the CCL.

*BIS response:* As described above, BIS disagrees with the assertion that there will be less focus on protecting human rights under the EAR. This final rule will control these items for Regional Stability and the license review policy specifies that human rights concerns are considered as part of the license review process. As referenced above, the Department of State is a license review agency for Commerce licenses, and the existing EO 12981 and EAR provide that other license review agencies have 30 days for review of Commerce license applications. EO 12981

DOC_0081056

does not specify what parts of those other agencies must review a Commerce license application, but the Department of State has discretion to ensure that DRL receives and reviews Commerce licenses.

This final rule includes a license review policy for regional stability to indicate license applications will also take into consideration human rights concerns, which can be a basis for denial. BIS also notes that there is a presumption of denial policy for license applications involving narcotics traffickers, criminal organizations, and terrorists because of their frequent involvement in human rights abuses, as well as other regional stability concerns.

**Crime Control and Detection License Review Policy**

The Commerce May 24 rule did not propose changes to the crime control and detection license review policy in part 742, but commenters made recommendations in this area that are described and responded to below.

*Comment 62:* One commenter recommended that "in order to bring the proposed regulations into alignment with provisions of the Foreign Assistance Act [22 U.S.C. 2304(a)(2), which makes explicit reference to crime control equipment under the aegis of the (expired) Export Administration Act], ECCN 0A501.a should be controlled for crime control."

One commenter requested that BIS provide the police profession a greater, better-defined role in the evaluation of firearm export license applications and possibly form a technical advisory committee (TAC). Another commenter requested that licensing officials should consider the effect of proposed exports on local communities, public safety, peace officer safety,

64

crime control, and control of civil disturbances to assure that the rule of law is not impaired by firearm exports.

One commenter asserted that highly destructive weapons should not be exported to civilians. This commenter recommended "a maximum limit on firepower exported to civilians. Firearms with a muzzle energy higher than 5,000 Joules should be barred from export to non-government end-users."

*BIS response:* BIS notes that the NS 1 and FC 1 license requirement included in this final rule for ECCN 0A501.a, as well as ECCN 0A501.b, will ensure U.S. multilateral commitments are met. In addition, the RS 1 license requirement and license review policies is revised in this final rule to further address the types of human rights concerns, as well as imposing a presumption of denial license review policies for certain types of end users of concern, such as narcotics traffickers, will ensure U.S. export control interests are protected and that exports are not approved that would otherwise not be consistent with the Foreign Assistance Act. As was discussed above, the U.S. Government agency granting aid to a foreign country will also have the ability to impose certain provisos as part of that foreign assistance agreement, and all exports made under the FMS programs are authorized by the Department of State. As warranted, there is nothing that will preclude BIS from consulting with other agencies of the U.S. Government regarding a particular license application.

BIS agrees that getting regular input from the police profession and those with expertise from the private sector will be beneficial but notes that this can be accomplished through BIS's existing TACs rather than through the creation of a new TAC. BIS notes that agency rules are regularly reviewed by BIS's EE as well as other agencies with law enforcement components.

DOC_0081058

BIS does not agree that an outright prohibition is needed to protect U.S. national security and foreign policy interests under the EAR. Imposing such a worldwide prohibition would be more restrictive than how these firearms were regulated under the ITAR and would impose significant burdens on the U.S. firearms industry that may result in significant U.S. job losses in the firearms and related industries. BIS appreciates the time and thought that went into the detailed suggested change, but an outright prohibition was not contemplated in the Commerce May 24 rule, would arbitrarily single out one industry for more restrictive control and is not needed to protect U.S. export control interests, as those interests can be served through the regulatory regime set forth in the EAR.

**License Exception TMP**

_Comment 63:_ One commenter requested increasing the number of items allowed for temporary export under § 740.9(a)(5) to 100 per shipment to more closely align with commercial expectations and practices. Another commenter asserted that larger film productions such as war movies, will oftentimes require well beyond 75 firearms.

_BIS response:_ BIS does not agree with expanding § 740.9(a)(5) of TMP to allow for 100 firearms per shipment or to address a particular type of export. The exhibition and demonstration authorization under paragraph (a)(5) of License Exception TMP is intended to provide for a sufficient quantity of firearms, and if an exporter needs a larger quantity, _e.g._, 100 or even 1,000 firearms for exhibition or demonstration, that the exporter may apply for a license to authorize the export. BIS maintains the status quo for how large temporary shipments of firearms are handled under the ITAR, which is through a licensing process that allows BIS to include any additional conditions to ensure the export will not be diverted.

66

*Comment 64*: BIS received comments requesting modifications to License Exception TMP, including to allow for the use of License Exception TMP (§ 740.9) under paragraph (a)(10) to transfer firearms to affiliates, such as a foreign parent or subsidiary; to allow TMP paragraph (b)(1) to be used to authorize temporary import and subsequent export of items moving in transit through the United States; and to allow for temporary importation for a period of one year. BIS also received a comment requesting extensions of temporary imports imported under paragraph (b)(5) to not be more restrictive than the ITAR.

*BIS response:* BIS does not accept these changes. Under this final rule, an exporter may apply for a license to authorize these same types of exports of firearms to affiliates. In addition, BIS notes that License Exception STA is available for parts and components, *e.g.*, those that this rule will control under ECCN 0A501.x, when the export, reexport, or transfer (in-country) is to a Country Group A:5 country, including affiliates. License Exception STA is more restrictive than paragraph (a)(10) of License Exception TMP, but because of the sensitivity of the items involved it is not appropriate to allow for the paragraph (a)(10) authorization to be available. As for firearms transshipped through the United States, § 740.9 (b)(3), (4), and (5) will be available to authorize the export and will be sufficient to address concerns about such authorizations.

BIS does not accept the suggested change to the time limitation in § 740.9(b)(5) to lengthen it from one year (as included in the Commerce May 24 rule) to four years because one year will be sufficient for these types of temporary end uses in the U.S. For the same reason, BIS also does not accept the suggestion to allow for extensions of temporary imports made under paragraph (b)(5) as suggested by one commenter.

DOC_0081060

*Comment 65:* One commenter noted that the proposed additions to § 740.9 included an instruction directing temporary importers and exporters to contact CBP at the port of temporary import or export, or at the CBP website, for the proper procedures to provide any data or documentation required by BIS. The commenter suggested that BIS and CBP coordinate to create standardized instructions for all ports that can be made available online, so that each shipment does not have to be specially coordinated.

*BIS response:* BIS agrees and will take steps, in coordination with CBP, to create standardized instructions for all ports that can be posted online prior to the effective date of this final rule.

*Comment 66:* One trade association commenter asserted that "new paragraph (b)(5) in License Exception TMP and the related provisions in § 758.10 that detail the process for temporary import and subsequent export of these items is fair and reasonable." This commenter asserted "it is common practice to cite the regulatory exception for the temporarily imported commodities at the time of import, then reference the import documents at time of return export of the goods" and does not believe the process in the Commerce May 24 rule will cause any additional burden to exporters.

*BIS response:* BIS agrees and adopts these provisions in this final rule as proposed.

*Comment 67:* One commenter requests License Exception TMP be expanded beyond paragraphs (a)(5) and (a)(6) to also allow for use in film production for subsequent permanent return to the United States. Alternatively, one commenter requests that BIS should consider a procedure or license, similar to a DSP-73, to allow for the temporary export and re-importation of firearms. Another commenter asserted that BIS should provide additional guidance on the return of temporary exports under the new paragraph (b)(5) under License Exception TMP.

DOC_0081061

*BIS response:* BIS confirms that License Exception TMP under paragraphs (a)(5) and (a)(6) will not be available in that type of a fact pattern, but a Commerce license could be applied for to authorize these types of exports. As noted above, Commerce licenses are flexible enough to authorize temporary exports that are not otherwise eligible for License Exception TMP. The importation into the United States after temporary export will not require a separate EAR authorization. BIS agrees providing guidance for the import of items temporarily exported will be helpful and clarifies that the import of items temporarily exported does not require an EAR authorization for import.

**License Exception GOV**

*Comment 68:* One commenter asserted that the phrase "or other sensitive end-users" is unclear and recommended deleting the phrase or enumerating the specific types of ineligible entities.

*BIS response:* BIS includes a parenthetical phrase in the final rule under the new Note 2 to paragraph (b)(2) to include illustrative examples of other sensitive end-users. This final rule adds the parenthetical phrase "(*e.g.*, contractors or other governmental parties performing functions on behalf of military, police, or intelligence entities)" after the phrase "or other sensitive end-users" to provide greater clarity on the other end-users that are excluded.

**License Exception BAG**

*Comment 69:* Several commenters expressed opposition to the requirement for individuals to have to file in AES for personally owned firearms and ammunition exported under License Exception BAG, that was included in the Commerce May 24 rule. The commenters expressed concerns that requiring individuals to file in AES is problematic and unduly burdensome; that

DOC_0081062

there is not a genuine need for this information and would violate the spirit of congressional prohibitions against Federal firearm registries; and that Department of State and CBP already tried requiring AES filing for individuals under the ITAR and it was not workable. Commenters identified a number of issues with the AES filing system for individuals, including the cost to create accounts, the compatibility of the hardware and software, concerns that IRS and Census requirements are in conflict, and the mismatch of required information for individuals with the fields that are currently in AES that are oriented to commercial exports.

For these reasons described above, several commenters requested use of CBP Form 4457 as the permanent solution. Some commenters asserted that CBP Form 4457 serves an important purpose for some foreign governments, but could be improved by harmonizing CBP procedures for Form 4457 between different CBP offices to ensure the forms are being issued consistently. Some commenters asserted that they would support a simplified system that would be based on U.S. passports, possibly linked to an electronic version of the CBP Form 4457.

_BIS response_: BIS was aware of these types of concerns, including the recent history of this issue under the ITAR. The Commerce May 24 rule stated that whether and how BIS includes this requirement in a final rule would be based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published. The Commerce May 24 rule also noted that if CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Form 4457, until a workable solution is developed or CBP suggests an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition.

DOC_0081063

At this time, BIS notes that CBP and the U.S. Census Bureau have not made changes to the AES system on the Automated Commercial Environment (ACE) that would address the concerns expressed. Therefore, taking that into account and the comments received on the Commerce May 24 rule, this final rule does not adopt the requirement for individuals exporting their personally owned firearms and ammunition under License Exception BAG to file in AES. Instead, this final rule incorporates the requirement for individuals to file the CBP Form 4457. BIS notes that if CBP and the U.S. Census Bureau later adopt changes that would address the underlying issues, or if CBP adopts changes to the process for submitting the CBP Form 4457, then BIS would make conforming changes to the EAR.

*Comment 70:* BIS also received comments expressing concern over the availability of License Exception BAG for firearms. One commenter requested that the provision authorizing license-free exports of semi-automatic rifles by citizens and legal permanent residents should be removed, because a sufficient justification was not provided in the Commerce May 24 rule. Another commenter asserted that if a firearm is stolen or lost that is exported under License Exception BAG, there will be little that can be done to recover the weapon. The commenter also asserted it will be easier for smugglers to take advantage of License Exception BAG to facilitate trafficking. One commenter expressed concern that foreigners temporarily in U.S. will abuse License Exception BAG. One commenter asserted that the May 24 rule would not stop non-resident aliens leaving the United States via commercial airlines from taking firearms "accessories," "attachments," "components," "parts," and ammunition with them.

