This final rule also makes the following additional change to § 758.10 to respond to the comments received on the Commerce May 24 rule:

In § 758.10, this final rule adds an exclusion to the entry clearance requirements proposed in the Commerce May 24 rule to clarify that firearms "subject to the EAR" brought into the United States by nonimmigrant aliens under the provisions of Department of Justice regulations at 27 CFR part 478 are not subject to these same entry clearance requirements for temporary imports. This final rule makes this change for consistency with License Exception BAG under paragraph (e) and because ATF regulations address nonimmigrant aliens temporarily bringing these types of firearms into the United States, so the requirements in § 758.10 do not need to apply.

In § 758.10, this final rule clarifies the penultimate sentence and the last sentence of paragraph (a) by removing references to "permanent return" and "permanent import" after items are temporarily exported under an EAR authorization, *e.g.*, License Exception TMP or a Commerce license. This clarification is made because the inbound portion of a temporary export is covered by the temporary export authorization, so it not accurate to describe those as a "permanent return" or as a "permanent import."

Also in § 758.10, this final rule clarifies the introductory text of paragraph (b) by deleting the title "the Port Directors" before U.S. Customs and Border Protection. This change is made because U.S. Customs and Border Protection Center Directors may also have an enforcement role in addition to Port Directors, so referencing U.S. Customs and Border Protection is sufficient. In paragraph (b)(2), this final rule revises the phrase "as requested by CBP" with the phrase "upon request by CBP." In the last sentence of paragraph (b)(2), this final rule removes the word "inspection" after the phrase "additional requirements" because the word was not intended to be included in the cross reference to § 758.1(g)(4).

This final rule also revises § 758.10 to add references to License Exception RPL and BIS licenses as two additional EAR authorizations as valid purposes for a temporary import under this section. This final rule does this by revising paragraph (b)(1)(i) to broaden the number of permissible statements to allow for three statements (instead of the single statement that was included in the Commerce May 24 rule). This final rule adds new paragraphs (b)(1)(i)(A) (to account for License

Exception TMP under 15 CFR 740.9(b)(5)), (b)(1)(i)(B) (to account for the addition of License Exception RPL under 15 CFR 740.10(b)), and (b)(1)(i)(C) (to account for BIS licenses) to add the three statements. The three statements are substantively the same, and the only difference is the EAR authorization being referenced in the statement. As a conforming change, this final rule adds a new paragraph (b)(1)(iv) that applies if the item being temporarily imported under § 758.10 is for servicing or replacement. Under this new paragraph (b)(1)(iv) at the time of temporary import, the name, address and contact information of the organization or individual in the U.S. that will be receiving the item for servicing or replacement must be provided to CBP. Lastly, as an additional conforming change, this final rule adds a new Note 2 to paragraph (b)(1) to impose exclusions, similar to those imposed on License Exception TMP that limit the availability of License Exception RPL for temporary imports of certain firearms shipped from or manufactured in listed countries.

*Unique Application and Submission Requirements for Licenses*

This final rule also adopts the following changes for BIS license applications in response to comments received. As described above, BIS agreed to include changes in § 758.10 to account for temporary imports that would require a BIS license for subsequent export.

In Supplement No. 2 to part 748—Unique Application and Submission Requirements, this final rule adds a new paragraph (z) (Exports of firearms and certain shotguns temporarily in the United States) describing a certification requirement for applicants to include in Block 24 of the BIS license application. The certification requirement is an acknowledgement by the applicant that the firearms in the application will not be shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740. The certification also requires that the applicant and other parties to the transaction will comply with the requirements in paragraphs (z)(2)(i) and (ii) of Supplement No. 2 to part 748. This final rule adds paragraph (z)(2) (*Requirements*) to describe the requirements that will be applicable for any license for the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than

18 inches controlled in ECCN 0A502 that will be temporarily imported to the United States. These requirements impose the same type of requirements as this final rule includes for License Exception TMP under paragraph (b)(5) and License Exception RPL under paragraph (b)(4), but does so by imposing the certification requirement in paragraph (z)(1). BIS will include a standard condition that will require compliance with the requirements in paragraphs (z)(2)(i) and (ii).

**Changes to EAR Recordkeeping Requirements for Firearms Being Moved to the CCL (Part 762)**

BIS does not make any additional changes in this final rule to what was proposed in the Commerce May 24 rule as a result of the comments received, so these changes are adopted as proposed. In part 762 (Recordkeeping), this final rule adopts two changes to the recordkeeping requirements under the EAR. These changes specify that certain records, that are already created and kept in the normal course of business, must be kept by the "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records.

Specifically, in § 762.2 (Records to be retained), this final rule redesignates paragraph (a)(11) as (a)(12) and adds a new paragraph (a)(11) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. The "exporter" or any other "party to the transaction" that creates or receives such records is the person responsible for retaining this record.

In § 762.3 (Records exempt from recordkeeping requirements), this final rule narrows the scope of an exemption from the EAR recordkeeping requirements for warranty certificates. This final rule narrows this exclusion to specify the exclusion from the recordkeeping requirements does not apply (meaning the record will need to be kept under the recordkeeping requirements) for warranty certificates for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502, when the certificate issued is for an address located outside the United States. This is an expansion of the EAR recordkeeping requirements, but because warranty certificates are already created and kept as part of normal business recordkeeping purposes, this expansion is not anticipated to create any new or increased burden under the

EAR, because it is a document that is created in the normal course of business and should be easily accessible. These recordkeeping requirements will assist the United States Government because it is important for law enforcement to have access to this information.

## Conforming Change To Add a New Definition for Use in ECCNs 0A501 and 0A502 (§ 772.1)

This final rule also adds a new definition to the definition part of the EAR to respond to the comments received on the Commerce May 24 rule:

In § 772.1 (Definitions of terms as used in the Export Administration Regulations), this final rule adds a definition of "complete breech mechanisms." The new definition specifies that this is a mechanism for opening and closing the breech of a breech-loading firearm, especially of a heavy-caliber weapon. As a conforming change, this final rule also adds double quotation marks around the term where it is used in ECCNs 0A501 and 0A502.

## Export Control Reform Act of 2018

On August 13, 2018, the President signed into law the John S. McCain National Defense Authorization Act for Fiscal Year 2019, which included the Export Control Reform Act of 2018 (ECRA) (50 U.S.C. 4801–4852) that provides the legal basis for BIS's principal authorities and serves as the authority under which BIS issues this rule. As set forth in Section 1768 of ECRA, all delegations, rules, regulations, orders, determinations, licenses, or other forms of administrative action that have been made, issued, conducted, or allowed to become effective under the Export Administration Act of 1979 (50 U.S.C. 4601 *et seq.*) (as in effect prior to August 13, 2018 and as continued in effect pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) and Executive Order 13222 of August 17, 2001, 3 CFR, 2001 Comp., p. 783 (2002), as amended by Executive Order 13637 of March 8, 2013, 78 FR 16129 (March 13, 2013), and as extended by the Notice of August 8, 2018, 83 FR 39871 (August 13, 2018)), or the Export Administration Regulations, and are in effect as of August 13, 2018, shall continue in effect according to their terms until modified, superseded, set aside, or revoked under the authority of ECRA.

## Executive Order Requirements

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distribute impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This final rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Although the items identified in this final rule have been determined to no longer warrant ITAR control by the President, the proliferation of such items has been identified as a threat to domestic and international security if not classified and controlled at the appropriate level under the EAR. Commerce estimates that the combined effect of all rules to be published adding items removed from the ITAR to the EAR will increase the number of license applications to be submitted to BIS by approximately 30,000 annually.

This final rule does not contain policies with Federalism implications as that term is defined under E.O. 13132.

To control these items under the EAR that no longer warrant ITAR control, appropriate controls on the CCL needed to be included in the Department of Commerce final rule. This includes creating new ECCNs and revising certain existing ECCNs, as well as making other changes to the EAR to control items that will be moved from these three USML categories to the CCL once the section 38(f) notification process is completed and a final rule is published and becomes effective. Adding new controls and other requirements to the EAR imposes regulatory burdens on exporters and some other parties involved with those items, but compared to the burdens these exporters and other parties faced under the ITAR, these regulatory burdens, including financial costs, will be reduced significantly. The EAR is a more flexible regulatory structure whereby the items can still be controlled appropriately, but in a much more efficient way that will significantly reduce the burdens on exporters and other parties compared to the regulatory burdens they faced when the items were "subject to the ITAR." Deregulatory does not mean a decontrol of these items.

For those items in USML Categories I, II, and III that will move by this rule to the CCL, BIS will be collecting the necessary information using the form associated with OMB Control No. 0694–0088. BIS estimates that this form takes approximately 43.8 minutes for a manual or electronic submission. Using the State Department's estimate that 10,000 license applications annually will move from the USML to the CCL and BIS's estimate in this final rule that 6,000 of the 10,000 license applications will require licenses under the EAR, that constitutes a burden of 4,380 hours for this collection under the EAR. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden is reduced by 5,620 hours. The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants will not be required to submit license applications under the EAR.

In addition to the reduced burden hours of 5,620 hours, there will also be direct cost savings to the State Department that will result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. The Department of State charges a registration fee to apply for a license under the ITAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance, and other related activities. The Department of Commerce will incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to apply for a license under the EAR, and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications. Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR will result in a permanent and recurring direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they will no longer

pay fees to the State Department for licenses and there is no fee charged by the Department of Commerce to apply for a license.

*Estimated Cost Savings*

For purposes of E.O. 13771 of January 30, 2017 (82 FR 9339), the Department of State and Department of Commerce final rules are expected to be "net deregulatory actions." The Department of Commerce has conducted this analysis in close consultation with the Department of State, because of how closely linked the two final rules are for the regulated public and the burdens imposed under the U.S. export control system.

E.O. 13771 and guidance provided to the agencies on interpreting the intended scope of the E.O. do not use the term "net deregulatory action," but rather refer to deregulatory actions. As outlined above, the Departments of State and Commerce final rules are closely linked and are best viewed as a consolidated deregulatory action although being implemented by two different agencies. Also, as noted above, items may not be subject to both sets of regulations. Therefore, the movement of a substantial number of items from the USML determined to no longer warrant ITAR control to the CCL will result in a significant reduction of regulatory burden for exporters and other persons involved with such items that were previously "subject to the ITAR."

For purposes of E.O. 13771, the Departments of State and Commerce have agreed to equally share the cost burden reductions that will result from the publication of these two integral deregulatory actions. The Department of State will receive 50% and the Department of Commerce will receive 50% for purposes of calculating the deregulatory benefit of these two integral actions.

*Under this agreed formulation, the burden reductions will be calculated as follows:*

For purposes of the Department of Commerce, the "net deregulatory actions" will result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810. The reduction in burden hours by 2,810 will result in an additional cost savings of [1] $126,281 to the exporting public. The total cost savings will be $1,376,281 in present (2017) dollars. To allow for cost

[1] The Department of Commerce used the Department of State's estimate that the burden hour cost for completing a license application is $44.94 per hour. Multiplied by the estimated burden hour savings of 2,810 equals a cost savings to the public of $126,281.

comparisons under E.O. 13771, the value of these costs savings in 2016 dollars is $1,353,574. Assuming a 7% discount rate, the present value of these cost savings in perpetuity is $19,336,771. Since the costs savings of this rule are expected to be permanent and recurring, the annualized value of these cost savings is also $1,353,574 in 2016 dollars.

For purposes of the Department of State, the "net deregulatory actions" will result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810. The reduction in burden hours by 2,810 will result in an additional cost savings of $126,281 to the exporting public. The total cost savings will be $1,376,281 in present (2017) dollars. To allow for cost comparisons under E.O. 13771, the value of these costs savings in 2016 dollars is $1,353,574. Assuming a 7% discount rate, the present value of these cost savings in perpetuity is $19,336,771. Since the costs savings of this rule are expected to be permanent and recurring, the annualized value of these cost savings is also $1,353,574 in 2016 dollars.

The Department of Commerce in the Commerce May 24 rule welcomed comments from the public on the analysis under E.O. 13771 described here. The Commerce May 24 rule noted that it would be helpful to receive comments from companies that will no longer need to register with the Department of State because the company only deals with items under USML Category I, II, and/or III that will move to the CCL. Comments were also encouraged on any of the other collections that may be relevant for the items that will move from the USML to the CCL. The Commerce May 24 rule also noted that it would be helpful to receive data on Department of State forms that will no longer need to be submitted.

**Paperwork Reduction Act Requirements**

Notwithstanding any other provision of law, no person may be required to respond to or be subject to a penalty for failure to comply with a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

This final regulation involves four collections currently approved by OMB under these BIS collections and control numbers: Simplified Network Application Processing System (control number 0694–0088), which includes, among other things, license

applications; License Exceptions and Exclusions (control number 0694–0137); Import Certificates and End-User Certificates (control number 0694–0093); Five Year Records Retention Period (control number 0694–0096); and the U.S. Census Bureau collection for the Automated Export System (AES) Program (control number 0607–0152).

This final rule will affect the information collection, under control number 0694–0088, associated with the multi-purpose application for export licenses. This collection carries a burden estimate of 43.8 minutes for a manual or electronic submission for a burden of 31,833 hours. BIS believes that the combined effect of all rules to be published adding items removed from the ITAR to the EAR will be an increase in the number of license applications to be submitted by approximately 30,000 annually, resulting in an increase in burden hours of 21,900 (30,000 transactions at 43.8 minutes each) under this control number. For those items in USML Categories I, II, and III that will move by this rule to the CCL, the State Department estimates that 10,000 applicants annually will move from the USML to the CCL. BIS estimates that 6,000 of the 10,000 applicants will require licenses under the EAR, resulting in a burden of 4,380 hours under this control number. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden will be reduced by 5,620 hours. (*See* the description above for the E.O. 13771 analysis for additional information on the cost benefit savings and designation of the two rules as "net deregulatory actions".)

This final rule will also affect the information collection under control number 0694–0137, addressing the use of license exceptions and exclusions. Some parts and components formerly on the USML, and "software" and "technology" for firearms and their parts and components formerly on the USML, will become eligible for License Exception STA under this final rule. Additionally, test, inspection and production equipment, and "software" and "technology" related to those firearms and "parts" may become eligible for License Exception STA. BIS believes that the increased use of License Exception STA resulting from the combined effect of all rules to be

published adding items removed from the ITAR to the EAR will increase the burden associated with control number 0694–0137 by about 23,858 hours (20,450 transactions at 1 hour and 10 minutes each).

BIS expects that this increase in burden as a result of the increased use of License Exception STA will be more than offset by a reduction in burden hours associated with approved collections related to the ITAR. This final rule addresses controls on firearms and "parts," production equipment and "parts" and related "software" and "technology" and specifically non-automatic and semi-automatic firearms and their "parts" and "parts," "components," "attachments," and "accessories" that are used in both semi-automatic and fully automatic firearms. BIS has made this determination on the basis that with few exceptions, the ITAR allows exemptions from license requirements only for exports to Canada, and requires a specific State Department authorization for most exports of firearms used for hunting and recreational purposes and exports of "parts," "components," "attachments," and "accessories" that are common to military fully automatic firearms and their semi-automatic civilian counterparts, even when destined to NATO and other close allies and also requires State Department authorization for the exports necessary to produce "parts" and "components" for defense articles in the inventories of the United States and its NATO and other close allies. However, under the EAR, as specified in this final rule, a number of low-level parts will be eligible for export under License Exception STA and will therefore not require a license to such destinations.

This final rule will also affect the information collection under control number 0694–0096, for the five-year recordkeeping retention because of two changes this rule will make to part 762 of the EAR. This rule adds a new paragraph (a)(11) to § 762.2 to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. This rule will also require warranty certificates for these items to be retained for EAR recordkeeping. However, because these records are already created and kept as part of normal business recordkeeping, this expansion is not anticipated to create any new or increased burden under the EAR.

Even in situations in which a license will be required under the EAR, the burden will likely be reduced compared to a license requirement under the ITAR. In particular, license applications for exports of "technology" controlled by ECCN 0E501 will likely be less complex and burdensome than the authorizations required to export ITAR-controlled technology, *i.e.,* Manufacturing License Agreements and Technical Assistance Agreements (as a result of the differences in the scope of the ITAR's and the EAR's technology controls).

This final rule will affect the information collection under control number 0694–0093, import certificates and end-user certificates because of the changes included in this final rule. First, this regulation will require that for shipments requiring a license of firearms, "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501, the exporter must obtain a copy of the import certificate or permit if the importing country requires one for importing firearms. License applications for which an import or end-user certificate is already required under § 748.12 of the EAR will not be subject to this new requirement. BIS expects that this requirement will result in no change in the burden under control number 0694–0093. Second, this final rule also will require that prior to departure, travelers leaving the United States and intending to temporarily export firearms, parts, and components controlled under ECCN 0A501 under License Exception BAG declare the firearms and parts to a CBP officer and present the firearms and parts to the CBP officer for inspection. As the State Department also requires that persons temporarily exporting firearms, parts, and components declare the items to CBP, BIS does not expect that the requirement in this final rule will result in a change in burden under control number 0694–0093.

