The Honorable Richard Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | ) | No. 2:20-cv-0111-RAJ |
| | ) | |
| Plaintiffs, | ) | **FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF STATE, et al., | ) | **NOTED FOR: FEBRUARY 12, 2021[1]** |
| | ) | |
| Defendants. | ) | ORAL ARGUMENT REQUESTED |

---

[1] The briefing schedule for this motion is currently governed by the unnumbered docket entry following ECF No. 91.

Motion for Summary Judgment
(No. 2:20-cv-00111-RAJ)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

TABLE OF ABBREVIATIONS ......................................................................................... ix

TABLE OF EXHIBITS ....................................................................................................... x

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS AND BACKGROUND .......................................................... 2

    I.    Statutory and Regulatory Background. ..................................................................... 2

    II.   The Challenged Rules. ............................................................................................... 3

STANDARD OF REVIEW ................................................................................................. 5

ARGUMENT ....................................................................................................................... 5

    I.    The Rules Are Exempt From Judicial Review. .......................................................... 5

        A.   The Commerce Rule is Exempt From Judicial Review ....................................... 5

        B.   The State Rule is Exempt From Judicial Review Under the APA. ..................... 6

        C.   Plaintiffs Fall Outside The Zone Of Interests of the AECA and ECRA. ........... 9

    II.   The Court Lacks Jurisdiction Over Plaintiffs' Claims ............................................ 10

        A.   Plaintiffs' Claims Present a Non-Justiciable Political Question ...................... 10

        B.   Plaintiffs Lack Article III Standing to Challenge the Rules. ........................... 13

    III.  Even if Plaintiffs' Claims Can Be Reviewed, Defendants Are Entitled To Judgment. ....... 15

        A.   The APA's Notice-and-Comment Requirements Do Not Apply To The Rules. ........ 15

        B.   The Rules Satisfied the APA's Notice-and-Comment Requirements. ....................... 17

        C.   State's Rule Is Not Arbitary or Capricious. ..................................................... 18

           1.   The Rules Fulfill The Purposes Of The AECA And ECRA ............................ 18

           2.   State's Rule Is Consistent With Its Litigating Position In *Defense Distributed*. ..... 21

           3.   Even If The Court Concludes State Has Changed Its Position, The Rule Provides a Reasoned Explanation. ....................................................................... 23

           4.   Commerce's Rule Is A Logical Outgrowth Of The NPRM ............................ 24

CONCLUSION .................................................................................................................. 24

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ)

i

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Air Courier Conf. of Am. v. APWU AFL-CIO,*
 498 U.S. 517 (1991) ........................................................................................................10

*Altera v. Comm'r,*
 *IRS,* 926 F.3d 1061 (9th Cir. 2019)................................................................................19

*Ashley Creek Phosphate Co. v. Norton,*
 420 F.3d 934 (9th Cir. 2005) ..........................................................................................9

*Baker v. Carr,*
 369 U.S. 186 (1962) ........................................................................................................11

*Becerra v. Azar,*
 950 F.3d 1067 (9th Cir. 2020) ........................................................................................23

*Bernstein v. DOJ,*
 176 F.3d 1132 (9th Cir. 1999) ..................................................................................21, 22

*Brady Campaign to Prevent Gun Violence United With The Million Mom March v. Ashcroft,*
 339 F. Supp. 2d 68 (D.D.C. 2004) ................................................................................15

*Bragdon v. Abbott,*
 524 U.S. 624 (1998) ........................................................................................................16

*Calif. Citizens Band Ass'n v. U.S.,*
 375 F.2d 43 (9th Cir. 1967) ............................................................................................24

*California v. Trump,*
 963 F.3d 926 (9th Cir. 2020) ..........................................................................................10

*Center for Biological Diversity v. Mattis,*
 868 F.3d 803 (9th Cir. 2017) ..........................................................................................14

*Chevron v. NRDC,*
 467 U.S. 837 (1984) ........................................................................................................19

*Chimei Innolux Corp.,*
 659 F.3d 842 (9th Cir. 2011) ..........................................................................................14

*City of N.Y. v. Permanent Mission of India to U.N.,*
 618 F.3d 172 (2d Cir. 2010)............................................................................................16

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ)

ii

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

*Clapper v. Amnesty Int'l*,
    568 U.S. 398 (2013) ...................................................................................15

*Corrie v. Caterpillar, Inc.*,
    503 F.3d 974 (9th Cir. 2007) ......................................................11, 12, 13, 16

*Crosby v. NFTC*,
    530 U.S. 363 (2000) ...................................................................................10

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ...............................................................................13, 15

*Defense Distributed v. State* ("*DD I*"),
    121 F. Supp. 3d 680..................................................................................13

*Defense Distributed v. Grewal*,
    971 F.3d 485 (5th Cir. 2020) .....................................................................13

*Defense Distributed v. State* ("*DD II*"),
    838 F.3d 451 (5th Cir. 2016) .........................................................3, 13, 19, 21

*Doe v. Trump*,
    288 F. Supp. 3d 1045 (W.D. Wash. 2017) ....................................................16

*Duncan v. Walker*,
    533 U.S. 167 (2001) .....................................................................................6

*East Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ........................................................................9

*Earth Island Inst. v. Christopher*,
    6 F.3d 648 (9th Cir. 1993).........................................................................12

*Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar*,
    958 F.3d 873 (9th Cir. 2020) ......................................................................18

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016)...............................................................................23

*Env'tl. Def. Ctr., Inc. v. EPA*,
    344 F.3d 832 (9th Cir. 2003).......................................................................18

*First Am. Discount Corp. v. CFTC*,
    222 F.3d 1008 (D.C. Cir. 2000)...................................................................24

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

*Food & Water Watch v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) .................................................................15

*Havasupai Tribe v. Provencio*,
906 F.3d 1155 (9th Cir. 2018) ................................................................ 9

*Health Ins. Ass'n of Am. v. Shalala*,
23 F.3d 412 (D.C. Cir. 1994) .................................................................24

*Hodge v. Dalton*,
107 F.3d 705 (9th Cir. 1997) .................................................................24

*Int'l Rehab. Sciences Inc. v. Sebelius*,
688 F.3d 994 (9th Cir. 2012) .................................................................23

*Karn v. Dep't of State*,
925 F. Supp. 1 (D.D.C. 1996)..............................................................7, 11

*Leyse v. Clear Channel Broad., Inc.*,
545 F. App'x 444 (6th Cir. 2013) ...........................................................18

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................................................13, 14

*Marshall Islands v. U.S.*,
865 F.3d 1187 (9th Cir. 2017) ...............................................................12

*Massachusetts v. EPA*,
8549 U.S. 497 (2007)...........................................................................14

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) ............................................................................14

*Wind River Min. Corp. v. U.S.*,
946 F.2d 710 (9th Cir. 1991) .................................................................19

*Mingtai Fire & Marine Ins. Co. v. UPS*,
177 F.3d 1142 (9th Cir. 1999) ...............................................................12

*Nat'l Family Farm Coalit. v. EPA*,
966 F.3d 893 (9th Cir. 2020) .................................................................15

*Neighborhood Assist. Corp. of Am. v. CFPB*,
907 F. Supp. 2d 112 (D.D.C. 2012) .........................................................18

*Nixon v. U.S.*,
506 U.S. 224 (1993) ............................................................................12

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ)                          iv

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

*Novak v. U.S.*,
   795 F.3d 1012 (9th Cir. 2015) ............................................................................................15

*Occidental Eng'g Co. v. INS*,
   753 F.2d 766 (9th Cir. 1985) ................................................................................................5

*Ohio v. EPA*,
   997 F.2d 1520 (D.C. Cir. 1993)..........................................................................................24

*Partridge v. Reich*,
   141 F.3d 920 (9th Cir. 1998) ................................................................................................5

*Patchak v. Salazar*,
   632 F.3d 702 (D.C. Cir. 2011)..............................................................................................9

*Portland Audubon Soc. v. Lujan*,
   884 F.2d 1233 (9th Cir. 1989) ..............................................................................................6

*Rybachek v. EPA*,
   904 F.2d 1276 (9th Cir. 1990) ............................................................................................24

*San Joaquin River Grp. Auth. v. NMFS*,
   819 F. Supp. 2d 1077 (E.D. Cal. 2011) ................................................................................5

*San Luis & Delta-Mendota Water Authority v. Jewell*,
   747 F.3d 581 (9th Cir. 2014)..............................................................................................20

*Sierra Forest Legacy v. Sherman*,
   646 F.3d 1161 (9th Cir. 2011) ............................................................................................14

*Stagg P.C. v. State*,
   354 F. Supp. 3d 448 (S.D.N.Y. 2019) ..........................................................................3, 13

*United States v. Alavi*,
   No. 07-CR-429, 2008 WL 1989773 (D. Ariz. May 5, 2008) ..............................................11

*United States v. Bozarov*,
   974 F.2d 1037 (9th Cir. 1992) ..............................................................................................6

*United States v. Helmy*,
   712 F. Supp. 1423 (E.D. Cal. 1989)....................................................................................11

*United States v. Hudak*,
   No. 02-CR-1574, 2003 WL 27384932 (D.N.M. Oct. 8, 2003) ...........................................11

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ)                     v

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

*United States v. Mead*,
   533 U.S. 218 (2001) ................................................................19

*United States v. Moller-Butcher*,
   560 F. Supp. 550 (D. Mass. 1983) ...........................................11

*United States v. Posey*,
   864 F.2d 1487 (9th Cir. 1989) .................................................10

