UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | No. 2:20-cv-0111-RAJ |
| Plaintiffs, | **FEDERAL DEFENDANTS'** |
| v. | **MOTION FOR SUMMARY** |
| | **JUDGMENT** |
| UNITED STATES DEPARTMENT OF STATE, et al., | |
| Defendants. | |

# EXHIBIT 1

Cited Excerpts from Administrative Record

1. Excerpts from Bates Range WASHSTATEA  (PDF pages 2-9)
2. Excerpts from Bates Range WASHSTATEB  (PDF pages 10-43)
3. Excerpts from Bates Range DOSWASHINGTONSUP (PDF pages 44-98)

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

# PUBLIC SUBMISSION

**As of:** 7/13/18 8:05 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 13, 2018
**Tracking No.** 1k2-946l-r79w
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0486
Public comment 950. CTP Inc. Anonymous. 7-9-18

---

## Submitter Information

**Name:** Anonymous Anonymous
**Organization:** CTP, Inc.

---

## General Comment

BIS has noted in its proposed rule announcement that [t]he EAR does not include a concept of defense services, and the technology related controls are more narrowly focused and apply in limited contexts as compared to the ITAR. Consider that if ECCN 0E501 will control technology for the development, production, operation, installation, maintenance, repair, or overhaul of firearms controlled by new ECCN 0A501, then certain firearms training, which would have previously been an ITAR-controlled defense service, may now be NLR to many destinations.

BIS has also noted, If a gun manufacturer posts a firearms operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published operation and maintenance manual would no longer be subject to the EAR. Following this logic, consider the fact that if a gun manufacturer posts on the internet for unlimited distribution 0E501 technology for the production of a 0A501 firearm (e.g., 3D printer specs), then it is not an unauthorized technology transfer but rather publicly available information no longer subject to the EAR.

30 June 2018

To:      DDTCPublicComments@state.gov
         Office of Defense Trade Controls Policy, Department of State
              and
         Regulatory Policy Division, Bureau of Industry and Security, U.S. Department of
         Commerce, Room 2099B, 14th Street and Pennsylvania Avenue NW, Washington DC
         20230

Subject: ITAR Amendment - Categories I  II, and III
         EAR Amendment - RIN 0694-AF47

_____

I am writing to submit comments on the proposed changes to ITAR (USML) and EAR (CCL) recently published in the Federal Register. I write in a personal capacity but the views expressed are informed by my research, policy analysis, and teaching as a professor at the University of Michigan, Gerald R. Ford School of Public Policy.

By way of a few introductory remarks, I am familiar with the complexities of US arms export laws and policy, as well as the regulatory framework.  There is a legitimate need for periodic updates of the USML and—in view of the labyrinth of entangled laws, regulations, and agencies involved in the current system—I am supportive of the reform initiative.  I am generally more concerned about keeping weapons out of the hands of those who would misuse them than in making them easier to procure, but that end is not at odds with the objective of putting in place a single control list and a single administrative agency. The reform effort has not progressed to that point, however, and I am wary about these proposed regulatory changes as an interim step. I will also add that I have been following the export control reform project since it was announced in 2009 and this is the only time I have felt the need to express concerns about the proposed changes. That is largely due to the particular, complete and recognizable, weapons that are being considered for change.

**1.      I urge you to delay the effective date of the proposed changes until the Government Accounting Office or the Library of Congress has publicly reported to the Congress their impact on numerous statutes referring to "defense articles."**

If enacted, the changes would have implications for several provisions of law.  From my reading of both sets of proposed regulations, I am not reassured that the implications have been fully considered. The USML is formally defined in the AECA (22 USC 2778) as a definitive list of defense articles,[1] and from a quick search of US statutes the term "defense article" appears in some 45 sections,[2] in many instances (but

_____

[1] 22 USC 2778(a)(1).

[2] Office of the Law Revision Counsel, United States Code, http://www.uscode.house.gov.

WASHSTATEA10475

not always) explicitly linked to the USML. In addition, several provisions of the AECA itself are explicitly linked to an item's presence on the USML (without necessarily referring to "defense articles"). On a separate statutory track, the Foreign Assistance Act was recently amended to include CCL 600 series items as defense articles, along with all items contained on the USML [22 USC 2304.(d)(2)(C)], but the legislation did not anticipate the new 500 series so there is likely a gap there with regards to Congressional intentions. To complicate things further, the US Munitions Import List (USMIL) makes liberal use of the term "defense article," defined as articles on the USMIL–which currently include the same items that are slated to lose the "defense article" designation that extends from inclusion on the USML – so that items designated as defense articles on the USMIL will not be considered defense articles for purposes of export.[3]

It is very challenging to sort out the tangle.  Some of the instances where terms and definitions are at variance may not prove significant, but others may have far-reaching implications. Due to the disparate definitions and linkages, the proposal to remove specified firearms from the USML raises some important questions about the continuing applicability of provisions of law that refer to "defense articles," a term that currently encompasses such firearms.  In numerous situations the current statutory treatment of non-automatic firearms would be altered – or at least become ambiguous—as a result simply of moving these weapons from Category I of the USML to the 500-series on CCL. Statutory provisions that could be affected by the proposed change range from Export-Import Bank financing of defense article sales to human rights conditionality on security assistance, to the provisions for third-party transfer of grant-supplied defense articles, and various reports to Congress.  (See references in the footnote below.[4]) In some cases, the law in question is not directly linked to arms exports, but the relevant statute refers to defense articles and links the definition to items on the USML. In this way, removing specified firearms from the USML is likely to have a host of unintended and unanticipated repercussions.

Further, if semi-automatic weapons and other non-automatic firearms are removed from the USML it will impact the ability of law enforcement to charge weapons traffickers with violating the AECA as was done in several of the cases cited in a recent report from the Department of Justice on export enforcement.[5]

---

[3] 27 CFR 447.11 and 27 CFR 447.21.

[4] The numerous places where the meaning of "defense article" would be called into question by the proposed rules include:
> • Export-Import Bank financing of defense article sales, including multiple end use considerations and other conditions (12 USC 635);
> • Requirement to give Congress notice of commercial firearms sales of $1,000,000 or more (22 USC 2776)
> • Annual report to Congress on military assistance, and specifically on transfers of USML Category I firearms (22 USC 2415)
> • Provisions for supplying defense articles on a grant-basis, and multiple restrictions (22 USC 2314)
> • Conditions for third-party transfer of defense articles provided on a grant basis (22 USC 2314)
> • Certification of end use as a condition of sale or lease of defense article (22 USC 2753)
> • Post-delivery verification of credible reports of misuse of weapons (22 USC 2753)
> • Brokers of items included on the USML are required to register and activity must be licensed; exporters of USML items must identify all consignees and freight forwarders in license application (22 USC 2778)

[5] Department of Justice, "Summary Of Major U.S. Export Enforcement, Economic Espionage, And Sanctions-Related Criminal Cases," January 2018, https://www.justice.gov/nsd/page/file/1044446/download .

As Acting Assistant Secretary for Political-Military Affairs Tina Kaidanow explained to the House Foreign Affairs Committee last June,[6] the US arms export architecture is very complex and involves what her predecessors have described as "cradle to grave" oversight of exported US *defense articles*. Removing that designation *defense article* from weapons that are not fully automatic has the effect of detaching them from the US Munitions List and the regulatory framework built around it: there may well be significant unintended consequences.

In the event that consideration of the proposals is not delayed, I would recommend several other changes to the proposed ITAR and EAR revisions.

**2.      Retain existing USML I(a) and (d) unchanged; retain the existing coverage of USML II(a) unchanged; delete proposed 0A501.a and .b; and limit proposed 0A502 to renumbering existing 0A984.**

My concern here is based on principle and definition. Several of the weapons that would be moved to CCL are military-style weapons that are either used in battlefield situations or are substantially comparable to weapons as used in battlefield situations – including semi-automatic assault rifles and bolt-action sniper rifles. All of USML I(a), I(d), and II(a) are currently designated "significant military equipment" due to "their capacity for substantial military utility or capability," per the ITAR definition.[7]  The prevalence of armed extremists and insurgents who depend on weapons currently included in USML Categories I and II makes the military utility or capability of these weapons as relevant as ever. Due to their size and long shelf life, firearms are easily diverted and resold on black markets around the world. The Department of Justice's January 2018 summary of major US export enforcement cases noted above includes recent smuggling of semi-automatic assault rifles (and other firearms) to Dominican Republic, the Gambia, Russia via Latvia, Thailand and other destinations. In addition, the report documents the case of two men in Georgia attempting to export firearms to a range of international on the dark net, and another similar case from Kansas.[8]

While the US military may not derive great advantage from most of these weapons, they still have the military utility and capability of threatening the lives and welfare of many people around the world.   It is in the interest of the US and American citizens to keep the tightest control on them. Indeed, it is for that very reason that the same weapons being proposed for removal from the US Munitions List are expected to remain on the US Munitions *Import* List, where their entry into the US will remain tightly controlled. It is also for that reason that a growing number of states are imposing limitations on the retail availability of these weapons and many retailers are voluntarily removing them from their shelves.  They should remain where they are, on the USML.

---

[6]  "Foreign Military Sales: Process and Policy," testimony from Tina S. Kaidanow, Acting Assistant Secretary, Bureau of Political-Military Affairs, Statement Before the Subcommittee on Terrorism, Nonproliferation and Trade, House Foreign Affairs Committee, June 2017. https://www.state.gov/t/pm/rls/rm/2017/271928.htm.

[7] 22 CFR 120.7 at https://www.gpo.gov/fdsys/pkg/CFR-2004-title22-vol1/pdf/CFR-2004-title22-vol1-sec120-7.pdf .

[8] Department of Justice, op. cit..

**3.      Before proposed regulatory changes are adopted, an opinion should be obtained from the Department of Justice concerning the legality of applying ITAR brokering restrictions to exports of firearms transferred from the USML to the CCL.  Furthermore, Congress and the public should be informed as to how the proposed arrangements will address the risk of diversion.**

There are several reasons to be concerned about the proposed rules pertaining to brokering.
From their origin in the 1930s, a major intent of efforts to regulate arms exports has been to curtail illicit and undesirable trafficking in weapons. In the 1980s and 1990s, illicit flows of small arms flooded international markets, with calamitous effects in every region of the world. The rate of flow may have slowed since the 1990s, but as the 2018 Justice Department report attests, the efforts to supply contraband firearms are very much alive in our own time. From a global perspective, brokering laws are considered a weak link in the regulatory apparatus, to the extent that in the 1990s there was some talk of negotiating an international treaty focused entirely on arms brokering. Provisions written into US law around that time were considered some of the strongest in the world. With the transfer of specified semi-automatic and non-automatic weapons to CCL, the brokering laws would no longer be applied to these weapons (or would be applied only in a much-weakened version) and they would not be available to law enforcement for prosecution purposes.

**My specific concerns with the proposal to apply existing AECA/ITAR brokering rules to items intended for transfer to the CCL are twofold, related to the dubious statutory underpinnings of the proposed rule change and to its practical implications.**

(a) <u>The first concern is a matter of statutory coherence and proper statutory authority</u>. The brokering clauses of the AECA require commercial brokers involved in the transfer of defense articles to register with the State Department and apply for their transactions to be licensed (22 USC 2778).[9] The AECA brokering provisions are explicitly linked to defense articles on the USML (and by implication, ITAR). Because the proposed changes to ITAR and CCL would remove specified non-automatic and semi-automatic firearms from the USML, on the face of it, it would seem that commercial brokers of these items would be released from ITAR registration and brokering requirements. To prevent this outcome, the State Department proposes a patch, by asserting that the AECA brokering provisions will also apply to the US Munitions *Import* List (which, as noted above, will continue to include the items that—for export purpose—are deemed no longer to warrant control under the USML). The intended effect is that brokers wanting to *export* items included on the list of items controlled as defense articles for *import* (but not for export) will be subject to the rules pertaining to the export of such items. The logic is convoluted at best, and it raises questions about the statutory grounding for requiring brokers who are exporting items "no longer warranting control under USML" to register with the State Department and comply with related ITAR requirements. Given the complexity of the issue and the risks associated with brokering activities, it would seem advisable and prudent to seek a legal opinion within the Executive Branch to ensure that the provisions of the AECA pertaining to brokers—including the registration requirement-- can be applied

---

[9] Per 22 USC 2778 (b)(1)(A)(i), "…every person (other than an officer or employee of the United States Government acting in official capacity) who engages in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President under subsection (a)(1), or in the business of brokering activities with respect to the manufacture, export, import, or transfer of any foreign defense article or defense service (as defined in subclause (IV)), shall register with the United States Government agency charged with the administration of this section, and shall pay a registration fee which shall be prescribed by such regulations.

robustly to all involved in the wide range of brokering activities associated with the *export* of items on the US Munitions Import List.[10] Such a legal opinion should be obtained and considered before the regulatory changes are adopted.

(b) The second issue about brokering rules relates to the practical effects of the numerous proposed changes to ITAR section 129. It is hard to imagine, in the first place, the steps by which the licensing of a transaction will be handled by Commerce and any brokering aspects (including completion of information required by 22 CFR 129.6) will be handled by State. It boggles the mind to consider how this might actually amount to a time-saving simplification of rules. I am primarily concerned about the proposed amendment 129.2(b)(2)(vii), however, which appears to negate the controls on brokering for transactions subject to EAR and open a significant loophole for unscrupulous brokers. If I have understood the proposed changes to Section 129.2 correctly, if a Michigan-based retail sports outlet licensed to sell firearms in the US wanted to sell, say, AR-15 semi-automatic rifles to clients in another country, then so long as the Michigan retailer could secure approval via the BIS licensing process, the various parties involved in shipment, financing, and possibly transshipment would be exempt from any registration and approval requirements. Nor would they necessarily be known to licensing and enforcement agents based in the Commerce Department. What in this scenario would deter an unknown and independent handler from diverting the weapons to unauthorized end-users? I would like to assume that government officials in the State and Commerce Departments have thought through the implications of the proposed rules as they might be bent for nefarious purpose as well as their service for industry cost and convenience, but the published rules do not provide assurance in that regard. **More clarification is needed about how the brokering regulations will be applied, how the inter-agency process will be managed, and the extent to which the proposed arrangements for registering and licensing brokers involved in acquiring, financing and transporting exported firearms will address the risk of diversion to non-authorized end-users.** One effect of transferring non-automatic firearms from the USML to the CCL is to remove them from the remit of the State Department's Blue Lantern program, which otherwise might be engaged to make post-shipment checks. It is not clear whether Commerce has a comparable program or what resources it will assign to monitoring the commerce in semi-automatic firearms.

4.      **Amend proposals for EAR Section 734.**

BIS has indicated that items moving "to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to 'development' and 'production,' as well operation, installation, and maintenance 'technology.'" This approach would appear to give rise to the possibility of widespread and openly sanctioned circulation of open source, non-proprietary instructions for using computer-aided design (CAD) files to produce via 3D-printing technology, or text files to produce via CNC milling the firearms removed from USML. Until now, this development has been blocked in the courts via application of ITAR provisions requiring export license. **Either the Department of Commerce should clarify that it views any software instructions for producing controlled firearms already to be within the ambit of the EAR, or EAR Section 734.7 should be amended to bring circulation of open-source, non-proprietary CAD and other electronic files under EAR control - possibly by establishing that electronic files for producing functional firearms are subject to EAR control as production technology.**

---

[10] When questions arose in 1996 as to the authority of the President to restrict munitions imports under the AECA, the Office of Legal Counsel in the Justice Department was asked to provide an opinion. A similar request for opinion is warranted here. See https://www.justice.gov/sites/default/files/olc/opinions/1996/02/31/op-olc-v020-p0049_0.pdf .

5.      **Amend provisions for License Control – Crime Control**

Shotguns controlled under 0A502 are subject to the Crime Control because they are not controlled by Wassenaar. It is not evident, however, why items 0A501a are controlled for Regional Security but not Crime Control, as firearms are a main element of crime control equipment used by police and security forces. Moreover, federal statutes explicitly prohibit the export of crime control equipment to police and security forces in countries whose governments have a consistent pattern of gross violations of internationally recognized human rights, with exceptions requiring Presidential certification. **To bring the proposed regulations into alignment with provisions of the Foreign Assistance Act [22 USC 2304(a)(2), which makes explicit reference to crime control equipment under the aegis of the (expired) Export Administration Act], items in 0A501A should be subject to Crime Control.**

6.      **Include information from enhanced reporting on certain firearms exports in annual 655 Report.**

Enhanced reporting of items in the 501 series is potentially one bright spot in the proposed regulations. Several proposed changes are welcome, including: proposed changes in EAR part 748 requiring information about required import licenses; proposed changes in reporting mandated in EAR part 758; the required use of EEI filing for 0A501.a firearms; and the proposed recordkeeping requirement in part 762.

If the proposed rules are ultimately accepted, the information provided to the Wassenaar Arrangement and the UN Register of Conventional Arms will provide more granular information about US commercial exports of firearms, which seemingly could be included without significant additional effort in the annual 655 report mandated by the Foreign Assistance Act, 22 USC 2415.

