UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF STATE, et al.,

Defendants.

No. 2:20-cv-0111-RAJ

**FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT 4

H.R. Rep. 115-200 (July 6, 2017)

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

115TH CONGRESS
*1st Session*

HOUSE OF REPRESENTATIVES

REPORT
115–200

# NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2018

---

## R E P O R T

OF THE

## COMMITTEE ON ARMED SERVICES
## HOUSE OF REPRESENTATIVES

ON

## H.R. 2810

together with

ADDITIONAL VIEWS

[Including cost estimate of the Congressional Budget Office]

JULY 6, 2017.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

# NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2018

115TH CONGRESS
*1st Session*

HOUSE OF REPRESENTATIVES

REPORT
115–200

# NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2018

---

## R E P O R T

OF THE

## COMMITTEE ON ARMED SERVICES HOUSE OF REPRESENTATIVES

ON

## H.R. 2810

together with

ADDITIONAL VIEWS

[Including cost estimate of the Congressional Budget Office]

JULY 6, 2017.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

U.S. GOVERNMENT PUBLISHING OFFICE

26–108 WASHINGTON : 2017

COMMITTEE ON ARMED SERVICES

ONE HUNDRED FIFTEENTH CONGRESS

WILLIAM M. "MAC" THORNBERRY, Texas, *Chairman*

WALTER B. JONES, North Carolina
JOE WILSON, South Carolina
FRANK A. LOBIONDO, New Jersey
ROB BISHOP, Utah
MICHAEL R. TURNER, Ohio
MIKE ROGERS, Alabama
TRENT FRANKS, Arizona
BILL SHUSTER, Pennsylvania
K. MICHAEL CONAWAY, Texas
DOUG LAMBORN, Colorado
ROBERT J. WITTMAN, Virginia
DUNCAN HUNTER, California
MIKE COFFMAN, Colorado
VICKY HARTZLER, Missouri
AUSTIN SCOTT, Georgia
MO BROOKS, Alabama
PAUL COOK, California
JIM BRIDENSTINE, Oklahoma
BRAD R. WENSTRUP, Ohio
BRADLEY BYRNE, Alabama
SAM GRAVES, Missouri
ELISE M. STEFANIK, New York
MARTHA MCSALLY, Arizona
STEPHEN KNIGHT, California
STEVE RUSSELL, Oklahoma
SCOTT DESJARLAIS, Tennessee
RALPH LEE ABRAHAM, Louisiana
TRENT KELLY, Mississippi
MIKE GALLAGHER, Wisconsin
MATT GAETZ, Florida
DON BACON, Nebraska
JIM BANKS, Indiana
LIZ CHENEY, Wyoming

ADAM SMITH, Washington
ROBERT A. BRADY, Pennsylvania
SUSAN A. DAVIS, California
JAMES R. LANGEVIN, Rhode Island
RICK LARSEN, Washington
JIM COOPER, Tennessee
MADELEINE Z. BORDALLO, Guam
JOE COURTNEY, Connecticut
NIKI TSONGAS, Massachusetts
JOHN GARAMENDI, California
JACKIE SPEIER, California
MARC A. VEASEY, Texas
TULSI GABBARD, Hawaii
BETO O'ROURKE, Texas
DONALD NORCROSS, New Jersey
RUBEN GALLEGO, Arizona
SETH MOULTON, Massachusetts
COLLEEN HANABUSA, Hawaii
CAROL SHEA–PORTER, New Hampshire
JACKY ROSEN, Nevada
A. DONALD MCEACHIN, Virginia
SALUD O. CARBAJAL, California
ANTHONY G. BROWN, Maryland
STEPHANIE N. MURPHY, Florida
RO KHANNA, California
TOM O'HALLERAN, Arizona
THOMAS R. SUOZZI, New York
TIMOTHY J. WALZ, Minnesota

JENNESS B. SIMLER, *Staff Director*

# CONTENTS

| | Page |
|---|---|
| Purpose of the Legislation | 1 |
| Rationale for the Committee Bill | 2 |
| Hearings | 6 |
| Committee Position | 6 |
| Explanation of the Committee Amendments | 6 |
| Relationship of Authorization to Appropriations | 7 |
| Summary of Discretionary Authorizations in the Bill | 7 |
| Budget Authority Implication | 7 |
| DIVISION A—DEPARTMENT OF DEFENSE AUTHORIZATIONS | 8 |
| TITLE I—PROCUREMENT | 8 |
| Aircraft Procurement, Army | 8 |
| Items of Special Interest | 8 |
| Health and Usage Monitoring Systems | 8 |
| Missile Procurement, Army | 8 |
| Items of Special Interest | 8 |
| Lethal Miniature Aerial Missile Systems | 8 |
| Procurement of Weapons and Tracked Combat Vehicles, Army | 9 |
| Items of Special Interest | 9 |
| Armored brigade combat team modernization | 9 |
| M240B medium machine gun inventory assessment | 11 |
| Small arms magazine procurement | 11 |
| Small arms production industrial base | 12 |
| Vehicle active protection systems | 12 |
| Procurement of Ammunition, Army | 13 |
| Items of Special Interest | 13 |
| Ammunition production base support | 13 |
| Clean disposal of conventional munitions | 13 |
| Other Procurement, Army | 13 |
| Items of Special Interest | 13 |
| Army land mobile radio acquisition | 13 |
| Army personal dosimeters | 14 |
| Heavy Equipment Transport System modernization strategy | 14 |
| Personnel and cargo parachute acquisition and management | 14 |
| Rough Terrain Container Handler recapitalization | 15 |
| Small unit support vehicle recapitalization strategy | 15 |
| Tactical network review | 16 |
| Vehicle medical kits | 16 |
| Aircraft Procurement, Navy | 17 |
| Items of Special Interest | 17 |
| EA–18G ALQ–99 tactical jamming system modernization | 17 |
| Implications of a 355-ship Navy on Naval and Marine Corps Aviation force structure requirements | 17 |
| Maritime intelligence, surveillance, and reconnaissance capabilities demonstration | 17 |
| MQ–4C Triton unmanned aircraft system | 18 |
| MV–22 upgrades | 19 |
| Naval aircraft physiological episodes | 19 |
| Procurement of Ammunition, Navy and Marine Corps | 20 |
| Items of Special Interest | 20 |
| Advanced Low Cost Munition Ordnance | 20 |
| Shipbuilding and Conversion, Navy | 21 |
| Items of Special Interest | 21 |
| America-class amphibious assault ships | 21 |
| Columbia-class submarine program | 21 |

Page

Guided missile patrol boats ..... 22
High-pressure Cold Spray repair ..... 22
Increased standardization and commonality for U.S. Navy shipbuilding programs ..... 22
Littoral Combat Ships capability enhancements ..... 23
Propeller shafts ..... 23
Protection of Navy ships against High-Altitude Electromagnetic Pulse ..... 24
Aircraft Procurement, Air Force ..... 24
Items of Special Interest ..... 24
A–10 to F–16 transition at Fort Wayne, Indiana ..... 24
A–10 wing replacement program ..... 24
B–52 modernization ..... 25
Bomber modernization ..... 25
C–130H Aircraft Modernization Program Increments 1 and 2 ..... 26
C–130H propulsion systems upgrades ..... 26
E–8C Joint Surveillance and Target Attack Radar System ..... 27
EC–130 Compass Call cross deck ..... 27
F–15C capability, capacity, and recapitalization ..... 28
F–16 radar modernization ..... 29
F–22 increment 3.2B upgrade ..... 29
F–35 Lightning II aircraft program ..... 30
Implications of increased Army, Navy, and Marine Corps force structure on Air Force airlift, air refueling tanker, and Navy sealift force structure requirements ..... 32
MQ–9 modernization and upgrades ..... 32
Next generation ejection seat acquisition ..... 33
RC–135S Cobra Ball ..... 34
Reporting on air traffic control avionics upgrades for Air Force aircraft ..... 34
RQ–4 and universal payload adapter integration ..... 35
Wide-area motion imagery intelligence capability ..... 35
Procurement, Defense-Wide ..... 36
Items of Special Interest ..... 36
MC–12 modernization initiatives ..... 36
Modernization of UH–60A/L aircraft bound for Afghanistan Aviation Forces ..... 36
Standard data link requirement for the Department of Defense ..... 37
LEGISLATIVE PROVISIONS ..... 38
Subtitle A—Authorization of Appropriations ..... 38
Section 101—Authorization of Appropriations ..... 38
Subtitle B—Army Programs ..... 38
Section 111—Report on Acceleration of Increment 2 of the Warfighter Information Network-Tactical ..... 38
Subtitle C—Navy Programs ..... 38
Section 121—Aircraft Carriers ..... 38
Section 122—Procurement Authority for Icebreaker Vessels ..... 38
Section 123—Limitation on Availability of Funds for Procurement of Icebreaker Vessels ..... 39
Section 124—Multiyear Procurement Authority for Virginia Class Submarine Program ..... 39
Section 125—Multiyear Procurement Authority for Arleigh Burke Class Destroyers and Associated Systems ..... 39
Section 126—Limitation on Availability of Funds for Arleigh Burke Class Destroyer ..... 39
Section 127—Extensions of Authorities Relating to Construction of Certain Vessels ..... 40
Section 128—Multiyear Procurement Authority for V–22 Osprey Aircraft ..... 40
Subtitle D—Air Force Programs ..... 40
Section 131—Streamlining Acquisition of Intercontinental Ballistic Missile Security Capability ..... 40
Section 132—Limitation on Selection of Single Contractor for C–130H Avionics Modernization Program Increment 2 ..... 40
Section 133—Limitation on Availability of Funds for EC–130H Compass Call Recapitalization Program ..... 41

Page
Section 134—Cost-Benefit Analysis of Upgrades to MQ–9 Reaper Aircraft ..... 41
Subtitle E—Defense-Wide, Joint, and Multiservice Matters ..... 41
Section 141—Authority for Procurement of Economic Order Quantities for the F–35 Aircraft Program ..... 41
Section 142—Limitation on Demilitarization of Certain Cluster Munitions ..... 41
Section 143—Reinstatement of Requirement to Preserve Certain C–5 Aircraft ..... 42
Section 144—Requirement That Certain Aircraft and Unmanned Aerial Vehicles Use Specified Standard Data Link ..... 42
TITLE II—RESEARCH, DEVELOPMENT, TEST, AND EVALUATION ..... 42
Research, Development, Test, and Evaluation, Army ..... 42
Items of Special Interest ..... 42
Acoustic threat detection technology ..... 42
AN/VVR–4 Laser Detecting Set ..... 43
Army counter-improvised explosive device technology ..... 43
Army Network Integration Evaluations and Joint Warfighting Assessments ..... 43
Army warfighter technology programs ..... 44
Civil Support Team Information Management System ..... 44
Cold Temperature and Arctic Protective System development ..... 45
Enhanced lightweight hard armor and combat helmet research and development ..... 45
Future Vertical Lift ..... 46
High Bandwidth Tethered Unmanned Air Systems Technology ..... 46
High Mobility Multipurpose Wheeled Vehicle external fire suppression systems ..... 46
Improved Turbine Engine Program ..... 47
Improved vehicle camouflage systems and next generation signature management ..... 47
Integrated Air and Missile Defense command and control capabilities ..... 48
Land-Based Anti-Ship Missile hardware and software integration and test capability ..... 49
Lightweight metal matrix composite technology for combat and tactical vehicles ..... 49
M4 Carbine Free Floating Rail Technology ..... 49
Material development, characterization, and computational modeling ..... 50
Mobile protected firepower ..... 50
Multi-function explosive material detection technology ..... 51
Open Campus ..... 51
Rapid integration for emerging threats against missile system networks ..... 51
Remote weapon system development and integration for tactical and ground combat vehicles ..... 52
Report on heavy and Stryker brigade combat team wireless intercommunication systems ..... 52
Short range air defense advanced development ..... 53
Software Based Mesh Network for Tactical Communications ..... 53
Soldier Enhancement Program ..... 54
Soldier Power development ..... 54
Testing and evaluation of supercavitating ammunition ..... 54
Underwater munitions disposal and waterjet technology development ..... 55
Research, Development, Test, and Evaluation, Navy ..... 55
Items of Special Interest ..... 55
Academic partnerships for undersea technology ..... 55
Advanced capability for 81mm and 120mm mortar development ..... 56
Airborne anti-submarine warfare systems ..... 56
Amphibious Combat Vehicle engineering and manufacturing development ..... 57
Automated Testing Technologies ..... 57
Barking Sands Tactical Underwater Range modernization ..... 58
F/A–18 noise reduction research ..... 58
Incremental development of Next Generation Jammer ..... 59
Littoral Combat Ship immersive virtual ship environment ..... 59

Page
Marine and hydrokinetic technology ..... 59
Marine Corps and Navy small unmanned aircraft system and capability development ..... 60
Marine Corps female body armor ..... 61
Marine Corps Group 5 unmanned aircraft systems experimentation initiative ..... 61
Maritime Strike Tomahawk ..... 62
Modification to independent review of F/A–18 physiological episodes and corrective actions as required by section 237 of the National Defense Authorization Act for Fiscal Year 2017 ..... 62
MQ–25 Unmanned Air System ..... 63
Naval energetic materials roadmap ..... 64
Passive rocket propelled grenade armor protection technology ..... 64
Scalable energy and chemical conversion system ..... 64
Torpedo defense ..... 65
Workforce management at Navy test ranges ..... 66
Research, Development, Test, and Evaluation, Air Force ..... 66
Items of Special Interest ..... 66
Adaptive engine transition program ..... 66
Advanced laser technologies for coating removal, surface restoration, and repair ..... 66
Advanced pilot training program ..... 67
Air Force dual-mode missile testing and evaluation ..... 68
Air Force test and evaluation support ..... 68
Assessment of Air Force Test Center ..... 69
Battlefield airborne communications node program ..... 69
Educational Partnership Agreements ..... 69
F135 aircraft engine component improvement program ..... 70
High-efficiency heat exchangers ..... 70
High-speed, anti-radiation missile targeting system pod block upgrade program ..... 70
Hypoxia research collaboration ..... 71
Joint Surveillance and Target Attack Radar System Recapitalization program ..... 71
Light Attack Aircraft Experiment Report ..... 72
Metals Affordability Initiative ..... 72
Remote and stand-off detection of weapons of mass destruction threats ..... 73
Reusable hypersonic vehicle structure ..... 73
Robust electrical power system for aircraft ..... 73
Technology transition efforts ..... 74
Research, Development, Test, and Evaluation, Defense-Wide ..... 74
Items of Special Interest ..... 74
Accumulation of section 219 funds ..... 74
Additive manufactured parts ..... 75
Briefing on improving overseas security from UAS threats and existing authorities to use countermeasures ..... 75
Common Analytical Laboratory System ..... 76
Cyber Grand Challenge ..... 76
Defense genomics research and training ..... 76
Department of Defense laboratories and engineering centers ..... 77
Deployable assured position, navigation, and timing systems ..... 77
Energy storage modules ..... 78
Enhancement of test and evaluation through modeling and simulation ..... 78
Explosive Ordnance Disposal equipment technology upgrades ..... 78
Historically black colleges and universities and minority serving institutions ..... 79
Joint Electronic Warfare wargaming ..... 79
Joint U.S. Forces Korea Portal and Integrated Threat Recognition program ..... 80
Latent and delayed-onset effects of traumatic brain injury ..... 80
Light field display technology ..... 80
Low-power, long-endurance radar for force protection ..... 81
Machine learning ..... 81
Medical simulation research ..... 81
Non-lethal directed energy technologies ..... 82

Page
Overseas waste disposal technology development ... 82
Pilot program on modernization and fielding of electromagnetic spectrum warfare systems and electronic warfare capabilities ... 82
Science, technology, engineering, and mathematics ... 83
Small turbine engines ... 83
Space-based debris remediation in Low Earth Orbit ... 83
Sterilization and inspection of medical instruments ... 84
Success metrics of the Defense Innovation Unit Experiment (DIUx) ... 84
System for reviewing and monitoring industrial base transactions ... 85
Training ranges for electronic warfare experimentation ... 85
Trusted microelectronics supply ... 86
U.S. Special Operations Command SOFWERX initiative ... 87
Weapons and munitions science and technology roadmap ... 87
LEGISLATIVE PROVISIONS ... 88
Subtitle A—Authorization of Appropriations ... 88
Section 201—Authorization of Appropriations ... 88
Subtitle B—Program Requirements, Restrictions, and Limitations ... 88
Section 211—Cost Controls for Presidential Aircraft Recapitalization Program ... 88
Section 212—Capital Investment Authority ... 88
Section 213—Modification of Authority to Award Prizes for Advanced Technology Achievements ... 88
Section 214—Critical Technologies for Columbia Class Submarine ... 89
Section 215—Joint Hypersonics Transition Office ... 89
Section 216—Hypersonic Airbreathing Weapons Capabilities ... 89
Section 217—Limitation on Availability of Funds for MQ–25 Unmanned Air System ... 89
Section 218—Limitation on Availability of Funds for Contract Writing Systems ... 89
TITLE III—OPERATION AND MAINTENANCE ... 90
ITEMS OF SPECIAL INTEREST ... 90
Budget Request Adjustments ... 90
Advanced Adversarial Air Training ... 90
Civil Air Patrol ... 91
Ship Repair in the Western Pacific ... 91
Energy Issues ... 91
Energy Resiliency for Mission Assurance ... 91
Energy Resilience of Overseas Military Installations ... 92
Logistics and Sustainment Issues ... 92
Army Contracting Command Reachback Functions ... 92
Corrosion Control and Prevention Executives for the Military Departments ... 93
Improving Asset Tracking and In-Transit Visibility ... 93
Inventory Management and Demand Planning Software Pilot Program 94
Joint Minimum Standards for Protective Covers ... 95
Logistics Management Business Systems Modernization ... 95
Opportunities to Consolidate Printing Services ... 96
Report on Operation of the Transportation Working Capital Fund ... 96
Revising Depot Carryover Calculations ... 97
Readiness Issues ... 98
Advanced Adversarial Air Training Program ... 98
Advanced Foreign Language Proficiency ... 98
Alternative-Source F/A–18 Depot-Level Maintenance ... 99
Counter-UAS Briefing ... 99
Expediting the Security Clearance Process ... 100
Explosive Ordnance Disposal Budget Display ... 101
Explosive Ordnance Disposal Organization and Support to Operational Plans ... 101
Joint Force Training and Exercises ... 102
Military Mission Line Moratorium ... 102
NASA Armstrong Flight Research Center F/A–18 Chase Aircraft ... 103
Naval Shipyard Development Plans ... 104
Readiness of Coastal Riverine Forces ... 106
Remotely Piloted Aircraft Training Strategy ... 107
Report on Army Aviation Restructure Initiative ... 107
Report on Military Training for Rotary-Wing Aviation ... 107
Report on Multi-Domain Battle Concept ... 108

Page
Report on Unit-Level Training Costs to Build Full-Spectrum Readiness 109
Small Arms Weapons Simulation Training ... 110
Training for Air Force Combined Air Operations Center Personnel ... 111
Training Range Inventory, Capacity, and Configuration in Europe ... 111
Undergraduate Pilot Training ... 112
Other Matters ... 113
Combatant Command Policies on Open-Air Burn Pits ... 113
Consideration of the Domestic Textile Industrial Base in Contracting for Uniforms ... 113
Dioxin-Based Herbicides Review Related to Guam ... 113
Ensuring Proper Fitting of Athletic Footwear ... 114
Environmental Restoration ... 114
Fabric and Membrane Technology for Footwear ... 115
Flame-Resistant Military Uniform Postures ... 116
Former Naval Weapons Industrial Plant Bethpage ... 116
Guam Micronesian Kingfisher Recovery Habitat ... 117
Personal Protection Equipment Awards Program ... 117
Polyfluoroalkyl Substances ... 117
Recurrent Flooding and Sea Level Rise ... 119
Standard-Issue Garments for Women ... 119
Water Quality Trading ... 119
LEGISLATIVE PROVISIONS ... 120
Subtitle A—Authorization of Appropriations ... 120
Section 301—Authorization of Appropriations ... 120
Subtitle B—Energy and Environment ... 120
Section 311—Codification of and Improvements to Department of Defense Clearinghouse to Coordinate Department Review of Applications for Certain Projects That May Have Adverse Impact on Military Operations and Readiness ... 120
Section 312—Energy Performance Goals and Master Plan ... 120
Section 313—Payment to Environmental Protection Agency of Stipulated Penalty in Connection with Umatilla Chemical Depot, Oregon .. 121
Section 314—Payment to Environmental Protection Agency of Stipulated Penalty in Connection with Longhorn Army Ammunition Plant, Texas ... 121
Section 315—Department of Defense Cleanup and Removal of Petroleum, Oil, and Lubricant Associated with the Prinz Eugen ... 121
Subtitle C—Logistics and Sustainment ... 121
Section 321—Reauthorization of Multi-Trades Demonstration Project ... 121
Section 322—Guidance Regarding Use of Organic Industrial Base ... 121
Subtitle D—Reports ... 121
Section 331—Quarterly Reports on Personnel and Unit Readiness ... 121
Section 332—Biennial Report on Core Depot-Level Maintenance and Repair Capability ... 122
Section 333—Annual Report on Personnel, Training, and Equipment Needs of Non-Federalized National Guard ... 122
Section 334—Annual Report on Military Working Dogs Used by the Department of Defense ... 122
Section 335—Annual Briefings on Army Explosive Ordnance Disposal .. 122
Section 336—Report on Effects of Climate Change on Department of Defense ... 122
Subtitle E—Other Matters ... 122
Section 341—Explosive Safety Board ... 122
Section 342—Department of Defense Support for Military Service Memorials and Museums that Highlight the Role of Women in the Armed Forces ... 122
Section 343—Limitation on Availability of Funds for Advanced Skills Management Software System of the Navy ... 123
Section 344—Cost-Benefit Analysis of Uniform Specifications for Afghan Military or Security Forces ... 123
TITLE IV—MILITARY PERSONNEL AUTHORIZATIONS ... 123
LEGISLATIVE PROVISIONS ... 123
Subtitle A—Active Forces ... 123
Section 401—End Strengths for Active Forces ... 123
Section 402—Revisions in Permanent Active Duty End Strength Minimum Levels ... 124
Subtitle B—Reserve Forces ... 124

Page
Section 411—End Strengths for Selected Reserve ... 124
Section 412—End Strengths for Reserves on Active Duty in Support of the Reserves ... 124
Section 413—End Strengths for Military Technicians (Dual Status) ... 125
Section 414—Fiscal Year 2018 Limitation on Number of Non-Dual Status Technicians ... 125
Section 415—Maximum Number of Reserve Personnel Authorized To Be on Active Duty for Operational Support ... 125
Subtitle C—Authorization of Appropriations ... 126
Section 421—Military Personnel ... 126
TITLE V—MILITARY PERSONNEL POLICY ... 126
ITEMS OF SPECIAL INTEREST ... 126
Bystander Intervention Training ... 126
Comptroller General Report on Race Data in the Military Justice System ... 126
Digital Transformation of the Recruiting Process ... 127
Female Propensity to Serve in the Armed Forces ... 127
Gender Double Standards ... 128
Gender Integration of United States Marine Corps Basic Recruit Training ... 128
GI Bill Benefit Review ... 129
Military Child Custody Protections ... 129
Military Officer Diversity ... 129
Military Service Academy Applications and Reserve Officer Training Corps Scholarship Programs ... 130
Pilot Shortage Assessment ... 130
Pre-Command Audit Training Course ... 130
Provision of Services at Department of Defense-Run Child Development Centers (CDC) ... 131
Report on the Feasibility of Establishing a Military Family Service Corps ... 131
Review of Resourcing of Trial Defense Services ... 132
Review of the Court Martial Appeals Process ... 132
Social Media Policy for Recruits ... 132
LEGISLATIVE PROVISIONS ... 133
Subtitle A—Regular and Reserve Component Management ... 133
Section 501—Modification of Requirements Relating to Conversion of Certain Military Technician (Dual Status) Positions to Civilian Positions ... 133
Section 502—Pilot Program on Use of Retired Senior Enlisted Members of the Army National Guard as Army National Guard Recruiters ... 133
Section 503—Equal Treatment of Orders to Serve on Active Duty under Section 12304a and 12304b of Title 10, United States Code ... 134
Section 504—Direct Employment Pilot Program for Members of the National Guard and Reserve ... 134
Subtitle B—General Service Authorities and Correction of Military Records ... 134
Section 511—Consideration of Additional Medical Evidence by Boards for the Correction of Military Records and Liberal Consideration of Evidence Relating to Post-Traumatic Stress Disorder or Traumatic Brain Injury ... 134
Section 512—Public Availability of Information Related to Disposition of Claims Regarding Discharge or Release of Members of the Armed Forces when the Claims Involve Sexual Assault ... 134
Section 513—Pilot Program on Use of Video Teleconferencing Technology by Boards for the Correction of Military Records and Discharge Review Boards ... 134
Section 514—Inclusion of Specific Email Address Block on Certificate of Release or Discharge from Active Duty (DD Form 214) ... 135
Section 515—Provision of Information on Naturalization Through Military Service ... 135
Subtitle C—Military Justice and Other Legal Issues ... 135
Section 521—Clarifying Amendments Related to the Uniform Code of Military Justice Reform by the Military Justice Act of 2016 ... 135
Section 522—Minimum Confinement Period Required for Conviction of Certain Sex-Related Offenses Committed by Members of the Armed Forces ... 135

| | Page |
|---|---|
| Section 523—Prohibition on Wrongful Broadcast or Distribution of Intimate Visual Images | 135 |
| Section 524—Information for the Special Victims' Counsel or Victims' Legal Counsel | 135 |
| Section 525—Special Victims' Counsel Training Regarding the Unique Challenges Often Faced by Male Victims of Sexual Assault | 136 |
| Section 526—Garnishment to Satisfy Judgement Rendered for Physically, Sexually, or Emotionally Abusing a Child | 136 |
| Section 527—Inclusion of Information in Annual SAPRO Reports regarding Military Sexual Harassment and Incidents Involving Nonconsensual Distribution of Private Sexual Images | 136 |
| Section 528—Inclusion of Information in Annual SAPRO Reports regarding Sexual Assaults Committed by a Member of the Armed Forces against the Member's Spouse or Other Family Member | 136 |
| Section 529—Notification of Members of the Armed Forces Undergoing Certain Administrative Separations of Potential Eligibility for Veterans Benefits | 136 |
| Section 530—Consistent Access to Special Victims' Counsel for Former Dependents of Members of the Armed Forces | 136 |
| Subtitle D—Member Education, Training, Resilience, and Transition | 137 |
| Section 541—Prohibition on Release of Military Service Academy Graduates to Participate in Professional Athletics | 137 |
| Section 542—ROTC Cyber Institutes at the Senior Military Colleges | 137 |
| Section 543—Lieutenant Henry Ossian Flipper Leadership Scholarship Program | 137 |
| Subtitle E—Defense Dependents' Education and Military Family Readiness Matters | 137 |
| Section 551—Continuation of Authority to Assist Local Educational Agencies That Benefit Dependents of Members of the Armed Forces and Department of Defense Civilian Employees | 137 |
| Section 552—Education for Dependents of Certain Retired Members of the Armed Forces | 137 |
| Section 553—Codification of Authority to Conduct Family Support Programs for Immediate Family Members of Members of the Armed Forces Assigned to Special Operations Forces | 138 |
| Section 554—Reimbursement for State Licensure and Certification Costs of a Spouse of a Member of the Armed Forces Arising from Relocation to Another State | 138 |
| Subtitle F—Decorations and Awards | 138 |
| Section 561—Replacement of Military Decorations at the Request of Relatives of Deceased Members of the Armed Forces | 138 |
| Section 562—Congressional Defense Service Medal | 138 |
| Section 563—Limitations on Authority to Revoke Certain Military Decorations Awarded to Members of the Armed Forces | 138 |
| Subtitle G—Miscellaneous Reports and Other Matters | 139 |
| Section 571—Expansion of United States Air Force Institute of Technology Enrollment Authority to Include Civilian Employees of the Homeland Security Industry | 139 |
| Section 572—Servicemembers' Group Life Insurance | 139 |
| Section 573—Voter Registration | 139 |
| Section 574—Sense of Congress regarding Section 504 of Title 10, United States Code, on Existing Authority of the Department of Defense to Enlist Individuals, Not Otherwise Eligible for Enlistment, Whose Enlistment Is Vital to the National Interest | 139 |
| TITLE VI—COMPENSATION AND OTHER PERSONNEL BENEFITS | 139 |
| ITEMS OF SPECIAL INTEREST | 139 |
| Local Purchasing Contracts for the Defense Commissary Agency | 139 |
| Morale, Welfare, and Recreation Assessment | 140 |
| Reserve Component Benefits Parity Under 12304b Mobilization Authority | 140 |
| Review of Department of Defense Debt Collection Practices | 141 |
| Service Member Financial Planning | 141 |
| LEGISLATIVE PROVISIONS | 142 |
| Subtitle A—Pay and Allowances | 142 |
| Section 601—Annual Adjustment of Basic Monthly Pay | 142 |

Page

Section 602—Limitation on Basic Allowance for Housing Modification Authority for Members of the Uniformed Services Residing in Military Housing Privatization Initiative Housing ..... 142
Section 603—Housing Treatment for Certain Members of the Armed Forces, and Their Spouses and Other Dependents, Undergoing a Permanent Change of Station Within the United States ..... 142
Section 604—Per Diem Allowance Policies ..... 142
Subtitle B—Bonuses and Special and Incentive Pays ..... 143
Section 611—One-Year Extension of Certain Bonus and Special Pay Authorities for Reserve Forces ..... 143
Section 612—One-Year Extension of Certain Bonus and Special Pay Authorities for Health Care Professionals ..... 143
Section 613—One-Year Extension of Special Pay and Bonus Authorities for Nuclear Officers ..... 143
Section 614—One-Year Extension of Authorities Relating to Title 37 Consolidated Special Pay, Incentive Pay, and Bonus Authorities ..... 143
Section 615—One-Year Extension of Authorities Relating to Payment of Other Title 37 Bonuses and Special Pays ..... 144
Section 616—Reimbursement for State Licensure and Certification Costs of a Member of the Armed Forces Arising from Separation from the Armed Forces ..... 144
Section 617—Increase in Maximum Amount of Aviation Bonus for 12-Month Period of Obligated Service ..... 144
Section 618—Technical and Clerical Amendments Relating to 2008 Consolidation of Certain Special Pay Authorities ..... 144
Subtitle C—Disability Pay, Retired Pay, and Survivor Benefits ..... 145
Section 621—Findings and Sense of Congress regarding the Special Survivor Indemnity Allowance ..... 145
Subtitle D—Other Matters ..... 145
Section 631—Land Conveyance Authority, Army and Air Force Exchange Service Property, Dallas, Texas ..... 145
Section 632—Advisory Boards regarding Military Commissaries and Exchanges ..... 145
TITLE VII—HEALTH CARE PROVISIONS ..... 145
ITEMS OF SPECIAL INTEREST ..... 145
Educational Opportunities for Certified Registered Nurse Anesthetists . 145
Force of the Future Pilot Program on Cryopreservation of Gametes ..... 145
Improving Access to Para Health Professional Extenders ..... 146
Medical Blood Volume Diagnostics ..... 146
Medical Simulation and Training with First Responders ..... 146
Military Caregivers ..... 147
Military Family Wellness and Suicide Prevention ..... 147
Motion Sickness Research ..... 147
Opioid—Chronic Pain and Recruiting ..... 148
Osteopathic Manipulative Medicine ..... 148
Personnel Policies regarding Members of the Armed Forces Infected with Human Immunodeficiency Virus (HIV) ..... 148
Post-Traumatic Stress Disorder ..... 149
Post-Traumatic Stress Disorder and Traumatic Brain Injury Research Initiatives ..... 150
Promising Burn Therapies ..... 150
TRICARE Pharmacy Pilot Program ..... 150
Use of Data Analytics within the Defense Medical Surveillance System for Complex Epidemiology and Pathology Research ..... 151
LEGISLATIVE PROVISIONS ..... 151
Subtitle A—TRICARE and Other Health Care Benefits ..... 151
Section 701—Physical Examinations for Members of a Reserve Component Who Are Separating from the Armed Forces ..... 151
Section 702—Mental Health Examinations Before Members Separate from the Armed Forces ..... 151
Section 703—Provision of Hyperbaric Oxygen Therapy for Certain Members of the Armed Forces ..... 152
Subtitle B—Health Care Administration ..... 152
Section 711—Clarification of Roles of Commanders of Military Medical Treatment Facilities and Surgeons General ..... 152
Section 712—Maintenance of Inpatient Capabilities of Military Medical Treatment Facilities Located Outside the United States ..... 152

Page
Section 713—Regular Update of Prescription Drug Pricing Standards Under TRICARE Retail Pharmacy Program ..... 152
Section 714—Residency Requirements for Podiatrists ..... 152
Subtitle C—Other Matters ..... 152
Section 721—One Year Extension of Pilot Program for Prescription Drug Acquisition Cost Parity in the TRICARE Pharmacy Benefits Program ..... 152
Section 722—Pilot Program on Health Care Assistance System ..... 153
Section 723—Research of Chronic Traumatic Encephalopathy ..... 153
Section 724—Sense of Congress on Eligibility of Victims of Acts of Terror for Evaluation and Treatment at Military Treatment Facilities ..... 153
TITLE VIII—ACQUISITION POLICY, ACQUISITION MANAGEMENT, AND RELATED MATTERS ..... 153
ITEMS OF SPECIAL INTEREST ..... 153
Accuracy of Pricing in Responses to Letters of Request for Pricing and Availability in Foreign Military Sales ..... 153
Best Value Criteria for Complex Acquisitions and Information Technology ..... 153
Collecting Historical Data on Rescinded Solicitations ..... 154
Congressional Notification for Direct Commercial Sales ..... 155
Other Transaction Consortia ..... 155
Outcome-Based Services Contracts ..... 156
Procurement Technical Assistance Centers ..... 156
Report on Commercial Acquisition Transparency ..... 156
Review of Implementation of Online Marketplace Procurement ..... 157
Reviews of Acquisition Statute and the Federal Acquisition Regulation . 157
Should-Cost Analysis Methodology and Transparency ..... 158
Soldier and Marine Equipment Requirements ..... 158
Technical Exchanges on Independent Research and Development Projects ..... 159
Transparency in Department of Defense Contract Negotiations ..... 160
Vendor Vetting Process and Guidance ..... 160
LEGISLATIVE PROVISIONS ..... 161
Subtitle A—Defense Acquisition Streamlining and Transparency ..... 161
Part I—Acquisition System Streamlining ..... 161
Section 801—Procurement through Online Marketplaces ..... 161
Section 802—Performance of Incurred Cost Audits ..... 162
Section 803—Modifications to Cost or Pricing Data and Reporting Requirements ..... 163
Part II—Early Investments in Acquisition Programs ..... 164
Section 811—Requirement to Emphasize Reliability and Maintainability in Weapon System Design ..... 164
Section 812—Licensing of Appropriate Intellectual Property to Support Major Weapon Systems ..... 164
Section 813—Management of Intellectual Property Matters within the Department of Defense ..... 165
Section 814—Improvement of Planning for Acquisition of Services ..... 165
Section 815—Improvements to Test and Evaluation Processes and Tools ..... 166
Part III—Acquisition Workforce Improvements ..... 167
Section 821—Enhancements to the Civilian Program Management Workforce ..... 167
Section 822—Improvements to the Hiring and Training of the Acquisition Workforce ..... 167
Section 823—Extension and Modifications to Acquisition Demonstration Project ..... 168
Section 824—Acquisition Positions in the Offices of the Secretaries of the Military Departments ..... 168
Part IV—Transparency Improvements ..... 169
Section 831—Transparency of Defense Business System Data ..... 169
Section 832—Major Defense Acquisition Programs: Display of Budget Information ..... 169
Section 833—Enhancements to Transparency in Test and Evaluation Processes and Data ..... 170
Subtitle B—Streamlining of Defense Acquisition Statutes and Regulations ..... 170

Page

Section 841—Modifications to the Advisory Panel on Streamlining and Codifying Acquisition Regulations .... 170
Section 842—Extension of Maximum Duration of Fuel Storage Contracts .... 171
Section 843—Exception for Business Operations from Requirement to Accept $1 Coins .... 171
Section 844—Repeal of Expired Pilot Program .... 171
Subtitle C—Amendments to General Contracting Authorities, Procedures, and Limitations .... 171
Section 851—Limitation on Unilateral Definitization .... 171
Section 852—Codification of Requirements Pertaining to Assessment, Management, and Control of Operating and Support Costs for Major Weapon Systems .... 172
Section 853—Use of Program Income by Eligible Entities That Carry Out Procurement Technical Assistance Programs .... 172
Section 854—Amendment to Sustainment Reviews .... 172
Section 855—Clarification to Other Transaction Authority .... 172
Section 856—Clarifying the Use of Lowest Price Technically Acceptable Source Selection Process .... 172
Section 857—Amendment to Nontraditional and Small Contractor Innovation Prototyping Program .... 173
Section 858—Modification to Annual Meeting Requirement of Configuration Steering Boards .... 173
Section 859—Change to Definition of Subcontract in Certain Circumstances .... 173
Section 860—Amendment Relating to Applicability of Inflation Adjustments .... 173
Subtitle D—Other Matters .... 173
Section 861—Exemption from Design-Build Selection Procedures .... 173
Section 862—Requirement That Certain Ship Components Be Manufactured in the National Technology and Industrial Base .... 174
Section 863—Procurement of Aviation Critical Safety Items .... 174
Section 864—Milestones and Timelines for Contracts for Foreign Military Sales .... 174
Section 865—Notification Requirement for Certain Contracts for Audit Services .... 174
Section 866—Training in Acquisition of Commercial Items .... 175
Section 867—Notice of Cost-Free Federal Procurement Technical Assistance in Connection with Registration of Small Business Concerns on Procurement Websites of the Department of Defense .... 175
Section 868—Comptroller General Report on Contractor Business System Requirements .... 175
Section 869—Standard Guidelines for Evaluation of Requirements for Services Contracts .... 175
Section 870—Temporary Limitation on Aggregate Annual Amount Available for Contract Services .... 175
TITLE IX—DEPARTMENT OF DEFENSE ORGANIZATION AND MANAGEMENT .... 175
LEGISLATIVE PROVISIONS .... 175
Subtitle A—Organization and Management of the Department of Defense Generally .... 175
Section 901—Responsibility of the Chief Information Officer of the Department of Defense for Risk Management Activities regarding Supply Chain for Information Technology Systems .... 175
Section 902—Repeal of Office of Corrosion Policy and Oversight .... 176
Section 903—Designation of Corrosion Control and Prevention Executives for the Military Departments .... 176
Section 904—Maintaining Civilian Workforce Capabilities to Sustain Readiness, the All Volunteer Force, and Operational Effectiveness .... 176
Subtitle B—Designation of the Navy and Marine Corps .... 176
Section 911—Redesignation of the Department of the Navy as the Department of the Navy and Marine Corps .... 176
Section 912—Conforming Amendments to Title 10, United States Code .... 176
Section 913—Other Provisions of Law and Other References .... 177
Section 914—Effective Date .... 177
Subtitle C—Other Matters .... 177

Page

Section 921—Transition of the Office of the Secretary of Defense to Reflect Establishment of Positions of Under Secretary of Defense for Research and Engineering, Under Secretary of Defense for Acquisition and Sustainment, and Chief Management Officer ..... 177
Section 922—Extension of Deadlines for Reporting and Briefing Requirements for Commission on the National Defense Strategy for the United States ..... 177
Section 923—Briefing on Force Management Level Policy ..... 178
TITLE X—GENERAL PROVISIONS ..... 178
ITEMS OF SPECIAL INTEREST ..... 178
Counter-Drug Activities ..... 178
Narcotics Flow to the United States from Central and South America ..... 178
National Guard Counterdrug Schools ..... 178
Peace in Colombia ..... 179
Venezuela Security and Stability ..... 179
Other Matters ..... 180
Assessment of Culture and Accountability in Special Operations Forces ..... 180
Botulinum Toxin Type A Countermeasures ..... 180
Combat Helmets for Female Service Members ..... 181
Comptroller General Assessment of Emerging Threats of High National Security Consequence ..... 181
Defense Department 501(c)3 Coordination and Strategy ..... 182
Department of Defense Overmatch Strategy ..... 182
Disposal of Excess Agriculture-Related Equipment ..... 182
High-Altitude Airborne Intelligence, Surveillance, and Reconnaissance Capacity, Capability, and Force Structure ..... 182
National Biodefense Strategy ..... 183
National Guard CBRN Enterprise Report ..... 183
National Guard Use of Department of Defense Issued Unmanned Aircraft Systems for Domestic Operations ..... 184
Navy Reserve F/A–18 Aircraft ..... 185
Next Generation Immersive Cockpit Systems ..... 185
Overseas Posture and Permanently Stationed Forces ..... 186
Report on the National Security Implications of Ukraine's Arbitration Proceedings against Russia under Annex VII of the United Nations Convention on the Law of the Sea ..... 187
Requirement for Notification of Modifications Made to Presidential Policy Guidance for Direct Action Against Terrorist Targets ..... 188
Ring Wheel Drive ..... 188
Special Operations Forces Demand, Priorities, and Over-Reliance ..... 188
Strategy to Counter Unconventional and Hybrid Warfare Threats ..... 189
U.S. Efforts to Train, Advise, Assist, and Equip the Iraqi Counterterrorism Service and the Iraqi Special Operations Forces ..... 189
LEGISLATIVE PROVISIONS ..... 190
Subtitle A—Financial Matters ..... 190
Section 1001—General Transfer Authority ..... 190
Section 1002—Preparation of Consolidated Corrective Action Plan and Implementation of Centralized Reporting System ..... 190
Section 1003—Additional Requirements Relating to Department of Defense Audits ..... 190
Subtitle B—Naval Vessels and Shipyards ..... 190
Section 1011—National Defense Sealift Fund ..... 190
Section 1012—National Defense Sealift Fund: Construction of National Icebreaker Vessels ..... 190
Section 1013—Use of National Sea-Based Deterrence Fund for Multiyear Procurement of Certain Critical Components ..... 190
Section 1014—Restrictions on the Overhaul and Repair of Vessels in Foreign Shipyards ..... 191
Section 1015—Availability of Funds for Retirement or Inactivation of Ticonderoga-Class Cruisers or Dock Landing Ships ..... 191
Section 1016—Policy of the United States on Minimum Number of Battle Force Ships ..... 191
Subtitle C—Counterterrorism ..... 191
Section 1021—Termination of Requirement to Submit Annual Budget Justification Display for Department of Defense Combating Terrorism Program ..... 191

Page

Section 1022—Prohibition on Use of Funds for Transfer or Release of Individuals Detained at United States Naval Station, Guantanamo Bay, Cuba to the United States .... 191
Section 1023—Prohibition on Use of Funds to Construct or Modify Facilities in the United States to House Detainees Transferred from United States Naval Station, Guantanamo Bay, Cuba .... 191
Section 1024—Prohibition on Use of Funds for Transfer or Release of Individuals Detained at United States Naval Station, Guantanamo Bay, Cuba, to Certain Countries .... 192
Section 1025—Biannual Report on Support of Special Operations to Combat Terrorism .... 192
Subtitle D—Miscellaneous Authorities and Limitations .... 192
Section 1031—Limitation on Expenditure of Funds for Emergency and Extraordinary Expenses for Intelligence and Counter-Intelligence Activities and Representation Allowances .... 192
Section 1032—Modifications to Humanitarian Demining Assistance Authorities .... 192
Section 1033—Prohibition on Charge of Certain Tariffs on Aircraft Traveling through Channel Routes .... 192
Section 1034—Limitation on Divestment of U–2 or RQ–4 Aircraft .... 192
Section 1035—Prohibition on Use of Funds for Retirement of Legacy Maritime Mine Countermeasures Platforms .... 193
Section 1036—Restriction on Use of Certain Funds Pending Solicitation of Bids for Western Pacific Dry Dock .... 193
Section 1037—National Guard Flyovers of Public Events .... 193
Section 1038—Transfer of Funds to World War I Centennial Commission .... 193
Section 1039—Rule of Construction Regarding Use of Department of Defense Funding of a Border Wall .... 193
Subtitle E—Studies and Reports .... 193
Section 1051—Elimination of Reporting Requirements Terminated After November 25, 2017, Pursuant to Section 1080 of the National Defense Authorization Act for Fiscal Year 2016 .... 193
Section 1052—Report on Department of Defense Arctic Capability and Resource Gaps .... 194
Section 1053—Review and Assessment of Department of Defense Personnel Recovery and Nonconventional Assisted Recovery Mechanisms .... 194
Section 1054—Mine Warfare Readiness Inspection Plan and Report .... 194
Section 1055—Report on Civilian Casualties from Department of Defense Strikes .... 194
Section 1056—Reports on Infrastructure and Capabilities of Lajes Field, Portugal .... 194
Section 1057—Report on Joint Pacific Alaska Range Complex Modernization .... 194
Subtitle F—Other Matters .... 194
Section 1061—Technical, Conforming, and Clerical Amendments .... 194
Section 1062—Workforce Issues for Relocation of Marines to Guam .... 194
Section 1063—Protection of Second Amendment Rights of Military Families .... 195
Section 1064—Transfer of Surplus Firearms to Corporation for the Promotion of Rifle Practice and Firearms Safety .... 195
Section 1065—National Guard Accessibility to Department of Defense Issued Unmanned Aircraft .... 195
Section 1066—Sense of Congress Regarding Aircraft Carriers .... 195
Section 1067—Notice to Congress of Terms of Department of Defense Settlement Agreements .... 195
Section 1068—Sense of Congress Recognizing the United States Navy Seabees .... 196
Section 1069—Recognition of the United States Special Operations Command .... 196
Section 1070—Sense of Congress Regarding World War I .... 196
Section 1071—Findings and Sense of Congress Regarding the National Guard Youth Challenge Program .... 196
Section 1072—Sense of Congress Regarding National Purple Heart Recognition Day .... 196
TITLE XI—CIVILIAN PERSONNEL MATTERS .... 196

Case 2:20-cv-00111-RAJ Document 111-4 Filed 11/24/20 Page 20 of 607

| | Page |
|---|---|
| ITEMS OF SPECIAL INTEREST | 196 |
| Accelerated Promotion Program | 196 |
| LEGISLATIVE PROVISIONS | 197 |
| Section 1101—Extension of Direct Hire Authority for Domestic Defense Industrial Base Facilities and Major Range and Test Facilities Base | 197 |
| Section 1102—Extension of Authority to Provide Voluntary Separation Incentive Pay for Civilian Employees of the Department of Defense | 197 |
| Section 1103—Additional Department of Defense Science and Technology Reinvention Laboratories | 197 |
| Section 1104—One-Year Extension of Authority to Waive Annual Limitation on Premium Pay and Aggregate Limitation on Pay for Federal Civilian Employees Working Overseas | 197 |
| Section 1105—Appointment of Retired Members of the Armed Forces to Positions In or Under the Department of Defense | 197 |
| Section 1106—Direct Hire Authority for Financial Management Experts in the Department of Defense Workforce | 197 |
| Section 1107—Extension of Authority for Temporary Personnel Flexibilities for Domestic Defense Industrial Base Facilities and Major Range and Test Facilities Base Civilian Personnel | 198 |
| Section 1108—One-Year Extension of Temporary Authority to Grant Allowances, Benefits, and Gratuities to Civilian Personnel on Official Duty in a Combat Zone | 198 |
| TITLE XII—MATTERS RELATING TO FOREIGN NATIONS | 198 |
| ITEMS OF SPECIAL INTEREST | 198 |
| Assessment of Freedom of Navigation Operations in the South China Sea | 198 |
| Attacks on U.S. Armed Forces Personnel by Partner Nation Security Forces | 198 |
| Briefing on the Role of the Russian Military in Influence Operations Targeting Democratic Elections and Disruption of Military Alliances and Partnerships | 199 |
| Countering Russian Aggression | 200 |
| Counterterrorism Effectiveness Research | 200 |
| Critical Shortfalls in the Indo-Asia-Pacific Region | 201 |
| Cultural Preservation in Armed Conflict | 201 |
| Defense Support to the Global Engagement Center Mission | 202 |
| Department of Defense Briefing on Crisis Response in Africa | 203 |
| DTRA International Countering WMD-Program | 203 |
| Forward-Stationed Combat Aviation Brigade in South Korea | 203 |
| Global Engagement Center | 204 |
| Global Theater Security Cooperation Management Information System | 204 |
| Impact of Foreign Laws on U.S. Defense Contractors | 205 |
| Implementation of Strategy to Prevent and Respond to Gender-Based Violence | 205 |
| Improvements to Transparency in the Technology Release Process in Foreign Military Sales | 206 |
| Independent Security Cooperation Evaluation Office | 206 |
| NATO Defense Weapon System Development Cooperation | 206 |
| Non-lethal Weapons for European Theater Contingencies | 207 |
| Plan to Enhance Imagery Sharing with Allies in the Asia-Pacific Region | 207 |
| Report on Impact of Outsourcing on the U.S. Defense Industrial Base | 208 |
| Security Cooperation Assessment, Monitoring, and Evaluation | 208 |
| Security Cooperation Reform | 209 |
| Support for Afghan Special Immigrant Visa Program | 209 |
| Support for Other Departments and Agencies of the United States Government that Advance Department of Defense Security Cooperation Objectives | 209 |
| Timor Sea Maritime Developments | 210 |
| U.S. Civilian Contractors in Iraq | 210 |
| U.S. National Security Threats in Africa | 210 |
| Utilizing Unmanned Aircraft Systems for International Humanitarian Assistance and Disaster Relief | 211 |
| LEGISLATIVE PROVISIONS | 212 |
| Subtitle A—Assistance and Training | 212 |
| Section 1201—One-Year Extension of Logistical Support for Coalition Forces Supporting Certain United States Military Operations | 212 |

| | Page |
|---|---|
| Section 1202—Modification to Special Defense Acquisition Fund | 212 |
| Section 1203—Modification to Ministry of Defense Advisor Authority | 212 |
| Section 1204—Modification of Authority to Build Capacity of Foreign Security Forces | 212 |
| Section 1205—Extension and Modification of Authority on Training for Eastern European National Military Forces in the Course of Multilateral Exercises | 213 |
| Section 1206—Extension of Participation in and Support of the Inter-American Defense College | 213 |
| Subtitle B—Matters Relating to Afghanistan and Pakistan | 213 |
| Section 1211—Extension of Authority to Transfer Defense Articles and Provide Defense Services to the Military and Security Forces of Afghanistan | 213 |
| Section 1212—Report on United States Strategy in Afghanistan | 213 |
| Section 1213—Extension and Modification of Authority for Reimbursement of Certain Coalition Nations for Support Provided to United States Military Operations | 213 |
| Subtitle C—Matters Relating to Syria, Iraq, and Iran | 214 |
| Section 1221—Report on United States Strategy in Syria | 214 |
| Section 1222—Extension and Modification of Authority to Provide Assistance to Counter the Islamic State of Iraq and the Levant | 214 |
| Section 1223—Extension and Modification of Authority to Support Operations and Activities of the Office of Security Cooperation in Iraq | 215 |
| Section 1224—Sense of Congress on Threats Posed by the Government of Iran | 215 |
| Subtitle D—Matters Relating to the Russian Federation | 216 |
| Section 1231—Extension of Limitation on Military Cooperation between the United States and the Russian Federation | 216 |
| Section 1232—Prohibition on Availability of Funds Relating to Sovereignty of the Russian Federation over Crimea | 216 |
| Section 1233—Statement of Policy on the Russian Federation | 216 |
| Section 1234—Modification and Extension of Ukraine Security Assistance Initiative | 216 |
| Section 1235—Limitation on Availability of Funds Relating to Implementation of the Open Skies Treaty | 217 |
| Section 1236—Sense of Congress on Importance of Nuclear Capabilities of NATO | 217 |
| Section 1237—Sense of Congress on Support for Georgia | 217 |
| Section 1238—Sense of Congress on Support for Estonia, Latvia, and Lithuania | 217 |
| Subtitle E—Intermediate-Range Nuclear Forces (INF) Treaty Preservation Act of 2017 | 218 |
| Section 1241—Short Title | 218 |
| Section 1242—Findings | 218 |
| Section 1243—Compliance Enforcement regarding Russian Violations of the INF Treaty | 218 |
| Section 1244—Development of INF Range Ground-Launched Missile System | 218 |
| Section 1245—Notification Requirement Related to Russian Federation Development of Noncompliant Systems and United States Actions Regarding Material Breach of INF Treaty by the Russian Federation | 219 |
| Section 1246—Limitation on Availability of Funds to Extend the Implementation of the New START Treaty | 219 |
| Section 1247—Review of RS–26 Ballistic Missile | 219 |
| Section 1248—Definitions | 220 |
| Subtitle F—Fostering Unity Against Russian Aggression Act of 2017 | 220 |
| Section 1251—Short Title | 220 |
| Section 1252—Findings and Sense of Congress | 220 |
| Section 1253—Strategy to Counter Threats by the Russian Federation | 220 |
| Section 1254—Strategy to Increase Conventional Precision Strike Weapon Stockpiles in the United States European Command's Areas of Responsibility | 220 |
| Section 1255—Plan to Counter the Military Capabilities of the Russian Federation | 220 |
| Section 1256—Plan to Increase Cyber and Information Operations, Deterrence, and Defense | 221 |
| Section 1257—Sense of Congress on Enhancing Maritime Capabilities | 221 |

Page
Section 1258—Plan to Reduce the Risks of Miscalculation and Unintended Consequences that Could Precipitate a Nuclear War ... 221
Section 1259—Definitions ... 221
Subtitle G—Matters Relating to the Indo-Asia-Pacific Region ... 221
Section 1261—Sense of Congress on the Indo-Asia-Pacific Region ... 221
Section 1262—Report on Strategy to Prioritize United States Defense Interests in the Indo-Asia-Pacific Region ... 221
Section 1263—Assessment of United States Force Posture and Basing Needs in the Indo-Asia-Pacific Region ... 222
Section 1264—Extended Deterrence Commitment to the Asia-Pacific Region ... 222
Section 1265—Authorization of Appropriations to Meet United States Financial Obligations under Compact of Free Association with Palau 222
Section 1266—Sense of Congress Reaffirming Security Commitments to the Governments of Japan and South Korea and Trilateral Cooperation between the United States, Japan, and South Korea ... 222
Section 1267—Sense of Congress on Freedom of Navigation Operations in the South China Sea ... 223
Section 1268—Sense of Congress on Strengthening the Defense of Taiwan ... 223
Section 1269—Sense of Congress on the Association on Southeast Asian Nations ... 223
Section 1270—Sense of Congress on Reaffirming the Importance of the United States-Australia Defense Alliance ... 223
Subtitle H—Other Matters ... 223
Section 1271—NATO Cooperative Cyber Defense Center of Excellence .. 223
Section 1272—NATO Strategic Communications Center of Excellence ... 224
Section 1273—Security and Stability Strategy for Somalia ... 224
Section 1274—Assessment of Global Theater Security Cooperation Management Information System ... 224
Section 1275—Future Years Plan for the European Deterrence Initiative ... 224
Section 1276—Extension of Authority to Enter into Agreements with Participating Countries in the American, British, Canadian, and Australian Armies' Program ... 225
Section 1277—Security Strategy for Yemen ... 225
Section 1278—Limitation on Transfer of Excess Defense Articles That Are High Mobility Multi-Purpose Wheeled Vehicles ... 225
Section 1279—Department of Defense Program to Protect United States Students Against Foreign Agents ... 226
Section 1280—Extension of United States-Israel Anti-Tunnel Cooperation Authority ... 226
Section 1281—Anticorruption Strategy ... 226
TITLE XIII—COOPERATIVE THREAT REDUCTION ... 226
LEGISLATIVE PROVISIONS ... 226
Section 1301—Specification of Cooperative Threat Reduction Funds ... 226
Section 1302—Funding Allocations ... 227
TITLE XIV—OTHER AUTHORIZATIONS ... 227
ITEMS OF SPECIAL INTEREST ... 227
Assessment of the Realignment of the Joint Improvised-Threat Defeat Organization under the Defense Threat Reduction Agency ... 227
Beryllium Supply Chain ... 228
Fiscal Stability of the National Defense Stockpile ... 228
LEGISLATIVE PROVISIONS ... 229
Subtitle A—Military Programs ... 229
Section 1401—Working Capital Funds ... 229
Section 1402—Chemical Agents and Munitions Destruction, Defense ... 229
Section 1403—Drug Interdiction and Counter-Drug Activities, Defense-Wide ... 229
Section 1404—Defense Inspector General ... 229
Section 1405—Defense Health Program ... 229
Section 1406—National Defense Sealift Fund ... 229
Subtitle B—Other Matters ... 229
Section 1411—Authority for Transfer of Funds to Joint Department of Defense-Department of Veterans Affairs Medical Facility Demonstration Fund for Captain James A. Lovell Health Care Center, Illinois ... 229

Page
Section 1412—Authorization of Appropriations for Armed Forces Retirement Home ..... 230
TITLE XV—AUTHORIZATION OF ADDITIONAL APPROPRIATIONS FOR OVERSEAS CONTINGENCY OPERATIONS ..... 230
ITEMS OF SPECIAL INTEREST ..... 230
National Guard and Reserve Component Equipment Account ..... 230
LEGISLATIVE PROVISIONS ..... 231
Subtitle A—Authorization of Appropriations ..... 231
Section 1501—Purpose and Treatment of Certain Authorizations of Appropriations ..... 231
Section 1502—Procurement ..... 231
Section 1503—Research, Development, Test, and Evaluation ..... 231
Section 1504—Operation and Maintenance ..... 231
Section 1505—Military Personnel ..... 231
Section 1506—Working Capital Funds ..... 231
Section 1507—Drug Interdiction and Counter-Drug Activities, Defense-Wide ..... 231
Section 1508—Defense Inspector General ..... 232
Section 1509—Defense Health Program ..... 232
Subtitle B—Financial Matters ..... 232
Section 1511—Treatment as Additional Authorizations ..... 232
Section 1512—Special Transfer Authority ..... 232
Subtitle C—Limitations, Reports, and Other Matters ..... 232
Section 1521—Afghanistan Security Forces Fund ..... 232
Section 1522—Joint Improvised-Threat Defeat Fund ..... 232
TITLE XVI—STRATEGIC PROGRAMS, CYBER, AND INTELLIGENCE MATTERS ..... 233
ITEMS OF SPECIAL INTEREST ..... 233
Space Activities ..... 233
Overview on National Security Space Organization ..... 233
Certification of Reusable Launch Vehicles for National Security Space Missions ..... 235
Commercial Geospatial Intelligence ..... 235
Comptroller General Review of Hosted Payloads ..... 236
Global Positioning System ..... 236
Multi-Band Satellite Communications Terminals ..... 236
Outer Space Cooperation with Japan ..... 237
Reliance on Global Positioning System for Defense of the Homeland ..... 237
Responsive Launch ..... 238
Small Satellite Technology Development ..... 238
Space Commercial Antenna Service ..... 239
Space Security ..... 239
Space Situational Awareness and Battle Management Command and Control ..... 240
Use of Surplus Intercontinental Ballistic Missile Motors for Commercial Space Launches ..... 241
Missile Defense Programs ..... 241
Hypersonic Defense ..... 241
Improving Ground Testing of the Ground-Based Midcourse Defense System ..... 241
Low Cost Missile Defense Initiative ..... 242
National Missile Defense Policy Change and Adversary Reactions ..... 242
Plan to Assess the Acquisition of Missile Defense Targets ..... 243
Sea-Based X-Band Radar ..... 243
Nuclear Forces ..... 244
Briefing on Commonality Related to the Ground-Based Strategic Deterrent Program ..... 244
Briefing on the 3+2 Strategy and Interoperable Warhead 1 (IW–1) ..... 244
Comptroller General Review of Nuclear Forces Readiness During Recapitalization and Transition ..... 245
Continuation of Nuclear Command, Control and Communications Acquisition Assessments by the Government Accountability Office ..... 246
Countering Threats from Unmanned Aircraft Systems ..... 246
Future of Nuclear Deterrence and the Joint Strategic Deterrence Review Process ..... 247
Nuclear Assurance and Deterrence Science, Technology, Innovation, and Collaboration ..... 247

Page

Nuclear Command, Control, and Communications Systems Modernization ..... 248
Nuclear Security Collaboration and Harmonization ..... 248
Office of the Secretary of Defense Oversight and Organization for the Nuclear Deterrence Mission ..... 249
Remote Visual Assessment System at Minuteman III Launch Facilities ..... 249
Report on Ground Based Strategic Deterrent and Minuteman III ..... 250
Status of Infrastructure Supporting NATO Nuclear Deterrence Mission ..... 251
Cyber-Related Matters ..... 252
Assessment of Effectiveness of Cyber Reporting ..... 252
Assessment of Third-Party Cybersecurity Risk ..... 252
Cloud Computing ..... 253
Comply-to-Connect Policy ..... 254
Comptroller General Assessment of Cyber Training ..... 254
Cyber Hardening ..... 254
Cyber Training and Talent Management ..... 255
Cyber Vulnerability Disclosure Program ..... 256
Data Protection ..... 256
Evaluation of Commercial Cyber Threat Information Sources ..... 257
Implementation of Recommendations by Defense Science Board Task Force on Cyber Deterrence and Cyber Supply Chain ..... 257
Persistent Training Environment ..... 258
Report on Army Network Security Consolidation ..... 258
Unified Platform ..... 259
Weapon System Cyber Vulnerabilities ..... 259
Intelligence Matters ..... 260
Defense Clandestine Service ..... 260
European Deterrence Initiative Intelligence, Surveillance, and Reconnaissance ..... 260
Improving Analytic Automation ..... 260
Intelligence Simulation Center ..... 261
Intelligence, Surveillance, and Reconnaissance Capability Imbalance ..... 261
Joint Intelligence, Surveillance, and Reconnaissance Management ..... 262
Report on National Intelligence Program and Military Intelligence Program Integration Against Hard Targets ..... 264
Review by Comptroller General of the United States of the General Defense Intelligence Program ..... 265
Secure Compartmented Information Facility Standardization ..... 265
Strengthening Intelligence Input to Milestone Decisions ..... 266
Threat Awareness Programs ..... 266
Underground Facility Targeting Capabilities ..... 267
LEGISLATIVE PROVISIONS ..... 267
Subtitle A—Management and Organization of Space Programs ..... 267
Section 1601—Establishment of Space Corps in the Department of the Air Force ..... 267
Section 1602—Establishment of Subordinate Unified Command of the United States Strategic Command ..... 268
Subtitle B—Space Activities ..... 268
Section 1611—Codification, Extension, and Modification of Limitation on Construction on United States Territory of Satellite Positioning Ground Monitoring Stations of Foreign Governments ..... 268
Section 1612—Foreign Commercial Satellite Services: Cybersecurity Threats and Launches ..... 268
Section 1613—Extension of Pilot Program on Commercial Weather Data ..... 269
Section 1614—Conditional Transfer of Acquisition and Funding Authority of Certain Weather Missions to National Reconnaissance Office ..... 269
Section 1615—Evolved Expendable Launch Vehicle Modernization and Sustainment of Assured Access to Space ..... 269
Section 1616—Commercial Satellite Communications Pathfinder Program ..... 270
Section 1617—Demonstration of Backup and Complementary Positioning, Navigation, and Timing Capabilities of Global Positioning System ..... 270
Section 1618—Enhancement of Positioning, Navigation, and Timing Capacity ..... 270
Section 1619—Establishment of Space Flag Training Event ..... 271

Page

Section 1620—Report on Operational and Contingency Plans for Loss or Degradation of Space Capabilities ..... 271
Section 1621—Limitation on Availability of Funding for Joint Space Operations Center Mission System ..... 272
Section 1622—Limitation on Availability of Funds Relating to the Advanced Extremely High Frequency Program ..... 272
Subtitle C—Defense Intelligence and Intelligence-Related Activities ..... 272
Section 1631—Security Clearances for Facilities of Certain Contractors 272
Section 1632—Extension of Authority to Engage in Certain Commercial Activities ..... 272
Section 1633—Submission of Audits of Commercial Activity Funds ..... 272
Section 1634—Clarification of Annual Briefing on the Intelligence, Surveillance, and Reconnaissance Requirements of the Combatant Commands ..... 272
Section 1635—Review of Support Provided by Defense Intelligence Elements to Acquisition Activities of the Department ..... 273
Section 1636—Limitation on Availability of Funds for Certain Offensive Counterintelligence Activities ..... 273
Section 1637—Prohibition on Availability of Funds for Certain Relocation Activities for NATO Intelligence Fusion Center ..... 273
Section 1638—Establishment of Chairman's Controlled Activity within Joint Staff for Intelligence, Surveillance, and Reconnaissance ..... 273
Section 1639—Sense of Congress and Report on Geospatial Commercial Activities for Basic and Applied Research and Development ..... 274
Section 1640—Department of Defense Counterintelligence Polygraph Program ..... 274
Section 1641—Security Clearance for Dual-Nationals ..... 274
Section 1642—Suspension or Revocation of Security Clearances Based on Unlawful or Inappropriate Contacts with Representatives of a Foreign Government ..... 274
Subtitle D—Cyberspace-Related Matters ..... 274
Section 1651—Notification Requirements for Sensitive Military Cyber Operations and Cyber Weapons ..... 274
Section 1652—Modification to Quarterly Cyber Operations Briefings ..... 275
Section 1653—Cyber Scholarship Program ..... 275
Section 1654—Plan to Increase Cyber and Information Operations, Deterrence, and Defense ..... 275
Section 1655—Report on Termination of Dual-Hat Arrangement for Commander of the United States Cyber Command ..... 275
Subtitle E—Nuclear Forces ..... 276
Section 1661—Notifications Regarding Dual-Capable F–35A Aircraft ..... 276
Section 1662—Oversight of Delayed Acquisition Programs by Council on Oversight of the National Leadership Command, Control, and Communications System ..... 276
Section 1663—Establishment of Nuclear Command and Control Intelligence Fusion Center ..... 276
Section 1664—Security of Nuclear Command, Control, and Communications System from Commercial Dependencies ..... 277
Section 1665—Oversight of Aerial-Layer Programs by Council on Oversight of the National Leadership Command, Control, and Communications System ..... 277
Section 1666—Security Classification Guide for Programs Relating to Nuclear Command, Control, and Communications and Nuclear Deterrence ..... 278
Section 1667—Evaluation and Enhanced Security of Supply Chain for Nuclear Command, Control, and Communications and Continuity of Government Programs ..... 278
Section 1668—Limitation on Pursuit of Certain Command and Control Concept ..... 279
Section 1669—Procurement Authority for Certain Parts of Intercontinental Ballistic Missile Fuzes ..... 279
Section 1670—Sense of Congress on Importance of Independent Nuclear Deterrent of United Kingdom ..... 280
Section 1671—Prohibition on Availability of Funds for Mobile Variant of Ground-Based Strategic Deterrent Missile ..... 280
Section 1672—Report on Impacts of Nuclear Proliferation ..... 280
Subtitle F—Missile Defense Programs ..... 280

Case 2:20-cv-00111-RAJ Document 111-4 Filed 11/24/20 Page 26 of 607

| | Page |
|---|---|
| Section 1681—Administration of Missile Defense and Defeat Programs | 280 |
| Section 1682—Preservation of the Ballistic Missile Defense Capacity of the Army | 281 |
| Section 1683—Modernization of Army Lower Tier Air and Missile Defense Sensor | 281 |
| Section 1684—Enhancement of Operational Test and Evaluation of Ballistic Missile Defense System | 281 |
| Section 1685—Defense of Hawaii from North Korean Ballistic Missile Attack | 282 |
| Section 1686—Aegis Ashore Anti-Air Warfare Capability | 283 |
| Section 1687—Iron Dome Short-Range Rocket Defense System, Israeli Cooperative Missile Defense Program Codevelopment and Coproduction, and Arrow 3 Testing | 283 |
| Section 1688—Review of Proposed Ground-Based Midcourse Defense System Contract | 284 |
| Section 1689—Sense of Congress and Plan for Development of Space-Based Sensor Layer for Ballistic Missile Defense | 285 |
| Section 1690—Sense of Congress and Plan for Development of Space-Based Ballistic Missile Intercept Layer | 285 |
| Section 1691—Limitation on Availability of Funds for Ground-Based Midcourse Defense Element of the Ballistic Missile Defense System | 285 |
| Section 1692—Conventional Prompt Global Strike Weapon System | 286 |
| Section 1693—Determination of Location of Continental United States Interceptor Site | 286 |
| Subtitle G—Other Matters | 286 |
| Section 1695—Protection of Certain Facilities and Assets from Unmanned Aircraft | 286 |
| Section 1696—Use of Commercial Items in Distributed Common Ground Systems | 286 |
| Section 1697—Independent Assessment of Costs Relating to Ammonium Perchlorate | 286 |
| Section 1698—Limitation and Business Case Analysis Regarding Ammonium Perchlorate | 286 |
| Section 1699—Industrial Base for Large Solid Rocket Motors and Related Technologies | 287 |
| Section 1699A—Pilot Program on Enhancing Information Sharing for Security of Supply Chain | 287 |
| Section 1699B—Commission to Assess the Threat to the United States from Electromagnetic Pulse Attacks and Events | 288 |
| Section 1699C—Pilot Program on Electromagnetic Spectrum Mapping | 288 |
| TITLE XVII—MATTERS RELATING TO SMALL BUSINESS PROCUREMENT | 288 |
| LEGISLATIVE PROVISIONS | 288 |
| Subtitle A—Improving Transparency and Clarity for Small Businesses | 288 |
| Section 1701—Improving Reporting on Small Business Goals | 288 |
| Section 1702—Uniformity in Procurement Terminology | 289 |
| Section 1703—Responsibilities of Commercial Market Representatives | 289 |
| Section 1704—Responsibilities of Business Opportunity Specialists | 289 |
| Subtitle B—Women's Business Programs | 289 |
| Section 1711—Office of Women's Business Ownership | 289 |
| Section 1712—Women's Business Center Program | 289 |
| Section 1713—Matching Requirements under Women's Business Center Program | 289 |
| Subtitle C—SCORE Program | 290 |
| Section 1721—SCORE Reauthorization | 290 |
| Section 1722—SCORE Program | 290 |
| Section 1723—Online Component | 290 |
| Section 1724—Study and Report on the Future Role of the SCORE Program | 290 |
| Section 1725—Technical and Conforming Amendments | 290 |
| Subtitle D—Small Business Development Centers Improvements | 290 |
| Section 1731—Use of Authorized Entrepreneurial Development Programs | 290 |
| Section 1732—Marketing of Services | 291 |
| Section 1733—Data Collection | 291 |
| Section 1734—Fees from Private Partnerships and Cosponsorships | 291 |
| Section 1735—Equity for Small Business Development Centers | 291 |

Page
Section 1736—Confidentiality Requirements ..... 291
Section 1737—Limitation on Award of Grants to Small Business Development Centers ..... 291
Subtitle E—Miscellaneous ..... 292
Section 1741—Modification of Past Performance Pilot Program to Include Consideration of Past Performance with Allies of the United States ..... 292
DIVISION B—MILITARY CONSTRUCTION AUTHORIZATIONS ..... 292
PURPOSE ..... 292
MILITARY CONSTRUCTION AND FAMILY HOUSING OVERVIEW ..... 292
Section 2001—Short Title ..... 292
Section 2002—Expiration of Authorizations and Amounts Required To Be Specified by Law ..... 293
Section 2003—Effective Date ..... 293
TITLE XXI—ARMY MILITARY CONSTRUCTION ..... 293
SUMMARY ..... 293
ITEMS OF SPECIAL INTEREST ..... 293
Explanation of Funding Adjustments ..... 293
Army Power Projection Platforms ..... 294
Pohakuloa Training Area ..... 294
LEGISLATIVE PROVISIONS ..... 294
Section 2101—Authorized Army Construction and Land Acquisition Projects ..... 294
Section 2102—Family Housing ..... 294
Section 2103—Improvements to Military Family Housing Units ..... 295
Section 2104—Authorization of Appropriations, Army ..... 295
Section 2105—Modification of Authority to Carry Out Certain Fiscal Year 2014 Project ..... 295
Section 2106—Modification of Authority to Carry Out Certain Fiscal Year 2015 Project ..... 295
Section 2107—Extension of Authorization of Certain Fiscal Year 2014 Project ..... 295
Section 2108—Extension of Authorizations of Certain Fiscal Year 2015 Projects ..... 295
Section 2109—Additional Authority to Carry Out Certain Fiscal Year 2000, 2005, 2006, and 2007 Projects ..... 295
TITLE XXII—NAVY MILITARY CONSTRUCTION ..... 296
SUMMARY ..... 296
ITEMS OF SPECIAL INTEREST ..... 296
Explanation of Funding Adjustments ..... 296
Assessment of Department of Defense Equities for Operation and Maintenance of the George P. Coleman Memorial Bridge, Yorktown, VA ..... 297
Red Hill Bulk Underground Fuel Storage Facility ..... 297
Requirements for Munitions and Explosives of Concern Clearance on Guam ..... 298
LEGISLATIVE PROVISIONS ..... 299
Section 2201—Authorized Navy Construction and Land Acquisition Projects ..... 299
Section 2202—Family Housing ..... 299
Section 2203—Improvements to Military Family Housing Units ..... 299
Section 2204—Authorization of Appropriations, Navy ..... 299
Section 2205—Extension of Authorizations for Certain Fiscal Year 2014 Projects ..... 299
Section 2206—Extension of Authorizations of Certain Fiscal Year 2015 Projects ..... 300
TITLE XXIII—AIR FORCE MILITARY CONSTRUCTION ..... 300
SUMMARY ..... 300
ITEMS OF SPECIAL INTEREST ..... 300
Explanation of Funding Adjustments ..... 300
Air Force Dormitory Master Plan ..... 302
Lincoln Laboratory Recapitalization ..... 303
LEGISLATIVE PROVISIONS ..... 303
Section 2301—Authorized Air Force Construction and Land Acquisition Projects ..... 303
Section 2302—Family Housing ..... 303
Section 2303—Improvements to Military Family Housing Units ..... 303
Section 2304—Authorization of Appropriations, Air Force ..... 303

Page

Section 2305—Modification of Authority to Carry Out Certain Fiscal Year 2017 Projects ..... 303
Section 2306—Extension of Authorizations of Certain Fiscal Year 2015 Projects ..... 304
TITLE XXIV—DEFENSE AGENCIES MILITARY CONSTRUCTION ..... 304
SUMMARY ..... 304
ITEMS OF SPECIAL INTEREST ..... 304
Explanation of Funding Adjustments ..... 304
LEGISLATIVE PROVISIONS ..... 306
Section 2401—Authorized Defense Agencies Construction and Land Acquisition Projects ..... 306
Section 2402—Authorized Energy Resiliency and Conservation Projects ..... 306
Section 2403—Authorization of Appropriations, Defense Agencies ..... 306
Section 2404—Modification of Authority to Carry Out Certain Fiscal Year 2017 Project ..... 306
Section 2405—Extension of Authorizations of Certain Fiscal Year 2014 Projects ..... 306
Section 2406—Extension of Authorizations of Certain Fiscal Year 2015 Projects ..... 307
TITLE XXV—INTERNATIONAL PROGRAMS ..... 307
SUMMARY ..... 307
ITEMS OF SPECIAL INTEREST ..... 307
Explanation of Funding Adjustments ..... 307
Infrastructure Capabilities, Capacity, and Investments ..... 307
LEGISLATIVE PROVISIONS ..... 308
Subtitle A—North Atlantic Treaty Organization Security Investment Program ..... 308
Section 2501—Authorized NATO Construction and Land Acquisition Projects ..... 308
Section 2502—Authorization of Appropriations, NATO ..... 308
Subtitle B—Host Country In-Kind Contributions ..... 308
Section 2511—Republic of Korea Funded Construction Projects ..... 308
Section 2512—Modification of Authority to Carry Out Certain Fiscal Year 2017 Projects ..... 308
TITLE XXVI—GUARD AND RESERVE FORCES FACILITIES ..... 308
SUMMARY ..... 308
ITEMS OF SPECIAL INTEREST ..... 308
Explanation of Funding Adjustments ..... 308
LEGISLATIVE PROVISIONS ..... 310
Subtitle A—Project Authorizations and Authorizations of Appropriations . 310
Section 2601—Authorized Army National Guard Construction and Land Acquisition Projects ..... 310
Section 2602—Authorized Army Reserve Construction and Land Acquisition Projects ..... 310
Section 2603—Authorized Navy Reserve and Marine Corps Reserve Construction and Land Acquisition Projects ..... 311
Section 2604—Authorized Air National Guard Construction and Land Acquisition Projects ..... 311
Section 2605—Authorized Air Force Reserve Construction and Land Acquisition Projects ..... 311
Section 2606—Authorization of Appropriations, National Guard and Reserve ..... 311
Subtitle B—Other Matters ..... 311
Section 2611—Modification of Authority to Carry Out Certain Fiscal Year 2015 Project ..... 311
Section 2612—Extension of Authorizations of Certain Fiscal Year 2014 Projects ..... 311
Section 2613—Extension of Authorizations of Certain Fiscal Year 2015 Projects ..... 312
TITLE XXVII—BASE REALIGNMENT AND CLOSURE ACTIVITIES ..... 312
OVERVIEW ..... 312
ITEMS OF SPECIAL INTEREST ..... 312
Explanation of Funding Adjustments ..... 312
LEGISLATIVE PROVISIONS ..... 312
Section 2701—Authorization of Appropriations for Base Realignment and Closure Activities Funded Through Department of Defense Base Closure Account ..... 312

Page

Section 2702—Prohibition on Conducting Additional Base Realignment and Closure (BRAC) Round ..... 312
TITLE XXVIII—MILITARY CONSTRUCTION GENERAL PROVISIONS ..... 313
ITEMS OF SPECIAL INTEREST ..... 313
Air Training Ranges in the Department of Defense ..... 313
Aircraft Stationing, Basing, and Laydown Process ..... 314
Collaboration with Federal Aviation Administration on Unmanned Aerial Systems ..... 315
Efficient and Integrated Military Installations ..... 315
Enhanced Use Leases ..... 316
Financial Institutions on Military Installations ..... 316
Infrastructure Master Plan for Defense Laboratory and Research, Development, Test, and Evaluation Infrastructure ..... 317
Overseas Infrastructure and Facility Investments ..... 317
Railroads for National Defense ..... 318
Sentinel Landscapes Partnership Program ..... 318
Sustainment and Recapitalization of Utilities ..... 319
Use of Federal Facilities by Contractors ..... 319
Veteran Apprenticeship Programs and Military Construction ..... 320
Wastewater Treatment Infrastructure ..... 320
LEGISLATIVE PROVISIONS ..... 321
Subtitle A—Military Construction Program and Military Family Housing ..... 321
Section 2801—Elimination of Written Notice Requirement for Military Construction Activities and Reliance on Electronic Submission of Notifications and Reports ..... 321
Section 2802—Modification of Thresholds Applicable to Unspecified Minor Construction Projects ..... 321
Section 2803—Extension of Temporary, Limited Authority to Use Operation and Maintenance Funds for Construction Projects Outside the United States ..... 321
Section 2804—Use of Operation and Maintenance Funds for Military Construction Projects to Replace Facilities Damaged or Destroyed by Natural Disasters or Terrorism Incidents ..... 321
Subtitle B—Real Property and Facilities Administration ..... 322
Section 2811—Elimination of Written Notice Requirement for Military Real Property Transactions and Reliance on Electronic Submission of Notifications and Reports ..... 322
Section 2812—Clarification of Applicability of Fair Market Value Consideration in Grants of Easements on Military Lands for Rights-of-Way ..... 322
Section 2813—Criteria for Exchanges of Property at Military Installations ..... 322
Section 2814—Prohibiting Use of Updated Assessment of Public Schools on Department of Defense Installations to Supersede Funding of Certain Projects ..... 322
Section 2815—Requirements for Window Fall Prevention Devices in Military Family Housing ..... 322
Section 2816—Authorizing Reimbursement of States for Costs of Suppressing Wildfires Caused by Department of Defense Activities on State Lands; Restoration of Lands of Other Federal Agencies for Damage Caused by Department of Defense Vehicle Mishaps ..... 323
Section 2817—Prohibiting Collection of Additional Amounts from Members Living in Units Under Military Housing Privatization Initiative . 323
Subtitle C—Land Conveyances ..... 323
Section 2821—Land Exchange, Naval Industrial Reserve Ordnance Plant, Sunnyvale, California ..... 323
Section 2822—Land Conveyance, Naval Ship Repair Facility, Guam ..... 323
Section 2823—Lease of Real Property to the United States Naval Academy Alumni Association and Naval Academy Foundation at United States Naval Academy, Annapolis, Maryland ..... 323
Section 2824—Land Conveyance, Natick Soldier Systems Center, Massachusetts ..... 324
Section 2825—Imposition of Additional Conditions on Land Conveyance, Castner Range, Fort Bliss, Texas ..... 324
Section 2826—Land Conveyance, Wasatch-Cache National Forest, Rich County, Utah ..... 324

Page

Section 2827—Land Conveyance, Former Missile Alert Facility known as Quebec-01, Laramie County, Wyoming ..... 324
Subtitle D—Military Land Withdrawals ..... 324
Section 2831—Indefinite Duration of Certain Military Land Withdrawals and Reservations and Improved Management of Withdrawn and Reserved Lands ..... 324
Section 2832—Temporary Segregation from Public Land Laws of Property Subject to Proposed Military Land Withdrawal; Temporary Use Permits and Transfers of Small Parcels of Land between Departments of Interior and Military Departments; More Efficient Surveying of Lands ..... 325
Subtitle E—Military Memorials, Monuments, and Museums ..... 325
Section 2841—Modification of Prohibition on Transfer of Veterans Memorial Objects to Foreign Governments without Specific Authorization in Law ..... 325
Section 2842—Recognition of the National Museum of World War II Aviation ..... 325
Section 2843—Principal Office of Aviation Hall of Fame ..... 325
Subtitle F—Shiloh National Military Park ..... 325
Section 2851—Short Title ..... 325
Section 2852—Definitions ..... 325
Section 2853—Areas to Be Added to Shiloh National Military Park ..... 326
Section 2854—Establishment of Affiliated Area ..... 326
Section 2855—Private Property Protection ..... 326
Subtitle G—Other Matters ..... 326
Section 2861—Modification of Department of Defense Guidance on Use of Airfield Pavement Markings ..... 326
Section 2862—Authority of Chief Operating Officer of Armed Forces Retirement Home to Acquire and Lease Property ..... 326
TITLE XXIX—OVERSEAS CONTINGENCY OPERATIONS MILITARY CONSTRUCTION ..... 326
SUMMARY ..... 326
ITEMS OF SPECIAL INTEREST ..... 327
Explanation of Funding Adjustments ..... 327
LEGISLATIVE PROVISIONS ..... 329
Section 2901—Authorized Army Construction and Land Acquisition Projects ..... 329
Section 2902—Authorized Navy Construction and Land Acquisition Project ..... 329
Section 2903—Authorized Air Force Construction and Land Acquisition Projects ..... 329
Section 2904—Authorized Defense Agencies Construction and Land Acquisition Project ..... 329
Section 2905—Authorization of Appropriations ..... 329
Section 2906—Extension of Authorization of Certain Fiscal Year 2015 Projects ..... 329

DIVISION C—DEPARTMENT OF ENERGY NATIONAL SECURITY AUTHORIZATIONS AND OTHER AUTHORIZATIONS ..... 330
TITLE XXXI—DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS ..... 330
OVERVIEW ..... 330
ITEMS OF SPECIAL INTEREST ..... 330
National Nuclear Security Administration ..... 330
Overview ..... 330
Weapons Activities ..... 330
Advanced simulation and computing ..... 330
Analysis of alternatives for unobligated enriched uranium ..... 330
Beryllium ..... 331
Defense nuclear security ..... 331
Nuclear Survivability ..... 332
Secure transportation asset and mobile guardian transporter ..... 333
Single-point failures in the nuclear security enterprise ..... 333
Defense Nuclear Nonproliferation ..... 334
Nuclear counterterrorism and incident response program and emergency preparedness ..... 334
Nuclear detection and verification efforts ..... 334
Naval Reactors ..... 335

Page
Naval Reactors program .......... 335
Federal Salaries and Expenses .......... 335
Comptroller General review of support service contracts .......... 335
Environmental and Other Defense Activities .......... 336
Overview .......... 336
Defense Environmental Cleanup .......... 336
Waste Isolation Pilot Plant .......... 336
LEGISLATIVE PROVISIONS .......... 337
Subtitle A—National Security Programs Authorizations .......... 337
Section 3101—National Nuclear Security Administration .......... 337
Section 3102—Defense Environmental Cleanup .......... 337
Section 3103—Other Defense Activities .......... 337
Section 3104—Nuclear Energy .......... 337
Subtitle B—Program Authorizations, Restrictions, and Limitations .......... 337
Section 3111—Nuclear Security Enterprise Infrastructure Recapitalization and Repair .......... 337
Section 3112—Incorporation of Integrated Surety Architecture in Transportation .......... 338
Section 3113—Cost Estimates for Life Extension Program and Major Alteration Projects .......... 339
Section 3114—Budget Requests and Certification regarding Nuclear Weapons Dismantlement .......... 339
Section 3115—Improved Information Relating to Defense Nuclear Nonproliferation Research and Development Program .......... 339
Section 3116—Research and Development of Advanced Naval Reactor Fuel Based on Low-Enriched Uranium .......... 340
Section 3117—Prohibition on Availability of Funds for Programs in Russian Federation .......... 340
Section 3118—National Nuclear Security Administration Pay and Performance System .......... 341
Section 3119—Disposition of Weapons-Usable Plutonium .......... 341
Section 3120—Modification of Minor Construction Threshold for Plant Projects .......... 341
Section 3121—Design Competition .......... 341
Section 3122—Department of Energy Counterintelligence Polygraph Program .......... 342
Section 3123—Security Clearance for Dual-Nationals Employed by National Nuclear Security Agency .......... 342
Subtitle C—Plans and Reports .......... 342
Section 3131—Modification of Certain Reporting Requirements .......... 342
Section 3132—Assessment of Management and Operating Contracts of National Security Laboratories .......... 342
Section 3133—Evaluation of Classification of Certain Defense Nuclear Waste .......... 343
Section 3134—Report on Critical Decision-1 on Material Staging Facility Project .......... 343
Section 3135—Modification to Stockpile Stewardship, Management, and Responsiveness Plan .......... 343
Section 3136—Improved Reporting for Anti-Smuggling Radiation Detection Systems .......... 343
Section 3137—Annual Selected Acquisition Reports on Certain Hardware Relating to Defense Nuclear Nonproliferation .......... 344
Section 3138—Assessment of Design Trade Options of W80–4 Warhead 344
TITLE XXXII—DEFENSE NUCLEAR FACILITIES SAFETY BOARD .......... 344
LEGISLATIVE PROVISIONS .......... 344
Section 3201—Authorization .......... 344
TITLE XXXIV—NAVAL PETROLEUM RESERVES .......... 344
LEGISLATIVE PROVISIONS .......... 344
Section 3401—Authorization of Appropriations .......... 344
TITLE XXXV—MARITIME ADMINISTRATION .......... 344
ITEMS OF SPECIAL INTEREST .......... 344
National Security Multi-Mission Vessel .......... 344
LEGISLATIVE PROVISIONS .......... 345
Section 3501—Authorization of the Maritime Administration .......... 345
Section 3502—Merchant Ship Sales Act of 1946 .......... 345
Section 3503—Maritime Security Fleet Program; Restriction on Operation for New Entrants .......... 345

Page

Section 3504—Codification of Sections Relating to Acquisition, Charter, and Requisition of Vessels ........ 345
Section 3505—Assistance for Small Shipyards ........ 345
Section 3506—Report on Sexual Assault Victim Recovery in the Coast Guard ........ 345
Section 3507—Centers of Excellence ........ 346

DIVISION D—FUNDING TABLES ........ 346
Section 4001—Authorization of Amounts in Funding Tables ........ 346
Summary of National Defense Authorizations for Fiscal Year 2018 ........ 347
National Defense Budget Authority Implication ........ 352
TITLE XLI—PROCUREMENT ........ 354
Section 4101—Procurement ........ 354
Section 4102—Procurement for Overseas Contingency Operations ........ 401
Section 4103—Procurement for Overseas Contingency Operations for Base Requirements ........ 419
TITLE XLII—RESEARCH, DEVELOPMENT, TEST, AND EVALUATION ........ 420
Section 4201—Research, Development, Test, and Evaluation ........ 420
Section 4202—Research, Development, Test, and Evaluation for Overseas Contingency Operations ........ 460
Section 4203—Research, Development, Test, and Evaluation for Overseas Contingency Operations for Base Requirements ........ 461
TITLE XLIII—OPERATION AND MAINTENANCE ........ 465
Section 4301—Operation and Maintenance ........ 465
Section 4302—Operation and Maintenance for Overseas Contingency Operations ........ 486
Section 4303—Operation and Maintenance for Overseas Contingency Operations for Base Requirements ........ 497
TITLE XLIV—MILITARY PERSONNEL ........ 500
Section 4401—Military Personnel ........ 501
Section 4402—Military Personnel for Overseas Contingency Operations ........ 501
Section 4403—Military Personnel for Overseas Contingency Operations for Base Requirements ........ 501
TITLE XLV—OTHER AUTHORIZATIONS ........ 502
Section 4501—Other Authorizations ........ 502
Section 4502—Other Authorizations for Overseas Contingency Operations ........ 505
TITLE XLVI—MILITARY CONSTRUCTION ........ 507
Section 4601—Military Construction ........ 507
Section 4602—Military Construction for Overseas Contingency Operations ........ 521
TITLE XLVII—DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS ........ 523
Section 4701—Department of Energy National Security Programs ........ 523

Department of Defense Authorization Request ........ 536
Communications from Other Committees ........ 537
Congressional Budget Office Estimate ........ 550
Statement Required by the Congressional Budget Act ........ 551
Committee Cost Estimate ........ 551
Advisory of Earmarks ........ 551
Oversight Findings ........ 551
General Performance Goals and Objectives ........ 551
Statement of Federal Mandates ........ 553
Federal Advisory Committee Statement ........ 553
Applicability to the Legislative Branch ........ 553
Duplication of Federal Programs ........ 553
Disclosure of Directed Rule Makings ........ 553
Committee Votes ........ 553
Changes in Existing Law Made by the Bill, as Reported ........ 563
Additional Views ........ 566

115TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
1st Session } { 115–200

# NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2018

JULY 6, 2017.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. THORNBERRY, from the Committee on Armed Services, submitted the following

## R E P O R T

together with

## ADDITIONAL VIEWS

[To accompany H.R. 2810]

[Including cost estimate of the Congressional Budget Office]

The Committee on Armed Services, to whom was referred the bill (H.R. 2810) to authorize appropriations for fiscal year 2018 for military activities of the Department of Defense and for military construction, to prescribe military personnel strengths for such fiscal year, and for other purposes, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

The amendments are as follows:

The amendment strikes all after the enacting clause of the bill and inserts a new text which appears in italic type in the reported bill.

The title of the bill is amended to reflect the amendment to the text of the bill.

## PURPOSE OF THE LEGISLATION

The bill would: (1) authorize appropriations for fiscal year 2018 for procurement and for research, development, test, and evaluation (RDT&E); (2) authorize appropriations for fiscal year 2018 for operation and maintenance (O&M) and for working capital funds; (3) authorize for fiscal year 2018 the personnel strength for each Active Duty component of the military departments, and the per-

sonnel strength for the Selected Reserve for each Reserve Component of the Armed Forces; (4) modify various elements of compensation for military personnel and impose certain requirements and limitations on personnel actions in the defense establishment; (5) authorize appropriations for fiscal year 2018 for military construction and family housing; (6) authorize appropriations for Overseas Contingency Operations; (7) authorize appropriations for fiscal year 2018 for the Department of Energy national security programs; and (8) authorize appropriations for fiscal year 2018 for the Maritime Administration.

## RATIONALE FOR THE COMMITTEE BILL

H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018, is a key mechanism through which Congress fulfills one of its primary responsibilities as mandated in Article I, Section 8, of the Constitution of the United States, which grants Congress the power to provide for the common defense, to raise and support an Army, to provide and maintain a Navy, and to make rules for the government and regulation of the land and naval forces. Rule X of the House of Representatives provides the House Committee on Armed Services with jurisdiction over the Department of Defense generally and over the military application of nuclear energy. The committee bill includes the large majority of the findings and recommendations resulting from its oversight activities, conducted through hearings, briefings, and roundtable discussions with Department of Defense and Department of Energy civilian and military officials, intelligence analysts, outside experts, and industry representatives, and informed by the experience gained over the previous decades of the committee's existence.

The committee believes that America's global military capabilities and commitments have undergirded peace, security, and economic prosperity, and underwritten an international world order and American interests. However, the committee also recognizes that others seek to threaten such security and prosperity. The committee further acknowledges that the U.S. Armed Forces have been under an unrelenting pace of operations. In fact, in testimony given to the committee on June 12, 2017, the Secretary of Defense described forces affecting the readiness of the military, noting "The first force we must recognize is 16 years of war. This period represents the longest continuous stretch of armed conflict in our Nation's history. In more than a quarter century since the end of the Cold War, our country has deployed large-scale forces in active operations for more months than we have been at peace."

The provisions contained in the committee bill reinforce the committee's belief that America's military strength and its global posture and presence will continue to be necessary to deter aggression, to reassure U.S. allies and partners, and to exercise global influence. Further, the committee bill would make much needed and overdue investments in the men and women in uniform as well as their equipment and training, as they face an uncertain a global threat environment.

### *Reforming the Department of Defense*

The committee continues to believe that reform of the Department of Defense is needed to improve the military's agility and the

speed at which it can address an increasingly complex security environment and unprecedented technological challenges. Reforms also ensure effective and efficient use of taxpayer dollars. The bill reflects three major reform initiatives undertaken by the committee in H.R. 2810: (1) acquisition reform, (2) data management reform, and (3) statutory streamlining.

Furthermore, in the area of defense healthcare, the committee refines the reforms of the Military Health System initiated in the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) by maintaining emphasis on the readiness of the force. To accomplish this goal, H.R. 2810 builds on the importance of these efforts by focusing on a Military Health System that reduces costs, improves the delivery of health care services at military medical treatment facilities and enhances readiness of health professionals supporting the war fighter.

In the area of military justice and sexual assault prevention and response, the committee recognizes the significant changes to the Uniform Code of Military Justice contained in last year's bill. Therefore, H.R. 2810 includes limited clarifying and technical amendments designed to refine last year's reforms. In addition, it includes a provision that would prohibit the nonconsensual sharing of intimate images, including cases in which the images were initially obtained with consent. The bill also contains improvements to sexual assault prevention and response, including a provision that would require special victims counsel to receive training on the unique challenges often faced by male sexual assault victims.

*Readiness of the Force and Rebuilding the Military*

The committee recognizes that while the Department's missions and requirements have increased, its resources have decreased and readiness has suffered. The Vice Chief of Staff of the Army testified that, "In total, only about two thirds of the Army's initial critical formations—the formations we would need at the outset of a major conflict—are at acceptable levels of readiness to conduct sustained ground combat in a full spectrum environment against a highly lethal hybrid threat or near-peer adversary. Stated more strategically, based on current readiness levels, the Army can only accomplish Defense Planning Guidance Requirements at high military risk." The Assistant Commandant of the MarineCorps testified, "Current readiness shortfalls require additional operations and maintenance resources, and we have exhausted our internal options. Additional resources would facilitate exercises and training and correct repair parts shortfalls, while specifically addressing aviation specific operations and maintenance funding." The other military service chiefs have expressed similar sentiments. These undeniable readiness shortfalls in the military services led Secretary of Defense James N. Mattis to testify before the committee that, after returning to the Pentagon ". . . I have been shocked by what I've seen with our readiness to fight."

To begin to address the decline in readiness and initiate the rebuilding of the military, the bill would include more than $2.9 billion in additional funds for ship and aircraft depot maintenance; aviation training and readiness; and long-neglected facilities sustainment, restoration, and modernization accounts, all of which were identified as unfunded requirements by the military services.

The bill would also fully resource U.S. Special Operations Command, provide additional resources for unfunded requirements to counter global terrorism threats, and provide resources to accelerate capabilities to support counterterrorism analytic tools.

Procurement of modernized systems is key to addressing the readiness of the force. Many legacy systems can no longer be maintained and adversary systems are increasingly able to challenge such platforms. H.R. 2810 responds to numerous unfunded, yet critical, modernization requirements identified by the military services, including in the areas of air dominance, strike fighter capability gaps, rotorcraft for ground forces, Navy cruiser modernization, surface combatants, shortfalls in war reserves for critical munitions, and accelerating full spectrum capability within the Army's ground forces.

The committee bill authorizes the total budget request funding level for the National Nuclear Security Administration's (NNSA) nuclear weapons activities and defense nuclear nonproliferation program, including critical efforts to modernize the nuclear weapons stockpile and to tackle the multibillion dollar backlog in deferred maintenance of NNSA facilities.

The committee recognizes that the cyber domain of modern warfare continues to grow in scope and sophistication. Therefore, H.R. 2810 fully funds the budget request for cyber operations and prioritizes the readiness of the cyber mission forces. The committee increases funding to U.S. Cyber Command by 16 percent, and enhances the Department's defensive and offensive cyberspace capabilities. The bill also addresses military service unfunded requirements for cyber warfare by providing additional funding to close these critical gaps.

The committee remains focused on assuring access to space, given the military's dependence on the capabilities provided from satellites. Thus, the bill would authorize funds for the development of a new American engine to replace the Russian-made RD–180 by 2019; ensure the maintenance and modernization of existing national security space launch capabilities; and, ensure funding of national security space-related modifications of commercial launch vehicles, instead of funding the development of new space launch vehicles. In light of the criticality of space as a new warfighting domain, the bill would establish a space corps within the Air Force and elevate U.S. Space Command to a subunified command under U.S. Strategic Command.

In the area of ballistic missile defense, the bill would authorize significant additional resources to meet combatant command shortfalls, and service unfunded requirements for missile defense interceptor inventories around the globe. The bill would also require the Director of the Missile Defense Agency (MDA) to begin the development of a space-based sensor layer for ballistic missile defense; give the U.S. Army a deadline to develop a modernization schedule that acceptably meets warfighter requirements for a replacement to the legacy Patriot air and missile defense radar system; require the Secretary of Defense to transfer acquisition authority for operational missile defense programs from the Director of MDA to a military service by the time the President's budget is submitted for fiscal year 2020; and prevent the Army from retiring GEM–T interceptors from its inventory until the Secretary of the Army submits

an evaluation of the Army's ability to meet warfighter requirements and operational needs without such interceptors.

The bill also includes provisions that would advance hypersonic weapons research, development, and transitional efforts within the Department, and require weapons and munitions science and technology roadmaps, including naval energetics, to ensure focused developmental efforts of critical weapon systems.

*Resources for Warfighters and Families*

The committee believes that caring for the troops and their families is the essential foundation of readiness. H.R. 2810 builds upon the bipartisan work of the Subcommittee on Military Personnel in providing the troops the benefits they need, deserve, and have earned. As always, the committee's approach is guided by a determination to maintain the viability and readiness of the All-Volunteer Force while ensuring that the Government does not break faith with U.S. service members, retirees, their family members, and survivors.

H.R. 2810 would authorize a fully funded, by-law pay raise for all U.S. service members at 2.4 percent. The bill would also begin to grow military end strength, by increasing the active duty Army by 10,000 to 486,000, the Army National Guard by 4,000 to 347,000, the Army Reserve by 3,000 to 202,000 in fiscal year 2018.

H.R. 2810 would grant permanency to family support programs within U.S. Special Operations Command. This important and proven pilot program now merits codification and permanency to ensure continued support and care for families of Special Operations Forces.

The bill also contains important provisions that would provide further protection to former service members, including those who have been diagnosed with Post-Traumatic Stress Disorder or Traumatic Brain Injury as a result of combat or sexual assault in the military.

*National Defense Strategy*

The committee remains concerned about the absence of a clear and cohesive strategy concerning national security priorities in places of conflict, including in the Syrian Arab Republic, the Islamic Republic of Afghanistan, the Republic of Yemen, and the Federal Republic of Somalia, and the provisions contained in the committee bill would require the Department of Defense to provide additional details on efforts in those countries. At the same time, the committee notes the importance of disrupting and dismantling terrorist groups that threaten U.S. interests and provides funds necessary to train and equip partner forces, including the Iraqi Security Forces, which combat the Islamic State in Iraq and the Levant and other terrorist groups across the Middle East, Africa, and Central Asia.

The committee remains concerned about the Islamic Republic of Iran's malign military activities, and H.R. 2810 would express the committee's view that the United States should counter such activities, ensure that the U.S. military maintains a capable posture in the Arabian Gulf to deter and respond to Iranian aggression, strengthen ballistic missile defense capabilities, ensure freedom of

navigation at the Bab al Mandab Strait and the Strait of Hormuz, and counter Iranian efforts to illicitly proliferate weapons.

The committee has also focused on the Department's efforts to deter aggression by the Russian Federation against Ukraine and other allies and partners in Europe. The committee supports a significant increase in European Deterrence Initiative funding above the fiscal year 2017 request, including funding for heel-to-toe rotations of U.S. forces, pre-positioning of equipment in Europe, and building up necessary Air Force infrastructure. The bill would also provide $150.0 million for the Ukraine Security Assistance Initiative to enhance the defense of Ukraine and to deter further Russian aggression.

The committee supports the Department of Defense in strengthening U.S. military posture and capabilities in the Indo-Asia-Pacific region. To aid in its oversight, H.R. 2810 would require the Department of Defense to provide a strategy on United States defense objectives and priorities in the Indo-Asia-Pacific region and an assessment of U.S. force posture and basing needs. Additionally, it would reaffirm U.S. extended deterrence commitments to Japan and the Republic of Korea and condemn any assertion that limits the right of freedom of navigation and overflight in the South China Sea. It would express a sense of Congress in strengthening security cooperation with allies and partners, including Japan, the Republic of Korea, Taiwan, Australia, and with regional institutions such as the Association of Southeast Asian Nations.

The committee also supports the Department of Defense in countering instability and strengthening capabilities of U.S. partners in Africa. To aid in its oversight, H.R. 2810 would require the president to provide a strategy on United States objectives and priorities in the Federal Republic of Somalia.

## HEARINGS

Committee consideration of the National Defense Authorization Act for Fiscal Year 2018 results from posture and budget-related hearings that began on February 1, 2017, and that were completed on June 12, 2017. The full committee conducted 8 hearing and the 6 subcommittees conducted a total of 31 sessions during this time period. Additionally, over the past year, the committee conducted numerous policy and program oversight hearings, including hearings in support of its reform initiatives, to inform its development of the legislative proposals contained in this Act.

## COMMITTEE POSITION

On June 28, 2017, the Committee on Armed Services held a markup session to consider H.R. 2810. The committee ordered the bill H.R. 2810, as amended, favorably reported to the House of Representatives by a recorded vote of 60–1, a quorum being present.

## EXPLANATION OF THE COMMITTEE AMENDMENTS

The committee adopted an amendment in the nature of a substitute during the consideration of H.R. 2810. The title of the bill is amended to reflect the amendment to the text of the bill. The remainder of the report discusses the bill, as amended.

## RELATIONSHIP OF AUTHORIZATION TO APPROPRIATIONS

The bill does not provide budget authority. This bill authorizes appropriations; subsequent appropriations acts will provide budget authority. However, the committee strives to adhere to the recommendations as issued by the Committee on the Budget as it relates to the jurisdiction of this committee.

The bill addresses the following categories in the Department of Defense budget: procurement; research, development, test, and evaluation; operation and maintenance; military personnel; working capital funds; and military construction and family housing. The bill also addresses the Armed Forces Retirement Home, Department of Energy National Security Programs, the Naval Petroleum Reserve, and the Maritime Administration.

Active Duty and Reserve personnel strengths authorized in this bill and legislation affecting compensation for military personnel determine the remaining appropriation requirements of the Department of Defense. However, this bill does not provide authorization of specific dollar amounts for military personnel.

## SUMMARY OF DISCRETIONARY AUTHORIZATIONS IN THE BILL

The President requested discretionary budget authority of $659.8 billion for programs within the jurisdiction of the committee for fiscal year 2018. Of this amount, $574.6 billion was requested for "base" Department of Defense programs, $64.6 billion was requested for Overseas Contingency Operations requirements covering the entire fiscal year, $20.5 billion was requested for Department of Energy national security programs and the Defense Nuclear Facilities Safety Board, and $0.2 billion was requested for defense-related activities associated with the Maritime Administration.

The committee recommends an overall discretionary authorization of $688.3 billion in fiscal year 2018. The base committee authorization of $613.8 billion is a $70.4 billion increase above the levels provided for in the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328). The authorization provided in title XV totals $74.6 billion for Overseas Contingency Operations, of which $10.0 billion is authorized in support of base budget requirements.

The table preceding the detailed program adjustments in division D of this report summarizes the committee's recommended discretionary authorizations by appropriation account for fiscal year 2018 and compares these amounts to the President's request.

## BUDGET AUTHORITY IMPLICATION

The President's total request for the national defense budget function (050) in fiscal year 2018 is $675.8 billion, as estimated by the Congressional Budget Office. In addition to funding for programs addressed in this bill, the total 050 request includes discretionary funding for national defense programs not in the committee's jurisdiction, discretionary funding for programs that do not require additional authorization in fiscal year 2018, and mandatory programs.

The table preceding the detailed program adjustments in division D of this report details changes to the budget request for all aspects of the national defense budget function.

# DIVISION A—DEPARTMENT OF DEFENSE AUTHORIZATIONS

## TITLE I—PROCUREMENT

### AIRCRAFT PROCUREMENT, ARMY

#### Items of Special Interest

*Health and Usage Monitoring Systems*

In the committee report (H. Rept. 113–446) accompanying the National Defense Authorization Act for Fiscal Year 2015, the committee directed the Secretary of the Army review the potential for integrating and demonstrating a Next Generation Health Monitoring System (NGHMS) for UH–72 light utility helicopters. The NGHMS could enable early warning for failing platform systems, reduce emergency maintenance demands, provide predictable platform maintenance schedules, reduce cost and should increase readiness.

The committee notes the Army is currently evaluating NGHMS systems and most recently conducted a critical design review in February 2017. The committee understands that preliminary test and evaluation have demonstrated promising results. Given these encouraging results with light utility rotorcraft, the committee believes there could be potential for integrating NGHMS on ground combat vehicles, in particular the Stryker Combat Vehicle, to help with improving maintenance and readiness.

Therefore, the committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by September 15, 2017, that provides the status and available results of the UH–72 NGHMS testing; the Army's plan for procuring and integrating NGHMS into the UH–72 fleet to include any detailed description of the planned changes to the UH–72 aircraft maintenance construct, expected efficiencies and estimated annual cost savings, as well as any potential for application on ground combat vehicles.

### MISSILE PROCUREMENT, ARMY

#### Items of Special Interest

*Lethal Miniature Aerial Missile Systems*

In the committee report (H. Rept. 114–102) accompanying the National Defense Authorization Act for Fiscal Year 2016, the committee noted the effectiveness of the Lethal Miniature Aerial Missile System (LMAMS) currently fielded in the U.S. Central Command (CENTCOM) theater of operations, and supported the potential distribution of this capability across Army infantry units. The LMAMS is a single man-portable/operable, lightweight, beyond-line-of-sight, precision-guided, loitering aerial missile system capable of locating and engaging obscured and/or fleeting enemy targets

who otherwise cannot be engaged by typical direct fire weapon systems.

The committee notes the Army requested a total of $63.5 million for 655 LMAMS as part of the fiscal year 2017 Overseas Contingency Operations request to address joint urgent operational needs in CENTCOM's area of operations. The committee understands the LMAMS Capability Development Document has completed initial Army staff review, is currently being revised by the U.S. Army Training and Doctrine Command Maneuver Center of Excellence, and will then be considered by the Army Requirements Oversight Council for transition to a program of record. While the committee fully supports the Army's request from fiscal year 2017 and the budget request for fiscal year 2018, the committee requires additional details regarding the Army's long-term acquisition strategy for LMAMS.

Therefore, the committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by November 1, 2017, on the Army's long-term plan for LMAMS, to include current analysis of LMAMS operational performance to date, current fielding strategy, as well as projected funding requests across the Future Years Defense Program.

## PROCUREMENT OF WEAPONS AND TRACKED COMBAT VEHICLES, ARMY

### Items of Special Interest

*Armored brigade combat team modernization*

The committee understands that Budget Control Act of 2011 (Public Law 112–25) funding levels have reduced buying power, disrupted modernization plans, and reduced the Army's capability advantage over near-peer, high-end competitors. The committee notes that Army modernization funding declined 74 percent from 2008–2015 as a result of the drawdown from two wars and the imposition of the budget caps by Public Law 112–25. Perhaps most significant is that research and development (R&D) funding has been reduced by 50 percent, and appears to be concentrated in the later stages of R&D at the prototyping and system design and development stages, which are the precursors to fielding new capabilities. The Vice Chief of Staff of the Army stated, in testimony before the House Committee on Armed Services, that today's Army is "out-ranged, outgunned, and outdated; and on our present course, the U.S. Army will not be sufficiently modern to deter and defeat potential enemies." The committee is concerned that the tactical overmatch that U.S. ground forces have enjoyed for decades is being diminished, or in some cases, no longer exists.

The committee believes the consequences of reduced modernization funding are most dramatic with respect to ground combat vehicle modernization. While the Army has definitive plans in place for Army aviation modernization, and has worked to establish mature acquisition strategies using multiyear procurement contracts for aviation platforms, the same cannot be said for ground combat vehicle modernization. The committee believes there is an immediate need for a more accelerated ground combat vehicle modernization strategy that should include the development of a next

generation infantry fighting vehicle and main battle tank, while also looking for ways to accelerate needed upgrades for legacy combat vehicles in the near term to address immediate threats.

The committee understands the armored brigade combat team (ABCT), which is comprised of Abrams tanks, Bradley fighting vehicles, M109A7 Paladin self-propelled artillery, M113 Armored Personnel Carriers, Armored Multipurpose Vehicles, M88 Improved Recovery Vehicles, Joint Light Tactical Vehicles, and other systems is the only full-spectrum force in the Army's force structure. Over the past several National Defense Authorization Acts, the committee has noted concerns regarding the reduction of active ABCTs and the Army's ability to have sufficient numbers of fully ready active ABCTs to meet combatant commander steady-state and contingency plan requirements. The committee has also taken action to prevent further reductions in ABCT force structure, and prevent any production breaks in the combat vehicle industrial base. Given the return of armored units to the European theater, as well as the Army's plans to increase ABCT capacity, the committee believes that these actions have been validated.

However, the committee remains concerned about the stability of ABCT modernization funding in fiscal year 2018 and beyond, and encourages the Army to fully modernize at least one ABCT per year. The committee directs the Secretary of the Army, in consultation with the Chief of Staff of the Army, to provide a report to the House Committee on Armed Services and the Senate Committee on Armed Services by April 5, 2018, on the Army's plan for executing its ground combat vehicle modernization strategy. Elements of the report should include: the Army's combat vehicle modernization priorities over the next 5 and 10 years; the extent to which those priorities can be supported at current funding levels within a relevant time period; the extent to which additional funds are required to support such priorities; detail how the Army is balancing and resourcing these priorities with efforts to rebuild and sustain readiness and increase force structure capacity over this same time period; and explain how the Army is balancing its near-term modernization efforts with an accelerated long-term strategy for acquiring next generation combat vehicle capabilities.

The committee also directs the Comptroller General of the United States to provide a briefing to the House Committee on Armed Services by May 1, 2018, on the Comptroller General's preliminary assessment of the Army's report on the ground combat vehicle modernization strategy. The committee further directs the Comptroller General to provide a report on the Comptroller General's final assessment to the House Committee on Armed Services at a date to be determined at the time of the briefing. The Comptroller General's review should focus in particular on how the Army has developed its modernization priorities for the next 5 years, and examine how the Army is balancing and resourcing these priorities with efforts to rebuild and sustain readiness and increase force structure capacity over this time period. Additionally, the review should evaluate the extent to which the Army has balanced its near-term modernization efforts with its long-term strategy for acquiring new capabilities.

*M240B medium machine gun inventory assessment*

The committee has concerns regarding the Army's inventory of M240B medium machine guns due to the Army's lack of detailed information regarding the condition of the weapons within that inventory. The committee understands the Army has achieved the procurement objective for the M240 medium machine gun, and that current M240 acquisition and sustainment strategies rely on piecemeal replacement of individual parts instead of new production. The committee is concerned about the impact of this strategy on the industrial base, and the potential to eliminate a critical production line that would be difficult and costly to reestablish at a later date. The committee also notes that M240 requirements could potentially increase as a result of the Army increasing end-strength levels and growing additional armored brigade combat teams. The committee believes the Army needs to clearly demonstrate the operational viability of its M240B inventory.

In light of these concerns, the committee directs the Secretary of the Army to conduct an assessment of the health and operational viability of the Army's M240B inventory. The committee further directs the Secretary of the Army to provide a briefing on the findings of this assessment to the Committees on Armed Services of the Senate and the House of Representatives by January 17, 2018. This briefing shall include, at a minimum: a detailed review of the Army's current M240B inventory, to include the number of systems that are operationally ready, the number of systems that require repair, and the number of systems that should be taken out of inventory and replaced; a description of the full cost to repair and refurbish an M240B machine gun, to include parts procurement, labor, logistics, and sustainment costs; a description of the current contracted cost to procure new production M240B machine guns; and a detailed comparison of the timelines associated with repair and refurbishment efforts, and those required to replace systems with new weapons.

*Small arms magazine procurement*

The committee understands the Enhanced Performance Magazine (EPM) is the latest upgrade of the 30 round 5.56mm magazine used in Army and Marine Corps rifles and carbines that resulted from the introduction of the M855A1 Enhanced Performance Round (EPR). The EPR, while providing a number of significant performance enhancements over the original general purpose M855 ammunition, to include improved lethality, contributed to a reduction in system level reliability under certain conditions. The committee understands the EPM mitigates the system reliability issues that resulted from using the EPR in Army weapons. However, the committee has been informed by the Marine Corps that in some Marine Corps unique weapons, such as the M27 Infantry Automatic Rifles and M16A4 rifles, reliability concerns remain. The committee further understands that, as a result of these concerns, that the Marine Corps conducted further reliability testing on additional commercial polymer magazines, and that the Commandant of the Marine Corps has approved the decision to field a different magazine than the EPM. The committee understands that as of now the Army will replace all legacy magazines with the EPM, and the Ma-

rine Corps will replace all legacy magazines with their qualified polymer magazine.

The committee has long supported small arms modernization, and notes that the Program Executive Office-Soldier through the Soldier Enhancement Program (SEP) is currently evaluating alternative magazines to the EPM, to include polymer magazines used by the Marine Corps. The committee expects the Army to leverage Marine Corps test and evaluation data and any other available Department of Defense data to the maximum extent possible to shorten the overall evaluation timeline which the committee understands could take up to 6–12 months. The committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by September 29, 2017, with an update on the status of the Army's SEP evaluation.

*Small arms production industrial base*

The committee notes that the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 (Public Law 111–383) repealed section 2473 of title 10, United States Code, which required the Department of Defense to only procure certain small arms repair parts and components from a limited number of industry sources that the Department had identified as comprising the small arms production industrial base (SAPIB).

The committee directs the Secretary of Defense, in coordination with senior military services acquisition executives, to provide a briefing to the House Committee on Armed Services by January 15, 2018, on the state of the small arms production industrial base. At a minimum, the briefing should identify critical small arms systems and items; describe the Department's strategy for preserving a stable SAPIB in the areas of development, production, maintenance, and competitive contracting; describe the results of increased use of small business set-asides, as well as organic depot activities on quality, delivery, competition, engineering, and research and development investments and capability.

*Vehicle active protection systems*

The committee is encouraged by the Army's expedited Non-Developmental Item (NDI) vehicle active protection systems (APS) risk reduction strategy, and notes the current program remains on cost and on schedule. In the committee report (H. Rept. 114–537) accompanying the National Defense Authorization Act for Fiscal Year 2017, the committee noted this strategy will allow the Army to better address the evolving threats posed by the growing proliferation of anti-tank guided missiles and rocket-propelled grenades. The committee is also aware of the importance of vehicle APS capabilities for forward-deployed units, specifically those units in the U.S. European Command area of operations. The committee understands this risk reduction effort installs and characterizes three different NDI APS solutions on Abrams main battle tanks, Bradley fighting vehicles, and Stryker combat vehicle platforms. The committee believes the outcomes of these characterization tests and evaluations will allow the Army to assess integration and performance risks, and should provide the necessary information to make an informed decision regarding the transition of these NDI solutions to a future program of record. The committee under-

stands this characterization effort will be completed in calendar year 2017. Should the outcomes of these characterization tests prove favorable, the committee expects the Army to proceed forward with an accelerated procurement strategy for this critical capability that is consistent with acquisition reform principles and maximizes use of all available acquisition authorities.

## PROCUREMENT OF AMMUNITION, ARMY

### Items of Special Interest

*Ammunition production base support*

In the committee report (H. Rept. 114–537) accompanying the National Defense Authorization Act for Fiscal Year 2017, the committee was concerned that despite a commitment by the Army to maintain steady-state funding of $250.0 million for ammunition industrial base upgrades, significant safety, environmental, and operational discrepancies exist among the Army ammunition plants (AAPs), in particular the four largest AAPs. This could require investments exceeding what is currently in the Army's long-term modernization plan for the ammunition industrial base. The committee remains concerned about this discrepancy between documented need and planned investment. These committee concerns are further amplified by the recent explosion that occurred at the Lake City AAP. The committee understands the explosion caused significant damage to the primer production area and that, as a result of the explosion, the Army was forced to stop all production of small caliber ammunition production for an indefinite amount of time until safety inspections can be completed.

The committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by November 1, 2017, on the Army's 2025 Ammunition Industrial Base strategic plan.

*Clean disposal of conventional munitions*

The committee continues to support the use of technologies like those deployed at Camp Minden as a cleaner and safer alternative to the open burning of munitions. The committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by January 31, 2018, on the use of cost-competitive technologies that minimize waste generation and air emissions to dispose of stockpiles of conventional munitions awaiting demilitarization, as directed by section 314 of the Fiscal Year 2017 National Defense Authorization.

## OTHER PROCUREMENT, ARMY

### Items of Special Interest

*Army land mobile radio acquisition*

The committee is aware of the Army's effort to secure upgraded communications infrastructure on U.S. military installations, specifically land mobile radios (LMRs), and its progress towards meeting this requirement. However, the committee is concerned that delays in fielding enhanced secure infrastructure could lead to risks to force protection, as well as to public safety. The committee

encourages the Army to consider an expedited timeline for LMR upgrades across U.S. military bases, if additional resources become available.

*Army personal dosimeters*

The committee is aware that the Department of the Army is investing in the Joint Personnel Dosimeter-Individual, an advanced radiological dosimeter that will replace legacy dosimetry systems. Personal dosimeters are essential tools for tracking radiological exposure throughout a service member's career, and provide important diagnostic data as the service member seeks medical care during and after Active Duty service. To ensure service members are provided with the best possible tracking data for radiological exposure, the committee urges the Army to ensure production requirements and schedules are met to provide Active Duty and Reserve Components the ability to track radiological exposure.

*Heavy Equipment Transport System modernization strategy*

The committee encourages the Army to continue development and procurement of a heavy equipment trailer solution to be used as part of the Heavy Equipment Transport System (HETS) for current and future combat vehicles. The committee notes the current heavy equipment transport (HET) trailer is rated for 70 tons, but the most modernized M1A2 Abrams main battle tank configuration, the M1A2 SEPv3, will weigh in excess of 80 tons. The committee understands the current HET trailer will be unable to transport modernized M1A2 SEPv3 tanks, or future M1A2 SEPv4 configurations. The committee believes the Army will require a more capable means of transport organic to the service. The committee encourages the Army to begin to plan and resource the modification of all 192 existing HET trailers, as well as develop ways to accelerate the new Enhanced HETS developmental program.

The committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by December 1, 2017, on the Army's strategy for upgrading current HETS and HET trailers.

*Personnel and cargo parachute acquisition and management*

The committee is concerned that the military services appear to lack a comprehensive and resourced plan to upgrade military personnel parachutes, parachute support equipment, and guided cargo parachutes. The committee understands both the Army and Marine Corps are pursuing high glide parachutes that will allow a parachutist to cover a substantial horizontal distance. However, this capability is not currently fully operational because the Army and Marine Corps have not procured complete parachute systems. While the military has the parachute, it does not have oxygen equipment with sufficient capacity to allow the full use of the high glide canopy. Additionally, the committee understands that the Army and Marine Corps have not procured guided cargo parachutes with the same glide capability as the personnel parachute. Finally, the committee notes that the Army has assigned responsibility for the acquisition of guided cargo parachutes and personnel parachutes to different program executive offices. The committee is

concerned that this organizational structure could fragment responsibility for integrating the capabilities of all systems involved in airborne missions.

The committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services by March 1, 2018, that examines (1) whether the Army and Marine Corps have a valid requirement for high glide canopies, and if so, whether each service has an integrated plan to procure all associated equipment required to use the high glide features; (2) whether the Army's decision to divide parachutes between two different program offices hinders or enhances integration of their capabilities; and (3) whether the Army and Marine Corps have a plan and contracts that will allow for the improvement of parachutes over the life cycle of the equipment.

*Rough Terrain Container Handler recapitalization*

The committee is concerned that the budget request does not include funding for the Rough Terrain Container Handler (RTCH), a material handling equipment system considered vital and critical to Department of Defense expeditionary logistics. The committee understands the RTCH system, along with other material handling equipment logistic systems, provides strategic capability to set the theater, strategic agility to the joint force, and maintains freedom of movement and action during sustained and high tempo operations at the end of extended lines of communication in austere environments. The committee is concerned by the number of RTCH systems that are combat worn, and notes there is neither a formal reset and recapitalization program for these systems, nor a long-term strategy to modernize a fleet that entered service in 2001.

Accordingly, the committee directs the Secretary of the Army to develop plans to recapitalize and modernize RTCH systems and other material handling equipment systems in a timely manner, and encourages the Army to resource this effort across the Future Years Defense Program. The committee further directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by September 1, 2017, on this recapitalization strategy.

*Small unit support vehicle recapitalization strategy*

The committee understands the Army's family of small unit support vehicle (SUSV) fleet is used by Army units that train and operate in extreme cold weather conditions, and that this vehicle provides those units with unique capabilities not found elsewhere in the Army. In addition, while the committee is aware of the Army's effort to refurbish some of the fleet, the committee notes that legacy SUSVs are beyond their economic useful life and have become increasingly difficult to maintain. In the committee report (H. Rept. 114–537) accompanying the National Defense Authorization Act for Fiscal Year 2017, the committee required a briefing on the potential requirement for a replacement to the SUSV fleet. The briefing indicated the Army National Guard has established an SUSV overhaul program; however, this overhaul does not provide any additional capability.

The committee remains concerned regarding the capability and capacity of the Army's SUSV fleet, and therefore directs the Sec-

retary of the Army to conduct a business case analysis (BCA) to determine whether the Army should develop or procure a replacement for the small unit support vehicle designated SUSV. The BCA should include the following elements:

(1) an analysis of how the SUSV fleet will be affected if a replacement for the vehicle is not developed or procured;

(2) an explanation of the costs associated with refurbishing the SUSV fleet;

(3) a description of specific requirements for a new SUSV vehicle and whether there is a vehicle available that would meet such requirements;

(4) an analysis that compares the costs and benefits of the procuring of a new SUSV to the costs and benefits of refurbishing the SUSV fleet; and

(5) recommendations for the most cost-effective approach to addressing the needs of the SUSV fleet.

The committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by March 1, 2018, on the results of the BCA.

*Tactical network review*

The committee understands that the Army is evaluating all of the tactical network components to reduce vulnerabilities and focus on capability gaps to ensure that the Army's end-to-end network is resilient, interoperable, and secure. The committee notes that this review will cover the lower and upper tactical internet that make up the Army's tactical network. The committee also notes that software-defined radios and various waveforms are among two of the components that comprise the lower tactical internet that support soldiers at the tactical level. The committee understands the Army's network review should allow for the rapid introduction of other new capabilities, including advances in satellite communications, cyber protection, and electronic warfare, as well as assured positioning, navigation, and timing technology and other technologies that enable assured communications. The committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by September 29, 2017, that details the network study results and the Army's recommended way ahead.

*Vehicle medical kits*

The committee understands there have been significant advances made in emergency medical treatment for combat casualties, and notes that during Operation Iraqi Freedom, the military services, as a result of a joint urgent operational need from U.S. Central Command, fielded a standardized vehicle medical kit called the warrior aid and litter kit (WALK), to complement the capabilities already provided as part of the improved first aid kit and the combat lifesaver bag. The committee notes there is no official program of record for the WALK, and it is unclear to the committee as to how the Army would provide standardized vehicle medical kits for future contingency operations.

The committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by March 1,

2018, on the advisability and feasibility of providing a standardized vehicle medical kit for combat and tactical vehicles.

AIRCRAFT PROCUREMENT, NAVY

Items of Special Interest

*EA–18G ALQ–99 tactical jamming system modernization*

The committee notes that the EA–18G is the Navy's primary tactical aircraft platform dedicated to the dominance of the radio frequency spectrum in support of contingency and training operations requiring electronic warfare support. The EA–18G currently accomplishes this mission with the ALQ–99 tactical jamming system, but certain legacy transmitters of this system have not been upgraded, resulting in unsatisfactory reliability and increased risk to fulfilling contingency operation requirements. The Navy's Next Generation Jammer program is planned to eventually replace legacy ALQ–99 equipment, and is currently scheduled to be fielded incrementally starting with initial operational capability being declared in 2021, and full operational capability projected for some time during the 2035 timeframe.

Therefore, the committee supports the continued sustainment of legacy ALQ–99 equipment, and expects the Navy to continue upgrading ALQ–99 transmitters, particularly bands 5 and 6 of the ALQ–99 legacy system that have not been upgraded, with solid state technologies in order to mitigate risk pertaining to low reliability and potential failures in flight.

*Implications of a 355-ship Navy on Naval and Marine Corps Aviation force structure requirements*

The committee notes that the Navy's most recent Force Structure Assessment indicates a need to increase Navy force structure to 355 ships, which includes a 12th aircraft carrier. The committee also notes that this greater fleet size may in turn impact Navy and Marine Corps Aviation force structure requirements.

Consequently, the committee directs the Secretary of the Navy to provide a briefing to the House Committee on Armed Services not later than September 30, 2018, or 12 months after the issuance of a new National Defense Strategy, whichever date is earlier. The briefing should provide estimates as to the number of Navy and Marine Corps aircraft by series and type needed to achieve the objectives of the National Defense Strategy and to complement the capability resident in a 355-ship Navy with 12 aircraft carriers. The briefing shall also include the following elements: (1) a detailed explanation of the strategy and associated force sizing and shaping constructs, associated scenarios and assumptions used to conduct the analysis; and (2) quantification of risk using Chairman of the Joint Chiefs of Staff risk management classifications.

*Maritime intelligence, surveillance, and reconnaissance capabilities demonstration*

The budget request contained $15.2 million in PE 63782N for mine and expeditionary warfare advanced technology program, but contained no funding for the MS–177A maritime enhanced sensor demonstration program.

The committee notes that the Navy has the opportunity to leverage a $300.0 million Air Force investment in the MS–177A sensor, which is meant to improve maritime target detection and long-range imaging and could significantly reduce procurement costs and expedite fielding. The committee is aware that PACOM identified the MS–177A in its classified fiscal year 2018 integrated priority list for consideration in meeting mission gaps. The committee believes that having an organic Navy MS–177A demonstration in the U.S. Pacific Command (PACOM) area of responsibility could help the Navy to assess the full range of anti-surface unit warfare and anti-submarine warfare capabilities, as well as gather needed intelligence against threats in the PACOM strategic environment. Specifically, this could allow the Navy to address, validate, and fill current PACOM maritime intelligence surveillance and reconnaissance mission gaps in a timely manner. The MS–117A could also improve the Navy organic capability to conduct standoff anti-surface unit warfare intelligence, surveillance, and reconnaissance and long-range positive identification of targets.

The committee recommends $38.7 million, an increase of $23.5 million, in PE 63782N to procure one MS–177A sensor for the maritime enhanced sensor demonstration program.

*MQ–4C Triton unmanned aircraft system*

The committee recognizes that the Navy's MQ–4C Triton will be a forward-deployed, land-based, remotely piloted aircraft system that provides persistent maritime intelligence, surveillance, and reconnaissance (ISR) capability using a mission payload that will eventually be able to collect information in the signals and imagery intelligence disciplines. Given the MQ–4C combination of long endurance and advanced sensors, it will provide robust ISR support in meeting combatant commanders' requirements in the maritime domain. Although the MQ–4C program has had its share of cost, schedule, and execution challenges over the years, the committee fully supports the program, and acknowledges that it will be a critical component and integral capability both for the Navy and the intelligence community as a whole.

The MQ–4C is integral to recapitalization of the Navy's maritime patrol and reconnaissance force (P–3C and EP–3E), and will be complementary to the capability provided by the P–8A patrol aircraft. The committee understands that a fleet of 68 MQ–4C aircraft is planned to support five separate lines of high-altitude airborne ISR capability to provide real-time ISR information to a variety of operational and tactical users. However, the committee is unclear as to how the Navy plans to support mission execution and subsequent tasking, collection, processing, exploitation, and dissemination (TCPED) processes of these ISR missions when ISR collection taskings may occur outside the traditional naval employment constructs of aircraft carrier strike group deployments and operations.

Therefore, the committee directs the Secretary of the Navy to provide a briefing to the House Committee on Armed Services not later than November 15, 2017, on MQ–4C mission execution and TCPED processes. The briefing should include:

(1) a framework description of the manning, equipping, and training requirements for the MQ–4C system;

(2) a description of the baseline architecture of the mission support infrastructure required to support MQ–4C operations;

(3) how the Navy plans to support and execute the TCPED processes;

(4) how the Navy plans to support flying operations from either line-of-sight or beyond-line-of-sight locations;

(5) how many aircraft the Navy plans to dedicate annually to the ISR Global Force Management Allocation Process of the Department of Defense; and (6) how many hours of collection the MQ–4C will be able to provide annually in each of the intelligence disciplines for combatant commanders.

*MV–22 upgrades*

The committee notes that the Commandant of the Marine Corps included the Special Purpose Marine Air-Ground Task Force Enroute Command, Control, Communications, and Computer Urgent Universal Need (SPMAGTF En-route C4 UUN) in his unfunded priorities for fiscal year 2017. The SPMAGTF En-route C4 UUN provides a communications capability to maintain tactical situation awareness of events ongoing in a target area, while Marines are en route to the target destination in an MV–22 aircraft. The committee further notes that in fiscal year 2017, the budget planned for fiscal year 2018 for the SPMAGTF En-route C4 UUN included $3.3 million for research, development, test, and evaluation; $42.1 million in Procurement, Marine Corps; $14.4 million for Operations and Maintenance, Marine Corps; and $171.4 million for Aircraft Procurement, Navy. The committee supports the SPMAGTF Enroute UUN, and expects that the Department of the Navy will execute the programmed funding for fiscal year 2018.

The committee understands that the majority of maintenance man-hours (MMH) conducted on the MV–22 are for components and wiring internal to the nacelle, and that high vibration and external environmental factors such as sand, dust, and water, have led to significantly more maintenance required on the nacelle than expected. According to aviation officials in the Department of the Navy, nacelle wiring alone accounts for 35 percent of MMH on the nacelles for MV–22. The committee also understands that recent aircraft incidents and failure to meet time on wing requirements for the engine have led to a need to improve the performance of the engine inlet system, and that high failure rates of infrared suppressor (IRS) components drive excessive MMH and contribute to low aircraft availability. Accordingly, the committee believes the Department of the Navy should pursue a common nacelle structure with options for changeable engine inlet systems, improved IRS, and optimized nacelle wiring. The committee believes that the Department of the Navy could develop the common nacelle with nacelle improvements by fiscal year 2019 and have testing complete by fiscal year 2020.

*Naval aircraft physiological episodes*

In the committee report (H. Rept. 114–537) accompanying the National Defense Authorization Act for Fiscal Year 2017, the committee noted its concern with the increasing rates of physiological episodes (PEs) experienced by F/A–18 pilots over the previous 5 years. At the committee's recommendation, the National Defense

Authorization Act for Fiscal Year 2017 (Public Law 114–328) included a provision that required the Secretary of the Navy to establish an independent review team to review the Navy's data on, and mitigation efforts related to, the increase in F/A–18 physiological episodes since January 1, 2009, and to report to the congressional defense committees on its findings by December 1, 2017. The committee understands that the Department of the Navy has engaged personnel assigned to the National Aeronautics and Space Administration to conduct this review, and expects that the Department of the Navy will submit the report on time.

To continue its oversight of naval aircraft physiological episodes, the Subcommittee on Tactical Air and Land Forces held a hearing on Naval Strike Fighter Issues and Concerns on March 28, 2017. At that hearing, Navy witnesses testified that the PE rate per 100,000 hours increased in the F/A–18A through D, F/A–18E/F, and EA–18G each year from 2012 to 2016. Also at that hearing, the committee requested PE data for the T–45C, and Navy witnesses testified that the PE rate per 100,000 hours had also increased each year since 2012. Within a few days of the March 28, 2017, hearing, the committee notes that a high percentage of T–45C pilots at the three T–45C flying locations opted not to fly the T–45C due to safety concerns with the aircraft's oxygen system, and the Department of the Navy suspended student training due to these concerns. The committee views these events as a serious readiness issue if student training continues to be suspended, which will result in fewer of the aircraft carrier qualified pilots and naval flight officers necessary to conduct fighter, attack, and electronic combat missions. The committee notes that the Department of the Navy has established a physiological episode team to evaluate these events, and has undertaken actions to address these occurrences and mitigate their effects, while considering this issue as its highest aviation safety priority.

The committee will continue to closely monitor PEs in naval aircraft, and expects the Department of the Navy to aggressively take actions to determine the root cause of these events, determine mitigation procedures, and to budget for the modifications for each aircraft necessary to lower the rate of PEs in naval aircraft.

## Procurement of Ammunition, Navy and Marine Corps

### Items of Special Interest

*Advanced Low Cost Munition Ordnance*

The committee continues to support development of the Advanced Low Cost Munition Ordnance (ALaMO), a guided 57 mm projectile, with fire-and-forget capability that requires no Littoral Combat Ship fire control system changes, to counter the growing threats posed by small boat swarms, unmanned aerial systems, and other emerging threats. Therefore, the committee directs the Secretary of the Navy to provide a briefing to the House Committee on Armed Services by August 30, 2017, on achieving low rate of initial production in 2019. The briefing should also include, but not be limited to, an evaluation of the current funding profile of this program across the Future Years Defense Program, as well as po-

tential courses of action to accelerate or streamline the current program strategy.

SHIPBUILDING AND CONVERSION, NAVY

Items of Special Interest

*America-class amphibious assault ships*

The committee is concerned that the Navy program of record for <E T=″03″>America</E>-class amphibious assault ships (LHA–9) would result in a break in production of 7 years following delivery of LHA–8, thereby accruing significant additional costs at both the shipyard and the supply chain. The committee believes the optimal schedule would be to begin construction of LHA–9 in 2020. Therefore, the committee directs the Secretary of the Navy to provide a briefing to the House Committee on Armed Services by March 1, 2018, that provides an assessment of the cost savings and other benefits of accelerating LHA–9 to 2020 compared to 2024, assuming LHA–9 is identical to LHA–8.

*Columbia-class submarine program*

The committee continues to exercise specific oversight on the progress and challenges facing the Navy's <E T=″03″>Columbia</E>-class acquisition program and the replacement to the <E T=″03″>Ohio</E>-class ballistic missile submarines, which are scheduled to begin retirement in 2027. The committee notes the Department of Defense and the Navy consider the <E T=″03″>Columbia</E>-class acquisition among the highest priorities in order to meet sea-based strategic deterrence requirements in the future threat environment through the 2080s. The magnitude of the program's estimated cost, expected to exceed $267.0 billion over its life cycle, as well as the aggressive schedule on which the Navy and its shipbuilders plan to complete the submarine's technology development and design, and start constructing the new class, among other issues, will be subjects of continued interest and concern to the committee.

Therefore, the committee directs the Comptroller General of the United States to assess the Navy's <E T=″03″>Columbia</E>-class acquisition and submit a report to the congressional defense committees by March 1, 2018, that includes an analysis of the following:

(1) technology development including activities in support of the submarine's nuclear propulsion system;

(2) progress of shipbuilder design products;

(3) program cost estimates;

(4) approved acquisition strategy and use of expanded authorities including cross-program material procurement, early structural fabrication, and advance construction;

(5) industrial base capacity to meet the Navy's plans and requirements; and

(6) construction readiness and feasibility of achieving on-time submarine delivery to meet Navy operational requirements.

*Guided missile patrol boats*

The committee recognizes that as the Navy continues to refine its distributed lethality concept, one component could be the incorporation of patrol boats equipped with guided missiles. As described in the 2017 Surface Force Strategy, one distinguishing component of the distributed lethality concept is increasing lethality at the unit level in order to reduce the susceptibility of higher end warships. Another key characteristic is the employment of adaptive force packages that allow operational commanders the ability to scale force capabilities based on the threat. The low cost of fielding combined with the ability to quickly disperse them make patrol boats an ideal platform in achieving these two distinguishing characteristics. Patrol boat units equipped with a variety of offensive capabilities, including short- and long-range anti-ship cruise missiles, would provide an operational commander the ability to inject increased levels of uncertainty and complexity into an adversary's planning. As the Navy concludes the planned production of the MK VI Patrol Boat and initiates the start of the PB(X) program, there are opportunities to leverage stable production lines that could rapidly field a patrol boat that is ideally suited to support the distributed lethality concept. Therefore, the committee strongly encourages the Navy to pursue an offensive capability, including guided missiles, which can be incorporated on patrol boats in support of surface warfare operations.

*High-pressure Cold Spray repair*

The committee is aware that the Department of Defense is utilizing high-pressure Cold Spray repair, a solid-state metal deposition technology that is capable of reapplying metal to highly worn or corroded metal surfaces without damaging the base metal. The committee understands this technology would restore the strength and serviceability of parts that previously would require replacement. The committee notes this technology is capable of portable, hand-held, high-pressure operation and has been used by the Department of the Navy to achieve cost savings for the repair of critical components. Therefore, the committee encourages the Secretary of the Navy to expand the use of this technology for the development of new repair processes for additional Navy components.

*Increased standardization and commonality for U.S. Navy shipbuilding programs*

The committee recognizes the importance of maintaining a robust shipbuilding budget to support increasing demands and commitments being placed upon the U.S. Navy. The committee also recognizes that steps need to be taken to continually reduce the cost of shipbuilding so that the U.S. Navy can maximize the number of ships being built under the current and projected fiscal constraints. Since a large portion of the cost associated with shipbuilding resides in the subcontracted systems, subsystems, and components provided by the shipbuilding supplier industrial base, it is important to help this industrial base reduce the cost of its products that support these major shipbuilding programs.

As many of these suppliers are small- to mid-sized companies, it is incumbent upon the U.S. Navy and the shipbuilding prime contractors to explore ways that help reduce the costs of these prod-

ucts without placing additional stress on this supplier base. The committee encourages the U.S. Navy to address alternate approaches to the shipbuilding process that would alleviate the more onerous and costly processes that increase the cost of these ships. The committee also encourages the U.S. Navy and major shipbuilding prime contractors to explore additional levels of standardization and commonality across shipbuilding programs and across major shipbuilding prime contractors to realize significant potential cost savings.

*Littoral Combat Ships capability enhancements*

The committee believes that the Littoral Combat Ship and the Frigate will continue to play a critical role in the mix of warships necessary for Distributed Maritime Operations and believe the Navy should begin Frigate construction as soon as possible. To better expand Frigate capabilities, the committee notes that the Chief of Naval Operations initiated an Independent Review Team to assess Frigate requirements. The committee further notes that the Navy intends to leverage the proposed capabilities of the original Frigate program while adding: increased air warfare capability in both self-defense and escort roles; enhanced survivability; and increased electromagnetic maneuver warfare. The committee supports the Navy's intent to increase the lethality and survivability of the Frigate and further supports backfit options that will provide appropriate enhancements to the existing Littoral Combat Ships. In fiscal year 2019, the committee also believes that additional forward fit options for the fiscal year 2019 Littoral Combat Ships should be pursued. Therefore, the committee directs the Secretary of the Navy to prepare a report to the congressional defense committees by March 1, 2018 that details a transition plan to include forward fit options for the fiscal year 2019 Littoral Combat Ships and backfit options for the existing fleet. Specifically, this report should include an assessment of the following elements: deploying an over-the-horizon weapons system; expanding electronic warfare capabilities to include SEWIP Block II or SEWIP Lite; enhancing survivability attributes; and expanding use of unmanned aerial vehicles or unmanned underwater vehicles.

*Propeller shafts*

The committee recognizes that title III of the Defense Production Act (Public Law 81–774) provides the Department of Defense with an important tool to ensure the timely creation and availability of domestic production capabilities for technologies that have the potential for wide-ranging impact on the operational capabilities and technological superiority of U.S. defense systems. The committee supports the Defense Production Act title III program and recognizes its importance to preserving key capabilities throughout the U.S. defense industrial base.

The committee notes the importance of the segments of the defense industrial base where limited numbers of suppliers provide materiel that is critical to readiness of the force. The committee further notes that the industrial segment responsible for the manufacturing and refurbishment of propeller shafts for the Navy's surface and submarine fleet faces considerable strain from high demand from Naval Supply Systems Command and Naval Sea Sys-

tems Command. Accordingly, the committee supports the Under Secretary of Defense for Acquisition, Technology and Logistics, as manager for the Defense Production Act title III program, working with the Secretary of the Navy to ensure that this and other areas of the defense industrial base are maintained and enhanced.

*Protection of Navy ships against High-Altitude Electromagnetic Pulse*

The committee notes that the High-Altitude Electromagnetic Pulse (HEMP) protection for military surface ships became an official Department of Defense interface standard when it was issued on January 25, 2016, as a result of the Department's interest in system survivability of warships to HEMP. MIL–STD–4023 establishes performance metrics, test protocols, and hardness margin levels for protection of military surface ships that must function when subjected to the HEMP environment.

The committee believes that the only reliable method to assure a ship will survive a HEMP event is to test the ship with physical, realistic simulations of the HEMP environment. Such assurance can be technically justified by evaluating the ship's resistance to a simulated, threat-representative HEMP environment and monitoring for any undesired effects. Incorporating guidance of MIL–STD–4023 combined with the active testing of ships using a threat level simulator can achieve a high-confidence, low-risk assurance that the Navy warships can survive the nuclear weapon-generated threat of HEMP environments.

AIRCRAFT PROCUREMENT, AIR FORCE

Items of Special Interest

*A–10 to F–16 transition at Fort Wayne, Indiana*

The committee notes that section 134 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) included a subsection that authorizes the Secretary of the Air Force to carry out the transition of the A–10 aircraft unit at Fort Wayne Air National Guard Base, Indiana, to an F–16 aircraft unit, as described by the Secretary in the Force Structure Actions map submitted in support of the budget request for fiscal year 2017. The committee understands that the Secretary of the Air Force has not yet planned for or announced this transfer, and encourages the Secretary to execute this transfer as soon as possible. The committee remains concerned about the status of other A–10 and F–16 basing decisions for the Active Duty Air Force, Air Force Reserve, and Air National Guard.

Therefore, the committee directs the Secretary of the Air Force to provide a briefing to the House Committee on Armed Services by September 1, 2017, on an update of A–10 and F–16 basing decisions for the Active Duty Air Force, Air Force Reserve, and Air National Guard.

*A–10 wing replacement program*

In the committee report (H. Rept. 114–537) accompanying the National Defense Authorization Act for Fiscal Year 2017, the committee noted its belief that the Department of the Air Force con-

tinues to suffer from capacity shortfalls in its fighter aircraft fleets. The committee further believes that sustainment of the 283-aircraft A–10 fleet helps to meet the Department of the Air Force fighter aircraft capacity requirements, and notes that the A–10 aircraft has been recently deployed in support of both Operations Inherent Resolve and Atlantic Resolve. To sustain the A–10 fleet, the committee understands that all 283 A–10 aircraft require wing replacement, but the committee notes that the Department of the Air Force has procured wing replacement for only 173 A–10 aircraft.

Accordingly, the committee encourages the Department of the Air Force to program the necessary funds to accelerate wing replacement for the remaining 110 A–10 aircraft.

*B–52 modernization*

The committee notes that the nation's ability to meet its long-range strike requirements may be placed at increased risk by the aging B–52 fleet, which averages more than 60 years old.

The committee also notes that the B–21 is not expected to achieve initial operational capability until the mid-2020s and that the Air Force is considering plans to retire certain bomber fleets over the next few decades while keeping the B–52 through 2040 and possibly longer. Consequently, there is a pressing need to upgrade the B–52 bomber fleet with new engines, ground mapping radar, and self-protection electronic warfare capabilities to meet future long-range strike requirements.

Therefore, the committee directs the Secretary of the Air Force to provide a briefing to the House Committee on Armed Services by February 6, 2018, on its modernization plan for the B–52 aircraft fleet. The briefing should include:

(1) re-engine options, including utilizing authorities pursuant to section 2371b of title 10, United States Code, third-party financing, and traditional procurement;

(2) plans to upgrade the ground mapping radar;

(3) electronic self-defense options; and

(4) an integration timeline that best takes advantage of scheduled depot throughput.

*Bomber modernization*

The committee notes that the Air Force has not released its bomber vector. This document is expected to describe the future of the current bomber fleets. It is also expected to detail when the new B–21 long range strike bomber will transition with the existing bomber force and identify which aircraft will be retired. The committee is uncertain that the bomber modernization plan is informed by the bomber vector. The committee is concerned that modernization programs with procurement delivery dates in the early to mid-2020s are not properly coordinated, and as such, bomber investment strategies across the Future Years Defense Program appear to lack justification. The committee expects the Secretary of the Air Force to provide the bomber vector to the committee upon its completion to better assist the committee with its oversight responsibilities for bomber programs.

The committee recommends a general Air Force reduction of $195.9 million for bomber modernization programs.

*C–130H Aircraft Modernization Program Increments 1 and 2*

The committee supports the C–130H Avionics Modernization Program (AMP) Increments 1 and 2 and encourages the Air Force to upgrade all 172 C–130H aircraft in the most expeditious and cost-effective way to meet military requirements. However, the committee is concerned that an over-reliance on military specification solutions could potentially delay completion of AMP Increments 1 and 2, despite the availability of commercial off-the-shelf (COTS) and non-developmental item (NDI) technologies, such as glass cockpit and autopilot systems available and in use on C–130 derivative aircraft today.

The committee encourages the Air Force to maximize efforts to procure COTS and NDI solutions to the maximum extent possible, while meeting the requirements for AMP Increments 1 and 2. The committee also encourages all efforts to meet the intent of section 2377 of title 10, United States Code, and the tenets of the Department of Defense Better Buying Power (BBP) 3.0 policy.

Therefore, the committee directs the Secretary of the Air Force to provide a briefing to the House Committee on Armed Services by January 15, 2018, that outlines Air Force efforts to leverage COTS and NDI solutions for the C–130H AMP Increment 1 and 2 programs. The briefing shall include the following elements:

(1) a detailed explanation of how the Air Force considered section 2377 of title 10, United States Code, and Department of Defense BBP 3.0 during the definition of the technical requirements and acquisition strategies for AMP Increments 1 and 2;

(2) examples of incentives made to offerors for accelerated and cost-capped implementation for C–130 AMP Increment 1 and 2;

(3) where military specification standards were selected for C–130 AMP Increment 1 and 2, a comparison of such standards and COTS standards; and

(4) where military specification standards were selected for C–130 AMP Increment 1 and 2, a comparison of operation and support costs for such standards and COTS standards.

*C–130H propulsion systems upgrades*

The budget request contained no funds for C–130H propulsion systems upgrades.

The committee continues to support the upgrade of C–130H aircraft with the T56 3.5 engine enhancement, NP2000 8-bladed propeller and the inflight propeller balancing system. The committee notes that the Air National Guard (ANG) is currently testing the T56 3.5 engine enhancement and preliminary test results have exceeded expectations for fuel savings and performance gained. The committee understands the ANG expects to issue a full test report in the summer of 2018 to be followed with a business case analysis for upgrading the entire fleet of C–130H aircraft. The committee is aware that only 8 of 172 C–130H aircraft are programmed to receive these upgrades across the Future Years Defense Program. The committee expects the Air Force to include the necessary funds to accelerate C–130H upgrades in future base budgets.

The committee recommends $146.6 million for the C–130H propulsion systems upgrade program.

*E–8C Joint Surveillance and Target Attack Radar System*

The committee acknowledges that the E–8C Joint Surveillance Target Attack Radar System (JSTARS) is a proven Air Force Battle Management Command and Control platform enabled by leveraging its extremely capable active radar system that provides invaluable moving target indicator (MTI) intelligence, surveillance, and reconnaissance (ISR) targeting information to multiple users both on the ground and in airborne attack platforms. The demand for MTI capability within each geographic combatant commander's area of responsibility far exceeds what JSTARS can currently provide due to its limited fleet size and strained crew resources. The committee also notes that the current fleet of 16 E–8C aircraft has issues and challenges the Air Force must successfully navigate to maintain viability until the current fleet of E–8C aircraft is replaced by the JSTARS Recapitalization program beginning in the late 2020s. Despite these issues and challenges, the committee is confident that the Secretary of the Air Force can develop a successful legacy JSTARS to JSTARS Recapitalization transition plan that would not prematurely retire E–8C aircraft, reassign crews or maintenance personnel, or otherwise create an MTI ISR capability gap or capacity deficit greater than what existing levels of aircraft should be providing currently.

Therefore, the committee directs the Secretary of the Air Force to provide a briefing to the House Committee on Armed Services not later than November 1, 2017, that describes, in detail, a strategy to sufficiently address manning, sustainment, modernization, and viability deficiencies that would resolve capability gaps, shortfalls, and deficiencies of the E–8C fleet of aircraft. The briefing should include a strategy that addresses right-sizing and balancing unit manning among the Total Force; maintaining proficient and current aircrews to meet operational requirements; resolving obsolescence and diminishing manufacturing sources of parts and supply; necessary mission system upgrades and operational enhancements across the E–8C fleet to keep the aircraft viable and relevant until the JSTARS Recapitalization aircraft is fielded; standardizing existing aircraft capabilities in areas such as imagery servers and the Automated Information System; a forward-deployed basing construct that would enable E–8C aircraft to operate simultaneously while deployed, if needed, from three forward-deployed locations while on temporary duty supporting a combatant commander's command and control or moving target indicator intelligence, surveillance, and reconnaissance requirements; and, the associated cost, budget, and timeline required to implement the strategy.

Finally, the committee also directs the Secretary of the Air Force to provide a report to the congressional defense committees not later than March 1, 2019, that explains in detail all aspects of how and when the Air Force will transition from legacy JSTARS aircraft capability to JSTARS Recapitalization aircraft capability.

*EC–130 Compass Call cross deck*

Last year, the committee received a letter from the U.S. Air Force requesting a technical adjustment to the fiscal year 2017 budget request and authorization for a new start program to rehost the EC–130H Compass Call mission equipment onto a new

platform identified as the EC–37B. At the time, the U.S. Air Force stated that there was only one aircraft option that met requirements and did not require development and/or further certification work. This aircraft was identified as the Gulfstream G550 Conformal Airborne Early Warning airframe. Earlier this year, the committee was notified that the acquisition strategy had changed and the Air Force no longer planned to make the selection as to which aircraft would re-host the mission equipment. In a letter dated February 1, 2017, the Air Force stated its intention to contract with a lead system integrator (LSI) and delegate the aircraft selection to the LSI. The letter claims that "after extensive analysis, we have determined that the most efficient, expedient, and cost effective means to acquire Compass Call capability is through a lead systems integrator approach."

However, in testimony before the Subcommittee on Seapower and Projection Forces on May 25, 2017, Air Force officials stated that they yet again changed their acquisition strategy. The committee understands the Air Force now intends to contract with a systems integrator, not an LSI, in contravention to what was stated in letters from both the Acting Secretary of the Air Force and the Office of the Assistant Secretary of the Air Force for Acquisition. While the committee supports the Air Force's need to accelerate fielding a replacement aircraft for the Compass Call mission that meets its requirement, it is not clear that the Air Force is pursuing a coherent acquisition strategy.

Elsewhere in this Act, the committee includes a provision that would restrict the Secretary of the Air Force from obligating or expending funds until 30 days after the Under Secretary of Defense for Acquisition, Technology, and Logistics certifies that the acquisition strategy conforms to law, follows appropriate guidelines, and adheres to best practices.

*F–15C capability, capacity, and recapitalization*

The committee notes that during the hearing on March 22, 2017, titled "The Current State of the U.S. Air Force," before the Subcommittee on Readiness of the House Committee on Armed Services, Air Force witnesses testified that the Department of the Air Force is likely to decide during fiscal year 2019 budget deliberations whether or not to proceed with an option of divesting F–15C aircraft from the Air Force inventory and replacing those aircraft with upgraded F–16 aircraft.

The committee notes that the Air Force is executing a service life extension program to upgrade the F–15C with an improved radar and missile warning system, as well as airframe structural enhancements. The committee strongly supports the Eagle Passive Active Warning and Survivability System (EPAWSS) modernization program for the F–15C fleet. The committee recalls that the Air Force has previously stated a requirement to extend the service life of the F–15C aircraft fleet to fill the air superiority mission capacity gap created by the truncation of the F–22 procurement program to only 187 aircraft. Similarly, the committee also recalls that the Air Force planned to keep the F–15C viable until the Air Force's next-generation air dominance aircraft is fielded to avoid a capacity gap in the air superiority mission area. Additionally, the committee is unaware of any warfighting analysis within the De-

partment of Defense that would validate replacing F–15C capability and capacity with upgraded F–16 aircraft to fulfill requirements of the air superiority mission area. The committee does not understand how the Air Force would grow to its desired number of 60 fighter squadrons by retiring a significant number of F–15C aircraft and replacing those with aircraft already in the Air Force inventory. As well, the committee is concerned such a decision would exacerbate the substantial personnel shortage that currently exists within the F–16 maintenance enterprise by having to retrain and qualify F–15C personnel to maintain F–16 aircraft.

Therefore, the committee directs the Secretary of the Air Force to provide a briefing to the House Committee on Armed Services not later than February 28, 2018, that provides detailed information on the following: the Air Force's weapon system sustainment and service-life plan for the F–15C aircraft, to include EPAWSS integration; when and with which material option(s) the Air Force plans to recapitalize air superiority mission capability provided by modernized F–15C aircraft, without incurring a reduction in capacity, if the F–15C is retired; how and when the Air Force plans to grow, and with which aircraft, to 60 fighter squadrons; any analysis completed by the Department of Defense that validates that the air superiority mission capability and capacity provided by a modernized F–15C can be supplanted with an upgraded F–16; and forecasted mission transition plans for locations and units that currently possess or support F–15C aircraft, personnel, operations, or maintenance activities if F–15C aircraft are retired.

*F–16 radar modernization*

In the committee report (H. Rept. 114–102) accompanying the National Defense Authorization Act for Fiscal Year 2016, the committee noted the joint operational urgent need (JOUN) that specifically required an active electronically scanned array (AESA) radar upgrade to the F–16 aircraft that perform the aerospace alert control mission, and the committee supported taking all appropriate steps to meet that JUON as soon as possible. For fiscal year 2017, the committee notes that the Department of the Air Force F–16 program includes $216.5 million for 72 AESA radars and $15.0 million for F–16 AESA radar development. The committee further notes that the budget request includes $2.9 million for AESA radar procurement, $40.8 million for AESA radar development, and the committee understands that the budget request also includes $14.4 million for procurement of six F–16 AESA radars as initial procurement spares.

The committee continues to view the procurement and development of the AESA radar upgrade to the F–16 aircraft that perform the aerospace alert control mission as a national security priority, and expects the Department of the Air Force will fully execute its planned procurement and development for fiscal years 2017 and 2018.

*F–22 increment 3.2B upgrade*

The committee notes that the Department of the Air Force plans to upgrade 143 F–22 aircraft with the increment 3.2B upgrade. The increment 3.2B upgrade provides the F–22 aircraft with the most advanced air superiority capabilities including the AIM–9X missile,

AIM–120D missile, electronic protection, and in-flight data link enhancements. The committee understands that the Department of the Air Force F–22 inventory includes 34 Block 20-configured F–22 aircraft which are used for training pilots upgrading to the F–22 aircraft, and believes those 34 F–22 aircraft should also be configured with the increment 3.2B upgrade.

Accordingly, the committee encourages the Department of the Air Force to program the necessary funds to configure the 34 Block 20-configured F–22 aircraft with the increment 3.2B upgrade, and believes that such an upgrade will improve F–22 pilot training, improve F–22 inventory capability, and standardize F–22 configurations for more efficient maintenance and parts replacement.

*F–35 Lightning II aircraft program*

The committee continues to support the F–35 Lightning II program. The F–35 Lightning II aircraft is the Department of Defense's largest acquisition program, which will eventually deliver 2,443 F–35 aircraft to the Departments of the Navy and Air Force. The committee notes the Department of Defense has taken delivery of over 285 F–35 aircraft. The committee believes that the F–35 will form the backbone of U.S. air combat superiority for decades to come, replacing or complementing the legacy tactical fighter fleets of the Air Force, Navy, and Marine Corps with a dominant, multirole, fifth-generation aircraft capable of projecting U.S. power and deterring potential adversaries. The committee notes that, for the F–35 program's international partners and foreign military sales customers, the F–35 will become a cornerstone for future coalition operations and will enhance the strength of our security alliances.

The committee understands the F–35 Lightning II program is approximately 90 percent through its system development and demonstration (SDD) phase, which is planned to be completed not later than the second quarter of fiscal year 2018 and will provide capabilities required by the Departments of the Navy and Air Force in a final software block known as block 3F. At a hearing held by the House Committee on Armed Services' Subcommittee on Tactical Air and Land Forces on February 16, 2017, the F–35 program executive officer (PEO) testified that the F–35 program is making solid progress as it grows and accelerates. The committee notes that looking beyond completion of the SDD phase of the F–35 program, the follow-on effort, known as the follow-on modernization (FOM) or block 4 program, is moving forward and will be executed as a continuation of the F–35 program with full transparency and reporting on cost, schedule, and performance as if it were a new program. The committee fully supports development and delivery of a FOM software increment that will provide vitally important additional combat capabilities such as advanced electronic protection, nuclear weapon delivery, and additional air-to-ground precision munitions. The committee believes that the FOM is critical to improve the F–35's warfighting capabilities to keep pace with rapidly maturing adversary threat aircraft and integrated air defense systems, and expects that the FOM engineering, manufacturing, and development contract award will take place as scheduled in late 2018.

The committee is aware the budget request for SDD is $231.0 million over the previous year's projection for SDD in fiscal year 2018, and that this additional amount is necessary due to delays in software development, the need to address problems found during testing, and funding reductions in prior years. The committee also notes that both the Director of Cost Assessment and Program Evaluation and the Government Accountability Office have estimated that significant additional funding beyond the amount requested may be necessary to finish the SDD phase of the program, and that the difference between their estimates and the F–35 joint program office estimates are due in large part to different assumptions about flight test efficiency and duration.

The committee supports completion of the SDD phase and delivery of full block 3F software capability as soon as possible. However, the committee is concerned that, if remaining SDD activities do take longer and cost more than planned, the joint program office may recommend termination of the SDD phase, and transfer of unfinished or incomplete capabilities could be deferred into the FOM portion of the program. While the committee understands that deferral of some minor capabilities may be appropriate and low-risk, the committee does not support premature termination of the SDD phase if combat capabilities critical to the military services are not completed. Accordingly, the committee directs the Secretary of Defense to submit a report to the congressional defense committees, not later than January 30, 2018, that provides an updated estimate of the cost and time necessary to complete the SDD phase, a list of any block 3F capabilities planned for deferral to the FOM phase, and the impact of any such deferred capabilities on the FOM phase of the program.

The committee continues to support increased F–35 aircraft production rates to address fighter aircraft capability and capacity shortfalls in both the Departments of the Navy and Air Force. The committee notes that at a hearing held by the Subcommittee on Tactical Air and Land Forces on July 13, 2016, entitled "Future Air Dominance and the Role of Fifth Generation Fighters," the Commander of the Air Combat Command testified that, to address capability and capacity shortfalls in the Department of the Air Force, the desired F–35A production rate is 60 aircraft per year. The committee believes that full-rate production in fiscal year 2021 would require an annual procurement rate of 80 F–35As, 36 F–35Bs, and 30 F–35Cs. The committee expects the Department of Defense to invest in the tooling necessary to accelerate these future F–35 production rates.

The committee is also aware that the Department of Defense has recently reached a successful agreement with the F–35 prime contractor that achieves lower unit costs for low-rate initial production (LRIP) lot 10. Further, the committee notes the testimony of the F–35 PEO at the February 16, 2017, hearing informed the committee that the then President-elect had a conversation with the F–35 PEO, prior to the conclusion of the lot 10 negotiations, where the President-elect sought more information about the F–35 and its affordability. The F–35 PEO also noted that the conversation with the President-elect resulted in tasks to the F–35 Program Office to determine what actions are currently being taken to ensure the affordability of the F–35, and how the Department of Defense can be

assured that F–35s are procured at the best value. The committee commends the actions taken by the administration and the F–35 PEO to negotiate lower unit costs and continued cost savings for F–35 aircraft.

To continue the trend of decreasing unit F–35 procurement costs, the committee notes that the Department of Defense submitted a request for authorization to enter into contracts for economic order quantities of material and equipment for use in F–35 procurement contracts, to be awarded during fiscal years 2019 and 2020, so that the Department of Defense can execute a block buy contracting strategy. The committee understands that such a block buy contracting strategy would generate cost savings of approximately $2.0 billion. Accordingly, elsewhere in this Act, the committee includes a provision that would authorize the Secretary of Defense to enter into one or more contracts, beginning with the fiscal year 2018 program year, for the procurement of economic order quantities for material and equipment for the F–35 program, to be used in F–35 procurement contracts in fiscal years 2019 and 2020.

*Implications of increased Army, Navy, and Marine Corps force structure on Air Force airlift, air refueling tanker, and Navy sealift force structure requirements*

The committee notes that the administration intends to increase Army, Navy, and Marine Corps force structure and that the last mobility capability and requirements study was completed in 2013. With this greater force structure, the committee is concerned about the anticipated impact on Air Force airlift and air refueling tanker and Navy sealift force structure.

Therefore, the committee directs the Secretary of Defense to carry out a mobility capability and requirements study and provide a briefing to the House Committee on Armed Services not later than September 30, 2018, or 12 months after the issue of a new National Defense Strategy, whichever date is earlier. The study should estimate the number of airlift aircraft, tanker aircraft, and sealift ships needed to meet the combatant commander requirements. The briefing shall include the following elements:

(1) a detailed explanation of the strategy and associated force sizing and shaping constructs, associated scenarios, and assumptions used to conduct the analysis;

(2) estimate of risk based on Chairman of the Joint Chiefs of Staff risk management classifications; and

(3) implications of operations in contested areas with regard to the Civil Reserve Air Fleet.

*MQ–9 modernization and upgrades*

The committee notes that the Air Force relies heavily upon its MQ–9 fleet of remotely piloted aircraft to support global combatant commander requirements for both steady-state and contingency operations. As a result of the extensive use of the MQ–9 platform for operations, many aircraft are reaching the end of their designed service life sooner than expected. The committee notes that in the fiscal year 2017 President's budget request, the Air Force proposed a new effort to retrofit and upgrade 166 MQ–9 aircraft to a Block 5 configuration. The committee also notes that while the Block 5 upgrade increases the mission capability of the aircraft by modern-

izing avionics and mission systems, the upgrade does not address structural or fatigue issues of the MQ–9 aircraft that could extend the designed service life of the aircraft. The committee understands that the Air Force could forgo the option of continued Block 5 upgrades to existing MQ–9 aircraft, and could pursue an option to participate in development and procurement of the MQ–9B aircraft. The committee also understands that the MQ–9B system plans to leverage both the current MQ–9 aircraft and the Advanced Cockpit Ground Control Station as points of departure for MQ–9B systems design, and that hardware, software, and structural upgrades will be included in MQ–9B aircraft to improve structural fatigue and damage tolerance over the current MQ–9 baseline aircraft. However, the committee currently lacks the required information to make an informed determination as to which effort the Air Force should pursue.

Elsewhere in this title, the committee includes a provision that would require the Secretary of Defense, in consultation with the Secretary of the Air Force, to conduct a cost-benefit analysis (CBA) that compares upgrading MQ–9 Reaper aircraft to a Block 5 configuration versus proceeding with procurement of MQ–9B aircraft. The committee expects the CBA to explain in detail all assumptions that underpin the CBA, and to weigh and analyze factors in the CBA such as investment cost, schedule, risk, open-architecture design, capability, capacity, mission systems configuration within the MQ–9 enterprise, manpower requirements, sustainment, logistics, and life-cycle cost or cost-avoidance.

*Next generation ejection seat acquisition*

The committee notes that section 146(b) of the National Defense Authorization Act for Fiscal Year 2014 (Public Law 113–66) required a report by the Secretary of the Air Force on various aspects of the health and safety risks associated with ejection seats. That report confirmed that, with increased use of helmet-mounted devices, the risks of death or serious injury increases, and increases even more for lighter weight aircrew. The committee also notes that the Joint Explanatory Statement to Accompany the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (Committee Print No. 4) stated that the Air Force should establish a program for increasing the ejection safety and reliability of the Air Force's fighter and bomber aircraft. Subsequently the Air Force established the Next Generation Escape System (NGES) program of record, and is currently in the market research phase of its next acquisition endeavor to upgrade and modernize ejection seats for aircraft currently in the Air Force inventory. The committee also recognizes that there are a limited number of ejection seat manufacturers qualified to meet Department of Defense egress requirements for high-performance military aircraft.

Concerning the acquisition of NGES, the committee expects the Secretary of the Air Force to design and execute an acquisition strategy that enables fair, open, equitable, and objective consideration of ejection seat technologies. The committee encourages the Air Force to also take into account industrial base considerations that will preserve sufficient access to ejection seat technology for future programs. The committee also expects that any ejection seat proposal assessed during source selection processes will be evalu-

ated in accordance with established Department of Defense policies, regulations, and instructions governing the acquisition of egress systems for military aircraft.

Therefore, the committee directs the Secretary of the Air Force, and a representative from the office of the Under Secretary of Defense for Acquisition, Technology, and Logistics, to provide a briefing to the House Committee on Armed Services not later than September 1, 2017, that explains in detail the acquisition strategy for NGES and how the committee's aforementioned considerations related to the acquisition strategy will be implemented. Finally, the committee is dissatisfied with the slow pace the Air Force has given this issue since it was initially addressed by the committee over 3 years ago, and expects the Secretary of the Air Force to demonstrate more urgency in providing modernized and safer egress systems for Air Force aircrews.

*RC–135S Cobra Ball*

The committee notes that the collection of information associated with foreign ballistic missile programs remains a priority for the Department of Defense. For many years, the RC–135S Cobra Ball program has served a vital role by providing unique and highly responsive collection on numerous high-priority missions. As one of the smallest aircraft inventories in the Department of the Air Force, the three aircraft of the RC–135S fleet struggle to balance routine and depot maintenance schedules against operations and training requirements. The committee remains concerned that the Department's ability to conduct responsive technical collection against high-priority items of interest is constrained by the small size of the RC–135S enterprise which must compete fulfilling requirements for operations, training, and maintenance.

Therefore, the committee directs the Secretary of the Air Force to provide a briefing to the House Committee on Armed Services not later than December 1, 2017, on modernization and upgrades to RC–135S aircraft and training facilities. Specifically, the briefing should include what actions the Secretary will take to complete the modernization and upgrade of the remaining two RC–135S aircraft to the newest baseline standard for mission systems and software, as well as what actions the Secretary will take to field an RC–135S ground-based mission trainer to reduce reliance on mission aircraft and increase operational availability of RC–135S aircraft for worldwide deployments.

*Reporting on air traffic control avionics upgrades for Air Force aircraft*

The committee notes that the Air Force is upgrading the avionics of its entire fleet to make the tracking of military aircraft by air traffic control facilities more secure and to comply with Federal Aviation Administration Air Traffic Management Surveillance mandates which go into effect on January 1, 2020.

The committee is aware that the Air Force is combining the acquisition of Identification, Friend or Foe Mode 5 and Automatic Dependent Surveillance Broadcast-Out capable avionics and the supporting software in an effort to reduce overall costs. The committee is concerned that the Air Force will not fully meet the January 1,

2020, mandate, which could seriously impact operational capability of the force.

Therefore, the committee directs the Secretary of the Air Force to provide a briefing to the House Committee on Armed Services not later than February 15, 2018, that addresses the following elements:

(1) operational and training impacts of non-compliant aircraft;

(2) mitigation efforts to minimize training and operational disruptions;

(3) plans to bring aircraft into compliance by aircraft series and type;

(4) challenges to bringing all aircraft into compliance; and

(5) steps taken to ensure cost effectiveness of avionics upgrades.

*RQ–4 and universal payload adapter integration*

The budget request contained $86.7 million for RQ–4 post-production charges, but contained no funding for integration of the universal payload adapter.

The committee notes that the RQ–4 Global Hawk is the Department of Defense's only remotely piloted, high-altitude, long-endurance, intelligence, surveillance, and reconnaissance (ISR) system that provides complementary capability alongside the U–2. The RQ–4 system provides critical support to deployed forces around the world, including providing critical communications to forward-deployed ground forces and essential ISR information to the intelligence community. The RQ–4 also provides support to homeland defense and disaster response operations that could not be achieved using other medium-altitude remotely piloted aircraft that are unable to operate in the high-altitude flight environment. The committee notes that integrating the universal payload adapter on the RQ–4 fleet will ensure greater interoperability and flexibility alongside the U–2, as it would enable employment of an array of ISR sensors, including select U–2 sensors, in support of combatant commander high-altitude ISR requirements.

Therefore, the committee recommends $105.0 million, an increase of $18.3 million, for RQ–4 post-production charges to support continued modifications to existing RQ–4 aircraft and integration of the universal payload adapter.

*Wide-area motion imagery intelligence capability*

The budget request contained $4.5 million in PE 35206F for development of airborne reconnaissance systems, and $321.1 million for MQ–9 unmanned aircraft system (UAS) modifications, but contained no funding for continued development or procurement of wide-area motion imagery (WAMI) beyond line-of sight (BLOS) capabilities.

The committee notes that persistent, near real-time day and night WAMI capability is considered by operational commanders to be a critical beyond line-of-sight intelligence, surveillance, and reconnaissance capability for numerous combat units. WAMI capability has been deployed in support of combat operations in Afghanistan since 2010 and in Iraq since 2015; however, despite the invaluable capability that WAMI capability provides, the Air Force has only been able to provide four steady-state UAS lines of WAMI capability. The committee understands that last year, the Depart-

ment of Defense validated a U.S. Central Command Joint Urgent Operational Need Statement that requires the further development and procurement of WAMI BLOS capabilities for forward-deployed operations.

Accordingly, the committee recommends $17.3 million in PE 35206F, an increase of $12.8 million, for development of WAMI BLOS processor upgrades to enable enhanced data management and integration of multi-intelligence WAMI technologies, automatic target recognition, correlation and tracking information, and near-vertical direction finding capabilities. The committee recommends $326.3 million for MQ–9 UAS modifications, an increase of $5.2 million, to complete the purchase of the 10th pod set for which partial funding was authorized by the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328).

Additionally, the committee directs the Vice Chairman of the Joints Chief of Staff (VCJCS), utilizing the Joint Requirements Oversight Council process, to provide a report to the House Committee on Armed Services by March 1, 2018, that determines the quantity of steady-state operational combat UAS lines that would be required to provide WAMI BLOS capabilities to meet airborne signals and imagery intelligence requirements for all of the geographic combatant commanders. The committee expects the VCJCS to seek input from all geographic combatant commanders, and to also provide an explanation of underpinning assumptions and risk analysis for the final derived requirement.

Finally, the committee directs the Secretary of the Air Force to provide a report to the House Committee on Armed Services by March 1, 2018, that describes in detail the life-cycle weapon system sustainment and modernization strategy for maintaining an enduring WAMI capability for the geographic combatant commanders.

## PROCUREMENT, DEFENSE-WIDE

### Items of Special Interest

*MC–12 modernization initiatives*

The budget request contained $5.8 million in Aircraft Procurement, Air Force, for MC–12 aircraft modernization initiatives.

The committee is aware of a capability and modernization gap with the MC–12W fleet of aircraft currently being flown by Air National Guard units when compared to those being flown by Active Components. The committee notes these critical capability gaps are found in tactical data links, signals intelligence, high definition optics, and antennas, all of which are critical for flight operations in contested environments.

Therefore, the committee recommends $70.8 million, an increase of $65.0 million, in Aircraft Procurement, Air Force, for MC–12W aircraft upgrades utilized by the Air National Guard.

*Modernization of UH–60A/L aircraft bound for Afghanistan Aviation Forces*

The committee encourages the Office of the Secretary of Defense (OSD) to develop strategies to modernize analog flight and crew advisory instruments in the UH–60A/L aircraft bound for Afghanistan Aviation Forces. The committee understands the aging analog

systems in the UH–60A/L are being phased out in favor of digital glass flight displays that provide increased situational awareness and avoid growing obsolescence and reduced readiness. The committee notes that the digital glass flight displays have the added benefit of more efficient delivery of information to the pilot and copilot, easier scan of flight parameters, and more intuitive use of this information in the control of safe flight operations.

The committee directs the Secretary of the Defense to provide a briefing to the House Committee on Armed Services by December 1, 2017, on OSD's strategy to transition UH–60A/L aircraft bound for Afghanistan Aviation Forces.

*Standard data link requirement for the Department of Defense*

The committee reminds the Department of Defense that the National Defense Authorization Act for Fiscal Year 2013 (Public Law 112–239) included a provision, section 157, requiring tactical manned intelligence, surveillance, reconnaissance (ISR) aircraft and unmanned aerial systems (UAS) to use a specified standard data link. The provision requires the use of encrypted waveforms to transmit and receive internet protocol communications, requires UAS use data formats that are consistent with North Atlantic Treaty Organization standards, and requires that acquisition solicitations conform to Department of Defense data link specification standards without requirements or evaluation criteria that mandate proprietary or undocumented waveforms, control interfaces, or data interfaces.

The committee understands that the office of the Under Secretary of Defense for Acquisition, Technology, and Logistics (USD(AT&L)) is currently developing a common data link (CDL) enterprise modernization policy intended to transition the Department of Defense to a Bandwidth Efficient CDL Revision B (BE CDL Rev B), implement an open system cryptographic modernization, and provide a vendor neutral terminal control interface. The committee also understands the CDL executive agent (the Department of the Air Force) is developing a BE CDL Rev B software upgrade that will allow the Department to port this compliant waveform into a number of widely fielded airborne and ground terminals. Further, the Department of Defense has informed the committee that preliminary transition is already beginning via the secure CDL ISR radio program which requires each vendor to implement BE CDL Rev B, Cryptographic Core Modernization (CCM) encryption, and the new terminal Common Control Interface (CCI), which are currently pending National Security Agency certification. The Department of Defense also informed the committee that the CDL enterprise modernization policy to be issued later this year will direct all new programs requiring CDL terminals (and existing programs replacing their terminals) to implement BE CDL Rev B, the CCI, and CCM modular encryption, and that the policy will retire the 466ER, Vortex Native, Predator Tactical, and Frequency Modulation (FM) Analog ISR waveforms, not later than October, 1, 2023.

However, the committee is not entirely convinced that the Department of Defense is on a path to meet the requirements of section 157 without a need to exercise future waiver authority, because the committee understands that some programs of the De-

partment of Defense may still seek to obtain waivers from USD(AT&L). The committee believes that the Department of Defense's waiver authority should be used rarely and only in cases in which vital, unavoidable circumstances exist. Therefore, the committee will consider in the future repealing the waiver authority provided in section 157 if the committee observes that program offices of the Department of Defense are utilizing the waiver authority as a matter of convenience rather than outright necessity.

Elsewhere in this title, the committee includes a provision that would amend section 157 to require the Secretary of Defense to provide the congressional defense committees notification of common data link solicitations containing certain waveforms, and modifies criteria related to the review and approval of waiver requests by program offices seeking to use legacy data link waveforms.

## LEGISLATIVE PROVISIONS

### Subtitle A—Authorization of Appropriations

#### Section 101—Authorization of Appropriations

This section would authorize appropriations for procurement at the levels identified in section 4101 of division D of this Act.

### Subtitle B—Army Programs

#### Section 111—Report on Acceleration of Increment 2 of the Warfighter Information Network-Tactical

This section would require the Secretary of the Army to submit a report to the congressional defense committees by January 30, 2018, detailing potential options for the acceleration of procurement and fielding of the Warfighter Information Network-Tactical Increment 2 program.

### Subtitle C—Navy Programs

#### Section 121—Aircraft Carriers

This section would express the sense of Congress as to the necessity to obtain 12 aircraft carriers, the frequency of aircraft carrier construction, the requirement to provide shock trials on the *USS John F. Kennedy* (CVN 79), and the desire to continue the Ford-class carrier design for CVN 81. This section would also require the Secretary of the Navy to obtain 12 aircraft carriers by September 2023, which is expected to occur with the delivery of the *USS John F. Kennedy*. Finally, this section would provide economic order quantity authority for the construction of two *Ford-class* aircraft carriers and incremental funding authority for the nuclear refueling and complex overhaul of four Nimitz-class aircraft carriers.

#### Section 122—Procurement Authority for Icebreaker Vessels

This section would authorize the Secretary of the Navy to act as a general agent for the Secretary of the Department in which the Coast Guard is operating and to enter into a contract for not more than three heavy icebreakers and three medium icebreakers.

Section 123—Limitation on Availability of Funds for Procurement of Icebreaker Vessels

This section would prohibit funds authorized to be appropriated by this Act or otherwise made available for the Department of Defense for fiscal year 2018 from being obligated or expended for the procurement of an icebreaker vessel.

Section 124—Multiyear Procurement Authority for Virginia Class Submarine Program

This section would authorize the Secretary of the Navy to enter into one or more multiyear contracts for *Virginia* class submarines beginning in fiscal year 2018, in accordance with section 2306b of title 10, United States Code.

Section 125—Multiyear Procurement Authority for Arleigh Burke Class Destroyers and Associated Systems

This section would authorize the Secretary of the Navy to enter into one or more multiyear contracts for *Arleigh Burke* class destroyers and associated systems beginning in fiscal year 2018, in accordance with section 2306b of title 10, United States Code.

Section 126—Limitation on Availability of Funds for Arleigh Burke Class Destroyer

This section would limit the obligation of certain funds to procure new air and missile defense radars for *Arleigh Burke* class destroyers unless the radars are AN/SPY–6(V) radar modular assembly (RMA) based. This section would authorize the Secretary of the Navy to a waive the limit if the Secretary determines that the cost or schedule risk associated with the integration of the AN/SPY–6(V) radar is unacceptable or incongruous with an appropriate business case.

The committee recognizes that the Under Secretary of Defense for Acquisition, Technology, and Logistics, in his report to Congress required by the committee report (S. Rept. 114–49) accompanying the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92), noted that the Navy's current radar program of record, AN/SPY–6(V) Air and Missile Defense Radar, was designed to be fully scalable and modular to support a variety of shipboard radar applications on a variety of platforms and that the radar modular assembly conforms to the Department of Defense's Better Buying Power initiative by leveraging open systems, common logistics, and software baselines, and by securing government data rights to both the hardware and software to affect affordability.

The committee applauds the Navy's successful efforts to leverage RMA-based applications of AN/SPY–6(V) technologies as part of the Enterprise Air Surveillance Radar (EASR) program that provides critical capabilities for America-class amphibious assault ships, amphibious transport docks, and aircraft carrier-class combatants. The committee believes these efforts demonstrate the feasibility of integrating RMA-based solutions to existing ship designs.

The committee believes that all future DDG–51 radar new construction procurements should remain consistent with the Navy's current destroyer modernization plan and leverage the AN/SPY–

6(V) radar modular assembly architecture to minimize operation and sustainment costs, reduce training and logistical requirements, and maintain affordability through economies of scale with other programs like EASR.

Section 127—Extensions of Authorities Relating to Construction of Certain Vessels

This section would extend incremental funding authorities for Ford class aircraft carriers and LHA replacement ships.

Section 128—Multiyear Procurement Authority for V–22 Osprey Aircraft

This section would authorize the Secretary of the Navy, subject to section 2306b of title 10, United States Code, to enter into one or more multiyear contracts, beginning with the fiscal year 2018 program year, for the procurement of V–22 Osprey aircraft and common configuration-readiness and modernization upgrades for the V–22 Osprey aircraft. Notwithstanding section 2306b(k) of title 10, United States Code, this section would also authorize the period covered by such contract entered into on a multiyear basis to exceed 5 years, but not to exceed 7 years. Additionally, this section would require that any such multiyear contract provide that any obligation of the United States to make a payment under the contract for a fiscal year, after fiscal year 2018, be subject to the availability of appropriations or funds for that purpose for such later fiscal year.

The committee encourages the Department of the Navy to execute a procurement profile for this multiyear in order to acquire the aircraft at economic order quantity levels that most efficiently acquire the aircraft and fully procures the programmed acquisition objective aircraft for the Department of the Navy.

SUBTITLE D—AIR FORCE PROGRAMS

Section 131—Streamlining Acquisition of Intercontinental Ballistic Missile Security Capability

This section would list findings regarding the acquisition of an aircraft to provide intercontinental ballistic missile security as a replacement for the UH–1N helicopter, express the sense of Congress that the Secretary of Defense should have the authority to expedite procurement of a replacement aircraft for the UH–1N helicopter, and authorize the Secretary of Defense to waive any provision of law requiring the use of competitive procedures for the procurement of a UH–1N helicopter replacement and enter into a contract for the procurement on a sole-source basis. The Secretary's authority in this section would be subject to a 15-day wait period, a notice of the Secretary's intent to exercise such authority, and the Secretary's certification of certain events and determinations.

Section 132—Limitation on Selection of Single Contractor for C–130H Avionics Modernization Program Increment 2

This section would prohibit the Department of the Air Force from selecting a single contractor for the C–130H avionics modernization program increment 2 until the Secretary of the Air Force certifies

to the congressional defense committees that every opportunity will be taken to make use of commercial-off-the-shelf technology solutions and nondevelopmental items and that excessively restrictive military specification standards were not used as criteria to restrict or eliminate fair and open competition.

Section 133—Limitation on Availability of Funds for EC–130H Compass Call Recapitalization Program

This section would restrict the Secretary of the Air Force from contracting with any entity for the purposes of the Compass Call re-host program until the Under Secretary of Defense for Acquisition, Technology, and Logistics submits a certification to the congressional defense committees that indicates the acquisition strategy has been reviewed and determined to meet applicable laws, guidelines, and best practices.

Section 134—Cost-Benefit Analysis of Upgrades to MQ–9 Reaper Aircraft

This section would require the Secretary of Defense, in coordination with the Secretary of the Air Force, to conduct a cost-benefit analysis that compares upgrading MQ–9 Reaper aircraft to a Block 5 configuration, or foregoing the Block 5 upgrade to MQ–9 aircraft and proceeding with procurement of MQ–9B aircraft instead. The provision also requires the Department of Defense to submit the analysis to the congressional defense committees not later than 180 days after the date of the enactment of this Act.

SUBTITLE E—DEFENSE-WIDE, JOINT, AND MULTISERVICE MATTERS

Section 141—Authority for Procurement of Economic Order Quantities for the F–35 Aircraft Program

This section would authorize the Secretary of Defense to enter into one or more contracts, beginning with the fiscal year 2018 program year, for the procurement of economic order quantities for material and equipment that has completed formal hardware qualification testing for the F–35 program and is to be used in procurement contracts to be awarded under the F–35 program in fiscal years 2019 and 2020. This section would also limit the amount of such contracts for fiscal year 2018, or any year thereafter, to not more than $661.0 million. Additionally, this section would limit the Secretary of Defense from entering into such contracts until a period of 15 days has elapsed following the date on which the Secretary submits to the congressional defense committees a written certification that the contract meets certain conditions.

Section 142—Limitation on Demilitarization of Certain Cluster Munitions

The section would prohibit the elimination of cluster munition stockpiles considered to be non-compliant after January 1, 2019, according to the Memorandum of the Secretary of Defense dated June 19, 2008, regarding the Department of Defense policy on cluster munitions and unintended harm to civilians. The prohibition remains in effect until the Secretary of Defense certifies that the Department retains sufficient inventory levels of operationally suit-

able cluster munitions that comply with the Department's current policy, and meets at least 75 percent of the U.S. combatant commands operational requirements across the full range of military operational environments.

This section would allow the demilitarization of cluster munitions determined to be unserviceable due to a significant failure to meet performance or logistics requirements. Cluster munitions categorized as unserviceable solely due to current or amended Department of Defense policy related to cluster munitions would not meet this definition of unserviceable, and would be subject to the limitation in this provision.

### Section 143—Reinstatement of Requirement To Preserve Certain C–5 Aircraft

This section would amend section 132 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) to reinstate the requirement for the Secretary of the Air Force to continue to preserve certain C–5 aircraft in a storage condition that would allow a recall of retired aircraft to future service in the Air Force Reserve, Air National Guard, or Active Force structure.

### Section 144—Requirement That Certain Aircraft and Unmanned Aerial Vehicles Use Specified Standard Data Link

This section would amend section 157 of the National Defense Authorization Act for Fiscal Year 2013 (Public Law 112–239) by: requiring the Secretary of Defense to notify the congressional defense committees not later than 15 days after a solicitation is issued for a Common Data Link-To Be Sunset (CDL–TBS) waveform; elevating waiver review and approval authority from the Under Secretary of Defense for Acquisition, Technology, and Logistics to the Deputy Secretary of Defense; and, terminating the waiver authority that enables use of legacy data link waveforms on October 1, 2023.

# TITLE II—RESEARCH, DEVELOPMENT, TEST, AND EVALUATION

## RESEARCH, DEVELOPMENT, TEST, AND EVALUATION, ARMY

### Items of Special Interest

*Acoustic threat detection technology*

The committee is aware of efforts undertaken by the Army to develop and operationally test acoustic threat detection technology as a method of improving forward operating base protection. The committee is also aware that acoustic threat detection technology has been successfully integrated and tested from fixed, aerostat, and deployable containerized platforms. As such, the committee encourages continued operational testing, to include limited user evaluations. If warranted, the committee expects the Army to consider acceleration of the transition of this technology to a program of record through the utilization of acquisition reform principles.

*AN/VVR–4 Laser Detecting Set*

The committee recognizes U.S. Army ground combat vehicles are increasingly susceptible to laser-aided threats. The committee believes ground combat vehicle crews require a reliable means to identify laser threats and to apply countermeasures or take evasive action against the growing reliance by adversaries on lasers to enhance ballistic solutions on weapons terminal guidance systems. The committee believes a key element to the detection of these threats is the AN/VVR–4 Laser Detecting Set, and is aware the AN/VVR–4 Laser Detecting Set was designed to meet or exceed all performance and environmental specifications defined by the U.S. Army. Therefore, the committee encourages the Secretary of the Army to pursue initial production and fielding of the AN/VVR–4 Laser Detecting Set and to begin initial integration on the M1A2 Abrams tank.

*Army counter-improvised explosive device technology*

The committee recognizes that over the last decade the military services have succeeded in developing, fielding, and deploying highly capable systems to address the threats from improvised explosive devices (IEDs), and that the Department of Defense is currently supportive of additional ongoing development efforts, including, but not limited to, the Army's Research, Development, and Engineering Command's activities in this area.

However, the committee is concerned that despite progress in research and development, shortcomings may still exist in areas such as real-time and easily interpreted imaging, non-metallic detection, false alert rates, and non-invasive sensor technologies. The committee is aware of currently available technologies, tested and endorsed by close allies and partners, such as the United Kingdom, capable of providing additional protection from these IEDs.

Therefore, the committee directs the Commanding General of the U.S. Army Materiel Command to provide a briefing to the House Committee on Armed Services by September 1, 2017, on such technologies. This briefing shall include a detailed assessment of the Army's ongoing efforts to improve capabilities to counter IEDs, the extent to which existing and innovative sensor technologies are and will be incorporated into relevant development efforts, and the applicability of those technologies by allies and partner nations, such as the United Kingdom, to Army development efforts.

*Army Network Integration Evaluations and Joint Warfighting Assessments*

The committee acknowledges the importance of the Department of the Army's Network Integration Evaluation (NIE) exercises conducted at Fort Bliss, Texas, and White Sands Missile Range, New Mexico. The committee notes that, through this program, the Army has been able to test equipment in a realistic battlefield environment in the hands of soldiers so the Army can successfully integrate new technologies. The committee also acknowledges the importance of the Joint Warfighting Assessments (JWA). The committee recognizes NIE and JWA as critical cost saving measures since these exercises allow the Army to clarify program requirements and discontinue programs that do not meet Army needs. As a result, the Army has produced over $1.8 billion in savings and

cost avoidance since 2011. The committee believes that these exercises help the Army to test emerging concepts, integrate new capabilities and technology, and promote interoperability between the military services and U.S. allies.

The committee also acknowledges the investments made in the Joint Modernization Command, located at Fort Bliss, and encourages the Army to continue NIE and JWA exercises at Fort Bliss whenever possible to utilize those investments as well as the unique space, terrain, and freedom of movement available at Fort Bliss and White Sands Missile Range. The committee also acknowledges that NIE and JWA events should be brigade-level exercises when practical to ensure any systems tested will be fully capable of deployment at the brigade level.

While the committee believes that the NIE and JWA should continue to be an integral part of the Army's modernization strategy, and encourages the Army to pursue both the NIE and JWA, the committee understands that the Army is assessing the most efficient way to test the integration of new concepts and technologies. The committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by March 1, 2018, on this assessment.

*Army warfighter technology programs*

The budget request contained $39.6 million in PE 62786A for Warfighter Technology research and development programs.

The committee is aware of the work being done by the Warfighter Technology Directorate in improving the protection, survivability, mobility, and combat effectiveness of soldiers. The committee understands the directorate is continuing research in the areas of advanced ballistic polymers for body armor, fibers to make more durable and breathable uniforms, fire resistant and lightweight infrastructures for advanced shelters, among other research programs that should provide tangible benefits to the individual soldier. The committee believes it is critical to ensure that the Army continues development of this technology and believes additional funding could help to accelerate its development.

The committee recommends $44.6 million, an increase of $5.0 million, in PE 62786A for Warfighter Technology research and development programs.

*Civil Support Team Information Management System*

The committee is aware that the National Guard Bureau (NGB) Weapons of Mass Destruction-Civil Support Teams (CST) currently field a system called the "CST Information Management System" (CIMS) to provide a common operating picture, promote information-sharing and real-time collaboration in an emergency situation, and support the CST mission of assisting and advising first responders and facilitating communications with other Federal resources. The committee is aware that the NGB has developed a long-term strategy to expand that system to the rest of the Chemical, Biological, Radiological and Nuclear Response Enterprise, known as "NG CIMS 2018+." The current plan for NG CIMS 2018+ would standardize the tactical common operational picture and information management systems for all elements of the CRE, and achieve full operational capability (FOC) by September 30, 2018.

The committee is also aware that this system has been successfully demonstrated in recent real-world operations and training events, including the 2017 Presidential Inauguration.

The committee encourages the National Guard to continue to develop and deploy NG CIMS 2018+ on the current timeline, and utilize the National Guard and Reserve Equipment appropriation, if necessary, to ensure resourcing to meet that FOC date.

*Cold Temperature and Arctic Protective System development*

The committee is aware that the Army is developing an updated cold weather clothing system referred to as the "Cold Temperature and Arctic Protective System" (CTAPS). The committee supports efforts to ensure that soldiers are equipped with organizational clothing and individual equipment for all environments. The committee is aware the CTAPS system would include flame-resistant technology similar to that of the current flame-resistant environmental ensemble. The committee encourages the Army to consider commercial-off-the-shelf technologies, as well as technologies already proven in current Army cold and extreme weather clothing systems as part of the CTAPS development program.

The committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by November 15, 2017, that includes the development timeline and schedule for CTAPS, as well as addresses the cooperative efforts being taken by the Army, to include the industrial base into the overall design of the CTAPS system.

*Enhanced lightweight hard armor and combat helmet research and development*

The budget request contained $20.2 million in PE 63827A for soldier systems—advanced development, to include weight reduction and performance improvements for body armor and combat helmets.

The committee has consistently highlighted the critical need for modernization of personal protective equipment (PPE), to include body armor and combat helmets. In previous legislation, the committee has expressed its concern regarding the Department of Defense's long-term strategy for PPE industrial base sustainment, and has encouraged the Department to pursue strategies that would allow for sustainment of this critical industrial base through modernization efforts. For example, section 141 and section 216 of the National Defense Authorization Act for Fiscal Year 2010 (Public Law 111–84) established separate procurement line items and separate program elements required for the procurement and research and development (R&D) of individual body armor and associated components. The committee continues to encourage and recommend a weapon system approach to PPE acquisition, in particular body armor and combat helmets. The committee believes this would provide for more efficient planning, programming, and budgeting for PPE, and would create a more stable environment for the industrial base to continue to invest in innovation and weight reduction technology.

The committee notes the Army's Soldier Protection System and other service R&D efforts have made significant progress in reducing the weight and improving the form, fit, and function of body

armor. The committee is also aware of current R&D projects in this PE to help advance improved performance. The committee understands that the Department of Defense Appropriations Act, 2017 (division C of Public Law 115–31) included an additional $25.0 million in PE 63827A to continue to improve the capability of hard and soft body armor and combat helmets. The committee supports this initiative and understands the industrial base is ready to start the efforts to address the Army's two key goals of reducing body armor weight by 20 percent or more, and improving combat helmet capability against projected threats.

The committee recommends $45.2 million, an increase of $25.0 million, in PE 63827A to ensure continuity and sufficient resources are programmed for enhanced soft and hard body armor and combat helmet research and development. The committee also directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by March 14, 2018, on the Army's plan to obligate these additional funds, and identify potential development projects that could be accelerated.

*Future Vertical Lift*

The committee is aware that the Army is continuing execution of the Future Vertical Lift (FVL) analysis of alternatives (AOA) during fiscal year 2018, and the FVL initiative has been informed by concept definition efforts such as the Joint Multi-Role Technology Demonstration and the Vertical Lift Consortium. The committee recommends that the Army continue leveraging existing Other Transaction Authority efforts to execute concept definition studies for the purpose of informing acquisition approaches and advancing vertical lift technologies in support of future requirements. The committee encourages the Army to fully fund FVL efforts and to seek opportunities to accelerate the program based on performance and available resources.

*High Bandwidth Tethered Unmanned Air Systems Technology*

The committee understands that there are new, commercial tethered unmanned air system solutions that could provide significant improvements in the following capability sets: communications, persistent surveillance, force protection, and counter-VAS. The committee believes these improved capabilities could benefit the forward deployed warfighter. As such, the committee directs the Secretary of the Army to provide a briefing to the Committees on Armed Services of the House of Representatives and the Committee on Armed Services of the Senate by September 30, 2017, on the advisability and feasibility of procuring new, tethered-based multirotor platforms as a potential solution to address critical operational capability gaps in communication, expeditionary cyber operations, and intelligence collection requirements as well as counter-unmanned aircraft systems applications.

*High Mobility Multipurpose Wheeled Vehicle external fire suppression systems*

The committee is aware that in 2008 the Army pursued Work Directive 379 in response to an operational needs statement, and that the purpose of the directive was to explore options for fluid-based fires in the fuel tank and engine compartment of Army High Mobil-

ity Multipurpose Wheeled Vehicles (HMMWV). The committee is also aware that one of the recommendations resulting from this effort was to continue testing of fuel tank, engine, and tire improvements that could potentially reduce the risk of fluid-based fires. However, despite this recommendation, the Army chose not to pursue such improvements or validate a requirement for an external fire suppression system (EFSS) for Army HMMWVs.

Given the evolution of fire suppression technology since this evaluation was conducted, the committee believes that the Army should reconsider the potential requirement for an EFSS for Army and Army National Guard HMMWVs. Therefore, the committee directs the Secretary of the Army, in coordination with the Chief, National Guard Bureau, to provide a briefing to the House Committee on Armed Services by September 1, 2017, on the advisability and feasibility of such a system being installed on Army and Army National Guard HMMWVs as part of HMMWV modernization and recapitalization programs.

*Improved Turbine Engine Program*

The committee continues to support the Army research and development budget request for the Improved Turbine Engine Program (ITEP), as well as the acquisition strategy included in the request. ITEP is a competitive acquisition program that is designed to develop a more fuel-efficient and powerful engine for the current Black Hawk and Apache helicopter fleets. This new engine will increase operational capabilities in high/hot environments, while reducing operating and support costs. The committee acknowledges the benefits of improved fuel efficiencies through lower specific fuel consumption that ITEP will bring to the battlefield. In addition, the committee encourages the Army to prioritize maintenance and sustainment cost savings for ITEP to ensure the continued affordability of the program.

In the committee report (H. Rept. 114–537) accompanying the National Defense Authorization Act for Fiscal Year 2017, the committee required the Army to provide a briefing to the House Committee on Armed Services on potential options to accelerate the ITEP program. The committee notes that the Army provided the briefing and that the Army stated that there are two potential acceleration opportunities that will be informed by program knowledge points. The committee understands that performance and available resources will drive these two knowledge points. The committee encourages the Army to continue to fully fund this competitive program and to pursue acceleration opportunities based on program performance and available resources.

*Improved vehicle camouflage systems and next generation signature management*

The budget request contained $91.0 million in PE 64804A for Logistics and Engineer Equipment-Engine Development. Of this amount, $6.6 million was requested for next generation signature management systems.

The committee remains encouraged by recent research and the approval of the updated requirements document for next generation signature management systems for combat and tactical vehicles. The committee continues to recognize the importance of this

low-cost defensive capability against current and emerging threats, particularly in Europe, and encourages the Department of Defense to continue to accelerate development, procurement, and fielding of this advanced camouflage net system to meet warfighter requirements.

Given the immediate increasing demand for next generation signature management systems by combatant commanders, the committee encourages the Army, to the maximum extent possible, to accelerate completion of the research and development of the woodland and arctic camouflage variants in order to set the conditions for a low-rate initial production decision in fiscal year 2018, 1 year earlier than planned.

The committee recommends $93.0 million, an increase of $2.0 million, in PE 64804A to address an unfunded requirement for next generation signature management systems.

*Integrated Air and Missile Defense command and control capabilities*

The committee acknowledges that fielding of an Integrated Air and Missile Defense command and control set of capabilities remains the U.S. Army's Air Defense Artillery community's number one priority and believes that such capabilities are urgently required to meet warfighter needs.

However, the committee is concerned about continued programmatic challenges that have delayed even incremental capability delivery. The committee notes the President's budget request for Fiscal Year 2018 formalizes a shift of initial operational capability for the Integrated Air and Missile Defense (IAMD) Battle Command System (IBCS) from September 2016 to April of 2022 and that total program costs have grown from $1.73 billion to $2.68 billion as of the end of 2016.

The committee is further concerned about recent IBCS performance observations by the Department of Defense's Office of Operational Test and Evaluation which, in its February 2017 report, called the system's software "neither mature nor stable . . ." and by the Army Test and Evaluation Command which noted in report detailing a June 2016 limited user test that the system is "Not suitable, Not survivable, Not reliable."

The committee recognizes that the Army IAMD architecture has changed significantly since IBCS requirements were validated in 2009 with the cancellation of the Joint Land Attack Cruise Missile Defense Elevated Netted Sensor System (JLENS), the Medium Extended Air Defense System (MEADS), and the Surface Launched Advanced Medium Range Air to Air Missile (SLAMRAAM), and that emphasis has now shifted to integration of other Army systems.

Therefore the committee directs the Secretary of Army, not later than September 30, 2017, to provide a briefing to the congressional defense committees on the status of the IBCS program. At a minimum, this briefing shall include:

(1) Updated information on programmatic risks, total estimated costs, and a new testing and fielding schedule;

(2) The program's plan to address emerging threats such as cyber and electronic attack; and

(3) A plan for potential IBCS capability delivery acceleration, including options for how the Army could use Fiscal Year 2018 funding, prior year funding, or otherwise leverage other programs' investments to contribute or be incorporated into IBCS prior to the completion of fielding or investments that could alternatively meet program requirements.

*Land-Based Anti-Ship Missile hardware and software integration and test capability*

The committee understands the U.S. Army Aviation and Missile Research, Development, and Engineering Center has initiated a science and technology program for the Land-Based Anti-Ship Missile effort. This effort includes adapting existing Army and Marine Corps High Mobility Artillery Rocket Systems (HIMARS) and Multiple Launch Rocket System (MLRS) missile systems for this land-based offensive surface warfare capability. The committee is aware that HIMARS and MLRS systems could be limited to only engagement of stationary area and point targets using global positioning system aided inertial navigation, while maritime targets would require the capability to engage mobile target sets. The committee notes that additional technology consisting of integrating multi-mode seekers and datalinks to existing HIMARS and MLRS systems could be required, and also notes that this would be a significant advancement in capability. The committee expects the Army to program the necessary resources required across the Future Years Defense Program to begin the integration work and testing of the capability to address maritime targets.

*Lightweight metal matrix composite technology for combat and tactical vehicles*

The committee recognizes the versatility and broad application that Metal Matrix Composite (MMC) technology may provide to the armed services through weight reduction of vehicle components by potentially 50 percent, and in turn could increase the service life of vehicles by three to four times that of vehicles manufactured with traditional steel and armor. The committee understands the U.S. Army Tank and Automotive Research, Development, and Engineering Command (TARDEC) is currently evaluating technologies that can reduce vehicle weight, reduce fuel consumption, increase payload capacity, and extend service life of combat and tactical vehicles, and that MMC technology is part of this ongoing evaluation.

The committee directs the Commanding General of TARDEC to provide a briefing to the House Committee on Armed Services by November 1, 2017, on the progress of development and implementation of Metal Matrix Composite component technology in order to reduce vehicle weight, reduce fuel consumption, increase payload capacity, and extend service life.

*M4 Carbine Free Floating Rail Technology*

The committee has long supported small arms modernization and continues to encourage increased investment to improve small arms capability. The committee notes that the Army continues to use and field legacy rail systems for use on M4 carbines. However, the committee understands that the U.S. Special Operations Command (SOCOM) and the Army Marksmanship Unit have begun to

field free-float rail systems instead of using current legacy systems. The committee is also aware that free-float rail systems are considered to be the commercial industry standard and are readily available. The committee understands that the Program Executive Office-Soldier (PEO-Soldier) through the Soldier Enhancement Program (SEP) is currently evaluating the SOCOM free-float rail system. The committee encourages the Army, subject to a favorable SEP evaluation, to consider the advisability and feasibility of developing an accelerated acquisition strategy for free-float rail systems.

The committee directs the Secretary of the Army, in coordination with PEO Soldier, to provide a briefing to the House Committee on Armed Services by December 1, 2017, on the results of the current SEP evaluation and the Army's plans for upgrading legacy rail systems.

*Material development, characterization, and computational modeling*

The committee recognizes the importance of evaluation of materials and technologies, designs, and the development of methodologies and models to enable enhanced lethality and survivability. Methods such as computational research allow for the development of models that predict the mechanical properties of materials that are used in research and development at the U.S. Army Research Laboratory (ARL). These models and simulations provide a cost savings to the Department of Defense by simulating materials prior to testing them to ensure mechanical properties will work together. Additionally, these methodologies allow for the enhanced development of technologies, such as lightweight armors, protective structures, kinetic energy active protection, ballistic shock and mine blast protection, and helmet technologies to prevent traumatic brain injury, as well as numerous other uses. The committee encourages ARL to continue the utilization of computational modeling and simulations research to achieve greater cost savings.

*Mobile protected firepower*

The committee understands that as part of the Army's modernization strategy, the Army is attempting to improve the tactical mobility and lethality of infantry brigade combat teams (IBCTs). The committee notes the mobile protected firepower (MPF) combat vehicle program would provide the Army's IBCTs with a mobile and survivable direct fire capability to defeat enemy armored vehicles, hardened fortifications, and dismounted personnel. The committee recognizes that the Army Chief of Staff has made MPF a high priority modernization program, and notes the Army is actively engaging with the industrial base to ensure clarity of requirements. The committee believes the Army is developing strategies to potentially accelerate the MPF schedule given that the current projected schedule has MPF fielding beginning in 2024.

Therefore, the committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by October 5, 2017, that outlines potential opportunities for MPF program acceleration. The briefing should include a review of testing requirements and potential areas for consolidation; funding required in fiscal year 2018 and beyond to accelerate the program;

and any areas of legislative relief that would be required in order to accelerate the program.

*Multi-function explosive material detection technology*

The committee notes that deployed U.S. military forces in the greater Middle East face a range of explosive threats from improvised explosive devices (IED), which vary based on geography, adversary technical expertise, and availability of different explosives. The committee is concerned that current explosive detection technology is limited to detecting a limited set of explosive materials. The committee is aware of research work conducted by the Joint Improvised Threat Defeat Organization and the Army in the area of multi-function detection technology between fiscal years 2012 and 2015 that had the potential of providing improved explosive material detection capability against certain threats. However, the committee was informed by the Army Armament Research, Development and Engineering Center (ARDEC) that there was no funding planned in fiscal years 2017 or 2018 to further pursue this technology due to a lack of a specific requirement. The committee is concerned that this potentially useful technology's development may be hindered as a result. Therefore, the committee directs the Director of the U.S. Army Armament Research, Development and Engineering Center to provide a briefing not later than September 30, 2017, on the mix of explosive materials that could be used to target US forces with IEDs, the variety of explosive detection technologies available, the potential utility of multi-function explosive detection technology, and an estimate of the funding necessary to accelerate work on this technology to a level that would enable thorough testing in the future.

*Open Campus*

The committee commends the Army Research Laboratory (ARL) for establishing its new Open Campus concept. The committee notes that the goal of Open Campus is to build a science and technology ecosystem that will encourage groundbreaking advances in basic and applied research areas of relevance to the Army through a unique arrangement that allows government, industry, and academia to work collaboratively on projects in common spaces. Such innovation initiated at the laboratory level reflects current practices in industry and academia, and can be a useful tool in maintaining the ability of ARL to maintain its technological competency, workforce, and facilities. The committee also encourages the Army to explore opportunities to provide stipends for temporary sabbaticals to allow academic experts to conduct research at ARL and to consider funding long-term joint assignments between academia and government. The committee recognizes that Open Campus might be a useful model for the other military service laboratories to examine to improve their collaboration as well as attract new researchers and foster new multidisciplinary teams.

*Rapid integration for emerging threats against missile system networks*

The committee is aware that there are a number of rapidly emerging threats to the integrity and security of space and missile systems and their associated networks. The committee recognizes

that the Program Executive Office for the Army Missile and Space Command is developing a capability to provide cyber-robust networked weapon systems the ability to assess and integrate rapid countermeasures to such threats. The committee understands this capability is accomplished through a unique approach to adapt to real-time threats, dramatically accelerating the timeline to employ resilience in networked weapon systems. Therefore, the committee directs the Secretary of the Army to provide a briefing to the Committee on Armed Services of the House of Representatives by March 1, 2018, on the status of progress being made through this accelerated program.

*Remote weapon system development and integration for tactical and ground combat vehicles*

The budget request included $87.6 million in PE 64601A for infantry support weapons. Of this amount, $22.5 million is for the purchase of prototypes, design improvements, and test and evaluation for a remote weapon station (RWS) that integrates a medium-caliber weapon system with a 30mm auto-cannon and a Stinger surface-to-air missile. This effort will support upgraded lethality capabilities for Army and Marine Corps tactical vehicles, including the Joint Light Tactical Vehicle (JLTV).

The committee understands these upgrades are necessary to fill emerging capability gaps identified by the Maneuver Support Center of Excellence (MSCoE) and identified in the Common Remotely Operated Weapon Stations (CROWS) Increment II Capability Development Document (CDD). The committee is aware the Army is considering upgrades to legacy remote weapon systems in order to accelerate fielding of this capability. The committee believes other alternative RWS platforms may be available that could address these capability gaps. The committee encourages the Army to consider a competitive acquisition strategy that would leverage advances made in this area by the industrial base that potentially generates better value for the warfighter, and address the capability gap without delaying fielding of this capability. However, the committee also recognizes that the Secretary of the Army can still exercise discretion in developing the appropriate acquisition strategy to meet urgent operational needs.

Therefore, the committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by August 31, 2017 that reviews the Army's current plan for acquisition and fielding of remote weapon stations for tactical and ground combat vehicles.

*Report on heavy and Stryker brigade combat team wireless intercommunication systems*

The committee understands the Army's Training and Doctrine Command conducted a requirement capability gap trace in March 2016 on wireless intercommunication systems for heavy brigade combat teams and Stryker brigade combat teams, and subsequently identified and re-certified a capability gap and standing requirements. The committee is aware the Army is conducting a Combined Arms Futures Integrated Exercise (CAFIX) assessment at the Maneuver Center of Excellence (MCoE) to identify potential technology solutions. Additionally, the committee understands that the

Program Executive Office Soldier (PEO Soldier) in coordination with the Army's Soldier Enhancement Program (SEP) is considering formal field user assessments of the wireless intercommunications systems evaluated by MCoE.

The committee directs the Secretary of the Army to provide a briefing to the House Armed Services Committee by March 29, 2018, that describes the technologies evaluated by MCoE during the CAFIX assessment, as well as provides the results of the SEP field user assessments.

*Short range air defense advanced development*

The committee believes there are significant capability and capacity shortfalls in the Army's short-range air defense artillery (SHORAD) force structure and posture. The committee notes the National Commission on the Future of the Army concluded that unacceptable modernization shortfalls can be found in SHORAD. Section 114 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) required an assessment of the ways and associated costs to reduce or eliminate capacity shortfalls in major capability areas, to include SHORAD. The committee has not received this assessment to date. However, the committee understands that the Army has conducted a Strategic Portfolio Analysis and Review (SPAR) to review 780 programs and evaluate their impact on warfighting, and that the SPAR identified SHORAD as a top priority. Given current and emerging threats, to include the proliferation of small, unmanned aircraft as well as near-peer and peer competitors' anti-access and area denial capability, the committee supports the SPAR's assessment. The committee also notes that U.S. forces can no longer assume air superiority or air dominance in future overseas contingency operations, which makes SHORAD that much more important.

The committee understands the Army is pursuing a maneuverable, protected, SHORAD capability, as well as plans to modernize legacy SHORAD capability and capacity. The committee supports these efforts and would encourage the Army to develop ways to accelerate this capability.

*Software Based Mesh Network for Tactical Communications*

The committee recognizes small dismounted teams require nodes of tactical communication that are operationally flexible, secure, reliable in austere and contested environments, and emit minimal electronic signature. Furthermore, the committee notes that satisfying these unique communications requirements often entails introduction of hardware infrastructure that degrades unit mobility, operational agility and stealth. The committee is aware of and encouraged by software-based alternatives that create secure mesh communications networks, are highly mission adaptable, hardware agnostic and scalable to larger maneuver units. As such, the committee directs the Department of the Army, in coordination with the U.S. Special Operations Command, to provide the Committee on Armed Services of the House of Representatives and the Committee on Armed Services of the Senate a briefing, not later than 90 days after enactment of this act, to include results of a market survey of existing software mesh capabilities, on its plan for ad-

dressing capability gaps in its tactical communications requirements.

*Soldier Enhancement Program*

The budget request contained $87.6 million in PE 64601A for Infantry Support Weapons. Of this amount, $3.3 million was requested for Soldier Enhancement Program (SEP) initiatives.

The committee supports the work of the Soldier Enhancement Program operated by Program Executive Office Soldier. For several years, SEP has helped the Army rapidly evaluate and type classify commercial off-the-shelf individual equipment and organizational clothing to ensure soldiers in training and in the field have the best products available. The committee encourages the Army, through SEP, to continue evaluating additional equipment in order to ensure soldiers have the best and latest equipment possible, and believes additional funding will allow the program to expand the scope of its work.

The committee recommends $90.6 million, an increase of $3.0 million, in PE 64601A for Soldier Enhancement Program initiatives.

*Soldier Power development*

The committee understands that the Soldier Power portfolio consists of the squad power manager (SPM) and integrated soldier power and data system-core (ISPDS–C) with conformal central power source (CCPS), universal battery charger (UBC), flexible solar blankets, and soldier power generation programs. The committee is aware that the SPM and ISPDS–C with CCPS Capability Production Document (CPD) received final approval from the Vice Chief of Staff of the Army on May 15, 2017. The committee understands the UBC program is currently completing low-rate initial production and is on track for full-rate production approval decision in July 2017. The committee notes these capabilities provide soldiers with expeditionary power and multiple power management alternatives all designed for combat operations in austere environments and can be tailored to any mission. The committee supports these critical programs and believes that they will help to reduce the soldier's combat carrying load. The committee encourages the Army to continue to work with the industrial base to improve and upgrade components in the Soldier Power portfolio to potentially reduce weight and cost, as well as to improve overall performance.

*Testing and evaluation of supercavitating ammunition*

The committee understands the defense industry has been investing in research and development of full caliber supercavitating ammunition for use in small arms. The committee notes supercavitating ammunition can be used in various operational environments, including air-to-air, water-to-water, air-to-water and water-to-air, and that this technology could potentially address critical mission capability gaps for the warfighter.

The committee is aware that the Government of Norway's Norwegian Defense Research Establishment has performed tests and evaluation of supercavitating ammunition and that initial assessments regarding these tests have demonstrated positive results. Given these positive results of the Norwegian government's assess-

ments, the committee encourages the Secretary of the Army and the Secretary of the Navy to consider conducting similar tests and evaluations of this technology.

Therefore, the committee directs the U.S. Army Program Executive Officer for Ammunition, in coordination with the Navy Surface Warfare Center–Crane, and any other relevant U.S. defense officials to provide a briefing to the House Committee on Armed Services by October 6, 2017, that addresses the advisability and feasibility of establishing a test and evaluation program that could provide for a full capabilities assessment.

*Underwater munitions disposal and waterjet technology development*

The committee remains concerned that the military services have programmed insufficient resources and attention towards technology that could significantly improve capabilities required for underwater explosive ordnance disposal. The committee notes the Navy continues to be threatened by mines placed in the waters in which they operate, as well as the Army having a requirement to remotely demilitarize obsolete, discarded, and unstable munitions that have become embedded in the undersea habitat, including coral, without damaging the ocean environmental habitat. As such, the committee understands the Department of Defense has a requirement for a feasible technological approach to recover a munition's chemical and explosive ordnance without removing the munition from the ocean environment that would both render a munition safe by removing the fuse, recovering the explosive material while also leaving the munitions body in place. The committee believes additional targeted research is needed to demonstrate technology capable of both remotely defeating mines threatening U.S. Naval forces, as well as providing the capability to demilitarize underwater munitions without damaging critical ocean habitat.

Therefore, the committee directs the Secretary of the Army, in coordination with the Secretary of the Navy, to provide a briefing to the House Committee on Armed Services by December 1, 2017, on research and development efforts by the Army and the Navy to further develop a prototype for underwater munition explosive ordnance disposal for the purpose stated above.

## RESEARCH, DEVELOPMENT, TEST, AND EVALUATION, NAVY

### Items of Special Interest

*Academic partnerships for undersea technology*

The budget request contained $57.8 million in PE 63680N for the manufacturing technology program.

The Navy has been studying the capacity of U.S. shipyards to maintain higher production rates for the Virginia-class submarine, while at the same time designing and then beginning construction of the first Columbia-class ballistic missile submarine in 2021. Although this is a feasible option aligned with the administration's stated strategic objectives, this scenario may present numerous schedule and affordability issues.

The committee is aware that opportunity may exist for the Navy to leverage existing relationships with higher education partners in

the Manufacturing Technology (MANTECH) program to decrease the risk the proposed concurrency at the shipyards may pose for the cost and schedule of the programs. Specifically, the committee believes greater leverage of existing partnerships within MANTECH that are focused on undersea vehicle applications relating to several key fabrication and manufacturing processes technologies, including composites, metals, and electronics, may be beneficial.

Therefore, the committee recommends $67.8 million, an increase of $10.0 million, in PE 63680N to develop increased manufacturing capability through academic and industrial partnerships to better support the needs of the submarine and undersea fleet.

*Advanced capability for 81mm and 120mm mortar development*

The committee understands that the Marine Corps has a science and technology (S&T) objective for a precision-guided, extended-range munition for the M252 81mm mortar system, and that the Office of Naval Research (ONR) is currently leading this effort. The committee is aware that ONR's goal is to demonstrate an affordable precision-guided round using a global positioning system or semi-active lasers with minimal size and weight growth that has an extended maximum range of 20 kilometers or more. The committee notes that current testing conducted by ONR in 2015 and 2016 have shown promising results, and that additional testing is planned in 2017 to demonstrate engagements in stationary and moving targets by utilizing a semi-active laser. The committee also notes that a potential employment concept option exists for either an 81mm or 120mm mortar round to be dropped from an aircraft at medium altitude with the mortar round utilizing precision guided maneuvering to strike the intended target set.

If either of these developmental and demonstration efforts are successful, the committee expects the Marine Corps to consider transitioning these validated employment concepts from S&T to a warfighting capability, and to consider developing an accelerated acquisition strategy that would utilize all available authorities to accelerate the acquisition of production ready, or near-production ready, capabilities.

*Airborne anti-submarine warfare systems*

The committee understands that the Secretary of the Navy continues to advocate for the advanced development and developmental testing of airborne anti-submarine warfare systems, including aircraft, equipment, and devices for use against all types of submarine targets. The committee notes that this includes sensors and components, processing, post-processing, data recording and display capabilities to address regional threat scenarios against surfaced or submerged conventionally and nuclear-powered submarines. The committee continues to support the rapid development of these technologies that are considered mature and provide increased operational capability through the use of the Rapid Capability Insertion program.

*Amphibious Combat Vehicle engineering and manufacturing development*

The budget request contained $179.0 million in PE 65611M for the Amphibious Combat Vehicle (ACV) program.

In testimony before the committee, senior Marine Corps officials, to include the Commandant of the Marine Corps, have described the Amphibious Combat Vehicle program as the service's highest modernization priority for the ground combat element. The committee supports the President's budget request for the ACV program. The committee commends the Marine Corps on executing an accelerated acquisition strategy that incorporates lessons learned from previous amphibious vehicle and armored personnel carrier programs. By using an incremental acquisition approach, the Marine Corps will be able to field a next generation modernized ground combat vehicle to the warfighter in an efficient and timely manner.

While the committee is encouraged by the progress of the ACV program to date, and the committee notes the program remains on cost and schedule with all engineering and manufacturing development prototype vehicles having been delivered, the committee will continue to exercise oversight on the ACV program. The committee will focus particular attention on the levels of concurrency, or overlap, that may exist between testing, and the low-rate production decision that is currently scheduled for the fourth quarter of fiscal year 2018.

The committee recommends $179.0, the full amount requested, in PE 65611M for the Amphibious Combat Vehicle program.

*Automated Testing Technologies*

The committee is aware that the Navy's Automated Testing and Analysis (ATA) program was established to expand the use of automated test methods currently in use by the Navy, such as Automated Test and Re-Test, and adds new methods of testing, promotes the use of automated test technologies, and standardizes automated test practices, methods, and tools. In addition, funding supports the development of enterprise level strategies to apply ATA technology to a broad range of software-intensive acquisition programs.

The committee applauds the Department's move to a more flexible and agile development approach for software intensive projects, but also recognizes that such activities must also be matched with the ability to do automated software assurance to improve security, and automated testing to improve software quality and effectiveness. While the Navy has struggled to develop an effective strategy for how to best utilize these technologies, the committee believes the other services and agencies are even more woefully underprepared to identify and adopt useful and effective automated testing technologies such as those demonstrated in the ATA program. The committee believes that automated tools like this could be beneficial to other service and agency test and evaluation activities for software intensive systems, and elsewhere in this bill has endorsed recommendations for how best to manage and centralize such tools to support widespread use across the services and agencies.

Therefore, the committee directs the Director of the Test Resource Management Center (TRMC) to provide a briefing to the

House Committee on Armed Services assessing the current state of the art in automated testing technologies available in the commercial marketplace by March 1, 2018. This briefing should assess the requirements for automated testing tools across each of the services and defense agencies developing software-intensive systems, include a matrix with current commercial automated testing tools that could service those requirements, a rough order of magnitude assessment of the resources needed for those tools, recommendations for making such tools available on an enterprise basis, and recommendations for measuring the use of and effectiveness of such tools, such as through quantitative goals for the reduction of time and improvements in the quality of tested software across the enterprise.

*Barking Sands Tactical Underwater Range modernization*

The budget request contained $66.5 million in PE 24571N for consolidated training systems. Of this amount, no funds were requested for research and development to upgrade the anti-submarine warfare (ASW) underwater range instrumentation needs at the Barking Sands Tactical Underwater Range at the Pacific Missile Range Facility in Hawaii.

The committee recognizes that the military's ability to conduct advanced ASW training is a critical aspect of our military technological superiority. The Barking Sands Tactical Underwater Range, which was designed, manufactured, and installed in 1994, is the largest underwater instrumented range in the world, and covers over 1,100 square nautical miles. However, the committee is concerned that the current system is beyond its 20-year design life, and rapidly becoming difficult to operate, repair, and maintain. Senior leaders within the Nation's submarine community have been on record since 2012 calling for a range replacement to begin in order to maintain worldwide ASW fleet readiness and superiority.

Therefore, the committee recommends $76.5 million, an increase of $10.0 million, in PE 24571N to support upgrading the ASW underwater range instrumentation needs at the Barking Sands Tactical Underwater Range.

*F/A–18 noise reduction research*

The committee understands that Navy testing to date on F/A–18E/F Super Hornet noise reduction concluded that engine chevron attachments achieved significant noise reduction in a limited area of the F/A–18's engine's power settings. However, the committee has also been informed by the Navy that further research is likely needed to determine if chevron attachment technology can be improved to cover a wider range of F/A–18 engine power settings, and in particular the range of settings most relevant to high-noise flight operations near naval air stations.

Therefore, the committee directs the Secretary of the Navy to provide a briefing to the House Committee on Armed Services not later than September 1, 2017, on the results of all noise reduction research complete as of the date of the briefing, its plans for continued testing of noise reduction technologies for the F/A–18E/F Super Hornet, and any possible funding needed to pursue such testing efforts in the future.

*Incremental development of Next Generation Jammer*

The committee notes that the Navy's Next Generation Jammer (NGJ) program is an element of airborne electronic attack that is required to meet both current and emerging electronic warfare capability gaps and shortfalls. The committee understands that the Navy plans to field NGJ capabilities in three increments, with each increment designed as separate podded systems that will cover a different segment of the electromagnetic spectrum. NGJ increment one is designed for the mid-band threat range, while NGJ increment two will be designed to cover frequency ranges to counter emerging threats from low-band radar systems.

The committee expects that funding already invested to develop NGJ increment one capability likely resulted in product development lessons learned that could be applied to implement efficiencies and capabilities, which could reduce the overall development cost of NGJ increment two capability. Furthermore, the committee notes that the modular open-architecture design of NGJ increment one should offer the Navy a significant opportunity to benchmark capability that could be leveraged into the design of NGJ increment two capability.

*Littoral Combat Ship immersive virtual ship environment*

The committee notes that the Littoral Combat Ships (LCS) training and certification capability is a key enabler of the reduced crew size. The Navy indicated that the LCS training is based on a virtual ship-centric concept, accomplished through a combination of classroom instruction, vendor training, shore-based trainers, and sophisticated virtual reality training systems. The committee notes that the original LCS training design relied upon using an immersive, virtual ship environment (IVSE) to replicate key training objectives and protocols for both ship variants. The committee continues to support efforts to fully employ such sophisticated training, particularly live-virtual-constructive training, for the LCS fleet with the objective of improving sailor performance through higher-fidelity, effective training solutions.

Despite the broad acknowledgement of the value of this approach to training, positive fleet feedback from the first immersive course, and the existence of a contract vehicle to support courseware development, the committee believes the Navy has been slow to leverage this capability to address readiness. The committee is concerned about the Navy's commitment to addressing the LCS training environment. In light of ongoing LCS operations and maintenance challenges, the committee encourages the Navy to more fully utilize IVSE courseware.

*Marine and hydrokinetic technology*

The committee is aware of the U.S. Navy's vision in the 30-year research and development plan for supporting energy harvesting, undersea sensor nets, and unmanned underwater vehicle operations. In order to conduct many of the development and research projects planned by the Navy, the committee recognizes the need to have sufficient infrastructure to not only test, but also to do a broader range of experimentation, prototyping, and development that will be necessary for future naval capabilities. The committee encourages the Navy, in coordination with its other Federal part-

ners, to continue its support for the development of marine and hydrokinetic technologies, including research, testing, and demonstration of maritime security systems, at-sea persistent surveillance and communications systems, and unmanned undersea vehicle charging. The committee believes that support from existing facilities, such as the Navy's Wave Energy Test Site in Hawaii and other research facilities that are supporting marine and hydrokinetic energy systems technology development, will be critical to developing the naval force of the future.

*Marine Corps and Navy small unmanned aircraft system and capability development*

The committee supports the U.S. Marine Corps pursuit of nano-sized vertical takeoff and landing small unmanned aircraft systems at the squad level to help Marines in small units enhance situational awareness. The committee notes that this plan was further supported in the 2017 Marine Corps Land Systems Investment Plan. For squad-level missions, pocket-sized sensors provide soldiers with improved intelligence, situational awareness, and enhanced targeting capability. The committee understands that this technology has been successfully demonstrated by the Army and allied militaries during operations, and believes it holds promising potential for Marine Corps operations. The committee is further aware that the Marine Corps Requirements Oversight Council approved a nano-sized and vertical takeoff and landing (VTOL) small unmanned aircraft system (SUAS) program.

The committee also recognizes that the Navy and Marine Corps are taking advantage of and increasing reliance on the many capabilities that SUAS have to offer. The committee understands that computer vision and machine learning algorithms have been used by other agencies of the federal government for the past decade for various applications ranging from face recognition to three-dimensional surface modeling. Until recently, these algorithms have required significant computational resources, and therefore, power consumption. However, because of recent technological advancements, it is now possible to place an embedded processor on a SUAS and perform a number of computer vision tasks onboard. Technologies developed by Small Business Innovative Research in the specialty of object detection, tracking, and recognition have high potential for addressing Department of Defense intelligence community surveillance and reconnaissance challenges. Automated object detection and tracking (AODT) capability for SUAS platforms applied to airborne computer vision technology have the potential to provide seamless, secure, and scalable SUAS deployed systems in support our Nation's surveillance and reconnaissance efforts.

The committee encourages the Navy and Marine Corps to advance development and implementation of nano-sized VTOL SUAS capability at the squad level, to include researching AODT integration opportunities. Therefore, the committee directs the Secretary of the Navy to provide a briefing to the House Committee on Armed Services not later than December 15, 2017, providing the status of the nano-sized and VTOL SUAS programs, a detailed discussion of the technologies being reviewed, and the acquisition

strategy for potentially implementing this capability into the Department of the Navy.

*Marine Corps female body armor*

The committee commends the Marine Corps for updating its guidance for body armor sizes to better fit Marines at both ends of the size distribution scale. Whereas before the standard for body armor sizes was to cover Marines from the 5th to 95th percentile in size, the new guidance goes further to cover the 2nd to 98th percentile in order to provide better form, fit, and function to a greater range of male and female Marines. The committee also notes that the Marine Corps made other changes to its plate carrier system to improve the fit for both smaller and larger Marines. The committee understands that the Marine Corps believes that this new sizing approach is the best way to ensure female Marines have body armor that fits properly. The committee supports these efforts.

In the committee report (H. Rept. 114–537) accompanying the National Defense Authorization Act for Fiscal Year 2017, the committee directed the Secretary of Defense to provide a briefing to the committee outlining plans to provide personal protective equipment (PPE) and organizational clothing and individual equipment developed specifically for female service members. The committee notes that this briefing was supposed to be presented by March 1, 2017; however, the Department of Defense requested additional time and now expects to deliver the briefing in late June 2017. As such, the committee remains concerned that the Marine Corps and the Army continue to take different approaches to the development of PPE, to include body armor, for female service members. Specifically, the committee notes that the Army has fielded female improved outer tactical vests, better designed female protective undergarments, ballistic combat shirts, as well as requiring female variants for the Torso and Extremity Protection System, as part of the overall Soldier Protection System. While the committee recognizes that both military services are trying to provide the best possible protection to their service members, the apparent disconnect on this issue is concerning. The committee expects the Marine Corps to fully coordinate with the Army regarding the Army's development of body armor and PPE to meet specific female needs.

Therefore, the committee directs the Commanding General, Marine Corps Combat Development Command, in coordination with the Principal Military Deputy to the Assistant Secretary of the Army for Acquisition, Logistics, and Technology, to participate in the briefing, as required by H. Rept. 114–537, to address the Marine Corps' views on the Army's female PPE efforts, as well as the Marine Corps' position on the appropriateness of adopting the Army's approach to PPE and body armor development for female service members. The committee further directs that the Secretary of Defense provide the briefing no later than September 1, 2017.

*Marine Corps Group 5 unmanned aircraft systems experimentation initiative*

The budget request included $8.0 million in PE 34240M for advanced tactical unmanned systems, of which $5.0 million is for development and capability requirements of the Marine Air Ground

Task Force Unmanned Aircraft System Expeditionary with Vertical/Short Take-Off and Vertical Landing Group 5 UAS capability (MUX).

The committee notes that these funds will allow for early trade studies, analysis, experimentation, and concept refinement for MUX capability, and that the MUX system's initial capabilities document was approved in October 2016. The committee is aware that the material development decision and analysis of alternatives is also planned to start in fiscal year 2018. The future MUX system concept is envisioned to be a multi-mission, weaponized, shipboard capable, expeditionary system that is runway independent for all weather, long-range, and persistence operations from the sea in a contested environment. The MUX effort will inform future program scope and phasing for development of a MUX capability that is planned to be part of a future program of record, supporting Expeditionary Force 21 Operating Concepts.

The committee looks forward to engaging with the Marine Corps as the MUX capability becomes more refined in the future. The committee also encourages the Commandant of the Marine Corps to proactively keep the committee apprised of concept refinement and any developmental efforts regarding the MUX capability.

The committee recommends $8.0 million, the amount of the request, in PE 34240M for advanced tactical unmanned systems.

*Maritime Strike Tomahawk*

The budget request contained $133.6 million in PE 24229N for Tomahawk mission planning and development. Of this amount, $114.8 million was requested for the Maritime Strike Tomahawk program.

The committee remains concerned about the Navy's ability to relieve the back-loading of development funding for the Maritime Strike Tomahawk (MST) effort. The vision of the Navy regarding the MST program implementation is to install the MST components in missiles concurrently with the Tomahawk missile recertification program. The committee supports this expanded research and development of the MST capability and the concurrent delivery of the MST effort with the Tomahawk recertification process.

The committee recommends $123.8 million, an increase of $9.0 million, in PE 24229N for the Maritime Strike Tomahawk program.

*Modification to independent review of F/A–18 physiological episodes and corrective actions as required by section 237 of the National Defense Authorization Act for Fiscal Year 2017*

Section 237 of the National Defense Authorization Act for Fiscal Year 2017 (PL 114–328) required an independent review of F/A–18 Physiological Episodes (PEs) and corrective actions. The findings of the Independent Review are to be sent to the congressional defense committees by December 1, 2017.

The committee notes that in June 2017 the Navy issued a Comprehensive Review (CR) examining the facts, circumstances and processes surrounding the recent PEs involving T–45 and FA–18 aircrew, including recommendations for how best to address this ongoing problem. The Committee notes with concern the CR's finding that at least four deaths have been related to incidents involving mishaps involving PEs over the past several years.

Therefore, as part of the Independent Review required by Section 237 of PL 114–328, the committee directs the Secretary of the Navy to provide further information on the service's effort to address this problem in the immediate and long term. This information should include, but not be limited to, addressing the findings and recommendations provided in the June 2017 CR including the Navy's plans (including aircraft design changes) to address the following:

(1) execution of a depot-level deep dive inspection of the entire F/A–18 environmental control system and onboard oxygen generation system, to include associated sub-components and piping;

(2) replacement of the F/A–18 cockpit altimeter;

(3) redesign of F/A–18 aircraft life support systems as required to meet onboard oxygen generation system input specifications;

(4) development of comprehensive F/A–18 physiological event resolution instrumented data plans including multi-media in-flight audio/video recording;

(5) design of an F/A–18 automatic or semi-automatic initiation of emergency oxygen;

(6) design of an F/A–18 automatic ground collision avoidance system;

(7) designs for improved FA–18 physiological monitoring and alerting systems;

(8) how all improvements to the F/A–18 aircraft will be included in future F/A–18 production.

The information provided by the Secretary of the Navy should also include an assessment of whether the Navy and the Independent Review Team have the Resources necessary to carry out its mission. Should resources be found to be insufficient, the Secretary of the Navy shall include an estimate of what resources are necessary.

*MQ–25 Unmanned Air System*

The committee notes that the MQ–25 Unmanned Air System program is programmed to provide an air refueling capability. The committee supports this unmanned air refueling capability and believes that it is critical that the Navy integrate an unmanned aerial vehicle into carrier aviation operations to increase the striking power of carrier air wings.

However, the committee is concerned that while the MQ–25 program continues to leverage Unmanned Carrier-Launched Airborne Surveillance and Strike (UCLASS) requirements justification, the most recent documentation that was sent to industry did not include precision strike capability as a requirement. The committee believes that the Navy may be unnecessarily excluding a critical capability and precluding future growth in a platform that will likely be integrated into the carrier air wing for the next 30 years.

Finally, the committee directs the Comptroller General of the United States to submit a report to the congressional defense committees by March 1, 2018, on the Navy's carrier based unmanned aircraft acquisition program(s), with specific focus on the MQ–25 that takes into account the revised capability development document. At a minimum the report should include: (1) the extent to which the program(s) have established cost, schedule, and performance goals, including test, production, and fielding plans; and (2) an assessment of program progress toward meeting those goals.

*Naval energetic materials roadmap*

The committee is aware that energetic materials, including both explosives and propellants, are critical components to Navy weapon systems and munitions. While the committee is aware that Navy laboratories and engineering centers have been involved in some research into energetic materials, the committee is concerned that these investments have not been strategic in scope or direction. Much of the ongoing work is devoted to sustaining legacy formulations for energetic materials, not investing in new or revolutionary propellants or explosives.

Therefore, the committee believes that the Navy should pursue a renaissance of its energetic materials enterprise and directs the Secretary of the Navy to develop a long-term science and technology roadmap for the development of energetic materials, both explosives and propellants. In developing this roadmap, the committee believes that Navy should consider the identification of the long-term research opportunities for the Navy for energetic materials; an assessment of the current laboratory and engineering infrastructure to meet the needs of this roadmap; and a resourcing strategy. The committee further directs the Secretary of the Navy to provide a briefing to the House Committee on Armed Services by March 2, 2018, on the plan.

*Passive rocket propelled grenade armor protection technology*

The committee notes there have been significant improvements in passive rocket propelled grenade (RPG) armor protection over legacy RPG armor systems, which are heavy and cumbersome, as well as present form, fit, and function constraints, particularly for Marine Corps ground combat tactical vehicle fleets operating in expeditionary environments. The committee encourages the Secretary of the Navy to consider lightweight RPG armor solutions that provide protection against RPG attacks, while maintaining the ability to fold flat against the vehicle to allow for rapid deployment and transport from amphibious ships and aircraft.

*Scalable energy and chemical conversion system*

The committee supports continued research by the Office of Naval Research into the development of a scalable energy and chemical conversion system. The goal of this research and development project is to convert small waste-energy sources, such as landfill gas, animal digester gas, sewage treatment plants, agricultural and forest product wastes, and wellhead flare gas, into useful fuels and chemicals. The committee is aware that a demonstration effort could take waste methane emissions from a solid-waste landfill, clean and desulfurize the methane, and then convert it catalytically into gasoline. Once fully piloted, it is anticipated that such plants would not only reduce or eliminate their fugitive methane emissions, but also the methane captured could be converted into a useful fuel with only a 2-year payback period before it becomes a positive cost contributor to the overall waste collection and disposal process. The committee encourages this research as a way to potentially reduce fuel cost for the military, and potentially address supply chain concerns in forward areas.

*Torpedo defense*

In 2010, the Chief of Naval Operations issued an urgent operational need for a robust surface ship torpedo defense (SSTD) system to address a range of torpedo threats facing the Navy's high value units. In response, the Navy accelerated research and development efforts of torpedo detection and defense capabilities, resulting in the deployment of a towed array sensor system and passive sonar signal processing, automation, and tactical control system four years ahead of its original schedule. Today, five systems with more than 20,000 operational hours are deployed on aircraft carriers, with active sonar upgrades to be delivered for all systems in 2017. In parallel, industry has continued to implement planned technology upgrades, with Department of Defense officials confirming that the most recent sea trial successfully identified system achievements and further development priorities.

The committee notes that these improvements have occurred against the backdrop of increasing torpedo threats as other nations become more aggressive in the maritime domain. While the intended goal was to develop a full SSTD capability for a program of record while supporting deployed systems, the committee understands that accelerating the program in this manner impacted funding originally planned for the program of record development. The committee appreciates the Navy's plan to use the results of the 2017 Quick Reaction Assessment (QRA) to help inform and validate the size and scope of planned future investments in this critical technology. While the committee also supports the Navy's interim plan to fully fund necessary upgrades to ensure the highest operational availability and performance of currently deployed CVN systems, the committee notes that the FY2018 SSTD budget request does not provide full funding to achieve this goal, let alone enable appropriate program planning and adjustments that may result following a successful QRA. As such, the committee believes that this capability is essential to support the fleet and will continue to monitor this program.

In addition, the committee notes that through the SSTD program, the Navy has expended significant resources to develop advanced Torpedo Warning System (TWS) software and algorithms for torpedo detection, classification and localization that could be used to enhance torpedo warning capabilities on surface ships, particularly combatants that carry a MultiFunction Towed Array (MFTA). This expanded utilization of the TWS capability aligns with the Navy's efforts to work across domains to leverage existing systems and programs to achieve efficiencies while addressing requirements effectively. Therefore, the committee directs the Navy to provide a briefing to the House Committee on Armed Services, no later than November 1, 2017, on the ability to integrate applicable surface ship torpedo defense technologies to support an expanded range of ships and the results of the QRA and related testing events. At a minimum, this briefing shall include an in-depth analysis of: the current and foreseeable torpedo threats facing surface combatants; requirements for a torpedo defense capability on surface combatants; the applicability of the Navy's existing test and operational data regarding the torpedo defense system to surface combatants; and cost savings that would be achieved by capital-

izing on the integration of mature SSTD capabilities on a broader range of surface ships.

*Workforce management at Navy test ranges*

The committee notes that Navy elements of the Major Range and Test Facility Base (MRTFB) operate under the Navy Working Capital Fund (WCF). As such, their workforce management should be dictated by section 2208 of title 10, United States Code, which allows for flexibility in decisions to expand the workforce driven by the funded work coming in from other Navy or government customers. However, other parts of the MRTFB, which in the other military services do not operate in a WCF, use a billeting system to manage the workforce. The committee notes that such conflicting workforce management methods can prove to be problematic when funding work across the MRTFB enterprise. The committee is concerned that this uncertainty may be posing challenges for planning at these Navy test ranges.

Therefore, the committee directs the Secretary of the Navy to provide a briefing to the House Committee on Armed Services by October 2, 2017, on the workforce management policies at Navy MRTFBs, including any shortfalls in staffing, conflicts in guidance between WCF organizations and MRTFB organizations, and recommendations for improving hiring and talent management at these facilities.

## RESEARCH, DEVELOPMENT, TEST, AND EVALUATION, AIR FORCE

### Items of Special Interest

*Adaptive engine transition program*

The committee continues to support Department of the Air Force efforts to mature technology and reduce the risk for the adaptive cycle engine (ACE). The committee notes that the Department of the Air Force has given official engine designations to the two competing ACE concepts. The committee also understands that significant accomplishments validated by the Department of the Air Force include the designation of technology readiness level six for the adaptive fan technology, completion of a preliminary design for an ACE, and validation of third stream cooling air operation for aircraft and engine heat sink capacity. Accordingly, the committee believes that both legacy and future aircraft can benefit from this technology and capability.

Therefore, the committee recommends the full amount requested in PE 64858F to continue the adaptive engine transition program, and further encourages the Department of the Air Force to continue to make the necessary investments in these critical technology demonstrations and engine developments to ensure achieving operational capability at the earliest opportunity.

*Advanced laser technologies for coating removal, surface restoration, and repair*

The committee recognizes the mission critical importance of using cutting-edge technologies in Air Force service depots. The committee notes that technologies such as advanced laser coating removal, repair, and additive restoration of aircraft skin made of

metal and composite materials results in significant increases in warfighter system readiness, sustainability, better environmental outcomes, and cost savings. By improving and upgrading laser technologies and incorporating them into aircraft life cycle, depot, and field programs, the Air Force has estimated a significant annual cost savings across all airframes and other Air Force systems and ground support equipment. Additionally, the Air Force has estimated environmental hazards due to coating removal at depots to be reduced by 50 percent through the use of laser technologies. Therefore, the committee encourages the Product Support Engineering Division in the Air Force Life Cycle Management Center, in support of the Air Force depots, to qualify and incorporate advanced laser technologies for de-painting, restoration, and repair of aircraft surfaces for both metal and composite surfaces.

*Advanced pilot training program*

As the Department of the Air Force continues to recapitalize its combat aircraft with fifth generation fighters and bombers, the committee is becoming increasingly concerned with the T–38C's inability to safely and affordably train the Department of the Air Force's incoming pilots. In the committee report (H. Rept. 114–537) accompanying the National Defense Authorization Act for Fiscal Year 2017, the committee noted that the average age of aircraft in the T–38C fleet is 50 years, with an average of over 16,000 flight hours on each aircraft. As a result, the committee believes that the T–38 is reaching the end of a safe and viable service life, and is increasingly unable to provide the modern pilot training required by the Department of the Air Force. The committee notes that the APT program office is currently engaged in the in-source selection phase to evaluate proposals received by the submission deadline of March 30, 2017, and that contract award is anticipated to occur late in 2017. Upon contract award, the committee understands that the program will enter a limited development phase to finalize and verify system design prior to a production decision planned for fiscal year 2022. The committee also understands that the Air Force plans to make a full rate production decision and declare initial operating capability in 2024. Further, the Department of the Air Force plans to attain full operating capability of the APT system in 2034. The committee notes that the costs of sustaining the T–38C fleet are growing even as aircraft availability is decreasing, and that the T–38C was originally intended to undergo replacement in the mid-1990s. Accordingly, the committee continues to believe that any delay to the APT program will place the Department of the Air Force combat readiness at risk, and that maintaining or accelerating the current APT program schedule is required to ensure safe and effective training of Department of the Air Force combat pilots.

Therefore, the committee recommends the full amount requested in PE 64233F to continue the T–X program. The committee also directs the Secretary of the Air Force to provide a briefing to the House Committee on Armed Services not later than January 15, 2018, on potential options to accelerate the APT program, subsequent to contract award.

*Air Force dual-mode missile testing and evaluation*

The committee understands the Department of the Air Force's plans to complete development and fielding of the GBU–53 Small Diameter Bomb II (SDB II) weapon, with initial operational capability on F–15E aircraft planned in fiscal year 2019. The committee notes that the SDB II has a three mode sensor that provides capability against many target sets in a variety of conditions. The committee also notes that, based on the 2016 selected acquisition report to Congress, the average procurement unit cost for the GBU–53 is approximately $140,000 per weapon. The committee supports continued development, production, and fielding of the GBU–53.

However, the committee also encourages the Department of the Air Force to look at less expensive dual-mode missiles that, if proven effective and fielded in quantity, could help increase precision munition stocks. In particular, the committee is concerned that the Department of the Air Force may struggle to meet anti-armor precision weapon stock requirements in a U.S. European Command context. Therefore, the committee encourages the Department of the Air Force to conduct integration testing with any dual-mode, air-launched, anti-armor missiles currently in production and available to the Department of the Air Force, including the Brimstone missile now in service with the United Kingdom of Great Britain and Northern Ireland and the Kingdom of Saudi Arabia, or other similar weapons.

*Air Force test and evaluation support*

The budget request contained $678.3 million in PE 65807F for the Department of the Air Force. Of this amount, the budget request contained $640.8 million for Department of the Air Force test and evaluation support. The committee notes that test facilities capabilities and resources operated through this program include wind tunnels, rocket and jet engine test cells, armament test ranges, civilian payroll, and contractor services.

Department of the Air Force officials have informed the committee that funding for test and evaluation support is about $30.0 million below its historical norm, and that this funding erosion has diminished the ability of the Air Force Test and Evaluation (T&E) enterprise to support T&E of next generation capabilities in the near-term. Therefore, the committee recommends an increase of $30.0 million for this purpose.

Additionally, the committee understands that due to late resolution of a collective bargaining agreement for a test range operations and maintenance contract, the determination of required increases for pay and benefits did not occur in time to be addressed in the fiscal year 2018 budget request. The Department of the Air Force has informed the committee that the shortfall amount is $2.4 million, and without these funds, critical support to ongoing testing of weapons systems and support for operational training activities would be in jeopardy. To address this shortfall, the committee recommends an increase of $2.4 million.

Finally, the committee understands that the Department of the Air Force does not have a validated requirement for joint threat emitters (JTEs) at all test ranges. However, the committee believes that the installation of JTEs on all test ranges would enhance tactical fighter pilot training, particularly for pilots flying fifth genera-

tion aircraft at nearby locations. Therefore, the committee encourages the Department of the Air Force to reconsider its requirement for JTEs at all test ranges.

In total, the committee recommends $710.7 million, an increase of $32.4 million, in PE 65807F for Air Force test and evaluation support.

*Assessment of Air Force Test Center*

The committee acknowledges the importance of the Air Force Test Center (AFTC) and the invaluable developmental test and evaluation (DT&E) of air, space, and cyber systems conducted throughout the AFTC enterprise. The AFTC enterprise leverages its 31 locations across the U.S., 100-plus aircraft, and a workforce of 18,000 strong to carryout complex electronic warfare testing, airframe and avionics testing, propulsion testing, C4ISR testing, and weapons integration. The Committee notes that through the AFTC the Air Force has successfully tested equipment and aircraft in a realistic and cutting-edge environment, ensuring the U.S. maintenance of airpower superiority.

While the Committee believes that the AFTC should continue to serve as the cornerstone of Air Force's test and evaluation enterprise, the Committee understands that the AFTC faces unique challenges in carrying out its mission. These challenges include funding for critical sustainment, restoration, and modernization of test capabilities; development and growth of hypersonic infrastructure and testing capabilities; and increasing workforce recruitment and retention. The committee directs the Secretary of the Air Force to submit a report on its assessment of these challenges and plans to address such challenges to the House Committee on Armed Services by March 1, 2018.

*Battlefield airborne communications node program*

The committee notes that the battlefield airborne communications node (BACN) system was initially developed to meet an urgent warfighter need, and continues to provide critical communications and information sharing capability between disparate tactical data and voice networks in some of the most challenging and important environments around the world. The committee appreciates the Department of the Air Force's efforts to establish a program of record, and encourages continued progress towards this goal.

In addition, the committee encourages the Secretary of the Air Force to continue the planning and establishment of a BACN program of record while continuing to meet ongoing warfighter requirements in theater. As part of the program's future, the committee encourages the Secretary to begin system modernization planning in support of anticipated future requirements across multiple theaters to ensure that BACN capability is maintained in the Department of the Air Force to support joint operational communications, 5th Generation communications, Combat Cloud, and data networking requirements.

*Educational Partnership Agreements*

The committee is aware that the Air Force performs a wide range of advanced research and engineering in multi-disciplinary design for unmanned air platforms. Further, the committee recog-

nizes that advanced modeling and design, as well as quicker comparative analyses, are beneficial to this effort. The committee believes that academia is well-suited to partner with the Air Force on modeling, design, and comparative analysis through the use of Educational Partnership Agreements, which are mutually beneficial agreements that also may enhance the Air Force's effort to recruit a diverse and educated workforce. The committee encourages the Air Force to leverage Educational Partnership Agreements for advanced research and engineering for unmanned air platforms.

*F135 aircraft engine component improvement program*

The budget requested contained $32.3 million in PE 27268F for the F135 aircraft engine component improvement program.

The committee notes that the F135 component improvement program (CIP) provides the only source of critical sustaining engineering support for this in-service propulsion system. Engine CIP maintains flight safety, fixes in-service revealed deficiencies, and improves system operational readiness and reliability and maintainability (R&M) to reduce propulsion system life-cycle cost and sustain the propulsion system throughout the service life of the aircraft. With most F135 systems design and development funding ending in fiscal year 2018, CIP funding will be a critical part of efforts to maintain single engine safety and support of the F–35 fleet.

The committee notes further that in 2015 the F135 CIP successfully completed a full service life demonstration test, and that the program continued in 2016 with an engine assembled and delivered to test by the end of the year. In addition, the program is now positioned with multiple tasks for design and development which will contribute to the planned course of reliability specification requirements. The committee believes that continued funding of CIP will ensure that necessary improvements can be properly fielded following planned task design, development, and test validation.

The committee recommends $32.3 million, the full amount requested, in PE 27268F for the F135 aircraft engine component improvement program.

*High-efficiency heat exchangers*

High-efficiency heat exchangers are becoming increasingly necessary for engines and aircraft, such as the F–35, that generate more heat as more advanced capabilities, and thus increased weight, are added to the platform. The committee is aware that current thermal management systems (TMS) may be limited by traditional manufacturing processes, and that additive manufacturing is crucial to next-generation TMS. Therefore, the committee encourages the Air Force to make investments in additive manufactured TMS.

*High-speed, anti-radiation missile targeting system pod block upgrade program*

The budget request contained $15.1 million in PE 27136F for manned destructive suppression, but included no funds for a high-speed, anti-radiation missile targeting system (HTS) pod block upgrade program.

The HTS pod is currently the only reactive suppression of enemy air defenses capability and enables the F–16 pilot to detect, iden-

tify, and locate hostile ground-based emitters. Additionally, the HTS pod provides the precise geo-location capability necessary to employ precision-guided munitions to destroy fixed and mobile enemy air defense systems.

The committee understands that component obsolescence diminishes the availability of HTS pods, and that the Department of the Air Force is currently managing this issue by using a part-by-part replacement approach that will maintain pod inventory, but will not increase the capability of the system since any re-design efforts are limited to form-fit-function constraints. The committee believes that this process may result in more advanced and agile threat systems outpacing the capability of the HTS pod. To address this issue, the committee believes that development of a block upgrade program would be a more efficient option to mitigate the impact of obsolescence in a single development cycle, and to provide the capability enhancements necessary to defeat future adversary threat systems.

Therefore, the committee recommends $35.1 million, an increase of $20.0 million, in PE 27136F for manned destructive suppression to begin a block upgrade program for the HTS pod.

*Hypoxia research collaboration*

The budget request contained $245.9 million in PE 63115DHA for medical technology development for promising candidate solutions for defense medical challenges.

The committee recognizes the challenges posed to military pilots from hypoxia, and notes the recent significant hypoxia challenges with the Navy's F/A–18 Hornet and F/A–18 Super Hornet fleets, and the grounding of Navy T–45C Goshawk training aircraft. The committee believes that the Air Force should be maintaining a robust aerospace research program focused on hypoxia research to enhance human resiliency and performance within extreme and variable cognitive and physical environments. The committee also believes that deeper relationships with universities and non-profit research institutes can be a useful mechanism to deepen the bench of expertise focused on these challenges. Finally, the committee encourages the Air Force to work with the Navy as it designs its research plans to ensure that hypoxia research efforts are fully coordinated across the Department of Defense.

Therefore, the committee recommends $250.9 million, an increase of $5.0 million, in PE 63115DHA to expand collaboration on hypoxia research for the Air Force.

*Joint Surveillance and Target Attack Radar System Recapitalization program*

The committee is aware of the progress to date being made by the Joint Surveillance Target Attack Radar System (JSTARS) Recapitalization program in the effort to replace the legacy E–8C JSTARS platform. In accordance with the waiver authority provided in section 223 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328), regarding the limitation on availability of funds for the JSTARS Recapitalization program, the committee notes that the Secretary of Defense waived the congressional requirement to have a firm-fixed-price contract structure for the engineering and manufacturing development phase of the pro-

gram. The committee expects the Secretary of the Air Force to keep the committee informed regarding the radar risk reduction effort, eventual source-selection and contract award for the aircraft, progress towards achieving a milestone B award. The committee also expects to be informed regarding any efforts that could be implemented to enable program acceleration without inadvertently increasing program cost, schedule, or risk beyond that are already planned for the program. Finally, the committee supports the current acquisition strategy and discourages any alteration to the strategy that would rely upon the use of a private-sector lead systems integrator.

*Light Attack Aircraft Experiment Report*

The committee is aware that the Air Force is conducting a Capability Assessment of Non-Developmental Light Attack Platforms run by the Air Force Strategic Development Planning and Experimentation Office with inexpensive, light attack aircraft to determine what missions such aircraft could perform, how well, and the efficacy of creating a 'high/low' aircraft capability mix within the Service. The committee supports service-wide efforts to explore innovative solutions that lower costs. The possibilities afforded by highly capable, low-cost, and low cost-per-flying-hour aircraft include: dramatically reducing the use of existing legacy and 5th Generation aircraft in low-threat insurgency-type environments, reducing the Service's yearly operations and support costs, offering increased joint training opportunities with ground forces, improving international partnerships and capacities, and helping to solve pilot absorption issues by dramatically increasing the amount of fighter mission flying time trained pilots receive every month. The committee does not believe that light attack aircraft can replace the high-end capabilities of aircraft such as the A–10 or F–35. The committee notes that these lower cost aircraft can be operated as supplement to, and thereby maximizing the life of, these important aircraft for the near-peer fight, were that to be necessary.

The committee directs the Secretary of the Air Force to submit a report to the House Committee on Armed Services by December 31, 2017, on the results of the OA–X experiment. If the Secretary has concluded that an OA–X program will effectively complement the existing force structure, reduce costs, and improve pilot training and proficiency, and that such a program should proceed expeditiously, the Secretary is encouraged to provide the Congress with a supplemental funding request and acquisition plan.

*Metals Affordability Initiative*

The committee is pleased by the continuing work of the Air Force Research Laboratory to decrease costs and weight of high-performance metals for use in airframes, engines, and other structures and devices through the Metals Affordability Initiative. Technologies produced through this program have aided many major weapons systems, including the F–35, C–130, and legacy aircraft such as the F–15 and F–16. The committee encourages the Air Force to continue the work of this innovative public-private partnership.

*Remote and stand-off detection of weapons of mass destruction threats*

The budget request included $124.7 million in PE 62201F for Aerospace Vehicle Technologies, but contained no funding for technology development research for remote and stand-off detection of weapons of mass destruction using remotely piloted aircraft.

The committee encourages the Department of Defense and the Air Force to leverage existing work to increase focus regarding the development of weapons of mass destruction sensor technology that could be potentially integrated on remotely piloted aircraft. The committee understands that analyzing and applying chemical plume tracking behavior could potentially lead to opportunities to address current requirements for improved detection and location of sources of chemical, biological, radiological and nuclear targets, and recovery of endangered personnel through the integration of this sensor technology on remotely piloted aircraft.

The committee recommends $129.7 million, an increase of $5.0 million, in PE 62201F to accelerate technology development for remote and stand-off detection of weapons of mass destruction using remotely piloted aircraft.

*Reusable hypersonic vehicle structure*

The committee is aware of the importance of hypersonic research to future defense needs. The committee notes that the Air Force has reinvigorated its work in this area, and in conjunction with the Defense Advanced Research Projects Agency, has been exploring near-term weapons systems options. The Air Force has also recently announced a new initiative to explore a reusable hypersonic vehicle, which will require investments to better characterize the materials properties, flight dynamics properties, and vehicle and wing structure that might be necessary for such a vehicle. The committee supports the goals of the Air Force initiative, and encourages the use of a consortium, including research universities, non-profit research institutes, industry partners, and other government laboratories, to focus on areas of thermal and mechanical load predictions through the use of computational models validated with limited hypersonic wind tunnel testing.

*Robust electrical power system for aircraft*

The budget request contained $104.5 million in PE 603216F for the development and demonstration of electrical power, thermal management, and distribution for aerospace applications.

The committee recognizes the Air Force is highly focused on developing directed energy weapons systems, both for aircraft self-protection as well as to provide offensive capability for future aircraft. In order to meet those goals, the Air Force will not just need a lasing system and optics with the size and weight to be incorporated into aircraft-sized systems, but it will also need a power generation system that can meet all of these new power demands in addition to all of the other electrical and avionics subsystems on these aircraft. The committee encourages the Air Force to focus developmental work on the aerospace electrical power for lightweight and efficient power technologies needed for those future aircraft concepts.

Therefore, the committee recommends $109.5 million, an increase of $5.0 million, in PE 603216F to enable the design, fabrication, and ability to test components in a ground demonstrator to support a robust electrical power system for future aircraft needs.

*Technology transition efforts*

The budget request contained $840.7 million in PE 604858F for efforts to demonstrate technologies and concepts to accelerate the transition to acquisition programs of record and operational use.

The committee recognizes the need to provide more opportunities to mature and demonstrate technology in order to improve acquisition outcomes and get new technology in the hands of the warfighter more rapidly. The committee also recognizes that without some dedicated funding to help bridge the "valley of death" between research efforts from the labs and acquisition programs of record, the warfighter will continue to be challenged with maintaining technological superiority and keeping a qualitative technological advantage over potential future adversaries. The committee encourages the Air Force to continue using this program element line to conduct large scale demonstrations, as well as to take greater advantage of cost-matching with its industry, academic, and other Government partners in order to support key technology areas, like system performance modeling and simulation, additive manufacturing, demonstrations, and rapid evaluation of systems-of-systems prototypes.

Therefore, the committee recommends $850.7 million, an increase of $10.0 million, in PE 604858F for cost-matched technology transition efforts.

RESEARCH, DEVELOPMENT, TEST, AND EVALUATION, DEFENSE–WIDE

Items of Special Interest

*Accumulation of section 219 funds*

The committee is aware that section 219 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Public Law 110–417) provided new authorities to allow the Department of Defense laboratories to set aside funds for activities to improve the labs' ability to conduct defense missions. That authority included the use of these funds for some minor military construction projects that would help alleviate the backlog in modernization needed to keep the labs at the cutting edge of research. The provision was further modified by section 262 of the National Defense Authorization Act for Fiscal Year 2014 (Public Law 113–66) to allow these funds to be accumulated for up to 5 years.

However, the committee is aware that to date, no actions have been taken to implement the new authority allowing the accumulation of funds among any of the military services. While there has been some discussion about difficulty in establishing the accounting procedures to account for these funds, the committee is not aware of any formal determination or explanation of the reasons for not implementing this authority. The committee is concerned that the Department, despite the widespread support for these authorities among the Department of Defense laboratories, has not provided sufficient attention to this issue to work through any difficulties.

Therefore, the committee directs the Secretary of Defense, in coordination with the Secretaries of the military departments, to provide a briefing to the House Committee on Armed Services by January 15, 2018, on the status and challenges of implementing subsection (b)(3) of section 219 of Public Law 110–417, including recommendations for actions that might support implementation.

*Additive manufactured parts*

The committee is aware of the significant possibilities that additive manufacturing, or 3–D printing, will provide to the Department of Defense, both in revolutionizing the industrial supply chain, as well as in providing radically new technological capabilities. The ability to utilize new materials in new ways, such as titanium or explosives, or to develop new manufacturing processes, has the potential to transform how the Department does business. The establishment of new Defense Manufacturing Innovation Institutes, as well as the growing prevalence of 3-D printers at tactical levels, indicates the Department sees that potential as well. Additive manufacturing could also greatly improve the organic industrial base's ability to respond to demands that original equipment manufacturers are unable to meet or to fabricate obsolete parts that are no-longer manufactured.

The committee understands that an inhibitor to seeing the full potential of this technology will be the need to do quality assurance and validation of additive manufactured parts, especially for those in flight or safety-critical systems. Until the Department can develop the standards and processes for assuring quality, 3-D printing will be limited in its application. Also, substantial room remains across the force to add more capacity for this capability, both to repair out-of-date equipment and to speed repair in order to meet urgent operational requirements.

Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services not later than December 1, 2017, on the Department's plans to develop and improve additive manufacturing. The briefing shall include the Department's plans to: develop military and quality assurance standards as quickly as possible; leverage current manufacturing institutes to conduct research in the validation of quality standards for additive manufactured parts; and further integrate additive manufacturing capabilities and capacity into the Department's organic depots, arsenals, and shipyards.

*Briefing on improving overseas security from UAS threats and existing authorities to use countermeasures*

The committee is aware that servicemembers and operational security are threatened by the global proliferation of unmanned aerial systems. Adversaries ranging from ISIS to North Korea have employed UAS of varying sophistication in capacities including offensive operations and reconnaissance. Because of the commercial availability of these systems, their relative affordability and ease of use, this trend is likely to continue into the future.

The committee is also aware of developments in counter-UAS strategies which have the capability to reduce this threat. Options range from sophisticated EW jamming technologies to specially trained birds of prey, such as those used to protect the May meet-

ing of NATO leaders. The committee believes a tiered approach to installation self-protection including multiple defensive measures is ideal. However, the committee notes the authorities employed to interdict UAS can vary greatly by host country. Therefore, the committee requests a briefing from the Secretary of Defense no later than September 30, 2017, on emerging technologies and techniques for counter-UAS installation security and force protection at locations with such requirements and any challenges to meeting requirements due to host nation law, rules, and regulations.

*Common Analytical Laboratory System*

The Common Analytical Laboratory System (CALS) would provide the U.S. military with a common platform across all the military services for analyzing, diagnosing, and investigating chemical, biological, radiological, and nuclear (CBRN) agents at home station or when forward deployed. Currently, each military service uses its own system requiring different training across each platform and differing sustainment resources and investments. The committee believes CALS will not only provide increased capability for analyzing, diagnosing, and investigating CBRN agents, but that commonality will also result in costs savings and other efficiencies. Therefore, the committee encourages the Department of Defense to continue its investment in CALS.

*Cyber Grand Challenge*

The committee recognizes the value in researching, testing, developing, and wargaming autonomous systems, artificial intelligence, and cyber tools in order to enable the Department of Defense with advanced systems and platforms. The committee recognizes that the Cyber Grand Challenge conducted by the Defense Advanced Research Projects Agency is an excellent example of such an engagement, in which the construct was productive and the purpose was critical. It is imperative that lessons learned from the Cyber Grand Challenge and other such exercises are not forgotten and that the Department work to incorporate the technology, lessons learned, and process into future research, development, testing, and evaluation. The committee encourages the Department to harness these lessons and ensure increased collaboration with the operational cyber mission forces as a way to get those emerging technologies into the hands of the warfighter. The committee believes the Department should continue to develop the technological advances displayed at Cyber Grand Challenge, and to consider incorporating these lessons, ideas, and challenge opportunities into other exercises moving forward.

*Defense genomics research and training*

Given recent advancements in genetic engineering, synthetic biology, and the genomic sciences, the committee is interested in advancing the genomics work performed by the U.S. Army Medical Research Institute of Infectious Diseases (USAMRIID) as a way to more effectively identify, monitor, and potentially counter emerging biological threats. The committee also notes that current research and development efforts underway in the Defense Advanced Research Projects Agency and the Defense Threat Reduction Agency may offer collaborative opportunities when combined with

USAMRIID's expertise and institutional knowledge. Therefore, the committee encourages a more robust and rapid collaborative effort between these organizations within the Department of Defense to more effectively deal with emerging biological threats.

*Department of Defense laboratories and engineering centers*

The committee is aware that vital work is being conducted at Department of Defense laboratories and research and engineering centers, along with the laboratories of the military services. The committee has previously noted its concern about the state of research facilities, office space, and other infrastructure at some of the Nation's premier labs. That concern was reiterated in a January 2017 report from the Defense Science Board, titled "Defense Research Enterprise Assessment." This report quantified the average age of facilities being between 45–50 years, and "found examples of dysfunction regarding infrastructure planning and operation."

Modern buildings, equipment, and other resources are vital to ensuring that the military services stay at the cutting edge of technology and are recruiting and retaining the most talented scientific personnel, but are not adequately or comprehensively addressed by laboratory, science and technology, or military service leadership. Therefore, the committee encourages the Department and other services to prioritize recapitalizing, refurbishing, and otherwise modernizing facilities at military service research laboratories and research and engineering centers.

*Deployable assured position, navigation, and timing systems*

The committee notes that the Department of Defense has several urgent research and development efforts underway to ensure that critical position, navigation, and timing (PNT) systems remain effective into the future as part of an assured PNT (A–PNT) program of record. The committee supports these efforts and believes that the threat to PNT capability is increasing and likely warrants an aggressive approach by the Department to stay ahead of the problem. The committee notes that the Army Rapid Capabilities Office is exploring a range of potential A–PNT alternatives in which existing technologies could efficiently meet near-term operational needs in the European theater. As the A–PNT program of record continues to progress, the committee expects that manufacturers of existing technologies will have the opportunity to bid on A–PNT contracts for the development of materiel solutions as part of the program of record.

Therefore, the committee directs the Under Secretary of Defense for Acquisition, Technology, and Logistics to provide a briefing to the House Committee on Armed Services by September 1, 2017, that includes the following: a summary of the Department's current programs related to assured PNT; the current requirements for the programs in terms of size, weight, power, resilience against kinetic and non-kinetic effects, and other factors; the current schedule and cost estimates for such programs; and any opportunities for potential acceleration of these efforts.

*Energy storage modules*

The committee supports continued research and development of directed energy weapons, including those capable of use on high-altitude aircraft. In order to make that goal achievable, the committee notes its concern surrounding the availability of energy and pulsed power source for airborne directed energy weapons. The committee is aware of significant advances in the capabilities, size, and weight of new energy sources, such as those that combine lithium-ion batteries with phase change materials and an active heat transfer loop. The committee believes that with further research, these activities could develop enhancements to current technology that might include reduced weight and volume; improved battery longevity; reduced procurement, operations and maintenance, and sustainment costs; significantly improved safety and survivability; increased recharge as well as discharge rates; and robust and well-damped thermal management process controls.

*Enhancement of test and evaluation through modeling and simulation*

The committee believes that advanced modeling and simulation (M&S) can moderate the rising costs associated with test and evaluation (T&E) of complex weapon systems. However, the committee notes there is no indication that the Department of Defense's T&E organizations are involved in any concentrated effort to reduce the cost of T&E activities through a coordinated M&S effort. The committee understands that significant investments have been made by program offices in M&S for their particular weapon system, and that some M&S is primarily for training uses and are proprietary or specifically designed for that weapon system. Therefore, these models cannot be easily integrated together in a complete war fighting fashion. The committee recommends that the Department aggressively pursue initiatives, like establishing a coordination group, to encourage the use of M&S more effectively by the T&E community in development and operational activities.

*Explosive Ordnance Disposal equipment technology upgrades*

The committee notes that conventional Explosive Ordnance Disposal (EOD) units across the military services require upgraded equipment and technology enhancements, particularly for routine inspection and search activities. The committee believes that conventional Joint Service EOD units would benefit from rapid acquisition of EOD equipment, which have high-definition resolution and encrypted signals, among other upgraded capabilities. The committee understands that the Department of Defense cancelled the Explosive Ordnance Disposal/Low Intensity Conflict program element which formerly developed and delivered Joint Service EOD advanced capabilities. The committee understands the Combating Terrorism Technology Support (CTTS) program will absorb this mission area within the Improvised Defeat Device and Explosive Countermeasures subgroup activity. The committee encourages the Director of the CTTS program to prioritize funding toward delivering advanced capabilities for conventional Joint-Service EOD units.

*Historically black colleges and universities and minority serving institutions*

The budget request contained $25.9 million in PE 61228D8Z for research work with historically black colleges and universities and minority serving institutions (HBCU/MSI).

The committee recognizes the important role this program plays in bolstering the research capabilities and capacities at HBCU/MSIs. Not only is such work important in meeting the defense research needs of the Department of Defense, but the committee also believes it provides an added benefit by diversifying the supply of scientists, engineers, and researchers working on defense problems. This diversity in people also provides diversity in thought and approach that can be immensely beneficial for research.

Section 233 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92) required the Department of Defense to develop a strategy for improving engagement with HBCU/MSIs. Among other things, this strategy outlined four objectives, including:

(1) increasing efforts to include HBCU/MSIs in ongoing research programs and activities for which institutions of higher learning, in general, are the eligible entities;

(2) increasing the visibility of the Department of Defense programs and activities among HBCU/MSIs and their students;

(3) re-emphasize the need to include HBCU/MSI faculty and students in Department of Defense research activities; and

(4) ensuring HBCU/MSIs and their faculty and students are mentored.

The committee applauds the Department for articulating a clear strategy, and encourages the Department to develop a scorecard for collecting and reporting metrics of success in achieving the components of this strategy.

Therefore, the committee recommends $35.9 million, an increase of $10.0 million, in PE 61228D8Z for additional research between historically black colleges and universities and minority serving institutions, as well and increased teaming opportunities between these institutions and other research universities with experience supporting defense needs.

*Joint electronic warfare wargaming*

The committee recognizes electronic warfare (EW) capabilities are a critical enabler of the U.S. military, and that the EW capabilities and countermeasures of our adversaries threaten our military's advantage on the battlefield. The committee believes effective and efficient management of joint EW capabilities are an essential element of addressing trans-regional, multi-functional, and multi-domain security challenges across the spectrum of conflict, and supports the Department of Defense's establishment of the Electronic Warfare Executive Committee (EW EXCOM) in 2015, and the development of an EW Strategy to that end.

However, the committee is concerned that the speed and scope of progress on the strategy and joint development of warfighting capabilities is not keeping pace with threats and opportunities. The committee believes wargaming may provide an opportunity to thoroughly understand the current preparedness of the joint force to operate in a EW contested environment, and such knowledge will

contribute to the overall management of joint EW capabilities and development of a strategy. Therefore, the committee encourages the Secretary of Defense to conduct an EW wargame to model and evaluate the preparedness of the joint force to operate in a contested environment based on current EW capabilities modeled against a selection of approved war plans and current intelligence estimates. The committee further encourages the Department to consider focusing on the challenges potentially posed by the Russian Federation or the People's Republic of China as part of any wargaming scenario.

*Joint U.S. Forces Korea Portal and Integrated Threat Recognition program*

The committee notes the recent increase in political tensions on the Korean peninsula caused by the growing threat of the use of weapons of mass destruction (WMD) by the Democratic People's Republic of Korea (North Korea), and recognizes the importance of the Joint U.S. Forces Korea Portal and Integrated Threat Recognition (JUPITR) Advanced Technology Demonstration (ATD). While threats posed by North Korea's nuclear weapon and ballistic missile programs remain paramount, deterrence and defense requires a comprehensive strategy against all WMD. JUPITR compliments this mission by providing essential detection and identification of biological threats.

The committee recognizes the important role JUPITR plays in the protection of U.S. Forces Korea and the defense of the Republic of Korea. The committee encourages the Department of Defense to take actions to accelerate and enhance the JUPITR ATD and to establish an operational program of record for fielding and operating suitable equipment to protect U.S. Forces Korea from biological threats.

*Latent and delayed-onset effects of traumatic brain injury*

The committee is aware that traumatic brain injury (TBI) disproportionately affects the warfighter and veterans, with symptoms including memory loss, an inability to manage emotions, impulsivity, and depression. However, due to the lack of overt symptoms for many who suffer mild TBI or concussions, service members may be left untreated or dismissed due to delayed effects that may only manifest over time. The committee commends the Department of Defense on its efforts to promote research aimed at addressing symptoms of TBI in the acute stages after injury and prevention of such injuries. However, a key challenge facing the military is understanding how TBI impacts the brain, both in the short-term and long-term, and how to improve the function of the brain regions that have escaped damage. Therefore, the committee encourages the Department to continue its efforts and collaborate with public and private partners to accelerate the development of treatments for the latent and delayed-onset effects of TBI.

*Light field display technology*

The committee notes that the Defense Advanced Project Research Agency funded and developed a working prototype of a holographic display for real-time battle space visualization through a program called the "Urban Photonic Sandtable Display." Subse-

quent efforts through Small Business Innovation Research grants by the Department of the Navy, the Department of the Army, and the Department of the Air Force have advanced this technology to support warfighter situational awareness requirements, including an enhanced glasses-free 3-Dimensional common operating picture. The committee supports accelerated development of this technology, including rapid transitions into military service programs of record.

*Low-power, long-endurance radar for force protection*

The committee is aware that U.S. Special Operations Command has developed an ultra-low-power, rapidly deployable field radar to enhance force protection, surveillance, and reconnaissance missions for small teams operating in austere environments. This capability has also shown promise in traditionally difficult areas, including riverine environments, mountains terrain, and dense foliage. Therefore, the committee encourages the Department of Defense and U.S. Special Operations Command to continue to develop similar capabilities, and to transition mature technology into a program of record when appropriate.

*Machine learning*

The committee applauds the Department of Defense's focus on machine learning in its Third Offset Strategy as a means of enhancing the safety of the warfighter, lowering costs and streamlining processes, and informing strategic decision making. The committee is aware that the exponential growth in data available globally, combined with evolving machine learning techniques and growing computational resources, are both an opportunity and a necessity. The committee recognizes that countries that make effective use of these data sets and tools will have strategic and tactical advantages over those who do not. As such, the committee urges the Department of Defense to continue to expand its exploration of commercial machine learning offerings, and in particular, to consider the promise of machine learning applied to non-traditional data sets, including financial markets, the Internet of Things, and global supply chains. These and other similar data sets encapsulate the actions and decisions of wide swaths of the world's population, and thus may provide enhanced situational awareness, as well as anticipatory signals on future events through crowd sourcing.

*Medical simulation research*

The committee is aware that medical simulation systems can improve education, training, and skills development. While many of the current simulator manikins used for practical, hands-on training lack the tactile fidelity and accurate portrayal of multiple biological and organ systems, these systems hold greater promise in the future after further development and validation. However, recent advances in computational power, big data analytics, machine learning, and medical informatics also indicate promise for new forms of medical simulation that might be applied to other areas of clinical outcomes, including clinical decision support.

The committee is encouraged by advances in both areas, and believes the Department of Defense could do more to leverage these technological advances to support medical training. Therefore, the

committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services by January 19, 2018, on current investments in medical simulation technology and research and Department-wide efforts to incorporate simulated learning techniques in defense medical training.

*Non-lethal directed energy technologies*

The committee supports the need to minimize collateral damage, take all available avenues to reduce civilian casualties, and prevent damage to infrastructure in engagements abroad. The utilization of radio-frequency and microwave-based non-lethal directed energy technologies provides many opportunities in this regard. These technologies have matured through the science and technology phase, and are already employed by military service and combatant commands in the operational environment across the globe, providing a complementary asset and additional flexibility to the warfighter and U.S. security forces. These technologies have the capacity to stop ground vehicles, small vessels, and unmanned aerial vehicles from infringing upon protected spaces, or to deny access to secured facilities. The effects of these technologies are entirely reversible. The committee, therefore, encourages the Department of Defense to make greater efforts to utilize these technologies where appropriate, and sustain these integrated non-lethal directed energy technologies in order to minimize risk to U.S. forces, noncombatants, and critical infrastructure.

*Overseas waste disposal technology development*

Section 317 of the National Defense Authorization Act for Fiscal Year 2010 (Public Law 111–84) required the Secretary of Defense to submit a report to the Committees on Armed Services of the Senate and House of Representatives regarding the use of open-air burn pits. The report submitted by the Secretary stated that "the introduction of incinerators, plus other thermal (to include waste-to-energy) and non-thermal waste disposal options, are intended to eventually displace the use of burn pits." The report concluded, "The Department of Defense must continue to explore viable technical solutions for waste reduction and waste disposal in all categories—solid, medical, and hazardous—and then make such solutions available through easily acquired commercial or Department of Defense provided equipment."

The committee directs the Under Secretary of Defense for Acquisition, Technology, and Logistics to provide a briefing to the House Committee on Armed Services by November 15, 2017, that provides an update on the progress made toward achieving the goals stated in the report required by section 317 of Public Law 111–84, as well as an update regarding how the Department is implementing lessons learned regarding waste-disposal technologies in overseas contingency operations.

*Pilot program on modernization and fielding of electromagnetic spectrum warfare systems and electronic warfare capabilities*

The committee notes that Section 234 of the Fiscal Year 2017 NDAA established a pilot program on modernization of electromagnetic spectrum (EMS) warfare systems and electronic warfare (EW) systems. This program was written to provide the Secretary

of Defense with flexibility in the use of appropriated funds, with the ultimate goal of developing and fielding more modern capabilities. As an example, some aircraft are currently operating with jammers and radar warning receivers developed in the 1980s which would be ideal candidates for inclusion in the pilot program. By using the authority granted in Section 234, the Department of Defense could then use appropriated sustainment funds to modernize these systems, delivering improved capability to the warfighter without additional appropriations. The committee directs the Secretary of Defense to deliver a report to the House Armed Services Committee no later than December 31, 2017 on implementation of the Section 234 pilot program, to include which EMS warfare and EW systems have been selected and any challenges encountered in modernization of these systems.

*Science, technology, engineering, and mathematics*

The committee acknowledges science, technology, engineering, and mathematics (STEM) educated personnel are required for a significant portion of the Department of Defense workforce. Personnel with STEM degrees are especially important to the viability of the science and technology workforce now and in the future, including at national labs. The committee believes it is important that the Department of Defense grow the next generation of scientists and researchers to contribute to national defense and technology through funding STEM education programs and collaboration with academia.

*Small turbine engines*

The committee recognizes the importance of low cost turbine engines in powering munitions and unmanned aerial vehicles that support operations in the various combatant command areas of responsibility, and is aware that technology for high-efficiency, low-cost systems may be available. Low-cost is driven by competition, as well as small business participation. Therefore, the committee encourages the Department of Defense to adequately resource efforts to identify low-cost, small engine technologies capable of powering missiles and unmanned aerial vehicles, and directs the Under Secretary of Defense for Acquisition, Technology, and Logistics to provide a briefing to the Senate Armed Services Committee and House Armed Services Committee by September 1, 2018, on current research and development efforts and the industrial base which supports this area.

*Space-based debris remediation in Low Earth Orbit*

The committee is concerned about the increasing challenges of space debris and growing risk to defense and other satellites. The committee thereby directs the Director of the Defense Advanced Research Projects Agency (DARPA) to assess the viability of space-based debris remediation in Low Earth Orbit (LEO), and also whether such system could be used for additional purposes, including space situational awareness. The committee believes that remediation of debris smaller than what can currently be detected and tracked may help prevent catastrophic conjunctions and preserve orbital regimes for future operations.

The committee directs DARPA to provide a briefing to the House and Senate Armed Services Committees no later than January 15, 2018 on the results of the assessment.

*Sterilization and inspection of medical instruments*

The committee is aware that a new class of small diameter, near-field inspection scopes and infection control systems, designed to provide ready access to and imaging of the interior chambers and working channels of medical and surgical devices and endoscopes, have been developed, and are commercially available on a competitive basis. The detailed inspection and focused sterilization they provide may be the most efficient and effective way to ensure that medical devices are safe when used on patients and compliant with the Association for the Advancement of Medical Instrumentation and American National Standards Institutes standards for surgical instrumentation sterilization. The committee is aware such advancements in technology would be beneficial to Department of Defense medical facilities, especially in forward deployed surgery centers. Therefore, the committee encourages the Assistant Secretary of Defense for Health Affairs, in coordination with the Surgeon Generals of the military departments, to explore deployment of these modern infection control systems.

*Success metrics of the Defense Innovation Unit Experiment (DIUx)*

The committee is aware of the Department of Defense's efforts to increase outreach to and collaboration with sources of commercial innovation throughout the United States. The committee is also aware that there is discussion about reorganizing the innovation organizations in the Office of the Secretary of Defense (OSD). The establishment of an Under Secretary of Defense for Research and Engineering under Section 901 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) would elevate the innovation function within the Department and provide a critical mass for all of the technology innovation functions within OSD, much like a Chief Innovation Office or a Chief Technology Officer would in a private sector organization. The committee recommends the Department look at the organization and functions of the Defense Innovation Unit Experiment (DIUx) as part of that holistic review, and encourages the Department to consider placing this organization under this new Under Secretary.

Further, the committee appreciates the DIUx report, dated January 16, 2016, which was submitted in response to requirements in the FY17 NDAA. However, additional information is necessary in order to fully evaluate the effectiveness of DIUx under the listed metrics. Lack of reporting on the metrics impacts the committee's ability to fully evaluate and understand if the DIUx program is meeting its mission of accelerating innovation to the warfighter.

Therefore, the committee directs the Secretary of Defense to submit to the congressional defense committees a report not later than March 1, 2018, on how DIUx activities will be sufficiently tied into the broader activities of the Department of Defense, including incorporating lessons learned to alleviate the systematic problems with technology access and timely contract execution. The report shall also contain results of DIUx's metrics of success, by year since DIUx establishment, that include complete data on the following:

(1) number of innovations delivered into the hands of the warfighter;

(2) return on investment for all DIUx projects, including both "demonstration effect" and incorporation of piloted technology if applicable;

(3) whether DOD access to technology leaders has increased as a result of DIUx, with specific examples;

(4) number of non-traditional companies doing business with DOD as a result of DIUx

(5) whether other DOD components have elected to adopt DIUx practices, with specific examples.

The report shall also include information on:

(1) how the Department plans to integrate, field and sustain capabilities acquired through the private sector to ensure maximum utility and value to the department through a capability's lifecycle; and

(2) how the Department is notifying its internal components about participation in DIUx.

*System for reviewing and monitoring industrial base transactions*

The budget request contained $10.9 million in PE 67210D8Z for industrial base analysis and sustainment support.

The committee is aware that the challenge of monitoring and analyzing foreign investments into the defense industrial base, including everything from mergers, acquisitions, joint ventures, strategic partnerships, and other transfers of intellectual property, is taxing the capabilities of the Department of Defense. Not only are the types of transactions becoming more opaque, but the use of tactics specifically to circumvent traditional regulatory mechanisms are making the situation increasingly difficult to identify and assess within a complex business environment. Recent reports in the news, as well as briefings to the committee, indicate a shortfall in our capabilities, especially for decision support systems to allow a limited number of highly trained analysts to be proactive and inform pending industrial base decisions before irreversible mergers or acquisitions are made. The committee believes that the Department should devote more resources to monitoring this complex business environment, utilizing both automated decision support systems, as well as use of more analysts to assess and make recommendations.

Therefore, the committee recommends $15.9 million, an increase of $5.0 million, in PE 67210D8Z for the development of an information technology systems to support the review and monitoring of industrial base transactions, especially those involving foreign transactions, as well as for additional analytical support.

*Training ranges for electronic warfare experimentation*

The committee is aware that electronic warfare is a field where the technology is undergoing rapid changes, based on both commercial pressures as well as tactical innovation on battlefields around the world. The resurgence of focus on this technical area is also a challenge to the Department of Defense, which must ensure that these new and quickly evolving capabilities can be adequately tested, trained with, and defended against. It also demands the capability to rapidly experiment with both new technologies and new

concepts to deliver capabilities to the warfighter that are relevant and effective. In order to do that, the Department needs to ensure it has sufficient range capabilities and space to perform important training. Therefore, the committee encourages the Secretary of Defense to review the efficacy of existing ranges for experimentation and testing of advanced electronic warfare technology and capability, as well as whether there is a need to increase investment and develop new approaches to testing, training, and experimentation for electronic warfare systems.

*Trusted microelectronics supply*

The committee recognizes that microelectronics technology provides critical capabilities in Department of Defense, other Government organizations' systems, and the commercial marketplace. The committee is also aware that that the U.S. microelectronics industrial base faces global competitive challenges, including from foreign competitors that receive substantial support from their government. A recent report from the President's Council of Advisors on Science and Technology (PCAST) titled, "Report to the President Ensurin Long-Term U.S. Leadership in Semiconductors" highlighted many of these challenges, including:

(1) a concerted push by the People's Republic of China to reshape the semiconductor industry in its favor, using industrial policy backed by over $100.0 billion dollars in government-directed funds, that threatens the competitiveness of U.S. industry;

(2) any presumption that existing market forces alone will yield optimal outcomes, particularly when faced with substantial industrial policies from other countries, is unwarranted;

(3) policy can slow the diffusion of technology, but it cannot stop its spread. The only way to retain leadership is to outpace the competition; and

(4) the United States should act in the short-term to reduce the market-distorting behavior of Chinese policy by increasing transparency on Chinese actions; working with allies to coordinate and strengthen inward investment security and export control, and to respond firmly and consistently to Chinese violations of international agreements.

Further, the committee notes that the Department's current approach to ensure trusted microelectronics supply is characterized by a narrow definition for trust-only applicable to application-specific integrated circuits, but not to other classes of circuits like field programmable gate arrays. The committee supported the requirement in section 231 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) for a strategy for assured access to microelectronics that would address this definition for trust, as well as ensure there is comprehensive thought on the acquisition and industrial base concerns related to microelectronics. As the Department develops and codifies that strategy, the committee encourages a thorough review all of the Department's related guidance and instructions, to include a more comprehensive definition of the items requiring a trust policy, as well as ensuring that appropriate language is included in relevant solicitations and contracts for applicable systems.

*U.S. Special Operations Command SOFWERX initiative*

The committee notes that the SOFWERX initiative within U.S. Special Operations Command (USSOCOM) has taken on several innovative projects that encourage collaboration between the private sector, and other Government agencies and organizations such as the Defense Advanced Research Project Agency, Defense Innovation Unit Experimental, and science and technology efforts within the military services.

The committee encourages these practices, specifically the continuation of the 1208 Rapid Prototyping Event (RPE) with its potential for cost efficiencies. RPE verified that the technology exists to supplement the 1208 counterterrorism authority in section 127e of title 10, United States Code, by equipping partner forces with commercial equipment in a cost effective manner. In a similar fashion, the committee also encourages USSOCOM and SOFWERX to advance the application of disruptive emerging technologies, including nano-technology, additive manufacturing, quantum computing, artificial intelligence, robotics, and the convergence of each, in fulfilling immediate and emerging special operations forces' requirements. The committee also encourages the military services to continue to monitor developments within this framework to leverage work being done through SOFWERX.

*Weapons and munitions science and technology roadmap*

The committee recognizes that Department of Defense investments in science and technology (S&T) to counter emerging threats should be reflected in the science and technology portfolio and understands that the exigencies of ongoing operations required a focus on improving our systems for uncontested or asymmetrically contested environments. As a result, advances in weapons and munitions have received less attention in recent years. At the same time, potential adversaries have made advances in platforms, missiles, long-range guns, new propellants, and explosive combinations that could threaten U.S. forces and frustrate U.S. efforts at forcible entry into contested areas. The committee believes the Department must concentrate on developing new generations of weapons and munitions to counter those threats.

Therefore, the committee urges the Secretary of Defense to develop a focused weapons and munitions science and technology roadmap to comprehensively guide investment needs for this area. In developing this roadmap, the Secretary should address the following:

(1) how have recent wargaming scenarios and exercises been used to identify key needs;

(2) how have the integrated priorities lists of the combatant commands articulated their needs for new munitions types and delivery systems;

(3) how are current S&T efforts aligned with these needs; and

(4) are there shortfalls in resources or capacity to address these needs.

## LEGISLATIVE PROVISIONS

### Subtitle A—Authorization of Appropriations

#### Section 201—Authorization of Appropriations

This section would authorize appropriations for research, development, test, and evaluation at the levels identified in section 4201 of division D of this Act.

### Subtitle B—Program Requirements, Restrictions, and Limitations

#### Section 211—Cost Controls for Presidential Aircraft Recapitalization Program

This section would fix the requirements for Presidential Aircraft Replacement (PAR) Program aircraft to those identified by the systems requirements document (SRD) for the Presidential aircraft recapitalization program version 7.0 dated December 14, 2016. This section would also limit changes to PAR requirements to only those approved by the Secretary of the Air Force following a written determination provided to the congressional defense committees that the change is necessary. This section would require that not less than 50 percent of the total amount of funds obligated or expended for contracts for engineering and manufacturing development (EMD) under the PAR Program shall be for fixed price type contracts. This section would authorize contracts other than fixed price type contracts for EMD only if such contract type is approved by the service acquisition executive. This section would also require the Secretary of the Air Force to provide quarterly briefings to the House Committee on Armed Services beginning no later than October 1, 2017 and continuing through October 1, 2022 on the efforts to control costs. The quarterly updates shall include the following:

(1) schedule overview;
(2) contract type and status;
(3) development status;
(4) modification status;
(5) test status;
(6) delivery status; and
(7) sustainment status.

#### Section 212—Capital Investment Authority

This section would amend section 2208(k)(2) of title 10, United States Code, to raise the limit on capital purchases from defense working capital funds from $0.25 million to $0.5 million.

#### Section 213—Modification of Authority To Award Prizes for Advanced Technology Achievements

This section would amend section 2374a of title 10, United States Code, to make permanent the Secretary of Defense's authority to award prizes for advanced technology achievements, to allow for the award of non-monetary awards, and to authorize the acceptance of non-monetary items from other parts of the Federal Government, from State government, and from non-governmental sources.

Section 214—Critical Technologies for Columbia Class Submarine

This section would deem certain *Columbia*-class ballistic missile submarine components as critical technologies.

Section 215—Joint Hypersonics Transition Office

This section would re-designate the "Joint Technology Office on Hypersonics'" as the "Joint Hypersonics Transition Office," with the responsibility to coordinate and integrate programs, ensure coordination of current and future programs of the Department of Defense on hypersonics, and approve demonstrations.

Section 216—Hypersonic Airbreathing Weapons Capabilities

This section would allow the Secretary of Defense to transfer oversight and management of the Hypersonic Airbreathing Weapons Concept from the Defense Advanced Research Projects Agency to an entity of the Air Force.

Section 217—Limitation on Availability of Funds for MQ–25 Unmanned Air System

This section would allow only 75 percent of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2018 for the MQ–25 unmanned air system to be obligated or expended until a period of 60 days has passed after the date on which the Secretary of the Navy certifies that the MQ–25 meets a validated capability gap; the Chief of Naval Operations has reviewed and approved the initial capabilities document (ICD) and the capability development document (CDD); and the ICD and CDD have been submitted to the congressional defense committees.

This section would also require the Assistant Secretary of the Navy for Research, Development, and Acquisition to submit a report to the congressional defense committees that includes key performance parameters, certification of performance parameters' achievement, as well as a description of requirements with respect to fuel transfer, equipment for intelligence, surveillance, and reconnaissance, electronic attack and electronic protection, communications equipment, weapons payload, range, mission endurance for unrefueled and aerial refueled operations, affordability, survivability, and interoperability.

Section 218—Limitation on Availability of Funds for Contract Writing Systems

This section would limit the amount of authorized funds available to be obligated or expended to not more than 75 percent for specified contract writing systems until the Secretary of Defense, in coordination with the Secretaries of the military departments, provides an assessment of the common requirements and potential use of shared information technology (IT) services as a means to provide that capability in a common, interoperable, and more cost effective manner.

The committee remains concerned that the Department of Defense continues to invest billions of dollars in systems that fail to provide integrated business solutions, timely and reliable information, and other important financial and business information for

the daily operations of the military. In fiscal year 2015, the Defense Business Council approved certification requests totaling $6.9 billion for 1,182 business systems. Of these, more than 30 are service or component unique contracting, procurement, and solicitation management systems. While this ongoing redundancy diverts available funding from direct warfighting capability and decreases the Department's ability to manage its operations as an enterprise, the Department has made little progress in consolidating such business systems.

Furthermore, the committee notes that the Government Accountability Office has repeatedly reported that the Department could achieve greater efficiency in defense business operations, including directing 49 related recommendations to the Department in 2011, 38 of which remain open and unresolved. The committee believes that more focus on implementing shared IT services may be helpful in overcoming the longstanding cultural barriers that continue to prevent more enterprise-wide management of defense business systems. It would also support the goal of the Secretary of Defense, as stated in his memorandum dated January 31, 2017, to achieve "horizontal integration across DOD components to improve efficiency and take advantage of economies of scale." As an example of where such efficiencies could be taken, the committee notes with skepticism the existence of multiple service and agency unique contract writing systems. The committee recommends the inclusion of this section to better understand the risks associated with eliminating or consolidating such systems and will rely on the information provided in assessing future support for such systems.

# TITLE III—OPERATION AND MAINTENANCE

## ITEMS OF SPECIAL INTEREST

### Budget Request Adjustments

#### Advanced Adversarial Air Training

The budget request included $516.8 million for advanced adversarial air training. The committee noted in section 350 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) its concern that advanced tactical air training and advanced adversarial air training has diminished significantly over the past 20 years, at a time when foreign air forces are growing in technical capability and their pilots are growing in proficiency. The committee has assessed that maintenance of combat aircraft will not, in and of itself, restore combat efficiency to U.S. flight crews or their squadrons. The committee notes that senior leaders in the military services understand this and have sought to increase advanced flight training and to restore adversarial air training as integral to combat pilot proficiency. The committee also understands that, due to the cost of operating frontline aircraft and the need to train pilots in their primary roles with these aircraft, it is most beneficial to use capable aircraft of older vintage to perform adversarial air training and to contract out the adversarial air mission to former flight instructors and combat pilots in order to save finite hours of life limits to frontline aircraft, costs of adversarial air training, and to help address the 40,000 hours-per-year

shortfall in adversary air training. The committee endorses the movement by the services to integrate these capabilities into their training regimens and recognizes the 1-year budget programming lag resulting in insufficient funds being requested in the fiscal year 2018 budget request.

Therefore, the committee recommends $527.0 million, an increase of $10.2 million, in Operation and Maintenance, Air Force, for contractor support for advanced adversarial air training.

### Civil Air Patrol

The budget request included $26.7 million in Operation and Maintenance, Air Force, for the Civil Air Patrol (CAP) to execute support to Federal agencies and State and local communities. The committee recommends $29.8 million, an increase of $3.1 million, in Operation and Maintenance, Air Force, to allow the CAP to comply with the mandate by the Federal Aviation Administration to install the Automatic Dependent Surveillance-Broadcast (ADS–B) system across the CAP aircraft fleet, replace non-repairable radios used for emergency response search-and-rescue and disaster-relief missions, and implement cyber security upgrades to critical mission systems.

### Ship Repair in the Western Pacific

The budget request included no funds for providing additional dry-docking capability in the western Pacific theater. A business-case analysis commissioned by the U.S. Pacific Fleet indicated a savings to the U.S. Navy by maintaining a dry dock on the Territory of Guam. The Asia-Pacific rebalance has increased Navy forward deployment in the Western Pacific, including the deployment of a fourth attack submarine and a second submarine tender to Naval Base Guam. However, depot-level maintenance capabilities have not followed, and current Pacific U.S. dry-docking maintenance capabilities exist only in Hawaii and the west coast of the continental United States, requiring surface and subsurface vessels to be removed from the theater and from Pacific Fleet's strategic inventory for an additional 2–3 weeks. Further, the interport differentials, temporary duty costs, and impact on families are significant added costs to these repairs. The only other dry-docking options remain outside of the United States, requiring that U.S. naval vessels receive significant repairs using foreign labor and technology, potentially compromising the quality of work as well as national security interests. The committee, therefore, recommends an increase of $9.5 million in Operation and Maintenance, Navy, Ship Depot Maintenance, for the chartering of a dry dock to meet maintenance requirement for the western Pacific Fleet.

## ENERGY ISSUES

### Energy Resiliency for Mission Assurance

The committee continues to believe that the Department of Defense must have the ability to sustain mission-critical operations during utility disruptions at its installations. The committee notes that the Department has placed a large emphasis on energy infrastructure investments that may reduce energy demand and provide

a financial return on investment. While the committee is supportive of these efforts, the committee is concerned that more emphasis is required on investments that reduce mission risk by increasing energy resiliency through on-installation energy generation, transmission, distribution, and storage. To that end, section 2805 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) expanded the authority of the Energy Conservation Investment Program (ECIP) to include energy resiliency projects. The committee encourages the Department to take further action, both through ECIP and other energy initiatives pursued through other authorities, to fully integrate energy resiliency with military value into their energy investment programs.

### Energy Resilience of Overseas Military Installations

As noted elsewhere in this report, the committee continues to assert that the Department of Defense must have the ability to sustain operations during energy supply disruptions, especially in the case of overseas military locations that rely on foreign-sourced energy. For example, the committee notes that a number of European countries that host permanent and rotational U.S. Armed Forces rely extensively on natural gas and oil from the Russian Federation. The committee believes that a policy of energy reliance through diversification is critical to maintaining a resilient U.S. overseas defense posture and presence.

Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services by March 1, 2018, on potential vulnerabilities to energy supply disruptions at overseas locations that host permanent and rotational U.S. Armed Forces and on mitigation efforts aimed at protecting mission resiliency. The briefing must, at a minimum, assess the operational risk of energy supply disruptions, identify mitigation measures to sustain mission-critical operations, and assess the feasibility and cost and schedule impacts of including diversified energy solutions for future overseas military construction projects.

## Logistics and Sustainment Issues

### Army Contracting Command Reachback Functions

The committee understands the Army Contracting Command has a policy by which contracting elements at Army installations are required to forward all contracts governing awards valued at more than $750,000 to their regional service centers for resolution with the stated goals of improved continuity of workflow and the potential for more efficiencies. Despite this, the committee is aware of anecdotal evidence that it is not having the desired effect and is creating inefficiencies.

Therefore, the committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services by October 2, 2017, on Army Contracting Command Reachback to include:

(1) The number of contracting actions that have been sent to the various Reachback groups across the contracting enterprise since the start of the Reachback program;

(2) The percentage of contracting actions that were awarded on time;

(3) Detailed impacts to installations due to late award of contracts;

(4) The amount of cost savings realized attributed to the Reachback program, specifically, administrative savings; and

(5) The amount of personnel reductions at each local contracting unit.

Corrosion Control and Prevention Executives for the Military Departments

The committee continues to be concerned that the military departments have not adequately addressed corrosion control and prevention in the military departments' sustainment plans for weapon systems. The committee believes that corrosion control and prevention must be addressed early in system design. To facilitate education, awareness, and prioritization of corrosion control and prevention, section 903 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Public Law 110–417) required each military department to identify a corrosion control prevention executive (CCPE). The committee has observed that the CCPEs are most effective when they have the time and seniority to manage corrosion control policy and resources across the military department, consistent with the requirements of section 903 of Public Law 110–417. The committee believes the Departments of the Navy and the Air Force have been most effective in corrosion control and prevention and notes they have assigned individuals whose primary responsibility is to perform the functions of the CCPE. The committee also notes that the Department of the Army has used a different model and implemented the requirements of section 903 of Public Law 110–417 by appointing a Deputy Assistant Secretary of the Army for Acquisition, Logistics, and Technology as the CCPE and having action-officer level individuals assist in those duties.

The committee directs the Secretaries of the military departments to provide a briefing to the House Committee on Armed Services, not later than September 30, 2017, on the steps the military departments have taken to comply with section 903 of Public Law 110–417. The briefing should describe the service corrosion executives' technical qualifications, duties, and responsibilities, including coordination with the Department of Defense Director of Corrosion Policy and Oversight and formulation of service-level guidance and policy regarding corrosion control and prevention as part of the development, procurement, and sustainment of the military services' weapon systems and infrastructure. Finally, the briefing should include the Secretaries' assessments as to the effectiveness of their corrosion control and prevention policies and the extent to which the CCPEs are taking steps to improve prioritization of this issue early in the planning of weapon systems.

Improving Asset Tracking and In-Transit Visibility

The committee is supportive of the Department of Defense's ongoing efforts to improve asset tracking and in-transit visibility. The committee supports the goal of enhancing asset visibility through

item-unique identification (IUID) and automatic identification technology/automatic identification and data capture processes because this initiative can help improve readiness, reduce waste, and increase oversight. However, the committee remains concerned with the Department's compliance with its own IUID policy as issued in 2015 in Department of Defense Instruction 8320.04 and believes that writing requirements into contracts fosters compliance with the IUID policy. The committee is also concerned that a briefing requirement on this subject from the National Defense Authorization Act for Fiscal Year 2017 has not yet been delivered, and expects to receive this briefing in a timely manner. Additionally, the committee directs the Director of the Defense Contract Management Agency (DCMA) to brief the committee not later than December 1, 2017, on the DCMA's plan to foster the adoption, implementation, and verification of the revised IUID policy across the Department and the defense industrial base.

Inventory Management and Demand Planning Software Pilot Program

The committee is aware that the Army completed a small test program using commercial-off-the-shelf (COTS) software on 27 various Army Black Hawk helicopter parts. This small-sample study showed significant cost savings and increased readiness when leveraging the Army's enterprise resource planning system, the Logistics Modernization Program (LMP), to manage inventory, particularly unserviceable assets. The committee remains interested in not only the cost savings and readiness increases found in the Army's Black Hawk inventory management, demand planning, and readiness-based sparing software application to LMP, but also cost savings and readiness increases if the Army were to apply this tool across Army Materiel Command's (AMC's) spare parts management portfolio.

The committee also seeks information on Naval Sea Systems Command's (NAVSEA's) views regarding the benefits of COTS product lifecycle management software to help with its growing challenge in managing its critical databases across the NAVSEA enterprise. Currently, two NAVSEA databases, the Naval Ships Engineering Drawing Repository (NSEDR) and the Naval Logistics Technical Data (NAVLOGTD), are growing faster than the antiquated and expensive system that manages them can handle.

The committee directs the commander of Army Materiel Command and the commander of Naval Sea Systems Command to provide briefings to the House Committee on Armed Services not later than February 7, 2018, on separate initial assessments of following:

(1) the extent to which AMC explored the use of COTS software as an add-on to LMP to improve its spare parts and inventory control management;

(2) the extent to which NAVSEA has explored the use of COTS product lifecycle management software to improve managing its NSEDR and NAVLOGTD databases; and

(3) the extent to which AMC and NAVSEA have found cost savings and readiness improvements for their programs by using this software and believe these cost savings and readiness increases could be expanded.

Joint Minimum Standards for Protective Covers

The committee recognizes and supports the military departments and the Office of the Secretary of Defense's efforts to identify and address the adverse readiness impacts of exposing critical military equipment to corrosive environmental conditions. However, the committee is concerned that there is no minimum U.S. military standard for protective covers. Subsequently, a wide range of covers has been procured, many of which do not adequately protect against corrosion. The committee understands that there are commercial, off-the-shelf protective covers that can address corrosion and thus improve the life of covered equipment.

Therefore, the committee directs the Secretary of Defense to provide a briefing to the congressional defense committees, not later than December 1, 2017, on the Department's efforts across the military services and within the Office of the Secretary of Defense to develop joint minimum standards for commercial, off-the-shelf protective covers. This briefing shall include a detailed description of plans and priorities for both the active and reserve components to use such covers to protect equipment, including but not limited to equipment returned from operational theaters, pre-deployed assets, and those items currently in storage within the United States and its territories. At a minimum, this briefing shall address requirements regarding the following: water, particulate, mold, and mildew intrusion; hydrophobic, oleo-phobic, and ultra-violet resistance; flexure; and temperature.

Logistics Management Business Systems Modernization

The committee is aware of the military services' challenges in developing, acquiring, and fielding integrated supply, maintenance, logistics and financial resource planning systems that work across the enterprise. The committee notes that the Department of the Army has achieved a measureable level of success with the Logistics Modernization Program (LMP), a commercially developed enterprise resource planning system (ERP) used by the Army to integrate its Working Capital Fund missions. The committee encourages the Secretaries of the Navy and the Air Force to explore alternative resource planning systems associated with Working Capital Fund operations and consider future implementation of LMP. The committee directs the Secretary of the Navy and the Secretary of the Air Force to provide a briefing to the committee, no later than December 1, 2017, on the following in regard to Navy, Marine Corps, and Air Force Working Capital Fund ERPs:

(1) The ERP or other systems the military services are currently using to integrate their Working Capital Fund business systems across the services' logistics enterprises;

(2) The annual cost of modernizing and maintaining their current Working Capital Fund business systems;

(3) How the three military services' current ERPs are contributing to the national security of the United States or to the efficient management of the Department of Defense, including auditability compliance;

(4) Options the military services have explored to find alternatives to their current systems which would provide equal or

greater capability at a lower cost, including consideration of the Army LMP; and

(5) Whether the existing acquisition management structure for the military services' current ERPs is adequate to manage and control program costs into the future.

Opportunities To Consolidate Printing Services

The committee notes that the Department of Defense requested funding for printing services that totaled more than $440.0 million in the fiscal year 2017 budget request. Department of Defense Instruction 5330.03 establishes the Defense Logistics Agency (DLA) Document Services as the preferred provider for document automation services to the Department, which includes printing services, scanning and conversion, office device support, and electronic content management. In addition, the Defense Business Board's February 2015 report "Transforming DOD's Core Business Processes for Revolutionary Change" noted that actions such as moving to managed printing services and consolidating print management services could achieve significant savings in related activities. Furthermore, the committee has noted that the printing budgets for active service components are excessive and that portions of these budgets should be realigned to address unfunded readiness priorities of the Department and the military services.

In light of the above, the committee directs the Comptroller General of the United States to assess the following:

(1) what is the nature and scope of printing activities financed by Department components, including the military services and DLA;

(2) how have estimated costs for printing activities compared to actual costs since fiscal year 2012;

(3) what options, if any, has the Department considered in adjusting its approach to printing services to achieve greater efficiencies or reduced costs for related activities; and

(4) any other issues the Comptroller General determines appropriate with respect to consolidation of printing services.

The committee further directs the Comptroller General to provide a briefing to the House Committee on Armed Services not later than December 1, 2017, on the Comptroller General's preliminary findings and to submit a final report to the Senate Committee on Armed Services and House Committee on Armed Services on a date agreed to at the time of the briefing.

Report on Operation of the Transportation Working Capital Fund

The committee notes that the Airlift Readiness Account (ARA), which maintains military airlift capacity during peacetime to be prepared for the higher level of activity needed during contingency operations, has received varying levels of funding in past years. The committee is concerned about how the Transportation Working Capital Fund (TWCF) can effectively operate and set reasonable rates with such fiscal uncertainty. Therefore, the committee directs the Comptroller General of the United States to submit a report to the congressional defense committees by August 1, 2018, regarding allocation of the ARA in conjunction with the TWCF during fiscal years 2007 to 2016, inclusive. The report should include:

(1) a review of the U.S. Transportation Command (TRANSCOM) oversight of the TWCF, including the command's adherence to statutory authorities related to the TWCF and ARA;

(2) a review of the rate-setting procedure used by TRANSCOM, including procedures to lower the TWCF rate once fixed costs of the program are covered and how ARA funding is used to fund airlift capacity not being fully utilized during peacetime but required to support contingency operations;

(3) how the Air Force pays its ARA bill during years in which ARA funding is not requested, authorized, or appropriated or years in which ARA funding is cut; and

(4) what steps the Air Force has taken to ensure the Air Force Working Capital Fund receives the appropriate funding if a cash shortfall occurs because of a lack of fiscal year ARA funding.

### Revising Depot Carryover Calculations

Department of Defense regulations limit the amount of carryover allowable at the military depots at the end of a fiscal year. These regulations require that carryover be calculated in a way that routinely exceeds allowable carryover ceilings, resulting in decrements to the military services' appropriations. While the committee believes there should be limits on the amount of carryover workload held by a depot, the committee is concerned that the current calculation of allowable carryover has indirectly affected military readiness and the ability of the depots to sustain core workload as required by section 2464 of title 10, United States Code. As a result, the committee would like to understand the Department's calculation of allowable carryover.

Therefore, the committee directs the Secretary of Defense, in consultation with the Secretaries of the military departments, to submit a report to the House Committee on Armed Services by December 31, 2017, on workload carryover to include:

(1) an explanation of how the carryover formula is currently calculated, and how each military service manages carryover;

(2) what exclusions from carryover are currently in place and how they were determined;

(3) how carryover has been affected by the late receipt of funds;

(4) the level of carryover of parts and materiel needed to support depot maintenance programs compared to direct labor hours;

(5) what portion of total carryover is for inter-service workload; and

(6) recommendations to modify the existing carryover formula.

The Secretary of Defense may also include other related matters as deemed appropriate in order to provide a comprehensive examination of carryover policies.

The committee further directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services not later than October 31, 2017, on preliminary findings of the Secretaries' evaluation.

## READINESS ISSUES

### Advanced Adversarial Air Training Program

The committee notes that the Air Force testified it is at its lowest state of full-spectrum readiness in its history, particularly when confronting near-peer adversaries. The Air Force has publicly stated its need for contracted adversarial air support. The committee is concerned about the disparity between the significance that senior Air Force leadership assigns to increased combat pilot training and the lack of budgetary and programmatic attention to addressing it. The fiscal year 2018 Air Force budget approach delays the entrance of new combat pilot training capabilities not currently available to the Air Force. Specifically, the current adversarial air training capability flies subsonic, single engine aircraft that address a portion of lower-end training requirements; it does not address supersonic training, which U.S. pilots will face when engaging near-peer adversaries.

In the absence of commercially supplied supersonic adversarial air capability, the Air Force will continue to rely on front-line aircraft and pilots to meet this need, which the committee notes is expensive, reduces the life of the fleet, and takes pilots away from practicing their intended missions.

The committee believes the Air Force should move aggressively to meet the adversarial air combat training requirements. Therefore, the committee directs the Secretary of the Air Force to brief the House Committee on Armed Services by September 1, 2017, on the status of near-peer training utilizing advanced adversarial air capabilities.

### Advanced Foreign Language Proficiency

The committee recognizes the importance of advanced foreign language and cultural proficiency for military readiness and national security. When proficient language speakers effectively communicate with non-English speakers, individually or via the broadcast media, they become a major force multiplier and key component of national defense. The committee is aware that, in partnership with universities across the country, the National Security Education Program provides critical training for service members and government officials in a number of languages and strategic cultures, including those of the Arab world, Afghanistan, China, Russia, and Iran. The committee understands that the Language Flagship Program has successfully recruited language-proficient students by utilizing partnerships with K–12 schools devoted to creating articulated pathways into the program. The committee is concerned that the Department of Defense has not sufficiently prioritized these language readiness programs.

The committee is further concerned that the Department of Defense allowed access to authentic, copyrighted foreign language broadcast services media to lapse in 2015. Despite the continued need, the committee understands that a competitive request for proposal has not yet been released to begin the process of contracting for a suitable solution.

Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services by December 1, 2017, that assesses:

(a) Whether the National Security Education Program meets the current need for language and culture training so that warfighters and national security professionals can complete their missions effectively, whether current partnerships with K–12 schools are sufficient to provide language-proficient students to the Language Flagship Program, and whether the need would warrant an expansion of the language and cultural training programs; and

(b) The status of whether access to authentic, copyrighted foreign language content should be restored for the joint force.

### Alternative-Source F/A–18 Depot-Level Maintenance

The committee understands that the Department of the Navy awarded an alternative-source contract for F/A–18A/B/C/D depot-level maintenance in February 2016. This award is another step toward addressing the backlog of F/A–18A/B/C/D depot-level maintenance requirements in a manner that leverages the range of relevant resources within the national technology and industrial base, and the committee encourages the Navy to induct aircraft to meet this contract's maximum authorization within each contract year. While the committee expects the Department of the Navy to workload its organic aviation depots to the maximum extent possible and in accordance with Federal law, the committee encourages the Navy to make maximum use of this contract to help eliminate the remaining backlog of F/A–18A/B/C/D depot-level maintenance requirements. Additionally, to improve efficiency of the aircraft maintenance process under this contract, the committee encourages the Navy to provide authorizations for engineering disposition and alternate supply chain as appropriate, with accompanying contractual changes.

The committee directs the Secretary of the Navy to submit a report to the House Committee on Armed Services not later than September 15, 2017, that includes, but is not limited to, plans to maximize the F/A–18A/B/C/D workload at its organic aviation depots; an evaluation of ongoing F/A–18A/B/C/D alternative-source depot-level maintenance efforts; plans for maximizing the number of aircraft authorized under the existing contract by contract year; plans for establishing a follow-on multiple-award contract for F/A–18A/B/C/D depot-level maintenance, as required to address the maintenance backlog; and confirmation that Navy officials are providing engineering disposition and other improvements to allow for optimal efficiency and throughput of aircraft.

### Counter-UAS Briefing

The committee believes that the importance of counter-unmanned aerial systems (C–UAS) will continue to increase due to the proliferating threat of commercially available and homemade hostile unmanned aerial systems used for reconnaissance and as flying Improvised Explosive Devices.

The committee is concerned that there is a shortage of C–UAS range space in the United States. Currently, there is only one site where test and training activities can take place, which is at the

Army's Yuma Proving Ground in Arizona. The committee notes it is important that training locations have sufficient contiguous and unimpeded ground and air space so that radio frequency jamming, directed energy, and kinetic capabilities can be utilized without concern for impact outside of the range.

The committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services not later than December 1, 2017, on the potential of using additional military installation ranges for C–UAS testing and training. To address this critical need, the committee encourages the Department of Defense to consider a number of additional sites that could be used for the testing and training of C–UAS capabilities.

Expediting the Security Clearance Process

The committee notes that the Department of Defense and the Office of Personnel Management have undertaken significant steps to improve the security clearance review process. While some progress has been made, the security clearance backlog continues to prevent the Federal Government and the national security industrial base from hiring otherwise qualified personnel. The committee believes more needs to be done to address this backlog, including reviewing current security clearance procedures. For example, the Questionnaire for Public Trust Positions Standard Form 85 requires nearly the same information as the Standard Form 86, Questionnaire for National Security Positions. The committee believes positions requiring access to classified information are inherently positions of public trust, and requiring an individual with a favorably adjudicated security clearance based on the Standard Form 86 to undergo an additional nearly identical background check based on the Standard Form 85 is redundant, and likely adds to the significant backlog of background investigations throughout the U.S. Government.

The Department risks losing new hires, particularly qualified linguists, engineers, computer scientists, and cyber professionals, who find jobs elsewhere while their security clearance review takes months to complete. However, the committee does note that the Federal Government already has options to expedite the security clearance process to bring in personnel that have linguistic and cultural competencies that are critical to the warfighter. Authority under title 5, United States Code, allows the government, in certain circumstances, to expedite hiring persons with specialized skills.

The committee directs the Secretary of Defense, in consultation with the Office of Personnel Management, to provide a briefing to the Senate Committee on Armed Services and the House Committee on Armed Services by December 1, 2017, on efforts to shorten the security clearance review process. The briefing shall address potential time-savers such as using Standard Form 86 in lieu of Standard Form 85, allowing industry to provide certified initial background materials, reducing the number of contractors who require a clearance, returning to interim secret clearances for low-risk hires, standardizing the process to allow civilians and contractors to move to new jobs within an agency without a lengthy wait for an additional security review, and standardizing adjudication measures. The briefing provided should also include information

about how the Federal Government uses other authorities to hire linguists and cultural experts where there are workforce gaps.

Explosive Ordnance Disposal Budget Display

The committee received a briefing in accordance with a directive in the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) that included budget data for all explosive ordnance disposal (EOD) activities throughout the Department of Defense. The committee notes that this information, collected from all of the services' budgets and including operation and maintenance, procurement, and research, development, test and evaluation accounts, was not easily found yet was useful in identifying where EOD funding originated. Given the increasing importance of EOD units and congressional interest in EOD activities, the committee expects that in all future Department and service budget justification documents EOD activities will be clearly marked and identified.

Explosive Ordnance Disposal Organization and Support to Operational Plans

Improvised explosive devices (IEDs) have been the enemy's weapon of choice in the Republic of Iraq, the Syrian Arab Republic, and the Islamic Republic of Afghanistan and, according to the Department of Defense, will probably be a mainstay in any future conflict, given their low cost to develop coupled with their potential for strategic impact. Since 2003, under the aegis first of the U.S. Army's Improvised Explosive Device Task Force, then of the Joint Improvised Explosive Device Defeat Organization, and now of the Joint Improvised-Threat Defeat Organization, the Department of Defense has sought to counter IED threats to U.S. forces. Integral to this effort, among other things, are explosive ordnance disposal (EOD) units which, despite a spike in growth since 2002, remain in high demand relative to the limited number of units throughout the Department. Moreover, the committee is concerned about the degree to which EOD requirements and capabilities have been integrated into standing operational plans. In light of the above, the committee directs the Comptroller General of the United States to assess the following:

(1) the extent to which EOD requirements and capabilities are integrated into operational plans, including those for potential support of civil authorities;

(2) the extent to which the Department's EOD capabilities, including manning and equipment, are sufficient to meet combatant commander requirements;

(3) what, if any, steps are being taken to identify and mitigate any EOD capability gaps in operational plans;

(4) the extent to which the Department conducts oversight of Department-wide EOD functions; and

(5) any other issues the Comptroller General determines appropriate with respect to EOD capability support to operational plans.

The committee further directs the Comptroller General to provide a briefing to the House Committee on Armed Services not later than December 1, 2017, on the Comptroller General's preliminary findings and to submit a final report to the congressional de-

fense committees on a date agreed to at the time of the briefing. The committee also directs the Secretary of Defense, the Secretaries of the military departments, and the combatant commanders, to share any pertinent information about EOD units, requirements, and capabilities, including EOD units required to support operational plans, with designated representatives of the Government Accountability Office assigned to this review commensurate with applicable classification guidance.

## Joint Force Training and Exercises

The budget request contained $583.6 million in Operation and Maintenance, Defense-Wide, for the Combatant Commanders Exercise Engagement and Training Transformation (CE2T2) program.

The committee understands that the CE2T2 program supports combatant command and service joint training, from individual specialized skills to large-scale joint exercises, and is a critical enabler to improving joint readiness and warfighting capabilities. However, since 2011, the CE2T2 program has been reduced by 38 percent.

The committee recognizes that the 2016 National Military Strategy emphasizes the four-plus-one security challenges of the Russian Federation, the People's Republic of China, the Democratic People's Republic of Korea, the Islamic Republic of Iran, and violent extremism. The committee remains concerned about the readiness of the joint force to address the full spectrum of security challenges. The committee believes that greater resources for joint force training and exercises that span the combatant commands and allow for experimentation with new concepts of operations are essential to improving the effectiveness and readiness of the joint force, and for maintaining an appropriate balance within the joint force.

Therefore, the committee recommends $603.6 million, an increase of $20.0 million, in Operation and Maintenance, Defense-Wide, for the Combatant Commanders Exercise Engagement and Training Transformation program to enhance joint training and exercises that span combatant commands and address the four-plus-one challenges identified in the 2016 National Military Strategy.

## Military Mission Line Moratorium

The committee notes that the military departments utilize ranges and operating areas in the Gulf of Mexico for a variety of testing and training missions. These include high altitude, supersonic air combat training, air-to-air missile testing, electronic warfare, drone targeting, naval sub-surface, air-to-surface, and surface-to-surface testing, including mine and counter-mine operations. These ranges and operating areas east of the Military Mission Line in the Gulf of Mexico provide approximately 120,000 square miles of ranges and operating areas that are essential to maintaining the maritime and airborne readiness of the military services. Furthermore, the ranges and operating areas east of the Military Mission Line in the Gulf of Mexico provide the military departments with critical airspace essential to 5th generation capabilities and provides for hypersonic weapons testing and space launch.

The Gulf of Mexico Energy Security Act (GOMESA) of 2006 (Public Law 119–432) established a moratorium on oil and gas leasing, pre-leasing, or any related activity in the ranges and operating areas east of the Military Mission Line in the Gulf of Mexico. This moratorium expires on June 30, 2022. With no comparable test and training area within the United States, the committee is concerned that the expiration of this moratorium may adversely impact the Department of Defense's ability to meet its military testing and training missions. Therefore, the committee directs the Secretary of Defense to deliver a report to the House Committee on Armed Services and the House Committee on Natural Resources not later than March 1, 2018. At a minimum the report shall address the following:

(1) The scope of military test and training events conducted in the area east of the Military Mission Line in the Gulf of Mexico;

(2) Comparable testing and training areas within the United States and its territories that can replicate the capabilities of the ranges and operating areas east of the Military Mission Line in the Gulf of Mexico;

(3) Comparable testing and training areas outside the United States which are available for United States military testing and training activities that can replicate the capabilities of the ranges and operating areas east of the Military Mission Line in the Gulf of Mexico;

(4) The number of test events, exercises, and military operations conducted annually in the ranges and operating areas east of the Military Mission Line in the Gulf of Mexico from 2006 to time of report;

(5) The extent to which the services will be unable to meet training and test requirements necessary to be prepared to support Operational Plans should the moratorium on oil and gas leasing, pre-leasing, or any related activity east of the Military Mission Line in the Gulf of Mexico not be extended.

### NASA Armstrong Flight Research Center F/A-18 Chase Aircraft

The committee is concerned about the availability of chase aircraft at NASA Armstrong Flight Research Center, which provides total flight safety during developmental and operational tests. The committee notes the NASA Armstrong Flight Research Center's proximity to Edwards Air Force Base, China Lake Naval Weapons Station, Marine Corps Air Station 29 Palms, and other associated desert and offshore test ranges, which makes the Center a regular provider of test missions for the Air Force, Navy, and Marine Corps. The committee believes these missions are critical to helping the U.S. military maintain its technological superiority.

The committee notes that chase aircraft maintain constant radio contact with research pilots, serve as an extra set of eyes during test flights, and provide a camera platform for research missions that must be photographed or videotaped. The committee understands that F/A–18F have the ideal high-speed test bed capacity and mold lines, can maintain safe, long-term, high-speed test operations, and do not confront the same maintenance issues as the current Armstrong Flight Research Center chase aircraft. The committee believes that Department of Defense-wide test missions are adversely impacted by the current aircraft availability at the Cen-

ter, and that the Department should consider replacing current NASA chase aircraft to support an aggressive future test schedule as the Department modernizes its overall aircraft fleet.

Accordingly, the committee directs the Secretary of the Navy to submit a report to the House Committee on Armed Services, not later than 90 days after the enactment of this Act, on its plans to consider the transfer of aircraft and the timeline associated with such plans. The report should include:

(1) The number of aircraft planned for transfer;

(2) The minimum number of remaining flight hours of each aircraft to be transferred; and

(3) The radar capabilities, centerline and wing station stores management system, and advanced targeting forward looking infrared equipment of such aircraft.

### Naval Shipyard Development Plans

The Department of the Navy operates and maintains four public shipyards in the United States: Norfolk Naval Shipyard, Virginia; Portsmouth Naval Shipyard, Maine; Puget Sound Naval Shipyard, Washington; and Pearl Harbor Naval Shipyard, Hawaii. The committee recognizes the vital role these shipyards play in generating readiness, supporting the Navy's surface and submarine fleet by performing depot- and intermediate-level maintenance, modernization, emergent repairs, and inactivations. However, the committee notes that the infrastructure at these shipyards has not been properly sustained, modernized, or configured to efficiently and effectively support the Navy's future force structure and shipyard workload. The committee believes that long-term underfunding of the Navy's infrastructure investment accounts has created capability gaps in shipyard infrastructure that will result in the public shipyards being unable to properly complete assigned and projected work. In fact, disturbing delays in ship overhaul work have already occurred.

The committee also notes that the public shipyards are supported by more than 34,000 employees and the Navy is planning to expand the workforce by another 2,000 employees by 2020 to accommodate anticipated workload. The committee notes that almost half of the entire public shipyard workforce has less than 5 years of experience and lacks the journeyman skills associated with a more experienced workforce. The Navy has testified that the manpower shortfall and inexperience in the public shipyard workforce may result in extended maintenance availabilities, thus affecting operational availability of combat-ready ships. This comes at a time when existing maintenance backlogs have expanded due to the increased operational tempo of the fleet, and continuing delays in receipt of appropriations have further affected the public shipyards' ability to execute work on time.

The shortage of journeyman-level experience and the insufficient industrial capacity have led to severe throughput issues at the public shipyards, highlighted by six nuclear attack submarines languishing in the shipyards for years beyond their scheduled completion date. As a result, some crews have spent their entire submarine assignment rotation pier-side, which degrades military personnel readiness and operational effectiveness. Further, insufficient capacity has led the Navy to decertify the USS *Boise* (SSN 764) for

diving operations until this submarine can be inducted for its engineered overhaul. Other attack submarines are likely to experience similar operational limitations until sufficient public-sector throughput can be provided. The committee is disappointed by the Navy's failure to respond in a timely and effective manner to growing backlogs and to implement corrective actions. The committee believes that significant workforce, workload planning, and infrastructure management changes should occur to enable more efficient planning and execution of maintenance availabilities.

While the public sector is expanding to accommodate the growing maintenance requirements, the committee also notes that private-sector shipyards currently have infrastructure and workforce capacity to help mitigate the shortfalls in nuclear maintenance availabilities. The committee believes that the Naval Sea Systems Command has moved away from the "One Naval Shipyard" concept that it had previously embraced at a time when it should be fully leveraging the entire industrial base. Furthermore, the committee notes that a significant private-sector workload expansion is programmed in conjunction with the start of the *Columbia*-class program. To reduce risk associated with the delivery of the *Columbia*-class ballistic missile submarine, the committee believes that the Navy should analyze the feasibility of moving additional workload to the private sector until the public sector can establish a higher workload throughput baseline. At the same time, the Navy must not divert funding from or delay the public shipyards' modernization and workforce expansion that are necessary to meet future Navy requirements. This will allow the private sector to build up its workforce gradually prior to commencing work on the first *Columbia*-class submarine rather than rapidly expanding its workforce in 2021. The committee further believes that this temporary move may lead to a more efficient private-sector workforce and eventually lower program costs associated with the *Columbia*-class program, which, at a cost of $100.2 billion, is the second largest acquisition program in the Department of Defense. Naval Sea Systems Command should examine ways to eliminate the barriers between the public- and private-sector nuclear shipyards and consider innovative ways to share resources and infrastructure across the enterprise while the public yards recapitalize.

Finally, the committee notes that the deficiencies within the public shipyard enterprise will be further exacerbated by the Navy's goal to expand ship force structure. The committee believes that the growth in the public shipyard enterprise should be paced by the anticipated growth in the Navy force structure, as detailed by the administration's 30-year shipbuilding plan, required annually pursuant to section 231 of title 10, United States Code.

Therefore, the committee directs the Secretary of the Navy to provide a report to the congressional defense committees, by March 1, 2018, on a comprehensive plan to address shortfalls in the public shipyard enterprise. Specifically, this plan shall address the following elements:

(1) Personnel Roadmap: Prepare an employment development plan by shipyard that estimates resourcing shortfalls and full-time equivalent allotments, including overtime and contracting support, workforce hiring targets, and the numbers and types of employees needed. To the degree possible include the number of apprentices

by trade skill, the number of engineers, and the number of overhead disciplines; and the training initiatives and time needed to meet the emerging workload requirements for fiscal year 2019 and beyond.

(2) Infrastructure Development Plan: Identify current infrastructure deficiencies at U.S. naval shipyards and prepare a detailed master plan for each shipyard that includes a list of specific infrastructure projects, scope of work, cost estimates, and schedule associated with the current and 30-year force structure projections.

(3) Metrics Assessment Plan: Develop holistic workload metrics to better assess the efficiency of the entire shipyard versus a narrow review by maintenance availability.

(4) Workload Management Plan: Using the limitation currently imposed by the shortfall of personnel and the existing material condition of the public shipyards, prepare a 5-year workload management plan to include the entirety of the nuclear maintenance enterprise, both public- and private-sector capacities, that limits lost operational days.

(5) Funding and Authority Plan: Each plan shall identify the additional funding and any legislative authority needed to achieve an end state, as quickly as practicable, of elimination of all ship maintenance backlogs and a return to predictable, sustainable, and affordable ship maintenance availabilities, including for the anticipated growth in Navy force structure.

### Readiness of Coastal Riverine Forces

Following an incident involving the temporary detention of 10 U.S. Navy sailors aboard two riverine patrol boats by Iran's Revolutionary Guard in January 2016, the Comptroller General of the United States conducted a comprehensive review of the readiness of the Navy's Coastal Riverine Force, whose operational responsibilities range from defending high-value assets and critical maritime infrastructure to conducting offensive combat operations. The Comptroller General's report on the readiness of the Coastal Riverine Force highlights manning, training, and equipping challenges the force faces in maintaining its warfighting readiness. However, the committee notes that the Navy's response to the report failed to describe the steps the Navy will take to address the challenges identified. The committee is concerned that the challenges outlined in the Comptroller General's report will continue to worsen without correction, particularly the manning challenges facing the force. Accordingly, the committee directs the Secretary of the Navy to:

(1) develop manning strategies tailored to the Coastal Riverine Force's unique needs to address gaps in critical skills and competencies;

(2) evaluate what human capital flexibilities the Navy could implement to support strategies to address Coastal Riverine Force's manning shortfalls; and

(3) develop a strategic human capital plan that addresses Coastal Riverine Force manning shortfalls.

Further, the committee directs the Secretary of the Navy to provide a briefing to the House Committee on Armed Services and the Senate Committee on Armed Services not later than January 12, 2018, on the results of these efforts.

Remotely Piloted Aircraft Training Strategy

The committee notes with concern that the Air Force's Active and Reserve Component MQ–1 and MQ–9 aircrews within the Air Force's remotely piloted aircraft (RPA) enterprise have limited access to unit training resources such as proficiency simulators and continuation training sorties because they are stretched to meet the operational demands of combatant commanders supporting deployed forces. The committee also notes that RPA aircrews are able to meet some training and proficiency requirements during the conduct of operational missions, but believes that this practice should be exercised only when absolutely necessary.

Therefore, the committee directs the Secretary of the Air Force to brief the House Committee on Armed Services not later than September 28, 2017, on the service's approach to RPA aircrew training, with a particular focus on how the Air Force plans to field simulator capability and training capacity among Active and Reserve Component units supporting RPA operations.

Report on Army Aviation Restructure Initiative

The committee is concerned about the status of Army attack aviation following the decision to execute the Aviation Restructure Initiative in 2013. The committee is aware that the decision to reduce attack and reconnaissance aviation battalions by 37 percent and realign most attack helicopters from the Army National Guard to the active component was made to meet the demands of strategic planning at the time. However, the committee notes there is a shortfall of both warrant officer and commissioned officer pilots in the active component. Meanwhile, there is a cadre of experienced and qualified Guard pilots that can help bridge this gap. The committee is concerned that this cadre may not remain a viable option, as the nation is facing a pilot shortage crisis and commercial airlines are now specifically targeting helicopter pilots. This mismatch of resources has created a situation where aircraft are assigned to bases with no pilots to fly them. The committee believes this scenario could negatively affect the ability of the Army to support combatant commanders' future needs. Furthermore, the committee needs to gain a better understanding of the overall operational impacts for National Guard Apache battalions given the current plan to retain 18 aircraft per unit in the National Guard instead of the 24 that their active-duty counterparts will have.

Accordingly, the committee directs the Secretary of the Army, in coordination with the Director of the National Guard Bureau, to provide a briefing to the House Committee on Armed Services, not later than December 31, 2017, on the status of Army attack aviation readiness. The briefing should also provide updates on new factors that affect the Army's ability to maintain a robust attack aviation capability over the next 3 years, including a plan to recruit and retain the required number of qualified attack helicopter pilots.

Report on Military Training for Rotary-Wing Aviation

Ongoing readiness challenges with rotary-wing aviation in the U.S. Armed Forces have raised a number of questions around the maintenance, training, manpower, safety, and deployability of

these aircraft. For example, both the Army and Marine Corps have cited a lack of funding for training and maintenance, including spare parts, as a critical concern for their rotary-wing aviation communities. Further, the military services have cited pilot shortages and the lengthy duration of new pilot training as issues affecting rotary-wing aviation readiness. These issues have been further exacerbated by increased civilian hiring competition for experienced rotary-wing pilots. The committee has expressed concern about the effect these readiness challenges have had on the frequency of accident mishaps in rotary-wing aviation over the past 5 years and has urged the military services to prioritize funding for rotary-wing aviation in order to ensure that the United States maintains this crucial capability into the future.

Given these concerns, the committee directs the Comptroller General of the United States to assess the following:

(1) to what extent have the military services met annual training requirements for rotary-wing aircraft, and identified any factors that have limited this training;

(2) what is known about the relationship between the amount and type of training completed on rotary-wing aircraft and the number of accident mishaps;

(3) to what extent have the military services utilized virtual training devices to meet training requirements for rotary-wing aircraft; and

(4) any other issues the Comptroller General determines appropriate with respect to rotary-wing aviation training.

The committee further directs the Comptroller General to provide a briefing to the House Committee on Armed Services not later than February 1, 2018, on the Comptroller General's preliminary findings and to submit a final report to the Senate Committee on Armed Services and the House Committee on Armed Services on a date agreed to at the time of the briefing.

### Report on Multi-Domain Battle Concept

Over the past decade, the Russian Federation, the People's Republic of China, and other potential adversaries have developed sophisticated intelligence, surveillance, and reconnaissance; air defense; artillery; information operations; and other capabilities that pose significant challenges to U.S. ground forces entering the theater and, once in place, would leave them exposed to counterattack. In February 2017, the Army and Marine Corps published a concept paper describing an approach for ground combat operations in the face of such challenges. This approach, named "multi-domain battle," would synthesize ground maneuver, fires, and information operations capabilities to project power from the land and into the air, maritime, and cyber domains. In doing so, land forces would be able to consolidate gains, deny the adversary freedom of movement, and create temporary windows that the joint force could then exploit for decisive operations.

The committee appreciates the Army and Marine Corps publication of the multi-domain battle concept and is encouraged by the Army's forward thinking on the next steps to bring multi-domain battle to the warfighter. The committee is aware of additional, planned Army concept development, experimentation, and potential force structure changes that are intended to translate the concept

into a warfighting capability. However, significant work remains. Importantly, the committee notes that multi-domain battle has implications for the Navy and Air Force, whose involvement will be instrumental in the concept's warfighting success. Bringing the multi-domain battle concept to fruition will require changes in warfighting doctrine, organization of new warfighting formations at multiple echelons, investment in key technologies, leader education, force training, and readiness evaluation.

Therefore, the committee directs the Comptroller General of the United States to review the Army's progress and plans in developing the concept. As part of the review, the Comptroller General should examine the extent to which the Army and Marine Corps have engaged with each other and with the other services to develop multi-domain battle concepts and doctrine, and set priorities for organizing, training, and equipping the force in the concept. Additionally, the review should assess:

(1) the services' priorities and plans for fielding new multi-domain battle capabilities over the next 2 to 5 years;

(2) the implications for the Army's near-term and long-term modernization plans;

(3) plans for educating, training, and evaluating the readiness of Army formations to execute multi-domain battle operations; and

(4) any other matters related to multi-domain battle the Comptroller General determines are appropriate.

The committee further directs the Comptroller General to provide a briefing to the House Committee on Armed Services by July 1, 2018, on preliminary findings of the review and to submit a final report to the Senate Committee on Armed Services and the House Committee on Armed Services by a date agreed to at the time of the briefing.

### Report on Unit-Level Training Costs to Build Full-Spectrum Readiness

The Department of Defense uses operation and maintenance (O&M) funding to train U.S. military forces in order to build combat readiness, among other purposes. However, in recent years, the military services have raised concerns about the level of O&M funding available to support unit-level training programs. For example, in 2016 the Assistant Commandant of the Marine Corps stated that given available resource levels, the Marine Corps was accepting prolonged readiness risks and focusing the training of some units to their more limited rotational missions versus full-spectrum training. The Vice Chief of Staff of the Army also stated that the Army took actions to enable the effective and efficient use of training resources in order to mitigate the risk posed by the fact that less than one-third of Army units were at acceptable levels of readiness.

The military service chiefs have identified rebuilding the readiness of the armed forces to prevail across a full range of potential contingencies as a top priority and, in recent budget requests, have recommended funding for training that had been cut due to budget constraints. The committee is aware that the military services use various approaches and models to determine funding requirements for training as part of the Department's planning, programming, budgeting, and execution processes. The committee is further

aware that the Department's annual budget requests include some information about the military services' O&M funding estimates for training. However, this information is not sufficiently detailed to determine unit training costs and the amount of readiness that is expected to be generated by annual O&M expenses. Therefore, it is difficult to determine the benefits that would be gained from additional O&M funding for unit-level training.

To better understand the military services' budgeting processes to build unit-level training readiness, and to achieve greater transparency over the military services' O&M funding requests, the committee directs the Comptroller General of the United States to assess the following:

(1) how the military services determine annual O&M budget estimates for unit-level training;

(2) the extent to which the Department of Defense and the military services established mechanisms to monitor the amount of O&M obligations for unit-level training and used data on actual O&M costs to develop future funding requests; and

(3) the extent to which the military services established processes and metrics to systematically evaluate unit training costs and the amount of readiness that is generated from O&M training expenditures.

The committee further directs the Comptroller General to provide a briefing to the House Committee on Armed Services not later than February 1, 2018, on the Comptroller General's preliminary findings and to submit a final report to the congressional defense committees on a date agreed to at the time of the briefing.

## Small Arms Weapons Simulation Training

The committee recognizes the benefits gained from the use of simulation and synthetic training systems to maximize military training and readiness requirements. As the use of such systems increases to supplement live training exercises and to meet critical warfighter readiness requirements, the committee is concerned that the Department of Defense has not implemented clear performance evaluation metrics, data collection requirements, and validation standards to accurately assess and document whether each command's chosen training system is transferring required skills proficiency to live fire and real-world combat scenarios.

Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services by December 1, 2017, that includes, at a minimum: a detailed description of the evaluation metrics that each service plans to use to ensure all new small arms simulation training systems and programs of instructions are tested to demonstrate clear and repeated live fire transfer proficiency and combat readiness prior to system acquisition; an assessment of the live fire performance results of existing simulation and synthetic small arms training systems being utilized; a plan to ensure future systems are capable of data collection that gives commands the ability to maintain and track individual and squad-level training records, provide trend analysis and forecast models to reduce training time and accurately determine live fire transfer readiness, and train to multiple proficiency levels and threat evolutions; and, examples of current simulation and synthetic small arms training systems that are documenting cost sav-

ings in ammunition, travel, training time, and expedited and improved qualification and remediation rates.

Training for Air Force Combined Air Operations Center Personnel

The committee recognizes that a top priority for the Air Force Chief of Staff is to qualify personnel to serve in joint task forces and combined air operations centers (CAOCs). This qualification relies in part on the opportunity for Air Force personnel to train in command and control procedures within the physical environment of a CAOC. Most Air Force CAOC training occurs during occasional large-force training and mission-rehearsal exercises, where the primary focus of the exercise is not the training of CAOC personnel. The committee believes that adequate command and control training of CAOC staffs is essential to safe, secure, and effective air operations in theaters and contingency environments around the world.

Additionally, the committee is aware that regional CAOC training centers provide effective training with reduced costs. The Air Combat Command (ACC) Crisis Action Center, where ACC staff plans and commands ACC forces responding to a national crisis, and the CAOC Exercise (CAOC–X), designed to support planning and execution of joint forces when ACC is the air component commander supporting an engaged combatant commander or a joint task force commander leading a crisis response, are two such regional centers. In those cases, the CAOC provides actual current intelligence and targeting and produces the daily air tasking order. The committee strongly encourages the Chief of Staff of the Air Force to ensure that CAOC–X and other regional CAOCs are resourced, manned, and fully utilized to serve as a training venue for the planning, execution, and command and control of joint forces taking part in major regional joint exercises.

Training Range Inventory, Capacity, and Configuration in Europe

As the committee asserts elsewhere in this report, the committee believes there is operational and strategic value in maintaining forward presence of United States military forces by providing rapid response capabilities to geographic combatant commanders, serving as a deterrent to potential adversaries, assuring partners and allies, and facilitating cooperative efforts to build and develop partner-nation security capabilities. The committee notes that permanently stationed U.S. forces presently are located primarily at legacy, enduring locations in Western Europe, while rotational U.S. forces have primarily been deployed to support exercises and assurance activities in the Baltic countries, as well as Central and Eastern Europe. With these rotational forces exercising in new locations, the committee is concerned that training requirements to build and sustain readiness may not be adequately met by current training range capabilities in the region.

Therefore, the committee directs the Secretary of Defense, in coordination with the Commander, U.S. European Command, to provide a report to the congressional defense committees by April 1, 2018, on the location, capabilities, and capacities of air and ground ranges, range complexes, military training routes, and special-use

areas in the European Command's area of responsibility. At a minimum, the report should address the following:

(1) an inventory of current air and ground ranges, range complexes, military training routes, and special-use areas the U.S. Armed Forces currently utilize or have access to in the U.S. European Command's area of responsibility;

(2) an overview of the current capabilities and capacity of these training areas to support permanent and rotational forward presence of U.S. military forces;

(3) an assessment of any capability gaps at these training areas that limit the ability to meet training requirements to U.S. standards; and

(4) details of current or planned investments in training infrastructure to mitigate identified capability gaps, help meet U.S. training requirements, or required to support additional permanent or rotational forces in Europe, funded either by the United States, NATO, or foreign partners.

## Undergraduate Pilot Training

The committee supports the Air Force's efforts to increase pilot production as a critical enabler to rebuilding readiness. Given current and future training demands, existing undergraduate pilot training (UPT) facilities are reaching maximum throughput capacity. The Air Force currently utilizes nearby civilian airfields to meet operational flight requirements. Therefore, the committee directs the Secretary of the Air Force to provide a briefing to the House Committee on Armed Services by October 27, 2017, on the following:

(1) A business case analysis to identify efficient ways to maximize current UPT activities including use of proximate civilian airfields;

(2) Efforts to maximize current UPT activities;

(3) Efforts to optimize the pilot instructor training force including use of retired-to-reserve, Air Force Reserve, Air National Guard, and civilian contract instructors;

(4) An assessment of availability of civilian aviation facilities proximate to current UPT installations including runway capacity, ramp space, access to military operating areas, hangars, other aviation operation infrastructure, facilities for administrative and support functions, and availability of instructors, maintainers, and other support personnel;

(5) A summary of currently shared operations and activities between each Air Force UPT installation and proximate civilian aviation facilities, and a list of other proximate civilian aviation facilities with potential utilization capabilities; and

(6) An evaluation of the feasibility and efficiency of increasing the use of proximate civilian aviation facilities to expand UPT capacity to meet throughput requirements and create additional surge capacity, including expanding operations at currently utilized civilian aviation facilities and increasing utilization of additional proximate civilian aviation facilities.

## OTHER MATTERS

### Combatant Command Policies on Open-Air Burn Pits

The committee notes that the Department of Defense has in place Department of Defense Instruction (DODI) 4715.19 that establishes policies, responsibilities, and procedures regarding the use of open-air burn pits in contingency environments. The committee notes that U.S. Central Command is currently the only geographic combatant command that has issued implementation policies and procedures for waste management. In September 2016, the Government Accountability Office (GAO) recommended that the commanders of U.S. Africa Command, U.S. European Command, U.S. Pacific Command, and U.S. Southern Command also issue implementation policies and procedures for waste management. The committee notes that the Department concurred with this recommendation and understands that the Department is currently in the process of revising DODI 4715.19. As the Department revises DODI 4715.19, the committee encourages the Department to incorporate the above GAO recommendation.

### Consideration of the Domestic Textile Industrial Base in Contracting for Uniforms

The committee is aware of an August 2016 Department of the Navy directive altering mandatory seabag requirements, including elimination of the wool peacoat and the all-weather coat. The committee is concerned this decision was made without considering upgrades or alternatives to the traditional peacoat or the impact to the nation's domestic textile industrial base. As the Department of the Navy works to streamline military uniforms, the committee notes the importance of a stable domestic textile industrial base to produce garments such as these and encourages the Department to take into consideration, when making decisions about uniform changes, such an impact upon the domestic textile industrial base, including the small businesses that provide critical contributions.

The committee directs the Secretary of the Navy to provide a briefing to the House Committee on Armed Services not later than October 1, 2017, that addresses the following:

(1) an explanation of why the Navy removed the peacoat from the mandatory seabag requirements;

(2) what consideration of alternatives was given to upgrades or improvements to the peacoat;

(3) any evaluation of the costs of the cold-weather parka compared to both the peacoat and the all-weather coat; and

(4) an assessment of the impact to the domestic textile industrial base of these changes.

### Dioxin-Based Herbicides Review Related to Guam

Agent Orange, a dioxin-based herbicide now known as a carcinogen, was used by the United States during the Vietnam war to defoliate trees and shrubs that provided cover for opposition forces. The committee is concerned that additional exposures to Agent Orange may have occurred in the U.S. Territory of Guam, where persistent questions have been raised about the use of locations on Guam as a transshipment point for Agent Orange intended for use

in Vietnam. The committee therefore directs the Comptroller General of the United States to conduct a review of the Federal Government's handling of Agent Orange on Guam and submit a report of the findings to the House Committee on Armed Services by March 22, 2018. The Comptroller General's study should address the following:

(1) what is known about where the Federal Government stored, transferred, and used Agent Orange or its components on Guam, and what is known about related contamination at these locations, including what is known about the storage or transfer of Agent Orange on Guam;

(2) the number of known and suspected environmental "hot spots" from dioxin contamination associated with Agent Orange that are on Guam;

(3) what is known about the current dioxin levels and threats to human health and the environment at these sites;

(4) the plans that are in place to remediate these sites, and the status of these plans; and

(5) the sum of money the Department of Defense spent to date to clean up these sites and the projected remaining costs associated with these cleanup efforts.

### Ensuring Proper Fitting of Athletic Footwear

The committee is aware of the Department of the Navy's use of specific foot imaging technology to properly gauge the individual foot type (overpronated, neutral, or underpronated) and appropriate shoe type (motion control, stability, or cushioned/neutral) for recruits entering basic training. The committee notes a Department of the Navy study demonstrating the effectiveness of its Recruit Training Command's standardized physical training program including injury prevention initiatives, such as matching individuals with appropriate shoe types, in lowering the rate of recruit injury by nearly 70 percent. The committee supports the Department of the Army and the Department of the Air Force's efforts to fit recruits with appropriate athletic footwear to reduce injury and encourages both departments to ensure that all recruit training facilities are equipped with foot imaging technology to prevent injury.

### Environmental Restoration

The committee notes that the Department of Defense has responsibility for more than 34,000 sites under the installation restoration program at active installations, Formerly Utilized Defense Sites, and BRAC locations. The Department has set a goal of achieving response complete at 90% of these sites by the end of fiscal year 2018 and 95% of these sites by the end of fiscal year 2021. The committee understands that the Department is currently on track to achieve these goals. However, the committee notes that even after the Department meets these goals, more than 1,700 sites will still not have achieved response complete status. Based on current estimates, many of these locations will require significant time and resources to achieve response complete.

The committee is concerned that current funding may be insufficient and result in inefficient remediation efforts, delays and overall higher costs. Therefore, the committee directs the Secretary of

Defense, in coordination with the secretaries of the military departments, to provide a report to the House Committee on Armed Services no later than December 31, 2017, on efforts to reach 100% response complete for sites under the installation restoration program. At minimum, the report should provide a list of sites that have not yet achieved response complete, a total estimated cost for achieving response complete at these sites, the number of years that it will take at current annual funding levels to achieve response complete at these sites, and current efforts the Department is taking to ensure the installation restoration program is resourced to maximize efficiency and minimize the total time required to reach response complete at these sites including the feasibility of public-private partnerships to expedite clean up.

### Fabric and Membrane Technology for Footwear

The committee expresses its ongoing support for Department of Defense research and testing of cutting-edge fabric and membrane technologies to improve service members' comfort, effectiveness, and mission readiness. The report (S. Rept. 114–49) accompanying the National Defense Authorization Act for Fiscal Year 2016 included a requirement for the Secretary of Defense to submit a report to the Senate Committee on Armed Services on fabric-based respiratory protective equipment, including evaluations of emerging technologies to minimize service member exposure to inhalation of particulates and pollutants. Additionally, in the report (S. Rept. 114–255) accompanying the National Defense Authorization Act for Fiscal Year 2017, the Senate Committee on Armed Services directed the Secretary of the Army to report similarly on footwear technologies that incorporate new polytetrafluoroethylene (ePTFE) and other membrane technologies. In light of these directives, the committee understands that the Army is currently evaluating the referenced technologies and that the evaluations are yielding positive results.

Recognizing the importance of these technologies to warfighter readiness, the committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services not later December 15, 2017, on the suitability of the aforementioned technologies to military applications. Specifically, the briefing shall provide an evaluation of the fabric-based filter protective equipment technologies reviewed under the reporting requirement in S. Rept. 114–49, identification of specific applications for integration of the technology, and a plan for transitioning the technology into such applications and programs. In line with the Army's review of footwear technologies as required in S. Rept. 114–255, the briefing shall provide a detailed evaluation of new ePTFE membranes, laminates, and other membrane technologies. Additionally, the briefing shall include suggested revisions to current requirements and product descriptions that could be implemented to expand access to these membrane technology advancements. Finally, the briefing shall address a plan for transitioning membrane technologies into military applications, including Army boot modernization programs such as the jungle combat boot program, the cold-weather and extreme cold-weather boot programs, and future cold-weather clothing systems.

Flame-Resistant Military Uniform Postures

In the committee report (H. Rept. 114–537) accompanying the National Defense Authorization Act for Fiscal Year 2017, the committee directed the military services to provide a joint briefing to the committee that outlined the plan and process, including costs, for providing flame-resistant (FR) uniform protection postures for all military personnel. The committee encouraged all military services to consider implementing FR uniform protective postures based on an assessment of the threat and the operating environment. In light of this report, the committee encourages the services to continue to update military requirements and implementation of FR protective postures based on the threat and the operating environment.

Former Naval Weapons Industrial Plant Bethpage

The committee notes that from 1942 until 1996, the Naval Weapons Industrial Reserve Plant (NWIRP) at Bethpage, New York, was a government-owned, contractor-operated facility. Since its inception, the plant's primary mission supported the research, prototyping, testing, design, engineering, fabrication, and primary assembly of military aircraft. The committee is aware of the environmental concerns related to soil and groundwater contamination in the vicinity of NWIRP Bethpage. There are other responsible parties and non-Navy sources that have contributed to regional groundwater contamination, including the contractor which operated the NWIRP and owned and operated adjacent facilities.

To guide remediation actions associated with the historic operations, the committee notes that the Navy has signed three separate records of decision (ROD) for the NWIRP Bethpage dated 1995, 2003, and 2015. To date, the U.S. Government has spent approximately $94 million to implement and comply with the RODs. The U.S. Government currently estimates that it will spend approximately $2.5 million to $10.0 million per year over the next 30 years. This funding supports a range of response actions including extensive off-property groundwater monitoring, construction, operation, maintenance and monitoring of public water supply treatment systems and hot spot mass removal systems. Funding is also being used to remove contaminated soil, construct and operate soil vapor extraction systems to treat contamination in solid and control vapor intrusion, and to conduct community and regulatory outreach through restoration advisory board and quarterly technical meetings. The committee is aware that the Navy intends to continue efforts to remediate soil and groundwater contamination while also putting in place land use controls to prevent human exposure to contaminated soil and groundwater.

The committee is supportive of the Navy's remediation efforts as outlined in the RODs and believes it is important for the Navy to continue to dedicate adequate resources to ensure timely and effective remediation of the former NWIRP Bethpage site. The committee also believes working with State and local governments to timely and efficiently execute the Navy's responsibilities under its RODs may help reduce the financial burden stemming from remediation efforts. As additional resources or new technologies are

made available, the committee encourages the Navy to seek opportunities to expedite the current remediation schedule.

### Guam Micronesian Kingfisher Recovery Habitat

The committee is aware that the Department of the Navy and the U.S. Fish and Wildlife Service signed a Memorandum of Agreement (MOA) on June 11, 2015 regarding the conservation of the Guam Micronesian kingfisher. The committee notes that this MOA was put in place to support the relocation of U.S. Marines to Guam as well as to ensure a sufficient amount of suitable survival recovery habitat is conserved and managed for the reintroduction and recovery of the Guam Micronesian kingfisher. Under the MOA, 5,234 acres of land under the control of the Department of Defense was identified and designated for enhanced management activity to ensure the continued suitability of the recovery habitat until such time as the species can be reintroduced on Guam. The committee notes that this MOA was signed by the Deputy Assistant Secretary of the Navy, as the Department of the Navy serves as the executive agent for installation management for Joint Region Marianas. However, the committee is concerned about the potential impacts this MOA may have on current and future military infrastructure development, training, and operational requirements on Guam as well as the limitations unrelated to the Department of Defense that affect the feasibility of reintroduction of the species. Therefore, the committee directs the Secretary of the Navy and the Secretary of the Air Force to provide a briefing to the House Committee on Armed Services not later than September 30, 2017, regarding the near- and long-term operational impacts of the MOA. At minimum, the briefing should address land use needs at Andersen Air Force Base, impacts on the operations master plan for future mission growth, any identified property deemed potentially in conflict with current land designations, and any other relevant information.

### Personal Protection Equipment Awards Program

The Army's Personal Protection Equipment Awards program recognizes soldiers whose lives were saved by their personal protective equipment. The award consists of a demilitarized piece of protective equipment that the soldier was wearing when injured, mounted on a wooden plaque or mount. The committee understands that the Secretary of the Army chose to limit eligibility for these awards to only those soldiers under the jurisdiction of the Secretary of Defense at the time of the award. The committee believes that the program is important to both soldiers and former soldiers and, when feasible, should be available to both groups. The committee supports the Army's Personal Protection Awards program for all recipients, including former soldiers who have earned the award.

### Polyfluoroalkyl Substances

The committee notes that perfluorooctanesulfonic acid (PFOS) and perfluorooctanoic acid (PFOA) are part of a class of man-made chemicals that are used in many industrial and consumer products to make the products resist heat, stains, water, and grease. In the 1970s, the Department of Defense and commercial airports began using aqueous film forming foam (AFFF), which contained these

chemical compounds, to extinguish petroleum fires. The committee notes that on May 19, 2016, the U.S. Environmental Protection Agency (EPA) issued new Lifetime Health Advisories (LHAs) under the Safe Drinking Water Act for combined PFOS and PFOA concentrations at 70 parts per trillion. Since EPA issued these new LHAs, the Department of Defense has completed testing of the 480 drinking water systems at locations where the Department supplies drinking water. In addition, the Department is currently working through The Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601) (CERCLA) process to conduct preliminary assessments and site inspections to identify sites where PFOS and PFOA may have been released by the Department of Defense. This activity includes performing tests of privately owned drinking water wells near military installations where warranted. These efforts will be used to inform future cleanup actions, and the Department incorporates LHA information when assessing risk to human health under CERCLA.

The committee understands that the Department of Defense spent approximately $200.0 million through December 31, 2016, in response to PFOS and PFOA. This funding has been used to conduct preliminary assessments and site inspections, test drinking water systems, and provide mitigations such as bottled water or drinking water filtration systems where water systems tests indicate PFOS/PFOA above the LHA levels. The committee notes that the Department was unable to program funds specifically for these actions in the fiscal year 2016 or fiscal year 2017 budget requests and have been funding their response to PFOS/PFOA using existing funds originally programmed for other response actions. The committee is supportive of the Department's near-term efforts to respond to PFOS and PFOA and believes it is critical for the Department to continue its outreach and engagement with local communities with drinking water systems that have PFOS/PFOA detected above the LHAs and may have been impacted by the Department's activities. Furthermore, the committee believes it is important for the Department to fully plan, program, and budget for actions related to PFOS and PFOA in order to meet its responsibilities under the CERCLA, the Safe Drinking Water Act (42 U.S.C. 300f), and other applicable Federal statutes, rules, and regulations.

Finally, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services not later than September 30, 2017, on the Department's response to PFOS/PFOA. The briefing should provide the following:

(1) the locations on or in proximity to current and former military installations where the Department has conducted testing of military, public, and private drinking water systems and a summary of the results of those tests where PFOS/PFOA levels were detected in excess of the LHA levels;

(2) the locations on or in proximity to current and former military installations where the Department has conducted groundwater testing where PFOS/PFOA may have been released and a summary of the results of those tests where PFOS/PFOA levels were detected in excess of the LHA levels;

(3) short-term mitigations that have been funded and provided by the Department, both on military installations and in the sur-

rounding communities, where PFOS/PFOA levels were detected in excess of the LHA levels;

(4) the process and timeline for identifying and resourcing long-term remediation on military installations or in the surrounding communities where PFOS/PFOA levels were detected in excess of the LHA levels; and

(5) research conducted in pursuit of less environmentally harmful AFFF blends containing less or no PFOS/PFOA.

### Recurrent Flooding and Sea Level Rise

The committee is aware that several Department of Defense installations and facilities are experiencing recurrent flooding events and encroachment from sea level rise. These events have the potential to adversely impact military operations, training, and readiness. The committee is aware that the Department of Defense and the military departments have initiated several studies and collaborations with academic, research, and intergovernmental institutions to model recurrent flooding and sea level rise and examine options for enhancing mission resiliency at impacted military installations. The committee supports these collaborations and encourages the Department of Defense to continue and expand these research efforts.

The committee directs the Secretary of Defense, in coordination with the Secretaries of the military departments, to provide a briefing to the House Committee on Armed Services not later than March 1, 2018, on recurrent flooding and sea level rise impacting military installations. At a minimum, the briefing should address the findings and recommendations of the research collaborations that have been undertaken to date, a discussion of areas where the Department of Defense believes additional research is needed, and ongoing and planned mitigations to ensure the continued operational viability and mission resilience of affected military installations.

### Standard-Issue Garments for Women

In the committee report (H. Rept. 114–537) accompanying the National Defense Authorization Act for Fiscal Year 2017, the committee directed the Secretary of Defense to provide a briefing to the committee outlining plans to provide personal protective equipment (PPE) and organizational clothing and individual equipment (OCIE) developed specifically for female service members. The committee notes that it has not yet received this briefing. The committee further directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services not later than September 30, 2017, on efforts to ensure that standard-issue garments, such as the Army Combat Shirt, are meeting the unique body types of female service members. This briefing should include a discussion of how the Army is seeking to leverage advancements in flame-resistant technology and integrate them into standard garments.

### Water Quality Trading

The Committee recognizes that the Department of Defense must comply with post-construction water quality requirements under

the Federal Water Pollution Control Act (Clean Water Act) when conducting construction activities on military installations. Water quality requirements may include, but are not limited to, those associated with the control and reduction of storm water runoff, total maximum daily loads, water quality standards and criteria, National Pollution Discharge Elimination System permits, or similar state or local permits. The committee is aware that some states are developing Water Quality Trading Program, where the purchase of water quality credits, generated by third parties and certified by the appropriate federal, state, or local agency, may help reduce costs while meeting water quality compliance requirements in a transparent and accountable manner. Therefore, the committee directs the Secretary of Defense, in coordination with the secretaries of the military departments, to provide a briefing to the House Committee on Armed Services not later than March 1, 2018, on the potential use of water quality credits to comply with applicable federal and state laws and regulations. At minimum, the briefing should address the Department's policy with respect to purchasing water quality credits, examples of where such credits have been used by the Department of Defense, as well as the financial costs, benefits, and challenges associated with such credits.

## LEGISLATIVE PROVISIONS

### Subtitle A—Authorization of Appropriations

#### Section 301—Authorization of Appropriations

This section would authorize appropriations for operation and maintenance activities at the levels identified in section 4301 of division D of this Act.

### Subtitle B—Energy and Environment

#### Section 311—Codification of and Improvements to Department of Defense Clearinghouse to Coordinate Department Review of Applications for Certain Projects That May Have Adverse Impact on Military Operations and Readiness

This section would amend chapter 7 of title 10, United States Code, by inserting a new section that would update the authorities of the Department of Defense Clearinghouse established by section 358 of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 (Public Law 111–383).

This section would also change the name of the Clearinghouse to the "Military Aviation, Range, and Installation Assurance Program Office" would repeal section 358 of Public Law 111–383 upon enactment.

#### Section 312—Energy Performance Goals and Master Plan

This section would amend section 2911 of title 10, United States Code, to add future energy demand, energy resiliency, and opportunities to leverage third-party financing to the special considerations the Secretary of Defense must consider when developing and implementing the energy performance goals and energy performance master plan.

Section 313—Payment to Environmental Protection Agency of Stipulated Penalty in Connection With Umatilla Chemical Depot, Oregon

This section would authorize the Secretary of the Army to transfer a specified amount to the Hazardous Substance Superfund to satisfy a stipulated penalty assessed by the Environmental Protection Agency against the Umatilla Chemical Depot, Oregon, under a Federal Facility Agreement entered into by the Army and the Environmental Protection Agency in 1989.

Section 314—Payment to Environmental Protection Agency of Stipulated Penalty in Connection With Longhorn Army Ammunition Plant, Texas

This section would authorize the Secretary of the Army to transfer a specified amount to the Hazardous Substance Superfund to satisfy a stipulated penalty assessed by the Environmental Protection Agency against Longhorn Army Ammunition Plant, Texas, under a Federal Facility Agreement entered into by the Army and the Environmental Protection Agency in 1991.

Section 315—Department of Defense Cleanup and Removal of Petroleum, Oil, and Lubricant Associated With the Prinz Eugen

This section would authorize removal and cleanup of petroleum, oil and lubricants from the heavy cruiser Prinz Eugen, which was transferred from the United States to the Republic of the Marshall Islands in 1986.

SUBTITLE C—LOGISTICS AND SUSTAINMENT

Section 321—Reauthorization of Multi-Trades Demonstration Project

This section would amend section 338 of the National Defense Authorization Act for Fiscal Year 2004 (Public Law 108–136) to extend the multi-trades demonstration project through 2024.

Section 322—Guidance Regarding Use of Organic Industrial Base

This section would direct the Secretary of the Army to maintain the arsenals with sufficient workloads to ensure affordability and technical competence in all critical capability areas.

SUBTITLE D—REPORTS

Section 331—Quarterly Reports on Personnel and Unit Readiness

This section would amend section 482 of title 10, United States Code, to change the matters reported in the Quarterly Readiness Reports to Congress (QRRC). Reports for the first and third quarters of a fiscal year would contain information on Department of Defense and military service readiness status while those for the second and fourth quarters of a fiscal year would contain Department of Defense mitigation plans for readiness deficiencies identified in the previous quarter's QRRC.

Section 332—Biennial Report on Core Depot-Level Maintenance and Repair Capability

This section would amend section 2464 of title 10, United States Code, to improve existing biennial reporting requirements on core depot-level maintenance and repair capabilities by clarifying what specific data should be included in such reports.

Section 333—Annual Report on Personnel, Training, and Equipment Needs of Non-Federalized National Guard

This section would amend section 10504 of title 10, United States Code, to require an annual report on the personnel, training, and equipment needs of the non-federalized National Guard.

Section 334—Annual Report on Military Working Dogs Used by the Department of Defense

This section would establish an annual reporting requirement on Military Working Dogs used by the Department of Defense.

Section 335—Annual Briefings on Army Explosive Ordnance Disposal

This section would require an annual briefing to the Committees on Armed Services of the Senate and House of Representatives on the Army's explosive ordnance disposal program.

Section 336—Report on Effects of Climate Change on Department of Defense

This section would state findings related to climate change, express the sense of Congress regarding climate change and national security, and would require the Secretary of Defense to provide a report on vulnerabilities to military installations and combatant commands from climate change related effects.

SUBTITLE E—OTHER MATTERS

Section 341—Explosive Safety Board

This section would amend section 172 of title 10, United States Code, to change the name of the Ammunition Storage Board to the Explosive Safety Board while also changing the membership requirements of that board.

Section 342—Department of Defense Support for Military Service Memorials and Museums That Highlight the Role of Women in the Armed Forces

This section would allow the Secretary of Defense to provide financial support for the acquisition, installation, and maintenance of exhibits, facilities, historical displays, and programs at military service memorials and museums that highlight the role of women in the Armed Forces.

The budget request included $5.0 million for financial support for the acquisition, installation, and maintenance of exhibits, facilities, historical displays, and programs at military service memorials and museums that highlight the role of women in the military in ac-

cordance with section 2833 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328). As noted in the justification materials accompanying the budget request, the committee expects these funds and the authority provided by this section to enable the memorial to address program shortfalls and chart a path to financial independence by end of year fiscal year 2018.

### Section 343—Limitation on Availability of Funds for Advanced Skills Management Software System of the Navy

This section would require the Secretary of the Navy to brief the committee on needed enhancements to the Advanced Skills Management software system. This section would also withhold funding for this software system until 60 days after the Secretary of the Navy has provided the committee with the results of a formal request for information that considers commercial-off-the-shelf solutions.

### Section 344—Cost-Benefit Analysis of Uniform Specifications for Afghan Military or Security Forces

This section would require a cost-benefit analysis of uniform specifications as a condition of the contract whenever the Secretary of Defense enters into a contract for the provision of uniforms for Afghan military or security forces.

# TITLE IV—MILITARY PERSONNEL AUTHORIZATIONS

## LEGISLATIVE PROVISIONS

## SUBTITLE A—ACTIVE FORCES

### Section 401—End Strengths for Active Forces

This section would authorize the following end strengths for Active Duty personnel of the Armed Forces as of September 30, 2018:

Sec. 401.

| Service | FY 2017 Authorized | FY 2018 | | Change from | |
|---|---|---|---|---|---|
| | | Request | Committee Recom-mendation | FY 2018 Request | FY 2017 Authorized |
| Army | 476,000 | 476,000 | 486,000 | 10,000 | 10,000 |
| Navy | 323,900 | 327,900 | 327,900 | 0 | 4,000 |
| USMC | 185,000 | 185,000 | 185,000 | 0 | 0 |
| Air Force | 321,000 | 325,100 | 325,100 | 0 | 4,100 |
| DOD Total | 1,305,900 | 1,314,000 | 1,324,000 | 10,000 | 18,100 |

### Section 402—Revisions in Permanent Active Duty End Strength Minimum Levels

This section would establish new minimum Active Duty end strengths for the Army, Navy, Marine Corps, and Air Force as of September 30, 2018. The committee recommends 486,000 as the minimum Active Duty end strength for the Army, 327,900 as the minimum Active Duty end strength for the Navy, 185,000 as the minimum Active Duty end strength for the Marine Corps, and 325,100 as the minimum Active Duty end strength for the Air Force.

## SUBTITLE B—RESERVE FORCES

### Section 411—End Strengths for Selected Reserve

This section would authorize the following end strengths for Selected Reserve personnel, including the end strength for Reserves on Active Duty in support of the Reserves, as of September 30, 2018:

Sec. 411.

| Service | FY 2017 Authorized | FY 2018 | | Change from | |
|---|---|---|---|---|---|
| | | Request | Committee Recom-mendation | FY 2018 Request | FY 2017 Authorized |
| Army National Guard | 343,000 | 343,000 | 347,000 | 4,000 | 4,000 |
| Army Reserve | 199,000 | 199,000 | 202,000 | 3,000 | 3,000 |
| Navy Reserve | 58,000 | 59,000 | 59,000 | 0 | 1,000 |
| Marine Corps Reserve | 38,500 | 38,500 | 38,500 | 0 | 0 |
| Air National Guard | 105,700 | 106,600 | 106,600 | 0 | 900 |
| Air Force Reserve | 69,000 | 69,800 | 69,800 | 0 | 800 |
| DOD Total | 813,200 | 815,900 | 822,900 | 7,000 | 9,700 |
| Coast Guard Reserve | 7,000 | 7,000 | 7,000 | 0 | 0 |

### Section 412—End Strengths for Reserves on Active Duty in Support of the Reserves

This section would authorize the following end strengths for Reserves on Active Duty in support of the Reserves as of September 30, 2018:

Sec. 412.

| Service | FY 2017 Authorized | FY 2018 | | Change from | |
|---|---|---|---|---|---|
| | | Request | Committee Recom-mendation | FY 2018 Request | FY 2017 Authorized |
| Army National Guard | 30,155 | 30,155 | 30,155 | 0 | 0 |
| Army Reserve | 16,261 | 16,261 | 16,261 | 0 | 0 |
| Navy Reserve | 9,955 | 10,101 | 10,101 | 0 | 146 |
| Marine Corps Reserve | 2,261 | 2,261 | 2,261 | 0 | 0 |

| Service | FY 2017 Authorized | FY 2018 | | Change from | |
|---|---|---|---|---|---|
| | | Request | Committee Recom- mendation | FY 2018 Request | FY 2017 Authorized |
| Air National Guard | 14,764 | 16,260 | 16,260 | 0 | 1,496 |
| Air Force Reserve | 2,955 | 3,588 | 3,588 | 0 | 633 |
| DOD Total | 76,351 | 78,626 | 78,626 | 0 | 2,275 |

## Section 413—End Strengths for Military Technicians (Dual Status)

This section would authorize the following end strengths for military technicians (dual status) as of September 30, 2018:

Sec. 413.

| Service | FY 2017 Authorized | FY 2018 | | Change from | |
|---|---|---|---|---|---|
| | | Request | Committee Recom- mendation | FY 2018 Request | FY 2017 Authorized |
| Army National Guard | 25,507 | 25,507 | 25,507 | 0 | 0 |
| Army Reserve | 7,570 | 7,427 | 7,427 | 0 | −143 |
| Air National Guard | 22,103 | 21,893 | 21,893 | 0 | −210 |
| Air Force Reserve | 10,061 | 10,160 | 10,160 | 0 | 99 |
| DOD Total | 65,241 | 64,987 | 64,987 | 0 | −254 |

## Section 414—Fiscal Year 2018 Limitation on Number of Non-Dual Status Technicians

This section would establish the maximum end strengths for the Reserve Components of the Army and Air Force for non-dual status technicians as of September 30, 2018:

Sec. 414.

| Service | FY 2017 Authorized | FY 2018 | | Change from | |
|---|---|---|---|---|---|
| | | Request | Committee Recom- mendation | FY 2018 Request | FY 2017 Authorized |
| Army National Guard | 1,600 | 1,600 | 1,600 | 0 | 0 |
| Air National Guard | 350 | 350 | 350 | 0 | 0 |
| Army Reserve | 420 | 420 | 420 | 0 | 0 |
| Air Force Reserve | 90 | 90 | 90 | 0 | 0 |
| DOD Total | 2,460 | 2,460 | 2,460 | 0 | 0 |

## Section 415—Maximum Number of Reserve Personnel Authorized To Be on Active Duty for Operational Support

This section would authorize, as required by section 115(b) of title 10, United States Code, the maximum number of Reserve

Component personnel who may be on Active Duty or full-time National Guard duty during fiscal year 2018 to provide operational support. The personnel authorized here do not count against the end strengths authorized by section 401 or section 412 of this Act unless the duration on Active Duty exceeds the limitations in section 115(b)(2) of title 10, United States Code.

Sec. 415.

| Service | FY 2017 Authorized | FY 2018 | | Change from | |
|---|---|---|---|---|---|
| | | Request | Committee Recom-mendation | FY 2018 Request | FY 2017 Authorized |
| Army National Guard | 17,000 | 17,000 | 17,000 | 0 | 0 |
| Army Reserve | 13,000 | 13,000 | 13,000 | 0 | 0 |
| Navy Reserve | 6,200 | 6,200 | 6,200 | 0 | 0 |
| Marine Corps Reserve | 3,000 | 3,000 | 3,000 | 0 | 0 |
| Air National Guard | 16,000 | 16,000 | 16,000 | 0 | 0 |
| Air Force Reserve | 14,000 | 14,000 | 14,000 | 0 | 0 |
| DOD Total | 69,200 | 69,200 | 69,200 | 0 | 0 |

## Subtitle C—Authorization of Appropriations

### Section 421—Military Personnel

This section would authorize appropriations for military personnel at the levels identified in the funding table in section 4401 of division D of this Act.

# TITLE V—MILITARY PERSONNEL POLICY

## ITEMS OF SPECIAL INTEREST

### Bystander Intervention Training

The committee notes that research in the use of evidence-based bystander intervention training and education has yielded promising results in helping to decrease the number of sexual assaults. The committee encourages the Department of Defense to continue to employ evidence-based training and education methods and to leverage civilian research centers in developing new and effective ways to reduce sexual assaults in the military.

### Comptroller General Report on Race Data in the Military Justice System

The committee is aware of a recent report that concluded that racial disparities may exist in the military justice system. The committee notes that the report relies on incomplete information because of differences in the way in which the military services collect and maintain data on this subject. Therefore, not later than January 30, 2019, the committee directs the Comptroller General of the United States to submit a report to the Armed Services Committee of the House of Representatives containing the following

components: (1) how the military services record and maintain the race and gender of service members convicted of violations of the Uniform Code of Military Justice; (2) the reason for any differences in collection and maintenance of this data among the military services; (3) recommendations to improve the collection of this data; (4) data and analysis to assist the committee in determining whether there is a racial disparity in the prosecution of cases under the Uniform Code of Military Justice; and (5) any other matters the Comptroller General believes are relevant to this issue.

Digital Transformation of the Recruiting Process

The committee understands that the Department of Defense and the military departments are working to improve and modernize the military recruiting process. However, the committee is aware that additional modernization is required to optimize recruiting and entrance processing. Therefore, the committee directs the Secretary of Defense, in consultation with the military services, to provide a briefing to the Committee on Armed Services of the House of Representatives no later than April 1, 2018, on the plan to modernize military recruiting and entrance processing. The briefing shall include:

(1) how the enlistment and commissioning workflow process can be modernized to improve workflow by minimizing paperwork and maximizing paperless transactions;

(2) how the military services measure effectiveness and return on investment for recruiting and advertising; and

(3) how the military services are using data analytics to improve recruiting.

Female Propensity To Serve in the Armed Forces

The committee recognizes that a broad talent pool is critical to attaining qualified recruits with the requisite skill sets in demand by the armed services. An analysis of Joint Advertising Market Research and Studies data conducted for the Defense Advisory Committee on Women in the Services estimated that only 29% of youth ages 17 to 24 meet eligibility criteria for military service. Over half of that population is comprised of women; however, women account for less than 15% of today's active duty force. Increasing the propensity of women to serve is an important step to achieving meaningful access to that eligible population and vital to meeting long-term readiness requirements. Therefore, the committee directs the Secretary of Defense to brief the House Armed Services Committee by January 31st, 2018 on the following:

(1) female propensity to serve in each of the Armed Services, including historical trends in propensity from 9/11 through the opening of remaining combat arms MOSs and units to women;

(2) a review of proactive measures the services have taken to increase the propensity of women to serve;

(3) an assessment of programs, policies, or incentives that could help increase the propensity of women to serve including an evaluation of how successful previous efforts been in this regard;

(4) service efforts to recruit women applicants, including measures of success weighted against the varying propensity of men and women to serve, funding directed towards gender diversity initia-

tives, and statistics related to female-targeted advertising and outreach to female athletes and high school students as a percentage of overall recruiting efforts in these areas; and

(5) an assessment of the impact of service culture on the propensity of women to serve, including departmental and service efforts to build environments of respect and inclusion and counter negative impressions of military service stemming from recent social media scandals.

## Gender Double Standards

The committee embraces the service of all qualified service members and believes that a single standard should apply to all service men and women to the degree practicable. While the committee supports the continuance of gender and age specific physical fitness evaluations, the committee is concerned that female service members are sometimes perceived to be held to different standards than their male service members. The committee is particularly concerned with the differences in basic training, such as the differing haircut standards for men and women in all services' initial entry training. The committee also believes that gender neutral physical standards should be adopted through the services for each occupation. Such standards would ease the gender neutral assignment policies to all duty positions, which should be the norm.

To begin the process of eliminating the perception of double standards as much as possible, the committee directs the Secretary of Defense, in coordination with service secretaries and the chiefs of the armed services, to review instances where men and women are held to different standards across the services and brief the House Committee on Armed Services by February 1, 2018 on any such differences the Secretary recommends retaining. Such a briefing should include discussion on appearance standards; a gender neutral assignment policy; gender neutral training and occupational standards, and any separate gender training.

## Gender Integration of United States Marine Corps Basic Recruit Training

The committee notes that on January 24, 2013 the Secretary of Defense rescinded the 1994 Direct Ground Combat Definition and Assignment Rule and directed the service to open all occupations and units to women as expeditiously as possible, but no later the 1 January 2016. The committee also recognizes that the military services have transitioned to gender-neutral occupational standards, but the military has retained different standards for men and women for the service's physical fitness test and encourages the services to continue to explore options for gender-neutral standards in this regard. The committee also notes that the United States Marine Corps is the only military service that has not integrated men and women at basic recruit training. Therefore, the committee directs the Commandant of the Marine Corps, not later than one year after enactment, to report to the Committees on Armed Services of the Senate and the House of Representatives on the required changes and cost the Marine Corps would require to execute a fully integrated basic recruit training, to include the construction or renovation of barracks.

GI Bill Benefit Review

The committee recognizes the substantial benefit the Post 9–11 GI Bill provides service members to further their or their dependent's education. Due to the length of service requirements to earn the benefit or transfer the benefit to a dependent, many service members have experienced difficulty understanding how much of the benefit they have earned. The committee is aware that service members, both Active Duty and in the Reserve Components, have had to reimburse the government for unauthorized use of the benefit due to not meeting the length of service requirements. Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services by November 30, 2017, on whether providing service members information on their remaining entitlement upon discharge from service would be feasible and appropriate. The committee believes relevant information would include the amount of the Post 9–11 GI Bill benefit each service member has earned prior to separation, retirement or release from military service, including whether or not they have completed any additional service obligation for transferring the benefit to a dependent.

Military Child Custody Protections

The committee remains concerned that service members are not receiving necessary information related to State child custody laws governing their dependents. While the Secretaries of the military departments are currently required to provide notice of child custody protections under the Servicemembers Civil Relief Act, the military departments do not have uniform requirements to provide information on State child custody laws. Therefore, the committee directs the Secretary of Defense, in consultation with the Secretaries of the military departments, to provide a briefing to the Committee on Armed Services of the House of Representatives not later than March 1, 2018, on the information and resources currently provided to service members regarding State child custody laws. The briefing shall include an analysis of how best to standardize the dissemination of this information to all affected service members, as well as an analysis of when, and how often, the information should be provided to these service members.

Military Officer Diversity

The Committee is concerned with the lack of diversity within commissioned officers and believes a new evaluation of military service academy attendees is necessary to obtain data in order to evaluate future policy. Therefore, the Committee directs the Secretary of Defense to evaluate the recruiting, retention, and persistence rates of military service academy candidates, current cadets/midshipmen, and graduates. The Secretary of Defense shall provide the results of the evaluation in a briefing to the Committee on Armed Services of the House of Representatives no later than December 1, 2018.

Military Service Academy Applications and Reserve Officer Training Corps Scholarship Programs

The committee recognizes that the selection opportunity for a position at a military service academy is a very selective process and the number of applications vastly outnumbers the available military service academy positions. Due to an abundance of well-qualified applicants for military service academies and their potential interest and qualification for a Reserve Officer Training Corps (ROTC) scholarship, the committee highly encourages the Secretaries of the military departments to forward all military service academy non-select applications to their respective ROTC commands for consideration for an ROTC scholarship. In so doing, the Secretaries should also inform the applicant of the full range of options for which he or she may be qualified.

Pilot Shortage Assessment

The committee recognizes that the services are having difficulty addressing shortfalls in critical career fields that are vital for the readiness of our Armed Forces, specifically in the pilot career field. The committee is concerned about the Air Force's retention and recruitment issues within the fighter pilot community. The committee notes that the Air Force provided written testimony to the committee on February 7, 2017, stating that the Air Force was short 723 fighter pilots below requirement and 1,555 pilots short across all mission areas.

Therefore, the committee encourages the Secretary of the Air Force to evaluate all options for improving the recruitment and retention of Air Force pilots. As part of such an assessment, the committee directs the Secretary of the Air Force to provide a briefing to the Committee on Armed Services of the House of Representatives by December 1, 2017, on the extent to which moving pilot or other aviation billets to the Active Guard and Reserve Components would address these shortages.

Pre-Command Audit Training Course

The committee believes that good financial management and auditability are important responsibilities of military leaders at all levels and is concerned that responsible officers receive inadequate training on these matters in the course of their careers. Therefore, the committee directs the Secretary of Defense to submit a report to the Committees on Armed Services of the Senate and the House of Representatives by March 1, 2018, on the current programs of education used to train those officers assuming a command billet or a billet directly responsible for financial management on their responsibilities regarding financial management and auditability.

Additionally, the committee directs the Comptroller General of the United States to submit a report to the Committees on Armed Services of the Senate and the House of Representatives by June 1, 2018, that provides an assessment of the programs identified in the Secretary's report. The report of the Comptroller General shall also include an overview of current law and the Department of Defense's financial management and audit efforts to be in compliance with statutory guidance, as well as general financial management

training requirements for command billets or billets requiring management of Department of Defense funds.

Provision of Services at Department of Defense-Run Child Development Centers (CDC)

The committee is concerned about staffing shortages at childcare centers on military installations. These facilities provide important services to the families of our men and women in uniform and allow the military to tap the potential of important demographics of society that otherwise might not be able to contribute to our national defense. On-base childcare is also an important workplace benefit that servicemembers and their families depend on as part of their total military compensation. The committee is further concerned that the civilian hiring freeze issued by the Administration in January 2017 has furthered these shortages. Therefore the committee directs the Secretary of Defense to brief the House Armed Services Committee by December 1, 2017 on:

(1) current staffing deficiencies at service-run child development centers (CDCs), to include part-time and preschool programs;

(2) whether the hiring freeze created any collateral effects on the services' ability to fill child-care positions (e.g. reduced administrative staff at personnel offices, etc.);

(3) how long the hiring process takes for filling individual childcare positions including information on what kinds of background checks are involved;

(4) an assessment of whether streamlined hiring authorities help fill vacancies faster;

(5) a discussion of the kinds of incentives that would help recruit child-care workers in areas where filling these positions is a challenge;

(6) how child care fee assistance programs could be improved to fill any gaps in availability; and

(7) how the Department intends to ensure that non-installation Child Development Centers address the unique developmental needs of servicemember families should military families have to seek outside care.

Report on the Feasibility of Establishing a Military Family Service Corps

The committee directs the Secretary of Defense to submit a report to the Committees on Armed Services of the Senate and the House of Representatives by February 1, 2018, on the feasibility of the U.S. Department of Defense entering into an agreement with the Corporation for National and Community Service to establish a Military Family Service Corps as an AmeriCorps Affiliate.

Participants in such a Corps would focus on service in a military community in activities selected by the installation commander from a list of options drawn from a survey of need in the military community. Potential activities could include the following: military spouse career support, transition support for members departing military service; integration of new military families into the military community and installation; development and implementation of morale and recreation activities for the installation; service as a liaison with local schools for military children; support for military

families with children of special needs, wounded warrior transition support, and any additional activities the Secretary deems appropriate.

Review of Resourcing of Trial Defense Services

The committee is aware of the integral role that an independent and adequately resourced military trial defense service plays in the military justice system. Accordingly, the committee directs the Secretary of Defense, in coordination with the Secretaries of the military departments, to conduct a review of the trial defense services resourcing, and to provide a briefing to the Committee on Armed Services of the House of Representatives not later than April 1, 2018. The review will include:

(1) whether military defense counsel require independent investigators in order to adequately defend their clients, and the costs associated with providing such investigators;

(2) whether trial defense offices are adequately resourced with personnel and equipment;

(3) the feasibility and advisability of providing independent funding and approval authority to trial defense services for expert witnesses; and

(4) the programs in place to ensure that lead defense counsel in complex cases, such as murder and sexual assault, have the appropriate experience and training required to effectively defend their clients.

Review of the Court Martial Appeals Process

The committee recognizes the significant efforts made to modernize the Uniform Code of Military Justice in order to maintain good order and discipline in the armed forces while providing service members due process protections. However, the committee is aware that certain service members are unable to appeal their court-martial cases to the United States Supreme Court. Under existing law, the Supreme Court lacks jurisdiction to hear appeals in which the Court of Appeals for the Armed Forces (CAAF): declined review; denied extraordinary relief; or, in some cases, denied interlocutory appeals. In these cases, service members have less access to Supreme Court review than civilians operating in the civilian court system. Therefore, the committee directs the Secretary of Defense to review restrictions on service member appeals to the United States Supreme Court and whether these restrictions should be eliminated and provide a briefing to the Committee on Armed Services of the House of Representatives no later than April 30, 2018.

Social Media Policy for Recruits

The committee notes that DOD Instruction 1304.26, March 23, 2015, ENCLOSURE 3 contains a section, "Character/Conduct," that reads as follows: "The underlying purpose of these enlistment, appointment, and induction standards is to minimize entrance of persons who are likely to become disciplinary cases, security risks, or who are likely to disrupt good order, morale, and discipline. The Military Services are responsible for the defense of the Nation and should not be viewed as a source of rehabilitation for those who

have not subscribed to the legal and moral standards of society at-large." The committee understands that DD FORM 4/1, OCT 2007, ENLISTMENT/REENLISTMENT DOCUMENT ARMED FORCES OF THE UNITED STATES, states, "If my behavior fails to meet acceptable military standards, I may be discharged and given a certificate for less than honorable service, which may hurt my future job opportunities and my claim for veteran's benefits."

The committee is troubled by recent high-profile cases involving the nonconsensual sharing of intimate images. In addition, the committee is concerned that the military departments continue to have varying policies outlining appropriate social media conduct. The committee believes that all service members must be explicitly notified, upon enlistment or reenlistment, that online harassment, bullying, or hazing, including sexual harassment, bullying, or hazing, will not be tolerated and, if verified, may lead to a less than honorable discharge.

Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services by January 31, 2018, on the best method to ensure uniform high standards across the military services for social media use by service members, and to require notification and acknowledgment by all enlistees of the existence of these policies and the potential consequences for violations of these standards.

## LEGISLATIVE PROVISIONS

### Subtitle A—Regular and Reserve Component Management

#### Section 501—Modification of Requirements Relating to Conversion of Certain Military Technician (Dual Status) Positions to Civilian Positions

This section would amend section 1053 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92), as amended by section 1084 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328), to reduce the clerical and administrative dual status technician conversions to title 5, United States Code, civilians required by those sections from 20 percent to 10 percent and would extend the date of completion of those conversions for 1 year until October 1, 2018. Additionally, this section would require the Secretary of Defense to submit a report to the Committees on Armed Services of the Senate and the House of Representatives not later than March 1, 2018, containing recommendations for revisions to section 709 of title 32, United States Code.

#### Section 502—Pilot Program on Use of Retired Senior Enlisted Members of the Army National Guard as Army National Guard Recruiters

This section would authorize the Secretary of the Army to carry out a pilot program under which retired senior enlisted members of the Army National Guard would serve as contract recruiters for the Army National Guard.

Section 503—Equal Treatment of Orders To Serve on Active Duty under Section 12304a and 12304b of Title 10, United States Code

This section would amend sections 1074(d)(2) and 1145(a) of title 10, United States Code, to authorize Reserve Component members activated under the authority provided by either section 12304a or 12304b of title 10, United States Code, to receive pre-mobilization and transitional TRICARE health care.

Section 504—Direct Employment Pilot Program for Members of the National Guard and Reserve

This section would authorize the Secretary of Defense to conduct a pilot program to provide job placement assistance to members of the National Guard and Reserves. This section would also require the Secretary to provide a report to the Committees on Armed Services of the Senate and the House of Representatives by January 31, 2022 describing the results of the pilot. The authority to conduct the program would expire on September 30, 2020. The Secretary would be further authorized to extend the pilot program for not more than 2 fiscal years.

SUBTITLE B—GENERAL SERVICE AUTHORITIES AND CORRECTION OF MILITARY RECORDS

Section 511—Consideration of Additional Medical Evidence by Boards for the Correction of Military Records and Liberal Consideration of Evidence Relating to Post-Traumatic Stress Disorder or Traumatic Brain Injury

This section would amend section 1552 of title 10, United States Code, to require Boards for the Correction of Military Records to review medical evidence of the Secretary of Veterans Affairs and civilian healthcare providers in cases in which the application is based on matters relating to post-traumatic stress disorder (PTSD) or traumatic brain injury (TBI). In addition, it would require the boards to review the case with liberal consideration to the former member that PTSD or TBI potentially contributed to the discharge or dismissal, or discharge characterization.

Section 512—Public Availability of Information Related to Disposition of Claims Regarding Discharge or Release of Members of the Armed Forces When the Claims Involve Sexual Assault

This section would amend sections 1552(h) and 1553(f) of title 10, United States Code, to add a requirement to publicly disclose statistics related to applications to the Boards for the Correction for Military Records and Discharge Review Boards in which sexual assault is alleged to have contributed to the original characterization of the discharge or release of the claimant.

Section 513—Pilot Program on Use of Video Teleconferencing Technology by Boards for the Correction of Military Records and Discharge Review Boards

This section would authorize the Secretary of Defense to conduct a pilot program on the use of video teleconferencing technology by boards for the correction of military records and discharge review

boards so that, when authorized, applicants may appear before the board without being physically present.

Section 514—Inclusion of Specific Email Address Block on Certificate of Release or Discharge From Active Duty (DD Form 214)

This section would require the Secretary of Defense to modify the Certificate of Release or Discharge from Active Duty (DD Form 214) to include a specific block for the service member's email address.

Section 515—Provision of Information on Naturalization Through Military Service

This section would direct the Secretary of Defense to ensure certain service members are informed of the availability of naturalization through military service under section 328 of the Immigration and Nationality Act (8 U.S.C. 143).

SUBTITLE C—MILITARY JUSTICE AND OTHER LEGAL ISSUES

Section 521—Clarifying Amendments Related to the Uniform Code of Military Justice Reform by the Military Justice Act of 2016

This section would make clarifying amendments to the Uniform Code of Military Justice, including clarifying that petitions for writs of mandamus by victims have priority in both the Court of Criminal Appeals and the Court of Appeals for the Armed Forces; expanding the pre-referral matters that a military judge may consider to include appointment of a certain individual to assume the rights of certain victims and pre-referral matters related to a petition for a writ of mandamus by a victim; clarifying that the President may establish the types of sentences that require automatic reduction in enlisted rank; and extending the due date of the Military Justice Review Panel's assessment on sentencing data from 2020 to 2021.

Section 522—Minimum Confinement Period Required for Conviction of Certain Sex-Related Offenses Committed by Members of the Armed Forces

This section would amend section 856(b)(1) of title 10, United States Code (article 56(b)(1) of the Uniform Code of Military Justice) to include a two-year mandatory minimum period of confinement for service members convicted of certain sex-related offenses.

Section 523—Prohibition on Wrongful Broadcast or Distribution of Intimate Visual Images

This section would amend the Uniform Code of Military Justice to insert a new section (article) prohibiting wrongful broadcast or distribution of intimate visual images.

Section 524—Information for the Special Victims' Counsel or Victims' Legal Counsel

This section would amend section 1044e(b)(6) of title 10, United States Code, to require that, if there is a prosecution of an alleged sex-related offense, the special victims' counsel or victims' legal

counsel representing the victim shall receive a copy of all case information in the possession of the trial counsel, unless the information is privileged.

Section 525—Special Victims' Counsel Training Regarding the Unique Challenges Often Faced by Male Victims of Sexual Assault

This section would require that baseline Special Victims' Counsel training include training on how to recognize and deal with the unique challenges often faced by male victims of sexual assault.

Section 526—Garnishment To Satisfy Judgement Rendered for Physically, Sexually, or Emotionally Abusing a Child

This section would amend section 1408 of title 10, United States Code, to authorize the garnishment of service member retired pay to satisfy a judgement rendered for physically, sexually, or emotionally abusing a child.

Section 527—Inclusion of Information in Annual SAPRO Reports Regarding Military Sexual Harassment and Incidents Involving Nonconsensual Distribution of Private Sexual Images

This section would amend section 1631(b) of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 (Public Law 111–383) to require inclusion of information on reports of sexual harassment and incidents involving nonconsensual distribution of private sexual images involving members of the Armed Forces in the annual Department of Defense Sexual Assault Prevention and Response Office Report.

Section 528—Inclusion of Information in Annual SAPRO Reports regarding Sexual Assaults Committed by a Member of the Armed Forces against the Member's Spouse or Other Family Member

This section would require inclusion of information regarding sexual assaults committed by service members against their spouse, intimate partner, or other dependent in an annual report required by section 1631 the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 (Public Law 111–383), which is issued on or after March 1, 2018.

Section 529—Notification of Members of the Armed Forces Undergoing Certain Administrative Separations of Potential Eligibility for Veterans Benefits

This section would require that service members being separated from the military with an other than honorable discharge be informed, in writing, that they may petition the Veterans Benefits Administration of the Department of Veterans Affairs for certain benefits despite their characterization of service.

Section 530—Consistent Access to Special Victims' Counsel for Former Dependents of Members of the Armed Forces

This section would direct the Secretary of the Navy to revise the Navy Victims' Legal Counsel policy to allow certain former dependents of service members to receive Victims' Legal Counsel representation.

## SUBTITLE D—MEMBER EDUCATION, TRAINING, RESILIENCE, AND TRANSITION

### Section 541—Prohibition on Release of Military Service Academy Graduates To Participate in Professional Athletics

This section would amend sections 4348(a), 6959(a), and 9348(a) of title 10, United States Code, to require that any graduate from a military service academy program must fulfill their military service commitments without exception before being released to participate in professional sports.

### Section 542—ROTC Cyber Institutes at the Senior Military Colleges

This section would authorize the Secretary of Defense to carry out a program to establish a Reserve Officers' Training Corps Cyber Institute at each of the senior military colleges.

### Section 543—Lieutenant Henry Ossian Flipper Leadership Scholarship Program

This section would require the Secretary of the Army to establish the Lieutenant Henry Ossian Flipper Leadership Scholarship Program. The scholarship program would provide financial assistance to an individual pursuing a recognized post-secondary credential at a minority-serving institution, who enters into an agreement for active duty service with the Army. This section would also require the Secretary to report to the congressional defense committees within one year following the date of enactment of this Act on the progress of the program.

## SUBTITLE E—DEFENSE DEPENDENTS' EDUCATION AND MILITARY FAMILY READINESS MATTERS

### Section 551—Continuation of Authority to Assist Local Educational Agencies That Benefit Dependents of Members of the Armed Forces and Department of Defense Civilian Employees

This section would authorize $30.0 million for the continuation of Department of Defense assistance in fiscal year 2018 to local educational agencies that are impacted by the enrollment of dependent children of military members and Department of Defense civilian employees. Elsewhere in this Act, the funding table in Division D would authorize an additional $20.0 million, for a total of $50.0 million, for such purposes.

### Section 552—Education for Dependents of Certain Retired Members of the Armed Forces

This section would amend section 2164 of title 10, United States Code, to allow dependents of retired members of the Army, Navy, Air Force, and Marine Corps residing on military installations in the United States to attend Department of Defense schools on those bases.

Section 553—Codification of Authority to Conduct Family Support Programs for Immediate Family Members of Members of the Armed Forces Assigned to Special Operations Forces

This section would make permanent the authority provided by section 554 of the National Defense Authorization Act for Fiscal Year 2014 (Public Law 113–66), as modified by section 574(a) of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92) by adding a new section to chapter 88 of title 10, United States Code. The section would provide the Commander, U.S. Special Operations Command the authority to conduct programs for immediate family members of members of the Armed Forces assigned to special operations forces.

Section 554—Reimbursement for State Licensure and Certification Costs of a Spouse of a Member of the Armed Forces Arising from Relocation to Another State

This section would amend section 476 of title 37, United States Code, to permit the Secretary of a military department or the Secretary of Homeland Security to reimburse a member of the Armed Forces up to $500 for a spouse's expenses related to obtaining licensing or certification in another State incident to a permanent change of station. This section would also require the Secretary of Defense and the Secretary of Homeland Security to work with States to improve the portability of licenses and certifications between States.

SUBTITLE F—DECORATIONS AND AWARDS

Section 561—Replacement of Military Decorations at the Request of Relatives of Deceased Members of the Armed Forces

This section would amend section 1135 of title 10, United States Code, to require the Secretary of Defense to replace the military decorations of a deceased recipient to certain relatives at no cost to the Department of Defense.

Section 562—Congressional Defense Service Medal

This section would amend chapter 57 of title 10, United States Code, to establish the Congressional Defense Service Medal. The medal would be awarded by the Secretary of Defense on the behest and behalf of Congress to groups or other entities that have distinguished themselves by exemplary service or achievement advancing the defense or national security of the United States. The committee believes that Congress will direct the Secretary to bestow these awards by passage of a law or concurrent resolution and that all awards will be approved on a bipartisan basis.

Section 563—Limitations on Authority to Revoke Certain Military Decorations Awarded to Members of the Armed Forces

This section would amend chapters 357, 567, and 857 of title 10, United States Code, to limit the authority of the President or Secretary of a military department to revoke certain military decorations after the presentation of the award to the service member.

### SUBTITLE G—MISCELLANEOUS REPORTS AND OTHER MATTERS

#### Section 571—Expansion of United States Air Force Institute of Technology Enrollment Authority to Include Civilian Employees of the Homeland Security Industry

The section would amend section 9314a of title 10, United States Code, to allow homeland security industry employees employed by a private firm in one of the critical infrastructure sectors identified in Presidential Policy Directive 21 to attend the United States Air Force Institute of Technology.

#### Section 572—Servicemembers' Group Life Insurance

This section would amend section 1967(f)(4) of title 38, United States Code, by striking the second sentence of such paragraph, regarding the failure to notify a member's spouse in a timely manner of certain elections and beneficiary designations.

#### Section 573—Voter Registration

This section would amend section 705 of the Servicemembers Civil Relief Act (50 U.S.C. 4025), to allow service members stationed in a State pursuant to military orders to vote in Federal, State and local elections in that State instead of their State of permanent residence.

#### Section 574—Sense of Congress regarding Section 504 of Title 10, United States Code, on Existing Authority of the Department of Defense To Enlist Individuals, Not Otherwise Eligible for Enlistment, Whose Enlistment is Vital to the National Interest

This section would express a sense of Congress that there is currently a statute, specifically paragraph (2) of subsection (b) of section 504 of title 10, United States Code, that allows the Secretary concerned to authorize the enlistment of certain non-citizens if the Secretary determines that such enlistment is vital to the national interest.

## TITLE VI—COMPENSATION AND OTHER PERSONNEL BENEFITS

### ITEMS OF SPECIAL INTEREST

#### Local Purchasing Contracts for the Defense Commissary Agency

The committee is aware that significant savings in Second Destination Travel costs may be realized by the Defense Commissary Agency (DeCA) by pursuing contracts with local distributors and vendors in the Pacific region. The Department of Defense Inspector General has recently verified that DeCA can maintain quality, selection and cost savings by exercising local purchase with Fresh Fruits and Vegetable. The committee believes that DeCA should explore every opportunity available to reduce second destination transportation cost and that utilizing existing contracts could provide commissary customers with greater variety while providing significant transportation savings to the Department of Defense. Additionally, an expansion of local products and distributor con-

tracts will strengthen local economic partnerships with DeCA. Therefore, the committee directs the Secretary of Defense to provide a briefing to the committee not later than January 1, 2018, on the following:

(1) The current percentage of goods that are provided by local vendors, to include commodity category and dollar value of sales, and an analysis of historical data for the past five years.

(2) The cost of Second Destination Transportation to provide commissary goods to the Commissaries on Guam.

(3) The feasibility of whether using local distributors for items other than Fresh Fruits and Vegetables will reduce the cost of Second Destination Transportation while maintaining savings to beneficiaries.

(4) Initiatives undertaken or explored that seek to encourage and promote local vendor and distributor access to commissaries on Guam.

Morale, Welfare, and Recreation Assessment

The committee recognizes that the continued support for service members and families is vital to their quality of life as operational requirements and budgetary pressures continue unabated. The committee is concerned that the military services have not complied with established Department of Defense policy to ensure appropriate financial support of family, welfare, and recreational programs for the past several years, particularly for programs within Category B, which relies on both appropriated and nonappropriated funding.

The committee recognizes that all programs, including Morale, Welfare, and Recreation (MWR) programs, need to be constantly reviewed to ensure that they are necessary, effective, and cost efficient. Therefore, the committee directs the Comptroller General of the United States to conduct a review of the Department of Defense's MWR programs by category to assess the Department's current Category A, B, and C appropriated and nonappropriated funding policies and priorities. The review should include a baseline assessment of the programs; the budgeting, funding, and accounting processes used by the services; an analysis and assessment of the review process by which services ensure that programs continue to be effective and cost-effective; and whether the organizational structure of the services are adequate to provide the appropriate oversight of these important programs. The committee further directs the Comptroller General to submit a report to the House Committee on Armed Services not later than April 1, 2018, on the results of the assessment.

Reserve Component Benefits Parity Under 12304b Mobilization Authority

The committee recognizes that Reserve Component units ordered to Active Duty should receive the same benefits for the same duty as their Active Duty counterparts. The committee understands that Reserve Component units involuntarily ordered to Active Duty under the authority provided by section 12304b of title 10, United States Code, are not entitled to several benefits that other deployed service members are provided, including the Post 9/11 GI Bill, pre-

mobilization TRICARE health care, reduced age for retirement, Federal civilian differential pay and high deployment allowance. Even though this mobilization authority was established by Congress at the Department of Defense's request to support non-contingency operations, the committee believes that these benefits should be made available to the Reserve Component units that are ordered to Active Duty under any authority. Section 515 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92) required the Secretary of Defense to assess the viability of consolidating the number of authorities to order members of the Reserve Components to perform duty. Once the recommendation from the Secretary of Defense is received, the committee expects that the benefits disparity will be corrected.

Review of Department of Defense Debt Collection Practices

The committee notes that the Department of Defense operates a debt collection process to recoup erroneous payments. While debt collection is sometimes necessary, the committee is concerned that some Department of Defense debt collection practices may place an undue burden on service members and their families. The committee therefore directs the Comptroller General of the United States to submit a report to the Committees on Armed Services of the Senate and the House of Representatives not later than June 1, 2018, on debt collection procedures of the Department of Defense. The report shall include an analysis of the following:

(1) policies of the Department that govern such overpayments and debt collection actions, including the extent to which such policies ensure uniform enforcement and due process for members of the Armed Forces;

(2) the extent to which the Department has processes or controls in place to ensure compliance with applicable laws related to debt collection;

(3) means by which the Department may be flexible in the enforcement of debt collection practices regarding members of the Armed Forces, including the ability to grant debt forgiveness or provide other forms of debt relief;

(4) how the Department reports such overpayments and related debt collection actions to credit rating agencies, including whether and how such agencies distinguish between types of delinquency; and

(5) policies and procedures of the Department that allow members of the Armed Forces to challenge alleged overpayments or debt collection actions by the Department before the Department reports such overpayments or actions to credit rating agencies.

Service Member Financial Planning

The Committee is concerned with the ensuring the Department of Defense provides sufficient assistance to service members retiring under the new Blended Retirement System beginning in January 2018. Specifically, current service members will have the option to opt into the Blended Retirement System and will be authorized to elect to take a lump sum disbursement of their retirement pay. The Committee remains concerned about ensuring service members are fully aware of their options and able to make the best choice

for themselves and their families. Therefore, the Secretary of Defense will provide a briefing to the Committee on Armed Services of the House of Representatives, no later than March 1, 2018, on the number of financial planners the Department has available to service members and how service members are informed or advised concerning professional financial planning and the availability of professional financial planners.

## LEGISLATIVE PROVISIONS

### Subtitle A—Pay and Allowances

#### Section 601—Annual Adjustment of Basic Monthly Pay

This section would direct that the rates of basic pay under section 203(a) of title 37, United States Code, be increased in accordance with section 1009 of title 37, United States Code, notwithstanding a determination made by the President under subsection (e) of section 1009.

#### Section 602—Limitation on Basic Allowance for Housing Modification Authority for Members of the Uniformed Services Residing in Military Housing Privatization Initiative Housing

This section would amend section 403(b) of title 37, United States Code, to temporarily prohibit the Secretary of Defense from further reducing the basic allowance for housing (BAH) below the current level for service members residing in Military Housing Privatization Initiative (MHPI) housing until 2019. The committee remains concerned about the reduction in BAH and its effect on the recapitalization of these housing units. The committee believes that military families must be provided with on-base housing that is safe and periodically modernized. Therefore, this section would also require the Comptroller General of the United States to submit a report to the Committees on Armed Services of the Senate and the House of Representatives not later than March 1, 2018, on the Department of Defense's management of MHPI, and plans and alternatives considered for ensuring the continued viability of MHPI projects for the life of the housing project.

#### Section 603—Housing Treatment for Certain Members of the Armed Forces, and Their Spouses and Other Dependents, Undergoing a Permanent Change of Station Within the United States

This section would amend chapter 7 of title 37, United States Code, to allow a member of the Armed Forces undergoing a permanent change of station within the United States to request that their spouse or other dependents continue to reside at the current duty station or move ahead of them to the new duty station if it is advantageous to the member and their family due to spousal employment, dependent schooling needs, dependent special medical needs or immediate family long term care needs.

#### Section 604—Per Diem Allowance Policies

This section would prohibit a Secretary of a military departments from implementing a flat rate per diem policy for long term temporary duty described in a certain policy memorandum. This sec-

tion would also prohibit a Secretary of a military department from implementing a new per diem allowance policy under section 474 of title 10, United States Code, until a report is issued by the Secretary of Defense to the congressional defense committees and the Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Oversight and Government Reform of the House of Representatives and until a period of 30 days has elapsed after notifying such congressional committees regarding any new policy.

## SUBTITLE B—BONUSES AND SPECIAL AND INCENTIVE PAYS

### Section 611—One-Year Extension of Certain Bonus and Special Pay Authorities for Reserve Forces

This section would extend the authority, through December 31, 2018, for the Selected Reserve reenlistment bonus, the Selected Reserve affiliation or enlistment bonus, special pay for enlisted members assigned to certain high-priority units, the Ready Reserve enlistment bonus for persons without prior service, the Ready Reserve enlistment and reenlistment bonus for persons with prior service, the Selected Reserve enlistment and reenlistment bonus for persons with prior service, the authority to reimburse travel expenses for inactive duty training outside of normal commuting distance, and income replacement payments for Reserve Component members experiencing extended and frequent mobilization for Active Duty service.

### Section 612—One-Year Extension of Certain Bonus and Special Pay Authorities for Health Care Professionals

This section would extend the authority for the nurse officer candidate accession program, repayment of educational loans for certain health professionals who serve in the Selected Reserve, the accession and retention bonuses for psychologists, the accession bonus for registered nurses, the incentive special pay for nurse anesthetists, the special pay for Selected Reserve health care professionals in critically short wartime specialties, the accession bonus for dental officers, the accession bonus for pharmacy officers, the accession bonus for medical officers in critically short wartime specialties, and the accession bonus for dental specialist officers in critically short wartime specialties, until December 31, 2018.

### Section 613—One-Year Extension of Special Pay and Bonus Authorities for Nuclear Officers

This section would extend the authority for the special pay for nuclear-qualified officers extending a period of active service, the nuclear career accession bonus, and the nuclear career annual incentive bonus until December 31, 2018.

### Section 614—One-Year Extension of Authorities Relating to Title 37 Consolidated Special Pay, Incentive Pay, and Bonus Authorities

This section would extend the general bonus authority for enlisted members, the general bonus authority for officers, the special bonus and incentive pay authority for nuclear officers, special aviation incentive pay and bonus authorities, the special health profes-

sions incentive pay and bonus authorities, contracting bonus for Senior Reserve Officers' Training Corps cadets and midshipmen, hazardous duty pay, assignment pay or special duty pay, skill incentive pay or proficiency bonus, and the retention bonus for members with critical military skills or assigned to high-priority units, until December 31, 2018.

Section 615—One-Year Extension of Authorities Relating to Payment of Other Title 37 Bonuses and Special Pays

This section would extend the authority for the aviation officer retention bonus, assignment incentive pay, the reenlistment bonus for active members, the enlistment bonus for active members, the incentive pay for members of precommissioning programs pursuing foreign language proficiency, the accession bonus for new officers in critical skills, the incentive bonus for conversion to military occupational specialty to ease personnel shortage, the incentive bonus for transfer between Armed Forces, and the accession bonus for officer candidates, until December 31, 2018.

Section 616—Reimbursement for State Licensure and Certification Costs of a Member of the Armed Forces Arising from Separation from the Armed Forces

This section would authorize the Secretary of Defense and the Secretary of Homeland Security to reimburse a service member up to $500 for relicensing costs incurred upon separation from the Armed Services. The section would also require the Secretaries to work with States on improving portability of licenses between States and to report recommendations on this matter to appropriate congressional committees and the States.

Section 617—Increase in Maximum Amount of Aviation Bonus for 12-Month Period of Obligated Service

This section would amend section 334(c)(1)(B) of title 37, United States Code, to increase the statutory limits for the aviation retention bonus to $50,000 and allow the Secretary concerned the flexibility to increase the aviation incentive pay limit set forth in regulations issued by the Secretary of Defense under section 374 of title 37, United States Code. The Secretary of Defense should revise applicable regulations as required.

Section 618—Technical and Clerical Amendments Relating to 2008 Consolidation of Certain Special Pay Authorities

This section would make technical and clerical corrections to titles 10, 14, 37, and 42, United States Code, as part of the Department of Defense's transition to the consolidated authorities described in section 661 of the National Defense Authorization Act for Fiscal Year 2008 (Public Law 110–181), which provided eight consolidated statutory special and incentive pay authorities to replace those currently in use.

SUBTITLE C—DISABILITY PAY, RETIRED PAY, AND SURVIVOR BENEFITS

Section 621—Findings and Sense of Congress regarding the Special Survivor Indemnity Allowance

This section would express the sense of Congress that the Special Survivor Indemnity Allowance was created as a stop gap measure to assist widowed spouses by reducing the Survivor Benefit Plan/ Dependency Indemnity Compensation offset required by law. This section would also state that the dollar-for-dollar reduction in payment to surviving spouses should be fully repealed at the first opportunity.

SUBTITLE D—OTHER MATTERS

Section 631—Land Conveyance Authority, Army and Air Force Exchange Service Property, Dallas, Texas

This section would allow the Secretary of Defense to authorize the Army and Air Force Exchange Service (AAFES) to divest itself of real property owned by AAFES at 8901 Autobahn Drive, Dallas, Texas, as part of its consolidation into one headquarters building in Dallas, Texas. Additionally, this section would authorize AAFES to retain the nonappropriated funds derived from the divestiture since AAFES acquired the property with nonappropriated funds.

Section 632—Advisory Boards regarding Military Commissaries and Exchanges

The section would require the Secretary of Defense to direct installation commanders to establish an advisory board regarding the interests of patrons and beneficiaries of military commissaries and exchanges.

# TITLE VII—HEALTH CARE PROVISIONS

## ITEMS OF SPECIAL INTEREST

Educational Opportunities for Certified Registered Nurse Anesthetists

The committee encourages the Secretary of Defense to establish educational opportunities for Certified Registered Nurse Anesthetists (CRNAs) to attend accredited CRNA post graduate pain management fellowships.

Force of the Future Pilot Program on Cryopreservation of Gametes

The committee is aware that nearly 2,000 servicemembers suffered injuries to the genitourinary tract while deployed to Iraq and Afghanistan. These injuries and other blast injuries to the spine and brain can have a profound impact on servicemembers' reproductive health.

In order to preserve the ability to start a family, some servicemembers have elected to freeze reproductive material predeployment, paying for the cost out of pocket. Recognizing this demand, the Department of Defense proposed a pilot program to

allow individuals to cryopreserve gametes, but has not moved forward with this initiative. The committee is supportive of this pilot program because it preserves deploying servicemembers' options for the future in the event of a catastrophic injury, and provides deploying servicemembers with important peace of mind. Therefore the committee directs the Secretary of Defense, not later than January 31, 2018, to brief the House Armed Services Committee on the program and the status of implementation.

### Improving Access to Para Health Professional Extenders

The committee notes the Department of Defense continues to seek ways to improve health care delivery and facilitate access to health care services for military beneficiaries and lower the total cost of care. The committee is aware that certain para health professionals may be used as physician and health professional extenders within the Military Health System if they meet and comply with specific professional qualification and licensing criteria. However the Committee is concerned that the Department does not have a common standard for hiring or reimbursing para health professionals. The Committee is also concerned with the delineated process that reviews the feasibility of using certain para health professionals or adding them to the list of individual professional providers of medical care who are authorized to provide services to TRICARE beneficiaries on an annual basis. Therefore, the committee directs the Secretary of Defense to submit a report not later than 1 April 2018 to the House Committee on Armed Services, outlining the process used by the Department to include para health professionals as healthcare providers within the Military Health System. The review shall also determine the feasibility of incorporating physical therapist assistants, occupational health therapy and mental health counselors, and other para health professionals determined by the Secretary into the Military Health System to improve beneficiary access to health care services, while ensuring quality and outcome standards are maintained, supervision by appropriate health professionals, and reasonable reimbursement for services provided.

### Medical Blood Volume Diagnostics

The committee is aware that medical research has shown improved patient outcomes when providers can access more accurate and faster direct blood-volume measurements. Recent breakthroughs in direct blood-volume analysis and management can improve care for congestive heart failure, sepsis, burns, trauma, and other life-threatening conditions by informing critical lifesaving medical decisions needing speedy resolution. The committee encourages the Secretary of Defense to fully leverage new direct blood-volume analysis to improve patient outcomes.

### Medical Simulation and Training with First Responders

The committee notes the efforts of the Navy bioskills simulation training centers to provide state-of-the-art simulation based medical training and the continued need to maintain critical trauma care skills. The centers provided a unique and realistic environment for training medical personnel who treat critical battlefield

injuries. In particular, the committee recognizes training center partnerships with local first responders and the local medical community to enhance training realism and provide train-the-trainer opportunities leveraging and sharing valuable real world experience. The committee encourages the Department of Defense to continue investing in this crucial capability and expanding local partnerships.

### Military Caregivers

The committee is aware that the Military Caregiver Heart of Recovery (MCHR) program provides much needed support to military caregivers, who are tireless in their support of their loved ones in uniform. The committee appreciates the value of military caregiver service and believes the MCHR is helping to lessen their burden. The committee has learned of several challenges facing the MCHR program as it develops, including ensuring a warm handoff to the Department of Veterans Affairs, approval of a critical caregiver survey, and stable funding and placement within the Department of Defense. The committee urges the Secretary of Defense to resolve these issues as quickly as possible.

### Military Family Wellness and Suicide Prevention

The Committee is concerned with the behavioral health and wellness of service members to include suicide risk factors and believes that an evaluation must be done on ways to inform the dependents' of service members of the suicide risk factors. The Committee seeks a report on the methods and resources in order to train and educate dependents on suicide risk factors and ways to support their service member, promote healthy environments, and reduce the overall risk factors for suicide. Emphasis should be placed on dependents living with service members that have been diagnosed with post-traumatic stress disorder (PTSD). Therefore, the Committee directs the Secretary of Defense to evaluate the resources, methods, and approaches for such training and education of dependents. The Secretary of Defense shall provide the results of the evaluation in a briefing to the Committee on Armed Services of the House of Representatives no later than December 1, 2018.

### Motion Sickness Research

The committee believes that motion sickness is a pervasive problem spanning a variety of mission sets across the services, and poses a real safety and readiness threat to aviation, seaborne, and ground combat missions, as well as simulator and remote vehicle operations. An estimated 11.5 percent of aviation training attrition is due to motion sickness. As the military moves towards smaller, leaner crews operating in complex, technological environments, the impacts of motion sickness are amplified as the loss of even a single crew member could cease operations or cause a human factors catastrophe.

The committee is encouraged by the Navy's efforts in developing and testing intranasal scopolamine (INSCOP) for use in operational environments in which cognitive and human performance must be maintained at high levels. INSCOP shows promise as a rapid-acting, safe, and effective treatment, and meets requirements for a

medication that is easy for personnel to self-administer, has no special storage requirements, and has a long stable shelf life.

The committee encourages the Navy to accelerate the next stage of advanced INSCOP testing and development.

Opioid—Chronic Pain and Recruiting

The committee notes with concern the growing number of servicemembers with chronic pain and musculoskeletal disorders caused in part by the physical stress of heavy kits, body armor and strain associated with training and deployment-related activities. Chronic pain is particularly pronounced among younger veterans returning from deployments to the Middle East and older generations of veterans. The Committee is also concerned that growing rates of addiction among young Americans, especially those in rural communities, can impact current and future recruitment, threatening the overall readiness and operational effectiveness of our military. The Committee has previously expressed its concern about the growing opioid epidemic at the national level and has asked the Department of Defense to submit a report to the House Committee on Armed Services that describes DOD's efforts to prevent, educate and treat prescription drug abuse by military servicemembers (House Report 114–537).

The committee is aware that the Secretary of Defense is designing a gap-driven musculoskeletal and pain research portfolio which includes a diverse collection of studies examining improved management of pain from the point of injury to chronic pain management. The committee is also concerned with the potential challenges that opioid abuse may be having on recruitment. Therefore, the Committee directs Secretary of Defense to brief the House Armed Services Committee by December 31, 2017 on efforts underway to provide opioid-alternative treatments and therapies to manage chronic pain and to address the adverse side effects and consequences of classic opioid use and/or abuse. The briefing shall also address the emerging and ongoing challenges to recruitment by prescription opioid use and include any information regarding departmental collaboration with schools, law enforcement, and health care professionals.

Osteopathic Manipulative Medicine

The committee is aware of research regarding the effectiveness of Osteopathic Manipulative Medicine (OMM) in reducing recovery time for injured athletes and as an adjunct therapy for pain management. OMM is a non-invasive, drug free treatment that can improve readiness and reduce the need for opioid pain medication in the armed services. While the committee understands that OMM has been used to limited degree in the Military Health System, the committee encourages the Department of Defense to further explore OMM as an adjunct to manage pain and expedite recovery for warfighters.

Personnel Policies Regarding Members of the Armed Forces Infected With Human Immunodeficiency Virus (HIV)

On September 22, 2014, the Department of Defense (DOD) submitted a report to Congress in response to section 572 of the Na-

tional Defense Authorization Act for Fiscal Year 2014 (Public Law 113–66) on personnel policies regarding members of the Armed Forces infected with human immunodeficiency virus (HIV) and hepatitis B (HBV). The Committee notes that while the report received did outline the current DOD policies, it failed to include how current policies reflect the evidence base and medical advances in the fields of HIV. The report also fell short in describing the criteria for which these policies are implemented throughout different branches and among commanding officers. Therefore, not later than March 1, 2018, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report on Department of Defense personnel policies regarding members of the Armed Forces infected with human immunodeficiency virus (HIV). The report shall include the following:

(1) A description of policies addressing the enlistment or commissioning of individuals with these conditions and retention policies, deployment policies, discharge policies, and disciplinary policies regarding individuals with these conditions.

(2) An update on the status of the Department of Army's HIV policy, which was under review during the issuance of the 2014 report.

(3) An assessment of these policies, with reference to medical experts and literature, which includes how the policies reflect an evidence-based, medically accurate understanding of how this condition is contracted; how this condition can be transmitted to other individuals; the risk of transmission; and treatment regimens available.

(4) The feasibility of allowing an individual who is currently serving as an enlisted member of the Armed Forces to become a commissioned officer of the Armed Forces and what restrictions are different for an officer.

## Post-Traumatic Stress Disorder

The committee acknowledges the efforts of the Department of Defense and the military services to diagnose and treat military members suffering from post-traumatic stress disorder (PTSD). Despite the progress that has been made, the committee believes that more needs to be done to ensure service members seek and receive the treatment they deserve. The committee continues to believe PTSD is underreported and underdiagnosed, leading to unnecessary suffering and some service members receiving other than honorable discharges that are unwarranted. The committee wishes to stay informed of the Department's progress in addressing these concerns and directs the Secretary of Defense to provide a briefing to the Committee on Armed Services of the House of Representatives not later than December 1, 2017, on the extent to which service members are seeking PTSD treatment; steps the military services are taking to eliminate the stigma sometimes associated with seeking treatment; and efforts by the military services to ensure commanders carefully weigh a diagnosis of PTSD when adjudicating involuntary separations.

Post-Traumatic Stress Disorder and Traumatic Brain Injury Research Initiatives

The committee notes that the Defense Centers of Excellence for Psychological Health and Traumatic Brain Injury collaborate with a wide variety of research institutions, both military and civilian, to better understand the impacts and improve treatment for post-traumatic stress disorder (PTSD) and traumatic brain injury (TBI). The committee encourages the Secretary of Defense to continue to explore complementary and integrative PTSD therapies that benefit patients, such as art or music therapy, and to pursue research into appropriate therapy drugs that are under development. With regard to TBI, the committee is heartened by the creation of the Center for Neuroscience and Regenerative Medicine Brain Tissue Repository that will allow service members to donate their brain for research after death, but is concerned by the Department's slow pace in publicizing the effort and the process involved. Therefore, the committee directs the Secretary of Defense to provide a briefing to the Committee on Armed Services of the House of Representatives by June 1, 2018, on his plan for informing service members about the Brain Tissue Repository, donor qualifications, and the donation process.

Promising Burn Therapies

The committee notes that deployed service members are at risk of suffering burn and smoke inhalation injuries in remote locations and are not yet benefiting from promising new burn treatment therapies using mesenchymal stem cells (MSCs). MSCs, which can come from a variety of sources, offer improved efficiency for wound healing and reduce long-term scarring, particularly with early application, and help treat multiple injuries simultaneously. The committee is heartened to learn that the Army and Defense Health Program recognize the value of MSCs and are conducting research into several potential applications. The committee urges the Secretary of Defense and the Secretary of the Army to develop and deploy these therapies to theaters of operation as soon as possible.

TRICARE Pharmacy Pilot Program

The committee notes that section 743 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) authorizes the Secretary of Defense to conduct a pilot program to evaluate whether extending additional discounts for prescription drugs filled at retail pharmacies will maintain or reduce cost for the Department of Defense. This pilot gives the Secretary of Defense the authority to implement a pilot program that would test prescription drug acquisition cost parity in the TRICARE pharmacy program. The committee believes there is merit in executing the pilot program in order to determine if TRICARE pharmacy costs to the Department can be reduced through decreased acquisition costs, lower administrative fees, and competition, while restoring beneficiary access to brand-name maintenance prescription drugs at all dispensing retail pharmacies. Therefore, the committee encourages the Secretary to promptly utilize the authority granted under section 743 and implement the pilot program. In the event the Secretary declines to conduct the pilot, the committee directs

the Secretary to provide a briefing to the House Committee on Armed Services by September 15, 2017, on the analytical basis for that decision.

### Use of Data Analytics Within the Defense Medical Surveillance System for Complex Epidemiology and Pathology Research

The Committee notes the persisting concerns of many veterans and current service members regarding possible linkages between their service and medically unexplained illnesses and/or diagnosed diseases with difficult to identify causes such as many forms of cancer. The committee supports the efforts of the Department to maximize data collection within the Defense Medical Surveillance System, as well as the use of this data by the Epidemiology and Analysis Section of the Armed Forces Health Surveillance Branch to improve our understanding of service member epidemiology.

Given recent advances in data processing and analytics, the Committee is hopeful that continued collection and improved analysis of the dataset within the Defense Medical Surveillance System will help confirm or disprove the statistical significance of a veteran's service as a causal factor in contracting certain diseases. However, the Committee also recognizes that the immense scale of the data contained within the Defense Medical Surveillance System would likely require significant processing power and advanced modeling systems to fully understand the patterns contained within its records.

Therefore, the Committee directs the Director of the Defense Health Agency to provide a briefing to the House Committee on Armed Services by December 31, 2017, on:

(1) the data processing systems currently employed to analyze records within the Defense Medical Surveillance System;

(2) any research completed or currently in progress using the Defense Medical Surveillance System to identify linkages between veterans' service and medically unexplained illnesses, and;

(3) current limitations or restrictions on research due to insufficient data processing capability.

## LEGISLATIVE PROVISIONS

### Subtitle A—TRICARE and Other Health Care Benefits

### Section 701—Physical Examinations for Members of a Reserve Component Who Are Separating From the Armed Forces

This section would amend section 1145 of title 10, United States Code, to require the Secretary of Defense to provide a physical examination upon request to a member of a Reserve Component upon separation from service, provided that the member had deployed for more than 30 days within the last 2 years prior to the service member's separation date.

### Section 702—Mental Health Examinations Before Members Separate From the Armed Forces

This section would amend section 1145 of title 10, United States Code, to require that service members receive a mental health ex-

amination, as well as a physical examination, before separation from active duty.

Section 703—Provision of Hyperbaric Oxygen Therapy for Certain Members of the Armed Forces

This section would amend chapter 55 of title 10, United States Code, to authorize the Secretary of Defense to furnish hyperbaric oxygen therapy at a military medical treatment facility to a covered member if such therapy is prescribed by a physician to treat post-traumatic stress disorder or traumatic brain injury.

SUBTITLE B—HEALTH CARE ADMINISTRATION

Section 711—Clarification of Roles of Commanders of Military Medical Treatment Facilities and Surgeons General

This section would amend section 1073c of title 10, United States Code, to clarify that the commanders of military medical treatment facilities are responsible for the operation of the military medical treatment facility they supervise. This section would also amend sections 3036, 5137, and 8036 of title 10, United States Code, to clarify that the surgeons general are responsible for the medical readiness provided by the military medical treatment facilities and maintaining a ready medical force within their respective military departments.

Section 712—Maintenance of Inpatient Capabilities of Military Medical Treatment Facilities Located Outside the United States

This section would prohibit the Secretary of Defense from reducing inpatient capacity at military medical facilities located outside the United States. The committee understands that reductions are being considered and believes further review is required before such reductions may proceed.

Section 713—Regular Update of Prescription Drug Pricing Standards Under TRICARE Retail Pharmacy Program

This section would amend section 1074g of title 10, United States Code, to require that contracts with a TRICARE pharmacy program contractor include requirements to ensure regular updates to the provision of information regarding the pricing standard for prescription drugs.

Section 714—Residency Requirements for Podiatrists

This section would require the Secretary of Defense to ensure podiatrists in the Armed Forces have successfully completed a three year podiatric medicine and surgical residency.

SUBTITLE C—OTHER MATTERS

Section 721—One Year Extension of Pilot Program for Prescription Drug Acquisition Cost Parity in the TRICARE Pharmacy Benefits Program

This section would amend section 743 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) to ex-

tend the authority of the Secretary of Defense to conduct a pilot program for prescription drug acquisition cost parity in the TRICARE pharmacy program until September 30, 2019.

Section 722—Pilot Program on Health Care Assistance System

This section would require the Secretary of Defense to carry out a pilot program for health care assistance services for certain TRICARE beneficiaries and that the Secretary provide the Committees on Armed Services of the Senate and House of Representatives an evaluation of the success of the pilot by January 1, 2021.

Section 723—Research of Chronic Traumatic Encephalopathy

This section would authorize not more than $25.0 million in funds for the Defense Health Program to be appropriated for advanced development for research, development, test, and evaluation for early detection of chronic traumatic encephalopathy, as reflected in Division D of this Act.

Section 724—Sense of Congress on Eligibility of Victims of Acts of Terror for Evaluation and Treatment at Military Treatment Facilities

This section would amend section 717 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) to express the sense of Congress that civilians covered by this section would include United States victims of domestic and international terrorism.

## TITLE VIII—ACQUISITION POLICY, ACQUISITION MANAGEMENT, AND RELATED MATTERS

### ITEMS OF SPECIAL INTEREST

Accuracy of Pricing in Responses to Letters of Request for Pricing and Availability in Foreign Military Sales

The committee is concerned about the pricing and availability (P&A) process for foreign military sales. Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services not later than November 1, 2017, on P&A responses. The briefing should address the process for contractors to provide input, feedback, and adjudication of any differences regarding the appropriateness of governmental P&A estimates prior to delivery to potential foreign customers of formal responses to letters of request for P&A as required by section 1297(b) of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328), as well as the methodology used to determine pricing for P&A responses.

Best Value Criteria for Complex Acquisitions and Information Technology

Lowest price technically acceptable (LPTA) source selection criteria are legitimate and useful in acquisitions with well-defined and non-complex requirements that are not expected to evolve over the life of a contract. However, the committee remains concerned

that the Department of Defense continues to use LPTA criteria for other acquisitions, including those for innovative professional services and high-performance technologies. Maintaining our military's technological edge requires technical superiority rather than mere acceptability. As the Under Secretary of Defense for Acquisition, Technology, and Logistics noted in a memorandum on "Appropriate Use of Lowest Priced, Technically Acceptable Source Selection Process and Associated Contract Type" dated March 4, 2015, "If not applied appropriately, however, the Department can miss an opportunity to secure an innovative, cost effective solution to meet warfighter needs to help maintain our technological edge." Therefore, the committee encourages the Secretary of Defense to ensure that the Department's acquisition policies clearly specify that best value source selection criteria should be used in acquisitions for complex services, complex electronics, and advanced innovative technologies. The committee also encourages the Secretary to carefully consider whether lowest price technically acceptable source selection processes are appropriate for the award of contracts related to major defense acquisition programs, given the technological complexity of the weapon systems being acquired.

Collecting Historical Data on Rescinded Solicitations

The committee is aware that the Government Accountability Office (GAO) released a report in June 2016 titled "Defense Contracting: Complete Historical Data Not Available on Canceled DOD Solicitations", in response to a provision in the National Defense Authorization Act for Fiscal Year 2016. In this provision, the committee specifically directed the Comptroller General to determine: (1) the number of solicitations that were canceled after bids were received, (2) whether these cancellations are increasing or decreasing and their distribution by Agency or military service and contracting command, (3) the bid and proposal incurred costs by the companies and the government resources committed to these solicitations, (4) the extent to which, if any, the bid and proposal costs for these solicitations have reduced the funding available for independent research and development, and (5) the reasons for the cancellation of the solicitations.

However, the committee is concerned that complete historical data are not available to assess patterns in the Department's cancellation of solicitations. The committee continues to be concerned with the significant cost of canceled solicitations to industry and government. Furthermore, the committee is concerned that the bid protest process is often an insufficient mechanism for contractors to contest circumstances of canceled solicitations. The GAO report noted that the federal business opportunities (FBO) webpage is the "best potential source for information on canceled solicitations"; however, "the FAR does not require contracting officials to publicize notices of canceled solicitations", and "the information from FBO is not available in a format that would allow for a reliable trend analysis of DOD's canceled solicitations".

Therefore, the committee directs the Administrator, General Services Administration, in coordination with the Undersecretary of Defense for Acquisition, Technology and Logistics, to provide a briefing to the House Committee on Armed Services not later than

December 1, 2017 regarding how this data could be collected via the FBO web page.

Congressional Notification for Direct Commercial Sales

The committee notes that as part of the U.S. Export Control Reform initiative, the House Committee on Armed Services supports the review of Categories I–III of the U.S. Munitions List (USML) of International Traffic in Arms Regulations (ITAR) to describe more precisely the firearms and related articles controlled by the USML. Category I of the USML currently covers firearms with a caliber up to .50 inches (other than non-combat shotguns with barrel length of 18 inches or longer), combat shotguns, close assault weapons systems, and related parts, components, and accessories. The committee understands that draft regulations to revise this category were developed more than two years ago, but final interagency approval has not occurred and thus a draft rule has never been published. Under the Export Control Reform Initiative, only firearms that are designed, manufactured, and exported for military end-use and otherwise warrant control on the USML or, if it is a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States should continue to be subject to ITAR controls. Those items not warranting USML control would shift to the more flexible licensing authorities of the Department of Commerce. Likewise, the committee supports review by the committee of jurisdiction of the current $1 million Congressional notification threshold for exports of USML-controlled firearms. The committee directs the Secretary of Defense, the Secretary of Commerce, and Secretary of State to provide a briefing to the Committee on Armed Services of the House of Representatives and the Committee on Foreign Affairs of the House of Representatives by September 30, 2017, detailing how current export controls on firearms and ammunition, to include the processing of licenses for direct commercial sales, may impact U.S. businesses, U.S. national security and foreign policy interests, and provide for effective monitoring of the end-uses of USML-controlled firearms.

Other Transaction Consortia

The committee remains committed to providing the Department of Defense needed flexibility to acquire advanced capabilities through streamlined and expedited processes. Toward that end, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services not later than November 1, 2017, on ways to improve the use of other transactions (OT) authorized in section 2371 of title 10, United States Code. The briefing should address the value and successes of OT, including development of OT consortia of willing companies, non-profit organizations, and academic institutions; potential areas where OT consortia may enable more effective, flexible, and agile acquisitions; opportunities for OT consortia to be used for emerging research and prototyping to develop better modeling, simulation, and training tools; and recommendations the Secretary may have for improving OT authorities.

## Outcome-Based Services Contracts

The committee is aware that the Department of Defense awards input-oriented services contracts that require, for example, the number of personnel to be contracted, as well as the education and experience levels, skill sets, and work locations of the contracted personnel. An alternative approach to services contracting is to require the outcomes that must be achieved in a specified time, along with associated milestones and standards by which success will be measured. This outcome-based approach could allow contractors the flexibility to deliver services in the most cost-effective manner using advancements in business processes, including innovations in automation and other technology. The committee directs the Secretary of Defense to evaluate the use of outcome-based services contracts within the Department and provide a briefing to the House Committee on Armed Services by March 1, 2018, on the results. The evaluation and briefing should include a comparison of the Department's use of outcome-based services contracts versus input-based services contracts, the limitations of outcome-based services contracts, a description of the obstacles to the use of outcome-based requirements in lieu of specified personnel requirements, and an analysis of the cost implications of both approaches.

## Procurement Technical Assistance Centers

The committee is concerned about reports that for-profit companies are selling services to assist other businesses in registering in the System for Award Management of the General Services Administration (GSA), a service that Procurement Technical Assistance Centers (PTACs) offer for free. The committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services not later than September 1, 2017, on ways to best inform businesses about free services available from PTACs. In developing the briefing, the Secretary should coordinate with the Administrator of GSA and the Administrator of the Small Business Administration.

## Report on Commercial Acquisition Transparency

The committee is concerned that some contractors of the Department of Defense may be disguising their identities and cost structures from procurement officers, in effect acting as hidden monopolists with unreasonable prices or establishing anonymous or opaque ownership structures for other benefits that are contrary to the government's interests. Therefore, the committee directs the Comptroller General of the United States to conduct a study of Department of Defense processes to determine the identities and cost structures of contractors, how anonymous or opaque ownership structures can circumvent these processes, potential abuses by companies with anonymous or opaque ownership structures, and means of improving such processes to enhance transparency and prevent such abuses. The committee further directs the Comptroller General to provide a briefing to the congressional defense committees by February 1, 2018, with a report to follow, on the results of the study.

Review of Implementation of Online Marketplace Procurement

Elsewhere in this title, the committee includes a provision that would require the General Services Administration (GSA) to contract with multiple commercial online marketplaces for the procurement of certain commercial-off-the-shelf products. The committee anticipates that opportunities to purchase additional products through online marketplaces may arise as GSA gains familiarity with the use of online marketplaces. Toward that end, the committee directs the Administrator of GSA to provide a briefing to the House Committee on Armed Services and the House Committee on Oversight and Government Reform, not later than 6 months after the first contract with a marketplace is awarded, on the results of online marketplace purchasing. The briefing should address the dollar value of purchases through each marketplace, lessons learned from implementation, any limitations on product purchases that were established in implementation guidance, potential means of addressing or overcoming such limitations, and potential means of procuring through marketplaces products referenced in section 2410n of title 10, United States Code.

Reviews of Acquisition Statute and the Federal Acquisition Regulation

The committee strongly supports efforts to thoroughly review the defense acquisition process by the Section 809 Panel on Streamlining and Codifying Acquisition Regulations, which was established in the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92). The Panel produced an interim report in May, 2017, that recommended several revisions to acquisition statutes and regulations. Elsewhere in this Act, the committee includes provisions related to the recommended statutory changes. The committee directs the Administrator of the Office of Federal Procurement Policy to review the recommended changes to the Federal Acquisition Regulation (FAR) and provide a briefing to the House Committee on Armed Services and the House Committee on Oversight and Government Reform not later than December 1, 2017, on the findings of the review. The briefing should include recommendations for modifying the FAR consistent with the Panel recommendations or reasons that the Panel's recommendations cannot be adopted.

In addition to the Panel's recommendations, the committee is concerned that process requirements have built up in acquisition statutes over time and may now impair effective procurement practices and decision making. The committee recognizes that each individual process requirement was intended to effect a specific change in acquisition outcomes. However, the amalgamation of processes may contribute to a culture of compliance within the defense acquisition system and hinder agile acquisitions that provide better capabilities to warfighters more quickly.

For example, section 2377 of title 10, United States Code, establishes a preference for acquisition of commercial items. However, it also stipulates processes for how requirements must be stated; how market research is to be conducted by government personnel and prime contractors; and required training. Section 2384a of title 10, United States Code, requires agencies to procure supplies in eco-

nomically efficient quantities. However, it also requires solicitations to invite contractors to submit alternative quantities that may be economically efficient, which may increase proposal costs and acquisition decision timelines.

The committee encourages the Panel to review such process requirements during its deliberations. It also directs the Secretary of Defense to conduct a review of process requirements in the acquisition sections of title 10, United States Code, and submit a report to the Committees on Armed Services of the Senate and the House of Representatives not later than April 1, 2018, on the findings of the review. The review should:

(1) identify process requirements in acquisition statutes that hinder agile acquisitions;

(2) identify any obsolete statute (elsewhere in this Act, the committee includes an example provision to repeal an expired pilot program); and

(3) recommend any related statutory changes that should be considered to simplify or improve the agility of the defense acquisition system.

Should-Cost Analysis Methodology and Transparency

Since 2010, the Department of Defense has promoted "should-cost" management to identify process efficiencies and technical trade-offs that can reduce acquisition costs without compromising performance requirements. The committee is concerned, however, that the Department may not be sufficiently transparent with should cost-cost analyses, thereby reducing associated benefits to the Department. Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services by September 30, 2017, on should-cost processes. At a minimum, the briefing shall address the following issues:

(1) a description of the features distinguishing should-cost reviews from analyses of program direct and indirect costs;

(2) the process for communicating with the contractor the elements of a proposed should-cost review;

(3) the method for ensuring that every identified should-cost savings opportunity is based on accurate, complete, and current information and is tied to a specific engineering or business change that can be quantified and tracked;

(4) a description of the training, skills, and experience, including cross-functional experience, that Department and contractor officials carrying out a should-cost review should possess;

(5) the method for ensuring appropriate collaboration with the contractor throughout the review process; and

(6) a description of review process requirements that provide for sufficient analysis and minimize any impact on program schedule.

Soldier and Marine Equipment Requirements

Ensuring that military service members receive the best available organizational clothing, individual equipment (OCIE), and personal protective equipment (PPE) without unnecessary delays has been a long-standing high priority for the committee. The committee believes that any OCIE and PPE solution must meet validated capability requirements and be certified through first article

testing before being fielded to the warfighter. The committee commends the Army for actively pursuing process efficiencies and acquisition reform for PPE and OCIE where feasible. The committee encourages the Army to continue taking necessary actions to help streamline the requirements development and acquisition process. The committee encourages the Army to routinely solicit the industrial base, and when appropriate leverage commercial-off-the-shelf (COTS) and modified COTS that could potentially meet OCIE and PPE validated capability requirements.

### Technical Exchanges on Independent Research and Development Projects

The committee supports efforts to increase mutually beneficial communications between government and industry and ensure the vital flow of information on technology needs and areas of research. The committee is aware that exchanges of information on independent research and development (IR&D) projects currently occur in many areas. Contractors often seek out information about the technology needs of the Department of Defense and inform the Department about IR&D projects in order to enhance their competitiveness.

The committee is concerned, however, that a recent Defense Federal Acquisition Regulation Supplement (DFARS) rule links the technical exchange of information on IR&D projects to the determination of allowable costs for those projects. While having greater visibility of IR&D projects early in the process can be beneficial to the Department, the committee questions the necessity of creating a direct linkage between technical exchanges and the determination of allowable costs. Further, the committee believes this linkage results in practical difficulties in implementation for both the Department and industry that could potentially disrupt ongoing research and development efforts that are vital to improving our warfighters' technological edge.

Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services by October 1, 2017, on technical exchanges for IR&D projects. The briefing should include:

(1) the extent to which technical exchanges occur presently with contractors, including contractor IR&D reviews, and how the Department uses the information received through these reviews;

(2) the extent to which IR&D information submitted to the Defense Technical Information Center database in accordance with the DFARS rule is used by the Department;

(3) a description of the additional information that is expected to be obtained through the technical exchanges required by the DFARS rule and how this information would be used by the Department;

(4) the rationale for linking the determination of cost allowability to technical exchanges and the advantages and disadvantages of such linkage; and

(5) a detailed plan for how the Department would implement the DFARS rule, including staffing, IT infrastructure, the implementation timeline, and required funding.

The committee expects the Secretary will consider suspending implementation of the DFARS rule until this implementation plan and briefing is completed.

Transparency in Department of Defense Contract Negotiations

The Federal Government requires defense contractors to submit substantial cost and pricing data in proposals for major defense acquisition programs. Contractors are also required to submit substantial amounts of information for business case analyses that support Government decision making. The committee is concerned that the Department of Defense may not be, in turn, providing appropriate transparency for industry to understand, evaluate, and respond to departmental counteroffers and requests for additional information. Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services not later than September 30, 2017, on efforts to improve transparency during contract negotiations and business case analyses.

Vendor Vetting Process and Guidance

The committee continues to believe that a comprehensive vendor vetting process is essential to prevent the Department of Defense from awarding contracts to companies having ties to violent extremist organizations or other inappropriate entities. The committee is encouraged by the fact that two combatant commands, U.S. Central Command and U.S. Transportation Command, have established vendor vetting cells to determine whether potential vendors actively support any terrorist, criminal, or other sanctioned organization, but is concerned about the extent to which the Department has developed an approach to institutionalize vendor vetting across the Department and geographic combatant commands, including guidance and the information systems involved in vendor vetting. For example, the committee notes that the U.S. Government Accountability Office reported in December 2015 that the Department lacks guidance specifying conditions under which combatant commands should have a vendor vetting process or cell in place, and has identified other deficiencies in the vendor vetting process (GAO–16–105).

Therefore, the committee directs the Comptroller General of the United States to assess the Department's efforts to institutionalize vendor vetting across the Department and geographic combatant commands. At a minimum, the review shall address:

(1) the extent to which the Department and its geographic combatant commands have developed guidance on vendor vetting;

(2) the extent to which the Department and its geographic combatant commands have established and are implementing vendor vetting processes, including information systems involved in vendor vetting;

(3) the sufficiency of the internal controls the Department has in place to ensure that the information used to make determinations of vendor risk is complete, accurate, and timely, including appeals processes, if any, available to vendors; and

(4) the challenges, if any, the Department faces with regard to vendor vetting.

The committee further directs the Comptroller General to provide a briefing to the House Committee on Armed Services not later than January 31, 2018, on the Comptroller General's preliminary findings and to submit a final report to the congressional defense committees on a date agreed to at the time of the briefing.

## LEGISLATIVE PROVISIONS

### Subtitle A—Defense Acquisition Streamlining and Transparency

### Part I—Acquisition System Streamlining

#### Section 801—Procurement through Online Marketplaces

This section would require the General Services Administration (GSA) to contract with multiple commercial online marketplaces for the procurement of certain commercial-off-the-shelf (COTS) products. Marketplaces would be limited to those that are commonly used in the private sector; provide a dynamic selection of products and prices from numerous suppliers; provide procurement oversight controls, such as two-person approval for purchases; and can screen suppliers and products to ensure compliance with suspension and debarment, domestic sourcing, and other similar statutes. Online marketplaces primarily provide streamlined and automated access to various suppliers; suppliers therefore would be considered prime vendors for purposes of the Small Business Act. This section would require the Comptroller General to provide a report to the relevant congressional committees on small business participation in the marketplaces not later than 3 years after a contract with an online marketplace provider is awarded.

The committee expects that by contracting with numerous marketplaces, there will be competition between marketplaces for procurement of COTS products, and government personnel will have streamlined access to suppliers, products, and prices from varying marketplaces. The section therefore would not require GSA to use competitive procedures to contract with each marketplace. This section would require marketplaces to provide electronic access to information about products that are purchased, including the date of each purchase, the price paid, the person or entity within the department or agency that made the purchase, the delivery address, and the number of sellers that offered the same or similar product at the same time. The committee believes that such information would provide much better transparency into the Federal Government's purchasing and thereby enable more thorough oversight and accountability. This section would require each contract with a marketplace to prohibit the sale or other use of such purchase information to a third party in a manner that identifies the Federal Government, or any of its departments or agencies, as the purchaser.

The committee believes that online marketplaces provide a substantial opportunity to greatly streamline procurement of COTS products. Namely, marketplaces generally ensure competition and price reasonableness, and therefore would obviate many of the time-consuming government-unique procurement processes GSA and the Department of Defense perform today. Additionally, de-

partments and agencies would be required to accept the standard terms and conditions related to purchases on each marketplace. The committee understands, however, that it may be prudent to procure some commercial products through traditional acquisition processes. Therefore, this section would require the Department of Defense to purchase COTS products from the marketplaces only in appropriate circumstances. The committee expects the Secretary of Defense to issue implementation guidance that may limit the products that the Department of Defense may purchase on marketplaces. The committee expects, however, that opportunities to purchase additional products through marketplaces may arise as GSA gains familiarity with the use of online marketplaces. Elsewhere in this report, the committee includes an item directing the Administrator of GSA to provide a briefing to the House Committee on Armed Services and the House Committee on Oversight and Government Reform on the results of online marketplace purchasing.

Section 802—Performance of Incurred Cost Audits

This section would require the Secretary of Defense to adhere to commercial standards for risk and materiality when auditing costs incurred under flexibly priced contracts. The committee is concerned that current incurred cost auditing processes in the Department of Defense are too slow, impede effective contract management, and may not provide good value to the taxpayer. The committee also understands that commercial auditors used by other Federal agencies may cost less and complete incurred cost audits sooner.

The section would authorize contract management personnel in the Department to choose either the Defense Contract Audit Agency (DCAA) or a qualified private auditor (QPA) to audit incurred costs, subject to guidelines of an audit planning committee. The section would require the Department to enter into an indefinite delivery-indefinite quantity task order contract with QPAs, and that QPAs audit at least 25 percent of incurred costs on flexibly priced contracts after September 1, 2020. The section would prohibit DCAA from further auditing audits performed by QPAs and would require the Secretary to treat DCAA and QPA audits equally. The section also would require DCAA to pass a peer review by a commercial auditor, which is consistent with commercial practice, to continue to issue unqualified audit findings after September 1, 2022. The section would require the Secretary of Defense to provide a briefing to the Committee on Armed Services of the House of Representatives not later than September 1, 2019, on the progress on finding a commercial auditor to perform the peer review.

This section also would specify a materiality standard for incurred cost audits effective September 1, 2020, based on private sector norms, for both DCAA and QPAs. The Comptroller General of the United States would be required to provide a report to the congressional defense committees not later than March 1, 2019, describing private sector and government standards for risk and materiality and providing recommendations as necessary to adjust the materiality standards in this section. On September 1, 2019, and every 5 years thereafter, the Department would be required to review private sector materiality standards and propose changes to the materiality standards in this section, as necessary.

The section would require incurred cost audits to be completed within 1 year after receipt of qualified cost submissions, or the submissions would be accepted in their entirety, unless the Department could demonstrate that the contractor withheld information necessary to perform the audit. The committee intends for the Department to redefine its incurred cost backlog to include all audits that are not completed within 1 year of receipt of qualified incurred cost submissions. The committee further intends the Department to allocate DCAA and QPA audit resources to the highest risk audits consistent with completing incurred cost audits within 1 year.

Toward that end, the section would direct the Comptroller General of the United States to provide a report to the congressional defense committees by April 1, 2025, that evaluates the relative timeliness, costs, and quality of incurred cost audits performed by DCAA and QPAs; relative contractor costs of incurred cost audits performed by DCAA and QPAs; any effects on other types of audits; and the capability and capacity of commercial auditors to perform incurred cost audits for the Department.

Section 803—Modifications to Cost or Pricing Data and Reporting Requirements

This section would amend section 2306a of title 10, United States Code, and section 3502 of title 41, United States Code, to raise contract dollar thresholds that require submission of certified cost and pricing data. The threshold for non-competitive prime contracts, modifications of such contracts, subcontracts, and modifications of subcontracts would increase from $500,000 to $2.5 million, while the threshold for modifications to legacy contracts would increase from $100,000 to $750,000. Raising certified cost and pricing data thresholds would reduce administrative burdens, improve process timelines for smaller contracts, and make thresholds approximately consistent with standard auditing thresholds. The section would further amend section 2306a of title 10, United States Code, to require offerors to submit other than certified cost or pricing data sufficient to determine price reasonableness when certified cost or pricing data is not required.

This section would also require the Comptroller General of the United States to submit a report to the congressional defense committees not later than March 1, 2022, on the implementation and effect of these modifications to cost or pricing data submission requirements.

This section also would amend section 2313a of title 10, United States Code, to revise reporting requirements of the Defense Contract Audit Agency (DCAA) to provide more clarity on the cost effectiveness of different types of audits. It would require DCAA to report separately for incurred cost, forward pricing, and other audits with regard to the number and dollar value of audits completed and pending, sustained questioned costs, the costs of performing audits, and the return on investment of conducting audits. This section also would change the inflation calculation for the thresholds for certified cost and pricing data, as well as covered contracts related to allowable costs, to be consistent with the inflation methodology in section 1908 of title 41, United States Code.

## PART II—EARLY INVESTMENTS IN ACQUISITION PROGRAMS

### Section 811—Requirement to Emphasize Reliability and Maintainability in Weapon System Design

This section would emphasize reliability and maintainability (R&M) in the system design of a major defense acquisition program (MDAP). First, the section would require the Secretary of Defense to include R&M as attributes of the existing key performance parameter on sustainment during the requirements development process. Second, when contracting for engineering and manufacturing development (EMD) or production of an MDAP, the program manager would be required to include clearly defined and measurable requirements for engineering activities and design specifications for R&M in the contract solicitation and contract terms unless he or she determines R&M should not be a contract requirement. Third, the section would require the Secretary to encourage the use of objective R&M criteria in the source selection process. Fourth, the section would authorize the use of incentive fees and would require the use of recovery options when practicable to encourage contractor performance in R&M for EMD and production contracts. The Department would be able to exercise incentive fees and recovery options until the date of acceptance of the last item under the contract. Finally, the section would establish a program through which program managers would compete for additional funding to invest in R&M during the EMD or production of an MDAP to reduce future operating and support (O&S) costs.

The committee notes that the design of a major weapon system directly affects its life-cycle sustainment activities and consequently drives its O&S costs. Elements of sustainment that are highly dependent on the system design, namely R&M, are easier and less costly to address during the development of an MDAP than after a weapon system is fielded. Therefore, the committee believes the Department should emphasize R&M in early engineering decisions.

### Section 812—Licensing of Appropriate Intellectual Property to Support Major Weapon Systems

This section would require the Department of Defense to work with contractors to determine prices for technical data the Department plans to acquire or license before selecting a contractor for the engineering and manufacturing development phase or the production phase of a major weapon system. Obtaining prices for technical data while competition exists among contractors encourages the Department to plan early for the technical data it needs to maintain a weapon system and affords the Department more competitive prices than it might pay later during the sustainment phase. Additionally, this section would encourage program managers to negotiate with industry to obtain the custom set of technical data necessary to support each major defense acquisition program rather than, as a default approach, seeking greater rights to more extensive, detailed technical data than is necessary.

The committee believes that acquiring broad rights to most or all of the technical data in a weapon system can be cost-prohibitive and deter contractors from bidding on defense programs. Not ac-

quiring enough technical data, however, can reduce subsequent competition and increase sustainment costs. Therefore, the committee urges program managers when seeking technical data to consider the particular data that is required, the level of detail necessary, the purpose for which it will be used, with whom the government needs to share it, and for how long the government needs it. Program managers should also consider the unique characteristics of the weapon system and its components, the product support strategy for the weapon system, the organic industrial base strategy of the military department, and the commercial market.

Section 813—Management of Intellectual Property Matters within the Department of Defense

This section would create a small cadre of experts in intellectual property (IP) that would advise, assist, and provide resources to program offices as they develop their IP strategies and negotiate with industry. The section would also establish a centralized Office of Intellectual Property within the Department of Defense to standardize the Department's approach toward obtaining technical data, promulgate policy on IP, oversee the cadre of IP experts, and serve as a single point of contact for industry on IP matters. Finally, this section would add IP positions to the acquisition workforce and would revise the training provided to the acquisition workforce on IP matters.

The committee has observed within the Department divergent philosophies toward acquiring technical data and varying knowledge of IP matters, including laws, regulations, and best practices. The committee is concerned that this inconsistency and lack of coordination disadvantages the Department. Additionally, because a provision elsewhere in this title would establish a preference for "specially negotiated licenses" to obtain the appropriate technical data customized to each weapon system, the committee believes the Department requires tools to improve its ability to negotiate with industry. A centralized Office of Intellectual Property and cadre of IP experts are warranted to address these issues. The committee intends that the office and cadre would provide advice and assistance to facilitate acquisitions. This section would not require the office or cadre to approve IP strategies, contracting actions, or other program office activities.

The committee also intends for the Office of Intellectual Property to maintain Department of Defense policy on Small Business Innovation Research (SBIR) data rights, particularly as it pertains to the transition from Phase I and II awards to Phase III awards, and to serve as a liaison between the Department of Defense and SBIR companies when IP issues arise related to SBIR.

Section 814—Improvement of Planning for Acquisition of Services

This section would require the Secretary of Defense to ensure that the appropriate information is available and that the right factors are considered to enable the most effective business decisions regarding the procurement of services. This section would require the Secretaries of the Department of Defense and of the military departments to analyze spending patterns and projected future requirements for contracted services and use this analysis to inform

future decisions on services acquisition. Additionally, the section would require the Secretary of Defense to submit to Congress with the annual budget clear and detailed information on the amounts requested for contracted services organized according to the common enterprise data structure required elsewhere in this Act.

This section also would require the Services Requirements Review Boards (SRRBs) that the Department of Defense established last year to focus primarily on evaluating the need for contracted services, rather than the contracting action. The SRRBs would be required to critically examine requirements in light of total force management, available resources, analysis of past spending, and contracting best practices.

Finally, this section would require the entities that need contracted services to plan appropriately, whenever possible, to receive validation of the requirement, secure the needed funding, and complete the contracting action before the service is needed. A requirements owner that does not adequately plan for contracted services and consequently relies on a bridge contract would be required to provide an update and explanation to a relevant senior official. Upon the second use of a bridge contract for the same service, the senior official would be required to notify senior leadership within the relevant military department, Defense Agency, Department of Defense Field Activity, or combatant command.

The committee believes that greater data and analytics would enable the Department of Defense to make more enterprise-oriented, strategic decisions about its acquisition of services. The committee also believes that if departmental organizations were encouraged to identify their known or enduring requirements earlier in the process, it would enable more thorough examination of the requirements, better and timelier alignment of resources, and opportunities to use contracting best practices. Additionally, improved planning processes would empower local installations and commands to better manage individual contracts and their associated funding. The committee notes that this legislation would improve headquarters analysis and management of the acquisition of services but would retain the decentralized nature of procuring services at local installations.

### Section 815—Improvements to Test and Evaluation Processes and Tools

This section would amend sections 2366b and 2366c of title 10, United States Code, to require an assessment of the sufficiency of the developmental test plan and resources for each major defense acquisition program (MDAP) be included in the "acquisition scorecards" that were created in section 808 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328). The committee believes that developmental testing is critical to reducing acquisition program risk by providing valuable information to support sound decision making. However, the committee is concerned that some MDAPs do not conduct enough developmental testing, so too many problems are first identified during operational testing, when they are expensive and time-consuming to fix. This section also would require the Secretary of Defense to evaluate the Department of Defense's strategy for developing and expanding the use of tools that facilitate cost-effective developmental

testing, including automated test methods and tools, modeling and simulation tools, and big data analytics technologies. The Secretary of Defense would be required to provide a briefing to the House Committee on Armed Services,not later than 1 year after the date of the enactment of this Act, on the Secretary's evaluation. The committee believes that emerging technologies and tools, such as Automated Test and Retest and modeling and simulation, can reduce program risk by facilitating rigorous system testing early in the life of a program.

## PART III—ACQUISITION WORKFORCE IMPROVEMENTS

### Section 821—Enhancements to the Civilian Program Management Workforce

This section would require the Secretary of Defense to implement a new career development program for highly qualified, competitively selected civilian employees to increase the pool of experienced civilian employees qualified to serve as program managers for major defense acquisition programs (MDAPs). The committee believes that a focus on career development and incentive structures for program managers would increase the number of personnel ready and willing to successfully manage MDAPs, thereby increasing the professionalization and tenure of personnel in these critical positions. The new career development program would include selection criteria for personnel in the program, necessary human capital flexibilities, and structured training and career paths. The Secretary would be required to provide a design for the program to the Committees on Armed Services of the Senate and the House of Representatives within 1 year after the date of the enactment of this Act. This section would also require an independent study of personnel policies and incentives needed to attract, retain, and hold accountable civilian and military program managers for the largest and most complex acquisition programs in the Department. The study would be required to be completed within 9 months after the date of the enactment of this Act, and the Secretary would be required to provide the study to the congressional defense committees within 30 days thereafter.

### Section 822—Improvements to the Hiring and Training of the Acquisition Workforce

This section would amend section 1705 of title 10, United States Code, to authorize the use of the Defense Acquisition Workforce Development Fund to pay salaries of personnel to manage the Fund. The committee expects that this authorization would improve the Department of Defense's ability to effectively sustain its acquisition workforce.

The section also would require the Comptroller General of the United States to submit a report to the congressional defense committees by June 30, 2019, on the effectiveness of existing hiring flexibilities for the acquisition workforce, as well as the need for acquisition training for personnel who work in acquisition programs but are not formally considered part of the acquisition workforce.

The section would require the Department to evaluate gaps in knowledge of industry operations, industry motivation, and busi-

ness acumen in the acquisition workforce, and would require the Under Secretary of Defense for Acquisition and Sustainment to submit a report on this evaluation to the Committees on Armed Services of the Senate and the House of Representatives by December 31, 2018.

Lastly, the section would require the Director of the Defense Contract Audit Agency to provide a briefing to the Committees on Armed Services of the Senate and the House of Representatives, not later than 180 days after the date of the enactment of this Act, on strategies to enhance the professionalization of the Agency's workforce.

The committee believes that the hiring, training, and retention of highly qualified civilian personnel for the defense acquisition workforce is vital to maintaining military readiness, increasing the Department's buying power, and achieving substantial long-term savings through systems engineering and contracting. Therefore, the committee urges that planning for any workforce reduction that would affect the civilian acquisition workforce takes into consideration potential long-term effects of those reductions on cost, technical baseline, and warfighting capability.

Section 823—Extension and Modifications to Acquisition Demonstration Project

This section would amend section 1762 of title 10, United States Code, to extend, through December 2023, the Acquisition Demonstration (AcqDemo) personnel demonstration project that was established in section 4308 of the National Defense Authorization Act for Fiscal Year 1996 (Public Law 104–106). AcqDemo allows the Department of Defense flexibility in setting compensation for recruiting and retaining high-performing acquisition personnel. The section also would require the Secretary of Defense to develop an implementation strategy to address potential AcqDemo improvements that were identified in a recent RAND assessment, and to provide a briefing to the Committees on Armed Services of the Senate and the House of Representatives and the Committee on Oversight and Government Reform of the House of Representatives on the implementation strategy within 1 year after the date of the enactment of this Act.

Section 824—Acquisition Positions in the Offices of the Secretaries of the Military Departments

This section would help to retain qualified acquisition personnel within the Department of Defense by amending sections 3014, 5014, and 8014 of title 10, United States Code, to authorize the Secretaries of the military departments to exceed statutory personnel caps for civilian employees when hiring acquisition oversight personnel from the Office of the Under Secretary of Defense for Acquisition, Technology, and Logistics or requirements personnel from the Joint Staff that supported the Joint Requirements Oversight Council. For the caps to be exceeded, a determination would be required that a position was no longer needed due to restructuring required by the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) and that the position would

not be refilled by the Office of the Secretary of Defense or the Joint Staff.

PART IV—TRANSPARENCY IMPROVEMENTS

Section 831—Transparency of Defense Business System Data

This section would amend section 2222 of title 10, United States Code, to require that all data within Department of Defense business systems be considered owned by the Department and be readily available to the Office of the Secretary of Defense, the Joint Staff, and the military departments. To facilitate the management and analysis of data from across the military departments and defense agencies, the section would require the creation and maintenance of common enterprise data structures (CEDS) into which business system data could be mapped to populate common data sets. The section would assign responsibility to the Deputy Chief Management Officer for creation of CEDS and would amend section 139a of title 10, United States Code, to require that the Director of Cost Assessment and Program Evaluation maintain the CEDS and establish and maintain access to all related data. The section would also require the Deputy Chief Management Officer, with the concurrence of the Director, Cost Assessment and Program Evaluation, to develop a plan to implement the data transparency requirements in this section and to submit the plan to the congressional defense committees not later than 6 months after the date of the enactment of this Act.

The committee is concerned that the Department lags well behind the private sector in effectively incorporating enterprise-wide data analyses into decision making and oversight. The committee therefore believes that a statutory requirement that the Office of the Secretary of Defense, the Joint Staff, and the military departments be given access to business system data is necessary to overcome institutional and cultural barriers to information sharing. The committee further believes that to bring about this significant culture change, it is necessary to assign responsibility at the highest levels of the Department for creating and maintaining CEDS.

The committee recommends $25.0 million in funding for the implementation of the data transparency requirements in this section.

Section 832—Major Defense Acquisition Programs: Display of Budget Information

This section would require greater transparency in the budget requests for major defense acquisition programs (MDAPs). Budget justification documents for MDAPs would be required to separately depict funding for developmental and operational testing and evaluation, the purchase of cost data from contractors, and the purchase or license of technical data. The committee believes that testing and evaluation, cost data, and intellectual property are necessary investments made early in a program. However, the committee is concerned that associated funding is often decremented when cost, schedule, or performance risks materialize. Improving transparency of funding for these items would improve the ability of the committee to conduct oversight.

Section 833—Enhancements to Transparency in Test and Evaluation Processes and Data

This section would require several improvements to the transparency of test and evaluation (T&E) processes and data. It would amend section 139 of title 10, United States Code, to require the Director of Operational Test and Evaluation (OT&E) to document specific circumstances that require the addition of smaller programs to the OT&E oversight list and to summarize those circumstances in the annual OT&E report. The section also would amend section 2399 of title 10, United States Code, to require the Director of OT&E to provide data in test reports on how the capabilities of new systems being tested compare to those of legacy systems.

The committee recognizes the value of an independent operational testing office in identifying potential vulnerabilities of weapon systems before such systems are purchased in significant quantity or deployed operationally. The committee believes that this information is critical to facilitate risk-based fielding decisions by senior Department of Defense leadership. However, the committee is concerned that, in recent years, operational test reports have provided evaluations of effectiveness and suitability but have not provided sufficient information to Congress on the performance improvements a system may provide when compared to legacy systems. The committee believes that more information on such comparisons, where appropriate and available, would provide useful context for evaluating a system's overall performance in operational testing.

This section also would amend section 139 of title 10, United States Code, to enhance the opportunity of the military departments to comment on the annual OT&E report to ensure that OT&E information is complete, accurate, and timely. The section also would require improved transparency of T&E cost data to enable oversight entities to better evaluate the adequacy of a program's T&E plans and resources. It would require the Department of Defense to develop an enterprise approach to T&E knowledge management to leverage T&E data across programs. The Director of the Test Resource Management Center and the senior Department official responsible for developmental testing would be required to submit a report to the congressional defense committees, within 1 year after the date of the enactment of this Act, on the Department's enterprise approach.

SUBTITLE B—STREAMLINING OF DEFENSE ACQUISITION STATUTES AND REGULATIONS

Section 841—Modifications to the Advisory Panel on Streamlining and Codifying Acquisition Regulations

This section would amend section 809 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92) to require the Advisory Panel on Streamlining and Codifying Acquisition Regulations to transmit its final report on January 15, 2019, rather than 2 years after the panel was established. It also would require the panel to transmit its final report simultaneously to the Secretary of Defense and the congressional defense committees.

The section would extend the period of time for the Secretary to submit comments on the final report from 30 to 60 days, and would establish a termination date for the panel 180 days after transmittal of the final report.

Section 842—Extension of Maximum Duration of Fuel Storage Contracts

This section would extend from 20 to 30 years the maximum total period of Department of Defense contracts for storage, handling, or distribution of liquid fuels and natural gas. This provision was recommended by the Section 809 Panel on Streamlining and Codifying Acquisition Regulations, which was established in the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92), as an example of updating acquisition regulations to be consistent with modern technology and business practices.

Section 843—Exception for Business Operations From Requirement to Accept $1 Coins

This section would exempt government contractors from the requirement of section 5112(p) of title 31, United States Code, that business operations performed on Federal Government premises provide for accepting and dispensing of existing and proposed dollar coins. This provision was recommended by the Section 809 Panel on Streamlining and Codifying Acquisition Regulations, which was established in the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92), as an example of an unnecessary contract clause.

Section 844—Repeal of Expired Pilot Program

This section would repeal an expired pilot program in section 2401a of title 10, United States Code, related to leasing utility cargo vehicles.

SUBTITLE C—AMENDMENTS TO GENERAL CONTRACTING AUTHORITIES, PROCEDURES, AND LIMITATIONS

Section 851—Limitation on Unilateral Definitization

This section would amend section 2326 of title 10, United States Code, to require the approval of the agency head before a Department of Defense contracting officer can unilaterally definitize the specifications, terms, or price of undefinitized contractual actions (UCAs) valued greater than $1.0 billion. Currently, departmental regulations allow contracting officers to unilaterally determine reasonable prices and applicable clauses governing definitized contracts, with approval from the head of contracting activity. The committee believes that this level of scrutiny is sufficient for low dollar value UCAs. However, for high dollar value UCAs, particularly those involving the development or production of major defense acquisition programs, the committee believes that greater oversight is warranted. This section would also require that the unilateral definitization not take effect until 30 calendar days after the approval by the agency head. The committee believes that a 30-day waiting period would result in the contractor and the government having additional time and incentive to reach agreement on

the contract and avoid the negative consequences of unilateral definitization.

Section 852—Codification of Requirements Pertaining to Assessment, Management, and Control of Operating and Support Costs for Major Weapon Systems

This section would codify section 832 of the National Defense Authorization Act for Fiscal Year 2012 (Public Law 112–81; 10 U.S.C. 2430 note) on assessing and controlling operating and support costs for major weapons systems.

Section 853—Use of Program Income by Eligible Entities That Carry Out Procurement Technical Assistance Programs

This section would amend section 2414 of title 10, United States Code, to give Procurement Technical Assistance Centers limited authority to carry over program income into the next fiscal year to further program objectives.

Section 854—Amendment to Sustainment Reviews

This section would amend section 2441 of title 10, United States Code, pertaining to sustainment reviews of major weapon systems. It would require the Secretaries of the military departments to make the results of sustainment reviews and supporting documentation available to the Under Secretary of Defense for Acquisition and Sustainment. The committee believes that data collected as part of sustainment reviews should be a Department of Defense-wide asset that is available for analysis and used to inform the Department's policies on sustainment of major weapon systems.

Section 855—Clarification to Other Transaction Authority

This section would modify section 2371b of title 10, United States Code, related to other transactions authority (OTA) to ensure consistency across the language and improve clarity for how the Department of Defense makes determinations when higher level authority is needed to sign off on a specific OTA award. The committee believes such changes will improve the speed and efficiency of issuing these awards by reducing the numbers of determinations requiring higher level signature. Due to the changes that have been made to this authority in recent years, the committee encourages the Department to revise and, if necessary, reissue guidance on using OTA.

Section 856—Clarifying the Use of Lowest Price Technically Acceptable Source Selection Process

This section would amend section 813 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) to require the Secretary of Defense to amend the Defense Federal Acquisition Regulation Supplement to require that lowest price technically acceptable source selection criteria are only used in situations in which the Department would realize no or minimal additional innovation or future technological advantage, and, with respect to a contract for procurement of goods, the goods procured are predominantly expendable in nature, nontechnical, or have a short

life expectancy. The section would also require the avoidance of the use of lowest price technically acceptable source selection criteria when procuring certain types of electronic test and measurement equipment.

Section 857—Amendment to Nontraditional and Small Contractor Innovation Prototyping Program

This section would amend section 844(d) of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) pertaining to the nontraditional and small contractor innovation prototyping program. It would add unmanned ground logistics and unmanned air logistics to the list of capabilities to be included in the program.

Section 858—Modification to Annual Meeting Requirement of Configuration Steering Boards

This section would amend section 814 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Public Law 110–417) to remove the requirement for a configuration steering board to meet annually to review an acquisition program if the senior acquisition executive determines in writing that there were no changes to the requirements of the acquisition program during the preceding year.

Section 859—Change to Definition of Subcontract in Certain Circumstances

This section would amend section 1906(c)(1) of title 41, United States Code, to make the definition of subcontract in that section consistent with the definition in section 2375 of title 10, United States Code.

Section 860—Amendment Relating to Applicability of Inflation Adjustments

This section would modify section 1908(d) of title 41, United States Code, to ensure 5-year inflation adjustments apply consistently to all subcontractors. Currently, inflation adjustments impact only prime contractors, so that subcontractors must maintain a compliance requirement for some contracts but not others. The committee believes that standardization will reduce regulatory and compliance challenges for both prime and subcontractors.

SUBTITLE D—OTHER MATTERS

Section 861—Exemption from Design-Build Selection Procedures

This section would amend section 2305a of title 10, United States Code, to exempt solicitations issued pursuant to an indefinite delivery/indefinite quantity contract from the statutory limitation on the number of offerors that may proceed to step-two of the procurement selection process.

Section 862—Requirement That Certain Ship Components Be Manufactured in the National Technology and Industrial Base

This section would amend section 2534 of title 10, United States Code, and would require certain auxiliary ship components to be procured from a manufacturer in the national technology and industrial base.

Section 863—Procurement of Aviation Critical Safety Items

This section would amend section 814 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) to include the procurement of aviation critical safety items.

The committee is concerned the military services may be interpreting the definition of personal protective equipment too narrowly and are not considering aviation critical safety items, such as military parachutes. This change ensures that to the maximum extent practicable, the source selection criteria used in the procurement of aviation critical safety items, such as parachutes, would be best-value based, rather than reverse auction or lowest price technically acceptable contracting methods.

Section 864—Milestones and Timelines for Contracts for Foreign Military Sales

This section would require the Secretary of Defense to develop standard timeline milestones for the foreign military sales (FMS) process, including related contracting activities. Timeline milestones would vary by the complexity of the FMS case. The Secretary would report quarterly to the congressional defense committees, the Committee on Foreign Affairs of the House of Representatives, and the Committee on Foreign Relations of the Senate any FMS cases that require congressional notification pursuant to section 36 of the Arms Export Control Act that do not meet timeline milestones. The Secretary would also report annually to the congressional defense committees, the Committee on Foreign Affairs of the House of Representatives, and the Committee on Foreign Relations of the Senate the number of FMS cases that did meet timeline milestones during the preceding fiscal year, and the number of FMS cases that failed to meet the timeline milestones, categorized by milestone and reason for the delay.

Section 865—Notification Requirement for Certain Contracts for Audit Services

This section would require the Secretary of Defense to notify the congressional defense committees when there is a protest of a contract for auditing services that contribute to the Department of Defense achieving auditable financial statements and the Department decides not to use existing authorities to continue performance of the contract while the protest is pending. The committee remains committed to the Department achieving auditable financial statements, and is concerned that a delay in any one annual auditing contract impairs the ability of the entire Department to achieve consolidated audited financial statements.

Section 866—Training in Acquisition of Commercial Items

This section would require the President of the Defense Acquisition University to establish a training program on part 12 of the Federal Acquisition Regulation pertaining to the procurement of commercial items.

Section 867—Notice of Cost-Free Federal Procurement Technical Assistance in Connection With Registration of Small Business Concerns on Procurement Websites of the Department of Defense

This section would require the Secretary of Defense to establish procedures to include information about cost-free services provided by a Federal procurement technical assistance program in notices or direct communications regarding the registration of a small business on a Department of Defense procurement website.

Section 868—Comptroller General Report on Contractor Business System Requirements

This section would require the Comptroller General of the United States to issue a report to the congressional defense committees not later than 1 year after the date of enactment of this Act on the feasibility and effect of revising the applicability of contractor business system rules contained in section 893 of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 (Public Law 111–383).

Section 869—Standard Guidelines for Evaluation of Requirements for Services Contracts

This section would require the Secretary of Defense to encourage standardization of guidelines for the evaluation of requirements for services contracts.

Section 870—Temporary Limitation on Aggregate Annual Amount Available for Contract Services

This section would extend the cap on spending for services contracts by the Department of Defense through fiscal year 2018.

# TITLE IX—DEPARTMENT OF DEFENSE ORGANIZATION AND MANAGEMENT

## LEGISLATIVE PROVISIONS

### SUBTITLE A—ORGANIZATION AND MANAGEMENT OF THE DEPARTMENT OF DEFENSE GENERALLY

Section 901—Responsibility of the Chief Information Officer of the Department of Defense for Risk Management Activities Regarding Supply Chain for Information Technology Systems

This section would amend section 142(b)(1) of title 10, United States Code, by making the Department of Defense Chief Information Officer responsible for policy, oversight, guidance, and coordination for supply chain risk management activities for the Department's information technology (IT) systems.

The committee remains concerned that the Department of Defense is not adequately postured or resourced to conduct the necessary planning, analysis, and assessment for supply chain risk management of Department of Defense information technology systems. This problem is exacerbated by the globalized nature of both the hardware and software supply chains for IT, and by the reliance of the Department on primarily commercial systems that are the products of the globalized management and supply chain. While the committee is aware that much progress has been made in developing policies and guidance, as well as creating the core of an analytic capability, the committee believes there is more to be done. In addition to rethinking how to address this problem with less manpower, the committee also believes the Department should do more to invest in automated information feeds, including from business and commercial intelligence providers, to fuse with classified information when needed, but also to provide stand-alone products more easily shareable with industry, interagency, and international partners.

Section 902—Repeal of Office of Corrosion Policy and Oversight

This section would repeal section 2228 of title 10, United States Code, requiring that there be an Office of Corrosion Policy and Oversight within the Office of the Under Secretary of Defense for Acquisition, Technology, and Logistics.

Section 903—Designation of Corrosion Control and Prevention Executives for the Military Departments

This section would designate corrosion control and prevention executives for the military departments.

Section 904—Maintaining Civilian Workforce Capabilities to Sustain Readiness, the All Volunteer Force, and Operational Effectiveness

This section would amend section 912 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) to add civilian workforce matters to the report required by that section.

SUBTITLE B—DESIGNATION OF THE NAVY AND MARINE CORPS

Section 911—Redesignation of the Department of the Navy as the Department of the Navy and Marine Corps

This section would re-designate the Department of the Navy as the Department of the Navy and Marine Corps. Further, this section would re-designate the Secretary of the Navy as the Secretary of the Navy and Marine Corps.

Section 912—Conforming Amendments to Title 10, United States Code

This section would make conforming amendments to Title 10, United States Code, consistent with designating the Department of the Navy as the Department of the Navy and Marine Corps.

Section 913—Other Provisions of Law and Other References

This section would amend other references in the United States Code consistent with the designation of the Department of the Navy as the Department of the Navy and Marine Corps.

Section 914—Effective Date

This section would make this subtitle effective on the first day of the first month beginning more than 60 days after the enactment of this Act.

SUBTITLE C—OTHER MATTERS

Section 921—Transition of the Office of the Secretary of Defense To Reflect Establishment of Positions of Under Secretary of Defense for Research and Engineering, Under Secretary of Defense for Acquisition and Sustainment, and Chief Management Officer

This section would allow the incumbent Principal Deputy Under Secretary of Defense for Acquisition, Technology, and Logistics to become the Under Secretary of Defense for Acquisition and Sustainment, and would allow the incumbent Deputy Chief Management Officer to continue to serve as the Chief Management Officer, once both positions come into effect on February 1, 2018, consistent with section 901 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328.) Additionally, this section would clarify that any statutory references to the positions established in the aforementioned section 901 also take effect on February 1, 2018.

In the conference report (H. Rept. 114–840) accompanying the National Defense Authorization Act for Fiscal Year 2017, the conferees encouraged the President to move expeditiously on nominations for the Under Secretary of Defense for Research and Engineering, the Under Secretary of Defense for Acquisition and Sustainment, and the Chief Management Officer. However, the committee recognizes the difficulty of recruiting talented, experienced individuals to the incumbent leadership positions if the tenure of such positions is short and the individuals are not retained for the newly established positions. Therefore, the committee recommends that the individuals appointed by and with the advice and consent of the Senate to the relevant incumbent positions be allowed to transition to the newly established positions.

Section 922—Extension of Deadlines for Reporting and Briefing Requirements for Commission on the National Defense Strategy for the United States

This section would amend section 942 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328), which establishes a Commission on the National Defense Strategy for the United States, to extend the deadlines for the final report and interim briefing.

The committee recognizes that the commissioners had not yet been appointed to the commission as of May 2017. To allow the commission sufficient time to conduct the review and assessment

as required, the committee recommends revising the deadlines for the final report and interim briefing.

#### Section 923—Briefing on Force Management Level Policy

This section would express the sense of Congress that the Department of Defense should discourage the practice of substituting contractor personnel for available members of the Armed Forces when a unit deploys overseas. This section would also require the Secretary of Defense to brief the congressional defense committees on steps the Secretary is taking to revise deployment guidelines to ensure readiness, unit cohesion, and maintenance are prioritized as well as a plan to establish a policy to avoid costly contractor practices when practicable in the future.

# TITLE X—GENERAL PROVISIONS

## ITEMS OF SPECIAL INTEREST

### COUNTER-DRUG ACTIVITIES

#### Narcotics Flow to the United States From Central and South America

Congress continues to be concerned regarding the flow illegal narcotics trafficking into the U.S. from in Central and South America. Congress notes the United States has a national security interest in the narcotics trafficking of transnational criminal organizations taking place in the Western Hemisphere risking widening insecurity and instability. The continuing efforts by U.S. Southern Command have been instrumental in combating the threats posed by the transnational criminal organizations. However, U.S. Southern Command could utilize additional requisite manpower, assets, and resources to assist the Office of National Drug Control Policy's mandated goal of forty percent reduction of narcotics entering through U.S. borders. The committee encourages the Department of Defense to continue to prioritize manpower, assets and resources to meet the mission of U.S. Southern Command to increase stability and security throughout the region. Therefore, the committee requires the Secretary of Defense, to provide a briefing, to the House Committee on Armed Services, no later than November 1, 2017 on the future manpower and resourcing needs in the U.S. Southern Command area of responsibility and the Department's plan to contribute to the interagency effort to reduce the amount of illicit narcotics entering the United States.

#### National Guard Counterdrug Schools

The committee acknowledges the continued contributions of the National Guard Counterdrug Schools as part of domestic counterdrug initiatives. The National Guard, working with law enforcement agencies and community-based organizations, operates five regional counterdrug training centers across the country to provide education and training to local, State, and Federal law enforcement in counterdrug and global threat reduction efforts.

The committee notes the importance of each school's curriculum in addressing the counterdrug threat. Each course provides stu-

dents with training and skill set development to better combat transnational criminal organizations, develop intelligence gathering skills, and develop investigation skills. The committee believes that the Department of Defense should perform a thorough review process, to include feedback from schools' leadership and instructors, of the effectiveness of courses and overall curriculum strategy. The committee encourages the Department, as it annually reviews the curricula of each school, to evaluate the holistic approach each school implements to train, educate, and assist its students.

Peace in Colombia

The committee lauds the Government of the Republic of Colombia on the signing of the peace accords with the Revolutionary Armed Forces of Colombia in September 2016. The committee further congratulates the Government on its implementation of the peace accords, beginning in November 2016. These accords lay the foundation for the peaceful transition of a country dealing with internal war and terrorism for 50 years to a country of stability.

The committee remains supportive of the U.S. mission in Colombia and of the strides made through the U.S.-Colombian partnership. Since 2000, the poverty rate in Colombia has dropped by 44 percent and the Gross Domestic Product has grown by 142 percent, while homicides have decreased by 53 percent. There have also been setbacks, including increased coca production and increased paramilitary attacks, as well as the possible resurgence of the National Liberation Army, and a rise in national violence and homicides. While an increase in coca production has hindered some of the progress of the Colombian Government over the past decade, the U.S. partnership with Colombia to address this and other challenges remains vital. The peace process is a generational transition with no easy victories.

The committee encourages the Government of Colombia to continue its efforts to promote and export stability, security, and transparency. The committee further encourages the Department of Defense and the Government of Colombia to continue their enduring partnership. The committee recognizes Colombia's work in Central America to train and assist countries with rampant violence and instability, leveraging lessons it has learned from 50 years of conflict, and to emphasize the professionalization of the military. The committee believes that, as Colombia evolves through its peaceful transition, a stronger and more stable hemisphere will emerge.

Venezuela Security and Stability

The committee is concerned about the growing economic and political unrest occurring in the Bolivarian Republic of Venezuela under President Nicolas Maduro. With reports of famine, political uncertainty and corruption, a disintegrating economy, and undue violent government action against its citizens, the committee is concerned that instability in Venezuela could lead to a government collapse and failed state. In addition, this instability could result in portions of the Venezuelan population migrating to neighboring countries, including the Republic of Colombia, the Cooperative Republic of Guyana, the Republic of Peru, and the Federative Repub-

lic of Brazil, seeking humanitarian relief. The effects of a large scale humanitarian crisis in the region could be catastrophic.

The committee is concerned about U.S. Government contingency planning if a collapse of the Venezuelan Government and economy occurs. Therefore, the committee directs the Secretary of Defense, in coordination with other Federal Government agencies and departments that the Secretary deems appropriate, to provide a briefing, which may be classified, to the House Committee on Armed Services not later than September 30, 2017, on U.S. Government contingency plans for a potential humanitarian and migration crisis in Venezuela if its Government and economy collapse, to include the Department of Defense's roles and responsibilities and assets that would contribute to such plans.

## OTHER MATTERS

### Assessment of Culture and Accountability in Special Operations Forces

The committee is aware of the integral role that Special Operations Forces play in the defense of our Nation. Special Operations Forces enjoy a stellar reputation as brave, competent and quiet professionals. The committee is concerned, however, that recent allegations of personal misconduct by a limited number of service members may be detracting from the honorable service of the vast majority of Special Operations Forces. These allegations of misconduct include reports of sexual assault and other sexual misconduct, as well as drug use. Additional concerns have been raised about increased public exposure of Special Operations Forces activities and operations via unauthorized books and media.

Therefore, the committee directs the Assistant Secretary of Defense for Special Operations/Low-Intensity Conflict and the Commander, U.S. Special Operations Command, to provide a briefing to the Committee on Armed Services of the House of Representatives not later than January 1, 2018, on the Department's assessment of the culture and accountability within Special Operations Forces.

### Botulinum Toxin Type A Countermeasures

The committee notes that the Department of Defense is managing efforts to develop a vaccine to counter botulinum toxin types A and B. There is evidence and discussion in the scientific community stating that the use of the botulinum neurotoxin (BoNT) type A vaccine, which the department is pursuing, can limit future medical treatments for military personnel in that it would prevent immunized warfighters and veterans from receiving the benefit of the rapidly growing number of important medical uses of botulinum toxin type A. Several of these medical uses are critically important to the military veteran population, including treatments for PTSD-associated migraine and amputation pain. Furthermore, the committee notes that advances in synthetic biology enhance both the potential threat and potential treatments of biological agents.

Therefore, the committee directs Secretary of Defense to brief the House Committee on Armed Services within 90 days of enactment of this act on the Department of Defense's research and development plans to counter botulinum toxin type A, the impact and/or

potential drawbacks in using the BoNT/A vaccine, and the potential future benefits and complications introduced through the advances of synthetic biology for the treatment and threat of biological agents.

## Combat Helmets for Female Service Members

The committee encourages the Army and the Marine Corps to continue its efforts to reduce the weight of combat helmets issued to service members, while maintaining or enhancing ballistic protection. The committee also recognizes the need for the Department of Defense to ensure that the military services are procuring properly fitting helmets for all military servicemen and women. Specifically, the committee is aware of the Army's efforts to develop and field improved helmet fit and retention systems to account for female service member needs.

Therefore, in finalizing the contracts for current and future combat helmet production, the committee encourages the Army and the Marine Corps to take into account the helmet needs of all military service members when determining the number, size variety, and fitting system designs, with the goal of ensuring that the entirety of the male and female military population have the appropriate size helmets.

## Comptroller General Assessment of Emerging Threats of High National Security Consequence

Within the next ten years, the committee believes that several challenges could present emerging threats of high national security consequence, such as: the proliferation of disruptive and exponentially deployed technologies; the introduction of novel asymmetric weapons; second and third-order effects of environmental and climate-related issues; global pandemic and public health issues; shifting demographics and urbanization effects; and unanticipated state and non-state acts of aggression.

Since the committee believes the Department of Defense must be prepared to counter these threats, the committee directs the Comptroller General of the United States to identify and assess these and other emerging threats that could affect the national security of the United States. Such an assessment should provide a snapshot of critical emerging threats based on the views of the intelligence community, combatant commands, and other Department of Defense organizations, such as the Defense Advanced Research Projects Agency and the Defense Threat Reduction Agency. The assessment should identify:

(1) the emerging threats within each geographic combatant commander's area of responsibility;

(2) the extent to which the threats are highlighted in current national security defense strategies; and

(3) the Department's component(s), if any, tasked to monitor and mitigate these threats.

The committee directs the Comptroller General to provide a briefing to the congressional defense committees by February 1, 2018, on preliminary findings, with a report to follow.

Defense Department 501(c)3 Coordination and Strategy

The committee is aware that non-profit 501(c)3 entities may provide a valuable utility when operating in concert with Department of Defense and other U.S. government agencies and plans, but that guidance for utilizing such entities is inconsistent throughout the Department and Combatant Commands.

The committee therefore directs the Secretary of Defense to submit a report by November 1, 2018, to the House Committee on Armed Services on the utility of 501(c)3 organizations to further the international goals and interests of the Department of Defense in concert with other U.S. government agencies and encourages the Department to issue standard guidance and standard operating procedures for working with such non-federal entities overseas.

Department of Defense Overmatch Strategy

The committee remains concerned that U.S. superiority in some key warfare domains may be at risk with the advances in technology being made by other nations that are designed to counter U.S. overmatch. While the committee appreciates the assessments conducted by the Department of Defense, including the Office of Net Assessment, to characterize trends in competitive capabilities, the committee also seeks to understand the Department's efforts to address these challenges.

Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services not later than September 30, 2017, on the Department's strategy to maintain overmatch, including the organizations, activities, and resources involved in the development and implementation of such strategy.

Disposal of Excess Agriculture-Related Equipment

The committee is aware that the Department of Defense has a disposal process for its excess or unused equipment. The committee believes that veteran-owned farming operations could benefit from greater awareness of equipment availability. Therefore, the committee directs the Director of the Defense Logistics Agency to provide a briefing, not later than December 31, 2017, to the House Committee on Armed Services on all agriculture-related equipment disposals for the past five years. The briefing shall include an itemized list of each item disposed, a brief description of each farming-related item, and whether the item was transferred to another government entity or a private company or citizen.

High-Altitude Airborne Intelligence, Surveillance, and Reconnaissance Capacity, Capability, and Force Structure

The committee recognizes that both the piloted U–2 Dragon Lady and the remotely piloted RQ–4 Global Hawk fleets of aircraft provide essential and extremely sought after high-altitude airborne intelligence, surveillance, and reconnaissance (ISR) capabilities for geographic combatant commanders. Due to varying circumstances, both aircraft have been viewed as competitors for resources with various stakeholders trying to decide which should remain within the Air Force inventory for the long-term. However, the committee

emphasizes that while both aircraft are highly capable and have differing attributes that may make one aircraft preferable at times over the other aircraft, the combination together provides critical, complementary capabilities within the Department's portfolio of high-altitude ISR capabilities. Furthermore, retiring either aircraft would create a significant capability gap and further exacerbate an existing and significant capacity shortfall in meeting combatant commanders' requirements.

Therefore, elsewhere in this Act, the committee includes a provision that would prohibit the Secretary of the Air Force from retiring either the U–2 or RQ–4 aircraft until at least the beginning of fiscal year 2024. Additionally, the committee also supports and expects the Secretary of the Air Force to robustly continue current and future modernization efforts and capability upgrades underway for the U–2 and RQ–4 to increase capability, generate synergy, and foster commonality within the high-altitude airborne ISR portfolio. Finally, the committee discourages the Secretary of the Air Force or the Chief of Staff of the Air Force from planning in the future or proposing to Congress any aircraft retirement that would create a capability deficit or capacity shortfall from existing levels until a sufficient replacement capability declares full operational capability.

### National Biodefense Strategy

Section 1086 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) directed the Secretary of Defense, the Secretary of Health and Human Services, the Secretary of Homeland Security, and the Secretary of Agriculture to jointly develop a national biodefense strategy and associated implementation plan. The strategy is also to include a review and assessment of biodefense policies, practices, programs, and initiatives, and is to be reviewed and revised biennially. The committee is pleased with the interagency coordination that has taken place thus far, including periodic update briefs to all congressional oversight committees and urges the continuation of these updates. The committee looks forward to receiving the completed strategy as required by section 1086, not later than its due date, September 25, 2017, including the subsequent review by the Comptroller General of the United States.

### National Guard CBRN Enterprise Report

The committee is aware that since the 1998 report on National Guard and WMD response, there has not been an updated study on the readiness, roles and tasks of the National Guard in both Title 10 and Title 32 as it relates to the Chemical Biological and Radiological and Nuclear (CBRN) threats has not been conducted to mirror evolving threats and technology including increased asymmetric threats, new chemical and biological threats, UAV and drone technology, and cyber warfare or maturing federal and state homeland defense architecture and policies.

This Committee believes it is appropriate to re-examine our National Guard CBRN enterprise and recommends that the Chief of the National Guard Bureau conduct a comprehensive study of its current federal, state and local Chemical, Biological, Radiological

and Nuclear operations, equipment and training requirements in light of today's threats. The report should highlight strengths as well as gaps and seams in the interagency planning and execution process.

The committee directs the Chief of the National Guard Bureau, working in close coordination with other state and federal agencies and stakeholders across multiple levels of government, to provide a report detailing the following, no later than September 30, 2019:

(1) define and clarify the roles and missions, structure, capabilities and training of the National Guard, as well as identifying emerging gaps and shortfalls in light of current CBRN threats to our country,

(2) by State and territory, comment on the resources each state has (Title 32 and Title 10) that are available to respond to a CBRN attack, proposing adaptions and updated response plans to combat current threats,

(3) the readiness and resourcing status of forces listed in (2),

(4) current strengths and areas of improvement in working with State and Federal interagency partners,

(5) current assessments that are in place that address both readiness and resourcing of Title 32 and Title 10 forces postured to respond to CBRN incidents.

## National Guard Use of Department of Defense Issued Unmanned Aircraft Systems for Domestic Operations

The committee notes that the Deputy Secretary of Defense issued policy memorandum (15–002) for the Department of Defense on February 17, 2015, to provide guidance for the domestic use of Department of Defense unmanned aircraft systems (UAS). The policy's purpose is to ensure that Department UAS platforms are used in accordance with U.S. law and Department policy, and to ensure the appropriate use of Department UAS assets in domestic operations, training, exercises, and testing within the Department. The policy also covers use of Department UAS platforms issued to the National Guard, in accordance with subsection 710 of title 32, United States Code, which provides accountability for property issued to the National Guard.

The committee supports the purpose and substantive issues that are addressed by the UAS policy memorandum, but the committee also believes that some of the coordination processes and governance structure stipulated by the policy may not be optimal and provides unclear guidance in support of certain State and National Guard operations and missions. For example, the policy states that Department UAS platforms may not be used for Federal, State, or local immediate response, yet the policy allows for State governors to consider Department UAS employment in their planning for disaster response activities, but only after a governor's response plan factors in the procedures and time required for Federal Aviation Administration consultation for access to the necessary airspace, and to obtain Secretary of Defense authorization through a formal request in writing. On the contrary, the committee notes that Secretary of Defense approval is not needed for Department UAS domestic operations for designated search and rescue missions involving distress and potential loss-of-life circumstances. However, the committee believes that most disaster response activities that a

governor would undertake would likely involve distress and potential loss-of-life circumstances in which immediate response may be necessary. The committee is uncertain as to why Secretary of Defense approval is necessary for a governor to use a Department UAS related to disaster response activities, but approval authority is delegated below the Secretary of Defense for search and rescue missions involving distress and potential loss-of-life.

Therefore, elsewhere in this title, the committee includes a provision that would require the Secretary of Defense, in coordination with the Chief of the National Guard Bureau, the Commander, U.S. Northern Command, and the Commander, U.S. Pacific Command, to perform a review of the Department policy memorandum governing the domestic use of Department UAS platforms not later than 1 year after the date of the enactment of this Act, with a particular focus on efficiently and effectively supporting State and National Guard operations and missions.

### Navy Reserve F/A–18 Aircraft

The committee remains concerned over the health and readiness of the Navy Reserve combat air fleet. The committee is aware that the Navy Reserve tactical aviation squadrons provide critical adversary support and strike fighter weapons training to Active Duty forces, and must maintain a high mobilization readiness level as the sole strategic reserve available to the U.S. Navy. The committee understands the Navy Reserve currently operates 33 legacy F/A–18A+ aircraft that are currently shared between 2 squadrons. The committee notes that with an average airframe age of 30 years and onboard systems that are no longer compatible with today's Carrier Air Wing, these aircraft are increasingly less capable than the F/A–18E/F Super Hornets. The committee believes this could impact the ability of these two Navy Reserve squadrons in meeting requirements for advanced strike employment, as well as simulating current advanced threat aircraft. The committee also believes these legacy F/A–18A+ aircraft need to be recapitalized with next generation capability in order to provide realistic threat-representative training for naval aviators and to maintain operational readiness that provides a relevant and deployable backstop to the Active Duty air wings.

Accordingly, the committee directs the Secretary of the Navy, in coordination with the Chief of the Navy Reserve, to provide a briefing to the House Committee on Armed Services, not later than December 1, 2017, on its plans to recapitalize the Navy Reserve combat air fleet.

### Next Generation Immersive Cockpit Systems

The committee is aware of next-generation immersive aircraft operator cockpit technologies, including advanced crew stations, that may reduce aircraft operator risk, while enabling new aircraft to be designed that achieve higher performance at reduced costs when compared to conventional cockpit technology. The committee encourages the Department of Defense to pursue evaluation of such technologies if they are deemed to be beneficial in meeting performance and cost requirements for advanced next-generation aircraft.

Overseas Posture and Permanently Stationed Forces

The committee asserts that there is operational and strategic value in maintaining forward presence of U.S. military forces in both the U.S. European Command and U.S. Pacific Command's areas of responsibilities. Forward-positioned forces reduce time and space limitations by providing rapid response capabilities to geographic combatant commanders, serve as a deterrent to potential adversaries while assuring partners and allies, and facilitate cooperative efforts to build and develop partner-nation security capabilities. However, the committee notes that several geographic combatant commands have relied on rotational forces to meet requirements due to reductions in the number of permanently stationed forces. While rotational forces can maintain required force levels and help exercise certain skill sets, the committee is concerned that an over-reliance on rotational forces may come at a greater financial cost and with limitations on meeting requirements for our strategic and operational aims when compared to permanently stationed forces.

For example, the use of rotational forces encumbers at least three units to support the one rotation: the unit currently performing the rotational mission, the unit training to assume the rotational mission, and the unit undergoing reset after completing the rotational mission. The committee is concerned that this may have an adverse impact on the readiness and availability of units. Unlike permanently stationed forces, rotational forces are also not assigned to a geographic area long enough to develop and sustain expertise on the terrain, supporting infrastructure, sustainable lines of communication, and regional security forces. This may adversely affect the ability of rotational and partner-nation forces to effectively coordinate responses to contingencies. The committee is also concerned that partner nations may question the United States' commitment, and partner forces may experience fatigue due to the higher operational training tempo associated with rotational forces. Finally, the committee is aware that the financial costs of supporting "heel-to-toe" rotational units over several years may be greater than correlating costs for permanently forward-stationed units.

Due to these limitations, the committee asserts that it better serves the United States' operational and strategic interests to maintain additional permanently stationed forces where the geographic combatant commanders have requirements for persistent force presence to: provide rapid response capabilities; deter potential adversaries; assure partners and allies; or facilitate cooperative efforts to build and develop partner-nation security capabilities. The committee is concerned that the United States' posture may be out of balance and lack sufficient emphasis on permanent forward-stationed forces.

Therefore, the committee directs the Secretary of Defense, in consultation with the service secretaries, to submit a report to the congressional defense committees not later than April 1, 2018, on the Department's strategy for balancing the force structure of the U.S. Armed Forces as part of any planned growth in end strength and force structure. The report shall be unclassified, but may include a classified annex. At a minimum, the report should address the

following issues with respect to U.S. European Command and U.S. Pacific Command's areas of responsibility:

(1) an assessment of the additional permanently stationed forces at overseas locations required to meet U.S. strategic requirements and the operational requirements of the geographic combatant commanders;

(2) an assessment of the infrastructure capacity of existing overseas locations and their ability to accommodate additional forces;

(3) an overview of new locations that might be considered for permanently stationed forces and the estimated cost and scope of infrastructure investments, to include improvements to training areas, which would be required at those locations to support permanently stationed forces. This should include an assessment of what infrastructure investments might be provided by the host-nation as well as new construction or modernization of existing facilities that would be funded by the United States;

(4) a detailed list of investments in equipment, supplies, logistics, storage, and maintenance, at current and new overseas locations, required to support additional permanently stationed forces;

(5) an assessment of the readiness benefits and disadvantages associated with stationing additional permanent forces at overseas locations; and

(6) a discussion of potential challenges with stationing additional permanent forces or developing new locations for permanently stationed forces as a result of treaty obligations, international agreements, or other legally binding instruments.

Report on the National Security Implications of Ukraine's Arbitration Proceedings against Russia under Annex VII of the United Nations Convention on the Law of the Sea

The Committee notes the September 14, 2016 announcement by Ukraine that it had initiated arbitration proceedings against Russia under Annex VII of the United Nations Convention on the Law of the Sea (UNCLOS). In bringing this suit, Ukraine is seeking validation of its maritime rights in the vicinity of Crimea in the Black Sea, the Sea of Azov, and the Kerch Strait. The Ukrainian Ministry of Foreign Affairs stated that "Ukraine has asked the arbitral tribunal to enforce its maritime rights by ordering the Russian Federation to cease its internationally wrongful actions in the relevant waters, to provide Ukraine with appropriate guarantees that it will respect Ukraine's rights under UNCLOS, and to make full reparation to Ukraine for the injuries the Russian Federation has caused."

Additionally, the committee notes that the United States was denied observer status to the tribunal's proceedings between the Philippines and the Republic of China, which also carried major national security implications. In its ruling on that case, the tribunal determined that "'only interested States parties to the United Nations Convention on the Law of the Sea will be admitted as observers' and thus could not accede to the U.S. request."

Therefore, the committee directs the Secretary of Defense, in consultation with the Secretary of State, to submit a report to the congressional defense committees by December 31, 2017 on:

(1) the national security implications of the arbitration proceedings brought by Ukraine against Russia under UNCLOS;

(2) actions the U.S. can take to support the arbitration proceedings brought by Ukraine;

(3) limitations to the U.S. position in this case given its failure to ratify UNCLOS, and;

(4) a recommendation on whether the U.S. should ratify the UNCLOS.

### Requirement for Notification of Modifications Made to Presidential Policy Guidance for Direct Action Against Terrorist Targets

When necessary, U.S. Armed Forces use lethal force abroad to protect the American people, consistent with American values and all applicable law, including the international laws of armed conflict. In 2013, the Administration issued Presidential Policy Guidance (PPG) establishing standard operating procedures for direct action, which refers to lethal and non-lethal uses of force, including capture operations against terrorist targets in areas of active hostilities outside of the United States. The committee is aware that the current Administration has directed the Department of Defense and the interagency to review the procedures for direct action against terrorist targets established by the 2013 PPG, and that the results of this review are forthcoming.

Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services within 30 days of any change made to procedures for direct action against terrorist targets conducted under title 10, United States Code, authorities, including any deviation, variation, change, or termination of procedure outlined within the 2013 PPG. Additionally, the committee expects the Secretary of Defense to continue to comply with standing requirements to notify the congressional defense committees of non-combatant causalities associated with direct action activities conducted under the auspices of the PPG, and all other title 10 operations, to include a year-end compilation by country.

### Ring Wheel Drive

The committee is interested in advancements in power- and drivetrain systems and whether these systems could offer mechanical and electromechanical benefits to Department of Defense procurements. This includes new "hub-less'" or "spoke-less'" technology that has been described as a ring wheel drive. The committee directs the Secretary of Defense, in coordination with the military services, to brief the congressional defense committees by March 1, 2018, on current commercial and government efforts to develop and deploy ring wheel drive technology. In addition, the briefing should include an assessment of the applicability of ring wheel drive for military platforms, including the broad range of wheeled vehicles and rotorcraft where ring wheel drive technology might improve the efficiency of current power and drivetrain systems.

### Special Operations Forces Demand, Priorities, and Over-Reliance

The committee recognizes the unique capabilities U.S. Special Operations Forces (SOF) offer to combatant commanders to achieve objectives in their assigned area of operations. The committee acknowledges the value of SOF in carrying out missions which the general purpose forces are not trained or equipped to meet.

The committee understands that all military operational units are pressed to meet current demand and maintain readiness, but believes SOF should be preserved for SOF specific missions as an elite, highly specialized, and small force available for high priority operations. However, the committee notes that SOF are increasingly assigned to missions more appropriate for general purpose forces, and the committee is concerned that the use of SOF for non-SOF specific missions may degrade SOF readiness for core missions.

Therefore, the committee urges the Secretary of Defense to review the joint force allocation process in conjunction with an assessment of SOF structure, and to recalibrate the allocation of forces process as necessary to preserve essential readiness of SOF.

### Strategy To Counter Unconventional and Hybrid Warfare Threats

The committee is concerned by the Department of Defense's failure to respond to the requirements of section 1097 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92). The committee continues to hear in open testimony from outside experts and combatant commanders on the need for a whole of government strategy to counter unconventional and hybrid threats. For several years, the committee has expressed concern over the growing sophistication of unconventional and hybrid state-sponsored threats by the Russian Federation, the People's Republic of China, and the Islamic Republic of Iran, and that these adversaries continue to advance and integrate conventional warfare, economic warfare, cyber and information operations, intelligence operations, and other activities to undermine U.S. national security objectives as well as the objectives of U.S. allies.

Therefore, the committee urges the Secretary of Defense to complete the strategy required by section 1097 of Public Law 114–92 as soon as possible.

### U.S. Efforts to Train, Advise, Assist, and Equip the Iraqi Counterterrorism Service and the Iraqi Special Operations Forces

The committee has received from the Inspector General of the Department of Defense the report entitled, "An Assessment of U.S. and Coalition Plans and Efforts to Train, Advise, Assist, and Equip the Iraqi Counterterrorism Service and the Iraqi Special Operations Forces" (DODIG–2017–074). Although the report found no statutory anomalies with the implementation of Iraqi train and equip efforts, the committee is concerned that several findings indicated a lack of accountability with materiel and equipment, training standards, and training metrics specifically for the Iraqi Counterterrorism Service and the Iraqi Special Operations Forces. Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services by September 1, 2017, on his plan to implement the recommendations made in DODIG–2017–074 concerning efforts to train, advise, assist, and equip the Iraqi Counterterrorism Service and the Iraqi Special Operations Forces.

## LEGISLATIVE PROVISIONS

### SUBTITLE A—FINANCIAL MATTERS

#### Section 1001—General Transfer Authority

This section would allow the Secretary of Defense, with certain limitations, to make transfers between amounts authorized for fiscal year 2018 in division A of this Act. This section would limit the total amount transferred under this authority to $5.00 billion. This section would also require prompt notification to Congress of each transfer made.

#### Section 1002—Preparation of Consolidated Corrective Action Plan and Implementation of Centralized Reporting System

This section would direct the Under Secretary of Defense (Comptroller) to execute two recommendations identified in the Government Accountability Office (GAO) report, "DOD Financial Management: Significant Efforts Still Needed for Remediating Audit Readiness Deficiencies" (GAO–17–85).

#### Section 1003—Additional Requirements Relating to Department of Defense Audits

This section changes Section 1003(a)(2)(A)(ii) of the National Defense Authorization Act for Fiscal Year 2010 (Public Law 111–84; 10 U.S.C. 2222 note) regarding audits of the Department of Defense.

### SUBTITLE B—NAVAL VESSELS AND SHIPYARDS

#### Section 1011—National Defense Sealift Fund

This section would amend section 2218 of title 10, United States Code, and strike the use of the fund for research and development related to national defense sealift. Additionally, this section would authorize the Secretary of Defense to purchase up to five used vessels, regardless of where constructed, for the Ready Reserve Force component on a one-for-one basis with new vessels authorized by the National Defense Sealift Fund. Finally, prior to the purchase of a vessel not constructed in the United States, the section would require the Secretary to certify that there are no United States constructed vessels available for purchase at a reasonable price that are suitable for national defense or military purposes.

#### Section 1012—National Defense Sealift Fund: Construction of National Icebreaker Vessels

This section would amend section 2218 of title 10, United States Code, and would authorize the obligation and expenditure of funds associated with the National Defense Sealift Fund for the construction, alteration, and conversion of national icebreaker vessels.

#### Section 1013—Use of National Sea-Based Deterrence Fund for Multiyear Procurement of Certain Critical Components

This section would expand the authority of the Secretary of the Navy to enter into a multiyear contract for certain nuclear-powered

vessel components to include missile tubes, torpedo tubes, and propulsors.

Section 1014—Restrictions on the Overhaul and Repair of Vessels in Foreign Shipyards

This section would amend section 7310(b)(1) of title 10, United States Code, to prohibit the Department of the Navy from performing any overhaul, repair, or maintenance work that takes longer than 6 months in foreign shipyards.

Section 1015—Availability of Funds for Retirement or Inactivation of *Ticonderoga*-Class Cruisers or Dock Landing Ships

This section would prohibit the Secretary of the Navy from using funds authorized to be appropriated by this Act to retire a cruiser or dock landing ship or to place in a modernization status more than six cruisers and one dock landing ship.

Section 1016—Policy of the United States on Minimum Number of Battle Force Ships

This section would establish the policy of the United States to have available, as soon as practicable, not fewer than 355 battle force ships.

SUBTITLE C—COUNTERTERRORISM

Section 1021—Termination of Requirement to Submit Annual Budget Justification Display for Department of Defense Combating Terrorism Program

This section would terminate the requirement to submit an annual budget justification display for Department of Defense combating terrorism programs under section 229 of title 10, United States Code, by December 31, 2020.

Section 1022—Prohibition on Use of Funds for Transfer or Release of Individuals Detained at United States Naval Station, Guantanamo Bay, Cuba to the United States

This section would prohibit the use of any amounts authorized to be appropriated or otherwise made available for the Department of Defense to be used during the period beginning on the date of the enactment of this Act and ending on December 31, 2018, to transfer or release detainees at U.S. Naval Station, Guantanamo Bay, Cuba, to or within the United States, its territories, or possessions.

Section 1023—Prohibition on Use of Funds to Construct or Modify Facilities in the United States to House Detainees Transferred from United States Naval Station, Guantanamo Bay, Cuba

This section would prohibit the use of any amounts authorized to be appropriated or otherwise made available for the Department of Defense to be used during the period beginning on the date of the enactment of this Act and ending on December 31, 2018, to construct or modify any facility in the United States, its territories, or possessions to house any detainee transferred from United States

Naval Station, Guantanamo Bay, Cuba, for the purposes of detention or imprisonment in the custody or under the effective control of the Department of Defense.

Section 1024—Prohibition on Use of Funds for Transfer or Release of Individuals Detained at United States Naval Station, Guantanamo Bay, Cuba, to Certain Countries

This section would prohibit the use of any amounts authorized to be appropriated or otherwise made available for the Department of Defense to be used during the period beginning on the date of the enactment of this Act and ending on December 31, 2018, to transfer, release, or assist in the transfer or release of any individual detained at U.S. Naval Station, Guantanamo Bay, Cuba, to Libya, the Federal Republic of Somalia, the Syrian Arab Republic, or the Republic of Yemen.

Section 1025—Biannual Report on Support of Special Operations to Combat Terrorism

This section would modify the biannual reporting requirements located in section 127e(g) of title 10, United States Code.

SUBTITLE D—MISCELLANEOUS AUTHORITIES AND LIMITATIONS

Section 1031—Limitation on Expenditure of Funds for Emergency and Extraordinary Expenses for Intelligence and Counter-Intelligence Activities and Representation Allowances

This section would modify section 127 of title 10, United States Code, to include an additional notification requirement for intelligence and counter-intelligence activities.

Section 1032—Modifications to Humanitarian Demining Assistance Authorities

This section would modify section 407, of title 10, United States Code, to remove "stockpiled conventional munitions" from the limitations of training opportunities with partner nations. This section would also modify the definitions of "humanitarian demining assistance" and "stockpiled conventional munitions assistance."

Section 1033—Prohibition on Charge of Certain Tariffs on Aircraft Traveling through Channel Routes

This section would prohibit U.S. Transportation Command from charging a tariff when a military service uses their aircraft on a route that is designated by U.S. Transportation Command as a channel route.

Section 1034—Limitation on Divestment of U–2 or RQ–4 Aircraft

This section would repeal section 133 of the National Defense Authorization Act for Fiscal Year 2012 (Public Law 112–81), regarding limitation on retirement of U–2 aircraft, and would prohibit the Department of Defense from retiring either U–2 or RQ–4 aircraft until at least fiscal year 2024.

### Section 1035—Prohibition on Use of Funds for Retirement of Legacy Maritime Mine Countermeasures Platforms

This section would prohibit the Secretary of the Navy from obligating or expending funds to deactivate, decommission, or place in reduced operating status any mine countermeasures ships or Sea Dragon (MH–53) helicopters. The limitation in this section may be waived if the Secretary of the Navy certifies that the replacement mine countermeasures capabilities are available in sufficient quantity and capacity to meet the combatant commander requirements that are currently fulfilled by legacy mine countermeasures platforms.

### Section 1036—Restriction on Use of Certain Funds Pending Solicitation of Bids for Western Pacific Dry Dock

This section would withhold funding for the Office of Secretary of the Navy until a request for proposal for a dry dock in the Western Pacific has been issued.

### Section 1037—National Guard Flyovers of Public Events

This section would require that National Guard flyovers of public events be flown only as part of an approved training mission and would make the Adjutant General the approval authority for all Air National Guard and Army National Guard flyovers in a state or territory.

### Section 1038—Transfer of Funds to World War I Centennial Commission

This section would authorize the Secretary of Defense to transfer funding to the World War I Centennial Commission to assist the Commission in carrying out activities in support of the World War I Centennial Commission Act.

### Section 1039—Rule of Construction Regarding Use of Department of Defense Funding of a Border Wall

This section would prohibit funds authorized to be appropriated or otherwise made available for fiscal year 2018 for the Department of Defense to be used to plan, develop, or construct any barriers, including walls or fences along the international border of the United States.

## Subtitle E—Studies and Reports

### Section 1051—Elimination of Reporting Requirements Terminated After November 25, 2017, Pursuant to Section 1080 of the National Defense Authorization Act for Fiscal Year 2016

This section makes technical and conforming edits to reflect the termination of certain Department of Defense reporting requirements pursuant to section 1080 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92), as amended by section 1061 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328).

Section 1052—Report on Department of Defense Arctic Capability and Resource Gaps

This section would require the Secretary of Defense to provide a report, not later than 90 days after the date of the enactment of this Act, to the congressional defense committees detailing the Department of Defense's efforts to resolve arctic security capability and resource gaps.

Section 1053—Review and Assessment of Department of Defense Personnel Recovery and Nonconventional Assisted Recovery Mechanisms

This section would direct the Secretary of Defense to submit to the congressional defense committees a review and assessment of personnel recovery and nonconventional assisted recovery programs, authorities, and policies not later than March 1, 2018.

Section 1054—Mine Warfare Readiness Inspection Plan and Report

This section would require the Navy to submit a plan for a readiness inspection of naval mine warfare units and report to Congress on the results after the first inspection has been completed. This section also repeals section 1090 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92).

Section 1055—Report on Civilian Casualties from Department of Defense Strikes

This section would require the Secretary of Defense to submit to the congressional defense committees a report on strikes carried out by the Department of Defense against terrorist targets.

Section 1056—Reports on Infrastructure and Capabilities of Lajes Field, Portugal

This section requires the Department of Defense to submit to the Committees on Armed Services of the Senate and the House of Representatives reports relating to Lajes Field, Portugal.

Section 1057—Report on Joint Pacific Alaska Range Complex Modernization

This section would require the Secretary of the Air Force to submit a report to the congressional defense committees regarding proposed improvements to the Joint Pacific Alaska Range Complex within 120 days after the date of enactment of this Act.

SUBTITLE F—OTHER MATTERS

Section 1061—Technical, Conforming, and Clerical Amendments

This section would make a number of technical and clerical amendments of a non-substantive nature to existing law.

Section 1062—Workforce Issues for Relocation of Marines to Guam

This section would amend section 1806 of title 48, United States Code, to permit the Director, U.S. Citizenship and Immigration Services, to approve H–2B visa applications and renewals through

October 1, 2020, for contractors performing work on the Territory of Guam for the construction program supporting the realignment of U.S. Marines to Guam.

Section 1063—Protection of Second Amendment Rights of Military Families

This section would require for the purposes of federal firearms laws that the residency of members of the armed forces and their spouses be determined in the same manner.

Section 1064—Transfer of Surplus Firearms to Corporation for the Promotion of Rifle Practice and Firearms Safety

This section would require the Secretary of the Army to transfer surplus firearms to the Corporation for the Promotion of Rifle Practice and Firearms Safety. This section also would terminate the pilot program established in section 1087 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 113–66).

Section 1065—National Guard Accessibility to Department of Defense Issued Unmanned Aircraft

This section would require the Secretary of Defense, in coordination with the Chief of the National Guard Bureau, the Commander, U.S. Northern Command, and the Commander, U.S. Pacific Command, to complete an efficiency and effectiveness review of the governance structure, coordination processes, documentation, and timing requirements stipulated in Department of Defense policy memorandum 15–002, titled "Guidance for the Domestic Use of Unmanned Aircraft Systems (UAS)." This section would require the review to be completed not later than 1 year after the date of the enactment of this Act and the Secretary of Defense to submit the review to the Committees on Armed Services of the Senate and the House of Representatives not later than 30 days after its completion. This section also would require the aforementioned officials to consider information and data points from State governors and State adjutant generals related to their assessment of the efficiency and effectiveness of accessing Department of Defense UASes for State and National Guard operations.

Section 1066—Sense of Congress Regarding Aircraft Carriers

This section would express the sense of Congress that U.S. aircraft carriers are the preeminent power projection platform and have served the Nation's interests in times of war and in times of peace, adapting to the immediate and ever-changing nature of the world for over 90 years.

Section 1067—Notice to Congress of Terms of Department of Defense Settlement Agreements

This section would require that, upon the request of the chairman of a specified committee, the Secretary of Defense shall make available to that chairman a settlement agreement in a civil action involving the Department of Defense, a military department, or a Defense Agency, if, in the opinion of the Secretary, in consultation with the Attorney General, the terms of such settlement agreement

could affect the congressional authorization or appropriations process with respect to the Department of Defense.

Section 1068—Sense of Congress Recognizing the United States Navy Seabees

This section would establish a sense of congress that recognizes the Navy Seabees and Navy personnel who comprise the construction force for the Navy and Marine Corps as critical elements in deterring conflict, overcoming aggression, and rebuilding democratic institutions.

Section 1069—Recognition of the United States Special Operations Command

This section recognizes contributions made by the U.S. Special Operations Command.

Section 1070—Sense of Congress Regarding World War I

This section would provide a sense of Congress to honor those members of the United States Armed Forces who served in the First World War.

Section 1071—Findings and Sense of Congress Regarding the National Guard Youth Challenge Program

This section would express findings and a sense of Congress regarding the National Guard Youth Challenge Program and its critical role in preparing qualified youth for military service.

Section 1072—Sense of Congress Regarding National Purple Heart Recognition Day

The section would express the sense of Congress that the citizens of the United States should learn about the history of the Purple Heart medal and conduct programs to support Purple Heart medal recipients.

# TITLE XI—CIVILIAN PERSONNEL MATTERS

## ITEMS OF SPECIAL INTEREST

### Accelerated Promotion Program

The committee is aware that the U.S. Office of Personnel Management (OPM) formally approved the Navy's request to establish a Naval Shipyards Engineer Accelerated Promotion Program in December 2016, about 11 months after the Navy Office of Civilian Human Resources directed naval shipyards to cease accelerated promotions. The program is intended to help the shipyards address geographically unique circumstances, such as major in-state competitors or a single in-state university with an engineering program from which to recruit. Given the criticality of engineers to the shipyards' effective planning and efficient and timely completion of ship maintenance availabilities, the committee directs the Secretary of the Navy to brief the House Committee on Armed Services on the history of the Accelerated Promotion Program and what consider-

ation was given to making accelerated promotions retroactive for shipyard engineers hired between January 2016 and December 2016, including any statutory or regulatory impediments to implementation.

LEGISLATIVE PROVISIONS

Section 1101—Extension of Direct Hire Authority for Domestic Defense Industrial Base Facilities and Major Range and Test Facilities Base

This section would extend the temporary direct hiring authority granted in section 1125 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) until September 30, 2021.

Section 1102—Extension of Authority to Provide Voluntary Separation Incentive Pay for Civilian Employees of the Department of Defense

This section would extend the temporary increase in Voluntary Separation Incentive Pay granted in section 1107 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) until September 30, 2021.

Section 1103—Additional Department of Defense Science and Technology Reinvention Laboratories

This section would revise and update the list of laboratories designated as Science and Technology Reinvention Laboratories, to include the Naval Medical Research Center and the Joint Warfighting Analysis Center.

Section 1104—One-Year Extension of Authority to Waive Annual Limitation on Premium Pay and Aggregate Limitation on Pay for Federal Civilian Employees Working Overseas

This section would amend section 1101 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Public Law 110–417) to extend the authority to waive the annual limitation on premium pay and aggregate limitation on pay for Federal civilian employees working overseas until September 30, 2018.

Section 1105—Appointment of Retired Members of the Armed Forces to Positions In or Under the Department of Defense

This section would amend section 3326 of title 5, United States Code, to allow the Secretary of Defense to appoint recently retired members of the Armed Forces to fill emergency needs.

Section 1106—Direct Hire Authority for Financial Management Experts in the Department of Defense Workforce

This section would amend section 1110 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) to expand the number of Department of Defense components that may hire financial management experts using direct hire authority.

Section 1107—Extension of Authority for Temporary Personnel Flexibilities for Domestic Defense Industrial Base Facilities and Major Range and Test Facilities Base Civilian Personnel

This section would amend subsection (a) of section 1132 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) to extend authority for temporary civilian personnel flexibilities for domestic defense industrial base facilities and Major Range and Test Facilities through fiscal year 2021.

Section 1108—One-Year Extension of Temporary Authority to Grant Allowances, Benefits, and Gratuities to Civilian Personnel on Official Duty in a Combat Zone

This section would amend section 1133 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) to extend temporary authority to grant allowances, benefits, and gratuities to civilian personnel on official duty in a combat zone through fiscal year 2019.

# TITLE XII—MATTERS RELATING TO FOREIGN NATIONS

## ITEMS OF SPECIAL INTEREST

### Assessment of Freedom of Navigation Operations in the South China Sea

The committee supports recent Freedom of Navigation Operations (FONOP) in the South China Sea that challenge arbitrary limitations that are in contravention of the United Nations Convention on the Law of the Sea. Therefore, the committee directs the Secretary of Defense, in consultation with the Secretary of State, to provide a report to the congressional defense committees, the Committee on Foreign Affairs of the House of Representatives, and the Committee on Foreign Relations of the Senate, not later than November 30, 2017, that outlines U.S. policy and strategy regarding freedom of navigation in the global commons and a plan for conducting FONOPs in the South China Sea with regularity and frequency. The report shall be submitted in unclassified form but may contain a classified annex.

### Attacks on U.S. Armed Forces Personnel by Partner Nation Security Forces

U.S. military operations to train, advise, and assist missions conducted by our partner nation security forces are a core element of U.S. efforts to enhance security. Nevertheless, the committee is concerned by the incidence of attacks on U.S. military personnel by individuals affiliated with partner nation security forces, so-called "insider" or "green-on-blue" attacks.

Therefore, the committee directs the Secretary of Defense to submit a report to the Committees on Armed Services of the Senate and House of Representatives by March 1, 2018 on the Department's efforts to mitigate the risk of attacks on U.S. military personnel working with partner nation security forces. The report should include:

(1) A description of each insider attack on U.S. Armed Forces since September 2001, to include the date, location, U.S. and partner nation security forces involved, associated casualties (both U.S. and partner forces), and a description of the circumstances surrounding each incident.

(2) A description of any training received or procedures implemented by U.S. Armed Forces to mitigate the risk of insider attacks (to include cultural awareness training).

(3) A description of any vetting procedures undertaken by U.S. and partner nation security forces to identify possible insider threats.

(4) Any recommendations the Secretary may have to further counter insider threats.

Briefing on the Role of the Russian Military in Influence Operations Targeting Democratic Elections and Disruption of Military Alliances and Partnerships

The committee directs the Secretary of Defense, in coordination with the Secretary of State and the Director of National Intelligence, to provide a briefing to the House Committee on Armed Services not later than October 1, 2017 on the role of the Russian military in influence operations and campaigns conducted by the Russian Federation targeting democratic elections and disruption of military alliances and partnerships of which the United States is a member. At a minimum, the briefing should include;

(a) An assessment of the Russian Federation's objectives in influence campaigns targeting democratic elections and disruption of military alliances and partnerships of which the United States is a member and how they relate to the Russian Federation's broader strategic objectives;

(b) The role of the Russian military in influence operations supporting such campaigns;

(c) Identification of the Russian military's tactics, techniques, and procedures used in influence operations supporting such campaigns;

(d) Identification of foreign countries with democratic elections systems that may be targeted in future influence operations and campaigns by the Russian Federation, an assessment of the likelihood each such foreign country will be targeted, and an analysis of the potential strategic advantage gained by the Russian Federation by targeting those foreign countries;

(e) Identification of the Russian military's tactics, techniques, and procedures used in influence operations that are likely to be applied in future influence campaigns targeting democratic elections and disruption of military alliances and partnerships of which the United States is a member;

(f) An assessment of the Russian Federation's perception and understanding of the security objectives of military alliances and partnerships of which the United States is a member and how that perception or understanding shapes the Russian Federation's intelligence collection and influence operations and campaigns; and

(g) Identification of any gaps in intelligence and warnings and recommendations to address such gaps.

### Countering Russian Aggression

The committee remains concerned about a resurgent, revanchist Russian Federation. Over the past decade and more acutely in the past 3 years, Russia has intervened in the Syrian Arab Republic, illegally occupied and attempted to annex Crimea, fomented conflict in eastern Ukraine through the direction of combined Russian-separatist forces, interfered in democratic elections in the United States and Europe, conducted propaganda campaigns to undermine the legitimacy of democratic governments, and aggressively sought to expand its global influence and undermine international norms and organizations.

The committee remains committed to reassuring our European partners and allies through the development, implementation, and sustainment of an effective, credible deterrent to Russian aggression, as well as measures to proactively address the danger Russia poses to international principles and institutions. The committee encourages the Department of Defense and other executive agencies to focus their manpower, resources, and capabilities toward the development a cohesive strategy.

### Counterterrorism Effectiveness Research

The committee recognizes that broad basic research into the effectiveness of counterterrorism policies and strategy is critical to informing and shaping future strategies. The committee believes that there is currently a wide range of social science research in these areas that should be leveraged, including better use of and integration with existing research by organizations maintaining databases of terrorism incidents globally.

For example, the National Consortium for the Study of Terrorism and Responses to Terrorism (START) is a university-based research and education center. The center is comprised of an international network of scholars committed to the scientific study of the causes and human consequences of terrorism in the United States and around the world. START supports the research efforts of leading social scientists at more than 50 academic and research institutions across the country and the globe and is headquartered at the University of Maryland with partner institutions around the United States, including the University of Nebraska.

The committee is aware the START program supports more than 14 terrorism and counterterrorism related datasets that are used across civilian and defense agencies including the Departments of Homeland Security and Department of Defense to directly inform international, federal, state and local training and educational programs. However, the budget request for fiscal year 2018 for the Department of Homeland Security does not include funding for this effort.

Therefore, the committee urges the Department of Defense to foster academically rigorous studies of terrorism, like the START initiative, to provide a foundational understanding for how to assess the effectiveness of specific counterterrorism program of the Department of Defense, and best practices to inform the Department of Defense's counterterrorism policies.

Critical Shortfalls in the Indo-Asia-Pacific Region

The committee remains concerned about existing shortfalls in critical preferred munitions inventories and the potential impacts this could have on the ability of the Armed Forces to perform required missions. The committee notes that all the military services have expressed concerns about having insufficient preferred munition stockpiles to meet global combatant command contingency requirements, and the committee believes this situation to be amplified for missions in the Indo-Asia-Pacific region. The committee recognizes that improvements in munition stockpiles and munition capacity will require sustained long-term investment, and notes the budget request does provide funding that will increase production capacity for certain high-priority munitions like Joint Direct Attack Munitions and Small Diameter Bombs. The committee expects the Department of Defense to continue to prioritize investment for critical munition capabilities such as long-range anti-ship weapons, advanced air-to-air munitions, theater ballistic missile defense, and torpedoes. The committee also expects the Department to plan and program for improvements in munition prepositioning arrangements, infrastructure for munitions storage and security, and logistical requirements for critical munitions, specifically in the Indo-Asia-Pacific region.

Cultural Preservation in Armed Conflict

The committee recognizes Department of Defense policy, including the Department Directive 2311.01E, "Department of Defense Law of War Program," which states it is Department policy to comply with the law of war during all armed conflicts and in all other military operations, including treaties and international agreements to which the United States is a party, such as the 1954 Hague Convention for the Protection of Cultural Property in the Event of Armed Conflict. The committee is encouraged by actions the Department has taken to protect cultural property, including its training, education, and cataloging efforts as discussed in the Department's 2015 report relating to the protection of cultural property in the event of armed conflict, required by section 1273 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (Public Law 113–291). However the committee remains concerned that the development, application, and oversight of policy and principles for cultural preservation in armed conflict remains inconsistent.

Therefore, the committee directs the Secretary of Defense to provide a report to the House Committee on Armed Services by September 29, 2017, that identifies:

(1) the specific Assistant Secretary of Defense or Deputy Assistant Secretary of Defense responsible for managing and evaluating compliance with the 1954 Hague Convention and other relevant law of war requirements;

(2) the offices and agencies within the Department that have responsibility for obtaining information related to safeguarding cultural heritage sites during armed conflict and other military operations;

(3) the funding mechanisms that the Department uses, or would plan to use, to obtain relevant cultural heritage information; and

(4) any other information the Secretary deems relevant.

Defense Support to the Global Engagement Center Mission

The committee recognizes that operating in the information environment will be an increasingly important task for the Department of Defense in dealing with future conflicts and national security contingencies. The Department of Defense Strategy for Operations in the Information Environment, dated June 2016, provided a rudimentary framework for trying to prepare for these kinds of operations. The key tenets of this strategy remain relevant, including the importance of information operations in all phases of future operations; the need for policies and procedures that can manage information activities appropriately across the spectrum of conflict; the need for intelligence support to conduct effective information operations; the need for increased resources and informed resource prioritization to provide key capabilities, personnel and approaches; and coordination of influence activities with the interagency and international partners.

In order to meet those goals, and many of the specific tasks needed to develop the ways to conduct operations in the information environment, the Department will need to place increased attention and resources to build the workforce, technological capabilities and operational concepts, as well as coordinate with technology companies. The Department is already renewing its emphasis on traditional information operations programs, but the committee also believes that the Department should also actively explore how to, deconflict, contribute to, as well as reap the benefits from, interagency and technology companies activities in this space. For example, the committee is aware that the Global Engagement Center (GEC) within the Department of State is tasked with countering violent extremist groups, as well as addressing threats posed by state-sponsored and state-directed propaganda and misinformation activities. As noted elsewhere in this report, the committee supports the activities of the GEC, including through the development of a strategy for fulfilling its roles and responsibilities. The committee also believes that the Department should find opportunities to increase support for, cooperation with, and integration of efforts with the GEC. Increased cooperation would help with integrating military and non-military efforts, but also develop other pathways for career opportunity and advancement that don't currently exist. Additionally, such actions might also help ameliorate many of the challenges described in testimony before the committee, such as "lack of accountability and oversight, bureaucracy resulting in insufficient levels of resourcing, and the inability to absorb cutting edge information and analytic tools, and access to highly skilled personnel."

Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Armed Services Committee by February 15, 2018 assessing the opportunities for support of and integration with the Global Engagement Center to address similar missions. This briefing should include identification of personnel or technology that has been or is being shared with the GEC, any requests for personnel or resources to the Department from the GEC, identification of training or exercise opportunities that might be beneficial for integrating GEC participation, and assessment of re-

quirements being generated by the GEC for personnel or capabilities needs for future years. Further, the report shall include coordination with technology companies, specifically on understanding their efforts to make platforms hostile to propaganda and violent extremism.

### Department of Defense Briefing on Crisis Response in Africa

The committee is concerned about the ability of the Department of Defense to provide rapid response to crises in Africa. The committee is aware that with current force posture and resources, the United States may be accepting a high level of risk in fulfilling crisis response support for U.S. posts that have been determined to be "high risk, high threat" as part of the "New Normal" requirements, as well as in responding to other emergent threats. Moreover, the committee is concerned that U.S. Africa Command may not have sufficient forces, enablers, and other resources to meet the "New Normal" requirements, particularly with the reduction in the force structure of the Special Purpose Marine Air Ground Task Force-Crisis Response-Africa, while also meeting other requirements.

Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services not later than October 31, 2017, on the Department's assessment of its ability to respond to "New Normal" and other crisis response requirements in Africa, and courses of action to reduce risk.

### DTRA International Countering WMD-Program

The committee notes with approval that the Defense Threat Reduction Agency (DTRA) conducts programs to improve the ability of partner nations to respond to the spread of infectious disease, whether naturally occurring or the product of biological attack. In support of this work, Section 1241 of the Fiscal Year 2017 National Defense Authorization Act expanded DTRA authority to conduct these programs by authorizing the Secretary of Defense to support programs that build the capacity of foreign military forces to conduct several types of operations, including counter-WMD and border security. By working with partners in Africa and Asia, these DTRA programs contribute to the national strategy for countering weapons of mass destruction, including biological attack and pandemic because stopping the spread of disease early in an outbreak protects national security and saves lives. Therefore, the committee directs the Director of the DTRA, to brief the House Armed Services Committee not later than September 30, 2017, on the agency's planned activities to promote the ability of partner nations to respond to WMD, including infectious disease.

### Forward-Stationed Combat Aviation Brigade in South Korea

The committee supports the Army's decision to retain a combat aviation brigade in the Republic of Korea. The committee was earlier concerned that the Army's plan to begin rotational sourcing in 2019 to meet the combat aviation brigade requirement in South Korea would present a significant risk in capabilities required for major contingencies, given terrain and aviation mission complexities in South Korea.

### Global Engagement Center

The committee remains concerned by the increasing prevalence of propaganda, disinformation, and influence activities aimed at undermining the decision-making of the Department of Defense and confidence in its actions. For several years, the committee has supported increasing the Department of Defense's focus and attention on these matters. To that end, the committee has directed actions to develop a strategy for operating in the information environment, pressed for technology development efforts to support this mission set, and issued clear guidance to help direct military information support operations.

The National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) included a provision to authorize and expand the mission of the Global Engagement Center (GEC) within the Department of State beyond countering violent extremist groups to also address state-sponsored and state-directed propaganda and misinformation activities. Recent news of Russian efforts to influence elections in the United States and Europe, as well as its continued support of state-run media and proxy groups, highlights the need to focus attention and resources on state-sponsored challenges to our national security. The committee continues to support the efforts by the GEC to address messaging of violent extremist groups, but believes that the methodologies, tools, and expertise developed in that fight can be adapted to address state-sponsored misinformation campaigns.

The committee believes that the GEC should exert greater leadership to better coordinate, synchronize, and leverage interagency capabilities in order to lead and coordinate this mission area across the Federal Government. In taking a long-term view, the committee believes the GEC should begin to develop a strategy for fulfilling its roles and responsibilities for the recently expanded mission. The strategy should include identification of additional required resources, personnel, authorities, and capabilities. The strategy should also include milestones for continually evaluating and assessing the effectiveness of efforts and available resources, and ensure transparency through regular updates to key stakeholders. The strategy should also evaluate how the GEC should leverage commercially available technology to enhance its mission's capability. Further, the committee encourages the Department of Defense to be involved with this strategy in order to find ways to leverage the authorities, people, and funding for mutual benefit.

### Global Theater Security Cooperation Management Information System

The committee is concerned that the functionality and effectiveness of the Global Theater Security Cooperation Management Information System (G–TSCMIS) are hindered by the lack of timely and regular input of high-quality security cooperation event information. The value and functionality of G–TSCMIS for all users is directly related to the input of information by those responsible across the Department of Defense. Inconsistent and late information creates an inaccurate global operating picture of security cooperation activities, thus hampering data analysis, planning, monitoring, and resource allocation decisions. Further, the committee

believes that G–TSCMIS should be considered as a means to capture and disseminate security cooperation assessment, monitoring, and evaluation information, including lessons learned.

Therefore, the committee directs the Under Secretary of Defense for Policy, in coordination with the Deputy Chief Management Officer, to provide a briefing to the House Committee on Armed Services not later than October 1, 2017, on:

(1) measures the Department can take to improve data entry in G–TSCMIS, including recommendations for G–TSCMIS business process reengineering to streamline processes;

(2) other steps to improve the functionality, utility, and effectiveness of G–TSCMIS; and

(3) the potential for incorporation of Assessment, Monitoring, and Evaluation functionality in future releases of G–TSCMIS, including an assessment of other technical means or collaboration opportunities to increase functionality that the Department of Defense may be pursuing.

Elsewhere in this Act, the committee includes a provision that would require the Secretary of Defense to submit an assessment to the congressional defense committees on the effectiveness of measures taken to improve the functionality of G–TSCMIS.

### Impact of Foreign Laws on U.S. Defense Contractors

Partners and allies of the United States are vital to the national security of the United States and the world. These partnerships and alliances are the bedrock of global stability and democratic principles. However, the committee is concerned with legislative action by certain U.S. partners and allies to prevent citizens and private groups to invest in the U.S. defense industrial base. Therefore, the committee directs the Secretary of Defense to brief the House Committee on Armed Services, the House Committee on Foreign Affairs, the House Committee on Ways and Means, and the House Committee on Financial Services, no later than October 1, 2017, on whether any U.S. partners and allies have enacted domestic laws which have created any adverse consequences for any U.S. defense contractors, and, if so, the impact of said laws on such contractors, and any policy recommendations the Secretary may have to address such laws.

### Implementation of Strategy to Prevent and Respond to Gender-Based Violence

The committee is aware of efforts by the Department of Defense to implement the "United States Strategy to Prevent and Respond to Gender-Based Violence Globally," and appreciates the Department's efforts to keep the committee apprised of its implementation activities. However, the committee remains concerned about the metrics used to assess, monitor, and evaluate the activities, programs, and investments employed to implement the strategy.

Therefore, the committee directs the Deputy Assistant Secretary of Defense for Stability and Humanitarian Affairs to provide a briefing to the House Committee on Armed Services not later than October 2, 2017, on the Department's efforts to effectively assess, monitor, and evaluate activities, programs, and investments, to include the methodology used in the formulation of metrics, related

to the "United States Strategy to Prevent and Respond to Gender-Based Violence Globally."

Improvements to Transparency in the Technology Release Process in Foreign Military Sales

The committee is encouraged by Department of Defense initiatives to improve internal Department processes in Foreign Military Sales (FMS) and urges the Department to continue to seek improvements. The committee is aware that the Deputy Secretary of Defense established a Defense Senior Steering Group on Arms Transfers and Technology Release in August 2008 to review and improve the Department's decision-making on arms transfers and release of sensitive technology. In July 2010, the Deputy Secretary issued a memorandum to revise the Department's Technology Security and Foreign Disclosure processes, pursuant to the Steering Group's recommendations and Presidential Study Directive 8, issued in December 2009. The committee is aware that the Defense Security Cooperation Agency and the Defense Technology Security Administration engage with stakeholders through a variety of means; however, the committee remains concerned about the extent to which these organizations communicate with industry stakeholders regarding the technology release processes. Therefore, the committee directs the Under Secretary of Defense for Policy to provide a briefing to the House Committee on Armed Services and the House Committee on Foreign Affairs not later than October 31, 2017, on communication with industry stakeholders on relevant processes for considering the release of sensitive technology and steps to improve that communication.

Independent Security Cooperation Evaluation Office

The committee commends the Department of Defense for issuing its policy, Department of Defense Instruction (DODI) 5132.14, requiring the assessment, monitoring, and evaluation of security cooperation programs. High-quality, independent evaluations of these programs can reveal important lessons for improving the effectiveness of security cooperation programs. The committee notes that DODI 5132.14 directs the establishment of an independent evaluation office, consistent with international best practices. Further, the committee believes the establishment of such an office to be an important prerequisite to effective implementation of the broader policy. To ensure that evaluations are both useful and utilized for decision-making, the committee directs the Under Secretary of Defense for Policy to provide a briefing to the House Committee on Armed Services by October 1, 2017, on its progress toward establishing an independent evaluation office.

NATO Defense Weapon System Development Cooperation

The committee recognizes the role that NATO defense industries have played in weapon systems programs through partnerships and supply chain activities. Joint weapon system development with NATO defense industries can help maintain stability and interoperability with partner defense forces. The committee encourages the Department to continue seeking avenues to provide the best weapon systems at the best cost for our Nation's defense, and when

appropriate, leverage NATO defense industries to maximize joint force integration and interoperability. The committee directs the Secretary of Defense to provide a briefing on joint weapon system development and coordination and interoperability efforts with NATO members and defense industries by February 1, 2018.

Non-Lethal Weapons for European Theater Contingencies

The committee reaffirms its longstanding support for the accelerated development, fielding, and deployment of non-lethal technologies. Non-lethal systems are useful for both force application and force protection missions, especially in ambiguous environments where conflicts simmer below the threshold of declared hostilities. The committee notes that their employment is consistent with U.S. military strategy and helps minimize damage to property and inadvertent civilian casualties in the kinds of operational contingencies, including irregular warfare and humanitarian crises, in which U.S. forces are likely to be engaged. Their use provides commanders with additional decision time and space before resorting to lethal force, helps mitigate the negative consequences of unintended non-combatant injuries and fatalities, and enhances the overall prospects of mission success.

With the challenges posed by grey zone conflicts, irregular warfare scenarios that co-mingle military and civilian militia forces, and the continuing growth of megacities and other expansive urban zones, the committee is concerned that insufficient planning, preparation or doctrinal development has been focused on the use of and integration of non-lethal systems in some of these scenarios. In light of the continuing importance of the European Deterrence Initiative (EDI) to preventing and deterring hostile actions with Russia, the committee believes that increased focus should be placed on how best to integrate non-lethal weapons into the strategic planning for regional scenarios, as well as the training and equipping of regional partner forces.

Accordingly, the committee directs the Chairman of the Joint Chiefs of Staff to provide a briefing to the House Committee on Armed Services by February 1, 2018, on the integration of non-lethal weapons planning and training as part of EDI. This briefing should examine current contingency planning within European Command, and with North Atlantic Treaty Organization partners, to determine if the level of investment estimated across the Future Years Defense Program is sufficient to support those plans, identification of training or exercise opportunities for integrating non-lethal weapons training and doctrinal development, as well as recommendations for ways improving partner nation access to non-lethal systems for military, border guard units, or other government affiliated units.

Plan to Enhance Imagery Sharing with Allies in the Asia-Pacific Region

The committee supports enhancing imagery sharing with allies in the Asia-Pacific region to improve joint non-proliferation, counterproliferation, and ballistic missile detection and defense capabilities. The committee directs the Secretary of Defense, in consultation with the Director of National Intelligence, to develop and

implement a plan for enhancing the sharing of commercial imagery and national technical means with the Governments of the Republic of Korea and Japan, consistent with the national security of the United States and with the protection of sources and methods. The committee further directs the Secretary to provide a briefing to the House Committee on Armed Services and the House Permanent Select Committee on Intelligence on this plan and its implementation not later than November 30, 2017.

### Report on Impact of Outsourcing on the U.S. Defense Industrial Base

The committee has long been concerned with the vitality of the U.S. defense industrial base. The committee notes the domestic manufacturing sector has been particularly affected by the compounding deleterious effects of current market practices and business trends regarding outsourcing. The committee believes that large-scale outsourcing of U.S. manufacturing requirements to receptive foreign countries, such as the People's Republic of China, is having a damaging effect on the U.S. defense industrial base and could endanger national security.

Therefore, the committee directs the Comptroller General of the United States to submit a report to the Committee on Armed Services of the House of Representatives by November 1, 2018, on the national security implications of private companies that outsource their industrial and manufacturing capacities to locations outside of the United States. The report shall include the following elements:

(1) an assessment of the material effects of such outsourcing on the U.S. defense industrial base;

(2) an assessment of the national security risks to the U.S. defense industrial base of such outsourcing, including the integrity of the Department of Defense acquisition system, logistics network, or supply chains;

(3) an assessment of the risks posed by such outsourcing to the readiness of U.S. military forces to field a full spectrum of military capabilities; and

(4) the risks posed by such outsourcing and its effects on the U.S. defense industrial base to the capacity of the United States to sustain a protracted conflict against a near-peer adversary.

### Security Cooperation Assessment, Monitoring, and Evaluation

The committee notes the critical importance of assessment, monitoring, and evaluation of security cooperation initiatives. Section 1205 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) expressed the sense of Congress that the Secretary of Defense should implement an assessment, monitoring, and evaluation framework consistent with interagency approaches and existing best practices, and that it should be sufficiently resourced, and appropriately organized and staffed to inform security cooperation planning, policies, and resource decisions as well as ensure the effectiveness and efficiency of security cooperation efforts. The committee expects the Department of Defense will invest sufficient resources to ensure that best practices and lessons learned are incorporated into security cooperation pol-

icy, plans, programs, program management, resources, and the security cooperation workforce to ensure the best return on investment for the Department's security cooperation initiatives.

Security Cooperation Reform

The National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) contained significant and extensive reform of security cooperation authorities, programs, and funding of the Department of Defense. The security cooperation reforms in Public Law 114–328 sought to provide greater clarity and consistency about the nature and scope of the Department's security cooperation programs and activities to those who plan, manage, implement, and conduct oversight of these programs. The committee is aware of the Department's initial progress toward implementing these reforms.

Of note, Public Law 114–328 consolidated multiple, similar "train and equip" authorities into a single authority to build partner capacity to conduct specific missions identified under section 333 of title 10, United States Code. Section 333 was crafted to synchronize and replace the so-called "patchwork of authorities" that previously existed for "train and equip" and to alleviate inefficiencies in design, funding, management, and implementation of such programs. The committee urges the Department to overcome bureaucratic obstacles that hinder continued progress in aggressively implementing the security cooperation reforms in Public Law 114–328.

Support for Afghan Special Immigrant Visa Program

The Committee on Armed Services of the House of Representatives recognizes the importance of the Afghan Special Immigrant Visa (SIV) program and the critical role these partners play in assisting the United States mission in Afghanistan. The Committee is concerned by reports that the United States Embassy in Kabul is close to exhausting available visas currently authorized to the program. Failing to authorize additional visas would leave threatened local partners in serious danger for many additional months beyond current processing times sometimes exceeding one year. This exposes these individuals and their families to attack, kidnapping, and death. The Committee directs the Secretary of Defense, in consultation with the Secretary of State, to brief the committee on the importance of continuing the SIV program by September 30, 2017.

Support for Other Departments and Agencies of the United States Government that Advance Department of Defense Security Cooperation Objectives

Section 385 of title 10, United States Code, authorizes the Secretary of Defense to transfer up to $75 million to other agencies in the United States Government for foreign assistance programs and activities that "(1) are necessary for the effectiveness of one or more programs of the Department of Defense relating to security cooperation conducted pursuant to an authority in this chapter; and (2) cannot be carried out by the Department." For example, programs within the United States Agency for International Development (USAID) and the Department of State to counter violent

extremism and terrorism may be an appropriate use of funds, if they are identified as a requirement by the Department and meet all of the conditions of section 385.

The committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services not later than February 1, 2018 on the status of any funds transferred to other departments and agencies.

### Timor Sea Maritime Developments

The committee recognizes the strategic importance of the Indo-Asia-Pacific region and has a strong interest in ensuring processes to resolve territorial and maritime disputes are done fairly and peacefully in accordance with international law. Given the growing and complex regional maritime security issues in the Pacific, the committee believes that negotiations between Australia and Timor-Leste to establish permanent maritime boundaries sends a positive signal to other states in the region regarding adherence to a rules-based international order. A mutually agreed upon resolution could serve as an example for resolving other disputes peacefully and have benefits to cooperative maritime efforts in the region. The committee directs the Secretary of Defense, in coordination with the Secretary of State, to provide a briefing to the House Committee on Armed Services, not later than September 30, 2017, on the potential security benefits that may result from the Australia-Timor Leste conciliation process and how a peaceful resolution to the dispute might affect overall U.S. defense and security interests in the region.

### U.S. Civilian Contractors in Iraq

The committee notes that U.S. civilian contractors supporting the U.S. military in the Republic of Iraq are performing services absent a diplomatic agreement that provides them with legal and financial safeguards. The committee is concerned that U.S. civilian contractors may be subject to visa denials, tax collection efforts, and other actions which may hinder support to U.S. forces and coalition partners, including their ability to provide U.S. forces and coalition partners with timely access to critical supplies.

Therefore, the committee directs the Secretary of Defense, in coordination with the Secretary of State, to provide a briefing to the House Committee on Armed Services and the House Committee on Foreign Affairs not later than July 31, 2017, on: tax collection, visa denials, and other issues that are affecting U.S. civilian contractors in Iraq; the impact of such issues; and, if necessary, any plans to mitigate such issues.

### U.S. National Security Threats in Africa

The committee remains concerned about the ability of the Department of Defense to address the broad range of current and evolving threats to U.S. national security in Africa. Numerous security threats challenge the United States and its partners, such as stability in Libya, the Federal Republic of Somalia, and the Republic of Mali; various terrorist organizations such as Al Shabaab, Al Qaeda in the Islamic Maghreb, the Islamic State of Iraq and the Levant, and Boko Haram; and many others.

Given the massive size of the continent, the array of security challenges, partners that may be unable or unwilling to address security challenges, and a constant shortage of resources, the Department of Defense and U.S. Africa Command must find innovative, effective, and efficient solutions to the security challenges they face. Over the previous several years, the committee has provided the Department with multiple new or revised authorities, as well as significant funding, to address these challenges. A comprehensive strategy for achieving the Department of Defense's objectives on the continent will better enable the Department to address and plan for these challenges, as well as assist the committee in its oversight role. The committee looks forward to receiving the strategy for U.S. defense interests in Africa, as required by section 1273 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328), not later than its due date of December 23, 2017.

Utilizing Unmanned Aircraft Systems for International Humanitarian Assistance and Disaster Relief

The Committee understands that over the last decade, unmanned aircraft systems (UAS) have increased in both number and capability in order to enhance warfighting operations. UAS have proven vital to enhancing situational awareness, improving mission performance, and minimizing risk to both civilian and military personnel within the U.S. Armed Forces.

The Committee notes that effective use of these technologies may also have the potential to improve military operations such as Overseas Humanitarian, Disaster, and Civic Aid missions in support of humanitarian crises and disaster relief. The Committee is also aware that UAS are being increasingly accepted and utilized for international humanitarian assistance and disaster relief (HA/DR).

The Committee believes that while unmanned aircraft systems provide the United States' Armed Forces strategic ISR and combat capabilities, these systems have additional potential to enhance the speed and quality of localized needs assessments, and to strengthen and revolutionize humanitarian assistance and disaster relief efforts abroad, particularly when it comes to mapping, lightweight essential item delivery, damage assessment support, and increased situational awareness.

The Committee therefore directs the Secretary of Defense to brief the House Committee on Armed Services and House Committee on Foreign Affairs on potential ways in which the Department of Defense can support increased utilization of unmanned aircraft systems in support of humanitarian assistance and disaster relief missions abroad understanding that such platforms are a limited, high demand resource. This brief should include the viability of UAS in support of these desired operations; address the feasibility of information sharing between civil authorities and multinational organizations for a common humanitarian purpose; determine payload delivery effectiveness or limitations; and identify any international regulations or jurisdictional constraints, as well as any other topics the Secretary deems appropriate, and should be delivered to the Committee by October 1, 2017.

# LEGISLATIVE PROVISIONS

## SUBTITLE A—ASSISTANCE AND TRAINING

### Section 1201—One-Year Extension of Logistical Support for Coalition Forces Supporting Certain United States Military Operations

This section would amend section 1234 of the National Defense Authorization Act for Fiscal Year 2008 (Public Law 110–181), as most recently amended by section 1201 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328), by authorizing the Secretary of Defense to provide supplies, services, transportation, and other logistical support to coalition forces supporting U.S. operations in the Republic of Iraq and the Islamic Republic of Afghanistan during fiscal year 2018.

### Section 1202—Modification to Special Defense Acquisition Fund

This section would amend section 114(c) of title 10, United States Code, to clarify the use of funds for the procurement of precision guided munitions with the Special Defense Acquisition Fund (SDAF).

Section 1202 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) increased the size of the SDAF from $1.07 billion to $2.50 billion. Section 1202(b)(2) further required that $500.0 million of the SDAF may only be used to procure and stock precision guided munitions that may be required by partner and allied forces to enhance the effectiveness of their contribution to overseas contingency operations conducted or supported by the United States. The intent of section 1202(b)(2) was to ensure that once SDAF funds were used to purchase $2.00 billion of defense articles or services in a fiscal year, the remaining $500.0 million was to be used only for the purchase of precision guided munitions. Prior to reaching the threshold of $2.00 billion of purchases in any fiscal year, SDAF funds may be used to purchase precision guided munitions, but are not required to be used to purchase precision guided munitions.

### Section 1203—Modification to Ministry of Defense Advisor Authority

This section would modify section 332 of title 10, United States Code, to authorize the Secretary of Defense to assign military personnel as advisors or trainers under the Ministry of Defense Advisor program to ensure that advisors or trainers with the appropriate expertise and skills are assigned to improve the institutional capacity of partner nations.

### Section 1204—Modification of Authority to Build Capacity of Foreign Security Forces

This section would amend section 333(c) of title 10, United States Code, to modify the required elements associated with the authority to build partner capacity by allowing human rights training conducted by the Department of State to satisfy the human rights training requirement, and clarifying the requirement regarding re-

spect for civilian control of the military and institutional capacity building to ensure that both are promoted as part of the capacity building programs of the Department of Defense.

Section 1205—Extension and Modification of Authority on Training for Eastern European National Military Forces in the Course of Multilateral Exercises

This section would extend the authority provided the Secretary of Defense by section 1251 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92), as amended by section 1233 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328), to train eastern European national security forces until December 31, 2019. This section would also modify the authority to address the payment of incremental expenses of partner nations.

Section 1206—Extension of Participation in and Support of the Inter-American Defense College

This section would extend for 1 year the authority in section 1243(c) of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) with respect to participation in and support of the Inter-American Defense College.

SUBTITLE B—MATTERS RELATING TO AFGHANISTAN AND PAKISTAN

Section 1211—Extension of Authority to Transfer Defense Articles and Provide Defense Services to the Military and Security Forces of Afghanistan

This section would extend through December 31, 2018, the authority under section 1222 of the National Defense Authorization Act for Fiscal Year 2013 (Public Law 112–239), as amended, to transfer defense articles and provide defense services to the military and security forces of the Islamic Republic of Afghanistan.

Section 1212—Report on United States Strategy in Afghanistan

This section would require the Secretary of Defense, in consultation with the Secretary of State, to submit a report to the appropriate congressional committees not later than February 15, 2018, that describes the strategy of the United States in the Islamic Republic of Afghanistan. The committee is concerned that the Department of Defense does not have a long-term strategy for U.S. involvement in Afghanistan to complement operational planning. A comprehensive strategy should look beyond the next five years and should connect current lines of effort to a steady state for U.S. involvement in Afghanistan that meets U.S. objectives.

Section 1213—Extension and Modification of Authority for Reimbursement of Certain Coalition Nations for Support Provided to United States Military Operations

This section would amend section 1233 of the National Defense Authorization Act for Fiscal Year 2008 (Public Law 110–181), as most recently amended by section 1218 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328), by ex-

tending the authority for reimbursement of coalition nations for support provided to the United States for military operations in the Islamic Republic of Afghanistan through December 31, 2018.

This section would also extend, through December 31, 2018, the requirement for the Secretary of Defense to notify the appropriate congressional committees prior to making any reimbursement to the Government of the Islamic Republic of Pakistan for any logistical, military or other support that Pakistan provides to the United States.

Further, this section would extend the requirement for the Secretary of Defense to certify, prior to making any reimbursement to Pakistan, that Pakistan is maintaining security along the Ground Lines of Communication through Pakistan, taking demonstrable steps to support counterterrorism operations, disrupting cross border attacks, and countering the threat of improvised explosive devices.

This section would specify that, of the total amount of reimbursement and support authorized for Pakistan during the period beginning on October 1, 2017, and ending on December 31, 2018, $400.0 million would not be eligible for a national security waiver unless the Secretary of Defense certifies that Pakistan continues to conduct military operations against the Haqqani Network in North Waziristan, is demonstrating commitment to preventing the Haqqani network from using North Waziristan as a safe haven, and is actively coordinating with the Government of Afghanistan to restrict the movement of militants, including the Haqqani Network, along the Pakistan-Afghanistan border.

## SUBTITLE C—MATTERS RELATING TO SYRIA, IRAQ, AND IRAN

### Section 1221—Report on United States Strategy in Syria

This section would require the Secretary of Defense, in coordination with the Secretary of State, to submit a report to the appropriate congressional committees not later than February 1, 2018, on the U.S. strategy in the Syrian Arab Republic. This report would require the Secretary to describe and prioritize interests, assess the ambitions of state actors in Syria, including the Islamic Republic of Iran, assess the threat to U.S. interests posed by Al Qaeda, the Islamic State of Iraq and the Levant, and Hezbollah, assess the resources and timeline required to achieve U.S. objectives, describe the transition from military operations to stabilization programming, and evaluate the risk to U.S. forces.

The committee understands that the political and military situation in Syria is unpredictable and that the nature of U.S. involvement may change as the result of such volatility. The committee, however, believes it important to articulate the United States' strategic objectives and describe a realistic process for achieving such objectives.

### Section 1222—Extension and Modification of Authority to Provide Assistance to Counter the Islamic State of Iraq and the Levant

This section would extend section 1236 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (Public Law 113–291), as most recently amended

by section 1222 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328), which authorizes the Secretary of Defense, in coordination with the Secretary of State, to provide $1.3 billion in assistance in fiscal year 2018 to the military and other security forces of, or associated with, the Government of the Republic of Iraq, including Kurdish and Sunni tribal security forces or other local security forces with a national security mission, through December 31, 2019. This section would also require a quarterly progress report that would detail the security in liberated areas in Iraq, the preparedness of the Iraqi Security Forces to conduct stabilization operations, and a description of the forces providing security in liberated areas.

The committee notes that an inclusive and representative Iraq is critical to achieving U.S. counterterrorism objectives and that Iraq must take meaningful steps to ensure that minorities' interests are represented by the central Government. The committee encourages the Government of Iraq to pursue efforts to include and promote ethnic and sectarian minorities in the Iraqi Security Forces, and to ensure that defense equipment and materiel are getting to Sunni, Kurdish, and Christian groups, including the minority groups of the Nineveh Plain that have a national security mission. To that end, this section would express the sense of congress that the United States should provide arms, training, and appropriate equipment to vetted elements of the Nineveh Plain Council.

The committee notes that funding provided to the Kurdish Regional Government (KRG) is to enhance Government of Iraq-KRG cooperation and support a unified effort to counter the Islamic State of Iraq and the Levant (ISIL). Such funding should be contingent upon KRG participation in the government of a unified Iraq and on their continued good faith cooperation in the anti-ISIL campaign.

Section 1223—Extension and Modification of Authority to Support Operations and Activities of the Office of Security Cooperation in Iraq

This section would amend section 1215 of the National Defense Authorization Act for Fiscal Year 2012 (Public Law 112–81), as most recently amended by section 1223 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328), by extending the authority for the Office of Security Cooperation in the Republic of Iraq (OSC–I) for 1 year through fiscal year 2018.

Section 1224—Sense of Congress on Threats Posed by the Government of Iran

This section would express the sense of Congress that the United States should counter the Islamic Republic of Iran's malign activities in the Middle East; maintain a capable military presence in the Arabian Gulf region to deter, and, if necessary, respond to Iranian aggression; strengthen ballistic missile defense capabilities; ensure freedom of navigation through the Bab al Mandab and the Strait of Hormuz; and, renew focus on countering Iranian efforts to illicitly proliferate weapons in the region.

## Subtitle D—Matters Relating to the Russian Federation

### Section 1231—Extension of Limitation on Military Cooperation between the United States and the Russian Federation

This section would extend, by 1 year, section 1232 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328). This section would limit the use of fiscal year 2018 funds for bilateral military-to-military cooperation between the Governments of the United States and the Russian Federation until the Secretary of Defense, in coordination with the Secretary of State, provides a certification to the appropriate congressional committees relating to certain actions by Russia. This section would also allow the Secretary of Defense to waive the limitation under certain conditions.

### Section 1232—Prohibition on Availability of Funds Relating to Sovereignty of the Russian Federation over Crimea

This section would extend by 1 year the prohibition imposed by section 1245 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–270), as amended by section 1234 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328). This section would prohibit the use of fiscal year 2018 funds to implement any activity that recognizes the sovereignty of the Russian Federation over Crimea. This section would allow the Secretary of Defense, in concurrence with the Secretary of State, to waive the prohibition if the Secretary determines that doing so would be in the national security interest of the United States and submits a notification to the Committees on Armed Services of the Senate and the House of Representatives, the Committee on Foreign Relations of the Senate, and the Committee on Foreign Affairs of the House of Representatives.

### Section 1233—Statement of Policy on the Russian Federation

This section would state that it is the policy of the United States to sustain credible deterrence against aggression by the Government of the Russian Federation in order to enhance regional and global security and stability. The section would also include a series of findings highlighting continued aggression and intimidation by the Russian Federation against U.S. allies and partners in Europe.

### Section 1234—Modification and Extension of Ukraine Security Assistance Initiative

This section would extend by 1 year section 1250 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92), as amended by section 1237 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328), to authorize the Secretary of Defense to provide security assistance and intelligence support to the Government of Ukraine.

Elsewhere in this Act, the committee includes a provision that would authorize $150.0 million to carry out this authority in fiscal year 2018.

As reflected in the past three National Defense Authorization Acts, Congress has authorized and encouraged the Department of Defense to provide defensive lethal assistance to the Government of Ukraine. The committee urges the Department to provide defensive lethal assistance to the Government of Ukraine to support its efforts to protect and defend its territorial integrity.

Section 1235—Limitation on Availability of Funds Relating to Implementation of the Open Skies Treaty

This section would prohibit the use of funds authorized to be appropriated by this Act, or otherwise made available for fiscal year 2018, or any subsequent fiscal year, for Department of Defense operations and maintenance, Defense-wide, or operations and maintenance, Air Force, to conduct any flight for the purposes of implementing the Open Skies Treaty until the President submits a plan with respect to such fiscal year to the appropriate congressional committees and 7 days have elapsed. Such a plan would be required to be developed by the Secretary of Defense, in coordination with the Secretary of State, the Chairman of the Joint Chiefs of Staff, and the Director of National Intelligence, and would contain a description of the objectives for each Open Skies Treaty flight in the upcoming fiscal year. These requirements would terminate 5 years after the date of enactment of this Act.

This section would also prohibit the use of funds authorized to be appropriated by this Act, or otherwise made available for fiscal year 2018, for the digital visual imaging system to carry out any activities to modify any U.S. aircraft for purposes of implementing the Open Skies Treaty.

Section 1236—Sense of Congress on Importance of Nuclear Capabilities of NATO

This section would make a series of findings and express the sense of Congress regarding the North Atlantic Treaty Organization's nuclear deterrence capability.

Section 1237—Sense of Congress on Support for Georgia

This section would express the sense of Congress regarding the United States' support for Georgia's sovereignty and territorial integrity as well as support for continued cooperation between the United States and Georgia.

Section 1238—Sense of Congress on Support for Estonia, Latvia, and Lithuania

This section would express the sense of Congress on U.S. support for the Republic of Estonia, the Republic of Latvia, and the Republic of Lithuania, including support for their sovereignty, concern over aggressive military actions of the Russian Federation against these nations, and encouragement for further defense cooperation between the United States and these nations.

SUBTITLE E—INTERMEDIATE-RANGE NUCLEAR FORCES (INF) TREATY PRESERVATION ACT OF 2017

Section 1241—Short Title

This section would cite this subtitle as the "Intermediate-Range Nuclear Forces (INF) Treaty Preservation Act of 2017."

Section 1242—Findings

This section would make a series of findings by Congress related to the Intermediate-Range Nuclear Forces Treaty and the Russian Federation's violations of that treaty.

Section 1243—Compliance Enforcement regarding Russian Violations of the INF Treaty

This section would make a statement of U.S. policy regarding Russian Federation compliance to the Intermediate-Range Nuclear Forces (INF) Treaty. It would state:

(1) it is the policy of the United States that the actions undertaken by Russia in violation of the INF Treaty constitute a material breach of the treaty;

(2) in light of such a material breach, the United States is legally entitled to suspend the operation of the INF Treaty in whole or in part for so long as Russia continues to be in material breach; and

(3) for so long as Russia remains in noncompliance with the INF Treaty, the United States should take actions to encourage a return to compliance, including by providing additional funds for certain capabilities identified in section 1243(d) of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92) and by seeking additional missile defense assets in the European theater to protect United States and North Atlantic Treaty Organization forces from missile systems of Russia that are in noncompliance with the INF Treaty.

This section would also make available $50.0 million of the funds authorized by this Act for fiscal year 2018, as specified in the funding table in division D of this Act, for the development of active defenses to counter ground-launched missile systems with ranges between 500 and 5,500 kilometers; counterforce capabilities to prevent attacks from such missiles; and, countervailing strike capabilities identified in section 1243(d) of Public Law 114–92.

Lastly, this section would authorize $25.0 million of the funds authorized by this section to be used for activities undertaken to carry out research and development activities contained elsewhere in this Act.

Section 1244—Development of INF Range Ground-Launched Missile System

This section would require the Secretary of Defense to establish a program of record to develop a conventional road-mobile ground-launched cruise missile system with a range of between 500 to 5,500 kilometers. This section would further require the Secretary of Defense to submit a report to the congressional defense committees, Committee on Foreign Affairs of the House of Representatives, and Committee on Foreign Relations of the Senate within

120 days after the date of the enactment of this Act on the cost, schedule, and feasibility to modify existing and planned systems for ground launch with a range of between 500 and 5,500 kilometers in order to meet the capabilities specified.

Section 1245—Notification Requirement Related to Russian Federation Development of Noncompliant Systems and United States Actions Regarding Material Breach of INF Treaty by the Russian Federation

This section would state that Congress declares the Russian Federation to be in material breach of the Intermediate-Range Nuclear Forces (INF) Treaty. This section would also require the Director of National Intelligence to notify the appropriate congressional committees of any development, deployment, or test of a system by Russia that the Director determines is inconsistent with the INF Treaty within 15 days of the Director making such determination. This section would further direct the President to submit a report within 15 months after the date of the enactment of this Act to the appropriate congressional committees that contains a determination by the President whether Russia engaged in activity that would be considered noncompliant with the INF Treaty during each of the 3 consecutive 120-day periods following the date of the enactment of this Act.

If the determination is made by the President that Russia has engaged in activities considered noncompliant with the INF Treaty, this section would provide that the United States, as a matter of law, would no longer be bound by the prohibitions set forth in Article VI of the INF Treaty.

Section 1246—Limitation on Availability of Funds to Extend the Implementation of the New START Treaty

This section would prohibit any funds authorized to be appropriated or otherwise made available for fiscal year 2018 for the Department of Defense to be obligated or expended to extend the implementation of the New Strategic Arms Reduction Treaty, unless the President certifies to the appropriate congressional committees that the Russian Federation has verifiably eliminated all missiles that are in violation of or may be inconsistent with the Intermediate-Range Nuclear Forces Treaty.

Section 1247—Review of RS–26 Ballistic Missile

This section would direct the President, in consultation with the Secretary of State, the Secretary of Defense, the Chairman of the Joint Chiefs of Staff, and the Director of National Intelligence to conduct a review of the RS–26 ballistic missile of the Russian Federation and submit a report to the appropriate congressional committees not later than 90 days after the date of the enactment of this Act.

Such a report would include a determination of whether the RS–26 ballistic missile is covered under the New Strategic Arms Reduction Treaty (NST) or would be a violation of the Intermediate-Range Nuclear Forces (INF) Treaty because Russia has conducted flight tests to ranges prohibited by the INF Treaty in more than one warhead configuration. If the President determines that the

RS–26 ballistic missile is covered under the NST, the report would further include a determination whether the Russian Federation has agreed that such a system is limited under the NST central limits and has agreed to an exhibition of such a system.

If the determination is made that the RS–26 ballistic missile is covered under the NST and that Russia has not agreed that such a system is limited under the NST or to an exhibition under the treaty of the system, the U.S. Government would consider such a system to be a violation of the INF Treaty for purposes of all policies and decisions.

### Section 1248—Definitions

This section would define the terms "appropriate congressional committees", "INF Treaty", "intelligence community", "New START Treaty", and "Open Skies Treaty", among other terms in this subtitle.

## SUBTITLE F—FOSTERING UNITY AGAINST RUSSIAN AGGRESSION ACT OF 2017

### Section 1251—Short Title

This section would cite this subtitle as the "Fostering Unity Against Russian Aggression Act of 2017".

### Section 1252—Findings and Sense of Congress

This section would express the sense of Congress on the Russian Federation's "escalate to de-escalate" doctrine, subversive and destabilizing activities of the Russian Federation, the European Deterrence Initiative as a long-term investment, and cooperation with North Atlantic Treaty Organization (NATO) allies.

### Section 1253—Strategy To Counter Threats by the Russian Federation

This section would require the Secretary of Defense, in coordination with the Secretary of State, to submit a strategy to the appropriate congressional committees not later than 180 days after the date of enactment of this Act containing a comprehensive strategy to counter threats by the Russian Federation.

### Section 1254—Strategy To Increase Conventional Precision Strike Weapon Stockpiles in the United States European Command's Areas of Responsibility

This section would also require the Secretary of Defense, in coordination with the Secretary of State, to submit a strategy to the appropriate congressional committees not later than April 1, 2018, to increase conventional precision strike weapon stockpiles in the United States European Command's Area of Responsibility.

### Section 1255—Plan To Counter the Military Capabilities of the Russian Federation

This section would require the Secretary of Defense to develop and implement a plan to counter the military capabilities of the

Russian Federation and submit the plan to the appropriate congressional committees not later than April 1, 2018.

Section 1256—Plan To Increase Cyber and Information Operations, Deterrence, and Defense

This section would require the Secretary of Defense and the Secretary of State to jointly develop and submit a plan to increase cyber and information operations deterrence and defense to the appropriate committees not later than 180 days after the date of enactment of this Act.

Section 1257—Sense of Congress on Enhancing Maritime Capabilities

This section would express the sense of Congress on enhancing maritime capabilities.

Section 1258—Plan To Reduce the Risks of Miscalculation and Unintended Consequences That Could Precipitate a Nuclear War

This section would require the Secretary of Defense to submit a plan not later than March 1, 2018, to the congressional defense committees that includes options to reduce the risk of miscalculation and unintended consequences that could precipitate a nuclear war.

Section 1259—Definitions

This section would define the terms "appropriate congressional committees'", and "NATO".

SUBTITLE G—MATTERS RELATING TO THE INDO-ASIA-PACIFIC REGION

Section 1261—Sense of Congress on the Indo-Asia-Pacific Region

This section would express the sense of Congress that the United States has a national interest in maintaining the stability and security of the Indo-Asia-Pacific region. It expresses that the United States should maintain a military capability to deter acts of aggression and respond to regional threats. It expresses that continuing efforts to realign forces, commit additional assets, and increase investments in the region are necessary to maintain a robust U.S. commitment to the region. The committee believes the United States should continue to strengthen alliances and partnerships and support regional institutions and bodies.

Section 1262—Report on Strategy To Prioritize United States Defense Interests in the Indo-Asia-Pacific Region

This section would require the Secretary of Defense to develop a strategic plan that would prioritize the Department of Defense's efforts in the Indo-Asia-Pacific region and to submit a report on this plan to the appropriate congressional committees by February 1, 2018. In preparing the report, the Secretary should consider the strategy required by section 1261 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92). This section would also repeal section 1251 of the Carl Levin and Howard P.

"Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (Public Law 113–291), even though the committee is disappointed that the Secretary failed to submit the report required by that section.

Section 1263—Assessment of United States Force Posture and Basing Needs in the Indo-Asia-Pacific Region

This section would require the Secretary of Defense to assess U.S. Pacific posture, deployment plans, and realignment and basing needs to accomplish U.S. defense priorities and respond to complex crises and contingencies. This section would also require the Secretary to report the results of this assessment to the congressional defense committees not later than March 1, 2018. The required report should align with the Department of Defense strategy to prioritize U.S. defense interests in the Indo-Asia-Pacific region that would be required elsewhere in this subtitle.

Section 1264—Extended Deterrence Commitment to the Asia-Pacific Region

This section would express the sense of Congress that the United States is committed to providing extended deterrence to allies in the Asia-Pacific, including Japan and the Republic of Korea. This section would also assert that the United States must maintain robust nuclear capabilities, including nuclear-capable aircraft, to assure that the full spectrum of military options associated with the extended deterrence commitments of the United States remains credible and executable.

Section 1265—Authorization of Appropriations To Meet United States Financial Obligations Under Compact of Free Association With Palau

This section would authorize the Secretary of the Interior to meet the financial obligations of the United States under an agreement with the Government of the Republic of Palau.

Section 1266—Sense of Congress Reaffirming Security Commitments to the Governments of Japan and South Korea and Trilateral Cooperation Between the United States, Japan, and South Korea

This section would express the sense of Congress that the United States values its alliances with the Governments of Japan and the Republic of Korea and that the United States should continue further defense cooperation. Additionally, the sense of Congress would convey the importance that the United States places on strengthening bilateral cooperation between Japan and South Korea and on trilateral cooperation among the United States, Japan, and South Korea. This section would seek to promote continued and strengthened bilateral and trilateral cooperation on a full range of issues related to the Democratic People's Republic of Korea and to other security challenges in the Asia-Pacific region.

Section 1267—Sense of Congress on Freedom of Navigation Operations in the South China Sea

This section would express the sense of Congress that the United States should regularly and routinely conduct freedom of navigation operations in the South China Sea.

Section 1268—Sense of Congress on Strengthening the Defense of Taiwan

This section would express the sense of Congress that the United States should strengthen and enhance its long-standing partnership and strategic cooperation with Taiwan, and that Taiwan should take steps to optimize its self-defense. This section would recommend that the United States should consider opportunities to expand exchanges and encourage more frequent provisioning of defense articles and services to Taiwan.

Section 1269—Sense of Congress on the Association on Southeast Asian Nations

This section would provide the sense of Congress in support of the Association of Southeast Asian Nations (ASEAN) on the 50th anniversary of its formation. It would recognize ASEAN efforts to promote peace, stability and prosperity in the region, including the steps taken to highlight the importance of peaceful dispute resolution and the need for adherence to international rules and standards. Finally, the section would state that ASEAN and the ASEAN Defense Ministers Meeting Plus should continue to be forums to discuss shared challenges in the maritime domain and for greater information sharing.

Section 1270—Sense of Congress on Reaffirming the Importance of the United States-Australia Defense Alliance

This section would provide the sense of Congress on the strength of United States-Australia relations. It recognizes that the United States and the Commonwealth of Australia maintain a critical strategic relationship underpinned by shared democratic values, common interests, and close defense ties. The committee recognizes that 2017 marks the 75th anniversary of the Battles of the Coral Sea, Midway, and Guadalcanal, and Australia has been a loyal ally, particularly with respect to international efforts in the Islamic Republic of Afghanistan and against the Islamic State of Iraq and the Levant. The committee also recognizes that the Force Posture Agreement between the Government of Australia and the Government of the United States, signed in 2014, strengthened the relationship between the two countries, a relationship that is an anchor for peace and security both in the Asia-Pacific region and worldwide.

SUBTITLE H—OTHER MATTERS

Section 1271—NATO Cooperative Cyber Defense Center of Excellence

This section would authorize up to $5.0 million for fiscal year 2018 for the purposes of establishing the NATO Cooperative Cyber

Center of Excellence, and would direct the Secretary of Defense to assign executive agent responsibilities to an appropriate organization within the Department of Defense.

Section 1272—NATO Strategic Communications Center of Excellence

This section would authorize up to $5.0 million for fiscal year 2018 for the purposes of establishing the NATO Strategic Communications Center of Excellence, and would direct the Secretary of Defense to assign executive agent responsibilities to an appropriate organization within the Department of Defense.

Section 1273—Security and Stability Strategy for Somalia

This section would require the President to submit a report to the appropriate congressional committees not later than 120 days after the date of enactment of this Act containing a comprehensive strategy to achieve long-term security and stability in the Federal Republic of Somalia.

Section 1274—Assessment of Global Theater Security Cooperation Management Information System

This section would require the Secretary of Defense to enter into an agreement with a federally funded research and development center to conduct an assessment of the effectiveness of measures taken to improve the functionality of the Global Theater Security Cooperation Management Information System (G–TSCMIS). The committee is aware of a July 2016 study prepared for the Defense Security Cooperation Agency (DSCA) that recommended that DSCA should ascertain the extent to which security cooperation organizations are fully and accurately entering information into G–TSCMIS. The study further concluded that, if accurate and complete, data drawn from G–TSCMIS could be a tremendous asset in the evaluation of security cooperation impacts. This section would also require the Secretary of Defense to submit the assessment to the congressional defense committees not later than six months after the date of the enactment of this Act.

Section 1275—Future Years Plan for the European Deterrence Initiative

This section would require the Secretary of Defense to develop and submit a plan to the congressional defense committees not later than 120 days after the date of the enactment of this Act, for the U.S. military's role in the European theater. This plan would include the allocation of resources in Europe through the continuation of the European Deterrence Initiative for fiscal year 2018 and four successive fiscal years. The plan would also include the Department's assessment of what would be required to fully resource U.S. force posture and capabilities in the European theater, as well as a plan to station additional permanent U.S. troops in Europe, along with the necessary infrastructure and enablers.

This section would also require the Secretary of Defense to pause divestment of any remaining sites under the European Infrastructure Consolidation (EIC) until the required plan is submitted to

Congress. Since the EIC was enacted into law in 2015, the strategic landscape of Europe has evolved with the resurgence of aggression by the Russian Federation. The committee notes that in a changing strategic environment, a re-evaluation of the sites the Department is planning to divest is necessary for long-term strategic planning.

The committee believes this section would provide the Department a tool to further develop its transition of European resources from reassurance to resources that develop, implement, and sustain a credible deterrent against a resurgent Russia.

Section 1276—Extension of Authority To Enter into Agreements With Participating Countries in the American, British, Canadian, and Australian Armies' Program

This section would extend by 5 years the authority in section 1274(g) of the National Defense Authorization Act for Fiscal Year 2013 (Public Law 112–239) to enter into agreements with participating countries in the American, British, Canadian, and Australian Armies Program.

Section 1277—Security Strategy for Yemen

This section would require the President to develop a security strategy for the Republic of Yemen and to submit a report on the required strategy to certain congressional committees within 120 days of the date of the enactment of this Act. The report required would include: discussion of the strategy's compliance with applicable legal authorities; a detailed description of the security environment; the threats posed by Al Qaeda in the Arabian Peninsula and the Islamic State in Iraq and the Levant—Yemen; a detailed description of the threat posed to maritime vessels at the Bab al Mandab Strait; the role of the U.S. Armed Forces in implementing the strategy; a discussion of the ends, ways, and means inherent to the strategy and the strategy's objectives regarding counterterrorism and long-term stability in Yemen; and a plan to coordinate the U.S. resources necessary to implement the strategy.

Section 1278—Limitation on Transfer of Excess Defense Articles That Are High Mobility Multi-Purpose Wheeled Vehicles

This section would prohibit the Secretary of Defense from transferring any excess defense articles (EDA) that are high mobility multipurpose wheeled vehicles (HMMWVs) until 30 days after the Comptroller General of the United States submits a report to the congressional defense committees, the Committee on Foreign Relations of the Senate, and the Committee on Foreign Affairs of the House of Representatives that assesses the Department of Defense's efforts to evaluate the potential impact of HMMWV EDA transfers on the U.S. industrial base pursuant to section 2321j(b)(1)(E) of title 22, United States Code, for fiscal years 2012 through 2016. The assessment shall also review the timing, rigor, and procedures used by the Department in conducting the industrial base analysis as required by current statute and any other related matters the Comptroller General considers appropriate.

The committee is concerned that the existing requirements to determine the potential impact of EDA transfers on the U.S. industrial base as required under section 2321j(b)(1)(E) of title 22,

United States Code, are not being enforced by the Department of Defense, and as such there could be adverse impacts to the U.S. industrial base or its workforce. The committee is particularly concerned about the potential adverse impacts of EDA transfers to the light tactical vehicle industrial base.

The committee expects the Secretary of Defense to actively engage the industrial base in a timely manner regarding any potential EDA transfers to assist in the determination of whether the transfer of such articles will have an adverse impact on the national technology and industrial base, or reduce the opportunities of entities in the national technology and industrial base to sell new or used equipment to the countries to which such articles are transferred. The committee also expects the Secretary of Defense to engage the industrial base in providing refurbishment and sustainment of EDA equipment, to include supplies and parts, to the fullest extent possible.

### Section 1279—Department of Defense Program To Protect United States Students Against Foreign Agents

This section would require the Secretary of Defense to develop and implement a program to prepare U.S. students studying abroad through Department of Defense National Security Education Programs to recognize and protect themselves against recruitment efforts by foreign intelligence agents. This section would also require the Secretary of Defense to provide a briefing to the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives on the plan to develop and implement the program.

### Section 1280—Extension of United States-Israel Anti-Tunnel Cooperation Authority

This section would amend section 1279(f) of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92) to extend the United States-Israel Anti-Tunnel Cooperation Authority to December 31, 2020.

### Section 1281—Anticorruption Strategy

This section would require the Secretary of Defense, the Secretary of State, and the Administrator of the United States Agency for International Development, in consultation with the heads of other relevant Federal agencies, to develop a strategy to prevent corruption in reconstruction efforts and submit it to the congressional defense committees, the Committee on Foreign Relations of the Senate, and the Committee on Foreign Affairs of the House of Representatives.

# TITLE XIII—COOPERATIVE THREAT REDUCTION

## LEGISLATIVE PROVISIONS

### Section 1301—Specification of Cooperative Threat Reduction Funds

This section would specify that funds authorized to be appropriated to the Department of Defense for the Cooperative Threat

Reduction Program established under the Department of Defense Cooperative Threat Reduction Act (50 U.S.C. 3711) would be available for obligation in fiscal years 2018, 2019, and 2020.

The committee also notes that section 1303 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) mandated the expenditure or obligation of semiannual installments of funds available for Cooperative Threat Reduction Activities in the People's Republic of China, and that such semiannual installments should be made in accordance with all applicable laws, to include chapter 39 of title 31, United States Code, also known as the "Prompt Payment Act."

### Section 1302—Funding Allocations

This section would allocate specific funding amounts for each program under the Department of Defense Cooperative Threat Reduction (CTR) Program from within the overall $324.6 million that the committee would authorize for the CTR Program. The allocation under this section reflects the amount of the budget request for fiscal year 2018.

# TITLE XIV—OTHER AUTHORIZATIONS

## ITEMS OF SPECIAL INTEREST

### Assessment of the Realignment of the Joint Improvised-Threat Defeat Organization under the Defense Threat Reduction Agency

The committee supports the transition of the Joint Improvised-Threat Defeat Agency (JIDA) to the Defense Threat Reduction Agency (DTRA) as the Joint Improvised-Threat Defeat Organization (JIDO) under DTRA. The committee also appreciates actions taken to achieve efficiencies and synergies while not compromising the mission of either JIDO or DTRA and without interruption of support to the warfighter. However, the committee believes there may be opportunities for additional efficiencies and collaboration that can be achieved as a result of this transition.

For example, the committee is aware JIDO has taken on a greater role in countering unmanned aerial systems (UAS). The committee recognizes the nexus between UAS and improvised explosive devices (IEDs). However, the committee is concerned about mission creep to countering weapon systems and platforms that may diminish focus on the mission of countering IEDs employed in all forms. Additionally, the JIDO director remains a two-star billet sourced by the Army. The committee is concerned about whether this level of seniority for JIDO is necessary given the leadership and oversight structures in place at DTRA.

Therefore, the committee directs the Comptroller General of the United States to assess the transition of JIDA as JIDO to DTRA, to include an assessment of additional efficiencies that may be achieved and recommendations for progress to that end in the near-term, as well as an assessment of JIDA's primary mission of countering current and future IED threats. The Comptroller General shall provide a briefing to the congressional defense committees, not later than March 1, 2018, on the results of the assessment

with a report to follow on a date agreed to at the time of the briefing.

### Beryllium Supply Chain

The committee notes the continuing importance of the strategic and critical material beryllium to national security. The committee understands that, starting in 2004, the Department of Defense took affirmative steps to invest in a domestic beryllium manufacturing facility in order to maintain security of supply, as well as the affordability of beryllium for defense systems. These interventions have not only provided security of supply, they have also stabilized the price for beryllium metal in recent years, and the committee is encouraged that the Department of Defense is considering additional measures that would stabilize prices at the U.S. beryllium metal facility.

However, the committee is concerned that individual program managers within the Department of Defense are considering the use of foreign-owned competitors. The committee believes there is no security of supply with foreign beryllium, and there is no realistic estimate for a supplier mine to be opened in the foreseeable future. As a result, the Department of Defense should exercise care when contractors or subcontractors seek to supply national security needs through use of these foreign manufacturers.

The committee directs the Under Secretary of Defense for Acquisition, Technology, and Logistics to submit a report to the House Committee on Armed Services by November 30, 2017, on the supply chains for beryllium metal used by the Department of Defense. Such a study shall include: (1) an analysis of the economic viability and long-term supply potential of all current beryllium metal suppliers; and (2) an analysis of when foreign supplies of beryllium are expected to be exhausted.

### Fiscal Stability of the National Defense Stockpile

The committee notes that the funds within the National Defense Stockpile (NDS) Transaction Fund have been significantly depleted due to the lack of excess materials available for disposal. The fund was designed to allow for the sale of excess materials, from which the funds in turn could be used to acquire emergent strategic and critical materials for national defense requirements. While this process has been ongoing since just after World War II, the value of the available inventory designated as "excess'" is no longer sufficient to acquire the strategic and critical material requirements identified by the President. The committee believes the current manager of the NDS, the Defense Logistics Agency Office for Strategic Materials (DLA–SM), is hampered in its acquisition strategy due to the lack of funds available for the procurement of materials. The committee has observed that the DLA–SM must determine which materials are most critical for acquisition, leaving other material requirements unfunded. The committee notes that the fund will become insolvent within the next three to seven years, despite the careful management of expenditures.

Accordingly, the committee directs the Secretary of Defense, in coordination with the NDS manager, to provide a briefing to the congressional defense committees not later than January 31, 2018,

on the plan to develop and implement a funding strategy for sustaining a robust national defense stockpile inventory when current funds in the transaction fund are depleted. This strategy should include the incorporation of acquisition requirements for strategic and critical materials though the discretionary appropriations process.

## LEGISLATIVE PROVISIONS

### SUBTITLE A—MILITARY PROGRAMS

#### Section 1401—Working Capital Funds

This section would authorize appropriations for Defense Working Capital Funds at the levels identified in section 4501 of division D of this Act.

#### Section 1402—Chemical Agents and Munitions Destruction, Defense

This section would authorize appropriations for Chemical Agents and Munitions Destruction, Defense at the levels identified in section 4501 of division D of this Act.

#### Section 1403—Drug Interdiction and Counter-Drug Activities, Defense-Wide

This section would authorize appropriations for Drug Interdiction and Counter-Drug Activities, Defense-Wide at the levels identified in section 4501 of division D of this Act.

#### Section 1404—Defense Inspector General

This section would authorize appropriations for the Office of the Inspector General at the levels identified in section 4501 of division D of this Act.

#### Section 1405—Defense Health Program

This section would authorize appropriations for the Defense Health Program at the levels identified in section 4501 of division D of this Act.

#### Section 1406—National Defense Sealift Fund

This section would authorize appropriations for the National Defense Sealift Fund at the levels identified in section 4501 of division D of this Act.

### SUBTITLE B—OTHER MATTERS

#### Section 1411—Authority for Transfer of Funds to Joint Department of Defense-Department of Veterans Affairs Medical Facility Demonstration Fund for Captain James A. Lovell Health Care Center, Illinois

This section would authorize the Secretary of Defense to transfer funds from the Defense Health Program to the Joint Department of Defense-Department of Veterans Affairs Medical Facility Dem-

onstration Fund created by section 1704 of the National Defense Authorization Act for Fiscal Year 2010 (Public Law 111–84).

Section 1412—Authorization of Appropriations for Armed Forces Retirement Home

This section would authorize $64.3 million to be appropriated for the operation of the Armed Forces Retirement Home during fiscal year 2018.

# TITLE XV—AUTHORIZATION OF ADDITIONAL APPROPRIATIONS FOR OVERSEAS CONTINGENCY OPERATIONS

## ITEMS OF SPECIAL INTEREST

### National Guard and Reserve Component Equipment Account

The budget request for Overseas Contingency Operations contained no funding for a National Guard and Reserve Component equipment account. Elsewhere as reflected in division D of this Act, the committee notes that the base budget request contained $1.5 billion for procurement of National Guard and Reserve Component equipment.

Given the uncertainty of the current and projected fiscal environment, the committee remains concerned about the availability of equipment needed to sustain and modernize the National Guard and Reserve Components as an operational reserve and for their domestic support missions. The committee recognizes the National Guard and Reserve Components continue to report significant shortages in modernized equipment and challenges associated with efficiently fulfilling combat readiness training requirements. For example, the committee notes there are significant modernization, capability, and training challenges associated with the current Air National Guard aircraft assigned to the Aerospace Control Alert mission, and those aircraft crews maintaining proficiency and readiness in other mission areas critical to full-spectrum combat readiness. The committee also notes the Army National Guard continues to experience modernization shortfalls in utility rotorcraft and heavy-lift rotorcraft.

The committee believes additional funds would help eliminate identified critical dual-use equipment shortfalls. The committee expects these funds to be used for the purposes of, but not limited to, the procurement of rotorcraft, avionic and radar upgrades for legacy strike fighter aircraft to include Navy Reserve F–18 strike fighters, wheeled and tracked combat vehicles, tactical wheeled vehicles, ammunition, small arms, tactical radios (to include single channel ground and airborne radio systems), non-system training devices, logistics automation systems, sense and avoid system upgrades for unmanned aerial systems, civil support communication systems, hail and warning escalation of force systems, out of band infrared pointer and illumination systems, near infrared aiming and illumination systems, crashworthy and ballistically tolerant auxiliary fuel systems, Engagement Skills Trainer II systems, F–16 distributed-operations mission training centers, mobile ad hoc network emergency communications equipment, commercial Wi-Fi

upgrades for operational support aircraft, and other critical dual-use, unfunded procurement items for the National Guard and Reserve Components.

The committee recommends additional funding for a National Guard and Reserve Component equipment account within the Overseas Contingency Operations budget request. The committee also recommends $1.5 billion, the full amount of the base budget request, for National Guard and Reserve equipment.

## LEGISLATIVE PROVISIONS

### Subtitle A—Authorization of Appropriations

#### Section 1501—Purpose and Treatment of Certain Authorizations of Appropriations

This section would establish the purpose of this title and make authorization of appropriations available upon enactment of this Act for the Department of Defense, in addition to amounts otherwise authorized in this Act, to provide for additional costs due to Overseas Contingency Operations and other additional funding requirements.

#### Section 1502—Procurement

This section would authorize additional appropriations for Procurement at the levels identified in section 4102 of division D of this Act.

#### Section 1503—Research, Development, Test, and Evaluation

This section would authorize additional appropriations for Research, Development, Test, and Evaluation at the levels identified in section 4202 of division D of this Act.

#### Section 1504—Operation and Maintenance

This section would authorize additional appropriations for operation and maintenance programs at the levels identified in section 4302 of division D of this Act.

#### Section 1505—Military Personnel

This section would authorize additional appropriations for military personnel at the levels identified in section 4402 of division D of this Act.

#### Section 1506—Working Capital Funds

This section would authorize additional appropriations for Defense Working Capital Funds at the levels identified in section 4502 of division D of this Act.

#### Section 1507—Drug Interdiction and Counter-Drug Activities, Defense-Wide

This section would authorize additional appropriations for Drug Interdiction and Counter-Drug Activities, Defense-Wide, at the levels identified in section 4502 of division D of this Act.

Section 1508—Defense Inspector General

This section would authorize additional appropriations for the Office of the Inspector General at the levels identified in section 4502 of division D of this Act.

Section 1509—Defense Health Program

This section would authorize additional appropriations for the Defense Health Program at the levels identified in section 4502 of division D of this Act.

SUBTITLE B—FINANCIAL MATTERS

Section 1511—Treatment as Additional Authorizations

This section would state that amounts authorized to be appropriated by this title are in addition to amounts otherwise authorized to be appropriated by this Act.

Section 1512—Special Transfer Authority

This section would authorize the transfer of up to $2.50 billion of additional war-related funding authorizations in this title among the accounts in this title.

SUBTITLE C—LIMITATIONS, REPORTS, AND OTHER MATTERS

Section 1521—Afghanistan Security Forces Fund

This section would continue through December 31, 2018, the existing limitation on the use of funds in the Afghanistan Security Forces Fund, subject to certain conditions of section 1513 of the National Defense Authorization Act for Fiscal Year 2008 (Public Law 110–181), as amended by section 1531(b) of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 (Public Law 111–383).

This section would also require the Secretary of Defense, in consultation with the Secretary of State, to conduct a progress assessment on the efforts of the Afghan National Defense and Security Forces. The assessment would focus on accountability and anti-corruption efforts, the capability and capacity of the security forces, the success of the security forces in holding and defending territory, and the appropriate distribution of equipment. Taking into account the results of such an assessment, the Secretary of Defense may withhold funding from the Afghan Security Forces Fund. The Secretaries are required to notify the appropriate congressional committees within 30 days of the decision to withhold such funds.

Section 1522—Joint Improvised-Threat Defeat Fund

This section would amend subsections (b) and (c) of section 1514 of the John Warner National Defense Authorization Act for Fiscal Year 2009 (Public Law 109–364) to extend the use and transfer authority for the Joint Improvised-Threat Defeat Fund through fiscal year 2018. This section would also extend the authority for interdiction of improvised explosive device precursor chemicals to December 31, 2018.

# TITLE XVI—STRATEGIC PROGRAMS, CYBER, AND INTELLIGENCE MATTERS

## ITEMS OF SPECIAL INTEREST

### SPACE ACTIVITIES

#### Overview on National Security Space Organization

The committee believes that, without significant reorganization of the national security space enterprise, the United States is at serious risk of losing the competitive advantage it has maintained as a result of its use of space for national security.

As noted by the Secretary of the Air Force, and other Air Force leaders, in a joint testimony to Congress on May 17, 2017, "space is now a warfighting domain, similar to the more familiar air, land, and maritime domains our men and women are fighting in today." The committee agrees with this statement and recognizes the gravity of this fundamental shift.

The committee is concerned that our posture to address this shift is inadequate. As noted by the Commander of U.S. Strategic Command, "[t]he space enterprise is not resilient enough to successfully prosecute—or even survive—a high-end conflict which extends to space," and that without space "you go back to industrial age warfare," which was fraught with levels of casualties in military and civilian populations that are simply unacceptable today.

The national security space enterprise is not sufficiently structured to facilitate the evolution of the space domain into a warfighting domain. And, the committee is concerned that the current organization and management construct of the national security space enterprise jeopardizes the sustainment of U.S. dominance in space.

The committee notes that numerous studies and reports have cited systemic flaws in the organization and management structure of the national security space enterprise. Specifically, these reports consistently point to a fragmentation of leadership and authorities across the enterprise, which result in insufficient focus and priority on space and ineffective decision making.

The first major report, the "Commission to Assess United States National Security Space Management and Organization," also known as the Rumsfeld Commission, was mandated by section 1623 of the National Defense Authorization Act for Fiscal Year 2000 (Public Law 106–65). The executive summary of the report states, "[t]he Commission has unanimously concluded that organizational and management changes are needed . . . the Commission concluded that a number of disparate space activities should promptly be merged, chains of command adjusted, lines of communication opened and policies modified to achieve greater responsibility and accountability."

Subsequent reports on national security space management, oversight, and acquisition by the Institute for Defense Analyses in 2008 and the Government Accountability Office (GAO) in 2016, reaffirmed the issues raised by the 2001 Rumsfeld Commission. In July of 2016, the GAO published a report titled, "DOD Space Acquisition Management and Oversight," required by a provision in

the committee report (S. Rept. 114–49) accompanying the National Defense Authorization Act for Fiscal Year 2016, which "identified approximately 60 stakeholder organizations involved in space acquisitions." This report stated that "[i]n general DOD has not made any significant changes to space leadership over the last two decades."

The committee further notes the conclusions made by these reports are consistent with the testimony from former national security space leaders during hearings the committee has held on the space enterprise.

In September 2016, the Subcommittee on Strategic Forces held a hearing titled, "National Security Space: 21st Century Challenges, 20th Century Organization" with several retired space experts. During the hearing, each witness was asked if he believed, "we are adequately postured to address the serious challenges faced in space" to which all three witnesses responded unequivocally, "[n]o."

In March 2017, the Subcommittee on Strategic Forces held a joint hearing with the House Committee on Homeland Security Subcommittee on Emergency Preparedness, Response, and Communications where several former national security leaders testified on the severity of threats facing U.S. space systems, the consequences of their loss, and an assessment of what has been done to address such threats. During his testimony, the former commander of Air Force Space Command summed up what has been done to improve U.S. posture in space since the 2007 Chinese anti-satellite weapon test, stating, "10 years of innumerable studies and policy debates have not produced tangible improvements in our space protection posture."

In May 2017, the Director of the National Reconnaissance Office testified to the Subcommittee on Strategic Forces, stating, "staying ahead of the adversaries who threaten our space capabilities is a challenge. Those adversaries are making space a priority. The U.S. has not been keeping pace. I believe we have not made the investment that would indicate space is a priority or fundamental to the U.S. Our requirements, budget, and acquisition processes are disconnected, and none of them moves quickly."

The committee believes several guiding principles must be addressed to solve these longstanding organization and management issues. First, bureaucracy should be reduced, roles and responsibilities clarified, and a person should be empowered with the proper authorities to lead the national security space enterprise. Second, space needs to be prioritized equally with the land, air, and maritime domains of conflict. Third, there needs to be a clearly identified cadre of space professionals who are trained, promoted, and sustained as space experts. Lastly, there needs to be an integrated national security space program.

Therefore, the committee recommends a legislative reorganization of the Department of Defense national security space structure that would:

(1) create a Space Corps within the United States Air Force to posture and properly focus the preponderance of our military services to protect U.S. interests in space; deter aggression in, from, and through space; and provide combat-ready space forces that enable combatant commanders to fight and win wars;

(2) elevate national security space operations within the combatant command structure by creating a subunified combatant command for space within U.S. Strategic Command and strengthen operational leadership of space in the Department; and

(3) eliminate unnecessary bureaucracy by terminating the Principal Department of Defense Space Advisor office and function, as well as the Defense Space Council construct.

### Certification of Reusable Launch Vehicles for National Security Space Missions

The committee is aware of the recent successful re-launch of an Evolved Expendable Launch Vehicle-class launch vehicle that had previously been used to deliver a payload to orbit. The potential to reuse launch vehicles for orbital space launch has the potential to significantly reduce the cost of space launch in the commercial sector and for national security space launches.

The committee believes that the Air Force should move rapidly to evaluate how to leverage this commercial technology in order to meet national security space requirements. Reusability offers the potential to enable the Department of Defense to further lower the price of national security space launch.

The committee believes that the government should move rapidly to evaluate the use of reusable space launch vehicles. Accordingly, the committee directs the Secretary of Defense to brief the Committee on Armed Services of the House of Representatives not later than March 1, 2018 on the Department's plan to evaluate the risks, benefits, costs and potential cost-savings of the use of reusable launch vehicles for use in national security space missions.

### Commercial Geospatial Intelligence

The committee supports the National Geospatial-Intelligence Agency's (NGA's) leadership in acquiring new and non-traditional sources for geospatial intelligence, including commercial geospatial intelligence data and services as part of its combat support mission. Commercial geospatial intelligence provides significant benefit to the Department of Defense, particularly in terms of increasing capability, providing cost-savings, and enhancing opportunities for sharing unclassified products with multinational coalition partners. Additionally, approximately 90 percent of NGA's foundational geospatial intelligence, to include mapping, navigation, and aeronautical charts, is derived from commercial imagery sources. Along with evolving current commercial capabilities, there are new commercial endeavors of space and ground exploitation which will likely offer opportunities from which the Department can benefit. For instance, there are commercial companies that are utilizing machine learning techniques and capabilities to automate and extract additional information from commercial imagery, which will enhance and maximize analytical capabilities. The committee encourages the NGA Director to continue to lead the Department in current and new sources of geospatial intelligence collection and exploitation, and to keep the committee informed of its progress.

Comptroller General Review of Hosted Payloads

The committee is aware that the Air Force is working to strengthen processes to ensure greater consideration of hosted payloads in space-related analysis of alternatives and architecture studies. Of note, the Air Force has undertaken some efforts to study, contract for, and use hosted payloads for technology development, but it appears the Air Force has done little to operationally use hosted payloads. The committee is concerned that the acquisition process may not fully consider the use of hosted payloads. Therefore, the committee directs the Comptroller General of the United States to provide a briefing to the House Committee on Armed Services by February 1, 2018, on the following:

(1) the Department of Defense's use of hosted payload arrangements to date;

(2) the extent to which the Department has the knowledge it needs, from the perspectives of cost, capability, and resilience, to determine whether to expand its use of hosted payloads;

(3) the extent that hosted payloads are appropriately considered throughout the acquisition process, including how acquisition requirements are written and how they impact the option to use hosted payloads; and

(4) barriers or challenges the Department faces for increasing its use of hosted payloads.

Global Positioning System

The committee is aware that the Air Force is developing an acquisition strategy for Global Positioning System (GPS) block III space vehicles 11 and beyond. The Air Force is anticipating a full and open competition for up to 22 space vehicles, with production starting in fiscal year 2019. The committee supports the GPS III program, and recommends the Air Force leverage the existing nonrecurring investment and technical risk reduction when developing an acquisition plan for future space vehicles. The committee continues to support evolutionary acquisition for space vehicles with technology insertion plans to meet warfighter requirements.

Multi-Band Satellite Communications Terminals

The committee is aware that satellite communications provide significant capabilities to deployed forces to communicate around the globe. The Department of Defense uses various satellite communication frequency ranges, each with advantages and drawbacks, to meet its mission. The committee also recognizes that potential adversaries are developing counter-space capabilities, to include but not limited to, systems which are designed to interfere with satellite communications. The committee therefore believes that warfighters may benefit from flexible user terminals which can communicate with a variety of government and commercial satellite systems. Therefore, the committee directs the Secretary of Defense to provide a briefing to the congressional defense committees by December 1, 2017, on an assessment, including benefits, costs, technology insertion opportunities, and timelines to expand the use of dual or multi-band satellite communication terminals. The briefing shall address:

(1) a review of fielded and projected Department of Defense platforms and mission sets using satellite communications terminals;

(2) a review of commercial and government satellite communications capabilities;

(3) an assessment of the viability, benefits, and drawbacks if applicable, of using dual or multi-band satellite communications terminals for all or some of the identified platforms and mission sets; and

(4) any other matter the Secretary deems appropriate.

Outer Space Cooperation With Japan

The committee encourages further outer space cooperation between the United States and Japan. The committee notes that the guidelines for defense cooperation between the United States and Japan issued in April 2015 include openness to cooperation in several areas, including areas relating to outer space. The committee further notes the Japanese QZSS regional navigation satellite system could potentially complement and augment the coverage provided by the Global Positioning System of the United States and improve availability of space-based position, navigation, and timing signals in the Asia-Pacific region.

Therefore, the committee directs the Secretary of Defense, jointly with the Chairman of the Joint Chiefs of Staff, and in coordination with the Secretary of State, to submit a report to the Committees on Armed Services of the Senate and the House of Representatives, the Committee on Foreign Affairs of the House of Representatives, and the Committee on Foreign Relations of the Senate by December 1, 2017, on the status of cooperation between the United States and the Government of Japan regarding outer space activities, including with respect to space-based position, navigation, and timing.

Reliance on Global Positioning System for Defense of the Homeland

The committee is aware that the Department of Defense is coordinating with the Department of Transportation and the Department of Homeland Security on efforts to strengthen positioning, navigation, and timing (PNT) capabilities, including considering redundant systems. The committee notes that section 1618 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) required a report on requirements and technology options to address PNT resilience. In addition to this assessment, the committee directs the Secretary of Defense, in coordination with the Commander of U.S. Northern Command, to provide a briefing to the Committee on Armed Services of the House of Representatives by December 15, 2017, on the risks associated with disruptions to the Global Positioning System (GPS) that could affect defense of the homeland and other defense activities in the United States. The briefing shall include the requirements for PNT reliability and redundancy for Department of Defense operations in the United States, an analysis of the extent to which defense of the homeland operations rely on accurate PNT signals from GPS, and an assessment of alternative sources of PNT that could be used as a backup to ensure continuity of operations in the event of a major disruption to GPS.

## Responsive Launch

According to the Department of Defense budget request documentation, U.S. Strategic Command (USSTRATCOM) has identified needs to:

(1) rapidly augment existing space capabilities when needed to expand operational capability;

(2) rapidly reconstitute/replenish critical space capabilities to preserve "continuity of operations" capability; and

(3) rapidly exploit and infuse space technological or operational innovations to increase U.S. advantage.

There have been a variety of previous and ongoing activities within the Air Force, Army, and the Defense Advanced Projects Research Agency to develop responsive launch capabilities. To date, none of these programs have matured to the point of a military operational capability that meets USSTRATCOM needs.

Therefore, the committee encourages the Secretary of Defense to increase the priority and resources of this mission area. This could include low-cost responsive launch for small satellites and modifications of existing launch infrastructure, including use of commercial capabilities. Additionally, the committee believes that state-owned spaceports may provide an opportunity to support this mission. The committee encourages the Department to evaluate the contribution and necessary investments in spaceports to support responsive launch.

The committee also directs the Secretary of Defense to provide a briefing to the Committee on Armed Services of the House of Representatives by December 1, 2017, on the warfighter requirements and documented needs for reconstitution and responsive launch; the current and projected activities to meet those requirements, to include investments in launch systems, infrastructure, and payloads; and the opportunities, risks, and challenges in this mission area.

## Small Satellite Technology Development

The committee supports the efforts of the Department of Defense to include the Air Force, Army, and Navy in the research and development of militarily relevant small satellites. Industry has made significant advances in recent years regarding the miniaturization of electronics and satellite-related components. The military services have begun to leverage this innovative technology. For instance, the Air Force is planning to invest in key mission areas, such as position, navigation, and timing, to develop a combination of small satellites and rapidly procured payloads. In addition, the Air Force's Space and Missile Systems Center has begun planning for utilization of small satellites in fulfilling its mission requirements. The Army Space and Missile Defense Command is building and testing multiple small satellites for warfighters' tactical use in contested, remote, and anti-access/area denial regions. The U.S. Naval Research Laboratory has worked on unique satellite capabilities, such as thruster technologies, to support efforts for smaller, less expensive satellites.

The committee supports these activities and encourages continued emphasis on the research and development of small satellites, including the maturation of small satellite technologies which sup-

port warfighter systems, as these systems can provide lower-cost solutions and increase agility and resiliency to address developing threats. The committee also encourages the Department to initiate and use commercial partnerships and demonstration efforts to procure small satellites for demonstrations relevant to military missions.

Therefore, the committee directs the Secretary of Defense, in coordination with the Secretaries of the Air Force, Army, and Navy, and the directors of defense agencies and offices as appropriate, to provide a briefing to the Committee on Armed Services of the House of Representatives by December 1, 2017, on the military applications of small satellites and a coordinated Department-wide strategy for technology development activities and investments in small satellites.

Space Commercial Antenna Service

The committee is aware that the Air Force is pursuing activities that augment the Air Force Satellite Control Network with commercial capabilities. The goal of these activities is to enhance resiliency, reduce costs, and leverage commercial systems in a timely, modern, and more automated fashion. The committee supports the continued investments in this area and encourages the Secretary of the Air Force to prioritize this endeavor.

Space Security

The committee is aware of the significant and increasing foreign threats to our national security space systems. Officials in the Department of Defense recognize this counter-space threat, and are taking steps to address it. However, as stated by General John Hyten, former Commander of Air Force Space Command and current Commander of U.S. Strategic Command, the space enterprise which evolved in an uncontested environment is not resilient enough to fight through and deliver warfighting effects in, from, and through today's contested space domain.

This lack of military preparedness for this new battlespace domain is of serious concern to the committee. The committee recognizes that the response to such threats will require a range of activity to include, but not limited to, investments, plans, training, allied partnerships, clear messaging, and diplomatic engagement. The committee requires close oversight of the progress being made in this area.

Therefore, the committee directs the Secretary of Defense to provide two briefings to the congressional defense committees in fiscal year 2018, the first by December 1, 2017, and the second by July 1, 2018, on the plans and progress in addressing counter-space threats. The briefings should address the following areas:

(1) intelligence analysis regarding current and projected foreign counter-space threats;

(2) status of the Department of Defense activities, plans, policies, and programs to address the threat, including effectively managing deterrence in space;

(3) areas of significant risk; and

(4) other areas the Secretary deems appropriate.

Space Situational Awareness and Battle Management Command and Control

The committee recognizes the importance of rapidly developing robust space situational awareness (SSA) and space battle management command and control (BMC2) capabilities in order to successfully operate in the space warfighting domain. The committee is aware that there are multiple acquisition and development efforts underway in response to warfighter requirements, including the Joint Space Operations Center Mission System (JMS) and Enterprise BMC2 program, managed by the Space and Missile Systems Center (SMC); a Joint Emergent Operational Need (JEON) spiral development program, managed by the Air Force Research Laboratory (AFRL); and a common standards and open mission system development program, managed by the Air Force Rapid Capabilities Office (AFRCO). SMC is serving as the enterprise manager for these BMC2 activities, which, when developed and acquired, will be delivered to the warfighter to operate at the Joint Space Operations Center (JSpOC) and the National Space Defense Center (formerly called the Joint Interagency Combined Space Operations Center).

The committee believes that, in addition to the aforementioned activities, the use of commercial capabilities can and should be increased to rapidly meet the warfighter requirement. The committee understands that SMC, AFRL, and AFRCO plan to, in the near term, competitively seek commercial solutions and to form a consortia to include additional commercial and defense industry partners in BMC2 efforts.

The committee supports these activities and plans, and expects the Air Force to appropriately leverage commercial capabilities, which may be able to address certain warfighter requirements in the near term.

Therefore, the committee directs the Commander of Air Force Space Command, in coordination with the Commander of U.S. Strategic Command, to provide a briefing to the Committee on Armed Services of the House of Representatives by October 1, 2017, on an assessment of relevant commercial capabilities and the near-term plan to leverage existing and mature commercial space situational awareness capabilities to rapidly address validated warfighter capability gaps concerning foundational SSA and BMC2. The briefing should include funding amounts, including any unfunded requirements, for development, operations, and sustainment of the following components:

(1) space surveillance sensor systems
(2) SSA software for operations centers
(3) BMC2 software for operations centers.

Additionally, considering the complexity and scope of this activity, the committee directs the Comptroller General of the United States to review the Air Force Enterprise Space BMC2 activities, to include JMS, and provide a briefing to the congressional defense committees by November 1, 2017, with an update briefing not more than 6 months later, on the status of the program, the extent to which the Air Force is following acquisition best practices for information technology, and whether it is appropriately leveraging commercial capabilities.

Use of Surplus Intercontinental Ballistic Missile Motors for Commercial Space Launches

In the committee report (H. Rept. 114–537) accompanying the National Defense Authorization Act for Fiscal Year 2017, the committee directed the Secretary of Defense to provide a briefing to the congressional defense committees on the range of options and recommendations for modification of the existing policy on the usage of intercontinental ballistic missile (ICBM) motors for commercial sales that would support the domestic industrial base. The committee has yet to receive this briefing, or the subsequent assessment from the Comptroller General of the United States.

The committee continues to believe that modification to the law in order to allow for increased commercial use of decommissioned U.S. ICBM motors could yield benefits for the U.S. domestic launch industry and payload launching capacity while also saving the U.S. Air Force excess motor storage costs. However, the committee also recognizes the concerns regarding unintended negative consequences for the U.S. commercial space industrial base resulting from such a change in policy.

The committee encourages the Secretary to finish the comprehensive study and provide the results to Congress in order to inform potential future legislation.

MISSILE DEFENSE PROGRAMS

Hypersonic Defense

The budget request contained $75.3 million in PE 64181C for the development of a defensive system to protect the nation from rapidly evolving hypersonic glide vehicle threats. The committee supports Missile Defense Agency (MDA) plans to develop requirements, conduct necessary engineering, and proceed with experiments that ultimately result in a fielded defensive architecture or system of systems. However, the committee is concerned that the current acquisition approach may increase risk by relying on a single technical approach.

Therefore, the committee directs the Director, MDA, to provide a briefing to the Committee on Armed Services of the House of Representatives by October 1, 2017 that details the potential benefits, challenges, and associated costs of an acquisition strategy allowing for at least two competitive designs until the operational demonstration. Further, the briefing should address whether this acquisition strategy requires additional funds than the current program of record.

Improving Ground Testing of the Ground-Based Midcourse Defense System

The committee notes the congressional requirement included in section 1664 of the Carl Levin and Howard P. “Buck” McKeon National Defense Authorization Act for Fiscal Year 2015 (Public Law 113–291) for an independent report to improve the effectiveness of the Ground-Based Midcourse Missile Defense system testing. The committee received this classified report from the Institute for Defense Analyses in 2016 which made recommendations related to improving testing, and recommended that the Director of the Mis-

sile Defense Agency develop a strategy for making these improvements. The committee commends the Director of the Missile Defense Agency for considering and accepting these recommendations. The committee remains interested in the implementation of these recommendations, and whether and how they might improve cost-effectiveness, reduce unnecessary risks, and increase the value of missile defense flight intercept tests. Therefore, the committee directs the Director of the Missile Defense Agency to provide a briefing to the Committee on Armed Services of the House of Representatives not later than November 1, 2017, on the implementation of the recommendations, any related funding requirements, and, any associated risk-reduction that is expected to occur as a result of implementing the recommendations.

### Low Cost Missile Defense Initiative

The committee is aware that the Department of Defense has undertaken a multiyear development effort referred to as the Low Cost Missile Defeat (LCMD) study, which began in fiscal year 2015 with technology development efforts under the purview of the Deputy Assistant Secretary of Defense for Emerging Capability and Prototyping, driven by requirements of the geographic combatant commands. The objective of this study is to assess options for ballistic missile defense (BMD) interceptors that cost between one-tenth to one-half of the cost of current regional BMD interceptors, and to identify the changes required for integration into an existing weapon system. The committee notes that such interceptors are intended to augment, not replace, the stockpile of existing interceptors.

The National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) supported the budget request of $50.0 million to continue the LCMD studies. The committee is also aware that the U.S. Army and the Missile Defense Agency have undertaken an analysis of alternatives-like study of LCMD that is due to be completed by July 31, 2017, concerning the path forward for LCMD. The committee expects to be briefed on the results of this study within 1 month of its completion. The committee further expects that, consistent with established means for reprogramming of funds, it will be consulted prior to any transfer of funding authorized to be appropriated for the LCMD study effort for any other purpose.

### National Missile Defense Policy Change and Adversary Reactions

The Fiscal Year 2017 National Defense Authorization Act changed the National Missile Defense Policy (NMDP) Act of 1999. Since 1999, it had been the policy of the United States "to deploy as soon as is technologically possible an effective National Missile Defense system capable of defending the territory of the United States against limited ballistic missile attack (whether accidental, unauthorized, or deliberate)."

The NDAA changed this policy to state that it is now the policy of the United States "to maintain and improve an effective, robust layered missile defense system capable of defending the territory of the United States, allies, deployed forces, and capabilities against the developing and increasingly complex ballistic missile threat."

The committee wishes to understand what, if any impact this has had on Russian or Chinese defense policy, including nuclear weapons and ballistic missile defense development programs. Therefore, the committee directs the Secretary of Defense, in coordination with the Director of the Defense Intelligence Agency to submit a report to the Committees on Armed Services of the House of Representatives and the Senate and the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence not later than December 15, 2017 on any impact to Russian or Chinese defense policy, including nuclear weapons and ballistic missile defense development programs resulting from past and present U.S. missile defense policy. This report should be unclassified, but may include a classified annex.

### Plan To Assess the Acquisition of Missile Defense Targets

The committee is interested in assuring the most effective and efficient acquisition of ballistic missile target vehicles used for ballistic missile defense tests. The committee is particularly mindful that, as the pace of ballistic missile defense flight intercept testing increases, the Missile Defense Agency will require the timely and cost-effective delivery of additional ballistic missile targets.

Therefore, the committee directs the Director of the Missile Defense Agency to submit a report to the Committee on Armed Services of the House of Representatives, not later than January 15, 2018, that assesses the options for acquisition strategies that could lead to more affordable, threat-representative, and reliable targets.

### Sea-Based X-Band Radar

The Committee notes that the Fiscal Year 2018 budget request contained $130.7M in Research, Development, Test, and Evaluation, Defense-Wide for the Sea-Based X-band (SBX) radar. The committee is also aware that this request includes funding to extend on-station time from 120 days at sea to 330 days at the request of the U.S. Pacific Command and U.S. Northern Command.

The committee recognizes that the SBX radar is a critical component of the U.S. ballistic missile defense system, providing critical track and discrimination capabilities to the Missile Defense Agency, combatant commanders, and the intelligence community in defense of the United States homeland and territories. In response to the intensifying ballistic missile threat in the Asia-Pacific region, the committee strongly supports full funding for the SBX Radar and extending on-station time to 330 days. In particular, the SBX radar will play an important role to provide continued track and discrimination information for the ballistic missile defense of Hawaii. The committee remains concerned about ballistic missile defense coverage for Hawaii as the SBX system transitions into depot maintenance in 2020, well ahead of the planned initial operational capability of the planned Homeland Defense Radar-Hawaii or equivalent capability.

Therefore, the Committee directs the Director of the Missile Defense Agency to brief the congressional defense committees by December 1, 2017 on the maintenance plan, and near-term and long-term sustainment costs for the SBX radar until an operational medium-range discrimination radar or equivalent capability is avail-

able for the defense of Hawaii, as well as the Agency's plans to more fully integrate the SBX radar into the ballistic missile defense architecture, and how it plans to mitigate any gaps in coverage resulting from the SBX radar's depot maintenance availability.

## NUCLEAR FORCES

### Briefing on Commonality Related to the Ground-Based Strategic Deterrent Program

The committee directs the Under Secretary of Defense for Acquisition, Technology, and Logistics to provide a briefing to the Committees on Armed Services of the Senate and House of Representatives by February 1, 2018, on the degree of commonality with other missile and rocket systems—such as Trident II D5, Ground-based Missile Defense, civilian or commercial rockets, and others—are included within the concepts proposed by the contractors awarded technology maturation and risk reduction contracts for the Ground-Based Strategic Deterrent program. Such briefing should include a discussion of:

(1) the degree and types of commonality within the concepts proposed;

(2) the incentives that were included in the request for proposals to encourage solutions and concepts that include common technologies or components, where appropriate; and

(3) how the proposals were evaluated for commonality or related savings in making contract awards.

### Briefing on the 3+2 Strategy and Interoperable Warhead 1 (IW–1)

The Obama Administration's nuclear modernization plan centered upon a "3+2" strategy that was intended to reduce the number of nuclear weapons and types of nuclear weapons in the U.S. stockpile. In the budget request for fiscal year 2018, the Trump Administration has proposed continuing this strategy for the coming year while evaluating its long-term plan within the ongoing Nuclear Posture Review.

The first ballistic missile warhead in the 3+2 strategy is the Interoperable Warhead 1 (IW–1), which would replace the current W78 and W88 warheads and provide some degree of interoperability or commonality between these sea-based and land-based weapons. According to the National Nuclear Security Administration's (NNSA) Fiscal Year 2017 Stockpile Stewardship and Management Plan, published in March 2016, the IW–1 is estimated to cost between $9.0 billion and $13.8 billion (in FY2016 dollars) and to enter production in 2029.

The committee is aware that the Nuclear Posture Review is assessing the long-term nuclear modernization plan and evaluating how this plan aligns with adversary threats to the effectiveness and credibility of U.S. nuclear forces. As the threat environment changes throughout the coming decades, the committee believes a thorough evaluation of its impacts to long-term programs, such as IW–1, is warranted.

To enable its oversight and inform its eventual consideration of the Nuclear Posture Review, the committee directs the Chairman

of the Nuclear Weapons Council to provide a briefing to the House Committee on Armed Services by February 15, 2018 on both the 3+2 strategy and IW–1. The briefing should include an assessment of:

(1) the costs, benefits, risks, and opportunities of the 3+2 strategy;

(2) the degree of interoperability or commonality within the IW–1 concept, and the costs, benefits, risks, and opportunities associated with that concept;

(3) the implications to certification requirements of the IW–1 concept, including whether such concept increases the potential need to resume nuclear explosive testing;

(4) the expected threats to U.S. nuclear forces in 2030 and beyond, and whether such threats should affect or change the 3+2 strategy or the requirements for IW–1 and its associated missile delivery vehicles; and

(5) whether and how the 3+2 strategy or IW–1 is driving infrastructure or capability requirements within the NNSA or DOD nuclear enterprises, and whether such infrastructure or capabilities would not be required absent such strategy or IW–1.

## Comptroller General Review of Nuclear Forces Readiness During Recapitalization and Transition

The Department of Defense is embarked on a large, complex, and interdependent effort to sustain and modernize U.S. nuclear forces. Current delivery systems, infrastructure, and nuclear command, control, and communications (NC3) systems are all aging, with many systems now deployed well beyond their intended service lives. For example, the Minuteman III missile system was first deployed in 1970 and, following multiple life extension efforts, is intended to stay in service through 2030. *Ohio*-class ballistic missile submarines will, by 2020, have been in service longer than any other submarines and will still have more than a decade until retirement. Meanwhile, the youngest airplane in the B–52 bomber fleet was delivered to the Air Force in 1962 and the B–2 bomber entered service 25 years ago.

The Department's plans to recapitalize these major systems concurrently are tightly scheduled and closely coupled to plans to sustain and maintain the readiness of the current systems until the new systems are fully operational. The committee believes the success of maintaining the readiness of nuclear forces at all times, but particularly during this transition period, is vital to national security. Therefore, the committee directs the Comptroller General of the United States to assess the readiness of U.S. nuclear forces and provide a report to the Committees on Armed Services of the Senate and the House of Representatives by March 1, 2018. Such report should include an assessment of:

(1) the historical and current status of nuclear forces readiness, including how well such forces and NC3 systems are meeting combatant commander requirements;

(2) the Department's strategy and plans, for maintaining the readiness of legacy delivery systems and NC3 systems until modern replacement systems are operational;

(3) the Department's risk mitigation plans for maintaining nuclear forces readiness and meeting combatant commander require-

ments during the transition from legacy systems, including risk reduction plans if legacy systems expire sooner than planned or new systems are delayed.

### Continuation of Nuclear Command, Control and Communications Acquisition Assessments by the Government Accountability Office

The committee values the ongoing work of the Government Accountability Office (GAO) in reviewing the progress and challenges facing the Department of Defense's nuclear command, control, and communications (NC3) acquisition programs. Similar to space acquisition programs, NC3 acquisition is a system of systems process, which takes years to oversee on a continuous basis to determine if the programs are achieving their cost, schedule, and performance goals. The committee supports the Department's continuing efforts to establish new and rigorous NC3 acquisition oversight structures to address NC3 capability gaps and weaknesses. However, much work remains to be done to establish these oversight structures at both the departmental and military services levels.

Therefore, the committee directs the Comptroller General of the United States to assess the Department's NC3 acquisition oversight and NC3 acquisition programs, as well as its progress in developing and implementing an overall NC3 architecture. The committee further directs the Comptroller General to provide a briefing to the congressional defense committees by March 1, 2018, on the results of GAO's assessment for fiscal year 2018. In conducting the assessment, the Comptroller General should include, as the Comptroller General deems appropriate, the insights of both Department of Defense and non-Department entities that have relevant NC3 knowledge. The Department organizations include, but are not limited to, the Office of the Secretary of Defense (Nuclear Matters, Cost Assessment and Program Evaluation, Chief Information Office), the military services, the Joint Staff, U.S. Strategic Command, Defense Information Systems Agency, and Department of Defense independent test offices. The non-Department entities include federally funded research and development centers, university affiliated research centers such as the Johns Hopkins University Applied Physics Laboratory, contractors, the White House Military Office, and industry groups. Finally, the committee encourages the Comptroller General to conduct periodic updates of such an assessment in consultation with the congressional defense committees.

### Countering Threats From Unmanned Aircraft Systems

With their rapidly increasing ubiquity, ease of use, and capabilities, the committee continues to be concerned that unmanned aircraft and unmanned aircraft systems (UAS) are a growing and significant threat to U.S. defense assets and U.S. national security more broadly. Sections 1697 and 3112 of the National Defense Authorization Act (NDAA) for Fiscal Year 2017 (Public Law 114–328) represent a first step to provide clear and direct authority to the Secretary of Defense and the Secretary of Energy to protect the nation's most critical defense facilities and assets from threats posed by UAS.

However, it appears that the administration has been slow to implement this statutory authority into guidance and directives that provide clear rules of engagement to security forces on the ground. In testimony before the committee on March 8, 2017, the Commander of U.S. Strategic Command noted that progress has been slow. More recently, the commander promulgated implementing guidance for countering UAS threats to facilities and assets under the authority of U.S. Strategic Command. The committee applauds this action and encourages the broader Department of Defense and the Department of Energy to take similar action without further delay.

Elsewhere in this Act, the committee includes a provision that would expand the counter-UAS authority provided by section 1697 of Public Law 114–328, as contained in section 130i of title 10, United States Code. The committee stresses that this proposed expansion must not slow down implementation of the existing authority.

### Future of Nuclear Deterrence and the Joint Strategic Deterrence Review Process

In late 2013 and early 2014, the Secretary of Energy tasked the directors of the U.S. national security laboratories to study the future of nuclear deterrence, saying in a tasking memorandum dated May 9, 2014, "The current stockpile was designed to meet the needs of a bipolar world with roots in the Cold War era. A more complex, chaotic, and dynamic security environment is emerging . . . we must look ahead, using the expertise of our laboratories, to how the capabilities that may be employed by other nations could impact deterrence over the next several decades [and] . . . we must challenge our thinking about our programs of record."

Later that year, the directors submitted to the Secretary the study report, which was eventually submitted to Congress pursuant to section 3138 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328). Subsequent to the study, the Department of Defense and Department of Energy continued to develop a framework for considering the changing global strategic environment and how such changes may impact U.S. nuclear deterrence requirements and capabilities. In December 2016, the Deputy Secretary of Defense and the Deputy Secretary of Energy created the Joint Strategic Deterrence Review (JSDR) process to institutionalize and perpetuate a structure for considering these matters.

The committee believes the JSDR process is an important tool for understanding the increasingly dynamic security environment that has emerged regarding nuclear deterrence and its implications for U.S. defense posture and policy. The committee urges the current administration to review and leverage this work and the JSDR process as it continues its ongoing Nuclear Posture Review.

### Nuclear Assurance and Deterrence Science, Technology, Innovation, and Collaboration

Air Force Global Strike Command (AFGSC) was established, and later elevated to a four-star command, to help address problems within the Air Force's nuclear enterprise and bring sustained senior leadership focus to the nuclear deterrence mission. AFGSC

leads Air Force efforts for both nuclear deterrence operations (NDO) and the National Leadership Command Capabilities/Nuclear Command, Control, and Communications (NLCC/NC3) system. The committee recognizes AFGSC's efforts, and believes sustained, focused, and consolidated attention on these issues will be required as the Air Force carries out its portions of the nuclear modernization program.

The committee is aware of AFGSC's strategy to enhance science, technology, innovation, and collaboration related to its missions. This nascent strategy includes outreach to academic institutions and researchers, cooperation and investment in multidisciplinary teams and programs, and creation of an institute for NLCC/NC3 and NDO. The committee expects these efforts to provide AFGSC the analytical foundation and access to expertise needed to carry out its important NDO and NLCC/NC3 missions.

### Nuclear Command, Control, and Communications Systems Modernization

The committee recognizes that maintaining and modernizing the nuclear command, control, and communications (NC3) system is a critical effort in the overall modernization of the nation's nuclear infrastructure. The committee notes the ongoing challenges in recapitalizing the NC3 architecture and expects continuous focus on these efforts after decades of neglect. The committee encourages the Department of Defense, and particularly the Air Force, which is responsible for acquiring and sustaining the preponderance of these systems, to move forward with NC3 modernization expeditiously to avoid further delays and potential capability gaps. Given the sensitive nature and prioritization of the mission, the committee expects that the Air Force is planning appropriately to ensure that secure facilities are available to enable NC3 recapitalization efforts.

### Nuclear Security Collaboration and Harmonization

The committee continues to encourage the Department of Defense and the National Nuclear Security Administration to collaborate and share expertise, resources, standards, processes, and lessons learned to more effectively and efficiently safeguard the nation's nuclear weapons and special nuclear materials. This collaboration began pursuant to a December 2011 memorandum of agreement between the Deputy Secretary of Defense and the Deputy Secretary of Energy, but it took several years for implementation to truly begin. Recent efforts to collaborate on development and validation of security technologies, develop and implement tools like the Joint Integrated Lifecycle Surety (JILS) system, and understand threats, are positive.

The committee encourages the Department of Defense and Department of Energy to recommit to the principles contained in the 2011 memorandum and establish milestones and a roadmap to carry out the activities called for within it. The committee believes more can be done to take common approaches to technology development and validation, share inspection and force-on-force capabilities and approaches, and take more consistent approaches to threat policies and security risk analyses. The committee believes these

steps will reduce costs, improve consistency, and lead to improved nuclear security.

The committee directs the Administrator for Nuclear Security, in coordination with the Chairman of the Nuclear Weapons Council and appropriate representatives from the Navy and Air Force, to provide a briefing to the Committees on Armed Services of the Senate and the House of Representatives by November 30, 2017, on progress in nuclear security collaboration and their plan or roadmap for future activities.

### Office of the Secretary of Defense Oversight and Organization for the Nuclear Deterrence Mission

The committee recognizes and appreciates the importance and priority placed by the Department of Defense on its nuclear deterrence mission. The Department's Nuclear Enterprise Review (NER) in 2014 brought renewed senior leadership attention to the mission and made a variety of recommendations to make improvements through increased focus, investment, and policy adjustments.

To track and ensure meaningful implementation of the recommendations of the NER, the Department created the Nuclear Deterrence Enterprise Review Group (NDERG), headed by the Deputy Secretary of Defense and supported by the Office of Cost Assessment and Program Evaluation (CAPE). The committee believes the NDERG was instrumental in correcting many of the longstanding problems and deficiencies identified by the NER. But the committee also believes that key cultural problems identified by the NER will take many years of continuous, high-level engagement and follow-through to successfully address. The committee is concerned that senior leader attention and engagement on the nuclear mission could wane with the transition of senior personnel between administrations.

The committee therefore directs the Deputy Secretary of Defense to provide a briefing to the Committees on Armed Services of the Senate and the House of Representatives by October 31, 2017, on the Department's approach to oversight and organization for the nuclear deterrence mission. Such briefing should include:

(1) a description of how the Department is following through on the recommendations of the NER and the NDERG process, and how the Department will ensure meaningful and successful remedies are being applied now and in the future;

(2) the Department's approach to ensuring senior leader engagement and focus continues for the nuclear deterrence mission;

(3) remaining gaps and challenges that will require ongoing attention, and metrics for measuring progress on those issues; and

(4) how the Office of the Secretary of Defense will be organized, taking into account recent legislation and executive actions, to oversee and steward the nuclear deterrence mission.

### Remote Visual Assessment System at Minuteman III Launch Facilities

The Air Force uses the Remote Visual Assessment (RVA) system to maintain situational awareness of activity at Minuteman III launch facilities. This important capability allows missile crews to remotely assess certain alarms and dispatch security forces accord-

ingly. The system has provided a significant improvement to the security and operations of the missile fields.

The committee is aware of early efforts to upgrade and modernize the RVA system as existing components become obsolete and unsupported by their original manufacturers. Such age and obsolescence can lead to increased failure rates and sustainment costs. The committee encourages the Air Force to closely examine its strategy for sustaining and upgrading the components and subsystems of the RVA system, the system's requirements and the ability of older technologies to meet those requirements, the value of procuring new systems, and the criteria used to determine schedules for component replacement.

Report on Ground Based Strategic Deterrent and Minuteman III

The United States currently deploys more than 400 LGM–30G Minuteman III intercontinental ballistic missiles. In the nuclear modernization program laid out by the Obama Administration and now continued by the Trump Administration's budget request for fiscal year 2018, the Air Force plans to replace the Minuteman III system with the Ground Based Strategic Deterrent (GBSD) system.

In testimony and reports provided to the committee by Department of Defense and Air Force officials, the total development and procurement costs for the GBSD program, including replacement of the missile flight system and recapitalization of all support ground infrastructure and command and control systems, will cost approximately $62.3 billion over the course of the 25+ year program. A separate analysis of the GBSD program by the Department of Defense's Office of Cost Assessment and Program Evaluation (CAPE) estimated the cost of development and procurement of the GBSD system in a range from $85.0 billion to significantly more than $100.0 billion (in then-year dollars). Ultimately, at the Milestone A decision for GBSD, the Under Secretary of Defense for Acquisition, Technology, and Logistics set a baseline cost for the program at CAPE's lower estimate.

The committee acknowledges the challenge of estimating replacement costs for a system first deployed 47 years ago, particularly when historical data is largely absent and present-day comparison systems are dissimilar. To ensure the Department is seeking greater fidelity in its varying cost estimates as the GBSD program moves forward, the committee directs the Secretary of Defense, in coordination with the Secretary of the Air Force and the Director of CAPE, to provide a report to the House Committee on Armed Services by March 1, 2018, on cost estimates and requirements related to the GBSD program. Such report should include:

(1) Updates, based on information gathered from the selected contractors for the technology maturation and risk reduction phase of the GBSD program, from the Air Force and CAPE regarding their cost estimates for the development and procurement of the GBSD system;

(2) A detailed breakdown of the costs associated with life extending Minuteman III as compared to the costs of GBSD, including a breakdown of the costs to replace or extend the life of relevant components until 2045, as well as until 2075; and

(3) The trade-offs between requirements and costs, including how GBSD and Minuteman III will meet military effectiveness requirements over the course of their expected lifecycles.

### Status of Infrastructure Supporting NATO Nuclear Deterrence Mission

The committee appreciates the importance of the North Atlantic Treaty Organization's (NATO's) deterrence and defense mission, and the role that U.S. forward-deployed nuclear weapons play in the Alliance. The committee understands that NATO, the U.S., and individual host nations all bear responsibilities for ensuring that the infrastructure supporting NATO's nuclear deterrence mission and the U.S. military personnel stationed in Europe enabling that mission, are safe, secure, and modern. As NATO continues to strengthen and update its deterrence posture following the Warsaw Summit in July 2016, and based on the findings of the Department of Defense's Nuclear Enterprise Review in 2014, the committee believes it is imperative upon all stakeholders to ensure NATO's nuclear-related infrastructure receives sufficient funding and senior leadership attention.

The committee appreciates the ongoing dialogue with the Department of Defense on this issue. To provide continuing and close oversight of this issue, the committee directs the Secretary of Defense, acting through the Secretary of Defense Advisor, Europe, and in consultation with the Secretary of State and the Secretary of the Air Force, to provide two briefings to the Committees on Armed Services of the Senate and the House of Representatives, with the first such briefing to be provided by October 1, 2017, on the status of U.S. and NATO nuclear-related infrastructure in Europe, including efforts to upgrade, modernize, and improve such infrastructure. The briefings should also address plans to encourage NATO to adopt and implement a common standard for perimeter security at relevant sites. The final briefing should be provided by April 1, 2018. Specifically, the briefings should include:

(1) the status of nuclear-related infrastructure across NATO, including descriptions of facilities' state of repair and progress on efforts to recapitalize or replace outdated facilities or equipment, and including a description of any variances in perimeter security and infrastructure at relevant sites;

(2) current or potential plans, programs, or activities that would improve NATO's nuclear-related infrastructure, including for safety, security, communications, or operations for U.S. nuclear weapons in Europe or quality of life for U.S. military personnel supporting this mission;

(3) actions taken by the U.S. Government to standardize or improve NATO's nuclear-related infrastructure and adopt common standards, such as for perimeter security, including engagements bilaterally with host nations and multilaterally through NATO; and

(4) such other matters as the Secretary of Defense determines appropriate.

## CYBER-RELATED MATTERS

### Assessment of Effectiveness of Cyber Reporting

The committee is aware that the Department of Defense has been working for several years to develop a new cyber security and incident reporting scheme for defense contractors with access to controlled, unclassified information stored on, or processed by, their own information networks. While this requirement is called for by section 941 of the National Defense Authorization Act for Fiscal Year 2013 (Public Law 112–239), the Department has drafted and promulgated a new contract clause in the Defense Federal Acquisition Regulation Supplement (DFARS) as a means to implement the requirements of this reporting.

The committee is aware that this new language, DFARS 252.204–7012 on Cyber Security and Incident Reporting, has been the cause of concern and misunderstanding from many in industry, particularly among small businesses, and those businesses where defense revenue is a very small percentage of their overall revenue. The committee acknowledges that the Department has made efforts to make this new guidance as easy to implement and track as possible, and understands that the new process provides wide latitude and flexibility for businesses to craft strategies for compliance. For example, the Department has made available a number of tools to help small businesses with implementation, and worked extensively with Procurement Technical Assistance Centers so they can understand the requirements and assist small businesses directly in the course of their normal support. Additionally, the Department of Homeland Security has updated and modified their Cyber Security Evaluation Tool to provide a means for businesses to self-evaluate their compliance with the new rules.

To ensure that these tools are effective at helping small businesses and other non-traditional defense contractors meet this requirement, the committee directs the Secretary of Defense to conduct an assessment of the DFARS clause. The Secretary should assess the compliance of industry, including the extent to which these support tools have been effective. This assessment should also identify any issues and concerns with the quality of System Security Plans from the contractors, and to the extent practicable, should include input from affected contractors. The committee further directs the Secretary to provide a briefing to the House Committee on Armed Services by December 7, 2018, on the results of this assessment.

### Assessment of Third-Party Cybersecurity Risk

The committee recognizes the work by the Defense Security Service to clear defense contractors and believes advanced capabilities would enhance their existing efforts. The committee is aware of capabilities that exist in the private sector, like cybersecurity ratings services, that can effectively provide rapid, accurate initial assessments and ongoing, continuous monitoring of defense contractors' cybersecurity. The committee believes such assessments are critical to protecting classified and controlled unclassified defense information. The committee encourages the Department of Defense to evaluate existing capabilities for assessment and monitoring of the

cybersecurity of defense contractors and critical infrastructure providers prior to a contract award and on an ongoing basis, and identify capability and tool options currently in use and available in the private sector for such purposes.

Cloud Computing

The committee believes the widespread adoption by the Department of Defense of cloud computing technology would be beneficial to both the management functions and operational functions of the Department of Defense, resulting in cost savings, increased flexibility and scalability, mobility, and improved security. For example, cloud computing provides enhanced data analytics capabilities, reduces the need for physical data storage centers, and increases situational awareness on the battlefield. The committee is pleased that the military departments, particularly the Department of the Navy and Department of the Army, have recognized cloud computing is not only beneficial to the enterprise, but can also provide increased warfighting capabilities for tactical and operational advantages.

The committee encourages the continued use of cloud computing to achieve battlefield advantages, and encourages the Department of Defense to use cloud computing in military exercises and wargaming. For example, the Department of Defense could examine the use of cloud computing to support continuity of operations planning or to support resilient operations in the face of a degraded cyber environment. The committee also encourages greater synergy and collaboration between the acquisition community and information technology community, so that future weapon systems and platforms take full advantage of cloud computing benefits. In addition, the committee encourages the Department to explore the benefits of hyperscale cloud computing, which enables advanced capabilities such as big data analytics, machine learning, and cognitive services while providing advanced cybersecurity and continual updates to services and cyber defense.

Additionally, the committee supports the less risk-averse approach by the military services, than is traditionally prevalent throughout the Department of Defense, to incorporate cloud computing at the tactical, operational, strategic, and enterprise-wide levels. The committee believes the Department of Defense Chief Information Office should leverage lessons learned by the military services on cloud computing, to include security, capabilities, and criteria to appropriately determine if commercial, government, or hybrid clouds are required to update the Department's cloud strategy and assess current Department of Defense cloud security requirements; specifically, on-premise and off-premise requirements.

Finally, the committee directs the Department of Defense's Chief Information Officer to provide a briefing to the House Committee on Armed Services by March 5, 2018, on cloud computing. The briefing should include efforts to coordinate with the acquisition community, encourage the use of cloud computing in wargaming and military exercises, and an assessment of the Department of Defense's current cloud strategy and security requirements.

Comply-to-Connect Policy

Section 1653 of the National Defense Authorization for Fiscal Year 2017 (Public Law 114–328) required the Department of Defense to develop and enforce a new automated continuous monitoring compliance tracking system and policy referred to as "Comply-to-Connect." The committee believes such automated ways to enforce compliance, as well as to isolate and deny access for systems that have not been adequately patched or updated, will be necessary in the future to handle the increasing numbers of new information technology systems, as well as the manpower burdens that scale will impose. However, the committee has become aware that there is some confusion that this Comply-to-Connect language refers to a specific technology offering and not a generic policy. The committee's intent was not to endorse or limit the Department to any specific technology product or provider with the inclusion of section 1653. The committee expects the Department to continue to comply with all applicable rules for open competition in the acquisition of any technical solutions to meet the requirements of that section.

Comptroller General Assessment of Cyber Training

The committee is aware that the military services have been developing cyber training standards and establishing cyber schools or centers of excellence to prepare their personnel for operations in cyberspace. While the services have responsibility to train their forces, these forces must be trained to consistent and joint standards. The committee believes that the military services should leverage each other's training capabilities to the extent possible.

Therefore, the committee directs the Comptroller General of the United States to assess the Department of Defense's current and planned state of cyber training. The assessment should identify the extent to which the military services:

(1) have established consistent cyber training standards for Active and Reserve Component forces;

(2) have leveraged each other's cyber training capabilities, to include training schools and ranges;

(3) are achieving training capability and capacity goals; and

(4) are leveraging other cyber experience to meet training requirements.

The committee directs the Comptroller General to provide a briefing to the House Committee on Armed Services by March 15, 2018, on preliminary findings, with a report to follow on a date agreed to at the time of the briefing.

Cyber Hardening

The committee recognizes the urgent need to harden our major weapon systems and critical infrastructure against cybersecurity threats. The committee notes that section 1647 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92) directed an evaluation of cyber vulnerabilities of each major weapon system by the Secretary of Defense, while section 1650 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) directed an evaluation of cyber vulnerabilities of the critical infrastructure of the Department of Defense. These reviews

have identified platforms in the field today that have aging software and hardware components vulnerable to cyber threats that could be extraordinarily costly to upgrade. The committee understands that the Department has evaluated how to implement a pilot project to cyber harden existing programs for fiscal year 2018 that includes an estimate of both resources and time required to carry out such efforts. This pilot project is intended to meet cyber-hardening objectives while mitigating the significant cost and time delays associated with traditional planned upgrades.

The committee strongly supports the Department's efforts to explore alternatives to traditional cyber defense architectures and approaches. Elsewhere in this report, the committee provides additional funds and guidance for cyber vulnerability assessments and hardening. The committee encourages the Secretary of Defense to continue to explore and invest in cyber technology that provides multi-tiered defensive capabilities, including those that leverage software defined "Moving Target Defense" technology and techniques.

### Cyber Training and Talent Management

The committee is aware of the efforts of the Reserve Components to develop cyber protection teams that can leverage the best attributes, authorities, and capabilities of both civilian and military cyber practitioners. The committee is aware that the Department of Defense is considering a concept for establishing Joint Reserve Cyber Centers as a way of bringing together this expertise into a critical mass of talent. The committee encourages the Department of Defense to examine how this concept might be used to help cyber forces evaluate and quickly integrate new technologies such as autonomy, machine learning, and big data analytics. The committee further encourages the Department to continue to improve the processes to give cyber personnel credit for other experience, certifications, or commercial training they may have received that meets the joint training standard.

The committee remains concerned, however, that the current training pipeline is a major bottleneck to fully manning and training cyber mission teams. The committee continues to believe that the Department of Defense should look at additional ways to diversify the training pipeline available to all cyber personnel to help relieve that bottleneck, to include building public-private partnerships with academia, industry, and non-profit institutions. Especially in specialized and emerging areas like Internet-of-Things applications, building and utility control systems, or other operational physical systems, the Department should develop these kinds of partnerships to support training and familiarization of these operational physical systems through emulation technology. The committee recognizes the role the National Security Agency (NSA), through the National Centers of Academic Excellence in Cyber Defense (CAE–CD) education, has in the establishment and development of curriculum for cyber education. The committee recognizes the value these university relationships have had, and accordingly recommends an additional $8.0 million to the NSA CAE–CD Program Office to support cyber defense education of reservists across all military services and the National Guard.

Finally, the committee believes it is imperative for the Department of Defense to have comprehensive visibility on the cyber talent available in both the Active and Reserve Components, as well as the civilian workforce. The committee is aware of the Department of the Army's talent management programs, including the Cyber Warrior Database (CWARD). CWARD is intended to capture relevant expertise, knowledge, skills, and abilities within the Army Cyber community in order to enable effective mission planning and human resource management. The committee supports this effort and encourages widespread adoption of common cyber talent management tools. The committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services by February 5, 2018, on cyber talent management tools in development and use across the Department of Defense.

## Cyber Vulnerability Disclosure Program

The committee supports the Department of Defense's recently initiated vulnerability disclosure program and "bug bounty" program, which allow the Department to crowd-source security and encourage security researchers to share their discoveries responsibly while providing accountability for institutions operating or developing software. Following the Pentagon's initial bug bounty program, several of the services have taken on their own similar programs under a Department-wide contract. These projects are helping to provide for greater security across the defense enterprise, with positive results.

Accordingly, it is critical that the Defense Cyber Crime Center (DC3) is supported in order to effectively coordinate vulnerability disclosure across the Department of Defense Information Network. The DC3 is responsible for receiving security vulnerabilities reported under the vulnerability disclosure policy and facilitating their remediation. Without sufficient resources, vulnerabilities may be found and never rectified, ultimately handicapping the Department's positive steps forward. The committee believes the DC3 must be supported with the appropriate resources and authorities in order to improve the Department's cybersecurity posture and strengthen relationships with the security research community.

## Data Protection

The committee remains concerned about continuing reports of unauthorized disclosures of critical program and other classified information, whether from insiders or from external network intrusions. While the Department of Defense has made significant investments to improve its cyber security posture, the committee also remains concerned by the rate of progress the Department is making in preventing unauthorized review, redistribution, and modification of sensitive government information. The committee recognizes that there are a number of technologies, such as digital rights management (DRM) and attribute-based access control (ABAC), that could provide useful, needed capabilities in the Joint Information Environment, and are specifically cited as new information security policy requirements to help intelligence and civilian agencies persistently protect their sensitive information and high-value asset data both inside and outside of agency networks.

Therefore, the committee directs the Department of Defense Chief Information Officer, in coordination with the Director of the Defense Information Systems Agency, to provide a briefing to the House Committee on Armed Services by November 1, 2017, on any current plans to demonstrate or incorporate Department-wide DRM and ABAC capabilities into upgrades to key enabling cyber capabilities inside the Joint Regional Security Stacks initiative.

Evaluation of Commercial Cyber Threat Information Sources

The committee is aware that the availability of commercially derived cyber threat information from various service providers has the potential to be a tremendous force multiplier for both the government and industry. Many of the companies providing this information have been successful at identifying new threats and reporting on them to broad audiences more dynamically than the government, and without the risk of disclosing sensitive intelligence or capabilities of the government. The committee believes these providers could be better integrated into a full-spectrum strategy that synchronizes government, industry, and third-party capabilities to increase cyber security.

However, the committee is concerned that many of the components utilizing such services are not smart consumers of such services, and it can be very difficult to evaluate the utility or quality of said services across differing providers. Additionally, since there is no view of assessing these services, it can be difficult to figure out how best to leverage these capabilities to supplement or even replace some government capabilities. That task becomes even harder for industry users hoping to incorporate this sort of threat information or threat services into their cybersecurity strategy.

Therefore, the committee directs the Department of Defense Chief Information Officer (CIO), in coordination with the Principal Cyber Adviser and the Commander of Cyber Command, to create criteria for evaluating commercial threat information service providers and sources. This assessment should look at the following:

(1) what capabilities exist commercially for cyber threat information providers;

(2) what criteria should the Department or defense industry be using when assessing when and how to leverage these sources;

(3) in what ways can these types of services fit with the Department's needs, or be integrated into the Department's cyber defense construct; and

(4) an assessment of whether there is a need to develop some joint enterprise license agreement or contractual mechanism to more quickly and efficiently gain access to and standardize the use of such activities.

The committee further directs the Department of Defense CIO to provide a briefing to the House Committee on Armed Services by February 28, 2018, on the results of this evaluation.

Implementation of Recommendations by Defense Science Board Task Force on Cyber Deterrence and Cyber Supply Chain

The committee has reviewed the findings and recommendations contained in the Defense Science Board Task Force on Cyber Deterrence report and the Defense Science Board Task Force on Cyber

Supply Chain report. The committee appreciates these comprehensive and substantive reviews that contain tangible recommendations for the Department of Defense in the areas of cybersecurity, deterrence, supply chain vulnerabilities, and other related issues. Over the previous several years, the committee has provided the Department with multiple new or revised authorities, as well as significant funding, to address many of the challenges identified in these two reports. The committee is concerned, however, that the Department nonetheless lacks a comprehensive strategy to implement many of the important recommendations contained in these two Defense Science Board reports on cyber.

Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services by September 1, 2017, on efforts to implement the recommendations contained in the Defense Science Board Task Force on Cyber Deterrence and the Defense Science Board Task Force on Cyber Supply Chain reports.

### Persistent Training Environment

The committee is aware that the development of a Persistent Training Environment (PTE) for cyber is a significant priority for U.S. Cyber Command. The committee recognizes that the Department of Defense is currently struggling to train, certify, and deploy sufficient personnel to man to the levels called for by the Cyber Mission Force (CMF) construct.

Further, the committee recognizes the need for periodic recertification for both individuals and teams to keep skills sharp. In order to meet this demand, the committee believes it will be critical to develop the PTE to provide the means to enable thousands of military and civilian personnel to maintain their skills and certification required to continue to work on missions.

Therefore, the committee directs the Commander of U.S. Cyber Command, in coordination with the Secretary of the Army, to provide a briefing to the House Committee on Armed Services by December 8, 2017, on the progress in developing the PTE. This briefing should address the capability goals for the program, funding profile, major projected milestones (including any exercises PTE is expected to be used in conjunction with), performers, and any significant risks to the program.

### Report on Army Network Security Consolidation

The committees notes that the Army is shrinking the number of vulnerable nodes by installing Joint Regional Security Stacks (JRSS) to reduce the need for security enclaves at more than 400 existing network access points by replacing them with regional security stacks at 28 global ingress locations. In addition to limiting the number of access points, the Army is also installing Multi-Protocol Label Switching (MPLS) technology to connect all of the 40 major posts in the United States, with a more robust network that can run up to 100 GB while providing substantial savings over the operation of legacy circuits.

The committee supports the Army's goal to operate a single network that is secure, integrated, standards-based, and which ensures uninterrupted global access to enable collaboration and deci-

sive action. To achieve this result, the committee directs the Secretary of the Army to submit a report to the committee no later than December 31, 2017 with a plan to carry out the timely completion of network consolidation and installation of JRSS and MPLS at key nodes in the United States per the three strategic plans published to date. The plan should include the milestones, timelines, and resources required to complete the consolidation of networks.

Unified Platform

The committee notes that the Department of Defense is in the process of developing the requirements for new systems for the Cyber Mission Force (CMF) operators known as Unified Platform (UP). UP is intended to unify existing or evolving systems infrastructure, mission capabilities, data analytics, and programs to meet current and future CMF mission requirements. The committee recognizes that this system will drive the concepts of operations and procedures for the CMF for several years, so careful thought and consideration should go into the requirements generation and acquisition development process. The committee encourages the Department to use this opportunity to implement UP as an open architecture concept informed by agile development practices to make this system sustainable and scalable in the future as new technological capabilities become available. The committee also believes that the Department should include, as part of the Request for Information and Request for Proposals (RFP) process, opportunities for industry to offer new and innovative concepts above and beyond those formally articulated. The committee also believes information technology programs such as this should find new ways of responding to RFPs, such as the requirement to provide working software code for evaluation in order to determine which proposal is deserving of award.

Weapon System Cyber Vulnerabilities

The budget request contained $30.1 million in PE 64942D8Z for conducting cyber vulnerability assessments for weapon systems.

The committee continues to support the assessments of weapon systems to understand and identify their cyber vulnerabilities. The committee is aware of the prioritization of these systems for review, and also that the fiscal year 2016 budget only included $100.0 million of the necessary funds to carry out all of these assessments. The committee believes this effort should be continued, and to the extent practical, the Department of Defense should begin the remediation and hardening of these systems. Further, the committee encourages the Department of Defense to pay special attention to examining software vulnerabilities in nuclear weapons systems, other delivery vehicles, and other advanced weapons systems. The committee believes that the Department of Defense should develop a framework for industry to share information on these threats. This framework should improve the methodology for the assessment and prioritization of vulnerabilities in weapon systems and embedded information technology systems.

Therefore, the committee recommends $50.1 million, an increase of $20.0 million, in PE 64942D8Z to provide needed additional

funding to complete weapon system vulnerability assessments, and as needed, to provide funding for hardening these systems.

## Intelligence Matters

### Defense Clandestine Service

The committee commends the Defense Intelligence Agency's work to improve the support the Defense Clandestine Service (DCS) provides to the Defense Intelligence Enterprise. The committee believes a human intelligence (HUMINT) capability within the Department of Defense directly supporting the integrated Department of Defense intelligence priorities directed in section 922 of the National Defense Authorization Act for Fiscal Year 2014 (Public Law 113–66) is preferable to an option that places the capability outside of the Department. The committee intends to continue to conduct oversight of the Department of Defense's HUMINT capability as DCS evolves, and believes consistent and improved career management of DCS officers will further enhance such capability. Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services and the House Permanent Select Committee on Intelligence not later than December 1, 2017, on the posture of the Defense Clandestine Service to address the integrated Department of Defense intelligence priorities. The briefing should also include the methodology the Department uses to assign officer locations to fulfill priority requirements, efforts to improve the career management of DCS officers and employees, and how the Department will continue to increase support for officers in the field, to include future information technology plans to address their needs.

### European Deterrence Initiative Intelligence, Surveillance, and Reconnaissance

The Department of Defense has requested a significant amount of funding for intelligence, surveillance, and reconnaissance (ISR) as a part of the European Deterrence Initiative (EDI). The committee supports this request and expects that the platforms and sensors developed with these funds will be deployed to support U.S. European Command (EUCOM) intelligence requirements, and not diverted to meet other combatant commander (COCOM) ISR requirements. If unexpected circumstances and requirements justify diversion of ISR assets from EUCOM to another COCOM, the committee expects to be notified in writing and provided an explanation for the action.

### Improving Analytic Automation

The committee continues to support efforts like the National Geospatial-Intelligence Agency (NGA) program called Expeditionary Large Data Object Repository for Analytics in Deployed Operations that gather, analyze, manage, and store large amounts of intelligence, surveillance, and reconnaissance (ISR) data from remote sources. Managing data by making information discoverable to analysts across the globe, while reducing storage and analytical access costs, are critical steps in Department of Defense efforts to leverage commercial best practices in big data analytics. NGA is at

the forefront of such efforts, but the committee is concerned by the Department's slow pace in developing formal requirements for big data analytic capabilities.

For example, wide area motion imagery (WAMI) provides extremely valuable ISR data, but ground processing and integration of this data is currently very labor intensive. While WAMI collection capabilities continue to evolve with technology, much of the ground processing, automation, and alert functions have fallen behind. The Department continues to struggle to provide data analysis and machine learning capabilities that have been available in the commercial sector for several years that can process ISR data like WAMI. The committee recognizes the significant challenges the Department has in addressing combatant commanders' ISR requirements, but new collection capabilities will produce ever larger volumes of data. The Department's processing, exploitation and dissemination (PED) shortfalls cannot be addressed without integrating commercial data processing and access techniques, and automating as much of the PED workflow as possible.

Therefore, the committee directs the Under Secretary of Defense for Intelligence, in concert with the Secretary of the Army, Secretary of the Air Force, Secretary of the Navy, and Director of National Intelligence, to provide a briefing to the House Committee on Armed Services and the House Permanent Select Committee on Intelligence by December 1, 2017, on efforts that allow for rapid adoption of data storage, access, and automated processing and machine learning technologies and techniques.

### Intelligence Simulation Center

The committee supports the Defense Intelligence Agency's efforts to develop an Intelligence Simulation Center. The center will fulfill a critical intelligence community-wide need for a collaborative venue for classified presentations within the National Capital Region to support intelligence planning, evaluation of Department of Defense and intelligence community requirements, senior leader seminars, modeling and simulations, and other high-level intelligence and operational events. The co-location of the center with the National Intelligence University will enhance Defense Intelligence Enterprise capabilities, and the committee believes the other defense intelligence agencies must be integrated into the center to maximize the potential benefits. The committee directs the Under Secretary of Defense for Intelligence to develop a plan to integrate the other defense intelligence agencies into the Intelligence Simulation Center, and to provide a briefing to the House Committee on Armed Services and the House Permanent Select Committee on Intelligence not later than February 1, 2018, on the plan. The briefing should include plans to integrate sources of intelligence, analytic capabilities, and any agency-specific capabilities available to the intelligence community and combatant commanders.

### Intelligence, Surveillance, and Reconnaissance Capability Imbalance

The committee is concerned about the Department of Defense's intelligence, surveillance, and reconnaissance (ISR) capability mix.

Over the past 15 years, the Department has rightfully focused its capability development on supporting counterterrorism efforts in the Middle East, but emerging intelligence challenges will require a renewed focus on traditional military intelligence collection capabilities. Understanding advanced foreign military capability development activities, developing operational understanding of integrated air defense networks, maintaining robust order of battle information for potential nuclear and conventional adversaries, and collection on traditional military activities undertaken by foreign nations will require different collection capabilities than are required to support counterterrorism operations. The committee also notes that combatant commanders with the most capable potential adversaries receive a disproportionately small allocation of collection assets when compared to the stated priorities of the Department. The committee directs the Chairman of the Joint Chiefs of Staff to provide a briefing to the House Committee on Armed Services and House Permanent Select Committee on Intelligence, by February 1, 2018 on efforts to develop capabilities to collect ISR on foreign military activities, and the ISR prioritization process.

Joint Intelligence, Surveillance, and Reconnaissance Management

The committee recognizes the importance of Department of Defense intelligence, surveillance, and reconnaissance (ISR) capabilities as vital enablers of U.S. military power. The committee also recognizes that demand for ISR capabilities continue to vastly outpace supply despite significant investments over the past decade. In this context, the committee views the effective and efficient management of joint force ISR capabilities as an essential element of a national military strategy capable of addressing transregional, multi-functional, and multi-domain security challenges across the spectrum of conflict. The committee also considers investments made in developing, fielding, and leveraging fifth-generation aircraft advanced sensors to be of immense value to joint force employment and the intelligence enterprise.

The committee notes that the collection, analysis, and dissemination of moving target indicator (MTI) ISR information obtained through airborne active radar capability remains a high-priority ISR requirement by many geographic combatant commanders, and is woefully under-resourced by the Secretary of the Air Force. Recent evolutions in the security environment resulting from counterterror, counterinsurgency, contingency ground-maneuver force, and steady-state operations have brought renewed emphasis on the need for MTI ISR information as a critical source of indicator, warning, and targeting information. Additionally, the committee remains concerned that the Department of Defense is highly constrained by the lack of an integrated, interoperable joint framework for the tasking, collection, processing, exploitation, and dissemination (TCPED) of MTI information across the Department's intelligence analysis enterprise.

Finally, the committee supports the decision to realign joint force ISR management functions from U.S. Strategic Command to a Chairman of the Joint Chiefs of Staff (CJCS) controlled activity under the Joint Staff, but is concerned that the speed and scope of this transition has been insufficient to facilitate effective coordination between the military services, combatant commands, combat

support agencies, and key allies and partners in implementing the CJCS vision of a single, integrated joint force ISR enterprise.

The committee therefore directs the Secretary of Defense, in coordination with the Chairman of the Joint Chiefs of Staff, to provide a briefing to the House Committee on Armed Services and the House Permanent Select Committee on Intelligence not later than December 1, 2017, on the following areas of joint force ISR management:

(1) an assessment of joint force ISR effectiveness by region;

(2) a summary of ISR global force management sourcing trends by region and force category;

(3) a summary of progress, shortfalls, and challenges in establishing an integrated and interoperable joint force TCPED enterprise;

(4) a summary of joint force development initiatives that should include new joint concepts and doctrine for ISR employment, as well as development of automated tools and processes to manage the joint ISR enterprise more effectively and efficiently; and

(5) An explanation of the CJCS policy that governs how combatant commanders should define and assign different levels of priority to ISR capability requirements to inform the CJCS global force management process that allocates ISR capabilities and force structure to combatant commanders.

Further, the committee directs the Chairman of the Joint Chiefs of Staff to submit a report to the congressional defense committees and congressional intelligence committees not later than March 1, 2018, that includes a Joint Force Sufficiency Assessment (JFSA) for ISR capability and capacity based on a stress test of current operationally fielded ISR assets and capabilities for all approved level three and level four warfighting plans. The JFSA for ISR should include a thorough explanation of underlying assumptions and an analysis of requirements and shortfalls of ISR platforms, sensors, multi-intelligence TCPED capabilities, and related command, control, and communications architectures. The JFSA should be unclassified, but may include a classified annex.

The committee also directs the Secretary of Defense to provide a report to the congressional defense committees and congressional intelligence committees not later than June 1, 2018, that includes a comprehensive strategy for the coordinated development and integration of ISR capabilities with key allies and partners as a means to enhance the capability, capacity, access, agility, and resilience of the joint ISR enterprise in support of U.S. national security objectives. The strategy should address foreign military sales of ISR platforms; integrated global force management processes; combined basing strategies; TCPED and information-sharing requirements; and integrated training and logistics support. The strategy also should address, at a minimum, relationships and information-sharing opportunities between the United Kingdom of Great Britain and Northern Ireland, Canada, the Commonwealth of Australia, New Zealand, Japan, the Republic of Korea, and the North Atlantic Treaty Organization.

In addition, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services and the House Permanent Select Committee on Intelligence by March 1, 2018, that describes the Department of Defense's strategy and

implementation plan regarding the storage, recovery, management, processing, exploitation, and dissemination of ISR information collected by fifth-generation aircraft sensors. The committee expects the strategy to address data sharing and exchange with select allies and partners, as well as integration into the U.S. intelligence enterprise at large.

The committee also directs the Chairman of the Joint Chiefs of Staff, in coordination with the Secretary of Defense, to provide a briefing to the House Committee on Armed Services and the House Permanent Select Committee on Intelligence not later than March 1, 2018, that describes a strategy and implementation plan to establish common standards and management procedures among Department of Defense stakeholders to ensure joint, integrated TCPED of MTI information collected from Department of Defense aircraft. Elements of the strategy and implementation plan should include achieving commonality regarding joint TCPED training, analysis, and product standards; enterprise management procedures that capture best TCPED practices among MTI collection platforms, regardless of service or organization; Department plans to integrate into future programs and architectures the MTI and TCPED capabilities funded with Overseas Contingency Operations resources to meet various Operational Needs Statements/Joint Urgent Operational Needs Statements; and common information exchange and sharing policies, in accordance with applicable U.S. national disclosure policy and export controls, that enable and maximize cooperative MTI collection and TCPED activities among North Atlantic Treaty Organization allies and closest U.S. partners.

Finally, the committee, elsewhere in this title, includes a provision that would require continuation of a current Department of Defense plan to transition the roles, missions, and responsibilities of Joint Functional Component Command for Intelligence, Surveillance, and Reconnaissance from U.S. Strategic Command to the Chairman of the Joint Chiefs of Staff (CJCS) as a CJCS controlled activity, and designate the Department of the Air Force as the controlled activity's funding sponsor, not later than 30 days after the date of the enactment of this Act.

Report on National Intelligence Program and Military Intelligence Program Integration Against Hard Targets

The committee believes that the intelligence community is underinvested in capabilities to understand the military capabilities of hard target countries. Over the last 15 years, the community has rightfully invested heavily in counterterrorism capabilities, and has accepted risk in understanding the emerging military capabilities of peer and near-peer countries. Department of Defense leadership has recently identified to the committee several emerging foreign military developments that provide particularly grave challenges. While the committee supports the efforts to identify emerging threats and provide options for countermeasures, it remains concerned about the need for further coordination between the National Intelligence Program and the Military Intelligence Program to develop capabilities and programs to understand hard targets. Therefore, the committee directs the Secretary of Defense and the Director of National Intelligence to provide a briefing to the House Committee on Armed Services and the House Permanent Select

Committee on Intelligence not later than November 1, 2017, on the integration of programs funded by the National Intelligence Program and programs funded by the Military Intelligence program to address hard targets.

Review by Comptroller General of the United States of the General Defense Intelligence Program

The committee is concerned about the ability of the Defense Intelligence Enterprise to effectively prioritize and allocate resources to address the strategic intelligence requirements of the Department of Defense and the military departments. The committee directs the Comptroller General of the United States to review the prioritization processes of the General Defense Intelligence Program (GDIP) managed by the Defense Intelligence Agency (DIA) and provide a briefing to the House Committee on Armed Services and the House Permanent Select Committee on Intelligence not later than February 1, 2018. The briefing shall:

(1) identify the processes and procedures for prioritizing resource allocations across the Defense Intelligence Enterprise, including with respect to the needs of the military departments;

(2) identify the process and methodology used by the Director of DIA to balance the internal priorities of DIA with the needs of the Defense Intelligence Enterprise; and

(3) identify methods of recourse available to the military departments to resolve prioritization disputes with DIA.

Secure Compartmented Information Facility Standardization

The committee is concerned by the duplication effort imposed by the Department of Defense and the intelligence community on the cleared contractor community to certify and operate Secure Compartmented Information Facilities (SCIFs). The committee notes that all SCIFs are constructed and accredited to the same Intelligence Community Directive standards, and believes the current practice of requiring co-utilization agreements on a contract-by-contract, facility-by-facility basis is unnecessarily costly, without providing additional security benefits. Therefore, the committee directs the Under Secretary of Defense for Intelligence and the Director of National Intelligence to review current policy not later than June 1, 2018. The committee further directs the Under Secretary and the Director to make recommendations, as part of the review, to maximize the co-utilization of SCIFs to support Department of Defense and intelligence community work within cleared contractor facilities. The review should include potential consolidation or elimination of the duplicative requirements for industry to certify a SCIF with multiple agencies. In the event a specific agency has additional requirements beyond those identified in the applicable Intelligence Community Directive or Department of Defense policy, the Under Secretary and Director should make recommendations for addressing those requirements at the enterprise level. Finally, the committee directs the Under Secretary of Defense for Intelligence and the Director of National Intelligence to provide a briefing to the House Committee on Armed Services and House Permanent Select Committee on Intelligence on the results of the review, not later than 30 days after completion.

## Strengthening Intelligence Input to Milestone Decisions

The committee is concerned about the Defense Intelligence Enterprise's ability to provide accurate and timely information to the acquisition community to make decisions about capability development. Intelligence inputs are required for each acquisition milestone and throughout each program's life cycle, but often do not play a significant role in acquisition decisions. Threat assessments are often developed out of cycle with program timelines, creating data latency issues, and the quality of intelligence data varies greatly across the Department of Defense. The committee is aware of at least one case in which a capability development requirement was fundamentally incorrect because the program office did not have access to highly classified threat information. This uncertainty about the timeliness and accuracy of threat information creates requirements instability, which in turn drives up acquisition costs. Even after systems are fully developed and fielded, many systems require regular intelligence mission data support, such as electronic warfare database updates and measurement and signatures intelligence support.

The committee supports the Department's initial efforts to plan for and prioritize intelligence mission data support and encourages continued refinement of intelligence mission data support processes. The committee directs the Under Secretary of Defense for Intelligence, the Under Secretary of Defense for Research and Engineering, the Under Secretary of Defense for Acquisition and Sustainment, and the Director of the Defense Intelligence Agency to provide a briefing to the House Committee on Armed Services and the House Permanent Select Committee on Intelligence not later than March 1, 2018, on proposals to ensure that intelligence support to acquisition is relevant and provides value to the acquisition community. The briefing should also include proposals to ensure adequate access to compartmented information that may contain key judgments that would change a program's understanding of a threat.

## Threat Awareness Programs

The committee has conducted multiple hearings and briefings that have provided information on the sophistication and increasing number of counterintelligence threats to the Department of Defense. For example, the People's Republic of China and other nation-state actors seek to impair U.S. technology superiority through espionage and exploitation of the regulatory processes that govern foreign investment, technology transfer, and international scientific cooperation to legally obtain access to technology and research. As noted elsewhere in this report, Russian military intelligence services are using influence operations to undermine global democratic institutions and frameworks. Unrelenting pressure on terrorist organizations overseas is leading them to prioritize the radicalization of individuals in their country of origin, resulting in increased homegrown threats. Therefore, the committee encourages more investments in counterintelligence, security, and insider threat programs to protect Department of Defense and the National Nuclear Security Administration personnel, property, and technology. These increases should be reinforced by policies that emphasize the re-

sponsibility of all individuals to maintain awareness of potential threats. Further discussion is contained in the classified annex to this report.

### Underground Facility Targeting Capabilities

The committee is aware of gaps in the intelligence community's capability to identify, characterize, and target foreign underground facilities that force combatant commanders to accept unacceptable risk in specific mission areas. The committee is also aware of Department of Defense plans to develop an automated analytic capability, but believes additional underground facility analytic expertise is necessary to provide adequate support to operational planning requirements. The committee directs the Secretary of Defense and the Director of National Intelligence to provide a briefing to the House Committee on Armed Services and House Permanent Select Committee on Intelligence not later than November 1, 2017, on intelligence community capabilities to characterize and target adversary underground facilities. The briefing should include an assessment of the capacity and efficacy of National Intelligence Program and Military Intelligence Program resources currently supporting combatant commander underground facility target requirements, and an assessment of the analytic workforce required to address those requirements that cannot be addressed within the current resource framework. The committee believes this capacity gap is not limited to the Underground Facility Analysis Center at the Defense Intelligence Agency, and expects the capabilities and resources of the other combat support agencies to be reflected in the briefing.

## LEGISLATIVE PROVISIONS

### SUBTITLE A—MANAGEMENT AND ORGANIZATION OF SPACE PROGRAMS

### Section 1601—Establishment of Space Corps in the Department of the Air Force

This section would authorize the creation of a Space Corps within the Department of the Air Force and require the Secretary of the Air Force to certify its establishment by January 1, 2019. The Space Corps would be led by the Chief of Staff of the Space Corps and would be composed of such offices and officials determined appropriate by the Secretary of the Air Force, in consultation with the Chief of Staff of the Space Corps. This section would further provide that the Chief of Staff of the Space Corps would be appointed for a term of 6 years, be a member of the Joint Chiefs of Staff, and would report directly to the Secretary of the Air Force, as a co-equal of the Chief of Staff of the Air Force.

The Secretary of the Air Force would be given Milestone Decision Authority for space acquisition programs, including with respect to research, development, test, and evaluation and procurement. This section would not affect the authority of the other Services to pursue Service-specific user terminals for space programs. This section would also not affect the authorities of the Director of the National Reconnaissance Office and the Director of the National Geospatial-

intelligence Agency. This section would terminate the Principal Department of Defense Space Advisor and Defense Space Council.

Nothing in this section would authorize or require the relocation of any facilities, infrastructure, or military installations of the Air Force.

Lastly, this section would require the Secretary of Defense to provide to the congressional defense committees an interim report by March 1, 2018, and a final report by August 1, 2018, on the plan for the establishment of the Space Corps, recommendations by the Secretary of Defense, and other specified matters related to such.

Section 1602—Establishment of Subordinate Unified Command of the United States Strategic Command

This section would direct the Secretary of Defense to establish United States Space Command as a subordinate unified command under United States Strategic Command not later than January 1, 2019. This section would also require the commander of such command to hold a four-star rank and be appointed by the President and confirmed by the Senate. The commander would exercise command of joint space activities or missions, and the United States Space Command would be jointly staffed.

SUBTITLE B—SPACE ACTIVITIES

Section 1611—Codification, Extension, and Modification of Limitation on Construction on United States Territory of Satellite Positioning Ground Monitoring Stations of Foreign Governments

This section would amend chapter 135 of title 10, United States Code, by adding a new section, 2279c. Subsection (b) of section 1602 of the National Defense Authorization Act for Fiscal Year 2014 (Public Law 113–66), which is a limitation on construction on United States territory of satellite positioning ground monitoring stations of certain foreign governments, would be transferred to section 2279c of title 10, United States Code. This section would exclude foreign governments that are allies of the United States from the underlying limitation and would extend the underlying limitation's sunset date to December 31, 2023.

Section 1612—Foreign Commercial Satellite Services: Cybersecurity Threats and Launches

This section would amend section 2279 of title 10, United States Code, by adding a new subsection concerning cybersecurity risk for the Department of Defense. This section would further amend section 2279 of title 10, United States Code, by adding a subsection that would prohibit the Secretary of Defense from entering into a contract for satellite services with any entity if such services will be provided using satellites launched from a covered foreign country or using a launch vehicle that is designed or manufactured in a covered foreign country, or that is provided by the government of a covered foreign country or by an entity controlled in whole or in part by, or acting on behalf of, the government of a covered foreign country, regardless of the location of the launch. Such prohibition would not apply to launches in the United States using launch vehicles with engines designed or manufactured or provided by any

entity of the Russian Federation or affect any other provision of law authorizing the use of Russian rocket engines within a United States launch vehicle.

This section would also add the Russian Federation to the list of covered foreign countries, and would make a number of conforming and clerical amendments to section 2279 of title 10, United States Code.

Section 1613—Extension of Pilot Program on Commercial Weather Data

This section would amend section 1613 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) by extending the pilot program on commercial weather data by 1 year. This section would also add the congressional intelligence committees to the existing reporting requirements.

Section 1614—Conditional Transfer of Acquisition and Funding Authority of Certain Weather Missions to National Reconnaissance Office

This section would amend section 1614 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328), by requiring the Secretary of the Air Force and the Director of the National Reconnaissance Office to execute the transfer of certain weather missions from the Air Force to the National Reconnaissance Office unless the Secretary and Director both issued the waivers described in section 1614(c) of Public Law 114–328.

Section 1615—Evolved Expendable Launch Vehicle Modernization and Sustainment of Assured Access to Space

This section would prohibit the Secretary of Defense from obligating or expending funds authorized by this Act or otherwise made available for fiscal year 2018 for research, development, test, and evaluation, Air Force, for the evolved expendable launch vehicle (EELV) program for any use other than the activities specified by this Act. This section would not affect or prohibit the Secretary from procuring launch services of EELV launch systems.

This section would require the Secretary to notify the congressional defense committees, and, in some circumstances, the congressional intelligence committees, not later than 30 days before the Secretary publishes a draft or final request for proposals, or obligates funds, for the development activities specified by this section. This section would further direct the Secretary, in coordination with the Director of Cost Assessment and Program Evaluation, to submit a report to the congressional defense committees within 120 days after the date of the date of the enactment of this Act, that contains an assessment of the cost-effective method to meet the assured access to space requirements pursuant to section 2273 of title 10, United States Code, with respect to several specified time periods.

Lastly, this section would define the circumstances for what the Government would pay for as unique to national security space missions.

### Section 1616—Commercial Satellite Communications Pathfinder Program

This section would state the sense of Congress regarding the Air Force's commercial satellite communications pathfinder program.

This section would also require the Secretary of the Air Force to submit a report, by March 1, 2018, to the Committees on Armed Services of the House of Representatives and the Senate regarding the views and plans of the Secretary related to carrying out a portion of the activities of such pathfinder program under the transaction authority provided by section 2371 of title 10, United States Code.

The committee has been concerned for several years that the Department of Defense is not using sound business practices to procure commercial satellite communications, which has resulted in millions of dollars in inefficient procurement of this key resource. The committee believes that leveraging Other Transaction Authority would further the activities of the Department to more effectively and efficiently procure commercial satellite communications.

### Section 1617—Demonstration of Backup and Complementary Positioning, Navigation, and Timing Capabilities of Global Positioning System

This section would require, during fiscal year 2018, the Secretary of Defense, the Secretary of Transportation, and the Secretary of Homeland Security to jointly develop a plan for carrying out a backup capability demonstration for the Global Positioning System (GPS). The plan would be required to be based on the results of the study conducted under section 1618 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) and include the activities that the Secretaries determine necessary to carry out such demonstration. The Secretaries would be required to provide a briefing on this plan to the appropriate congressional committees within 120 days of the date of the enactment of this Act.

This section would further state that, subject to the availability of appropriations, the Secretaries would be required to jointly initiate the backup GPS capability demonstration and that the demonstration would terminate 18 months after the date of the enactment of this Act. At this date of termination, the Secretaries would be required to submit a report on the demonstration.

Finally, this section would authorize for this demonstration, for fiscal year 2018, $10.0 million as specified in the funding tables.

### Section 1618—Enhancement of Positioning, Navigation, and Timing Capacity

This section would require the Secretary of Defense to develop and implement a plan to increase resilience for the positioning, navigation, and timing (PNT) capacity for the Department of Defense. This section would require the plan to ensure that military Global Positioning System (GPS) user equipment (MGUE) terminals have the capability to receive signals from the Galileo satellites of the European Union and the QZSS satellites of Japan, beginning with increment 2 of the acquisition of such terminals.

This plan would also include an assessment of the feasibility, benefits, and risks of military GPS MGUE terminals having the capability to receive foreign PNT signals, beginning with increment 2 of the acquisition of such terminals. Such plan would also include an assessment of options to use hosted payloads to provide redundancy for the GPS signal; ensure that the Secretary of Defense, with the concurrence of the Secretary of State, engages with relevant U.S. allies to enable MGUE terminals to receive allied signals and negotiates other potential agreements relating to PNT enhancement; and include any other options the Secretary of Defense determines appropriate.

Finally, this section would require the Secretary of Defense to submit the plan along with certain evaluations to specified congressional committees not later than 180 days after the date of the enactment of this Act.

Section 1619—Establishment of Space Flag Training Event

This section would require the Secretary of Defense to establish, not later than December 31, 2020, an annual capstone training event titled "Space Flag" for space professionals to develop and test doctrine, concepts of operation, and tactics, techniques, and procedures. The event would also serve to inform and develop the appropriate design of the operational training infrastructure of the space domain. This section would further require the Secretary to model the event on the Red Flag and Cyber Flag exercises and ensure that Space Flag includes live, virtual, and constructive training and on-orbit threat replication, as appropriate.

Lastly, this section would require the Secretary, in coordination with the Commander of Air Force Space Command, Commander, Army Space and Missile Defense Command, and Commander, Navy Space and Naval Warfare Systems Command to submit a plan to the congressional defense committees, not later than 1 year after the date of the enactment of this Act, on the establishment of Space Flag, including a description of each of the objectives of the event.

The committee recognizes that the Air Force has started initial activities for Space Flag training, but the committee expects a more comprehensive, Department of Defense-wide approach for exercise participation and infrastructure, consistent with this provision. Additionally, the committee notes the related ongoing testing and development activities in the Air Force, such as the Big Top program, and fully supports these activities.

Section 1620—Report on Operational and Contingency Plans for Loss or Degradation of Space Capabilities

This section would require the Secretary of Defense and the Chairman of the Joint Chiefs of Staff, in coordination with each commander of a combatant command, to assess the implications of a loss or degradation of U.S. space capabilities on operational and contingency plans. The Secretary and Chairman, in coordination with the combatant commanders, would then be required to submit a report of their assessment to the appropriate congressional committees within 180 days after the date of the enactment of this Act.

Section 1621—Limitation on Availability of Funding for Joint Space Operations Center Mission System

This section limits the funds authorized for fiscal year 2018 for the Joint Space Operations Center mission system until the Secretary of the Air Force develops and implements a plan to operationalize existing commercial space situational awareness capabilities.

Section 1622—Limitation on Availability of Funds Relating to the Advanced Extremely High Frequency Program

This section would limit the funds authorized to be appropriated by this Act for fiscal year 2018 for research, development, test, and evaluation, Air Force, for protected tactical enterprise, protected tactical service, or protected satellite communication services for the Evolved Strategic Satellite Communications (SATCOM) system until several certifications, reports, and plans are submitted to the congressional defense committees ensuring that a protected SATCOM system other than Advanced Extremely High Frequency (AEHF) will meet the relevant validated military requirements.

SUBTITLE C—DEFENSE INTELLIGENCE AND INTELLIGENCE-RELATED ACTIVITIES

Section 1631—Security Clearances for Facilities of Certain Contractors

This section would provide the Department of Defense with the authority to approve facility clearances for a company in the event its senior management official does not have a security clearance at the level of the facility clearance, if a company designates an official with the appropriate clearance to act as the senior management official for the purposes of the facility clearance.

Section 1632—Extension of Authority to Engage in Certain Commercial Activities

This section would amend section 431(a) of title 10, United States Code, to extend the authority to engage in commercial activities as security for intelligence collection activities through December 31, 2023.

Section 1633—Submission of Audits of Commercial Activity Funds

This section would modify section 432 of title 10, United States Code, for audits to be submitted to the congressional defense committees and the congressional intelligence committees by not later than December 31 of each year.

Section 1634—Clarification of Annual Briefing on the Intelligence, Surveillance, and Reconnaissance Requirements of the Combatant Commands

This section would modify section 1626 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (Public Law 113–291) by including space-based intelligence, surveillance, and reconnaissance in the briefing.

Section 1635—Review of Support Provided by Defense Intelligence Elements to Acquisition Activities of the Department

This section would require the Secretary of Defense to review the support provided by the defense intelligence enterprise to Department of Defense acquisition activities, and to develop a specific budget structure for intelligence support to acquisition that would be implemented beginning with the budget submission for fiscal year 2020. It also would require the Secretary to provide a briefing to the congressional defense committees and congressional intelligence committees not later than May 1, 2018, on the results of the review and the plan for the budget structure.

Section 1636—Limitation on Availability of Funds for Certain Offensive Counterintelligence Activities

This section would limit the availability of funds for certain offensive counterintelligence operation (OFCO) activities until specified certification and briefing requirements are fulfilled not later than March 1, 2018. It would require the Secretary of Defense to certify that elements of the Department of Defense with OFCO authorities have appropriate oversight procedures. It would require the Director of the Defense Intelligence Agency (DIA) to provide the congressional defense committees and congressional intelligence committees with an accounting of certain resources transferred from the Defense Counterintelligence Field Activity. It also would require a briefing to the same committees from the Under Secretary of Defense for Intelligence and the Director of DIA on improvement of OFCO management. The committee has serious concerns about the lack of rigorous internal oversight of the Department's OFCO program. Recent briefings have shown several elements of the OFCO community are exposing the Department to unacceptable risk by failing to adhere to Department policies. The committee expects the Under Secretary of Defense for Intelligence to conduct rigorous, proactive oversight of all aspects of counterintelligence across the Department to ensure compliance with applicable regulations.

Section 1637—Prohibition on Availability of Funds for Certain Relocation Activities for NATO Intelligence Fusion Center

This section would prohibit certain funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2018 from being used to support the relocation of the NATO Intelligence Fusion Center from Royal Air Force Molesworth, United Kingdom, to Royal Air Force Croughton, United Kingdom.

Section 1638—Establishment of Chairman's Controlled Activity Within Joint Staff for Intelligence, Surveillance, and Reconnaissance

This section would require continuation of a current Department of Defense plan to transition the roles, missions, and responsibilities of Joint Functional Component Command for Intelligence, Surveillance, and Reconnaissance from U.S. Strategic Command to the Chairman of the Joint Chiefs of Staff (CJCS) as a CJCS con-

trolled activity, and designate the Department of the Air Force as the controlled activity's funding sponsor.

Section 1639—Sense of Congress and Report on Geospatial Commercial Activities for Basic and Applied Research and Development

This section expresses the sense of Congress and requires a report on authorities needed to establish commercial activities for the purposes of Research and Technology development.

Section 1640—Department of Defense Counterintelligence Polygraph Program

This section would authorize the Secretary of Defense to add dual citizens in positions with access to highly classified information to their counterintelligence polygraph program, for the purposes of assessing risk.

Section 1641—Security Clearance for Dual-Nationals

This section would authorize the Secretary of Defense to apply additional security reviews to dual citizens seeking positions that require access to highly classified information.

Section 1642—Suspension or Revocation of Security Clearances Based on Unlawful or Inappropriate Contacts With Representatives of a Foreign Government

This section would authorize the Secretary of Defense to suspend or revoke the security clearances of individuals who engage in unlawful or inappropriate contacts with representatives of foreign governments.

SUBTITLE D—CYBERSPACE-RELATED MATTERS

Section 1651—Notification Requirements for Sensitive Military Cyber Operations and Cyber Weapons

This section would amend title 10, United States Code, to require the Secretary of Defense to promptly submit in writing to the congressional defense committees notice of any sensitive military cyber operation and notice of the results of the review of any cyber capability that is intended for use as a weapon. This section would also require the Secretary of Defense to establish procedures for providing such notice in a manner consistent with national security of the United States and the protection of operational integrity.

The term "sensitive military cyber operation" would include cyber actions carried out by the Armed Forces and actions intended to cause effects outside a geographic location where United States forces are involved in hostilities (as that term is used in section 1543 of title 50, United States Code).

This section is not intended to create or alter reporting requirements of any other agency or department of the Department of Defense.

Section 1652—Modification to Quarterly Cyber Operations Briefings

This section would amend section 484 of title 10, United States Code, related to quarterly cyber operations briefings by including all of the congressional defense committees in the requirement, as well as increasing the fidelity of the items to be included in each quarterly briefing. In addition, the committee encourages the Department of Defense to also include reporting on the Cybersecurity Scorecard, how measures of resilience may be addressed by this scorecard, and means for measuring or tracking supply chain risk management activities.

Section 1653—Cyber Scholarship Program

This section would amend chapter 112 of title 10, United States Code, to establish the Department of Defense Cyber Scholarship Program, setting aside 5 percent of the available funding for pursuit of associate degrees in cyber and authorizing $10.0 million in fiscal year 2018 for such scholarships.

The committee is concerned that lack of funding under this program may further aggravate the challenges the Department is experiencing in recruiting and retaining cyber security personnel. The committee believes that providing additional opportunities under the program will be beneficial in continuing to address Department requirements for a qualified cyber workforce. Further, the committee encourages the Department to use the opportunity to educate the public on this program and to focus on institutions with high-quality computer science, engineering, and cyber security programs, including historically black colleges and universities, and minority-serving institutions, as a way to expand the pool of talented applicants.

Section 1654—Plan To Increase Cyber and Information Operations, Deterrence, and Defense

This section would direct the Secretary of Defense to develop a plan to increase regional cyber planning and enhance information operations and strategic communication strategies to counter Chinese and North Korean information warfare, malign influence, and propaganda activities. It would further direct the Secretary to provide a briefing to the congressional defense committees on the plan not later than 180 days after the date of the enactment of this Act.

Section 1655—Report on Termination of Dual-Hat Arrangement for Commander of the United States Cyber Command

This section would require the Secretary of Defense to provide a report on the Department of Defense's progress in meeting the requirements of section 1642 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) to the congressional defense committees, the House Permanent Select Committee on Intelligence, and the Senate Select Committee on Intelligence.

## SUBTITLE E—NUCLEAR FORCES

### Section 1661—Notifications Regarding Dual-Capable F–35A Aircraft

This section would amend section 179(f) of title 10, United States Code, to require the Nuclear Weapons Council to notify the congressional defense committees if either the United States Senate or the United States House of Representatives adopts a bill authorizing or appropriating funds for the Department of Defense that, as determined by the Council, provides funds in an amount that will result in a delay in the nuclear certification or delivery of F–35A dual-capable aircraft.

### Section 1662—Oversight of Delayed Acquisition Programs by Council on Oversight of the National Leadership Command, Control, and Communications System

This section would amend section 171a of title 10, United States Code, to require each program manager of a covered acquisition program to transmit quarterly reports to the co-chairs of the Council on Oversight of the National Leadership Command, Control, and Communications System that identify (1) the covered acquisition program; (2) the requirements of the program; (3) the development timeline of the program; and (4) the status of the program, including whether the program is delayed and whether such delay will result in a program schedule delay.

This section would further require that, in the event an acquisition program is delayed by more than 180 days or in the event a program manager did not properly notify the Council, the co-chairs of the Council shall notify the congressional defense committees by not later than 7 days after the end of a quarter.

Lastly, this section would require the Secretary of Defense to issue or revise a Department of Defense Instruction to ensure that program managers carry out subsection (k)(1) of section 171a of title 10, United States Code, as amended by this Act.

### Section 1663—Establishment of Nuclear Command and Control Intelligence Fusion Center

This section would direct the Secretary of Defense and the Director of National Intelligence to jointly establish an intelligence fusion center, not later than 180 days after the date of the enactment of this Act, for the purpose of enhancing the protection of nuclear command, control, and communications programs, systems, and processes and continuity of government programs, systems, and processes. In establishing the fusion center, the Secretary and Director would be required to develop a charter that includes the following:

(1) the roles and responsibilities of officials and elements of the Federal Government that are key stakeholders;

(2) the organization reporting chain of the fusion center;

(3) the staffing of the fusion center;

(4) the processes of the fusion center;

(5) how the fusion center integrates with other elements of the Federal Government;

(6) the management and administrative processes required to carry out the fusion center; and

(7) procedures to ensure that the appropriate number of staff of the fusion center have the security clearance necessary, including with respect to programs that are designated special access programs.

This section would further require the Secretary and the Director to submit an initial report to the congressional defense committees and the congressional intelligence committees, not later than 120 days after the date of the enactment of this Act, on the development of the charter and the plan for budget and staffing of the fusion center.

Lastly, this section would require the Secretary and Director to submit an annual report to the congressional defense committees and the congressional intelligence committees at the same time as the President's budget request is submitted to Congress, beginning in fiscal year 2019 and each fiscal year thereafter, on any updates to the plan on the budget and staffing of the fusion center; any updates to the charter; and a summary of the activities and accomplishments of the fusion center. This reporting requirement would expire on December 31, 2021.

Section 1664—Security of Nuclear Command, Control, and Communications System From Commercial Dependencies

This section would make a series of findings related to Department of Defense use of systems produced by Huawei Technologies Company or ZTE Corporation. This section would also require the Secretary of Defense to certify whether the Secretary uses telecommunications equipment or services from Huawei Technologies Company or ZTE Corporation to carry out the Department's nuclear deterrence mission, including with respect to the nuclear command, control, and communications, integrated tactical warning and attack assessment, and continuity of government, or the homeland defense mission, including with respect to ballistic missile defense.

Beginning 1 year after the date of the enactment of this Act, this section would prohibit the Secretary from procuring, obtaining, or renewing a contract to do so, any equipment, system, or service that uses telecommunications equipment from Huawei Technologies Company or ZTE Corporation to carry out the Department's nuclear deterrence or homeland defense missions. Lastly, this section would provide for a waiver for such prohibition, on a case-by-case basis, for a single 1-year period, if the Secretary determines it to be in the national security interests of the United States and certifies to the congressional defense committees that certain criteria are met.

Section 1665—Oversight of Aerial-Layer Programs by Council on Oversight of the National Leadership Command, Control, and Communications System

This section would establish that any analysis of alternatives (AOA) for the Senior Leader Airborne Operations Center, the executive airlift program of the Air Force, and the E–6B modernization program may not receive final approval by the Joint Requirements

Oversight Council and the Director of Cost Assessment and Program Evaluation may not complete the AOA sufficiency review unless:

(1) the Council on Oversight of the National Leadership Command, Control, and Communications System determines that the alternatives are capable of meeting the requirements for senior leadership communications in support of the nuclear command, control, and communications missions of the Department of Defense and the continuity of government mission of the Department;

(2) the Council submits to the congressional defense committees such a determination; and

(3) a period of 30 days elapses following the date of such submission.

Section 1666—Security Classification Guide for Programs Relating to Nuclear Command, Control, and Communications and Nuclear Deterrence

This section would require that, not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall require the issuance of a security classification guide for nuclear weapons, and nuclear command and control programs and continuity of Government programs of the Department of Defense to ensure the protection of sensitive information of such programs. Such classification guides would be jointly approved by the Nuclear Weapons Council and the Council on Oversight of the National Leadership Command, Control, and Communications System and should be in place not later than March 19, 2019.

Section 1667—Evaluation and Enhanced Security of Supply Chain for Nuclear Command, Control, and Communications and Continuity of Government Programs

This section would direct the Secretary of Defense to evaluate by December 31, 2019, the supply chain vulnerabilities of programs related to nuclear weapons; nuclear command, control, and communications (NC3); continuity of Government; and ballistic missile defense. As part of the evaluation, the Secretary would be required to develop a plan to carry out such evaluation and submit the plan to the congressional defense committees not later than 180 days after the date of the enactment of this Act. This section would also provide a waiver, on a case-by-case basis, for any program, weapon system, or system of systems, that the Secretary certifies to the congressional defense committees within 180 days after the date of the enactment of this Act that all known supply chain vulnerabilities have minimal consequences for the capability of such systems.

This section would further require the Secretary to develop strategies for mitigating the risks of supply chain vulnerabilities identified in the course of the evaluation. The Secretary would also be required to issue a Department of Defense Instruction, or update such an Instruction, not later than 180 days after the date of the enactment of this Act, establishing the prioritization of supply chain risk management programs, including supply chain risk management threat assessment reporting, to ensure that programs related to nuclear weapons, NC3, continuity of Government, and

ballistic missile defense receive the highest priority of such supply chain risk management programs and reporting.

Lastly, this section would direct the Secretary to establish a requirement to carry out supply chain risk management threat assessment collections and analyses under acquisition and sustainment programs related to nuclear weapons, NC3, continuity of government, and ballistic missile defense programs and submit such requirement not later than 120 days after the date of the enactment of this Act.

### Section 1668—Limitation on Pursuit of Certain Command and Control Concept

This section would provide that the Secretary of the Air Force may not award a contract for engineering and manufacturing development for the Ground Based Strategic Deterrent (GBSD) program that would result in a command and control concept for such program that consists of less than 15 fixed launch control centers per missile wing unless the Commander of U.S. Strategic Command determines that:

(1) the plans of the Secretary for a command and control concept consisting of less than 15 fixed launch control centers per missile wing are appropriate, meet requirements, and do not contain excessive risk;

(2) the risks to schedules and costs from such concepts are minimized and manageable;

(3) the strategy and plan of the Secretary for addressing cyber threats for such concept are robust; and

(4) with respect to such concept, the Secretary has established an appropriate process for considering and managing trade-offs among requirements relating to survivability, long-term operations and sustainment costs, procurement costs, and military personnel needs.

This section would require the Commander to submit to the Secretary and the congressional defense committees the Commander's determination. If the Commander is unable to make the determination under subsection (a), the Commander would be required to submit the reasons for not making such determination.

Finally, this section would state that the requirements of this section shall not be construed to affect or prohibit the ability of the Secretary to use fair and open competition procedures in soliciting, evaluating, and awarding contracts for this program.

The committee is concerned about cost, schedule, and technology maturity risks in the GBSD program, particularly as the program considers significant deviations from proven, reliable, and survivable command and control concepts. The committee believes this provision will enable the Commander of U.S. Strategic Command to more closely track and assess how the Air Force is implementing the Commander's requirements and minimizing risk in this important nuclear modernization program.

### Section 1669—Procurement Authority for Certain Parts of Intercontinental Ballistic Missile Fuzes

This section would authorize $6.3 million of the funds made available by this Act for Missile Procurement, Air Force, for the

procurement of certain commercially available parts of intercontinental ballistic missile fuzes, notwithstanding section 1502(a) of title 31, United States Code, under contracts entered into under section 1645(a) of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (Public Law 113–291).

Section 1670—Sense of Congress on Importance of Independent Nuclear Deterrent of United Kingdom

This section would express the sense of Congress regarding the independent nuclear deterrent of the United Kingdom of Great Britain and Northern Ireland.

Section 1671—Prohibition on Availability of Funds for Mobile Variant of Ground-Based Strategic Deterrent Missile

This section would provide that none of the funds authorized to be appropriated by this Act or otherwise made available for fiscal years 2017 through 2019 may be obligated or expended to retain the option for, or develop, a mobile variant of the ground-based strategic deterrent missile.

This section would also repeal section 1664 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328).

Section 1672—Report on Impacts of Nuclear Proliferation

This section would express a Sense of Congress regarding nuclear proliferation as a serious threat to national security and require the Secretary of Defense to submit a report to the congressional defense committees not later than 90 days after enactment of this Act regarding the impacts of nuclear proliferation, how the Department of Defense is contributing to the current strategy to respond to the threat of nuclear proliferation, and if and how nuclear proliferation is being addressed in the Nuclear Posture Review and other pertinent strategy reviews.

SUBTITLE F—MISSILE DEFENSE PROGRAMS

Section 1681—Administration of Missile Defense and Defeat Programs

This section would amend chapter 9 of title 10, United States Code, by creating a new section that would establish a unified major force program for missile defense and missile defeat programs. This section would require the Secretary of Defense to submit a report on such programs for fiscal years 2019–2023, included with the budget materials submitted as part of the President's budget request for such years.

This section would further require the Secretary to transfer acquisition authority and total obligation authority for each program covered by this section from the Missile Defense Agency to a military department not later than the date on which the President's budget is submitted for fiscal year 2020. The Secretary would also be required to submit a report, not later than 1 year after the date of the enactment of this Act, to the congressional defense committees on the plans for such a transition.

Lastly, this section would change the term of the Director of the Missile Defense Agency to 6 years and require that the Director report to and be under the authority of the Under Secretary of Defense for Research and Engineering.

Section 1682—Preservation of the Ballistic Missile Defense Capacity of the Army

This section would prohibit the Army from obligating or expending any funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2018 or any fiscal year thereafter to demilitarize any Guidance Enhanced Missile TBM (GEM–T) interceptor or remove any such interceptor from the operational inventory of the Army until the date on which the Secretary of the Army submits an evaluation to the congressional defense committees of the ability of the Army to meet warfighter requirements and operational needs if GEM–T interceptors are removed from the operational inventory of the Army. Such an evaluation shall consider whether the Army can maintain such an inventory by either (1) recertifying GEM–T interceptors either with or without modification; or (2) developing, testing, and fielding a new low-cost interceptor that can be added to the Army's inventory prior to the retirement of GEM–T interceptors.

Section 1683—Modernization of Army Lower Tier Air and Missile Defense Sensor

This section would direct the Secretary of the Army to issue an acquisition strategy not later than April 15, 2018, for a 360-degree lower tier air and missile defense sensor that achieves initial operating capability by January 1, 2022. This section would also establish the requirements, including the use of competitive procedures, that must be satisfied by such an acquisition strategy.

If the Secretary of the Army does not issue such an acquisition strategy by April 15, 2018, the Secretary would no longer be authorized to obligate or expend funding for the lower tier air and missile defense sensor. Additionally, the Secretary of Defense would be required to transfer the acquisition responsibility for such a sensor to the Missile Defense Agency, and its Director would be required to issue such acquisition strategy by not later than December 15, 2018.

If the Secretary of Defense carries out such transfer, this section would further require that after the 360-degree sensor achieves milestone-B approval (or equivalent), but before such sensor achieves milestone C approval (or equivalent), the Secretary of Defense would transfer the responsibility to procure such sensor and the funding authorized to carry out such procurement from the Director of the Missile Defense Agency to the Secretary of the Army.

Section 1684—Enhancement of Operational Test and Evaluation of Ballistic Missile Defense System

This section would require that, not later than 90 days after the date of the enactment of this Act, the Director of the Missile Defense Agency, the Director of Operational Test and Evaluation, the Secretary of the Army, and the Secretary of the Navy shall jointly ensure that the test plans of the Integrated Master Test Plan of

the ballistic missile defense system prioritize the integration of missile defense capabilities including Patriot, Aegis ballistic missile defense, and Terminal High Altitude Area Defense (THAAD).

The committee notes the recent emergency deployment of a THAAD battery to the Republic of Korea to protect U.S. and allied forces against the rapidly escalating ballistic missile threat from the Democratic People's Republic of Korea. While the committee supports this deployment, it remains concerned about substantial delays to the integration of and coordination between THAAD and other critical forward-deployed integrated air and missile defense systems, such as Patriot. The committee believes it is imperative that the Department of Defense be able to fully leverage forward-deployed missile defense assets as part of one integrated system capable of discriminating, tracking, and defeating advanced threats. Further, the committee believes that field commanders should have access to the full range of effectors and sensors to address any incoming missile threat.

The committee will continue to monitor efforts by the Department to fully integrate the various missile defense capabilities that have been developed.

Additionally, the committee looks forward to receiving the report on "Integration and Interoperability of Allied Missile Defense Capabilities" required to be submitted not later than December 31, 2017, by section 1676 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92).

### Section 1685—Defense of Hawaii from North Korean Ballistic Missile Attack

This section would state findings of Congress concerning the North Korean ballistic missile threat, and the sense of Congress concerning the improvement of the missile defense of Hawaii. This section also would direct the Secretary of Defense to protect the test and training operations of the Pacific Missile Range Facility, and assess the siting and functionality of a discrimination radar throughout the Hawaiian Islands before assessing the feasibility of using existing missile defense assets to improve the missile defense of Hawaii.

Further, this section would direct the Director of the Missile Defense Agency to conduct a test to evaluate the capability to defeat a simple intercontinental ballistic missile (ICBM) using the standard missile 3 (SM–3) block IIA interceptor and to develop a plan, as part of the integrated master test plan for the ballistic missile defense system, to defeat a complex ICBM threat, including a complex threat posed by North Korean ICBMs.

Lastly, this section would require the Secretary of Defense to submit a report to the congressional defense committees within 120 days after the enactment of this Act that indicates whether the nuclear deterrence capabilities of any adversary of the United States would be undermined by a capability to defend against North Korean ICBMs using SM–3 block IIA interceptors and whether the Secretary has developed a strategy to address any such effect upon an adversary's nuclear deterrent capabilities.

Section 1686—Aegis Ashore Anti-Air Warfare Capability

This section would authorize the Secretary of Defense to use funds authorized by sections 101 and 201 of this Act or otherwise made available for fiscal year 2018 for procurement, research, development, test, and evaluation, to continue development, procurement, and deployment of anti-air warfare capabilities at each Aegis Ashore site in Romania and the Republic of Poland.

This section would further require the Secretary to ensure that such capabilities are deployed at the site in Romania by not later than 1 year after the date of the enactment of this Act, and at the site in Poland by not later than 1 year after the declaration of operational status of that site.

Any reprogramming or transfer made to carry out this section would be carried out in accordance with established procedures for reprogramming or transfers.

Section 1687—Iron Dome Short-Range Rocket Defense System, Israeli Cooperative Missile Defense Program Codevelopment and Coproduction, and Arrow 3 Testing

This section would make available $92.0 million of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2018 for procurement, defense-wide, and for the Missile Defense Agency, for the Government of the State of Israel for the procurement of Tamir interceptors for the Iron Dome short-range rocket defense system.

This section would condition those funds subject to the terms, conditions, and coproduction targets specified for fiscal year 2018 in a bilateral international agreement amending the "Agreement Between the Department of Defense of the United States of America and the Ministry of Defense of the State of Israel Concerning Iron Dome Defense System Procurement."

This section would also require that not less than 30 days prior to the initial obligation of these funds, the Director of the Missile Defense Agency and the Under Secretary of Defense for Acquisition, Technology, and Logistics shall jointly submit to the congressional defense committees, the Committee on Foreign Affairs of the House of Representatives, and the Committee on Foreign Relations of the Senate, a certification that such agreement is being implemented as provided in the agreement and an assessment detailing any risks relating to the implementation of such agreement.

This section would authorize $221.5 million and $287.3 million out of such funds as are authorized to be appropriated by this Act or otherwise made available for fiscal year 2018 for procurement, defense-wide, and for the Missile Defense Agency, for procurement and coproduction of the David's Sling Weapon System and the Arrow 3 Upper Tier missile defense system, respectively.

This section would further specify the terms and conditions that shall be achieved by the Director of the Missile Defense Agency and the Under Secretary of Defense for Acquisition, Technology, and Logistics prior to the disbursement of the authorized funds for David's Sling and Arrow 3. These terms and conditions would include achievement of the knowledge points and production readiness agreements within the current bilateral research, development, test, and evaluation agreements; matched funding by the

Government of the State of Israel; the successful negotiation of a bilateral international agreement between the United States and the Government of Israel; agreed coproduction targets based on the teaming agreements for the codevelopment programs; and certain other matters, including apportionment of the costs of any delays for coproduction.

This section would also require the Under Secretary of Defense for Acquisition, Technology, and Logistics to provide a briefing to the congressional defense committees, the Committee on Foreign Affairs of the House of Representatives, and the Committee on Foreign Relations of the Senate, on the plans for improving the affordability of the David's Sling Weapon system and the Arrow 3 Upper Tier Interceptor Program not later than 30 days after such plans are approved.

Lastly, this section would limit the funds to be authorized by this Act or otherwise made available during fiscal year 2018 for the Missile Defense Agency for the testing of the Arrow 3 Upper Tier Development Program in ranges located in the United States and expenses related to such testing to not more than $105.0 million.

The committee recommends the authorization of these funds for procurement of missile defense system batteries and interceptors for the Government of Israel; however, it is not establishing specific production goals or commitments.

### Section 1688—Review of Proposed Ground-Based Midcourse Defense System Contract

This section would prohibit the Director of the Missile Defense Agency from changing the contracting strategy for the systems integration, operations, and test of the Ground-based Midcourse Defense (GMD) system until 30 days after the report specified at the end of this section is submitted to the congressional defense committees.

This section would require the Director of Cost Assessment and Program Evaluation (CAPE) to conduct a review of the contract for the systems integration, operations, and test of the GMD system, and submit such review to the Under Secretary of Defense for Research and Engineering and the Missile Defense Executive Board.

Lastly, this section would direct the Under Secretary of Defense for Research and Engineering and the Missile Defense Executive Board to submit a report to the congressional defense committees within 30 days after the review is received that includes the review itself, without change, and any views and recommendations of the Under Secretary and the Board on the review.

The committee has previously imposed limits on the use of lead system integrator (LSI) contracts. For example, section 807 of the John Warner National Defense Authorization Act for Fiscal Year 2007 (Public Law 109–364) prohibited the use of new LSI contracts under most circumstances. The committee believes that, generally, such contract arrangements have been of limited utility. In the case of the contract for the Ground-based Midcourse Defense System, which was in place at the time section 807 of Public Law 109–364 was enacted, the committee is concerned that while threats to the homeland are increasing, not enough information is known about the potential risks of disaggregating this contract. Moreover,

the GMD system is in the midst of robust and diverse modernization and test efforts.

Section 1689—Sense of Congress and Plan for Development of Space-Based Sensor Layer for Ballistic Missile Defense

This section would express the sense of Congress on the importance of a space-based missile defense sensor layer.

This section would require the Director of the Missile Defense Agency, in coordination with the Secretary of the Air Force and the heads of the appropriate Defense Agencies and combat support agencies, to develop a space-based sensor layer for ballistic missile defense that provides precision tracking data of missiles beginning in the boost phase and continuing throughout subsequent flight regimes; serves other intelligence, surveillance, and reconnaissance requirements; and achieves an operational prototype payload at the earliest practicable opportunity.

This section would require the Director to submit a plan within 1 year after the date of the enactment of this Act to the appropriate congressional committees that explains how the Director will carry out the development of a space-based sensor layer; the estimated costs of such a layer, including development, acquisition, deployment, and operations and sustainment; his assessment of the maturity of critical technologies necessary to make such a sensor layer operational and recommendations for any research and development activities; his assessment of the capabilities that can be provided by a space sensor layer that other ballistic missile sensor layers cannot provide; how the Director will leverage certain capabilities, including national technical means, hosted payloads, small satellites, among others; and any other matters the Director determines appropriate.

Section 1690—Sense of Congress and Plan for Development of Space-Based Ballistic Missile Intercept Layer

This section expresses the sense of Congress regarding the natural advantages of space systems and their potential integration into ballistic missile defense systems. It directs the Missile Defense Agency to submit a plan to develop a space-based ballistic missile intercept layer and establishes a space test bed for space-based ballistic missile intercept.

Section 1691—Limitation on Availability of Funds for Ground-Based Midcourse Defense Element of the Ballistic Missile Defense System

This section would limit the funds authorized by this Act for fiscal year 2018 for the Ground-Based Midcourse Defense (GMD) System by $50 million until the Secretary of Defense provides a written certification that risk of mission failure of GMD enhanced kill vehicles due to foreign object debris has been minimized; or if the certification cannot be made, a briefing on the corrective measures that will be carried out to minimize such risk.

Section 1692—Conventional Prompt Global Strike Weapon System

This section would direct the Secretary of Defense, in coordination with the Chairman of the Joint Chiefs of Staff, to plan to reach early operational capability for the conventional prompt global strike weapon system by September 30, 2022. Further, this section would limit the funds authorized by this Act for fiscal year 2018 for the conventional prompt global strike weapons system by 50% until the Chairman of the Joint Chiefs submits the report specified within this section to the congressional defense committees.

Section 1693—Determination of Location of Continental United States Interceptor Site

This section would require the Secretary of Defense to determine the location of a potential additional continental United States interceptor site within 30 days after the Ballistic Missile Defense Review is issued. The section would also require the Secretary to consider specified contributing factors when making such determination. Lastly, this section would direct the Secretary to submit a report to the congressional defense committees within 30 days after the site determination is made.

SUBTITLE G—OTHER MATTERS

Section 1695—Protection of Certain Facilities and Assets From Unmanned Aircraft

This section would amend section 130i of title 10, United States Code, to provide the authority to protect against a threat posed by unmanned aircraft against certain military ranges.

Section 1696—Use of Commercial Items in Distributed Common Ground Systems

This section would require that procurement for each Distributed Common Ground System (DCGS) be carried out in accordance with section 2377 of title 10, United States Code.

Section 1697—Independent Assessment of Costs Relating to Ammonium Perchlorate

This section would require the Secretary of Defense to seek to enter into a contract with a federally funded research and development center (FFRDC) for an assessment of the costs to the Department of Defense associated with Department contractors and subcontractors utilizing a new supplier for ammonium perchlorate in Department weapon systems that utilize such materials. The Secretary would be required to provide a report to the congressional defense committees containing the FFRDC's assessment, unchanged, along with any comments or views of the Secretary by not later than 120 days after the date of the enactment of this Act.

Section 1698—Limitation and Business Case Analysis Regarding Ammonium Perchlorate

This section would require the Secretary of Defense, acting through the Director of the Cost Assessment and Program Evaluation, to conduct a business case analysis regarding the options of

the Federal Government to ensure a robust domestic industrial base to supply ammonium perchlorate for use in solid rocket motors and submit a report including such analysis to the Comptroller General of the United States and the Committees on Armed Services of the Senate and House of Representatives by March 1, 2018. This section would also require the Comptroller General to review the report and provide a briefing to the Committees on Armed Services of the Senate and House of Representatives within 30 days after receiving the report. This section would also prohibit the use of any funds authorized by this Act for fiscal year 2018 for the Department of Defense to be obligated or expended for the development or construction of a new source for ammonium perchlorate until 45 days after the report containing the business case analysis is submitted.

Section 1699—Industrial Base for Large Solid Rocket Motors and Related Technologies

This section would require the Secretary of Defense, in consultation with the Administrator of the National Aeronautics and Space Administration, to develop a plan to ensure a robust domestic industrial base for large solid rocket motors and critical technologies, subsystems, components, and materials related to such rocket motors. The Secretary would be required to ensure the plan sustains not less than two domestic suppliers of:

(1) large solid rocket motors;
(2) small liquid-fueled rocket engines;
(3) aeroshells for reentry vehicles or reentry bodies;
(4) strategic radiation-hardened microelectronics; and
(5) any other critical technologies, subsystems, components, and materials within and relating to large solid rocket motors that the Secretary determines appropriate.

The Secretary would be required to submit a report that contains this plan and the views of the Secretary on various related matters to pertinent congressional committees by February 1, 2018.

Section 1699A—Pilot Program on Enhancing Information Sharing for Security of Supply Chain

This section would direct the Secretary of Defense to establish a pilot program by June 1, 2019, to enhance information sharing with cleared defense contractors for the purpose of ensuring supply chain security. This section would require the Secretary to select 10 acquisition or sustainment programs to participate in the pilot program and would further provide criteria that the Secretary would be required to satisfy when selecting the 10 programs.

This section would also require the Secretary to submit a report to the congressional defense committees by March 1, 2018, that includes details on how the Secretary will establish the pilot program and the identification of any legislative action or administrative action required to provide the Secretary with specific additional authorities required to fully implement the pilot program.

Section 1699B—Commission to Assess the Threat To the United States From Electromagnetic Pulse Attacks and Events

This section would establish a "Commission to Assess the Threat to the United States from Electromagnetic Pulse Attacks and Events." Members of the Commission would be appointed by the chairmen and ranking members of the House Committee on Armed Services and the Senate Committee on Armed Services.

This section would state that the duties of the Commission would be to review and assess various matters related to electromagnetic pulse attacks and events, both natural and man-made, that could be directed at or affect the United States within the next 20 years. The Commission would be required to submit a final report and interim briefing on its findings, conclusions, and recommendations, and the Secretary of Defense would be required to submit any views of the Secretary on the Commission's final report. This section would authorize $3.0 million for the activities of the Commission, would terminate the Commission 3 months after the Secretary submits views on the Commission's report, and would state that the Federal Advisory Committee Act (5 U.S.C. App.) applies to the Commission.

Finally, this section would repeal title XIV of the Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001 (Public Law 106–398).

Section 1699C—Pilot Program on Electromagnetic Spectrum Mapping

This section would establish a pilot program to assess the viability of space-based mapping of the electromagnetic spectrum used by the Department of Defense. It also directs an interim and final briefing by the Secretary of the Defense demonstrating how the Secretary plans to implement the pilot program.

# TITLE XVII—MATTERS RELATING TO SMALL BUSINESS PROCUREMENT

## LEGISLATIVE PROVISIONS

### SUBTITLE A—IMPROVING TRANSPARENCY AND CLARITY FOR SMALL BUSINESSES

Section 1701—Improving Reporting on Small Business Goals

This section would amend section 15(h) of the Small Business Act (15 U.S.C. 644(h)) to require the Small Business Administration, using data already required to be collected from contractors, to track companies that outgrow or no longer qualify for a small business program, as well as identify how prime contracting goals are met. The Small Business Administration would provide this information in its annual report, but only after relevant data systems have been modified to facilitate data collection and reporting. The committee expects the Office of Small Business Programs at the Department of Defense to take a leadership role in ensuring that the systems are appropriately modified.

Section 1702—Uniformity in Procurement Terminology

This section would amend section 3(m) of the Small Business Act (15 U.S.C. 632(m)) and section 15(j) of the Small Business Act (15 U.S.C. 644(j)) to update procurement terminology consistent with the Federal Acquisition Regulation and with terminology used in titles 10 and 41, United States Code.

Section 1703—Responsibilities of Commercial Market Representatives

This section would amend section 4(h) of the Small Business Act (15 U.S.C. 633(h)) to provide a clear definition of the duties and responsibilities of the commercial market representatives employed by the Small Business Administration. Responsibilities would include providing assistance to small business concerns seeking subcontracting opportunities on Federal contracts and assisting prime contractors with meeting the subcontracting obligations found in section 8(d) of the Small Business Act (15 U.S.C. 637(d)).

Section 1704—Responsibilities of Business Opportunity Specialists

This section would amend section 4(g) of the Small Business Act (15 U.S.C. 633(g)) to add a job description and reporting hierarchy for business opportunity specialists of the Small Business Administration.

SUBTITLE B—WOMEN'S BUSINESS PROGRAMS

Section 1711—Office of Women's Business Ownership

This section would amend section 29(g) of the Small Business Act (15 U.S.C. 656(g)) to clarify the duties of the Small Business Administration's Office of Women's Business Ownership and require that the office establish an accreditation program for its grant recipients.

Section 1712—Women's Business Center Program

This section would amend section 29 of the Small Business Act (15 U.S.C. 656), relating to the Women's Business Center Program, to provide definitions of key terms relating to eligibility; adjust the statutory cap on grants and requirement for matching funds by $0.035 million; establish a mechanism for use of unobligated grant funds at the end of the fiscal year; and improve oversight of grant recipients. This section also would require longer term planning, provide for continued authorization levels, and improve the application process.

Section 1713—Matching Requirements Under Women's Business Center Program

This section would amend section 29 of the Small Business Act (15 U.S.C. 656), relating to the Women's Business Center Program, to limit the ability of the Administrator of the Small Business Administration to waive the requirement for matching funds by grant recipients. It also would provide that excess non-Federal dollars obtained by a grant recipient will not be subject to part 200 of title 2, Code of Federal Regulations, or any successor regulations.

SUBTITLE C—SCORE PROGRAM

Section 1721—SCORE Reauthorization

This section would amend section 20 of the Small Business Act (15 U.S.C. 631 note) to authorize the SCORE program through fiscal year 2019, and to permit the current level of appropriations to extend through that period.

Section 1722—SCORE Program

This section would amend sections 8(b) and 8(c) of the Small Business Act (15 U.S.C. 637(b)–(c)) to rename the Service Corps of Retired Executives program as the "SCORE" program. This section would provide definitions for terms used in the SCORE program, require an annual report on the effectiveness of the program, and direct the Small Business Administration to establish standards protecting the information of entrepreneurs counseled by SCORE. Finally, this section would direct SCORE to utilize webinars and electronic mentoring as a way to increase SCORE's presence, and to engage in longer term strategic planning.

Section 1723—Online Component

This section would amend section 8(c) of the Small Business Act (15 U.S.C. 637(c)) to require SCORE to utilize webinars and electronic mentoring as a way to increase SCORE's presence. It would further require SCORE to provide a report to the Senate Committee on Small Business and Entrepreneurship and the House Committee on Small Business regarding the results of the online component requirement.

Section 1724—Study and Report on the Future Role of the SCORE Program

This section would require SCORE to engage in long-term strategic planning for how the program will evolve to meet the needs of America's entrepreneurs over the next 5 years.

Section 1725—Technical and Conforming Amendments

This section makes technical and conforming amendments to the Small Business Act (15 U.S.C. 631) reflective of other changes made in this title, such as the changing of name of program from Services Corps of Retired Executives to SCORE.

SUBTITLE D—SMALL BUSINESS DEVELOPMENT CENTERS IMPROVEMENTS

Section 1731—Use of Authorized Entrepreneurial Development Programs

This section would amend the Small Business Act (15 U.S.C. 631) by creating a new section to prohibit the Administrator of the Small Business Administration (SBA) from using unauthorized programs to deliver entrepreneurial development assistance. It would further require the Administrator to issue a report to the Committee on Small Business of the House of Representatives and the Committee on Small Business and Entrepreneurship of the Senate

detailing all entrepreneurial development activities to ensure taxpayer dollars are being spent wisely and efficiently.

Section 1732—Marketing of Services

This section would amend section 21 of the Small Business Act (15 U.S.C. 648) by creating a new subsection to provide more flexibility to Small Business Development Centers to market and advertise their products and services.

Section 1733—Data Collection

This section would amend section 21(a)(3)(A) of the Small Business Act (15 U.S.C. 648(a)(3)(A)) to require the Administrator of the Small Business Administration to collaborate with the Association of Small Business Development Centers, which acts as a resource partner, on the development of data collection documents. It further creates a new subsection that requires an annual report to the Committee on Small Business of the House of Representatives and the Committee on Small Business and Entrepreneurship of the Senate on data collection activities and establishes a working group on data collection.

Section 1734—Fees From Private Partnerships and Cosponsorships

This section would further amend Section 21(a)(3) of the Small Business Act (15 U.S.C. 648(a)(3)(C)), as amended by section 104, to allow Small Business Development Centers to collect fees for the operation of partnerships and cosponsorships, which is currently not permissible.

Section 1735—Equity for Small Business Development Centers

This section would amend section 21(a)(4)(C)(v) of the Small Business Act (15 U.S.C. 648(a)(4)(C)(v)) to increase by $100,000 the authorized funding level that could be used by the Administrator of the Small Business Administration to pay the Association of Small Business Development Centers for accreditation services, which would help to ensure enhanced Small Business Development Centers across the United States.

Section 1736—Confidentiality Requirements

This section would amend Section 21(a)(7)(A) of the Small Business Act (15 U.S.C. 648(a)(7)(A)) to prohibit the Small Business Administration from sharing Small Business Development Center client information with third parties. While the collection of certain information enhances the ability to track performance metrics, sharing sensitive information, such as the name of a business, is not necessary.

Section 1737—Limitation on Award of Grants to Small Business Development Centers

This section would amend Section 21 of the Small Business Act (15 U.S.C. 648) by creating a new subsection that prohibits entities other than higher education institutions from becoming a Small Business Development Center grantee. It also would provide an exception to those non-higher education entities that are currently

operating in the program. It would clarify that Women's Business Centers may receive funds from Small Business Development Center lead centers to act as subgrantees.

### SUBTITLE E—MISCELLANEOUS

#### Section 1741—Modification of Past Performance Pilot Program to Include Consideration of Past Performance With Allies of the United States

This section would amend section 8(d)(17) of the Small Business Act (15 U.S.C. 637(d)(17)) to require that the past performance pilot program authorized in section 8(d) of the Small Business Act allow small businesses to submit performance of a contract for a sale of defense items to the Government of a North Atlantic Treaty Organization (NATO) ally, the Government of a major non-NATO ally, or the government of a country with which the United States has a defense cooperation agreement for consideration for a past performance rating. The committee believes that this provision would improve the ability of small businesses to compete for contracts with Federal agencies.

# DIVISION B—MILITARY CONSTRUCTION AUTHORIZATIONS

## PURPOSE

Division B provides military construction, family housing, and related authorities in support of the military departments during fiscal year 2018. As recommended by the committee, division B would authorize appropriations in the amount of $10,221,942,000 for construction in support of the Active Forces, Reserve Components, defense agencies, and the North Atlantic Treaty Organization security infrastructure fund for fiscal year 2018.

## MILITARY CONSTRUCTION AND FAMILY HOUSING OVERVIEW

The Department of Defense requested $8,119,429,000 for military construction, $255,867,000 for Base Realignment and Closure (BRAC) activities, and $1,407,155,000 for family housing for fiscal year 2018. The committee recommends authorization of appropriations of $7,932,978,000 for military construction, $290,867,000 for BRAC activities, and $1,361,155,000 for family housing in fiscal year 2018. The Department of Defense also requested $638,130,000 for Overseas Contingency Operations military construction for fiscal year 2018. The committee recommends authorization of appropriations of $636,942,000 for Overseas Contingency Operations military construction within title XXIX.

#### Section 2001—Short Title

This section would cite division B of this Act as the "Military Construction Authorization Act for Fiscal Year 2018."

Section 2002—Expiration of Authorizations and Amounts Required To Be Specified by Law

This section would ensure that the authorizations provided in titles XXI through XXVII and title XXIX of this Act shall expire on October 1, 2020, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2021, whichever is later.

Section 2003—Effective Date

This section would provide that titles XXI through XXVII and title XXIX of this Act shall take effect on October 1, 2017, or the date of the enactment of this Act, whichever is later.

# TITLE XXI—ARMY MILITARY CONSTRUCTION

## SUMMARY

The budget request contained $920,394,000 for Army military construction and $529,287,000 for family housing for fiscal year 2018. The committee recommends authorization of appropriations of $957,794,000 for military construction and $511,287,000 for family housing for fiscal year 2018.

## ITEMS OF SPECIAL INTEREST

### Explanation of Funding Adjustments

The committee recommends an increase of funding for a project contained in the budget request submitted by the Department of the Army for military construction and family housing. Specifically, this increase is:

(1) $10.0 million for Unspecified Minor Construction at various worldwide locations. The budget request included $31.5 million in funding for this project. The committee recommends $41.5 million, an increase of $10.0 million, for this project.

In addition, the committee recommends reduction of funding for a project contained in the base budget request for military construction and family housing and recommends a transfer of this project to the Overseas Contingency Operations title of this Act. This reductions is:

(1) $6.4 million for the Forward Operating Site at an unspecified location in Turkey. The budget request included $6.4 million to support the expansion of Life and Mission support facilities for U.S. and host-nation personnel at a Missile Defense forward operating site (FOS). The committee supports this requirement. However, the committee recommends no funds in the base budget, a reduction of $6.4 million, for this project in order to transfer this project to Title XXIX, Overseas Contingency Operations Military Construction.

Finally, the committee recommends the inclusion of funding for several projects requested by the Department of the Army but not contained in the budget request for military construction and family housing. These increases include:

(1) $33.0 million for a Vehicle Maintenance Shop at Fort Hood, Texas. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of

the Army. Therefore, the committee recommends $33.0 million, an increase of $33.0 million, for this project.

(2) $10.8 million for an Air Traffic Control Tower at Fort Benning, Georgia. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Army. Therefore, the committee recommends $10.8 million, an increase of $10.8 million, for this project.

### Army Power Projection Platforms

Army power projection platforms are critical to mission readiness. Consistent review, sustainment, and timely recapitalization are necessary to maintain airfield and rail infrastructure at the required mission functional and readiness ratings. Therefore, the committee directs the Secretary of the Army to provide a briefing to the House Committee on Armed Services, not later than March 1, 2018, detailing the Army's power projection platform infrastructure investment strategy. The briefing shall include an overview of the current mission function and readiness ratings for the Infrastructure Mobility Category at power project platforms as indicated in the Installation Status Report and a current Army Power Projection Platform Transportation Infrastructure Capability Assessment Study with the Army's recommendations and associated cost estimates for required infrastructure improvements.

### Pohakuloa Training Area

The committee notes that the Pohakuloa Training Area supports joint and combined arms training for military forces in the Pacific region. Its 133,000 acres, cantonment area, and airfield support company and battalion level live-fire training using small-arms and crew-served weapons as well as artillery and mortar live-fire training. The committee is aware that the Department of the Army currently leases land from the State of Hawaii that makes up a portion of the Pohakuloa Training Area. The committee recognizes the important role that Pohakuloa Training Area plays in support of building and sustaining Army and Joint Force readiness and believes that ensuring continued long-term access to Pohakuloa is in the Army's interests. While the committee recognizes that the current lease is set to expire in 2029, the committee believes the Army should begin the process as soon as possible to ensure continued long-term access to the land for training.

## LEGISLATIVE PROVISIONS

### Section 2101—Authorized Army Construction and Land Acquisition Projects

This section would contain the list of authorized Army construction projects for fiscal year 2018. The authorized amounts are listed on an installation-by-installation basis. The State list contained in this Act is intended to be the binding list of the specific projects authorized at each location.

### Section 2102—Family Housing

This section would authorize new construction and planning and design of family housing units for the Army for fiscal year 2018.

Section 2103—Improvements to Military Family Housing Units

This section would authorize the Secretary of the Army to make improvements to existing units of family housing for fiscal year 2018.

Section 2104—Authorization of Appropriations, Army

This section would authorize appropriations for Army military construction at the levels identified in section 4601 of division D of this Act.

Section 2105—Modification of Authority to Carry Out Certain Fiscal Year 2014 Project

This section would modify the authority provided by section 2101 of the Military Construction Authorization Act for Fiscal Year 2014 (division B of Public Law 113–66) and authorize the Secretary of the Army to make certain modifications to the scope of a previously authorized construction project.

Section 2106—Modification of Authority to Carry Out Certain Fiscal Year 2015 Project

This section would modify the authority provided by section 2101 of the Military Construction Authorization Act for Fiscal Year 2015 (division B of Public Law 113–291) to authorize the Secretary of the Army to make certain modifications to the scope of a previously authorized construction project.

Section 2107—Extension of Authorization of Certain Fiscal Year 2014 Project

This section would extend the authorization of a certain project originally authorized by section 2101 of the Military Construction Authorization Act for Fiscal Year 2014 (division B of Public Law 113–66) until October 1, 2018, or the date of the enactment of an act authorizing funds for military construction for fiscal year 2019, whichever is later.

Section 2108—Extension of Authorizations of Certain Fiscal Year 2015 Projects

This section would extend the authorization of certain projects originally authorized by section 2101 of the Military Construction Authorization Act for Fiscal Year 2015 (division B of Public Law 113–291) until October 1, 2018, or the date of the enactment of an act authorizing funds for military construction for fiscal year 2019, whichever is later. This section was included in the President's request.

Section 2109—Additional Authority to Carry Out Certain Fiscal Year 2000, 2005, 2006, and 2007 Projects

This section provides additional authority to carry out certain fiscal year 2000, 2005, 2006, and 2007 projects.

# TITLE XXII—NAVY MILITARY CONSTRUCTION

## SUMMARY

The budget request contained $1,616,665,000 for Navy military construction and $411,964,000 for family housing for fiscal year 2018. The committee recommends authorization of appropriations of $1,674,985,000 for military construction and $403,964,000 for family housing for fiscal year 2018.

## ITEMS OF SPECIAL INTEREST

### Explanation of Funding Adjustments

The committee recommends reduction of funding for a project contained in the budget request submitted by the Department of the Navy for military construction and family housing. This reduction is:

(1) $45.19 million for Washington Navy Yard antiterrorism/force protection at the Washington Navy Yard, District of Columbia. The budget request included $60.0 million to enable protection of critical assets from explosive threats, acoustic and electronic surveillance and encroachment. The committee believes the Navy should seek more fiscally responsible options to address antiterrorism and force protection issues at the Washington Navy Yard. The committee supports taking steps to address force protection at Navy installations, but believes a $45.19 million land acquisition for real property on which to construct a museum is not a cost-effective or appropriate approach. Therefore, the committee recommends $14.81 million, a reduction of $45.19 million, for this project.

In addition, the committee recommends reduction of funding for a project contained in the base budget request submitted by the Department of the Navy for military construction and family housing and recommends a transfer of this projects to the Overseas Contingency Operations title of this Act. This reduction is:

(1) $13.39 million for an Aircraft Parking Apron Expansion at Camp Lemonnier, Djibouti. The budget request included $13.39 million to support transient and steady-state aircraft parking requirements. The committee supports this requirement. However, the committee recommends no funds in the base budget, a reduction of $13.39 million, for this project in order to transfer this project to Title XXIX, Overseas Contingency Operations Military Construction.

Finally, the committee recommends the inclusion of funding for several projects requested by the Department of the Navy but not contained in the budget request for military construction and family housing. These increases include:

(1) $47.6 million for an F–35 Simulator Facility at Miramar, California. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Navy. Therefore, the committee recommends $47.6 million, an increase of $47.6 million, for this project.

(2) $43.3 million for a Combat Vehicle Warehouse at Albany, Georgia. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department

of the Navy. Therefore, the committee recommends $43.3 million, an increase of $43.3 million, for this project.

(3) $36.0 million for an Undersea Rescue Command Operations Building at Coronado, California. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Navy. Therefore, the committee recommends $36.0 million, an increase of $36.0 million, for this project.

### Assessment of Department of Defense Equities for Operation and Maintenance of the George P. Coleman Memorial Bridge, Yorktown, VA

The committee notes that the George P. Coleman Memorial Bridge, spanning the York River between Yorktown and Gloucester Point, Virginia, is critical to the efficient transport of cargo to and from Naval Weapons Station Yorktown. The bridge's unique double swing design allows transport vessels bound for military installations upstream to reach their destinations without delay. In 1996, the bridge became a toll bridge to support construction of a new four-lane bridge to improve traffic flow. Daily bridge commuters can pay upwards of $500 per year in toll fees, some of which may go to operate the bridge's double swing span. The committee wishes to better understand the benefit the Department is deriving from commuter tolls and whether commuters are bearing an unfair burden. Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services, not later than March 1, 2018, that assesses the military value of the span, including details on the utilization rate of the span by the Department of Defense and other non-Department of Defense upriver traffic. In addition, the briefing should address the Department's discussions with local and State stakeholders that have fiduciary responsibility for the construction and management of the bridge, summarize any Department of Defense authorities and opportunities to help mitigate costs, and provide the Department's views whether such mitigations are appropriate.

### Red Hill Bulk Underground Fuel Storage Facility

The committee has previously noted the strategic value of the Red Hill Underground Fuel Storage Facility and the support that it provides to U.S. Pacific Command operations in peacetime and contingency. The committee continues to believe that the Red Hill Underground Storage Facility is a national strategic asset that supports combatant commander theater security requirements, contingency operations, and routine movements in the Indo-Asia-Pacific region. Despite its importance, the committee notes that the facility faces long-term challenges without adequate and timely resources to recapitalize the storage tanks to ensure their long-term integrity and environmental compliance.

The committee notes that in the committee report (H. Rept. 114–102) accompanying the National Defense Authorization Act for Fiscal Year 2016, the committee required the Director of the Defense Logistics Agency to provide a briefing to the committee 30 days after the approval of the best available and practicable technology (BAPT) solutions and the proposed recapitalization plan for the

Red Hill Underground Storage Facility. Similarly, in the committee report (H. Rept. 114–537) accompanying the National Defense Authorization Act for Fiscal Year 2017, the committee required the Secretary of the Navy to brief the committee 30 days after the approval of the completion of the Tank Upgrade Alternative decision document for application of the BAPT that will be used for the Red Hill Underground Storage Facility as well as address any updates to the Ground Water Protection Plan. The committee believes these briefing requirements remain valid and looks forward to receiving these briefings within the specified timelines.

Finally, the committee believes it is important for the Department of Defense to provide a detailed plan that identifies funding requirements, scope of work, and timelines for the application of the BAPT solutions that will be used in the Red Hill Underground Storage Facility. The committee expects that much of these details would be included in the annual budget justification materials submitted to Congress in support of the Department of Defense budget for a given fiscal year, as well as the Future Years Defense Program. However, the committee also believes that it is important the Department make this information publicly available to ensure transparency of the work being performed and ensure continued safe operations while mitigating and preventing future fuel leaks at the Red Hill Bulk Fuel Storage Facility.

## Requirements for Munitions and Explosives of Concern Clearance on Guam

The committee recognizes the efforts the Navy has undertaken to improve communication with stakeholders regarding the Explosive Safety Submission (ESS) requirements for Munitions and Explosives of Concern (MEC) clearance on military construction projects on Guam. The committee is supportive of these efforts and encourages the Navy to continue to hold regular sessions with stakeholders to solicit feedback on the ESS and its exemptions, consistency of application across projects, and impacts on military construction projects. The committee believes a key element to continuing to improve communication with stakeholders is to hire a full-time civilian employee to oversee, coordinate, and administer the implementation of the ESS and its associated amendments. The committee understands that the Navy has still not filled such a position and encourages the Navy to expedite the hiring process and consider temporarily assigning military or civilian personnel to fill that role in the interim. In addition, the committee believes the establishment of a Quality Assurance Surveillance Program would help better standardize the quality assurance requirements and streamline the implementation of the written requirements related to MEC clearance in support of military construction projects on Guam.

As this process has developed, the preponderance of possible hazardous explosives found at construction sites on Guam have been determined to be nonhazardous.

With that in mind, the committee believes the Navy should continue to periodically revisit the ESS and consider issuing additional exemptions that reflect stakeholder input and conditions on the ground to balance the cost, schedule, and efficacy of MEC clearance in support of military construction projects on Guam. The com-

mittee also notes that the Navy has not updated its MEC Likelihood Map for Guam to reflect data that has been gathered since the ESS was initially approved in 2010. The committee believes the Navy should update this document to better inform the ESS and additional exemptions to better inform MEC clearance on Guam. The committee directs the Secretary of the Navy to provide a briefing to the House Committee on Armed Services not later than September 30, 2017, on the status of the Navy's MEC response on Guam. Specifically the briefing should provide an update on the Navy's efforts to hire a full-time individual to oversee, coordinate, and administer the implementation of the ESS on Guam; how the Navy is addressing the Quality Assurance Surveillance Program requirements for MEC clearance on Guam; its plans to update the MEC Likelihood Map for Guam; and the data on hazardous versus nonhazardous anomalies detected, to include inoperable munitions, on Guam.

## LEGISLATIVE PROVISIONS

### Section 2201—Authorized Navy Construction and Land Acquisition Projects

This section would contain the list of authorized Navy construction projects for fiscal year 2018. The authorized amounts are listed on an installation-by-installation basis. The State list contained in this Act is intended to be the binding list of the specific projects authorized at each location.

### Section 2202—Family Housing

This section would authorize new construction and planning and design of family housing units for the Department of the Navy for fiscal year 2018.

### Section 2203—Improvements to Military Family Housing Units

This section would authorize the Secretary of the Navy to make improvements to existing units of family housing for fiscal year 2018.

### Section 2204—Authorization of Appropriations, Navy

This section would authorize appropriations for Navy military construction at the levels identified in section 4601 of division D of this Act.

### Section 2205—Extension of Authorizations for Certain Fiscal Year 2014 Projects

This section would extend the authorization of certain projects originally authorized by section 2201 of the Military Construction Authorization Act for Fiscal Year 2014 (division B of Public Law 113–66) until October 1, 2018, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2019, whichever is later.

Section 2206—Extension of Authorizations of Certain Fiscal Year 2015 Projects

This section would extend the authorization of certain projects originally authorized by section 2201 of the Military Construction Authorization Act for Fiscal Year 2015 (division B of Public Law 113–291) until October 1, 2018, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2019, whichever is later.

# TITLE XXIII—AIR FORCE MILITARY CONSTRUCTION

## SUMMARY

The budget request contained $1,738,796,000 for Air Force military construction and $403,386,000 for family housing for fiscal year 2018. The committee recommends authorization of appropriations of $1,610,774,000 for military construction and $383,386,000 for family housing for fiscal year 2018.

## ITEMS OF SPECIAL INTEREST

### Explanation of Funding Adjustments

The committee recommends reduction of funding for a project contained in the budget request submitted by the Department of the Air Force for military construction and family housing. This reduction is:

(1) $130.0 million for the Presidential Aircraft Recap Complex at Joint Base Andrews, Maryland. This budget request included $254.0 million to construct a complex to support the beddown of the new aircraft for the Presidential Airlift Group. The committee supports the requirement for this project and provides the full project authorization of $254.0 million included in the budget request. However, the committee supports the authorization of appropriations in an amount equivalent to the ability of the Department to execute in the year of the authorization for appropriations. For this project, the committee believes that the Department of Defense has exceeded its ability to fully expend the funding in fiscal year 2018. Therefore, the committee recommends $124.0 million, a reduction of $130.0 million, for this project.

In addition, the committee also recommends reduction of funding for several projects contained in the base budget request submitted by the Department of the Air Force for military construction and family housing and recommends a transfer of these projects to the Overseas Contingency Operations title of this Act. These reductions include:

(1) $27.325 million for a Guardian Angel Operations Facility at Aviano Air Base, Italy. The budget request included $27.325 million to support the relocation of search and rescue operations to Aviano Air Base, Italy. The committee supports this requirement. However, the committee recommends no funds in the base budget, a reduction of $27.325 million, for this project in order to transfer this project to Title XXIX, Overseas Contingency Operations Military Construction.

(2) $25.977 million for a 216 Person Dormitory at Incirlik Air Base, Turkey. The budget request included $25.977 million to construct a dormitory to support security forces and required response times. The committee supports this requirement. However, the committee recommends no funds in the base budget, a reduction of $25.977 million, for this project in order to transfer this project to Title XXIX, Overseas Contingency Operations Military Construction.

(3) $15.0 million for a Consolidated Squadron Operations Facility at Al Udeid Air Base, Qatar. The budget request included $15.0 million to support the consolidation of administration and management functions from separated temporary facilities into a consolidated permanent facility that is properly sized and configured. The committee supports this requirement. However, the committee recommends no funds in the base budget, a reduction of $15.0 million, for this project in order to transfer this project to Title XXIX, Overseas Contingency Operations Military Construction.

The committee also recommends the inclusion of funding for several projects requested by the Department of the Air Force but not contained in the budget request for military construction and family housing. These increases include:

(1) $44.0 million for Dormitories (288 RM) at Eglin Air Force Base, Florida. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Air Force. Therefore, the committee recommends $44.0 million, an increase of $44.0 million, for this project.

(2) $17.0 million for a Fire Station at Tyndall Air Force Base, Florida. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Air Force. Therefore, the committee recommends $17.0 million, an increase of $17.0 million, for this project.

(3) $9.3 million for a Fire Station at Kirtland Air Force Base, New Mexico. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Air Force. Therefore, the committee recommends $9.3 million, an increase of $9.3 million, for this project.

Finally, the budget request submitted by the Department of the Air Force for military construction and family housing included $269.0 million for a KC–46A Main Operating Base 4 at an unspecified location. The committee notes that on January 12, 2017, the Secretary of the Air Force announced Joint Base McGuire-Dix-Lakehurst, New Jersey, and Travis Air Force Base, California, as preferred alternatives for KC–46A Main Operating Base 4, with 24 primary assigned aircraft at each base. Furthermore, on June 5, 2017, the Secretary of the Air Force announced the decision to sequence the aircraft to Joint Base McGuire-Dix-Lakehurst with first aircraft arrival in fiscal year 2021, and to Travis Air Force Base with first aircraft arriving fiscal year 2023, pending KC–46 delivery schedule. Based on these announcements, the Air Force provided the committee with a list of specific military construction projects to facilitate this basing action. Therefore, the committee recommends a reduction of $269.0 million for the KC–46A Main Operating Base 4 project at an unspecified location and the inclusion of funding for several projects for the KC–46A Main Operating Base 4 requested by the Department of the Air Force but not con-

tained in the budget request for military construction and family housing. These projects include:

(1) $107.0 million for a KC–46A Aircraft 3–Bay Maintenance Hangar at Travis Air Force Base, California;

(2) $72.0 million for a KC–46A Two-Bay General Purpose Maintenance Hangar at Joint Base McGuire-Dix-Lakehurst, New Jersey;

(3) $18.0 million for a KC–46A ADAL B2324 Regional MX Training Facility at Joint Base McGuire-Dix-Lakehurst, New Jersey;

(4) $17.0 million for a KC–46A Alter Apron & Fuel Hydrants project at Joint Base McGuire-Dix-Lakehurst, New Jersey;

(5) $9.0 million for a KC–46A Alter Bldgs for Ops and TFI AMU–AMXS project at Joint Base McGuire-Dix-Lakehurst, New Jersey;

(6) $7.7 million for a KC–46A Alter B811 Corrosion Control Hangar project at Travis Air Force Base, California;

(7) $6.9 million for KC–46A ADAL B1816 for Supply project at Joint Base McGuire-Dix-Lakehurst, New Jersey;

(8) $6.4 million for a KC–46A Alter B181/185/187 Squad Ops/AMU project at Travis Air Force Base, California;

(9) $6.1 million for KC–46A ADAL B2319 for Boom Operator Trainer project at Joint Base McGuire-Dix-Lakehurst, New Jersey;

(10) $5.8 million for a KC–46A Alter Facilities for Maintenance project at Joint Base McGuire-Dix-Lakehurst, New Jersey;

(11) $4.1 million for a KC–46A Aerospace Ground Equipment Storage project at Joint Base McGuire-Dix-Lakehurst, New Jersey;

(12) $3.3 million for a KC–46A ADAL B3209 for Fuselage Trainer project at Joint Base McGuire-Dix-Lakehurst, New Jersey;

(13) $2.3 million for KC–46A Add to B1837 for Body Tanks Storage project at Joint Base McGuire-Dix-Lakehurst, New Jersey;

(14) $2.0 million for KC–46A ADAL B1749 for ATGL & LST Servicing project at Joint Base McGuire-Dix-Lakehurst, New Jersey;

(15) $1.4 million for KC–46A ADAL B14 Fuel Cell Hangar project at Travis Air Force Base, California.

### Air Force Dormitory Master Plan

The committee is aware that the Air Force maintains 866 permanent party dormitories world-wide and is in the process of developing an updated Dormitory Master Plan. The committee also understands the Air Force is reviewing its current unaccompanied housing strategy and policy as part of a working group led by senior Air Force enlisted personnel, with an emphasis on sustaining and improving the existing dormitory inventory. Therefore, the committee directs the Secretary of the Air Force to provide a briefing to the House Committee on Armed Services by March 1, 2018, on the results of the senior Airmen working group and the Air Force's updated Dormitory Master Plan. The briefing should include the total amount of military construction, sustainment, restoration, and modernization funding required to recapitalize unaccompanied dormitories by an Air Force determined date and the annual sustainment funding required to maintain unaccompanied dormitories. The briefing should also include an analysis of the feasibility of privatizing dormitories in some locations to speed improvements and reduce costs.

Lincoln Laboratory Recapitalization

The committee recognizes the critical role that Lincoln Laboratory plays in conducting research and developing technologies that address critical national security challenges. The committee notes that the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) included $40.0 million, as requested by the Air Force, for the planning and design of two military construction projects to support the recapitalization of facilities to support Lincoln Laboratory. The committee understands that the Air Force intends to award an architectural and engineering contract for the design of these facilities by early October 2017. Furthermore, the committee notes that the Future Years Defense Program submitted with the budget request for fiscal year 2018 has $225.0 million programmed for the construction of a West Laboratory Compound Semi-Conductor Lab/Microelectronics Integration Facility in fiscal year 2019, and $216.0 million programmed for a West Laboratory Engineering Prototype Facility in fiscal year 2022. The committee commends the Secretary of the Air Force for programming these investments and for committing to the recapitalization of the facilities and Lincoln Laboratory. The committee supports these important recapitalization efforts in order to keep the Department of Defense and the military services at the cutting edge of technology.

LEGISLATIVE PROVISIONS

Section 2301—Authorized Air Force Construction and Land Acquisition Projects

This section would contain the list of authorized Air Force construction projects for fiscal year 2018. The authorized amounts are listed on an installation-by-installation basis. The State list contained in this Act is intended to be the binding list of the specific projects authorized at each location.

Section 2302—Family Housing

This section would authorize new construction and planning and design of family housing units for the Air Force for fiscal year 2018.

Section 2303—Improvements to Military Family Housing Units

This section would authorize the Secretary of the Air Force to make improvements to existing units of family housing for fiscal year 2018.

Section 2304—Authorization of Appropriations, Air Force

This section would authorize appropriations for Air Force military construction at the levels identified in section 4601 of division D of this Act.

Section 2305—Modification of Authority To Carry Out Certain Fiscal Year 2017 Projects

This section would modify the authority provided by section 2301 of the Military Construction Authorization Act for Fiscal Year 2017 (division B of Public Law 114–328) and authorize the Secretary of

the Air Force to make certain modifications to the scope of previously authorized construction projects.

Section 2306—Extension of Authorizations of Certain Fiscal Year 2015 Projects

This section would extend the authorization of certain projects originally authorized by section 2301 of the Military Construction Authorization Act for Fiscal Year 2015 (division B of Public Law 113–291) until October 1, 2018, or the date of the enactment of an act authorizing funds for military construction for fiscal year 2019, whichever is later.

# TITLE XXIV—DEFENSE AGENCIES MILITARY CONSTRUCTION

## SUMMARY

The budget request contained $3,114,913,000 for defense agency military construction and $62,518,000 for family housing for fiscal year 2018. The committee recommends authorization of appropriations of $2,763,832,000 for military construction and $62,518,000 for family housing for fiscal year 2018.

## ITEMS OF SPECIAL INTEREST

### Explanation of Funding Adjustments

The committee recommends reduction of funding for several projects contained in the budget request submitted by the Department of Defense for military construction and family housing. These reductions include:

(1) $181.0 million for Next NGA West (N2W) Complex at St. Louis, Missouri. The budget request included $381.0 million to construct the first phase of a new complex for the National Geospatial-Intelligence Agency as it relocates to a new location in St. Louis, Missouri. The committee is aware that a $439.1 million second phase is also required to support the relocation. The committee believes it is more appropriate to authorize the full scope of a military construction requirement and provide incremental funding as opposed to bifurcating a construction project into separate phases. Therefore, the committee recommends combining the two phases into a single project and provides a total authorization of $812.0 million for the Next NGA West (N2W) Complex in St. Louis, Missouri. However, the committee supports providing an authorization of appropriations for fiscal year 2018 only in an amount equivalent to the ability of the National Geospatial-Intelligence Agency to execute in the year of the authorization of appropriations. Therefore, the committee recommends $200.0 million, a reduction of $181.0 million, for this project in fiscal year 2018.

(2) $100.0 million for the Hospital Replacement at Fort Leonard Wood, Missouri. The budget request includes $250.0 million to construct the first phase of a replacement hospital at Fort Leonard Wood, Missouri. The committee is aware that a $135.0 million second phase is also required to support the medical requirements at Fort Leonard Wood. The committee believes it is more appropriate

to authorize the full scope of a military construction requirement and provide incremental funding as opposed to bifurcating a construction project into separate phases. Therefore, the committee recommends combining the two phases into a single project and provides a total authorization of $381.3 million for the Hospital Replacement at Fort Leonard Wood, Missouri. However, the committee supports providing an authorization of appropriations for fiscal year 2018 only in an amount equivalent to the ability of the Defense Health Agency to execute in the year of the authorization of appropriations. Therefore, the committee recommends $150.0 million, a reduction of $100.0 million, for this project in fiscal year 2018.

(3) $11.941 million for the Blood Processing Center Replacement at Fort Leonard Wood, Missouri. The budget request included $11.941 million to construct a new blood processing center at Fort Leonard Wood, Missouri. The committee notes that a project was also included in the budget request to construct a hospital replacement at Fort Leonard Wood, Missouri. The committee believes there is a valid requirement for a new blood processing center, but believes the Defense Health Agency should consider including it in the scope of the new hospital as opposed to constructing it as a separate, stand-alone project. Therefore, the committee recommends no funds, a reduction of $11.941 million, for this project.

(4) $8.3 million for a Blood Processing Center at Fort Bliss, Texas. The budget requests includes $8.3 million to construct a new blood processing center at Fort Bliss, Texas. The committee notes that a project was also included in the budget request to provide an authorization of appropriations for the 8th increment for a hospital replacement project at Fort Bliss. The committee believes there is a valid requirement for a new blood processing center, but believes the Defense Health Agency should consider including it in the scope of the new hospital as opposed to constructing it as a separate, stand-alone project. Therefore, the committee recommends no funds, a reduction of $8.3 million, for this project.

(5) $10.0 million for Contingency Construction at Unspecified Worldwide Locations. The budget request included $10.0 million to support contingency construction requirements not previously authorized by law. The committee notes that the Department of Defense has not requested a military construction project using funds from this account since 2008. In addition, the committee notes that unobligated balances remain available in the military construction account and other authorities exist to construct projects that are in keeping with a national security interest. As such, the committee recommends no funds, a reduction of $10.0 million, for this program.

In addition, the committee recommends reduction of funding for a project contained in the base budget request for military construction and family housing and recommends a transfer of this project to the Overseas Contingency Operations title of this Act. This reduction is:

(1) $22.4 million to Construct Hydrant System at Naval Air Station Sigonella, Italy. The budget request included $22.4 million to replace an aging and inadequate jet fuel hydrant system and piping loop needed to support U.S. and North Atlantic Treaty Organization aircraft. The committee supports this requirement. However,

the committee recommends no funds in the base budget, a reduction of $22.4 million, for this project in order to transfer this project to Title XXIX, Overseas Contingency Operations Military Construction.

Finally, the committee recommends an increase of funding for a project for military construction and family housing. Specifically, this increase is:

(1) $10.0 million for the Missile Defense Agency Military Construction Planning and Design activities for an East Coast site for homeland missile defense. The budget request did not include funding for this project. The committee recommends $10.0 million, an increase of $10.0 million, for this project.

## LEGISLATIVE PROVISIONS

### Section 2401—Authorized Defense Agencies Construction and Land Acquisition Projects

This section would contain the list of authorized defense agencies' construction projects for fiscal year 2018. The authorized amounts are listed on an installation-by-installation basis. The state list contained in this Act is intended to be the binding list of the specific projects authorized at each location.

### Section 2402—Authorized Energy Resiliency and Conservation Projects

This section would authorize the Secretary of Defense to carry out energy conservation projects valued at a cost greater than $3.0 million at the amounts authorized for each project at a specific location. This section would also authorize the sum total of projects across various locations, each project of which is less than $3.0 million.

### Section 2403—Authorization of Appropriations, Defense Agencies

This section would authorize appropriations for defense agencies' military construction at the levels identified in section 4601 of division D of this Act.

### Section 2404—Modification of Authority To Carry Out Certain Fiscal Year 2017 Project

This section would modify the authority provided by section 2401(b) of the Military Construction Authorization Act for Fiscal Year 2017 (division B of Public Law 114–328) and authorize the Secretary of Defense to make certain modifications to the scope of a previously authorized construction project.

### Section 2405—Extension of Authorizations of Certain Fiscal Year 2014 Projects

This section would extend the authorization of certain projects originally authorized by section 2401 of the Military Construction Authorization Act for Fiscal Year 2014 (division B of Public Law 113–66) until October 1, 2018, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2019, whichever is later.

Section 2406—Extension of Authorizations of Certain Fiscal Year 2015 Projects

This section would extend the authorization of certain projects originally authorized by section 2401 of the Military Construction Authorization Act for Fiscal Year 2015 (division B of Public Law 113–291) until October 1, 2018, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2019, whichever is later.

# TITLE XXV—INTERNATIONAL PROGRAMS

## SUMMARY

The budget request contained $154,000,000 for the North Atlantic Treaty Organization Security Investment Program (NSIP) for fiscal year 2018. The committee recommends authorization of appropriations of $152,932,000 for NSIP for fiscal year 2018.

## ITEMS OF SPECIAL INTEREST

### Explanation of Funding Adjustments

The committee recommends an increase of funding for a project contained in the budget request submitted by the Department of Defense for the North Atlantic Treaty Organization (NATO) Security Investment Program. Specifically, this increase is:

(1) $23.932 million for the NATO Security Investment Program. The budget request includes $154.0 for the NATO Security Investment Program. The committee recommends $177.932 million, an increase of $23.932 million, for this program.

### Infrastructure Capabilities, Capacity, and Investments

Elsewhere in this report, the committee notes its position that there is operational and strategic value in maintaining forward presence of U.S. military forces in the U.S. European Command area of responsibility. As the Department of Defense considers what infrastructure investments may be required in Europe to support enduring and rotational U.S. forces, the committee believes it is important to identify the infrastructure capacity, capabilities, and planned investments of our North Atlantic Treaty Organization (NATO) partners. Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services by March 1, 2018, on the capability and capacity of the current and planned European infrastructure available to the Department of Defense by our NATO allies and partners. The briefing should address the current and planned capabilities and capacity of our NATO allies' and partners' infrastructure (to include transportation and logistics infrastructure); an assessment of any capability and capacity gaps that limit military exercises and operations with NATO allies and partners; and planned investments.

LEGISLATIVE PROVISIONS

SUBTITLE A—NORTH ATLANTIC TREATY ORGANIZATION SECURITY INVESTMENT PROGRAM

Section 2501—Authorized NATO Construction and Land Acquisition Projects

This section would authorize the Secretary of Defense to make contributions to the North Atlantic Treaty Organization Security Investment Program in an amount equal to the sum of the amount specifically authorized in section 2502 of this Act and the amount collected from the North Atlantic Treaty Organization as a result of construction previously financed by the United States.

Section 2502—Authorization of Appropriations, NATO

This section would authorize appropriations for the North Atlantic Treaty Organization Security Investment Program at the levels identified in section 4601 of division D of this Act.

SUBTITLE B—HOST COUNTRY IN-KIND CONTRIBUTIONS

Section 2511—Republic of Korea Funded Construction Projects

This section would authority the Secretary of Defense to accept four military construction projects totaling $105.5 million pursuant to agreement with the Republic of Korea for required in-kind contributions.

Section 2512—Modification of Authority To Carry Out Certain Fiscal Year 2017 Projects

This section would modify the authority provided by section 2511 of the Military Construction Authorization Act for Fiscal Year 2017 (division B of Public Law 114–328) and authorize the Secretary of Defense to make certain modifications to the scope of previously authorized construction projects.

# TITLE XXVI—GUARD AND RESERVE FORCES FACILITIES

SUMMARY

The budget request contained $574,661,000 for military construction of National Guard and Reserve facilities for fiscal year 2018. The committee recommends authorization of appropriations of $772,661,000 for military construction for fiscal year 2018.

ITEMS OF SPECIAL INTEREST

Explanation of Funding Adjustments

The committee recommends the inclusion of funding for several projects requested by the Department of the Army for the Army Reserve that were not contained in the budget request for military construction and family housing. These increases include:

(1) $30.0 million for a Reserve Center at Joint Base Lewis-McChord, Washington. The committee notes that this project was

included on a list of unfunded project requirements submitted by the Department of the Army. Therefore, the committee recommends $30.0 million, an increase of $30.0 million, for this project.

(2) $26.0 million for a Reserve Center at Fort Buchanan, Puerto Rico. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Army. Therefore, the committee recommends $26.0 million, an increase of $26.0 million, for this project.

In addition, the committee recommends the inclusion of funding for several projects requested by the Department of the Army for the Army National Guard that were not contained in the budget request for military construction and family housing. These increases include:

(1) $15.0 million for a Readiness Center Add/Alt at Fort Belvoir, Virginia. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Army. Therefore, the committee recommends $15.0 million, an increase of $15.0 million, for this project.

(2) $32.0 million for an Aircraft Maintenance Hangar at Springfield, Missouri. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Army. Therefore, the committee recommends $32.0 million, an increase of $32.0 million, for this project.

(3) $9.0 million for an Enlisted Barracks Transient Training at Mission Training Center Gowen, Idaho. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Army. Therefore, the committee recommends $9.0 million, an increase of $9.0 million, for this project.

In addition, the committee recommends the inclusion of funding for several projects requested by the Department of the Air Force for the Air Force Reserves that were not contained in the budget request for military construction and family housing. These increases include:

(1) $32.0 million for a Consolidated Mission Complex, Phase 2 at Robins Air Force Base, Georgia. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Air Force. Therefore, the committee recommends $32.0 million, an increase of $32.0 million, for this project.

(2) $3.1 million for a Munitions Training/Admin Facility at Naval Air Station Joint Reserve Base Fort Worth, Texas. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Air Force. Therefore, the committee recommends $3.1 million, an increase of $3.1 million, for this project.

(3) $9.0 million for an Indoor Small Arms Range at Minneapolis-St. Paul International Airport, Minnesota. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Air Force. Therefore, the committee recommends $9.0 million, an increase of $9.0 million, for this project.

Finally, the committee recommends the inclusion of funding for several projects requested by the Department of the Air Force for

the Air National Guard that were not contained in the budget request for military construction and family housing. These increases include:

(1) $8.0 million to Construct Small Arms Range at Hulman Regional Airport, Indiana. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Air Force. Therefore, the committee recommends $8.0 million, an increase of $8.0 million, for this project.

(2) $8.0 million to Construct Small Arms Range at Tulsa International Airport, Oklahoma. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Air Force. Therefore, the committee recommends $8.0 million, an increase of $8.0 million, for this project.

(3) $8.0 million to Construct Small Arms Range at Jackson International Airport, Mississippi. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Air Force. Therefore, the committee recommends $8.0 million, an increase of $8.0 million, for this project.

(4) $8.0 million to Construct Small Arms Range at Dane County Regional Airport/Truax Field, Wisconsin. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Air Force. Therefore, the committee recommends $8.0 million, an increase of $8.0 million, for this project.

(5) $1.9 million for an Addition to Building 764 for Weapons Release at Fort Wayne International Airport, Indiana. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Air Force. Therefore, the committee recommends $1.9 million, an increase of $1.9 million, for this project.

(6) $8.0 million to Construct Small Arms Range at Rickenbacker International Airport, Ohio. The committee notes that this project was included on a list of unfunded project requirements submitted by the Department of the Air Force. Therefore, the committee recommends $8.0 million, an increase of $8.0 million, for this project.

## LEGISLATIVE PROVISIONS

### Subtitle A—Project Authorizations and Authorizations of Appropriations

#### Section 2601—Authorized Army National Guard Construction and Land Acquisition Projects

This section would contain the list of authorized Army National Guard construction projects for fiscal year 2018. The authorized amounts are listed on an installation-by-installation basis. The State list contained in this Act is intended to be the binding list of the specific projects authorized at each location.

#### Section 2602—Authorized Army Reserve Construction and Land Acquisition Projects

This section would contain the list of authorized Army Reserve construction projects for fiscal year 2018. The authorized amounts are listed on an installation-by-installation basis. The State list

contained in this Act is intended to be the binding list of the specific projects authorized at each location.

Section 2603—Authorized Navy Reserve and Marine Corps Reserve Construction and Land Acquisition Projects

This section would contain the list of authorized Navy Reserve and Marine Corps Reserve construction projects for fiscal year 2018. The authorized amounts are listed on an installation-by-installation basis. The State list contained in this Act is intended to be the binding list of the specific projects authorized at each location.

Section 2604—Authorized Air National Guard Construction and Land Acquisition Projects

This section would contain the list of authorized Air National Guard construction projects for fiscal year 2018. The authorized amounts are listed on an installation-by-installation basis. The State list contained in this Act is intended to be the binding list of the specific projects authorized at each location.

Section 2605—Authorized Air Force Reserve Construction and Land Acquisition Projects

This section would contain the list of authorized Air Force Reserve construction projects for fiscal year 2018. The authorized amounts are listed on an installation-by-installation basis. The State list contained in this Act is intended to be the binding list of the specific projects authorized at each location.

Section 2606—Authorization of Appropriations, National Guard and Reserve

This section would authorize appropriations for the National Guard and Reserve military construction at the levels identified in section 4601 of division D of this Act.

SUBTITLE B—OTHER MATTERS

Section 2611—Modification of Authority to Carry Out Certain Fiscal Year 2015 Project

This section would modify the authority provided by section 2602 of the Military Construction Authorization Act for Fiscal Year 2015 (division B of Public Law 113–291) to authorize the Secretary of the Army to make certain modifications to the scope of a previously authorized construction project.

Section 2612—Extension of Authorizations of Certain Fiscal Year 2014 Projects

This section would extend the authorization of certain projects originally authorized by sections 2602, 2604, and 2605 of the Military Construction Authorization Act for Fiscal Year 2014 (division B of Public Law 113–66) until October 1, 2018, or the date of the enactment of an act authorizing funds for military construction for fiscal year 2019, whichever is later.

### Section 2613—Extension of Authorizations of Certain Fiscal Year 2015 Projects

This section would extend the authorization of certain projects originally authorized by sections 2602 and 2604 of the Military Construction Authorization Act for Fiscal Year 2015 (division B of Public Law 113–291) until October 1, 2018, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2019, whichever is later.

# TITLE XXVII—BASE REALIGNMENT AND CLOSURE ACTIVITIES

## OVERVIEW

The budget request contained $255,867,000 for activities related to Base Realignment and Closure (BRAC) activities. The committee recommends authorization of appropriations of $290,867,000 for BRAC activities.

## ITEMS OF SPECIAL INTEREST

### Explanation of Funding Adjustments

The committee recommends an increase of funding for a project contained in the budget request submitted by the Department of the Navy for Base Realignment and Closure (BRAC) activities from legacy rounds. Specifically, this increase is:

(1) $35.0 million for Base Realignment and Closure, Navy, at various worldwide locations. The budget request contained $93.474 million in funding for this project. The committee recommends $128.474 million, an increase of $35.0 million, for this project.

## LEGISLATIVE PROVISIONS

### Section 2701—Authorization of Appropriations for Base Realignment and Closure Activities Funded Through Department of Defense Base Closure Account

This section would authorize appropriations for ongoing activities that are required to implement the Base Realignment and Closure activities authorized by the Defense Base Closure and Realignment Act of 1990 (part A of title XXIX of Public Law 101–510), at the levels identified in section 4601 of division D of this Act.

### Section 2702—Prohibition on Conducting Additional Base Realignment and Closure (BRAC) Round

This section would affirm that nothing in this Act shall be construed to authorize an additional Base Realignment and Closure (BRAC) round.

# TITLE XXVIII—MILITARY CONSTRUCTION GENERAL PROVISIONS

## ITEMS OF SPECIAL INTEREST

### Air Training Ranges in the Department of Defense

The committee notes that the Department of the Air Force is in the process of developing an Enterprise Range Plan (ERP) to support and implement the live portion of the Air Force Operational Training Infrastructure Flight Plan. The ERP's ten-year service-wide investment strategy addresses current capabilities and training gaps for aircrew, mission crews, and battlefield airmen across the live training spectrum. The ERP proposes the establishment of 6 regional CONUS training ranges, down from 32 Air Force training ranges currently. This regional approach to investment in range capabilities addresses concerns with the airspace and simulated threat environment needed to train aircrews in 5th Generation weapon systems and advanced munitions. The Air Force is including a comprehensive review of the requirements for advanced training to include realistic live simulations of threats, targets, and air adversaries, as well as the efficiencies gained by proximity of regional ranges to flying units, the availability of air refueling and command-and-control assets, and instrumentation and range integration. The Air Force further views regionalization as not just a 5th Generation solution but one that can provide more opportunities for sophisticated team training, optimize 4th and 5th Generation integration opportunities, while continuing investment and procurement of 5th Generation training equipment.

The committee commends the Air Force for the frank assessment that current training systems for Contested, Degraded & Operationally Limited (CDO) operations have not kept pace with adversary capabilities, that training is degraded by lack of joint communication, review, and range control, and that encroachment of frequencies, airspace, and land continues to challenge the live enterprise. The committee is aware that the other military services face similar air combat training shortfalls which affect the readiness of their forces to simulate the range of threats posed by potential adversaries. These challenges are increased by reduced funding for electronic warfare (EW) range equipment such as mobile Advanced Long Range Strategic threat systems, an Advanced Medium Range Tactical Threat System (Double Digit Replicators) and legacy threat emitters to provide, along with simulated Integrated Air Defense System, the density to be expected in a contested environment.

Addressing these challenges, the committee notes that the Air Force budget request for fiscal year 2018 includes $8.9 million to start development of versions 3 and 4 of an Advanced Radar Threat System (ARTS) for combat training ranges, leveraging in part the Navy's program system development and demonstration of previous versions. The systems being developed by the Air Force will provide their combat training ranges with highly advanced surface-to-air threat simulation capabilities replicating current tactical highly mobile threats that, with the fielding of Joint Threat

Emitters (JTE), will ensure comprehensive EW training for aircrews of 5th Generation weapon systems for all the services.

The committee is concerned, though, that current funding plans at the six regional CONUS ranges for the installation of ARTS and JTEs systems will not result in an operational capability until 2026. Given the concerns of military leaders about the readiness and preparedness of current forces to deter or respond to the capabilities of near-peer competitors, the committee believes the extended funding profile adds more risk to readiness. In addition, the Air Force training systems may not be compatible with the Navy's Electronic Warfare Infrastructure Improvement Project intended to develop full power, multi-function, threat emitters and threat simulators.

The committee is also concerned that the ERP will only partially satisfy the need for expanded range capabilities and training space for each of the Services in order to support 5th Generation weapon systems and advanced munitions. In addition, the new threat simulation assets being developed by each Service are expensive to procure and operate. The committee is aware that the concept of regional ranges in the ERP can provide advanced training access to the largest number of users based on proximity and regional density. Properly executed regionalization for all the services can vastly improve the ability of units to access advanced training from home station with a Total Force and Joint approach.

Therefore, the committee directs the Secretary of Defense to review the efforts of the Air Force to date and to submit a briefing to the committee no later than December 1, 2017, on the following items:

(1) A review of the aircrew training requirements for 5th generation weapons systems and advanced munitions for each service and the current capabilities of air ranges operated by the service to meet emerging needs;

(2) To what extent the Air Force ERP, as linked to the broader Operational Training Infrastructure Flight Plan, can meet the aviation training requirements for the other services;

(3) The value of expanding the development of the ERP to incorporate the training needs of the other services;

(4) A review of costs and benefits of combining service development efforts and accelerating the acquisition timeline for new combat air training systems;

(5) An assessment of the risk to aircrew readiness as a result of deferred funding for investments in a complete array of threat simulation systems; and

(6) A review of the extent to which the Secretary of Defense can improve the effectiveness and efficient use of resources by promoting a policy for the collaborative and joint use of airspace range ranges by all the Services.

## Aircraft Stationing, Basing, and Laydown Process

The committee believes that the military departments' selection process for stationing, basing, and laydown decisions for units and missions should be transparent, repeatable, and defendable in nature. This includes transparency during the initial evaluation of basing criteria at the installation level. While the military departments each have their own unique requirements that may require

variations in their stationing, basing, and laydown decisions, the committee notes that the capacity of a military installation, its associated training areas, and their ability to support mission requirements remain the primary drivers in the process. The committee believes this emphasis on mission requirements and capacity is appropriate and believes that continued engagement with the congressional defense committees at multiple points throughout each of the military services' stationing, basing, and laydown processes is critical.

The committee directs the Secretary of Defense to provide a report to the House Committee on Armed Services by January 31, 2018, on each military service's existing process for stationing, basing, and laydown decisions for the F–35 Joint Strike Fighter. Specifically, the report should detail how the current selection criteria take into consideration elements such as capacity, availability, and access to training areas and whether military requirements may drive changes to the criteria for future stationing, basing, or laydown decisions. The report shall address how each military service assesses the importance of having immediate access to training areas and how each service accounts for the impact of weather at the training areas. Finally, the report shall also address how current basing criteria consider the capacity, availability, and access to training areas in support of the other services or to host joint exercises to fully utilize the F–35 Joint Strike Fighter's capabilities when making their basing decision.

### Collaboration with Federal Aviation Administration on Unmanned Aerial Systems

The committee believes that the significant military training demand for Unmanned Aerial Systems suggests that Federal Aviation Administration (FAA) regulations regarding line-of-sight requirements be reevaluated. The committee encourages the Secretary of Defense and the Administrator of the Federal Aviation Administration to continue to collaborate on the development of plans and policies that would allow the Department's Unmanned Aerial Systems to operate within military operating area airspace contiguous to existing restricted airspace without line-of-sight requirements. Furthermore, the committee is interested in understanding in detail the Department's current engagement on this issue with the Federal Aviation Administration. Therefore, the committee directs the Chair of the Department of Defense's Policy Board on Federal Aviation to provide a briefing to the House Committee on Armed Services, not later than March 1, 2018, detailing the board's efforts to advocate for the elimination regulatory restrictions that prevent routine access to national airspace for the Department of Defenses' Unmanned Aerial Systems.

### Efficient and Integrated Military Installations

The committee notes that the Department of Transportation initiated the Smart City Challenge in December 2015, seeking innovative ideas for an integrated smart transportation system to move people and goods more quickly, cheaply, and efficiently. The committee notes that this program resulted in seven cities being selected to further develop their proposals. The committee is inter-

ested in how the Department of Defense can leverage Smart City concepts and apply them to military installations to improve military readiness and the delivery of services to military personnel and military families, manage infrastructure more efficiently, and enhance installation physical and cyber security. Therefore, the committee directs the Secretary of Defense, in coordination with the Secretaries of the military departments, to provide a briefing to the House Armed Services Committee not later than March 1, 2018. The briefing should provide an overview of initiatives the Department has undertaken to incorporate a broad range of government, commercial, and other innovative technological and processes that improve the performance, efficiency, and effectiveness of military infrastructure and services provided on military installations and how these initiatives are being incorporated into installation master plans.

### Enhanced Use Leases

The committee notes that the military departments have authorities provided by section 2667 of title 10, United States Code, to enter into long-term agreements commonly referred to as "enhanced use leases" (EULs). Under these agreements, the military departments are able to receive cash or in-kind consideration for non-excess military land that is then developed by a private entity. This authority has been used to develop electricity generation, commercial and industrial facilities, and other infrastructure projects that have benefited both the military installation as well as the surrounding communities. However, the committee notes that concerns have been raised on the length of time it can take to initiate, negotiate, and implement an EUL. The committee encourages the military departments to seek opportunities to streamline this process where possible while continuing to ensure that agreements are in the Government's best interest. If the Secretary of Defense believes legislative changes are needed to speed the process, the committee welcomes any recommendations he may choose to make.

### Financial Institutions on Military Installations

The committee is aware that the Department of Defense has not established a standardized method of calculating and considering the in-kind value of the financial education, support, and services provided by financial institutions when determining the terms of a facility lease to support the operation of financial institutions on a military installation. Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services, not later than March 1, 2018, regarding the Department's progress in establishing a standardized process. At a minimum, the briefing should address how the Department calculates the in-kind value of services provided by financial institutions on military installations, as well as whether the in-kind value calculated for these services can be used to partially or fully satisfy the fair market value requirement for leasing non-excess property on military installations pursuant to section 2667 of title 10, United States Code. It should also address the Department's efforts to ensure appropriate policies and instructions are in place to support the consistent calculation of the in-kind value of services when

negotiating facility leases to support the operation of financial institutions on military installations.

Infrastructure Master Plan for Defense Laboratory and Research, Development, Test, and Evaluation Infrastructure

The committee notes that the Department of Defense laboratory enterprise and facilities supporting research, development, test, and evaluation (RDT&E) are critical to ensuring the Department of Defense and the military services are at the cutting edge of technology. The committee notes that the National Defense Authorization for fiscal year 2016 (Public Law 114–92) established a pilot program authorizing the use of up to $150.0 million per year in RDT&E funding to support military construction projects to support laboratory and research and development infrastructure requirements. In addition, the National Defense Authorization for fiscal year 2017 (Public Law 114–328) increased the minor military construction threshold for laboratory facilities to $6.0 million. These authorities were provided as a supplement to the traditional military construction process to provide additional flexibility and options for recapitalizing laboratory and RDT&E infrastructure. The committee encourages the Department to utilize these authorities to sustain the health of infrastructure critical to the in-house enterprise. However, the committee notes that many of the laboratory and RDT&E facilities do not currently have fully developed master plans that synchronize required infrastructure investments with current and emerging military requirements. Therefore, the committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services not later than March 1, 2018 on the Department's timeline and efforts to develop infrastructure master plans to support laboratory and RDT&E infrastructure requirements.

Overseas Infrastructure and Facility Investments

The committee asserts that there is operational and strategic value in maintaining infrastructure and access to facilities that can support forward presence of U.S. military forces. Forward-positioned forces provide rapid response capabilities to geographic combatant commanders, serve as a deterrent to potential adversaries while assuring partners and allies, and facilitate cooperative efforts to build and develop partner-nation security capabilities. The committee recognizes that infrastructure and facilities contribute to developing and sustaining readiness, projecting military capabilities, and supporting the quality-of-life for military personnel and their families.

As the Department of Defense develops its military construction and facility investment program, the committee encourages the Department to propose military construction and facility investments that support strategic or operational requirements, including projects at overseas locations. The committee welcomes overseas military construction projects or facility investments connected to validated operational or strategic requirements that support the forward-deployed posture of the U.S. Armed Forces.

### Railroads for National Defense

The committee is aware that the Military Surface Deployment and Distribution Command Transportation Engineering Agency manages the Railroads for National Defense Program. This program helps ensure the readiness capability and capacity of the national railroad network to support defense deployment and peacetime needs. While the program has no funding to support rail infrastructure investments, the committee notes that the program helps to integrate defense rail needs into civil sector planning, policies, and standards working in concert with the Federal Railroad Administration through the establishment of the Strategic Rail Corridor Network (STRACNET). The committee notes that STRACNET is an interconnected and continuous rail line network that is supplemented by defense connector lines that serve locations that generate military rail shipments. Together STRACNET and the defense connector lines consist of over 36,000 miles of track serving over 100 defense installations.

The committee is aware that the Railroads for National Defense Program reviews, analyzes, and identifies rail line requirements to support military rail service and movement of oversize and overweight cargo. This analysis is updated every 5 years, with the most recent report published in October 2013. Therefore, the committee directs the Commander of the Military Surface Deployment and Distribution Command to provide a briefing to the House Committee on Armed Services, not later than 30 days after completion of the next updated STRACNET report, regarding the analysis and findings of the report. At minimum, the briefing should address rail networks that have been identified as part of the Strategic Rail Corridor Network or defense connector lines, identify any rail infrastructure capability or capacity gaps that impact military installations requiring rail service, and discuss mitigations or plans to address any rail infrastructure capability or capacity gaps that have been identified.

### Sentinel Landscapes Partnership Program

The committee notes the successful initial implementation of the Sentinel Landscapes Partnership Program. The interagency, intergovernmental, and public private partnership approach of the Sentinel Landscapes Partnership Program contributes to a strong rural economy, to advancing natural resource goals, and to achieving the overall goal of the Department of Defense's Readiness and Environmental Protection Integration (REPI) program to address encroachment issues that limit or restrict military training, testing, and operations. Operating under an interagency Memorandum of Understanding since 2013, six partner landscapes at military installations around the country have been designated, which has provided additional opportunities for collaboration to achieve mutually beneficial outcomes both for the eligible landowners and agricultural producers who voluntarily choose to participate and for DoD and the other agencies participating in the Sentinel Landscapes Partnership Program. The committee encourages the Department to support the designation of additional Sentinel Landscapes in order to further enhance efforts to address current or potential restric-

tions on the testing and training activities that are vital to preserving military readiness.

The committee directs the Secretary of Defense to provide a briefing to the House Committee on Armed Services not later than September 30, 2017:

(1) How the program has benefited the military and defense communities in terms of limiting encroachment and protecting training and other readiness development and sustainment efforts, the benefits to landowners and agricultural producers who have elected to participate;

(2) The process and criteria for designating an area as a Sentinel Landscape;

(3) Steps taken or planned to expand the number of designated Sentinel; Landscapes; and

(4) Whether codifying the Sentinel Landscapes Partnership program would be beneficial

### Sustainment and Recapitalization of Utilities

The committee believes that military installations must have modern, efficient, resilient utility infrastructure. The committee notes that while some installations have undergone a modernization of their utility infrastructure, many continue to rely on aging and inefficient systems that marginally support today's missions. The committee observes that some installations have utilized utility privatization authorities to reinvest, operate, and sustain their utility systems and other installations still maintain and operate their utility systems.

The committee seeks to better understand the Department of Defense's investment strategy to ensure military installations are supported by modern, efficient, and resilient utility infrastructure. Therefore, the committee directs the Secretaries of the military departments to provide a briefing to the House Committee on Armed Services by March 1, 2018, on their plans for recapitalizing aging utility infrastructure and systems. The briefing should include a discussion of the condition of utility systems that are currently owned, sustained, and operated by the military departments and a discussion on the military departments' plans for modernization or recapitalizing aging utility systems through appropriated funds or utility privatization authorities.

### Use of Federal Facilities by Contractors

The Committee is aware that the Army is in the process of reviewing real property accountability and facility utilization with an eye towards reducing installation footprints and eliminating underused and unused excess facilities within the United States. Part of the Army's review will result in consolidating facility occupancy in accordance with Army standards to the minimum space needed to accomplish missions. The Army's planned completion date of the review and consolidation actions is currently October 2021. The Committee commends the Army for undertaking this endeavor and encourages the Department of the Navy and Air Force to devote resources to carry out reviews similar to the Army.

The Committee is concerned that contractors may occupy space in a DOD-owned or leased space co-located with military functions

as a matter of convenience rather than a bona fide contractual obligation. As a result, facilities may be overcrowded even though the authorized number of personnel assigned to the facility falls within Unified Facilities Criteria standards. Also, in some cases, the military leases trailers or other temporary facilities in order to meet emerging mission requirements even as they accommodate extraneous civilian contractor personnel occupying a government facility.

Therefore, the committee directs the Secretary of Defense, in coordination with the secretaries of the military departments, to provide a briefing to the House Committee on Armed Services not later than March 30, 2018. At a minimum, the briefing shall quantify the amount of space currently occupied by government contractors and whether or not their occupancy is pursuant to a contractual obligation on the part of the government, or whether their occupancy is provided as a convenience for the contractor. The briefing shall include statements by the departments regarding actions taken to relocate contractors not required by federal contract to be co-located with the military on DOD-owned installations or in a federally leased space principally occupied by a DOD activity.

### Veteran Apprenticeship Programs and Military Construction

The committee notes that section 2805 of the Ike Skelton National Defense Authorization Act for Fiscal Year 2011 (Public Law 111–383) expressed the sense of Congress regarding the establishment of a "Veterans to Work" pilot program to provide an opportunity for apprentices, who are also veterans, to work on military construction projects. The committee continues to believe that state certified and Federally recognized apprenticeship training programs can help with a military service member's transition to a civilian career. Therefore, the committee encourages the Secretary of Defense and the Secretaries of the military departments to seek opportunities to increase the utilization of veterans' apprenticeship programs on military construction projects.

### Wastewater Treatment Infrastructure

The committee notes that the budget request includes a number of military construction projects to provide potable water and wastewater treatment infrastructure to support military installations. The committee notes that the military departments have leveraged existing authorities to enter into intergovernmental support agreements with local municipalities as well as utilizing the Utility Privatization authorities to provide utility services to military installations. The committee has been supportive of the use of these authorities, and notes that they provide opportunities for military installations and neighboring communities to work together to provide mutually beneficial utility services in a more efficient and cost-effective manner. The committee believes that in certain cases, it may be in the interest of the military installation to enter into mutually beneficial agreements with local municipalities to provide utility services, to include water and wastewater. Therefore, the committee directs the Secretary of Defense, in coordination with the secretaries of the military departments, to provide a briefing to the House Committee on Armed Services not later than March 30, 2018. At minimum, the briefing shall address the proc-

ess used to identify utility infrastructure investments required to support a military installation, how the development of those requirements is coordinated with local municipalities, and how the Department makes a determination to carry out a military construction project or enter into an agreement with a local municipality or private partner to meet the installation's requirement.

## LEGISLATIVE PROVISIONS

### SUBTITLE A—MILITARY CONSTRUCTION PROGRAM AND MILITARY FAMILY HOUSING

#### Section 2801—Elimination of Written Notice Requirement for Military Construction Activities and Reliance on Electronic Submission of Notifications and Reports

This section would modify sections of title 10, United States Code, to eliminate the submission of a notification in writing for certain infrastructure, facility, and real property related investments while maintaining the requirement that the notification be provided in an electronic medium pursuant to section 480 of title 10, United States Code.

#### Section 2802—Modification of Thresholds Applicable to Unspecified Minor Construction Projects

This section would modify section 2805(a) of title 10, United States Code, to increase the unspecified minor military construction project threshold from $3.0 million to $6.0 million and to remove the differentiation between aforementioned unspecified minor military construction projects and "life-threatening, health-threatening, or safety-threatening" projects. This section would also modify section 2805(b) of title 10, United States Code, to decrease the unspecified minor military construction project advance approval threshold requirement for the service secretary concerned from $1.0 million to $0.75 million and would increase the threshold for use of operation and maintenance amounts to carry out an unspecified minor military construction project from $1.0 million to $2.0 million pursuant to section 2805(c) of title 10, United States Code.

#### Section 2803—Extension of Temporary, Limited Authority To Use Operation and Maintenance Funds for Construction Projects Outside the United States

This section would provide continued authority for the Secretary of Defense to use funds appropriated for Operation and Maintenance for military construction to meet temporary operational requirements during a time of declared war, national emergency, or contingency operation through the end of fiscal year 2018.

#### Section 2804—Use of Operation and Maintenance Funds for Military Construction Projects To Replace Facilities Damaged or Destroyed by Natural Disasters or Terrorism Incidents

This section would amend section 2854 of title 10, United States Code, to enable use of operation and maintenance funds to replace a facility damaged or destroyed by a natural disaster or a terrorism incident.

## SUBTITLE B—REAL PROPERTY AND FACILITIES ADMINISTRATION

### Section 2811—Elimination of Written Notice Requirement for Military Real Property Transactions and Reliance on Electronic Submission of Notifications and Reports

This section would amend several sections of title 10, United States Code, to eliminate the submission of a notification in writing for certain real property related transactions while maintaining the requirement that the notification be provided in an electronic medium pursuant to section 480 of title 10, United States Code.

### Section 2812—Clarification of Applicability of Fair Market Value Consideration in Grants of Easements on Military Lands for Rights-of-Way

This section would clarify section 2668 of title 10, United States Code, to ensure the Secretary of a military department receives fair market value when granting easements.

### Section 2813—Criteria for Exchanges of Property at Military Installations

This section would amend section 2869 of title 10, United States Code, to allow for the exchange of real property located on a military installation when it is determined to be advantageous to the United States.

### Section 2814—Prohibiting Use of Updated Assessment of Public Schools on Department of Defense Installations To Supersede Funding of Certain Projects

This section would amend section 2814 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) to ensure that the schools contained in the top 33 highest priority schools on the Department of Defense July 2011 assessment of public schools on military installations that have not yet received funding would not be superseded by an updated assessment.

The committee encourages the Office of Economic Adjustment to work with school districts when administering the Public Schools on Military Installations program to find innovative funding solutions to meet State match requirements.

### Section 2815—Requirements for Window Fall Prevention Devices in Military Family Housing

This section would amend chapter 169 of title 10, United States Code, to require the Secretaries of the military departments to provide for the installation of fall prevention devices in windows meeting specific requirements at all current military family housing units, including housing under the Military Housing Privatization Initiative, family housing owned by the military departments, family housing leased by the Department of Defense, as well as units acquired or constructed in the future. This section would also require the Secretaries to brief the House Committee on Armed Services not later than 180 days after the date of the enactment of this Act on matters relating to the implementation of this section.

Section 2816—Authorizing Reimbursement of States for Costs of Suppressing Wildfires Caused by Department of Defense Activities on State Lands; Restoration of Lands of Other Federal Agencies for Damage Caused by Department of Defense Vehicle Mishaps

This section would amend section 2691 of title 10, United States Code, to allow the Secretary of Defense to reimburse a State for the reasonable costs of the State in suppressing wildland fires caused by the activities of the Department of Defense on State lands. In addition, this section would allow the Secretary of Defense to restore land under the administrative jurisdiction of another Federal agency when that land is damaged as the result of a mishap involving a vessel, aircraft, or vehicle of the Department of Defense. Finally, this section would also allow another Federal agency to restore land under the administrative jurisdiction of the Secretary of Defense or a military department if damaged as the result of a mishap involving a vessel, aircraft, or vehicle of a Federal agency that is not part of the Department of Defense.

Section 2817—Prohibiting Collection of Additional Amounts from Members Living in Units Under Military Housing Privatization Initiative

This section would add section 2879 to sub-chapter IV of chapter 169 of title 10, United States Code, to prohibit the collection of additional out of pocket fees from service members living in Military Housing Privatization Initiative housing.

SUBTITLE C—LAND CONVEYANCES

Section 2821—Land Exchange, Naval Industrial Reserve Ordnance Plant, Sunnyvale, California

This section would authorize a land exchange of the Naval Industrial Reserve Ordnance Plant located in Sunnyvale, California, for property interests that meet the readiness requirements of the Department of the Navy.

Section 2822—Land Conveyance, Naval Ship Repair Facility, Guam

This section would direct the Secretary of the Navy to convey, without consideration, certain Navy real property to the Guam Economic Development Authority for the purpose of providing support for ship repair and other military maintenance requirements.

Section 2823—Lease of Real Property to the United States Naval Academy Alumni Association and Naval Academy Foundation at United States Naval Academy, Annapolis, Maryland

This section would provide authority for the Secretary of the Navy to lease approximately three acres at the United States Naval Academy in Annapolis, Maryland, to the United States Naval Academy Alumni Association and the United States Naval Academy Foundation.

Section 2824—Land Conveyance, Natick Soldier Systems Center, Massachusetts

This section would authorize the Secretary of the Army to sell and convey approximately 98 acres of real property in the vicinity of Hudson, Wayland, and Needham, Massachusetts in exchange for cash payment that is not less than the fair market value of the property. This section would also authorize the Secretary to use the proceeds of the sale to demolish, construct, or rehabilitate military family housing, unaccompanied soldier housing, or ancillary support facilities to support military personnel assigned to the U.S. Army Natick Soldier Systems Center.

Section 2825—Imposition of Additional Conditions on Land Conveyance, Castner Range, Fort Bliss, Texas

This provision would amend section 2844 of the National Defense Authorization Act for Fiscal Year 2013 (Public Law 112–239) to place additional conditions on an authorized conveyance of 7,081 acres of real property at Fort Bliss to the Parks and Wildlife Department of the State of Texas.

Section 2826—Land Conveyance, Wasatch-Cache National Forest, Rich County, Utah

This section would direct the Secretary of Agriculture to transfer 80 acres of U.S. Forest Service managed public land to the Utah State University Space Dynamics Laboratory Research Foundation, a non-profit organization exempt from Federal income taxes under section 501(c)(3) of title 26, United States Code.

Section 2827—Land Conveyance, Former Missile Alert Facility known as Quebec-01, Laramie County, Wyoming

This section would authorize the Secretary of the Air Force to convey, without consideration, certain Air Force real property to the State of Wyoming for the purpose of operating a museum for the benefit of the public.

SUBTITLE D—MILITARY LAND WITHDRAWALS

Section 2831—Indefinite Duration of Certain Military Land Withdrawals and Reservations and Improved Management of Withdrawn and Reserved Lands

This section would amend the existing statutory military land withdrawals from Department of the Interior jurisdiction by extending them for an indefinite time period while putting in place a continuous review, coordinated between the Department of Defense and the Department of Interior, and public comment process regarding the resource management plans and military use of such lands.

Section 2832—Temporary Segregation from Public Land Laws of Property Subject to Proposed Military Land Withdrawal; Temporary Use Permits and Transfers of Small Parcels of Land between Departments of Interior and Military Departments; More Efficient Surveying of Lands

This section would amend chapter 6 of title 43, United States Code, to allow the Secretary of the Interior to grant permission to the Secretary of Defense to conduct military training or testing on land under the jurisdiction of the Department of the Interior for up to 30 days, provided such use would be consistent with the purposes for which the Secretary of the Interior manages the land. In addition, this section would authorize the transfer of parcels of land smaller than 5,000 acres between the Department of Defense and the Department of the Interior. Finally, this section would permit the use of geographic coordinates for conducting original surveys of land instead of using physical monuments.

SUBTITLE E—MILITARY MEMORIALS, MONUMENTS, AND MUSEUMS

Section 2841—Modification of Prohibition on Transfer of Veterans Memorial Objects to Foreign Governments without Specific Authorization in Law

This section would amend section 2572(e) of title 10, United States Code, to limit the restrictions in that section to veterans memorial objects brought to the United States prior to 1907. This section would also extend the prohibition of the return of veterans memorial objects to a foreign country or an entity controlled by a foreign government until September 30, 2022.

Section 2842—Recognition of the National Museum of World War II Aviation

This section would recognize the National Museum of World War II Aviation in Colorado Springs, Colorado, as America's National World War II Aviation Museum.

Section 2843—Principal Office of Aviation Hall of Fame

This section would amend section 23107 of title 36, United States Code, to remove the requirement that the Principal Office of the Aviation Hall of Fame be located in Dayton, Ohio, while retaining the requirement that the office be located in Ohio.

SUBTITLE F—SHILOH NATIONAL MILITARY PARK

Section 2851—Short Title

This section would provide that this subtitle may be cited as the "Shiloh National Military Park Boundary Adjustment and Parker's Crossroads Battlefield Designation Act."

Section 2852—Definitions

This section would provide definitions for specific terms used in this subtitle.

Section 2853—Areas to Be Added to Shiloh National Military Park

This section would modify the boundary of Shiloh National Military Park and provide the Secretary of the Interior with authority to acquire lands by donation, purchase from willing sellers with donated or appropriated funds, or exchange.

Section 2854—Establishment of Affiliated Area

This section would establish Parker's Crossroads Battlefield in the State of Tennessee as an affiliated area of the National Park System, authorize the Secretary of the Interior to provide technical assistance and to enter into cooperative agreements with the management entity, and require the development of a general management plan for the affiliated area.

Section 2855—Private Property Protection

This section would prohibit the Secretary of the Interior from acquiring land or interests in land by condemnation for the purposes of this subtitle, would require written consent from property owners prior to their property being included in the Shiloh National Military Park, and prohibits the creation of buffer zones outside of the park.

SUBTITLE G—OTHER MATTERS

Section 2861—Modification of Department of Defense Guidance on Use of Airfield Pavement Markings

This section would direct the Secretary of Defense modify the Unified Facilities Guide Specifications for pavement markings, or any other Department of Defense guidance on airfield pavement markings, to prohibit the use of Type I glass beads or any glass bead with a 1.6 refractive index or less from use on airfield markings on airfields under the control of the Secretary.

Section 2862—Authority of Chief Operating Officer of Armed Forces Retirement Home to Acquire and Lease Property

This section would amend section 411 of title 24, United States Code, to authorize the Chief Operating Officer of the Armed Forces Retirement Home to acquire and lease property.

## TITLE XXIX—OVERSEAS CONTINGENCY OPERATIONS MILITARY CONSTRUCTION

### SUMMARY

The budget request contained $638,130,000 for Overseas Contingency Operations military construction for fiscal year 2018. The committee recommends authorization of appropriations of $636,942,000 for Overseas Contingency Operations military construction for fiscal year 2018.

## ITEMS OF SPECIAL INTEREST

### Explanation of Funding Adjustments

The committee recommends reduction of funding for several projects contained in the budget request submitted by the Department of Defense for military construction and family housing. These reductions include:

(1) $30.0 million to Construct Parallel Taxiway at Kecskemet Air Base, Hungary. The budget request included $30.0 million in funding for this project. The committee supports the requirement for this project and provides the full project authorization of $30.0 million included in the budget request. However, the committee supports the authorization of appropriations in an amount equivalent to the ability of the Department to execute in the year of the authorization for appropriations. For this project, the committee is concerned the Department may not be able to begin construction in fiscal year 2018. Therefore, the committee recommends no funds, a reduction of $30.0 million, for the authorization of appropriation for this project.

(2) $22.0 million for Airfield Upgrades at Sliac Airport, Slovakia. The budget request included $22.0 million in funding for this project. The committee supports the requirement for this project and provides the full project authorization of $22.0 million included in the budget request. However, the committee supports the authorization of appropriations in an amount equivalent to the ability of the Department to execute in the year of the authorization for appropriations. For this project, the committee is concerned the Department may not be able to begin construction in fiscal year 2018. Therefore, the committee recommends no funds, a reduction of $22.0 million, for the authorization of appropriation for this project.

(3) $20.0 million to Increase POL Storage Capacity at Malacky, Slovakia. The budget request included $20.0 million in funding for this project. The committee supports the requirement for this project and provides the full project authorization of $20.0 million included in the budget request. However, the committee supports the authorization of appropriations in an amount equivalent to the ability of the Department to execute in the year of the authorization for appropriations. For this project, the committee is concerned the Department may not be able to begin construction in fiscal year 2018. Therefore, the committee recommends no funds, a reduction of $20.0 million, for the authorization of appropriation for this project.

(4) $12.9 million for Airfield Upgrades at Kecskemet Air Base, Hungary. The budget request included $12.9 million in funding for this project. The committee supports the requirement for this project and provides the full project authorization of $12.9 million included in the budget request. However, the committee supports the authorization of appropriations in an amount equivalent to the ability of the Department to execute in the year of the authorization for appropriations. For this project, the committee is concerned the Department may not be able to begin construction in fiscal year 2018. Therefore, the committee recommends no funds, a reduction of $12.9 million, for the authorization of appropriation for this project.

(5) $12.5 million to Increase POL Storage Capacity at Kecskemet Air Base, Hungary. The budget request included $12.5 million in funding for this project. The committee supports the requirement for this project and provides the full project authorization of $12.5 million included in the budget request. However, the committee supports the authorization of appropriations in an amount equivalent to the ability of the Department to execute in the year of the authorization for appropriations. For this project, the committee is concerned the Department may not be able to begin construction in fiscal year 2018. Therefore, the committee recommends no funds, a reduction of $12.5 million, for the authorization of appropriation for this project.

(6) $10.3 million to Replace/Expand Quick Reaction Alert Pad at Rygge, Norway. The budget request included $10.3 million in funding for this project. The committee supports the requirement for this project and provides the full project authorization of $10.3 million included in the budget request. However, the committee supports the authorization of appropriations in an amount equivalent to the ability of the Department to execute in the year of the authorization for appropriations. For this project, the committee is concerned the Department may not be able to begin construction in fiscal year 2018. Therefore, the committee recommends no funds, a reduction of $10.3 million, for the authorization of appropriation for this project.

(7) $4.0 million for Airfield Upgrades at Malacky, Slovakia. The budget request included $4.0 million in funding for this project. The committee supports the requirement for this project and provides the full project authorization of $4.0 million included in the budget request. However, the committee supports the authorization of appropriations in an amount equivalent to the ability of the Department to execute in the year of the authorization for appropriations. For this project, the committee is concerned the Department may not be able to begin construction in fiscal year 2018. Therefore, the committee recommends no funds, a reduction of $4.0 million, for the authorization of appropriation for this project.

As noted earlier in this report, the committee recommended a reduction in funding for several projects included in the base budget request in order to transfer them to the Overseas Contingency Operations title of this Act. Therefore the committee recommends a commensurate increase in the Overseas Contingency Operations account to support these projects. Specifically, these projects include:

(1) $27.325 million for a Guardian Angel Operations Facility at Aviano Air Base, Italy.

(2) $25.997 million for a 216 Person Dormitory at Incirlik Air Base, Turkey.

(3) $22.4 million to Construct Hydrant System at Naval Air Station Sigonella, Italy.

(4) $15.0 million for a Consolidated Squadron Operations Facility at Al Udeid Air Base, Qatar.

(5) $13.39 million for an Aircraft Parking Apron Expansion at Camp Lemonnier, Djibouti.

(6) $6.4 million for the Forward Operating Site at an unspecified location in Turkey.

## LEGISLATIVE PROVISIONS

### Section 2901—Authorized Army Construction and Land Acquisition Projects

This section would contain the list of certain authorized Army construction projects for fiscal year 2018. These projects represent a binding list of the specific projects authorized at these locations.

### Section 2902—Authorized Navy Construction and Land Acquisition Project

This section would contain the list of a certain authorized Navy construction project for fiscal year 2018. This project represents a binding list of the specific project authorized at this location.

### Section 2903—Authorized Air Force Construction and Land Acquisition Projects

This section would contain the list of certain authorized Air Force construction projects for fiscal year 2018. These projects represent a binding list of the specific projects authorized at these locations.

### Section 2904—Authorized Defense Agencies Construction and Land Acquisition Project

This section would contain the list of a certain authorized defense agency's construction project for fiscal year 2018. This project represents a binding list of the specific project authorized at this location.

### Section 2905—Authorization of Appropriations

This section would authorize appropriations for Overseas Contingency Operations military construction at the levels identified in section 4602 of division D.

### Section 2906—Extension of Authorization of Certain Fiscal Year 2015 Projects

This section would extend the authorizations of certain projects originally authorized by section 2902 of the Military Construction Authorization Act for Fiscal Year 2015 (division B of Public Law 113-291) until October 1, 2018, or the date of the enactment of an act authorizing funds for military construction for fiscal year 2019, whichever is later.

# DIVISION C—DEPARTMENT OF ENERGY NATIONAL SECURITY AUTHORIZATIONS AND OTHER AUTHORIZATIONS

# TITLE XXXI—DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS

## OVERVIEW

The budget request for fiscal year 2018 contained $20.31 billion for atomic energy defense activities. The committee recommends $20.64 billion, an increase of $326.2 million to the budget request.

## ITEMS OF SPECIAL INTEREST

### NATIONAL NUCLEAR SECURITY ADMINISTRATION

#### Overview

The budget request for fiscal year 2018 contained $13.93 billion for the programs of the National Nuclear Security Administration. The committee recommends $14.18 billion, an increase of $253.2 million to the budget request.

#### Weapons Activities

*Advanced simulation and computing*

The committee understands the central role high-performance computing plays in stockpile stewardship, management, and responsiveness efforts, particularly in the absence of nuclear explosive testing. The committee acknowledges and supports NNSA's push towards exascale computing technologies, but is mindful of the need to ensure the long-term compatibility of supercomputer hardware architectures and critical nuclear weapons software codes. Accordingly, it will be essential to ensure that the computing industry is aware of NNSA's unique needs and that the industry develops the necessary technology. Also central will be reworking or remaking software codes to ensure future compatibility. Furthermore, trust in software results must be tempered by comparison to nuclear test histories and continued robust real-world, non-nuclear testing.

The committee recognizes that the Department of Energy's Office of Science is a key partner with NNSA in developing exascale computing and sustaining current high-performance computing capabilities. The committee expects NNSA and the Office of Science to remain closely linked and provide updates to the committee on dislocations or cuts in either program that could affect NNSA's nuclear weapons mission.

*Analysis of alternatives for unobligated enriched uranium*

The committee believes the Department of Energy must ensure the availability of a long-term supply of unobligated enriched uranium for national security purposes, notably for the production of tritium and to power naval reactors. The committee notes that in October 2015, the Department of Energy released its report entitled "Tritium and Enriched Uranium Management Plan Through

2060" that identified options the Department of Energy is currently undertaking to extend its existing inventory of unobligated low enriched uranium (LEU) for tritium production. In addition, in December 2016, the Department of Energy formally initiated an analysis of alternatives process to assess technology and policy options that could provide a supply of unobligated enriched uranium for the long term.

As it proceeds with its analysis of alternatives on the technology and policy options for providing future unobligated enriched uranium, the committee expects the Department of Energy to comprehensively and rigorously consider all alternatives, consistent with Department of Energy guidance and the Government Accountability Office's October 2015 report on best practices for analysis of alternatives processes. Such analysis of alternatives should comprehensively consider construction costs, total life-cycle costs, scheduled need dates, domestic industrial base impacts, opportunities to make changes in existing policy, and risks and benefits across all potential programs and options. The committee also expects that the Department of Energy will work closely with other pertinent departments and agencies to consider the options. The committee expects the Department of Energy to keep the committee updated on its progress related to these efforts.

*Beryllium*

Beryllium is a critical strategic material used by the Department of Energy, the Department of Defense, and the defense industry. If manufactured or processed improperly or without adequate safety measures, it can cause fatal health problems in exposed workers. While research efforts are underway to determine the performance of possible alternative materials, beryllium remains unique in its ability to fulfill important material requirements, particularly for nuclear weapons. The committee believes that elements of the U.S. Government, in particular the Secretary of Energy, should be mindful of the need to ensure a reliable and efficient supply of beryllium and beryllium-oxide as long as such materials remain crucial to national defense. The committee believes the Secretary of Energy and the Administrator for Nuclear Security should consider whether to designate beryllium a strategic material for the nuclear weapons stockpile, similar to plutonium, uranium, lithium, and tritium, and apply similar rigor and attention to ensuring sufficient capacity and capability is available. The committee also expects the Administrator to keep the committee informed on issues or plans related to beryllium procurement and supply, including existing stocks, as well as timelines and costs for future production or procurement.

*Defense nuclear security*

The budget request contained $687.0 million for Defense Nuclear Security at the National Nuclear Security Administration (NNSA). This funding supports both day-to-day security operations across the nuclear security enterprise, as well as sustainment and recapitalization of physical security infrastructure and equipment.

With the change in administrations and senior leadership at NNSA and the Department of Energy, the committee emphasizes the need for continued leadership attention on physical security

within the nuclear security enterprise. The committee believes recent efforts, such as the Security Management Improvement Program (S–MIP), the Security Infrastructure Revitalization Program (SIRP) and associated 10-Year Revitalization Plan, and the Center for Security Technology, Analysis, Response, and Testing (CSTART) are encouraging steps towards resolving longstanding deficiencies in NNSA's physical security program. The committee believes that clarity on roles, responsibilities, and accountability for physical security is essential. NNSA and the Department of Energy must continue efforts to bring greater effectiveness, clarity, and consistency to oversight and management practices, requirements, standards, and policies for physical security. Of particular importance will be efforts to provide and clearly document physical security roles, responsibilities, and accountability. The committee believes that there has been limited progress on this front, but that it is essential that a successful security program use scarce resources for maximum benefit while appropriately assessing, managing, mitigating, accepting, and overseeing risk. The committee therefore urges the Administrator for Nuclear Security, in consultation with appropriate officials from the Department of Energy, to provide a briefing to the Committees on Armed Services of the Senate and the House of Representatives by December 1, 2017, on efforts and plans to align and clarify roles, responsibilities, and accountability for physical security. The committee seeks additional information on efforts related to security risk assessments and acceptance, budgets, inspections, policy making, oversight, and operations.

The committee recommends $720.0 million, an increase of $33.0 million, for Defense Nuclear Security. The committee expects this increase to support CSTART efforts, accelerate the realization of significant cost savings via the Y–12 protected area reduction project, and enable SIRP to accelerate projects to recapitalize physical security infrastructure. Elsewhere in this title, the committee includes a provision to ensure the initiation of the Material Staging Facility at Pantex, which would provide a significant boost to security and operations while avoiding significant future costs to modernize outdated security infrastructure.

*Nuclear Survivability*

The budget request contained $45.2 million for the Nuclear Survivability subprogram, which is focused on ensuring U.S. nuclear weapons can survive in even the most extreme hostile environments.

In its December 2016 report, the Defense Science Board stated, "A consequence of the reduction in numbers of U.S. nuclear weapons is that an even higher premium is placed on reliability and survivability of the remaining force," and noted that, "It should be obvious that if U.S. nuclear forces are to be part of a credible deterrent, they must be able to survive and function in an adversary generated nuclear environment." The committee has no doubt that current U.S. nuclear forces and weapons meet this exacting and critical requirement today and for the foreseeable future.

However, as it looks to the future, including the current and planned major nuclear modernization programs before it, the National Nuclear Security Administration and the Department of De-

fense must be mindful of effectively countering and addressing the defensive capabilities that adversaries continue to advance and change. U.S. nuclear warheads and forces of the future must be capable of surviving and functioning for the entirety of their expected design lives in a highly uncertain and more dynamic adversary-generated nuclear environment, particularly as the size of the stockpile declines. The committee recognizes that the world-class experts and cutting-edge capabilities in the national security laboratories and plants will be key to understanding and meeting this challenge. Robust capabilities and knowledge related to advanced radiography, subcritical and scaled experiments, inertial confinement fusion, pulsed power, high performance computing, hardened microelectronics, materials, systems engineering, and many more will all play a vital role for enhancing our understanding of how U.S. nuclear weapons perform. In addition, the plans and concepts of operation employed by U.S. Strategic Command will also play an important role in addressing requirements for a credible nuclear deterrent.

The committee recommends $49.2 million for Nuclear Survivability, an increase of $4.0 million to the budget request.

*Secure transportation asset and mobile guardian transporter*

The budget request for the National Nuclear Security Administration's (NNSA) Secure Transportation Asset includes funding for the Mobile Guardian Transporter (MGT) program, which will develop and procure new highly secure trailers for the transportation of nuclear weapons, nuclear components, and special nuclear material.

The committee notes NNSA's submission, pursuant to section 3142 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92), of its analysis of alternatives for the MGT design and appreciates its thoroughness. The committee believes a full understanding of requirements, risk, and cost trade-offs is essential for the MGT program. As the current Safeguards Transporter (SGT) trailers near the end of their 20-year design life, the committee expects NNSA to execute the MGT program on schedule and on budget to ensure that the Office of Secure Transportation is prepared to support the coming workload of the nuclear security enterprise. Efforts to extend portions of the SGT fleet must also be made, but the committee stresses that new trailers must be a priority to ensure safety and security.

*Single-point failures in the nuclear security enterprise*

The committee supports the National Nuclear Security Administration's (NNSA) efforts to examine alternative means for acquiring key capabilities, components, or materials from industry partners when such alternative means make sense for both budgets and national security. The committee is aware of significant concerns regarding potential single-point failures within the nuclear security enterprise. As NNSA has appropriately sought to reduce redundancy within the enterprise over the past several decades, the impact from such a failure has increased and could potentially create large and long-term impacts on NNSA's nuclear weapons mission.

To better understand these concerns and potential avenues for addressing them, the committee directs the Administrator for Nu-

clear Security to provide a briefing to the House Committee on Armed Services by January 30, 2018, on what operations are carried out in aging or inadequate facilities within the nuclear security enterprise that are at significant risk of single-point failures. As part of this briefing, the Administrator should assess and describe the costs, benefits, risks, opportunities, and national security implications of: (1) recapitalizing or replacing these facilities, including how these facilities are being prioritized for recapitalization or replacement; (2) leveraging industry partners to provide the necessary capabilities, components, or materials; and (3) other courses of action the Administrator determines appropriate to ensure a robust but cost effective enterprise.

Defense Nuclear Nonproliferation

*Nuclear counterterrorism and incident response program and emergency preparedness*

The committee has long highlighted the importance and value of the National Nuclear Security Administration's (NNSA) programs that counter and respond to nuclear terrorism threats. The unique capabilities and knowledge that NNSA's laboratories provide to these programs enable the nation's first responders and warfighters to detect, evaluate, and take decisive and technically informed action against all types of nuclear threats. The committee encourages continued close collaboration among NNSA and its partner agencies to prioritize technology development and deployment funding to ensure technical information and leading-edge capabilities are in the field and available.

The committee notes continued concerns about the Department of Energy's emergency preparedness and response programs. The Defense Nuclear Facilities Safety Board (DNFSB) has highlighted these concerns in two formal recommendations since 2014. The committee expects NNSA and the Department of Energy to take robust action to follow through on the commitments made in the implementation plans that were provided in response to these DNFSB recommendations.

*Nuclear detection and verification efforts*

The committee is aware that nuclear detection and verification efforts, and improving related cooperation and engagement, were a focus of discussion at the May 2017 Preparatory Committee for the 2020 Nuclear Non-Proliferation Treaty Review Conference. To support the coming Review Conference and increase international support for a successful conference, the committee believes a comprehensive understanding of U.S. Government efforts related to research, development, policies, and plans is warranted.

In this context, the committee notes that section 3132 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) required an updated national roadmap for nuclear detection and verification. The committee remains concerned that, for a second year in a row, the report delivered pursuant to this statutory requirement failed to provide an adequate or comprehensive response. Instead, the report only described initial steps and lacked a clear explanation of the plan, current and planned capabilities,

near-term or long-term objectives, funding needs, actions, or recommendations.

Therefore, as a step toward increasing understanding of current and planned efforts, the committee directs the Administrator for Nuclear Security, in coordination with the relevant national security laboratories, to provide a briefing to the Committee on Armed Services of the House of Representatives not later than December 1, 2017, on nuclear verification and detection programs. In particular, such briefing should include a description of relevant current or potential research and development programs that could enhance international cooperation with foreign partners, and the opportunities, benefits, risks, and challenges associated with such programs.

## Naval Reactors

### *Naval Reactors program*

The Naval Reactors program is responsible for all aspects of naval nuclear propulsion efforts, including reactor plant technology design and development, reactor plant operation and maintenance, and reactor retirement and disposal. The program ensures the safe and reliable operation of reactor plants in nuclear-powered submarines and aircraft carriers. These ships comprise over 40 percent of the Navy's major combatants.

The committee notes that the recent identification of a manufacturing problem with the prototype electric-drive motor for the *Columbia*-class submarine will result in late delivery of the prototype motor to the test facility. Naval Reactors assures the committee that this delay will not delay delivery of the shipboard motor for the lead ship of the *Columbia* class. The committee understands that there is no margin left in the *Columbia*-class schedule and expects Naval Reactors to take strong action to ensure they meet all deliverables to the Navy.

The committee has long been supportive of the Naval Reactors program and believes it is an exceptional example of a nuclear-related government program that is safety-focused, mission-driven, and well-managed. Due to this success, the committee and the Navy will continue to have very high expectations for performance by Naval Reactors. The committee will continue its oversight of Naval Reactors' stewardship of the Navy's nuclear mission.

## Federal Salaries and Expenses

### *Comptroller General review of support service contracts*

In 2015, the Department of Energy's Inspector General conducted a review of the National Nuclear Security Administration's (NNSA) use and management of support service contracts (SSC) and concluded that certain NNSA SSCs exhibited characteristics that could create the appearance, depending on how they are managed, of violating Federal acquisition regulations. NNSA agreed to implement corrective actions in response to the Inspector General's findings.

The committee remains concerned about NNSA's use and management of SSCs, both from the perspective of compliance with pertinent acquisition regulations and laws, as well as a potential

means to circumvent the intent of the statutory cap on the number of Federal NNSA employees contained in section 3241A of the National Nuclear Security Administration Act (50 U.S.C. 2441a). The committee therefore directs the Comptroller General of the United States to conduct a review of NNSA's use and management of SSCs and to provide a briefing on such review to the Committee on Armed Services of the Senate and the House of Representatives by March 1, 2018. This review should include:

(1) the number and cost of NNSA's SSCs over the past 8 years, including the value of the contracts, the number of personnel working under SSCs, and the cost of such personnel as compared to costs of comparable Federal employees;

(2) the functions performed by SSC personnel and the type of funding used to support SSCs, and the extent to which such functions and funding sources were consistent with applicable rules, guidance, directives, and laws;

(3) an assessment of NNSA's potential use of SSC personnel to compensate for a perceived shortage in Federal employee billets;

(4) actions taken by NNSA to address the findings and recommendations made by the Inspector General in its 2015 review; and

(5) such other matters or additional opportunities for improvement in the use and management of SSCs by NNSA as the Comptroller General determines appropriate.

## Environmental and Other Defense Activities

### Overview

The budget request for fiscal year 2018 contained $6.38 billion for environmental and other defense activities. The committee recommends $6.46 billion, an increase of $73.0 million to the budget request.

### Defense Environmental Cleanup

*Waste Isolation Pilot Plant*

The committee continues its oversight of recovery efforts and operations at the Department of Energy's Waste Isolation Pilot Plant (WIPP) in Carlsbad, New Mexico. This unique facility is central to the nation's immediate and long-term plans for the disposal of transuranic nuclear waste created by the nuclear weapons program. It suffered several incidents in 2014, one of which was caused by improper packaging of waste at the Los Alamos National Laboratory that resulted in a release of radioactive material and shutdown of the facility, costing over $500.0 million in repairs and delaying shipments to the facility for over 3 years.

The committee continues to monitor and oversee the Department's efforts to recover from the 2014 incidents, and acknowledges WIPP's resumption of limited waste emplacement operations in January 2017. Shipments of waste to WIPP also resumed in April. The committee believes that timely resumption of full operations at WIPP is essential to eliminating the risks posed by transuranic waste stored across the Department of Energy defense enterprise, but cautions that such efforts proceed with safety as the foremost priority. The committee supports the Department's efforts to drill

a new ventilation shaft and build a new filter building. The committee encourages the Department to explore options that would enable WIPP to be more efficient, effective, and safe with its disposal of waste, and expects the Department to keep Congress and the public apprised of its continued recovery actions.

## LEGISLATIVE PROVISIONS

### SUBTITLE A—NATIONAL SECURITY PROGRAMS AUTHORIZATIONS

#### Section 3101—National Nuclear Security Administration

This section would authorize appropriations for the National Nuclear Security Administration for fiscal year 2018, including funds for weapons activities, defense nuclear nonproliferation programs, naval reactor programs, and Federal Salaries and Expenses (formerly known as the "Office of the Administrator"), at the levels specified in the funding table in division D of this Act.

This section would also authorize several new plant projects for the National Nuclear Security Administration.

#### Section 3102—Defense Environmental Cleanup

This section would authorize appropriations for defense environmental cleanup activities for fiscal year 2018 at the levels specified in the funding table in division D of this Act.

This section would also authorize several new plant projects for the defense environmental cleanup program.

#### Section 3103—Other Defense Activities

This section would authorize appropriations for Other Defense Activities for the Department of Energy for fiscal year 2018 at the levels specified in the funding table in division D of this Act.

#### Section 3104—Nuclear Energy

This section would authorize appropriations for certain nuclear energy programs for the Department of Energy for fiscal year 2018 at the levels specified in the funding table in division D of this Act.

### SUBTITLE B—PROGRAM AUTHORIZATIONS, RESTRICTIONS, AND LIMITATIONS

#### Section 3111—Nuclear Security Enterprise Infrastructure Recapitalization and Repair

This section would make a series of findings regarding the need to address infrastructure problems within the nuclear security enterprise.

This section would also require the Administrator for Nuclear Security to establish, within 30 days after the date of the enactment of this Act, a program known as the Facilities and Infrastructure Recapitalization and Repair Program (FIRRP) with a goal of reducing the nuclear security enterprise backlog of deferred maintenance and repair needs by at least 50 percent within 5 years.

Furthermore, this section would require the Secretary of Energy to provide the Administrator a process that will enhance and

streamline the ability of the Administrator to carry out this program efficiently and effectively, including with respect to:

(1) demolition or construction of non-nuclear facilities where the total project cost is estimated to be less than $100.0 million; and

(2) authority to decontaminate, decommission, and demolish (to be performed in accordance with applicable health and safety standards used by the defense environmental cleanup program) process-contaminated facilities if the total project cost is estimated to be less than $50.0 million.

This section would authorize the Administrator to carry out this program without regard to certain requirements laid out in Office of Management and Budget Management Procedures Memorandum 2015–01. The Secretary and the Administrator would be required to provide, alongside the President's budget request for fiscal year 2019, a plan for achieving this goal. The program would terminate 5 years after the date of the enactment of this Act.

In addition, this section would require, within the annual Stockpile Stewardship, Management, and Responsiveness Plan mandated by section 2523 of title 50, United States Code, the Administrator to report metrics related to infrastructure deferred maintenance and repair needs based on industry best practices.

Furthermore, this section would provide mechanisms such that, for any line item plant projects authorized by Congress, the Administrator ensures that all requirements that increase scope, schedule, or budgets for such projects do not change after certain steps in the design and construction process.

Finally, this section would also express the sense of Congress regarding the program authorized by this section and infrastructure needs within the nuclear security enterprise.

### Section 3112—Incorporation of Integrated Surety Architecture in Transportation

This section would create a new section, section 4222, in the Atomic Energy Defense Act (50 U.S.C. 2521) that would require the Administrator for Nuclear Security, in coordination with the Chairman of the Nuclear Weapons Council, to jointly ensure that all nuclear warhead development programs, life extension programs, and major alteration programs incorporate integrated designs compatible with the Integrated Surety Architecture (ISA) Program of the National Nuclear Security Administration (NNSA). The Administrator would further be required to ensure that over-the-road shipments of the NNSA involving any nuclear weapon planned to be in the active stockpile after 2025 incorporates surety technologies relating to transportation and shipping developed by the ISA Program. If, on a case-by-case basis, the Administrator determines that a shipment (or class of shipments) or program will not incorporate some or all of the technologies, the Administrator would be required to submit that determination and a documented risk analysis to the congressional defense committees. The requirements of this section would terminate on December 31, 2029, and the Administrator would be required to implement direction relating to this section contained in the classified annex accompanying this Act.

Section 3113—Cost Estimates for Life Extension Program and Major Alteration Projects

This section would amend section 4217(b) of the Atomic Energy Defense Act (50 U.S.C. 2537(b)) to require the Secretary of Energy, acting through the Administrator for Nuclear Security, to conduct an independent cost estimate or independent cost review at various phases of warhead life extension programs. The Administrator would be required to submit the independent cost estimate or independent cost review to the congressional defense committees not later than 30 days after approval of the pertinent acquisition phase. Not later than 30 days after that, the Administrator would be required to submit any views of the Administrator regarding the cost estimate or the program and whether the Administrator has changed the baseline cost estimate and the future years nuclear security program budget for the program.

Section 3114—Budget Requests and Certification regarding Nuclear Weapons Dismantlement

This section would amend section 3125 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328) to require that the Administrator for Nuclear Security ensure that the President's request submitted to Congress under section 1105(a) of title 31, United States Code, for each of the fiscal years 2019 through 2021 includes amounts for the nuclear weapons dismantlement and disposition activities of the National Nuclear Security Administration (NNSA) in accordance with the limitation in section 3125(a) of Public Law 114–328, which prescribes a maximum amount of $56.0 million. This section would also require the Administrator to certify to the congressional defense committees by February 1, 2018, that the Administrator is carrying out NNSA's nuclear weapons dismantlement and disposition activities in accordance with the limitations in subsections (a) and (b) of section 3125 of Public Law 114–328.

Section 3115—Improved Information Relating to Defense Nuclear Nonproliferation Research and Development Program

This section would create a new section 4310 in the Atomic Energy Defense Act (50 U.S.C. 2563) to require the Administrator for Nuclear Security to track and document, for efforts that are not focused on basic research, the technologies and capabilities developed by the Defense Nuclear Nonproliferation Research and Development (DNN R&D) program to better understand whether such technologies are transitioned to end users or deployed.

Furthermore, this section would require the Administrator, in assessing projects within the DNN R&D program and the Nonproliferation and Arms Control program, to compare the status of each project, including the final results of such projects, to baseline targets and goals established in the initial project plan.

Lastly, this section would require the Administrator to include, within the annual plan required by section 4309(b) of the Atomic Energy Defense Act (50 U.S.C. 2575(b)), information related to these requirements.

Section 3116—Research and Development of Advanced Naval Reactor Fuel Based on Low-Enriched Uranium

This section would provide that none of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2018 for the Department of Energy or the Department of Defense may be obligated or expended to plan or carry out research and development of an advanced naval nuclear fuel system based on low-enriched uranium. However, the section would authorize for these purposes, from within amounts made available for fiscal year 2018 for defense nuclear nonproliferation, $5.0 million for the Deputy Administrator for Naval Reactors of the National Nuclear Security Administration. This section would also authorize an additional $30.0 million for these purposes from the amounts made available for defense nuclear nonproliferation if the Secretary of Energy and Secretary of the Navy determine under section 3118(c)(1) of the National Defense Authorization Act for Fiscal Year 2016 (P.L. 114–92) that such research and development should continue.

This section would also create a new section, section 7319, in title 10, United States Code, to provide that activities related to planning or carrying out research and development of an advanced naval nuclear fuel system based on low-enriched uranium, and procuring of ships that use low-enriched uranium in naval nuclear propulsion reactors, may only be carried out using funding from the defense nuclear nonproliferation account of the Department of Energy. This section would state that this prohibition may not be superseded except by a provision of law that specifically supersedes, repeals, or modifies this section, section 7319.

Finally, this section would require two reports related to this program.

Section 3117—Prohibition on Availability of Funds for Programs in Russian Federation

This section would provide that none of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2018 for atomic energy defense activities may be obligated or expended to enter into a contract with, or otherwise provide assistance to, the Russian Federation. The Secretary of Energy, without delegation, would be provided the authority to waive this prohibition if the Secretary determines, in writing, that a nuclear-related threat arising in the Russian Federation must be addressed urgently and that it is necessary to waive the prohibition to address that threat. The waiver could only be used if the Secretary of State and the Secretary of Defense concur in that determination, and the Secretary of Energy submits a report to the appropriate congressional committees containing notification that such waiver is in the national security interest of the United States, a justification for such waiver, a description of the activities to be carried out pursuant to the waiver, and a period of 7 days elapses. The prohibition and waiver contained in this section would not apply to up to $3.0 million that the Secretary of Energy may make available for the Department of Energy's Russian Health Studies Program.

Section 3118—National Nuclear Security Administration Pay and Performance System

This section would require the Administrator for Nuclear Security to continue to carry out the National Nuclear Security Administration's (NNSA) Pay Banding and Performance-Based Pay Adjustment Demonstration Project authorized under section 4703 of title 5, United States Code, for 5 years after the date of the enactment of this Act. As part of this project, the Administrator for Nuclear Security would be required to enable and incentivize NNSA employees to undertake rotational assignments and ensure that employees complete certain requirements (as determined by the Administrator) related to rotational assignments, professional training, and continuing education before they may be considered for appointment to senior-level positions.

This section would further require the Administrator to take actions (as determined by the Administrator) to strengthen and increase the use of rotational assignments through intergovernmental personnel agreements or similar programs by NNSA employees and the employees of its management and operating contractors.

This section would also require the Director of the NNSA Office of Cost Estimating and Program Evaluation to carry out a red-team analysis of NNSA's Federal staffing structure.

Finally, the Administrator and the Director would be required to provide briefings to the appropriate congressional committees within 180 days after the date of the enactment of this Act on the matters contained in this section.

Section 3119—Disposition of Weapons-Usable Plutonium

This section would require the Secretary of Energy to carry out construction and project support activities for the Mixed Oxide Fuel Fabrication Facility with any funds authorized to be appropriated or otherwise made available for such purposes for fiscal year 2018. The Secretary would be allowed to waive this requirement if the Secretary submits certain matters, notifications, and certifications to the Committees on Armed Services of the Senate and the House of Representatives.

Section 3120—Modification of Minor Construction Threshold for Plant Projects

This section would amend section 4701 of the Atomic Energy Defense Act (50 U.S.C. 2741) to increase the minor construction threshold for projects authorized by a Department of Energy national security authorization from $10.0 million to $20.0 million and index such threshold to inflation.

Section 3121—Design Competition

This section would make a series of findings and require the Administrator for Nuclear Security to plan and carry out a new and comprehensive design competition for a nuclear warhead that could be employed on ballistic missiles of the United States by 2030. The Administrator would be required to develop a plan to carry out this design competition in fiscal year 2018 and implement such plan in

fiscal year 2019. The Administrator would be required to provide a briefing to the Committees on Armed Services of the Senate and House of Representatives by March 1, 2018, on the plan to carry out this design competition.

### Section 3122—Department of Energy Counterintelligence Polygraph Program

This section would authorize the Secretary of Energy to add dual citizens in positions with access to highly classified information to their counterintelligence polygraph program, for the purposes of assessing risk.

### Section 3123—Security Clearance for Dual-Nationals Employed by National Nuclear Security Agency

This section would authorize the Secretary of Energy to apply additional security reviews to dual citizens seeking positions that require access to highly classified information.

## SUBTITLE C—PLANS AND REPORTS

### Section 3131—Modification of Certain Reporting Requirements

This section would eliminate, consolidate, or modify several existing reporting requirements.

### Section 3132—Assessment of Management and Operating Contracts of National Security Laboratories

This section would require, within 30 days after the date of the enactment of this Act, the Administrator for Nuclear Security to seek to enter into a contract with a federally funded research and development center (FFRDC) to conduct an assessment of the benefits, costs, challenges, risks, efficiency, and effectiveness of the Administrator's strategy with respect to management and operating contracts for national security laboratories. This section would prohibit the Administrator from awarding such contract to an FFRDC for which the Department of Energy or the National Nuclear Security Administration (NNSA) is the primary sponsor.

This section would further require the Administrator and the director of each national security laboratory to provide the FFRDC conducting the assessment full cooperation and access to all information required to conduct the assessment. The FFRDC would be required to submit a report to the Administrator containing their assessment within 90 days of contract award. Such report would be required to include the FFRDC's assessment of matters related to the NNSA's acquisition strategy and contract oversight process, particularly with respect to the use of for-profit contracts as opposed to nonprofit approaches, and whether the NNSA is appropriately using, managing, and overseeing the laboratories with respect to their nature as FFRDCs. The Administrator would be required to provide the FFRDC report, unchanged, to the congressional defense committees.

Finally, this section would prohibit any funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2018 for the NNSA to be obligated or expended to award, or extend, a management and operating contract for a national security

laboratory until the Administrator submits the FFRDC report to the Committees on Armed Services of the Senate and the House of Representatives. The Secretary of Energy would be authorized to waive this prohibition and extend such a contract only if the Secretary determines it is required in the interest of national security and notifies the Committees on Armed Services of the Senate and the House of Representatives.

This section would also express the sense of Congress that states that this section should not be construed to mandate or encourage an extension of an existing management and operating contract for a national security laboratory.

### Section 3133—Evaluation of Classification of Certain Defense Nuclear Waste

This section would require the Secretary of Energy to conduct an evaluation of the feasibility, costs, and cost savings of classifying, without decreasing safety requirements, certain defense nuclear waste as other than high-level radioactive waste. The Secretary would be required to submit a report on this evaluation to the appropriate congressional committees by February 1, 2018.

### Section 3134—Report on Critical Decision–1 on Material Staging Facility Project

This section would require that the Administrator for Nuclear Security submit a report to the congressional defense committees, not later than October 31, 2017, containing the Administrator's decision memorandum for Critical Decision–1 (CD–1) on the Material Staging Facility project at the Pantex Plant. The report would be required to contain the preferred alternative approved by the Administrator for CD–1 and several other key pieces of information regarding the project.

### Section 3135—Modification to Stockpile Stewardship, Management, and Responsiveness Plan

This section would amend section 4203 of the Atomic Energy Defense Act (50 U.S.C. 2523) to require the Administrator to include, within the Stockpile Stewardship, Management, and Responsiveness Plan (SSMRP), an assessment of whether the programs described by the SSMRP can be executed with current and projected budgets and any associated risks.

### Section 3136—Improved Reporting for Anti-Smuggling Radiation Detection Systems

This section would require the Administrator for Nuclear Security to submit to the congressional defense committees, with the President's budget request for fiscal years 2019 through 2021, a report regarding any anti-smuggling radiation detection systems that the Administrator proposes to deploy during the fiscal year covered by the budget request.

Section 3137—Annual Selected Acquisition Reports on Certain Hardware Relating to Defense Nuclear Nonproliferation

The section would require the Administrator for Nuclear Security to submit to the congressional defense committees, at the end of each fiscal year, selected acquisition reports for certain projects carried out by the defense nuclear nonproliferation research and development program that are focused on the production and deployment of hardware (including with respect to the development and deployment of satellites or satellite payloads) and exceed $500.0 million in total program cost over the course of five years.

Section 3138—Assessment of Design Trade Options of W80–4 Warhead

This section would require the Director for Cost Estimating and Program Evaluation of the National Nuclear Security Administration to conduct an assessment of the design trade options, and the associated costs and benefits of each option, for the W80–4 warhead. The Director would be required to submit such assessment to the Administrator for Nuclear Security within 60 days of enactment of this Act. The Administrator would be required to provide a briefing to the congressional defense committees 30 days later containing a copy of the assessment and any views of the Administrator.

# TITLE XXXII—DEFENSE NUCLEAR FACILITIES SAFETY BOARD

## LEGISLATIVE PROVISIONS

### Section 3201—Authorization

The budget request contained $30.6 million for the Defense Nuclear Facilities Safety Board for fiscal year 2018. The committee recommends $30.6 million, the amount of the budget request.

# TITLE XXXIV—NAVAL PETROLEUM RESERVES

## LEGISLATIVE PROVISIONS

### Section 3401—Authorization of Appropriations

This section would authorize $4.9 million for fiscal year 2018 for operation and maintenance of the Naval Petroleum Reserves.

# TITLE XXXV—MARITIME ADMINISTRATION

## ITEMS OF SPECIAL INTEREST

### National Security Multi-Mission Vessel

The committee continues to support the Maritime Administration's efforts to develop and procure the National Security Multi-Mission Vessel for the recapitalization of the state maritime academies training vessels. The state maritime academies play a vital role in the education and training of United States merchant mari-

ners. A substantial portion of the training is done aboard training vessels provided by the Maritime Administration. Most of these vessels have reached the end of their service life and in some cases are over 50 years old. The committee is disappointed that the administration did not provide any funding in the budget request after 2 years of requirements review and design funding. Therefore, the committee recommends $36.0 million for the continued development of the National Security Multi-Mission vessel.

## LEGISLATIVE PROVISIONS

### Section 3501—Authorization of the Maritime Administration

This section would authorize appropriations for the national security aspects of the merchant marine for fiscal year 2018.

### Section 3502—Merchant Ship Sales Act of 1946

This section would repeal the first section and sections 2, 3, 5, 12, and 14 of the Merchant Ship Sales Act of 1946. Additionally, the section transfers section 8(d) of the Act to chapter 563, Emergency Acquisition of Vessels, of title 46, United States Code. Finally, the section transfers section 11 of the Act to chapter 571, General Authority, of title 46, United States Code.

### Section 3503—Maritime Security Fleet Program; Restriction on Operation for New Entrants

This section would amend section 53105 of title 46, United States Code, and prohibit a maritime security program payment to a vessel operating in the transportation of cargo between points in the United States and its territories either directly or via a foreign port. This section would further authorize the replacement of vessels under an existing operating agreement.

### Section 3504—Codification of Sections Relating to Acquisition, Charter, and Requisition of Vessels

This section would move certain sections related to the acquisition, charter and requisition of vessels from title 50 to title 46 and make additional conforming changes.

### Section 3505—Assistance for Small Shipyards

This section would amend section 54101 of title 46, United States Code, and limit small shipyard grants to organizations relating to shipbuilding, ship repair and associated industries. Additionally, this section would authorize funds for small shipyard grants for fiscal years 2018 and 2019.

### Section 3506—Report on Sexual Assault Victim Recovery in the Coast Guard

This section would require the Commandant of the Coast Guard to submit a report on sexual assault prevention and response policies of the Coast Guard and strategic goals related to sexual assault victim recovery to the Committee on Transportation and Infrastructure no later than 180 days after the enactment of this Act.

Section 3507—Centers of Excellence

This section would amend chapter 541 of title 46, United States Code, to authorize the Secretary of Transportation to designate centers of excellence for domestic maritime workforce training and education.

## DIVISION D—FUNDING TABLES

Section 4001—Authorization of Amounts in Funding Tables

This section would provide for the allocation of funds among programs, projects, and activities in accordance with the tables in division D of this Act, subject to reprogramming guidance in accordance with established procedures.

Consistent with the previously expressed views of the committee, this section would also require that a decision by an agency head to commit, obligate, or expend funds to a specific entity on the basis of such funding tables be based on merit-based selection procedures in accordance with the requirements of section 2304(k) and section 2374 of title 10, United States Code, and other applicable provisions of law.

**SUMMARY OF NATIONAL DEFENSE AUTHORIZATIONS FOR FISCAL YEAR 2018**

(In Thousands of Dollars)

| | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **DISCRETIONARY AUTHORIZATIONS WITHIN THE JURISDICTION OF THE ARMED SERVICES COMMITTEE** | | | |
| **National Defense Funding, Base Budget Request** | | | |
| **Function 051, Department of Defense-Military** | | | |
| **Division A: Department of Defense Authorizations** | | | |
| **Title I—Procurement** | | | |
| Aircraft Procurement, Army | 4,149,894 | 1,443,667 | 5,593,561 |
| Missile Procurement, Army | 2,519,054 | 559,247 | 3,078,301 |
| Weapons & Tracked Combat Vehicles, Army | 2,423,608 | 2,535,039 | 4,958,647 |
| Procurement of Ammunition, Army | 1,879,283 | 355,964 | 2,235,247 |
| Other Procurement, Army | 6,469,331 | 1,993,891 | 8,463,222 |
| Joint Improvised-Threat Defeat Fund | 14,442 | | 14,442 |
| Aircraft Procurement, Navy | 15,056,235 | 3,358,550 | 18,414,785 |
| Weapons Procurement, Navy | 3,420,107 | 74,200 | 3,494,307 |
| Procurement of Ammunition, Navy & Marine Corps | 792,345 | | 792,345 |
| Shipbuilding & Conversion, Navy | 19,903,682 | –680,300 | 19,223,382 |
| Other Procurement, Navy | 8,277,789 | 445,986 | 8,723,775 |
| Procurement, Marine Corps | 2,064,825 | 8,879 | 2,073,704 |
| Aircraft Procurement, Air Force | 15,430,849 | 2,917,162 | 18,348,011 |
| Missile Procurement, Air Force | 2,296,182 | 17,000 | 2,313,182 |
| Space Procurement, Air Force | 3,370,775 | 176,350 | 3,547,125 |
| Procurement of Ammunition, Air Force | 1,376,602 | | 1,376,602 |
| Other Procurement, Air Force | 19,603,497 | 314,648 | 19,918,145 |
| Procurement, Defense-Wide | 4,835,418 | 457,100 | 5,292,518 |
| Joint Urgent Operational Needs Fund | 99,795 | –99,795 | 0 |
| **Subtotal, Title I—Procurement** | **113,983,713** | **13,877,588** | **127,861,301** |
| **Title II—Research, Development, Test and Evaluation** | | | |
| Research, Development, Test & Evaluation, Army | 9,425,440 | 228,940 | 9,654,380 |
| Research, Development, Test & Evaluation, Navy | 17,675,035 | 309,200 | 17,984,235 |
| Research, Development, Test & Evaluation, Air Force | 34,914,359 | 278,255 | 35,192,614 |
| Research, Development, Test & Evaluation, Defense-Wide | 20,490,902 | 505,326 | 20,996,228 |
| Operational Test & Evaluation, Defense | 210,900 | | 210,900 |
| **Subtotal, Title II—Research, Development, Test and Evaluation** | **82,716,636** | **1,321,721** | **84,038,357** |
| **Title III—Operation and Maintenance** | | | |
| Operation & Maintenance, Army | 38,945,417 | 1,494,172 | 40,439,589 |
| Operation & Maintenance, Army Reserve | 2,906,842 | 1,282 | 2,908,124 |
| Operation & Maintenance, Army National Guard | 7,307,170 | 74,410 | 7,381,580 |
| Operation & Maintenance, Navy | 45,439,407 | –3,689 | 45,435,718 |
| Operation & Maintenance, Marine Corps | 6,933,408 | 123,733 | 7,057,141 |
| Operation & Maintenance, Navy Reserve | 1,084,007 | –9,800 | 1,074,207 |
| Operation & Maintenance, Marine Corps Reserve | 278,837 | –300 | 278,537 |
| Operation & Maintenance, Air Force | 39,429,232 | 954,826 | 40,384,058 |
| Operation & Maintenance, Air Force Reserve | 3,267,507 | –4,100 | 3,263,407 |
| Operation & Maintenance, Air National Guard | 6,939,968 | 164,300 | 7,104,268 |

**SUMMARY OF NATIONAL DEFENSE AUTHORIZATIONS FOR FISCAL YEAR 2018**—Continued

(In Thousands of Dollars)

| | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| Operation & Maintenance, Defense-Wide | 34,585,817 | 207,025 | 34,792,842 |
| US Court of Appeals for the Armed Forces, Defense | 14,538 | | 14,538 |
| Overseas Humanitarian, Disaster and Civic Aid | 104,900 | | 104,900 |
| Cooperative Threat Reduction | 324,600 | | 324,600 |
| Environmental Restoration, Army | 215,809 | | 215,809 |
| Environmental Restoration, Navy | 281,415 | 42,234 | 323,649 |
| Environmental Restoration, Air Force | 293,749 | 30,000 | 323,749 |
| Environmental Restoration, Defense | 9,002 | | 9,002 |
| Environmental Restoration, Formerly Used Sites | 208,673 | | 208,673 |
| **Subtotal, Title III—Operation and Maintenance** | **188,570,298** | **3,074,093** | **191,644,391** |
| | | | |
| **Title IV—Military Personnel** | | | |
| Military Personnel Appropriations | 133,881,636 | 184,389 | 134,066,025 |
| Medicare-Eligible Retiree Health Fund Contributions | 7,804,427 | | 7,804,427 |
| **Subtotal, Title IV—Military Personnel** | **141,686,063** | **184,389** | **141,870,452** |
| | | | |
| **Title XIV—Other Authorizations** | | | |
| Working Capital Fund, Army | 83,776 | 50,111 | 133,887 |
| Working Capital Fund, Air Force | 66,462 | | 66,462 |
| Working Capital Fund, DECA | 1,389,340 | –45,000 | 1,344,340 |
| Working Capital Fund, Defense-Wide | 47,018 | | 47,018 |
| National Defense Sealift Fund | 509,327 | 7,000 | 516,327 |
| Chemical Agents & Munitions Destruction | 961,732 | | 961,732 |
| Drug Interdiction and Counter Drug Activities | 790,814 | 17,000 | 807,814 |
| Office of the Inspector General | 336,887 | | 336,887 |
| Defense Health Program | 33,664,466 | –118,600 | 33,545,866 |
| **Subtotal, Title XIV—Other Authorizations** | **37,849,822** | **–89,489** | **37,760,333** |
| | | | |
| **Total, Division A: Department of Defense Authorizations** | **564,806,532** | **18,368,302** | **583,174,834** |
| | | | |
| **Division B: Military Construction Authorizations** | | | |
| | | | |
| **Military Construction** | | | |
| Army | 920,394 | 37,400 | 957,794 |
| Navy | 1,616,665 | 58,320 | 1,674,985 |
| Air Force | 1,738,796 | –128,022 | 1,610,774 |
| Defense-Wide | 3,114,913 | –351,081 | 2,763,832 |
| NATO Security Investment Program | 154,000 | –1,068 | 152,932 |
| Army National Guard | 210,652 | 56,000 | 266,652 |
| Army Reserve | 73,712 | 56,000 | 129,712 |
| Navy and Marine Corps Reserve | 65,271 | | 65,271 |
| Air National Guard | 161,491 | 41,900 | 203,391 |
| Air Force Reserve | 63,535 | 44,100 | 107,635 |
| Unaccompanied Housing Improvement Fund | 623 | | 623 |
| **Subtotal, Military Construction** | **8,120,052** | **–186,451** | **7,933,601** |
| | | | |
| **Family Housing** | | | |
| Construction, Army | 182,662 | –18,000 | 164,662 |
| Operation & Maintenance, Army | 346,625 | | 346,625 |
| Construction, Navy and Marine Corps | 83,682 | –8,000 | 75,682 |

**SUMMARY OF NATIONAL DEFENSE AUTHORIZATIONS FOR FISCAL YEAR 2018**—Continued

(In Thousands of Dollars)

| | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| Operation & Maintenance, Navy and Marine Corps | 328,282 | | 328,282 |
| Construction, Air Force | 85,062 | –20,000 | 65,062 |
| Operation & Maintenance, Air Force | 318,324 | | 318,324 |
| Operation & Maintenance, Defense-Wide | 59,169 | | 59,169 |
| Improvement Fund | 2,726 | | 2,726 |
| **Subtotal, Family Housing** | **1,406,532** | **–46,000** | **1,360,532** |
| **Base Realignment and Closure** | | | |
| Base Realignment and Closure—Army | 58,000 | | 58,000 |
| Base Realignment and Closure—Navy | 143,644 | 35,000 | 178,644 |
| Base Realignment and Closure—Air Force | 54,223 | | 54,223 |
| **Subtotal, Base Realignment and Closure** | **255,867** | **35,000** | **290,867** |
| **Total, Division B: Military Construction Authorizations** | **9,782,451** | **–197,451** | **9,585,000** |
| **Total, 051, Department of Defense-Military** | **574,588,983** | **18,170,851** | **592,759,834** |
| **Division C: Department of Energy National Security Authorization and Other Authorizations** | | | |
| **Function 053, Atomic Energy Defense Activities** | | | |
| **Environmental and Other Defense Activities** | | | |
| Nuclear Energy | 133,000 | | 133,000 |
| Weapons Activities | 10,239,344 | 184,200 | 10,423,544 |
| Defense Nuclear Nonproliferation | 1,793,310 | 80,000 | 1,873,310 |
| Naval Reactors | 1,479,751 | | 1,479,751 |
| Federal Salaries and Expenses | 418,595 | –11,000 | 407,595 |
| Defense Environmental Cleanup | 5,537,186 | 70,000 | 5,607,186 |
| Other Defense Activities | 815,512 | 3,000 | 818,512 |
| Defense Nuclear Waste Disposal | 30,000 | | 30,000 |
| **Subtotal, Environmental and Other Defense Activities** | **20,446,698** | **326,200** | **20,772,898** |
| **Independent Federal Agency Authorization** | | | |
| Defense Nuclear Facilities Safety Board | 30,600 | | 30,600 |
| **Subtotal, Independent Federal Agency Authorization** | **30,600** | **0** | **30,600** |
| **Subtotal, 053, Atomic Energy Defense Activities** | **20,477,298** | **326,200** | **20,803,498** |
| **Function 054, Defense-Related Activities** | | | |
| **Other Agency Authorizations** | | | |
| Maritime Security Program | 210,000 | | 210,000 |
| **Subtotal, Independent Federal Agency Authorization** | **210,000** | **0** | **210,000** |
| **Subtotal, 054, Defense-Related Activities** | **210,000** | **0** | **210,000** |
| **Subtotal, Division C: Department of Energy National Security Authorization and Other Authorizations** | **20,687,298** | **326,200** | **21,013,498** |
| **Total, National Defense Funding, Base Budget Request** | **595,276,281** | **18,497,051** | **613,773,332** |

**SUMMARY OF NATIONAL DEFENSE AUTHORIZATIONS FOR FISCAL YEAR 2018**—Continued

(In Thousands of Dollars)

| | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **National Defense Funding, Overseas Contingency Operations** | | | |
| **National Defense Funding, Overseas Contingency Operations Funding for Base Requirements** | | | |
| **Function 051, Department of Defense-Military** | | | |
| **Procurement** | | | |
| Shipbuilding & Conversion, Navy | | 6,046,800 | 6,046,800 |
| **Subtotal, Procurement** | **0** | **6,046,800** | **6,046,800** |
| **Research, Development, Test and Evaluation** | | | |
| Research, Development, Test & Evaluation, Army | | 85,866 | 85,866 |
| Research, Development, Test & Evaluation, Navy | | 38,500 | 38,500 |
| Research, Development, Test & Evaluation, Air Force | | 190,750 | 190,750 |
| Research, Development, Test & Evaluation, Defense-Wide | | 463,500 | 463,500 |
| **Subtotal, Research, Development, Test and Evaluation** | **0** | **778,616** | **778,616** |
| **Operation and Maintenance** | | | |
| Operation & Maintenance, Army | | 629,047 | 629,047 |
| Operation & Maintenance, Army Reserve | | 82,619 | 82,619 |
| Operation & Maintenance, Army National Guard | | 173,900 | 173,900 |
| Operation & Maintenance, Navy | | 414,200 | 414,200 |
| Operation & Maintenance, Marine Corps | | 217,487 | 217,487 |
| Operation & Maintenance, Navy Reserve | | 11,500 | 11,500 |
| Operation & Maintenance, Marine Corps Reserve | | 7,246 | 7,246 |
| Operation & Maintenance, Air Force | | 507,700 | 507,700 |
| Operation & Maintenance, Air Force Reserve | | 15,300 | 15,300 |
| Operation & Maintenance, Air National Guard | | 47,600 | 47,600 |
| **Subtotal, Operation and Maintenance** | **0** | **2,106,599** | **2,106,599** |
| **Military Personnel** | | | |
| Military Personnel Appropriations | | 1,017,700 | 1,017,700 |
| Medicare-Eligible Retiree Health Fund Contributions | | 44,140 | 44,140 |
| **Subtotal, Military Personnel** | **0** | **1,061,840** | **1,061,840** |
| **Subtotal, 051, Department of Defense-Military** | **0** | **9,993,855** | **9,993,855** |
| **Total, National Defense Funding, Overseas Contingency Operations Funding for Base Requirements** | **0** | **9,993,855** | **9,993,855** |
| **National Defense Funding, Overseas Contingency Operations Budget Request** | | | |
| **Function 051, Department of Defense-Military** | | | |
| **Procurement** | | | |
| Aircraft Procurement, Army | 424,686 | 110,234 | 534,920 |
| Missile Procurement, Army | 559,283 | 845,181 | 1,404,464 |
| Weapons & Tracked Combat Vehicles, Army | 1,191,139 | –1,014,139 | 177,000 |
| Procurement of Ammunition, Army | 193,436 | 552,320 | 745,756 |

**SUMMARY OF NATIONAL DEFENSE AUTHORIZATIONS FOR FISCAL YEAR 2018**—Continued

(In Thousands of Dollars)

| | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| Other Procurement, Army | 405,575 | 172,378 | 577,953 |
| Joint Improvised-Threat Defeat Fund | 483,058 | | 483,058 |
| Aircraft Procurement, Navy | 157,300 | 16,000 | 173,300 |
| Weapons Procurement, Navy | 152,373 | 12,000 | 164,373 |
| Procurement of Ammunition, Navy & Marine Corps | 225,587 | 42,500 | 268,087 |
| Other Procurement, Navy | 220,059 | –58,586 | 161,473 |
| Procurement, Marine Corps | 65,274 | 149,129 | 214,403 |
| Aircraft Procurement, Air Force | 740,778 | 14,183 | 754,961 |
| Missile Procurement, Air Force | 395,400 | | 395,400 |
| Space Procurement, Air Force | 2,256 | | 2,256 |
| Procurement of Ammunition, Air Force | 501,509 | | 501,509 |
| Other Procurement, Air Force | 4,008,887 | 262,549 | 4,271,436 |
| Procurement, Defense-Wide | 518,026 | 67,525 | 585,551 |
| National Guard & Reserve Equipment | 0 | 500,000 | 500,000 |
| **Subtotal, Procurement** | **10,244,626** | **1,671,274** | **11,915,900** |
| **Research, Development, Test and Evaluation** | | | |
| Research, Development, Test & Evaluation, Army | 119,368 | 183,239 | 302,607 |
| Research, Development, Test & Evaluation, Navy | 130,365 | –11,600 | 118,765 |
| Research, Development, Test & Evaluation, Air Force | 135,358 | 14,000 | 149,358 |
| Research, Development, Test & Evaluation, Defense-Wide | 226,096 | 509,646 | 735,742 |
| **Subtotal, Research, Development, Test and Evaluation** | **611,187** | **695,285** | **1,306,472** |
| **Operation and Maintenance** | | | |
| Operation & Maintenance, Army | 16,126,403 | –1,427,940 | 14,698,463 |
| Operation & Maintenance, Army Reserve | 24,699 | 33,279 | 57,978 |
| Operation & Maintenance, Army National Guard | 108,111 | | 108,111 |
| Afghanistan Security Forces Fund | 4,937,515 | | 4,937,515 |
| Counter-ISIS Train & Equip Fund | 1,769,000 | | 1,769,000 |
| Operation & Maintenance, Navy | 5,875,015 | 39,489 | 5,914,504 |
| Operation & Maintenance, Marine Corps | 1,116,640 | –164,733 | 951,907 |
| Operation & Maintenance, Navy Reserve | 23,980 | | 23,980 |
| Operation & Maintenance, Marine Corps Reserve | 3,367 | | 3,367 |
| Operation & Maintenance, Air Force | 10,266,295 | –313,426 | 9,952,869 |
| Operation & Maintenance, Air Force Reserve | 58,523 | | 58,523 |
| Operation & Maintenance, Air National Guard | 15,400 | | 15,400 |
| Operation & Maintenance, Defense-Wide | 7,712,080 | –424,519 | 7,287,561 |
| Ukraine Security Assistance | 0 | 150,000 | 150,000 |
| **Subtotal, Operation and Maintenance** | **48,037,028** | **–2,107,850** | **45,929,178** |
| **Military Personnel** | | | |
| Military Personnel Appropriations | 4,276,276 | –214,289 | 4,061,987 |
| **Subtotal, Military Personnel** | **4,276,276** | **–214,289** | **4,061,987** |
| **Other Authorizations** | | | |
| Working Capital Fund, Army | 50,111 | –50,111 | 0 |
| Working Capital Fund, Defense-Wide | 98,845 | | 98,845 |
| Drug Interdiction and Counter Drug Activities | 196,300 | | 196,300 |
| Office of the Inspector General | 24,692 | | 24,692 |
| Defense Health Program | 395,805 | | 395,805 |

**SUMMARY OF NATIONAL DEFENSE AUTHORIZATIONS FOR FISCAL YEAR 2018**—Continued

(In Thousands of Dollars)

| | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **Subtotal, Other Authorizations** | **765,753** | **–50,111** | **715,642** |
| **Military Construction** | | | |
| Army | 139,700 | 6,400 | 146,100 |
| Navy | 18,500 | 13,390 | 31,890 |
| Air Force | 478,030 | –43,378 | 434,652 |
| Defense-Wide | 1,900 | 22,400 | 24,300 |
| **Subtotal, Military Construction** | **638,130** | **–1,188** | **636,942** |
| **Total, Overseas Contingency Operations Budget Request** | **64,573,000** | **–6,879** | **64,566,121** |
| **Total, National Defense Funding, Overseas Contingency Operations** | **64,573,000** | **9,986,976** | **74,559,976** |
| **Subtotal, 051, Department of Defense-Military** | **64,573,000** | **9,986,976** | **74,559,976** |
| **Total, National Defense Funding, Overseas Contingency Operations** | **64,573,000** | **9,986,976** | **74,559,976** |
| **Total, National Defense** | **659,849,281** | **28,484,027** | **688,333,308** |
| **MEMORANDUM: NON-DEFENSE AUTHORIZATIONS** | | | |
| Title XII—Financial oblications pursuant to Section 432 of the Compact of Free Association with Palau (Function 800) | 0 | 123,900 | 123,900 |
| Title XIV—Armed Forces Retirement Home (Function 600) | 64,300 | | 64,300 |
| Title XXXIV—Naval Petroleum and Oil Shale Reserves (Function 270) | 4,900 | | 4,900 |
| **MEMORANDUM: TRANSFER AUTHORITIES (NON-ADD)** | | | |
| Title X—General Transfer Authority | [5,000,000] | | [5,000,000] |
| Title XV—Special Transfer Authority | [4,500,000] | [–2,000,000] | [2,500,000] |
| **MEMORANDUM: DEFENSE AUTHORIZATIONS NOT UNDER THE JURISDICTION OF THE ARMED SERVICES COMMITTEE (NON-ADD)** | | | |
| Defense Production Act | [37,401] | | [37,401] |

**NATIONAL DEFENSE BUDGET AUTHORITY IMPLICATION**

(In Thousands of Dollars)

| | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **Summary, Discretionary Authorizations Within the Jurisdiction of the Armed Services Committee** | | | |
| **SUBTOTAL, DEPARTMENT OF DEFENSE (051)** | **574,588,983** | **18,170,851** | **592,759,834** |
| **SUBTOTAL, ATOMIC ENERGY DEFENSE PROGRAMS (053)** | **20,477,298** | **326,200** | **20,803,498** |
| **SUBTOTAL, DEFENSE-RELATED ACTIVITIES (054)** | **210,000** | | **210,000** |

**NATIONAL DEFENSE BUDGET AUTHORITY IMPLICATION**—Continued

(In Thousands of Dollars)

| | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **TOTAL, NATIONAL DEFENSE (050)—BASE BILL** | **595,276,281** | **18,497,051** | **613,773,332** |
| **TOTAL, OVERSEAS CONTINGENCY OPERATIONS** | **64,573,000** | **9,986,976** | **74,559,976** |
| **GRAND TOTAL, NATIONAL DEFENSE** | **659,849,281** | **28,484,027** | **688,333,308** |
| **Base National Defense Discretionary Programs that are Not In the Jurisdiction of the Armed Services Committee or Do Not Require Additional Authorization (CBO Estimates)** | | | |
| Defense Production Act Purchases | 37,000 | | 37,000 |
| Indefinite Account: Disposal Of DOD Real Property | 8,000 | | 8,000 |
| Indefinite Account: Lease Of DOD Real Property | 38,000 | | 38,000 |
| **Subtotal, Budget Sub-Function 051** | **83,000** | | **83,000** |
| Formerly Utilized Sites Remedial Action Program | 118,000 | | 118,000 |
| **Subtotal, Budget Sub-Function 053** | **118,000** | | **118,000** |
| Other Discretionary Programs | 7,645,000 | | 7,645,000 |
| **Subtotal, Budget Sub-Function 054** | **7,645,000** | | **7,645,000** |
| **Total Defense Discretionary Adjustments (050)** | **7,846,000** | | **7,846,000** |
| **Budget Authority Implication, National Defense Discretionary** | | | |
| Department of Defense--Military (051) | 639,244,983 | 28,157,827 | 667,402,810 |
| Atomic Energy Defense Activities (053) | 20,595,298 | 326,200 | 20,921,498 |
| Defense-Related Activities (054) | 7,855,000 | | 7,855,000 |
| **Total BA Implication, National Defense Discretionary** | **667,695,281** | **28,484,027** | **696,179,308** |
| **National Defense Mandatory Programs, Current Law (CBO Baseline)** | | | |
| Concurrent receipt accrual payments to the Military Retirement Fund | 7,496,000 | | 7,496,000 |
| Revolving, trust and other DOD Mandatory | 1,333,000 | | 1,333,000 |
| Offsetting receipts | −1,889,000 | | −1,889,000 |
| **Subtotal, Budget Sub-Function 051** | **6,940,000** | | **6,940,000** |
| Energy employees occupational illness compensation programs and other | 1,273,000 | | 1,273,000 |
| **Subtotal, Budget Sub-Function 053** | **1,273,000** | | **1,273,000** |
| Radiation exposure compensation trust fund | 59,000 | | 59,000 |
| Payment to CIA retirement fund and other | 514,000 | | 514,000 |
| **Subtotal, Budget Sub-Function 054** | **573,000** | | **573,000** |
| BCA Mandatory Sequestration—Undistributed Plug | −691,000 | | −691,000 |
| **Total National Defense Mandatory (050)** | **8,095,000** | | **8,095,000** |
| **Budget Authority Implication, National Defense Discretionary and Mandatory** | | | |
| Department of Defense--Military (051) | 646,184,983 | 28,157,827 | 674,342,810 |
| Atomic Energy Defense Activities (053) | 21,868,298 | 326,200 | 22,194,498 |
| Defense-Related Activities (054) | 8,428,000 | | 8,428,000 |
| Undistributed (050) | −691,000 | | −691,000 |
| **Total BA Implication, National Defense Discretionary and Mandatory** | **675,790,281** | **28,484,027** | **704,274,308** |

# TITLE XLI—PROCUREMENT

## SEC. 4101. PROCUREMENT.

SEC. 4101. PROCUREMENT
(In Thousands of Dollars)

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | **AIRCRAFT PROCUREMENT, ARMY** | | | | | | |
| | **FIXED WING** | | | | | | |
| 002 | UTILITY F/W AIRCRAFT | 4 | 75,115 | | | 4 | 75,115 |
| 004 | MQ–1 UAV | 2 | 30,206 | 6 | 60,000 | 8 | 90,206 |
| | Unfunded requirement | | | [6] | [60,000] | | |
| | **ROTARY** | | | | | | |
| 005 | HELICOPTER, LIGHT UTILITY (LUH) | 13 | 108,383 | | | 13 | 108,383 |
| 006 | AH–64 APACHE BLOCK IIIA REMAN | 48 | 725,976 | | | 48 | 725,976 |
| 007 | ADVANCE PROCUREMENT (CY) | | 170,910 | | | | 170,910 |
| 008 | AH–64 APACHE BLOCK IIIB NEW BUILD | 13 | 374,100 | 8 | 274,400 | 21 | 648,500 |
| | Unfunded requirement | | | [8] | [274,400] | | |
| 009 | ADVANCE PROCUREMENT (CY) | | 71,900 | | | | 71,900 |
| 010 | UH–60 BLACKHAWK M MODEL (MYP) | 48 | 938,308 | 5 | 286,402 | 53 | 1,224,710 |
| | Unfunded requirement—additional 5 for ARNG | | | [5] | [100,000] | | |
| | Unfunded requirement—UH–60M ECPs | | | | [186,402] | | |
| 011 | ADVANCE PROCUREMENT (CY) | | 86,295 | | | | 86,295 |
| 012 | UH–60 BLACK HAWK A AND L MODELS | 36 | 76,516 | 3 | 16,700 | 39 | 93,216 |
| | Unfunded requirement—UH–60Vs | | | [3] | [16,700] | | |
| 013 | CH–47 HELICOPTER | 6 | 202,576 | 8 | 354,500 | 14 | 557,076 |
| | Emergent requirements—additional 4 CH–47F Block I | | | [4] | [108,000] | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Unfunded requirement—additional 4 MH–47Gs | | [4] | [246,500] | | |
| 014 | ADVANCE PROCUREMENT (CY) | 17,820 | | | | 17,820 |
| | **MODIFICATION OF AIRCRAFT** | | | | | |
| 015 | MQ–1 PAYLOAD (MIP) | 5,910 | 10 | 24,000 | 10 | 29,910 |
| | Realign European Reassurance Initiative to Base | | | [8,000] | | |
| | Unfunded requirement | | [10] | [16,000] | | |
| 016 | UNIVERSAL GROUND CONTROL EQUIPMENT (UAS) | 15,000 | | | | 15,000 |
| 017 | GRAY EAGLE MODS2 | 74,291 | | | | 74,291 |
| 018 | MULTI SENSOR ABN RECON (MIP) | 68,812 | 7 | 58,950 | 7 | 127,762 |
| | Realign European Reassurance Initiative to Base | | | [29,475] | | |
| | Unfunded requirement | | [7] | [29,475] | | |
| 019 | AH–64 MODS | 238,141 | | 144,800 | | 382,941 |
| | Unfunded requirement | | | [144,800] | | |
| 020 | CH–47 CARGO HELICOPTER MODS (MYP) | 20,166 | | 61,000 | | 81,166 |
| | Unfunded requirement | | | [61,000] | | |
| 021 | GRCS SEMA MODS (MIP) | 5,514 | | | | 5,514 |
| 022 | ARL SEMA MODS (MIP) | 11,650 | | | | 11,650 |
| 023 | EMARSS SEMA MODS (MIP) | 15,279 | | | | 15,279 |
| 024 | UTILITY/CARGO AIRPLANE MODS | 57,737 | | | | 57,737 |
| 025 | UTILITY HELICOPTER MODS | 5,900 | | | | 5,900 |
| 026 | NETWORK AND MISSION PLAN | 142,102 | | | | 142,102 |
| 027 | COMMS, NAV SURVEILLANCE | 166,050 | 505 | 41,580 | 505 | 207,630 |
| | Unfunded requirement—ARC–201D encrypted radios | | [505] | [41,580] | | |
| 028 | GATM ROLLUP | 37,403 | | | | 37,403 |
| 029 | RQ–7 UAV MODS | 83,160 | | 111,000 | | 194,160 |
| | Unfunded requirement | | | [111,000] | | |
| 030 | UAS MODS | 26,109 | | 320 | | 26,429 |
| | Unfunded requirement | | | [320] | | |
| | **GROUND SUPPORT AVIONICS** | | | | | |
| 031 | AIRCRAFT SURVIVABILITY EQUIPMENT | 70,913 | | | | 70,913 |
| 032 | SURVIVABILITY CM | 5,884 | | | | 5,884 |
| 033 | CMWS | 26,825 | | | | 26,825 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 034 | COMMON INFRARED COUNTERMEASURES (CIRCM) | | 6,337 | | | | 6,337 |
| | **OTHER SUPPORT** | | | | | | |
| 035 | AVIONICS SUPPORT EQUIPMENT | | 7,038 | | | | 7,038 |
| 036 | COMMON GROUND EQUIPMENT | | 47,404 | 92 | 8,900 | 92 | 56,304 |
| | Unfunded requirement—grow the Army | | | | [1,800] | | |
| | Unfunded requirement—Non destructive test equip | | | [92] | [7,100] | | |
| 037 | AIRCREW INTEGRATED SYSTEMS | | 47,066 | | | | 47,066 |
| 038 | AIR TRAFFIC CONTROL | | 83,790 | | 1,115 | | 84,905 |
| | Unfunded requirement | | | | [1,115] | | |
| 039 | INDUSTRIAL FACILITIES | | 1,397 | | | | 1,397 |
| 040 | LAUNCHER, 2.75 ROCKET | | 1,911 | | | | 1,911 |
| | **TOTAL AIRCRAFT PROCUREMENT, ARMY** | **170** | **4,149,894** | **644** | **1,443,667** | **814** | **5,593,561** |
| | | | | | | | |
| | **MISSILE PROCUREMENT, ARMY** | | | | | | |
| | **SURFACE-TO-AIR MISSILE SYSTEM** | | | | | | |
| 001 | LOWER TIER AIR AND MISSILE DEFENSE (AMD) | | 140,826 | | | | 140,826 |
| 002 | MSE MISSILE | 93 | 459,040 | | | 93 | 459,040 |
| 003 | INDIRECT FIRE PROTECTION CAPABILITY INC 2–I | | 57,742 | | | | 57,742 |
| | **AIR-TO-SURFACE MISSILE SYSTEM** | | | | | | |
| 005 | HELLFIRE SYS SUMMARY | 998 | 94,790 | | | 998 | 94,790 |
| 006 | JOINT AIR-TO-GROUND MSLS (JAGM) | 824 | 178,432 | | –5,000 | 824 | 173,432 |
| | Program decrease | | | | [–5,000] | | |
| | **ANTI-TANK/ASSAULT MISSILE SYS** | | | | | | |
| 008 | JAVELIN (AAWS-M) SYSTEM SUMMARY | 525 | 110,123 | 47 | 8,112 | 572 | 118,235 |
| | Realign European Reassurance Initiative to Base | | | [47] | [8,112] | | |
| 009 | TOW 2 SYSTEM SUMMARY | 1,156 | 85,851 | 49 | 3,907 | 1,205 | 89,758 |

| Line | Item | Qty | Amount | Qty | Amount | Qty | Amount |
|---|---|---|---|---|---|---|---|
| | Realign European Reassurance Initiative to Base | | | [49] | [3,907] | | |
| 010 | ADVANCE PROCUREMENT (CY) | | 19,949 | | | | 19,949 |
| 011 | GUIDED MLRS ROCKET (GMLRS) | 4,458 | 595,182 | | –1,300 | 4,458 | 593,882 |
| | Program reduction—unit cost savings | | | | [–2,800] | | |
| | Unfunded requirement—training devices | | | | [1,500] | | |
| 012 | MLRS REDUCED RANGE PRACTICE ROCKETS (RRPR) | 3,306 | 28,321 | | | 3,306 | 28,321 |
| 013 | HIGH MOBILITY ARTILLERY ROCKET SYSTEM (HIMARS | | | 64 | 476,728 | 64 | 476,728 |
| | Realign European Reassurance Initiative to Base | | | | [41,000] | | |
| | Unfunded requirement—ERI | | | [32] | [197,000] | | |
| | Unfunded requirement—grow the Army | | | [32] | [238,728] | | |
| | **MODIFICATIONS** | | | | | | |
| 015 | PATRIOT MODS | | 329,073 | | | | 329,073 |
| 016 | ATACMS MODS | | 116,040 | | | | 116,040 |
| 017 | GMLRS MOD | | 531 | | | | 531 |
| 018 | STINGER MODS | | 63,090 | | 28,000 | | 91,090 |
| | Realign European Reassurance Initiative to Base | | | | [28,000] | | |
| 019 | AVENGER MODS | | 62,931 | | | | 62,931 |
| 020 | ITAS/TOW MODS | | 3,500 | | | | 3,500 |
| 021 | MLRS MODS | | 138,235 | 32 | 48,800 | 32 | 187,035 |
| | Unfunded requirement | | | [32] | [48,800] | | |
| 022 | HIMARS MODIFICATIONS | | 9,566 | | | | 9,566 |
| | **SPARES AND REPAIR PARTS** | | | | | | |
| 023 | SPARES AND REPAIR PARTS | | 18,915 | | | | 18,915 |
| | **SUPPORT EQUIPMENT & FACILITIES** | | | | | | |
| 024 | AIR DEFENSE TARGETS | | 5,728 | | | | 5,728 |
| 026 | PRODUCTION BASE SUPPORT | | 1,189 | | | | 1,189 |
| | **TOTAL MISSILE PROCUREMENT, ARMY** | **11,360** | **2,519,054** | **192** | **559,247** | **11,552** | **3,078,301** |
| | | | | | | | |
| | **PROCUREMENT OF W&TCV, ARMY** | | | | | | |
| | **TRACKED COMBAT VEHICLES** | | | | | | |
| 001 | BRADLEY PROGRAM | | | 60 | 200,000 | 60 | 200,000 |
| | Realign European Reassurance Initiative to Base | | | [60] | [200,000] | | |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 002 | ARMORED MULTI PURPOSE VEHICLE (AMPV) | 42 | 193,715 | 65 | 253,903 | 107 | 447,618 |
| | Realign European Reassurance Initiative to Base | | | [65] | [253,903] | | |
| | **MODIFICATION OF TRACKED COMBAT VEHICLES** | | | | | | |
| 004 | STRYKER (MOD) | | 97,552 | | | | 97,552 |
| 005 | STRYKER UPGRADE | | | | 348,000 | | 348,000 |
| | Unfunded requirement – completes 4th DVH SBCT | | | | [348,000] | | |
| 006 | BRADLEY PROGRAM (MOD) | | 444,851 | 33 | 141,000 | 33 | 585,851 |
| | Realign European Reassurance Initiative to Base | | | | [30,000] | | |
| | Unfunded requirement | | | [33] | [111,000] | | |
| 007 | M109 FOV MODIFICATIONS | | 64,230 | | | | 64,230 |
| 008 | PALADIN INTEGRATED MANAGEMENT (PIM) | 59 | 646,413 | 12 | 125,736 | 71 | 772,149 |
| | Realign European Reassurance Initiative to Base | | | [12] | [125,736] | | |
| 009 | IMPROVED RECOVERY VEHICLE (M88A2 HERCULES) | 16 | 72,402 | 35 | 122,000 | 51 | 194,402 |
| | Unfunded requirement | | | [35] | [122,000] | | |
| 010 | ASSAULT BRIDGE (MOD) | | 5,855 | | | | 5,855 |
| 011 | ASSAULT BREACHER VEHICLE | 7 | 34,221 | 3 | 30,000 | 10 | 64,221 |
| | Unfunded requirement | | | [3] | [30,000] | | |
| 012 | M88 FOV MODS | | 4,826 | | | | 4,826 |
| 013 | JOINT ASSAULT BRIDGE | 27 | 128,350 | | | 27 | 128,350 |
| 014 | M1 ABRAMS TANK (MOD) | | 248,826 | | 309,700 | | 558,526 |
| | Realign European Reassurance Initiative to Base | | | | [138,700] | | |
| | Unfunded requirement | | | | [171,000] | | |
| 015 | ABRAMS UPGRADE PROGRAM | 20 | 275,000 | 65 | 817,800 | 85 | 1,092,800 |
| | Realign European Reassurance Initiative to Base | | | [36] | [442,800] | | |
| | Unfunded requirement | | | [29] | [375,000] | | |
| | **WEAPONS & OTHER COMBAT VEHICLES** | | | | | | |

| Line | Item | | | | | |
|---|---|---|---|---|---|---|
| 018 | M240 MEDIUM MACHINE GUN (7.62MM) | 1,992 | 161 | 1,300 | 161 | 3,292 |
| | Unfunded requirement | | [161] | [1,300] | | |
| 019 | MULTI-ROLE ANTI-ARMOR ANTI-PERSONNEL WEAPON S | 6,520 | 742 | 52,000 | 742 | 58,520 |
| | Unfunded requirement | | [742] | [52,000] | | |
| 020 | MORTAR SYSTEMS | 21,452 | | 13,100 | | 34,552 |
| | Unfunded requirement—120mm mortars | | | [13,100] | | |
| 021 | XM320 GRENADE LAUNCHER MODULE (GLM) | 4,524 | 234 | 800 | 234 | 5,324 |
| | Unfunded requirement | | [234] | [800] | | |
| 023 | CARBINE | 43,150 | 12311 | 8,000 | 12,311 | 51,150 |
| | Unfunded requirement | | [7,656] | [5,000] | | |
| | Unfunded requirement—grow the Army | | [4,655] | [3,000] | | |
| 024 | COMMON REMOTELY OPERATED WEAPONS STATION | 750 | | 10,000 | | 10,750 |
| | Unfunded requirement—modifications | | | [10,000] | | |
| 025 | HANDGUN | 8,326 | 1389 | 400 | 1,389 | 8,726 |
| | Unfunded requirement | | [1,389] | [400] | | |
| | **MOD OF WEAPONS AND OTHER COMBAT VEH** | | | | | |
| 026 | MK–19 GRENADE MACHINE GUN MODS | 2,000 | | | | 2,000 |
| 027 | M777 MODS | 3,985 | 18 | 85,800 | 18 | 89,785 |
| | Unfunded requirement | | [18] | [85,800] | | |
| 028 | M4 CARBINE MODS | 31,315 | | | | 31,315 |
| 029 | M2 50 CAL MACHINE GUN MODS | 47,414 | 188 | 5,000 | 188 | 52,414 |
| | Unfunded requirement—accessories | | | [2,600] | | |
| | Unfunded requirement—M2A1 machine guns | | [188] | [2,400] | | |
| 030 | M249 SAW MACHINE GUN MODS | 3,339 | | | | 3,339 |
| 031 | M240 MEDIUM MACHINE GUN MODS | 4,577 | | 6,600 | | 11,177 |
| | Unfunded requirement—accessories | | | [1,000] | | |
| | Unfunded requirement—M240Ls | | | [5,600] | | |
| 032 | SNIPER RIFLES MODIFICATIONS | 1,488 | | | | 1,488 |
| 033 | M119 MODIFICATIONS | 12,678 | | | | 12,678 |
| 034 | MORTAR MODIFICATION | 3,998 | | | | 3,998 |
| 035 | MODIFICATIONS LESS THAN $5.0M (WOCV-WTCV) | 2,219 | | | | 2,219 |
| | **SUPPORT EQUIPMENT & FACILITIES** | | | | | |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 036 | ITEMS LESS THAN $5.0M (WOCV-WTCV) | | 5,075 | | 2,700 | | 7,775 |
| | Unfunded requirement | | | | [2,700] | | |
| 037 | PRODUCTION BASE SUPPORT (WOCV-WTCV) | | 992 | | | | 992 |
| 039 | SMALL ARMS EQUIPMENT (SOLDIER ENH PROG) | | 1,573 | | | | 1,573 |
| | **UNDISTRIBUTED** | | | | | | |
| 042 | UNDISTRIBUTED | | | | 1,200 | | 1,200 |
| | Security Force Assistance Brigade | | | | [1,200] | | |
| | **TOTAL PROCUREMENT OF W&TCV, ARMY** | **171** | **2,423,608** | **15,316** | **2,535,039** | **15,487** | **4,958,647** |
| | | | | | | | |
| | **PROCUREMENT OF AMMUNITION, ARMY** | | | | | | |
| | **SMALL/MEDIUM CAL AMMUNITION** | | | | | | |
| 001 | CTG, 5.56MM, ALL TYPES | | 39,767 | | | | 39,767 |
| 002 | CTG, 7.62MM, ALL TYPES | | 46,804 | | | | 46,804 |
| 003 | CTG, HANDGUN, ALL TYPES | | 10,413 | | 5 | | 10,418 |
| | Realign European Reassurance Initiative to Base | | | | [5] | | |
| 004 | CTG, .50 CAL, ALL TYPES | | 62,837 | | 121 | | 62,958 |
| | Realign European Reassurance Initiative to Base | | | | [121] | | |
| 005 | CTG, 20MM, ALL TYPES | | 8,208 | | | | 8,208 |
| 006 | CTG, 25MM, ALL TYPES | | 8,640 | | | | 8,640 |
| 007 | CTG, 30MM, ALL TYPES | | 76,850 | | 25,000 | | 101,850 |
| | Realign European Reassurance Initiative to Base | | | | [25,000] | | |
| 008 | CTG, 40MM, ALL TYPES | | 108,189 | | | | 108,189 |
| | **MORTAR AMMUNITION** | | | | | | |
| 009 | 60MM MORTAR, ALL TYPES | | 57,359 | | | | 57,359 |
| 010 | 81MM MORTAR, ALL TYPES | | 49,471 | | | | 49,471 |
| 011 | 120MM MORTAR, ALL TYPES | | 91,528 | | | | 91,528 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **TANK AMMUNITION** | | | | | | |
| 012 | CARTRIDGES, TANK, 105MM AND 120MM, ALL TYPES | | 133,500 | | | | 133,500 |
| | **ARTILLERY AMMUNITION** | | | | | | |
| 013 | ARTILLERY CARTRIDGES, 75MM & 105MM, ALL TYPES | | 44,200 | | | | 44,200 |
| 014 | ARTILLERY PROJECTILE, 155MM, ALL TYPES | | 187,149 | | | | 187,149 |
| 015 | PROJ 155MM EXTENDED RANGE M982 | 480 | 49,000 | | 202,545 | 480 | 251,545 |
| | Realign European Reassurance Initiative to Base | | | | [19,045] | | |
| | Unfunded requirement | | | | [183,500] | | |
| 016 | ARTILLERY PROPELLANTS, FUZES AND PRIMERS, ALL | | 83,046 | | 16,678 | | 99,724 |
| | Realign European Reassurance Initiative to Base | | | | [16,678] | | |
| | **MINES** | | | | | | |
| 017 | MINES & CLEARING CHARGES, ALL TYPES | | 3,942 | | 11,615 | | 15,557 |
| | Realign European Reassurance Initiative to Base | | | | [11,615] | | |
| | **ROCKETS** | | | | | | |
| 019 | SHOULDER LAUNCHED MUNITIONS, ALL TYPES | | 5,000 | | | | 5,000 |
| 020 | ROCKET, HYDRA 70, ALL TYPES | | 161,155 | | | | 161,155 |
| | **OTHER AMMUNITION** | | | | | | |
| 021 | CAD/PAD, ALL TYPES | | 7,441 | | | | 7,441 |
| 022 | DEMOLITION MUNITIONS, ALL TYPES | | 19,345 | | | | 19,345 |
| 023 | GRENADES, ALL TYPES | | 22,759 | | | | 22,759 |
| 024 | SIGNALS, ALL TYPES | | 2,583 | | | | 2,583 |
| 025 | SIMULATORS, ALL TYPES | | 13,084 | | | | 13,084 |
| | **MISCELLANEOUS** | | | | | | |
| 026 | AMMO COMPONENTS, ALL TYPES | | 12,237 | | | | 12,237 |
| 027 | NON-LETHAL AMMUNITION, ALL TYPES | | 1,500 | | | | 1,500 |
| 028 | ITEMS LESS THAN $5 MILLION (AMMO) | | 10,730 | | | | 10,730 |
| 029 | AMMUNITION PECULIAR EQUIPMENT | | 16,425 | | | | 16,425 |
| 030 | FIRST DESTINATION TRANSPORTATION (AMMO) | | 15,221 | | | | 15,221 |
| | **PRODUCTION BASE SUPPORT** | | | | | | |
| 032 | INDUSTRIAL FACILITIES | | 329,356 | | 100,000 | | 429,356 |
| | Unfunded requirement | | | | [100,000] | | |
| 033 | CONVENTIONAL MUNITIONS DEMILITARIZATION | | 197,825 | | | | 197,825 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 034 | ARMS INITIATIVE | | 3,719 | | | | 3,719 |
| | **TOTAL PROCUREMENT OF AMMUNITION, ARMY** | **480** | **1,879,283** | | **355,964** | **480** | **2,235,247** |
| | **OTHER PROCUREMENT, ARMY** | | | | | | |
| | **TACTICAL VEHICLES** | | | | | | |
| 001 | TACTICAL TRAILERS/DOLLY SETS | | 9,716 | | | | 9,716 |
| 002 | SEMITRAILERS, FLATBED: | | 14,151 | 263 | 22,000 | 263 | 36,151 |
| | Unfunded requirement—additional M872s | | | [263] | [22,000] | | |
| 003 | AMBULANCE, 4 LITTER, 5/4 TON, 4X4 | | 53,000 | 121 | 34,792 | 121 | 87,792 |
| | Unfunded requirement | | | [121] | [34,792] | | |
| 004 | GROUND MOBILITY VEHICLES (GMV) | | 40,935 | | | | 40,935 |
| 006 | JOINT LIGHT TACTICAL VEHICLE | 2,110 | 804,440 | | | 2,110 | 804,440 |
| 007 | TRUCK, DUMP, 20T (CCE) | | 967 | | | | 967 |
| 008 | FAMILY OF MEDIUM TACTICAL VEH (FMTV) | | 78,650 | 979 | 163,294 | 979 | 241,944 |
| | Unfunded requirement—FMTVs | | | [710] | [154,100] | | |
| | Unfunded requirement—trailers | | | [269] | [9,194] | | |
| 009 | FIRETRUCKS & ASSOCIATED FIREFIGHTING EQUIP | | 19,404 | | | | 19,404 |
| 010 | FAMILY OF HEAVY TACTICAL VEHICLES (FHTV) | | 81,656 | 31 | 33,002 | 31 | 114,658 |
| | Realign European Reassurance Initiative to Base | | | | [25,874] | | |
| | Unfunded requirement—forward repair systems | | | [31] | [7,128] | | |
| 011 | PLS ESP | | 7,129 | 90 | 52,600 | 90 | 59,729 |
| | Unfunded requirement | | | [90] | [52,600] | | |
| 012 | HVY EXPANDED MOBILE TACTICAL TRUCK EXT SERV | | | 200 | 150,878 | 200 | 150,878 |
| | Realign European Reassurance Initiative to Base | | | | [38,628] | | |
| | Unfunded requirement | | | [200] | [112,250] | | |
| 013 | TACTICAL WHEELED VEHICLE PROTECTION KITS | | 43,040 | | | | 43,040 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 014 | MODIFICATION OF IN SVC EQUIP | 83,940 | | 5,530 | | 89,470 |
| | Realign European Reassurance Initiative to Base | | | [2,599] | | |
| | Unfunded requirement—CTE equipment | | | [2,931] | | |
| | **NON-TACTICAL VEHICLES** | | | | | |
| 016 | HEAVY ARMORED SEDAN | 269 | | | | 269 |
| 017 | PASSENGER CARRYING VEHICLES | 1,320 | | | | 1,320 |
| 018 | NONTACTICAL VEHICLES, OTHER | 6,964 | | | | 6,964 |
| | **COMM—JOINT COMMUNICATIONS** | | | | | |
| 019 | WIN-T—GROUND FORCES TACTICAL NETWORK | 420,492 | | | | 420,492 |
| 020 | SIGNAL MODERNIZATION PROGRAM | 92,718 | | | | 92,718 |
| 021 | TACTICAL NETWORK TECHNOLOGY MOD IN SVC | 150,497 | 89 | 77,500 | 89 | 227,997 |
| | Program reduction | | | [–10,000] | | |
| | Unfunded requirement | | [89] | [87,500] | | |
| 022 | JOINT INCIDENT SITE COMMUNICATIONS CAPABILITY | 6,065 | | | | 6,065 |
| 023 | JCSE EQUIPMENT (USREDCOM) | 5,051 | | | | 5,051 |
| | **COMM—SATELLITE COMMUNICATIONS** | | | | | |
| 024 | DEFENSE ENTERPRISE WIDEBAND SATCOM SYSTEMS | 161,383 | | | | 161,383 |
| 025 | TRANSPORTABLE TACTICAL COMMAND COMMUNICATIONS | 62,600 | | | | 62,600 |
| 026 | SHF TERM | 11,622 | | | | 11,622 |
| 028 | SMART-T (SPACE) | 6,799 | | | | 6,799 |
| 029 | GLOBAL BRDCST SVC—GBS | 7,065 | | | | 7,065 |
| 031 | ENROUTE MISSION COMMAND (EMC) | 21,667 | | | | 21,667 |
| | **COMM—COMBAT SUPPORT COMM** | | | | | |
| 033 | MOD-IN-SERVICE PROFILER | 70 | | | | 70 |
| | **COMM—C3 SYSTEM** | | | | | |
| 034 | ARMY GLOBAL CMD & CONTROL SYS (AGCCS) | 2,658 | | | | 2,658 |
| | **COMM—COMBAT COMMUNICATIONS** | | | | | |
| 036 | HANDHELD MANPACK SMALL FORM FIT (HMS) | 355,351 | 2565 | 8,409 | 2,565 | 363,760 |
| | Unfunded requirement | | [2,565] | [8,409] | | |
| 037 | MID-TIER NETWORKING VEHICULAR RADIO (MNVR) | 25,100 | | | | 25,100 |
| 038 | RADIO TERMINAL SET, MIDS LVT(2) | 11,160 | | | | 11,160 |
| 040 | TRACTOR DESK | 2,041 | | | | 2,041 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 041 | TRACTOR RIDE | | 5,534 | | 8,200 | | 13,734 |
| | Unfunded requirement | | | | [8,200] | | |
| 042 | SPIDER APLA REMOTE CONTROL UNIT | | 996 | | | | 996 |
| 043 | SPIDER FAMILY OF NETWORKED MUNITIONS INCR | | 4,500 | 18 | 2,358 | 18 | 6,858 |
| | Unfunded requirement | | | [18] | [2,358] | | |
| 045 | TACTICAL COMMUNICATIONS AND PROTECTIVE SYSTEM | | 4,411 | | | | 4,411 |
| 046 | UNIFIED COMMAND SUITE | | 15,275 | | | | 15,275 |
| 047 | FAMILY OF MED COMM FOR COMBAT CASUALTY CARE | | 15,964 | | 761 | | 16,725 |
| | Unfunded requirement | | | | [761] | | |
| | **COMM—INTELLIGENCE COMM** | | | | | | |
| 049 | CI AUTOMATION ARCHITECTURE | | 9,560 | | | | 9,560 |
| 050 | DEFENSE MILITARY DECEPTION INITIATIVE | | 4,030 | | | | 4,030 |
| | **INFORMATION SECURITY** | | | | | | |
| 054 | COMMUNICATIONS SECURITY (COMSEC) | | 107,804 | 5608 | 22,863 | 5,608 | 130,667 |
| | Unfunded Requirement | | | [5,608] | [22,863] | | |
| 055 | DEFENSIVE CYBER OPERATIONS | | 53,436 | 4 | 8,000 | 4 | 61,436 |
| | Unfunded Requirement | | | [4] | [8,000] | | |
| 056 | INSIDER THREAT PROGRAM—UNIT ACTIVITY MONITO | | 690 | | | | 690 |
| 057 | PERSISTENT CYBER TRAINING ENVIRONMENT | | 4,000 | | | | 4,000 |
| | **COMM—LONG HAUL COMMUNICATIONS** | | | | | | |
| 058 | BASE SUPPORT COMMUNICATIONS | | 43,751 | | 7,539 | | 51,290 |
| | Unfunded requirement—first responder communication equipment | | | | [7,539] | | |
| | **COMM—BASE COMMUNICATIONS** | | | | | | |
| 059 | INFORMATION SYSTEMS | | 118,101 | | | | 118,101 |
| 060 | EMERGENCY MANAGEMENT MODERNIZATION PROGRAM | | 4,490 | | | | 4,490 |
| 061 | HOME STATION MISSION COMMAND CENTERS (HSMCC) | | 20,050 | | | | 20,050 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 062 | INSTALLATION INFO INFRASTRUCTURE MOD PROGRAM | 186,251 | | 2,500 | | 188,751 |
| | Realign European Reassurance Initiative to Base | | | [2,500] | | |
| | **ELECT EQUIP—TACT INT REL ACT (TIARA)** | | | | | |
| 065 | JTT/CIBS-M | 12,154 | | 7,600 | | 19,754 |
| | Unfunded requirement | | | [7,600] | | |
| 068 | DCGS-A (MIP) | 274,782 | 105 | 20,712 | 105 | 295,494 |
| | Unfunded requirement | | [105] | [20,712] | | |
| 070 | TROJAN (MIP) | 16,052 | 7 | 19,160 | 7 | 35,212 |
| | Realign European Reassurance Initiative to Base | | | [6,000] | | |
| | Unfunded requirement | | [7] | [13,160] | | |
| 071 | MOD OF IN-SVC EQUIP (INTEL SPT) (MIP) | 51,034 | | | | 51,034 |
| 072 | CI HUMINT AUTO REPRTING AND COLL(CHARCS) | 7,815 | | | | 7,815 |
| 073 | CLOSE ACCESS TARGET RECONNAISSANCE (CATR) | 8,050 | | | | 8,050 |
| 074 | MACHINE FOREIGN LANGUAGE TRANSLATION SYSTEM-M | 567 | | | | 567 |
| | **ELECT EQUIP—ELECTRONIC WARFARE (EW)** | | | | | |
| 076 | LIGHTWEIGHT COUNTER MORTAR RADAR | 20,459 | | | | 20,459 |
| 077 | EW PLANNING & MANAGEMENT TOOLS (EWPMT) | 5,805 | | | | 5,805 |
| 078 | AIR VIGILANCE (AV) | 5,348 | | | | 5,348 |
| 081 | COUNTERINTELLIGENCE/SECURITY COUNTERMEASURES | 469 | | 5,900 | | 6,369 |
| | Realign European Reassurance Initiative to Base | | | [5,900] | | |
| 082 | CI MODERNIZATION | 285 | | | | 285 |
| | **ELECT EQUIP—TACTICAL SURV. (TAC SURV)** | | | | | |
| 083 | SENTINEL MODS | 28,491 | 12 | 72,000 | 12 | 100,491 |
| | Unfunded requirement | | [12] | [72,000] | | |
| 084 | NIGHT VISION DEVICES | 166,493 | 449 | 62,896 | 449 | 229,389 |
| | Unfunded requirement—grow the Army | | | [47,147] | | |
| | Unfunded requirement—LTLM enhancement | | [449] | [15,749] | | |
| 085 | SMALL TACTICAL OPTICAL RIFLE MOUNTED MLRF | 13,947 | | | | 13,947 |
| 087 | INDIRECT FIRE PROTECTION FAMILY OF SYSTEMS | 21,380 | | 434,623 | | 456,003 |
| | Unfunded requirement—Air and Missile Defense (SHORAD) | | | [434,623] | | |
| 088 | FAMILY OF WEAPON SIGHTS (FWS) | 59,105 | | | | 59,105 |
| 089 | ARTILLERY ACCURACY EQUIP | 2,129 | | | | 2,129 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 091 | JOINT BATTLE COMMAND—PLATFORM (JBC-P) | | 282,549 | 3771 | 62,400 | 3,771 | 344,949 |
| | Realign European Reassurance Initiative to Base | | | | [2,300] | | |
| | Unfunded requirement | | | [3,771] | [60,100] | | |
| 092 | JOINT EFFECTS TARGETING SYSTEM (JETS) | | 48,664 | | | | 48,664 |
| 093 | MOD OF IN-SVC EQUIP (LLDR) | | 5,198 | | 3,974 | | 9,172 |
| | Realign European Reassurance Initiative to Base | | | | [3,974] | | |
| 094 | COMPUTER BALLISTICS: LHMBC XM32 | | 8,117 | | | | 8,117 |
| 095 | MORTAR FIRE CONTROL SYSTEM | | 31,813 | | 15,775 | | 47,588 |
| | Realign European Reassurance Initiative to Base | | | | [75] | | |
| | Unfunded requirement | | | | [15,700] | | |
| 096 | COUNTERFIRE RADARS | | 329,057 | 4 | 64,200 | 4 | 393,257 |
| | Unfunded requirement | | | [4] | [64,200] | | |
| | **ELECT EQUIP—TACTICAL C2 SYSTEMS** | | | | | | |
| 097 | FIRE SUPPORT C2 FAMILY | | 8,700 | 99 | 4,758 | 99 | 13,458 |
| | Unfunded requirement | | | [99] | [4,758] | | |
| 098 | AIR & MSL DEFENSE PLANNING & CONTROL SYS | | 26,635 | 133 | 106,078 | 133 | 132,713 |
| | Realign European Reassurance Initiative to Base | | | | [9,100] | | |
| | Unfunded requirement | | | [133] | [96,978] | | |
| 100 | LIFE CYCLE SOFTWARE SUPPORT (LCSS) | | 1,992 | | | | 1,992 |
| 101 | NETWORK MANAGEMENT INITIALIZATION AND SERVICE | | 15,179 | | | | 15,179 |
| 102 | MANEUVER CONTROL SYSTEM (MCS) | | 132,572 | 575 | 4,602 | 575 | 137,174 |
| | Unfunded requirement | | | [575] | [4,602] | | |
| 103 | GLOBAL COMBAT SUPPORT SYSTEM-ARMY (GCSS-A) | | 37,201 | | | | 37,201 |
| 104 | INTEGRATED PERSONNEL AND PAY SYSTEM-ARMY (IPP | | 16,140 | | | | 16,140 |
| 105 | RECONNAISSANCE AND SURVEYING INSTRUMENT SET | | 6,093 | 12 | 14,755 | 12 | 20,848 |
| | Unfunded requirement | | | [12] | [14,755] | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 106 | MOD OF IN-SVC EQUIPMENT (ENFIRE) | 1,134 | | | | 1,134 |
| | **ELECT EQUIP—AUTOMATION** | | | | | |
| 107 | ARMY TRAINING MODERNIZATION | 11,575 | | | | 11,575 |
| 108 | AUTOMATED DATA PROCESSING EQUIP | 91,983 | | | | 91,983 |
| 109 | GENERAL FUND ENTERPRISE BUSINESS SYSTEMS FAM | 4,465 | | | | 4,465 |
| 110 | HIGH PERF COMPUTING MOD PGM (HPCMP) | 66,363 | | | | 66,363 |
| 111 | CONTRACT WRITING SYSTEM | 1,001 | | | | 1,001 |
| 112 | RESERVE COMPONENT AUTOMATION SYS (RCAS) | 26,183 | | | | 26,183 |
| | **ELECT EQUIP—AUDIO VISUAL SYS (A/V)** | | | | | |
| 113 | TACTICAL DIGITAL MEDIA | 4,441 | | | | 4,441 |
| 114 | ITEMS LESS THAN $5M (SURVEYING EQUIPMENT) | 3,414 | 20 | 13,000 | 20 | 16,414 |
| | Unfunded requirement | | | [10,000] | | |
| | Unfunded requirement—global positioning system | | [20] | [3,000] | | |
| | **ELECT EQUIP—SUPPORT** | | | | | |
| 115 | PRODUCTION BASE SUPPORT (C-E) | 499 | | | | 499 |
| 116 | BCT EMERGING TECHNOLOGIES | 25,050 | | | | 25,050 |
| | **CLASSIFIED PROGRAMS** | | | | | |
| 116A | CLASSIFIED PROGRAMS | 4,819 | | | | 4,819 |
| | **CHEMICAL DEFENSIVE EQUIPMENT** | | | | | |
| 117 | PROTECTIVE SYSTEMS | 1,613 | | | | 1,613 |
| 118 | FAMILY OF NON-LETHAL EQUIPMENT (FNLE) | 9,696 | 500 | 14,000 | 500 | 23,696 |
| | Unfunded Requirement | | [500] | [14,000] | | |
| 120 | CBRN DEFENSE | 11,110 | | | | 11,110 |
| | **BRIDGING EQUIPMENT** | | | | | |
| 121 | TACTICAL BRIDGING | 16,610 | | | | 16,610 |
| 122 | TACTICAL BRIDGE, FLOAT-RIBBON | 21,761 | 28 | 22,000 | 28 | 43,761 |
| | Unfunded requirement | | [28] | [22,000] | | |
| 124 | COMMON BRIDGE TRANSPORTER (CBT) RECAP | 21,046 | 112 | 40,400 | 112 | 61,446 |
| | Unfunded requirement | | [112] | [40,400] | | |
| | **ENGINEER (NON-CONSTRUCTION) EQUIPMENT** | | | | | |
| 125 | HANDHELD STANDOFF MINEFIELD DETECTION SYS-HST | 5,000 | 455 | 12,800 | 455 | 17,800 |
| | Unfunded requirement—grow the Army | | [227] | [5,600] | | |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | Unfunded requirement—PSS–14Cs | | | [228] | [7,200] | | |
| 126 | GRND STANDOFF MINE DETECTN SYSM (GSTAMIDS) | | 32,442 | | | | 32,442 |
| 127 | AREA MINE DETECTION SYSTEM (AMDS) | | 10,571 | | | | 10,571 |
| 128 | HUSKY MOUNTED DETECTION SYSTEM (HMDS) | | 21,695 | | | | 21,695 |
| 129 | ROBOTIC COMBAT SUPPORT SYSTEM (RCSS) | | 4,516 | 5 | 15,100 | 5 | 19,616 |
| | Unfunded requirement—M160s | | | [5] | [15,100] | | |
| 130 | EOD ROBOTICS SYSTEMS RECAPITALIZATION | | 10,073 | | 5,000 | | 15,073 |
| | Unfunded requiremet | | | | [5,000] | | |
| 131 | ROBOTICS AND APPLIQUE SYSTEMS | | 3,000 | | | | 3,000 |
| 133 | REMOTE DEMOLITION SYSTEMS | | 5,847 | 44 | 1,192 | 44 | 7,039 |
| | Unfunded requirement—radio frequency remote activated munitions | | | [44] | [1,192] | | |
| 134 | < $5M, COUNTERMINE EQUIPMENT | | 1,530 | | | | 1,530 |
| 135 | FAMILY OF BOATS AND MOTORS | | 4,302 | | 8,000 | | 12,302 |
| | Unfunded requirement | | | | [8,000] | | |
| | **COMBAT SERVICE SUPPORT EQUIPMENT** | | | | | | |
| 136 | HEATERS AND ECU'S | | 7,405 | | 9,056 | | 16,461 |
| | Unfunded requirement | | | | [9,056] | | |
| 137 | SOLDIER ENHANCEMENT | | 1,095 | | | | 1,095 |
| 138 | PERSONNEL RECOVERY SUPPORT SYSTEM (PRSS) | | 5,390 | | | | 5,390 |
| 139 | GROUND SOLDIER SYSTEM | | 38,219 | | 4,589 | | 42,808 |
| | Unfunded requirement | | | | [4,589] | | |
| 140 | MOBILE SOLDIER POWER | | 10,456 | 419 | 1,562 | 419 | 12,018 |
| | Unfunded requirement | | | [419] | [1,562] | | |
| 141 | FORCE PROVIDER | | | 6 | 13,850 | 6 | 13,850 |
| | Unfunded requirement | | | [6] | [13,850] | | |
| 142 | FIELD FEEDING EQUIPMENT | | 15,340 | | 14,400 | | 29,740 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Unfunded requirement | | | [14,400] | | |
| 143 | CARGO AERIAL DEL & PERSONNEL PARACHUTE SYSTEM | 30,607 | | | | 30,607 |
| 144 | FAMILY OF ENGR COMBAT AND CONSTRUCTION SETS | 10,426 | | 8,474 | | 18,900 |
| | Unfunded requirement | | | [8,474] | | |
| | **PETROLEUM EQUIPMENT** | | | | | |
| 146 | QUALITY SURVEILLANCE EQUIPMENT | 6,903 | | | | 6,903 |
| 147 | DISTRIBUTION SYSTEMS, PETROLEUM & WATER | 47,597 | | | | 47,597 |
| | **MEDICAL EQUIPMENT** | | | | | |
| 148 | COMBAT SUPPORT MEDICAL | 43,343 | 190 | 22,919 | 190 | 66,262 |
| | Realign European Reassurance Initiative to Base | | | [21,122] | | |
| | Unfunded requirement | | [190] | [1,797] | | |
| | **MAINTENANCE EQUIPMENT** | | | | | |
| 149 | MOBILE MAINTENANCE EQUIPMENT SYSTEMS | 33,774 | | 14,420 | | 48,194 |
| | Realign European Reassurance Initiative to Base | | | [1,124] | | |
| | Unfunded requirement—metal working and machine shop sets | | | [13,296] | | |
| 150 | ITEMS LESS THAN $5.0M (MAINT EQ) | 2,728 | | 954 | | 3,682 |
| | Unfunded requirement | | | [954] | | |
| | **CONSTRUCTION EQUIPMENT** | | | | | |
| 151 | GRADER, ROAD MTZD, HVY, 6X4 (CCE) | 989 | 48 | 14,730 | 48 | 15,719 |
| | Unfunded requirement | | [48] | [14,730] | | |
| 152 | SCRAPERS, EARTHMOVING | 11,180 | | | | 11,180 |
| 154 | TRACTOR, FULL TRACKED | | | 48,679 | | 48,679 |
| | Unfunded requirement—T9 Dozers | | | [48,679] | | |
| 155 | ALL TERRAIN CRANES | 8,935 | 2 | 3,000 | 2 | 11,935 |
| | Unfunded requiremnt | | [2] | [3,000] | | |
| 157 | HIGH MOBILITY ENGINEER EXCAVATOR (HMEE) | 64,339 | 40 | 20,560 | 40 | 84,899 |
| | Unfunded requirement | | [40] | [20,560] | | |
| 158 | ENHANCED RAPID AIRFIELD CONSTRUCTION CAPAP | 2,563 | | | | 2,563 |
| 160 | CONST EQUIP ESP | 19,032 | 65 | 7,000 | 65 | 26,032 |
| | Unfunded requirement—Engineer Mission Modules and Vibratory Rollers | | [65] | [7,000] | | |
| 161 | ITEMS LESS THAN $5.0M (CONST EQUIP) | 6,899 | | 5,012 | | 11,911 |
| | Unfunded requirement—water well drill systems | | | [5,012] | | |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | **RAIL FLOAT CONTAINERIZATION EQUIPMENT** | | | | | | |
| 162 | ARMY WATERCRAFT ESP | | 20,110 | | | | 20,110 |
| 163 | ITEMS LESS THAN $5.0M (FLOAT/RAIL) | | 2,877 | | | | 2,877 |
| | **GENERATORS** | | | | | | |
| 164 | GENERATORS AND ASSOCIATED EQUIP | | 115,635 | | 17,210 | | 132,845 |
| | Unfunded requirement | | | | [17,210] | | |
| 165 | TACTICAL ELECTRIC POWER RECAPITALIZATION | | 7,436 | | | | 7,436 |
| | **MATERIAL HANDLING EQUIPMENT** | | | | | | |
| 166 | FAMILY OF FORKLIFTS | | 9,000 | 15 | 1,635 | 15 | 10,635 |
| | Unfunded requirement | | | [15] | [1,635] | | |
| | **TRAINING EQUIPMENT** | | | | | | |
| 167 | COMBAT TRAINING CENTERS SUPPORT | | 88,888 | | 37,750 | | 126,638 |
| | Unfunded requirement | | | | [37,750] | | |
| 168 | TRAINING DEVICES, NONSYSTEM | | 285,989 | | 2,700 | | 288,689 |
| | Realign European Reassurance Initiative to Base | | | | [2,700] | | |
| 169 | CLOSE COMBAT TACTICAL TRAINER | | 45,718 | | | | 45,718 |
| 170 | AVIATION COMBINED ARMS TACTICAL TRAINER | | 30,568 | | | | 30,568 |
| 171 | GAMING TECHNOLOGY IN SUPPORT OF ARMY TRAINING | | 5,406 | | 11,500 | | 16,906 |
| | Unfunded requirement—SVCT systems | | | | [11,500] | | |
| | **TEST MEASURE AND DIG EQUIPMENT (TMD)** | | | | | | |
| 172 | CALIBRATION SETS EQUIPMENT | | 5,564 | | | | 5,564 |
| 173 | INTEGRATED FAMILY OF TEST EQUIPMENT (IFTE) | | 30,144 | | 7,500 | | 37,644 |
| | Realign European Reassurance Initiative to Base | | | | [7,500] | | |
| 174 | TEST EQUIPMENT MODERNIZATION (TEMOD) | | 7,771 | | | | 7,771 |
| | **OTHER SUPPORT EQUIPMENT** | | | | | | |
| 175 | M25 STABILIZED BINOCULAR | | 3,956 | | | | 3,956 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 176 | RAPID EQUIPPING SOLDIER SUPPORT EQUIPMENT | | 5,000 | | | | 5,000 |
| 177 | PHYSICAL SECURITY SYSTEMS (OPA3) | | 60,047 | | | | 60,047 |
| 178 | BASE LEVEL COMMON EQUIPMENT | | 13,239 | | | | 13,239 |
| 179 | MODIFICATION OF IN-SVC EQUIPMENT (OPA–3) | | 60,192 | 538 | 39,240 | 538 | 99,432 |
| | Unfunded requirement—EOD Technician Tool Kits | | | [538] | [29,240] | | |
| | Unfunded requirement—Rapidly Emplaced Bridge System Arctic Kit Technical Manual (TM) update. | | | | [2,000] | | |
| | Unfunded requirement—Service Life Extension Program for the VOLCANO system. | | | | [8,000] | | |
| 180 | PRODUCTION BASE SUPPORT (OTH) | | 2,271 | | | | 2,271 |
| 181 | SPECIAL EQUIPMENT FOR USER TESTING | | 5,319 | | | | 5,319 |
| 182 | TRACTOR YARD | | 5,935 | | | | 5,935 |
| | **OPA2** | | | | | | |
| 184 | INITIAL SPARES—C&E | | 38,269 | | | | 38,269 |
| | **UNDISTRIBUTED** | | | | | | |
| 185 | UNDISTRIBUTED | | | | 56,000 | | 56,000 |
| | Security Force Assistance Brigade | | | | [56,000] | | |
| | **TOTAL OTHER PROCUREMENT, ARMY** | **2,110** | **6,469,331** | **17,622** | **1,993,891** | **19,732** | **8,463,222** |
| | | | | | | | |
| | **JOINT IMPROVISED EXPLOSIVE DEVICE DEFEAT FUND** | | | | | | |
| | **NETWORK ATTACK** | | | | | | |
| 001 | RAPID ACQUISITION AND THREAT RESPONSE | | 14,442 | | | | 14,442 |
| | **TOTAL JOINT IMPROVISED-THREAT DEFEAT FUND** | | **14,442** | | | | **14,442** |
| | | | | | | | |
| | **AIRCRAFT PROCUREMENT, NAVY** | | | | | | |
| | **COMBAT AIRCRAFT** | | | | | | |
| 002 | F/A–18E/F (FIGHTER) HORNET | 14 | 1,200,146 | 8 | 591,200 | 22 | 1,791,346 |
| | Unfunded Requirement | | | [8] | [591,200] | | |
| 003 | ADVANCE PROCUREMENT (CY) | | 52,971 | | | | 52,971 |
| 004 | JOINT STRIKE FIGHTER CV | 4 | 582,324 | 4 | 520,000 | 8 | 1,102,324 |
| | Unfunded Requirement—Marine Corps | | | [2] | [260,000] | | |
| | Unfunded Requirement—Navy | | | [2] | [260,000] | | |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 005 | ADVANCE PROCUREMENT (CY) | | 263,112 | | | | 263,112 |
| 006 | JSF STOVL | 20 | 2,398,139 | 3 | 462,600 | 23 | 2,860,739 |
| | Unfunded Requirement | | | [3] | [462,600] | | |
| 007 | ADVANCE PROCUREMENT (CY) | | 413,450 | | | | 413,450 |
| 008 | CH–53K (HEAVY LIFT) | 4 | 567,605 | | | 4 | 567,605 |
| 009 | ADVANCE PROCUREMENT (CY) | | 147,046 | | | | 147,046 |
| 010 | V–22 (MEDIUM LIFT) | 6 | 677,404 | 4 | 351,500 | 10 | 1,028,904 |
| | Multiyear procurement contract savings | | | | [–25,000] | | |
| | Unfunded Requirement | | | [4] | [376,500] | | |
| 011 | ADVANCE PROCUREMENT (CY) | | 27,422 | | | | 27,422 |
| 012 | H–1 UPGRADES (UH–1Y/AH–1Z) | 22 | 678,429 | 5 | 151,000 | 27 | 829,429 |
| | Unfunded requirement – additional AH–1Zs | | | [5] | [157,500] | | |
| | Unit cost savings | | | | [–6,500] | | |
| 013 | ADVANCE PROCUREMENT (CY) | | 42,082 | | | | 42,082 |
| 016 | P–8A POSEIDON | 7 | 1,245,251 | 3 | 506,500 | 10 | 1,751,751 |
| | P–8A | | | [3] | [506,500] | | |
| 017 | ADVANCE PROCUREMENT (CY) | | 140,333 | | –17,000 | | 123,333 |
| | Excess to need | | | | [–17,000] | | |
| 018 | E–2D ADV HAWKEYE | 5 | 733,910 | 2 | 191,800 | 7 | 925,710 |
| | E–2D | | | [2] | [201,800] | | |
| | Excessive growth | | | | [–10,000] | | |
| 019 | ADVANCE PROCUREMENT (CY) | | 102,026 | | | | 102,026 |
| | **OTHER AIRCRAFT** | | | | | | |
| 022 | KC–130J | 2 | 129,577 | 4 | 355,300 | 6 | 484,877 |
| | KC–130J | | | [4] | [355,300] | | |
| 023 | ADVANCE PROCUREMENT (CY) | | 25,497 | | | | 25,497 |

Case 2:20-cv-00111-RAJ Document 111-4 Filed 11/24/20 Page 405 of 607

| Line | Item | Qty | Amount | Qty | Amount | Qty | Amount |
|---|---|---|---|---|---|---|---|
| 024 | MQ–4 TRITON | 3 | 522,126 | | –5,000 | 3 | 517,126 |
| | Excess cost growth | | | | [–5,000] | | |
| 025 | ADVANCE PROCUREMENT (CY) | | 57,266 | | | | 57,266 |
| 026 | MQ–8 UAV | | 49,472 | | | | 49,472 |
| 027 | STUASL0 UAV | | 880 | | | | 880 |
| | **MODIFICATION OF AIRCRAFT** | | | | | | |
| 030 | AEA SYSTEMS | | 52,960 | | | | 52,960 |
| 031 | AV–8 SERIES | | 43,555 | | | | 43,555 |
| 032 | ADVERSARY | | 2,565 | | | | 2,565 |
| 033 | F–18 SERIES | | 1,043,661 | 14 | 32,550 | 14 | 1,076,211 |
| | Unfunded requirement—ALQ–214 Retrofits | | | [14] | [32,550] | | |
| 034 | H–53 SERIES | | 38,712 | | | | 38,712 |
| 035 | SH–60 SERIES | | 95,333 | | | | 95,333 |
| 036 | H–1 SERIES | | 101,886 | | | | 101,886 |
| 037 | EP–3 SERIES | | 7,231 | | | | 7,231 |
| 038 | P–3 SERIES | | 700 | | | | 700 |
| 039 | E–2 SERIES | | 97,563 | | | | 97,563 |
| 040 | TRAINER A/C SERIES | | 8,184 | | | | 8,184 |
| 041 | C–2A | | 18,673 | | | | 18,673 |
| 042 | C–130 SERIES | | 83,541 | | | | 83,541 |
| 043 | FEWSG | | 630 | | | | 630 |
| 044 | CARGO/TRANSPORT A/C SERIES | | 10,075 | | | | 10,075 |
| 045 | E–6 SERIES | | 223,508 | | | | 223,508 |
| 046 | EXECUTIVE HELICOPTERS SERIES | | 38,787 | | | | 38,787 |
| 047 | SPECIAL PROJECT AIRCRAFT | | 8,304 | | | | 8,304 |
| 048 | T–45 SERIES | | 148,071 | | | | 148,071 |
| 049 | POWER PLANT CHANGES | | 19,827 | | | | 19,827 |
| 050 | JPATS SERIES | | 27,007 | | | | 27,007 |
| 051 | COMMON ECM EQUIPMENT | | 146,642 | | | | 146,642 |
| 052 | COMMON AVIONICS CHANGES | | 123,507 | | | | 123,507 |
| 053 | COMMON DEFENSIVE WEAPON SYSTEM | | 2,317 | | | | 2,317 |
| 054 | ID SYSTEMS | | 49,524 | | | | 49,524 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 055 | P–8 SERIES | | 18,665 | | | | 18,665 |
| 056 | MAGTF EW FOR AVIATION | | 10,111 | | | | 10,111 |
| 057 | MQ–8 SERIES | | 32,361 | | | | 32,361 |
| 059 | V–22 (TILT/ROTOR ACFT) OSPREY | | 228,321 | | | | 228,321 |
| 060 | F–35 STOVL SERIES | | 34,963 | | | | 34,963 |
| 061 | F–35 CV SERIES | | 31,689 | | | | 31,689 |
| 062 | QRC | | 24,766 | | | | 24,766 |
| 063 | MQ–4 SERIES | | 39,996 | | | | 39,996 |
| | **AIRCRAFT SPARES AND REPAIR PARTS** | | | | | | |
| 064 | SPARES AND REPAIR PARTS | | 1,681,914 | | 200,600 | | 1,882,514 |
| | Additional F–35 Initial Spares | | | | [32,600] | | |
| | Unfunded requirement | | | | [168,000] | | |
| | **AIRCRAFT SUPPORT EQUIP & FACILITIES** | | | | | | |
| 065 | COMMON GROUND EQUIPMENT | | 388,052 | 10 | 17,500 | 10 | 405,552 |
| | Unfunded requirement—F–18C/D H12C Training Systems for USMC | | | [10] | [17,500] | | |
| 066 | AIRCRAFT INDUSTRIAL FACILITIES | | 24,613 | | | | 24,613 |
| 067 | WAR CONSUMABLES | | 39,614 | | | | 39,614 |
| 068 | OTHER PRODUCTION CHARGES | | 1,463 | | | | 1,463 |
| 069 | SPECIAL SUPPORT EQUIPMENT | | 48,500 | | | | 48,500 |
| 070 | FIRST DESTINATION TRANSPORTATION | | 1,976 | | | | 1,976 |
| | **TOTAL AIRCRAFT PROCUREMENT, NAVY** | **87** | **15,056,235** | **57** | **3,358,550** | **144** | **18,414,785** |
| | | | | | | | |
| | **WEAPONS PROCUREMENT, NAVY** | | | | | | |
| | **MODIFICATION OF MISSILES** | | | | | | |
| 001 | TRIDENT II MODS | | 1,143,595 | | | | 1,143,595 |
| | **SUPPORT EQUIPMENT & FACILITIES** | | | | | | |

| Line | Item | Qty | Amount | Qty | Amount | Qty | Amount |
|---|---|---|---|---|---|---|---|
| 002 | MISSILE INDUSTRIAL FACILITIES | | 7,086 | | | | 7,086 |
| | **STRATEGIC MISSILES** | | | | | | |
| 003 | TOMAHAWK | 34 | 134,375 | | | 34 | 134,375 |
| | **TACTICAL MISSILES** | | | | | | |
| 004 | AMRAAM | 120 | 197,109 | | | 120 | 197,109 |
| 005 | SIDEWINDER | 185 | 79,692 | | | 185 | 79,692 |
| 006 | JSOW | | 5,487 | | | | 5,487 |
| 007 | STANDARD MISSILE | 117 | 510,875 | | | 117 | 510,875 |
| 008 | SMALL DIAMETER BOMB II | 90 | 20,968 | | | 90 | 20,968 |
| 009 | RAM | 60 | 58,587 | 60 | 48,000 | 120 | 106,587 |
| | RAM BLK II | | | [60] | [48,000] | | |
| 010 | JOINT AIR GROUND MISSILE (JAGM) | | 3,789 | | | | 3,789 |
| 013 | STAND OFF PRECISION GUIDED MUNITIONS (SOPGM) | 19 | 3,122 | | | 19 | 3,122 |
| 014 | AERIAL TARGETS | | 124,757 | | | | 124,757 |
| 015 | OTHER MISSILE SUPPORT | | 3,420 | | | | 3,420 |
| 016 | LRASM | 25 | 74,733 | | | 25 | 74,733 |
| | **MODIFICATION OF MISSILES** | | | | | | |
| 017 | ESSM | 30 | 74,524 | | | 30 | 74,524 |
| 019 | HARPOON MODS | | 17,300 | | | | 17,300 |
| 020 | HARM MODS | | 183,368 | | | | 183,368 |
| 021 | STANDARD MISSILES MODS | | 11,729 | | | | 11,729 |
| | **SUPPORT EQUIPMENT & FACILITIES** | | | | | | |
| 022 | WEAPONS INDUSTRIAL FACILITIES | | 4,021 | | | | 4,021 |
| 023 | FLEET SATELLITE COMM FOLLOW-ON | | 46,357 | | | | 46,357 |
| | **ORDNANCE SUPPORT EQUIPMENT** | | | | | | |
| 025 | ORDNANCE SUPPORT EQUIPMENT | | 47,159 | | | | 47,159 |
| | **TORPEDOES AND RELATED EQUIP** | | | | | | |
| 026 | SSTD | | 5,240 | | | | 5,240 |
| 027 | MK–48 TORPEDO | 17 | 44,771 | 10 | 26,200 | 27 | 70,971 |
| | MK 48 HWT | | | [10] | [26,200] | | |
| 028 | ASW TARGETS | | 12,399 | | | | 12,399 |
| | **MOD OF TORPEDOES AND RELATED EQUIP** | | | | | | |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 029 | MK–54 TORPEDO MODS | | 104,044 | | | | 104,044 |
| 030 | MK–48 TORPEDO ADCAP MODS | | 38,954 | | | | 38,954 |
| 031 | QUICKSTRIKE MINE | | 10,337 | | | | 10,337 |
| | **SUPPORT EQUIPMENT** | | | | | | |
| 032 | TORPEDO SUPPORT EQUIPMENT | | 70,383 | | | | 70,383 |
| 033 | ASW RANGE SUPPORT | | 3,864 | | | | 3,864 |
| | **DESTINATION TRANSPORTATION** | | | | | | |
| 034 | FIRST DESTINATION TRANSPORTATION | | 3,961 | | | | 3,961 |
| | **GUNS AND GUN MOUNTS** | | | | | | |
| 035 | SMALL ARMS AND WEAPONS | | 11,332 | | | | 11,332 |
| | **MODIFICATION OF GUNS AND GUN MOUNTS** | | | | | | |
| 036 | CIWS MODS | | 72,698 | | | | 72,698 |
| 037 | COAST GUARD WEAPONS | | 38,931 | | | | 38,931 |
| 038 | GUN MOUNT MODS | | 76,025 | | | | 76,025 |
| 039 | LCS MODULE WEAPONS | 110 | 13,110 | | | 110 | 13,110 |
| 040 | CRUISER MODERNIZATION WEAPONS | | 34,825 | | | | 34,825 |
| 041 | AIRBORNE MINE NEUTRALIZATION SYSTEMS | | 16,925 | | | | 16,925 |
| | **SPARES AND REPAIR PARTS** | | | | | | |
| 043 | SPARES AND REPAIR PARTS | | 110,255 | | | | 110,255 |
| | **TOTAL WEAPONS PROCUREMENT, NAVY** | **807** | **3,420,107** | **70** | **74,200** | **877** | **3,494,307** |
| | | | | | | | |
| | **PROCUREMENT OF AMMO, NAVY & MC** | | | | | | |
| | **NAVY AMMUNITION** | | | | | | |
| 001 | GENERAL PURPOSE BOMBS | | 34,882 | | | | 34,882 |
| 002 | JDAM | 2,492 | 57,343 | | | 2,492 | 57,343 |
| 003 | AIRBORNE ROCKETS, ALL TYPES | | 79,318 | | | | 79,318 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 004 | MACHINE GUN AMMUNITION | | 14,112 | | | 14,112 |
| 005 | PRACTICE BOMBS | | 47,027 | | | 47,027 |
| 006 | CARTRIDGES & CART ACTUATED DEVICES | | 57,718 | | | 57,718 |
| 007 | AIR EXPENDABLE COUNTERMEASURES | | 65,908 | | | 65,908 |
| 008 | JATOS | | 2,895 | | | 2,895 |
| 010 | 5 INCH/54 GUN AMMUNITION | | 22,112 | | | 22,112 |
| 011 | INTERMEDIATE CALIBER GUN AMMUNITION | | 12,804 | | | 12,804 |
| 012 | OTHER SHIP GUN AMMUNITION | | 41,594 | | | 41,594 |
| 013 | SMALL ARMS & LANDING PARTY AMMO | | 49,401 | | | 49,401 |
| 014 | PYROTECHNIC AND DEMOLITION | | 9,495 | | | 9,495 |
| 016 | AMMUNITION LESS THAN $5 MILLION | | 3,080 | | | 3,080 |
| | **MARINE CORPS AMMUNITION** | | | | | |
| 020 | MORTARS | | 24,118 | | | 24,118 |
| 023 | DIRECT SUPPORT MUNITIONS | | 64,045 | | | 64,045 |
| 024 | INFANTRY WEAPONS AMMUNITION | | 91,456 | | | 91,456 |
| 029 | COMBAT SUPPORT MUNITIONS | | 11,788 | | | 11,788 |
| 032 | AMMO MODERNIZATION | | 17,862 | | | 17,862 |
| 033 | ARTILLERY MUNITIONS | | 79,427 | | | 79,427 |
| 034 | ITEMS LESS THAN $5 MILLION | | 5,960 | | | 5,960 |
| | **TOTAL PROCUREMENT OF AMMO, NAVY & MC** | **2,492** | **792,345** | | **2,492** | **792,345** |
| | | | | | | |
| | **SHIPBUILDING AND CONVERSION, NAVY** | | | | | |
| | **FLEET BALLISTIC MISSILE SHIPS** | | | | | |
| 001 | ADVANCE PROCUREMENT (CY) | | 842,853 | | | 842,853 |
| | **OTHER WARSHIPS** | | | | | |
| 002 | CARRIER REPLACEMENT PROGRAM | 1 | 4,441,772 | –700,000 | 1 | 3,741,772 |
| | Early to need | | | [–700,000] | | |
| 004 | VIRGINIA CLASS SUBMARINE | 2 | 3,305,315 | | 2 | 3,305,315 |
| 005 | ADVANCE PROCUREMENT (CY) | | 1,920,596 | 943,000 | | 2,863,596 |
| | VA Class AP | | | [693,000] | | |
| | VA Class EOQ | | | [250,000] | | |
| 006 | CVN REFUELING OVERHAULS | | 1,604,890 | –423,300 | | 1,181,590 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | CVN 73 MQ–25 integration | | | | [26,700] | | |
| | Early to need | | | | [–450,000] | | |
| 007 | ADVANCE PROCUREMENT (CY) | | 75,897 | | | | 75,897 |
| 008 | DDG 1000 | | 223,968 | | | | 223,968 |
| 009 | DDG–51 | 2 | 3,499,079 | | | 2 | 3,499,079 |
| 010 | ADVANCE PROCUREMENT (CY) | | 90,336 | | | | 90,336 |
| 011 | LITTORAL COMBAT SHIP | 1 | 636,146 | | | 1 | 636,146 |
| | **AMPHIBIOUS SHIPS** | | | | | | |
| 015 | LHA REPLACEMENT | | 1,710,927 | | –500,000 | | 1,210,927 |
| | Early to need | | | | [–500,000] | | |
| | **AUXILIARIES, CRAFT AND PRIOR YR PROGRAM COST** | | | | | | |
| 018 | TAO FLEET OILER | 1 | 465,988 | | | 1 | 465,988 |
| 019 | ADVANCE PROCUREMENT (CY) | | 75,068 | | | | 75,068 |
| 020 | TOWING, SALVAGE, AND RESCUE SHIP (ATS) | 1 | 76,204 | | | 1 | 76,204 |
| 023 | LCU 1700 | 1 | 31,850 | | | 1 | 31,850 |
| 024 | OUTFITTING | | 548,703 | | | | 548,703 |
| 025 | SHIP TO SHORE CONNECTOR | 3 | 212,554 | | | 3 | 212,554 |
| 026 | SERVICE CRAFT | | 23,994 | | | | 23,994 |
| 029 | COMPLETION OF PY SHIPBUILDING PROGRAMS | | 117,542 | | | | 117,542 |
| | **TOTAL SHIPBUILDING AND CONVERSION, NAVY** | **12** | **19,903,682** | | **–680,300** | **12** | **19,223,382** |
| | | | | | | | |
| | **OTHER PROCUREMENT, NAVY** | | | | | | |
| | **SHIP PROPULSION EQUIPMENT** | | | | | | |
| 003 | SURFACE POWER EQUIPMENT | | 41,910 | | | | 41,910 |
| 004 | HYBRID ELECTRIC DRIVE (HED) | | 6,331 | | | | 6,331 |
| | **GENERATORS** | | | | | | |

| | | | | |
|---|---|---|---|---|
| 005 | SURFACE COMBATANT HM&E | 27,392 | | 27,392 |
| | **NAVIGATION EQUIPMENT** | | | |
| 006 | OTHER NAVIGATION EQUIPMENT | 65,943 | | 65,943 |
| | **PERISCOPES** | | | |
| 007 | SUB PERISCOPES & IMAGING EQUIP | | 76,000 | 76,000 |
| | Submarine Warfare Federated Tactial Systems | | [76,000] | |
| | **OTHER SHIPBOARD EQUIPMENT** | | | |
| 008 | SUB PERISCOPE, IMAGING AND SUPT EQUIP PROG | 151,240 | | 151,240 |
| 009 | DDG MOD | 603,355 | 99,000 | 702,355 |
| | CEC IFF Mode 5 Acceleration | | [4,000] | |
| | Destroyer modernization | | [65,000] | |
| | SPY–1 refurbishment | | [30,000] | |
| 010 | FIREFIGHTING EQUIPMENT | 15,887 | | 15,887 |
| 011 | COMMAND AND CONTROL SWITCHBOARD | 2,240 | | 2,240 |
| 012 | LHA/LHD MIDLIFE | 30,287 | | 30,287 |
| 014 | POLLUTION CONTROL EQUIPMENT | 17,293 | | 17,293 |
| 015 | SUBMARINE SUPPORT EQUIPMENT | 27,990 | | 27,990 |
| 016 | VIRGINIA CLASS SUPPORT EQUIPMENT | 46,610 | | 46,610 |
| 017 | LCS CLASS SUPPORT EQUIPMENT | 47,955 | | 47,955 |
| 018 | SUBMARINE BATTERIES | 17,594 | | 17,594 |
| 019 | LPD CLASS SUPPORT EQUIPMENT | 61,908 | | 61,908 |
| 021 | STRATEGIC PLATFORM SUPPORT EQUIP | 15,812 | | 15,812 |
| 022 | DSSP EQUIPMENT | 4,178 | | 4,178 |
| 023 | CG MODERNIZATION | 306,050 | | 306,050 |
| 024 | LCAC | 5,507 | | 5,507 |
| 025 | UNDERWATER EOD PROGRAMS | 55,922 | 4,016 | 59,938 |
| | Realign European Reassurance Initiative to Base | | [4,016] | |
| 026 | ITEMS LESS THAN $5 MILLION | 96,909 | | 96,909 |
| 027 | CHEMICAL WARFARE DETECTORS | 3,036 | | 3,036 |
| 028 | SUBMARINE LIFE SUPPORT SYSTEM | 10,364 | | 10,364 |
| | **REACTOR PLANT EQUIPMENT** | | | |
| 029 | REACTOR POWER UNITS | 324,925 | | 324,925 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 030 | REACTOR COMPONENTS | | 534,468 | | | | 534,468 |
| | **OCEAN ENGINEERING** | | | | | | |
| 031 | DIVING AND SALVAGE EQUIPMENT | | 10,619 | | | | 10,619 |
| | **SMALL BOATS** | | | | | | |
| 032 | STANDARD BOATS | | 46,094 | | | | 46,094 |
| | **PRODUCTION FACILITIES EQUIPMENT** | | | | | | |
| 034 | OPERATING FORCES IPE | | 191,541 | | | | 191,541 |
| | **OTHER SHIP SUPPORT** | | | | | | |
| 036 | LCS COMMON MISSION MODULES EQUIPMENT | | 34,666 | 2 | 34,000 | 2 | 68,666 |
| | MCM-USV | | | [2] | [34,000] | | |
| 037 | LCS MCM MISSION MODULES | | 55,870 | | | | 55,870 |
| 039 | LCS SUW MISSION MODULES | | 52,960 | | | | 52,960 |
| 040 | LCS IN-SERVICE MODERNIZATION | | 74,426 | | 84,000 | | 158,426 |
| | LCS Modernization | | | | [84,000] | | |
| | **LOGISTIC SUPPORT** | | | | | | |
| 042 | LSD MIDLIFE & MODERNIZATION | | 89,536 | | | | 89,536 |
| | **SHIP SONARS** | | | | | | |
| 043 | SPQ–9B RADAR | | 30,086 | | | | 30,086 |
| 044 | AN/SQQ–89 SURF ASW COMBAT SYSTEM | | 102,222 | | | | 102,222 |
| 046 | SSN ACOUSTIC EQUIPMENT | | 287,553 | | 43,500 | | 331,053 |
| | Realign European Reassurance Initiative to Base | | | | [43,500] | | |
| 047 | UNDERSEA WARFARE SUPPORT EQUIPMENT | | 13,653 | | | | 13,653 |
| | **ASW ELECTRONIC EQUIPMENT** | | | | | | |
| 049 | SUBMARINE ACOUSTIC WARFARE SYSTEM | | 21,449 | | | | 21,449 |
| 050 | SSTD | | 12,867 | | | | 12,867 |
| 051 | FIXED SURVEILLANCE SYSTEM | | 300,102 | | | | 300,102 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 052 | SURTASS | 30,180 | 1 | 10,000 | 1 | 40,180 |
| | SURTASS Array | | [1] | [10,000] | | |
| | **ELECTRONIC WARFARE EQUIPMENT** | | | | | |
| 054 | AN/SLQ–32 | 240,433 | | | | 240,433 |
| | **RECONNAISSANCE EQUIPMENT** | | | | | |
| 055 | SHIPBOARD IW EXPLOIT | 187,007 | | 40,000 | | 227,007 |
| | Ship Signal Exploitation Equipment | | | [40,000] | | |
| 056 | AUTOMATED IDENTIFICATION SYSTEM (AIS) | 510 | | | | 510 |
| | **OTHER SHIP ELECTRONIC EQUIPMENT** | | | | | |
| 058 | COOPERATIVE ENGAGEMENT CAPABILITY | 23,892 | | | | 23,892 |
| 060 | NAVAL TACTICAL COMMAND SUPPORT SYSTEM (NTCSS) | 10,741 | | | | 10,741 |
| 061 | ATDLS | 38,016 | | | | 38,016 |
| 062 | NAVY COMMAND AND CONTROL SYSTEM (NCCS) | 4,512 | | | | 4,512 |
| 063 | MINESWEEPING SYSTEM REPLACEMENT | 31,531 | | | | 31,531 |
| 064 | SHALLOW WATER MCM | 8,796 | | | | 8,796 |
| 065 | NAVSTAR GPS RECEIVERS (SPACE) | 15,923 | | | | 15,923 |
| 066 | AMERICAN FORCES RADIO AND TV SERVICE | 2,730 | | | | 2,730 |
| 067 | STRATEGIC PLATFORM SUPPORT EQUIP | 6,889 | | | | 6,889 |
| | **AVIATION ELECTRONIC EQUIPMENT** | | | | | |
| 070 | ASHORE ATC EQUIPMENT | 71,882 | | | | 71,882 |
| 071 | AFLOAT ATC EQUIPMENT | 44,611 | | | | 44,611 |
| 077 | ID SYSTEMS | 21,239 | | | | 21,239 |
| 078 | NAVAL MISSION PLANNING SYSTEMS | 11,976 | | | | 11,976 |
| | **OTHER SHORE ELECTRONIC EQUIPMENT** | | | | | |
| 080 | TACTICAL/MOBILE C4I SYSTEMS | 32,425 | | 7,900 | | 40,325 |
| | Realign European Reassurance Initiative to Base | | | [7,900] | | |
| 081 | DCGS-N | 13,790 | | 1,900 | | 15,690 |
| | Realign European Reassurance Initiative to Base | | | [1,900] | | |
| 082 | CANES | 322,754 | | | | 322,754 |
| 083 | RADIAC | 10,718 | | | | 10,718 |
| 084 | CANES-INTELL | 48,028 | | | | 48,028 |
| 085 | GPETE | 6,861 | | | | 6,861 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 086 | MASF | | 8,081 | | | | 8,081 |
| 087 | INTEG COMBAT SYSTEM TEST FACILITY | | 5,019 | | | | 5,019 |
| 088 | EMI CONTROL INSTRUMENTATION | | 4,188 | | | | 4,188 |
| 089 | ITEMS LESS THAN $5 MILLION | | 105,292 | | | | 105,292 |
| | **SHIPBOARD COMMUNICATIONS** | | | | | | |
| 090 | SHIPBOARD TACTICAL COMMUNICATIONS | | 23,695 | | | | 23,695 |
| 091 | SHIP COMMUNICATIONS AUTOMATION | | 103,990 | | | | 103,990 |
| 092 | COMMUNICATIONS ITEMS UNDER $5M | | 18,577 | | | | 18,577 |
| | **SUBMARINE COMMUNICATIONS** | | | | | | |
| 093 | SUBMARINE BROADCAST SUPPORT | | 29,669 | | | | 29,669 |
| 094 | SUBMARINE COMMUNICATION EQUIPMENT | | 86,204 | | | | 86,204 |
| | **SATELLITE COMMUNICATIONS** | | | | | | |
| 095 | SATELLITE COMMUNICATIONS SYSTEMS | | 14,654 | | | | 14,654 |
| 096 | NAVY MULTIBAND TERMINAL (NMT) | | 69,764 | | | | 69,764 |
| | **SHORE COMMUNICATIONS** | | | | | | |
| 097 | JOINT COMMUNICATIONS SUPPORT ELEMENT (JCSE) | | 4,256 | | | | 4,256 |
| | **CRYPTOGRAPHIC EQUIPMENT** | | | | | | |
| 099 | INFO SYSTEMS SECURITY PROGRAM (ISSP) | | 89,663 | | | | 89,663 |
| 100 | MIO INTEL EXPLOITATION TEAM | | 961 | | | | 961 |
| | **CRYPTOLOGIC EQUIPMENT** | | | | | | |
| 101 | CRYPTOLOGIC COMMUNICATIONS EQUIP | | 11,287 | | | | 11,287 |
| | **OTHER ELECTRONIC SUPPORT** | | | | | | |
| 110 | COAST GUARD EQUIPMENT | | 36,584 | | | | 36,584 |
| | **SONOBUOYS** | | | | | | |
| 112 | SONOBUOYS—ALL TYPES | | 173,616 | | 24,900 | | 198,516 |
| | Sonobuoys | | | | [24,900] | | |

| Line | Item | | | |
|---|---|---|---|---|
| | **AIRCRAFT SUPPORT EQUIPMENT** | | | |
| 113 | WEAPONS RANGE SUPPORT EQUIPMENT | 72,110 | | 72,110 |
| 114 | AIRCRAFT SUPPORT EQUIPMENT | 108,482 | 7,500 | 115,982 |
| | EMALS initial spares | | [7,500] | |
| 115 | ADVANCED ARRESTING GEAR (AAG) | 10,900 | | 10,900 |
| 116 | METEOROLOGICAL EQUIPMENT | 21,137 | | 21,137 |
| 117 | DCRS/DPL | 660 | | 660 |
| 118 | AIRBORNE MINE COUNTERMEASURES | 20,605 | | 20,605 |
| 119 | AVIATION SUPPORT EQUIPMENT | 34,032 | | 34,032 |
| | **SHIP GUN SYSTEM EQUIPMENT** | | | |
| 120 | SHIP GUN SYSTEMS EQUIPMENT | 5,277 | | 5,277 |
| | **SHIP MISSILE SYSTEMS EQUIPMENT** | | | |
| 121 | SHIP MISSILE SUPPORT EQUIPMENT | 272,359 | | 272,359 |
| 122 | TOMAHAWK SUPPORT EQUIPMENT | 73,184 | | 73,184 |
| | **FBM SUPPORT EQUIPMENT** | | | |
| 123 | STRATEGIC MISSILE SYSTEMS EQUIP | 246,221 | | 246,221 |
| | **ASW SUPPORT EQUIPMENT** | | | |
| 124 | SSN COMBAT CONTROL SYSTEMS | 129,972 | | 129,972 |
| 125 | ASW SUPPORT EQUIPMENT | 23,209 | | 23,209 |
| | **OTHER ORDNANCE SUPPORT EQUIPMENT** | | | |
| 126 | EXPLOSIVE ORDNANCE DISPOSAL EQUIP | 15,596 | | 15,596 |
| 127 | ITEMS LESS THAN $5 MILLION | 5,981 | | 5,981 |
| | **OTHER EXPENDABLE ORDNANCE** | | | |
| 128 | SUBMARINE TRAINING DEVICE MODS | 74,550 | | 74,550 |
| 130 | SURFACE TRAINING EQUIPMENT | 83,022 | | 83,022 |
| | **CIVIL ENGINEERING SUPPORT EQUIPMENT** | | | |
| 131 | PASSENGER CARRYING VEHICLES | 5,299 | | 5,299 |
| 132 | GENERAL PURPOSE TRUCKS | 2,946 | 106 | 3,052 |
| | Realign European Reassurance Initiative to Base | | [106] | |
| 133 | CONSTRUCTION & MAINTENANCE EQUIP | 34,970 | | 34,970 |
| 134 | FIRE FIGHTING EQUIPMENT | 2,541 | | 2,541 |
| 135 | TACTICAL VEHICLES | 19,699 | | 19,699 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 136 | AMPHIBIOUS EQUIPMENT | | 12,162 | | | | 12,162 |
| 137 | POLLUTION CONTROL EQUIPMENT | | 2,748 | | | | 2,748 |
| 138 | ITEMS UNDER $5 MILLION | | 18,084 | | | | 18,084 |
| 139 | PHYSICAL SECURITY VEHICLES | | 1,170 | | | | 1,170 |
| | **SUPPLY SUPPORT EQUIPMENT** | | | | | | |
| 141 | SUPPLY EQUIPMENT | | 21,797 | | 164 | | 21,961 |
| | Realign European Reassurance Initiative to Base | | | | [164] | | |
| 143 | FIRST DESTINATION TRANSPORTATION | | 5,572 | | | | 5,572 |
| 144 | SPECIAL PURPOSE SUPPLY SYSTEMS | | 482,916 | | | | 482,916 |
| | **TRAINING DEVICES** | | | | | | |
| 146 | TRAINING AND EDUCATION EQUIPMENT | | 25,624 | | | | 25,624 |
| | **COMMAND SUPPORT EQUIPMENT** | | | | | | |
| 147 | COMMAND SUPPORT EQUIPMENT | | 59,076 | | | | 59,076 |
| 149 | MEDICAL SUPPORT EQUIPMENT | | 4,383 | | | | 4,383 |
| 151 | NAVAL MIP SUPPORT EQUIPMENT | | 2,030 | | | | 2,030 |
| 152 | OPERATING FORCES SUPPORT EQUIPMENT | | 7,500 | | | | 7,500 |
| 153 | C4ISR EQUIPMENT | | 4,010 | | | | 4,010 |
| 154 | ENVIRONMENTAL SUPPORT EQUIPMENT | | 23,644 | | 1,000 | | 24,644 |
| | Realign European Reassurance Initiative to Base | | | | [1,000] | | |
| 155 | PHYSICAL SECURITY EQUIPMENT | | 101,982 | | | | 101,982 |
| 156 | ENTERPRISE INFORMATION TECHNOLOGY | | 19,789 | | | | 19,789 |
| | **OTHER** | | | | | | |
| 160 | NEXT GENERATION ENTERPRISE SERVICE | | 104,584 | | | | 104,584 |
| | **CLASSIFIED PROGRAMS** | | | | | | |
| 161A | CLASSIFIED PROGRAMS | | 23,707 | | | | 23,707 |
| | **SPARES AND REPAIR PARTS** | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 161 | SPARES AND REPAIR PARTS | | 278,565 | | 12,000 | | 290,565 |
| | E–2D AHE | | | | [12,000] | | |
| | **TOTAL OTHER PROCUREMENT, NAVY** | | **8,277,789** | **3** | **445,986** | **3** | **8,723,775** |
| | | | | | | | |
| | **PROCUREMENT, MARINE CORPS** | | | | | | |
| | **TRACKED COMBAT VEHICLES** | | | | | | |
| 001 | AAV7A1 PIP | | 107,665 | | | | 107,665 |
| 002 | AMPHIBIOUS COMBAT VEHICLE 1.1 | 26 | 161,511 | | | 26 | 161,511 |
| 003 | LAV PIP | | 17,244 | | | | 17,244 |
| | **ARTILLERY AND OTHER WEAPONS** | | | | | | |
| 004 | EXPEDITIONARY FIRE SUPPORT SYSTEM | | 626 | | | | 626 |
| 005 | 155MM LIGHTWEIGHT TOWED HOWITZER | | 20,259 | | | | 20,259 |
| 006 | HIGH MOBILITY ARTILLERY ROCKET SYSTEM | | 59,943 | | | | 59,943 |
| 007 | WEAPONS AND COMBAT VEHICLES UNDER $5 MILLION | | 19,616 | | | | 19,616 |
| | **OTHER SUPPORT** | | | | | | |
| 008 | MODIFICATION KITS | | 17,778 | | | | 17,778 |
| | **GUIDED MISSILES** | | | | | | |
| 010 | GROUND BASED AIR DEFENSE | | 9,432 | | | | 9,432 |
| 011 | JAVELIN | 222 | 41,159 | | | 222 | 41,159 |
| 012 | FOLLOW ON TO SMAW | | 25,125 | | | | 25,125 |
| 013 | ANTI-ARMOR WEAPONS SYSTEM-HEAVY (AAWS-H) | | 51,553 | | | | 51,553 |
| | **COMMAND AND CONTROL SYSTEMS** | | | | | | |
| 016 | COMMON AVIATION COMMAND AND CONTROL SYSTEM (C | | 44,928 | | | | 44,928 |
| | **REPAIR AND TEST EQUIPMENT** | | | | | | |
| 017 | REPAIR AND TEST EQUIPMENT | | 33,056 | | | | 33,056 |
| | **COMMAND AND CONTROL SYSTEM (NON-TEL)** | | | | | | |
| 020 | ITEMS UNDER $5 MILLION (COMM & ELEC) | | 17,644 | | | | 17,644 |
| 021 | AIR OPERATIONS C2 SYSTEMS | | 18,393 | | | | 18,393 |
| | **RADAR + EQUIPMENT (NON-TEL)** | | | | | | |
| 022 | RADAR SYSTEMS | | 12,411 | | | | 12,411 |
| 023 | GROUND/AIR TASK ORIENTED RADAR (G/ATOR) | 3 | 139,167 | | | 3 | 139,167 |
| 024 | RQ–21 UAS | 4 | 77,841 | | | 4 | 77,841 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | **INTELL/COMM EQUIPMENT (NON-TEL)** | | | | | | |
| 025 | GCSS-MC | | 1,990 | | | | 1,990 |
| 026 | FIRE SUPPORT SYSTEM | | 22,260 | | | | 22,260 |
| 027 | INTELLIGENCE SUPPORT EQUIPMENT | | 55,759 | | | | 55,759 |
| 029 | UNMANNED AIR SYSTEMS (INTEL) | | 10,154 | | | | 10,154 |
| 030 | DCGS-MC | | 13,462 | | | | 13,462 |
| 031 | UAS PAYLOADS | | 14,193 | | | | 14,193 |
| | **OTHER SUPPORT (NON-TEL)** | | | | | | |
| 035 | NEXT GENERATION ENTERPRISE NETWORK (NGEN) | | 98,511 | | | | 98,511 |
| 036 | COMMON COMPUTER RESOURCES | | 66,894 | | | | 66,894 |
| 037 | COMMAND POST SYSTEMS | | 186,912 | | | | 186,912 |
| 038 | RADIO SYSTEMS | | 34,361 | | | | 34,361 |
| 039 | COMM SWITCHING & CONTROL SYSTEMS | | 54,615 | | | | 54,615 |
| 040 | COMM & ELEC INFRASTRUCTURE SUPPORT | | 44,455 | | | | 44,455 |
| | **CLASSIFIED PROGRAMS** | | | | | | |
| 040A | CLASSIFIED PROGRAMS | | 4,214 | | | | 4,214 |
| | **ADMINISTRATIVE VEHICLES** | | | | | | |
| 042 | COMMERCIAL CARGO VEHICLES | | 66,951 | | | | 66,951 |
| | **TACTICAL VEHICLES** | | | | | | |
| 043 | MOTOR TRANSPORT MODIFICATIONS | | 21,824 | | | | 21,824 |
| 044 | JOINT LIGHT TACTICAL VEHICLE | 527 | 233,639 | | | 527 | 233,639 |
| 045 | FAMILY OF TACTICAL TRAILERS | | 1,938 | | | | 1,938 |
| 046 | TRAILERS | | 10,282 | | | | 10,282 |
| | **ENGINEER AND OTHER EQUIPMENT** | | | | | | |
| 048 | ENVIRONMENTAL CONTROL EQUIP ASSORT | | 1,405 | | | | 1,405 |
| 050 | TACTICAL FUEL SYSTEMS | | 1,788 | | | | 1,788 |

| Line | Item | Qty | Amount | Qty | Amount | Qty | Amount |
|---|---|---|---|---|---|---|---|
| 051 | POWER EQUIPMENT ASSORTED | | 9,910 | | | | 9,910 |
| 052 | AMPHIBIOUS SUPPORT EQUIPMENT | | 5,830 | | | | 5,830 |
| 053 | EOD SYSTEMS | | 27,240 | | | | 27,240 |
| | **MATERIALS HANDLING EQUIPMENT** | | | | | | |
| 054 | PHYSICAL SECURITY EQUIPMENT | | 53,477 | | | | 53,477 |
| | **GENERAL PROPERTY** | | | | | | |
| 056 | TRAINING DEVICES | | 76,185 | | 8,879 | | 85,064 |
| | Unfunded requirement | | | | [8,879] | | |
| 058 | FAMILY OF CONSTRUCTION EQUIPMENT | | 26,286 | | | | 26,286 |
| 059 | FAMILY OF INTERNALLY TRANSPORTABLE VEH (ITV) | | 1,583 | | | | 1,583 |
| | **OTHER SUPPORT** | | | | | | |
| 060 | ITEMS LESS THAN $5 MILLION | | 7,716 | | | | 7,716 |
| | **SPARES AND REPAIR PARTS** | | | | | | |
| 062 | SPARES AND REPAIR PARTS | | 35,640 | | | | 35,640 |
| | **TOTAL PROCUREMENT, MARINE CORPS** | **782** | **2,064,825** | | **8,879** | **782** | **2,073,704** |
| | | | | | | | |
| | **AIRCRAFT PROCUREMENT, AIR FORCE** | | | | | | |
| | **TACTICAL FORCES** | | | | | | |
| 001 | F–35 | 46 | 4,544,684 | 10 | 1,260,000 | 56 | 5,804,684 |
| | Additional Tooling in Support of Unfunded Priority | | | | [60,000] | | |
| | Unfunded requirement | | | [10] | [1,200,000] | | |
| 002 | ADVANCE PROCUREMENT (CY) | | 780,300 | | | | 780,300 |
| | **TACTICAL AIRLIFT** | | | | | | |
| 003 | KC–46A TANKER | 15 | 2,545,674 | 2 | 400,000 | 17 | 2,945,674 |
| | KC–46A | | | [2] | [400,000] | | |
| | **OTHER AIRLIFT** | | | | | | |
| 004 | C–130J | | 57,708 | | | | 57,708 |
| 006 | HC–130J | 2 | 198,502 | 1 | 100,000 | 3 | 298,502 |
| | HC–130J | | | [1] | [100,000] | | |
| 008 | MC–130J | 5 | 379,373 | 6 | 600,000 | 11 | 979,373 |
| | MC–130J | | | [6] | [600,000] | | |
| 009 | ADVANCE PROCUREMENT (CY) | | 30,000 | | | | 30,000 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | **MISSION SUPPORT AIRCRAFT** | | | | | | |
| 012 | CIVIL AIR PATROL A/C | 6 | 2,695 | | | 6 | 2,695 |
| | **OTHER AIRCRAFT** | | | | | | |
| 014 | TARGET DRONES | 42 | 109,841 | | | 42 | 109,841 |
| 017 | MQ–9 | | 117,141 | | | | 117,141 |
| | **STRATEGIC AIRCRAFT** | | | | | | |
| 018 | B–2A | | 96,727 | 54 | 9,000 | 54 | 105,727 |
| | B–2 Rotary Launcher assembly | | | [54] | [9,000] | | |
| 019 | B–1B | | 155,634 | | –34,000 | | 121,634 |
| | Duplicate funding of F101 engine kits | | | | [–34,000] | | |
| 020 | B–52 | | 109,295 | | | | 109,295 |
| 021 | LARGE AIRCRAFT INFRARED COUNTERMEASURES | | 4,046 | 50 | 118,945 | 50 | 122,991 |
| | C–130 LAIRCM | | | | [18,900] | | |
| | C–17 LAIRCM | | | [40] | [76,145] | | |
| | C–5 LAIRCM | | | [10] | [23,900] | | |
| | **TACTICAL AIRCRAFT** | | | | | | |
| 022 | A–10 | | 6,010 | 4 | 103,000 | 4 | 109,010 |
| | Unfunded Requirement | | | [4] | [103,000] | | |
| 023 | F–15 | | 417,193 | | | | 417,193 |
| 024 | F–16 | | 203,864 | | | | 203,864 |
| 025 | F–22A | | 161,630 | | | | 161,630 |
| 026 | ADVANCE PROCUREMENT (CY) | | 15,000 | | | | 15,000 |
| 027 | F–35 MODIFICATIONS | | 68,270 | | | | 68,270 |
| 028 | INCREMENT 3.2B | 72 | 105,756 | | | 72 | 105,756 |
| 030 | KC–46A TANKER | | 6,213 | | | | 6,213 |
| | **AIRLIFT AIRCRAFT** | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 031 | C–5 | | 36,592 | | | | 36,592 |
| 032 | C–5M | | 6,817 | | | | 6,817 |
| 033 | C–17A | | 125,522 | | | | 125,522 |
| 034 | C–21 | | 13,253 | | | | 13,253 |
| 035 | C–32A | | 79,449 | | | | 79,449 |
| 036 | C–37A | | 15,423 | | | | 15,423 |
| 037 | C–130J | | 10,727 | | | | 10,727 |
| | **TRAINER AIRCRAFT** | | | | | | |
| 038 | GLIDER MODS | | 136 | | | | 136 |
| 039 | T–6 | | 35,706 | | | | 35,706 |
| 040 | T–1 | | 21,477 | | | | 21,477 |
| 041 | T–38 | | 51,641 | | | | 51,641 |
| | **OTHER AIRCRAFT** | | | | | | |
| 042 | U–2 MODS | | 36,406 | | | | 36,406 |
| 043 | KC–10A (ATCA) | | 4,243 | | | | 4,243 |
| 044 | C–12 | | 5,846 | | 65,000 | | 70,846 |
| | MC–12W upgrades for Air National Guard | | | | [65,000] | | |
| 045 | VC–25A MOD | | 52,107 | | | | 52,107 |
| 046 | C–40 | | 31,119 | | | | 31,119 |
| 047 | C–130 | | 66,310 | 264 | 147,000 | 264 | 213,310 |
| | C–130H Inflight rebalance system | | | [88] | [18,000] | | |
| | C–130H NP2000 Prop | | | [88] | [55,000] | | |
| | C–130H T56 3.5 | | | [88] | [74,000] | | |
| 048 | C–130J MODS | | 171,230 | | | | 171,230 |
| 049 | C–135 | | 69,428 | | | | 69,428 |
| 050 | OC–135B | | 23,091 | | | | 23,091 |
| 051 | COMPASS CALL MODS | | 166,541 | | | | 166,541 |
| 052 | COMBAT FLIGHT INSPECTION (CFIN) | | 495 | | | | 495 |
| 053 | RC–135 | | 201,559 | | | | 201,559 |
| 054 | E–3 | | 189,772 | | | | 189,772 |
| 055 | E–4 | | 30,493 | | | | 30,493 |
| 056 | E–8 | | 13,232 | | | | 13,232 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 057 | AIRBORNE WARNING AND CONTROL SYSTEM | | 164,786 | | | | 164,786 |
| 058 | FAMILY OF BEYOND LINE-OF-SIGHT TERMINALS | | 24,716 | | | | 24,716 |
| 059 | H–1 | | 3,730 | | | | 3,730 |
| 060 | H–60 | | 75,989 | | 16,100 | | 92,089 |
| | Unfunded requirement | | | | [16,100] | | |
| 061 | RQ–4 MODS | | 43,968 | | 18,300 | | 62,268 |
| | HA-ISR Payload Adapters | | | | [18,300] | | |
| 062 | HC/MC–130 MODIFICATIONS | | 67,674 | | | | 67,674 |
| 063 | OTHER AIRCRAFT | | 59,068 | | | | 59,068 |
| 065 | MQ–9 MODS | | 264,740 | | 5,200 | | 269,940 |
| | FY17 10th Pod Set Procurement Shortfall | | | | [5,200] | | |
| 066 | CV–22 MODS | | 60,990 | | | | 60,990 |
| | **AIRCRAFT SPARES AND REPAIR PARTS** | | | | | | |
| 067 | INITIAL SPARES/REPAIR PARTS | | 1,041,569 | | 79,600 | | 1,121,169 |
| | Additional F–35 Initial Spares | | | | [79,600] | | |
| | **COMMON SUPPORT EQUIPMENT** | | | | | | |
| 068 | AIRCRAFT REPLACEMENT SUPPORT EQUIP | | 75,846 | | 25,417 | | 101,263 |
| | Realign European Reassurance Initiative to Base | | | | [25,417] | | |
| 069 | OTHER PRODUCTION CHARGES | | 8,524 | | | | 8,524 |
| 071 | T–53A TRAINER | | 501 | | | | 501 |
| | **POST PRODUCTION SUPPORT** | | | | | | |
| 072 | B–2A | | 447 | | | | 447 |
| 073 | B–2A | | 38,509 | | | | 38,509 |
| 074 | B–52 | | 199 | | | | 199 |
| 075 | C–17A | | 12,028 | | | | 12,028 |
| 078 | RC–135 | | 29,700 | | | | 29,700 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 079 | F–15 | | 20,000 | | | | 20,000 |
| 080 | F–15 | | 2,524 | | | | 2,524 |
| 081 | F–16 | | 18,051 | | –12,400 | | 5,651 |
| | Program reduction | | | | [–12,400] | | |
| 082 | F–22A | | 119,566 | | | | 119,566 |
| 083 | OTHER AIRCRAFT | | 85,000 | | | | 85,000 |
| 085 | RQ–4 POST PRODUCTION CHARGES | | 86,695 | | | | 86,695 |
| 086 | CV–22 MODS | | 4,500 | | | | 4,500 |
| | **INDUSTRIAL PREPAREDNESS** | | | | | | |
| 087 | INDUSTRIAL RESPONSIVENESS | | 14,739 | | 16,000 | | 30,739 |
| | Program increase | | | | [16,000] | | |
| 088 | C–130J | | 102,000 | | | | 102,000 |
| | **WAR CONSUMABLES** | | | | | | |
| 089 | WAR CONSUMABLES | | 37,647 | | | | 37,647 |
| | **OTHER PRODUCTION CHARGES** | | | | | | |
| 090 | OTHER PRODUCTION CHARGES | | 1,339,160 | | | | 1,339,160 |
| 092 | OTHER AIRCRAFT | | 600 | | | | 600 |
| | **CLASSIFIED PROGRAMS** | | | | | | |
| 092A | CLASSIFIED PROGRAMS | | 53,212 | | | | 53,212 |
| | **TOTAL AIRCRAFT PROCUREMENT, AIR FORCE** | **188** | **15,430,849** | **391** | **2,917,162** | **579** | **18,348,011** |
| | | | | | | | |
| | **MISSILE PROCUREMENT, AIR FORCE** | | | | | | |
| | **MISSILE REPLACEMENT EQUIPMENT—BALLISTIC** | | | | | | |
| 001 | MISSILE REPLACEMENT EQ-BALLISTIC | | 99,098 | | | | 99,098 |
| | **TACTICAL** | | | | | | |
| 002 | JOINT AIR-SURFACE STANDOFF MISSILE | 360 | 441,367 | | | 360 | 441,367 |
| 003 | LRASM0 | 15 | 44,728 | | 17,000 | 15 | 61,728 |
| | LRASM | | | | [17,000] | | |
| 004 | SIDEWINDER (AIM–9X) | 310 | 125,350 | | | 310 | 125,350 |
| 005 | AMRAAM | 205 | 304,327 | | | 205 | 304,327 |
| 006 | PREDATOR HELLFIRE MISSILE | 399 | 34,867 | | | 399 | 34,867 |
| 007 | SMALL DIAMETER BOMB | 5,039 | 266,030 | | | 5,039 | 266,030 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | **INDUSTRIAL FACILITIES** | | | | | | |
| 008 | INDUSTR'L PREPAREDNS/POL PREVENTION | | 926 | | | | 926 |
| | **CLASS IV** | | | | | | |
| 009 | ICBM FUZE MOD | | 6,334 | | | | 6,334 |
| 010 | MM III MODIFICATIONS | | 80,109 | | | | 80,109 |
| 011 | AGM–65D MAVERICK | | 289 | | | | 289 |
| 013 | AIR LAUNCH CRUISE MISSILE (ALCM) | | 36,425 | | | | 36,425 |
| 014 | SMALL DIAMETER BOMB | | 14,086 | | | | 14,086 |
| | **MISSILE SPARES AND REPAIR PARTS** | | | | | | |
| 015 | INITIAL SPARES/REPAIR PARTS | | 101,153 | | | | 101,153 |
| | **SPECIAL PROGRAMS** | | | | | | |
| 020 | SPECIAL UPDATE PROGRAMS | | 32,917 | | | | 32,917 |
| | **CLASSIFIED PROGRAMS** | | | | | | |
| 020A | CLASSIFIED PROGRAMS | | 708,176 | | | | 708,176 |
| | **TOTAL MISSILE PROCUREMENT, AIR FORCE** | **6,328** | **2,296,182** | | **17,000** | **6,328** | **2,313,182** |
| | | | | | | | |
| | **SPACE PROCUREMENT, AIR FORCE** | | | | | | |
| | **SPACE PROGRAMS** | | | | | | |
| 001 | ADVANCED EHF | | 56,974 | | | | 56,974 |
| 002 | AF SATELLITE COMM SYSTEM | | 57,516 | | | | 57,516 |
| 003 | COUNTERSPACE SYSTEMS | | 28,798 | | | | 28,798 |
| 004 | FAMILY OF BEYOND LINE-OF-SIGHT TERMINALS | | 146,972 | | | | 146,972 |
| 005 | WIDEBAND GAPFILLER SATELLITES(SPACE) | | 80,849 | | 100,000 | | 180,849 |
| | Long-lead procurement for protecting supply chain and schedule for WGS communications. | | | | [100,000] | | |
| 006 | GPS III SPACE SEGMENT | | 85,894 | | | | 85,894 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 007 | GLOBAL POSTIONING (SPACE) | | 2,198 | | | | 2,198 |
| 008 | SPACEBORNE EQUIP (COMSEC) | | 25,048 | | | | 25,048 |
| 010 | MILSATCOM | | 33,033 | | | | 33,033 |
| 011 | EVOLVED EXPENDABLE LAUNCH CAPABILITY | | 957,420 | | | | 957,420 |
| 012 | EVOLVED EXPENDABLE LAUNCH VEH(SPACE) | 3 | 606,488 | | | 3 | 606,488 |
| 013 | SBIR HIGH (SPACE) | | 981,009 | | 76,350 | | 1,057,359 |
| | AF UPL—fully fund emerging cyber security requirement | | | | [44,900] | | |
| | AF UPL—procure commercially available antenna | | | | [15,450] | | |
| | AF UPL upgrades ground antenna | | | | [16,000] | | |
| 014 | ADVANCE PROCUREMENT (CY) | | 132,420 | | | | 132,420 |
| 015 | NUDET DETECTION SYSTEM | | 6,370 | | | | 6,370 |
| 016 | SPACE MODS | | 37,203 | | | | 37,203 |
| 017 | SPACELIFT RANGE SYSTEM SPACE | | 113,874 | | | | 113,874 |
| | **SSPARES** | | | | | | |
| 018 | INITIAL SPARES/REPAIR PARTS | | 18,709 | | | | 18,709 |
| | **TOTAL SPACE PROCUREMENT, AIR FORCE** | **3** | **3,370,775** | | **176,350** | **3** | **3,547,125** |
| | | | | | | | |
| | **PROCUREMENT OF AMMUNITION, AIR FORCE** | | | | | | |
| | **ROCKETS** | | | | | | |
| 001 | ROCKETS | | 147,454 | | | | 147,454 |
| | **CARTRIDGES** | | | | | | |
| 002 | CARTRIDGES | | 161,744 | | | | 161,744 |
| | **BOMBS** | | | | | | |
| 003 | PRACTICE BOMBS | | 28,509 | | | | 28,509 |
| 004 | GENERAL PURPOSE BOMBS | | 329,501 | | | | 329,501 |
| 005 | MASSIVE ORDNANCE PENETRATOR (MOP) | | 38,382 | | | | 38,382 |
| 006 | JOINT DIRECT ATTACK MUNITION | 10,330 | 319,525 | | | 10,330 | 319,525 |
| 007 | B61 | 30 | 77,068 | | | 30 | 77,068 |
| 008 | ADVANCE PROCUREMENT (CY) | | 11,239 | | | | 11,239 |
| | **OTHER ITEMS** | | | | | | |
| 009 | CAD/PAD | | 53,469 | | | | 53,469 |
| 010 | EXPLOSIVE ORDNANCE DISPOSAL (EOD) | | 5,921 | | | | 5,921 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 011 | SPARES AND REPAIR PARTS | | 678 | | | | 678 |
| 012 | MODIFICATIONS | | 1,409 | | | | 1,409 |
| 013 | ITEMS LESS THAN $5 MILLION | | 5,047 | | | | 5,047 |
| | **FLARES** | | | | | | |
| 015 | FLARES | | 143,983 | | | | 143,983 |
| | **FUZES** | | | | | | |
| 016 | FUZES | | 24,062 | | | | 24,062 |
| | **SMALL ARMS** | | | | | | |
| 017 | SMALL ARMS | | 28,611 | | | | 28,611 |
| | **TOTAL PROCUREMENT OF AMMUNITION, AIR FORCE** | **10,360** | **1,376,602** | | | **10,360** | **1,376,602** |
| | | | | | | | |
| | **OTHER PROCUREMENT, AIR FORCE** | | | | | | |
| | **PASSENGER CARRYING VEHICLES** | | | | | | |
| 001 | PASSENGER CARRYING VEHICLES | | 15,651 | | 1,350 | | 17,001 |
| | Realign European Reassurance Initiative to Base | | | | [1,350] | | |
| | **CARGO AND UTILITY VEHICLES** | | | | | | |
| 002 | MEDIUM TACTICAL VEHICLE | | 54,607 | | | | 54,607 |
| 003 | CAP VEHICLES | | 1,011 | | | | 1,011 |
| 004 | CARGO AND UTILITY VEHICLES | | 28,670 | | | | 28,670 |
| | **SPECIAL PURPOSE VEHICLES** | | | | | | |
| 005 | SECURITY AND TACTICAL VEHICLES | | 59,398 | | | | 59,398 |
| 006 | SPECIAL PURPOSE VEHICLES | | 19,784 | | 31,821 | | 51,605 |
| | Realign European Reassurance Initiative to Base | | | | [31,821] | | |
| | **FIRE FIGHTING EQUIPMENT** | | | | | | |
| 007 | FIRE FIGHTING/CRASH RESCUE VEHICLES | | 14,768 | | 22,583 | | 37,351 |
| | Realign European Reassurance Initiative to Base | | | | [22,583] | | |

| | | | | |
|---|---|---|---|---|
| | **MATERIALS HANDLING EQUIPMENT** | | | |
| 008 | MATERIALS HANDLING VEHICLES | 13,561 | 4,026 | 17,587 |
| | Realign European Reassurance Initiative to Base | | [4,026] | |
| | **BASE MAINTENANCE SUPPORT** | | | |
| 009 | RUNWAY SNOW REMOV & CLEANING EQUIP | 3,429 | 9,161 | 12,590 |
| | Realign European Reassurance Initiative to Base | | [9,161] | |
| 010 | BASE MAINTENANCE SUPPORT VEHICLES | 60,075 | 39,692 | 99,767 |
| | Realign European Reassurance Initiative to Base | | [39,692] | |
| | **COMM SECURITY EQUIPMENT(COMSEC)** | | | |
| 011 | COMSEC EQUIPMENT | 115,000 | 8,000 | 123,000 |
| | Unfunded requirement | | [8,000] | |
| | **INTELLIGENCE PROGRAMS** | | | |
| 013 | INTERNATIONAL INTEL TECH & ARCHITECTURES | 22,335 | | 22,335 |
| 014 | INTELLIGENCE TRAINING EQUIPMENT | 5,892 | | 5,892 |
| 015 | INTELLIGENCE COMM EQUIPMENT | 34,072 | | 34,072 |
| | **ELECTRONICS PROGRAMS** | | | |
| 016 | AIR TRAFFIC CONTROL & LANDING SYS | 66,143 | | 66,143 |
| 017 | NATIONAL AIRSPACE SYSTEM | 12,641 | | 12,641 |
| 018 | BATTLE CONTROL SYSTEM—FIXED | 6,415 | | 6,415 |
| 019 | THEATER AIR CONTROL SYS IMPROVEMENTS | 23,233 | | 23,233 |
| 020 | WEATHER OBSERVATION FORECAST | 40,116 | | 40,116 |
| 021 | STRATEGIC COMMAND AND CONTROL | 72,810 | | 72,810 |
| 022 | CHEYENNE MOUNTAIN COMPLEX | 9,864 | | 9,864 |
| 023 | MISSION PLANNING SYSTEMS | 15,486 | | 15,486 |
| 025 | INTEGRATED STRAT PLAN & ANALY NETWORK (ISPAN) | 9,187 | | 9,187 |
| | **SPCL COMM-ELECTRONICS PROJECTS** | | | |
| 026 | GENERAL INFORMATION TECHNOLOGY | 51,826 | | 51,826 |
| 027 | AF GLOBAL COMMAND & CONTROL SYS | 3,634 | | 3,634 |
| 028 | MOBILITY COMMAND AND CONTROL | 10,083 | | 10,083 |
| 029 | AIR FORCE PHYSICAL SECURITY SYSTEM | 201,866 | | 201,866 |
| 030 | COMBAT TRAINING RANGES | 115,198 | | 115,198 |
| 031 | MINIMUM ESSENTIAL EMERGENCY COMM N | 292 | | 292 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 032 | WIDE AREA SURVEILLANCE (WAS) | | 62,087 | | | | 62,087 |
| 033 | C3 COUNTERMEASURES | | 37,764 | | | | 37,764 |
| 034 | GCSS-AF FOS | | 2,826 | | | | 2,826 |
| 035 | DEFENSE ENTERPRISE ACCOUNTING AND MGMT SYSTEM | | 1,514 | | | | 1,514 |
| 036 | THEATER BATTLE MGT C2 SYSTEM | | 9,646 | | | | 9,646 |
| 037 | AIR & SPACE OPERATIONS CTR-WPN SYS | | 25,533 | | | | 25,533 |
| | **AIR FORCE COMMUNICATIONS** | | | | | | |
| 040 | BASE INFORMATION TRANSPT INFRAST (BITI) WIRED | | 28,159 | | | | 28,159 |
| 041 | AFNET | | 160,820 | | 26,000 | | 186,820 |
| | Unfunded requirement | | | | [26,000] | | |
| 042 | JOINT COMMUNICATIONS SUPPORT ELEMENT (JCSE) | | 5,135 | | | | 5,135 |
| 043 | USCENTCOM | | 18,719 | | | | 18,719 |
| | **ORGANIZATION AND BASE** | | | | | | |
| 044 | TACTICAL C-E EQUIPMENT | | 123,206 | | | | 123,206 |
| 045 | COMBAT SURVIVOR EVADER LOCATER | | 3,004 | | | | 3,004 |
| 046 | RADIO EQUIPMENT | | 15,736 | | | | 15,736 |
| 047 | CCTV/AUDIOVISUAL EQUIPMENT | | 5,480 | | | | 5,480 |
| 048 | BASE COMM INFRASTRUCTURE | | 130,539 | | 55,000 | | 185,539 |
| | Realign European Reassurance Initiative to Base | | | | [55,000] | | |
| | **MODIFICATIONS** | | | | | | |
| 049 | COMM ELECT MODS | | 70,798 | | | | 70,798 |
| | **PERSONAL SAFETY & RESCUE EQUIP** | | | | | | |
| 051 | ITEMS LESS THAN $5 MILLION | | 52,964 | | 500 | | 53,464 |
| | Unfunded requirement—Instructor Training Parachutes | | | | [500] | | |
| | **DEPOT PLANT+MTRLS HANDLING EQ** | | | | | | |
| 052 | MECHANIZED MATERIAL HANDLING EQUIP | | 10,381 | | | | 10,381 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **BASE SUPPORT EQUIPMENT** | | | | | | |
| 053 | BASE PROCURED EQUIPMENT | | 15,038 | | 12,500 | | 27,538 |
| | Program increase—Civil Engineers Construction, Surveying, and Mapping Equipment. | | | | [5,000] | | |
| | Realign European Reassurance Initiative to Base | | | | [7,500] | | |
| 054 | ENGINEERING AND EOD EQUIPMENT | | 26,287 | | | | 26,287 |
| 055 | MOBILITY EQUIPMENT | | 8,470 | | | | 8,470 |
| 056 | ITEMS LESS THAN $5 MILLION | | 28,768 | | 104,015 | | 132,783 |
| | Realign European Reassurance Initiative to Base | | | | [104,015] | | |
| | **SPECIAL SUPPORT PROJECTS** | | | | | | |
| 058 | DARP RC135 | | 25,985 | | | | 25,985 |
| 059 | DCGS-AF | | 178,423 | | | | 178,423 |
| 061 | SPECIAL UPDATE PROGRAM | | 840,980 | | | | 840,980 |
| | **CLASSIFIED PROGRAMS** | | | | | | |
| 062A | CLASSIFIED PROGRAMS | | 16,601,513 | | | | 16,601,513 |
| | **SPARES AND REPAIR PARTS** | | | | | | |
| 064 | SPARES AND REPAIR PARTS | | 26,675 | | | | 26,675 |
| | **TOTAL OTHER PROCUREMENT, AIR FORCE** | | **19,603,497** | | **314,648** | | **19,918,145** |
| | | | | | | | |
| | **PROCUREMENT, DEFENSE-WIDE** | | | | | | |
| | **MAJOR EQUIPMENT, OSD** | | | | | | |
| 042 | MAJOR EQUIPMENT, OSD | 20 | 36,999 | | | 20 | 36,999 |
| | **MAJOR EQUIPMENT, NSA** | | | | | | |
| 041 | INFORMATION SYSTEMS SECURITY PROGRAM (ISSP) | | 5,938 | | | | 5,938 |
| | **MAJOR EQUIPMENT, WHS** | | | | | | |
| 045 | MAJOR EQUIPMENT, WHS | | 10,529 | | | | 10,529 |
| | **MAJOR EQUIPMENT, DISA** | | | | | | |
| 007 | INFORMATION SYSTEMS SECURITY | | 24,805 | | | | 24,805 |
| 008 | TELEPORT PROGRAM | | 46,638 | | | | 46,638 |
| 009 | ITEMS LESS THAN $5 MILLION | | 15,541 | | | | 15,541 |
| 010 | NET CENTRIC ENTERPRISE SERVICES (NCES) | | 1,161 | | | | 1,161 |
| 011 | DEFENSE INFORMATION SYSTEM NETWORK | | 126,345 | | | | 126,345 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 012 | CYBER SECURITY INITIATIVE | | 1,817 | | | | 1,817 |
| 013 | WHITE HOUSE COMMUNICATION AGENCY | | 45,243 | | | | 45,243 |
| 014 | SENIOR LEADERSHIP ENTERPRISE | | 294,139 | | | | 294,139 |
| 016 | JOINT REGIONAL SECURITY STACKS (JRSS) | | 188,483 | | | | 188,483 |
| 017 | JOINT SERVICE PROVIDER | | 100,783 | | | | 100,783 |
| | **MAJOR EQUIPMENT, DLA** | | | | | | |
| 019 | MAJOR EQUIPMENT | | 2,951 | | | | 2,951 |
| | **MAJOR EQUIPMENT, DSS** | | | | | | |
| 023 | MAJOR EQUIPMENT | | 1,073 | | | | 1,073 |
| | **MAJOR EQUIPMENT, DCAA** | | | | | | |
| 001 | ITEMS LESS THAN $5 MILLION | | 1,475 | | | | 1,475 |
| | **MAJOR EQUIPMENT, TJS** | | | | | | |
| 043 | MAJOR EQUIPMENT, TJS | | 9,341 | | | | 9,341 |
| 044 | MAJOR EQUIPMENT, TJS—CE2T2 | | 903 | | | | 903 |
| | **MAJOR EQUIPMENT, MISSILE DEFENSE AGENCY** | | | | | | |
| 027 | THAAD | 34 | 451,592 | 24 | 319,400 | 58 | 770,992 |
| | Procure additional THAAD interceptors | | | [24] | [319,400] | | |
| 028 | AEGIS BMD | 34 | 425,018 | 11 | 158,000 | 45 | 583,018 |
| | Additional SM–3 Block 1B | | | [11] | [158,000] | | |
| 029 | ADVANCE PROCUREMENT (CY) | | 38,738 | | | | 38,738 |
| 030 | BMDS AN/TPY–2 RADARS | | 947 | | | | 947 |
| 033 | AEGIS ASHORE PHASE III | | 59,739 | | | | 59,739 |
| 034 | IRON DOME | 1 | 42,000 | | | 1 | 42,000 |
| 035 | AEGIS BMD HARDWARE AND SOFTWARE | 21 | 160,330 | | | 21 | 160,330 |
| | **MAJOR EQUIPMENT, DHRA** | | | | | | |
| 003 | PERSONNEL ADMINISTRATION | | 14,588 | | | | 14,588 |

| Line | Item | Qty | Cost | Qty | Cost | Qty | Cost |
|---|---|---|---|---|---|---|---|
| | **MAJOR EQUIPMENT, DEFENSE THREAT REDUCTION AGENCY** | | | | | | |
| 025 | VEHICLES | | 204 | | | | 204 |
| 026 | OTHER MAJOR EQUIPMENT | | 12,363 | | | | 12,363 |
| | **MAJOR EQUIPMENT, DODEA** | | | | | | |
| 021 | AUTOMATION/EDUCATIONAL SUPPORT & LOGISTICS | | 1,910 | | | | 1,910 |
| | **MAJOR EQUIPMENT, DCMA** | | | | | | |
| 002 | MAJOR EQUIPMENT | | 4,347 | | | | 4,347 |
| | **MAJOR EQUIPMENT, DMACT** | | | | | | |
| 020 | MAJOR EQUIPMENT | 3 | 13,464 | | | 3 | 13,464 |
| | **CLASSIFIED PROGRAMS** | | | | | | |
| 045A | CLASSIFIED PROGRAMS | | 657,759 | | | | 657,759 |
| | **AVIATION PROGRAMS** | | | | | | |
| 049 | ROTARY WING UPGRADES AND SUSTAINMENT | | 158,988 | | –7,500 | | 151,488 |
| | Per SOCOM requested realignment | | | | [–7,500] | | |
| 050 | UNMANNED ISR | | 13,295 | | | | 13,295 |
| 051 | NON-STANDARD AVIATION | | 4,892 | | | | 4,892 |
| 052 | U–28 | | 5,769 | | | | 5,769 |
| 053 | MH–47 CHINOOK | | 87,345 | | | | 87,345 |
| 055 | CV–22 MODIFICATION | | 42,178 | | | | 42,178 |
| 057 | MQ–9 UNMANNED AERIAL VEHICLE | | 21,660 | | | | 21,660 |
| 059 | PRECISION STRIKE PACKAGE | | 229,728 | | | | 229,728 |
| 060 | AC/MC–130J | | 179,934 | | | | 179,934 |
| 061 | C–130 MODIFICATIONS | | 28,059 | | | | 28,059 |
| | **SHIPBUILDING** | | | | | | |
| 062 | UNDERWATER SYSTEMS | | 92,606 | | –12,800 | | 79,806 |
| | Per SOCOM requested realignment | | | | [–12,800] | | |
| | **AMMUNITION PROGRAMS** | | | | | | |
| 063 | ORDNANCE ITEMS <$5M | | 112,331 | | | | 112,331 |
| | **OTHER PROCUREMENT PROGRAMS** | | | | | | |
| 064 | INTELLIGENCE SYSTEMS | | 82,538 | | | | 82,538 |
| 065 | DISTRIBUTED COMMON GROUND/SURFACE SYSTEMS | | 11,042 | | | | 11,042 |
| 066 | OTHER ITEMS <$5M | | 54,592 | | | | 54,592 |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 067 | COMBATANT CRAFT SYSTEMS | | 23,272 | | | | 23,272 |
| 068 | SPECIAL PROGRAMS | | 16,053 | | | | 16,053 |
| 069 | TACTICAL VEHICLES | | 63,304 | | | | 63,304 |
| 070 | WARRIOR SYSTEMS <$5M | | 252,070 | | | | 252,070 |
| 071 | COMBAT MISSION REQUIREMENTS | | 19,570 | | | | 19,570 |
| 072 | GLOBAL VIDEO SURVEILLANCE ACTIVITIES | | 3,589 | | | | 3,589 |
| 073 | OPERATIONAL ENHANCEMENTS INTELLIGENCE | | 17,953 | | | | 17,953 |
| 075 | OPERATIONAL ENHANCEMENTS | | 241,429 | | | | 241,429 |
| | **CBDP** | | | | | | |
| 076 | CHEMICAL BIOLOGICAL SITUATIONAL AWARENESS | | 135,031 | | | | 135,031 |
| 077 | CB PROTECTION & HAZARD MITIGATION | | 141,027 | | | | 141,027 |
| | **TOTAL PROCUREMENT, DEFENSE-WIDE** | **113** | **4,835,418** | **35** | **457,100** | **148** | **5,292,518** |
| | | | | | | | |
| | **JOINT URGENT OPERATIONAL NEEDS FUND** | | | | | | |
| | **JOINT URGENT OPERATIONAL NEEDS FUND** | | | | | | |
| 001 | JOINT URGENT OPERATIONAL NEEDS FUND | | 99,795 | | –99,795 | | 0 |
| | Program reduction | | | | [–99,795] | | |
| | **TOTAL JOINT URGENT OPERATIONAL NEEDS FUND** | | **99,795** | | **–99,795** | | **0** |
| | | | | | | | |
| | **TOTAL PROCUREMENT** | **35,463** | **113,983,713** | **34,330** | **13,877,588** | **69,793** | **127,861,301** |

**SEC. 4102. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS.**

**SEC. 4102. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | **AIRCRAFT PROCUREMENT, ARMY** | | | | | | |
| | **FIXED WING** | | | | | | |
| 004 | MQ–1 UAV | 9 | 87,300 | | | 9 | 87,300 |
| | **ROTARY** | | | | | | |
| 006 | AH–64 APACHE BLOCK IIIA REMAN | 4 | 39,040 | | 39,000 | 4 | 78,040 |
| | Unfunded requirement | | | | [39,000] | | |
| | **MODIFICATION OF AIRCRAFT** | | | | | | |
| 015 | MQ–1 PAYLOAD (MIP) | | 41,400 | | –8,000 | | 33,400 |
| | Realign European Reassurance Initiative to Base | | | | [–8,000] | | |
| 018 | MULTI SENSOR ABN RECON (MIP) | | 33,475 | | –29,475 | | 4,000 |
| | Realign European Reassurance Initiative to Base | | | | [–29,475] | | |
| 023 | EMARSS SEMA MODS (MIP) | | 36,000 | | | | 36,000 |
| 025 | UTILITY HELICOPTER MODS | | | | 34,809 | | 34,809 |
| | Unfunded requirement | | | | [34,809] | | |
| 027 | COMMS, NAV SURVEILLANCE | | 4,289 | | | | 4,289 |
| | **GROUND SUPPORT AVIONICS** | | | | | | |
| 033 | CMWS | | 139,742 | 24 | 61,800 | 24 | 201,542 |
| | Unfunded requirement—B kits | | | [24] | [61,800] | | |
| 034 | COMMON INFRARED COUNTERMEASURES (CIRCM) | | 43,440 | | | | 43,440 |
| | **OTHER SUPPORT** | | | | | | |
| 037 | AIRCREW INTEGRATED SYSTEMS | | | | 12,100 | | 12,100 |
| | Unfunded requirement | | | | [12,100] | | |
| | **TOTAL AIRCRAFT PROCUREMENT, ARMY** | **13** | **424,686** | **24** | **110,234** | **37** | **534,920** |
| | | | | | | | |
| | **MISSILE PROCUREMENT, ARMY** | | | | | | |
| | **SURFACE-TO-AIR MISSILE SYSTEM** | | | | | | |

**SEC. 4102. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 002 | MSE MISSILE | | | 147 | 633,570 | 147 | 633,570 |
| | Meet inventory requirements for COCOMS | | | [147] | [633,570] | | |
| | **AIR-TO-SURFACE MISSILE SYSTEM** | | | | | | |
| 005 | HELLFIRE SYS SUMMARY | 2,927 | 278,073 | 106 | 10,000 | 3,033 | 288,073 |
| | Unfunded requirement | | | [106] | [10,000] | | |
| | **ANTI-TANK/ASSAULT MISSILE SYS** | | | | | | |
| 008 | JAVELIN (AAWS-M) SYSTEM SUMMARY | 47 | 8,112 | 326 | 139,188 | 373 | 147,300 |
| | Realign European Reassurance Initiative to Base | | | [–47] | [–8,112] | | |
| | Unfunded requirement | | | [373] | [147,300] | | |
| 009 | TOW 2 SYSTEM SUMMARY | 49 | 3,907 | –49 | –3,907 | | 0 |
| | Realign European Reassurance Initiative to Base | | | [–49] | [–3,907] | | |
| 011 | GUIDED MLRS ROCKET (GMLRS) | 1,542 | 191,522 | | 13,000 | 1,542 | 204,522 |
| | Unfunded requirement | | | | [13,000] | | |
| 012 | MLRS REDUCED RANGE PRACTICE ROCKETS (RRPR) | | | 576 | 6,330 | 576 | 6,330 |
| | Unfunded requirement | | | [576] | [6,330] | | |
| 013 | HIGH MOBILITY ARTILLERY ROCKET SYSTEM (HIMARS | | 41,000 | | –41,000 | | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–41,000] | | |
| 014 | LETHAL MINIATURE AERIAL MISSILE SYSTEM (LMAMS | 120 | 8,669 | | 46,600 | 120 | 55,269 |
| | Unfunded requirement | | | | [46,600] | | |
| | **MODIFICATIONS** | | | | | | |
| 016 | ATACMS MODS | | | 75 | 69,400 | 75 | 69,400 |
| | Unfunded requirement | | | [75] | [69,400] | | |
| 018 | STINGER MODS | | 28,000 | | –28,000 | | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–28,000] | | |
| | **TOTAL MISSILE PROCUREMENT, ARMY** | **4,685** | **559,283** | **1,181** | **845,181** | **5,866** | **1,404,464** |

| Line | Item | | | | | |
|---|---|---|---|---|---|---|
| | **PROCUREMENT OF W&TCV, ARMY** | | | | | |
| | **TRACKED COMBAT VEHICLES** | | | | | |
| 001 | BRADLEY PROGRAM | 60 | 200,000 | –60 | –200,000 | 0 |
| | Realign European Reassurance Initiative to Base | | | [–60] | [–200,000] | |
| 002 | ARMORED MULTI PURPOSE VEHICLE (AMPV) | 65 | 253,903 | –65 | –253,903 | 0 |
| | Realign European Reassurance Initiative to Base | | | [–65] | [–253,903] | |
| | **MODIFICATION OF TRACKED COMBAT VEHICLES** | | | | | |
| 004 | STRYKER (MOD) | | | | 177,000 | 177,000 |
| | Unfunded requirement – lethality upgrades | | | | [177,000] | |
| 006 | BRADLEY PROGRAM (MOD) | | 30,000 | | –30,000 | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–30,000] | |
| 008 | PALADIN INTEGRATED MANAGEMENT (PIM) | 12 | 125,736 | –12 | –125,736 | 0 |
| | Realign European Reassurance Initiative to Base | | | [–12] | [–125,736] | |
| 014 | M1 ABRAMS TANK (MOD) | | 138,700 | | –138,700 | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–138,700] | |
| 015 | ABRAMS UPGRADE PROGRAM | 36 | 442,800 | –36 | –442,800 | 0 |
| | Realign European Reassurance Initiative to Base | | | [–36] | [–442,800] | |
| | **TOTAL PROCUREMENT OF W&TCV, ARMY** | **173** | **1,191,139** | **–173** | **–1,014,139** | **177,000** |
| | | | | | | |
| | **PROCUREMENT OF AMMUNITION, ARMY** | | | | | |
| | **SMALL/MEDIUM CAL AMMUNITION** | | | | | |
| 001 | CTG, 5.56MM, ALL TYPES | | | | 7,100 | 7,100 |
| | Unfunded requirement | | | | [7,100] | |
| 002 | CTG, 7.62MM, ALL TYPES | | | | 14,900 | 14,900 |
| | Unfunded requirement | | | | [14,900] | |
| 003 | CTG, HANDGUN, ALL TYPES | | 5 | | 85 | 90 |
| | Realign European Reassurance Initiative to Base | | | | [–5] | |
| | Unfunded requirement | | | | [90] | |
| 004 | CTG, .50 CAL, ALL TYPES | | 121 | | 8,769 | 8,890 |
| | Realign European Reassurance Initiative to Base | | | | [–121] | |
| | Unfunded requirement | | | | [8,890] | |
| 005 | CTG, 20MM, ALL TYPES | | 1,605 | | | 1,605 |

**SEC. 4102. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 006 | CTG, 25MM, ALL TYPES | | | | 31,862 | | 31,862 |
| | Unfunded requirement | | | | [31,862] | | |
| 007 | CTG, 30MM, ALL TYPES | | 35,000 | | –22,850 | | 12,150 |
| | Realign European Reassurance Initiative to Base | | | | [–25,000] | | |
| | Unfunded requirement | | | | [2,150] | | |
| 008 | CTG, 40MM, ALL TYPES | | | | 17,191 | | 17,191 |
| | Unfunded requirement | | | | [17,191] | | |
| | **MORTAR AMMUNITION** | | | | | | |
| 009 | 60MM MORTAR, ALL TYPES | | | | 2,500 | | 2,500 |
| | Unfunded requirement | | | | [2,500] | | |
| 010 | 81MM MORTAR, ALL TYPES | | | | 3,109 | | 3,109 |
| | Unfunded requirement | | | | [3,109] | | |
| 011 | 120MM MORTAR, ALL TYPES | | | | 18,192 | | 18,192 |
| | Unfunded requirement | | | | [18,192] | | |
| | **TANK AMMUNITION** | | | | | | |
| 012 | CARTRIDGES, TANK, 105MM AND 120MM, ALL TYPES | | | 3228 | 40,300 | 3,228 | 40,300 |
| | Unfunded requirement | | | [3,228] | [40,300] | | |
| | **ARTILLERY AMMUNITION** | | | | | | |
| 014 | ARTILLERY PROJECTILE, 155MM, ALL TYPES | | | | 159,181 | | 159,181 |
| | Unfunded requirement | | | | [159,181] | | |
| 015 | PROJ 155MM EXTENDED RANGE M982 | 266 | 23,234 | | –19,045 | 266 | 4,189 |
| | Realign European Reassurance Initiative to Base | | | | [–19,045] | | |
| 016 | ARTILLERY PROPELLANTS, FUZES AND PRIMERS, ALL | | 20,023 | | 64,044 | | 84,067 |
| | Realign European Reassurance Initiative to Base | | | | [–16,678] | | |
| | Unfunded requirement | | | | [80,722] | | |
| | **MINES** | | | | | | |

| Line | Item | | | | | | |
|---|---|---|---|---|---|---|---|
| 017 | MINES & CLEARING CHARGES, ALL TYPES | | 11,615 | | –8,615 | | 3,000 |
| | Realign European Reassurance Initiative to Base | | | | [–11,615] | | |
| | Unfunded requirement | | | | [3,000] | | |
| | **ROCKETS** | | | | | | |
| 019 | SHOULDER LAUNCHED MUNITIONS, ALL TYPES | | 25,000 | | 61,881 | | 86,881 |
| | Unfunded requirement | | | | [61,881] | | |
| 020 | ROCKET, HYDRA 70, ALL TYPES | | 75,820 | 1245 | 88,000 | 1,245 | 163,820 |
| | Unfunded requirement | | | [1,245] | [20,000] | | |
| | Unfunded requirement—APKWS and M282 warheads | | | | [68,000] | | |
| | **OTHER AMMUNITION** | | | | | | |
| 022 | DEMOLITION MUNITIONS, ALL TYPES | | | | 2,261 | | 2,261 |
| | Unfunded requirement | | | | [2,261] | | |
| 023 | GRENADES, ALL TYPES | | | | 25,361 | | 25,361 |
| | Unfunded requirement | | | | [25,361] | | |
| 024 | SIGNALS, ALL TYPES | | 1,013 | | 829 | | 1,842 |
| | Unfunded requirement | | | | [829] | | |
| 025 | SIMULATORS, ALL TYPES | | | | 450 | | 450 |
| | Unfunded requirement | | | | [450] | | |
| | **MISCELLANEOUS** | | | | | | |
| 027 | NON-LETHAL AMMUNITION, ALL TYPES | | | | 150 | | 150 |
| | Unfunded requirement | | | | [150] | | |
| 028 | ITEMS LESS THAN $5 MILLION (AMMO) | | | | 3,665 | | 3,665 |
| | Unfunded requirement | | | | [3,665] | | |
| | **PRODUCTION BASE SUPPORT** | | | | | | |
| 033 | CONVENTIONAL MUNITIONS DEMILITARIZATION | | | | 53,000 | | 53,000 |
| | Unfunded requirement | | | | [53,000] | | |
| | **TOTAL PROCUREMENT OF AMMUNITION, ARMY** | **266** | **193,436** | **4,473** | **552,320** | **4,739** | **745,756** |
| | | | | | | | |
| | **OTHER PROCUREMENT, ARMY** | | | | | | |
| | **TACTICAL VEHICLES** | | | | | | |
| 010 | FAMILY OF HEAVY TACTICAL VEHICLES (FHTV) | | 25,874 | | –25,874 | | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–25,874] | | |

**SEC. 4102. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 012 | HVY EXPANDED MOBILE TACTICAL TRUCK EXT SERV | | 38,628 | | –38,628 | | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–38,628] | | |
| 014 | MODIFICATION OF IN SVC EQUIP | | 64,647 | | 71,253 | | 135,900 |
| | Realign European Reassurance Initiative to Base | | | | [–2,599] | | |
| | Unfunded requirement—route clearance and mine protected vehicles | | | | [73,852] | | |
| 015 | MINE-RESISTANT AMBUSH-PROTECTED (MRAP) MODS | | 17,508 | | | | 17,508 |
| | **COMM—JOINT COMMUNICATIONS** | | | | | | |
| 020 | SIGNAL MODERNIZATION PROGRAM | | 4,900 | | | | 4,900 |
| | **COMM—COMBAT COMMUNICATIONS** | | | | | | |
| 041 | TRACTOR RIDE | | 1,000 | | | | 1,000 |
| | **COMM—BASE COMMUNICATIONS** | | | | | | |
| 062 | INSTALLATION INFO INFRASTRUCTURE MOD PROGRAM | | 2,500 | | –2,500 | | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–2,500] | | |
| | **ELECT EQUIP—TACT INT REL ACT (TIARA)** | | | | | | |
| 068 | DCGS-A (MIP) | | 39,515 | 106 | 13,000 | 106 | 52,515 |
| | Unfunded requirement | | | [106] | [13,000] | | |
| 070 | TROJAN (MIP) | | 21,310 | | –6,000 | | 15,310 |
| | Realign European Reassurance Initiative to Base | | | | [–6,000] | | |
| 071 | MOD OF IN-SVC EQUIP (INTEL SPT) (MIP) | | 2,300 | | | | 2,300 |
| 072 | CI HUMINT AUTO REPRTING AND COLL(CHARCS) | | 14,460 | | | | 14,460 |
| 075 | BIOMETRIC TACTICAL COLLECTION DEVICES (MIP) | | 5,180 | | | | 5,180 |
| | **ELECT EQUIP—ELECTRONIC WARFARE (EW)** | | | | | | |
| 079 | CREW | | | 10 | 17,500 | 10 | 17,500 |
| | Unfunded requirement—EOD DR SKOs | | | [10] | [17,500] | | |
| 080 | FAMILY OF PERSISTENT SURVEILLANCE CAPABILITIE | | 16,935 | 3 | 5,000 | 3 | 21,935 |
| | Unfunded requirement | | | [3] | [5,000] | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 081 | COUNTERINTELLIGENCE/SECURITY COUNTERMEASURES | 18,874 | | –5,900 | | 12,974 |
| | Realign European Reassurance Initiative to Base | | | [–5,900] | | |
| | **ELECT EQUIP—TACTICAL SURV. (TAC SURV)** | | | | | |
| 084 | NIGHT VISION DEVICES | 377 | | | | 377 |
| 085 | SMALL TACTICAL OPTICAL RIFLE MOUNTED MLRF | 60 | 150 | 2,150 | 150 | 2,210 |
| | Unfunded requirement | | [150] | [2,150] | | |
| 086 | BASE EXPEDITIARY TARGETING AND SURV SYS | | 53 | 29,462 | 53 | 29,462 |
| | Unfunded requirement | | [53] | [29,462] | | |
| 087 | INDIRECT FIRE PROTECTION FAMILY OF SYSTEMS | 57,500 | 13 | 142,610 | 13 | 200,110 |
| | Unfunded requirement—Air and Missile Defense (SHORAD) | | [13] | [142,610] | | |
| 091 | JOINT BATTLE COMMAND—PLATFORM (JBC-P) | | | –2,300 | | –2,300 |
| | Realign European Reassurance Initiative to Base | | | [–2,300] | | |
| 093 | MOD OF IN-SVC EQUIP (LLDR) | 3,974 | | –3,974 | | 0 |
| | Realign European Reassurance Initiative to Base | | | [–3,974] | | |
| 095 | MORTAR FIRE CONTROL SYSTEM | 2,947 | | –75 | | 2,872 |
| | Realign European Reassurance Initiative to Base | | | [–75] | | |
| | **ELECT EQUIP—TACTICAL C2 SYSTEMS** | | | | | |
| 098 | AIR & MSL DEFENSE PLANNING & CONTROL SYS | 9,100 | | –9,100 | | 0 |
| | Realign European Reassurance Initiative to Base | | | [–9,100] | | |
| | **CHEMICAL DEFENSIVE EQUIPMENT** | | | | | |
| 119 | BASE DEFENSE SYSTEMS (BDS) | 3,726 | | | | 3,726 |
| | **ENGINEER (NON-CONSTRUCTION) EQUIPMENT** | | | | | |
| 126 | GRND STANDOFF MINE DETECTN SYSM (GSTAMIDS) | | | 10,800 | | 10,800 |
| | Unfunded requirement | | | [10,800] | | |
| 128 | HUSKY MOUNTED DETECTION SYSTEM (HMDS) | | 4 | 2,400 | 4 | 2,400 |
| | Unfunded requirement | | [4] | [2,400] | | |
| | **COMBAT SERVICE SUPPORT EQUIPMENT** | | | | | |
| 136 | HEATERS AND ECU'S | 270 | | | | 270 |
| 142 | FIELD FEEDING EQUIPMENT | 145 | | | | 145 |
| 143 | CARGO AERIAL DEL & PERSONNEL PARACHUTE SYSTEM | 1,980 | | | | 1,980 |
| | **MEDICAL EQUIPMENT** | | | | | |
| 148 | COMBAT SUPPORT MEDICAL | 25,690 | | –21,122 | | 4,568 |

SEC. 4102. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS
(In Thousands of Dollars)

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | Realign European Reassurance Initiative to Base | | | | [–21,122] | | |
| | **MAINTENANCE EQUIPMENT** | | | | | | |
| 149 | MOBILE MAINTENANCE EQUIPMENT SYSTEMS | | 1,124 | | –1,124 | | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–1,124] | | |
| | **CONSTRUCTION EQUIPMENT** | | | | | | |
| 153 | HYDRAULIC EXCAVATOR | | 3,850 | | | | 3,850 |
| 157 | HIGH MOBILITY ENGINEER EXCAVATOR (HMEE) | | 1,932 | | | | 1,932 |
| | **GENERATORS** | | | | | | |
| 164 | GENERATORS AND ASSOCIATED EQUIP | | 569 | | | | 569 |
| | **TRAINING EQUIPMENT** | | | | | | |
| 168 | TRAINING DEVICES, NONSYSTEM | | 2,700 | | –2,700 | | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–2,700] | | |
| | **TEST MEASURE AND DIG EQUIPMENT (TMD)** | | | | | | |
| 173 | INTEGRATED FAMILY OF TEST EQUIPMENT (IFTE) | | 7,500 | | –7,500 | | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–7,500] | | |
| | **OTHER SUPPORT EQUIPMENT** | | | | | | |
| 176 | RAPID EQUIPPING SOLDIER SUPPORT EQUIPMENT | | 8,500 | | 5,000 | | 13,500 |
| | Unfunded requirement | | | | [5,000] | | |
| | **TOTAL OTHER PROCUREMENT, ARMY** | | **405,575** | **339** | **172,378** | **339** | **577,953** |
| | | | | | | | |
| | **JOINT IMPROVISED EXPLOSIVE DEVICE DEFEAT FUND** | | | | | | |
| | **NETWORK ATTACK** | | | | | | |
| 001 | RAPID ACQUISITION AND THREAT RESPONSE | | 483,058 | | | | 483,058 |
| | **TOTAL JOINT IMPROVISED-THREAT DEFEAT FUND** | | **483,058** | | | | **483,058** |
| | | | | | | | |
| | **AIRCRAFT PROCUREMENT, NAVY** | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **OTHER AIRCRAFT** | | | | | | |
| 027 | STUASL0 UAV | | 3,900 | | | | 3,900 |
| | **MODIFICATION OF AIRCRAFT** | | | | | | |
| 033 | F–18 SERIES | | | 34 | 16,000 | 34 | 16,000 |
| | Unfunded requirement -ALR–67(V)3 Retrofit A and B Kits | | | [34] | [16,000] | | |
| 034 | H–53 SERIES | | 950 | | | | 950 |
| 035 | SH–60 SERIES | | 15,382 | | | | 15,382 |
| 037 | EP–3 SERIES | | 7,220 | | | | 7,220 |
| 047 | SPECIAL PROJECT AIRCRAFT | | 19,855 | | | | 19,855 |
| 051 | COMMON ECM EQUIPMENT | | 75,530 | | | | 75,530 |
| 062 | QRC | | 15,150 | | | | 15,150 |
| | **AIRCRAFT SPARES AND REPAIR PARTS** | | | | | | |
| 064 | SPARES AND REPAIR PARTS | | 18,850 | | | | 18,850 |
| | **AIRCRAFT SUPPORT EQUIP & FACILITIES** | | | | | | |
| 066 | AIRCRAFT INDUSTRIAL FACILITIES | | 463 | | | | 463 |
| | **TOTAL AIRCRAFT PROCUREMENT, NAVY** | | **157,300** | **34** | **16,000** | **34** | **173,300** |
| | | | | | | | |
| | **WEAPONS PROCUREMENT, NAVY** | | | | | | |
| | **STRATEGIC MISSILES** | | | | | | |
| 003 | TOMAHAWK | 66 | 100,086 | | | 66 | 100,086 |
| | **TACTICAL MISSILES** | | | | | | |
| 004 | AMRAAM | | | | 12,000 | | 12,000 |
| | Unfunded requirement—AIM–120 Captive Air Training Missiles Guidance sections. | | | | [12,000] | | |
| 007 | STANDARD MISSILE | 8 | 35,208 | | | 8 | 35,208 |
| 011 | HELLFIRE | 110 | 8,771 | | | 110 | 8,771 |
| 012 | LASER MAVERICK | | 5,040 | | | | 5,040 |
| | **MODIFICATION OF MISSILES** | | | | | | |
| 017 | ESSM | 1 | 1,768 | | | 1 | 1,768 |
| | **GUNS AND GUN MOUNTS** | | | | | | |
| 035 | SMALL ARMS AND WEAPONS | | 1,500 | | | | 1,500 |
| | **TOTAL WEAPONS PROCUREMENT, NAVY** | **185** | **152,373** | | **12,000** | **185** | **164,373** |

**SEC. 4102. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | **PROCUREMENT OF AMMO, NAVY & MC** | | | | | | |
| | **NAVY AMMUNITION** | | | | | | |
| 001 | GENERAL PURPOSE BOMBS | | 74,021 | | | | 74,021 |
| 002 | JDAM | 4,717 | 106,941 | | | 4,717 | 106,941 |
| 003 | AIRBORNE ROCKETS, ALL TYPES | | 1,184 | | | | 1,184 |
| 007 | AIR EXPENDABLE COUNTERMEASURES | | 15,700 | | | | 15,700 |
| 008 | JATOS | | 540 | | | | 540 |
| 012 | OTHER SHIP GUN AMMUNITION | | 13,789 | | | | 13,789 |
| 013 | SMALL ARMS & LANDING PARTY AMMO | | 1,963 | | | | 1,963 |
| 014 | PYROTECHNIC AND DEMOLITION | | 765 | | | | 765 |
| 016 | AMMUNITION LESS THAN $5 MILLION | | 866 | | | | 866 |
| | **MARINE CORPS AMMUNITION** | | | | | | |
| 019 | 60MM, ALL TYPES | | | | 11,000 | | 11,000 |
| | Unfunded requirement—Full range practice rounds | | | | [11,000] | | |
| 020 | MORTARS | | 1,290 | | | | 1,290 |
| 021 | 81MM, ALL TYPES | | | | 14,500 | | 14,500 |
| | Unfunded requirement—Full range practice rounds | | | | [14,500] | | |
| 023 | DIRECT SUPPORT MUNITIONS | | 1,355 | | | | 1,355 |
| 024 | INFANTRY WEAPONS AMMUNITION | | 1,854 | | | | 1,854 |
| 027 | ARTILLERY, ALL TYPES | | | | 17,000 | | 17,000 |
| | Unfunded requirement—HE Training Rounds | | | | [17,000] | | |
| 033 | ARTILLERY MUNITIONS | | 5,319 | | | | 5,319 |
| | **TOTAL PROCUREMENT OF AMMO, NAVY & MC** | **4,717** | **225,587** | | **42,500** | **4,717** | **268,087** |
| | **OTHER PROCUREMENT, NAVY** | | | | | | |

| | | | | |
|---|---|---|---|---|
| | **OTHER SHIPBOARD EQUIPMENT** | | | |
| 025 | UNDERWATER EOD PROGRAMS | 12,348 | –4,016 | 8,332 |
| | Realign European Reassurance Initiative to Base | | [–4,016] | |
| | **SMALL BOATS** | | | |
| 032 | STANDARD BOATS | 18,000 | | 18,000 |
| | **SHIP SONARS** | | | |
| 046 | SSN ACOUSTIC EQUIPMENT | 43,500 | –43,500 | 0 |
| | Realign European Reassurance Initiative to Base | | [–43,500] | |
| | **AVIATION ELECTRONIC EQUIPMENT** | | | |
| 078 | NAVAL MISSION PLANNING SYSTEMS | 2,550 | | 2,550 |
| | **OTHER SHORE ELECTRONIC EQUIPMENT** | | | |
| 080 | TACTICAL/MOBILE C4I SYSTEMS | 7,900 | –7,900 | 0 |
| | Realign European Reassurance Initiative to Base | | [–7,900] | |
| 081 | DCGS-N | 6,392 | –1,900 | 4,492 |
| | Realign European Reassurance Initiative to Base | | [–1,900] | |
| | **CRYPTOLOGIC EQUIPMENT** | | | |
| 101 | CRYPTOLOGIC COMMUNICATIONS EQUIP | 2,280 | | 2,280 |
| | **AIRCRAFT SUPPORT EQUIPMENT** | | | |
| 119 | AVIATION SUPPORT EQUIPMENT | 29,245 | | 29,245 |
| | **SHIP MISSILE SYSTEMS EQUIPMENT** | | | |
| 121 | SHIP MISSILE SUPPORT EQUIPMENT | 2,436 | | 2,436 |
| | **OTHER ORDNANCE SUPPORT EQUIPMENT** | | | |
| 126 | EXPLOSIVE ORDNANCE DISPOSAL EQUIP | 31,970 | | 31,970 |
| | **CIVIL ENGINEERING SUPPORT EQUIPMENT** | | | |
| 132 | GENERAL PURPOSE TRUCKS | 496 | –106 | 390 |
| | Realign European Reassurance Initiative to Base | | [–106] | |
| 134 | FIRE FIGHTING EQUIPMENT | 2,304 | | 2,304 |
| 135 | TACTICAL VEHICLES | 2,336 | | 2,336 |
| | **SUPPLY SUPPORT EQUIPMENT** | | | |
| 141 | SUPPLY EQUIPMENT | 164 | –164 | 0 |
| | Realign European Reassurance Initiative to Base | | [–164] | |
| 143 | FIRST DESTINATION TRANSPORTATION | 420 | | 420 |

**SEC. 4102. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | **COMMAND SUPPORT EQUIPMENT** | | | | | | |
| 147 | COMMAND SUPPORT EQUIPMENT | | 21,650 | | | | 21,650 |
| 152 | OPERATING FORCES SUPPORT EQUIPMENT | | 15,800 | | | | 15,800 |
| 154 | ENVIRONMENTAL SUPPORT EQUIPMENT | | 1,000 | | –1,000 | | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–1,000] | | |
| 155 | PHYSICAL SECURITY EQUIPMENT | | 15,890 | | | | 15,890 |
| | **CLASSIFIED PROGRAMS** | | | | | | |
| 161A | CLASSIFIED PROGRAMS | | 2,200 | | | | 2,200 |
| | **SPARES AND REPAIR PARTS** | | | | | | |
| 161 | SPARES AND REPAIR PARTS | | 1,178 | | | | 1,178 |
| | **TOTAL OTHER PROCUREMENT, NAVY** | | **220,059** | | **–58,586** | | **161,473** |
| | | | | | | | |
| | **PROCUREMENT, MARINE CORPS** | | | | | | |
| | **ARTILLERY AND OTHER WEAPONS** | | | | | | |
| 006 | HIGH MOBILITY ARTILLERY ROCKET SYSTEM | | 5,360 | | | | 5,360 |
| | **GUIDED MISSILES** | | | | | | |
| 011 | JAVELIN | 11 | 2,833 | | | 11 | 2,833 |
| 012 | FOLLOW ON TO SMAW | | 49 | | | | 49 |
| 013 | ANTI-ARMOR WEAPONS SYSTEM-HEAVY (AAWS-H) | | 5,024 | | | | 5,024 |
| | **REPAIR AND TEST EQUIPMENT** | | | | | | |
| 017 | REPAIR AND TEST EQUIPMENT | | 8,241 | | | | 8,241 |
| | **OTHER SUPPORT (TEL)** | | | | | | |
| 019 | MODIFICATION KITS | | 750 | | | | 750 |
| | **COMMAND AND CONTROL SYSTEM (NON-TEL)** | | | | | | |
| 020 | ITEMS UNDER $5 MILLION (COMM & ELEC) | | 200 | 374 | 20,200 | 374 | 20,400 |
| | Unfunded requirement—night optics for sniper rifles | | | [374] | [20,200] | | |

| Line | Item | Qty | Amount | Qty | Amount | Qty | Amount |
|---|---|---|---|---|---|---|---|
| | **RADAR + EQUIPMENT (NON-TEL)** | | | | | | |
| 023 | GROUND/AIR TASK ORIENTED RADAR (G/ATOR) | | | 1 | 39,200 | 1 | 39,200 |
| | Unfunded requirement—CEG Shelters | | | | [1,500] | | |
| | Unfunded requirement—G/ATOR acceleration | | | [1] | [37,700] | | |
| 024 | RQ–21 UAS | | 8,400 | | | | 8,400 |
| | **INTELL/COMM EQUIPMENT (NON-TEL)** | | | | | | |
| 026 | FIRE SUPPORT SYSTEM | | 50 | | | | 50 |
| 027 | INTELLIGENCE SUPPORT EQUIPMENT | | 3,000 | | | | 3,000 |
| 029 | UNMANNED AIR SYSTEMS (INTEL) | | | 10 | 16,600 | 10 | 16,600 |
| | Unfunded requirement – UUNS for long endurance small UAS | | | [10] | [16,600] | | |
| | **OTHER SUPPORT (NON-TEL)** | | | | | | |
| 037 | COMMAND POST SYSTEMS | | 5,777 | | 70,000 | | 75,777 |
| | Additional NOTM-A Systems for emerging operational requirements | | | | [70,000] | | |
| 038 | RADIO SYSTEMS | | 4,590 | | | | 4,590 |
| | **ENGINEER AND OTHER EQUIPMENT** | | | | | | |
| 053 | EOD SYSTEMS | | 21,000 | | | | 21,000 |
| | **SPARES AND REPAIR PARTS** | | | | | | |
| 062 | SPARES AND REPAIR PARTS | | | | 3,129 | | 3,129 |
| | Unfunded requirement—G/ATOR spares | | | | [3,129] | | |
| | **TOTAL PROCUREMENT, MARINE CORPS** | **11** | **65,274** | **385** | **149,129** | **396** | **214,403** |
| | | | | | | | |
| | **AIRCRAFT PROCUREMENT, AIR FORCE** | | | | | | |
| | **OTHER AIRCRAFT** | | | | | | |
| 017 | MQ–9 | 16 | 271,080 | | | 16 | 271,080 |
| | **AIRLIFT AIRCRAFT** | | | | | | |
| 033 | C–17A | | 26,850 | | | | 26,850 |
| | **OTHER AIRCRAFT** | | | | | | |
| 048 | C–130J MODS | | 8,400 | | | | 8,400 |
| 051 | COMPASS CALL MODS | | 56,720 | | | | 56,720 |
| 056 | E–8 | | 3,000 | | | | 3,000 |
| 061 | RQ–4 MODS | | | 4 | 39,600 | 4 | 39,600 |
| | Unfunded requirement—Tactical Field Terminal Antennaes | | | [4] | [39,600] | | |

SEC. 4102. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS
(In Thousands of Dollars)

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 062 | HC/MC–130 MODIFICATIONS | | 153,080 | | | | 153,080 |
| 063 | OTHER AIRCRAFT | | 10,381 | | | | 10,381 |
| 065 | MQ–9 MODS | | 56,400 | | | | 56,400 |
| | **AIRCRAFT SPARES AND REPAIR PARTS** | | | | | | |
| 067 | INITIAL SPARES/REPAIR PARTS | | 129,450 | | | | 129,450 |
| | **COMMON SUPPORT EQUIPMENT** | | | | | | |
| 068 | AIRCRAFT REPLACEMENT SUPPORT EQUIP | | 25,417 | | –25,417 | | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–25,417] | | |
| | **TOTAL AIRCRAFT PROCUREMENT, AIR FORCE** | **16** | **740,778** | **4** | **14,183** | **20** | **754,961** |
| | | | | | | | |
| | **MISSILE PROCUREMENT, AIR FORCE** | | | | | | |
| | **TACTICAL** | | | | | | |
| 006 | PREDATOR HELLFIRE MISSILE | 3,230 | 294,480 | | | 3,230 | 294,480 |
| 007 | SMALL DIAMETER BOMB | 2,273 | 90,920 | | | 2,273 | 90,920 |
| | **CLASS IV** | | | | | | |
| 011 | AGM–65D MAVERICK | | 10,000 | | | | 10,000 |
| | **TOTAL MISSILE PROCUREMENT, AIR FORCE** | **5,503** | **395,400** | | | **5,503** | **395,400** |
| | | | | | | | |
| | **SPACE PROCUREMENT, AIR FORCE** | | | | | | |
| | **SPACE PROGRAMS** | | | | | | |
| 010 | MILSATCOM | | 2,256 | | | | 2,256 |
| | **TOTAL SPACE PROCUREMENT, AIR FORCE** | | **2,256** | | | | **2,256** |
| | | | | | | | |
| | **PROCUREMENT OF AMMUNITION, AIR FORCE** | | | | | | |
| | **ROCKETS** | | | | | | |
| 001 | ROCKETS | | 49,050 | | | | 49,050 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **CARTRIDGES** | | | | | | |
| 002 | CARTRIDGES | | 11,384 | | | | 11,384 |
| | **BOMBS** | | | | | | |
| 006 | JOINT DIRECT ATTACK MUNITION | 16,990 | 390,577 | | | 16,990 | 390,577 |
| | **FLARES** | | | | | | |
| 015 | FLARES | | 3,498 | | | | 3,498 |
| | **FUZES** | | | | | | |
| 016 | FUZES | | 47,000 | | | | 47,000 |
| | **TOTAL PROCUREMENT OF AMMUNITION, AIR FORCE** | **16,990** | **501,509** | | | **16,990** | **501,509** |
| | | | | | | | |
| | **OTHER PROCUREMENT, AIR FORCE** | | | | | | |
| | **PASSENGER CARRYING VEHICLES** | | | | | | |
| 001 | PASSENGER CARRYING VEHICLES | | 3,855 | 101 | 4,522 | 101 | 8,377 |
| | Realign European Reassurance Initiative to Base | | | | [–1,350] | | |
| | Unfunded requirement | | | [101] | [5,872] | | |
| | **CARGO AND UTILITY VEHICLES** | | | | | | |
| 002 | MEDIUM TACTICAL VEHICLE | | | 113 | 13,300 | 113 | 13,300 |
| | Unfunded requirement | | | [113] | [13,300] | | |
| 004 | CARGO AND UTILITY VEHICLES | | 1,882 | 2447 | 98,796 | 2,447 | 100,678 |
| | Unfunded requirement | | | [2,447] | [98,796] | | |
| | **SPECIAL PURPOSE VEHICLES** | | | | | | |
| 005 | SECURITY AND TACTICAL VEHICLES | | 1,100 | 60 | 9,964 | 60 | 11,064 |
| | Unfunded requirement | | | [60] | [9,964] | | |
| 006 | SPECIAL PURPOSE VEHICLES | | 32,479 | 60 | –21,214 | 60 | 11,265 |
| | Realign European Reassurance Initiative to Base | | | | [–31,821] | | |
| | Unfunded requirement | | | [60] | [10,607] | | |
| | **FIRE FIGHTING EQUIPMENT** | | | | | | |
| 007 | FIRE FIGHTING/CRASH RESCUE VEHICLES | | 22,583 | | –22,583 | | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–22,583] | | |
| | **MATERIALS HANDLING EQUIPMENT** | | | | | | |
| 008 | MATERIALS HANDLING VEHICLES | | 5,353 | 469 | 75,031 | 469 | 80,384 |
| | Realign European Reassurance Initiative to Base | | | | [–4,026] | | |

**SEC. 4102. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | Unfunded requirement | | | [469] | [79,057] | | |
| | **BASE MAINTENANCE SUPPORT** | | | | | | |
| 009 | RUNWAY SNOW REMOV & CLEANING EQUIP | | 11,315 | 44 | –1,040 | 44 | 10,275 |
| | Realign European Reassurance Initiative to Base | | | | [–9,161] | | |
| | Unfunded requirement | | | [44] | [8,121] | | |
| 010 | BASE MAINTENANCE SUPPORT VEHICLES | | 40,451 | 68 | –26,462 | 68 | 13,989 |
| | Realign European Reassurance Initiative to Base | | | | [–39,692] | | |
| | Unfunded requirement | | | [68] | [13,230] | | |
| | **INTELLIGENCE PROGRAMS** | | | | | | |
| 013 | INTERNATIONAL INTEL TECH & ARCHITECTURES | | 8,873 | | | | 8,873 |
| 015 | INTELLIGENCE COMM EQUIPMENT | | 2,000 | | | | 2,000 |
| | **ELECTRONICS PROGRAMS** | | | | | | |
| 016 | AIR TRAFFIC CONTROL & LANDING SYS | | 56,500 | 1 | 38,700 | 1 | 95,200 |
| | Unfunded requirement—deployable RAPCON systems | | | [1] | [16,500] | | |
| | Unfunded requirement—digital air traffic control radios | | | | [6,000] | | |
| | Unfunded requirement—D-ILS | | | | [16,200] | | |
| 018 | BATTLE CONTROL SYSTEM—FIXED | | | | 1,400 | | 1,400 |
| | Unfunded requirement | | | | [1,400] | | |
| 019 | THEATER AIR CONTROL SYS IMPROVEMENTS | | 4,970 | | | | 4,970 |
| | **SPCL COMM-ELECTRONICS PROJECTS** | | | | | | |
| 029 | AIR FORCE PHYSICAL SECURITY SYSTEM | | 3,000 | | 34,500 | | 37,500 |
| | Unfunded requirement—Intrusion Detection Systems | | | | [18,000] | | |
| | Unfunded requirement—PL2 BPSS systems | | | | [16,500] | | |
| | **ORGANIZATION AND BASE** | | | | | | |
| 048 | BASE COMM INFRASTRUCTURE | | 55,000 | | –55,000 | | 0 |
| | Realign European Reassurance Initiative to Base | | | | [–55,000] | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | **PERSONAL SAFETY & RESCUE EQUIP** | | | | | |
| 051 | ITEMS LESS THAN $5 MILLION | 8,469 | | 63,400 | | 71,869 |
| | Unfunded requirement—battlefield airman combat equipment | | | [59,400] | | |
| | Unfunded requirements | | | [4,000] | | |
| | **BASE SUPPORT EQUIPMENT** | | | | | |
| 053 | BASE PROCURED EQUIPMENT | 7,500 | | −7,500 | | 0 |
| | Realign European Reassurance Initiative to Base | | | [−7,500] | | |
| 054 | ENGINEERING AND EOD EQUIPMENT | 80,427 | | 32,550 | | 112,977 |
| | Unfunded requirement | | | [32,550] | | |
| 055 | MOBILITY EQUIPMENT | | | 37,000 | | 37,000 |
| | Unfunded requirement—Basic Expeditionary Airfield Resources | | | [37,000] | | |
| 056 | ITEMS LESS THAN $5 MILLION | 110,405 | | −104,015 | | 6,390 |
| | Realign European Reassurance Initiative to Base | | | [−104,015] | | |
| | **SPECIAL SUPPORT PROJECTS** | | | | | |
| 058 | DARP RC135 | 700 | | | | 700 |
| 059 | DCGS-AF | 9,200 | | 91,200 | | 100,400 |
| | Unfunded requirement | | | [91,200] | | |
| | **CLASSIFIED PROGRAMS** | | | | | |
| 062A | CLASSIFIED PROGRAMS | 3,542,825 | | | | 3,542,825 |
| | **TOTAL OTHER PROCUREMENT, AIR FORCE** | **4,008,887** | **3,363** | **262,549** | **3,363** | **4,271,436** |
| | | | | | | |
| | **PROCUREMENT, DEFENSE-WIDE** | | | | | |
| | **MAJOR EQUIPMENT, DISA** | | | | | |
| 008 | TELEPORT PROGRAM | 1,979 | | | | 1,979 |
| 018 | DEFENSE INFORMATION SYSTEMS NETWORK | 12,000 | | | | 12,000 |
| | **MAJOR EQUIPMENT, MISSILE DEFENSE AGENCY** | | | | | |
| 034 | IRON DOME | | | 50,000 | | 50,000 |
| | Additional funds for Iron Dome Tamir interceptors | | | [50,000] | | |
| | **CLASSIFIED PROGRAMS** | | | | | |
| 045A | CLASSIFIED PROGRAMS | 43,653 | | | | 43,653 |
| | **AVIATION PROGRAMS** | | | | | |
| 046 | MANNED ISR | 15,900 | | | | 15,900 |

**SEC. 4102. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| 047 | MC–12 | | 20,000 | | | | 20,000 |
| 050 | UNMANNED ISR | | 38,933 | | | | 38,933 |
| 051 | NON-STANDARD AVIATION | | 9,600 | | | | 9,600 |
| 052 | U–28 | | 8,100 | | | | 8,100 |
| 053 | MH–47 CHINOOK | | 10,270 | | | | 10,270 |
| 057 | MQ–9 UNMANNED AERIAL VEHICLE | | 19,780 | | | | 19,780 |
| 061 | C–130 MODIFICATIONS | | 3,750 | | | | 3,750 |
| | **AMMUNITION PROGRAMS** | | | | | | |
| 063 | ORDNANCE ITEMS <$5M | | 62,643 | | | | 62,643 |
| | **OTHER PROCUREMENT PROGRAMS** | | | | | | |
| 064 | INTELLIGENCE SYSTEMS | | 12,000 | | | | 12,000 |
| 069 | TACTICAL VEHICLES | | 38,527 | | | | 38,527 |
| 070 | WARRIOR SYSTEMS <$5M | | 20,215 | | | | 20,215 |
| 073 | OPERATIONAL ENHANCEMENTS INTELLIGENCE | | 7,134 | | | | 7,134 |
| 075 | OPERATIONAL ENHANCEMENTS | | 193,542 | | 17,525 | | 211,067 |
| | Unfunded requirement- Joint Task Force Platform Expansion | | | | [15,900] | | |
| | Unfunded requirement- Publicly Available Information (PAI) Capability Acceleration. | | | | [1,625] | | |
| | **TOTAL PROCUREMENT, DEFENSE-WIDE** | | **518,026** | | **67,525** | | **585,551** |
| | | | | | | | |
| | **NATIONAL GUARD AND RESERVE EQUIPMENT** | | | | | | |
| | **UNDISTRIBUTED** | | | | | | |
| 007 | UNDISTRIBUTED | | | | 500,000 | | 500,000 |
| | Program increase | | | | [500,000] | | |
| | **TOTAL NATIONAL GUARD AND RESERVE EQUIPMENT** | | | | **500,000** | | **500,000** |

| | TOTAL PROCUREMENT | 32,559 | 10,244,626 | 9,630 | 1,671,274 | 42,189 | 11,915,900 |
|---|---|---|---|---|---|---|---|

## SEC. 4103. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS FOR BASE REQUIREMENTS.

**SEC. 4103. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS FOR BASE REQUIREMENTS**
(In Thousands of Dollars)

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | **SHIPBUILDING AND CONVERSION, NAVY** | | | | | | |
| | **OTHER WARSHIPS** | | | | | | |
| 003 | ADVANCE PROCUREMENT (CY) | | | | 200,000 | | 200,000 |
| | CVN 81 AP | | | | [200,000] | | |
| 009 | DDG–51 | | | 1 | 1,896,800 | 1 | 1,896,800 |
| | DDG | | | [1] | [1,862,800] | | |
| | Ship Signal Exploitation Equipment | | | | [34,000] | | |
| 010 | ADVANCE PROCUREMENT (CY) | | | | 45,000 | | 45,000 |
| | DDG AP | | | | [45,000] | | |
| 011 | LITTORAL COMBAT SHIP | | | 2 | 1,033,000 | 2 | 1,033,000 |
| | LCS | | | [2] | [1,033,000] | | |
| | **AMPHIBIOUS SHIPS** | | | | | | |
| 012A | AMPHIBIOUS SHIP REPLACEMENT LX(R) ADVANCE PROCUREMENT (CY) | | | | 100,000 | | 100,000 |
| | Program increase | | | | [100,000] | | |
| 013 | LPD–17 | | | 1 | 1,786,000 | 1 | 1,786,000 |
| | LPD–30 | | | [1] | [1,786,000] | | |
| 014 | EXPEDITIONARY SEA BASE (ESB) | | | 1 | 635,000 | 1 | 635,000 |
| | ESB | | | [1] | [635,000] | | |
| | **AUXILIARIES, CRAFT AND PRIOR YR PROGRAM COST** | | | | | | |
| 025 | SHIP TO SHORE CONNECTOR | | | 5 | 312,000 | 5 | 312,000 |
| | SSC | | | [5] | [312,000] | | |
| 026 | SERVICE CRAFT | | | | 39,000 | | 39,000 |

SEC. 4103. PROCUREMENT FOR OVERSEAS CONTINGENCY OPERATIONS FOR BASE REQUIREMENTS
(In Thousands of Dollars)

| Line | Item | FY 2018 Request | | House Change | | House Authorized | |
|---|---|---|---|---|---|---|---|
| | | Qty | Cost | Qty | Cost | Qty | Cost |
| | Berthing Barge | | | | [39,000] | | |
| | **TOTAL SHIPBUILDING AND CONVERSION, NAVY** | | | **10** | **6,046,800** | **10** | **6,046,800** |
| | **TOTAL PROCUREMENT** | | | **10** | **6,046,800** | **10** | **6,046,800** |

# TITLE XLII—RESEARCH, DEVELOPMENT, TEST, AND EVALUATION

## SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION.

SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| | | **RESEARCH, DEVELOPMENT, TEST & EVAL, ARMY** | | | |
| | | **BASIC RESEARCH** | | | |
| 001 | 0601101A | IN-HOUSE LABORATORY INDEPENDENT RESEARCH | 12,010 | | 12,010 |
| 002 | 0601102A | DEFENSE RESEARCH SCIENCES | 263,590 | | 263,590 |
| 003 | 0601103A | UNIVERSITY RESEARCH INITIATIVES | 67,027 | | 67,027 |
| 004 | 0601104A | UNIVERSITY AND INDUSTRY RESEARCH CENTERS | 87,395 | | 87,395 |
| | | **SUBTOTAL BASIC RESEARCH** | **430,022** | | **430,022** |

| | | | | | |
|---|---|---|---|---|---|
| | | **APPLIED RESEARCH** | | | |
| 005 | 0602105A | MATERIALS TECHNOLOGY | 29,640 | | 29,640 |
| 006 | 0602120A | SENSORS AND ELECTRONIC SURVIVABILITY | 35,730 | | 35,730 |
| 007 | 0602122A | TRACTOR HIP | 8,627 | | 8,627 |
| 008 | 0602211A | AVIATION TECHNOLOGY | 66,086 | | 66,086 |
| 009 | 0602270A | ELECTRONIC WARFARE TECHNOLOGY | 27,144 | | 27,144 |
| 010 | 0602303A | MISSILE TECHNOLOGY | 43,742 | | 43,742 |
| 011 | 0602307A | ADVANCED WEAPONS TECHNOLOGY | 22,785 | | 22,785 |
| 012 | 0602308A | ADVANCED CONCEPTS AND SIMULATION | 28,650 | | 28,650 |
| 013 | 0602601A | COMBAT VEHICLE AND AUTOMOTIVE TECHNOLOGY | 67,232 | | 67,232 |
| 014 | 0602618A | BALLISTICS TECHNOLOGY | 85,309 | | 85,309 |
| 015 | 0602622A | CHEMICAL, SMOKE AND EQUIPMENT DEFEATING TECHNOLOGY | 4,004 | | 4,004 |
| 016 | 0602623A | JOINT SERVICE SMALL ARMS PROGRAM | 5,615 | | 5,615 |
| 017 | 0602624A | WEAPONS AND MUNITIONS TECHNOLOGY | 41,455 | | 41,455 |
| 018 | 0602705A | ELECTRONICS AND ELECTRONIC DEVICES | 58,352 | | 58,352 |
| 019 | 0602709A | NIGHT VISION TECHNOLOGY | 34,723 | | 34,723 |
| 020 | 0602712A | COUNTERMINE SYSTEMS | 26,190 | | 26,190 |
| 021 | 0602716A | HUMAN FACTORS ENGINEERING TECHNOLOGY | 24,127 | | 24,127 |
| 022 | 0602720A | ENVIRONMENTAL QUALITY TECHNOLOGY | 21,678 | | 21,678 |
| 023 | 0602782A | COMMAND, CONTROL, COMMUNICATIONS TECHNOLOGY | 33,123 | | 33,123 |
| 024 | 0602783A | COMPUTER AND SOFTWARE TECHNOLOGY | 14,041 | | 14,041 |
| 025 | 0602784A | MILITARY ENGINEERING TECHNOLOGY | 67,720 | | 67,720 |
| 026 | 0602785A | MANPOWER/PERSONNEL/TRAINING TECHNOLOGY | 20,216 | | 20,216 |
| 027 | 0602786A | WARFIGHTER TECHNOLOGY | 39,559 | 5,000 | 44,559 |
| | | Program increase | | [5,000] | |
| 028 | 0602787A | MEDICAL TECHNOLOGY | 83,434 | | 83,434 |
| | | **SUBTOTAL APPLIED RESEARCH** | **889,182** | **5,000** | **894,182** |
| | | | | | |
| | | **ADVANCED TECHNOLOGY DEVELOPMENT** | | | |
| 029 | 0603001A | WARFIGHTER ADVANCED TECHNOLOGY | 44,863 | | 44,863 |
| 030 | 0603002A | MEDICAL ADVANCED TECHNOLOGY | 67,780 | | 67,780 |
| 031 | 0603003A | AVIATION ADVANCED TECHNOLOGY | 160,746 | | 160,746 |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 032 | 0603004A | WEAPONS AND MUNITIONS ADVANCED TECHNOLOGY | 84,079 | | 84,079 |
| 033 | 0603005A | COMBAT VEHICLE AND AUTOMOTIVE ADVANCED TECHNOLOGY | 125,537 | | 125,537 |
| 034 | 0603006A | SPACE APPLICATION ADVANCED TECHNOLOGY | 12,231 | | 12,231 |
| 035 | 0603007A | MANPOWER, PERSONNEL AND TRAINING ADVANCED TECHNOLOGY | 6,466 | | 6,466 |
| 036 | 0603009A | TRACTOR HIKE | 28,552 | | 28,552 |
| 037 | 0603015A | NEXT GENERATION TRAINING & SIMULATION SYSTEMS | 16,434 | | 16,434 |
| 039 | 0603125A | COMBATING TERRORISM—TECHNOLOGY DEVELOPMENT | 26,903 | | 26,903 |
| 040 | 0603130A | TRACTOR NAIL | 4,880 | | 4,880 |
| 041 | 0603131A | TRACTOR EGGS | 4,326 | | 4,326 |
| 042 | 0603270A | ELECTRONIC WARFARE TECHNOLOGY | 31,296 | | 31,296 |
| 043 | 0603313A | MISSILE AND ROCKET ADVANCED TECHNOLOGY | 62,850 | 10,000 | 72,850 |
| | | Simulation upgrades for land based anti-ship missile development | | [10,000] | |
| 044 | 0603322A | TRACTOR CAGE | 12,323 | | 12,323 |
| 045 | 0603461A | HIGH PERFORMANCE COMPUTING MODERNIZATION PROGRAM | 182,331 | | 182,331 |
| 046 | 0603606A | LANDMINE WARFARE AND BARRIER ADVANCED TECHNOLOGY | 17,948 | | 17,948 |
| 047 | 0603607A | JOINT SERVICE SMALL ARMS PROGRAM | 5,796 | | 5,796 |
| 048 | 0603710A | NIGHT VISION ADVANCED TECHNOLOGY | 47,135 | | 47,135 |
| 049 | 0603728A | ENVIRONMENTAL QUALITY TECHNOLOGY DEMONSTRATIONS | 10,421 | | 10,421 |
| 050 | 0603734A | MILITARY ENGINEERING ADVANCED TECHNOLOGY | 32,448 | | 32,448 |
| 051 | 0603772A | ADVANCED TACTICAL COMPUTER SCIENCE AND SENSOR TECHNOLOGY | 52,206 | | 52,206 |
| 052 | 0603794A | C3 ADVANCED TECHNOLOGY | 33,426 | | 33,426 |
| | | **SUBTOTAL ADVANCED TECHNOLOGY DEVELOPMENT** | **1,070,977** | **10,000** | **1,080,977** |
| | | | | | |
| | | **ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | | | |
| 053 | 0603305A | ARMY MISSLE DEFENSE SYSTEMS INTEGRATION | 9,634 | | 9,634 |
| 055 | 0603327A | AIR AND MISSILE DEFENSE SYSTEMS ENGINEERING | 33,949 | 15,000 | 48,949 |
| | | Realign European Reassurance Initiative to Base | | [15,000] | |

| | | | | | |
|---|---|---|---|---|---|
| 056 | 0603619A | LANDMINE WARFARE AND BARRIER—ADV DEV | 72,909 | | 72,909 |
| 057 | 0603627A | SMOKE, OBSCURANT AND TARGET DEFEATING SYS-ADV DEV | 7,135 | | 7,135 |
| 058 | 0603639A | TANK AND MEDIUM CALIBER AMMUNITION | 41,452 | 2,450 | 43,902 |
| | | Unfunded requirement—RF countermeasures | | [2,450] | |
| 059 | 0603645A | ARMORED SYSTEM MODERNIZATION—ADV DEV | 32,739 | 22,000 | 54,739 |
| | | Unfunded requirement | | [22,000] | |
| 060 | 0603747A | SOLDIER SUPPORT AND SURVIVABILITY | 10,157 | | 10,157 |
| 061 | 0603766A | TACTICAL ELECTRONIC SURVEILLANCE SYSTEM—ADV DEV | 27,733 | 1,620 | 29,353 |
| | | Unfunded requirement | | [1,620] | |
| 062 | 0603774A | NIGHT VISION SYSTEMS ADVANCED DEVELOPMENT | 12,347 | | 12,347 |
| 063 | 0603779A | ENVIRONMENTAL QUALITY TECHNOLOGY—DEM/VAL | 10,456 | | 10,456 |
| 064 | 0603790A | NATO RESEARCH AND DEVELOPMENT | 2,588 | | 2,588 |
| 065 | 0603801A | AVIATION—ADV DEV | 14,055 | | 14,055 |
| 066 | 0603804A | LOGISTICS AND ENGINEER EQUIPMENT—ADV DEV | 35,333 | | 35,333 |
| 067 | 0603807A | MEDICAL SYSTEMS—ADV DEV | 33,491 | | 33,491 |
| 068 | 0603827A | SOLDIER SYSTEMS—ADVANCED DEVELOPMENT | 20,239 | 25,000 | 45,239 |
| | | Enhanced lightweight body armor and combat helmets technology | | [25,000] | |
| 069 | 0604017A | ROBOTICS DEVELOPMENT | 39,608 | | 39,608 |
| 070 | 0604100A | ANALYSIS OF ALTERNATIVES | 9,921 | | 9,921 |
| 071 | 0604114A | LOWER TIER AIR MISSILE DEFENSE (LTAMD) SENSOR | 76,728 | | 76,728 |
| 072 | 0604115A | TECHNOLOGY MATURATION INITIATIVES | 115,221 | –15,000 | 100,221 |
| | | Program Reduction | | [–15,000] | |
| 073 | 0604117A | MANEUVER—SHORT RANGE AIR DEFENSE (M-SHORAD) | 20,000 | | 20,000 |
| 074 | 0604118A | TRACTOR BEAM | 10,400 | | 10,400 |
| 075 | 0604120A | ASSURED POSITIONING, NAVIGATION AND TIMING (PNT) | 164,967 | | 164,967 |
| 076 | 0604121A | SYNTHETIC TRAINING ENVIRONMENT REFINEMENT & PROTOTYPING | 1,600 | | 1,600 |
| 077 | 0604319A | INDIRECT FIRE PROTECTION CAPABILITY INCREMENT 2–INTERCEPT (IFPC2) | 11,303 | | 11,303 |
| 078 | 0305251A | CYBERSPACE OPERATIONS FORCES AND FORCE SUPPORT | 56,492 | | 56,492 |
| 079 | 1206308A | ARMY SPACE SYSTEMS INTEGRATION | 20,432 | | 20,432 |
| | | **SUBTOTAL ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | **890,889** | **51,070** | **941,959** |
| | | | | | |
| | | **SYSTEM DEVELOPMENT & DEMONSTRATION** | | | |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 080 | 0604201A | AIRCRAFT AVIONICS | 30,153 | | 30,153 |
| 081 | 0604270A | ELECTRONIC WARFARE DEVELOPMENT | 71,671 | | 71,671 |
| 083 | 0604290A | MID-TIER NETWORKING VEHICULAR RADIO (MNVR) | 10,589 | | 10,589 |
| 084 | 0604321A | ALL SOURCE ANALYSIS SYSTEM | 4,774 | | 4,774 |
| 085 | 0604328A | TRACTOR CAGE | 17,252 | | 17,252 |
| 086 | 0604601A | INFANTRY SUPPORT WEAPONS | 87,643 | 1,600 | 89,243 |
| | | Program increase—soldier enhancement program | | [3,000] | |
| | | Program reduction- obligation delays | | [–5,000] | |
| | | Unfunded requirement—air soldier system | | [3,600] | |
| 087 | 0604604A | MEDIUM TACTICAL VEHICLES | 6,039 | | 6,039 |
| 088 | 0604611A | JAVELIN | 21,095 | | 21,095 |
| 089 | 0604622A | FAMILY OF HEAVY TACTICAL VEHICLES | 10,507 | | 10,507 |
| 090 | 0604633A | AIR TRAFFIC CONTROL | 3,536 | | 3,536 |
| 092 | 0604642A | LIGHT TACTICAL WHEELED VEHICLES | 7,000 | | 7,000 |
| 093 | 0604645A | ARMORED SYSTEMS MODERNIZATION (ASM)—ENG DEV | 36,242 | | 36,242 |
| 094 | 0604710A | NIGHT VISION SYSTEMS—ENG DEV | 108,504 | 17,500 | 126,004 |
| | | Unfunded requirement | | [17,500] | |
| 095 | 0604713A | COMBAT FEEDING, CLOTHING, AND EQUIPMENT | 3,702 | | 3,702 |
| 096 | 0604715A | NON-SYSTEM TRAINING DEVICES—ENG DEV | 43,575 | | 43,575 |
| 097 | 0604741A | AIR DEFENSE COMMAND, CONTROL AND INTELLIGENCE—ENG DEV | 28,726 | | 28,726 |
| 098 | 0604742A | CONSTRUCTIVE SIMULATION SYSTEMS DEVELOPMENT | 18,562 | | 18,562 |
| 099 | 0604746A | AUTOMATIC TEST EQUIPMENT DEVELOPMENT | 8,344 | | 8,344 |
| 100 | 0604760A | DISTRIBUTIVE INTERACTIVE SIMULATIONS (DIS)—ENG DEV | 11,270 | | 11,270 |
| 101 | 0604768A | BRILLIANT ANTI-ARMOR SUBMUNITION (BAT) | 10,000 | | 10,000 |
| 102 | 0604780A | COMBINED ARMS TACTICAL TRAINER (CATT) CORE | 18,566 | | 18,566 |
| 103 | 0604798A | BRIGADE ANALYSIS, INTEGRATION AND EVALUATION | 145,360 | | 145,360 |
| 104 | 0604802A | WEAPONS AND MUNITIONS—ENG DEV | 145,232 | 12,178 | 157,410 |

| | | | | | |
|---|---|---|---|---|---|
| | | Unfunded requirement | | [8,000] | |
| | | Unfunded requirement—40mm low velocity M320 cartridge | | [4,178] | |
| 105 | 0604804A | LOGISTICS AND ENGINEER EQUIPMENT—ENG DEV | 90,965 | 2,000 | 92,965 |
| | | Next generation vehicle camouflage technology | | [2,000] | |
| 106 | 0604805A | COMMAND, CONTROL, COMMUNICATIONS SYSTEMS—ENG DEV | 9,910 | | 9,910 |
| 107 | 0604807A | MEDICAL MATERIEL/MEDICAL BIOLOGICAL DEFENSE EQUIPMENT—ENG DEV | 39,238 | | 39,238 |
| 108 | 0604808A | LANDMINE WARFARE/BARRIER—ENG DEV | 34,684 | | 34,684 |
| 109 | 0604818A | ARMY TACTICAL COMMAND & CONTROL HARDWARE & SOFTWARE | 164,409 | 24,000 | 188,409 |
| | | Unfunded requirement | | [5,000] | |
| | | Unfunded requirement—Assured Communications | | [19,000] | |
| 110 | 0604820A | RADAR DEVELOPMENT | 32,968 | | 32,968 |
| 111 | 0604822A | GENERAL FUND ENTERPRISE BUSINESS SYSTEM (GFEBS) | 49,554 | | 49,554 |
| 112 | 0604823A | FIREFINDER | 45,605 | | 45,605 |
| 113 | 0604827A | SOLDIER SYSTEMS—WARRIOR DEM/VAL | 16,127 | 7,000 | 23,127 |
| | | Program increase- soldier power development initiatives | | [7,000] | |
| 114 | 0604852A | SUITE OF SURVIVABILITY ENHANCEMENT SYSTEMS—EMD | 98,600 | 35,000 | 133,600 |
| | | Unfunded requirements | | [35,000] | |
| 115 | 0604854A | ARTILLERY SYSTEMS—EMD | 1,972 | 2,000 | 3,972 |
| | | Unfunded requirement—IT3 demonstrator | | [2,000] | |
| 116 | 0605013A | INFORMATION TECHNOLOGY DEVELOPMENT | 81,776 | | 81,776 |
| 117 | 0605018A | INTEGRATED PERSONNEL AND PAY SYSTEM-ARMY (IPPS-A) | 172,361 | | 172,361 |
| 118 | 0605028A | ARMORED MULTI-PURPOSE VEHICLE (AMPV) | 199,778 | | 199,778 |
| 119 | 0605029A | INTEGRATED GROUND SECURITY SURVEILLANCE RESPONSE CAPABILITY (IGSSR-C) | 4,418 | | 4,418 |
| 120 | 0605030A | JOINT TACTICAL NETWORK CENTER (JTNC) | 15,877 | | 15,877 |
| 121 | 0605031A | JOINT TACTICAL NETWORK (JTN) | 44,150 | | 44,150 |
| 122 | 0605032A | TRACTOR TIRE | 34,670 | 78,900 | 113,570 |
| | | Unfunded requirement | | [78,900] | |
| 123 | 0605033A | GROUND-BASED OPERATIONAL SURVEILLANCE SYSTEM—EXPEDITIONARY (GBOSS-E) | 5,207 | | 5,207 |
| 124 | 0605034A | TACTICAL SECURITY SYSTEM (TSS) | 4,727 | | 4,727 |
| 125 | 0605035A | COMMON INFRARED COUNTERMEASURES (CIRCM) | 105,778 | | 105,778 |
| 126 | 0605036A | COMBATING WEAPONS OF MASS DESTRUCTION (CWMD) | 6,927 | | 6,927 |
| 127 | 0605037A | EVIDENCE COLLECTION AND DETAINEE PROCESSING | 214 | | 214 |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 128 | 0605038A | NUCLEAR BIOLOGICAL CHEMICAL RECONNAISSANCE VEHICLE (NBCRV) SENSOR SUITE | 16,125 | | 16,125 |
| 129 | 0605041A | DEFENSIVE CYBER TOOL DEVELOPMENT | 55,165 | | 55,165 |
| 130 | 0605042A | TACTICAL NETWORK RADIO SYSTEMS (LOW-TIER) | 20,076 | | 20,076 |
| 131 | 0605047A | CONTRACT WRITING SYSTEM | 20,322 | | 20,322 |
| 132 | 0605049A | MISSILE WARNING SYSTEM MODERNIZATION (MWSM) | 55,810 | | 55,810 |
| 133 | 0605051A | AIRCRAFT SURVIVABILITY DEVELOPMENT | 30,879 | | 30,879 |
| 134 | 0605052A | INDIRECT FIRE PROTECTION CAPABILITY INC 2—BLOCK 1 | 175,069 | | 175,069 |
| 135 | 0605053A | GROUND ROBOTICS | 70,760 | | 70,760 |
| 137 | 0605380A | AMF JOINT TACTICAL RADIO SYSTEM (JTRS) | 8,965 | | 8,965 |
| 138 | 0605450A | JOINT AIR-TO-GROUND MISSILE (JAGM) | 34,626 | | 34,626 |
| 140 | 0605457A | ARMY INTEGRATED AIR AND MISSILE DEFENSE (AIAMD) | 336,420 | –84,100 | 252,320 |
| | | Program Reduction | | [–84,100] | |
| 143 | 0605766A | NATIONAL CAPABILITIES INTEGRATION (MIP) | 6,882 | 2,500 | 9,382 |
| | | Unfunded requirement | | [2,500] | |
| 144 | 0605812A | JOINT LIGHT TACTICAL VEHICLE (JLTV) ENGINEERING AND MANUFACTURING DEVELOPMENT PH | 23,467 | | 23,467 |
| 145 | 0605830A | AVIATION GROUND SUPPORT EQUIPMENT | 6,930 | | 6,930 |
| 146 | 0210609A | PALADIN INTEGRATED MANAGEMENT (PIM) | 6,112 | | 6,112 |
| 147 | 0303032A | TROJAN—RH12 | 4,431 | | 4,431 |
| 150 | 0304270A | ELECTRONIC WARFARE DEVELOPMENT | 14,616 | | 14,616 |
| 151 | 1205117A | TRACTOR BEARS | 17,928 | | 17,928 |
| | | **SUBTOTAL SYSTEM DEVELOPMENT & DEMONSTRATION** | **3,012,840** | **98,578** | **3,111,418** |
| | | | | | |
| | | **RDT&E MANAGEMENT SUPPORT** | | | |
| 152 | 0604256A | THREAT SIMULATOR DEVELOPMENT | 22,862 | | 22,862 |
| 153 | 0604258A | TARGET SYSTEMS DEVELOPMENT | 13,902 | | 13,902 |
| 154 | 0604759A | MAJOR T&E INVESTMENT | 102,901 | | 102,901 |
| 155 | 0605103A | RAND ARROYO CENTER | 20,140 | | 20,140 |

| | | | | | |
|---|---|---|---|---|---|
| 156 | 0605301A | ARMY KWAJALEIN ATOLL | 246,663 | | 246,663 |
| 157 | 0605326A | CONCEPTS EXPERIMENTATION PROGRAM | 29,820 | | 29,820 |
| 159 | 0605601A | ARMY TEST RANGES AND FACILITIES | 307,588 | | 307,588 |
| 160 | 0605602A | ARMY TECHNICAL TEST INSTRUMENTATION AND TARGETS | 49,242 | | 49,242 |
| 161 | 0605604A | SURVIVABILITY/LETHALITY ANALYSIS | 41,843 | | 41,843 |
| 162 | 0605606A | AIRCRAFT CERTIFICATION | 4,804 | | 4,804 |
| 163 | 0605702A | METEOROLOGICAL SUPPORT TO RDT&E ACTIVITIES | 7,238 | | 7,238 |
| 164 | 0605706A | MATERIEL SYSTEMS ANALYSIS | 21,890 | | 21,890 |
| 165 | 0605709A | EXPLOITATION OF FOREIGN ITEMS | 12,684 | | 12,684 |
| 166 | 0605712A | SUPPORT OF OPERATIONAL TESTING | 51,040 | | 51,040 |
| 167 | 0605716A | ARMY EVALUATION CENTER | 56,246 | | 56,246 |
| 168 | 0605718A | ARMY MODELING & SIM X-CMD COLLABORATION & INTEG | 1,829 | | 1,829 |
| 169 | 0605801A | PROGRAMWIDE ACTIVITIES | 55,060 | | 55,060 |
| 170 | 0605803A | TECHNICAL INFORMATION ACTIVITIES | 33,934 | | 33,934 |
| 171 | 0605805A | MUNITIONS STANDARDIZATION, EFFECTIVENESS AND SAFETY | 43,444 | | 43,444 |
| 172 | 0605857A | ENVIRONMENTAL QUALITY TECHNOLOGY MGMT SUPPORT | 5,087 | | 5,087 |
| 173 | 0605898A | ARMY DIRECT REPORT HEADQUARTERS—R&D - MHA | 54,679 | | 54,679 |
| 174 | 0606001A | MILITARY GROUND-BASED CREW TECHNOLOGY | 7,916 | | 7,916 |
| 175 | 0606002A | RONALD REAGAN BALLISTIC MISSILE DEFENSE TEST SITE | 61,254 | | 61,254 |
| 176 | 0303260A | DEFENSE MILITARY DECEPTION INITIATIVE | 1,779 | | 1,779 |
| | | **SUBTOTAL RDT&E MANAGEMENT SUPPORT** | **1,253,845** | | **1,253,845** |
| | | | | | |
| | | **OPERATIONAL SYSTEMS DEVELOPMENT** | | | |
| 178 | 0603778A | MLRS PRODUCT IMPROVEMENT PROGRAM | 8,929 | | 8,929 |
| 179 | 0603813A | TRACTOR PULL | 4,014 | | 4,014 |
| 180 | 0605024A | ANTI-TAMPER TECHNOLOGY SUPPORT | 4,094 | | 4,094 |
| 181 | 0607131A | WEAPONS AND MUNITIONS PRODUCT IMPROVEMENT PROGRAMS | 15,738 | | 15,738 |
| 182 | 0607133A | TRACTOR SMOKE | 4,513 | | 4,513 |
| 183 | 0607134A | LONG RANGE PRECISION FIRES (LRPF) | 102,014 | | 102,014 |
| 184 | 0607135A | APACHE PRODUCT IMPROVEMENT PROGRAM | 59,977 | | 59,977 |
| 185 | 0607136A | BLACKHAWK PRODUCT IMPROVEMENT PROGRAM | 34,416 | 9,300 | 43,716 |
| | | Unfunded requirement—UH–60V development | | [9,300] | |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 186 | 0607137A | CHINOOK PRODUCT IMPROVEMENT PROGRAM | 194,567 | | 194,567 |
| 187 | 0607138A | FIXED WING PRODUCT IMPROVEMENT PROGRAM | 9,981 | | 9,981 |
| 188 | 0607139A | IMPROVED TURBINE ENGINE PROGRAM | 204,304 | | 204,304 |
| 189 | 0607140A | EMERGING TECHNOLOGIES FROM NIE | 1,023 | | 1,023 |
| 190 | 0607141A | LOGISTICS AUTOMATION | 1,504 | | 1,504 |
| 191 | 0607142A | AVIATION ROCKET SYSTEM PRODUCT IMPROVEMENT AND DEVELOPMENT | 10,064 | | 10,064 |
| 192 | 0607143A | UNMANNED AIRCRAFT SYSTEM UNIVERSAL PRODUCTS | 38,463 | | 38,463 |
| 193 | 0607665A | FAMILY OF BIOMETRICS | 6,159 | | 6,159 |
| 194 | 0607865A | PATRIOT PRODUCT IMPROVEMENT | 90,217 | | 90,217 |
| 195 | 0202429A | AEROSTAT JOINT PROJECT—COCOM EXERCISE | 6,749 | | 6,749 |
| 196 | 0203728A | JOINT AUTOMATED DEEP OPERATION COORDINATION SYSTEM (JADOCS) | 33,520 | | 33,520 |
| 197 | 0203735A | COMBAT VEHICLE IMPROVEMENT PROGRAMS | 343,175 | 8,000 | 351,175 |
| | | Unfunded requirement—M88A2E1 | | [8,000] | |
| 198 | 0203740A | MANEUVER CONTROL SYSTEM | 6,639 | | 6,639 |
| 199 | 0203743A | 155MM SELF-PROPELLED HOWITZER IMPROVEMENTS | 40,784 | | 40,784 |
| 200 | 0203744A | AIRCRAFT MODIFICATIONS/PRODUCT IMPROVEMENT PROGRAMS | 39,358 | | 39,358 |
| 201 | 0203752A | AIRCRAFT ENGINE COMPONENT IMPROVEMENT PROGRAM | 145 | | 145 |
| 202 | 0203758A | DIGITIZATION | 4,803 | | 4,803 |
| 203 | 0203801A | MISSILE/AIR DEFENSE PRODUCT IMPROVEMENT PROGRAM | 2,723 | 15,000 | 17,723 |
| | | Realign European Reassurance Initiative to Base | | [15,000] | |
| 204 | 0203802A | OTHER MISSILE PRODUCT IMPROVEMENT PROGRAMS | 5,000 | | 5,000 |
| 205 | 0203808A | TRACTOR CARD | 37,883 | | 37,883 |
| 206 | 0205402A | INTEGRATED BASE DEFENSE—OPERATIONAL SYSTEM DEV | | 4,500 | 4,500 |
| | | Unfunded requirement—modal passive detection system | | [4,500] | |
| 207 | 0205410A | MATERIALS HANDLING EQUIPMENT | 1,582 | | 1,582 |
| 208 | 0205412A | ENVIRONMENTAL QUALITY TECHNOLOGY—OPERATIONAL SYSTEM DEV | 195 | | 195 |
| 209 | 0205456A | LOWER TIER AIR AND MISSILE DEFENSE (AMD) SYSTEM | 78,926 | | 78,926 |

| | | | | | |
|---|---|---|---|---|---|
| 210 | 0205778A | GUIDED MULTIPLE-LAUNCH ROCKET SYSTEM (GMLRS) | 102,807 | | 102,807 |
| 213 | 0303028A | SECURITY AND INTELLIGENCE ACTIVITIES | 13,807 | | 13,807 |
| 214 | 0303140A | INFORMATION SYSTEMS SECURITY PROGRAM | 132,438 | | 132,438 |
| 215 | 0303141A | GLOBAL COMBAT SUPPORT SYSTEM | 64,370 | | 64,370 |
| 217 | 0303150A | WWMCCS/GLOBAL COMMAND AND CONTROL SYSTEM | 10,475 | | 10,475 |
| 220 | 0305172A | COMBINED ADVANCED APPLICATIONS | 1,100 | | 1,100 |
| 222 | 0305204A | TACTICAL UNMANNED AERIAL VEHICLES | 9,433 | 7,492 | 16,925 |
| | | Realign European Reassurance Initiative to Base | | [7,492] | |
| 223 | 0305206A | AIRBORNE RECONNAISSANCE SYSTEMS | 5,080 | 15,000 | 20,080 |
| | | Realign European Reassurance Initiative to Base | | [15,000] | |
| 224 | 0305208A | DISTRIBUTED COMMON GROUND/SURFACE SYSTEMS | 24,700 | | 24,700 |
| 225 | 0305219A | MQ–1C GRAY EAGLE UAS | 9,574 | | 9,574 |
| 226 | 0305232A | RQ–11 UAV | 2,191 | | 2,191 |
| 227 | 0305233A | RQ–7 UAV | 12,773 | | 12,773 |
| 228 | 0307665A | BIOMETRICS ENABLED INTELLIGENCE | 2,537 | | 2,537 |
| 229 | 0310349A | WIN-T INCREMENT 2—INITIAL NETWORKING | 4,723 | | 4,723 |
| 230 | 0708045A | END ITEM INDUSTRIAL PREPAREDNESS ACTIVITIES | 60,877 | 5,000 | 65,877 |
| | | Development of improved manufacturing technology for separation, extraction, smelter, sintering, leaching, processing, beneficiation, or production of specialty metals such as lanthanide elements, yttrium or scandium. | | [5,000] | |
| 231 | 1203142A | SATCOM GROUND ENVIRONMENT (SPACE) | 11,959 | | 11,959 |
| 232 | 1208053A | JOINT TACTICAL GROUND SYSTEM | 10,228 | | 10,228 |
| 232A | 9999999999 | CLASSIFIED PROGRAMS | 7,154 | | 7,154 |
| | | **SUBTOTAL OPERATIONAL SYSTEMS DEVELOPMENT** | **1,877,685** | **64,292** | **1,941,977** |
| | | | | | |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, ARMY** | **9,425,440** | **228,940** | **9,654,380** |
| | | | | | |
| | | **RESEARCH, DEVELOPMENT, TEST & EVAL, NAVY** | | | |
| | | **BASIC RESEARCH** | | | |
| 001 | 0601103N | UNIVERSITY RESEARCH INITIATIVES | 118,130 | 20,000 | 138,130 |
| | | Defense University Research Instrumentation Program | | [20,000] | |
| 002 | 0601152N | IN-HOUSE LABORATORY INDEPENDENT RESEARCH | 19,438 | | 19,438 |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 003 | 0601153N | DEFENSE RESEARCH SCIENCES | 458,333 | | 458,333 |
| | | **SUBTOTAL BASIC RESEARCH** | **595,901** | **20,000** | **615,901** |
| | | **APPLIED RESEARCH** | | | |
| 004 | 0602114N | POWER PROJECTION APPLIED RESEARCH | 13,553 | | 13,553 |
| 005 | 0602123N | FORCE PROTECTION APPLIED RESEARCH | 125,557 | | 125,557 |
| 006 | 0602131M | MARINE CORPS LANDING FORCE TECHNOLOGY | 53,936 | | 53,936 |
| 007 | 0602235N | COMMON PICTURE APPLIED RESEARCH | 36,450 | | 36,450 |
| 008 | 0602236N | WARFIGHTER SUSTAINMENT APPLIED RESEARCH | 48,649 | | 48,649 |
| 009 | 0602271N | ELECTROMAGNETIC SYSTEMS APPLIED RESEARCH | 79,598 | | 79,598 |
| 010 | 0602435N | OCEAN WARFIGHTING ENVIRONMENT APPLIED RESEARCH | 42,411 | | 42,411 |
| 011 | 0602651M | JOINT NON-LETHAL WEAPONS APPLIED RESEARCH | 6,425 | | 6,425 |
| 012 | 0602747N | UNDERSEA WARFARE APPLIED RESEARCH | 56,094 | | 56,094 |
| 013 | 0602750N | FUTURE NAVAL CAPABILITIES APPLIED RESEARCH | 156,805 | | 156,805 |
| 014 | 0602782N | MINE AND EXPEDITIONARY WARFARE APPLIED RESEARCH | 32,733 | | 32,733 |
| 015 | 0602792N | INNOVATIVE NAVAL PROTOTYPES (INP) APPLIED RESEARCH | 171,146 | | 171,146 |
| 016 | 0602861N | SCIENCE AND TECHNOLOGY MANAGEMENT—ONR FIELD ACITIVITIES | 62,722 | | 62,722 |
| | | **SUBTOTAL APPLIED RESEARCH** | **886,079** | | **886,079** |
| | | **ADVANCED TECHNOLOGY DEVELOPMENT** | | | |
| 019 | 0603123N | FORCE PROTECTION ADVANCED TECHNOLOGY | 26,342 | | 26,342 |
| 020 | 0603271N | ELECTROMAGNETIC SYSTEMS ADVANCED TECHNOLOGY | 9,360 | | 9,360 |
| 021 | 0603640M | USMC ADVANCED TECHNOLOGY DEMONSTRATION (ATD) | 154,407 | | 154,407 |
| 022 | 0603651M | JOINT NON-LETHAL WEAPONS TECHNOLOGY DEVELOPMENT | 13,448 | | 13,448 |
| 023 | 0603673N | FUTURE NAVAL CAPABILITIES ADVANCED TECHNOLOGY DEVELOPMENT | 231,772 | | 231,772 |
| 024 | 0603680N | MANUFACTURING TECHNOLOGY PROGRAM | 57,797 | 10,000 | 67,797 |
| | | Program increase for manufacturing capability industrial partnerships for undersea vehicles | | [10,000] | |

| | | | | | |
|---|---|---|---|---|---|
| 025 | 0603729N | WARFIGHTER PROTECTION ADVANCED TECHNOLOGY | 4,878 | | 4,878 |
| 027 | 0603758N | NAVY WARFIGHTING EXPERIMENTS AND DEMONSTRATIONS | 64,889 | | 64,889 |
| 028 | 0603782N | MINE AND EXPEDITIONARY WARFARE ADVANCED TECHNOLOGY | 15,164 | | 15,164 |
| 029 | 0603801N | INNOVATIVE NAVAL PROTOTYPES (INP) ADVANCED TECHNOLOGY DEVELOPMENT | 108,285 | 24,000 | 132,285 |
| | | Program increase for railgun tactical demonstrator | | [24,000] | |
| | | **SUBTOTAL ADVANCED TECHNOLOGY DEVELOPMENT** | **686,342** | **34,000** | **720,342** |
| | | | | | |
| | | **ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | | | |
| 030 | 0603207N | AIR/OCEAN TACTICAL APPLICATIONS | 48,365 | | 48,365 |
| 031 | 0603216N | AVIATION SURVIVABILITY | 5,566 | | 5,566 |
| 033 | 0603251N | AIRCRAFT SYSTEMS | 695 | | 695 |
| 034 | 0603254N | ASW SYSTEMS DEVELOPMENT | 7,661 | | 7,661 |
| 035 | 0603261N | TACTICAL AIRBORNE RECONNAISSANCE | 3,707 | | 3,707 |
| 036 | 0603382N | ADVANCED COMBAT SYSTEMS TECHNOLOGY | 61,381 | | 61,381 |
| 037 | 0603502N | SURFACE AND SHALLOW WATER MINE COUNTERMEASURES | 154,117 | 23,000 | 177,117 |
| | | LDUUV | | [23,000] | |
| 038 | 0603506N | SURFACE SHIP TORPEDO DEFENSE | 14,974 | | 14,974 |
| 039 | 0603512N | CARRIER SYSTEMS DEVELOPMENT | 9,296 | | 9,296 |
| 040 | 0603525N | PILOT FISH | 132,083 | | 132,083 |
| 041 | 0603527N | RETRACT LARCH | 15,407 | | 15,407 |
| 042 | 0603536N | RETRACT JUNIPER | 122,413 | | 122,413 |
| 043 | 0603542N | RADIOLOGICAL CONTROL | 745 | | 745 |
| 044 | 0603553N | SURFACE ASW | 1,136 | | 1,136 |
| 045 | 0603561N | ADVANCED SUBMARINE SYSTEM DEVELOPMENT | 100,955 | | 100,955 |
| 046 | 0603562N | SUBMARINE TACTICAL WARFARE SYSTEMS | 13,834 | | 13,834 |
| 047 | 0603563N | SHIP CONCEPT ADVANCED DESIGN | 36,891 | | 36,891 |
| 048 | 0603564N | SHIP PRELIMINARY DESIGN & FEASIBILITY STUDIES | 12,012 | | 12,012 |
| 049 | 0603570N | ADVANCED NUCLEAR POWER SYSTEMS | 329,500 | | 329,500 |
| 050 | 0603573N | ADVANCED SURFACE MACHINERY SYSTEMS | 29,953 | | 29,953 |
| 051 | 0603576N | CHALK EAGLE | 191,610 | | 191,610 |
| 052 | 0603581N | LITTORAL COMBAT SHIP (LCS) | 40,991 | | 40,991 |
| 053 | 0603582N | COMBAT SYSTEM INTEGRATION | 24,674 | | 24,674 |

SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 054 | 0603595N | OHIO REPLACEMENT | 776,158 | | 776,158 |
| 055 | 0603596N | LCS MISSION MODULES | 116,871 | | 116,871 |
| 056 | 0603597N | AUTOMATED TEST AND ANALYSIS | 8,052 | | 8,052 |
| 057 | 0603599N | FRIGATE DEVELOPMENT | 143,450 | | 143,450 |
| 058 | 0603609N | CONVENTIONAL MUNITIONS | 8,909 | | 8,909 |
| 060 | 0603635M | MARINE CORPS GROUND COMBAT/SUPPORT SYSTEM | 1,428 | | 1,428 |
| 061 | 0603654N | JOINT SERVICE EXPLOSIVE ORDNANCE DEVELOPMENT | 53,367 | | 53,367 |
| 063 | 0603713N | OCEAN ENGINEERING TECHNOLOGY DEVELOPMENT | 8,212 | | 8,212 |
| 064 | 0603721N | ENVIRONMENTAL PROTECTION | 20,214 | | 20,214 |
| 065 | 0603724N | NAVY ENERGY PROGRAM | 50,623 | | 50,623 |
| 066 | 0603725N | FACILITIES IMPROVEMENT | 2,837 | | 2,837 |
| 067 | 0603734N | CHALK CORAL | 245,143 | | 245,143 |
| 068 | 0603739N | NAVY LOGISTIC PRODUCTIVITY | 2,995 | | 2,995 |
| 069 | 0603746N | RETRACT MAPLE | 306,101 | | 306,101 |
| 070 | 0603748N | LINK PLUMERIA | 253,675 | | 253,675 |
| 071 | 0603751N | RETRACT ELM | 55,691 | | 55,691 |
| 072 | 0603764N | LINK EVERGREEN | 48,982 | | 48,982 |
| 074 | 0603790N | NATO RESEARCH AND DEVELOPMENT | 9,099 | | 9,099 |
| 075 | 0603795N | LAND ATTACK TECHNOLOGY | 33,568 | | 33,568 |
| 076 | 0603851M | JOINT NON-LETHAL WEAPONS TESTING | 29,873 | | 29,873 |
| 077 | 0603860N | JOINT PRECISION APPROACH AND LANDING SYSTEMS—DEM/VAL | 106,391 | | 106,391 |
| 078 | 0603925N | DIRECTED ENERGY AND ELECTRIC WEAPON SYSTEMS | 107,310 | 26,000 | 133,310 |
| | | Program increase for railgun tactical demonstrator | | [26,000] | |
| 079 | 0604112N | GERALD R. FORD CLASS NUCLEAR AIRCRAFT CARRIER (CVN 78—80) | 83,935 | | 83,935 |
| 081 | 0604272N | TACTICAL AIR DIRECTIONAL INFRARED COUNTERMEASURES (TADIRCM) | 46,844 | | 46,844 |
| 083 | 0604286M | MARINE CORPS ADDITIVE MANUFACTURING TECHNOLOGY DEVELOPMENT | 6,200 | | 6,200 |
| 085 | 0604320M | RAPID TECHNOLOGY CAPABILITY PROTOTYPE | 7,055 | | 7,055 |

| | | | | | |
|---|---|---|---|---|---|
| 086 | 0604454N | LX (R) | 9,578 | | 9,578 |
| 087 | 0604536N | ADVANCED UNDERSEA PROTOTYPING | 66,543 | 10,000 | 76,543 |
| | | XLUUV | | [10,000] | |
| 089 | 0604659N | PRECISION STRIKE WEAPONS DEVELOPMENT PROGRAM | 31,315 | | 31,315 |
| 090 | 0604707N | SPACE AND ELECTRONIC WARFARE (SEW) ARCHITECTURE/ENGINEERING SUPPORT | 42,851 | | 42,851 |
| 091 | 0604786N | OFFENSIVE ANTI-SURFACE WARFARE WEAPON DEVELOPMENT | 160,694 | | 160,694 |
| 093 | 0303354N | ASW SYSTEMS DEVELOPMENT—MIP | 8,278 | | 8,278 |
| 094 | 0304240M | ADVANCED TACTICAL UNMANNED AIRCRAFT SYSTEM | 7,979 | | 7,979 |
| 095 | 0304270N | ELECTRONIC WARFARE DEVELOPMENT—MIP | 527 | | 527 |
| | | **SUBTOTAL ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | **4,218,714** | **59,000** | **4,277,714** |
| | | | | | |
| | | **SYSTEM DEVELOPMENT & DEMONSTRATION** | | | |
| 096 | 0603208N | TRAINING SYSTEM AIRCRAFT | 16,945 | | 16,945 |
| 097 | 0604212N | OTHER HELO DEVELOPMENT | 26,786 | | 26,786 |
| 098 | 0604214N | AV–8B AIRCRAFT—ENG DEV | 48,780 | | 48,780 |
| 099 | 0604215N | STANDARDS DEVELOPMENT | 2,722 | | 2,722 |
| 100 | 0604216N | MULTI-MISSION HELICOPTER UPGRADE DEVELOPMENT | 5,371 | | 5,371 |
| 101 | 0604218N | AIR/OCEAN EQUIPMENT ENGINEERING | 782 | | 782 |
| 102 | 0604221N | P–3 MODERNIZATION PROGRAM | 1,361 | | 1,361 |
| 103 | 0604230N | WARFARE SUPPORT SYSTEM | 14,167 | | 14,167 |
| 104 | 0604231N | TACTICAL COMMAND SYSTEM | 55,695 | | 55,695 |
| 105 | 0604234N | ADVANCED HAWKEYE | 292,535 | | 292,535 |
| 106 | 0604245N | H–1 UPGRADES | 61,288 | | 61,288 |
| 107 | 0604261N | ACOUSTIC SEARCH SENSORS | 37,167 | | 37,167 |
| 108 | 0604262N | V–22A | 171,386 | 15,000 | 186,386 |
| | | Unfunded requirement | | [15,000] | |
| 109 | 0604264N | AIR CREW SYSTEMS DEVELOPMENT | 13,235 | 10,000 | 23,235 |
| | | Air Crew Sensor Improvements | | [10,000] | |
| 110 | 0604269N | EA–18 | 173,488 | | 173,488 |
| 111 | 0604270N | ELECTRONIC WARFARE DEVELOPMENT | 54,055 | 29,000 | 83,055 |
| | | Unfunded requirement—EWSA | | [5,500] | |
| | | Unfunded requirement—Intrepid Tiger II (V)3 UH–1Y jettison capability | | [3,000] | |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| | | Unfunded requirements—range improvements and upgrades | | [20,500] | |
| 112 | 0604273N | EXECUTIVE HELO DEVELOPMENT | 451,938 | | 451,938 |
| 113 | 0604274N | NEXT GENERATION JAMMER (NGJ) | 632,936 | –8,800 | 624,136 |
| | | Unjustified cost growth | | [–8,800] | |
| 114 | 0604280N | JOINT TACTICAL RADIO SYSTEM—NAVY (JTRS-NAVY) | 4,310 | | 4,310 |
| 115 | 0604282N | NEXT GENERATION JAMMER (NGJ) INCREMENT II | 66,686 | | 66,686 |
| 116 | 0604307N | SURFACE COMBATANT COMBAT SYSTEM ENGINEERING | 390,238 | | 390,238 |
| 117 | 0604311N | LPD–17 CLASS SYSTEMS INTEGRATION | 689 | | 689 |
| 118 | 0604329N | SMALL DIAMETER BOMB (SDB) | 112,846 | | 112,846 |
| 119 | 0604366N | STANDARD MISSILE IMPROVEMENTS | 158,578 | | 158,578 |
| 120 | 0604373N | AIRBORNE MCM | 15,734 | | 15,734 |
| 122 | 0604378N | NAVAL INTEGRATED FIRE CONTROL—COUNTER AIR SYSTEMS ENGINEERING | 25,445 | | 25,445 |
| 124 | 0604501N | ADVANCED ABOVE WATER SENSORS | 87,233 | 5,000 | 92,233 |
| | | SPY–1 Solid State Advancement | | [5,000] | |
| 125 | 0604503N | SSN–688 AND TRIDENT MODERNIZATION | 130,981 | | 130,981 |
| 126 | 0604504N | AIR CONTROL | 75,186 | | 75,186 |
| 127 | 0604512N | SHIPBOARD AVIATION SYSTEMS | 177,926 | | 177,926 |
| 128 | 0604518N | COMBAT INFORMATION CENTER CONVERSION | 8,062 | | 8,062 |
| 129 | 0604522N | AIR AND MISSILE DEFENSE RADAR (AMDR) SYSTEM | 32,090 | | 32,090 |
| 130 | 0604558N | NEW DESIGN SSN | 120,087 | | 120,087 |
| 131 | 0604562N | SUBMARINE TACTICAL WARFARE SYSTEM | 50,850 | | 50,850 |
| 132 | 0604567N | SHIP CONTRACT DESIGN/ LIVE FIRE T&E | 67,166 | 20,000 | 87,166 |
| | | CVN 80 DFA | | [20,000] | |
| 133 | 0604574N | NAVY TACTICAL COMPUTER RESOURCES | 4,817 | | 4,817 |
| 134 | 0604580N | VIRGINIA PAYLOAD MODULE (VPM) | 72,861 | | 72,861 |
| 135 | 0604601N | MINE DEVELOPMENT | 25,635 | | 25,635 |
| 136 | 0604610N | LIGHTWEIGHT TORPEDO DEVELOPMENT | 28,076 | | 28,076 |

| | | | | | |
|---|---|---|---|---|---|
| 137 | 0604654N | JOINT SERVICE EXPLOSIVE ORDNANCE DEVELOPMENT | 7,561 | | 7,561 |
| 138 | 0604703N | PERSONNEL, TRAINING, SIMULATION, AND HUMAN FACTORS | 40,828 | | 40,828 |
| 139 | 0604727N | JOINT STANDOFF WEAPON SYSTEMS | 435 | | 435 |
| 140 | 0604755N | SHIP SELF DEFENSE (DETECT & CONTROL) | 161,713 | | 161,713 |
| 141 | 0604756N | SHIP SELF DEFENSE (ENGAGE: HARD KILL) | 212,412 | 31,000 | 243,412 |
| | | OTH Weapon Development | | [31,000] | |
| 142 | 0604757N | SHIP SELF DEFENSE (ENGAGE: SOFT KILL/EW) | 103,391 | | 103,391 |
| 143 | 0604761N | INTELLIGENCE ENGINEERING | 34,855 | | 34,855 |
| 144 | 0604771N | MEDICAL DEVELOPMENT | 9,353 | | 9,353 |
| 145 | 0604777N | NAVIGATION/ID SYSTEM | 92,546 | 9,000 | 101,546 |
| | | Program increase | | [9,000] | |
| 146 | 0604800M | JOINT STRIKE FIGHTER (JSF)—EMD | 152,934 | | 152,934 |
| 147 | 0604800N | JOINT STRIKE FIGHTER (JSF)—EMD | 108,931 | | 108,931 |
| 148 | 0604810M | JOINT STRIKE FIGHTER FOLLOW ON MODERNIZATION (FOM)—MARINE CORPS | 144,958 | | 144,958 |
| 149 | 0604810N | JOINT STRIKE FIGHTER FOLLOW ON MODERNIZATION (FOM)—NAVY | 143,855 | | 143,855 |
| 150 | 0605013M | INFORMATION TECHNOLOGY DEVELOPMENT | 14,865 | | 14,865 |
| 151 | 0605013N | INFORMATION TECHNOLOGY DEVELOPMENT | 152,977 | | 152,977 |
| 152 | 0605024N | ANTI-TAMPER TECHNOLOGY SUPPORT | 3,410 | | 3,410 |
| 153 | 0605212N | CH–53K RDTE | 340,758 | | 340,758 |
| 154 | 0605215N | MISSION PLANNING | 33,430 | | 33,430 |
| 155 | 0605217N | COMMON AVIONICS | 58,163 | | 58,163 |
| 156 | 0605220N | SHIP TO SHORE CONNECTOR (SSC) | 22,410 | | 22,410 |
| 157 | 0605327N | T-AO 205 CLASS | 1,961 | | 1,961 |
| 158 | 0605414N | UNMANNED CARRIER AVIATION (UCA) | 222,208 | | 222,208 |
| 159 | 0605450N | JOINT AIR-TO-GROUND MISSILE (JAGM) | 15,473 | | 15,473 |
| 160 | 0605500N | MULTI-MISSION MARITIME AIRCRAFT (MMA) | 11,795 | | 11,795 |
| 161 | 0605504N | MULTI-MISSION MARITIME (MMA) INCREMENT III | 181,731 | | 181,731 |
| 162 | 0605611M | MARINE CORPS ASSAULT VEHICLES SYSTEM DEVELOPMENT & DEMONSTRATION | 178,993 | | 178,993 |
| 163 | 0605813M | JOINT LIGHT TACTICAL VEHICLE (JLTV) SYSTEM DEVELOPMENT & DEMONSTRATION | 20,710 | | 20,710 |
| 164 | 0204202N | DDG–1000 | 140,500 | | 140,500 |
| 168 | 0304785N | TACTICAL CRYPTOLOGIC SYSTEMS | 28,311 | | 28,311 |
| 170 | 0306250M | CYBER OPERATIONS TECHNOLOGY DEVELOPMENT | 4,502 | | 4,502 |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| | | **SUBTOTAL SYSTEM DEVELOPMENT & DEMONSTRATION** | **6,362,102** | **110,200** | **6,472,302** |
| | | **MANAGEMENT SUPPORT** | | | |
| 171 | 0604256N | THREAT SIMULATOR DEVELOPMENT | 91,819 | | 91,819 |
| 172 | 0604258N | TARGET SYSTEMS DEVELOPMENT | 23,053 | | 23,053 |
| 173 | 0604759N | MAJOR T&E INVESTMENT | 52,634 | 7,000 | 59,634 |
| | | Program increase | | [7,000] | |
| 174 | 0605126N | JOINT THEATER AIR AND MISSILE DEFENSE ORGANIZATION | 141 | | 141 |
| 175 | 0605152N | STUDIES AND ANALYSIS SUPPORT—NAVY | 3,917 | | 3,917 |
| 176 | 0605154N | CENTER FOR NAVAL ANALYSES | 50,432 | | 50,432 |
| 179 | 0605804N | TECHNICAL INFORMATION SERVICES | 782 | | 782 |
| 180 | 0605853N | MANAGEMENT, TECHNICAL & INTERNATIONAL SUPPORT | 94,562 | | 94,562 |
| 181 | 0605856N | STRATEGIC TECHNICAL SUPPORT | 4,313 | | 4,313 |
| 182 | 0605861N | RDT&E SCIENCE AND TECHNOLOGY MANAGEMENT | 1,104 | | 1,104 |
| 183 | 0605863N | RDT&E SHIP AND AIRCRAFT SUPPORT | 105,666 | | 105,666 |
| 184 | 0605864N | TEST AND EVALUATION SUPPORT | 373,667 | 40,000 | 413,667 |
| | | Program increase | | [40,000] | |
| 185 | 0605865N | OPERATIONAL TEST AND EVALUATION CAPABILITY | 20,298 | | 20,298 |
| 186 | 0605866N | NAVY SPACE AND ELECTRONIC WARFARE (SEW) SUPPORT | 17,341 | | 17,341 |
| 188 | 0605873M | MARINE CORPS PROGRAM WIDE SUPPORT | 21,751 | | 21,751 |
| 189 | 0605898N | MANAGEMENT HQ—R&D | 44,279 | | 44,279 |
| 190 | 0606355N | WARFARE INNOVATION MANAGEMENT | 28,841 | | 28,841 |
| 191 | 0902498N | MANAGEMENT HEADQUARTERS (DEPARTMENTAL SUPPORT ACTIVITIES) | 1,749 | | 1,749 |
| 194 | 1206867N | SEW SURVEILLANCE/RECONNAISSANCE SUPPORT | 9,408 | | 9,408 |
| | | **SUBTOTAL MANAGEMENT SUPPORT** | **945,757** | **47,000** | **992,757** |
| | | **OPERATIONAL SYSTEMS DEVELOPMENT** | | | |

| | | | | | |
|---|---|---|---|---|---|
| 196 | 0607658N | COOPERATIVE ENGAGEMENT CAPABILITY (CEC) | 92,571 | 11,000 | 103,571 |
| | | CEC IFF Mode 5 Acceleration | | [11,000] | |
| 197 | 0607700N | DEPLOYABLE JOINT COMMAND AND CONTROL | 3,137 | | 3,137 |
| 198 | 0101221N | STRATEGIC SUB & WEAPONS SYSTEM SUPPORT | 135,219 | | 135,219 |
| 199 | 0101224N | SSBN SECURITY TECHNOLOGY PROGRAM | 36,242 | | 36,242 |
| 200 | 0101226N | SUBMARINE ACOUSTIC WARFARE DEVELOPMENT | 12,053 | | 12,053 |
| 201 | 0101402N | NAVY STRATEGIC COMMUNICATIONS | 18,221 | | 18,221 |
| 203 | 0204136N | F/A–18 SQUADRONS | 224,470 | –11,000 | 213,470 |
| | | Program reduction- delayed procurement rates | | [–11,000] | |
| 204 | 0204163N | FLEET TELECOMMUNICATIONS (TACTICAL) | 33,525 | | 33,525 |
| 205 | 0204228N | SURFACE SUPPORT | 24,829 | | 24,829 |
| 206 | 0204229N | TOMAHAWK AND TOMAHAWK MISSION PLANNING CENTER (TMPC) | 133,617 | 9,000 | 142,617 |
| | | Tomahawk Modernization | | [9,000] | |
| 207 | 0204311N | INTEGRATED SURVEILLANCE SYSTEM | 38,972 | 11,600 | 50,572 |
| | | Realign European Reassurance Initiative to Base | | [11,600] | |
| 208 | 0204413N | AMPHIBIOUS TACTICAL SUPPORT UNITS (DISPLACEMENT CRAFT) | 3,940 | | 3,940 |
| 209 | 0204460M | GROUND/AIR TASK ORIENTED RADAR (G/ATOR) | 54,645 | | 54,645 |
| 210 | 0204571N | CONSOLIDATED TRAINING SYSTEMS DEVELOPMENT | 66,518 | 10,000 | 76,518 |
| | | Modernization of Barking Sands Tactical Underwater Range | | [10,000] | |
| 211 | 0204574N | CRYPTOLOGIC DIRECT SUPPORT | 1,155 | | 1,155 |
| 212 | 0204575N | ELECTRONIC WARFARE (EW) READINESS SUPPORT | 51,040 | | 51,040 |
| 213 | 0205601N | HARM IMPROVEMENT | 87,989 | 10,000 | 97,989 |
| | | Unfunded requirement—AARGM Derivative Program | | [10,000] | |
| 214 | 0205604N | TACTICAL DATA LINKS | 89,852 | | 89,852 |
| 215 | 0205620N | SURFACE ASW COMBAT SYSTEM INTEGRATION | 29,351 | | 29,351 |
| 216 | 0205632N | MK–48 ADCAP | 68,553 | | 68,553 |
| 217 | 0205633N | AVIATION IMPROVEMENTS | 119,099 | | 119,099 |
| 218 | 0205675N | OPERATIONAL NUCLEAR POWER SYSTEMS | 127,445 | | 127,445 |
| 219 | 0206313M | MARINE CORPS COMMUNICATIONS SYSTEMS | 123,825 | –3,500 | 120,325 |
| | | Excess growth—tactical radio systems | | [–3,500] | |
| 220 | 0206335M | COMMON AVIATION COMMAND AND CONTROL SYSTEM (CAC2S) | 7,343 | | 7,343 |
| 221 | 0206623M | MARINE CORPS GROUND COMBAT/SUPPORTING ARMS SYSTEMS | 66,009 | | 66,009 |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 222 | 0206624M | MARINE CORPS COMBAT SERVICES SUPPORT | 25,258 | | 25,258 |
| 223 | 0206625M | USMC INTELLIGENCE/ELECTRONIC WARFARE SYSTEMS (MIP) | 30,886 | | 30,886 |
| 224 | 0206629M | AMPHIBIOUS ASSAULT VEHICLE | 58,728 | | 58,728 |
| 225 | 0207161N | TACTICAL AIM MISSILES | 42,884 | 9,000 | 51,884 |
| | | Unfunded requirement—AIM–9X Blk II Systems Improvement program | | [9,000] | |
| 226 | 0207163N | ADVANCED MEDIUM RANGE AIR-TO-AIR MISSILE (AMRAAM) | 25,364 | | 25,364 |
| 232 | 0303138N | CONSOLIDATED AFLOAT NETWORK ENTERPRISE SERVICES (CANES) | 24,271 | | 24,271 |
| 233 | 0303140N | INFORMATION SYSTEMS SECURITY PROGRAM | 50,269 | | 50,269 |
| 236 | 0305192N | MILITARY INTELLIGENCE PROGRAM (MIP) ACTIVITIES | 6,352 | | 6,352 |
| 237 | 0305204N | TACTICAL UNMANNED AERIAL VEHICLES | 7,770 | | 7,770 |
| 238 | 0305205N | UAS INTEGRATION AND INTEROPERABILITY | 39,736 | | 39,736 |
| 239 | 0305208M | DISTRIBUTED COMMON GROUND/SURFACE SYSTEMS | 12,867 | | 12,867 |
| 240 | 0305208N | DISTRIBUTED COMMON GROUND/SURFACE SYSTEMS | 46,150 | | 46,150 |
| 241 | 0305220N | MQ–4C TRITON | 84,115 | | 84,115 |
| 242 | 0305231N | MQ–8 UAV | 62,656 | | 62,656 |
| 243 | 0305232M | RQ–11 UAV | 2,022 | | 2,022 |
| 245 | 0305234N | SMALL (LEVEL 0) TACTICAL UAS (STUASL0) | 4,835 | | 4,835 |
| 246 | 0305239M | RQ–21A | 8,899 | | 8,899 |
| 247 | 0305241N | MULTI-INTELLIGENCE SENSOR DEVELOPMENT | 99,020 | | 99,020 |
| 248 | 0305242M | UNMANNED AERIAL SYSTEMS (UAS) PAYLOADS (MIP) | 18,578 | –7,100 | 11,478 |
| | | Program reduction | | [–7,100] | |
| 249 | 0305421N | RQ–4 MODERNIZATION | 229,404 | | 229,404 |
| 250 | 0308601N | MODELING AND SIMULATION SUPPORT | 5,238 | | 5,238 |
| 251 | 0702207N | DEPOT MAINTENANCE (NON-IF) | 38,227 | | 38,227 |
| 252 | 0708730N | MARITIME TECHNOLOGY (MARITECH) | 4,808 | | 4,808 |
| 253 | 1203109N | SATELLITE COMMUNICATIONS (SPACE) | 37,836 | | 37,836 |
| 253A | 9999999999 | CLASSIFIED PROGRAMS | 1,364,347 | | 1,364,347 |

| | | | | | |
|---|---|---|---|---|---|
| | | **SUBTOTAL OPERATIONAL SYSTEMS DEVELOPMENT** | **3,980,140** | **39,000** | **4,019,140** |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, NAVY** | **17,675,035** | **309,200** | **17,984,235** |
| | | **RESEARCH, DEVELOPMENT, TEST & EVAL, AF** | | | |
| | | **BASIC RESEARCH** | | | |
| 001 | 0601102F | DEFENSE RESEARCH SCIENCES | 342,919 | | 342,919 |
| 002 | 0601103F | UNIVERSITY RESEARCH INITIATIVES | 147,923 | | 147,923 |
| 003 | 0601108F | HIGH ENERGY LASER RESEARCH INITIATIVES | 14,417 | | 14,417 |
| | | **SUBTOTAL BASIC RESEARCH** | **505,259** | | **505,259** |
| | | **APPLIED RESEARCH** | | | |
| 004 | 0602102F | MATERIALS | 124,264 | | 124,264 |
| 005 | 0602201F | AEROSPACE VEHICLE TECHNOLOGIES | 124,678 | 5,000 | 129,678 |
| | | Program increase | | [5,000] | |
| 006 | 0602202F | HUMAN EFFECTIVENESS APPLIED RESEARCH | 108,784 | | 108,784 |
| 007 | 0602203F | AEROSPACE PROPULSION | 192,695 | 5,000 | 197,695 |
| | | Educational Partnership Agreements | | [5,000] | |
| 008 | 0602204F | AEROSPACE SENSORS | 152,782 | | 152,782 |
| 009 | 0602298F | SCIENCE AND TECHNOLOGY MANAGEMENT— MAJOR HEADQUARTERS ACTIVITIES | 8,353 | | 8,353 |
| 010 | 0602601F | SPACE TECHNOLOGY | 116,503 | | 116,503 |
| 011 | 0602602F | CONVENTIONAL MUNITIONS | 112,195 | | 112,195 |
| 012 | 0602605F | DIRECTED ENERGY TECHNOLOGY | 132,993 | | 132,993 |
| 013 | 0602788F | DOMINANT INFORMATION SCIENCES AND METHODS | 167,818 | | 167,818 |
| 014 | 0602890F | HIGH ENERGY LASER RESEARCH | 43,049 | | 43,049 |
| | | **SUBTOTAL APPLIED RESEARCH** | **1,284,114** | **10,000** | **1,294,114** |
| | | **ADVANCED TECHNOLOGY DEVELOPMENT** | | | |
| 015 | 0603112F | ADVANCED MATERIALS FOR WEAPON SYSTEMS | 37,856 | 10,000 | 47,856 |
| | | Metals affordability research | | [10,000] | |
| 016 | 0603199F | SUSTAINMENT SCIENCE AND TECHNOLOGY (S&T) | 22,811 | | 22,811 |
| 017 | 0603203F | ADVANCED AEROSPACE SENSORS | 40,978 | | 40,978 |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 018 | 0603211F | AEROSPACE TECHNOLOGY DEV/DEMO | 115,966 | | 115,966 |
| 019 | 0603216F | AEROSPACE PROPULSION AND POWER TECHNOLOGY | 104,499 | 5,000 | 109,499 |
| | | Program Increase for Robust Electronical Power System | | [5,000] | |
| 020 | 0603270F | ELECTRONIC COMBAT TECHNOLOGY | 60,551 | | 60,551 |
| 021 | 0603401F | ADVANCED SPACECRAFT TECHNOLOGY | 58,910 | | 58,910 |
| 022 | 0603444F | MAUI SPACE SURVEILLANCE SYSTEM (MSSS) | 10,433 | | 10,433 |
| 023 | 0603456F | HUMAN EFFECTIVENESS ADVANCED TECHNOLOGY DEVELOPMENT | 33,635 | | 33,635 |
| 024 | 0603601F | CONVENTIONAL WEAPONS TECHNOLOGY | 167,415 | | 167,415 |
| 025 | 0603605F | ADVANCED WEAPONS TECHNOLOGY | 45,502 | | 45,502 |
| 026 | 0603680F | MANUFACTURING TECHNOLOGY PROGRAM | 46,450 | | 46,450 |
| 027 | 0603788F | BATTLESPACE KNOWLEDGE DEVELOPMENT AND DEMONSTRATION | 49,011 | | 49,011 |
| | | **SUBTOTAL ADVANCED TECHNOLOGY DEVELOPMENT** | **794,017** | **15,000** | **809,017** |
| | | | | | |
| | | **ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | | | |
| 028 | 0603260F | INTELLIGENCE ADVANCED DEVELOPMENT | 5,652 | 2,700 | 8,352 |
| | | Unfunded requirement—OSINT exploitation and fusion | | [1,200] | |
| | | Unfunded requirement—SIGINT Tactical Analysis Reporting Gateway | | [1,500] | |
| 030 | 0603742F | COMBAT IDENTIFICATION TECHNOLOGY | 24,397 | | 24,397 |
| 031 | 0603790F | NATO RESEARCH AND DEVELOPMENT | 3,851 | | 3,851 |
| 033 | 0603851F | INTERCONTINENTAL BALLISTIC MISSILE—DEM/VAL | 10,736 | | 10,736 |
| 034 | 0603859F | POLLUTION PREVENTION—DEM/VAL | 2 | | 2 |
| 035 | 0604015F | LONG RANGE STRIKE—BOMBER | 2,003,580 | | 2,003,580 |
| 036 | 0604201F | INTEGRATED AVIONICS PLANNING AND DEVELOPMENT | 65,458 | | 65,458 |
| 037 | 0604257F | ADVANCED TECHNOLOGY AND SENSORS | 68,719 | 26,200 | 94,919 |
| | | Unfunded requirement—ASARS–2B | | [11,500] | |
| | | Unfunded requirement—Hyperspectral Chip Development | | [14,700] | |
| 038 | 0604288F | NATIONAL AIRBORNE OPS CENTER (NAOC) RECAP | 7,850 | | 7,850 |

| | | | | | |
|---|---|---|---|---|---|
| 039 | 0604317F | TECHNOLOGY TRANSFER | 3,295 | | 3,295 |
| 040 | 0604327F | HARD AND DEEPLY BURIED TARGET DEFEAT SYSTEM (HDBTDS) PROGRAM | 17,365 | | 17,365 |
| 041 | 0604414F | CYBER RESILIENCY OF WEAPON SYSTEMS-ACS | 32,253 | | 32,253 |
| 044 | 0604776F | DEPLOYMENT & DISTRIBUTION ENTERPRISE R&D | 26,222 | | 26,222 |
| 046 | 0604858F | TECH TRANSITION PROGRAM | 840,650 | 95,000 | 935,650 |
| | | Program Increase | | [10,000] | |
| | | Unfunded Requirement | | [70,000] | |
| | | Unfunded requirement—Long-Endurance Aerial Platform(LEAP) Ahead Prototyping | | [15,000] | |
| 047 | 0605230F | GROUND BASED STRATEGIC DETERRENT | 215,721 | | 215,721 |
| 049 | 0207110F | NEXT GENERATION AIR DOMINANCE | 294,746 | 127,000 | 421,746 |
| | | Unfunded Requirement | | [127,000] | |
| 050 | 0207455F | THREE DIMENSIONAL LONG-RANGE RADAR (3DELRR) | 10,645 | | 10,645 |
| 052 | 0305236F | COMMON DATA LINK EXECUTIVE AGENT (CDL EA) | 41,509 | | 41,509 |
| 053 | 0306250F | CYBER OPERATIONS TECHNOLOGY DEVELOPMENT | 226,287 | | 226,287 |
| 054 | 0306415F | ENABLED CYBER ACTIVITIES | 16,687 | | 16,687 |
| 055 | 0408011F | SPECIAL TACTICS / COMBAT CONTROL | 4,500 | | 4,500 |
| 056 | 0901410F | CONTRACTING INFORMATION TECHNOLOGY SYSTEM | 15,867 | | 15,867 |
| 057 | 1203164F | NAVSTAR GLOBAL POSITIONING SYSTEM (USER EQUIPMENT) (SPACE) | 253,939 | 10,000 | 263,939 |
| | | Demonstration of Backup and Complementary PNT Capabilities of GPS | | [10,000] | |
| 058 | 1203710F | EO/IR WEATHER SYSTEMS | 10,000 | | 10,000 |
| 059 | 1206422F | WEATHER SYSTEM FOLLOW-ON | 112,088 | | 112,088 |
| 060 | 1206425F | SPACE SITUATION AWARENESS SYSTEMS | 34,764 | | 34,764 |
| 061 | 1206434F | MIDTERM POLAR MILSATCOM SYSTEM | 63,092 | | 63,092 |
| 062 | 1206438F | SPACE CONTROL TECHNOLOGY | 7,842 | | 7,842 |
| 063 | 1206730F | SPACE SECURITY AND DEFENSE PROGRAM | 41,385 | | 41,385 |
| 064 | 1206760F | PROTECTED TACTICAL ENTERPRISE SERVICE (PTES) | 18,150 | | 18,150 |
| 065 | 1206761F | PROTECTED TACTICAL SERVICE (PTS) | 24,201 | | 24,201 |
| 066 | 1206855F | PROTECTED SATCOM SERVICES (PSCS)—AGGREGATED | 16,000 | | 16,000 |
| 067 | 1206857F | OPERATIONALLY RESPONSIVE SPACE | 87,577 | 30,000 | 117,577 |
| | | Responsive Launch vehicles, infrastructure, and small sats | | [30,000] | |
| | | **SUBTOTAL ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | **4,605,030** | **290,900** | **4,895,930** |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| | | **SYSTEM DEVELOPMENT & DEMONSTRATION** | | | |
| 068 | 0604200F | FUTURE ADVANCED WEAPON ANALYSIS & PROGRAMS | 5,100 | | 5,100 |
| 069 | 0604201F | INTEGRATED AVIONICS PLANNING AND DEVELOPMENT | 101,203 | | 101,203 |
| 070 | 0604222F | NUCLEAR WEAPONS SUPPORT | 3,009 | | 3,009 |
| 071 | 0604270F | ELECTRONIC WARFARE DEVELOPMENT | 2,241 | | 2,241 |
| 072 | 0604281F | TACTICAL DATA NETWORKS ENTERPRISE | 38,250 | | 38,250 |
| 073 | 0604287F | PHYSICAL SECURITY EQUIPMENT | 19,739 | | 19,739 |
| 074 | 0604329F | SMALL DIAMETER BOMB (SDB)—EMD | 38,979 | | 38,979 |
| 078 | 0604429F | AIRBORNE ELECTRONIC ATTACK | 7,091 | | 7,091 |
| 080 | 0604602F | ARMAMENT/ORDNANCE DEVELOPMENT | 46,540 | | 46,540 |
| 081 | 0604604F | SUBMUNITIONS | 2,705 | | 2,705 |
| 082 | 0604617F | AGILE COMBAT SUPPORT | 31,240 | 3,000 | 34,240 |
| | | Joint Expeditionary Airfield Damage Repair | | [3,000] | |
| 084 | 0604706F | LIFE SUPPORT SYSTEMS | 9,060 | | 9,060 |
| 085 | 0604735F | COMBAT TRAINING RANGES | 87,350 | | 87,350 |
| 086 | 0604800F | F–35—EMD | 292,947 | | 292,947 |
| 088 | 0604932F | LONG RANGE STANDOFF WEAPON | 451,290 | | 451,290 |
| 089 | 0604933F | ICBM FUZE MODERNIZATION | 178,991 | | 178,991 |
| 090 | 0605030F | JOINT TACTICAL NETWORK CENTER (JTNC) | 12,736 | | 12,736 |
| 091 | 0605031F | JOINT TACTICAL NETWORK (JTN) | 9,319 | | 9,319 |
| 092 | 0605213F | F–22 MODERNIZATION INCREMENT 3.2B | 13,600 | | 13,600 |
| 094 | 0605221F | KC–46 | 93,845 | –93,845 | |
| | | Under execution | | [–93,845] | |
| 095 | 0605223F | ADVANCED PILOT TRAINING | 105,999 | | 105,999 |
| 096 | 0605229F | COMBAT RESCUE HELICOPTER | 354,485 | | 354,485 |
| 100 | 0605458F | AIR & SPACE OPS CENTER 10.2 RDT&E | 119,745 | –70,000 | 49,745 |
| | | Program reduction | | [–70,000] | |

| | | | | | |
|---|---|---|---|---|---|
| 101 | 0605931F | B–2 DEFENSIVE MANAGEMENT SYSTEM | 194,570 | | 194,570 |
| 102 | 0101125F | NUCLEAR WEAPONS MODERNIZATION | 91,237 | | 91,237 |
| 103 | 0207171F | F–15 EPAWSS | 209,847 | | 209,847 |
| 104 | 0207328F | STAND IN ATTACK WEAPON | 3,400 | | 3,400 |
| 105 | 0207701F | FULL COMBAT MISSION TRAINING | 16,727 | | 16,727 |
| 109 | 0307581F | JSTARS RECAP | 417,201 | | 417,201 |
| 110 | 0401310F | C–32 EXECUTIVE TRANSPORT RECAPITALIZATION | 6,017 | | 6,017 |
| 111 | 0401319F | PRESIDENTIAL AIRCRAFT RECAPITALIZATION (PAR) | 434,069 | | 434,069 |
| 112 | 0701212F | AUTOMATED TEST SYSTEMS | 18,528 | | 18,528 |
| 113 | 1203176F | COMBAT SURVIVOR EVADER LOCATOR | 24,967 | | 24,967 |
| 114 | 1203940F | SPACE SITUATION AWARENESS OPERATIONS | 10,029 | | 10,029 |
| 115 | 1206421F | COUNTERSPACE SYSTEMS | 66,370 | | 66,370 |
| 116 | 1206425F | SPACE SITUATION AWARENESS SYSTEMS | 48,448 | | 48,448 |
| 117 | 1206426F | SPACE FENCE | 35,937 | | 35,937 |
| 118 | 1206431F | ADVANCED EHF MILSATCOM (SPACE) | 145,610 | | 145,610 |
| 119 | 1206432F | POLAR MILSATCOM (SPACE) | 33,644 | | 33,644 |
| 120 | 1206433F | WIDEBAND GLOBAL SATCOM (SPACE) | 14,263 | | 14,263 |
| 121 | 1206441F | SPACE BASED INFRARED SYSTEM (SBIRS) HIGH EMD | 311,844 | | 311,844 |
| 122 | 1206442F | EVOLVED SBIRS | 71,018 | | 71,018 |
| 123 | 1206853F | EVOLVED EXPENDABLE LAUNCH VEHICLE PROGRAM (SPACE) – EMD | 297,572 | | 297,572 |
| | | **SUBTOTAL SYSTEM DEVELOPMENT & DEMONSTRATION** | **4,476,762** | **–160,845** | **4,315,917** |
| | | | | | |
| | | **MANAGEMENT SUPPORT** | | | |
| 124 | 0604256F | THREAT SIMULATOR DEVELOPMENT | 35,405 | | 35,405 |
| 125 | 0604759F | MAJOR T&E INVESTMENT | 82,874 | 5,000 | 87,874 |
| | | Unfunded requirement | | [5,000] | |
| 126 | 0605101F | RAND PROJECT AIR FORCE | 34,346 | | 34,346 |
| 128 | 0605712F | INITIAL OPERATIONAL TEST & EVALUATION | 15,523 | | 15,523 |
| 129 | 0605807F | TEST AND EVALUATION SUPPORT | 678,289 | 60,800 | 739,089 |
| | | Program Increase | | [32,400] | |
| | | Testing, evaluation, and certification of additional suppliers for arresting gear systems for fighter aircraft. | | [1,000] | |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| | | Unfunded requirement | | [27,400] | |
| 130 | 0605826F | ACQ WORKFORCE- GLOBAL POWER | 219,809 | | 219,809 |
| 131 | 0605827F | ACQ WORKFORCE- GLOBAL VIG & COMBAT SYS | 223,179 | | 223,179 |
| 132 | 0605828F | ACQ WORKFORCE- GLOBAL REACH | 138,556 | | 138,556 |
| 133 | 0605829F | ACQ WORKFORCE- CYBER, NETWORK, & BUS SYS | 221,393 | | 221,393 |
| 134 | 0605830F | ACQ WORKFORCE- GLOBAL BATTLE MGMT | 152,577 | | 152,577 |
| 135 | 0605831F | ACQ WORKFORCE- CAPABILITY INTEGRATION | 196,561 | | 196,561 |
| 136 | 0605832F | ACQ WORKFORCE- ADVANCED PRGM TECHNOLOGY | 28,322 | | 28,322 |
| 137 | 0605833F | ACQ WORKFORCE- NUCLEAR SYSTEMS | 126,611 | | 126,611 |
| 140 | 0605898F | MANAGEMENT HQ—R&D | 9,154 | | 9,154 |
| 141 | 0605976F | FACILITIES RESTORATION AND MODERNIZATION—TEST AND EVALUATION SUPPORT | 135,507 | | 135,507 |
| 142 | 0605978F | FACILITIES SUSTAINMENT—TEST AND EVALUATION SUPPORT | 28,720 | | 28,720 |
| 143 | 0606017F | REQUIREMENTS ANALYSIS AND MATURATION | 35,453 | 75,000 | 110,453 |
| | | Unfunded requirement | | [50,000] | |
| | | Unfunded requirement—Penetrating Counter air (PCA) Risk Reduction | | [25,000] | |
| 146 | 0308602F | ENTEPRISE INFORMATION SERVICES (EIS) | 29,049 | | 29,049 |
| 147 | 0702806F | ACQUISITION AND MANAGEMENT SUPPORT | 14,980 | | 14,980 |
| 148 | 0804731F | GENERAL SKILL TRAINING | 1,434 | | 1,434 |
| 150 | 1001004F | INTERNATIONAL ACTIVITIES | 4,569 | | 4,569 |
| 151 | 1206116F | SPACE TEST AND TRAINING RANGE DEVELOPMENT | 25,773 | | 25,773 |
| 152 | 1206392F | SPACE AND MISSILE CENTER (SMC) CIVILIAN WORKFORCE | 169,887 | | 169,887 |
| 153 | 1206398F | SPACE & MISSILE SYSTEMS CENTER—MHA | 9,531 | | 9,531 |
| 154 | 1206860F | ROCKET SYSTEMS LAUNCH PROGRAM (SPACE) | 20,975 | | 20,975 |
| 155 | 1206864F | SPACE TEST PROGRAM (STP) | 25,398 | | 25,398 |
| | | **SUBTOTAL MANAGEMENT SUPPORT** | **2,663,875** | **140,800** | **2,804,675** |
| | | | | | |
| | | **OPERATIONAL SYSTEMS DEVELOPMENT** | | | |

| Line | Program Element | Item | Request | Change | Authorized |
|---|---|---|---|---|---|
| 157 | 0604222F | NUCLEAR WEAPONS SUPPORT | 27,579 | | 27,579 |
| 158 | 0604233F | SPECIALIZED UNDERGRADUATE FLIGHT TRAINING | 5,776 | | 5,776 |
| 159 | 0604445F | WIDE AREA SURVEILLANCE | 16,247 | | 16,247 |
| 161 | 0605018F | AF INTEGRATED PERSONNEL AND PAY SYSTEM (AF-IPPS) | 21,915 | | 21,915 |
| 162 | 0605024F | ANTI-TAMPER TECHNOLOGY EXECUTIVE AGENCY | 33,150 | | 33,150 |
| 163 | 0605117F | FOREIGN MATERIEL ACQUISITION AND EXPLOITATION | 66,653 | | 66,653 |
| 164 | 0605278F | HC/MC–130 RECAP RDT&E | 38,579 | | 38,579 |
| 165 | 0606018F | NC3 INTEGRATION | 12,636 | | 12,636 |
| 166 | 0101113F | B–52 SQUADRONS | 111,910 | | 111,910 |
| 167 | 0101122F | AIR-LAUNCHED CRUISE MISSILE (ALCM) | 463 | | 463 |
| 168 | 0101126F | B–1B SQUADRONS | 62,471 | | 62,471 |
| 169 | 0101127F | B–2 SQUADRONS | 193,108 | | 193,108 |
| 170 | 0101213F | MINUTEMAN SQUADRONS | 210,845 | | 210,845 |
| | | Increase ICBM Cryptopgraphy Upgrade II | | [20,000] | |
| | | Reduce MM Ground and Communications Equipment | | [–10,000] | |
| | | Reduce MM Support Equipment | | [–10,000] | |
| 171 | 0101313F | INTEGRATED STRATEGIC PLANNING AND ANALYSIS NETWORK (ISPAN)—USSTRATCOM | 25,736 | | 25,736 |
| 173 | 0101316F | WORLDWIDE JOINT STRATEGIC COMMUNICATIONS | 6,272 | 64,000 | 70,272 |
| | | Enhances E–4B cyber security | | [64,000] | |
| 174 | 0101324F | INTEGRATED STRATEGIC PLANNING & ANALYSIS NETWORK | 11,032 | | 11,032 |
| 176 | 0102110F | UH–1N REPLACEMENT PROGRAM | 108,617 | | 108,617 |
| 177 | 0102326F | REGION/SECTOR OPERATION CONTROL CENTER MODERNIZATION PROGRAM | 3,347 | | 3,347 |
| 179 | 0205219F | MQ–9 UAV | 201,394 | | 201,394 |
| 182 | 0207131F | A–10 SQUADRONS | 17,459 | | 17,459 |
| 183 | 0207133F | F–16 SQUADRONS | 246,578 | 25,000 | 271,578 |
| | | Unfunded requirement—MIDS-JTRS software changes | | [25,000] | |
| 184 | 0207134F | F–15E SQUADRONS | 320,271 | | 320,271 |
| 185 | 0207136F | MANNED DESTRUCTIVE SUPPRESSION | 15,106 | 20,000 | 35,106 |
| | | HTS pod block upgrade program | | [20,000] | |
| 186 | 0207138F | F–22A SQUADRONS | 610,942 | | 610,942 |
| 187 | 0207142F | F–35 SQUADRONS | 334,530 | | 334,530 |
| 188 | 0207161F | TACTICAL AIM MISSILES | 34,952 | | 34,952 |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 189 | 0207163F | ADVANCED MEDIUM RANGE AIR-TO-AIR MISSILE (AMRAAM) | 61,322 | | 61,322 |
| 191 | 0207227F | COMBAT RESCUE—PARARESCUE | 693 | | 693 |
| 193 | 0207249F | PRECISION ATTACK SYSTEMS PROCUREMENT | 1,714 | | 1,714 |
| 194 | 0207253F | COMPASS CALL | 14,040 | | 14,040 |
| 195 | 0207268F | AIRCRAFT ENGINE COMPONENT IMPROVEMENT PROGRAM | 109,243 | | 109,243 |
| 197 | 0207325F | JOINT AIR-TO-SURFACE STANDOFF MISSILE (JASSM) | 29,932 | | 29,932 |
| 198 | 0207410F | AIR & SPACE OPERATIONS CENTER (AOC) | 26,956 | | 26,956 |
| 199 | 0207412F | CONTROL AND REPORTING CENTER (CRC) | 2,450 | | 2,450 |
| 200 | 0207417F | AIRBORNE WARNING AND CONTROL SYSTEM (AWACS) | 151,726 | | 151,726 |
| 201 | 0207418F | TACTICAL AIRBORNE CONTROL SYSTEMS | 3,656 | | 3,656 |
| 203 | 0207431F | COMBAT AIR INTELLIGENCE SYSTEM ACTIVITIES | 13,420 | | 13,420 |
| 204 | 0207444F | TACTICAL AIR CONTROL PARTY-MOD | 10,623 | | 10,623 |
| 205 | 0207448F | C2ISR TACTICAL DATA LINK | 1,754 | | 1,754 |
| 206 | 0207452F | DCAPES | 17,382 | | 17,382 |
| 207 | 0207573F | NATIONAL TECHNICAL NUCLEAR FORENSICS | 2,307 | | 2,307 |
| 208 | 0207590F | SEEK EAGLE | 25,397 | | 25,397 |
| 209 | 0207601F | USAF MODELING AND SIMULATION | 10,175 | | 10,175 |
| 210 | 0207605F | WARGAMING AND SIMULATION CENTERS | 12,839 | | 12,839 |
| 211 | 0207697F | DISTRIBUTED TRAINING AND EXERCISES | 4,190 | | 4,190 |
| 212 | 0208006F | MISSION PLANNING SYSTEMS | 85,531 | | 85,531 |
| 213 | 0208007F | TACTICAL DECEPTION | 3,761 | | 3,761 |
| 214 | 0208087F | AF OFFENSIVE CYBERSPACE OPERATIONS | 35,693 | | 35,693 |
| 215 | 0208088F | AF DEFENSIVE CYBERSPACE OPERATIONS | 20,964 | | 20,964 |
| 218 | 0301017F | GLOBAL SENSOR INTEGRATED ON NETWORK (GSIN) | 3,549 | | 3,549 |
| 219 | 0301112F | NUCLEAR PLANNING AND EXECUTION SYSTEM (NPES) | 4,371 | | 4,371 |
| 227 | 0301401F | AIR FORCE SPACE AND CYBER NON-TRADITIONAL ISR FOR BATTLESPACE AWARENESS | 3,721 | | 3,721 |
| 228 | 0302015F | E–4B NATIONAL AIRBORNE OPERATIONS CENTER (NAOC) | 35,467 | | 35,467 |

| | | | | | |
|---|---|---|---|---|---|
| 230 | 0303131F | MINIMUM ESSENTIAL EMERGENCY COMMUNICATIONS NETWORK (MEECN) | 48,841 | | 48,841 |
| 231 | 0303140F | INFORMATION SYSTEMS SECURITY PROGRAM | 42,973 | | 42,973 |
| 232 | 0303141F | GLOBAL COMBAT SUPPORT SYSTEM | 105 | | 105 |
| 233 | 0303142F | GLOBAL FORCE MANAGEMENT—DATA INITIATIVE | 2,147 | | 2,147 |
| 236 | 0304260F | AIRBORNE SIGINT ENTERPRISE | 121,948 | | 121,948 |
| 237 | 0304310F | COMMERCIAL ECONOMIC ANALYSIS | 3,544 | | 3,544 |
| 240 | 0305020F | CCMD INTELLIGENCE INFORMATION TECHNOLOGY | 1,542 | | 1,542 |
| 241 | 0305099F | GLOBAL AIR TRAFFIC MANAGEMENT (GATM) | 4,453 | | 4,453 |
| 243 | 0305111F | WEATHER SERVICE | 26,654 | 5,000 | 31,654 |
| | | Commercial weather pilot program | | [5,000] | |
| 244 | 0305114F | AIR TRAFFIC CONTROL, APPROACH, AND LANDING SYSTEM (ATCALS) | 6,306 | 1,500 | 7,806 |
| | | Unfunded requirement—ground based sense and avoid | | [1,500] | |
| 245 | 0305116F | AERIAL TARGETS | 21,295 | | 21,295 |
| 248 | 0305128F | SECURITY AND INVESTIGATIVE ACTIVITIES | 415 | | 415 |
| 250 | 0305146F | DEFENSE JOINT COUNTERINTELLIGENCE ACTIVITIES | 3,867 | | 3,867 |
| 257 | 0305202F | DRAGON U–2 | 34,486 | | 34,486 |
| 259 | 0305206F | AIRBORNE RECONNAISSANCE SYSTEMS | 4,450 | 12,800 | 17,250 |
| | | WAMI Technology Upgrades | | [12,800] | |
| 260 | 0305207F | MANNED RECONNAISSANCE SYSTEMS | 14,269 | | 14,269 |
| 261 | 0305208F | DISTRIBUTED COMMON GROUND/SURFACE SYSTEMS | 27,501 | 11,500 | 39,001 |
| | | Unfunded requierment | | [11,500] | |
| 262 | 0305220F | RQ–4 UAV | 214,849 | | 214,849 |
| 263 | 0305221F | NETWORK-CENTRIC COLLABORATIVE TARGETING | 18,842 | | 18,842 |
| 265 | 0305238F | NATO AGS | 44,729 | | 44,729 |
| 266 | 0305240F | SUPPORT TO DCGS ENTERPRISE | 26,349 | | 26,349 |
| 269 | 0305600F | INTERNATIONAL INTELLIGENCE TECHNOLOGY AND ARCHITECTURES | 3,491 | | 3,491 |
| 271 | 0305881F | RAPID CYBER ACQUISITION | 4,899 | | 4,899 |
| 275 | 0305984F | PERSONNEL RECOVERY COMMAND & CTRL (PRC2) | 2,445 | | 2,445 |
| 276 | 0307577F | INTELLIGENCE MISSION DATA (IMD) | 8,684 | | 8,684 |
| 278 | 0401115F | C–130 AIRLIFT SQUADRON | 10,219 | | 10,219 |
| 279 | 0401119F | C–5 AIRLIFT SQUADRONS (IF) | 22,758 | | 22,758 |
| 280 | 0401130F | C–17 AIRCRAFT (IF) | 34,287 | | 34,287 |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 281 | 0401132F | C–130J PROGRAM | 26,821 | | 26,821 |
| 282 | 0401134F | LARGE AIRCRAFT IR COUNTERMEASURES (LAIRCM) | 5,283 | | 5,283 |
| 283 | 0401218F | KC–135S | 9,942 | | 9,942 |
| 284 | 0401219F | KC–10S | 7,933 | | 7,933 |
| 285 | 0401314F | OPERATIONAL SUPPORT AIRLIFT | 6,681 | | 6,681 |
| 286 | 0401318F | CV–22 | 22,519 | | 22,519 |
| 287 | 0401840F | AMC COMMAND AND CONTROL SYSTEM | 3,510 | | 3,510 |
| 288 | 0408011F | SPECIAL TACTICS / COMBAT CONTROL | 8,090 | | 8,090 |
| 289 | 0702207F | DEPOT MAINTENANCE (NON-IF) | 1,528 | | 1,528 |
| 290 | 0708055F | MAINTENANCE, REPAIR & OVERHAUL SYSTEM | 31,677 | | 31,677 |
| 291 | 0708610F | LOGISTICS INFORMATION TECHNOLOGY (LOGIT) | 33,344 | | 33,344 |
| 292 | 0708611F | SUPPORT SYSTEMS DEVELOPMENT | 9,362 | | 9,362 |
| 293 | 0804743F | OTHER FLIGHT TRAINING | 2,074 | | 2,074 |
| 294 | 0808716F | OTHER PERSONNEL ACTIVITIES | 107 | | 107 |
| 295 | 0901202F | JOINT PERSONNEL RECOVERY AGENCY | 2,006 | | 2,006 |
| 296 | 0901218F | CIVILIAN COMPENSATION PROGRAM | 3,780 | | 3,780 |
| 297 | 0901220F | PERSONNEL ADMINISTRATION | 7,472 | | 7,472 |
| 298 | 0901226F | AIR FORCE STUDIES AND ANALYSIS AGENCY | 1,563 | | 1,563 |
| 299 | 0901538F | FINANCIAL MANAGEMENT INFORMATION SYSTEMS DEVELOPMENT | 91,211 | | 91,211 |
| 300 | 1201921F | SERVICE SUPPORT TO STRATCOM—SPACE ACTIVITIES | 14,255 | | 14,255 |
| 301 | 1202247F | AF TENCAP | 31,914 | | 31,914 |
| 302 | 1203001F | FAMILY OF ADVANCED BLOS TERMINALS (FAB-T) | 32,426 | | 32,426 |
| 303 | 1203110F | SATELLITE CONTROL NETWORK (SPACE) | 18,808 | 2,500 | 21,308 |
| | | Program increase | | [2,500] | |
| 305 | 1203165F | NAVSTAR GLOBAL POSITIONING SYSTEM (SPACE AND CONTROL SEGMENTS) | 10,029 | | 10,029 |
| 306 | 1203173F | SPACE AND MISSILE TEST AND EVALUATION CENTER | 25,051 | | 25,051 |
| 307 | 1203174F | SPACE INNOVATION, INTEGRATION AND RAPID TECHNOLOGY DEVELOPMENT | 11,390 | | 11,390 |

| | | | | | |
|---|---|---|---|---|---|
| 308 | 1203179F | INTEGRATED BROADCAST SERVICE (IBS) | 8,747 | | 8,747 |
| 309 | 1203182F | SPACELIFT RANGE SYSTEM (SPACE) | 10,549 | | 10,549 |
| 310 | 1203265F | GPS III SPACE SEGMENT | 243,435 | | 243,435 |
| 311 | 1203400F | SPACE SUPERIORITY INTELLIGENCE | 12,691 | | 12,691 |
| 312 | 1203614F | JSPOC MISSION SYSTEM | 99,455 | | 99,455 |
| 313 | 1203620F | NATIONAL SPACE DEFENSE CENTER | 18,052 | | 18,052 |
| 314 | 1203699F | SHARED EARLY WARNING (SEW) | 1,373 | | 1,373 |
| 315 | 1203906F | NCMC—TW/AA SYSTEM | 5,000 | | 5,000 |
| 316 | 1203913F | NUDET DETECTION SYSTEM (SPACE) | 31,508 | | 31,508 |
| 317 | 1203940F | SPACE SITUATION AWARENESS OPERATIONS | 99,984 | | 99,984 |
| 318 | 1206423F | GLOBAL POSITIONING SYSTEM III—OPERATIONAL CONTROL SEGMENT | 510,938 | | 510,938 |
| 318A | 9999999999 | CLASSIFIED PROGRAMS | 14,938,002 | 36,000 | 14,974,002 |
| | | Program increase | | [36,000] | |
| | | **SUBTOTAL OPERATIONAL SYSTEMS DEVELOPMENT** | **20,585,302** | **178,300** | **20,763,602** |
| | | | | | |
| | | **UNDISTRIBUTED** | | | |
| 319 | 0901560F | UNDISTRIBUTED | | –195,900 | –195,900 |
| | | Bomber Modernization—Excess to Need | | [–195,900] | |
| | | **SUBTOTAL UNDISTRIBUTED** | | **–195,900** | **–195,900** |
| | | | | | |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, AF** | **34,914,359** | **278,255** | **35,192,614** |
| | | | | | |
| | | **RESEARCH, DEVELOPMENT, TEST & EVAL, DW** | | | |
| | | **BASIC RESEARCH** | | | |
| 001 | 0601000BR | DTRA BASIC RESEARCH | 37,201 | | 37,201 |
| 002 | 0601101E | DEFENSE RESEARCH SCIENCES | 432,347 | | 432,347 |
| 003 | 0601110D8Z | BASIC RESEARCH INITIATIVES | 40,612 | | 40,612 |
| 004 | 0601117E | BASIC OPERATIONAL MEDICAL RESEARCH SCIENCE | 43,126 | | 43,126 |
| 005 | 0601120D8Z | NATIONAL DEFENSE EDUCATION PROGRAM | 74,298 | | 74,298 |
| 006 | 0601228D8Z | HISTORICALLY BLACK COLLEGES AND UNIVERSITIES/MINORITY INSTITUTIONS | 25,865 | 10,000 | 35,865 |
| | | Program Increase | | [10,000] | |
| 007 | 0601384BP | CHEMICAL AND BIOLOGICAL DEFENSE PROGRAM | 43,898 | | 43,898 |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| | | **SUBTOTAL BASIC RESEARCH** | **697,347** | **10,000** | **707,347** |
| | | **APPLIED RESEARCH** | | | |
| 008 | 0602000D8Z | JOINT MUNITIONS TECHNOLOGY | 19,111 | | 19,111 |
| 009 | 0602115E | BIOMEDICAL TECHNOLOGY | 109,360 | | 109,360 |
| 011 | 0602234D8Z | LINCOLN LABORATORY RESEARCH PROGRAM | 49,748 | | 49,748 |
| 012 | 0602251D8Z | APPLIED RESEARCH FOR THE ADVANCEMENT OF S&T PRIORITIES | 49,226 | | 49,226 |
| 013 | 0602303E | INFORMATION & COMMUNICATIONS TECHNOLOGY | 392,784 | | 392,784 |
| 014 | 0602383E | BIOLOGICAL WARFARE DEFENSE | 13,014 | | 13,014 |
| 015 | 0602384BP | CHEMICAL AND BIOLOGICAL DEFENSE PROGRAM | 201,053 | | 201,053 |
| 016 | 0602668D8Z | CYBER SECURITY RESEARCH | 14,775 | | 14,775 |
| 017 | 0602702E | TACTICAL TECHNOLOGY | 343,776 | | 343,776 |
| 018 | 0602715E | MATERIALS AND BIOLOGICAL TECHNOLOGY | 224,440 | | 224,440 |
| 019 | 0602716E | ELECTRONICS TECHNOLOGY | 295,447 | | 295,447 |
| 020 | 0602718BR | COUNTER WEAPONS OF MASS DESTRUCTION APPLIED RESEARCH | 157,908 | | 157,908 |
| 021 | 0602751D8Z | SOFTWARE ENGINEERING INSTITUTE (SEI) APPLIED RESEARCH | 8,955 | | 8,955 |
| 022 | 1160401BB | SOF TECHNOLOGY DEVELOPMENT | 34,493 | | 34,493 |
| | | **SUBTOTAL APPLIED RESEARCH** | **1,914,090** | | **1,914,090** |
| | | **ADVANCED TECHNOLOGY DEVELOPMENT** | | | |
| 023 | 0603000D8Z | JOINT MUNITIONS ADVANCED TECHNOLOGY | 25,627 | | 25,627 |
| 024 | 0603122D8Z | COMBATING TERRORISM TECHNOLOGY SUPPORT | 76,230 | 5,000 | 81,230 |
| | | Program increase—conventional EOD equipment | | [5,000] | |
| 025 | 0603133D8Z | FOREIGN COMPARATIVE TESTING | 24,199 | | 24,199 |
| 026 | 0603160BR | COUNTER WEAPONS OF MASS DESTRUCTION ADVANCED TECHNOLOGY DEVELOPMENT | 268,607 | | 268,607 |
| 027 | 0603176C | ADVANCED CONCEPTS AND PERFORMANCE ASSESSMENT | 12,996 | | 12,996 |
| 029 | 0603178C | WEAPONS TECHNOLOGY | 5,495 | 55,100 | 60,595 |

| | | | | | |
|---|---|---|---|---|---|
| | | Restore funding for directed energy prioritization in DoD's BMD efforts | | [55,100] | |
| 031 | 0603180C | ADVANCED RESEARCH | 20,184 | | 20,184 |
| 032 | 0603225D8Z | JOINT DOD-DOE MUNITIONS TECHNOLOGY DEVELOPMENT | 18,662 | | 18,662 |
| 035 | 0603286E | ADVANCED AEROSPACE SYSTEMS | 155,406 | | 155,406 |
| 036 | 0603287E | SPACE PROGRAMS AND TECHNOLOGY | 247,435 | | 247,435 |
| 037 | 0603288D8Z | ANALYTIC ASSESSMENTS | 13,154 | | 13,154 |
| 038 | 0603289D8Z | ADVANCED INNOVATIVE ANALYSIS AND CONCEPTS | 37,674 | –7,000 | 30,674 |
| | | Program decrease | | [–7,000] | |
| 039 | 0603291D8Z | ADVANCED INNOVATIVE ANALYSIS AND CONCEPTS—MHA | 15,000 | | 15,000 |
| 040 | 0603294C | COMMON KILL VEHICLE TECHNOLOGY | 252,879 | | 252,879 |
| 041 | 0603342D8W | DEFENSE INNOVATION UNIT EXPERIMENTAL (DIUX) | 29,594 | | 29,594 |
| 042 | 0603375D8Z | TECHNOLOGY INNOVATION | 59,863 | –35,000 | 24,863 |
| | | Unjustified growth | | [–35,000] | |
| 043 | 0603384BP | CHEMICAL AND BIOLOGICAL DEFENSE PROGRAM—ADVANCED DEVELOPMENT | 145,359 | | 145,359 |
| 044 | 0603527D8Z | RETRACT LARCH | 171,120 | | 171,120 |
| 045 | 0603618D8Z | JOINT ELECTRONIC ADVANCED TECHNOLOGY | 14,389 | | 14,389 |
| 046 | 0603648D8Z | JOINT CAPABILITY TECHNOLOGY DEMONSTRATIONS | 105,871 | | 105,871 |
| 047 | 0603662D8Z | NETWORKED COMMUNICATIONS CAPABILITIES | 12,661 | | 12,661 |
| 048 | 0603680D8Z | DEFENSE-WIDE MANUFACTURING SCIENCE AND TECHNOLOGY PROGRAM | 136,159 | | 136,159 |
| 049 | 0603680S | MANUFACTURING TECHNOLOGY PROGRAM | 40,511 | | 40,511 |
| 050 | 0603699D8Z | EMERGING CAPABILITIES TECHNOLOGY DEVELOPMENT | 57,876 | –8,000 | 49,876 |
| | | SOCOM ATL effort | | [–8,000] | |
| 051 | 0603712S | GENERIC LOGISTICS R&D TECHNOLOGY DEMONSTRATIONS | 10,611 | | 10,611 |
| 053 | 0603716D8Z | STRATEGIC ENVIRONMENTAL RESEARCH PROGRAM | 71,832 | 10,000 | 81,832 |
| | | Environmental resiliency | | [10,000] | |
| 054 | 0603720S | MICROELECTRONICS TECHNOLOGY DEVELOPMENT AND SUPPORT | 219,803 | | 219,803 |
| 055 | 0603727D8Z | JOINT WARFIGHTING PROGRAM | 6,349 | | 6,349 |
| 056 | 0603739E | ADVANCED ELECTRONICS TECHNOLOGIES | 79,173 | | 79,173 |
| 057 | 0603760E | COMMAND, CONTROL AND COMMUNICATIONS SYSTEMS | 106,787 | | 106,787 |
| 058 | 0603766E | NETWORK-CENTRIC WARFARE TECHNOLOGY | 439,386 | | 439,386 |
| 059 | 0603767E | SENSOR TECHNOLOGY | 210,123 | | 210,123 |
| 060 | 0603769D8Z | DISTRIBUTED LEARNING ADVANCED TECHNOLOGY DEVELOPMENT | 11,211 | | 11,211 |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 062 | 0603781D8Z | SOFTWARE ENGINEERING INSTITUTE | 15,047 | | 15,047 |
| 063 | 0603826D8Z | QUICK REACTION SPECIAL PROJECTS | 69,203 | | 69,203 |
| 064 | 0603833D8Z | ENGINEERING SCIENCE & TECHNOLOGY | 25,395 | | 25,395 |
| 065 | 0603941D8Z | TEST & EVALUATION SCIENCE & TECHNOLOGY | 89,586 | | 89,586 |
| 066 | 0604055D8Z | OPERATIONAL ENERGY CAPABILITY IMPROVEMENT | 38,403 | | 38,403 |
| 067 | 0303310D8Z | CWMD SYSTEMS | 33,382 | | 33,382 |
| 068 | 1160402BB | SOF ADVANCED TECHNOLOGY DEVELOPMENT | 72,605 | | 72,605 |
| | | **SUBTOTAL ADVANCED TECHNOLOGY DEVELOPMENT** | **3,445,847** | **20,100** | **3,465,947** |
| | | | | | |
| | | **ADVANCED COMPONENT DEVELOPMENT AND PROTOTYPES** | | | |
| 069 | 0603161D8Z | NUCLEAR AND CONVENTIONAL PHYSICAL SECURITY EQUIPMENT RDT&E ADC&P | 32,937 | | 32,937 |
| 070 | 0603600D8Z | WALKOFF | 101,714 | | 101,714 |
| 072 | 0603821D8Z | ACQUISITION ENTERPRISE DATA & INFORMATION SERVICES | 2,198 | | 2,198 |
| 073 | 0603851D8Z | ENVIRONMENTAL SECURITY TECHNICAL CERTIFICATION PROGRAM | 54,583 | | 54,583 |
| 074 | 0603881C | BALLISTIC MISSILE DEFENSE TERMINAL DEFENSE SEGMENT | 230,162 | | 230,162 |
| 075 | 0603882C | BALLISTIC MISSILE DEFENSE MIDCOURSE DEFENSE SEGMENT | 828,097 | 21,996 | 850,093 |
| | | Improve Discrimination Capability for GMD | | [21,996] | |
| 076 | 0603884BP | CHEMICAL AND BIOLOGICAL DEFENSE PROGRAM—DEM/VAL | 148,518 | | 148,518 |
| 077 | 0603884C | BALLISTIC MISSILE DEFENSE SENSORS | 247,345 | 78,862 | 326,207 |
| | | Funding increase to accelerate development and deployment of interim and perm MD enhancements for HI. | | [21,000] | |
| | | Improve Discrimination Capability for GMD | | [57,862] | |
| 078 | 0603890C | BMD ENABLING PROGRAMS | 449,442 | 29,442 | 478,884 |
| | | GMD Discrimination | | [23,342] | |
| | | Improve High Fidelity Modeling and Simulation for GMD | | [6,100] | |
| 079 | 0603891C | SPECIAL PROGRAMS—MDA | 320,190 | | 320,190 |
| 080 | 0603892C | AEGIS BMD | 852,052 | | 852,052 |

| | | | | | |
|---|---|---|---|---|---|
| 083 | 0603896C | BALLISTIC MISSILE DEFENSE COMMAND AND CONTROL, BATTLE MANAGEMENT AND COMMUNICATI | 430,115 | | 430,115 |
| 084 | 0603898C | BALLISTIC MISSILE DEFENSE JOINT WARFIGHTER SUPPORT | 48,954 | | 48,954 |
| 085 | 0603904C | MISSILE DEFENSE INTEGRATION & OPERATIONS CENTER (MDIOC) | 53,265 | | 53,265 |
| 086 | 0603906C | REGARDING TRENCH | 9,113 | | 9,113 |
| 087 | 0603907C | SEA BASED X-BAND RADAR (SBX) | 130,695 | | 130,695 |
| 088 | 0603913C | ISRAELI COOPERATIVE PROGRAMS | 105,354 | | 105,354 |
| 089 | 0603914C | BALLISTIC MISSILE DEFENSE TEST | 305,791 | | 305,791 |
| 090 | 0603915C | BALLISTIC MISSILE DEFENSE TARGETS | 410,425 | | 410,425 |
| 091 | 0603920D8Z | HUMANITARIAN DEMINING | 10,837 | | 10,837 |
| 092 | 0603923D8Z | COALITION WARFARE | 10,740 | | 10,740 |
| 093 | 0604016D8Z | DEPARTMENT OF DEFENSE CORROSION PROGRAM | 3,837 | | 3,837 |
| 094 | 0604115C | TECHNOLOGY MATURATION INITIATIVES | 128,406 | 130,000 | 258,406 |
| | | Acceleration of kintetic and nonkinetic boost phase BMD | | [100,000] | |
| | | Program increase | | [30,000] | |
| 095 | 0604132D8Z | MISSILE DEFEAT PROJECT | 98,369 | | 98,369 |
| 096 | 0604181C | HYPERSONIC DEFENSE | 75,300 | | 75,300 |
| 097 | 0604250D8Z | ADVANCED INNOVATIVE TECHNOLOGIES | 1,175,832 | –22,000 | 1,153,832 |
| | | Program decrease | | [–22,000] | |
| 098 | 0604294D8Z | TRUSTED & ASSURED MICROELECTRONICS | 83,626 | | 83,626 |
| 099 | 0604331D8Z | RAPID PROTOTYPING PROGRAM | 100,000 | | 100,000 |
| 101 | 0604400D8Z | DEPARTMENT OF DEFENSE (DOD) UNMANNED SYSTEM COMMON DEVELOPMENT | 3,967 | | 3,967 |
| 102 | 0604682D8Z | WARGAMING AND SUPPORT FOR STRATEGIC ANALYSIS (SSA) | 3,833 | | 3,833 |
| 104 | 0604826J | JOINT C5 CAPABILITY DEVELOPMENT, INTEGRATION AND INTEROPERABILITY ASSESSMENTS | 23,638 | | 23,638 |
| 105 | 0604873C | LONG RANGE DISCRIMINATION RADAR (LRDR) | 357,659 | | 357,659 |
| 106 | 0604874C | IMPROVED HOMELAND DEFENSE INTERCEPTORS | 465,530 | 80,000 | 545,530 |
| | | C3 Booster Development | | [80,000] | |
| 107 | 0604876C | BALLISTIC MISSILE DEFENSE TERMINAL DEFENSE SEGMENT TEST | 36,239 | | 36,239 |
| 108 | 0604878C | AEGIS BMD TEST | 134,468 | 26,351 | 160,819 |
| | | To provide AAW at Aegis Ashore sites, consistent w/ FY16 and FY17 NDAAs | | [26,351] | |
| 109 | 0604879C | BALLISTIC MISSILE DEFENSE SENSOR TEST | 84,239 | | 84,239 |
| 110 | 0604880C | LAND-BASED SM–3 (LBSM3) | 30,486 | 67,275 | 97,761 |
| | | To provide AAW at Aegis Ashore sites, consistent w/ FY16 and FY17 NDAAs | | [67,275] | |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 111 | 0604881C | AEGIS SM–3 BLOCK IIA CO-DEVELOPMENT | 9,739 | | 9,739 |
| 112 | 0604887C | BALLISTIC MISSILE DEFENSE MIDCOURSE SEGMENT TEST | 76,757 | | 76,757 |
| 113 | 0604894C | MULTI-OBJECT KILL VEHICLE | 6,500 | | 6,500 |
| 114 | 0303191D8Z | JOINT ELECTROMAGNETIC TECHNOLOGY (JET) PROGRAM | 2,902 | | 2,902 |
| 115 | 0305103C | CYBER SECURITY INITIATIVE | 986 | | 986 |
| 116 | 1206893C | SPACE TRACKING & SURVEILLANCE SYSTEM | 34,907 | | 34,907 |
| 117 | 1206895C | BALLISTIC MISSILE DEFENSE SYSTEM SPACE PROGRAMS | 16,994 | | 16,994 |
| | | **SUBTOTAL ADVANCED COMPONENT DEVELOPMENT AND PROTOTYPES** | **7,736,741** | **411,926** | **8,148,667** |
| | | **SYSTEM DEVELOPMENT AND DEMONSTRATION** | | | |
| 118 | 0604161D8Z | NUCLEAR AND CONVENTIONAL PHYSICAL SECURITY EQUIPMENT RDT&E SDD | 12,536 | | 12,536 |
| 119 | 0604165D8Z | PROMPT GLOBAL STRIKE CAPABILITY DEVELOPMENT | 201,749 | | 201,749 |
| 120 | 0604384BP | CHEMICAL AND BIOLOGICAL DEFENSE PROGRAM—EMD | 406,789 | | 406,789 |
| 122 | 0604771D8Z | JOINT TACTICAL INFORMATION DISTRIBUTION SYSTEM (JTIDS) | 15,358 | | 15,358 |
| 123 | 0605000BR | COUNTER WEAPONS OF MASS DESTRUCTION SYSTEMS DEVELOPMENT | 6,241 | | 6,241 |
| 124 | 0605013BL | INFORMATION TECHNOLOGY DEVELOPMENT | 12,322 | | 12,322 |
| 125 | 0605021SE | HOMELAND PERSONNEL SECURITY INITIATIVE | 4,893 | | 4,893 |
| 126 | 0605022D8Z | DEFENSE EXPORTABILITY PROGRAM | 3,162 | | 3,162 |
| 127 | 0605027D8Z | OUSD(C) IT DEVELOPMENT INITIATIVES | 21,353 | | 21,353 |
| 128 | 0605070S | DOD ENTERPRISE SYSTEMS DEVELOPMENT AND DEMONSTRATION | 6,266 | | 6,266 |
| 129 | 0605075D8Z | DCMO POLICY AND INTEGRATION | 2,810 | | 2,810 |
| 130 | 0605080S | DEFENSE AGENCY INITIATIVES (DAI)—FINANCIAL SYSTEM | 24,436 | | 24,436 |
| 131 | 0605090S | DEFENSE RETIRED AND ANNUITANT PAY SYSTEM (DRAS) | 13,475 | | 13,475 |
| 133 | 0605210D8Z | DEFENSE-WIDE ELECTRONIC PROCUREMENT CAPABILITIES | 11,870 | | 11,870 |
| 134 | 0605294D8Z | TRUSTED & ASSURED MICROELECTRONICS | 61,084 | | 61,084 |
| 135 | 0303141K | GLOBAL COMBAT SUPPORT SYSTEM | 2,576 | | 2,576 |
| 136 | 0305304D8Z | DOD ENTERPRISE ENERGY INFORMATION MANAGEMENT (EEIM) | 3,669 | | 3,669 |

| | | | | | |
|---|---|---|---|---|---|
| 137 | 0305310D8Z | CWMD SYSTEMS: SYSTEM DEVELOPMENT AND DEMONSTRATION | 8,230 | | 8,230 |
| | | **SUBTOTAL SYSTEM DEVELOPMENT AND DEMONSTRATION** | **818,819** | | **818,819** |
| | | **MANAGEMENT SUPPORT** | | | |
| 138 | 0604774D8Z | DEFENSE READINESS REPORTING SYSTEM (DRRS) | 6,941 | | 6,941 |
| 139 | 0604875D8Z | JOINT SYSTEMS ARCHITECTURE DEVELOPMENT | 4,851 | | 4,851 |
| 140 | 0604940D8Z | CENTRAL TEST AND EVALUATION INVESTMENT DEVELOPMENT (CTEIP) | 211,325 | | 211,325 |
| 141 | 0604942D8Z | ASSESSMENTS AND EVALUATIONS | 30,144 | 20,000 | 50,144 |
| | | Program increase for cyber vulnerability assessments and hardening | | [20,000] | |
| 142 | 0605001E | MISSION SUPPORT | 63,769 | | 63,769 |
| 143 | 0605100D8Z | JOINT MISSION ENVIRONMENT TEST CAPABILITY (JMETC) | 91,057 | | 91,057 |
| 144 | 0605104D8Z | TECHNICAL STUDIES, SUPPORT AND ANALYSIS | 22,386 | | 22,386 |
| 145 | 0605126J | JOINT INTEGRATED AIR AND MISSILE DEFENSE ORGANIZATION (JIAMDO) | 36,581 | | 36,581 |
| 147 | 0605142D8Z | SYSTEMS ENGINEERING | 37,622 | | 37,622 |
| 148 | 0605151D8Z | STUDIES AND ANALYSIS SUPPORT—OSD | 5,200 | | 5,200 |
| 149 | 0605161D8Z | NUCLEAR MATTERS-PHYSICAL SECURITY | 5,232 | | 5,232 |
| 150 | 0605170D8Z | SUPPORT TO NETWORKS AND INFORMATION INTEGRATION | 12,583 | | 12,583 |
| 151 | 0605200D8Z | GENERAL SUPPORT TO USD (INTELLIGENCE) | 31,451 | | 31,451 |
| 152 | 0605384BP | CHEMICAL AND BIOLOGICAL DEFENSE PROGRAM | 104,348 | | 104,348 |
| 161 | 0605790D8Z | SMALL BUSINESS INNOVATION RESEARCH (SBIR)/ SMALL BUSINESS TECHNOLOGY TRANSFER | 2,372 | | 2,372 |
| 162 | 0605798D8Z | DEFENSE TECHNOLOGY ANALYSIS | 24,365 | | 24,365 |
| 163 | 0605801KA | DEFENSE TECHNICAL INFORMATION CENTER (DTIC) | 54,145 | | 54,145 |
| 164 | 0605803SE | R&D IN SUPPORT OF DOD ENLISTMENT, TESTING AND EVALUATION | 30,356 | | 30,356 |
| 165 | 0605804D8Z | DEVELOPMENT TEST AND EVALUATION | 20,571 | | 20,571 |
| 166 | 0605898E | MANAGEMENT HQ—R&D | 14,017 | | 14,017 |
| 167 | 0605998KA | MANAGEMENT HQ—DEFENSE TECHNICAL INFORMATION CENTER (DTIC) | 4,187 | | 4,187 |
| 168 | 0606100D8Z | BUDGET AND PROGRAM ASSESSMENTS | 3,992 | | 3,992 |
| 169 | 0606225D8Z | ODNA TECHNOLOGY AND RESOURCE ANALYSIS | 1,000 | | 1,000 |
| 170 | 0203345D8Z | DEFENSE OPERATIONS SECURITY INITIATIVE (DOSI) | 2,551 | | 2,551 |
| 171 | 0204571J | JOINT STAFF ANALYTICAL SUPPORT | 7,712 | | 7,712 |
| 174 | 0303166J | SUPPORT TO INFORMATION OPERATIONS (IO) CAPABILITIES | 673 | | 673 |
| 175 | 0303260D8Z | DEFENSE MILITARY DECEPTION PROGRAM OFFICE (DMDPO) | 1,006 | | 1,006 |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 177 | 0305172K | COMBINED ADVANCED APPLICATIONS | 16,998 | | 16,998 |
| 180 | 0305245D8Z | INTELLIGENCE CAPABILITIES AND INNOVATION INVESTMENTS | 18,992 | | 18,992 |
| 181 | 0306310D8Z | CWMD SYSTEMS: RDT&E MANAGEMENT SUPPORT | 1,231 | | 1,231 |
| 183 | 0804767J | COCOM EXERCISE ENGAGEMENT AND TRAINING TRANSFORMATION (CE2T2)—MHA | 44,500 | | 44,500 |
| 184 | 0901598C | MANAGEMENT HQ—MDA | 29,947 | | 29,947 |
| 187 | 0903235K | JOINT SERVICE PROVIDER (JSP) | 5,113 | | 5,113 |
| 187A | 9999999999 | CLASSIFIED PROGRAMS | 63,312 | | 63,312 |
| | | **SUBTOTAL MANAGEMENT SUPPORT** | **1,010,530** | **20,000** | **1,030,530** |
| | | | | | |
| | | **OPERATIONAL SYSTEM DEVELOPMENT** | | | |
| 188 | 0604130V | ENTERPRISE SECURITY SYSTEM (ESS) | 4,565 | | 4,565 |
| 189 | 0605127T | REGIONAL INTERNATIONAL OUTREACH (RIO) AND PARTNERSHIP FOR PEACE INFORMATION MANA | 1,871 | | 1,871 |
| 190 | 0605147T | OVERSEAS HUMANITARIAN ASSISTANCE SHARED INFORMATION SYSTEM (OHASIS) | 298 | | 298 |
| 191 | 0607210D8Z | INDUSTRIAL BASE ANALYSIS AND SUSTAINMENT SUPPORT | 10,882 | 5,000 | 15,882 |
| | | Program increase for increase analytical support | | [5,000] | |
| 192 | 0607310D8Z | CWMD SYSTEMS: OPERATIONAL SYSTEMS DEVELOPMENT | 7,222 | | 7,222 |
| 193 | 0607327T | GLOBAL THEATER SECURITY COOPERATION MANAGEMENT INFORMATION SYSTEMS (G-TSCMIS) | 14,450 | | 14,450 |
| 194 | 0607384BP | CHEMICAL AND BIOLOGICAL DEFENSE (OPERATIONAL SYSTEMS DEVELOPMENT) | 45,677 | | 45,677 |
| 195 | 0208043J | PLANNING AND DECISION AID SYSTEM (PDAS) | 3,037 | | 3,037 |
| 196 | 0208045K | C4I INTEROPERABILITY | 59,490 | | 59,490 |
| 198 | 0301144K | JOINT/ALLIED COALITION INFORMATION SHARING | 6,104 | | 6,104 |
| 202 | 0302016K | NATIONAL MILITARY COMMAND SYSTEM-WIDE SUPPORT | 1,863 | | 1,863 |
| 203 | 0302019K | DEFENSE INFO INFRASTRUCTURE ENGINEERING AND INTEGRATION | 21,564 | | 21,564 |
| 204 | 0303126K | LONG-HAUL COMMUNICATIONS—DCS | 15,428 | | 15,428 |
| 205 | 0303131K | MINIMUM ESSENTIAL EMERGENCY COMMUNICATIONS NETWORK (MEECN) | 15,855 | | 15,855 |
| 206 | 0303135G | PUBLIC KEY INFRASTRUCTURE (PKI) | 4,811 | | 4,811 |
| 207 | 0303136G | KEY MANAGEMENT INFRASTRUCTURE (KMI) | 33,746 | | 33,746 |

| Line | Program Element | Item | Request | Change | Authorized |
|---|---|---|---|---|---|
| 208 | 0303140D8Z | INFORMATION SYSTEMS SECURITY PROGRAM | 9,415 | 10,000 | 19,415 |
| | | Cyber Scholarship Program | | [10,000] | |
| 209 | 0303140G | INFORMATION SYSTEMS SECURITY PROGRAM | 227,652 | 8,000 | 235,652 |
| | | Program increase to support cyber defense education of reservists and the National Guard | | [8,000] | |
| 210 | 0303150K | GLOBAL COMMAND AND CONTROL SYSTEM | 42,687 | | 42,687 |
| 211 | 0303153K | DEFENSE SPECTRUM ORGANIZATION | 8,750 | | 8,750 |
| 214 | 0303228K | JOINT INFORMATION ENVIRONMENT (JIE) | 4,689 | | 4,689 |
| 216 | 0303430K | FEDERAL INVESTIGATIVE SERVICES INFORMATION TECHNOLOGY | 50,000 | | 50,000 |
| 222 | 0305103K | CYBER SECURITY INITIATIVE | 1,686 | | 1,686 |
| 227 | 0305186D8Z | POLICY R&D PROGRAMS | 6,526 | | 6,526 |
| 228 | 0305199D8Z | NET CENTRICITY | 18,455 | | 18,455 |
| 230 | 0305208BB | DISTRIBUTED COMMON GROUND/SURFACE SYSTEMS | 5,496 | | 5,496 |
| 233 | 0305208K | DISTRIBUTED COMMON GROUND/SURFACE SYSTEMS | 3,049 | | 3,049 |
| 236 | 0305327V | INSIDER THREAT | 5,365 | | 5,365 |
| 237 | 0305387D8Z | HOMELAND DEFENSE TECHNOLOGY TRANSFER PROGRAM | 2,071 | | 2,071 |
| 243 | 0307577D8Z | INTELLIGENCE MISSION DATA (IMD) | 13,111 | | 13,111 |
| 245 | 0708012S | PACIFIC DISASTER CENTERS | 1,770 | | 1,770 |
| 246 | 0708047S | DEFENSE PROPERTY ACCOUNTABILITY SYSTEM | 2,924 | | 2,924 |
| 248 | 1105219BB | MQ–9 UAV | 37,863 | | 37,863 |
| 251 | 1160403BB | AVIATION SYSTEMS | 259,886 | 7,500 | 267,386 |
| | | Per SOCOM requested realignment | | [7,500] | |
| 252 | 1160405BB | INTELLIGENCE SYSTEMS DEVELOPMENT | 8,245 | | 8,245 |
| 253 | 1160408BB | OPERATIONAL ENHANCEMENTS | 79,455 | | 79,455 |
| 254 | 1160431BB | WARRIOR SYSTEMS | 45,935 | | 45,935 |
| 255 | 1160432BB | SPECIAL PROGRAMS | 1,978 | | 1,978 |
| 256 | 1160434BB | UNMANNED ISR | 31,766 | | 31,766 |
| 257 | 1160480BB | SOF TACTICAL VEHICLES | 2,578 | | 2,578 |
| 258 | 1160483BB | MARITIME SYSTEMS | 42,315 | 12,800 | 55,115 |
| | | Per SOCOM requested realignment | | [12,800] | |
| 259 | 1160489BB | GLOBAL VIDEO SURVEILLANCE ACTIVITIES | 4,661 | | 4,661 |
| 260 | 1160490BB | OPERATIONAL ENHANCEMENTS INTELLIGENCE | 12,049 | | 12,049 |
| 261 | 1203610K | TELEPORT PROGRAM | 642 | | 642 |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 261A | 9999999999 | CLASSIFIED PROGRAMS | 3,689,646 | | 3,689,646 |
| | | **SUBTOTAL OPERATIONAL SYSTEM DEVELOPMENT** | **4,867,528** | **43,300** | **4,910,828** |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, DW** | **20,490,902** | **505,326** | **20,996,228** |
| | | **OPERATIONAL TEST & EVAL, DEFENSE** | | | |
| | | **MANAGEMENT SUPPORT** | | | |
| 001 | 0605118OTE | OPERATIONAL TEST AND EVALUATION | 83,503 | | 83,503 |
| 002 | 0605131OTE | LIVE FIRE TEST AND EVALUATION | 59,500 | | 59,500 |
| 003 | 0605814OTE | OPERATIONAL TEST ACTIVITIES AND ANALYSES | 67,897 | | 67,897 |
| | | **SUBTOTAL MANAGEMENT SUPPORT** | **210,900** | | **210,900** |
| | | **TOTAL OPERATIONAL TEST & EVAL, DEFENSE** | **210,900** | | **210,900** |
| | | **TOTAL RDT&E** | **82,716,636** | **1,321,721** | **84,038,357** |

## SEC. 4202. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION FOR OVERSEAS CONTINGENCY OPERATIONS.

**SEC. 4202. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 006 | 0602120A | SENSORS AND ELECTRONIC SURVIVABILITY | | | v |
| | | **ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | | | |

| | | | | | |
|---|---|---|---|---|---|
| 055 | 0603327A | AIR AND MISSILE DEFENSE SYSTEMS ENGINEERING | 15,000 | –15,000 | |
| | | Realign European Reassurance Initiative to Base | | [–15,000] | |
| 058 | 0603639A | TANK AND MEDIUM CALIBER AMMUNITION | | 4,000 | 4,000 |
| | | Unfunded requirement—JLTV lethality 30mm upgrade | | [4,000] | |
| 060 | 0603747A | SOLDIER SUPPORT AND SURVIVABILITY | 3,000 | | 3,000 |
| | | **SUBTOTAL ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | **18,000** | **–11,000** | **7,000** |
| | | | | | |
| | | **SYSTEM DEVELOPMENT & DEMONSTRATION** | | | |
| 080 | 0604201A | AIRCRAFT AVIONICS | | 12,000 | 12,000 |
| | | Unfunded requirement—A-PNT measures | | [12,000] | |
| 122 | 0605032A | TRACTOR TIRE | 5,000 | | 5,000 |
| 125 | 0605035A | COMMON INFRARED COUNTERMEASURES (CIRCM) | 21,540 | | 21,540 |
| 132 | 0605049A | MISSILE WARNING SYSTEM MODERNIZATION (MWSM) | | 155,000 | 155,000 |
| | | Unfunded requirements—LIMWS | | [155,000] | |
| 133 | 0605051A | AIRCRAFT SURVIVABILITY DEVELOPMENT | 30,100 | | 30,100 |
| 147 | 0303032A | TROJAN—RH12 | 1,200 | | 1,200 |
| | | **SUBTOTAL SYSTEM DEVELOPMENT & DEMONSTRATION** | **57,840** | **167,000** | **224,840** |
| | | | | | |
| | | **OPERATIONAL SYSTEMS DEVELOPMENT** | | | |
| 183 | 0607134A | LONG RANGE PRECISION FIRES (LRPF) | | 56,731 | 56,731 |
| | | Unfunded requirement | | [42,731] | |
| | | Unfunded requirement—CDAEM Bridging Strategy | | [14,000] | |
| 191 | 0607142A | AVIATION ROCKET SYSTEM PRODUCT IMPROVEMENT AND DEVELOPMENT | | 8,000 | 8,000 |
| | | Unfunded requirement—M282 warhead qualification | | [8,000] | |
| 203 | 0203801A | MISSILE/AIR DEFENSE PRODUCT IMPROVEMENT PROGRAM | 15,000 | –15,000 | |
| | | Realign European Reassurance Initiative to Base | | [–15,000] | |
| 222 | 0305204A | TACTICAL UNMANNED AERIAL VEHICLES | 7,492 | –7,492 | |
| | | Realign European Reassurance Initiative to Base | | [–7,492] | |
| 223 | 0305206A | AIRBORNE RECONNAISSANCE SYSTEMS | 15,000 | –15,000 | |
| | | Realign European Reassurance Initiative to Base | | [–15,000] | |
| 228 | 0307665A | BIOMETRICS ENABLED INTELLIGENCE | 6,036 | | 6,036 |
| | | **SUBTOTAL OPERATIONAL SYSTEMS DEVELOPMENT** | **43,528** | **27,239** | **70,767** |

**SEC. 4202. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, ARMY** | **119,368** | **183,239** | **302,607** |
| | | **ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | | | |
| 041 | 0603527N | RETRACT LARCH | 22,000 | | 22,000 |
| 081 | 0604272N | TACTICAL AIR DIRECTIONAL INFRARED COUNTERMEASURES (TADIRCM) | 5,710 | | 5,710 |
| | | **SUBTOTAL ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | **27,710** | | **27,710** |
| | | **OPERATIONAL SYSTEMS DEVELOPMENT** | | | |
| 207 | 0204311N | INTEGRATED SURVEILLANCE SYSTEM | 11,600 | –11,600 | |
| | | Realign European Reassurance Initiative to Base | | [–11,600] | |
| 211 | 0204574N | CRYPTOLOGIC DIRECT SUPPORT | 1,200 | | 1,200 |
| 253A | 9999999999 | CLASSIFIED PROGRAMS | 89,855 | | 89,855 |
| | | **SUBTOTAL OPERATIONAL SYSTEMS DEVELOPMENT** | **102,655** | **–11,600** | **91,055** |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, NAVY** | **130,365** | **–11,600** | **118,765** |
| | | **ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | | | |
| 029 | 0603438F | SPACE CONTROL TECHNOLOGY | 7,800 | | 7,800 |
| 053 | 0306250F | CYBER OPERATIONS TECHNOLOGY DEVELOPMENT | 5,400 | | 5,400 |
| | | **SUBTOTAL ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | **13,200** | | **13,200** |
| | | **OPERATIONAL SYSTEMS DEVELOPMENT** | | | |
| 196 | 0207277F | ISR INNOVATIONS | 5,750 | | 5,750 |
| 214 | 0208087F | AF OFFENSIVE CYBERSPACE OPERATIONS | 4,000 | | 4,000 |
| 286 | 0401318F | CV–22 | | 14,000 | 14,000 |
| | | Unfunded requirement—common eletrical interface | | [7,000] | |

| | | | | | |
|---|---|---|---|---|---|
| | | Unfunded requirement—intelligence broadcast system | | [7,000] | |
| 318A | 9999999999 | CLASSIFIED PROGRAMS | 112,408 | | 112,408 |
| | | **SUBTOTAL OPERATIONAL SYSTEMS DEVELOPMENT** | **122,158** | **14,000** | **136,158** |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, AF** | **135,358** | **14,000** | **149,358** |
| | | **ADVANCED TECHNOLOGY DEVELOPMENT** | | | |
| 024 | 0603122D8Z | COMBATING TERRORISM TECHNOLOGY SUPPORT | 25,000 | | 25,000 |
| | | **SUBTOTAL ADVANCED TECHNOLOGY DEVELOPMENT** | **25,000** | | **25,000** |
| | | **ADVANCED COMPONENT DEVELOPMENT AND PROTOTYPES** | | | |
| 088 | 0603913C | ISRAELI COOPERATIVE PROGRAMS | | 507,646 | 507,646 |
| | | Additional Cooperative funds, consistent with Title XVI authorizations | | [507,646] | |
| | | **SUBTOTAL ADVANCED COMPONENT DEVELOPMENT AND PROTOTYPES** | | **507,646** | **507,646** |
| | | **OPERATIONAL SYSTEM DEVELOPMENT** | | | |
| 253 | 1160408BB | OPERATIONAL ENHANCEMENTS | 1,920 | 2,000 | 3,920 |
| | | Unfunded Requirement- Publicly Available Information (PAI) Capability Acceleration | | [2,000] | |
| 256 | 1160434BB | UNMANNED ISR | 3,000 | | 3,000 |
| 261A | 9999999999 | CLASSIFIED PROGRAMS | 196,176 | | 196,176 |
| | | **SUBTOTAL OPERATIONAL SYSTEM DEVELOPMENT** | **201,096** | **2,000** | **203,096** |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, DW** | **226,096** | **509,646** | **735,742** |
| | | **TOTAL RDT&E** | **611,187** | **695,285** | **1,306,472** |

**SEC. 4203. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION FOR OVERSEAS CONTINGENCY OPERATIONS FOR BASE REQUIREMENTS.**

**SEC. 4203. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION FOR OVERSEAS CONTINGENCY OPERATIONS FOR BASE REQUIREMENTS**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| | | **RESEARCH, DEVELOPMENT, TEST & EVAL, ARMY** | | | |
| | | **ADVANCED TECHNOLOGY DEVELOPMENT** | | | |
| 042 | 0603270A | ELECTRONIC WARFARE TECHNOLOGY | | 3,000 | 3,000 |
| | | Multi-Domain Battle Exercise Capability | | [3,000] | |
| | | **SUBTOTAL ADVANCED TECHNOLOGY DEVELOPMENT** | | **3,000** | **3,000** |
| | | **SYSTEM DEVELOPMENT & DEMONSTRATION** | | | |
| 085 | 0604328A | TRACTOR CAGE | | 13,000 | 13,000 |
| | | Unfunded Requirement | | [13,000] | |
| 117 | 0605018A | INTEGRATED PERSONNEL AND PAY SYSTEM-ARMY (IPPS-A) | | 15,000 | 15,000 |
| | | Unfunded Requirement | | [15,000] | |
| | | **SUBTOTAL SYSTEM DEVELOPMENT & DEMONSTRATION** | | **28,000** | **28,000** |
| | | **OPERATIONAL SYSTEMS DEVELOPMENT** | | | |
| 203 | 0203801A | MISSILE/AIR DEFENSE PRODUCT IMPROVEMENT PROGRAM | | 26,000 | 26,000 |
| | | Unfunded requirement—Stinger PIP | | [26,000] | |
| 213 | 0303028A | SECURITY AND INTELLIGENCE ACTIVITIES | | 21,845 | 21,845 |
| | | Unfunded Requirement | | [21,845] | |
| 214 | 0303140A | INFORMATION SYSTEMS SECURITY PROGRAM | | 7,021 | 7,021 |
| | | Unfunded Requirement | | [7,021] | |
| | | **SUBTOTAL OPERATIONAL SYSTEMS DEVELOPMENT** | | **54,866** | **54,866** |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, ARMY** | | **85,866** | **85,866** |
| | | **RESEARCH, DEVELOPMENT, TEST & EVAL, NAVY** | | | |
| | | **APPLIED RESEARCH** | | | |
| 010 | 0602435N | OCEAN WARFIGHTING ENVIRONMENT APPLIED RESEARCH | | 15,000 | 15,000 |

| Line | Program Element | Item | | |
|---|---|---|---|---|
| | | AGOR SLEP | [15,000] | |
| 014 | 0602782N | MINE AND EXPEDITIONARY WARFARE APPLIED RESEARCH | 23,500 | 23,500 |
| | | MS–177A Maritime Senson | [23,500] | |
| | | **SUBTOTAL APPLIED RESEARCH** | **38,500** | **38,500** |
| | | | | |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, NAVY** | **38,500** | **38,500** |
| | | | | |
| | | **RESEARCH, DEVELOPMENT, TEST & EVAL, AF** | | |
| | | **APPLIED RESEARCH** | | |
| 007 | 0602203F | AEROSPACE PROPULSION | 2,500 | 2,500 |
| | | Unfunded Requirement | [2,500] | |
| 012 | 0602605F | DIRECTED ENERGY TECHNOLOGY | 8,300 | 8,300 |
| | | Unfunded Requirement | [8,300] | |
| | | **SUBTOTAL APPLIED RESEARCH** | **10,800** | **10,800** |
| | | | | |
| | | **ADVANCED TECHNOLOGY DEVELOPMENT** | | |
| 018 | 0603211F | AEROSPACE TECHNOLOGY DEV/DEMO | 5,700 | 5,700 |
| | | Unfunded requirement | [5,700] | |
| 019 | 0603216F | AEROSPACE PROPULSION AND POWER TECHNOLOGY | 13,500 | 13,500 |
| | | Unfunded requirement | [13,500] | |
| | | **SUBTOTAL ADVANCED TECHNOLOGY DEVELOPMENT** | **19,200** | **19,200** |
| | | | | |
| | | **ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | | |
| 041 | 0604414F | CYBER RESILIENCY OF WEAPON SYSTEMS-ACS | 10,200 | 10,200 |
| | | Unfunding requirement | [10,200] | |
| 062 | 1206438F | SPACE CONTROL TECHNOLOGY | 56,900 | 56,900 |
| | | AF UPL | [56,900] | |
| | | **SUBTOTAL ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | **67,100** | **67,100** |
| | | | | |
| | | **OPERATIONAL SYSTEMS DEVELOPMENT** | | |
| 230 | 0303131F | MINIMUM ESSENTIAL EMERGENCY COMMUNICATIONS NETWORK (MEECN) | 11,000 | 11,000 |
| | | AF UPL—support for AEHF terminals | [11,000] | |

**SEC. 4203. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION FOR OVERSEAS CONTINGENCY OPERATIONS FOR BASE REQUIREMENTS**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 302 | 1203001F | FAMILY OF ADVANCED BLOS TERMINALS (FAB-T) | | 58,400 | 58,400 |
| | | AF UPL—FAB-T testing activities | | [7,400] | |
| | | AF UPL—POTUS voice conference configuration | | [31,900] | |
| | | AF UPL—spares for testing | | [6,600] | |
| | | AF UPL -spares for testing | | [12,500] | |
| 312 | 1203614F | JSPOC MISSION SYSTEM | | 24,250 | 24,250 |
| | | AF UPL—BMC2 software | | [24,250] | |
| | | **SUBTOTAL OPERATIONAL SYSTEMS DEVELOPMENT** | | **93,650** | **93,650** |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, AF** | | **190,750** | **190,750** |
| | | **RESEARCH, DEVELOPMENT, TEST & EVAL, DW** | | | |
| | | **ADVANCED COMPONENT DEVELOPMENT AND PROTOTYPES** | | | |
| 075 | 0603882C | BALLISTIC MISSILE DEFENSE MIDCOURSE DEFENSE SEGMENT | | 351,000 | 351,000 |
| | | Increase GBI magazine capacity at Fort Greely | | [208,000] | |
| | | Procure 3 additional EKVs | | [45,000] | |
| | | Procure 7 additional boosters | | [98,000] | |
| 117 | 1206895C | BALLISTIC MISSILE DEFENSE SYSTEM SPACE PROGRAMS | | 27,500 | 27,500 |
| | | Initiates BMDS Global Sensors AoA reccommendations for space sensor architecture | | [27,500] | |
| | | **SUBTOTAL ADVANCED COMPONENT DEVELOPMENT AND PROTOTYPES** | | **378,500** | **378,500** |
| | | **SYSTEM DEVELOPMENT AND DEMONSTRATION** | | | |
| 137A | 0604XXX | RESEARCH AND DEVELOPMENT OF MILITARY RESPONSE OPTIONS FOR RUSSIAN INF TREATY VIOLATION | | 50,000 | 50,000 |
| | | Program increase | | [50,000] | |
| | | **SUBTOTAL SYSTEM DEVELOPMENT AND DEMONSTRATION** | | **50,000** | **50,000** |
| | | **MANAGEMENT SUPPORT** | | | |

| | | | | | |
|---|---|---|---|---|---|
| 151 | 0605200D8Z | GENERAL SUPPORT TO USD (INTELLIGENCE) | | 30,000 | 30,000 |
| | | PROJECT Maven | | [30,000] | |
| | | **SUBTOTAL MANAGEMENT SUPPORT** | | **30,000** | **30,000** |
| | | **OPERATIONAL SYSTEM DEVELOPMENT** | | | |
| 236 | 0305327V | INSIDER THREAT | | 5,000 | 5,000 |
| | | Defense Insider Threat Management and Analysis Center | | [5,000] | |
| | | **SUBTOTAL OPERATIONAL SYSTEM DEVELOPMENT** | | **5,000** | **5,000** |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, DW** | | **463,500** | **463,500** |
| | | **TOTAL RDT&E** | | **778,616** | **778,616** |

# TITLE XLIII—OPERATION AND MAINTENANCE

## SEC. 4301. OPERATION AND MAINTENANCE.

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| | **OPERATION & MAINTENANCE, ARMY** | | | |
| | **OPERATING FORCES** | | | |
| 010 | MANEUVER UNITS | 1,455,366 | 738,291 | 2,193,657 |
| | Improve unit training and maintenance readiness | | [54,700] | |
| | Realign European Reassurance Initiative to Base | | [683,591] | |
| 020 | MODULAR SUPPORT BRIGADES | 105,147 | 7,700 | 112,847 |
| | Execute the National Military Strategy | | [7,700] | |
| 030 | ECHELONS ABOVE BRIGADE | 604,117 | 88,300 | 692,417 |
| | Improve training readiness | | [88,300] | |

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| 040 | THEATER LEVEL ASSETS | 793,217 | 27,300 | 820,517 |
| | Decisive Action training and operations | | [27,300] | |
| 050 | LAND FORCES OPERATIONS SUPPORT | 1,169,478 | 37,700 | 1,207,178 |
| | Combat Training Center Operations and Maintenance | | [37,700] | |
| 060 | AVIATION ASSETS | 1,496,503 | 178,300 | 1,674,803 |
| | Aviation and ISR Maintenance Requirements | | [28,200] | |
| | Realign European Reassurance Initiative to Base | | [150,100] | |
| 070 | FORCE READINESS OPERATIONS SUPPORT | 3,675,901 | 91,969 | 3,767,870 |
| | Maintenance of organizational clothing and equipment | | [26,500] | |
| | Realign European Reassurance Initiative to Base | | [8,969] | |
| | SOUTHCOM—Maritime Patrol Aircraft Expansion | | [38,500] | |
| | SOUTHCOM—Mission and Other Ship Operations | | [18,000] | |
| 080 | LAND FORCES SYSTEMS READINESS | 466,720 | | 466,720 |
| 090 | LAND FORCES DEPOT MAINTENANCE | 1,443,516 | 150,749 | 1,594,265 |
| | Depot maintenance of hardware and munitions | | [46,600] | |
| | Realign European Reassurance Initiative to Base | | [104,149] | |
| 100 | BASE OPERATIONS SUPPORT | 8,080,357 | 61,907 | 8,142,264 |
| | C4I / Cyber capabilities enabling support | | [13,200] | |
| | Realign European Reassurance Initiative to Base | | [48,707] | |
| 110 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | 3,401,155 | 32,000 | 3,433,155 |
| | Realign European Reassurance Initiative to Base | | [32,000] | |
| 120 | MANAGEMENT AND OPERATIONAL HEADQUARTERS | 443,790 | | 443,790 |
| 140 | ADDITIONAL ACTIVITIES | | 135,150 | 135,150 |
| | Realign European Reassurance Initiative to Base | | [126,250] | |
| | Training, supplies, spares, and repair site support | | [8,900] | |
| 180 | US AFRICA COMMAND | 225,382 | | 225,382 |
| 190 | US EUROPEAN COMMAND | 141,352 | 44,250 | 185,602 |

| Line | Item | | | |
|---|---|---|---|---|
| | Realign European Reassurance Initiative to Base | | [44,250] | |
| 200 | US SOUTHERN COMMAND | 190,811 | 3,500 | 194,311 |
| | Mission and Other Ship Operations | | [3,500] | |
| 210 | US FORCES KOREA | 59,578 | | 59,578 |
| | **SUBTOTAL OPERATING FORCES** | **23,752,390** | **1,597,116** | **25,349,506** |
| | | | | |
| | **MOBILIZATION** | | | |
| 220 | STRATEGIC MOBILITY | 346,667 | 1,124 | 347,791 |
| | Sustainment of strategically positioned assets enabling force projection | | [1,124] | |
| 230 | ARMY PREPOSITIONED STOCKS | 422,108 | 61,738 | 483,846 |
| | Realign European Reassurance Initiative to Base | | [56,500] | |
| | Sustain Army War Reserve Secondary Items for deployed forces | | [5,238] | |
| 240 | INDUSTRIAL PREPAREDNESS | 7,750 | | 7,750 |
| | **SUBTOTAL MOBILIZATION** | **776,525** | **62,862** | **839,387** |
| | | | | |
| | **TRAINING AND RECRUITING** | | | |
| 250 | OFFICER ACQUISITION | 137,556 | | 137,556 |
| 260 | RECRUIT TRAINING | 58,872 | | 58,872 |
| 270 | ONE STATION UNIT TRAINING | 58,035 | | 58,035 |
| 280 | SENIOR RESERVE OFFICERS TRAINING CORPS | 505,089 | | 505,089 |
| 290 | SPECIALIZED SKILL TRAINING | 1,015,541 | 3,144 | 1,018,685 |
| | Leadership development and training | | [3,144] | |
| 300 | FLIGHT TRAINING | 1,124,115 | | 1,124,115 |
| 310 | PROFESSIONAL DEVELOPMENT EDUCATION | 220,688 | | 220,688 |
| 320 | TRAINING SUPPORT | 618,164 | 3,526 | 621,690 |
| | Department of the Army directed training | | [3,526] | |
| 330 | RECRUITING AND ADVERTISING | 613,586 | | 613,586 |
| 340 | EXAMINING | 171,223 | | 171,223 |
| 350 | OFF-DUTY AND VOLUNTARY EDUCATION | 214,738 | | 214,738 |
| 360 | CIVILIAN EDUCATION AND TRAINING | 195,099 | | 195,099 |
| 370 | JUNIOR RESERVE OFFICER TRAINING CORPS | 176,116 | | 176,116 |
| | **SUBTOTAL TRAINING AND RECRUITING** | **5,108,822** | **6,670** | **5,115,492** |

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| | **ADMIN & SRVWIDE ACTIVITIES** | | | |
| 390 | SERVICEWIDE TRANSPORTATION | 555,502 | 154,050 | 709,552 |
| | Logistics associated with increased end strength | | [57,900] | |
| | Realign European Reassurance Initiative to Base | | [96,150] | |
| 400 | CENTRAL SUPPLY ACTIVITIES | 894,208 | 11,449 | 905,657 |
| | Realign European Reassurance Initiative to Base | | [11,449] | |
| 410 | LOGISTIC SUPPORT ACTIVITIES | 715,462 | | 715,462 |
| 420 | AMMUNITION MANAGEMENT | 446,931 | | 446,931 |
| 430 | ADMINISTRATION | 493,616 | | 493,616 |
| 440 | SERVICEWIDE COMMUNICATIONS | 2,084,922 | 17,900 | 2,102,822 |
| | Annual maintenance of Enterprise License Agreements | | [17,900] | |
| 450 | MANPOWER MANAGEMENT | 259,588 | | 259,588 |
| 460 | OTHER PERSONNEL SUPPORT | 326,387 | | 326,387 |
| 470 | OTHER SERVICE SUPPORT | 1,087,602 | –9,000 | 1,078,602 |
| | Program decrease | | [–9,000] | |
| 480 | ARMY CLAIMS ACTIVITIES | 210,514 | | 210,514 |
| 490 | REAL ESTATE MANAGEMENT | 243,584 | | 243,584 |
| 500 | FINANCIAL MANAGEMENT AND AUDIT READINESS | 284,592 | 8,400 | 292,992 |
| | DISA migration cost and system support | | [8,400] | |
| 510 | INTERNATIONAL MILITARY HEADQUARTERS | 415,694 | | 415,694 |
| 520 | MISC. SUPPORT OF OTHER NATIONS | 46,856 | | 46,856 |
| 565 | CLASSIFIED PROGRAMS | 1,242,222 | 70,825 | 1,313,047 |
| | Army Analytics Group | | [5,000] | |
| | Realign European Reassurance Initiative to Base | | [65,825] | |
| | **SUBTOTAL ADMIN & SRVWIDE ACTIVITIES** | **9,307,680** | **253,624** | **9,561,304** |

| Line | Item | | | |
|---|---|---|---|---|
| | **UNDISTRIBUTED** | | | |
| 570 | UNDISTRIBUTED | | –426,100 | –426,100 |
| | Excessive standard price for fuel | | [–20,600] | |
| | Foreign Currency adjustments | | [–146,400] | |
| | Historical unobligated balances | | [–259,100] | |
| | **SUBTOTAL UNDISTRIBUTED** | | **–426,100** | **–426,100** |
| | **TOTAL OPERATION & MAINTENANCE, ARMY** | **38,945,417** | **1,494,172** | **40,439,589** |
| | **OPERATION & MAINTENANCE, ARMY RES** | | | |
| | **OPERATING FORCES** | | | |
| 010 | MODULAR SUPPORT BRIGADES | 11,461 | | 11,461 |
| 020 | ECHELONS ABOVE BRIGADE | 577,410 | | 577,410 |
| 030 | THEATER LEVEL ASSETS | 117,298 | | 117,298 |
| 040 | LAND FORCES OPERATIONS SUPPORT | 552,016 | | 552,016 |
| 050 | AVIATION ASSETS | 80,302 | 1,159 | 81,461 |
| | Increase aviation readiness | | [1,159] | |
| 060 | FORCE READINESS OPERATIONS SUPPORT | 399,035 | 223 | 399,258 |
| | Pay and allowances for career development training | | [223] | |
| 070 | LAND FORCES SYSTEMS READINESS | 102,687 | | 102,687 |
| 080 | LAND FORCES DEPOT MAINTENANCE | 56,016 | | 56,016 |
| 090 | BASE OPERATIONS SUPPORT | 599,947 | | 599,947 |
| 100 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | 273,940 | | 273,940 |
| 110 | MANAGEMENT AND OPERATIONAL HEADQUARTERS | 22,909 | | 22,909 |
| | **SUBTOTAL OPERATING FORCES** | **2,793,021** | **1,382** | **2,794,403** |
| | **ADMIN & SRVWD ACTIVITIES** | | | |
| 120 | SERVICEWIDE TRANSPORTATION | 11,116 | | 11,116 |
| 130 | ADMINISTRATION | 17,962 | | 17,962 |
| 140 | SERVICEWIDE COMMUNICATIONS | 18,550 | 2,400 | 20,950 |
| | Annual maintenance of Enterprise License Agreements | | [2,400] | |
| 150 | MANPOWER MANAGEMENT | 6,166 | | 6,166 |

SEC. 4301. OPERATION AND MAINTENANCE
(In Thousands of Dollars)

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| 160 | RECRUITING AND ADVERTISING | 60,027 | | 60,027 |
| | **SUBTOTAL ADMIN & SRVWD ACTIVITIES** | **113,821** | **2,400** | **116,221** |
| | **UNDISTRIBUTED** | | | |
| 190 | UNDISTRIBUTED | | –2,500 | –2,500 |
| | Excessive standard price for fuel | | [–2,500] | |
| | **SUBTOTAL UNDISTRIBUTED** | | **–2,500** | **–2,500** |
| | **TOTAL OPERATION & MAINTENANCE, ARMY RES** | **2,906,842** | **1,282** | **2,908,124** |
| | **OPERATION & MAINTENANCE, ARNG** | | | |
| | **OPERATING FORCES** | | | |
| 010 | MANEUVER UNITS | 777,883 | 33,100 | 810,983 |
| | Unit training and maintenance readiness | | [33,100] | |
| 020 | MODULAR SUPPORT BRIGADES | 190,639 | | 190,639 |
| 030 | ECHELONS ABOVE BRIGADE | 807,557 | 11,900 | 819,457 |
| | Improve training readiness | | [11,900] | |
| 040 | THEATER LEVEL ASSETS | 85,476 | 7,900 | 93,376 |
| | Decisive Action training and operations | | [7,900] | |
| 050 | LAND FORCES OPERATIONS SUPPORT | 36,672 | 2,225 | 38,897 |
| | Aviation contract support for rotary wing aircraft | | [2,225] | |
| 060 | AVIATION ASSETS | 956,381 | 18,200 | 974,581 |
| | Increase aviation readiness | | [18,200] | |
| 070 | FORCE READINESS OPERATIONS SUPPORT | 777,756 | 185 | 777,941 |
| | Pay and allowances for career development training | | [185] | |
| 080 | LAND FORCES SYSTEMS READINESS | 51,506 | | 51,506 |
| 090 | LAND FORCES DEPOT MAINTENANCE | 244,942 | | 244,942 |

| Line | Item | | | |
|---|---|---|---|---|
| 100 | BASE OPERATIONS SUPPORT | 1,144,726 | | 1,144,726 |
| 110 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | 781,895 | | 781,895 |
| 120 | MANAGEMENT AND OPERATIONAL HEADQUARTERS | 999,052 | | 999,052 |
| | **SUBTOTAL OPERATING FORCES** | **6,854,485** | **73,510** | **6,927,995** |
| | | | | |
| | **ADMIN & SRVWD ACTIVITIES** | | | |
| 130 | SERVICEWIDE TRANSPORTATION | 7,703 | | 7,703 |
| 140 | ADMINISTRATION | 79,236 | 2,000 | 81,236 |
| | Department of Defense State Partnership Program | | [2,000] | |
| 150 | SERVICEWIDE COMMUNICATIONS | 85,160 | 9,600 | 94,760 |
| | Annual maintenance of Enterprise License Agreements | | [9,600] | |
| 160 | MANPOWER MANAGEMENT | 8,654 | | 8,654 |
| 170 | OTHER PERSONNEL SUPPORT | 268,839 | | 268,839 |
| 180 | REAL ESTATE MANAGEMENT | 3,093 | | 3,093 |
| | **SUBTOTAL ADMIN & SRVWD ACTIVITIES** | **452,685** | **11,600** | **464,285** |
| | | | | |
| | **UNDISTRIBUTED** | | | |
| 190 | UNDISTRIBUTED | | –10,700 | –10,700 |
| | Excessive standard price for fuel | | [–10,700] | |
| | **SUBTOTAL UNDISTRIBUTED** | | **–10,700** | **–10,700** |
| | | | | |
| | **TOTAL OPERATION & MAINTENANCE, ARNG** | **7,307,170** | **74,410** | **7,381,580** |
| | | | | |
| | **OPERATION & MAINTENANCE, NAVY** | | | |
| | **OPERATING FORCES** | | | |
| 010 | MISSION AND OTHER FLIGHT OPERATIONS | 5,544,165 | 26,750 | 5,570,915 |
| | Cbt logistics Mnt for TAO–187 | | [22,000] | |
| | Realign European Reassurance Initiative to Base | | [4,750] | |
| 020 | FLEET AIR TRAINING | 2,075,000 | | 2,075,000 |
| 030 | AVIATION TECHNICAL DATA & ENGINEERING SERVICES | 46,801 | | 46,801 |
| 040 | AIR OPERATIONS AND SAFETY SUPPORT | 119,624 | | 119,624 |
| 050 | AIR SYSTEMS SUPPORT | 552,536 | 42,000 | 594,536 |

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| | Fund aviation spt to max executable | | [42,000] | |
| 060 | AIRCRAFT DEPOT MAINTENANCE | 1,088,482 | | 1,088,482 |
| 070 | AIRCRAFT DEPOT OPERATIONS SUPPORT | 40,584 | | 40,584 |
| 080 | AVIATION LOGISTICS | 723,786 | 120,000 | 843,786 |
| | Fund aviation logistics to max executable | | [120,000] | |
| 090 | MISSION AND OTHER SHIP OPERATIONS | 4,067,334 | 3,677 | 4,071,011 |
| | Realign European Reassurance Initiative to Base | | [3,677] | |
| 100 | SHIP OPERATIONS SUPPORT & TRAINING | 977,701 | | 977,701 |
| 110 | SHIP DEPOT MAINTENANCE | 7,165,858 | 9,500 | 7,175,358 |
| | Western Pacific Ship Repair | | [9,500] | |
| 120 | SHIP DEPOT OPERATIONS SUPPORT | 2,193,851 | | 2,193,851 |
| 130 | COMBAT COMMUNICATIONS AND ELECTRONIC WARFARE | 1,288,094 | 11,400 | 1,299,494 |
| | Logistics support for legacy C41 systems | | [6,000] | |
| | Realign European Reassurance Initiative to Base | | [5,400] | |
| 150 | SPACE SYSTEMS AND SURVEILLANCE | 206,678 | 4,400 | 211,078 |
| | Realign European Reassurance Initiative to Base | | [4,400] | |
| 160 | WARFARE TACTICS | 621,581 | 1,000 | 622,581 |
| | Operational Range and Environmental Compliance | | [1,000] | |
| 170 | OPERATIONAL METEOROLOGY AND OCEANOGRAPHY | 370,681 | | 370,681 |
| 180 | COMBAT SUPPORT FORCES | 1,437,966 | 22,984 | 1,460,950 |
| | Coastal Riverine Force meet operational requirements | | [7,000] | |
| | COMPACFLT C41 Upgrade | | [10,000] | |
| | Realign European Reassurance Initiative to Base | | [5,984] | |
| 190 | EQUIPMENT MAINTENANCE AND DEPOT OPERATIONS SUPPORT | 162,705 | | 162,705 |
| 210 | COMBATANT COMMANDERS CORE OPERATIONS | 65,108 | | 65,108 |
| 220 | COMBATANT COMMANDERS DIRECT MISSION SUPPORT | 86,892 | 69,100 | 155,992 |
| | Joint Training Capability and Exercise Programs | | [64,100] | |

| Line | Item | | | |
|---|---|---|---|---|
| | No-Notice Agile Logistics Exercise | | [5,000] | |
| 230 | MILITARY INFORMATION SUPPORT OPERATIONS | 8,427 | | 8,427 |
| 240 | CYBERSPACE ACTIVITIES | 385,212 | | 385,212 |
| 260 | FLEET BALLISTIC MISSILE | 1,278,456 | | 1,278,456 |
| 280 | WEAPONS MAINTENANCE | 745,680 | 6,300 | 751,980 |
| | Munitions wholeness | | [5,000] | |
| | Realign European Reassurance Initiative to Base | | [1,300] | |
| 290 | OTHER WEAPON SYSTEMS SUPPORT | 380,016 | | 380,016 |
| 300 | ENTERPRISE INFORMATION | 914,428 | | 914,428 |
| 310 | SUSTAINMENT, RESTORATION AND MODERNIZATION | 1,905,679 | | 1,905,679 |
| 320 | BASE OPERATING SUPPORT | 4,333,688 | 23,000 | 4,356,688 |
| | Operational range clearance | | [11,000] | |
| | Port Operations Service Craft Maintenance | | [12,000] | |
| | **SUBTOTAL OPERATING FORCES** | **38,787,013** | **340,111** | **39,127,124** |
| | | | | |
| | **MOBILIZATION** | | | |
| 330 | SHIP PREPOSITIONING AND SURGE | 417,450 | 10,000 | 427,450 |
| | Strategic sealift management | | [10,000] | |
| 360 | SHIP ACTIVATIONS/INACTIVATIONS | 198,341 | | 198,341 |
| 370 | EXPEDITIONARY HEALTH SERVICES SYSTEMS | 66,849 | | 66,849 |
| 390 | COAST GUARD SUPPORT | 21,870 | | 21,870 |
| | **SUBTOTAL MOBILIZATION** | **704,510** | **10,000** | **714,510** |
| | | | | |
| | **TRAINING AND RECRUITING** | | | |
| 400 | OFFICER ACQUISITION | 143,924 | | 143,924 |
| 410 | RECRUIT TRAINING | 8,975 | | 8,975 |
| 420 | RESERVE OFFICERS TRAINING CORPS | 144,708 | | 144,708 |
| 430 | SPECIALIZED SKILL TRAINING | 812,708 | | 812,708 |
| 450 | PROFESSIONAL DEVELOPMENT EDUCATION | 180,448 | 2,000 | 182,448 |
| | Naval Sea Cadets | | [2,000] | |
| 460 | TRAINING SUPPORT | 234,596 | | 234,596 |
| 470 | RECRUITING AND ADVERTISING | 177,517 | | 177,517 |

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| 480 | OFF-DUTY AND VOLUNTARY EDUCATION | 103,154 | | 103,154 |
| 490 | CIVILIAN EDUCATION AND TRAINING | 72,216 | | 72,216 |
| 500 | JUNIOR ROTC | 53,262 | | 53,262 |
| | **SUBTOTAL TRAINING AND RECRUITING** | **1,931,508** | **2,000** | **1,933,508** |
| | | | | |
| | **ADMIN & SRVWD ACTIVITIES** | | | |
| 510 | ADMINISTRATION | 1,135,429 | –9,000 | 1,126,429 |
| | Program decrease | | [–9,000] | |
| 530 | CIVILIAN MANPOWER AND PERSONNEL MANAGEMENT | 149,365 | | 149,365 |
| 540 | MILITARY MANPOWER AND PERSONNEL MANAGEMENT | 386,749 | | 386,749 |
| 590 | SERVICEWIDE TRANSPORTATION | 165,301 | | 165,301 |
| 610 | PLANNING, ENGINEERING, AND PROGRAM SUPPORT | 311,616 | | 311,616 |
| 620 | ACQUISITION, LOGISTICS, AND OVERSIGHT | 665,580 | | 665,580 |
| 660 | INVESTIGATIVE AND SECURITY SERVICES | 659,143 | | 659,143 |
| 775 | CLASSIFIED PROGRAMS | 543,193 | 10,000 | 553,193 |
| | Research and Technology Protection | | [10,000] | |
| | **SUBTOTAL ADMIN & SRVWD ACTIVITIES** | **4,016,376** | **1,000** | **4,017,376** |
| | | | | |
| | **UNDISTRIBUTED** | | | |
| 780 | UNDISTRIBUTED | | –356,800 | –356,800 |
| | Excessive standard price for fuel | | [–143,600] | |
| | Foreign Currency adjustments | | [–35,300] | |
| | Historical unobligated balances | | [–177,900] | |
| | **SUBTOTAL UNDISTRIBUTED** | | **–356,800** | **–356,800** |
| | | | | |
| | **TOTAL OPERATION & MAINTENANCE, NAVY** | **45,439,407** | **–3,689** | **45,435,718** |

| Line | Item | | | |
|---|---|---|---|---|
| | **OPERATION & MAINTENANCE, MARINE CORPS** | | | |
| | **OPERATING FORCES** | | | |
| 010 | OPERATIONAL FORCES | 967,949 | 164,733 | 1,132,682 |
| | Realign European Reassurance Initiative to Base | | [164,733] | |
| 020 | FIELD LOGISTICS | 1,065,090 | | 1,065,090 |
| 030 | DEPOT MAINTENANCE | 286,635 | | 286,635 |
| 040 | MARITIME PREPOSITIONING | 85,577 | | 85,577 |
| 050 | CYBERSPACE ACTIVITIES | 181,518 | | 181,518 |
| 060 | SUSTAINMENT, RESTORATION & MODERNIZATION | 785,264 | | 785,264 |
| 070 | BASE OPERATING SUPPORT | 2,196,252 | | 2,196,252 |
| | **SUBTOTAL OPERATING FORCES** | **5,568,285** | **164,733** | **5,733,018** |
| | | | | |
| | **TRAINING AND RECRUITING** | | | |
| 080 | RECRUIT TRAINING | 16,163 | | 16,163 |
| 090 | OFFICER ACQUISITION | 1,154 | | 1,154 |
| 100 | SPECIALIZED SKILL TRAINING | 100,398 | | 100,398 |
| 110 | PROFESSIONAL DEVELOPMENT EDUCATION | 46,474 | | 46,474 |
| 120 | TRAINING SUPPORT | 405,039 | | 405,039 |
| 130 | RECRUITING AND ADVERTISING | 201,601 | | 201,601 |
| 140 | OFF-DUTY AND VOLUNTARY EDUCATION | 32,045 | | 32,045 |
| 150 | JUNIOR ROTC | 24,394 | | 24,394 |
| | **SUBTOTAL TRAINING AND RECRUITING** | **827,268** | | **827,268** |
| | | | | |
| | **ADMIN & SRVWD ACTIVITIES** | | | |
| 160 | SERVICEWIDE TRANSPORTATION | 28,827 | | 28,827 |
| 170 | ADMINISTRATION | 378,683 | –3,000 | 375,683 |
| | Program decrease | | [–3,000] | |
| 190 | ACQUISITION AND PROGRAM MANAGEMENT | 77,684 | | 77,684 |
| 215 | CLASSIFIED PROGRAMS | 52,661 | | 52,661 |
| | **SUBTOTAL ADMIN & SRVWD ACTIVITIES** | **537,855** | **–3,000** | **534,855** |
| | | | | |
| | **UNDISTRIBUTED** | | | |

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| 220 | UNDISTRIBUTED | | –38,000 | –38,000 |
| | Excessive standard price for fuel | | [–1,800] | |
| | Foreign Currency adjustments | | [–11,400] | |
| | Historical unobligated balances | | [–24,800] | |
| | **SUBTOTAL UNDISTRIBUTED** | | **–38,000** | **–38,000** |
| | **TOTAL OPERATION & MAINTENANCE, MARINE CORPS** | **6,933,408** | **123,733** | **7,057,141** |
| | **OPERATION & MAINTENANCE, NAVY RES** | | | |
| | **OPERATING FORCES** | | | |
| 010 | MISSION AND OTHER FLIGHT OPERATIONS | 596,876 | | 596,876 |
| 020 | INTERMEDIATE MAINTENANCE | 5,902 | | 5,902 |
| 030 | AIRCRAFT DEPOT MAINTENANCE | 94,861 | | 94,861 |
| 040 | AIRCRAFT DEPOT OPERATIONS SUPPORT | 381 | | 381 |
| 050 | AVIATION LOGISTICS | 13,822 | | 13,822 |
| 060 | SHIP OPERATIONS SUPPORT & TRAINING | 571 | | 571 |
| 070 | COMBAT COMMUNICATIONS | 16,718 | | 16,718 |
| 080 | COMBAT SUPPORT FORCES | 118,079 | | 118,079 |
| 090 | CYBERSPACE ACTIVITIES | 308 | | 308 |
| 100 | ENTERPRISE INFORMATION | 28,650 | | 28,650 |
| 110 | SUSTAINMENT, RESTORATION AND MODERNIZATION | 86,354 | | 86,354 |
| 120 | BASE OPERATING SUPPORT | 103,596 | | 103,596 |
| | **SUBTOTAL OPERATING FORCES** | **1,066,118** | | **1,066,118** |
| | **ADMIN & SRVWD ACTIVITIES** | | | |
| 130 | ADMINISTRATION | 1,371 | | 1,371 |
| 140 | MILITARY MANPOWER AND PERSONNEL MANAGEMENT | 13,289 | | 13,289 |

| Line | Item | | | |
|---|---|---|---|---|
| 160 | ACQUISITION AND PROGRAM MANAGEMENT | 3,229 | | 3,229 |
| | **SUBTOTAL ADMIN & SRVWD ACTIVITIES** | **17,889** | | **17,889** |
| | **UNDISTRIBUTED** | | | |
| 180 | UNDISTRIBUTED | | –9,800 | –9,800 |
| | Excessive standard price for fuel | | [–9,800] | |
| | **SUBTOTAL UNDISTRIBUTED** | | **–9,800** | **–9,800** |
| | **TOTAL OPERATION & MAINTENANCE, NAVY RES** | **1,084,007** | **–9,800** | **1,074,207** |
| | **OPERATION & MAINTENANCE, MC RESERVE** | | | |
| | **OPERATING FORCES** | | | |
| 010 | OPERATING FORCES | 103,468 | | 103,468 |
| 020 | DEPOT MAINTENANCE | 18,794 | | 18,794 |
| 030 | SUSTAINMENT, RESTORATION AND MODERNIZATION | 32,777 | | 32,777 |
| 040 | BASE OPERATING SUPPORT | 111,213 | | 111,213 |
| | **SUBTOTAL OPERATING FORCES** | **266,252** | | **266,252** |
| | **ADMIN & SRVWD ACTIVITIES** | | | |
| 060 | ADMINISTRATION | 12,585 | | 12,585 |
| | **SUBTOTAL ADMIN & SRVWD ACTIVITIES** | **12,585** | | **12,585** |
| | **UNDISTRIBUTED** | | | |
| 080 | UNDISTRIBUTED | | –300 | –300 |
| | Excessive standard price for fuel | | [–300] | |
| | **SUBTOTAL UNDISTRIBUTED** | | **–300** | **–300** |
| | **TOTAL OPERATION & MAINTENANCE, MC RESERVE** | **278,837** | **–300** | **278,537** |
| | **OPERATION & MAINTENANCE, AIR FORCE** | | | |
| | **OPERATING FORCES** | | | |
| 010 | PRIMARY COMBAT FORCES | 694,702 | 33,100 | 727,802 |

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| | Adversarial Air Training- mission qualification | | [10,200] | |
| | B–2 Replenishment spares | | [9,000] | |
| | PACAF Contingency response group | | [4,200] | |
| | Rocket system launch program | | [8,000] | |
| | Training equipment shortfalls | | [1,700] | |
| 020 | COMBAT ENHANCEMENT FORCES | 1,392,326 | 154,722 | 1,547,048 |
| | Battlefield airman equipment assembly | | [8,300] | |
| | Personnel recovery requirements | | [500] | |
| | Realign European Reassurance Initiative to Base | | [96,522] | |
| | TARP contractor specialist | | [800] | |
| | Training equipment shortfalls | | [6,000] | |
| | Training specialist contract | | [400] | |
| | Unified capabilities | | [42,200] | |
| 030 | AIR OPERATIONS TRAINING (OJT, MAINTAIN SKILLS) | 1,128,640 | 51,300 | 1,179,940 |
| | F–35 maintenance instructors | | [49,700] | |
| | Readiness decision support enterprise | | [1,600] | |
| 040 | DEPOT PURCHASE EQUIPMENT MAINTENANCE | 2,755,367 | 117,721 | 2,873,088 |
| | Aircraft depot level reparables | | [92,100] | |
| | Battlefield airman equipment | | [7,100] | |
| | Realign European Reassurance Initiative to Base | | [18,521] | |
| 050 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | 3,292,553 | 22,700 | 3,315,253 |
| | Realign European Reassurance Initiative to Base | | [22,700] | |
| 060 | CONTRACTOR LOGISTICS SUPPORT AND SYSTEM SUPPORT | 6,555,186 | 201,779 | 6,756,965 |
| | Aircraft depot level repairables | | [177,700] | |
| | E4B maintenance personnel | | [1,000] | |
| | EC–130H service life extension | | [12,000] | |
| | Realign European Reassurance Initiative to Base | | [4,279] | |

| | | | | |
|---|---|---|---|---|
| | Sustain C–37B | | [6,800] | |
| 070 | FLYING HOUR PROGRAM | 4,135,330 | 66,667 | 4,201,997 |
| | Realign European Reassurance Initiative to Base | | [66,667] | |
| 080 | BASE SUPPORT | 5,985,232 | 105,305 | 6,090,537 |
| | Application hosting/MSO | | [27,000] | |
| | Cloud migration | | [25,600] | |
| | Enterprise svcs in FY18 | | [39,000] | |
| | Realign European Reassurance Initiative to Base | | [13,705] | |
| 090 | GLOBAL C3I AND EARLY WARNING | 847,516 | 129,700 | 977,216 |
| | Aviation readiness shortfalls | | [2,000] | |
| | Cyber readiness shortfalls | | [35,300] | |
| | Cyber security readiness shortfalls | | [57,500] | |
| | Realign European Reassurance Initiative to Base | | [2,000] | |
| | Space based readiness shortfalls | | [32,900] | |
| 100 | OTHER COMBAT OPS SPT PROGRAMS | 1,131,817 | 121,562 | 1,253,379 |
| | Anti-terrorism force protection | | [10,000] | |
| | Cyber readiness shortfalls | | [4,000] | |
| | Cyber training readiness shortfalls | | [11,000] | |
| | EOD training and readiness shortfalls | | [5,400] | |
| | Installation processing nodes | | [51,400] | |
| | ISR sustainment and readiness | | [9,800] | |
| | PACAF- restore contingency response group | | [10,100] | |
| | Realign European Reassurance Initiative to Base | | [19,562] | |
| | Tailored OPIR intel products | | [300] | |
| 120 | LAUNCH FACILITIES | 175,457 | | 175,457 |
| 130 | SPACE CONTROL SYSTEMS | 353,458 | 188,300 | 541,758 |
| | Command and Control sustainment and readiness | | [47,100] | |
| | Operationalizing commercial SSA | | [15,000] | |
| | Space based sustainment and readiness shortfalls | | [126,200] | |
| 160 | US NORTHCOM/NORAD | 189,891 | | 189,891 |
| 170 | US STRATCOM | 534,236 | | 534,236 |
| 180 | US CYBERCOM | 357,830 | | 357,830 |

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| 190 | US CENTCOM | 168,208 | | 168,208 |
| 200 | US SOCOM | 2,280 | | 2,280 |
| 210 | US TRANSCOM | 533 | | 533 |
| 215 | CLASSIFIED PROGRAMS | 1,091,655 | | 1,091,655 |
| | **SUBTOTAL OPERATING FORCES** | **30,792,217** | **1,192,856** | **31,985,073** |
| | **MOBILIZATION** | | | |
| 220 | AIRLIFT OPERATIONS | 1,570,697 | 6,400 | 1,577,097 |
| | C–37B flying hours | | [1,800] | |
| | Realign European Reassurance Initiative to Base | | [4,600] | |
| 230 | MOBILIZATION PREPAREDNESS | 130,241 | 158,070 | 288,311 |
| | Basic Expeditionary Airfield Resources PACOM | | [22,600] | |
| | BEAR PACOM | | [22,600] | |
| | BEAR PACOM spares | | [2,900] | |
| | PACAF Contingency response group | | [10,100] | |
| | Realign European Reassurance Initiative to Base | | [99,870] | |
| | **SUBTOTAL MOBILIZATION** | **1,700,938** | **164,470** | **1,865,408** |
| | **TRAINING AND RECRUITING** | | | |
| 270 | OFFICER ACQUISITION | 113,722 | | 113,722 |
| 280 | RECRUIT TRAINING | 24,804 | | 24,804 |
| 290 | RESERVE OFFICERS TRAINING CORPS (ROTC) | 95,733 | | 95,733 |
| 320 | SPECIALIZED SKILL TRAINING | 395,476 | | 395,476 |
| 330 | FLIGHT TRAINING | 501,599 | | 501,599 |
| 340 | PROFESSIONAL DEVELOPMENT EDUCATION | 287,500 | | 287,500 |
| 350 | TRAINING SUPPORT | 91,384 | | 91,384 |
| 370 | RECRUITING AND ADVERTISING | 166,795 | | 166,795 |

| Line | Item | | | |
|---|---|---|---|---|
| 380 | EXAMINING | 4,134 | | 4,134 |
| 390 | OFF-DUTY AND VOLUNTARY EDUCATION | 222,691 | | 222,691 |
| 400 | CIVILIAN EDUCATION AND TRAINING | 171,974 | | 171,974 |
| 410 | JUNIOR ROTC | 60,070 | | 60,070 |
| | **SUBTOTAL TRAINING AND RECRUITING** | **2,135,882** | | **2,135,882** |
| | | | | |
| | **ADMIN & SRVWD ACTIVITIES** | | | |
| 420 | LOGISTICS OPERATIONS | 805,453 | 3,000 | 808,453 |
| | Realign European Reassurance Initiative to Base | | [3,000] | |
| 430 | TECHNICAL SUPPORT ACTIVITIES | 127,379 | | 127,379 |
| 470 | ADMINISTRATION | 911,283 | | 911,283 |
| 480 | SERVICEWIDE COMMUNICATIONS | 432,172 | –10,000 | 422,172 |
| | Program decrease | | [–10,000] | |
| 490 | OTHER SERVICEWIDE ACTIVITIES | 1,175,658 | –9,000 | 1,166,658 |
| | Program decrease | | [–9,000] | |
| 500 | CIVIL AIR PATROL | 26,719 | 3,100 | 29,819 |
| | Civil Air Patrol | | [3,100] | |
| 530 | INTERNATIONAL SUPPORT | 76,878 | | 76,878 |
| 535 | CLASSIFIED PROGRAMS | 1,244,653 | | 1,244,653 |
| | **SUBTOTAL ADMIN & SRVWD ACTIVITIES** | **4,800,195** | **–12,900** | **4,787,295** |
| | | | | |
| | **UNDISTRIBUTED** | | | |
| 540 | UNDISTRIBUTED | | –389,600 | –389,600 |
| | Excessive standard price for fuel | | [–135,400] | |
| | Foreign Currency adjustments | | [–84,300] | |
| | Historical unobligated balances | | [–169,900] | |
| | **SUBTOTAL UNDISTRIBUTED** | | **–389,600** | **–389,600** |
| | | | | |
| | **TOTAL OPERATION & MAINTENANCE, AIR FORCE** | **39,429,232** | **954,826** | **40,384,058** |
| | | | | |
| | **OPERATION & MAINTENANCE, AF RESERVE** | | | |
| | **OPERATING FORCES** | | | |

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| 010 | PRIMARY COMBAT FORCES | 1,801,007 | | 1,801,007 |
| 020 | MISSION SUPPORT OPERATIONS | 210,642 | | 210,642 |
| 030 | DEPOT PURCHASE EQUIPMENT MAINTENANCE | 403,867 | | 403,867 |
| 040 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | 124,951 | | 124,951 |
| 050 | CONTRACTOR LOGISTICS SUPPORT AND SYSTEM SUPPORT | 240,835 | 17,800 | 258,635 |
| | C–17 CLS workload | | [5,700] | |
| | C–17 depot-level repairable | | [12,100] | |
| 060 | BASE SUPPORT | 371,878 | | 371,878 |
| | **SUBTOTAL OPERATING FORCES** | **3,153,180** | **17,800** | **3,170,980** |
| | | | | |
| | **ADMINISTRATION AND SERVICEWIDE ACTIVITIES** | | | |
| 070 | ADMINISTRATION | 74,153 | | 74,153 |
| 080 | RECRUITING AND ADVERTISING | 19,522 | | 19,522 |
| 090 | MILITARY MANPOWER AND PERS MGMT (ARPC) | 12,765 | | 12,765 |
| 100 | OTHER PERS SUPPORT (DISABILITY COMP) | 7,495 | | 7,495 |
| 110 | AUDIOVISUAL | 392 | | 392 |
| | **SUBTOTAL ADMINISTRATION AND SERVICEWIDE ACTIVITIES** | **114,327** | | **114,327** |
| | | | | |
| | **UNDISTRIBUTED** | | | |
| 120 | UNDISTRIBUTED | | –21,900 | –21,900 |
| | Excessive standard price for fuel | | [–21,900] | |
| | **SUBTOTAL UNDISTRIBUTED** | | **–21,900** | **–21,900** |
| | | | | |
| | **TOTAL OPERATION & MAINTENANCE, AF RESERVE** | **3,267,507** | **–4,100** | **3,263,407** |
| | | | | |
| | **OPERATION & MAINTENANCE, ANG** | | | |
| | **OPERATING FORCES** | | | |

| | | | | |
|---|---|---|---|---|
| 010 | AIRCRAFT OPERATIONS | 3,175,055 | 90,900 | 3,265,955 |
| | Additional training man days | | [54,900] | |
| | Two C–130 simulators | | [36,000] | |
| 020 | MISSION SUPPORT OPERATIONS | 746,082 | 55,600 | 801,682 |
| | Additional training man days | | [37,100] | |
| | Restore support operations | | [18,500] | |
| 030 | DEPOT PURCHASE EQUIPMENT MAINTENANCE | 867,063 | | 867,063 |
| 040 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | 325,090 | | 325,090 |
| 050 | CONTRACTOR LOGISTICS SUPPORT AND SYSTEM SUPPORT | 1,100,829 | 51,300 | 1,152,129 |
| | C–130 propulsion improvements | | [16,100] | |
| | Maintenance for RC–26 a/c | | [28,700] | |
| | Sustain DCGS | | [6,500] | |
| 060 | BASE SUPPORT | 583,664 | 9,800 | 593,464 |
| | Additional training man days | | [9,800] | |
| | **SUBTOTAL OPERATING FORCES** | **6,797,783** | **207,600** | **7,005,383** |
| | | | | |
| | **ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** | | | |
| 070 | ADMINISTRATION | 44,955 | | 44,955 |
| 080 | RECRUITING AND ADVERTISING | 97,230 | | 97,230 |
| | **SUBTOTAL ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** | **142,185** | | **142,185** |
| | | | | |
| | **UNDISTRIBUTED** | | | |
| 090 | UNDISTRIBUTED | | –43,300 | –43,300 |
| | Excessive standard price for fuel | | [–43,300] | |
| | **SUBTOTAL UNDISTRIBUTED** | | **–43,300** | **–43,300** |
| | | | | |
| | **TOTAL OPERATION & MAINTENANCE, ANG** | **6,939,968** | **164,300** | **7,104,268** |
| | | | | |
| | **OPERATION AND MAINTENANCE, DEFENSE-WIDE** | | | |
| | **OPERATING FORCES** | | | |
| 010 | JOINT CHIEFS OF STAFF | 440,853 | | 440,853 |
| 020 | JOINT CHIEFS OF STAFF—CE2T2 | 551,511 | | 551,511 |

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| 040 | SPECIAL OPERATIONS COMMAND/OPERATING FORCES | 5,008,274 | 95,970 | 5,104,244 |
| | Realign European Reassurance Initiative to Base | | [95,970] | |
| | **SUBTOTAL OPERATING FORCES** | **6,000,638** | **95,970** | **6,096,608** |
| | **TRAINING AND RECRUITING** | | | |
| 050 | DEFENSE ACQUISITION UNIVERSITY | 144,970 | | 144,970 |
| 060 | JOINT CHIEFS OF STAFF | 84,402 | | 84,402 |
| 080 | SPECIAL OPERATIONS COMMAND/TRAINING AND RECRUITING | 379,462 | | 379,462 |
| | **SUBTOTAL TRAINING AND RECRUITING** | **608,834** | | **608,834** |
| | **ADMIN & SRVWIDE ACTIVITIES** | | | |
| 090 | CIVIL MILITARY PROGRAMS | 183,000 | 26,500 | 209,500 |
| | National Guard Youth Challenge | | [1,500] | |
| | STARBASE | | [20,000] | |
| | World War I Centennial Commission | | [5,000] | |
| 110 | DEFENSE CONTRACT AUDIT AGENCY | 597,836 | | 597,836 |
| 120 | DEFENSE CONTRACT MANAGEMENT AGENCY | 1,439,010 | | 1,439,010 |
| 130 | DEFENSE HUMAN RESOURCES ACTIVITY | 807,754 | | 807,754 |
| 140 | DEFENSE INFORMATION SYSTEMS AGENCY | 2,009,702 | | 2,009,702 |
| 160 | DEFENSE LEGAL SERVICES AGENCY | 24,207 | | 24,207 |
| 170 | DEFENSE LOGISTICS AGENCY | 400,422 | 14,500 | 414,922 |
| | Procurement Technical Assistance Program (PTAP) | | [14,500] | |
| 180 | DEFENSE MEDIA ACTIVITY | 217,585 | –2,131 | 215,454 |
| | Program decrease | | [–2,500] | |
| | Realign European Reassurance Initiative to Base | | [369] | |
| 190 | DEFENSE PERSONNEL ACCOUNTING AGENCY | 131,268 | | 131,268 |
| 200 | DEFENSE SECURITY COOPERATION AGENCY | 722,496 | 150,000 | 872,496 |

| | | | | |
|---|---|---|---|---|
| | Realign European Reassurance Initiative to Base | | [150,000] | |
| 210 | DEFENSE SECURITY SERVICE | 683,665 | 20,000 | 703,665 |
| | Joint Acquisition Protection and Exploitation Cell (JAPEC) | | [20,000] | |
| 230 | DEFENSE TECHNOLOGY SECURITY ADMINISTRATION | 34,712 | | 34,712 |
| 240 | DEFENSE THREAT REDUCTION AGENCY | 542,604 | –25,000 | 517,604 |
| | Efficiencies from DTRA/JIDO integration | | [–25,000] | |
| 260 | DEPARTMENT OF DEFENSE EDUCATION ACTIVITY | 2,794,389 | 50,000 | 2,844,389 |
| | Impact Aid | | [50,000] | |
| 270 | MISSILE DEFENSE AGENCY | 504,058 | | 504,058 |
| 290 | OFFICE OF ECONOMIC ADJUSTMENT | 57,840 | | 57,840 |
| 300 | OFFICE OF THE SECRETARY OF DEFENSE | 1,488,344 | 26,766 | 1,515,110 |
| | Implementation of Military Housing Fall Prevention | | [16,000] | |
| | Implementation of transparency of Defense Business System Data | | [25,000] | |
| | Program decrease | | [–17,234] | |
| | Support for Commission to Assess the Threat from Electromagnetic Pulse Attacks and Events | | [3,000] | |
| 310 | SPECIAL OPERATIONS COMMAND/ADMIN & SVC-WIDE ACTIVITIES | 94,273 | | 94,273 |
| 320 | WASHINGTON HEADQUARTERS SERVICES | 436,776 | | 436,776 |
| 325 | CLASSIFIED PROGRAMS | 14,806,404 | 55,320 | 14,861,724 |
| | Realign European Reassurance Initiative to Base | | [55,320] | |
| | **SUBTOTAL ADMIN & SRVWIDE ACTIVITIES** | **27,976,345** | **315,955** | **28,292,300** |
| | | | | |
| | **UNDISTRIBUTED** | | | |
| 330 | UNDISTRIBUTED | | –204,900 | –204,900 |
| | Excessive standard price for fuel | | [–6,500] | |
| | Foreign Currency adjustments | | [–19,400] | |
| | Historical unobligated balances | | [–179,000] | |
| | **SUBTOTAL UNDISTRIBUTED** | | **–204,900** | **–204,900** |
| | | | | |
| | **TOTAL OPERATION AND MAINTENANCE, DEFENSE-WIDE** | **34,585,817** | **207,025** | **34,792,842** |
| | | | | |
| | **MISCELLANEOUS APPROPRIATIONS** | | | |
| 010 | US COURT OF APPEALS FOR THE ARMED FORCES, DEFENSE | 14,538 | | 14,538 |

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| 020 | OVERSEAS HUMANITARIAN, DISASTER AND CIVIC AID | 104,900 | | 104,900 |
| 030 | COOPERATIVE THREAT REDUCTION | 324,600 | | 324,600 |
| 050 | ENVIRONMENTAL RESTORATION, ARMY | 215,809 | | 215,809 |
| | Department of Defense Cleanup and Removal of Petroleum, Oil, and Lubricant associated with the Prinz Eugen | | [6,000] | |
| | Program decrease | | [–6,000] | |
| 060 | ENVIRONMENTAL RESTORATION, NAVY | 281,415 | 42,234 | 323,649 |
| | PFOA/PFOS Remediation | | [30,000] | |
| | Program increase | | [12,234] | |
| 070 | ENVIRONMENTAL RESTORATION, AIR FORCE | 293,749 | 30,000 | 323,749 |
| | PFOA/PFOS Remediation | | [30,000] | |
| 080 | ENVIRONMENTAL RESTORATION, DEFENSE | 9,002 | | 9,002 |
| 090 | ENVIRONMENTAL RESTORATION FORMERLY USED SITES | 208,673 | | 208,673 |
| | **TOTAL MISCELLANEOUS APPROPRIATIONS** | **1,452,686** | **72,234** | **1,524,920** |
| | **TOTAL OPERATION & MAINTENANCE** | **188,570,298** | **3,074,093** | **192,294,497** |

## SEC. 4302. OPERATION AND MAINTENANCE FOR OVERSEAS CONTINGENCY OPERATIONS.

**SEC. 4302. OPERATION AND MAINTENANCE FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| | **OPERATION & MAINTENANCE, ARMY** | | | |
| | **OPERATING FORCES** | | | |

| | | | | |
|---|---|---|---|---|
| 010 | MANEUVER UNITS | 828,225 | –683,591 | 144,634 |
| | Realign European Reassurance Initiative to Base | | [–683,591] | |
| 030 | ECHELONS ABOVE BRIGADE | 25,474 | | 25,474 |
| 040 | THEATER LEVEL ASSETS | 1,778,644 | | 1,778,644 |
| 050 | LAND FORCES OPERATIONS SUPPORT | 260,575 | | 260,575 |
| 060 | AVIATION ASSETS | 284,422 | –150,100 | 134,322 |
| | Realign European Reassurance Initiative to Base | | [–150,100] | |
| 070 | FORCE READINESS OPERATIONS SUPPORT | 2,784,525 | –8,969 | 2,775,556 |
| | Realign European Reassurance Initiative to Base | | [–8,969] | |
| 080 | LAND FORCES SYSTEMS READINESS | 502,330 | | 502,330 |
| 090 | LAND FORCES DEPOT MAINTENANCE | 104,149 | –104,149 | 0 |
| | Realign European Reassurance Initiative to Base | | [–104,149] | |
| 100 | BASE OPERATIONS SUPPORT | 80,249 | –48,707 | 31,542 |
| | Realign European Reassurance Initiative to Base | | [–48,707] | |
| 110 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | 32,000 | –32,000 | 0 |
| | Realign European Reassurance Initiative to Base | | [–32,000] | |
| 140 | ADDITIONAL ACTIVITIES | 6,151,378 | –126,250 | 6,025,128 |
| | Realign European Reassurance Initiative to Base | | [–126,250] | |
| 150 | COMMANDERS EMERGENCY RESPONSE PROGRAM | 5,000 | | 5,000 |
| 160 | RESET | 864,926 | | 864,926 |
| 180 | US AFRICA COMMAND | 186,567 | | 186,567 |
| 190 | US EUROPEAN COMMAND | 44,250 | –44,250 | 0 |
| | Realign European Reassurance Initiative to Base | | [–44,250] | |
| | **SUBTOTAL OPERATING FORCES** | **13,932,714** | **–1,198,016** | **12,734,698** |
| | | | | |
| | **MOBILIZATION** | | | |
| 230 | ARMY PREPOSITIONED STOCKS | 56,500 | –56,500 | 0 |
| | Realign European Reassurance Initiative to Base | | [–56,500] | |
| | **SUBTOTAL MOBILIZATION** | **56,500** | **–56,500** | **0** |
| | | | | |
| | **ADMIN & SRVWIDE ACTIVITIES** | | | |
| 390 | SERVICEWIDE TRANSPORTATION | 755,029 | –96,150 | 658,879 |

**SEC. 4302. OPERATION AND MAINTENANCE FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| | Realign European Reassurance Initiative to Base | | [–96,150] | |
| 400 | CENTRAL SUPPLY ACTIVITIES | 16,567 | –11,449 | 5,118 |
| | Realign European Reassurance Initiative to Base | | [–11,449] | |
| 410 | LOGISTIC SUPPORT ACTIVITIES | 6,000 | | 6,000 |
| 420 | AMMUNITION MANAGEMENT | 5,207 | | 5,207 |
| 460 | OTHER PERSONNEL SUPPORT | 107,091 | | 107,091 |
| 490 | REAL ESTATE MANAGEMENT | 165,280 | | 165,280 |
| 565 | CLASSIFIED PROGRAMS | 1,082,015 | –65,825 | 1,016,190 |
| | Realign European Reassurance Initiative to Base | | [–65,825] | |
| | **SUBTOTAL ADMIN & SRVWIDE ACTIVITIES** | **2,137,189** | **–173,424** | **1,963,765** |
| | **TOTAL OPERATION & MAINTENANCE, ARMY** | **16,126,403** | **–1,427,940** | **14,698,463** |
| | **OPERATION & MAINTENANCE, ARMY RES** | | | |
| | **OPERATING FORCES** | | | |
| 020 | ECHELONS ABOVE BRIGADE | 4,179 | 15,643 | 19,822 |
| | Training and operations of USAR early deploying units | | [15,643] | |
| 030 | THEATER LEVEL ASSETS | | 4,718 | 4,718 |
| | Training and operations of USAR early deploying units | | [4,718] | |
| 040 | LAND FORCES OPERATIONS SUPPORT | 2,132 | 12,918 | 15,050 |
| | Training and operations of USAR early deploying units | | [12,918] | |
| 060 | FORCE READINESS OPERATIONS SUPPORT | 779 | | 779 |
| 090 | BASE OPERATIONS SUPPORT | 17,609 | | 17,609 |
| | **SUBTOTAL OPERATING FORCES** | **24,699** | **33,279** | **57,978** |
| | **TOTAL OPERATION & MAINTENANCE, ARMY RES** | **24,699** | **33,279** | **57,978** |

| | | | |
|---|---|---|---|
| | **OPERATION & MAINTENANCE, ARNG** | | |
| | **OPERATING FORCES** | | |
| 010 | MANEUVER UNITS | 41,731 | 41,731 |
| 020 | MODULAR SUPPORT BRIGADES | 762 | 762 |
| 030 | ECHELONS ABOVE BRIGADE | 11,855 | 11,855 |
| 040 | THEATER LEVEL ASSETS | 204 | 204 |
| 060 | AVIATION ASSETS | 27,583 | 27,583 |
| 070 | FORCE READINESS OPERATIONS SUPPORT | 5,792 | 5,792 |
| 100 | BASE OPERATIONS SUPPORT | 18,507 | 18,507 |
| 120 | MANAGEMENT AND OPERATIONAL HEADQUARTERS | 937 | 937 |
| | **SUBTOTAL OPERATING FORCES** | **107,371** | **107,371** |
| | **ADMIN & SRVWD ACTIVITIES** | | |
| 150 | SERVICEWIDE COMMUNICATIONS | 740 | 740 |
| | **SUBTOTAL ADMIN & SRVWD ACTIVITIES** | **740** | **740** |
| | **TOTAL OPERATION & MAINTENANCE, ARNG** | **108,111** | **108,111** |
| | **AFGHANISTAN SECURITY FORCES FUND** | | |
| | **MINISTRY OF DEFENSE** | | |
| 010 | SUSTAINMENT | 2,660,855 | 2,660,855 |
| 020 | INFRASTRUCTURE | 21,000 | 21,000 |
| 030 | EQUIPMENT AND TRANSPORTATION | 684,786 | 684,786 |
| 040 | TRAINING AND OPERATIONS | 405,117 | 405,117 |
| | **SUBTOTAL MINISTRY OF DEFENSE** | **3,771,758** | **3,771,758** |
| | **MINISTRY OF INTERIOR** | | |
| 050 | SUSTAINMENT | 955,574 | 955,574 |
| 060 | INFRASTRUCTURE | 39,595 | 39,595 |
| 070 | EQUIPMENT AND TRANSPORTATION | 75,976 | 75,976 |
| 080 | TRAINING AND OPERATIONS | 94,612 | 94,612 |
| | **SUBTOTAL MINISTRY OF INTERIOR** | **1,165,757** | **1,165,757** |

**SEC. 4302. OPERATION AND MAINTENANCE FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| | **TOTAL AFGHANISTAN SECURITY FORCES FUND** | **4,937,515** | | **4,937,515** |
| | **COUNTER-ISIS TRAIN & EQUIP FUND** | | | |
| | **COUNTER-ISIS TRAIN AND EQUIP FUND (CTEF)** | | | |
| 010 | IRAQ | 1,269,000 | | 1,269,000 |
| 020 | SYRIA | 500,000 | | 500,000 |
| | **SUBTOTAL COUNTER-ISIS TRAIN AND EQUIP FUND (CTEF)** | **1,769,000** | | **1,769,000** |
| | **TOTAL COUNTER-ISIS TRAIN & EQUIP FUND** | **1,769,000** | | **1,769,000** |
| | **OPERATION & MAINTENANCE, NAVY** | | | |
| | **OPERATING FORCES** | | | |
| 010 | MISSION AND OTHER FLIGHT OPERATIONS | 412,710 | –4,750 | 407,960 |
| | Realign European Reassurance Initiative to Base | | [–4,750] | |
| 030 | AVIATION TECHNICAL DATA & ENGINEERING SERVICES | 1,750 | | 1,750 |
| 040 | AIR OPERATIONS AND SAFETY SUPPORT | 2,989 | | 2,989 |
| 050 | AIR SYSTEMS SUPPORT | 144,030 | | 144,030 |
| 060 | AIRCRAFT DEPOT MAINTENANCE | 211,196 | | 211,196 |
| 070 | AIRCRAFT DEPOT OPERATIONS SUPPORT | 1,921 | | 1,921 |
| 080 | AVIATION LOGISTICS | 102,834 | | 102,834 |
| 090 | MISSION AND OTHER SHIP OPERATIONS | 855,453 | –3,677 | 851,776 |
| | Realign European Reassurance Initiative to Base | | [–3,677] | |
| 100 | SHIP OPERATIONS SUPPORT & TRAINING | 19,627 | | 19,627 |
| 110 | SHIP DEPOT MAINTENANCE | 2,483,179 | 65,000 | 2,548,179 |
| | Repairs related to USS Fitzgerald | | [65,000] | |
| 130 | COMBAT COMMUNICATIONS AND ELECTRONIC WARFARE | 58,886 | –5,400 | 53,486 |

| | | | | |
|---|---|---|---|---|
| | Realign European Reassurance Initiative to Base | | [–5,400] | |
| 150 | SPACE SYSTEMS AND SURVEILLANCE | 4,400 | –4,400 | 0 |
| | Realign European Reassurance Initiative to Base | | [–4,400] | |
| 160 | WARFARE TACTICS | 21,550 | | 21,550 |
| 170 | OPERATIONAL METEOROLOGY AND OCEANOGRAPHY | 21,104 | | 21,104 |
| 180 | COMBAT SUPPORT FORCES | 605,936 | –5,984 | 599,952 |
| | Realign European Reassurance Initiative to Base | | [–5,984] | |
| 190 | EQUIPMENT MAINTENANCE AND DEPOT OPERATIONS SUPPORT | 11,433 | | 11,433 |
| 280 | WEAPONS MAINTENANCE | 325,011 | –1,300 | 323,711 |
| | Realign European Reassurance Initiative to Base | | [–1,300] | |
| 290 | OTHER WEAPON SYSTEMS SUPPORT | 9,598 | | 9,598 |
| 310 | SUSTAINMENT, RESTORATION AND MODERNIZATION | 31,898 | | 31,898 |
| 320 | BASE OPERATING SUPPORT | 228,246 | | 228,246 |
| | **SUBTOTAL OPERATING FORCES** | **5,553,751** | **39,489** | **5,593,240** |
| | | | | |
| | **MOBILIZATION** | | | |
| 360 | SHIP ACTIVATIONS/INACTIVATIONS | 1,869 | | 1,869 |
| 370 | EXPEDITIONARY HEALTH SERVICES SYSTEMS | 11,905 | | 11,905 |
| 390 | COAST GUARD SUPPORT | 161,885 | | 161,885 |
| | **SUBTOTAL MOBILIZATION** | **175,659** | | **175,659** |
| | | | | |
| | **TRAINING AND RECRUITING** | | | |
| 430 | SPECIALIZED SKILL TRAINING | 43,369 | | 43,369 |
| | **SUBTOTAL TRAINING AND RECRUITING** | **43,369** | | **43,369** |
| | | | | |
| | **ADMIN & SRVWD ACTIVITIES** | | | |
| 510 | ADMINISTRATION | 3,217 | | 3,217 |
| 540 | MILITARY MANPOWER AND PERSONNEL MANAGEMENT | 7,356 | | 7,356 |
| 590 | SERVICEWIDE TRANSPORTATION | 67,938 | | 67,938 |
| 620 | ACQUISITION, LOGISTICS, AND OVERSIGHT | 9,446 | | 9,446 |
| 660 | INVESTIGATIVE AND SECURITY SERVICES | 1,528 | | 1,528 |
| 775 | CLASSIFIED PROGRAMS | 12,751 | | 12,751 |

SEC. 4302. OPERATION AND MAINTENANCE FOR OVERSEAS CONTINGENCY OPERATIONS
(In Thousands of Dollars)

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| | **SUBTOTAL ADMIN & SRVWD ACTIVITIES** | **102,236** | | **102,236** |
| | **TOTAL OPERATION & MAINTENANCE, NAVY** | **5,875,015** | **39,489** | **5,914,504** |
| | **OPERATION & MAINTENANCE, MARINE CORPS** | | | |
| | **OPERATING FORCES** | | | |
| 010 | OPERATIONAL FORCES | 710,790 | –164,733 | 546,057 |
| | Realign European Reassurance Initiative to Base | | [–164,733] | |
| 020 | FIELD LOGISTICS | 242,150 | | 242,150 |
| 030 | DEPOT MAINTENANCE | 52,000 | | 52,000 |
| 070 | BASE OPERATING SUPPORT | 17,529 | | 17,529 |
| | **SUBTOTAL OPERATING FORCES** | **1,022,469** | **–164,733** | **857,736** |
| | **TRAINING AND RECRUITING** | | | |
| 120 | TRAINING SUPPORT | 29,421 | | 29,421 |
| | **SUBTOTAL TRAINING AND RECRUITING** | **29,421** | | **29,421** |
| | **ADMIN & SRVWD ACTIVITIES** | | | |
| 160 | SERVICEWIDE TRANSPORTATION | 61,600 | | 61,600 |
| 215 | CLASSIFIED PROGRAMS | 3,150 | | 3,150 |
| | **SUBTOTAL ADMIN & SRVWD ACTIVITIES** | **64,750** | | **64,750** |
| | **TOTAL OPERATION & MAINTENANCE, MARINE CORPS** | **1,116,640** | **–164,733** | **951,907** |
| | **OPERATION & MAINTENANCE, NAVY RES** | | | |
| | **OPERATING FORCES** | | | |
| 030 | AIRCRAFT DEPOT MAINTENANCE | 14,964 | | 14,964 |

| Line | Item | Request | Change | Authorized |
|---|---|---|---|---|
| 080 | COMBAT SUPPORT FORCES | 9,016 | | 9,016 |
| | **SUBTOTAL OPERATING FORCES** | **23,980** | | **23,980** |
| | **TOTAL OPERATION & MAINTENANCE, NAVY RES** | **23,980** | | **23,980** |
| | **OPERATION & MAINTENANCE, MC RESERVE** | | | |
| | **OPERATING FORCES** | | | |
| 010 | OPERATING FORCES | 2,548 | | 2,548 |
| 040 | BASE OPERATING SUPPORT | 819 | | 819 |
| | **SUBTOTAL OPERATING FORCES** | **3,367** | | **3,367** |
| | **TOTAL OPERATION & MAINTENANCE, MC RESERVE** | **3,367** | | **3,367** |
| | **OPERATION & MAINTENANCE, AIR FORCE** | | | |
| | **OPERATING FORCES** | | | |
| 010 | PRIMARY COMBAT FORCES | 248,235 | | 248,235 |
| 020 | COMBAT ENHANCEMENT FORCES | 1,394,962 | –96,522 | 1,298,440 |
| | Realign European Reassurance Initiative to Base | | [–96,522] | |
| 030 | AIR OPERATIONS TRAINING (OJT, MAINTAIN SKILLS) | 5,450 | | 5,450 |
| 040 | DEPOT PURCHASE EQUIPMENT MAINTENANCE | 699,860 | 19,479 | 719,339 |
| | Realign European Reassurance Initiative to Base | | [–18,521] | |
| | Restoration of Damaged U–2 Aircraft | | [38,000] | |
| 050 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | 113,131 | –22,700 | 90,431 |
| | Realign European Reassurance Initiative to Base | | [–22,700] | |
| 060 | CONTRACTOR LOGISTICS SUPPORT AND SYSTEM SUPPORT | 2,039,551 | –4,279 | 2,035,272 |
| | Realign European Reassurance Initiative to Base | | [–4,279] | |
| 070 | FLYING HOUR PROGRAM | 2,059,363 | –66,667 | 1,992,696 |
| | Realign European Reassurance Initiative to Base | | [–66,667] | |
| 080 | BASE SUPPORT | 1,088,946 | –13,705 | 1,075,241 |
| | Realign European Reassurance Initiative to Base | | [–13,705] | |
| 090 | GLOBAL C3I AND EARLY WARNING | 15,274 | –2,000 | 13,274 |
| | Realign European Reassurance Initiative to Base | | [–2,000] | |

**SEC. 4302. OPERATION AND MAINTENANCE FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| 100 | OTHER COMBAT OPS SPT PROGRAMS | 198,090 | –19,562 | 178,528 |
| | Realign European Reassurance Initiative to Base | | [–19,562] | |
| 120 | LAUNCH FACILITIES | 385 | | 385 |
| 130 | SPACE CONTROL SYSTEMS | 22,020 | | 22,020 |
| 160 | US NORTHCOM/NORAD | 381 | | 381 |
| 170 | US STRATCOM | 698 | | 698 |
| 180 | US CYBERCOM | 35,239 | | 35,239 |
| 190 | US CENTCOM | 159,520 | | 159,520 |
| 200 | US SOCOM | 19,000 | | 19,000 |
| 215 | CLASSIFIED PROGRAMS | 58,098 | | 58,098 |
| | **SUBTOTAL OPERATING FORCES** | **8,158,203** | **–205,956** | **7,952,247** |
| | | | | |
| | **MOBILIZATION** | | | |
| 220 | AIRLIFT OPERATIONS | 1,430,316 | –4,600 | 1,425,716 |
| | Realign European Reassurance Initiative to Base | | [–4,600] | |
| 230 | MOBILIZATION PREPAREDNESS | 213,827 | –99,870 | 113,957 |
| | Realign European Reassurance Initiative to Base | | [–99,870] | |
| | **SUBTOTAL MOBILIZATION** | **1,644,143** | **–104,470** | **1,539,673** |
| | | | | |
| | **TRAINING AND RECRUITING** | | | |
| 270 | OFFICER ACQUISITION | 300 | | 300 |
| 280 | RECRUIT TRAINING | 298 | | 298 |
| 290 | RESERVE OFFICERS TRAINING CORPS (ROTC) | 90 | | 90 |
| 320 | SPECIALIZED SKILL TRAINING | 25,675 | | 25,675 |
| 330 | FLIGHT TRAINING | 879 | | 879 |
| 340 | PROFESSIONAL DEVELOPMENT EDUCATION | 1,114 | | 1,114 |
| 350 | TRAINING SUPPORT | 1,426 | | 1,426 |

| Line | Item | | | |
|---|---|---|---|---|
| | **SUBTOTAL TRAINING AND RECRUITING** | **29,782** | | **29,782** |
| | **ADMIN & SRVWD ACTIVITIES** | | | |
| 420 | LOGISTICS OPERATIONS | 151,847 | –3,000 | 148,847 |
| | Realign European Reassurance Initiative to Base | | [–3,000] | |
| 430 | TECHNICAL SUPPORT ACTIVITIES | 8,744 | | 8,744 |
| 470 | ADMINISTRATION | 6,583 | | 6,583 |
| 480 | SERVICEWIDE COMMUNICATIONS | 129,508 | | 129,508 |
| 490 | OTHER SERVICEWIDE ACTIVITIES | 84,110 | | 84,110 |
| 530 | INTERNATIONAL SUPPORT | 120 | | 120 |
| 535 | CLASSIFIED PROGRAMS | 53,255 | | 53,255 |
| | **SUBTOTAL ADMIN & SRVWD ACTIVITIES** | **434,167** | **–3,000** | **431,167** |
| | **TOTAL OPERATION & MAINTENANCE, AIR FORCE** | **10,266,295** | **–313,426** | **9,952,869** |
| | **OPERATION & MAINTENANCE, AF RESERVE** | | | |
| | **OPERATING FORCES** | | | |
| 030 | DEPOT PURCHASE EQUIPMENT MAINTENANCE | 52,323 | | 52,323 |
| 060 | BASE SUPPORT | 6,200 | | 6,200 |
| | **SUBTOTAL OPERATING FORCES** | **58,523** | | **58,523** |
| | **TOTAL OPERATION & MAINTENANCE, AF RESERVE** | **58,523** | | **58,523** |
| | **OPERATION & MAINTENANCE, ANG** | | | |
| | **OPERATING FORCES** | | | |
| 020 | MISSION SUPPORT OPERATIONS | 3,468 | | 3,468 |
| 060 | BASE SUPPORT | 11,932 | | 11,932 |
| | **SUBTOTAL OPERATING FORCES** | **15,400** | | **15,400** |
| | **TOTAL OPERATION & MAINTENANCE, ANG** | **15,400** | | **15,400** |
| | **OPERATION AND MAINTENANCE, DEFENSE-WIDE** | | | |

**SEC. 4302. OPERATION AND MAINTENANCE FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| | **OPERATING FORCES** | | | |
| 010 | JOINT CHIEFS OF STAFF | 4,841 | | 4,841 |
| 040 | SPECIAL OPERATIONS COMMAND/OPERATING FORCES | 3,305,234 | –68,830 | 3,236,404 |
| | Realign European Reassurance Initiative to Base | | [–95,970] | |
| | Unfunded Requirement- Joint Task Force Platform Expansion | | [6,300] | |
| | Unfunded Requirement- Publicly Available Information (PAI) Capability Acceleration | | [20,840] | |
| | **SUBTOTAL OPERATING FORCES** | **3,310,075** | **–68,830** | **3,241,245** |
| | **ADMIN & SRVWIDE ACTIVITIES** | | | |
| 110 | DEFENSE CONTRACT AUDIT AGENCY | 9,853 | | 9,853 |
| 120 | DEFENSE CONTRACT MANAGEMENT AGENCY | 21,317 | | 21,317 |
| 140 | DEFENSE INFORMATION SYSTEMS AGENCY | 64,137 | | 64,137 |
| 160 | DEFENSE LEGAL SERVICES AGENCY | 115,000 | | 115,000 |
| 180 | DEFENSE MEDIA ACTIVITY | 13,255 | –369 | 12,886 |
| | Realign European Reassurance Initiative to Base | | [–369] | |
| 200 | DEFENSE SECURITY COOPERATION AGENCY | 2,312,000 | –300,000 | 2,012,000 |
| | Realign European Reassurance Initiative to Base | | [–150,000] | |
| | Transfer of funds to Ukraine Security Assistance | | [–150,000] | |
| 260 | DEPARTMENT OF DEFENSE EDUCATION ACTIVITY | 31,000 | | 31,000 |
| 300 | OFFICE OF THE SECRETARY OF DEFENSE | 34,715 | | 34,715 |
| 320 | WASHINGTON HEADQUARTERS SERVICES | 3,179 | | 3,179 |
| 325 | CLASSIFIED PROGRAMS | 1,797,549 | –55,320 | 1,742,229 |
| | Realign European Reassurance Initiative to Base | | [–55,320] | |
| | **SUBTOTAL ADMIN & SRVWIDE ACTIVITIES** | **4,402,005** | **–355,689** | **4,046,316** |
| | **TOTAL OPERATION AND MAINTENANCE, DEFENSE-WIDE** | **7,712,080** | **–424,519** | **7,287,561** |

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| | **UKRAINE SECURITY ASSISTANCE** | | | |
| | **UKRAINE SECURITY ASSISTANCE** | | | |
| 010 | UKRAINE SECURITY ASSISTANCE | | 150,000 | 150,000 |
| | Transfer from DSCA | | [150,000] | |
| | **SUBTOTAL UKRAINE SECURITY ASSISTANCE** | | **150,000** | **150,000** |
| | **TOTAL UKRAINE SECURITY ASSISTANCE** | | **150,000** | **150,000** |
| | **TOTAL OPERATION & MAINTENANCE** | **48,037,028** | **–2,107,850** | **45,929,178** |

## SEC. 4303. OPERATION AND MAINTENANCE FOR OVERSEAS CONTINGENCY OPERATIONS FOR BASE REQUIREMENTS.

**SEC. 4303. OPERATION AND MAINTENANCE FOR OVERSEAS CONTINGENCY OPERATIONS FOR BASE REQUIREMENTS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| | **OPERATION & MAINTENANCE, ARMY** | | | |
| | **OPERATING FORCES** | | | |
| 110 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | | 629,047 | 629,047 |
| | Demolition of excess facilities | | [50,000] | |
| | Restore restoration and modernization shortfalls | | [154,500] | |
| | Restore sustainment shortfalls | | [424,547] | |
| | **SUBTOTAL OPERATING FORCES** | | **629,047** | **629,047** |
| | **TOTAL OPERATION & MAINTENANCE, ARMY** | | **629,047** | **629,047** |
| | **OPERATION & MAINTENANCE, ARMY RES** | | | |
| | **OPERATING FORCES** | | | |
| 100 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | | 82,619 | 82,619 |
| | Demolition of excess facilities | | [25,000] | |
| | Restore restoration and modernization shortfalls | | [12,300] | |

**SEC. 4303. OPERATION AND MAINTENANCE FOR OVERSEAS CONTINGENCY OPERATIONS FOR BASE REQUIREMENTS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| | Restore sustainment shortfalls | | [45,319] | |
| | **SUBTOTAL OPERATING FORCES** | | **82,619** | **82,619** |
| | **TOTAL OPERATION & MAINTENANCE, ARMY RES** | | **82,619** | **82,619** |
| | **OPERATION & MAINTENANCE, ARNG** | | | |
| | **OPERATING FORCES** | | | |
| 110 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | | 173,900 | 173,900 |
| | Demolition of excess facilities | | [25,000] | |
| | Restore restoration and modernization shortfalls | | [35,200] | |
| | Restore sustainment shortfalls | | [113,700] | |
| | **SUBTOTAL OPERATING FORCES** | | **173,900** | **173,900** |
| | **TOTAL OPERATION & MAINTENANCE, ARNG** | | **173,900** | **173,900** |
| | **OPERATION & MAINTENANCE, NAVY** | | | |
| | **OPERATING FORCES** | | | |
| 310 | SUSTAINMENT, RESTORATION AND MODERNIZATION | | 414,200 | 414,200 |
| | Demolition of excess facilities | | [50,000] | |
| | Restore restoration and modernization shortfalls | | [87,200] | |
| | Restore sustainment shortfalls | | [277,000] | |
| | **SUBTOTAL OPERATING FORCES** | | **414,200** | **414,200** |
| | **TOTAL OPERATION & MAINTENANCE, NAVY** | | **414,200** | **414,200** |
| | **OPERATION & MAINTENANCE, MARINE CORPS** | | | |
| | **OPERATING FORCES** | | | |

| | | | |
|---|---|---|---|
| 060 | SUSTAINMENT, RESTORATION & MODERNIZATION | 217,487 | 217,487 |
| | Demolition of excess facilities | [50,000] | |
| | Restore restoration and modernization shortfalls | [35,300] | |
| | Restore sustainment shortfalls | [132,187] | |
| | **SUBTOTAL OPERATING FORCES** | **217,487** | **217,487** |
| | **TOTAL OPERATION & MAINTENANCE, MARINE CORPS** | **217,487** | **217,487** |
| | **OPERATION & MAINTENANCE, NAVY RES** | | |
| | **OPERATING FORCES** | | |
| 110 | SUSTAINMENT, RESTORATION AND MODERNIZATION | 11,500 | 11,500 |
| | Restore restoration and modernization shortfalls | [1,500] | |
| | Restore sustainment shortfalls | [10,000] | |
| | **SUBTOTAL OPERATING FORCES** | **11,500** | **11,500** |
| | **TOTAL OPERATION & MAINTENANCE, NAVY RES** | **11,500** | **11,500** |
| | **OPERATION & MAINTENANCE, MC RESERVE** | | |
| | **OPERATING FORCES** | | |
| 030 | SUSTAINMENT, RESTORATION AND MODERNIZATION | 7,246 | 7,246 |
| | Restore restoration and modernization shortfalls | [3,900] | |
| | Restore sustainment shortfalls | [3,346] | |
| | **SUBTOTAL OPERATING FORCES** | **7,246** | **7,246** |
| | **TOTAL OPERATION & MAINTENANCE, MC RESERVE** | **7,246** | **7,246** |
| | **OPERATION & MAINTENANCE, AIR FORCE** | | |
| | **OPERATING FORCES** | | |
| 050 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | 507,700 | 507,700 |
| | Demolition of excess facilities | [50,000] | |
| | Restore restoration and modernization shortfalls | [153,300] | |
| | Restore sustainment shortfalls | [304,400] | |

Case 2:20-cv-00111-RAJ Document 111-4 Filed 11/24/20 Page 532 of 607

**SEC. 4303. OPERATION AND MAINTENANCE FOR OVERSEAS CONTINGENCY OPERATIONS FOR BASE REQUIREMENTS**
**(In Thousands of Dollars)**

| Line | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|
| | **SUBTOTAL OPERATING FORCES** | | **507,700** | **507,700** |
| | **TOTAL OPERATION & MAINTENANCE, AIR FORCE** | | **507,700** | **507,700** |
| | **OPERATION & MAINTENANCE, AF RESERVE** | | | |
| | **OPERATING FORCES** | | | |
| 040 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | | 15,300 | 15,300 |
| | Restore restoration and modernization shortfalls | | [5,600] | |
| | Restore sustainment shortfalls | | [9,700] | |
| | **SUBTOTAL OPERATING FORCES** | | **15,300** | **15,300** |
| | **TOTAL OPERATION & MAINTENANCE, AF RESERVE** | | **15,300** | **15,300** |
| | **OPERATION & MAINTENANCE, ANG** | | | |
| | **OPERATING FORCES** | | | |
| 040 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | | 47,600 | 47,600 |
| | Restore restoration and modernization shortfalls | | [14,600] | |
| | Restore sustainment shortfalls | | [33,000] | |
| | **SUBTOTAL OPERATING FORCES** | | **47,600** | **47,600** |
| | **TOTAL OPERATION & MAINTENANCE, ANG** | | **47,600** | **47,600** |
| | **TOTAL OPERATION & MAINTENANCE** | | **2,106,599** | **2,106,599** |

# TITLE XLIV—MILITARY PERSONNEL

## SEC. 4401. MILITARY PERSONNEL.

SEC. 4401. MILITARY PERSONNEL (In Thousands of Dollars)

| Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **Military Personnel Appropriations** | 133,881,636 | 184,389 | 134,066,025 |
| Military Personnel Pay Raise | | [206,400] | |
| Realign European Reassurance Initiative to Base | | [214,289] | |
| Freeze BAH reduction for Military Housing Privatization Initiative | | [125,000] | |
| Historical unobligated balances | | [–363,300] | |
| Department of Defense State Partnership Program | | [2,000] | |
| **Medicare-Eligible Retiree Health Fund Contributions** | 7,804,427 | | 7,804,427 |
| **Total, Military Personnel** | 141,686,063 | 182,389 | 141,870,452 |

## SEC. 4402. MILITARY PERSONNEL FOR OVERSEAS CONTINGENCY OPERATIONS.

SEC. 4402. MILITARY PERSONNEL FOR OVERSEAS CONTINGENCY OPERATIONS (In Thousands of Dollars)

| Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **Military Personnel Appropriations** | 4,276,276 | –214,289 | 4,061,987 |
| Realign European Reassurance Initiative to Base | | [–214,289] | |

## SEC. 4403. MILITARY PERSONNEL FOR OVERSEAS CONTINGENCY OPERATIONS FOR BASE REQUIREMENTS.

**SEC. 4403. MILITARY PERSONNEL FOR OVERSEAS CONTINGENCY OPERATIONS FOR BASE REQUIREMENTS.**
**(In Thousands of Dollars)**

| Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **Military Personnel Appropriations** | | **1,017,700** | **1,017,700** |
| Increase Active Army end strength by 10k | | [829,400] | |
| Increase Army National Guard end strength by 4k | | [105,500] | |
| Increase Army Reserve end strength by 3k | | [82,800] | |
| **Medicare-Eligible Retiree Health Fund Contributions** | | **44,140** | **44,140** |
| Accrual payment associated with increased Army end strength | | [44,140] | |
| **Total, Military Personnel** | | **1,061,840** | **1,061,840** |

# TITLE XLV—OTHER AUTHORIZATIONS

## SEC. 4501. OTHER AUTHORIZATIONS.

**SEC. 4501. OTHER AUTHORIZATIONS**
**(In Thousands of Dollars)**

| Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **WORKING CAPITAL FUND, ARMY** | | | |
| INDUSTRIAL OPERATIONS | 43,140 | | 43,140 |
| SUPPLY MANAGEMENT—ARMY | 40,636 | 50,111 | 90,747 |
| Realign European Reassurance Initiative to Base | | [50,111] | |
| **TOTAL WORKING CAPITAL FUND, ARMY** | **83,776** | **50,111** | **133,887** |

| Item | | | |
|---|---|---|---|
| **WORKING CAPITAL FUND, AIR FORCE** | | | |
| SUPPLY MANAGEMENT | 66,462 | | 66,462 |
| **TOTAL WORKING CAPITAL FUND, AIR FORCE** | **66,462** | | **66,462** |
| **WORKING CAPITAL FUND, DECA** | | | |
| COMMISSARY OPERATIONS | 1,389,340 | –45,000 | 1,344,340 |
| Civilian Personnel Compensation and Benefits | | [–20,000] | |
| Commissary operations | | [–25,000] | |
| **TOTAL WORKING CAPITAL FUND, DECA** | **1,389,340** | **–45,000** | **1,344,340** |
| **WORKING CAPITAL FUND, DEFENSE-WIDE** | | | |
| SUPPLY CHAIN MANAGEMENT—DEFENSE | 47,018 | | 47,018 |
| **TOTAL WORKING CAPITAL FUND, DEFENSE-WIDE** | **47,018** | | **47,018** |
| **NATIONAL DEFENSE SEALIFT FUND** | | | |
| LG MED SPD RO/RO MAINTENANCE | 135,800 | | 135,800 |
| DOD MOBILIZATION ALTERATIONS | 11,197 | | 11,197 |
| TAH MAINTENANCE | 54,453 | | 54,453 |
| RESEARCH AND DEVELOPMENT | 18,622 | | 18,622 |
| READY RESERVE FORCES | 289,255 | 7,000 | 296,255 |
| Strategic Sealift SLEP | | [7,000] | |
| **TOTAL NATIONAL DEFENSE SEALIFT FUND** | **509,327** | **7,000** | **516,327** |
| **CHEM AGENTS & MUNITIONS DESTRUCTION** | | | |
| CHEM DEMILITARIZATION—O&M | 104,237 | | 104,237 |
| CHEM DEMILITARIZATION—RDT&E | 839,414 | | 839,414 |
| CHEM DEMILITARIZATION—PROC | 18,081 | | 18,081 |
| **TOTAL CHEM AGENTS & MUNITIONS DESTRUCTION** | **961,732** | | **961,732** |
| **DRUG INTERDICTION & CTR-DRUG ACTIVITIES, DEF** | | | |
| DRUG INTERDICTION AND COUNTER-DRUG ACTIVITIES, DEFENSE | 674,001 | 17,000 | 691,001 |
| Administrative Overhead | | [–2,000] | |

Case 2:20-cv-00111-RAJ Document 111-4 Filed 11/24/20 Page 536 of 607

**SEC. 4501. OTHER AUTHORIZATIONS**
**(In Thousands of Dollars)**

| Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| SOUTHCOM ISR | | [21,000] | |
| Travel, Infrastructure, Support | | [–2,000] | |
| DRUG DEMAND REDUCTION PROGRAM | 116,813 | | 116,813 |
| **TOTAL DRUG INTERDICTION & CTR-DRUG ACTIVITIES, DEF** | **790,814** | **17,000** | **807,814** |
| **OFFICE OF THE INSPECTOR GENERAL** | | | |
| OPERATION AND MAINTENANCE | 334,087 | | 334,087 |
| RDT&E | 2,800 | | 2,800 |
| **TOTAL OFFICE OF THE INSPECTOR GENERAL** | **336,887** | | **336,887** |
| **DEFENSE HEALTH PROGRAM** | | | |
| **OPERATION & MAINTENANCE** | | | |
| IN-HOUSE CARE | 9,457,768 | 18,000 | 9,475,768 |
| Maintenance of inpatient capabilities of OCONUS MTFs | | [10,000] | |
| Pre-mobilization health care under section 12304b | | [8,000] | |
| PRIVATE SECTOR CARE | 15,317,732 | | 15,317,732 |
| CONSOLIDATED HEALTH SUPPORT | 2,193,045 | | 2,193,045 |
| INFORMATION MANAGEMENT | 1,803,733 | | 1,803,733 |
| MANAGEMENT ACTIVITIES | 330,752 | –9,000 | 321,752 |
| Program decrease | | [–9,000] | |
| EDUCATION AND TRAINING | 737,730 | | 737,730 |
| BASE OPERATIONS/COMMUNICATIONS | 2,255,163 | | 2,255,163 |
| **RDT&E** | | | |
| RESEARCH | 9,796 | | 9,796 |
| EXPLORATRY DEVELOPMENT | 64,881 | | 64,881 |
| ADVANCED DEVELOPMENT | 246,268 | 30,000 | 276,268 |

| Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| Program increase for hypoxia research | | [5,000] | |
| Research of chronic traumatic encephalopathy | | [25,000] | |
| DEMONSTRATION/VALIDATION | 99,039 | | 99,039 |
| ENGINEERING DEVELOPMENT | 170,602 | | 170,602 |
| MANAGEMENT AND SUPPORT | 69,191 | | 69,191 |
| CAPABILITIES ENHANCEMENT | 13,438 | | 13,438 |
| **PROCUREMENT** | | | |
| INITIAL OUTFITTING | 26,978 | | 26,978 |
| REPLACEMENT & MODERNIZATION | 360,831 | | 360,831 |
| **THEATER MEDICAL INFORMATION PROGRAM** | | | |
| JOINT OPERATIONAL MEDICINE INFORMATION SYSTEM | 8,326 | | 8,326 |
| DOD HEALTHCARE MANAGEMENT SYSTEM MODERNIZATION | 499,193 | | 499,193 |
| **UNDISTRIBUTED** | | | |
| UNDISTRIBUTED | | –149,600 | –149,600 |
| Foreign Currency adjustments | | [–15,500] | |
| Historical unobligated balances | | [–134,100] | |
| **TOTAL DEFENSE HEALTH PROGRAM** | **33,664,466** | **–118,600** | **33,545,866** |
| **TOTAL OTHER AUTHORIZATIONS** | **37,849,822** | **–89,489** | **37,760,333** |

## SEC. 4502. OTHER AUTHORIZATIONS FOR OVERSEAS CONTINGENCY OPERATIONS.

**SEC. 4502. OTHER AUTHORIZATIONS FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **WORKING CAPITAL FUND, ARMY** | | | |
| **INDUSTRIAL OPERATIONS** | | | |
| SUPPLY MANAGEMENT—ARMY | 50,111 | –50,111 | |

**SEC. 4502. OTHER AUTHORIZATIONS FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| Realign European Reassurance Initiative to Base | | [–50,111] | |
| **TOTAL WORKING CAPITAL FUND, ARMY** | **50,111** | **–50,111** | |
| | | | |
| **WORKING CAPITAL FUND, DEFENSE-WIDE** | | | |
| ENERGY MANAGEMENT—DEFENSE | 70,000 | | 70,000 |
| SUPPLY CHAIN MANAGEMENT—DEFENSE | 28,845 | | 28,845 |
| **TOTAL WORKING CAPITAL FUND, DEFENSE-WIDE** | **98,845** | | **98,845** |
| | | | |
| **DRUG INTERDICTION & CTR-DRUG ACTIVITIES, DEF** | | | |
| DRUG INTERDICTION AND COUNTER-DRUG ACTIVITIES, DEFENSE | 196,300 | | 196,300 |
| **TOTAL DRUG INTERDICTION & CTR-DRUG ACTIVITIES, DEF** | **196,300** | | **196,300** |
| | | | |
| **OFFICE OF THE INSPECTOR GENERAL** | | | |
| OPERATION AND MAINTENANCE | 24,692 | | 24,692 |
| **TOTAL OFFICE OF THE INSPECTOR GENERAL** | **24,692** | | **24,692** |
| | | | |
| **DEFENSE HEALTH PROGRAM** | | | |
| **OPERATION & MAINTENANCE** | | | |
| IN-HOUSE CARE | 61,857 | | 61,857 |
| PRIVATE SECTOR CARE | 331,968 | | 331,968 |
| CONSOLIDATED HEALTH SUPPORT | 1,980 | | 1,980 |
| **TOTAL DEFENSE HEALTH PROGRAM** | **395,805** | | **395,805** |
| | | | |
| **TOTAL OTHER AUTHORIZATIONS** | **765,753** | **–50,111** | **715,642** |

# TITLE XLVI—MILITARY CONSTRUCTION

## SEC. 4601. MILITARY CONSTRUCTION.

SEC. 4601. MILITARY CONSTRUCTION
(In Thousands of Dollars)

| Account | State/ Country | Installation | Project Title | FY 2018 Request | House Change | House Agreement |
|---|---|---|---|---|---|---|
| Army | ALABAMA | Fort Rucker | TRAINING SUPPORT FACILITY | 38,000 | | 38,000 |
| Army | ARIZONA | Davis-Monthan AFB | GENERAL INSTRUCTION BUILDING | 22,000 | | 22,000 |
| Army | ARIZONA | Fort Huachuca | GROUND TRANSPORT EQUIPMENT BUILDING | 30,000 | | 30,000 |
| Army | CALIFORNIA | Fort Irwin | LAND ACQUISITION | 3,000 | | 3,000 |
| Army | COLORADO | Fort Carson | AMMUNITION SUPPLY POINT | 21,000 | | 21,000 |
| Army | COLORADO | Fort Carson | BATTLEFIELD WEATHER FACILITY | 8,300 | | 8,300 |
| Army | FLORIDA | Eglin AFB | MULTIPURPOSE RANGE COMPLEX | 18,000 | | 18,000 |
| Army | GEORGIA | Fort Benning | AIR TRAFFIC CONTROL TOWER | 0 | 10,800 | 10,800 |
| Army | GEORGIA | Fort Benning | TRAINING SUPPORT FACILITY | 28,000 | | 28,000 |
| Army | GEORGIA | Fort Gordon | ACCESS CONTROL POINT | 33,000 | | 33,000 |
| Army | GEORGIA | Fort Gordon | AUTOMATION-AIDED INSTRUCTIONAL BUILDING | 18,500 | | 18,500 |
| Army | GERMANY | Stuttgart | COMMISSARY | 40,000 | | 40,000 |
| Army | GERMANY | Wiesbaden | ADMINISTRATIVE BUILDING | 43,000 | | 43,000 |
| Army | HAWAII | Fort Shafter | COMMAND AND CONTROL FACILITY, INCR 3 | 90,000 | | 90,000 |
| Army | INDIANA | Crane Army Ammunition Plant | SHIPPING AND RECEIVING BUILDING | 24,000 | | 24,000 |
| Army | KOREA | Kunsan AB | UNMANNED AERIAL VEHICLE HANGAR | 53,000 | | 53,000 |
| Army | NEW YORK | U.S. Military Academy | CEMETERY | 22,000 | | 22,000 |
| Army | SOUTH CAROLINA | Fort Jackson | RECEPTION BARRACKS COMPLEX, PH1 | 60,000 | | 60,000 |
| Army | SOUTH CAROLINA | Shaw AFB | MISSION TRAINING COMPLEX | 25,000 | | 25,000 |
| Army | TEXAS | Camp Bullis | VEHICLE MAINTENANCE SHOP | 13,600 | | 13,600 |
| Army | TEXAS | Fort Hood | VEHICLE MAINTENANCE SHOP | 0 | 33,000 | 33,000 |
| Army | TEXAS | Fort Hood | BATTALION HEADQUARTERS COMPLEX | 37,000 | | 37,000 |

SEC. 4601. MILITARY CONSTRUCTION
(In Thousands of Dollars)

| Account | State/ Country | Installation | Project Title | FY 2018 Request | House Change | House Agreement |
|---|---|---|---|---|---|---|
| Army | TURKEY | Turkey Various | FORWARD OPERATING SITE | 6,400 | –6,400 | 0 |
| Army | VIRGINIA | Fort Belvoir | SECURE ADMIN/OPERATIONS FACILITY, INCR 3 | 14,124 | | 14,124 |
| Army | VIRGINIA | Joint Base Langley-Eustis | AIRCRAFT MAINTENANCE INSTRUCTIONAL BLDG | 34,000 | | 34,000 |
| Army | VIRGINIA | Joint Base Myer-Henderson | SECURITY FENCE | 20,000 | | 20,000 |
| Army | WASHINGTON | Joint Base Lewis-McChord | CONFINEMENT FACILITY | 66,000 | | 66,000 |
| Army | WASHINGTON | Yakima | FIRE STATION | 19,500 | | 19,500 |
| Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | HOST NATION SUPPORT | 28,700 | | 28,700 |
| Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING AND DESIGN | 72,770 | | 72,770 |
| Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PRIOR YEAR SAVINGS: UNSPECIFIED MINOR CONSTRUCTION, ARMY. | 0 | –10,000 | –10,000 |
| Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 31,500 | 10,000 | 41,500 |
| **Military Construction, Army Total** | | | | **920,394** | **37,400** | **957,794** |
| Navy | ARIZONA | Yuma | ENLISTED DINING FACILITY & COMMUNITY BLDGS | 36,358 | | 36,358 |
| Navy | CALIFORNIA | Barstow | COMBAT VEHICLE REPAIR FACILITY | 36,539 | | 36,539 |
| Navy | CALIFORNIA | Camp Pendleton, California | AMMUNITION SUPPLY POINT UPGRADE | 61,139 | | 61,139 |
| Navy | CALIFORNIA | Coronado | UNDERSEA RESCUE COMMAND OPERATIONS BUILDING. | 0 | 36,000 | 36,000 |
| Navy | CALIFORNIA | Lemoore | F/A 18 AVIONICS REPAIR FACILITY REPLACEMENT | 60,828 | | 60,828 |
| Navy | CALIFORNIA | Miramar | AIRCRAFT MAINTENANCE HANGAR (INC 2) | 39,600 | | 39,600 |
| Navy | CALIFORNIA | Miramar | F–35 SIMULATOR FACILITY | 0 | 47,600 | 47,600 |
| Navy | CALIFORNIA | Twentynine Palms, California | POTABLE WATER TREATMENT/BLENDING FACILITY | 55,099 | | 55,099 |
| Navy | DISTRICT OF COLUMBIA | NSA Washington | ELECTRONICS SCIENCE AND TECHNOLOGY LABORATORY. | 37,882 | | 37,882 |
| Navy | DISTRICT OF COLUMBIA | NSA Washington | WASHINGTON NAVY YARD AT/FP | 60,000 | –45,190 | 14,810 |
| Navy | DJIBOUTI | Camp Lemonier, Djibouti | AIRCRAFT PARKING APRON EXPANSION | 13,390 | –13,390 | 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Navy | FLORIDA | Mayport | ADVANCED WASTEWATER TREATMENT PLANT (AWWTP). | 74,994 | | 74,994 |
| Navy | FLORIDA | Mayport | MISSILE MAGAZINES | 9,824 | | 9,824 |
| Navy | GEORGIA | Albany | COMBAT VEHICLE WAREHOUSE | 0 | 43,300 | 43,300 |
| Navy | GREECE | Souda Bay | STRATEGIC AIRCRAFT PARKING APRON EXPANSION | 22,045 | | 22,045 |
| Navy | GUAM | Joint Region Marianas | AIRCRAFT MAINTENANCE HANGAR #2 | 75,233 | | 75,233 |
| Navy | GUAM | Joint Region Marianas | CORROSION CONTROL HANGAR | 66,747 | | 66,747 |
| Navy | GUAM | Joint Region Marianas | MALS FACILITIES | 49,431 | | 49,431 |
| Navy | GUAM | Joint Region Marianas | NAVY-COMMERCIAL TIE-IN HARDENING | 37,180 | | 37,180 |
| Navy | GUAM | Joint Region Marianas | WATER WELL FIELD | 56,088 | | 56,088 |
| Navy | HAWAII | Joint Base Pearl Harbor-Hickam | SEWER LIFT STATION & RELIEF SEWER LINE | 73,200 | | 73,200 |
| Navy | HAWAII | Kaneohe Bay | LHD PAD CONVERSIONS MV–22 LANDING PADS | 19,012 | | 19,012 |
| Navy | HAWAII | Wahiawa | COMMUNICATIONS/CRYPTO FACILITY | 65,864 | | 65,864 |
| Navy | JAPAN | Iwakuni | KC-130J ENLISTED AIRCREW TRAINER FACILITY | 21,860 | | 21,860 |
| Navy | MAINE | Kittery | PAINT, BLAST, AND RUBBER FACILITY | 61,692 | | 61,692 |
| Navy | NORTH CAROLINA | Camp Lejeune | BACHELOR ENLISTED QUARTERS | 37,983 | | 37,983 |
| Navy | NORTH CAROLINA | Camp Lejeune | WATER TREATMENT PLANT REPLACEMENT HADNOT PT. | 65,784 | | 65,784 |
| Navy | NORTH CAROLINA | Marine Corps Air Station Cherry Point | F–35B VERTICAL LIFT FAN TEST FACILITY | 15,671 | | 15,671 |
| Navy | VIRGINIA | Dam Neck | ISR OPERATIONS FACILITY EXPANSION | 29,262 | | 29,262 |
| Navy | VIRGINIA | Joint Expeditionary Base Little Creek—Story | ACU–4 ELECTRICAL UPGRADES | 2,596 | | 2,596 |
| Navy | VIRGINIA | Norfolk | CHAMBERS FIELD MAGAZINE RECAP PH 1 | 34,665 | | 34,665 |
| Navy | VIRGINIA | Portsmouth | SHIP REPAIR TRAINING FACILITY | 72,990 | | 72,990 |
| Navy | VIRGINIA | Yorktown | BACHELOR ENLISTED QUARTERS | 36,358 | | 36,358 |
| Navy | WASHINGTON | Indian Island | MISSILE MAGAZINES | 44,440 | | 44,440 |
| Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING AND DESIGN | 219,069 | | 219,069 |
| Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PRIOR YEAR SAVINGS: UNSPECIFIED MINOR CONSTRUCTION. | 0 | –10,000 | –10,000 |
| Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 23,842 | | 23,842 |
| **Military Construction, Navy Total** | | | | **1,616,665** | **58,320** | **1,674,985** |

SEC. 4601. MILITARY CONSTRUCTION
(In Thousands of Dollars)

| Account | State/ Country | Installation | Project Title | FY 2018 Request | House Change | House Agreement |
|---|---|---|---|---|---|---|
| AF | ALASKA | Eielson AFB | F–35A ADAL CONVENTIONAL MUNITIONS FACILITY .... | 2,500 | | 2,500 |
| AF | ALASKA | Eielson AFB | F–35A AGE FACILITY / FILLSTAND ............................ | 21,000 | | 21,000 |
| AF | ALASKA | Eielson AFB | F–35A CONSOLIDATED MUNITIONS ADMIN FACILITY .. | 27,000 | | 27,000 |
| AF | ALASKA | Eielson AFB | F–35A EXTEND UTILIDUCT TO SOUTH LOOP ............. | 48,000 | | 48,000 |
| AF | ALASKA | Eielson AFB | F–35A OSS/WEAPONS/INTEL FACILITY ........................ | 11,800 | | 11,800 |
| AF | ALASKA | Eielson AFB | F–35A R–11 FUEL TRUCK SHELTER .......................... | 9,600 | | 9,600 |
| AF | ALASKA | Eielson AFB | F–35A SATELLITE DINING FACILITY ........................... | 8,000 | | 8,000 |
| AF | ALASKA | Eielson AFB | REPAIR CENTRAL HEAT/POWER PLANT BOILER PH 4 | 41,000 | | 41,000 |
| AF | AUSTRALIA | Darwin | APR—BULK FUEL STORAGE TANKS .......................... | 76,000 | | 76,000 |
| AF | CALIFORNIA | Travis Air Force Base | KC–46A ADAL B14 FUEL CELL HANGAR .................... | 0 | 1,400 | 1,400 |
| AF | CALIFORNIA | Travis Air Force Base | KC–46A AIRCRAFT 3–BAY MAINTENANCE HANGAR ... | 0 | 107,000 | 107,000 |
| AF | CALIFORNIA | Travis Air Force Base | KC–46A ALTER B181/185/187 SQUAD OPS/AMU ....... | 0 | 6,400 | 6,400 |
| AF | CALIFORNIA | Travis Air Force Base | KC–46A ALTER B811 CORROSION CONTROL HANGAR | 0 | 7,700 | 7,700 |
| AF | COLORADO | Buckley Air Force Base | SBIRS OPERATIONS FACILITY .................................... | 38,000 | | 38,000 |
| AF | COLORADO | Fort Carson, Colorado | 13 ASOS EXPANSION ................................................. | 13,000 | | 13,000 |
| AF | COLORADO | U.S. Air Force Academy | AIR FORCE CYBERWORX ........................................... | 30,000 | | 30,000 |
| AF | FLORIDA | Eglin AFB | F–35A ARMAMENT RESEARCH FAC ADDITION (B614) | 8,700 | | 8,700 |
| AF | FLORIDA | Eglin AFB | LONG-RANGE STAND-OFF ACQUISITION FAC ............. | 38,000 | | 38,000 |
| AF | FLORIDA | Eglin AFB | DORMITORIES (288 RM) ............................................ | 0 | 44,000 | 44,000 |
| AF | FLORIDA | MacDill AFB | KC–135 BEDDOWN OG/MXG HQ ................................ | 8,100 | | 8,100 |
| AF | FLORIDA | Tyndall Air Force Base | FIRE STATION ............................................................ | 0 | 17,000 | 17,000 |
| AF | GEORGIA | Robins AFB | COMMERCIAL VEHICLE VISITOR CONTROL FACILITY .. | 9,800 | | 9,800 |
| AF | ITALY | Aviano AB | GUARDIAN ANGEL OPERATIONS FACILITY .................. | 27,325 | –27,325 | 0 |
| AF | KANSAS | McConnell AFB | COMBAT ARMS FACILITY ........................................... | 17,500 | | 17,500 |
| AF | MARIANA ISLANDS | Tinian | APR LAND ACQUISITION ............................................ | 12,900 | | 12,900 |
| AF | MARYLAND | Joint Base Andrews | PAR LAND ACQUISITION ............................................ | 17,500 | | 17,500 |

| | | | | | | |
|---|---|---|---|---|---|---|
| AF | MARYLAND | Joint Base Andrews | PRESIDENTIAL AIRCRAFT RECAP COMPLEX .............. | 254,000 | –130,000 | 124,000 |
| AF | MASSACHUSETTS | Hanscom AFB | VANDENBERG GATE COMPLEX .................................. | 11,400 | | 11,400 |
| AF | NEVADA | Nellis AFB | RED FLAG 5TH GEN FACILITY ADDITION ................... | 23,000 | | 23,000 |
| AF | NEVADA | Nellis AFB | VIRTUAL WARFARE CENTER OPERATIONS FACILITY ... | 38,000 | | 38,000 |
| AF | NEW JERSEY | McGuire-Dix-Lakehurst | KC–46A ADAL B1749 FOR ATGL & LST SERVICING ... | 0 | 2,000 | 2,000 |
| AF | NEW JERSEY | McGuire-Dix-Lakehurst | KC–46A ADAL B1816 FOR SUPPLY ........................... | 0 | 6,900 | 6,900 |
| AF | NEW JERSEY | McGuire-Dix-Lakehurst | KC–46A ADAL B2319 FOR BOOM OPERATOR TRAINER. | 0 | 6,100 | 6,100 |
| AF | NEW JERSEY | McGuire-Dix-Lakehurst | KC–46A ADAL B2324 REGIONAL MX TRAINING FAC .. | 0 | 18,000 | 18,000 |
| AF | NEW JERSEY | McGuire-Dix-Lakehurst | KC–46A ADAL B3209 FOR FUSELAGE TRAINER ......... | 0 | 3,300 | 3,300 |
| AF | NEW JERSEY | McGuire-Dix-Lakehurst | KC–46A ADD TO B1837 FOR BODY TANKS STORAGE | 0 | 2,300 | 2,300 |
| AF | NEW JERSEY | McGuire-Dix-Lakehurst | KC–46A AEROSPACE GROUND EQUIPMENT STORAGE | 0 | 4,100 | 4,100 |
| AF | NEW JERSEY | McGuire-Dix-Lakehurst | KC–46A ALTER APRON & FUEL HYDRANTS .............. | 0 | 17,000 | 17,000 |
| AF | NEW JERSEY | McGuire-Dix-Lakehurst | KC–46A ALTER BLDGS FOR OPS AND TFI AMU-AMXS | 0 | 9,000 | 9,000 |
| AF | NEW JERSEY | McGuire-Dix-Lakehurst | KC–46A ALTER FACILITIES FOR MAINTENANCE ......... | 0 | 5,800 | 5,800 |
| AF | NEW JERSEY | McGuire-Dix-Lakehurst | KC–46A TWO-BAY GENERAL PURPOSE MAINTENANCE HANGER. | 0 | 72,000 | 72,000 |
| AF | NEW MEXICO | Cannon AFB | DANGEROUS CARGO PAD RELOCATE CATM .............. | 42,000 | | 42,000 |
| AF | NEW MEXICO | Holloman AFB | RPA FIXED GROUND CONTROL STATION FACILITY ..... | 4,250 | | 4,250 |
| AF | NEW MEXICO | Kirtland Air Force Base | FIRE STATION ........................................................... | 0 | 9,300 | 9,300 |
| AF | NORTH DAKOTA | Minot AFB | INDOOR FIRING RANGE ............................................ | 27,000 | | 27,000 |
| AF | OKLAHOMA | Altus AFB | KC–46A FTU FUSELAGE TRAINER PHASE 2 .............. | 4,900 | | 4,900 |
| AF | QATAR | Al Udeid | CONSOLIDATED SQUADRON OPERATIONS FACILITY .... | 15,000 | –15,000 | 0 |
| AF | TEXAS | Joint Base San Antonio | AIR TRAFFIC CONTROL TOWER .................................. | 10,000 | | 10,000 |
| AF | TEXAS | Joint Base San Antonio | BMT CLASSROOMS/DINING FACILITY 4 ..................... | 38,000 | | 38,000 |
| AF | TEXAS | Joint Base San Antonio | BMT RECRUIT DORMITORY 7 .................................... | 90,130 | | 90,130 |
| AF | TEXAS | Joint Base San Antonio | CAMP BULLIS DINING FACILITY ................................. | 18,500 | | 18,500 |
| AF | TURKEY | Incirlik AB | DORMITORY—216 PN ............................................... | 25,997 | –25,997 | 0 |
| AF | UNITED KINGDOM | Royal Air Force Fairford | EIC RC–135 INFRASTRUCTURE ................................. | 2,150 | | 2,150 |
| AF | UNITED KINGDOM | Royal Air Force Fairford | EIC RC–135 INTEL AND SQUAD OPS FACILITY .......... | 38,000 | | 38,000 |
| AF | UNITED KINGDOM | Royal Air Force Fairford | EIC RC–135 RUNWAY OVERRUN RECONFIGURATION | 5,500 | | 5,500 |
| AF | UNITED KINGDOM | Royal Air Force Lakenheath | CONSOLIDATED CORROSION CONTROL FACILITY ....... | 20,000 | | 20,000 |

SEC. 4601. MILITARY CONSTRUCTION
(In Thousands of Dollars)

| Account | State/ Country | Installation | Project Title | FY 2018 Request | House Change | House Agreement |
|---|---|---|---|---|---|---|
| AF | UNITED KINGDOM | Royal Air Force Lakenheath | F–35A 6–BAY HANGAR | 24,000 | | 24,000 |
| AF | UNITED KINGDOM | Royal Air Force Lakenheath | F–35A F–15 PARKING | 10,800 | | 10,800 |
| AF | UNITED KINGDOM | Royal Air Force Lakenheath | F–35A FIELD TRAINING DETACHMENT FACILITY | 12,492 | | 12,492 |
| AF | UNITED KINGDOM | Royal Air Force Lakenheath | F–35A FLIGHT SIMULATOR FACILITY | 22,000 | | 22,000 |
| AF | UNITED KINGDOM | Royal Air Force Lakenheath | F–35A INFRASTRUCTURE | 6,700 | | 6,700 |
| AF | UNITED KINGDOM | Royal Air Force Lakenheath | F–35A SQUADRON OPERATIONS AND AMU | 41,000 | | 41,000 |
| AF | UTAH | Hill AFB | UTTR CONSOLIDATED MISSION CONTROL CENTER | 28,000 | | 28,000 |
| AF | WORLDWIDE | Unspecified Worldwide Locations | KC–46A MAIN OPERATING BASE 4 | 269,000 | –269,000 | 0 |
| AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING AND DESIGN | 97,852 | | 97,852 |
| AF | WORLDWIDE UNSPECIFIED | Various Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 31,400 | | 31,400 |
| AF | WYOMING | F. E. Warren AFB | CONSOLIDATED HELO/TRF OPS/AMU AND ALERT FAC | 62,000 | | 62,000 |
| **Military Construction, Air Force Total** | | | | **1,738,796** | **–128,022** | **1,610,774** |
| Def-Wide | CALIFORNIA | Camp Pendleton | AMBULATORY CARE CENTER REPLACEMENT | 26,400 | | 26,400 |
| Def-Wide | CALIFORNIA | Camp Pendleton | SOF MARINE BATTALION COMPANY/TEAM FACILITIES | 9,958 | | 9,958 |
| Def-Wide | CALIFORNIA | Camp Pendleton | SOF MOTOR TRANSPORT FACILITY EXPANSION | 7,284 | | 7,284 |
| Def-Wide | CALIFORNIA | Coronado | SOF BASIC TRAINING COMMAND | 96,077 | | 96,077 |
| Def-Wide | CALIFORNIA | Coronado | SOF LOGISTICS SUPPORT UNIT ONE OPS FAC. #3 | 46,175 | | 46,175 |
| Def-Wide | CALIFORNIA | Coronado | SOF SEAL TEAM OPS FACILITY | 66,218 | | 66,218 |
| Def-Wide | CALIFORNIA | Coronado | SOF SEAL TEAM OPS FACILITY | 50,265 | | 50,265 |
| Def-Wide | COLORADO | Schriever AFB | AMBULATORY CARE CENTER/DENTAL ADD./ALT. | 10,200 | | 10,200 |
| Def-Wide | CONUS CLASSIFIED | Classified Location | BATTALION COMPLEX, PH 1 | 64,364 | | 64,364 |
| Def-Wide | FLORIDA | Eglin AFB | SOF SIMULATOR FACILITY | 5,000 | | 5,000 |
| Def-Wide | FLORIDA | Eglin AFB | UPGRADE OPEN STORAGE YARD | 4,100 | | 4,100 |
| Def-Wide | FLORIDA | Hurlburt Field | SOF COMBAT AIRCRAFT PARKING APRON | 34,700 | | 34,700 |
| Def-Wide | FLORIDA | Hurlburt Field | SOF SIMULATOR & FUSELAGE TRAINER FACILITY | 11,700 | | 11,700 |
| Def-Wide | GEORGIA | Fort Gordon | BLOOD DONOR CENTER REPLACEMENT | 10,350 | | 10,350 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Def-Wide | GERMANY | Rhine Ordnance Barracks | MEDICAL CENTER REPLACEMENT INCR 7 .................. | 106,700 | | 106,700 |
| Def-Wide | GERMANY | Spangdahlem AB | SPANGDAHLEM ELEMENTARY SCHOOL REPLACEMENT | 79,141 | | 79,141 |
| Def-Wide | GERMANY | Stuttgart | ROBINSON BARRACKS ELEM. SCHOOL REPLACEMENT | 46,609 | | 46,609 |
| Def-Wide | GREECE | Souda Bay | CONSTRUCT HYDRANT SYSTEM ................................. | 18,100 | | 18,100 |
| Def-Wide | GUAM | Andersen AFB | CONSTRUCT TRUCK LOAD & UNLOAD FACILITY ......... | 23,900 | | 23,900 |
| Def-Wide | HAWAII | Kunia | NSAH KUNIA TUNNEL ENTRANCE .............................. | 5,000 | | 5,000 |
| Def-Wide | ITALY | Sigonella | CONSTRUCT HYDRANT SYSTEM ................................. | 22,400 | –22,400 | 0 |
| Def-Wide | ITALY | Vicenza | VICENZA HIGH SCHOOL REPLACEMENT ..................... | 62,406 | | 62,406 |
| Def-Wide | JAPAN | Iwakuni | CONSTRUCT BULK STORAGE TANKS PH 1 ................ | 30,800 | | 30,800 |
| Def-Wide | JAPAN | Kadena AB | SOF MAINTENANCE HANGAR ..................................... | 3,972 | | 3,972 |
| Def-Wide | JAPAN | Kadena AB | SOF SPECIAL TACTICS OPERATIONS FACILITY ............ | 27,573 | | 27,573 |
| Def-Wide | JAPAN | Okinawa | REPLACE MOORING SYSTEM ..................................... | 11,900 | | 11,900 |
| Def-Wide | JAPAN | Sasebo | UPGRADE FUEL WHARF ............................................. | 45,600 | | 45,600 |
| Def-Wide | JAPAN | Torri Commo Station | SOF TACTICAL EQUIPMENT MAINTENANCE Facility .... | 25,323 | | 25,323 |
| Def-Wide | JAPAN | Yokota AB | AIRFIELD APRON ........................................................ | 10,800 | | 10,800 |
| Def-Wide | JAPAN | Yokota AB | HANGAR/AIRCRAFT MAINTENANCE UNIT ..................... | 12,034 | | 12,034 |
| Def-Wide | JAPAN | Yokota AB | OPERATIONS AND WAREHOUSE FACILITIES ................ | 8,590 | | 8,590 |
| Def-Wide | JAPAN | Yokota AB | SIMULATOR FACILITY ................................................ | 2,189 | | 2,189 |
| Def-Wide | MARYLAND | Bethesda Naval Hospital | MEDICAL CENTER ADDITION/ALTERATION INCR 2 ...... | 123,800 | | 123,800 |
| Def-Wide | MARYLAND | Fort Meade | NSAW RECAPITALIZE BUILDING #2 INCR 3 ................ | 313,968 | | 313,968 |
| Def-Wide | MISSOURI | Fort Leonard Wood | BLOOD PROCESSING CENTER REPLACEMENT ........... | 11,941 | –11,941 | 0 |
| Def-Wide | MISSOURI | Fort Leonard Wood | HOSPITAL REPLACEMENT .......................................... | 250,000 | –100,000 | 150,000 |
| Def-Wide | MISSOURI | St Louis | NEXT NGA WEST (N2W) COMPLEX ............................ | 381,000 | –181,000 | 200,000 |
| Def-Wide | NEW MEXICO | Cannon AFB | SOF C–130 AGE FACILITY ......................................... | 8,228 | | 8,228 |
| Def-Wide | NORTH CAROLINA | Camp Lejeune | AMBULATORY CARE CENTER ADDITION/ALTERATION | 15,300 | | 15,300 |
| Def-Wide | NORTH CAROLINA | Camp Lejeune | AMBULATORY CARE CENTER/DENTAL CLINIC ............ | 21,400 | | 21,400 |
| Def-Wide | NORTH CAROLINA | Camp Lejeune | AMBULATORY CARE CENTER/DENTAL CLINIC ............ | 22,000 | | 22,000 |
| Def-Wide | NORTH CAROLINA | Camp Lejeune | SOF HUMAN PERFORMANCE TRAINING CENTER ........ | 10,800 | | 10,800 |
| Def-Wide | NORTH CAROLINA | Camp Lejeune | SOF MOTOR TRANSPORT MAINTENANCE EXPANSION | 20,539 | | 20,539 |
| Def-Wide | NORTH CAROLINA | Fort Bragg | SOF HUMAN PERFORMANCE TRAINING Center ........... | 20,260 | | 20,260 |
| Def-Wide | NORTH CAROLINA | Fort Bragg | SOF SUPPORT BATTALION ADMIN FACILITY ................ | 13,518 | | 13,518 |
| Def-Wide | NORTH CAROLINA | Fort Bragg | SOF TACTICAL EQUIPMENT MAINTENANCE FACILITY .. | 20,000 | | 20,000 |

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/ Country | Installation | Project Title | FY 2018 Request | House Change | House Agreement |
|---|---|---|---|---|---|---|
| Def-Wide | NORTH CAROLINA | Fort Bragg | SOF TELECOMM RELIABILITY IMPROVEMENTS | 4,000 | | 4,000 |
| Def-Wide | NORTH CAROLINA | Seymour Johnson AFB | CONSTRUCT TANKER TRUCK DELIVERY SYSTEM | 20,000 | | 20,000 |
| Def-Wide | PUERTO RICO | Punta Borinquen | RAMEY UNIT SCHOOL REPLACEMENT | 61,071 | | 61,071 |
| Def-Wide | SOUTH CAROLINA | Shaw AFB | CONSOLIDATE FUEL FACILITIES | 22,900 | | 22,900 |
| Def-Wide | TEXAS | Fort Bliss | BLOOD PROCESSING CENTER | 8,300 | –8,300 | 0 |
| Def-Wide | TEXAS | Fort Bliss | HOSPITAL REPLACEMENT INCR 8 | 251,330 | | 251,330 |
| Def-Wide | UNITED KINGDOM | Menwith Hill Station | RAFMH MAIN GATE REHABILITATION | 11,000 | | 11,000 |
| Def-Wide | UTAH | Hill AFB | REPLACE POL FACILITIES | 20,000 | | 20,000 |
| Def-Wide | VIRGINIA | Joint Expeditionary Base Little Creek—Story | SOF SATEC RANGE EXPANSION | 23,000 | | 23,000 |
| Def-Wide | VIRGINIA | Norfolk | REPLACE HAZARDOUS MATERIALS WAREHOUSE | 18,500 | | 18,500 |
| Def-Wide | VIRGINIA | Pentagon | PENTAGON CORR 8 PEDESTRIAN ACCESS CONTROL PT. | 8,140 | | 8,140 |
| Def-Wide | VIRGINIA | Pentagon | S.E. SAFETY TRAFFIC AND PARKING IMPROVEMENTS | 28,700 | | 28,700 |
| Def-Wide | VIRGINIA | Pentagon | SECURITY UPDATES | 13,260 | | 13,260 |
| Def-Wide | VIRGINIA | Portsmouth | REPLACE HAZARDOUS MATERIALS WAREHOUSE | 22,500 | | 22,500 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | CONTINGENCY CONSTRUCTION | 10,000 | –10,000 | 0 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | ENERGY RESILIENCE AND CONSERV. INVEST. PROG. | 150,000 | | 150,000 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | ERCIP DESIGN | 10,000 | | 10,000 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | EXERCISE RELATED MINOR CONSTRUCTION | 11,490 | | 11,490 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING & DESIGN | 23,012 | | 23,012 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING & DESIGN MDA EAST COAST SITE | 0 | 10,000 | 10,000 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING AND DESIGN | 26,147 | | 26,147 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING AND DESIGN | 39,746 | | 39,746 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING AND DESIGN | 1,942 | | 1,942 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING AND DESIGN | 1,150 | | 1,150 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING AND DESIGN | 40,220 | | 40,220 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING AND DESIGN | 20,000 | | 20,000 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING AND DESIGN | 13,500 | | 13,500 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PRIOR YEAR SAVINGS: DEFENSE WIDE UNSPECIFIED MINOR CONSTRUCTION. | 0 | –27,440 | –27,440 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 3,000 | | 3,000 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 7,384 | | 7,384 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 3,000 | | 3,000 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 3,000 | | 3,000 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 8,000 | | 8,000 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 2,039 | | 2,039 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 10,000 | | 10,000 |
| **Military Construction, Defense-Wide Total** | | | | **3,114,913** | **–351,081** | **2,763,832** |
| NATO | WORLDWIDE UNSPECIFIED | NATO Security Investment Program | NATO SECURITY INVESTMENT PROGRAM | 154,000 | 23,932 | 177,932 |
| NATO | WORLDWIDE UNSPECIFIED | NATO Security Investment Program | PRIOR YEAR SAVINGS: NATO SECURITY INVESTMENT PROGRAM. | 0 | –25,000 | –25,000 |
| **NATO Security Investment Program Total** | | | | **154,000** | **–1,068** | **152,932** |
| Army NG | DELAWARE | New Castle | COMBINED SUPPORT MAINTENANCE SHOP | 36,000 | | 36,000 |
| Army NG | IDAHO | MTC Gowen | ENLISTED BARRACKS TRANSIENT TRAINING | 0 | 9,000 | 9,000 |
| Army NG | IDAHO | Orchard Training Area | DIGITAL AIR/GROUND INTEGRATION RANGE | 22,000 | | 22,000 |
| Army NG | MAINE | Presque Isle | NATIONAL GUARD READINESS CENTER | 17,500 | | 17,500 |
| Army NG | MARYLAND | Sykesville | NATIONAL GUARD READINESS CENTER | 19,000 | | 19,000 |
| Army NG | MINNESOTA | Arden Hills | NATIONAL GUARD READINESS CENTER | 39,000 | | 39,000 |
| Army NG | MISSOURI | Springfield | AIRCRAFT MAINTENANCE CENTER | 0 | 32,000 | 32,000 |
| Army NG | NEW MEXICO | Las Cruces | NATIONAL GUARD READINESS CENTER ADDITION | 8,600 | | 8,600 |
| Army NG | VIRGINIA | Fort Belvoir | READINESS CENTER ADD/ALT | 0 | 15,000 | 15,000 |
| Army NG | VIRGINIA | Fort Pickett | TRAINING AIDS CENTER | 4,550 | | 4,550 |
| Army NG | WASHINGTON | Turnwater | NATIONAL GUARD READINESS CENTER | 31,000 | | 31,000 |
| Army NG | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING AND DESIGN | 16,271 | | 16,271 |
| Army NG | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 16,731 | | 16,731 |

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/ Country | Installation | Project Title | FY 2018 Request | House Change | House Agreement |
|---|---|---|---|---|---|---|
| **Military Construction, Army National Guard Total** | | | | **210,652** | **56,000** | **266,652** |
| Army Res | CALIFORNIA | Fallbrook | ARMY RESERVE CENTER | 36,000 | | 36,000 |
| Army Res | PUERTO RICO | Aguadilla | ARMY RESERVE CENTER | 12,400 | | 12,400 |
| Army Res | PUERTO RICO | Fort Buchanan | RESERVE CENTER | 0 | 26,000 | 26,000 |
| Army Res | WASHINGTON | Lewis-McCord | RESERVE CENTER | 0 | 30,000 | 30,000 |
| Army Res | WISCONSIN | Fort McCoy | AT/MOB DINING FACILITY–1428 PN | 13,000 | | 13,000 |
| Army Res | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING AND DESIGN | 6,887 | | 6,887 |
| Army Res | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 5,425 | | 5,425 |
| **Military Construction, Army Reserve Total** | | | | **73,712** | **56,000** | **129,712** |
| N/MC Res | CALIFORNIA | Lemoore | NAVAL OPERATIONAL SUPPORT CENTER LEMOORE | 17,330 | | 17,330 |
| N/MC Res | GEORGIA | Fort Gordon | NAVAL OPERATIONAL SUPPORT CENTER FORT GORDON. | 17,797 | | 17,797 |
| N/MC Res | NEW JERSEY | Joint Base McGuire-Dix-Lakehurst | AIRCRAFT APRON, TAXIWAY & SUPPORT FACILITIES | 11,573 | | 11,573 |
| N/MC Res | TEXAS | Fort Worth | KC130-J EACTS FACILITY | 12,637 | | 12,637 |
| N/MC Res | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING & DESIGN | 4,430 | | 4,430 |
| N/MC Res | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 1,504 | | 1,504 |
| **Military Construction, Naval Reserve Total** | | | | **65,271** | **0** | **65,271** |
| Air NG | CALIFORNIA | March AFB | TFI CONSTRUCT RPA FLIGHT TRAINING UNIT | 15,000 | | 15,000 |
| Air NG | COLORADO | Peterson AFB | SPACE CONTROL FACILITY | 8,000 | | 8,000 |
| Air NG | CONNECTICUT | Bradley IAP | CONSTRUCT BASE ENTRY COMPLEX | 7,000 | | 7,000 |
| Air NG | INDIANA | Fort Wayne International Airport | ADD TO BUILDING 764 FOR WEAPONS RELEASE | 0 | 1,900 | 1,900 |
| Air NG | INDIANA | Hulman Regional Airport | CONSTRUCT SMALL ARMS RANGE | 0 | 8,000 | 8,000 |
| Air NG | KENTUCKY | Louisville IAP | ADD/ALTER RESPONSE FORCES FACILITY | 9,000 | | 9,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Air NG | MISSISSIPPI | Jackson International Airport | CONSTRUCT SMALL ARMS RANGE | 0 | 8,000 | 8,000 |
| Air NG | MISSOURI | Rosecrans Memorial Airport | REPLACE COMMUNICATIONS FACILITY | 10,000 | | 10,000 |
| Air NG | NEW YORK | Hancock Field | ADD TO FLIGHT TRAINING UNIT, BUILDING 641 | 6,800 | | 6,800 |
| Air NG | OHIO | Rickenbacker International Airport | CONSTRUCT SMALL ARMS RANGE | 0 | 8,000 | 8,000 |
| Air NG | OHIO | Toledo Express Airport | NORTHCOM—CONSTRUCT ALERT HANGAR | 15,000 | | 15,000 |
| Air NG | OKLAHOMA | Tulsa International Airport | CONSTRUCT SMALL ARMS RANGE | 0 | 8,000 | 8,000 |
| Air NG | OREGON | Klamath Falls IAP | CONSTRUCT CORROSION CONTROL HANGAR | 10,500 | | 10,500 |
| Air NG | OREGON | Klamath Falls IAP | CONSTRUCT INDOOR RANGE | 8,000 | | 8,000 |
| Air NG | SOUTH DAKOTA | Joe Foss Field | AIRCRAFT MAINTENANCE SHOPS | 12,000 | | 12,000 |
| Air NG | TENNESSEE | McGhee-Tyson Airport | REPLACE KC–135 MAINTENANCE HANGAR AND SHOPS. | 25,000 | | 25,000 |
| Air NG | WISCONSIN | Dane County Regional Airport/ Truax Field | CONSTRUCT SMALL ARMS RANGE | 0 | 8,000 | 8,000 |
| Air NG | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING AND DESIGN | 18,000 | | 18,000 |
| Air NG | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 17,191 | | 17,191 |
| **Military Construction, Air National Guard Total** | | | | **161,491** | **41,900** | **203,391** |
| AF Res | FLORIDA | Patrick AFB | GUARDIAN ANGEL FACILITY | 25,000 | | 25,000 |
| AF Res | GEORGIA | Robins Air Force Base | CONSOLIDATED MISSION COMPLEX PHASE 2 | 0 | 32,000 | 32,000 |
| AF Res | GUAM | Joint Region Marianas | RESERVE MEDICAL TRAINING FACILITY | 5,200 | | 5,200 |
| AF Res | HAWAII | Joint Base Pearl Harbor-Hickam | CONSOLIDATED TRAINING FACILITY | 5,500 | | 5,500 |
| AF Res | MASSACHUSETTS | Westover ARB | INDOOR SMALL ARMS RANGE | 10,000 | | 10,000 |
| AF Res | MINNESOTA | Minneapolis-St Paul IAP | INDOOR SMALL ARMS RANGE | 0 | 9,000 | 9,000 |
| AF Res | NORTH CAROLINA | Seymour Johnson AFB | KC–46A ADAL FOR ALT MISSION STORAGE | 6,400 | | 6,400 |
| AF Res | TEXAS | NAS JRB Fort Worth | MUNITIONS TRAINING/ADMIN FACILITY | 0 | 3,100 | 3,100 |
| AF Res | UTAH | Hill AFB | ADD/ALTER LIFE SUPPORT FACILITY | 3,100 | | 3,100 |
| AF Res | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING & DESIGN | 4,725 | | 4,725 |
| AF Res | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNSPECIFIED MINOR CONSTRUCTION | 3,610 | | 3,610 |
| **Military Construction, Air Force Reserve Total** | | | | **63,535** | **44,100** | **107,635** |
| FH Con Army | GEORGIA | Fort Gordon | FAMILY HOUSING NEW CONSTRUCTION | 6,100 | | 6,100 |

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/ Country | Installation | Project Title | FY 2018 Request | House Change | House Agreement |
|---|---|---|---|---|---|---|
| FH Con Army | GERMANY | Baumholder | CONSTRUCTION IMPROVEMENTS | 34,156 | | 34,156 |
| FH Con Army | GERMANY | South Camp Vilseck | FAMILY HOUSING NEW CONSTRUCTION (36 UNITS) | 22,445 | | 22,445 |
| FH Con Army | KOREA | Camp Humphreys | FAMILY HOUSING NEW CONSTRUCTION INCR 2 | 34,402 | | 34,402 |
| FH Con Army | KWAJALEIN | Kwajalein Atoll | FAMILY HOUSING REPLACEMENT CONSTRUCTION | 31,000 | | 31,000 |
| FH Con Army | MASSACHUSETTS | Natick | FAMILY HOUSING REPLACEMENT CONSTRUCTION | 21,000 | | 21,000 |
| FH Con Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING & DESIGN | 33,559 | | 33,559 |
| FH Con Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PRIOR YEAR SAVINGS: FAMILY HOUSING CONSTRUCTION, ARMY. | 0 | –18,000 | –18,000 |
| **Family Housing Construction, Army Total** | | | | **182,662** | **–18,000** | **164,662** |
| FH Ops Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | FURNISHINGS | 12,816 | | 12,816 |
| FH Ops Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | HOUSING PRIVATIZATION SUPPORT | 20,893 | | 20,893 |
| FH Ops Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | LEASING | 148,538 | | 148,538 |
| FH Ops Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | MAINTENANCE | 57,708 | | 57,708 |
| FH Ops Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | MANAGEMENT | 37,089 | | 37,089 |
| FH Ops Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | MISCELLANEOUS | 400 | | 400 |
| FH Ops Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | SERVICES | 8,930 | | 8,930 |
| FH Ops Army | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UTILITIES | 60,251 | | 60,251 |
| **Family Housing Operation And Maintenance, Army Total** | | | | **346,625** | **0** | **346,625** |
| FH Con Navy | BAHRAIN ISLAND | SW Asia | CONSTRUCT ON-BASE GFOQ | 2,138 | | 2,138 |
| FH Con Navy | MARIANA ISLANDS | Guam | REPLACE ANDERSEN HOUSING PH II | 40,875 | | 40,875 |
| FH Con Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | CONSTRUCTION IMPROVEMENTS | 36,251 | | 36,251 |
| FH Con Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING & DESIGN | 4,418 | | 4,418 |
| FH Con Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PRIOR YEAR SAVINGS: FAMILY HOUSING CONSTRUCTION, N/MC. | 0 | –8,000 | –8,000 |
| **Family Housing Construction, Navy And Marine Corps Total** | | | | **83,682** | **–8,000** | **75,682** |

| | | | | | | |
|---|---|---|---|---|---|---|
| FH Ops Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | FURNISHINGS | 14,529 | | 14,529 |
| FH Ops Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | HOUSING PRIVATIZATION SUPPORT | 27,587 | | 27,587 |
| FH Ops Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | LEASING | 61,921 | | 61,921 |
| FH Ops Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | MAINTENANCE | 95,104 | | 95,104 |
| FH Ops Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | MANAGEMENT | 50,989 | | 50,989 |
| FH Ops Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | MISCELLANEOUS | 336 | | 336 |
| FH Ops Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | SERVICES | 15,649 | | 15,649 |
| FH Ops Navy | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UTILITIES | 62,167 | | 62,167 |
| **Family Housing Operation And Maintenance, Navy And Marine Corps Total** | | | | **328,282** | **0** | **328,282** |
| FH Con AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | CONSTRUCTION IMPROVEMENTS | 80,617 | | 80,617 |
| FH Con AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PLANNING & DESIGN | 4,445 | | 4,445 |
| FH Con AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | PRIOR YEAR SAVINGS: FAMILY HOUSING CONSTRUCTION. | 0 | –20,000 | –20,000 |
| **Family Housing Construction, Air Force Total** | | | | **85,062** | **–20,000** | **65,062** |
| FH Ops AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | FURNISHINGS | 29,424 | | 29,424 |
| FH Ops AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | HOUSING PRIVATIZATION | 21,569 | | 21,569 |
| FH Ops AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | LEASING | 16,818 | | 16,818 |
| FH Ops AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | MAINTENANCE | 134,189 | | 134,189 |
| FH Ops AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | MANAGEMENT | 53,464 | | 53,464 |
| FH Ops AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | MISCELLANEOUS | 1,839 | | 1,839 |
| FH Ops AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | SERVICES | 13,517 | | 13,517 |
| FH Ops AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UTILITIES | 47,504 | | 47,504 |
| **Family Housing Operation And Maintenance, Air Force Total** | | | | **318,324** | **0** | **318,324** |
| FH Ops DW | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | FURNISHINGS | 407 | | 407 |
| FH Ops DW | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | FURNISHINGS | 641 | | 641 |
| FH Ops DW | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | FURNISHINGS | 6 | | 6 |
| FH Ops DW | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | LEASING | 12,390 | | 12,390 |
| FH Ops DW | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | LEASING | 39,716 | | 39,716 |

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/ Country | Installation | Project Title | FY 2018 Request | House Change | House Agreement |
|---|---|---|---|---|---|---|
| FH Ops DW | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | MAINTENANCE | 567 | | 567 |
| FH Ops DW | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | MAINTENANCE | 655 | | 655 |
| FH Ops DW | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | MANAGEMENT | 319 | | 319 |
| FH Ops DW | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | SERVICES | 14 | | 14 |
| FH Ops DW | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UTILITIES | 268 | | 268 |
| FH Ops DW | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UTILITIES | 4,100 | | 4,100 |
| FH Ops DW | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UTILITIES | 86 | | 86 |
| **Family Housing Operation And Maintenance, Defense-Wide Total** | | | | **59,169** | **0** | **59,169** |
| FHIF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | ADMINISTRATIVE EXPENSES—FHIF | 2,726 | | 2,726 |
| **DOD Family Housing Improvement Fund Total** | | | | **2,726** | **0** | **2,726** |
| UHIF | WORLDWIDE UNSPECIFIED | Unaccompanied Housing Improvement Fund | ADMINISTRATIVE EXPENSES—UHIF | 623 | | 623 |
| **Unaccompanied Housing Improvement Fund Total** | | | | **623** | **0** | **623** |
| BRAC | WORLDWIDE UNSPECIFIED | Base Realignment & Closure, Army | BASE REALIGNMENT AND CLOSURE | 58,000 | | 58,000 |
| **Base Realignment and Closure—Army Total** | | | | **58,000** | **0** | **58,000** |
| BRAC | WORLDWIDE UNSPECIFIED | Base Realignment & Closure, Navy | BASE REALIGNMENT & CLOSURE | 93,474 | 35,000 | 128,474 |
| BRAC | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | DON–100: PLANNING, DESIGN AND MANAGEMENT | 8,428 | | 8,428 |
| BRAC | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | DON–101: VARIOUS LOCATIONS | 23,753 | | 23,753 |
| BRAC | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | DON–138: NAS BRUNSWICK, ME | 647 | | 647 |
| BRAC | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | DON–157: MCSA KANSAS CITY, MO | 40 | | 40 |
| BRAC | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | DON–172: NWS SEAL BEACH, CONCORD, CA | 5,355 | | 5,355 |

| | | | | | | |
|---|---|---|---|---|---|---|
| BRAC | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | DON–84: JRB WILLOW GROVE & CAMBRIA REG AP | 4,737 | | 4,737 |
| BRAC | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | UNDISTRIBUTED | 7,210 | | 7,210 |
| | **Base Realignment and Closure—Navy Total** | | | **143,644** | **35,000** | **178,644** |
| BRAC | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | DOD BRAC ACTIVITIES—AIR FORCE | 54,223 | | 54,223 |
| | **Base Realignment and Closure—Air Force Total** | | | **54,223** | **0** | **54,223** |
| | **Total, Military Construction** | | | **9,782,451** | **–197,451** | **9,585,000** |

## SEC. 4602. MILITARY CONSTRUCTION FOR OVERSEAS CONTINGENCY OPERATIONS.

**SEC. 4602. MILITARY CONSTRUCTION FOR OVERSEAS CONTINGENCY OPERATIONS**
**(In Thousands of Dollars)**

| Account | State/ Country | Installation | Project Title | FY 2018 Request | House Change | House Agreement |
|---|---|---|---|---|---|---|
| Army | CUBA | Guantanamo Bay | OCO: BARRACKS | 115,000 | | 115,000 |
| Army | TURKEY | Various Locations | FORWARD OPERATING SITE | 0 | 6,400 | 6,400 |
| Army | WORLDWIDE UN-SPECIFIED | Unspecified Worldwide Locations | ERI: PLANNING AND DESIGN | 15,700 | | 15,700 |
| Army | WORLDWIDE UN-SPECIFIED | Unspecified Worldwide Locations | OCO: PLANNING AND DESIGN | 9,000 | | 9,000 |
| | **Military Construction, Army Total** | | | **139,700** | **6,400** | **146,100** |
| Navy | DJIBOUTI | Camp Lemonier | AIRCRAFT PARKING APRON EXPANSION | 0 | 13,390 | 13,390 |
| Navy | WORLDWIDE UN-SPECIFIED | Unspecified Worldwide Locations | ERI: PLANNING AND DESIGN | 18,500 | | 18,500 |
| | **Military Construction, Navy Total** | | | **18,500** | **13,390** | **31,890** |
| AF | ESTONIA | Amari Air Base | ERI: POL CAPACITY PHASE II | 4,700 | | 4,700 |
| AF | ESTONIA | Amari Air Base | ERI: TACTICAL FIGHTER AIRCRAFT PARKING APRON | 9,200 | | 9,200 |
| AF | HUNGARY | Kecskemet AB | ERI: AIRFIELD UPGRADES | 12,900 | –12,900 | 0 |

SEC. 4602. MILITARY CONSTRUCTION FOR OVERSEAS CONTINGENCY OPERATIONS
(In Thousands of Dollars)

| Account | State/ Country | Installation | Project Title | FY 2018 Request | House Change | House Agreement |
|---|---|---|---|---|---|---|
| AF | HUNGARY | Kecskemet AB | ERI: CONSTRUCT PARALLEL TAXIWAY | 30,000 | –30,000 | 0 |
| AF | HUNGARY | Kecskemet AB | ERI: INCREASE POL STORAGE CAPACITY | 12,500 | –12,500 | 0 |
| AF | ICELAND | Keflavik | ERI: AIRFIELD UPGRADES | 14,400 | | 14,400 |
| AF | ITALY | Aviano AB | GUARDIAN ANGEL OPERATIONS FACILITY | 0 | 27,325 | 27,325 |
| AF | JORDAN | Azraq | OCO: MSAB DEVELOPMENT | 143,000 | | 143,000 |
| AF | LATVIA | Lielvarde Air Base | ERI: EXPAND STRATEGIC RAMP PARKING | 3,850 | | 3,850 |
| AF | LUXEMBOURG | Sanem | ERI: ECAOS DEPLOYABLE AIRBASE SYSTEM STORAGE | 67,400 | | 67,400 |
| AF | NORWAY | Rygge | ERI: REPLACE/EXPAND QUICK REACTION ALERT PAD | 10,300 | –10,300 | 0 |
| AF | QATAR | Al Udeid | CONSOLIDATION SQUADRON OPERATIONS FACILITY | 0 | 15,000 | 15,000 |
| AF | ROMANIA | Campia Turzii | ERI: UPGRADE UTILITIES INFRASTRUCTURE | 2,950 | | 2,950 |
| AF | SLOVAKIA | Malacky | ERI: AIRFIELD UPGRADES | 4,000 | –4,000 | 0 |
| AF | SLOVAKIA | Malacky | ERI: INCREASE POL STORAGE CAPACITY | 20,000 | –20,000 | 0 |
| AF | SLOVAKIA | Sliac Airport | ERI: AIRFIELD UPGRADES | 22,000 | –22,000 | 0 |
| AF | TURKEY | Incirlik AB | DORMITORY—216PN | 0 | 25,997 | 25,997 |
| AF | TURKEY | Incirlik AB | OCO: RELOCATE BASE MAIN ACCESS CONTROL POINT | 14,600 | | 14,600 |
| AF | TURKEY | Incirlik AB | OCO: REPLACE PERIMETER FENCE | 8,100 | | 8,100 |
| AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | ERI: PLANNING AND DESIGN | 56,630 | | 56,630 |
| AF | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | OCO—PLANNING AND DESIGN | 41,500 | | 41,500 |
| **Military Construction, Air Force Total** | | | | **478,030** | **–43,378** | **434,652** |
| Def-Wide | ITALY | Sigonella | CONSTRUCT HYDRANT SYSTEM | 0 | 22,400 | 22,400 |
| Def-Wide | WORLDWIDE UNSPECIFIED | Unspecified Worldwide Locations | ERI: PLANNING AND DESIGN | 1,900 | | 1,900 |
| **Military Construction, Defense-Wide Total** | | | | **1,900** | **22,400** | **24,300** |

| | | | |
|---|---|---|---|
| **Total, Military Construction** | **638,130** | **–1,188** | **636,942** |

# TITLE XLVII—DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS

## SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS.

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS**
**(In Thousands of Dollars)**

| Program | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **Discretionary Summary By Appropriation** | | | |
| **Energy And Water Development, And Related Agencies** | | | |
| **Appropriation Summary:** | | | |
| **Energy Programs** | | | |
| Nuclear Energy | 133,000 | 0 | 133,000 |
| | | | |
| **Atomic Energy Defense Activities** | | | |
| **National nuclear security administration:** | | | |
| Weapons activities | 10,239,344 | 184,200 | 10,423,544 |
| Defense nuclear nonproliferation | 1,793,310 | 80,000 | 1,873,310 |
| Naval reactors | 1,479,751 | 0 | 1,479,751 |
| Federal salaries and expenses | 418,595 | –11,000 | 407,595 |
| **Total, National nuclear security administration** | **13,931,000** | **253,200** | **14,184,200** |
| | | | |
| **Environmental and other defense activities:** | | | |
| Defense environmental cleanup | 5,537,186 | 70,000 | 5,607,186 |
| Other defense activities | 815,512 | 3,000 | 818,512 |

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS**
**(In Thousands of Dollars)**

| Program | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| Defense nuclear waste disposal | 30,000 | 0 | 30,000 |
| **Total, Environmental & other defense activities** | **6,382,698** | **73,000** | **6,455,698** |
| **Total, Atomic Energy Defense Activities** | **20,313,698** | **326,200** | **20,639,898** |
| **Total, Discretionary Funding** | **20,446,698** | **326,200** | **20,772,898** |
| | | | |
| **Nuclear Energy** | | | |
| Idaho sitewide safeguards and security | 133,000 | | 133,000 |
| **Total, Nuclear Energy** | **133,000** | **0** | **133,000** |
| | | | |
| **Weapons Activities** | | | |
| **Directed stockpile work** | | | |
| **Life extension programs** | | | |
| B61 Life extension program | 788,572 | | 788,572 |
| W76 Life extension program | 224,134 | | 224,134 |
| W88 Alteration program | 332,292 | | 332,292 |
| W80–4 Life extension program | 399,090 | | 399,090 |
| **Total, Life extension programs** | **1,744,088** | **0** | **1,744,088** |
| | | | |
| **Stockpile systems** | | | |
| B61 Stockpile systems | 59,729 | | 59,729 |
| W76 Stockpile systems | 51,400 | | 51,400 |
| W78 Stockpile systems | 60,100 | | 60,100 |
| W80 Stockpile systems | 80,087 | | 80,087 |
| B83 Stockpile systems | 35,762 | | 35,762 |
| W87 Stockpile systems | 83,200 | | 83,200 |
| W88 Stockpile systems | 131,576 | | 131,576 |
| **Total, Stockpile systems** | **501,854** | **0** | **501,854** |

| | | | |
|---|---|---|---|
| **Weapons dismantlement and disposition** | | | |
| Operations and maintenance | 52,000 | | 52,000 |
| | | | |
| **Stockpile services** | | | |
| Production support | 470,400 | | 470,400 |
| Research and development support | 31,150 | | 31,150 |
| R&D certification and safety | 196,840 | | 196,840 |
| Management, technology, and production | 285,400 | | 285,400 |
| **Total, Stockpile services** | **983,790** | **0** | **983,790** |
| | | | |
| **Strategic materials** | | | |
| Uranium sustainment | 20,579 | | 20,579 |
| Plutonium sustainment | 210,367 | | 210,367 |
| Tritium sustainment | 198,152 | | 198,152 |
| Domestic uranium enrichment | 60,000 | | 60,000 |
| Strategic materials sustainment | 206,196 | | 206,196 |
| **Total, Strategic materials** | **695,294** | **0** | **695,294** |
| **Total, Directed stockpile work** | **3,977,026** | **0** | **3,977,026** |
| | | | |
| **Research, development, test and evaluation (RDT&E)** | | | |
| **Science** | | | |
| Advanced certification | 57,710 | | 57,710 |
| Primary assessment technologies | 89,313 | | 89,313 |
| Dynamic materials properties | 122,347 | | 122,347 |
| Advanced radiography | 37,600 | | 37,600 |
| Secondary assessment technologies | 76,833 | –2,000 | 74,833 |
| Program decrease | | [–2,000] | |
| Academic alliances and partnerships | 52,963 | | 52,963 |
| Enhanced Capabilities for Subcritical Experiments | 50,755 | | 50,755 |
| **Total, Science** | **487,521** | **–2,000** | **485,521** |

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS**
**(In Thousands of Dollars)**

| Program | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **Engineering** | | | |
| Enhanced surety | 39,717 | | 39,717 |
| Weapon systems engineering assessment technology | 23,029 | | 23,029 |
| Nuclear survivability | 45,230 | 4,000 | 49,230 |
| Program increase | | [4,000] | |
| Enhanced surveillance | 45,147 | | 45,147 |
| Stockpile Responsiveness | 40,000 | | 40,000 |
| **Total, Engineering** | **193,123** | **4,000** | **197,123** |
| | | | |
| **Inertial confinement fusion ignition and high yield** | | | |
| Ignition | 79,575 | –3,000 | 76,575 |
| Program decrease | | [–3,000] | |
| Support of other stockpile programs | 23,565 | | 23,565 |
| Diagnostics, cryogenics and experimental support | 77,915 | | 77,915 |
| Pulsed power inertial confinement fusion | 7,596 | | 7,596 |
| Joint program in high energy density laboratory plasmas | 9,492 | | 9,492 |
| Facility operations and target production | 334,791 | –3,000 | 331,791 |
| Program decrease | | [–3,000] | |
| **Total, Inertial confinement fusion and high yield** | **532,934** | **–6,000** | **526,934** |
| | | | |
| **Advanced simulation and computing** | | | |
| Advanced simulation and computing | 709,244 | | 709,244 |
| **Construction:** | | | |
| 18–D–670, Exascale Class Computer Cooling Equipment, LNL | 22,000 | | 22,000 |
| 18–D–620, Exascale Computing Facility Modernization Project | 3,000 | | 3,000 |
| **Total, Construction** | **25,000** | **0** | **25,000** |
| **Total, Advanced simulation and computing** | **734,244** | **0** | **734,244** |

| | | | |
|---|---|---|---|
| **Advanced manufacturing** | | | |
| Additive manufacturing | 12,000 | | 12,000 |
| Component manufacturing development | 38,644 | | 38,644 |
| Processing technology development | 29,896 | | 29,896 |
| **Total, Advanced manufacturing** | **80,540** | **0** | **80,540** |
| **Total, RDT&E** | **2,028,362** | **–4,000** | **2,024,362** |
| | | | |
| **Infrastructure and operations (formerly RTBF)** | | | |
| Operations of facilities | 868,000 | | 868,000 |
| Safety and environmental operations | 116,000 | | 116,000 |
| Maintenance and repair of facilities | 360,000 | 35,000 | 395,000 |
| Program increase to address high-priority preventative maintenance through FIRRP | | [35,000] | |
| Recapitalization | 427,342 | 115,000 | 542,342 |
| Program increase to address high-priority deferred maintenance through FIRRP | | [115,000] | |
| | | | |
| **Construction:** | | | |
| 18–D–670, Material Staging Facility, PX | 0 | 5,200 | 5,200 |
| Project initiation | | [5,200] | |
| 18–D–660, Fire Station, Y–12 | 28,000 | | 28,000 |
| 18–D–650, Tritium Production Capability, SRS | 6,800 | | 6,800 |
| 17–D–640 U1a Complex Enhancements Project, NNSS | 22,100 | | 22,100 |
| 17–D–630 Expand Electrical Distribution System, LLNL | 6,000 | | 6,000 |
| 16–D–515 Albuquerque complex project | 98,000 | | 98,000 |
| 15–D–613 Emergency Operations Center, Y–12 | 7,000 | | 7,000 |
| 07–D–220 Radioactive liquid waste treatment facility upgrade project, LANL | 2,100 | | 2,100 |
| 07–D–220-04 Transuranic liquid waste facility, LANL | 17,895 | | 17,895 |
| 06–D–141 Uranium processing facility Y–12, Oak Ridge, TN | 663,000 | | 663,000 |
| 04–D–125 Chemistry and metallurgy research facility replacement project, LANL | 180,900 | | 180,900 |
| **Total, Construction** | **1,031,795** | **5,200** | **1,036,995** |
| **Total, Infrastructure and operations** | **2,803,137** | **155,200** | **2,958,337** |

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS**
**(In Thousands of Dollars)**

| Program | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **Secure transportation asset** | | | |
| Operations and equipment | 219,464 | | 219,464 |
| Program direction | 105,600 | | 105,600 |
| **Total, Secure transportation asset** | **325,064** | **0** | **325,064** |
| **Defense nuclear security** | | | |
| Operations and maintenance | 686,977 | 33,000 | 719,977 |
| Support to physical security infrastructure recapitalization and CSTART | | [33,000] | |
| **Total, Defense nuclear security** | **686,977** | **33,000** | **719,977** |
| Information technology and cybersecurity | 186,728 | | 186,728 |
| Legacy contractor pensions | 232,050 | | 232,050 |
| **Total, Weapons Activities** | **10,239,344** | **184,200** | **10,423,544** |
| **Defense Nuclear Nonproliferation** | | | |
| **Defense Nuclear Nonproliferation Programs** | | | |
| **Global material security** | | | |
| International nuclear security | 46,339 | | 46,339 |
| Radiological security | 146,340 | | 146,340 |
| Nuclear smuggling detection | 144,429 | –5,000 | 139,429 |
| Program decrease | | [–5,000] | |
| **Total, Global material security** | **337,108** | **–5,000** | **332,108** |
| **Material management and minimization** | | | |
| HEU reactor conversion | 125,500 | | 125,500 |
| Nuclear material removal | 32,925 | 5,000 | 37,925 |

| | | | |
|---|---|---|---|
| Acceleration of priority programs | | [5,000] | |
| Material disposition | 173,669 | | 173,669 |
| **Total, Material management & minimization** | **332,094** | **5,000** | **337,094** |
| Nonproliferation and arms control | 129,703 | | 129,703 |
| Defense nuclear nonproliferation R&D | 446,095 | 5,000 | 451,095 |
| Acceleration of low-yield detection experiments and 3D printing efforts | | [5,000] | |
| **Nonproliferation Construction:** | | | |
| 18–D–150 Surplus Plutonium Disposition Project | 9,000 | | 9,000 |
| 99–D–143 Mixed Oxide (MOX) Fuel Fabrication Facility, SRS | 270,000 | 70,000 | 340,000 |
| Program increase | | [70,000] | |
| **Total, Nonproliferation construction** | **279,000** | **70,000** | **349,000** |
| **Total, Defense Nuclear Nonproliferation Programs** | **1,524,000** | **75,000** | **1,599,000** |
| Low Enriched Uranium R&D for Naval Reactors | 0 | 5,000 | 5,000 |
| Direct support to low-enriched uranium R&D for Naval Reactors | | [5,000] | |
| Legacy contractor pensions | 40,950 | | 40,950 |
| Nuclear counterterrorism and incident response program | 277,360 | | 277,360 |
| Rescission of prior year balances | –49,000 | | –49,000 |
| **Total, Defense Nuclear Nonproliferation** | **1,793,310** | **80,000** | **1,873,310** |
| **Naval Reactors** | | | |
| Naval reactors development | 473,267 | | 473,267 |
| Columbia-Class reactor systems development | 156,700 | | 156,700 |
| S8G Prototype refueling | 190,000 | | 190,000 |
| Naval reactors operations and infrastructure | 466,884 | | 466,884 |
| **Construction:** | | | |
| 15–D–904 NRF Overpack Storage Expansion 3 | 13,700 | | 13,700 |
| 15–D–903 KL Fire System Upgrade | 15,000 | | 15,000 |

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS**
**(In Thousands of Dollars)**

| Program | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| 14–D–901 Spent fuel handling recapitalization project, NRF | 116,000 | | 116,000 |
| **Total, Construction** | **144,700** | **0** | **144,700** |
| Program direction | 48,200 | | 48,200 |
| **Total, Naval Reactors** | **1,479,751** | **0** | **1,479,751** |
| | | | |
| **Federal Salaries And Expenses** | | | |
| Program direction | 418,595 | –11,000 | 407,595 |
| Program decrease to support maximum of 1,690 employees | | [–11,000] | |
| **Total, Office Of The Administrator** | **418,595** | **–11,000** | **407,595** |
| | | | |
| **Defense Environmental Cleanup** | | | |
| **Closure sites:** | | | |
| Closure sites administration | 4,889 | | 4,889 |
| | | | |
| **Hanford site:** | | | |
| River corridor and other cleanup operations | 58,692 | 35,000 | 93,692 |
| Acceleration of priority programs | | [35,000] | |
| Central plateau remediation | 637,879 | 8,000 | 645,879 |
| Acceleration of priority programs | | [8,000] | |
| Richland community and regulatory support | 5,121 | | 5,121 |
| **Construction:** | | | |
| 18–D–404 WESF Modifications and Capsule Storage | 6,500 | | 6,500 |
| 15–D–401 Containerized sludge removal annex, RL | 8,000 | | 8,000 |
| **Total, Construction** | **14,500** | **0** | **14,500** |
| **Total, Hanford site** | **716,192** | **43,000** | **759,192** |

| | | | |
|---|---|---|---|
| **Idaho National Laboratory:** | | | |
| SNF stabilization and disposition—2012 | 19,975 | | 19,975 |
| Solid waste stabilization and disposition | 170,101 | | 170,101 |
| Radioactive liquid tank waste stabilization and disposition | 111,352 | | 111,352 |
| Soil and water remediation—2035 | 44,727 | | 44,727 |
| Idaho community and regulatory support | 4,071 | | 4,071 |
| **Total, Idaho National Laboratory** | **350,226** | **0** | **350,226** |
| | | | |
| **NNSA sites** | | | |
| Lawrence Livermore National Laboratory | 1,175 | | 1,175 |
| Separations Process Research Unit | 1,800 | | 1,800 |
| Nevada | 60,136 | | 60,136 |
| Sandia National Laboratories | 2,600 | | 2,600 |
| Los Alamos National Laboratory | 191,629 | | 191,629 |
| **Total, NNSA sites and Nevada off-sites** | **257,340** | **0** | **257,340** |
| | | | |
| **Oak Ridge Reservation:** | | | |
| **OR Nuclear facility D & D** | | | |
| OR-0041—D&D - Y–12 | 29,369 | | 29,369 |
| OR-0042—D&D -ORNL | 48,110 | | 48,110 |
| **Construction:** | | | |
| 17–D–401 On-site waste disposal facility | 5,000 | | 5,000 |
| 14–D–403 Outfall 200 Mercury Treatment facility | 17,100 | | 17,100 |
| **Total, OR Nuclear facility D & D** | **82,479** | **0** | **82,479** |
| | | | |
| U233 Disposition Program | 33,784 | | 33,784 |
| OR cleanup and disposition | 66,632 | | 66,632 |
| OR reservation community and regulatory support | 4,605 | | 4,605 |
| OR Solid waste stabilization and disposition technology development | 3,000 | | 3,000 |
| **Total, Oak Ridge Reservation** | **207,600** | **0** | **207,600** |

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS**
**(In Thousands of Dollars)**

| Program | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| **Office of River Protection:** | | | |
| **Waste treatment and immobilization plant** | | | |
| **Construction:** | | | |
| 01–D–416 A-D WTP Subprojects A-D | 655,000 | | 655,000 |
| 01–D–416 E—Pretreatment Facility | 35,000 | | 35,000 |
| **Total, 01–D–416 Construction** | **690,000** | **0** | **690,000** |
| WTP Commissioning | 8,000 | | 8,000 |
| **Total, Waste treatment and immobilization plant** | **698,000** | **0** | **698,000** |
| **Tank farm activities** | | | |
| Rad liquid tank waste stabilization and disposition | 713,311 | | 713,311 |
| **Construction:** | | | |
| 15–D–409 Low activity waste pretreatment system, ORP | 93,000 | | 93,000 |
| **Total, Tank farm activities** | **806,311** | **0** | **806,311** |
| **Total, Office of River protection** | **1,504,311** | **0** | **1,504,311** |
| **Savannah River Sites:** | | | |
| Nuclear Material Management | 323,482 | 27,000 | 350,482 |
| Acceleration of priority programs | | [27,000] | |
| **Environmental Cleanup** | | | |
| Environmental Cleanup | 159,478 | | 159,478 |
| **Construction:** | | | |
| 08–D–402, Emergency Operations Center | 500 | | 500 |
| **Total, Environmental Cleanup** | **159,978** | **0** | **159,978** |

| | | | |
|---|---|---|---|
| SR community and regulatory support | 11,249 | | 11,249 |
| **Radioactive liquid tank waste:** | | | |
| Radioactive liquid tank waste stabilization and disposition | 597,258 | | 597,258 |
| **Construction:** | | | |
| 18–D–401, SDU #8/9 | 500 | | 500 |
| 17–D–402—Saltstone Disposal Unit #7 | 40,000 | | 40,000 |
| 05–D–405 Salt waste processing facility, Savannah River Site | 150,000 | | 150,000 |
| **Total, Construction** | **190,500** | **0** | **190,500** |
| **Total, Radioactive liquid tank waste** | **787,758** | **0** | **787,758** |
| **Total, Savannah River site** | **1,282,467** | **27,000** | **1,309,467** |
| **Waste Isolation Pilot Plant** | | | |
| Operations and maintenance | 206,617 | | 206,617 |
| Central characterization project | 22,500 | | 22,500 |
| Transportation | 21,854 | | 21,854 |
| **Construction:** | | | |
| 15–D–411 Safety significant confinement ventilation system, WIPP | 46,000 | | 46,000 |
| 15–D–412 Exhaust shaft, WIPP | 19,600 | | 19,600 |
| **Total, Construction** | **65,600** | **0** | **65,600** |
| **Total, Waste Isolation Pilot Plant** | **316,571** | **0** | **316,571** |
| Program direction | 300,000 | | 300,000 |
| Program support | 6,979 | | 6,979 |
| WCF Mission Related Activities | 22,109 | | 22,109 |
| Minority Serving Institution Partnership | 6,000 | | 6,000 |
| **Safeguards and Security** | | | |
| Oak Ridge Reservation | 16,500 | | 16,500 |
| Paducah | 14,049 | | 14,049 |
| Portsmouth | 12,713 | | 12,713 |
| Richland/Hanford Site | 75,600 | | 75,600 |
| Savannah River Site | 142,314 | | 142,314 |

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS**
**(In Thousands of Dollars)**

| Program | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|
| Waste Isolation Pilot Project | 5,200 | | 5,200 |
| West Valley | 2,784 | | 2,784 |
| **Total, Safeguards and Security** | **269,160** | **0** | **269,160** |
| Cyber Security | 43,342 | | 43,342 |
| Technology development | 25,000 | | 25,000 |
| HQEF-0040—Excess Facilities | 225,000 | | 225,000 |
| **Total, Defense Environmental Cleanup** | **5,537,186** | **70,000** | **5,607,186** |
| **Other Defense Activities** | | | |
| **Environment, health, safety and security** | | | |
| Environment, health, safety and security | 130,693 | | 130,693 |
| Program direction | 68,765 | | 68,765 |
| **Total, Environment, Health, safety and security** | **199,458** | **0** | **199,458** |
| **Independent enterprise assessments** | | | |
| Independent enterprise assessments | 24,068 | | 24,068 |
| Program direction | 50,863 | | 50,863 |
| **Total, Independent enterprise assessments** | **74,931** | **0** | **74,931** |
| Specialized security activities | 237,912 | 3,000 | 240,912 |
| Classified topic | | [3,000] | |
| **Office of Legacy Management** | | | |
| Legacy management | 137,674 | | 137,674 |
| Program direction | 16,932 | | 16,932 |

| | | | |
|---|---|---|---|
| **Total, Office of Legacy Management** | **154,606** | **0** | **154,606** |
| **Defense-related activities** | | | |
| **Defense related administrative support** | | | |
| Chief financial officer | 48,484 | | 48,484 |
| Chief information officer | 91,443 | | 91,443 |
| Project management oversight and assessments | 3,073 | | 3,073 |
| **Total, Defense related administrative support** | **143,000** | **0** | **143,000** |
| Office of hearings and appeals | 5,605 | | 5,605 |
| **Subtotal, Other defense activities** | **815,512** | **3,000** | **818,512** |
| **Total, Other Defense Activities** | **815,512** | **3,000** | **818,512** |
| **Defense Nuclear Waste Disposal** | | | |
| Yucca mountain and interim storage | 30,000 | | 30,000 |
| **Total, Defense Nuclear Waste Disposal** | **30,000** | **0** | **30,000** |

DEPARTMENT OF DEFENSE AUTHORIZATION REQUEST

The Department of Defense requested legislation, in accordance with the program of the President, as illustrated by the correspondence set out below:

MAY 25, 2017.

Hon. PAUL D. RYAN,
*Speaker of the House of Representatives,*
*Washington, DC.*

DEAR MR. SPEAKER: Enclosed please find a draft of proposed legislation, titled the "National Defense Authorization Act for Fiscal Year 2018", which the Department of Defense requests be enacted during the first session of the 115th Congress.

The purpose of each provision in the proposed bill is stated in the accompanying section-by-section analysis.

The Department is currently working with the Administration on additional legislative initiatives, which the Department hopes to transmit to Congress for its consideration in the coming weeks.

The Office of Management and Budget advises that there is no objection, from the standpoint of the Administration's program, to the presenting of these legislative proposals for your consideration and the consideration of Congress.

Sincerely,

E. PETER GIAMBASTIANI, III.

Enclosure: As Stated.

---

JUNE 16, 2017.

Hon. PAUL D. RYAN,
*Speaker of the House of Representatives,*
*Washington, DC.*

DEAR MR. SPEAKER: Enclosed please find additional legislative proposals that the Department of Defense requests be enacted during the first session of the 115th Congress. The purpose of each proposal is stated in the accompanying section-by-section analysis. These proposals are submitted by the Department as a follow-on to the earlier transmittal of our request for enactment of proposed legislation titled the "National Defense Authorization Act for Fiscal Year 2018."

The Department is currently working with the Administration on additional legislative initiatives, which the Department hopes to transmit to Congress for its consideration in the coming weeks.

The Office of Management and Budget advises that there is no objection, from the standpoint of the Administration's program, to the presenting of these legislative proposals for your consideration and the consideration of Congress.

Sincerely,

E. PETER GIAMBASTIANI, III.

Enclosure: As Stated.

## COMMUNICATIONS FROM OTHER COMMITTEES

HOUSE OF REPRESENTATIVES,
COMMITTEE ON HOUSE ADMINISTRATION,
*Washington, DC, June 29, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR MR. THORNBERRY: I am writing to you concerning the bill H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. There are certain provisions in the legislation which fall within the Rule X jurisdiction of the Committee on House Administration.

In the interest of permitting your committee to proceed expeditiously to floor consideration of this important bill, I am willing to waive this committee's right to sequential referral. I do so with the understanding that by waiving consideration of the bill the Committee on House Administration does not waive any future jurisdictional claim over the subject matters contained in the bill which fall within its Rule X jurisdiction. I request that you urge the Speaker to name members of this committee to any conference committee which is named to consider such provisions.

Please place this letter into the committee report on H.R. 2810 and into the Congressional Record during consideration of the measure on the House floor. Thank you for the cooperative spirit in which you have worked regarding this matter and others between our respective committees.

Sincerely,

GREGG HARPER,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. GREGG HARPER,
*Chairman, Committee on House Administration,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Committee on House Administration has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Committee on House Administration is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

HOUSE OF REPRESENTATIVES,
COMMITTEE ON AGRICULTURE,
*Washington, DC, July 5, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR MR. THORNBERRY: I am writing concerning H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018.

This legislation contains provisions within the Committee on Agriculture's Rule X jurisdiction. As a result of your having consulted with the Committee and in order to expedite this bill for floor consideration, the Committee on Agriculture will forego action on the bill. This is being done on the basis of our mutual understanding that doing so will in no way diminish or alter the jurisdiction of the Committee on Agriculture with respect to the appointment of conferees, or to any future jurisdictional claim over the subject matters contained in the bill or similar legislation.

I would appreciate your response to this letter confirming this understanding, and would request that you include a copy of this letter and your response in the Committee Report and in the *Congressional Record* during the floor consideration of this bill. Thank you in advance for your cooperation.

Sincerely,

K. MICHAEL CONAWAY,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. K. MICHAEL CONAWAY,
*Chairman, Committee on Agriculture,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Committee on Agriculture has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Committee on Agriculture is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

HOUSE OF REPRESENTATIVES,
COMMITTEE ON THE BUDGET,
*Washington, DC, July 5, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR MR. THORNBERRY: I am writing regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018, which the Committee on Armed Services ordered reported on June 28, 2017.

The bill contains provisions that fall within the jurisdiction of the Committee on the Budget. In order to expedite House consideration of H.R. 2810, the Committee on the Budget will forgo action on the bill. This is being done with the understanding that it does not waive any jurisdiction over the subject matter contained in H.R. 2810 or similar legislation and that the Committee will be appropriately consulted and involved as this bill or similar legislation moves forward so that the Committee may address any remaining issues that fall within its jurisdiction. The Committee on the Budget also reserves the right to seek appointment of an appropriate number of conferees to any House-Senate conference involving this or similar legislation and requests your support of any such request.

I also request that you include this letter and your response as part of your committee's report on H.R. 2810 and in the *Congressional Record* during its consideration on the House floor.

Thank you for your attention to these matters. I look forward to working with you as this bill moves through the Congress.

Sincerely,

DIANE BLACK,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. DIANE BLACK,
*Chairman, Committee on the Budget,*
*House of Representatives, Washington, DC.*

DEAR MADAM CHAIRMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Committee on the Budget has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Committee on the Budget is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ENERGY AND COMMERCE,
*Washington, DC, July 5, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: I write to confirm our mutual understanding regarding H.R. 2810, the "National Defense Authorization Act for Fiscal Year 2018." While the legislation does contain provisions within the jurisdiction of the Committee on Energy and Commerce, the Committee will not request a sequential referral so that it can proceed expeditiously to the House floor for consideration.

The Committee takes this action with the understanding that its jurisdictional interests over this and similar legislation are in no way diminished or altered, and that the Committee will be appropriately consulted and involved as such legislation moves forward. The Committee also reserves the right to seek appointment to any House-Senate conference on such legislation and requests your support when such a request is made.

Finally, I would appreciate a response to this letter confirming this understanding and ask that a copy of our exchange of letters be included in the *Congressional Record* during consideration of H.R. 2810 on the House floor.

Sincerely,

GREG WALDEN,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. GREG WALDEN,
*Chairman, Committee on Energy and Commerce,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Committee on Energy and Commerce has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Committee on Energy and Commerce is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

HOUSE OF REPRESENTATIVES,
COMMITTEE ON EDUCATION AND THE WORKFORCE,
*Washington, DC, July 5, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: I am writing to confirm our mutual understanding with respect to H.R. 2810, *the National Defense Authorization Act for Fiscal Year 2018*. Thank you for consulting with the Committee on Education and the Workforce with regard to H.R. 2810 on those matters within the Committee's jurisdiction.

In the interest of expediting the House's consideration of H.R. 2810, the Committee on Education and the Workforce will forgo further consideration of this bill. However, I do so only with the understanding this procedural route will not be construed to prejudice my committee's jurisdictional interest and prerogatives on this bill or any other similar legislation and will not be considered as precedent for consideration of matters of jurisdictional interest to my committee in the future.

I respectfully request your support for the appointment of outside conferees from the Committee on Education and the Workforce should this bill or a similar bill be considered in a conference with the Senate. I also request you include our exchange of letters on this matter in the Committee Report on H.R. 2810 and in the Congressional Record during consideration of this bill on the House Floor. Thank you for your attention to these matters.

Sincerely,

VIRGINIA FOXX,
*Chairwoman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. VIRGINIA FOXX,
*Chairwoman, Committee on Education and the Workforce,*
*House of Representatives, Washington, DC.*

DEAR MADAM CHAIRWOMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Committee on Education and the Workforce has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Committee on Education and the Workforce is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

HOUSE OF REPRESENTATIVES,
COMMITTEE ON FINANCIAL SERVICES,
*Washington, DC, June 30, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: I am writing to you regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. There are certain provisions in the legislation which fall within the Rule X jurisdiction of the Committee on Financial Services.

In the interest of permitting your committee to proceed expeditiously to floor consideration of this important bill, I am willing to waive this committee's right to sequential referral. I do so with the understanding that by waiving consideration of the bill the Committee on Financial Services does not waive any future jurisdictional claim over the subject matters contained in the bill which fall within its Rule X jurisdiction. I request that you urge the Speaker to name members of this committee to any conference committee which is named to consider such provisions.

Please place this letter into the committee report on H.R. 2810 and into the Congressional Record during consideration of the measure on the House floor. Thank you for the cooperative spirit in which you have worked regarding this matter and others between our respective committees.

Sincerely,

JEB HENSARLING,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. JEB HENSARLING,
*Chairman, Committee on Financial Services,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Committee on Financial Services has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Committee on Financial Services is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

HOUSE OF REPRESENTATIVES,
COMMITTEE ON FOREIGN AFFAIRS,
*Washington, DC, June 30, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: I write to confirm our mutual understanding regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018, which contains substantial matter that falls within the Rule X legislative jurisdiction of the Foreign Affairs Committee. I appreciate the cooperation that allowed us to work out mutually agreeable text on numerous matters prior to your markup.

Based on that cooperation and our associated understandings, the Foreign Affairs Committee will not seek a sequential referral or object to floor consideration of the bill text approved at your Committee markup. This decision in no way diminishes or alters the jurisdictional interests of the Foreign Affairs Committee in this bill, any subsequent amendments, or similar legislation. I request your support for the appointment of House Foreign Affairs conferees during any House-Senate conference on this legislation.

Finally, I respectfully request that you include this letter and your response in your committee report on the bill and in the Congressional Record during consideration of H.R. 2810 on the House floor.

Sincerely,

EDWARD R. ROYCE,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. EDWARD R. ROYCE,
*Chairman, Committee on Foreign Affairs,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Committee on Foreign Affairs has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Committee on Foreign Affairs is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

HOUSE OF REPRESENTATIVES,
PERMANENT SELECT COMMITTEE ON INTELLIGENCE,
*Washington, DC, July 3, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: I write to you concerning H.R. 2810, National Defense Authorization Act for Fiscal Year 2018, which contains provisions within the Rule X jurisdiction of the Permanent Select Committee on Intelligence ("the Committee"). The Committee recognizes the need for proceeding expeditiously to Floor consideration of this important bill. Therefore, I do not intend to request a sequential referral.

This waiver is conditional on our mutual understanding that my decision to forego Committee consideration of this legislation does not diminish or otherwise affect any future claim over the matters in the bill which fall within the Committee's jurisdiction, and that a copy of this letter and your response acknowledging the Committee's jurisdictional interest will be included in the committee report accompanying H.R. 2810 and submitted into the Congressional Record during consideration of this bill on the House Floor.

I also intend to seek the appointment of Committee Members to any House-Senate conference on this legislation and request your support if such a request is made. Thank you for the cooperative spirit in which you have worked regarding this and other matters between our respective committees.

Sincerely,

DEVIN NUNES,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. DEVIN NUNES,
*Chairman, Permanent Select Committee on Intelligence,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Permanent Select Committee on Intelligence has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Permanent Select Committee on Intelligence is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

HOUSE OF REPRESENTATIVES,
COMMITTEE ON THE JUDICIARY,
*Washington, DC, June 30, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR CHAIRMAN THORNBERRY: I write to confirm our mutual understanding regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. This legislation contains subject matter within the jurisdiction of the Committee on the Judiciary. However, in order to expedite floor consideration of this important legislation, the committee waives consideration of the bill.

The Judiciary Committee takes this action only with the understanding that the committee's jurisdictional interests over this and similar legislation are in no way diminished or altered.

The Committee also reserves the right to seek appointment to any House-Senate conference on this legislation and requests your support if such a request is made. Finally, I would appreciate your including this letter in your committee report on this bill and in the Congressional Record during consideration of H.R. 2810 on the House Floor. Thank you for your attention to these matters.

Sincerely,

BOB GOODLATTE,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. BOB GOODLATTE,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Committee on the Judiciary has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Committee on the Judiciary is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON NATURAL RESOURCES,
*Washington, DC, June 29, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: I write concerning H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. That bill, as or-

dered reported, contains provisions within the Rule X jurisdiction of the Natural Resources Committee, including those affecting public lands, the National Oceanic and Atmospheric Administration Corps, and matters regarding the Freely Associated States and insular areas of the United States.

In the interest of permitting you to proceed expeditiously to floor consideration of this very important bill, I waive this committee's right to a sequential referral. I do so with the understanding that the Natural Resources Committee does not waive any future jurisdictional claim over the subject matter contained in the bill that fall within its Rule X jurisdiction. I also request that you urge the Speaker to name members of the Natural Resources committee to any conference committee to consider such provisions.

Please place this letter into the committee report on H.R. 2810 and into the Congressional Record during consideration of the measure on the House floor. Thank you for the cooperative spirit in which you and your staff have worked regarding this matter and others between our respective committees, and congratulations on this significant achievement.

Sincerely,

ROB BISHOP,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. ROB BISHOP,
*Chairman, Committee on Natural Resources,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Committee on Natural Resources has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Committee on Natural Resources is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

---

HOUSE OF REPRESENTATIVES, COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM,
*Washington, DC, June 29, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: I am writing to you concerning the jurisdictional interest of the Committee on Oversight and Government Reform in matters being considered in H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018.

Our committee recognizes the importance of H.R. 2810 and the need for the legislation to move expeditiously. Therefore, while we have a valid claim to jurisdiction over the bill, I do not intend to request a sequential referral. This, of course, is conditional on our mutual understanding that nothing in this legislation or my decision to forego a sequential referral waives, reduces or otherwise affects the jurisdiction of the Committee on Oversight and Government Reform, and that a copy of this letter and your response acknowledging our jurisdictional interest will be included in the Committee Report and as part of the Congressional Record during consideration of this bill by the House.

The Committee on Oversight and Government Reform also asks that you support our request to be conferees on the provisions over which we have jurisdiction during any House-Senate conference.

Thank you for your consideration in this matter.

Sincerely,

TREY GOWDY,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. TREY GOWDY,
*Chairman, Committee on Oversight and Government Reform,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Committee on Oversight and Government Reform has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Committee on Oversight and Government Reform is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON SMALL BUSINESS,
*Washington, DC, June 27, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR CHAIRMAN THORNBERRY: I write to confirm our mutual understanding regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. This legislation contains subject matter within the jurisdiction of the Committee on Small Business. However, in order to expedite floor consideration of this important legislation, the committee waives consideration of the bill.

The Committee on Small Business takes this action only with the understanding that the committee's jurisdictional interests over this and similar legislation are in no way diminished or altered.

The committee also reserves the right to seek appointment to any House-Senate conference on this legislation and requests your support if such a request is made. Finally, I would appreciate your including this letter in the Congressional Record during consideration of H.R. 2810 on the House Floor. Thank you for your attention to these matters.

Sincerely,

STEVE CHABOT,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. STEVE CHABOT,
*Chairman, Committee on Small Business,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Committee on Small Business has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Committee on Small Business is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE,
*Washington, DC, July 5, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR CHAIRMAN THORNBERRY: I write concerning H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018, as amended. There are certain provisions in the legislation that fall within the Rule X jurisdiction of the Committee on Transportation and Infrastructure.

However, in order to expedite this legislation for floor consideration, the Committee will forgo action on this bill. This, of course, is conditional on our mutual understanding that forgoing consideration of the bill does not prejudice the Committee with respect to the appointment of conferees or to any future jurisdictional claim over the subject matters contained in the bill or similar legislation that fall within the Committee's Rule X jurisdiction. I request you urge the Speaker to name members of the Committee to any conference committee named to consider such provisions.

Please place a copy of this letter and your response acknowledging our jurisdictional interest into the committee report on H.R. 2810 and into the Congressional Record during consideration of the measure on the House floor.

Sincerely,

BILL SHUSTER,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. BILL SHUSTER,
*Chairman, Committee on Transportation and Infrastructure,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Committee on Transportation and Infrastructure has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Committee on Transportation and Infrastructure is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

---

HOUSE OF REPRESENTATIVES,
COMMITTEE ON VETERANS' AFFAIRS,
*Washington, DC, June 30, 2017.*

Hon. WILLIAM M. "MAC" THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR MR. THORNBERRY: I write to confirm our mutual understanding regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. This legislation contains subject matter within the jurisdiction of the Veterans' Affairs Committee. However, in order to expedite floor consideration of this important legislation, the committee waives consideration of the bill.

The Veterans' Affairs Committee takes this action only with the understanding that the committee's jurisdictional interests over this and similar legislation are in no way diminished or altered.

The committee also reserves the right to seek appointment to any House-Senate conference on this legislation and requests your support if such a request is made. Finally, I would appreciate your including this letter in the Congressional Record during consideration of H.R. 2810 on the House Floor. Thank you for your attention to these matters.

Sincerely,

DAVID P. ROE, M.D.,
*Chairman.*

HOUSE OF REPRESENTATIVES,
COMMITTEE ON ARMED SERVICES,
*Washington, DC, July 5, 2017.*

Hon. DAVID P. ROE, M.D.,
*Chairman, Committee on Veterans' Affairs,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: Thank you for your letter regarding H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018. I agree that the Committee on Veterans' Affairs has valid jurisdictional claims to certain provisions in this important legislation, and I am most appreciative of your decision not to request a referral in the interest of expediting consideration of the bill. I agree that by foregoing a sequential referral, the Committee on Veterans' Affairs is not waiving its jurisdiction. Further, this exchange of letters will be included in the committee report on the bill.

Sincerely,

WILLIAM M. "MAC" THORNBERRY,
*Chairman.*

---

CONGRESSIONAL BUDGET OFFICE ESTIMATE

In compliance with clause 3(c)(3) of rule XIII of the House of Representatives, the cost estimate prepared by the Congressional Budget Office and submitted pursuant to section 402 of the Congressional Budget Act of 1974 is as follows:

CONGRESSIONAL BUDGET OFFICE PRELIMINARY COST ESTIMATE

JULY 5, 2017.

Hon. MAC THORNBERRY,
*Chairman, Committee on Armed Services,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has completed a preliminary estimate of the direct spending and revenue effects of H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018, as ordered reported by the House Committee on Armed Services on June 28, 2017. This preliminary estimate is based on the Committee Print 115–23 of H.R. 2810 that was posted to the website of the House Committee on Rules on June 30, 2017. CBO's complete cost estimate for H.R. 2810, including discretionary costs, will be provided shortly.

Several provisions of the legislation would have insignificant effects on direct spending over the 2017–2026 period, primarily as a result of changes to military health care benefits. On a preliminary basis, CBO estimates that in total enacting H.R. 2810 would increase or decrease net direct spending by less than $500,000 over the 2018–2027 period.

The bill also would add a specified offense under the military justice system that CBO expects would increase the amount of fines and forfeitures of pay, which are classified as revenues, that are assessed at military courts-martial. Those increases would total less than $500,000 over the next 10 years, CBO estimates. Because en-

acting the bill would affect direct spending and revenues, pay-as-you-go procedures apply.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is David Newman, who can be reached at 226–2840.

Sincerely,

KEITH HALL,
*Director.*

Attachment.

## STATEMENT REQUIRED BY THE CONGRESSIONAL BUDGET ACT

Pursuant to clause (3)(c)(2) of rule XIII of the Rules of the House of Representatives, and section 308(a) of the Congressional Budget Act of 1974 (Public Law 93–344):

(1) this legislation does not provide budget authority subject to an allocation made pursuant to section 302(b) of Public Law 93–344;

(2) the Congressional Budget Office (CBO) Estimate included in this report pursuant to clause (3)(c)(3) of rule XIII of the Rules of the House of Representatives contains CBO's projection of how this legislation will affect the levels of budget authority, budget outlays, revenues, and tax expenditures for fiscal year 2018 and for the ensuring 5 fiscal years; and

(3) the CBO Estimate does not identify any new budget authority for assistance to state and local governments by this measure at the time that this report was filed.

## COMMITTEE COST ESTIMATE

Pursuant to clause (3)(d)(2)(B) of rule XIII of the Rules of the House of Representatives, the Congressional Budget Office Estimate included in this report satisfies the requirement for the committee to include an estimate by the committee of the costs incurred in carrying out this bill.

## ADVISORY OF EARMARKS

The committee finds that H.R. 2810, the National Defense Authorization Act for Fiscal Year 2018, as reported, does not contain any congressional earmarks, limited tax benefits, or limited tariff benefits as defined in clause 9 of rule XXI of the Rules of the House of Representatives.

## OVERSIGHT FINDINGS

With respect to clause 3(c)(1) of rule XIII of the Rules of the House of Representatives, this legislation results from hearings and other oversight activities conducted by the committee pursuant to clause 2(b)(1) of rule X. The findings are reflected in the body of this report.

## GENERAL PERFORMANCE GOALS AND OBJECTIVES

With respect to clause 3(c)(4) of rule XIII of the Rules of the House of Representatives, the general goal and objective of H.R. 2810 is to begin the restoration of our national defense, to prepare

the warfighter for the threats of tomorrow as well as today, and to do so in a fiscally responsible manner.

The world is growing increasingly dangerous. In just the last year, the fight against the Islamic State of Iraq and the Levant (ISIL) in the Republic of Iraq and the Syrian Arab Republic has intensified, the Russian Federation has continued an aggressive push to destabilize the United States and its allies, and the Democratic People's Republic of Korea has tested increasingly sophisticated ballistic missiles. Unfortunately, constraints on defense funding are directly affecting our country's ability to address threats to our security, interests, and values and to deter aggression from adversaries and rising regional powers. As a result of the increased threat to national security and our concurrent military drawdown, there is a significant gap between what the American people expect the military to be able to do and what it actually could do effectively if called upon today. Much of the funding provided to the Department of Defense has been consumed by current operations and to keep the next to deploy forces ready. We have allowed other capabilities to atrophy, capacity to shrink, and the readiness of forces training at home station to suffer.

This legislation is a continuation of efforts of the Committee on Armed Services to reverse these trends and restore our national defense to a level the American people can, and should expect. The bill provides $621.5 billion to support core Department of Defense requirements, and an increase of $18.5 billion over the budget request. It also includes an additional $74.6 billion of Overseas Contingency Operations, $10.0 billion of which is set aside for additional base requirements. This includes money to fully fund the 2.4 percent pay raise troops are entitled to by law, to increase the size of the Army, Navy, and Air Force, to expand funding for maintenance and readiness, and to deter Russian aggression in Europe and their continued violations of bilateral treaty obligations.

The bill also refocuses the Armed Forces on crucial areas that have been neglected. The United States must be prepared to fight the wars of tomorrow, not just today. To that end, this legislation creates a Space Corps within the Department of the Air Force to ensure the Armed Forces are adequately focused on warfighting in space; it increases congressional oversight of military cyber operations, and it funds numerous upgrades to equipment that will ensure the warfighter is entering battle with 21st century weapon systems.

Finally, this bill cuts waste. Though we must increase our commitment to national defense, we must also ensure that increase is spent efficiently and effectively. This legislation includes numerous reforms to streamline the Department of Defense so that dollars invested in national defense are spent to secure the Nation, not on overhead or unnecessary red tape. The bill increases oversight of service contracts, which constitute a majority of Department of Defense contracting dollars; it improves purchasing of off-the-shelf goods, so that the Government is not paying needlessly high prices for items easily available on the commercial market; and it reforms contract auditing to return the most value for invested resources.

STATEMENT OF FEDERAL MANDATES

Pursuant to section 423 of Public Law 104–4, this legislation contains no Federal mandates with respect to state, local, and tribal governments, nor with respect to the private sector. Similarly, the bill provides no Federal intergovernmental mandates.

FEDERAL ADVISORY COMMITTEE STATEMENT

Consistent with the requirements of section 5(b) of the Federal Advisory Committee Act, the committee finds that the functions of the proposed advisory committee authorized in the bill are not currently being nor could they be performed by one or more agencies, an advisory committee already in existence or by enlarging the mandate of an existing advisory committee.

APPLICABILITY TO THE LEGISLATIVE BRANCH

The committee finds that this legislation does not relate to the terms and conditions of employment or access to public services or accommodations within the meaning of section 102(b)(3) of the Congressional Accountability Act (Public Law 104–1).

DUPLICATION OF FEDERAL PROGRAMS

No provision of H.R. 2810 establishes or reauthorizes a program of the Federal Government known to be duplicative of another Federal program, a program that was included in any report from the Government Accountability Office to Congress pursuant to section 21 of Public Law 111–139, or a program related to a program identified in the most recent Catalog of Federal Domestic Assistance.

DISCLOSURE OF DIRECTED RULE MAKINGS

The committee estimates that H.R. 2810 requires six instances of directed rule makings. They are contained in the following provisions:

(1) section 815;
(2) section 822;
(3) section 833;
(4) section 851;
(5) section 856; and
(6) section 1722.

COMMITTEE VOTES

In accordance with clause 3(b) of rule XIII of the Rules of the House of Representatives, record votes were taken with respect to the committee's consideration of H.R. 2810. The record of these votes is contained in the following pages.

The committee ordered H.R. 2810 to be reported to the House with a favorable recommendation by a vote of 60–1, a quorum being present.

COMMITTEE ON ARMED SERVICES

ROLL CALL VOTE NO. 1

H.R. 2810

On Moulton Log 121r1—Reduces amount of Littoral Combat Ship by a quantity of 1 and adds corresponding cost to PACOM and EUCOM munitions shortfalls.

| Member | Aye | No | Present | Member | Aye | No | Present |
|---|---|---|---|---|---|---|---|
| Mr. Thornberry ......... | | x | | Mr. Smith ............ | x | | |
| Mr. Jones ................. | x | | | Mr. Brady ............ | | x | |
| Mr. Wilson ............... | | x | | Mrs. Davis ........... | x | | |
| Mr. LoBiondo ........... | | x | | Mr. Langevin ....... | | x | |
| Mr. Bishop ............... | | x | | Mr. Larsen ........... | x | | |
| Mr. Turner ................ | | x | | Mr. Cooper .......... | x | | |
| Mr. Rogers ............... | | x | | Ms. Bordallo ........ | x | | |
| Mr. Franks ............... | | x | | Mr. Courtney ....... | | x | |
| Mr. Shuster .............. | | x | | Ms. Tsongas ........ | x | | |
| Mr. Conaway ............ | | x | | Mr. Garamendi .... | x | | |
| Mr. Lamborn ............ | | x | | Ms. Speier ........... | x | | |
| Mr. Wittman ............ | | x | | Mr. Veasey .......... | x | | |
| Mr. Hunter ............... | | x | | Ms. Gabbard ....... | x | | |
| Mr. Coffman ............ | | x | | Mr. O'Rourke ....... | x | | |
| Mrs. Hartzler ............ | | x | | Mr. Norcross ........ | | x | |
| Mr. Scott .................. | | x | | Mr. Gallego ......... | | x | |
| Mr. Brooks ............... | | x | | Mr. Moulton ......... | x | | |
| Mr. Cook .................. | | x | | Ms. Hanabusa ..... | x | | |
| Mr. Bridenstine ........ | | x | | Ms. Shea-Porter .. | x | | |
| Dr. Wenstrup ........... | | x | | Ms. Rosen ........... | x | | |
| Mr. Byrne ................. | | x | | Mr. McEachin ...... | | x | |
| Mr. Graves ............... | | x | | Mr. Carbajal ........ | x | | |
| Ms. Stefanik ............ | | x | | Mr. Brown ........... | | x | |
| Ms. McSally ............. | | x | | Mrs. Murphy ........ | x | | |
| Mr. Knight ............... | | x | | Mr. Khanna ......... | x | | |
| Mr. Russell .............. | | x | | Mr. O'Halleran ..... | | x | |
| Dr. DesJarlais .......... | | x | | Mr. Suozzi ........... | | x | |
| Dr. Abraham ............ | | x | | Mr. Walz .............. | | x | |
| Mr. Kelly .................. | | x | | | | | |
| Mr. Gallagher .......... | | x | | | | | |
| Mr. Gaetz ................. | | x | | | | | |
| Mr. Bacon ................ | | x | | | | | |
| Mr. Banks ................ | | x | | | | | |
| Ms. Cheney ............. | | x | | | | | |
| **Roll Call Vote Total:** | **19** | **43** | **0** | | | | |

COMMITTEE ON ARMED SERVICES

ROLL CALL VOTE NO. 2

H.R. 2810

On Speier Log 096—Extend the application of military selective service registration and conscription requirements to female citizens and US residents between ages of 18 and 26.

| Member | Aye | No | Present | Member | Aye | No | Present |
|---|---|---|---|---|---|---|---|
| Mr. Thornberry ......... | | x | | Mr. Smith ........... | x | | |
| Mr. Jones ................. | | x | | Mr. Brady ........... | x | | |
| Mr. Wilson ............... | | x | | Mrs. Davis .......... | x | | |
| Mr. LoBiondo ........... | | x | | Mr. Langevin ....... | x | | |
| Mr. Bishop ............... | | x | | Mr. Larsen .......... | x | | |
| Mr. Turner ................ | | x | | Mr. Cooper .......... | x | | |
| Mr. Rogers ............... | | x | | Ms. Bordallo ........ | x | | |
| Mr. Franks ............... | | x | | Mr. Courtney ....... | x | | |
| Mr. Shuster ............. | | x | | Ms. Tsongas ........ | x | | |
| Mr. Conaway ............ | | x | | Mr. Garamendi .... | x | | |
| Mr. Lamborn ............ | | x | | Ms. Speier ........... | x | | |
| Mr. Wittman ............ | | x | | Mr. Veasey .......... | x | | |
| Mr. Hunter ............... | | x | | Ms. Gabbard ....... | | | |
| Mr. Coffman ............ | | x | | Mr. O'Rourke ....... | x | | |
| Mrs. Hartzler ............ | | x | | Mr. Norcross ........ | x | | |
| Mr. Scott .................. | | x | | Mr. Gallego ......... | x | | |
| Mr. Brooks ............... | | x | | Mr. Moulton ......... | x | | |
| Mr. Cook .................. | | x | | Ms. Hanabusa ..... | x | | |
| Mr. Bridenstine ........ | | x | | Ms. Shea-Porter .. | x | | |
| Dr. Wenstrup ........... | | x | | Ms. Rosen ........... | x | | |
| Mr. Byrne ................. | | x | | Mr. McEachin ...... | x | | |
| Mr. Graves ............... | | x | | Mr. Carbajal ........ | x | | |
| Ms. Stefanik ............ | | x | | Mr. Brown ........... | x | | |
| Ms. McSally ............. | x | | | Mrs. Murphy ........ | x | | |
| Mr. Knight ............... | | x | | Mr. Khanna ......... | x | | |
| Mr. Russell .............. | | x | | Mr. O'Halleran ..... | x | | |
| Dr. DesJarlais .......... | | x | | Mr. Suozzi ........... | x | | |
| Dr. Abraham ............ | | x | | Mr. Walz ............. | x | | |
| Mr. Kelly .................. | | x | | | | | |
| Mr. Gallagher .......... | | x | | | | | |
| Mr. Gaetz ................. | | x | | | | | |
| Mr. Bacon ................ | | x | | | | | |
| Mr. Banks ................ | | x | | | | | |
| Ms. Cheney ............. | | x | | | | | |
| **Roll Call Vote Total:** | **28** | **33** | **0** | | | | |

COMMITTEE ON ARMED SERVICES

ROLL CALL VOTE NO. 3

H.R. 2810

On Speier Log 095—This amendment requires TRICARE to offer similar contraceptive coverage currently provided through the Affordable Care Act by removing cost sharing through the mail order pharmacy and removal of cost sharing for related contraceptive care, education and counseling.

| Member | Aye | No | Present | Member | Aye | No | Present |
|---|---|---|---|---|---|---|---|
| Mr. Thornberry | | x | | Mr. Smith | x | | |
| Mr. Jones | | x | | Mr. Brady | x | | |
| Mr. Wilson | | x | | Mrs. Davis | x | | |
| Mr. LoBiondo | | x | | Mr. Langevin | x | | |
| Mr. Bishop | | x | | Mr. Larsen | x | | |
| Mr. Turner | | x | | Mr. Cooper | x | | |
| Mr. Rogers | | x | | Ms. Bordallo | x | | |
| Mr. Franks | | x | | Mr. Courtney | x | | |
| Mr. Shuster | | x | | Ms. Tsongas | x | | |
| Mr. Conaway | | x | | Mr. Garamendi | x | | |
| Mr. Lamborn | | x | | Ms. Speier | x | | |
| Mr. Wittman | | x | | Mr. Veasey | x | | |
| Mr. Hunter | | x | | Ms. Gabbard | | | |
| Mr. Coffman | | x | | Mr. O'Rourke | x | | |
| Mrs. Hartzler | | x | | Mr. Norcross | x | | |
| Mr. Scott | | x | | Mr. Gallego | x | | |
| Mr. Brooks | | x | | Mr. Moulton | x | | |
| Mr. Cook | | x | | Ms. Hanabusa | x | | |
| Mr. Bridenstine | | x | | Ms. Shea-Porter | x | | |
| Dr. Wenstrup | | x | | Ms. Rosen | x | | |
| Mr. Byrne | | x | | Mr. McEachin | x | | |
| Mr. Graves | | x | | Mr. Carbajal | x | | |
| Ms. Stefanik | x | | | Mr. Brown | x | | |
| Ms. McSally | x | | | Mrs. Murphy | x | | |
| Mr. Knight | x | | | Mr. Khanna | x | | |
| Mr. Russell | | x | | Mr. O'Halleran | x | | |
| Dr. DesJarlais | | x | | Mr. Suozzi | x | | |
| Dr. Abraham | | x | | Mr. Walz | x | | |
| Mr. Kelly | | x | | | | | |
| Mr. Gallagher | | x | | | | | |
| Mr. Gaetz | | x | | | | | |
| Mr. Bacon | | x | | | | | |
| Mr. Banks | | x | | | | | |
| Ms. Cheney | | x | | | | | |
| **Roll Call Vote Total:** | **30** | **31** | **0** | | | | |

COMMITTEE ON ARMED SERVICES

ROLL CALL VOTE NO. 4

H.R. 2810

On Byrne Log 345—Substitute Amendment to O'Halleran Log 220r1 requiring DOD to submit an annual report on the costs to DOD in support of travel of the President, Vice President, and members of the cabinet.

| Member | Aye | No | Present | Member | Aye | No | Present |
|---|---|---|---|---|---|---|---|
| Mr. Thornberry | x | | | Mr. Smith | | x | |
| Mr. Jones | | x | | Mr. Brady | | x | |
| Mr. Wilson | x | | | Mrs. Davis | | x | |
| Mr. LoBiondo | x | | | Mr. Langevin | | x | |
| Mr. Bishop | x | | | Mr. Larsen | | x | |
| Mr. Turner | x | | | Mr. Cooper | | x | |
| Mr. Rogers | x | | | Ms. Bordallo | | x | |
| Mr. Franks | x | | | Mr. Courtney | | x | |
| Mr. Shuster | x | | | Ms. Tsongas | | x | |
| Mr. Conaway | | x | | Mr. Garamendi | | x | |
| Mr. Lamborn | | x | | Ms. Speier | | x | |
| Mr. Wittman | x | | | Mr. Veasey | | x | |
| Mr. Hunter | | x | | Ms. Gabbard | | | |
| Mr. Coffman | x | | | Mr. O'Rourke | | x | |
| Mrs. Hartzler | | x | | Mr. Norcross | | x | |
| Mr. Scott | x | | | Mr. Gallego | | x | |
| Mr. Brooks | x | | | Mr. Moulton | | x | |
| Mr. Cook | x | | | Ms. Hanabusa | | x | |
| Mr. Bridenstine | x | | | Ms. Shea-Porter | | x | |
| Dr. Wenstrup | x | | | Ms. Rosen | | x | |
| Mr. Byrne | x | | | Mr. McEachin | | x | |
| Mr. Graves | x | | | Mr. Carbajal | | x | |
| Ms. Stefanik | x | | | Mr. Brown | | x | |
| Ms. McSally | x | | | Mrs. Murphy | | x | |
| Mr. Knight | x | | | Mr. Khanna | | x | |
| Mr. Russell | x | | | Mr. O'Halleran | | x | |
| Dr. DesJarlais | x | | | Mr. Suozzi | | x | |
| Dr. Abraham | x | | | Mr. Walz | | x | |
| Mr. Kelly | | x | | | | | |
| Mr. Gallagher | x | | | | | | |
| Mr. Gaetz | | x | | | | | |
| Mr. Bacon | x | | | | | | |
| Mr. Banks | | x | | | | | |
| Ms. Cheney | | x | | | | | |
| **Roll Call Vote Total:** | **25** | **36** | **0** | | | | |

COMMITTEE ON ARMED SERVICES

ROLL CALL VOTE NO. 5

H.R. 2810

On Veasey Log 151—Directs the Secretary of Defense to conduct a study on the feasibility of establishing a standalone cyber service tasked with the overall cybersecurity of the United States.

| Member | Aye | No | Present | Member | Aye | No | Present |
|---|---|---|---|---|---|---|---|
| Mr. Thornberry ......... | | x | | Mr. Smith ........... | | x | |
| Mr. Jones ................. | | x | | Mr. Brady ........... | | x | |
| Mr. Wilson ............... | | x | | Mrs. Davis .......... | | x | |
| Mr. LoBiondo ........... | | x | | Mr. Langevin ....... | | x | |
| Mr. Bishop ............... | | x | | Mr. Larsen .......... | | x | |
| Mr. Turner ................ | | x | | Mr. Cooper .......... | | x | |
| Mr. Rogers ............... | | x | | Ms. Bordallo ........ | | x | |
| Mr. Franks ............... | | x | | Mr. Courtney ....... | | x | |
| Mr. Shuster ............. | | x | | Ms. Tsongas ........ | | x | |
| Mr. Conaway ............ | | x | | Mr. Garamendi .... | | x | |
| Mr. Lamborn ............ | | x | | Ms. Speier ........... | x | | |
| Mr. Wittman ............ | | x | | Mr. Veasey .......... | x | | |
| Mr. Hunter ............... | | x | | Ms. Gabbard ....... | | | |
| Mr. Coffman ............ | | x | | Mr. O'Rourke ....... | x | | |
| Mrs. Hartzler ............ | | x | | Mr. Norcross ........ | x | | |
| Mr. Scott .................. | | x | | Mr. Gallego ......... | x | | |
| Mr. Brooks ............... | | x | | Mr. Moulton ......... | x | | |
| Mr. Cook .................. | | x | | Ms. Hanabusa ..... | | x | |
| Mr. Bridenstine ........ | | x | | Ms. Shea-Porter .. | | x | |
| Dr. Wenstrup ........... | | x | | Ms. Rosen ........... | x | | |
| Mr. Byrne ................. | | x | | Mr. McEachin ...... | x | | |
| Mr. Graves ............... | | x | | Mr. Carbajal ........ | x | | |
| Ms. Stefanik ............ | | x | | Mr. Brown ........... | | x | |
| Ms. McSally ............. | | x | | Mrs. Murphy ........ | x | | |
| Mr. Knight ............... | | x | | Mr. Khanna ......... | x | | |
| Mr. Russell .............. | | x | | Mr. O'Halleran ..... | x | | |
| Dr. DesJarlais .......... | | x | | Mr. Suozzi ........... | x | | |
| Dr. Abraham ............ | | x | | Mr. Walz ............. | | x | |
| Mr. Kelly .................. | | x | | | | | |
| Mr. Gallagher .......... | | x | | | | | |
| Mr. Gaetz ................. | | x | | | | | |
| Mr. Bacon ................ | | x | | | | | |
| Mr. Banks ................ | | x | | | | | |
| Ms. Cheney ............. | | x | | | | | |
| **Roll Call Vote Total:** | **13** | **48** | **0** | | | | |

COMMITTEE ON ARMED SERVICES

ROLL CALL VOTE NO. 6

H.R. 2810

On Rogers Log 116—Would require the Army to transfer excess .45 caliber M1911A1 pistols to the Civilian Marksmanship Program (CMP).

| Member | Aye | No | Present | Member | Aye | No | Present |
|---|---|---|---|---|---|---|---|
| Mr. Thornberry | x | | | Mr. Smith | | x | |
| Mr. Jones | x | | | Mr. Brady | | x | |
| Mr. Wilson | x | | | Mrs. Davis | | x | |
| Mr. LoBiondo | x | | | Mr. Langevin | | x | |
| Mr. Bishop | x | | | Mr. Larsen | | x | |
| Mr. Turner | x | | | Mr. Cooper | x | | |
| Mr. Rogers | x | | | Ms. Bordallo | | x | |
| Mr. Franks | x | | | Mr. Courtney | | x | |
| Mr. Shuster | x | | | Ms. Tsongas | | x | |
| Mr. Conaway | x | | | Mr. Garamendi | | x | |
| Mr. Lamborn | x | | | Ms. Speier | | x | |
| Mr. Wittman | x | | | Mr. Veasey | | x | |
| Mr. Hunter | x | | | Ms. Gabbard | | | |
| Mr. Coffman | x | | | Mr. O'Rourke | | x | |
| Mrs. Hartzler | x | | | Mr. Norcross | | x | |
| Mr. Scott | x | | | Mr. Gallego | | x | |
| Mr. Brooks | x | | | Mr. Moulton | | x | |
| Mr. Cook | x | | | Ms. Hanabusa | | x | |
| Mr. Bridenstine | x | | | Ms. Shea-Porter | | x | |
| Dr. Wenstrup | x | | | Ms. Rosen | | x | |
| Mr. Byrne | x | | | Mr. McEachin | | x | |
| Mr. Graves | x | | | Mr. Carbajal | | x | |
| Ms. Stefanik | x | | | Mr. Brown | | x | |
| Ms. McSally | x | | | Mrs. Murphy | | x | |
| Mr. Knight | x | | | Mr. Khanna | | x | |
| Mr. Russell | x | | | Mr. O'Halleran | | x | |
| Dr. DesJarlais | x | | | Mr. Suozzi | | x | |
| Dr. Abraham | x | | | Mr. Walz | | x | |
| Mr. Kelly | x | | | | | | |
| Mr. Gallagher | x | | | | | | |
| Mr. Gaetz | x | | | | | | |
| Mr. Bacon | x | | | | | | |
| Mr. Banks | x | | | | | | |
| Ms. Cheney | x | | | | | | |
| **Roll Call Vote Total:** | **35** | **26** | **0** | | | | |

COMMITTEE ON ARMED SERVICES

ROLL CALL VOTE NO. 7

H.R. 2810

On Speier Log 100—Prohibits DOD funds from being obligated or expended to pay for expenses incurred at a property owned or operated by the President or an immediate family member if the payments will result in their financial benefit.

| Member | Aye | No | Present | Member | Aye | No | Present |
|---|---|---|---|---|---|---|---|
| Mr. Thornberry ......... | | x | | Mr. Smith ........... | x | | |
| Mr. Jones ................. | x | | | Mr. Brady ........... | x | | |
| Mr. Wilson ............... | | x | | Mrs. Davis ........... | x | | |
| Mr. LoBiondo ........... | | x | | Mr. Langevin ....... | x | | |
| Mr. Bishop ............... | | x | | Mr. Larsen ........... | x | | |
| Mr. Turner ................ | | x | | Mr. Cooper .......... | x | | |
| Mr. Rogers ............... | | x | | Ms. Bordallo ........ | x | | |
| Mr. Franks ............... | | x | | Mr. Courtney ....... | x | | |
| Mr. Shuster ............. | | x | | Ms. Tsongas ........ | x | | |
| Mr. Conaway ............ | | x | | Mr. Garamendi .... | x | | |
| Mr. Lamborn ............ | | x | | Ms. Speier ........... | x | | |
| Mr. Wittman ............ | | x | | Mr. Veasey .......... | x | | |
| Mr. Hunter ............... | | x | | Ms. Gabbard ....... | x | | |
| Mr. Coffman ............ | x | | | Mr. O'Rourke ....... | x | | |
| Mrs. Hartzler ............ | | x | | Mr. Norcross ........ | x | | |
| Mr. Scott .................. | | x | | Mr. Gallego ......... | x | | |
| Mr. Brooks ............... | | x | | Mr. Moulton ......... | x | | |
| Mr. Cook .................. | | x | | Ms. Hanabusa ..... | x | | |
| Mr. Bridenstine ........ | | x | | Ms. Shea-Porter .. | x | | |
| Dr. Wenstrup ........... | | x | | Ms. Rosen ........... | x | | |
| Mr. Byrne ................. | | x | | Mr. McEachin ...... | x | | |
| Mr. Graves ............... | | x | | Mr. Carbajal ........ | x | | |
| Ms. Stefanik ............ | | x | | Mr. Brown ........... | x | | |
| Ms. McSally ............. | | x | | Mrs. Murphy ........ | x | | |
| Mr. Knight ............... | | x | | Mr. Khanna ......... | x | | |
| Mr. Russell .............. | | x | | Mr. O'Halleran ..... | x | | |
| Dr. DesJarlais .......... | | x | | Mr. Suozzi ........... | x | | |
| Dr. Abraham ............ | | x | | Mr. Walz ............. | x | | |
| Mr. Kelly .................. | | x | | | | | |
| Mr. Gallagher .......... | | x | | | | | |
| Mr. Gaetz ................. | | x | | | | | |
| Mr. Bacon ................ | | x | | | | | |
| Mr. Banks ................ | | x | | | | | |
| Ms. Cheney ............. | | x | | | | | |
| **Roll Call Vote Total:** | **30** | **32** | **0** | | | | |

COMMITTEE ON ARMED SERVICES

ROLL CALL VOTE NO. 8

H.R. 2810

On O'Halleran Log 220r1—Requires DOD to provide the committee with a quarterly report detailing costs in support of presidential travel, including costs incurred for travel to property owned by the President or his immediate family.

| Member | Aye | No | Present | Member | Aye | No | Present |
|---|---|---|---|---|---|---|---|
| Mr. Thornberry ......... | | x | | Mr. Smith ........... | x | | |
| Mr. Jones ................. | x | | | Mr. Brady ........... | x | | |
| Mr. Wilson ............... | | x | | Mrs. Davis ........... | x | | |
| Mr. LoBiondo ........... | | x | | Mr. Langevin ....... | x | | |
| Mr. Bishop ............... | | x | | Mr. Larsen ........... | x | | |
| Mr. Turner ................ | | x | | Mr. Cooper .......... | x | | |
| Mr. Rogers ............... | | x | | Ms. Bordallo ........ | x | | |
| Mr. Franks ............... | | x | | Mr. Courtney ....... | x | | |
| Mr. Shuster ............. | | x | | Ms. Tsongas ........ | x | | |
| Mr. Conaway ........... | | x | | Mr. Garamendi .... | x | | |
| Mr. Lamborn ........... | | x | | Ms. Speier ........... | x | | |
| Mr. Wittman ............ | | x | | Mr. Veasey .......... | x | | |
| Mr. Hunter ............... | | x | | Ms. Gabbard ....... | x | | |
| Mr. Coffman ............ | x | | | Mr. O'Rourke ....... | x | | |
| Mrs. Hartzler ........... | | x | | Mr. Norcross ........ | x | | |
| Mr. Scott .................. | | x | | Mr. Gallego ......... | x | | |
| Mr. Brooks ............... | | x | | Mr. Moulton ......... | x | | |
| Mr. Cook .................. | | x | | Ms. Hanabusa ..... | x | | |
| Mr. Bridenstine ........ | | x | | Ms. Shea-Porter .. | x | | |
| Dr. Wenstrup ........... | | x | | Ms. Rosen ........... | x | | |
| Mr. Byrne ................. | | x | | Mr. McEachin ...... | x | | |
| Mr. Graves ............... | | x | | Mr. Carbajal ........ | x | | |
| Ms. Stefanik ............ | | x | | Mr. Brown ........... | x | | |
| Ms. McSally ............. | | x | | Mrs. Murphy ........ | x | | |
| Mr. Knight ............... | x | | | Mr. Khanna ......... | x | | |
| Mr. Russell .............. | | x | | Mr. O'Halleran ..... | x | | |
| Dr. DesJarlais .......... | | x | | Mr. Suozzi ........... | x | | |
| Dr. Abraham ............ | | x | | Mr. Walz .............. | x | | |
| Mr. Kelly .................. | | x | | | | | |
| Mr. Gallagher .......... | | x | | | | | |
| Mr. Gaetz ................. | | x | | | | | |
| Mr. Bacon ................ | | x | | | | | |
| Mr. Banks ................ | | x | | | | | |
| Ms. Cheney ............. | | x | | | | | |
| **Roll Call Vote Total:** | **31** | **31** | **0** | | | | |

COMMITTEE ON ARMED SERVICES

ROLL CALL VOTE NO. 9

H.R. 2810

On Franks Log 274r2—Establishes a Space Test Bed and begins development of a Space Based Missile Defense Layer.

| Member | Aye | No | Present | Member | Aye | No | Present |
|---|---|---|---|---|---|---|---|
| Mr. Thornberry ......... | x | | | Mr. Smith ........... | | x | |
| Mr. Jones ................. | x | | | Mr. Brady ........... | | x | |
| Mr. Wilson ............... | x | | | Mrs. Davis ........... | | x | |
| Mr. LoBiondo ........... | x | | | Mr. Langevin ....... | | x | |
| Mr. Bishop ............... | x | | | Mr. Larsen ........... | | x | |
| Mr. Turner ................ | x | | | Mr. Cooper .......... | | x | |
| Mr. Rogers ............... | x | | | Ms. Bordallo ........ | | x | |
| Mr. Franks ............... | x | | | Mr. Courtney ....... | | x | |
| Mr. Shuster .............. | x | | | Ms. Tsongas ........ | | x | |
| Mr. Conaway ............ | x | | | Mr. Garamendi .... | x | | |
| Mr. Lamborn ............ | x | | | Ms. Speier ........... | | x | |
| Mr. Wittman ............ | x | | | Mr. Veasey .......... | | x | |
| Mr. Hunter ............... | x | | | Ms. Gabbard ....... | | x | |
| Mr. Coffman ............ | x | | | Mr. O'Rourke ....... | | x | |
| Mrs. Hartzler ............ | x | | | Mr. Norcross ........ | x | | |
| Mr. Scott .................. | x | | | Mr. Gallego ......... | | x | |
| Mr. Brooks ............... | x | | | Mr. Moulton ......... | | x | |
| Mr. Cook .................. | x | | | Ms. Hanabusa ..... | | x | |
| Mr. Bridenstine ........ | x | | | Ms. Shea-Porter .. | | x | |
| Dr. Wenstrup ........... | x | | | Ms. Rosen ........... | | x | |
| Mr. Byrne ................. | x | | | Mr. McEachin ...... | | x | |
| Mr. Graves ............... | x | | | Mr. Carbajal ........ | | x | |
| Ms. Stefanik ............ | x | | | Mr. Brown ........... | | x | |
| Ms. McSally ............. | x | | | Mrs. Murphy ........ | | x | |
| Mr. Knight ............... | x | | | Mr. Khanna ......... | | x | |
| Mr. Russell .............. | x | | | Mr. O'Halleran ..... | | x | |
| Dr. DesJarlais .......... | x | | | Mr. Suozzi ........... | | x | |
| Dr. Abraham ............ | x | | | Mr. Walz .............. | | x | |
| Mr. Kelly .................. | x | | | | | | |
| Mr. Gallagher .......... | x | | | | | | |
| Mr. Gaetz ................. | x | | | | | | |
| Mr. Bacon ................ | x | | | | | | |
| Mr. Banks ................ | x | | | | | | |
| Ms. Cheney ............. | x | | | | | | |
| **Roll Call Vote Total:** | **36** | **26** | **0** | | | | |

COMMITTEE ON ARMED SERVICES

ROLL CALL VOTE NO. 10

H.R. 2810

On the motion by Mr. Wilson to report the bill H.R. 2810 as amended favorably to the House, with a recommendation that it do pass.

| Member | Aye | No | Present | Member | Aye | No | Present |
|---|---|---|---|---|---|---|---|
| Mr. Thornberry | x | | | Mr. Smith | x | | |
| Mr. Jones | x | | | Mr. Brady | x | | |
| Mr. Wilson | x | | | Mrs. Davis | x | | |
| Mr. LoBiondo | x | | | Mr. Langevin | x | | |
| Mr. Bishop | x | | | Mr. Larsen | x | | |
| Mr. Turner | x | | | Mr. Cooper | x | | |
| Mr. Rogers | x | | | Ms. Bordallo | x | | |
| Mr. Franks | x | | | Mr. Courtney | x | | |
| Mr. Shuster | x | | | Ms. Tsongas | x | | |
| Mr. Conaway | x | | | Mr. Garamendi | x | | |
| Mr. Lamborn | x | | | Ms. Speier | x | | |
| Mr. Wittman | x | | | Mr. Veasey | x | | |
| Mr. Hunter | x | | | Ms. Gabbard | | x | |
| Mr. Coffman | x | | | Mr. O'Rourke | x | | |
| Mrs. Hartzler | x | | | Mr. Norcross | x | | |
| Mr. Scott | x | | | Mr. Gallego | x | | |
| Mr. Brooks | x | | | Mr. Moulton | x | | |
| Mr. Cook | x | | | Ms. Hanabusa | x | | |
| Mr. Bridenstine | x | | | Ms. Shea-Porter | x | | |
| Dr. Wenstrup | x | | | Ms. Rosen | x | | |
| Mr. Byrne | x | | | Mr. McEachin | x | | |
| Mr. Graves | x | | | Mr. Carbajal | x | | |
| Ms. Stefanik | x | | | Mr. Brown | x | | |
| Ms. McSally | x | | | Mrs. Murphy | x | | |
| Mr. Knight | x | | | Mr. Khanna | x | | |
| Mr. Russell | x | | | Mr. O'Halleran | x | | |
| Dr. DesJarlais | x | | | Mr. Suozzi | x | | |
| Dr. Abraham | x | | | Mr. Walz | x | | |
| Mr. Kelly | x | | | | | | |
| Mr. Gallagher | x | | | | | | |
| Mr. Gaetz | | | | | | | |
| Mr. Bacon | x | | | | | | |
| Mr. Banks | x | | | | | | |
| Ms. Cheney | x | | | | | | |
| **Roll Call Vote Total:** | **60** | **1** | **0** | | | | |

## CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

The committee has taken steps to make available the analysis of changes in existing law made by the bill, as required by clause 3(e) of rule XIII of the Rules of the House of Representatives, and will make the analysis available as soon as possible.

RANKING MEMBER ADAM SMITH'S ADDITIONAL VIEWS ON
H.R. 2810, THE NATIONAL DEFENSE AUTHORIZATION ACT
FOR FISCAL YEAR 2018

I thank Chairman Thornberry for his efficient, bipartisan work in developing the National Defense Authorization Act for Fiscal Year 2018, and I congratulate him for successfully passing the bill out of committee. I appreciate that this bill includes needed measures to strengthen deterrence and to boost unity against Russia's campaign to undermine democracy worldwide. I also appreciate the steps the bill takes to fill genuine military readiness gaps; to require strategies from President Trump and the Department of Defense on Russia, Syria, Afghanistan, Yemen, and Somalia; and to acknowledge and to plan for the real threat that climate change poses to national security. However; I am concerned by several aspects of the bill, and I look forward to working with Chairman Thornberry to further improve it.

My chief concern relates to the bill's funding. While we have marked this bill up to support an overall top line of $696.1 billion in discretionary budget authority for the national defense budget function, including $621.5 billion in base budget authority, it is unlikely that, at the end of this legislative process, we will have that much money. The budget cap for defense spending for fiscal year 2018 is $549 billion, and if the House, the Senate, and the President do not come to an agreement to lift or modify the budget caps, the base budget supported by the bill would fall from $621.5 billion to $549 billion as a matter or law. The constraints imposed by the Budget Control Act of 2011 (the BCA) continue to pose significant challenges for the military, and the bill currently does nothing to alleviate the situation.

The bill also authorizes $74.6 billion for overseas contingency operations (OCO). Of that amount, nearly $10 billion is reserved for base budget requirements. So, the bill not only fails to comply with the discretionary caps imposed by the BCA, it also misuses the BCNs off-book allowance for OCO by using it for significant non-OCO purposes. If this same approach is ultimately taken to buffer sequestration, then $147.1 billion in OCO funding would need to be authorized to support a top line of $696.1 billion. That would be a tremendous abuse since only $64.6 billion has been requested for actual OCO. We need to exercise better fiscal discipline.

Unfortunately, this bill does not attempt to make really hard choices regarding national security priorities. That is a serious mistake, the consequences of which Congress will eventually be forced to confront. We cannot indiscriminately fund every single program on every defense wish list, while cutting taxes, refusing to raise revenue, refusing to reform mandatory spending, imposing draconian cuts on non-defense discretionary programs that keep our

country safe and prosperous, and insisting on a balanced budget. It doesn't add up.

Moreover, President Trump's budget has thrown into stark relief the relationship between defense spending and non-defense spending, by requesting trade-off cuts to domestic discretionary spending to subsidize increases for defense. It would be unconscionable and a net loss for national security to plus up defense, while imposing a requested cut of 28% to the State Department and USAID. As Secretary Mattis said, "If you don't fund the State Department fully, then I need to buy more ammunition ultimately."

I am disappointed that the bill extends provisions, which effectively prevent closure of the detention facility at Guantanamo Bay, Cuba (GTMO). The bill prohibits the transfer of detainees from GTMO to the United States and the construction or modification of facilities within the United States to house GTMO detainees for another calendar year. Our perennial failure to close the detention facility at GTMO continues to undermine our standing within the international community.

I run disappointed that the bill includes provisions that would prohibit funding for the extension of the New START treaty; abrogate the Intermediate Nuclear Forces treaty by 2019 if Russia has not returned to compliance; limit funding for nuclear weapons dismantlement; mandate the development of space-based interceptors about which the director of the Missile Defense Agency has said, "I have serious concerns about the technical feasibility of the interceptors in space and I have serious concerns about the long-term affordability of a program like that"; and mandate a test of the SM3–IIA missile defense interceptor against an ICBM, which will undermine strategic and regional stability. Strategic stability is in the manifest interest of the United States, and we must respond to Russia's aggressive actions in ways that seek to preserve it, rather than adopting reckless measures that could fuel a nuclear arms race or increase the risk of accidental nuclear war.

I am also disappointed that the bill contains a provision prohibiting a new base realignment and closure (BRAC) round, rejecting DOD's request for flexibility to implement a BRAC for the sixth year in a row.

ADAM SMITH.

ADDITIONAL VIEWS FOR H.R. 2810, THE NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2018

We congratulate Chairman Thornberry and Ranking Member Smith on the passage of the committee mark for the 56th National Defense Authorization Act, and appreciate the attentions of all members of the House Armed Services Committee on this important endeavor. However, a particular issue remains of concern to us.

In 2012, Congress created U.S.C. Title 10, §12304b to give combatant commanders the authority to utilize the reserve component more broadly in order to meet combatant commander requirements. Unfortunately, when involuntarily mobilized under this authority, members of the National Guard and Reserves are not granted the same benefits as the active-duty military members with whom they serve. These reserve component troops who mobilize under §12304b do not currently receive pre-mobilization and transitional TRICARE access, eligibility for educational benefits such as the Post-9/11 GI bill, high temp deployment accounting, or early retirement credit.

While deployed in such places as the Sinai Peninsula, Kosovo, the Americas, and across Eastern Europe, these reserve component troops perform the same missions and duties as active component troops, but are not entitled to the same benefits. This is unjust and wrong. Along with their active-duty counterparts, Reserve and Guard troops have served in a variety of essential missions, including the European Reassurance Initiative in Germany and Ukraine to counter Russian aggression. Fixing this inequity—getting our reserve component service members the benefits they earned for their active duty service—is a high priority for the National Guard Bureau, the Office of the Chief of the Army Reserve, other reserve components, as well as many state governors across the country.

Drawn from H.R. 1384, the Reserve Component Benefits Parity Act of which we are sponsors, a provision contained within H.R. 2810, the National Defense Authorization Act (NDAA) for Fiscal Year 2018 corrects part of this inequity by providing pre-mobilization and transitional TRICARE benefits for those mobilized under §12304b. Upon final passage of the NDAA, this will allow Guard and Reserve troops to access the healthcare they need before and after mobilization. This is a step in the right direction, and we thank the Chairman and Ranking Member for assenting to its inclusion.

H.R. 1384 corrects the remainder of inequities under §12304b, and has been endorsed by a host of organizations, including: the National Guard Association of the United States (NGAUS), the Military Coalition (TMC), the Reserve Officers Association (ROA), the Enlisted Association of the National Guard of the United States (EANGUS), the Minnesota National Guard Enlisted Association

(MNGEA), The American Legion, the Veterans of Foreign Wars of the United States (VFW), the United States Army Warrant Officers Association (USAWOA), the Student Veterans of America (SVA), the Military Order of the Purple Heart (MOPH), VoteVets.org, the Fleet Reserve Association (FRA), the Air Force Association, the Air Force Sergeants Association, the Military Officers Association of America (MOAA), AMVETS, Army Aviation Association of America, National Military Family Association, AMSUS, Naval Enlisted Reserve Association, Association of the Unites States Army (AUSA), Association of the United States Navy (AUSN), The Military Chaplains Association of the USA, Commissioned Officers Association of the US Public Health Service, INC, the Retired Enlisted Association, Tragedy Assistance Program for Survivors, the USCG Chief Petty Officers Association, Gold Star Wives of America, Iraq and Afghanistan Veterans of America, and the Jewish War Veterans of the USA.

It is our hope that the rest of this bill will pass without delay, as it is needed to provide the reserve component full parity in benefits with their active duty counterparts in this time of increasing operational utilization of the reserve components. We thank you for your consideration of this important matter and for your continued support of the men and women of our Armed Forces.

CAROL SHEA-PORTER.
WALTER JONES.
JIM BRIDENSTINE.
TIM WALZ.
MADELEINE Z. BORDALLO.
ANTHONY G. BROWN.
JACKY ROSEN.

## ADDITIONAL VIEWS OF MR. LARSEN

This bill includes many provisions which will contribute to overall warfighter readiness. I am pleased that many of my proposals have been included in this legislation and the committee report, and I will work with Chairman Thornberry and Ranking Member Smith to ensure they remain in the final text of the legislation.

Congress is considering this NOAA in the absence of a budget resolution to guide the committee's work. In addition, the topline authority granted in this law greatly exceeds the defense discretionary cap in the Budget Control Act (BCA). The bipartisan BCA was enacted to mollify House Republicans who threatened default on the national debt absent discretionary spending cuts. As much as members may dislike it, the BCA remains the law of the land. Authorizing $624 billion for base requirements against a $549 billion cap is irresponsible, because it forces others to make the difficult decisions about how to set priorities for the Department of Defense.

As Ranking Member Smith observed, the trade-offs in President Trump's 2018 budget request exposed as a myth the oft-repeated refrain that HASC must ignore the non-defense budget when considering the NOAA. Paying for defense increases with dollar-for-dollar cuts to non-defense spending is not just harmful to working Americans—it's also self-defeating. As witness after witness has told this committee, our national security is based on more than our strength of arms. National security depends on capable diplomacy, scientific leadership, and healthy, educated young Americans willing to wear the uniform. The President's proposed cuts to these building blocks of national security would force our military to shoulder even more of the burden in keeping Americans safe from harm.

It is my hope that the whole Congress will address these larger budget issues. And I will work with my colleagues to ensure the conference bill includes important priorities I support, including resources to address physiological episodes on EA–18G Growler aircraft, justice for victims of child abuse, and improved oversight of nuclear modernization programs.

Lastly, I would like the record to include an explanation of my absence from the subcommittee mark-ups. Due to a request by the Governor of Washington to lead the largest-ever state delegation to the Paris Air Show, I was unable to participate in HASC proceedings for the week of June 19–23, 2017.

The Paris Air Show brings together the world aerospace industry, and provides Washington companies the opportunity to showcase the products and services they provide that make my state's aerospace sector the envy of the world.

Consequently, I would like to submit for the record how I would have voted in subcommittee. During the Strategic Forces sub-

committee mark-up, I would have voted no on an amendment offered by Mr. Franks because I am concerned it would have reduced Congressional oversight of the Missile Defense Agency.

In addition, I would have spoken in favor of an amendment offered by Ranking Member Cooper to strike a provision in the underlying mark which prohibits funding to extend the New START treaty. According to testimony from senior military leadership, the New START treaty is in America's national security interest and strengthens strategic stability.

I commend Chairman Thornberry and Ranking Member Smith for their leadership on this committee, and look forward to working with them further on the Fiscal Year 2018 National Defense Authorization Act.

RICK LARSEN.

# CONGRESSMAN JOHN GARAMENDI ADDITIONAL VIEWS FOR H.R. 2810, THE NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2018

I congratulate Chairman Thornberry and Ranking Member Smith on the passage of the committee mark for the 56th National Defense Authorization Act. I also appreciate the efforts of the House Armed Services Committee to prepare a committee mark that aims to ensure that our men and women in uniform have the means to protect our nation and advance American interests. However, there are several areas of concern that I have with this bill, and I look forward to our continued work to improve this critically important legislation.

Most importantly, this bill and the associated budget process demonstrate Congress's continued refusal to make the difficult choices necessary to fund our national defense in a responsible manner. It continues the annual cycle of debate between defense hawks and budget hawks over spending levels which is completely devoid of a thorough assessment of a broader national security strategy. That strategy would recognize that the United States will only be secure when we adequately and responsibly fund all elements of our national power and do not fund the military at the expense of important domestic programs.

Just one example of our refusal to make difficult choices is the continued march down a road to spending more than one trillion dollars over the next 20–25 to operate, maintain, and recapitalize a nuclear arsenal which is in excess to our real security needs. This bill increases nuclear spending by more than $300 million over and above the President's increase of more than $1 billion. If we continue down this path, excessive nuclear weapons spending will put significant pressure on the rest of the procurement budget in the middle of next decade when other areas of our national defense will also require recapitalization.

I am pleased the Committee's mark requires the Department of Defense to deliver assessments of US national security interests in Afghanistan, Syria, Iraq, and Somalia as well as robust military strategies to advance those interests. But piecemeal strategy is piecemeal security. We, as a Congress, must engage with the Executive Branch to develop a comprehensive national security strategy which is clearly linked to stable and responsible funding. This bill does not accomplish that goal and I look forward to working to improve it as the legislative process continues.

JOHN GARAMENDI.

## ADDITIONAL VIEWS OF REP. SALUD CARBAJAL

As a Marine veteran, I am honored to serve on the House Armed Services Committee and be part of the 56th National Defense Authorization Act. The purpose of this legislation is to ensure the readiness of our military by providing the right resources and implementing the right policies. Today, we face a wide range of traditional and non-traditional security threats, and these threats are evolving on a daily basis. Whether it is the threat from countries like North Korea, Russia and Iran or defending the nation from cybersecurity attacks, the United States must be well-resourced and ready to protect the American people and our interests here and abroad.

We must invest in the right capabilities and continue to promote research and development in order to sustain our technological edge. The Department of Defense must recognize and address the increasing impacts of climate change on national security. It is also imperative that the Department of Defense implement non-discriminatory policies and protect service members and civilian personnel against any forms of discrimination.

Although I supported the overall bill, I remain deeply concerned over the funding issue. This legislation is funded well-beyond the caps imposed by the Budget Control Act. I believe it is irresponsible and a disservice to the American people to continue to impose arbitrary cuts on domestic spending while increasing defense spending. As I have stated before, I believe the question we must ask ourselves is, what are we trying to defend? As we continue to impose cuts to this country's education and health systems and not take steps to protect our environment, we will ultimately be left with a hollow nation—nothing for the military to protect.

SALUD CARBAJAL.

## CONGRESSMEN RO KHANNA'S ADDITIONAL VIEWS FOR H.R. 2810, THE FISCAL YEAR 2018 NATIONAL DEFENSE AUTHORIZATION ACT

I voted in favor of this bill in committee. I commend the bipartisan nature of the House Armed Services to make sure our defense authorization is done on time in the interest of national security. I support our troops and elements of this bill. But I am very concerned with the size of the defense spending increases, especially in light of the Administration's proposed diplomatic funding cuts and the lack of a new strategy for peace. Not only is this bill a massive increase in defense spending, it will most likely be coupled with cuts to diplomacy and foreign aid. I am also waiting to hear a newly articulated foreign policy for how to best use this money. The administration has asked for this increase in money without offering a new strategy. In Silicon Valley, where I represent California's 17th Congressional District, venture capitalists would not fund businesses seeking more money if they do not have a new strategy. Our recent foreign interventions have led to more terrorism and violence across the world. Although we must have a strong military that deters war and keeps the peace, we should be smarter about when and how we use force abroad.

I am pleased that this bill makes great strides towards improving procurement transparency and aims to reduce waste, fraud and abuse in defense spending. The committee worked with me to secure an important provision that directs the Comptroller General of the United States to conduct a study of Department of Defense (DoD) procurement processes to determine "potential abuses by companies of such processes, and means of improving such processes to improve transparency in commercial acquisitions by the Department of Defense." The bill also includes three of my amendments that will save money for the American taxpayer by: (1) allowing the Chief Operating Officer of Armed Forces Retirement Home (AFRH) to acquire and lease property, generating much needed revenue for the AFRH. (2) requiring a cost-benefit analysis for future afghan military uniform specifications considering the report showing millions of dollars were wasted on forest camouflage in a desert country, and (3) requiring an assessment of design trade options and a cost-benefit analysis of the W80 thermonuclear warhead.

I am also pleased that three amendments I cosponsored were adopted. These amendments deem climate change a national security issue, make it easier for the military to contact soldiers following their discharge and require the Secretary of Defense to submit a report on the dual-hat arrangement for the Commander of U.S. Cyber Command.

In sum, I applaud the committee staff that worked with me to include important provisions that will save the taxpayer money.

My main concern remains the increases in defense spending without a new strategy for peace. I am hopeful that this concern will be addressed during the fiscal year 2018 NDAA consideration by the full House of Representatives, and I look forward to working with my colleagues to make sure we are not authorizing additional spending for missions that are not succeeding.

RO KHANNA.

CONGRESSMAN THOMAS R. SUOZZI'S ADDITIONAL VIEWS FOR H.R. 2810, THE NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2018

I congratulate Chairman Thornberry and Ranking Member Smith on the passage of the committee mark for the 56th National Defense Authorization Act. I appreciate the efforts of my colleagues of the House Armed Services to ensure the national security and defense of the United States. I also applaud the Chairman's reform efforts contained in the committee's mark. While I share, and support,the Chairman's objectives, I disagree with several of the methods contained in the mark which seek to address the backlog of incurred cost audits at the Defense Contract Audit Agency (DCAA).

I share the Chairman's goal of reducing the backlog of incurred costs by utilizing qualified private auditors. I believe that qualified private auditors will assist the DCAA's goal of reducing the incurred cost audit backlog. However, I am opposed to adding additional layers of bureaucracy and setting mandates on the amount of work that must be contracted out to private contractors.

I believe that any reform should give the Director of the DCAA the authority and discretion to hire all the necessary and required qualified private auditors to address the backlog of incurred cost audits instead of a committee. Resting the authority and the discretion with the Director will expedite the hiring of private contractors to address the backlog. Additionally, I am opposed to legislators setting a mandated minimum percentage of contracts that must be completed by private auditors. While I want to ensure measures are in place to prevent a reoccurrence of a backlog, Congress should rely on the expertise of the Director of the DCAA to ensure capacity in the private sector continues to exist whenever needed.

I will continue to work with Chairman Thornberry, Ranking Member Smith and my colleagues to address this issue and to achieve our shared objectives of reform to increase efficiency and save the taxpayers' dollars. I will continue to work to encourage the use of private auditors by the DCAA in their efforts to eliminate the backlog of incurred cost audits, to encourage the use of qualified private auditors to assist with the burden created by the backlog of incurred cost audits to allow the DCAA to reallocate agency resources to prioritize high-risk audits with a higher rate of return on investment, to ensure private sector capacity exists to conduct incurred costs audits to assist the DCAA with any potential surge of incurred costs audits in order to avoid the recurrence of a backlog, and to foster collaboration between the DCAA and the private sector to increase efficiencies and root out waste, fraud, and abuse, and to maximize the return on investment of tax payer dollars.

THOMAS R. SUOZZI.

○