UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, et al.,<br><br>Defendants. | No. 2:20-cv-0111-RAJ<br><br>**FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

# EXHIBIT 5

Joint Conference Report, H.R. 6942, Authorizing Appropriations for FY 1981

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – i

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

JOINT CONFEREES

H.R. 6942, AUTHORIZING APPROPRIATIONS FOR THE FISCAL YEAR 1981 FOR INTERNATIONAL SECURITY AND DEVELOPMENT ASSISTANCE, THE PEACE CORPS, AND REFUGEE ASSISTANCE, AND FOR OTHER PURPOSES.

\- - -

Tuesday, November 18, 1980

United States Congress,

Senate Committee on Foreign Relations
and the
House Committee on Foreign Affairs,

Washington, D. C.

The Conferees met, pursuant to notice, at 11:13 a.m., in Room S-116, The Capitol, the Honorable Frank Church (Chairman of the Senate Committee on Foreign Relations) and the Honorable Clement Zablocki (Chairman of the House Committee on Foreign Affairs) jointly presiding.

Present: Senators Church, Pell, Glenn, Javits, Percy and Hayakawa; and Representatives Zablocki, Fountain, Hamilton, Wolff, Bingham, Solarz, Gray, Bowen, Broomfield and Buchanan.

Also Present: Senate Foreign Relations Committee Staff--William Bader, Albert A. Lakeland, Hans Binnendijk, and Rudolph Rousseau; House Foreign Affairs Committee Staff--Jack Brady, George Berdes, Lou Gulick and Bob Huber.

Also Present from the Executive Branch: General Ernest Graves, Defense Security Assistance Agency; Genta Hawkins,

REPRODUCED AT THE NATIONAL ARCHIVES

Agency for International Development; Ambassador Walter Cutler, Robert Mantel, Kathleen Moody and Andrew Thoms--Department of State.

\- - -

Chairman Zablocki. Good morning, Mr. Chairman. May I apologize for our being late. We had an important meeting with the Secretary of State which detained us.

Chairman Church. I understand.

Clem, since the Republicans have a leadership meeting at 11:45, we are kind of limited in what we can accomplish this morning. If we can get to the numbers, however, I understand that quite a lot of staff work has been done, and maybe we could get that part settled.

Is that acceptable to you?

Chairman Zablocki. There is no problem if you find the staff work acceptable.

Chairman Church. I think we should talk about it for a minute to make sure that we understand what we are doing. Then, if we can get the numbers settled, we would be in a good position to move on with other issues this afternoon.

Chairman Zablocki. If we do settle the numbers, Frank, will we have any problems when we get to some of the other policy questions and differences that we have?

Chairman Church. I don't think so. The only one is the FMS provision, and we could do this contingent upon a satisfactory

REPRODUCED AT THE NATIONAL ARCHIVES

settlement of that. In other words, we could settle the numbers with the understanding that they are tentatively adopted contingent on settling the FMS issue satisfactorily.

Chairman Zablocki. Mr. Chairman, if we do that, might we perhaps be repeating ourselves? Couldn't we first resolve the FMS and then go to the numbers?

Senator Javits. Are you referring to the 10 percent reserve business? Is that the one?

Chairman Church. If we can get that settled, that would be fine.

Chairman Zablocki. We don't have a Republican here at the moment. Ed had to leave before we started.

Mr. Brady. Mr. Derwinski said he would be back over as soon as he could.

Chairman Zablocki. In view of the fact that there is not a Republican here on our side, perhaps we could discuss some of the issues and differences between us on which there is really no problem. Then we could get to the 10 percent issue, the FMS, and the numbers.

I do think we ought to wait for the Republicans regarding the amounts.

Chairman Church. All right.

Chairman Zablocki. I believe item 3 was not yet resolved. Oh, that is FMS. Then I would suggest we go to item four.

Chairman Church. That's still FMS. What about item 6?

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

REPRODUCED AT THE NATIONAL ARCHIVES

I believe we had deferred on item 6.

Chairman Zablocki. Item 6 is the nonrecurring research and development costs. The House removes present Presidential authority to waive reimbursement for certain plant and production equipment and research and development costs for foreign military sales to non-NATO countries which, if made, would encourage foreign procurement in the United States under coproduction arrangements.

The Senate had no comparable provision.

The House feels very strongly about this, Mr. Chairman.

The Executive Branch strongly supports the House bill.

I wonder if the Senate would offer a modification or perhaps even an outright rescission.

Chairman Church. I believe Senator Stone has strong feelings on this issue.

Senator Javits. So do I.

Chairman Church. I feel we ought to confer with the Senator before we make a decision on our side.

Senator Javits. Is this Section 64(b)?

Mr. Binnendijk. No. This is coproduction.

Senator Pell. Mr. Chairman.

Chairman Church. Senator Pell.

