UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | ) | No. 2:20-cv-0111-RAJ |
| | ) | |
| Plaintiffs, | ) | **FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF STATE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# EXHIBIT 6

H.R. Rep. 97-58 (May 19, 1981)

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

97TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
1st Session No. 97–58

# INTERNATIONAL SECURITY AND DEVELOPMENT COOPERATION ACT OF 1981

---

## REPORT

OF THE

## COMMITTEE ON FOREIGN AFFAIRS

TOGETHER WITH

## ADDITIONAL VIEWS

[INCLUDING COST ESTIMATE OF THE CONGRESSIONAL BUDGET OFFICE]

ON

## H.R. 3566

TO AUTHORIZE APPROPRIATIONS FOR THE FISCAL YEARS 1982 AND 1983 FOR INTERNATIONAL SECURITY AND DEVELOPMENT ASSISTANCE AND FOR THE PEACE CORPS, AND FOR OTHER PURPOSES



MAY 19, 1981.—Ordered to be printed

---

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1981

78–752 O

## COMMITTEE ON FOREIGN AFFAIRS

CLEMENT J. ZABLOCKI, Wisconsin, *Chairman*

L. H. FOUNTAIN, North Carolina
DANTE B. FASCELL, Florida
BENJAMIN S. ROSENTHAL, New York
LEE H. HAMILTON, Indiana
JONATHAN B. BINGHAM, New York
GUS YATRON, Pennsylvania
STEPHEN J. SOLARZ, New York
DON BONKER, Washington
GERRY E. STUDDS, Massachusetts
ANDY IRELAND, Florida
DAN MICA, Florida
MICHAEL D. BARNES, Maryland
HOWARD WOLPE, Michigan
GEORGE W. CROCKETT, Jr. Michigan
BOB SHAMANSKY, Ohio
SAM GEJDENSON, Connecticut
MERVYN M. DYMALLY, California
DENNIS E. ECKART, Ohio
TOM LANTOS, California
DAVID R. BOWEN, Mississippi

WILLIAM S. BROOMFIELD, Michigan
EDWARD J. DERWINSKI, Illinois
PAUL FINDLEY, Illinois
LARRY WINN, Jr., Kansas
BENJAMIN A. GILMAN, New York
ROBERT J. LAGOMARSINO, California
WILLIAM F. GOODLING, Pennsylvania
JOEL PRITCHARD, Washington
MILLICENT FENWICK, New Jersey
ROBERT K. DORNAN, California
JIM LEACH, Iowa
ARLEN ERDAHL, Minnesota
TOBY ROTH, Wisconsin
OLYMPIA J. SNOWE, Maine
JOHN LeBOUTILLIER, New York

JOHN J. BRADY, Jr., *Chief of Staff*
EVERETT E. BIERMAN, *Minority Staff Director*

(II)

# CONTENTS

| | Page |
|---|---|
| Committee comment | 1 |
| Committee action | 9 |
| Authorizations | 10 |
| Special committee concerns | 11 |
|    Clark amendment | 11 |
|    Guatemala | 12 |
|    Honduras | 12 |
|    Conflict on Central America | 12 |
|    Symington amendment (Foreign Assistance Act, section 669) | 13 |
|    Assistance to Asian countries | 13 |
|    Uganda | 13 |
|    Zimbabwe | 14 |
|    Mozambique | 14 |
| Section-by-section analysis: | |
|    Section 1—Short title | 15 |
|    Title I—Military and related assistance and sales: | |
|       Section 101—Reports to Congress | 19 |
|       Section 102—Charges for use and nonrecurring research, development, and production costs | 20 |
|       Section 103—Foreign military sales authorization and aggregate ceilings | 20 |
|       Section 104—Periodic review of items on the munitions list | 21 |
|       Section 105—Charges for administrative services | 22 |
|       Section 106—Special defense acquisition fund | 22 |
|       Section 107—Leasing of defense articles | 23 |
|       Section 108—Military assistance | 25 |
|       Section 109—Stockpiling of defense articles for foreign countries | 26 |
|       Section 110—International military assistance and sales program management | 27 |
|       Section 111—International military education and training | 28 |
|       Section 112—Peacekeeping operations | 30 |
|       Section 113—Restrictions on military assistance and sales to El Salvador | 31 |
|    Title II—Economic support fund: | |
|       Section 201—Authorization of appropriations | 33 |
|       Section 202—Provisions relating to use of funds | 35 |
|    Title III—Development assistance: | |
|       Development concerns: | |
|          1. Effectiveness of AID programs | 39 |
|          2. Ocean freight reimbursement | 40 |
|          3. Private voluntary organizations | 40 |
|          4. Appropriate Technology International | 41 |
|          5. Caribbean Development Bank | 41 |
|       Section 301—Agriculture, rural development, and nutrition | 42 |
|       Section 302—Population and health | 43 |
|       Section 303—Education and human resources development | 44 |
|       Section 304—Energy development and production | 45 |
|       Section 305—Private voluntary organizations and selected development activities | 45 |
|       Section 306—Human rights | 46 |
|       Section 307—Environment and natural resources | 47 |
|       Section 308—Sahel development program | 48 |
|       Section 309—Housing guaranty programs | 48 |
|       Section 310—International organizations and programs | 48 |

Section-by-section analysis—Continued — Page

Title III—Development assistance—Continued
Section 311—Trade and development program ......................... 51
Section 312—African Development Foundation ....................... 51

Title IV—Food for peace:
1. Study on developmental use of Public Law 480 ............................ 53
2. Public Law 480 title II in Africa ....................................... 54
Section 401—Repeal of obsolete foreign currency provisions ................. 54
Section 402—Emergency or extraordinary relief requirements .............. 54
Section 403—Self-help measures to increase agricutural production..... 54
Section 404—Assessment of self-help provisions ........................ 54
Section 405—Allocations of title I assistance............................ 55
Section 406—Title II minimum............................................ 56
Text of Public Law 480 provisions approved by the Committee on Foreign Affairs for inclusion in the 1980 agriculture legislation........ 56

Title V—Other assistance programs:
Section 501—American schools and hospitals abroad.............................. 57
Section 502—International narcotics control............................ 57
Section 503—International disaster assistance........................... 58
Section 504—Assistance for victims of strife in El Salvador ................. 58

Title VI—Peace Corps:
Section 601—Establishment as an independent agency........................... 59
Section 602—Authorization of appropriations............................. 60
Section 603—Integration of disabled people............................. 60
Section 604—Restoration of certain authorities formerly contained in the Foreign Service Act.................................................. 60
Section 605—Miscellaneous conforming amendments ............................ 61

Title VII—Miscellaneous provisions:
Section 701—Excess property...................................... 61
Section 702—Construction of productive enterprises in Egypt............... 61
Section 703—Compensation for participating agency employees........... 62
Section 704—Operating expenses................................... 62
Section 705—Inspector General.................................... 62
Section 706—Use of certain Polish currencies........................... 63
Section 707—Findings regarding global security ....................... 64
Section 708—Findings and declaration of policy regarding world hunger................................................................. 64
Section 709—World food security reserves................................ 64
Section 710—Promoting the development of the Haitian people and providing for orderly emigration from Haiti............................. 64
Impact of suspending assistance to Haiti............................. 67
Section 711—Assistance for Nicaragua............................... 67
Section 712—Reaffirmation of support for human rights provisions..... 67
Section 713—External debt burdens of Egypt, Israel, and Turkey........ 68
Section 714—Lebanon ............................................... 68
Section 715—Assistance and sales to Argentina ........................ 68
Section 716—Assistance for El Salvador................................ 70
Section 717—Savings provision...................................... 70

Required reports section:
Cost estimate............................................................ 70
Inflationary impact statement........................................... 71
Statements required by clause 2(l)(3) of House rule XI .................... 71
(a) Oversight findings and recommendations............................ 71
(b) Budget authority .................................................. 71
(c) Committee on Government Operations summary ...................... 72
(d) Congressional Budget Office cost estimate .......................... 72

Changes in existing law made by the bill, as reported.......................... 74

Additional views:
Hon. William S. Broomfield and Hon. Robert I. Lagomarsino....... ............... 127
Hon Edward J. Derwinski ................................................. 128
Hon. Paul Findley ...................................................... 131

| 97TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
|---|---|---|
| *1st Session* | | No. 97–58 |

## INTERNATIONAL SECURITY AND DEVELOPMENT COOPERATION ACT OF 1981

———————

MAY 19, 1981.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

———————

Mr. ZABLOCKI, from the Committee on Foreign Affairs, submitted the following

# R E P O R T

together with

## ADDITIONAL VIEWS

[To accompany H.R. 3566]

[Including cost estimate of the Congressional Budget Office]

The Committee on Foreign Affairs, to whom was referred the bill (H.R. 3566) to authorize appropriations for the fiscal years 1982 and 1983 for international security and development assistance and for the Peace Corps, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

### COMMITTEE COMMENT

Foreign assistance is an essential foreign policy tool for the promotion of U.S. interests throughout the world. The question "why foreign aid" has a variety of answers as the kinds of aid—military, economic, development food aid, et cetera—respond to a range of U.S. strategic, political, economic, and humanitarian interests. In H.R. 3566, the International Security and Development Cooperation Act of 1981, the Committee on Foreign Affairs has approved programs balanced to reflect these varied U.S. interests and to insure efficient and effective use of foreign aid funds.

2

## COSTS SAVINGS

The limited availability of Federal resources, as evidenced in all aspects of the Federal budget process, were considered carefully in the preparation of H.R. 3566. In recognition of that fiscal reality and as an example of the committee's own belt-tightening responsibilities, the committee reduced the total authorization in this legislation $654,124,000 below President Reagan's requested foreign assistance budget.

### PURPOSES OF H.R. 3566

*Military support for U.S. friends and allies.*—$1.07 billion is authorized for each of the fiscal years 1982 and 1983 for foreign military sales, grants, training, and peace-keeping operations to help nations friendly or allied to the United States to strengthen their military capabilities. The strengthening of their defenses in turn contributes to the security of the United States.

*U.S. access to military facilities.*—Security and economic assistance to the Philippines, Portugal, and Spain, as well as Kenya, Somalia, Oman, Greece, and Turkey, helps the defenses and economies of their allies and assists them in providing base facilities for U.S. forces in these strategic regions of the world.

*Middle East peace.*—Encouraging the peace process in the Middle East region is a major objective of H.R. 3566. The following table shows U.S. assistance authorized in this bill to key countries of the region in fiscal year 1982:

[In millions of dollars]

| Country | Grant military assistance | FMS financing | Grant military training | ESF/ Peacekeeping | Development assistance | Total |
|---|---|---|---|---|---|---|
| Egypt | 100.000 | 800.0 | 2.0 | 771.0 | | 1,673.000 |
| Israel | | [1]1,400.0 | | 806.0 | | 2,206.000 |
| Jordan | [2].437 | 50.0 | 2.0 | 20.0 | | 72.437 |
| Lebanon | | 15.0 | .840 | 7.0 | | 22.840 |
| Oman | | 40.0 | .100 | 15.0 | | 55.100 |
| Yemen | 2.500 | 12.5 | 1.500 | | 21.1 | 37.600 |
| Middle East regional cooperation | | | | 4.0 | 4.4 | 8.400 |
| Program support and private voluntary organizations | | | | 7.0 | | 7.000 |
| Sinai support mission | | | | 10.0 | | 10.000 |
| Total for region | 102.937 | 2,317.5 | 6.440 | 1,640.0 | 25.5 | 4,092.377 |

[1] $500 million credits with payment waived, an additional $50 million in direct credits, and $850 million in loan guarantees.
[2] Windup costs, for programs in prior fiscal years.

*Economic development assistance.*—$1.9 billion is authorized in fiscal year 1982 and $2 billion in fiscal year 1983 for economic development to more than 70 Third World countries. Development assistance serves humanitarian, economic, and political objectives as it improves people's lives, strengthens U.S. export markets, helps to insure supplies of strategic minerals and other important raw materials, and encourages political stability. H.R. 3566 also contains significant provisions to strengthen indigenous energy development in oil-importing Third World countries.

3

*Food for the hungry and for development.*—H.R. 3566 provides assurance of supplies under the food-for-peace program for regular humanitarian nutritional programs of private voluntary agencies among poor populations abroad, strengthens the economic development use of U.S. food aid, and contains a policy declaration on world hunger.

*Special humanitarian assistance.*—$50 million is authorized in each fiscal year 1982 and 1983 for special programs to support long-term rehabilitation for African refugees, $27 million each year to provide immediate relief to victims of disasters abroad, and $5 million for special programs for Salvadoran refugees.

*Trade and development.*—$10 million is authorized in fiscal year 1982 and $10.89 million in fiscal year 1983 for the trade and development program. This program provides seed funds for U.S. firms involved in feasibility and other studies for major development projects in developing countries which can lead to large foreign purchases of U.S. goods and services. It also promotes U.S. Government and private enterprise involvement in development projects overseas the costs of which are born by the foreign government.

*Peace Corps.*—In addition to authorizing $105 million in fiscal year 1982 and $114 million in fiscal year 1983 to support Peace Corps volunteers working in nearly 60 countries, H.R. 3566 removes the Peace Corps from ACTION and establishes it as an independent agency in the executive branch. This move is designed to strengthen the vitality of the Peace Corps unique person-to-person diplomacy.

*Drug control.*—$37.7 million is authorized in fiscal year 1982 and $41 million in fiscal year 1983 to strengthen narcotics control programs of countries cooperating with the United States in trying to control international drug trafficking.

### BALANCED RESPONSE TO U.S. INTERESTS

The provisions of H.R. 3566 represent a careful balancing of the variety of foreign policy interests and issues which confront the United States—from those immediate challenges facing the United States and its friends and allies today, to more general concerns which threaten to become future crises if ignored at this time.

The largest portion of funds authorized by this legislation goes to support programs which are vital in enabling U.S. friends and allies to strengthen their defenses, promote political stability, and provide U.S. forces with access to strategically located facilities. These important programs promote clearly perceived U.S. security needs.

A substantial portion of the programs authorized by H.R. 3566, also addresses less direct but nonetheless vital aspects of U.S. and worldwide security. Reflecting H.R. 2793, legislation referred to the committee known as the Hunger and Global Security Act, H.R. 3566 states that U.S. security is affected by a broad range of global problems, including hunger, disease, extreme poverty, shortages of natural resources, mismanagment of the environment, and large-scale refugee problems.

*Recognition of long-term global issues.*—Over the last year, several reports have presented thorough analyses of the costs of failing to act now to improve economic and social conditions of poor people

and poor countries. The Presidential Commission on World Hunger concluded that "there are compelling moral, economic, and national security reasons for the U.S. Government to make the elimination of hunger the central focus of its relations with developing countries * * *." The Global 2000 study, an interagency analysis of current trends in the world environment, states that "if present trends continue, the world in 2000 will be more crowded, more polluted, less stable ecologically, and more vulnerable to disruption * * *." Finally, the conclusions of a prestigious international commission headed by former West German Prime Minister Willy Brandt agreed that the North cannot prosper or improve its situation unless there is greater progress in the South.

These statements from a variety of eminent sources, as well as the current and dramatic example of the impact of oil prices on the world economy, make it clear that U.S. security in the coming years cannot be guaranteed by military strength alone; it will be affected by conditions in the rest of the world, such as rates of population increase, food production, environmental quality, and ability to efficiently develop and conserve key resources. The committee believes that in seeking to help countries deal with their immediate problems, the United States can not neglect support for long-term development, as to do so will only contribute to more serious crises in the future.

### TRADE RELATIONS ENHANCED

Foreign assistance, in addition to its role in promoting U.S. security interests, also is an important element in U.S. economic relations, particularly with developing countries, which represent an increasingly important segment of the international economy. As figure 1 indicates, developing countries, which have been the fastest growing segment of the U.S. export market in recent years, now purchase nearly 40 percent of U.S. exports. U.S. economic assistance, by assisting the economic growth of developing countries, likewise helps maintain and expand demand for U.S. exports. On the import side, the United States is dependent on developing countries for many key resources (see figure 2). Foreign aid programs are one way the United States can concretely demonstrate to these countries its interest in expanding economic relations with them.

### U.S. JOBS CREATED

Since 70 percent of foreign aid money is spent to procure goods and services in the United States (see figure 3), foreign assistance spending creates jobs in the United States. Based on Commerce Department estimates that each $1 billion in U.S. exports creates 40,000–50,000 jobs in this country, the foreign assistance and credits authorized in this bill represent up to 450,000 American jobs.

### BIPARTISAN SUPPORT

H.R. 3566 is a product of bipartisan teamwork by the Committee on Foreign Affairs, acting on requests received from President Reagan.

## SUMMARY

The provisions of H.R. 3566 represent a careful balance of the tools needed to meet U.S. political, economic, security, and humanitarian interests. Clearly these issues overlap. Our humanitarian interest in feeding a child today provides the basis for his contribution to the political and economic stability of his nation—and the world—in the future. The immediate security provided by military assistance in this bill helps make this possible. The programs and policies authorized in this legislation will further these vital U.S. interests.



*Figure 1*

7



U.S. IMPORT RELIANCE ON DEVELOPING COUNTRIES FOR SELECTED MINERALS, METALS, AND RAW MATERIALS
1979
(Percentage Of Total Imports)

| Mineral | Percentage | Use |
|---|---|---|
| Graphite (crystal & flake) | 100% | crucibles, grinding, lapping burnishing |
| Ferrocolumbium | 100% | steel and aerospace industries |
| Natural Rubber | 100% | transportation, industrial prod. |
| Strontium | 99.58% | TV picture tubes, pyrotechnic |
| Tin (metal) | 95.08% | electrical, construction, transport. |
| Graphite (crystalline & amorphous) | 90.20% | iron and steel production |
| Bauxite | 88.40% | metal production, refractories, chemicals, abrasives |
| Tin (concentrate) | 86.42% | electrical, construction, transport. |
| Zinc | 79.69% | construction, transportation, electrical equipment |
| Cobalt | 75.31% | industrial and aircraft engines, computers |
| Beryllium | 70.78% | nuclear reactors, aerospace, electronics, computers, communications |
| Copper | 65.99% | electrical, industrial, transport. |
| Tungsten Ore | 56.04% | metal working, construction |
| Silver | 53.10% | photography, electronic components, sterlingware |
| Columbium (concentrate) | 51.62% | metals, gas industry, machinery |
| Lead | 51.21% | ammunition, batteries, electrical |
| Petroleum | 50.21% | industry, heating |
| Chromium | 38.08% | oil refineries, power plants |
| Iron Ore | 18.07% | steel |
| Manganese (ferro) | 17.27% | steel production, chemical processes |

0%         50%         100%

SOURCE:  U.S. Bureau of Mines, Mineral Experts — all figures exclude China

*Figure 2*



*Figure 3*

### COMMITTEE ACTION

The executive branch request for international security and economic assistance programs for fiscal year 1982 and 1983 was transmitted to Congress on April 6, 1981. The draft legislation was formally introduced in the House, by request, by Hon. Clement J. Zablocki, chairman of the Committee on Foreign Affairs, and Hon. Edward J. Derwinski, as H.R. 3175. The committee also had under consideration the executive branch request for the Peace Corps authorizing legislation for fiscal year 1982, which was transmitted to the Congress on March 24, 1981, in the form of an Executive communication. H.R. 3176, introduced by request by Chairman Zablocki and Hon. William S. Broomfield, ranking minority member of the committee, reflects that communication.

Committee consideration of the foreign aid authorizing legislation included the following:

#### SUBCOMMITTEES

Subcommittees singly or jointly conducted hearings and made recommendations for international security and economic assistance legislation as follows:

Subcommittee on International security and Scientific Affairs (chairman, Clement J. Zablocki)—March 12, March 19, March 23, and April 9; Subcommittee on Europe and the Middle East (chairman, Lee H. Hamilton)—February 26, March 12, March 16, March 23, March 25, April 6, April 7, April 8, and April 9; Subcommittee on International Economic Policy and Trade (chairman, Jonathan B. Bingham)—March 11, 24, 26 and 31; Subcommittee on Asian and Pacific Affairs (chairman, Stephen J. Solarz)—March 23, March 24, March 25, March 26, March 30, March 31, and April 6; Subcommittee on Human Rights and International Organizations (chairman, Don Bonker)—March 12, March 16, and April 2; Subcommittee on Inter-American Affairs (chairman, Michael D. Barnes)—March 23, March 30, April 1, and April 8; Subcommittee on Africa (chairman, Howard Wolpe)—March 19, March 24, March 26, March 31, April 1, April 2, and April 27.

#### FULL COMMITTEE

In addition to the hearings conducted by the subcommittees, the full committee received testimony from the Secretary of State, the Secretary of Agriculture, the Acting Director of the International Development Cooperation Agency, and Administrator of the Agency for International Development, the Acting Director of the Peace Corps, and from private witnesses. The full committee received recommendtions from the subcommmittee on April 28, and proceeded to mark up the draft authorizing legislation at sessions on April 29, April 30, May 5, May 6, May 7, concluding consideration May 12, and May 12 the committee then approved the draft legislation, as amended, and agreed to introduce a clean bill.

On May 13, Chairman Zablocki, along with 18 cosponsors, introduced a clean bill, H.R. 3566, which incorporated the provisions previously agreed to by the full committee. That measure, which authorizes international security and economc assistance programs

for fiscal years 1982 and 1983, was ordered favorably reported by a voice vote on May 13, 1981.

## AUTHORIZATIONS

The principal purpose of H.R. 3566 is to authorize appropriations totaling $6,026,883,000 for fiscal year 1982 and $6,215,930,000 for fiscal year 1983 for certain international security and economic assistance programs. The following table compares the amounts of such authorizations for fiscal year 1981, the amounts appropriated for fiscal year 1981 under the most recent continuing resolution (H.J. Res. 644; Publc Law 96–536), the amounts requested by the executive branch under the current administration for fiscal year 1982, and those amounts recommended by the committee for fiscal year 1982 and fiscal year 1983, as provided by this bill:

COMMITTEE RECOMMENDATIONS FOR FOREIGN ASSISTANCE, FISCAL YEAR 1982

[In thousands of dollars]

| | 1981 authorization | 1981 appropriations (CR) | Reagan 1982 request | Committee recommendations 1982 | Zablocki amendment 1983 |
|---|---|---|---|---|---|
| Title I—Military assistance: | | | | | |
| FMS.. | 500,000 | 500,000 | 1,481,800 | [1] 550,000 | 550,000 |
| Special defense acquisition fund | | | | [2] 150,000 | 150,000 |
| Grant MAP | 106,100 | 110,200 | 131,400 | [3] 304,375 | 304,375 |
| IMET | 34,000 | 28,400 | 47,700 | 47,700 | 51,945 |
| Peacekeeping operations | 25,000 | 25,000 | 19,000 | 19,000 | 19,000 |
| Title I subtotal | 665,100 | 663,600 | 1,679,900 | 1,071,075 | 1,075,320 |
| Title II—Economic Support Fund | 2,065,300 | 2,104,500, | 2,581,500 | [4] 2,538,000 | 2,538,000 |
| Title III—Development assistance: Bilateral: | | | | | |
| Agriculture | 713,500 | 635,000 | 727,779 | 747,679 | 814,222 |
| Population | 238,000 | 190,000 | 253,370 | 273,370 | 297,699 |
| Health | 145,300 | 135,000 | 120,405 | 133,405 | 145,278 |
| Education | 101,000 | 101,000 | 109,574 | [5] 109,574 | 119,326 |
| Energy | | | | [6] 39,446 | 42,957 |
| PVO's and SDA | 140,000 | 111,888 | 178,240 | [7] 178,794 | 194,707 |
| Science and technology | 12,000 | 12,000 | 10,000 | ([7]) | |
| Bilateral subtotal | 1,349,800 | 1,184,888 | 1,399,368 | 1,482,268 | 1,614,189 |
| IFAD | | 180,000 | | [8] 45,000 | |
| Sahel development program | 88,442 | 90,500 | 107,500 | 86,558 | 117,068 |
| International organizations | 233,350 | 262,380 | 215,000 | [9] 255,650 | 278,403 |
| Trade and development | | | 6,907 | 10,000 | 10,890 |
| Title III subtotal | 1,671,592 | 1,537,678 | 1,908,775 | [10] 1,879,476 | 2,020,550 |
| Title V—Other assistance: | | | | | |
| American schools and hospitals abroad. | 30,000 | 20,000 | 7,500 | 20,000 | 20,000 |
| International narcotics | 38,573 | 48,758 | 37,700 | 37,700 | 41,055 |
| International disaster assistance | 25,000 | 87,250 | 27,000 | 27,000 | 27,000 |
| Assistance to Central American refugees | | | | 5,000 | 5,445 |
| Title V subtotal | 93,573 | 156,008 | 72,200 | 89,700 | 93,500 |
| Title VI—Peace Corps | 118,000 | 105,000 | 95,000 | 105,000 | 114,345 |
| Title VII—Operating expenses: (AID/IDCA) | 293,800 | 280,000 | 343,632 | 343,632 | 374,215 |

COMMITTEE RECOMMENDATIONS FOR FOREIGN ASSISTANCE, FISCAL YEAR 1982—Continued

[In thousands of dollars]

| | 1981 authorization | 1981 appropriations (CR) | Reagan 1982 request | Committee recommendations 1982 | Zablocki amendment 1983 |
|---|---|---|---|---|---|
| Grand total ... ... ......... ... | 4,907,365 | 4,846,876 | 6,681,007 | 6,026,883 | 6,215,930 |
| Amount below Reagan request ...... . ........ . ...... .... | | | | (−654,124) | |

¹ Entire $550 million earmarked for Israel, repayment for $500 million forgiven  The committee made the following changes in the executive branch request  Subtracted $981.8 million to be provided as combined one-quarter grant/three-quarter FMS loan guaranties instead of FMS direct credits and subtracted $6.5 million from that for Zaire, added $50 million to FMS direct credits for Israel  The net effect is a $931.8 million reduction from the executive branch request for FMS direct credits
  Including off-budget FMS loan guaranties of $3,269,525,000, the committee authorizes a total FMS direct credit and loan guaranty program of $3,819,525,000. Of this program, $1.4 billion is earmarked for Israel and $280 million for Greece
² The executive branch requested authority to establish a SDAF using off-budget funds  The committee felt this new program required special on-budget authorization and appropriation
³ The committee made the following changes to the executive branch request  Added and earmarked $248,375,000 to fund the grant portion of a combined one-quarter grant/three-quarter FMS loan guaranties formula in lieu of FMS direct credits for 15 countries as proposed by the executive branch, subtracted $75 million from the special requirements fund, and subtracted $400,000 from general costs.
⁴ Earmarks $785 million for Israel, $750 million for Egypt, and $15 million for Cyprus  The committee also directed that $21 million each be available for Israel and Egypt to replace funds which were appropriated for those countries in fiscal year 1981 but were reprogramed
⁵ Earmarks $5.7 million for South Africa scholarship fund
⁶ $39.446 million transferred from energy and PVO account to new energy account established by committee action; earmarks $7 million for geological surveys
⁷ $10 million transferred from science and technology account to PVO and SDA account; $30 million added for African resettlement services; $39.446 million transferred from PVO and SDA account to new energy account
⁸ $180 million authorized on no-year basis, limitation of $45 million on appropriation for this purpose in fiscal year 1982
⁹ Earmarks $45 million for UNICEF, $8.2 million for UNEP, and $500,000 for UNITAR.
¹⁰ Of funds available for ch. 1 of pt. I of the Foreign Assistance Act, $2 million is earmarked for the African Development Foundation, and $1.5 million is earmarked for promotion of human rights

## SPECIAL COMMITTEE CONCERNS

### CLARK AMENDMENT

The committee recommends that the Congress not repeal the Clark amendment which prohibits the administration from providing any covert or overt military or paramilitary assistance to groups in Angola.

For the past 3½ years, the United States has been working closely with the United Nations, France, Great Britain, Germany, and Canada to reach an internationally acceptable solution to the question of Namibia. As a member of the Front Line states and as the principal sanctuary for SWAPO forces, Angola has played a critical and cooperative role in the Namibian negotiations. It is the committee's view that if the effort to repeal the amendment should succeed, it will almost certainly end any possiblitity of future Angolan and African assistance in Western efforts to solve the Namibian conflict.

Repeal of the Clark amendment would play into the hands of the Soviets and the Cubans by increasing, not diminishing, the reliance the Angolans now have on the Cubans for security needs. Senior Angolan officials have repeatedly stated that the Cubans are in Angola to provide them with security from South African raids into their country from across the Namibian border. Once the Namibian problem is resolved and the threat of South African raids has disappeared, they say the Cuban presence will decline. In a January 1981 interview with the New York Times, the Angolan Foreign Minister said: "We have said this very clearly to the Americans, when the threat from South Africa disappears, and we believe it will with the independence of Namibia, then we won't need the Cuban presence here."

12

It would be viewed by most African states as a U.S. tilt toward South Africa, which supports the cause of Mr. Jonas Savimbi and his UNITA forces. On March 20, 50 black states at the United Nations warned of the dangers of lifting the Clark amendment. More recently, five key African leaders (including Prime Minister Robert Mugabe of Zimbabwe, President Siaka Stevens of Sierra Leone and current chairman of the OAU, and President Shahu Shagari of Nigeria) have all expressed their deep apprehension and strong reservations about the administration's decision to repeal the Clark amendment.

The American business community has also expressed substantial concern about the consequences such an action will have on their activities in Angola and the rest of Africa.

In the context of a Namibian settlement and the normalization of diplomatic relations between the United States and Angola, the subcommittee thinks a reasonable and persuasive case for the repeal of the Clark amendment could be made and sustained.

### GUATEMALA

The committee notes that there is no formal request for military assistance, grant military training, or foreign military sales financing for Guatemala and consequently the committee has not considered any provision for Guatemala. The committee would expect that no military assistance, training, or foreign military sales (FMS) financing will be provided to Guatemala without prior approval by the Committee on Foreign Affairs.

### HONDURAS

The committee supports the administration's economic assistance proposals for Honduras, but accepts the decision to recommend a doubling in the level of our security assistance only with the condition that the Honduran military continue to support the political liberalization program currently going forward in that country.

The committee strongly endorses the proposed transfer of power to civilian rule through the holding of free elections late this year or early 1982. Any evidence that the military is changing its position and is seeking to obstruct the reform process would lead to a prompt and critical reappraisal of congressional support for security assistance to Honduras.

### CONFLICT IN CENTRAL AMERICA

The committee is concerned about the growing possibility of armed conflict among the countries of Central America and states that it would look with extreme disfavor upon any country initiating hostilities. The committee notes that the use of U.S. equipment for such an invasion of another country is prohibited under sections 502 and 505(d) of the Foreign Assistance Act of 1961, and sections 3(a) and 4 of the Arms Export Control Act, and the committee expects that security assistance would be suspended under these sections in the event of an invasion.

### SYMINGTON AMENDMENT (FOREIGN ASSISTANCE ACT, SEC. 669)

The administration requested a change in section 669 of the Foreign Assistance Act which would enable the President more easily to waive the restrictions on assistance to countries possessing unsafeguarded uranium enrichment facilities. The only country to date to which these restrictions have been applied is Pakistan, which had U.S. economic and military assistance suspended in April 1979.

The committee believes it inappropriate to consider altering section 669 without having received from the administration a clear statement of its nuclear non-proliferation policy. While the committee is encouraged by recent, high-level administration testimony regarding its perception of nuclear proliferation as a serious security threat, the methods which will be used by the administration to prevent the further spread of nuclear weapons capabilities have yet to be elaborated upon.

In attempting to address the severe security threats faced by Pakistan as a result of the Soviet invasion of Afghanistan, the administration has recently requested $100 million in economic support funds for Pakistan for fiscal year 1982. However, the committee has not yet received sufficient information regarding the total proposed program for Pakistan to give the matter the complete consideration it deserves. When it receives the necessary information from the administration, the committee will consider in a timely fashion both the proposed change in section 669 and the request for assistance to Pakistan. The committee wishes further to emphasize that its deferral of consideration is without prejudice to the administration's efforts to work out a new and closer relationship with Pakistan.

### ASSISTANCE TO ASIAN COUNTRIES

Asia's poverty and great needs indicate that all donors should provide more assistance for economic development. This applies particularly to Japan, Asia's wealthiest nation. Japan has increased its foreign aid to Asian countries sigificantly in recent years, and plans substantial future increases. However, these increases were from a very low base, and Japan still ranks near the bottom in terms of aid extended by wealthy industrial nations. Whatever the merits of Japanese claims that there are constitutional constraints on its defense spending, no such constraints limit its economic assistance, and Japan can and should significantly increase the share of its GNP that is used for foreign aid.

In regard to certain other countries of the area, and as general policy, the Congress urges the administration to press vigorously for continued progress in the fields of human rights and popular participation in its private discussions with the leaders of such countries as the Philippines and the Republic of Korea. Progress in these areas will improve their prospects for long-term political stability.

### UGANDA

The committee believes the administration should pay particular attention to the situation in Uganda and consider making available

additional resources, if conditions improve, to assist that country in its economic recovery and relief efforts.

In December 1980, Uganda held elections to install a civilian democratic regime to replace the provisional government established after the oppressive regime of Idi Amin was toppled. Despite the return to civil rule, the situation in Uganda remains very critical. Drought conditions, refugee problems, continued civil strife, and declining agricultural productivity in both the subsistence and the cash-crop sector have continued to trouble many parts of the country, particularly the north.

The committee supports administration efforts to provide humanitarian relief to Uganda and to establish a meaningful aid program to help that country begin its process of reconstruction and development.

### ZIMBABWE

The committee supports the administration's request for $75 million in Economic Support Fund (ESF) assistance for Zimbabwe in fiscal year 1982. This request is similar to the one made by the previous administration and is consistent with America's support for the Lancaster House Agreement which ended Zimbabwe's 15-year civil war. The committee also endorses the administration's intention to provide $225 million in assistance to Zimbabwe over the next 3 fiscal years.

In the 12 months since Zimbabwe attained its independence it has achieved a remarkable degree of political and economic stability. The Government has promoted reconciliation between Zimbabwe's black and white communities and maintained a commitment to multiracial government. In the economic field, the Government has encouraged white farmers and businessmen to remain in the country and has taken a variety of measures to stimulate the country's economy and attract new foreign investment to Zimbabwe.

### MOZAMBIQUE

The committee urges that the administration consider using funds from the regional Economic Support Fund account for southern Africa to help Mozambique develop and improve its transportation infrastructure which is vital to the development of all of southern Africa.

Mozambique has a vital role to play in the economic revitalization and political stability of the region. It's economy is integrally linked to other states in the region. Mozambique's importance lies in its location as a hub of the region's transportation infrastructure. Mozambique has three important ports (at Maputo, Beira, and Nacala) which are connected by rail lines to the landlocked states of Zimbabwe, Zambia, Swaziland, and Malawi. If these ports and the associated railroads are not adequately maintained, economic development in the region will be hindered.

The committee also recommends that the administration consider lifting the suspension on shipments of Public Law 480 title II emergency food to Mozambique. The food shipments were suspended after the expulsion of four American diplomats. The food was

being provided for humanitarian reasons to assist the people of Mozambique overcome acute food shortages resulting from a severe drought in the central and southern part of the country. As a result of the drought, half of Mozambique's 10 million people are short of food. The committee notes that this was the first time the United States has suspended Public Law 480 emergency food shipments to Africa for political reasons.

The committee urges the appointment of a U.S. Ambassador to Mozambique feeling this could help improve relations between the two countries.

## SECTION-BY-SECTION ANALYSIS

### Section 1—Short Title

This section cites the title of the bill as the "International Security and Development Cooperation Act of 1981."

#### TITLE I—MILITARY AND RELATED ASSISTANCE AND SALES

Title I authorizes the appropriation of funds for fiscal years 1982 and 1983 for grant military assistance, grant military training, credit financing for foreign purchase of U.S. defense items, peacekeeping operations, and the Special Defense Acquisition Fund as follows:

| | Fiscal year— | |
| --- | --- | --- |
| | 1982 | 1983 |
| Foreign military sales (FMS) direct credits (sec. 103) .. ....... ..... .. | $550,000,000 | $550,000,000 |
| Special defense acquisition fund (sec. 106)........... ............ ............... ......... ........ | 150,000,000 | 150,000,000 |
| Military assistance program (sec. 108)  ...  .. ......... .......... ...  . | 304,375,000 | 304,375,000 |
| International military education and training (IMET) (sec. 111) ...................... ... ....... | 47,700,000 | 51,945,000 |
| Peacekeeping operations (PKO) (sec 112) .  ... .. ... ... ..... .  . | 19,000,000 | 19,000,000 |
| Total...... ... ... . ......... .. .. ........... .. ..... .. ... .... . | 1,071,075,000 | 1,075,320,000 |

The committee-recommended authorization for fiscal year 1982 is $608,825,000 less than the total amounts proposed by the executive branch. This reduction will provide the U.S. Government with budgetary as well as long-term financial savings while still advancing vital U.S. national security interests. In fact, proposed foreign recipients of U.S. military aid will still be eligible to receive the same amount of assistance, except where specifically reduced, but on terms more advantageous to the United States than under the executive branch proposal. The budget reduction and savings are produced by the formula adopted by the committee whereby all low-interest FMS direct credits proposed by the executive branch (except for Israel) will be provided instead as combined one-quarter grant/three-quarter FMS loan guaranties. Grants, like FMS direct credits, require dollar-for-dollar authorization and appropriation; FMS loan guaranties do not and are provided at market interest rates.

The combined grant/FMS guaranties formula will allow extension of financing to the same 15 countries proposed to receive FMS direct credits by the executive branch but at one-quarter the cost to the U.S. taxpayer in fiscal year 1982. The combined total of one-

fourth grant and three-fourths guaranties under the committee formula will equal the amount of direct credits proposed, except for Zaire. The committee reduced financing proposed for Zaire by $6,500,000.

The formula does not affect other FMS loan guaranties proposed for all intended recipient countries.

