UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | No. 2:20-cv-0111-RAJ |
| Plaintiffs, | **FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES DEPARTMENT OF STATE, et al., | |
| Defendants. | |

# EXHIBIT 7

135 Cong. Rec. 31345-31347 (Nov. 21, 1989)

Motion for Summary Judgment
Exhibits

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – i

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

without jeopardizing the progress Amtrak has made. For this reason, S. 462 contains a cushion to authorize such capital expenditures, should funding for this purpose become available in the future.

In my opinion, S. 462 represents a sound proposal that will advance our Nation's transportation network. I urge its passage, swift action in conference, and favorable consideration by the President.

The bill was ordered to be engrossed for a third reading and was read the third time.

Mr. MITCHELL. Mr. President, I ask unanimous consent that the Commerce Committee be discharged from further consideration of H.R. 2346, the House companion bill; that all after the enacting clause be stricken; that the text of S. 462, as amended, be inserted in lieu thereof; and that the bill be read a third time and passed; and that the motion to reconsider be laid on the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

So the bill (H.R. 2346), as amended, was passed.

Mr. MITCHELL. Mr. President, I move that the Senate insist on its position, and request a conference with the House, and that the Chair be authorized to appoint conferees on the part of the Senate.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

Mr. MITCHELL. Mr. President, I ask unanimous consent that S. 462 be indefinitely postponed.

The PRESIDING OFFICER. Without objection, it is so ordered.

## TRADE AUTHORIZATION ACT

Mr. MITCHELL. Mr. President, I ask that the Chair lay before the Senate a message from the House of Representatives on S. 1164.

The PRESIDING OFFICER laid before the Senate the following message from the House of Representatives:

*Resolved,* That the bill from the Senate (S. 1164) entitled "An act to authorize appropriations for fiscal year 1990 for the Office of the United States Trade Representative, the United States International Trade Commission, and the United States Customs Service," do pass with the following amendment:

Page 3, strike out line 1 and all that follows through page 4, line 9, and insert:

(b) APPOINTMENT OF THE COMMISSIONER OF CUSTOMS.—(1) The second sentence of the first section of the Act entitled "An Act to create a Bureau of Customs and a Bureau of Prohibition in the Department of the Treasury", approved March 3, 1927 (44 Stat. 1381, 19 U.S.C. 2071), is amended to read as follows: "The Commissioner of Customs, who shall be appointed by the President by and with the advice and consent of the Senate, shall—

"(1) be at the head of the United States Customs Service;

"(2) carry out the duties and powers prescribed by the Secretary of the Treasury; and

"(3) report to the Secretary of the Treasury through such other officials as may be designated by the Secretary.".

(2) The individual who is serving as the Commissioner of Customs on the day before the date of the enactment of this Act may continue to serve in such capacity until a Commissioner of Customs, appointed as provided in the amendment made by paragraph (1), takes office.

Mr. MITCHELL. Mr. President, I move that the Senate concur in the amendment of the House.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

Mr. MITCHELL. Mr. President, I move to reconsider the vote by which the motion was agreed to.

Mr. DOLE. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

## ANTITERRORISM AND ARMS EXPORT AMENDMENTS ACT

Mr. MITCHELL. Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of Calendar No. 315, H.R. 91, an act to prohibit exports of military equipment to countries supporting international terrorism.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

A bill (H.R. 91) to prohibit exports of military equipment to countries supporting international terrorism, and for other purposes.

The PRESIDING OFFICER. Is there objection to the immediate consideration of the bill?

There being no objection, the Senate proceeded to consider the bill.

AMENDMENT NOS. 1204 AND 1205

Mr. MITCHELL. Mr. President, in behalf of Senators RIEGLE and GARN, I send two amendments to the desk, and ask unanimous consent that they be considered en bloc.

The PRESIDING OFFICER. Without objection, it is so ordered.

The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Maine [Mr. MITCHELL], for Mr. RIEGLE (for himself and Mr. GARN) proposes amendments numbered 1204 and 1205, en bloc.

Mr. MITCHELL. Mr. President, I ask unanimous consent that reading of the amendments be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendments are as follows:

AMENDMENT NO. 1204

On page 11, line 7, strike "The" and insert "With regard to munitions items controlled pursuant to this Act, the".

AMENDMENT NO. 1205

On page 19, line 17, delete all from "shall" through the second "and" on page 19, line 18.

Mr. HELMS. Mr. President, section 10 was added to the language of this act in order to provide for the legitimate exercise of individual or collective self-defense against terrorist attacks against target countries.

