1

2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

3

4

5

6

7

8

STATE OF WASHINGTON, et al.,

    Plaintiffs,

              v.

UNITED STATES DEPARTMENT OF
STATE, et al.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 2:20-cv-0111-RAJ

**FEDERAL DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

9

10

11

# EXHIBIT 13

12

13

Public Law 75 Fed. Reg. 76940 (Dec. 10, 2010)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Motion for Summary Judgment
Exhibits

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – i

75 FR 76935-01, 2010 WL 5016021(F.R.)
PROPOSED RULES
DEPARTMENT OF STATE
22 CFR Part 121
RIN 1400-AC78
[Public Notice: 7257]

Revisions to the United States Munitions List

Friday, December 10, 2010

AGENCY: Department of State.

 **\*76935**  ACTION: Advance notice of proposed rulemaking.

SUMMARY: As part of the President's export control reform initiative, the Directorate of Defense Trade Controls (DDTC) seeks public comment on revisions to the United States Munitions List (USML) that would make it a "positive list" of controlled defense articles, requests that the public "tier" defense articles based on the Administration's three-tier control criteria, and identify those current defense articles that the public believes do not fall within the scope of any of the criteria's tiers. A "positive list" is a list that describes controlled items using objective criteria rather than broad, open-ended, subjective, or design intent-based criteria. DDTC is not seeking with this advance notice of proposed rulemaking (ANPRM) input on whether particular defense articles should or should not be controlled on the USML or whether any defense articles should be controlled differently. Rather, it is only seeking with this ANPRM input on how the USML can be revised so that it clearly describes what is subject to the jurisdiction of the International Traffic in Arms Regulations (ITAR), how defense articles are identified by tier, and what current defense articles do not fall within the scope of any of the tiers. Guidelines for revision of the USML toward this end are provided in this ANPRM. Please see the proposed rule published elsewhere in this issue of the Federal Register for an example of a USML Category that has been revised in this manner.
DATES: Comments must be received by February 8, 2011**.**

ADDRESSES: Interested parties may submit comments within 60 days of the date of the publication by any of the following methods:
• E-mail: DDTCResponseTeam@state.gov with the subject line, "USML—Positive List."

• Mail: PM/DDTC, SA-1, 12th Floor, Directorate of Defense Trade Controls, Office of Defense Trade Controls Policy, ATTN: USML—Positive List, Bureau of Political Military Affairs, U.S. Department of State, Washington, DC 20522-0112.

• Persons with access to the Internet may also view this ANPRM by searching for its RIN on the U.S. Government regulations Web site at http://regulations.gov/index.cfm.

FOR FURTHER INFORMATION CONTACT: Director Charles B. Shotwell, Office of Defense Trade Controls Policy, Department of State, Telephone (202) 663-2792 or Fax (202) 261-8199; E-mail DDTCResponseTeam@state.gov, ATTN: USML—Positive List.

SUPPLEMENTARY INFORMATION:

**Existing Controls**
The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120-130). The items subject to the jurisdiction of the ITAR, i.e., "defense articles," including

related technical data, and "defense services," are identified on the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). With few exceptions, items that are not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations (EAR), 15 CFR Parts 730-774. The Bureau of Industry and Security (BIS), U.S. Department of Commerce, administers the EAR, which include the Commerce Control List (CCL) (15 CFR part 774). The descriptions in many USML categories are general and include design intent as a reason for an item to be controlled. The descriptions in most CCL categories are specific and generally include technical parameters for an item to be controlled.

**Export Control Reform**

A key part of the Administration's Export Control Reform effort is to review and revise both the ITAR and the CCL to enhance national security so that they: (1) Are "tiered" consistent with the criteria the U.S. Government has established to distinguish the types of items that should be controlled at different levels for different types of destinations, end-uses, and end-users; (2) create a "bright line" between the two lists to clarify jurisdictional determinations and reduce government and industry uncertainty about whether a particular item is subject to the jurisdiction of the ITAR or the EAR; and (3) are structurally "aligned" so that they can eventually be combined into a single control list.

The Administration has determined that these changes are necessary to better focus its resources on protecting those items that need to be protected, to end jurisdictional confusion between the ITAR and EAR, and to provide clarity to make it easier for exporters to comply with the regulations and for the U.S. Government to administer and enforce them.

