# Exhibit A

such as turning, grinding or milling, where metal or other material is removed from the base shape to form the final product. For example, you take a steel block and remove material until it becomes the final item. In additive manufacturing, which is often referred to as 3D printing, material such as metal or plastic is laid down in very thin layers one upon the other fusing together until the final net shape is achieved. In both instances, the adding or removing of the material is controlled by a computer without human intervention. 3D printers utilize electronic digital files to process the materials into a physical object, and these files can be distributed over the internet. A 3D printer or computer numerically-controlled (CNC) equipment uses Computer Aided Manufacturing (CAM) files in G-code or AMF format as executable code to produce certain items. There are currently technological limitations for the effectiveness of 3D printing of firearms, but the concept has been demonstrated and the ability to manufacture commercially viable firearms is inevitable given the increasing improvements of 3D printing equipment and 3D printing materials. Congress directed that the export control system under ECRA is intended to have "the flexibility to be adapted to address new threats in the future," and this final rule implements that instruction. 50 U.S.C. 4811(8).

Technology and software are required for 3D printing of firearms and are critical for the 3D printing manufacturing process. Publicly posting such technology and software online without restriction creates the risk that foreign persons and countries, including countries of concern, will be able to obtain technology and software for 3D printing of firearms. In the absence of controls on the export, reexport, or in-country transfer of such technology and software, such items could be easily used in the proliferation of conventional weapons, the acquisition of destabilizing numbers of such weapons, or for acts of terrorism. As noted earlier,

WASHSTATEB000118

to ensure unrestricted releases are not being made to persons of concern outside the United States or to foreign persons in the United States. BIS also took into account these commenters' support for the part 734 criteria and their First Amendment concerns but did not adopt the approach that they advocated. Given concerns regarding First Amendment restrictions the control is appropriately tailored to only impact technology and software in an electronic format, such as AMF or G-code, that is ready for direct insertion into a computer numerically controlled machine tool, additive manufacturing equipment to produce the firearm frame or receiver or complete firearm. This technology and software are functional in nature, having the capability to cause a machine to use physical materials to produce a firearm frame or receiver or complete firearm. Limitations on the dissemination of such functional technology and software do not violate the right to free expression under the First Amendment. Nor does the final rule violate the right to keep and bear arms under the Second Amendment. The rule does not prohibit U.S. persons within the United States from acquiring firearms of any type; indeed, nothing in this rule prohibits persons within the United States from developing, discussing, or transferring by hand or mail (*e.g.*, by the U.S. Postal Service or a common carrier) CAM files related to 3D-printing technology and software. The domestic transfer of commodities is outside of the scope of BIS jurisdiction and would be within the purview of domestic law. The release of controlled technology in the United States would only be regulated to the extent it would constitute a deemed export (*i.e.*, release to a foreign person). This means transfers between U.S. persons within the United States are not regulated under the EAR so long as there is no release to a foreign national. The ITAR takes a similar approach. BIS's approach in using targeted changes is not intended to otherwise change the other criteria in part 734 that these commenters assert they strongly support.

23

(a) Except as set forth in paragraph (b) and (c) of this section, unclassified "technology" or "software" is "published," and is thus not "technology" or "software" subject to the EAR, when it has been made available to the public without restrictions upon its further dissemination such as through any of the following:

\* \* \* \* \*

(c) The following remains subject to the EAR: "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, that is made available by posting on the internet in an electronic format, such as AMF or G-code, and is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the "software" or "technology" to produce the firearm frame or receiver or complete firearm.

\* \* \* \* \*

## PART 736 – GENERAL PROHIBITIONS

5. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of November

WASHSTATEB000248

* * * * *

(c) The following remains subject to the EAR: "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, that is made available by posting on the internet in an electronic format, such as AMF or G-code, and is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the "software" or "technology" to produce the firearm frame or receiver or complete firearm.

* * * * *

## PART 736 – GENERAL PROHIBITIONS

5. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of November 8, 2018, 83 FR 56253 (November 9, 2018); Notice of May 8, 2019, 84 FR 20537 (May 10, 2019).

6. Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

3

426

## SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
### (In Thousands of Dollars)

| Line | Program Element | Item | FY 2018 Request | House Change | House Authorized |
|---|---|---|---|---|---|
| 128 | 0605038A | NUCLEAR BIOLOGICAL CHEMICAL RECONNAISSANCE VEHICLE (NBCRV) SENSOR SUITE | 16,125 | | 16,125 |
| 129 | 0605041A | DEFENSIVE CYBER TOOL DEVELOPMENT | 55,165 | | 55,165 |
| 130 | 0605042A | TACTICAL NETWORK RADIO SYSTEMS (LOW-TIER) | 20,076 | | 20,076 |
| 131 | 0605047A | CONTRACT WRITING SYSTEM | 20,322 | | 20,322 |
| 132 | 0605049A | MISSILE WARNING SYSTEM MODERNIZATION (MWSM) | 55,810 | | 55,810 |
| 133 | 0605051A | AIRCRAFT SURVIVABILITY DEVELOPMENT | 30,879 | | 30,879 |
| 134 | 0605052A | INDIRECT FIRE PROTECTION CAPABILITY INC 2—BLOCK 1 | 175,069 | | 175,069 |
| 135 | 0605053A | GROUND ROBOTICS | 70,760 | | 70,760 |
| 137 | 0605380A | AMF JOINT TACTICAL RADIO SYSTEM (JTRS) | 8,965 | | 8,965 |
| 138 | 0605450A | JOINT AIR-TO-GROUND MISSILE (JAGM) | 34,626 | | 34,626 |
| 140 | 0605457A | ARMY INTEGRATED AIR AND MISSILE DEFENSE (AIAMD) | 336,420 | -84,100 [-84,100] | 252,320 |
| | | Program Reduction | | | |
| 143 | 0605766A | NATIONAL CAPABILITIES INTEGRATION (MIP) | 6,882 | 2,500 [2,500] | 9,382 |
| | | Unfunded requirement | | | |
| 144 | 0605812A | JOINT LIGHT TACTICAL VEHICLE (JLTV) ENGINEERING AND MANUFACTURING DEVELOPMENT PH | 23,467 | | 23,467 |
| 145 | 0605830A | AVIATION GROUND SUPPORT EQUIPMENT | 6,930 | | 6,930 |
| 146 | 0210609A | PALADIN INTEGRATED MANAGEMENT (PIM) | 6,112 | | 6,112 |
| 147 | 0303032A | TROJAN—RH12 | 4,431 | | 4,431 |
| 150 | 0304270A | ELECTRONIC WARFARE DEVELOPMENT | 14,616 | | 14,616 |
| 151 | 1205117A | TRACTOR BEARS | 17,928 | | 17,928 |
| | | **SUBTOTAL SYSTEM DEVELOPMENT & DEMONSTRATION** | 3,012,840 | 98,578 | 3,111,418 |
| | | | | | |
| | | **RDT&E MANAGEMENT SUPPORT** | | | |
| 152 | 0604256A | THREAT SIMULATOR DEVELOPMENT | 22,862 | | 22,862 |
| 153 | 0604258A | TARGET SYSTEMS DEVELOPMENT | 13,902 | | 13,902 |
| 154 | 0604759A | MAJOR T&E INVESTMENT | 102,901 | | 102,901 |
| 155 | 0605103A | RAND ARROYO CENTER | 20,140 | | 20,140 |

WASHSTATEA458

In addition, Ghost Gunner builds on technology readily available in the Open Source community, including the gshield 3 axis motion hardware (http://synthetos.myshopify.com/products/gshield-v5), the grbl g-code parser and motion controller (https://github.com/grbl/grbl), and the Arduino microcontroller (http://arduino.cc).

Further, instructions and/or electronic files for production of jig presses with similar form, fit, and function to the Ghost Gunner are publicly available for download at a variety of web addresses, to include the following:

> http://aresarmor.com/store/Item/Polymer-80-Black
> http://www.thingiverse.com/thing:160266
> https://github.com/DefiantCad/defcad-repo/tree/master/Rifles/AR-15_80_percent_lower_v5-shadowfall/AR-15_80_percent_Lower_Drill_Jig_v1-Shadowfall
> http://www.advancedrifles.com/3d-printed-jig-version-2-0/
> http://www.80percentarms.com/products/80-ar-15-easy-jig
> http://www.sierranevadaarms.com/jig.pdf
> http://www.rockethub.com/projects/24384-80-lower-receiver-ar15-ar10-rudius-1911

## III.    CONCLUSION

Considering the apparent intent of the U.S. Government in implementing relevant Wassenaar Arrangement controls in the EAR, Defense Distributed believes that the Ghost Gunner does not meet the criteria of an article described on the USML.  In addition, the Ghost Gunner does not provide a critical military or intelligence advantage.  Accordingly, Defense Distributed respectfully requests that the Department of State issue a commodity jurisdiction determination stating that the Ghost Gunner, its plastic mounting jig, operating software, and production and operation instructions do not meet the criteria of ITAR 120.3 and are subject to Department of Commerce jurisdiction under the EAR.

Defense Distributed authorizes the release for general publication of the information contained in Block 5 of the DS-4076 Form.  However, other information in this request and documents submitted with Defense Distributed's DS-4076 Submission contain sensitive business information that is proprietary, confidential, and exempt from disclosure under the Freedom of Information Act, 5 U.S.C. Section 552, and is also protected under the Trade Secrets Act, 18 U.S.C. Section 1905.  Accordingly, pursuant to ITAR Section 130.15, Defense Distributed requests that information in this submission other than that contained in Block 5 be withheld in the event of a request for its disclosure.

DOSWASHINGTONSUP00171

# Exhibit B

SUBSCRIBE      SIGN IN

*POLICY —*

# "Download this gun": 3D-printed semi-automatic fires over 600 rounds

And the Department of Justice says there's nothing illegal about it, either.

CYRUS FARIVAR - 3/1/2013, 6:00 AM



*Defense Distributed*

The white portion of this AR-15, known as the "lower," was manufactured using 3D printing.

Cody Wilson, like many Texan gunsmiths, is fast-talkin' and fast-shootin'—but unlike his predecessors in the Lone Star State, he's got 3D printing technology to help him with his craft.

Wilson's nonprofit organization, Defense Distributed, released a video this week showing a gun firing off over 600 rounds—illustrating what is likely to be the first wave of semi-automatic and automatic weapons produced by the additive manufacturing process.



Join Ars Technica and

## Get Our Best Tech Stories

**DELIVERED STRAIGHT TO YOUR INBOX.**

| Email address |
|---|

SIGN ME UP

Will be used in accordance with our Privacy Policy

Last year, his group famously demonstrated that it could use a 3D-printed "lower" for an AR-15 semi-automatic rifle—but the gun failed after six rounds. Now, after some re-tooling, Defense Distributed has shown that it has fixed the design flaws and a gun using its lower can seemingly fire for quite a while. (The AR-15 is the civilian version of the military M16 rifle.)

The lower, or "lower receiver" part of a firearm, is the crucial part that contains all of the gun's operating parts, including the trigger group and the magazine port. (Under American law, the lower is what's defined as the firearm itself.) The AR is designed to be modular, meaning it can receive different types of "uppers" (barrels) as well as different-sized magazines.

"This is the first publicly printed AR lower demonstrated to withstand a large volume of .223 without structural degradation or failure," Wilson wrote on Wednesday. "The actual count was 660+ on day 1 with the SLA lower. The test ended when we ran out of ammunition, but this lower could easily withstand 1,000 rounds."

Already, he says, over 10,000 people have downloaded the lower CAD file, and more have downloaded it through BitTorrent.

DefDist Printed AR Lower - Part III

Case 2:20-cv-00111-RAJ Document 123-1 Filed 02/19/21 Page 11 of 298



## "I just made an AK-47 magazine—I've got it printing as we speak"

While it may be easy to paint Wilson as a 2nd Amendment-touting conservative, the 25-year-old second-year law student at the Univeristy of Texas, Austin told Ars on Thursday that he's actually a "crypto-anarchist."

"I believe in evading and disintermediating the state," he said. "It seemed to be something we could build an organization around. Just like Bitcoin can circumvent financial mechanisms. This means you can make something that is contentious and politically important—not just a multicolored cookie cutter—but something important. It's more about disintermediating some of these control schemes entirely and there's increasingly little that you can do about it. That's no longer a valid answer."

He added, "The message is in what we're doing—the message is: download this gun."

And he practices what he preaches. The group's entire set of design files are made available, for free, on DEFCAD, an online library for everything from grips to lowers to magazines.

Advertisement

Download this gun: Cheap printed semi-automatic fires over 600 rounds | Ars Technica

"I just made an AK-47 magazine—I've got it printing as we speak," he added. "[I've got a] Glock 17, we got a bunch coming, man. We've got a library of magazines."

Wilson's group was founded last year on similar principles:

> The specific purposes for which this corporation is organized are: To defend the civil liberty of popular access to arms as guaranteed by the United States Constitution and affirmed by the United States Supreme Court, through facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge in promotion of the public interest.



*Defense Distributed*

Here are .223 Remington bullets loaded into a 3D-printed magazine.

# Totally legal

So that raises the question: is this legal? For now, it would appear so.

Case 2:20-cv-00111-RAJ Document 123 Filed 02/16/21 Page 13 of 298

"There are no restrictions on an individual manufacturing a firearm for personal use," a Bureau of Alcohol, Tobacco, and Firearms (ATF) spokesperson told Ars. "However, if the individual is engaged in business as a firearms manufacturer, that person must obtain a manufacturing license."

Wilson said that he's applied for a federal firearms license in his own name with the ATF in October, and he expects to hear a response "any day now." The ATF did not respond to our request for confirmation of Wilson's claims.

Specifically, Wilson said he's looking to become a Class 2 Special Occupational Taxpayer, as licensed under federal law (PDF), which would allow him to become a dealer under the National Firearms Act.

The law student said that anyone with the same type of 3D printer ("SLA resin and P400 ABS on a used Dimension") could replicate his efforts with "9 to 12 hours" of print time and "$150 to $200" in parts. "We've proven that you can build one for $50," he said, presuming the builder is using lower quality materials. (Dimensions typically sell in the $30,000 range—but Wilson says his results could be duplicated using the less-expensive Ultimaker ($1,500) or Reprap.")

Assuming Defense Distributed's AR-15 lower costs around $150 to print, it likely won't end up being price-competitive with other, commercially available polymer AR-15 lowers—a few minutes of Google searching turned up options priced at $135 to $170, depending on the manufacturer.

Of course, lots of 3D printing enthusiasts extol the fact that the price of the technology is rapidly falling—as we reported previously, a California company announced a $600 model last year.

Some experts who have been following the world of 3D printing for a while say that from a policy perspective, not much has changed in terms of firearm production, even if the parts are cheaper to make.

"When you're thinking about it from a policy standpoint [the question is], was this possible before 3D printing? If the answer is yes, what was the existing policy response?" said Michael Weinberg, a staff attorney at Public Knowledge.

Advertisement

Download this gun: 3D-printed semi-automatic fires over 600 rounds | Ars Technica

"Has this fundamentally changed the dynamic in a way that we need to revisit the response? The answer strikes me as no. It's amazing. You can imagine a world where the 3D printer is accessible to people—I am not convinced that we need a 3D printing-specific solution."



*Defense Distributed*

**An earlier model of the 3D-printed AR-15 lower resulted in a crack by the rear takedown pin.**

## "The guns that will be"

Since December 2012, Wilson and his team have been hard at work on two problems. The first was the fact that the lower's "buffer tower" (the circular ring part jutting upward that the "upper" fits into) kept breaking—that's what caused the initial failure that prevented the gun from firing more than six rounds of 5.7x28FN bullets.

To fix that, the group re-engineered the buffer tower so it had increased exterior thickness. "We doubled or tripled the thickness," Wilson said.

With that fix under their belt, the modern gunsmiths tried firing with .223 Remington bullets (standard in an AR-15), which raised the firing range to about 20 rounds before a failure—but that wasn't good enough.

By the end of the month, there was a different failure, this time on the "rear takedown pin," where a metal pin fits between the upper and the lower, connecting them together solidly. There, the 3D-printed plastic was cracking around the pin, making the gun less safe to use.

2/14/2021
Case 2:20-cv-0011 RAJ Document 123-1 Filed 02/16/21 Page 15 of 298
Download this gun: 3D-printed semi-automatic fires over 600 rounds | Ars Technica

"There was so much force concentrating around it that that was the failure place," Wilson said. "At first we started using bigger bosses and using longer pins and realized that it's still a cross-sectional area. We changed the dimensions of the rear takedown pins."

He explained that they've changed pin design entirely, adding "more surface area around these pins," as well as an "internal" 90-degree angle, along with various curves and "steps and risers" that take advantage of the fact that the housing is made of plastic, not metal.

"The thing was still built like it would be made out of metal," he said. "This is about plastic, and everything needs to be curves. It has to act like more of a spring."

And that, he points out, is the ultimate lesson in gun manufacturing.

"The idea is not to print components for guns that are, but the guns that will be," he said.

For now, though, Wilson said that Defense Distributed has essentially taken over the bulk of his time, and he's effectively become a part-time amateur engineer.

"I don't go to [law school] class, but I do pass the exams—here's looking at you [American Bar Association]!" he told Ars.

Defense Distributed, Wilson says, receives "around $100" in daily donations, and he has an operating budget of about $2,400 monthly. He says that the next phase will be to publish "primers" teaching people specifically how to make such weapons.

"I don't consider myself a tech guy, but I do consider myself a crypto-anarchist," he said.

"I mean the philosophy that Tim May expressed, he predicted WikiLeaks and digital currency. [What I mean is] that the Internet and cryptography are these anarchic tools that can allow for the expanse of citizen action. We like the idea of the market becoming completely black and starving the nation-state from all the money they claim."

(Thanks to Ars editor Sean Gallagher, a Navy veteran, for helping me with all my gun questions.)

READER COMMENTS     687                                    SHARE THIS STORY

CYRUS FARIVAR
Cyrus is a former Senior Tech Policy Reporter at Ars Technica, and is also a radio producer and author. His latest book, Habeas Data, about the legal cases over the last 50 years that have had an outsized impact on surveillance and privacy law in America, is out now from Melville House. He is based in Oakland, California.

EMAIL cyrus.farivar@arstechnica.com // TWITTER @cfarivar

Advertisement

# Exhibit C

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
      Plaintiffs,

v.

                               No. 1:15-cv-372-RP

U.S. DEPARTMENT OF STATE, et al.,
      Defendants.

---

### <u>DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT</u>

DOSWASHINGTONSUP01533

**TABLE OF CONTENTS**

BACKGROUND ..................................................................................................................1

ARGUMENT .....................................................................................................................2

I.      Plaintiffs' First Amendment Claims Should Be Dismissed. ..............................2

        A.      The First Amendment Does Not Apply To The Export Of CAD
                Files That Function To Automatically Create A Firearm Or Its
                Components ....................................................................................................2

        B.      If the First Amendment Applies, This Regulation Survives First
                Amendment Scrutiny. ....................................................................................5

        C.      ITAR's Export Controls Are Not Unconstitutionally Overbroad. ...............8

        D.      ITAR's Export Controls Are Not An Unconstitutional Prior Restraint. .....10

II.     Plaintiffs' Second Amendment Claims Should Be Dismissed. ...........................13

        A.      Plaintiffs Lack Standing to Bring a Second Amendment Challenge. ..........13

                1.      Defense Distributed Has Not Suffered a Harm to Second
                        Amendment Interests. .......................................................................14

                2.      SAF and Conn Williamson Have Failed to Plead Sufficient
                        Allegations of Injury and Any Second Amendment Injury is Not
                        Traceable to Defendants' Acts. .........................................................15

        B.      Plaintiffs' Second Amendment Challenge Fails on the Merits. ....................16

III.    Plaintiffs' Other Claims Should Also Be Dismissed on the Merits. ..................19

CONCLUSION ...................................................................................................................20

DOSWASHINGTONSUP01534

# TABLE OF AUTHORITIES

**CASES**

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
   627 F.3d 547 (5th Cir. 2010) .......................................................................................15

*Bernstein v. U.S. Dep't. of Justice*,
   192 F.3d 1308 (9th Cir. 1999) ......................................................................................4

*Bernstein v. U.S. Dep't. of Justice*,
   176 F.3d 1132 (9th Cir. 1999) ......................................................................................4

*Bonds v. Tandy*,
   457 F.3d 409 (5th Cir. 2006) .......................................................................................14

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) ................................................................................................. 8, 9

*Brockett v. Spokane Arcades*,
   472 U.S. 491 (1985) ......................................................................................................9

*Brown v. Entm't Merchs. Ass'n*,
   564 U.S. 786 (2011) ....................................................................................................17

*Brown v. Livingston*,
   524 F. Appx. 111 (5th Cir. 2013) ..............................................................................15

*Bullfrog Films v. Wick*,
   646 F. Supp. 492 (C.D. Cal. 1986) ..............................................................................4

*Capital Cities/ABC, Inc. v. Brady*,
   740 F. Supp. 1007 (S.D.N.Y. 1990) ..........................................................................11

*Catholic Leadership Coal. of Tex. v. Reisman*,
   764 F.3d 409 (5th Cir. 2014) .......................................................................................10

*CFTC v. Vartuli*,
   228 F.3d 94 (2d Cir. 2000) ...................................................................................... 3, 4

*City of Lakewood v. Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988) ........................................................................................10, 11, 12

*City of Littleton v. Z.J. Gifts D-4*,
   541 U.S. 774 (2004) ...............................................................................................11, 12

DOSWASHINGTONSUP01535

*Collins v. Morgan Stanley Dean Witter*,
224 F.3d 496 (5th Cir. 2000) ..................................................................................3

*Def. Distributed v. Dep't of State*,
121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD I*") ..........................................*passim*

*Def. Distributed v. Dep't of State*,
838 F.3d 451 (5th Cir. 2016) ("*DD II*"),
rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017),
*certiorari* denied, 138 S. Ct. 638 (2018) ....................................................*passim*

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .............................................................................................16

*Equal Rights Ctr. v. Post Properties, Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ..........................................................................16

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ..........................................................................13, 14

*Fontenot v. McCraw*,
777 F.3d 741 (5th Cir. 2015) ...............................................................................14

*Forsyth Cnty. v. Nationalist Movement*,
505 U.S. 123 (1992) .............................................................................................11

*Freedman v. State of Md.*,
380 U.S. 51 (1965) ...............................................................................................11

*FW/PBS v. City of Dallas*,
493 U.S. 215 (1990) .............................................................................................14

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) .............................................................................................10

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ..........................................................................................4, 5, 6

*Hotze v. Burwell*,
784 F.3d 984 (5th Cir. 2015) ...............................................................................14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995) ...............................................................................................3

*Junger v. Daley*,
209 F.3d 481 (6th Cir. 2000) .................................................................................5

DOSWASHINGTONSUP01536

*Karn v. U.S. Dept. of State*,
    925 F.Supp. 1 (D.D.C. 1996) ...................................................................................................10

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.*,
    604 F. Supp. 280 (D.D.C. 1984) .................................................................................................4

*Lewis v. Casey*,
    518 U.S. 343 (1996) ...................................................................................................................14

*Mance v. Sessions*,
    880 F.3d 183 (5th Cir. 2018) ...........................................................................................*passim*

*Matal v. Tam*,
    137 S. Ct. 1744 (2017)..................................................................................................................6

*Mather v. Central Pac. Bank*,
    2014 WL 5580963 (D. Haw. 2014) ............................................................................................15

*Members of City Council of City of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) .....................................................................................................................9

*Milwaukee Police Ass'n v. Jones*,
    192 F.3d 742 (7th Cir. 1999) .....................................................................................................10

*Miss. State Democratic Party v. Barbour*,
    529 F.3d 538 (5th Cir. 2008) .....................................................................................................14

*N.Y. State Club Ass'n v. City of New York*,
    487 U.S. 1 (1988) .........................................................................................................................8

*Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
    700 F.3d 185 (5th Cir. 2012) .........................................................................................15, 16, 17

*Near v. Minnesota ex rel. Olson*,
    283 U.S. 697 (1931) .............................................................................................................11, 12

*New York Times Co. v. United States*,
    403 U.S. 713 (1971) ...................................................................................................................11

*Oller v. Roussel*,
    609 F. App'x 770 (5th Cir. 2015) ..............................................................................................12

*Petro-Chem Processing v. EPA*,
    866 F.2d 433 (D.C. Cir. 1989) ...................................................................................................16

*Prometheus Radio Project v. FCC*,
    373 F.3d 372 (3d Cir. 2004) ..................................................................................................8, 18

iv

*Pub. Citizen, Inc. v. Bomer,*
   274 F.3d 212 (5th Cir. 2001) .................................................................. 14, 15

*Reed v. Town of Gilbert,*
   135 S. Ct. 2218 (2015) ............................................................................ 5, 6

*S. Utah Wild. Alliance v. Palma,*
   2011 WL 2565198 (D. Utah 2011) ...............................................................15

*Sec'y of State of Md. v. Munson,*
   467 U.S. 947 (1984) .........................................................................................9

*Second Amendment Arms v. City of Chicago,*
   135 F. Supp. 3d 743 (N.D. Ill. 2015) ...........................................................14

*Shelby Cty. v. Holder,*
   133 S. Ct. 2612 (2013) ...................................................................................17

*Se. Promotions v. Conrad,*
   420 U.S. 546 (1975) .......................................................................................12

*Spokeo, Inc. v. Robins,*
   136 S. Ct. 1540 (2016) ...................................................................................14

*Stagg P.C. v. U.S. Dep't of State,*
   158 F. Supp. 3d 203 (S.D.N.Y. 2016),
   *aff'd,* 673 F. App'x 93 (2d Cir. 2016),
   *cert. denied,* 138 S. Ct. 721 (2018) ........................................................... 6, 9

*Teixeira v. County of Alameda,*
   873 F.3d 670 (9th Cir. 2017) ...........................................................13, 14, 17

*Texas v. Johnson,*
   491 U.S. 397 (1989) .........................................................................................2

*United States v. Hicks,*
   980 F.2d 963 (5th Cir. 1992) ....................................................................... 8, 9

*United States v. Hsu,*
   364 F.3d 192 (4th Cir. 2004) .........................................................................20

*United States v. Chi Mak,*
   683 F.3d 1126 (9th Cir. 2012) ................................................................*passim*

*United States v. Edler Indus., Inc.,*
   579 F.2d 516 (9th Cir. 1978) ..................................................................... 6, 11

v

DOSWASHINGTONSUP01538

*United States v. Martinez,*
   904 F.2d 601 (11th Cir. 1990)...................................................................................7

*United States v. Posey,*
   864 F.2d 1487 (9th Cir. 1989)...................................................................................6

*United States v. Williams,*
   553 U.S. 285 (2008)...................................................................................20

*United States v. Zhen Zhou Wu,*
   711 F.3d 1 (1st Cir. 2013),
   *cert. denied sub nom., Yufeng Wei v. United States,* 134 S. Ct. 365 (2013)............................................. 2, 20

*Universal City Studios, Inc. v. Corley,*
   273 F.3d 429 (2d Cir. 2001)...................................................................................4

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.,*
   454 U.S. 464 (1982)...................................................................................16

*Virginia v. Hicks,*
   539 U.S. 113 (2003)...................................................................................9

*Voting for Am., Inc. v. Steen,*
   732 F.3d 382 (5th Cir. 2013)................................................................... 3, 4, 9

*Warth v. Seldin,*
   422 U.S. 490 (1975)...................................................................................8

*Williams-Yulee v. Florida Bar,*
   135 S. Ct. 1656 (2015)...................................................................................8

## STATUTES

18 U.S.C. § 2339B ...................................................................................5

22 U.S.C. § 2778……………...................................................................................*passim*

## REGULATIONS

22 C.F.R. § 120.1 *et seq.*...................................................................................2

22 C.F.R. § 120.4 ................................................................................... 2, 8

22 C.F.R. § 120.6 ...................................................................................2, 7, 20

22 C.F.R. § 120.10...................................................................................*passim*

DOSWASHINGTONSUP01539

22 C.F.R. § 120.11 .................................................................................................. 7, 11

22 C.F.R. § 120.17 ...................................................................................................... 19

**RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 4

**OTHER AUTHORITIES**

*Black's Law Dictionary* (10th ed. 2014) ........................................................................ 8

Constitutionality of the Proposed Revision of the International
 Traffic in Arms Regulations,
     5 Op. O.L.C. 202 (1981).............................................................................13

DOSWASHINGTONSUP01540

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
　　　Plaintiffs,

v.　　　　　　　　　　　　　　　　　　No. 1:15-cv-372-RP

U.S. DEPARTMENT OF STATE, et al.,
　　　Defendants.

---

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

At issue in this litigation is the United States' ability to control the export of weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files and other, related files, that are indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components. There is no dispute that the Government does not restrict Plaintiffs from disseminating such files domestically to U.S. persons or from using such files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek to bar the Government from preventing the *export* of these design files, which can be easily used overseas to make firearms that are subject to U.S. export controls. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—these files unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms by those abroad. Whatever informational value there may be in the process by which 3-D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' Second Amended Complaint should be dismissed.

### BACKGROUND

In the spring of 2015, Plaintiffs filed their initial Complaint in this action and moved for a preliminary injunction. *See* ECF Nos. 1, 7.  On August 4, 2015, this Court entered an Order denying Plaintiffs' motion. *See Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD

1

*I'*). Appellate review confirmed the Court's Order, *see Def. Distributed v. Dep't of State*, 838 F.3d 451 (5th Cir. 2016) ("*DD II*"), rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017), *certiorari* denied, 138 S. Ct. 638, after which proceedings resumed in this Court. On March 16, 2018, Plaintiffs filed the Second Amended Complaint ("SAC"). *See* ECF No. 90.

In its August 4, 2015 Order, the Court set forth an account of the statutory and regulatory provisions that are the target of Plaintiffs' challenge:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the [Directorate of Defense Trade Controls ("DDTC")] and its employees. 22 C.F.R. 120.1(a).
>
> The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). . . . The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6.
>
> A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction ['CJ']." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*

*DD I* at 686-87.[1] This regulatory framework remains in place. *See* 22 C.F.R. 120.1 *et seq.*

## ARGUMENT

## I.  Plaintiffs' First Amendment Claims Should Be Dismissed.

### A. The First Amendment Does Not Apply To The Export Of CAD Files That Function To Automatically Create A Firearm Or Its Components.

The First Amendment does not encompass all types of conduct. *Texas v. Johnson*, 491 U.S.

---

[1] Unless otherwise stated, all internal citations and quotation marks have been omitted in this brief.

DOSWASHINGTONSUP01542

397, 404 (1989). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995); *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) ("[N]on-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech."). "To determine whether particular conduct possesses sufficient communicative elements to be embraced by the First Amendment, courts look to whether the conduct shows an intent to convey a particular message and whether the likelihood was great that the message would be understood by those who viewed it." *Steen*, 732 F.3d at 388.

Plaintiffs cannot carry their burden to prove that the First Amendment applies to their technical data for the manufacture of firearms and their components. As an initial matter, the relevant ITAR provisions govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad. Indeed, the CJ requests Defense Distributed submitted to DDTC illustrate that the mere publication of ideas is not at issue.[2] The CJ requests make clear the CAD files are functional: "essentially blueprints that can be read by CAD software," ECF No. 8-2, Pl. Br. at App. 208,[3] to generate firearms, firearms components, or other defense articles "automatically." *Id.* at 267. Further, in its CJ requests, Defense Distributed itself described its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun."[4] *Id.* at 211. Plaintiffs' own description

---

[2] "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

[3] Defendants determined that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within ITAR's commodity jurisdiction. Ex. A, attached hereto.

[4] Defendants recognize that, in its Order denying Plaintiffs' preliminary injunction motion, the Court concluded that "the files [are] subject to the protection of the First Amendment," at least "for the purpose of the preliminary injunction analysis," relying on representations "Plaintiffs made . . . at the hearing that Defense Distributed is interested in distributing the files as 'open source.'" *DD I*, 121 F. Supp. 3d at 692. The Court's provisional conclusion at the PI stage may be revisited, however, and as set forth below, even under that view Plaintiffs' claims should be dismissed. Notwithstanding the notice the Court provided that this allegation is important, Plaintiffs make no

3

of the items thus removes their conduct from the purview of the First Amendment. *See CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (rejecting First Amendment challenge to prohibition on distributing software, and emphasizing that software provided "automatic" advice and, rather than educating the consumer, provided explicit instructions about whether to buy or sell); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (upholding injunction prohibiting the Internet posting of computer software that facilitated the unlawful reproduction of movies stored on DVDs, because the injunction "target[ed] only the nonspeech component" of the software). Nor have Plaintiffs adequately alleged that the intended export of CAD files "shows an intent to convey a particular message" or that "the likelihood was great that the message would be understood by those who viewed it." *See Steen*, 732 F.3d at 388. Moreover, Plaintiffs do not even allege that they have undertaken any effort to engage in purely domestic distribution of their CAD files, whether on the Internet or otherwise, suggesting their true interests lie in export, not expression. These deficiencies, coupled with the First Amendment's limited application abroad, *e.g.*, *Laker Airways v. Pan Am. World Airways*, 604 F. Supp. 280 (D.D.C. 1984); *Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986), warrant dismissal of Plaintiffs' First Amendment claim pursuant to Rule 12(b)(6).[5]

To be sure, the SAC does reference a Ninth Circuit case, *Bernstein v. U.S. Dep't of Justice*, SAC ¶¶ 21, 28, which extended First Amendment protections to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer. *See* 176 F.3d 1132, 1139-43 (9th Cir. 1999). The opinion in that case, however, was subsequently withdrawn and rehearing granted, suggesting the Court should be cautious before relying on it. *See Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999). And even assuming, *arguendo*, that the Ninth Circuit's conclusion were correct as to the source code of software—a conclusion with which Defendants disagree—the CAD files here do not merely cause a computer to function generally, but provide specific direction to a machine in furtherance of

_____

mention in the SAC of their alleged "open source" intention or any other stated intent for "the files . . . to be used by others as a baseline" for discussion. *Compare id.* at *with* SAC, ECF No. 90 (lacking any reference to "open source" distribution).

[5] Should the Court conclude, as Defendants contend, that Plaintiffs' exports are not sufficiently expressive, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies. *See Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

4

manufacturing firearms and defense articles.[6]

    B.  <u>If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny.</u>

    "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," which includes laws that "defin[e] regulated speech by particular subject matter . . . [or] by its function or purpose." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). As a result, the Court should assess whether application of the ITAR "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 2231.

    The Supreme Court's analysis in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*") illustrates why application of the ITAR to Defense Distributed's would-be export of 3-D printing information is permissible. There, the Supreme Court upheld a restriction on providing "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), as applied to a group that sought to "facilitate only the lawful, nonviolent purposes" of certain foreign groups. *HLP*, 561 U.S. at 8. The Court recognized that the particular activities in which the plaintiffs wished to engage—legal training and political advocacy—"consist[ed] of communicating a message" and thus, unlike the computer files at issue here, had an expressive component. *See id.* at 28. But the Court nonetheless upheld the statute against a First Amendment challenge, concluding that Congress had permissibly determined that even support for peaceable, lawful conduct "can further terrorism by foreign groups." *Id.* at 30.

    In considering the First Amendment challenge in *HLP*, the Court emphasized that the issues presented "implicate[d] sensitive and weighty interests of national security and foreign affairs." *Id.* at 33-45; *see also id.* at 28 ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."). Giving deference to the Government's determinations of the likely consequences of allowing the material support at issue, the Court also concluded that the statute was narrowly tailored to achieve those important interests. *See id.* at 33-37. In doing so, the

---

[6] As this Court noted, the Sixth Circuit in *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) similarly "found . . . 'computer source code is . . . protected by the First Amendment.'" *DD I* at 692 (quoting *Junger*). Like *Bernstein*, however, the precedential value of this opinion is nil in light of the dismissal with prejudice agreed to by plaintiff in that case on remand. *See Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Oh. Nov. 16, 2000).

DOSWASHINGTONSUP01545

Court explained that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35. Thus, where "sensitive interests in national security and foreign affairs [are] at stake," *id.* at 36, courts applying First Amendment scrutiny must give "significant weight" to the "political branches['] . . . determination" of what is "necessary."[7]

Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Courts have likewise recognized "the Government's important interest in regulating the international dissemination of military information." *United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012); *see also United States v. Posey*, 864 F.2d 1487, 1496 (9th Cir. 1989) (citing *United States v. Edler Indus., Inc.* 579 F.2d 516, 520 (9th Cir. 1978)). Indeed, on appeal from this Court's denial of Plaintiffs' motion for a preliminary injunction, the Fifth Circuit explained that "the State Department's stated interest in preventing foreign nationals— including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." *DD II*, 838 F.3d at 458; *accord Posey*, 864 F.2d at 1497 ("Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security."); *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 210-11 (S.D.N.Y.), *aff'd*, 673 F. App'x 93 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 721 (2018) (holding that injunction barring enforcement of the ITAR's licensing provisions "would have very serious adverse impacts on the national security of the United States"; among the "parade of horribles" would be the release of "digital plans for 3D-printable plastic firearms").

Plaintiffs do not contest this point, either in their SAC or elsewhere. *See* Pls'. Mem. in

---

[7] Although Defendants previously briefed this case as one involving a "content-neutral" Regulation to which "intermediate scrutiny" would apply, *see* Defs.' Opp. to Pls.' Mot. for a PI at 15-18, ECF No. 32, and the Court adopted this reasoning, *see DD I*, 121 F. Supp. 3d at 694, the Supreme Court has made clear that "laws that, though facially content neutral . . . cannot be justified without reference to the content of the regulated speech . . . must also satisfy strict scrutiny." *Reed*, 135 S. Ct. at 2227. *Matal v. Tam*, 137 S. Ct. 1744, 1765-66 (2017) ("laws 'targeted at specific subject matter'" are to be treated "as content based discrimination") (citing *Reed*); *see also DD II*, 838 F.3d at 468-69 (Jones, J., dissenting).

DOSWASHINGTONSUP01546

Support of PI at 28, ECF No. 8 (acknowledging that "Plaintiffs do not question that the Government has a compelling interest in regulating the exportation of arms"). That concession, coupled with the deference owed by this Court to national security and foreign policy judgments of the Executive Branch, *e.g., HLP*, 561 U.S. at 35; *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990), leaves no doubt as to the importance of the Government's interests in this case.

The ITAR's licensing requirements are also narrowly tailored to achieve the Government's compelling interests. In longstanding regulations, the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted. *See* 22 C.F.R. §§ 120.6, 120.10; *see also Chi Mak*, 683 F.3d at 1135 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment."). Nevertheless, the statutory and regulatory scheme confirms that the Government "has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns." *HLP*, 561 U.S. at 35; *see* SAC ¶ 20 (recognizing Government's efforts "to address First Amendment concerns").

For example, the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Chi Mak*, 683 F.3d at 1135 (citing *HLP*, 561 U.S. at 35-36). The regulations also exclude from the definition of "technical data" "basic marketing information on function or purpose or general system descriptions of defense articles." 22 C.F.R. 120.10(b). Also excluded is information within the public domain, *id.*, broadly defined as "information which is published and which is generally accessible or available to the public," *inter alia*, "[t]hrough sales at newsstands and bookstores," "[a]t libraries open to the public or from which the public can obtain documents," and "[t]hrough unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States," *id.* § 120.11. And of course, the AECA and ITAR restrict only the export of technical data: "Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to

7

disseminate the information internationally." *DD I* at 695 (rejecting argument that Defendants'

interpretation of "export" was overbroad); *see also id.* at 696 ("ITAR provides a method through the

commodity jurisdiction request process for determining whether information is subject to its export

controls") (citing 22 C.F.R. § 120.4). *Cf. U.S. v. Hicks*, 980 F.2d 963, 970-72 (5th Cir. 1992) (holding

statute prohibiting intimidation of flight crew withstood First Amendment strict scrutiny because, as

here, the statute "does not cast a sweeping net at amorphous categories of speech"; "the operative

term in the instant case[] ["intimidate" in *Hicks*, as "export" here] is a word that is not simply

associated with a type of speech, but includes conduct as well"; and "encompasses only a relatively

narrow range of speech").

To be sure, a dissent from the Fifth Circuit's opinion in *DD II* rejected this analysis,

concluding that the application of the ITAR here could not survive strict scrutiny. But that opinion

incorrectly analyzed the question of "overinclusive[ness]," resting its conclusion on a purported

distinction between an "export" and "domestic posting on the Internet." *See DD II*, 838 F.3d at 470-

71 (Jones, J., dissenting). But "[b]y nature, the Internet is uniform everywhere. Its content is not

dependent on geographic or metropolitan boundaries." *Prometheus Radio Project v. FCC*, 373 F.3d

372, 469 (3d Cir. 2004) (Scirica, C.J., concurring in part and dissenting in part). Overinclusiveness

can be measured only with respect to available, less-restrictive alternatives, *see Williams-Yulee v. Fla.

Bar*, 135 S. Ct. 1656, 1671 (2015), and because the Internet has no dividing lines, the ITAR's

regulation of the export of technical data must encompass all such postings to achieve its ends.[8]

C. ITAR's Export Controls Are Not Unconstitutionally Overbroad.

Plaintiffs also raise an "overbreadth" challenge to the ITAR's regulation of technical data. *See

SAC ¶ 55. Overbreadth is an exception to the prudential standing requirement that a plaintiff may

only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In

circumstances where a regulation is alleged to be so broad that it is incapable of any permissible

application, courts may allow a party to bring a facial challenge to a statute because it threatens

---

[8] Nor is it the case that defining "export" to include the transfer abroad of information is improper,
as the Fifth Circuit dissent suggests in reliance on, *inter alia*, dictionary definitions of "the verb
'export.'" *DD II*, 838 F.3d at 466-67. But the underlined noun "export" is defined as "[a] product <u>or service</u>
created in one country and transported to another." *Export* (noun form), *Black's Law Dictionary* (10th
ed. 2014) (emphasis added).

8

others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep," *id.* at 615; *see also Steen*, 732 F.3d at 387 (describing this test for First Amendment facial challenges as "daunting").

First, Plaintiffs' overbreadth claim fails because, for the reasons described above, the AECA and ITAR are not directed at speech, but rather to the export of defense articles and related technical data, 22 U.S.C. 2778(a)(1); 22 C.F.R § 120.1. *See Virginia v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech"); *see also Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984). Further, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *Hicks*, 980 F.2d at 969 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* And an overbreadth challenge should not properly lie if the regulations have been applied permissibly to Plaintiffs. *See Sec'y of State of Md. v. Munson*, 467 U.S. 947, 958 (1984). Here, because Defense Distributed's explicit purpose is international in nature—to promote "global access to . . . 3D[] printing of arms," SAC ¶ 1— the ITAR is being applied directly in its intended manner.

Additionally, Plaintiffs' overbreadth claim fails on the merits. The ITAR's export controls on technical data have a substantially permissible purpose. Specifically, these regulations prevent the circumvention of export controls on munitions by proscribing the export of instructions, blueprints, or—as in the instant case—the automated processes to produce such munitions. *See Stagg PC*, 158 F. Supp. 3d at 210-11; *Chi Mak*, 683 F.3d at 1135. Further, Plaintiffs have nowhere alleged that the regulations have been applied in a substantial number of impermissible ways. To the contrary, they plead that "[a]t the time Defense Distributed posted the Published Files, there was no publicly

DOSWASHINGTONSUP01549

known case of Defendants enforcing a prepublication approval requirement under the ITAR." SAC ¶ 27. Plaintiffs' theory also ignores that the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(b)(5). Accordingly, Plaintiffs' overbreadth claim is without merit. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge); *Karn v. Dep't of State*, 925 F. Supp. at 13 (D.D.C. 1996) ("plaintiff's overbreadth concerns [about the ITAR's 'technical data' provision] are not genuine").

D. ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.

Plaintiffs' repeated references to the regulations as a "prior restraint," *e.g.*, SAC ¶¶ 17-22, 40-45, 54-57, do not advance their First Amendment claim. As this Court previously explained, the Fifth Circuit has recognized that "judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *DD I*, 121 F Supp. 3d at 692 (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014)). For example, while a prior restraint involving "a facially content-based restriction on political speech in a public forum" is subject to strict scrutiny, "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), cited in *Catholic Leadership Coal.*, 764 F.3d at 438.

The licensing scheme at issue here could not plausibly give rise to the sort of censorship that has caused courts to invalidate prior restraints on news publications or public rallies. Heightened concerns about prior restraints arise when "a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). For such concerns to arise, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks." *Id.* By contrast, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken[] carry with them little danger of

10

censorship." *Id.* at 760-61. The provisions at issue fall squarely in this latter category. The AECA and ITAR are part of a scheme designed to curtail the spread of defense articles to foreign nationals, in this case, CAD files that directly facilitate the 3-D printing of firearms. Far from being aimed at restricting expression, the regulations "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works." *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.11(a).

While computer files could, in some circumstances, be distributed for expressive purposes, it nonetheless stands in obvious contrast to activities such as parading, posting signs, distributing handbills, or publishing newspapers, which are always (or almost always) done for expressive purposes. Cases involving restrictions on those activities are inapposite here. *See, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (publication of charges of official misconduct in newspaper); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) (permit for protest march). Thus, Plaintiffs' attempt to shoehorn the AECA and ITAR into the classic prior restraint framework is unpersuasive. *Chi Mak*, 683 F.3d at 1136 (rejecting similar prior restraint argument); *see also Edler Indus.*, 579 F.2d at 521 (same). *Cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (upholding against First Amendment challenge licensing strictures for international television broadcasts without concluding such a licensing system constituted a prior restraint).

The ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that the institutional bias of the censors will lead to the suppression of speech that should be permitted. *Freedman v. Md.*, 380 U.S. 51, 52, 57 (1965). In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004)

11

(upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Here, regulation of the export of 3-D printing files in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. Nor have Plaintiffs sufficiently alleged that licensing applications are denied at a rate demonstrating an "institutional bias of a censor" here. *See id.*[9]

In addition, Plaintiffs are mistaken in suggesting that the State Department's processing times render the scheme an impermissible prior restraint. *See* SAC ¶¶ 40-43. To begin with, that argument depends on the incorrect conclusion that the licensing scheme is a classic prior restraint subject to *Freedman*'s rigorous procedural requirements. Moreover, on its face, the licensing determination appropriately involves considerations of numerous difficult questions of national security or foreign policy. *See* 22 U.S.C. § 2778(a)(2) (requiring consideration of "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of an outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements."). Given the stakes and the complexity of the issues involved, there is no basis for Plaintiffs' apparent view that such determinations must be made hastily. Further, there is no legal obligation to obtain a CJ determination before exporting items or data that are not subject to the regulations. As a technical matter, the availability of such determinations thus does not impose a prior restraint. As a practical matter, such determinations will be sought (and may be time consuming) only in difficult cases that require extensive review. And to reiterate, no license, and therefore no determination, is required for domestic distribution to U.S. persons. *Cf. Oller v. Roussel*, 609 F. App'x 770, 774 (5th Cir. 2015) ("To the extent [plaintiff's] First Amendment claims

---

[9] While prior restraints are disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint, *see Near v. Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Proms. v. Conrad*, 420 U.S. 546, 558-59 (1975), here, such after-the-fact punishment cannot suffice because of the possible irreversible harm to national security and foreign policy that could not be remedied by later punishment. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure").

DOSWASHINGTONSUP01552

arise from a 'prior restraint' on his speech, we find that he fails to show evidence that Defendants have prohibited him from stating his beliefs or censored his speech [given] . . . [t]hat Defendants have allowed Oller to use his textbook as secondary material, discuss his views during class, and publish and speak about his views outside the classroom.").

Finally, Plaintiffs cannot advance their argument by relying on opinions from the Office of Legal Counsel ("OLC") in the Justice Department. SAC ¶ 18. These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here. For example, in one opinion the Justice Department cited the Government's "compelling interest in suppressing the development and use of sensitive technologies abroad," and concluded that the provision of "technical advice" was "an integral part of conduct that the government has a compelling interest in suppressing by appropriate means." Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 208 (1981), ECF No. 8-2, App. 123. Written in 1981, the opinion understandably did not analyze the First Amendment implications of the dissemination of computer files on the Internet. Instead, the examples of applications that would raise constitutional concern involved "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." *Id.* at 212 (App. 127). This case, however, does not involve university lectures or discussions of matters of theoretical interest at a dinner party. Rather, the regulation's application in this case involves the dissemination of computer files to foreign nationals that can be used to automatically generate firearms, parts, or components that are on the U.S. Munitions List.

Plaintiffs have therefore failed to state a claim for relief under the First Amendment.

## II.    Plaintiffs' Second Amendment Claims Should Be Dismissed.

A.   Plaintiffs Lack Standing to Bring a Second Amendment Challenge.

Plaintiffs' Second Amendment claims are based on two collateral constitutional guarantees Defendants allegedly infringe: "the right to acquire arms, and the right to make arms." SAC ¶ 59; *see Ezell v. City of Chi.*, 651 F.3d 864, 704 (7th Cir. 2011); *Teixeira v. Cty of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Yet the SAC is deficient in allegations of injury to support these claims,

DOSWASHINGTONSUP01553

notwithstanding the principle that "if the plaintiff does not carry his burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute,' then dismissal for lack of standing is appropriate." *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (quoting *FW/PBS v. City of Dallas*, 493 U.S. 215, 231 (1990)); *see Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) ("at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating" standing").[10]

1.  Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.

To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008). The SAC alleges no injury to Defense Distributed associated with any Second Amendment claims: Plaintiffs have not set forth any facts describing how Defense Distributed is limited in its "right to acquire arms" or its "right to make arms." As the Court recognized in the context of Plaintiffs' equally-deficient original Complaint, "Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment." *DD I* at 696-97. Nor should Defense Distributed be permitted to assert Second Amendment claims on behalf of would-be downloaders of its files: although courts have recognized a right to "firearms retailers to sue on behalf of their potential customers," *Second Amendment Arms v. City of Chi.*, 135 F. Supp. 3d 743, 751 (N.D. Ill. 2015), such standing has not been recognized for a non-profit entity making its services available for free. *See, e.g., id.* (would-be firearms retailer); *Teixeira*, 873 F.3d at 677 (same); *Ezell*, 651 F.3d 704.

Defense Distributed would also fail to meet the generally-applicable test for standing on behalf of a third-party: it has not, nor could it plausibly, allege the existence of "a close relation" with unnamed, likely-anonymous, and non-paying website visitors, nor has it identified any obstacle to those visitors asserting their own Second Amendment interests. *See Bonds v. Tandy*, 457 F.3d 409, 416 n.11 (5th Cir. 2006) (requiring these elements for a third-party standing claim). Defense Distributed has therefore failed to set forth specific facts indicating that its Second Amendment

---

[10] In reviewing a motion to dismiss for lack of standing, "[t]he court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'" *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

14

rights have been injured in fact. *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

    2.    SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any
           <u>Second Amendment Injury is Not Traceable to Defendants' Acts.</u>

Associational standing is available for Second Amendment claims under the same standards as for other claims, *see Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185, 191 (5th Cir. 2012) ("*NRA*"), but this requires that the organization demonstrate that "its members would otherwise have standing to sue in their own right,"[11] including by pleading that they have suffered a concrete, specific injury sufficient to confer Article III standing. *Id.*

Here, SAF and Mr. Williamson have failed to sufficiently plead an injury. Even if their alleged "keen interest" in Defense Distributed's files and vague claim that they would "access" such files, SAC ¶ 45, were sufficient to demonstrate a First Amendment injury, their further suggestion that, after doing so, they would "use the files for . . . the manufacture of firearms . . . that they would keep operable and use for self-defense" is a "hypothetical and conjectural" allegation about the usage of these files that is insufficient to satisfy the obligation to plead injury. *Compare Brown v. Livingston*, 524 F. App'x. 111, 114-15 (5th Cir. 2013). It is true that this Court previously held that Mr. Williamson, and by implication, SAF as an organization, <u>had</u> demonstrated injury. *See DD I* at 698. But the Court recognized this standard had been met not by the original Complaint, but by supplementary "affidavit testimony." *Id.* Plaintiffs have added a bare sentence of conclusory allegations to reinforce the pleaded allegations in the SAC. *Compare* SAC at ¶ 45 *with* Compl., ECF No. 1 at ¶ 38. Thus, because Plaintiffs have now been on notice that their pleadings are defective as to standing and have failed to cure this defect through two amended complaints, the Court should dismiss the Second Amendment claims for failure to allege a sufficient injury. *See Mather v. Cent. Pac. Bank*, 2014 WL 5580963 at *3 (D. Haw. 2014) (dismissal after "failure to cure the defects identified" as to standing); *cf. S. Utah Wild. All. v. Palma*, 2011 WL 2565198 (D. Utah 2011) (similar).

Further, given the passage of nearly three years since the filing of those affidavits, the Court

---

[11] Associational standing also requires that a plaintiff organization establish that "the interests it seeks to protect are germane to the organization's purpose; and [that] . . . the participation of individual members" in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). Defendants are not aware of any reason to believe that the Second Amendment Foundation's purpose is not "germane" to the Second Amendment interests at issue here or that participation of SAF's members would be required in this action.

DOSWASHINGTONSUP01555

should not continue to credit the injuries alleged therein as ongoing. *Cf. Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011) (questioning validity of claims of injury based on lapse of time between complaint and affidavit). To the extent Mr. Williamson or SAF's other members seek to acquire and make arms based on Defense Distributed's 3-D printing files, they have had ample opportunity to seek access to those files via offline means, given that the ITAR governs only exports and would not limit the ability of Defense Distributed or SAF to provide 3-D printing files directly to Americans within United States borders. For similar reasons, the evident lack of action on the part of SAF and Mr. Williamson to obtain the files they insist are needed to exercise their Second Amendment rights should be treated as "incurred voluntarily," and thus, no longer "fairly can be traced to the challenged action." *See Petro-Chem Processing v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting *Valley Forge Christian Coll. v. Ams. United*, 454 U.S. 464, 472 (1982)).

     B. <u>Plaintiffs' Second Amendment Challenge Fails on the Merits.</u>

     In *Mance v. Sessions*, the Fifth Circuit set forth the governing approach for Second Amendment analysis of regulations that restrict the access of prospective firearms owners and users to firearms protected by the Second Amendment. *See* 880 F.3d 183 (5th Cir. 2018). Applying the analysis set forth in *Mance* here establishes that Defendants may, consistent with the Second Amendment, limit the international distribution of electronic files which enable the 3-D printing of firearms. Thus, even if the Court concludes that one or more Plaintiffs have standing to assert a Second Amendment claim, that claim should be dismissed.

     The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Conducting an "extensive analysis of the historical context of the Second Amendment, the Court concluded 'that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right' to keep and bear arms . . . [for which] self-defense . . . was the central component." *Mance*, 880 F.3d at 187 (quoting *Heller*, 554 U.S. at 592, 599). To determine whether a federal statute is consonant with this right, the Fifth Circuit requires a "two-step approach. . . . [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment . . . ; the second step is . . . to determine whether the law survives the proper level of scrutiny." *NRA*, 700

DOSWASHINGTONSUP01556

F.3d 194. Here, just as pleading deficiencies leave doubt as to Plaintiffs' standing, they leave unclear the extent of the "encroach[ment] on the core of the Second Amendment." *Id.* at 195. Although the "core Second Amendment right . . . wouldn't mean much without the ability to acquire arms," *Teixeira*, 873 F.3d at 677, including through their manufacture, the pleadings do not establish the extent to which that core is infringed here.

Under these circumstances, the Fifth Circuit's approach in *Mance* may guide the Court's inquiry. There, the Fifth Circuit first addressed whether "the laws and regulations at issue withstand strict scrutiny," before examining whether "the strict, rather than intermediate, standard of scrutiny is applicable," and the same approach is permissible here. *Mance*, 880 F.3d at 188; *see id.* at 196 (Owen, J., concurring) ("it is prudent first to apply strict scrutiny," and, if the Court concludes that the challenged law "satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is *required*"). For a firearms restriction to satisfy strict scrutiny, "the Government 'must specifically identify an actual problem in need of solving,' and the 'curtailment of the constitutional right must be actually necessary to the solution.'" *Mance*, 880 F.3d at 188 (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)).

Applying this standard, the Fifth Circuit in *Mance* reversed and vacated a district court decision enjoining the enforcement of two federal statutory provisions and a regulation that "generally prohibit the direct sale of a handgun by a federally licensed firearms dealer (FFL) to a person who is not a resident of the state in which the FFL is located." *Mance*, 880 F.3d at 185. Emphasizing that "current burdens on constitutional rights 'must be justified by current needs,'" the Fifth Circuit first assessed the nature of the government interest served by the restrictions, and recognized that "there is a compelling government interest in preventing circumvention of the handgun laws of various states." *Id.* at 189-90 (quoting *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619 (2013)). Likewise here, there is an equally compelling interest in preventing the circumvention of laws restricting the export of firearms, particularly to hostile foreign state and non-state adversaries.

As noted above, Plaintiffs have previously conceded the compelling nature of the interest in regulating the export of arms, and that interest encompasses the export of the 3-D printing files at issue here. For this reason, Congress did not limit the scope of the AECA merely to the regulation

DOSWASHINGTONSUP01557

of exports of physical weapons like firearms or bombs, but recognized that the transfer of ideas, expertise, and knowledge beyond the borders of the United States can be just as inimical to the national interest as the transfer of objects: hence the inclusion of "defense services," alongside "defense articles" in the AECA's coverage. 22 U.S.C. § 2778(a)(1).

As explained above, the ITAR restrictions here are narrowly tailored to this concededly compelling interest. *See* Part I.B, *supra*. Defense Distributed explicitly promotes "global" use of its ideas, SAC ¶ 1, so the compelling interest in limiting the transfer of arms abroad requires that the ITAR be applied to Defense Distributed. And, applying the approach the Fifth Circuit employed in *Mance* where "[a]ll concede[d] there is a compelling government interest," a review of the available alternatives shows none that would effectively protect the interests at issue. *See* 880 F.3d at 190-92.

The claims set forth in the SAC suggest two alternatives by which Defendants could act to reduce the alleged burden on the Second Amendment rights of SAF, Mr. Williamson, and others. As with the alternatives considered in *Mance*, however, neither would effectively satisfy Defendants' interest in preventing persons from circumventing export controls for munitions technology.  First, Plaintiffs, like the Fifth Circuit dissent described above, *see DD II*, 838 F.3d at 470-71, suggest that the distribution of technical data over the Internet could be exempted from ITAR's export controls. But the Internet does not have separate parts, "domestic" and "foreign." *Prometheus Radio*, 373 F.3d at 469. If Mr. Williamson and SAF could access Defense Distributed's "files on the Internet," so too could innumerable foreign persons or entities, and thus, the United States' efforts to regulate the export of firearms and of firearms technical data would alike be rendered nullities.[12]  The other alternative suggested by Plaintiffs' pleadings is for Defendants to permit Defense Distributed to place its files into the public domain, in which case they would not be subject to ITAR's restrictions

---

[12] The Government previously stated that there may be means of limiting access to files posted on the Internet to assure that such postings are distributed only domestically. *See* 7/6/2015 Tr. at 32-34, ECF No. 50. But in its narrow-tailoring analysis in *Mance*, the Fifth Circuit made clear that it is "unrealistic to expect" that a compelling public interest can be protected by "expecting . . . each of [hundreds of thousands of private parties to] become, and remain knowledgeable about" a wide variety of subjects necessary to protect the public interest.  *See Mance*, 880 F.3d at 190.  In *Mance*, that subject was "the handgun laws of the 50 states and the District of Columbia." *Id.*  Here, that subject would be the means of identifying U.S. persons who are the residents of the 50 states and D.C., a comparable subject, and the means of falsely identifying one's self over the Internet as a U.S. person, a subject area that is likely to be intricately complex and ever-changing.

DOSWASHINGTONSUP01558

on the export of technical data. *See* 22 C.F.R. § 120.10. Yet this would be even less effective at protecting the public interest in export control as the 3-D printing plans for firearms—and thus, the ability to make export-controlled firearms—could then be taken abroad using all sorts of means, not just by transmission over the Internet. Given that the available alternatives clearly would be ineffective at preventing the broad circumvention of export controls for munitions technology, and that the ITAR is narrowly constructed to regulate only the transfer abroad of arms or the equivalent,[13] the Court should find the challenged restriction to be narrowly tailored to a compelling interest, and therefore, permitted by the Second Amendment. *See Mance*, 880 F.3d at 192. And for the same reasons, the challenged restriction would also satisfy intermediate scrutiny. *See id.* at 196.

## III. Plaintiffs' Other Claims Should Also Be Dismissed on the Merits.

The SAC contains two additional claims, each of which the Court analyzed in depth in its Order denying Plaintiffs' 2015 motion for a preliminary injunction. First, Plaintiffs seek to enjoin application of the ITAR to Defense Distributed as an *ultra vires* action by the State Department. Second, Plaintiffs assert that the ITAR's limits on the export of technical data are unconstitutionally vague. The Court should now apply its prior analysis to dismiss these claims.

Plaintiffs first allege that application of the ITAR is *ultra vires* in light of a "1985 ITAR amendment." SAC ¶ 52; *see id.* ¶ 17 (describing this amendment as having removed "Footnote 3 to former ITAR Section 125.11"). This Court previously found there was no "likelihood of success" as to this claim, given that the AECA authorizes the regulation of exports and that Defense Distributed's stated purpose of "facilitating global access to firearms" falls squarely within the conduct Congress has authorized the ITAR to regulate. *See DD I* at 690-91. The Court should apply this analysis and dismiss the *ultra vires* claim. Further, even beyond the Court's prior analysis, Plaintiffs' allegation that a licensing requirement for exports of technical data exceeds the "authority conferred by Congress," *id.* ¶ 52, is inconsistent with the plain text of the AECA. Section 2778 authorizes regulation of "technical data," and it provides for "export licenses" to be required,

---

[13] *See* 22 C.F.R. § 120.17(a), supplying relevant definitions of exports, including § 120.17(a)(1) ("[s]ending or taking a defense article out of the United States in any manner"); § 120.17(a)(2) ("transferring technical data to a foreign person in the United States); § 120.17(a)(4), "transferring a defense article to an embassy . . . in the United States").

19

explicitly recognizing "technical data" as within the scope of the licensing requirement. 22 U.S.C. §§ 2778(b)(2); 2778(f)(2)(A). In short, Defendants' actions could only be *ultra vires* by exceeding constitutional limitations, not statutory limits.[14]

Plaintiffs' final claim is that the ITAR's regulation of the export of technical data is unconstitutionally vague under the Due Process Clause of the Fifth Amendment. SAC ¶¶ 63-65. As the Court previously observed, this challenge is "hampered because [Plaintiffs] have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague," ECF No. 43 at 23, a shortcoming Plaintiffs have not rectified in the SAC. *Compare* SAC ¶¶ 11-15 *with* Compl. ¶¶ 12-15. As the Court recognized, "persons of ordinary intelligence are clearly put on notice by the language of the regulations" that "post[ing], on the Internet, . . . directions for the 3D printing of firearms" falls within the scope of the ITAR. *DD I* at 700-01 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (a statutory term is vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement")). The ITAR's "carefully crafted regulatory scheme," *Zhen Zhou Wu*, 711 F.3d at 13, which defines the terms "defense articles" and "technical data" at length, provides fair notice and is not susceptible to a vagueness challenge. *See DD I* at 701 (describing 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical data) & 121.1 (Munitions List)). Equally, the term "export" is explicitly defined to include "[a]n actual shipment or transmission out of the United States," or "a release in the United States of technical data to a foreign person." 22 C.F.R. § 120.17. For this reason, this Court found no likelihood of success as to Plaintiffs' vagueness challenge, and this Court should now dismiss consistent with its previous analysis. *See DD I* at 700-01 (citing *Zhen Zhou Wu*, 711 F.3d at 13; *U.S. v. Hsu*, 364 F.3d 192 (4th Cir. 2004)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed.

---

[14] Indeed, Plaintiffs acknowledge that the 1985 amendment, on which their *ultra vires* claim hinges, *see* SAC ¶ 52, was enacted not because of limitations imposed by the Congress in the AECA, but "to address First Amendment concerns." *Id.* ¶ 20. This further confirms that no *ultra vires* claim survives dismissal of the constitutional claims.

DOSWASHINGTONSUP01560

Dated: April 6, 2018      Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

JOHN F. BASH
United States Attorney

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

*/s/ ERIC J. SOSKIN*
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
STUART J. ROBINSON
California Bar No. 267183
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for U.S. Government Defendants*

DOSWASHINGTONSUP01561

## CERTIFICATE OF SERVICE

I certify that on April 6, 2018, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapllc.com
William B. Mateja, mateja@polsinelli.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew A. Goldstein, matthew@goldsteinpllc.com
Joshua M. Blackman, joshblackman@gmail.com
*Attorneys for Plaintiffs*


/s/ Eric J. Soskin
ERIC J. SOSKIN
Senior Trial Counsel

Exhibit D

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

# Exhibit A: Declaration of Lisa V. Aguirre

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,                §
    Plaintiffs,                              §
                                            §
v.                                          §          No. 1:15-cv-372-RP
                                            §
U.S. DEPARTMENT OF STATE, et al.,           §
    Defendants.                             §

## DECLARATION OF LISA V. AGUIRRE

I, Lisa Aguirre, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.  I am the Director of the Office of Defense Trade Controls Management (DTCM),
    one of four directors within the Directorate of Defense Trade Controls (DDTC),
    Bureau of Political-Military Affairs at the Department of State. I have held this
    position since June, 2013. My roles and responsibilities in this position include
    managing, overseeing or supporting all DDTC activities.

2.  Prior to holding my current position, I was Director of the Office of Defense
    Trade Controls Compliance in DDTC for over three years, during which time I
    oversaw numerous DDTC activities, including the management and processing of
    registration applications and registration fee submissions, reviews of export
    licenses for prohibited parties, the DDTC Company Visit Program (CVP), a
    program in which State Department officials visit arms exporters or end users to
    gather information on compliance with the Arms Export Control Act (AECA) and
    the International Traffic in Arms Regulations (ITAR), and reviews under the

Committee on Foreign Investment in the United States (CFIUS). As Compliance Director, I also oversaw civil enforcement actions and provided support to criminal enforcement matters under ITAR. In these capacities at DDTC, I have become familiar with the application of the AECA and ITAR as part of DDTC's mission and the full range of DDTC activities in support of its mission.

3. Since joining DDTC, first as a contractor in June 2007, and then through appointment to the federal service in July 2008, I have served continuously in defense trade controls roles.

4. This declaration is submitted in support of the opposition to a motion for preliminary injunction to be filed by the official capacity defendants in the above-captioned case. The information contained herein is based on my personal knowledge and on information provided to me in my official capacity.

**Directorate of Defense Trade Controls**

5. The Directorate of Defense Trade Controls (DDTC) is part of the Department of State's Bureau of Political-Military Affairs (PM), which reports to the Under Secretary for Arms Control and International Security. DDTC controls the export and temporary import and brokering of defense articles and services covered by the United States Munitions List (USML), in accordance with 22 U.S.C. §§ 2778-2780 of the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR) (22 CFR Parts 120-130).

2

6. DDTC's mission is to carry out the purposes of the AECA to further world peace and the national security and foreign policy of the United States, including by ensuring that commercial defense exports support key objectives of U.S. national security and foreign policy, including weapons nonproliferation, support for allies, and preservation of human rights. DDTC also seeks to ensure that regulation keeps pace with innovation, that U.S. industry and foreign partners comply with applicable policies and requirements, and that the munitions export process is reliable and predictable. DDTC also serves as a resource to the U.S. government, industry, and foreign counterparts on defense trade matters.

7. As part of its mission, DDTC licenses the export and temporary import and brokering of items subject to the International Traffic in Arms Regulations ("ITAR") and seeks to ensure appropriate compliance with, and enforcement of, these regulations. DDTC also maintains, reviews, and clarifies the U.S. Munitions List (USML), and oversees the Commodity Jurisdiction process.

8. The Office of Defense Trade Controls Policy (DTCP) within the Directorate of Defense Trade Controls oversees the development of policy and guidance related to exports of defense articles and services on the USML and subject to the ITAR and the AECA. DTCP manages the interagency Commodity Jurisdiction process, which determines whether or not certain items are controlled on the USML when questions arise concerning whether or not an item is subject to the licensing jurisdiction of the Department of State. DTCP also prepares all changes to the ITAR, which are published in the Federal Register, manages bilateral defense

3

DOSWASHINGTONSUP00441

trade agreements, such as the United Kingdom and Australia Defense Trade Cooperation Treaties, and provides export control policy and regulatory guidance to exporters, defense manufacturers, and foreign allies and partners.

## Statutory and Regulatory Framework

9.    The Arms Export Control Act (AECA), Section 38(a)(1) (22 U.S.C. 2778(a)(1)), authorizes the President "in furtherance of world peace and the security and foreign policy of the United States . . . to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List."

(a)  The statutory authority of the President to "promulgate regulations for the import and export of such articles and services" has been delegated to the Secretary of State by Executive Order 13637, § 1(n). This delegation requires that "Designations, including changes in designations, by the Secretary of State of items or categories of items that shall be considered as defense articles and defense services subject to export control under section 38 (22 U.S.C. 2778) shall have the concurrence of the Secretary of Defense."

4

(b) The authorities under the AECA delegated to the Secretary of State have been further delegated pursuant to Department of State Delegation of Authority 293-2, *Delegation of Authority by the Secretary of State to Officers of the Department of State and the Administrator of the U.S. Agency for International Development of Authorities under the Foreign Assistance Act of 1961 and Other Related Acts* (Oct. 23, 2011), which delegates to the Under Secretary for Arms Control and International Security "the functions conferred on the Secretary by Executive Order 13637 relating to sales and exports under the Arms Export Control Act (22 U.S.C. 2751 *et seq.*)."

10. The ITAR, 22 C.F.R. Chapter I, Subchapter M, Parts 120-130, as amended, 79 Fed. Reg. 77884 (Dec. 29, 2014), implements the AECA. Section 120.1 of the ITAR sets forth how the ITAR is administered:

(a) Section 38 of the Arms Export Control Act (22 U.S.C. 2778), as amended, authorizes the President to control the export and import of defense articles and defense services. The statutory authority of the President to promulgate regulations with respect to exports of defense articles and defense services is delegated to the Secretary of State by Executive Order 13637. This subchapter implements that authority, as well as other relevant authorities in the Arms Export Control Act (22 U.S.C. 2751 *et seq.*). By virtue of delegations of authority by the Secretary of State, these regulations are primarily administered by the Deputy Assistant Secretary of State for Defense Trade Controls, Bureau of Political-Military Affairs.

5

11. The ITAR provides what particular activities constitute an export. Section 120.17 defines an "export" to mean:

> (1) Sending or taking a defense article out of the United States in any manner, except by mere travel outside of the United States by a person whose personal knowledge includes technical data; or
>
> (2) Transferring registration, control or ownership to a foreign person of any aircraft, vessel, or satellite covered by the U.S. Munitions List, whether in the United States or abroad; or
>
> (3) Disclosing (including oral or visual disclosure) or transferring in the United States any defense article to an embassy, any agency or subdivision of a foreign government (e.g., diplomatic missions); or
>
> (4) Disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad; or
>
> (5) Performing a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad.
>
> (6) A launch vehicle or payload shall not, by reason of the launching of such vehicle, be considered an export for purposes of this subchapter. However, for certain limited purposes (see § 126.1 of this subchapter), the controls of this subchapter may apply to any sale, transfer or proposal to sell or transfer defense articles or defense services."[1]

---

[1] On June 3, 2015, the Department of State published in the Federal Register a Notice of Proposed Rulemaking (NPRM) proposing revisions to the ITAR. Among other proposed changes, the Department proposed to clarify the definition of "technical data" by

6

DOSWASHINGTONSUP00444

12. Part 121 of the ITAR sets out those "articles, services, and related technical data" that have been designated as defense articles and defense services pursuant to sections 38 and 47(7) of the AECA. These items make up the USML. There are 21 categories on the USML under which a particular item may be designated as a defense article.

13. As relevant to this litigation, under Category I, *Firearms, Close Assault Weapons and Combat Shotguns,* the following items are designated as defense articles:

   (a) Non-automatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm).

   (b) Fully automatic firearms to .50 caliber inclusive (12.7 mm).

   (c) Firearms or other weapons (*e.g.*, insurgency-counterinsurgency, close assault weapons systems) having a special military application regardless of caliber.

   (d) Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.

   (e) Silencers, mufflers, sound and flash suppressors for the articles in (a) through (d) of this category and their specifically designed, modified or adapted components and parts.

   (f) Riflescopes manufactured to military specifications. (See category XII(c) for controls on night sighting devices.)

   (g) Barrels, cylinders, receivers (frames) or complete breech mechanisms for the articles in paragraphs (a) through (d) of this category.

   (h) Components, parts, accessories and attachments for the articles in paragraphs (a) through (g) of this category.

---

specifying that technical data may take the form of, inter alia, CAD files. In addition, to make more explicit the existing control on exports, the Department proposed to add a paragraph specifying that providing technical data on a publicly-accessible network, such as the Internet, is an export because of its inherent accessibility to foreign powers. The Department has requested that interested parties submit comments on these and other elements of the proposed rulemaking between June 3 and August 3, 2015. *See* Exhibit 7.

7

(i) Technical data (as defined in § 120.10 of this subchapter) and defense services (as defined in § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a) through (h) of this category. Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(j) The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

    (1)    A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

    (2)    A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

    (3)    A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

    (4)    A pistol is a hand-operated firearm having a chamber integral with or permanently aligned with the bore.

    (5)    A revolver is a hand-operated firearm with a revolving cylinder containing chambers for individual cartridges.

    (6)    A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.

14.    In addition to the inclusion of "technical data" for Category I defense articles on the USML, there are several other provisions of the ITAR related to "technical data."

    a.    Section 120.10 of the ITAR defines "technical data" as "(a)(1) Information, other than software as defined in § 120.10(a)(4) which is required for the design, development, production, manufacture,

8

assembly, operation, repair, testing, maintenance or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation[;] (2) Classified information relating to defense articles and defense services on the U.S. Munitions List and 600-series items controlled by the Commerce Control List; (3) Information covered by an invention secrecy order; or (4) Software (see § 120.45(f)) directly related to defense articles.[2] (b)[3] The definition in paragraph (a) of this section does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain as defined in § 120.11 of this subchapter or telemetry data as defined in note 3 to Category XV(f) of part 121 of this subchapter. It also does not include basic marketing information on function or purpose or general system descriptions of defense articles."

b. Section 120.6 of the ITAR defines a "defense article" as "any item or technical data designated in § 121.1 of this subchapter. This term includes technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in § 121.1 of this subchapter. It also includes forgings, castings, and other unfinished products, such as

---

[2] This sentence added by 79 FR 61226 (Oct. 10, 2014).
[3] Amended by 79 FR 27180 (May 13, 2014, effective Nov. 10, 2014), as corrected by 79 FR 66608 (Nov. 10, 2014).

DOSWASHINGTONSUP00447

extrusions and machined bodies, that have reached a stage in manufacturing where they are clearly identifiable by mechanical properties, material composition, geometry, or function as defense articles.[4] It does not include basic marketing information on function or purpose or general system descriptions."

c. Section 120.9 of the ITAR defines a "defense service" as "(1) The furnishing of assistance (including training) to foreign persons, whether in the United States or abroad in the design, development, engineering, manufacture, production, assembly, testing, repair, maintenance, modification, operation, demilitarization, destruction, processing or use of defense articles; (2) The furnishing to foreign persons of any technical data controlled under this subchapter (see § 120.10), whether in the United States or abroad; or (3) Military training of foreign units and forces, regular and irregular, including formal or informal instruction of foreign persons in the United States or abroad or by correspondence courses, technical, educational, or information publications and media of all kinds, training aid, orientation, training exercise, and military advice. (See also § 124.1.)"

d. Collectively, the "technical data" provisions serve the purpose of limiting the export of detailed information needed to manufacture, maintain, or operate defense articles controlled on the USML. Such

_____

[4] This sentence was added to the definition of defense article by 79 FR 61226 (Oct. 10, 2014).

10

export limitations advance the purposes of the AECA by limiting the ability of foreign powers to design, develop, and produce defense articles in lieu of being able to obtain those articles directly. Absent the inclusion of technical data in the ITAR, the ITAR's limits on arms transfers would be of negligible practical effect because the ITAR would leave unregulated the exportation of the fundamental technology, know-how, blueprints, and other design information sufficient for foreign powers to construct, produce, manufacture, maintain, and operate the very same equipment regulated in its physical form by the ITAR.

15. The ITAR also sets forth the policy on designating and determining how a specific article or service may be designated as a defense article or defense service.

   a. Pursuant to section 120.3, a particular article or service will be designated as a defense article if it: "(1) Meets the criteria of a defense article or defense service on the U.S. Munitions List; or (2) Provides the equivalent performance capabilities of a defense article on the U.S. Munitions List."

   b. Section 120.3 also provides that a specific article or service "shall be determined in the future as a defense article or defense service if it provides a critical military or intelligence advantage such that it warrants control" under the ITAR.

11

c. Section 120.3 also specifies that the "intended use of the article or service after its export (*i.e.*, for a military or civilian purpose), by itself, is not a factor in determining whether the article or service is subject to the controls of this subchapter."

16. ITAR jurisdiction extends only to the export of defense articles, defense services, and technical data. For this reason, ITAR does not limit the ability of Defense Distributed or others to distribute CAD files to U.S. persons within the United States for domestic use.

**The Commodity Jurisdiction (CJ) process**

17. Commodity Jurisdictions, commonly referred to as "CJs," are the determination made by the Department of State identifying the export control jurisdiction of goods, services and information.

18. The purpose of these determinations is to reach a conclusion as to whether, for purposes of export controls, goods, services, or information are under the jurisdiction of the Department of State pursuant to ITAR or under the jurisdiction of the Department of Commerce, which administers the Export Administration Regulations (EAR).[5]

---

[5] A few categories of goods, services, or information are under the jurisdiction of the Department of Energy, Department of Homeland Security, or another Executive Branch agency. Goods, services, or information may also be within the public domain and not subject to export controls at all.

12

19.     Section 120.4 of the ITAR establishes the CJ procedure,[6] which "is used with the
        U.S. Government if doubt exists as to whether an article or service is covered by
        the U.S. Munitions List. It may also be used for consideration of a re-designation
        of an article or service currently covered by the U.S. Munitions List. The
        Department must provide notice to Congress at least 30 days before any item is
        removed from the U.S. Munitions List." As required by Section 120.4, the
        determination "entails consultation among the Departments of State, Defense,
        Commerce, and other U.S. Government agencies and industry in appropriate
        cases." In the vast majority of circumstances, the CJ procedure is unnecessary
        because there is no doubt as to whether an item to be exported is a defense article
        or defense service.

20.     Section 120.4 of the ITAR sets forth the criteria for making a CJ determination:
        A designation that an article or service meets the criteria of a defense article or
        defense service, or provides the equivalent performance capabilities of a defense
        article on the U.S. Munitions List set forth in this subchapter, is made on a case-
        by-case basis by the Department of State, taking into account:

            (i) The form and fit of the article;[7] and

---

[6] *See* 58 FR 39283, July 22, 1993, as amended at 71 FR 20536, Apr. 21, 2006; 75 FR
46843, Aug. 4, 2010; 78 FR 22753, Apr. 16, 2013; 79 FR 8084, Feb. 11, 2014.

[7] The form of a commodity is defined by its configuration (including the geometrically
measured configuration), material, and material properties that uniquely characterize it.
The fit of a commodity is defined by its ability to physically interface or connect with or

13

(ii) The function and performance capability of the article.[8]

21. Section 120.4(f) further requires that "State, Defense and Commerce will resolve commodity jurisdiction disputes in accordance with established procedures. State shall notify Defense and Commerce of the initiation and conclusion of each case."

22. Section 120.4(g) provides an avenue for appeal of a CJ determination:

A person may appeal a commodity jurisdiction determination by submitting a written request for reconsideration to the Deputy Assistant Secretary of State for Defense Trade Controls. The Deputy Assistant Secretary's determination of the appeal will be provided, in writing, within 30 days of receipt of the appeal. If desired, an appeal of the Deputy Assistant Secretary's decision can then be made to the Assistant Secretary for Political-Military Affairs.

23. DTCP considers a variety of information in its consideration of CJ requests, including the information attached to the request (such as product brochures, technical specifications and/or blue prints, sales information, etc.), the USML category in which an item most likely may fit, previous CJs on the technology or related matters, and previously-issued export licenses for similar items.

---

become an integral part of another commodity. [*See* Note 1 to paragraph (d), section 120.4 of the ITAR.

[8] The function of a commodity is the action or actions it is designed to perform. Performance capability is the measure of a commodity's effectiveness to perform a designated function in a given environment (e.g., measured in terms of speed, durability, reliability, pressure, accuracy, efficiency).

14

After DTCP prepares a preliminary analysis, the CJ request and preliminary analysis are circulated to the relevant interagency partners for consultation.

**Defense Distributed's CJ Requests**

24. In early May, 2013, DTCP became aware through media reports that Defense Distributed (DD), a pending 501(c)(3) non-profit corporation located in Austin, Texas, had placed on an unrestricted website executable Computer Aided Design (CAD) files enabling the manufacture of plastic firearm components, accessories, and attachments with a 3D printer. *See, e.g.,* Exhibit 1.

25. As a result, the Department of State's Office of Defense Trade Controls Compliance (DTCC) became concerned that these files might be subject to the ITAR, in which case DD might be exporting these files without authorization. DTCC therefore sent a letter to DD, suggesting that they remove the files from their website and submit CJ requests to determine whether the files were controlled by the ITAR. *See* Exhibit 2. DD complied with the request and on June 21, 2013, submitted ten CJ requests. *See* Exhibit 3.

26. In its CJ submission, DD identified a number of publicly available sources for information on how to manufacture firearms and related components, including books on gunsmithing and gun design blueprints and schematics available in a variety of media, including on the Internet. DD asserted that their CAD files were no different from any other medium that contains basic manufacturing "know

15

how" for firearms, and that these files should be found to be in the public domain and not controlled under the ITAR. *See* Exhibit 3.

27. In addition to conferring with other agencies in accordance with ITAR Section 120.4, DTCP sought to better understand additive manufacturing and 3D printing hardware and technology and its evolution and diffusion, the impact of the availability of CAD files (and other, similar data files) on the enforcement of export controls, and the application of multilateral export control regime, particularly the Wassenaar Arrangement on Export Controls on Conventional Arms and Dual-use Goods and Technologies, to such files and technologies. DTCP consulted other State Department offices and U.S. government agencies to benefit from their expertise and consideration of these technologies and issues. In addition, DTCP organized a conference on additive manufacturing/3D printing technology in March 2014.

28. In January 2015, while consideration of DD's June. 2013 CJ requests was ongoing, DD submitted a CJ request for the "Ghost Gunner," a computer numerically controlled (CNC) press for milling metal firearms components. *See* Exhibit 4. On April 15, 2015, DDTC responded by providing a CJ determination to Defense Distributed, finding that the Ghost Gunner would not be subject to the jurisdiction of the Department of State. *See* Exhibit 5. In the course of consideration of the Ghost Gunner, DTCP determined that project files and data files for producing a defense article on a 3D printer or similar device constituted technical data on that defense article that would be subject to ITAR jurisdiction,

16

Resolution of the Ghost Gunner CJ request also helped DTCP conclude the CJ

process for DD's June 21, 2013 CJ requests. On June 4, 2015, DTCP provided CJ

determinations for the requested items. *See* Exhibit 6.

**DDTC's CJ Determination**

29.    In making its CJ determination, DDTC identified several factors that warrant

treatment of DD's CAD files as technical data subject to ITAR jurisdiction.

    a.  The central function of DD's executable CAD files appears to be to enable

       the manufacture of end-items that are ITAR-controlled defense articles.

    b.  As DD described in its Ghost Gunner CJ request, DD's CAD files can be

       used to "automatically find, align, and mill" a defense article such as a

       firearm on a 3D printer or other manufacturing device. Manufacture of a

       defense article in this way requires considerably less know-how than

       manufacture in reliance on conventional technical data, which merely

       *guides* the manufacture of a defense article and requires additional

       craftsmanship, know-how, tools, and materials.

    c.  Although DD contended that the technical data constituted published data

       already in the public domain, the existing material in the public domain

       identified by DD did not include CAD files that could be used to

       automatically generate defense articles. Because CAD files provide the

17

additional functionality described above, DD's CAD files are a
meaningful step beyond previous, public-domain material.

    d.  In addition, because DD's CAD files are information similar to
"blueprints, drawings, photographs, plans, instructions or documentation"
that can be used to automatically manufacture defense articles, DDTC
concluded that the regulations place them within ITAR commodities
jurisdiction.

30.    Based on these considerations, its consultations with other State Department
offices and U.S. government agencies, its own expertise, and the text of the
AECA and ITAR, DDTC concluded that DD's CAD files fall within the
jurisdiction of the ITAR as technical data under Category I, subsection (i) of the
USML, relying on the definition of technical data in 22 C.F.R. § 120.10(a)(1).
DDTC concluded that other information, including a "read-me" file submitted by
DD for a CJ determination, did not fall within the jurisdiction of the ITAR.
Accordingly, DDTC's determination does not restrict DD from discussing
information and ideas about 3D printing, either domestically or internationally, as
long as such discussions do not include the export of technical data.

31.    Classification of DD's CAD files as within the jurisdiction of the ITAR is not an
outright prohibition on the export of these files. Rather, ITAR requires that DD
obtain a "license or other approval . . . pursuant to the ITAR prior to any export"
for these CAD files.

18

32.     Should DD submit an application for approval to export its CAD files, DDTC will

        review the proposed export, including its intended recipients and the type, form,

        and scope of the export.  DDTC will consider the application in accordance with

        the factors enumerated in 22 C.F.R. § 126.7, including whether such export is

        prohibited "by any statute of the United States." 22 C.F.R. § 126.7(a), whether

        such export would be "in furtherance of world peace, the national security or the

        foreign policy of the United States." 22 C.F.R. § 126.7(a)(1), whether "[a]n

        applicant, any party to the export or agreement, any source or manufacturer of the

        defense article or defense service or any person who has a significant interest in

        the transaction has been debarred, suspended, or otherwise is ineligible to receive

        an export license or other authorization from any agency of the U.S. government."

        *id.* § 126.7(a)(6).  In addition, there are numerous countries to which exports of

        some or all categories of defense articles are prohibited. *See, e.g.*, 22 C.F.R. §

        126.1.

33.     In my experience, the overwhelming majority of ITAR licensing applications are

        approved outright or approved with conditions intended to safeguard the defense

        article being exported from use in a way that would damage world peace or the

        national security or foreign policy interests of the United States.  Of course, any

        given licensing application will only be approved if the application satisfies the

        standards required under 22 C.F.R. § 126.7.

19

DOSWASHINGTONSUP00457

**Likely Effects of the Preliminary Injunction Sought by Plaintiffs**

34.  The entry of a preliminary injunction authorizing the posting of DD's CAD files

to the Internet without restriction would make those files available worldwide to

any Internet user, thereby permitting the export of those files to any foreign

person or foreign power with access to DD's website. Such an injunction would

deny DDTC the opportunity to consider, among other things, whether any specific

export of DD's CAD files would violate the law or would cause significant harm

to the national security or foreign policy interests of the United States.

35.  Absent a specific request for an export license, I have considered the likely

impacts of an unrestricted export of DD's CAD files to any interested person,

entity, or foreign power and concluded that the likely effect of a preliminary

injunction would be to cause significant harm to the national security and foreign

policy interests of the United States. Although a comprehensive enumeration of

the possible harms would be difficult, I can identify the following as among the

most concerning:

  a.  The "Liberator" firearm included in DD's CAD designs presents a specific

and unique risk to the national security and foreign policy interests of the

United States. The Liberator is a plastic firearm which can be produced in

a way as to be both fully operable and virtually undetectable by

conventional security measures such as metal detectors. police and

security services, could particularly, (though not uniquely) cause damage

U.S. foreign policy interests. If U.S.-origin CAD files were used to

20

manufacture an undetectable "Liberator" in a foreign country, and that

weapons was then used to commit an act of terrorism, piracy,

assassination, or other serious crime (e.g., to compromise aviation security

overseas), the act itself – or the interests of a foreign country in holding

the United States accountable – could cause serious and long-lasting harm

to the foreign policy and national security interests of the United States.[9]

b. The United States and other countries rely on international arms

embargoes, export controls, and other measures to restrict the availability

of defense articles sought by terrorist organizations. Making DD's CAD

files available through unrestricted access on the Internet would provide

any such organization with defense articles, including firearms, at its

convenience, subject only to its access to a 3D printer, an item that is

widely commercially available. Terrorist groups and other actors could

then potentially manufacture and use such weapons against the United

States or its allies.

c. Making DD's CAD files available through unrestricted access on the

Internet would likewise provide access to the firearms components and

replacement parts to armed insurgent groups, transnational organized

criminal organizations, and states subject to U.S. or UN arms embargoes.

---

[9] Undetectable firearms are unlawful in the United States pursuant to the Undetectable Firearms Act of 1988. *See* 18 U.S.C. § 922(p). Although the "Liberator" design includes insertion of a six-ounce piece of metal to make it detectable by metal detectors, this metal content can be removed without rendering it inoperable, thereby permitting it to be both operable and undetectable.

21

Access to weapons technology coupled with the uncontrolled and increasingly ubiquitous means of production (i.e., 3D printers or other similar manufacturing technology capable of executing CAD files) could contribute to armed conflict, terrorist or criminal acts, and seriously undermine global export control and non-proliferation regimes designed to prevent the dangerous and destabilizing spread and accumulation of weapons and related technologies. U.S leadership in these areas also would suffer, contributing overall to a more dangerous international environment.

d. Many countries, including important U.S. allies, have more restrictive firearms laws than the United States and have identified firearms CAD files for 3D printers as a threat to domestic firearms laws. For example, both the United Kingdom and Japan have arrested individuals for manufacturing or attempting to use firearms CAD files and 3D printers to manufacture firearms. *See, e.g.*, http://www.bbc.com/news/technology-27322947, accessed, June 6, 2015. Unrestricted exports from the United States of munitions or technical data, such as DD's CAD files, which could be used to automatically manufacture a firearm or other defense article, would undercut the domestic laws of these nations, increase the risk of domestic violence in those countries, and thereby damage U.S. foreign relations with those countries and foreign policy interests.

22

DOSWASHINGTONSUP00460

36.     In my judgment, the entry of a preliminary injunction in this matter would
        increase the risk of all of the foregoing harms. Indeed, such an injunction could
        reasonably be expected to bring attention to DD's CAD files, making awareness
        of their capabilities and accessibility known more widely to individuals, entities,
        and foreign powers that would make use of DD's CAD files to the detriment of
        U.S. foreign policy and national security interests.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 10, 2015.

Lisa V. Aguirre

23

# EXHIBIT

# 1

DOSWASHINGTONSUP00462

# the guardian

# 3D-printable guns are just the start, says Cody Wilson

The inventor of 'The Liberator' plastic firearm believes in an open future and the 'complete explosion' of all gun law

**Alex Rayner**

Monday 6 May 2013 11.56 EDT

Cody Wilson is a polite, 25-year-old law student at the University of Texas in Austin, with dark, close-cropped hair and a forward, affable charm. This week he plans to release the blueprint for a gun that can be downloaded from the internet and produced using a 3D printer.

He and his friends have spent almost a year developing the Liberator, a "Wiki weapon" that can be assembled from components made on an $8,000 (£5,150) printer that they bought on eBay. Using files shared online, the machine creates the solid parts from layers of plastic.

Wilson's group, Defense Distributed, thinks everyone should have access to a gun and is working to make it possible through Defcad.org, a depository for weapons designs. It was set up in December after its files were removed from another site following the Sandy Hook elementary school shootings. In March, Wilson was issued a federal firearms licence, allowing him to make guns legally.

"I come from a typical middle class family, for the United States in the south: religious parents, conservative values, though we didn't own a lot of firearms," he says. "We had one shotgun that we never really used."

Despite buying a shotgun shortly after turning 21, Wilson says it was his studies, first as an English literature major, then as a law student, that started his interest in the politics of weapons ownership. "I read [19th-century French anarchist theorist Pierre-Joseph] Proudhon," he says, "I like Jean Baudrillard. I like their critiques of mass culture."

He admits that, given current technology, printing a gun is the least effective way of obtaining a firearm, and that it is easier to simply fashion a gun from the contents of any hardware store.

Yet he half hopes, half believes that soon, thanks to the convergence of file-sharing and 3D printing, there will come about "a complete explosion of all available gun laws. I think we should be allowed to own automatic weapons; we should have the right to own all the

DOSWASHINGTONSUP00463

terrible implements of war, as [American political philosopher] Tench Coxe said, and I think this principle probably applies globally."

A self-described child of the internet age, Wilson is an admirer of Julian Assange and Kim Dotcom. "I number myself among them, at least in spirit," he says. "I think the future is openness to the point of the eradication of government. The state shouldn't have a monopoly on violence; governments should live in fear of their citizenry."

His ambitions don't stop at firearms. Ultimately, he wants to turn Defcad into "the world's first unblockable open-source search engine for all 3D printable parts", a Pirate Bay-style archive not only for printable pistols, but for everything from prosthetic limbs to drugs and birth-control devices.

More features

# Topics

US gun control

DOSWASHINGTONSUP00464

# the**guardian**

# Shots fired from world's first 3D-printed handgun

Cody Wilson, 25, successfully tested plastic handgun built by his Texas firm Defense Distributed using an $8,000 3D printer

Adam Gabbatt in New York

Monday 6 May 2013 14.43 EDT

The world's first gun made almost entirely by a 3D plastic printer has been successfully fired in Texas.

The successful test of the plastic handgun, which was built by Defense Distributed using an $8,000 3D printer, came after a year of development. The company, which is run by 25-year-old Cody Wilson, now plans to publish the blueprints for the gun online.

Wilson and a companion successfully fired the gun for the first time in Austin, Texas, at the weekend, Forbes reported. A video published online shows the gun held in place by a metal stand, with yellow string attached to its trigger. By yanking on the string, the pair were able to pull the trigger from 20ft away, successfully discharging a .380 caliber bullet.

Defense Distributed's device is controversial because of the way it is made. Fifteen of its 16 pieces were constructed in a second-hand Stratasys Dimension SST 3D printer, Forbes said. The final piece, the firing pin, is a common nail available from any hardware store. The printer used ABS plastic to create the gun parts, which were then slotted together by Wilson. After Forbes's revelation, the BBC filmed a later test, in which Wilson successfully fired the gun by hand.

The Undetectable Firearms Act of 1988 makes it illegal to manufacture in the US any firearm that is not detectable by walk-through metal detectors. To combat this, Wilson inserted a 6oz piece of steel into the body of his gun, making it legal.

How long the law stays this way remains to be seen, however. On Sunday, New York senator Charles Schumer called for legislation to make building a gun with a 3D printer illegal, and said he and the New York congressman Steve Israel would introduce the Undetectable Firearms Modernisation Act, which would ban weapons like Wilson's.

Such an act would not be the first setback for Wilson, a law student at the University of Texas. An attempt to raise money for the 3D printed gun project through Indiegogo was thwarted when the crowdfunding website took his pitch offline, citing a breach of rules. After Wilson raised $20,000 through Bitcoin donations, he was hindered again when

DOSWASHINGTONSUP00465

Stratys seized back his printer.

Defense Distributed acquired a second-hand Stratys, however, and carried on experimenting. Wilson successfully made and tested parts of an AR-15 semi-automatic rifle - the weapon which has been used in a number of mass shootings in the US - before turning his attention to a plastic handgun.

More news

# Topics

US gun control
3D printing
3D

DOSWASHINGTONSUP00466

# EXHIBIT

# 2

DOSWASHINGTONSUP00467



United States Department of State

*Bureau of Political-Military Affairs*
*Office of Defense Trade Controls Compliance*
*Washington, D.C. 20522-0112*

MAY 08 2013

In reply refer to
DTCC Case: 13-0001444

Mr. Cody Wilson
Defense Distributed
711 W. 32nd Street, Apt. 115
Austin, TX  78705

Dear Mr. Wilson:

The Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance, Enforcement Division (DTCC/END) is responsible for compliance with and civil enforcement of the Arms Export Control Act (22 U.S.C. 2778) (AECA) and the AECA's implementing regulations, the International Traffic in Arms Regulations (22 C.F.R. Parts 120-130) (ITAR). The AECA and the ITAR impose certain requirements and restrictions on the transfer of, and access to, controlled defense articles and related technical data designated by the United States Munitions List (USML) (22 C.F.R. Part 121).

DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

Technical data regulated under the ITAR refers to information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles, including information in the form of blueprints, drawings, photographs, plans, instructions or documentation. For a complete definition of technical data, see § 120.10 of the ITAR. Pursuant to § 127.1 of the ITAR,

- 2 -

it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR.

The Department believes Defense Distributed may not have established the proper jurisdiction of the subject technical data. To resolve this matter officially, we request that Defense Distributed submit Commodity Jurisdiction (CJ) determination requests for the following selection of data files available on DEFCAD.org, and any other technical data for which Defense Distributed is unable to determine proper jurisdiction:

1. Defense Distributed Liberator pistol
2. .22 electric
3. 125mm BK-14M high-explosive anti-tank warhead
4. 5.56/.223 muzzle brake
5. Springfield XD-40 tactical slide assembly
6. Sound Moderator – slip on
7. "The Dirty Diane" 1/2-28 to 3/4-16 STP S3600 oil filter silencer adapter
8. 12 gauge to .22 CB sub-caliber insert
9. Voltlock electronic black powder system
10. VZ-58 front sight.

DTCC/END requests that Defense Distributed submit its CJ requests within three weeks of receipt of this letter and notify this office of the final CJ determinations. All CJ requests must be submitted electronically through an online application using the DS-4076 Commodity Jurisdiction Request Form. The form, guidance for submitting CJ requests, and other relevant information such as a copy of the ITAR can be found on DDTC's website at http://www.pmddtc.state.gov.

Until the Department provides Defense Distributed with final CJ determinations, Defense Distributed should treat the above technical data as ITAR-controlled. This means that all such data should be removed from public access immediately. Defense Distributed should also review the remainder of the data made public on its website to

- 3 -

determine whether any additional data may be similarly controlled and proceed according to ITAR requirements.

Additionally, DTCC/END requests information about the procedures Defense Distributed follows to determine the classification of its technical data, to include the aforementioned technical data files. We ask that you provide your procedures for determining proper jurisdiction of technical data within 30 days of the date of this letter to Ms. Bridget Van Buren, Compliance Specialist, Enforcement Division, at the address below:

> Office of Defense Trade Controls Compliance
> PM/DTCC, SA-1, Room L132
> 2401 E Street, NW
> Washington, DC  20522
> Phone:  202-663-3323.

We appreciate your full cooperation in this matter.  Please note our reference number in any future correspondence.

Sincerely,

Glenn E. Smith
Chief, Enforcement Division

# EXHIBIT

# 3

DOSWASHINGTONSUP00471

# WILLIAMS MULLEN

Jahna M. Hartwig
Direct Dial: 202.293-8145
jhartwig@williamsmullen.com

June 21, 2013

Ms. Sarah Heidema
U.S. Department of State
Directorate of Defense Trade Controls
PM/DDTC, SA-1, Room 1200
2401 E Street, NW
Washington, DC 20037

Subject:    Commodity Jurisdiction Requests for Data Files Posted by Defense Distributed

Enclosures:   (1) Printouts of Drawings from Files Posted at DEFCAD.org
              (2) Wikipedia Page for 125mm BK-14M HEAT
              (3) Thingiverse Page for Sound Moderator
              (4) Thingiverse Page for VZ-58 Front Sight
              (5) Examples of Solvent Trap Adapters
              (6) Examples of CAD Files for .22 Pistols
              (7) Examples of CAD Files for Muzzle Brakes
              (8) Examples of CAD Files for Slide Assemblies
              (9) Examples of CAD Files for Voltlock System

Dear Ms. Heidema:

    Defense Distributed has been requested by DTCC/END to submit requests for commodity jurisdiction determinations in connection with Case No. 13-0001444 for ten sets of data files posted to DEFCAD.org. As demonstrated below, the files are primarily Computer Aided Design (CAD) data files and should be considered public domain information that is excluded from the ITAR pursuant to Section 120.11. Defense Distributed therefore respectfully requests a determination that these files are not subject to the ITAR.

## COMMODITY DESCRIPTIONS

    Each of these Commodity Jurisdiction requests relates to data files, almost all of which are essentially blueprints that can be read by CAD software. A description of each file or set of files is set out below. The files are in one of the following formats:

          • STL (STereoLithography or Standard Tessellation Language) is a file format native to the stereolithography CAD software and can be used with some 3D printers. "Stereolithography" is a means of creating physical 3D models of objects using resin or carefully cut and joined pieces of paper. STL files describe only

the surface geometry of a three dimensional object without any representation of color, texture or other common CAD model attributes.
- The IGS (Initial Graphics Exchange Specification) file format is the standard format for transferring three-dimensional models between CAD programs. IGS files can store wireframe models, surface or solid object representations, circuit diagrams, and other objects.
- SLDPRT is the proprietary image file format associated with the SolidWorks brand CAD software. SLDPRT files contain three-dimensional images of one specific part of a product.
- SKP is the CAD drawing format for Google Sketchup, which is a quick, entry-level 3D drawing program.

There are also a small number of Word (.DOC), text (.TXT) or image (.JPG or .BMP) files. A printout of each file is attached to the relevant DS-4076.

As explained further below, each of these files either was previously placed in the public domain or contains only public domain information.

### 1. Liberator Pistol Data Files

The files for the Liberator Pistol include sixteen STL files for the various parts and components of the pistol, two "read me" text files that explain how to lawfully assemble the pistol, a diagram of a pistol, and a permissive software license. If printed on a 3D printer, the parts could be assembled into a single shot .380 caliber firearm.

### 2. .22 Electric Data Files

The files for the .22 Electric are two stereolithography (STL) CAD files for models of a barrel and grip for a .22 caliber pistol. If printed, the barrel would be a plastic cylinder with a .22 mm bore and the grip would be a plastic piece with two 5mm diameter holes. If those pieces were printed in plastic and used with an electronic system and firing mechanism, the barrel would be expected to fail upon firing.

### 3. 125 mm BK-14M High Explosive Anti-Tank Warhead Model Data File

The file is a STL CAD file for a model of a BK-14M high explosive anti-tank warhead without fins. The model, if printed on a 3D printer, would be a solid piece of plastic in the shape of the warhead, but would not be capable of functioning as a warhead.

### 4. 5.56/.223 Muzzle Brake Data Files

The data files are three different CAD file formats (.IGS. .SLDPRT, and .STL) for a model of a 5.56/.223 muzzle brake. If printed on a 3D printer, the model would be a plastic piece in the shape of the muzzle brake, but would be expected to fail if used with a weapon.

### 5. Springfield XD-40 Tactical Slide Assembly Data Files

The files are nineteen Computer Aided Design (CAD) data files in the SolidWorks .SLDPRT file format for models of components of a pistol slide for the Springfield XD-40. The

components, if printed on a 3D printer, would be plastic pieces in the shape of the components of the slide assembly, but would be expected to fail if used with a weapon.

### 6. Sound Moderator – Slip On File

The file is a stereolithography CAD file for a model of a slip-on sound moderator for an air gun. The model, if printed on a 3D printer, would work with an air gun, but would likely melt if used with a firearm.

### 7. "The Dirty Diane" ½-28 to ¾-16 STP S3600 Oil Filter Silencer Adapter Files

The file is a CAD data file in the SolidWorks .SLDPRT file format for a model of an oil filter silencer adapter that is typically produced in stainless steel. If printed on a 3D printer, this item could be used as a solvent trap adapter, which is used to catch solvents that are used in the process of cleaning a gun. While a metal solvent trap adapter could be used as a silencer, a plastic adapter would likely melt if used with a weapon as a silencer.

### 8. 12 Gauge to .22 CB Sub-Caliber Insert Files

The files are a SKP CAD file for a model of a sub-caliber insert, two renderings of the sub-caliber insert, and a "read me" text file providing information about the National Firearms Act and the Undetectable Firearms Act. This item, if printed on a 3D printer, would be a plastic cylinder with a .22 bore, and would be expected to fail if used with a weapon.

### 9. Voltlock Electronic Black Powder System Files

The files are twelve CAD files for models of cylinders of various bores with a touch hole. Eleven of the files are in the STL file format and one is in the IGS format. If those pieces were printed on a 3D printer and used with an electronic ignition, the barrel would be expected to fail.

### 10. VZ-58 Front Sight Files

The files are a SolidWorks CAD file in the .SLDPRT file format and a rendering of a model of a sight for a VZ-58 rifle. If printed on a 3D printer and used with a weapon, the sight would be expected to fail.

## DATA ORIGIN

With the exception of item 1 (Liberator Pistol Data Files), each of these files was provided to Defense Distributed by the creator of the files identified in the DS4076. In addition, as explained below, many of these files were originally posted to www.thingiverse.com or other internet sites, and were freely available to any person with access to the internet.

The Liberator Pistol CAD files were developed by Defense Distributed. The Liberator pistol was designed as a combination of already extant and working files and concepts. The pistol frame, trigger housing, and grip specifications were all taken directly from an AR-15 lower receiver file that is in the public domain. The spring file is taken from a toy car file available on Thingiverse. The hammer relies on striking a common roofing nail, and the barrel is a cylinder bored for .380. The gun functions because of the properties of the .380 cartridge – the brass

Defense Distributed CJ Requests
June 21, 2013
Page 4

casing itself is relied on to act as a breech. The printed and assembled gun is a simple improvised weapon, not as complex as many of the improvised weapons of the 20th century, those available in Army manuals, etc. All of the technologies used to create the Liberator data files are widely available in the public domain.

## IDENTICAL & SIMILAR FILES

The Liberator Pistol data files are for an improvised firearm that is similar to and based on numerous items that are available on the internet as well as in various books. The Library of Congress online catalog lists numerous books on gunsmithing, including

- Clyde Baker, Modern gunsmithing; a manual of firearms design, construction, and remodeling for amateurs & professionals (1959)
- John E. Traister, Clyde Baker's Modern gunsmithing : a revision of the classic (1981)
- Frank de Haas, Mr. Single Shot's gunsmithing idea book (1983)
- Roy F. Dunlop, Gunsmithing (1996),
- Franklin Fry, Gunsmithing fundamentals : a guide for professional results (1988),
- James Virgil Howe, The modern gunsmith : a guide for the amateur and professional gunsmith in the design and construction of firearms, with practical suggestions for all who like guns (1982),
- Gérard Métral, A do-it-yourself submachine gun: it's homemade, 9mm, lightweight, durable, and it'll never be on any import ban lists! (1995),
- Jack Mitchell, The Gun digest book of pistolsmithing (1980),
- J. Parrish Stelle, The gunsmith's manual; a complete handbook for the American gunsmith (1883), and
- Patrick Sweeney, Gunsmithing: pistols & revolvers (2009),

among many others. Examples of online sources include:

- http://www.weaponscombat.com/zip-pipe-and-pen-guns
- http://www.infinitearms.com/images2/v/manuals/Misc+Gun+Plans
- http://thehomegunsmith.com
- http://www.scribd.com/doc/24445441/Pen-Gun-Mk1-Blueprint
- https://www.google.com/search?q=zip+gun+blueprints&rlz=1C1SKPM_enUS43 6US489&source=lnms&tbm=isch&sa=X&ei=9t- oUZybJILm8wSx0YHoBg&ved=0CAoQ_AUoAQ&biw=1600&bih=837
- http://ebookbrowse.com/gu/guns-homemade

Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun.

A drawing of the 125 BK-14M HEAT (Item 3), including measurements, is currently available on Wikipedia at http://en.wikipedia.org/wiki/File:125mm_BK-14m_HEAT.JPG.

Defense Distributed CJ Requests
June 21, 2013
Page 5

The Sound Moderator CAD file (Item 6) was published on Thingiverse on March 3, 2011 and is still available on that site at http://www.thingiverse.com/thing:6808. The VZ-58 Front Sight (Item 10) was also published on Grabcad on December 14, 2012 and is still available on that site at http://grabcad.com/library/front-sight-for-vz-dot-58-rifle.

The Oil Filter Silencer Adapter is identical to Solvent Trap Adapters, which are produced by numerous manufacturers and available as commercial products on many websites, including amazon.com. (see http://www.amazon.com/s/ref=nb_sb_noss_1?url=search-alias%3Dautomotive&field-keywords=solvent+trap+adapter&rh=n%3A15684181%2Ck%3Asolvent+trap+adapter.) These items appear to be commercial products that would be subject to the EAR. As such, any related technologies or technical data would also be subject to the EAR.

Examples of CAD files similar to the .22 Electric Pistol (Item 2), Muzzle Brake (Item 4), Slide Assembly (Item 5), and Voltlock Electronic Black Powder System (Item 9) that are currently available on the internet are attached to the relevant DS4076.

As demonstrated above, all of the technical information included in the data files posted to DEFCAD.org was previously available in the public domain. As such, this information is excluded from the definition of "technical data" by 22 C.F.R. § 120.10(a)(5). For these reasons, Defense Distributed respectfully requests that the Department determine that the subject data files posted to DEFCAD.org are not subject to the ITAR.

This submission contains Defense Distributed confidential business information. We respectfully request that the submission be kept confidential. If you need additional information regarding this submission, please contact me at 202-293-8145 or jhartwig@williamsmullen.com.

Sincerely,

Jahna M. Hartwig

# EXHIBIT

# 4

DOSWASHINGTONSUP00477

**MATTHEW A. GOLDSTEIN, PLLC**
1012 14TH STREET, NW, SUITE 620
WASHINGTON DC 20005

**VIA ELECTRONIC FILING**

January 2, 2015

PM/DDTC, SA-1, 12th Floor
Office of Defense Trade Controls
Bureau of Political Military Affairs
U.S. Department of State
Washington, D.C. 20522-0012

**SUBJECT:** **Commodity Jurisdiction Request for Ghost Gunner Machine, Plastic Mounting Jig, User Instructions, and Software** (Defense Distributed, Inc., PM/DDTC Code M-34702)

Dear Sir or Madam:

Pursuant to Section 120.4 of the International Traffic in Arms Regulations ("ITAR") (22 C.F.R. Sections 120-130), Defense Distributed requests a commodity jurisdiction determination from the Directorate of Defense Trade Controls ("DDTC") on the Ghost Gunner machine (the "Ghost Gunner"), its plastic mounting jig, user instructions, and software for production, operation, and use of the Ghost Gunner.

The Ghost Gunner is an approximately one-foot-cubed black box that uses a drill bit mounted on a head that moves in three dimensions to automatically carve digitally-modeled shapes into polymer, wood or aluminum. It functions as a 3-axis computer-numerically-controlled ("CNC") press that can be used to manufacture parts to firearms controlled under U.S. Munitions List ("USML") Category I. It can also be used to manufacture items that are not controlled under the USML. The machine was designed, developed, and manufactured by Defense Distributed to automatically manufacture publicly available designs with nearly zero user interaction.

As discussed below, the Department of Defense recommended that Defense Distributed submit this commodity jurisdiction request.

Export jurisdiction over the Ghost Gunner, Jig, software, and instructions is uncertain because, although the Department of Commerce Export Administration Regulations ("EAR") maintain a control listing for jigs, fixtures, and other metal-working items "exclusively designed for use in the manufacture of firearms" under Commerce Control List ("CCL") Export Control Number ("ECCN") 2B018.n, there is no corresponding carve-out for these items and related software and technical information otherwise controlled by USML Category I generally; and Category I(i) controls technical data and defense services directly related to firearms, with technical data directly related to the manufacture or production of firearms designated as Significant Military Equipment.

Please note that a letter from Defense Distributed authorizing my law firm to file this request was uploaded with this DS-4076 submission. Please direct any questions and all correspondence related to this request to my office. Communications to me at matthew@goldsteinpllc.com are preferred.

www.GoldsteinPLLC.com

DOSWASHINGTONSUP00478

Case 2:20-cv-00111-RAJ   Document 152-1   Filed 09/29/20   Page 496 of 986
Case 2:15-cv-00372-RAJ   Document 32-1   Filed 09/29/20   Page 89 of 298

Commodity Jurisdiction Request
January 2, 2015
Page 2 of 9

## I.    BACKGROUND

### A.    Defense Distributed

Defense Distributed is a Texas corporation, registered with the Department of State under PM/DDTC Code M-34702. The company has developed technical information that can be used to produce, manufacture, and assemble various parts components, accessories, and attachments to firearms controlled under USML Category I. This includes information for the design and production of the Ghost Gunner, software necessary to operate Ghost Gunner, and code that allows production of certain items by the Ghost Gunner.[1]

Following notification from DDTC in May 8, 2013, that the agency requires U.S. Government prior approval before publications of otherwise ITAR-controlled technical data into the public domain (Attachment 1), Defense Distributed has submitted requests for U.S. Government clearance of technical data to the Department of Defense Office of Prepublication and Security Review ("DOPSR").[2] On October 1, 2014, DOPSR returned a Defense Distributed request for clearance of technical information on the Ghost Gunner for public release, stating that commodity jurisdiction over the item was uncertain and recommending that Defense Distributed submit a commodity jurisdiction request. See Attachment 2.

### B.    The Ghost Gunner

Existing CNC machines are expensive or too inaccurate to manufacture firearms for the casual user. Defense Distributed developed the Ghost Gunner to address this problem by miniaturizing the build envelope to just large enough to mill common firearm receivers, which in turn improves rigidity, reduces material cost and simultaneously relaxes certain design limits, allowing Defense Distributed to sell an inexpensive machine with more than enough accuracy to manufacture firearms.

The first design tested on the Ghost Gunner was for an AR-15 lower receiver and the Ghost Gunner was able to automatically find, align, and mill a so-called "80%" lower receiver, which was not a firearm prior to milling. The Ghost Gunner has since undergone several design revisions to reduce machine chatter, backlash, and jitter, all with the goal of keeping total design cost low.

Photographs of Ghost Gunner are provided at Attachment 3 and rendered images of the machine with the plastic jig are provided at Attachment 4.

---

[1] This commodity jurisdiction request seeks a determination of the code necessary to operate Ghost Gunner. It does not seek a determination on the various project files specific to production of certain items by the Ghost Gunner.

[2] In complying with DDTC prepublication review requirements on publication of technical information into the public domain, Defense Distributed does not intent to, nor should it be considered to, waive any defense, claim or right under law.

DOSWASHINGTONSUP00479

A schematic drawing for the Ghost Gunner is provided at Attachment 5.

Ghost Gunner form, fit, function, and performance characteristics include the following:

- It uses a compact, powder coated A36 steel frame and thick stainless T-slot rail, with preloaded ball bearings for maximum rigidity. Linear motion is achieved with low-backlash direct-drive ball screws mounted in-line with the cutting surface, thus preventing torsional gantry chatter while machining.

- It incorporates an electronic probe that automatically detects when the machine comes into contact with the work piece, allowing automatic part discovery and alignment. Ghost Gunner requires conductive parts if auto-discovery and alignment are used.

- It can manually machine nonconductive materials, but this requires manual calibration of a part to the machine - following a few simple instructions - as is required with existing CNC machines.

- Its moving parts are entirely sealed from chip debris. All bearings are sealed and contain wipers to prevent foreign contaminate entry. The rails are stainless steel and are factory lubricated, but do require periodic wiping to prolong life. End Mills dull over time and are considered a consumable.

- To contain aluminum chips, it includes a chip collection tray and all moving components are fully enclosed.

- It is capable of manufacturing deep pockets due to its horizontal gantry, which allows gravity to pull chips away from the cutting surface before they can build up and dull the end mill, as is the case on traditional CNC designs.

- It uses industry standard ER-11 collets, and ships with both 1/4" and 5/32" collets.

- It uses a standard IEC power cord and is compatible with any 110/220V circuit. No external power brick is used; the machine is entirely self-contained.

- It has two ports: Power (IEC standard) and USB (Type 'B').

- Its machinable dimensions are 140 x 75 x 60mm (~5.50 x 2.95 x 2.35")

- Its maximum part dimensions are 230 x 90 x 100mm (~9.05 x 3.50 x 3.90")

- Its overall footprint is 330 x 280mm (~13 x 11")

- Its weight is 20kg (~45 pounds)

www.GoldsteinPLLC.com

- Its Spindle Speed is 10,000+ RPM (Final Value TBD)

- Its software requirements are Windows 7 or higher. Mac version TBD

As noted above, Ghost Gunner is capable of manufacturing more than just firearm receivers. With Defense Distributed's open source Physibles Development SDK ("pDev"), designers can distribute files via the company's '.dd' file format, which contains all installation and assembly instructions, any required jig files to hold a part in place (that users can print with a 3D printer), and all machine definitions and code to physically manufacture a particular design. To a casual user, the .dd file is a one-stop solution to manufacturing any aluminum physible that the public can design to fit into the build envelope. Defense Distributed will be developing in and supporting this format.

The .dd file format is itself open source and not constrained to the Ghost Gunner or Defense Distributed; any user can define any existing machine's specific parameters via the machine parameters list. A single file can contain specific code and installation instructions for any number of machines. A user with both a Ghost Gunner and a Tormach P1100 could manufacture a particular .dd file on either machine and manufacture the same physible with zero additional user knowledge, as only the instructions required for a particular machine are revealed to the end user. The .dd file format is a CNC response to 3D printing's universal .stl file format. However, Ghost Gunner will also accept TinyG code from any CAM program.

In operation, users provide the parts for milling. They can then simply plug their computer into the Ghost Gunner, install the Ghost Gunner software, and download any compatible .dd design file. 3D printable jigs are used to hold each part in place as each milling step is performed. For example, milling an eighty percent AR-15 lower receiver requires two jig pieces to secure the lower in place while the trigger pocket is milled, and then two more jig pieces are installed to drill the trigger pinholes. As most eighty percent firearms require deep pocket milling, Ghost Gunner's mounting table is parallel to the end mill shaft. This orientation maximizes 3D printed jig strength, minimizes jig complexity, and mechanically aligns the part to the machine upon insertion into the Maker Slide-patterned, Open Source T Slot stainless rails.

Defense Distributed expects its typical order fulfillment will contain the fully assembled Ghost Gunner CNC, plastic mounting jig designed to secure 80% AR-15 receivers, operating software and instructions. Defense Distributed also intends to place instructions and computer code needed to build and use Ghost Gunner into the public domain as Open Source technology.

Block 13 ("Sales information) is not provided with this request because the Ghost Gunner is still in development as Defense Distributed awaits arrival of various production pieces and continues to make any required changes to the product. As such, the company has not yet delivered any machines (i.e., no completed sales). However, the company has accepted 469 pre-orders and 413 advance deposits from prospective purchasers. Each of these orders, except for one, are intended for domestic sale. In addition, consistent with U.S. law, final sales will carry conditions that limit purchases to private use (i.e., not for commercial or military use).

### C. User Instructions and Operating Software for the Ghost Gunner

The current draft User Instructions for the Ghost Gunner accompanies this commodity jurisdiction request at Attachment 6. It contains information on how to attach a "80%" lower receiver to Ghost Gunner, such that Ghost Gunner can mill and drill all required holes to transform the lower receiver into a firearm. Ghost Gunner presents numerous User Instructions, User Graphics, and User Selections to the operator. Ghost Gunner performs work via Calibration Code and Milling Code. Ghost Gunner also assists the user in creating 3D printable Jigs, if needed.

The software necessary to produce and operate the Ghost Gunner includes AutoDesk Inventor and a simple executable application that can interpret CNC part files and TinyG code. Additional information detailing the purpose, function, and capability of the software, as requested by DDTC's DS-4076 Commodity Jurisdiction (CJ) Guidance for Software, accompanies this commodity jurisdiction request at Attachment 7.

## II. COMMODITY JURISDICTION STANDARD

The standard applicable to Department of State and other agency considerations of commodity jurisdiction is set forth at ITAR Section 120.3. ITAR Subsection 120.3(a) extends Department of State jurisdiction to any item that meets the criteria of a defense article described on the USML or that provides equivalent performance capabilities; and ITAR Section 120.3(b) provides that a specific article not presently described on the USML shall be determined in the future as a defense article if it provides a critical military or intelligence advantage.

### A. Relevant USML Control Listings

Subparagraph (h) to USML Category I controls components, parts, accessories, and attachments for firearms to .50 caliber inclusive. The Ghost Gunner does not meet the Category I(h) criteria because it is not a component or part to a firearm. Rather, it is a machine that can be used for the manufacture of such articles.

Subparagraph (i) to USML Category I controls technical data, to include "software" as defined at Section 120.45(f), and defense services directly related to the firearms and components, parts, accessories, and attachments for firearms to .50 caliber inclusive. Technical data directly related to the manufacture or production of firearms controlled in Category I is designated as Significant Military Equipment.

The USML does not contain a control listing that describes items used for the manufacture of firearms. Instead, that listing is contained on the EAR Commerce Control List ("CCL") entry for ECCN 2B018.n, which controls "Jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms. ECCN 2D018 controls software" for the "development", "production" or "use" of equipment controlled by 2B018; and ECCN 2E018, in turn, controls "Technology" for the "use" of equipment controlled by 2B018.

Case 2:20-cv-00011-FFA-D Document 10-21 Filed 09/29/20 Page 460 of 2986
Case 2:15-cv-00372-AP Document 35-1 Filed 09/29/20 Page 45 of 296

The scope of the CCL controls on firearms manufacturing equipment and technology is unclear because the EAR only controls items not described on the USML and Category I does not contain any carve-out from ITAR control for software or technology controlled under ECCNs 2D018 and 2E018. To the contrary, if literally applied, USML Category I(i) treats such technical information as Significant Military Equipment.

Because there is no specific carve-out in Category I or elsewhere in the USML for software or technology controlled by 2D018 and 2E018, it is very difficult to distinguish between technical data for the manufacture or production of firearms controlled in Category I and technology for the development, production, and use of equipment used to manufacture firearms controlled at 2D018 and 2E018. This is a primary concern of the present commodity jurisdiction request.

Nevertheless, EAR control is consistent with U.S. Implementation of Wassenaar Controls. Specifically, ECCNs 2B018, ECCN 2E018, and 2B018 are Wassenaar Arrangement-based controls, subject to the National Security reason for control and which correspond to Category 2 of the Wassenaar Arrangement List of Dual-Use Items. In fact, 2B018 is titled, "Equipment on the Wassenaar Arrangement Munitions List."

Although relevant text of the ITAR and EAR control listings lack clarity, it appears that the U.S. Government decided to implement export controls on firearms manufacturing equipment and associated technical information in the EAR when it first implemented the Wassenaar Arrangement controls for such items. Accordingly, Defense Distributed believes that the Ghost Gunner does not meet criteria of a defense article described on the USML and that it does not provide equivalent performance capabilities to an article described on the USML.

Defense Distributed further notes that the DDTC should consider amending USML Category I to provide an express carve-out for EAR items controlled under ECCNs 2B018.n, ECCN 2E018, and 2B018. Alternatively, if DDTC intends to control firearms manufacturing equipment under the USML, it should make this clear in the regulations. Towards this end, any determination on the instant request that imposes ITAR control should be widely disseminated and shared with the firearms manufacturing industry.

## B.   Ghost Gunner Does Not Provide a Critical Military or Intelligence Advantage.

As noted above, ITAR Section 120.3(b) provides that a specific article not presently described on the USML shall be determined in the future as a defense article if it provides a critical military or intelligence advantage.

The function and performance of the Ghost Gunner does not provide a critical military or intelligence advantage. Rather, it is essentially a jig press based on a simple design that is easily replicated by any skilled machinist. In fact, the Ghost Gunner can be produced by persons with no formal engineering background.

DOSWASHINGTONSUP00483

In addition, Ghost Gunner builds on technology readily available in the Open Source community, including the gshield 3 axis motion hardware (http://synthetos.myshopify.com/products/gshield-v5), the grbl g-code parser and motion controller (https://github.com/grbl/grbl), and the Arduino microcontroller (http://arduino.cc).

Further, instructions and/or electronic files for production of jig presses with similar form, fit, and function to the Ghost Gunner are publicly available for download at a variety of web addresses, to include the following:

http://aresarmor.com/store/Item/Polymer-80-Black
http://www.thingiverse.com/thing:160266
https://github.com/DefiantCad/defcad-repo/tree/master/Rifles/AR-
15_80_percent_lower_v5-shadowfall/AR-15_80_percent_Lower_Drill_Jig_v1-Shadowfall
http://www.advancedrifles.com/3d-printed-jig-version-2-0/
http://www.80percentarms.com/products/80-ar-15-easy-jig
http://www.sierranevadaarms.com/jig.pdf
http://www.rockethub.com/projects/24384-80-lower-receiver-ar15-ar10-rudius-1911

## III.   CONCLUSION

Considering the apparent intent of the U.S. Government in implementing relevant Wassenaar Arrangement controls in the EAR, Defense Distributed believes that the Ghost Gunner does not meet the criteria of an article described on the USML. In addition, the Ghost Gunner does not provide a critical military or intelligence advantage. Accordingly, Defense Distributed respectfully requests that the Department of State issue a commodity jurisdiction determination stating that the Ghost Gunner, its plastic mounting jig, operating software, and production and operation instructions do not meet the criteria of ITAR 120.3 and are subject to Department of Commerce jurisdiction under the EAR.

Defense Distributed authorizes the release for general publication of the information contained in Block 5 of the DS-4076 Form. However, other information in this request and documents submitted with Defense Distributed's DS-4076 Submission contain sensitive business information that is proprietary, confidential, and exempt from disclosure under the Freedom of Information Act, 5 U.S.C. Section 552, and is also protected under the Trade Secrets Act, 18 U.S.C. Section 1905. Accordingly, pursuant to ITAR Section 130.15, Defense Distributed requests that information in this submission other than that contained in Block 5 be withheld in the event of a request for its disclosure.

Commodity Jurisdiction Request
January 2, 2015
Page 8 of 9

Thank you for your prompt attention to this matter and please contact me at 202-550-0040 or at matthew@goldsteinpllc.com if any additional information is needed.

Yours truly,

Matthew A. Goldstein
Legal Counsel

COMPANY CERTIFICATION:

Cody Wilson, the Principal of Defense Distributed, certifies that he is the duly authorized representative of Defense Distributed; and that in such capacity, he certifies that he has carefully read the foregoing Commodity Jurisdiction request; and that the contents of the request are true and correct to the best of his knowledge, information and belief after reasonable inquiry into the matters discussed.

Signature                                             1/2/2015
                                                       Date

ATTACHMENTS TO LETTER OF EXPLANATION:

Attachment 1     May 8, 2013 DDTC Letter to Defense Distributed

Attachment 2     October 1, 2014 DOPSR Letter to Defense Distributed

Attachment 3     Photographs of Ghost Gunner Machine

Attachment 4     Rendered Images of Ghost Gunner Machine

Attachment 5     Ghost Gunner Schematics

Attachment 6     Ghost Gunner User Instructions

Attachment 7     Answers to DS-4076 Commodity Jurisdiction (CJ) Guidance for Software

www.GoldsteinPLLC.com

Scanned by CamScanner

**OTHER ATTACHMENTS INCLUDED WITH DS-4076 SUBMISSION:**

DD_DS4076.pdf

DD_Attorney_Authorization_Letter_Block_2-1.pdf

[Instant document] DD_Cover_Ltr_Block_6-1.pdf

DD_Certification_Block_19-1.pdf

DOSWASHINGTONSUP00486

# EXHIBIT

# 5

DOSWASHINGTONSUP00487



United States Department of State

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

Washington, D.C. 20522-0112

In Reply refer to

**APR 1 5 2015**

DDTC Case CJ 1083-14 (RE-ISSUE)

YOUR SUBMISSION DATED: January 2, 2015

COMMODITY JURISDICTION DETERMINATION FOR: **Ghost Gunner Machine, Plastic Mounting Jig, User Instructions, and Software**

The product described in your submission is a one cubic foot box that functions as a 3-axis, computer-numerically-controlled (CNC) press capable of automatically milling parts out of various materials through software designs.

A technical review of your commodity jurisdiction (CJ) request has been concluded by the requisite agencies of the United States Government. A split jurisdiction determination of this request has been determined, as follows:

> The Department of State has determined that the **Ghost Gunner, its plastic mounting jig, operating software, and production and operation instructions are not subject to the jurisdiction of the Department of State.** However, export may require authorization from the Department of Commerce (DOC). Please consult the DOC Office of Exporter Services at (202) 482-4811 to make a Classification Request (CCATS) and satisfy other applicable requirements prior to export.

> The Department of State has determined that the **project files, data files, or any form of technical data for producing a defense article, including an 80% AR-15 lower receiver, are subject to the jurisdiction of the Department of State in accordance with the International Traffic in Arms Regulations (ITAR) (22 CFR 120 through 130).** They are

Continued on Page Two

Cody R. Wilson
Defense Distributed, Inc.
1101 W 34th Street, #340
Austin, TX 78705
crw@defdist.org

Page Two

In Reply refer to
DDTC Case CJ 1083-14

designated as technical data under Category I(i) of the United
States Munitions List (USML). A license or other approval is
required pursuant to the ITAR prior to any export or temporary
import.

Should you not agree with this determination and have additional facts not
included in the original submission, you may submit a new CJ request. If you do
not agree with this determination and have no additional facts to present, you may
request that this determination be reviewed by the Deputy Assistant Secretary of
State for Defense Trade Controls.

Should you require further assistance on this matter, please contact Samuel
Harmon at (202) 663-2811 or HarmonSC@state.gov.

Sincerely,

C. Edward Peartree
Director
Office of Defense Trade Controls Policy

Cc: Matthew A. Goldstein
1012 14th Street, NW, Suite 620
Washington, DC 20005
matthew@goldsteinpllc.com

# EXHIBIT

# 6

DOSWASHINGTONSUP00490



United States Department of State

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

Washington, D.C. 20522-0112

In Reply refer to
DDTC Cases CJ 651-13 through 660-13

JUN 0 4 2015

YOUR SUBMISSION DATED: June 21, 2013

COMMODITY JURISDICTION DETERMINATIONS FOR: **Liberator Pistol Data Files, .22 Electric Data Files, 125 mm BK-14M High Explosive Anti-Tank Warhead Model Data File, 5.56/.223 Muzzle Brake Data Files, Springfield XD-40 Tactical Slide Assembly Data Files, Sound Moderator - Slip On Data File, "The Dirty Diane" Oil Filter Silencer Adapter Data File, 12 Gauge to .22 CB Sub-Caliber Insert Data Files, Voltlock Electronic Black Powder System Data Files, and VZ-58 Front Sight Data Files**

The data described in your submission are Computer Aided Design (CAD) data files that can be used in a 3D printer to produce physical models of the associated item.

A technical review of your commodity jurisdiction (CJ) request has been concluded by requisite agencies of the United States Government. The findings of that technical review are:

The Department of State has determined that the **125 mm BK-14M High Explosive Anti-Tank Warhead Model Data File, Sound Moderator - Slip On Data File, and "The Dirty Diane" Oil Filter Silencer Adapter Data File are not subject to the jurisdiction of the Department of State.** The Department of Commerce (DOC) advises that these items are classified as EAR99. Please consult the DOC Office of Exporter Services at (202) 482-4811 to satisfy applicable requirements prior to export.

The Department of State has determined that the **Voltlock Electronic Black Powder System Data Files are not subject to the jurisdiction of the**

Continued on Page Two

Cody R. Wilson
Defense Distributed
711 W. 32nd Street, Apt. 115
Austin, TX 78705
crw@defdist.org

DOSWASHINGTONSUP00491

Page Two

In Reply refer to
DDTC Cases CJ 651-13 through 660-13

**Department of State.** However, export may require authorization from the Department of Commerce (DOC). Please consult the DOC Office of Exporter Services at (202) 482-4811 to make a Classification Request (CCATS) and satisfy other applicable requirements prior to export.

The Department of State has determined that the **Liberator Pistol Data Files, .22 Electric Data Files, 5.56/.223 Muzzle Brake Data Files, Springfield XD-40 Tactical Slide Assembly Data Files, 12 Gauge to .22 CB Sub-Caliber Insert Data Files (except for "read me" text file), and VZ-58 Front Sight Data Files are subject to the jurisdiction of the Department of State in accordance with the International Traffic in Arms Regulations (ITAR) (22 CFR 120 through 130).** They are designated as technical data under Category I(i) of the United States Munitions List (USML) pursuant to §120.10 of the ITAR. A license or other approval is required pursuant to the ITAR prior to any export or temporary import.

Should you not concur with this determination and have additional facts not included in the original submission, you may submit a new CJ request. If you do not concur with this determination and have no additional facts to present, then you may request that this determination be reviewed by the Deputy Assistant Secretary of State for Defense Trade Controls.

Should you require further assistance on this matter, please contact Sam Harmon at (202) 663-2811 or HarmonSC@state.gov.

Sincerely,

C. Edward Peartree
Director
Office of Defense Trade Controls Policy

Cc: Matthew A. Goldstein
1012 14th Street, NW, Suite 620
Washington, DC 20005
matthew@goldsteinpllc.com

# EXHIBIT

# 7

DOSWASHINGTONSUP00493


hearing," which are conducted pursuant to the provisions of 5 U.S.C. 556 and 557. The CSA sets forth the criteria for scheduling a drug or other substance and for removing a drug or substance from the schedules of controlled substances. Such actions are exempt from review by the Office of Management and Budget (OMB) pursuant to section 3(d)(1) of Executive Order 12866 and the principles reaffirmed in Executive Order 13563.

### Executive Order 12988

This regulation meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988 Civil Justice Reform to eliminate drafting errors and ambiguity, minimize litigation, provide a clear legal standard for affected conduct, and promote simplification and burden reduction.

### Executive Order 13132

This rulemaking does not have federalism implications warranting the application of Executive Order 13132. The rule does not have substantial direct effects on the States, on the relationship between the Federal Government and the States, or the distribution of power and responsibilities among the various levels of government.

### Executive Order 13175

This rule does not have tribal implications warranting the application of Executive Order 13175. This rule does not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

### Regulatory Flexibility Act

The Administrator, in accordance with the Regulatory Flexibility Act (5 U.S.C. 601–612) (RFA), has reviewed this proposed rule and by approving it certifies that it will not have a significant economic impact on a substantial number of small entities. The purpose of this rule is to remove [123I]ioflupane from the list of schedules of the CSA. This action will remove regulatory controls and administrative, civil, and criminal sanctions applicable to controlled substances for handlers and proposed handlers of [123I]ioflupane. Accordingly, it has the potential for some economic impact in the form of cost savings.

If finalized, the proposed rule will affect all persons who would handle, or propose to handle, [123I]ioflupane. Due to the wide variety of unidentifiable and unquantifiable variables that potentially could influence the distribution and administration rates of new molecular entities, the DEA is unable to determine the number of entities and small entities which might handle [123I]ioflupane.

Although the DEA does not have a reliable basis to estimate the number of affected entities and quantify the economic impact of this proposed rule, a qualitative analysis indicates that, if finalized, this rule is likely to result in some cost savings for the healthcare industry. The affected entities will continue to meet existing Federal and/or state requirements applicable to those who handle radiopharmaceutical substances, including licensure, security, recordkeeping, and reporting requirements, which in many cases are more stringent than the DEA's requirements. However, the DEA estimates cost savings will be realized from the removal of the administrative, civil, and criminal sanctions for those entities handling or proposing to handle [123I]ioflupane, in the form of saved registration fees, and the elimination of additional physical security, recordkeeping, and reporting requirements.

Because of these facts, this rule will not result in a significant economic impact on a substantial number of small entities.

### Unfunded Mandates Reform Act of 1995

On the basis of information contained in the "Regulatory Flexibility Act" section above, the DEA has determined and certifies pursuant to the Unfunded Mandates Reform Act of 1995 (UMRA), 2 U.S.C. 1501 *et seq.*, that this action would not result in any federal mandate that may result "in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted for inflation) in any one year * * * ." Therefore, neither a Small Government Agency Plan nor any other action is required under provisions of UMRA.

### Paperwork Reduction Act

This action does not impose a new collection of information requirement under the Paperwork Reduction Act, 44 U.S.C. 3501–3521. This action would not impose recordkeeping or reporting requirements on State or local governments, individuals, businesses, or organizations. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

### List of Subjects in 21 CFR part 1308

Administrative practice and procedure, Drug traffic control, Reporting and recordkeeping requirements.

For the reasons set out above, 21 CFR part 1308 is proposed to be amended to read as follows:

### PART 1308—SCHEDULES OF CONTROLLED SUBSTANCES

■ 1. The authority citation for 21 CFR part 1308 continues to read as follows:

**Authority:** 21 U.S.C. 811, 812, 871(b), unless otherwise noted.

■ 2. In § 1308.12, revise paragraph (b)(4) to read as follows:

### § 1308.12  Schedule II.

\* \* \* \* \*

(b) \* \* \*

(4) Coca leaves (9040) and any salt, compound, derivative or preparation of coca leaves (including cocaine (9041) and ecgonine (9180) and their salts, isomers, derivatives and salts of isomers and derivatives), and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include:

(i) Decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine; or

(ii) [123I]ioflupane.

\* \* \* \* \*

Dated: May 6, 2015.

**Michele M. Leonhart,**

*Administrator.*

[FR Doc. 2015–13455 Filed 6–2–15; 8:45 am]

**BILLING CODE 4410–09–P**

---

### DEPARTMENT OF STATE

**22 CFR Parts 120, 123, 125, and 127**

**[Public Notice 9149]**

**RIN 1400–AD70**

**International Traffic in Arms: Revisions to Definitions of Defense Services, Technical Data, and Public Domain; Definition of Product of Fundamental Research; Electronic Transmission and Storage of Technical Data; and Related Definitions**

**AGENCY:** Department of State.

**ACTION:** Proposed rule.

---

**SUMMARY:** As part of the President's Export Control Reform (ECR) initiative, the Department of State proposes to amend the International Traffic in Arms

Regulations (ITAR) to update the definitions of "defense article," "defense services," "technical data," "public domain," "export," and "reexport or retransfer" in order to clarify the scope of activities and information that are covered within these definitions and harmonize the definitions with the Export Administration Regulations (EAR), to the extent appropriate. Additionally, the Department proposes to create definitions of "required," "technical data that arises during, or results from, fundamental research," "release," "retransfer," and "activities that are not exports, reexports, or retransfers" in order to clarify and support the interpretation of the revised definitions that are proposed in this rulemaking. The Department proposes to create new sections detailing the scope of licenses, unauthorized releases of information, and the "release" of secured information, and revises the sections on "exports" of "technical data" to U.S. persons abroad. Finally, the Department proposes to address the electronic transmission and storage of unclassified "technical data" via foreign communications infrastructure. This rulemaking proposes that the electronic transmission of unclassified "technical data" abroad is not an "export," provided that the data is sufficiently secured to prevent access by foreign persons. Additionally, this proposed rule would allow for the electronic storage of unclassified "technical data" abroad, provided that the data is secured to prevent access by parties unauthorized to access such data. The revisions contained in this proposed rule are part of the Department of State's retrospective plan under Executive Order 13563 first submitted on August 17, 2011.

**DATES:** The Department of State will accept comments on this proposed rule until August 3, 2015.

**ADDRESSES:** Interested parties may submit comments within 60 days of the date of publication by one of the following methods:

• *Email: DDTCPublicComments@ state.gov* with the subject line, "ITAR Amendment—Revisions to Definitions; Data Transmission and Storage."

• *Internet:* At *www.regulations.gov,* search for this notice by using this rule's RIN (1400–AD70).

Comments received after that date may be considered, but consideration cannot be assured. Those submitting comments should not include any personally identifying information they do not desire to be made public or information for which a claim of

confidentiality is asserted because those comments and/or transmittal emails will be made available for public inspection and copying after the close of the comment period via the Directorate of Defense Trade Controls Web site at *www.pmddtc.state.gov.* Parties who wish to comment anonymously may do so by submitting their comments via *www.regulations.gov,* leaving the fields that would identify the commenter blank and including no identifying information in the comment itself. Comments submitted via *www.regulations.gov* are immediately available for public inspection.

**FOR FURTHER INFORMATION CONTACT:** Mr. C. Edward Peartree, Director, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663–1282; email *DDTCResponseTeam@ state.gov.* ATTN: ITAR Amendment— Revisions to Definitions; Data Transmission and Storage. The Department of State's full retrospective plan can be accessed at *http:// www.state.gov/documents/organization/ 181028.pdf.*

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130). The items subject to the jurisdiction of the ITAR, *i.e.,* "defense articles" and "defense services," are identified on the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations ("EAR," 15 CFR parts 730 through 774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR impose license requirements on exports and reexports. Items not subject to the ITAR or to the exclusive licensing jurisdiction of any other set of regulations are subject to the EAR.

BIS is concurrently publishing comparable proposed amendments (BIS companion rule) to the definitions of "technology," "required," "peculiarly responsible," "published," results of "fundamental research," "export," "reexport," "release," and "transfer (in-country)" in the EAR. A side-by-side comparison on the regulatory text proposed by both Departments is available on both agencies' Web sites: *www.pmddtc.state.gov* and *www.bis.doc.gov.*

### 1. Revised Definition of Defense Article

The Department proposes to revise the definition of "defense article" to clarify the scope of the definition. The current text of § 120.6 is made into a new paragraph (a), into which software is added to the list of things that are a "defense article" because software is being removed from the definition of "technical data." This is not a substantive change.

A new § 120.6(b) is added to list those items that the Department has determined should not be a "defense article," even though they would otherwise meet the definition of "defense article." All the items described were formerly excluded from the definition of "technical data" in § 120.10. These items are declared to be not subject to the ITAR to parallel the EAR concept of "not subject to the EAR" as part of the effort to harmonize the ITAR and the EAR. This does not constitute a change in policy regarding these items or the scope of items that are defense articles.

### 2. Revised Definition of Technical Data

The Department proposes to revise the definition of "technical data" in ITAR § 120.10 in order to update and clarify the scope of information that may be captured within the definition. Paragraph (a)(1) of the revised definition defines "technical data" as information "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of a "defense article," which harmonizes with the definition of "technology" in the EAR and the Wassenaar Arrangement. This is not a change in the scope of the definition, and additional words describing activities that were in the prior definition are included in parentheticals to assist exporters.

Paragraph (a)(1) also sets forth a broader range of examples of formats that "technical data" may take, such as diagrams, models, formulae, tables, engineering designs and specifications, computer-aided design files, manuals or documentation, or electronic media, that may constitute "technical data." Additionally, the revised definition includes certain conforming changes intended to reflect the revised and newly added defined terms proposed elsewhere in this rule.

The proposed revised definition also includes a note clarifying that the modification of the design of an existing item creates a new item and that the "technical data" for the modification is "technical data" for the new item. Paragraph (a)(2) of the revised definition defines "technical data" as

also including information that is enumerated on the USML. This will be "technical data" that is positively described, as opposed to "technical data" described in the standard catch-all "technical data" control for all "technical data" directly related to a "defense article" described in the relevant category. The Department intends to enumerate certain controlled "technical data" as it continues to move the USML toward a more positive control list.

Paragraph (a)(3) of the revised definition defines "technical data" as also including classified information that is for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of a "defense article" or a 600 series item subject to the EAR. Paragraph (a)(5) of the revised definition defines "technical data" as also including information to access secured "technical data" in clear text, such as decryption keys, passwords, or network access codes. In support of the latter change, the Department also proposes to add a new provision to the list of violations in § 127.1(b)(4) to state that any disclosure of these decryption keys or passwords that results in the unauthorized disclosure of the "technical data" or software secured by the encryption key or password is a violation and will constitute a violation to the same extent as the "export" of the secured information. For example, the "release" of a decryption key may result in the unauthorized disclosure of multiple files containing "technical data" hosted abroad and could therefore constitute a violation of the ITAR for each piece of "technical data" on that server.

Paragraph (b) of the revised definition of "technical data" excludes non-proprietary general system descriptions, information on basic function or purpose of an item, and telemetry data as defined in Note 3 to USML Category XV(f) (§ 121.1). Items formerly identified in this paragraph, principles taught in schools and "public domain" information, have been moved to the new ITAR § 120.6(b).

The proposed definition removes software from the definition of "technical data." Specific and catch-all controls on software will be added elsewhere throughout the ITAR as warranted, as it will now be defined as a separate type of "defense article."

## 3. Proposed Definition of Required

The Department proposes a definition of "required" in a new § 120.46. "Required" is used in the definition of "technical data" and has, to this point,

been an undefined term in the ITAR. The word is also used in the controls on technology in both the EAR and the Wassenaar Arrangement, as a defined term, which the Department is now proposing to adopt:

. . . [O]nly that portion of [technical data] that is peculiarly responsible for achieving or exceeding the controlled performance levels, characteristics, or functions. Such required [technical data] may be shared by different products.

The proposed definition of "required" contains three notes. These notes explain how the definition is to be applied.

Note 1 provides that the definition explicitly includes information for meeting not only controlled performance levels, but also characteristics and functions. All items described on the USML are identified by a characteristic or function. Additionally, some descriptions include a performance level. As an example, USML Category VIII(a)(1) controls aircraft that are "bombers" and contains no performance level. The characteristic of the aircraft that is controlled is that it is a bomber, and therefore, any "technical data" peculiar to making an aircraft a bomber is "required."

Note 2 states that, with the exception of "technical data" specifically enumerated on the USML, the jurisdictional status of unclassified "technical data" is the same as that of the commodity to which it is directly related. Specifically, it explains that "technical data" for a part or component of a "defense article" is directly related to that part or component, and if the part or component is subject to the EAR, so is the "technical data."

Note 3 establishes a test for determining if information is peculiarly responsible for meeting or achieving the controlled performance levels, characteristics or functions of a "defense article." It uses the same catch-and-release concept that the Department implemented in the definition of "specially designed." It has a similarly broad catch of all information used in or for use in the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of a "defense article." It has four releases that mirror the "specially designed" releases, and one reserved paragraph for information that the Department determines is generally insignificant. The first release is for information identified in a commodity jurisdiction determination. The second release is reserved. The third release is for information that is identical to information used in a non-defense

article that is in "production," and not otherwise enumerated on the ITAR. The fourth release is for information that was developed with knowledge that it is for both a "defense article" and a non-defense article. The fifth release is information that was developed for general purpose commodities.

In the companion rule, BIS proposes to make Note 3 into a stand-alone definition for "peculiarly responsible" as it has application outside of the definition of "required." The substance of Note 3 and the BIS definition of "peculiarly responsible" are identical. DDTC asks for comments on the placement of this concept.

## 4. Proposed Definitions of Development and Production

The Department proposes to add § 120.47 for the definition of "development" and § 120.48 for the definition of "production." These definitions are currently in Notes 1 and 2 to paragraph (b)(3) in § 120.41, the definition of "specially designed." Because "technical data" is now defined, in part, as information "required" for the "development" or "production" of a "defense article," and these words are now used in the definition of a "defense service," it is appropriate to define these terms. The adoption of these definitions is also done for the purpose of harmonization because these definitions are also used in the EAR and by the Wassenaar Arrangement.

## 5. Revised Definition of Public Domain

The Department proposes to revise the definition of "public domain" in ITAR § 120.11 in order to simplify, update, and introduce greater versatility into the definition. The existing version of ITAR § 120.11 relies on an enumerated list of circumstances through which "public domain" information might be published. The Department believes that this definition is unnecessarily limiting in scope and insufficiently flexible with respect to the continually evolving array of media, whether physical or electronic, through which information may be disseminated.

The proposed definition is intended to identify the characteristics that are common to all of the enumerated forms of publication identified in the current rule—with the exception of ITAR § 120.11(a)(8), which is addressed in a new definition for "technical data that arises during, or results from, fundamental research"—and to present those common characteristics in a streamlined definition that does not require enumerated identification

within the ITAR of every current or future qualifying publication scenario. Additionally, the proposed definition incorporates phrases such as "generally accessible" and "without restriction upon its further dissemination" in order to better align the definition found in the EAR and more closely aligned with the definition in the Wassenaar Arrangement control lists.

The proposed definition requires that information be made available to the public without restrictions on its further dissemination. Any information that meets this definition is "public domain." The definition also retains an exemplary list of information that has been made available to the public without restriction and would be considered "public domain." These include magazines, periodicals and other publications available as subscriptions, publications contained in libraries, information made available at a public conference, meeting, seminar, trade show, or exhibition, and information posted on public Web sites. The final example deems information that is submitted to co-authors, editors, or reviewers or conference organizers for review for publication to be "public domain," even prior to actual publication. The relevant restrictions do not include copyright protections or generic property rights in the underlying physical medium.

Paragraph (b) of the revised definition explicitly sets forth the Department's requirement of authorization to release information into the "public domain." Prior to making available "technical data" or software subject to the ITAR, the U.S. government must approve the release through one of the following: (1) The Department; (2) the Department of Defense's Office of Security Review; (3) a relevant U.S. government contracting authority with authority to allow the "technical data" or software to be made available to the public, if one exists; or (4) another U.S. government official with authority to allow the "technical data" or software to be made available to the public.

The requirements of paragraph (b) are not new. Rather, they are a more explicit statement of the ITAR's requirement that one must seek and receive a license or other authorization from the Department or other cognizant U.S. government authority to release ITAR controlled "technical data," as defined in § 120.10. A release of "technical data" may occur by disseminating "technical data" at a public conference or trade show, publishing "technical data" in a book or journal article, or posting "technical data" to the Internet. This proposed provision will enhance

compliance with the ITAR by clarifying that "technical data" may not be made available to the public without authorization. Persons who intend to discuss "technical data" at a conference or trade show, or to publish it, must ensure that they obtain the appropriate authorization.

Information that is excluded from the definition of "defense article" in the new § 120.6(b) is not "technical data" and therefore does not require authorization for a release into the "public domain." This includes information that arises during or results from "fundamental research," as described in the new § 120.49; general scientific, mathematical, or engineering principles commonly taught in schools, and information that is contained in patents.

The Department also proposes to add a new provision to § 127.1 in paragraph (a)(6) to state explicitly that the further dissemination of "technical data" or software that was made available to the public without authorization is a violation of the ITAR, if, and only if, it is done with knowledge that the "technical data" or software was made publicly available without an authorization described in ITAR § 120.11(b)(2). Dissemination of publicly available "technical data" or software is not an export-controlled event, and does not require authorization from the Department, in the absence of knowledge that it was made publicly available without authorization.

"Technical data" and software that is made publicly available without proper authorization remains "technical data" or software and therefore remains subject to the ITAR. As such, the U.S. government may advise a person that the original release of the "technical data" or software was unauthorized and put that person on notice that further dissemination would violate the ITAR.

### 6. Proposed Definition of Technical Data That Arises During, or Results From, Fundamental Research

The Department proposes to move "fundamental research" from the definition of "public domain" in ITAR § 120.11(a)(8) and define "technical data that arises during, or results from, fundamental research" in a new ITAR § 120.49. The Department believes that information that arises during, or results from fundamental research is conceptually distinguishable from the information that would be captured in the revised definition of "public domain" that is proposed in this rule. Accordingly, the Department proposes to address this concept with its own definition. The new definition of

"technical data that arises during, or results from, fundamental research" is consistent with the prior ITAR § 120.11(a)(8), except that the Department has expanded the scope of eligible research to include research that is funded, in whole or in part, by the U.S. government.

### 7. Revised Definition of Export

The Department proposes to revise the definition of "export" in ITAR § 120.17 to better align with the EAR's revised definition of the term and to remove activities associated with a defense article's further movement or release outside the United States, which will now fall within the definition of "reexport" in § 120.19. The definition is revised to explicitly identify that ITAR §§ 126.16 and 126.17 (exemptions pursuant to the Australia and UK Defense Trade Cooperation Treaties) have their own definitions of "export," which apply exclusively to those exemptions. It also explicitly references the new § 120.49, "Activities that are Not Exports, Reexports, or Retransfers," which excludes from ITAR control certain transactions identified therein.

Paragraph (a)(1) is revised to parallel the definition of "export" in proposed paragraph (a)(1) of § 734.13 of the EAR. Although the wording has changed, the scope of the control is the same. The provision excepting travel outside of the United States by persons whose personal knowledge includes "technical data" is removed, but the central concept is unchanged. The "release" of "technical data" to a foreign person while in the United States or while travelling remains a controlled event.

Paragraph (a)(2) includes the control listed in the current § 120.17(a)(4) (transfer of technical data to a foreign person). The proposed revisions replace the word "disclosing" with "releasing," and the paragraph is otherwise revised to parallel proposed paragraph (a)(2) of § 734.13 of the EAR. "Release" is a newly defined concept in § 120.50 that encompasses the previously undefined term "disclose."

Paragraph (a)(3) includes the control listed in the current § 120.17(a)(2) (transfer of registration, control, or ownership to a foreign person of an aircraft, vessel, or satellite). It is revised to parallel proposed paragraph (a)(3) of § 734.13 of the EAR.

Paragraph (a)(4) includes the control listed in the current § 120.17(a)(3) (transfer in the United States to foreign embassies).

Paragraph (a)(5) maintains the control on performing a "defense service."

Paragraph (a)(6) is added for the "release" or transfer of decryption keys,

DOSWASHINGTONSUP00497

passwords, and other items identified in the new paragraph (a)(5) of the revised definition of "technical data" in § 120.10. This paragraph makes "release" or transfer of information securing "technical data" an "export." Making the release of decryption keys and other information securing technical data in an inaccessible or unreadable format an export allows the Department to propose that providing someone with encrypted "technical data" would not be an "export," under certain circumstances. Provision of a decryption key or other information securing "technical data" is an "export" regardless of whether the foreign person has already obtained access to the secured "technical data." Paragraph (a)(6) of the definitions of export and reexport in this rule and the BIS companion rule present different formulations for this control and the agencies request input from the public on which language more clearly describes the control. The agencies intend, however, that the act of providing physical access to unsecured "technical data" (subject to the ITAR) will be a controlled event. The mere act of providing access to unsecured technology (subject to the EAR) will not, however, be a controlled event unless it is done with "knowledge" that such provision will cause or permit the transfer of controlled "technology" in clear text or "software" to a foreign national.

Paragraph (a)(7) is added for the release of information to a public network, such as the Internet. This makes more explicit the existing control in (a)(4), which includes the publication of "technical data" to the Internet due to its inherent accessibility by foreign persons. This means that before posting information to the Internet, you should determine whether the information is "technical data." You should review the USML, and if there is doubt about whether the information is "technical data," you may request a commodity jurisdiction determination from the Department. If so, a license or other authorization, as described in § 120.11(b), will generally be required to post such "technical data" to the Internet. Posting "technical data" to the Internet without a Department or other authorization is a violation of the ITAR even absent specific knowledge that a foreign national will read the "technical data."

Paragraph (b)(1) is added to clarify existing ITAR controls to explicitly state that disclosing "technical data" to a foreign person is deemed to be an "export" to all countries in which the

foreign person has held citizenship or holds permanent residency.

**8. Revised Definition of Reexport**

The Department proposes to revise the definition of "reexport" in ITAR § 120.19 to better align with the EAR's revised definition and describe transfers of items subject to the jurisdiction of the ITAR between two foreign countries. The activities identified are the same as those in paragraphs (a)(1) through (4) of the revised definition of "export," except that the shipment, release or transfer is between two foreign countries or is to a third country national foreign person outside of the United States.

**9. Proposed Definition of Release**

The Department proposes to add § 120.50, the definition of "release." This term is added to harmonize with the EAR, which has long used the term to cover activities that disclose information to foreign persons. "Release" includes the activities encompassed within the undefined term "disclose." The activities that are captured include allowing a foreign person to inspect a "defense article" in a way that reveals "technical data" to the foreign persons and oral or written exchanges of "technical data" with a foreign person. The adoption of the definition of "release" does not change the scope of activities that constitute an "export" and other controlled transactions under the ITAR.

**10. Proposed Definition of Retransfer**

The Department proposes to add § 120.51, the definition of "retransfer." "Retransfer" is moved out of the definition of "reexport" in § 120.19 to better harmonize with the EAR, which controls "exports," "reexports" and "transfers (in country)" as discrete events. Under this new definition, a "retransfer" occurs with a change of end use or end user within the same foreign territory. Certain activities may fit within the definition of "reexport" and "retransfer," such as the disclosure of "technical data" to a third country national abroad. Requests for both "reexports" and "retransfers" of "defense articles" will generally be processed through a General Correspondence or an exemption.

**11. Proposed Activities That Are Not Exports, Reexports, or Retransfers**

The Department proposes to add § 120.52 to describe those "activities that are not exports, reexports, or retransfers" and do not require authorization from the Department. It is not an "export" to launch items into

space, provide "technical data" or software to U.S. persons while in the United States, or move a "defense article" between the states, possessions, and territories of the United States. The Department also proposes to add a new provision excluding from ITAR licensing requirements the transmission and storage of encrypted "technical data" and software.

The Department recognizes that ITAR-controlled "technical data" may be electronically routed through foreign servers unbeknownst to the original sender. This presents a risk of unauthorized access and creates a potential for inadvertent ITAR violations. For example, email containing "technical data" may, without the knowledge of the sender, transit a foreign country's Internet service infrastructure en route to its intended and authorized final destination. Any access to this data by a foreign person would constitute an unauthorized "export" under ITAR § 120.17. Another example is the use of mass data storage (*i.e.*, "cloud storage"). In this case, "technical data" intended to be resident in cloud storage may, without the knowledge of the sender, be physically stored on a server or servers located in a foreign country or multiple countries. Any access to this data, even if unintended by the sender, would constitute an "export" under ITAR § 120.17.

The intent of the proposed ITAR § 120.52(a)(4) is to clarify that when unclassified "technical data" transits through a foreign country's Internet service infrastructure, a license or other approval is not mandated when such "technical data" is encrypted prior to leaving the sender's facilities and remains encrypted until received by the intended recipient or retrieved by the sender, as in the case of remote storage. The encryption must be accomplished in a manner that is certified by the U.S. National Institute for Standards and Technology (NIST) as compliant with the Federal Information Processing Standards Publication 140–2 (FIPS 140–2). Additionally, the Department proposes that the electronic storage abroad of "technical data" that has been similarly encrypted would not require an authorization, so long as it is not stored in a § 126.1 country or in the Russian Federation. This will allow for cloud storage of encrypted data in foreign countries, so long as the "technical data" remains continuously encrypted while outside of the United States.

DOSWASHINGTONSUP00498

## 12. Revised Exemption for the Export of Technical Data for U.S. Persons Abroad

The Department proposes to revise § 125.4(b)(9) to better harmonize controls on the "release" of controlled information to U.S. persons abroad and to update the provisions. The most significant update is that foreign persons authorized to receive "technical data" in the United States will be eligible to receive that same "technical data" abroad, when on temporary assignment on behalf of their employer. The proposed revisions clarify that a person going abroad may use this exemption to "export" "technical data" for their own use abroad. The proposed revisions also clarify that the "technical data" must be secured while abroad to prevent unauthorized "release." It has been long-standing Department practice to hold U.S. persons responsible for the "release" of "technical data" in their possession while abroad. However, given the nature of "technical data" and the proposed exception from licensing for transmission of secured "technical data," the Department has determined it is necessary to implement an affirmative obligation to secure data while abroad.

## 13. Proposed Scope of License

The Department proposes to add § 123.28 to clarify the scope of a license, in the absence of a proviso, and to state that authorizations are granted based on the information provided by the applicant. This means that while providing false information to the U.S. government as part of the application process for the "export," "reexport," or "retransfer" of a "defense article" is a violation of the ITAR, it also may void the license.

## 14. Revised Definition of Defense Service

Proposed revisions of the "defense service" definition were published on April 13, 2011, RIN 1400–AC80 (*see* "International Traffic in Arms Regulations: Defense Services," 76 FR 20590) and May 24, 2013 (*see* 78 FR 31444, RIN 1400–AC80). In those rules, the Department explained its determination that the scope of the current definition is overly broad, capturing certain forms of assistance or services that no longer warrant ITAR control.

The Department reviewed comments on that first proposed definition and, when the recommended changes added to the clarity of the regulation, the Department accepted them. For the Department's evaluation of those public comments and recommendations regarding the April 13, 2011, proposed

rule (the first revision), *see* 78 FR 31444, May 24, 2013. The Department's evaluation of the written comments and recommendations in response to the May 24, 2013 proposed rule (the second revision) follows.

Parties commenting on the second revision expressed concern that the definition of "defense service" in paragraph (a)(1) was premised on the use of "other than public domain information." The observation was made that with the intent of removing from the definition of a "defense service" the furnishing of assistance using "public domain" information, but not basing the assistance on the use of "technical data," the Department was continuing to require the licensing of activities akin to those that were based on the use of "public domain" information. The Department has fully revised paragraph (a)(1) to remove the use of the "other than public domain information" or "technical data" from the determination of whether an activity is a "defense service." Furthermore, the Department has added a new provision declaring that the activities described in paragraph (a)(1) are not a "defense service" if performed by a U.S. person or foreign person in the United States who does not have knowledge of U.S.-origin "technical data" directly related to the "defense article" that is the subject of the assistance or training or another "defense article" described in the same USML paragraph prior to performing the service. A note is added to clarify that a person will be deemed to have knowledge of U.S.-origin "technical data" if the person previously participated in the "development" of a "defense article" described in the same USML paragraph, or accessed (physically or electronically) that "technical data." A note is also added to clarify that those U.S. persons abroad who only received U.S.-origin "technical data" as a result of their activities on behalf of a foreign person are not included within the scope of paragraph (a)(1). A third note is added to clarify that DDTC-authorized foreign person employees in the United States who provide "defense services" on behalf of their U.S. employer are considered to be included with the U.S. employer's authorization, and need not be listed on the U.S. employer's technical assistance agreement or receive a separate authorization for those services. The Department also removed the activities of design, development, and engineering from paragraph (a)(1) and moved them to paragraph (a)(2).

Commenting parties recommended revising paragraph (a)(1) to remove the

provision of "technical data" as a "defense service," because there are already licensing requirements for the "export" of "technical data." The Department confirms that it eliminated from the definition of a "defense service" the act of furnishing "technical data" to a foreign person. Such activity still constitutes an "export" and would require an ITAR authorization. New paragraph (a)(1) is concerned with the furnishing of assistance, whereas the "export" of "technical data" alone, without the furnishing of assistance, is not a "defense service." The "export" of "technical data" requires an authorization (Department of State form DSP–5 or DSP–85) or the use of an applicable exemption.

Commenting parties recommended the definition be revised to explicitly state that it applies to the furnishing of assistance by U.S. persons, or by foreign persons in the United States. The Department partially accepted this recommendation. However, the Department notes that ITAR § 120.1(c) provides that only U.S. persons and foreign governmental entities in the United States may be granted a license or other approval pursuant to the ITAR, and that foreign persons may only receive a "reexport" or "retransfer" approval or approval for brokering activities. Therefore, approval for the performance of a defense service in the United States by a foreign person must be obtained by a U.S. person, such as an employer, on behalf of the foreign person. Regarding a related recommendation, the Department also notes that the furnishing of a type of assistance described by the definition of a "defense service" is not an activity within the Department's jurisdiction when it is provided by a foreign person outside the United States to another foreign person outside the United States on a foreign "defense article" using foreign-origin "technical data."

In response to commenting parties, the Department specified that the examples it provided for activities that are not "defense services" are not exhaustive. Rather, they are provided to answer the more frequent questions the Department receives on the matter. The Department removed these examples from paragraph (b) and included them as a note to paragraph (a).

A commenting party recommended that paragraphs (a)(5) and (a)(6), regarding the furnishing of assistance in the integration of a spacecraft to a launch vehicle and in the launch failure analysis of a spacecraft or launch vehicle, respectively, be removed, and that those activities be described in the USML categories covering spacecraft

and launch vehicles, on the basis that a general definition should not have such program-specific clauses. As discussed in the May 13, 2014 interim final rule revising USML Category XV (79 FR 27180), the Department accepted this recommendation and revised paragraph (f) of USML Category XV and paragraph (i) of USML Category IV accordingly. The revision includes the recommendation of commenting parties to specifically provide that the service must be provided to a foreign person in order for it to be a licensable activity.

Commenting parties recommended the Department define the term "tactical employment," so as to clarify what services would be captured by paragraph (a)(3). The Department determined that employment of a "defense article" should remain a controlled event, due to the nature of items now controlled in the revised USML categories. After ECR, those items that remain "defense articles" are the most sensitive and militarily critical equipment that have a significant national security or intelligence application. Allowing training and other services to foreign nationals in the employment of these "defense articles" without a license would not be appropriate. Therefore, the Department removed the word "tactical" and converted the existing exemption for basic operation of a "defense article," authorized by the U.S. government for "export" to the same recipient, into an exclusion from paragraph (a)(3).

A commenting party recommended the Department address the instance of the integration or installation of a "defense article" into an item, much as it addressed the instance of the integration or installation of an item into a "defense article." Previously, the Department indicated this would be the subject of a separate rule, and addressed the "export" of such items in a proposed rule (see 76 FR 13928), but upon review the Department accepted this recommendation, and revised paragraph (a)(2), the note to paragraph (a)(2), and the note to paragraph (a) accordingly. In addition, the Department has changed certain terminology used in the paragraph: instead of referring to the "transfer" of "technical data," the paragraph is premised on the "use" of "technical data." This change is consistent with removing from the definition of a "defense service" the furnishing of "technical data" to a foreign person when there is not also the furnishing of assistance related to that "technical data."

A commenting party requested clarification of the rationale behind selectively excepting from the "defense services" definition the furnishing of services using "public domain" information. The Department did so in paragraph (a)(1), and now excludes those services performed by U.S. persons who have not previously had access to any U.S. origin "technical data" on the "defense article" being serviced. In contrast, the Department did not do so in paragraphs (a)(2) and (a)(3) and former paragraphs (a)(5) and (a)(6). In the case of paragraph (a)(2), the rationale for not doing so is that the activities involved in the development of a "defense article," or in integrating a "defense article" with another item, inherently involve the advancement of the military capacity of another country and therefore constitute activities over which the U.S. government has significant national security and foreign policy concerns. To the extent that an activity listed in paragraph (a)(1), such as modification or testing, is done in the "development" of a "defense article," such activities constitute "development" and are within the scope of paragraph (a)(2). With regard to paragraph (a)(3), the furnishing of assistance (including training) in the employment of a "defense article" is a type of activity that the Department believes warrants control as a "defense service," due to the inherently military nature of providing training and other services in the employment of a "defense article" (changes to paragraph (a)(3) are described above). The services described in former paragraphs (a)(5) and (a)(6) (and now in USML Categories IV(i) and XV(f)) are pursuant to Public Law 105–261.

A commenting party recommended limiting paragraph (a)(2) to the integration of ECCN 9A515 and 600 series items into defense articles, saying that the regulations should focus on items subject to the EAR with a military or space focus. The Department's focus with this provision is in fact the "defense article." Items that are to be integrated with a "defense article," which may not themselves be defense articles, may be beyond the authority of the Department to regulate. The Department did not accept this recommendation.

A commenting party recommended limiting the definition of integration to changes in the function of the "defense article," and to exclude modifications in fit. For the purposes of illustration, this commenting party used one of the examples provided by the Department in the note to paragraph (a)(2): The manufacturer of the military vehicle will need to know the dimensions and electrical requirements of the dashboard radio when designing the vehicle. In this instance, paragraph (a)(2) would not apply, as this example addresses the manufacture of a "defense article," which is covered by paragraph (a)(1). If the radio is to be installed in this vehicle is subject to the EAR, the provision to the manufacturer of information regarding the radio is not within the Department's licensing jurisdiction. In an instance of a service entailing the integration of an item with a "defense article," where there would be modification to any of the items, the Department believes such assistance would inherently require the use of "technical data." Therefore, this exclusion would be unacceptably broad. However, the Department has accepted the recommendation to clarify the definition and exclude changes to fit to any of the items involved in the integration activity, provided that such services do not entail the use of "technical data" directly related to the "defense article." Upon review, changes to fit are not an aspect of integration, which is the "engineering analysis needed to unite a 'defense article' and one or more items," and therefore are not captured in paragraph (a)(2). The modifications of the "defense article" to accommodate the fit of the item to be integrated, which are within the activity covered by installation, are only those modifications to the "defense article" that allow the item to be placed in its predetermined location. Any modifications to the design of a "defense article" are beyond the scope of installation. Additionally, while minor modifications may be made to a "defense article" without the activity being controlled under (a)(2) as an integration activity, all modifications of defense articles, regardless of sophistication, are activities controlled under (a)(1) if performed by someone with prior knowledge of U.S.-origin "technical data." "Fit" is defined in ITAR § 120.41: "The fit of a commodity is defined by its ability to physically interface or connect with or become an integral part of another commodity" (see, Note 4 to paragraph (b)(3)).

Commenting parties recommended revising paragraph (a)(2) to provide that such assistance described therein would be a "defense service" only if U.S.-origin "technical data" is exported. The law and regulations do not mandate this limitation. Section 38 of the Arms Export Control Act provides that the President is authorized to control the "export" of defense articles and defense services. The ITAR, in defining "defense article," "technical data," and "export," does not provide the qualifier "U.S.-

**31532** Federal Register / Vol. 80, No. 106 / Wednesday, June 3, 2015 / Proposed Rules

origin'' (see ITAR §§ 120.6, 120.10, and 120.17, respectively). In the instance described by the commenting party, of the integration of a commercial item into a foreign-origin "defense article," the Department retains jurisdiction when the service is provided by a U.S. person.

A commenting party recommended revising paragraph (a)(2) so that the paragraph (a)(1) exception of the furnishing of assistance using "public domain" information is not nullified by paragraph (a)(2), as most of the activities described in paragraph (a)(1) involve integration as defined in the note to paragraph (a)(2). The Department believes each of the activities described in paragraphs (a)(1) and (a)(2) are sufficiently well defined to distinguish them one from the other. Therefore, the Department does not agree that paragraph (a)(2) nullifies the intention of paragraph (a)(1), and does not accept this recommendation.

A commenting party requested clarification that providing an item subject to the EAR for the purposes of integration into a "defense article" is not a "defense service." The provision of the item in this instance, unaccompanied by assistance in the integration of the item into a "defense article," is not within the scope of "the furnishing of assistance," and therefore is not a defense service.

Commenting parties recommended clarification on whether the servicing of an item subject to the EAR that has been integrated with a "defense article" would be a "defense service." The Department notes that such activity is not a "defense service," provides it as an example of what is not a "defense service" in the note to paragraph (a), and also notes that it would be incumbent on the applicant to ensure that in providing this service, "technical data" directly related to the "defense article" is not used.

Commenting parties expressed concern over the potential negative effect of paragraph (a)(2) and the definition in general on university-based educational activities and scientific communication, and recommended clarification of the relationship between the definition of "defense services" and the exemption for the "export" of "technical data" at ITAR § 125.4(b)(10). Disclosures of "technical data" to foreign persons who are bona-fide and full time regular employees of universities continue to be exports for which ITAR § 125.4(b)(10) is one licensing exemption. The Department believes that, in most cases, the normal duties of a university employee do not encompass the

furnishing of assistance to a foreign person, in the activities described in paragraph (a). Therefore, in the context of employment with the university, the Department does not perceive that the foreign person's use of the "technical data" would be described by ITAR § 120.9(a)(2), or any part of paragraph (a).

In response to the recommendation of one commenting party, the Department added a note clarifying that the installation of an item into a "defense article" is not a "defense service," provided no "technical data" is used in the rendering of the service.

A commenting party recommended clarification of the licensing process for the "export" of an EAR 600 series item that is to be integrated into a "defense article." The Department of Commerce has "export" authority over the 600 series item, and the exporter must obtain a license from the Department of Commerce, if necessary. The exporter must also obtain an approval from the Department of State to provide any "defense service," including integration assistance pursuant to paragraph (a)(2).

A commenting party recommended removing "testing" as a type of "defense service," stating it was not included in the definition of "organizational-level maintenance." In including testing as part of the former definition but not of the latter, the Department does not perceive an inconsistency or conflict. To the extent that certain testing is within the definition of organization-level maintenance, that testing is explicitly excluded, as organizational-level maintenance is not covered under the definition of a "defense service." However, all other testing remains a "defense service." The Department intends for the furnishing of assistance to a foreign person, whether in the United States or abroad, in the testing of defense articles to be an activity requiring Department approval under the conditions of paragraph (a)(1). The Department did not accept this recommendation.

Commenting parties provided recommendations for revising the definitions of "public domain" information and "technical data." Those definitions are proposed in this rule as well. To the extent that evaluation of the proposed changes to "defense services" hinges on these terms, the Department invites commenting parties to submit analyses of the impact of these revised definitions on the revised "defense service" definition in this proposed rule.

Commenting parties recommended clarification of the regulation regarding the furnishing of assistance and training

in organizational-level (basic-level) maintenance. The Department harmonized paragraph (a)(1) and the example regarding organizational-level maintenance by revising the Note to Paragraph (a), which sets forth activities that are not "defense services," so that it specifically provides that "the furnishing of assistance (including training) in organizational-level (basic-level) maintenance of a defense article" is an example of an activity that is not a defense service.

In response to commenting parties, the Department clarifies that the example of employment by a foreign person of a natural U.S. person as not constituting a "defense service" is meant to address, among other scenarios, the instance where such a person is employed by a foreign defense manufacturer, but whose employment in fact does not entail the furnishing of assistance as described in ITAR § 120.9(a). By "natural person," the Department means a human being, as may be inferred from the definition of "person" provided in ITAR § 120.14.

In response to the recommendation of a commenting party, the Department confirms that, as stated in a Department of Commerce notice, "Technology subject to the EAR that is used with technical data subject to the ITAR that will be used under the terms of a Technical Assistance Agreement (TAA) or Manufacturing License Agreement (MLA) and that would otherwise require a license from [the Department of Commerce] may all be exported under the TAA or MLA" (see 78 FR 22660). In DDTC publication Guidelines for Preparing Electronic Agreements (Revision 4.2), Section 20.1.d., the following conditions are stipulated: The technology subject to the EAR will be used with "technical data" subject to the ITAR and described in the agreement, and the technology subject to the EAR will be used under the terms of a TAA or MLA (see http:// www.pmddtc.state.gov/licensing/ agreement.html).

**Request for Comments**

The Department invites public comment on any of the proposed definitions set forth in this rulemaking. With respect to the revisions to ITAR § 120.17, the Department recognizes the increasingly complex nature of telecommunications infrastructure and the manner in which data is transmitted, stored, and accessed, and accordingly seeks public comment with special emphasis on: (1) How adequately the proposed regulations address the technical aspects of data transmission and storage; (2) whether

the proposed regulations mitigate unintended or unauthorized access to transmitted or stored data; and (3) whether the proposed regulations impose an undue financial or compliance burden on the public.

The public is also asked to comment on the effective date of the final rule. Export Control Reform rules that revised categories of the USML and created new 600 series ECCN have had a six-month delayed effective date to allow for exporters to update the classification of their items. In general, rules effecting export controls have been effective on the date of publication, due to the impact on national security and foreign policy. As this proposed rule and the companion proposed rule from the Bureau of Industry and Security revise definitions within the ITAR and the EAR and do not make any changes to the USML or CCL, the Department proposes (should the proposed rule be adopted) a 30-day delayed effective date to allow exporters to ensure continued compliance.

## Regulatory Analysis and Notices

### Administrative Procedure Act

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the U.S. government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of the APA, the Department is publishing this rule with a 60-day provision for public comment and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function.

### Regulatory Flexibility Act

Since the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of 5 U.S.C. 553, there is no requirement for an analysis under the Regulatory Flexibility Act.

### Unfunded Mandates Reform Act of 1995

This proposed amendment does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the

Unfunded Mandates Reform Act of 1995.

### Small Business Regulatory Enforcement Fairness Act of 1996

For purposes of the Small Business Regulatory Enforcement Fairness Act of 1996 (the "Act"), a major rule is a rule that the Administrator of the OMB Office of Information and Regulatory Affairs finds has resulted or is likely to result in: (1) An annual effect on the economy of $100,000,000 or more; (2) a major increase in costs or prices for consumers, individual industries, federal, state, or local government agencies, or geographic regions; or (3) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and foreign markets.

The Department does not believe this rulemaking will have an annual effect on the economy of $100,000,000 or more, nor will it result in a major increase in costs or prices for consumers, individual industries, federal, state, or local government agencies, or geographic regions, or have significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and foreign markets. The proposed means of solving the issue of data protection are both familiar to and extensively used by the affected public in protecting sensitive information.

### Executive Orders 12372 and 13132

This proposed amendment will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this proposed amendment does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this proposed amendment.

### Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess costs and benefits of available regulatory

alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). The executive orders stress the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This proposed rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the proposed rule has been reviewed by the Office of Management and Budget (OMB).

### Executive Order 12988

The Department of State has reviewed the proposed amendment in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

### Executive Order 13175

The Department of State has determined that this rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not preempt tribal law. Accordingly, Executive Order 13175 does not apply to this rulemaking.

### Paperwork Reduction Act

This rule does not impose any new reporting or recordkeeping requirements subject to the Paperwork Reduction Act, 44 U.S.C. Chapter 35; however, the Department of State seeks public comment on any unforeseen potential for increased burden.

## List of Subjects

### 22 CFR 120 and 125

Arms and munitions, Classified information, Exports.

### 22 CFR 123

Arms and munitions, Exports, Reporting and recordkeeping requirements.

### 22 CFR Part 127

Arms and munitions, Exports, Crime, Law, Penalties, Seizures and forfeitures.

Accordingly, for the reasons set forth above, title 22, chapter I, subchapter M, parts 120, 123, 125, and 127 are proposed to be amended as follows:

## PART 120—PURPOSE AND DEFINITIONS

■ 1. The authority citation for part 120 continues to read as follows:

**31534** **Federal Register** / Vol. 80, No. 106 / Wednesday, June 3, 2015 / Proposed Rules

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2794; 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 2. Section 120.6 is amended by designating the current text as paragraph (a), revising the first sentence of newly designated paragraph (a), and adding paragraph (b) to read as follows:

**§ 120.6 Defense article.**

(a) *Defense article* means any item, software, or technical data designated in § 121.1 of this subchapter. * * *

(b) The following are not defense articles and thus not subject to the ITAR:

(1) [Reserved]

(2) [Reserved]

(3) Information and software that:

(i) Are in the public domain, as described in § 120.11;

(ii) Arise during, or result from, fundamental research, as described in § 120.46;

(iii) Concern general scientific, mathematical, or engineering principles commonly taught in schools, and released by instruction in a catalog course or associated teaching laboratory of an academic institution; or

(iv) Appear in patents or open (published) patent applications available from or at any patent office, unless covered by an invention secrecy order.

**Note to paragraph (b):** Information that is not within the scope of the definition of technical data (*see* § 120.10) and not directly related to a defense article, or otherwise described on the USML, is not subject to the ITAR.

■ 3. Section 120.9 is revised to read as follows:

**§ 120.9 Defense service.**

(a) *Defense service* means:

(1) The furnishing of assistance (including training) to a foreign person (*see* § 120.16), whether in the United States or abroad, in the production, assembly, testing, intermediate- or depot-level maintenance (*see* § 120.38), modification, demilitarization, destruction, or processing of a defense article (*see* § 120.6), by a U.S. person or foreign person in the United States, who has knowledge of U.S.-origin technical data directly related to the defense article that is the subject of the assistance, prior to performing the service;

**Note 1 to paragraph (a)(1):** "Knowledge of U.S.-origin technical data" for purposes of paragraph (a)(1) can be established based on all the facts and circumstances. However, a person is deemed to have "knowledge of

U.S.-origin technical data" directly related to a defense article if the person participated in the development of a defense article described in the same USML paragraph or accessed (physically or electronically) technical data directly related to the defense article that is the subject of the assistance, prior to performing the service.

**Note 2 to paragraph (a)(1):** U.S. persons abroad who only receive U.S.-origin technical data as a result of their activities on behalf of a foreign person are not included within paragraph (a)(1).

**Note 3 to paragraph (a)(1):** Foreign person employees in the United States providing defense services as part of Directorate of Defense Trade Controls-authorized employment need not be listed on the U.S. employer's technical assistance agreement or receive separate authorization to perform defense services on behalf of their authorized U.S. employer.

(2) The furnishing of assistance (including training) to a foreign person (*see* § 120.16), whether in the United States or abroad, in the development of a defense article, or the integration of a defense article with any other item regardless of whether that item is subject to the ITAR or technical data is used;

**Note to paragraph (a)(2):** "Integration" means any engineering analysis (*see* § 125.4(c)(5) of this subchapter) needed to unite a defense article and one or more items. Integration includes the introduction of software to enable operation of a defense article, and the determination during the design process of where an item will be installed (*e.g.*, integration of a civil engine into a destroyer that requires changes or modifications to the destroyer in order for the civil engine to operate properly; not plug and play). Integration is distinct from "installation." Installation means the act of putting an item in its predetermined place without the use of technical data or any modifications to the defense article involved, other than to accommodate the fit of the item with the defense article (*e.g.*, installing a dashboard radio into a military vehicle where no modifications (other than to accommodate the fit of the item) are made to the vehicle, and there is no use of technical data). The "fit" of an item is defined by its ability to physically interface or connect with or become an integral part of another item. (*see* § 120.41).

(3) The furnishing of assistance (including training) to a foreign person (*see* § 120.16), regardless of whether technical data is used, whether in the United States or abroad, in the employment of a defense article, other than basic operation of a defense article authorized by the U.S. government for export to the same recipient;

(4) Participating in or directing combat operations for a foreign person (*see* § 120.16), except as a member of the regular military forces of a foreign

nation by a U.S. person who has been drafted into such forces; or

(5) The furnishing of assistance (including training) to the government of a country listed in § 126.1 of this subchapter in the development, production, operation, maintenance, repair, overhaul or refurbishing of a defense article or a part component, accessory or attachments specially designed for a defense article.

**Note to paragraph (a):** The following are examples of activities that are not defense services:

1. The furnishing of assistance (including training) in organizational-level (basic-level) maintenance (*see* § 120.38) of a defense article;

2. Performance of services by a U.S. person in the employment of a foreign person, except as provided in this paragraph;

3. Servicing of an item subject to the EAR (*see* § 120.42) that has been integrated or installed into a defense article, or the servicing of an item subject to the EAR into which a defense article has been installed or integrated, without the use of technical data, except as described in paragraph (a)(5) of this section;

4. The installation of any item into a defense article, or the installation of a defense article into any item;

5. Providing law enforcement, physical security, or personal protective services (including training and advice) to or for a foreign person (if such services necessitate the export of a defense article a license or other approval is required for the export of the defense article, and such services that entail the employment or training in the employment of a defense article are addressed in paragraph (a)(3) of this section);

6. The furnishing of assistance by a foreign person not in the United States;

7. The furnishing of medical, logistical (other than maintenance), translation, financial, legal, scheduling, or administrative services;

8. The furnishing of assistance by a foreign government to a foreign person in the United States, pursuant to an arrangement with the Department of Defense; and

9. The instruction in general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities.

(b) [Reserved]

■ 4. Section 120.10 is revised to read as follows:

**§ 120.10 Technical data.**

(a) *Technical data* means, except as set forth in paragraph (b) of this section:

(1) Information required for the development (*see* § 120.47) (including design, modification, and integration design), production (*see* § 120.48) (including manufacture, assembly, and integration), operation, installation, maintenance, repair, overhaul, or refurbishing of a defense article. Technical data may be in any tangible or intangible form, such as written or

oral communications, blueprints, drawings, photographs, plans, diagrams, models, formulae, tables, engineering designs and specifications, computer-aided design files, manuals or documentation, electronic media or information gleaned through visual inspection;

Note to paragraph (a)(1): The modification of an existing item creates a new item and technical data for the modification is technical data for the development of the new item.

(2) Information enumerated on the USML (i.e., not controlled pursuant to a catch-all USML paragraph);

(3) Classified information for the development, production, operation, installation, maintenance, repair, overhaul, or refurbishing of a defense article or a 600 series item subject to the EAR;

(4) Information covered by an invention secrecy order; or

(5) Information, such as decryption keys, network access codes, or passwords, that would allow access to other technical data in clear text or software (see § 127.1(b)(4) of this subchapter).

(b) Technical data does not include:
(1) Non-proprietary general system descriptions;

(2) Information on basic function or purpose of an item; or

(3) Telemetry data as defined in note 3 to USML Category XV(f) (see § 121.1 of this subchapter).

■ 5. Section 120.11 is revised to read as follows:

### § 120.11 Public domain.

(a) Except as set forth in paragraph (b) of this section, unclassified information and software are in the public domain, and are thus not technical data or software subject to the ITAR, when they have been made available to the public without restrictions upon their further dissemination such as through any of the following:

(1) Subscriptions available without restriction to any individual who desires to obtain or purchase the published information;

(2) Libraries or other public collections that are open and available to the public, and from which the public can obtain tangible or intangible documents;

(3) Unlimited distribution at a conference, meeting, seminar, trade show, or exhibition, generally accessible to the interested public;

(4) Public dissemination (i.e., unlimited distribution) in any form (e.g., not necessarily in published form), including posting on the Internet on sites available to the public; or

(5) Submission of a written composition, manuscript or presentation to domestic or foreign co-authors, editors, or reviewers of journals, magazines, newspapers or trade publications, or to organizers of open conferences or other open gatherings, with the intention that the compositions, manuscripts, or publications will be made publicly available if accepted for publication or presentation.

(b) Technical data or software, whether or not developed with government funding, is not in the public domain if it has been made available to the public without authorization from:

(1) The Directorate of Defense Trade Controls;

(2) The Department of Defense's Office of Security Review;

(3) The relevant U.S. government contracting entity with authority to allow the technical data or software to be made available to the public; or

(4) Another U.S. government official with authority to allow the technical data or software to be made available to the public.

Note 1 to § 120.11: Section 127.1(a)(6) of this subchapter prohibits, without written authorization from the Directorate of Defense Trade Controls, U.S. and foreign persons from exporting, reexporting, retransferring, or otherwise making available to the public technical data or software if such person has knowledge that the technical data or software was made publicly available without an authorization described in paragraph (b) of this section.

Note 2 to § 120.11: An export, reexport, or retransfer of technical data or software that was made publicly available by another person without authorization is not a violation of this subchapter, except as described in § 127.1(a)(6) of this subchapter.

■ 6. Section 120.17 is revised to read as follows:

### § 120.17 Export.

(a) Except as set forth in § 120.52, § 126.16, or § 126.17 of this subchapter, export means:

(1) An actual shipment or transmission out of the United States, including the sending or taking of a defense article outside of the United States in any manner;

(2) Releasing or otherwise transferring technical data or software (source code or object code) to a foreign person in the United States (a "deemed export");

(3) Transferring by a person in the United States of registration, control, or ownership of any aircraft, vessel, or satellite subject to the ITAR to a foreign person;

(4) Releasing or otherwise transferring a defense article to an embassy or to any agency or subdivision of a foreign government, such as a diplomatic mission, in the United States;

(5) Performing a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad;

(6) Releasing or otherwise transferring information, such as decryption keys, network access codes, passwords, or software, or providing physical access, that would allow access to other technical data in clear text or software to a foreign person regardless of whether such data has been or will be transferred; or

(7) Making technical data available via a publicly available network (e.g., the Internet).

(b) Any release in the United States of technical data or software to a foreign person is a deemed export to all countries in which the foreign person has held citizenship or holds permanent residency.

■ 7. Section 120.19 is revised to read as follows:

### § 120.19 Reexport.

(a) Except as set forth in § 120.52, reexport means:

(1) An actual shipment or transmission of a defense article from one foreign country to another foreign country, including the sending or taking of a defense article to or from such countries in any manner;

(2) Releasing or otherwise transferring technical data or software to a foreign person of a country other than the foreign country where the release or transfer takes place (a "deemed reexport");

(3) Transferring by a person outside of the United States of registration, control, or ownership of any aircraft, vessel, or satellite subject to the ITAR to a foreign person outside the United States; or

(4) Releasing or otherwise transferring outside of the United States information, such as decryption keys, network access codes, password, or software, or providing physical access, that would allow access to other technical data in clear text or software to a foreign person regardless of whether such data has been or will be transferred.

(b) [Reserved]

### § 120.41 [Amended]

■ 8. Section 120.41 is amended by reserving Note 1 to paragraph (b)(3) and Note 2 to paragraph (b)(3).

■ 9. Section 120.46 is added to read as follows:

### § 120.46 Required.

(a) As applied to technical data, the term required refers to only that portion

of technical data that is peculiarly responsible for achieving or exceeding the controlled performance levels, characteristics, or functions. Such required technical data may be shared by different products.

> **Note 1 to paragraph (a):** The references to "characteristics" and functions" are not limited to entries on the USML that use specific technical parameters to describe the scope of what is controlled. The "characteristics" and "functions" of an item listed are, absent a specific regulatory definition, a standard dictionary's definition of the item. For example, USML Category VIII(a)(1) controls aircraft that are "bombers." No performance level is identified in the entry, but the characteristic of the aircraft that is controlled is that it is a bomber. Thus, any technical data, regardless of significance, peculiar to making an aircraft a bomber as opposed to, for example, an aircraft controlled under ECCN 9A610.a or ECCN 9A991.a, would be technical data required for a bomber and thus controlled under USML Category VIII(i).

> **Note 2 to paragraph (a):** The ITAR and the EAR often divide within each set of regulations or between each set of regulations:
>
> 1. Controls on parts, components, accessories, attachments, and software; and
> 2. Controls on the end items, systems, equipment, or other items into which those parts, components, accessories, attachments, and software are to be installed or incorporated.
>
> With the exception of technical data specifically enumerated on the USML, the jurisdictional status of unclassified technical data is the same as the jurisdictional status of the defense article or item subject to the EAR to which it is directly related. Thus, if technology is directly related to the production of an ECCN 9A610.x aircraft component that is to be integrated or installed in a USML Category VIII(a) aircraft, the technology is controlled under ECCN 9E610, not USML Category VIII(i).

> **Note 3 to paragraph (a):** Technical data is "peculiarly responsible for achieving or exceeding the controlled performance levels, characteristics, or functions" if it is used in or for use in the development (including design, modification, and integration design), production (including manufacture, assembly, and integration), operation, installation, maintenance, repair, overhaul, or refurbishing of a defense article unless:
>
> 1. The Department of State has determined otherwise in a commodity jurisdiction determination;
> 2. [Reserved];
> 3. It is identical to information used in or with a commodity or software that:
>     i. Is or was in production (i.e., not in development); and
>     ii. Is not a defense article;
> 4. It was or is being developed with knowledge that it is for or would be for use in or with both defense articles and commodities not on the U.S. Munitions List; or

5. It was or is being developed for use in or with general purpose commodities or software (i.e., with no knowledge that it would be for use in or with a particular commodity).

(b) [Reserved]

■ 10. Section 120.47 is added to read as follows:

### § 120.47 Development.

*Development* is related to all stages prior to serial production, such as: design, design research, design analyses, design concepts, assembly and testing of prototypes, pilot production schemes, design data, process of transforming design data into a product, configuration design, integration design, and layouts. Development includes modification of the design of an existing item.

■ 11. Section 120.48 is added to read as follows:

### § 120.48 Production.

*Production* means all production stages, such as product engineering, manufacture, integration, assembly (mounting), inspection, testing, and quality assurance. This includes "serial production" where commodities have passed production readiness testing (i.e., an approved, standardized design ready for large scale production) and have been or are being produced on an assembly line for multiple commodities using the approved, standardized design.

■ 12. Section 120.49 is added to read as follows:

### § 120.49 Technical data that arises during, or results from, fundamental research.

(a) *Technical Data arising during, or resulting from, fundamental research.* Unclassified information that arises during, or results from, fundamental research and is intended to be published is not technical data when the research is:

(1) Conducted in the United States at an accredited institution of higher learning located; or

(2) Funded, in whole or in part, by the U.S. government.

> **Note 1 to paragraph (a):** The inputs used to conduct fundamental research, such as information, equipment, or software, are not "technical data that arises during or results from fundamental research" except to the extent that such inputs are technical data that arose during or resulted from earlier fundamental research.

> **Note 2 to paragraph (a):** There are instances in the conduct of research, whether fundamental, basic, or applied, where a researcher, institution, or company may decide to restrict or protect the release or publication of technical data contained in research results. Once a decision is made to

maintain such technical data as restricted or proprietary, the technical data becomes subject to the ITAR.

(b) *Prepublication review.* Technical data that arises during, or results from, fundamental research is intended to be published to the extent that the researchers are free to publish the technical data contained in the research without any restriction or delay, including U.S. government-imposed access and dissemination controls or research sponsor proprietary information review.

> **Note 1 to paragraph (b):** Although technical data arising during or resulting from fundamental research is not considered "intended to be published" if researchers accept restrictions on its publication, such technical data will nonetheless qualify as technical data arising during or resulting from fundamental research once all such restrictions have expired or have been removed.

> **Note 2 to paragraph (b):** Research that is voluntarily subjected to U.S. government prepublication review is considered intended to be published for all releases consistent with any resulting controls.

> **Note 3 to paragraph (b):** Technical data resulting from U.S. government funded research which is subject to government-imposed access and dissemination or other specific national security controls qualifies as technical data resulting from fundamental research, provided that all government-imposed national security controls have been satisfied.

(c) *Fundamental research definition.* Fundamental research means basic or applied research in science and engineering, the results of which ordinarily are published and shared broadly within the scientific community. This is distinguished from proprietary research and from industrial development, design, production, and product utilization, the results of which ordinarily are restricted for proprietary or national security reasons.

(1) *Basic research* means experimental or theoretical work undertaken principally to acquire new knowledge of the fundamental principles of phenomena or observable facts, not primarily directed towards a specific practical aim or objective.

(2) *Applied research* means the effort that:

(i) Normally follows basic research, but may not be severable from the related basic research;

(ii) Attempts to determine and exploit the potential of scientific discoveries or improvements in technology, materials, processes, methods, devices, or techniques; and

(iii) Attempts to advance the state of the art.

■ 13. Section 120.50 is added to read as follows:

### § 120.50 Release.

(a) Except as set forth in § 120.52, technical data and software are released through:

(1) Visual or other inspection by foreign persons of a defense article that reveals technical data or software to a foreign person; or

(2) Oral or written exchanges with foreign persons of technical data in the United States or abroad.

(b) [Reserved]

■ 14. Section 120.51 is added to read as follows:

### § 120.51 Retransfer.

Except as set forth in § 120.52 of this subchapter, a *retransfer* is a change in end use or end user of a defense article within the same foreign country.

■ 15. Section 120.52 is added to read as follows:

### § 120.52 Activities that are not exports, reexports, or retransfers.

(a) The following activities are not exports, reexports, or retransfers:

(1) Launching a spacecraft, launch vehicle, payload, or other item into space;

(2) While in the United States, releasing technical data or software to a U.S. person;

(3) Shipping, moving, or transferring defense articles between or among the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands or any territory, dependency, or possession of the United States as listed in Schedule C, Classification Codes and Descriptions for U.S. Export Statistics, issued by the Bureau of the Census; and

(4) Sending, taking, or storing technical data or software that is:

(i) Unclassified;

(ii) Secured using end-to-end encryption;

(iii) Secured using cryptographic modules (hardware or software) compliant with the Federal Information Processing Standards Publication 140–2 (FIPS 140–2) or its successors, supplemented by software implementation, cryptographic key management and other procedures and controls that are in accordance with guidance provided in current U.S. National Institute for Standards and Technology publications; and

(iv) Not stored in a country proscribed in § 126.1 of this subchapter or the Russian Federation.

(b) For purposes of this section, end-to-end encryption means the provision of uninterrupted cryptographic protection of data between an originator and an intended recipient, including between an individual and himself or herself. It involves encrypting data by the originating party and keeping that data encrypted except by the intended recipient, where the means to access the data in unencrypted form is not given to any third party, including to any Internet service provider, application service provider or cloud service provider.

(c) The ability to access technical data or software in encrypted form that satisfies the criteria set forth in paragraph (a)(4) of this section does not constitute the release or export of such technical data or software.

**Note to § 120.52:** See § 127.1 of this subchapter for prohibitions on the release or transfer of technical data or software, in any form, to any person with knowledge that a violation will occur.

## PART 123—LICENSES FOR THE EXPORT AND TEMPORARY IMPORT OF DEFENSE ARTICLES

■ 16. The authority citation for part 123 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, 90, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2753; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec. 1205(a), Pub. L. 107–228; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 17. Section 123.28 is added to read as follows:

### § 123.28 Scope of a license.

Unless limited by a condition set out in a license, the export, reexport, retransfer, or temporary import authorized by a license is for the item(s), end-use(s), and parties described in the license application and any letters of explanation. DDTC grants licenses in reliance on representations the applicant made in or submitted in connection with the license application, letters of explanation, and other documents submitted.

## PART 124—AGREEMENTS, OFF-SHORE PROCUREMENT, AND OTHER DEFENSE SERVICES

■ 18. The authority citation for part 124 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, 90, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; 22 U.S.C. 2776; Section 1514, Pub. L. 105–261; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 19. Section 124.1 is amended by adding paragraph (e) to read as follows:

### § 124.1 Manufacturing license agreements and technical assistance agreements.

*    *    *    *    *

(e) Unless limited by a condition set out in an agreement, the export, reexport, retransfer, or temporary import authorized by a license is for the item(s), end-use(s), and parties described in the agreement, license, and any letters of explanation. DDTC approves agreements and grants licenses in reliance on representations the applicant made in or submitted in connection with the agreement, letters of explanation, and other documents submitted.

## PART 125—LICENSES FOR THE EXPORT OF TECHNICAL DATA AND CLASSIFIED DEFENSE ARTICLES

■ 20. The authority citation for part 125 continues to read as follows:

**Authority:** Secs. 2 and 38, 90, 90 Stat. 744 (22 U.S.C. 2752, 2778); 22 U.S.C. 2651a; E.O. 13637, 78 FR 16129.

■ 21. Section 125.4 is amended by revising paragraph (b)(9) to read as follows:

### § 125.4 Exemptions of general applicability.

*    *    *    *    *

(b) *    *    *

(9) Technical data, including classified information, regardless of media or format, exported by or to a U.S. person or a foreign person employee of a U.S. person, travelling or on temporary assignment abroad subject to the following restrictions:

(i) Foreign persons may only export or receive such technical data as they are authorized to receive through a separate license or other approval.

(ii) The technical data exported under this authorization is to be possessed or used solely by a U.S. person or authorized foreign person and sufficient security precautions must be taken to prevent the unauthorized release of the technology. Such security precautions include encryption of the technical data, the use of secure network connections, such as virtual private networks, the use of passwords or other access restrictions on the electronic device or media on which the technical data is stored, and the use of firewalls and other network security measures to prevent unauthorized access.

(iii) The U.S. person is an employee of the U.S. government or is directly employed by a U.S. person and not by a foreign subsidiary.

(iv) Technical data authorized under this exception may not be used for foreign production purposes or for defense services unless authorized through a license or other approval.

(v) The U.S. employer of foreign persons must document the use of this exemption by foreign person employees,

Case 2:20-cv-00111-RAJ Document 83-21 Filed 08/18/20 Page 117 of 296
Case 4:19-cv-00063-RAJ Document 83-21 Filed 08/18/20 Page 164 of 296

31538　　Federal Register / Vol. 80, No. 106 / Wednesday, June 3, 2015 / Proposed Rules

including the reason that the technical data is needed by the foreign person for their temporary business activities abroad on behalf of the U.S. person.

(vi) Classified information is sent or taken outside the United States in accordance with the requirements of the Department of Defense National Industrial Security Program Operating Manual (unless such requirements are in direct conflict with guidance provided by the Directorate of Defense Trade Controls, in which case such guidance must be followed).

\* 　 \* 　 \* 　 \* 　 \*

## PART 127—VIOLATIONS AND PENALTIES

■ 22. The authority citation for part 127 continues to read as follows:

**Authority:** Sections 2, 38, and 42, 90, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2791); 22 U.S.C. 401; 22 U.S.C. 2651a; 22 U.S.C. 2779a; 22 U.S.C. 2780; E.O. 13637, 78 FR 16129.

■ 23. Section 127.1 is amended by adding paragraphs (a)(6) and (b)(4) to read as follows:

### § 127.1　Violations.

(a) \* 　 \* 　 \*

(6) To export, reexport, retransfer, or otherwise make available to the public technical data or software if such person has knowledge that the technical data or software was made publicly available without an authorization described in § 120.11(b) of this subchapter.

(b) \* 　 \* 　 \*

(4) To release or otherwise transfer information, such as decryption keys, network access codes, or passwords, that would allow access to other technical data in clear text or to software that will result, directly or indirectly, in an unauthorized export, reexport, or retransfer of the technical data in clear text or software. Violation of this provision will constitute a violation to the same extent as a violation in connection with the export of the controlled technical data or software.

\* 　 \* 　 \* 　 \* 　 \*

Dated: May 20, 2015.

**Rose E. Gottemoeller,**

*Under Secretary, Arms Control and International Security, Department of State.*

[FR Doc. 2015–12844 Filed 6–2–15; 8:45 am]

**BILLING CODE 4710–25–P**

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### 24 CFR Parts 91 and 576

[Docket No. FR–5474–N–02]

RIN 2506–AC29

### Emergency Solutions Grants (ESG) Program, Solicitation of Comment on Specific Issues

**AGENCY:** Office of the Assistant Secretary for Community Planning and Development, HUD.

**ACTION:** Regulatory review; request for comments.

**SUMMARY:** On December 5, 2011, HUD published an interim rule entitled "Homeless Emergency Assistance and Rapid Transition to Housing: Emergency Solutions Grants Program and Consolidated Plan Conforming Amendments" (interim rule). The comment period for the interim rule ended on February 3, 2012. Because recipients and subrecipients have now had more experience implementing the interim rule, HUD recognizes that they may have additional input and comments for HUD to consider in its development of the ESG final rule (final rule). Therefore, this document takes comments for 60 days to allow additional time for public input, and for HUD to solicit specific comment on certain issues.

**DATES:** *Comment due date:* August 3, 2015.

**ADDRESSES:** Interested persons are invited to submit comments responsive to this request for information to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW., Room 10276, Washington, DC 20410–7000. Communications must refer to the above docket number and title and should contain the information specified in the "Request for Comments" of this notice.

*Electronic Submission of Comments.* Interested persons may submit comments electronically through the Federal eRulemaking Portal at *http:// www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make them immediately available to the public. Comments submitted electronically through the *http:// www.regulations.gov* Web site can be viewed by interested members of the public. Commenters should follow

instructions provided on that site to submit comments electronically.

*Submission of Hard Copy Comments.* Comments may be submitted by mail or hand delivery. To ensure that the information is fully considered by all of the reviewers, each commenter submitting hard copy comments, by mail or hand delivery, should submit comments or requests to the address above, addressed to the attention of the Regulations Division. Due to security measures at all federal agencies, submission of comments or requests by mail often result in delayed delivery. To ensure timely receipt of comments, HUD recommends that any comments submitted by mail be submitted at least 2 weeks in advance of the public comment deadline. All hard copy comments received by mail or hand delivery are a part of the public record and will be posted to *http:// www.regulations.gov* without change.

**Note:** To receive consideration as public comments, comments must be submitted through one of the two methods specified above. Again, all submissions must refer to the docket number and title of the rule.

*No Facsimile Comments.* Facsimile (fax) comments are not acceptable.

*Public Inspection of Comments.* All comments submitted to HUD regarding this notice will be available, without charge, for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the above address. Due to security measures at the HUD Headquarters building, an advance appointment to review the documents must be scheduled by calling the Regulation Division at 202–708–3055 (this is not a toll-free number). Copies of all comments submitted will also be available for inspection and downloading at *http:// www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Norm Suchar, Director, Office of Special Needs Assistance Programs, Office of Community Planning and Development, Department of Housing and Urban Development, 451 7th Street SW., Room 7262, Washington, DC 20410–7000, telephone number (202) 708–4300 (this is not a toll-free number). Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Relay Service at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

# Exhibit E

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
|     Defendants. | § | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

DOSWASHINGTONSUP00397

# TABLE OF CONTENTS

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** ................................................................ 1

**BACKGROUND** ........................................................................................... 3

    **I.**    **Statutory and Regulatory Framework** ........................................... 3

    **II.**    **Defendants' Regulation of Plaintiffs' Conduct** ............................ 4

**LEGAL STANDARD** ................................................................................... 7

**ARGUMENT** ................................................................................................ 7

    **I.**    **Plaintiffs' Motion for a Preliminary Injunction Should Be Denied.** ................. 7

        A.    Plaintiffs Have Failed to Carry Their Burden of Demonstrating Irreparable Injury. ................. 8

        B.    The Threatened Harm to the National Security and Foreign Policy Interests of the United States From an Injunction Outweighs any Irreparable Harm to Plaintiffs. ................. 10

        C.    The Public Interest Would be Disserved By a Preliminary Injunction. ................. 11

    **II.**    **Plaintiffs' Motion for a Preliminary Injunction Should Be Denied Because Plaintiffs Have Not Shown a Substantial Likelihood of Success on the Merits.** ................. 11

        A.    The Export of CAD Files That Function to Automatically Create a Firearm or its Components is Not the Publishing of an Item of Expressive Speech. ................. 11

        B.    Even If Limiting the Export of CAD Files Implicates the First Amendment, Defendants Are Likely to Prevail on Plaintiffs' First Amendment Claims. ................. 14

            1.    ITAR's Export Controls Are a Valid, Content-Neutral Regulation of Plaintiffs' Conduct That Do Not Infringe First Amendment Rights. ................. 15

            2.    ITAR's Export Controls Are Not a Facially Unconstitutional Prior Restraint. ................. 18

            3.    ITAR's Export Controls Are Not Unconstitutionally Overbroad. ................. 21

        B.    Defendants Are Likely to Prevail on Plaintiffs' Second Amendment Claims. ................. 22

            1.    Plaintiffs Lack Standing for Their Second Amendment Claims. ................. 22

            2.    Plaintiffs Are Unlikely to Succeed on Their Second Amendment Claims. ................. 25

C.  Defendants Are Likely to Prevail on Plaintiffs' Other Claims. ................ 27

    1.  ITAR's Standards Are Not Void for Vagueness. ............................ 27

    2.  Application of ITAR's Export Requirements to Plaintiffs'
    CAD Files Does Not Exceed the Statutory Authority Granted by
    Congress.................................................................................................. 28

**CONCLUSION** ........................................................................................................ **31**

DOSWASHINGTONSUP00399

# TABLE OF AUTHORITIES

## Cases

*AF Holdings, LLC. v. Does 1-1058*,
  752 F.3d 990 (D.C. Cir. 2014) ........................................................................................ 6

*Alexander v. U.S.*,
  509 U.S. 544 (1993) ...................................................................................................... 18

*Bernstein v. U.S. Dep't of Justice*,
  176 F.3d 1132 (9th Cir. 1999) ...................................................................................... 13

*Bonds v. Tandy*,
  457 F.3d 409 (5th Cir. 2006) ........................................................................................ 24

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ...................................................................................................... 21

*Brockett v. Spokane Arcades*,
  472 U.S. 491 (1985) ................................................................................................ 21, 22

*Brown v. District of Columbia*,
  888 F. Supp. 2d 28 (D.D.C. 2012) .................................................................................. 9

*Brown v. Entm't Merchants Ass'n*,
  131 S. Ct. 2729 (2011) .................................................................................................. 12

*Brown v. Town of Cary*,
  706 F.3d 294 (4th Cir. 2013) ........................................................................................ 28

*Bullfrog Films v. Wick*,
  646 F. Supp. 492 (C.D. Cal. 1986) ............................................................................... 14

*Canal Auth. of State of Fla. v. Callaway*,
  489 F.2d 567 (5th Cir. 1974) .......................................................................................... 8

*Capital Cities/ABC, Inc. v. Brady*,
  740 F. Supp. 1007 (S.D.N.Y. 1990) ........................................................................ 16, 19

*Carey v. Population Servs. Int'l*,
  431 U.S. 678 (1977) ...................................................................................................... 25

*City of Lakewood v. Plain Dealer Pub. Co.*,
  486 U.S. 750 (1988) .................................................................................. 18, 19, 20, 21

*City of Littleton v. Z.J. Gifts D-4*,
  541 U.S. 774 (2004) ...................................................................................................... 20

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984) ...................................................................................................... 15

*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971) ...................................................................................................... 28

*Corrosion Proof Fittings v. EPA*,
  947 F.2d 1201 (5th Cir. 1991) ...................................................................................... 25

*Ctr. for Biological Diversity v. Salazar*,
  706 F.3d 1085 (9th Cir. 2013) ........................................................................................ 8

*DaimlerChrysler v. Cuno*,
  547 U.S. 332 (2006) ...................................................................................................... 23

*Dole v. Petroleum Treaters*,
  876 F.2d 518 (5th Cir. 1989) ........................................................................................ 30

*Emergency Coal. to Defend Educ. Travel v. Dep't of Treas.*,

545 F.3d 4 (D.C. Cir. 2008) ............................................................................................ 16

*Escamilla v. M2,*
Tech., 2013 WL 4577538 (E.D. Tex. 2013) ................................................................. 11

*Faculty Senate of Fla. Int'l U. v. Winn,*
477 F. Supp. 2d 1198 (S.D. Fla. 2007) ......................................................................... 9

*Feit v. Ward,*
886 F.2d 848 (7th Cir. 1989) ......................................................................................... 1

*Forsyth Cnty., Ga. v. Nationalist Movement,*
505 U.S. 123 (1992) ...................................................................................................... 21

*Frank v. Relin,*
1 F.3d 1317 (2d Cir. 1993) ............................................................................................ 1

*Freedman v. Maryland,*
380 U.S. 51 (1965) .............................................................................................. 19, 20

*Gonannies, Inc. v. Goupair.Com, Inc.,*
464 F. Supp. 2d 603 (N.D. Tex. 2006) .......................................................................... 9

*Haig v. Agee,*
453 U.S. 280 (1981) ...................................................................................................... 14

*Heller v. District of Columbia,*
670 F.3d 1244 (D.C. Cir. 2011) ................................................................................... 27

*Henderson v. Stalder,*
287 F.3d 374 (5th Cir. 2002) ....................................................................................... 23

*Holy Land Found. v. Ashcroft,*
219 F. Supp. 2d 57 (D.D.C. 2002), ............................................................................. 11

*House the Homeless v. Widnall,*
94 F.3d 176 (5th Cir. 1996) ........................................................................... 7, 12, 13

*Huitron-Guizar,*
678 F.3d 1169 ............................................................................................................... 24

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
515 U.S. 557 (1995) ...................................................................................................... 12

*In re Iraq & Afg. Detainees Litig.,*
479 F. Supp. 2d 85 (D.D.C. 2007) ................................................................................ 2

*Johnson v. Moore,*
958 F.2d 92 (5th Cir. 1992) ......................................................................................... 24

*Junger v. Daley,*
209 F.3d 481 (6th Cir. 2000) ....................................................................................... 13

*Karn v. Dep't of State,*
925 F.Supp. 1 (D.D.C.1996) ........................................................................................ 13

*Katt v. Dykhouse,*
983 F.2d 690 (6th Cir. 1992) ....................................................................................... 17

*Kirby v. City of Elizabeth,*
388 F.3d 440 (4th Cir. 2004) ......................................................................................... 1

*Kleindienst v. Mandel,*
408 U.S. 753 (1972) ...................................................................................................... 18

*Kleinman v. City of San Marcos,*
597 F.3d 323 (5th Cir. 2010) ....................................................................................... 17

DOSWASHINGTONSUP00401

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.*,
   604 F. Supp. 280 (D.D.C. 1984) ........................................................................ 14

*Linick v. U.S.*,
   104 Fed. Cl. 319 (Fed. Cl. 2012) ..................................................................... 18

*Lorillard v. Pons*,
   434 U.S. 575 (1978) ......................................................................................... 30

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................................................... 24

*Mance v. Holder*,
   2015 WL 567302 (N.D. Tex. Feb. 11, 2015) .................................................. 25

*Marchese v. California*,
   545 F.2d 645 (9th Cir. 1976) ........................................................................... 26

*Martinez v. Mathews*,
   544 F.2d 1233 (5th Cir. 1976) ................................................................... passim

*Milena Ship Mgmt. Co. v. Newcomb*,
   804 F. Supp. 846 (E.D. La. 1992) ...................................................................... 8

*Miss. State Democratic Party v. Barbour*,
   529 F.3d 538 (5th Cir. 2008) ........................................................................... 23

*Munn v. Ocean Springs, Miss.*,
   763 F.3d 437 (5th Cir. 2014) ..................................................................... 27, 28

*N.Y. State Club Ass'n v. City of New York*,
   487 U.S. 1 (1987) ............................................................................................ 21

*NAACP v. Kyle, Tex.*,
   626 F.3d 233 (5th Cir. 2010) ........................................................................... 23

*Nation Magazine v. Dep't of Def.*,
   762 F. Supp. 1558 (S.D.N.Y. 1991) ................................................................ 14

*Nat'l Rifle Ass'n v. ATF*,
   700 F.3d 185 (5th Cir. 2012) ........................................................ 24, 25, 26, 27

*Near v. State of Minn.*,
   283 U.S. 697 (1931) ......................................................................................... 20

*Osterweil v. Edmonson*,
   424 F. App'x 342 (5th Cir. 2011) .................................................................... 24

*Planned Parenthood Ass'n of Hidalgo Cnty. Tex. v. Suehs*,
   692 F.3d 343 (5th Cir. 2012) ................................................................... 2, 7, 14

*Promotions v. Conrad*,
   420 U.S. 546 (1975) ......................................................................................... 20

*Pub. Citizen, Inc. v. Bomer*,
   274 F.3d 212 (5th Cir. 2001) ........................................................................... 23

*Reeves v. McConn*,
   631 F.2d 377 (5th Cir. 1980) ........................................................................... 28

*Reliable Consultants, Inc. v. Earle*,
   517 F.3d 738 (5th Cir. 2008) ........................................................................... 25

*RTM Media, L.L.C. v. City of Houston*,
   584 F.3d 220 (5th Cir. 2009) ........................................................................... 17

*Scott v. Flowers*,
   910 F.2d 201 (5th Cir. 1990) ............................................................................. 1

DOSWASHINGTONSUP00402

*Sec'y State of Md. v. Munson*,
    467 U.S. 947 (1984) ................................................................. 22

*Siegel v. Lepore*,
    234 F.3d 1163 (11th Cir. 2000) ............................................... 9

*Spence v. Washington*,
    418 U.S. 405 (1974) ............................................................... 12

*Teague v. Reg'l Comm'r of Customs*,
    404 F.2d 441 (2d Cir. 1968) .................................................... 20

*Texas v. Johnson*,
    491 U.S. 397 (1989) ............................................................... 12

*Thomas v. Chicago Park Dist.*,
    534 U.S. 316 (2002) ............................................................... 21

*Tough Traveler, Ltd. v. Outbound Prods.*,
    60 F.3d 964 (2d Cir. 1995) ....................................................... 9

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ............................................................... 15

*U.S. Civil Service Comm. v. Nat'l Ass'n of Letter Carriers*,
    413 U.S. 548 (1973) ............................................................... 28

*U.S. v. 12 200-Ft. Reels*,
    413 U.S. 123 (1972) ............................................................... 14

*U.S. v. Bell*,
    414 F.3d 474 (3d Cir. 2005) ................................................... 17

*U.S. v. Chi Mak*,
    683 F.3d 1126 (9th Cir. 2012) ......................................... passim

*U.S. v. Edler Indus.*,
    579 F.2d 516 (9th Cir. 1978) .......................................... passim

*U.S. v. Gurrola-Garcia*,
    547 F.2d 1075 (9th Cir. 1976) ............................................... 26

*U.S. v. Hicks*,
    980 F.2d 963 (5th Cir. 1992) ................................................. 21

*U.S. v. Hoffman*,
    10 F.3d 808  (9th Cir. 1993) .................................................. 17

*U.S. v. Huitron-Guizar*,
    678 F.3d 1164 (10th Cir. 2012) ............................................. 16

*U.S. v. Mandel*,
    914 F.2d 1215 (9th Cir. 1990) ............................................... 18

*U.S. v. Martinez*,
    904 F.2d 601 (11th Cir. 1990) ............................................... 18

*U.S. v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) .................................................... 26

*U.S. v. Merkt*,
    794 F.2d 950 (5th Cir. 1986) ................................................... 2

*U.S. v. O'Brien*,
    391 U.S. 367 (1968) .......................................................... 12, 17

*U.S. v. Posey*,
    864 F.2d 1487 (9th Cir. 1989) ........................................... 17, 18

*U.S. v. Ramsey*,
    431 U.S. 606 (1977)........................................................................................ 2, 3
*U.S. v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) ........................................................................ 11
*U.S. v. W.T. Grant Co.*,
    345 U.S. 629 (1953)........................................................................................ 9
*U.S. v. Yakou*,
    428 F.3d 241 (D.C. Cir. 1995)...................................................................... 30
*Voting for Am. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) ........................................................................ 16
*W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*,
    302 F. Supp. 2d 672 (S.D. Tex. 2004)........................................................... 9
*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)................................................................................. 15, 21
*Warth v. Seldin*,
    422 U.S. 490 (1975)...................................................................................... 21
*Water Keeper Alliance v. Dep't of Def.*,
    152 F. Supp. 2d 155 (D.P.R. 2001),.............................................................. 11
*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008)..................................................................................... 7, 8, 11
*Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*,
    No. 3:05-CV-0094, 2006 WL 1540587 (N.D. Tex. June 6, 2006) ................ 9
*Wolfe v. Strankman*,
    392 F.3d 358 (9th Cir. 2004) .......................................................................... 1

## Statutes

22 U.S.C. § 2751 et seq.,...................................................................................... 3
22 U.S.C. § 2778(a)(1)..................................................................... 3, 11, 15, 29
50 U.S.C. § 5(b) (1964)...................................................................................... 20
22 U.S.C. § 2778(a)(2)....................................................................................... 29
22 U.S.C. § 2778(b)(1)(A)(i) ............................................................................. 29
22 U.S.C. § 2778(b)(2)........................................................................................ 29

## Regulations

22 C.F.R. § 120.10 ...................................................................................... 19, 21
22 C.F.R. § 120.10(a)......................................................................................... 28
22 C.F.R. § 120.10(a)(1) ..................................................................................... 7
22 C.F.R. § 120.10(a)(5) ................................................................................... 22
22 C.F.R. § 120.16 .............................................................................................. 4
22 C.F.R. § 120.17(a)(1) ..................................................................................... 4
22 C.F.R. § 120.17(a)(3) ..................................................................................... 4
22 C.F.R. § 120.17(a)(4) ..................................................................................... 4
22 C.F.R. § 120.3 ............................................................................................... 27
22 C.F.R. § 120.4 ................................................................................................ 4
22 C.F.R. § 120.4(d)(1)-(2)................................................................................. 5

22 C.F.R. § 121.1(I)(a) .................................................................................................... 3

22 C.F.R. § 125.11 ........................................................................................................... 28

22 C.F.R. § 125.11(a)(1) ................................................................................................. 30

22 C.F.R. §§ 120-130 ........................................................................................................ 4

22 C.F.R. Part 120 ........................................................................................................... 16

22 C.F.R. Part 121 ..................................................................................................... 3, 19

## **Executive Orders**

Executive Order 12637 ...................................................................................................... 4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
|     Defendants. | § | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

At issue in this litigation is the United States' system of export controls for weapons—laws and regulations that seek to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, foreign policy, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files that are indispensable to the creation of guns and their components through a three-dimensional ("3D") printing process. There is no dispute that the Government does not restrict Plaintiffs from sharing CAD files domestically or from using CAD files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek a mandatory preliminary injunction to bar the Government from preventing the *export* of these design files, which can be easily used to manufacture arms overseas. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—the CAD files unquestionably control the functioning of a 3D printer and cause it to manufacture firearms. Whatever informational value there may be in the process by which 3D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' motion for a preliminary injunction should be denied.[1]

---

[1] Injunctive relief designed to affect the conduct of a government entity is available only from official-capacity defendants. *See Scott v. Flowers*, 910 F.2d 201, 213 n.25 (5th Cir. 1990); *accord Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004); *Kirby v. City of Elizabeth*, 388 F.3d 440, 452 n.10 (4th Cir. 2004); *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993); *Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989); *In re Iraq & Afg. Detainees Litig.*, 479 F. Supp. 2d 85, 118-19 (D.D.C. 2007). This brief is therefore filed only on behalf of Defendants in their official

The Fifth Circuit and the Supreme Court have set forth a demanding four-part test to obtain a preliminary injunction and require that a party seeking such an "extraordinary remedy . . . clearly carr[y] the burden of persuasion" on each element. *Planned Parenthood Ass'n of Hidalgo Cnty. Tex. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012). Plaintiffs here have not even attempted to demonstrate: (1) "a substantial threat of irreparable injury if the injunction were not granted," (2) "that their substantial injury outweigh[s] the threatened harm to the party whom they [seek] to enjoin," or (3) "that granting the preliminary injunction would not disserve the public interest." *Id.* As Defendants show below, while Plaintiffs face little immediate harm, entry of an injunction would be likely to irrevocably harm national security and foreign policy and damage the public interest. Under these circumstances, Plaintiffs' failure to address the legal requirements for a preliminary injunction alone warrants the straightforward denial of their motion without addressing the legal issues raised by Plaintiffs' arguments on the merits.

Nonetheless, Plaintiffs also have no likelihood of success on the merits. The International Traffic in Arms Regulations ("ITAR") regulate only the export of defense articles and defense services for the legitimate and important purpose of protecting national security and U.S. foreign policy interests. "Control of one's borders . . . is an essential feature of national sovereignty," *U.S. v. Merkt*, 794 F.2d 950, 955 (5th Cir. 1986), and it is well established that the United States has authority to regulate the trafficking of articles, particularly military articles, across those borders. *See U.S. v. Ramsey*, 431 U.S. 606, 619 (1977) ("border search" exception to Fourth Amendment rooted in "different rules of constitutional law" than apply domestically).

Plaintiffs characterize the cross-border transmission of digital instructions that automatically generate firearms as the "publication" of expression and claim that any licensing requirement on such export is an impermissible prior restraint on speech. But that claim is wrong both factually and legally. The Government does not seek to limit Plaintiffs from spreading ideas or information *about* 3D printing, but rather seeks to apply the generally applicable conduct regulation on exports of arms to CAD files that indisputably control the

---

capacities, and the term "Defendants," as used herein, does not include the individual-capacity Defendants in this action.

DOSWASHINGTONSUP00407

functioning of a 3D printer and direct it to manufacture firearms. For these reasons, as other courts have concluded, the claim that the First Amendment forbids application of ITAR's export requirements to these items is meritless.

There is also no dispute that Plaintiffs may use these CAD files to make or acquire firearms in connection with their right to keep and bear arms under the Second Amendment. That Plaintiffs have not done so because they wish to "facilitat[e] *global* access to arms," Complaint ("Compl."), ECF No. 1 at ¶ 1,[2] calls into doubt whether their Second Amendment rights are even at issue, and in any case, Plaintiffs' Second Amendment and other claims likewise fail to satisfy the essential minimums of the legal theories that Plaintiffs assert. The Court should therefore deny Plaintiffs' motion.

## BACKGROUND

## I.      Statutory and Regulatory Framework

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq*., authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States" to "control the import and the export of defense articles and defense services" and to promulgate regulations accordingly. 22 U.S.C. § 2778(a)(1). At the heart of the AECA is the United States Munitions List ("USML"), an extensive listing of materials that constitute "defense articles and defense services" under the AECA. 22 C.F.R. Part 121. Category I of the USML includes all firearms up to .50 caliber, and all technical data directly related to such firearms. *See* 22 C.F.R. § 121.1(I)(a). Technical data is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." *Id.* § 120.10(a).[3] Section 2778(a) of the AECA authorizes the

---

[2] *See* Mem. in Support of Pls. Mot. for Prelim. Injunction, ECF No. 8 ("Pl. Br."), Ex. 1 ¶ 2 (Decl. of Cody Wilson); *id.* at App. 270 (deposit from prospective foreign "Ghost Gunner" buyer).

[3] Technical data includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation," and broadly exempts information already in the public domain, as defined in Section 120.11. *Id.* § 120.10. On June 3, 2014, the State Department issued a Notice of Proposed Rulemaking to update, *inter alia*, the definitions of "technical data" in the ITAR, the scope of the "public domain" exemption, and the application of ITAR to technical data on the Internet. *See* 80 Fed. Reg. 31525; Aguirre Decl. ¶ 11. The proposal would clarify that CAD files are a form of "technical data" and make explicit that providing technical data on a publicly accessible network, such as the Internet, is an export because of its inherent accessibility to foreign powers. 80 Fed. Reg. 31525. As relevant here, the clarified definitions in this NPRM

DOSWASHINGTONSUP00408

President: (1) to designate those defense articles and services to be included on the USML; (2) to require licenses for the export of items on the USML; and (3) to promulgate regulations for the import and export of such items on the USML. *Id.* The President has delegated to the State Department this authority, and the Department has accordingly promulgated the ITAR, which is administered by the State Department's Directorate of Defense Trade Controls ("DDTC"). *See* Executive Order 13637(n)(iii); 22 C.F.R. §§ 120-130.

Importantly, ITAR does not regulate any activities except those that constitute "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons. ITAR's definition of exports includes, in relevant part: (1) "[s]ending or taking a defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2) "[d]isclosing (including oral or visual disclosure) or transferring in the United States any defense article to an embassy, any agency or subdivision of a foreign government," *id.* § 120.17(a)(3); and (3) "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." *Id.* § 120.17(a)(4).

In the vast majority of circumstances, there is no doubt as to whether a particular item to be exported is a defense article or defense service. *See* Declaration of Lisa V. Aguirre ("Aguirre Decl.") ¶ 19. For those cases in which there is doubt, however, ITAR contains a "commodity jurisdiction" ("CJ") procedure. Upon written request, the DDTC will provide potential exporters with a determination as to whether the item, service, or data is within the scope of ITAR. 22 C.F.R. § 120.4. These assessments are made on a case-by-case basis through an inter-agency process, evaluating whether the article is covered by the USML, is functionally equivalent to an article on the USML, or has substantial military or intelligence application. *See id.* § 120.4(d).

## II. Defendants' Regulation of Plaintiffs' Conduct

On May 8, 2013, shortly after learning about Defense Distributed's unrestricted posting of CAD files to the Internet, the DDTC's Enforcement Division sent a letter to Defense Distributed noting that "it is unlawful to export any defense article or technical data for which a

---

would simply confirm that treatment of the Plaintiffs' posting of the CAD files to the Internet under the current regulations would remain the same, and thus Defendants do not anticipate the NPRM would impact application of the ITAR to the files at issue in this case.

4

license or written approval is required without first obtaining the required authorization from the DDTC." Pl. Br. at App. 14; *see* Ex. 1. Observing that "disclosing (including oral or visual disclosure) or transferring foreign data to a foreign person, whether in the United States or abroad, is considered an export," DDTC requested that Defense Distributed submit CJ determination requests for ten CAD files and that Defense Distributed "treat [this] technical data as ITAR-controlled" until DDTC could "provide[] Defense Distributed with final CJ determinations." Pl. Br. at App. 14-15. These files included "a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun named 'The Liberator.'" Pl. Br. at App. 1, ¶ 3. DDTC therefore suggested that the technical data be removed from Defense Distributed's website—*i.e.*, a location in which it would be disclosed without limitation to a foreign person, *see* 22 C.F.R. § 120.16, should any foreign person visit Defense Distributed's website and download the file, during the review process. Defendants did not suggest in any way that Defense Distributed's CAD files could not be provided to U.S. persons within the U.S. or otherwise used, altered, or discussed in ways that would not constitute "exports."

On June 21, 2013, Defense Distributed filed CJ requests for the ten items identified in the DDTC letter. Defense Distributed described its submissions as "data files" that are "essentially blueprints that can be read by CAD software . . . [as] a means of creating physical 3D models of objects." Pl. Br. at App. 208. These data files instruct 3D printers to create:

> (1) sixteen . . . parts and components of the ["Liberator"] pistol [which] could be assembled into a single shot .380 caliber firearm;
> (2) a barrel and grip for a .22 caliber pistol;
> (3) a solid piece of plastic in the shape of [a 125 mm BK-14M High Explosive Anti-Tank ("HEAT") Warhead];
> (4) a plastic piece in the shape of [a 5.56/.223] muzzle brake;
> (5) nineteen . . . components of a pistol slide for the Springfield XD-40;
> (6) a slip-on sound moderator for an air gun;
> (7) "The Dirty Diane" . . . an oil filter silencer adapter;
> (8) a model of a sub-caliber insert [for] a cylinder with a .22 bore;
> (9) Voltock Electronic Black Powder System . . . models of cylinders of various bores;
> (10)     a model of a sight for a VZ-58 rifle.

Pl. Br. at App. 210.

At no time did Defense Distributed inquire about whether ITAR would affect its distribution of CAD files to U.S. persons within the United States or would limit its ability, or

DOSWASHINGTONSUP00410

that of other U.S. persons, to use the CAD files in 3D printing.[4]

While the Government reviewed Defense Distributed's first CJ ten requests, Defense Distributed submitted an additional request on January 2, 2015, seeking a determination on: (1) the "Ghost Gunner," a "3-axis, computer-numerically-controlled [machine] . . . designed, developed, and manufactured by Defense Distributed to *automatically manufacture* publicly available designs with nearly zero user interaction." Pl. Br. at App. 267 (emphasis added). On April 15, 2015, DDTC provided a CJ determination to Defense Distributed, finding that the Ghost Gunner would not be subject to the jurisdiction of the Department of State (although "project files, data files, or any form of technical data for producing a defense article" would be subject to ITAR jurisdiction). *Id.* at App. 280-81.

On June 4, 2015, review of Defense Distributed's first ten requests was completed and DDTC provided CJ determinations for the requested items. *See* Aguirre Decl. ¶ 28. As explained in DDTC's determination letter, the Department of State determined that only six of the CAD files were subject to ITAR control: those for the "Liberator pistol," ".22 [caliber] electric [pistol]," "5.56/.223 muzzle brake," "Springfield XD-40 tactical slide assemble," "sub-caliber insert," and "VZ-58 front sight." *Id.* In finding the CAD files to be within the commodity jurisdiction of the State Department, DDTC classified the CAD files as technical data under Category I, subsection (i) of the USML, relying on the definition of technical data in § 120.10(a)(1). As DDTC's letter explained, these determinations require that a "license or other approval . . . pursuant to the ITAR" be obtained before any export of these CAD files. *Id.*

As to the items determined to be within ITAR's commodity jurisdiction, the CJ review process concluded that Defense Distributed's CAD files constitute electronic data that can be used, in conjunction with a 3D printer, to automatically, and without further human intervention, generate a defense article or a component of a defense article identified on the USML. *See*

---

[4] ITAR jurisdiction is limited to *exports* of defense articles and related technical data and does not prohibit the transmission of defense articles from one U.S. person to another known to be a U.S. person within the U.S. Although DDTC's May 8, 2013 letter expressed DDTC's concerns about Defense Distributed's unrestricted postings to the Internet, the availability of online material to users outside the U.S. can be limited in a number of ways. For example, Internet users can be generally located using their Internet Protocol addresses. *See generally AF Holdings, v. Does 1-1058*, 752 F.3d 990, 996 (D.C. Cir. 2014) (discussing geolocation services).

DOSWASHINGTONSUP00411

Aguirre Decl. ¶¶ 29-30. The CAD files are "technical data" that are regulated by the ITAR because, absent such regulation, providing the CAD designs to a foreign person or foreign government would be equivalent to providing the defense article itself, enabling the complete circumvention of ITAR's export regulations.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). Rather, a plaintiff seeking a preliminary injunction must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that their substantial injury outweighed the threatened harm to the party whom they sought to enjoin, and (4) that granting the preliminary injunction would not disserve the public interest." *Suehs*, 692 F.3d at 348. "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Due to its "extraordinary" nature, no preliminary injunction should be "granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Id.* (internal quotation omitted).

Here, Plaintiffs' burden is even higher, given the nature of the injunction they seek. Plaintiffs ask this Court to enjoin Defendants "from enforcing any prepublication approval requirement against unclassified information under the International Traffic in Arms Regulations." Proposed Order, ECF No. 7, at 1. This request constitutes "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo *pendente lite*." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (citations omitted). Such relief "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Id.* (citations omitted); *see also Milena Ship Mgmt. Co. v. Newcomb*, 804 F. Supp. 846, 852-55 (E.D. La. 1992).

## ARGUMENT

### I.    Plaintiffs' Motion for a Preliminary Injunction Should Be Denied.

Plaintiffs must persuasively demonstrate that each of the four conditions for a preliminary

DOSWASHINGTONSUP00412

injunction is met, not just a single element of their choosing. *See Winter*, 555 U.S. at 20. This requirement serves interests of critical importance; among them, "preserv[ation] of the court's ability to render a meaningful decision on the merits" based on a fully developed record and the reasoned and considered arguments of the parties. *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974); *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013). Nevertheless, Plaintiffs have elected to rely on only one element of the standard: their likelihood of success. They give short shrift—less than one page in a brief for which the Court granted leave to extend the page limits to thirty—to the three other elements. Plaintiffs' failure to address these other elements alone warrants denial of their motion.

**A.      Plaintiffs Have Failed to Carry Their Burden of Demonstrating Irreparable Injury**.

As the Supreme Court explained in *Winter*, because "[a] preliminary injunction is an extraordinary remedy," courts must consider the actual "effect on each party of the granting or withholding" of relief and do so "[i]n each case." 555 U.S. at 24. But Plaintiffs have disregarded this principle and offered no specifics to support their claim of irreparable harm other than the allegation that Defendants have infringed upon their constitutional rights. *See* Pl. Br. at 29. This *pro forma* statement—particularly in light of Defendants' demonstration below that Plaintiffs' rights have not been violated—is insufficient to carry Plaintiffs' burden to obtain a mandatory injunction.

The presumption that alleged violations of constitutional rights can be sufficient to presume irreparable injury for purposes of injunctive relief should only be made "where there is an 'imminent likelihood that *pure speech* will be chilled or prevented altogether'," and the circumstances presented here undercut Plaintiffs' argument that such injury has occurred. *Faculty Senate of Fla. Int'l U. v. Winn*, 477 F. Supp. 2d 1198 (S.D. Fla. 2007) (declining to find irreparable harm in limits on foreign academic research) (quoting *Siegel v. Lepore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (en banc)). First, Plaintiffs' claim of imminent irreparable injury is significantly undermined by their delay in seeking judicial relief. Plaintiffs challenge the State Department's application of the ITAR to unrestricted postings of technical data on their website—an application of which they have been aware since receiving the State Department's

8

May 8, 2013 letter.  *See* Compl. ¶¶ 25-27.  Nearly two years later, on May 6, 2015, Plaintiffs

filed this lawsuit.  ECF No. 1.  "[D]elay in seeking a remedy is an important factor bearing on

the need for a preliminary injunction."  *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d

603, 609 (N.D. Tex. 2006) (quoting *Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*, No. 3:05-

CV-0094, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006)).  The two-year delay between the

challenged action and the filing of this lawsuit seriously "undercuts the sense of urgency that

ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no

irreparable injury."  *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)

(internal quotation marks and citation omitted); *see Brown v. District of Columbia*, 888 F. Supp.

2d 28, 32 (D.D.C. 2012) (noting as relevant to the irreparable harm analysis the fact that plaintiff

waited almost seven months to file lawsuit).

     Second, irreparable harm can be "neither speculative nor remote," but must be "actual

and imminent."  *W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d

672, 684 (S.D. Tex. 2004) (quoting *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).  As

discussed above, the State Department's jurisdiction over Defense Distributed's technical data

extends only to its export, and the State Department has not suggested that ITAR imposes any

limitation on Plaintiffs' actual distribution of technical data to U.S. persons in the United States.

Yet despite actual knowledge of U.S. persons interested in obtaining this technical data,

allegedly including co-Plaintiff Second Amendment Foundation ("SAF") and some of its

members, Defense Distributed has apparently done nothing to distribute the technical data in a

manner that would not constitute an export.  Nor have Plaintiffs made any inquiry of Defendants

about any measures Defense Distributed could take that would allow it to post the technical data

on the Internet without violating ITAR.  Plaintiffs' apparent failure to exercise these options

undermines their claim that they have incurred an actual, imminent, and irreparable harm.  In

these circumstances, Plaintiffs' brief citation to inapposite case law does not demonstrate

"irreparable injury," let alone satisfy the heightened standard for a mandatory injunction.[5]

---

[5] The cases relied on by Plaintiffs presented immediate instances of harm not illustrated in
Plaintiffs' threadbare allegations here.  For example, in *Deerfield Med. Ctr. v. Deerfield Beach*,
irreparable harm existed with respect to an abortion clinic denied zoning privileges and its

DOSWASHINGTONSUP00414

**B.** **The Threatened Harm to the National Security and Foreign Policy Interests of the United States From an Injunction Outweighs any Irreparable Harm to Plaintiffs.**

As explained in detail in the Declaration of Lisa V. Aguirre, Director of the Office of Defense Trade Controls Management, the Department of State has concluded that: (1) export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests; and (2) a preliminary injunction in this case would be likely to cause such harm.

As Plaintiffs described in their submissions to Defendants, their CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of "automatically" generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment. *See* Aguirre Decl. ¶ 35; Pl. Br. at App. 208-59.[6] The unrestricted provision of such undetectable firearms by U.S. persons to individuals in other countries—particularly those countries with stricter firearms regulations that may not have the same security preparedness as the United States—presents a serious risk of acts of violence in those countries. The State Department is particularly concerned that Plaintiffs' proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons.[7] *See* Aguirre Decl. ¶ 35. As with the export of firearms themselves, these potential risks to U.S. foreign policy and national security interests warrant subjecting Defense Distributed's CAD files to ITAR's export licensing of technical data.

**C.** **The Public Interest Would be Disserved By a Preliminary Injunction**.

The threat of harm to U.S. foreign policy and national security interests tilts the public

---

"physician and those women for whom he would otherwise perform the operation in the meantime." 661 F.2d 328, 338 (5th Cir. 1981). Similarly, in *Elrod v. Burns*, the Court found irreparable injury where challenged patronage requirements imposed on plaintiffs an obligation to "pledge [] allegiance to another political party" and avoid "associat[ing] with others of [their] political persuasion." 427 U.S. 347, 355-56 (1976).
[6] Indeed, in part for this reason, the Liberator design includes the insertion a sufficient amount of metal into the resulting firearm to ensure its detectability. *See* Aguirre Decl. ¶ 35. Although this instruction promotes users' compliance with federal law prohibiting the manufacture of undetectable firearms, federal law does not prevent the manufacture of undetectable firearms by users outside the United States, and the Liberator remains operable without the inserted metal.
[7] The harm is reinforced by the fact that entry of an injunction is likely to bring attention to the availability of the CAD files on the Internet. *See* Aguirre Decl. ¶ 37.

10

DOSWASHINGTONSUP00415

interest factor heavily in the Government's favor, particularly in the context of a mandatory injunction. *See Winter*, 555 U.S. at 24; *U.S. v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013) ("injury to the nation's foreign policy" weighs in favor of the United States in public interest inquiry); *accord Water Keeper Alliance v. Dep't of Def.*, 152 F. Supp. 2d 155, 163 (D.P.R. 2001), *aff'd* 271 F.3d 21, 34-35 (1st Cir. 2001). This is true even where, as here, the harms from an injunction are likely to be felt abroad rather than domestically, because—as recognized by Congress in enacting the AECA, *see* 22 U.S.C. § 2778(a)(1)—"[b]oth the Government and the public have a strong interest in curbing" violent regional conflicts elsewhere in the world, especially when such conflict implicates "the security of the United States and the world as a whole." *Holy Land Found. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002), *aff'd* 333 F.3d 156 (D.C. Cir. 2003). Plaintiffs' barebones discussion of the public interest cannot supersede the demonstrated possibility of harm to national security and foreign policy provided by Defendants. *See Escamilla v. M2 Tech.*, 2013 WL 4577538 (E.D. Tex. 2013) (injunction that would harm "issues of national security," even "indirectly," would disserve public interest).[8]

## II. Plaintiffs' Motion for a Preliminary Injunction Should Be Denied Because Plaintiffs Have Not Shown a Substantial Likelihood of Success on the Merits.

Plaintiffs have also failed to demonstrate either a likelihood of success on the merits for a preliminary injunction or that "the facts and law clearly favor" their claims; accordingly, they have failed to meet their burden for a mandatory injunction. *See Martinez*, 544 F.2d at 1243.

### A. The Export of CAD Files That Function to Automatically Create a Firearm or its Components is Not the Publishing of an Item of Expressive Speech.

Underpinning Plaintiffs' First Amendment claims is the assumption that Plaintiffs seek to "publish" CAD files for 3D printers and that doing so is no different than the "publication of an idea." Pl. Br. at 14-15. Plaintiffs themselves recognize this is a critical threshold issue on which they must succeed, *see id.*, but they have failed to make the requisite showing on the merits to obtain a mandatory preliminary injunction.

---

[8] Importantly, because ITAR restricts only exports, any public interest in persons in the U.S. obtaining Defense Distributed's CAD files, whether to manufacture a firearm or for any other lawful purpose, is not affected by the absence of an injunction. The possibility of such a public interest therefore does not weigh against the Government's interests in regulating the export of the CAD files.

DOSWASHINGTONSUP00416

Although "speech" under the First Amendment is not limited to written or spoken words, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995), the Supreme Court has made clear that the First Amendment does not encompass all types of conduct. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("[W]e have rejected 'the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea'" (quoting *U.S. v. O'Brien*, 391 U.S. 367, 376 (1968))). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley*, 515 U.S. at 569; *Spence v. Washington*, 418 U.S. 405, 409 (1974))). *Cf. Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) (First Amendment protects video games because they "communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world)"). The ITAR regulations at issue govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad.

The CJ requests submitted by Defense Distributed to DDTC themselves illustrate that the mere publication of ideas is not at issue. According to the CJ requests, the CAD files are functional: "essentially blueprints that can be read by CAD software," Pl. Br. at App. 208, to "automatically" generate firearms, firearms components, or other defense articles, *id.* at 267.[9] Further, in its commodity jurisdiction requests, Defense Distributed characterized its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun." *Id.* at 211. Plaintiffs' own description of the items and planned course of conduct thus fails to establish that the export of CAD files is mere "speech" for First Amendment purposes.

The cases on which Plaintiffs rely fail to establish that the law clearly favors their claim

---

[9] In the CJ determinations, Defendants concluded that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within the commodity jurisdiction of ITAR.

DOSWASHINGTONSUP00417

that export of CAD files is an act of protected speech.  Plaintiffs rely primarily on *Universal City Studios, Inc. v. Corley*, a Second Circuit copyright decision holding that computer code and computer programs can qualify for First Amendment protection.  273 F.3d 429, 445-49 (2d Cir. 2001).  Yet *Corley* expressly distinguished, and thereby recognized the continuing validity of, a prior Second Circuit opinion, *CFTC v. Vartuli*, which held that computer instructions that "induce action without the intercession of the mind or the will of the recipient" are not constitutionally protected speech.  228 F.3d 94, 111 (2d Cir. 2000); *see Corley*, 273 F.3d 448 at n.20 (distinguishing from its holding *Vartuli* and other situations where "a human's mental faculties do not intercede in executing the instructions"), *id.* at 449 (confirming that code used to communicate to a program user is "not necessarily protected" and that code used to communicate to a computer is "never protected").  Importantly, *Vartuli* held that the fact that some users of the computer instructions at issue might interact with those instructions, rather than simply following them, did not change the constitutional analysis: it was the functionality of the code, not its use, that determined whether the regulations were consistent with the First Amendment.[10]  *See Vartuli*, 228 F.3d at 110-12.  Plaintiffs' failure to prove a substantial likelihood of success on this issue alone would be a sufficient basis to deny their motion.  *See Suehs*, 692 F.3d at 348.

Further, Plaintiffs' stated intent to distribute their CAD designs abroad or across U.S. national boundaries also suggests that the First Amendment's application may be limited here.  "It is less [than] clear . . . whether even American citizens are protected specifically by the First Amendment with respect to their activities abroad."  *Laker Airways, Ltd. v. Pan Am. World*

---

[10]  The other two cases cited by Plaintiffs also indicate that code that is purely functional does not warrant First Amendment protection.  In *Bernstein v. U.S. Dep't of Justice*, 176 F.3d 1132, 1139-43 (9th Cir. 1999) and *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000), the courts held that First Amendment protections extended to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer.  *See also Karn v. Dep't of State*, 925 F.Supp. 1, 9 n.19 (D.D.C. 1996) (computer source code alone is "merely a means of commanding a computer to perform a function").  Even assuming, *arguendo*, that conclusion were correct as to the source code of software here it is undisputed that the CAD files control the functioning of a device.  Indeed, here, the CAD files do not merely cause a computer to function generally, but specifically direct a machine to manufacture a firearm and defense articles.  Plaintiffs' reliance on these cases also ignores that the Ninth Circuit opinion in *Bernstein* was subsequently withdrawn and rehearing granted, *see Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999), and that, after remand, the plaintiff in *Junger* stipulated to dismissal with prejudice.  *See* Notice of Dismissal, *Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Ohio Nov. 16, 2000).

DOSWASHINGTONSUP00418

*Airways*, *Inc.*, 604 F. Supp. 280 (D.D.C. 1984) (finding that aliens have no First Amendment rights abroad); *see Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986) ("No Supreme Court case squarely holds that the First Amendment applies abroad."); *cf. U.S. v. 12 200-Ft. Reels*, 413 U.S. 123, 125 (1972) (explaining that adjudication of rights at "national borders" implicates "considerations and different rules of constitutional law from domestic regulations"). Even courts that have applied the First Amendment to international speech have recognized that overseas speech or conduct that endangers national security may be outside First Amendment protection. *See, e.g.*, *Haig v. Agee*, 453 U.S. 280, 308 (1981) (even "assuming . . . that First Amendment protections reach beyond our national boundaries," likelihood of damage to national security rendered speech by a former CIA employee "not protected by the Constitution"); *accord Bullfrog Films*, 646 F. Supp. at 502. Here, where Plaintiffs deliberately seek to use the Internet to distribute CAD files abroad and have made no effort to engage in purely domestic distribution, whether on the Internet or otherwise, their foreign distribution of CAD files may not be protected by the First Amendment.

In any event, the Court need not resolve finally the constitutional question at this stage in light of Plaintiffs' failure to meet their burden with regard to the other required elements for an injunction. *Cf. Nation Magazine v. Dep't of Def.*, 762 F. Supp. 1558, 1572 (S.D.N.Y. 1991) (refraining from deciding, absent "a full record," constitutional questions regarding the First Amendment and military interests abroad). Moreover, as explained below, even assuming that Defense Distributed's files constitute protected speech, Defendants may properly restrict their export, consistent with the First Amendment.

**B.     Even If Limiting the Export of CAD Files Implicates the First Amendment, Defendants Are Likely to Prevail on Plaintiffs' First Amendment Claims.**

Plaintiffs' First Amendment theory relies heavily on the notion that the Internet is merely a means of "publication" of ideas, but this characterization misleads when describing CAD files that generate defense articles and/or their parts with minimum human intervention. Plaintiffs consistently use the terms "publish" or "publication," *see, e.g.*, Pl. Br. at 1, 5, 8, 13, 14, but in fact it is an "export" that is at issue. ITAR does not prohibit Plaintiffs from distributing these

14

files to U.S. persons in the United States.  Similarly, Defendants have not restricted Plaintiffs'

rights to use the Internet to discuss 3D printing, firearms, the Second Amendment, or engage in

other expression.  Rather, the narrow issue here is Plaintiffs' alleged desire to "facilitat[e] global

access" to the CAD files, *i.e.*, to disseminate the automatic ability to make firearms worldwide.

## 1. ITAR's Export Controls Are a Valid, Content-Neutral Regulation of Plaintiffs' Conduct That Do Not Infringe First Amendment Rights.

Plaintiffs contend that ITAR's export controls on technical data should be subject to strict

scrutiny, Pl. Br. at 23-24, but this argument is in error.  "[R]egulations that are unrelated to the

content of speech" receive less demanding First Amendment scrutiny because they ordinarily

"pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994).  And where the Government's

purpose in imposing a regulation is "justified without reference to the content of the regulated

speech," such regulation is content-neutral.  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S.

288, 293 (1984).  It is the Government's purpose, not other factors, that is the "controlling

consideration" in this determination.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

ITAR regulates the conduct of exporting defense articles for the purpose of "further[ing]"

world peace [and] the [national] security and foreign policy interests" of the United States, 22

U.S.C. § 2778(a)(1), and Defense Distributed's files function to "automatically" produce such

articles or their components.  Pl. Br. at App. 267.  ITAR's regulation of technical data,

particularly Defense Distributed's CAD files, is part and parcel of its regulation of the export of

defense articles, a regulation unrelated to the suppression of free expression.  *See U.S. v. Chi*

*Mak*, 683 F.3d 1126, 1134-35 (9th Cir. 2012) ("AECA prohibits export without a license of

items on the USML without regard to content or viewpoint . . . , defines [] technical data based

on its *function*," and is therefore "content-neutral") (emphasis in original); *U.S. v. Edler Indus.*,

579 F.2d 516, 520 (9th Cir. 1978) (recognizing the equivalence for arms control purposes of

"military equipment" and the "blueprints specifying the construction of the very same

equipment").  The overarching policy objective set forth by Congress and the State Department

is to control the spread of defense articles abroad (and related services and technical data)

15

DOSWASHINGTONSUP00420

because munitions and materiel can be used to jeopardize the United States' security interests, a content-neutral interest.[11] *See Emergency Coal. to Defend Educ. Travel v. Dep't of Treas.*, 545 F.3d 4, 13-14 (D.C. Cir. 2008).

Plaintiffs' CAD files directly instruct a device to automatically carry out the specified task of manufacturing a defense article. Whatever expressive value may exist in the theory of the CAD files, they indisputably function to create a weapon. Thus, the ITAR may restrict their export on the basis of the *literal* functionality to create the very defense articles that could also indisputably be restricted for export. Moreover, the AECA and ITAR do not attempt in any way to restrict the free flow of public information and ideas about CAD files or 3D printing, either domestically or internationally. *See* Aguirre Decl. ¶ 30; 22 C.F.R. Part 120. This regulatory scheme is obviously not the product of government hostility toward the spread of ideas about 3D printing of firearms, but rather against the very *means* to easily do so. Accordingly, ITAR's limits on the export of Defense Distributed's CAD files are not directed at the content of expression. *See Chi Mak*, 683 F.3d at 1135; *cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (holding content-neutral a licensing requirement applied to U.S. TV network's broadcasts from Cuba, as part of overall scheme regulating imports and exports).[12] For this reason, strict scrutiny does not apply to a First Amendment analysis of export controls on these CAD files.[13]

---

[11] The government's interest in limiting the distribution of firearms abroad also does not implicate the Second Amendment. *Cf. U.S. v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012) (rejecting attempt by non-U.S. person to assert Second Amendment rights).

[12] Should the Court conclude, as Defendants contend above, that Plaintiffs' exports are not expressive at all, *see supra* Part II.A, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies. *See Voting for Am. v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

[13] Also suggesting that the applicable First Amendment protections are reduced is Plaintiffs' characterization of those to whom they wish to supply their CAD files as "customers," Pl. Br. at 27, and Plaintiffs' allegation that their Internet postings of CAD files are intended to "generate revenue." Compl. ¶ 22; *see id.* ¶ 24 (Internet postings would have "generated advertising revenue"). Plaintiffs also discuss "offering . . . items for sale," such as "jigs and code." Pl. Br. at App. 3-4, n.1. Restrictions on "particular type[s] of commercial transaction[s]" are generally treated as regulations of conduct, not speech, *see, e.g., Katt v. Dykhouse*, 983 F.2d 690, 695-96 (6th Cir. 1992); *U.S. v. Bell*, 414 F.3d 474 (3d Cir. 2005). Even if treated as speech, it is well-established that "commercial speech enjoys lesser, intermediate-scrutiny constitutional protection." *RTM Media, L.L.C. v. City of Houston*, 584 F.3d 220, 224 (5th Cir. 2009).

16

Under intermediate scrutiny, the Government's regulation of "'speech' and 'non-speech' elements [] united in a course of conduct" must be sustained if it is "within the constitutional power of the government; it furthers an important or substantial governmental interest; the government interest is unrelated to the suppression of free expression; and the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Kleinman v. City of San Marcos*, 597 F.3d 323, 328 (5th Cir. 2010) (quoting *O'Brien*, 391 U.S. at 376). As the Ninth Circuit held in *Chi Mak*, these standards are met by the "AECA and its implementing regulations," including ITAR. 683 F.3d at 1135. Regulation of arms trafficking is an "important interest" of the Government with "unquestionable legitimacy." *Id.* (quoting *Edler*, 579 F.2d at 520). "The technical data regulations substantially advance that interest, unrelated to the suppression of expression, because they set forth clear procedures for seeking approval for export licenses and policies for limiting USML-designation." *Id.* Nor is the restriction greater than essential: "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers," as well as other materials in the public domain. *Chi Mak*, 683 F.3d at 1135; *see U.S. v. Hoffman*, 10 F.3d 808 at *4 (9th Cir. 1993) (unpublished disposition) (if defense articles are "in the public domain, then the AECA does not prohibit their exportation"). Accordingly, even if subjected to a heightened standard of review under the First Amendment, ITAR's regulation of technical data exports is constitutional. *See id.*; *see also U.S. v. Posey*, 864 F.2d 1487 (9th Cir. 1989).[14]

Importantly, the government interests at issue here are the type that merit great deference, even in the context of a First Amendment challenge. *See Kleindienst v. Mandel*, 408 U.S. 753, 766-69 (1972). Courts have recognized that the decision on whether to control a particular commodity for export is one that inherently involves national security and foreign policy judgments that should be left to the discretion of the Executive branch. *See U.S. v. Martinez*, 904

---

[14] Defendants do not concede that application of strict scrutiny would be fatal to the application of ITAR to Defense Distributed's CAD files, particularly given that Plaintiffs themselves acknowledge the government interests at issue here as "compelling." *See* Pl. Br. at 28. In light of the arguments set forth herein, however, Plaintiffs have not met the high burden of persuasion required to obtain a mandatory injunction even under a lesser standard of review. *See Martinez*, 544 F.2d at 1243.

DOSWASHINGTONSUP00422

F.2d 601, 602 (11th Cir. 1990); *U.S. v. Mandel*, 914 F.2d 1215, 1223 (9th Cir. 1990). Under Plaintiffs' broad First Amendment theory, export restrictions on the designs to build a rocket, or software that controls a radar, or technical data concerning missile systems, would all be subject to strict scrutiny on the theory that each such item has informational content as well. *See* Pl. Br. at 23-24. It is no answer to suggest, as Plaintiffs do, that the question turns on whether information is "classified." *See, e.g.*, Pl. Br. at 11. Courts have squarely rejected this argument:

> if the government wished to prevent technical data from being sent to foreign powers, it would be required to suppress the information altogether, at home as well as abroad. This outcome would blur the fact that national security concerns may be more sharply implicated by the export abroad of military data than by the domestic disclosure of such data. Technical data that is relatively harmless . . . when available domestically may, when sent abroad, pose unique threats to national security. It would hardly serve First Amendment values to compel the government to purge the public libraries of every scrap of data whose export abroad it deemed for security reasons necessary to prohibit.

*Posey*, 864 F.2d at 1496-97. *Cf. Linick v. U.S.*, 104 Fed. Cl. 319, 321 (Fed. Cl. 2012) (Patent Office may "order that an invention be kept secret" if "divulgence might harm national security," regardless of whether the "Government itself [has] any interest in the invention").

### 2. ITAR's Export Controls Are Not a Facially Unconstitutional Prior Restraint.

Plaintiffs also have no likelihood of success on the merits of their theory that restrictions on the export of the CAD files constitute an unlawful prior restraint on speech. "The doctrine of prior restraint originated in the common law of England, where prior restraints of the press were not permitted, but punishment after publication was." *Alexander v. U.S.*, 509 U.S. 544, 553 (1993). The classic administrative prior restraint is what is often described as a licensing scheme for speech, where the plaintiff's right to speak is conditioned on prior approval from the government. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988). Such a prior restraint is contrasted with prohibitions on certain speech enforced by punishment *after* the fact, which is not a prior restraint. *See id.* at 764 (distinguishing between statute imposing prohibition on speech and one conditioning speech on obtaining a license or permit). A licensing requirement for conduct that incidentally impacts expression is not such a classic prior restraint, however, and courts have so concluded in the context of the AECA and ITAR, and other prohibitions on imports and exports. *See, e.g.*, *Edler Indus.*, 579 F.2d at 521; *Chi Mak*, 683 F.3d

18

1136. *Cf. Capital Cities/ABC*, 740 F. Supp. 1007 (upholding against First Amendment challenge licensing requirements applied to international television broadcasts without concluding such a licensing system constituted a prior restraint).[15]

Plaintiffs rely heavily on *Freedman v. Maryland*, 380 U.S. 51 (1965)—the case that generally defines the requirements for licensing schemes that affect expression—but both the nature of ITAR and the circumstances here demonstrate that ITAR differs significantly from the prior restraint considered in that case. The "censorship statute" at issue in *Freedman* made it unlawful to exhibit any motion picture unless a state Board of Censors judged the film to be "moral and proper" and not "tend[ing] . . . to debase or corrupt morals or incite to crimes." 380 U.S. at 52 & n.2. Unlike in *Freedman*, ITAR's export licensing requirement is not directed at a vast and open-ended category of expressive speech like films, but instead governs the act of providing defense articles or related technical data to those outside the United States (or to foreign persons inside the United States), a much narrower category of conduct that is not characteristically expressive nor remotely comparable to the licensing of adult films domestically. *Compare* 22 C.F.R. Part 121 (the USML) *and* 22 C.F.R. § 120.10 (defining technical data) *with* 380 U.S. at 52; *see also Teague v. Reg'l Comm'r of Customs*, 404 F.2d 441, 446 (2d Cir. 1968) (application of Trading with the Enemy Act, 50 U.S.C. § 5(b) (1964) to academic publications imported from Cuba did not constitute a prior restraint in light of broader regulatory purpose of Act). The Ninth Circuit in *Edler* thus concluded that ITAR's licensing requirements for technical data, as long as such data is "significantly and directly related to specific articles on the USML," constitute an appropriate means to "control the conduct of

---

[15] Plaintiffs' reliance on opinions of the Department of Justice's Office of Legal Counsel ("OLC"), Pl. Br. at 3, 18, to support their prior restraint claims is misplaced. These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here. *See* Pl. Br. at App. 139 (OLC opinions do not "purport to determine the constitutionality of all possible applications of the ITAR"). Thus, Plaintiffs' lengthy quotation of OLC's July 1, 1981 opinion regarding "dissemination of technical data," Pl. Br. at 18, is inapposite. As the July 1, 1981 opinion made clear, its discussion focused on domestic distribution of technical data to foreign persons who might subsequently take that data abroad, for example, "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest," *id.* at App. 127-28, not a situation like the present where Plaintiffs seek to themselves engage in the overseas transmission of technical data.

19

assisting foreign enterprises to obtain military equipment and related technical expertise," and "not an unconstitutional prior restraint on speech." 579 F.2d at 521.[16]

ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that "the institutional bias of a censorship board . . . [will] lead to the suppression of speech that should be permitted." *Freedman*, 380 U.S. at 57. In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004) (upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Indeed, the regulation of the export of technical data in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. And the vast majority of ITAR licensing applications are approved, *see* Aguirre Decl. ¶ 33, demonstrating that there is no "institutional bias of a censor" at issue here. *See id.*[17]

---

[16] Prior restraints are traditionally disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint. *See Near v. State of Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Promotions v. Conrad*, 420 U.S. 546, 558-59 (1975). Here, however, such an approach is apt to be inadequate because the ITAR licensing system is intended to prevent irreversible harm to national security and foreign policy that may ensure from export. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure"). In the export context, after-the-fact punishment is likely available only for the exporter because foreign actors making harmful use of military data are likely often to be beyond the reach of U.S. prosecution.

[17] For similar reasons, these statutory criteria are precise enough to avoid the dangers of "a licensing statute placing unbridled discretion" in the hands of DDTC. Pl. Br. at 20-21 (quoting *Lakewood*, 486 U.S. at 757). The unbridled discretion doctrine applies only where a statute or regulation lacks "narrow, objective, and definite standards to guide the licensing authority," and the Supreme Court has explained that such standards do not require "perfect clarity and precise guidance." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992); *Ward*, 491

20

3. **ITAR's Export Controls Are Not Unconstitutionally Overbroad.**

Plaintiffs also raise an "overbreadth" challenge to ITAR's regulation of technical data. *See* Pl. Br. at 16-17. Overbreadth is an exception to the prudential standing requirement that a plaintiff may only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In circumstances where a regulation is alleged to be so broad that it is incapable of *any* permissible application, courts may allow a party to bring a facial challenge to a statute because it threatens others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep." *Id.* at 615.

Here, Plaintiffs' overbreadth claim cannot meet these standards. First, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *U.S. v. Hicks*, 980 F.2d 963, 969 (5th Cir. 1992) (quoting *Brockett v. Spokane Arcades*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* Here, as the Supreme Court observed in *Brockett*, "[t]here is . . . no want of a proper party to challenge the [regulations], no concern that the attack on the [regulations] will be unduly delayed or protected speech discouraged." 472 U.S. at 504. And, indeed, an overbreadth challenge should not properly lie if the regulations have been applied *permissibly* to Plaintiffs, which they have for the reasons outlined above. *See Sec'y State of Md. v. Munson*, 467 U.S. 947, 958 (1984).

Second, even if the merits of Plaintiffs' overbreadth claim are reached, ITAR's export

---

U.S. at 794. As the Ninth Circuit has recognized, the listing of defense articles in the USML and the definition of technical data "delineate narrowly the scope of information subject to arms controls" and thus do not violate the First Amendment. *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.10 (defining technical data as the matter "required for the design development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles . . . includ[ing] . . . blueprints, drawings, photographs, plans, instructions and documentation"); USML Category I(a) (defining included firearms). These criteria provide "adequate standards to guide the official's decision." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002).

DOSWASHINGTONSUP00426

controls on technical data have a substantially permissible purpose. Plaintiffs have nowhere

demonstrated that the regulations have been applied in a substantial number of impermissible

ways.[18] To the contrary, the regulations serve the vital purpose of preventing the circumvention

of export controls on munitions by the method of providing foreign powers the technical know-

how, instructions, blueprints, or—as in the instant case—the automated processes to produce

such munitions. *See* Aguirre Decl. ¶ 14. Further, the regulations do not extend to domestic

distribution of technical data to U.S. persons and carve out a wide exemption for "public

domain" data that helps ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(a)(5).

For this reason, there is simply no substantial overbreadth here, and Plaintiffs are not likely to

succeed on this claim. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge).

**B.      Defendants Are Likely to Prevail on Plaintiffs' Second Amendment Claims.**

Plaintiffs are also unable to carry their burden for a mandatory preliminary injunction for

their Second Amendment claims because the Court lacks subject matter jurisdiction over these

claims, and Plaintiffs have not established that the facts and law are clearly in their favor.

### 1.      Plaintiffs Lack Standing for Their Second Amendment Claims.

According to Plaintiffs, Defendants have infringed upon "two complimentary [sic]

guarantees" of the Second Amendment: "the right to acquire arms, and the right to make arms."

Compl. ¶ 49; Pl. Br. at 25-29. Yet none of the Plaintiffs have demonstrated that they have

standing to pursue such Second Amendment claims. To establish standing, "a plaintiff must

show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact;

(2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely

to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir.

2008) (citation omitted). Plaintiffs must also demonstrate standing for each claim asserted.

*DaimlerChrysler v. Cuno*, 547 U.S. 332, 352-53 (2006).

With respect to Defense Distributed, Plaintiffs have failed to establish an injury

associated with their claims because they have not set forth any facts indicating that Defense

---

[18] Indeed, Plaintiffs plead precisely the opposite. *See* Compl. ¶ 24 ("At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.").

DOSWASHINGTONSUP00427

Distributed's ability to manufacture or acquire arms has been or imminently will be restricted in any way. Rather, Plaintiffs have alleged only a restriction on Defense Distributed's ability to post certain files on its website. *See* Compl. ¶¶ 22-37. Plaintiffs acknowledge that Defense Distributed is in possession of the CAD files that it could use to manufacture firearms or components. *See* Compl. ¶ 37. And Cody Wilson, the "co-founde[r] and now lead[er] [of] Defense Distributed," Pl. Br. at App. 1 ¶ 2, possesses an ATF license to manufacture firearms. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, Listing of Federal Firearms Licensees at lines 61673 & 61675 (May 2015), *available at* https://www.atf.gov/file/83411/ (last accessed June 3, 2015).[19] Plaintiffs have therefore failed to set forth specific facts indicating that Defense Distributed's alleged Second Amendment rights have been injured in fact. *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

Plaintiffs have likewise failed to demonstrate that SAF has direct standing to pursue its Second Amendment claims.[20] "An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals." *Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002) (citation and internal quotation marks omitted). Plaintiffs do not claim that SAF seeks to manufacture or acquire arms, nor is the suggestion that SAF "would expend its resources to publish and promote" CAD files, Compl. ¶ 38, indicative of a "concrete and demonstrable" injury related to these ostensible Second Amendment rights. *Cf. NAACP v. Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010). Nor is the alleged injury to SAF fairly traceable to Defendants' conduct, which directly affected Defense Distributed only.

To the extent SAF asserts associational Second Amendment claims, its standing fares no better. *See* Pl. Br. at 28, App. 7; *see also* Compl. ¶ 2. An association lacks standing to bring a claim on behalf of its members unless "its members would otherwise have standing to sue in their own right." *Nat'l Rifle Ass'n v. ATF*, 700 F.3d 185, 191 (5th Cir. 2012) (*NRA*) (citation omitted). SAF cannot meet this test. The members' alleged "keen interest" in the CAD files, *see*

---

[19] This monthly report is published by ATF as an online spreadsheet. Updates are made available at https://www.atf.gov/content/firearms/firearms-industry/listing-FFLs.
[20] It is unclear from Plaintiffs' Complaint and motion whether they contend that SAF has direct standing or is asserting associational standing only.

DOSWASHINGTONSUP00428

Compl. ¶ 38; *see also* Pl. Br. at App. 6-11, is insufficient to demonstrate that their Second

Amendment rights have been injured "in a personal and individual way" as required by Article

III. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992). This is particularly true for

the injunctive relief sought here: SAF members' allegations of future injury, *see* Pl. Br. at App.

9, 11, are purely speculative. *See Lujan*, 504 U.S. at 564; *Osterweil v. Edmonson*, 424 F. App'x

342, 344 (5th Cir. 2011); *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992).

      Plaintiffs have also failed to establish traceability for any injury to SAF's members to

Defendants' actions. Accessing and sharing 3D printing files, *see* Pl. Br. at App. 9, 11, is neither

a necessary nor sufficient precondition to manufacturing or acquiring arms. Further, Plaintiffs

plead that SAF has members "nationwide" only, Compl. ¶ 2, and ITAR does not limit the ability

of Defense Distributed or SAF to distribute CAD files directly to U.S. persons within the United

States (or otherwise prevent SAF members from acquiring the CAD files). *See* Aguirre Decl. ¶

16; *cf. Huitron-Guizar*, 678 F.3d at 1169-70. Therefore, any alleged violation of SAF's

members' Second Amendment rights is not fairly traceable to any action taken by Defendants.[21]

      Nor can Plaintiffs obtain standing by "assert[ing] the Second Amendment rights of their

customers and website visitors." Pl. Br. at 27. Plaintiffs have failed to satisfy the requirements

for such third-party standing because they have: (1) failed to adequately allege that they

themselves suffered an injury in fact; (2) never demonstrated that they have "a close relation" to

the unspecified "customers and website visitors"; and (3) not described any hindrance to these

customers' and website visitors' ability to protect their own interests. *See Bonds v. Tandy*, 457

F.3d 409, 416 n.11 (5th Cir. 2006). In contrast to the cases cited by Plaintiffs, no commercial

transaction has occurred and no vendor-vendee relationship appears to exist between Plaintiffs

and their "customers." *Compare* Compl. ¶¶ 5-6 *with Carey v. Population Servs. Int'l*, 431 U.S.

678 (1977) (vendor relationship) *and Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir.

2008) (commercial transactions). More importantly, however, the Fifth Circuit has explained

---

[21] Although SAF's members assert that they have been unable to "locate [firearms files] on
Defense Distributed's website," they make no allegation that they have attempted to request files
from Defense Distributed through other channels, an activity outside the purview of ITAR. *See*
Pl. Br. at App. 8-11.

24

that "*Carey* . . . gives *jus tertii* standing to a party only if the party directly affected is incapable of asserting its own interests." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1210 n.6 (5th Cir. 1991), *opinion clarified* (Nov. 15, 1991) (citations omitted). There is no reason to doubt that Plaintiffs' unspecified "customers and website visitors" are "independent entit[ies], fully capable of asserting their own rights." *See id.*

## 2. Plaintiffs Are Unlikely to Succeed on Their Second Amendment Claims.

Assuming Plaintiffs could establish their standing, they have failed to consistently identify the nature of the Second Amendment right that they seek to enforce or a likelihood of success on these claims. Plaintiffs primarily focus on the claim that the Second Amendment encompasses a right to make or acquire arms. Compl. ¶¶ 48-51; Pl. Br. at 26. Elsewhere, they describe the right as "constitutional protection" of "any components necessary to the functioning of one's constitutionally-protected firearm." Pl. Br. at 26. At another point, they assert their Second Amendment claim as an infringement on the right to "operate a business that provides Second Amendment services." Compl. ¶ 49 (quoting *Mance v. Holder*, 2015 WL 567302, at *15 n.8 (N.D. Tex. Feb. 11, 2015); Pl. Br. at 27 (same). Regardless of the Second Amendment right claimed, however, Defendants have at most restricted Defense Distributed's ability to *export* arms-related technical data, and the Second Amendment does not provide such a right.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." 554 U.S. 570, 635-36 (2008). In holding that the Second Amendment secures an individual right, the Court emphasized that the "central right" secured is "to defend oneself in one's home," a right that "is not unlimited." *NRA*, 700 F.3d at 193-94; *Heller*, 554 U.S. at 635.

The Fifth Circuit, like other Courts of Appeals, has adopted a two-step framework for analyzing firearms restrictions challenged on Second Amendment grounds:

> [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to

DOSWASHINGTONSUP00430

determine whether to apply intermediate or strict scrutiny to the law, and then to
determine whether the law survives the proper level of scrutiny.

*NRA*, 700 F.3d at 194 (citations omitted). "To determine whether a law impinges on the Second
Amendment right, we look to whether the law harmonizes with the historical traditions
associated with the Second Amendment guarantee." *Id.* (citing *Heller*, 554 U.S. at 577-628). "If
the challenged law burdens conduct that falls outside the Second Amendment's scope, then the
law passes constitutional muster." *Id.* at 195 (citing *U.S. v. Marzzarella*, 614 F.3d 85, 89 (3d Cir.
2010)). "If the law burdens conduct that falls within the Second Amendment's scope, we then
proceed to apply the appropriate level of means-end scrutiny." *Id.*

Here, the Court's inquiry can end at Step One because the challenged regulations do not
impose any burden, let alone a substantial burden, on conduct historically protected by the
Second Amendment. The Second Amendment's "central right" is the right to use arms in self-
defense in the home, not to export arms across international borders. *Cf. U.S. v. Gurrola-Garcia*,
547 F.2d 1075, 1079 n.6 (9th Cir. 1976) ("Certainly the Second Amendment guarantee of 'the
right of the people to keep and bear Arms' . . . does not protect the efforts of a person to take
munitions across an international border and into a foreign country" (citing *Marchese v.
California*, 545 F.2d 645, 647 (9th Cir. 1976))). Restrictions on arms-related exports are "firmly
historically rooted," and therefore harmonize with historic tradition. *See NRA*, 700 F.3d at 204.
For example, prior to the Revolution, it was high treason for British subjects to sell arms to the
King's enemies. 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 82-83
(1769). The early republic similarly placed restrictions on arms-related exports. In 1794, just
three years after ratification of the Bill of Rights, "the exportation of munitions of war was
prohibited for a year." 7 JOHN BASSETT MOORE, A DIGEST OF INTERNATIONAL LAW, § 1098
(1906). These restrictions have also been used to advance foreign policy interests during times
of peace. In 1902, for example, Congress ratified a treaty with Britain that prevented the export
of firearms to certain regions of the Pacific in order to promote international "humanitarian
purposes." 2 MOORE, § 229. These historical restrictions therefore confirm that the "activities
covered" by the challenged ITAR provisions are "presumptively not protected from regulation
by the Second Amendment." *NRA*, 700 F.3d at 196 (quoting *Heller v. District of Columbia*, 670

26

F.3d 1244, 1253 (D.C. Cir. 2011) (*Heller II*)).

Even if the Court concludes that Plaintiffs' claims implicate conduct protected by the Second Amendment, the challenged provisions readily withstand intermediate scrutiny. The Fifth Circuit has applied intermediate scrutiny to laws that, like ITAR's export controls, do not prevent a "law-abiding, responsible adult" from "possess[ing] and us[ing] a handgun to defend his or her home and family," *See id.* at 195 (citations omitted). In applying intermediate scrutiny, the relevant inquiry is "whether there is a reasonable fit between the law and an important government objective." *Id.* at 207. Here, for the same reasons that ITAR's limits on technical data satisfy intermediate scrutiny under the First Amendment, the regulations survive such review under the Second Amendment. *See supra* Part II.B.[22] For these reasons, Plaintiffs are unlikely to succeed on their Second Amendment claims.

## C. Defendants Are Likely to Prevail on Plaintiffs' Other Claims.

### 1. ITAR's Standards Are Not Void for Vagueness.

Plaintiffs are also unlikely to succeed in their vagueness challenge to the ITAR's restrictions on the export of defense articles, including "components and parts for firearms" and "technical data" relating to those firearms, components, and parts. These restrictions neither "fail[] to provide [people] of ordinary intelligence fair notice of what is prohibited [n]or . . . authorize[] . . . discriminatory enforcement." *Munn v. Ocean Springs, Miss.*, 763 F.3d 437, 439 (5th Cir. 2014). As explained above, the State Department has enumerated the categories of defense articles for which export is prohibited in the USML, and ITAR specifically defines "technical data" as that which is "required for the design development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles . . . includ[ing] . . . blueprints, drawings, photographs, plans, instructions and documentation." 22

---

[22] In the nomenclature supplied by *NRA*, ITAR: (1) is "focused on a particular problem," namely, unauthorized exports that pose a danger to national security or foreign policy; (2) implicates a concededly compelling government interest; and (3) employs "means that were reasonably adapted to achieving the objective," by compiling and maintaining on the USML those defense articles and defense services that pose a danger to national security and foreign policy, and reasonably defining "export" to address the ways that items can be disseminated. *See NRA*, 700 F.3d at 208-09; 22 C.F.R. § 120.3, 120.17; *see also* Pl. Br. at 11 ("Nor do Plaintiffs suggest that uploading files to the Internet cannot be viewed, in some sense, as an export."), 28 (acknowledging that interest is compelling).

DOSWASHINGTONSUP00432

C.F.R. § 120.10(a).  This definition, which accords with the ordinary meaning of the words "technical" and "data," constitutes a "comprehensible normative standard" in which a "standard of conduct is specified."  *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).  If "technical data" as so defined nevertheless "lack[s] the clarity [Plaintiffs] would insist on, it is because . . . 'we can never expect mathematical certainty from our language.'"  *Brown v. Town of Cary*, 706 F.3d 294, 306 (4th Cir. 2013); *accord Munn*, 763 F.3d at 440.  In addition, even if an individual were truly uncertain about the definition of "technical data," that person can apply for a license or submit a CJ request to DDTC.  Thus, no one need risk criminal prosecution or civil sanction because it is possible to get an advance determination as to the application of ITAR.  *See U.S. Civil Service Comm. v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 580 (1973).

Plaintiffs' contention that the exclusion of information in the public domain from ITAR renders the regime unconstitutionally vague is even less well-founded.  The purpose of the vagueness doctrine in the First Amendment context is to protect against enactments that would limit "the free dissemination of ideas."  *Reeves v. McConn*, 631 F.2d 377, 383 (5th Cir. 1980).  Inclusion of the public domain exception in ITAR explicitly promotes the values of free speech and protects First Amendment interests, not the opposite.  Similarly, repeal of ITAR's previous requirement that "[t]he burden for obtaining . . . approval for the publication of technical data . . . is on the [entity] seeking publication," 49 Fed. Reg. 47,682 (Dec. 6, 1984), *see* 22 C.F.R. § 125.11 n.3 (1978), lessens any First Amendment harms caused by ITAR, and does not thereby demonstrate that ITAR's straightforward regulation of exports is impermissibly vague.

2.    **Application of ITAR's Export Requirements to Plaintiffs' CAD Files Does Not Exceed the Statutory Authority Granted by Congress**.

Plaintiffs' claim that Congress has not provided the authority to regulate their transmittal of automated firearms assembly techniques ignores the plain text of the statute.  The AECA provides that "the President is authorized to control the import and the export of defense articles and defense services . . . [and] is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services.  The items so designated shall

DOSWASHINGTONSUP00433

constitute the USML." 22 U.S.C. § 2778(a)(1). In doing so, Congress authorized the President

to "take into account whether the export of an article would contribute to an arms race, aid in the

development of weapons of mass destruction, support international terrorism, increase the

possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or

multilateral arms control or nonproliferation agreements or other arrangements." *Id.*

§ 2778(a)(2). In addition, the statute requires that "every person . . . who engages in the business

of manufacturing, exporting, or importing any defense articles or defense services designated by

the President under subsection (a)(1) of this section shall register with the United States

Government agency charged with the administration of this section." *Id.* § 2778(b)(1)(A)(i).

And "[e]xcept as otherwise specifically provided in regulations issued under subsection (a)(1)…,

no defense articles or defense services designated by the President under subsection (a)(1) . . .

may be exported or imported without a license for such export or import." *Id.* § 2778(b)(2). The

plain text of the statute therefore directly authorizes the export licensing scheme at issue here.

Plaintiffs concede that this language provides "authority under the AECA to . . . regulate

the export of certain technical data," and that "uploading files to the Internet can[] be viewed . . .

as an export," but contend that reading these two authorities together—as authorization to

regulate technical data on the Internet—is "not what Congress had in mind." Pl. Br. at 12. But

that argument cannot possibly be sustained under a plain reading of the statutory authority. As

Defense Distributed itself described in its "Ghost Gunner" application, the technical data in files

for that device functions "to automatically find, align, and mill" firearms and their components.

*Id*. at App. 267. In the crafting of the AECA, Congress expressed specific concern that "arms

transfers [not] become an automatic, unregulated process." H.R. Rep. No. 94-1144, at 12 (1976),

*reprinted in* 1976 U.S.C.C.A.N. 1378, 1388. The regulation of Defense Distributed's technical

data thus fits with Congress's intent "that the technical data subject to control would be directly

relevant to the production of a specified article on the Munitions List." *Edler Indus.*, 579 F.2d at

521 (noting that the legislative history of AECA's predecessor statute announced Congress's

direct intention to "allow[] control of munitions, 'including relevant technical data.'") (quoting

S. Rep. No. 83-1799, at 57 (1954), *reprinted in* U.S.C.C.A.N. 3175, 3244). Thus, Plaintiffs'

DOSWASHINGTONSUP00434

*ultra vires* argument is unpersuasive because it would permit the automatic, "virtual export" of defense articles by anyone willing to undertake the expedient of creating a digital model, sending that digital version abroad, and thereby enabling foreign recipients to "automatically" create an unlimited number of identical copies of the original defense article.[23]  *Cf. Edler*, 579 F.2d at 520 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment.").

Nor do the opinions issued to the State Department by OLC demonstrate that ITAR's regulations of technical data exceed the scope of authority granted by Congress.  To the contrary, the July 1, 1981 OLC opinion recognizes that, under ITAR, the State Department has "*traditionally undertaken* to regulate the export of technical *information*" through the technical data provisions.  *Id.*  Although OLC acknowledged as "somewhat unclear" the delegation of technical data authority, *see* Pl. Br. at App. 125, 129 & nn.7, 11, these opinions are drafted at a high level of generality and nowhere do they state that authority is lacking to regulate matters similar to the CAD files at issue here.[24]

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be denied.

_____

[23] As Plaintiffs note, the State Department's administration of ITAR and the USML has long subjected technical data, including computer code, to export controls.  *See* Pl. Br. at 3; *see also Edler*, 579 F.2d at 519.  Congress has repeatedly ratified the USML, incorporating its definitions into subsequent enactments and requiring the Executive to report to Congress in advance of the removal "of any item from the Munitions List."  *See* P.L. 107-228 § 1406; *id.* § 1403; *see also, e.g.*, PL 104-64 § 573 (relying on USML to restrict scope of antiterrorism assistance provided to foreign countries); Omnibus Diplomatic Security and Antiterrorism Act of 1986, P.L. 99-399 § 509(a) (prohibiting export of items on USML to countries providing support for international terrorism).  "Congressional actions after the interpretation by the [Executive Branch] . . . indicate acquiescence" where Congress "revisit[s]" a statute without "seek[ing] . . . to change the [] definition."  *Dole v. Petroleum Treaters*, 876 F.2d 518, 522 (5th Cir. 1989); *see also Lorillard v. Pons*, 434 U.S. 575, 580 (1978).  Congress has elsewhere ratified ITAR's definitions of persons subject to its requirements.  *See, e.g.*, *U.S. v. Yakou*, 428 F.3d 241, 243-44 (D.C. Cir. 1995).
[24] Neither the 1980 official guidance, nor the amendment to ITAR published on December 6, 1984, *see* 49 Fed. Reg. 47,682, indicates that Defendants lack the authority to regulate Plaintiffs' *export* of technical data via the Internet.  *See* Compl. ¶¶ 19-20.  The former makes clear that it is addressing the "publication of data *within the United States*."  The language removed from ITAR by the latter amendment fell within the public domain exemption to ITAR, and concerned only "the publication of technical data" for purposes of placing such data in the public domain.  *See* 22 C.F.R. § 125.11(a)(1) n.3 (1978); Pl. Br. App. 200.  As explained *supra* Part II.B, publication of technical data is not equivalent to the *export* of such data.

DOSWASHINGTONSUP00435

Dated: June 10, 2015

Respectfully submitted,

RICHARD L. DURBIN, JR.
Acting United States Attorney
Western District of Texas

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

ZACHARY C. RICHTER
Assistant United States Attorney
Western District of Texas

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

/s/ *Eric J. Soskin* _____
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
STUART J. ROBINSON
California Bar No. 267183
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Phone: (202) 514-9239;
Fax: (202) 616-8460
Email: stuart.j.robinson@usdoj.gov

*Attorneys for Defendants*

31

DOSWASHINGTONSUP00436

## CERTIFICATE OF SERVICE

I certify that on June 10, 2015, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapossessky.com
William B. Mateja, mateja@fr.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew Goldstein, matthew@goldsteinpllc.com
*Attorneys for Plaintiffs*

In addition, I have dispatched this document using the United States Postal Service to the following, who is not listed as a CM/ECF participant:

Josh Blackman
1303 San Jacinto Street
Houston, TX 77002

*/s/ Eric J. Soskin*
ERIC J. SOSKIN
Trial Attorney

# Exhibit F

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1. *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

DOSWASHINGTONSUP00001

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment. The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.  *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

5. *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6. *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7. *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

5

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10.  *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11.  *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

DOSWASHINGTONSUP00006

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12. *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

DOSWASHINGTONSUP00007

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

DOSWASHINGTONSUP00008

Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON, | § Case No. 15-CV-372-RP |
| | § |
| Plaintiffs, | § SECOND AMENDED |
| | § COMPLAINT |
| v. | § |
| | § |
| U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary, Defense Trade Controls, Bureau of Political Military Affairs, Department of State; and SARAH J. HEIDEMA, in her official capacity as Acting Director, Office of Defense Trade Controls Policy, Bureau of Political Military Affairs, Department of State; | § § § § § § § § § § § § § |
| | § |
| Defendants. | § |
| | § |

SECOND AMENDED COMPLAINT

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn

Williamson, by and through undersigned counsel, complain of Defendants as follows:

INTRODUCTION

"Any system of prior restraints of expression comes to this Court bearing a heavy

presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70

(1963). The prior restraint system challenged here cannot overcome its presumption of

invalidity.

Contrary to the Justice Department's warning that such actions are unconstitutional, Defendants unlawfully apply the International Traffic in Arms Regulations, 22 C.F.R. Part 120 *et seq*. ("ITAR") to prohibit and frustrate Plaintiffs' public speech, on the Internet and other open forums, regarding arms in common use for lawful purposes. Defendants' censorship of Plaintiffs' speech, and the ad hoc, informal and arbitrary manner in which that scheme is applied, violate the First, Second, and Fifth Amendments to the United States Constitution. Plaintiffs are entitled to declaratory and injunctive relief barring any further application of this prior restraint scheme, and to recover money damages to compensate for the harm such application has already caused.

*The Parties*

1.      Plaintiff Defense Distributed is a Texas corporation organized under the laws of the State of Texas, whose headquarters are located in Austin, Texas, and whose principal place of business is located in Austin, Texas. Defense Distributed was organized and is operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating global access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest.

2.      Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including in Texas. The purposes of SAF include promoting, securing, and expanding access to the exercise of the right to keep and bear arms; and education, research, publishing and legal

WASHSTATEB007309

action focusing on the constitutional right to privately own and possess firearms, and the

consequences of gun control. SAF brings this action on behalf of its members.

3.      Conn Williamson is a natural person and a citizen of the United States and the

State of Washington.

4.      Defendant the United States Department of State is an executive agency of the

United States government responsible for administering and enforcing the ITAR under the

authority of the Arms Export Control Act of 1976, 22 U.S.C. § 2778, *et seq.* ("AECA").

5.      Defendant Rex W. Tillerson is sued in his official capacity as the Secretary of

State. In this capacity, he is responsible for the operation and management of the United States

Department of State, and this includes the operation and management of the Directorate of

Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.

6.      Defendant DDTC is a subordinate unit within the Department of State Bureau of

Political and Military Affairs responsible for administering and enforcing the ITAR.

7.      Defendant Mike Miller is sued in his official capacity as the Acting Deputy

Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military

Affairs. In his official capacity, Miller is responsible for the operation and management of

DDTC, and this includes administration and enforcement of the ITAR.

8.      Defendant Sarah Heidema is sued in her official capacity as the Acting Director

of the Office of Defense Trade Controls Policy Division. In her official capacity, she is

responsible for administration of the ITAR, including ITAR's commodity jurisdiction

procedures; implementation of regulatory changes as a result of defense trade reforms; and

providing guidance to industry on ITAR requirements.

WASHSTATEB007310

JURISDICTION AND VENUE

9.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, and 2202.

10.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a

substantial part of the events and omissions giving rise to the claim occurred, and Plaintiff

Defense Distributed resides, within the Western District of Texas.

STATEMENT OF FACTS

*Broad and Vague Scope of the ITAR*

11.     The AECA affords the President limited control over the export of "defense

articles." 22 U.S.C. § 2778(a)(1).

12.     Although the AECA does not expressly authorize control over "technical data,"

the ITAR, which implements the Act, includes "technical data" within its definition of "defense

articles." 22 C.F.R. § 120.6.

13.     The ITAR broadly defines "technical data" as information "required for the

design, development, production, manufacture, assembly, operation, repair, testing, maintenance

or modification of defense articles." 22 C.F.R. § 120.10. This includes "information in the form

of blueprints, drawings, photographs, plans, instructions or documentation" and "software"

"directly related to defense articles." *Id*.

14.     The ITAR requires advance government authorization to export technical data.

Criminal penalties for unauthorized exports of technical data and other violations of the ITAR

include, inter alia, prison terms of up to twenty (20) years and fines of up to $1,000,000 per

violation. 22 U.S.C. § 2778(c). Civil penalties include fines of over $1,000,000 per violation. 22

U.S.C. § 2778(e); 83 Fed. Reg. 234, 235 (Jan. 3, 2018).

4

15.     The scope of technical data subject to ITAR control, as described on the U.S. Munitions List ("USML"), 22 C.F.R. § 121.1, is vague, ambiguous, and complex. Defendants constantly change, often without notice, their views of what this scope entails.

16.     Americans have submitted thousands of written requests, known as "commodity jurisdiction requests," to DDTC for official determinations as to the ITAR's scope.

*History of Defendants' Prior Restraint Scheme*

17.     From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied that the ITAR imposed a prepublication approval requirement on publications of privately generated ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S. Government approval for the publication of technical data falling within the definition in § 125.01, including such data as may be developed under other than U.S. Government contract, is on the person or company seeking publication."

18.     Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel issued a series of written opinions advising Congress, the White House, and the Department of State that the use of the ITAR to impose a prior restraint on publications of privately generated unclassified information into the public domain violated the First Amendment of the United States Constitution (the "Department of Justice memoranda").

19.     In 1980, the Department of State Office of Munitions Control, the predecessor to Defendant DDTC, issued official guidance providing that "[a]pproval is not required for publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to Section 125.11 does not establish a prepublication review requirement."

20.     Thereafter, the Department of State removed Footnote 3 from the ITAR, expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682 (Dec.

WASHSTATEB007312

6, 1984). As such, to the extent the ITAR imposed any prepublication approval requirement on private, non-classified speech, the requirement was ostensibly removed in 1984.

21. In 1995, Defendant the United States Department of State conceded in federal court that reading the ITAR as imposing a prior restraint "is by far the most **un**-reasonable interpretation of the provision, one that people of ordinary intelligence are least likely to assume is the case." *Bernstein v. United States Department of State, et. al.*, No. C-95-0582, 1997 U.S. Dist. Lexis 13146 (N.D. Cal. August 25, 1997).

22. Prior to May 2013, Defendant the United States Department of State had not only disavowed the prior restraint in public notices and in federal court, it had never publicly enforced a prior restraint under the ITAR.

*The Published Files*

23. Posting technical data on the Internet is perhaps the most common and effective means of creating and disseminating information. A cursory search on Google and other Internet search engines evidences that ITAR-controlled technical data is freely published in books, scientific journals, and on the Internet.

24. Plaintiff Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public.

25. Defense Distributed privately generated technical information regarding a number of gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun (the "Published Files").

6

26.     In December 2012, Defense Distributed began posting the Published Files on the Internet for free, at no cost to the public. That publication inherently advanced Defense Distributed's educational mission.

27.     At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.

28.     Notwithstanding the Department of Justice memoranda, the 1980 guidance, the 1985 ITAR amendment, Defendant the United States Department of State's representations to a federal court in *Bernstein v. United States*, and Defendants' failure to previously enforce a prepublication approval requirement under the ITAR, on May 8, 2013, DDTC sent Defense Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

29.     At the time it posted the Published Files, Defense Distributed did not know that DDTC would demand pre-approval of public speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with DDTC's demands and removed all of the Published Files from its servers.

30.     The DDTC letter further directed Defense Distributed to submit the Published Files to DDTC for review using the DDTC "commodity jurisdiction" procedure, the ITAR procedure "used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a).

WASHSTATEB007314

31.     Defense Distributed complied with DDTC's request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013.

32.     On June 4, 2015—nearly two years from the date of Defense Distributed's commodity jurisdiction requests and six days before their first responsive pleading was due in this case—Defendants issued a response to the ten commodity jurisdiction requests. They determined that six of the Published Files, including the handgun files, were ITAR-controlled.

*The "Ghost Gunner" Files*

33.     DDTC identifies the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control.

34.     Neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations.

35.     Worsening this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR.

36.     On September 25, 2014, Defense Distributed sent DOPSR a request for prepublication approval for public release of files containing technical information on a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").

37.     On October 1, 2014, DOPSR sent Defense Distributed a letter stating that it refused to review Defense Distributed's request for approval because DOPSR was unsure whether the Ghost Gunner was subject to the ITAR. Also in its letter, DOPSR recommended that Defense Distributed submit another commodity jurisdiction request to DDTC.

WASHSTATEB007315

38.     Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner to DDTC on January 2, 2015.

39.     On April 13, 2015, DDTC responded to the Ghost Gunner commodity jurisdiction request. It determined that the Ghost Gunner machine is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [the ITAR]." Defense Distributed did not seek a determination with respect to such files, but it did seek a determination as to whether the software necessary to build and operate the Ghost Gunner machine is ITAR-controlled. DDTC subsequently clarified that such software is, like the machine itself, not subject to ITAR controls, but reiterated its ruling with respect to files related to the production of a "defense article."

*Prior Restraint on CAD Files*

40.     Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files.

41.     On December 31, 2014, nearly four months after Defense Distributed submitted the first of the CAD review requests, DOPSR sent Defense Distributed two letters dated December 22, 2014, stating that it refused to review the CAD files. DOPSR's decision was made, in whole or in part, with specific direction from DDTC.

42.     The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. However, because this is not the DDTC division responsible for issuing licenses or other forms of DDTC authorization, on January 5, 2015, Defense Distributed sent a written request to DDTC for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

WASHSTATEB007316

43.     To date, DDTC has not responded to Defense Distributed's request for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

*Prior Restraint on Other Files*

44.     Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public forums on the Internet. Many of these files are described in the USML.

45.     Plaintiff SAF's members, including, e.g., Conn Williamson and Peter Versnel, have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearms that they or others have created. They would access and share these files on the Internet, and use the files for various purposes, including the manufacture of firearms of the kind in common use that they would keep operable and use for self-defense, but cannot do so owing to the prepublication approval requirement. But for DDTC's prepublication approval requirement on such files, SAF would expend its resources to publish and promote, on the Internet, the distribution of Defense Distributed's various files, and similar files generated by its members and others.

*High Price Tag for Public Speech Licenses*

46.     The ITAR requires that any person who engages in the United States in the business of exporting technical data to register with the DDTC. *See* 22 C.F.R. § 122.1(a).  For the purpose of the ITAR, engaging in such a business requires only one occasion of exporting technical data. *Id.*

47.     DDTC Registration is a precondition to the issuance of any license or other approval under the ITAR. *See* 22 C.F.R. § 122.1(c).

WASHSTATEB007317

48.     The base fee for DDTC registration is $2,250.00 a year. *See* 22 C.F.R. § 122.3(a).

This fee increases based on the number of licenses requested in the previous year.

*Great, Irreparable, and Continuing Harm*

49.     But for DDTC's impositions upon the distribution of the Published Files, Ghost

Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject

Files"), Plaintiffs would freely distribute the Subject Files. Plaintiffs refrain from distributing the

Subject Files because they reasonably fear that Defendants would pursue criminal and civil

enforcement proceedings against Plaintiffs for doing so.

50.     DDTC's acts have thus caused irreparable injury to Plaintiffs, their customers,

visitors, and members, whose First, Second, and Fifth Amendment rights are violated by

DDTC's actions.

COUNT ONE

ULTRA VIRES GOVERNMENT ACTION

51.     Paragraphs 1 through 50 are incorporated as though fully set forth herein.

52.     The Defendants' imposition of the prepublication requirement, against any non-

classified privately-generated speech, including on (but not limited to) the Subject Files, lies

beyond any authority conferred upon them by Congress under the AECA, as confirmed by the

1985 ITAR amendment. Accordingly, Defendants' imposition of the prepublication approval

requirement is ultra vires and Plaintiffs are entitled to injunctive relief against Defendants'

application of the prepublication approval requirement.

11

WASHSTATEB007318

COUNT TWO

RIGHT OF FREE SPEECH—U.S. CONST. AMEND. I

53.     Paragraphs 1 through 52 are incorporated as though fully set forth herein.

54.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as an unconstitutional prior restraint on protected expression.

55.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as overly broad, inherently vague, ambiguous, and lacking adequate procedural protections.

56.     Defendants' prepublication approval requirement is invalid as applied to Defense Distributed's posting of the Subject Files, because Defendants have selectively applied the prior restraint based on the content of speech and/or the identity of the speaker.

57.     Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of federal law, violates Plaintiffs' rights under the First Amendment to the United States Constitution, causing Plaintiffs, their customers, visitors and members significant damages. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT THREE

RIGHT TO KEEP AND BEAR ARMS—U.S. CONST. AMEND. II

58.     Paragraphs 1 through 57 are incorporated as though fully set forth herein.

59.     The fundamental Second Amendment right to keep and bear arms inherently embodies two complimentary guarantees: the right to acquire arms, and the right to make arms.

60.     If one cannot acquire or create arms, one cannot exercise Second Amendment rights. Infringing upon the creation and acquisition of arms of the kind in common use for

WASHSTATEB007319

traditional lawful purposes violates the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

61.     By maintaining and enforcing the prepublication approval requirement and forbidding Plaintiffs from publishing the subject files, which enable the lawful manufacture of firearms, Defendants are violating the Second Amendment rights of Plaintiffs, their customers, members, and visitors. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

<div align="center">

COUNT FOUR

RIGHT TO DUE PROCESS OF LAW—U.S. CONST. AMEND. V

</div>

62.     Paragraphs 1 through 61 are incorporated as though fully set forth herein.

63.     The Due Process Clause of the Fifth Amendment to the United States Constitution  requires the Government to provide fair notice of what is prohibited, prohibits vague laws, and prevents arbitrary enforcement of the laws.

64.     On its face, Defendants' prepublication approval requirement is overly broad, vague, arbitrary, and lacks adequate procedural safeguards. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

65.     As applied to Defense Distributed, Defendants' imposition of the prepublication approval requirement, failure to clearly describe the information subject to the prior restraint, and failure to provide a process for timely review of Defense Distributed's speech have deprived Defense Distributed of its right to fair notice of what is required under the law and adequate process, in violation of the Fifth Amendment. Defense Distributed is therefore entitled to injunctive relief against Defendants' application of the prior restraint.

<div align="center">

13

</div>

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information is, on its face and as applied to Plaintiffs' public speech, null and void, and of no effect, as an unconstitutional Ultra Vires government action.

2.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the First Amendment to the United States Constitution;

3.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to public speech, to include the Internet posting of files used in the production of arms of the kind in common use for traditional lawful purposes, including but not limited to the Subject Files, violates the Second Amendment to the United States Constitution;

4.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the Fifth Amendment to the United States Constitution;

5.      An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against public speech on privately generated unclassified information;

WASHSTATEB007321

6.     An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against Plaintiffs' public speech, to include Internet postings of the Subject Files;

7.     Attorney fees and costs pursuant to 28 U.S.C. § 2412; and

8.     Any other further relief as the Court deems just and appropriate.

Dated: January 31, 2018                              Respectfully submitted,

_/s/ Alan Gura_                                       _/s/ William B. Mateja_
Alan Gura                                            William B. Mateja
Virginia Bar No. 68842*                              Texas State Bar No. 13185350
Gura PLLC                                            POLSINELLI P.C.
916 Prince Street, Suite 107                         2950 N. Harwood, Suite 2100
Alexandria, Virginia 22314                           Dallas, Texas 75201
703.835.9085/Fax 703.997.7665                        214.397.0030/Fax 214.397.0033
alan@gurapllc.com                                    Mateja@polsinelli.com

_/s/ Matthew Goldstein_                              _/s/ Josh Blackman_
Matthew Goldstein                                    Josh Blackman
D.C. Bar No. 975000*                                 Virginia Bar No. 78292
Matthew A. Goldstein, PLLC                           1303 San Jacinto Street
1875 Connecticut Avenue, N.W.                        Houston, Texas 77002
10th Floor                                           202.294.9003/Fax: 713.646.1766
Washington, DC 20009                                 joshblackman@gmail.com
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com

_/s/ David S. Morris_
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
512.472.5070/Fax 512.320.8935
jacks@fr.com
dmorris@fr.com                                       *Admitted pro hac vice

Exhibit H

1          UNITED STATES DISTRICT COURT

2       WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

4                              )
     STATE OF WASHINGTON, et al., ) C18-1115-RSL
5                              )
                    Plaintiffs,  ) SEATTLE, WASHINGTON
6                              )
     v.                          ) August 21, 2018
7                              )
     UNITED STATES DEPARTMENT OF  ) MOTION HEARING
8    STATE, et al.,              )
                              )
9                   Defendants.  )

10   _____

11            VERBATIM REPORT OF PROCEEDINGS
           BEFORE THE HONORABLE ROBERT S. LASNIK
12            UNITED STATES DISTRICT JUDGE

     _____
13

14
     APPEARANCES:
15

16

17    For the Plaintiffs:     Jeffrey G. Rupert
                              Attorney General's Office
18                            PO Box 40110
                              Olympia, WA  98504
19
                              Jeffrey T. Sprung
20                            Kristin Beneski
                              Zachary P. Jones
21                            Attorney General's Office
                              800 5th Avenue
22                            Suite 2000
                              Seattle, WA  98104
23
                              Scott J. Kaplan
24                            Oregon Department of Justice
                              100 SW Market Street
25                            Portland, OR  97201

```
 1      For the Defendant      Steven A. Myers
        United States          US Department of Justice
 2      Defendants:            20 Massachusetts Avenue NW
                               Washington, DC  20530
 3
        For the Defendant      Charles R. Flores
 4      Defense Distributed:   Daniel Hammond
                               Beck Redden LLP
 5                             1221 McKinney Street
                               Suite 4500
 6                             Houston, Texas  77010

 7      For the Defendants     Matthew Goldstein
        Defense Distributed;   Farhang & Medcoff
 8      Second Amendment       4901 East Broadway Blvd.
        Foundation, Inc.;      Suite 311
 9      and Conn Williamson:   Tucson, AZ  85711

10                             Joel B. Ard
                               Immix Law Group PC
11                             701 5th Avenue
                               Suite 4710
12                             Seattle, WA  98104

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1    Category I, and specifically with respect to the subject

 2    files that are at issue here.

 3        Finally, with respect to plaintiffs' arbitrary and

 4    capricious claim, we submit that the notices of proposed

 5    rulemaking directly answer that claim.  Those notices of

 6    proposed rulemaking make clear that the federal government

 7    has been involved in a year's long process to determine what

 8    kinds of weapons present a critical military or intelligence

 9    advantage.  And they further reflect the government's

10    judgment that small-caliber, nonautomatic firearms, of a kind

11    that you can buy in essentially any gun store in the United

12    States, do not present such a critical military or

13    intelligence advantage.

14        And so we think that answers their arbitrary and

15    capricious claim.

16        THE COURT:  Of course you cannot buy a 3D-printed gun

17    in any firearms store in the United States that's

18    undetectable and untraceable, can you?

19        MR. MYERS:  No, Your Honor, if it were undetectable

20    and untraceable, that would be a violation of the

21    Undetectable Firearms Act.

22        THE COURT:  So what I keep coming back to, Mr. Myers,

23    is saying we're just doing this gross category of "under

24    50-caliber nonautomatic" because that has no defense or

25    international implications, may apply to every other weapon,

# Exhibit I

1

The Honorable Robert S. Lasnik

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

8

9

STATE OF WASHINGTON; STATE OF
CALIFORNIA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF COLUMBIA;
STATE OF HAWAII; STATE OF ILLINOIS;
STATE OF IOWA; STATE OF
MARYLAND; COMMONWEALTH OF
MASSACHUSETTS; STATE OF
MINNESOTA; STATE OF NEW JERSEY;
STATE OF NEW YORK; STATE OF
NORTH CAROLINA; STATE OF OREGON;
COMMONWEALTH OF PENNSYLVANIA;
STATE OF RHODE ISLAND; STATE OF
VERMONT and COMMONWEALTH OF
VIRGINIA,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
STATE, et al.,

Defendants.

NO. 2:18-cv-01115-RSL

**PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:
APRIL 19, 2019**[1]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

---

[1] The briefing schedule for this motion is set by the Case Management Order (Dkt. # 115).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007403

***TABLE OF CONTENTS***

I.    INTRODUCTION AND RELIEF REQUESTED .................................................................. 1

II.   STATEMENT OF UNDISPUTED FACTS ...................................................................... 2

     A.   AECA and ITAR Govern Export Control of Weapons and Related Technical
          Data .................................................................................................................. 2

     B.   The Subject Files Can Produce Functional Weapons Using a 3D Printer ................ 2

     C.   The State Department Defends Its Regulation of the Subject Files, Defeating
          Defense Distributed at Every Stage of the Litigation ............................................ 3

     D.   Reversing Its Position, the State Department Settles with Defense Distributed
          by Agreeing to Remove the Subject Files from the U.S. Munitions List ................. 5

     E.   This Court Preliminarily Enjoins the Temporary Modification and Letter .............. 7

     F.   The State Department Offers Shifting, Unsupported Rationales for Its Actions ....... 7

     G.   Final Rules Are Forthcoming, According to the Federal Defendants ...................... 8

III.   ARGUMENT ............................................................................................................ 9

     A.   Legal Standard ................................................................................................. 9

     B.   The State Department Failed to Provide the Required 30 Days' Notice to
          Congress and Exceeded Its Regulatory Authority ............................................... 10

     C.   The State Department's Actions Were Arbitrary and Capricious .......................... 12

          1.   The administrative record fails to explain or support the agency's
                asserted rationales for abruptly reversing its position. ................................... 12

          2.   The agency failed to consider the specific properties of 3D-printed guns
                and disregarded the unique threats they pose. ............................................... 15

          3.   The agency's stated rationales are pretextual as applied to 3D-printable
                firearm files. ............................................................................................. 18

     D.   The Court Should Vacate the State Department's Actions and Enjoin It from
          Further Attempts to Unlawfully Deregulate the Files .......................................... 20

IV.   CONCLUSION ........................................................................................................ 24

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007404

## I.    INTRODUCTION AND RELIEF REQUESTED

This lawsuit challenges the State Department's "temporary" deregulation of 3D-printable computer files for the automatic production of undetectable, untraceable plastic firearms. The subject files include specific files that Defense Distributed plans to release on the internet if they are exempted from federal export control, as well as files that may be created in the future and other unknown, unreviewed files. If the files are allowed to be published online, they will be permanently available to virtually anyone inside or outside the United States—including terrorists, assassins, violent criminals, mentally ill persons, and unsupervised children.

The State Department, which has regulated the subject files for years by including them on the U.S. Munitions List pursuant to the Arms Export Control Act (AECA), abruptly attempted to deregulate the files via a "Temporary Modification of Category I" of the Munitions List ("Temporary Modification") and a letter to Defense Distributed ("Letter"). It did so pursuant to a private settlement agreement, without following statutorily mandated procedures or providing any public notice, as a *fait accompli* before promulgating any final rule (or even considering public comments on a proposed rule). It also did so without considering the unique properties of 3D-printable firearms or the national and domestic security implications of permitting their "unlimited" release. The State Department's actions were unlawful, *ultra vires*, arbitrary and capricious, and unconstitutional, as established by the administrative record and other undisputed evidence. Its reckless and covert deregulation evaded Congress's "particularly rigorous oversight of the Munitions List" and public scrutiny as to an issue of national significance.

The Plaintiff States ask the Court to enter summary judgment in their favor, vacate the Temporary Modification and Letter, and permanently enjoin the Federal Defendants from removing the subject files from the Munitions List without following AECA's procedural requirements. The only potentially lawful way to remove the files is to comply with all mandatory procedures. In fact, the Federal Defendants say a compliant final rule is forthcoming, implicitly conceding the point even as they continue to defend the indefensible.

1

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

## II.   STATEMENT OF UNDISPUTED FACTS

The filed administrative record is consistent with the undisputed facts alleged and established by the States at earlier stages of this litigation, as set forth below.

### A.   AECA and ITAR Govern Export Control of Weapons and Related Technical Data

The Arms Export Control Act (AECA) authorizes the President of the United States "to control the import and the export of defense articles and defense services" "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Items he designates as "defense articles and defense services" constitute the U.S. Munitions List. *Id.* The President delegated his authority to designate Munitions List items to the State Department, *see* Executive Order 13637 § 1(n)(i), and the Department promulgated the International Traffic in Arms Regulations (ITAR), which are administered by its Directorate of Defense Trade Controls.[2] 22 C.F.R. §§ 120–130; *see* Dkt. # 64 (Fed. Defs' Opp. to PI) at 2.

Category I of the Munitions List includes all firearms up to .50 caliber and related "technical data," 22 C.F.R. § 121.1(I)(a), i.e., data "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" such firearms, *id.* § 120.10(a). In cases where it is unclear whether a particular item is a defense article subject to ITAR, the Department makes an individualized "commodity jurisdiction" (CJ) determination using a procedure set forth in the ITAR. *See id.* § 120.4; Dkt. # 64 at 3.[3]

### B.   The Subject Files Can Produce Functional Weapons Using a 3D Printer

The files at issue in this case are Defense Distributed's 3D-printable Computer Aided Design (CAD) files that can be used to produce the "Liberator" pistol and other defense articles, plus other unidentified files that Defense Distributed "has and will continue to create and

---

[2] The Department, the Directorate, Michael R. Pompeo, Mike Miller, and Sarah Heidema are collectively referred to as the "State Department" or the "Federal Defendants."

[3] *See also* Declaration of Kristin Beneski, Ex. A (Aguirre Declaration), ¶¶ 19–20 (describing the CJ determination procedure).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007406

possess" in the future and any "similar files generated by its members and others."[4] A functional Liberator pistol can be made almost entirely of plastic using the CAD files and a commonly available 3D printer, with "considerably less know-how" than is needed to manufacture a firearm using "conventional technical data."[5] As then-Director of the Office of Defense Trade Controls Management Lisa V. Aguirre stated in a 2015 declaration, the "'Liberator' firearm included in DD's CAD designs presents a specific and unique risk to the national security and foreign policy interests of the United States" because it "is a plastic firearm which can be produced in a way as to be both fully operable and virtually undetectable by conventional security measures such as metal detectors."[6] In addition to being undetectable, privately manufactured 3D-printed weapons can be untraceable by law enforcement because they lack serial numbers.[7]

From 2013 to April 2018, the Department considered the Liberator files and other 3D-printable firearm files to be "ITAR-controlled technical data" that cannot be exported (including by posting on the borderless internet) without prior authorization.[8] In 2015, the Directorate conducted an individualized CJ review of Defense Distributed's files and confirmed that they are "technical data under Category I(i) of the [Munitions List]" and subject to ITAR regulation.[9]

## C.   The State Department Defends Its Regulation of the Subject Files, Defeating Defense Distributed at Every Stage of the Litigation

In May 2015, Defense Distributed sued the State Department in a Texas federal district court, seeking to enjoin it from regulating the files. *Def. Distributed v. U.S. Dep't of State*, Case

---

[4] Ex. L (*Def. Distributed*: Second Amended Complaint), ¶¶ 25, 36, 40, 44–45 (referenced in Ex. B (Temporary Modification) and Ex. C (Settlement Agreement), ¶ 12).
   [5] Ex. A (Aguirre Declaration), ¶ 29(b).
   [6] *Id.* ¶ 35; *see also id.* n.9 (the Liberator's detectable metal component "can be removed without rendering it inoperable"); Ex. D (*Def. Distributed*: Opp. to Mot. for PI) at 10 n.6 ("the Liberator remains operable without the inserted metal"); Ex. E (*Def. Distributed*: Mot. to Dismiss) at 1 (Defense Distributed's CAD files "unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms . . ."); Dkt. # 112 (Answer), ¶ 39 (admitting that "the Liberator is a plastic firearm" that is undetectable by walk-through metal detectors when it does not contain a removable piece of steel); *infra* at 22–23 & n.57.
   [7] *See* Dkt. # 43-2 at 29–39 (McCord Decl.), ¶¶ 29–30, 33; *id.* at 40–44 (Kyes Decl.), ¶ 8; *id.* at 4–18 (Graham Decl.), ¶ 35.
   [8] Ex. A, Ex. 2 (CJ letter dated 5/8/13); *see* Ex. E (filed 4/6/18).
   [9] Exs. F, G (CJ determinations).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007407

1   No. 15-cv-372-RP (W.D. Tex.). In opposing Defense Distributed's motion for a preliminary

2   injunction, the State Department argued that its regulation of the files was proper (and

3   furthermore, vital) because, *inter alia*:

- "export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests" that "warrant subjecting [the files] to ITAR's export licensing of technical data;"

- Defense Distributed's "CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of 'automatically' generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment;"

- "The State Department is particularly concerned that [Defense Distributed's] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons;" and

- both the government and the public "have a strong interest in curbing violent regional conflicts elsewhere in the world, especially when such conflict implicates the security of the United States and the world as a whole."[10]

14          In a supporting declaration, then-Director Aguirre explained that the unrestricted export

15   of Defense Distributed's CAD files would result in the production of fully operable and

16   undetectable plastic firearms, that their use to commit terrorism, piracy, assassinations, or other

17   crimes would cause serious and long-lasting harm to the foreign policy and national security

18   interests of the United States, that efforts to restrict the availability of defense articles to enemies

19   of the United States would fail, that the proliferation of weapons and related technologies would

20   contribute to a more dangerous international environment, and that their export would undercut

21   the domestic laws of nations that have more restrictive firearm controls and the United States'

22   foreign relations with those nations would suffer.[11]

23          The district court denied Defense Distributed's motion for a preliminary injunction,

24   noting that the company's avowed purpose is to facilitate "*global* access to, and the collaborative

25   _____

26       [10] Ex. D at 10–11.
         [11] Ex. A, ¶ 35.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007408

1   production of, information and knowledge related to the three-dimensional ('3D') printing of

2   arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation

3   of conflict" and are of the type Congress authorized the President to regulate through AECA.[12]

4   The Fifth Circuit affirmed, citing both the national security implications of the CAD files and

5   the permanent nature of the internet, and found the State Department had "asserted a very strong

6   public interest in national defense and national security."[13]

7         On April 6, 2018, the State Department moved to dismiss Defense Distributed's lawsuit,

8   reiterating that what was at stake was "the United States' ability to control the export of

9   weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare

10  or terrorism are not shipped from the United States to other countries (or otherwise provided to

11  foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to

12  threaten U.S. national security, U.S. foreign policy interests, or international peace and

13  stability."[14] According to the State Department, the CAD files "unquestionably direct the

14  functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation

15  of such firearms by those abroad" and the Department "has consistently and reasonably

16  concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if

17  unfettered access to technical data essential to the production of those arms is permitted."[15]

18  **D.    Reversing Its Position, the State Department Settles with Defense Distributed by
19         Agreeing to Remove the Subject Files from the U.S. Munitions List**

20         By April 30, 2018, the State Department had "reached a tentative settlement agreement"

21  with Defense Distributed,[16] which was ultimately approved by Department officials.[17] Pursuant

22  to the Settlement Agreement, the State Department changed course, abandoning its prior

23  regulatory and litigation positions and permitting Defense Distributed to post the subject files on

---

[12] Ex. H (*Def. Distributed*: Order denying PI) at 8–9.
[13] Ex. I (*Def. Distributed*: 5th Cir Opinion) at 10, 12–13.
[14] Ex. E at 1.
[15] *Id.* at 1, 3, 7.
[16] Ex. M (*Def. Distributed*: Mot. to Stay) (filed 4/30/18).
[17] Ex. N (*Def. Distributed*: Joint Settlement Status Rpt.) (filed 6/28/18).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

the internet and distribute them to "any United States person." Specifically, the Department

agreed to: (a) "draft and . . . fully pursue" a notice of proposed rulemaking (NPRM) and final

rule revising Munitions List Category I to exclude the "technical data that is the subject of the

Action"; (b) announce a "temporary modification" of Category I to exclude the data while the

final rule is "in development"; (c) issue a letter to Defense Distributed advising that its files are

"approved for public release (i.e., unlimited distribution)" and exempt from ITAR; and (d)

acknowledge and agree that the Temporary Modification "permits any United States person" to

"access, discuss, use, reproduce, or otherwise benefit from" the data, and that the Letter "permits

any such person to access, discuss, use, reproduce or otherwise benefit from" Defense

Distributed's files.[18] The Settlement Agreement contains no findings of fact or other information

that could explain the Department's change of position or invalidate its prior analysis as to the

security implications of "unlimited distribution" of the files.[19]

The State Department fulfilled each of these terms. On May 24, 2018, it published the

promised NPRM in the Federal Register, with a public comment period ending on July 9. 83 Fed.

Reg. 24,198. The NPRM does not specifically mention 3D-printed guns. *See id.* The Settlement

Agreement was signed on June 29, in the midst of the comment period, but was not made public

until July, when the comment period ended.[20] On July 27, the Department issued the Temporary

Modification and the Letter. The Temporary Modification states that the Department "has

determined that it is in the interest of the security and foreign policy of the United States to

temporarily modify United States Munitions List (USML) Category I to exclude" the subject

files. The "temporary" removal of these files was to "remain in effect while the final rule

referenced in paragraph 1(a) of the Settlement Agreement is in development."[21] The Letter states

---

[18] Ex. C, ¶ 1(a)–(d).

[19] *See generally* Ex. C. The Settlement Agreement expressly states that it does not "reflect any agreed-upon purpose other than the desire of the Parties to reach a full and fair conclusion of the Action, and to resolve the Action without the time and expense of further litigation." *Id.* ¶ 5.

[20] Dkt. # 95 (Preliminary Injunction) at 7; Dkt. # 112 (Answer), ¶ 53 (admitting the Settlement Agreement was "made public in July 2018").

[21] Ex. B.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007410

that the Department "approve[s]" Defense Distributed's files "for public release (i.e., unlimited distribution)," but offers no rationale for this.[22] Those actions prompted this lawsuit.

**E.       This Court Preliminarily Enjoins the Temporary Modification and Letter**

The Court granted the States' motion for a temporary restraining order, then converted the order to a preliminary injunction.[23] The Court ruled that the States had standing to challenge the Temporary Modification and Letter, were likely to succeed on the merits of their APA claim that the Department removed items from the Munitions List "without the required Congressional notice," "raised serious questions regarding the merits" of their claim that the Department's actions were arbitrary and capricious, and established that the public interest "strongly supports" an injunction to prevent irreparable harm caused by the files' public release on the internet.[24]

**F.       The State Department Offers Shifting, Unsupported Rationales for Its Actions**

In this litigation, the Federal Defendants offered a new and different reason for the State Department's deregulation of the subject files. Contrary to the Temporary Modification's assertion that the deregulation was "in the interest of the security and foreign policy of the United States,"[25] the Federal Defendants conceded at oral argument that "undetectable plastic firearms are a serious security threat."[26] Their new rationale is that "the Department determined" that non-automatic and semi-automatic firearms under .50 caliber and related technical data "do not provide the United States with a critical military or intelligence advantage" because these items are "already commonly available," as stated in the August 15, 2018 Declaration of Sarah J. Heidema.[27] But at oral argument, the Federal Defendants conceded as follows:

THE COURT: Of course you cannot buy a 3D-printed gun in any firearms

---

[22] Ex. J (Letter) at 2.
[23] Dkt. # 23 (TRO); Dkt. # 95.
[24] Dkt. # 95 at 9–11, 12–15, 16–18, 20–24, 25.
[25] Ex. B.
[26] Ex. K (Verbatim Report of Proceedings on Aug. 21, 2018) at 35:4–8; *see also id.* at 24:12–14 ("The federal government agrees that undetectable plastic firearms pose a significant risk to domestic public safety.").
[27] Dkt. # 64-1 (Heidema Decl.) ¶¶ 19, 21; Dkt. # 64 (Fed. Defs' Opp. to PI) at 22. The "critical military or intelligence advantage" rationale also appears in the preamble to the 2018 NPRM, which is part of the Supplemental Record, but the NPRM does not specifically mention 3D-printed guns or the subject files.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007411

1     store in the United States that's undetectable and untraceable, can you?

2              MR. MYERS: No, Your Honor, if it were undetectable and untraceable, that

3     would be a violation of the Undetectable Firearms Act.[28]

4              On October 19, 2018, the Federal Defendants submitted their designated "Administrative

5 Record."[29] The States challenged the sufficiency of that record and moved to supplement it.[30] In

6 response, the Federal Defendants agreed to partially supplement the record as requested,[31] and

7 they filed supplemental materials (the "Supplemental Record") on December 20, 2018.[32]

8              Neither the Administrative Record nor the Supplemental Record contains any evidence

9 to support either of the State Department's purported "determin[ations]" regarding the subject

10 files.[33] The Supplemental Record contains over 3,000 public comments on the May 24, 2018

11 NPRM.[34] Although the NPRM does not specifically mention 3D-printed firearms, approximately

12 386 of the public comments do; of those, all are opposed to the NPRM.[35] The Federal Defendants

13 represented in this litigation that they did not consider the 2018 NPRM comments in enacting

14 the Temporary Modification and Letter.[36]

15 **G.**     **Final Rules Are Forthcoming, According to the Federal Defendants**

16              The State Department's May 24, 2018 NPRM proposes to remove all non-automatic and

17 semi-automatic firearms under .50 caliber and related technical data from the Munitions List,

18 which would instead be governed by the Commerce Department's Export Administration

19 Regulations (EAR). 83 Fed. Reg. 24,198. Unlike the ITAR, the EAR do not allow for regulation

20 of items that have been posted on the internet—even for national security reasons. *See* 15 C.F.R.

21 §§ 734.3(b)(3), 734.7(a)(4) (excluding from EAR regulatory jurisdiction any "published"

22         [28] Ex. K at 32:5–21.
23         [29] Dkt. # 116.
        [30] Dkt. # 132. The Motion to Supplement is pending as of the filing of this motion.
24         [31] *See* Dkt. # 152 at 3.
        [32] Dkt. # 158.
25         [33] *See generally id.*
        [34] *See* Declaration of Jennifer D. Williams ¶ 4(25); Dkt. ## 158-5, 158-6, 158-7.
        [35] Williams Decl. ¶ 4(25).
26         [36] *See* Dkt. # 152 at 6–7 (arguing that the original Administrative Record was "complete" and there was "no reason" for the Department to have considered the 2018 NPRM comments).

8

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007412

1   information and software, including that made available for "[p]ublic dissemination (i.e.,

2   unlimited distribution) in any form . . . including posting on the Internet on sites available to the

3   public . . . ."). The Commerce Department's May 24, 2018 companion NPRM explains that, for

4   example, "if a gun manufacturer posts a firearm's operation and maintenance manual on the

5   internet," the "manual would no longer be 'subject to the EAR.'" 83 Fed. Reg. 24,166, 24,167

6   (May 24, 2018) (citing 15 C.F.R. §§ 734.3(b), 734.7(a)).

7         As of the filing of this brief, neither State nor Commerce has issued a final rule. The

8   Federal Defendants have represented in this litigation that final rules are forthcoming, Dkt.

9   # 131, but offered "no details regarding the substance" of these rules, Dkt. # 169 (Order) at 2,

10  including whether they will be consistent with the NPRMs as applied to the subject files.

11                         **III.    ARGUMENT**

12  **A.    Legal Standard**

13        Under the APA, courts "shall . . . hold unlawful and set aside agency action" that is

14  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

15  § 706. Where the material facts are not genuinely disputed and the questions before the Court

16  are purely legal, the Court can resolve an APA challenge on a motion for summary judgment.

17  Fed. R. Civ. P. 56; *King County v. Azar*, 320 F. Supp. 3d 1167, 1171 (W.D. Wash. 2018), *appeal*

18  *dismissed*, 2018 WL 5310765 (9th Cir. Sept. 20, 2018) (citing *Fence Creek Cattle Co. v. U.S.*

19  *Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010)).

20        "[I]n APA cases, the Court's role is to determine whether, as a matter of law, evidence

21  in the administrative record supports the agency's decision." *King County*, 320 F. Supp. 3d at

22  1171 (citing *Occidental Engineering Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985)). Review

23  is based on "the whole record," 5 U.S.C. § 706, which "consists of all documents and material

24  directly or *indirectly* considered by the agency decision-makers and includes evidence contrary

25  to the agency's position." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).

26  Courts may also consider extra-record evidence when necessary to determine whether the agency

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007413

has considered all relevant factors and explained its decision, has relied on documents not in the

filed record, or has acted in bad faith. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d

971, 992 (9th Cir. 2014); *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

**B.     The State Department Failed to Provide the Required 30 Days' Notice to Congress
and Exceeded Its Regulatory Authority**

AECA prohibits the State Department from removing any item from the Munitions List

"until 30 days after the date on which [it] has provided notice of the proposed removal to the

Committee on International Relations of the House of Representatives and the Committee on

Foreign Relations of the Senate" in accordance with established notification procedures. 22

U.S.C. § 2778(f)(1). The notice requirement furthers Congress's "particularly rigorous oversight

of the Munitions List," *United States v. Zheng*, 590 F. Supp. 274, 278–79 (D.N.J. 1984), *vacated

on other grounds*, 768 F.2d 518 (3d Cir. 1985), and was strengthened in 2002 in response to

perceived attempts to evade that oversight, *see* H.R. Rep. No. 107-57, at 86–87 (2001).

The Federal Defendants concededly failed to provide this 30-day notice before issuing

the Temporary Modification and Letter.[37] This failure is confirmed by the Administrative Record

and the Supplemental Record, which contain no evidence that such notice was given.[38] Based on

this statutory violation alone, the Court should invalidate the Temporary Modification and

Letter. *See* 5 U.S.C. § 706(2)(A), (C), (D) (a reviewing court "shall . . . hold unlawful and set

aside" agency action that is "not in accordance with law," "in excess of statutory jurisdiction,

authority, or limitations," or "without observance of procedure required by law").

The Federal Defendants previously sought to justify their failure to provide notice by

claiming that the Temporary Modification did not remove an "item" from the Munitions List,

but the Court has already correctly ruled as a matter of law that the subject files at issue here are

---

[37] *See* Dkt. # 95 (Preliminary Injunction) at 12–13 & n.7 (noting that Federal Defendants "acknowledge" the notice requirement and that the Heidema Declaration "confirms" the notice was not given); Dkt. # 64-1 ¶ 30 (stating that "Congress will receive the necessary notifications" only in connection with a final rule).

[38] *See generally* Dkt. # 116 (Admin. Record); Dkt. # 133 (Williams Decl.) ¶ 4 (summarizing contents of Administrative Record); Dkt. # 158 (Supp. Record); Second Williams Decl.) ¶ 4 (summarizing contents of Supplemental Record).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007414

1   "items" or "articles" to which the notice requirement applies. Dkt. # 95 at 14–15; *see* 22 U.S.C.

2   § 2778(a)(1) (designated "defense articles" are "items" that "constitute the United States

3   Munitions List"); 22 C.F.R. § 121.1 (Munitions List does not enumerate every controlled

4   "article" or "item," but describes "categories" of items); *United States v. Zhen Zhou Wu*, 711

5   F.3d 1, 12 (1st Cir. 2013) (the Munitions List is "a series of categories describing the kinds of

6   items that qualify as 'defense articles'"). AECA's 30-day notice requirement therefore applies,

7   and was not followed in this case. The Temporary Modification and Letter are procedurally

8   defective and must be set aside for this reason alone.

9          In addition to violating AECA's procedural requirements, the Temporary Modification

10  and Letter exceeded the State Department's delegated authority under AECA and violated the

11  limits on federal power established by the Tenth Amendment by purporting to authorize "*any

12  United States person*" to "*use*" the files to print their own undetectable and untraceable weapons,

13  and to permit "*unlimited distribution*" of the files.[39] The States have numerous laws restricting

14  the possession and use of firearms by "United States persons" and others, including laws

15  prohibiting ineligible persons from possessing firearms, requiring background checks as a

16  condition of acquiring firearms, and regulating the manufacture of firearms. *See* Dkt. # 29

17  (FAC), ¶¶ 68–217 (citing state gun-safety laws). Several of the Plaintiff States have also enacted

18  or proposed laws that specifically regulate 3D-printed guns. *See* N.J. SB 2465; Wash. SB 5061;

19  D.C. B23-0018; R.I. S0084; Md. SB 8. The Department's overly broad authorization well

20  exceeds the scope of its authority under AECA to regulate exports, and on its face purports to

21  abrogate the states' police powers to enforce their gun-safety laws in violation of the Tenth

22  Amendment. *See* U.S. Const. amend. X ("The powers not delegated to the United States by the

23  Constitution . . . are reserved to the States respectively, or the people."); *Bond v. United States*,

24  572 U.S. 844, 854 (2014) ("The States have broad authority to enact legislation for the public

25  good—what we have often called a 'police power.'"); *cf. District of Columbia v. Heller*, 554

26
    _____
    [39] Ex. C, ¶ 1(d) (emphasis added); Ex. J at 2.

11

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007415

U.S. 570, 626–27 (2008) (acknowledging validity of "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms"). The States' ability and authority to enforce their gun-safety laws is undermined by the State Department's purported authorization of "any United States person" to "use" the files to print their own undetectable and untraceable weapons.

## C.    The State Department's Actions Were Arbitrary and Capricious

In addition to violating both AECA and the U.S. Constitution, the Temporary Modification and Letter are arbitrary and capricious, and should be invalidated for that independent reason. Agency action is "arbitrary and capricious," and must be set aside, if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action is also arbitrary and capricious if it is not based on a "reasoned analysis" that indicates the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 42–43 (citation and internal quotation marks omitted). When an agency reverses position, it must provide a "reasoned explanation" for "disregarding facts and circumstances that underlay or were engendered by the prior policy," *F.C.C. v. Fox Television Studios, Inc.*, 556 U.S. 502, 516 (2009), and "must show that there are good reasons for the new policy," *id.* at 515. In short, to survive arbitrary-and-capricious review, agency action must be demonstrably "logical and rational." *Allentown Mack Sales & Service, Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998).

### 1.    The administrative record fails to explain or support the agency's asserted rationales for abruptly reversing its position.

Judicial review of agency action "is based on the administrative record and the basis for

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007416

1   the agency's decision must come from the record." *Ass'n of Irritated Residents v. E.P.A.*, 790

2   F.3d 934, 942 (9th Cir. 2015); *see also, e.g.*, *Choice Care Health Plan, Inc. v. Azar*, 315 F. Supp.

3   3d 440, 443 (D.D.C. 2018) (to survive APA review, "the facts on which the agency purports to

4   have relied" must "have some basis in the record") (internal quotation marks omitted). Absent

5   compliance with this basic requirement, a reviewing court would be unable to measure agency

6   action against the relevant governing standard. *See, e.g.*, *U.S. Lines, Inc. v. Fed. Mar. Comm'n*,

7   584 F.2d 519, 533 (D.C. Cir. 1978) (observing that the court could not "determine whether the

8   final agency decision reflect[ed] the rational outcome of the agency's consideration of all

9   relevant factors," as required by the APA, because it "ha[d] no idea what factors . . . were in fact

10   considered by the agency").

11       Here, the Temporary Modification itself is the *only* document in the filed administrative

12   record that reflects any reason for the State Department's reversal of its position on 3D-printable

13   firearm files.[40] Neither the Letter nor the Settlement Agreement, nor any other part of the filed

14   record, memorializes the Department's "determin[ation]" or offers any reasoning to support it.[41]

15   The Temporary Modification asserts, with no explanation or elaboration, that the State

16   Department "has determined that it is in the interest of the security and foreign policy of the

17   United States to temporarily modify the United States Munitions List to exclude" the subject

18   files. Simply stating that the Department "has determined" that permitting dissemination via the

19   internet is somehow "in the interest" of U.S. national security and foreign policy is insufficient

20   to survive judicial review. The Department must explain *why* it made this determination,

21   demonstrating a "rational connection between the facts found and the choice made." *State Farm*,

22   463 U.S. at 43. But the filed record is completely devoid of any relevant "facts found," much

23   less a "rational connection" to the decision to deregulate the subject files.

---

24       [40] *See* Ex. B; *see generally* Dkt. ## 116 (Admin. Record), 158 (Supp. Record).

25       [41] *See* Ex. J; Ex. C; Dkt. # 95 at 6 ("No findings of fact or other statements are provided in the agreement
    that could explain the federal government's dramatic change of position or that address, much less invalidate, its
26   prior analysis regarding the likely impacts of publication on the United States' national security interests."); *see
    generally* Dkt. ## 116, 158.

13

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007417

1       The absence of evidence or explanation is unsurprising, since the Federal Defendants

2  conceded in this litigation that 3D-printable firearms *do* pose a "serious security threat," and

3  offered a *different* explanation for the deregulation: that the subject files do not provide a "critical

4  military or intelligence advantage" because they are "already commonly available[.]"[42] This new

5  explanation, which is supported only by the *post hoc* Heidema Declaration, merits no

6  consideration because "[t]he focal point for judicial review should be the administrative record

7  already in existence, not some new record made initially in the reviewing court." *Fla. Power &*

8  *Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *San Luis & Delta-Mendota Water Auth. v. Jewell*,

9  747 F.3d 581, 602 (9th Cir. 2014) (same). In any case, neither the Heidema Declaration itself

10  nor any part of the administrative record provides a reasoned explanation for the new rationale

11  as applied to the subject files. In fact, the Federal Defendants conceded in these proceedings that

12  undetectable and untraceable 3D-printable firearms are *not* commonly available.[43]

13       Furthermore, far from acknowledging that the Temporary Modification and Letter

14  represent a reversal of its regulatory position or offering a rational explanation for this (as is

15  required), the State Department concealed the reversal until it was a *fait accompli*. *See Fox*

16  *Television Stations*, 556 U.S. at 515 ("the requirement that an agency provide reasoned

17  explanation for its action would ordinarily demand that it display awareness that it *is* changing

18  position"); *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1029 (D.C. Cir. 2017) ("To

19  provide a satisfactory explanation, an agency must acknowledge and explain any departure from

20  its precedents."). The State Department privately reached the tentative settlement in the *Defense*

21  *Distributed* case in April 2018, which became final on June 29. Meanwhile, the comment period

22  for the NPRM (which does not even mention 3D-printed firearms) was still open through July

23  9. The Settlement Agreement was not publicly disclosed until July. The Department issued the

24  Temporary Modification and Letter on July 27 without the required notice to Congress or any

25

26     [42] Dkt. # 64 at 22; Dkt. # 64-1 ¶¶ 19, 21.
       [43] *See* Ex. K at 32:5–21.

14

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007418

1   other advance warning or opportunity for public input on the reversal.

2          In sum, neither the original rationale asserted in the Temporary Modification, nor the

3   new rationale asserted in this case, finds any factual support or rational explanation in the record.

4   Instead of acknowledging or explaining its reversal, the Department concealed it, and would

5   have entirely evaded oversight and review if not for this lawsuit. These basic failures render the

6   Temporary Modification and Letter arbitrary and capricious.

7          **2.    The agency failed to consider the specific properties of 3D-printed guns and
                    disregarded the unique threats they pose.**

8          Not only are the State Department's shifting rationales entirely unsupported, but the

9   administrative record also demonstrates that the Department failed to consider the specific

10  properties of 3D-printed guns and their unique threats to world peace, national security, and

11  foreign policy. In ignoring these issues, the Department disregarded the factors Congress deemed

12  relevant to export control, as well as the evidence supporting the Department's previous

13  regulation of the subject files to further AECA's stated purposes.

14         An agency's action is arbitrary and capricious where it "entirely failed to consider an

15  important aspect of the problem" or "offered an explanation for its decision that runs counter to

16  the evidence before the agency[.]" *State Farm*, 463 U.S. at 43. The agency must consider all

17  "relevant factors," *id.* at 42—in particular, the factors "Congress intended" the agency to

18  consider, *id.* at 55. And the agency cannot pick and choose what evidence to rely on and disregard

19  the rest; judicial review is based on the "whole" record, i.e., "all documents and material directly

20  or *indirectly* considered by the agency decision-makers," including "evidence contrary to the

21  agency's position." *Thompson*, 885 F.2d at 555.

22         Congress directed that export regulation under AECA must be "[i]n furtherance of world

23  peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). The

24  State Department based its previous regulation of the subject files squarely on fulfilling these

25  purposes, invoking threats to "U.S. national security, U.S. foreign policy interests, or

26

15

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007419

1   international peace and stability" in its April 6, 2018 motion to dismiss in the *Defense*
2   *Distributed* case.[44] Elsewhere in its briefing, the Department emphasized the unique dangers
3   posed by the subject files, which "constitute the functional equivalent of defense articles" and
4   can be used to "automatically" generate a "lethal firearm" that is "virtually undetectable in metal
5   detectors and other security equipment."[45] The Department expressed its particular concern that
6   such "undetectable firearms technology could be used in an assassination, for the manufacture
7   of spare parts by embargoed nations, terrorist groups, or guerilla groups, or to compromise
8   aviation security overseas in a manner specifically directed at U.S. persons."[46] The Supplemental
9   Record amply supports the conclusion that the subject files pose unique threats to U.S. national
10  security and foreign policy, as reflected in the Department's own CJ determinations, the Aguirre
11  Declaration, and the Department's briefing in the *Defense Distributed* case.[47] Moreover,
12  hundreds of the public comments on the 2018 NPRM, which the Department received before
13  issuing the Temporary Modification and letter on July 27, 2018 (but admittedly did not consider),
14  oppose the rule on the grounds that it would deregulate 3D-printable firearms.[48]

15       Despite this evidence, the Department decided to deregulate the subject files sometime
16  during a three-week period in April 2018, providing no "reasoned explanation" for disregarding
17  the facts and circumstances supporting its previous position. *Fox Television Studios*, 556 U.S. at
18  516; *see also SNR Wireless*, 868 F.3d at 1029 (D.C. Cir. 2017); *City of Kansas City, Mo. v. Dep't*
19  *of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual
20  premise that is flatly contradicted by the agency's own record does not constitute reasoned
21  administrative decisionmaking, and cannot survive review under the arbitrary and capricious
22  standard."). As of April 6, 2018, the Department's position was that distributing the subject files
23  on the internet would "threaten U.S. national security, U.S. foreign policy interests, or

24  ――――――――――
    [44] Ex. E at 1.
25  [45] Ex. D at 10.
    [46] *Id.*
26  [47] *See* Exs. A, D, E, F, G.
    [48] *See* Williams Decl., ¶ 4(25).

16

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007420

1    international peace and stability." By April 30, 2018, the Department had reached the settlement

2    agreement that resulted in the Temporary Modification and Letter, which deregulated the subject

3    files and approved them for "unlimited distribution."

4            Even though the Department was well aware of the characteristics and qualities of

5    undetectable firearms that render them uniquely dangerous, as reflected in its own CJ

6    determinations and its position in the *Defense Distributed* proceedings, there is no indication in

7    the record that it considered them in connection with the deregulation. This is consistent with

8    the Federal Defendants' statements at oral argument indicating that they did not consider these

9    unique factors until they took a "further look" at the issue in light of this Court's TRO:

10           MR. MYERS: Your Honor, since Your Honor entered the TRO, the
         government has been further studying and further looking into this issue, as the
11       press secretary I think indicated she was -- or the President was welcoming that
         opportunity. That further look has concluded. And the government's position on
12       this issue has not changed.[49]

13   Further, the Department admitted it did not consider the public comments on the 2018 NPRM—

14   even the hundreds of comments that oppose the rule due to its implications for 3D-printed guns,

15   which merit a meaningful response. *See Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 35–36

16   (D.C. Cir. 1977) ("[T]he opportunity to comment is meaningless unless the agency responds to

17   significant points raised by the public.").

18           As noted above, the Federal Defendants' *post hoc* rationale for deregulating the subject

19   files—that they do not provide a "critical military or intelligence advantage"—need not be

20   considered because it is not reflected or supported anywhere in the filed record. But even taking

21   it at face value, this explanation fails to account for all of the factors Congress directed the

22   Department to consider. A defense article can threaten "world peace and the security and foreign

23   policy of the United States"—as the subject files do—regardless of whether it provides a "critical

24   military or intelligence advantage." Yet as the Court previously noted, the Department "appears

25   to have evaluated the export controls on small caliber firearms only through the prism of whether

26   ────────────────
         [49] Ex. K at 34:3–8.

17

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007421

1    restricting foreign access would provide the United States with a military or intelligence

2    advantage." Dkt. # 95 at 18. This is borne out by the filed record, which contains no evidence

3    whatsoever that any other factors were considered. The Department's asserted rationale fails to

4    account for the national security and foreign policy factors Congress directed it to consider.

5    "Such a failure to address 'an important aspect of the problem' that is factually substantiated in

6    the record is unreasoned, arbitrary, and capricious decisionmaking." *Humane Soc'y of U.S. v.*

7    *Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) (quoting *State Farm*, 463 U.S. at 43)).

8          **3.**    **The agency's stated rationales are pretextual as applied to 3D-printable**

9                   **firearm files.**

10          The available evidence strongly suggests that the State Department's asserted rationales

11    for deregulating the subject files are pretextual. "[C]ourts have not hesitated to find that reliance

12    on a pretextual justification violates the APA." *New York v. U.S. Dep't of Commerce*, --- F. Supp.

13    3d ----, 2019 WL 190285, at *112 (S.D.N.Y. Jan. 15, 2019) (citing, *inter alia*, *Woods Petroleum*

14    *Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859 (10th Cir. 1994) (setting aside agency action

15    because the "sole reason" for the action was "to provide a pretext" for the agency's "ulterior

16    motive")). Because the basis for the agency's action must be disclosed in the record, "[i]t follows

17    that a court cannot sustain agency action founded on a pretextual or sham justification that

18    conceals the true 'basis' for the decision." *Id.* The *New York* court concluded, based on a number

19    of factors, that the Commerce Department's rationale for adding a citizenship question to the

20    U.S. Census was pretextual. *See id.* at *112–115. Many similar factors are also present here.

21          First, the Temporary Modification and Letter were highly procedurally irregular. As

22    discussed above, they were issued without the required notice to Congress, or any other advance

23    notice that would have afforded an opportunity for public scrutiny, and they partially effectuated

24    a non-final proposed rulemaking. This concealed the deregulation from public view until it was

25    complete, and deprived Congress of its right to exercise its "particularly rigorous oversight" of

26    the Munitions List. *See New York*, 2019 WL 190285, at *112 ("conspicuous procedural

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007422

1   irregularities" supported finding of pretext, as did a "failure to disclose" that prevented subject

2   matter experts from "conducting rigorous testing").

3          Second, the evidence shows that the State Department decided to deregulate the subject

4   files abruptly, sometime during the three-week period from April 6 to April 30, 2018, in

5   connection with the *Defense Distributed* settlement. Even if the global state of affairs had

6   somehow changed drastically during the three-week period in which the reversal occurred—an

7   improbable scenario for which there is no evidence—this short period would not have afforded

8   enough time to reach a reasoned "determin[ation]" that permanent deregulation no longer

9   presented a national security or foreign policy threat. The Federal Defendants have sought to

10  justify the Temporary Modification and Letter by asserting they are of a piece with the May 24,

11  2018 NPRM, but this only underscores their irregularity, since the NPRM was not (and as of this

12  filing, still is not) final, and the deregulation decision was made months before the NPRM

13  comment period closed. *See New York*, 2019 WL 190285, at *112 (finding pretext where

14  decision was made before the alleged basis for the decision occurred).

15         Third, evidence outside the filed record indicates that the Department's decision was

16  based on a reason not disclosed in the record. Heather Nauert, then the State Department

17  spokesperson, stated at a July 31, 2018 press briefing that the "Department of Justice suggested

18  that the State Department and the U.S. Government settle this [*Defense Distributed*] case, and

19  so that is what was done. . . . We took the advice of the Department of Justice, and here we are

20  right now."[50] This "following DOJ's advice" rationale does not appear anywhere in the filed

21  record. At the same time, Ms. Nauert acknowledged that the State Department still had "equity"

22  in the matter of 3D-printed guns because it "wants to prevent the wrong people from acquiring

23  weapons overseas."[51] This is inconsistent with deregulation being "in the interest of" U.S.

24  national security and foreign policy and is further evidence of pretext. *See New York*, 2019 WL

25  _____

26      [50] Dkt. # 35-1 at 5 of 46.
        [51] *Id.*

19

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007423

190285, at *112 (extra-record statements by Commerce Department official contradicted agency's stated rationale for its decision, supporting finding that this rationale was pretextual); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) (consideration of extra-record evidence is appropriate where the record "does not disclose the factors that were considered" or the agency's "construction of the evidence").

Fourth, the original Administrative Record filed by the State Department failed to include evidence that was before it when it made its decision, including the Department's own CJ determinations related to the subject files, the Aguirre Declaration, and complete records from the *Defense Distributed* litigation in which the Department's regulation of the files was directly at issue. *See New York*, 2019 WL 190285, at *113, *48 ("curated and highly sanitized nature" of initial administrative record suggested intent to conceal true basis for decision).

In sum, the stated bases for the State Department's deregulation of the subject files—that deregulation is "in the interest of" U.S. national security and foreign policy, or that the subject files "do not provide a critical military or intelligence advantage"—are pretextual. "Because [the State Department's] stated rationale was not [its] actual rationale, [it] did not comply with the APA's requirement that [it] 'disclose the basis of [its] decision.'" *New York*, 2019 WL 190285, at *115 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–168 (1962)).

**D.      The Court Should Vacate the State Department's Actions and Enjoin It from Further Attempts to Unlawfully Deregulate the Files**

The Temporary Modification and Letter should be vacated. When agency action is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the APA provides that the reviewing court "shall . . . hold unlawful and set aside" the agency action. 5 U.S.C. § 706(2). Vacatur is the "normal remedy" for unlawful agency action. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). Failure to provide required notice of the agency action is a "fundamental flaw," *id.*, and failure to address important aspects of the problem and ignoring relevant evidence are "major shortcomings," *Humane Soc'y*, 865 F.3d at

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007424

1  614, that make vacatur the appropriate remedy. Here, the Temporary Modification and Letter

2  suffer from all of these fatal deficiencies and more. Further, this is not a case in which "the egg

3  has been scrambled," *Allina*, 746 F.3d at 1110–1111; vacatur would simply restore the status

4  quo and "allow the [pending final rule] to take effect," *Nat'l Venture Capital Ass'n v. Duke*, 291

5  F. Supp. 3d 5, 21 (D.D.C. 2017)—assuming a final rule is lawfully promulgated.[52]

6       The States additionally ask the Court to enjoin the Federal Defendants from issuing any

7  subsequent "temporary modification" or otherwise removing the subject files from the Munitions

8  List or permitting their export without providing congressional notice as required by AECA.[53]

9  Where vacatur of a deregulation decision is not "sufficient to redress [plaintiffs'] injury," a court

10  may issue an injunction that has a "meaningful practical effect independent of its vacatur."

11  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). Here, absent a permanent

12  injunction prohibiting further procedurally defective agency actions, the State Department may

13  attempt another end-run around AECA's requirements before any final rule goes into effect. *See*

14  *New York*, 2019 WL 190285, at *122 (permanent injunction was "necessary to make . . . vacatur

15  effective, as it prevents [the agency] from arriving at the same decision *without* curing the

16  problems" with its initial action). The States could once again face an abrupt final deregulation

17  that threatens immediate, serious, and irreparable harm, and leaves them with no remedy aside

18  from seeking another emergency TRO. Notably, the Department's position is that congressional

19  notice was not required, *see* Dkt. # 64 at 18–20, and it has continued to defend this lawsuit

20  without ever acknowledging the impropriety of its use of ITAR's "temporary modification"

21

22       [52] The States anticipate that any final rule that removes the subject files from the Munitions List would be
arbitrary and capricious for many of the same reasons discussed herein. Of course, the issue is not ripe at this time,
23  since no final rule has been published.

       [53] The Private Defendants have previously opposed the entry of injunctive relief. *See* Dkt. ## 8, 11, 63.
24  Their theories regarding the constitutionality of regulating the subject files are at best tangential to this case, in
which the States merely ask the Court to invalidate procedurally defective and unlawful agency actions and require
25  the State Department to follow the law in making regulatory changes that affect the subject files. Federal regulation
of Munitions List items has repeatedly survived constitutional challenge, *see United States v. Chi Mak*, 683 F.3d
26  1126, 1136 (9th Cir. 2012), but to the extent there are any constitutional implications with respect to the subject
files, they are not squarely presented here and the Court need not consider them.

21

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   procedure to bypass the notice requirement and prematurely effectuate a non-final rule. *See*

2   *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852 (9th Cir. 1995) ("defendant's recognition of

3   the wrongful nature of its conduct" is a factor in whether a permanent injunction should issue).

4   Even if a final rule that complies with the notice requirement is published in the near future, it

5   may not go into effect until six months later. *See* 83 Fed. Reg. 24,200 (May 24, 2018) (rules

6   revising Munitions List categories typically have a "delayed effective date of 180 days").

7   Another procedurally improper deregulation in the meantime would again leave the states with

8   no option other than filing yet another complaint and seeking yet another TRO.

9         The standards for permanent and preliminary injunctions are "essentially the same,"

10  except that to obtain permanent relief, the plaintiff must show "actual success" on the merits

11  rather than a likelihood of success. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

12  Success on the merits, including as to procedural defectiveness, is established above. The

13  irreparable harm the States will suffer if the files are permitted to be published online, and the

14  strong public interest in preventing this, is also well established in the record of these

15  proceedings. *See* Dkt. # 95 at 20–25; Dkt. # 43 at 19–24 & accompanying citations. Anyone with

16  access to a public or commercially available, relatively inexpensive 3D printer[54]—regardless of

17  their age, mental health status, or criminal history—would be able to download and instantly use

18  the files to make functional weapons, fulfilling Defense Distributed co-founder Cody Wilson's

19  "crypto-anarchist" vision of "evading and disintermediating" gun-safety regulations.[55] 3D-

20  printed weapons will only become deadlier as the technology continues to evolve.[56]

21        3D-printable firearms pose substantial threats to public health and safety. The Liberator

22  and other weapons made of plastic can evade metal detectors,[57] which are one of the most

23  _____

24  [54] Patel Decl., ¶¶ 9, 17–18, 26; Scott Decl., ¶¶ 4–5; Racine Decl., ¶¶ 3–6. Unless otherwise indicated, all declarations cited in this section are filed at Dkt. # 43-2. An index of these declarations is filed at Dkt. # 43-1.

25  [55] *See* Dkt. # 44 (Rupert Decl.), Ex. 16.

[56] *See* Patel Decl., ¶¶ 21–26 (discussing emerging materials and technology that could be used to make deadlier weapons).

26  [57] McCord Decl., ¶¶ 11–13; Hosko Decl., ¶ 14; Bisbee Decl., ¶ 18; Dkt. # 29-1, Ex. 2 (Johanknecht Decl.), ¶ 7; Dkt. # 29-1, Ex. 3 (Best Decl.), ¶ 7; Coyne Decl., ¶ 4; Camper Decl., ¶ 7; Kyes Decl., ¶ 17.

22

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   significant forms of protection for public facilities such as airports, stadiums, courthouses and

2   other government buildings, schools,[58] and prisons.[59] For example, 3D-printable weapons will

3   make it possible for students to manufacture their own weapons that could be used in a school

4   shooting (and could evade metal detectors that some schools are installing to prevent such

5   shootings).[60] 3D-printed weapons such as the Liberator do not always look like conventional

6   firearms, and children may mistake them for toys and play with them—a common reason for

7   accidental gun deaths among children.[61]

8          3D-printable firearms would compromise law-enforcement efforts. They can be privately

9   manufactured with no serial numbers,[62] hampering law enforcement's ability to "trace" a firearm

10  to its original seller and subsequent purchasers, which can be used to solve crimes and combat

11  gun trafficking.[63] Untraceable "ghost guns" of the non-3D-printed variety are already

12  increasingly popular[64]—and increasingly being used to commit horrific crimes, including

13  multiple mass shootings in California.[65] 3D-printed weapons would also undermine law

14  enforcement efforts to forensically match bullets used to commit crimes with the gun from which

15  they are shot, both because plastic weapons do not leave "ballistic fingerprints" on a bullet or

16  casing,[66] and because the firing conditions cannot be reliably or safely replicated since the gun

17  is unstable and dangerous even to the shooter.[67] For many of these reasons, 3D-printed weapons

18  may be particularly attractive to criminal enterprises, which would likely embrace the technology

19

20  ───────────────

       [58] McCord Decl., ¶¶ 7–8, 13, 18–21; Camper Decl., ¶ 7; Rivara Decl., ¶ 7; Hemenway Decl., ¶ 21;
21  Wintemute Decl., ¶ 14.
       [59] See generally Herzog Decl.
22     [60] Rivara Decl., ¶ 7; see also Hemenway Decl., ¶ 21; Wintemute Decl., ¶ 14.
       [61] Rivara Decl., ¶ 6; Hemenway Decl., ¶ 20; Wintemute Decl., ¶ 13.
       [62] McCord Decl., ¶¶ 29–30, 33; Kyes Decl., ¶ 8; Graham Decl., ¶ 35.
23     [63] Hosko Decl., ¶¶ 11, 11; McCord Decl., ¶¶ 30–32, 34, 40; Bisbee Decl., ¶¶ 17–18; Camper Decl., ¶¶ 6,
    8; Kyes Decl., ¶¶ 8, 11, 13, 15–16; Graham Decl., ¶¶ 16, 32; Dkt. # 29-1, Ex. 2 (Johanknecht Decl.), ¶ 8.
24     [64] Graham Decl., ¶¶ 17–18; id. ¶ 30 (noting increase in prohibited persons who possess ghost guns).
       [65] Id., ¶¶ 25(a)–(t), 33.
25     [66] Camper Decl., ¶ 12; see also McCord Decl., ¶ 35 ("law enforcement agencies and prosecutors will not
    be able to rely on forensic experts to match bullets used to commit crimes with [3D-printed] firearms").
       [67] Camper Decl., ¶¶ 12–13; see Dkt. # 29, ¶¶ 74, 95, 109–10, 126, 131, 142, 150, 154, 157–58, 165,
26  170–71, 180–82, 207 (citing States' laws establishing background-check requirements).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007427

1  for use in engaging in the violence, proceeds-collection, and retaliation that commonly attends

2  the work of those organizations.[68]

3        3D-printable firearms also create a heightened risk of terrorist attacks, as the State

4  Department has acknowledged.[69] Undetectable and untraceable firearms could be used by

5  foreign terrorist organizations for attacks within the United States, including against persons

6  residing in or visiting the Plaintiff States.[70] The apparent effectiveness of metal detectors in

7  hindering such attacks would become meaningless if undetectable weapons became widely

8  available; for example, "the 72,000 fans who pack CenturyLink for a Seahawks game suddenly

9  become much more vulnerable to terrorists who seek to cause as much bloodshed as possible."[71]

10       Such "ongoing and concrete harm to [the States'] law enforcement and public safety

11  interests . . . constitutes irreparable harm." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts,

12  C.J., as Circuit Justice). In opposing entry of a preliminary injunction, the Federal Defendants

13  "d[id] not argue that any of these injuries are reparable." Dkt. # 95 at 22. The Federal Defendants

14  would be unharmed by entry of a permanent injunction, which will merely prevent them from

15  circumventing AECA's procedural requirements and ensure that any future agency action

16  affecting export control of the subject files is AECA-compliant.

17                        **IV.    CONCLUSION**

18       For the reasons above, the Plaintiff States respectfully request that the Court enter

19  summary judgment in their favor, vacate and set aside the Temporary Modification and Letter,

20  and permanently enjoin the State Department from taking any other action to permit export of

21  the subject files absent compliance with AECA.

22

23       [68] Hosko Decl., ¶¶ 15–16; McCord Decl., ¶¶ 39–41; Graham Decl., ¶ 37.
         [69] Ex. D at 10–11.
24       [70] McCord Decl., ¶¶ 14–22; *see also* Dkt. # 44-1, Ex. 9 (Sen. Menendez letter 8/8/2018). These concerns
     are perhaps particularly salient for the District of Columbia, which is entirely urban, densely populated, hosts
25   hundreds of heavily attended events each year, including numerous political marches and protests, and is filled with
     thousands of high-ranking federal officials and diplomats from around the world. *Id.*, Ex. 20 (Lanier Decl.), ¶¶ 13–
26   15; *see also id.*, Ex. 21 (Op-ed by former Chief of U.S. Capitol Police and Senate Sergeant at Arms).
         [71] McCord Decl., ¶¶ 17–18, 22.

                                   24                  ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF STATES' MOTION FOR                              Complex Litigation Division
SUMMARY JUDGMENT                                            7141 Cleanwater Drive SW
2:18-cv-01115-RSL                                               PO Box 40111
                                                            Olympia, WA 98504-0111
                                                               (360) 709-6470

WASHSTATEB007428

DATED this 15th day of February, 2019.

ROBERT W. FERGUSON
Attorney General of Washington

*/s/ Jeffrey Rupert*
JEFFREY RUPERT, WSBA #45037
Division Chief
TODD BOWERS, WSBA #25274
Deputy Attorney General
KRISTIN BENESKI, WSBA #45478
JEFFREY T. SPRUNG, WSBA #23607
ZACHARY P. JONES, WSBA #44557
Assistant Attorneys General
JeffreyR2@atg.wa.gov
ToddB@atg.wa.gov
JeffS2@atg.wa.gov
KristinB1@atg.wa.gov
ZachJ@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

XAVIER BECERRA
Attorney General of California

*/s/ Nelson R. Richards*
NELSON R. RICHARDS, *admitted pro hac vice*
Deputy Attorney General
Nelson.Richards@doj.ca.gov
*Attorneys for Plaintiff State of California*

PHIL WEISER
Attorney General of Colorado

*/s/ Matthew D. Grove*
MATTHEW D. GROVE, *admitted pro hac vice*
Assistant Solicitor General
Matt.Grove@coag.gov
*Attorneys for Plaintiff State of Colorado*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Maura Murphy Osborne*
MAURA MURPHY OSBORNE, *admitted pro hac vice*

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

Assistant Attorney General
Maura.MurphyOsborne@ct.gov
*Attorneys for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

/s/ Ilona M. Kirshon
ILONA M. KIRSHON, *admitted pro hac vice*
Deputy State Solicitor
PATRICIA A. DAVIS, *admitted pro hac vice*
Deputy Attorney General
Ilona.Kirshon@state.de.us
PatriciaA.Davis@state.de.us
*Attorneys for Plaintiff State of Delaware*

KARL A. RACINE
Attorney General for the District of Columbia

/s/ Robyn Bender
ROBYN BENDER, *admitted pro hac vice*
Deputy Attorney General
JIMMY ROCK, *admitted pro hac vice*
Assistant Deputy Attorney General
ANDREW J. SAINDON, *admitted pro hac vice*
Senior Assistant Attorney General
Robyn.Bender@dc.gov
Jimmy.Rock@dc.gov
Andy.Saindon@dc.gov
*Attorneys for Plaintiff District of Columbia*

CLARE E. CONNORS
Attorney General of Hawaii

/s/ Robert T. Nakatsuji
ROBERT T. NAKATSUJI, *admitted pro hac vice*
Deputy Attorney General
Robert.T.Nakatsuji@hawaii.gov
*Attorneys for Plaintiff State of Hawaii*

KWAME RAOUL
Attorney General of Illinois

/s/ Brett E. Legner

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007430

1    BRETT E. LEGNER, *admitted pro hac vice*
Deputy Solicitor General
2    ELIZABETH ROBERSON-YOUNG, *admitted pro hac*
*vice*
3    Deputy Solicitor General
4    BLegner@atg.state.il.us
ERobersonYoung@atg.state.il.us
5    *Attorneys for Plaintiff State of Illinois*

6    THOMAS J. MILLER
7    Attorney General of Iowa

8    */s/ Nathanael Blake*
NATHANAEL BLAKE, *admitted pro hac vice*
9    Deputy Attorney General
10    Nathan.Blake@ag.iowa.gov
*Attorneys for Plaintiff State of Iowa*

11

12    BRIAN E. FROSH
Attorney General of Maryland
13

14    */s/ Julia Doyle Bernhardt*
JULIA DOYLE BERNHARDT, *admitted pro hac vice*
15    JEFFREY PAUL DUNLAP, *admitted pro hac vice*
Assistant Attorneys General
16    JBernhardt@oag.state.md.us
jdunlap@oag.state.md.us
17    *Attorneys for Plaintiff State of Maryland*

18    MAURA HEALEY
Attorney General of Commonwealth of Massachusetts
19

20    */s/ Jonathan B. Miller*
JONATHAN B. MILLER, *admitted pro hac vice*
21    Assistant Attorney General
Jonathan.Miller@state.ma.us
22    *Attorneys for Plaintiff Commonwealth of Massachusetts*

23

24

25

26

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007431

1

2    KEITH ELLISON
     Attorney General of Minnesota
3
     /s/ Jacob Campion
4    JACOB CAMPION, *admitted pro hac vice*
     Jacob.Campion@ag.state.mn.us
5    *Attorneys for Plaintiff State of Minnesota*

6    GURBIR GREWAL
     Attorney General of New Jersey
7
     /s/ Jeremy M. Feigenbaum
8    JEREMY M. FEIGENBAUM, *admitted pro hac vice*
     Assistant Attorney General
9    Jeremy.Feigenbaum@njoag.gov
     *Attorneys for Plaintiff State of New Jersey*
10

11   LETITIA JAMES
     Attorney General of New York
12
     /s/ Steven Wu
13   STEVEN WU, *admitted pro hac vice*
     Deputy Solicitor General
14   Steven.Wu@ag.ny.gov
     *Attorneys for Plaintiff State of New York*
15

16   JOSH SHAPIRO
     Attorney General of Commonwealth of Pennsylvania
17
     /s/ Jonathan Scott Goldman
18   JONATHAN SCOTT GOLDMAN, *admitted pro hac vice*
     Executive Deputy Attorney General
19   MICHAEL J. FISCHER, *admitted pro hac vice*
     Chief Deputy Attorney General
20   JGoldman@attorneygeneral.gov
     MFischer@attorneygeneral.gov
21   *Attorneys for Plaintiff Commonwealth of Pennsylvania*

22   JOSHUA H. STEIN
     Attorney General of North Carolina
23
     /s/ Sripriya Narasimhan
24

25

26

                                    28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007432

1   SRIPRIYA NARASIMHAN, *admitted pro hac vice*
    Deputy General Counsel
2   SNarasimhan@ncdoj.gov
3   *Attorneys for Plaintiff State of North Carolina*

4   ELLEN F. ROSENBLUM
    Attorney General of Oregon
5
    */s/ Scott J. Kaplan*
6   SCOTT J. KAPLAN, WSBA #49377
7   Scott.Kaplan@doj.state.or.us
    *Attorneys for Plaintiff State of Oregon*
8
    PETER F. NERONHA
9   Attorney General of Rhode Island
10
    */s/ Justin Sullivan*
11  JUSTIN SULLIVAN, *admitted pro hac vice*
    Assistant Attorney General
12  JJSullivan@riag.ri.gov
    *Attorneys for Plaintiff State of Rhode Island*
13
    THOMAS J. DONOVAN, JR.
14  Attorney General of Vermont
15
    */s/ Benjamin D. Battles*
16  BENJAMIN D. BATTLES, *admitted pro hac vice*
    Solicitor General
17  Benjamin.Battles@vermont.gov
    *Attorneys for Plaintiff State of Vermont*
18
    MARK R. HERRING
19  Attorney General of the Commonwealth of Virginia
20
    */s/ Samuel T. Towell*
21  SAMUEL T. TOWELL, *admitted pro hac vice*
    Deputy Attorney General
22  STowell@oag.state.va.us
    *Attorney for Plaintiff Commonwealth of Virginia*
23

24

25

26

29

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007433

Exhibit J

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

STATE OF WASHINGTON; STATE OF
CONNECTICUT; STATE OF MARYLAND;
STATE OF NEW JERSEY; STATE OF NEW
YORK; STATE OF OREGON;
COMMONWEALTH OF
MASSACHUSETTS; COMMONWEALTH
OF PENNSYLVANIA; DISTRICT OF
COLUMBIA; STATE OF CALIFORNIA;
STATE OF COLORADO; STATE OF
DELAWARE; STATE OF HAWAII; STATE
OF ILLINOIS; STATE OF IOWA; STATE
OF MINNESOTA; STATE OF NORTH
CAROLINA; STATE OF RHODE ISLAND;
STATE OF VERMONT; and
COMMONWEALTH OF VIRGINIA.

          Plaintiffs,

     v.

UNITED STATES DEPARTMENT OF
STATE, et al.,

          Defendants.

NO. 2:18-cv-01115-RSL

**PLAINTIFF STATES' COMBINED
REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANTS'
CROSS-MOTIONS FOR SUMMARY
JUDGMENT**

NOTED FOR CONSIDERATION:
JUNE 7, 2019[1]

---
[1] *See* Dkt. # 183.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEB007452

### *TABLE OF CONTENTS*

I.      INTRODUCTION ........................................................................................ 1

II.     SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS .................... 1

        A.   The Federal Defendants Supplement the Record in Response to the Court's
             Order .................................................................................................. 1

        B.   The Revised Second Supplement Reveals That "Nothing Changed" from the
             State Department's Perspective Regarding 3D-Printable Guns ................ 3

        C.   The State Department Admittedly Failed to Consider Public Comments on the
             NPRMs *and* the Challenged Actions Themselves .................................... 5

        D.   No Final Rules Have Been Published .......................................................... 8

III.    ARGUMENT ................................................................................................. 8

        A.   The Plaintiff States Have Standing, as the Court Already Ruled .............. 9

        B.   The Temporary Modification and Letter Are Contrary to Law .............. 10

             1.   The Temporary Modification and Letter violate AECA. ................. 10

             2.   The Temporary Modification and Letter violate the Tenth Amendment. ...... 11

        C.   The Temporary Modification and Letter Are Arbitrary and Capricious ........ 12

        D.   Vacatur and a Permanent Injunction Are Needed to Provide Complete Relief. ...... 17

        E.   The Private Defendants' Arguments Do Not Require a Different Result ........... 18

             1.   The Private Defendants' jurisdictional arguments lack merit. ................. 19

             2.   The Private Defendants' constitutional theories do not preclude the Court
                  from setting aside unlawful agency actions. .................................... 20

             3.   The Private Defendants' APA arguments do not explain, let alone justify,
                  the Federal Defendants' abrupt regulatory about-face. .................... 23

IV.     CONCLUSION ............................................................................................ 24

PLAINTIFF STATES' COMBINED                  ii                ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                     Complex Litigation Division
JUDGMENT AND OPP TO                                                800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                           Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                       (206) 474-7744

WASHSTATEB007453

1    This brief is a combined reply in support of the States' Motion for Summary Judgment

2    (Dkt. # 170) ("SMSJ") and opposition to the Federal Defendants' Cross-Motion for Summary

3    Judgment (Dkt. # 173) ("FDMSJ") and the Private Defendants' Motion for Summary Judgment

4    (Dkt. # 174) ("PDMSJ").

5                                    **I.      INTRODUCTION**

6          The Temporary Modification and Letter deregulating 3D-printed firearm files violate

7    AECA's congressional notice provisions and must be vacated as contrary to law. In addition,

8    these actions are arbitrary and capricious and were pretextually rationalized after the fact in

9    violation of the APA. After multiple supplementations of the administrative record in this case,

10   including the most recent Revised Second Supplementation on May 6, 2019, the evidence shows

11   that the State Department failed to consider the national security implications of deregulation in

12   light of the unique properties of untraceable, undetectable, 3D-printable plastic firearms, and did

13   not independently "determine" that deregulation was "in the interest of the security and foreign

14   policy of the United States," as asserted. It is now more clear than ever that the State

15   Department's abrupt reversal of its longstanding regulation of the subject files—as President

16   Trump tweeted on July 31, 2018—"doesn't seem to make much sense!" Dkt. # 15-2.

17         The Court should grant summary judgment in the States' favor, vacate and set aside the

18   unlawful Temporary Modification and Letter, and enjoin the Federal Defendants from

19   attempting any further "temporary" deregulation of 3D-printable firearms that illegally evades

20   Congress's oversight.

21                **II.      SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS**

22         Much of the relevant background is set forth in the States' Motion for Summary

23   Judgment (Dkt. # 170, Part II). This section covers factual developments since February 2019.

24   **A.      The Federal Defendants Supplement the Record in Response to the Court's Order**

25         On March 19, 2019, the Court granted the States' Motion to Supplement the

26   Administrative Record; incorporated Dkt. # 158 (First Supplement) into the administrative

PLAINTIFF STATES' COMBINED                              1              ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                                  Complex Litigation Division
JUDGMENT AND OPP TO                                                            800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                                       Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                                  (206) 474-7744

WASHSTATEB007454

record; and ordered the Federal Defendants to (1) certify the production of a *complete* administrative record that includes "all materials [the State Department] considered, directly or indirectly" in taking the challenged actions and (2) supplement the administrative record with a privilege log and with settlement-related communications and materials generated in *Defense Distributed v. U.S. Dep't of State*, Case No. 15-cv-372-RP (W.D. Tex.).[2] The Court also granted the States "leave to take discovery aimed at establishing whether the pre-July 27, 2018, comments to the NPRMs were directly or indirectly considered when issuing the temporary modification and letter."[3] As discussed below (Part II.C), this discovery revealed that the State Department did *not* consider the comments.

On April 16, 2019, the Federal Defendants filed a Second Supplement (Dkt. # 179),[4] and on May 6, 2019, they filed a Revised Second Supplement (Dkt. # 184) of the administrative record. According to the Certifications, these supplemental materials consist of 4,150 previously unfiled documents, of which 904 are filed publicly and 3,246 are logged as privileged and withheld in full.[5] The revised privilege log (Dkt. ## 184-13 & 184-14) reflects documents with a number of questionable redactions. For example, an email from New Hampshire Governor Chris Sununu to State Department officials lobbying on behalf of a New Hampshire-based multinational firearms manufacturer was redacted, purportedly under the deliberative process privilege,[6] as were numerous post-decisional communications and communications with internal public relations staff. Because of these and other irregularities and omissions, the States do not concede that the record is complete or that the privilege claims are proper. Nevertheless, because the record in its current form amply demonstrates that the Federal Defendants' covert

---

[2] Dkt. # 175 at 8.

[3] *Id.* at 7. By way of response to the States' discovery request pursuant to the Order, the Federal Defendants submitted the Declaration of Michael F. Miller and the Declaration of Robert Monjay. *See* Dkt. # 179 at 2.

[4] The original privilege log filed on April 16, 2019 was deficient, as hundreds of pages' worth of entries did not indicate any basis for withholding whatsoever. Second Declaration of Kristin Beneski, Ex. O (Ltr. dated April 25, 2019); Dkt. # 184-1, ¶ 11.

[5] Dkt. # 179-1 (Certification of Second Supplement), ¶ 21 (3,240 documents withheld; 910 produced); Dkt. # 184-1 (Certification of Revised Second Supplement), ¶¶ 5–10 (30 additional privilege claims, 6 withheld in full).

[6] Ex. P (WASHAR0035756); Dkt. No. 184-14 at 606.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

deregulation of 3D-printable guns was unlawful for multiple reasons, this case is ripe for determination by summary judgment.

**B.    The Revised Second Supplement Reveals That "Nothing Changed" from the State Department's Perspective Regarding 3D-Printable Guns**

Despite the questionable validity of the withholding and redactions, the Revised Second Supplement is far more complete than the cherry-picked record the Federal Defendants initially filed in October 2018. Among other documents, it includes samples of the *more than 106,000 emails* from members of the public between July 23 and July 27, 2018, urging the Department not to exempt 3D-printable guns from regulation via the "temporary" modification; multiple letters from Congressional leaders urging reconsideration of the deregulation of 3D-printable gun files; detailed comment letters from U.S. Senators and public policy organizations; and approximately 155 documents and communications related to the settlement of the *Defense Distributed* litigation.[7]

One document in the Revised Second Supplement in particular sheds new light on the decision to deregulate 3D-printable firearms: on July 26, 2018—the day before the State Department issued the Temporary Modification and Letter—a Senate Foreign Relations staffer emailed State Department personnel to request an analysis as to why the Department had changed the position it took in its April 4, 2018 motion to dismiss in the *Defense Distributed* case.[8] Joshua M. Paul of the State Department replied that this was a "technical legal question" that should be directed to the Department of Justice.[9] In a following internal email exchange, Defendant Sarah Heidema—the Director within DDTC who in this case certified that the original, cherry-picked administrative record filed was "complete" and asserted, absent any record evidence, that the State Department "determined" that 3D-printable firearms "pose little national security concern"[10]—argued that it was actually "a question for us [the State

---

[7] *See* Second Declaration of Jennifer D. Williams, ¶ 4.
[8] Ex. Q (WASHAR0000212).
[9] *Id.*
[10] Dkt. # 64-1 (Heidema Decl.), ¶ 19; Dkt. # 116 (Certification), ¶ 4; *see also* Dkt. # 175 (Order) at 3–6.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   Department]" about "why we stopped arguing that the technology subject to the case, if released,

2   would harm national security or foreign policy[.]"[11] But Paul stated that the reason for the

3   planned deregulation was "fundamentally a DOJ question" because "nothing changed on our

4   side" as to those issues.[12] Paul's statements are consistent with contemporaneous remarks by

5   Heather Nauert, who told the press that the State Department still had "equity" in the matter of

6   3D-printable guns, but that it "took the advice of the Department of Justice" to settle the case by

7   agreeing to deregulate them.[13] Paul's and Nauert's statements are *inconsistent* with the Federal

8   Defendants' assertion in this case that the Department "determined" that deregulating 3D-

9   printable firearms was "in the interest of" U.S. national security and foreign policy. *See* SMSJ

10  at 19.

11        Another email exchange between Paul and a Senate Foreign Relations staffer starkly

12  reveals the Federal Defendants' failure to consider the particular problems posed by 3D-printed

13  guns before issuing the Temporary Modification and Letter. On July 20, 2018, the staffer wrote

14  to Paul to ask about "the law enforcement and counter-terrorism implications of" the

15  deregulation, noting that "[e]nabling the widespread acquisition of undetectable or largely-

16  undetectable firearms" would potentially undermine "protection of domestic and international

17  airline flights from terrorist hijacking/attacks."[14] The staffer further asked: "What changes will

18  be required by TSA here and abroad to deal with this?"[15] Paul was unable to answer these basic

19  questions. Instead, he admitted that the State Department "would need to refer you to TSA or

20  other law enforcement organizations on this question."[16] Paul suggested that the State

21  Department could not answer these key national security questions because its "nexus on this

22  issue was/is limited to [its] role in controlling exports of tech data[.]"[17] Paul's statements, made

23  ———————————

24        [11] Ex. Q (WASHAR0000211).
        [12] *Id.*
25        [13] SMSJ at 19 (citing Dkt. # 35-1 at 5 of 46).
        [14] Ex. R (WASHAR0000221).
26        [15] *Id.*
        [16] *Id.* (WASHAR0000220).
        [17] *Id.*

PLAINTIFF STATES' COMBINED                    4              ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                        Complex Litigation Division
JUDGMENT AND OPP TO                                                   800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                             Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                        (206) 474-7744

WASHSTATEB007457

1    just a week before the Federal Defendants issued their Temporary Modification, highlight the

2    extent to which they utterly failed to consider the national security implications of their plan to

3    deregulate 3D-printable guns.

4         Yet another email from Paul undermines one of the Federal Defendants' *post hoc*

5    arguments concerning the deregulation of 3D-printable guns. In a July 25, 2018, email thread

6    discussing public talking points on the Defense Distributed settlement, a staffer notes that the

7    Department of Justice has requested language indicating that the "3-D files at issue" do not

8    violate the Undetectable Firearms Act because Defense Distributed's "design . . . requires adding

9    metal after printing."[18] In response, Paul states: "I think that's legally valid but not particularly

10   useful in a public/Congressional context, as the pin can be removed and put in your other

11   pocket."[19] Paul's response confirms the obvious: the State Department is well aware that

12   allowing the unlimited distribution of 3D-printable gun files will make it much easier for anyone

13   who wants to evade the Undetectable Firearms Act to do so.

14   **C.    The State Department Admittedly Failed to Consider Public Comments on the
15           NPRMs *and* the Challenged Actions Themselves**

16         In addition to the revelations discussed above, the Miller Declaration (Dkt. # 179-2)

17   shows that the decision to enact the Temporary Modification and Letter was taken *solely*

18   "pursuant to an action memorandum recommending to the Under Secretary of State for Arms

19   Control and International Security that she approve the temporary modification to the ITAR."[20]

20   The redacted "action memo" states that approval of the Temporary Modification and Letter is

21   "required to comply with the Defense Distributed settlement agreement."[21] No other rationale is

22   provided. *See also* SMSJ at 5–6, 16–17, 19; FDMSJ at 10 ("[I]t is no secret that the Temporary

23   Modification and Letter arose from a settlement of the *Defense Distributed* litigation."). Despite

24   _____

25   [18] Ex. S (WASHAR0035889–90).
     [19] *Id.*
     [20] Dkt. # 179-2 (Miller Decl.) ¶ 7.

26   [21] *Id.*, Ex. 1. The action memo's redactions are for "Deliberative - Predecisional Intra-agency Discussion"
     and "Attorney-Client Privilege." Dkt. # 184-13 at 1 of 47 (Privilege Log).

PLAINTIFF STATES' COMBINED                    5              ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                     Complex Litigation Division
JUDGMENT AND OPP TO                                                  800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                              Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                         (206) 474-7744

1   the Court's statement that it "seems likely that a reasonable decisionmaker would be interested

2   in reviewing comments regarding a related rule change proposal before announcing a temporary

3   modification of the same rule,"[22] the Miller Declaration confirms that State Department staff

4   **"did not rely on the comments to the NPRM in preparing the memorandum."**[23] This means

5   that the Department failed to consider or account for over 3,600 public comments, including the

6   nearly 400 that specifically opposed the new rule on the ground that it would deregulate 3D-

7   printable gun files. Dkt. # 170 at 8.

8        Some of the comments the State Department ignored came from key experts—including

9   several that were significant enough to merit special mention by the State Department staffer in

10  charge of comment review[24]—warning of the dangerous sweep of the Federal Defendants' covert

11  deregulation of 3D-printable guns. For example, Professor Susan Waltz of the University of

12  Michigan's Gerald R. Ford School of Public Policy pointed out that the State Department's

13  proposed rule "would appear to give rise to the possibility of widespread and openly sanctioned

14  circulation of open source, non-proprietary instructions for using computer-aided design (CAD)

15  files to produce via 3D-printing technology . . . the firearms removed from USML."[25] Professor

16  Waltz suggested a few simple ways the State Department could address this glaring problem—

17  none of which the Department adopted.[26] Another comment, from the Brady Campaign to

18  Prevent Gun Violence, warned that, "under the proposed rules," companies like Defense

19  Distributed "would be able to freely release 3-D printing instructions and code into the public

20  domain (and thereby enable the private production of firearms overseas and in the United

21  States)."[27] The State Department also disregarded comments from hundreds of individuals

22  warning that "[t]he rule change would make the world a far more dangerous place" by

23

---

24   [22] Dkt. # 175 at 7.
     [23] Dkt. # 179-2 (Miller Decl.) ¶ 7 (emphasis added).
     [24] Dkt. # 179-3 (Monjay Decl.) ¶ 4.
25   [25] Dkt. # 179-3 at 14 of 44 (Monjay Decl. Ex. B at 5).
     [26] *Id.*
26   [27] Dkt. # 179-3 at 39 of 44 (Monjay Decl. Ex. D (part 2) at 8).

PLAINTIFF STATES' COMBINED                          6                    ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                                     Complex Litigation Division
JUDGMENT AND OPP TO                                                               800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                                          Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                                      (206) 474-7744

WASHSTATEB007459

"effectively enabling 3D printing of firearms in the U.S. and around the globe."[28] The Federal

Defendants concede that all of these comments and more were ignored entirely.

Not only did the State Department ignore comments received during the formal

rulemaking comment period, but it also admittedly failed to consider public input *specifically

opposing the challenged actions themselves* during the week prior to July 27, 2018, once word

of their impending issuance had gotten out.[29] These additional materials included letters from

members of Congress and over 106,000 emails from individuals. For example:

- A July 20, 2018, letter from then-Ranking Member (now Chairman) of the
  House Foreign Affairs Committee, Rep. Eliot Engel,[30] urging Secretary
  Pompeo not to deregulate 3D-printable gun files. As Rep. Engel warned,
  deregulation was "exceptionally dangerous," as it would make "undetectable"
  weapons "available to anyone with a laptop and a 3-D printer," and "defeat[]
  US laws which require background checks on the sale of weaponry." Rep.
  Engel further noted that the State Department was "mis-using authority under
  Section 126.2 of the [ITAR] to 'temporarily' remove this technical information
  from the [USML]" when, "as anyone who has ever posted something on the
  internet knows, once posted, the item is instantly and permanently available to
  all who seek it." This misuse of Section 126.2 "suggests the Department
  officials sought a way to avoid complying with Section 38(f) of the [AECA],
  which requires advance notification to Congress for any removal from the
  USML."

- A July 25, 2018, letter from Ranking Member of the Senate Foreign relations
  Committee, Sen. Robert Menendez,[31] urging Secretary Pompeo to halt the
  "worldwide release" of 3D-printable gun files, which "would allow any
  foreign or domestic persons, including arms traffickers, terrorists,
  transnational criminals, and domestic abusers to effectively 'download' a
  gun." As Senator Menendez noted, the State Department's "temporary"
  deregulation "appears to evade statutory requirements and skirts an ongoing
  regulatory review process." Moreover, echoing AECA's statutory standards,
  Senator Menendez's letter pointed out that it was "hard to see how making it
  easier for criminal and terrorist organizations to obtain untraceable weapons
  is in the foreign policy and national security interests of the United States."

---

[28] *See, e.g.*, Ex. T; *see generally* Second Williams Decl. ¶ 4(1) & n.1.

[29] FDMSJ at 10 ("[D]ocuments . . . initially omitted from the administrative record . . . were not among the
documents considered by the agency decision-maker.").

[30] Ex. U (CWASHAR0000413–14).

[31] Ex. V (WASHAR0003424-25). On July 23, 2018, five Senators sent a similar letter to then-Attorney
General Jeff Sessions, urging dismay with the Department's settlement of the *Defense Distributed* suit. Ex. W.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

"This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks."

- Hundreds of individual emails[32] from Americans who were "deeply disturbed" by the State Department's decision to allow "blueprints . . . online [that] will be used by criminals and terrorists to easily and cheaply mass-manufacture all-plastic weapons that can defeat security checkpoints" and "are difficult if not impossible to trace";[33] who urged the Department to "[s]top the special exemption for downloading printable 3D guns" which "will, without a doubt, be used in illegal, violent activity";[34] and who were "begging [the Department] to use common sense" and prevent "individuals who can't pass background checks —terrorists, felons, and domestic abusers" from obtaining "functioning guns . . . on demand."[35]

- 105,555 emails received from visitors to Everytown.org in a single five-day period,[36] urging the Department to "stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers."

The Revised Second Supplementation also includes a breakdown of comments on the Commerce Department's companion NPRM. Of the roughly 3,000 comments received by the Department, 2,945—98%—opposed the rule.[37] It appears the State Department did not consider these comments, either.

**D.   No Final Rules Have Been Published**

As a further factual update, as of this filing, neither the State Department nor the Commerce Department has issued the final rules that they indicated would be forthcoming.[38]

### III.   ARGUMENT

The Federal Defendants mostly repeat arguments that the Court has already correctly rejected, pointing to nothing in the several-times-supplemented administrative record to support

---

[32] Dkt. # 184-12 at WASHAR0036607–37068.
[33] *Id.* at WASHAR0036611.
[34] *Id.* at WASHAR0036612.
[35] *Id.* at WASHAR0036621.
[36] *Id.* at WASHAR0037069–74. The States agreed that the 105,555 emails referenced in this "Summary of Duplicative Materials" could be incorporated into the administrative record by reference.
[37] Ex. X (WASHAR0000903–04).
[38] *See* SMSJ at 9; Dkt. # 131 (Fed. Defs' Mot. to Stay).

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEB007461

1    their position, and otherwise offering no valid reason why they should prevail. The Court should

2    vacate the Temporary Modification and Letter and permanently enjoin any future attempt to

3    "temporarily" deregulate 3D-printable guns that bypasses congressional review and oversight.

4    **A.      The Plaintiff States Have Standing, as the Court Already Ruled**

5            The Court has already correctly ruled that the States have standing. The Federal

6    Defendants ask the Court to revisit that conclusion, but offer no new reason to do so: instead,

7    they rehash and incorporate meritless arguments made in opposing preliminary injunctive relief.

8    FDMSJ at 7–9 & n.3.[39] The Court should reject these recycled arguments and find that the States

9    have standing for the same reasons it did so previously. *See* Dkt. # 95 (Preliminary Injunction)

10   at 9–11.

11           The Federal Defendants argue that the States are not within the "zone of interests"

12   protected by AECA. FDMSJ at 7–9. This test, which "is not meant to be especially demanding,"

13   asks whether the plaintiff is "arguably within the zone of interests to be protected or regulated

14   by the statute" at issue. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

15   567 U.S. 209, 224–25 (2012) (citations and quotations omitted). Its purpose is to "exclude those

16   plaintiffs whose suits are more likely to frustrate rather than to further statutory objectives."

17   *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 (1987). Thus, "[t]he test forecloses suit only when

18   a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the

19   statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-*

20   *E-Be-Nash-She-Wish*, 567 U.S. at 225; *see also Havasupai Tribe v. Provencio*, 906 F.3d 1155,

21   1166 n.5 (9th Cir. 2018) (same). The test is applied "in keeping with Congress's evident intent

22   when enacting the APA to make agency action presumptively reviewable," and requires no

23   "indication of congressional purpose to benefit" the plaintiff. *Match-E-Be-Nash-She-Wish*, 567

---

24           [39] *Compare* Dkt. # 64 (Fed. Defs' Opp. to Mot. for PI) at 16–18. To the extent the Federal Defendants

25   incorporate their prior briefing on the motion for preliminary injunction by reference, the States likewise incorporate
     their own prior briefing. *See* Dkt. # 43 (Mot. for PI) at 9–10; Dkt. # 68 (Reply ISO Mot. for PI) at 11–12. The States'
     previous briefing also addresses the Private Defendants' already-rejected challenges to standing. *Compare* PDMSJ

26   at 7–8 *with* Dkt. # 63 (Pvt. Defs' Opp. to Mot. for PI) at 12–13.

PLAINTIFF STATES' COMBINED                              9                    ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                                      Complex Litigation Division
JUDGMENT AND OPP TO                                                                 800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                                           Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                                        (206) 474-7744

1    U.S. at 225. Any doubts about zone-of-interests standing must be resolved in the plaintiff's favor.

2    *Id.* ("[W]e have always conspicuously included the word 'arguably' in the test to indicate that

3    the benefit of any doubt goes to the plaintiff.").

4         The States easily satisfy this test: their significant safety and security interests are not

5    only consistent with, but fall *squarely within*, AECA's purpose of protecting "the security . . . of

6    the United States." 22 U.S.C. § 2778(a)(1); *see* FDMSJ at 8 (acknowledging that "national

7    security" is a "primary concern" of AECA). The States' domestic security concerns are part and

8    parcel of "national security." *See, e.g.*, *United States v. U.S. Dist. Court*, 407 U.S. 297, 321

9    (1972) (recognizing the "domestic aspects of national security"); *Hodges v. Abraham*, 253 F.

10   Supp. 2d 846, 868 (D.S.C. 2002) (federal government using "national" and "domestic" security

11   interchangeably). Because the States seek to "vindicate some of the same concerns that underlie"

12   AECA—namely, concerns about security and safety—their claims fall squarely "within the

13   statute's zone of interests." *Havasupai Tribe*, 906 F.3d at 1167.

14        Not only are the States' interests fully consistent with AECA's purpose, but this lawsuit

15   expressly seeks to enforce the statute's terms. In contrast to *Cheney* (FDMSJ at 8–9), in which

16   the State of Illinois challenged the validity of a statute governing the closure of military

17   installations in furtherance of interests "completely inconsistent" with that statute, the States here

18   do not seek to usurp any authority that properly "rests with Congress." *People ex rel. Hartigan*

19   *v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989). Rather, the States seek to *vindicate* the statute

20   and Congress's intent by challenging *ultra vires* executive actions that unlawfully bypassed the

21   statute's congressional notice requirement. This lawsuit furthers AECA's purposes in every

22   sense; it is the Federal Defendants, not the States, who sought to "frustrate" AECA by evading

23   congressional review and oversight of their deregulatory effort.

24   **B.    The Temporary Modification and Letter Are Contrary to Law**

25        **1.    The Temporary Modification and Letter violate AECA.**

26        As with standing, the Federal Defendants recycle their meritless argument that the State

PLAINTIFF STATES' COMBINED                        10          ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                       Complex Litigation Division
JUDGMENT AND OPP TO                                                 800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                            Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                        (206) 474-7744

WASHSTATEB007463

1   Department did not violate AECA's congressional notice requirement because the subject files

2   are not "items," and can therefore be removed from the Munitions List without notice. FDMSJ

3   at 9. But as the Court has already correctly ruled, this argument conflates "category" with "item,"

4   contrary to the "language, structure, and purpose of the statute and implementing regulations[.]"

5   Dkt. # 95 at 14; *see also* Dkt. # 43 at 11–13; Dkt. # 68 at 4–5. Furthermore, the challenged actions

6   were not "only" a "temporary" modification, as asserted (FDMSJ at 9); rather, the Temporary

7   Modification was to "remain in effect while the final rule . . . is in development"—leapfrogging

8   the entire notice-and-comment rulemaking process. *See* Dkt. # 95 at 15 ("The temporary

9   modification was an effort to implement the removal immediately, without waiting for the rule

10   to become final and without giving Congress notice and an opportunity to exercise its oversight

11   role."). Moreover, as the Court has already found, even a "temporary" deregulation would allow

12   "immediate" distribution of the subject files and cause "irreparable" harms to the States. *Id.* at

13   13, 20–25. Public commenters (whom the State Department ignored) pointed this out as well.[40]

14   As for the Letter, it was not "temporary" even by its own terms, as it purported to approve the

15   subject files for "public release (i.e., unlimited distribution)" immediately and with no time

16   limitation.[41] The State Department's failure to comply with AECA's 30-day congressional notice

17   requirement before issuing the Temporary Modification and Letter, on its own, renders these

18   actions unlawful and requires that they be set aside. *See* SMSJ at 10–11.[42]

19       **2.    The Temporary Modification and Letter violate the Tenth Amendment.**

20       The Federal Defendants' litigation position that the Temporary Modification and Letter

21   do not "conflict[] with or otherwise preempt[]" state laws is belied by the text of those

22   documents, which on their face expressly authorize "any United States person" to "use" the

23

24       [40] *See, e.g.*, Ex. U (Rep. Eliot Ltr.) (modification of the Munitions List was not "temporary" because "as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it").

25       [41] Ex. J.

26       [42] The Private Defendants argue that Congress received notice after the fact. PDMSJ at 18. The Court has already correctly rejected this argument, ruling that *post hoc* notice does not satisfy AECA. Dkt. # 95 at 15.

PLAINTIFF STATES' COMBINED                                11                    ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                                          Complex Litigation Division
JUDGMENT AND OPP TO                                                                      800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                                                 Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                                              (206) 474-7744

1  subject files to 3D-print untraceable and undetectable weapons, and expressly authorize the

2  "unlimited distribution" of such files. SMSJ at 11–12; *cf. Price v. Stevedoring Serv. of Am., Inc.*,

3  697 F.3d 820, 830 (9th Cir. 2012) (no deference owed to agency's *post hoc* litigation position;

4  agency actions must be adjudged on the record). These federal authorizations are inconsistent

5  with, and on their face purport to preempt and undermine, state gun-safety laws that *restrict*

6  certain persons from possessing and manufacturing firearms and/or that regulate the distribution

7  of CAD files for 3D-printed firearms. SMSJ at 11–12. Such laws are concededly within the

8  police powers reserved to the States and protected by the Tenth Amendment. *Id.*; FDMSJ at 12.

9  That the Federal Defendants disavow any preemptive intent for litigation purposes is small

10  comfort given the plain language of the operative Temporary Modification and Letter.

11       The anti-commandeering cases on which the Federal Defendants rely (FDMSJ at 10–11)

12  confirm that the Tenth Amendment has the force of law and meaningfully protects states from

13  interference that exceeds the limits of the federal government's powers. Commandeering state

14  officials to enforce federal laws is by no means the only way in which the federal government

15  can violate the Tenth Amendment, and the Federal Defendants cite no support for that view.

16  Their authority is distinguishable, as this is not a case in which the federal government is merely

17  encouraging (but not coercing) states to implement federal programs, as in *Environmental

18  Defense Center, Inc. v. U.S. E.P.A.*, 344 F.3d 832 (9th Cir. 2003), *Printz v. United States*, 521

19  U.S. 898 (1997), and *New York v. United States*, 505 U.S. 144 (1992). Here, the State Department

20  is intruding into the States' sphere of authority by exercising a power it does not have—the

21  power to authorize any adult or child in the United States to access and "use" 3D-printable files

22  to produce illegal and dangerous weapons—in a way that deprives the States of their ability to

23  exercise their sovereign police powers and enforce their gun-safety laws. This federal usurpation

24  of state authority is unconstitutional.

25  **C.     The Temporary Modification and Letter Are Arbitrary and Capricious**

26       The States' Motion details *numerous* ways in which the Temporary Modification and

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   Letter are arbitrary and capricious as a matter of law. SMSJ at 12–20. This is substantiated by

2   the Revised Second Supplement, which reveals that the State Department's decision to

3   deregulate 3D-printable guns was made *solely* to settle a lawsuit, without any apparent

4   consideration for how the proliferation of undetectable, untraceable guns would affect "world

5   peace and the security and foreign policy of the United States." 22 U.S.C. § 2278(a)(1).

6       The Federal Defendants have little to say in response: they argue that the challenged

7   actions are lawful because (1) "the government had determined that small-caliber firearms" do

8   not provide a "critical military or intelligence advantage"; and (2) untraceable, undetectable, 3D-

9   printable firearms are no different than "small-caliber firearms generally" for purposes of export

10  regulation. FDMSJ at 9–10. These conclusory arguments are fatally flawed for several reasons.

11      First of all, the exclusive focus on "critical military or intelligence advantage" ignores

12  the "important aspect[s] of the problem" that the State Department "entirely failed to consider":

13  namely, the specific properties of 3D-printed guns and the unique threats they pose to world

14  peace, national security, and foreign policy. SMSJ at 15–18. The Federal Defendants do not

15  address these issues at all; this tacitly conceded failure to consider them alone renders the

16  Department's actions arbitrary and capricious. *See id*; *Motor Vehicle Mfrs. Ass'n of U.S. v. State*

17  *Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 1983) (agency must consider all "relevant factors,"

18  particularly those "Congress intended" the agency to consider); *Humane Soc'y of U.S. v. Zinke*,

19  865 F.3d 585, 606 (D.C. Cir. 2017) (failure to address record evidence on an "important aspect

20  of the problem" renders agency action arbitrary and capricious); *see also Jenkins v. Cty. of*

21  *Riverside*, 398 F.3d 1093, 1095 (9th Cir. 2005) (noting that a party "abandoned . . . claims by

22  not raising them in opposition to [a] . . . motion for summary judgment"). Furthermore, the Miller

23  Declaration confirms that the Department failed to consider or account for hundreds of public

24  comments that opposed the 2018 NPRMs *precisely* because they would deregulate 3D-printed

25  guns, and therefore threaten safety and security in the United States. The Department concededly

26  failed to consider these or the remainder of the 3,600 comments opposing the NPRMs, or the

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   desperate pleas of over 106,000 members of the public and Congress seeking to stop the

2   "temporary" deregulation in the final days before it was effectuated. The Department completely

3   failed to fulfill its obligation to "'consider and respond to significant comments received during

4   the period for public comment.'" *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1251

5   (9th Cir. 2018) (quoting *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015)); *see also*

6   *Tesoro Alaska Petrol. Co. v. F.E.R.C.*, 234 F.3d 1286, 1294 (D.C. Cir. 2000) ("Unless an agency

7   answers objections that on their face appear legitimate, its decision can hardly be said to be

8   reasoned.").

9        Second, merely reiterating the Department's conclusory "determin[ation]" (FDMSJ at 9)

10   is far from adequate: to survive judicial review, the Federal Defendants must show that the

11   determination was a *reasoned* one that is "logical and rational" and supported by the

12   administrative record. SMSJ at 12–15. Otherwise, judicial review would be meaningless, for an

13   agency would always be able to defend an irrational decision by stating the tautology that it

14   "determined" the decision was justified. *See id.* This is not what the APA prescribes. A reviewing

15   court's "'inquiry into the facts is to be searching and careful,'" *ASSE Int'l, Inc. v. Kerry*, 803

16   F.3d 1059, 1072 (9th Cir. 2015) (quoting *Overton Park v. Volpe*, 401 U.S. 402 at 416), and courts

17   "shall" invalidate arbitrary and capricious agency actions. 5 U.S.C. § 706. Here, the only asserted

18   basis for the State Department's "determination" is the 2018 NPRMs. FDMSJ at 9. That rationale

19   is circular: the NPRMs are *proposed* rules published at the beginning of the rulemaking process,

20   before the agencies received any public comments, and they do not even mention 3D-printed

21   guns. Yet the "temporary" modification purported to implement the NPRMs before the

22   rulemaking process was complete, and the State Department admittedly did not consider *any* of

23   the public comments. Remarkably, even as they ignore a mountain of comments and evidence

24   that contradict their position, the Federal Defendants point to *nothing* in the filed administrative

25   record that would support a determination that 3D-printable firearms somehow no longer pose

26   unique risks or that authorizing their publication on the internet poses no problems. Even after

PLAINTIFF STATES' COMBINED                              14                    ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                                      Complex Litigation Division
                                                                                   800 5th Avenue, Suite 2000
JUDGMENT AND OPP TO                                                                 Seattle, WA 98104-3188
DEFENDANTS' CROSS-MOTIONS                                                             (206) 474-7744
2:18-cv-01115-RSL

1   multiple supplementations, the record contains no such support.

2        Third, the notion that 3D-printable guns are no different than "small-caliber firearms

3   generally" (FDMSJ at 10) cannot be credited because it lacks any support in the record. *See*

4   SMSJ at 12–13 (citing case law explaining that "the basis for the agency's decision must come

5   from the record"). In fact, although the Federal Defendants have repeatedly characterized the

6   Temporary Modification and Letter as an outgrowth of a decade-long export reform effort,[43] the

7   Revised Second Supplement confirms that the federal government did not consider 3D-printable

8   firearms or the export of CAD files via the domestic/international internet *at all* when it

9   developed the proposed rules. Specifically, in a news article circulated within the State

10  Department on May 24, 2018, the Commerce Department official who was leading the

11  development of those regulations as of 2012 stated that the NPRMs **"have literally absolutely**

12  **nothing to do with domestic gun control . . ."**[44] The Federal Defendants' *post hoc* litigation

13  position also contradicts thousands of public comments opposing the rules on the grounds that

14  they would deregulate 3D-printable firearms—comments that the Department admittedly did not

15  consider and failed to address.[45] Likewise, Department official Joshua M. Paul admitted that he

16  could not answer basic questions regarding how TSA or other law enforcement agencies would

17  deal with a proliferation of 3D-printed firearms because the State Department's consideration

18  "was/is limited to [its] role in controlling exports of tech data[.]"[46] Moreover, the Federal

19  Defendants' *post hoc* litigation position contradicts the Department's *own admissions*—both

20  before and after the *Defense Distributed* settlement, and in this litigation—that 3D-printable

21  firearms *do* pose unique security threats. *See* SMSJ at 14, 15–16, 17, 19–20. State Department

22  communications recently filed as part of the Revised Second Supplement make this strikingly

23  clear: on July 27, 2018, Paul stated that **"nothing changed on our side"** regarding the national

24  _____

25  [43] FDMSJ at 5 n.1; Dkt. # 64 at 5 n.1; Dkt. # 131 at 1.
    [44] Ex. Y (WASHAR0035627) (emphasis added).
    [45] Dkt. # 179-2 (Miller Decl.) ¶ 7; *see also* FDMSJ at 10 ("[D]ocuments . . . initially omitted from the

26  administrative record . . . were not among the documents considered by the agency decision-maker.").
    [46] Ex. R (WASHAR0000220).

PLAINTIFF STATES' COMBINED                    15                   ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                           Complex Litigation Division
JUDGMENT AND OPP TO                                                      800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                                Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                           (206) 474-7744

WASHSTATEB007468

1   security and foreign policy threats posed by 3D-printable firearms.[47]

2       Further, the idea that 3D-printed firearms may be regulated by "other agencies" (FDMSJ

3   at 10) does not make it rational for the State Department to unilaterally authorize functional CAD

4   files to be exported and published on the internet, allowing anyone in the world to download and

5   use them to create untraceable and undetectable weapons that could drastically threaten safety

6   and security. *See* Dkt. # 95 at 23 ("Promising to detect the undetectable while at the same time

7   removing a significant regulatory hurdle to the proliferation of these weapons—both

8   domestically and internationally—rings hollow and in no way ameliorates, much less avoids, the

9   harms that are likely to befall the States . . ."). Indeed, the State Department has privately

10  conceded that allowing for the distribution of 3D-printable guns will make it easy to evade the

11  Undetectable Firearms Act.[48]

12      A finding of pretext or bad faith is not necessary for the States to prevail on their claim

13  that the challenged actions are arbitrary and capricious. But the evidence that the Department's

14  stated rationale was pretextual is overwhelming; its shifting and inconsistent explanations are

15  well documented in the record. SMSJ at 7–8, 13–14, 18–20. The Revised Second Supplement—

16  which contains documents that were improperly withheld for over six months after the Federal

17  Defendants certified an incomplete administrative record—provides further evidence that the

18  real reason for the deregulation of 3D-printable firearms was a directive from the Department of

19  Justice, not a rational and evidence-based determination by the State Department. The Revised

20  Second Supplement reveals the State Department's understanding that **"nothing changed on**

21  **our side"** with respect to the national security implications of 3D-printable guns, and that the

22  reason for the *Defense Distributed* settlement was "fundamentally a DOJ question[.]"[49]

23      In sum, the Temporary Modification and Letter are both contrary to law and arbitrary

24  and capricious, and should be set aside. 5 U.S.C. § 706.

25  _____

26  [47] Ex. Q.
    [48] Ex. S (WASHAR0035889–90) (discussed *supra*, Part II.B).
    [49] Ex. Q.

PLAINTIFF STATES' COMBINED                    16          ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                              Complex Litigation Division
JUDGMENT AND OPP TO                                       800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                 Seattle, WA 98104-3188
2:18-cv-01115-RSL                                        (206) 474-7744

**D.      Vacatur and a Permanent Injunction Are Needed to Provide Complete Relief**

The Federal Defendants agree that vacatur is the appropriate remedy in the event the Court finds the Temporary Modification and Letter to be contrary to law and/or arbitrary and capricious. FDMSJ at 12. Remand *without* vacatur, as discussed in *National Association of Home Builders* (FDMSJ at 13), is inappropriate because this is not a case in which "clarification" would resolve the issues with the State Department's actions; rather, the Temporary Modification and Letter are fundamentally deficient because they are contrary to law and arbitrary and capricious, as discussed above. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 657–58 (2007) (courts may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," but must vacate agency actions that violate the APA).

The Federal Defendants disagree that injunctive relief is warranted. FDMSJ at 12–15. But the States are not improperly seeking a "vague" or "sweeping injunction[] to obey the law," as the Federal Defendants suggest. *Id.* at 13. The States are seeking to prevent the same type of "temporary" deregulation with no warning as occurred in July 2018, which required the States to act swiftly to file this lawsuit and obtain emergency relief to prevent irreparable harm. Thus, this case in fact presents "temporal constraints" similar to those supporting the injunction in *New York v. U.S. Department of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019). FDMSJ at 14. The Federal Defendants appear to raise the possibility of addressing the States' concern by some means other than a permanent injunction, but have not proposed any such solution to the States or the Court. *See id.* (suggesting that "the Department should be permitted to address any concerns the Court might have without the need for an injunction," but making no proposal).

The Federal Defendants also argue that the *Winter* factors are not met. FDMSJ at 14–15. But their contention that the States' evidence of irreparable harm caused by the international and domestic availability of 3D-printed guns is somehow unrelated to the State Department's deregulation of 3D-printable gun files fails for the same reasons the Court has already articulated. The Court found that "Defendants' argument is so myopic and restrictive as to be unreasonable.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEB007470

1 Whatever defendants' statutory authority, the fact is that the internet is both domestic and

2 international. . . . Thus, the alleged failures to provide notice and to make a reasonable evaluation

3 of the risks and benefits of the proposed action not only impact national security but have

4 domestic repercussions as well." Dkt. # 95 at 10; *see also id.* at 20–24 (discussing likelihood of

5 irreparable harm and balance of hardships weighing in favor of the States and the public).

6      The Private Defendants, for their part, rely on Justice Thomas' concurring opinion in

7 *Trump v. Hawaii*, which every other justice declined to join, to argue against the concept of

8 nationwide injunctions generally. PDMSJ at 23–24 (citing *Trump v. Hawaii*, 138 S. Ct. 2392,

9 2424–29 (2018) (Thomas, J., concurring)). But injunctions against unlawful federal agency

10 actions are "commonplace in APA cases" and supported by an "uncontroverted line of

11 precedent." *E. Bay Sanctuary Covenant*, 909 F.3d at 1256; *see also New York*, 351 F. Supp. 3d

12 at 677 ("Because the Secretary's *decision* was universal, APA relief directed at that decision

13 may—indeed, arguably must—be too.") (citing 5 U.S.C. § 706(2) and *Califano v. Yamasaki*, 442

14 U.S. 682, 702 (1979)). The Private Defendants fail to explain how a less-than-nationwide

15 injunction—one that somehow prohibits the Federal Defendants from attempting another

16 unconstrained "temporary" deregulation of export-controlled items as to some areas of the

17 United States but not others—would even function. Practically speaking, such an injunction

18 would quickly become obsolete, because once files are posted on the internet from *any* location,

19 they can be accessed virtually anywhere. Moreover, an injunction without regard to location is

20 appropriate because *any* "temporary" modification of the Munitions List "would almost certainly

21 run afoul" of AECA. *New York*, 351 F. Supp. 3d at 678.

22 **E.**     **The Private Defendants' Arguments Do Not Require a Different Result**

23      The Private Defendants oppose summary judgment in the States' favor for a host of

24 meritless reasons: from an asserted lack of personal jurisdiction (which was waived long ago) to

25 novel constitutional theories that have little relevance to this case and have never been accepted

26 by any court. This Court has already rejected many of these theories, and should do so again.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEB007471

1        **1.      The Private Defendants' jurisdictional arguments lack merit.**

2        The Private Defendants challenge both the Court's personal jurisdiction over them and

3   its subject matter jurisdiction over this case. PDMSJ at 4–12. Their challenge to personal

4   jurisdiction is waived because they failed to preserve it when they filed a motion under Rule 12.

5   *See* Fed. R. Civ. P. 12(h)(1)(A) (a party waives the defense of lack of personal jurisdiction by

6   "omitting it from a motion" under Rule 12). Plaintiffs' Rule 12(c) motion (Dkt. # 114) did not

7   assert any lack of personal jurisdiction, and their convoluted non-waiver theory misreads Rule

8   12(h)(1)(A) by conflating it with Rule 12(g)(2). *See* PDMSJ at 8 n.7. The Court may disregard

9   the Private Defendants' lengthy argument against personal jurisdiction (*id.* at 8–12), since they

10  have waived that defense. *See Schnabel v. Lui*, 302 F.3d 1023, 1034 (9th Cir. 2002) (declining

11  to examine personal jurisdiction over defendant that "waived any defense of lack of personal

12  jurisdiction . . . by failing to raise the defense in its first motion" under Rule 12). The Private

13  Defendants' objections to personal jurisdiction lack merit in any event. Defense Distributed's

14  website is not "passive" (PDMSJ at 9), but instead actively invites visitors to download CAD

15  files. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) ("If

16  the defendant enters into contracts with residents of a foreign jurisdiction that involve the

17  knowing and repeated transmission of computer files over the Internet, personal jurisdiction is

18  proper."). And the Private Defendants' contention that any downloads of Defense Distributed's

19  files are purely conjectural is patently inconsistent with their claims that the files have been

20  downloaded "millions" of times. *Compare* PDMSJ at 10–11 *with* PDMSJ at 2 n.2.

21       The Private Defendants' multi-pronged challenge to subject matter jurisdiction—which

22  the Federal Defendants notably have never joined—fails for the same reasons it failed

23  previously. *Compare* PDMSJ at 4–7 *with* Dkt. # 63 at 10–12 *and* Dkt. # 69 (Pvt. Defs' Notice of

24  Supp. Auth. re Tucker Act). Their assertion that executive actions under AECA are *never*

25

26

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEB007472

1    reviewable (PDMSJ at 4, 5–6) relies on the same inapposite case law they cited previously[50] and

2    ignores cases that *have* reviewed agency action under AECA. Dkt. # 68 at 12 & nn. 26–27. Their

3    observation that the *designation* of Munitions List items is not subject to judicial review under

4    22 U.S.C. § 2778(h) (PDMSJ at 4) has no applicability to the *removal* of items from the

5    Munitions List at issue here. *See* Dkt. # 68 at 12; Dkt. # 95 at 13 ("the temporary modification

6    . . . constitutes the *removal* of one or more items from the USML . . .") (emphasis added).[51] And

7    the Tucker Act (PDMSJ at 6–7) plainly doesn't apply to the *statutory* (not contractual) challenges

8    to agency action in this case. *N. Side Lumber Co. v. Block*, 753 F.2d 1482, 1486 (9th Cir. 1985);

9    *contra Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646 (9th Cir. 1998) (Tucker

10   Act bars claims that are "contractually-based, not statutorily-based"). As the Private Defendants

11   have already acknowledged, this is not a contract case: "the [*Defense Distributed*] settlement

12   agreement is not this action's true subject and this action will neither assail nor protect the Private

13   Defendants' interest therein." Dkt. # 114 at 5; *see* Dkt. # 95 at 11–12 (this lawsuit is not a

14   "collateral attack" on the dismissal of the *Defense Distributed* lawsuit pursuant to the settlement

15   agreement).

16   **2.    The Private Defendants' constitutional theories do not preclude the Court
17          from setting aside unlawful agency actions.**

18   The Private Defendants argue that setting aside the unlawful agency actions at issue

19   would offend the First Amendment. PDMSJ at 19–23. This argument is doubly flawed because

20   (i) the First Amendment is inapposite to the merits of this APA case and (ii) the Private

21   Defendants' novel and expansive First Amendment theory fails on its merits.

22   (i)     *The First Amendment is irrelevant*.

23   It is a "simple but fundamental" rule of administrative law that the propriety of agency

---

24   [50] *Corrie v. Caterpillar, Inc.* (PDMSJ at 6) is likewise inapposite, as it did not involve a challenge to agency action, but was a private lawsuit against a supplier of equipment to the Israeli Defense Forces. 503 F.3d 974 (9th
25   Cir. 2007). As *Corrie* itself cautions, "it is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Id.* at 982 (quoting *Baker v. Carr*, 369 U.S. 186, 211 (1962)).

26   [51] For the same reasons, their argument that the State Department's actions here are unreviewable under the APA (PDMSJ at 12) lack merit.

20

WASHSTATEB007473

action is judged "solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Neither the court nor the other parties may "supply a reasoned basis . . . that the agency itself has not given." *Id.* at 196. However emphatically the Private Defendants invoke the First Amendment, the Federal Defendants have never asserted it as a basis for the Temporary Modification or the Letter. To the contrary, they have consistently maintained—both in this case and throughout the *Defense Distributed* proceedings in Texas—that the Department's regulation of the subject files under ITAR never violated Defense Distributed's First Amendment rights.[52] The Private Defendants may wish to inject the First Amendment into these proceedings, but the Federal Defendants have never invoked it as a basis for the challenged actions. It therefore does not bear on the legal merits of this APA case.

The Private Defendants' dogged efforts to be dismissed from this case at multiple stages further undercuts any notion that their purported First Amendment rights are directly implicated.[53] *See* PDMSJ at 4–12 (seeking dismissal on jurisdictional grounds); Dkt. # 114 at 4–7 (seeking dismissal on the grounds that "The Private Defendants Have No Interest Protected By this Action").[54] While the Private Defendants are wrong on the merits for the many reasons discussed herein, they are right about one thing: they have "no interest" directly at issue in this APA case. The Private Defendants' issue, at bottom, is not with the States' challenge to unlawful agency action, but with federal export regulation of the subject files. They challenged such regulation by suing the regulator in the *Defense Distributed* case. The State Department prevailed at every stage. Then, the Private Defendants chose to settle in exchange for the State

---

[52] *See, e.g.*, Heidema Decl. (Dkt. # 64-1), ¶ 28.

[53] If, on the other hand, the Private Defendants are making constitutional arguments in the abstract, they lack standing to effectively seek to block judicial enforcement of AECA on such grounds. *See Hein v. Freedom From Religion Foundation, Inc.*, 551 U.S. 587, 598 (2007) ("The federal courts are not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution. Rather, federal courts sit solely, to decide on the rights of individuals, and must refrain from passing upon the constitutionality of an act unless obliged to do so . . . when the question is raised by a party whose interests entitle him to raise it." (internal citations and markings omitted)).

[54] The Court ruled that, contrary to the Private Defendants' disclaimer of interest, "their actions show otherwise." Dkt. # 130 (Order Denying 12(c) MTD) at 3.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEB007474

1    Department's agreement to deregulate 3D-printable firearm files—subject to the express caveat

2    that such deregulation would proceed only "to the extent authorized by law (including the

3    Administrative Procedure Act) . . ."[55] Now that the caveat is in play, the Private Defendants

4    renew their dubious constitutional arguments in this Court—curiously, even as they seek to

5    escape its jurisdiction. As the Private Defendants' own actions underscore, this lawsuit, with the

6    parties positioned as they are, is an improper place for a constitutional challenge.

7         (ii) *The First Amendment does not require the Court to uphold the unlawful deregulation*.

8         The Private Defendants' constitutional arguments are meritless in any event. First,

9    although the First Amendment's inapplicability to the subject files was briefed previously (*see*

10   Dkt. # 43 at 17–18; Dkt. # 47-1), the Private Defendants fail to point to *any* case in *any*

11   jurisdiction in which a court has *ever* held that click-and-print firearm files are "speech" entitled

12   to any level of constitutional protection. On the other hand, courts have held that computer files

13   that "induce action without the intercession of the mind or the will of the recipient"—as the

14   subject files do[56]—are not entitled to any level of constitutional protection. *CFTC v. Vartuli*, 228

15   F.3d 94, 111 (2d Cir. 2000) (no First Amendment protection for automatic stock trading system

16   that used language to operate "in an entirely mechanical way"; "The point was not to convey

17   information or to assert values," so "[n]one of the reasons for which speech is thought to require

18   protection above and beyond that accorded to non-speech behavior" were implicated) (brackets

19   and ellipses removed); *see generally* Dkt. # 47-1 (*Amicus* Br. of Everytown for Gun Safety) at

20   4–9 (extensively analyzing why the subject files "lack any expressive value for the First

21   Amendment to protect"). Notably, although the subject files themselves are not protectable

22   speech, the Private Defendants are not and have never been restricted in any way from speaking

23   *about* 3D-printed guns, including advocating for policy changes related to 3D-printed guns or

24   criticizing gun-safety laws that apply to the subject files.

25   _____

26       [55] Ex. C, ¶ 1(a).
         [56] *See* SMSJ at 22 & nn. 54–56.

PLAINTIFF STATES' COMBINED                              22                    ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                                       Complex Litigation Division
                                                                                     800 5th Avenue, Suite 2000
JUDGMENT AND OPP TO                                                                  Seattle, WA 98104-3188
DEFENDANTS' CROSS-MOTIONS                                                               (206) 474-7744
2:18-cv-01115-RSL

1    Even if the Court were to find some merit in the Private Defendants' novel constitutional

2    theories, the Private Defendants fail to show that the Constitution precludes the relief requested

3    here. Again, the States merely ask the Court to set aside unlawful agency action, as required by

4    the APA. The Temporary Modification and Letter are procedurally defective in violation of

5    AECA's plain language, among other flaws. Preventing these unlawful agency actions from

6    taking effect does not permanently deprive the Private Defendants of any purported rights: it

7    simply requires the State Department to follow AECA's mandatory procedures and comply with

8    the APA if it wishes to remove 3D-printable firearm files from the Munitions List. Moreover,

9    federal law does not prohibit the Private Defendants from distributing the subject files in a

10   manner that does not involve export. Now as before, correcting the State Department's unlawful

11   power grab does not abrogate any rights of the Private Defendants. *See* Dkt. # 95 at 25.

12   The Private Defendants try to spin a constitutional argument from the alleged fact that

13   others are (illegally) distributing 3D-printable gun files via the internet. PDMSJ at 2–3, 23. But

14   even if others are violating federal law at their peril, that does not somehow create a violation of

15   the Private Defendants' First Amendment rights. *Cf. Wayte v. United States*, 470 U.S. 598 (1985)

16   (upholding conviction for failure to register for selective service against First Amendment and

17   Equal Protection challenges to government's "passive enforcement policy," under which it

18   prosecuted only those reported as having violated the law, generally the draft's most vocal

19   opponents). Nor does the widespread violation of federal law alleged—but not proven—by the

20   Private Defendants somehow justify the Federal Defendants' broad, unlawful deregulation (and

21   certainly the Federal Defendants do not make this argument). In short, the Private Defendants'

22   novel constitutional arguments do not provide a reasoned basis for the unlawful deregulation of

23   3D-printable guns via the Temporary Modification and Letter.

24   **3.    The Private Defendants' APA arguments do not explain, let alone justify, the
         Federal Defendants' abrupt regulatory about-face.**

25   Since 2013 (when the Federal Defendants apparently became aware of Defense

26

PLAINTIFF STATES' COMBINED                        23          ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                      Complex Litigation Division
JUDGMENT AND OPP TO                                                 800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                           Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                      (206) 474-7744

WASHSTATEB007476

1   Distributed's 3D-printable gun files) until April 2018 (when the *Defense Distributed* case was

2   abruptly settled), the Federal Defendants consistently maintained their position that 3D-printable

3   gun files were and ought to be subject to regulation under AECA and ITAR. Dkt # 95 at 3–4;

4   *see also* Dkt. # 29 (FAC) ¶¶ 39–41 & Dkt. # 112 (Fed Defs' Answer) ¶¶ 39–41. As explained

5   above and in the States' Motion for Summary Judgment, the Federal Defendants have failed

6   adequately to explain their total regulatory about-face, failed to consider the specific dangers of

7   3D-printable gun files, and offered only pretextual rationales for their sudden reversal. *See S*MSJ

8   at 12–20. The Private Defendants fare no better in trying to defend the indefensible.

9       The Private Defendants' argument relies primarily on memoranda from the Department

10   of Justice discussing various potential limits of ITAR. PDMSJ at 14–16. As an initial matter, the

11   Federal Defendants have not purported to rely on any of these statements, so they cannot possibly

12   "supply a reasoned basis" for the Federal Defendants' decision. *Chenery Corp.*, 332 U.S. at 196.

13   Moreover, these general statements about the limits of ITAR do not contemplate the subject files,

14   which were not made public until late 2012,[57] and which are not protected speech, as discussed

15   above. The Private Defendants also try to rely on a "legal analysis . . .  performed by Defense

16   Distributed's legal counsel" as evidence of the Federal Defendants' supposed basis for its

17   regulatory about-face. PDMSJ at 17. But obviously, the mere fact that the government's files

18   contained Defense Distributed's self-serving analysis does not prove the government based its

19   decision on that analysis, particularly where the government has never claimed to do so.

20   ### IV.   CONCLUSION

21       For the reasons above and in their Motion for Summary Judgment, the States respectfully

22   request that the Court grant summary judgment in their favor, deny Defendants' motions for

23   summary judgment, and grant the States' requests for vacatur and a permanent injunction.

24   ---
[57] The Private Defendants assert the Federal Defendants' initial action to regulate the files came in response
25   to the devastating December 2012 murder of 26 people, mostly children, at Sandy Hook Elementary School. PDMSJ
     at 14. In fact, the timing was driven by when Defense Distributed posted its files online—December 2012, the same
26   month as the Sandy Hook massacre. PDMSJ at 2 n.2; *see* Ex. A (Aguirre Decl.) ¶¶ 24–25 (DDTC initiated regulatory
     action "[a]s a result" of media reports that Defense Distributed had posted executable CAD files online).

PLAINTIFF STATES' COMBINED                24          ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                              Complex Litigation Division
JUDGMENT AND OPP TO                                        800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                  Seattle, WA 98104-3188
2:18-cv-01115-RSL                                              (206) 474-7744

1     DATED this 24th day of May, 2019.

2

3                                          ROBERT W. FERGUSON
                                           Attorney General of Washington
4
                                           /s/ Jeffrey Rupert
5                                          JEFFREY RUPERT, WSBA #45037
                                           Division Chief
6                                          TODD BOWERS, WSBA #25274
                                           Deputy Attorney General
7                                          JEFFREY T. SPRUNG, WSBA #23607
                                           KRISTIN BENESKI, WSBA #45478
8                                          ZACHARY P. JONES, WSBA #44557
9                                          Assistant Attorneys General
                                           JeffreyR2@atg.wa.gov
10                                         ToddB@atg.wa.gov
                                           JeffS2@atg.wa.gov
11                                         KristinB1@atg.wa.gov
                                           ZachJ@atg.wa.gov
12                                         Attorneys for Plaintiff State of Washington
13

14                                         WILLIAM TONG
                                           Attorney General of Connecticut
15
                                           /s/ Maura Murphy Osborne
16                                         MAURA MURPHY OSBORNE, admitted pro
                                           hac vice
17                                         Assistant Attorney General
18                                         Maura.MurphyOsborne@ct.gov
                                           Attorneys for Plaintiff State of Connecticut
19

20                                         BRIAN E. FROSH
                                           Attorney General of Maryland
21
                                           /s/ Julia Doyle Bernhardt
22                                         JULIA DOYLE BERNHARDT, admitted pro
23                                         hac vice
                                           JEFFREY PAUL DUNLAP, admitted pro
24                                         vice
                                           Assistant Attorneys General
25                                         JBernhardt@oag.state.md.us
26

PLAINTIFF STATES' COMBINED                        25              ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                           Complex Litigation Division
JUDGMENT AND OPP TO                                                    800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                                Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                          (206) 474-7744

WASHSTATEB007478

jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

GURBIR GREWAL
Attorney General of New Jersey

*/s/ Jeremy M. Feigenbaum*
JEREMY M. FEIGENBAUM, *admitted pro hac vice*
Assistant Attorney General
Jeremy.Feigenbaum@njoag.gov
*Attorneys for Plaintiff State of New Jersey*

LETITIA JAMES
Attorney General of New York

*/s/ Steven Wu*
STEVEN WU, *admitted pro hac vice*
Deputy Solicitor General
Steven.Wu@ag.ny.gov
*Attorneys for Plaintiff State of New York*

MAURA HEALEY
Attorney General of Commonwealth of Massachusetts

*/s/ Jonathan B. Miller*
JONATHAN B. MILLER, *admitted pro hac vice*
Assistant Attorney General
Jonathan.Miller@state.ma.us
*Attorneys for Plaintiff Commonwealth of Massachusetts*

JOSH SHAPIRO
Attorney General of Commonwealth of Pennsylvania

*/s/ Jonathan Scott Goldman*
JONATHAN SCOTT GOLDMAN, *admitted pro hac vice*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEB007479

1   Executive Deputy Attorney General
    MICHAEL J. FISCHER, *admitted pro hac vice*
2   Chief Deputy Attorney General
    JGoldman@attorneygeneral.gov
3   MFischer@attorneygeneral.gov
    *Attorneys for Plaintiff Commonwealth of*
4   *Pennsylvania*

5

6   KARL A. RACINE
    Attorney General for the District of Columbia
7

8   */s/ Robyn Bender*
    ROBYN BENDER, *admitted pro hac vice*
9   Deputy Attorney General
    JIMMY ROCK, *admitted pro hac vice*
10  Assistant Deputy Attorney General
    ANDREW J. SAINDON, *admitted pro hac vice*
11  Senior Assistant Attorney General
    Robyn.Bender@dc.gov
12  Jimmy.Rock@dc.gov
    Andy.Saindon@dc.gov
13  *Attorneys for Plaintiff District of Columbia*

14

15  ELLEN F. ROSENBLUM
    Attorney General of Oregon
16

17  */s/ Scott J. Kaplan*
    SCOTT J. KAPLAN, WSBA #49377
18  Senior Assistant Attorney General
    scott.kaplan@doj.state.or.us
19  *Attorneys for Plaintiff State of Oregon*

20

21  XAVIER BECERRA
    Attorney General of California
22
    */s/ Nelson R. Richards*
23  NELSON R. RICHARDS, *admitted pro hac
    vice*
24  Deputy Attorney General
    Nelson.Richards@doj.ca.gov
25  *Attorneys for Plaintiff State of California*

26

PLAINTIFF STATES' COMBINED            27        ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                         Complex Litigation Division
JUDGMENT AND OPP TO                                    800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                               Seattle, WA 98104-3188
2:18-cv-01115-RSL                                          (206) 474-7744

WASHSTATEB007480

PHIL J. WEISER
Attorney General of Colorado

/s/ Matthew D. Grove
MATTHEW D. GROVE, *admitted pro hac vice*
Assistant Solicitor General
matt.grove@coag.gov
*Attorneys for Plaintiff State of Colorado*


KATHLEEN JENNINGS
Attorney General of Delaware

/s/ Ilona M. Kirshon
ILONA M. KIRSHON, *admitted pro hac vice*
Deputy State Solicitor
PATRICIA A. DAVIS, *admitted pro hac vice*
Deputy Attorney General
Ilona.kirshon@state.de.us
PatriciaA.Davis@state.de.us
*Attorneys for Plaintiff State of Delaware*


CLARE E. CONNORS
Attorney General of Hawaii

/s/ Robert T. Nakatsuji
ROBERT T. NAKATSUJI, *admitted pro hac vice*
Deputy Attorney General
Robert.T.Nakatsuji@hawaii.gov
*Attorneys for Plaintiff State of Hawaii*


KWAME RAOUL
Attorney General of Illinois

/s/ Elizabeth Roberson-Young
ELIZABETH ROBERSON-YOUNG, *admitted pro hac vice*
Deputy Solicitor General
erobersonyoung@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

THOMAS J. MILLER
Attorney General of Iowa

*/s/ Nathan Blake*
NATHAN BLAKE, *admitted pro hac vice*
Deputy Attorney General
Nathan.Blake@ag.iowa.gov
*Attorneys for Plaintiff State of Iowa*

KEITH ELLISON
Attorney General of Minnesota

*/s/ Jacob Campion*
JACOB CAMPION, *admitted pro hac vice*
Minnesota Attorney General's Office
Solicitor General's Division
jacob.campion@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

JOSHUA H. STEIN
Attorney General of North Carolina

*/s/ Sripriya Narasimhan*
SRIPRIYA NARASIMHAN, *admitted pro hac
vice*
Deputy General Counsel
SNarasimhan@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Justin Sullivan*
JUSTIN SULLIVAN, *admitted pro hac vice*
Special Assistant Attorney General
JJSullivan@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

THOMAS J. DONOVAN, JR.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Attorney General of Vermont

*/s/ Benjamin D. Battles*
BENJAMIN D. BATTLES, *admitted pro hac
vice*
Solicitor General
benjamin.battles@vermont.gov
*Attorneys for Plaintiff State of Vermont*


MARK R. HERRING
Attorney General of the Commonwealth of
Virginia

*/s/ Samuel T. Towell*
SAMUEL T. TOWELL, *admitted pro hac vice*
Deputy Attorney General, Civil Litigation
STowell@oag.state.va.us
*Attorney for Plaintiff Commonwealth of
Virginia*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

30

WASHSTATEB007483

# Exhibit K

30 June 2018

To:        DDTCPublicComments@state.gov
              Office of Defense Trade Controls Policy, Department of State
                    and
              Regulatory Policy Division, Bureau of Industry and Security, U.S. Department of
              Commerce, Room 2099B, 14th Street and Pennsylvania Avenue NW, Washington DC
              20230

Subject:    ITAR Amendment - Categories I  II, and III
              EAR Amendment - RIN 0694-AF47

---

I am writing to submit comments on the proposed changes to ITAR (USML) and EAR (CCL) recently published in the Federal Register. I write in a personal capacity but the views expressed are informed by my research, policy analysis, and teaching as a professor at the University of Michigan, Gerald R. Ford School of Public Policy.

By way of a few introductory remarks, I am familiar with the complexities of US arms export laws and policy, as well as the regulatory framework. There is a legitimate need for periodic updates of the USML and—in view of the labyrinth of entangled laws, regulations, and agencies involved in the current system—I am supportive of the reform initiative. I am generally more concerned about keeping weapons out of the hands of those who would misuse them than in making them easier to procure, but that end is not at odds with the objective of putting in place a single control list and a single administrative agency. The reform effort has not progressed to that point, however, and I am wary about these proposed regulatory changes as an interim step. I will also add that I have been following the export control reform project since it was announced in 2009 and this is the only time I have felt the need to express concerns about the proposed changes. That is largely due to the particular, complete and recognizable, weapons that are being considered for change.

**1.     I urge you to delay the effective date of the proposed changes until the Government Accounting Office or the Library of Congress has publicly reported to the Congress their impact on numerous statutes referring to "defense articles."**

If enacted, the changes would have implications for several provisions of law. From my reading of both sets of proposed regulations, I am not reassured that the implications have been fully considered. The USML is formally defined in the AECA (22 USC 2778) as a definitive list of defense articles,[1] and from a quick search of US statutes the term "defense article" appears in some 45 sections,[2] in many instances (but

---

[1] 22 USC 2778(a)(1).

[2] Office of the Law Revision Counsel, United States Code, http://www.uscode.house.gov.

not always) explicitly linked to the USML. In addition, several provisions of the AECA itself are explicitly linked to an item's presence on the USML (without necessarily referring to "defense articles"). On a separate statutory track, the Foreign Assistance Act was recently amended to include CCL 600 series items as defense articles, along with all items contained on the USML [22 USC 2304.(d)(2)(C)], but the legislation did not anticipate the new 500 series so there is likely a gap there with regards to Congressional intentions. To complicate things further, the US Munitions Import List (USMIL) makes liberal use of the term "defense article," defined as articles on the USMIL–which currently include the same items that are slated to lose the "defense article" designation that extends from inclusion on the USML – so that items designated as defense articles on the USMIL will not be considered defense articles for purposes of export.[3]

It is very challenging to sort out the tangle.  Some of the instances where terms and definitions are at variance may not prove significant, but others may have far-reaching implications. Due to the disparate definitions and linkages, the proposal to remove specified firearms from the USML raises some important questions about the continuing applicability of provisions of law that refer to "defense articles," a term that currently encompasses such firearms.  In numerous situations the current statutory treatment of non-automatic firearms would be altered – or at least become ambiguous—as a result simply of moving these weapons from Category I of the USML to the 500-series on CCL. Statutory provisions that could be affected by the proposed change range from Export-Import Bank financing of defense article sales to human rights conditionality on security assistance, to the provisions for third-party transfer of grant-supplied defense articles, and various reports to Congress.  (See references in the footnote below.[4]) In some cases, the law in question is not directly linked to arms exports, but the relevant statute refers to defense articles and links the definition to items on the USML. In this way, removing specified firearms from the USML is likely to have a host of unintended and unanticipated repercussions.

Further, if semi-automatic weapons and other non-automatic firearms are removed from the USML it will impact the ability of law enforcement to charge weapons traffickers with violating the AECA as was done in several of the cases cited in a recent report from the Department of Justice on export enforcement.[5]

---

[3] 27 CFR 447.11 and 27 CFR 447.21.

[4] The numerous places where the meaning of "defense article" would be called into question by the proposed rules include:
- Export-Import Bank financing of defense article sales, including multiple end use considerations and other conditions (12 USC 635);
- Requirement to give Congress notice of commercial firearms sales of $1,000,000 or more (22 USC 2776)
- Annual report to Congress on military assistance, and specifically on transfers of USML Category I firearms (22 USC 2415)
- Provisions for supplying defense articles on a grant-basis, and multiple restrictions (22 USC 2314)
- Conditions for third-party transfer of defense articles provided on a grant basis (22 USC 2314)
- Certification of end use as a condition of sale or lease of defense article (22 USC 2753)
- Post-delivery verification of credible reports of misuse of weapons (22 USC 2753)
- Brokers of items included on the USML are required to register and activity must be licensed; exporters of USML items must identify all consignees and freight forwarders in license application (22 USC 2778)

[5] Department of Justice, "Summary Of Major U.S. Export Enforcement, Economic Espionage, And Sanctions-Related Criminal Cases," January 2018, https://www.justice.gov/nsd/page/file/1044446/download .

As Acting Assistant Secretary for Political-Military Affairs Tina Kaidanow explained to the House Foreign Affairs Committee last June,[6] the US arms export architecture is very complex and involves what her predecessors have described as "cradle to grave" oversight of exported US *defense articles*. Removing that designation *defense article* from weapons that are not fully automatic has the effect of detaching them from the US Munitions List and the regulatory framework built around it: there may well be significant unintended consequences.

In the event that consideration of the proposals is not delayed, I would recommend several other changes to the proposed ITAR and EAR revisions.

**2.      Retain existing USML I(a) and (d) unchanged; retain the existing coverage of USML II(a) unchanged; delete proposed 0A501.a and .b; and limit proposed 0A502 to renumbering existing 0A984.**

My concern here is based on principle and definition. Several of the weapons that would be moved to CCL are military-style weapons that are either used in battlefield situations or are substantially comparable to weapons as used in battlefield situations – including semi-automatic assault rifles and bolt-action sniper rifles. All of USML I(a), I(d), and II(a) are currently designated "significant military equipment" due to "their capacity for substantial military utility or capability," per the ITAR definition.[7]  The prevalence of armed extremists and insurgents who depend on weapons currently included in USML Categories I and II makes the military utility or capability of these weapons as relevant as ever. Due to their size and long shelf life, firearms are easily diverted and resold on black markets around the world. The Department of Justice's January 2018 summary of major US export enforcement cases noted above includes recent smuggling of semi-automatic assault rifles (and other firearms) to Dominican Republic, the Gambia, Russia via Latvia, Thailand and other destinations. In addition, the report documents the case of two men in Georgia attempting to export firearms to a range of international on the dark net, and another similar case from Kansas.[8]

While the US military may not derive great advantage from most of these weapons, they still have the military utility and capability of threatening the lives and welfare of many people around the world.   It is in the interest of the US and American citizens to keep the tightest control on them. Indeed, it is for that very reason that the same weapons being proposed for removal from the US Munitions List are expected to remain on the US Munitions *Import* List, where their entry into the US will remain tightly controlled. It is also for that reason that a growing number of states are imposing limitations on the retail availability of these weapons and many retailers are voluntarily removing them from their shelves.  They should remain where they are, on the USML.

---

[6] "Foreign Military Sales: Process and Policy," testimony from Tina S. Kaidanow, Acting Assistant Secretary, Bureau of Political-Military Affairs, Statement Before the Subcommittee on Terrorism, Nonproliferation and Trade, House Foreign Affairs Committee, June 2017. https://www.state.gov/t/pm/rls/rm/2017/271928.htm.

[7] 22 CFR 120.7 at https://www.gpo.gov/fdsys/pkg/CFR-2004-title22-vol1/pdf/CFR-2004-title22-vol1-sec120-7.pdf .

[8] Department of Justice, op. cit..

**3.     Before proposed regulatory changes are adopted, an opinion should be obtained from the Department of Justice concerning the legality of applying ITAR brokering restrictions to exports of firearms transferred from the USML to the CCL.  Furthermore, Congress and the public should be informed as to how the proposed arrangements will address the risk of diversion.**

There are several reasons to be concerned about the proposed rules pertaining to brokering. From their origin in the 1930s, a major intent of efforts to regulate arms exports has been to curtail illicit and undesirable trafficking in weapons. In the 1980s and 1990s, illicit flows of small arms flooded international markets, with calamitous effects in every region of the world. The rate of flow may have slowed since the 1990s, but as the 2018 Justice Department report attests, the efforts to supply contraband firearms are very much alive in our own time. From a global perspective, brokering laws are considered a weak link in the regulatory apparatus, to the extent that in the 1990s there was some talk of negotiating an international treaty focused entirely on arms brokering. Provisions written into US law around that time were considered some of the strongest in the world. With the transfer of specified semi-automatic and non-automatic weapons to CCL, the brokering laws would no longer be applied to these weapons (or would be applied only in a much-weakened version) and they would not be available to law enforcement for prosecution purposes.

**My specific concerns with the proposal to apply existing AECA/ITAR brokering rules to items intended for transfer to the CCL are twofold, related to the dubious statutory underpinnings of the proposed rule change and to its practical implications.**

(a) <u>The first concern is a matter of statutory coherence and proper statutory authority</u>. The brokering clauses of the AECA require commercial brokers involved in the transfer of defense articles to register with the State Department and apply for their transactions to be licensed (22 USC 2778).[9] The AECA brokering provisions are explicitly linked to defense articles on the USML (and by implication, ITAR). Because the proposed changes to ITAR and CCL would remove specified non-automatic and semi-automatic firearms from the USML, on the face of it, it would seem that commercial brokers of these items would be released from ITAR registration and brokering requirements. To prevent this outcome, the State Department proposes a patch, by asserting that the AECA brokering provisions will also apply to the US Munitions *Import* List (which, as noted above, will continue to include the items that—for export purpose—are deemed no longer to warrant control under the USML). The intended effect is that brokers wanting to *export* items included on the list of items controlled as defense articles for *import* (but not for export) will be subject to the rules pertaining to the export of such items. The logic is convoluted at best, and it raises questions about the statutory grounding for requiring brokers who are exporting items "no longer warranting control under USML" to register with the State Department and comply with related ITAR requirements. Given the complexity of the issue and the risks associated with brokering activities, it would seem advisable and prudent to seek a legal opinion within the Executive Branch to ensure that the provisions of the AECA pertaining to brokers—including the registration requirement-- can be applied

---

[9] Per 22 USC 2778 (b)(1)(A)(i), "…every person (other than an officer or employee of the United States Government acting in official capacity) who engages in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President under subsection (a)(1), or in the business of brokering activities with respect to the manufacture, export, import, or transfer of any foreign defense article or defense service (as defined in subclause (IV)), shall register with the United States Government agency charged with the administration of this section, and shall pay a registration fee which shall be prescribed by such regulations.

robustly to all involved in the wide range of brokering activities associated with the *export* of items on the US Munitions Import List.[10] Such a legal opinion should be obtained and considered before the regulatory changes are adopted.

(b) The second issue about brokering rules relates to the practical effects of the numerous proposed changes to ITAR section 129. It is hard to imagine, in the first place, the steps by which the licensing of a transaction will be handled by Commerce and any brokering aspects (including completion of information required by 22 CFR 129.6) will be handled by State. It boggles the mind to consider how this might actually amount to a time-saving simplification of rules. <u>I am primarily concerned about the proposed amendment 129.2(b)(2)(vii), however, which appears to negate the controls on brokering for transactions subject to EAR and open a significant loophole for unscrupulous brokers</u>. If I have understood the proposed changes to Section 129.2 correctly, if a Michigan-based retail sports outlet licensed to sell firearms in the US wanted to sell, say, AR-15 semi-automatic rifles to clients in another country, then so long as the Michigan retailer could secure approval via the BIS licensing process, the various parties involved in shipment, financing, and possibly transshipment would be exempt from any registration and approval requirements. Nor would they necessarily be known to licensing and enforcement agents based in the Commerce Department. What in this scenario would deter an unknown and independent handler from diverting the weapons to unauthorized end-users? I would like to assume that government officials in the State and Commerce Departments have thought through the implications of the proposed rules as they might be bent for nefarious purpose as well as their service for industry cost and convenience, but the published rules do not provide assurance in that regard. **More clarification is needed about how the brokering regulations will be applied, how the inter-agency process will be managed, and the extent to which the proposed arrangements for registering and licensing brokers involved in acquiring, financing and transporting exported firearms will address the risk of diversion to non-authorized end-users.** One effect of transferring non-automatic firearms from the USML to the CCL is to remove them from the remit of the State Department's Blue Lantern program, which otherwise might be engaged to make post-shipment checks. It is not clear whether Commerce has a comparable program or what resources it will assign to monitoring the commerce in semi-automatic firearms.

**4.     Amend proposals for EAR Section 734.**

BIS has indicated that items moving "to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to 'development' and 'production,' as well operation, installation, and maintenance 'technology.'" This approach would appear to give rise to the possibility of widespread and openly sanctioned circulation of open source, non-proprietary instructions for using computer-aided design (CAD) files to produce via 3D-printing technology, or text files to produce via CNC milling the firearms removed from USML. Until now, this development has been blocked in the courts via application of ITAR provisions requiring export license. **Either the Department of Commerce should clarify that it views any software instructions for producing controlled firearms already to be within the ambit of the EAR, or EAR Section 734.7 should be amended to bring circulation of open-source, non-proprietary CAD and other electronic files under EAR control - possibly by establishing that electronic files for producing functional firearms are subject to EAR control as production technology.**

---

[10] When questions arose in 1996 as to the authority of the President to restrict munitions imports under the AECA, the Office of Legal Counsel in the Justice Department was asked to provide an opinion. A similar request for opinion is warranted here. See https://www.justice.gov/sites/default/files/olc/opinions/1996/02/31/op-olc-v020-p0049_0.pdf .

5.      **Amend provisions for License Control – Crime Control**

Shotguns controlled under 0A502 are subject to the Crime Control because they are not controlled by Wassenaar. It is not evident, however, why items 0A501a are controlled for Regional Security but not Crime Control, as firearms are a main element of crime control equipment used by police and security forces. Moreover, federal statutes explicitly prohibit the export of crime control equipment to police and security forces in countries whose governments have a consistent pattern of gross violations of internationally recognized human rights, with exceptions requiring Presidential certification. **To bring the proposed regulations into alignment with provisions of the Foreign Assistance Act [22 USC 2304(a)(2), which makes explicit reference to crime control equipment under the aegis of the (expired) Export Administration Act], items in 0A501A should be subject to Crime Control.**

6.      **Include information from enhanced reporting on certain firearms exports in annual 655 Report.**

Enhanced reporting of items in the 501 series is potentially one bright spot in the proposed regulations. Several proposed changes are welcome, including: proposed changes in EAR part 748 requiring information about required import licenses; proposed changes in reporting mandated in EAR part 758; the required use of EEI filing for 0A501.a firearms; and the proposed recordkeeping requirement in part 762.

If the proposed rules are ultimately accepted, the information provided to the Wassenaar Arrangement and the UN Register of Conventional Arms will provide more granular information about US commercial exports of firearms, which seemingly could be included without significant additional effort in the annual 655 report mandated by the Foreign Assistance Act, 22 USC 2415.

7. **The balance of costs and benefits significantly favors industry over the taxpayer.**

The two sets of proposed rules include calculations of expected costs and benefits of the changes. Having invested several hours parsing the proposed rules, I suspect that one major benefit of the changes will accrue to the attorneys who help clients wend their way through federal regulations. The registration system as it was initially set up was intended to pay for itself, via modest registration and licensing fees that covered the costs of recording and updating information on US arms manufacturers and reviewing details for proposed transactions. In some sense, it has been a fee-for-service arrangement. The proposed changes significantly alter that approach with regards to firearms proposed for transfer to the CCL.

Except for the presumably few brokers unable to qualify for the firearms registration exemption outlined in proposed changes to ITAR section 129.2, no registration or license fees will be collected. Some of the transactions may be straightforward, but the workload promises to be substantial, with 4000-10,000 applications and virtually every 0A501 transaction subject to at least regional security controls, with no license exceptions available. **Whereas under the current system fees paid by industry and brokers help offset the costs of processing the license applications, under the proposed system the expenses associated with reviewing license applications will be charged to the taxpayer.** In the current political environment where government hiring is anathema, unless a streamlined new process delivers extraordinary returns, it is difficult to imagine how the tally could come out in the taxpayer's favor without

significant sacrifice of quality control. With respect to firearms exports, taxpayers and the public at large should be concerned about pressures to cut corners that could result in authorization of irresponsible transfers. **In my view as a taxpayer, the ITAR fee structure is yet one more reason for retaining non-automatic and semi-automatic firearms on the USML, and should these weapons ultimately be transferred to the CCL, I urge public officials at the Commerce Department to explore charging a service fee for processing export license applications.**

## Conclusion

I appreciate the opportunity to comment on these rules. I am disappointed, however, that by and large they downplay the lethality of the weapons currently controlled in ITAR categories I and III. I realize that these documents were prepared for a different purpose than the materials posted to inform the global public about US government programs and policy, but **the difference between the tone and emphasis of the proposed rules and the public presentation of US policy on the export of small arms and light weapons over the past twenty years is striking**. By contrast to the public statements and documents, including the 2017 Congressional testimony by a State Department official, the emphasis in these regulations is on reducing transaction costs for industry rather than promoting the public good, including national security and public safety.

In response to public comments on the proposed regulatory changes, I hope that the Departments of State and Commerce will reconsider the proposal to transfer any complete weapons from the USML to CCL. In the event that the proposed regulations go forward substantially unchanged, I can only hope that other countries will tighten and strictly enforce their own import restrictions to reduce the risk of diversion and misuse.

Thank you,

Susan Waltz
Professor
Gerald R. Ford School of Public Policy
University of Michigan
Ann Arbor, Michigan

swaltz@umich.edu

Exhibit L



<div style="background-color: yellow">

Comments of the Brady Center and Brady Campaign to Prevent Gun Violence
On the
Department of State Proposed Rule to Amend the International Traffic in Arms Regulations:
U.S. Munitions List Categories I, II, and III
And the
Department of Commerce Proposed Rule Regarding Control of Firearms, Guns, Ammunition
and Related Articles the President Determines No Longer Warrant Control Under the United
States Munitions List

</div>

*Filed via email to [DDTCPublicComments@state.gov](mailto:DDTCPublicComments@state.gov); electronically via
[http://www.regulations.gov](http://www.regulations.gov)*

Together the Brady Center and the Brady Campaign to Prevent Gun Violence ("Brady") are
national leaders in strengthening, supporting and expanding gun laws, policies, and practices in
the United States. Our complimentary missions are to significantly decrease the number of gun
deaths and injuries in America. We achieve this by amplifying the voice of the American public;
changing social norms through public health and safety programs; and holding the gun industry
accountable for dangerous and irresponsible practices and products.[1] These comments are
submitted in furtherance of those shared goals. Brady specifically seeks to ensure the safe use
and transfer of legal firearms within and outside of the United States by advocating for
appropriate regulations that reflect the sensitive nature of the firearms industry.

Brady hereby comments on the proposed rules published by the Department of State's Directorate
of Defense Trade Controls ("DDTC") and the Department of Commerce's Bureau of Industry and
Security ("BIS") on May 24, 2018 (83 Fed. Reg. 24198; 83 Fed. Reg. 24166) ("Proposed Rules"),
which seek comments on the transfer of certain firearms and related items from the International
Traffic in Arms Regulations' ("ITAR") U.S. Munitions List ("USML") to the Export
Administration Regulations' ("EAR") Commerce Control List ("CCL"). In particular, the
Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms,
including those used by the military, (along with their components and ammunition) from USML
Categories I, II, and III, where they are classified as significant military equipment, to the CCL,
where they will be categorized as "600 Series" items

We respectfully submit that the proposed transfer of semi-automatic and firearms used by the
military (and related items) from the stringent control of the USML to the more permissive regime
administered by the Commerce Department would be contrary to Congressional intent and would
undermine U.S national security interests, international stability and the protection of human
rights. We respectfully request that the State and Commerce Departments withdraw their current

---

[1] For more about Brady's mission and work, see [www.bradycampaign.org](http://www.bradycampaign.org).

proposed rules, and keep these dangerous weapons (and related items) subject to State Department jurisdiction on USML, consistent with well-settled and established practice.

Both the Proposed Rules indicate that the firearms at issue, which include armor-piercing sniper rifles used by the military, side arms used by the military, and semi-automatic rifles such as AR-15 and other military-style weapons, no longer warrant control under the ITAR because they are not "inherently military" or are widely available for commercial sale. The transfer of these items to Commerce Department jurisdiction is framed by DDTC and BIS as merely technical measures to reduce procedural burdens and compliance associated with exports of firearms. The reality, however, is that these rule changes would significantly weaken existing controls on the exports of military-style weapons, and would thereby increase the supply of such weapons to dangerous repressive regimes, rebel movements, criminals, and gun and drug traffickers. Many state and non-state groups in importing countries use semi-automatic weapons and sniper rifles in armed conflicts, drug trafficking and crime, and would be eager beneficiaries of the proposed rule changes. Further, if U.S. troops are called upon to intervene in certain conflicts, they may be exposed to significant danger from enemy combatants using military sniper rifles and semi-automatic weapons exported from the United States because of the weaker standards set forth in this rule change. Since Congress first imposed these regulations many years ago, the world has not suddenly become more safe, nor our military less at risk.

In granting statutory authority to regulate arms exports to the State Department in the Arms Export Control Act ("AECA"), Congress emphasized the importance of promoting regional stability and preventing armed conflict. In contrast, the delegation of export control authority to the Commerce Department in the Export Administration Act ("EAA") provides that the promotion of trade and other commercial interests are significant factors in agency decisions. Congress purposefully delegated the authority for licensing arms exports to the State Department, recognizing that the two agencies have very different mandates. In the State Department licensing process, international security and human rights are given more weight, while in the Commerce Department licensing process, commercial interests are given more weight. To transfer jurisdiction over these firearms, which have substantial military utility, from the State to the Commerce Department means that U.S. international security and human rights interests will not have the appropriate weight required before determining whether exports of firearms should be undertaken.

We also note that many of the firearms that are subject to the proposed rules are not widely available for commercial sale. As set forth in more detail below, a number of countries prohibit the commercial sale and civilian possession of semi-automatic weapons and military-style firearms, and therefore these weapons cannot be considered to be widely commercially available. Transferring semi-automatic firearms to the more permissive Commerce Department regime would result in less control over these items and a greater likelihood that they will end up in the hands of repressive regimes, terrorist organizations, criminal gangs, gun traffickers and other dangerous actors. Less stringent state gun laws in the United States already fuel a gun pipeline across the border into Mexico and other Central and Latin American countries, causing an increase in violent crime in those countries and subsequently higher numbers of displaced citizens of those countries fleeing across the border into the United States. The proposed transfer of the firearms in question to the less stringent regulation of items on the CCL would further exacerbate these existing problematic firearm and migration flow issues.

2

We discuss below the various ways the current controls on exports of semi-automatic and military-style firearms would be weakened by the transfer of such items to the jurisdiction of the Commerce Department.

### 1. Types of Firearms that Would be Released from State Department Control

The Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms, including firearms typically used by the military and military-style firearms, to Commerce Department jurisdiction. For example, below is a non-exhaustive list of the types of weapons that would be transferred:

| Sniper Rifles Used by Armed Forces | | |
|---|---|---|
| • M40A5 (used by US Marines)<br>• M24 (used by US Army) | • L115A3 (used by UK Armed Forces)<br>• Barrett M82 (used by multiple armies including US) | • Knight's Armament M110 (used by US Army) |
| **Sidearms Used by Armed Forces** | | |
| • Sig Sauer XM17 and XM 18 pistols (used by US Army)<br>• Glock M007 (Glock 19M) pistol (used by US Marines) | • Heckler & Koch Mk 23 pistol (used by US Special Forces) | • SIG Sauer Mk 25 (used by Navy Seals) |
| **Semi-automatic Assault Rifles** | | |
| • Bushmaster XM15 (AR-type rifle)<br>• Daniel Defense M4A1 rifles (AR-type rifle)<br>• IWI TAVOR<br>• Kalashnikov KR-9 (AK-type rifle) | • Kel-Tec Sub-2000<br>• Mossberg MMR Tactical rifles (AR-type rifle)<br>• POF USA P415 (AR-type rifle) | • SIG Sauer MCX rifles<br>• SKS assault rifle (predecessor to the AK-47)<br>• Sturm, Ruger & Co. AR-556 rifles (AR-type rifle) |
| **Semiautomatic Assault Pistols** | | |
| • Bushmaster SquareDrop pistol<br>• CZ Scorpion pistol | • CORE Rifle Systems Core 14 Roscoe pistol<br>• Daniel Defense MH18 pistol | • PAP M92 pistol |

3

The sniper rifles set forth above are some of the deadliest and most lethal firearms used on the battlefield when used by trained snipers. They can be used to target battlefield commanders, radio or heavy weapon operators, and other equipment, inflicting considerable damage to troop morale.[2]

A number of the semi-automatic rifles set forth above, including the Bushmaster XM15 and the Mossberg MMR Tactical Rifle, are AR-15 style rifles that were originally based on the M16 automatic rifle used by the U.S. military. Certain semi-automatic rifles, including the Kalashnikov KR-9 above, are based on the original design of the AK-47 automatic rifle used by many militaries and terrorist groups around the world.

## 2. The Firearms at Issue Would be Subject to a Less Stringent Licensing Policy and Review Process under the EAR

The transfer of the firearms at issue, including those set forth above, to BIS jurisdiction would likely result in more permissive licensing of these firearms for export. Congress enacted the AECA, which provides the statutory authority for the ITAR, in order to "bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments." AECA § 1. In contrast, the Export Administration Act ("EAA"), which provided the original statutory authority for the EAR, emphasizes in addition to national security concerns that "[i]t is the policy of the United States to minimize uncertainties in export control policy and to encourage trade with all countries with which the United States has diplomatic or trading relations, except those countries with which such trade has been determined by the President to be against the national interest." EAA § 3.

The purposeful delegation of authority by Congress in the AECA to regulate arms to the State Department, rather than the Commerce Department, reflects the reality that these two agencies have very different mandates governing their priorities and decision-making. The State Department's mission is to promote international security and human rights, while the Commerce Department is tasked with promoting and regulating trade and the interests of U.S. industry in addition to protecting national security. Specifically, in the DDTC review process for firearms, U.S. national security, U.S. foreign policy, and human rights considerations are important elements of the review. Under the BIS licensing process, commercial considerations would have a heighted significance, which would result in less stringent licensing decisions. The risk associated with transferring semi-automatic and military-style firearms from the State Department to the Commerce Department is that the latter will elevate commercial interests associated with increasing beneficial trade and assisting U.S. companies, while deemphasizing international security and human rights concerns.

---

[2] Kyle Mizokami, "5 Sniper Rifles That Can Turn Any Solider into the Ultimate Weapon," National Interest (March 11, 2018), located at <http://nationalinterest.org/blog/the-buzz/5-sniper-rifles-can-turn-any-solider-the-ultimate-weapon-24851>.

4

WASHSTATEA10401

In addition, the State Department, unlike the Commerce Department, keeps a database of human rights violators that it uses to conduct Leahy Law vetting of military and police assistance overseas, and many recipients of exported firearms are military and police actors. Under the ITAR, a license application involving firearms is reviewed against this database to prevent their use in human rights abuses. It is not clear that this practice would continue once the licensing jurisdiction moves to the Commerce Department.

**3.  The Firearms at Issue are not Widely Available for Commercial Sale**

The Commerce Department's proposed rule provides that the scope of the items that are to be moved from the USML to the CCL "is essentially commercial items widely available in retail outlets and less sensitive military items."[3]  The rule adds that: "There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities."[4]

The proposed rule, however, cites to examples of firearms sales in the United States rather than providing examples of countries that import firearms from the United States:

> "Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their 'parts,' 'components,' 'accessories' and 'attachments.'"[5]

The U.S. market should not be the basis for assessing the commercial availability of firearms, as this is not the market to which the proposed rule would be directed.  Moreover, the U.S. retail firearms market is unique and cannot be used as a proxy for other markets, given that the United States, with less than 4.5% of the world's population, comprises more than 45% of the world's firearms in civilian possession.[6]

Furthermore, a number of importing countries outside the United States ban or otherwise substantially restrict the sale and transfer of firearms that are subject to the Proposed Rules, including semi-automatic and military-style weapons.  By way of example, in Mexico, there is only one retail outlet in the entire country for the legal purchase of any kind of firearm;[7] China bans firearm purchases for most people, and private gun ownership is almost unheard of;[8] Germany bans semi-automatic weapons not intended for hunting or marksmanship, as well as

---

[3] Department of Commerce, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (proposed May 24, 2018).

[4] *Id.*

[5] *Id.*

[6] Aaron Karp, Estimating Global Civilian-Held Firearms Numbers, *Small Arms Survey* (June 2018), located at <http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-BP-Civilian-Firearms-Numbers.pdf>.

[7] Kate Linthicum, "There is only one gun store in all of Mexico. So why is gun violence soaring?" The Los Angeles Times (May 24, 2018), located at <https://www.latimes.com/world/la-fg-mexico-guns-20180524-story html>.

[8] Ben Blanchard, "Difficult to buy a gun in China, but not explosives," Reuters (October 2, 2015), located at <https://www.reuters.com/article/uk-china-security-idUSKCN0RV5QV20151002>.

5

some multiple-shot semi-automatic firearms; Norway bans certain semi-automatic weapons; Great Britain bans military-style weapons; Spain bans firearms "designed for war use"; and many other countries ban "military style" and other high capacity weapons.[9]  In the vast majority of countries, according to one of the few studies of firearms regulations, "there is a presumption against civilians owning firearms unless certain conditions and requirements are met."[10]

Given the significant differences in the regulation of semi-automatic and non-automatic firearms outside the United States, it appears that firearms that are covered by this rule change as "widely commercially available" are, in fact, not only not widely commercially available in many countries, but outright banned in other major developed countries. Therefore, at a minimum, BIS and DDTC should withdraw the proposed rules and further study the retail or commercial availability worldwide of the firearms at issue prior to taking any regulatory action.

### 4. Under the EAR, Firearms Manufacturers Would no Longer be Subject to Registration Requirements

Under the ITAR, persons who engage in the business of manufacturing, exporting, or temporarily importing defense articles in the United States must register with the DDTC.  *See* ITAR Part 122. In order to register, manufacturers are required to submit a Statement of Registration and undergo a background check, and then must re-register and pay a registration fee annually.  In contrast, the EAR contain no such registration requirement, so firearms manufacturers will be able to engage in exports, re-exports, and other activities subject to the EAR, or seek an export license, without being subject to the additional controls of registering with the U.S. Government, being subject to a background check and paying an annual registration fee.   In addition, the U.S. Government would lose a valuable source of information about manufacturers of firearms in the United States, such as the registrant's name, address, organization stricture, directors and officers, foreign ownership, and whether directors or officers of the company have been charged, indicted or convicted of a U.S. or foreign crime.  This information is used by the U.S. Government to monitor gun manufacturers and exporters, and losing this source of information would increase the likelihood of dangerous firearms being manufactured and transferred in significant quantities without effective oversight.

### 5. The Proposed Rules Would Permit Foreign Companies to Assume Control of U.S. Firearms Manufacturers with Minimal Oversight

The ITAR require registrants to notify DDTC at least 60 days in advance of any intended sale or transfer to a foreign person of ownership or control of the registrant or any entity owned by the registrant.  *See* ITAR § 122.4(b).  This 60-day notification from the registrant must include detailed information about the foreign buyer, the target, and the nature of the transaction, including any post-closing rights the foreign buyer will have with regard to ITAR-controlled

---

[9] *See* Firearms-Control Legislation and Policy, Law Library of the Library of Congress, February 2013, located at <http://www.loc.gov/law/help/firearms-control/firearms-control.pdf>.

[10] Sarah Parker, "Balancing Act: Regulation of Civilian Firearm Possession," States of Security: Small Arms Survey 2011 6, located at <http://www.smallarmssurvey.org/fileadmin/docs/A-Yearbook/2011/en/Small-Arms-Survey-2011-Chapter-09-EN.pdf>.

WASHSTATEA10403

items and any related steps that will be taken to confirm compliance with the ITAR. The 60-day rule ensures that DDTC is aware of acquisitions that pose potential threats to U.S. national security or foreign access to controlled commodities and technical data, and can coordinate review by the Committee on Foreign Investment in the United States ("CFIUS") as necessary. In contrast, the EAR impose no such 60-day advance notification requirement for acquisitions of U.S. companies with sensitive items or technology by foreign entities. Therefore, to the extent a U.S. manufacturer of semi-automatic or non-automatic firearms (and related items) is acquired by a foreign company, there would no longer be an advance notification required to the U.S. Government. As such, the U.S. Government would be unaware of a potential acquisition of a U.S. firearms manufacturer by a foreign entity that could influence the sales and marketing activities of the manufacturer in a manner that undermines U.S. national security, international security, and human rights.

**6.  Under the EAR, the Firearms at Issue Would no Longer be Subject to Congressional Reporting Requirements**

Once semi-automatic and military-style firearms are transferred to the CCL, there would no longer be any requirements for reporting significant sales of this significant military equipment to Congress. This would result in less transparency and would weaken Congress's ability to monitor exports of dangerous firearms to other countries.

Under the ITAR, Congress must be provided with a certification prior to the granting of "[a] license for export of a firearm controlled under Category I of the [USML] in an amount of $1,000,000 or more." *See* ITAR § 123.15(a)(3). The EAR does not impose similar reporting requirements on firearms controlled as 600 Series items.[11] Therefore, Congress would not be give advance notification of Commerce Department licensing of sizeable exports of firearms, undermining its oversight role with regard to these significant military equipment, which potentially could be diverted to repressive regimes, criminal enterprises, rebel factions, or terrorist organizations.

Congress has in the past played a vital role in halting arm sales that were inconsistent with U.S. interests. For example, Congress halted the $1.2 million sale of 1,600 semi-automatic pistols to the security force of Turkish President Recep Tayyip Erdoğan in 2017 after reports of public beatings of protestors. Furthermore, Senator Ben Cardin opposed the sale of 26,000 assault weapons to the Philippines police in 2016, citing grave human rights concerns. In sum, the State Department's regulatory framework ensures that both Congress and the public are kept aware of arms sales that raise human rights and other concerns. This critical oversight function, which stop transfers against U.S. national interests, would be lost if regulatory oversight of the firearms at issue were transferred to the Commerce Department.

---

[11] Under the EAR, items that are "600 Series Major Defense Equipment" are subject to Congressional notification requirements where such items are exported (a) in an amount exceeding $14,000,000 to a country outside the countries listed in Country Group A:5, or (b) in an amount exceeding $25,000,000, to a country listed in Country Group A:5. "600 Series Major Defense Equipment" is defined as "[a]ny item listed in ECCN 9A610.a, 9A619.a, 9A619.b or 9A619.c, having a nonrecurring research and development cost of more than $50,000,000 or a total production cost of more than $200,000,000," which would not include the firearms affected by the Proposed Rules. *See* EAR §§ 743.5.; 772.1.

WASHSTATEA10404

**<u>7.</u>  The Firearms at Issue Would no Longer be Subject to the ITAR's Controls on Public Release of Controlled Technology**

It has been DDTC's long standing practice to require prior authorization for any public release of ITAR-controlled technical data, source code or software (e.g., posting controlled technical data on a public website). BIS, however, takes a less stringent approach to publicly available information, removing technology, software, and source code from EAR controls once the items are made public (or intended to be made public) without requiring prior authorization BIS.  *See* EAR § 734.3(b)(3).  Therefore, if jurisdiction over technical data related to the design, production or use of semi-automatic or military-style firearms transfers to BIS, there would no longer be any controls on companies or individuals releasing such sensitive information into the public domain.

This significant risk is not hypothetical.  In *Defense Distributed v. U.S. Department of State*, the Fifth Circuit ordered manufacturer Defense Distributed to remove 3-D printing instructions from the Internet after the State Department charged the company with violating the ITAR.  In contrast, under the proposed rules, such manufacturers would be able to freely release 3-D printing instructions and code into the public domain (and thereby enable the private production of firearms overseas and in the United States), as the EAR permit publication of source code and technology (except encryption source code and technology) without authorization from BIS.  If this were the case, the public would have significantly higher access to the knowledge needed to manufacture guns, which could result in huge increases in the private manufacture and transfer of firearms with little to no oversight by governments.

In general, items that would move to the CCL would be subject to existing EAR controls on technology, software, and source code.  However, while the EAR control certain technology, software, and source code set forth in the CCL, Section 734.3 excludes certain published information and software from control under the EAR.  For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restriction on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published manual would no longer be "subject to the EAR," and therefore no longer subject to export controls.  *See* EAR §§ 734.3(b) and 734.7(a). Non-proprietary system descriptions, including for firearms and related items, are another example of information that are not subject to the EAR.  *See* EAR § 734.3(b)(3)(v).

This lack of control on public release of technology, software and source code related to semi-automatic and non-automatic firearms appears to be a significant loophole that could be exploited to release sensitive design, production and use technology regarding highly dangerous weapons.

**<u>8.</u>  The Proposed Rules Would Remove Licensing Requirements for Temporary Imports, Creating Another Channel for Criminals to Obtain Dangerous Weapons in the United States**

Temporary imports (import into the United States of defense articles, technical data, and defense services on the USML and their subsequent export) are regulated by the ITAR (*see* ITAR Part

8

123), while permanent imports of items on the U.S. Munitions Import List ("USMIL") are regulated by the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). The EAR imposes no import licensing requirements, so if semi-automatic or military-style firearms are transferred from the USML to the CCL, temporary imports of such items will not be regulated by any agency. Therefore, semi-automatic and military-style firearms could be freely imported into the United States without any authorization if the importer intends to subsequently export the items (the subsequent export of the item would require an export license from BIS). This includes temporary imports into the United States of semi-automatic and military-style firearms for gun shows, trade shows, or for repair or refurbishment. While the subsequent export of these firearms would require an export license from BIS, a key control that requires U.S. Government authorization *before* the import of the controlled firearms into the United States would be removed.

This approach would not only cause confusion and make compliance more difficult, but could result in more firearms flooding the U.S. market without any meaningful regulation. The United States already has a significant crime gun problem; while every firearm is manufactured as a legal consumer product, the opportunities for diversion to the criminal market are numerous. Guns are trafficked across jurisdictional lines, from states with weak laws to those cities and states where there are more gun regulations. This practice continues to fuel violence in cities like Chicago and Baltimore, which both have strong gun laws in place but border areas where it is easy to purchase multiple guns in one transaction with little or no regulation. Additionally, the large private sale loophole continues to put guns in the hands of dangerous criminals, who can exploit a system that only requires licensed gun dealers to conduct background checks on firearms sales. It is through this method that approximately at least one in five guns are sold in the United States today without a background check. Continually flooding the market with a supply of cheap handguns and assault rifles by permitting the legal "temporary import" of firearms that may never be re-exported will only exacerbate these problems.

Furthermore, the ATF does not have the capacity or resources to pursue the illegal distribution of firearms that were originally intended to be temporary imports, but are subsequently sold in the United States (thus making them permanent imports). While the ATF is tasked with regulating permanent imports of items on the USMIL, it is subject to severe resource constraints in exercising its jurisdiction, including finding and sanctioning individuals trying to distribute temporarily imported firearms in the United States. Therefore, the BIS export licensing process and the reality of the ATF's capacity together mean that illegal gun sales and transfers within the United States may skyrocket if the Proposed Rules go into effect.

**9. The Proposed Rules Would Make it Easier For Foreign Gun Manufacturers to Sell and Distribute Firearms Based on U.S. Origin Components and Technology**

Under the ITAR, defense articles, such as firearms and their components and ammunition, require export licensing regardless of their destination, unless a narrow exemption applies. The ITAR "See-Through Rule" provides that foreign manufactured items are subject to the ITAR, including licensing requirements, if they contain any amount of U.S.-origin content subject to the ITAR, no matter how trivial. As such, foreign manufacturers must seek authorization from DDTC prior to exporting foreign items that incorporate ITAR-controlled components or technology in their foreign made item.

9

BIS, however, has a less strict approach to incorporation of U.S.-origin content than DDTC. Unlike the ITAR, the EAR apply the "De Minimis Rule" to foreign items that are manufactured using U.S.-origin content. *See* EAR § 734.4. Under the De Minimis Rule, foreign items that have less than 25% U.S.-origin controlled content (by value) are not subject to the controls of the EAR. Therefore, foreign manufacturers could use U.S.-origin components or technology to produce products that are not subject to U.S. export control laws if the value of the U.S.-origin controlled content is under 25% of the value of the final product. With regard to components of semi-automatic and non-automatic firearms transferred to the CCL, such items would remain subject to the ITAR's See-Through Rule when incorporated into a foreign firearm and exported to certain countries subject to U.S. unilateral or United Nations arms embargoes. *See* ITAR § 126.1. However, exports of such firearms with U.S. content outside of these arms embargoed countries would be subject to the more permissive De Minimis Rule under the EAR. As such, foreign manufacturers would be able to export semi-automatic and military-style firearms made using less than 25% U.S.-origin controlled content without any U.S. Government scrutiny to most countries around the world (except for those subject to U.S. or United Nations arms embargoes).

For example, under the current State Department rules, if a foreign gun manufacturer in Germany sourced its barrels from a U.S. company and the barrels made up 20% of the value of the foreign manufactured gun, that gun would be subject to ITAR licensing and congressional reporting requirements if the German manufacturer wanted to export such guns to the Philippines. Under the Commerce Department rules, such sales would not be subject to U.S. export control requirements.

Based on the foregoing, we urge DDTC and BIS to withdraw the proposed rule and keep semi-automatic and military-style guns (along with their components and ammunition) on the USML under DDTC jurisdiction. This approach would best support the safe use and export of firearms outside the United States.

Brady is available to comment further on this proposed rule change and any other agency initiatives impacting the domestic or global firearms policy. Please contact us by reaching out to Sean Kirkendall, Policy Director, Brady Campaign to Prevent Gun Violence, at skirkendall@bradymail.org or (202) 370-8145.

WASHSTATEA10407

Exhibit M

REVIEWED|10-18-2019|S reviewed 10/18.



201921859
**United States Department of State**

*Washington, D.C.   20520*

SENSITIVE BUT UNCLASSIFIED
DELIBERATIVE PROCESS/PRE-DECISIONAL

October 18, 2019

☐ Read by _____

**INFORMATION MEMO FOR THE SECRETARY**

FROM:      PM – R. Clarke Cooper
           H – Mary Elizabeth Taylor

SUBJECT:   (SBU) Providing Regulatory Relief with Rules Transferring Controls for Exports
           of Certain Firearms and Ammunition from State to Commerce

BLUF:      (SBU) The Departments of State and Commerce will proceed with final steps
           toward publication of rules transferring controls for exports of certain firearms
           and ammunition from State to Commerce.  The rules will include Commerce
           controls on 3D-printed firearm files.

(SBU) In the near future, State and Commerce will proceed to complete the steps for publication
of final rules revising the International Traffic in Arms Regulations (ITAR) and Export
Administration Regulations to transfer firearms and related items that do not confer a "critical
military or intelligence advantage" from State to Commerce.  Because the Commerce proposed
rule has changed, the Administration will resubmit a formal 30-day notification to Congress on
the transfer of Categories I, II, and III from State to Commerce prior to publication.  The new
notification will effectively replace the February formal notification and, in a change from the
previously notified version, will include Commerce controls on the publication of 3D-printed
firearm files (i.e., computer files that enable a 3D printer to produce components of an operable
firearm) under its regulations.  The publication of the rules had been paused ▌

▌            Publication of the final rules that transfer control of certain firearms and
ammunition from State to Commerce will be greeted with relief by many small manufacturers
around the country, but is also likely to elicit strong political objections and legal challenges.

(SBU) **Export Control Implications and Regulatory Relief:**  Publication of the final rule will
complete the first comprehensive review of the ITAR's U.S. Munitions List (USML), which
commenced a decade ago.  Review of the USML to remove those items that no longer merit the
stringent controls of the ITAR continues to be a key line of effort for the Implementation Plan
under the President's Conventional Arms Transfer (CAT) Policy.  This effort enjoys broad
support from the U.S. defense, space, electronics, and other export-oriented industries.  This rule
in particular will impact a large number of small manufacturers and gunsmiths around the

country, most of whom are non-exporting, who will no longer have to register with State and pay the annual $2,250 fee with these regulatory changes.

(SBU) **Path Forward and Congressional Implications:**  When State notified Congress of intent to publish the firearms rules, Senator Menendez (D-NJ) requested the Department hold until two issues are "sufficiently addressed":  (1) congressional oversight of exports of firearms over specified value thresholds is maintained, and (2) the public release of 3D gun printing technical information remains controlled.  In addition, the House adopted an amendment offered by HFAC Chairman Engel (D-NY) to FY 2020 National Defense Authorization Act (NDAA) that would prevent the Department from shifting controls over firearms to Commerce, perhaps reflecting broader concerns that the rule will result in the global proliferation of U.S.-origin guns.



(SBU) The process for congressional notification of rules that would remove items from the USML typically involves a 30-day informal consultation with Congress and a formal 30-day congressional notification as required by Section 38(f) of the AECA.  In this case, however, after we notified Congress of the firearm rules in February, Commerce changed its draft rule to establish controls over the publication of 3D gun files.                                        The current congressional rollout plan includes a briefing for SFRC and HFAC staff prior to delivering the formal notification.

(SBU)

(SBU) At the expiration of the 30-day notification period, absent congressional holds, State and Commerce plan to publish our rules simultaneously, with an effective date that is 45 days after publication in order to allow for an orderly transition of the items from State to Commerce.  In

the likely event the committees seek to assert a basis to "hold" this action, ███████████████████ When the rules are final, State and Commerce must forward them to the House, the Senate, and GAO pursuant to the Congressional Review Act. ████████████████████████████████████████

(SBU) **Litigation Implications:**  In 2018, State settled a lawsuit, *Defense Distributed v. U.S. Department of State*, in which the plaintiff asserted a First, Second, and Fifth Amendment challenge to the control of certain technical data for the 3D printing of firearms under the ITAR.

████████████████████████████████████████████ After the Department entered into a settlement agreement, which permitted publication of Defense Distributed's data on the internet, a number of states then sued the Department to block implementation of the settlement agreement (*Washington v. U.S. Department of State*), arguing that the Department's temporary amendment of the ITAR called for by the settlement agreement was not properly notified to Congress pursuant to section 38(f) of the Arms Export Control Act (AECA).  The court in *Washington* entered a preliminary injunction enjoining the Department from complying with the settlement agreement in *Defense Distributed*, and the court is currently considering cross motions for summary judgment.

(SBU) **Messaging and Engagement:**  PM is working with colleagues in the Department and interagency partners to prepare for the rollout of the rules, as amended, as well as any potential litigation challenges. ████████████████████████████████████████

SENSITIVE BUT UNCLASSIFIED – DELIBERATIVE PROCESS/PRE-DECISIONAL
-4-

Approved:      PM – R. Clarke Cooper        [RCC]
               H – Mary Elizabeth Taylor     [MET]

Drafted:       PM/CPA:  Josh Paul, ext. 7-7878 and cell: ███████

Cleared:       PM/FO          Stan Brown            OK
               PM/DDTC        Michael Miller        OK
               D              Brett Eggleston       OK
               P              Melanie Carter        OK
               M              Lareina Ockerman      OK
               S/P            Michael Urena         OK
               L              Josh Dorosin          OK
               T              Maureen Tucker        OK
               H              Tamara Darrach        OK

SENSITIVE BUT UNCLASSIFIED – DELIBERATIVE PROCESS/PRE-DECISIONAL

# Exhibit N

```
REC1|APPROVE|1-10-2020|S Approved.
REC2|APPROVE|1-10-2020|S approved.
```

202000035
**United States Department of State**

*Washington, D.C. 20520*



SENSITIVE BUT UNCLASSIFIED

January 6, 2020

**ACTION MEMO FOR THE SECRETARY**

FROM:   PM – R. Clarke Cooper

SUBJECT:   (SBU) Amendment to the International Traffic in Arms Regulations (ITAR):
Revision of U.S. Munitions List (USML) Categories I, II, and III

**BLUF:**   (SBU) PM seeks your approval to publish a final rule revising USML Categories
I, II, and III (i.e., controls on firearms and related items). We seek your approval
on a way forward. ██████████████████████████████████████
but Sen. Menendez placed a hold on the action until a particular concern is
addressed.

**Recommendations**
(SBU) That you:

(1) Sign on January 10 the Federal Register notice authorizing publication of revisions to the
ITAR as a final rule, even if Senator Menendez continues to maintain a hold on
publication. This will provide the Department time before the rule is actually published
to attempt to address Menendez's concerns ████████████████████████
████████████████████. (Approve/Disapprove by 1/10/20)

(2) Concur that this rule is not a "major" rule for the purposes of the Small Business
Regulatory Enforcement Fairness Act of 1996. (Approve/Disapprove by 1/10/20)

**Background**
(U) Since 2010, the Department has worked to revise the USML to limit it to defense articles
providing the United States with a critical military or intelligence advantage or, in the case of
weapons, having an inherently military function. Revising the USML is in the Implementation
Plan to the Conventional Arms Transfer Policy (NSPM-10), which seeks to ensure protection of
defense technology needed to preserve U.S. interests while supporting U.S. defense-industrial
base efforts to expand trade. Items determined no longer to warrant control on the USML are
removed and subsequently controlled on the Commerce Control List (CCL) through a separate,
but simultaneously published, companion rule. (Such exports are *not* decontrolled; the principal
authorization role simply shifts to Commerce.)

(U) On May 24, 2018, the Department published a proposed rule to revise three USML
Categories: I (firearms and related articles), II (guns and armaments), and III (ammunition and
ordnance). After solicitation and review of public comments on the proposed rule, the
Department drafted a final rule to revise the USML. The final rule would remove items from the
USML, including: 1) most semi-automatic and non-automatic firearms; 2) most firearm parts and
components, other than silencers and magazines greater than 50 rounds; and 3) most firearm

ammunition, unless belted or linked.  The Department's rule was reviewed and cleared by the interagency through an OMB-led process.

(SBU) Subsequent to OMB's approval and pursuant to Section 38(f)(1) of the Arms Export Control Act (AECA), the Department notified Congress in February 2019 of its intent to remove items from the USML.  This notification included the Commerce rule that would impose CCL controls on items removed from the USML.  On February 22, 2019, Senator Menendez placed a "hold" on the action "until such time as [his concerns] are sufficiently addressed," noting (1) Commerce's limited controls on information for 3D-printing firearms, and (2) Congressional oversight on exports of firearms transferring to the CCL.  Following the notification, Commerce revised its rule to control certain information concerning the 3D-printing of firearms.

(SBU) Both rules were again cleared by the interagency, and a new notification pursuant to Section 38(f)(1) of the AECA was submitted to Congress on November 12, 2019.  This notification superseded the previous notification and expired on December 12, 2019.  On December 10, Senator Menendez again placed a hold on the action.  His letter acknowledged that Commerce had addressed his concern about 3D-printed firearms but declared that his hold would remain, as also noted in his February 2019 letter, until a mechanism is established to "immediately [inform Congress] of any proposed license to export firearms formerly controlled on the USML at the appropriate dollar threshold mandated in the [AECA]."

(SBU) In a meeting with Menendez's staff on December 23, 2019, Commerce offered regular briefings on firearms export licenses it had issued.  Menendez's staff stressed that the Senator sought to review pending (not already-approved) licenses, but that it would take the offer to him, and requested a delay in publication prior to his reply.  The Department is working to schedule a meeting with Menendez on January 7 in order to allay his concerns.

Currently, under the tiered review process State uses for such transfers under the USML, Congress is given advanced notification of significant firearms exports.

(SBU)

he rules are ready for signature and publication, with the changes in the rules taking effect 45 days after publication.

(U) The final rule does not meet the criteria for being a "major" rule under P.L. 104-121, because 1) the annual effect on the economy will not be $100,000,000 or more; 2) there will be no major

-3-

increase in costs or prices for consumers, individual industries, federal, state, or local government agencies, or geographic regions; and 3) there will be no adverse effects on competition, employment, investment, productivity, innovation, or on the ability of U.S.-based enterprises to compete with foreign-based enterprises in domestic and foreign markets.

Attachments:
       Tab 1 – Overview of Department Efforts to Revise USML Categories I, II, and III
       Tab 2 – Background on "Major" vs. "Non Major" Rules
       Tab 3 – February 2019 Senator Menendez Letter
       Tab 4 – December 2019 Senator Menendez Letter

       *Available upon request:*
       Federal Register Notice for Department of State Final Rule
       Federal Register Notice for Department of Commerce Final Rule

WASHSTATEB000003

Approved:    PM – R. Clarke Cooper       RCC

Drafted:      PM/DTCP:  Sarah Heidema, ext. 3-2809 and cell: █████████

| Clearances: | | | |
|---|---|---|---|
| | T | Chris Ford | OK |
| | D | Brett Eggleston | OK |
| | P | Melanie Carter | Info |
| | S/P | Michael Urena | OK |
| | PM/DDTC | Michael Miller | OK |
| | PM/DTCP | Sarah Heidema | OK |
| | PM/DTCC | Julia Tulino | OK |
| | PM/DTCL | Catherine Hamilton | Info |
| | PM/DTCM | Neal Kringle | Info |
| | L | Josh Dorosin | OK |
| | L/PM | Joe Khawam | OK |
| | L/M | Alice Kottmyer | OK |
| | L/LFA | Shawn Pompian | OK |
| | PM/CPA | Josh Paul | OK |
| | ISN | Renee Sonderman | OK |
| | T | Maureen Tucker | OK |
| | H | Mary Taylor | OK |
| | A/DIR | Yvonne Peckham | OK |
| | CGFS/GAO | Julianne Shinnick | OK |
| | DRL | Asa Miller | Info by Request |
| | GPA | Kim Liao | OK |
| | R | Heidi Smith | OK |

202000035

16. Section 129.6 is amended by revising paragraph (b)(3)(i) to read as follows:

**§ 129.6 Procedures for obtaining approval.**

* * * * *

(b) * * *

(3) * * *

(i) The U.S. Munitions List (*see* § 121.1 of this subchapter) or U.S. Munitions Import List (*see* 27 CFR 447.21) category and sub-category for each article;

* * * * *

_____

**Michael R. Pompeo,**
*Secretary of State.*

**Billing Code 4710-25**

85

WASHSTATEB000005

SENSITIVE BUT UNCLASSIFIED

**Overview of State Department's Efforts to Revise**
**U.S. Munitions List Categories I, II, and III**

(SBU) <u>Background on Ongoing U.S. Munitions List Review</u>:  Since 2010, the Department has engaged in an effort to revise the U.S. Munitions List (USML) to limit its scope to those defense articles providing the United States with a critical military or intelligence advantage or, in the case of weapons, having an inherently military function.  This effort is transforming the USML into a "positive" list that describes controlled items using objective criteria.  Categories I (firearms and related articles), II (guns and armaments), and III (ammunition and ordnance) of the USML are the final three categories to be subject to initial revision.  Reviewing and revising the USML is also a key line of effort of the Implementation Plan to the Conventional Arms Transfer (CAT) Policy (NSPM-10) and seeks to help ensure that defense technology needed to preserve U.S. interests is protected, while supporting the U.S. defense-industrial base's efforts to expand commercial defense trade.  As part of this effort, items determined no longer to warrant control on the USML are transferred to Commerce's Commerce Control List (CCL) through a separate, but simultaneously published, companion rule.

(U) <u>Interagency Review of Categories I-III</u>:  The Department led an interagency process to identify those items in USML Categories I-III that the Department will continue to control on the USML, based on whether those items provide the United States with a critical military or intelligence advantage or, in the case of weapons, perform an inherently military function and thus warrant control on the USML.  The result of the review is that certain items on the USML were determined not to meet this standard.  These items were proposed for transition to the CCL.  Such items included:  1) most semi-automatic and non-automatic firearms; 2) most firearm parts and components, other than silencers, magazines greater than 50 rounds, parts and components to convert a semi-automatic firearm to a fully-automatic firearm, and accessories or attachments for automatic targeting or stabilization; 3) most firearm ammunition, unless belted or linked; and 4) many of the minor parts and components of large guns, such as howitzers and artillery pieces.  Removal of these items will enable the Department to improve significantly its regulation of defense articles and services that warrant continued control on the USML.  Tab 3, attachment 2, describes in greater detail the national-security and foreign-policy analysis underlying the rule change.

(SBU) <u>Drafting Proposed Rules</u>:  Following the initial review, State and Commerce began drafting proposed rules to implement the transfer of items from Categories I-III of the USML to the CCL.  On May 24, 2018, the Department published its proposed rule in the Federal Register to revise Categories I-III (tab 3, attachment 3).  Commerce published its companion proposed rule on the same date (tab 3, attachment 4).  These rules solicited public comment on the proposed transfer.  The Department received more than 3,000 public comments and correspondence from members of Congress.  The proposed rule engendered a great deal of public attention, given that it involved transferring regulatory control of firearms and technical data related to the 3D printing of guns.

(SBU) <u>Drafting Final Rules</u>:  State and Commerce each reviewed their respective public comments in preparation for drafting the final rules.  The draft final rules addressed the public

comments received in the preambles.  The draft final rules were reviewed and cleared by the interagency (including DoD) through an OMB-led process.

(SBU) <u>Initial Notification to Congress</u>:  Subsequent to the OMB's approval and pursuant to an informal review process established in consultation with Congress in 2011, the Department provided to Congress on January 3, 2019, informal notification of the intent to transfer certain items in Categories I-III of the USML to the CCL.  On February 4, 2019, pursuant to Section 38(f)(1) of the Arms Export Control Act (AECA), the Department formally notified Congress of its intent to transfer these items (tab 3, attachment 8).  The Congressional notification included the regulatory text of the draft Commerce final rule that would impose CCL controls on the items removed from the USML.

(U) <u>Commerce Controls of Physical Items Transferred</u>:  In its draft final rule, Commerce imposed an export-license requirement on most of the physical items removed from categories I-III of the USML, including all of the firearms (with the exception of firearms manufactured prior to 1898) and ammunition.  Consistent with existing processes for the review of Commerce license applications, ISN will review all Commerce export-license applications for firearms and provide foreign-policy guidance.

(SBU) <u>Commerce Controls of Technical Data Transferred – 3D Printing of Firearms</u>:  In addition to transferring physical items to the CCL, the Department of State's draft final rule would transition to the CCL certain technical data, including the data for semi-automatic and non-automatic firearms.  Under the CCL regulatory framework in place for Commerce's proposed rule and draft final rule notified to Congress in February 2019, the technical data could be publicly released without prior government authorization.  This generated substantial public and Congressional interest, especially in the area of controls over 3D-printed guns and associated technical data (tab 3, attachments 5, 6, and 9).  The President weighed in on the issue in July 2018, shortly after the publication of the proposed rules and the Department's settlement with Defense Distributed, tweeting, "I am looking into 3D Plastic Guns being sold to the public.  Already spoke to NRA, doesn't seem to make much sense!" (tab 3, attachment 10).  Following additional interagency discussion and consideration of this issue, Commerce amended the current CCL regulatory framework through its final rule to control the publication of technical data associated with 3D printing of guns.

(SBU) <u>Revision of Final Rules</u>:  Following Commerce's decision, the regulatory text of the draft Commerce final rule was revised to impose controls on certain technology and software capable of producing 3D-printed firearms when posted on the internet.  As described in further detail below, this change addressed concerns raised by some members of Congress and the public about 3D-printed firearms.  The preambles to State's and Commerce's draft final rules were also revised to make conforming edits.  The draft final rules then were once again cleared by the interagency (including DoD) through OMB.

(SBU) <u>Congressional and Public Concerns Addressed in the Final Rules</u>:  The draft final rules, where appropriate, have addressed the concerns raised by the public and Congress and include a review of public comments.  Media, civil society, and academia have also expressed their views through various publications, representative samples of which are provided in tab 3, attachment 9.  Some of the concerns – such as the publication of technical data for 3D-printed guns, as described above – have been addressed in coordination with Commerce through amendments that will be reflected in the final rules.  Other concerns do not warrant any changes in the final rules because they are not grounded in fact.  For example, one concern often expressed is that transferring control of certain firearms from State to Commerce will result in the deregulation of U.S. firearm exports, thereby increasing the numbers of U.S.-manufactured small arms around the world and contributing to armed conflicts abroad.  The transfer of such firearms, however, does not deregulate the export of firearms.  All firearms transferring from the jurisdiction of State to the jurisdiction of Commerce will continue to require authorization for export.  The Department sought to address these types of arguments by publishing a fact sheet that explains the effects of the transfer (tab 3, attachment 12).  The Department, together with Commerce and DoD, also held a roundtable with NGOs and advocacy organizations to listen to their concerns and correct any misconceptions (tab 3, attachment 20).  There were some concerns raised that were factual but nonetheless did not warrant any changes in the final rules.  For example, one concern expressed was that the rules would reduce Congressional oversight of arms transfers, because Commerce is not subject to the same Congressional notification requirements for firearm exports as State.  While it is true that Commerce is not currently subject to the same congressional notification requirements for firearm exports, we do not believe this fact warrants any changes in the final rules.  Firearms that we deemed through the interagency review process to warrant continued control under the ITAR as defense articles will remain subject to the congressional notification requirements in the AECA.  Congress will therefore retain its oversight role over these exports of firearms.

(SBU) <u>Menendez "Hold"</u>:  Following the Department's February 2019 Congressional notification, the Department received a letter from Senator Bob Menendez (D-NJ) dated February 22, 2019, purporting to "place a hold on the Congressional notification … until such time as [the following  issues] are sufficiently addressed":  1) Congressional oversight of exports of firearms over specified value thresholds is maintained, and 2) Department of Commerce ability to control the public release of technical information related to 3D gun printing (tab 5).  As described above, Commerce is addressing Menendez's second concern through its final rule, but these changes do not address his first concern.

(SBU) <u>Department Issues New Congressional Notification</u>:  After briefing the Secretary (tab 3, attachment 14) and obtaining his approval (tab 3, attachment 15), the Department submitted a new 38(f) notification on November 12, 2019, to inform the Congress about Commerce's proposed controls over the publication of technology and software to enable the 3D printing of firearms (tab 3, attachment 16).  This notification superseded the previous February notification. The associated 30-day notification period expired on December 12, 2019.  During that notification period, the Department received a letter from Menendez dated December 10, 2019, reasserting his first concern in his February 2019 letter that "the Senate Foreign Relations and House Foreign Affairs committees must be immediately informed of any proposed license to export firearms formerly controlled on the USML at the appropriate dollar threshold mandated in

the Arms Export Control Act" and purporting to place a "hold" until this concern has been addressed (tab 6). While the Department generally seeks to address Congressional concerns before proceeding with activities following a notification to Congress, there is no legal requirement to implement "holds" placed by a member of Congress, including "holds" on a regulatory process. However, failure to address Menendez's "hold" would almost certainly have far-reaching consequences for other Department business pending before SFRC, such as nominations.

(SBU) <u>Legislative Efforts to Forestall the Rule Change</u>: In addition to sending correspondence, some members of Congress sought to forestall the contemplated transfer through the legislative process. The House adopted an amendment to the National Defense Authorization Act for FY 2020 (FY 2020 NDAA) proposed by Representatives Eliot Engel (D-NY), the Chairman of the House Committee on Foreign Affairs, and Norma Torres (D-CA) that would prohibit the President from removing from the USML "any item that was included in category I, II, or III of the United States Munitions List, as in effect on August 31, 2017" (tab 3, attachment 13). However, according to the Conference Report for the FY 2020 NDAA, the House amendment was not included in the FY 2020 NDAA conference bill (tab 3, attachment 17) and therefore was not enacted as part of the FY 2020 NDAA signed by the President on December 20, 2019.

(SBU) <u>Lawsuits Related to Controls on 3D-Printed Firearms</u>: Over the last year and a half, the Department defended a lawsuit brought by several states and the District of Columbia (*Washington v. State*) related to the 3D printing of firearms. This lawsuit arose after the Department entered into a settlement agreement and filed a stipulation of dismissal with private plaintiffs in a separate case (*Defense Distributed v. State*), thereby allowing the public release of certain technical data to enable 3D printing of firearms (tab 3, attachment 18). The court in the *Washington* litigation entered a preliminary injunction enjoining the Department from complying with the settlement agreement in *Defense Distributed*. After considering cross motions for summary judgment and the parties' various written submissions, the court granted the plaintiffs' request to vacate certain actions taken by the Department in furtherance of the settlement agreement that were intended to permit the public release of certain technical data to enable 3D printing of firearms (tab 3, attachment 19). The Department's final rule will move the technical data that was at issue in this lawsuit from the USML to the CCL, and a Commerce license will be required prior to the posting on the Internet of certain technology and software that could enable 3-D printing of firearms. L advises that ██████████████████████████████

<u>Available upon request</u>:

      Attachment 1: CAT Policy and Implementation Plan Fact Sheet (Full Implementation Plan Available on S//NF System)
      Attachment 2: National Security and Foreign Policy Analysis
      Attachment 3: Department of State Proposed Rule
      Attachment 4: Department of Commerce Proposed Rule
      Attachment 5: Public Comments to the Department of State Proposed Rule
      Attachment 6: Congressional Correspondence
      Attachment 7: Public Comments to the Department of Commerce Proposed Rule

Attachment 8:  January and February 2019 Congressional Notification
Attachment 9:  Representative Samples of Media, Civil Society, and Academia Publications
Attachment 10: President Tweet
Attachment 11:  SOCs for Small Group on Categories I-III
Attachment 12:  Categories I-III Draft Roll-Out Plan & Fact Sheet
Attachment 13:  Section 1050 of the FY 2020 House NDAA Bill
Attachment 14:  IM for S on Categories I-III
Attachment 15:  November 2019 AM for S on Congressional Notification
Attachment 16:  November 2019 Congressional Notification
Attachment 17:  FY 2020 NDAA Conference Report
Attachment 18:  Defense Distributed Case:  Key Documents
Attachment 19:  Washington Case:  Key Documents
Attachment 20:  Readout of NGO Roundtable (12-12-19)

-6-

Approved:      L/PM – Jeffrey Kovar

Drafted:       L/PM – Joseph Khawam, ext. 7-8546 and cell: ████████

Clearances:    D              Brett Eggleston           OK
               P              Melanie Carter            Info
               S/P            Michael Urena             OK
               PM/DDTC        Michael Miller            OK
               PM/DTCP        Sarah Heidema             OK
               PM/DTCC        Julia Tulino              OK
               PM/DTCL        Catherine Hamilton        Info
               PM/DTCM        Neal Kringle              Info
               L              Josh Dorosin              OK
               L/PM           Joe Khawam                OK
               L/M            Alice Kottmyer            OK
               L/LFA          Shawn Pompian             OK
               PM/CPA         Josh Paul                 OK
               ISN            Renee Sonderman           OK
               T              Maureen Tucker            OK
               H              Mary Taylor               OK
               A/DIR:         Yvonne Peckham            OK
               CGFS/GAO       Julianne Shinnick         OK
               DRL:           Asa Miller                Info by Request

## "Major" versus "Non Major" Rule

For the purposes of the Small Business Regulatory Enforcement Fairness Act of 1996 (the "Act"), a "major" rule is a rule that the Administrator of the OMB Office of Information and Regulatory Affairs finds has resulted or is likely to result in:

(a) an annual effect on the economy of $100,000,000 or more;

(b) a major increase in costs or prices for consumers, individual industries, federal, state or local government agencies, or geographic regions; or

(c) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and foreign markets.
(5 U.S.C. 804(2))

In our assessment, this International Traffic in Arms Regulation (ITAR) change, while important to U.S. foreign policy and national security, does not meet the criteria in the Act for being a "major rule." However, the OMB Office of Information and Regulatory Affairs may make a determination that the definition or criteria of a major rule have been triggered to meet the statutory criteria described above.

JAMES E. RISCH, IDAHO, CHAIRMAN

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

February 22, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20520

Dear Secretary Pompeo:

On February 4, 2019, I received a congressional notification from the Department for a proposal to transfer responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I write to inform you that I am placing a hold on the congressional notification, pursuant to the authority of Section 38(f) of the Arms Export Control Act (AECA).

I am deeply concerned about this proposed transfer. As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely used by military and security services – are uniquely dangerous. They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more, not less, rigorous export controls and oversight.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

Consequently, my hold will remain in place until such time as the issues identified below are sufficiently addressed.

1) Removal of Firearms Exports from Congressional Information and Review
The AECA enables congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests. Congress took action in 2002 to ensure that the sale and export of these weapons would receive stringent oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL would directly

contradict congressional intent and effectively eliminate congressional oversight and potential disapproval of exports of these weapons. Congressional oversight must be retained.


2) Proliferation of 3D Gun Printing Technical Information

There is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests. The Department of Commerce claims that it cannot, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally. This is outrageous and simply unacceptable given the dangers it poses to U.S. citizens and interests.

Moreover, it may also be at variance with recent law. Section 1758 of the Export Control Reform Act of 2018 authorizes the Secretary of Commerce to control "emerging and foundational technologies" that (A) are essential to the national security of the United States; and (B) are not critical technologies described in clauses (i) through (v) of section 721(a)(6)(A) of the Defense Production Act of 1950. 3D printing has been identified by this Administration as an emerging technology of concern, and the Department of Commerce itself used 3D printing as an example of "emerging technology" in its November 19, 2018 Federal Register notice seeking public comment on what constitutes emerging technologies pursuant to this new statutory charge. Then-Secretary of Defense Mattis twice mentioned the challenges of 3D printing in congressional testimony, and Director of National Intelligence Coats, in his 2018 Worldwide Threat Assessment of the U.S. Intelligence Community, stated that, "[a]dvances in manufacturing, particularly the development of 3D printing, almost certainly will become even more accessible to a variety of state and non-state actors and be used in ways contrary to our interests."

It would seem axiomatic that the capability to 3D-print lethal weaponry that cannot easily or reliably be detected by metal detectors at airports, schools, governmental or other facilities (including the U.S. Capitol and the Department of State) would qualify as an emerging technology in need of regulatory control. Yet, the Commerce Department has told my staff that the interagency process to identify emerging and foundational technologies to be controlled has not been completed, and is unlikely to be completed for months. By proceeding with the transfer of firearms, including 3D printing technical information, to Commerce, the Administration is acting recklessly and endangering innocent lives. It should go without saying that we collectively need to understand the threat and have a plan to address this issue before making the regulatory change.

Moreover, the Department of Commerce would seem to have adequate additional regulatory authority to control 3D gun printing information, at least temporarily. Commerce can control any item for foreign policy reasons under the miscellaneous category of 0Y521, according to a final rule issued by Commerce in 2012. Preventing foreign terrorists and thugs from acquiring

the means to print undetectable guns to use against U.S. citizens is a sufficient foreign policy justification to control this technology from public release.

Ultimately, the specific provision of the Export Administration Regulations is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control. Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.

I look forward to your prompt response to my concerns.

Sincerely,

Robert Menendez
Ranking Member

CC: The Honorable Wilbur Ross, U.S. Secretary of Commerce

JAMES E. RISCH, IDAHO, CHAIRMAN

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

**United States Senate**

COMMITTEE ON FOREIGN RELATIONS

Washington, DC 20510–6225

December 10, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C.

Dear Secretary Pompeo:

On February 4, 2019, I received congressional notification from the Department, pursuant to the authority of section 38(f) of the Arms Export Control Act (AECA), for the proposed transfer of responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I wrote to inform you on February 22 that I was placing a hold on that congressional notification. On November 12, 2019, the Department submitted a new 38(f) notification in response to a proposed regulatory change by the Department of Commerce. I write to inform you that I am placing a hold on the November 12, 2019 notification for the reasons detailed below.

As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely in-use by military and security services - are uniquely dangerous.  They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more rigorous export controls and oversight, not less.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

My hold will remain in place until such time as the issue identified below is sufficiently addressed.

1) Removal of Firearms Exports from Congressional Information and Review
The AECA provides for congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests.  As you know, Congress took action in 2002 to ensure that the sale and export of these weapons would receive closer scrutiny and oversight, including by amending the AECA to set a lower congressional reporting threshold (from $14 million to $1 million) specifically for firearms on the USML.  Moving such firearms from the USML to the CCL would effectively eliminate congressional oversight of exports of these weapons by eliminating this congressional reporting requirement, and would be directly contrary to congressional intent.

To that end, I reiterate my demand from my previous letter: the Senate Foreign Relations and House Foreign Affairs committees must be immediately informed of any proposed license to export firearms formerly controlled on the USML at the appropriate dollar threshold mandated in the Arms Export Control Act. This concern must be satisfactorily addressed before I will lift my hold.

2) Proliferation of 3D Gun Printing Technical Information

In my February letter, I expressed that there is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests. The Department of Commerce claimed that it could not, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally. I wrote that:

> *Ultimately, the specific provision of the Export Administration Regulations that is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control. Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.*

I understand that the Department of Commerce has now decided to alter its regulations to address this concern; technical information related to the manufacture of firearms, to include 3D-printing information, proposed for transfer to the CCL will be prohibited from publication or Internet posting without a license. That does seek to address my previously-expressed concern, and I will not insist on this to lift my hold. However, I note that this improvement could easily be undone through a simple regulatory change in the future that would not even require congressional notification or review; a statutory authority to maintain such licensing, or better yet, an outright prohibition, may be required. Moreover, Commerce must maintain a policy of "presumption of denial" for any license application sought to publish or post such information, and pursue any violations vigorously.

Sincerely,

Robert Menendez
Ranking Member

Exhibit O



An official website of the United States government

Here's how you know ⌄

**U.S. DEPARTMENT OF STATE**
# Directorate of Defense Trade Controls

🔍 Search

Understand The ITAR    Conduct Business    ITAR Compliance    Country Policies    Support    News & Events    About DDTC

## Category

**All Categories**
Notice
Event
Report
Federal Register
DTAG

## Timeframe

Anytime ▾

# News & Events

03/07/20 9:05 EST

### Court Ordered Injunction Pertaining to Revisions to the U.S. Munitions List Categories I, II, and III

On March 6, 2020 a federal district court issued an "Order Granting in Part Plaintiff States' Motion for Preliminary Injunction." This court order states that the Department of State is enjoined "from implementing or enforcing the regulation entitled International Traffic In Arms Regulations: U.S. Munitions List Categories I, II, and III, 85 Fed. Reg. 3819 (Jan. 23, 2020) insofar as it alters the status quo restrictions on technical data and software directly related to the production of firearm or firearm parts using a 3D-printer or similar equipment." The Department of State is complying with the terms of this order and will provide further guidance on the DDTC website, as appropriate.

The court order partially enjoins the final rule issued by the Department of State on January 23, 2020 State Rule revising export controls on certain firearms, ammunitions, and related items. The order has the effect of maintaining on the U.S. Munitions List (USML) "technical data and software directly related to the production of firearm and firearm parts using a 3D-printer or similar equipment." Persons engaging in activities controlled under the International Traffic in Arms Regulations (ITAR) related to such technical data and software must continue to comply with all ITAR requirements. The transfer of jurisdiction over all other items that the Department of State's final rule removes from the USML and the Department of Commerce's companion final rule adds to the Commerce Control List (CCL) will take effect on March 9, 2020.

The "State Transition Guidance for Revisions to Categories I, II, and III" Transition Guidance issued on January 23, 2020 remains applicable to all items that are transferring to the Department of Commerce's jurisdiction pursuant to these final rules. For questions pertaining to items now subject to the Department of Commerce's controls, please contact the Department of Commerce, Bureau of Industry and Security BIS website.

Background:

On January 23, 2020, the Department of State published a final rule in the Federal Register at 85 Fed. Reg. 3819 that amends the International Traffic in Arms Regulations (ITAR) to revise Categories I, II, and III of the USML and remove certain items that no longer warrant control. On the same date, the Department of Commerce published a companion final rule in the Federal Register at 85 Fed. Reg. 4136 that makes conforming changes to the Export Administration Regulations (EAR) to control the items removed from the USML. Both final rules set an effective date of March 9, 2020.

On January 23, 2020, several U.S. States filed a lawsuit in the United States District Court for the Western District of Washington (Civil Action No. 2:20-cv-00111) seeking a court order to prohibit the Departments of State and Commerce from implementing or enforcing the final rules. Plaintiff States subsequently filed a motion for a preliminary injunction. As described above, on March 6, 2020, the District Court issued an order partially enjoining the Department of State's final rule.

Previous

Provide Feedback

📅 EVENT: **IN-HOUSE SEMINARS**                                          03/04/20

### DDTC In–House Seminar on April 8, 2020

Please be advised due to scheduling conflicts; the DDTC In-House Seminar scheduled for
April 8, 2020, has been rescheduled for April 29, 2020. Registration will be extended by one