*BIS response:* BIS acknowledges these concerns but disagrees that additional changes to this final rule are warranted. The availability of License Exception BAG will be made to be consistent with 22 CFR 123.17(c), which authorizes U.S. persons to take up to three non-

71

automatic firearms and up to 1,000 cartridges therefor abroad for personal use. As far as the

potential for items to be lost or stolen, License Exception BAG requires the exporter to maintain

control of their personal belongings and to return with those items unless destroyed overseas and

the requirements are more straightforward than a commercial transaction in which there are

multiple parties. BIS notes that related to loss or theft the concern applies equally if a firearm

was exported under a Commerce license. Further, the U.S. Government maintains oversight

through the requirement in this final rule for the CBP Form 4457 to be filed, along with the

export requirements to present the firearm to CBP prior to export under License Exception BAG.

In addition, this final rule requires the serial number, make, model, and caliber of the firearm to

be included on the CBP Form 4457. When the U.S. citizen or permanent resident alien returns,

the U.S. Government expects and requires that the same firearm to be returned as included on the

CBP Form 4457. Failure to comply with these requirements could subject a U.S. citizen or

permanent resident alien to administrative and/or criminal penalties depending on the specifics of

the potential violation. BIS notes that License Exception BAG for non-resident aliens will be

limited to allowing nonresident aliens leaving the United States to take firearms, and ammunition

controlled by ECCN 0A501 or 0A505 that they lawfully brought into the United States, under

the provisions of Department of Justice regulations at 27 CFR part 478. This is an important

safeguard to ensure that the items being exported under License Exception BAG are limited to

those that were lawfully brought into the U.S. The availability of License Exception BAG for

these non-resident aliens will also be consistent with 22 CFR 123.17(d), which authorizes

foreign persons leaving the United States to take firearms and ammunition controlled under

Category I(a) of the USML (both non-automatic and semi-automatic) that they lawfully brought

into the United States. The export of "accessories," "attachments," "components," and "parts" is

DOC_0081065

not eligible for License Exception BAG and would require a separate U.S. Government authorization.

*Comment 71:* One commenter noted that § 740.14(c)(1) "Limits on eligibility" currently states that the items must be "owned by" the individuals rather than ITAR § 123.17(c)(3)'s focus on the person's "exclusive use" and recommended conforming the EAR with the ITAR's scope.

*BIS response:* BIS does not agree. The requirements in § 740.14 (c)(1) apply to all items that subject to the EAR that are eligible, so these requirements are intended to be broader than the exclusive use limitation in paragraph (e) (Special provisions for firearms and ammunition).

**Reporting Requirements**

*Comment 72:* BIS received a number of comments related to reporting requirements. One commenter asserted that it appears that requiring conventional arms reporting for firearms to be controlled under ECCN 0A501.a and .b would add welcomed specificity to reports required by the United Nations and the Wassenaar Arrangement while another commenter was concerned that firearms are being singled out for conventional arms reporting. One commenter asserted that exporters should not have to submit reports under the conventional arms reporting for the Wassenaar Arrangement and the United Nations because BIS already has ways to obtain this information from other U.S. Government sources.

*BIS response:* BIS agrees that the conventional arms reporting requirements will improve transparency and meet U.S. Government multilateral commitments to the Wassenaar Arrangement and the United Nations. BIS notes that other USML Categories that were revised that moved items to the CCL under "600 series" and 9x515 ECCNs were not identified under the

Wassenaar Arrangement or United Nations List for requiring reporting for conventional arms. Some of the USML Category I items being moved to the CCL are identified under the Wassenaar Arrangement or United Nations List for requiring conventional arms reporting and thus were included to meet U.S. Government commitments.

To ease reporting requirements on exporters as suggested by one commenter and provide greater flexibility for industry, BIS clarifies that for the reporting required in this final rule can be accomplished in one of two ways. First, the exporter can follow the process outlined in part 743 by sending in reports to BIS with the required information. However, because of the EEI filing requirements in § 758.1(g)(4)(ii) for the firearms that require conventional arms reporting, all conventional arms reporting requirements for firearms should be able to be met by using the alternative submission method described below in the regulatory changes. Under the alternative method, the U.S. Government will rely on the EEI record in AES for firearms classified under 0A501.a and 0A501.b, by the exporter being required to always include as the first text in the Commodity Description field in AES the first six characters of the ECCN number, *i.e.*, "0A501.a" or "0A501.b."

*Comment 73:* One commenter raised questions whether the requirements of the Paperwork Reduction Act (PRA) were met for imposing a new requirement and whether this information would be needed by BIS.

*BIS response:* BIS had created this reporting requirement in the April 16, 2013, initial implementation rule, including providing estimates for the anticipated burden at that time in anticipation of the full completion of the USML to CCL review process and these end item firearms being moved to the CCL. BIS makes this clearer in this final rule, as well as describing

DOC_0081067

the alternative method that will eliminate the need for any type of additional reporting and instead use the data that will be reported in the EEI filing in AES.

*Comment 74:* One commenter asserted that BIS reporting provides even less data than the Department of State 665 report and requested that BIS improve its reporting.

*BIS response:* In the past, BIS has provided similar data that is included in the Department of State 655 report in the BIS annual foreign policy report and in reports on the BIS website detailing exports by country and largest quantity of ECCNs being exported to the respective countries. Going forward under ECRA, BIS will be required to submit an annual report to Congress that will include the information specified in Section 1765 of ECRA, including implementation of end-use monitoring of military items on the EAR. BIS notes because this final rule will require EEI filing in AES for the firearms moved to the CCL and CBP Form 4457 for License Exception BAG, BIS will have data available on exports of firearms moved from USML Category I to the CCL.

**Serial Numbers, Make, Model, and Caliber in AES (§ 758.1(g)(4)).**

*Comment 75:* Several commenters asserted they were opposed to the expanded data elements (*i.e.*, serial numbers, make, model, and caliber) required as part of the EEI filing to AES for firearms that would be transferred from the USML to the CCL, suggesting that the expanded data elements would exacerbate the problems for private travelers forced to use the system and violate the spirit of congressional prohibitions against Federal firearm registries. BIS also received comments asserting that filing in AES poses an undue burden on exporters to file information that is otherwise available to U.S. Government, such as through the Gun Control Act and ATF regulations, and that it may violate the PRA because the burden is redundant. Another

DOC_0081068

commenter asserted that because of AES character limitations it may be difficult or impossible to include the serial number, make, model, and caliber information. In addition, one commenter asserted that the manufacturer, model number, and caliber does not assist law enforcement verify the export because the Foreign Trade Regulations (FTR) and EAR already require that the item description entered in the EEI filing in AES conform to that shown on the license. One commenter asserted it generally supports strong oversight measures for arms transfers and from that perspective, it welcomes detailed digital record-keeping requirements. Another commenter recommended using the term "model" or "model designation" rather than "model number," consistent with ATF regulations.

*BIS response:* BIS has included filing requirements only when necessary to ensure that export control concerns will be protected, including export enforcement and transparency concerns. As noted above, BIS in this final rule addresses the concerns about exports under License Exception BAG by not requiring an EEI filing in AES for such exports, though CBP Form 4457 will require information on the serial numbers, make, model, and caliber for the firearms being exported. This much more focused requirement will also be responsive to assertions that the information proposed to be collected was an undue paperwork burden on exporters.

While other Federal regulations may require similar information, BIS would not have the legal authority to subpoena or otherwise request the same information unless the records are required to be kept under the EAR. If different regulations require the same information, then there should be no additional burden on exporters or other relevant parties for maintaining this information to meet their various regulatory requirements. Typically, the EAR is flexible in how specific records are maintained since it regulates a variety of industries with different norms.

DOC_0081069

For items that are exported under a U.S. Government authorization for temporary export, it is still warranted to require that information to be filed as EEI in AES. This final rule adopts a revised requirement in § 758.1(g)(4) to limit it to temporary exports from the United States or when the license or other approval contains a condition requiring all or some of this information to be filed as EEI in AES. This final rule clarifies that a temporary export for purposes of § 758.1(g)(4) is any export whereby the EAR authorization requires subsequent return to the United States (*e.g.*, License Exception TMP or a license authorizing a temporary export). BIS notes that this revised approach scales back the reporting requirement significantly, focuses it on exports of the primary concern for ensuring the U.S. Government can confirm what was temporarily exported is what will be returned, and importantly still retains the ability of BIS to impose this condition when warranted on a case-by-case for any particular license where BIS and the other license review agencies believe requiring the filing of this information as EEI in AES is warranted. BIS is aware that the Department of State sometimes includes such a requirement as a proviso on some of its licenses or approvals for firearms, so the requirement that is included in this final rule that retains the ability of BIS to impose such a condition on Commerce licenses is consistent with licensing practices under the ITAR.

BIS has confirmed with CBP and the U.S. Census Bureau that AES on the ACE platform can accommodate EEI filers to submit the serial number, make, model, and caliber information. Under the current ITAR licensing practices, sometimes provisos are included on a State license or other approval that requires this information to be entered as EEI in AES, and BIS is not aware of the current system not permitting the proper filing of this information as EEI in AES.

BIS generally supports strong oversight. It also accepts the recommendation to adopt the term "model" instead of the proposed "model number."

DOC_0081070

*Comment 76*: Two commenters asserted that the only place where the reporting requirement of serial numbers, make, model, and caliber may be warranted was for License Exception TMP. One of these commenters noted that "such a requirement of mandatory serial number reporting in AES might make sense only for temporary exports and imports under TMP in particular, to allow re-import procedures to be followed and verified." However, the requirements proposed in new §§ 758.10(b)(1)(ii) and 740.9(b)(5)(iv)(B) already cover this by requiring serial numbers as part of a complete list to be submitted to CBP at the time of import and/or export.

*BIS response*: BIS clarifies that the reference in License Exception TMP in new §§ 758.10(b)(1)(ii) and 740.9(b)(5)(iv)(B) are for information to be provided at the time of temporary import and export of firearms temporarily in the United States. The proposed requirements in § 758.10(b)(1)(ii) in the phrase "or other appropriate import documentation (or electronic equivalents)" and the reference to "or electronic equivalents" was referring to the possibility that such information could be provided to CBP in person or electronically by using the ACE portal at the time of temporary import and subsequent export, so BIS does not see an inconsistency with the proposed requirement and therefore will include the requirement in this final rule as originally proposed. BIS agrees with the commenter's assertion that for firearms temporarily exported under License Exception TMP under paragraph (a)(6), there is a possibility that in certain cases the returned firearm may not be the same. This final rule includes a Note 3 to paragraph (g)(4) in § 758.1 to provide guidance on that issue.

**Entry Clearance Requirements for Temporary Imports**

*Comment 77*: BIS received comments asserting that foreign visitors exporting personal firearms after temporary import should not have to file in AES for many of the same reasons why filing in AES for exports authorized under License Exception BAG is not appropriate. Another

DOC_0081071

commenter asserted that such AES declaration requirement would discourage foreign participants from coming to the U.S. for hunting and competitive shooting.