Third, this final rule will affect the information collection under control number 0694–0093 by creating a new temporary import entry clearance requirement by adding § 758.10. This new section will be limited to items in this rule that are both "subject to the EAR" and on the United States Munitions Import List (USMIL) in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this rule implements a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export under License Exceptions TMP, RPL, and BIS licenses. BIS will not impose a license requirement for such imports, but collecting this information will be necessary to facilitate the export after a temporary import. The temporary import entry clearance requirement in § 758.10 will also conform to the requirements in License Exception TMP under § 740.9(b)(5), License Exception RPL under § 740.9(b)(4), and for BIS licenses under paragraph (z) in Supplement No. 2 to part 748, so providing this information to CBP at entry after a temporary import will facilitate the export phase of a temporary import under License Exceptions TMP, RPL and BIS licenses. At the time of entry for a temporary import, the importer will need to provide a statement to CBP indicating that this shipment was being temporarily imported in accordance with the EAR for subsequent export in accordance with and under the authority of License Exceptions TMP, RPL, or a BIS license. The entry clearance requirement will be an EAR requirement and any false representation made under the new § 758.10 will be a violation of the EAR. The importer will also need to provide CBP an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the items being imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value. If imported for a trade show, exhibition, demonstration, or testing, the temporary importer will need to provide CBP with the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are temporarily in the United States. If imported for servicing or replacement, the temporary importer will need to provide CBP with the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement. Lastly, at the time of exportation, upon request by CBP, the exporter, or an agent acting on his or her behalf, will have to provide the entry document number or a copy of the CBP document under which the "item" "subject to the EAR" on the USMIL was temporarily imported under this entry clearance requirement. As the State Department also requires that persons temporarily importing items in this rule provide the same type of information to CBP, BIS expects that the requirement in this final rule will result in a change in burden under control number 0694–0093, but because of the decrease under the burden imposed

under the State collection, the burden on the public will not change.

This final rule will also affect the information collection under control number 0607–0152, for filing EEI in AES because of one change this final rule makes to part 758 of the EAR. Under new § 758.1(b)(9), EEI will be required for all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada. Exports of these USML firearms and ammunition prior to moving to the CCL required filing EEI in AES for all items "subject to the ITAR," so the burden in this collection will not change for the exporter.

This final rule includes a requirement that, for all exports of temporary exports from the United States or when the license or other approval contains a condition requiring all or some of this information to be filed as EEI in AES of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing requirements, the exporter must provide to CBP the serial number, make, model, and caliber for each firearm being exported. The Department of Commerce is carrying over the existing CBP filing requirements for items transferred from the USML to the CCL. The Department of Homeland Security currently is collecting these data elements for firearms "subject to the ITAR" under OMB Control Number 1651–0010 (CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad). There is no change to the information being collected or to the burden hours as a result of this rule. Separate from this rule, CBP will update the information collection to reflect the use of AES or some other simplified electronic alternative to CBP Form 4457.

Any comments regarding the collection of information associated with this final rule, including suggestions for reducing the burden, may be sent to Jasmeet K. Seehra, Office of Management and Budget (OMB), by email to *Jasmeet_K._Seehra@omb.eop.gov,* or by fax to (202) 395–7285.

## Administrative Procedure Act and Regulatory Flexibility Act Requirements

Pursuant to section 1762 of the Export Control Reform Act of 2018 (Title XVII, Subtitle B of Pub. L. 115–232), which was included in the John S. McCain National Defense Authorization Act for Fiscal Year 2019, this action is exempt from the Administrative Procedure Act (APA) (5 U.S.C. 553) requirements for notice of proposed rulemaking, opportunity for public participation, and delay in effective date.

Because a notice of proposed rulemaking and an opportunity for public comment are not required to be given for this rule by the APA or any other law, the analytical requirements of the Regulatory Flexibility Act, 5 U.S.C. 601, *et seq.,* are not applicable. Accordingly, no regulatory flexibility analysis is required and none has been prepared.

## List of Subjects

*15 CFR Parts 732, 740, and 748*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 734*

Administrative practice and procedure, Exports, Inventions and patents, Research, Science and technology.

*15 CFR Parts 736 and 772*

Exports.

*15 CFR Part 742*

Exports, Terrorism.

*15 CFR Part 743*

Administrative practice and procedure, Reporting and recordkeeping requirements.

*15 CFR Part 744*

Exports, Reporting and recordkeeping requirements, Terrorism.

*15 CFR Parts 746 and 774*

Exports, Reporting and recordkeeping requirements.

*15 CFR Part 758*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 762*

Administrative practice and procedure, Business and industry, Confidential business information, Exports, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, parts 732, 734, 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774 of the Export Administration Regulations (15 CFR parts 730–774) are amended as follows:

## PART 732—STEPS FOR USING THE EAR

■ 1. The authority citation for 15 CFR part 732 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 2. Section 732.2 is amended by adding one sentence to the end of paragraph (b) introductory text to read as follows:

### § 732.2   Steps regarding scope of the EAR.

\*   \*   \*   \*   \*

(b) \* \* \* The following also remains subject to the EAR: "Software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, as referenced in § 734.7(c) of the EAR).

\*   \*   \*   \*   \*

## PART 734—SCOPE OF THE EXPORT ADMINISTRATION REGULATIONS

■ 3. The authority citation for 15 CFR part 734 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; Notice of November 12, 2019, 84 FR 61817 (November 13, 2019).

■ 4. Section 734.7 is amended by revising paragraph (a) introductory text and adding paragraph (c) to read as follows:

### § 734.7   Published.

(a) Except as set forth in paragraphs (b) and (c) of this section, unclassified "technology" or "software" is "published," and is thus not "technology" or "software" subject to the EAR, when it has been made available to the public without restrictions upon its further dissemination such as through any of the following:

\*   \*   \*   \*   \*

(c) The following remains subject to the EAR: "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, that is made available by posting on the internet in an electronic format, such as AMF or G-code, and is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the "software" or "technology" to

produce the firearm frame or receiver or complete firearm.

## PART 736—GENERAL PROHIBITIONS

■ 5. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of May 8, 2019, 84 FR 20537 (May 10, 2019); Notice of November 12, 2019, 84 FR 61817 (November 13, 2019).

■ 6. Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

## Supplement No. 1 to Part 736—General Orders

\*  \*  \*  \*  \*

(e) \* \* \*

(3) *Prior commodity jurisdiction determinations.* If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for purposes of the 9x515 ECCNs), then the item is per se not within the scope of a "600 series" ECCN, a 0x5zz ECCN, or a 9x515 ECCN. If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.,* the item was designated EAR99), the item shall remain designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

\*  \*  \*  \*  \*

## PART 740—LICENSE EXCEPTIONS

■ 7. The authority citation for 15 CFR part 740 continues to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 7201 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 8. Section 740.2 is amended by adding paragraphs (a)(21) and (22) to read as follows:

## §740.2 Restrictions on all License Exceptions.

(a) \* \* \*

(21) The reexport or transfer (in-country) of firearms classified under ECCNs 0A501 or 0A502 if a part or component that is not "subject to the ITAR," but would otherwise meet the criteria in USML Category I(h)(2) (*i.e.,* parts and components specially designed for conversion of a semiautomatic firearm to a fully

automatic firearm) is incorporated into the firearm or is to be reexported or transferred (in-country) with the firearm with "knowledge" the part or component will be subsequently incorporated into the firearm. (*See* USML Category I(h)(2)). In such instances, no license exceptions are available except for License Exception GOV (§ 740.11(b)(2)(ii)).

(22) The export, reexport, or transfer (in-country) of any item classified under a 0x5zz ECCN when a party to the transaction is designated on the Department of the Treasury, Office of Foreign Assets Control (OFAC), Specially Designated Nationals and Blocked Persons (SDN) list under the designation [SDNT], pursuant to the Narcotics Trafficking Sanctions Regulations, 31 CFR part 536, or under the designation [SDNTK], pursuant to the Foreign Narcotics Kingpin Sanctions Regulations, 31 CFR part 598.

\*  \*  \*  \*  \*

■ 9. Section 740.9 is amended by:
■ a. Adding five sentences at the end of paragraph (a) introductory text;
■ b. Adding one sentence at the end of paragraph (b)(1) introductory text;
■ c. Adding paragraph (b)(5); and
■ d. Redesignating notes 1 through 3 to paragraph (b) as notes 2 through 4 to paragraph (b).

The additions read as follows:

## §740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP).

\*  \*  \*  \*  \*

(a) \* \* \* This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 to this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair"). In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment. In accordance with the requirements in § 758.1(b)(9) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES. In accordance with the exclusions in License Exception TMP under paragraph (b)(5) of this

section, the entry clearance requirements in § 758.1(b)(9) do not permit the temporary import of: Firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country, or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model designation (if assigned) controlled by 0A501 that is specified under Annex A in Supplement No. 4 to this part); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5) of this section.

\*  \*  \*  \*  \*

(b) \* \* \*

(1) \* \* \* No provision of paragraph (b) of this section, other than paragraph (b)(3), (4), or (5), may be used to export firearms controlled by ECCN 0A501.a, .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\*  \*  \*  \*  \*

(5) *Exports of firearms and certain shotguns temporarily in the United States.* This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.,* destination listed in Country Group D:5 in Supplement No. 1 to this part;

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to this part; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.,* destination listed in Country Group D:5 in Supplement No. 1 to this part, or to Russia;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in

accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5))'';

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States; and

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(5)(iv)(B) of this section to U.S. Customs and Border Protection at the time of export.

**Note 1 to paragraph (b)(5):** In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5) of this section, exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.

\*     \*     \*     \*     \*

■ 10. Section 740.10 is amended by:
■ a. Adding one sentence at the end of paragraph (b)(1); and
■ b. Adding paragraph (b)(4).
The additions read as follows:

### §740.10 License Exception Servicing and replacement of parts and equipment (RPL).

\*     \*     \*     \*     \*

(b) \* \* \*
(1) \* \* \* The export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 temporarily in the United States for servicing and replacement may be exported under paragraph (b)(2) or (3) of this section only if the additional requirements in paragraph (b)(4) of this section are also met.

\*     \*     \*     \*     \*

(4) This paragraph (b)(4) authorizes the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches

controlled in ECCN 0A502 that are temporarily in the United States for servicing or replacement for a period not exceeding one year or the time it takes to service or replace the commodity, whichever is shorter, provided that the requirements of paragraph (b)(2) or (3) of this section are met and:

(i) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to this part;

(ii) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b))'';

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement; and

(iii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(4)(iii)(B) of this section to U.S. Customs and Border Protection at the time of export.

**Note 1 to paragraph (b)(4):** In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(4) of this section, exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.

\*     \*     \*     \*     \*

■ 11. Section 740.11 is amended by:
■ a. Adding two sentences at the end of the introductory text;

■ b. Adding note 2 to paragraph (b)(2); and
■ c. Redesignating note 1 to paragraph (c)(1) as note 3 to paragraph (c)(1) and notes 1 and 2 to paragraph (e) as notes 4 and 5 to paragraph (e).
The additions read as follows:

### §740.11 Governments, international organizations, international inspections under the Chemical Weapons Convention, and the International Space Station (GOV).

\* \* \* Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) of this section. Any item listed in a 0x5zz ECCN for export, reexport, or transfer (in-country) to an E:1 country is eligible only for transactions described in paragraphs (b)(2)(i) and (ii) solely for U.S. Government official use of this section.

\*     \*     \*     \*     \*

**Note 2 to paragraph (b)(2):** Items controlled for NS, MT, CB, NP, FC, or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end users (*e.g.*, contractors or other governmental parties performing functions on behalf of military, police, or intelligence entities) of a government in a Country Group E:1 or E:2 country.

\*     \*     \*     \*     \*

■ 12. Section 740.14 is amended by revising paragraph (b)(4) introductory text and paragraph (e) heading and adding paragraphs (e)(3) and (4) to read as follows:

### §740.14 Baggage (BAG).

\*     \*     \*     \*     \*

(b) \* \* \*
(4) *Tools of trade.* Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving. For special provisions regarding firearms and ammunition, see paragraph (e) of this section. For special provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section. For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph (b)(4), see paragraph (g) of this section. For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

\*     \*     \*     \*     \*

(e) *Special provisions for firearms and ammunition.* \* \* \*
(3) A United States citizen or a permanent resident alien leaving the

United States may export under this License Exception firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii) "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph (e)(3) must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control. Accordingly, except as provided in paragraph (e)(4) of this section, firearms, "parts," "components," "accessories," "attachments," and ammunition, may not be exported permanently under this License Exception. All firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under this License Exception must be returned to the United States.

(v) Travelers leaving the United States temporarily are required to declare the firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this License Exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonimmigrant alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the relevant provisions of Department of Justice regulations at 27 CFR part 478.

\*     \*     \*     \*     \*

■ 13. Section 740.16 is amended by revising paragraphs (a)(2) and (b)(2)(iv) and (v) and adding paragraph (b)(2)(vi) to read as follows:

### §740.16  Additional permissive reexports (APR).

\*     \*     \*     \*     \*

(a) \* \* \*

(2) The commodities being reexported are not controlled for NP, CB, MT, SI, or CC reasons or described in ECCNs 0A919, 3A001.b.2 or b.3 (except those that are being reexported for use in civil telecommunications applications), 6A002, 6A003; or commodities classified under a 0x5zz ECCN; and

\*     \*     \*     \*     \*

(b) \* \* \*

(2) \* \* \*

(iv) Commodities described in ECCN 0A504 that incorporate an image intensifier tube;

(v) Commodities described in ECCN 6A002; or

(vi) Commodities classified under a 0x5zz ECCN.

\*     \*     \*     \*     \*

■ 14. Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

### §740.20  License Exception Strategic Trade Authorization (STA).

\*     \*     \*     \*     \*

(b) \* \* \*

(2) \* \* \*

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503; 0E504; 0E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

\*     \*     \*     \*     \*

■ 15. Add Supplement No. 4 to part 740 to read as follows:

## Supplement No. 4 to Part 740—Annex A Firearm Models

(a) *Pistols/revolvers.*
(1) German Model P08 Pistol = SMCR.
(2) IZH 34M, .22 Target pistol.
(3) IZH 35M, .22 caliber Target pistol.
(4) Mauser Model 1896 pistol = SMCR.
(5) MC–57–1 pistol.
(6) MC–1–5 pistol.
(7) Polish Vis Model 35 pistol = SMCR.
(8) Soviet Nagant revolver = SMCR.
(9) TOZ 35, .22 caliber Target pistol.
(10) MTs 440.
(11) MTs 57–1.
(12) MTs 59–1.
(13) MTs 1–5.
(14) TOZ–35M (starter pistol).
(15) Biathlon–7K.
(b) *Rifles.*
(1) BARS–4 Bolt Action carbine.
(2) Biathlon target rifle, .22.
(3) British Enfield rifle = SMCR.
(4) CM2, .22 target rifle (also known as SM2, .22).
(5) German model 98K = SMCR.
(6) German model G41 = SMCR.
(7) German model G43 = SMCR.
(8) IZH–94.
(9) LOS–7, bolt action.
(10) MC–7–07.
(11) MC–18–3.
(12) MC–19–07.

(13) MC–105–01.
(14) MC–112–02.
(15) MC–113–02.
(16) MC–115–1.
(17) MC–125/127.
(18) MC–126.
(19) MC–128.
(20) Saiga.
(21) Soviet Model 38 carbine = SMCR.
(22) Soviet Model 44 carbine = SMCR.
(23) Soviet Model 91/30 rifle = SMCR.
(24) TOZ 18, .22 bolt action.
(25) TOZ 55.
(26) TOZ 78.
(27) Ural Target, .22lr.
(28) VEPR rifle.
(29) Winchester Model 1895, Russian Model rifle = SMCR.
(30) Sever—double barrel.
(31) IZH18MH single barrel break action.
(32) MP–251 over/under rifle.
(33) MP–221 double barrel rifle.
(34) MP–141K.
(35) MP–161K.
(36) MTs 116–1.
(37) MTs 116M.
(38) MTs 112–02.
(39) MTs 115–1.
(40) MTs 113–02.
(41) MTs 105–01.
(42) MTs 105–05.
(43) MTs 7–17 combination gun.
(44) MTs 7–12–07 rifle/shotgun.
(45) MTs 7–07.
(46) MTs 109–12–07 rifle.
(47) MTs 109–07 rifle.
(48) MTs 106–07 combination.
(49) MTs 19–97.
(50) MTs 19–09.
(51) MTs 18–3M.
(52) MTs 125.
(53) MTs 126.
(54) MTs 127.
(55) Berkut–2.
(56) Berkut–2M1.
(57) Berkut–3.
(58) Berkut–2–1.
(59) Berkut–2M2.
(60) Berkut–3–1.
(61) Ots–25.
(62) MTs 20–07.
(63) LOS–7–1.
(64) LOS–7–2.
(65) LOS–9–1.
(66) Sobol (Sable).
(67) Rekord.
(68) Bars–4–1.
(69) Saiga.
(70) Saiga–M.
(71) Saiga 308.
(72) Saiga–308–1.
(73) Saiga 308–2.
(74) Saiga–9.
(75) Korshun.
(76) Ural–5–1.
(77) Ural 6–1.
(78) Ural–6–2.
(79) SM–2.
(80) Biatlon–7–3.
(81) Biatlon–7–4.
(82) Rekord–1.
(83) Rekord–2.
(84) Rekord–CISM.
(85) Rekord–1–308.
(86) Rekord–2–308.
(87) Rekord–1–308–CISM.