*United States v. Spawr Optical Research, Inc.*,
   864 F.2d 1467 (9th Cir. 1988) .................................................11

*United States v. Mandel*,
   914 F.2d 1215 (9th Cir. 1990) .................................11, 12, 16

*United States v. Martinez*,
   904 F.2d 601 (11th Cir. 1990) ...........................................7, 11, 13

*United States v. Pulungan*,
   569 F.3d 326 (7th Cir. 2009) ...................................................7, 17

*Universal City Studios v. Corley*,
   273 F.3d 429 (2d Cir. 2001) .....................................................21

*Washington v. State* ("*In re DD Settlement*"),
   420 F. Supp. 3d 1130 (W.D. Wash. 2019) .....................2, 13, 14, 21, 24

*Wyoming v. Dep't of Interior*,
   674 F.3d 1220 (10th Cir. 2012) ...............................................14

## Statutes and Public Laws

5 U.S.C. § 553(a) ..........................................................................16

22 U.S.C. § 2751 .......................................................................2, 16

22 U.S.C. § 2778(a) .............................................................2, 10, 16

22 U.S.C. § 2778(f) ................................................................3, 8, 19

22 U.S.C. § 2778(h) ....................................................................3, 7

28 U.S.C. § 2401(a) ......................................................................19

50 U.S.C. § 4811(1) ......................................................................10

50 U.S.C. § 4813 ............................................................................6

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ)                             vi

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

50 U.S.C. § 4821 ..............................................................................6, 16

Pub. L. 83-665 ................................................................................... 8

Pub. L. 96-533 ................................................................................... 7

Pub. L. No. 94-329 ........................................................................8, 16

## Rules and Regulations

Fed. R. Civ. P. 56(a) ............................................................................ 5

15 C.F.R. § 734.7 .................................................................3, 8, 15, 21, 22

15 C.F.R. §§ 734.13 ............................................................................22

22 C.F.R. § 120.3(b) ........................................................................2, 19

22 C.F.R. § 120.6 ............................................................................... 4

22 C.F.R. § 128.1 ...............................................................................16

22 C.F.R. §§ 120.10 ............................................................................ 3

## Federal Register Items

*United States Munitions List* ("*USML*"), 19 Fed. Reg. 7403 (Nov. 17, 1954) ..........................16

*International Traffic in Arms* ("*ITAR*"), 34 Fed. Reg. 12029 (July 17, 1969)..........................16

*Revisions to the USML*, 75 FR 76935 (Dec. 10, 2010) ....................................2, 19

*Amendments to the ITAR: Initial Implementation of Export Control* Reform, 78 Fed. Reg. 22740 (Apr. 16, 2013) .....................................................................19

*Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)*, 83 Fed. Reg. 24166 (May 24, 2018) .................................................................4, 17

*ITAR*: *United States Munitions List Categories I, II, and III*, 83 Fed. Reg. 24198  (May 24, 2018) .................................................................................4, 17

*ITAR*: *United States Munitions List Categories I, II, and III*, 85 Fed. Reg. 3819  (Jan. 23, 2020) ............................................................................passim

United States  Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

*Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)*, 85 Fed. Reg. 4136 (Jan. 23, 2020) ................................................................................................ passim

## <u>United States Constitution</u>

U.S. Const. art. I ........................................................................................................ 12

U.S. Const. art. III ................................................................................................ 11, 13

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

## TABLE OF ABBREVIATIONS

Each of the following abbreviations is also identified in a parenthetical at the point of introduction in the text.  Defendants provide this additional reference for the convenience of the reader.

| | |
|---|---|
| **AECA** | **Arms Export Control Act** |
| **APA** | **Administrative Procedure Act** |
| **CCL** | **Commerce Control List** |
| **DD** | **Defense Distributed** |
| **EAR** | **Export Administration Regulations** |
| **ECCN** | **Export Control Classification Number** |
| **ECRA** | **Export Control Reform Act of 2018** |
| **FR** | **Federal Register** |
| **ITAR** | **International Traffic in Arms Regulations** |
| **MSA** | **Mutual Security Act of 1954** |
| **USML** | **United States Munitions List** |

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

# TABLE OF EXHIBITS

Exhibit 1            Excerpts from Administrative Record

Exhibit 2            White House Press Release, *President Obama Lays the Foundation for a New Export Control System* (Aug. 30, 2010)

Exhibit 3            Opinion of Office of Legal Counsel, *Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations* (July 1, 1981)

Exhibit 4            H.R. Rep. 115-200 (July 6, 2017)

Exhibit 5            Joint Conferees Report, *Authorizing Appropriations for FY 1981*

Exhibit 6            H.R. Rep. 97-58 (May 19, 1981)

Exhibit 7            135 Cong. Rec. 31345 (Nov. 21, 1989)

Exhibit 8            *ITAR: United States Munitions List Categories I, II, and III,* 83 Fed. Reg. 24198 (Jan. 23, 2020)

Exhibit 9            *Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML),* 85 Fed. Reg. 4136 (Jan. 23, 2020)

Exhibit 10           *United States Munitions List,* 19 Fed. Reg. 7403 (Nov. 17, 1954)

Exhibit 11           *International Traffic in Arms,* 34 Fed. Reg. 12029 (July 17, 1969)

Exhibit 12           *An Act to Amend the Foreign Assistance Act of 1961 and the Foreign Military Sales Act and for other Purposes,* Pub. L. 94-329 (June 30, 1976)

Exhibit 13           *Revisions to the USML,* 75 FR 76935 (Dec. 10, 2010)

Exhibit 14           *Revision of the ITAR,* 45 Fed. Reg. 83970 (Dec. 19, 1980)

Exhibit 15           ATF – Website excerpt

Exhibit 16           ATF – Website excerpt

Exhibit 17           *ITAR: United States Munitions List Categories I, II, and III,* 83 Fed. Reg. 24198 (May 24, 2018)

Exhibit 18           *Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML),* 83 Fed. Reg. 24166 (May 24, 2018)

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

# INTRODUCTION

In the Arms Export Control Act ("AECA"), Congress assigned to the President the responsibility to regulate exports of "defense articles" and "defense services" by determining whether those exports further national security, foreign policy, and world peace.  Congress has concurred in the President's delegation of that authority to the Department of State ("State"); and excluded from judicial review under the Administrative Procedure Act ("APA") Executive Branch decisions about national security and foreign policy, including which items constitute defense articles because those decisions are inextricably tied to foreign policy and national security.  Congress has also created a congressional review process as a substitute for judicial review.  In the Export Control Reform Act ("ECRA"), Congress assigned to the President the responsibility to regulate the export of other "items" to further national security, concurred in the President's delegation of that authority to the Department of Commerce ("Commerce"), and explicitly excluded such decisions from judicial review. Since 2010, State—following the direction of the President—has consistently interpreted the AECA's "defense articles and defense services" language as limited to items of "critical military or intelligence advantage," in order to focus State's limited export-control resources on the most important, "crown jewel" items, and transferred export-regulatory authority for other items to Commerce.

In this case, several States assert APA claims challenging a limited part of the most recent transfer of export control authority from State to Commerce of small-caliber, non-automatic firearms and other items, as set forth in two final rules, 85 Fed. Reg. ("FR") 3819 (2020) ("State Rule") and 85 FR 4136 (2020) ("Commerce Rule").  Defendants are entitled to judgment because Congress has barred judicial review of the State Rule and the Commerce Rule and reserved to itself the ability to review the agencies' judgments about which items should be regulated for export, and by which agency, based on the consequences of such exports for national security.  Plaintiffs' claims are also barred by controlling precedent on the application of the political question doctrine and by the fact that Plaintiffs cannot establish standing or that they fall within the zone of interests needed to challenge State decisions under the AECA or Commerce decisions under ECRA.

Plaintiffs' claims also fail on the merits. Plaintiffs mistakenly assert that State's transfer of export

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

control to Commerce will deregulate exports (and, through an ensuing chain of events, the domestic distribution) of the functional files used in 3-D printers to create firearms ("3-D firearms files").  In actuality, State and Commerce explicitly decided that Commerce would *maintain* export controls on 3-D firearms files that are equivalent, if not more effective, than State's previous export controls.  State and Commerce reasonably explained their decisions in the Rules, including the fact that those Rules made changes specifically to solve the concerns raised by commenters, Congress, and litigants in a previous lawsuit, *Washington v. State*, 420 F. Supp. 3d 1130 (W.D. Wash. 2019) ("*In re DD Settlement*").  Thus, Defendants are entitled to judgment on all merits issues, should the Court address them.

## STATEMENT OF FACTS AND BACKGROUND

Prior briefing in this action sets forth the factual and legal background at length.  *See* P's Mot. for Prelim. Inj., ECF No. 55 ("PI Mot."); D's Opp. to Mot. for Prelim. Inj., ECF No. 84 ("PI Opp.").  Defendants describe again the most relevant elements from that background below.