**7. The balance of costs and benefits significantly favors industry over the taxpayer.**

The two sets of proposed rules include calculations of expected costs and benefits of the changes. Having invested several hours parsing the proposed rules, I suspect that one major benefit of the changes will accrue to the attorneys who help clients wend their way through federal regulations. The registration system as it was initially set up was intended to pay for itself, via modest registration and licensing fees that covered the costs of recording and updating information on US arms manufacturers and reviewing details for proposed transactions. In some sense, it has been a fee-for-service arrangement. The proposed changes significantly alter that approach with regards to firearms proposed for transfer to the CCL.

Except for the presumably few brokers unable to qualify for the firearms registration exemption outlined in proposed changes to ITAR section 129.2, no registration or license fees will be collected. Some of the transactions may be straightforward, but the workload promises to be substantial, with 4000-10,000 applications and virtually every 0A501 transaction subject to at least regional security controls, with no license exceptions available. **Whereas under the current system fees paid by industry and brokers help offset the costs of processing the license applications, under the proposed system the expenses associated with reviewing license applications will be charged to the taxpayer.** In the current political environment where government hiring is anathema, unless a streamlined new process delivers extraordinary returns, it is difficult to imagine how the tally could come out in the taxpayer's favor without

significant sacrifice of quality control. With respect to firearms exports, taxpayers and the public at large should be concerned about pressures to cut corners that could result in authorization of irresponsible transfers. **In my view as a taxpayer, the ITAR fee structure is yet one more reason for retaining non-automatic and semi-automatic firearms on the USML, and should these weapons ultimately be transferred to the CCL, I urge public officials at the Commerce Department to explore charging a service fee for processing export license applications.**

## Conclusion

I appreciate the opportunity to comment on these rules. I am disappointed, however, that by and large they downplay the lethality of the weapons currently controlled in ITAR categories I and III. I realize that these documents were prepared for a different purpose than the materials posted to inform the global public about US government programs and policy, but **the difference between the tone and emphasis of the proposed rules and the public presentation of US policy on the export of small arms and light weapons over the past twenty years is striking**. By contrast to the public statements and documents, including the 2017 Congressional testimony by a State Department official, the emphasis in these regulations is on reducing transaction costs for industry rather than promoting the public good, including national security and public safety.

In response to public comments on the proposed regulatory changes, I hope that the Departments of State and Commerce will reconsider the proposal to transfer any complete weapons from the USML to CCL. In the event that the proposed regulations go forward substantially unchanged, I can only hope that other countries will tighten and strictly enforce their own import restrictions to reduce the risk of diversion and misuse.

Thank you,

Susan Waltz
Professor
Gerald R. Ford School of Public Policy
University of Michigan
Ann Arbor, Michigan

swaltz@umich.edu

```
REC1|APPROVE|1-10-2020|S Approved.
REC2|APPROVE|1-10-2020|S approved.
```



202000035

**United States Department of State**

*Washington, D.C.   20520*

<u>SENSITIVE BUT UNCLASSIFIED</u>                                    January 6, 2020

**ACTION MEMO FOR THE SECRETARY**

FROM:        PM – R. Clarke Cooper

SUBJECT:   (SBU) Amendment to the International Traffic in Arms Regulations (ITAR):
                    Revision of U.S. Munitions List (USML) Categories I, II, and III

**BLUF:**      (SBU) PM seeks your approval to publish a final rule revising USML Categories
                    I, II, and III (i.e., controls on firearms and related items).  We seek your approval
                    on a way forward. ███████████████████████████████████████
                    but Sen. Menendez placed a hold on the action until a particular concern is
                    addressed.

**Recommendations**
(SBU) That you:
   (1) Sign on January 10 the Federal Register notice authorizing publication of revisions to the
         ITAR as a final rule, even if Senator Menendez continues to maintain a hold on
         publication.  This will provide the Department time before the rule is actually published
         to attempt to address Menendez's concerns ██████████████████████████████
         ████████████████████████.  (Approve/Disapprove by 1/10/20)

   (2) Concur that this rule is not a "major" rule for the purposes of the Small Business
         Regulatory Enforcement Fairness Act of 1996.  (Approve/Disapprove by 1/10/20)

**Background**
(U) Since 2010, the Department has worked to revise the USML to limit it to defense articles
providing the United States with a critical military or intelligence advantage or, in the case of
weapons, having an inherently military function.  Revising the USML is in the Implementation
Plan to the Conventional Arms Transfer Policy (NSPM-10), which seeks to ensure protection of
defense technology needed to preserve U.S. interests while supporting U.S. defense-industrial
base efforts to expand trade.  Items determined no longer to warrant control on the USML are
removed and subsequently controlled on the Commerce Control List (CCL) through a separate,
but simultaneously published, companion rule.  (Such exports are *not* decontrolled; the principal
authorization role simply shifts to Commerce.)

(U) On May 24, 2018, the Department published a proposed rule to revise three USML
Categories: I (firearms and related articles), II (guns and armaments), and III (ammunition and
ordnance).  After solicitation and review of public comments on the proposed rule, the
Department drafted a final rule to revise the USML.  The final rule would remove items from the
USML, including: 1) most semi-automatic and non-automatic firearms; 2) most firearm parts and
components, other than silencers and magazines greater than 50 rounds; and 3) most firearm

-2-

ammunition, unless belted or linked.  The Department's rule was reviewed and cleared by the interagency through an OMB-led process.

(SBU) Subsequent to OMB's approval and pursuant to Section 38(f)(1) of the Arms Export Control Act (AECA), the Department notified Congress in February 2019 of its intent to remove items from the USML.  This notification included the Commerce rule that would impose CCL controls on items removed from the USML.  On February 22, 2019, Senator Menendez placed a "hold" on the action "until such time as [his concerns] are sufficiently addressed," noting (1) Commerce's limited controls on information for 3D-printing firearms, and (2) Congressional oversight on exports of firearms transferring to the CCL.  Following the notification, Commerce revised its rule to control certain information concerning the 3D-printing of firearms.

(SBU) Both rules were again cleared by the interagency, and a new notification pursuant to Section 38(f)(1) of the AECA was submitted to Congress on November 12, 2019.  This notification superseded the previous notification and expired on December 12, 2019.  On December 10, Senator Menendez again placed a hold on the action.  His letter acknowledged that Commerce had addressed his concern about 3D-printed firearms but declared that his hold would remain, as also noted in his February 2019 letter, until a mechanism is established to "immediately [inform Congress] of any proposed license to export firearms formerly controlled on the USML at the appropriate dollar threshold mandated in the [AECA]."

(SBU) In a meeting with Menendez's staff on December 23, 2019, Commerce offered regular briefings on firearms export licenses it had issued.  Menendez's staff stressed that the Senator sought to review pending (not already-approved) licenses, but that it would take the offer to him, and requested a delay in publication prior to his reply.  The Department is working to schedule a meeting with Menendez on January 7 in order to allay his concerns.

Currently, under the tiered review process State uses for such transfers under the USML, Congress is given advanced notification of significant firearms exports.

(SBU) he rules are ready for signature and publication, with the changes in the rules taking effect 45 days after publication.

(U) The final rule does not meet the criteria for being a "major" rule under P.L. 104-121, because 1) the annual effect on the economy will not be $100,000,000 or more; 2) there will be no major

-3-

increase in costs or prices for consumers, individual industries, federal, state, or local government agencies, or geographic regions; and 3) there will be no adverse effects on competition, employment, investment, productivity, innovation, or on the ability of U.S.-based enterprises to compete with foreign-based enterprises in domestic and foreign markets.

Attachments:
        Tab 1 – Overview of Department Efforts to Revise USML Categories I, II, and III
        Tab 2 – Background on "Major" vs. "Non Major" Rules
        Tab 3 – February 2019 Senator Menendez Letter
        Tab 4 – December 2019 Senator Menendez Letter

*Available upon request:*
Federal Register Notice for Department of State Final Rule
Federal Register Notice for Department of Commerce Final Rule

SENSITIVE BUT UNCLASSIFIED
-4-

Approved:     PM – R. Clarke Cooper               RCC

Drafted:      PM/DTCP:  Sarah Heidema, ext. 3-2809 and cell: ███████

Clearances:   T              Chris Ford               OK
              D              Brett Eggleston          OK
              P              Melanie Carter           Info
              S/P            Michael Urena            OK
              PM/DDTC        Michael Miller           OK
              PM/DTCP        Sarah Heidema            OK
              PM/DTCC        Julia Tulino             OK
              PM/DTCL        Catherine Hamilton       Info
              PM/DTCM        Neal Kringle             Info
              L              Josh Dorosin             OK
              L/PM           Joe Khawam               OK
              L/M            Alice Kottmyer           OK
              L/LFA          Shawn Pompian            OK
              PM/CPA         Josh Paul                OK
              ISN            Renee Sonderman          OK
              T              Maureen Tucker           OK
              H              Mary Taylor              OK
              A/DIR           Yvonne Peckham          OK
              CGFS/GAO       Julianne Shinnick        OK
              DRL            Asa Miller               Info by Request
              GPA            Kim Liao                 OK
              R              Heidi Smith              OK

SENSITIVE BUT UNCLASSIFIED

202000035

16. Section 129.6 is amended by revising paragraph (b)(3)(i) to read as follows:

**§ 129.6 Procedures for obtaining approval.**

* * * * *

(b) * * *

(3) * * *

(i) The U.S. Munitions List (*see* § 121.1 of this subchapter) or U.S. Munitions Import List (*see* 27 CFR 447.21) category and sub-category for each article;

* * * * *

_____

**Michael R. Pompeo,**
*Secretary of State.*

**Billing Code 4710-25**

85

WASHSTATEB000005

SENSITIVE BUT UNCLASSIFIED

## Overview of State Department's Efforts to Revise
## U.S. Munitions List Categories I, II, and III

(SBU) <u>Background on Ongoing U.S. Munitions List Review</u>:  Since 2010, the Department has engaged in an effort to revise the U.S. Munitions List (USML) to limit its scope to those defense articles providing the United States with a critical military or intelligence advantage or, in the case of weapons, having an inherently military function.  This effort is transforming the USML into a "positive" list that describes controlled items using objective criteria.  Categories I (firearms and related articles), II (guns and armaments), and III (ammunition and ordnance) of the USML are the final three categories to be subject to initial revision.  Reviewing and revising the USML is also a key line of effort of the Implementation Plan to the Conventional Arms Transfer (CAT) Policy (NSPM-10) and seeks to help ensure that defense technology needed to preserve U.S. interests is protected, while supporting the U.S. defense-industrial base's efforts to expand commercial defense trade.  As part of this effort, items determined no longer to warrant control on the USML are transferred to Commerce's Commerce Control List (CCL) through a separate, but simultaneously published, companion rule.

(U) <u>Interagency Review of Categories I-III</u>:  The Department led an interagency process to identify those items in USML Categories I-III that the Department will continue to control on the USML, based on whether those items provide the United States with a critical military or intelligence advantage or, in the case of weapons, perform an inherently military function and thus warrant control on the USML.  The result of the review is that certain items on the USML were determined not to meet this standard.  These items were proposed for transition to the CCL.  Such items included:  1) most semi-automatic and non-automatic firearms; 2) most firearm parts and components, other than silencers, magazines greater than 50 rounds, parts and components to convert a semi-automatic firearm to a fully-automatic firearm, and accessories or attachments for automatic targeting or stabilization; 3) most firearm ammunition, unless belted or linked; and 4) many of the minor parts and components of large guns, such as howitzers and artillery pieces.  Removal of these items will enable the Department to improve significantly its regulation of defense articles and services that warrant continued control on the USML.  Tab 3, attachment 2, describes in greater detail the national-security and foreign-policy analysis underlying the rule change.

(SBU) <u>Drafting Proposed Rules</u>:  Following the initial review, State and Commerce began drafting proposed rules to implement the transfer of items from Categories I-III of the USML to the CCL.  On May 24, 2018, the Department published its proposed rule in the Federal Register to revise Categories I-III (tab 3, attachment 3).  Commerce published its companion proposed rule on the same date (tab 3, attachment 4).  These rules solicited public comment on the proposed transfer.  The Department received more than 3,000 public comments and correspondence from members of Congress.  The proposed rule engendered a great deal of public attention, given that it involved transferring regulatory control of firearms and technical data related to the 3D printing of guns.

(SBU) <u>Drafting Final Rules</u>:  State and Commerce each reviewed their respective public comments in preparation for drafting the final rules.  The draft final rules addressed the public

comments received in the preambles.  The draft final rules were reviewed and cleared by the interagency (including DoD) through an OMB-led process.

(SBU) <u>Initial Notification to Congress</u>:  Subsequent to the OMB's approval and pursuant to an informal review process established in consultation with Congress in 2011, the Department provided to Congress on January 3, 2019, informal notification of the intent to transfer certain items in Categories I-III of the USML to the CCL.  On February 4, 2019, pursuant to Section 38(f)(1) of the Arms Export Control Act (AECA), the Department formally notified Congress of its intent to transfer these items (tab 3, attachment 8).  The Congressional notification included the regulatory text of the draft Commerce final rule that would impose CCL controls on the items removed from the USML.

(U) <u>Commerce Controls of Physical Items Transferred</u>:  In its draft final rule, Commerce imposed an export-license requirement on most of the physical items removed from categories I-III of the USML, including all of the firearms (with the exception of firearms manufactured prior to 1898) and ammunition.  Consistent with existing processes for the review of Commerce license applications, ISN will review all Commerce export-license applications for firearms and provide foreign-policy guidance.

(SBU) <u>Commerce Controls of Technical Data Transferred – 3D Printing of Firearms</u>:  In addition to transferring physical items to the CCL, the Department of State's draft final rule would transition to the CCL certain technical data, including the data for semi-automatic and non-automatic firearms.  Under the CCL regulatory framework in place for Commerce's proposed rule and draft final rule notified to Congress in February 2019, the technical data could be publicly released without prior government authorization.  This generated substantial public and Congressional interest, especially in the area of controls over 3D-printed guns and associated technical data (tab 3, attachments 5, 6, and 9).  The President weighed in on the issue in July 2018, shortly after the publication of the proposed rules and the Department's settlement with Defense Distributed, tweeting, "I am looking into 3D Plastic Guns being sold to the public.  Already spoke to NRA, doesn't seem to make much sense!" (tab 3, attachment 10).  Following additional interagency discussion and consideration of this issue, Commerce amended the current CCL regulatory framework through its final rule to control the publication of technical data associated with 3D printing of guns.

(SBU) <u>Revision of Final Rules</u>:  Following Commerce's decision, the regulatory text of the draft Commerce final rule was revised to impose controls on certain technology and software capable of producing 3D-printed firearms when posted on the internet.  As described in further detail below, this change addressed concerns raised by some members of Congress and the public about 3D-printed firearms.  The preambles to State's and Commerce's draft final rules were also revised to make conforming edits.  The draft final rules then were once again cleared by the interagency (including DoD) through OMB.

(SBU) <u>Congressional and Public Concerns Addressed in the Final Rules</u>:  The draft final rules, where appropriate, have addressed the concerns raised by the public and Congress and include a review of public comments.  Media, civil society, and academia have also expressed their views through various publications, representative samples of which are provided in tab 3, attachment 9.  Some of the concerns – such as the publication of technical data for 3D-printed guns, as described above – have been addressed in coordination with Commerce through amendments that will be reflected in the final rules.  Other concerns do not warrant any changes in the final rules because they are not grounded in fact.  For example, one concern often expressed is that transferring control of certain firearms from State to Commerce will result in the deregulation of U.S. firearm exports, thereby increasing the numbers of U.S.-manufactured small arms around the world and contributing to armed conflicts abroad.  The transfer of such firearms, however, does not deregulate the export of firearms.  All firearms transferring from the jurisdiction of State to the jurisdiction of Commerce will continue to require authorization for export.  The Department sought to address these types of arguments by publishing a fact sheet that explains the effects of the transfer (tab 3, attachment 12).  The Department, together with Commerce and DoD, also held a roundtable with NGOs and advocacy organizations to listen to their concerns and correct any misconceptions (tab 3, attachment 20).  There were some concerns raised that were factual but nonetheless did not warrant any changes in the final rules.  For example, one concern expressed was that the rules would reduce Congressional oversight of arms transfers, because Commerce is not subject to the same Congressional notification requirements for firearm exports as State.  While it is true that Commerce is not currently subject to the same congressional notification requirements for firearm exports, we do not believe this fact warrants any changes in the final rules.  Firearms that we deemed through the interagency review process to warrant continued control under the ITAR as defense articles will remain subject to the congressional notification requirements in the AECA.  Congress will therefore retain its oversight role over these exports of firearms.

(SBU) <u>Menendez "Hold"</u>:  Following the Department's February 2019 Congressional notification, the Department received a letter from Senator Bob Menendez (D-NJ) dated February 22, 2019, purporting to "place a hold on the Congressional notification … until such time as [the following  issues] are sufficiently addressed":  1) Congressional oversight of exports of firearms over specified value thresholds is maintained, and 2) Department of Commerce ability to control the public release of technical information related to 3D gun printing (tab 5).  As described above, Commerce is addressing Menendez's second concern through its final rule, but these changes do not address his first concern.