Senator Pell. Mr. Chairman, on this item, it would seem to me that we should want to encourage the further use of copies of our weapons, and if we could persuade other nations to utilize or make use of the research to buy more interchangeable

REPRODUCED AT THE NATIONAL ARCHIVES

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

weapon systems with us, it would be to our advantage. I don't see what the disadvantage would be of leaving the law as it is.

Representative Solarz. Mr. Chairman.

Chairman Zablocki. I believe the gentleman from Indiana feels rather strongly on this.

Representative Hamilton. Well, I don't know if I feel that strongly, but I think the concern probably of the Senator, and I think of a good many Members here, is the impact this would have on Israel. It seems to me that maybe special arrangements could be made in that case for coproduction. It does seem to me that the effect of the provision, and the Senate has no provision at all, is to encourage foreign governments to have coproduction. So what you do, in effect, is to shift production from the United States to the foreign country. I'm not sure that it is in our interest to do that.

I am wondering if we can take some approach which would take care of the concern that might be expressed for Israel and the coproduction of the aircraft -- I believe it is the F-18 -- and at the same time maintain the House provision for general application, which seems to me to be meritorious.

Representative Bingham. Mr. Chairman, may I speak to that?

Senator Javits. Mr. Chairman, gentlemen, it seems to me that this is jumping the gun. We have a new President coming on board soon. He has not asked for this authority to be taken

REPRODUCED AT THE NATIONAL ARCHIVES

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

away from him. He has not even had a chance to review the situation. So we, a lame duck Congress, are going to take it away from him because the President, who is, but effectively was the President, asked for it. It seems to me that we are standing logic on its head.

Representative Bingham. Mr. Chairman.

Chairman Zablocki. Mr. Bingham, the gentleman from New York.

Representative Bingham. The point, as I see it, is this. Here is something the Executive Branch asked for originally and now it has concluded that it has been a mistake, that it has had the opposite effect of what was intended. The same Executive Branch that asked for it is now asking that it be removed.

Otherwise I would certainly agree with Senator Javits' point. But in this case I like very much Congressman Hamilton's idea. As far as I know, the only objection to the House language is the effect on the coproduction agreements in Israel. Now if they can be taken care of in some way, I don't think there is any objection to the House provision.

Chairman Church. Why don't we have the staff work up a formula that might put into words Congressman Hamilton's suggestion and then we can look at it.

Chairman Zablocki. I believe if we are going to back away from the Executive's request, then we ought to back away entirely. I think if we do it for one country, it would not be good. If we are interested in having more production in the

REPRODUCED AT THE NATIONAL ARCHIVES

United States, then if we are going to exempt just one country, I would suggest that we just recede and leave the law as it is.

Senator Javits. And let the report say that our reason is there is a new President who is entitled to have a new look at this thing, there will be a foreign aid bill up promptly, and if he wishes to do it, we would like to hear his recommendation.

Chairman Zablocki. May I further add that the reason I believe we should recede entirely is it is my understanding, with the waiver authority, it would indeed cause political problems with countries who thought they had this right to have a waiver.

If we are going to give the waiver only to Israel, it would cause some real problems with other friends and allies.

Chairman Church. I believe that is right.

Chairman Zablocki. If there is no objection, then, the House will recede.

Chairman Church. Very well. The House recedes.

Does that get us back to FMS?

Chairman Zablocki. The next item is item 9, FMS guarantee reserve.

The House is prepared to recede with an amendment. I believe it was worked out with the staff.

Do you have the amendment, Mr. Chairman?

Chairman Church. No, I don't have it yet.

Chairman Zablocki. Would the staff please hand out copies of the amendment, and would the staff please read the amendment.

REPRODUCED AT THE NATI

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

Mr. Huber. In lieu of Senate section 103(d), shown on page 5 of the Comparative Print, insert the following: "(d) For the Fiscal Year 1981, credits may not be extended under section 23 of the Arms Export Control Act in an amount, and loans may not be guaranteed under section 24(a) of that act in a principal amount which exceeds any maximum amount which may be established with respect to such credits or such loan guarantees in legislation appropriating funds to carry out the Arms Export Control Act."

Chairman Zablocki. What that really does is this. This would expire after a year. We would try it for one year to see how it would work out.

Senator Percy. Would you give us just a moment, please? We want to discuss this.

(Pause)

Chairman Zablocki. Mr. Chairman, our problem is that the provision of the Senate would give the Appropriations Committee power to legislate in foreign policy matters.

Chairman Church. Well, at the present time, the Appropriations Committee does have this authority because it must appropriate the 10 percent, or any limitation thereon.

Senator Javits. We are cutting that down.

Chairman Church. We are actually giving the Foreign Relations Committees of both Houses a larger measure of authority than they have had before.

We were able to persuade the Senate Appropriations Committee

REPRODUCED AT THE NATIONAL ARCHIVES

to do this only on the basis of its continuing to hold the right to review the programs and impose some limit below the authorization, as it normally can, if it chose to do it. It could do that anyway.