Title I assistance is designed to help American friends and allies throughout the world obtain necessary military supplies and training to support their own national security requirements. This title will provide funding for peacekeeping operations in Cyprus and the Middle East and will establish a new Special Defense Acquisition Fund to facilitate procurement of U.S. defense items in high demand by foreign purchasers.

As with past years, authorization under the title will provide financing, which otherwise would be difficult to obtain, for foreign countries to purchase U.S. defense articles and services. Thus, the authorized ceilings for FMS direct credit and guaranties and the related grant military assistance contained in the bill will allow $4,067,900,000 in financing to be extended in fiscal year 1982 to foreign purchasers of U.S. equipment. Although grant military assistance is authorized, none of these funds will be used to establish country grant material programs as has been the practice with MAP in the past. Instead, most of the grant assistance funds will only be used under the authority of section 503(a)(3) of the Foreign Assistance Act of 1961, in conjunction with FMS loan guaranties to purchase U.S. defense items. The rest of the grant military assistance authorization will cover administrative and program costs associated with prior year MAP recipients and a $25 million MAP Contingency Fund.

The main recipients of military assistance will continue to be countries of the Middle East, particularly Israel and Egypt. As in the past, Israel is authorized a total $1.4 billion in foreign military sales financing, repayment forgiven on $500 million. Similarly Israel will also have 30 years to repay for the remaining $900 million with a grace period of 10 years on repayment of principal. In addition, $50 million of the $900 million for Israel will be direct credits for which low interest rates may be set.

Egypt is programed to receive $100 million in grant and $800 million in FMS guaranteed financing. Together, these funds for Israel and Egypt, which constitute over half of the worldwide FMS financing program, are intended to help maintain their ability to sustain their own national defense and proceed more securely with full implementation of the Egyptian-Israeli peace treaty.

Military assistance under title I will continue to assist other countries with which the United States has important security relationships. Assistance is authorized for Kenya, Somalia, and Oman which have just recently agreed to provide U.S. access to facilities important to the growing U.S. military role in the Persian Gulf and Indian Ocean. Other countries, such as Spain, Portugal, Greece, Turkey, and the Philippines continue to allow the United States access to bases and are also programed to receive military assistance. Finally, assistance under the title also contributes to worldwide security by assisting treaty allies and other countries important to U.S. interests, some of which face increased external

threat. For example, the title provides security assistance for Korea and Thailand.

In authorizing security assistance for Somalia, the committee reaffirms the need for verified assurances that the Somalis will not reintroduce regular forces into the Ogaden and endorses the policy of the Somali Government to avoid the presence of any regular Somali units in the Ogaden. It is also the committee's intent that U.S. military equipment provided to Somalia will not be used in the Ogaden. Any change in this policy could risk U.S. involvement in the Ogaden conflict, create new opportunities for Soviet and Cuban influence in Ethiopia, and generate tensions in the region.

As a means of reducing Soviet and Cuban influence in Ethiopia, the Administration is strongly urged to work with all parties in the Horn, including Ethiopia. Such an initiative by the United States, or in concert with efforts by European countries to whom all nations in the region are well disposed, would help to achieve a political and diplomatic solution to the conflict in the Ogaden—and in Eritrea as well. Current military and economic aid programs need to be articulated with a coherent vision of a peaceful developing region with which we can enjoy good relations, and be supported by an active U.S. diplomacy. In this connection the committee emphasizes particularly the need for high-level representation of U.S. views in Ethiopia, and for pursuing recent progress in resolving cases in which U.S. companies were nationalized without compensation—resulting in the termination of U.S. development assistance to Ethiopia.

The committee is concerned by the continued regional conflict in the Western Sahara, and remains convinced that a negotiated, political solution is in the interests of the United States as well as Morocco and the other parties to the conflict. Therefore, the committee reaffirms the following language regarding the sale of arms to Morocco suitable for use in the Western Sahara from its Report on the International Security and Development Cooperation Act of 1980:

> With respect to Morocco, the committee believes that the purposes of arms sales to that country are to strengthen Morocco's capability to defend its territorial integrity and to encourage movement toward meaningful negotiations to bring about a peaceful political resolution to the Western Sahara conflict. Since a primary purpose of the arms sales proposals presented to the Congress in January 1980 was to encourage Morocco to enter negotiations, it is the committee's view that delivery of those arms and services should be related to Morocco's willingness to help achieve a cease-fire, to negotiate all the relevant Western Sahara issues, and to cooperate with international efforts to mediate the dispute.
>
> Accordingly, barring new and extraordinary circumstances such as the introduction of foreign troops into the Western Sahara, the defense articles and services are to be made available to the Government of Morocco as consideration is given to the extent that Morocco demonstrates good-faith efforts to reach a negotiated solution in the Western Sahara. It is also expected that the Polisario and other parties to the conflict demonstrate similar good-faith

efforts to reach a negotiated solution. The committee regrets that at the time of this report there has been no apparent progress toward starting negotiations. The committee supports the executive branch decision to broaden its official contacts in the region with all parties to the conflict.

Several provisions under title I are designed to improve conventional arms transfers policy and procedures. In recognition of the increased costs of defense items and the particular needs concerning NATO, the committee has therefore raised ceilings on required reports to Congress and lifted possible legislative veto for arms sales and third-country transfers to and among NATO members, Australia, New Zealand, and Japan.

The committee has additionally required that foreign leasing of defense articles be conducted under the Arms Export Control Act or Foreign Assistance Act of 1961 and increased congressional oversight prospects with respect to such arms transfers. It has also better defined policy and functions concerning overseas management of security assistance programs.

In making such changes affecting conventional arms transfers policy and procedures, the committee has reaffirmed its commitment to appropriate conventional arms export control. It understands that the executive branch is undertaking a comprehensive interagency review of conventional arms transfer policy and expects consultation with the committee during this reveiw and prompt report of findings upon its completion. The committee is particularly interested in preserving the following qualitative controls on arms transfers:

(1) To avoid being the first supplier to introduce a significantly higher combat capability into a region.

(2) To avoid selling newly advanced weapons systems until they are operationally deployed by the U.S. Armed Forces.

(3) To limit coproduction of significant weapons with developing countries.

The continuation of these guidelines to govern future U.S. foreign arms sales should thereby enhance the prospects for more effective congressional oversight and facilitate executive branch implementation of a comprehensive arms transfer policy for the 1980's.

To improve the decisionmaking process within the executive branch, the committee notes that a centralized body, such as the existing Arms Export Control Board, should be retained and strengthened to provide coherent decisionmaking and to assure a primary role for the Department of State. Within the Department of State, clear lines of authority should be observed, with principal responsibility for security assistance programs placed with the Under Secretary of State for Security Assistance.

Also to improve operations regarding security assistance programs, and to insure that security assistance is not subsidized by the Department of Defense, the committee recommends that the Secretary of Defense expedite a program to centralize all accounting and billing within the Department of Defense for collection of full costs on FMS sales. Sufficient and uniform guidance should be issued to all services to insure the objectives of this centralization. This recommendation is an attempt to rectify the serious financial

management problems and inconsistencies which have resulted in the failure to charge foreign governments hundreds of millions of dollars. Failure to collect for these charges means the U.S. taxpayer must bear these costs since they become absorbed in the DOD budget. The Security Assistance Accounting Center (SAAC) would be a logical candidate to head such a centralized system.

*Section 101—Reports to Congress*

This section consists of five subsections that amend the Arms Export Control Act to change the dollar thresholds for 30-day congressional prenotification on third-country arms transfers, government-to-government arms sales, and commercial arms sales. The section exempts NATO and its members, Australia, New Zealand, and Japan from legislative veto provisions concerning such transfers and sales but retains a prior notification requirement of unspecified length for the exempted countries. Finally, this section increases from 5 to 15 days after each calendar quarter the deadline for submission of price and availability estimates relating to possible future arms sales.

Subsection (a) consists of four programs all relating to third-country transfers, which do the following:

Paragraph (1) amends section 3(d)(1) of the Arms Export Control Act to set dollar thresholds at $14 million for major defense equipment and $50 million for any other defense articles and any defense services for congressional prenotification on third-country transfers of items sold or granted through government-to-government channels. This paragraph also makes conforming changes concerning the types of information provided in the congressional prenotification on third-country transfers.

Paragraph (2) amends section 3(d)(2) of the Arms Export Control Act to exempt NATO and its members, Australia, New Zealand, and Japan from the legislative veto provision in that section concerning third-country transfers of items originally sold or granted through government-to-government channels. This paragraph would still require prenotification of transfers involving the exempted countries, unless the President certifies that an emergency exists which requires that any proposed transfer take effect immediately.

Paragraph (3) amends section 3(d)(3) of the Arms Export Control Act to raise the dollar thresholds from $7 million to $14 million for major defense equipment and from $25 million to $50 million for any other defense articles and any defense services for congressional prenotification on third-country transfers of items sold through commercial channels. It exempts NATO and its members, Australia, New Zealand, and Japan from the 30-day prenotification requirement but still requires a prenotification of unspecified length for transfers involving the exempted countries. Finally, the paragraph makes conforming changes to section 3(d)(3) of the Arms Export Control Act to reflect the amendments to such section.

Paragraph (4) amends section 3(d)(4) of the Arms Export Control Act to make conforming changes required because of the changes made in this section with respect to dollar thresholds for congressional notification and/or legislative veto provisions.

Subsection (b) consists of two paragraphs which do the following:

Paragraph (1) amends section 28(a) of the Arms Export Control Act to extend from 5 to 15 days after each calendar quarter the deadline for submission of price and availability estimates relating to possible arms sales.

Paragraph (2) amends section 28(b) of the Arms Export Control Act to continue dollar thresholds at $7 million for major defense equipment and $25 million for any other defense articles and any defense services on quarterly reports to Congress of FMS letter of offer requests.

Subsection (c) consists of two paragraphs which do the following:

Paragraph (1) amends section 36(b)(1) of the Arms Export Control Act to raise the dollar thresholds from $7 million to $14 million for major defense equipment and from $25 million to $50 million for defense articles and services for congressional prenotification and possible legislative veto of government-to-government arms sales.

Paragraph (2) amends section 36(b)(1) of the Arms Export Control Act to exempt NATO and its members, Australia, New Zealand, and Japan from the 30-day prenotification and legislative veto provisions of that section. This paragraph would still require a prenotification of unspecified length on FMS sales within the dollar thresholds to the exempted countries unless the President certifies that an emergency exists.

Subsection (d) consists of two paragraphs which do the following:

Paragraph (1) amends section 36(c)(1) of the Arms Export Control Act to raise the dollar thresholds from $7 million to $14 million for major defense equipment and from $25 million to $50 million for any defense articles and services for congressional notification of commercial arms sales.

Paragraph (2) amends section 36(c)(2) of the Arms Export Control Act to exempt NATO and its members, Australia, New Zealand, and Japan from the 30-day prenotification and legislative veto provisions of that section. This paragraph would still require a prenotification of unspecified length on commercial arms sales within the dollar thresholds to the exempted countries unless the President certifies that an emergency exists.

Subsection (e) amends section 36(d) of the Arms Export Control Act to make a technical cross-reference change necessitated by the amendments to section 36(c) of the Arms Export Control Act.

### Section 102—Charges for use and nonrecurring research, development, and production costs

This section amends section 21(e)(2) of the Arms Export Control Act to permit the President to waive reimbursement for a proportionate share of charges for use for U.S. plant and production equipment, nonrecurring research, development, and production costs in the case of FMS sales which, if made, would significantly advance U.S. interests in standardization with armed forces of Japan, Australia, or New Zealand. Similar waiver authority is already provided in existing law for NATO member countries.

### Section 103—Foreign military sales authorization and aggregate ceilings

This section consists of four subsections. Three of the subsections amend the Arms Export Control Act to authorize FMS direct credit financing for fiscal years 1982 and 1983, to set ceilings on principal

amounts of direct credit and loan guaranties that may be extended in these fiscal years, to earmark funds for Israel and Greece and to continue special repayment terms for Israel. The fourth subsection also provides long-term repayment on loans for Egypt, Greece, and Turkey. The FMS authorizations of this section take account of the committee formula providing one-fourth grant/three-fourths guaranties instead of low interest FMS direct credits proposed by the executive branch.

Subsection (a) amends section 31(a) of the Arms Export Control Act to authorize $550 million for appropriation for FMS direct credits for each of the fiscal years 1982 and 1983. This is a $50 million increase over amounts authorized and appropriated for fiscal year 1981 but a $931.8 million reduction from the executive branch request for fiscal year 1982. The reduction was made possible by the adoption of a formula that eliminates all direct credits except for Israel. Instead of direct credits, the same countries proposed for direct credits will be eligible to receive a combination of grant assistance and FMS guaranties.

The combined grant-FMS guaranties formula greatly reduces the budget authority and future costs to the United States by reducing subsidized loans. However, designated countries will be eligible to receive the same value of U.S. equipment as with the subsidized FMS direct credits proposed by the executive branch. Of the designated countries, only Zaire was reduced by a total of $6,500,000 in combined grant/FMS guaranties.

Subsection (b) amends section 31(b) of the Arms Export Control Act to set two ceilings applicable in each of the fiscal years 1982 and 1983, one for FMS direct credits at $550 million and the other for FMS loan guaranties credit at $3,269,525,000. A total of $1.4 billion in direct credits and guaranteed loans is earmarked for Israel, $550 million in direct credits. Finally, while the executive branch requested $260 million for Greece, the subsection earmarks $280 million of FMS loan guaranties for Greece.

Subsection (c) amends section 31(c) of the Arms Export Control Act to continue favorable repayment terms for FMS financing to Israel for 2 additional years. As with past years, Israel will have a repayment period of 30 years with an initial 10-year grace period on repayment of principal. Repayment to the U.S. Government of $500 million of the FMS direct credits programed to be extended to Israel during each of fiscal years 1982 and 1983 is forgiven.

Subsection (d) extends the same favorable repayment terms allowed for Israel, excluding forgiveness, for FMS guaranties to Egypt, Greece, and Turkey for fiscal years 1982 and 1983.

*Section 104—Periodic review of items on the munitions list*

This section amends section 38 of the Arms Export Control Act by adding a new subsection (f) requiring the President to periodically review the items on the munitions list to determine what items, if any, no longer warrant export control under section 38. The results of such reviews shall be reported to the Congress at least 30 days before any item is removed from the munitions list. The report must describe the nature of any controls to be imposed on that item under the Export Administration Act of 1979.

The purpose of this section is to respond in a responsible way to legitimate industry concerns about the appropriate level of U.S.

arms export controls. It is consistent with past congressional actions to maintain prudent arms export controls while contemplating removal of items from the munitions list which should no longer be considered defense articles for purposes of this section. While this section does not legislate the removal of any items from the munitions list, the committee expects the executive branch will avoid unnecessary export regulation by conducting thorough reviews of the list on a semiannual basis.

### Section 105—Charges for administrative services

This section amends section 43(b) of the Arms Export Control Act to expand the types of expenses related to foreign military sales which can be included in administrative costs charged to foreign governments. Extraordinary expenses for which foreign governments would be charged consist primarily of security assistance representational activities undertaken by U.S. security assistance management personnel in the implementation of U.S. military assistance and sales programs. This provision would add no costs to the U.S. Government.

### Section 106—Special Defense Acquisition Fund

This section amends the Arms Export Control Act to establish a new chapter 5—Sepcial Defense Acquisition Fund (SDAF)—which consists of three sections. Under the direction of the President and " in consultation with the Secretary of State, this section authorizes" the Secretary of Defense to procure high-demand foreign military sales items in advance in order to expedite deliveries for sales and assistance already approved by or notified to Congress. This section also provides for an annual authorization of funds for the SDAF, permits use of items procured through the Fund for U.S. forces prior to their transfer and requires an annual report to Congress on the Fund's procurement and sales activities.

New section 51 consists of three subsections which do the following:

Subsection (a) provides authority for the Secretary of Defense, under the direction of the President and in consultation with the Secretary of State, to establish a Special Defense Acquisition Fund (SDAF), which would finance the acquisition of defense articles and defense services in anticipation of their transfer to eligible foreign countries and international organizations pursuant to the Arms Export Control Act or the Foreign Assistance Act of 1961. This section also permits the Secretary of Defense to acquire such defense articles and defense services as he may determine with SDAF funds. Procurement of "short supply" items is to be emphasized where compatible with expected security assistance requirements.

The establishment of this Fund complements U.S. national security and foreign policy interests while preserving the readiness of U.S. Armed Forces. The Fund should be managed in such a way as to avoid the stimulation of unnecessary arms sales.

Subsection (b) provides that the SDAF shall only consist of sums authorized and appropriated and authorizes $150 million for each of the fiscal years 1982 and 1983. Amounts appropriated are authorized to remain available until expended.

Subsection (c) provides that nothing in the new chapter 5 shall be construed to limit or impair any responsibilities conferred upon

the Secretary of State or the Secretary of Defense under the Arms Export Control Act or the Foreign Assistance Act of 1961. The present statutory allocation of policy and implementation responsibilities between the Secretaries of State and Defense will not be affected by the creation of the SDAF.

New section 52 consists of three subsections which do the following:

Subsection (a) prohibits transfers to foreign countries or international organizations of defense articles and services acquired under the SDAF unless authorized by the Foreign Assistance Act of 1961 or the Arms Export Control Act.

Subsection (b) permits the President to authorize the temporary use by U.S. Armed Forces of defense articles and services acquired under the SDAF, if such temporary use is necessary for U.S. national defense requirements and U.S. Armed Forces bear the cost of operation, maintenance, and restoration or replacement of such articles and services.

Subsection (c) provides that funds in the SDAF account may be used to pay for storage, maintenance, and other costs related to the preservation and preparation for transfer of defense articles and services acquired under the new account. Administrative expenses not otherwise reimbursed would also be paid from funds available under the new account.

New section 53 requires an annual report to Congress on SDAF acquisitions of defense articles and defense services. The report shall include: (1) A description of each contract for the acquisition of defense articles or defense services entered into during a preceding fiscal year; (2) a description of each contract for the acquisition of defense articles or defense services which the President anticipates will be entered into during the current fiscal year; (3) a description of each defense article or defense service transferred to a foreign country or international organization under the new SDAF authority during a preceding fiscal year; and (4) an evaluation of the impact of the SDAF on U.S. defense production and armed forces readiness.

### Section 107—Leasing of defense articles

This section amends the Arms Export Control Act by adding a new chapter 6—pertaining to leases of defense articles. The purpose of the new chapter is to require that leasing of U.S. defense articles to foreign countries occurs under the authority of the Arms Export Control Act or the Foreign Assistance Act, instead of under the authority of 10 U.S.C. 2667. The new chapter stipulates certain conditions that must be met for foreign leases to be approved, requires full cost reimbursement to the United States except for cases where the United States receives certain benefit or for old property. It also requires congressional notification with possible legislative veto for major leases and makes conforming changes necessitated by the creation of the new chapter.

Section 107 contains four subsections.

Section 107(a) creates new chapter 6, which contains four sections.

New section 61 authorizes the President to lease to eligible foreign countries and international organizations articles from Department of Defense stocks if he determines there are compelling

foreign policy and national security reasons for a lease rather than a sale and that the articles are not for the time needed for public use. The foreign lessee is required to pay to the United States full costs associated with the lease unless the lease is for the purpose of cooperative research and development, military exercises, or communications or electronics interface projects. Full reimbursement is also not required for leasing of articles that have passed three-quarters of normal service life. These exemptions are intended to allow for less than full reimbursement only in cases where the United States receives clear benefit from the leasing arrangement or where items to be leased are well beyond their prime service utility. The exemption from full reimbursement for leases connected with cooperative research or development, military exercises, or communications or electronics interface projects is intended to include only leases in connection with joint undertakings with the United States and exclude leases for purposes of providing military assistance. Authority to lease for military assistance purposes is provided by section 503 of the Foreign Assistance Act. Cooperative research and development may be interpreted to include test and evaluation for leases which would provide the United States valuable performance information that would otherwise not be obtainable.

New section 61 also stipulates that leases under this authority may be for no more than 5 years and that the President may terminate the lease and require immediate return of leased articles at any time during the duration of the lease. The section specifies that leasing to foreign governments may be conducted only under this chapter or under the Foreign Assistance Act and not under the authority of 10 U.S.C. 2667, which is by interpretation currently being used for leases of defense articles to foreign governments with virtually no congressional oversight. Leasing to a foreign government either directly or through a third party can only be done under the authority of new chapter 6 of the Arms Export Control Act or the Foreign Assistance Act of 1961.

New section 62 requires a report to Congress 30 days before the lease agreement is entered into or renewed on foreign leases or loans proposed for 1 year or more. Loans should not be entered into or renewed for less than 1 year only for the purpose of avoiding the reporting and legislative veto requirements of this section. It is further anticipated that leases of less than 1 year duration will be reported to Congress in the annual report on military assistance and military exports under section 657 of the Foreign Assistance Act of 1961. Information required in the report under new section 62 is to include the country or organization to which the defense article is being leased, the type, quantity, and value (in terms of replacement cost) of the leased articles, the terms and duration of the lease, and a justification for the lease explaining why the article is being leased rather than sold under the Arms Export Control Act. If the President determines and immediately reports to Congress that an emergency exists which requires that a lease be entered into immediately in U.S. national security interests, he may waive the notification requirements of this section and of the notification and review requirements in new section 63.

New section 63 provides for legislative review and possible disapproval by concurrent resolution of leases valued at $14 million or

more for major defense equipment or $50 million or more for other leases. Leases and loans of defense articles to NATO and its members, Australia, New Zealand, and Japan are exempted from the provisions of new section 63.

New section 64 provides that any restrictions on sales under the Arms Export Control Act also apply to leases of defense articles under new chapter 6.

Section 107(b) makes changes to the Arms Export Control Act conforming to the adoption of new chapter 6.

Section 107(c) makes conforming changes to section 503(b) of the Foreign Assistance Act to make the costing of loans of defense articles under that section consistent with leases of defense articles under new chapter 6.

Section 107(d) repeals two reports on leases of defense articles which are effectively superseded by the reporting requirement of new section 62.

*Section 108—Military assistance*

This section consists of two subsections which amend the Foreign Assistance Act to authorize grant military assistance for fiscal years 1982 and 1983, to earmark funds to finance procurement of defense articles and services in conjunction with FMS guaranties, and to repeal a provision which presently requires no more than 5 years to wind up grant military assistance programs authorized in previous years. The MAP authorization takes account of the committee formula providing one-fourth grant/three-fourths guaranties instead of low-interest FMS direct credits proposed by the executive branch.

Subsection (a) authorizes $304,375,000 in appropriations to carry out grant military assistance programs in each of the fiscal years 1982 and 1983. This figure essentially funds the grant portion (earmarked at $248,375,000) of a combined grant/FMS guaranty program available to 15 designated countries, a $25 million special requirements fund and windup costs for programs of previous years. It also funds general administrative costs to the extent not offset by reimbursements to the grant military assistance account. The committee reduced the authorization by $400,000 and reallocated that amount for the U.N. Trust Fund for South Africa under the international organizations and programs account.

In sum, the authorization of $304,375,000 funds a total program of $339,075,000. The program includes $248,375,000 in grants for 15 countries in conjunction with FMS loan guaranties, plus $6,668,000 for supply operations costs (packing, crating, handling, and transportation of previous funded materiel), plus $25,000,000 special requirements fund, plus $59,032,000 for administrative and general costs to defray salaries and related costs of U.S. personnel engaged in administering the security assistance program. These administrative costs pertain to the entire worldwide overseas security assistance and sales program management, not just for military assistance program countries. The grant amount provided to each country under the grant/FMS loan guaranty formula may be increased by not more than 20 percent of such amount if the President deems such increase necessary.

For fiscal year 1982, an estimated $34,700,000 will be reimbursed from the administrative surcharge included in most foreign mili-

tary sales contracts and proceeds from sales of MAP property. Such reimbursements are subtracted from the total program to make a $304,375,000 requirement for authorization.

This authorization figure does not include $7.1 million for which appropriation, but not additional authorization, is required to reimburse the Department of Defense for fiscal years 1980 and 1981 emergency drawdowns for El Salvador, Liberia, and Thailand under section 506(a) of the Foreign Assistance Act of 1961. Finally, this subsection makes a technical change in section 503(a)(3) of the Foreign Assistance Act of 1961 necessitated by the adoption of the grant/FMS guaranty formula referred to above.

Subsection (b) repeals, effective October 1, 1981, section 516 of the Foreign Assistance Act of 1961, which presently requires the windup of MAP programs from previous fiscal years in no more than 5 years and requires that any country MAP program be specifically authorized by law. The repeal of section 516 is necessary because of the authorization of a $25 million contingency fund, the use of which obviously cannot be confined to specific countries for specific periods of time.

### Section 109—Stockpiling of defense articles for foreign countries

This section amends section 514(b)(2) of the Foreign Assistance Act of 1961 to establish a $100 million ceiling on the aggregate value of additions to be made in fiscal year 1982 and $125 million in fiscal year 1983 to overseas stockpiles of defense articles (other than in NATO countries) which are designated as war reserve stocks for allied or other foreign forces (WRSA). This provision permits further additions to the U.S.-owned stockpiles for Korea.

Since fiscal year 1976, Congress has authorized slightly over $760 million in additions to WRSA stockpiles. With the fiscal year 1982 additions, the Department of Defense estimates that a total of $1,639 million war reserve stocks will be stored in Korea under the WRSA program. These stocks are composed mostly of ammunition with minimal amounts of major and secondary items and are excess to U.S. requirements.

As with past years' authorizations of additions, the United States retains title to any stocks so designated. Any transfer of these stocks to any foreign country may take place only under the authority of the Foreign Assistance Act, the Arms Export Control Act, or by special authorization.

The committee recognizes the importance of United States-Korean security cooperation to peace and security on the Korean Peninsula and in Northeast Asia and supports U.S. Government efforts to further such cooperation. It notes the particular importance of cooperation on logistics and considers authorized additions to war reserve stockpiles in Korea as a U.S. contribution to defense preparedness in Korea.

The committee recognizes that Korean sales abroad increase the production of Korean defense plants and thus reduce unit costs, and also recognizes that Korean budget constraints are such that these materials might not be produced if they were not contracted for by foreign buyers. Nonetheless, the committee is concerned that, while the United States is making additions to war reserve stocks in Korea, Korea is transferring to other countries similar

types of war reserve material manufactured by its own defense industries for which its military units continue to have requirements.

*Section 110—International military assistance and sales program management*

This section replaces section 515 of the Foreign Assistance Act of 1961 with a new section 515 which authorizes the functions, types, and numbers of U.S. security assistance management personnel annually assigned to manage U.S. security assistance programs in foreign countries.

New section 515 consists of six subsections which do the following:

Subsection (a) provides the President with authority to assign members of the U.S. Armed Forces to foreign countries to perform designated security assistance management functions. Functions authorized to be performed include equipment and services case managment, training management, program monitoring, evaluation and planning of the host government's military capabilities and requirements, administrative support, promoting rationalization, standardization, and interoperability, and other defense cooperation measures among NATO members and with the Armed Forces of Australia, New Zealand, and Japan, and liaison functions exclusive of advisory and training assistance.

The committee regards these functions as encompassing all the authorized activities of security assistance management personnel worldwide.

Subsection (b) specifies that advisory and training assistance conducted by military personnel assigned under this section shall be kept to an absolute minimum and states the sense of Congress that advisory and training assistance in countries to which military personnel are assigned under this section shall be provided primarily by other personnel who are not assigned under this section and who are detailed for limited periods to perform specific tasks.

Subsection (c) provides that no security assistance management team greater than six can operate in a foreign country under new section 515 unless specifically authorized by Congress. The President may waive this limitation if he determines and reports to the Congress 30 days prior to the introduction of additional military personnel that U.S. national interests require a greater-than-six-man management team in a country *not* specifically authorized.

Twelve countries are authorized for greater-than-six-man teams under this subsection for fiscal years 1982 and 1983. This number is one less country than in fiscal year 1981 and two less than the number proposed by the administration in congressional presentation materials for fiscal year 1982. The two countries proposed by the administration but not authorized for greater-than-six-man security assistance management teams are Liberia and El Salvador. The committee notes that the major part of U.S. military personnel in those two countries is composed of temporary training teams who are assigned for limited periods of time. Such temporary and limited teams can be used in lieu of a large, permanent security assistance management team. Furthermore, the size of Liberia's security assistance program simply does not justify the administration's original proposal for a 16-man management team when compared to programs of a similar size in other foreign countries.

28

Finally, this subsection provides that the total number of U.S. military personnel assigned to a foreign country under this section in a fiscal year may not exceed the number justified to the Congress for that country in the congressional presentation materials for that fiscal year unless Congress is notified 30 days in advance of the introduction of the additional military personnel. The total number of U.S. military personnel to be assigned to foreign countries under this section is projected to be 614, an increase of 92 from fiscal year 1981 and 18 over fiscal year 1980.

Subsection (d) provides that, effective October 1, 1982, the entire cost (including salaries) of overseas program management under section 515 is to be reimbursed from military assistance funds, except for such costs that are either paid directly for such services under section 21(a) of the Arms Export Control Act or reimbursed from charges for services collected from foreign governments in accordance with sections 21(e) and 43(b) of the Arms Export Control Act. Until October 1, 1982, all reimbursement for all such costs will continue to be to the MAP account, as currently required by section 515(g) of the Foreign Assistance Act of 1961.

Subsection (e) retains a provision of present law stipulating that security assistance management teams in foreign countries be under the direction and supervision of the chief of the U.S. diplomatic mission to that country.

Subsection (f) retains a provision of present law directing the President to instruct United States diplomatic and military personnel abroad not to promote military sales, unless specifically instructed to do so by appropriate officials of the executive branch.

*Section 111—International military education and training*

This section amends section 542 of the Foreign Assistance Act of 1961 to authorize the appropriation of $47,700,000 in fiscal year 1982 and $51,945,000 in fiscal year 1983 to carry out international military education and training programs. The $47,700,000 authorization is the same amount as that requested by the executive branch and is $13,700,000 more than the $34 million authorized for fiscal year 1981. The $47,700,000 authorization would allow training and instruction for military and related civilian personnel from 72 countries. This compares to a fiscal year 1981 program which provides training for personnel from 63 countries.

The proposed program grant for fiscal year 1982 would provide grant training to military personnel of 73 countries plus funds for the Canal Zone schools, as shown below:

INTERNATIONAL MILITARY EDUCATION AND TRAINING PROGRAM

[Fiscal years, in thousands of dollars]

| | Actual 1980 | Estmated 1981 | Proposed 1982 |
|---|---|---|---|
| East Asia and Pacific: | | | |
| Burma | 30 | 31 | 150 |
| Indonesia | 1,639 | 1,630 | 2,950 |
| Korea | 1,028 | 1,200 | 1,800 |
| Malaysia | 258 | 300 | 650 |
| Papua New Guinea | 11 | | 20 |
| Philippines | 539 | 580 | 1,300 |
| Singapore | | | 50 |
| Thailand | 764 | 770 | 2,000 |

## INTERNATIONAL MILITARY EDUCATION AND TRAINING PROGRAM—Continued

[Fiscal years; in thousands of dollars]

|  | Actual 1980 | Estimated 1981 | Proposed 1982 |
|---|---|---|---|
| Regional total | 4,267 | 4,511 | 8,920 |
| **Near East and South Asia:** | | | |
| Bangladesh | 116 | 164 | 225 |
| Egypt | 845 | 846 | 2,000 |
| India | 273 | 300 | 500 |
| Jordan | 1,002 | 880 | 2,000 |
| Lebanon | 370 | 400 | 840 |
| Morocco | 937 | 1,055 | 1,300 |
| Nepal | 27 | 50 | 75 |
| Oman | 18 | 100 | 100 |
| Sri Lanka | 24 | 60 | 100 |
| Tunisia | 642 | 650 | 1,300 |
| Yemen | 487 | 770 | 1,500 |
| Regional total | 4,741 | 5,275 | 9,940 |
| **Europe:** | | | |
| Austria | 24 | 25 | 45 |
| Finland | 40 | 40 | 40 |
| Greece | 1,180 | 1,220 | 1,900 |
| Iceland | 4 | | 20 |
| Portugal | 1,864 | 1,790 | 2,200 |
| Spain | 2,084 | 2,550 | 2,200 |
| Turkey | 1,370 | 1,624 | 3,500 |
| Yugoslavia | 36 | 64 | 130 |
| Regional total | 6,602 | 7,313 | 10,035 |
| **Africa:** | | | |
| Botswana | 72 | 30 | 100 |
| Cameroon | 43 | 50 | 100 |
| Cape Verde | | | 35 |
| Congo | | | 35 |
| Djibouti | | | 100 |
| Equatorial Guinea | | | 35 |
| Gabon | 49 | 50 | 100 |
| Ghana | 188 | 185 | 400 |
| Guinea-Bissau | | | 35 |
| Ivory Coast | 12 | 25 | 35 |
| Kenya | 500 | 500 | 1,300 |
| Liberia | 230 | 449 | 600 |
| Malawi | 18 | 20 | 50 |
| Mali | 97 | 110 | 100 |
| Niger | | 205 | 400 |
| Rwanda | 52 | 50 | 50 |
| Senegal | 166 | 211 | 350 |
| Somalia | | 300 | 350 |
| Sudan | 409 | 650 | 1,300 |
| Tanzania | | 60 | 75 |
| Togo | 30 | 30 | 60 |
| Uganda | | 50 | 50 |
| Upper Volta | 86 | 75 | 135 |
| Zaire | 757 | 757 | 1,560 |
| Zimbabwe | | | 100 |
| Regional total | 2,709 | 3,807 | 7,455 |
| **American republics:** | | | |
| Bahamas | | 40 | 60 |
| Barbados | 58 | 84 | 100 |
| Bolivia | 144 | | |
| Brazil | | [1] 10 | 50 |
| Colombia | 255 | 280 | 850 |
| Costa Rica | | 30 | 60 |
| Dominica | | 33 | 60 |

## INTERNATIONAL MILITARY EDUCATION AND TRAINING PROGRAM—Continued

[Fiscal years; in thousands of dollars]

|  | Actual 1980 | Estmated 1981 | Proposed 1982 |
|---|---|---|---|
| Dominican Republic | 250 | 420 | 600 |
| Ecuador | 269 | 280 | 750 |
| El Salvador | 247 | 440 | 1,000 |
| Guyana | | 25 | 40 |
| Haiti | 127 | 145 | 415 |
| Honduras | 441 | 420 | 700 |
| Jamaica | | 25 | 75 |
| Mexico | 128 | 130 | 245 |
| Panama | 289 | 410 | 500 |
| Peru | 307 | 310 | 750 |
| St. Lucia | | 58 | 60 |
| St. Vincent and the Grenadines | | 46 | 60 |
| Suriname | 26 | 38 | 75 |
| Venezuela | | 10 | 50 |
| Panama Canal area military schools | 4,000 | 4,100 | 4,600 |
| Regional total | 6,541 | 7,334 | 11,100 |
| General costs | 140 | 160 | 250 |
| Worldwide total | 25,000 | 28,400 | 47,700 |

[1] Reprograming decision; statutory notifications to be provided Congress.

Note.—Totals may not add due to rounding

*Section 112—Peacekeeping operations*

This section consists of three subsections which do the following:

Subsection (a) amends section 552(a) of the Foreign Assistance Act of 1961 to authorize the appropriation of $19 million in each of the fiscal years 1982 and 1983 to carry out peacekeeping operations programs. The authorizations are the same as that requested by the executive branch and are $6 million less than the $25 million authorized for fiscal year 1981.

Peacekeeping operations assistance will fund the same two programs in each fiscal year 1982 and 1983 that it funds in fiscal year 1981; namely, the Sinai Support Mission (SSM) and the U.S. contribution to the U.N. Forces in Cyprus (UNFICYP). The projected program for peacekeeping operations for fiscal year 1982 is shown below:

### PEACEKEEPING OPERATIONS

[Fiscal years; in thousands of dollars]

|  | Actual 1980 | Estimated 1981 | Proposed 1982 |
|---|---|---|---|
| Sinai Support Mission | [1] 16,000 | 16,000 | 10,000 |
| U.N. Forces in Cyprus | 9,000 | 9,000 | 9,000 |
| Total | 25,000 | 25,000 | 19,000 |

[1] Includes $3,900 transferred from Economic Support Fund in accordance with sec 610(a) of the Foreign Assistance Act of 1961.

Subsection (b) amends section 551 of the Foreign Assistance Act of 1961 to prohibit the authority of the peacekeeping operations chapter from being used to finance either the establishment of a peacekeeping force in the Sinai pursuant to the Egyptian-Israeli peace treaty or to position units of U.S. armed forces in the Sinai.

The 1979 peace treaty between Israel and Egypt contemplated a peacekeeping role in the Sinai to be carried out by United Nations forces and observers. In view of the growing doubt that the United Nations would agree to assume this role by April 1982, an alternative peacekeeping force, which could include a U.S. contingent, has been proposed. The committee feels strongly that it is in the U.S. national interest that the Egyptian-Israeli peace treaty be fully implemented.

Representatives of the executive branch have informed the committee of the progress being made in these negotiations, and have assured that any resulting agreement will be presented to the Congress with a request for legislation to specifically authorize and fund U.S. participation in the peacekeeping force, if such is ultimately recommended.

The amendment to section 551 of the Foreign Assistance Act of 1961 added by section 112(b) of the bill insures that the United States will not participate in the proposed multinational force, and will not finance the operation of such force, unless and until Congress has thoroughly reviewed the proposal and has enacted legislation expressly authorizing such activities. This provision is not intended to prohibit the use of funds made available under chapter 6 of part II (the peacekeeping operations chapter) of the Foreign Assistance Act of 1961 to pay costs incidental to helping the parties with planning and preparation for deployment of the peacekeeping force next April. The cost could occur between the time authorizing legislation is presented to the Congress and the time when it is enacted.

Subsection (c) amends, effective October 1, 1981, section 552(c) of the Foreign Assistance Act of 1961 to remove the prohibition in current law on the transfer of earmarked Economic Support Fund (ESF) moneys into the peacekeeping operations account and places a $15 million ceiling on the total amount of funds that may be transferred into the account. The prohibition on earmarked ESF funds for peacekeeping operations reprogramings is being removed because it has no legal effect. Any ESF earmarking inherently prevents those funds from being used for reprograming unless the special authority under section 614 of the Foreign Assistance Act of 1961 is exercised.