The right of individual or collective self-defense has existed in customary international law since the writings of Hugo Grotius and the development of classical international law during the middle of the 17th century. That is a long time and this is a widely recognized and universally accepted principle.

The right of self-defense was an established norm of international law before the U.N. Charter and has continued to be an established norm of international law since the U.N. Charter entered into force. What the charter did—and I remind my colleagues that the U.N. Charter according to the U.S. Department of State is a treaty-contract and not a legal constitution—was to codify this fundamental standard of international law. The right of self-defense against armed attack by other states, or by terrorist groups supported or tolerated by other states, has been recognized by the majority of civilized states since rise of state-supported and state-sponsored terrorism.

Both customary international law and article 51 of the U.N. Charter say that a state may defend itself against an armed attack. A terrorist armed attack is nothing more nor less than a terrorist attack directed against a state and its defenseless civilian populations. The terrorists in Israel, and also in southern Africa, utilize cross-border raids to wreak their savage depredations.

Israel has on numerous occasions gone into Lebanon to defend its population and its very survival against the PLO, the PFLP, and the Abu Nidal groups which have taken sanctuary in Lebanon. Israel also has been attacked from Syria and from Jordan in the past and quite possibly will be again attacked in the future. South Africa has suffered outright terrorist raids against defenseless civilians by the ANC and SWAPO. Those countries then took the appropriate response—the utilization of force which did not change the political independence or the territorial integrity of the states from which the terrorist attacks were launched.

Obviously, the elimination of terrorist bases will aid in the elimination of terrorism. That is why we attacked Colonel Qadhafi's Libya, and why that raid was a success. We utilized the historic and traditional right of self-defense, and Israel and other states sub-

ject to heinous terrorism have the right to do likewise.

This is a standard right recognized by international law, and there is no reason to provide specific references to any international agreements. U.S. law is based on the Constitution. That is the way it is, and that is the way it is going to be. We are supporting the national right of self-defense, indeed self-preservation, under longstanding international law.

Mr. GARN. Mr. President, I rise in support of Senate adoption of H.R. 91, the Antiterrorism and Arms Export Control Amendments Act of 1989. This legislation imposes a ban on arms trade with terrorist countries and places tighter licensing requirements on nonmilitary exports to them. This bill attempts to make sense of a very complex area of foreign policy and, while I am not in agreement with every word of it, I support its adoption.

I want to express my gratitude for the cooperation exhibited by the Foreign Relations Committee and the House Foreign Affairs Committee in working out certain concerns with the legislation on the part of the Banking Committee. The Banking Committee concerns arose because of two substantial changes being made in the Arms Export Control Act and the potential for overlap in the jurisdiction of that law and the Export Administration Act.

First, H.R. 91 would ban munitions sales, and even facilitating munitions trade, with terrorist countries "notwithstanding any other provision of law." It is unclear how this change would affect legal trade in so-called dual use items which sometimes involve overlapping jurisdiction. In addition, H.R. 91 would make determinations by the Secretary of State about items to be controlled on the munitions list "final and conclusive." Given the jurisdictional problems in the gray area of high technology items with potential military applications, these changes would likely trigger even more interagency disputes and cause unnecessary licensing problems for U.S. exporters.

To address these concerns, the involved committees agreed to modify the "notwithstanding" clause in the new section 40 of the Arms Export Control Act to make clear that application of the ban is limited to "munitions items controlled pursuant to" the arms control act. This change is intended to ensure that the munitions trade ban that is made total by this act is limited to items specifically controlled as munitions items, not goods and technology that can be legally shipped under the Export Administration Act.

A second change has been made to strike the language making control decisions under the arms act "final and conclusive." This will maintain the status quo in which any jurisdictional disputes arising over designation of an item on either the munitions list or the commodity control list would have to be resolved among the administering agencies.

I believe these are important changes that have improved the bill and I welcome the cooperation of the other committees involved in making them.

Mr. RIEGLE. Mr. President, I rise in support of adoption by the Senate of H.R. 91, the Antiterrorism and Arms Export Control Amendments Act of 1989. This legislation is designed to combat international terrorism and further the national security and foreign policy interests of the United States. It imposes a ban on the export of arms from the United States to countries that sponsor international terrorism, and also imposes tighter controls on nonmilitary exports to such countries. It is a good bill and I support its adoption. The House Foreign Affairs and Senate Foreign Relations Committees are to be commended for crafting it.