In order to accomplish the three above-referenced tasks simultaneously, the USML and, to a lesser degree, the CCL must be revised so that they are aligned into "positive lists." A "positive list" is one that describes controlled items using objective criteria such as horsepower, microns, wavelength, speed, accuracy, hertz or other precise descriptions rather than broad, open-ended, subjective, or design intent-based criteria.

The U.S. Government has developed a methodology to transition the current control lists to this new structure. This methodology includes guidance on how to articulate the parameters for the items controlled and criteria to be used to screen these items to determine their tier of control. The full draft methodology that was developed for internal use by the U.S. Government was provided to the Department of State's Defense Trade Advisory Group (DTAG) as well as to the Department of Commerce's Technical Advisory Committees as it was being finalized. The full text is not included in this notice, as aspects are beyond the scope of the request for public comment; however, the full text is available for public review on the DDTC Web page at http://www.pmddtc.state.gov/DTAG/index.html.

This notice provides a summary of the full methodology and the full text of its guidance for building a "positive" list to order to request input from the public on this key feature of the control list reform.

**Request for Comments**

As the U.S. Government continues its work on preparing proposed revisions to the USML, it seeks public input on how best to describe the USML in a positive **\*76936** manner. U.S. companies, trade associations, and individuals that produce, market, or export USML-controlled defense articles are generally well positioned to describe their articles positively and to provide comments on what are and are not clear descriptions of controls over the articles. Public comment at this stage of the USML review process also ensures that affected industry sectors have the opportunity to contribute and comment on a key element of Export Control Reform.

The U.S. Government is not, at this time, seeking public comment on whether an item should or should not be controlled on the USML; however, the public is requested to identify those defense articles that it believes do not fall within the scope of any of the criteria's tiers. The U.S. Government is also not seeking public comment at this time on whether an item should be controlled differently for export to different countries. General comments on the overall reform process or the other aspects of current

export controls are outside the scope of this inquiry. In order to contribute directly to export control reform, all comments are strongly encouraged to abide by the detailed guidelines provided in this notice.

BIS will publish a separate request for public comments on (1) how to describe items controlled on CCL more clearly and in a more "positive" "tiered" manner and (2) the availability of certain items outside of certain destinations.

The following is a summary of the specific requests for public comment described in this notice:

• Public comments should be provided on a category-by-category basis.

• Within each category, public input should be further identified by groups A thru E as further described below.

• Public input should describe defense articles in a "positive" way:

1. Use objective criteria or thresholds, such as precise descriptions or technical parameters, that do not lend themselves to multiple interpretations by reasonable people.

2. Descriptions should not contain any (a) controls that use generic labels for "parts," "components," "accessories," "attachments," or "end-items" or (b) other types of controls for specific types of defense articles because, for example, they were "specifically designed or modified" for a defense article, but should contain identification of those "parts," "components," "accessories," "attachments," or "end-items" that do warrant enumerated control on the USML. Separately, the use of "specially designed" as a control criterion for the other "parts," "components," "accessories," "attachments," or "end-items" should only be applied when required by multilateral obligations or when no other reasonable option exists.

3. Items are not to be listed on both the CCL and the USML unless there are specific technical or other objective criteria— regardless of the reason why any particular item was designed or modified—that distinguish between when an item is USML-controlled or when it is CCL-controlled.

4. In cases where technical characteristics are classified and need to be protected, the objective descriptions of the products controlled should be set at an unclassified level below the classified level.

5. Public input should include the recommended tier of control for the defense articles described using the tiering criteria in Part IV, Step 4 of the Guidelines in this notice.

6. The public is also requested to identify any current defense articles that do not fall within the scope of any of the criteria's tiers, and provide an explanation why they believe that such items are not within the scope of the criteria.

**The U.S. Government's Work on the USML**
The U.S. Government has already begun reviewing and revising the USML. The State Department published as a proposed rule elsewhere in this issue of the Federal Register a proposed revision to USML Category VII, which pertains to tanks and military vehicles. As members of the public prepare their comments on how to revise other USML categories into positive lists, they should use this revised Category VII as a guide for the level and type of detail the U.S. Government is seeking to develop in the remaining USML categories other than Category XVII (Classified Articles, Technical Data and Defense Services Not Otherwise Enumerated) and Category XXI (Miscellaneous Articles).