*BIS response:* BIS does not agree with these assertions. As noted above, one of the permissible identifiers in filing in AES is a foreign passport, so the most substantive concern for individuals filing in AES does not apply for these filings. In addition, those using License Exception TMP will generally be companies, so the concerns expressed about AES being more oriented to companies compared to individuals also does not apply. For these reasons, BIS in this final rule publishes the changes as proposed. In addition, as noted above, each country, including the United States, imposes requirements that it believes are warranted to regulate the importation and use of firearms in its country. U.S. hunters and competitive shooters that travel overseas and foreign hunters and competitive shooters who come to the United States understand that firearms are regulated.

*Comment 78:* One commenter asserted that the ATF Form 6NIA can confirm that the individual is returning with the same firearm that was brought to the U.S., so there is no need to require EEI filing in AES.

*BIS response:* BIS does not accept this change. To properly administer and enforce export controls, BIS must have access to basic information about an item and cannot solely rely on information collected by another agency, though this information, as appropriate, could supplement information collected by BIS.

*Comment 79:* One commenter asserted that the ITAR does not have the same type of EEI filing in AES requirement, so including this under the EAR would be more restrictive.

DOC_0081072

*BIS response:* BIS clarifies here that under the ITAR, the Department of State is licensing the temporary import and export, which required much of the same information requirements. The Commerce May 24 rule did not change the basic construct for how the EAR regulates imports, but BIS needed a means to track firearms temporarily entering the U.S. for subsequent export.

*Comment 80:* One commenter requested text be added to § 758.10(a)(2) to exempt from the entry clearance requirements temporary imports by nonresident aliens who temporarily import firearms under the provisions of 27 CFR 478.115(d).

*BIS response:* BIS clarifies here the purpose of § 758.10. Because a nonresident alien, *e.g.*, a foreign hunter, will need an approved Form 6NIA (ATF Form 5330.3D Application/Permit for Temporary Importation of Firearms and Ammunition by Nonimmigrant Aliens) from ATF prior to bringing the USMIL firearm or ammunition into the U.S., the ATF controls will account for the temporary import. Therefore, License Exception BAG does not need to be referenced in § 758.10. The subsequent export out of the U.S. will require an EAR authorization and would need to be done in accordance with License Exception BAG, or some other U.S. Government authorization if License Exception BAG was not available.

*Comment 81:* One commenter asserted that the new § 758.10 "Entry clearance requirements for temporary imports" appears to apply to all temporary imports at the time of temporary import. This commenter asserted that as the requirements of § 758.10 should not apply to nonresident aliens temporarily importing firearms under the separate provisions of the ATF, and recommended clarifying this in the final rule.

*BIS response:* BIS agrees. This final rule clarifies that the requirements of § 758.10 do not apply to temporary imports for nonimmigrant aliens under the provisions of the Gun Control Act of 1968 and administered in part with the ATF Form 6NIA.

DOC_0081073

*Comment 82*: One commenter was concerned that the new § 758.10 "Entry clearance requirements for temporary imports" does not address the potential use of License Exception RPL. Specifically, proposed § 758.10(b)(1)(i) requires a statement to CBP certifying "…This shipment will be exported in accordance with and under the authority of License Exception TMP," which would be a false certification if RPL were being used.

*BIS response*: BIS agrees and accepts adding License Exception RPL as a valid purpose for a temporary import under § 758.10. For the same reason, this final rule adds BIS licenses as a valid purpose for a temporary import under § 758.10. In addition, this final rule clarifies that a temporary import for repair or servicing in the United States does not require an EAR authorization, but the subsequent export must be authorized either as eligible for License Exception RPL or authorized under a BIS license at the time of entry. For example, a BIS license would be required at the time of entry if the repair or servicing of a temporarily imported firearm would result in enhanced capability of the item because License Exception RPL is not available for such enhancements. Instead, under this final rule, the exporter could obtain a BIS license to authorize such an export that was brought into the United States as a temporary import. Section 758.10(a)(1) addresses these types of imports for repair and servicing. For additional information, please see section Entry clearance requirements for temporary imports (§ 758.10) below that details the requirements for use of these authorizations.

**Relationship between EAR and ATF Regulations**

*Comment 83*: One commenter requested the ATF Ruling 2004-2 be amended to account for this USML to CCL transition, in order to not be more restrictive under the EAR compared to the ITAR. The commenter asserted that the ITAR draws a clear distinction between permanent and temporary import jurisdiction in 22 CFR 120.18, although certain items regulated under the Gun

Control Act or National Firearms Act, if authorized for import under those laws, continue to require transactional import approval from ATF for temporary imports unless ATF Ruling 2004-2 (April 7, 2004) permits the DSP-61 or ITAR exemption to substitute for this approval.

*BIS response*: The changes included in the Commerce May 24 rule under §§ 740.9 and 758.10 were intended to address issues related to temporary importation under the EAR. As noted above, this final rule adds License Exception RPL and BIS licenses to § 758.10 to further address issues related to temporary imports under the EAR. Other agencies will review, and if necessary, address, any effects of these final rules.

*Comment 84*: One commenter recommended coordinating proposed changes with ATF so that the corresponding changes are made to the USMIL at the same time, which would prevent businesses from having to consult both the USML and USMIL when deciding whether a transaction involves brokering.

*BIS response*: The USML and the USMIL are separate lists of AECA defense articles with both shared as well as different AECA objectives, and as such warrant the retention as separate lists.

*Comment 85:* One commenter was concerned that removing license requirements for temporary imports of the items removed from the USML would create another channel for criminal elements to obtain weapons in the U.S.

*BIS response*: BIS disagrees. Temporary imports will be addressed by BIS, and the same type of U.S. Government authorization requirement will apply for exports of items temporarily imported as other exports under the EAR.

*Comment 86*: One commenter was concerned that the Commerce May 24 rule did not provide a mechanism, such as a DSP-73, for certain firearms to be temporarily exported and subsequently returned to the U.S., given the firearm importation prohibitions under 18 U.S.C. 922(l) and

DOC_0081075

925(d)(3). This commenter asserted that unlike many other items that have transitioned from the USML to the CCL, firearms are subject to unique restrictions on the permanent import side under the jurisdiction of the ATF. This commenter asserted that the Department of State's jurisdiction over temporary exports and temporary imports has played an important role by providing companies with a viable method of bringing their guns back into the U.S. without running afoul of ATF's strict importation prohibitions and similar treatment should be retained under the EAR.

*BIS response*: BIS clarifies that BIS will require a U.S. Government authorization for temporary exports. The EAR authorizations most likely to be used to authorize temporary exports include License Exceptions BAG and TMP, as well as Commerce licenses. Therefore, BIS does have similar authorization requirements and approval mechanisms as under the ITAR. BIS notes that the import back into the U.S. will not require an EAR authorization.

*Comment 87*: One commenter asserted that a DSP-73 license is vital because it covers both the U.S. export and U.S. import requirements and the commenter is concerned without adding a similar type of authorization under the EAR that certain temporary exports for use in filming will not be possible because the return of the exported firearms would be subject to ATF's permanent import process which restricts many types of firearms pursuant to Federal law, *e.g.*, short barreled shotguns. This commenter asserted that because most firearms temporarily exported for the movie industry are either military surplus, non-sporting, or National Firearms Act weapons, of which importation is prohibited under the ATF regulations, that this is an importation issue to be addressed to ensure these types of temporary exports can still proceed under the EAR and ATF construct, similar to the ITAR and ATF construct.

DOC_0081076

*BIS response*: A Commerce license to authorize a temporary export would authorize the temporary export and require the item's return. A separate EAR authorization is not required for the import back into the United States after the temporary export since this would be covered under the scope of the authorizing export license.

*Comment 88:* One commenter requested clarification for permanent import after temporary export for repair or servicing under License Exception TMP under paragraph (a)(6). This commenter asserted it agreed with the proposed changes but requested that the subject of temporary export of firearms, specifically vintage shotguns with barrel lengths over 18 to Canada, be clearly addressed.

*BIS response:* BIS notes that the long barrel shotguns this final rule will move from ECCN 0A984 to 0A502 may require a U.S. Government authorization depending on the specifics of the export, in particular the destination for the export. Regardless of the EAR authorization used to authorize the export, a separate EAR authorization will not be required for the subsequent import into the United States.

*Comment 89*: One commenter asserted that ATF 27 CFR 478.92 includes a requirement to mark firearms being imported with the importer's name and address. This commenter was concerned that this destroys the originality and affects the value of the firearm that was temporarily exported. This commenter asserts because these long barreled shotguns fall under the EAR, the ATF will not clarify the requirement on shotguns and it creates confusion. This commenter requests the final rule to clarify this issue regarding markings for shotguns being moved from ECCN 0A984 to ECCN 0A502, as well as for the other firearms being moved from the USML to the CCL.

DOC_0081077

*BIS response*: BIS clarifies here that the EAR does not require any types of physical markings to be made on a firearm or any other commodity being temporarily exported for repair or servicing for return to the United States. For a licensed transaction in an exceptional case, a condition could potentially be placed on a Commerce license that required the exporter to make some type of physical marking on the commodity, but this would be extremely rare under BIS licensing. If additional safeguards were needed, BIS licenses would typically require additional documentation to confirm delivery verification or to require the exporter to get other written affirmations from the other parties to the transaction.

**EAR Recordkeeping Requirements**

*Comment 90:* One commenter asserted that the GCA requires all Federal Firearm Licensees to maintain firearm records for 20 years after the date of disposition and that the proposed change requiring records under the EAR is redundant and may cause confusion because of the different record retention periods. This commenter asserted in complying with the EAR, companies may inadvertently violate the GCA.

*BIS response:* BIS does not agree. The EAR does not require records to be destroyed after five years, just that the records be kept for at least that long. Nothing in the EAR prohibits maintaining the records for longer periods.

*Comment 91:* One commenter asserted that the recordkeeping requirement for warranty certificates for people outside the U.S. would be more restrictive than the ITAR. The commenter asserted that BIS has not provided a coherent explanation for why the new recordkeeping burden makes sense, is related to exports, or would be of benefit to the enforcement of the export control laws.

DOC_0081078

*BIS response:* BIS does not agree with the requested change to remove the warranty certificate requirement as a recordkeeping requirement. As noted above by many commenters, BIS has an interest in ensuring the firearms and related items on the CCL are used by the intended end user for the intended end use, and BIS needs any information that may be relevant to the ultimate disposition of those firearms to safeguard U.S. national security. The recordkeeping requirements for the warranty certificates included in the Commerce May 24 rule and in this final rule will be an additional safeguard for EE to have further insights into where a firearm exported under a U.S. Government authorization may have ultimately ended up after export. A warranty certificate that is submitted by a person located outside the United States to a U.S. exporter is relevant to the U.S. Government for export control enforcement purposes. The ITAR and EAR control structures are not the same, so in certain cases a restriction may be more restrictive under the EAR compared to the ITAR and this is an example of where the EAR will be more restrictive, but it is still warranted in the context of the EAR.

*Comment 92:* One commenter asserted that warranties are issued by the manufacturer, not the exporter and that many manufacturers do not always issue specific "warranty certificates" to individuals. This commenter asserted that most manufacturers provide warranty statements in a broad boilerplate statement included in an instruction manual, or on their website. This commenter also asserted that there is thus no way to know when that information is accessed by a foreign person or sent to an address outside the U.S. One commenter asserted that a potential issue is with the recordkeeping requirement of warranty certificates is that an exporter may not have a manufacturer's (or any other) warranty certificate as part of the transaction. This commenter requested some clarification on the requirements.