(88) VEPR.
(89) VEPR Super.
(90) VEPR Pioneer.
(91) VEPR Safari.
(92) TOZ 109.
(93) KO 44–1.
(94) TOZ 78–01.
(95) KO 44.
(96) TOZ 99.
(97) TOZ 99–01.
(98) TOZ 55–01 Zubr.
(99) TOZ 55–2 Zubr.
(100) TOZ 120 Zubr.
(101) MTs 111.
(102) MTs 109.
(103) TOZ 122.
(104) TOZ 125.
(105) TOZ 28.
(106) TOZ 300.

## PART 742—CONTROL POLICY—CCL BASED CONTROLS

■ 16. The authority citation for part 742 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 3201 *et seq.;* 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of November 12, 2019, 84 FR 61817 (November 13, 2019).

■ 17. Section 742.6 is amended by revising the first and sixth sentences of paragraph (b)(1)(i) and adding a seventh sentence at the end of paragraph (b)(1)(i) to read as follows:

### §742.6  Regional stability.

*     *     *     *     *

(b) * * *
(1) * * *
(i) Applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and "600 series" items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. * * * When destined to the People's Republic of China or a country listed in Country Group E:1 in Supplement No. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial. In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

*     *     *     *     *

■ 18. Section 742.7 is amended by revising paragraphs (a)(1) through (4) and (c) to read as follows:

### §742.7  Crime control and detection.

(a) * * *

(1) Crime control and detection instruments and equipment and related "technology" and "software" identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section. A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR). Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979 0E502, 0E505 ("technology" for "development" or for "production" of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2) Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License Requirements" section regardless of end user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3) Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the "License Requirements" section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4) Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982. Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

*     *     *     *     *

(c) *Contract sanctity.* Contract sanctity date: August 22, 2000. Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503, and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

*     *     *     *     *

■ 19. Section 742.17 is amended by revising the first sentence of paragraph (a) and paragraph (f) to read as follows:

### §742.17  Exports of firearms to OAS member countries.

(a) *License requirements.* BIS maintains a licensing system for the export of firearms and related items to all OAS member countries. * * *

*     *     *     *     *

(f) *Items/Commodities.* Items requiring a license under this section are ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d). (See Supplement No. 1 to part 774 of the EAR).

*     *     *     *     *

### §742.19  [Amended]

■ 20. Section 742.19(a)(1) is amended by:
■ a. Removing "0A986" and adding in its place "0A505.c"; and
■ b. Removing "0B986" and adding in its place "0B505.c".

## PART 743—SPECIAL REPORTING AND NOTIFICATION

■ 21. The authority citation for 15 CFR part 743 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223.

■ 22. Section 743.4 is amended by:
■ a. In paragraph (a):
■ i. Removing "(c)(1)" and "(c)(2)" and adding in their places "(c)(1) of this section" and "(c)(2) of this section," respectively; and
■ ii. Adding four sentences to the end of the paragraph;
■ b. Redesignating the note to paragraph (a) as note 1 to paragraph (a) and removing "§ 743.4" in newly redesignated note 1 and adding "this section" in its place;
■ c. Revising paragraph (b) introductory text;
■ d. Adding paragraphs (c)(1)(i) and (c)(2)(i);
■ e. Redesignating the note to paragraph (e)(1)(ii) as note 2 to paragraph (e)(1)(ii);

■ e. Revising paragraph (h); and
■ f. Adding paragraph (i).
   The additions and revisions read as follows:

### §743.4   Conventional arms reporting.

   (a) * * * This section does not require reports when the exporter uses the alternative submission method described under paragraph (h) of this section. The alternative submission method under paragraph (h) requires the exporter to submit the information required for conventional arms reporting in this section as part of the required EEI submission in AES, pursuant to § 758.1(b)(9) of the EAR. Because of the requirements in § 758.1(g)(4)(ii) of the EAR for the firearms that require conventional arms reporting of all conventional arms, the Department of Commerce believes all conventional arms reporting requirements for firearms will be met by using the alternative submission method. The Department of Commerce leaves standard method for submitting reports in place in case any additional items are moved from the USML to the CCL, that may require conventional arms reporting.

*       *       *       *       *

   (b) *Requirements.* You must submit one electronic copy of each report required under the provisions of this section, or submit this information using the alternative submission method specified in paragraph (h) of this section, and maintain accurate supporting records (see § 762.2(b) of the EAR) for all exports of items specified in paragraph (c) of this section for the following:

*       *       *       *       *

   (c) * * *
   (1) * * *
   (i) ECCN 0A501.a and .b.

*       *       *       *       *

   (2) * * *
   (i) ECCN 0A501.a and .b.

*       *       *       *       *

   (h) *Alternative submission method.* This paragraph (h) describes an alternative submission method for meeting the conventional arms reporting requirements of this section. The alternative submission method requires the exporter, when filing the required EEI submission in AES, pursuant to § 758.1(b)(9) of the EAR, to include the six character ECCN classification (*i.e.,* 0A501.a or 0A501.b) as the first text to appear in the Commodity description block. If the exporter properly includes this information in the EEI filing in AES, the Department of Commerce will be able to obtain that export information directly from AES to meet the U.S.

Government's commitments to the Wassenaar Arrangement and United Nations for conventional arms reporting. An exporter that complies with the requirements in § 758.1(g)(4)(ii) of the EAR does not have to submit separate annual and semi-annual reports to the Department of Commerce pursuant to this section.

   (i) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel.: (202) 482–0092, Fax: (202) 482–4094. Information concerning the reporting requirements for items identified in paragraphs (c)(1) and (2) of this section is available from the Office of Nonproliferation and Treaty Compliance (NPTC), Tel.: (202) 482–4188, Fax: (202) 482–4145.

### PART 744—CONTROL POLICY: END-USER AND END-USE BASED

■ 23. The authority citation for 15 CFR part 744 is revised to read as follows:

   **Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 3201 *et seq.;* 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786; Notice of September 19, 2019, 83 FR 49633 (September 20, 2019); Notice of November 12, 2019, 84 FR 61817 (November 13, 2019).

### §744.9   [Amended]

■ 24. Section 744.9 is amended by removing "0A987" from paragraphs (a)(1) introductory text and (b) and adding in its place "0A504".

### PART 746—EMBARGOES AND OTHER SPECIAL CONTROLS

■ 25. The authority citation for 15 CFR part 746 continues to read as follows:

   **Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 287c; Sec 1503, Pub. L. 108–11, 117 Stat. 559; 22 U.S.C. 2151 note; 22 U.S.C. 6004; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O. 12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007–7, 72 FR 1899, 3 CFR, 2006 Comp., p. 325; Notice of May 8, 2019, 84 FR 20537 (May 10, 2019).

### §746.3   [Amended]

■ 26. Section 746.3 is amended by removing "0A986" from paragraph (b)(2) and adding in its place "0A505.c".

### §746.7   [Amended]

■ 27. Section 746.7(a)(1) is amended by:
■ a. Adding "0A503," immediately before "0A980"; and
■ b. Removing "0A985,".

### PART 748—APPLICATIONS (CLASSIFICATION, ADVISORY, AND LICENSE) AND DOCUMENTATION

■ 28. The authority citation for 15 CFR part 748 is revised to read as follows:

   **Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 29. Section 748.12 is amended by:
■ a. Revising the section heading;
■ b. Adding introductory text;
■ c. Revising paragraphs (a) introductory text and (a)(1);
■ d. Redesignating the note to paragraph (c)(8) as note 1 to paragraph (c)(8); and
■ e. Adding paragraph (e).
   The revisions and additions read as follows.

### §748.12   Firearms import certificate or import permit.

   License applications for certain firearms and related commodities require support documents in accordance with this section. For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section. For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraph (e) of this section.

   (a) *Requirement to obtain document for OAS member states.* Unless an exception in § 748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that are destined for member countries of the OAS. This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

   (1) *Items subject to requirement.* Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), or 0A505 (except 0A505.d).

*       *       *       *       *

   (e) *Requirement to obtain an import certificate or permit for other than OAS member states.* If the country to which

firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1) A license is not required for the export or reexport; or

(2) The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraphs (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

**Note 2 to paragraph (e).** Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) of this section because that statement is not issued by a government.

■ 30. Supplement No. 2 to part 748 is amended by adding paragraph (z) to read as follows:

**Supplement No. 2 to Part 748—Unique Application and Submission Requirements**

\* \* \* \* \*

(z) *Exports of firearms and certain shotguns temporarily in the United States*— (1) *Certification.* If you are submitting a license application for the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that will be temporarily in the United States, *e.g.,* for servicing and repair or for intransit shipments, you must include the following certification in Block 24:

The firearms in this license application will not be shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740. I and the parties to this transaction will comply with the requirements specified in paragraphs (z)(2)(i) and (ii) of Supplement No. 2 to part 748.

(2) *Requirements.* Each approved license for commodities described under this paragraph (z) must comply with the requirements specified in paragraphs (z)(2)(i) and (ii) of this supplement.

(i) When the firearms enter the U.S. as a temporary import, the temporary importer or its agent must:

(A) Provide the following statement to U.S. Customs and Border Protection: "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);"

(B) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address, and contact information (telephone number and/ or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement); and

(ii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (z)(2)(i)(B) of this supplement to U.S. Customs and Border Protection at the time of export.

**Note 1 to paragraph (z):** In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (z) of this supplement, exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.

**PART 758—EXPORT CLEARANCE REQUIREMENTS**

■ 31. The authority citation for part 758 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 32. Section 758.1 is amended by:
■ a. Revising paragraphs (b)(7) and (8);
■ b. Adding paragraph (b)(9);
■ c. Revising paragraph (c)(1);
■ d. Adding paragraph (g)(4); and
■ e. Redesignating note to paragraph (h)(1) as note 3 to paragraph (h)(1).

The revisions and additions read as follows:

**§ 758.1   The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).**

\* \* \* \* \*

(b) \* \* \*

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as described in § 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement No. 6 to part 744 of the EAR), regardless of value or destination; or

(9) For all exports, except for exports authorized under License Exception BAG, as set forth in § 740.14 of the EAR, of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

(c) \* \* \*

(1) License Exception Baggage (BAG), as set forth in § 740.14 of the EAR. See 15 CFR 30.37(x) of the FTR;

**Note 1 to paragraph (c)(1):** See the export clearance requirements for exports of firearms controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, authorized under License Exception BAG, as set forth in § 740.14 of the EAR.

\* \* \* \* \*

(g) \* \* \*

(4) *Exports of firearms and related items.* This paragraph (g)(4) includes two separate requirements under paragraphs (g)(4)(i) and (ii) of this section that are used to better identify exports of certain end item firearms under the EAR. Paragraph (g)(4)(i) of this section is limited to certain EAR authorizations. Paragraph (g)(4)(ii) of this section applies to all EAR authorizations that require EEI filing in AES.

(i) *Identifying end item firearms by manufacturer, model, caliber, and serial number in the EEI filing in AES.* For any export authorized under License Exception TMP or a BIS license authorizing a temporary export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model, caliber, and serial number of the exported items. The requirements of this paragraph (g)(4)(i) also apply to any other export authorized under a BIS license that includes a condition or proviso on the license requiring the submission of this information specified in paragraph (g) of this section when the EEI is filed in AES.

(ii) *Identifying end item firearms by "items" level classification or other control descriptor in the EEI filing in AES.* For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must include the six character ECCN classification (*i.e.,* 0A501.a, or 0A501.b), or for shotguns controlled under 0A502 the phrase "0A501 barrel length less than 18 inches" as the first text to appear in the Commodity description block in the EEI filing in AES. (*See* § 743.4(h) of the EAR for the use of this information for conventional arms reporting).

*Note 2 to paragraph (g)(4):* If a commodity described in paragraph (g)(4) of this section is exported under License Exception TMP under § 740.9(a)(6) of the EAR for inspection, test, calibration, or repair is not consumed or destroyed in the normal course of authorized temporary use abroad, the commodity must be disposed of or retained in one of the ways specified in § 740.9(a)(14)(i), (ii), or (iii) of the EAR. For example, if a commodity described in paragraph (g)(4) was destroyed while being repaired after being exported under § 740.9(a)(6), the commodity described in paragraph (g)(4) would not be required to be returned. If the entity doing the repair returned a replacement of the commodity to the exporter from the United States, the import would not require an EAR authorization. The entity that exported the commodity described in paragraph (g)(4) and the entity that received the commodity would need to document this as part of their recordkeeping related to this export and subsequent import to the United States.

\* \* \* \* \*

■ 33. Add § 758.10 to read as follows:

### § 758.10 Entry clearance requirements for temporary imports.

(a) *Scope.* This section specifies the temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27 CFR 447.21), except for firearms "subject to the EAR" that are temporarily brought into the United States by nonimmigrant aliens under the provisions of Department of Justice regulations at 27 CFR part 478 (*See* § 740.14(e) of the EAR for information on the export of these firearms "subject to the EAR"). These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502. Items that are temporarily exported under the EAR must have met the export clearance requirements specified in § 758.1.

(1) An authorization under the EAR is *not* required for the temporary import of

"items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL. Temporary imports of firearms described in this section must meet the entry clearance requirements specified in paragraph (b) of this section.

(2) Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports.* To the satisfaction of U.S. Customs and Border Protection, the temporary importer must comply with the following procedures:

(1) At the time of entry into the U.S. of the temporary import:

(i) Provide one of the following statements specified in paragraph (b)(1)(i)(A), (B), or (C) of this section to U.S. Customs and Border Protection:

(A) "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));"

(B) "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b));" or

(C) "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);"

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value;

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States; or

(iv) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S.

that will be receiving the item for servicing or replacement).

*Note 1 to paragraph (b)(1):* In accordance with the exclusions in License Exception TMP under § 740.9(b)(5) of the EAR, the entry clearance requirements in § 758.1(b)(9) do not permit the temporary import of: Firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740 of the EAR); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under § 740.9(b)(5).

*Note 2 to paragraph (b)(1):* In accordance with the exclusions in License Exception RPL under § 740.10(b)(4) and Supplement No. 2 to part 748, paragraph (z), of the EAR, the entry clearance requirements in § 758.1(b)(9) do not permit the temporary import of: Firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740 of the EAR); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception RPL under § 740.10(b)(4) and Supplement No. 2 to part 748, paragraph (z), of the EAR.

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(9) file the export information with CBP by filing EEI in AES, noting the applicable EAR authorization as the authority for the export, and provide, upon request by CBP, the entry document number or a copy of the CBP document under which the "item" subject to the EAR" on the USMIL was temporarily imported. *See* also the additional requirements in § 758.1(g)(4).

■ 34. Add § 758.11 to read as follows:

### § 758.11 Export clearance requirements for firearms and related items.

(a) *Scope.* The export clearance requirements of this section apply to all exports of commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or

ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada, that are authorized under License Exception BAG, as set forth in § 740.14 of the EAR.

(b) *Required form.* Prior to making any export described in paragraph (a) of this section, the exporter is required to submit a properly completed Department of Homeland Security, CBP Form 4457, (Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651–0010), to the U.S. Customs and Border Protection (CBP), pursuant to 19 CFR 148.1, and as required by this section.

(1) *Where to obtain the form?* The CBP Certification of Registration Form 4457 can be found on the following CBP website: *https://www.cbp.gov/ document/forms/form-4457-certificate-registration-personal-effects-taken-abroad.*

(2) *Required "description of articles" for firearms to be included on the CBP Form 4457.* For all exports of firearms controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, the exporter must provide to CBP the serial number, make, model, and caliber for each firearm being exported by entering this information under the "Description of Articles" field of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad.

(c) *Where to find additional information on the CBP Form 4457?* See the following CBP website page for additional information: *https:// help.cbp.gov/app/answers/detail/a_id/ 323/~/traveling-outside-of-the-u.s.-temporarily-taking-a-firearm%2C-rifle %2C-gun%2C.*

(d) *Return of items exported pursuant to this section.* The exporter when returning with a commodity authorized under License Exception BAG and exported pursuant this section, is required to present a copy of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651–0010), to CBP, pursuant to 19 CFR 148.1, and as required by this section.

## PART 762—RECORDKEEPING

■ 35. The authority citation for part 762 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 36. Section 762.2 is amended by removing "and," at the end of paragraph (a)(10), redesignating paragraph (a)(11)

as paragraph (a)(12), and adding a new paragraph (a)(11) to read as follows:

### § 762.2  Records to be retained.

(a) * * *

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been exported. The "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record; and

*       *       *       *       *

■ 37. Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

### § 762.3  Records exempt from recordkeeping requirements.

(a) * * *

(5) Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502;

*       *       *       *       *

## PART 772—DEFINITIONS OF TERMS

■ 38. The authority citation for part 772 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 39. In § 772.1:

■ a. The definition of "Complete breech mechanisms" is added in alphabetical order; and

■ b. In the definition of "Specially designed," note 1 is amended by removing "0B986" and adding in its place "0B505.c".