### I.      Statutory and Regulatory Background

The AECA, 22 U.S.C. § 2751 *et seq.*, authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States" to "control the import and the export of defense articles and defense services."  22 U.S.C. § 2778(a)(1).  The President has delegated this authority to State, in part, which promulgated the International Traffic in Arms Regulations ("ITAR"), *see* EO 13637; 22 C.F.R. §§ 120-130, to govern the export of items on the United States Munitions List ("USML"), a listing of defense articles and defense services that "provide a critical military or intelligence advantage," 22 C.F.R. § 120.3(b); *see* 22 C.F.R. Part 121.[2]  The USML does not regulate every item with a conceivable defense purpose, but rather, only those "with respect to which the United States cannot afford to fall to parity and that would pose a grave threat to national security if not controlled (i.e., a 'crown jewel')."  Ex. 13, 75 FR 76939-40 (Dec. 10, 2010).  The ITAR also regulates "technical data" that is "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification" of USML-controlled items, such as

---

[2] The President announced the decision to make "military or intelligence advantage" of a "critical" nature the touchstone for a USML listing in 2010. Ex. 2, *Press Release*, The White House (Aug. 30, 2010), https://go.usa.gov/xdNe4. State sought public comment on this criteria. *See* Ex. 13, 75 FR 76935 (Dec. 10, 2010); *see generally* https://go.usa.gov/xdmEd (linking comments).

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ) – 2

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1  "blueprints, drawings, photographs, plans, instructions or documentation" for those items.  22 C.F.R.

2  § 120.10(a)(1).   In 22 U.S.C. § 2778(f), Congress directed the President to "periodically review the

3  items on the [USML] to determine what items, if any, no longer warrant export controls."   In 22

4  U.S.C. § 2778(h) Congress barred judicial review of the Executive Branch's decisions regarding what

5  items should appear on the USML.  Meanwhile, under the Export Control Reform Act ("ECRA"),

6  Commerce regulates items listed on the Commerce Control List ("CCL"), pursuant to the Export

7  Administration Regulations ("EAR").   In 22 U.S.C. § 2778(f)(1) Congress provided for legislative

8  branch review of decisions to transfer items from State control to Commerce control by requiring a

9  30-day notice period and other reporting to officers and committees of the House and Senate, and

10  mandating that a 30-day notice be provided to Congress before a transfer.

11     Both State and Commerce have similar exclusions of categories of "information" from export

12  control.  22 C.F.R. §§ 120.10 and 120.11 enumerate significant exclusions from export regulation of

13  "technical data" otherwise encompassed by the ITAR, including "public domain" information

14  (defined, in part, as "information which is published and generally accessible or available to the

15  public") and matters of "general scientific, mathematical, or engineering principles."  *Id.*  15 C.F.R.

16  § 734.7 defines a similar category of "published" information that falls outside the scope of the EAR,

17  including information available through: (1) subscriptions; (2) libraries; (3) distribution at conferences,

18  meetings, seminars, trade shows, or exhibitions generally accessible to the public; (4) unlimited public

19  dissemination or distribution, such as by posting on the Internet; and (5) submission for publication

20  in journals, magazines, newspapers, etc. These categories are necessarily similar, as they are influenced

21  by First Amendment protections.  *See* Ex. 3, *Constitutionality of the Proposed Revision of ITAR*, 5 Op. OLC

22  202 (July 1, 1981); *Stagg P.C. v. State*, 354 F. Supp. 3d 448, 463-64 (S.D.N.Y. 2019), *reconsid. denied*, 2019

23  WL 1863418; *Defense Dist. v. State*, 838 F.3d 451, 468-69 (5th Cir. 2016) ("*DD II*") (Jones, J., dissenting).

24  **II.   The Challenged Rules**

25     The challenged State Rule removes items that do not provide a "critical military or intelligence

26  advantage" from Categories I-III of the USML.  The challenged Commerce Rule adds the same items

27  to the CCL.  These rules were subjected to a lengthy interagency review process before publication in

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

draft form.  *See* Ex. 4 at 155, H.R. Rep. No. 115-200 (2017).[3]  As explained in Defendants' opposition

to the motion for preliminary injunction, State, Commerce, and the Defense Department ("DoD")

engaged with each other regarding the military and intelligence uses of the listed items and determined

that many of the items controlled by those categories do not provide the United States with a critical

military or intelligence advantage.  PI Opp. at 30; *see* Decl. of Mike Miller ¶ 38, ECF No. 85-1 ("Miller

Decl.").  In this process, DoD recognized that non-automatic firearms of .50 caliber or less are

commonly available worldwide, not inherently for military end-use, and regularly used in the United

States for lawful purposes by civilians.  *See id.*  Because State's authority to regulate exports of technical

data under the ITAR is limited to technical data for items on the USML, removal of these firearms

from the USML also removes export controls over the associated technical data.  *See* 22 C.F.R. § 120.6.

Recognizing that the draft State Rule would no longer regulate exports of 3-D firearms files,

members of the public and Congress expressed concern that Commerce regulation of 3-D firearms

files would be less effective than State regulation had been.  *See, e.g.*, WASHSTATEB000014 (Letter

from Sen. Menendez);[4] WASHSTATEA8436, WASHSTATEA10479 (public comments to State);

DOC 0082238-39 (discussing comments received by Commerce).  President Trump also expressed

publicly the view that 3-D firearms files should be regulated.  *See* WASHSTATEB000007 (discussing

presidential remark on Twitter).  In light of these comments, as well as the concerns raised in the

previous litigation brought by some of the Plaintiffs here, State and Commerce continued to examine

the treatment of 3-D firearms files in the final rules.  *See* Ex. 9, 85 FR 4142 (discussing prior litigation).

As a result, Commerce's final rule amended the EAR to close gaps between State export regulation of

3-D firearms files under the ITAR and Commerce export regulation of 3-D firearms files under the

EAR.  *See id.*  Specifically, the Commerce Rule amended the definition of "published" in Section 734.7

of the EAR to exclude: "'software' or 'technology' for the production of a firearm, or firearm frame

or receiver . . . made available by posting on the internet in an electronic format . . . ready for insertion

---

[3] State briefed the outcome of this review to staff in Congress on May 14, 2018, just weeks after State and
Defense Distributed exchanged settlement offers pursuant to court order.  *See Def. Dist. v. State*, No. 1:15-
cv-372 (W.D. Tex.) ("*DDI*"), ECF No. 81, *with* Ex. 17, 83 FR 24198 (2018) & Ex. 18, 83 FR 24166 (2018).
[4] Cited excerpts from the administrative record, *see* ECF Nos. 106, 107, 109, are attached as Exhibit 1.

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ) – 4

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

into" a 3-D printer or similar device.[5]  Ex. 9, 85 FR 4172.  As explained in their text, and further elaborated by State's declarant at the preliminary injunction stage, with this amendment, the Final Rules provide for "Commerce [to] be able to control [3-D firearms files] publication as effectively" as "the extent [State] was able to control the publication of such files."  Miller Decl. ¶ 85; *see id.* ¶ 77.

State and Commerce published the Rules on January 23, 2020.  Plaintiffs moved for a preliminary injunction against the Rules.  *See* ECF No. 55.  After Defendants and intervenor National Shooting Sports Foundation ("NSSF") pointed out the harms of a broad injunction, Plaintiffs proposed a narrower injunction limited to 3-D firearms files, *see* ECF No. 89, which the Court granted, ECF No. 94 ("PI Order").[6]  By agreement of the parties, Defendants produced an administrative record, not for the Rules in their entirety, but for the consideration of 3-D firearms files in connection with the Rules.  *See* ECF No. 97, 106, 109 (excerpted in Ex. 1).  Defendants now move for summary judgment.

## STANDARD OF REVIEW

Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Generally, judicial review of agency action is limited to review of the record on which the administrative decision was based."  *Partridge v. Reich*, 141 F.3d 920, 926 n.4 (9th Cir. 1998).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).  "[I]n a case involving review of a final agency action under the [APA] . . . summary judgment becomes the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *San Joaquin River Grp. Auth. v. NMFS*, 819 F. Supp. 2d 1077, 1084 (E.D. Cal. 2011) (citation omitted).

## ARGUMENT

I.    **The Rules Are Exempt From Judicial Review.**

   A.    **The Commerce Rule is Exempt from Judicial Review.**

Plaintiffs bring claims solely under the APA.  *See* First Am. Compl. ("FAC") pp. 85-90, ECF

---

[5] By excluding such material, the Commerce Rule provides that it remains subject to the EAR.
[6] Defendants appealed the Court's order to the Ninth Circuit.  *See* Case No. 20-35391 (docketed May 6, 2020).  That appeal is fully briefed and oral argument is scheduled for January 11, 2021.

No. 54.  However, under the plain language of ECRA, the APA does not apply to the Commerce Rule, which controls the "exports, reexports, and in-country transfers" of small-caliber firearms and their associated technology, by adding them to "a list of items that are controlled under" the ECRA. *See* 50 U.S.C. § 4821(a) ("[e]xcept [when imposing a civil penalty or sanction] as provided in section 4819(c)(2) or 4843(c) of [50 U.S.C. ch. 58, subch. I], the functions exercised in this subchapter shall not be subject to sections 551, 553 through 559, and 701 through 706 of Title 5," *i.e.*, the APA); *see also id.* § 4813(a)(1), (3).  This language is explicit: the Commerce Rule "*shall not be* subject to the APA." *Id.* (emphasis added). Although Congress enacted ECRA relatively recently, the statutory bar to judicial review in 50 U.S.C. § 4821(a) derives from Congress's long history of prohibiting APA challenges to Commerce's actions under the export control laws, which the Ninth Circuit has recognized as having "explicitly excluded from judicial review and from the protections of the [APA]" "all functions exercised under the" export-control statute.  *U.S. v. Bozarov*, 974 F.2d 1037, 1039 (9th Cir. 1992) (interpreting Export Administration Act ("EAA"), Pub. L. No. 96-72, § 13, 93 Stat. 503, 531 (1979)).