(SBU) <u>Department Issues New Congressional Notification</u>:  After briefing the Secretary (tab 3, attachment 14) and obtaining his approval (tab 3, attachment 15), the Department submitted a new 38(f) notification on November 12, 2019, to inform the Congress about Commerce's proposed controls over the publication of technology and software to enable the 3D printing of firearms (tab 3, attachment 16).  This notification superseded the previous February notification.  The associated 30-day notification period expired on December 12, 2019.  During that notification period, the Department received a letter from Menendez dated December 10, 2019, reasserting his first concern in his February 2019 letter that "the Senate Foreign Relations and House Foreign Affairs committees must be immediately informed of any proposed license to export firearms formerly controlled on the USML at the appropriate dollar threshold mandated in

SENSITIVE BUT UNCLASSIFIED
-4-

the Arms Export Control Act" and purporting to place a "hold" until this concern has been addressed (tab 6). While the Department generally seeks to address Congressional concerns before proceeding with activities following a notification to Congress, there is no legal requirement to implement "holds" placed by a member of Congress, including "holds" on a regulatory process. However, failure to address Menendez's "hold" would almost certainly have far-reaching consequences for other Department business pending before SFRC, such as nominations.

(SBU) <u>Legislative Efforts to Forestall the Rule Change</u>:  In addition to sending correspondence, some members of Congress sought to forestall the contemplated transfer through the legislative process.  The House adopted an amendment to the National Defense Authorization Act for FY 2020 (FY 2020 NDAA) proposed by Representatives Eliot Engel (D-NY), the Chairman of the House Committee on Foreign Affairs, and Norma Torres (D-CA) that would prohibit the President from removing from the USML "any item that was included in category I, II, or III of the United States Munitions List, as in effect on August 31, 2017" (tab 3, attachment 13). However, according to the Conference Report for the FY 2020 NDAA, the House amendment was not included in the FY 2020 NDAA conference bill (tab 3, attachment 17) and therefore was not enacted as part of the FY 2020 NDAA signed by the President on December 20, 2019.

(SBU) <u>Lawsuits Related to Controls on 3D-Printed Firearms</u>:  Over the last year and a half, the Department defended a lawsuit brought by several states and the District of Columbia (*Washington v. State*) related to the 3D printing of firearms.  This lawsuit arose after the Department entered into a settlement agreement and filed a stipulation of dismissal with private plaintiffs in a separate case (*Defense Distributed v. State*), thereby allowing the public release of certain technical data to enable 3D printing of firearms (tab 3, attachment 18).  The court in the *Washington* litigation entered a preliminary injunction enjoining the Department from complying with the settlement agreement in *Defense Distributed*.  After considering cross motions for summary judgment and the parties' various written submissions, the court granted the plaintiffs' request to vacate certain actions taken by the Department in furtherance of the settlement agreement that were intended to permit the public release of certain technical data to enable 3D printing of firearms (tab 3, attachment 19).  The Department's final rule will move the technical data that was at issue in this lawsuit from the USML to the CCL, and a Commerce license will be required prior to the posting on the Internet of certain technology and software that could enable 3-D printing of firearms.  L advises that ███████████████████████████████

<u>Available upon request</u>:
> Attachment 1: CAT Policy and Implementation Plan Fact Sheet (Full Implementation Plan Available on S//NF System)
> Attachment 2: National Security and Foreign Policy Analysis
> Attachment 3: Department of State Proposed Rule
> Attachment 4: Department of Commerce Proposed Rule
> Attachment 5: Public Comments to the Department of State Proposed Rule
> Attachment 6: Congressional Correspondence
> Attachment 7: Public Comments to the Department of Commerce Proposed Rule

<u>SENSITIVE BUT UNCLASSIFIED</u>
-5-

Attachment 8:  January and February 2019 Congressional Notification
Attachment 9:  Representative Samples of Media, Civil Society, and Academia Publications
Attachment 10: President Tweet
Attachment 11:  SOCs for Small Group on Categories I-III
Attachment 12:  Categories I-III Draft Roll-Out Plan & Fact Sheet
Attachment 13:  Section 1050 of the FY 2020 House NDAA Bill
Attachment 14:  IM for S on Categories I-III
Attachment 15:  November 2019 AM for S on Congressional Notification
Attachment 16:  November 2019 Congressional Notification
Attachment 17:  FY 2020 NDAA Conference Report
Attachment 18:  Defense Distributed Case:  Key Documents
Attachment 19:  Washington Case:  Key Documents
Attachment 20:  Readout of NGO Roundtable (12-12-19)

SENSITIVE BUT UNCLASSIFIED
-6-

Approved:      L/PM – Jeffrey Kovar

Drafted:       L/PM – Joseph Khawam, ext. 7-8546 and cell: ██████████

Clearances:    D                Brett Eggleston          OK
               P                Melanie Carter           Info
               S/P              Michael Urena            OK
               PM/DDTC          Michael Miller           OK
               PM/DTCP          Sarah Heidema            OK
               PM/DTCC          Julia Tulino             OK
               PM/DTCL          Catherine Hamilton       Info
               PM/DTCM          Neal Kringle             Info
               L                Josh Dorosin             OK
               L/PM             Joe Khawam               OK
               L/M              Alice Kottmyer           OK
               L/LFA            Shawn Pompian            OK
               PM/CPA           Josh Paul                OK
               ISN              Renee Sonderman          OK
               T                Maureen Tucker           OK
               H                Mary Taylor              OK
               A/DIR:           Yvonne Peckham           OK
               CGFS/GAO         Julianne Shinnick        OK
               DRL:             Asa Miller               Info by Request

### "Major" versus "Non Major" Rule

For the purposes of the Small Business Regulatory Enforcement Fairness Act of 1996 (the "Act"), a "major" rule is a rule that the Administrator of the OMB Office of Information and Regulatory Affairs finds has resulted or is likely to result in:

(a) an annual effect on the economy of $100,000,000 or more;

(b) a major increase in costs or prices for consumers, individual industries, federal, state or local government agencies, or geographic regions; or

(c) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and foreign markets.
(5 U.S.C. 804(2))

In our assessment, this International Traffic in Arms Regulation (ITAR) change, while important to U.S. foreign policy and national security, does not meet the criteria in the Act for being a "major rule."  However, the OMB Office of Information and Regulatory Affairs may make a determination that the definition or criteria of a major rule have been triggered to meet the statutory criteria described above.

JAMES E. RISCH, IDAHO, CHAIRMAN

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

## United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

February 22, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20520

Dear Secretary Pompeo:

On February 4, 2019, I received a congressional notification from the Department for a proposal to transfer responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I write to inform you that I am placing a hold on the congressional notification, pursuant to the authority of Section 38(f) of the Arms Export Control Act (AECA).

I am deeply concerned about this proposed transfer. As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely used by military and security services – are uniquely dangerous. They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more, not less, rigorous export controls and oversight.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

Consequently, my hold will remain in place until such time as the issues identified below are sufficiently addressed.

1) Removal of Firearms Exports from Congressional Information and Review
The AECA enables congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests. Congress took action in 2002 to ensure that the sale and export of these weapons would receive stringent oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL would directly

WASHSTATEB000013

contradict congressional intent and effectively eliminate congressional oversight and potential disapproval of exports of these weapons. Congressional oversight must be retained.


2) Proliferation of 3D Gun Printing Technical Information

There is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests. The Department of Commerce claims that it cannot, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally. This is outrageous and simply unacceptable given the dangers it poses to U.S. citizens and interests.

Moreover, it may also be at variance with recent law. Section 1758 of the Export Control Reform Act of 2018 authorizes the Secretary of Commerce to control "emerging and foundational technologies" that (A) are essential to the national security of the United States; and (B) are not critical technologies described in clauses (i) through (v) of section 721(a)(6)(A) of the Defense Production Act of 1950. 3D printing has been identified by this Administration as an emerging technology of concern, and the Department of Commerce itself used 3D printing as an example of "emerging technology" in its November 19, 2018 Federal Register notice seeking public comment on what constitutes emerging technologies pursuant to this new statutory charge. Then-Secretary of Defense Mattis twice mentioned the challenges of 3D printing in congressional testimony, and Director of National Intelligence Coats, in his 2018 Worldwide Threat Assessment of the U.S. Intelligence Community, stated that, "[a]dvances in manufacturing, particularly the development of 3D printing, almost certainly will become even more accessible to a variety of state and non-state actors and be used in ways contrary to our interests."

It would seem axiomatic that the capability to 3D-print lethal weaponry that cannot easily or reliably be detected by metal detectors at airports, schools, governmental or other facilities (including the U.S. Capitol and the Department of State) would qualify as an emerging technology in need of regulatory control. Yet, the Commerce Department has told my staff that the interagency process to identify emerging and foundational technologies to be controlled has not been completed, and is unlikely to be completed for months. By proceeding with the transfer of firearms, including 3D printing technical information, to Commerce, the Administration is acting recklessly and endangering innocent lives. It should go without saying that we collectively need to understand the threat and have a plan to address this issue before making the regulatory change.

Moreover, the Department of Commerce would seem to have adequate additional regulatory authority to control 3D gun printing information, at least temporarily. Commerce can control any item for foreign policy reasons under the miscellaneous category of 0Y521, according to a final rule issued by Commerce in 2012. Preventing foreign terrorists and thugs from acquiring

the means to print undetectable guns to use against U.S. citizens is a sufficient foreign policy justification to control this technology from public release.

Ultimately, the specific provision of the Export Administration Regulations is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control.  Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.

I look forward to your prompt response to my concerns.

Sincerely,

Robert Menendez
Ranking Member

CC: The Honorable Wilbur Ross, U.S. Secretary of Commerce

WASHSTATEB000015

JAMES E. RISCH, IDAHO, CHAIRMAN

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

December 10, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C.

Dear Secretary Pompeo:

On February 4, 2019, I received congressional notification from the Department, pursuant to the authority of section 38(f) of the Arms Export Control Act (AECA), for the proposed transfer of responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I wrote to inform you on February 22 that I was placing a hold on that congressional notification. On November 12, 2019, the Department submitted a new 38(f) notification in response to a proposed regulatory change by the Department of Commerce. I write to inform you that I am placing a hold on the November 12, 2019 notification for the reasons detailed below.

As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely in-use by military and security services - are uniquely dangerous.  They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more rigorous export controls and oversight, not less.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

My hold will remain in place until such time as the issue identified below is sufficiently addressed.

1) Removal of Firearms Exports from Congressional Information and Review
The AECA provides for congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests.  As you know, Congress took action in 2002 to ensure that the sale and export of these weapons would receive closer scrutiny and oversight, including by amending the AECA to set a lower congressional reporting threshold (from $14 million to $1 million) specifically for firearms on the USML.  Moving such firearms from the USML to the CCL would effectively eliminate congressional oversight of exports of these weapons by eliminating this congressional reporting requirement, and would be directly contrary to congressional intent.

To that end, I reiterate my demand from my previous letter: the Senate Foreign Relations and House Foreign Affairs committees must be immediately informed of any proposed license to export firearms formerly controlled on the USML at the appropriate dollar threshold mandated in the Arms Export Control Act. This concern must be satisfactorily addressed before I will lift my hold.

2) Proliferation of 3D Gun Printing Technical Information

In my February letter, I expressed that there is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests. The Department of Commerce claimed that it could not, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally. I wrote that:

> *Ultimately, the specific provision of the Export Administration Regulations that is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control. Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.*

I understand that the Department of Commerce has now decided to alter its regulations to address this concern; technical information related to the manufacture of firearms, to include 3D-printing information, proposed for transfer to the CCL will be prohibited from publication or Internet posting without a license. That does seek to address my previously-expressed concern, and I will not insist on this to lift my hold. However, I note that this improvement could easily be undone through a simple regulatory change in the future that would not even require congressional notification or review; a statutory authority to maintain such licensing, or better yet, an outright prohibition, may be required. Moreover, Commerce must maintain a policy of "presumption of denial" for any license application sought to publish or post such information, and pursue any violations vigorously.

Sincerely,

Robert Menendez
Ranking Member

SENSITIVE BUT UNCLASSIFIED

## National Security and Foreign Policy Analysis

The President was given discretionary authority in section 38(a) of the Arms Export Control Act (AECA) to control the import and export of defense articles and defense services in furtherance of world peace and the security and foreign policy of the United States.  Section 38(f) of the AECA also requires the President to periodically review the items on the United States Munitions List (USML) to determine what items, if any, no longer warrant export controls.  Pursuant to these authorities, as delegated to the Secretary of State, the Department has developed the final rule amending the International Traffic in Arms Regulations (ITAR), 22 CFR 120-130.

1. **The final rule will enable the Department of State to focus its resources on regulating only those defense articles and services that provide the United States with a critical military or intelligence advantage.**

The Department of State's publication of a final rule to transfer export controls for certain firearms, parts, components, and accessories thereof, and related ammunition, from the USML to the Commerce Control List (CCL) will enable the Department of State to significantly improve its regulation of defense articles and services by focusing its limited resources on regulating only those defense articles and services that provide the United States with a critical military or intelligence advantage.  *See* 22 C.F.R. § 120.3 ("For purposes of this subchapter, a specific article or service shall be determined in the future as a defense article or defense service if it provides a critical military or intelligence advantage such that it warrants control under this subchapter.").

Since 2009, the Department of State, in conjunction with the Department of Commerce and other interagency partners, has revised 18 of the 21 USML categories with this goal in mind. This is a key line of effort of the Implementation Plan to the President's National Security Policy Memorandum Regarding U.S. Conventional Arms Transfer Policy of April 19, 2018 (Conventional Arms Transfer Policy).  *See* Implementation Plan to Conventional Arms Transfer Policy, at 9 ("Continue to review the USML with an aim to transfer items that do not offer a critical military or intelligence advantage from the USML to the [CCL], and ensure that the USML adequately controls and clearly describes items that merit USML control.  This will help ensure that defense technology needed to preserve U.S. national security interests is protected, while supporting the U.S. defense industrial base's efforts to expand commercial defense trade.")

As part of this effort, the Department has published 26 final or interim final rules transferring numerous less sensitive items from the USML to the CCL.  The revision of these USML categories has decreased the Department of State's export licensing burden by more than 50 percent and allowed the Department and its interagency partners to engage in a more concentrated review of the export license requests for the defense articles and services that remain on the USML.

The three remaining unrevised USML categories – Category I, Firearms, Close Assault Weapons and Combat Shotguns; Category II, Guns and Armament; and Category III, Ammunition/Ordnance – have required the Department to expend a considerable amount of

SENSITIVE BUT UNCLASSIFIED

resources on licensing the export of many articles that are widely available in retail outlets in the United States and abroad.  Transferring export controls for certain articles under Categories I, II, and III from the USML to CCL will substantially decrease the Department of State's licensing burden and enable greater focus on regulating those defense articles and services that provide the United States with a critical military or intelligence advantage.

**2. The final rule is the product of a thorough interagency review process that rigorously scrutinized the national security and foreign policy ramifications of transferring certain firearms and ammunition from the USML to the CCL.**

Review of the USML is statutorily required by section 38(f) of the AECA, and the Department of State conducts regular reviews of individual USML categories in accordance with, and in full recognition of, the President's authority, conferred in section 38(a) of the AECA, to control the import and export of defense articles and defense services in furtherance of world peace and the security and foreign policy of the United States, and to designate those items that constitute the USML.  While a wide range of interagency stakeholders review and clear revisions to the USML before they are published, the Department works particularly closely with the Departments of Defense and Commerce to solicit their views on the appropriate composition of the USML.  As required by Executive Order 13637, the Department obtains the concurrence of the Secretary of Defense for designations, including changes in designations, of items or categories of items that are defense articles and defense services enumerated on the USML.  Close coordination with the Department of Commerce is further intended to ensure that the application of ITAR or Export Administration Regulations (EAR) controls to that item can be readily identified and understood by the public.

With respect to revisions of Categories I-III, the Department's review was focused on identifying for retention those defense articles now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States.  If a defense article satisfies one or both of those criteria, it remained on the USML.  For example, while the U.S. military supplies some of its service members with sidearms for military use, a sidearm also has many uses outside of the military, such that its function is not inherently military and therefore it does not warrant control on the USML.  Alternatively, squad automatic weapons do not generally have such non-military uses and remain controlled on the USML in this final rule.  Any single non-military use, however, of an item, such as a silencer, does not negate its inherently military function.  In summary, the Department has analyzed the patterns, both current and anticipated, of use and availability of the defense articles, the impact on the national security and foreign policy of the United States, and the utility they provide to the U.S. military or intelligence community to inform the ultimate determination as to whether control is merited on the USML.

**3. National security and foreign policy considerations will continue to be addressed through interagency review of license applications to Commerce.**

The Department recognizes the sensitivities and national security and foreign policy implications associated with the sale and export of small arms, light weapons, and associated

**SENSITIVE BUT UNCLASSIFIED**

equipment and ammunition as expressed in the President's Conventional Arms Transfer Policy. Those sensitivities and national security and foreign policy implications related to the export of items no longer controlled under the ITAR will continue to be addressed through the licensing and enforcement requirements of the Department of Commerce. All export license applications for the items transitioning to Commerce jurisdiction are subject to review by the interagency, specifically the Departments of State, Defense, and Energy, as appropriate. The Department will continue to advance its national security and foreign policy mission by reviewing all license applications submitted to the Department of Commerce for the export of firearms and related technology to ensure consistency with national security and foreign policy interests, including the prevention of human rights abuses. In addition, the Department of Commerce will maintain longstanding end-use monitoring efforts, including vetting of potential end-users.