The Committee won't buy it on any other basis. Senator Inouye and I went through this in a very long colloquy, and the only basis upon which they would buy it was their right for continuing review. We really move it a long way in the direction of our two Committees. I think what we are trying to do here is a very good thing.

But, if we accepted your amendment, it would be challenged by the Appropriations Committee. That is very clear from the understanding that reached me. It would be challenged on the floor and I believe it would be overturned.

They felt that they went as far as they could go in accommodating us when we had it on the floor before.

Senator Javits. If I may, there is one other consideration. If we leave it as it is and satisfy the Appropriations Committee, then we don't have to make cuts which otherwise it would impose, because the genius of this amendment--which, I am very proud to say, was developed not by me but by a member of the Minority Staff, Mr. Sienkiewicz--is it is a brilliant move saving us from very heavy cuts for Israel, Egypt, and Turkey. It suddenly comes in with a quarter of a billion dollars, which we never figured on. It was a ten strike.

REPRODUCED AT THE NATIONAL ARCHIVES

Chairman Church. Yes, it was a ten strike.

Senator Javits. We don't want to muck it up now by going back to a battle which we are going to lose.

Chairman Zablocki. Mr. Chairman, I don't quite understand how you maintain that we are giving more power to the authorizing Committee.

As I understand the Senate language, it would give the Appropriations Committee an opportunity to legislate in foreign policy.

Chairman Church. But only as the Appropriations Committee can always refuse to fully fund a given authorization.

Chairman Zablocki. But we put on the ceiling, we put in the amount.

Chairman Church. Yes, we do.

Chairman Zablocki. And they can appropriate less.

Chairman Church. But that is all they can do in this case. They can establish a ceiling below our own. But, in effect, that is simply exercising the power which they normally would have.

Mr. Brady. It's not a funding matter. The aggregate ceiling is not a funding matter. A funding matter is the authorization itself.

Chairman Church. But under the present law, that requires an appropriation of 10 percent.

Mr. Brady. That's right.

Chairman Church. We are eliminating that and thus, in effect,

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

REPRODUCED AT THE NATIONAL ARCHIVES

we are eliminating the appropriations process.

The price we have had to pay for that is giving the Senate Appropriations Committee and the House Appropriations Committee a right for continuing review, in which they could establish a ceiling below our own.

Chairman Zablocki. Mr. Chairman, I would suggest that we pass over this because I have very strong feelings about it.

About five years ago, on 17 points on an appropriations bill I raised a point of order because it was legislation on an appropriations bill. Now we are giving them on a platter something we have tried to hold on to for so long, the fact that they don't legislate in appropriations bills.

Why don't we pass over this temporarily.

Chairman Church. All right.

Chairman Zablocki. I thought we had a compromise which we could go along with for one year and then it would terminate. Oh, no, that is not the amendment. I would just prefer to pass this over.

Chairman Church. All right. We will go back to the Appropriations Committee and confer further to see if there is a possibility of further compromise that we can reach.

Chairman Zablocki. We'll go along for a year, but I don't think we should do more than that.

Now that we have some Republican Members on our side, shall we get back to FMS?

REPRODUCED AT THE NATIONAL ARCHIVES

Item 11 on page 5, let's do that next.

Chairman Church. Mr. Chairman, may we pass over that, please, because both Senators Sarbanes and Biden have asked to participate. They will be here this afternoon for the afternoon session.

Chairman Zablocki. Let's then go to item 13, turbine engines for Iraqi naval frigates.

I believe Senator Stone is interested in this.

Chairman Church. Have you seen this report language? We could recede on item 13 if we included this in the report (indicating.)

Representative Broomfield. May we see a copy of that, please.

Chairman Church. I understand that this is agreeable to Senator Stone, and it was his issue to start with.

Chairman Zablocki. This would withhold the shipment.

Chairman Church. If it is all right with him, it is all right with me.

Chairman Zablocki. Does the Senate recede with an understanding that there will be language in the report?

Chairman Church. Yes, this language in the report.

Chairman Zablocki. Yes.

The next item is item 15 on page 7, defense articles with a direct civilian application.

This is Congressman Lloyd's amendment on the House side.

Senator Javits. May we have copies of that.

Chairman Zablocki. Certainly.

The House Conferees had discussed this provision and we are prepared to recede with an amendment. The amendment which we would offer adopts the entire Senate amendment with one addition. The amendment would provide that the types of defense articles and defense services specified in the House bill not be prohibited from sale to Argentina.

Representative Bingham. Do we have the language on that yet?

Chairman Zablocki. We discussed it yesterday.

Representative Bingham. Yes, but we didn't have the language written out.

Senator Javits. Clem, could we have your feeling as to the rationale of singling out Argentina?