*Section 113—Restrictions on military assistance and sales to El Salvador*

Section 113 consists of five subsections related to the provision of military assistance and sales to El Salvador.

Subsection (a) states the findings of Congress with regard to the situation in El Salvador, United States policy, and the provision of military assistance and sales to that country. These findings include:

That peaceful and democratic development in Central America is in the interest of the United States and the community of American States generally;

That the recent civil strife in El Salvador has caused great human suffering and disruption to the economy of that country and that substantial assistance to El Salvador is necessary to help alleviate that suffering and to promote economic recovery within a peaceful and democratic process;

That substantial progress is being made by the Government of El Salvador in land and banking reforms and the United States encourages and supports the Government of El Salvador in the further implementation of these reforms;

That the United States also welcomes the continuing efforts of President Durate and his supporters to establish greater control over the activities of the El Salvador armed force and security forces;

That it is in the interest of the United States to cooperate with the Duarte government in putting an end to extremist violence among both the insurgents and the security forces, and in establishing a unified command and control of all government forces.

That the United States supports the holding of free, fair, and open elections in El Salvador and notes the progress being made by the Duarte government toward scheduling elections, as evidenced by the appointment of an electoral commission.

Subsection (b) provides that MAP or IMET assistance, government-to-government arms sales and FMS direct credits and guaranties may be provided to El Salvador and members of the U.S. Armed Forces may be assigned, detailed, or otherwise sent to El Salvador to carry out functions under the Foreign Assistance Act of 1961 or the Arms Export Control Act only if the President makes a certification described in subsection (d) of this section.

The prior certification requirement of subsection (b) is met if, within the preceding six months, a certification has been made under subsection (c) of this section. In other words, once the certification required by subsection (e) of this section (regarding the investigations of the murder of U.S. citizens) is made, only two certifications are required under this section in any 12-month period in order for El Salvador to receive U.S. military assistance and sales.

Subsection (c) provides that 30 days after the enactment of this section, and every 6 months thereafter, the President shall make a certification in accordance with subsection (d) of this section. If the President does not make such a certification, he shall immediately suspend MAP and IMET assistance, obligated FMS credits and guaranties extended, and deliveries of defense articles, defense services, and design and construction services sold to El Salvador after the date of enactment of this act. The President is also required to order the prompt withdrawal from El Salvador of all U.S. armed forces performing military training, defense services, or program management activities regardless of when they were sent to El Salvador. The suspension of military assistance and sales remains in effect until such time as the President makes a certification in accordance with subsection (d) of this section.

Subsection (d) requires the President to certify to Congress that the Government of El Salvador:

Is not engaged in a consistent pattern of gross violations of internationally recognized human rights;

Is achieving substantial control over all elements of its armed forces, so as to bring to an end the indiscriminate torture and murder of Salvadoran citizens by these forces;

Is making continued progress in implementing essential economic and political reforms, including the land reform program, and is supporting the private sector;

Is committed to the holding of free elections at an early date; and

Has demonstrated its willingness to negotiate with opposition groups an equitable political resolution of the conflict.

In its consideration of the second condition in this subsection, the committee took into account the difficult nature of the task confronting the Government of El Salvador in gaining substantial control over all elements of its armed forces. The committee therefore did not include in the certification requirement a condition that the Government of El Salvador has achieved total and complete control over all elements of its armed forces. Instead, it provided that the President must be able to certify that the Salvador Government "is achieving" substantial control. The committee wants to make its intent clear: It expects that the President will certify that this condition has been fulfilled only if the Salvadoran Government has actually made substantial progress in gaining control over all elements of its armed forces.

Neither vague commitments to enact reforms at some point in the future nor public statements by government leaders to the effect that they were trying to achieve such control would be a sufficient basis for a Presidential certification that this condition had been satisfied. What the committee is looking for is real rather than rhetorical progress.

Subsection (e) provides that the Presidential certification required in subsection (b), which permits military assistance and sales to El Salvador if such certification is submitted, cannot be made until after the President has also notified the Congress that he has determined that the Government of El Salvador has made good faith efforts both to investigate the murders of the six United States citizens in El Salvador in December 1980 and January 1981 and to bring to justice those responsible for those murders.

### TITLE II—ECONOMIC SUPPORT FUND

The Economic Support Fund (ESF) is economic assistance provided because of special economic, political, or security interests of the United States. The largest portion is allocated to the Middle East, principally to Israel and Egypt, as a key economic aid instrument in support of the peace effort. ESF assistance also is provided to meet important U.S. interests in Africa, Asia, Latin America, and Europe.

While the use of ESF is, in the first instance, determined by special situations involving a country or region, the committee reaffirms its intent that, as far as practicable, consistent with its purpose, such assistance which is intended for economic development shall be administered in accord with the "New Directions" principles set forth in the Foreign Assistance Act so as to achieve as much developmental benefit as possible.

*Section 201—Authorization of appropriations*

Section 201 amends section 531(b)(1) of the Foreign Assistance Act to authorize $2,538 million for ESF for fiscal year 1982 and the same amount for fiscal year 1983. The $2,538 million for fiscal 1982 is $43.5 million below the executive branch request.

As indicated in the following table, the committee recommendation includes the following changes from the list presented by the executive branch in its fiscal year 1982 request: $10 million is added for Morocco; Kenya is increased from $10 million to $20 million; Somalia is increased from $20 million to $30 million; $25 million is added for Costa Rica; Cyprus is increased from $7.5 million to $15 million and earmarked; Egypt is increased from an unearmarked amount of $750 million to an earmarked amount of $771 million, of which the additional $21 million is a payback for funds withdrawn from Egypt's 1981 account; Israel is increased from an earmarked amount of $785 million to an earmarked amount of $806 million, of which the additional $21 million is a payback for funds withdrawn from Israel's fiscal year 1981 account; Lebanon is increased from $5 million to $7 million with the additional $2 million to be for humanitarian purposes; and the Special Requirements Fund (i.e., an unallocated reserve for contingencies) is reduced from $250 million to $100 million.

ECONOMIC SUPPORT FUND

| Country program | Fiscal year 1982 | |
|---|---|---|
| | Executive request | Committee recommendation |
| **Africa:** | | |
| Botswana | 10,000 | 10,000 |
| Djibouti | 2,000 | 2,000 |
| Kenya | 10,000 | 20,000 |
| Liberia | 10,000 | 10,000 |
| Mauritius | 2,000 | 2,000 |
| Morocco | | 10,000 |
| Seychelles | 2,000 | 2,000 |
| Somalia | 20,000 | 30,000 |
| Southern Africa regional | 30,000 | 30,000 |
| Sudan | 50,000 | 50,000 |
| Zambia | 20,000 | 20,000 |
| Zimbabwe | 75,000 | 75,000 |
| Uganda | | |
| Subtotal | 231,000 | 261,000 |
| **Asia** | | |
| Philippines | 50,000 | 50,000 |
| Thailand | 10,000 | 10,000 |
| Subtotal | 60,000, | 60,000 |
| **Latin America and Caribbean:** | | |
| Costa Rica | | 25,000 |
| Eastern Caribbean | 20,000 | 20,000 |
| El Salvador | 40,000 | 40,000 |
| Haiti | | |
| Jamaica | 40,000 | 40,000 |
| Nicaragua | 20,000 | 20,000 |
| Subtotal | 120,000 | 145,000 |
| **Near East:** | | |
| Cyprus | 7,500 | [1] 15,000 |
| Egypt | 750,000 | [2] 771,000 |
| Israel | 785,000 | [3] 806,000 |
| Jordan | 20,000 | 20,000 |
| Lebanon | 5,000 | 7,000 |
| Middle East regional Corporation | 4,000 | [4] 4,000 |
| Oman | 15,000 | 15,000 |
| Program support and PVO's | 6,000 | [4] 6,000 |

ECONOMIC SUPPORT FUND—Continued

| Country program | Fiscal year 1982 | |
| --- | --- | --- |
| | Executive request | Committee recommendation |
| Turkey | 300,000 | 300,000 |
| Middle East project development and support | 1,000 | [4] 1,000 |
| Subtotal | 1,893,000 | 1,945,000 |
| Other: | | |
| Portugal | 20,000 | 20,000 |
| Spain | 7,000 | 7,000 |
| Special requirements fund | [5] 250,000 | 100,000 |
| Subtotal | 277,000 | 127,000 |
| Total ESF | 2,581,500 | 2,538,000 |

[1] Earmark
[2] Earmarks $771 million for Egypt, of which $21 million is a payback for funds withdrawn from Egypt's fiscal year 1981 account.
[3] Earmarks $806 million for Israel, of which $21 million is a payback for funds withdrawn from Israel's fiscal year 1981 account
[4] The committee recommendation combines these three programs into a Middle East special requirements account
[5] Includes an additional $21 million each for Israel and Egypt to pay back funds withdrawn from Israel's and Egypt's fiscal year 1981 accounts

In allocating $25 million for Costa Rica, the committee notes that Costa Rica has a strong democratic tradition and is an old ally of the United States. Because of rising oil costs, declining coffee prices, and an overextended public sector, Costa Rica is suffering a large current deficit, a decline in real economic growth and per capita income, rising employment, acute inflation, and a severe credit shortage. In an attempt to deal with these problems, Costa Rica has devalued its currency, undertaken an austerity program, improved the Government's control over the national budget, and sought to encourage nontraditional exports. Costa Rica is attempting to negotiate an agreement for balance of payments with the International Monetary Fund. The committee believes that the provision of $25 million in economic support funds for Costa Rica will encourage Costa Rica to enter into an agreement with the IMF, and help the Government to follow the IMF's recommendations while avoiding cuts in social programs so deep as to provoke unrest.

*Section 202—Provisions relating to use of funds*

Section 202 strikes out the previous sections 532 and 533 of the Foreign Assistance Act and substitutes new sections 532, 533, and 534. The new sections provide as follows:

*Middle East programs.*—The new section 532 deals with ESF assistance in the Middle East.

Subsection (a)(1) earmarks $785 million for Israel and $750 million for Egypt for each of the fiscal years 1982 and 1983. The amounts made available for Israel and Egypt under this subsection are in addition to the amounts made available to those countries pursuant to subsection (a)(4).

Subsection (a)(2) provides that all ESF assistance for Israel and for Egypt in fiscal years 1982 and 1983 be furnished on a grant basis.

Subsection (a)(3) provides for a cash transfer of the total ESF amount for Israel. The President is to insure that the cash transfers will not cause an adverse impact on the total amount of non-military exports from the United States to Israel.

Subsection (a)(4) authorizes an additional $21 million each to Israel and Egypt from the ESF account in fiscal year 1982, beyond the $785 million and the $750 million requested by the executive branch respectively for the two countries, in order to replace the ESF funds authorized and appropriated for those countries in fiscal year 1981, but reprogramed to provide assistance for Liberia and El Salvador. The committee raised it's total ESF authorization amount for fiscal year 1982 by $42 billion above the amounts recommended by its subcommittees to accommodate this increase.

Subsection (a)(5) permits an initial obligation of ESF funding for new lands (i.e., desert agricultural reclamation) projects in Egypt only after a 90-day period has elapsed and the AID Administrator as reported to the Speaker of the House and to the Senate Foreign Relations Committtee on the feasibility, costs, and cost-benefits of such projects and the extent of projected U.S. involvement in new lands development. The committee is requiring this one-time report because the weight of expert opinion on the feasibility of land reclamation in Egypt seriously questions the viability and cost-effectiveness of large-scale investment in new lands as opposed to old agricultural lands.

Subsection (a)(6) provides that up to $50 million each year in fiscal 1982 and 1983 of ESF assistance to Egypt may be used under title XII of chapter 2 of part I of the Foreign Assistance Act ("Famine Prevention and Freedom from Hunger") for building agricultural extension services in Egypt for the small farmer, in order to upgrade skills of agricultural faculty in provincial universities, improve the agricultural curriculums and equipment there, and to establish a provincial university extension service which can directly reach small farmers.

Subsection (b)(1) authorizes $11 million of the ESF funds in each of fiscal year 1982 and 1983 for special requirements in the Middle East, including regional cooperative scientific and technological programs in accord with subsection (b)(2), West Bank/Gaza development programs for Palestinians, and population programs, project development and support, and participant training programs for the entire region. The executive branch request also lists $11 million for these purposes, under the headings of Middle East regional cooperation ($4 million), West Bank and Gaza ($6 million), and project development and support ($1 million).

Subsection (b)(2) expresses the sense of the Congress regarding the United States financing and participation in cooperative projects of a scientific and technical nature, involving Israel, Egypt, and other Middle East countries. It also authorizes the use of up to $4 million of the $11 million available under subsection (b)(1) for Middle East scientific and technological projects which will promote regional cooperation. The funds provided in this section are intended to be used for projects which promote mutual research interests; strengthen institutional capabilities in Egypt and Israel for trilateral endeavors; improve research methodologies within and between the countries involved; facilitate contact between counterpart institutions and researchers of Egypt and Israel; fund the participation of the three parties in conferences sponsored by any public or private institutions; fund technical conference sponsored by U.S. Government agencies attended by Egyptians and Israelis; fund long-term visits by Israeli and Egyptian scientists and acade-

micians to work on joint projects and research endeavors in Egypt, Israel, or the United States; and fund parallel cooperative research projects in Egypt and Israel.

AID, in administering this program, may fund projects involving solely Egypt and Israel, and without direct participation by the United States.

Subsection (b)(3) subjects the use of funds available under subsection (b)(1) to the prenotification procedures under section 634A of the Foreign Assistance Act, requiring a report to the Committee on Foreign Affairs and the Committee on Appropriations of the House of Representatives and the Committee on Foreign Relations and the Committee on Appropriations of the Senate, at least 15 days prior to any obligations under subsection (b)(1), setting forth the name of the proposed recipient, the amount, and the purpose for which the funds are to be made available.

Subsection (b)(4) requires a Presidential report at the end of fiscal years 1981, 1982, and 1983 on the use of funds for special requirements in the Middle East.

Subsection (c)(1) directs deobligation of all funds appropriated in prior fiscal years for Syria, except for funds committed or earmarked as of April 9, 1981, in four specified categories. It is the intention of the committee that all obligated but uncommitted funds (which are understood to amount to between $106 and $130 million), should be deobligated. The deobligated funds are to be deposited with the U.S. Treasury, except for those used under subsection (c)(2).

Subsection (c)(2) provides that funds deobligated pursuant to subsection (c)(1) may be used by the Administrator of AID to reimburse U.S. contractors in event of certain losses resulting from the deobligation. This provision is designed to prevent, through reimbursement, any loss to U.S. firms which might otherwise result from the deobligation of the AID funds.

*Eastern Mediterranean programs.*—The new section 533 deals with ESF assistance in the Eastern Mediterranean.

Subsection (a) provides that not less than two-thirds of the ESF funds for Turkey in fiscal years 1982 and 1983 shall be provided on a grant basis.

Subsection (b) earmarks $15 million in ESF funds for fiscal years 1982 and 1983 for Cyprus. Of that amount, $5 million is earmarked each year for scholarships to bring Cypriots to U.S. educational institutions. These scholarships should be distributed on a proportional basis to students from the two Cypriot communities. Currently, Cypriot students receive substantial educational opportunities in Greece and elsewhere in Europe and the Communist bloc also provides extensive free education for Cypriots. The committee feels it is in our national interest to provide as many Cypriots as possible with educational opportunities in the United States.

*General provisions.*—The new section 534 includes general provisions concerning ESF assistance.

Subsection (a) prohibits the use of ESF funds for fiscal years 1982 and 1983 to finance the construction of, the operation or maintenance of, or the supplying of fuel for, any nuclear facility in a foreign country unless the President certifies to the Congress that the use of funds for such purpose is indispensable to the achievement of U.S. nonproliferation objectives.

Subsection (b)(1) provides for a $100 million contingency fund, in addition to the $100 million Special Requirements Fund. Up to $100 million of ESF funds appropriated for fiscal years 1982 and 1983 may be made available for emergency use when U.S. national interests urgently require such funding to promote economic or political stability.

Subsection (b)(2) provides that, notwithstanding any provisions of chapter 4 or of an appropriations act—including a joint resolution providing continuing appropriations—which earmarks funds available for the fiscal years 1982 and 1983 to carry out this chapter for a specific country or purpose, up to 5 percent of any earmarked funds may be drawn on to carry out the provisions of subsection (b)(1). In authorizing this special authority to help the President's ability to meet emergency situations, the committee notes that any use of this authority will be subject to prior notification of 15 days to the authorizing and appropriations committees before any obligations of funds, pursuant to section 634A (notification of program changes) of the Foreign Assistance Act, and it expects full consultation by the executive branch with the Congress prior to any use of funds for activities not justified in the congressional presentation materials.

### TITLE III—DEVELOPMENT ASSISTANCE

Title III contains authorizations for economic development assistance to some 70 countries of the Third World. All of them are poor by Western standards and most of them fall below the poverty line set by the World Bank for its soft loan aid. They also have rapidly rising populations, rising expectations, and, in most cases, a strong will to improve their own economies and raise the quality of life for their people through self-help.

The provisions of title III extend assistance for self-help improvement under the "New Directions" policies set forth by the Congress in the Foreign Assistance Act. These policies mandate programs and projects whose benefits go primarily to the poor majorities in developing countries, in a manner promoting participation by the poor in economic development, and equitable sharing of the economic gains. The funding accounts under title III reflect the effort to deal with problems common to most developing countries. Assistance is authorized for agricultural and rural development; for population and health programs; for education; and for selected development programs and development assistance through international organizations.

Committee initiatives in H.R. 3566 include the placing of energy programs in a new, separate functional account, in view of the pervasive importance of the energy to development problems, and a policy statement addressing the need to stem tropical deforestation and the accompanying widespread adverse environmental impact. The committee also increased funding for the new trade and development program (see sec. 311) by $3 million, with the expectation that the benefits for U.S. sales abroad will be multifold.

The committee accomplished savings in title III wherever possible. The total funding approved for fiscal year 1982 in the development assistance accounts is $1,879,476,000, a $29 million reduction below the amount requested by President Reagan. At the same

time, the committee is concerned about the relative dimunition of U.S. economic aid to the Third World, as the United States is now near the bottom of the list of Western donors based on a percentage of gross national product (GNP). The United States, which a decade ago was providing development assistance equal to 0.32 percent of GNP, had dropped to 0.20 percent of GNP by 1979. Of the 17 donor countries in the Development Assistance Committee, only Austria (0.19 percent) and Italy (0.08 percent) contribute a lower percentages of GNP than the United States.

The title III accounts form the heart of the U.S. bilateral efforts to improve economic conditions in developing countries. The intent of these programs is not only to improve living conditions for the poor abroad, but also to strengthen the climate for peace through the greater political stability which accompanies economic growth, and to improve markets for U.S. exports and access for raw materials needed by U.S. industry.

For the most efficient and effective application of U.S. foreign assistance funds, however, there must be coordination of the various U.S. aid and other instruments and policies dealing with the developing world, and consolidation of functions where possible. As a result of congressional and executive branch action to establish greater coherency and coordination to the various economic programs concerning developing countries, the International Development Cooperation Administration (IDCA) was created in 1979. In its relatively brief life to date, IDCA has made some notable strides and encountered some difficulties, in pulling into a more cohesive pattern the programs administered under the Agency for International Development, the Overseas Private Investment Corporation, the trade and development program, and U.S. assistance through the multilateral development banks, United Nations organizations, and the food-for-peace program. The new administration has indicated to the committee that it has not yet decided what future it intends for IDCA, but that it will consult with the Congress before coming to any decision. In the meanwhile IDCA is continuing, without any additional cost in this bill, as its operating expenses are funded from the AID budget. The Committee urges that IDCA's authorities for coordination and cohesive implementation of U.S. policies and programs relating to developing countries be exercised as effectively as possible, to provide for the strong coordination and cohesion that is essential if the United States is to obtain maximum benefit from its overseas economic operations. As a matter of sound and practical economic sense, every effort should be undertaken to expand IDCA's coordinating role. The committee would, therefore, disapprove any effort to weaken or lessen the function and responsibilities of IDCA.

*Development concerns*

### 1. Effectiveness of AID programs

The committee wishes to express its continuing concern over the need for improved implementation of U.S. development assistance programs. In this connection it welcomes AID's increased emphasis on program evaluation and the increasingly professional analyses done by the Office of Evaluation and by the Inspector General's Office. It welcomes the new AID Administrator's pledge to continue

to expand AID's evaluation program, particularly impact evaluations. It notes that information as to what is, and what is not, being achieved by development projects is a vital tool both for assessing the impact of past development assistance and for improving ongoing programs and those of the future.

There remains the question of whether these evaluations are being taken into account sufficiently at the operating levels in AID. Among other factors, bureaucratic pressures to "move money" quickly can bypass needed careful scrutiny of ongoing and proposed programs. In Africa, for example, the committee recommends that follow-on projects for Sine Saloum health in Senegal and Eastern ORD in Upper Volta not be undertaken until AID satisfies the committee that it has taken adequate account of the findings of AID's own evaluations of these projects.

The committee also expects AID to extend its recent initiatives, as taken in Zaire, Gambia, and the Sahel, to promote institutional changes in host country practices to assure more effective support of AID projects and their continuation after U.S. funding lapses.

### 2. Ocean freight reimbursement

The committee notes that AID has increased the funds allotted to private voluntary organizations (PVO's) for reimbursement of ocean freight costs from $4.5 million in fiscal year 1980 to $8 million in fiscal year 1982. The committee supports the gradual expansion of AID funds for this worthwhile program, through which PVO's are able to send a variety of commodities to developing countries. Should additional funds become available, the committee urges AID to increase its level of support for this program in fiscal year 1982.

However, the committee also notes that the ocean freight program is a cooperative venture involving both AID and PVO's, and is concerned that PVO's are almost completely dependent on AID funds for overseas shipping costs. The committee further notes that AID is in the process of converting all of its financial support for PVO's to a cost-sharing basis in order to avoid undue dependency on AID, an effort which the committee strongly supports. Such an approach to the ocean freight program would increase the scarce resources available for shipping commodities overseas by mobilizing private resources to help meet the ever increasing demand for ocean freight requests. The committee therefore urges AID and the PVO's to cooperate in developing a cost-sharing approach to the ocean freight reimbursement program.

### 3. Private voluntary organizations

The committee notes with concern the number of agencies which have been registered with AID as private voluntary organizations (PVO's) and yet have very little financial support from the private sector. At least 30 PVO's registered with AID receive more than 80 percent of their total funding from AID. While there are many legitimate reasons why a PVO may not be able to attract sufficient funding from the private sector, the committee is concerned at the dependency on AID which results from a PVO relying almost entirely on AID funding.

The committee had under consideration, but did not adopt, an amendment which would have required any agency registered as a

PVO with AID to provide at least 20 percent of its annual budget from private sources. AID currently uses the 20 percent figure as a guideline to be followed in registering PVO's, but makes numerous exceptions. The committee strongly urges AID to be more stringent in applying this guideline when registering new PVO's, and to develop plans to encourage registered PVO's not meeting this requirement to obtain additional nongovernmental funding.

### 4. Appropriate technology international

The committee notes with satisfaction that Appropriate Technology International (ATI) and the Agency for International Development (AID) are implementing the recommendations of the 1979 AID "Report on the Current Status and Operations of Appropriate Technology International," and hopes that the recommendations will soon be fully implemented: especially that ATI delineate a less open-ended program which will be closely tailored to the original objectives of the program of promoting appropriate technology, and that ATI more directly involve the resources of the U.S. appropriate technology community and the private business sector.

The committee is pleased to learn that ATI and AID are overcoming the initial "distance" in their relations, and urge that they continue to expand the cooperative attitude and relations they have now established.

The committee is concerned about the proposed funding level for ATI for fiscal year 1982 and urges AID to provide ATI with adequate funding to permit the 1982 program at least at the 1981 level, and to provide ATI with a commitment on multiyear funding. The committee expects to be kept informed on this matter.

In its original concept for an appropriate technology entity, the committee intended that such an entity operate with the maximum degree of flexibility and independence, and anticipates that AID would implement that intent in ATI's grant agreements.

The committee is pleased that the April 28, 1981, AID audit report on ATI identified only several readily resolvable minor problems, on which corrective steps have or are being taken, and that it identified no major difficulties in the operations of ATI. The committee also notes that AID and ATI have agreed to fund a joint evaluation of the activities of ATI and expresses its desire to be informed of the results of the study.

### 5. Caribbean Development Bank (CDB)

The United States, while not a member of the Caribbean Development Bank, has contributed about 30 percent of its total resources and almost 50 percent of its soft funds. To the best of the committee's knowledge, the CDB is making a solid contribution to development of the English-speaking countries and territories. The United States, along with member countries, should make every effort to strengthen and support the CDB, and we should encourage it to play a more dynamic role.

It has been suggested to the committee that the multiplicity of funding sources contributing to the CDB, which insist on different terms and conditions, causes great administrative difficulty for the CDB and complicates its task of putting together the financing of individual projects.

The committee requests the Administrator, within 6 months of the enactment of this bill, to make a report to Congress assessing this problem and suggesting ways in which AID could alter its loan and grant procedures in order to help ameliorate the problem. As part of this same report, the committee requests an assessment of the adequacy of the information provided by the CDB to U.S. authorities in terms of the latter's ability to maintain prudent oversight over the operations of the CDB including the utilization of U.S. funding.

*Section 301—Agriculture, rural development, and nutrition*

Section 301(a) amends section 103(a)(2) of the Foreign Assistance Act to authorize appropriations of $714,279,000 for fiscal year 1982 and $817,222,000 for fiscal year 1983 for the purposes of assisting developing countries in agriculture, rural development, and nutrition. This is the largest single account in the U.S. bilateral development assistance program. It reflects the high priority the committee places on the campaign against hunger and malnutrition which afflict the poor masses in developing countries, as shown also in the policy statements concerning hunger and global security in title VII of this bill.

Projects funded under the agriculture, rural development, and nutrition account aim not only at increasing domestic agricultural production, which is the long-term solution for achieving food sufficiency in developing countries, but also at breaking the cycle which links poverty and hunger. The projects seek to increase farm production and rural economic activity in ways which will become self-sustaining, involve participation of the poor, and provide for growth with equity.

The account provides funding of title XII of chapter 2 of part I of the Foreign Assistance Act, "Famine Prevention and Freedom From Hunger," under which the talent and expertise of U.S. agricultural universities are enlisted to help expand agricultural production and improve nutrition levels in developing countries. The title XII program is directed by the Board for International Food and Agricultural Development (BIFAD), a Presidentially appointed Board of seven members from the universities and the public. The committee reaffirms its support for the title XII program. It looks forward to further progress under title XII in research, teaching, and extension projects related to the agricultural needs of developing countries. It again wishes to encourage a BIFAD emphasis on building institutions in developing countries, for the key to success in this area is the ability of countries to develop a self-sustaining capability to train their own agriculturalists, produce locally useful technology, and deliver information and technology to the farmers and provide other essential agricultural services. (See also title II, section 202 (new section 532(a)(6)) above concerning title XII in Egypt.)

The fiscal year 1982 authorization for this section includes a $13,500,000 increase above the executive branch request recommended by the Subcommittee on Africa. The subcommittee recommended adding $10 million for assistance to Tunisia and $3.5 million for assistance to Zaire in the agriculture, rural development, and nutrition category, to be offset by savings below the budget request which the committee adopted elsewhere.

The authorization also stipulates that up to $1 million for each of the fiscal years 1982 and 1983 shall be used for section 316 of the International Security and Development Cooperation Act of 1980. That section directs the Director of the International Development Cooperation Agency to encourage ongoing work of private and voluntary organizations to deal with world hunger problems abroad, and to assist them in facilitating public discussion of hunger and related issues.

Section 710 of this act authorizes an additional $6.4 million for the purposes of section 103 for aid to Haiti in fiscal year 1982.

Section 301(b) adds to section 103 of the Foreign Assistance Act a new subsection (g) authorizing continued U.S. participation in the International Fund for Agricultural Development (IFAD) and appropriations for this purpose of up to $180 million. For fiscal year 1982, the appropriations authorization is limited to $45 million, the amount budgeted by the executive branch.

IFAD is a specialized agency of the United Nations established in December 1977 to assist developing countries through financial aid for projects to expand agricultural production. IFAD gives highest priority to projects in the poorest food deficit countries and focuses its resources on activities that are designed to assist small farmers and the landless poor.

IFAD is unique among international agencies in that its governing body is composed of three components consisting of developed country donors, Organization of Petroleum Export Countries (OPEC) donors, and developing countries, each component with equal voting power, and in that it receives a substantial percentage of its resources from the OPEC group. When IFAD began with initial funding of about $1 billion, $435 million came from the OPEC category and about $570 million from the developed countries, including $200 million from the United States.

The $180 million authorized in this subsection would allow for a proposed U.S. contribution, spread out over 2 or 3 years, to a first IFAD replenishment. The terms of the replenishment were still in the process of international negotiation at the time of committee action on the executive branch request for this amount. Because of the favorable aspects of IFAD's performance to date and in order to strengthen the hand of U.S. negotiators in the replenishment negotiations, the committee approved the authorization, which will be subject to later appropriations action.

Information given the committee indicated that the replenishment goal is again to be about $1 billion, and that if the replenishment is negotiated, the OPEC contribution would be well more than double the U.S. contribution of $180 million and in a ratio higher in this respect than was the case with the initial funding. The committee stresses again, as it did for the initial funding, the need for equitable burden sharing in contributions to the Fund. It also reaffirms its intention that IFAD staffing be held to a minimum level as indicated in the original executive branch presentations concerning the proposed size and activities of IFAD.

*Section 302—Population and health*

This section amends section 104(g) of the Foreign Assistance Act to authorize the appropriation of $273,370,000 in fiscal year 1982 and $297,699,000 in fiscal year 1983 for population programs, and

$133,405,000 in fiscal year 1982 and $145,278,000 in fiscal year 1983 for health programs. The amount for population programs for fiscal year 1982 represents a $20 million increase over the executive branch revised request, and the amount for health for fiscal year 1982 is a $13 million increase over this request.

The committee's decision to increase the funding for population programs reflects its recognition of the importance of programs, both bilateral and through such international organizations as the U.N. Fund for Population Activities and the International Planned Parenthood Federation, in dealing with the critical problem of population. It notes that requests from developing countries for assistance in population now exceed the funds from all sources available to meet these requests. In the face of these increasing requests, U.S. assistance over the past few years has remained at virtually the same level.

The populations of such large nations as India, Bangladesh, and Indonesia are expanding so rapidly that they will, if unchecked, double within the next generation. Such rapid growth would create increasingly severe pressures on resources, drastically limit the gains from continued economic growth, and increase the prospects of political instability. U.S. aid programs should place continued emphasis, in a manner consistent with U.S. laws, on working with peoples and governments of aid recipients to reduce these rates of populations growth as soon as possible.

The amount recommended for health programs for fiscal year 1982 reflects in part the committee's approval of the recommendation of the Subcommittee on Africa that $3 million be added to this account for programs in Zaire. In approving the additional $10 million increase in health programs, the committee encouraged the President, to the extent practicable, to provide at least $20 million in health assistance to projects sponsored by private and voluntary organizations in developing countries.

*Section 303—Education and human resources development*

Section 303(a) amends section 105(a) of the Foreign Assistance Act to authorize the appropriation of $109,574,000 for education and human resources and programs for fiscal year 1982 and $119,326,000 for these programs for fiscal year 1983. Section 303(b) earmarks $5,700,000 of these funds to finance undergraduate and professional education in the United States for South African students who are legally restricted from obtaining an adequate education on those levels in their country. Up to $1,000,000 of the $5,700,000 may be drawn each year from Economic Support Fund allocations for southern African regional programs.

In approving ths authorization for education and human resources programs, the committee noted that AID's education budget has declined significantly as a percent of its total budget, from a level of 15.2 percent in fiscal year 1974 to the current level of 8 percent. Furthermore, since the "New Directions" foreign assistance legislation was approved, the Agency has not issued a general policy statement regarding its education programs.

The committee has also noted that several recent reports have documented what common sense implies—that in addition to its intrinsic value, education has positive effects on such important issues as people's receptivity to new agricultural techniques, their

views about desired family size, and the health of their children. School attendance in many developing countries, particularly for girls, however, remains very low.

The Agency for International Development is therefore requested to define its policy with regard to priorities for education programs and to provide the committee with a report on this policy. It is expected that such a policy review will take into consideration such issues as the trade-offs between supporting various levels and kinds of education programs, and the particular activities for which AID is best equipped to focus its efforts, in relation both to its own capabilities and those of other donors.

*Section 304—Energy development and production*

Section 304 amends section 106 of the Foreign Assistance Act to create a separate functional account for energy development and production. This provision separates the energy provision in the existing section 106 of the act from the other provisions of that section, placing all of the energy provisions in a new section 106 and the other provisions in a new section 107. The committee has not changed the administration's funding requests for energy programs. There is also no change intended in the current practice of funding energy-related agricultural activities through section 103, the agricultural, rural development, and nutrition account.

The purpose of this change is to provide a stronger programmatic basis from which the United States can continue to expand bilateral energy activities. The committee notes that AID's energy programing from all functional accounts has increased significantly over the past few years, from $52.5 million in fiscal year 1981 to a total of $93.25 million in fiscal year 1982. However, the committee remains concerned that there is no focal point for energy activities within AID and intends by this amendment to encourage AID to give the priority to energy development that would be commensurate with the devastating impact of oil import on the economies of developing countries.

The kinds of activities which will be funded out of the new section 106 energy development and production account include energy planning, institution building, renewable energy projects, energy conservation programs, fossil fuel surveys, and energy training.

This section authorizes the appropriation of $39,446,000 for fiscal year 1982 and $42,957,000 for fiscal year 1983 for energy programs.

*Section 305—Private voluntary organizations and selected development activities*

This section amends new section 107 of the Foreign Assistance Act (as redesignated by section 304 of this legislation) to authorize the appropriation of $178,794,000 for fiscal year 1982 and $194,707,000 for fiscal year 1983 for section 107 of the act, private voluntary organizations and selected development activities. Section 107 authorizes funds for: Technical assistance, particularly through U.S. private and voluntary agencies and regional and international development organizations; research and evaluation of the process of economic development; reconstruction following natural or manmade disasters; programs to help solve the special development problems and to make possible the proper utilization of

infrastructure and related projects funded with earlier U.S. assistance; and programs for urban development.

The funds authorized by the committee for this section are $40 million higher than the administration's request for this specified section for two reasons. First, the committee placed into this section the $10 million which the administration proposed for a new section on scientific and technological cooperation. As the purposes of that section were identical to the purposes of the Institute for Scientific and Technological Cooperation (ISTC), authorized by title IV of the International Development Cooperation Act of 1979, the committee considered it redundant to create a separate functional account. Authorizing these funds in section 107 provides the administration with the flexibility to use the funds as intended, for programs of scientific and technological cooperation as were designed for the ISTC, without the formal ISTC structure. The committee remains supportive of the concept of an ISTC and would hope that the existing authorizing legislation would at some point be implemented.

Second, the committee authorized an additional $30 million to add to the $20 million initiative proposed by the administration in this section for African refugess. The administration indicated that it intends to provide vocational training, primary health care, and semipermanent housing to help these refugees and displaced persons become self-sufficient members of their new societies.

Today, Africa has the largest population of refugees and displaced persons of any continent. The United Nations High Commissioner for Refugees estimates there are approximately 4 million refugees in Africa.The care and feeding of these displaced persons places a heavy burden on local governments and has a negative impact on their development programs. Further, it is becoming increasingly clear that many of these persons will not be able to return home in the near future and assistance must be provided to address their long-term needs. The committee's recommended increase over the amount of assistance the administration intends to program for meeting these needs is proposed particularly to help meet the needs of refugees in the Horn of Africa.

Section 105 expands the authorization to provide assistance for programs of reconstruction following natural or manmade disasters also to programs of disaster preparedness, including the prediction of and contingency planning for natural disasters abroad.

*Section 306—Human rights*

This section amends section 116(e) of the Foreign Assistance Act to authorize and encourage the President to use not less than $1,500,000 of the funds available for fiscal years 1982 and 1983 for studies to identify and carry out programs and activities which will encourage increased adherence to civil and political rights as set forth in the Universal Declaration of Human Rights in countries eligible for assistance.

AID supported about 40 projects in 1980 and about 15 projects to date in 1981 (workshops, conferences, and studies) under this section. Continued support under this section for such activities is recommended by the committee.

*Section 307—Environment and natural resources*

This section amends section 118 of the Foreign Assistance Act, "Environment and Natural Resources," in several aspects.

Subsection (a) adds findings, drawn from the Global 2000 report, that if current trends in the degradation of natural resources in developing countries continue, they will severely undermine the best efforts to meet basic human needs, to achieve sustained economic growth, and to prevent international tension and conflict, and that it is in the economic and security interests of the United States to provide leadership in international environmental matters.

Subsection (b) strengthens existing authority for the President to furnish assistance which would help developing countries to protect and manage their own environment.

Subsection (c) codifies AID's current practice of preparing environmental impact statements for U.S. aid programs which significantly affect the global commons or the U.S. environment, and more limited environmental impact assessments where the environment of a foreign country or countries would be significantly affected. In carrying out this mandate, AID is urged, where appropriate, to use local technical resources. The President may establish exceptions from these requirements for emergency conditions and for cases in which compliance with such requirements would be seriously detrimental to the foreign policy interests of the United States.

In adopting this new language, the committee intended to underscore the urgency of seeking solutions to widespread problems of international environmental deterioration and to insure that AID continue its current practice of taking environmental considerations fully into account in its decisionmaking process. The committee does not, however, expect this amendment to section 118 to impose any more or any fewer requirments on AID than are already set forth in AID's own environmental procedures (regulation 16, 22 CFR par. 216). Indeed, the committee struck the specific reference in the original draft of the amendment to the "National Environmental Policy Act of 1969" so as to avoid confusion on this point. AID's procedures were first adopted in 1976 and most recently modified in October 1980 to reflect operating experience.