I also want to thank the chairmen and ranking members of those two committees for agreeing to the amendment that Senator GARN and I are offering. I want to give particular recognition to Congressman BERMAN for his cooperation in helping us craft this amendment in a manner that will not interfere with the purposes of H.R. 91.

The two changes that our amendment makes are actually designed to strengthen administration of the bill by heading off possible interagency disputes over a couple of its provisions. The first part of the amendment is designed to make clear that with regard to munitions items controlled pursuant to this act, this law applies notwithstanding any other provision of law in this area, except for section 614(a) of the Foreign Assistance Act of 1961. Our change is designed to make absolutely clear that the total ban on munitions sales imposed by this bill does not ban the export of nonmilitary items that might be licensed under the Export Administration Act.

A second part of our amendment strikes the language in H.R. 91 that makes a decision by the Administrator of the Arms Export Control Act as to what is a munitions item "final and conclusive." This portion of our amendment is designed to maintain the current situation in which interagency disputes as to whether an item should be on the munitions list or the commodity control list are settled among the administering agencies and ultimately the President if they can not agree. The Banking Committee made important changes to the Export Administration Act in the trade bill to ensure that interagency disputes are settled in a timely fashion and that exporters get timely decisions on whether an item can be exported. This amendment will ensure those changes are not inadvertently voided.

Again, let me thank Senators PELL and HELMS for their cooperation in shaping these two amendments.

### THE ANTITERRORISM AND ARMS EXPORT AMENDMENTS ACT OF 1989

Mr. KERRY. Mr. President, I am pleased that today the Senate is acting on the Antiterrorism and Arms Export Amendments Act of 1989, legislation I authored in this Congress as well as the last Congress. The bill's purpose is to reaffirm, strengthen, and clarify this Nation's prohibition on exports of military weapons and equipment to countries which have been designated by the Secretary of State as supporters of international terrorism. The bill also requires more detailed and periodic reporting of arms exports by the executive branch. Further, it imposes new criminal and civil penalties on violators of the prohibitions on arms exports to terrorist countries.

In 1986, section 40 of the Arms Export Control Act was amended to ban the export of items on the U.S. munitions list to any country which the Secretary of State determines repeatedly provides support for acts of international terrorism. A Presidential waiver is included in section 40 based on national interests of the United States. Any time such waiver authority is exercised, the President is required to report to Congress justifying the national interests and describing the proposed export.

Two months after enactment of this seemingly straightforward prohibition on exporting arms to terrorist states, 500 TOW missiles were shipped to Iran without notification to Congress. During the Iran/Contra investigation, repeated questions were raised as to the meaning and intent of section 40 and its relationship to other antiterrorism provisions in other laws.

Over the years, Federal law has absorbed overlapping standards that can lead to confusion and misinterpretation. There is no single standard in law for: First, determining whether a country supports international terrorism; second, identifying which U.S. official should make such a determination; third, identifying which arms are subject to restrictions; fourth, identifying the criteria that empower the President to waive statutory restrictions; and fifth, informing Congress of arms exports, including covert exports. The inconsistent provisions of existing law have blunted the effectiveness of U.S. antiterrorism policy, both in terms of Government actions and the activities of private American citizens who look to the law for guidance.

In the 100th Congress, Congressman HOWARD BERMAN of California, and Congressman HENRY J. HYDE of Illi-

nois, took the initiative to sort out the somewhat vague and ambiguous antiterrorism statutes which currently make up our antiterrorism policy. In a truly bipartisan manner, they developed legislation which states U.S. antiterrorism policy in a clear, uniform, and consistent manner. That legislation was adopted by the House of Representatives on three separate occasions in the last Congress.

In September 1988, Senators LUGAR and LAUTENBERG and I first introduced companion legislation in the Senate. Subsequent to hearings held by the Senate Foreign Relations Committee, a number of relatively minor changes were made—changes, I might add, which were made at the suggestion of the ranking minority member of the Foreign Relations Committee, Senator HELMS, and which were acceptable to the Department of State and the principal sponsors of the legislation in the House of Representatives, Congressmen BERMAN and HYDE.

Mr. President, it is high time the Senate acted on this bill designed to strengthen the statutory underpinnings of a strong U.S. antiterrorism policy.