**Guidelines**

**I. Introduction**

This notice describes the background to and the process by which the U.S. Government is reviewing and, as appropriate, revising the two primary lists of items it controls—the USML and the CCL. The review and revision are part of Phase II of the broad, three-phased Export Control Reform effort. A summary of the control list work and the three phase reform effort is available at the White House Web page at http://www.whitehouse.gov/the-press-office/2010/08/30/president-obama-lays-foundation-a-new-export-control-system-strengthen-n. "Items," for purposes of this notice, are (a) physical things such as goods, products, materials, commodities, end-items, parts, components, and defense articles; (b) technology and technical data; and (c) software. The types of services and other transactions, licensing policies, and the lists of destinations, end-uses, and end-users that are subject to export controls, and the efforts to review and revise them, will be described in separate documents.

## II. Goals of the Phase II Control List Review and Revision Effort

The purpose of the control list review effort is to enhance national security by reviewing and revising the USML and the CCL so that they:

1. Are "tiered" consistent with the criteria the U.S. Government has established to distinguish the types of items that should be controlled at different levels for different types of destinations, end-uses, and end-users ("Criteria," detailed below);

2. Create a "bright line" between the two lists to clarify jurisdictional determinations and reduce government and industry uncertainty about whether particular items are subject to the jurisdiction of the International Traffic in Arms Regulations (ITAR) or the Export Administration Regulations (EAR); and

3. Are structurally "aligned" so that they later can eventually be combined into a single control list.

In order to accomplish these tasks simultaneously, the USML and, to a lesser degree, the CCL must be revised so that they are aligned into "positive lists." A "positive list" is a list that describes controlled items using objective criteria such as horsepower, microns, wavelength, speed, accuracy, hertz or other precise descriptions rather than broad, open-ended, subjective, catch-all, or design intent-based criteria.

## III. Background to the Control List Review and Revision Effort

A key element of Export Control Reform is that all items on the USML and the CCL must be screened against the Criteria the U.S. Government has developed to determine new control levels consistent with contemporary national security threats and other issues.

The basic premise of the effort is that if an item type falls within the scope of one of the Criteria's three tiers, the item should be controlled for export, reexport, and in-country transfer at the  *76937  level set forth in the licensing policy the U.S. Government is developing for that tier. The licensing policies to be assigned to each tier are still under development but, generally, the highest tier of control will carry the most comprehensive license and compliance requirements.

If an item is determined not to be within the scope of any of the three tiers, it should not be on a control list. (Items that do not meet one of the primary elements of the tiered criteria, such as being significant for maintaining a military or intelligence advantage, which must nonetheless be controlled for a separate foreign policy, statutory, or multilateral obligation, will be identified as Tier 3 items.)

The U.S. Government has also determined that, during Phase II, the USML and the CCL should be revised and aligned so that there is a clear jurisdictional "bright line" between the items subject to the control of the ITAR and the control of the EAR.

The U.S. Government is committed to creating a clear jurisdictional "bright line" so that exporters and foreign parties can more easily and consistently determine whether many types of commodities, technologies, and software—and directly related services—are subject to the ITAR or the EAR.

The creation of a "bright line" is also a vital interim step in the U.S. Government's plan to have, by the end of Phase III, a single list of controlled items that is divided into three tiers and administered by a single licensing agency under a single set of export control regulations. The interim "bright line" is necessary because the structures of the USML and the CCL are significantly different. Many of the ITAR's USML controls are based on subjective or design-intent criteria. That is, regardless of an item's capability, sophistication, age, funding, lethality, end-use, or origins, it is, with some exceptions, USML-controlled if it was originally "specifically designed, modified, or adapted" for a military or space application, purpose, or use. In particular, most USML categories contain a non-specific catch-all control over every "part" or "component" that was "specifically designed or modified" for any of the defense articles listed in that category. This means, for example, that a bolt specifically modified for a military vehicle, and all technical data and services directly related to the bolt, are controlled for almost worldwide export in a similar manner to the military vehicle itself (and all the technical data and services directly related to the military vehicle).