DOC_0081079

*BIS response:* BIS clarifies here that the EAR recordkeeping requirements generally do not impose an affirmative duty to create a record. The recordkeeping requirements typically apply if in the normal course of your business activities related to an export, reexport, or transfer (in-country) a record is created or received that is within the scope of records that must be retained for purposes of the EAR recordkeeping requirements.

BIS confirms here that if the manufacturer is not the exporter, it is not required to keep the warranty certificate for purposes of part 762. Section 762.1(b) (Persons subject to the part) identifies the persons that are required to keep records for purposes of part 762 of the EAR.

*Comment 93:* One commenter asserted that there is the possibility that retaining such information that would be contained in a warranty certificate may violate the privacy laws of other countries, such as the General Data Protection Regulation (GDPR) (EU).

*BIS response:* BIS is not in a position to opine on the applicability of the GDPR here but notes that parties transacting in items subject to the EAR are subject to U.S. laws and regulations, including recordkeeping requirements.

**Alignment with the Wassenaar Arrangement Munitions List**

*Comment 94:* One commenter asserted that the proposed changes do not appear to be in line with established WAML I-III, suggesting that the inclusion of semi-automatic weapons in WAML1 explicitly as munitions demonstrates an intentional differentiation between military and security items, on one hand, and dual-use items on the other.

*BIS response:* On the general question of whether the changes included in the Commerce May 24 rule align with the WAML, BIS notes that Wassenaar Arrangement member countries implement the WA control lists in accordance with their own national export controls. The items being

moved from USML Category II are controlled under four new "600 series" ECCNs. The items moved from USML Categories I and III are not controlled in the "600 series," but importantly are still subject to the same NS 1 license requirement that would apply if these WAML items were added to the "600 series." In addition, although not derived from the Wassenaar Arrangement, the end item firearms are subject to a license requirement for the Firearms Convention (FC) – meaning that the end item firearms are subject to an even more restrictive license requirement under the EAR compared to the "600 series," 9x515 items, and other items controlled for NS reasons on the CCL. In addition, the final rule also includes other provisions, such as requiring conventional arms reporting, that reflects U.S. Government commitments to the Wassenaar Arrangement and to the United Nations. Thus, the changes are consistent with the U.S. Government's commitments to the Wassenaar Arrangement.

*Comment 95*: One commenter asserted semi-automatic weapons used by peacekeepers, military, and police are intended to be controlled as munitions. The proposal to move semi-automatic firearms and large caliber rifles to ECCN 0A501 on the CCL does not appear to be in line with this designation.

*BIS response*: For the reasons noted above in the BIS response to Comment 1, BIS does not agree. BIS notes that the export of semi-automatic weapons used by peacekeepers, military, and police will still require U.S. Government authorization and in most cases will require an approved license under the EAR, except when destined to the U.S. Government or it is a semi-automatic weapon that was legally exported or reexported under U.S. export controls that is being returned after servicing or repair under License Exception RPL.

*Comment 96*: One commenter provided several comments related to the combined ITAR and EAR amendments to U.S. Government commitments to multilateral controls, that included 33

DOC_0081081

numbered topics listed in the order that topic appears in the WAML and then subdivided into three parts, with the following number of examples: 27 U.S. and multilateral texts are either identical or substantially equivalent; 74 US controls omit what WAML controls (or WAML omits U.S. decontrols); and 165 WAML omits what U.S. controls (or U.S. omits WAML decontrols).

*BIS response*: BIS notes that this one commenter submitted a large number of comments regarding the alignment with the WAML.  For the comments where BIS does not believe any changes are needed to align with the WAML, BIS has not summarized each of those comments in this final rule because of the length of the comments, but does confirm that BIS did review each of the comments.  For many of these comments, the items were already controlled prior to the effective date of this final rule or will be controlled for NS reasons on the CCL on the effective date of this final rule, and for certain comments the ITAR retains control of the items that the commenter thought would not be adequately controlled under the USML.  For the alignment with the WAML comments where the commenter has raised an issue that BIS believes warranted a change to ensure the changes in the final rule align with the WAML, those suggested changes, *e.g.*, the revisions described above to ECCN 0A018 and 0A505, are described above in greater detail, along with the BIS responses.

**Delayed Effective Date for a Final Rule**

*Comment 97*: BIS received a number of recommendations on the appropriate length for the delayed effective date for the final rule, ranging from 90 to 180 days for delayed effective dates. The rationale for the shorter length was to allow small businesses to immediately benefit while those recommending longer or split effective dates suggested the time period would allow time

89

for updates to IT systems, policies, and processes. Other commenters asserted that they supported a split implementation period (180 days for certain provisions, effective immediately or short as possible for other provisions).

*BIS response:* BIS has determined that a 45-day delayed effective date is appropriate. To address concerns that a longer delayed effective date and transition period may be warranted, BIS highlights here the importance of the various grandfathering provisions included in General Order No. 5 in Supplement No. 1 to part 736 of the EAR and in the previously published State transition guidance, that is supplemented with information on the DDTC website.

*Comment 98:* One commenter requested that BIS delay publishing a final rule until the Government Accounting Office (GAO) or the Library of Congress has publicly reported to the Congress their impact on numerous statutes referring to "defense articles," because of the potential loss of so many U.S. arms export controls and likely negative impact on curbing irresponsible and illegal arms transfers.

*BIS response:* BIS welcomes the publication of the GAO report. However, the timing of the publication of a final rule and its effective date are not contingent on the publication of the GAO report.


## DESCRIPTION OF REGULATORY CHANGES

This final rule creates 17 new ECCNs on the CCL to control items that are being removed from the USML as described in a final rule issued concurrently by the Department of State. BIS did not receive any comments on the proposed addition of ECCNs 0A503, 0B602, 0D501, 0D505, 0D602, 0E502, 0E504, 0E505, and 0E602 in the Commerce May 24 rule, so this final rule adopts these ECCNs as proposed, except for one clarification made to ECCN

90

0B602.a.8 and minor clarifications to the Related Controls paragraphs to ECCNs 0D501, 0D505, 0D602, 0E502, and 0E505.  In ECCN 0B602, this final rule replaces "gun straightening presses" with the more specific control parameter "barrel straightening presses."  This change is made to clarify that the straightening presses controlled under ECCN 0B602.a.8 are those for barrels.  In the Related Controls paragraphs for ECCNs 0D501, 0D505, 0D602, and 0E505, this final rule removes the parenthetical phrase that references 22 CFR 121.1 and the related USML category because this information is duplicative of existing text in these Related Controls paragraphs. This final rule also revises the Related Controls paragraph in ECCN 0E502 by removing "N/A" and adding that "[t]echnical data required for and directly related to articles enumerated in USML Category I are 'subject to the ITAR.'"  This clarification does not change the scope of ECCN 0E502 and simply alerts the public to review the ITAR for such technical data.  BIS does not make any additional changes to proposed ECCN 0E501 and adopts it as proposed.  See the Commerce May 24 rule for additional background on these provisions.  BIS received comments on seven proposed ECCNs for which the agency is adopting additional changes: 0A501, 0A502, 0A504, 0A505, 0A602, 0B501, and 0B505.  The summary below describes each of these ECCNs and the controls that apply to them.

*New ECCN 0A501: Firearms and related commodities.*

This final rule adds new ECCN 0A501 and applies national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC Column 1), United Nations (UN), and anti-terrorism (AT Column 1) reasons for control to the non-automatic and semi-automatic firearms, including rifles, carbines, revolvers or pistols listed in the ECCN entry in the regulatory text to this final rule, enumerated parts and components and to "specially designed" "parts,"

DOC_0081084

"components," "accessories" and "attachments" for those firearms and "parts" and "components."

This final rule adds ECCN 0A501.y and only imposes an anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and covers such items as scope mounts or accessory rails, iron sights, sling swivels, butt plates, recoil pads, bayonets, and stocks or grips that do not contain any fire control "parts" or "components."

This final rule adds a technical note to ECCN 0A501 stating that "parts" and "components" include "parts" and "components" that are common to firearms described in ECCN 0A501 and to firearms "subject to the ITAR."

It also adds another note to ECCN 0A501 to state that certain firearms and similar items are EAR99. Those items are: Antique firearms (*i.e.*, those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles.

In addition, for purposes of new ECCN 0A501 and the rest of the new ECCNs described below, items previously determined to be "subject to the EAR" under a commodity jurisdiction determination issued by the U.S. Department of State that were designated as EAR99 will generally not be classified in any of the new ECCNs that are being created with this final rule. As a conforming change, this final rule revises paragraph (e)(3) of General Order No. 5 to add a reference to the "0x5zz" ECCNs this final rule adds to the CCL.

This final rule adopts the following additional changes to ECCN 0A501 to respond to the comments received on the Commerce May 24 rule:

92

This final rule revises Related Controls paragraph (1) to clarify that the magazines that are "subject to the ITAR" are those with a capacity "greater than 50 rounds." The Commerce May 24 rule used terminology in the control parameter that created ambiguity because it was slightly different than as proposed in the State May 24 rule, so this final rule revises the EAR text based on the comments received to align with the terminology used on the ITAR.

This final rule revises "items" paragraph (a) to remove the phrase "of caliber less than or equal to .50 inches (12.7 mm)" and add in its place the phrase "equal to .50 caliber (12.7 mm) or less." In making this change, BIS uses the same control text of ".50 caliber (12.7 mm)" as used in the Department of State companion rule.

This final rule adds a Note 1 to paragraph 0A501.a. This note clarifies that combination pistols are controlled under items paragraph .a. The note also defines the term 'combination pistol' for purposes of this ECCN. A combination pistol has at least one rifled barrel and at least one smoothbore barrel. Because of the hybrid nature of these firearms, commenters requested that this type of clarifying note be added.

This final rule adds a Note 2 to 0A501.d to address a question, raised by the commenters, whether magazines with a capacity of 16 rounds or less are controlled under 0A501.x or designated EAR99. The new note specifies that magazines with a capacity of 16 rounds or less are controlled under 0A501.x. BIS notes this was the intent of the Commerce May 24 rule, but because commenters were not sure, this rule specifies where these magazines are controlled.

This final rule revises "items" paragraph (e) to add the phrase "or machined items" to specify that ECCN 0A501.e includes those machined items even if they are not casted, forged, or stamped.

DOC_0081086

This final rule revises the introductory text of 0A501.y to add the phrase "as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor" to clarify, consistent with the other .y paragraphs on the CCL, that the "specially designed" "parts," "components," "accessories," and "attachments" for .y items will also be controlled under this .y paragraph and not controlled under 0A501.x.

This final rule adds a new paragraph y.7 to control firearms manufactured from 1890 to 1898 and reproductions thereof. This final rule makes this change to address commenters that asserted that the year 1890 should be changed to 1898 in Note 3 to 0A501 for defining antique firearms. BIS did not accept the change because the year 1890 is based on the Wassenaar Arrangement, but does address this concern by controlling these firearms under a new .y paragraph. As a conforming change, this final rule adds a new License Requirement Note to ECCN 0A501 to specify that a license is required for exports and reexports to China of 0A501.y.7 firearms.