The addition reads as follows:

### § 772.1  Definitions of terms as used in the Export Administration Regulations (EAR).

*       *       *       *       *

*Complete breech mechanisms.* The mechanism for opening and closing the breech of a breech-loading firearm, especially of a heavy-caliber weapon.

*       *       *       *       *

## PART 774—THE COMMERCE CONTROL LIST

■ 40. The authority citation for 15 CFR part 774 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 10 U.S.C. 8720; 10 U.S.C. 8730(e); 22 U.S.C. 287c, 22 U.S.C. 3201 *et seq.;* 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824; 50 U.S.C. 4305; 22

U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 41. In Supplement No. 1 to part 774, Category 0, revise Export Control Classification Number (ECCN) 0A018 to read as follows:

## Supplement No. 1 to Part 774—The Commerce Control List

*       *       *       *       *

**0A018  Items on the Wassenaar Munitions List (see List of Items Controlled)**

No items currently are in this ECCN. See ECCN 0A505 for "parts" and "components" for ammunition that, immediately prior to March 9, 2020, were classified under 0A018.b.

■ 42. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504, and 0A505 to read as follows:

**0A501  Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items Controlled)**

### License Requirements

*Reason for Control:* NS, RS, FC, UN, AT

| Control(s) | Country chart (see supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except 0A501.y. | NS Column 1 |
| RS applies to entire entry except 0A501.y. | RS Column 1 |
| FC applies to entire entry except 0A501.y. | FC Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls. |
| AT applies to entire entry. | AT Column 1 |

*License Requirement Note:* In addition to using the Commerce Country Chart to determine license requirements, a license is required for exports and reexports of ECCN 0A501.y.7 firearms to the People's Republic of China.

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $500 for 0A501.c, .d, and .x. $500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.
*GBS:* N/A
*CIV:* N/A

### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in this entry.

### List of Items Controlled

*Related Controls:* (1) Firearms that are fully automatic, and magazines with a capacity of greater than 50 rounds, are "subject to the ITAR." (2) *see* ECCN 0A502 for

shotguns and their "parts" and "components" that are subject to the EAR. Also see ECCN 0A502 for shot-pistols. (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Related Definitions:* N/A.

*Items:*

a. Non-automatic and semi-automatic firearms equal to .50 caliber (12.7 mm) or less.

**Note 1 to paragraph 0A501.a:**
'*Combination pistols*' are controlled under ECCN 0A501.a. A '*combination pistol*' (*a.k.a., a combination gun*) has at least one rifled barrel and at least one smoothbore barrel (generally a shotgun style barrel).

b. Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c. The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)): Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.,* triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d. Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

**Note 2 to paragraph 0A501.d:** Magazines with a capacity of 16 rounds or less are controlled under 0A501.x.

e. Receivers (frames) and "complete breech mechanisms," including castings, forgings stampings, or machined items thereof, "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

f. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y. Specific "parts", "components", "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor.

y.1. Stocks or grips, that do not contain any fire control "parts" or "components" (*e.g.,* triggers, hammers, sears, disconnectors);"

y.2. Scope mounts or accessory rails;

y.3. Iron sights;

y.4. Sling swivels;

y.5. Butt plates or recoil pads;

y.6. Bayonets; and

y.7. Firearms manufactured from 1890 to 1898 and reproductions thereof.

**Technical Note 1 to 0A501:** The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."

**Note 3 to 0A501:** Antique firearms (*i.e.,* those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.

**Note 4 to 0A501:** Muzzle loading (black powder) firearms with a caliber less than 20 mm that were manufactured later than 1937 that are used for hunting or sporting purposes that were not "specially designed" for military use and are not "subject to the ITAR" nor controlled as shotguns under ECCN 0A502 are EAR99 commodities.

**0A502  Shotguns; shotguns "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes; "complete breech mechanisms;" except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

**License Requirements**

*Reason for Control:* RS, CC, FC, UN, AT, NS

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | NS Column 1 |
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | RS Column 1 |
| FC applies to entire entry. | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user. | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of end user. | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in.. (60.96 cm) if for sale or resale to police or law enforcement. | CC Column 3 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm). | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $500 for 0A502 shotgun "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes.

$500 for 0A502 shotgun "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes; "complete breech mechanisms" if the ultimate destination is Canada.

*GBS:* N/A

*CIV:* N/A

**List of Items Controlled**

*Related Controls:* Shotguns that are fully automatic are "subject to the ITAR."

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

**Note 1 to 0A502:** Shotguns made in or before 1898 are considered antique shotguns and designated as EAR99.

**Technical Note:** Shot pistols or shotguns that have had the shoulder stock removed and a pistol grip attached are controlled by ECCN 0A502. Slug guns are also controlled under ECCN 0A502.

**0A503  Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s.**

**License Requirements**

*Reason for Control:* CC, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | A license is required for ALL destinations, except Canada, regardless of end use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information) |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A

*GBS:* N/A

*CIV:* N/A

**List of Items Controlled**

*Related Controls:* Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982. Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

**0A504 Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* FC, RS, CC, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| RS applies to paragraph .i. | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, .d, .e, .g, and .i of this entry. | FC Column 1 |
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $500 for 0A504.g.

*GBS:* N/A

*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 μA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 of the EAR imposes a license requirement on certain commodities described in 0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

*Related Definitions:* N/A

*Items:*

a. Telescopic sights.

b. Holographic sights.

c. Reflex or "red dot" sights.

d. Reticle sights.

e. Other sighting devices that contain optical elements.

f. Laser aiming devices or laser illuminators "specially designed" for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

**Note 1 to 0A504.f:** 0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.

g. Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e, or .i.

h. [Reserved]

i. Riflescopes that were not "subject to the EAR" as of March 8, 2020 and are "specially designed" for use in firearms that are "subject to the ITAR."

**Note 2 to paragraph i:** For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" in § 772.1 of the EAR is what is used to determine whether the riflescope is "specially designed."

**0A505 Ammunition as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x. | NS Column 1 |
| RS applies to 0A505.a and .x. | RS Column 1 |
| CC applies to 0A505.b. | CC Column 1 |
| FC applies to entire entry except 0A505.d. | FC Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to 0A505.a, .d, and .x. | AT Column 1 |
| AT applies to 0A505.c | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons. The Commerce Country Chart is not designed to determine AT licensing requirements for this entry. See § 742.19 of the EAR for additional information. |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $500 for items in 0A505.x, except $3,000 for items in 0A505.x that, immediately prior to March 9, 2020, were classified under 0A018.b. (*i.e.,* "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130))

*GBS:* N/A

*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.

**List of Items Controlled**

*Related Controls:* (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR." (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions:* N/A

*Items:*

a. Ammunition for firearms controlled by ECCN 0A501 or USML Category I and not enumerated in paragraph .b, .c, or .d of this entry or in USML Category III.

b. Buckshot (No. 4 .24" diameter and larger) shotgun shells.

c. Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

**Note 1 to 0A505.c:** Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.

d. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

**Note 2 to 0A505.x:** The controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.

**Note 3 to 0A505.x:** The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

**Note 4 to 0A505:** Lead shot smaller than No. 4 Buckshot, empty and unprimed shotgun shells, shotgun wads, smokeless gunpowder, 'Dummy rounds' and blank rounds (unless linked or belted), not incorporating a lethal or non-lethal projectile(s) are designated EAR99. A 'dummy round or drill round' is a round that is completely inert, *i.e.,* contains no primer, propellant, or explosive charge. It is typically used to check weapon function and for crew training.

■ 43. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

**0A602 Guns and Armament as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $500
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

**List of Items Controlled**

*Related Controls:* (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles are "subject to the ITAR." (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items. (3) See ECCN 0A606 for engines that are "specially designed" for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or USML Category VII.
*Related Definitions:* N/A
*Items:*
  a. Guns and armament manufactured between 1890 and 1919.
  b. Military flame throwers with an effective range less than 20 meters.
  c. through w. [Reserved]
  x. "Parts" and "components" that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

  **Note 1 to 0A602.x:** Engines that are "specially designed" for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or a defense article in USML Category VII are controlled under ECCN 0A606.x.

  **Note 2 to 0A602:** "Parts," "components," "accessories," and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.

  **Note 3 to 0A602:** Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99.

## Supplement No. 1 to Part 774— [Amended]

■ 44. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0A918, 0A984, 0A985, 0A986, and 0A987.
■ 45. In Supplement No. 1 to part 774, Category 0, revise ECCN 0A988 to read as follows:

**0A988   Conventional military steel helmets.**

  No items currently are in this ECCN. See ECCN 1A613.y.1 for conventional steel

helmets that, immediately prior to July 1, 2014, were classified under 0A988.

■ 46. In Supplement No. 1 to part 774, Category 0, add, before the entry for ECCN 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501   Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment for ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except equipment for ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
  a. Small arms chambering machines.
  b. Small arms deep hole drilling machines and drills therefor.
  c. Small arms rifling machines.
  d. Small arms spill boring machines.
  e. Production equipment (including dies, fixtures, and other tooling) "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I.

**0B505   Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to paragraphs .a and .x. | NS Column 1 |
| RS applies to paragraphs .a and .x. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to paragraphs .a, .d, and .x. | AT Column 1 |
| AT applies to paragraph .c. | A license is required for export or reexport of these items to North Korea for anti-terrorism reasons |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B505.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
  a. Production equipment (including tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment), not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.
  b. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.
  c. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.
  d. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.
  e. through .w [Reserved]
  x. "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

■ 47. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602   Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B602.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
  a. The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:
  a.1. Gun barrel rifling and broaching machines and tools therefor;
  a.2. Gun barrel rifling machines;
  a.3. Gun barrel trepanning machines;
  a.4. Gun boring and turning machines;
  a.5. Gun honing machines of 6 feet (183 cm) stroke or more;
  a.6. Gun snap screw lathes;
  a.7. Gun rifling machines; and
  a.8. Barrel straightening presses.
  b. Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.
  c. Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.
  d. Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

**Supplement No. 1 to Part 774—[Amended]**

■ 48. In Supplement No. 1 to part 774, Category 0, remove ECCN 0B986.

■ 49. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

**0D501  "Software"  "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A501 or 0B501.**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR".
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

**0D505  "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by 0A505 or 0B505.**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x. | NS Column 1 |
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| AT applies to "software" for commodities in ECCN 0A505.a, .d, or .x and equipment in ECCN 0B505.a, .d, or .x. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR".
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 50. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

**0D602  "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

**List of Items Controlled**

*Related Controls:* (1) "Software" required for and directly related to articles enumerated in USML Category II is "subject to the ITAR". (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions:* N/A

*Items:* "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

## Supplement No. 1 to Part 774—[Amended]

■ 51. In Supplement No. 1 to part 774, Category 0, remove ECCN 0E018.

■ 52. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E001 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

**0E501** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).

### License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in ECCN 0E501.

### List of Items Controlled

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."
*Related Definitions:* N/A
*Items:*
a. "Technology" "required" for the "development" or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.
b. "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

**0E502** "Technology" "required" for the "development" or "production" of commodities controlled by 0A502.

### License Requirements

*Reason for Control:* CC, UN

| Control(s) | Country chart (see part 738) |
|---|---|
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

### List of Items Controlled

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E504** "Technology" "required" for the "development" or "production" of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.

### License Requirements

*Reason for Control:* RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

### List of Items Controlled

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E505** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A505.

### License Requirements

*Reason for Control:* NS, RS, UN, CC, AT

| Control(s) | Country chart (see part 738) |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505. | NS Column 1 |
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for "software" for those commodities and that equipment in 0D505. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b. | CC Column 1 |
| AT applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a, .d, and .x. | AT Column 1 |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

### List of Items Controlled

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR".
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 53. In Supplement No. 1 to part 774, Category 0, add, between the entries for

ECCNs 0E521 and 0E604, an entry for ECCN 0E602:

**0E602** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

**List of Items Controlled**

*Related Controls:* Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."
*Related Definitions:* N/A
*Items:* "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

**Supplement No. 1 to Part 774—[Amended]**

■ 54. In Supplement No. 1 to part 774, Category 0, remove ECCN 0E918.

■ 55. In Supplement No. 1 to part 774, Category 0, revise ECCN 0E982 to read as follows.

**0E982** "Technology" exclusively for the "development" or "production" of equipment controlled by 0A982 or 0A503.

**License Requirements**

*Reason for Control:* CC

| Control(s) | |
|---|---|

CC applies to "technology" for items controlled by 0A982 or 0A503. A license is required for All destinations, except Canada, regardless of end use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information.)

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
The list of items controlled is contained in the ECCN heading.

**Supplement No. 1 to Part 774—[Amended]**

■ 56. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0E984 and 0E987.

■ 57. In Supplement No. 1 to part 774, Category 1, revise ECCN 1A984 to read as follows:

**1A984** Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less; smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and "parts" and "components" "specially designed" therefor, n.e.s.

**License Requirements**

*Reason for Control:* CC

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | CC Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
The list of items controlled is contained in the ECCN heading.

■ 58. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B004 to read as follows:

**2B004** Hot "isostatic presses" having all of the characteristics described in the list of items controlled, and "specially designed" "components" and "accessories" therefor.

**License Requirements**

*Reason for Control:* NS, MT NP, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 2 |
| MT applies to entire entry. | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa. | NP Column 1 |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See ECCN 2D001 for software for items controlled under this entry. (2) See ECCNs 2E001 ("development"), 2E002 ("production"), and 2E101 ("use") for technology for items controlled under this entry. (3) For "specially designed" dies, molds and tooling, see ECCNs 0B501, 0B602, 0B606, 1B003, 9B004, and 9B009. (4) For additional controls on dies, molds and tooling, see ECCNs 1B101.d, 2B104, and 2B204. (5) Also see ECCNs 2B117 and 2B999.a.
*Related Definitions:* N/A
*Items:*

a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*

b. Having any of the following:

b.1. A maximum working pressure exceeding 207 MPa;

b.2. A controlled thermal environment exceeding 1,773 K (1,500 °C); *or*

b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

**Technical Note:** The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.

■ 59. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B018 to read as follows:

**2B018** Equipment on the Wassenaar Arrangement Munitions List.

No commodities currently are controlled by this entry. Commodities formerly controlled by paragraphs .a through .d, .m, and .s of this entry are controlled in ECCN 0B606. Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602. Commodities formerly controlled by paragraphs .o through

.r of this entry are controlled by ECCN 0B501. Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B602 if they are "specially designed" for the "production" of the items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

■ 60. In Supplement No. 1 to part 774, Category 2, revise ECCN 2D018 to read as follows:

**2D018** "Software" for the "development," "production," or "use" of equipment controlled by 2B018.

No software is currently controlled under this entry. See ECCNs 0D501, 0D602, and 0D606 for software formerly controlled under this entry.

■ 61. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E001 to read as follows:

**2E001** "Technology" according to the General Technology Note for the "development" of equipment or "software" controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).

**License Requirements**

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for items controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002. | NS Column 1 |
| MT applies to "technology" for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons. | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201, or 2D202 for NP reasons. | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons. | NP Column 2 |
| CB applies to "technology" for equipment controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No. 1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* See also 2E101, 2E201, and 2E301
*Related Definitions:* N/A
*Items:*

The list of items controlled is contained in the ECCN heading.

**Note 1 to 2E001:** ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.

■ 62. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E002 to read as follows:

**2E002** "Technology" according to the General Technology Note for the "production" of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).

**License Requirements**

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment controlled by 2A001, 2B001 to 2B009. | NS Column 1 |
| MT applies to "technology" for equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons. | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233 for NP reasons. | NP Column 1 |
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons. | NP Column 2 |
| CB applies to "technology" for equipment Controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No. 1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

The list of items controlled is contained in the ECCN heading.

■ 63. In Supplement No. 1 to part 774, Category 7, revise ECCN 7A611 to read as follows:

**7A611 Military fire control, laser, imaging, and guidance equipment, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, MT, RS, AT, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except 7A611.y. | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c. | MT Column 1 |
| RS applies to entire entry except 7A611.y. | RS Column 1 |
| AT applies to entire entry. | AT Column 1 |
| UN applies to entire entry except 7A611.y. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $1500
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 7A611.

**List of Items Controlled**

*Related Controls:* (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR. (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103. (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment. (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S. origin "600 series" controlled content.
*Related Definitions:* N/A
*Items:*

a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.

b. to w. [RESERVED]

x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are "specially designed" for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:

1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;

2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102, or 7A103; or

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:
y.1 [RESERVED]

Dated: January 10, 2020.