Plaintiffs assert that this bar to judicial review is inapplicable because Commerce consulted with State in its review to produce a CCL coordinated with the USML.  *See* Reply at 8, ECF No. 87 ("Reply Br.").[7]  But the mere fact that Commerce coordinated with State does not and cannot "subject" Commerce to the APA, thereby displacing or modifying the "explicit statutory command precluding review." *Portland Audubon Soc. v. Lujan*, 884 F.2d 1233, 1240 (9th Cir. 1989).  Moreover, Congress explicitly directed Commerce to carry out its export-control activities "in consultation with the Secretary of State," 50 U.S.C. § 4813, so to read 50 U.S.C. § 4821 as inapplicable when such consultation occurs would nullify that provision altogether and cannot be correct.[8]  *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (a "cardinal rule" of statutory construction requires rejecting interpretations that render a clause insignificant).

---

[7] As with several other arguments adopted at the PI stage, Defendants acknowledge the Court reached a different conclusion at that stage and seek to persuade the Court otherwise for the reasons set forth herein.
[8] Interpreting the judicial review bar in 50 U.S.C. § 4821 as inapplicable when Commerce works together with State would also have the effect of incentivizing Commerce to develop its export regulations in isolation, thereby insulating its activities from APA review but depriving the United States of the benefits of a consistent and seamless export-control regime.  Such a reading cannot be correct.

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

**B.  The State Rule is Exempt from Judicial Review under the APA.**

The AECA explicitly prohibits judicial review of the State Department rule at issue here as well. The relevant statutory provision, 22 U.S.C. § 2778(h), provides that "[t]he designation by the President (or by an official to whom the President's functions under subsection (a) have been duly delegated), in regulations issued under this section, of items as defense articles or defense services for purposes of this section *shall not be subject to judicial review*." (emphasis added). The courts of appeals have consistently understood that statutory bar to unambiguously "shield the contents of the [USML] from judicial review," *United States v. Martinez*, 904 F.2d 601, 602-03 (11th Cir. 1990); *see United States v. Pulungan*, 569 F.3d 326, 327-28 (7th Cir. 2009) (22 U.S.C. § 2778(h) renders contents of regulations "not subject to judicial review"), and courts interpret this bar broadly "considering the deference afforded the President in matters of foreign policy." *Karn v. Dep't of State*, 925 F. Supp. 1, 6-7 (D.D.C. 1996). Here, Plaintiffs challenge State's exercise of authority explicitly conferred on the President and his delegees to remove small-caliber, non-automatic firearms up to .50 caliber (and associated technical data) from the USML, and Section 2778(h) explicitly bars judicial review of that action.

Plaintiffs assert that this bar on judicial review does not apply to "removals" from the USML. *See* Reply Br. at 8. But, as illustrated here, a removal is accomplished by issuing a new "designation . . . in regulations issued under this section, of items as defense articles or defense services," *see* Ex. 8, precisely the act for which Congress explicitly barred review in Section 2778(h).[9]  Moreover, the statute makes clear that Congress placed review of removals from the USML in its own hands, not those of the courts.  Section 2778(f)(1) specifically requires the President to periodically review the USML to determine "what items, if any, no longer warrant export controls."  The results of that review must then be reported to "the Speaker of the House of Representatives, the Committee on Foreign Affairs of the House of Representatives, and to the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate." *Id.*  And if any items are to be removed, the

---

[9] Congress likewise understood additions and removals to the USML to be treated identically under the AECA. *See* Pub. L. 96-533, § 108(a), 94 Stat. 3131, 3137 (1980) (directing the President to review the USML and report to Congress concerning whether any items had been removed). Ex. 5, Joint Conferees: H.R. 6942, Authorizing Appropriations for [FY] 1981 . . . , 96th Cong. 19-20 (1980) (statements of Rep. Bingham and Sen. Church) (explaining that some items may be "suitable for removal from the [USML] generally" and that "the Administration" would have authority to make those changes "in the [USML]").

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

President or his designee must first provide 30 days' "notice of the proposed removal" to Congress. *See id.* (further providing that the notice "shall describe the nature of any controls to be imposed on that item under" any other laws, including ECRA). Those congressional review measures were followed here, *see* WASHSTATEB000002, and following that review, State worked with Commerce on the changes to the final rules that ensure that Commerce can regulate the export of 3D firearms files posted on the Internet. 15 C.F.R. § 734.7(c); *see supra* pp. 4-5; Ex. 8, 85 FR 3823. This process worked as Congress intended: following the revisions to the Commerce Rule, Senator Menendez informed the State Department that he "underst[ood] that the Department of Commerce has now decided to alter its regulations to address [the] concern" about 3-D firearms files, and would "not insist" on any further changes. WASHSTATEB0000002, WASHSTATEB000013-000017.

Plaintiffs' position would undermine the effectiveness of the statutory congressional-review provision, which can work only because changes to the USML are not subject to judicial review. If Congress and the Executive Branch engage in a substantive back-and-forth over proposed removals to the USML and the end result can be challenged in district court under the APA, as here, the give-and-take between the branches would be significantly undercut. Indeed, Plaintiffs' APA claim in this very case seeks to challenge the substance of State's regulations after consulting with Congress, alleging that the final rule deviates *too far* from what the proposed rule contemplated. *See* FAC ¶ 297, ECF No. 54. That is precisely what the preclusion of judicial review is intended to foreclose.

Further, Plaintiffs are substantively wrong in contending that designations and removals are fundamentally different. As originally enacted, § 2778 made no mention of removals from the USML—the only authority conferred was the authority to "designate." Pub. L. No. 94-329, § 212, 90 Stat. 729, 744 (1976). Section 414 of the Mutual Security Act of 1954, the AECA's predecessor, used similar language. *See* Pub. L. 83-665, 68 Stat. 848. That did not mean that the President or State lacked authority to remove items, but rather that removals were a subset of possible designations.[10] Indeed, Congress later enacted the notification procedures in 22 U.S.C. § 2778(f)—the only subsection in the statute that expressly mentions "removal" of items—because it understood that the President already

---

[10] *See, e.g.*, Ex. 14, 45 FR 83970 (Dec. 19, 1980) (proposed "deletion of certain" items from USML).

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

had the power to remove items. *See* Ex. 6, H.R. Rep. No. 97-58, at 21-22 (1981) (explaining that the proposed notification procedures in § 2778(f) were "consistent with past congressional actions to maintain prudent arms export controls while contemplating removal of items from the munitions list"). Thus, when Congress barred judicial review of the President's designations of items in § 2778(h), that bar equally applied to the President's removal of those items, with the only review procedures being those that Congress granted to itself. *See* Ex. 7, 135 Cong. Rec. 31345, 31347 (Nov. 21, 1989) (Sen. Kerry) (the bill that enacted § 2778(h)'s judicial review bar "does not impair the President's discretionary authority" but still "hold[s] him to a reasonable standard of accountability to Congress in the exercise of that authority"). Congress intended that any dispute about "whether an item should be on the munitions list or the commodity control list" be "settled among the administering agencies and ultimately the President," with no role for the judiciary. *Id.* at 31346 (Sen. Riegle). Review of State's decision as to what items do or do not warrant control on the USML would upend over 65 years of consistent practice where the judiciary has never encroached on this authority.

### C. Plaintiffs Fall Outside the Zone of Interests of the AECA and ECRA.

Plaintiffs also fall outside the zone of interests of the AECA and ECRA. The "prudential" inquiry of the zone-of-interests test forecloses suit under the APA unless Plaintiffs can demonstrate that their interests are "arguably within the zone of interests to be protected or regulated by the statute that [they] say[] was violated." *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018) (internal quotations omitted). The zone-of-interests test "asks whether the statute grants the plaintiff the cause of action that he asserts." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 767 (9th Cir. 2018) (internal quotations omitted). Although this test is "not meant to be especially demanding," if the plaintiff is not within the statute's zone of interests, then the plaintiff may not bring an APA challenge based on the statute. *Id.* at 768; *see Patchak v. Salazar*, 632 F.3d 702, 704-06 (D.C. Cir. 2011). For example, a purely economic harm not intertwined with an environmental interest does not permit an APA challenge based on a statute that focuses on the environment. *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005). Nor does a law concerned "with the receipt of necessary revenues for the Postal Service" support a suit by postal employees alleging harm to their employment, particularly

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

in the context of a long line of similar statutes. *Air Courier Conf. of Am. v. APWU AFL-CIO*, 498 U.S. 517, 524-26 (1991); *see Calif. v. Trump*, 963 F.3d 926, 958-59 (9th Cir. 2020) (Collins, J., dissenting) (States fall outside zone of interests where Congress has sought to "preserv[e] congressional control").

Here, the interests that Plaintiffs have asserted are similarly unrelated to the economic, diplomatic, and national security interests protected by § 2778. That provision authorizes export controls "to further world peace and the security and foreign policy of the United States," 22 U.S.C. § 2778(a)(1), *i.e.*, to limit the "national security threat [from] the unrestricted flow of *military* information abroad." *U.S. v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989) (emphasis added). Plaintiffs' interests are also unrelated to those protected by ECRA, which regulates exports that could "significant[ly] contribut[e] to the military potential of" foreign countries or otherwise "further significantly ... foreign policy." 50 U.S.C. § 4811(1)(A).[11] In contrast, Plaintiffs assert purely-domestic harms to state-level interests, such as to their systems of firearms regulations. *See* FAC ¶¶ 23-25. The AECA and ECRA do not regulate and are not concerned with domestic firearms regulation, and Plaintiffs nowhere claim to be asserting a state interest in the capabilities of foreign militaries, national security, or foreign policy, and are thus outside the zone of interests. *See APWU*, 498 U.S. 526.