4. **An interagency review concluded that technical data for 3-D printed firearms does not provide the United States with a critical military or intelligence advantage and therefore should be transferred from the USML to the CCL. The Department of Commerce will retain appropriate export controls over the publication of technology and software that can be used to produce 3-D printed firearms in order to safeguard national security and foreign policy.**

During the multi-year process of reviewing and revising the USML, the Department has exercised its discretion, authorized by delegation in section 38(a)(1) of the AECA, to make determinations about the national security and foreign policy interests that warrant changes to U.S. export controls. As a part of this process, the Department considered the unique characteristics and qualities of 3-D printed firearms controlled under the USML and their utility to the U.S. military and intelligence. The Department also considered the potential uses for the technical data that can be used to 3-D print firearms. The Department determined, in consultation with the Department of Defense and other interagency partners, that such technical data does not confer a critical military or intelligence advantage and is not inherently military based on its function. This determination took into account the effect that a transfer to the CCL would have on the national security and foreign policy interests of the United States, consistent with the AECA and ITAR, including the degree to which it would limit the ability of a foreign person to obtain such technical data, publish it on the internet, and subsequently manufacture CCL-controlled firearms, including those that are unserialized or manufactured from a non-metallic material.

Although the Department determined that the technical data for 3-D printed firearms does not confer a critical military or intelligence advantage or perform an inherently military function for purposes of maintaining inclusion on the USML, the Department agrees with the Department of Commerce that maintaining controls over such exports remains in the national security and foreign policy interests of the United States. The Department of Commerce has recognized in its companion rule that concerns raised over the possibility of widespread and unchecked availability of 3-D printing technology and software, the lack of government visibility into production and use, and the potential damage to U.S. counter-proliferation efforts warrant making certain technology and software capable of producing firearms subject to the EAR when posted on the internet in certain circumstances. The Department agrees that EAR controls on such technology and software for 3-D printed firearms previously controlled on the USML

**SENSITIVE BUT UNCLASSIFIED**

sufficiently address the U.S. national security and foreign policy interests relevant to export controls.

5.  **The Department considered the *Defense Distributed* and *Washington* cases when evaluating U.S. national security and foreign policy interests related to the revisions of Categories I-III.**

In reaching the conclusions described above, the Department took into account all aspects of the *Defense Distributed* and *Washington* cases.  In particular, the Department considered the arguments made by the plaintiffs in both cases, as well as the orders issued by the courts in both cases.  The Department also considered the determinations and findings the Department made with respect to both cases, including the position it took related to whether controls on the technical data that allow the 3-D printing of firearms are in the U.S. national security and foreign policy interests and the Department's policy justifications for entering into the settlement agreement with Defense Distributed.  This background informed the Department's analysis of whether the transfer of certain firearms, parts, components, and accessories thereof, and related ammunition, from the USML to the CCL was in the U.S. national security and foreign policy interest, in addition to whether the Department agreed that the EAR controls on the publication of technology and software for 3-D printed firearms were appropriate.

# **PUBLIC SUBMISSION**

**As of:** 6/15/18 12:06 PM
**Received:** June 14, 2018
**Status:** Posted
**Posted:** June 15, 2018
**Tracking No.** 1k2-93pw-pup8
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No
Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No
Longer Warrant Control Under the United States Munitions List

**Document:** BIS-2017-0004-0042
Public comment 41. Amnesty International USA. A Akwei. 6-14-18

## **Submitter Information**

**Name:** Adotei Akwei
**Address:**
   600 Pennsylvania Avenue SE
   Suite 500
   Washington, DC, 20003
**Email:** aakwei@aiusa.org
**Phone:** 2025098148

## **General Comment**

Please find attached Amnesty International USA's concerns with the proposed changes to
CATI-III

Adotei Akwei
Deputy Director Advocacy and Government Relations
Amnesty International USA

## **Attachments**

Amnesty International USA Comments on CATI-III 06142018

WASHSTATEB005100



DATE: June 14, 2018

TO:   Directorate of Defense Trade Controls
        U.S. Department of State
        DDTCPublicComments@state.gov

        and

        Regulatory Policy Division
        Bureau of Industry and Security
        U.S. Department of Commerce
        Room 2099B
        14th Street and Pennsylvania Avenue NW
        Washington, DC 20230

FROM: Adotei Akwei, Amnesty International USA, Washington DC

I am writing on behalf of Amnesty International-USA to comment on proposed changes to the *International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III* issued by the Department of State and proposed regulations for the *Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)*, both of which were published in the Federal Register on May 24, 2018.

As a global civil society organization focused on the promotion and protection of human rights, Amnesty International does not oppose the arms trade per se but calls for strong legally-binding controls to prevent arms being used for serious violations of international human rights and humanitarian law.  We do document

AMNESTY INTERNATIONAL USA I 600 PENNSYLVANIA AVENUE SE, 5TH FLOOR I WASHINGTON, DC 20003
T 202.544.0200 I F 202.546.7142 I WWW.AMNESTYUSA.ORG

WASHSTATEB005101

the human rights impact of the irresponsible arms trade, raising concerns or calling for specific transfers that pose significant human rights risks to be halted.

Our comments and questions about the proposed changes to International Traffic in Arms Regulations and the Export Administration Regulations, thus, are all conveyed with potential human rights consequences in mind.  In particular, we are concerned that some of the proposed changes weaken existing controls on transfers, increasing the risk that irresponsible brokers of small arms and light weapons could evade regulation, and arms will be diverted to states or non-state actors with poor human rights records.  There is further risk of undermining US laws restricting transfers to foreign military units that have committed gross violations of human rights. Amnesty International has for many years called attention to the risks associated with untrammeled export of small arms and light weapons around the world. These arms have been associated with the deployment of child soldiers and the rise of insurgent groups.  They are easier to divert than larger weapons and often end up in the illicit market.

The proposed changes to Categories I-III of the ITAR introduced as part of the Export Control Reform Initiative would transfer some specific and completely operable military-style semi-automatic weapons from the USML to the CCL and thereby affect some statutory controls on what are now considered defense articles.  We do not believe that the line drawn between automatic and semi-automatic is as clear as the proposed regulations would suggest, and accordingly we are concerned that the changes would significantly diminish Congressional oversight of the transfer of these weapons.

Below we have elaborated and itemized our concerns for each set of proposed changes.

AMNESTY INTERNATIONAL USA | 600 PENNSYLVANIA AVENUE SE, 5TH FLOOR | WASHINGTON, DC 20003
T 202.544.0200 | F 202.546.7142 | WWW.AMNESTYUSA.ORG

**Comment on changes to ITAR proposed by Department of State and relevant to the changes proposed for the EAR/CCL.**

1. Our principal concern here is with the risk of proliferation and diversion that could be exacerbated by the transfer of semi-automatic weapons to the CCL from the USML, where such weapons currently meet the statutory definition of "defense article" and are subject to a number of oversight mechanisms. The term "defense article" is used explicitly in several statutes to require controls on brokering, Congressional notification, and inclusion of an item on the US Munitions Import List controlled by the Bureau of Alcohol, Tobacco and Firearms.  In addition, semi-automatic weapons are currently included as defense articles in Directorate of Defense Trade Control's annual 655 report and are currently included, as defense articles, in the definition of security assistance (22USC 2014 and 22 USC 2304). The explanatory text accompanying the rules proposed by the State Department did not comment on the ancillary effect of removing semi-automatic weapons from the USML, but the implied changes are of concern to us. Several of these concerns are elaborated below.

2. Brokering Laws.  The proposed changes to Categories I, II and III mean that brokers of semi-automatic weapons and related ammunition will be exempt from registration and licensing that is currently triggered by their inclusion as defense articles on the USML.  On many occasions over the past two decades, human rights advocates have called attention to national brokering laws as a weak link in the chain of efforts to curtail illicit market transfers of small arms and light weapons. [See Amnesty International's 2010 report, "[Deadly Movements](#)."]

   Since 1996, US brokering laws have been seen among the strongest in the world.  They apply to US agents wherever they are located as well as to foreign nationals operating from within the US; and they cover the full range of facilitating activity--including finance, insurance, transport and

trans-shipment (freight-forwarding).  The US statutory provisions on brokering are robust, but their application is directly and specifically linked to the USML.  Regulatory authority over brokers in the Export Administration Regulations that house the CCL is without a clear statutory basis.  Consequently, we are concerned that moving semi-automatic weapons and related ammunition to the CCL – and simultaneously *removing* them from the USML – will lead to the US government relinquishing its regulatory authority over brokers of these weapons.  This is of particular concern because many of the proposed changes to Categories I-III pertain to completely operable weapons or ammunition, and not simply components or software.

We agree with the State Department's past assessment that establishing controls over brokering activity is a major step towards blocking unauthorized and illicit arms transfers that have fueled so many conflicts and serious human rights violations around the world.  In some well-known cases, states have been unable to prosecute notorious arms traffickers because local brokering laws were insufficiently robust.  We strongly support the current requirement for arms brokers to be registered and licensed before arranging deals to transfer these small but still deadly weapons.  For that reason, we oppose transferring semi-automatic weapons and ammunition to the CCL until and unless the continuing application of this requirement can be assured.

3. The proposed changes do not appear to be in line with established Wassenaar Categories I-III.  Semi-automatic weapons are included in Wassenaar ML1 explicitly as munitions, with exceptions for smooth bore weapons used in hunting and sporting.  From descriptions in the Wassenaar Munitions List, it seems clear that the intention was to differentiate between military and security items, on one hand, and dual-use items on the other.  Semi-automatic weapons used by peacekeepers, military, and

AMNESTY INTERNATIONAL USA | 600 PENNSYLVANIA AVENUE SE, 5TH FLOOR | WASHINGTON, DC 20003
T 202.544.0200 | F 202.546.7142 | WWW.AMNESTYUSA.ORG

police are intended to be controlled as munitions. The proposal to move semi-automatic firearms and large caliber rifles to the 500-series on CCL does not appear to be in line with this designation.

Moreover, we are concerned that the proposed changes may result in increased circulation of plans for non-automatic weapons produced by 3D printing technology, and this may be at odds with Wassenaar expectations, at least with regards to Wassenaar Best Practices Guidelines on Small Arms and Light Weapons.  We are concerned about possible weapons proliferation from 3D printing. We took note of the well-publicized 2012 case where the State Department invoked ITAR (and by extension the USML) to oblige a manufacturer to remove plans for a 3D printable gun from the internet. The Fifth Circuit Court upheld the State Department's view that the device in question was a "defense article" covered by ITAR, but we are concerned that the case might have ended differently if the 3D gun were considered a CCL-500 item rather than a defense article included on the US Munitions List.  From our perspective, this story illustrates the grave dangers of uncontrolled arms proliferation. The combination of internet dissemination and do-it-yourself 3D production is problematic in that the government has no knowledge of or control over the producer or end-user or the purpose to which the weapons will be put. Permitting such transactions would be a significant step backwards in normative development and contrary to US policy over past 25 years.

4.  Registration and End Use Controls (Blue Lantern).  The fact that manufacturers (and brokers) of semi-automatic weapons would no longer be required to register before applying for a license presents an additional concern. As we understand it, registration documents often provide regulators with important information during the licensing phase, and we are concerned that under the new rules the regulators at Commerce would not have access to the same background information that DDTC now uses

in the early stages of its monitoring and investigation.  Moreover, we are concerned that Blue Lantern investigations would exclude transfers of semi-automatic weapons.

5.  Waiting period before implementation.  A sufficient amount of time should be allowed for Congress to enact statutory changes to address gaps noted above.

**Additional comments on CCL rules proposed by Department of Commerce.**

6.  It appears that the new 500-series number would add specificity to reports required by the UN and the Wassenaar Arrangement, and that would be welcome.  However, Amnesty International has concerns about changing the designation of semi-automatic weapons so as to exclude them from consideration as "defense articles," elaborated in comments to the State Department above.

7.  While some of the weapons that are proposed for inclusion on the CCL are commercially available in the US, that is not the case globally and – increasingly—state governments in the US seek to limit their sale. In recent months many commercial outlets have discontinued sales of semi-automatic assault weapons, and the proposed rule goes in the opposite, and wrong, direction. Seventeen American states have proposed a total of 56 bills to regulate or ban the sale of assault weapons in the 2018 legislative season.

AMNESTY INTERNATIONAL USA I 600 PENNSYLVANIA AVENUE SE, 5TH FLOOR I WASHINGTON, DC 20003
T 202.544.0200 I F 202.546.7142 I WWW.AMNESTYUSA.ORG

8.  Amnesty International generally supports strong oversight measures for arms transfers and from that perspective, we welcome detailed digital record-keeping requirements (serial number, model, caliber, and manufacturer) and increased enforcement of end-use controls.  However, given the increase in license applications shifted to Commerce combined with the absence of information currently gained through the registration procedure, we are concerned at the likelihood that increased workload without commensurate resources will actually result in less oversight than at present under authority of the State Department.

Thank you for your attention to our concerns.

Sincerely,

Adotei Akwei
Deputy Director Advocacy and Government Relations
Amnesty International USA
600 Pennsylvania Avenue SE Suite 500
Email: aakwei@aiusa.org
Tel: (202) 509-8148

AMNESTY INTERNATIONAL USA I 600 PENNSYLVANIA AVENUE SE, 5TH FLOOR I WASHINGTON, DC 20003
T 202.544.0200 I F 202.546.7142 I WWW.AMNESTYUSA.ORG

WASHSTATEB005107

# **PUBLIC SUBMISSION**

**As of:** 6/15/18 12:30 PM
**Received:** June 15, 2018
**Status:** Posted
**Posted:** June 15, 2018
**Tracking No.** 1k2-93qg-o4lc
**Comments Due:** July 09, 2018
**Submission Type:** Unknown

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No
Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No
Longer Warrant Control Under the United States Munitions List

**Document:** BIS-2017-0004-0043
Public comment 42. Individual. L Hageman. 6-11-18

## **Submitter Information**

## **General Comment**

See Attached

## **Attachments**

Public comment 42. Individual. L Hageman. 6-11-18

WASHSTATEB005108

**Regulatory Policy Division-Ref RIN 0694-AF47**

We fully support the proposed ruling and thank
you for your attention to this matter.

L.A. Hagemann
519 Turnstone Drive
Durham NC 27703

Received by BIS on 6/11/18

# PUBLIC SUBMISSION

**As of:** 7/14/18 8:17 AM
**Received:** July 07, 2018
**Status:** Posted
**Posted:** July 14, 2018
**Tracking No.** 1k2-9458-2q0l
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0758
Public comment 762. Individual. Gretchen Crook. 7-7-18

---

## Submitter Information

**Name:** Gretchen Crook

---

## General Comment

Against this proposed change.
Treats semi-automatic assault rifles as non-military

Transfers the cost of processing licenses from gun manufacturers to taxpayers.

Removes statutory license requirements for brokers, increasing risk of trafficking.

Reduces or eliminates end-use controls, such as State Depts Blue Lantern program, and by eliminating registration of firearms exporters, a requirement since the 1940s.

Enables unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms.

Reduces transparency and reporting on gun exports.

Transfers gun export licensing from an agency with mission to promote stability, conflict reduction, and human rights, to an agency with mission to promote trade.

# PUBLIC SUBMISSION

**As of:** 7/13/18 8:05 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 13, 2018
**Tracking No.** 1k2-946l-r79w
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0486
Public comment 950. CTP Inc. Anonymous. 7-9-18

---

## Submitter Information

**Name:** Anonymous Anonymous
**Organization:** CTP, Inc.

---

## General Comment

BIS has noted in its proposed rule announcement that [t]he EAR does not include a concept of defense services,
and the technology related controls are more narrowly focused and apply in limited contexts as compared to the
ITAR. Consider that if ECCN 0E501 will control technology for the development, production, operation,
installation, maintenance, repair, or overhaul of firearms controlled by new ECCN 0A501, then certain firearms
training, which would have previously been an ITAR-controlled defense service, may now be NLR to many
destinations.

BIS has also noted, If a gun manufacturer posts a firearms operation and maintenance manual on the Internet,
making it publicly available to anyone interested in accessing it and without restrictions on further dissemination
(i.e., unlimited distribution), the operation and maintenance information included in that published operation and
maintenance manual would no longer be subject to the EAR. Following this logic, consider the fact that if a gun
manufacturer posts on the internet for unlimited distribution 0E501 technology for the production of a 0A501
firearm (e.g., 3D printer specs), then it is not an unauthorized technology transfer but rather publicly available
information no longer subject to the EAR.

# PUBLIC SUBMISSION

**As of:** 7/13/18 9:07 PM
**Received:** July 08, 2018
**Status:** Posted
**Posted:** July 13, 2018
**Tracking No.** 1k2-945n-5o0k
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0708
Public comment 812. Individual. A. S. 7-8-18

---

## Submitter Information

**Name:** A. S.

---

## General Comment

Please stop the NRA backed rule and re-consider how your proposed regulations will change the face of safety in
our society using the following points:

1. It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out
hundreds of pre-license and post-shipment inspections and publicly reports on them.

2. It would remove licensing requirements for brokers, increasing the risk of trafficking.

3. It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed
founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully
charged him with violating arms export laws, since his open-source posting made it possible for anyone with
access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block,
effectively enabling 3D printing of firearms in the U.S. and around the globe.