Chairman Zablocki. Well, we would not single out Argentina in the legislation, but we would refer to it in the statement on the part of the managers.

Senator Javits. What would be our rationale? Why are we leaving out Argentina?

Representative Bingham, If the gentleman would yield, it is because section 620B refers to Argentina.

Senator Javits. But this is the proposed substitute.

Representative Bingham. No, no. As I understand it, the (f) here, as I understand it, section 620B, is now in the law and refers to Argentina. That first paragraph, (f), refers to it, therefore.

REPRODUCED AT THE NATIONAL ARCHIVES

Chairman Church. What you are doing is accepting the Senate amendment. We had this argued out and voted on in the floor, as I recall. You are accepting the Senate amendment, but making an exception for Argentina. Isn't that really the substance of it?

Representative Bingham. Yes.

Chairman Church. Why do you want to do that?

What it is is an open sesame for rearming the Argentine Government, one of the most repressive in the world.

Representative Bingham. Yes, but just with respect to these items.

Chairman Church. I know, but just look at them: training, helicopters, propeller-driven transports, training aircraft, trucks, vehicles, defense services related to any of the items described. That is really an open sesame.

Senator Pell. Why choose Argentina for the exception? That's what I don't understand.

Representative Solarz. Because the author of the amendment in the House has an industry in his district which wanted to sell some equipment to Argentina and he is in the process of trying to protect his district's interest by having the House adopt an amendment.

Representative Bingham. It has civilian application.

Chairman Church. But the language is so broad that it easily could be converted to military use.

REPRODUCED AT THE NATIONAL ARCHIVES

Representative Solarz. I think the Chairman's line of reasoning, personally, is very persuasive.

Senator Javits. There is something we could do to mollify the authors of this amendment, and that is to take what is in (f), which, as Jack Bingham says, relates to Argentina, and swing it into the last item on page 2 in another number, 5, so as to express the sense of the Congress with particularity respecting Argentina.

Do you see what I mean, Jack? We would have to draft it, but I think it could be done intelligently. Give them something on Argentina by swinging it into an "it is the sense of the Congress," which would come in the second part of the proposed conference substitute.

Chairman Church. But I am just against the policy. I don't see why the United States should start supplying military equipment to the Government of Argentina.

I don't see how that is consistent with any of our declared principles on human rights, for example.

Senator Javits. We may do it anyhow, because that is a result of the review, and that is the result of the specification of a sense of the Congress.

Representative Broomfield. How do you get away from the prohibition on it? A sense of the Congress wouldn't do that, would it?

Senator Javits. No, it would not, but it gives the authors

AT THE NATIONAL ARCHIVES

of the amendment something to chew on. It opens the door.

Representative Broomfield. It really doesn't allow it.

Senator Javits. No, of course not.

(General laughter.)

Representative Broomfield. Are you sure this is going to satisfy them?

Senator Javits. Well, it is a point in their favor, don't underestimate it. It does point the finger directly to giving some satisfaction on the Argentine situation by pledging the Congress to the proposition that it is our sense that this should be included as a result of a review. That's all.

It is doing something. They can't say we did nothing about it.

Representative Solarz. What if we further try to reconcile the differences by including this section (f) at the end, in the form of asking the Administration to report on the wisdom of doing it, rather than expressing the sense of the Congress that it should be done?

Senator Javits. That's what it would do. It would have to be drafted properly.

Representative Solarz. But let's draft it in such a way that we do not express the sense of the Congress that these controls should be lifted with respect to Argentina. Let's draft it in a way that says the Administration should report to the Congress on whether those restrictions should be lifted with respect to Argentina.

REPRODUCED AT THE NATIONAL ARCHIVES

Chairman Church. That's good.

Representative Solarz. I think that would satisfy Senator Church's concerns and still leave the sponsors of the House amendment with something.

Chairman Church. The Administration, of course, is always free to express its views in respect of changing any provision of law. I would find that satisfactory.

Senator Javits. Steve; you say that with respect to this review, it is the sense of the Congress that defense articles, and so on. Now, Argentina comes in that anyhow. We're not excluding Argentina.

Representative Solarz. What I am suggesting, in order to satisfy the concerns expressed by Senator Church and also to leave Mr. Lloyd with some bone to show for his efforts is this. Instead of including section (f) in the list of items, Congress should express its view that these restrictions could be lifted and we could draft it in such a way that we say, with respect to section 620B and the list of items contained therein, the Executive Branch should review the wisdom of maintaining restrictions and then report that.

Senator Javits. I understand. But I point out that you are doing more than that in (b) now.

Chairman Church. But we don't want to do more than that.

Senator Javits. I understand. But then you would have to exclude 620B for (b) because as it stands now, (b) does more.

REPRODUCED AT THE NATIONAL ARCHIVES

So have it as a separate section.

Chairman Church. As I understood the proposition, we would just leave in the law the present prohibition as it stands, but invite the Administration to make recommendations with respect to possible changes, if it felt such changes were desirable.