It was pointed out during the debate that these procedures have enabled AID to identify early potential environmental and health hazards associated with proposed AID projects, hazards which could undermine the viability of such projects, and in some cases, prove politically embarrassing to the United States. Specifically cited was a case involving a proposed sewage disposal plan for Panama where, because AID discovered serious threats to nearby shrimp industries, the Agency was able to design an alternative, environmentally sound project. AID's cadre of environmental experts also in 1980 discovered that a host-country contribution to a U.S.-sponsored pesticide program included a chemical that had been found to cause malformed births. The chemical was removed early on in the project and serious consequences were avoided locally and in other locations where this pesticide was to be introduced.

Section 307 also adds new policy language to section 118 of the Foreign Assistance Act on the destruction and loss of tropical forests. The purpose of this additional language is to highlight the se-

rious threat that continued alteration and loss of the world's tropical forests pose to development and the environment in tropical developing countries. The provision directs the President to take into consideration the report and recommendations of the U.S. Interagency Task Force on Tropical Forests and expresses the sense of Congress that the President instruct U.S. representatives to appropriate international organizations including the multilateral development banks, to urge that this problemi receive a higher priority in the programs of these organizations and that they improve cooperation and coordination among themselves with respect to tropical forest activities.

*Section 308—Sahel development program*

Section 308(a) amends section 121(c) of the Foreign Assistance Act to authorize the appropriation of $86,558,000 for fiscal year 1982 and $117,068,000 in fiscal year 1983 for the Sahel development program. Combined with $20,442,000 available from previous no-year authorizations for the Sahel program, the amount available for appropriation in fiscal year 1982 will total $107,500,000, the amount requested by the President.

Section 308(b) adds a new subsection to section 121 of the Foreign Assistance Act to provide that funds to carry out the activities of the Sahel program may not be made available to any foreign government for disbursement by that government unless AID's Administrator determines that that government will maintain an accounting system which will provide adequate control over the receipt and expenditure of such funds.

Testimony before the Subcommittee on Africa and a recent report on the Sahel program by AID's Inspector General pointed out serious deficiencies in host country accounting for local currency funds supplied by AID. These deficiencies have resulted in situations in which accounting for substantial amounts of AID local currency funds disbursed to host governments cannot be verified.

The purpose of this new section is to direct AID to insure that means exist to provide adquate accountability for U.S. assistance to the Sahelian states.

*Section 309—Housing guaranty programs*

This section amends section 222 of the Foreign Assistance Act to extend the authorities for the housing guaranty program through September 30, 1984, and provides a ceiling on guaranties of $1,718 million. It also provides a technical change in the law to permit fees and other income to be placed in an interest-bearing account, as is permitted for other similar programs.

*Section 310—International organizations and programs*

Section 310(a) amends section 301 of the Foreign Assistance Act to authorize U.S. participation in and use of funds for assistance to the International Food Policy Research Institute (IFPRI). IFPRI, located in Washington, D.C., is one of the international agricultural research institutions which have been funded by various donors including the United States. Statutory authorization for U.S. participation in an international organization is one of the prerequisites for the State department to recommend to the President that the organization can be designated under the International Organiza-

tion Immunities Act (IOIA). Designation under IOIA makes an organization eligible for certain privileges and immunities relating to tax exemptions and travel facilitation. A similar authorization has previously been enacted for the International Fertilizer Development Center, an international organization located in Alabama, under section 310(f) of the Foreign Assistance Act.

Section 310(b) amends section 302(a)(1) of the Foreign Assistance Act to authorize the appropriation of $255,650,000 for fiscal year 1982 and $278,403,000 for fiscal year 1983 for U.S. voluntary contributions to international organizations and programs. The fiscal year 1982 increase of $40,650,000 above the President's request provides additional U.S. support of development assistance activities and programs in this section, bearing in mind that the United States plans to delay payment of its assessed contributions to the United Nations over the next several years. The committee noted that the U.S. share of voluntary contributions to the United Nations over the past several years has fallen below the pledge of the U.S. delegation in 1972 at the United Nations to contribute 25 percent of the assessed and voluntary budgets of these international organizations and programs. The U.S. per capita contribution to a number of these organizations and programs is much lower than that of many Western allies.

U.S. voluntary contributions complement its bilateral efforts to improve the condition of the world's poor. They also reflect the understanding that improved social and economic conditions are likely to promote political stability in the developing world. It should also be noted that the United States receives a considerable return on these contributions, since programs based in New York as well as abroad purchase U.S. technical expertise and equipment in amounts that frequently surpass U.S. contributions. Finally, the United States expects Americans to continue to serve in top positions in these international organizations and programs. U.S. financial commitments of the amounts recommended here are necessary for this purpose and for other reasons noted here.

With these considerations in mind, the committee recommends U.S. voluntary contributions to various international organizations and programs in the amounts indicated on the following table:

*Committee recommendations on international organizations and programs for fiscal year 1982*

[In thousands of dollars]

| | |
|---|---|
| U.N. development program | 154,500 |
| Interim Fund for Science and Technology | 5,000 |
| U.N. Children's Fund (UNICEF) | [1] 45,000 |
| Organization of American States | 16,500 |
| U.N. capital development program | 2,000 |
| FAO/world food program | 2,500 |
| U.N. education and training program for southern Africa | 1,000 |
| Institute for Namibia | 500 |
| U.N. Trust Fund for South Africa | [1] 400 |
| U.N. Decade for Women/Voluntary Fund | 500 |
| WMO/voluntary assistance program | 2,300 |
| International Atomic Energy Agency | 14,100 |
| U.N. environment program | [1] 8,200 |
| Convention on International Trade in Endangered Species | 150 |
| U.N. Institute for Training and Research | [1] 500 |
| U.N. fellowship program | 2,500 |

Total ............................................................................................................. 255,650

[1] Earmarked.

The committee approved the recommendations of the Subcommittee on Human Rights and International Organizations to increase the amounts recommended for the U.N. Children's Fund to $45 million and for the U.N. environmental program to $8.2 million, and to add $0.5 million for the U.N. Institute for Training and Research. It also approved the subcommittee's recommended earmarks of three programs. The committee endorsed the full amount of the President's request for a U.S. contribution to the Organization of American States and the International Atomic Energy Agency's safeguards program.

The committee also approved increases in the U.S. contribution to the U.N. development program, the Interim Fund for Science and Technology for Development, and upon the recommendation of the Subcommittee on Africa, to the South Africa Trust Fund.

The U.N. development program is the central funding agency in the U.N. family responsible for coordinating and delivering development assistance to poor member countries. The committee recommends a $25 million increase in the U.S. contribution, bringing the total to $154.5 million or 16.8 percent of UNDP's 1982 fiscal year budget. The Administrator of UNDP is an American who has initiated greater efficiency, effectiveness, and economy in UNDP's management and capacity to deliver technical assistance. Soviet representatives in the U.N. characterize UNDP as one of the most effective tools of American foreign policy. U.S. firms stand to gain considerably more in sales and contracts than the amount of the U.S. contribution.

The U.S. contribution of $5 million to the U.N. Interim Fund for Science and Technology for Development (IFSTD) is intended to provide international assistance to assist developing countries to build the science and technology infrastructure required to meet their own science and technology needs and development problems in the future. The United States initially anticipated a $20 million contribution to the $250 million Interim Fund, whose establishment was recommended by the 1979 U.N. Conference on Science and Technology. The $5 million provided here will retain at least a minimal U.S. participation in the Fund's activities to which 75 countries have already pledged $40 million.

The $0.4 million earmarked contribution to the South Africa Trust Fund is to be allocated to persons unjustly imprisoned as a result of apartheid policy and practice in South Africa and their families who are in need of legal counsel and advice.

The committee recommends the continuing support of overhead expenses for the U.N. fellows programs in the amount of $2.5 million. Under this program, the U.N. agencies select and fund U.N. fellows—usually government officials from developing countries or students destined for government service—to receive training in U.S. universities or in Federal Government agencies. The $2.5 million is used by AID to support administrative costs of 20 government agencies that operate training programs themselves or that arrange for the training of fellows in U.S. universities.

The committee recognizes the useful work of other U.N. programs, such as the U.N. Research Institute for Social Development and hopes the administration will submit requests for their funding in the future.

Section 310 also amends section 301 of the Foreign Assistance Act to authorize U.S. participation in the International Food Policy Research Institute.

### Section 311—Trade and development program

This section amends section 661 of the Foreign Assistance Act.

Section 311(a) changes the caption of section 661 from "Reimbursable Development Programs" to "Trade and Development Program" (TDP). This change reflects the administration's action in 1980 in removing the reimbursable development program from within AID and recreating it as the trade and development program, a separate component of the International Development Cooperation Agency. The purpose of this structural change, which was welcomed by the committee, was to enhance the priority given to the program and its ability to function.

Section 311(b) authorizes the appropriation of $10 million for fiscal year 1982 and $10,890,000 for fiscal year 1983 for the trade and development program. The administration had requested $6,907,000 for fiscal year 1982. In increasing the funds, the committee intends to demonstrate its enthusiams for this program, which produces substantial U.S. export benefits, and to respond to the fact that many meritorious and beneficial projects have had to be turned down because of insufficient funding. Trade and development projects have resulted in U.S. exports amounting to as much as several hundred dollars for every TDP dollar spent. The committee's addition of slightly over $3 million, therefore, can be expected to contribute significantly to U.S. exports.

The committee notes an unfortunate bias against smaller projects under the TDP program, possibly a consequence of the requirement that foreign governments formally request projects, and the preference of such foreign governments for larger projects. The committee suggests that the managers of the program work actively with foreign governments to achieve a greater balance of larger and smaller projects in the future. It suggests also that the program managers increase their efforts to obtain reimbursement from U.S. companies which have gained economic benefits from TDP projects when their benefits would justify such reimbursement, and that they give high priority to alternative energy feasibility projects.

### Section 312—African Development Foundation

Section 312 amends section 510 of the International Security and Development Cooperation Act of 1980 to provide that $2 million in fiscal year 1982 and $2,178,000 in fiscal year 1983 of the funds appropriated to carry out part I of the Foreign Assistance Act of 1961, other than the Economic Support Fund, shall be used to carry out the activities of the African Development Foundation.

The Foundation was created in fiscal year 1981 and $2 million was provided to carry out its purposes. The administration has requested a rescission of the fiscal year 1981 funding and did not request funds for fiscal year 1982. In again authorizing funds for the African Development Foundation, the committee intends to demonstrate its continuing support for the Foundation.

### TITLE IV—FOOD FOR PEACE

Title IV of H.R. 3566 contains amendments to the Agricultural Trade Development and Assistance Act of 1954, the law authorizing the food-for-peace program (also commonly known as Public Law 480). Public Law 480 finances shipment abroad of U.S. agricultural products which are in excess of domestic requirements and anticipated commercial exports. The law provides for a range of constructive uses of the food-for-peace assistance, including humanitarian food aid, assistance for economic development in developing countries, promotion of U.S. farm exports, and for other foreign policy purposes.

Because the current 4-year authority for continuation of the food-for-peace program expires at the end of 1981, the executive branch requested extension of the authority, for another 4 years, and some other amendments mostly related to funding and technical matters.

Jurisdiction over Public Law 480 in the House resides with the Committee on Foreign Affairs with respect to the foreign policy, overseas distribution, and nondomestic aspects of the program, and with the Committee on Agricultural with respect to its domestic aspects. Jurisdiction is shared by the two committees on those aspects spanning both foreign and domestic Public Law 480 activities. The two committees have again acted cooperatively in Public Law 480 matters this year, as in the past, and have designated provisions requested by the executive branch for inclusion either in the foreign assistance or in agricultural omnibus legislation for this year, depending on the subject matter. The Committee on Foreign Affairs took action on the provisions within the joint jurisdiction of the two committees, for inclusion in the 1980 agricultural legislation, as follows:

*Title II authorization ceiling.*—The committee increased, from $750 million to $1 billion, the annual ceiling on Public Law 480 title II contained in section 204 of that act.

*Annual report.*—The committee changed, from April 1 to February 15, the date for the annual report required under section 408(a) of the act.

*Extension of authorities.*—The committee approved a 4-year extension of the Public Law 480 program, until December 31, 1985.

Additionally, the committee approved an administration-requested *overseas market development* amendment to section 402 of the act, adding alcoholic beverages to the commodities for which Public Law 480 foreign currencies may be used for market promotion. Wine and beer already are eligible under the law. The amendment is agreed to be included in the agricultural legislation without prejudice to the jurisdiction of the Committee on Foreign Affairs in this matter. The text of the committee amendments to be included in the agriculture legislation follows the sectional analyses for title IV of this bill.

The following principal amendments to public Law 480 in H.R. 3566 were initiated by the Committee on Foreign Affairs focus on the humanitarian and developmental aspects of the food-for-peace program:

*Self-help.*—Sections 403 and 404 of the bill strengthen the important provision of Public Law 480, section 109, which requires con-

sideration, before providing aid through concessional sales of food-for-peace commodities, of the extent to which the aid-receiving countries are carrying out self-help measures to increase their own agricultural production. These sections are derived from comparable provisions in H.R. 2793, the Hunger and Global Security Act.

*30-percent limit.*—In order to prevent an excessive amount of Public Law 480 concessional sales assistance from going to any one country, in view of the many other countries which need food aid, section 405 of the bill limits the amount which can go to any single nation in 1 year to no more than 30 percent of the total.

*Title II minimum.*—Section 406 of the bill provides a 1.2-million-ton annual minimum for the flow of food to the regular, nonemergency programs of private voluntary agencies and the world food program overseas for activities such as school lunches, mother/child health care, and food-for-work. This minimum, a subminimum to the 1.7-million-ton overall minimum for title II grants, protects these humanitarian programs against damaging fluctuations in food supplies which could otherwise occur from diversions of available commodities to other purposes.

### 1. Study on developmental use of Public Law 480

In it continuing interest in Public Law 480 benefits for economic development of developing countries, the committee considered various proposals for improving developmental effectiveness of the program in addition to the amendments it did adopt to section 109, the self-help provision for title I concessional sales.

The committee deliberation made clear that furthur information is needed than is presently available concerning the potentials for strengthening the developmental effectiveness of the food-for-peace program. The committee therefore requests that a study be conducted into the present impact of Public Law 480 on economic development on developing countries, and ways in which it could be made more effective. The study should include, but not be limited to, the potential for using terms and interest rates on title I loans as incentives for developmental use of Public Law 480; the relationship between Public Law 480 loan terms and other loans extended by the U.S. Government; the present and potential developmental impact of title II shipments; and the present impact of title III (food-for-development programs) and ways in which its effectiveness might be improved. In requesting the study related to developmental aspects of Public Law 480, the committee is not intending to lessen its support also for the humanitarian, foreign policy and trade developmental benefits of Public Law 480. The study should take into account what impact, if any, the present or potential developmental uses of Public Law 480 would have on other purposes of the act. The committee suggests that the study should be undertaken under the leadership of the International Development Cooperation Agency, inasmuch as the responsibilities of IDCA extend beyond bilateral economic development assistance to include the range of U.S. relationships with developing countries including food aid and debt terms. Information from interested private voluntary organizations should be included in the study as appropriate. The committee requests that the study results be reported to the committee by December 31, 1981.

## 2. Public Law 480 title II in Africa

It is the committee's understanding that although the administration plans a worldwide reduction in the Public Law 480 title II program for fiscal year 1982, the percentage of the worldwide total planned for Africa should be about equal to that planned for fiscal year 1981. Given Africa's precarious food situation, burgeoning refugee problems and relative deprivation among developing regions, the committee urges the administration at least to meet this target and to provide additional assistance if resources are available. It expects Africa will receive the largest portion of the Public Law 480 title II unallocated reserves.

## Section 401—Repeal of obsolete foreign currency provisions

This section is a technical amendment designed to repeal provisions of the Agricultural Trade Development and Assistance Act of 1954 (commonly referred to as Public Law 480, or the food-for-peace program), which became obsolete with the termination as of December 31, 1971, of authority under title I to sell agricultural commodities for foreign currencies not convertible into dollars or of use for certain specified purposes. The technical rearrangement includes transfer of a provision previously in section 103(b) of the act, dealing with payment terms, to section 106(a), which contains other provisions concerning payment terms.

## Section 402—Emergency or extraordinary relief requirements

Section 402 amends section 104(d) of Public Law 480 by raising from $5 million to $10 million the amount which may be available for section 104(d) purposes in any fiscal year. Section 104(d) authorizes the use of foreign currencies received from sales of commodities under title I of the act for assistance to meet emergency or extraordinary relief requirements other than requirements for food commodities.

## Section 403—Self-help measures to increase agricultural production

Section 403 amends section 109(a) of Public Law 480 in two respects. Section 109(a) lists self-help measures by recipient countries which the President is to take into account entering into title I sales agreements. Section 403 adds (1) reducing illiteracy among farmers, and (2) carrying out programs to improve the health of farmers and their families to that list.

## Section 404—Assessment of self-help provisions

Section 404 adds a new subsection (d) to section 109 of Public Law 480. Section 109 deals with self-help measures undertaken by title I recipient countries to increase their agricultural production. The new subsection provides that:

(1) Each title I sales agreement shall describe the economic and self-help measures the recipient government agrees to undertake (a) to the maximum feasible extent, in quantitative and measurable terms, and (b) in a manner insuring that the needy people in the recipient country will be the major beneficiaries of the self-help measures.

(2) The President, shall, to the maximum feasible extent, satisfy himself that the economic development and self-help meas-

ures in each agreement are additional to the measures which the recipient government otherwise would have undertaken.

(3) The President shall take all appropriate steps to determine whether the economic development and self-help provisions of each agreement are being fully carried out.

The committee adopted the amendment with the intent of strengthening self-help efforts under title I of Public Law 480 and in view of the vagueness which has characterized many of the self-help provisions in title I agreements to date. By including greater specificity in the self-help provisions, officials charged with implementation of title I programs will be able to target developmental and self-help objectives more clearly and to encourage and monitor progress toward achieving these objectives. The "additionality" requirement is intended to insure also that the self-help provisions in title I agreements are not merely references to activities which would occur regardless of whether there were Public Law 480 asistance, but in fact reflect an additional effort. However, "additional" measures could incude activities previously considered and favored by the title I recipient which could not be implemented without the resources provided by the agreement. The "additionality" requirement should not be construed to encourage "new" projects of low priority within the recipient country's development plan.

The committee wishes to make clear that the amendment is not to be misconstrued to impose bureaucratic requirements that would hamper the implementation of title I programs. For example, the amendment states that self-help measures shall be described in quantitative and measureable terms "to the maximum feasible extent," recognizing that there may be instances, such as assistance to meet emergencies, in which it would not be feasible to develop quantitative and measureable self-help terms in the limited time available. By seeking greater specificity and measurability, the committee does not wish in any way to discourage the administration from focusing on the most important policy or program problems which may be impeding agricultural production.

The reference to needy people is similar to the thrust of New Directions policy under the Foreign Assistance Act. The "additionality" requirement is intended to be essentially the same as that which already applies to title III of Public Law 480: Food for Development, and should be applied and administered in similar fashion. While the economic development and self-help provisions in most cases would be included in the public text of a title I agreement, it could still be within the intent of the amendment, where necessitated for reasons such as political sensitivity, to include specific terms in letters or other forms of agreement which are less public. The committee intends to monitor implementation of the amendment and expects timely responses from the executive branch to any committee requests for information on how the provisions are being carried out.

*Section 405—Allocation of title I assistance*

This section amends Public Law 480 by adding a new section 116 to that act. The new section 116 provides that no more than 30 percent of the total dollar amount of concessional sales under title I of Public Law 480 in each fiscal year may be to any one country.

The intent of the amendment is to prevent excessive allocations of title I sales to any one country, and concomitantly to have at least 70 percent of the total available for other countries. The committee believes that with the limitations on funding and food shipments available under title I, the food shortages prevailing in many places around the world, and the difficulties in making decisions on allocations in tight situations, the annual allocation of as much as 40 percent or more of the total to one country, as is now the case, reduces the opportunity for most effective use of the title I aid. The new requirement would take effect beginning with fiscal year 1983.

*Section 406—Title II minimum*

This section amends the subminimum requirement in title II of Public Law 480. Section 201(b)(3) of the act presently sets a minimum for title II distribution of 1.7 million metric tons a year, of which not less than 1.4 million metric tons is to be distributed through nonprofit voluntary agencies and the world food program. The amendment reduces the subminimum from 1.4 to 1.2 million metric tons, and applies the subminimum only to nonemergency programs. The intent of the amendment is to assure availability of at least 1.2 million tons of Public Law 480 commodities yearly for the regular, nonemergency programs of private and voluntary agencies and the WFP, regardless of the amounts of title II distributed to meet emergency situations. The amendment protects the 1.2-million-ton subminimum against drawdowns for emergency purposes. The distribution above 1.2 million tons, to 1.7 million tons and above, may be used flexibly for regular and for emergency programs depending on the priorities of a given year.

*Text of Public Law 480 provisions approved by the Committee on Foreign Affairs for inclusion in the 1980 agriculture legislation*

### TITLE II AUTHORIZATION CEILING

Sec. —. Section 204 of the Agricultural Trade Development and Assistance Act of 1954 is amended by striking out "$750,000,000" in the first sentence and inserting in lieu thereof "$1,000,000,000".

### OVERSEAS MARKET DEVELOPMENT ACTIVITIES

Sec. —. Section 402 of the Agricultural Trade Development and Assistance Act of 1954 is amended by striking out "or beer" in the second sentence and inserting in lieu thereof ", beer, or other alcoholic beverage"

### ANNUAL REPORT

Sec. —. Section 408(a) of the Agricultural Trade Development and Assistance Act of 1954 is amended by striking out "April 1" and inserting in lieu thereof "February 15".

### EXTENSION OF AUTHORITIES

Sec. —. Section 409 of the Agricultural Trade Development and Assistance Act of 1954 is amended—

(1) in the first sentence by striking out "1981" and inserting in lieu thereof "1985"; and

(2) in the second sentence by striking out "Food and Agriculture Act of 1977" and inserting in lieu thereof "[Short title of bill]".

### TITLE V—OTHER ASSISTANCE PROGRAMS

#### Section 501—American schools and hospitals abroad

This section amends section 214(c) of the Foreign Assistance Act to authorize the appropriation of $20 million for each fiscal year 1982 and 1983 for the American schools and hospitals abroad (ASHA) program. Although the amount authorized is $12.5 million above the amount requested by the executive branch, the committee notes that it is the level at which the ASHA program has been funded under the fiscal year 1981 continuing resolution.

#### Section 502—International narcotics control

Section 502(a)(1) repeals section 481(d) of the Foreign Assistance Act, which prohibited the use of international narcotics control funds for spraying herbicides on marihuana plants if the Secretary of Health and Human Services advises the Secretary of State that such herbicides are likely to cause serious harm to the health of consumers of the sprayed marihuana.

Section 502(a)(2), originally proposed in the 97th Congress as H.R. 2364, authorizes the use of previously appropriated funds for spraying herbicides on marihuana plants as previously prohibited by subsection (d) of section 481.

Section 502(a)(3), also taken from H.R. 2364, authorizes the use of funds previously appropriated for fiscal year 1980 which were obligated for assistance to the Republic of Colombia, for purposes other than those specified in section 482(a)(2) of the Foreign Assistance Act. Section 482(a)(2) at that time had limited the purposes for which the $16 million earmarked for Colombia during fiscal year 1980 could be spent to (A) helicopters, patrol vessels, fixed radar equipment, transport vehicles and fuel which will be used exclusively for interdicting drug traffic, and (B) for training personnel with respect to the interdiction of drug traffic.

Section 502(a)(4) states that subsections 502(a)(2) and 502(a)(3) are authorizations for new and amended uses of previously appropriated funds and as such, still must be provided for in an appropriations act before these provisions can take effect.

The committee recognizes that lifting the ban on the use of funds for programs utilizing these herbicides does not assure their effective deployment of funds in Colombia, where they are most needed. The committee calls on the Department of State to emphasize to the Government of Colombia the health and societal damage being caused by narcotics in both nations and the importance which the Congress attaches to the cooperation of the Colombian Government in implementing as soon as possible effective measures such as the large-scale spraying of the herbicide paraquat, to limit the cultivation of marihuana in Colombia.

Section 502(b) amends section 482(a) of the Foreign Assistance Act to: (1) Authorize the appropriation of $37,700,000 in fiscal year 1982 and $41,055,000 in fiscal year 1983 to carry out the interna-

tional narcotics control program; and (2) restates the provision of existing law that funds appropriated for this purpose are authorized to remain available until expended.

### Section 503—International disaster assistance

This section amends section 492 of the Foreign Assistance Act to authorize $27 million in each of the fiscal years 1982 and 1983 for international disaster assistance, the same amount as proposed by the executive branch for fiscal year 1982.

### Section 504—Assistance for victims of strife in El Salvador

This section authorizes $5 million in fiscal year 1982 and $5,445,000 in fiscal year 1983 for humanitarian assistance for those made homeless by the ongoing violence in El Salvador. The assistance is intended to be available for such persons wherever they may be concentrated in large numbers, in El Salvador itself or in neighboring countries. This assistance will be governed by the general authorities of section 491 of the Foreign Assistance Act, but it is anticipated that it will be administered by the Bureau of Refugee Programs within the Department of State in combination with other officials familiar with the problems of El Salvador and the region.

Several international relief agencies and private voluntary organizations are active in providing assistance to victims of the Salvadoran violence, and it is expected that money authorized under this section will be used in part to facilitate the work of these groups.

### TITLE VI—PEACE CORPS

This title takes the important initiative of separating the Peace Corps from ACTION, restoring to it the independence it enjoyed when it was established 20 years ago.

In 1979, in response to a similar initiative from the Committee on Foreign Affairs to separate the Peace Corps from ACTION, the executive branch responded with Executive Order 12137, establishing the Peace Corps as in autonomous agency within the ACTION agency. Although this reorganization provided some measure of greater direct control for the Peace Corps over its own programs, it left several crucial areas, such as volunteer recruitment, under shared authority with ACTION. More importantly, it failed to define clearly the overall authority of the ACTION Director to the Peace Corps, thus leaving this vital area open to questions in the future.

The committee's continued interest in the reestablishment of an independent Peace Corps stems from two major concerns. First, the Peace Corps can be run more efficiently and effectively as an independent agency, with restored vitality and visibility. Second, the committee's action reemphasizes its intent that the Peace Corps be insulated from short-term political concerns—both foreign and domestic pressures—to maintain its credibility as a nonpolitical person-to-person expression of American values. The committee continues to support the principles set forth by the Department of State in April, 1978, reaffirming the day-to-day autonomy of the Peace Corps and of Peace Corps country directors in their relationship to U.S. country teams abroad. The statement made by Dean

Rusk 20 years ago continues to hold true today "* * * to make the Peace Corps an instrument of foreign policy is to deprive it of its contribution *to* foreign policy."

Now in its 20th anniversary year, the Peace Corps has established a distinguished history. The more than 80,000 volunteers who have served around the world have carried out the Agency's lofty statement of purpose, to promote world peace and friendship through the technical assistance, and to promote better understanding on a personal level between the United States and the many countries where they have served. By reestablishing the Peace Corps as an independent agency, the committee seeks to strengthen the Peace Corps ability to promote its special kind of international diplomacy: Volunteers living, working, and learning with the people of other countries, and returning to share their experiences with the people of this country.

*Section 601—Establishment as an independent agency*

Section 601(a) removes the Peace Corps from the ACTION agency and establishes it as an independent agency within the executive branch.

Section 601(b) amends section 4(b) of the Peace Corps Act to direct the President to exercise the functions vested in him by the Peace Corps Act through the Director of the Peace Corps.

Section 601(c) states that the Director of the Peace Corps shall continue to exercise all of the functions under the Peace Corps Act which the Director was performing on the day before the date of enactment of this act; transfers to the Director of the Peace Corps those functions under the Peace Corps Act which were vested in the Director of ACTION; and states that the personnel, liabilities, contracts, property, records, and unexpended balances of available funds used, held, employed, or assumed primarily in connection with function of the Peace Crops prior to the date of enactment of this act shall be employed, held, used or assumed by the Peace Corps on or after the date of enactment.

Section 601(d) requires a report to Congress from the Director of the Office of Management and Budget within 30 days of enactment of this act on the implementation of this section and from the Comptroller General within 45 days on whether the determinations made by the Director of OMB on implementation of this section are equitable.

Section 601(e) declares that any references to the ACTION agency or to the Director of ACTION agency in any official document with respect to Peace Corps functions or activities shall be deemed to refer to the Peace Corps or to the Director of the Peace Corps.

In recommending the establishment of the Peace Corps as an independent agency, the committee emphasized its belief that the vitality and unique person-to-person contribution which the Peace Corps brings to foreign assistance can be maximized if the Peace Corps is fully independent and removed from short-term political considerations in the conduct of U.S. foreign policy. The committee maintains the view, however, that the Peace Corps should continue and strengthen its efforts to coordinate volunteer activities with projects sponsored by the Agency for International Development and other development organizations whenever possible, and to co-

operate with other activities under the auspices of the International Development Cooperation Agency (IDCA), in order to maximize both the role of volunteers and the impact of financial and material support to development efforts. The committee continues to support the Peace Corps role as a member of the Development Coordinating Committee chaired by IDCA.

The committee recognizes that additional legislation may be required in the future to provide necessary authorities to complete the transfer of personnel to an independent Peace Corps.

### Section 602—Authorization of appropriations

Subsection (a) amends section 3(b) of the Peace Corps Act to authorize the appropriation of $105 million for fiscal year 1982 and $114,345,000 for fiscal year 1983 to carry out the purposes of the Peace Corps Act.

The $105 million for fiscal year 1982 is $10 million more than requested by the President, and would be the same as currently appropriated for the Peace Corps in fiscal year 1981. The $10 million restoration to the fiscal year 1981 level was intended to provide adequate resources to the Peace Corps to augment its traditional bilateral country approach with a new, specialized emphasis on refugee assistance programs in those circumstances in which Peace Corps aid is an effective and appropriate means of extending U.S. help.

The committee stresses that given increased attention in this administration and in the country to security concerns throughout the world, a bolstering of the Peace Corps symbolizes the importance of the complementary human dimension of U.S. foreign policy.

Subsection (b) amends section 3(c) of the Peace Corps Act to provide continuing authority to appropriate for nondiscretionary increases in salaries, pay, retirement, and other employee benefits authorized by law.

### Section 603—Integration of disabled people

This section adds a new subsection (h) to section 3 of the Peace Corps Act requiring Peace Corps programs to be administered to give particular attention to activities which tend to integrate disabled people into the national economies of developing countries.

### Section 604—Restoration of certain authorities formerly contained in the Foreign Service Act

Subsection (a) amends section 10 of the Peace Corps Act by adding new subsections (i) and (j) to restore certain authorities formerly contained in the Foreign Service Act of 1946 (which was repealed as of February 15, 1981) and inadvertantly not continued by the Foreign Service Act of 1980.

New subsection (i) gives to the Director of the Peace Corps the same authority as is available under section 26 of the State Department Basic Authorities Act of 1956, to procure legal services abroad. The committee expresses the intention that the Peace Corps work closely with the Department of State to develop coordinated regulations to implement this authority.

New subsection (j) applies the provisions of section 30 of the State Department Basic Authorities Act of 1956 to provide mal-

practice protection to Peace Corps volunteers and persons employed, appointed, or assigned under the Peace Corps Act.

Subsection (b) deletes the last two sentences of section 5(h) of the Peace Corps Act, which are obsolete.

Subsection (c) restricts the expenditure of funds under the authorities provided by the amendments made by subsection (a) to funds appropriated on or before February 15, 1981, or on or after the date of enactment of this act. This is done in order to avoid a possible point of order.

## Section 605—Miscellaneous conforming amendments

Subsection (a) amends section 9 of the Peace Corps Act to revise the reference to section 10(a)(4) to refer correctly to section 10(a)(5).

Subsection (b) repeals section 18 of the Peace Corps Act, which contains an obsolete reference to the Mutual Defense Assistance Control Act of 1951.

### TITLE VII—MISCELLANEOUS PROVISIONS

## Section 701—Excess property

Section 701 amends section 608(a) of the Foreign Assistance Act to allow for the acquisition of nonexcess property. Section 608 provides the basic authority for AID to acquire excess property which becomes available from other U.S. Government agencies, for use in development assistance programs overseas.

Due to changes in the law governing the governmentwide excess property system, AID's access to excess property has been significantly inhibited, thus forcing AID to acquire nonexcess property in order to satisfy the needs of its foreign aid recipients. However, the question has arisen as to whether AID's acquisition of nonexcess property (that is, property for which some reimbursement must be made to the owning agency) is permissible under the language of section 608.

This amendment does not restore AID's priority in acquiring excess property, nor does it increase the property available for acquisition by AID. It merely provides a legal clarification which will remove any question of AID's authority to acquire nonexcess property. The amendment also provides that nonexcess property acquisition by AID be limited to cases in which substantial savings can be achieved by such acquisition.

## Section 702—Construction of productive enterprises in Egypt

This section amends section 620(k) of the foreign Assistance Act. Section 620(k) prohibits assistance under the act to any country for construction of any productive enterprise exceeding $100 million, unless the Congress expressly approves. The section 620(k) prohibition presently does not apply to construction of any productive enterprise in Egypt which is described in the presentation materials to Congress for fiscal year 1977, 1980, or 1981. The amendment strikes out the reference to fiscal years, thus providing a permanent exemption for Egypt. The committee expects of course that proposed assistance projects for Egypt will continue to be contained in congressional presentations as before.

*Section 703—Compensation for participating agency employees*

This section amends section 625(d) of the Foreign Assistance Act to provide for the compensation of non-Foreign Service employees of Federal agencies performing functions under that act under the General Schedule pay system or other pay systems authorized by law in lieu of compensation under the Foreign Service Act pay system. Presently, section 625(d) requires that such employees be compensated at Foreign Service pay rates, often resulting in grade creep, pay windfalls and other pay administration problems as employees move back and forth between the Foreign Service pay system and non-Foreign Service pay systems due to the differences in the pay systems. The amendment gives AID the authority to require agencies to continue to pay such employees under their present pay system; for example, GS, SES, or Public Health Commissioned Officer Corps, while continuing to allow such employees to receive Foreign Service allowances and benefits.

*Section 704—Operating expenses*

This section amends section 667(a) of the Foreign Assistance Act to authorize the appropriation of $343,632,000 for fiscal year 1982 and $374,215,000 for fiscal year 1983, to cover the cost of Washington and overseas operating expenses of the International Development Cooperation Agency and the Agency for International Development, including development assistance and Economic Support Fund programs.

Operating costs include administrative expenses, support costs, and management of program and projects—such as technical planning and management of specific projects, contracting, procurement of commodities, engineering services, and handling of trainees abroad.

Increases in operating expenses are due to expanding programs in Africa, combined with pay raises and substantial inflation in Washington and overseas.

At the end of fiscal year 1980, AID personnel totaled 5,445, of which 3,584 were U.S. nationals. By the end of fiscal year 1981, AID estimates personnel will decline to a level of 5,351, including 3,501 U.S. nationals, of which 1,475 will be in overseas missions. AID projects that by the end of fiscal year 1982 it will have 5,251 employees, including 3,401 U.S. nationals, of which 1,475 will be in overseas missions.

*Section 705—Inspector general*

This section amends the Inspector General Act of 1978 to place AID's Office of Inspector General (AID/IG) within the authorities contained in that act. Hon. Jack Brooks, chairman of the House Committee on Government Operations has introduced, and that committee has approved, H.R. 2098 which includes a provision incorporating AID/IG into the Inspector General Act of 1978. Because some of the provisions relating to the AID/IG office differ from other IG offices, Chairman Brooks agreed on behalf of the Committee on Government Operations that the Committee on Foreign Affairs should include language in this act necessary to place AID/IG in the Inspector General Act.

This amendment:

(1) Places AID/IG in the Omnibus Inspector General Act;

(2) Provides that in addition to the other duties and responsibilities specified in the Inspector General Act, AID/IG shall (subject to the supervision of the Administrator of AID) supervise, direct, and control all security activities relating to the programs and operations of AID in the United States and overseas. The Administrator has overall responsibility for the security of the Agency's operations, while the Inspector General, under the supervision of the Administrator, is responsible for day-to-day management of security operations;

(3) Gives the Director of the International Development Cooperation Agency authority to use the Inspector General to audit all components of IDCA;

(4) Requires that the AID/IG's semiannual reports be submitted to the Director of IDCA;

(5) Provides that both Foreign Service and civil service employees may be assigned to the Inspector General's office and shall be under the supervision of the Inspector General during their assignments;

(6) Provides that the Administrator of AID shall not be bound by overseas personnel ceilings established under the monitoring overseas direct employment policy. The intent is to insure that the Agency is provided with clear-out authority to establish and maintain adequate audit and inspection capability in place in the several regions of the world in which it carries forward the U.S. foreign aid program.

(7) Makes the position of AID/IG subject to Presidential appointment, while exempting the current incumbent from this requirement. This provision states the committee's position that the individual holding the Inspector General office upon enactment of this act can be retained in that position without the necessity of Presidential appointment and Senate confirmation.

*Section 706—Use of certain Polish currencies*

Section 706(a) provides statutory framework for the use, to the extent as may be provided in an appropriation act, of some Polish zlotys which have come into the possession of the United States.

The Commodity Credit Corporation recently sold more than $70 million worth (60,000 tons) of surplus dairy products to Poland. Because of a lack of foreign exchange Poland is paying for the commodities in zlotys, its local currency.

The zlotys could be used for direct U.S. Government expenses for the American Embassy in Warsaw. However, the United States already has a large supply of zlotys from prior years which are ample for such needs for many years. Therefore, this section would make proceeds from the recent sale available to be used by the President in Poland in a manner which serves U.S. interests. It is intended that funds be used for activities of common benefit to the people of the United States and the people of Poland such as the Children's Hospital at Krakow.