Let me briefly describe the major objectives embodied in the bill:

First. To clarify and strengthen the prohibition on the export of military arms and equipment, "munitions items," to countries which the Secretary of State has determined repeatedly provide support for acts of international terrorism, "terrorist countries", including the imposition of criminal and civil penalties for violations of the prohibition;

Second. To establish uniform standards in the Arms Export Control Act, the Foreign Assistance Act of 1961, and the Export Administration Act of 1979 for the designation of a country as one whose government repeatedly provides support for acts of international terrorism and for the President's authority to waive statutory prohibitions or to rescind the Secretary of State's determination;

Third. To require validated licenses for the export of any goods technology which could significantly contribute to the military potential of a terrorist country or could enhance that country's ability to support international terrorism;

Fourth. To require quarterly reports from the executive branch listing all Presidential consents to transfers of munitions list items exceeding $1 million in value from a recipient country to a third country and to require quarterly reports, classified if necessary, of interagency transfers of munitions list items which will not ultimately be disposed of within the United States but excluding from such reports those munitions list items which are used solely in connection with intelligence activities and therefore subject to other reporting requirements under the National Security Act; and

Fifth. To clarify that the President's authority under the Hostage Act of 1868 to take action to release hostages cannot be carried out in a manner which would otherwise be prohibited by law.

Mr. President, the Senate Banking Committee has two amendments to the bill before us, both of which seek to avoid any unintended effect of the Export Administration Act, a matter within the jurisdiction of the Banking Committee. The first relates to a clarification that the provisions of this bill, as they relate to munitions items, will apply notwithstanding any other provision of law. The second amendment relates to new subsection 38(h) of this bill which exempts designation of munitions items by the President from judicial review, and makes a designation by the President final and conclusive. The Banking Committee amendment deletes the "final and conclusive" language, leaving the judicial review exemption intact. The committee will accept both of these provisions.

Mr. President, as I stated at the outset of my remarks, the Antiterrorism and Arms Export Amendments Act of 1989 is largely a restatement of existing law, closing potential loopholes and revising certain existing provisions to ensure that uniform standards are present in the United States Code. The bill makes no attempt to reform the personnel or structure of the National Security Council or the State, Commerce or Defense Departments. Nor does it seek to change the manner in which arms exports are approved by the U.S. Government or to impose blanket sanctions on terrorist states. The bill does not impair the President's discretionary authority. In fact, in some cases, the bill broadens the President's discretion while holding him to a reasonable standard of accountability to Congress in the exercise of that authority.

During House debate on the companion legislation to this bill last year, Congressman HYDE ably summed up the need for prompt enactment of this measure as follows:

As serious terrorist acts proliferate and the global community struggles to respond effectively, it is now more important than ever that the United States have a consistent, clearly stated terrorist policy. This legislation is designed to help fill this need.

Mr. President, I urge adoption of H.R. 91.

The PRESIDING OFFICER. Is there further debate on the amendments? If not, the question is on agreeing to the amendments of the Senator from Michigan en bloc.

The amendments (Nos. 1204 and 1205) were agreed to.

The PRESIDING OFFICER. The question is on the engrossment of the amendments and third reading of the bill.

The amendments were ordered to be engrossed, and the bill to be read a third time.

The bill was read a third time.

The PRESIDING OFFICER. The bill having been read the third time, the question is, Shall the bill pass?

So the bill (H.R. 91), as amended, was passed.

Mr. MITCHELL. Mr. President, I move to reconsider the vote by which the bill was passed.

Mr. DOLE. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

## INTERNATIONAL NARCOTICS CONTROL ACT—CONFERENCE REPORT

Mr. MITCHELL. Mr. President, I submit a report of the committee of conference on H.R. 3611 and ask for its immediate consideration.

The PRESIDING OFFICER. The report will be stated.

The assistant legislative clerk read as follows:

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 3611) to combat international narcotics production and trafficking having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses this report, signed by a majority of the conferees.

The PRESIDING OFFICER. Without objection, the Senate will proceed to the consideration of the conference report.

(The conference report is printed in the House proceedings of the RECORD of today, November 21, 1989.)

Mr. HELMS. Mr. President, I am pleased that the Congress is now in a position to pass the international component of the President's Drug Program.

The bill closely resembles the House-passed bill, H.R. 3611 with several modifications.

The most important provision in the conference report is that contained in section 3. This is the provision authorizing $125 million for military and law enforcement assistance to Bolivia, Colombia, and Peru for fiscal year 1990. This is the amount requested by the President.

Unfortunately, the House conferees were insistent in maintaining subtotal allocations for various purposes, thereby potentially restricting the flexibility the President had sought and limiting the waiver authority. Of the $125 million, no more than $12.5 million may be made available for equipment, both lethal and nonlethal, to police in the three countries, and no more than $6.5 million in training for police there.