Most of the EAR's CCL controls are based on the technical capabilities and specifications of items regardless of their intended end-use or the reasons for which they were designed. The CCL's controls are also more flexible in that different types of items are controlled differently to different groups of destinations and end-users depending on the significance of the item. In other words, the CCL is a more "positive" list with more flexible controls than the USML. The EAR do nonetheless have a significant number of export control classification numbers (ECCNs) with controls on items that are "specially designed" for some purpose or end-item. The issues involving the definition of this term—a term that must remain in many ECCNs, at least for now, to remain consistent with multilateral obligations—are addressed below.

Because the USML contains many broad, general descriptions of the types of articles controlled, each USML category will need to be "opened" in order to further assess whether each defense article within its scope still warrants control under the USML based on national security concerns and to screen them against the U.S. Government's Criteria to create a tiered "positive list." "Screening" articles means determining which items that are currently USML-controlled defense articles should remain on the USML, which items that are currently USML controlled defense articles could be controlled under the CCL, and which items no longer require any control beyond EAR99 controls because they do not meet the criteria of any of the three tiers. "Opening" USML categories means identifying and then creating specific, positive lists of the specific types of articles the U.S. Government wants to control rather than relying on broad, general descriptions of or subjective criteria for determining when something is controlled.

**IV. Steps for and Guidelines Controlling List Review and Revision Effort**
The following are the steps and the guidelines that the U.S. Government has developed to prepare proposed amendments to the USML and the CCL so that they are, with rare exceptions, aligned "positive lists" that do not overlap and are consistent with the tiered criteria. The guidelines are set out in ordered steps.

*Step 1—Review Each USML Category and Related ECCNs Separately*
The USML and the CCL are too big and complex to be reviewed in their entirety all at once. In order to make the project more manageable, USML categories (and related ECCNs) are being reviewed separately, albeit with an awareness to the reviews or planned reviews in any other USML category or ECCN that could affect the effort. Public comments should be provided on a category-by-category basis, as further described below.

*Step 2 —Provide Input Following the New Proposed Structure of the USML*
The U.S. Government is proposing to revise the structure of the USML so that it tracks the A, B, C, D, E structure of the CCL (which also tracks the Wassenaar Arrangement dual-use list structure) and also has an additional F and G "Group" to address ITAR-specific defense service and manufacturing controls. That is, each revised USML category is being divided into seven "Groups":

"A," for "Equipment, Assemblies, and Components";

"B," for "Test, Inspection, and Production Equipment";

"C," for "Materials";

"D," for Software";

"E," for "Technology";

"F," for "Defense Services"; and

"G," for "Manufacturing and Production Authorizations."

For purposes of the list review and revision effort, the public is requested to provide input in sections A thru E. Sections F and G at this stage do not require input for building the positive list. To facilitate public comment, these heading terms are defined as follows:

A. "Equipment, Assemblies, and Components" means any tangible item that falls within the scope of any one of the defined terms in ITAR § 121.8—i.e., "end-item," "accessory," "attachment," "associated equipment," "component," or "part"—or "commodity," as defined in EAR § 772.1, and is not "test, inspection, or production equipment," as defined for Group B, or "materials," as defined for Group C.

B. "Test, Inspection, and Production Equipment" means any tangible item that is "specially designed" to test, inspect, produce, or develop any of the types of items defined in ITAR § 121.8 or a "commodity," as defined in EAR § 772.1. Examples include machine tools, measuring equipment, lithography equipment, tape lay-up machines, templates, jigs, mandrels, moulds, dies, fixtures, and alignment mechanisms.

C. "Material" means any crude or processed matter that is not clearly identifiable as any of the types of items defined in ITAR § 121.8 or a "commodity" that is more broadly defined in EAR § 772.1. Examples **\*76938** include the alloys, ceramics, prepregs, and raw material out of which parts, components, accessories, attachments, associated equipment, and end-items are made. Examples also include chemicals, toxins, and biological organisms.

D. "Software" means a collection of one or more programs or microprograms fixed in any tangible medium of expression. It includes object code, source code, system functional design logic flows, algorithms, application programs, operating systems, and other programs to design, implement, test, operate, diagnose, or repair other software or items. A "program" is a sequence of instructions to carry out a process in, or convertible into, a form executable by an electronic computer. A "microprogram" is a sequence of elementary instructions, maintained in a special storage, the execution of which is initiated by the introduction of its reference instruction into an instruction register.