This final rule adds a new Note 4 to 0A501, to clarify the classification of certain muzzle loading (black powder) firearms. This is a conforming change as part of the removal of the control text of ECCN 0A018 in this final rule.

_New ECCN 0A502:  Shotguns and certain related commodities._

This final rule adds new ECCN 0A502 to control both the shotguns being moved from the USML that are being added to the CCL (barrel length less than 18 inches) and the shotguns and the enumerated "parts" and "components" controlled in ECCN 0A984 (barrel length 18 inches or greater) prior to this final rule. This final rule controls shotguns with a barrel length less than 18 inches under NS Column 1, CC Column 1, FC, UN, and AT Column 1 plus regional

DOC_0081087

stability (RS Column 1). Shotguns controlled in ECCN 0A984 that are transferred to ECCN 0A502 by this final rule will retain Firearms Convention (FC), crime control (CC Column 1, 2, or 3 depending on barrel length and end user), and United Nations (UN) reasons for control. Such shotguns will not be controlled for national security reasons because they are not on the WAML.

This final rule adopts the following additional changes to ECCN 0A502 to respond to the comments received on the Commerce May 24 rule:

This final rule revises the heading of ECCN 0A502 to add the phrase "shotguns "parts" and "components," consisting of" to clarify that the parts and components controlled under 0A502 are for shotguns in response to one commenter's request.

This final rule revises the LVS paragraph in the License Exception section to add License Exception LVS eligibility of $500 for certain parts and components under ECCN 0A502. The Commerce May 24 rule proposed N/A for LVS for ECCN 0A502. This final rule makes this change to create equivalent treatment for License Exception LVS for purposes of ECCNs 0A501 and 0A502. Similar to LVS eligibility in ECCN 0A501, the LVS eligibility will include all Country Group B countries and an additional paragraph that identifies other parts and components that are eligible for LVS if the ultimate destination is Canada.

This final rule revises the Related Controls paragraph to remove the phrase "combat shotguns and" because it is not needed as a modifier of fully automatic shotguns and the phrase is not used on the USML. This final rule also simplifies the Related Controls paragraph to use a single sentence to identify shotguns that are fully automatic as "subject to the ITAR."

95

This final rule adds a Note 1 to 0A502 to clarify that shotguns made in or before 1898 are considered antique shotguns. This note clarifies that these antique shotguns are designated as EAR99.

Lastly, in ECCN 0A502, this final rule adds a Technical Note to specify the classification of shot pistols or shotguns that have had the shoulder stock removed and a pistol grip attached. The technical note specifies these are controlled by ECCN 0A502. The technical note also specifies that slug guns are controlled under ECCN 0A502.

*New ECCN 0A504: Optical sighting devices and certain related commodities.*

This final rule adds new ECCN 0A504 to replace ECCN 0A987, which controlled optical sighting devices for firearms. This final rule revises the reasons for control table to state specifically that the Firearms Convention (FC) reason for control applies to all paragraphs in the ECCN except 0A504.f, which controls laser pointing devices. In addition, BIS adds an RS control for certain riflescopes, which are identified in their own paragraph in the ECCN under 0A504.i in this final rule. The riflescopes in this paragraph are limited to those "specially designed" for use in firearms that are "subject to the ITAR." This final rule includes an exclusion in the criteria of this paragraph to ensure less sensitive riflescopes that are being moved from ECCN 0A987 to 0A504 on the effective date of this final rule, that currently are not RS controlled under the EAR, will not be controlled under this paragraph. This final rule also adds a note to this paragraph (i) to specify that paragraph (a)(1) of the definition of "specially designed" in § 772.1 of the EAR is what is used to determine whether a riflescope is "specially designed" for purposes of this paragraph of ECCN 0A504.i – meaning paragraph (a)(2) and the paragraph (b) releases are not reviewed to make the "specially designed" determination.

DOC_0081089

This change makes clear, consistent with BIS's existing interpretation, that such devices are not optical sights and are not subject to the FC reason for control. The new number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other.

This final rule adopts the following additional changes to ECCN 0A504 to respond to the comments received on the Commerce May 24 rule:

This final rule revises the LVS paragraph in the License Exceptions section of ECCN 0A504 to add LVS eligibility of $500 for 0A504.g. Commenters requested that LVS eligibility be added for these less sensitive lenses and other optical elements controlled under 0A504.g. These commenters also requested adding LVS eligibility for consistency with the types of parts and components eligible for LVS under ECCN 0A501 in the Commerce May 24 rule. BIS agrees and adds LVS eligibility of $500 for 0A504.g in this final rule.

*New ECCN 0A505:  Ammunition and certain related commodities.*

This final rule adds new ECCN 0A505 and imposes national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC), United Nations (UN), and anti-terrorism (AT Column 1) controls on ammunition not enumerated on the USML, for firearms that will be classified under ECCN 0A501, and for most "parts" and "components" of such ammunition. Such ammunition included in this final rule are for small arms, in most cases, firearms of caliber not exceeding 0.50 inches, although some ammunition for firearms of caliber up to 0.72 inches is included. This final rule retains the CCL reasons for control currently found in ECCNs 0A984 and 0A986 for shotgun shells. Buckshot shotgun shells will be subject to the CC Column 1, FC Column 1, and UN reasons for control under this final rule. Other shotgun

DOC_0081090

shells are subject to the FC, UN, and AT (North Korea only) reasons for control in this final rule. Only "parts" and "components" will be eligible for License Exception LVS. Ammunition for larger caliber weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles will remain in USML Category III in this final rule. Ammunition that has little or no civil use or that is inherently military such as ammunition that is preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile also remains in USML Category III. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in Category III of the USML will be controlled for United Nations and anti-terrorism reasons only in this final rule.

This final rule adds three notes to clarify the scope of "parts" and "components" for ammunition classified under ECCN 0A505. Note 1 to 0A505.c clarifies the relationship between ECCNs 0A505 and 1A984 for shotgun shells, stating that shotgun shells that contain only chemical irritants are controlled under 1A984 and not 0A505. Separately, Note 2 to 0A505.x includes an illustrative list of the controls on "parts" and "components" in this entry, such as Berdan and boxer primers. Note 3 to 0A505.x clarifies that the controls in ECCN 0A505 include "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

This final rule adopts the following additional changes to ECCN 0A505 to respond to the comments received on the Commerce May 24 rule:

This final rule revises the LVS paragraph in the License Exceptions section of ECCN 0A505 to increase the LVS eligibility from $100 to $500. The Commerce May 24 rule had proposed $100, but commenters noted that the cost of these parts and components would

98

undermine the usefulness of LVS eligibility if the $100 limitation was maintained. Some commenters provided detailed price lists to support their position that $100 of LVS eligibility would be of limited usefulness. BIS took this into account and in this final rule increases the LVS eligibility to $500 for ECCN 0A505.x. As a conforming change, because this final rule moves ECCN 0A018.b to 0A505, this final rule adds grandfathering provisions to retain LVS eligibility of $3,000 for any commodity that was classified under 0A018.b prior the effective date of this final rule.

This final rule revises ECCN 0A505.a to add the phrase "or USML Category I" to clarify that ammunition for firearms controlled under USML Category I is also controlled under 0A501.a, provided the ammunition is not otherwise excluded by the control parameters in 0A501.a, *i.e.*, being enumerated in 0A505.b, .c, .d, or in USML Category III.

This final rule adds a Note 4 to 0A505 to specify that certain types of ammunition (*i.e.*, Lead shot smaller than No. 4 Buckshot, empty and unprimed shotgun shells, shotgun wads, smokeless gunpowder, 'Dummy rounds' and blank rounds (unless linked or belted)), not incorporating a lethal or non-lethal projectile(s) are designated EAR99. This final rule also defines the terms 'dummy round or drill round.' The new note clarifies that these rounds are completely inert - meaning they contain no primer, propellant, or explosive charge. The note specifies that these types of rounds are typically used to check weapon function and for crew training.

*New ECCN 0A602: Guns and Armament.*

This final rule adds new ECCN 0A602 and imposes national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1)

DOC_0081092

controls on guns and armament manufactured between 1890 and 1919 and for military flame

throwers with an effective range less than 20 meters. It imposes those same reasons for control

on parts and components for those commodities and for defense articles in USML Category II if

such parts or components are not specified elsewhere on the CCL or USML. Note 3 to 0A602

confirms that black powder guns and armament manufactured in or prior to 1890 and replicas

thereof designed for use with black powder propellants are designated EAR99. The guns

controlled in this ECCN are between 99 and 128 years old. The parts, components, accessories,

and attachments controlled in this ECCN include some that are for modern artillery. Modern

artillery remains on the USML, along with the most sensitive "parts," "components,"

"accessories," and "attachments" for these USML items. This final rule adds a note to clarify

that "parts," "components," "accessories," and "attachments" specified in USML subcategory

II(j) are not subject to the EAR. The USML Order of Review and CCL Order of Review already

provide guidance for making such a jurisdictional and classification determination, but to

highlight that these "parts," "components," "accessories," and "attachments" are not classified

under paragraph .x of 0A602, this final rule adds a note.


This final rule adopts the following additional changes to ECCN 0A602 to respond to the

comments received on the Commerce May 24 rule:

This final rule revises the Related Controls paragraph of ECCN 0A602 to add a Related

Controls paragraph (3). This new Related Controls paragraph provides a cross reference to

ECCN 0A606 for engines that are "specially designed" for a self-propelled gun or howitzer

subject to control under 0A606.a or USML Category VII. The Department of State final rule

includes a similar cross reference for purposes of the USML and commenters requested the same

DOC_0081093

type of note or related control pointer be added to the EAR. The Department agrees and adds Related Controls paragraph (3). As a conforming change, this final rule redesignates Note 1 to 0A602 and Note 2 to 0A602 as Notes 2 and 3, respectively.

*New ECCN 0B501: Test, inspection, and production equipment for firearms.*

This final rule adds new ECCN 0B501 to cover "Test, inspection, and production 'equipment' and related commodities for the 'development' or 'production' of commodities enumerated or otherwise described in ECCN 0A501 or USML Category I." This new ECCN applies the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) reasons for control to four specific types of machinery and to one class of items as proposed in the Commerce May 24 rule. The four specific types of machinery are: small arms chambering machines, small arms deep hole drilling machines and drills therefor, small arms rifling machines, and small arms spill boring machines. The class of items covers dies, fixtures, and other tooling "specially designed" for the "production" of items in the State Department final rule for USML Category I or ECCN 0A501. In addition, as described below, this final rule also expands the scope of 0B501.e to include all production equipment "specially designed" for USML Category I items.

The NS and RS reasons for control do not apply to equipment for the "development" or "production" of commodities in ECCN 0A501.y because those reasons for control do not apply to the commodities in ECCN 0A501.y themselves.

The first four specific items noted above were listed in paragraphs .o, .p, .q, and .r of ECCN 2B018 prior to the effective date of this final rule, and are being listed in paragraphs .a, .b, .c, and .d of ECCN 0B501 in this final rule. In addition, the class of items in new 0B501 that

DOC_0081094

was included within ECCN 2B018, paragraph .n (jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms, ordnance, and other stores and appliances for land, sea or aerial warfare) prior to the effective date of this final rule, will, if applicable to firearms controlled in 0A501, be subsumed in paragraph .e. Jigs, fixtures, and metal working implements currently in 2B018 that are applicable to larger guns will be controlled in ECCN 0B602 in this final rule and are discussed below.