**Richard E. Ashooh,**

*Assistant Secretary for Export Administration.*

[FR Doc. 2020–00573 Filed 1–17–20; 11:15 am]

**BILLING CODE 3510–33–P**

**From**: Jim Bartlett, Full Circle Compliance ("FCC") ▬▬▬@fullcirclecompliance.eu]
**Sent**: 1/23/2020 6:17:22 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 20-0123 Thursday "Daily Bugle"

Forward this copy of the Daily Bugle to others or share this subscription link

## Thursday, 23 January 2020



### ITEMS FROM FEDERAL REGISTER

1. Commerce/BIS Amends EAR to Transfer Items from the USML to the CCL
2. State/DDTC Amends ITAR to Revise Categories I, II, and II

### OTHER GOVERNMENT SOURCES

3. Items Scheduled for Publication in Future Federal Register Editions
4. Commerce/BIS (No new items.)
5. State/DDTC: (No new items.)

### NEWS

6. Cape May Herald: "Fight Continues Against Federal Government's Efforts to Make 3-D Printable Guns Readily Accessible"
7. Defense News: "A Slippery Slope: Will Foreign Companies Start Ditching American Dual-Use Tech?"
8. Statesman: "Appeals Court Declines to Revive Lawsuit Supporting 3D-printed Guns"

### COMMENTARY

9. Australian Defense: "Navigating the Compliance Dilemma of Defence Export Controls"
10. Tuttle Law: "USTR Announces New Round of Section 301 Duty Exclusions for List 3"
11. Volkov Law: " 2019 OFAC Sanctions Enforcement Review (Part I of II)"

### EX/IM TRAINING EVENTS & CONFERENCES






12. ECS Presents "ITAR/EAR Boot Camp: Achieving Compliance" on 11-12 Feb in Tampa, FL

13. Full Circle Compliance Presents: Export Compliance Training Seminars

**EDITOR'S NOTES**

14. New Edition of the BITAR is Available Today

15. Bartlett's Unfamiliar Quotations

16. Are Your Copies of Regulations Up to Date? Find the Latest Amendments Here.

17. Weekly Highlights of the Daily Bugle Top Stories

18. Submit Your Job and View All Job Openings

## Are You Keeping Up to Date with the Latest Regulations?

Bartlett's Annotated ITAR and FTR are Word documents to download to your laptop that will keep you updated on the latest amendments, and contain over 800 footnotes of section history, key cases, practice tips & tricks, and extensive Tables of Contents. Subscribers receive updated editions every time the regulations are amended (usually within 24 hours) so you will always have the current versions of the regulations.







**Combo
BITAR + BAFTR**
*Price: $300*
*Offer: $275*
Buy Here

**BITAR**
*Price: $200*
Buy Here

**BAFTR**
*Price: $100*
Buy Here

**ITEMS FROM TODAY'S FEDERAL REGISTER**

DOC_0082368

# 1. Commerce/BIS Amends EAR to Transfer Items from the USML to the CCL

(Source: <u>Federal Register</u>, 23 Jan 2020.) [Excerpts.]

85 FR 4136-4188: Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML); Final Rule

* AGENCY: Bureau of Industry and Security, Department of Commerce.
* ACTION: Final rule.
* SUMMARY: On May 24, 2018, the Department of Commerce published a proposed rule in conjunction with a Department of State proposed rule to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armaments), and III (ammunition/ordnance) of the USML and transfer items that no longer warrant control on the USML to the Commerce Control List (CCL). This final rule responds to and adopts changes based on the comments received on the Commerce proposed rule and is being published simultaneously with a final rule by the Department of State that will revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list. These revisions complete the initial review of the USML that the Department of State began in 2011 and the conforming changes made to the EAR to control these items not warranting control under the International Traffic in Arms Regulations (ITAR).
* DATES: This rule is effective March 9, 2020.
* FOR FURTHER INFORMATION CONTACT: Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482-1641 or email steven.clagett@bis.doc.gov.
* SUPPLEMENTARY INFORMATION:

Background

On May 24, 2018, the Department of Commerce (referred to henceforth as ``the Department'') published the proposed rule, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML) (83 FR 24166) (referred to henceforth as the ``Commerce May 24 rule'') in conjunction with a Department of State proposed rule to revise Categories I, II, and III of the USML (referred to henceforth as the ``State May 24 rule''). The Department of Commerce is issuing this final rule that describes how articles the President determines no longer warrant control under USML Category I--Firearms, Close Assault Weapons and Combat Shotguns; Category II--Guns and Armament; and Category III--Ammunition/Ordnance will be controlled on the CCL of the Export Administration Regulations (EAR) and is being published in conjunction with a final rule on Categories I, II, and III from the Department of State, Directorate of Defense Trade Controls (DDTC), completing the initial review of the USML that began in 2011 and making conforming changes to the EAR to control these items on the Commerce Control List (CCL).
   The changes described in this final rule and in the State Department's companion final rule on Categories I, II, and III of the USML are based on a

thorough interagency review of those categories, after which the Department of State concluded that the items added to the CCL in this final rule do not provide a critical military or intelligence advantage to the United States and, in the case of firearms, do not have an inherently military function. The Departments of Defense, State, and Commerce have, therefore, determined that the EAR is the appropriate source of authority to control these firearms, ammunition, and other articles previously controlled under Categories I-III of the USML. There is a significant worldwide market for items in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities.

This final rule does not deregulate the transferred items. BIS will require authorization to export or reexport to any country a firearm or other weapon that is being moved from the USML to the CCL by this final rule, including releases of related technology and software to foreign persons in the United States. Rather than decontrolling firearms and other items, in publishing this final rule, BIS, working with the Departments of Defense and State, is continuing to ensure that appropriate regulatory oversight will be exercised over exports, reexports, and transfers (in- country) of these items while reducing the procedural burdens and costs of export compliance on the U.S. firearms industry and allowing the U.S. Government to make better use of its export control resources.

Certain software and technology capable of producing firearms when posted on the internet under specified circumstances is being controlled under this final rule in order to protect important U.S. national security and foreign policy interests; however, communication of ideas regarding such software or technology is freely permitted. Moreover, nothing in this final rule prohibits U.S. persons within the United States from acquiring firearms of any type--there are other laws and regulations that control the acquisition of firearms in the U.S.

Structure of 600 Series

BIS has created Export Control Classification Numbers (ECCNs), referred to as the ``600 series,'' to control items that will be removed from the USML and controlled under the CCL, or items from the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (Wassenaar Arrangement Munitions List or WAML) that are already controlled elsewhere on the CCL.

These ECCNs are referred to as the ``600 series'' because the third character in each of the new ECCNs is ``6.'' The first two characters of the ``600 series'' ECCNs serve the same function as any other ECCN as described in Sec. 738.2 of the EAR. The first character is a digit in the range 0 through 9 that identifies the Category on the CCL in which the ECCN is located. The second character is a letter in the range A through E that identifies the product group within a CCL Category. With few exceptions, the final two characters identify the WAML category that covers items that are the same or similar to items in a particular ``600 series'' ECCN. Category II of the USML and category ML2 of the WAML cover large caliber guns and other military weapons such as: Howitzers, cannon, mortars, anti-tank weapons, projectile launchers, military flame throwers, and recoilless rifles.

Items that are currently controlled in Category II of the USML will be controlled on the CCL under four new ``600 series'' ECCNs. Placement of the

items currently in USML Category II into the CCL's 600 series is consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML will be controlled in new ECCNs in which the third character is a ``5.'' These items are not appropriate for 600 series control because, for the most part, they havecivil, recreational, law enforcement, or other non-military applications. As with 600 series ECCNs, the first character represents the CCL category, the second character represents the product group, and the final two characters represent the WAML category that covers items that are the same or similar to items in the ECCN.

Relation to USMIL

Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import, or that are subject to brokering controls, are part of the USML under the AECA. All references to the USML in this final rule are to the list of defense articles that are controlled for purposes of export, temporary import, or brokering pursuant to the ITAR, 22 CFR parts 120 through 130, and not to the list of AECA defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. All defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under section 38 of the AECA, 22 U.S.C. 2778, for purposes of permanent import or brokering controls. ...

back to top

* * * * * * * * * * * * * * * * * * *


# 2. State Amends ITAR to Revise Categories I, II, and II
(Source: <u>Federal Register</u>, 23 Jan 2020.) [Excerpts.]

85 FR 3819-3833: International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

* AGENCY: Department of State.
* ACTION: Final rule.
* SUMMARY: The Department of State (the Department) amends the International Traffic in Arms Regulations (ITAR) to revise Categories I--firearms, close assault weapons and combat shotguns, II--guns and armament, and III--ammunition/ordnance of the U.S. Munitions List (USML) to describe more precisely the articles that provide a critical military or intelligence advantage or, in the case of weapons, perform an inherently military function and thus warrant export and temporary import control on the USML. These revisions complete the initial review of the USML that the Department began in 2011. Items not subject to the ITAR or to the exclusive licensing jurisdiction of

any other set of regulations are subject to the Export Administration Regulations.

* DATES: This rule will be effective March 9, 2020.

* FOR FURTHER INFORMATION CONTACT: Sarah Heidema, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663-2809; email DDTCPublicComments@state.gov. ATTN: Regulatory Change, USML Categories I, II, and III.

* SUPPLEMENTARY INFORMATION: The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130). On May 24, 2018, DDTC published a proposed rule, 83 FR 24198, for public comment regarding proposed revisions to Categories I, II, and III of the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). After review of received comments and with the revisions to the proposed rule further described below, DDTC now publishes this final rule to amend the ITAR.

The articles and related technical data subject to the jurisdiction of the ITAR, i.e., ``defense articles,'' are identified on the USML. With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations (EAR, 15 CFR parts 730 through 774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR impose license requirements on exports and reexports. Items not subject to the ITAR or to the exclusive licensing jurisdiction of any other set of regulations are subject to the EAR. The Department of Commerce is publishing a companion rule in this edition of the Federal Register.

Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import are part of the USML under the AECA. All references to the USML in this rule, however, are to the list of AECA defense articles that are controlled for purposes of export or temporary import pursuant to the ITAR, and not to the list of AECA defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. References to the USMIL are to the list of AECA defense articles controlled by ATF for purposes of permanent import.

Section 38(b)(1)(A)(ii) of the AECA, requires, with limited exceptions, registration of persons who engage in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President as such under section 38(a)(1) and licensing for such activities. Through Executive Order 13637, the President delegated the responsibility for registration and licensing of brokering activities to the Department of State with respect to defense articles or defense services controlled either for purposes of export by the Department of State or for purposes of permanent import by ATF. Section 129.1 of the ITAR states this requirement. As such, all defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of jurisdiction from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA for purposes of permanent import or brokering controls for any brokering activity, including

facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. This rule adds two new paragraphs, (b)(2)(vii) and (viii), to Sec. 129.2 to update the enumerated list of actions that are not brokering. This change is a conforming change and is needed to address the transfer from the USML to the CCL of USMIL defense articles that remain subject to the brokering controls, and to ensure that the U.S. government does not impose a double licensing requirement on the export, reexport, or retransfer of such items subject to the EAR or continue to require registration with the Department solely based on activities related to the manufacture of these items.

The Department of State is engaged in an effort, described more fully below, to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, have an inherently military function. The Department has undertaken these revisions pursuant to the President's delegated discretionary statutory authority in section 38(a)(1) of the AECA to control the import and export of defense articles and defense services in furtherance of world peace and the security and foreign policy of the United States and to designate those items which constitute the USML. The Department determined that the articles in USML Categories I, II, and III that are removed from the USML under this final rule do not meet this standard, including many articles that are widely available in retail outlets in the United States and abroad (such as many firearms previously described in Category I, paragraph (a), including, for example, a .22 caliber rifle).

The descriptions below describe the status of the subject categories of the USML and CCL as of the effective date of this rule and the companion rule published by the Department of Commerce in this Federal Register issue. Any reference in the preamble to this final rule to transfer from the USML to the CCL reflects the combined effects of removal of the defense article from the controls of the ITAR by virtue of the removal of an item (i.e., enumerated control text) from the USML by this rule and the corresponding adoption of the former defense article as an item subject to the EAR by action of the companion rule. Comments regarding the overall rule are addressed immediately below, while comments specific to a Category or amended section of the ITAR are addressed in the relevant discussion of revisions to Categories I, II, or III, or in the discussion under the title of ``Conforming ITAR Changes.'' ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OTHER GOVERNMENT SOURCES

## 3. Items Scheduled for Publication in Future Federal Register Editions

\* Commerce/BIS; NOTICES; Order Temporarily Denying Export Privileges [Pub. Date: 24 Jan 2020.]

\* Commerce/BIS; NOTICES; Order: Marjan Caby [Pub. Date: 24 Jan 2020.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * *

## 5. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * *



Live Webinar Training on Export Controls & Sanctions?
Contact us for more infos at events@fullcirclecompliance.eu

## NEWS

## 6. Cape May Herald: "Fight Continues Against Federal Government's Efforts to Make 3-D Printable Guns Readily Accessible"
(Source: Cape May (NJ) Herald, 22 Jan 2020.) [Excerpts.]

TRENTON - Attorney General Gurbir S. Grewal announced he is joining a coalition of states in suing to stop the Trump Administration from trying, once again, to enact rules to weaken federal oversight of certain firearm-designing software files, which would make it easier for anyone with access to such files and a 3D printer to create a gun.

According to a release, the multistate coalition, which expects to file its suit later this week, is opposing new rules that would remove from the U.S. Munitions List software and technology that enables the design and production of certain firearms. That proposed removal is accompanied by a transfer of authority over such printable gun files from the U.S. State Department to the Department of Commerce, where the coalition explains there will be no "meaningful regulation" of the printable firearm files.

These files pose a serious risk to public safety. With digital firearm files, anyone with a computer and access to a 3D printer - including minors, convicted felons, domestic abusers and the mentally ill - can make a working gun.  To make

matters worse, the guns are printed with serial numbers, meaning that law enforcement cannot trace these weapons when they are used in a crime, and the printed guns are potentially also undetectable by standard metal detectors, posing a risk to sensitive locations.  . . .

Earlier this year, the State Department sought to loosen the regulations covering on 3D-printable gun files by removing them from the U.S. Munitions List, but a federal court blocked the move after a legal challenge by the states, including New Jersey.  Among other things, the court ruled that federal officials had violated the Arms Export Control Act (AECA) by failing to consider how removing printable gun files -- which were subject to federal export controls as long they remained on the U.S. Munitions List - "would impact world peace, national security and foreign policy." The court also held that the State Department failed to provide Congress with adequate notice of its plan to remove 3D-printable gun files from the Munitions List.

In its latest action, the federal government has issued two Final Rules that together would (1) remove from the U.S. Munitions List digital firearms files for non-automatic weapons up to .50 caliber and (2) transfer regulatory authority for such 3D-printable gun files from the Department of State to the Department of Commerce.   Once removed from the U.S. Munitions List and State Department oversight, the coalition asserts, digital firearm files will no longer be subject to federal export controls under the AECA and "firearm files will instantly become easily accessible both within the United States ... and outside the United States."

Under the new rules, the Department of Commerce ostensibly retains jurisdiction over firearm files available on the Internet in electronic formats that are ready for insertion into a computer. Today's lawsuit, however, contends that such regulatory authority is mostly window dressing. If the firearm files are disseminated by any means other than publication over the Internet - for example, e-mail, direct file transfer or hard drive transmission - Commerce will not exercise regulatory authority over them.

The coalition argues that the new federal rules "effectively deregulate 3D-printable gun files entirely" and, if allowed to stand, will make printable guns "widely available" around the world through online posting, file sharing, etc.  The impending multi-state lawsuit is the latest in a series of actions by Attorney General Grewal to protect New Jerseyans from the threat of gun violence.

In June 2018, Attorney General Grewal sent cease-and-desist letters to "ghost gun" companies across the United States,  ordering them to stop advertising and selling partially-built firearms, including assault weapons, in New Jersey. Then in November 2018, Governor Phil Murphy signed into law new restrictions on ghost guns.   In light of the new law, Attorney General Grewal sent additional cease-and-desist letters in December 2018, promising to sue any ghost gun companies that failed to comply. As a result, over a dozen companies agreed to block all New Jersey sales.

When one company, U.S. Patriot Armory, failed to comply, Attorney General Grewal filed suit, marking the first such lawsuit against a ghost gun distributor in the nation. That same month, Grewal also announced this year the indictment of nine men who had allegedly participated in a Camden-County-based criminal network that trafficked "ghost guns" in the form of untraceable assault rifles. Grewal also took steps to tackle the risk posed by large capacity magazines. In June of this year, Attorney General Grewal filed suit against a Nevada company - New Frontier Armory - after it ignored a cease-and-desist letter and allegedly sold six LCMs to an undercover state investigator, including a 100-round magazine, a 30-round magazine and a 15-round magazine.

The state also remains in the appellate court in two states (Texas and New Jersey) with Defense Distributed, the Texas-based company that has sought to make its 3D-printable ghost gun and other firearm files widely available to the public, and has challenged New Jersey's statutory restrictions on the dissemination of such weapons.

back to top

* * * * * * * * * * * * * * * * * *

## 7. Defense News: "A Slippery Slope: Will Foreign Companies Start Ditching American Dual-Use Tech?"
(Source: Defense News, 22 Jan 2020.) [Excerpts.]