Nor is it the case, as Plaintiffs contend, that state interests in preventing terrorism or providing security within their own borders are "national security" interests within the statute, FAC ¶ 25, because the AECA and ECRA clearly vest national security judgments in the President and his designees, and the purpose of doing so is to make these truly *national* decisions that cannot be second-guessed at the state level. *Cf. Crosby v. NFTC*, 530 U.S. 363, 374-86 (2000) (holding that Massachusetts may not enact a law to regulate commerce with Burma, when that law might pose an obstacle to the President's exercise of statutory authority to regulate commerce, impose sanctions, and conduct diplomacy).

## II.   The Court Lacks Jurisdiction Over Plaintiffs' Claims.

### A.   Plaintiffs' Claims Present a Non-Justiciable Political Question.

It is likewise well-established that the exercise of "executive discretion" to fulfill "the purpose

---

[11] The statute is also concerned with furthering the United States' "foreign policy" and its "declared international obligations," as well as the regulatory "impact on the economy." 50 U.S.C. § 4811(1)(B).

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ) – 10

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1  of the [AECA] . . . to maintain and foster . . . international peace and security" presents a "non-

2  justiciable" political question. *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982, 984 (9th Cir. 2007); *id.* at 980

3  ("[D]isputes involving political questions lie outside of the Article III jurisdiction of federal courts").

4  The Ninth Circuit has also squarely held that there are "no meaningful standards of judicial review"

5  that can be applied to decisions about the contents of the CCL (and, by implication, the USML), and

6  that such decisions are political questions for this reason as well. *United States v. Mandel*, 914 F.2d 1215,

7  1223 (9th Cir. 1990). As the Ninth Circuit explained, decisions about whether to control arms exports

8  turn on "such things as whether the imposition of export controls would be detrimental to the foreign

9  policy or national security interests of the United States," as well as "whether the export of a given

10  commodity would make a significant contribution to the military potential of other countries." *Id.*

11  These "are quintessentially matters of policy entrusted by the Constitution to the Congress and the

12  President," and courts therefore have no jurisdiction to review them. *Id.*; *see also U.S. v. Spawr Optical*

13  *Research, Inc.*, 864 F.2d 1467, 1473 (9th Cir. 1988), *cert. denied*, 493 U.S. 809 (1989); *accord Martinez*, 904

14  F.2d 602 (11th Cir. 1990) ("The question [of] whether a particular item should have been placed on

15  [the USML] … [has] [n]o satisfactory or manageable standards [] for judicial determination"). District

16  courts have not hesitated to follow this controlling precedent. *See, e.g.*, *U.S. v. Helmy*, 712 F. Supp.

17  1423, 1430 (E.D. Cal. 1989) ("decisions made under the AECA and the EAA are nonjusticiable");

18  *U.S. v. Alavi*, No. 07-CR-429, 2008 WL 1989773 (D. Ariz. May 5, 2008) ("Whether a specific item is

19  on the CCL is a political question delegated exclusively to . . . Commerce") (citing *Mandel*).[12]

20       Every test of whether a political question exists is satisfied here. First, there is a "textually

21  demonstrable constitutional commitment" of the issue to the political branches rather than to the

22  judiciary. *Baker v. Carr*, 369 U.S. 186, 217 (1962). Plaintiffs' claims explicitly request that this Court

23  determine whether regulation of 3-D firearms files on the CCL rather than the USML would "further[]

---

24  [12] *See also U.S. v. Hudak*, No. 02-CR-1574, 2003 WL 27384932 (D.N.M. Oct. 8, 2003) ("the determination
25  of which items should be subject to the export controls contained in the ITAR involves judgments [that]
   . . . concern political questions . . . incapable of resolution by any judicially discoverable or manageable
   standard"); *Karn*, 925 F. Supp. 11 ("The Court will not scrutinize the President's foreign policy decision"
26  regarding whether "proliferation of cryptographic [software] will harm the United States"); *U.S. v. Moller-*
   *Butcher*, 560 F. Supp. 550, 554 (D. Mass. 1983) ("Whether particular items make a significant contribution
27  to a country's military potential and hurt our own national security is the quintessential political question").

'world peace and the security and foreign policy of the United States.'" FAC ¶¶ 301-302. *Corrie* and *Martinez* make clear that this Court may not hear such claims, consistent with the Ninth Circuit's repeated holdings that "the conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government," and that "the propriety of the exercise of that power is not open to judicial review." *Mingtai Fire & Marine Ins. Co. v. UPS*, 177 F.3d 1142, 1144 (9th Cir. 1999); *accord Earth Island Inst. v. Christopher*, 6 F.3d 648, 652 (9th Cir. 1993) ("the foreign affairs function . . . rests within the exclusive province of the Executive Branch under Article II, section 2 of the United States Constitution"); *Repub. of Marshall Islands v. U.S.*, 865 F.3d 1187, 1201 (9th Cir. 2017) (no jurisdiction over claims that "call[] into question the prudence of the political branches" in a "matter[] of foreign policy or national security"). Resolution of the merits of whether export control regulations are sufficiently effective also transgresses on the exclusive power to regulate imports and exports, including potentially harmful ones, textually committed by the Constitution to Congress.[13]

The question of how inclusion of 3-D firearms files on the USML or the CCL affects national security also exceeds "the constitutional limitations of a court's jurisdiction" because there is "a lack of judicially discoverable and manageable standards for resolving" that question. *Corrie*, 503 F.3d at 980; *see Nixon v. U.S.*, 506 U.S. 224, 228 (1993). The Court cannot reach the conclusion urged by Plaintiffs, that the Rules will, through "proliferation of [3-D firearms files] . . . threaten[] our national security," FAC ¶ 18, without making "policy choices and value determinations . . . not subject to judicial review." *Mandel*, 914 F.2d 1222. For example, there is no standard by which the Court could weigh State regulation of 3-D firearms files against Commerce regulation of the same without second-guessing the President's decision to "strengthen our national security" by focusing the USML "on . . .

---

[13] *See* U.S. Const. art. I, § 8, cl. 1 ("Congress shall have Power to lay and collect . . . Duties"); *id.* § 10 ("No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports," and such duties and State "inspection Laws" regarding imports and exports "shall be subject to the Revision and Controul of the Congress"); art. I, § 9 (prohibiting Congress from imposing a duty . . . "on Articles exported from any State"). This textual commitment includes the express authority to overrule State "inspection Laws" regarding imports and exports, including when States fear potentially harmful imports or exports. U.S. Const. art. I, § 10. Collectively, these provisions make clear that, in a federal system comprising separate sovereigns and branches, it is Congress that has been given final authority over laws and taxes governing imports and exports.

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ) – 12

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

the most critical products and technologies." Ex. 2 (White House statement); *accord* 85 FR 3821 (title includes "The President Determines"). Plaintiffs' claims that CCL regulation of 3-D firearms files would be inadequate likewise requires a "policy determination of a kind clearly for nonjudicial discretion." *Corrie*, 503 F.3d at 980. In short, "[t]he question whether a particular item" belongs on the USML "possesses nearly every trait that the Supreme Court has enumerated traditionally renders a question 'political'," so there is no jurisdiction to hear Plaintiffs' claims. *Martinez*, 904 F.2d at 602.[14]

**B. Plaintiffs Lack Article III Standing To Challenge The Rules.**

The "irreducible constitutional minimum of standing" has three elements: that a plaintiff suffer a concrete and particularized injury-in-fact, that the injury be fairly traceable to the challenged action of the defendants, and that it be likely (as opposed to speculative) that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing is "not dispensed in gross," and a "plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352-53 (2006). Plaintiffs lack a cognizable injury traceable to Defendants.

As to a concrete injury-in-fact, Plaintiffs claim to have injuries to their sovereign, proprietary, and quasi-sovereign interests. *See* FAC ¶¶ 23-25. But Plaintiffs fail to carry their burden with respect to any of these theories. Under the sovereign interest rubric, Plaintiffs claim a harm to their "ability to enforce their public safety laws" because persons may violate those laws with firearms obtained using 3-D firearms files. *Id.* ¶ 24. But Plaintiffs' claim that the *export* of 3-D firearms files will cause injury to States domestically is implausible, given that, as the Fifth Circuit has recognized, 3-D firearms files are already widely available for use by U.S. persons and have been for years, *see Defense Dist. v. Grewal*, 971 F.3d 485, 493 n.7 (5th Cir. 2020); *DD II*, 838 F.3d 466 (Jones, J., dissenting) (files are "now available on the Internet"). This is because the ITAR does not regulate the *domestic* distribution of firearms files. *See* Miller Decl. ¶ 19; *accord DD I*, 121 F. Supp. 3d at 695 (all are "free[] [to] disseminat[e] the computer files at issue domestically in public or private forums"); *Stagg*, 354 F. Supp. 3d 469.[15]

---

[14] Although *In re DD Settlement* concluded that jurisdiction over that case was not barred as a political question, Plaintiffs there did not attack the substance of State and Commerce's determinations about world peace, national security, and foreign policy, as Plaintiffs have done here. *See* FAC at ¶¶ 302, 309.