I am the mother of 5 children who deserve to be safe and protected. Please stop this!
A.S.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
|      Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
|      Defendants. | § | |

# Exhibit A: Declaration of Lisa V. Aguirre

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

## DECLARATION OF LISA V. AGUIRRE

I, Lisa Aguirre, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.  I am the Director of the Office of Defense Trade Controls Management (DTCM), one of four directors within the Directorate of Defense Trade Controls (DDTC), Bureau of Political-Military Affairs at the Department of State. I have held this position since June, 2013. My roles and responsibilities in this position include managing, overseeing or supporting all DDTC activities.

2.  Prior to holding my current position, I was Director of the Office of Defense Trade Controls Compliance in DDTC for over three years, during which time I oversaw numerous DDTC activities, including the management and processing of registration applications and registration fee submissions, reviews of export licenses for prohibited parties, the DDTC Company Visit Program (CVP), a program in which State Department officials visit arms exporters or end users to gather information on compliance with the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR), and reviews under the

Committee on Foreign Investment in the United States (CFIUS). As Compliance Director, I also oversaw civil enforcement actions and provided support to criminal enforcement matters under ITAR. In these capacities at DDTC, I have become familiar with the application of the AECA and ITAR as part of DDTC's mission and the full range of DDTC activities in support of its mission.

3.   Since joining DDTC, first as a contractor in June 2007, and then through appointment to the federal service in July 2008, I have served continuously in defense trade controls roles.

4.   This declaration is submitted in support of the opposition to a motion for preliminary injunction to be filed by the official capacity defendants in the above-captioned case. The information contained herein is based on my personal knowledge and on information provided to me in my official capacity.

**Directorate of Defense Trade Controls**

5.   The Directorate of Defense Trade Controls (DDTC) is part of the Department of State's Bureau of Political-Military Affairs (PM), which reports to the Under Secretary for Arms Control and International Security. DDTC controls the export and temporary import and brokering of defense articles and services covered by the United States Munitions List (USML), in accordance with 22 U.S.C. §§ 2778-2780 of the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR) (22 CFR Parts 120-130).

2

DOSWASHINGTONSUP00440

6.    DDTC's mission is to carry out the purposes of the AECA to further world peace and the national security and foreign policy of the United States, including by ensuring that commercial defense exports support key objectives of U.S. national security and foreign policy, including weapons nonproliferation, support for allies, and preservation of human rights. DDTC also seeks to ensure that regulation keeps pace with innovation, that U.S. industry and foreign partners comply with applicable policies and requirements, and that the munitions export process is reliable and predictable. DDTC also serves as a resource to the U.S. government, industry, and foreign counterparts on defense trade matters.

7.    As part of its mission, DDTC licenses the export and temporary import and brokering of items subject to the International Traffic in Arms Regulations ("ITAR") and seeks to ensure appropriate compliance with, and enforcement of, these regulations. DDTC also maintains, reviews, and clarifies the U.S. Munitions List (USML), and oversees the Commodity Jurisdiction process.

8.    The Office of Defense Trade Controls Policy (DTCP) within the Directorate of Defense Trade Controls oversees the development of policy and guidance related to exports of defense articles and services on the USML and subject to the ITAR and the AECA. DTCP manages the interagency Commodity Jurisdiction process, which determines whether or not certain items are controlled on the USML when questions arise concerning whether or not an item is subject to the licensing jurisdiction of the Department of State. DTCP also prepares all changes to the ITAR, which are published in the Federal Register, manages bilateral defense

3

trade agreements, such as the United Kingdom and Australia Defense Trade

Cooperation Treaties, and provides export control policy and regulatory guidance

to exporters, defense manufacturers, and foreign allies and partners.

**Statutory and Regulatory Framework**

9.    The Arms Export Control Act (AECA), Section 38(a)(1) (22 U.S.C. 2778(a)(1)),

authorizes the President "in furtherance of world peace and the security and

foreign policy of the United States . . . to control the import and the export of

defense articles and defense services and to provide foreign policy guidance to

persons of the United States involved in the export and import of such articles and

services. The President is authorized to designate those items which shall be

considered as defense articles and defense services for the purposes of this section

and to promulgate regulations for the import and export of such articles and

services. The items so designated shall constitute the United States Munitions

List."

(a)  The statutory authority of the President to "promulgate regulations for the

import and export of such articles and services" has been delegated to the

Secretary of State by Executive Order 13637, § 1(n). This delegation requires

that "Designations, including changes in designations, by the Secretary of

State of items or categories of items that shall be considered as defense

articles and defense services subject to export control under section 38 (22

U.S.C. 2778) shall have the concurrence of the Secretary of Defense."

4

DOSWASHINGTONSUP00442

(b) The authorities under the AECA delegated to the Secretary of State have been further delegated pursuant to Department of State Delegation of Authority 293-2, *Delegation of Authority by the Secretary of State to Officers of the Department of State and the Administrator of the U.S. Agency for International Development of Authorities under the Foreign Assistance Act of 1961 and Other Related Acts* (Oct. 23, 2011), which delegates to the Under Secretary for Arms Control and International Security "the functions conferred on the Secretary by Executive Order 13637 relating to sales and exports under the Arms Export Control Act (22 U.S.C. 2751 *et seq.*)."

10. The ITAR, 22 C.F.R. Chapter I, Subchapter M, Parts 120-130, as amended, 79 Fed. Reg. 77884 (Dec. 29, 2014), implements the AECA. Section 120.1 of the ITAR sets forth how the ITAR is administered:

(a) Section 38 of the Arms Export Control Act (22 U.S.C. 2778), as amended, authorizes the President to control the export and import of defense articles and defense services. The statutory authority of the President to promulgate regulations with respect to exports of defense articles and defense services is delegated to the Secretary of State by Executive Order 13637. This subchapter implements that authority, as well as other relevant authorities in the Arms Export Control Act (22 U.S.C. 2751 *et seq.*). By virtue of delegations of authority by the Secretary of State, these regulations are primarily administered by the Deputy Assistant Secretary of State for Defense Trade Controls, Bureau of Political-Military Affairs.

5

11.     The ITAR provides what particular activities constitute an export. Section 120.17 defines an "export" to mean:

>   (1) Sending or taking a defense article out of the United States in any manner, except by mere travel outside of the United States by a person whose personal knowledge includes technical data; or
>
>   (2) Transferring registration, control or ownership to a foreign person of any aircraft, vessel, or satellite covered by the U.S. Munitions List, whether in the United States or abroad; or
>
>   (3) Disclosing (including oral or visual disclosure) or transferring in the United States any defense article to an embassy, any agency or subdivision of a foreign government (e.g., diplomatic missions); or
>
>   (4) Disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad; or
>
>   (5) Performing a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad.
>
>   (6) A launch vehicle or payload shall not, by reason of the launching of such vehicle, be considered an export for purposes of this subchapter. However, for certain limited purposes (see § 126.1 of this subchapter), the controls of this subchapter may apply to any sale, transfer or proposal to sell or transfer defense articles or defense services."[1]

---

[1] On June 3, 2015, the Department of State published in the Federal Register a Notice of Proposed Rulemaking (NPRM) proposing revisions to the ITAR. Among other proposed changes, the Department proposed to clarify the definition of "technical data" by

6

DOSWASHINGTONSUP00444

12. Part 121 of the ITAR sets out those "articles, services, and related technical data" that have been designated as defense articles and defense services pursuant to sections 38 and 47(7) of the AECA. These items make up the USML. There are 21 categories on the USML under which a particular item may be designated as a defense article.

13. As relevant to this litigation, under Category I, *Firearms, Close Assault Weapons and Combat Shotguns,* the following items are designated as defense articles:

   (a) Non-automatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm).

   (b) Fully automatic firearms to .50 caliber inclusive (12.7 mm).

   (c) Firearms or other weapons (*e.g.*, insurgency-counterinsurgency, close assault weapons systems) having a special military application regardless of caliber.

   (d) Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.

   (e) Silencers, mufflers, sound and flash suppressors for the articles in (a) through (d) of this category and their specifically designed, modified or adapted components and parts.

   (f) Riflescopes manufactured to military specifications. (See category XII(c) for controls on night sighting devices.)

   (g) Barrels, cylinders, receivers (frames) or complete breech mechanisms for the articles in paragraphs (a) through (d) of this category.

   (h) Components, parts, accessories and attachments for the articles in paragraphs (a) through (g) of this category.

---

specifying that technical data may take the form of, inter alia, CAD files. In addition, to make more explicit the existing control on exports, the Department proposed to add a paragraph specifying that providing technical data on a publicly-accessible network, such as the Internet, is an export because of its inherent accessibility to foreign powers. The Department has requested that interested parties submit comments on these and other elements of the proposed rulemaking between June 3 and August 3, 2015. *See* Exhibit 7.

7

(i) Technical data (as defined in § 120.10 of this subchapter) and defense services (as defined in § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a) through (h) of this category. Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(j) The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

    (1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

    (2) A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

    (3) A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

    (4) A pistol is a hand-operated firearm having a chamber integral with or permanently aligned with the bore.

    (5) A revolver is a hand-operated firearm with a revolving cylinder containing chambers for individual cartridges.

    (6) A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.

14. In addition to the inclusion of "technical data" for Category I defense articles on the USML, there are several other provisions of the ITAR related to "technical data."

    a. Section 120.10 of the ITAR defines "technical data" as "(a)(1) Information, other than software as defined in § 120.10(a)(4) which is required for the design, development, production, manufacture,

8

assembly, operation, repair, testing, maintenance or modification of defense articles.  This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation[;] (2) Classified information relating to defense articles and defense services on the U.S. Munitions List and 600-series items controlled by the Commerce Control List; (3) Information covered by an invention secrecy order; or (4) Software (see § 120.45(f)) directly related to defense articles.[2] (b)[3] The definition in paragraph (a) of this section does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain as defined in § 120.11 of this subchapter or telemetry data as defined in note 3 to Category XV(f) of part 121 of this subchapter.  It also does not include basic marketing information on function or purpose or general system descriptions of defense articles."

b.  Section 120.6 of the ITAR defines a "defense article" as "any item or technical data designated in § 121.1 of this subchapter.  This term includes technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in § 121.1 of this subchapter.  It also includes forgings, castings, and other unfinished products, such as

---

[2] This sentence added by 79 FR 61226 (Oct. 10, 2014).
[3] Amended by 79 FR 27180 (May 13, 2014, effective Nov. 10, 2014), as corrected by 79 FR 66608 (Nov. 10, 2014).

DOSWASHINGTONSUP00447

extrusions and machined bodies, that have reached a stage in manufacturing where they are clearly identifiable by mechanical properties, material composition, geometry, or function as defense articles.[4] It does not include basic marketing information on function or purpose or general system descriptions."

c. Section 120.9 of the ITAR defines a "defense service" as "(1) The furnishing of assistance (including training) to foreign persons, whether in the United States or abroad in the design, development, engineering, manufacture, production, assembly, testing, repair, maintenance, modification, operation, demilitarization, destruction, processing or use of defense articles; (2) The furnishing to foreign persons of any technical data controlled under this subchapter (see § 120.10), whether in the United States or abroad; or (3) Military training of foreign units and forces, regular and irregular, including formal or informal instruction of foreign persons in the United States or abroad or by correspondence courses, technical, educational, or information publications and media of all kinds, training aid, orientation, training exercise, and military advice. (See also § 124.1.)"

d. Collectively, the "technical data" provisions serve the purpose of limiting the export of detailed information needed to manufacture, maintain, or operate defense articles controlled on the USML. Such

---

[4] This sentence was added to the definition of defense article by 79 FR 61226 (Oct. 10, 2014).

10

DOSWASHINGTONSUP00448

export limitations advance the purposes of the AECA by limiting the ability of foreign powers to design, develop, and produce defense articles in lieu of being able to obtain those articles directly. Absent the inclusion of technical data in the ITAR, the ITAR's limits on arms transfers would be of negligible practical effect because the ITAR would leave unregulated the exportation of the fundamental technology, know-how, blueprints, and other design information sufficient for foreign powers to construct, produce, manufacture, maintain, and operate the very same equipment regulated in its physical form by the ITAR.

15. The ITAR also sets forth the policy on designating and determining how a specific article or service may be designated as a defense article or defense service.

   a. Pursuant to section 120.3, a particular article or service will be designated as a defense article if it: "(1) Meets the criteria of a defense article or defense service on the U.S. Munitions List; or (2) Provides the equivalent performance capabilities of a defense article on the U.S. Munitions List."

   b. Section 120.3 also provides that a specific article or service "shall be determined in the future as a defense article or defense service if it provides a critical military or intelligence advantage such that it warrants control" under the ITAR.

11

DOSWASHINGTONSUP00449

  c. Section 120.3 also specifies that the "intended use of the article or service after its export (*i.e.*, for a military or civilian purpose), by itself, is not a factor in determining whether the article or service is subject to the controls of this subchapter."

16. ITAR jurisdiction extends only to the export of defense articles, defense services, and technical data. For this reason, ITAR does not limit the ability of Defense Distributed or others to distribute CAD files to U.S. persons within the United States for domestic use.

**The Commodity Jurisdiction (CJ) process**

17. Commodity Jurisdictions, commonly referred to as "CJs," are the determination made by the Department of State identifying the export control jurisdiction of goods, services and information.

18. The purpose of these determinations is to reach a conclusion as to whether, for purposes of export controls, goods, services, or information are under the jurisdiction of the Department of State pursuant to ITAR or under the jurisdiction of the Department of Commerce, which administers the Export Administration Regulations (EAR).[5]

---

[5] A few categories of goods, services, or information are under the jurisdiction of the Department of Energy, Department of Homeland Security, or another Executive Branch agency. Goods, services, or information may also be within the public domain and not subject to export controls at all.

12

19.     Section 120.4 of the ITAR establishes the CJ procedure,[6] which "is used with the
        U.S. Government if doubt exists as to whether an article or service is covered by
        the U.S. Munitions List.  It may also be used for consideration of a re-designation
        of an article or service currently covered by the U.S. Munitions List.  The
        Department must provide notice to Congress at least 30 days before any item is
        removed from the U.S. Munitions List."  As required by Section 120.4, the
        determination "entails consultation among the Departments of State, Defense,
        Commerce, and other U.S. Government agencies and industry in appropriate
        cases."  In the vast majority of circumstances, the CJ procedure is unnecessary
        because there is no doubt as to whether an item to be exported is a defense article
        or defense service.

20.     Section 120.4 of the ITAR sets forth the criteria for making a CJ determination:
        A designation that an article or service meets the criteria of a defense article or
        defense  service, or provides the equivalent performance capabilities of a defense
        article on the U.S. Munitions List set forth in this subchapter, is made on a case-
        by-case basis by the Department of State, taking into account:

               (i) The form and fit of the article;[7] and

---

[6] *See* 58 FR 39283, July 22, 1993, as amended at 71 FR 20536, Apr. 21, 2006; 75 FR
46843, Aug. 4, 2010; 78 FR 22753, Apr. 16, 2013; 79 FR 8084, Feb. 11, 2014.

[7] The form of a commodity is defined by its configuration (including the geometrically
measured configuration), material, and material properties that uniquely characterize it.
The fit of a commodity is defined by its ability to physically interface or connect with or

13

(ii) The function and performance capability of the article.[8]

21.    Section 120.4(f) further requires that "State, Defense and Commerce will resolve commodity jurisdiction disputes in accordance with established procedures. State shall notify Defense and Commerce of the initiation and conclusion of each case."

22.    Section 120.4(g) provides an avenue for appeal of a CJ determination:

A person may appeal a commodity jurisdiction determination by submitting a written request for reconsideration to the Deputy Assistant Secretary of State for Defense Trade Controls.  The Deputy Assistant Secretary's determination of the appeal will be provided, in writing, within 30 days of receipt of the appeal. If desired, an appeal of the Deputy Assistant Secretary's decision can then be made to the Assistant Secretary for Political-Military Affairs.

23.    DTCP considers a variety of information in its consideration of CJ requests, including the information attached to the request (such as product brochures, technical specifications and/or blue prints, sales information, etc.), the USML category in which an item most likely may fit, previous CJs on the technology or related matters, and previously-issued export licenses for similar items.

---

become an integral part of another commodity. [*See* Note 1 to paragraph (d), section 120.4 of the ITAR.

[8] The function of a commodity is the action or actions it is designed to perform. Performance capability is the measure of a commodity's effectiveness to perform a designated function in a given environment (e.g., measured in terms of speed, durability, reliability, pressure, accuracy, efficiency).

14

DOSWASHINGTONSUP00452

After DTCP prepares a preliminary analysis, the CJ request and preliminary analysis are circulated to the relevant interagency partners for consultation.

**Defense Distributed's CJ Requests**

24.    In early May, 2013, DTCP became aware through media reports that Defense Distributed (DD), a pending 501(c)(3) non-profit corporation located in Austin, Texas, had placed on an unrestricted website executable Computer Aided Design (CAD) files enabling the manufacture of plastic firearm components, accessories, and attachments with a 3D printer. *See, e.g.*, Exhibit 1.

25.    As a result, the Department of State's Office of Defense Trade Controls Compliance (DTCC) became concerned that these files might be subject to the ITAR, in which case DD might be exporting these files without authorization. DTCC therefore sent a letter to DD, suggesting that they remove the files from their website and submit CJ requests to determine whether the files were controlled by the ITAR. *See* Exhibit 2.  DD complied with the request and on June 21, 2013, submitted ten CJ requests. *See* Exhibit 3.