Senator Javits. Then you have to include all the items.

My point is if you do that, then you have to include (1) to (4) and make what was (f) into (5). Then it makes sense. Then it adds up. That's all right with me.

Representative Solarz. Is that acceptable?

Senator Javits. Do you see what I mean? In other words, compel a report to Congress but don't express it as the sense of Congress that (b) should be excluded.

Representative Solarz. Yes.

Chairman Church. Right.

Senator Pell. But wouldn't this, then, open up the door to a much more widespread crack in the dam?

Senator Javits. You're doing it anyhow.

Chairman Church. As I understand it, the section relates just to Argentina anyway, and the Administration would be making recommendations as to the advisability of changing this provision.

Representative Solarz. Only with respect to Argentina.

I think the problem is that both the Senate and the House adopted amendments which addressed this problem from a slightly different perspective. I think the best way to handle it is to

REPRODUCED AT THE NATIONAL ARCHIVES

leave out the provisions indicating this is the sense of the Congress, asking for the Executive to report on the wisdom of making the changes with respect to all the countries, and then, with respect to Argentina, asking it to report on the wisdom of eliminating (f).

Chairman Church. That's fine.

Is that understood?

Representative Wolff. Why don't we go back to the Senate amendment, which is broad enough to accomplish everything without even putting all of this other stuff in there?

Chairman Church. I think we are better off approaching it the way Steve says. I really do.

Senator Javits. I do, too.

Chairman Church. All right. If the staff would prepare an amendment along that line, we can come back to it.

Chairman Zablocki. We'll get back to it.

I might point out that although Lloyd proposed this amendment, there are others industries that are concerned about not being able to sell to certain countries civilian aircraft. I just want to make clear that this is not just for one particular member of Congress or particular industry in his district.

Representative Bingham. Mr. Chairman, before we leave this, may I please make a caveat to the staff?

I think we want to be careful that by specifying certain items that we think would be given special consideration for

REPRODUCED AT THE NATIONAL ARCHIVES

Argentina, we are not suggesting that those items aren't suitable for removal from the Munitions List generally.

Chairman Church. I think the final version avoids that pitfall. The final version would ask for the Administration to report on both provisions -- in other words, what changes the Administration may feel should be made in the Munitions List as it applies generally to the world; and, secondly, the Administration's view on the continuation of the prohibition to Argentina.

Chairman Zablocki. With the new Administration, I think we will have a new interpretation.

Chairman Church. Very well.

Chairman Zablocki. We'll probably get what we want.

Representative Broomfield. That's a nice way of putting it. We appreciate that bipartisanship.

Chairman Zablocki. I would hope that the new Administration is going to think about some of our export problems and the unemployment in our country to permit us to sell civilian goods.

Representative Broomfield. You got the word.

Chairman Zablocki. The next item for consideration is item 16 on page 7. This is the international military education and training program, or IMET.

The House bill requires a human rights program as a prerequisite for completion of IMET courses. It requires a Presidential report on implementation. The Senate has no comparable

REPRODUCED AT THE NATIONAL ARCHIVES

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

provision.

It is my understanding that the members of the Senate would want to apply human rights courses to selected IMET courses because there are some IMET courses where human rights just don't fit in, as, for example, in some of the very brief courses.

Ours is across the board.

Senator Javits. Mr. Chairman, may we hear from General Graves on this subject?

Senator Glenn. Mr. Chairman, may I be recognized first, please

Chairman Church. Yes, Senator Glenn.

Senator Glenn. I think section 544, as it has been proposed, is essentially the same amendment which the House passed in 1978, which was rejected by the Conference Committee in favor of the Senate amendment. We adopted section 543 (3) which required that education and training activities be designed "to increase the awareness of IMET students of basic issues involving internationally recognized human rights." Subsequent to that, DOD went ahead and set up what I thought had been a successful information program. It was designed to carry out the intent of 543(3).

In 1979, a course for U.S. foreign training officers was established, which was supposed to assist them in consistently maintaining some of those standards in their information program.

On 9 January, 1979, a GAO symposium on public diplomacy, which reviewed, as part of its agenda, this DOD information

REPRODUCED AT THE NATIONAL ARCHIVES

program, was complimentary to it, as a matter of fact.

Section 544 assumes a need for further legislation, it seems to me, without having the benefit of knowing the results of what is going on right now.

There is a program underway right now to do what 543 proposed. Section 544 would require political courses which I am sure many countries would interpret as political indoctrination, since it would come into every single course.

I think that probably would be counterproductive. I think it would insult some countries. I would recommend that we look at the existing program which, as is my understanding, has been working pretty well before we change horses. After all, it has only been in effect for a short period of time.

I think they are moving on this and I thought they were doing a good job on it. At least that is what I have heard. I don't see any need to change this and make an indoctrination program that I think would be far less beneficial than the one they are going through right now.