Section 706(b) provides that the use of the zlotys made available by the recent sale shall not reduce or affect appropriations otherwise available for the purposes described in subsection (a).

64

*Section 707—Findings regarding global security*

This section and sections 708 and 709 contain policy language drawn from H.R. 2793, the Hunger and Global Security Act, legislation introduced by Representative Stephen J. Solarz and Representative Benjamin A. Gilman which calls for strengthened U.S. efforts to limit hunger around the world. In adopting this language, the committee hopes to draw attention to problems of hunger and poverty and their relationship to the security of the United States and other nations.

Section 707 states that the security of the United States and other countries is affected by a broad range of global problems, of which the most critical include hunger, disease, and extreme poverty. Stating that such problems may lead to unrest and violence, it finds that U.S. global and national security must be defined to include these problems.

At a time when increasing emphasis is being placed on the importance of defense spending and military assistance to the security of the United States, the committee strongly believes it is important to be on record as recognizing that, in an increasingly interdependent world, the resolution of pressing global problems is also in the U.S. national security interest.

*Section 708—Findings and declaration of policy regarding world hunger*

This section states that the Congress declares that the elimination of hunger and its causes is of fundamental moral significance, is in the political, economic, security interests of the United States, and shall be a primary object of U.S. relations with developing countries.

As there are now more hungry people in the world than ever before, the committee believes it is appropriate and desirable to commit the United States to the goal of eliminating hunger throughout the world.

*Section 709—World food security reserves*

This section calls on the President to encourage other grain exporting countries to establish their own food security reserves or take other measures that complement the U.S. food security reserve. The President is required to report to the Congress on his actions and the response of other countries to his proposals. This amendment is designed to strengthen the hand of the administration in its negotiations with other countries by putting the Congress on record in support of the administration's efforts in this regard.

*Section 710—Promoting the development of the Haitian people and providing for orderly emigration from Haiti*

Section 710(a)(1) expresses the sense of Congress that $15 million in functional development assistance funds for fiscal year 1982 should be made available for Haiti subject to certain limitations. This represents an increase of $6.4 million over the $8.6 million proposed by the Reagan administration and a $3 million increase over the amount proposed by the Carter administration.

The funding level recommended by the present administration would allow AID to fund only a limited number of ongoing develop-

ment projects, but would permit no new project proposals and would not allow for expanding the AID program to the northwest region of Haiti, where there is a pressing need and where AID currently has no projects.

The $15 million level recommended in this legislation for Haiti would permit funding of new project proposals, including projects for the northwest region of Haiti which is one of the major sources of illegal emigration due to the overwhelming poverty of that area and its complete lack of infrastructure. The committee is convinced that any development strategy for Haiti's agricultural sector must include a strong commitment to this northwest region. The committee further believes that if economic and political reforms are instituted in the rural areas of Haiti, rural Haitians will be less likely to emigrate.

Section 710(a)(2) increases the overall authorization for section 103(a) of the Foreign Assistance Act, agriculture, rural development, and nutrition, by $6.4 million for fiscal year 1982, the difference between the Reagan administration proposal and the $15 million recommended by the committee.

Section 710(a)(3) stipulates that insofar as practicable, U.S. AID development assistance for fiscal year 1982 should be provided through private and voluntary organizations (PVO's), in order to bypass generally ineffective host-country government agencies and to emphasize grassroots development. Currently, about 30 percent of AID's funding for Haiti is channeled through PVO's. While there is a limit to the absorptive capacity of such organizations, at least some of the additional funds proposed at the $15 million level could be channeled either through PVO's which are currently funded by AID, through PVO's who have expressed interest in AID funding, or through indigenous PVO's. Although this provision specifically states that development assistance to Haiti in fiscal year 1982 should be provided through PVO's, it is the committee's intention that this provision not be limited to fiscal year 1982, and that AID will continue to increase its use of PVO's in Haiti to implement development programs.

Section 710(b) stipulates that no military assistance or development assistance provided in fiscal year 1982 may be expended for Haiti and no foreign military sales credits or guaranties may be approved for use by Haiti for fiscal year 1982 unless the President makes the following determinations:

(1) That the Government of Haiti has cooperated with the United States in halting illegal emigration from Haiti;

(2) That the Government of Haiti has not aided or abetted or in any way supported illegal emigration from Haiti;

(3) That the Government of Haiti has provided assurances that it will cooperate fully in implementing ongoing and new development assistance programs in Haiti; and

(4) That the Government of Haiti is not engaged in a consistent pattern of gross violations of internationally recognized human rights.

With respect to condition No. 1, the President's Interagency Task Force on Refugees and Immigration will soon announce a comprehensive policy for dealing with the overall immigration problem and a specific program for addressing the problem of illegal emigration from Haiti to the United States. If the U.S. program is to

be successful, however, the Haitian Government must enforce its own emigration laws. Moreover, it will probably be necessary to secure an agreement with Haiti involving the orderly return of those Haitian immigrants who do not qualify for political asylum in the United States including credible assurances that such returnees will not be persecuted.

With respect to condition No. 2, it should be noted that there is strong evidence indicating that some Haitian law enforcement officials are involved in the illegal trafficking of boat people and other illegal emigration activities. Therefore, if any enforcement procedure is to be successful, such acquiescence in illegal boat trafficking on the part of Haitian officials must be terminated.

With respect to condition No. 3, although developmental expertise in most major sectors is minimal in Haitian Government ministries, the Government of Haiti has not projected a sincere commitment to improve its capacity in the area of development in order to implement effectively current and future development assistance programs.

The committee recognizes that it cannot dictate the development strategy for any country receiving assistance from the United States. In the case of Haiti, however, the committee feels that it is important that the Haitian Government make such a commitment by instituting those economic and political reforms needed to indicate that Haiti is willing to accept responsibility for its own development.

With respect to condition No. 4, it is important to make clear to the Haitian Government that U.S. insistence on orderly emigration procedures does not mean that U.S. interest in the observance of basic human rights has in any way diminished. Last year the Department of State issued a critical report on human rights violations by the Haitian Government, including arbitrary arrests, expulsions, cruel and inhuman treatment of prisoners, and regular suspensions of civil and constitutional rights. Moreover, the forced exile of journalists and others working for changes in Haiti, in November 1980, has emphasized the perception that the Haitian Government is reluctant to institute policies which are necessary to improve the quality of life of the Haitian poor. The committee, therefore, urges the administration to communicate its concerns about the persistent pattern of human rights violations in Haiti.

While many Haitians may have legitimate claims for political asylum, the Haitian Government cannot be allowed to solve its internal problems by encouraging illegal migration to the shores of southern Florida and other parts of the United States rather than instituting reforms in Haiti. Therefore, the committee has conditioned the continuation of both development and military assistance, not only on the Haitian Government providing assurances that it will cooperate fully in implementing U.S. development assistance programs, but also on the President certifying that the Government of Haiti has cooperated with the United States in halting illegal emigration and that that Government has not aided, abetted, or otherwise supported such activity.

In requiring the Government of Haita to enforce its emigration laws and to cooperate in staunching the flow of illegal emigrants, it is not the intention of the committee that the fundamental right of people to emigrate as embodied in article 13, paragraph 2 of the

Universal Declaration of Human Rights, in any way be infringed. In this regard, the committee notes that current U.S. immigration laws permit 20,000 Haitian nationals to emigrate to the United States annually. Last year less that one-fourth of this quota was used.

Section 710(c) requires the President to report to Congress on the extent to which the actions of the Government of Haiti are consistent with the above conditions.

Section 710(d) amends section 660(b) of the Foreign Assistance Act to permit certain military assistance and training to be provided to the Government of Haiti to assist in halting illegal emigration from that country to the United States. In providing this exemption, it is not intended that lethal equipment be furnished to Haiti; rather, the purpose of this exemption is to permit the training of Haitian officials to enforce Haitian emigration laws and to repair or replace Haitian naval vessels devoted to halting illegal emigration if necessary.

### Impact of suspending assistance to Haiti

For fiscal year 1982, the administration has proposed a $715,000 military assistance and sales financing program for Haiti, an increase of $270,000 over fiscal year 1981. In the event Haiti fails to comply with the conditions cited above, none of this assistance would go forward. Should economic assistance be suspended as a result of this provision, currently funded PVO activities would not be affected as they are exempted from such prohibitions by law. Similarly, Public Law 480 title II assistance would not be affected. At the end of fiscal year 1980 there was approximately $30 million in the U.S. AID pipeline for Haiti. By the end of fiscal year 1981 AID officials estimate the pipeline will be reduced to $17 million. None of the funds in the pipeline would be affected by a cutoff.

### Section 711—Assistance for Nicaragua

Section 711 expresses the sense of the Congress that in considering bilateral or multilateral assistance to Nicaragua, the United States should take into consideration whether elections will be held in that country and whether political groups there are allowed to promote specific candidates. This concern arises in part from instances during the first part of 1981 of disruption of public meetings of political organizations.

### Section 712—Reaffirmation of support for human rights provisions

This section reaffirms congressional support for the various statutory provisions which have been enacted to promote internationally recognized human rights. There now exists an international consensus that recognizes basic human rights and obligations owed by all governments to their citizens. Continued American support for progress regarding human rights and increased popular participation in government is in the U.S. national and strategic interest.

The committee reaffirms its support for the annual Country Reports on Human Rights Practices and for multilateral human rights commissions which can serve as an effective component to initiatives undertaken bilaterally.

*Section 713—External debt burdens of Egypt, Israel, and Turkey*

This section recognizes that the financing of U.S. assistance programs may make more difficult the debt burdens of Egypt, Israel, and Turkey. It requires the President to report to the Congress by January 15, 1982, regarding economic conditions prevailing in these countries affecting their respective abilities to meet their international debt obligations and to stabilize their economies, in order to assist the Congress in assessing future U.S. assistance to these countries.

*Section 714—Lebanon*

This section finds that an immediate cease-fire in Lebanon is in the interest of the United States and that removal of Syrian forces from Lebanon would enhance its prospects of returning to democracy.

The section further states a sense of Congress that the President should continue efforts to bring about an immediate cease-fire, reaffirm the United States-Lebanon relationship and U.S. commitment to that country's integrity, freedom, and sovereignty, and support a free and open national election in Lebanon.

*Section 715—Assistance and sales to Argentina*

Section 715 deals with U.S. security assistance and sales of military equipment to the Government of Argentina.

Subsection (a) repeals section 620B of the Foreign Assistance Act, which prohibits the U.S. Government from providing to the Government of Argentina any assistance from the Economic Support Fund or peacekeeping accounts, military assistance or training, credits or guarantees for military equipment, or government-to-government or comercial arms sales.

Subsection (b) provides that such assistance, credits, guaranties, and sales may be extended to Argentina only if the President has submitted to the Congress in advance a detailed report certifying that (1) the Government of Argentina has made significant progress in complying with internationally recognized principles of human rights and (2) such assistance, credits, guaranties, or sales are in the national interest of the United States.

Subsection (c) provides that, in determining whether the requirement regarding human rights of subsection (b) has been met, particular attention shall be paid to whether the Government of Argentina (1) has made every effort to account for those citizens identified as "disappeared" and (2) has either released or brought to justice those prisoners held at the disposition of the National Executive Power (PEN). In accounting for those citizens identified as disappeared, the committee notes the existence of already existing listings, such as the one compiled by Amnesty International,[1] and it would expect the Government of Argentina to provide its own, complete listing of those persons who have disappeared. The committee would expect the executive branch to seek a full accounting of those known to have disappeared.

---

[1] See Human Rights and the Phenomenon of Disappearances, hearings before the Subcommittee on International Organizations of the Committee on Foreign Affairs, Sept. 20, 25; and Oct. 18, 1979, pp. 500–601.

69

In repealing section 620B and lifting the prohibition on asistance and sales of military equipment, the committee intends to provide the administration with flexibility to establish a new dialog with the Government of Argentina in order to pursue issues of mutual concern.

However, as indicated by the provisions of subsections (b) and (c), the committee does not intend in any way to condone, or to imply any diminution of its concern about human rights violations in Argentina. The committee notes that the rupture in United States-Argentine relations that is reflected in part in the provisions of section 620B was occassioned by masive human rights violations in Argentina and notes a reduction in human rights violations following the effective date of section 620B in 1978.

The committee wishes to express its deep concern over the serious human rights problems that still remain in that country. In particular, as stated in the State Department's human rights report for 1980, "fundamental, internationally recognized rights of the integrity of the person have been violated through the continued application by the security forces of the practice of disappearances, although at a much lower level than occurred in the first 2 years of the (Videla) regime." The Government of Argentina has yet to account satisfactorily for the disappearances, or even to commit itself to do so. According to testimony before the Subcommittee on Human Rights and International Organizations and the Subcommittee on Inter-American Affairs, 900 people remain imprisoned in Argentina for political offenses, some without having had any charges filed against them. Incidents of arbitrary arrest, detention, and torture continue to be reported in the press. Finally, the committee is concerned that the Government of Argentina has not adequately addressed problems of antisemitism in that country.

In proposing the repeal of section 620B, the committee recognizes that there has been some improvement in human rights practices by the Government of Argentina. In particular, there have been no reported disappearances thus far in 1981. If the disappearances begin again, the committee would be constrained to reevaluate its position.

The committee notes that the provisions of section 502B of the Foreign Assistance Act of 1961, which generally prohibit the provision of security assistance to governments which engage in a consistent pattern of gross violations of internationally recognized human rights, remain fully operative. Thus, notwithstanding the repeal of section 620B, the provision of security assistance to the Government of Argentina would remain contingent upon the adherence by that Government to certain international standards of conduct. The committee's action in proposing the repeal of section 620B is taken with the understanding that no security assistance for Argentina is requested for fiscal year 1982. The committee fully expects that any proposal to provide security assistance to Argentina would be made only after the letter and the spirit of section 502B had been met.

Finally, the committee wishes to express its concern about the possible regional imbalance between Argentina and Chile that would be created by the provision of arms to Argentina, and to state its intention that any action taken by the administration as a result of the repeal of section 620B be consistent with the interest

of the United States in promoting peace and stability in the southern cone.

The committee intends to keep the situation in Argentina and in the southern cone under very careful review, and to reconsider the repeal of section 620B at a later date if events should warrant it.

## Section 716—Assistance for El Salvador

Section 716 provides a statement of general U.S. policy in providing economic and military assistance to El Salvador.

Subsection (a) states that the Congress finds that peaceful and democratic development in Central America is in the interest of the United States and of the community of American States generally, that the recent civil strife in El salvador has caused great human suffering and disruption to the economy of that country, and that substantial external assistance to El Salvador is necessary to help alleviate that suffering and to promote economic recovery within a peaceful and democratic process.

Subsection (b) expresses the sense of the Congress that assistance furnished to the Government of El Salvador, both economic and military, should be used to encourage the following developments:

(1) Full observance of internationally recognized human rights in accordance with sections 116 and 502B of the Foreign Assistance Act of 1961;

(2) Full respect for all other fundamental human rights, including the right of freedom of speech and of the press, the right to organize and operate free labor unions, and the right to freedom of religion;

(3) Continued progress in implementing essential economic and political reforms, including land reform, and support for the private sector;

(4) A complete and timely investigation of the deaths of all United States citizens killed in El Salvador since October 1979;

(5) An end to extremist violence and the establishment of a unified command and control of all government security forces in this effort;

(6) Free, fair, and open elections at the earliest date; and

(7) Increased professional capability of the Salvadoran Armed Forces in order to establish a peaceful and secure environment in which economic development and reform and the democratic processes can be fully implemented, thereby permitting a phased withdrawal of U.S. military training and advisory personnel at the earliest possible date.

## Section 717—Savings provision

This section states that except as otherwise provided in this act, the provisions of existing law applicable to fiscal year 1981 which are replaced by provisions of this act shall continue to be effective for fiscal year 1981.

## REQUIRED REPORTS SECTION

### COST ESTIMATE

The committee estimates that, assuming the full appropriation of the amounts authorized in this bill, the total budget authority re-

quired to carry out the provisions of H.R. 3566 will be $6,026,883,000 for fiscal year 1982 and $6,215,930,000 for fiscal year 1983. The fiscal year allocation of the total cost is set forth in the Congressional Budget Office estimate below. The committee agrees with the projected cost estimate of the Congressional Budget Office.

### INFLATIONARY IMPACT STATEMENT

The total fiscal year 1982 authorization contained in H.R. 3566, ($6,026,883,000), if fully appropriated, would only amount to 0.8 percent of the President's revised March 1981 budget authority request. The committee notes that the total amount of authorizations in this legislation combined with the aggregate amount of all other fiscal year 1982 authorizations reported by the committee is $652.5 million under the total amount requested by the President for the international affairs function (150) programs under the committee's jurisdiction. The committee also notes that the First Concurrent Resolution on the Budget for fiscal year 1982, as agreed to by the House, endorses the President's total request for the international affairs budget function. Therefore, in view of the fact that the authorizations contained in this and other legislation reported by the committee would be well below the President's request, the enactment of the legislation would contribute to the total effort to reduce the deficit and the present rate of inflation.

### STATEMENTS REQUIRED BY CLAUSE 2(l)(3) OF HOUSE RULE XI

#### (a) Oversight findings and recommendations

Among the principal oversight activities which contributed to the formulation of H.R. 3566 have been:

> (1) Extensive hearings and review of the executive branch request by the full committee as well as the Subcommittees on International Security and Scientific Affairs and on Human Rights and International Organizations, and the committee's four regional subcommittees (see section on "Committee Action," above).
>
> (2) Numerous Washington-based and field studies and review of U.S. security development and food assistance policies and programs by the committee members and staff.
>
> (3) Ongoing consultation between the committee members and staff and the executive branch officials concerning the administration of U.S. international security assistance programs and activities; the implementation of functional development assistance and Public Law 480 programs; and the administration of Peace Corps activities.

As a result of these oversight activities the committee recommends the programs and activities authorized in H.R. 3566 for fiscal years 1982 and 1983 be approved.

#### (b) Budget authority

The enactment of H.R. 3566 will create no new budget authority except to the extent that section 309(b) provides for the investment of housing guarantee fees and the use of resulting income for such program. This provision would impact on budget authority and outlay levels in the interest function (900) of the Federal budget.

The committee agrees with the cost estimate and projection made by the CBO with respect to this provision.

*(c) Committee on Government Operations summary*

No oversight findings and recommendations which relate to this measure have been received by the Committee on Government Operations under clause 4(c)(2) of rule X of the rules of the House.

*(d) Congressional Budget Office cost estimate*

MAY 15, 1981.

1. Bill number: H.R. 3566.
2. Bill title: International Security and Development Cooperation Act of 1981.
3. Bill status: As ordered reported by the House Committee on Foreign Affairs on May 13, 1981.
4. Bill purpose: This legislation authorizes the appropriation of funds for fiscal years 1982 and 1983 for international security and development assistance programs and the Peace Corps; authorizes a contribution to the International Fund for Agricultural Development; creates a new Special Defense Acquisition Fund; and otherwise amends the Foreign Assistance Act of 1961, the Arms Export Control Act, the Peace Corps Act, the Agricultural Trade Development and Assistance Act of 1954, and other legislation.
5. Cost estimate: Section 309(b) creates a revolving fund for the Housing Investment Guaranty program. The fund balance of the program may be invested in U.S. Government securities:

[By fiscal year, in millions of dollars]

|  | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|
| Budget function 900. | | | | | |
| Estimated budget authority | 3 | 3 | 3 | 4 | 4 |
| Estimated outlays | 3 | 3 | 3 | 4 | 4 |
| Budget function 150  Estimated outlays | −3 | −3 | −3 | −3 | −3 |

Section 202 requires the deobligation of obligated balances in the security assistance funds for Syria. This deobligation is estimated to reduce outlays from prior years balances:

[By fiscal year, in millions of dollars]

|  | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|
| Budget function 150. Estimated outlays | −1 | −15 | −25 | −24 | −24 |

The bill authorizes the appropriation of funds for new and existing programs in the international affairs area.

| [By fiscal year, in millions of dollars] | | | | | |
|---|---|---|---|---|---|
| | 1982 | 1983 | 1984 | 1985 | 1986 |
| Budget function 150· | | | | | |
| Authorization amount | 6,027 | 6,276 | 75 | | |
| Estimated outlays | 2,767 | 3,847 | 1,919 | 1,532 | 1,058 |
| Budget function 920 | | | | | |
| Estimated authorization | 12 | 30 | | | |
| Estimated outlays | 11 | 29 | 1 | | |
| Budget function 900 | | | | | |
| Estimated authorization | −2 | −6 | −10 | −15 | −20 |
| Estimated outlays | −2 | −6 | −10 | −15 | −20 |

6. Basis of estimate: This estimate assumes enactment of this legislation by September 30, 1981, and subsequent appropriation of the amounts authorized.

Section 309(b) creates a revolving fund for the fund balance of the housing investment guarantee program. Upon enactment, the fund balance of approximately $32 million may be invested in interest-bearing securities of the United States. Interest and interest income for the housing investment guarantee fund in budget function 150 were calculated using the economic assumptions contained in the Conference Agreement on the First Budget Resolution for Fiscal Year 1982.

Section 202 requires the deobligation of obligated balances in security assistance funds for Syria not committed or earmarked as of April 9, 1981. The Agency for International Development estimates that approximately $107 million would be deobligated as a result of enactment of this legislation. These funds were appropriated in fiscal years 1975 through 1979 and are disbursing very slowly. Outlay savings were calculated using the same methods as were used in calculating outlays from prior years' balances in CBO current policy projections.

Authorized amounts in budget function 150 are estimated to be appropriated in the year in which they are authorized with the exception of the authorization for the International Fund for Agricultural Development (IFAD). The IFAD is estimated to be appropriated over 3 years as requested by the President. Pay and employee benefit increases are estimated using the amounts implicit in the authorization amount and the President's pay proposal. Outlays were estimated using historical outlay rates.

Repayment of interest on direct loans authorized by this legislation was calculated using estimated outstanding balances on these loans and terms authorized by section 122(b) of the Foreign Assistance Act of 1961, as amended. All loans were estimated to have grace periods on repayment of principal of greater than 5 years.

7. Estimate comparison: None.
8. Previous CBO estimate: None.
9. Estimate prepared by: Joe Whitehill
10. Estimate approved by:

JAMES L. BLUM,
*Assistant Director for Budget Analysis.*

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

ARMS EXPORT CONTROL ACT

## Chapter 1—FOREIGN AND NATIONAL SECURITY POLICY OBJECTIVES AND RESTRAINTS

\*        \*        \*        \*        \*        \*        \*

SEC. 2. COORDINATION WITH FOREIGN POLICY.—(a) Nothing contained in this Act shall be construed to infringe upon the powers or functions of the Secretary of State.

(b) Under the direction of the President, the Secretary of State, taking into account other United States activities abroad, such as military assistance, economic assistance, and food for freedom, shall be responsible for the continuous supervision and general direction of sales, *leases,* and exports under this Act, including, but not limited to, determining whether there shall be a sale to a country and the amount thereof, *whether there shall be a lease to a country,* and whether there shall be delivery or other performance under such sale, *lease,* or export, to the end that sales, *leases,* and exports are integrated with other United States activities and the foreign policy of the United States is best served thereby.

\*        \*        \*        \*        \*        \*        \*

SEC. 3. ELIGIBILITY.—(a) No defense article or defense service shall be sold *or leased* by the United States Government under this Act to any country or international organization unless—

(1) the President finds that the furnishing of defense articles and defense services to such country or international organization will strengthen the security of the United States and promote world peace;

(2) the country or international organization shall have agreed not to transfer title to, or possession of, any defense article or related training or other defense service so furnished to it to anyone not an officer, employee, or agent of that country or international organization and not to use or permit the use of such article or related training or other defense service for purposes other than those for which furnished unless the consent of the President has first been obtained;

(3) the country or international organization shall have agreed that it will maintain the security of such article and will provide substantially the same degree of security protection afforded to such article by the United States Government; and

(4) the country or international organization is otherwise eligible to purchase *or lease* defense articles or defense services. In considering a request for approval of any transfer of any weapon, weapons system, munitions, aircraft, military boat, military vessel, or other implement of war to another country, the

President shall not give his consent under paragraph (2) to the transfer unless the United States itself would transfer the defense article under consideration to that country. In addition, the President shall not give his consent under paragraph (2) to the transfer of any significant defense articles on the United States Munitions List unless the foreign country requesting consent to transfer agrees to demilitarize such defense articles prior to transfer, or the proposed recipient foreign country provides a commitment in writing to the United States Government that it will not transfer such defense articles, if not demilitarized, to any other foreign country or person without first obtaining the consent of the President. The President shall promptly submit a report to the Speaker of the House of Representatives and to the Committee on Foreign Relations of the Senate on the implementation of each agreement entered into pursuant to clause (2) of this subsection.

\*        \*        \*        \*        \*        \*        \*

(d)(1) The President may not give his consent under paragraph (2) of subsection (a) or under the third sentence of such subsection [to a transfer of a defense article, or related training or other defense service, sold under this Act and may not give his consent to such a transfer under section 505(a)(1) or 505(a)(4) of the Foreign Assistance Act of 1961], *or under section 505(a)(1) or 505(a)(4) of the Foreign Assistance Act of 1961, to a transfer of any major defense equipment valued (in terms of its original acquisition cost) at $14,000,000 or more, or any defense article or related training or other defense service valued (in terms of its original acquisition cost) at $50,000,000 or more,* unless the President submits to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate a written certification with respect to such proposed transfer containing—

(A) the name of the country or international organization proposing to make such transfer,

[(B) a description of the defense article or related training or other defense service proposed to be transferred, including the original acquisition cost of such defense article or related training or other defense service,]

*(B) a description of the article or service proposed to be transferred, including its acquisition cost,*

(C) the name of the proposed recipient of such [defense article or related training or other defense service] *article or service,*

(D) the reasons for such proposed transfer, and

(E) the date on which such transfer is proposed to be made. Any certification submitted to Congress pursuant to this paragraph shall be unclassified, except that information regarding the dollar value and number of [defense articles, or related training or other defense services,] *articles or services* proposed to be transferred may be classified if public disclosure thereof would be clearly detrimental to the security of the United States.

(2) Unless the President states in the certification submitted pursuant to paragraph (1) of this subsection that an emergency exists which requires that consent to the proposed transfer become effective immediately in the national security interests of the United States, such consent shall not become effective until 30 calendar

days after the date of such submission and such consent shall become effective then only if the Congress does not adopt, within such 30-day period, a concurrent resolution diaspproving the proposed transfer. *The preceding sentence shall not apply with respect to transfers to the North Atlantic Treaty Organization, any member country of such Organization, Japan, Australia, or New Zealand; however, the President shall submit the certification required by paragraph (1) of this subsection with respect to such a transfer before giving his consent to the transfer unless the President states in his certification that an emergency exists which requires that consent to the proposed transfer take effect immediately in the national security interests of the United States.*

(3) The President may not give his consent to the transfer [to a third country] *from one foreign country or international organization to another such country or organization* of a defense article or a defense service valued (in terms of its original acquisition costs) at [$25,000,000] *$50,000,000* or more, or of major defense equipment valued (in terms of its original acquisition costs) [$7,000,000] *$14,000,000* or more, the export of which has been licensed or approved under section 38 of this Act, unless [at least 30 calendar days] before giving such consent the President submits to the Speaker of the House of Representatives and the Chairman of the Committee on Foreign Relations of the Senate a report containing the information specified in subparagraphs (A) through (E) of paragraph (1). *Except in the case of transfers to the North Atlantic Treaty Organization, any member country of such Organization, Japan, Australia, or New Zealand, such report shall be submitted at least 30 calendar days before consent is to be given.*

(4) This subsection shall not apply—

(A) to transfers of maintenance, repair, or overhaul defense services, or of the repair parts or other defense articles used in furnishing such services, if the transfer will not result in any increase, relative to the original specifications, in the military capability of the defense articles and services to be maintained, repaired, or overhauled;

(B) to temporary transfers of defense articles for the sole purpose of receiving maintenance, repair, or overhaul; *or*

(C) to arrangements among members of the North Atlantic Treaty Organization or between the North Atlantic Treaty Organization and any of its member countries—

(i) for cooperative cross servicing, or

(ii) for lead-nation procurement if the certification transmitted to the Congress pursuant to section 36(b) of this Act with regard to such lead-nation procurement identified the transferees on whose behalf the lead-nation procurement was proposed[; or].

[(D) to transfers to the North Atlantic Treaty Organization, any member country of such Organization, Japan, Australia, or New Zealand, of any major defense equipment valued (in terms of its original acquisition cost) at less than $7,000,000 or of any defense article or related training or other defense service valued (in terms of its original acquisition cost) at less than $25,000,000.]

\*          \*          \*          \*          \*          \*          \*

Sec. 4. Purposes for Which Military Sales by the United States Are Authorized.—Defense articles and defense services shall be sold *or leased* by the United States Government under this Act to friendly countries solely for internal security, for legitimate self-defense, to permit the recipient country to participate in regional or collective arrangements or measures consistent with the Charter of the United Nations, or otherwise to permit the recipient country to participate in collective measures requested by the United Nations for the purpose of maintaining or restoring international peace and security, or for the purposes of enabling foreign military forces in less developed friendly countries to construct public works and to engage in other activities helpful to the economic and social development of such friendly countries. It is the sense of the Congress that such foreign military forces should not be maintained or established solely for civic action activities and that such civic action activities not significantly detract from the capability of the military forces to perform their military missions and be coordinated with and form part of the total economic and social development effort: *Provided,* That none of the funds contained in this authorization shall be used to guarantee, or extend credit, or participate in an extension of credit in connection with any sale of sophisticated weapons systems, such as missile systems and jet aircraft for military purposes, to any underdeveloped country other than Greece, Turkey, Iran, Israel, the Republic of China, the Philippines, and Korea unless the President determines that such financing is important to the national security of the United States and reports within thirty days each such determination to the Congress.

\*     \*     \*     \*     \*     \*     \*

## Chapter 2—FOREIGN MILITARY SALES AUTHORIZATIONS

Sec. 21. Sales From Stocks.—(a) \* \* \*

\*     \*     \*     \*     \*     \*     \*

(e)(1) After September 30, 1976, letters of offer for the sale of defense articles or for the sale of defense services that are issued pursuant to this section or pursuant to section 22 of this Act shall include appropriate charges for—

(A) administrative services, calculated on an average percentage basis to recover the full estimated costs of administration of sales made under this Act to all purchasers of such articles and services;

(B) any use of plant and production equipment in connection with such defense articles;

(C) a proportionate amount of any nonrecurring costs of research, development, and production of major defense equipment; and

(D) the recovery of ordinary inventory losses associated with the sale from stock of defense articles that are being stored at the expense of the purchaser of such articles.

(2) The President may reduce or waive the charge or charges which would otherwise be considered appropriate under paragraphs (1)(B) and (1)(C) for particular sales that would, if made, significantly advance United States Government interests in North

Atlantic Treaty Organization standardization, *standardization with the armed forces of Japan, Australia, or New Zealand in furtherance of the mutual defense treaties between the United States and those countries,* or foreign procurement in the United States under coproduction arrangements.

*         *         *         *         *         *         *

SEC. 28. REPORTS ON PRICE AND AVAILABILITY ESTIMATES.—(a) The President shall transmit to the Speaker of the House of Representatives and the chairman of the Committee on Foreign Relations of the Senate, within [five] *fifteen* days after the end of each calendar quarter, a report listing each price and availability estimate provided by the United States Government during such quarter to a foreign country with respect to a possible sale under this Act of major defense equipment for $7,000,000 or more or of any other defense articles or defense services for $25,000,000 or more. Each such listing shall specify the name of the country to which the estimate was provided, the defense articles or services involved, the quantity involved, and the price estimate provided.

(b) Such reports shall also list each request received by the United States Government from a foreign country, during the quarter in question, for the issuance of a letter of offer to sell defense articles or defense services if (1) the proposed sale has not been the subject of a listing pursuant to subsection (a) of this section, and (2) [the issuance of a letter of offer in accordance with such request would be subject to the requirements of section 36(b) of this Act] *the request involves a proposed sale of major defense equipment for $7,000,000 or more or of any other defense articles or defense services for $25,000,000 or more.* Each such listing shall include the name of the country making the request, the date of the request, the defense articles or services involved, the quantity involved, and the price and availability terms requested.

*         *         *         *         *         *         *

## Chapter 3—MILITARY EXPORT CONTROLS

SEC. 31. AUTHORIZATION AND AGGREGATE CEILING ON FOREIGN MILITARY SALES CREDITS.—(a) There is hereby authorized to be appropriated to the President to carry out this Act [$500,000,000 for the fiscal year 1981] *$550,000,000 for the fiscal year 1982 and $550,000,000 for the fiscal year 1983.* Credits may not be extended under section 23 of this Act in an amount, and loan may not be guaranteed under section 24(a) of this Act in a principal amount, which exceeds any maximum amount which may be established with respect to such credits or such loan guarantees in legislation appropriating funds to carry out this Act. Unobligated balances of funds made available pursuant to this section are hereby authorized to be continued available by appropriations legislation to carry out this Act.

[(b)(1) the total amount of credits, or participations in credits, extended pursuant to section 23 of this Act for the fiscal year 1981 shall not exceed $500,000,000.

[(2) The total principal amount of loans guaranteed pursuant to section 24(a) of this Act for fiscal year 1981 shall not exceed $2,616,000,000.

【(3) Of the aggregate total of such credits, or participations in credits, and of the total principal amount of such loans guaranteed, not less than $1,400,000,000 for the fiscal year 1981 shall be available only for Israel, of which $200,000,000 shall be available only for costs asociated with the relocation of Israeli forces from the Sinai.】

*(b)(1) The total amount of credits (or participations in credits) extended under section 23 of this Act shall not exceed $550,000,000 for the fiscal year 1982 and $550,000,000 for the fiscal year 1983.*

*(2) The total principal amount of loans guaranteed under section 24(a) of this Act shall not exceed $3,269,525,000 for the fiscal year 1982 and $3,269,525,000 for the fiscal year 1983.*

*(3) Of the aggregate total of credits (or participations in credits) under section 23 of this Act, and of the total principal amount of loans guaranteed under section 24(a) of this Act, not less than $1,400,000,000 for the fiscal year 1982 and not less than $1,400,000,000 for the fiscal year 1983 shall be available only for Israel, of which not less than $550,000,000 for each such year shall be available as credits under section 23 of this Act.*

*(4) Of the amount available under paragraph (2) of this subsection for loan guaranties under section 24(a) of this Act, not less that $280,000,000 for fiscal year 1982 and not less than $280,000,000 for the fiscal year 1983 shall be available only for Greece.*

(c) Funds made available for the 【fiscal year 1981】 *fiscal year 1982 and for the fiscal year 1983* under subsection (a) of this section shall be obligated to finance the procurement of defense articles, defense services, and design and construction services by Israel on a long-term repayment basis either by the extension of credits, without regard to the limitation contained in section 23, or by the issuance of guaranties under section 24. Repayment shall be in not less than twenty years, following a grace period of ten years on repayment of principal. Israel shall be released from $500,000,000 of its contractual liability to repay the United States Government with respect to defense articles, defense services, and design and construction services so financed for *each* such year.

\*      ×      \*      \*      \*      \*      \*

SEC. 36. REPORTS ON COMMERCIAL AND GOVERNMENTAL MILITARY EXPORTS; CONGRESSIONAL ACTION.—(a) The President shall transmit to the Speaker of the House of Representatives and to the chairman of the Committee on Foreign Relations of the Senate not more than sixty days after the end of each quarter an unclassified report (except that any material which was transmitted in classified form under subsection (b)(1) or (c)(1) of this section may be contained in a classified addendum to such report, and any letter of offer referred to in paragraph (1) of this subsection may be listed in such addendum unless such letter of offer has been the subject of an unclassified pursuant to subsection (b)(1) of this section) containing—

(1) \* \* \*

\*      \*      \*      \*      \*      \*      \*

(8) a description of each payment, contribution, gift, commission, or fee reported to the Secretary of State under section 39, including (A) the name of the person who made such payment, contribution, gift, commission, or fee; (B) the name of any sales agent or other person to whom such payment, contribution, gift, commission, or fee was paid; (C) the date and amount of

such payment, contribution, gift, commission, or fee; (D) a description of the sale in connection with which such payment, contribution, gift, commission, or fee was paid; and (E) the identification of any business information considered confidential by the person submitting it which is included in the report; *and*

(9) a listing of each sale under section 29 during the quarter for which such report is made, specifying (A) the purchaser, (B) the United States Government department or agency responsible for implementing the sale, (C) an estimate of the dollar amount of the sale, and (D) a general description of the real property facilities to be constructed pursuant to such sale [; and]

[(10) a listing (classified if necessary) of all property valued at $1,000,000 or more which was leased, during the quarter for which such report is submitted, to a foreign government for a period of more than six months under section 2667 of title 10, United States Code.]

For each letter of offer to sell under paragraphs (1) and (2), the report shall specify (i) the foreign country or international organization to which the defense article or service is offered or was sold, as the case may be: (ii) the dollar amount of the offer to sell or the sale and the number of defense articles offered or sold, as the case may be; (iii) a description of the defense article or service offered or sold, as the case may be; and (iv) the United States Armed Forces or other agency of the United States which is making the offer to sell or the sale, as the case may be.