E. "Technology" means, when reviewing items that are or should be on the USML, "technical data" as defined in ITAR § 120.10(a)(1). "Technology" means, when reviewing items that are or should be on the CCL, "technology" as defined in EAR § 772.1. "Technology" does not include any information that falls within the scope of "public domain," as defined in ITAR § 120.11, or is outside the scope of the EAR or "publicly available," as referenced in EAR §§ 734.3(b)(2) and (b)(3), respectively.

These definitions are not intended to narrow or materially alter any term in the ITAR or the EAR. Rather, they are combinations of similar terms that are used now in the EAR and the ITAR to give structure to the tiered, aligned, positive list revision effort. The U.S. Government is currently preparing proposed harmonized terms to be used in the ITAR, EAR, and the sanctions

regulations. This separate task should not, however, affect the public's review and input. The scope and meaning of and controls over defense services and manufacturing and production authorizations will be addressed separately.

*Step 3—Describe Defense Articles in a "Positive" Way*

The Department of State requests public input on how defense articles should be described, to the maximum extent possible, in a "positive" way. When providing input describing defense articles within the A, B, C, D, and E Group structure, the Department offers the following guidelines to aid the public in providing comments that make the revised USML a "positive list":

1. Positive List Guideline #1: The public should, to the extent possible, use objective criteria or thresholds, such as precise descriptions or technical parameters, that do not lend themselves to multiple interpretations by reasonable people.

Controls on items using technical descriptions will be the most effective means for all parties involved in the export process to clearly and easily determine jurisdiction and control requirements. For example, USML Categories V and XIV are subject to few jurisdictional questions because the controls are, in the main, based on specifically identified chemical compounds.

Category V also illustrates the value of using a technical parameter to create clear controls. Both the USML and the CCL control spherical aluminum powder. The controls on the USML are limited, however, to a specific technical parameter: Spherical aluminum powder "in particle sizes of 60 micrometers or less."

By using this guideline for revisions to the USML, reliance on subjective or discretionary terms such as "design-intent" or "ultimate end-use" of an item will be eliminated. Such terms have historically been difficult for industry and government to apply and consistently agree upon.

2. Positive List Guideline #2: When providing suggestions for revised USML categories, descriptions should avoid any (i) controls that use generic labels for "parts," "components," "accessories," "attachments," or "end-items"; or (ii) other types of controls for specific types of defense articles because, for example, they were "specifically designed or modified" for a defense article.

This guideline includes a recommended prohibition against using as standards for in the USML generic phrases such as the following:

• Are "capable for use with" a defense article;

• Are "equivalent to" a defense article;

• Have "significant military or intelligence applicability";

• Have a "military purpose";

• Have "military application"; or

• Are "predominately used" in military applications or end items.

This instruction does not prohibit the control on the USML of items that have, by whatever definition, any of these characteristics. To the contrary, the instruction requests the public describe and identify such items without using the generic phrases, which are at the root of many of the difficulties encountered in the current export control lists.

This instruction also does not mean that specific models or part numbers of components need to be identified. Rather, types of items should be listed. For example, the parts and components controlled under a revised USML Category I could be limited

to "barrels, receiver, frames, slides, bolts, and bolt carriers that fit and function in any of the above-listed firearms." All other parts and components that fit or function in such firearms, even if specifically or specially designed or modified for them in terms of their size, shape or configuration, could be controlled in a separate entry that could become subject to the EAR.

The guidelines governing how items moved to the jurisdiction of the EAR would be controlled will be addressed in a separate future Department of Commerce notice. The Department of State is seeking with this notice comments on current defense articles that the public does not view meet any of the criteria as explained in Step 4 below.

This guideline is a critical tool for achieving one of the essential goals of the list reform effort, which is to "de-conflict" the USML and the CCL. At the end of the process, the lists should be written so that exporters easily and consistently can determine the jurisdictional status of an article, technical data, or software—and reasonable parties would reach the same conclusion about the nature of the item at issue if presented with the same facts.

This drafting prohibition exists because it is necessary to stop using terms that do not readily lend themselves to objective determinations. These terms have been at the core of most jurisdictional disputes over the decades and have thus been a distraction from the larger mission of precisely and clearly controlling items for national security and foreign policy purposes.