Moving these items from 2B018 to 0B501 in this final rule retains the national security (NS Column 1), anti-terrorism (AT Column 1), and United Nations (UN) reasons for control and raises the regional stability (RS) reason for control from RS Column 2 to RS Column 1. This causes no change in destination-based license requirements, but allows consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the item is exported or reexported in considering whether to approve a license.

This final rule adopts the following additional changes to ECCN 0B501 to respond to the comments received on the Commerce May 24 rule:

This final rule expands ECCN 0B501.e to include all production equipment "specially designed" for USML Category I items. This final rule adds the term production equipment to the beginning of the control text of ECCN 0B501.e and revises the phrase "dies, fixtures, and other tooling" included in the Commerce May 24 rule to "including dies, fixtures, and other tooling" to indicate that these items are illustrative and that other types of production equipment that meet the control parameters are also controlled under ECCN 0B501.

*New ECCN 0B505:  Test, inspection, and production equipment for ammunition.*

DOC_0081095

This final rule adds new ECCN 0B505 to impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III, and "specially designed" "parts" and "components" therefor, that are "specially designed" for the "production" of ammunition other than for the ammunition specified in 0A505.b, .c, or .d (certain shotgun shells with buckshot and without buckshot and certain blank ammunition). In addition, as described below, this final rule also expands the scope of 0B505.a to include all production equipment "specially designed" for USML Category III items. Equipment for manufacturing shotgun shells that do not contain buckshot will be controlled for the AT (North Korea only) and UN reasons for control, which are the reasons for control that applied to this equipment in ECCN 0B986 prior to this final rule. ECCN 0B505 in this final rule does not include equipment for the hand loading of cartridges and shotgun shells, so this final rule specifies this in the heading.

This final rule adopts the following additional changes to ECCN 0B505 to respond to the comments received on the Commerce May 24 rule:

This final rule expands ECCN 0B505.a to include all production equipment "specially designed" for USML Category III items. This final rule adds the term production equipment to the beginning of the control text of ECCN 0B505.a and revises the phrase "tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment" included in the Commerce May 24 rule to "including tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment" to indicate that these items are illustrative and other types of production equipment that meet the control parameters are also controlled under ECCN 0B505.

DOC_0081096

**Revisions to eight ECCNs**

To conform to new *Federal Register Drafting Handbook* requirements, the amendatory instructions in this final rule sets forth the entire text of eight ECCNs to be revised. BIS did not receive any comments on the proposed revisions to the following six ECCNs 0E982, 1A984, 2B004, 2B018, 2D018, and 7A611 in the Commerce May 24 rule, so this final rule revises those ECCNs as proposed. *See* the Commerce May 24 rule for additional background on these revisions.

To help the public understand what specific parts of ECCN 0A018 will be different as a result of the changes in this final rule, the narrative below describes the amendment in detail, including a conforming change made to ECCN 0A988.

*Revision to ECCN 0A018, and conforming change to ECCN 0A988.*

With the removal of ECCN 0A984 and the addition of 0A502 described above, the Commerce May 24 rule proposed to make the conforming change of removing and reserving 0A018.c since all the items classified in 0A018.c would be classified under other entries on the CCL once a final rule was published.

This final rule adopts the following additional changes to ECCN 0A018 to respond to the comments received on the Commerce May 24 rule:

This final rule still revises ECCN 0A018, but instead of retaining the commodities under 0A018.b as was proposed in the Commerce May 24 rule, these commodities are being moved to ECCN 0A505. As a conforming change, this final rule replaces the control text of ECCN 0A018 with a statement referring readers to ECCN 0A505.

104

This final rule adopts the following additional changes to ECCN 0A988 to respond to the comments received on the Commerce May 24 rule:

This final rule as a conforming change revises the heading of ECCN 0A988 to remove an outdated reference to 0A018.d. ECCN 0A018.d had been previously removed and reserved, but the cross reference in 0A988 was not updated. This final rule makes that correction.

**Removal of nine ECCNs.**

The Commerce May 24 rule proposed removing nine ECCNs. BIS did not receive any comments on proposed removals of ECCNs 0A918, 0A984, 0A985, 0A986, 0A987, 0B986, 0E918, 0E984, and 0E987 in the Commerce May 24 rule, so this final rule removes those ECCNs as proposed. *See* the Commerce May 24 rule for additional background on these removals.

**Revision of "Published"**

This final rule adopts the following changes to part 734, and one conforming change to part 732, to respond to the comments received on the Commerce May 24 rule:

Specifically, this final rule adds a paragraph (c) to § 734.7 stating that "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, that is made available by posting on the internet in an electronic format and that may be directly loaded without further modification by the machine operator into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the "software" or "technology" to produce the firearm frame or receiver or complete firearm, remains "subject to the EAR." Also in § 734.7, this final rule as a conforming

DOC_0081098

change revises the paragraph (a) introductory text to add a reference to new paragraph (c) for the exclusions that apply to paragraph (a) for what is considered "published." In § 732.2 (Steps regarding scope of the EAR), under the paragraph (b) introductory text for step 2 for publicly available technology and software, this final rule also adds a reference to § 734.7(c) to specify such "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, as referenced in § 734.7(c)), is "subject to the EAR."

**Conforming Change to General Order No. 5**

BIS does not make any additional changes in this final rule to what was proposed in the Commerce May 24 rule as a result of the comments received, so these changes are adopted as proposed. This final rule amends General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determinations), in Supplement No. 1 to part 736, to add a reference in two places to the new 0x5zz ECCNs that are being created by this rule. This change to paragraph (e)(3) is a conforming change and is needed because paragraph (e)(3) now only references the "600 series" and 9x515 ECCNs. 0x5zz ECCNs will include new ECCNs 0A501, 0A502, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E502, and 0E505.

**Revisions to Regional Stability Licensing Policy for Firearms and Ammunition**

BIS does not make any additional changes in this final rule to what was proposed in the Commerce May 24 rule as a result of the comments received, so these changes are adopted as proposed. This final rule applies the regional stability licensing policy set forth in § 742.6(b)(1)(i) of the EAR to the items controlled for regional stability reasons in ECCNs 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505. That policy, which also applies to "600 series" and 9x515 items is case-by-case review "to determine whether

DOC_0081099

the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world." This final rule also revises the regional stability licensing policy set forth in paragraph (b)(1)(i) that is specific to the People's Republic of China for 9x515 items. This final rule adds ECCNs 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 to this sentence to specify that these firearms and related items are to be subject to a policy of denial when destined to the People's Republic of China or a country listed in Country Group E:1. Lastly, this final rule adds a sentence to the end of paragraph (b)(1)(i) to make it explicit that applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items are subject to a policy of denial when there is reason to believe the transaction involves certain parties of concern, such as criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability.

**Availability of License Exceptions.**

Many of the items in the new "600 series" ECCNs generally will be eligible for the same license exceptions and subject to the same restrictions on use of license exceptions as other "600 series" ECCNs in this final rule. For the ECCNs on the CCL prior to the effective date of this final rule that are being renumbered and placed in closer proximity to the firearms-related items that are being removed from the USML and added to the CCL, these existing firearms-related items will continue to be eligible for the same EAR license exceptions as they were prior to the effective date of this final rule, unless otherwise restricted under § 740.2, if the requirements of the license exceptions are met.

_Restrictions on all license exceptions_

DOC_0081100

This final rule also makes the following additional changes to part 740 to respond to the comments received on the Commerce May 24 rule by adding two new general restrictions.

In § 740.2 (Restriction on all license exceptions), this final rule adds two additional restrictions for when license exceptions may not be used. This final rule adds new paragraph (a)(21) to restrict the use of license exceptions, except for License Exception GOV under § 740.11(b)(2)(ii) for the reexport or transfer (in-country) of certain firearms classified under ECCNs 0A501 or 0A502. The restriction on the use of license exceptions applies if a part or component that is not "subject to the ITAR," but would otherwise meet the criteria in USML Category I(h)(2) is incorporated into the firearm or is to be reexported or transferred (in-country) with the firearm with "knowledge" the part or component will be subsequently incorporated into the firearm. Because these parts or components that would otherwise meet the criteria in USML Category I(h)(2) could be used for conversion of a semi-automatic firearm to a fully automatic firearm, this final rule excludes those firearms from license exception eligibility.

In § 740.2 this final rule also adds a new paragraph (a)(22) to restrict the use of license exceptions for the export, reexport, or transfer (in-country) of any item classified under a 0x5zz ECCN when a party to the transaction is designated on the Department of the Treasury, Office of Foreign Assets Control (OFAC), Specially Designated Nationals and Blocked Persons (SDN) list under the designation [SDNT], or under the designation [SDNTK]. OFAC makes SDNT designations pursuant to the Narcotics Trafficking Sanctions Regulations, 31 CFR part 536, and SDNTK designations are made, pursuant to the Foreign Narcotics Kingpin Sanctions Regulations, 31 CFR part 598. This restriction on the use of license exceptions for these 0x5zz items will ensure that such parties designated on the SDN list will not be able to receive these 0x5zz items without a BIS license.

108

DOC_0081101

*License Exception:  Shipments of Limited Value (LVS).*

Under this final rule, complete firearms controlled under ECCN 0A501 are not eligible for License Exception LVS, 15 CFR 740.3.  Firearms "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501, other than receivers (frames), and "complete breech mechanisms," including castings, forgings or stampings thereof, are eligible for License Exception LVS, with a limit of $500 on net value per shipment.  In addition, receivers (frames), and "complete breech mechanisms," including castings, forgings or stampings thereof, are eligible for License Exception LVS if the ultimate destination is Canada.  This final rule states these limits in the License Exceptions paragraph of ECCN 0A501, and no revisions to the text of the license exception itself are needed to implement them.  BIS believes that this provision is generally consistent with the license exemption for limited value shipments of firearms formerly found in ITAR (22 CFR 123.17(a)) (removed and reserved by the companion rule).  This LVS eligibility included in this final rule is less restrictive than the former ITAR provision in two respects.  First, the value limit per shipment will be $500 compared to $100 in the ITAR. Second, the LVS eligibility in the final rule allows exports of receivers and "complete breech mechanisms" to Canada whereas § 123.17(a) did not.  However, the $500 LVS limit is based on the actual selling price or fair market value, whereas the ITAR $100 limit is based on "wholesale" value.  In addition, with respect to Canada, an LVS limit of $500 per shipment is needed to comply with the Section 517 of the Commerce, Justice, Science, and Related Agencies Appropriations Act of 2015, which prohibits expending any appropriated funds to require licenses for the export of certain non-automatic firearms parts, components, accessories and attachments to Canada when valued at under $500.

DOC_0081102

Guns and armament and related items controlled under ECCN 0A602 are eligible for License Exception LVS, with a limit of $500 net value per shipment in this final rule.

Ammunition controlled under ECCN 0A505 are eligible for License Exception LVS; however, ammunition parts and components will be eligible with a limit of $500 (Commerce May 24 rule proposed $100, but as described below in the changes to ECCN 0A505, this final rule increases the limit of $500) net value per shipment in this final rule.