Largely the result of European space and defense manufacturer design outs, the "U.S. International Trade in Arms Regulations-free" movement began in the 1990s. Since that time, the ITAR-free movement has diffused into other industry sectors and regions. For example, in 2017, the German Ministry of Defence announced tenders for new assault rifles for the German armed forces. The tender included an "ITAR-free" exclusion criterion not only for the rifles but for supplies as well. India's space program is working with vendors on the basis of ITAR-free systems.

The ITAR is a government regulation administering the export, re-export and import of defense-related articles, services and technology on the U.S. Munitions List, or USML. ITAR controls are highly stringent, so much so that the Obama administration in 2010 initiated the Export Control Reform Initiative to streamline controls to make them both effective and to increase American competitiveness.

As the U.S. government controls the re-export of USML items, the ITAR is an internationally well-known quantity. In many instances, foreign defense product producers and consumers know the ITAR more intimately than their U.S. counterparts. Transferring or re-exporting U.S. defense items requires U.S. government approval no matter how seemingly trivial the part or mundane the transfer. The practical effect of ITAR requirements makes U.S. defense items very sticky and cumbersome; therefore: the ITAR-free movement.

In terms of other strategic items, the U.S. Department of Commerce licenses the exports of dual-use components in a similar manner, albeit to a much more nuanced degree. The Export Administration Regulations, or EAR, requires

consumers of U.S.-origin dual-use items to seek licenses for re-exports and transfers of said items depending upon the amount of U.S.-origin technology/components and/or the proposed destination of the transfer. In contrast to ITAR controls, EAR re-export and retransfer controls are simultaneously more complicated, but more flexible. . . .

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. Statesman: "Appeals Court Declines to Revive Lawsuit Supporting 3D-printed Guns"
(Source: The Statesman, 22 Jan 2020.) [Excerpts.]

In the continuing fight over the legality of publishing schematics for making mostly plastic guns on 3D printers, a federal appeals court has rejected efforts to revive a lawsuit that sought to allow distribution of the do-it-yourself plans. [Defense Distributed, et al., v. U.S. Dep't of State, et al; No. 18-50811.]

That lawsuit was originally filed in 2015 after the U.S. State Department, which enforces federal law on exporting military weaponry, ordered Austin-based Defense Distributed to remove from its website plans for building the Liberator, a 3D-printed, single-shot pistol.

Defense Distributed dismissed its lawsuit in 2018 after the State Department, under President Donald Trump, agreed to let the plans be published.  However, the company moved to revive that lawsuit after publication was again blocked - this time by a federal judge in Seattle. Responding to a lawsuit by Washington and 18 other states, U.S. District Judge Robert Lasnik issued a restraining order blocking the State Department agreement in 2018, then followed with a November 2019 ruling that voided the agreement.

Lasnik said the policy change was not reported to Congress as required by federal law. He also said the administration failed to offer any justification for changing a policy that banned the publication of schematics for 3D-printed guns as "a threat to world peace and the security and foreign policy of the United States."  . . .

After a Texas judge declined to revive Defense Distributed's lawsuit, the company - joined by the Second Amendment Foundation - appealed.  In a ruling released Tuesday evening, the 5th U.S. Circuit Court of Appeals upheld the lower court, saying Defense Distributed cited a rule that allows a judgment to be altered or amended only to correct an error of law or present newly discovered evidence.  "It does not allow a party to revive and initiate further proceedings in a dismissed lawsuit," Judge James Ho wrote for the appeals court's three-judge panel.  Ho rejected arguments that the lawsuit should be revived because Defense Distributed could not have foreseen the Washington lawsuit and the resulting nationwide injunction issued by Lasnik.
Judge Ho stated "Plaintiffs are undoubtedly sincere in their belief that the government interfered with their constitutional rights by forbidding them from publishing information about assembling the Liberator firearm to fellow citizens- as evidenced by the settlement agreement they were able to obtain from the

State Department. And they are understandably frustrated by the nationwide injunction that stands in their way today. But established rules of civil procedure do not permit this court to grant the relief they seek here. We affirm."

back to top

* * * * * * * * * * * * * * * * * * *

## COMMENTARY

## 9. Australian Defense: "Navigating the Compliance Dilemma of Defence Export Controls"
(Source: Australian Defense Magazine, 23 Jan 2020.) [Excerpts.]

* Author: Kevin Chenney, Senior Consultant, goal@goalgroup.com.au, of Goal Professional Services.

The spectre of Defence Export Control Regulations for Australian Defence businesses is ever-present, and there are emerging changes and challenges that will require a renewed focus.

Factors such as the Cybersecurity Maturity Model Certification (CMMC), National Technology Industrial Base (NTIB), and the 2018 Defence Trade Control Act Review have been introduced or reviewed in the past twelve months. They have created a current and impending compliance dilemma for many businesses that will become clearer as 2020 progresses.

The challenges for businesses attempting to maintain compliance are increasing, while pressures to maintain work and open new markets remains the core focus. These challenges are even more pertinent when we consider the US International Traffic in Arms Regulations (ITAR) and Export Administration regulations (EAR), which Australian businesses must ensure they factor into any risk assessments linked to Defence business associated with US technology.

ITAR is an often confusing and challenging concept for many Defence businesses, particularly SMEs. It requires businesses to be aware of the regulations as they impact their business, and for them to initiate compliance requirements to mitigate the associated risks. Assistance in navigating these regulations is only occasionally given by government, so what do they do to remain compliant?

The implementation of the NTIB for Australia indicates that the US Government wish to encourage US Defence business involvement in Australia, leading to exposure to ITAR and EAR products and technical data. Canada is a long established NTIB member as a result of its geographic location, and has an accepted process for assisting their Defence Industry with compliance measures in the field.

Australia has the pre-existing Australia-US Defence Trade Cooperation Treaty, which was established in 2013 in order to facilitate the efficient transfer of controlled goods between the members of an Approved Community without the need for export licences. The importance of such a Treaty cannot be denied, but the operation of the Treaty is restricting the ability for Australia SMEs to take advantage of it.

Reported difficulties with the Treaty include: Treaty articles authorised for export are limited to those listed on the Defense Trade Cooperation Munitions List 2017; the use of the Treaty is limited to Australian and US Government approved end-use only; and the administrative burden in facilitating changes to projects where items may be required to be exported outside the Treaty boundaries.

In comparison, the Canadian Controlled Goods Program is a dual-focussed Export Control and Security Program. Originating from US revocation of ITAR exemptions for Canada in 1999 due to increased security concerns, it was developed to introduce legislative measures to strengthen defence trade controls in Canada. It ensures that Canadian businesses have the necessary measures in place to not only protect Canadian interests, but also those of the US through ITAR. Notwithstanding numerous changes to this policy construct since establishment, the Program remains in force.

Using the construct already established under the Australia-US Defence Trade Cooperation Treaty, Australia should look to mirror the Canadian example by doing the following:
  - Requiring all businesses looking to export or handle US goods to be registered for notification to US and Australian Governments;
  - Widening the list of treaty articles to as far as possible mirror the US Munitions List (USML); and
  - the introduction of complementing Defence Industry Security Program (DISP) requirements for businesses to ensure security is maintained.

Amendment of the Treaty scope and eligibility should allow for the changes and challenges prevalent in the current world geo-political environment.

More on this will be available through the year as the effects of recent legislative changes are realised.  ...

back to top

* * * * * * * * * * * * * * * * * *

## 10. Tuttle Law: "USTR Announces New Round of Section 301 Duty Exclusions for List 3"
(Source: Tuttle Law, 22 Jan 2020.)

* Author: George R. Tuttle III, Esq., george.tuttle.iii@tuttlelaw.com, 1-415-986-8780, Law Offices of George R. Tuttle, PC.

China List 4A Reduction to 7.5% Effective February 14, 2020

The U.S.-China Phase One trade agreement signed on January 15, 2020 announced the reduction of List 4A tariffs from 15% to 7.5%. The USTR published official notice on January 22, 2020 (85 FR 3741) that the reduction is scheduled to enter into force on February 14, 2020. The HTSUS number for List 4A duty sanctions remains as 9903.88.15.

Proposed Section 301 Duty Retaliation for France Digital Services Tax

The USTR and various news agencies have reported that the U.S. will not move forward on the tariffs on French imports as the two countries work toward a solution on the Digital Services Taxation. France has agreed to suspend a tax on American technology companies in exchange for a postponement of the retaliatory tariff on French goods.

back to top

* * * * * * * * * * * * * * * * * *

## 11. Volkov Law: " 2019 OFAC Sanctions Enforcement Review (Part I of II)"
(Source: Volkov Law Group Blog, 20 Jan 2020. Reprinted by permission.) [*Part II will be published tomorrow*]

While DOJ had its biggest year in FCPA enforcement, OFAC quietly had a record year in enforcement. OFAC collected approximately $1.28 billion (yes, with a B) in 26 separate enforcement actions. That is quite an increase over 2018 when OFAC collected $71 million in 7 separate enforcement actions.

OFAC enforcement is maturing, and its relationship with DOJ is coordinated in much the same way that FCPA enforcement is coordinated between the Justice Department and the SEC.

In fact, on December 13, 2019, DOJ announced its own corporate enforcement policy for export controls and sanctions cases. No longer will DOJ rely on OFAC referrals of potential criminal cases since it is now encouraging companies to self-report directly to DOJ separately from any self-report to OFAC, depending on the nature of the evidence surrounding potential violations.

Under DOJ's new policy, companies that self-report will receive a non-prosecution agreement, unless aggravating factors are present, and the company fully cooperates and implements timely and appropriate remediation.

Given its new policy, DOJ's prosecution of individual sanctions cases is likely to increase in 2020 and beyond.

OFAC's enforcement program has grown with the accumulation of new and complex sanctions regulations, including Ukraine-Russia Sectoral and Oligarch Sanctions Programs, and Venezuela's Sanctions Program. Aside from the increase in substantive regulations, OFAC has expanded the targets of its enforcement actions to non-financial institutions, i.e. manufacturing companies, technology companies, service companies and a broad mix of the economy. Notwithstanding this trend, however, OFAC brought two major enforcement

actions against financial institutions, each of which exceeded totals of $1 billion (yes, with a B) - Standard Chartered and Unicredit. (OFAC shared these large settlements with DOJ, NY Department of Financial Services, and the Manhattan District Attorney's Office).

OFAC's enforcement emphasis can be categorized into four basic themes, each of which creates new and significant risks for companies.

The most significant trend, which OFAC emphasized in its Sanctions Compliance Guidance, is sanctions liability for supply chain violations. In typical cases, this translates to OFAC violations for supply chain sourcing from prohibited countries or individuals.

This was underscored by what I would argue was the most important OFAC case of the year - the E.L.F. Cosmetics case (here) in which a U.S. company was found liable and paid nearly $1 million for sourcing of materials from North Korea, even though the U.S. company was not aware that its supplies were sourced from North Korea.

Supply chain risk was specifically noted in OFAC's Sanctions Compliance Guidance issued in May 2019 in which OFAC identified Supply Chain risks as a specific topic for review in a risk assessment.

Aside from supply chain risk, OFAC brought four major enforcement actions focusing on U.S. company acquisition of foreign companies and failure to terminate ongoing business that violated OFAC sanctions programs. Again, this trend was noted by OFAC in its Sanctions Compliance Guidance and companies are under unique pressures now to identify potential OFAC risks when acquiring companies and integrating these companies into existing sanctions compliance programs.

On the distribution side of business, OFAC enforcement highlighted several cases in which companies were found liable for failing to ensure that third-party representatives and/or distributors did not conduct business with prohibited countries or individuals. Third-party liability is a major sanctions risk and OFAC's focus on this fact underscored the fact that contractual representations and warranties in a contract with a distributor are not sufficient, by themselves, to mitigate third-party risks.

To round out OFAC's record-setting enforcement year, OFAC brought a specific enforcement action against a U.S. company for violating the Ukraine-Russia sectoral sanctions, and specifically, the prohibition against debt exceeding specific time limits. In the Haverly case (here), OFAC settled a case in which Haverly extended payment terms for two invoices beyond the then-applicable 90-day limit.

[*Part II will be published tomorrow*]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 12. ECS Presents "ITAR/EAR Boot Camp:  Achieving Compliance" on 11-12 Feb in Tampa, FL
(Source: ECS)

*What:  ITAR/EAR Boot Camp:  Achieving Compliance
*When:  February 11-12, 2020
*Where:  Double Tree Beach Resort; Tampa, FL
*Sponsor:  Export Compliance Solutions & Consulting (ECS)
*ECS Speaker Panel: Suzanne Palmer, Mal Zerden
*Register here or by calling 866-238-4018 or
email spalmer@exportcompliancesolutions.com

back to top

* * * * * * * * * * * * * * * * * * * *

## 13. Full Circle Compliance Presents: Export Compliance Training Seminars
(Source: Full Circle Compliance)







**U.S. Export Controls: ITAR**
Tuesday, 7 April 2020 near Amsterdam More Info

**U.S. Export Controls: EAR**
Wednesday, 8 April 2020 near Amsterdam More Info

**The ABC of Foreign Military Sales (FMS)**
Tuesday, 9 April 2020 near Amsterdam
More Info

## 14. New Edition of the BITAR is Available Today
(Source: Editor)

We are pleased to release a revised edition of *Bartlett's Annotated International Traffic in Arms Regulations* ("The BITAR") including footnotes to the amendments published today in 85 Fed. Reg 3819, effective March 9, 2020, which contain a final rule amending § 121.1, USML Categories I, II, and III, and numerous related sections. To download your soft copy of the BITAR in Word, please login to your account on our website. If you are not yet a subscriber, go HERE to subscribe.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 15. Bartlett's Unfamiliar Quotations
(Source: Editor)

**\* Stendhal** (Marie-Henri Beyle, better known by his pen name Stendhal; 23 Jan 1783 - 23 Mar 1842; was a 19th-century French writer. Best known for the novels *Le Rouge et le Noir* (The Red and the Black) and *La Chartreuse de Parme* (The Charterhouse of Parma), he is highly regarded for the acute analysis of his characters' psychology and considered one of the early and foremost practitioners of realism.)
  - *"Nothing is so hideous as an obsolete fashion."*
  - *"In love, unlike most other passions, the recollection of what you have had and lost is always better than what you can hope for in the future."*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments are listed below.

| Agency | Regulations | Latest Update |
|--------|-------------|---------------|



| | DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199. | 5 Apr 2019:5 Apr 2019, 84 FR 13499-13513: Civil Monetary Penalty Adjustments for Inflation. |
| --- | --- | --- |
| | DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. | 23 Jan 2020: 85 FR 4136-4188: Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML) |



| | DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30. | Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates |
|---|---|---|
| | DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense. | 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.) |



| | | |
|---|---|---|
| | DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810. | 23 Feb 2015: 80 FR 9359, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. |
| | DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL; 10 CFR Part 110. | 25 Nov 2019: 84 FR 64740-64754: Rules of Practice in Explosives License and Permit Proceedings; Revisions Reflecting Changes Consistent With the Homeland Security Act of 2002 |



| | | |
|---|---|---|
| | DOJ ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War. | 14 Mar 2019: 84 FR 9239-9240: Bump-Stock-Type Devices. |
| | DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. | 23 Jan 2020: 85 FR 3819: Department of State final rule amending § 121.1, USML Categories I, II, and III, and numerous related sections (effective Mar. 9, 2020). |
| | DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders. | 22 Nov 2019: 84 FR 64415-64417: Venezuela Sanctions Regulations |

| | | |
|---|---|---|
|  | USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2019: 19 USC 1202 Annex. | 4 Sep 2019: Harmonized System Update (HSU) 1915<br>  - HTS codes for AES are available here.<br>  - HTS codes that are not valid for AES are available here. |

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*





**Weekly Highlights**

Missed the most important trade compliance updates last week? Read last week's highlights here.

**The Daily Bugle Archive**

Are you searching for updates from the past editions of the Daily Bugle? Click here to search the Archive.





## Submit Your Job Opening

We publish a list of over 100 trade compliance job openings every day. Submit your job for free.

## View All Job Openings

Are you looking for a new job in trade compliance? Click here to see the current job openings.

## Follow Us on Our Social Media Channels



Editorial Policy | The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

**From**: Richard Ashooh [/O=CAIM/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=RICHARD ASHOOH2CB]
**Sent**: 1/23/2020 7:02:29 PM
**To**: Dombrowski, Eileen (Federal) [EDombrowski@doc.gov]
**Subject**: FW: BIS News Clips 21 JAN 2020

**From:** BISnewsletter <bisnewsletter@bis.doc.gov>
**Sent:** Tuesday, January 21, 2020 2:46 PM
**Subject:** BIS News Clips 21 JAN 2020

## BIS News Clips 21 JAN 2020

**1. Trump administration eases firearm export rules** | CNBC
**2. These new rules might end tech's reliance on Chinese investors** | Fortune
**3. Old export regulations get a new use** | The Economist
**4. EU Won't Recommend Banning Huawei in Upcoming 5G Risk Rules** | Bloomberg
**5. Huawei Partners With TomTom To Develop Google Maps Alternative** | Benzinga
**6. Yellow or Blue? In Hong Kong, Businesses Choose Political Sides** | The New York Times
**7. CFIUS' First Full Year Under FIRRMA** | Lexology

---

**1. Trump administration eases firearm export rules | CNBC**
https://www.cnbc.com/2020/01/17/trump-administration-eases-firearm-export-rules.html
By Amanda Macias
Jan. 17, 2020

• The Trump administration announced Friday that it will pass oversight of some commercial firearm exports from the State Department to the Commerce Department.
• The long-delayed rule change, which began under the Obama administration, is intended to lower costs at home for U.S. firearm makers while refocusing regulatory attention on weapon sales that could pose national security risks.
• Under the new rule, blueprints for 3D printed guns will still be regulated.