[15] Nor does federal law require the use of serial numbers on, or the registration of, firearms manufactured

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

Plaintiffs fare no better in invoking their alleged proprietary or quasi-sovereign interests. Plaintiff allege they have suffered proprietary injury because, *inter alia*, the 3-D firearms files at issue could be used to make "undetectable and untraceable firearms" that "threaten state and county prison safety" if used to "smuggl[e] . . . undetectable weapons," that may be used in "terrorist attacks," or that may make "solving crimes" more expensive.  FAC ¶ 25.  But Plaintiffs have not pointed to any evidence that exported 3-D firearms files—as opposed to those already available domestically, *see supra*—would be preferred by wrongdoers intent on making undetectable weapons, let alone that the transfer of export control authority from State to Commerce would meaningfully affect these risks. They have thus not demonstrated a concrete, non-speculative injury to proprietary interests from the Rules.  *See Lujan*, 504 U.S. 560; *Wyo. v. Dep't of Interior*, 674 F.3d 1220, 1233-35 (10th Cir. 2012).  As to quasi-sovereign interests, Plaintiffs' assert only an alleged harm to "the safety of their residents."  FAC ¶ 23.  Although this type of injury falls within the *parens patriae* doctrine, *see Wash. v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011), it is well established that a state "does not have standing as *parens patriae* to bring an action against the Federal Government."  *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011); *see also Mass. v. Mellon*, 262 U.S. 447, 485-86 (1923).

Traceability is also lacking.  In its order granting a preliminary injunction, the Court relied on the decision in *In re DD Settlement*, but that decision is flawed and should not be applied here.  First, the *In re DD Settlement* court adopted plaintiffs' argument that the standards for traceability are "relaxed" because plaintiffs brought a procedural APA challenge.  *See In re DD Settlement*, ECF No. 43, at 7 (quoting *Mass. v. EPA*, 549 U.S. 497, 518 (2007)).[16]  But that principle cannot apply here because when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of someone [other than plaintiff], much more is needed" to establish traceability.  *Lujan*, 504 U.S. 562.

Further, even under a "relaxed" traceability analysis, Plaintiffs' causal chain relies too heavily

---

for personal use, including those made from so-called "80%" receivers (properly known as receiver blanks). *See generally* Ex. 15 & Ex. 16, (Bureau of Alcohol, Tobacco, Firearms, and Explosives publications).

[16] Defendants disagree that *Mass. v. EPA*, 549 U.S. 497 (2007) "relax[es]" traceability, rather than "immediacy" and "redressability," *compare In re DD Settlement*, ECF No. 43, at 7, *with Mass.*, 549 U.S. at 517-18, but acknowledge that the Ninth Circuit has held otherwise, *see CBD v. Mattis*, 868 F.3d 803, 817 (9th Cir. 2017).

United States  Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

"on the behavior of other parties [and] an attenuated chain of conjecture as to what could happen in the future" to support standing. *Nat'l Family Farm Coalit. v. EPA*, 966 F.3d 893, 912 (9th Cir. 2020); *see Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 (2013) ("speculation about" "decisions of independent actors" does not suffice for standing). "That's so because the third parties may well . . . engage[] in their injury-inflicting actions even in the absence" of the new Rules. *Novak v. U.S.*, 795 F.3d 1012, 1019 (9th Cir. 2015). Here, Plaintiffs' theories of injury turn on an attenuated chain of decisions by third-party wrongdoers. At the first step in this chain, private individuals intending to commit a crime would need to decide to forego acquiring the physical weapons readily available through private transfers, commercial vendors, or various conventional methods of home manufacturing in favor of creating weapons through 3-D printing. Second, these individuals would need to decide to forego obtaining 3-D firearms files that are already available and lawful (at least under federal law) to distribute domestically, in favor of new 3-D firearms files that purportedly would become available through the transfer of export-control authority from State to Commerce (despite new provision 15 C.F.R. § 734.7(c)). Third, these individuals would then need to use the 3-D printed firearms files to commit or attempt to commit crimes in Plaintiffs' jurisdictions. And fourth, a foreign person would need to be involved to make this an export-control matter. Not only would each third-party step in this chain need to occur, but it would need to occur on a sufficient scale to "substantially increase[] the risk" of crime and other purported harms identified by Plaintiffs. *Food & Water Watch v. Vilsack*, 808 F.3d 905, 915 (D.C. Cir. 2015); *see also Brady Campaign . . .[&] Million Mom March v. Ashcroft*, 339 F. Supp. 2d 68, 77-78 (D.D.C. 2004) (plaintiff must "adduce facts showing that [third parties] would not seek some alternative means" to establish traceability from attenuated increased risk of crime).[17]

## III.   Even if Plaintiffs' Claims Can Be Reviewed, Defendants Are Entitled To Judgment.

### A.   The APA's Notice-and-Comment Requirements Do Not Apply To The Rules.

As noted above, *see supra* Part I.A., Congress has explicitly exempted from the APA—including the requirement of notice-and-comment rulemaking—Commerce's exercise of authority to control

---

[17] As the Court noted in its opinion granting preliminary injunction, Plaintiffs' theory of relaxed traceability applies only to claims of "procedural injury." PI Order at 8-9. Because standing "is not dispensed in gross," *Cuno*, 547 U.S. 353, Plaintiffs' theory would apply, at most, only to the "logical outgrowth" and "notice and comment" claims in Plaintiffs' first count, FAC pp. 86-87, and not Plaintiffs' other claims.

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

"the export, reexport, and in-country transfer of items subject" to its jurisdiction or to "establish and maintain a list of items that are controlled." *See supra* Part I.A (citing 50 U.S.C. § 4821). The State Rule is likewise exempt from notice-and-comment requirements because it involves a "foreign affairs function of the United States." 5 U.S.C. § 553(a); *see* 22 U.S.C. § 2778(a)(1) (export controls and USML modifications are ""[i]n furtherance of . . . [the] foreign policy of the United States"); *id.* § 2751 (describing ECRA's foreign policy purposes). State has reiterated that fact through the AECA's implementing regulations, explaining that administration of the AECA is a foreign affairs function encompassed within the meaning of the APA's exclusion of such functions. 22 C.F.R. § 128.1. State has held this interpretation consistently for over 65 years. *See* Ex. 10, 19 FR 7403, 7405 (1954) (export control functions "are excluded from the operation of the [APA]"); Ex. 11, 34 FR 12029, 12040 (1969) (retaining exception). Congress repeatedly ratified that interpretation by re-enacting the export control statutes, including by explicitly stating that State's relevant regulations "shall continue in full force and effect." Ex. 12, Pub. L. 94-329, 90 Stat. 745 (1976); *see Bragdon v. Abbott*, 524 U.S. 624, 645 (1998).

Although in the immigration context, this Court and others have occasionally required evidence of an impact on foreign affairs to invoke the exception in 5 U.S.C. § 553(a), *see, e.g.*, *Doe v. Trump*, 288 F. Supp. 3d 1045, 1076 (W.D. Wash. 2017) (cited, ECF No. 94 at 12), those cases are inapposite because the plain concern of immigration statutes transcends the border and involves the regulation of persons within the United States. In contrast, the AECA is a statutory scheme that expressly regulates exports in the interests of foreign policy and national security and thereby "relates directly to, and has clear consequences for, foreign affairs," a circumstance in which courts have recognized the foreign affairs exception applies broadly. *City of N.Y. v. Permanent Mission of India to U.N.*, 618 F.3d 172, 201 (2d Cir. 2010) (rule preempting New York's application of property taxes to foreign-owned buildings falls in foreign affairs exception). Here, the Ninth Circuit has explicitly recognized that the AECA and ECRA implicate core foreign policy functions of the United States across the board. *See Corrie*, 503 F.3d 982 (explaining that the AECA is "a congressionally enacted program calling for executive discretion as to what lies in the foreign policy and national security interests of the [U.S.]"); *Mandel*, 914 F.2d 1222 ("administrative decisions under" ECRA's predecessor statute "implicate

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

national security concerns and foreign policy"). In this setting, the APA's notice-and-comment requirements do not apply, regardless of the speculation about potential domestic effects.

**B. The Rules Satisfied the APA's Notice-and-Comment Requirements.**

Even though State and Commerce were not required to engage in notice-and-comment rulemaking, the agencies complied with the APA's requirements for doing so. First, the proposed State rule gave adequate notice that it would implicate technical data associated with the manufacture of firearms up to .50 caliber, which would necessarily include 3D printing files. State proposed revising the USML to "not include non-automatic and semi-automatic firearms to caliber .50." Ex. 17, 83 FR 24198. In doing so, State explained that the USML would "continue to cover the technical data and defense services" that were directly related to items that remained on the USML. *Id.* at 24199; *see also id.* at 24201 (USML, Category I(i), would include "Technical data (see § 120.10 of this subchapter) . . . directly related to the defense articles described" earlier in Category I). Likewise, Commerce's proposed rule discussed the regulation of the firearms that would be transferred to the CCL and noted that Commerce's then-existing export controls on "technology" were "more narrowly focused and apply in limited contexts as compared to" State's controls. Ex. 18, 83 FR 24167 (2018). Thus, it was well understood that the agencies were proposing to shift regulatory authority over the export of non-automatic and semi-automatic firearms up to .50 caliber from State to Commerce—and that this transfer would include regulation of technical data ("technology," in the parlance of ECRA), necessarily encompassing computer files and 3-D firearms files.[18] *See* WASHSTATEB000006 (explaining that "proposed rule engendered a great deal of public attention, given that it involved transferring regulatory control of firearms and technical data related to the 3D printing of guns").