26.    In its CJ submission, DD identified a number of publicly available sources for information on how to manufacture firearms and related components, including books on gunsmithing and gun design blueprints and schematics available in a variety of media, including on the Internet.  DD asserted that their CAD files were no different from any other medium that contains basic manufacturing "know

15

how" for firearms, and that these files should be found to be in the public domain and not controlled under the ITAR. *See* Exhibit 3.

27.　　In addition to conferring with other agencies in accordance with ITAR Section 120.4, DTCP sought to better understand additive manufacturing and 3D printing hardware and technology and its evolution and diffusion, the impact of the availability of CAD files (and other, similar data files) on the enforcement of export controls, and the application of multilateral export control regime, particularly the Wassenaar Arrangement on Export Controls on Conventional Arms and Dual-use Goods and Technologies, to such files and technologies. DTCP consulted other State Department offices and U.S. government agencies to benefit from their expertise and consideration of these technologies and issues. In addition, DTCP organized a conference on additive manufacturing/3D printing technology in March 2014.

28.　　In January 2015, while consideration of DD's June. 2013 CJ requests was ongoing, DD submitted a CJ request for the "Ghost Gunner," a computer numerically controlled (CNC) press for milling metal firearms components. *See* Exhibit 4. On April 15, 2015, DDTC responded by providing a CJ determination to Defense Distributed, finding that the Ghost Gunner would not be subject to the jurisdiction of the Department of State. *See* Exhibit 5. In the course of consideration of the Ghost Gunner, DTCP determined that project files and data files for producing a defense article on a 3D printer or similar device constituted technical data on that defense article that would be subject to ITAR jurisdiction,

16

DOSWASHINGTONSUP00454

Resolution of the Ghost Gunner CJ request also helped DTCP conclude the CJ process for DD's June 21, 2013 CJ requests. On June 4, 2015, DTCP provided CJ determinations for the requested items. *See* Exhibit 6.

**DDTC's CJ Determination**

29. In making its CJ determination, DDTC identified several factors that warrant treatment of DD's CAD files as technical data subject to ITAR jurisdiction.

   a. The central function of DD's executable CAD files appears to be to enable the manufacture of end-items that are ITAR-controlled defense articles.

   b. As DD described in its Ghost Gunner CJ request, DD's CAD files can be used to "automatically find, align, and mill" a defense article such as a firearm on a 3D printer or other manufacturing device. Manufacture of a defense article in this way requires considerably less know-how than manufacture in reliance on conventional technical data, which merely *guides* the manufacture of a defense article and requires additional craftsmanship, know-how, tools, and materials.

   c. Although DD contended that the technical data constituted published data already in the public domain, the existing material in the public domain identified by DD did not include CAD files that could be used to automatically generate defense articles. Because CAD files provide the

17

additional functionality described above, DD's CAD files are a
meaningful step beyond previous, public-domain material.

    d.  In addition, because DD's CAD files are information similar to
"blueprints, drawings, photographs, plans, instructions or documentation"
that can be used to automatically manufacture defense articles, DDTC
concluded that the regulations place them within ITAR commodities
jurisdiction.

30.  Based on these considerations, its consultations with other State Department
offices and U.S. government agencies, its own expertise, and the text of the
AECA and ITAR, DDTC concluded that DD's CAD files fall within the
jurisdiction of the ITAR as technical data under Category I, subsection (i) of the
USML, relying on the definition of technical data in 22 C.F.R. § 120.10(a)(1).
DDTC concluded that other information, including a "read-me" file submitted by
DD for a CJ determination, did not fall within the jurisdiction of the ITAR.
Accordingly, DDTC's determination does not restrict DD from discussing
information and ideas about 3D printing, either domestically or internationally, as
long as such discussions do not include the export of technical data.

31.  Classification of DD's CAD files as within the jurisdiction of the ITAR is not an
outright prohibition on the export of these files. Rather, ITAR requires that DD
obtain a "license or other approval . . . pursuant to the ITAR prior to any export"
for these CAD files.

18

32.   Should DD submit an application for approval to export its CAD files, DDTC will
review the proposed export, including its intended recipients and the type, form,
and scope of the export.  DDTC will consider the application in accordance with
the factors enumerated in 22 C.F.R. § 126.7, including whether such export is
prohibited "by any statute of the United States." 22 C.F.R. § 126.7(a), whether
such export would be "in furtherance of world peace, the national security or the
foreign policy of the United States." 22 C.F.R. § 126.7(a)(1), whether "[a]n
applicant, any party to the export or agreement, any source or manufacturer of the
defense article or defense service or any person who has a significant interest in
the transaction has been debarred, suspended, or otherwise is ineligible to receive
an export license or other authorization from any agency of the U.S. government."
*id.* § 126.7(a)(6).  In addition, there are numerous countries to which exports of
some or all categories of defense articles are prohibited. *See, e.g.,* 22 C.F.R. §
126.1.

33.   In my experience, the overwhelming majority of ITAR licensing applications are
approved outright or approved with conditions intended to safeguard the defense
article being exported from use in a way that would damage world peace or the
national security or foreign policy interests of the United States.  Of course, any
given licensing application will only be approved if the application satisfies the
standards required under 22 C.F.R. § 126.7.

DOSWASHINGTONSUP00457

**Likely Effects of the Preliminary Injunction Sought by Plaintiffs**

34.   The entry of a preliminary injunction authorizing the posting of DD's CAD files
to the Internet without restriction would make those files available worldwide to
any Internet user, thereby permitting the export of those files to any foreign
person or foreign power with access to DD's website.  Such an injunction would
deny DDTC the opportunity to consider, among other things, whether any specific
export of DD's CAD files would violate the law or would cause significant harm
to the national security or foreign policy interests of the United States.

35.   Absent a specific request for an export license, I have considered the likely
impacts of an unrestricted export of DD's CAD files to any interested person,
entity, or foreign power and concluded that the likely effect of a preliminary
injunction would be to cause significant harm to the national security and foreign
policy interests of the United States.  Although a comprehensive enumeration of
the possible harms would be difficult, I can identify the following as among the
most concerning:

a.   The "Liberator" firearm included in DD's CAD designs presents a specific
and unique risk to the national security and foreign policy interests of the
United States.  The Liberator is a plastic firearm which can be produced in
a way as to be both fully operable and virtually undetectable by
conventional security measures such as metal detectors.  police and
security services, could particularly, (though not uniquely) cause damage
U.S. foreign policy interests.  If U.S.-origin CAD files were used to

20

manufacture an undetectable "Liberator" in a foreign country, and that weapons was then used to commit an act of terrorism, piracy, assassination, or other serious crime (e.g., to compromise aviation security overseas), the act itself – or the interests of a foreign country in holding the United States accountable – could cause serious and long-lasting harm to the foreign policy and national security interests of the United States.[9]

b.  The United States and other countries rely on international arms embargoes, export controls, and other measures to restrict the availability of defense articles sought by terrorist organizations. Making DD's CAD files available through unrestricted access on the Internet would provide any such organization with defense articles, including firearms, at its convenience, subject only to its access to a 3D printer, an item that is widely commercially available. Terrorist groups and other actors could then potentially manufacture and use such weapons against the United States or its allies.

c.  Making DD's CAD files available through unrestricted access on the Internet would likewise provide access to the firearms components and replacement parts to armed insurgent groups, transnational organized criminal organizations, and states subject to U.S. or UN arms embargoes.

---

[9] Undetectable firearms are unlawful in the United States pursuant to the Undetectable Firearms Act of 1988. *See* 18 U.S.C. § 922(p). Although the "Liberator" design includes insertion of a six-ounce piece of metal to make it detectable by metal detectors, this metal content can be removed without rendering it inoperable, thereby permitting it to be both operable and undetectable.

DOSWASHINGTONSUP00459

Access to weapons technology coupled with the uncontrolled and increasingly ubiquitous means of production (i.e., 3D printers or other similar manufacturing technology capable of executing CAD files) could contribute to armed conflict, terrorist or criminal acts, and seriously undermine global export control and non-proliferation regimes designed to prevent the dangerous and destabilizing spread and accumulation of weapons and related technologies. U.S leadership in these areas also would suffer, contributing overall to a more dangerous international environment.

d.  Many countries, including important U.S. allies, have more restrictive firearms laws than the United States and have identified firearms CAD files for 3D printers as a threat to domestic firearms laws. For example, both the United Kingdom and Japan have arrested individuals for manufacturing or attempting to use firearms CAD files and 3D printers to manufacture firearms. *See, e.g.,* http://www.bbc.com/news/technology-27322947, accessed, June 6, 2015. Unrestricted exports from the United States of munitions or technical data, such as DD's CAD files. which could be used to automatically manufacture a firearm or other defense article, would undercut the domestic laws of these nations, increase the risk of domestic violence in those countries, and thereby damage U.S. foreign relations with those countries and foreign policy interests.

22

DOSWASHINGTONSUP00460

36.     In my judgment, the entry of a preliminary injunction in this matter would

        increase the risk of all of the foregoing harms.  Indeed, such an injunction could

        reasonably be expected to bring attention to DD's CAD files, making awareness

        of their capabilities and accessibility known more widely to individuals, entities,

        and foreign powers that would make use of DD's CAD files to the detriment of

        U.S. foreign policy and national security interests.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 10, 2015.

Lisa V. Aguirre

DOSWASHINGTONSUP00461

# EXHIBIT

# 1

DOSWASHINGTONSUP00462

# the guardian

# 3D-printable guns are just the start, says Cody Wilson

The inventor of 'The Liberator' plastic firearm believes in an open future and the 'complete explosion' of all gun law

**Alex Rayner**

Monday 6 May 2013 11.56 EDT

Cody Wilson is a polite, 25-year-old law student at the University of Texas in Austin, with dark, close-cropped hair and a forward, affable charm. This week he plans to release the blueprint for a gun that can be downloaded from the internet and produced using a 3D printer.

He and his friends have spent almost a year developing the Liberator, a "Wiki weapon" that can be assembled from components made on an $8,000 (£5,150) printer that they bought on eBay. Using files shared online, the machine creates the solid parts from layers of plastic.

Wilson's group, Defense Distributed, thinks everyone should have access to a gun and is working to make it possible through Defcad.org, a depository for weapons designs. It was set up in December after its files were removed from another site following the Sandy Hook elementary school shootings. In March, Wilson was issued a federal firearms licence, allowing him to make guns legally.

"I come from a typical middle class family, for the United States in the south: religious parents, conservative values, though we didn't own a lot of firearms," he says. "We had one shotgun that we never really used."

Despite buying a shotgun shortly after turning 21, Wilson says it was his studies, first as an English literature major, then as a law student, that started his interest in the politics of weapons ownership. "I read [19th-century French anarchist theorist Pierre-Joseph] Proudhon," he says, "I like Jean Baudrillard. I like their critiques of mass culture."

He admits that, given current technology, printing a gun is the least effective way of obtaining a firearm, and that it is easier to simply fashion a gun from the contents of any hardware store.

Yet he half hopes, half believes that soon, thanks to the convergence of file-sharing and 3D printing, there will come about "a complete explosion of all available gun laws. I think we should be allowed to own automatic weapons; we should have the right to own all the

DOSWASHINGTONSUP00463

terrible implements of war, as [American political philosopher] Tench Coxe said, and I think this principle probably applies globally."

A self-described child of the internet age, Wilson is an admirer of Julian Assange and Kim Dotcom. "I number myself among them, at least in spirit," he says. "I think the future is openness to the point of the eradication of government. The state shouldn't have a monopoly on violence; governments should live in fear of their citizenry."

His ambitions don't stop at firearms. Ultimately, he wants to turn Defcad into "the world's first unblockable open-source search engine for all 3D printable parts", a Pirate Bay-style archive not only for printable pistols, but for everything from prosthetic limbs to drugs and birth-control devices.

More features

## Topics

US gun control

DOSWASHINGTONSUP00464

# the**guardian**

# Shots fired from world's first 3D-printed handgun

Cody Wilson, 25, successfully tested plastic handgun built by his Texas firm Defense Distributed using an $8,000 3D printer

Adam Gabbatt in New York

Monday 6 May 2013 14.43 EDT

The world's first gun made almost entirely by a 3D plastic printer has been successfully fired in Texas.

The successful test of the plastic handgun, which was built by Defense Distributed using an $8,000 3D printer, came after a year of development. The company, which is run by 25-year-old Cody Wilson, now plans to publish the blueprints for the gun online.

Wilson and a companion successfully fired the gun for the first time in Austin, Texas, at the weekend, Forbes reported. A video published online shows the gun held in place by a metal stand, with yellow string attached to its trigger. By yanking on the string, the pair were able to pull the trigger from 20ft away, successfully discharging a .380 caliber bullet.

Defense Distributed's device is controversial because of the way it is made. Fifteen of its 16 pieces were constructed in a second-hand Stratasys Dimension SST 3D printer, Forbes said. The final piece, the firing pin, is a common nail available from any hardware store. The printer used ABS plastic to create the gun parts, which were then slotted together by Wilson. After Forbes's revelation, the BBC filmed a later test, in which Wilson successfully fired the gun by hand.

The Undetectable Firearms Act of 1988 makes it illegal to manufacture in the US any firearm that is not detectable by walk-through metal detectors. To combat this, Wilson inserted a 6oz piece of steel into the body of his gun, making it legal.

How long the law stays this way remains to be seen, however. On Sunday, New York senator Charles Schumer called for legislation to make building a gun with a 3D printer illegal, and said he and the New York congressman Steve Israel would introduce the Undetectable Firearms Modernisation Act, which would ban weapons like Wilson's.

Such an act would not be the first setback for Wilson, a law student at the University of Texas. An attempt to raise money for the 3D printed gun project through Indiegogo was thwarted when the crowdfunding website took his pitch offline, citing a breach of rules. After Wilson raised $20,000 through Bitcoin donations, he was hindered again when

Stratys seized back his printer.

Defense Distributed acquired a second-hand Stratys, however, and carried on experimenting. Wilson successfully made and tested parts of an AR-15 semi-automatic rifle - the weapon which has been used in a number of mass shootings in the US - before turning his attention to a plastic handgun.

More news

## Topics

US gun control

3D printing

3D

# EXHIBIT

# 2

DOSWASHINGTONSUP00467



United States Department of State

*Bureau of Political-Military Affairs*
*Office of Defense Trade Controls Compliance*

*Washington, D.C. 20522-0112*

MAY 0 8 2013

In reply refer to
DTCC Case: 13-0001444

Mr. Cody Wilson
Defense Distributed
711 W. 32nd Street, Apt. 115
Austin, TX 78705

Dear Mr. Wilson:

The Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance, Enforcement Division (DTCC/END) is responsible for compliance with and civil enforcement of the Arms Export Control Act (22 U.S.C. 2778) (AECA) and the AECA's implementing regulations, the International Traffic in Arms Regulations (22 C.F.R. Parts 120-130) (ITAR). The AECA and the ITAR impose certain requirements and restrictions on the transfer of, and access to, controlled defense articles and related technical data designated by the United States Munitions List (USML) (22 C.F.R. Part 121).

DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

Technical data regulated under the ITAR refers to information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles, including information in the form of blueprints, drawings, photographs, plans, instructions or documentation. For a complete definition of technical data, see § 120.10 of the ITAR. Pursuant to § 127.1 of the ITAR,

DOSWASHINGTONSUP00468

Case 2:20-cv-00011-RAJ   Document 32-11   Filed 01/24/20   Page 76 of 99
Case 1:15-cv-00372-RP   Document 31-1   Filed 06/10/15   Page 32 of 89

- 2 -

it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR.

The Department believes Defense Distributed may not have established the proper jurisdiction of the subject technical data. To resolve this matter officially, we request that Defense Distributed submit Commodity Jurisdiction (CJ) determination requests for the following selection of data files available on DEFCAD.org, and any other technical data for which Defense Distributed is unable to determine proper jurisdiction:

1. Defense Distributed Liberator pistol
2. .22 electric
3. 125mm BK-14M high-explosive anti-tank warhead
4. 5.56/.223 muzzle brake
5. Springfield XD-40 tactical slide assembly
6. Sound Moderator – slip on
7. "The Dirty Diane" 1/2-28 to 3/4-16 STP S3600 oil filter silencer adapter
8. 12 gauge to .22 CB sub-caliber insert
9. Voltlock electronic black powder system
10. VZ-58 front sight.

DTCC/END requests that Defense Distributed submit its CJ requests within three weeks of receipt of this letter and notify this office of the final CJ determinations. All CJ requests must be submitted electronically through an online application using the DS-4076 Commodity Jurisdiction Request Form. The form, guidance for submitting CJ requests, and other relevant information such as a copy of the ITAR can be found on DDTC's website at http://www.pmddtc.state.gov.

Until the Department provides Defense Distributed with final CJ determinations, Defense Distributed should treat the above technical data as ITAR-controlled. This means that all such data should be removed from public access immediately. Defense Distributed should also review the remainder of the data made public on its website to

DOSWASHINGTONSUP00469

- 3 -

determine whether any additional data may be similarly controlled and proceed according to ITAR requirements.

Additionally, DTCC/END requests information about the procedures Defense Distributed follows to determine the classification of its technical data, to include the aforementioned technical data files. We ask that you provide your procedures for determining proper jurisdiction of technical data within 30 days of the date of this letter to Ms. Bridget Van Buren, Compliance Specialist, Enforcement Division, at the address below:

Office of Defense Trade Controls Compliance
PM/DTCC, SA-1, Room L132
2401 E Street, NW
Washington, DC  20522
Phone:  202-663-3323.