Let me say this, too. The DOD information program has eleven objectives. It goes into U.S. Government institutions, the judicial system, political parties, the press, diversity of American life, minorities, agriculture, economy, labor and labor management relations, education, public and social welfare; and human rights is stressed in all of these different objectives.

For instance, at Maxwell Air Force Base, when they study

REPRODUCED AT THE NATIONAL ARCHIVES

judicial process, they visit a courtroom, they observe trials, they visit with a judge in chambers to discuss trial and judicial process, they are briefed when the results of the trial are announced, and in the education objective they even visit a local high school, talk to principals who explain the education system, and so on. Human rights instruction varies in sophistication with the qualification of the student, the length of the course, the level of the course, depending on whether it is at the War College, Command and General Staff, Basic Officer Courses or Technical Courses.

We have some 400 foreign training officers now who have been indoctrinated in this process and I would like to see the system work.

I would welcome any comments General Graves might want to make in addition to this. But I think we are jumping into a whole new process here, and we just had one underway as a result of previous legislation.

Representative Solarz. Can Members of Congress enroll in this course? It sounds pretty interesting.

(General laughter.)

Senator Glenn. We'd be glad to send you an application.

(General laughter.)

Senator Javits. May we hear from General Graves on this?

Chairman Church. General?

General Graves. Sir, I think Senator Glenn has summarized the

THE NATIONAL ARCHIVES

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

effort we have made to tailor the human rights effort to the particular course. If you go to a school like [Leavenworth], where you have a nine month curriculum, you have a lot of opportunity to introduce this. If you go to a short course, which may last a month or so, then you have to have a much more limited program. You also have to tailor it to the educational level of the students, and so forth.

We are trying to optimize the program. It seems to me that the amendment implies a more stereotyped approach which, in fact, would be less effective than what we now are doing.

Chairman Church. Well, I am convinced.

Senator Hayakawa. Mr. Chairman.

Chairman Church. Senator Javits said that he would be against receding on this.

Senator Hayakawa.

Senator Hayakawa. Mr. Chairman, it seems to me that this is a process by means of which we undertake to preach to citizens and officers of other countries about democracy and human rights, and I do believe that it is an insult to other nations. It does not take into consideration the fact that what are human rights in one country may not be included in the category of human rights in another. We are taking advantage of their desire for military and technical training to give them a little brain-washing on our own account.

It seems to me to be a cultural arrogance on our part to

REPRODUCED AT THE NATIONAL ARCHIVES

instruct others as to what is moral and what is immoral in human relations.

I, myself, regard this as very serious to other nations.

Senator Pell. Mr. Chairman.

Chairman Church. Senator Pell.

Senator Pell. Usually I find myself in agreement with Senator Hayakawa, but I think in this case I do not. That is because what we are talking about here is not voting rights or what we call the rights that generally come under the Civil Rights Act of 1965 of our country. What we are talking about here is torture, such as beating, electrical devices and other tortuous methods designed to coerce statements out of people. I think as we sit in this antiseptic atmosphere here today we do not realize that at this very time torture is being applied to many people all over the world.

It is not a nice thing to say and it is very hard for us to imagine some poor fellow sitting on the table being tortured. But I think that is really what we are talking about. So I would like to see the strongest possible view on this matter. This is what I mean by human rights. I don't mean pure legalities. I mean the abuse of the physical person.

Senator Hayakawa. With all respect, Senator Pell, I do feel that the association -- well, let me ask the General, first of all to what degree the foreign officers do associate with the general public and with American soldiers in the course of their training?

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

REPRODUCED AT THE NATIONAL ARCHIVES

General Graves. That is one of the major purposes of the information program, to put them into the communities where the schools are located, so that they can have contacts.

With respect to the subject of torture, we are getting it back through teaching the code of conduct which has to do with our prisoner of war circumstances and that sort of thing. So I would say that the question of proper behavior with respect to prisoners and all that is one thing that is addressed already, and is specifically addressed wherever we are teaching the code of conduct.

Senator Glenn. Mr. Chairman.

Chairman Church. Senator Glenn.

Senator Glenn. This is not a matter of whether or not we are against torture. We are all against torture. It is how to best indoctrinate people to our ways in this country and how to make the biggest impression on them. It is do you make the biggest impression on them by working these things into their study of our judicial process, by working them into the community or programs like that, or whether you have a specific human rights requirement for every single course they take.

Let me give an example. If you have a person who is going through a course in engine mechanics--let's say he is studying aircraft engines -- you would have to take him aside and give him his ten minutes out of that course on human rights, or so I understand this intent to be.

REPRODUCED AT THE NATIONAL ARCHIVES

I think you would have the possibility, while that may be an extreme situation, of making this a laughing stock rather than something they would wind up going home truly believing in.