(b)(1) In the case of any letter of offer to sell any defense articles or services under this Act for [$25,000,000] *$50,000,000* or more, any design and construction services for $200,000,000 or more, or any major defense equipment for [$7,000,000 or more, before such letter of offer is issued] *$14,000,000 or more,* the President shall submit to the Speaker of the House of Representatives and to the chairman of the Committee on Foreign Relations of the Senate a numbered certification with respect to such offer to sell containing the information specified in clauses (i) through (iv) of subsection (a), or (in the case of a sale of design and construction services) the information specified in clauses (A) through (D) of paragraph (9) of subsection (a), and a description, containing the information specified in paragraph (8) of subsection (a), of any contribution, gift, commission, or fee paid or offered or agreed to be paid in order to solicit, promote, or otherwise to secure such letter of offer. Such numbered certifications shall also contain an item, classified if necessary, identifying the sensitivity of technology contained in the defense articles, defense services, or design and construction services proposed to be sold. In addition, the President shall, upon the request of such committee or the Committee on International Relations of the House of Representatives, transmit promptly to both such committees a statement setting forth, to the extent specified in such request—

(A) a detailed description of the defense articles, defense services, or design and construction services to be offered, including a brief description of the capabilities of any defense article to be offered;

(B) an estimate of the number of officers and employees of the United States Government and of United States civilian contract personnel expected to be needed in such country to carry out the proposed sale;

(C) the name of each contractor expected to provide the defense article, defense service, or design and construction services proposed to be sold (if known on the date of transmittal of such statement);

(D) an evaluation, prepared by the Director of the Arms Control and Disarmament Agency in consultation with the Secretary of State and the Secretary of Defense, of the manner, if any, in which the proposed sale would—

    (i) contribute to an arms race;

    (ii) increase the possibility of an outbreak or escalation of conflict;

    (iii) prejudice the negotiation of any arms controls; or

    (iv) adversely affect the arms control policy of the United States;

(E) the reasons why the foreign country or international organization to which the sale is proposed to be made needs the defense articles, defense services, or design and construction services which are the subject of such sale and a description of how such country or organization intends to use such defense articles, defense services, or design and construction services;

(F) an analysis by the President of the impact of the proposed sale on the military stocks and the military preparedness of the United States;

(G) the reasons why the proposed sale is in the national interest of the United States;

(H) an analysis by the President of the impact of the proposed sale on the military capabilities of the foreign country or international organization to which such sale would be made;

(I) an analysis by the President of how the proposed sale would affect the relative military strengths of countries in the region to which the defense articles, defense services, or design and construction services which are the subject of such sale would be delivered and whether other countries in the region have comparable kinds and amounts of defense articles, defense services, or design and construction services;

(J) an estimate of the levels of trained personnel and maintenance facilities of the foreign country or international organization to which the sale would be made which are needed and available to utilize effectively the defense articles, defense services, or design and construction services proposed to be sold;

(K) an analysis of the extent to which comparable kinds and amounts of defense articles, defense services, or design and construction services are available from other countries;

(L) an analysis of the impact of the proposed sale on United States relations with the countries in the region to which the defense articles, defense services, or design and construction services which are the subject of such sale would be delivered;

(M) a detailed description of any agreement proposed to be entered into by the United States for the purchase or acquisition by the United States of defense articles, defense services, design and construction services or defense equipment, or

other articles, services, or equipment of the foreign country or international organization in connection with, or as consideration for, such letter of offer, including an analysis of the impact of such proposed agreement upon United States business concerns which might otherwise have provided such articles, services, or equipment to the United States, an estimate of the costs to be incurred by the United States in connection with such agreement compared with costs which would otherwise have been incurred, an estimate of the economic impact and unemployment which would result from entering into such proposed agreement, and an analysis of whether such costs and such domestic economic impact justify entering into such proposed agreement;

(N) the projected delivery dates of the defense articles, defense services, or design and construction services to be offered;

(O) a detailed description of weapons and levels of munitions that may be required as support for the proposed sale; and

(P) an analysis of the relationship of the proposed sale to projected procurements of the same item.

A certification transmitted pursuant to this subsection shall be unclassified, except that the information specified in clause (ii) and the details of the description specified in clause (iii) of subsection (a) may be classified if the public disclosure thereof would be clearly detrimental to the security of the United States. ⟦The letter of offer shall not be issued if the Congress, within thirty calendar days after receiving such certification, adopts a concurrent resolution stating that it objects to the proposed sale, unless the President states in his certification that an emergency exists which requires such sale in the national security interests of the United States.⟧ *Unless the President states in his certification that an emergency exists which requires the proposed sale in the national security interests of the United States, the letter of offer shall not be issued until at least 30 calendar days after the Congress receives the certification required by the first sentence of this paragraph, and shall not be issued then if the Congress, within such 30-day period, adopts a concurrent resolution stating that it objects to the proposed sale. The preceding sentence shall not apply with respect to a letter of offer to be issued to the North Atlantic Treaty Organization, any member country of that Organization, Japan, Australia, or New Zealand; however, the President shall submit the required certification with respect to such a letter of offer before issuing the letter of offer unless the President states in his certification that an emergency exists which requires that the letter of offer be issued immediately in the national security interests of the United States.* If the President states in his certification that an emergency exists which requires the proposed sale in the national security interest of the United States, thus waiving the congressional review requirements of this subsection, he shall set forth in the certification a detailed justification for his determination, including a description of the emergency circumstances which necessitate the immediate issuance of the letter of offer and a discussion of the national security interests involved.

(2) Any such resolution shall be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976.

(3) For the purpose of expediting the consideration and adoption of concurrent resolutions under this subsection, a motion to proceed to the consideration of any such resolution after it has been reported by the appropriate committee shall be treated as highly privileged in the House of Representatives.

(4) In addition to the other information required to be contained in a certification submitted to the Congress under this subsection, each such certification shall cite any quarterly report submitted pursuant to section 28 of this Act which listed a price and availability estimate, or a request for the issuance of a letter of offer, which was a basis for the proposed sale which is the subject of such certification.

(c)(1) In the case of an application by a person (other than with regard to a sale under section 21 or section 22 of this Act) for a license for the export of any major defense equipment sold under a contract in the amount of 【$7,000,000】 *$14,000,000* or more or of defense articles or defense services sold under a contract in the amount of 【$25,000,000 or more, before issuing such license】 *$50,000,000 or more,* the President shall transmit to the Speaker of the House of Representatives and to the chairman of the Committee on Foreign Relations of the Senate an unclassified numbered certification with respect to such application specifying (A) the foreign country or international organization to which such export will be made, (B) the dollar amount of the items to be exported, and (C) a description of the items to be exported. In addition, the President shall, upon the request of such committee or the Committee on International Relations of the House of Representatives, transmit promptly to both such committees a statement setting forth, to the extent specified in such request a description of the capabilities of the items to be exported, an estimate of the total number of United States personnel expected to be needed in the foreign country concerned in connection with the items to be exported and an analysis of the arms control impact pertinent to such application, prepared in consultation with the Secretary of Defense. A certification transmitted pursuant to this subsection shall be unclassified, except that the information specified in clause (B) and the details of the description specified in clause (C) may be classified if the public disclosure thereof would be clearly detrimental to the security of the United States.

(2) Unless the President states in his certification that an emergency exists which requires the proposed export in the national security interests of the United States, a license for export described in paragraph (1)—

    (A) shall not be issued until at least 30 calendar days after the Congress receives such certification; and

    (B) shall not be issued then if the Congress, within such 30-day period, adopts a concurrent resolution stating that it objects to the proposed export 【, except that this subparagraph does not apply with respect to a license issued for an export to the North Atlantic Treaty Organization, any member country of that Organization, Japan, Australia, or New Zealand】.

*The preceding sentence shall not apply with respect to a license for export to the North Atlantic Treaty Organization, any member country of that Organization, Japan, Australia, or New Zealand; however, the President shall submit the certification required by para-*

*graph (1) of this subsection with respect to such a license before issuing the license unless the President states in his certification that an emergency exists which requires that the license be issued immediately in the national security interests of the United States.* If the President states in his certification that an emergency exists which requires the proposed export in the national security interests of the United States, thus waiving the requirements of [subparagraphs (A) and (B) of] this paragraph, he shall set forth in the certification a detailed justification for his determination, including a description of the emergency circumstances which necessitate the immediate issuance of the export license and a discussion of the national security interests involved.

(3)(A) Any resolution under this subsection shall be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976.

(B) For the purpose of expediting the consideration and adoption of concurrent resolutions under this subsection, a motion to proceed to the consideration of any such resolution after it has been reported by the appropriate committee shall be treated as highly privileged in the House of Representatives.

(d) In the case of an approval under section 38 of this Act of a United States commercial technical assistance or manufacturing licensing agreement for or in a country not a member of the North Atlantic Treaty Organization which involves the manufacture abroad of any item of significant combat equipment on the United States Munitions List, before such approval is given, the President shall submit a certification with respect to such proposed commercial agreement in a manner similar to the certification required under subsection *(c)(1)* containing comparable information, except that the last sentence of such subsection shall not apply to certifications submitted pursuant to this subsection.

\*      \*      \*      \*      \*      \*      \*

SEC. 38. CONTROL OF ARMS EXPORTS AND IMPORTS.—(a)(1) \* \* \*

\*      \*      \*      \*      \*      \*      \*

*(f) The President shall periodically review the items on the United States Munitions List to determine what items, if any, no longer warrant export controls under this section. The results of such reviews shall be reported to the Speaker of the House of Representatives and to the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate. Such a report shall be submitted at least 30 days before any item is removed from the Munitions List and shall describe the nature of any controls to be imposed on that item under the Export Administration Act of 1979.*

\*      \*      \*      \*      \*      \*      \*

## Chapter 4—GENERAL, ADMINISTRATIVE, AND MISCELLANEOUS PROVISIONS

\*      \*      \*      \*      \*      \*      \*

SEC. 43. ADMINISTRATIVE EXPENSES.—(a) Funds made available under other law for the operations of United States Government

agencies carrying out functions under this Act shall be available for the administrative expenses incurred by such agencies under this Act.

(b) Charges for administrative services calculated under section 21(e)(1)(A) of this Act shall include recovery of administrative *and extraordinary* expenses incurred by any department or agency of the United States Government, including any mission or group thereof, in carrying out functions under this Act when—

> (1) such functions are primarily for the benefit of any foreign country; and

> (2) such expenses are not directly and fully charged to, and reimbursed from amounts received for, sale of defense services under section 21(a) of this Act.

*　　*　　*　　*　　*　　*　　*

### Chapter 5—SPECIAL DEFENSE ACQUISITION FUND

*Sec. 51. Special Defense Acquisition Fund.—(a) Under the direction of the President and in consultation with the Secretary of State, the Secretary of Defense—*

> *(1) may establish a Special Defense Acquisition Fund (hereafter in this chapter referred to as the "Fund"), to be separate from other accounts, under the control of the Department of Defense, to finance the acquisition of defense articles and defense services in anticipation of their transfer pursuant to this Act or the Foreign Assistance Act of 1961 to eligible foreign countries and international organizations; and*

> *(2) may acquire such defense articles and defense services as he may determine with the funds in the Fund.*

*Acquisition under this chapter of items in short supply within the Department of Defense for which the initial issue quantity requirements for United States Armed Forces are not under current procurement contract shall be emphasized when compatible with security assistance requirements for the transfer of such items.*

*(b) The Fund shall consist of such sums as may be appropriated under this subsection for deposit in the Fund. There are authorized to be appropriated for deposit in the Fund $150,000,000 for the fiscal year 1982 and $150,000,000 for the fiscal year 1983. Amounts appropriated under this subsection are authorized to remain available until expended.*

*(c) Nothing in this chapter shall be construed to limit or impair any responsibilities conferred upon the Secretary of State or the Secretary of Defense under this Act or the Foreign Assistance Act of 1961.*

*Sec. 52. Use and Transfer of Items Procured With the Fund.—(a) No defense article or defense service acquired by the Secretary of Defense under this chapter may be transferred to any foreign country or international organization unless such transfer is authorized by this Act or the Foreign Assistance Act of 1961.*

*(b) The President may authorize the temporary use by the United States Armed Forces of defense articles and defense services acquired under this chapter prior to their transfer to a foreign country or international organization, if such use is necessary to meet national defense requirements and the United States Armed Forces*

bear the costs of operation and maintenance of such articles or services while in their use and the costs of restoration or replacement upon the termination of such use.

(c) Except for costs provided for in subsection (b) of this section, the Fund may be used to pay for storage, maintenance, and other costs related to the preservation and preparation for transfer of defense articles and defense services acquired under this chapter prior to their transfer, as well as the administrative costs of the Department of Defense incurred in the acquisition of such articles and services to the extent not reimbursed pursuant to section 43(b) of this Act.

SEC. 53. ANNUAL REPORT TO CONGRESS.—Not later than December 31 of each year, the President shall submit to the Congress a comprehensive report on acquisitions of defense articles and defense services under this chapter. Each such report shall include—

(1) a description of each contract for the acquisition of defense articles or defense services under this chapter which was entered into during the preceding fiscal year;

(2) a description of each contract for the acquisition of defense articles or defense services under this chapter which the President anticipates will be entered into during the current fiscal year;

(3) a description of each defense article or defense service acquired under this chapter which was transferred to a foreign country or international organization during the preceding fiscal year; and

(4) an evaluation of the impact of the utilization of the authority of this chapter on United States defense production and the readiness of the United States Armed Forces.

## Chapter 6—LEASES OF DEFENSE ARTICLES

SEC. 61. LEASING AUTHORITY.—(a) The President may lease defense articles in the stocks of the Department of Defense to an eligible foreign country or international organization if—

(1) he determines that there are compelling foreign policy and national security reasons for providing such articles on a lease basis rather than on a sales basis under this Act;

(2) he determines that the articles are not for the time needed for public use; and

(3) the country or international organization has agreed to pay in United States dollars all costs incurred by the United States Government in leasing such articles, including reimbursement for depreciation of such articles while leased, the costs of restoration or replacement if the articles are damaged while leased, and the replacement cost (less any depreciation in the value) of the articles if the articles are lost or destroyed while leased.

The requirement of paragraph (3) shall not apply to leases entered into for purposes of cooperative research or development, military exercises, or communications or electronics interface projects, or to any defense article which has passed three-quarters of its normal service life.

(b) Each lease agreement under this section shall be for a fixed duration of not to exceed five years and shall provide that, at any

time during the duration of the lease, the President may terminate the lease and require the immediate return of the leased articles.

(c) Defense articles in the stocks of the Department of Defense may be leased or loaned to a foreign country or international organization only under the authority of this chapter or chapter 2 of part II of the Foreign Assistance Act of 1961, and may not be leased to a foreign country or international organization under the authority of section 2667 of title 10, United States Code.

SEC. 62. REPORTS TO THE CONGRESS.—(a) Not less than 30 days before entering into or renewing any agreement with a foreign country or international organization to lease any defense article under this chapter, or to loan any defense article under chapter 2 of part II of the foreign Assistance Act of 1961, for a period of one year or longer, the President shall transmit to the Speaker of the House of Representatives, and to the chairman of the Committee on Foreign Relations of the Senate and the chairman of the Committee on Armed Services of the Senate, a written certification which specifies—

  (1) the country or international organization to which the defense article is to be leased or loaned;

  (2) the type, quantity, and value (in terms of replacement cost) of the defense article to be leased or loaned;

  (3) the terms and duration of the lease or loan; and

  (4) a justification for the lease or loan, including an explanation of why the defense article is being leased or loaned rather than sold under this Act.

(b) The President may waive the requirements of this section (and in the case of an agreement described in section 63, may waive the provisions of that section) if he determines, and immediately reports to the Congress, that an emergency exists which requires that the lease or loan be entered into immediately in the national security interests of the United States.

SEC. 63. LEGISLATIVE REVIEW.—(a)(1) In the case of any agreement involving the lease under this chapter, or the loan under chapter 2 of part II of the Foreign Assistance Act of 1961, to any foreign country or international organization for a period of one year or longer of any defense articles which are either (i) major defense equipment valued (in terms of its original replacement cost less any depreciation in its value) at $14,000,000 or more, or (ii) defense articles valued (in terms of their replacement cost less any depreciation in their value) at $50,000,000 or more, the agreement may not be entered into or renewed if the Congress, within 30 calendar days after receiving the certification with respect to that proposed agreement pursuant to section 62(a), adopts a concurrent resolution stating that it objects to the proposed lease or loan.

(2) This section shall not apply with respect to a loan or lease to the North Atlantic Treaty Organization, any member country of that Organization, Japan, Australia, or New Zealand.

(b) Any resolution under subsection (a) shall be considered in the Senate in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976.

(c) For the purpose of expediting the consideration and adoption of concurrent resolutions under subsection (a), a motion to proceed to the consideration of any such resolution after it has been reported

*by the appropriate committee shall be treated as highly privileged in the House of Representatives.*

SEC. 64. APPLICATION OF OTHER PROVISIONS OF LAW.—*Any reference to sales of defense articles under this Act in any provision of law restricting the countries or organizations to which such sales may be made shall be deemed to include a reference to leases of defense articles under this chapter.*

FOREIGN ASSISTANCE ACT OF 1961

## PART I

### Chapter 1—Policy; Development Assistance Authorizations

\*　　\*　　\*　　\*　　\*　　\*　　\*

SEC. 103. AGRICULTURE, RURAL DEVELOPMENT, AND NUTRITION.—(a)(1) In recognition of the fact that the great majority of the people of developing countries live in rural areas and are dependent on agriculture and agricultural-related pursuits for their livelihood, the President is authorized to furnish assistance, on such terms and conditions as he may determine, for agriculture, rural development, and nutrition—

(A) to alleviate starvation, hunger, and malnutrition;

(B) to expand significantly the provision of basic services to rural poor people to enhance their capacity for self-help; and

(C) to help create productive farm and off-farm employment in rural areas to provide a more viable economic base and enhance opportunities for improved incomes, living standards, and contributions by rural poor people to the economic and social development of their countries.

(2) There are authorized to be appropriated to the President for purposes of this section, in addition to funds otherwise available for such purposes, 【$713,500,000 for the fiscal year 1981】 *$741,279,000 for the fiscal year 1982 and $814,222,000 for the fiscal year 1983, of which up to $1,000,000 for each such year shall be available only to carry out section 316 of the International Security and Development Cooperation Act of 1980.* Amounts appropriated under this section are authorized to remain available until expended.

*(g) In order to carry out the purposes of this section, the President may continue to participate in and may provide, on such terms and conditions as he may determine, up to $180,000,000 to the International Fund for Agricultural Development. Effective October 1, 1981, there are authorized to be appropriated to the President for the purposes of this subsection $180,000,000, except that not more than $45,000,000 may be appropriated under this subsection for the fiscal year 1982. Amounts appropriated under this subsection are authorized to remain available until expended.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

SEC. 104. POPULATION AND HEALTH.—(a) FINDINGS.—\* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(g) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the President, in addition to funds otherwise available for such purposes—

【(1) $238,000,000 for the fiscal year 1981 to carry out subsection (b) of this section, of which not less than $3,000,000 shall be available only to support the World Health Organization's Special Program of Research, Development and Research Training in Human Reproduction; and

【(2) $145,300,000 for the fiscal year 1981 to carry out subsection (c) of this section.】

*(1) $273,370,000 for the fiscal year 1982 and $297,699,000 for the fiscal year 1983 to carry out subsection (b) of this section; and*

*(2) $133,405,000 for the fiscal year 1982 and $145,278,000 for the fiscal year 1983 to carry out subsection (c) of this section.* Funds appropriated under this subsection are authorized to remain available until expended.

SEC. 105. EDUCATION AND HUMAN RESOURCES DEVELOPMENT.—(a) In order to reduce illiteracy, to extend basic education, and to increase manpower training in skills related to development, the President is authorized to furnish assistance on such terms and conditions as he may determine, for education, public administration, and human resource development. There are authorized to be appropriated to the President for the purposes of this section, in addition to funds otherwise available for such purposes, 【$101,000,000 for the fiscal year 1981,】 *$109,574,000 for the fiscal year 1982 and $119,326,000 for the fiscal year 1983,* which are authorized to remain available until expended. *For each of the fiscal years 1982 and 1983, the President shall use not less than $5,700,000 of the funds made available for purposes of this section to finance scholarships for undergraduate or professional education in the United States for South African students who are disadvantaged by virtue of legal restrictions on their ability to get an adequate undergraduate or professional education, except that up to $1,000,000 of the funds made available for each such fiscal year under chapter 4 of part II of this Act for southern African regional programs may be used to finance such scholarships in lieu of an equal amount under this section.*

SEC. 106. 【ENERGY, PRIVATE VOLUNTARY ORGANIZATIONS, AND SELECTED DEVELOPMENT ACTIVITIES】 *ENERGY DEVELOPMENT AND PRODUCTION.—(a)(1)* * * *

   *      \*      \*      \*      \*      \*      \**

(b)(1)(A) In order to help developing countries alleviate their energy problems by improving their ability to use indigenous energy resources to produce the energy needed by their economies, the President is authorized to furnish assistance, on such terms and conditions as he may determine, to enable such countries to prepare for and undertake development of their energy resources. Such assistance may include data collection and analysis, the training of skilled personnel, research on and development of suitable energy sources, and pilot projects to test new methods of energy production.

(B) Of the funds made available to carry out this section up to $7,000,000 for the 【fiscal year 1981】 *fiscal year 1982 and up to $7,000,000 for the fiscal year 1983* shall be used for purposes of paragraph (A) to facilitate geological and geophysical survey work to locate potential oil, natural gas, and coal reserves and to encourage exploration for potential oil, natural gas, and coal reserves in

developing countries which are not members of the Organization of Petroleum Exporting Countries.

(2) The President is authorized to furnish assistance under this chapter for cooperative programs with developing countries in energy production and conservation through research on and development and use of small-scale, decentralized, renewable energy sources for rural areas carried out as integral parts of rural development efforts in accordance with section 103 of this Act. Such programs shall also be directed toward the earliest practicable development and use of energy technologies which are environmentally acceptable, require minimum capital investment, are most acceptable to and affordable by the people using them, are simple and inexpensive to use and maintain, and are transferable from one region of the world to another. Such programs may include research on and the development, demonstration, and application of suitable energy technologies (including use of wood); analysis of energy uses, needs, and resources; training and institutional development; and scientific interchange.

(c) The agency primarily responsible for administering this part and the Department of Energy shall coordinate with one another, to the maximum extent possible, the planning and implementation of energy programs under this chapter.

*(d)(1) There are authorized to be appropriated to the President for purposes of this section, in addition to funds otherwise available for such purposes, $39,446,000 for the fiscal year 1982 and $42,957,000 for the fiscal year 1983.*

*(2) Amounts appropriated under this section are authorized to remain available until expended.*

**[(d)]** SEC. 107. PRIVATE VOLUNTARY ORGANIZATIONS AND SELECTED DEVELOPMENT ACTIVITIES.—*(a)* The President is authorized to furnish assistance, on such terms and conditions as he may determine, for the following activities, to the extent that such activities are not authorized by sections 103, 104, **[and]** 105, *and 106* of this Act:

(1) programs of technical cooperation and development, particularly the development efforts of United States private and voluntary agencies and regional and international development organizations;

(2) programs of research into, and evaluation of, the process of economic development in less developed countries and areas, into the factors affecting the relative success and costs of development activities, and into the means, techniques, and such other aspects of development assistance as the President may determine in order to render such assistance of increasing value and benefit;

(3) programs of reconstruction following natural or manmade disasters *and programs of disaster preparedness, including the prediction of and contingency planning for natural disasters abroad;*

(4) programs designed to help solve special development problems in the poorest countries and to make possible proper utilization of infrastructure and related projects funded with earlier United States assistance; and

(5) programs of urban development, with particular emphasis on small, labor intensive enterprises, marketing systems for

small producers, and financial and other institutions which enable the urban poor to participate in the economic and social development of their country.

**[**(e)**]** *(b)*(1) There are authorized to be appropriated to the President for purposes of this section, in addition to funds otherwise available for such purposes, **[**$140,000,000 for the fiscal year 1981**]** *$178,794,000 for the fiscal year 1982 and $194,707,000 for the fiscal year 1983.*

(2) Amounts appropriated under this section are authorized to remain available until expended.

SEC. **[**107.**]** *108.* APPROPRIATE TECHNOLOGY.—(a) In carrying out activities under this chapter, the President shall place special emphasis on the use of relatively smaller, cost-savings, labor-using technologies that are generally most appropriate for the small farms, small businesses, and small incomes of the poor.

(b) Funds made available to carry out this chapter should be used to the extent practicable for activities in the field of appropriate technology, including support of an expanded and coordinated private effort to promote the development and dissemination of appropriate technology in developing countries.

\*       \*       \*       \*       \*       \*       \*

SEC. 110. COST-SHARING AND FUNDING LIMITS.—(a) No assistance shall be furnished by the United States Government to a country under sections 103 through **[**106**]** *107* of this Act until the country provides assurances to the President, and the President is satisfied, that such country provide at least 25 per centum of the costs of the entire program, project, or activity with respect to which such assistance is to be furnished, except that such costs borne by such country may be provided on an "in-kind" basis.

(b) No grant assistance shall be disbursed by the United States Government under sections 103 through **[**106**]** *107* of this Act for a project, for a period exceeding thirty-six consecutive months, without further justification satisfactory to the Congress and efforts being made to obtain sources of financing within that country and from other foreign countries and multilateral organizations.

\*       \*       \*       \*       \*       \*       \*

SEC. 116. HUMAN RIGHTS.—(a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

(e) The President is authorized and encouraged to use not less than $1,500,000 of the funds made available under this chapter for **[**the fiscal year 1981**]** *each of the fiscal years 1982 and 1983* for studies to identify, and for openly carrying out, programs and activities which will encourage or promote increased adherence to civil and political rights, as set forth in the Universal Declaration of Human Rights, in countries eligible for assistance under this chapter. None of these funds may be used, directly or indirectly, to influence the outcome of any election in any country.

\*       \*       \*       \*       \*       \*       \*

**[**SEC. 118. ENVIRONMENT AND NATURAL RESOURCES.—(a) The President is authorized to furnish assistance under this part for developing and strengthening the capacity of less developed countries to protect and manage their environment and natural resources. Special efforts shall be made to maintain and where possible re-

store the land, vegetation, water, wildlife, and other resources upon which depend economic growth and human well-being, especially that of the poor.

【(b) In carrying out programs under this chapter, the President shall take into consideration the environmental consequence of development actions.】

Sec. 118. Environment and Natural Resources.—(a) The Congress finds that if current trends in the degradation of natural resources in developing countries continue, they will severely undermine the best efforts to meet basic human needs, to achieve sustained economic growth, and to prevent international tension and conflict. The Congress also finds that the world faces enormous, urgent, and complex problems, with respect to natural resources, which require new forms of cooperation between the United States and developing nations to prevent such problems from becoming unmanageable. It is, therefore, in the economic and security interests of the United States to provide leadership both in thoroughly reassessing policies relating to natural resources and the environment, and in cooperating extensively with developing countries in order to achieve environmentally sound development.

(b) In order to address the serious problems described in subsection (a), the President is authorized to furnish assistance under this part for developing and strengthening the capacity of developing countries to protect and manage their environment and natural resources. Special efforts shall be made to maintain and where possible to restore the land, vegetation, wildlife, and other resources upon which depend economic growth and human well-being, especially of the poor.

(c)(1) The President, in implementing programs and projects under this chapter, shall take fully into account the impact of such programs and projects upon the environment and natural resources of developing countries. Subject to such procedures as the President considers appropriate, the President shall require all agencies and officials responsible for programs or projects under this chapter—

(A) to prepare and take fully into account an environmental impact statement for any program or project under this chapter significantly affecting the environment of the global commons outside the jurisdiction of any country, the environment of the United States, or other aspects of the environment which the President may specify; and

(B) to prepare and take fully into account an environmental assessment of any proposed program or project under this chapter significantly affecting the environment of any foreign country.

Such agencies and officials should, where appropriate, use local technical resources in preparing environmental impact statements and environmental assessments pursuant to this subsection.

(2) The President may establish exceptions from the requirements of this subsection for emergency conditions and for cases in which compliance with those requirements would be seriously detrimental to the foreign policy interests of the United States.

(d)(1) In enacting section 103(b)(3) of this Act the Congress recognized the importance of forests and tree cover to the developing countries. The Congress is particularly concerned about the continuing and accelerating alteration, destruction, and loss of tropical for-

ests in developing countries. Tropical forests constitute a major world resource. Their destruction and loss pose a serious threat to development and the environment in developing countries. Tropical forest destruction and loss result in shortages of wood, especially wood for fuel; siltation of lakes, reservoirs and irrigation systems; floods; destruction of indigenous peoples; extinction of plant and animal species; reduced capacity for food production; and loss of genetic resources; and can result in desertification and in destabilization of the Earth's climate. Properly managed tropical forests provide a sustained source of fiber and other commodities essential to the economic growth of developing countries.

(2) The concerns expressed in paragraph (1) and the recommendations of the United States Interagency Task Force on Tropical Forests shall be considered by the President—

(A) in formulating and carrying out programs and policies with respect to developing countries, including those relating to bilateral and multilateral assistance and those relating to private sector activities, and

(B) in seeking opportunities to coordinate public and private development and investment activities which affect forests in developing countries.

(3) It is the sense of the Congress that the President should instruct the representatives of the United States to the United Nations and to other appropriate international organizations to urge—

(A) that higher priority be given in the programs of these organizations to the problems of tropical forest alteration and loss, and

(B) that there be improved cooperation and coordination among these organizations with respect to tropical forest activities.

\*　　\*　　\*　　\*　　\*　　\*　　\*

SEC. 121. SAHEL DEVELOPMENT PROGRAM—IMPLEMENTATION.—(a)
\* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) There are authorized to be appropriated to the President for purposes of this section beginning in the fiscal year 1978, in addition to funds otherwise available for such purposes, $200,000,000, except that not to exceed $50,000,000 may be appropriated under this section for the fiscal year 1978. In addition to the amount authorized in the preceding sentence and to funds otherwise available for such purposes, these are authorized to be appropriated to the President for purposes of this section $25,000,000. In addition to the amounts authorized in the preceding sentences and to funds otherwise available for such purposes, there are authorized to be appropriated to the President for purposes of this section [$88,442,000 for the fiscal year 1981.] $86,558,000 for the fiscal year 1982 and $117,068,000 for the fiscal year 1983. Amounts appropriated under this section are authorized to remain available until expended.

(d) Funds available to carry out this section (including foreign currencies acquired with funds appropriated to carry out this section) may not be made available to any foreign government for disbursement unless the Administrator of the Agency for International Development determines that the foreign government will maintain a system of accounts with respect to those funds which will provide

*adequate identification of and control over the receipt and expenditure of those funds.*

*   *   *   *   *   *   *

### Chapter 2—Other Programs

*   *   *   *   *   *   *

### TITLE II—AMERICAN SCHOOLS AND HOSPITALS ABROAD; PROTOTYPE DESALTING PLANT

SEC. 214. AMERICAN SCHOOLS AND HOSPITALS ABROAD.—(a) * * *

*   *   *   *   *   *   *

(c) To carry out the purposes of this section, there are authorized to be appropriated to the President 〖$30,000,000 for the fiscal year 1981〗 *$20,000,000 for the fiscal year 1982 and $20,000,000 for the fiscal year 1983,* which are authorized to remain available until expended.

*   *   *   *   *   *   *

### TITLE III—HOUSING AND OTHER CREDIT GUARANTY PROGRAMS

*   *   *   *   *   *   *

SEC. 222. AUTHORIZATION.—(a) To carry out the policy of section 221, the President is authorized to issue guaranties to eligible investors (as defined in section 238(c)) assuring against losses incurred in connection with loans made for projects meeting the criteria set forth in section 221. The total principal amount of guaranties issued under this title or heretofore issued under prior housing guaranty authorities, which are outstanding at any one time, shall not exceed 〖$1,555,000,000〗 *$1,718,000,000.* The authority of this section shall continue through September 30, 〖1982〗 *1984.* The President may issue regulations from time to time with regard to the terms and conditions upon which such guaranties shall be issued and the eligibility of lenders.

*   *   *   *   *   *   *

SEC. 223. GENERAL PROVISIONS.—(a) * * *

(b) The amount of $50,000,000 of fees accumulated under prior investment guaranty provisions repealed by the Foreign Assistance Act of 1969, together with all fees collected in connection with guaranties issued under section 222 or under prior housing guaranty authorities, shall be available for meeting necessary administrative and operating expenses of carrying out the provisions of section 222 and administering housing guaranties heretofore authorized under this title and under prior housing guaranty provisions repealed by the Foreign Assistance Act of 1969 (including, but not limited to expenses pertaining to personnel, supplies, and printing), subject to such limitations as may be imposed in annual appropriation Acts; for meeting management and custodial costs incurred with respect to currencies or other assets acquired under guaranties made pursuant to section 222 or heretofore pursuant to this

title or prior Latin American and other housing guaranty authorities repealed by the Foreign Assistance Act of 1969; and to pay the cost of investigating and adjusting (including cost of arbitration) claims under such guaranties; and shall be available for expenditure in discharge of liabilities under such guaranties until such time as all such property has been disposed of and all such liabilities have been discharged or have expired, or until all such fees have been expended in accordance with the provisions of this subsection. Fees collected in connection with guaranties issued under section 222A shall likewise be available to meet similar expenses, costs, or liabilities incurred in connection with the programs authorized by that section. *All of the foregoing fees referred to in this section together with earnings thereon and other income arising from guaranty operations under this title shall be held in a revolving fund account maintained in the Treasury of the United States. All funds in such account may be invested in obligations of the United States. Any interest or other receipts derived from such investments shall be credited to such account and may be used for the purposes cited in this section.*

\*         \*         \*         \*         \*         \*         \*

## TITLE IV—OVERSEAS PRIVATE INVESTMENT CORPORATION

\*         \*         \*         \*         \*         \*         \*

SEC. 239. GENERAL PROVISIONS AND POWERS.—(a) \* \* \*

\*         \*         \*         \*         \*         \*         \*

(e) The [Auditor-General] *Inspector General* of the Agency for International Development (1) shall have the responsibility for planning and directing the execution of audits, reviews, investigations, and inspections of all phases of the Corporation's operations and activities and (2) shall conduct all security activities of the Corporation relating to personnel and the control of classified material. With respect to his responsibilities under this subsection, the [Auditor-General] *Inspector General* shall report to the Board. The agency primarily responsible for administering part I shall be reimbursed by the Corporation for all expenses incurred by the [Auditor-General] *Inspector General* in connection with his responsibilities under this subsection.

\*         \*         \*         \*         \*         \*         \*

## Chapter 3—International Organizations and Programs

SEC. 301. GENERAL AUTHORITY.—(a) \* \* \*

\*         \*         \*         \*         \*         \*         \*

*(h) The President is authorized to permit the United States to participate in and to use any of the funds made available under this part after the date of enactment of this subsection for the purpose of furnishing assistance (on such terms and conditions as the President may determine) to the International Food Policy Research Institute.*

Sec. 302. Authorization.—(a)(1) There are authorized to be appropriated to the President for grants to carry out the purposes of this chapter, in addition to funds available under any other Acts for such purposes, [$233,350,000 for the fiscal year 1981.] *$255,650,000 for the fiscal year 1982 and $278,403,000 for the fiscal year 1983, of which amount for each such year not less than $45,000,000 shall be made available for the United Nations Children's Fund, not less than $8,200,000 shall be made available for the United Nations Environment Program, not less than $500,000 shall be made available for the United Nations Institute for Training and Research, and not less than $400,000 shall be made available for the United Nations Trust Fund for South Africa.*

\*         \*         \*         \*         \*         \*         \*

## Chapter 8—International Narcotics Control

Sec. 481. International Narcotics Control.—(a) * * *

\*         \*         \*         \*         \*         \*         \*

[(d)(1) Assistance authorized by this chapter may not be made available for the purpose of the spraying of a herbicide to eradicate marihuana plants if the use of that herbicide is likely to cause serious harm to the health of persons who may use or consume the sprayed marihuana. This prohibition shall not apply if the herbicide is used in conjunction with another substance that will clearly and readily warn potential users and consumers of the sparyed marihuana that a herbicide has been used on it.

[(2) The Secretary of State shall inform the Secretary of Health, Education, and Welfare of the use or intended use by any country or international organization of any herbicide to eradicate marihuana in a program receiving assistance under this chapter. The Secretary of Health, Education, and Welfare, on the basis of scientific information and testing and after receiving comments from the Secretary of Agriculture and the Administrator of the Environmental Protection Agency, shall promptly advise the Secretary of State if the use of that herbicide is likely to cause serious harm to the health of persons who may use or consume marihuana sprayed with that herbicide. If the Secretary of State is so advised with respect to any herbicide, the prohibition contained in paragraph (1) shall apply with respect to the use of that herbicide.

[(3) The Secretary of State shall submit a comprehensive report to the Congress not later than January 1 of each year explicitly detailing all efforts he has taken to ensure compliance with the requirements of this subsection and to prevent the spraying of marihuana with herbicides that are likely to cause serious harm to human health.]

Sec. 482. Authorization.—[(a)(1) To carry out the purposes of section 481, there are authorized to be appropriated to the President $38,573,000 for the fiscal year 1981.

[(2) Funds appropriated under this subsection for the fiscal year 1981 may not be used for a contribution to the United Nations Fund for Drug Abuse Control in an amount which exceeds the lesser of $3,000,000 or 50 percent of the total contributions by all countries to such Fund for the calendar year with respect to which the United States contribution is made.

【(3) Amounts appropriated under this subsection are authorized to remain available until expended.】
*(a)(1) To carry out the purposes of section 481, there are authorized to be appropriated to the President $37,700,000 for the fiscal year 1982 and $41,055,000 for the fiscal year 1983.*
*(2) Amounts appropriated under this subsection are authorized to remain available until expended.*

\*          \*          \*          \*          \*          \*          \*

## Chapter 9—International Disaster Assistance

\*          \*          \*          \*          \*          \*          \*

SEC. 492. AUTHORIZATION.—(a) There is authorized to be appropriated to the President to carry out section 491, 【$25,000,000 for the fiscal year 1981】 *$27,000,000 for the fiscal year 1982 and $27,000,000 for the fiscal year 1983.* Amounts appropriated under this section are authorized to remain available until expended.