Guideline #2 does not apply to the miscellaneous USML Categories XVII or XXI. The guidelines, the limitations on and requirements for use, and its prospective-only characteristics, will be described in more detail in a separate notice.

3. Positive List Guideline # 3: Items are not to be listed on both the CCL and the USML unless there are specific technical or other objective criteria—regardless of the reason why any particular item was designed or modified—that distinguish between when an item is USML-controlled and when it is CCL-controlled.

 **\*76939**  An implication of this guideline is that if an item is listed on the CCL, an exporter is entitled to conclude that it is EAR-controlled unless there is a specific cross reference in the ECCN to the USML stating that such items that exceed the technical characteristics described in that USML category are ITAR-controlled—even if the item was specifically designed, modified, or intended for use in civil applications. If a cross-reference does not exist, one will be added to recommend consulting both the USML and the CCL for potential controls, particularly in situations where an item exceeds specific technical parameters that could cause it to be USML-controlled.

For example, an integrated circuit that falls within the technical description of ECCN 3A001 is CCL-controlled regardless of whether it was specifically designed or modified, in terms of its form or fit, to function exclusively in a military end-item unless it exceeds the radiation tolerances described in USML subcategory XV(d). An integrated circuit that exceeds such tolerances would be USML controlled regardless of why it was so designed. This example does not preclude the possibility that subcategory XV(d) may need to be amended to increase the radiation-tolerant thresholds.

An implication of this guideline is that all controls in the amended USML and CCL on parts and components must be at the item-type level, with technical characteristics determining whether or how the part or component is controlled for export, and not at the model or part number level by virtue of an item having been modified to fit into a particular end-item. This approach de-emphasizes the significance of "form" or "fit" in determining whether an item is USML-controlled and focuses more on its function, capability, performance, or characteristics.

4. Positive List Guideline #4: In cases where technical characteristics are classified and need to be protected, the objective descriptions of the products controlled should be set at an unclassified level below the classified level.

As a reminder, both the USML and CCL list review efforts pertain only to unclassified information (e.g., not Confidential, Secret, or Top Secret). This means that USML Category XVII (Classified Articles, Technical Data and Defense Services Not Otherwise Enumerated) does not need to be reviewed or revised.

5. Positive List Guideline #5: Use "Specially Designed" as a control criterion only when required by multilateral obligations or when no other reasonable option exists.

There are specific, identified types of end-items and generic "components" that are controlled on the Wassenaar Munitions List because they are "specially designed" for another item or some purpose. The Wassenaar Arrangement does not define the term "specially designed." Controls for such items should nonetheless carry forward to the revised USML or revised CCL with as precise of a description as possible of what is controlled. Thus, for example, the revised USML subcategory VII(g) generic, catch-all controls over components would read "Military Vehicle components as follows:". The subcategory would then list the types of components controlled by that subcategory in that tier using the objective criteria set forth above.

For articles that are not within the scope of the Wassenaar Munitions List or other multilateral regime, but should nonetheless be listed on the USML, the term "specially designed" should rarely be used as a control parameter. Where a revised USML subcategory must use "specially designed" to remain consistent with the Wassenaar Arrangement or other multilateral regime obligation or when no other reasonable option exists to describe the control without using the term, the public is asked to use the following draft definition of the term:

"For the purposes of this Subchapter, the term "specially designed" means that the end-item, equipment, accessory, attachment, system, component, or part (see ITAR § 121.8) has properties that (i) distinguish it for certain predetermined purposes, (ii) are directly related to the functioning of a defense article, and (iii) are used exclusively or predominantly in or with a defense article identified on the USML."

The Departments of State and Commerce will be seeking public comment on this draft definition in a later notice.

### *Step 4: Provide Recommended Tier of Control for the Defense Articles Identified in Step 3*
The Department of State requests public input on screening those items the public identifies in a more "positive" way in Step 3 against the three tier control criteria listed in Section III above and described further below, and identify the tier of control for items within each category and group (A, B, C, D, and E). The U.S. Government will make the final decisions on what types of defense articles are within the scope of any of the three tiers and, thus, may or may not accept suggestions regarding how items should be tiered. Nonetheless, the Department of State is interested in the public's views on the issue of how defense articles on a positive list can be described so that they are distinguished with tiered, objective criteria.