Test, inspection, and production equipment controlled under ECCNs 0B501, 0B505, and 0B602 for firearms, guns and armament, and ammunition/ordnance are eligible for License Exception LVS with a limit of $3,000 net value per shipment, which is consistent with LVS eligibility for most 600 series ECCNs in this final rule.

*License Exception: Temporary imports, exports, reexports, and transfers (in-country) (TMP).*

This final rule amends § 740.9 to state that License Exception TMP is not available to export or reexport the items that are the subject of this rule to destinations in Country Group D:5 (*See* Supplement No. 1 to part 740), or to Russia (Russian Federation). License Exception TMP is also not available to export or reexport some firearms and ammunition shipped from or manufactured in Russia (Russian Federation), Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. In addition, this final rule will prohibit the use of License Exception TMP to export or reexport any item controlled by ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 that was shipped from or manufactured in Country Group D:5. This final rule also prohibits use of License Exception TMP to export or reexport any item controlled by ECCN 0A501 that is shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine,

DOC_0081103

or Uzbekistan, except for any firearm model controlled by 0A501 that is also excluded under Annex A in Supplement No. 4 to part 740 (the prohibition will not apply to such firearms;); and any shotgun with a barrel length less than 18 inches controlled under 0A502 that was shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. These prohibitions will apply to temporary exports of firearms from the United States, and the export of firearms temporarily in the United States. This final rule for consistency with the ITAR requirements for exports of firearms to Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, and Uzbekistan, removes the restriction included in the Commerce May 24 rule in paragraph (b)(5)(iii) that the firearms may not ultimately be destined to one of these seven countries from the restriction in paragraph (b)(5)(iii), but retains the restriction for Russia. This final rule makes one correction in Annex A in Supplement No. 4 to part 740 for the rifle "VEPR Pioner" under paragraph (b)(90) to correctly spell it as "VEPR Pioneer."

This final rule limits temporary exports of firearms controlled under ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 pursuant to License Exception TMP to exhibition and demonstration (§ 740.9(a)(5) of the EAR) and inspection, test, calibration, and repair (§ 740.9(a)(6) of the EAR). Consistent with the ITAR requirements previously applicable to temporary exports of the firearms covered by this rule (see 22 CFR 123.17(c), 123.22), exporters will continue to be required to file EEI in AES for transactions involving such firearms that are authorized pursuant to License Exception TMP (*See* § 758.1(a)(10) of the EAR).

This final rule authorizes the use of License Exception TMP for the export of ECCN 0A501 firearms temporarily in the United States for a period of not more than one year subject to

DOC_0081104

the requirement that the firearms not be imported from or ultimately destined for certain proscribed or restricted countries. Certain information as described in the regulatory text will also be collected by CBP on behalf of BIS under existing or new Commerce paperwork collections. This final rule also makes eligibility to export under License Exception TMP for ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 subject to the following conditions:

At the time of entry for a temporary import, the temporary importer is required to provide the required statement to CBP, as specified in paragraph (b)(5)(iv)(A).

The temporary importer is required to include on the invoice or other appropriate import-related documentation (or electronic equivalents) provided to CBP a complete list and description of the 0A501 firearms being imported, including their serial numbers, model, make, caliber, quantity, and U.S. dollar value, as specified in paragraph (b)(5)(iv)(B).

If the firearms are temporarily imported for a trade show, exhibition, demonstration, or testing, the temporary importer must provide to CBP the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States, as specified in paragraph (b)(5)(iv)(C).

At the time of export, the temporary importer or its agent as specified in paragraph (b)(5)(v) are required to provide the temporary import documentation (*i.e.*, the invoice used at the time of entry for the temporary importation or other appropriate temporary import-related documentation (or electronic equivalents)) related to paragraph (b)(5)(iv)(B) to CBP. This

112

DOC_0081105

information will be used by CBP to confirm that such firearms were in fact temporarily imported under the EAR for subsequent export under License Exception TMP.

This final rule adds a note to License Exception TMP to direct temporary importers and exporters to contact CBP at the port of import or export for the proper procedures to provide any data or documentation required by BIS.

*License Exception: Governments, International Organizations, International Inspections under the Chemical Weapons Convention, and the International Space Station (GOV).*

This final rule revises § 740.11 to limit the applicability of License Exception GOV for firearms, "parts" and "components" controlled by ECCN 0A501 and ammunition controlled by 0A505 to exports, reexports, and transfers for official use by U.S government agencies and official and personal use by U.S. Government employees (and the immediate families and household employees of those government employees) (§ 740.11(b)(2)(i) and (ii) of the EAR). This authorization under License Exception GOV treats 0A501 firearms in the same manner that other items that are subject to the EAR may be exported to U.S. Government employees under License Exception GOV. It does not impose certain restrictions that are imposed by the former ITAR license exemption (22 CFR 123.18) (removed and reserved by companion rule) that authorized shipments consigned to and for the use of servicemen's clubs, and for service members or civilian employees if the firearms are for personal use and the shipment is accompanied by a written authorization from the commanding officer concerned. *See* the Commerce May 24 rule for additional background. License Exception GOV authorizes non-automatic and semi-automatic firearms and related "parts" and "components."

DOC_0081106

All other items that are the subject of this final rule will be subject to the limits on use of License Exception GOV that apply to 600 series items generally, *i.e.*, § 740.11(b) – to, for, or on behalf of the U.S. Government (including contractors, government employees, their families and household employees) or § 740.11(c) to a government in Country Group A:1 cooperating governments or an agency of NATO. However, this rule will add some additional restrictions for E:1 and E:2 countries. This final rule will exclude the use of License Exception GOV for any item listed in a 0x5zz ECCN for E:1 countries, unless authorized under paragraph (b)(2)(i) or (ii) when the items are solely for U.S. Government official use. In addition, to better ensure compliance with section 1754(c) of the ECRA and address concerns with certain end users and uses in Country Group E:1 and E:2 countries, this final rule adds a new Note 2 to paragraph (b)(2), which restricts the use of License Exception GOV for E:1 and E:2 countries for multilaterally controlled items and anti-terrorism (AT) controlled items when destined to certain end users or end uses of concern.

This final rule also makes the following additional change to License Exception GOV to respond to the comments received on the Commerce May 24 rule:

In § 740.11 of License Exception GOV, this final rule revises Note 2 to paragraph (b)(2) to include illustrative examples of other sensitive end-users. This final rule adds the parenthetical phrase "(*e.g.*, contractors or other governmental parties performing functions on behalf of military, police, or intelligence entities)" after the phrase "or other sensitive end-users" to provide greater clarity on the other end-users that are excluded.

*License Exception: Baggage (BAG).*

DOC_0081107

This final rule revises License Exception BAG, § 740.14, to allow United States citizens and permanent resident aliens leaving the United States temporarily to take up to three firearms controlled by proposed ECCN 0A501 and up to 1,000 rounds of ammunition for such firearms controlled under ECCN 0A505.a for personal use while abroad. This change to License Exception BAG is made to be consistent with former 22 CFR 123.17(c) (removed and reserved by companion rule), which authorized U.S. persons to take up to three non-automatic firearms and up to 1,000 cartridges therefor abroad for personal use. This amendment to License Exception BAG applies to both non-automatic and semi-automatic firearms.

Travelers leaving the United States temporarily are required to declare the 0A501 and 0A505 items to a CBP officer prior to departure from the United States and present the firearms, "parts," "components," "accessories," "attachments," and ammunition they are exporting to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG, that the exporter is compliant with its terms. Should exporters desire to contact CBP prior to departure, contact information and a list of U.S. air, land and sea ports of entry can be found at: https://www.cbp.gov/contact/ports.

This final rule also revises License Exception BAG to allow nonresident aliens leaving the United States to take firearms, "accessories," "attachments," "components," "parts," and ammunition controlled by ECCN 0A501 or 0A505 that they lawfully brought into the United States. This change is consistent with former 22 CFR 123.17(d) (removed and reserved by companion rule), which authorized foreign persons leaving the United States to take firearms and ammunition controlled under Category I(a) of the USML (both non-automatic and semi-automatic) that they lawfully brought into the United States. This final rule does not adopt any

115

changes to the availability of License Exception BAG for shotguns and shotgun shells authorized under paragraphs (e)(1) or (2).

As a clarification to License Exception BAG, this final rule adds one sentence to the introductory text of paragraph (b)(4) to highlight the special provisions that apply in paragraph (e) for firearms and ammunition and in paragraph (h) for personal protective equipment under ECCN 1A613.c or .d. This one sentence does not change the existing requirement and has been included to assist the public in better identifying these special provisions.

Consistent with the ITAR requirements previously applicable to temporary exports of the firearms and associated ammunition covered by the May 24 proposed rule, BIS proposed in the Commerce May 24 rule to modify § 758.1 of the EAR to make clear that exporters would continue to be required to file EEI in AES for transactions involving such firearms and associated ammunition that are otherwise authorized pursuant to License Exception BAG. However, for the reasons described above in the description of the comments and BIS responses, this final rule adopts an alternative approach with the addition of the new § 758.11 described immediately below.

This final rule makes the following additional changes in response to the public comments received on the Commerce May 24 rule:

As described above, this final rule removes the EEI filing requirement in AES as set forth in § 758.1(b)(9) for firearms authorized under License Exception BAG.

In response to public comments as described above, this final rule instead adds a new § 758.11 (Export clearance requirements for firearms and related items) and incorporates a

116

requirement to use the Department of Homeland Security, CBP Form 4457, Certificate of

Registration for Personal Effects Taken Abroad) (OMB Control Number 1651-0010) for all

exports of commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length

less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN

0A505 except for .c, regardless of value or destination, including exports to Canada, that are

authorized under License Exception BAG, as set forth in § 740.14.  Section 758.11 includes four

paragraphs:  paragraph (a) (Scope) specifies when these export clearance requirements apply;

paragraph (b) (Required form) identifies the required form that needs to be used in connection

with these exports authorized under License Exception BAG, including paragraph (b)(1) that

includes a website for where to find the form, and paragraph (b)(2) that specifies the "description

of articles" for firearms to be included on the CBP Form 4457; paragraph (c) provides a link for

where to find additional information on the CBP Form 4457; and paragraph (d) (Return of items

exported pursuant to this section) specifies the requirements for the return of items exported

under License Exception BAG when the export clearance requirements in § 758.11 apply.

*License Exception: Servicing and Replacement of Parts and Equipment (RPL).*

This final rule also adopts the following changes to License Exception RPL to respond to the

comments received on the Commerce May 24 rule, that requested License Exception RPL be

included as a valid purpose for a temporary import under § 758.10.  As described above, BIS

agreed to include License Exception RPL in § 758.10, and these changes are described below.