The Trump administration announced Friday that it will pass oversight of some commercial firearm exports from the State Department to the Commerce Department, a move aimed at boosting the sale of U.S. firearms and ammunition abroad. The long-delayed rule change, which began under the Obama administration, is intended to lower costs at home for U.S. firearm makers such as American Outdoor Brands Corp. and Sturm, Ruger and Co., while refocusing regulatory attention on weapon sales that could pose national security risks. "Firearms and related articles that perform an inherently military function or provide the United States with a critical military or intelligence advantage will remain under State Department export licensing controls," explained Assistant Secretary Clarke Cooper of the Bureau of Political-Military Affairs on a call with reporters. "When we are talking about the easing of certain aspects of industry, it does free us up at State to focus on the larger significant systems and platforms that are inherently of a military function and do provide the United States a critical military edge or an intelligence advantage," Clarke said. The movement in jurisdiction of certain firearm sales from State to Commerce means U.S. manufacturers will have fewer registration requirements in order to obtain an export license. For example, under the Arms Export Control Act, the State Department must disclose any commercial arms sale worth $1 million or more to Congress for review. The Commerce Department has no such requirement. What's more, the State Department required an annual fee from industry whereas Commerce does not require such a fee. Under the new rule, blueprints for 3D printed guns will still be regulated. "Clearly one of the benefits to this change is the business-friendly approach that Commerce takes to its licensing — that is certainly the big one. Keeping in mind that a significant percentage of firearms and equipment

manufacturers are small businesses and that fee really makes a difference," said Rich Ashooh, the assistant secretary of Commerce for export administration. "Regardless of which department controls the export, all firearms will remain subject to U.S. government export authorization requirements, interagency review, and monitoring of commercial entities involved in export and sales," he added. The move to shift commercial gun export licenses to the Commerce Department was nearly complete under the Obama administration when a gunman opened fire and killed 26 at Sandy Hook Elementary School in Newtown, Connecticut, in late 2012. While the proposal is unrelated to domestic gun control, the Obama administration dropped the decision. In May 2018, Trump formally proposed streamlining the process for exporting American firearms.

_____

## 2. These new rules might end tech's reliance on Chinese investors | Fortune
https://fortune.com/2020/01/20/cfius-rules-regulations-china-investment/
By Mira Ricardel
Jan. 20, 2020

*If you are a technology company looking for capital and have some interested Chinese investors, you may want to broaden your sights.*

On Jan. 13, the Treasury Department issued landmark regulations that will scrutinize foreign investments into critical technology firms—especially those from China. These rules will dramatically expand the scope of the Committee on Foreign Investment in the United States (CFIUS), a U.S. interagency committee that considers the threat, vulnerability, and potential impact on national security of a foreign investment transaction. The new regulations constitute a seismic shift in the way the U.S. government views and regulates foreign direct investment (FDI). While this is not the first time that new FDI regulations have come into force with a sense of urgency, this update is the most comprehensive to date, from both the breadth of the U.S. economy addressed, as well as the effort to persuade and compel global partners to create similar regimes.

This move reflects a fundamental reassessment of what constitutes U.S. national security. From 1975, when CFIUS was established by executive order, until 2001, national security was defined largely in terms of the U.S. defense posture and capabilities. Post-9/11, this was enlarged to encompass homeland security and associated infrastructure. The 2020 regulations reflect a much wider view that economic security—based on technological superiority—is a central component of America's national security. As such, the regulations will not be limited to protecting U.S. defense and aerospace capabilities and commensurate supply chains, but also America's technological edge, critical infrastructure, and sensitive data. Furthermore, the scope will extend to non-controlling investments—even some below 10%—not just majority investments and acquisitions.

So how did we get here? China's efforts to gain strategic advantage through the legal and illegal acquisition of U.S. technology and intellectual property has become more aggressive, more comprehensive, and more public. In 2015, Chinese leaders announced the Made in China 2025 plan, a strategic roadmap to compete with and supersede the U.S. in advanced manufacturing and the development of advanced technologies. Implementing this roadmap, China has ramped up its foreign investments in the U.S., favoring manufacturing (especially semiconductors and electronics), information technology, and financial services, but also displaying interest in health care and real estate. At the same time, Chinese academics have been sent to American universities and Chinese ministries have funded R&D projects in the U.S. China aspires to become one of the world's top innovative countries by 2035, according to a speech by President Xi Jinping reported in Straits Times, and has been making significant strides toward this goal.

American and multinational corporations need to understand what this all means. First, businesses that are considering foreign investment, especially those involved with advanced technology, critical infrastructure, or sensitive personal data, need to become familiar with the new CFIUS regulations and the related, emerging Export Control Reform Act rules governing the level of control of a specific technology. Second, investment from countries like China, which has a track record of violating U.S. intellectual property laws and export controls, will be reviewed and investigated with a very critical eye—and is likely to have difficulty achieving CFIUS approval if these investments are in the technology, infrastructure, or data sectors.

Third, penalties for violations are high—not just fines, but also transactional costs and loss of potential revenue from investments that are blocked or are forced to unwind. Recently, the $245 million acquisition of Grindr by Kunlun Tech of China was reversed, and prior to that Broadcom's attempted takeover of Qualcomm, a $117 billion deal, was blocked by executive order.

Fourth, mitigation—which involves taking concrete steps such as firewalling sensitive information from foreign nationals and instituting third-party monitoring to assess compliance—is possible in some cases—but success is not guaranteed. The $1.2 billion MoneyGram-Ant Financial transaction failed in the wake of mitigation proposals being rejected by CFIUS.

Fifth, a strong compliance process and culture is essential. This is not just a requirement for general counsels, but for the C-suite and key employees. Failure to understand, internalize, and comply with the law can affect a company's stock price and reputation. It can also affect the confidence CFIUS has in a firm and thus the trust necessary for potential approval or mitigation of future transactions.

So buyers and sellers beware: These regulations are not going away. There is strong bipartisan consensus for tightening FDI rules and even a change in administrations is highly unlikely to alter this new course. The number of investigations of foreign investment transactions by CFIUS grew from 25 in 2009 to 172 in 2017, as documented in the committee's most recent annual report to Congress. The prudent business course is to assess the risks associated with certain sources and types of foreign investment, and either avoid or manage those risks through corporate governance, due diligence, and realistic growth planning.

———————————————————————

### 3. Old export regulations get a new use | The Economist
https://www.economist.com/united-states/2020/01/16/old-export-regulations-get-a-new-use

AN OBSCURE PART of the Department of Commerce called the Bureau of Industry and Security (BIS) is not used to grabbing the limelight. But lately it has had plenty of attention. That is thanks to its control of rules governing the flow of goods from and through America, called the Export Administration Regulations (EAR). Under Donald Trump, these rules are being transformed into a new weapon in the fight against Chinese technology. But changing them risks driving high-tech business out of America. The traditional tools for attacking foreign companies are the economic sanctions available through the Department of the Treasury. Sanctions prevent the target firm from doing transactions in American dollars, essentially cutting them off from the global financial system. But Steven Mnuchin, the treasury secretary, is widely understood to be against that option for one of the main objects of America's beef with China, the tech giant Huawei. That is possibly because shutting out Huawei could risk global network blackouts and great economic turmoil. Mr Mnuchin's resistance meant the Trump administration needed another option. It found BIS. The idea was to target Huawei through the "entity list", first published in 1997 as a part of the EAR and designed to fight the proliferation of weapons of mass destruction. Back then it was understood that if the American government somehow became aware of a shipment bound for a dangerous regime it could invoke the EAR, place that regime on the entity list, and halt the components' movement in its tracks. The Trump administration's first big EAR salvo came in May 2019, when it placed Huawei on the entity list, claiming it posed a threat to America's national-security and foreign-policy interests. Huawei denies that it does. The listing prohibited the export of components from America to the company, and seemed to inhibit the export of American-made components from other countries to Huawei. After some initial confusion, companies worked out that they were in fact prohibited only from exporting components directly to Huawei from American soil. Now the Department of Commerce is preparing new rules that would clamp down afresh on exports to Huawei. That is despite the fact that on January 15th the Trump administration signed a "phase one" trade deal with China—the latest demonstration that the many disagreements between the two countries do not scale up and down in tandem (see article). Those rules would cut Huawei off from a greater proportion of American technology than at the moment, according to many people close to the process, removing the option of shipping American technology in from abroad. Companies such as Intel, which manufactures semiconductors, and Arm, which designs chips, would have to strip more American content out of their products, or stop shipping to Huawei.

The rules are still under discussion, but are expected to be published soon. Deeper controls on tech exports to the whole of China are also being considered. According to people familiar with the process the changes are driven not by Wilbur Ross, the commerce secretary, but by Earl Comstock, the department's director of policy and deputy chief of staff. How and whether these new rules will go into effect is unclear. As with Huawei's initial entity listing, they may be held back as ammunition in case phase-two negotiations stall, or used as leverage to keep them on track. American tech firms say that tightened export controls, especially the misfired first round, are misjudged. Instead of cutting Huawei off, American unilateralism forces Huawei to obtain non-American components from competitors. Other Chinese firms may do the same for fear of similar treatment. (Treasury sanctions do not come with this unintended consequence of helping non-American suppliers.) This process may slow Huawei down, but lost revenue and commensurate gains by competitors could lead to a downward spiral for American firms that leads to lower relative spending on research and competitiveness. Newly flush with Huawei's cash, European and East Asian suppliers could overtake American firms. At best, the industry expects the controls to force American firms' operations offshore, into the hands of non-American suppliers. At worst, they risk scalping firms' competitive advantage entirely.

The mission statement of the BIS takes these trade-offs into account. It promises not to impose "unreasonable restrictions on legitimate international commercial activity that is necessary for the health of US industry". That is no simple task. If Washington and Beijing carry on along the path of technological "decoupling" then American industry will inevitably suffer (as will Chinese). Few organisations have greater power to determine the nature of that suffering than the Trump administration's Department of Commerce. The entity list was not designed as a tool of geostrategic competition. But, increasingly, it is being turned into one.

_____

## 4. EU Won't Recommend Banning Huawei in Upcoming 5G Risk Rules | Bloomberg
- Bloc to unveil 5G risk measures for EU states end of January
- EU states have ultimate say to ban Huawei from networks

The European Union won't explicitly ban Huawei Technologies Co. or other 5G equipment vendors when the bloc unveils guidelines for member states to mitigate security risks. The EU will unveil a set of recommended measures that are "naturally strict and vigilant" at the end of January, European Digital Commissioner Thierry Breton said at a news conference in Paris on Monday. No companies will be explicitly excluded in the EU's recommendations, he said. U.S. officials have criss-crossed Europe over the past year, urging the EU and its members to exclude the Chinese company from their networks. Washington argues Huawei poses a national security risk while Huawei and Chinese officials deny the accusations. The bloc has sought to coordinate the member states' approach on 5G, in an effort to avoid potential U.S. or Chinese retaliation targeting any individual European country. Last month, EU countries agreed to use only trustworthy parties for infrastructure that's critical to national security, and pledged to consider the laws of a supplier's home country before buying their products. The EU is limited in what it can tell its member states to do, however. Any decisions to ban companies for national security reasons rest with member states, and many operators in various European countries have already struck deals with Huawei on 5G.

### 5G Battle
Europe has been caught between two major world powers, China and the U.S., over the question of whether to include Huawei in its 5G roll-out. Many European countries are loath to incense Beijing, a significant trading partner, while the U.S., an important security ally, has repeatedly said it may reassess intelligence sharing with countries that use Huawei in their 5G networks. Chinese ambassador Wu Ken in December warned that a Huawei ban in the German market would result in "consequences" and cited German auto sales in the Asian giant's market. The comments came as German Chancellor Angela Merkel started facing intense pressure from hardliners inside her governing coalition, who have criticized her opposition of a ban on Huawei. The U.K. government is also weighing Huawei's role in developing the country's networks. Culture Secretary Nicky Morgan in January said the U.K. would keep Huawei out of critical national infrastructure.

_____

## 5. Huawei Partners With TomTom To Develop Google Maps Alternative | Benzinga
https://finance.yahoo.com/news/huawei-partners-tomtom-develop-google-094008930.html

By Amit Nag
Jan. 21, 2020

*Chinese telecom giant Huawei Technologies Co. Ltd. is collaborating with Dutch digital maps supplier TomTom NV (OTC: TMOAF) to make an alternative to Google Maps for its phones, according to Reuters.*

What Happened
Huawei can now use the Dutch digital mapping company's maps, traffic information, and navigation software to develop apps for its smartphones, a TomTom spokesperson told Reuters on Friday. The deal, signed some time ago, was not made public until late last week, added the spokesperson.

Why It Matters
The U.S. Department of Commerce banned Huawei and placed the Chinese phone maker on its entity list, citing national security risks in May 2019. Following the ban, Alphabet Inc's (NASDAQ: GOOGL) Google suspended all business activities with Huawei, including the transfer of software and key technical services, which forced Huawei to stop relying on Google's Android mobile operating system for its smartphones. The Chinese phone maker, at the time, responded to Google, saying it would build its own operating system. Later in August, a report published in China Daily claimed Huawei could develop its "mapping service," to challenge Google Maps' dominance.

_____

**6. Yellow or Blue? In Hong Kong, Businesses Choose Political Sides | The New York Times**
https://www.nytimes.com/2020/01/19/world/asia/hong-kong-protests-yellow-blue.html
By Hannah Beech
Jan. 19, 2020

*Shops and restaurants are now being labeled either yellow, to note support for the city's protest movement, or blue, in support of the police. The move is having a big economic impact.*

HONG KONG — The tapioca pearls at Fred Liu's bubble teahouse are springy and fresh, just like the fish balls at Elaine Lau's noodle shop. But that is not the only reason customers flock to these eateries in Hong Kong's bustling Causeway Bay shopping district. Both are members of the so-called yellow economy, shops that openly support the democracy movement remaking Hong Kong as it strives to protect the freedoms differentiating the territory from the rest of China. After seven months of street protests against Beijing's assault on these liberties, Hong Kong is color-coded — and bitterly divided. The yellow economy refers to the hue of umbrellas once used to defend demonstrators against pepper spray and streams of tear gas. That is in contrast to blue businesses, which support the police. Families and businesses have cleaved, sometimes forcefully, between those who believe Beijing must be compelled to carry out promised reforms and those who worry that the democracy crusade is destroying Hong Kong's reputation as a stable financial capital. A middle ground between the blue and yellow factions barely exists. "I'm yellow, but my parents are blue," said Ms. Lau, the fish ball noodle seller. "A lot of families are like that." "Luckily, I control 90 percent of the restaurant," she added, as diners slurped down bowls of soup. "So I can do what I want here."

Both Ms. Lau's noodle shop and Mr. Liu's teahouse are plastered with Post-it notes of encouragement for pro-democracy forces, mimicking the Lennon Wall in Prague where messages of dissent proliferated under Soviet domination. Maps and apps showing businesses' perceived leanings help guide customers their way. "We want to show the Chinese Communist Party that Hong Kong people can be economically self-sufficient through the yellow economic circle," Mr. Liu said. "We want to put pressure on blue shops to close." Devoid of natural resources and crowded onto limited land, Hong Kong has flourished because of its people, mostly entrepreneurial immigrants who left China for better prospects in the former British colony. Hong Kong residents advanced up the economic ladder, as sweatshop laborers rose to become bosses with factories on the mainland and even real estate or shipping tycoons. Today, the territory, which was returned to Chinese rule in 1997, ranks behind only New York and London as a nexus of global finance.

Yet months of unrest, along with the trade war between the United States and China, have battered Hong Kong's economy, which entered recession last year. In the central business district, police officers fired live bullets and arrested unarmed students. On university campuses, students lobbed firebombs with homemade catapults. Tear gas has been unleashed in all but two of Hong Kong's 18 districts. On Sunday the violence flared again as two police officers were beaten when officials tried to halt a pro-democracy rally in the Central district. Tourists from mainland China, a vital source of income for local businesses, have stayed away because of the turmoil. Retail sales have plummeted.

Small-business owners, whose operations make up the bulk of Hong Kong's enterprises, are bearing the brunt of the downturn, even as they contend with some of the highest rents in the world. Economic analysts fear for the city's future. "A deterioration of the sociopolitical situation and delays in addressing structural challenges of insufficient housing supply and high income inequality could further weaken economic activity and negatively affect the city's competitiveness in the long term," the International Monetary Fund warned last month. Amanda Leung's family has sold dried seafood for three generations. In recent years, mainland visitors concerned about the safety of the domestic food supply have been some of her biggest customers, she said. They bought fish maw and mollusks, abalone and sea cucumber. "They have stopped coming," she said.