Numerous commenters understood the effect of the State Rule on the regulation of exports of 3-D firearms files. *See* Ex. 8, 85 FR 3822-23 (discussing comments); *e.g.*, WASHSTATEB005945,

---

[18] The public also understood that removing items from the USML would mean that related technical data would also be removed just like with the 26 previous rules removing items from the USML issued from 2013-17, all of which worked the same way. *See* PI Opp. Br. at 6-7. None of these rules specified *all* applicable types of technical data or manufacturing methods that were implicated by removal, and it would have been impracticable to do so. *Cf. Pulungan*, 569 F.3d 328 (the USML's "language deals with attributes rather than names [because] an effort to enumerate each item would be futile").

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ) – 17

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1  WASHSTATEB006146.   Congress understood this as well: Based on the proposed rule, Congress

2  considered whether it should enact a law to "prohibit the President from 'remov[ing] any firearm, or

3  technical information relating to such firearm, from the USML based on concerns about "[f]irearms

4  manufactured with 3D printers." *See* S. 459, 116th Cong. (2019), *available at*: https://go.usa.gov/

5  x7fCh. Senator Menendez wrote to State, expressing concerns over "3D gun printing" information.

6  WASHSTATEB000014.   And various interested associations wrote to State to express their views on

7  the shift of export controls for 3-D firearms files.  *See, e.g.*, WASHSTATEB005105 (Amnesty Int'l).

8  This evidence that commenters understood the effects of the Rule is sufficient to defeat Plaintiffs'

9  claim of inadequate notice.  *See Leyse v. Clear Channel Broad., Inc.*, 545 F. App'x 444, 454 (6th Cir. 2013)

10  ("comments that address the issue resolved in the Final Rule provide evidence that the notice was

11  adequate"); *Neighborhood Assist. Corp. of Am. v. CFPB*, 907 F. Supp. 2d 112, 125 (D.D.C. 2012) ("[T]he

12  volume and substance of the comments support the . . . contention that notice was indeed adequate.").

13     Plaintiffs contend that, notwithstanding the fact that numerous commenters and Congress

14  understood the coverage of the Rules, the Rules nonetheless failed to provide adequate notice because

15  they did not explicitly mention 3-D firearms files.  *See* FAC ¶ 294.  However, it is well-established that

16  agencies do not need to list every precise application of a proposed regulation to provide fair notice;

17  rather, "notice [is] adequate" where parties can and "should have anticipated that a particular

18  requirement might be imposed," as Congress and interested members of the public did.  *Env'tl. Def.*

19  *Ctr., Inc. v. EPA*, 344 F.3d 832, 851 (9th Cir. 2003).  Even where a rulemaking is "not perfect," all that

20  the APA requires is for the public to understand "what the agency was considering," a standard that

21  is met here. *Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar*, 958 F.3d 873, 883 (9th Cir. 2020).[19]

22     **C.  State's Rule Is Not Arbitrary Or Capricious.**

23       **1.  The Rules Fulfill The Purposes Of The AECA And ECRA.**

24     Plaintiffs assert that State failed to consider the impact on world peace and national security and

---

25  [19] To the extent Plaintiffs claim that the Rules did not adequately address comments, such a claim would
also fail, as the text of the Rules demonstrates otherwise.  State noted that many comments focused on "use
of these files in the United States," and explained that the AECA does not regulate domestic distribution of

26  defense articles or technical data.  *See* Ex. 8, 85 FR at 3822-28.  The Commerce Rule addressed comments
received about numerous issues, including "concerns about 3D printing of firearms," the *Defense*

27  *Distributed* litigation, and "internet dissemination" of 3-D firearms files. Ex. 9, 85 FR 4140.

---

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

other relevant statutory factors in promulgating its Rule because State relied on the "critical military or intelligence advantage" standard. *See* FAC pp. 87-89. Not so. On its face, the Rule explains State's role in furthering the decade-long effort to better focus the USML, thereby exercising the President's delegated authority to "control the import and export of defense articles and defense services in furtherance of world peace and the security and foreign policy of the United States." Ex. 8, 85 FR 3820. State, in consultation with DoD and others, determined that removing those items from the USML furthered national security and foreign policy by applying the "critical . . . advantage" standard and recognizing that the items are not "inherently military based on their function." *Id.*, 85 FR 3823.

State is entitled to "defer[ence] to [this] interpretation . . . [as] a necessary presupposition" of the Rule as long as it is "reasonable, even when alternative interpretations are available," *Altera v. Comm'r, IRS*, 926 F.3d 1061, 1083 (9th Cir. 2019), particularly here where President, Congress, and State have all concluded that this interpretation is correct. The "critical military or intelligence advantage" criteria fulfills a Presidential determination that this "strengthen[s] . . . national security." Ex. 2 at 2. It complies with Congress's intended standard when it issued the statutory command to "periodically review the items" on the USML and remove those that "no longer warrant export controls." 22 U.S.C. § 2778(f)(1); *see* Ex. 4, H.R. Rep. No. 115-200 at 155 (encouraging removal of items not of "critical military or intelligence" value). And State has further explained the basis for the standard and adopted it into 22 C.F.R. § 120.3(b),[20] stating that the transfer of non-military items (such as small-caliber firearms and the technical data to produce those arms) is "necessary to better focus" enforcement resources on "crown jewel" items that the United States does not want adversaries to possess. Ex. 13, 75 FR 76940; *see* 78 FR 22740. The administrative record also reflects State's conclusion that the State Rule will "significantly improve its regulation of defense articles and services by focusing its limited resources on regulating only those defense articles and services that provide the [U.S.] with a

---

[20] Plaintiffs do not challenge 22 C.F.R. § 120.3(b), and any such claim would be precluded by the statute of limitations. *See Wind Riv. Min. Corp. v. U.S.*, 946 F.2d 710, 713 (9th Cir. 1991); 28 U.S.C. § 2401(a). Such a claim would also be futile, given Congress's concurrence and the principle that State's regulatory interpretation of the AECA through its exercise of delegated authority and use of the notice-and-comment process is entitled to great deference rooted in *Chevron v. NRDC*, 467 U.S. 837 (1984) and *U.S. v. Mead*, 533 U.S. 218 (2001). *See DD II*, 838 F.3d 466 n.11 (Jones, J., dissenting) (applying *Chevron* analysis).

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ) – 19

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

critical military or intelligence advantage." WASHSTATEB000384. As State has explained, exports of such items of strategic value pose risks from "[a]rmed hostilities against the United States or its allies; disruption of foreign relations vitally affecting the national security; [and] the compromise of vital national defense plans or complex cryptologic . . . systems," Ex. 13, and so focusing State's efforts on such items fulfills the statutory purpose of furthering world peace and security and foreign policy.

With regard to 3-D firearms files in particular, the Rule explains that State had "determined, in consultation with the Department of Defense and other interagency partners, that these [] files do not confer a critical military or intelligence advantage and are not inherently military based on their function." Ex. 8, 85 FR 3823. And it explained that the CCL provisions being adopted in the Commerce Rule "sufficiently address the U.S. national security and foreign policy interests relevant to export controls." *Id.* It is therefore clear that State considered the factors listed in 22 U.S.C. § 2778, including considerations of "world peace" and "national security." The administrative record confirms that State considered and reasonably evaluated these factors, including in State's contemporaneous National Security and Foreign Policy Analysis,[21] which accounted for "the unique characteristics and qualities of 3-D printed firearms controlled under the USML . . . , the effect that a transfer to the CCL would have on [] national security and foreign policy interests," the possible manufacture of "unserialized or . . . non-metallic" firearms," and views raised in an "interagency review." WASHSTATEB000386-000387; WASHSTATEB00001-00003, 00006-00009.

Regardless of whether State's "consideration of the [statutory] factors could . . . have been even more exhaustive, or stated more expressly, its determination that" those factors were satisfied "may be reasonably discerned from the record, and therefore should be upheld." *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 637 (9th Cir. 2014) (internal quotation marks omitted).

---

[21] The National Security and Foreign Policy Analysis in the administrative record is a contemporaneous analysis that State officials prepared at the time they recommended publication of the State Rule in January 2020 to explain why the State Rule was "in furtherance of world peace and the security and foreign policy of the United States," consistent with the AECA. *See* WASHSTATEB000006 (explaining that the "national security and foreign policy analysis" attached "describes in greater detail" the evaluations "underlying the rule change"); WASHSTATEB000384-000387. This document was part of the detailed "Action Memo" package, over 7,000 pages in length, that State officials prepared for the Secretary of State that ensured the Secretary had all relevant information to make an informed decision when approving the publication of the State Rule. *See* WASHSTATEB000001-007493, ECF No. 106 (not included in its entirety in Ex. 1).

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ) – 20

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

### 2.   State's Rule is Consistent With Its Position In The *Defense Distributed* Litigation.

Plaintiffs also advance the theory, *see* FAC p. 20, that the State Rule contradicts the position taken by State in fighting a preliminary injunction sought against the application of the AECA to 3-D firearms files, *see DD II*, 838 F.3d 453, but this claim misunderstands the Rule and its effects.   In that prior litigation, State expressed its concern that a preliminary injunction would forbid the government from regulating the export, through posting on the Internet, of "as many 3D printing . . . files as [plaintiffs] wish[ed]" which could then "remain online essentially forever." *Id.* at 460.   As the State Rule recognizes, however, that would not happen under the final State and Commerce Rules because those Rules *do not* leave the export of 3-D firearms files through posting on the Internet unregulated, instead imposing "EAR controls on technology and software for firearms previously controlled in USML Category I(a)," *e.g.*, 15 C.F.R. § 734.7(c).   Ex. 8, 85 FR 3823.   For this reason, State concluded in its Rule that the modifications to the USML, considered in light of the modifications to Commerce's authority, "sufficiently address the U.S. national security and foreign policy interests relevant to export controls"—the same interests State discussed in the *Defense Distributed* litigation.   *See id.*, 85 FR 3821.