We appreciate your full cooperation in this matter.  Please note our reference number in any future correspondence.

Sincerely,

Glenn E. Smith
Chief, Enforcement Division

# EXHIBIT

# 3

DOSWASHINGTONSUP00471

# WILLIAMS MULLEN

Jahna M. Hartwig
Direct Dial: 202.293-8145
jhartwig@williamsmullen.com

June 21, 2013

Ms. Sarah Heidema
U.S. Department of State
Directorate of Defense Trade Controls
PM/DDTC, SA-1, Room 1200
2401 E Street, NW
Washington, DC 20037

Subject:   Commodity Jurisdiction Requests for Data Files Posted by Defense Distributed

Enclosures:   (1) Printouts of Drawings from Files Posted at DEFCAD.org
              (2) Wikipedia Page for 125mm BK-14M HEAT
              (3) Thingiverse Page for Sound Moderator
              (4) Thingiverse Page for VZ-58 Front Sight
              (5) Examples of Solvent Trap Adapters
              (6) Examples of CAD Files for .22 Pistols
              (7) Examples of CAD Files for Muzzle Brakes
              (8) Examples of CAD Files for Slide Assemblies
              (9) Examples of CAD Files for Voltlock System

Dear Ms. Heidema:

Defense Distributed has been requested by DTCC/END to submit requests for
commodity jurisdiction determinations in connection with Case No. 13-0001444 for ten sets of
data files posted to DEFCAD.org. As demonstrated below, the files are primarily Computer
Aided Design (CAD) data files and should be considered public domain information that is
excluded from the ITAR pursuant to Section 120.11. Defense Distributed therefore respectfully
requests a determination that these files are not subject to the ITAR.

## COMMODITY DESCRIPTIONS

Each of these Commodity Jurisdiction requests relates to data files, almost all of which
are essentially blueprints that can be read by CAD software. A description of each file or set of
files is set out below. The files are in one of the following formats:

> • STL (STereoLithography or Standard Tessellation Language) is a file format
>   native to the stereolithography CAD software and can be used with some 3D
>   printers. "Stereolithography" is a means of creating physical 3D models of objects
>   using resin or carefully cut and joined pieces of paper. STL files describe only

the surface geometry of a three dimensional object without any representation of
color, texture or other common CAD model attributes.

- The IGS (Initial Graphics Exchange Specification) file format is the standard
  format for transferring three-dimensional models between CAD programs. IGS
  files can store wireframe models, surface or solid object representations, circuit
  diagrams, and other objects.
- SLDPRT is the proprietary image file format associated with the SolidWorks
  brand CAD software. SLDPRT files contain three-dimensional images of one
  specific part of a product.
- SKP is the CAD drawing format for Google Sketchup, which is a quick, entry-
  level 3D drawing program.

There are also a small number of Word (.DOC), text (.TXT) or image (.JPG or .BMP) files. A
printout of each file is attached to the relevant DS-4076.

As explained further below, each of these files either was previously placed in the public
domain or contains only public domain information.

### 1. Liberator Pistol Data Files

The files for the Liberator Pistol include sixteen STL files for the various parts and
components of the pistol, two "read me" text files that explain how to lawfully assemble the
pistol, a diagram of a pistol, and a permissive software license. If printed on a 3D printer, the
parts could be assembled into a single shot .380 caliber firearm.

### 2. .22 Electric Data Files

The files for the .22 Electric are two stereolithography (STL) CAD files for models of a
barrel and grip for a .22 caliber pistol. If printed, the barrel would be a plastic cylinder with a .22
mm bore and the grip would be a plastic piece with two 5mm diameter holes. If those pieces
were printed in plastic and used with an electronic system and firing mechanism, the barrel
would be expected to fail upon firing.

### 3. 125 mm BK-14M High Explosive Anti-Tank Warhead Model Data File

The file is a STL CAD file for a model of a BK-14M high explosive anti-tank warhead
without fins. The model, if printed on a 3D printer, would be a solid piece of plastic in the shape
of the warhead, but would not be capable of functioning as a warhead.

### 4. 5.56/.223 Muzzle Brake Data Files

The data files are three different CAD file formats (.IGS. .SLDPRT, and .STL) for a
model of a 5.56/.223 muzzle brake. If printed on a 3D printer, the model would be a plastic
piece in the shape of the muzzle brake, but would be expected to fail if used with a weapon.

### 5. Springfield XD-40 Tactical Slide Assembly Data Files

The files are nineteen Computer Aided Design (CAD) data files in the SolidWorks
.SLDPRT file format for models of components of a pistol slide for the Springfield XD-40. The

DOSWASHINGTONSUP00473

components, if printed on a 3D printer, would be plastic pieces in the shape of the components of the slide assembly, but would be expected to fail if used with a weapon.

### 6. Sound Moderator – Slip On File

The file is a stereolithography CAD file for a model of a slip-on sound moderator for an air gun. The model, if printed on a 3D printer, would work with an air gun, but would likely melt if used with a firearm.

### 7. "The Dirty Diane" ½-28 to ¾-16 STP S3600 Oil Filter Silencer Adapter Files

The file is a CAD data file in the SolidWorks .SLDPRT file format for a model of an oil filter silencer adapter that is typically produced in stainless steel. If printed on a 3D printer, this item could be used as a solvent trap adapter, which is used to catch solvents that are used in the process of cleaning a gun. While a metal solvent trap adapter could be used as a silencer, a plastic adapter would likely melt if used with a weapon as a silencer.

### 8. 12 Gauge to .22 CB Sub-Caliber Insert Files

The files are a SKP CAD file for a model of a sub-caliber insert, two renderings of the sub-caliber insert, and a "read me" text file providing information about the National Firearms Act and the Undetectable Firearms Act. This item, if printed on a 3D printer, would be a plastic cylinder with a .22 bore, and would be expected to fail if used with a weapon.

### 9. Voltlock Electronic Black Powder System Files

The files are twelve CAD files for models of cylinders of various bores with a touch hole. Eleven of the files are in the STL file format and one is in the IGS format. If those pieces were printed on a 3D printer and used with an electronic ignition, the barrel would be expected to fail.

### 10. VZ-58 Front Sight Files

The files are a SolidWorks CAD file in the .SLDPRT file format and a rendering of a model of a sight for a VZ-58 rifle. If printed on a 3D printer and used with a weapon, the sight would be expected to fail.

## DATA ORIGIN

With the exception of item 1 (Liberator Pistol Data Files), each of these files was provided to Defense Distributed by the creator of the files identified in the DS4076. In addition, as explained below, many of these files were originally posted to www.thingiverse.com or other internet sites, and were freely available to any person with access to the internet.

The Liberator Pistol CAD files were developed by Defense Distributed. The Liberator pistol was designed as a combination of already extant and working files and concepts. The pistol frame, trigger housing, and grip specifications were all taken directly from an AR-15 lower receiver file that is in the public domain. The spring file is taken from a toy car file available on Thingiverse. The hammer relies on striking a common roofing nail, and the barrel is a cylinder bored for .380. The gun functions because of the properties of the .380 cartridge – the brass

casing itself is relied on to act as a breech. The printed and assembled gun is a simple improvised weapon, not as complex as many of the improvised weapons of the 20th century, those available in Army manuals, etc. All of the technologies used to create the Liberator data files are widely available in the public domain.

## IDENTICAL & SIMILAR FILES

The Liberator Pistol data files are for an improvised firearm that is similar to and based on numerous items that are available on the internet as well as in various books. The Library of Congress online catalog lists numerous books on gunsmithing, including

- Clyde Baker, Modern gunsmithing; a manual of firearms design, construction, and remodeling for amateurs & professionals (1959)
- John E. Traister, Clyde Baker's Modern gunsmithing : a revision of the classic (1981)
- Frank de Haas, Mr. Single Shot's gunsmithing idea book (1983)
- Roy F. Dunlop, Gunsmithing (1996),
- Franklin Fry, Gunsmithing fundamentals : a guide for professional results (1988),
- James Virgil Howe, The modern gunsmith : a guide for the amateur and professional gunsmith in the design and construction of firearms, with practical suggestions for all who like guns (1982),
- Gérard Métral, A do-it-yourself submachine gun: it's homemade, 9mm, lightweight, durable, and it'll never be on any import ban lists! (1995),
- Jack Mitchell, The Gun digest book of pistolsmithing (1980),
- J. Parrish Stelle, The gunsmith's manual; a complete handbook for the American gunsmith (1883), and
- Patrick Sweeney, Gunsmithing: pistols & revolvers (2009),

among many others. Examples of online sources include:

- http://www.weaponscombat.com/zip-pipe-and-pen-guns
- http://www.infinitearms.com/images2/v/manuals/Misc+Gun+Plans
- http://thehomegunsmith.com
- http://www.scribd.com/doc/24445441/Pen-Gun-Mk1-Blueprint
- https://www.google.com/search?q=zip+gun+blueprints&rlz=1C1SKPM_enUS43 6US489&source=lnms&tbm=isch&sa=X&ei=9t- oUZybJILm8wSx0YHoBg&ved=0CAoQ_AUoAQ&biw=1600&bih=837
- http://ebookbrowse.com/gu/guns-homemade

Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun.

A drawing of the 125 BK-14M HEAT (Item 3), including measurements, is currently available on Wikipedia at http://en.wikipedia.org/wiki/File:125mm_BK-14m_HEAT.JPG.

The Sound Moderator CAD file (Item 6) was published on Thingiverse on March 3, 2011 and is still available on that site at http://www.thingiverse.com/thing:6808. The VZ-58 Front Sight (Item 10) was also published to Grabcad on December 14, 2012 and is still available on that site at http://grabcad.com/library/front-sight-for-vz-dot-58-rifle.

The Oil Filter Silencer Adapter is identical to Solvent Trap Adapters, which are produced by numerous manufacturers and available as commercial products on many websites, including amazon.com. (see http://www.amazon.com/s/ref=nb_sb_noss_1?url=search-alias%3Dautomotive&field-keywords=solvent+trap+adapter&rh=n%3A15684181%2Ck%3Asolvent+trap+adapter.) These items appear to be commercial products that would be subject to the EAR. As such, any related technologies or technical data would also be subject to the EAR.

Examples of CAD files similar to the .22 Electric Pistol (Item 2), Muzzle Brake (Item 4), Slide Assembly (Item 5), and Voltlock Electronic Black Powder System (Item 9) that are currently available on the internet are attached to the relevant DS4076.

As demonstrated above, all of the technical information included in the data files posted to DEFCAD.org was previously available in the public domain. As such, this information is excluded from the definition of "technical data" by 22 C.F.R. § 120.10(a)(5). For these reasons, Defense Distributed respectfully requests that the Department determine that the subject data files posted to DEFCAD.org are not subject to the ITAR.

This submission contains Defense Distributed confidential business information. We respectfully request that the submission be kept confidential. If you need additional information regarding this submission, please contact me at 202-293-8145 or jhartwig@williamsmullen.com.

Sincerely,

Jahna M. Hartwig

# EXHIBIT

# 4

DOSWASHINGTONSUP00477

**MATTHEW A. GOLDSTEIN, PLLC**
1012 14TH STREET, NW, SUITE 620
WASHINGTON  DC 20005

**VIA ELECTRONIC FILING**

January 2, 2015

PM/DDTC, SA-1, 12th Floor
Office of Defense Trade Controls
Bureau of Political Military Affairs
U.S. Department of State
Washington, D.C. 20522-0012

**SUBJECT:  Commodity Jurisdiction Request for Ghost Gunner Machine, Plastic
Mounting Jig, User Instructions, and Software** (Defense Distributed, Inc.,
PM/DDTC Code M-34702)

Dear Sir or Madam:

Pursuant to Section 120.4 of the International Traffic in Arms Regulations ("ITAR") (22
C.F.R. Sections 120-130), Defense Distributed requests a commodity jurisdiction determination
from the Directorate of Defense Trade Controls ("DDTC") on the Ghost Gunner machine (the
"Ghost Gunner"), its plastic mounting jig, user instructions, and software for production,
operation, and use of the Ghost Gunner.

The Ghost Gunner is an approximately one-foot-cubed black box that uses a drill bit
mounted on a head that moves in three dimensions to automatically carve digitally-modeled
shapes into polymer, wood or aluminum.  It functions as a 3-axis computer-numerically-controlled
("CNC") press that can be used to manufacture parts to firearms controlled under U.S. Munitions
List ("USML") Category I.  It can also be used to manufacture items that are not controlled under
the USML.  The machine was designed, developed, and manufactured by Defense Distributed to
automatically manufacture publicly available designs with nearly zero user interaction.

As discussed below, the Department of Defense recommended that Defense Distributed
submit this commodity jurisdiction request.

Export jurisdiction over the Ghost Gunner, Jig, software, and instructions is uncertain
because, although the Department of Commerce Export Administration Regulations ("EAR")
maintain a control listing for jigs, fixtures, and other metal-working items "exclusively designed
for use in the manufacture of firearms" under Commerce Control List ("CCL") Export Control
Number ("ECCN") 2B018.n, there is no corresponding carve-out for these items and related
software and technical information otherwise controlled by USML Category I generally; and
Category I(i) controls technical data and defense services directly related to firearms, with
technical data directly related to the manufacture or production of firearms designated as
Significant Military Equipment.

Please note that a letter from Defense Distributed authorizing my law firm to file this
request was uploaded with this DS-4076 submission.  Please direct any questions and all
correspondence related to this request to my office.  Communications to me at
matthew@goldsteinpllc.com are preferred.

DOSWASHINGTONSUP00478

## I.    BACKGROUND

### A.    Defense Distributed

Defense Distributed is a Texas corporation, registered with the Department of State under PM/DDTC Code M-34702. The company has developed technical information that can be used to produce, manufacture, and assemble various parts components, accessories, and attachments to firearms controlled under USML Category I. This includes information for the design and production of the Ghost Gunner, software necessary to operate Ghost Gunner, and code that allows production of certain items by the Ghost Gunner.[1]

Following notification from DDTC in May 8, 2013, that the agency requires U.S. Government prior approval before publications of otherwise ITAR-controlled technical data into the public domain (Attachment 1), Defense Distributed has submitted requests for U.S. Government clearance of technical data to the Department of Defense Office of Prepublication and Security Review ("DOPSR").[2] On October 1, 2014, DOPSR returned a Defense Distributed request for clearance of technical information on the Ghost Gunner for public release, stating that commodity jurisdiction over the item was uncertain and recommending that Defense Distributed submit a commodity jurisdiction request. See Attachment 2.

### B.    The Ghost Gunner

Existing CNC machines are expensive or too inaccurate to manufacture firearms for the casual user. Defense Distributed developed the Ghost Gunner to address this problem by miniaturizing the build envelope to just large enough to mill common firearm receivers, which in turn improves rigidity, reduces material cost and simultaneously relaxes certain design limits, allowing Defense Distributed to sell an inexpensive machine with more than enough accuracy to manufacture firearms.

The first design tested on the Ghost Gunner was for an AR-15 lower receiver and the Ghost Gunner was able to automatically find, align, and mill a so-called "80%" lower receiver, which was not a firearm prior to milling. The Ghost Gunner has since undergone several design revisions to reduce machine chatter, backlash, and jitter, all with the goal of keeping total design cost low.

Photographs of Ghost Gunner are provided at Attachment 3 and rendered images of the machine with the plastic jig are provided at Attachment 4.

---

[1] This commodity jurisdiction request seeks a determination of the code necessary to operate Ghost Gunner. It does not seek a determination on the various project files specific to production of certain items by the Ghost Gunner.

[2] In complying with DDTC prepublication review requirements on publication of technical information into the public domain, Defense Distributed does not intent to, nor should it be considered to, waive any defense, claim or right under law.

DOSWASHINGTONSUP00479

A schematic drawing for the Ghost Gunner is provided at Attachment 5.

Ghost Gunner form, fit, function, and performance characteristics include the following:

* It uses a compact, powder coated A36 steel frame and thick stainless T-slot rail, with preloaded ball bearings for maximum rigidity. Linear motion is achieved with low-backlash direct-drive ball screws mounted in-line with the cutting surface, thus preventing torsional gantry chatter while machining.

* It incorporates an electronic probe that automatically detects when the machine comes into contact with the work piece, allowing automatic part discovery and alignment. Ghost Gunner requires conductive parts if auto-discovery and alignment are used.

* It can manually machine nonconductive materials, but this requires manual calibration of a part to the machine - following a few simple instructions - as is required with existing CNC machines.

* Its moving parts are entirely sealed from chip debris. All bearings are sealed and contain wipers to prevent foreign contaminate entry. The rails are stainless steel and are factory lubricated, but do require periodic wiping to prolong life. End Mills dull over time and are considered a consumable.

* To contain aluminum chips, it includes a chip collection tray and all moving components are fully enclosed.

* It is capable of manufacturing deep pockets due to its horizontal gantry, which allows gravity to pull chips away from the cutting surface before they can build up and dull the end mill, as is the case on traditional CNC designs.

* It uses industry standard ER-11 collets, and ships with both 1/4" and 5/32" collets.

* It uses a standard IEC power cord and is compatible with any 110/220V circuit. No external power brick is used; the machine is entirely self-contained.

* It has two ports: Power (IEC standard) and USB (Type 'B').