There is the very extensive program that DOD has instituted for information officers which follows every single IMET person. It follows every one of them. If there is one IMET officer at a post somewhere, only one, wherever he is, this information program is at that spot and available to help him to work his way into our community and give him a better understanding of our system.

I would like to see this sytem work; let it work a little longer now that it has been in effect, before we start changing it.

Representative Solarz. Mr. Chairman, if I may ask a question, we seem to have become deeply involved in a discussion of the art of pedagogy and how best to instruct visiting military officials in human rights concepts. But I am not clear what are the practical differences between the existing situation and whatever obligations would be entailed under the terms of the House amendment.

As I understand it, right now you weave instruction on human rights into the framework of the courses you already give on other subjects. Is that correct?

General Graves. That is correct.

Representative Solarz. Are you interpreting the House amendment to require a specific course just on human rights as

REPRODUCED AT THE NATIONAL ARCHIVES

a prerequisite for completion of the program?

General Graves. The word in the amendment is "program", but the use of the words "prerequisite for graduation" implies a formality which has caused us great concern.

Representative Solarz. Right now, have you incorporated within all of your programs some instruction on human rights?

General Graves. It is our belief that we have, but it has not gotten to the formality of requiring it as a prerequisite for graduation.

Representative Solarz. If I understood the thrust of Senator Glenn's remarks, right now, literally every course of instruction that you have under the IMET program has some human rights included in it?

General Graves. That is correct.

Representative Solarz. Well, since they use the word "program" rather than "course" in the House amendment, why wouldn't the status quo be compatible to the House amendment? As I see it, the only difference is that the House amendment says as a prequisite for completion you have to have a program on human rights. Right now it is not a prerequisite. But in reality you include it in every course of instruction anyway.

So what are the practical differences?

General Graves. Well, I would have to say that in some of the shorter courses, the exposure is not really large. If you have somebody here for a week or two, for instance, it is not large

REPRODUCED AT THE NATIONAL ARCHIVES

Chairman Zablocki. If the gentleman from New York would yield, I think the key word is on line 11 of the Comparative Print, which says for completion of "all" other courses.

Now, we can modify that. I understood an amendment which the Senate members would propose would strike "all other" and would say "selected courses." This would give discretion to the Executive Branch where completion would be required of human rights courses in "selected courses." This probably would not be the technical, short, one or two week courses.

Would that be satisfactory?

Chairman Church. I think if we have a program in this field which is working pretty well, why should we muck it up with new language that would raise all sorts of questions as to how far this has to go. If somebody comes to take a two week course on repairing jeep engines, isn't it rather ridiculous to change language that might force him to take a general course in American Government, American law, and American educational systems?

Representative Solarz. I frankly think this is a distinction without a difference because I think they are doing it already.

Would we consider yielding to the Senate or receding to the Senate on this with some report language reemphasizing the concern of the Conferees that, where appropriate, this instruction be included in all courses?

Senator Glenn. That would be fine with me.

Representative Broomfield. Why don't we put the whole thing

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

REPRODUCED AT THE NATIONAL ARCHIVES

in the report language?

Chairman Church. It is being done on a practical basis.

Chairman Zablocki. I have no problem with it. But I would suggest that the gentleman from New York explain the House proceeding to the author.

(General laughter.)

Chairman Zablocki. On (b) will the Senate recede? What (b) provides is it allows grant training recipients to purchase additional training on a reduced cost basis.

The House will recede on (a) if the Senate will recede on (b). Is that all right?

Senator Glenn. Mr. Chairman, I move that we accept the House position on (b) if it accepts ours on (a).

Chairman Zablocki. Gee, we could have done that a half hour ago if we had tried.

(General laughter.)

Chairman Church. All right.

What time are we to return to Conference, at 2:00 o'clock?

Mr. Binnendijk. Yes, 2:00.

Chairman Church. Clem, how much longer do you want to go this morning?

Chairman Zablocki. I think we can do item 17, which refers to special authority, Presidential determination and report to Congress. The special authority has been used in the past to waive outdated prohibitions or restrictions in order to provide useful

REPRODUCED AT THE NATIONAL ARCHIVES

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

types of assistance.

The aid provided was important to U.S. security but hardly vital.

We have a problem with the Senate version of the word "vital." In the House version it said that the special authority of the President determines that to do so is important to United States security.

Chairman Church. We have some language prepared that we would like to circulate.

We will make that available to your side so that you can look at it and we can take this up this afternoon. This is a rather broad waiver authority. I think we ought to look at it carefully.

Chairman Zablocki. Okay.

Chairman Church. We will give you this language to look at.

Chairman Zablocki. Item 18 is reports to Congress on intelligence activities.

Chairman Church. I believe the House has receded on this one already.

Chairman Zablocki. We have.

Chairman Church. We had already done that, yes.

Chairman Zablocki. All right, let's go to item 19. This is prohibition on assistance to the People's Republic of China.