\*          \*          \*          \*          \*          \*          \*

*SEC. 495I. ASSISTANCE FOR DISPLACED PERSONS IN CENTRAL AMERICA.—(a) The Congress recognizes that prompt United States assistance is necessary to help meet the basic human needs of persons displaced by strife in El Salvador. Therefore, the President is authorized to furnish assistance, on such terms and conditions as he may determine, to help alleviate the suffering of these displaced persons. Assistance provided under this section shall be for humanitarian purposes, with emphasis on the provision of food, medicine, medical care, and shelter and, where possible, implementation of other relief and rehabilitation activities. The Congress encourages the use, where appropriate, of the services of private and voluntary organizations and international relief agencies in the provision of assistance under this section.*
*(b) There are authorized to be appropriated to the President for the purposes of this section, in addition to amounts otherwise available for such purposes, $5,000,000 for the fiscal year 1982 and $5,445,000 for the fiscal year 1983. Amounts appropriated under this section are authorized to remain available until expended.*
*(c) Assistance under this section shall be provided in accordance with the policies and utilizing the general authorities provided in section 491.*

\*          \*          \*          \*          \*          \*          \*

## PART II

\*          \*          \*          \*          \*          \*          \*

## Chapter 2—Military Assistance

SEC. 503. GENERAL AUTHORITY.—(a) The President is authorized to furnish military assistance, on such terms and conditions as he may determine, to any friendly country or international organization, the assisting of which the President finds will strengthen the security of the United States and promote world peace and which is otherwise eligible to receive such assistance, by—

(1) acquiring from any source and providing (by loan or grant) any defense article or defense service;

(2) assigning or detailing members of the Armed Forces of the United States and other personnel of the Department of Defense to perform duties of a non-combatant nature; or

(3) transferring such of the funds appropriated or otherwise made available under this chapter as the President may determine for assistance to a recipient specified in section [504(a)(1) of this Act, within the dollar limitations of that section,] *504(a)(2) of this Act* to the account in which funds for the procurement of defense articles and defense services under section 21 and section 22 of the Arms Export Control Act have been deposited for such recipient, to be merged with such deposited funds, and to be used solely to meet obligations of the recipient for payment for sales under that Act.

(b) In addition to such other terms and conditions as the President may determine pursuant to subsection (a), defense articles may be loaned thereunder only if—

(1) there is a bona fide reason, other than the shortage of funds, for providing such articles on a loan basis rather than on a grant basis;

(2) there is a reasonable expectation that such articles will be returned to the agency making the loan at the end of the loan period unless the loan is then renewed;

(3) the loan period is of fixed duration not exceeding five years, during which such article may be recalled for any reason by the United States;

(4) the agency making the loan is reimbursed for the loan based on the amount charged to the appropriation for military assistance under subsection (c); and

[(5) arrangements are made with the agency making the loan to be reimbursed in the event such article is lost or destroyed while on loan, such reimbursement being made first out of any funds available to carry out this chapter and based on the depreciated value of the article at the time of loss or destruction.]

*(5) the loan agreement provides that (A) if the defense article is damaged while on loan, the country or international organization to which it was loaned will reimburse the United States for the cost of restoring or replacing the defense article, and (B) if the defense article is lost or destroyed while on loan, the country or international organization to which it was loaned will pay to the United States an amount equal to the replacement cost (less any depreciation in the value) of the defense article.*

\*       \*       \*       \*       \*       \*       \*

SEC. 504. AUTHORIZATION.—[(a)(1) There are authorized to be appropriated to the President to carry out the purposes of this chapter not to exceed $106,100,000 for the fiscal year 1981. Not more than the following amounts of funds available to carry out this chapter may be allocated and made available for assistance to each of the following countries for the fiscal year 1981:

| Country: | Amount |
|---|---|
| Portugal | $51,000,000 |
| Spain | 3,600,000 |
| The Philippines | 25,000,000 |
| The Sudan | 1,700,000 |

The amount specified in this paragraph for military assistance to any such country may be increased by not more than 10 percent of such amount if the President deems such increase necessary for the purposes of this chapter.

〔(2) Except with respect to costs incurred under the authority of section 516(b) or as otherwise specifically authorized by law, none of the funds available for assistance under this chapter may be used to provide assistance to any recipient other than the countries specified in paragraph (1).

〔(3) The authority of section 610(a) and of section 614(a) may not be used to increase any amount specified in paragraph (1) or to waive the limitations of paragraph (2).

〔(4) Amounts appropriated under this subsection are authorized to remain available until expended.〕

*(a)(1) There are authorized to be appropriated to the President to carry out the purposes of this chapter not to exceed $304,375,000 for the fiscal year 1982 and not to exceed $304,375,000 for the fiscal year 1983.*

*(2)(A) Of the amount available to carry out this chapter for the fiscal year 1982, $248,375,000 shall be available only to provide grants to be used under section 503(a)(3) of this Act to finance the procurements of defense articles and defense services by countries for which foreign military sales credits under section 23 of the arms Export Control Act were requested in the fiscal year 1982 Congressional presentation materials but for which such credits were not made available by the Congress. The grant to a country under this subparagraph may not exceed an amount equal to one-fourth of the amount of such credits so requested for that country, except that such grant may be increased by not more than 20 percent of such amount if the President deems such increase necessary for the purposes of this subparagraph.*

*(B) Of the amount available to carry out this chapter for the fiscal year 1983, $248,375,000 shall be available only to provide grants to be used under section 503(a)(3) of this Act to finance the procurements of defense articles and defense services by countries for which such grants are requested in the fiscal year 1983 Congressional presentation materials for use in conjunction with loan guarantees under section 24(a) of the Arms Export Control Act. The grant to a country under this subparagraph may not exceed the amount of the grant so requested for that country, except that such grant may be increased by not more than 20 percent of such amount if the President deems such increase necessary for the purposes of this subparagraph.*

*(3) Amounts appropriated under this subsection are authorized to remain available until expended.*

\*   \*   \*   \*   \*   \*   \*

SEC. 514. STOCKPILING OF DEFENSE ARTICLES FOR FOREIGN COUNTRIES.—(a) \* \* \*

(b)(1) The value of defense articles to be set aside, earmarked, reserved, or intended for use as war reserve stocks for allied or other foreign countries (other than for purposes of the North Atlantic Treaty Organization) in stockpiles located in foreign countries may

not exceed in any fiscal year an amount greater than is specified in security assistance authorizing legislation for that fiscal year.

(2) The value of such additions to stockpiles in foreign countries shall not exceed [$85,000,000 for the fiscal year 1981.] *$100,000,000 for the fiscal year 1982 and $125,000,000 for the fiscal year 1983.*

      \*      \*      \*      \*      \*      \*      \*

[SEC. 515. OVERSEAS MANAGEMENT OF ASSISTANCE AND SALES PROGRAMS.—(a) No military assistance advisory group, military mission, or other organization of United States military personnel performing similar military advisory functions under this Act or the Arms Export Control Act may operate in any foreign country unless specifically authorized by the Congress. The prohibition contained in this subsection does not apply to regular units of the Armed Forces of the United States engaged in routine functions designed to bring about the standardization of military operations and procedures between the Armed Forces of the United States and countries which are members of the North Atlantic Treaty Organization or other defense treaty allies of the United States.

[(b)(1) In order to carry out his responsibilities for the management during the fiscal year 1981 of international security assistance programs conducted under this chapter, under chapter 5 of this part, or under the Arms Export Control Act, the President may assign members of the Armed Forces of the United States to perform necessary functions with respect to such programs in Portugal, Spain, Jordan, the Philippines, the Republic of Korea, Panama, Greece, Turkey, Indonesia, Thailand, Morocco, Egypt, and Saudi Arabia. Members of the Armed Forces assigned under this subsection shall have as their primary functions logistics management, transportation, fiscal management, and contract administration of country programs. It is the sense of the Congress that advisory and training assistance in the countries specified above shall primarily be provided by personnel who are not assigned under this subsection and who are detailed for limited periods to perform specific tasks.

[(2) The total number of members of the Armed Forces assigned under this subsection to each country specified in paragraph (1) of this subsection may not exceed the number justified to the Congress in the congressional presentation materials, unless the Committee on Foreign Relations of the Senate and the Committee on International Relations of the House of Representatives are so notified.

[(3) Members of the Armed Forces authorized to be assigned to Saudi Arabia by paragraph (1) of this subsection may only be assigned to such country on a fully reimbursable basis under section 21(a) of the Arms Export Control Act, except that this requirement shall apply only to the extent that the number of members of the Armed Forces assigned to such country exceeds six.

[(c) The President may assign not to exceed three members of the Armed Forces to any country not specified in subsection (b)(1) to perform accounting and other management functions with respect to international security assistance programs conducted under this chapter, chapter 5 of this part, or under the Arms Export Control Act, except that not to exceed three additional

members of the Armed Forces may be assigned to a country to perform such functions when specifically requested by the Chief of the Diplomatic Mission as necessary to the efficient operation of the Mission.

〔(d) The total number of members of the Armed Forces assigned to foreign countries under subsections (b) and (c), including any such members serving on a reimbursable basis pursuant to subsection (b)(3) may not exceed 790 for the fiscal year 1979.

〔(e) Members of the Armed Forces assigned to a foreign country under subsection (b) or (c) shall serve under the direction and supervision of the Chief of the United States Diplomatic Mission in that country.

〔(f) Defense attachés may perform overseas management functions described in this section only if the President determines that the performance of such functions by defense attachés is the most economic and efficient means of performing such functions. The President shall promptly report each such determination to the Speaker of the House of Representatives and to the chairman of the Senate Committee on Foreign Relations and the chairman of the Senate Committee on Armed Services, together with a description of the number of personnel involved and a statement of the reasons for such determination. The number of defense attachés performing overseas management functions in a country under this subsection may not exceed six more than the number of defense attachés authorized to be assigned to that country on December 31, 1979, except that the President may assign an aggregate total of not to exceed eight additional defense attachés to such countries and countries to which military personnel have been assigned pursuant to subsection (c) in order to perform overseas management functions under this subsection.

〔(g) The entire costs (including salaries of United States military personnel) of overseas management of international security assistance programs under this section shall be charged to or reimbursed from funds made available to carry out this chapter, including any such costs which are reimbursed from charges for services collected from foreign governments pursuant to sections 21(e) and 43(b) of the Arms Export Control Act. The prohibition contained in subsection (a) of this section and the numerical limitations contained in subsections (b), (c), and (d) of this section shall not apply to members of the Armed Forces performing services for specific purposes and for fixed periods of time on a fully reimbursable basis under section 21(a) of the Arms Export Control Act.

〔(h) The President shall continue to instruct United States diplomatic and military personnel in United States missions abroad that they should not encourage, promote, or influence the purchase by any foreign country of United States-made military equipment, unless they are specifically instructed to do so by an appropriate official of the executive branch.〕

SEC. 515. OVERSEAS MANAGEMENT OF ASSISTANCE AND SALES PROGRAMS.—(a) In order to carry out his responsibilities for the management of international security assistance programs conducted under this chapter, chapter 5 of this part, and the Arms Export Control Act, the President may assign members of the Armed Forces of the United States to a foreign country to perform one or more of the following functions:

(1) equipment and services case management;

(2) training management;

(3) program monitoring;

(4) evaluation and planning of the host government's military capabilities and requirements;

(5) administrative support;

(6) promoting rationalization, standardization, interoperability, and other defense cooperation measures among members of the North Atlantic Treaty Organization and with the armed forces of Japan, Australia, and New Zealand; and

(7) liaison functions exclusive of advisory and training assistance.

(b) Advisory and training assistance conducted by military personnel assigned under this section shall be kept to an absolute minimum. It is the sense of the Congress that advising and training assistance in countries to which military personnel are assigned under this section shall be provided primarily by other personnel who are not assigned under this section and who are detailed for limited periods to perform specific tasks.

(c)(1) The number of members of the Armed Forces assigned to a foreign country under this section may not exceed six unless specifically authorized by the Congress. The President may waive this limitation if he determines and reports to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives, 30 days prior to the introduction of the additional military personnel, that United States national interests require that more than six members of the Armed Forces be assigned under this section to carry out international security assistance programs in a country not specified in this paragraph. For the fiscal year 1982 and the fiscal year 1983, Indonesia, the Republic of Korea, the Philippines, Thailand, Egypt, Jordan, Morocco, Saudi Arabia, Greece, Portugal, Spain, and Turkey are authorized to have military personnel strengths larger than six under this section to carry out international security assistance programs.

(2) The total number of members of the Armed Forces assigned under this section to a foreign country in a fiscal year may not exceed the number justified to the Congress for that country in the congressional presentation materials for that fiscal year, unless the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives are notified 30 days in advance of the introduction of the additional military personnel.

(d) Effective October 1, 1982, the entire costs (including salaries of United States military personnel) of overseas management of international security assistance programs under this section shall be charged to or reimbursed from funds made available to carry out this chapter, other than any such costs which are either paid directly for such defense services under section 21(a) of the Arms Export control Act or reimbursed from charges for services collected from foreign governments pursuant to section 21(e) and section 43(b) of that Act.

(e) Members of the Armed Forces assigned to a foreign country under this section shall serve under the direction and supervision of the Chief of the United States Diplomatic Mission to that country.

*(f) The President shall continue to instruct United States diplomatic and military personnel in the United States missions abroad that they should not encourage, promote, or influence the purchase by any foreign country of United States-made military equipment, unless they are specifically instructed to do so by an appropriate official of the executive branch.*

[SEC. 516. TERMINATION OF AUTHORITY.—(a) Except to the extent that the Congress may, subsequent to the enactment of this section, authorize the furnishing of military assistance in accordance with this chapter to specified countries in specified amounts, the authorities contained in this chapter (other than the authorities contained in sections 506, 514, and 515) may not be exercised after September 30, 1977, except that such authorities shall remain available until September 30, 1982, to the extent necessary to carry out obligations incurred under this chapter on or before September 30, 1977, and shall remain available for a period of five fiscal years next following any fiscal year after the fiscal year 1977 for which assistance under this chapter has been authorized for a country, to the extent necessary to carry out obligations incurred under this chapter with respect to such assistance for such country on or before September 30 of such fiscal year.

[(b) Funds available to carry out this chapter shall be available notwithstanding the limitations contained in paragraph (2) of section 504(a) of this Act—

[(1) For the winding up of military assistance under this chapter, including payment of the costs of packing, crating, handling, and transporting defense articles furnished under this chapter and of related administrative costs; and

[(2) for costs incurred under section 503(c) with respect to defense articles on loan to countries no longer eligible under section 504(a) for military assistance.]

\*      \*      \*      \*      \*      \*      \*

## Chapter 4—Economic Support Fund

SEC. 531. AUTHORITY.—(a) * * *
(b)(1) There are authorized to be appropriated to the President to carry out the purposes of this chapter [for the fiscal year 1981, $2,065,300,000] *$2,538,000,000 for the fiscal year 1982 and $2,538,000,000 for the fiscal year 1983.*

\*      \*      \*      \*      \*      \*      \*

[SEC. 532. USE OF FISCAL YEAR 1981 FUNDS.—(a)(1) Of the funds authorized to be appropriated to carry out this chapter for the fiscal year 1981, not less than $785,000,000 shall be available only for Israel and not less than $750,000,000 shall be available only for Egypt.

[(2) All of the funds made available to Israel and to Egypt under this chapter for the fiscal year 1981 shall be provided on a grant basis.

[(3) The total amount of funds allocated for Israel under this chapter for the fiscal year 1981 may be made available as a cash transfer. In exercising the authority of this paragraph, the President shall ensure that the level of cash transfers made to Israel

does not cause an adverse impact on the total amount of nonmilitary exports from the United States to Israel.

[(b) Of the funds authorized to be appropriated to carry out this chapter for the fiscal year 1981, not less than $200,000,000 shall be available only for Turkey. Not less than two-thirds of the funds made available to Turkey under this chapter for the fiscal year 1981 shall be provided on a grant basis.

[(c) Of the funds authorized to be appropriated to carry out this chapter for the fiscal year 1981, $15,000,000 shall be available only for Cyprus for refugee relief, reconstruction, and educational exchange programs.

[(d)(1) Of this amount authorized to be appropriated to carry out this chapter for the fiscal year 1981, $12,500,000 may be used for special requirements in the Middle East, including regional programs and development programs on the West Bank and in Gaza.

[(2) The President may obligate or expend funds under this subsection only if—

[(A) he has transmitted to the Speaker of the House of Representatives, and to the chairman of the Committee on Foreign Relations and the chairman of the Committee on Appropriations of the Senate, a report setting forth—

[(i) the name of the proposd recipient of such funds,

[(ii) the amount of funds to be made available to such recipient, and

[(iii) the purpose for which such funds are to be made available;

[(B) a period of 30 calendar days has elapsed since the Congress received such report; and

[(C) the Congress did not adopt, during such 30-day period, a concurrent resolution stating in substance that the Congress does not approve the proposed use of funds described in such report.

[(e)(1) Up to $50,000,000 of the funds appropriated to carry out this chapter for the fiscal year 1981 may be made available for emergency use under this chapter when the national interests of the United States urgently require economic support to promote economic or political stability.

[(2) Notwithstanding subsections (a)(1), (b), (c) and (d)(1) of this section, up to 5 percent of the funds available for any country or region pursuant to such subsections may be used under paragraph (1) of this subsection.

[(f) None of the funds appropriated to carry out this chapter for fiscal year 1981 may be made available for Syria.

[(g) Funds available to carry out this chapter for the fiscal year 1981 may not be used to finance the construction of, the operation or maintenance of, or the supplying of fuel for, any nuclear facility in a foreign country unless the President certifies to the Congress that use of funds for such purpose is indispensable to the achievement of nonproliferation objectives which are uniquely significant and of paramount importance to the United States.

[SEC. 533. CENTRAL AMERICAN ECONOMIC SUPPORT.—(a) The Congress finds that peaceful and democratic development in Central America is in the interest of the United States and of the community of American States generally, that the recent civil strife in Nicaragua has caused great human suffering and disruption to the

economy of that country, and that substantial external assistance to Nicaragua is necessary to help alleviate that suffering and to promote economic recovery within a peaceful and democratic process. The Congress further finds that peaceful and democratic development in certain other Central American countries will be significantly assisted by additional economic support at this time.

〔(b) In furnishing assistance under this chapter to the Government of Nicaragua, the President shall take into account the extent to which that Government has engaged in violations of the right to organize and operate labor unions free from political oppression, has engaged in or permitted violations of human rights, has engaged in violations of the right to freedom of the press, or has engaged in violations of the right to freedom of religion.

〔(c) The President shall encourage the Government of Nicaragua to respect the right to freedom of the press, the right to organize and operate free labor unions, the right to freedom of religion, as well as all other fundamental human rights.

〔(d) The Congress reaffirms the requirement of section 502B(a)(1) of this Act that a principal goal of the foreign policy of the United States shall be to promote the increased observance of internationally recognized human rights by all countries. In furtherance of the goal, assistance to Nicaragua for the fiscal year 1981 under this chapter shall be terminated, in accordance with sections 116 and 502B of this Act, if the Government of Nicaragua engages in a consistent pattern of gross violations of internationally recognized human rights.

〔(e) The President shall transmit to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate a report for each 6-month period in which funds are expended under this chapter for Nicaragua for the fiscal year 1981. Each such report shall discuss fully and completely the status of respect in Nicaragua for human rights, political pluralism, freedom of the press and assembly, freedom of religion, and freedom of labor to organize and bargain collectively.

〔(f) Prior to releasing any assistance to the Government of Nicaragua under this chapter, the President shall transmit a certification to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate that the Government of Nicaragua has not cooperated with or harbored any international terrorist organization or is not aiding, abetting, or supporting acts of violence or terrorism in other countries. In the event that the President transmits such a certification, but at a later date he determines that the Government of Nicaragua cooperates with or harbors any international terrorist organization or is aiding, abetting, or supporting acts of violence or terrorism in other countries, the President shall terminate assistance to the Government of Nicaragua under this chapter and the outstanding balance of any loan to the Government of Nicaragua, or any of its agencies or instrumentalities, with funds authorized to be appropriated by this chapter shall become immediately due and payable.

〔(g) It is the sense of the Congress that the United States should support those traditionally faithful allies of the United States which are responsible members of the Organization of American States including Guatemala, El Salvador, Costa Rica, Nicaragua, Panama, and Honduras, against terrorism and external subversion.

[(h) Funds made available under this chapter for the National School of Agriculture in Nicaragua shall be used under an understanding with the Autonomous National University of Nicaragua that the National School of Agriculture will cooperate in programs with United States institutions of higher education.

[(i) Any agreement between the United States and the Government of Nicaragua regarding the use of funds authorized to be appropriated under this chapter, which are to be made available in the form of loans, shall specifically require that at least 60 per centum of such loan funds, and any local currency generated in conjunction therewith, shall be used for assistance to the private sector. Insofar as practicable, local currency used for assistance to the private sector in Nicaragua shall, consistent with the accomplishmnent of the purposes set forth in subsection (a) of this section, be used in ways which will strengthen private financial institutions which will help the private sector in Nicaragua financially independent. Local currency loan programs in Nicaragua shall be monitored and audited in accordance with section 642(g) of this Act. The President shall report on the implementation of this subsection in the report required under subsection (e) of this section.

[(j) The President shall terminate assistance to the Government of Nicaragua under this chapter if he determines and reports to the Congress that Soviet, Cuban, or other foreign combat military forces are stationed or situated within the borders of Nicaragua and the presence of such forces constitutes a threat to the national security of the United States or to any Latin Amerian ally of the United States.

[(k) The President shall terminate assistance to Nicaragua under this chapter for the fiscal year 1981 if he determines that the Government of Nicaragua has engaged in a consistent pattern of violations of the right to organize and operate labor unions free from political oppression.

[(l) The President shall encourage the holding of free, open elections in Nicaragua within a reasonable period of time and shall, in providing any additional assistance to Nicaragua, take into consideration the progress which is being made toward holding such elections.

[(m) None of the funds made available for Nicaragua under this chapter may be used for assistance for any school or other educational instrumentality or facility which would house, employ or be made available to Cuban personnel.

[(n) The President shall terminate assistance to Nicaragua under this chapter if he determines that the Government of Nicaragua engages in systematic violations of free speech and press.

[(o) Any agreement between the United States and the Government of Nicaragua regarding the use of funds authorized to be appropriated under this chapter, which are to be made available in the form of loans, shall specifically require that such loan funds shall be used for the purchase of goods or services of United States origin.

[(p) Up to one percent of the funds made available to Nicaragua under this chapter for the fiscal year 1981 shall be used to make publicly known to the people of Nicaragua the extent of United States aid programs to them. The President shall periodcally report

to the Congress on the effectiveness of his efforts to carry out this subsection.**]**

SEC. 532. MIDDLE EAST PROGRAMS.—(a)(1) Of the funds authorized to be appropriated to carry out this chapter for the fiscal year 1982 and for the fiscal year 1983, not less than $785,000,000 for each such year shall be available only for Israel and not less than $750,000,000 for each such year shall be available only for Egypt. Amounts made available for Israel and Egypt for the fiscal year 1982 pursuant to this paragraph shall be in addition to the amounts made available to those countries pursuant to paragraph (4) of this subsection.

(2) All of the funds made available to Israel and to Egypt under this chapter for the fiscal years 1982 and 1983 shall be provided on a grant basis.

(3) The total amount of funds allocated for Israel under this chapter for the fiscal year 1982 and for the fiscal year 1983 may be made available as a cash transfer. In exercising the authority of this paragraph, the President shall ensure that the level of cash transfers made to Israel does not cause an adverse impact on the total amount of nonmilitary exports from the United States to Israel.

(4) In addition to the amounts requested for Israel and Egypt under this chapter for the fiscal year 1982, $21,000,000 shall be made available for Israel for the fiscal year 1982 and $21,000,000 shall be made available for Egypt for the fiscal year 1982 in order to replace the funds which were authorized and appropriated for those countries in the fiscal year 1981 but which were reprogrammed in order to provide assistance for Liberia and El Salvador.

(5) Funds may be obligated for Egypt under this chapter to finance activities relating to the reclamation of desert lands (known as "new lands development") 90 days after the Administrator of the Agency for International Development submits a report to the Speaker of the House of Representatives, and the chairman of the Committee on Foreign Relations of the Senate, on the feasibility, the projected costs, and the cost-benefits of desert reclamation in Egypt and on the projected role and magnitude of United States economic assistance in Egyptian desert reclamation.

(6) Of the amounts provided to Egypt under this chapter for the fiscal year 1982 and for the fiscal year 1983, up to $50,000,000 for each such year may be used under title XII of chapter 2 of part I of this Act in building agricultural extension services in Egypt for the small farmer in order to upgrade the skills of the agricultural faculty in provincial universities, improve the agricultural curriculum offered and the equipment available in provincial universities, and establish a provincial university extension service with an outreach program which can directly reach the Egyptian small farmer.

(b)(1) Of the funds authorized to be appropriated to carry out this chapter for the fiscal year 1982 and for the fiscal year 1983, $11,000,000 for each such year may be used for special requirements in the Middle East, including regional cooperative projects of a scientific and technological nature in accordance with paragraph (2) of this subsection, other regional programs, development programs on the West Bank and in Gaza, population programs, project development and support, and programs of participant training.

(2) It is the sense of the Congress that, in order to continue to build the structure of peace in the Middle East, the United States should finance, and where appropriate participate in, cooperative projects of a scientific and technological nature involving Israel and Egypt and other Middle East countries wishing to participate. These cooperative projects should include projects in the fields of agriculture, health, energy, the environment, education, water resources, and the social sciences. Of the funds available under paragraph (1) of this subsection for the fiscal year 1982 and for the fiscal year 1983, $4,000,000 for each such year may be used in accordance with this paragraph for scientific and technologial projects which will promote regional cooperation among Israel and Egypt and other Middle East countries.

(3) The President may obligate funds under paragraph (1) of this subsection only if, in accordance with the established prenotification procedures under section 634A of this Act, he transmits a report to the Committee on Foreign Affairs and the Committee on Appropriations of the House of Representatives, and to the Committee on Foreign Relations and the Committee on Appropriations of the Senate, at least 15 days prior to such obligation. This report shall set forth—

(A) the name of the proposed recipient of such funds.

(B) the amount of funds to be made available to such recipient, and

(C) the purpose for which such funds are to be made available.

(4) At the end of the fiscal year 1981, at the end of the fiscal year 1982, and at the end of the fiscal year 1983, the President shall report to the Congress on the use of funds under this chapter during that fiscal year for special requirements in the Middle East.

(c)(1) All funds appropriated in prior fiscal years to carry out this chapter which have been obligated for Syria shall be deobligated except for funds committed or earmarked as of April 9, 1981, for (A) signed contracts; (B) issued invitations for bids, requests for proposals or offers, or purchase orders; (C) projects involving the "Fixed Amount Reimbursement" payment procedure for which designs had been approved by the Agency for International Development; or (D) participant training which had been approved by the Agency for International Development and which is being conducted in the United States or at a university outside Syria which receives assistance under section 214 of this Act. Except for funds necessary to carry out paragraph (2), all funds deobligated pursuant to this paragraph shall be deposited in the Treasury as miscellaneous receipts.

(2) Funds deobligated pursuant to paragraph (1) may be used by the Administrator of the Agency for International Development to reimburse a United States company or other United States person for bid and preparation costs if the Administrator determines that—

(A) those costs were reasonably incurred for a procurement transaction which the Agency for International Development had expressed its intention to finance in whole or in part with the funds deobligated pursuant to paragraph (1), and

(B) the bid and preparation would have resulted in the award of a contract to that company or person if the funds had not been deobligated pursuant to paragraph (1),

*to the extent that such reimbursement is allowed under guidelines issued by the Administrator. Such funds may also be used for necessary operating expenses in carrying out this paragraph.*

SEC. 533. EASTERN MEDITERRANEAN PROGRAMS.—*(a) Not less than two-thirds of the funds made available to Turkey under this chapter for each of the fiscal years 1982 and 1983 shall be provided on a grant basis.*

*(b) Of the funds authorized to be appropriated to carry out this chapter for the fiscal year 1982 and for the fiscal year 1983, $15,000,000 for each such year shall be available only for Cyprus. Of that amount, $5,000,000 for each such year shall be for scholarship programs to bring Cypriots to the United States for education.*

SEC. 534. GENERAL PROVISIONS.—*(a) Funds available to carry out this chapter for the fiscal year 1982 and for the fiscal year 1983 may not be used to finance the construction of, the operation or maintenance of, or the supplying of fuel for, any nuclear facility in a foreign country unless the President certifies to the Congress that use of funds for such purpose is indispensable to the achievement of nonproliferation objectives which are uniquely significant and of paramount importance to the United States.*

*(b)(1) Of the funds appropriated to carry out this chapter, up to $100,000,000 for the fiscal year 1982 and up to $100,000,000 for the fiscal year 1983 may be made available for emergency use under this chapter when the national interests of the United States urgently require economic support to promote economic or political stability.*

*(2) Notwithstanding any provision of this chapter or of an appropriations Act (including a joint resolution making continuing appropriations) which earmarks funds available to carry out this chapter for a specific country or purpose, up to 5 percent of each amount so earmarked may be used to carry out paragraph (1) of this subsection.*

## Chapter 5—International Military Education and Training

\*       \*       \*       \*       \*       \*       \*

SEC. 542. AUTHORIZATION.—There are authorized to be appropriated to the President to carry out the purposes of this chapter **[**$34,000,000 for the fiscal year 1981**]** *$47,700,000 for the fiscal year 1982 and $51,945,000 for the fiscal year 1983.* After June 30, 1976, no training under this section may be conducted outside the United States unless the President has reported and justified such training to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate.

\*       \*       \*       \*       \*       \*       \*

## Chapter 6—Peacekeeping Operations

SEC. 551. GENERAL AUTHORITY.—The President is authorized to furnish assistance to friendly countries and international organizations, on such terms and conditions as he may determine, for peacekeeping operations and other programs carried out in furtherance of the national security interests of the United States. Such assistance may include reimbursement to the Department of Defense for expenses incurred pursuant to section 7 of the United Na-

tions Participation Act of 1945, except that such reimbursements may not exceed $5,000,000 in any fiscal year unless a greater amount is specifically authorized by this section. *Unless the Congress hereafter expressly approves such action, the authority of this chapter may not be used either to finance the establishment of a peacekeeping force in the Sinai pursuant to the treaty between Egypt and Israel or to position units of the United States Armed Forces in the Sinai.*

SEC. 552. AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to the President to carry out the purposes of this chapter, in addition to amounts otherwise available for such purposes, [$25,000,000 for the fiscal year 1981.] *$19,000,000 for the fiscal year 1982 and $19,000,000 for the fiscal year 1983.*

(b) Amounts appropriated under this section are authorized to remain available until expended.

(c) If the President determines that, as the result of an unforeseen emergency, the provision of assistance under this chapter in amounts in excess of funds otherwise available for such assistance is important to the national interests of the United States, the President may exercise the authority of section 610(a) of this Act to transfer funds available to carry out chapter 4 of this part for use under this chapter without regard to the 20-percent increase limitation contained in such section, except that [(1) the total amount so transferred in any fiscal year may not exceed $10,000,000, and (2) earmarked funds may not be transferred] *the total amount so transferred in any fiscal year may not exceed $15,000,000.*

\*      \*      \*      \*      \*      \*      \*

# PART III

## Chapter 1—General Provisions

\*      \*      \*      \*      \*      \*      \*

SEC. 608. ADVANCE ACQUISITION OF PROPERTY.—(a) It is the sense of the Congress that in furnishing assistance under part I excess personal property, *or (if a substantial savings would occur) other property already owned by an agency of the United States Government,* should be utilized wherever practicable in lieu of *or supplementary to* the procurement of new items for United States-assisted projects and programs. The President is authorized to maintain in a separate account, which shall, notwithstanding section 1210 of the General Appropriation Act, 1951 (64 Stat. 765), be free from fiscal year limitations, $5,000,000 of funds made available under chapter 1 of part I, which may be used to pay costs (including personnel costs) of acquisition, storage, renovation and rehabilitation, packing, crating, handling transportation, and related costs of property classified as domestic or foreign excess property pursuant to the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 471 et seq.), *any property available from an agency of the United States Government,* or other property, in advance of known requirements therefor for use in furtherance of the purposes of part I: *Provided,* That the amount of property classified as domestic excess property pursuant to the Federal Property and Administrative Services Act of 1949, as amended, held at any one time pursuant to this section shall not exceed $15,000,000 in total

original acquisition cost. Property acquired pursuant to the preceding sentence may be furnished (1) pursuant to any provision of part I for which funds are authorized for the furnishing of assistance, in which case the separate account established pursuant to this section shall be repaid from funds made available for such provision for all costs incurred, or (2) pursuant to section 607, in which case such separate account shall be repaid in accordance with the provisions of that section for all costs incurred.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Sec. 620. Prohibitions Against Furnishing Assistance.—(a) \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(k) Without the express approval of Congress, no assistance shall be furnished under this Act to any country for construction of any productive enterprise with respect to which the aggregate value of assistance to be furnished by the United States will exceed $100,000,000, except that this sentence does not apply with respect to assistance for construction of any productive enterprise in Egypt which is described in the presentation materials to Congress [for fiscal year 1977, fiscal year 1980, or fiscal year 1981]. Except as otherwise provided in section 506, no military assistance to be furnished beginning July 1, 1966, by the United States will exceed $100,000,000 unless such program has been included in the presentation to the Congress during its consideration of authorizations for appropriations under this Act or of appropriations pursuant to authorizations contained in this Act. No provision of this or any other Act shall be construed to authorize the President to waive the provisions of this subsection.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Sec. 620B. Prohibition Against Assistance and Sales to Argentina.—After September 30, 1978—

[(1) no assistance may be furnished under chapter 2, 4, 5, or 6 of part II of this Act to Argentina;

[(2) no credits (including participation in credits) may be extended and no loan may be guaranteed under the Arms Export Control Act with respect to Argentina;

[(3) no sales of defense articles or services may be made under the Arms Export Control Act to Argentina; and

[(4) no export licenses may be issued under section 38 of the Arms Export Control Act to or for the Government of Argentina.]

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### Chapter 2—Administrative Provisions

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Sec. 624. Statutory Officers.—(a) \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

[(g)(1) In addition to the officers provided for in subsection (a) of this section, there shall be an Inspector General who shall be appointed by the Administrator of the agency primarily responsible for administering part I of this Act. The Inspector General shall be

compensated at the rate provided for level V of the Executive Schedule under section 5316 of title 5, United States Code.

〔(2) The Inspector General shall report to and be under the direct supervision of the Administrator.

〔(3) The Inspector General shall, with respect to the duties and responsibilities of the agency primarily responsible for administering part I of the Act and subject to the authority of the Administrator of such agency, supervise, direct, and control all audit, investigtive, and security activities relating to the programs and operations of the agency. In addition, to the extent requested by the Director of the United States International Development Cooperation Agency (after consultation with the Administrator), the Inspector General shall with respect to the duties and responsiblities of that Agency supervise, direct, and control all audit, investigative, and security activities relating to programs and operations within the United States International Development Cooperation Agency.

〔(4) The Inspector General shall submit an annual report to the Administrator and the Director. This report shall be provided to the Congress without further clearance or approval as part of the annual report required by section 634 of this Act.

〔(5) In the execution of the responsibilities and duties assigned in paragraph (3) of this subsection, the Inspector General shall have (A) access to all records, reports, papers, and documents of the agency and its administrative subdivisions, and (B) authority to request such information or assistance as necessary for carrying out the duties set forth in this subsection from any Federal, State, or local governmental agency or unit thereof, and from contractors, grantees, and loan recipients of the agency.

〔(6) The Inspector General shall have the authority to require by subpena the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence necessary in the performance of functions under this subsection. Any such subpena, in the case of contumacy of refusal to obey shall be enforceable by order of any appropriate United States district court. Procedures other than subpenas shall be used to obtain documents and information from agencies of the United States Government.

〔(7) In carrying out the responsibilities specified in paragraph (3), the Inspector General shall—

〔(A) comply with standards established by the Comptroller General of the United States for audits of Federal establishments, organizations, programs, activities, and functions;

〔(B) establish guidelines for determining when it is appropriate to use non-Federal auditors; and

〔(C) take appropriate steps to assure that any work performed by non-Federal auditors complies with the standards established by the Comptroller General as described in subparagraph (A).

〔(8) The Administrator shall provide the Inspector General with appropriate and adequate office space at central and field office locations of the agency primarily responsible for administering part I of this Act, together with such equipment, office supplies, and communications facilities and services as may be necessary for the operation of such offices and the equipment and facilities located in such offices. In establishing and staffing such field offices, the Ad-

ministrator shall not be bound by overseas personnel ceilings established under the Monitoring Overseas Direct Employment policy.

〔(9)(A) The Inspector General may receive and investigate complaints or information from any employee of or under the United States International Development Cooperation Agency concerning the possible existence of an activity constituting a violation of law, rules, or regulations, constituting mismanagement, gross waste of funds, abuse of authority, or constituting a substantial and specific danger to the public health and safety.

〔(B) The Inspector General shall not, after receipt of a complaint or information from an employee, disclose the identity of the employee without the consent of the employee, unless the Inspector General determines such disclosure is unavoidable during the course of the investigation.

〔(C) Any employee who has authority to take, direct others to take, recommend, or approve any personnel action shall not exercise or threaten to exercise such authority in order to take any action against any employee as a reprisal for making a complaint or disclosing information to the Inspector General, unless the complaint was made or the information disclosed with the knowledge that it was false or with willful disregard for its truth or falsity.〕

SEC. 625. EMPLOYMENT OF PERSONNEL.—(a) * * *

\*           \*           \*           \*           \*           \*           \*

(d) For the purpose of performing functions under this Act outside the United States, the President may employ or assign individuals, or may authorize the employment or assignment of officers or employees by agencies of the United States Government which are not authorized to utilize the Foreign Service personnel system, who shall receive compensation at any of the rates provided for under section 402 or section 403 of the Foreign Service Act of 1980, 〔together with allowances and benefits under that Act〕 *or under chapter 53 of title 5, United States Code, or at any other rate authorized by law, together with allowances and benefits under the Foreign Service Act of 1980.* Individuals so employed or assigned shall be entitled, except to the extent that the President may specify otherwise in cases in which the period of employment or assignment exceeds thirty months, to the same benefits as are provided by section 310 of that Act for individuals appointed to the Foreign Service.