Although the U.S. Government retains full discretion in deciding how any particular type of defense article is tiered, or divided by objective criteria among different tiers, the public is asked to provide input regarding how defense articles, or types of defense articles with different capabilities, should be described within different tiers.

The Criteria and the scope of its three tiers are as follows:

1. A Tier 1 control shall apply to:

a. A weapon of mass destruction (WMD);

b. A WMD-capable unmanned delivery system;

c. A plant, facility or item specially designed for producing, processing, or using:

(i) WMDs;

(ii) Special nuclear materials; or

(iii) WMD-capable unmanned delivery systems; or

d. An item almost exclusively available from the United States that provides a critical military or intelligence advantage.

2. A Tier 2 control shall apply to an item that is not in Tier 1, is almost exclusively available from Regime Partners or Adherents and:

a. Provides a substantial military or intelligence advantage; or

b. Makes a substantial contribution to the indigenous development, production, use, or enhancement of a Tier 1 or Tier 2 item.

3. A Tier 3 control shall apply to an item not in Tiers 1 or 2 that:

a. Provides a significant military or intelligence advantage;

b. Makes a significant contribution to the indigenous development, production, use, or enhancement of a Tier 1, 2, or 3 item; or

c. Is controlled for national security, foreign policy, or human rights reasons.

Tier 1 defense articles are those that are almost exclusively available from the United States and that provide a critical military or intelligence advantage.

Tier 2 defense articles are those that are almost exclusively available from countries that are members of the multilateral export control regimes that control such items and (i) provide a substantial military or intelligence advantage, or (ii) make a substantial contribution to the indigenous development, production, use, or enhancement of a Tier 1 or Tier 2 item.

 **\*76940**  Tier 3 defense articles are those that provide a significant military or intelligence advantage, or make a significant contribution to the indigenous development, production, use, or enhancement of a Tier 1, 2, or 3 item.

For defense articles currently controlled on the USML, the public is asked to identify the items they believe do not fall within the scope of any of the criteria's tiers and explain why they believe such items are not within the scope of the criteria. These items may be candidates to be moved to the CCL.

Items controlled pursuant to multilateral agreement, i.e., the Wassenaar Arrangement, the Missile Technology Control Regime, the Australia Group, the Chemical Weapons Convention, and the Nuclear Suppliers Group, that do not meet the availability or "military or intelligence advantage" control criteria in Tiers 1, 2 or 3 will be identified by the U.S. Government as Tier 3 items until and unless their control status is adjusted consistent with the procedures of the applicable multilateral agreement.

The following are definitions of several of the key terms and phrases used in the tiered criteria set forth above. The term "almost exclusively available" means that the item is only available from a very small number of other countries that have in place effective export controls on the item. The term "critical" means providing a capability with respect to which the United States cannot afford to fall to parity and that would pose a grave threat to national security if not controlled (i.e., a "crown jewel"). Examples of "grave threat to national security" include: Armed hostilities against the United States or its allies; disruption of foreign relations vitally affecting the national security; the compromise of vital national defense plans or complex crypto-logic and communications intelligence systems; the revelation of sensitive intelligence operations; the disclosure of scientific or technological developments vital to national security; or critical assistance to foreign development and/or acquisition of WMD.

The term "substantial" means providing a capability with respect to which the United States must maintain parity and that would pose a serious threat to national security if not controlled. Examples of a "serious threat to the national security" include: Disruption of foreign relations significantly affecting the national security; significant impairment of a program or policy directly related to the national security; revelation of significant military plans or intelligence operations; compromise of scientific or technological developments relating to national security; or substantial assistance to foreign development or acquisition of a WMD.

The term "significant" means providing a capability that could be reasonably expected to cause damage to national security if not controlled.

Dated: November 30, 2010.

Ellen O. Tauscher,

Under Secretary, Arms Control and International Security, Department of State.

[FR Doc. 2010-30994 Filed 12-8-10; 4:15 pm]

BILLING CODE 4710-25-P

---

**End of Document**                                                                 © 2020 Thomson Reuters. No claim to original U.S. Government Works.