In § 740.10(b) (Servicing and replacement of parts and equipment), this final rule makes needed

conforming changes for the addition of License Exception RPL to § 758.10 and to include

similar changes as were made to License Exception TMP under § 740.9(b)(5) in the Commerce

DOC_0081110

May 24 rule. This final rule adds one sentence to the end of the introductory text of § 740.10(b)(1) to specify that that additional requirements in new paragraph (b)(4) must be met in order to use License Exception RPL to authorize under paragraphs (b)(2) or (b)(3) the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 temporarily in the United State for servicing and replacement. This final rule adds new paragraph (b)(4) (Exports of firearms and certain shotguns temporarily in the United States for servicing and replacement). Under the introductory text of paragraph (b)(4), this final rule imposes a requirement that the firearms and certain shotguns must be temporarily in the United States for servicing or replacement for a period not exceeding one year or the time it takes to service or replace the commodity, whichever is shorter in order to use License Exception RPL to authorize the export. This final rule adds paragraphs (b)(4)(i) and (ii) to impose restrictions for firearms shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740, to impose the same types of restrictions and impose the same type of information requirements for providing information to CBP as this final rule includes for License Exception TMP under paragraph (b)(5).

*License Exception: Additional Permissive Reexports (APR).*

This final rule also adopts the following change to License Exception APR to respond to the comments received on the Commerce May 24 rule:

In § 740.16 of License Exception APR, this final rule adds commodities classified under a 0x5zz ECCN to the list of commodities excluded under paragraph (a) of License Exception

DOC_0081111

APR. This final rule also adds a new paragraph (b)(2)(vi) to exclude commodities classified under a 0x5zz ECCN under paragraph (b) of License Exception APR. The Commerce May 24 rule did not propose these exclusions from License Exception APR, but BIS identified these two paragraphs of License Exception APR as two authorizations that were not intended to be available under the Commerce May 24 rule, but based on the stated criteria prior to the effective date of this final rule would have been available. Therefore, this final rule makes these changes to ensure the authorizations available for reexports and transfers (in-country) will be equivalent to those available for exports.

*License Exception STA.*

BIS did not receive any comments on the proposed changes to License Exception STA, § 740.20, in the Commerce May 24 rule, so this final rule adopts those changes as proposed. This final rule revises the regulations at § 740.20 to make firearms controlled under ECCN 0A501 and most "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501 ineligible for License Exception STA. Only those "parts," "components," "accessories," and "attachments" that are controlled under paragraph .x are eligible for export under License Exception STA. Items controlled under ECCNs 0A502 and 0A503 are also excluded from STA eligibility.

**Support documentation for firearms, parts, components, accessories, and attachments controlled by ECCN 0A501.**

BIS did not receive any comments on this proposed change to § 748.12 in the Commerce May 24 rule, so the change is published in this final rule as proposed. This final rule requires that for commodities controlled by ECCN 0A501 that are the subject of export or reexport

DOC_0081112

transactions for which a license is required, the exporter or reexporter must obtain, prior to submitting an application, an import permit (or copy thereof) if the importing country requires such permits for import of firearms. That import permit is a record that must be kept by the exporter or reexporter as required by part 762 of the EAR. The purpose of this requirement is to assure foreign governments that their regulations concerning the importation of firearms are not circumvented. To implement this change, this final rule revises § 748.12 to include the commodities controlled under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d) within the list of commodities that are subject to the requirement and adds a new paragraph (e) requiring that import certificates or permits be obtained from countries other than OAS member states if those states require such a certificate or permit.

**Licenses for firearms and ammunition will be limited to the authorized end use and end users.**

BIS did not receive any comments on these statements of EAR licensing policy in the Commerce May 24 rule but restates them here to assist the public. Consistent with other BIS licenses, including "600 series" and 9x515 items, licenses for firearms and ammunition that move from the USML to the CCL are limited to the authorized end use and end users specified on the license and supporting documentation submitted as part of the license application. This means any change in the authorized end use or end user for a licensed transaction will require a BIS authorization. This existing requirement of BIS licenses is specified in § 750.7(a) and on the boiler plate text included on all BIS licenses. These requirements are also applied to firearms and ammunition licenses. A change in end use or end user, including a change of authorized end use or end user within a single foreign country for a firearm or ammunition authorized under a

DOC_0081113

BIS license, requires a BIS authorization. BIS does not adopt any changes in this final rule to these well-established and understood requirements on using BIS licenses. Applicants for firearms and ammunition licenses are also advised that BIS continues to exercise its authority, as specified in § 748.11 in the Note 2 to paragraph (a), on a case-by-case basis to require a Statement by Ultimate Consignee and Purchaser as warranted.

The exporter, reexporter, or transferor using a BIS license, including for firearms and ammunition licenses, is also required, pursuant to § 750.7(a), to inform the other parties identified on the license, such as the ultimate consignees and end users of the license's scope and of the specific conditions applicable to them. As an additional safeguard for firearms and ammunition licenses, BIS will include, when warranted, a license condition requiring the exporter, reexporter, or transferor to obtain from the other parties identified on the license a written confirmation that those other parties have received and agree to the terms and conditions of the license. For example, the condition may state "Prior to using this license, the exporter (reexporter or transferor) and other parties to the license must agree to the conditions in writing and the exporter (reexporter or transferor) must keep this on file with their other records." The documents described in this paragraph are required to be kept for EAR recordkeeping purposes under part 762 of the EAR.

**Conventional arms reporting for certain exports of ECCN 0A501.a and .b commodities**

In § 743.4 (Conventional arms reporting), this final rule revises paragraphs (c)(1)(i) and (c)(2)(i) to add ECCN 0A501.a and .b as commodities that require Wassenaar Arrangement reporting and United Nations reporting under this conventional arms reporting section of the EAR. This requirement assists the U.S. Government to meet its multilateral commitments for the special reporting requirements for exports of certain items listed on the WAML and the

DOC_0081114

United Nations Register of Conventional Arms when these items are authorized for export under

License Exceptions LVS, TMP, RPL, STA, or GOV (see part 740 of the EAR) or the Validated

End-User authorization (see § 748.15 of the EAR) and for United Nations reporting. License

Exceptions LVS and STA are identified in § 743.4(b)(1), but because ECCN 0A501.a and .b

commodities are not eligible for those two license exceptions, the reporting requirements under §

743.4(c)(1)(i) and (c)(2)(i) are limited to exports authorized License Exceptions TMP, GOV, and

RPL or the Validated End-User authorization. This final rule also adds contact information for

these reports.

This final rule also makes the following additional change to § 743.4 to respond to the

comments received on the Commerce May 24 rule:

Commenters requested that BIS use information required to be submitted in the EEI

filing in AES to pull the conventional arms reporting data directly in order to eliminate the need

for exporters to submit separate reports to BIS. BIS agreed and this final rule revises three

paragraphs in § 743.4 to adopt an alternative method for BIS to receive the information that is

required for conventional arms reporting. This rule revises paragraph (a) to add four sentences at

the end of the paragraph. These four sentences specify that if the exporter follows the

requirements specified in this section for the alternative submission method described in new

paragraph (h) (Alternative submission method), that separate reporting does not need to be made

to BIS for purposes of § 743.4. Because of the EEI filing requirements in AES in new §

758.1(g)(4)(ii) for the firearms that require conventional arms reporting, all conventional arms

reporting requirements for firearms should be able to be met by using the alternative submission

method. Under paragraph (b) (Requirements), this final rule adds a reference to meeting the

reporting requirement by using the alternative submission method in new paragraph (h).

DOC_0081115

This final rule adds paragraph (h) that describes the requirements for the alternative submission method. To use the alternative reporting method, each time the exporter files an EEI record in AES, the exporter must include as the first text in the Commodity Description field in AES the first six characters of the ECCN number, *i.e.*, "0A501.a" or "0A501.b." In addition, the exporter must document for recordkeeping requirements under the EAR that for purposes of the conventional arms reporting requirements under part 743, it has decided to use the alternate submission method by taking steps to identify the end item firearms in the EEI filing in AES that will enable the U.S. Government to pull the data and meet national reporting commitments to the Wassenaar Arrangement and the United Nations.

As a conforming change, in § 758.1 (The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES)), this final rule adds a new paragraph (g)(4)(ii) (Identifying end item firearms by "items" level classification or other control descriptor in the EEI filing in AES). Exporters must include the six character ECCN classification (*i.e.*, 0A501.a or 0A501.b), as the first text to appear in the Commodity description block in the EEI filing in AES. Exporters for shotguns controlled under 0A502 must include the phrase "0A502 barrel length less than 18 inches" as the first text to appear in the Commodity description block in the EEI filing in AES. This information will be used by BIS as referenced in § 743.4(h) for conventional arms reporting.

**Changes to export clearance requirements for firearms being moved to the CCL (part 758)**

In § 758.1, this final rule adopts changes to clarify that a filing of EEI in AES will be required for exports of the firearms transferred from the USML pursuant to this rule regardless of value or destination, including exports to Canada. As noted above, this requirement applies, as

DOC_0081116

was the case under the ITAR prior to the effective date of this final rule, for temporary exports of such items pursuant to License Exception TMP, but not for License Exception BAG.

In addition, this final rule expands the data elements required as part of an EEI filing to AES filing for these firearms to include serial numbers, make, model and caliber. This requirement will ensure law enforcement officials are able to effectively verify that firearms exports are properly authorized and in conformance with all applicable regulations, including those associated with the temporary export and subsequent return of controlled firearms and unused ammunition.

This final rule also makes the following additional changes to § 758.1(b)(10) and (c)(1) to respond to the comments received on the Commerce May 24 rule regarding the concerns for individuals having to file EEI in AES:

In § 758.1, this final rule revises new paragraph (b)(10) that was included in the Commerce May 24 rule, but adds it as new paragraph (b)(9). This final rule excludes exports authorized under License Exception BAG from the EEI filing requirement in AES. As a conforming change, this final rule revises paragraph (c)(1) to eliminate the restriction from the exemption for License Exception BAG. This final rule makes this change because of excluding License Exception BAG from paragraph (b)(9) means the general exemption for not filing EEI in AES for these firearms authorized under License Exception BAG, should be available, so this final rule makes this conforming change. This final rule adds a new Note to paragraph (c)(1) to add a cross reference to the export clearance requirements that are specific to firearms exported under License Exception BAG.

DOC_0081117

This final rule also makes the following additional changes to § 758.1(g)(4) to respond to the comments received on the Commerce May 24 rule regarding concerns for having to include the manufacture, model, caliber, and serial number in the EEI filing in AES:

In § 758.1(g)(4) (Exports of Firearms and Related Items), this final rule adds a new paragraph (g)(4)(i) (Identifying end item firearms by manufacturer, model, caliber, and serial number in the EEI filing in AES) to narrow the requirement for when firearms must be identified by manufacture, model, caliber, and serial number in the EEI filing in AES to License Exception TMP or a BIS license that contains a condition requiring all or some of this information to be filed as EEI in AES.

**Entry clearance requirements for temporary imports (§ 758.10)**

Temporary imports are transactions that involve both the temporary entry of an item into the U.S. from a foreign country and the subsequent export of that item from the U.S. To preserve the treatment of temporary import transactions for items in this rule that will transfer from the USML in the ITAR to become subject to the EAR, BIS imposes a temporary imports entry clearance requirement in this final rule by adding new § 758.10. This new section is limited to items in this rule that are both "subject to the EAR" and on the USMIL in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this final rule imposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export. BIS does not impose a license requirement for such imports, but this information is necessary to facilitate the export after a temporary import. The entry clearance requirement is an EAR requirement and any false representation made under the new § 758.10 will be a violation of the EAR.

DOC_0081118