Still, Ms. Leung said she understood the frustrations that have kept the protest movement going, from peaceful marches of more than a million people demonstrating against a now-withdrawn extradition bill to the passions of a hard core of brick-throwing youth. "China should leave Hong Kong alone," she said. "We can do business our own way." As tempers have flared, businesses on both sides of the color divide have been attacked. Down the street from Mr. Liu's tea shop, vandals lobbed red paint at a food stall known as a yellow establishment, while a nearby snack food store considered to be pro-Beijing was damaged. The battle has gone online, too. Ken Leung helped create WhatsGap, a popular app in Hong Kong that maps businesses that are considered yellow, helping them draw customers.

This month Google removed the app from its online store, saying it violated its policies related to sensitive events, but critics said the company might have been acting to placate China. Apple pulled a similar service from its app offerings last year. "The divide in Hong Kong society has only increased, not lessened," Mr. Leung said. But in November, pro-democracy candidates won a landslide victory in district council elections, the first time that Hong Kong voters had a chance to express their positions on the protests since this movement began. The yellow economy was backed up by the ballot box. "There's a perception that Hong Kong businesspeople are not sympathetic to the protests, but look at the silent majority that spoke in large peaceful marches or in the district council elections," said Todd Darling, an American restaurateur who has lived in Hong Kong for 16 years.

As the protests gathered force last year, Rocky Siu watched as an orderly column of demonstrators, miles long, marched past one of his ramen restaurants. When the police cracked down, he opened his doors, offering half-price bowls of noodles and free saline solution to wash the tear gas from protesters' eyes. "I'm losing money, but that's not the point," he said. "We have to support our young people." Mr. Siu's father was born in China and came to Hong Kong to seek a better life. But he owns a jewelry factory on the mainland and is, as Mr. Siu puts it, "deep blue." "I tell him, 'I don't understand. You escaped China, but now you're supporting them,'" Mr. Siu said. "To me, it's not yellow or blue. It's black and white, right and wrong."

---

**7. CFIUS' First Full Year Under FIRRMA | Lexology**
https://www.lexology.com/library/detail.aspx?g=82e987e3-35ce-4196-a19d-10f87d83d3e2
By Skadden Arps Slate Meagher & Flom LLP
Jan. 17, 2020

The achievement of legislative consensus in 2018 around a preferred approach to safeguarding U.S. technology and information from national security threats via foreign investment resulted in passage of the Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA). Following the legislation and the associated adoption of two sets of rules by the Committee on Foreign Investment in the United States (CFIUS) to begin implementing the legislative vision, the focus shifted from the legislators to the activity of CFIUS itself.

In its first full year under FIRRMA, CFIUS has learned what works and does not work under its interim rules, clarified its increased jurisdiction and focus on transactions involving critical technology and infrastructure and sensitive personal data, and demonstrated a growing appetite for reviewing non-notified transactions (i.e., transactions that are not voluntarily filed with the Committee) and enforcing mitigation agreements. In 2020, we expect general continuity of CFIUS practices, with an increased focus on China-related non-notified transactions; implementation of the final FIRRMA regulations (effective February 13, 2020) that will fill some regulatory gaps, including civil penalties, use of voluntary declarations and white-listed countries; and, likely most significantly, expanded mandatory CFIUS coverage via continuing export control reform.

## Key Takeaways for 2020 and Beyond

Although CFIUS is a crucial and often-used tool in the U.S. government's broader efforts to protect U.S. technology, information, infrastructure and security from foreign actors, it is far from the only tool available. More specifically, as the U.S. government has pursued a "decoupling" of the U.S. and China — particularly as it relates to sensitive U.S. technology — Congress and the executive branch have pursued numerous related but distinct initiatives. Export control reform, greater scrutiny of export control licenses, executive orders related to specific Chinese actors and broader review of foreign technology in U.S. information and communications technology, limits on the U.S. government's use of technology from certain foreign providers and aggressive use of more traditional trade instruments all combine to significantly complicate cross-border business, investments and supply chains. In this light, CFIUS and other developing initiatives likely will remain central to investors and businesses through 2020 and beyond.

## Safeguarding Critical Technology: FIRRMA's Pilot Program and Mandatory Filings

In October 2018, CFIUS implemented FIRRMA's Pilot Program for critical technology transactions, which effectuated both the Committee's expanded jurisdiction to review certain noncontrolling investments that involve information rights for minority investors and its new authority to direct that certain filings — for the first time ever — be mandatory. (See "US Finalizes CFIUS Reform: What It Means for Dealmakers and Foreign Investment" and "CFIUS Pilot Program Expands Jurisdiction to Certain Noncontrolling Investments, Requires Mandatory Declarations for Some Critical Technology Investments.") With the release of the final regulations, CFIUS clarified that the Pilot Program in its current form remains in effect through February 12, 2020. Beginning February 13, 2020, the Pilot Program will, in substance, remain in effect, but will be fully integrated within the CFIUS final regulations. Thus, mandatory filings for controlling and certain noncontrolling investments in critical technology remain, and they have in fact been expanded to certain foreign government-related transactions in businesses involving critical infrastructure and sensitive data. What remains uncertain — although CFIUS' general intent is clear — is exactly how CFIUS will modify the current NAICS-code based mandatory filing requirements and implement a filing requirement based solely on export control considerations. (According to the preamble to the final rule, Treasury anticipates issuing a separate notice of proposed rulemaking that would effectively eliminate the association between "critical technologies" and the 27 industries previously identified as sensitive. Rather, the mandatory filing requirement would be triggered by export licensing requirements alone.)

Thus far, the mandatory filing requirement has impacted both deal diligence and timing for many implicated transactions. In particular, technology-focused funds and early-stage investors have confronted a disconnect between a fast-moving investment environment in the early-stage technology sector and the delays inherent to a CFIUS review. CFIUS sought to address delays by creating a short-form declaration and providing alternative results to approve or block a transaction, but investors encountered mixed results in terms of both timing and certainty. CFIUS has yet to publish statistics on the declaration process but has made informal comments to the effect that, although a significant number of declarations have been submitted, they often do not provide investors with the "safe harbor" that results from formal CFIUS approval of a transaction. In other cases, filing a short-form declaration has resulted in CFIUS requesting that the parties file a full notice, extending the length of the CFIUS process. Accordingly, parties should consider filing a full notice for a Pilot Program transaction at the outset, in lieu of a short-form declaration, or should carefully structure the transaction (e.g., by limiting governance or information rights) such that a mandatory filing is not required. In 2020, short-form declarations may prove much more helpful once CFIUS implements rules permitting parties to use them for voluntary filings for less sensitive transactions, and not just for mandatory critical technology filings.

**Emerging and Foundational Technologies: Ongoing Reform Means Continued Uncertainty**

The Pilot Program compelled U.S. companies to pay closer attention to, and often to become more educated about, the export control classifications of their products, services and technology — a task made more difficult by ongoing export control reform. (See "Tightened Restrictions on Technology Transfer Under the Export Control Reform Act.") In November 2018, the Department of Commerce (Commerce) published an advance notice of proposed rulemaking to solicit comments on the criteria it will use to identify "emerging" technologies. Emerging technologies fall into representative categories that include artificial intelligence and machine learning, quantum computing, robotics, nanotechnology and biotechnology, among others. Commerce has yet to publish specific proposed rules for emerging technologies — newly developed technologies such as artificial intelligence, machine learning, autonomous vehicle technology or robotics that are not already captured by existing export controls — or an advanced notice of proposed rulemaking regarding "foundational" technologies — meaning technologies currently subject to existing export controls that are only controlled for anti-terrorism reasons, and which are therefore generally freely exportable to all but U.S.-embargoed destinations. However, we expect gradual rulemaking on this front throughout 2020. (See "Commerce Department Will Move Forward With More Stringent Export Controls for Certain Emerging Technologies" for additional insight into the proposed emerging technologies rules.) Both technologies are explicitly included in CFIUS' definition of "critical technology" and thus potentially implicate mandatory filing requirements and impact CFIUS' view of the risk associated with affected transactions.

**Non-Notified Transactions: Increasing Scrutiny**

Before FIRRMA, CFIUS had the authority to review non-notified transactions; however, its resources were limited. The number of voluntarily filed transaction notices continues to increase, with over 200 filed in 2017, over 230 in 2018 and over 240 in 2019 (not including additional short-form declarations filed in the past year). FIRRMA granted CFIUS increased hiring authority, permitting it to build up its capacity and allowing certain staff members to spend more time strictly focused on non-notified transactions. Over the past year CFIUS demonstrated an increased emphasis on this category, which tends to generate dramatic outcomes, including its authority to unwind transactions. This was demonstrated in Beijing Kunlun Wanwei Technology's acquisition of a stake in Grindr — a company that collects personal user data including sexual orientation, HIV status and photos — in which CFIUS initiated and ultimately ordered Kunlun to divest its interest; and PatientsLikeMe's acquisition by iCarbonX — a Chinese digital health company — in which CFIUS similarly forced iCarbonX to divest its interest. These divestments demonstrate both CFIUS' willingness to review completed transactions and force divestiture when it finds a national security concern and its increasing focus on deals that involve sensitive data about U.S. persons, such as health, genetic and other general information. Given CFIUS' increased focus on non-notified transactions, and its willingness to force divestitures of completed transactions to address its concerns, companies should carefully weigh the effects a voluntary filing will have on deal certainty and timing against the sensitivity of the transaction and the likelihood CFIUS may take an interest. This becomes most important when investments have a nexus — either direct or indirect — to China or Russia, or involve especially sensitive technology or information. As both above-cited cases illustrate, CFIUS' definition of what makes a transaction sensitive goes far beyond traditional government-related technologies and information.

**National Security Agreements: Evolving CFIUS Practices**

FIRRMA granted CFIUS broader powers to mitigate threats to national security. For example, CFIUS can suspend a transaction during its review or call for interim mitigation before completing review, and CFIUS may unilaterally open a review for any breach — even if unintentional — of a mitigation agreement. In April 2019, for the first time ever, CFIUS imposed a $1 million civil penalty for repeated breaches of a 2016 CFIUS mitigation agreement, citing its "commitment to enforcement." Later in 2019, CFIUS imposed a $750,000 civil penalty for violations of a CFIUS interim order related to data access and monitoring. CFIUS' increased hiring authority is likely to correspond to greater attention to negotiating and enforcing mitigation agreements in 2020; such agreements may involve — among other measures — limitations on governance and information rights, supply chain assurances, cyber and data security requirements, supply assurances to the U.S. government, security monitoring and annual audits. Given CFIUS' growing appetite for enforcement, companies must carefully consider their future ability to comply when entering into a new agreement. Companies operating under mitigation should consider allocating resources to prioritize and ensure ongoing compliance.

**China-Related Investments: No Relief in Sight**

Despite tense ongoing trade negotiations, most notably with China, the U.S. government has strictly maintained that the country remains open to foreign investment — a sentiment CFIUS representatives have echoed publicly. But CFIUS and a number of federal agencies also have continued to articulate strong concerns about both the legal and illegal transfer of U.S. technology and data to China — a worry that was the principal motivating factor behind FIRRMA's enactment. A number of recent public enforcement actions have targeted Chinese companies, such as CFIUS' forced divestments of Grindr and PatientsLikeMe, and in other contexts, such as with the $1 billion fine ZTE was required to pay under its settlement agreement in connection with export violations. Although CFIUS approved some deals involving China in 2019, the harsh scrutiny and increased likelihood of either heavily mitigated or blocked transactions coincided with a noticeable downturn in Chinese foreign direct investment. CFIUS' concerns about China extend to joint ventures as well. Even before FIRRMA, CFIUS had the jurisdiction to review technology transfers to China through joint ventures, and CFIUS' focus on and skepticism of these arrangements has continued. Accordingly, non-Chinese investors should continue to carefully consider the terms of their existing joint venture agreements, as well as the ultimate sources of any co-investment funds they may use when entering into a transaction.

**Final Rules: Greater Definitiveness and Possible Changes in 2020**

In September 2019, CFIUS issued two sets of proposed regulations seeking to further implement FIRRMA, and, on January 13, 2020, CFIUS issued final FIRRMA regulations effective February 13, 2020. (See "Draft CFIUS Regulations Portend Evolution, Not Revolution.") Among other things, these rules codified CFIUS' expanded jurisdiction over noncontrolling investments in, and increasing attention to, businesses involving critical technology, infrastructure or bulk U.S. personal data — "TID U.S. Businesses." The final rules address most of FIRRMA's mandated changes, including the following key highlights:

• Technology U.S. Businesses. As noted above, the final rules clarify that CFIUS will maintain the mandatory filing regime for entities in this category. The most significant changes yet to come in this realm will be Commerce's release of defined "emerging and foundational technologies" and future rulemaking to replace the industry-based filing criteria with one focused on export control licensing requirements.

• Infrastructure U.S. Businesses. The final rules clarify CFIUS' focus on Infrastructure U.S. Businesses, which will be defined through the functions a U.S. business performs in relation to critical infrastructure. For example, covered critical infrastructure includes telecommunications services, a particular focus of the U.S. government over the past year, and the final rules implicate U.S. businesses that supply or service telecommunications infrastructure. (See "Commerce Department Takes Steps To Thwart Use of Information and Communications Technology and Services Associated With Foreign Adversaries.") Parties contemplating covered transactions in the telecommunications industry should expect more focus on supply chain restrictions and vendor review in potential mitigation agreements.

• Data U.S. Businesses. Motivated by concerns that foreign governments may influence foreign parent companies to directly access U.S. personal data, the final regulations define Data U.S. Businesses in a way that affects a wide range of companies that likely would not have considered themselves to be of interest to CFIUS. This is in part because CFIUS has prospectively defined personally "identifiable data" to include all data that "can be used to distinguish or trace an individual's identity" when it is not aggregated or otherwise anonymized. While CFIUS has limited the definition to apply to businesses that have collected or maintained data on over 1 million individuals (or have demonstrated an objective to do so), in practice this requirement does little to narrow CFIUS' scope. Examples added to the final regulations confirm CFIUS' expansive scope, for example, stating that the time period for demonstrating a business objective to maintain or collect sensitive data from 1 million individuals could extend out to at least two years. Foreign investors will want to expand their diligence regarding how a U.S. business collects, stores and protects its U.S. personal data when considering a new transaction. Conversely, sellers will be interested in a potential purchaser's history of data-related compliance and practices. Importantly, CFIUS has shown an interest in all data, not just identifiable data that meets the definition for a TID U.S. Business, and this sensitivity to data can provide a hook for jurisdiction where CFIUS may have other concerns about a foreign investor.

• In addition to the primary set of rules that addresses TID U.S. Businesses, CFIUS issued a second set of rules to codify its expanded jurisdiction over real estate. Under FIRRMA, the Committee's jurisdiction includes certain stand-alone real estate deals that would not traditionally have been covered transactions. The final regulations focus primarily on real estate transactions that could provide a foreign person with proximity to airports and maritime ports or to military installations or other sensitive facilities or properties of the U.S. government. Like with Infrastructure U.S. Businesses, the final rules lack specificity, and investors will be looking to see how CFIUS asserts its jurisdiction in practice once the rules are published. The Committee anticipates providing a web-based tool for the public to better understand the geographic coverage of the final regulations. Investors should remain cognizant, however, that CFIUS' expanded jurisdiction over real estate transactions does not preclude the Committee from exercising jurisdiction over transactions that involve could result in foreign control or certain non-controlling investments by a foreign person in an entity engaged in interstate commerce that also owns or leases real estate.

**CFIUS 'White List'**

One of the more widely anticipated changes under the final rules was clarification of whether and how CFIUS would establish the "white list" to exempt certain foreign investors from filing requirements for their noncontrolling investments in TID U.S. businesses. Under FIRRMA, CFIUS was directed to specify criteria to limit its application of expanded jurisdiction to certain categories of foreign persons. In its final rules, CFIUS addressed this by creating a set of "excepted foreign states" to receive special treatment; excepted investors, in turn, must be from "excepted foreign states." CFIUS' initial list includes Australia, Canada and the United Kingdom — three countries that share extremely close intelligence and foreign investment review relationships with the United States.

Perhaps most importantly, the expected benefit to these "excepted investors" is likely to be small because the white list will not exempt foreign investors from CFIUS' jurisdiction in controlling transactions. In essence, meeting the "excepted investor" criteria exempts certain Australian, Canadian and U.K. investors from CFIUS' expanded jurisdiction, but does nothing to remove their investments from the Committee's traditional jurisdiction over transactions in which the foreign person obtains a controlling interest in a U.S. business. Further, although inclusion as an excepted investor can suggest that CFIUS views a foreign investor as a relatively lower-threat acquirer, a filing may be warranted if the acquired asset is particularly sensitive to U.S. national security. Given these limitations, we expect the white list likely will have limited practical effect for investors..

—————————————————