State's conclusion is reasonable.   Under the final Rules, Commerce will "subject to the EAR" 3-D firearms files "consistent with the regulation . . . under the USML."[22]   Ex. 9, 85 FR 4142.   The EAR's "ready for insertion" language in 15 C.F.R. § 734.7(c) defines as the type of "technology" subject to export regulation those files that are "functional" in nature, consistent with First Amendment principles limiting the scope of permissible regulation of speech.   *See* Decl. of Matthew S. Borman ¶ 49(d), (e), ECF No. 85-2 ("Borman Decl."); *Universal City Studios v. Corley*, 273 F.3d 429, 452 (2d Cir. 2001) ("The functionality of computer code properly affects the scope of its First Amendment protection"); *Bernstein v. DOJ*, 176 F.3d 1132, 1141-42, 1145-46 (9th Cir. 1999), *withdrawn*, 192 F.3d 1308 (9th Cir. 1999).   The "ready for insertion" language is at least as broad, and arguably broader, than the scope of State's past regulation of 3-D firearms files under the ITAR, which (in connection with Defense Distributed's 3-D firearms files) State explained as limited to "files that could

---

[22] This specifically includes the 3-D firearms files at issue in the *Defense Distributed* litigation, because under this Court's decision in *In re DD Settlement*, exports of those files remained regulated by State until the implementation of the new State and Commerce Rules.   *See* Borman Decl. ¶ 49(a)(i).

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ) – 21

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

be used to automatically generate defense articles." Miller Decl. ¶ 44; *see* DOSWASHINGTON-SUP00455 (Decl. of Lisa Aguirre). Contrary to Plaintiffs' argument, moreover, the text of Commerce's "ready for insertion" language does not exclude Commerce from regulating files that can be "easily converted to a readable format" using off-the-shelf software. FAC ¶ 312. Instead, this language provides Commerce the flexibility to address future changes in technology *and* to cover such files as "ready for insertion." Nor are Plaintiffs correct when they allege, *see id.*, that methods of export other than posting on the Internet (such as mail or email) are unregulated by the EAR. Rather, as with State's regulation of exports under the ITAR, Commerce's EAR jurisdiction extends to transfers "via email, direct file transfer, or transfer via a physical hard drive," Borman Decl. ¶ 49(a)(iii), *see* 15 C.F.R. §§ 734.13(a)(1), 734.17(a)(1), as well as to postings on the Internet under new regulation 15 C.F.R. § 734.7(c). Commerce's EAR jurisdiction also extends to any item manufactured outside the United States if that item was a "direct product[] of U.S. origin technology or software." *Id.* § 734.3(a)(4). Finally, the EAR and the ITAR's exemptions associated with First Amendment concerns, such as the exemptions for published information and information in the public domain, as described above, are extremely similar once 15 C.F.R. § 734.7(c) is in force. *See supra* p. 3.

State also reasonably supported its conclusion by noting the greater resources available to Commerce to enforce export regulations for 3-D firearms files. Because State's authority encompasses "crown jewel" items of critical national security importance, State "focuses its ITAR enforcement efforts" on items other than 3-D firearms files, and "enforcement efforts related to [such] files . . . have been rare." Miller Decl. ¶ 86. Transfer of export control authority from State to Commerce would enable the latter to dedicate enforcement resources currently unavailable to State to enforcing export controls on transferred items, including 3-D firearms files. *See* Ex. 8, 85 FR 3821 (explaining that Commerce "will apply its years of export control enforcement expertise"); Decl. of Douglas Hassebrock ¶ 26, ECF No. 85-3 (highlighting 136 new enforcement agents and "the existing list of law enforcement agents already responsible for enforcement of [export] controls" under the EAR). For all of these reasons, State's Rule does not "change" State's position, but instead treats the export of 3-D firearms files consistently with the treatment of such files in the *Defense Distributed* litigation.

Motion for Summary Judgment
(No. 2:20-cv-111-RAJ) – 22

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

### 3.   Even If The Court Concludes State Has Changed Its Position, The Rule Provides A Reasoned Explanation.

As explained above, the State Rule is wholly consistent with State's position in the *Defense Distributed* litigation.  But even if the Court concludes that State's decision to transfer export control authority to Commerce constituted a change in position, the Rule "provide[s] a reasoned explanation for the change" and therefore satisfies the standards of the APA as long as it "display[s] awareness" of the prior position and articulates "good reasons" for the change.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  Courts do not "give heightened review to agency action that changes prior policy" because the "APA makes no distinction ... between initial agency action and subsequent agency action undoing or revising that action." *Calif. by and through Becerra v. Azar*, 950 F.3d 1067, 1096 (9th Cir. 2020) (internal quotations omitted).  Applying these principles, an agency's "inconsistency provides a basis for" rejecting a rule "only in rare instances, such as when an agency provides no explanation at all for a change in policy, or when its explanation is so unclear or contradictory that we are left in doubt as to the reason for the change in direction." *Int'l Rehab. Sciences Inc. v. Sebelius*, 688 F.3d 994, 1001 (9th Cir. 2012) (cleaned up).

This is not the case here.  The State Rule on its face recognizes the agency's position in the *Defense Distributed* litigation, acknowledges that regulatory authority over 3-D firearms files will be in the hands of Commerce in the future, and explains that Commerce regulation will satisfy the national security and foreign policy interests at issue under the AECA.[23]  *See* Ex. 8, 85 FR 3823.  That is all that the APA requires, and Plaintiffs' mere preference for a different regulatory regime does not render the Rule arbitrary and capricious in light of the explanation provided. *See Azar*, 950 F.3d 1097 ("agency need not demonstrate . . . that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible . . ., that there are good reasons for it, and that the

---

[23] The administrative record further confirms that State's decision fully accounted for its prior position in the *Defense Distributed* litigation.  State's contemporaneous discussion in the National Security and Foreign Policy Analysis explains that State "took into account all aspects of the *Defense Distributed* and *Washington* cases," including "the position [State] took related to whether controls on the technical data that allow the 3-D printing of firearms are in the U.S. national security and foreign policy interests," when determining that "the transfer ... from the USML to the CCL was in the U.S. national security and foreign policy interest" and "the EAR controls on the publication of technology and software for 3-D printed firearms [in the Commerce Rule] were appropriate."  WASHSTATEB000387.

United States  Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

agency believes it to be better, which the conscious change of course adequately indicates").

### 4. Commerce's Rule Is A Logical Outgrowth Of The NPRM.

Plaintiffs' claim that the decision to add regulatory requirements to 3-D firearms files in the Commerce Rule is not a "logical outgrowth" of the NPRM, FAC ¶ 297, also fails. The Commerce Rule "'is in character with the original proposal and a logical outgrowth of the notice and comments,' and was therefore validly promulgated." *Hodge v. Dalton*, 107 F.3d 705, 712 (9th Cir. 1997) (quoting *Rybachek v. EPA*, 904 F.2d 1276, 1288 (9th Cir. 1990)). As noted above, both State and Commerce received comments concerning 3-D firearm files, which shows that "a reasonable commenter should have anticipated" that the rules would affect regulation of 3-D firearms files and that Commerce could regulate them alongside its regulation of the transferred small arms. *First Am. Discount Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C. Cir. 2000). The APA "does not require an agency to publish in advance every precise proposal which it may ultimately adopt as a rule." *Calif. Citizens Band Ass'n v. U.S.*, 375 F.2d 43, 48 (9th Cir. 1967). Rather, "[i]nformed changes and distinctions are the very *raison d'etre* of the notice-and-comment period," *Rybachek*, 904 F.2d at 1288, which means "[a] new opportunity for comment is not generated every time the agency reacts to comments that it receives." *Hodge*, 107 F.3d at 712. Agencies are entitled to adopt entirely new regulatory subdivisions in response to comments and concerns—particularly when those form a minor part of a larger regulatory scheme. *See Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 421 (D.C. Cir. 1994) (subsection "added in response to comments" that "hence appeared for the first time in the final rule" did not offend APA); *see also Ohio v. EPA*, 997 F.2d 1520, 1547 (D.C. Cir. 1993). This is particularly true where, as discussed above, the text of the regulatory scheme provides *Congress* with the opportunity to weigh in and exercise its legislative authority or negotiate with the Executive Branch over the agency action. *See supra* Part I.B. Plaintiffs' theory that Commerce's action to address congressional concerns, *see* WASHSTATE-B000008, violates the APA is illogical and would short-circuit the statutory "oversight role" of Congress that this Court previously deemed important. *In re DD Settlement*, 420 F. Supp. 3d 1143.

## CONCLUSION

For the foregoing reasons, Defendants should be granted summary judgment in this action.

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

Dated:  November 24, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

MATTHEW J. GLOVER
CHRISTOPHER A. BATES
Senior Counsels, Civil Division

*/s/ Eric J. Soskin*
ERIC J. SOSKIN
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW Room 12002
Washington, D.C. 20530
(202) 353-0533 (telephone)
(202) 616-8460 (facsimile)
eric.soskin@usdoj.gov

*Attorneys for Federal Defendants*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 24, 2020, I electronically filed the foregoing brief using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: November 24, 2020                          */s/ Eric J. Soskin*
                                                                    Eric J. Soskin

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533