* Its machinable dimensions are 140 x 75 x 60mm (~5.50 x 2.95 x 2.35")

* Its maximum part dimensions are 230 x 90 x 100mm (~9.05 x 3.50 x 3.90")

* Its overall footprint is 330 x 280mm (~13 x 11")

* Its weight is 20kg (~45 pounds)

Case 2:15-cv-00372-RAJ   Document 32-1   Filed 06/18/20   Page 88 of 99

- Its Spindle Speed is 10,000+ RPM (Final Value TBD)

- Its software requirements are Windows 7 or higher. Mac version TBD

As noted above, Ghost Gunner is capable of manufacturing more than just firearm receivers. With Defense Distributed's open source Physibles Development SDK ("pDev"), designers can distribute files via the company's '.dd' file format, which contains all installation and assembly instructions, any required jig files to hold a part in place (that users can print with a 3D printer), and all machine definitions and code to physically manufacture a particular design. To a casual user, the .dd file is a one-stop solution to manufacturing any aluminum physible that the public can design to fit into the build envelope. Defense Distributed will be developing in and supporting this format.

The .dd file format is itself open source and not constrained to the Ghost Gunner or Defense Distributed; any user can define any existing machine's specific parameters via the machine parameters list. A single file can contain specific code and installation instructions for any number of machines. A user with both a Ghost Gunner and a Tormach P1100 could manufacture a particular .dd file on either machine and manufacture the same physible with zero additional user knowledge, as only the instructions required for a particular machine are revealed to the end user. The .dd file format is a CNC response to 3D printing's universal .stl file format. However, Ghost Gunner will also accept TinyG code from any CAM program.

In operation, users provide the parts for milling. They can then simply plug their computer into the Ghost Gunner, install the Ghost Gunner software, and download any compatible .dd design file. 3D printable jigs are used to hold each part in place as each milling step is performed. For example, milling an eighty percent AR-15 lower receiver requires two jig pieces to secure the lower in place while the trigger pocket is milled, and then two more jig pieces are installed to drill the trigger pinholes. As most eighty percent firearms require deep pocket milling, Ghost Gunner's mounting table is parallel to the end mill shaft. This orientation maximizes 3D printed jig strength, minimizes jig complexity, and mechanically aligns the part to the machine upon insertion into the Maker Slide-patterned, Open Source T Slot stainless rails.

Defense Distributed expects its typical order fulfillment will contain the fully assembled Ghost Gunner CNC, plastic mounting jig designed to secure 80% AR-15 receivers, operating software and instructions. Defense Distributed also intends to place instructions and computer code needed to build and use Ghost Gunner into the public domain as Open Source technology.

Block 13 ("Sales information) is not provided with this request because the Ghost Gunner is still in development as Defense Distributed awaits arrival of various production pieces and continues to make any required changes to the product. As such, the company has not yet delivered any machines (i.e., no completed sales). However, the company has accepted 469 pre-orders and 413 advance deposits from prospective purchasers. Each of these orders, except for one, are intended for domestic sale. In addition, consistent with U.S. law, final sales will carry conditions that limit purchases to private use (i.e., not for commercial or military use).

DOSWASHINGTONSUP00481

### C.   User Instructions and Operating Software for the Ghost Gunner

The current draft User Instructions for the Ghost Gunner accompanies this commodity jurisdiction request at Attachment 6. It contains information on how to attach a "80%" lower receiver to Ghost Gunner, such that Ghost Gunner can mill and drill all required holes to transform the lower receiver into a firearm. Ghost Gunner presents numerous User Instructions, User Graphics, and User Selections to the operator. Ghost Gunner performs work via Calibration Code and Milling Code. Ghost Gunner also assists the user in creating 3D printable Jigs, if needed.

The software necessary to produce and operate the Ghost Gunner includes AutoDesk Inventor and a simple executable application that can interpret CNC part files and TinyG code. Additional information detailing the purpose, function, and capability of the software, as requested by DDTC's DS-4076 Commodity Jurisdiction (CJ) Guidance for Software, accompanies this commodity jurisdiction request at Attachment 7.

## II.   COMMODITY JURISDICTION STANDARD

The standard applicable to Department of State and other agency considerations of commodity jurisdiction is set forth at ITAR Section 120.3. ITAR Subsection 120.3(a) extends Department of State jurisdiction to any item that meets the criteria of a defense article described on the USML or that provides equivalent performance capabilities; and ITAR Section 120.3(b) provides that a specific article not presently described on the USML shall be determined in the future as a defense article if it provides a critical military or intelligence advantage.

### A.   Relevant USML Control Listings

Subparagraph (h) to USML Category I controls components, parts, accessories, and attachments for firearms to .50 caliber inclusive. The Ghost Gunner does not meet the Category I(h) criteria because it is not a component or part to a firearm. Rather, it is a machine that can be used for the manufacture of such articles.

Subparagraph (i) to USML Category I controls technical data, to include "software" as defined at Section 120.45(f), and defense services directly related to the firearms and components, parts, accessories, and attachments for firearms to .50 caliber inclusive. Technical data directly related to the manufacture or production of firearms controlled in Category I is designated as Significant Military Equipment.

The USML does not contain a control listing that describes items used for the manufacture of firearms. Instead, that listing is contained on the EAR Commerce Control List ("CCL") entry for ECCN 2B018.n, which controls "Jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms. ECCN 2D018 controls software" for the "development", "production" or "use" of equipment controlled by 2B018; and ECCN 2E018, in turn, controls "Technology" for the "use" of equipment controlled by 2B018.

The scope of the CCL controls on firearms manufacturing equipment and technology is unclear because the EAR only controls items not described on the USML and Category I does not contain any carve-out from ITAR control for software or technology controlled under ECCNs 2D018 and 2E018. To the contrary, if literally applied, USML Category I(i) treats such technical information as Significant Military Equipment.

Because there is no specific carve-out in Category I or elsewhere in the USML for software or technology controlled by 2D018 and 2E018, it is very difficult to distinguish between technical data for the manufacture or production of firearms controlled in Category I and technology for the development, production, and use of equipment used to manufacture firearms controlled at 2D018 and 2E018. This is a primary concern of the present commodity jurisdiction request.

Nevertheless, EAR control is consistent with U.S. Implementation of Wassenaar Controls. Specifically, ECCNs 2B018, ECCN 2E018, and 2B018 are Wassenaar Arrangement-based controls, subject to the National Security reason for control and which correspond to Category 2 of the Wassenaar Arrangement List of Dual-Use Items. In fact, 2B018 is titled, "Equipment on the Wassenaar Arrangement Munitions List."

Although relevant text of the ITAR and EAR control listings lack clarity, it appears that the U.S. Government decided to implement export controls on firearms manufacturing equipment and associated technical information in the EAR when it first implemented the Wassenaar Arrangement controls for such items. Accordingly, Defense Distributed believes that the Ghost Gunner does not meet criteria of a defense article described on the USML and that it does not provide equivalent performance capabilities to an article described on the USML.

Defense Distributed further notes that the DDTC should consider amending USML Category I to provide an express carve-out for EAR items controlled under ECCNs 2B018.n, ECCN 2E018, and 2B018. Alternatively, if DDTC intends to control firearms manufacturing equipment under the USML, it should make this clear in the regulations. Towards this end, any determination on the instant request that imposes ITAR control should be widely disseminated and shared with the firearms manufacturing industry.

### B.    Ghost Gunner Does Not Provide a Critical Military or Intelligence Advantage.

As noted above, ITAR Section 120.3(b) provides that a specific article not presently described on the USML shall be determined in the future as a defense article if it provides a critical military or intelligence advantage.

The function and performance of the Ghost Gunner does not provide a critical military or intelligence advantage. Rather, it is essentially a jig press based on a simple design that is easily replicated by any skilled machinist. In fact, the Ghost Gunner can be produced by persons with no formal engineering background.

DOSWASHINGTONSUP00483

In addition, Ghost Gunner builds on technology readily available in the Open Source community, including the gshield 3 axis motion hardware (http://synthetos.myshopify.com/products/gshield-v5), the grbl g-code parser and motion controller (https://github.com/grbl/grbl), and the Arduino microcontroller (http://arduino.cc).

Further, instructions and/or electronic files for production of jig presses with similar form, fit, and function to the Ghost Gunner are publicly available for download at a variety of web addresses, to include the following:

http://aresarmor.com/store/Item/Polymer-80-Black
http://www.thingiverse.com/thing:160266
https://github.com/DefiantCad/defcad-repo/tree/master/Rifles/AR-15_80_percent_lower_v5-shadowfall/AR-15_80_percent_Lower_Drill_Jig_v1-Shadowfall
http://www.advancedrifles.com/3d-printed-jig-version-2-0/
http://www.80percentarms.com/products/80-ar-15-easy-jig
http://www.sierranevadaarms.com/jig.pdf
http://www.rockethub.com/projects/24384-80-lower-receiver-ar15-ar10-rudius-1911

## III.   CONCLUSION

Considering the apparent intent of the U.S. Government in implementing relevant Wassenaar Arrangement controls in the EAR, Defense Distributed believes that the Ghost Gunner does not meet the criteria of an article described on the USML. In addition, the Ghost Gunner does not provide a critical military or intelligence advantage. Accordingly, Defense Distributed respectfully requests that the Department of State issue a commodity jurisdiction determination stating that the Ghost Gunner, its plastic mounting jig, operating software, and production and operation instructions do not meet the criteria of ITAR 120.3 and are subject to Department of Commerce jurisdiction under the EAR.

Defense Distributed authorizes the release for general publication of the information contained in Block 5 of the DS-4076 Form. However, other information in this request and documents submitted with Defense Distributed's DS-4076 Submission contain sensitive business information that is proprietary, confidential, and exempt from disclosure under the Freedom of Information Act, 5 U.S.C. Section 552, and is also protected under the Trade Secrets Act, 18 U.S.C. Section 1905. Accordingly, pursuant to ITAR Section 130.15, Defense Distributed requests that information in this submission other than that contained in Block 5 be withheld in the event of a request for its disclosure.

DOSWASHINGTONSUP00484

Thank you for your prompt attention to this matter and please contact me at 202-550-0040 or at matthew@goldsteinpllc.com if any additional information is needed.

Yours truly,

Matthew A. Goldstein
Legal Counsel

COMPANY CERTIFICATION:

Cody Wilson, the Principal of Defense Distributed, certifies that he is the duly authorized representative of Defense Distributed; and that in such capacity, he certifies that he has carefully read the foregoing Commodity Jurisdiction request; and that the contents of the request are true and correct to the best of his knowledge, information and belief after reasonable inquiry into the matters discussed.

Signature                                          1/2/2015
                                                   Date

ATTACHMENTS TO LETTER OF EXPLANATION:

| Attachment 1 | May 8, 2013 DDTC Letter to Defense Distributed |
| Attachment 2 | October 1, 2014 DOPSR Letter to Defense Distributed |
| Attachment 3 | Photographs of Ghost Gunner Machine |
| Attachment 4 | Rendered Images of Ghost Gunner Machine |
| Attachment 5 | Ghost Gunner Schematics |
| Attachment 6 | Ghost Gunner User Instructions |
| Attachment 7 | Answers to DS-4076 Commodity Jurisdiction (CJ) Guidance for Software |

www.GoldsteinPLLC.com

Scanned by CamScanner

DOSWASHINGTONSUP00485

Commodity Jurisdiction Request
January 2, 2015
Page 9 of 9

**OTHER ATTACHMENTS INCLUDED WITH DS-4076 SUBMISSION:**

DD_DS4076.pdf

DD_Attorney_Authorization_Letter_Block_2-1.pdf

[Instant document] DD_Cover_Ltr_Block_6-1.pdf

DD_Certification_Block_19-1.pdf

DOSWASHINGTONSUP00486

# EXHIBIT

# 5

DOSWASHINGTONSUP00487



United States Department of State

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

Washington, D.C. 20522-0112

In Reply refer to
DDTC Case CJ 1083-14 (RE-ISSUE)

APR 1 5 2015

YOUR SUBMISSION DATED: January 2, 2015

COMMODITY JURISDICTION DETERMINATION FOR: **Ghost Gunner Machine, Plastic Mounting Jig, User Instructions, and Software**

The product described in your submission is a one cubic foot box that functions as a 3-axis, computer-numerically-controlled (CNC) press capable of automatically milling parts out of various materials through software designs.

A technical review of your commodity jurisdiction (CJ) request has been concluded by the requisite agencies of the United States Government. A split jurisdiction determination of this request has been determined, as follows:

> The Department of State has determined that the **Ghost Gunner, its plastic mounting jig, operating software, and production and operation instructions are not subject to the jurisdiction of the Department of State.** However, export may require authorization from the Department of Commerce (DOC). Please consult the DOC Office of Exporter Services at (202) 482-4811 to make a Classification Request (CCATS) and satisfy other applicable requirements prior to export.

> The Department of State has determined that the **project files, data files, or any form of technical data for producing a defense article, including an 80% AR-15 lower receiver, are subject to the jurisdiction of the Department of State in accordance with the International Traffic in Arms Regulations (ITAR) (22 CFR 120 through 130).** They are

Continued on Page Two

Cody R. Wilson
Defense Distributed, Inc.
1101 W 34th Street, #340
Austin, TX 78705
crw@defdist.org

DOSWASHINGTONSUP00488

Page Two

In Reply refer to
DDTC Case CJ 1083-14

> designated as technical data under Category I(i) of the United
> States Munitions List (USML). A license or other approval is
> required pursuant to the ITAR prior to any export or temporary
> import.

Should you not agree with this determination and have additional facts not
included in the original submission, you may submit a new CJ request. If you do
not agree with this determination and have no additional facts to present, you may
request that this determination be reviewed by the Deputy Assistant Secretary of
State for Defense Trade Controls.

Should you require further assistance on this matter, please contact Samuel
Harmon at (202) 663-2811 or HarmonSC@state.gov.

Sincerely,

C. Edward Peartree
Director
Office of Defense Trade Controls Policy

Cc: Matthew A. Goldstein
1012 14th Street, NW, Suite 620
Washington, DC 20005
matthew@goldsteinpllc.com

# EXHIBIT

# 6



**United States Department of State**

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

*Washington, D.C. 20522-0112*

In Reply refer to
DDTC Cases CJ 651-13 through 660-13

JUN 0 4 2015

YOUR SUBMISSION DATED: June 21, 2013

COMMODITY JURISDICTION DETERMINATIONS FOR: **Liberator Pistol Data Files, .22 Electric Data Files, 125 mm BK-14M High Explosive Anti-Tank Warhead Model Data File, 5.56/.223 Muzzle Brake Data Files, Springfield XD-40 Tactical Slide Assembly Data Files, Sound Moderator - Slip On Data File, "The Dirty Diane" Oil Filter Silencer Adapter Data File, 12 Gauge to .22 CB Sub-Caliber Insert Data Files, Voltlock Electronic Black Powder System Data Files, and VZ-58 Front Sight Data Files**

The data described in your submission are Computer Aided Design (CAD) data files that can be used in a 3D printer to produce physical models of the associated item.

A technical review of your commodity jurisdiction (CJ) request has been concluded by requisite agencies of the United States Government. The findings of that technical review are:

The Department of State has determined that the **125 mm BK-14M High Explosive Anti-Tank Warhead Model Data File, Sound Moderator - Slip On Data File, and "The Dirty Diane" Oil Filter Silencer Adapter Data File are not subject to the jurisdiction of the Department of State.** The Department of Commerce (DOC) advises that these items are classified as EAR99. Please consult the DOC Office of Exporter Services at (202) 482-4811 to satisfy applicable requirements prior to export.

The Department of State has determined that the **Voltlock Electronic Black Powder System Data Files are not subject to the jurisdiction of the**

Continued on Page Two

Cody R. Wilson
Defense Distributed
711 W. 32nd Street, Apt. 115
Austin, TX 78705
crw@defdist.org

DOSWASHINGTONSUP00491

Page Two

In Reply refer to
DDTC Cases CJ 651-13 through 660-13

**Department of State.** However, export may require authorization from the Department of Commerce (DOC). Please consult the DOC Office of Exporter Services at (202) 482-4811 to make a Classification Request (CCATS) and satisfy other applicable requirements prior to export.

The Department of State has determined that the **Liberator Pistol Data Files, .22 Electric Data Files, 5.56/.223 Muzzle Brake Data Files, Springfield XD-40 Tactical Slide Assembly Data Files, 12 Gauge to .22 CB Sub-Caliber Insert Data Files (except for "read me" text file), and VZ-58 Front Sight Data Files are subject to the jurisdiction of the Department of State in accordance with the International Traffic in Arms Regulations (ITAR) (22 CFR 120 through 130).** They are designated as technical data under Category I(i) of the United States Munitions List (USML) pursuant to §120.10 of the ITAR. A license or other approval is required pursuant to the ITAR prior to any export or temporary import.

Should you not concur with this determination and have additional facts not included in the original submission, you may submit a new CJ request. If you do not concur with this determination and have no additional facts to present, then you may request that this determination be reviewed by the Deputy Assistant Secretary of State for Defense Trade Controls.

Should you require further assistance on this matter, please contact Sam Harmon at (202) 663-2811 or HarmonSC@state.gov.

Sincerely,

C. Edward Peartree
Director
Office of Defense Trade Controls Policy

Cc: Matthew A. Goldstein
1012 14th Street, NW, Suite 620
Washington, DC 20005
matthew@goldsteinpllc.com