The House bill prohibits military assistance to the People's

REPRODUCED AT THE NATIONAL ARCHIVES

Republic of China.

Chairman Church. Let's put it in the report. We don't want to insult the People's Republic of China by giving this the status of law.

No military aid is planned anyway.

Chairman Zablocki. That's right.

If there is no objection on the part of the House Conferees, the House will recede with the understanding that there will be language in the report.

Chairman Church. May I just suggest that that language in the report be written in a way that does not give offense; in other words, that it is the understanding of the Congress that no military aid is planned and that we expect that that understanding will be honored.

Let's put in something to that effect, in very diplomatic language.

Chairman Zablocki. Okay.

Next is item 20. May we have distributed a copy of that amendment, please.

Item 20 is export controls of depleted uranium incorporated in defense articles.

The Senate amendment exempts, if a determination is made, depleted uranium incorporated in defense articles or commodities solely to take advantage of high density of pyrophoric characteristics from export control under the Atomic Energy Act of 1954 and the Nuclear Non-Proliferation Act of 1979, if

REPRODUCED AT THE NATIONAL ARCHIVES

such items are already controlled under the Arms Export Control Act or the Export Administration Act of 1979.

Chairman Church. Whose amendment is this?

Mr. Binnendijk. This is a Stone amendment which was suggested by the Administration.

Essentially, we passed a similar provision last year. This is a technical correction of that. It allows that munitions, such as tank rounds, which use depleted uranium as a round itself, would be allowed for sale overseas.

Chairman Zablocki. The House is prepared to recede with an amendment and report language of the proposed amendment to this item, 20, on page 19 of the Comparative Print, line 4 of the Senate, which reads, "depleted in the isotope 235 is to be incorporated." Delete the words "to be." It would read, "depleted in the isotope 235 is incorporated."

Senator Glenn. So the difference here would be whether it was a finished product or not.

I would agree with striking "to be."

Chairman Church. So as to have a finished item.

Senator Glenn. Yes, so you have a finished item and you can't just make bulk shipments which then could be used for a lot of different things we might or might not agree with. If we know what shape it is in going out of the country, we know what they can do with it.

Chairman Church. I agree with that.

REPRODUCED AT THE NATIONAL ARCHIVES

Senator Glenn. This does relieve it from the Nuclear Non-Proliferation Act.

Chairman Zablocki. And we will have language explaining the position in the report.

Senator Glenn. Yes.

I move that we recede to the House on this.

Chairman Zablocki. No, the House will recede.

Senator Glenn. Oh, you will recede to us.

Chairman Zablocki. Yes, with an amendment.

Senator Glenn. You are right. As amended.

Chairman Church. Would the NRC have a role in these determinations?

Chairman Zablocki. No, I don't think so.

Jack Bingham is not in the room at the moment, but I am almost positive that NRC is not involved.

Mr. Brady. It should not be because there is no nuclear capability or no nuclear qualities, as I understand it.

Senator Glenn. Mr. Chairman, I am told by staff that we do have a letter from NRC that says they do not see this as any threat and they would agree this should not come under their jurisdiction.

Chairman Church. Okay. Then that takes care of that.

Chairman Zablocki. Item 21 is military operations in Angola.

The Senate version prohibits assistance of any kind for

REPRODUCED AT THE NATIONAL ARCHIVES

military or paramilitary operations in Angola unless the President determines such assistance is in the United States' national security interest and provides for a detailed report to Congress if such a determination is made.

Chairman Church. Clem, I think we should not decide this one in the absence of any Republican members on our side.

I think maybe we ought to adjourn and come back this afternoon.

Chairman Zablocki. Maybe we can take up item 22 before we adjourn this morning.

Chairman Church. All right.

Chairman Zablocki. Item 22 is reports on lease of defense property.

The House is prepared to recede with an amendment.

On page 29 of the side by side print, on line 29 -- did you pass the amendment over to the other side? If not, would you do so, please.

Senator Glenn. Did we leave item 21?

Chairman Zablocki. We are coming back to it later.

Chairman Church. The lease would have to be subject to the approval of the Secretary of State, which is a good idea.

Chairman Zablocki. Yes, that is the purpose of our amendment.

Chairman Church. That's good. I see no objection to that. I would be agreeable to it.

Chairman Zablocki. Then the House will recede with an

REPRODUCED AT THE NATIONAL ARCHIVES

36

amendment.

Shall we adjourn now until 2:00 p.m.?

Chairman Church. Yes.

Thank you, Clem.

Chairman Zablocki. Thank you, Frank. See you later.

(Whereupon, at 12:16 p.m., the Joint Conferees recessed, to reconvene at 2:00 p.m., the same day.)

\- - -

300 7TH STREET, S.W., REPORTERS BUILDING, WASHINGTON, D.C. 20024 (202) 554-2345

ALDERSON REPORTING COMPANY, INC.