\*           \*           \*           \*           \*           \*           \*

## Chapter 3—Miscellaneous Provisions

\*           \*           \*           \*           \*           \*           \*

SEC. 660. PROHIBITING POLICE TRAINING.—(a) On and after July 1, 1975, none of the funds made available to carry out this Act, and none of the local currencies generated under this Act, shall be used to provide training or advice, or provide any financial support, for police, prisons, or other law enforcement forces for any foreign government or any program of internal intelligence or surveillance on behalf of any foreign government within the United States or abroad.

(b) Subsection (a) of this section shall not apply—

(1) with respect to assistance rendered under section 515(c) of the Omnibus Crime Control and Safe Streets Act of 1968 with respect to any authority of the Drug Enforcement Administration or the Federal Bureau of Investigation which relates to crimes of the nature which are unlawful under the laws of the United States or with respect to assistance authorized under section 482 of this Act; or

(2) to any contract entered into prior to the date of enactment of this section with any person, organization, or agency of the United States Government to provide personnel to conduct, or assist in conducting, any such program【.】*; or*

*(3) to any assistance under this Act to assist in halting significant illegal emigration to the United States from foreign countries.*

Notwithstanding clause (2), subsection (a) shall apply to any renewal or extension of any contract referred to in such paragraph entered into on or after such date of enactment.

Sec. 661. 【Reimbursable Development Programs.—】*Trade and Development Program.—(a)* The President is authorized 【to use $4,000,000 of the funds made available for the fiscal year 1981 for the purposes of this Act】, to work with friendly countries, especially those in which the United States development programs have been concluded or those not receiving assistance under part I of this Act, in (1) facilitating open and fair access to natural resources of interest to the United States and (2) stimulation of reimbursable aid programs consistent with part I of this Act. Any funds used for purposes of this section may be used notwithstanding any other provision of this Act.

*(b) There are authorized to be appropriated to the President for purposes of this section, in addition to funds otherwise available for such purposes, $10,000,000 for the fiscal year 1982 and $10,890,000 for the fiscal year 1983. Amounts appropriated under this subsection are authorized to remain available until expended.*

\*       \*       \*       \*       \*       \*       \*

Sec. 667. Operating Expenses.—(a) There are authorized to be appropriated to the President, in addition to funds otherwise available for such purposes, 【for the fiscal year 1981】—

(1) 【$293,800,000】 *$343,632,000 for the fiscal year 1982 and $374,215,000 for the fiscal year 1983* for necessary operating expenses of the agency primarily responsible for administering part I of this Act; and

(2) such amounts as may be necessary for increases in salary, pay, retirement, and other employee benefits authorized by law, and for other nondiscretionary costs of such agency.

\*       \*       \*       \*       \*       \*       \*

# INTERNATIONAL SECURITY DEVELOPMENT COOPERATION ACT OF 1980

## TITLE I—MILITARY AND RELATED ASSISTANCE AND SALES PROGRAMS

\*       \*       \*       \*       \*       \*       \*

### LEASING OF DEFENSE PROPERTY

⟦SEC. 109. (a) Not less than thirty days before the Secretary of a military department exercises his authority under section 2667 of title 10, United States Code, in order to lease defense property to a foreign government for a period of more than six months, the President shall transmit to the Speaker of the House of Representatives and the chairman of the Committee on Foreign Relations of the Senate, a written notification which specifies—

⟦(1) the country to which such defense property is to be leased;

⟦(2) the type, quantity, and value of the defense property to be leased;

⟦(3) the terms and duration of the lease; and

⟦(4) a justification for the lease.

⟦(b) Each such lease agreement shall be subject to the approval of the Secretary of State.

⟦(c) Each such lease agreement shall be provided to the Congress not later than thirty days after its date of signature.

⟦(d) The President may waive the requirements of subsections (a) and (b) of this section if he determines and immediately reports such determination to the Congress that an emergency exists which requires such lease in the national security interests of the United States.

⟦(e) As used in this section, the term "defense property" means any major defense equipment (as defined in section 47(6) of the Arms Export Control Act) valued at $7,000,000 or more and any other property valued at $25,000,000 or more.

⟦(f) Section 36(a) of the Arms Export Control Act is amended by inserting the following new paragraph immediately after paragraph (9), as added by section 105(c) of this Act:

⟦"(10) a listing (classified if necessary) of all property valued at $1,000,000 or more which was leased, during the quarter for which such report is submitted, to a foreign government for a period of more than six months under section 2667 of title 10, United States Code." ⟧

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## TITLE V—AFRICAN DEVELOPMENT FOUNDATION

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### USE OF CERTAIN FUNDS

SEC. 510. Of the funds appropriated ⟦for the fiscal year 1981⟧ to carry out part I of the Foreign Assistance Act of 1961, other than funds appropriated for the Economic Support Fund, $2,000,000 *for the fiscal year 1982 and $2,178,000 for the fiscal year 1983* shall be used to carry out this title.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

AGRICULTURAL TRADE DEVELOPMENT AND ASSISTANCE ACT OF 1954

\*        \*        \*        \*        \*        \*        \*

## TITLE I

SEC. 101. In order to carry out the policies and accomplish the objectives set forth in section 2 of this Act, the President is authorized to negotiate and carry out agreements with friendly countries to provide for the sale of agricultural commodities for dollars on credit terms or [for foreign currencies.], *to the extent that sales for dollars under the terms applicable to such sales are not possible, for foreign currencies on credit terms and on terms which permit conversion to dollars at the exchange rate applicable to the sales agreement.*

\*        \*        \*        \*        \*        \*        \*

SEC. 103. In exercising the authorities conferred upon him by this title, the President shall—

(a) take into account efforts of friendly countries to help themselves toward a greater degree of self-reliance, including efforts to increase their own agricultural production, especially through small, family farm agriculture, to improve their facilities for transportation, storage, and distribution of food commodities, and to reduce their rate of population growth;

[(b) take steps to assure a progressive transition from sales for foreign currencies to sales for dollars (or to the extent that transition to sales for dollars under the terms applicable to such sales is not possible, transition to sales for foreign currencies on credit terms no less favorable to the United States than those for development loans made under section 122 of the Foreign Assistance Act of 1961, as amended, and on terms which permit conversion to dollars at the exchange rate applicable to the sales agreement) at a rate whereby the transition can be completed by December 31, 1971: *Provided,* That, except where he determines that it would be inconsistent with the objectives of the Act, the President shall determine the amount of foreign currencies needed for the uses specified in subsections (a), (b), (c), (e), and (h) of section 104 and in title III, and the agreements for such credit sales shall provide for payment of such amounts in dollars or in foreign currencies upon delivery of the agricultural commodities. Such payment may be considered as an advance payment of the earliest installments;]

*(b) except where the President determines that it would be inconsistent with the objectives of this Act, determine the amount of foreign currencies needed for the uses specified in subsections (a), (b), (e), and (h) of section 104 and in title III, and the agreements for credit sales shall provide for payment of such amounts in dollars or in foreign currencies upon delivery of the agricultural commodities; and such payment may be considered as an advance payment of the earliest installments;*

\*        \*        \*        \*        \*        \*        \*

(d) makes sales agreements only with those countries which he determines to be friendly to the United States: *Provided,* That the President shall periodically review the status of those countries which are eligible under this subsection and report the results of such review to the Congress. As used in this Act, "friendly country" shall not include 【1】 any country or area dominated or controlled by a foreign government or organization controlling a world Communist movement 【, or (2) for the purpose only of sales of agricultural commodities for foreign currencies under title I of this Act, any country or area dominated by a Communist government】. Notwithstanding any other Act, the President may enter into agreements for the sale of agricultural commodities for dollars on credit terms under title I of this Act with countries which fall within the definition of "friendly country" for the purpose of such sales and no sales under this Act shall be made with any country if the President finds such country is (a) an aggressor, in a military sense, against any country having diplomatic relations with the United States, or (b) using funds, of any sort, from the United States for purposes inimical to the foreign policies of the United States;

(1) 【obtain commitments from friendly purchasing countries that will insure, insofar as practicable, that food commodities sold for foreign currencies under title I of this Act shall be marked or identified at point of distribution or sale as being provided on a concessional basis to the recipient government through the generosity of the people of the United States of America, and】 obtain commitments from purchasing countries to publicize widely to their people, by public media and other means, that the commodities are being provided on a concessional basis through the friendship of the American people as food for peace.

    \*      \*      \*      \*      \*      \*      \*

SEC. 104. Notwithstanding any other provision of law, the President may use or enter into agreements with foreign countries or international organizations to use the foreign currencies, including principal and interest from loan repayments, which accrue in connection with sales for foreign currencies under 【this title】 *agreements for such sales entered into prior to January 1, 1972,* for one or more of the following purposes;

(a) For payment of United States obligations (including obligations entered into pursuant to other legislation);

    \*      \*      \*      \*      \*      \*      \*

(d) For assistance to meet emergency or extraordinary relief requirements other than requirements for food commodities; *Provided,* That not more than a total amount equivalent to 【$5,000,000】 *$10,000,000* may be made available for this purpose during any fiscal year;

    \*      \*      \*      \*      \*      \*      \*

(k) For paying, to the maximum extent practicable, the costs of carrying out programs for the control of rodents, insects, weeds, and other animal or plant pests; *Provided,* That—

(1) Section 1415 of the Supplemental Appropriation Act, 1953, shall apply to currencies used for the purposes specified in subsections (a) and (b), and in the case of currencies to be used for the purposes specified in paragraph (2) of subsection (b) the Appropriation Act may specifically authorize the use of such currencies and shall not require the appropriation of dollars for the purchase of such currencies.

(2) Section 1415 of the Supplemental Appropriation Act, 1953, shall apply to all foreign currencies used for grants under subsections (f) and (g), to not less than 10 per centum of the foreign currencies which accrue pursuant to agreements entered into on or before December 31, 1964, and to not less than 20 per centum in the aggregate of the foreign currencies which accrue pursuant to agreements entered into thereafter: *Provided, however,* That the President is authorized to waive such applicability of section 1415 in any case where he determines that it would be inappropriate or inconsistent with the purposes of this title.

(3) No agreement or proposal to grant any foreign currencies [except as provided in subsection (c) of this section),] or to use (except pursuant to appropriation Act) any principal or interest from loan repayments under this section shall be entered into or carried out until the expiration of thirty days following the date on which such agreement or proposal is transmitted by the President to the Senate Committee on Agriculture and Forestry and the Senate Committee on Foreign Relations and to the House Committee on Agriculture and the House Committee on International Relations, if transmitted while Congress is in session, or sixty days following the date of transmittal if transmitted while Congress is not in session.

*  *  *  *  *  *  *

Sec. 106. (a) Payment by any friendly country for commodities purchased for dollars on credit shall be upon terms as favorable to the United States as the economy of such country will permit. Payment for such commodities shall be in dollars with interest at such rates as the Secretary may determine but not less than the minimum rate required by section 122(b) of the Foreign Assistance Act of 1961 for loans made under that section. Payment may be made in reasonable annual amounts over periods of not to exceed twenty years from the date of the last delivery of commodities in each calendar year under the agreement, except that the date for beginning such annual payment may be deferred for a period not later than two years after such date of last delivery, and interest shall be computed from the date of such last delivery. Delivery of such commodities shall be made in annual installments for not more than ten years following the date of the sales agreement and subject to the availability of the commodities at the time delivery is to be made. *Payment by any friendly country for commodities purchased for foreign currencies on credit terms and on terms which permit conversion to dollars shall be upon terms no less favorable to the United States than those for development loans made under section 122(b) of the Foreign Assistance Act of 1961.*

*  *  *  *  *  *  *

【SEC. 108. The Commodity Credit Corporation may finance ocean freight charges incurred pursuant to agreements for sales for foreign currencies (other than those providing for conversion to dollars as described in section 103(b) of this Act) entered into hereunder only to the extent that such charges are higher (than would otherwise be the case) by reason of a requirement that the commodities be transported in United States-flag vessels. Such agreements shall require the balance of such charges for transportation in United States vessels to be paid in dollars by the nations or organizations with whom such agreements are entered into.】

SEC. 109. (a) Before entering into agreements with developing countries for the sale of United States agricultural commodities on whatever terms, the President shall consider the extent to which the recipient country is undertaking wherever practicable self-help measures to increase per capita production and improve the means for storage and distribution of agricultural commodities, including:

(1) devoting land resources to the production of needed food rather than to the production of nonfood crops—especially non-food crops in world surplus;

(2) development of the agricultural chemical, farm machinery and equipment, transportation and other necessary industries through private enterprise;

(3) training and instructing farmers in agricultural methods and techniques, *and reducing illiteracy among farmers*;

(4) constructing adequate storage facilities;

(5) improving marketing and distribution systems;

(6) creating a favorable environment for private enterprise and investment, both domestic and foreign, and utilizing available technical know-how;

(7) establishing and maintaining Government policies to insure adequate incentives to producers;

(8) establishing and expanding institutions for adaptive agricultural research;

(9) allocating for these purposes sufficient national budgetary and foreign exchange resources (including those supplied by bilateral, multilateral and consortium aid programs) and local currency resources (resulting from loans or grants to recipient governments of the proceeds of local currency sales);

(10) carrying out voluntary programs to control population growth【.】; *and*

*(11) carrying out programs to improve the health of farmers and their families.*

In taking these self-help measures into consideration the President shall take into particular account the extent to which they are being carried out in ways designed to contribute directly to development progress in poor rural areas and to enable the poor to participate actively in increasing agricultural production through small farm agriculture.

【(b) Notwithstanding any other provisions of this Act, in agreements with nations not engaged in armed conflict against Communist forces or against nations with which the United States has no diplomatic relations, not less than 20 per centum of the foreign currencies set aside for purposes other than those in sections 104(a), (b), (e), and (j) shall be allocated for the self-help measures set forth in this section.】

(c) Each agreement entered into under this title shall describe the program which the recipient country is undertaking to improve its production, storage, and distribution of agricultural commodities; and shall provide for termination of such agreement whenever the President finds that such program is not being adequately developed.

*(d)(1) In each agreement entered into under this title and in each amendment to such an agreement, the economic development and self-help measures which the recipient country agrees to undertake shall be described (A) to the maximum feasible extent, in quantitative and measurable terms, and (B) in a manner which ensures that the needy people in the recipient country will be the major beneficiaries of the self-help measures pursuant to each agreement.*

*(2) The President shall, to the maximum feasible extent, take appropriate steps to satisfy himself that, in each agreement entered into under this title and in each amendment to such an agreement, the economic development and self-help measures which the recipient country agrees to undertake are additional to the measures which the recipient country otherwise would have undertaken irrespective of that agreement or amendment.*

*(3) The President shall take all appropriate steps to determine whether the economic development and self-help provisions of each agreement entered into under this title, and of each amendment to such an agreement, are being fully carried out.*

\*       \*       \*       \*       \*       \*       \*

SEC. 116. *Beginning with fiscal year 1983, not more than 30 percent of the dollar amount of financing made available under this title in each fiscal year may be made available for any one country.*

## TITLE II

SEC. 201. (a) The President is authorized to determine requirements and furnish agricultural commodities, on behalf of the people of the United States of America, to meet famine or other urgent or extraordinary relief requirements; to combat malnutrition, especially in children; to promote economic and community development in friendly developing areas; and for needy persons and nonprofit school lunch and preschool feeding programs outside the United States. The Commodity Credit Corporation shall make available to the President such agricultural commodities determined to be available under section 401 as he may request.

(b) The minimum quantity of agricultural commodities distributed under this title—

(1) for fiscal years 1978 through 1980 shall be 1,600,000 metric tons, of which not less than 1,300,000 metric tons shall be distributed through nonprofit voluntary agencies and the World Food Program;

(2) for fiscal year 1981 shall be 1,650,000 metric tons, of which not less than 1,350,000 metric tons shall be distributed through nonprofit voluntary agencies and the World Food Program; and

(3) for fiscal year 1982 and each fiscal year thereafter shall be 1,700,000 metric tons, of which not less than [1,400,000 metric tons] *1,200,000 metric tons for nonemergency programs*

shall be distributed through nonprofit voluntary agencies and
the World Food Program;
unless the President determines and reports to the Congress, to-
gether with his reasons, that such quantity cannot be used effec-
tively to carry out the purposes of this title: *Provided,* That such
minimum quantity shall not exceed the total quantity of commod-
ities determined to be available for disposition under this Act pur-
suant to section 401, less the quantity of commodities required to
meet famine or other urgent or extraordinary relief requirements.

*     *     *     *     *     *     *

---

### PEACE CORPS ACT

*     *     *     *     *     *     *

#### AUTHORIZATION

SEC. 3. (a) The President is authorized to carry out programs in
furtherance of the purposes of this Act, on such terms and condi-
tions as he may determine.

(b) There are authorized to be appropriated to carry out the pur-
poses of the Act for [fiscal year 1981 not to exceed $118,000,000]
*the fiscal year 1982 not to exceed $105,000,000 and for the fiscal
year 1983 not to exceed $114,345,000*: *Provided, however,* That not to
exceed $500,000 of funds made available hereunder for fiscal year
1967 shall be obligated under contracts or agreements to carry out
research: *Provided further,* That no such contracts or agreements
shall be executed unless the research in question related to the
basic responsibilites of the Peace Corps. Unobligated balances of
funds made available hereunder are hereby authorized to be con-
tinued available for the general purposes for which appropriated
and may at any time be consolidated with appropriations hereun-
der. None of the funds authorized to carry out the purposes of this
Act shall be used to carry out the Volunteers to America Program
conducted under the Mutual Educational and Cultural Exchange
Act of 1961, as amended (22 U.S.C. 2451 et seq.), or any similar pro-
gram involving the service or training of foreign nationals in the
United States.

(c) In addition to the amount authorized to be appropriated by
subsection (b) to carry out the purposes of this Act, there are au-
thorized to be appropriated for increases in salary, pay, retirement,
or other employee benefits authorized by law, for [fiscal year
1981,] *each fiscal year,* such sums as may be necessary.

[(d) The Director of ACTION shall transfer to the readjustment
allowance, ACTION, account at the Treasury Department, no later
than December 31, 1975, not to exceed $315,000 from any sums
available to carry out the purposes of this Act in fiscal year 1976 to
rectify the imbalance in the Peace Corps readjustment allowance
account for the period March 1, 1961, to February 28, 1973.

[(e) The Director of ACTION is authorized to waive claims re-
sulting from erroneous payments of readjustment allowances to
Peace Corps Volunteers who terminated their volunteer service be-
tween March 1, 1961, and February 28, 1973, notwithstanding the
provisions of section 5584 of title 5, United States Code, and not-

withstanding the fact that the names of the recipients of such over-payments may be unknown.

[(f) Disbursing and certifying officers of the Peace Corps and ACTION are relieved from liability for improper or incorrect payment of readjustment allowances made to volunteers between March 1, 1961, and February 28, 1973, other than any cases known to have resulted from fraud, notwithstanding the provisions of the first section of the Act entitled "An Act to provide permanent authority for the relief of certain disbursing officers, and for other purposes", approved August 11, 1955 (31 U.S.C. 82a–2), and of section 2 of the Act entitled "An Act to fix the responsibilities of disbursing and certifying officers, and for other purposes", approved December 29, 1941 (31 U.S.C. 82c).]

(g) In recognition of the fact that women in developing countries play a significant role in economic production, family support, and the overall development process, the Peace Corps shall be administered so as to give particular attention to those programs, projects, and activities which tend to integrate women into the national economics of developing countries, thus improving their status and assisting the total development effort.

*(h) In recognition of the fact that there are over 400,000,000 disabled people in the world, 95 percent of whom are among the poorest of the poor, the Peace Corps shall be administered so as to give particular attention to programs, projects, and activities which tend to integrate disabled people into the national economies of developing countries, thus improving their status and assisting the total development effort.*

### DIRECTOR OF THE PEACE CORPS AND DELEGATION OF FUNCTIONS

SEC. 4. (a) The President may appoint, by and with the advice and consent of the Senate, a Director of the Peace Corps and a Deputy Director of the Peace Corps.

(b) The President may exercise any functions vested in him by this Act through [such agency or officer of the United States Government as he shall direct. The head of any such agency or any such officer] *the Director of the Peace Corps. The Director of the Peace Corps* may promulgate such rules and regulations as he may deem necessary or appropriate to carry out such functions, and may delegate to any of his subordinates authority to perform any of such functions.

\*          \*          \*          \*          \*          \*          \*

### PEACE CORPS VOLUNTEERS

SEC. 5. (a) \* \* \*

\*          \*          \*          \*          \*          \*          \*

(h) Volunteers shall be deemed employees of the United States Government for the purposes of the Federal Tort Claims Act and any other Federal tort liability statute, the Federal Voting Assistance Act of 1955 (5 U.S.C. 2171 et seq.), the Act of June 4, 1954, chapter 264, section 4 (5 U.S.C. 73b–75), the Act of December 23, 1944, chapter 716, section 1, as amended (31 U.S.C. 492a), section 5584 of title 5, United States Code (and readjustment allowances

paid under this Act shall be considered as pay for purposes of such section, and section 1 of the Act of June 4, 1920 (41 Stat. 750), as amended (22 U.S.C. 214). ⟦The provisions of section 30 of the State Department Basic Authorities Act of 1956, relating to malpractice protection shall apply to volunteers, and the President shall have the authority granted to the Secretary of State in subsection (f) of such section. For purposes of subsection (g) of such section, a Peace Corps representative shall be deemed to be a principal representative of the United States.⟧

\*       \*       \*       \*       \*       \*       \*

## PARTICIPATION OF FOREIGN NATIONALS

SEC. 9. In order to provide for assistance by foreign nationals in the training of volunteers, and to permit effective implementation of Peace Corps projects with due regard for the desirability of cost-sharing arrangements, where appropriate, the President may make provision for transportation, housing, subsistence, or per diem in lieu thereof, and health care or health and accident insurance for foreign nationals engaged in activities authorized by this Act while they are away from their homes, without regard to the provisions of any other law: *Provided, however,* That per diem in lieu of subsistence furnished to such persons shall not be at rates higher than those prescribed by the Secretary of State pursuant to section 12 of Public Law 84–855 (70 Stat. 890). Such persons, and persons coming to the United States under contract pursuant to section 10(a)⟦(4)⟧, *(5),* may be admitted to the United States, if otherwise qualified, as nonimmigrants under section 101(a)(15) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)) for such time and under such conditions as may be prescribed by regulations promulgated by the Secretary of State and the Attorney General. A person admitted under this section who fails to maintain the status under which he was admitted or who fails to depart from the United States at the expiration of the time for which he was admitted, or who engages in activities of a political nature detrimental to the interests of the United States, or in activities not consistent with the security of the United States, shall, upon the warrant of the Attorney General, be taken into custody and promptly deported pursuant to sections 241, 242, and 243 of the Immigration and Nationality Act. Deportation proceedings under this section shall be summary and the findings of the Attorney General as to matters of fact shall be conclusive.

## GENERAL POWERS AND AUTHORITIES

SEC. 10. (a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

*(i) The Director of the Peace Corps shall have the same authority as is available under section 26 of the State Department Basic Authorities Act of 1956 to the Secretary of State, the Director of the International Communication Agency, and the Director of the United States International Development Cooperation Agency. For purposes of this subsection, the reference in that section to a principal officer of the Foreign Service shall be deemed to be a reference*

to a Peace Corps representative and the reference in that section to a member of the Foreign Service shall be deemed to be a reference to a person employed, appointed, or assigned under this Act.

(j) The provisions of section 30 of the State Department Basic Authorities Act of 1956 shall apply to volunteers and persons employed, appointed, or assigned under this Act. For purposes of this subsection, references to the Secretary in subsection (b) of such section shall be deemed to be references to the Director of the Peace Corps and references to the Secretary in subsection (f) of such section shall be deemed to be references to the President. For purposes of subsection (g) of such section, a Peace Corps representative shall be deemed to be a principal representative of the United States.

\*         \*         \*         \*         \*         \*         \*

[APPLICABILITY OF MUTUAL DEFENSE ASSISTANCE CONTROL ACT

[SEC. 18. The Mutual Defense Assistant Control Act of 1951 (22 U.S.C. 1611 et seq.) shall apply with respect to functions carried out under this Act except in cases where the President shall determine that such application would be detrimental to the interests of the United States.]

\*         \*         \*         \*         \*         \*         \*

INSPECTOR GENERAL ACT OF 1978

PURPOSE; ESTABLISHMENT

SEC. 2. In order to create independent and objective units—

(1) to conduct and supervise audits and investigations relating to programs and operations of the Department of Agriculture, the Department of Commerce, the Department of Education, the Department of Housing and Urban Development, the Department of the Interior, the Department of Labor, the Department of Transportation, *the Agency for International Development,* the Community Services Administration, the Environmental Protection Agency, the General Services Administration, the National Aeronautics and Space Administration, the Small Business Administration, and the Veterans' Administration;

(2) to provide leadership and coordination and recommend policies for activities designed (A) to promote economy, efficiency, and effectiveness in the administration of, and (B) to prevent and detect fraud and abuse in, such programs and operations; and

(3) to provide a means for keeping the head of the establishment and the Congress fully and currently informed about problems and deficiencies relating to the administration of such programs and operations and the necessity for and progress of corrective action;

there is hereby established in each of such establishments an office of Inspector General.

\*         \*         \*         \*         \*         \*         \*

*SPECIAL PROVISIONS RELATING TO THE AGENCY FOR INTERNATIONAL DEVELOPMENT*

SEC. 8A. *(a) In addition to the other duties and responsibilities specified in this Act, the Inspector General of the Agency for International Development—*

*(1) shall supervise, direct, and control all security activities relating to the programs and operations of that Agency, subject to the supervision of the Administrator of that Agency; and*

*(2) to the extent requested by the Director of the United States International Development Cooperation Agency (after consultation with the Administrator of the Agency for International Development), shall supervise, direct, and control all audit, investigative, and security activities relating to programs and operations within the United States International Development Cooperation Agency.*

*(b) In addition to the Assistant Inspector Generals provided for in section 3(d) of this Act, the Inspector General of the Agency for International Development shall, in accordance with applicable laws and regulations governing the civil service, appoint an Assistant Inspector General for Security who shall have the responsibility for supervising the performance of security activities relating to programs and operations of the Agency for International Development.*

*(c) The semiannual reports required to be submitted to the Administrator of the Agency for International Development pursuant to section 5(b) of this Act shall also be submitted to the Director of the United States International Development Cooperation Agency.*

*(d) In addition to the officers and employees provided for in section 6(a)(6) of this Act, members of the Foreign Service may, at the request of the Inspector General of the Agency for International Development, be assigned as employees of the Inspector General. Members of the Foreign Service so assigned shall be responsible solely to the Inspector General, and the Inspector General (or his or her designee) shall prepare the performance evaluation reports for such members.*

*(e) In establishing and staffing field offices pursuant to section 6(c) of this Act, the Administrator of the Agency for International Development shall not be bound by overseas personnel ceilings established under the Monitoring Overseas Direct Employment policy.*

*(f) The reference in section 7(a) of this Act to an employee of the establishment shall, with respect to the Inspector General of the Agency for International Development, be construed to include an employee of or under the United States International Development Cooperation Agency.*

*(g) The Inspector General of the Agency for International Development shall be in addition to the officers provided for in section 624(a) of the Foreign Assistance Act of 1961.*

*(h) As used in this Act, the term "Agency for International Development" includes any successor agency primarily responsible for administering part I of the Foreign Assistance Act of 1961.*

\*          \*          \*          \*          \*          \*          \*

DEFINITIONS

Sᴇᴄ. 11. As used in this Act—

(1) the term "head of the establishment" means the Secretary of Agriculture, Commerce, Education, Housing and Urban Development, the Interior, Labor, or Transportation or the Administrator of *the Agency for International Development* Community Services, Environmental Protection, General Services, National Aeronautics and Space, Small Business, or Veterans' Affairs, as the case may be;

(2) the term "establishment" means the Department of Agriculture, Commerce, Education, Housing and Urban Development, the Interior, Labor, or Transportation or *the Agency for International Development,* the Community Services Administration, the Environmental Protection Agency, the General Services Administration, the National Aeronautics and Space Administration, the Small Business Administration, or the Veterans' Administration, as the case may be;

(3) the term "Inspector General" means the Inspector General of an establishment;

(4) the term "Office" means the Office of Inspector General of an establishment; and

(5) the term "Federal agency" means an agency as defined in section 552(e) of title 5 (including an establishment as defined in paragraph (2)), United States Code, but shall not be construed to include the General Accounting Office.

\*        \*        \*        \*        \*        \*        \*

---

## SECTION 5316 OF TITLE 5, UNITED STATES CODE

### § 5316. Positions at level V

Level V of the Executive Schedule applies to the following positions, for which the annual rate of basic pay shall be the rate determined with respect to such level under chapter 11 of title 2, as adjusted by section 5318 of this title:

Administrator, Agricultural Marketing Service, Department of Agriculture.

\*        \*        \*        \*        \*        \*        \*

[Auditor-General of the Agency for International Development.]

*Inspector General, Agency for International Development.*

\*        \*        \*        \*        \*        \*        \*

ADDITIONAL VIEWS OF HON. WILLIAM S. BROOMFIELD
AND HON. ROBERT J. LAGOMARSINO

In its totality, we believe the committee has produced a comprehensive legislative package on foreignassistance that will provide the President and his administration with the needed tools to carry out U.S.-foreign policy and support our interests around the globe. We would, however, like to draw my colleagues' attention to three specific concerns that remain and reserve the right to raise these issues on the floor for further consideration.

First, we are concerned over the increasing tendency of some members of the committee to unnecessarily restrict the President in his efforts to bring about a new approach in the execution of U.S.-foreign policy. With regard to U.S. policy toward El Salvador and Argentina, the President has stated time and again his desire to move from the arena of public denunciation to one of private diplomacy when pressing for positive change in sensitive areas, such as human rights. While we support the need to use our influence and resources for positive change, continued public denigration more often than not hampers our efforts as the forces against change rally a nationalistic backlash against external intervention.

Second, we must express our deep disappointment over the lack of progress in settling the crisis on Cyprus. The continued occupation of that island by Turkish forces, and the failure of all attempts in seeking a just, equitable, and peaceful resolution to the problem threatens not only the nations and peoples involved, but the entire Eastern Mediterranean and the stability of the southern flank of NATO. We believe the United States has acted with great restraint in this matter, and has demonstrated its willingness to support all efforts to bring about a settlement to this question. Unfortunately, unless some positive action by Turkey is forthcoming in the near future, we may have reached a time when the Congress should reassess the role its assistance plays in the peace process.

Finally, while the committee has made a good start in cutting back on the total cost of our foreign aid programs, in light of the Nation's economic problems, we are not sure we have gone far enough. To the committee's credit, we have reduced the fiscal year 1982 foreign assistance budget by some $650 million from the administration's request of $6,681,007,000. However, the committee's recommendation of $6,026,883,000 is still more than a billion dollars above the fiscal year 1981 authorization of $4,907,365,000. At a time when we are asking the American people to accept significant reductions in Government services, including domestic social welfare programs, we are concerned that we may not be matching that regrettable but necessary degree of austerity in our foreign assistance programs.

WILLIAM S. BROOMFIELD.
ROBERT J. LAGOMARSINO.

## ADDITIONAL VIEWS OF HON. EDWARD J. DERWINSKI

Last year a number of us held that friends of the United States should be favored in our foreign aid; those countries who vote or work against our interests should not. This year the majority of the committee came around to this point of view in several instances. For example, the committee now realizes the pointlessness of pouring money for economic assistance into Syria while the Soviets pour in billions of dollars worth of arms. The committee's action, therefore, to "deobligate" the more than $100 million still in the pipeline for Syria is both appropriate and timely as Syrian forces are expanding their heavyhanded occupation in Lebanon while shielding PLO terrorists activities directed against Israel and the Lebanese Christian community.

Commendably, the committee unanimously approved $2 million in humanitarian assistance for Lebanon and called for an immediate cease-fire in Lebanon and the removal of Syrian forces from that beleaguered country. It also encouraged the President to continue his diplomatic efforts to implement a comprehensive and coordinated policy that provides for an immediate cease-fire, by all parties, reaffirmation of the historic United States-Lebanon relationship, restoration of the freedom, sovereignty and integrity of Lebanon, and support for free and open national elections.

Deserving of special mention in this bill are those provisions which authorize humanitarian assistance. With so many people around the world being affected by war, famine, and natural disasters, this assistance is absolutely essential.

Of particular importance is the committee's endorsement of the administration's request to rescind the arms embargo against Argentina. The human rights situation in that country has significantly improved; the committee recognized that improvement and is betting that it will continue. However, I regret that the committee then complicated the issue by adding conditional language. The administration had already affirmed the improvement in the human rights situation in Argentina; its request to Congress to lift the embargo is based on that fact. On the other hand, the administration was not making a request for aid per se for Argentina; it was attempting to remove an impediment. The committee's action, therefore, is particularly strange and counterproductive, especially in view of the fact that the main purpose of lifting the embargo was to transfer the issue from the arena of public debate to quiet diplomatic channels, thereby providing the new administration with an opportunity to conduct its new policy.

The committee also made a mistake in imposing conditions on the administration in extending military assistance to El Salvador. The amendment that passed contains certain restrictions, one of which requires a Presidential certification that El Salvador is not engaged in a consistent pattern of violating human rights. It is unwarranted to suggest that the new administration would condone a widespread repression in El Salvador. Another condition requires a

willingness on the part of the Salvadoran Government to negotiate with opposition groups.

I believe it is an error, and certainly unfair, to require a friendly government to negotiate with revolutionary opposition groups who, if they were in control, would have no free election themselves and who care nothing at all about human rights. The State Department estimates that 10,000 people were killed in El Salvador last year, the left admits responsibility for 6,000 of these deaths. Yet, somehow, the Salvadoran Government alone is being tagged with the human rights issue.

There has been an extensive domestic campaign opposing American support for the Salvadoran Government. Part of a well-orchestrated international movement, it would inflict upon the United States another defeat in the image of Vietnam, Cambodia, and Nicaragua. We should not withdraw support from another beleaguered ally only to watch it fall to the "revolutionary" left. Our uneven concern over human rights and elections has moved the focus of our attention to another country not yet under Communist control. My concern is that by viewing El Salvador in isolation and concentrating on the government in power, rather than its internationally supported Marxist opposition, we will weaken the government dangerously. The next step would be, I fear, internationally supervised negotiations, a position the left has been unable to gain by either popular will or force, an all too familiar pattern. I hope my colleagues, upon reflection, will agree. I intend to offer an amendment on the floor to reverse this lapse on the part of the committee.

I plan also to offer an amendment to restore the FMS credits for Zaire which were reduced by the Subcommittee on Africa, an action confirmed by the full committee. American defense relies heavily on cobalt from Zaire. There are compelling reasons for Zaire to be strong and stable in the midst of unfriendly neighbors. Our European allies, who also have a vital need for Zaire's strategically important raw materials, have demonstrated what Zaire means to them by furnishing assistance that is commensurate with what they have at stake there. In contrast, U.S. assistance to Zaire has been conspicuously low over the past 4 years. Given our continuing national security interests in Zaire, it's imperative that we take steps to underscore our commitment there.

As far as Angola is concerned, the committee acted unwisely in voting to retain the sweeping limitations of the Clark amendment. We do not treat any other country as we do Angola. Even the Soviet Union and Cambodia would be easier to assist. That illustrates how preposterous this amendment is. Consequently, as a matter of principle, I intend to offer an amendment that will eliminate these restrictions as the President must have more latitude and flexibility in conducting U.S. foreign policy. In this connection, I note that the Senate Foreign Relations Committee has acted much more responsibly in this matter.

In pondering the merits of the Clark amendment, one other observation is in order. Members should bear in mind that there is a common Cuban thread running through many of the foreign policy problems the United States faces today in Latin America and Africa. Whether it be El Salvador and Nicaragua, or Ethiopia and Angola, the Cuban influence and presence is indisputably there

and working assiduously against the interests and friends of the free world.

In conclusion, I would like to add an observation regarding the Cyprus negotiations. Notwithstanding a lengthy provision in the law requiring that the President report to Congress each 60 days, progress in solving the problems on Cyprus has been minimal. Therefore, I urge the President, consistent with the terms of the law, to give some long-overdue priority to a solution of the Cyprus question, particularly with respect to the return of refugees to New Famagusta (Varosha).

EDWARD J. DERWINSKI.

## ADDITIONAL VIEWS OF HON. PAUL FINDLEY

During the committee consideration of the foreign aid bill, I was prepared to offer an amendment to cut economic aid to India by $35 million, reducing the total from $110 million to $75 million (the United States provides no military aid to India). My amendment would not have affected the anticipated $154 million in Public Law 480 title II India is to receive in fiscal year 1982.

With a per capita GNP of only $180, India certainly qualifies on a humanitarian basis for U.S. developmental assistance. However, I question providing such a large assistance package to a nation which devotes a considerable proportion of its own resources to the purchase of Soviet military equipment. While the United States was providing more than $475 million in economic and food aid in fiscal years 1980 and 1981, India was contracting to purchase $1.6 billion in Soviet military equipment even though India already enjoys clear military superiority in Southwest Asia.

I did not offer the amendment, however, in order not to affect adversely United States-Indian negotiations regarding the termination of the U.S. nuclear cooperation agreement with India. At stake is the issue of whether safeguards will continue to apply to U.S.-supplied nuclear fuel in India after the termination of the bilateral nuclear relationship. In other words, will India agree in the future not to divert U.S.-supplied nuclear material from its intended peaceful uses to the manufacture of a bomb?

Congress will be very interested in this question much as it has been since 1974 when India detonated a bomb made in part with U.S.-supplied heavy water. Should the Indians prove unwilling to assure the United States that they will not again divert U.S.-supplied nuclear materials to nonpeaceful uses and should they refuse to agree to continued safeguards on U.S.-supplied nuclear materials, I believe that it would be appropriate for Congress to reexamine its aid relationship with India.

PAUL FINDLEY.

(131)

O